IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION


UNITED STATES OF AMERICA                    PLAINTIFF

v.                          CASE NO. 5:21-CR-50014

JOSHUA JAMES DUGGAR                         DEFENDANT


---------------------------------------------------------------


TRANSCRIPT OF DETENTION HEARING

HELD BY ZOOM VIDEOCONFERENCE

BEFORE THE HONORABLE CHRISTY COMSTOCK

MAY 5, 2021

FAYETTEVILLE, ARKANSAS

---------------------------------------------------------------

Paula K. Barden, RPR, RMR, Federal Official Court Reporter
35 East Mountain Street, Fayetteville, Arkansas 72701

APPEARANCES

FOR THE PLAINTIFF:

MS. CARLY MARSHALL
MR. DUSTIN ROBERTS
United States Attorney's Office
414 Parker Avenue
Fort Smith, Arkansas 72901
(479) 494-4069
carly.marshall@usdoj.gov
dustin.roberts@usdoj.gov


FOR THE DEFENDANT:

MR. JUSTIN K. GELFAND
Margulis Gelfand
7700 Bonhomme Avenue, Suite 750
St. Louis, Missouri 63105
(314) 390-0234
justin@margulisgelfand.com


MR. GREGORY F. PAYNE
MR. TRAVIS W. STORY
Story Law Firm
3608 North Steele Boulevard, Suite 105
Fayetteville, AR 72703
(479) 845-5700
greg@storylawfirm.com
travis@storylawfirm.com

I N D E X

                                                            Page

Introduction of the Case by the Court ............... 6

WITNESSES FOR THE GOVERNMENT:

Special Agent Gerald Faulkner

    Direct Examination by Mr. Roberts ................ 11

    Cross Examination by Mr. Gelfand ................. 57

    Redirect Examination by Mr. Roberts ............. 81

    Recross Examination by Mr. Gelfand .............. 86

    Inquiry by the Court ............................ 87

    Redirect Examination by Mr. Roberts ............. 89

PROBATION OFFICER DIEM NGUYEN

    Direct Examination by Ms. Marshall .............. 90

    Cross Examination by Mr. Gelfand ................ 106

    Redirect Examination by Ms. Marshall ............ 113

    Recross Examination by Mr. Gelfand............... 116

    Redirect Examination by Ms. Marshall ........... 119

Government Rests ..................................... 120

WITNESSES FOR THE DEFENDANT:

MARIA REBER

    Direct Examination by Mr. Story ................. 122

    Cross Examination by Ms. Marshall ............... 128

    Redirect Examination by Mr. Story ............... 140

    Inquiry by the Court ............................ 141

1               I N D E X (cont'd)

2                                                    Page

3  LACOUNT REBER

4     Direct Examination by Mr. Story .................. 144

5     Cross Examination by Mr. Roberts ................. 145

6     Inquiry by the Court ............................. 156

7  Defense Rests ....................................... 158

8  Closing Argument by Ms. Marshall .................... 159

9  Closing Argument by Mr. Gelfand ..................... 166

10 Court's Ruling ...................................... 171

11 Reporter's Certificate .............................. 187

12

13

14

15

16

17

18

19

20

21

22

23

24

25

E X H I B I T S

                                                              Received

Government's Exhibit No. 1    Photo of Wholesale        25
                             Motorcars Office

Government's Exhibit No. 2    Photo of HP All-in-One     25
                             Desktop Computer

Government's Exhibit No. 3    Forensic Examination       42
                             Summary,
                             May 13-14, 2019

Government's Exhibit No. 4    Forensic Examination       47
                             Summary,
                             May 15-16, 2019

1          COURTROOM DEPUTY GUERRERO:  The United States

2    District Court for the Western District of Arkansas,

3    Fayetteville Division, the Honorable Judge Christy Comstock

4    presiding is now in session.

5          THE COURT:  Good afternoon, everybody.

6          The Court calls the case of the United States

7    versus Joshua James Duggar.  Is Mr. Duggar available?

8          MR. STORY:  Yes, Your Honor.

9          THE DEFENDANT:  Yes, Your Honor.

10          THE COURT:  I can't see him.  Let me see if I can

11    change my view.  Give me just one second.  I want to make

12    sure that I can see and speak with Mr. Duggar.

13          Can you hear me, Mr. Duggar?

14          THE DEFENDANT:  Yes, Your Honor.

15          THE COURT:  All right.  There you are.

16          THE DEFENDANT:  I can't hear you, Your Honor.

17          THE COURT:  Thank you.  We're holding this

18    hearing by Zoom as a result of the COVID-19 pandemic.

19    Rule 53 of the Federal Rules of Criminal Procedure continue

20    to apply to this proceeding, just as if we were here in

21    person.

22          Rule 53 states in clear and unequivocal language

23    that the Court must not permit photography or broadcasting

24    of the judicial proceedings of this Court.  This is

25    something that the Court takes very seriously, and so I

want to speak clearly to our observers.  This means there's
no recordings, no photographs, no screen shots and no other
broadcasting.  No person has moved, pursuant to our local
rules, to make a recording, and that means there shall be
no recordings today.  (audio cut out)  Also --

            MS. MARSHALL:  Your Honor -- Your Honor, I
apologize.

            COURTROOM DEPUTY GUERRERO:  Your Honor --

            MS. MARSHALL:  You're going -- it's going on
mute.

            THE COURT:  Okay.  Well, we'll have to figure
that out, because we need to hear each other.

            MR. ROBERTS:  Your Honor, your microphone was
muted for a while there.

            THE COURT:  I'm going to stop my video for just a
minute and I want to talk to Roxana and I'll be right back.

            (pause)

            COURTROOM DEPUTY GUERRERO:  The United States
District Court for the Western District of Arkansas,
Fayetteville Division, the Honorable Judge Christy Comstock
presiding is now in session.

            THE COURT:  Good afternoon, everybody.  We're
going to try this again.  If we can't stay connected, then
I will talk to counsel by telephone and we'll figure out
how we are going to handle it.

1          At this time, the Court calls the United States

2    versus Joshua James Duggar for detention hearing.

3          Ms. Marshall and Mr. Roberts are here present

4    representing the United States.  Is the government ready to

5    proceed?

6          MR. ROBERTS:  Yes, Your Honor.

7          THE COURT:  The defendant is represented today by

8    Gregory Payne, Travis Story, and Justin Gelfand.

9          Good afternoon.  Is the defendant ready to

10   proceed?

11         MR. GELFAND:  Good afternoon, Your Honor.  Justin

12   Gelfand for the defense.  We are ready to proceed.

13         THE COURT:  Thank you, Mr. Gelfand.

14         Mr. Duggar, can you hear me?

15         THE DEFENDANT:  Yes, Your Honor.

16         THE COURT:  You have previously signed a waiver

17   of your personal appearance for today's hearing.  Are you

18   still in agreement to proceed by Zoom videoconference,

19   assuming we can keep the technology up and running?

20         THE DEFENDANT:  Yes, Your Honor.

21         THE COURT:  All right.  Just so you know, I have

22   received your counsel's written response in opposition to

23   the United States' motion for detention, and I have

24   considered that in connection with today's hearing.

25         Do you understand that?

1    THE DEFENDANT:  Yes.  Thank you, Your Honor.

2    THE COURT:  Does anyone wish to invoke the Rule?

3    MR. GELFAND:  Yes, Your Honor.  We would invoke

4  the Rule on behalf of the defense.

5    THE COURT:  Thank you, sir.  What this means for

6  our witnesses is that you will be put into a Zoom waiting

7  room where you will not be able to hear the testimony of

8  other witnesses.  You will wait in the waiting room until

9  you're called out to testify.  We ask for your patience.

10  We don't know how long this might take, but when it's your

11  turn, you will be notified that you will enter the Zoom as

12  if you would enter the courtroom.

13    There's some indication that one or more of the

14  lawyers may call the Court's probation officer.  Is this

15  correct, Mr. Roberts?

16    MR. ROBERTS:  Yes, Your Honor, it is.

17    THE COURT:  Mr. Gelfand, is it still agreeable

18  with the defendant that the Court's probation officer may

19  be excused from the Rule if a third-party custodian

20  testifies?

21    MR. GELFAND:  Yes, Your Honor.  We have no

22  objection to that.

23    THE COURT:  Thank you, sir.

24    Mr. Roberts, if you're ready to proceed, you may

25  call your first.

MR. ROBERTS:  Thank you, Your Honor.  The United States would call Special Agent Gerald Faulkner to the stand.

THE COURT:  Agent Faulkner, would you raise your right hand to be sworn.

COURTROOM DEPUTY GUERRERO:  Give me one second, Judge.  I'm trying to find him.

MR. ROBERTS:  Your Honor, also, I'd alert the Court that Special Agent Howard Aycock is still present.  He is not in a breakout room.

COURTROOM DEPUTY GUERRERO:  Yes.  I'm trying to find him too.  He's on iPad.

THE COURT:  Okay.  We'll just take a minute while Roxana can handle the technology.  I'm still getting the message that our bandwidth is low, so there's still a little bit of a delay.  So we'll get our breakout room set so we can honor the Rule, and then we'll proceed with Agent Faulkner.

COURTROOM DEPUTY GUERRERO:  Okay.  We have our witness back.

THE COURT:  Agent Faulkner, would you raise your right hand to be sworn, please.

THE WITNESS:  Yes, ma'am.

(Witness is sworn)

MR. ROBERTS:  May I proceed, Your Honor?

1    THE COURT:  You may proceed, Mr. Roberts.

2    MR. ROBERTS:  Thank you.

3    GERALD FAULKNER, having been first duly sworn,

4    testified as follows:

5                    DIRECT EXAMINATION

6    BY MR. ROBERTS:

7    Q.   Agent, would you state your full name for the Court,

8    and please spell your last name for the record.

9    A.   Yes, sir.  Gerald Faulkner.  F-A-U-L-K-N-E-R.

10   Q.   Would you tell the Court how you're currently

11   employed?

12   A.   I'm a Special Agent with Homeland Security

13   Investigations out of the Fayetteville, Arkansas, field

14   office.

15   Q.   Would you tell the Court how long you have been a

16   Special Agent with HSI?

17   A.   Yes, sir.  Since April of 2009.

18   Q.   Are you assigned to any particular area or division

19   within Homeland Security?

20   A.   Yes.  Since approximately 2010, I've been assigned to

21   work federal child exploitation cases to include sex

22   trafficking, interstate transportation of minors, and child

23   pornography based offenses.  But more specifically, I work

24   with the HSI Internet Crimes Against Children Task Force,

25   or as we refer to it as the ICAC.

Q.   Okay.   Could you explain the role of the ICAC for the Court?

A.   Yes, sir.   The ICAC primarily investigates the production, the possession, distribution of images and --

(audio cut out.)

Q.   I'm sorry, Agent.   You can proceed.

A.   I'm sorry.   I thought I heard an objection.

          THE COURT:   You may proceed, Agent.

Q.   (by Mr. Roberts.)   No objection.   Please start over. I was asking you to explain the role of the ICAC.

A.   Yes, sir.   The ICAC primarily investigates, again, the production, possession, and distribution of images and videos containing child pornography via the internet.

Q.   Do you, as a Homeland Security Agent, actually work on the Internet Crimes Against Children Task Force at this time?

A.   Yes, sir.   Since approximately 2010, during that time span, I'd say I've worked over approximately 1,000 child exploitation cases in the last 11 years.

Q.   Out of that approximate 1,000 child exploitation cases, how many have been specifically for online child pornography?

A.   The vast majority.

Q.   Are you familiar with the case that led to the indictment and arrest of Mr. Duggar?

A.    Yes, sir, I am.

Q.    What was your role within this investigation?

A.    For this particular case, I was assisting HSI Special
Agent Howard Aycock.  This was his first child exploitation
case, and he is the case agent.

Q.    So did you take an active role in all of this
investigation?

A.    Yes, sir, I did.

Q.    Turning to the facts of the case, can you tell the
Court how this investigation began?

A.    Yes, sir.  So in May of 2019, Detective Amber Kalmer
of the Little Rock Arkansas Police Department was
conducting an online investigation from the BitTorrent
peer-to-peer file sharing program, at which time she
identified a computer that was located in the Northwest
Arkansas area that was participating in the sharing of
known images and videos containing child pornography.

Q.    All right.  I want to elicit a few definitions to make
sure the Court and all the parties are aware of what we're
speaking about.

      You mentioned "peer-to-peer."  Could you tell the
Court what a peer-to-peer file-sharing program is?

A.    Yes, sir.  So basically a peer-to-peer is a
file-sharing program where users can download a program to
a device.  That allows their device to connect to other

devices who have also downloaded that program, and then those computers can share files such as pictures, videos, music, documents, games, et cetera.

Q.   Are peer-to-peer file-sharing networks in general a common platform that is known to law enforcement used to trade, distribute, receive, images of child pornography?

A.   Yes, sir, very common.  We work -- we have worked multiple peer-to-peer file-sharing cases in the past.

Q.   In your summary of how this case came to law enforcement's attention, you mention the program "BitTorrent."  Is that simply a version of peer-to-peer?

A.   Yes, sir, it is.

Q.   Okay.  Directing your attention back to the initial events of the investigation, could you tell the Court what happened after the Little Rock detective noted images of child pornography being offered for download over this BitTorrent peer-to-peer network?

A.   Yes, sir.  So specifically on May 14th and 15th, 2019, Detective Kalmer was able to download two distinct files. The first being "Mov_0216," which was downloaded on May 14th, 2019, at approximately 5:42 p.m.  The video is approximately two minutes in length and depicts two prepubescent females, approximately seven to nine years of age.  The prepubescent females are both completely naked, laying on top of each other.  A male subject is then seen

penetrating one of the prepubescent female's vagina with his erect penis.

The second file being, "Marissa.zip," which was downloaded on May 15th, 2019, at approximately 6:45 p.m. This zip folder contains approximately 65 image files of a prepubescent female, many of which were consistent with child pornography. One file within the folder entitled "2203.jpg" is an image depicting a prepubescent female approximately seven to nine years of age laying on her back and using her hands to spread her vagina and anus.

Q. During an undercover investigation or an investigation into the distribution of child pornography over a peer-to-peer network, is it common for the officer involved to download the images of child pornography and preserve them for the investigation?

A. That is correct. Yes, sir.

Q. At this stage in the investigation, of any general peer-to-peer investigation, what is known to law enforcement about the source of these illegal images?

A. So at this point in the investigation, only the specific IP address, the geolocation of that specific IP address, and the internet service provider for that specific IP address of who was making whatever files available for sharing.

Q. Okay. Again, to make sure the Court and all the

parties are aware, an IP address is simply a unique address

or series of numbers assigned by an internet service

provider when a user logs on to the internet, is that

correct?

A.    Yes, sir.  That is correct.

Q.    That specific IP address that is logged in this case

by law enforcement, it's specific to an internet user at

that specific date and time, is that correct?

A.    Yes, sir.

Q.    After the Little Rock officer successfully downloaded

these images, can you tell the Court what occurred next?

A.    Yes, sir.  Due to the fact and based on the

geolocation of that IP address, the file or the case files

and images were sent to the Homeland Security

Investigations ICAC Task Force for further investigation.

     I received those files, and following that, I then

sent a federal summons to OzarksGo, who was the internet

service provider, for the account subscriber information

associated to that specific IP address in attempts to

obtain the name and physical address for the service, who

was receiving service at that time.

Q.    Could you detail for the Court the response you

received from OzarksGo regarding the IP address at issue?

A.    Yes, sir.  So in October of 2019, OzarksGo responded

that the IP address from which Detective Kalmer downloaded

the images of child pornography was assigned to the account

holder of Joshua Duggar, with a physical address listed in

Springdale, Arkansas.

Q.    With respect to the address listed and provided to you

by OzarksGo, can you tell the Court a little bit more about

that?

A.    So initially when we received the address, we secured

a federal search warrant for the property.  Upon executing

that said warrant, or at least arriving at the property of

that warrant, we encountered a couple living at a residence

that was not part of this investigation, nor did they have

any internet services through OzarksGo.  I believe it was

through Cox Communications.

      Based on that information and additional information

that the couple provided that Mr. Duggar owned and operated

the car lot, which was adjacent to their residence, and per

the residence at the property is approximately 27 acres and

had been split and sold, I went back and revisited

representatives from OzarksGo.

      After speaking with the representatives, OzarksGo had

informed me that their mapping system was out of date.

They had relied on old records and they believed that the

proper address, that of Wholesale Motorcars where

Mr. Duggar owned his car lot, was at 14969 Wildcat Creek

Road in Springdale, Arkansas.

So basically, at the end of the day, the subscriber information did not change, but the physical address based on what OzarksGo had changed.

Q.   Am I correct that the subscriber information did not change in that it was still Mr. Duggar, or his account, that was assigned that IP address during the time of the Little Rock officer's downloads, is that correct?

A.   That is correct.

Q.   Based on this information, did law enforcement subsequently obtain a second federal search warrant documenting all of what you just discussed that allowed for the search of the car lot itself directed at locating child pornography on any and all digital devices?

A.   Yes, sir, we did.

Q.   Okay.  Next, I want to direct your attention to the events surrounding the day in which law enforcement executed the search warrant.

Can you provide to the Court the date and approximate time that the warrant was executed?

A.   Yes, sir.  It was executed on November 8th, 2019, at approximately 3:15 p.m.

Q.   Can you tell the Court who within law enforcement executed the search warrant?  Who went out with you?

A.   Yes, sir.  It was myself, Special Agent Aycock, along with three other HSI special agents, and three other HSI

1  computer forensic analysts.

2  Q.   Could you describe for the Court the physical layout

3  of the car lot itself?

4  A.   Yes, sir.  It's a used car lot.  It's adjacent to

5  Highway 412, basically between Springdale and Siloam

6  Springs, Arkansas.  There is what we would consider to be

7  an unpaved driveway that leads up to that lot.  At the time

8  of the search warrant, I'd say there were approximately 30

9  vehicles, including an RV, on the lot.

10      There were two structures on the business, one of

11  which was a -- I'd refer to it I guess as a wooden shed

12  that was basically undergoing some construction and

13  remodel.  And then there was a second metal building, which

14  approximate size of a tollbooth, which we had found out was

15  the Wholesale Motorcars' main office.

16  Q.   When law enforcement arrived on the scene, could you

17  identify for the Court who was present at the car lot?

18  A.   Yes, sir.  We encountered Mr. Duggar, along with two

19  other individuals.

20  Q.   Could you describe for the Court how law enforcement

21  went about executing this search warrant?

22  A.   Yes, sir.  So as we arrived on scene and exited our

23  vehicles, we approached Mr. Duggar and the two other

24  individuals in what we would call as a "soft approach,"

25  meaning we did not have our guns drawn.  I immediately

identified myself to Mr. Duggar as a Federal Agent with
Homeland Security Investigations.  I then explained to him
that based on an ongoing investigation, a federal search
warrant had been obtained for the property for items of
evidentiary value that possibly contained digital
contraband.  More importantly, I told Mr. Duggar that this
was a federal search warrant.  This was not an arrest
warrant.  Neither him, nor the other individuals, were
under arrest, and they were free to leave if they feel to
do so.

Q.    Agent, I'm going to pause your testimony right now.

        MR. ROBERTS:  Your Honor, I did just notice that
Probation Officer Nguyen is still monitoring the Zoom.  I'm
not sure -- based on the Court's prior ruling, I understand
that she should be in a breakout room, is that correct?

        THE COURT:  I think that's right.  You'll have to
forgive us.  That may be a technology error on our part.

        Roxana, can you invite our officer to join the
breakout?

        COURTROOM DEPUTY GUERRERO:  Yes, she's already in
the breakout room, Judge.  I apologize for that.

        THE COURT:  Okay.  Thanks, Roxana.

        Thank you, Mr. Roberts, for bringing that to our
attention.  Please proceed.

        MR. ROBERTS:  Thank you, Your Honor.

Q.   (by Mr. Roberts.)   Now, Agent Faulkner, I kind of lost
exactly where you ended there, so I'm going to ask you the
previous question again and you can summarize.

     Could you describe for the Court how law enforcement
went about executing that warrant?

A.   Yes, sir.  We arrived on scene.  I informed Mr. Duggar
about the federal search warrant and that he was not under
arrest and free to leave if he chose to do so.

Q.   Now, overall, could you explain to the Court why you
didn't, or law enforcement didn't, tell Mr. Duggar and the
others that were there present that the warrant was based
on child pornography being downloaded on the premises?

A.   Yes, sir.  So typically, we don't like to tell our
potential targets or witnesses case-specific facts because
it's possible to spoil any statement that could be made.
So instead of a statement based on their own knowledge,
they could tend to start to include facts that was only
told to them or known to them through law enforcement.

     Also, this -- given my experience with child
exploitation investigations, normally, the mention of child
pornography, or child sexual abuse material is typically
unsettling, is an unsettling topic for people to talk
about.

Q.   I take it, then, from your response that you're not
wearing insignia that would say "Internet Crimes Against

Children Task Force" or any kind of child exploitation task
force, is that correct?

A.    That is correct.  That day in particular, we were
wearing plain clothes and only had HSI attire or police.

Q.    Okay.  None of the vehicles indicated child
exploitation, computer forensic examination examiners on
child exploitation, anything of that nature?

A.    No, sir.

Q.    After you informed Mr. Duggar he was free to leave,
could you tell us what happened directly after?

A.    Yes, sir.  Mr. Duggar produced a personal cell phone
and said he wanted to call his attorney.  I informed
Mr. Duggar that his phone, the phone itself, was being
seized as evidence pursuant to the federal search warrant.
I then confiscated that phone.

Q.    Could you explain for the Court why you did not allow
Mr. Duggar to use that cell phone?

A.    Yes, sir.  So I did not want there to be any chance of
anyone contaminating potential evidence by either altering,
destroying, deleting any digital data or files that were
particular on that device.  I know in previous
investigations as recently as a few months leading up to
the arrest, or the search warrant of Mr. Duggar's property,
I had an individual as we made entry into a residence pull
a cell phone from his pocket and start immediately deleting

1  files off of that.  We've also had individuals take hammers

2  to hard drives as we have entered, so I was trying to

3  eliminate the fact of anything being deleted.

4  Q.    Thank you.  After confiscating the phone, was

5  Mr. Duggar detained by law enforcement?

6  A.    No, sir.  Again, he was told that this was a search

7  warrant, not an arrest warrant, and he was free to leave if

8  he chose to do so.

9  Q.    Did he elect to leave?

10  A.    No, sir.  He remained on scene.  We started processing

11  everything in terms of taking photographs of the property

12  and labeling evidence, or potential evidence, that was

13  going to be seized.

14  Q.    Was he being guarded by law enforcement?

15  A.    No, sir.

16  Q.    Overall that day, did Homeland Security confiscate

17  anything of evidentiary value as far as digital devices?

18  A.    Yes, sir.  So that day, we seized an HP All-in-One

19  desktop computer which was taken from the main office of

20  the Wholesale Motorcars lot.  We also took a MacBook laptop

21  that was inside of an RV that Mr. Duggar arrived on scene

22  in.  And also Mr. Duggar's personal cell phone, which was

23  identified as an iPhone.

24  Q.    Special Agent, prior to your testimony today, did you

25  have an opportunity to view two photos labeled Government's

Exhibit 1 and 2?

A.    Yes, sir.

Q.    Could you describe Government's 1 and 2 for the Court?

A.    Government's Exhibit Number 1 is a picture of the Wholesale Motorcars' main office.  That was the metal building that I previously described that is about the approximate size of, I'd say a tollbooth.

       Government Exhibit Number 2 is a picture from the search warrant.  It is of the HP All-in-One desktop computer that was located inside the office of Wholesale Motorcars.  And depicted on the home screen of that All-in-One computer is a picture of Mr. Duggar, his wife, Anna Duggar, and their children.

Q.    Now, Agent, do those pictures truly and accurately reflect the scene as you located it that day?

A.    Yes, sir, they do.

Q.    Is it correct that Government's Exhibit 2 has been redacted for purposes of protecting minors?

A.    That is correct.

       MR. ROBERTS:  Your Honor, I would move to introduce Government's Exhibit 1 and 2.

       THE COURT:  Any objection?

       MR. GELFAND:  No objection, Your Honor.

       THE COURT:  Government's Exhibits 1 and 2 will be admitted.

```
1              (Government's Exhibits No. 1-2 admitted)

2              MR. ROBERTS:  Your Honor, may I have permission

3    to publish these two exhibits?

4              THE COURT:  You may.  Mr. Gelfand, will you make

5    sure that your client can still -- is still connected by

6    the video and can see the exhibits that Mr. Roberts is

7    going to publish?

8              MR. GELFAND:  Yes, Your Honor.  I'm having

9    trouble locating Mr. Duggar.

10             THE DEFENDANT:  I'm still here, yes.

11             THE COURT:  Thank you, Mr. Duggar, for speaking

12   up.  Mr. Roberts, you may proceed.

13             MR. ROBERTS:  Thank you, Your Honor.  According

14   to our device, that image is being shared.  I believe it's

15   Government's Exhibit 1.

16   Q.   (by Mr. Roberts.)  Special Agent, are you able to see

17   Government's Exhibit 1?

18   A.   Yes, sir.

19   Q.   So to reaffirm, that is the main office that you

20   described as essentially the tollbooth, the main office of

21   Wholesale Motors, is that correct?

22   A.   That is correct, yes, sir.

23   Q.   Moving to Government's Exhibit 2, please.  Give us one

24   moment.

25             THE COURT:  Take your time.
```

Q.   (by Mr. Roberts.)  Agent Faulkner, according to our
computer, it is being shared, Government's Exhibit 2 is
being shared.  Can you see the Government's Exhibit 2?

A.   Yes, sir.

Q.   Could you describe again or identify exactly what
Government's Exhibit 2 is?

A.   That is the HP All-in-One desktop computer that was
located in the Wholesale Motorcar office, main office.  And
the background or home screen of that computer is set to
Mr. Duggar.  The blocked out area is Mr. Duggar's wife and
their children.

Q.   All right.  Thank you.  So back to the timeline, you
stated that after first encountering Mr. Duggar, telling
him he was free to leave, and then you went about working
the scene.  Did you have any further contact with
Mr. Duggar that day?

A.   Yes, sir, we did.  A short time --

Q.   Could you tell us about that?

A.   I'm sorry.  Yes, sir.  So a short time later, after we
secured the scene, started our photographs and labeling
evidence, Agent Aycock and myself approached Mr. Duggar and
asked if he would be willing to discuss the details, the
further details, surrounding the issuance of the federal
search warrant.

Q.   How did he respond to that inquiry?

A.   He agreed to speak with us.

Q.   Where did this conversation occur?

A.   So we decided, since this was in fact an active search scene, to conduct the conversation inside of one of our government-issued vehicles.  We then relocated to Agent Aycock's vehicle.  Myself and Agent Aycock entered from the driver's side.  Mr. Duggar entered from the passenger side and sat in the front passenger seat.  I sat in the driver's seat, and Agent Aycock sat in the rear seat.

Q.   Now, at any point during this time, was Mr. Duggar escorted or directed to a particular seat?

A.   No, sir.  Well, he was asked to --

Q.   Again, he was not in custody, is that correct?

A.   He was not in custody, that's right.

Q.   That's ultimately where I'm going.

A.   Yes, sir.

Q.   Once entering the vehicle, could you tell the Court what happened next?

A.   Sure.  As soon as we all got seated in the vehicle, Agent Aycock began by seeking and receiving verbal consent from Mr. Duggar to record the interview and our conversation.  Once that was completed, Mr. Duggar turned in his seat and spontaneously asked, "What is this about? Has somebody been downloading child pornography?"

Q.   Again, at this point, had anyone told Mr. Duggar the

1  basis of this search warrant?

2  A.    No, sir.

3  Q.    Had anybody discussed with Mr. Duggar, within law

4  enforcement, the fact that child pornography was being

5  detected or was detected being downloaded at that premises?

6  A.    No, sir, not to my knowledge.

7  Q.    And, again, no one at that point or at any point was

8  wearing any insignia or had any kind of sign on the outside

9  of a vehicle that would indicate that this is a child

10  exploitation case, is that correct?

11  A.    That is correct.  Yes, sir.

12  Q.    I am right that previously you testified that you

13  informed Mr. Duggar that you were in search of digital

14  contraband, is that correct?

15  A.    Digital contraband.

16  Q.    Once Mr. Duggar stated, "Has somebody been downloading

17  child pornography," how did you and Agent Aycock respond?

18  A.    So Agent Aycock stopped him.  He then began recording

19  the interview and our conversation, and then we issued him

20  and read him his Miranda rights.

21  Q.    So you state you issue him and you read him his

22  Miranda rights.  And so does that include a right to remain

23  silent and a right to an attorney?

24  A.    Yes, sir.  It's one of our standardized forms.

25  Q.    Okay.  And did he sign the form acknowledging that he

knew of his rights?

A.    Yes, sir.  But prior to signing the form and waiving his rights, there is a section at the bottom of our standardized form that says that the suspect was taken into custody on "blank date" at "blank time."  Per Mr. Duggar's request, I scratched out that section of our form, again because he was told that he was not under arrest and free to leave.

Q.    Did he specifically bring that to law enforcement's attention that the form said that he was in custody and he didn't agree to that?

A.    Yes, sir.

Q.    With respect to the car lot itself and the confiscated devices, can you tell the Court if Mr. Duggar made any admissions regarding ownership?

A.    So he explained that he had owned and operated the car lot since approximately, I'd say June of 2018.  He also stated that he owned the HP All-in-One desktop computer that we found located in the main office.  That -- I think he said for about two to three years, he had owned that particular device.  He further admitted that he had the MacBook laptop, which was found in the RV.  And then also the personal cell phone, which was his -- the iPhone.

Q.    Just to make sure we're clear, the HP All-in-One desktop computer located in the main office, is that

Government's Exhibit 2?

A.    Yes, sir, it is.

Q.    With respect to that HP that is Government's Exhibit 2, or depicted in Government's Exhibit 2, what specifically did he state with regard to this device?

A.    Aside from owning it, that it was password protected.

Q.    While on the scene, was there anything about that device that you had already known that stood out to you that connected it directly to Mr. Duggar?

A.    Again, the home screen or background of the home screen was Mr. Duggar and his family.

Q.    With respect to his phone, what specifically did Mr. Duggar state about that device?

A.    That he owned that device, but that other family members would have access to that.  And that, too, was also password protected.

Q.    Did he provide that password to law enforcement?

A.    No, sir, he declined.

Q.    Okay.  So you specifically asked him, but he declined, is that correct?

A.    That is correct.

Q.    With respect to the Mac, the MacBook, could you tell us more about his statement regarding that device?

A.    Again, that he owned it and that other family members would have had access to that and that it was, too, I

believe, password protected.

Q.   Did he make any statements about peer-to-peer
networks?

A.   We asked specifically about peer-to-peer file-sharing
networks.  He said he was familiar with them, but that he
did not want to provide any specifics about his knowledge
of electronic devices or peer-to-peer file-sharing
networks.  He did say, though, however, that his devices,
meaning the HP All-in-One desktop computer, the MacBook
laptop, and his iPhone, possibly had those types of
networks on them, meaning peer-to-peer filing-sharing
networks.  He also specifically mentioned or referenced
that the TOR browser -- and that's T-O-R -- was possibly
located on one of those devices.

Q.   Okay.  So can you define for the Court exactly what
the "TOR browser" is?

A.   Yes, sir.  So the TOR browser, T-O-R, stands for the
"Onion Router."  It's a browser a user can download that
allows access to what's called the "Dark Web" or the "Dark
Net," and that's a place where individuals can search for
content on the internet anonymously.

Q.   Now, this browser is separate and apart from
peer-to-peer, or specifically in this case, the BitTorrent
peer-to-peer program which kind of initiated law
enforcement's lead in this case, right?

A.   That is correct.  Yes, sir.

Q.   The TOR browser and the Dark Web in general, is it a known source of child pornography material?

A.   Yes, sir.  We have currently and are still actively working many child exploitation cases on the Dark Web.

Q.   Partially, and maybe to a large extent, would you agree that that is because of the anonymous nature of the Dark Web?

A.   Yes, sir.

Q.   Are Dark Web type investigations forensically usually hard to substantiate?

A.   They are, because based on the masking of the IP address and the location of where that potential target is, it makes it very difficult for law enforcement to find those individuals.

Q.   Okay.  When Mr. Duggar stated or referenced the TOR browser, was law enforcement aware of any evidentiary links in this case to the TOR, or to TOR, or generally the Dark Web?

A.   No, sir, not at that point.

Q.   During your interview, did you specifically ask him if he was familiar with "Torrent" files, "BitTorrent," or "uTorrent?"

A.   Yes, sir, I asked.  He declined to answer that question.

Q.   At any point, did you tell Mr. Duggar the warrant was
authorized to search devices specifically for child
pornography?

A.   Yes, sir.  We eventually summarized our investigation
to date which led us to the car lot.  And I explained to
him the investigation, that someone was downloading,
sharing, basically child pornography to the internet via
the BitTorrent peer-to-peer file-sharing network from his
car lot.  I specifically told him that the child
pornography -- excuse me -- at issue involved minors
ranging from approximately I'd say five to 10 years of age.

Q.   How did he respond?

A.   Specifically -- and this is from the transcript of his
interview.  Apologies.  I asked Mr. Duggar, "We're talking
about children ranging in the ages I'd say between five and
10.  So has there been anything in the past that you, or
maybe you have seen, that somebody else has been on their
laptops in passing by that had inappropriate by definition
child pornography, images of kids ranging between five and
10 years of age?"

    Mr. Duggar replied, "I'd rather not answer that
question."

Q.   Okay.  Now, I want to turn your attention to the
forensic examination of the seized computer, the HP
computer from the main office, the MacBook that was taken

1  from the RV, and then third, the phone that was taken from
2  Mr. Duggar's person.  Were all of these items forensically
3  examined?
4  A.    Yes, sir, they were.
5  Q.    First, let's discuss the forensic examination of the
6  HP computer.  Can you tell the Court overall what the
7  results of the examination revealed?
8  A.    So forensic examinations revealed that a user of that
9  device was found to have downloaded, viewed, and deleted
10 child pornography and child sexual abuse material, both
11 through the BitTorrent peer-to-peer file-sharing network
12 and the TOR browser, which Mr. Duggar had just previously
13 mentioned.
14 Q.    Before we get into specifics regarding the child
15 pornography in this case, were there any other programs
16 located during the forensic examination of evidentiary
17 value to this investigation?
18 A.    Yes, sir.  We located a program called "Covenant
19 Eyes."
20 Q.    Please define and explain for the Court what Covenant
21 Eyes is.
22 A.    Covenant Eyes is an internet accountability software
23 advertised to help overcome an online pornography
24 addiction.  It basically monitors internet usage and
25 provides reports to what's called an accountability

partner.

Q.   So this Covenant Eyes, is this just a commercially
available service that anyone can utilize to help with, as
advertised, a pornography addiction?

A.   Yes, sir.

Q.   Did law enforcement send legal process to Covenant
Eyes to obtain the account holder or subscriber information
related to that account?

A.   Yes, sir, we did.  And the information came back that
it was registered to Joshua and Anna Duggar.

Q.   Were there any other programs located on the HP
computer by the forensic examination of evidentiary value
outside of the child pornography, outside of Covenant Eyes?

A.   That is correct.  So the analyst also found that on
May 13th, 2019, what's called a Linux partition was
installed on that HP All-in-One desktop computer.

Q.   Did you say May 13th, 2019?

A.   That is correct.  Yes, sir.

Q.   Could you define for the Court a "partition" and
specifically what a "Linux partition" is?

A.   Sure.  So a Linux partition is something that can
divide a hard drive of a computer into two isolated
sections.  So basically what that means, it can make one
computer into two sides, separate sides, both independently
working upon each other.

1  Q.   So these separate sides, you stated they worked,
2  operated independently.  Does that mean what is done on one
3  side is not available or affected, or does it affect the
4  other side?
5  A.   No, sir.  They are two separate working computers,
6  basically.
7  Q.   Thank you.  Now, the Linux partition that was created
8  on May 13th, 2019, was it password protected per the
9  forensic examination?
10  A.   Yes, sir, it was.  And the analyst further found that
11  the password for the Linux partition side ended in the last
12  four digits of Mr. Duggar's birth year.  And they further
13  found throughout continued forensic examinations that that
14  same password was used by Mr. Duggar for years past for
15  things such as personal banking accounts, utility website
16  accounts.  I believe it was also for the Duggar family
17  social media accounts.  And then it was also at one point
18  his login for the Family Research Council, which I believe
19  was in Washington D.C.
20  Q.   Okay.  Is that a place that law enforcement, during
21  their investigation, determined that he was employed prior
22  to the actions at issue, the events at issue?
23  A.   That is correct.  Yes, sir.
24  Q.   What specifically was located on that partition side?
25  A.   So basically everything that was relevant to our child

exploitation investigation.  We found child sexual abuse
material.  We found the BitTorrent peer-to-peer
file-sharing program, as well as the TOR browser.

Q.   Okay.  Was Covenant Eyes located on that partition
side?

A.   No, sir, it was not.  And we later learned from
representatives of Covenant Eyes that it will not work, nor
monitor, on a Linux partition.

Q.   So does that overall mean anything done on that Linux
partition side in this case would not have been detected by
Covenant Eyes?

A.   That's right.  The accountability partner would not
have seen anything on the Linux side of that partition.

Q.   With respect to the MacBook -- and, Officer, before we
move on, did you also testify that part of Covenant Eyes is
that it creates a report of an individual, whoever the
subscriber is, the user is, of their internet use and sends
it to an accountability partner?

A.   That is correct.

Q.   And in this case, again, the account holders were
Mr. Duggar and his wife, is that correct?

A.   That is correct.

Q.   All right.  With respect to the MacBook, could you
tell us, or tell the Court, rather, if the forensic
examination of that device identified both BitTorrent, the

peer-to-peer file sharing network, and then separately

Covenant Eyes?

A.    Yes, sir, it did.

Q.    Anything else of evidentiary value -- was anything

else of evidentiary value learned about or discovered

during the forensic examination of the MacBook?

A.    Yes, sir.  We learned that Mr. Duggar had backed up

his previous iPhone, which I believe was an iPhone 8, to

that MacBook which allowed us to obtain text messages,

e-mail messages, pictures, you name it, from the MacBook

itself, especially for the date range between May 13th

through May 16th of 2019.

Q.    For that May 13th through May 16th, were you also able

to, or forensic examiners able to locate iChat messages

coming from the MacBook?

A.    Yes, sir, we were.

Q.    In preparation for today's hearing, did you have an

opportunity to view two documents labeled as Government's

Exhibit 3 and 4?

A.    Yes, sir, I have.

Q.    Can you identify Government's 3 and 4 for the Court?

A.    So Government Exhibit Number 3 is a forensic

examination summary of May 13th, 2019, and May 14th, 2019,

extracted from Mr. Duggar's electronic devices.

Q.    With respect to Government's Exhibit 3, as outlined on

that document, does the entries represent the important

events determined by the forensic examination of both the

MacBook and the HP computer?

A.   The MacBook, the HP, and the previous iPhone 8.

Q.   Understood.  Are they true and accurate summaries of

the forensic examination of both the HP -- or all three --

the HP computer, the MacBook, and the iPhone that you

reference?

A.   Correct.  Now, just to be -- there was no iPhone 8

seized.  Mr. Duggar had turned that phone in a few months

prior to the execution of the search warrant on November

8th.  This is all information we obtained through forensics

on the backup of that device.

Q.   The important question there, is it all true and

accurate based on the results of the forensic examination?

A.   Yes, sir.

     MR. ROBERTS:  Your Honor, I would move to

introduce Government's Exhibit 3 and separate -- 3 into

evidence, Your Honor.

     THE COURT:  Any objection, Mr. Gelfand?

     MR. GELFAND:  Yes, Your Honor.  We would object

on a number of different grounds.

     First of all, lack of foundation.  Second of all,

what this effectively is, is a summary prepared for

litigation purposes only summarizing a forensic examination

1  that this witness did not actually conduct.  We think that

2  that's improper from an evidentiary value, from an

3  evidentiary basis.  We acknowledge, Your Honor, that the

4  Rules of Evidence do not technically apply to this hearing,

5  but at the same time, this Court has within its discretion

6  the ability to limit appropriate evidence from

7  inappropriate evidence, and we would ask the Court to use

8  that discretion.

9         THE COURT:  Thank you, sir.  Mr. Roberts, if you

10  could ask your witness to just lay a bit of a foundation

11  about the process post-seizure of the examination.  I'm

12  inclined to admit this, but I need to hear a little more.

13         MR. ROBERTS:  Thank you, Your Honor.  I will do.

14  Q.   (by Mr. Roberts.)  Special Agent Faulkner, now once

15  the HP computer and the MacBook was seized by Homeland

16  Security, can you describe the overall forensic process

17  that these devices went through?  Who conducted the

18  forensic examination?  Starting there.

19  A.   Yes, sir.  Yes, sir.  So after this was initially

20  seized on November 8th, 2019, the items were turned over to

21  a Homeland Security Investigations, what we refer to as a

22  computer forensic analyst.  He then what's called "imaged"

23  these devices, meaning he made a digital copy so that he

24  could run it against forensic software tools.

25         Once he ran it against those forensic software tools,

a report was generated.  I want to say in sometime March of 2020, I was given a copy -- since I'm not a forensic analyst -- I was given a copy of a report, including all of the retrieved evidence out of the HP All-in-One Mac -- I'm sorry -- the HP All-in-One desktop computer, the MacBook laptop, and the backed up files from the iPhone 8.  So I personally --

Q.    Am I correct that the -- I'm sorry, Agent.  State that last bit again.  I think we were talking over each other.

A.    Yes, sir.  So I personally reviewed every aspect of that forensic report that I was given in March of 2020.

Q.    Am I correct that these devices, or at least the forensic image of these devices, were also sent to the high technology information unit that's located in the child exploitation and obscenity section of the Department of Justice?

A.    That is correct.  Another forensic examination was conducted on all three of those devices by the Department of Justice.

Q.    Have you also been made aware of the results via a report from those examinations?

A.    That is correct.  Yes, sir.

            MR. ROBERTS:  Your Honor, again, the government would move to introduce Government's Exhibit 3 into evidence.

```
 1            THE COURT:  Mr. Gelfand, do you have the same
 2   objections?
 3            MR. GELFAND:  Your Honor, same objections.  I
 4   would also just note that this individual testified that
 5   he's not an expert, he's not a computer forensic analyst.
 6   He's essentially just parroting back what he read.  We
 7   would object on those grounds as well.
 8            THE COURT:  All right.  Thank you.  The Court
 9   will note your objection, but overrule it, and Government's
10   Exhibit 3 will be admitted.
11            (Government's Exhibit No. 3 admitted)
12            MR. ROBERTS:  Your Honor, if we could be given
13   one minute.  And I would ask permission to publish this
14   exhibit, Your Honor.
15            THE COURT:  You may.
16            MR. ROBERTS:  Thank you.
17   Q.   (by Mr. Roberts.)  All right.  Special Agent Faulkner,
18   now according to our screen, Government's Exhibit 3 has
19   been published.  Can you see Government's Exhibit 3?
20   A.   Yes, sir.
21   Q.   All right.  Please orient the Court --
22            THE COURT:  Mr. Roberts, can I interrupt you for
23   a second?
24            MR. ROBERTS:  Yes, Your Honor.
25            THE COURT:  I just want to take a chance, because
```

we had some technology problems at the beginning.  I want
to take this opportunity to remind all of our observers
that there is to be no screen-shotting, no photographs, no
memorialization of these exhibits, in particular Exhibit 3
introduced by the government.

You may proceed, Mr. Roberts.

MR. ROBERTS:  Thank you, Your Honor.

Q.   (by Mr. Roberts.)  Now, Agent Faulkner, am I correct,
you stated this is a summary of the forensic examination.

Now, this particular summary outlines the important
events identified by that forensic examination covering May
13th and May 14th of 2019, is that correct?

A.   That is correct.

Q.   Could you please explain the important events that are
noted there, bullet-pointed, within the document?

A.   Yes, sir.  So on May 13th, 2019, that's when it was
discovered that the Linux partition was created on the HP
All-in-One desktop computer.  And also that the TOR, T-O-R,
browser was installed on that same side of the partition.

Q.   Moving to May 14th, 2019, could you note and explain
the important events located or determined, identified, by
the forensic examination?

A.   Yes, sir.  So on May 14th, 2019, at approximately
4:14 p.m., Mr. Duggar's iPhone was utilized to take a
picture of a vehicle on the Wholesale Motorcar lot.  And we

were able to determine that based on latitude and longitude
that it geolocated at or near that lot.

At 4:20, same thing. Mr. Duggar's iPhone utilized to
take a picture. This time it's of the HP All-in-One
desktop computer. Again --

Q. Agent, let me pause you there. Is that the HP
computer depicted in Government's Exhibit 2?

A. That is correct. Yes, sir.

Q. All right. Please continue.

A. That also geolocated at or near the Wholesale
Motorcars lot.

At 4:49 p.m., again on the 14th, there's a text
message sent from Mr. Duggar's iPhone stating, "Got stuck
here and still not free yet. I'm going to aim for tomorrow
just after lunch."

At 4:58 p.m., the TOR browser on the partition side of
the HP computer was utilized to access porn sites
associated with rape and files associated with child
pornography. More specifically a file named
"webcam-collection-prevs.7z" download, which was through
the TOR browser, was viewed on that computer.

Between 5:28 and 5:38 p.m. on that same day, the user
of that computer accesses the BitTorrent websites. The
movie, or the files, "Mov_0214.mp4.torrent" and
"Mov_216.mp4.torrent" files were downloaded onto the HP

1  computer.

2  5:41 p.m. through 5:46 p.m., the user of that same

3  All-in-One HP computer accesses multiple TOR directory

4  sites associated with the BitTorrent peer-to-peer

5  file-sharing network.  And at 5:42 p.m., that is when

6  Detective Kalmer from the Little Rock Police Department had

7  downloaded the "Mov_216.mp4" file from that specific

8  address associated to Mr. Duggar's internet subscriber

9  account.

10  5:48 p.m., there's an iChat message from

11  "Josh@championnwa.com" sent from the MacBook, or at least

12  retrieved from the MacBook that says, "I have your Versa

13  down here for Carlin by the way," and "I'm at my car lot."

14  6:01 p.m. to 6:05 p.m., Mr. Duggar's phone takes

15  multiple pictures of vehicles at the Wholesale Motorsale

16  car lot.

17  Q.   All right.  Thank you, Agent.  One follow-up now.  You

18  stated that the Little Rock officer downloaded the

19  "Mov_216" file.  Is that the same file that you described

20  kind of on the outset of your testimony today?

21  A.   That is correct, the same file.

22  MR. ROBERTS:  Now, Your Honor, I don't believe I

23  actually moved to introduce Government's Exhibit 4.

24  Q.   (by Mr. Roberts.)  Special Agent, now covering

25  Government's Exhibit 4, can you identify that for the

Court?

A.   Again, this is a forensic examiner summary outlining May 15th, 2019, and May 16th, 2019, that was extracted by analysts from both the Department of Justice and from Homeland Security Investigations.  These computer forensic examinations line out everything that you see here.

Q.   Again, were the reports generated from the forensic examination of these devices made available to you?

A.   That is correct.  In, again, I think it was March of 2020, I received copies of the reports.  I want to say there was over 7 million digital artifacts that I went through and comprised the reports of, that are similar to what I'm looking at right now.

Q.   For the record, are the events listed in Government's Exhibit 4 true and accurate based on the reports provided to you from the forensic examination of the devices at issue?

A.   Through a review of the forensic examination reports and my own reports, these are accurate.

          MR. ROBERTS:  Your Honor, I would move to introduce Government's Exhibit 4 into the record, or into evidence.

          MR. GELFAND:  Your Honor, I would just ask the Court to incorporate the same objections that I made with respect to Government Exhibit 3.

```
 1         THE COURT:  Mr. Gelfand, your objections will be
 2  noted in the Court's record.  They are overruled.
 3         Mr. Roberts, you may proceed.  I'm sorry.
 4  Government Exhibit --
 5         MR. ROBERTS:  Your Honor, may I likewise publish?
 6         THE COURT:  I'm sorry, Mr. Roberts.  I'm talking
 7  over you.  Government 4 will be admitted.
 8         (Government's Exhibit No. 4 admitted)
 9         MR. ROBERTS:  Your Honor, I apologize.  May I
10  publish Government's Exhibit 4?
11         THE COURT:  You may.
12         MR. ROBERTS:  Thank you.
13  Q.   (by Mr. Roberts.)  Now, Agent, again, per the
14  government's screen, we are displaying Government's
15  Exhibit 4.  Can you see Government's Exhibit 4?
16  A.   Yes, sir, I can.
17  Q.   Again, as we did in the previous exhibit, would you
18  orient the Court to what we are looking at and describe the
19  events that are noted via bullet points?
20  A.   Again, this is going to be the forensic examination
21  summary dated for March, 15th, 2019, and May 16th, 2019.
22         Starting off with May 15th at approximately 11:15
23  a.m., Mr. Duggar sends a message from his iPhone saying,
24  "I'm at my car lot now."
25         11:30 a.m., same day, the "About TOR" website is
```

bookmarked on that HP All-in-One desktop computer.

At 11:35 through 11:41 a.m., that HP computer, a user downloads three Torrent files associated with child pornography. Out of respect for the Court, I will just say that the files listed are accurate in terms of the titles and correct, and I will not read those, if that's okay.

Q. It is, Agent. I would ask you just to proceed to the next bullet point.

A. Sure. Yes, sir. At 3:20 p.m., Mr. Duggar's iPhone takes a picture of a Tontitown fire truck. That image is believed to have geolocated also near or at the Wholesale Motorcar car lot.

3:39 p.m., Mr. Duggar's iPhone takes a picture of a vehicle accident that occurred outside Wholesale Motorcars, which was -- which occurred on Highway 412.

Q. Stopping you there now. Has law enforcement had a chance to verify that a vehicle accident report and a vehicle accident in fact happened during that approximate time in that approximate location?

A. That is correct. We spoke with state and local law enforcement who confirmed that there was in fact an accident involving a motorcycle rider that occurred. And I don't remember the exact latitude and longitude, but it was directly across from the intersection entering into the Wholesale Motorcar lot.

Q.    All right.  Please proceed to the next bullet point.

A.    I believe I'm at 3:35 p.m.  There's an iChat message sent from Mr. Duggar's MacBook to 22 messages of his family stating, "Be praying for Mark, older guy that was riding motorcycle on 412."

      5:08 p.m., a message sent from Mr. Duggar's iPhone stating, "I'm here at the car lot, will be here til around 6:00 or so."

      5:20 p.m., the user of the HP desktop accesses the BitTorrent website.

      5:22 p.m., the user of the HP desktop downloads, "playtoysweetie.7z," which is a Torrent file.

      5:25, the user of that HP desktop downloads the "DD.torrent" at 5:25 p.m.

Q.    Agent, I need to stop you there.

A.    Yes, sir.

Q.    Could you tell the Court if the file, the Torrent file "DD.torrent," is significant to law enforcement?

A.    Yes, sir.  So "DD" is a known series of child pornography, very well known within the ICAC law enforcement community, better described as something called "Daisy's Destruction," which is a series of child sexual abuse material involving minor children ranging from about 18 months of age to 12 years of age.  And I can say in the 11 years of doing this and the thousands and thousands of

child pornography images and videos I've had unfortunately

to see, the "Daisy's Destruction" series ranks in the top

five of the worst-worst that I've ever had to examine.

Q.    Thank you, Agent.  Would you proceed to the next

bullet point?

A.    Yes, sir.  So then at 5:25 through 5:30 p.m., the user

of the HP computer accesses the website "homeadvisor.com"

and inputs user name "Joshua" into an auto-fill box and

then connects to a review of a construction company.

Q.    Agent, I need to stop you there.

          MR. ROBERTS:  Your Honor, I have just been

provided a note that Mr. Duggar's screen is now blank.  I

want to make sure that we have him present for the hearing.

          THE COURT:  Mr. Duggar, can you still hear us?

          THE DEFENDANT:  Thank you.  Yes, Your Honor.

          THE COURT:  Mr. Duggar --

          THE DEFENDANT:  Can you hear me?  Yes, Your

Honor.

          THE COURT:  I can, sir.  I can hear you.

          THE DEFENDANT:  Okay.  Is the video on here?

Sorry.

          THE COURT:  That's okay.  Were you able to view

the screen and see Government's --

          THE DEFENDANT:  Yes.

          THE COURT:  -- Exhibit 3 and 4?

THE DEFENDANT:  Yes.  Yes, Your Honor.  Yes, Your Honor.

THE COURT:  Have you been able to hear Mr. Roberts' examination of Agent Faulkner?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Okay.  Thank you for confirming that. We couldn't see you, so we needed to know.

THE DEFENDANT:  Okay.  Thank you.

THE COURT:  All right.  Mr. Roberts, you may proceed.  Thank you.

MR. ROBERTS:  Thank you, Your Honor.

Q.   (by Mr. Roberts.)  Agent Faulkner, will you start again with entry 5:25 through 5:30?

A.   Yes, sir.  So that was, the user of the HP computer accessed the website "homeadvisor.com," inputs the user name "Joshua" into an auto-fill box, and then conducts a review online of a local construction company.

Q.   Agent, I need to stop you again there.  Has law enforcement had an opportunity to follow-up on that "homeadvisor" review --

A.   Yes, sir.

Q.   -- to see its relevance to this case?

A.   My apologies.  Yes, sir.  So I made contact with the owner of that specific construction company who advised me that he had in fact done work for Mr. Duggar and his wife

in the past, and at the conclusion of that project, had

asked them to post a review on their website, or on a

website for his business.

Q.   All right.  Please proceed to the very next bullet

point, which I believe is approximately one minute later.

A.   Yes, sir.  So again at 5:30 p.m., the "DD.torrent"

file is downloaded again to that HP computer.

Q.   Again, is that the "Daisy's Destruction" video that

you referenced before?

A.   That is, yes, sir.

Q.   Please continue.

A.   At 5:32 p.m., the user of the HP computer downloads a

Torrent file "asi se mama linda."  At 5:41 p.m., a user

downloads the "Marissa.zip.torrent" file.

Q.   Agent, is that the same file downloaded by the Little

Rock officer that you described at the opening of your

testimony?

A.   That is correct.  That is the file that contains the

65 images of child pornography.

Q.   All right.  Please proceed.

A.   5:48 p.m., a message sent from Mr. Duggar's iPhone,

"still have customers here."  "No problem, probably be here

awhile."

     6:45 p.m. on that same date, the "Marissa.zip.torrent"

file is downloaded by Detective Kalmer from the BitTorrent

network.

6:51 p.m., the user of Mr. Duggar's iPhone takes pictures of two notes on the desk located inside of the Wholesale Motorcar office.

Q.   Now, Agent, have you had an opportunity to view that specific photo?

A.   Yes, sir.

Q.   You said, "of the desk in the Wholesale Motors office."  Is that the same desk that agents found, law enforcement found, the HP computer sitting on?

A.   That is correct.

Q.   Thank you.  Please proceed to May 16th, 2019.

A.   So on May 16th, 2019, at 11:20 a.m., the user of that HP All-in-One desktop computer downloads the Torrent file "Pedomom."

At 11:35 a.m., the user of Mr. Duggar's iPhone takes pictures of the desk in the main office, again at Wholesale Motorcars.

Q.   You referenced earlier in your testimony that these images geolocated to the Wholesale Motor lot.  Can you tell us a little bit about geolocation services?

A.   Yes, sir.  So Apple devices will often geolocate media that is taken or produced from that particular device.  We were able to extract that during the forensics.  And the latitude and longitude showed that the believed area where

these images of vehicles and pictures of the desk inside of

that car lot were taken at or near Mr. Duggar's business.

Q.   In your training and experience working, I believe you

said well over 1,000 cases, is that latitude and longitude

information accurate?

A.   Yes, sir.

Q.   With your knowledge of the entire case, comparing what

was depicted in the picture and the geolocation

information, meaning the latitude and longitude, again, is

that accurate?

A.   Yes, sir.

        MR. GELFAND:  Your Honor, I would object to

opinion testimony about the accuracy of latitude and

longitude coordinates that the witness has no control over

producing.

        THE COURT:  I will sustain that objection.

Mr. Roberts --

        MR. ROBERTS:  Your Honor, I'll move on.

        THE COURT:  Okay.

Q.   (by Mr. Roberts.)  Based on your review of the

forensic examination reports generated in this case, can

you tell the Court if files or images of child pornography

were in fact viewed by the user of that HP computer?

A.   Yes, sir.  So multiple child pornography files were --

excuse me -- were essential -- they were found in a

"recently viewed" folder, meaning that the user had
unzipped those Torrent files and had viewed them on the
desktop.

Q.   Did analysts locate any of the child pornography
images that you were referencing in the "unallocated space"
of that device?

A.   Yes, sir.  So approximately over 200 images that were
flagged as child sexual abuse material involving naked
minors and minors engaged in sexual activity were located
there.

Q.   Just to make sure everybody, or the Court is aware of
our definition of "unallocated space," could you please
define that for the Court?

A.   Sure.  So unallocated space is basically a place that
a file will go to when a user deletes it, but it still
stays on the hard drive.

Q.   Okay.  So in this case, for there to be those images
that you just described, I believe you said 200-plus images
of minors and child pornography, minors, including child
sexual abuse material, would someone have to delete those
files in order for them to be located in the unallocated
space?

A.   Yes, sir.  That is correct.

Q.   In your experience, is it common for someone to
download, view, and then delete images of child

1  pornography?

2  A.    Yes, sir, very common.

3  Q.    Now, Agent, generally, the date of the execution of

4  the search warrant was November 8th, 2019, is that correct?

5  A.    That is correct.

6  Q.    Forensic examination of the devices at issue, that was

7  ongoing until when again?

8  A.    I believe the last report that we received was

9  sometime in February of 2021.

10  Q.    Agent, does any part of your investigation in this

11  case reveal or indicate that Mr. Duggar had a pornography

12  addiction during the relevant time frame?

13  A.    Yes, sir.  So between --

14           MR. GELFAND:  Your Honor, I would object --

15           THE COURT:  Mr. Gelfand?

16           MR. GELFAND:  Your Honor, I would object on

17  relevance.  It also calls for improper expert testimony as

18  to this Special Agent's view of what a "pornography

19  addiction" is.

20           THE COURT:  I tend to agree with that.  Can you

21  rephrase, Mr. Roberts?

22           MR. ROBERTS:  I can, Your Honor.

23  Q.    (by Mr. Roberts.)  Special Agent, were there any

24  witnesses identified during your investigation that

25  reported to law enforcement that Mr. Duggar had a

1  pornography addiction that they were aware of?

2  A.    Yes, sir.

3  Q.    Were these witness statements, or did these witness

4  statements, include friends and family of Mr. Duggar?

5  A.    That is correct.

6  Q.    All right.

7         MR. ROBERTS:  Thank you, Your Honor.  I'll pass

8  the witness at this point.

9         THE COURT:  Mr. Gelfand, it's your witness.

10         MR. GELFAND:  Thank you, Your Honor.  May I

11  proceed?

12         THE COURT:  You may.

13                    CROSS EXAMINATION

14  BY MR. GELFAND:

15  Q.    Agent Faulkner, can you hear me okay?

16  A.    Yes, sir.  Good afternoon.

17  Q.    Good afternoon, Agent.  Agent, you testified that you

18  are a Special Agent with the Homeland Security

19  Investigations part of the Department of Homeland Security,

20  is that correct?

21  A.    Yes, sir.

22  Q.    Okay.  And that you've been a Special Agent since

23  approximately April of 2009, is that correct?

24  A.    Yes, sir.

25  Q.    Okay.  And, Agent, you testified that your role in

this case was essentially to train Special Agent Howard
Aycock, who was investigating his first case of this
nature, is that correct?

A.    Yes, sir.

Q.    And to be clear, in performing that role of training
Special Agent Aycock, you were personally involved in all
aspects of this investigation, is that correct?

A.    That is correct.  Yes, sir.

Q.    Would you agree with me that as the training agent on
this case, or even if you were just the lead agent on the
case, it's important to be thorough and fair in your
investigation?

A.    Yes, sir.

Q.    It's important to keep an open mind and follow all
leads, correct?

A.    That is correct.  Yes, sir.

Q.    And it's important to be honest and accurate in
reports, search warrant affidavits, testimony, anything
along those lines, correct?

A.    Yes, sir.

Q.    Okay.  Now, Special Agent, you testified that this
investigation began in May of 2019, is that correct?

A.    That is correct.

Q.    And you testified that a detective in Little Rock
named Amber Kalmer was the initial law enforcement officer

1  investigating this case, is that correct?

2  A.    Yes, sir.

3  Q.    And to be clear, this detective in Little Rock is not

4  affiliated with the Department of Homeland Security,

5  correct?

6  A.    We work closely, but she's not an HSI task force

7  officer, no, sir.

8  Q.    Okay.  And when you say you work closely, meaning law

9  enforcement -- fair to say law enforcement works within

10  others in the law enforcement community?

11  A.    I'm sorry.  Could you repeat that?

12  Q.    Sure.  Law enforcement often works with others in the

13  law enforcement community, correct?

14  A.    Yes, sir.

15  Q.    Okay.  But in this particular instance, the HSI ICAC

16  Task Force was a totally separate and different entity than

17  the Little Rock Police Department with which this detective

18  was affiliated, correct?

19  A.    She is an ICAC affiliate, and we do have ICAC

20  affiliate task force officers, so she was part of an ICAC;

21  just not our ICAC in Northwest Arkansas.  If that was your

22  question, I'm sorry.

23  Q.    Well, as a practical matter, HSI agents such as

24  yourself and Agent Aycock did not become directly involved

25  in this case until October of 2019, is that correct?

A.   No, sir.  I was given the initial files by Detective
Kalmer, I want to say in possibly June of 2019.

Q.   Okay.  So let's back up for a second.  If I understood
your testimony correctly, Detective Kalmer is conducting
this computer-based investigation from Little Rock,
Arkansas, in May of 2019, is that correct?

A.   Yes, sir.

Q.   Okay.  And Detective Kalmer had identified, you
testified, a computer, quote, unquote, "offering certain
files," vis-a-vis a BitTorrent network, is that correct?

A.   Yes, sir.

Q.   Okay.  And to be clear, what the detective was able to
identify was actually an IP address as opposed to a
particular device, is that correct?

A.   An IP address, correct.

Q.   In other words, multiple devices can use an IP
address, correct?

A.   Yes, sir.

Q.   So for lack of a better way of putting it, if in my
home I have 10 different computers, three iPhones, and two
iPads, and they all use the same internet connection, as
far as the detective in Little Rock is concerned, all of
that is going to correlate with a single IP address,
correct?

A.   Yes, sir.

Q.   Now, individual devices can actually be identified by
something called a MAC address, correct?

A.   Correct.

Q.   That didn't happen here, correct?

A.   No, sir.

Q.   Meaning that's correct?  Did that happen here?

A.   No, sir.

Q.   Okay.  Now, so when you say that it identified a
specific computer, what you're really saying is that it
identified, meaning the Little Rock detective identified, a
specific IP address as opposed to a specific device, is
that correct?

A.   That is correct.

Q.   Okay.  And to be clear, that detective in Arkansas was
essentially surveying the peer-to-peer network for any
device that had known hash value images, correct?

A.   Correct.

Q.   And you understand what I mean by that, correct?

A.   Yes, sir.  Yes, sir.

Q.   Okay.  And "known hash value images" are images of
suspected child pornography or other contraband images
that, regardless of what they are titled, they have a
specific designation tied to the image, correct?

A.   Correct.  The hash and SHA values act as a digital
fingerprint.

Q.   And in this particular instance, the law enforcement
officer in Arkansas, Ms. Kalmer, Detective Kalmer,
identified a specific IP address offering what she believed
was known hash value images of investigative significance,
correct?

A.   Yes, sir.

Q.   Okay.  Did she have a network investigative technique
warrant, or an NIT warrant?

A.   I don't believe so, no, sir.

Q.   And you understand what a network investigative
technique warrant is, correct?

A.   Correct.

Q.   Okay.  And you've testified previously that you're
familiar with all aspects of this investigation.  You would
agree with me that if she had one of those warrants, you
would know that, correct?

A.   That is correct.  Yes, sir.

Q.   And she didn't have one of those warrants, correct?

A.   No, sir.

        MR. ROBERTS:  Your Honor, at this point, I'm a
little late, given the technology, but I was going to
object to relevance.  This is a detention hearing, Your
Honor.

        THE COURT:  Well, Mr. Roberts, I tend to agree
with you.  I'm going to give Mr. Gelfand a little latitude.

I'm sure he's going to make a point for me here in a minute.

            MR. GELFAND:  I am, Your Honor.

Q.    (by Mr. Gelfand.)  The software that the detective was using, that you testified she used to identify an IP address, what software was that?

A.    I'm not aware.  I just know that she was able to connect to that IP address.

Q.    Now, if I understood your testimony correctly, the three dates that you testified essentially mattered were May 14th, May 15th, and May 16th of 2019, is that correct?

A.    I'm sorry.  Could you repeat that?  In terms of when there was actual pornography?

Q.    Yes.

A.    Yes, sir.  So that would have been the May 14th, May 15th, and May 16th.

Q.    Okay.  So you're talking three days, approximately two years ago, correct?

A.    Approximately, yes, sir.

Q.    The first time that you actually personally reviewed alleged child pornographic files from the detective was in October of 2019, is that correct?

A.    No, sir.

Q.    When is the first time that you reviewed those alleged files?

A.    It would have been probably as early as June of 2019.

Q.    You prepared an under-oath affidavit in support of a search warrant that you testified about in this case, is that correct?

A.    That is correct.  Yes, sir.

Q.    And you took an oath to tell the truth, the same way you took an oath to tell the truth today, correct?

A.    Yes, sir.

Q.    In that search warrant, you said, "In October 2019, your affiant" -- meaning you -- "reviewed the two files successfully downloaded by the HSI ICAC affiliate computer from IP address," and then it lists an IP address, is that correct?

A.    Yes, sir.

Q.    Okay.  You never mentioned doing any sort of investigative work prior to October 2019 in your search warrant, did you?

A.    No, sir.  The October date is when I would have reviewed those files to the search warrant for an image description.

Q.    You would agree with me, though, that's not what you said in your search warrant under oath, correct?

A.    Restate the question, please.  I'm sorry.

Q.    You would agree with me that that's not actually what you said in your under-oath statement in your search

1  warrant in paragraph 35, correct?

2         MR. ROBERTS:  Your Honor, I'm going to object.

3  If he's going to try to impeach the officer, he should at

4  least direct him to the topic that he is trying to impeach

5  him on, meaning the actual warrant in this case.

6         THE COURT:  I agree.

7         MR. ROBERTS:  He's asking a very general

8  question, Your Honor.

9         THE COURT:  I agree.  I'm going to sustain that

10  objection.  Proceed a different way, Mr. Gelfand.

11  Q.  (by Mr. Gelfand.)  Agent, do you have Defendant's

12  Exhibit, what's been previously marked for identification

13  purposes only as Defendant's Exhibit B in front of you?

14  A.  No, sir.

15         MR. GELFAND:  Can that be made available to the

16  Agent without publishing it?

17  A.  I have copies of the search warrants if that's --

18  Q.  (by Mr. Gelfand.)  That is.  Do you have a copy of the

19  November 4th, 2019, application for a search warrant that

20  you signed under oath?

21  A.  Yes.

22  Q.  I direct your attention to paragraph 35.  You state,

23  do you not, "In October 2019, your affiant reviewed the two

24  files successfully downloaded by the HSI ICAC affiliate

25  computer from IP address 167.224.196.113," is that correct?

A.    Yes, sir.

Q.    In the summary of the investigation to date, do you reference anything at all of anything you did in June, July, August, or September of 2019?

A.    No, sir.

Q.    Now, Special Agent, after May 16th of 2019, did law enforcement continue to monitor this particular IP address for suspected activity involving alleged child pornography?

A.    There was no active monitoring, no, sir.

Q.    When you say "active monitoring," let's be very precise.  Was there ongoing automatic monitoring?

A.    If that IP address had been flagged in the past, I would assume that ICAC software tools would probably have made a record of that.

Q.    And based on your entire investigation to date, there was no such record that you're aware of, correct?

A.    No, sir.  Not actively tracking it, no, sir.

Q.    Now, you testified that in October of 2019, you obtain the first federal search warrant to search a residence in Springdale, Arkansas, is that correct?

A.    Agent Aycock obtained that search warrant.

Q.    And you were supervising Agent Aycock in obtaining that search warrant, correct?

A.    Yes.  I was assisting him, yes, sir.

Q.    Okay.  And the search warrant was obtained based on

Agent Aycock's under-oath affidavit telling the Court there was probable cause to believe evidence of this crime was at that house, correct?

A.   Correct.

Q.   About a day or two later, October 31st of 2019, you executed the search warrant, but as you testified, did not find any evidence of any crime at that house, correct?

A.   Technically, the search warrant was not executed.

Q.   Did you show up at the house to execute the search warrant?

A.   We did do that, yes, sir.

Q.   Did you look for things?

A.   We did not.  We spoke with the residents.  And after it was determined that they did not have OzarksGo as an internet service provider, and after the information that they had provided to us, we left the residence.

Q.   So without parsing words, you showed up to execute the search warrant and realized that there was no -- nothing of evidentiary value there as you expected there would be, correct?

A.   That is correct.

Q.   Okay.  On November 1st of 2019, HSI sent an undercover agent into Wholesale Motorcars, correct?

A.   That is correct.  Yes, sir.

Q.   And just to be clear, Wholesale Motorcars is the name

1  of the car lot that you've testified extensively about on
2  direct examination, correct?
3  A.    That is correct.  Yes, sir.
4  Q.    And that undercover agent observed Mr. Duggar use an
5  iPhone and a laptop computer, correct?
6  A.    That is correct.
7  Q.    That undercover agent was physically in the "office,"
8  quote, unquote, that you testified about where the HP
9  computer was found, correct?
10  A.    I believe so.
11  Q.    And that undercover agent was in the office with
12  Mr. Duggar and with another individual who was present on
13  that day, is that correct?
14  A.    Yes, sir, I believe so.
15  Q.    And to be clear, in an undercover operation like this,
16  no one knows you're coming, correct?
17  A.    That is correct.  Yes, sir.
18  Q.    That's the whole idea, is you get what you get without
19  anyone being able to manufacture it, correct?
20  A.    Yes, sir.
21  Q.    So to be clear, the agent observed Mr. Duggar
22  conducting what he believed was a business, or at least
23  what your agent was pretending to do was conduct a business
24  transaction, but Mr. Duggar was using the laptop computer
25  that you identified as opposed to the HP computer, correct?

1          MR. ROBERTS:  Your Honor, again, I'm going to
2     object to relevance.  I just don't see where Mr. Gelfand is
3     going with this.
4          MR. GELFAND:  Your Honor, this Agent has
5     testified extensively on direct examination about his
6     investigation.  To the extent that it was relevant at all
7     for the government to elicit this testimony, I think I
8     should be permitted to cross-examine the witness on it.
9          THE COURT:  I will allow it, but let's be mindful
10    of the time.  We've got a lot of ground to cover.
11         MR. GELFAND:  Thank you, Your Honor.
12    Q.   (by Mr. Gelfand.)  You can answer the question.
13    A.   I'm sorry, sir.  Can you repeat it?
14    Q.   I can ask you a different one, because I'm not sure I
15    can remember exactly how I phrased it.
16    A.   No problem.
17    Q.   Agent, the undercover agent observed Mr. Duggar use
18    his laptop computer and iPhone as opposed to any other
19    device over the course of the undercover operation,
20    correct?
21    A.   I don't know if he saw him using it, other than the
22    fact that he saw a laptop and an iPhone in the office.
23    Q.   On November 4th, three days later, you applied for the
24    second, what you described as a second federal search
25    warrant in this case, correct?

A.    That is correct.  Yes, sir.

Q.    And to be clear, the only devices referenced in your under-oath affidavit were the iPhone and the laptop computer, correct?

A.    That that's what the undercover had seen?

Q.    Was there any mention in the entirety of your under-oath affidavit of the HP computer?

A.    I'm sorry.  I was asking, were you asking me if the only reference in the second search warrant was the iPhone and the laptop?

Q.    Correct.

A.    Yes, sir, based on the undercover's observations.

Q.    On November 8th of 2019, you executed the search warrant as you testified, correct?

A.    Yes, sir.

Q.    And would you agree that November 2019 was 17 months ago?

A.    Yes, sir.

Q.    When you arrived, you testified that Mr. Duggar took his iPhone out of his pocket and expressly told you and Special Agent Aycock that he was calling his lawyer, correct?

A.    He said he wanted to call his lawyer, correct.

Q.    And he made very clear to you that his intention of taking out his physical iPhone device was to make contact

1  with his attorney, correct?

2  A.    Yes, sir.

3  Q.    Okay.  At that time, before he could make contact with

4  his attorney, you physically took the phone out of his hand

5  before he could contact his attorney, correct?

6  A.    That is correct.  Yes, sir.

7  Q.    When you arrived, you also provided a copy of the

8  search warrant that the Judge had signed off on to

9  Mr. Duggar, correct?

10  A.    That is correct.  Yes, sir.  Well, he was shown a

11  copy.  I'm sorry.  He was shown a copy at the onset of the

12  execution of the search warrant, and he was provided a copy

13  at the conclusion.

14  Q.    And to be clear, when you showed him a copy, you

15  showed him a copy of the search warrant and the two

16  attachments, Attachment A and Attachment B, correct?

17  A.    He was shown initially the search and seizure warrant.

18  Q.    With the attachments attached to them, correct?

19  A.    He was provided the attachments at the conclusion.

20  Q.    And the search and seizure warrant, he had an

21  opportunity to review what you provided him, correct?

22  A.    Yes, sir, I would assume so.

23  Q.    Did you watch him?

24  A.    At the conclusion of the search warrant?

25  Q.    No.  Did you watch him when you initially arrived have

an opportunity to review the search warrant and the
attachments?

A.    No, sir.  He was shown a copy, and then we started to
proceed to process the scene.

Q.    During the execution of the search warrant, would you
describe Mr. Duggar as having been fully compliant with law
enforcement?

A.    He was cooperative in the sense that he was polite and
he was courteous.  In terms of the overall investigation,
I'd have to honestly say -- I'd have to say no based on the
fact that he declined to give us the passwords to his
devices.  He also further declined to give us the names of
some of his former employees that we could have potentially
have been talking to right then and there as to what was
going on.

Q.    Let me ask the question I actually asked you, Agent.
The question I asked you was, during the entirety of the
execution of the search warrant, did Mr. Duggar fully
comply with law enforcement directives?

A.    Yes, sir.

Q.    He was polite, he didn't run away, he wasn't violent.
None of those things, correct?

A.    That is correct.  Yes, sir.

Q.    Okay.  And in fact, he expressly said that he wanted
to make sure you obtained everything you were looking for

1  before agents left, correct?

2  A.   I believe he told Agent Aycock that, yes, sir.

3  Q.   And you've reviewed that in Special Agent Aycock's

4  official memorandum on this event, correct?

5  A.   In his report of investigation, yes, sir.

6  Q.   Okay.  Now, all of the alleged conduct as you

7  testified about was in May of 2019, about 24 months ago,

8  correct?

9  A.   Give or take, yes, sir.

10  Q.   So you would agree with me, would you not, that

11  Mr. Duggar knew about this investigation in November of

12  2019?

13  A.   Obviously, he was aware of the summary of the events

14  that brought us to the car lot that day, yes, sir.  Or back

15  in May he was, of 2019.

16  Q.   And since then, based on your investigation,

17  Mr. Duggar has continued to reside in the Western District

18  of Arkansas, correct?

19  A.   I'm assuming so, yes, sir.

20  Q.   Based on your investigation, Mr. Duggar has deep

21  family roots in this district, right?

22  A.   I believe so, yes, sir.

23  Q.   He was born and raised in this district, correct?

24  A.   I believe so.

25  Q.   He lived his entire life in this district, with the

exception of a brief stint in Washington, D.C., correct?

A.    I believe so.

Q.    He's maintained lawful employment in this district throughout the totality of your investigation, correct?

A.    I'm not aware of that, sir.  I'm sorry.

Q.    You're not aware of what he's been doing for employment over the course of your two-year investigation?

A.    Not in terms of employment.

Q.    He's provided for his wife and his six children during this time, correct?

A.    Again, sir, I'm unaware of that.  I'm not just telling you no.  I just don't know.

Q.    Agent, if you believed that Mr. Duggar posed an immediate danger to the community at any time after May of 2019, you could have arrested him, correct?

A.    Absolutely, yes, sir.

Q.    And you didn't, correct?

A.    Yes, sir.

Q.    Now, you've been investigating this for approximately two years.  With respect to the dates May 13th, 14th, and 15th, who else was physically present at the car lot on those days?

          THE COURT:  Mr. Gelfand, I'm going to interrupt you for just a minute.

          MR. GELFAND:  Sure.

1          THE COURT:  As long as we're talking about the

2     factors under 3142(g) that I must consider, I'm going to

3     give you a lot of latitude.  But this is not a suppression

4     hearing and it's not a day to try your case, so let's

5     tighten it up.

6          MR. GELFAND:  I understand that.  I'm

7     cross-examining the witness based on what the direct

8     examination was.

9          THE COURT:  I understand, but let's keep a focus.

10          MR. GELFAND:  Can the witness answer that

11     question?

12          THE COURT:  Please answer, Mr. Faulkner.

13     A.    I'm sorry, sir.  Can you repeat it?

14     Q.    (by Mr. Gelfand.)  Yes.  Who else was physically

15     present at the car lot on May 13th, 14th, and 15th of 2019?

16     A.    On the date of the execution of the search warrant?

17     Q.    No.  May 13th, 14th and 15th of 2019.

18     A.    So far from our forensic examinations and review of

19     the evidence in terms of employees, we are only aware of

20     Mr. Duggar.  We are unsure of all of the potential

21     customers that arrived on scene, but we know, based on the

22     forensics, that Mr. Duggar was there.

23     Q.    In other words, your testimony is that others may have

24     been working there too; you just don't know?

25     A.    No, sir.  We believe Mr. Duggar was the only one

working at the car lot during that time frame.

Q.    Now, in this particular case, you're aware that law enforcement, meaning HSI in particular, permitted Mr. Duggar to self-surrender when the indictment was issued, correct?

A.    That is correct.  Yes, sir.

Q.    Okay.  And as directed, Mr. Duggar, with counsel, complied immediately with what his instructions were as far as self-surrendering, correct?

A.    There were arrangements made between the attorneys for him to turn himself in.  He was also made aware, though, that HSI personnel and agents were basically on surveillance outside of the residence and that he was going to be followed into our office to self turn himself in, yes, sir.

Q.    And he turned himself in as directed, correct?

A.    That is correct.

Q.    And when he turned himself in, he was fully cooperative with law enforcement, correct?

A.    Yes, sir.

Q.    Now, you testified about computer forensics when the prosecutor asked you about Exhibits 3 and 4, is that correct?

A.    Yes, sir.

Q.    And let's be crystal clear.  You are not a computer

1  forensics expert, correct?

2  A.    No, sir, I'm not.

3  Q.    So 100 percent of your testimony was based on your

4  understanding of what other people, who are not you, opined

5  as far as the case and what the evidence showed, correct?

6  A.    No, sir.

7  Q.    No, that's not correct?

8  A.    No, sir.

9  Q.    Did you conduct a forensic examination of any of the

10  devices?

11  A.    I conducted a review of reports of those examinations.

12  Q.    Reports prepared by forensic, computer forensic

13  examiners, correct?

14  A.    Correct.  Yes, sir.

15  Q.    Okay.  In other words, you're basically summarizing

16  what you understand that they said, correct?

17  A.    No, sir.

18  Q.    Exhibit 3 and Exhibit 4, who prepared this document?

19  Was that you, these documents?

20  A.    It looks like it's taken from my reports.

21  Q.    So did you personally prepare Exhibits 3 and 4?

22  A.    No, sir.

23  Q.    You testified just briefly about a couple of things on

24  Exhibits 3 and 4.  You testified that a Linux partition was

25  created on May 13th of 2019, correct?

A.    Correct.  Yes, sir.

Q.    Okay.  You have no evidence that Mr. Duggar created that, correct?

A.    Again, we can, based on the forensic examinations, put Mr. Duggar in the vicinity of the computer at times near the computer during this timeframe.

Q.    So is the answer yes or no to my question as to whether you have evidence that he created that?

A.    Specific evidence, no, sir.

Q.    Okay.  And similarly, you testified that on May 13th, a TOR browser was installed, correct?

A.    Yes, sir.

Q.    And there's no evidence Mr. Duggar actually installed that himself, correct?

A.    I did not personally view Mr. Duggar download that, no, sir.  You're right.

Q.    Okay.  On Exhibit 1, the photograph that the prosecutor showed you, that's a photograph of the HP computer, correct?

A.    No, sir.

          THE COURT:  Mr. Gelfand, I think you're referring to Exhibit 2.

          MR. GELFAND:  Exhibit 2.  I apologize, Your Honor.

Q.    (by Mr. Gelfand.)  Exhibit 2, do you have that in

1  front of you?

2  A.    Yes, sir.   That is the HP All-in-One desktop computer,

3  correct.

4  Q.    Okay.   And if we look specifically at Exhibit 2, do

5  you see there's an icon on the left of the screen that says

6  "F?"  I can show you Exhibit 2 if it's helpful.

7  A.    I have a picture.   I'm trying to see it on this

8  print-up.   I'll believe you if you say there's one there,

9  that's fine, yes, sir.

10 Q.    Do you see a yellow icon on the left side of the

11 computer screen approximately five icons from the top?

12 A.    Yes, sir.

13 Q.    Okay.   That icon is for car software called "Frazer,"

14 correct?

15 A.    I believe so, yes, sir.

16 Q.    This was a work computer, a PC in particular, used by

17 a number of different people, correct?

18 A.    It has been used by others other than Mr. Duggar, that

19 side, correct, yes, sir.

20 Q.    And in fact, the Frazer software for car sales and car

21 inventories and things like that, that was not found on any

22 of the other devices, correct?

23 A.    Not that I recall, no, sir.

24 Q.    And in fact, the devices that you have identified as

25 Mr. Duggar's personal devices, the laptop and the iPhone,

1  were both Mac devices as opposed to PCs, correct?

2  A.    Yes, sir.

3  Q.    The HP computer was a PC, correct?

4  A.    Correct.  Yes, sir.

5  Q.    Now, you testified about the password for the Linux

6  side on direct examination.  Do you recall your testimony?

7  A.    Yes, sir.

8  Q.    The password was physically written on a Post-it in

9  the office when you executed the search warrant, correct?

10  A.    Not the password for the partition side.

11  Q.    What's your testimony as to what the password was that

12  was recovered during the search warrant?

13  A.    On the partition side, there was not one recovered,

14  the day of the search warrant.

15  Q.    Now, Agent, you testified that you conducted this

16  investigation in your capacity as an HSI Special Agent, is

17  that correct?

18  A.    Yes, sir.

19  Q.    Okay.  And no other federal agencies were involved,

20  correct?

21  A.    The Department of Justice assisted with forensic

22  examinations.  Outside of that, nobody else.

23  Q.    In other words, for law enforcement agencies, as far

24  as prosecutors, this was an HSI case, a Department of

25  Homeland Security case, correct?

A.    That is correct.  Yes, sir.

Q.    Okay.  And so at all times, you were working under the authority of the Department of Homeland Security and whoever was in charge, correct?

A.    That is correct.  Yes, sir.

        MR. GELFAND:  Your Honor, may I have just one minute?

        THE COURT:  You may.

        (pause)

        MR. GELFAND:  Thank you, Your Honor.  I have no further questions at this time for this witness.

        THE COURT:  Thank you, sir.  Mr. Roberts, anything further?

        MR. ROBERTS:  Yes, Your Honor.  Just a few follow-up questions, if I may be permitted.

        THE COURT:  Please proceed.

        MR. ROBERTS:  Thank you, Your Honor.

                    REDIRECT EXAMINATION

BY MR. ROBERTS:

Q.    Agent Faulkner, you were asked on cross-examination questions regarding Mr. Duggar the day of his arrest, is that correct?

A.    Yes, sir.

Q.    Would it be accurate that prior to Mr. Duggar becoming aware that there was an active federal warrant, you and

1  other agents took up stationary positions outside of his
2  residence, is that correct?
3  A.    That is correct.  Yes, sir.
4  Q.    Is it also accurate that while you were in those
5  stationary positions, that an attorney for the government
6  called an attorney for Mr. Duggar and told him that
7  Homeland Security was essentially at his residence and that
8  he needed to drive himself to Homeland Security so that no
9  children were made aware that there were armed officers
10 coming to arrest Mr. Duggar, is that correct?
11 A.    That is correct.  Yes, sir.
12 Q.    In that sense, Mr. Duggar did, with the aid of his
13 wife, drive himself to Homeland Security, and agents
14 followed, is that correct?
15 A.    Yes, sir.  That is correct.
16 Q.    When Mr. Gelfand was asking you what specific evidence
17 did you have placing Mr. Duggar behind the computer, you
18 referenced, "I did not directly see him," is that correct?
19 A.    That is correct.
20 Q.    That's generally in the law called "direct evidence,"
21 is that correct?
22 A.    That is correct.
23 Q.    Would you agree with me that Government's Exhibit 2
24 and 3, based on all the forensic examination, is evidence
25 that it was in fact Mr. Duggar behind the keyboard during

the downloading and installation of the Linux partition,
the BitTorrent program, the use of the BitTorrent program,
the download and installation of TOR browser, the use of
TOR browser, and the downloading and viewing and then
deleting of child pornography?

MR. GELFAND:  Your Honor, I would object on the
grounds that it invades the province of the Court.  It's
improper opinion testimony.

THE COURT:  Your objection will be overruled.
You can answer.

Q.   (by Mr. Roberts.)  Please answer the question.

A.   Just to be clear, Mr. Roberts, you spoke of, I think
Exhibits 2 and 3.  Did you mean 3 and 4?

Q.   I did.  If I referenced 2 and 3, I was referencing,
and should have been referencing 3 and 4.

A.   Okay.  I might have heard that wrong.  But, yes, in
terms of Exhibits 3 and 4, you are correct, yes, sir.

Q.   Now, just to make sure there's no confusion, the
password for the HP computer was located in the office at
some place, is that correct?

A.   Correct.

Q.   Now, the password for the Linux partition that was
installed on May 13th, did law enforcement locate a
physically written down password for that partition?

A.   No, sir, I do not believe so.  That was recovered

1 during forensic examinations.

2 Q.   And, again, that specific password ended in

3 Mr. Duggar's birth year, 1988, is that correct?

4 A.   That is correct.

5         MR. ROBERTS:  Your Honor, may I have a moment to

6 confer?

7         THE COURT:  You may.

8         (pause)

9         MR. ROBERTS:  Your Honor, may I proceed?  Two

10 more questions.  Two more areas of inquiry, actually.

11        THE COURT:  You may proceed.

12        MR. ROBERTS:  Thank you, Your Honor.

13 Q.   (by Mr. Roberts.)  Now, Agent, Mr. Gelfand asked you

14 about the day you executed the search warrant, what exact

15 document on the outset of this search warrant was

16 Mr. Duggar shown?

17 A.   He was shown a copy of the search and seizure warrant.

18 Q.   Okay.  The copy and the exact information shown to

19 Mr. Duggar, does it indicate at all a child pornography

20 based investigation?

21 A.   No, sir, it does not.

22 Q.   Okay.  Again, so your testimony that when Mr. Duggar

23 stated or asked the question whether someone was

24 downloading child pornography, are you still maintaining

25 that you, law enforcement in general, never disclosed that

information to him?

A.    That is correct.  He did not receive a copy of

Attachments A and B, I believe it was, until the conclusion

of the search warrant.

Q.    Last question, Agent.  Now, during an undercover

peer-to-peer based operation such as this, Mr. Gelfand

asked you that it -- whether it was fair that an IP

address, but not a specific device was detected, is that

correct?

A.    That is correct.

Q.    All right.  Now, based on your understanding and

experience, would it be more accurate to say that it is a

specific device using that IP address that a direct

download is made from?

A.    That is correct.  And I apologize.  That's what I

thought he was getting at.

Q.    Okay.  So let's explain that a little bit.  Because

there was a direct download, or please define a direct

download for the Court.

A.    So the direct download would have been through the

specific IP address, which had been utilized by a specific

computer, or a computer located in the Northwest Arkansas

area.

Q.    Well, am I correct, the term "direct download" as used

in an undercover investigation such as this, a download of

child pornography means that it is directly downloaded from one singular device, not multiple devices at once, is that correct?

A.   No, that is correct.

Q.   So when the Little Rock officer made a download of two files of child pornography, that download came from one device utilizing the IP address assigned to Mr. Duggar during May of 2019, is that correct?

A.   That is correct.  And not only that, but we found it on one -- both of those downloads on one single device.

Q.   So not only did that IP address, or rather the device that utilized that IP address, the two images came from one device, you actually located the HP computer that contained those two images, is that clear?

A.   The images and the video file, correct.

Q.   Okay.

          MR. ROBERTS:  Your Honor, I'll pass the witness again.

          THE COURT:  Mr. Gelfand, anything as a result of those questions?

          MR. GELFAND:  Just one quick clarification, Your Honor.

          THE COURT:  Go ahead.

                    RECROSS EXAMINATION

BY MR. GELFAND:

1  Q.   Special Agent, you just testified just a minute ago in

2  response to the prosecutor's question that the images and

3  video at issue were found on one specific device, correct?

4  A.   Yes, sir.

5  Q.   That device was not identified by the Little Rock

6  detective, correct?

7  A.   No, sir.  She was unable to determine at that stage in

8  the investigation what type of device it was being

9  downloaded from.

10  Q.   And the device that you're claiming the images were on

11  was the HP business computer with the car software on it,

12  not any of the personal devices, correct?

13  A.   No, sir.  That's correct.

14  Q.   Okay.  Thank you.

15        MR. GELFAND:  I have no further questions for

16  this witness, Your Honor.

17        THE COURT:  Thank you, Mr. Gelfand.  Agent

18  Faulkner, I have a question.

19        THE WITNESS:  Yes, ma'am.

20        THE COURT:  And it concerns "Covenant Eyes."

21        THE WITNESS:  Yes, ma'am.

22        THE COURT:  You may have testified and I missed

23  it.  Can you tell me when Covenant Eyes was installed and

24  on what device?

25        THE WITNESS:  I don't know the exact date of when

it was installed, but I can tell you that it was installed on the HP laptop -- I'm sorry -- the HP All-in-One desktop, as well as the MacBook laptop.

THE COURT: So the forensic investigation at least suggested that it was -- Covenant Eyes was a program installed on two devices seized as part of the search warrant?

THE WITNESS: Yes, Your Honor. That is correct.

THE COURT: All right. And did I understand your testimony that Covenant Eyes will not monitor a Linux partition?

THE WITNESS: That is correct. That's what the representatives informed us of, yes, ma'am.

THE COURT: And did you also testify that Covenant Eyes creates some kind of reports?

THE WITNESS: Yes, ma'am.

THE COURT: And to whom did reports go for this particular software downloaded?

THE WITNESS: Which software? I'm sorry, Your Honor.

THE COURT: The Covenant Eyes.

THE WITNESS: If any reports would have been generated, they would have been sent to Anna Duggar. Based on the fact that these -- the TOR browser and BitTorrent were downloaded on the partition side, no reports would

have been generated because Covenant Eyes would not have

monitored that.

THE COURT: All right. That's all I have.

THE WITNESS: If that's what you were asking.

I'm sorry.

THE COURT: Thank you, Agent. Mr. Roberts, any

questions as a result of mine?

MR. ROBERTS: Yes, Your Honor, if I may be

permitted.

THE COURT: Quickly.

MR. ROBERTS: Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. ROBERTS:

Q. Special Agent, would it be correct to say Covenant

Eyes, while you don't know the download date, it did

predate, the installation of that software predated the

May 13th, 14th, 15th, 16th of 2019 time frame, is that

correct?

A. That is correct.

MR. ROBERTS: Thank you. Nothing further, Your

Honor.

THE COURT: Mr. Gelfand, you can have a swing.

MR. GELFAND: Your Honor, I appreciate the

opportunity to have a swing, but I have no questions based

on the Court's questions.

1          THE COURT:  All right.  Mr. Roberts, are you

2   finished with Agent Faulkner?

3          MR. ROBERTS:  I am, Your Honor.

4          THE COURT:  May he be released?

5          MR. ROBERTS:  Yes, Your Honor.

6          THE COURT:  Thank you, Agent.  You may go about

7   your day.

8          THE WITNESS:  Thank you, ma'am.

9          THE COURT:  Call your next.

10          MS. MARSHALL:  Your Honor, we would call Federal

11   Probation Officer Diem Nguyen.

12          THE COURT:  All right.  Roxana, will you help us

13   get our witness ready to testify?

14          COURTROOM DEPUTY GUERRERO:  She's joined in,

15   Judge.

16          THE COURT:  All right.  Officer, will you raise

17   your right hand to be sworn.

18          (Witness Sworn)

19          THE COURT:  Ms. Marshall, you may proceed.

20          MS. MARSHALL:  Thank you, Your Honor.

21          DIEM NGUYEN, having been first duly sworn,

22   testified as follows:

23                      DIRECT EXAMINATION

24   BY MS. MARSHALL:

25   Q.   Can you please state your name and spell your name,

your last name?

A.    Diem Nguyen.  Last name is N-G-U-Y-E-N.

Q.    And, Officer Nguyen, how are you employed?

A.    I am employed with the Federal Probation Office here in Fayetteville.

Q.    Are you a Federal Probation Officer?

A.    Yes.

Q.    Okay.  How long have you been a Federal Probation Officer?

A.    I have been since July of 2012.

Q.    Okay.  What did you do previously before joining the Federal Probation Office?

A.    I worked at the state probation officer, as a state probation officer.

Q.    How long were you a state probation officer?

A.    For approximately five years.

Q.    As part of your job as a Federal Probation Officer, do you work to determine whether you believe that persons who have been indicted and charged with a federal crime and subsequently arrested on that federal crime, whether they are a good candidate for release conditions pending adjudication of their case?

A.    That is correct.

Q.    Okay.  What are different factors that you would consider in making this determination?

A.   Some of the factors that we take in is the nature and circumstances of the case, their history, if they have any criminal history, any background.  Their place of employment, and their residence situation.

Q.   Okay.  Are there some cases that you do -- do you investigate this and then prepare a report?

A.   Yes.

Q.   Okay.  Are there some cases that you work on that are considered what's called to be "presumption" cases where there is a presumed detention that would take place based on the charge?

A.   Yes.

Q.   Okay.  Is it then the defendant's burden to overcome that presumption of detention?

A.   That is correct.

Q.   Okay.  And then as part of that determination, vetting a proposed third-party custodian that would be put forth by the defendant?

A.   I'm sorry.  Ms. Marshall, could you repeat that?

Q.   Yes, of course.  As part of that determination is vetting a proposed third-party custodian that would be put forth by the defendant?

A.   That's correct.

Q.   Okay.  What is a third-party custodian?

A.   A third-party custodian is someone who vouches for the

defendant for federal court while they are pending their

case.

Q.   Okay.  When you say "vouches for," what do you mean by

that?

A.   A person who signs off on their release conditions

agreeing, acknowledging, that they will help the Court

monitor the defendant's activities, make sure they stay in

compliance while they are pending their case.

Q.   Are they basically in charge of the defendant if he or

she is released from custody?

A.   Yes.

Q.   And it's their job to ensure, along with the

defendant, to ensure that the defendant is abiding by any

and all conditions put in place by the Court?

A.   That is correct.

Q.   Okay.  And that they are to report any violations of

the defendant to the Court immediately, is that correct?

A.   That is correct.

Q.   Okay.  Have you been assigned the case of Joshua

Duggar?

A.   Yes, I have.

Q.   Okay.  So the process that you described in doing your

investigation and then preparing your report and your

determination whether you believe that a defendant is a

good candidate for pretrial release, have you followed that

1  same process with Josh Duggar's case?

2  A.    Yes, I have.

3  Q.    Okay.  Who is the proposed third-party custodian in

4  this case?

5  A.    It is Mr. LaCount Reber and Mrs. Maria Reber.

6  Q.    Okay.  As part of your investigation, did you prepare

7  a report and then an addendum to that report?

8  A.    Yes, I have.

9  Q.    Okay.  And that addendum to that report was released

10  today, May the 5th, 2021?

11  A.    That's correct.

12  Q.    Okay.  Do you outline your conversations with

13  Mr. LaCount Reber and Mrs. Maria Reber in your addendum?

14  A.    Yes, I did.

15  Q.    Okay.  As part of your investigation, did you have the

16  opportunity to speak with Mr. and Mrs. Reber?

17  A.    I did.

18  Q.    Okay.  Can you tell the Court, does Mr. Reber work?

19  A.    Yes, he does.

20  Q.    Okay.  Does he work outside of the home?

21  A.    I believe he does.

22  Q.    Okay.  Does he work in a full-time capacity?

23  A.    Yes.  If I'm not mistaken, Mrs. Reber advised that he

24  works full-time at the VA.

25  Q.    So Mrs. Reber told you that he worked full-time

1    outside of the home?

2    A.    That's correct.

3    Q.    Okay.  Besides that, what did Mrs. Reber also tell you

4    that Mr. Reber was involved in?

5    A.    Mrs. Reber also indicated that he was a pastor and he

6    also volunteers with the jail ministries.

7    Q.    Okay.  To your knowledge, are both of those outside of

8    the home as well?

9    A.    I believe so.

10   Q.    Okay.  Does Mrs. Reber work?

11   A.    I believe she is a full-time homemaker.

12   Q.    Officer Nguyen, are you there?

13            THE COURT:  Looks like we're having problems with

14   our connectivity again.  Let's see if she dials back in.

15            MS. MARSHALL:  Okay.  Yes, Your Honor.

16            THE COURT:  We've got a poltergeist at the

17   courthouse today.

18            COURTROOM DEPUTY GUERRERO:  There she is, Your

19   Honor.

20            THE COURT:  Thank you.  Thank you, Diem.

21   Q.    (by Ms. Marshall.)  Officer Nguyen, we lost you for a

22   minute, so I think we'll pick back up where we left off.

23       Mrs. Reber, does she work outside of the home?

24   A.    As far as I'm aware, Ms. Reber advised me that she was

25   a full-time homemaker.

Q.   Okay.  In your conversations with Mrs. Reber this last
week, did she make any statements to you that would cause
you concern that you indicated in your addendum?

A.   Yes.  Mrs. Reber was concerned regarding being left
alone with Josh because he was a male and that she was a
female, and so she expressed some concern with me regarding
that.

Q.   What did she say about that?

A.   Could you be more specific?

Q.   Yes.  So what was her -- what did she state that her
concern was?

A.   Her concern was that she was a woman and that Josh was
a man.  And that she felt -- she wasn't sure -- she didn't
know how she felt about being alone with him for long
durations of time.

Q.   And it's your understanding that she would be alone
with him, because Mr. Reber would be outside of the home at
work?

A.   Yes.  Mr. Reber does work from 8:00 to 4:00 outside of
the home.

Q.   Monday through Friday?

A.   Yes.

Q.   Okay.  Did she also make statements to you that there
were children that come to the home for some sort of piano
lessons?

A.    Yes.  Mrs. Reber advised me that her daughter teaches
piano lessons and had two minors that would frequent the
home either on a weekly or biweekly basis.
Q.    Okay.  So those minors would be coming into the
residence where Mr. Duggar would be, is that correct?
A.    That is correct.
Q.    What did Mrs. Reber say about her relationship to
Mr. Duggar, Josh Duggar?
A.    Mrs. Reber advised me that she is close friends with
Mr. Duggar's parents, and I believe they attended the same
church at one time.  And that she was -- and she and her
husband felt that they should help Mr. Duggar's parents and
Mr. Duggar.
Q.    Did Mrs. Reber say that she didn't really know
Mr. Josh Duggar like she knew Mr. Duggar's parents?
A.    That is correct.  Mrs. Reber did say that she was a
lot closer to his parents than she was with Mr. Duggar
himself.
Q.    Do you know who asked the Rebers to be the proposed
third-party custodians?
A.    If I'm not mistaken, I believe Mr. Duggar's parents
reached out to the Rebers for their assistance.
Q.    Okay.  Did Mrs. Reber state that she -- was she fully
aware of the charges against Mr. Duggar when she agreed to
take on this responsibility?

A.   She indicated that she was familiar with the charges, but she did not know the details of.

Q.   What about firearms in the home?  What did Mrs. Reber say in relation to firearms?

A.   Mrs. Reber advised that both she and her husband have their concealed carry license, and they have firearms at their residence.  They have two rifles and three pistols in their residence.

Q.   Was there anything about those statements that caused you concern?

A.   I asked Mrs. Reber if they had a gun safe to where Mr. Duggar would not have access to it if he was to be released to their residence.  And, however, Mrs. Reber advised that they would lock up their -- the firearms in a master bedroom closet, with a lock.

Q.   I'm going to go back.  You stated that -- go back a minute to the children that you stated would be coming in the home, Mrs. Reber said would be coming in the home for the piano lessons.

     Did she tell you any plan that she had come up with for when those children would be in the home?

A.   She did not necessarily mention a plan, but she did advise me that the minors are almost always accompanied by an adult, with adult supervision.

Q.   Okay.  Did she state where Mr. Duggar would be staying

in the home?

A.    Yes.  Mrs. Reber advised that there is a back addition

add-on bedroom that they have in their residence that

Mr. Duggar would be staying in.

Q.    Does that door have a lock?

A.    Yes.  Yes, it does.

Q.    Where does that door lock from?

A.    According to Mrs. Reber, the door locks from the

inside, so Mr. Duggar would not be able to unlock it from

his side of the room.

Q.    Okay.  Do you know if there's an exterior exit in that

room?

A.    If I'm not mistaken, I believe Mrs. Reber said that he

can exit the bedroom from an exterior door.

Q.    Okay.  In speaking with Mrs. Reber, did you talk with

her about the potential attention that this would bring her

and her husband, and did she express concern regarding

that?

A.    Yes.  Mrs. Reber did have a few questions for me as it

relates to their privacy.  She did express concern.  She

felt -- she expressed concern merely for her safety and her

family's safety.  And I advised her that, you know, her

address, their address would be redacted, however, their

names would still be listed on the list of conditions if

they -- Mr. Duggar were to be released.

Q.   Okay.  She's still concerned about that, about the
possibility that people may be contacting them or she would
have additional attention brought to her home.  Did she
still express concern after that?
A.   She did.  And she sought my advice in a sense and
asked what she should do if there were unwanted publicity
there.  And I asked her just to -- you know, I asked her to
call the police, or, you know, put up a "no trespassing"
sign of sorts if she felt that there might be publicity or
media at her residence.
Q.   In your report, you state that should the Court
determine that pretrial release is appropriate, the Rebers
could be suitable third-party custodians.  Why do you use
the word "could?"
A.   I believe that the Rebers, based on Mrs. Reber's
availability, based on Mr. Reber's job, occupation, the
fact that he's a pastor and volunteers at jail ministries,
I believe that they could be suitable third-party
custodians.
     However, the minors that come to the home causes the
probation office some concern, as well as the pistols that
won't be locked away in a safe and/or removed from the home
also causes the probation office some concern.
Q.   Do you have any concerns based on the hesitancy that
Mrs. Reber expressed to you on multiple occasions?

A.   I believe Mrs. Reber's hesitancy could come from the
lack of understanding the roles and responsibilities of
being a third-party custodian.  And of course her
expressing concern that she wasn't comfortable with
possibly being alone with Mr. Duggar for long periods of
time because of their respective genders.

Q.   Do you know if there's internet that is currently in
the household?

A.   I spoke with Mr. Reber yesterday, and he said that
there is internet at the residence, however, it is password
protected.

Q.   In preparing your report, did you interview
Mr. Duggar?

A.   I did.

Q.   I'm talking about Joshua Duggar, just to be clear.

A.   Yes, ma'am.

Q.   Okay.  In his interview, did he deny having any sort
of addictions?

A.   I asked Mr. Duggar if he currently suffered or had
suffered from any addictions.

          MR. GELFAND:  Your Honor, I'm sorry.  I would
object as to relevance.

          MS. MARSHALL:  Your Honor, it's in her report
that she prepared for the Court regarding the
appropriateness of the release of Mr. Duggar, so I believe

that it's relevant as it's stated in the report that was
provided to the Court.

    MR. GELFAND:  Your Honor, the question was about
drug, alcohol and gambling.  And I believe that the
anticipated answer is unrelated to any of those things.

    MS. MARSHALL:  My question was whether or not he
stated -- that he was asked if he had any addictions.

    THE COURT:  I will allow that question and a
simple answer to it.  You may proceed, Ms. Marshall.

    MS. MARSHALL:  Yes, Your Honor.

Q.   (by Ms. Marshall.)  Your Honor -- I mean, excuse me --
Officer Nguyen, was Mr. Duggar asked about any addictions
that he had?

A.   Yes.  I asked him if he had -- he was currently
suffering or had suffered from any addictions.

Q.   Okay.  What was his answer?

A.   He responded no.

Q.   Do you have any information contrary to that answer
that you have found in your investigation?

A.   During my investigation, I had found that Mr. Duggar
made a statement in 2015 onto the family's website
regarding his admitted addiction to viewing pornography.

Q.   Did you ask him about his -- any addictions to
pornography?

A.   I did not.

1  Q.   Okay.  What did that admission that you found on the

2  website state?

3          MR. GELFAND:  Your Honor, I would object to

4  relevance.

5          THE COURT:  Yeah, I'm going to grant that.

6  Ms. Marshall, let's move on.

7          MS. MARSHALL:  Yes, Your Honor.

8  Q.   (by Ms. Marshall.)  Officer Nguyen, in your report,

9  did you also note past sexual abuse that Mr. Duggar did

10 when he was a minor?

11 A.   Yes.

12         MR. GELFAND:  Your Honor, I'm sorry.  I would

13 object to this entire line of questioning.  This deals with

14 alleged juvenile records that, by law, were ordered to be

15 sealed.  And this relates to basically things found on

16 tabloid publications.  I don't see any relevance at all to

17 this.

18         THE COURT:  Ms. Marshall, I'd like to hear from

19 you on that.

20         MS. MARSHALL:  Yes, Your Honor.  Your Honor, I do

21 not believe that is correct.  This goes to weight, not

22 admissibility.  I do not intend to get into the abuse that

23 took place.  I intend to elicit a statement as to whether

24 or not the defendant has specifically addressed this abuse

25 in the past and his statements about the abuse.  Your

Honor, also I would note that the police reports have been
provided in discovery.

MR. GELFAND:  Your Honor, the allegations,
putting aside the merits behind any of them, involved
allegations involving what a child did as a child,
allegedly.  There's just no relevance to that under the
Bail Reform Act.

MS. MARSHALL:  Your Honor, it goes to past
history of the defendant, particularly sexual abuse history
that the defendant has engaged in.

THE COURT:  Yes.  I'm ready to rule.
Mr. Gelfand, I'm going to overrule your objection, and I
want to take a moment to tell you why.

I am concerned about the safety of the community
into which Mr. Duggar has been asked to be released.  If
this was a matter that had been handled in the juvenile
courts and had been sealed or otherwise adjudicated as
something that this Court should not consider, that would
be one thing that I would need to take into consideration.

I understand and take notice of the pretrial
report and the addendum.  And what I understand is that
Mr. Duggar and members of his family have chosen to be very
public about these alleged activities and admissions.  And
I do believe that they are not too far in time, based on
some other facts, for the Court to take them into

consideration.

So I'm going to overrule the objection.
Ms. Marshall, please proceed lightly and briefly with your
questions.

MS. MARSHALL:  Yes, Your Honor.  Thank you.

Q.   (by Ms. Marshall.)  Officer Nguyen, according to the
police reports that you have viewed, did the defendant
admit to the conduct that he was alleged to have done to
minors when he was a minor, sexual abuse conduct?

A.   That is correct.  The police report indicated that he
admitted his conduct to his parents.

Q.   Okay.  And those ages of the minors, were those minors
11, 10, 9, and 5 at the time of the incidents?

A.   That's correct.

Q.   And Mr. Duggar was approximately 14 years old at the
time, is that correct?

A.   That's correct.

Q.   Officer Nguyen, is your recommendation in this case
that Mr. Duggar be detained, that the presumption should
apply?

A.   That's correct.

MS. MARSHALL:  May I have one moment, Your Honor?

THE COURT:  You may.

(pause)

Q.   (by Ms. Marshall.)  Officer Nguyen, I just want to

confirm with you that even if you do believe that the

Rebers are appropriate third-party custodians, is it still

your recommendation that Mr. Duggar be detained given all

the information that you have compiled and put in your

report, but you do not believe that any third -- that this

third-party custodian sufficiently mitigates the risk to

the community, is that correct?

A.    That's correct.

          MS. MARSHALL:  Pass the witness, Your Honor.

          THE COURT:  Thank you, Ms. Marshall.

          Mr. Gelfand?

          MR. GELFAND:  Thank you.  May I proceed, Your

Honor?

          THE COURT:  You may proceed.

          MR. GELFAND:  Thank you.

                    CROSS EXAMINATION

BY MR. GELFAND:

Q.    Ms. Nguyen, you testified that you conducted this

brief investigation as to the detention or bail issue on

behalf of the Probation Office, or the Office of Pretrial

Services, correct?

A.    That's correct.

Q.    Okay.  And based on your investigation, you concluded

that Mr. Duggar was born and raised in this particular

judicial district, correct?

A.   That's correct.

Q.   He's always lived here with the exception of a few

years in Washington, D.C., correct?

A.   That is correct.

Q.   He has deep family roots in this district, to say the

least, correct?

A.   I believe so.

Q.   And he has work ties, employment ties, to this

district involving lawful employment, correct?

A.   It appears that way.

Q.   He's never been convicted of any sort of crime,

correct?

A.   That's correct.

Q.   He's married to Anna, and the two of them have six,

soon to be seven children, correct?

A.   Yes.

Q.   Okay.  Now, you testified that you were provided the

name of a possible third-party custodian option, Mr. and

Mrs. Reber, correct?

A.   That's correct.

Q.   Okay.  And based on your investigation, you testified

briefly about some of this.  LaCount Reber, you testified

is a federal employee full-time at the VA, correct?

A.   Yes.

Q.   And that he also is a pastor and volunteers with jail

ministries, correct?

A.   That is what Mrs. Reber told me, yes.

Q.   And you had an opportunity to speak with both LaCount

Reber and Maria Reber, correct?

A.   Yes.

Q.   Okay.  And you concluded that Maria Reber is a

full-time homemaker.  In other words, she doesn't have any

sort of formal employment outside of the home, correct?

A.   Yes.

Q.   Okay.  The two of them, based on your investigation,

have no criminal history, correct?

A.   That's correct.

Q.   And no minors reside in this particular home, correct?

A.   That's correct.

Q.   They affirmed to you, did they not, that they would do

whatever they need to do to assist in being Mr. Duggar's

third-party custodian in this case, correct?

A.   Yes.

Q.   Okay.  In other words, notwithstanding what the

prosecutor characterized as some, quote, unquote,

"hesitations," when push comes to shove, they said they

would do whatever is necessary.  They want to serve in this

role, correct?

A.   That is correct.

Q.   And fair to say, based on your investigation, that

these two individuals are, for lack of a better way of
putting it, just stand-up, law-abiding people?

A.    That's what it appears, yes, sir.

Q.    Okay.  And because of that, you concluded that the
Rebers could be suitable third-party custodians, and that
their home provides a suitable residence for Mr. Duggar,
correct?

A.    We believe so.

Q.    Okay.  And that's the determination of the United
States Probation Office or Pretrial Services Office in this
district, correct?

A.    Yes.

Q.    Okay.  In other words, you work with others in your
office as well to make these determinations, correct?

A.    That's correct.

Q.    Okay.  Now, if I understood your testimony correctly,
Officer, it sounds like there were basically two potential
hangups; piano lessons and firearms.  Is that fair to say?

A.    We took those into account, as well as other factors
as well, yes.

Q.    Okay.  Let me ask you point-blank.  If the firearms
were removed from the house and the piano lessons didn't
occur at the house, would that immediately eliminate any of
those concerns?

A.    Quite possibly.

Q.   And you say "quite possibly," meaning if children were

not going to come into the house, even in this limited

capacity for piano lessons, and if there were no firearms

in the house, not withstanding the locks and things like

that --

A.   Sure.

Q.   -- you wouldn't have concerns about children entering

the home or firearms, correct?

A.   Yes.

Q.   Okay.  Now, in your brief investigation -- and I

understand you didn't investigate the case.  I'm not going

to ask you about the underlying allegations.  But you're

aware, at least broadly speaking, that Mr. Duggar has known

about this investigation for well over a year, correct?

A.   I believe so, yes.

Q.   And based on your investigation, in those 17 months,

he hasn't left the country, correct?

A.   I believe that's correct.

Q.   Okay.  He's resided here in this judicial district,

correct?

A.   Yes.

Q.   And in that whole time frame, he hasn't even been

accused by anyone of breaking a single law in those 17

months, correct?

A.   Not that I'm aware of.

1  Q.   And that's something that you would be aware of with

2  your access to law enforcement databases, correct?  That's

3  something you looked for in conducting your investigation,

4  correct?

5  A.   Yes.

6  Q.   Okay.  Would you agree with me that self-surrendering

7  to law enforcement is an indication that a defendant will

8  comply with court orders?

9  A.   I believe so.

10  Q.   Now, you testified briefly about allegations that

11  Ms. Marshall asked you about arising out of 2002, is that

12  correct?

13  A.   That's correct.

14  Q.   And just to be clear so we're on the same page, the

15  allegations, whether true or untrue, were from 19 years

16  ago, correct?

17  A.   Yes.

18  Q.   And the allegations involved conduct where Mr. Duggar

19  and the other individuals involved were all children,

20  correct?

21  A.   They were minors, yes.

22  Q.   Okay.  Now, Ms. Nguyen, I understand that your

23  recommendation in this case is detention as opposed to

24  release, correct?

25  A.   That's correct.

Q.   However, if in fact this Court concludes that release
is appropriate, and if in fact the issues involving
firearms and the piano lessons were resolved, are you
comfortable that the Rebers would be a suitable home and a
suitable third-party custodian option for Mr. Duggar?
A.   The probation office would reconsider allowing
Mr. Duggar to reside with them as third-party custodian,
yes.
Q.   And when you say you would reconsider, meaning that
the concerns that you have identified, the totality of them
in your report, would basically disappear if you take those
two things off the table, correct?
A.   We would reconsider based on those two things being
removed, but still have to take into account some of the
other factors in this case.
Q.   Okay.  Do the Rebers appear to you to be responsible
people?
A.   Yes.
Q.   Do they appear to you to be the kinds of people that
would follow a Court's orders to the best of their
abilities?
A.   Based on my brief conversations with them, it appears
that they are stand-up citizens and would uphold their --
the roles and responsibilities.
Q.   Thank you.

1      MR. GELFAND:  I have no further questions, Your

2  Honor.

3      THE COURT:  Thank you, sir.

4      Ms. Marshall, any follow-up?

5      MS. MARSHALL:  Yes, just briefly, Your Honor.

6                    REDIRECT EXAMINATION

7  BY MS. MARSHALL:

8  Q.   Officer Nguyen, Mr. Gelfand stated that the past

9  conduct of Mr. Duggar, it occurred approximately, I think

10 you said 19 years ago, is that correct, somewhere in that

11 range?

12 A.   Yeah.  Yeah, I think so.  I can't math that quickly.

13 Q.   That conduct involves the sexual abuse of minors, is

14 that correct?

15 A.   That's correct.

16 Q.   Okay.  Even though it was sometime ago, it was the

17 sexual abuse of minors?

18 A.   That's correct.

19 Q.   Okay.  Officer Nguyen, have you been to the Rebers'

20 home?

21 A.   I have not.

22 Q.   How many times were you able to speak with Mr. Reber?

23 A.   Once.

24 Q.   Okay.  Is that because Mr. Reber was at work whenever

25 you spoke to Mrs. Reber?

A.   Yes, that's correct.

Q.   In talking to Mrs. Reber, would she ever want to consult with Mr. Reber or seem hesitant to give you an answer when you asked her any questions?

A.   She did a few times, yes.

Q.   A few times, is that what you said?

A.   Yes.

Q.   Okay.  Is that why you put in your report that you said that, "Maria seemed hesitant."  Those were your words, is that correct?

A.   That's correct.

Q.   Mr. Gelfand asked you that, if the two concerns that you stated regarding the firearms and the children in the home were remedied, would you then -- your concerns be gone as to whether or not release was appropriate.  And you stated that there were other factors that you would still have to consider, is that correct?

A.   Yes.

Q.   Would those other factors be the prior sexual abuse that Mr. Duggar engaged in?

A.   Yes.

Q.   Would those factors be the nature of the offense?

A.   That's correct.

Q.   The offense, one of the offenses in this case is the receipt of child pornography, is that correct?

A.   That's correct.

Q.   The other one is the possession of child pornography with minors under the age of 12?

A.   That's correct.

Q.   Okay.  And because that offense, the receipt of child pornography, involves minors, it is a presumption case, that he presumably should be detained, is that correct?

MR. GELFAND:  Your Honor, I would object.  I'm sorry.  I would object that that misstates the law, but the Court is aware of the law governing this.

THE COURT:  Well, I appreciate -- I appreciate all the help from all the counsel about the law.  Let's move on, Ms. Marshall.

Q.   (by Ms. Marshall.)  Would the probation office also take into account the conduct of Mr. Duggar in his law violations, including the lengths that he went to to try to cover up his illegal conduct?

A.   Yes, that would be part of the nature of the offense that we would take into consideration.

Q.   Because this case involves child pornography, would also the prior pornography addiction be a factor and a concern that you would take into account when determining whether you believed that release was appropriate in this case?

A.   Yes, that's correct.

Q.   Given all of those things, do you still believe that there is a danger that he presents to the community should he be released?

MR. GELFAND:  Your Honor, I would object.  This is obviously a question for the Court to answer; not the probation officer.

THE COURT:  Ms. Marshall, I agree that that's what I've got to decide today, so it's not her place to do that.

MS. MARSHALL:  Yes, Your Honor.  I apologize.  I should have stated it a different way.

THE COURT:  You may restate it.  Go ahead.

MS. MARSHALL:  Yes, Your Honor.

Q.   (by Ms. Marshall.)  Is it your recommendation to the Court that Mr. Duggar be detained pending adjudication of his case?

A.   Yes, it is.

MS. MARSHALL:  No further questions, Your Honor.

THE COURT:  All right.  Mr. Gelfand, I want to give you a chance to re-inquire if you want to, but the Court needs to take a short recess.  Do you have any additional questions for this witness, Mr. Gelfand?

MR. GELFAND:  Just very briefly, Your Honor, but I would defer to the Court as far as scheduling.

THE COURT:  Okay.  Well, we need to take about a

1  five-minute break.  The Court will be in recess.

2          (recess taken)

3                  RECROSS EXAMINATION

4  BY MR. GELFAND:

5  Q.   As a pretrial services or probation officer, you're

6  familiar with the number of conditions that a Court could

7  impose in the event that a Court released someone while the

8  case is pending, correct?

9  A.   Yes.

10  Q.   And you're aware that a Court could, theoretically, if

11  it was appropriate in any given case, impose conditions

12  involving access to internet or use of computer devices,

13  correct?

14  A.   Yes.

15  Q.   That happens not infrequently in cases involving

16  allegations of computer misconduct, correct?

17  A.   That's correct.

18  Q.   The Court could impose certain restrictions of where

19  somebody can go at any given time or within certain

20  parameters, correct?

21  A.   That's correct.

22  Q.   In other words, it's not an all-or-nothing

23  proposition.  A Court can fashion conditions of release

24  unique to the particular case, correct?

25  A.   That's correct.

Q.   And your office assists the Court in making sure that
those conditions are complied with, correct?
A.   That is correct.
Q.   So in other words, in this context of a third-party
custodian, your office is still involved in supervising the
defendant while the case is pending, correct?
A.   That's correct.
Q.   Okay.  And your office is not only available, but
independently acts regardless of what the third-party
custodian wants, correct?
A.   I'm sorry.  Could you please repeat that?
Q.   Sure.  Regardless of whether a third-party custodian
were to even participate in a case or ask or reach out to
you for anything, your office independently supervises the
defendant, correct?
A.   Yes.
Q.   In other words, you'll meet with the defendant, you'll
talk with the defendant, you'll make sure that the
defendant is complying with whatever orders the Court sets,
correct?
A.   That's correct.
Q.   And if in fact a defendant were to violate any orders
or that you believed the defendant violated any conditions
of release, you have mechanisms to bring that to the
attention of the Court and the Court could at any point

1 revoke release, correct?

2 A.   That's correct.

3 Q.   In this particular instance, Ms. Marshall asked you

4 about a whole number of things that your office would

5 reconsider as far as different factors, correct?

6 A.   That's correct.

7 Q.   And to be clear, those are the factors you're

8 considering at the outset in this case as well, correct?

9 A.   I'm sorry.  What was that?

10 Q.   Sure.  Those factors are not new factors to

11 reconsider; they are factors that you've already taken into

12 consideration, correct?

13 A.   That's correct.

14 Q.   Okay.  Thank you.

15        MR. GELFAND:  I have no further questions.

16        THE COURT:  Thank you, Mr. Gelfand.

17        Ms. Marshall, any follow-up?

18        MS. MARSHALL:  One question, Your Honor.

19        THE COURT:  Please proceed.

20                    REDIRECT EXAMINATION

21 BY MS. MARSHALL:

22 Q.   Officer Nguyen, is it correct that the probation

23 office is not housed with the defendant once they are

24 released from custody?

25 A.   That's correct.

Q.   It's the third-party custodian that is with the
defendant, supposed to be with the defendant at all times,
continuously monitoring the defendant?

A.   Yes, that's correct.

          MS. MARSHALL:  That's all I have, Your Honor.

          THE COURT:  Anything further, Mr. Gelfand?

          MR. GELFAND:  No, Your Honor.  Thank you.

          THE COURT:  May Officer Nguyen be released?

          MS. MARSHALL:  Yes, Your Honor.

          MR. GELFAND:  Yes, Your Honor.

          THE COURT:  May Officer Nguyen also be released
from invocation of the Rule?

          MS. MARSHALL:  Yes, Your Honor.

          MR. GELFAND:  Yes, Your Honor.

          THE COURT:  Thank you for that.

          Mr. Roberts or Ms. Marshall, do you have any
other witnesses to call?

          MS. MARSHALL:  No, Your Honor.

          THE COURT:  Mr. Gelfand, do you have any
witnesses that you intend to call?

          MR. GELFAND:  We do, Your Honor.  And if I may,
I'm going to turn it over to Mr. Story, who is going to
call our first witness, Your Honor.

          THE COURT:  That's perfectly fine.

          Welcome, Mr. Story.

1          MR. STORY:  Thank you, Your Honor.  Right now,
2    the defense would call Maria Reber, please.
3          THE COURT:  Maria Reber.
4          MR. STORY:  And if you will give me a second, she
5    is actually outside the conference room in the hallway, so
6    I'm going to have to get her and bring her in.  So one
7    moment.
8          THE COURT:  Very good.
9          (pause)
10         MR. STORY:  Your Honor, I have Mrs. Reber here
11   with me, if I can proceed.
12         THE COURT:  Just one minute, Mr. Story.
13         Ms. Reber, can you hear us?
14         THE WITNESS:  Yes.
15         THE COURT:  All right.  There may be a short
16   delay, so we'll go slow.  If you can't hear us at any time,
17   let Mr. Story know, okay?
18         THE WITNESS:  Yes.
19         THE COURT:  Please raise your right hand to be
20   sworn.
21         MR. STORY:  Your Honor, we can't hear Roxana.
22   Sorry.
23         COURTROOM DEPUTY GUERRERO:  I apologize for that.
24   Thank you.
25         (Witness sworn)

1        THE COURT:  All right.  Thank you, Ms. Reber.

2        Mr. Story, you may proceed.

3        MR. STORY:  Thank you, Your Honor.

4        MARIA REBER, having been first duly sworn,

5   testified as follows:

6                    DIRECT EXAMINATION

7   BY MR. STORY:

8   Q.   Could you state your name for the Court, please?

9   A.   Maria Reber.

10  Q.   And are you married?

11  A.   Yes.

12  Q.   And what is your husband's name?

13  A.   LaCount Reber.

14  Q.   And were you interviewed by pretrial services in this

15  case to be the third-party custodian for Joshua Duggar?

16  A.   Yes.

17  Q.   And did you talk with pretrial services and answer all

18  their questions?

19  A.   Yes.

20  Q.   And all the questions that you answered were true and

21  fully honest to the best of your knowledge, weren't they?

22  A.   Yes.

23  Q.   Okay.  Have you been aware of the charges brought

24  against Mr. Duggar?

25  A.   Some.

Q.   You know that he's been charged with a count of
receipt of child pornography and a count of possession of
child pornography?
A.   Yes.
Q.   Okay.  Have you, even knowing that, knowing those
charges, have you agreed, or would you agree to serve as
the third-party custodian for Mr. Duggar if the Court were
so inclined to order that?
A.   Yes.
Q.   And just a couple of background questions.  Do you
have any criminal history?
A.   No.
Q.   And do you have a place where Mr. Duggar could live
inside your home?
A.   Yes.
Q.   And it's true that you live here in Washington County,
or the Western District of Arkansas?
A.   Yes.
Q.   When you say you have a place for him to live, is it
like a bedroom that it's its own bedroom, or what is it?
A.   Well, we have a four-bedroom, three-bath home, but the
back room, we -- when we built the house, kind of something
like a future mother-in-law suite would be.  There's a
separate bathroom there and we have a sofa bed there.
Q.   So it's a self-contained place that he could stay?

1  A.    Yes.

2  Q.    Okay.  And would it be your understanding and

3  willingness that you would be, along with your husband,

4  part of the Court monitoring system?  In other words, you

5  would help monitor, enforce, any kind of conditions that

6  the Court might set on Mr. Duggar?

7  A.    Yes.

8  Q.    And you understand that it would be your job if one of

9  those conditions were not to be -- not to be upheld, to be

10  broken, in other words, you would then report that to the

11  Court?

12  A.    Yes.

13  Q.    And you're willing to do that?

14  A.    Yes.

15  Q.    One of the questions that I think has come up is, you

16  have an adult daughter who still lives at your house, is

17  that correct?

18  A.    Yes.

19  Q.    Does she sometimes teach piano lessons at your house?

20  A.    Yes.

21  Q.    Is there maybe a couple of students who are minors

22  that currently come over to your house for piano lessons

23  with your daughter?

24  A.    Yes.

25  Q.    If the Court were to order that no minors be at the

house, would it be possible to move the location where she

taught those particular students their piano lessons?

A.    Yes.

Q.    So they wouldn't necessarily have to come over to the

house any further if the Court were to award, or if the

Court were to have ya'll be the third-party custodians?

A.    Yes.  We -- yes.

Q.    You could find another place for them to go?

A.    We have a friend down the road, yeah.

Q.    Okay.  And they have a piano where she could --

A.    Yes.

Q.    -- teach piano lessons and things like that?

A.    Yes.

Q.    One of the other issues is, you and your husband have

firearms in the house, is that correct?

A.    Yes.

Q.    And those firearms, do you have a gun safe?

A.    We -- no.

Q.    No gun safe.  If the Court were to make one of the

conditions that Mr. Duggar not be around or have access to

any firearms, would you and your husband be willing to

remove the firearms from your house?

A.    Yes.

Q.    And do you have a -- let's say an alternate location

for storage of those firearms?

1  A.   Yes, we do.

2  Q.   Okay.  Do you have a current occupation?

3  A.   I'm a full-time homemaker.

4  Q.   So you're at home pretty much all the time?

5  A.   Yes.

6  Q.   What does your husband do?

7  A.   He works at the VA.  He's an MRI tech.

8  Q.   Okay.  And what are his hours?

9  A.   He leaves at 6:30 and gets home at 4:00.

10 Q.   Gets home at 4:00.  Okay.  So that means you would be

11 home with Mr. Duggar potentially for a good part of the day

12 by yourself?

13 A.   With my daughter.

14 Q.   With your daughter?

15 A.   Yes.

16 Q.   But your daughter may come and go and do other things,

17 would that be correct?

18 A.   Yes.

19 Q.   So would you still be willing to serve as a

20 third-party custodian, even knowing that your daughter may

21 be gone and you may be at home with Mr. Duggar by yourself

22 for a good part of the day?

23 A.   Yes.

24 Q.   That's okay with you?

25 A.   I'm okay with that.

Q.   You're okay with that.  Okay.  And one of the other

things that I guess has kind of come up is the fact that

your husband serves as the pastor and does jail ministry.

Does that take him out of the home?

A.   Well, with COVID, it -- they pretty much cut that out

last year.

Q.   It's less, for sure?

A.   It's less, yes, yes.  But that's his heart, is

ministering.

Q.   And why would you want to serve as the third-party

custodian for Mr. Duggar?

A.   We want to be of help to the family, and minister to

them.

Q.   And you're willing to take on this responsibility to

help them out, aren't you?

A.   Yes, with God's help.

Q.   That's admirable.  The Court can impose conditions on

Mr. Duggar's release, do you understand that?

A.   Not fully, but, yeah.

Q.   You understand the Court can come up with the rules

that, if Mr. Duggar is let out, he has to follow?

A.   Oh, yes.

Q.   And are you willing to serve as a third-party

custodian regardless of whatever rules or conditions the

Court imposes on Mr. Duggar, if they find that appropriate?

A.    Yes.

Q.    Okay.

        MR. STORY:  Your Honor, I don't have any further questions of the witness, so I'll pass it at this time.

        THE COURT:  Thank you, Mr. Story.  Who will inquire for the government?

        MS. MARSHALL:  I will, Your Honor.

        THE COURT:  Please proceed, Ms. Marshall.

        MS. MARSHALL:  Thank you, Your Honor.

                        CROSS EXAMINATION

BY MS. MARSHALL:

Q.    Mrs. Reber, my name is Carly Marshall.  I'm going to ask you a couple of questions.  Can you hear me okay?  Okay.

      Mrs. Reber, I don't want to talk about exactly where you live, but it's my understanding that you live on some land, is that correct?

A.    Yes.

Q.    Do you have neighbors still, though?

        THE COURT:  Excuse me, Ms. Marshall.  Ms. Reber, we're having a hard time hearing you at the court.  Could you get a little bit closer to Mr. Story's computer, speak up a little?

        THE WITNESS:  Yes.

        THE COURT:  That's better.  Thank you.

1          Proceed, Ms. Marshall.  I'm sorry for the
2    interruption.
3          MS. MARSHALL:  Thank you, Your Honor.
4    Q.  (by Ms. Marshall.)  Do you have neighbors?
5    A.   We have neighbors, yes.
6    Q.   You do.  Approximately how many neighbors do you have?
7    A.   Well, we live in an outward property, so they are kind
8    of far.  But in that particular area, there's about nine
9    residences in there.  But like I said, we all have -- it
10   ranges from five to 10 acres.
11   Q.   Okay.  Any families that live in proximity to you with
12   children?
13   A.   You mean the closest ones?
14   Q.   You said that there are approximately nine residences,
15   is that correct?
16   A.   Yes.
17   Q.   Do any of those nine residences that are in proximity
18   to you, do children live on those residences, in those
19   residences?
20   A.   I believe so, yes.
21   Q.   Approximately how many?
22   A.   I don't have an idea.
23   Q.   How long have you known Joshua Duggar?
24   A.   We've known them through the family, the Duggar
25   family.  I would say maybe about five, six years.

1  Q.    Do you know Joshua Duggar directly, or do you just
2  know his family?
3  A.    I know his family.  And from time to time, I would
4  interact with him.
5  Q.    Okay.  Where would you interact with him?
6  A.    See, we've been at the Duggar home, Michelle and Jim
7  Bob's place.  And we've been to a couple of weddings, and
8  we've seen them there.
9  Q.    Have you ever had a one-on-one conversation with Josh
10  Duggar?
11  A.    No, but I have said hello to him and he's said hello
12  to me.
13  Q.    Have you ever been alone with Josh Duggar before?
14  A.    No.
15  Q.    How long again have you stated that you have known the
16  Duggar family?
17  A.    For five or six years.
18  Q.    How did you first meet them?
19  A.    We met them through church.
20  Q.    Did you all attend church together?
21  A.    Yes.
22  Q.    Okay.  Did you attend church together with them in
23  2015?
24  A.    Yes.
25  Q.    Okay.  Were you attending church with the Duggar

family when the allegations against Joshua Duggar regarding

his conduct when he was a minor, when it came to public

light, the sexual abuse allegations?

A.    Yes, but I'm not really -- I wasn't fully aware of all

that.

Q.    Okay.  Are you now fully aware of that?

A.    Yes.

Q.    Okay.  Can you tell me what you know about that?

A.    Yes.  Can I get a minute?

Q.    Take your time.

         MR. STORY:  Your Honor, I'm going to object.

She's asking about the knowledge of a witness five years

ago that doesn't have any relevance into her being able to

serve as a third-party custodian at this point.

         THE COURT:  I'm going to overrule that objection.

Ms. Marshall is not going to stay long on this line of

inquiry, I assure you, but I need to understand if

Ms. Reber has taken that into consideration, this big

decision she's making.

         Ms. Reber, can you answer the question?

A.    Can you repeat the question, please?

Q.    (by Ms. Marshall.)  Yes.  Can you tell me what you

currently know about the conduct that occurred when Joshua

Duggar -- the sexual conduct that occurred when Joshua

Duggar was a minor against approximately five other minor

1  victims?

2  A.    I don't fully know everything, but from my

3  understanding, there was some, when he was younger, I'm not

4  sure how old, maybe a teenager, that there was

5  inappropriate touching with some of the minors.

6  Q.    Is that something hard for you to think about and to

7  grasp and understand?

8  A.    Yes.

9  Q.    Okay.  Are you aware that one of the minors was

10 approximately five years of age?

11 A.    No, I was not aware of that.

12 Q.    Does anything about that change your opinion and your

13 willingness to have Mr. Duggar in your home and you be his

14 third-party custodian?

15 A.    I'm looking at it as, we are here to be of help to the

16 family, to Josh and Anna.  And we want to minister to them

17 as best as we can.

18 Q.    When you stated "minister to them" earlier, what do

19 you mean by that?

20 A.    To be of help in whatever that may be.

21 Q.    Who asked you to be the proposed third-party

22 custodian?

23 A.    Jim Bob Duggar had called my husband, LaCount Reber,

24 and asked him to be the custodian.

25 Q.    Okay.  I'm sorry.  I'm leaning up because I'm having a

hard time hearing you again, so thank you.  I'm going to
lean up too, but --
A.   Jim Bob Duggar has called my husband, I believe it was
that Saturday, to be a custodial, to be a -- if we can be a
custodial to Josh Duggar.
Q.   Did he state why he was asking you all to do that?
A.   Well, I think because we're -- my husband and Jim Bob
are good friends.  And at such a time as this, we are here
to be of help to the family.
Q.   Do you feel any loyalty or pressure because Jim Bob
Duggar asked you to do this?
A.   My husband -- my husband has made the decision, and
I'm here to support that decision.
Q.   So this was your husband's decision to do this?
A.   Well, together.  Together.  But at same time, I'm here
-- we are here to, again, be of help to this family.
Q.   Did you have some hesitation in your willingness to
want to do this?
A.   Of course, because we have never really done this
before.  I had some questions.  You know, different things
kind of went in my mind.  But at the same time, my
husband -- my husband is -- my husband has a passion and
love for ministering to people, and so am I.  And as a
family, we have always done ministry to others.  Maybe not
in this capacity, but, you know, as we -- as we go through

life, you just never know what God will put before you.
And this is such a time as this.
Q.   Mrs. Reber, I believe that you testified that
Mr. Reber works outside of the home, is that correct?
A.   Yes.
Q.   Okay.  And so you're going to be in the home with
Joshua Duggar, it sounds like for -- that will become your
new full-time job in essence, is that correct?
A.   Yes.
Q.   Okay.  You stated that this was Mr. Reber's -- he
wanted to do this, is that correct?
A.   Yes.  We both talked about it.  We both prayed about
it.  And if this is what God would have for us to minister
to this family, then by God's grace and by God's strength,
we will be able to help this family.
Q.   If something happened when Mr. Reber was at work, any
sort of violation or potential violation of Mr. Duggar's
release conditions, would you want to talk about this with
Mr. Reber first and get his okay before you notified the
Court or the probation office?
A.   No.  I'm an adult.  If there are those provisions and
conditions, I can make the decision.  My husband, at times
I cannot get ahold of him, but he trusts me.  And like I
said, I'm -- I can make those judgments as well.  I've
raised two children.  And they're full adult.  And one is

1  married, happily married.  And one is at home still.  And

2  she just graduated from bible college and she is -- and

3  we're very thankful that she is continuing to live with us.

4  Q.    Yes, ma'am.  Yes, ma'am.  So you have another child.

5  I don't want to pry, but are you a grandmother yet, then?

6  A.    No, not yet.

7  Q.    Okay.

8  A.    My daughter --

9  Q.    Are there any minor -- I'm sorry.  Go ahead.

10  A.    My daughter, who is living with us, is 22 years old.

11  Q.    Okay.  And then you said you had another child.  How

12  old is that other child?

13  A.    He is 24.

14  Q.    Okay.  Is he married?

15  A.    Yes, he is.

16  Q.    Okay.  But no children yet?

17  A.    Not yet.

18  Q.    Okay.  Are there any other minors that come to your

19  home besides the minors that currently partake in the piano

20  lessons?

21  A.    No.

22  Q.    I want to talk a little bit about the charges that

23  Mr. Duggar has been charged with and is facing.  You stated

24  that you knew a little bit about the charges.  Are you

25  aware that he has been charged with the receipt of child

1  pornography?

2  A.    Yes.

3  Q.    Okay.  Are you aware that some of this pornography

4  includes the sexual abuse of minors as young as toddlers?

5  A.    Yes.

6  Q.    You are aware of that?

7  A.    Yes.

8  Q.    Okay.  Your daughter, you say your daughter still

9  lives in the home?

10  A.    Yeah.

11  Q.    Okay.  How do you feel about your daughter being alone

12  in the home with Mr. Duggar should that come to pass?

13  A.    We're always together, for the most part.  I don't --

14  I don't think that, especially at this time, that that's

15  going to happen.

16  Q.    So you wouldn't leave her alone?

17  A.    We will be together.

18  Q.    Okay.  Is that because you have some sort of concern?

19        MR. STORY:  Your Honor, I'm going to object at

20  this point.  They are here trying to figure out if Mr. and

21  Mrs. Reber are the appropriate custodians.  I don't know

22  that this is a relevant line of questioning as far as

23  taking into account what her feelings are, her daughter

24  would think about this.  It's just too far removed.  And

25  ultimately, we're trying to decide if they are adequate

third-party custodians, and I don't think that this line of
questioning is relevant.

THE COURT:  Ms. Marshall, do you want to be heard
on that?

MS. MARSHALL:  Yes, Your Honor.  Your Honor, she
stated that her daughter lives in the home.  If Mr. Duggar
is released to their home, he would be living in their home
with them.  And I want to make sure that Mrs. Reber has
fully considered all of the circumstances that could arise
when Mr. Duggar is living in their home and that she is
still on board, having considered those circumstances, with
being a proposed third-party custodian.

THE COURT:  Okay.  The objection will be
overruled.  Ms. Marshall, ask that question, and let's see
what Ms. Reber says.

MS. MARSHALL:  Yes, Your Honor.  Thank you.

COURTROOM DEPUTY GUERRERO:  Your Honor, I'm sorry
to interrupt.  I just want to remind everybody that we are
making a recording of this, so please speak up so we can
get a clear recording of the audio.  Thank you.

A.    Yes.  Could you repeat that question again, please?

Q.    (by Ms. Marshall.)  Yes.  I'm probably going to have
to ask it a little different because I don't remember
exactly how I asked you.

Would you be hesitant in leaving your daughter alone

with Mr. Duggar should he come to stay with you and you be

his proposed third-party custodian?

A.    I am a mother.  And I think of everything, every

situation, whether they were a baby, and all the way up to

being 22 years old.  And if you're asking me that if I'm

going to be comfortable leaving my daughter at home while

Mr. Duggar is there, I would rather not.  If at all

possible, I would like to be there.  And if my daughter

needs to go and be outside the home, that's fine.  And I

can be at home and he can be -- and Josh Duggar could be

where he's supposed to be, and I'm fine with that.

Q.    Okay.  And I think you stated this earlier, but am I

correct to say that you would not be leaving your daughter

alone with him?

A.    At this time, while he's staying in our home.

Q.    While he's in your home, you would not leave him alone

with her?

A.    Yes.  We are always together.  Me and my daughter, for

the most part, we do a lot of things together.  We go to

church together.  Of course, she spends time with her

friends and she teaches piano.  And we're very well aware

of most of her activities.  And during this time, yes, I

will be home.  While she's home, I will be home.  But if

she has to go somewhere, I am fine staying at home while

Josh Duggar is in the other room.  And I am fine with that.

Q.   Can you tell me about the internet that you have at
your home?  Do you have internet at your home?
A.   Not cable.  We don't have -- we don't have -- I don't
know what you call that -- we don't have like an
internet-internet.  Our internet is only in our phone.
Basically, it's like a hot-spot.  We can turn it on and
off.
Q.   Okay.
A.   There's no wiring, you know, like wi-fi.  There's no
wi-fi that is put in there.  Our wi-fi is in our phone.  So
if we have to do e-mails, I turn on my hot-spot wi-fi, and
then when I'm done, I turn it off.  And the same thing for
my daughter, and the same thing for my husband.  We all
have our different hot-spot, and we turn it off when we're
done with it.  There's no hard-wire cable.  We don't have
cable.  We don't really watch -- well, we have a T.V., but
there's no cable.
Q.   Okay.  Is your phone password protected?  I think you
said yes, but it cut out.
A.   They are all password protected, all our laptops and
phones.
Q.   I believe that the bedroom that Mr. Duggar would be
staying in, does that bedroom have an exterior door, a door
that goes outside?
A.   Yes.  It's a side door.  We have three doors; a side

door, the front door, and the back porch.

Q.   Okay.  And so where would the door that goes outside
where Mr. Duggar would be staying, where does that go?

A.   That door, it just goes out into the carport.  We
have -- basically, he could go in and out there.  That
would be his private door, I guess, where he would go out.

Q.   Is that a door that you unlock from the inside, you
turn the knob and you can go out?

A.   Yeah, yeah.  It's one of those, yes.

Q.   Okay.

A.   It's basically our sunroom area, mudroom/sunroom, but
it happens to be our guest room with a bathroom, with a
separate bathroom.

Q.   Okay.  And just one more question.  I want to make
sure that you understand that if Mr. Duggar is released to
your home, you understand that he could be there for
possibly six months or so until this matter is resolved?

A.   Yes, I understand.

Q.   Okay.

        MS. MARSHALL:  No further questions at this time,
Your Honor.

        THE COURT:  Anything additional, Mr. Story?

        MR. STORY:  Just a couple of quick questions,
Your Honor.

        THE COURT:  Please proceed.

REDIRECT EXAMINATION

BY MR. STORY:

Q.   Ms. Marshall asked you if you would need to call your husband if one of the conditions was broken.  Are you able to be able to follow the order of the Court without calling your husband?

A.   Yes.

Q.   And your daughter, she's 22, is that correct?

A.   Yes.

Q.   So she's an adult?

A.   Yes.

Q.   So if she wants to leave or feels endangered or anything else, she can get up and leave the house, correct?

A.   Yes.

Q.   Okay.

          MR. STORY:  No further questions, Your Honor.

          THE COURT:  Ms. Marshall, anything additional?

          MS. MARSHALL:  No, Your Honor.

          THE COURT:  Ms. Reber, I do have some questions of you.  Can you hear me?

          THE WITNESS:  Yes.

          THE COURT:  All right.  I appreciate that you want to help the family, and I appreciate that you're good friends with Mr. Duggar's parents.

          THE WITNESS:  Yes.

1         THE COURT: But I need an assurance from you if

2 I'm to consider you as part of Mr. Duggar's release. And

3 that's this:

4         I need for you to assure the Court that if there

5 is a violation, that your first call will be to the U.S.

6 Probation Officer who is supervising this case. Can you

7 tell me that?

8         THE WITNESS: Yes.

9         THE COURT: Not to your husband; not to Jim Bob

10 Duggar; not to elders in the church. Is that what you're

11 telling me?

12         THE WITNESS: Yes.

13         THE COURT: All right. And have you talked to

14 your daughter about relocating her piano lessons?

15         THE WITNESS: Yes.

16         THE COURT: Is she agreeable?

17         THE WITNESS: Yes.

18         THE COURT: The last question I have, and I may

19 need to ask your husband this as well, it is not the

20 Court's intention to interfere with your Second Amendment

21 rights. However, this case has already garnered a lot of

22 publicity, and the last thing that Mr. Duggar needs is for

23 there to be an incident at your home with a firearm.

24         Can you assure this Court that if Mr. Duggar

25 comes to live with you, that you will remove the firearms

from your home?

THE WITNESS:  Yes, we will remove the firearms from our home.

THE COURT:  Do you feel confident that you can speak for your husband, or do I need to ask him that myself?

THE WITNESS:  You can both ask us, but I feel confident that he would say the same thing.

THE COURT:  All right.  Thank you, Ms. Reber.  I appreciate that.

Mr. Story, any questions as a result of mine?

MR. STORY:  No, Your Honor.

THE COURT:  Ms. Marshall?

MS. MARSHALL:  No, Your Honor.

THE COURT:  All right.  Do any of the lawyers wish to hear from Mr. Reber at this time?

MR. STORY:  Your Honor, we would go ahead and call Mr. Reber, if that pleases the Court.

THE COURT:  It does.

MR. STORY:  Okay.  One moment, let me get him.

THE COURT:  Thank you, Mr. Story.

(pause)

MR. STORY:  Your Honor, Mr. Reber is here now.

THE COURT:  Mr. Reber, can you hear me?

THE WITNESS:  Yes, ma'am.

MR. STORY:  Talk up real loud and she's going to swear you in here in just a second.

THE WITNESS:  Yes, I can hear you.

THE COURT:  Yeah, please speak up so we can make sure and hear you.  Would you raise your right hand to be sworn.

(Witness Sworn)

THE COURT:  You may proceed, Mr. Story.

MR. STORY:  Thank you, Your Honor.

LACOUNT REBER, having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. STORY:

Q.   Mr. Reber, could you just state your name for the Court?

A.   LaCount Reber.

Q.   And Mr. Reber, do you currently have firearms inside your house?

A.   I do.

Q.   If the Court were to make a condition of Mr. Duggar's release that he couldn't be in a place that had firearms, would you be willing to relocate your firearms outside of the house?

A.   Yes, I'd be willing to do that.

Q.   Are you willing to serve, along with your wife, as the

third-party custodian for Mr. Duggar?

A.   Yes.

     MR. STORY:  Your Honor, I would have no further
questions at this time and pass the witness.

     THE COURT:  Ms. Marshall, are you going to
inquire?

     MR. ROBERTS:  Your Honor, if I may, I will for
the government.

     THE COURT:  Mr. Roberts, you may proceed.

     MR. ROBERTS:  Thank you.

                    CROSS EXAMINATION

BY MR. ROBERTS:

Q.   Mr. Reber, prior to today and prior to testifying,
were you aware of the charges that Mr. Duggar is facing?

A.   Yes, sir.

Q.   Okay.  Based on your knowledge coming into this
hearing, were you aware that he is charged specifically
with receipt and possession of child pornography?

A.   Yes, sir.

Q.   Are you aware that he is specifically charged, and the
evidence reflects, that images were downloaded on a
computer that he owned depicting minors being sexually
abused, and those minors were as young as toddlers?

A.   I wasn't aware of all the details, but --

Q.   Now that you are, does that change your opinion with

1  regard to being a third-party custodian?

2  A.    No, sir.

3  Q.    Prior to coming here today, who -- or better

4  question -- who initially reached out to you concerning the

5  possibility of you acting, your family acting, as a

6  third-party custodian?

7  A.    Mr. Duggar.

8  Q.    Okay.  By Mr. Duggar, who do you mean?

9  A.    Jim Bob.

10  Q.    Okay.  Can you tell us more about that conversation?

11  A.    He just kind of explained briefly, not in great

12  detail, the situation and asked if it was something that I

13  could think about and pray about being a part of.  I told

14  him I would consider that.

15  Q.    At any point during that conversation, did he state

16  that he believed you were a good third-party custodian

17  because you offer prison-related ministry and counseling?

18  A.    I think the conversation did include that information.

19  Q.    So we like to be very clear.  Did it factually include

20  that?

21  A.    Can you restate the question again?

22  Q.    During your conversation with Mr. Jim Bob Duggar, did

23  he state that he thought in his opinion that you would be a

24  proper third-party custodian because you offer counseling

25  and ministry services to prisoners, and you could be of aid

to his son, Joshua Duggar?

A.   I don't think those were the specific words that I recall, but there was a conversation -- in the conversation, that I do have, or have had some prison ministry.  And that he mentioned that Josh was in the situation he was.  I don't remember the exact -- the exact wording details, but there was that -- I think some thoughts along those lines, yes, sir.

Q.   Am I correct that you go to church with the Duggars, the overall larger Duggar family, including Jim Bob, is that correct?

A.   Yes, sir.

Q.   I'm sorry, sir.  It cut out.

A.   Yes, sir.

          MR. STORY:  Talk up real loud too.

Q.   (by Mr. Roberts.)  How long have you known the Duggars, or how long have you attended church with the Duggars?

A.   Oh, it's been a number of years.  I can't -- I don't recall exactly how long, but it's been six, eight years, somewhere along those lines.

Q.   Do you think you were a member of the church and/or friends with the Duggars, associated with the Duggars, in 2015?

A.   Was I associated with the church?

1  Q.   No, sir.  Did you have any association with the

2  Duggars, the overall larger family, in 2015?

3        MR. STORY:  Your Honor, I'm going to object to

4  this line of questioning again.  It's irrelevant to whether

5  or not the Rebers are suitable third-party custodians.

6  It's outside of the scope and so we would object to that.

7        THE COURT:  Mr. Roberts?

8        MR. ROBERTS:  Your Honor, again, he is inviting

9  and offering himself as a third-party custodian, that

10 Mr. Duggar come into his home and reside there.  I think

11 it's fair for the Court to hear, and fair for the parties

12 to know, whether he is fully aware of the history that

13 Mr. Duggar has related to child exploitation and child

14 sexual offenses.

15       THE COURT:  Mr. Story, I'm going to agree with

16 the government on this one.  We're not going to spend a lot

17 of time on it, but I want to hear the answer to this

18 question.  Your objection is overruled.

19       MR. STORY:  Thank you, Your Honor.

20 Q.   (by Mr. Roberts.)  So my question, Mr. Reber, is were

21 you familiar or associated with the Duggars in any way?

22 Were you friends, going to church, in 2015?

23 A.   Yes, sir.

24 Q.   Are you aware that there are allegations that when

25 Mr. Duggar, Joshua Duggar, was a juvenile, that he

committed hands-on offenses against a number of minors --

five total -- ranging in age of five to I believe 11?

A.   I don't know the exact details, but I was familiar

with some charges that related to him, yes, sir.

Q.   Did you in fact know that those minors, some of them,

resided in the house in which Mr. Duggar resided?

A.   Yes, sir.

Q.   Does that fact give you any pause or hesitation into

inviting him into your home?

A.   No, sir.

Q.   If you can remember -- and tell me if you can't --

were you part of the church in 2005?

A.   No, sir.  Are you talking about -- when you say "the

church," but --

Q.   I can specify.  The church that the Duggars attended,

did you go to church and/or associate with the Duggars in

the 2005 time frame?

A.   No, sir.  No.

Q.   Now, your wife previously testified that she will be

home for a majority of the day, is that correct?

A.   Yes, sir.

Q.   You will be going to work.  And is it correct that you

work 8:00 to 5:00, or some close version of that time

frame?

A.   7:00 to 3:30, uh-huh.

Q.   Do you normally go straight to work and straight home?

A.   I do.

Q.   Do you have any pause, hesitation, or concerns leaving your wife alone with Mr. Duggar?

A.   No, sir.

Q.   Do you have any pause, hesitation, or concerns leaving your daughter alone with Mr. Duggar?

A.   No, sir.

Q.   Make sure I'm referencing the right child.  It's the -- you have a 22-year-old living with you and residing in the residence, right?

A.   That's correct.

Q.   Do you have any hesitation or concern if he was released -- the Duggars live a very public life.  That's going to bring public attention to you, your wife, and your family.  Do you understand that?

A.   Yes, sir.

Q.   And you're agreeing, knowing that?

A.   I'm agreeing to do what it takes to be a help to them, yes, sir.

Q.   Is your agreement to be a third-party custodian just based on your relationship with Mr., meaning Jim Bob Duggar?

A.   I would say that's -- the relationship there is a good one.  And he's a friend, and I think it's important to help

friends when they need help, so --

Q.   Was there any promise by Mr. Duggar or anyone else
that if you would house or participate as a third-party
custodian, that you would get something in return?

A.   No, sir.

Q.   Now, you stated that you operate or you sometimes
counsel individuals either that have been paroled out of
prison or in jail, is that correct?

A.   It was actually -- I was a volunteer chaplain at the
Washington County Jail.  And currently I am as well, but
that ministry kind of came to a halt last year with the
Coronavirus situation.  They would no longer allow
volunteer chaplains into the jail due to the risk with the
Coronavirus.

Q.   Is it your intention to offer services to Mr. Duggar,
Joshua Duggar?

A.   Not necessarily.  If it's something he's interested
in, I'm there for counsel.  If he wants to talk, I'm open
to that.  But I'm not there to force anything on him at
all, no, sir.

Q.   If he reports a violation during one of -- if he does
engage in counseling, are you going to be free to call U.S.
Probation directly and report such?

A.   Yes, sir.

Q.   Finally, with respect to the internet in your home,

could you describe that?

A.    We have phone internet, wi-fi internet, that we use in our phones.  And then we use that as well for the computers or laptop.

Q.    Could you describe -- sorry, sir.  Please continue.

A.    The laptop computer, we use wi-fi for internet access for the laptop computers.

Q.    How would you gauge you and your family members on knowledge of digital devices and internet from a scale of say one to 10?

A.    I would say --

Q.    Ten being like you are a computer expert; one being you are pretty -- you could turn a computer on, but you can't really use it that well.

A.    Oh, I'd say probably three or four, you know.  I'd say on the low scale.

Q.    Sir, is your phone password protected?

A.    It is, yes, sir.

Q.    Do you know what brand of phone you have?

A.    I have an iPhone.

Q.    Is it protected via a facial ID, or is it a PIN that you type in?

A.    It's a PIN number.

Q.    Are you confident that Mr. Duggar, if he came to live with you -- or better question -- are you aware that there

is some very sophisticated partitions and other digital

related aspects of this case which would reflect that

Mr. Duggar is pretty computer savvy?  Did you know he was

computer savvy, is a better question?

A.    I'm not real familiar with his computer knowledge,

sir.

Q.    Have you ever had a one-on-one conversation with

Mr. Duggar?

A.    I have.

Q.    Joshua?

A.    Yes, sir, uh-huh.

Q.    When is the last time you think you have spoken to

Mr. Duggar, meaning Joshua?

A.    One-on-one?  What, it's been probably more than a

year, better than a year.

Q.    Has your wife ever had a one-on-one conversation with

him?

A.    That, I don't know.  I think together, we have spoken

with him.

Q.    Is it a common practice in your marriage that when

your wife is around other males, that you should be there

or some other chaperone or escort-type male?

A.    I think that would be best.

Q.    Do you live your life like that?

            MR. STORY:  Your Honor, I'm going to object.

We're again getting into their personal marriage relationship. They both testified that they're willing to report any violations, which I believe is the standard that we're here to obtain, not whether or not -- how they live and conduct their marriage.

THE COURT: Mr. Roberts, do you want to speak to that?

MR. ROBERTS: Yes, Your Honor. The Court does have to make a determination of the credibility of any witness. The witnesses have indicated they live a lifestyle in which it is not appropriate or it's not customary for an adult male and married females to be around each other, yet they are telling the Court they are going to draw out this exception, which is contrary to the way they live their life. I think that's something of concern for the Court of whether they are viable third-party custodians.

THE COURT: Mr. Story, I'm going to overrule your objection. This is why.

Mr. Reber has testified that he's away from the home from 7:00 until 3:30 in the afternoon. And so I'm going to let the government inquire about his comfort level of Mr. Duggar being home alone with his wife. Again, like some of these other areas that we sort of tiptoed around, I don't want to spend a lot more time on it, Mr. Roberts, but

1  you may proceed.  Objection overruled.

2          MR. ROBERTS:  Thank you, Your Honor.

3  Q.   (by Mr. Roberts.)  Mr. Reber, I can restate the

4  question, but if you remember it, you can answer it at this

5  point.

6  A.   Yeah, please restate it.

7  Q.   Do you live your life in a manner in which typically

8  your wife, if she is around another adult male, she is

9  either in the presence of you, you alone with her, or is

10 escorted by some other adult male within your family?

11 A.   I would say that if not with me, then someone else.

12 Not necessarily a male.  My daughter lives at home as well,

13 and she's an adult.

14 Q.   Now, your wife spoke and testified that initially you

15 brought this idea of serving as a third-party custodian to

16 her and you both prayed and discussed this arrangement.

17        Can you tell the Court just directly, was this your

18 idea or was it truly a neutral idea from both of you,

19 meaning that both of you agreed to this?

20 A.   It was a conversation that I had.  And upon that,

21 reached out to her, obviously, because we are a family and

22 we do discuss things.  And we both prayed and agreed that

23 we felt led to move forward with it.

24 Q.   Did you tell her that you wanted to do this

25 arrangement at any point?

A.    I said I was willing to help.  And I said, when a friend is in help and need, and they ask you for help, I think that's probably something that most anyone would do. I don't think it's unusual at all.

Q.    And because this friend, Jim Bob Duggar, reached out to you, you're again willing to make this exception to the customary way you live your life, meaning that your wife could be at home alone with an adult male, unescorted?

A.    Yes, sir.

            MR. ROBERTS:  No further questions, Your Honor.

            THE COURT:  Mr. Story, anything further?

            MR. STORY:  No redirect, Your Honor.

            THE COURT:  Mr. Reber, the Court does have some questions.

            THE WITNESS:  Okay.

            THE COURT:  I understand that you and your wife own firearms, is that correct?

            THE WITNESS:  Yes, ma'am.

            THE COURT:  And you have firearms in your home today?

            THE WITNESS:  We do.

            THE COURT:  Are you willing to remove those firearms from your home if the Court allows Mr. Duggar to be released to your custody?

            THE WITNESS:  Yes, ma'am.

1    THE COURT:  Do you agree that, even if you are

2  pressured, you under no circumstances will share your

3  passwords for your telephones or your computers with

4  Mr. Duggar if he's released to your custody?

5    THE WITNESS:  I agree to that.

6    THE COURT:  You and your wife have both mentioned

7  prayer, and the church, and helping a friend in the time of

8  need.  And I can appreciate that, sir.  But here's the

9  question that I'm most concerned with.

10    If you or your wife or your daughter observe or

11  learn about a violation by Mr. Duggar, I need to hear you

12  say that your first call will be to the U.S. Probation

13  Officer who is supervising this case.

14    THE WITNESS:  Yes, ma'am.

15    THE COURT:  And I mean you no disrespect, but

16  your answer tells me that the time for prayer and

17  consultation with Jim Bob Duggar and the elders of the

18  church, that will happen after you call U.S. Probation, is

19  that correct?

20    THE WITNESS:  That's correct.

21    THE COURT:  All right.  I don't have any further

22  questions.

23    Mr. Roberts, do you have questions as a result of

24  mine?

25    MR. ROBERTS:  I do not, Your Honor.  Thank you,

though.

THE COURT:  Mr. Story, any additional questions as a result of my questions?

MR. STORY:  No, Your Honor.

THE COURT:  All right.  Can Mr. Reber and Mrs. Reber be released?

MR. STORY:  Yes, Your Honor.

THE COURT:  All right.  Mr. Story or Mr. Gelfand, do you have any other witnesses?

MR. GELFAND:  We have no -- I'm sorry, Your Honor.  We have no additional witnesses, Your Honor, at this time.

THE COURT:  No additional witnesses.  I hesitate to even offer this, but would either the government or the defense want to make a closing argument?

MS. MARSHALL:  Yes, Your Honor.

THE COURT:  All right.  Mr. Gelfand, do you want to make a closing argument as well?

MR. GELFAND:  If they are going to, of course I do, Your Honor.

THE COURT:  I thought that might be your answer.

I don't mean to place unnecessary time constraints on either of you, but because of the hour and my need to take some time to consider what I'm going to do, I would ask you each to spend maybe only five or six

minutes summing up what you think is the key evidence that
I need to consider in making my decision.

Is that agreeable, Ms. Marshall?

MS. MARSHALL:  Yes, Your Honor.

THE COURT:  Mr. Gelfand, does that sound
reasonable to you?

MR. GELFAND:  Yes, Your Honor, it does.

THE COURT:  All right.  Whenever you're ready to
proceed, Ms. Marshall, you can be heard.

MS. MARSHALL:  Thank you, Your Honor.

Your Honor, Title 18 United States Code 3142,
Subsection (b) gives us the factors that you as the Court
should consider in making the determination of whether
Mr. Duggar should be released pending adjudication of his
case.  I want to go through those factors with you and talk
about the evidence that the government believes that the
Court should consider in making this decision.

The first factor that the Court is to consider is
the nature and circumstances of the offense charged.
Mr. Duggar is charged with the receipt and possession of
child pornography.  As the government alleges in the
indictment, some of those images and videos that were
possessed by Mr. Duggar contained minors under the age of
12 and as young as a toddler.

But what exactly is the nature and circumstances

of the offense charged?  You heard Special Agent Faulkner

talk about how this case first came to law enforcement's

attention.  It first came to law enforcement's attention

through the program of BitTorrent, a peer-to-peer program

that is known for the sharing and receiving of child

pornography.  It's a way that people can obtain child

pornography in a somewhat anonymous way because they are --

you get it and receive it, Your Honor.  You don't have to

reach out and ask somebody for it.  That's the way the

program works is, your peers, peer-to-peer, you are

obtaining it and receiving the child pornography through

the BitTorrent program.

          Agent Faulkner talked about that the child

pornography was found on the HP computer located in the

office of Mr. Duggar's business, his car lot.  Agent

Faulkner talked about the partition that was downloaded,

another anonymous way, another hiding way, to obtain the

child pornography.  Why do you install a partition?  You

install a partition in order to conceal what you are doing.

          We heard about Covenant Eyes.  We heard about

that it's an internet monitoring software program, a

program that's supposed to hold you accountable, supposed

to show what internet you're using, where you're looking,

and report that to your person who you've put down.

          You heard Agent Faulkner talk about the fact that

Covenant Eyes does not pierce the veil of the partition.
That Covenant Eyes does not pick up on what is going on
behind the partition, and that it did not then pick up on
the child pornography that was being downloaded by
Mr. Duggar behind the partition that he installed on the HP
computer at his car lot.

All of those things go to show what Mr. Duggar
was doing and the links he was going to in order to conceal
his activity.  He was doing it on a computer at his
business.  He was doing it behind a partition, behind a
partition that does not detect Covenant Eyes, the program
that is supposed to alert his wife, Anna Duggar, if he's
looking at things that he shouldn't be looking at.  And
he's doing it through the Dark Web, which Agent Faulkner
talked about that it is hard to find evidence of users from
the Dark Web given the nature of the browser and what the
Dark Web is, and also through the BitTorrent peer-to-peer
program.

And we can't forget about what Agent Faulkner
said about the images that were found on Mr. Duggar's
computer.  The images of "Daisy's Destruction," the video,
and the fact that Agent Faulkner said that he's been doing
these cases for years, and that it rates in some of the
worst that he has ever seen.  Those are the types of images
and videos that Josh Duggar was looking at on his computer.

1       The next factor that the Court needs to consider
2  is the weight of the evidence against the person.  As was
3  testified to, this child pornography was found on the
4  business computer.  The defense wants to point out to the
5  fact that this was a business computer.  This wasn't
6  Mr. Duggar's, quote, unquote "personal device."  But you
7  can't escape the fact that this partition, or the partition
8  was password protected, and the password was Josh Duggar's
9  password that he had personally used for years for his
10 personal other accounts, his bank account, utilities
11 account, family Instagram.  That was the password that Josh
12 Duggar had been using for years, and it goes to show that
13 he is the person behind the partition, behind downloading
14 the child pornography.
15      Mr. Roberts and Agent Faulkner went through
16 Exhibits 3 and 4, and for the sake of time, I won't go
17 through those again.  But Exhibits 3 and 4 show the
18 outlines of the days of the downloading of the child
19 pornography.  They show Mr. Duggar at the car lot.  They
20 show him actively talking to people, telling them that he's
21 at the car lot.  They show him on the computer and they
22 show him downloading the child pornography, and then within
23 minutes of that, using the computer and being behind the
24 computer.
25      Also in his statement to law enforcement, he

admitted that he was familiar with peer-to-peer programming, and he specifically referenced the TOR browser. Your Honor, given all these things, the weight of the evidence against Mr. Duggar is strong in this case.

As to his history and characteristics, the next factor that the Court is to consider, we heard from Officer Nguyen that Mr. Duggar has priorly admitted to hands-on sexual abuse of minors. Now, this was when he was a minor, but this was the sexual abuse of approximately five minors that he lived in the home with when he was a teenager. She spoke to the pornography addiction and the statement that Mr. Duggar had made regarding the pornography addition that Mr. Duggar admitted to in a statement in approximately 2015.

The defense has talked about that Mr. Duggar has known that this investigation has been going on for the last 17 months and that he hasn't gone anywhere since then. But, Your Honor, what that fails to take into consideration is that now Mr. Duggar has been indicted by a Grand Jury. He's been arrested on the charges, and he has been put in jail because of those charges. What was "a maybe," is now "a reality." And I don't believe that you can say that he hasn't gone anywhere for the past 17 months totally satisfies the concern that he won't go anywhere now. Circumstances have changed, and while we don't have a

history of him being a flight risk, the circumstances are different now.  And I believe that the Court needs to take that into consideration when determining whether Mr. Duggar should be detained.

The next factor that the Court needs to take into consideration under the statute is the nature and the seriousness of the danger to any person or the community that would be posed by Mr. Duggar's release.  Your Honor, we have seen the extent that Mr. Duggar will go to in order to hide his illegal activity.  We know he is capable of hands-on offenses because he has engaged in them in the past, and we know that the child pornography that Mr. Duggar was looking at involves the sexual abuse of toddlers and young children.  He has a history, and he has shown the Court that he has a history, a history dating back 20 years, that shows his sexual attraction to children and the deviousness of his activity.

We recently heard from Mr. and Mrs. Reber.  The government can appreciate that Jim Bob Duggar reached out to them, asked them to do him a favor, to take in their son and to house him at their house.  I'm not sure that they fully appreciate, Mrs. Reber in particular, fully appreciates the task that she is about -- should the Court release Mr. Duggar -- would have to take on. Officer Nguyen in her addendum noted the hesitancy of

Mrs. Reber.  And, Your Honor, the government noted
hesitancy in Mrs. Reber in talking about some of the
aspects, in talking about Mr. Duggar's prior hands-on
abuse.  She showed some hesitancy in wanting to discuss
that.  She showed some hesitancy in talking about initially
whose idea and whose decision this was.  And she showed
some hesitancy in wanting to leave her own minor daughter
alone with Mr. Duggar.

We understand that they have loyalty to Jim Bob
Duggar and want to be a good friend and want to take Josh
Duggar in and that they state that they are willing to
change the way that they live their whole lives in order to
do this.  Mr. Reber talked about that, normally, he would
prefer that Mrs. Reber be with someone else, and that's how
they have lived their life, and that she not be alone with
another male.  And, Your Honor, it's hard for the
government to fully appreciate that Mr. and Mrs. Reber are
willing to turn their whole life around in order to do this
favor for a family friend.

Your Honor, we're talking about someone who has
shown that they are capable of hands-on abuse.  We're
talking about someone who has shown that they are willing
to go to great lengths to try to conceal the illegal
activity that they want to engage in regarding children.
And, Your Honor, the government does not believe that the

presumption of detention has been overcome, and we would
ask the Court to continue to detain Mr. Duggar.

        THE COURT:  Thank you, Ms. Marshall.  Who will
speak for the defendant?

        MR. GELFAND:  I will, Your Honor.  Justin
Gelfand, if I may proceed.

        THE COURT:  You may.

        MR. GELFAND:  Thank you, Your Honor.

        I think it's important to not lose sight of
perspective here of the fact that Mr. Duggar is, by law,
presumed innocent of what he is charged with, and that a
detention hearing is not the time or the place to try this
case.  In the event this case proceeds to trial, there will
be a time and there will be a place, and we're far from
that.  So I want to focus my attention, Your Honor, on the
two prongs under the Bail Reform Act that the Court needs
to consider.

        First of all, I think the evidence is very clear
that Mr. Duggar is not a risk of flight.  This case, as the
evidence, really the undisputed evidence has established,
has been investigated for approximately two years, since
May of 2019.  And the Homeland Security investigators
executed a search warrant making contact with Mr. Duggar in
November of 2019, 17 months ago.  To state what's sometimes
the obvious, but the obvious is sometimes the most

important, Mr. Duggar has not fled.  He has not left the
jurisdiction.  He has not left the country.  He has not
done anything at all other than continue to live his life
in this judicial district, where he has deep roots.

He voluntarily surrendered without issue.  Your
Honor, the government can basically argue that, well,
essentially he voluntarily surrendered, but we would have
arrested him if he hadn't.  And I can respect that and I
can appreciate that, and I can understand that as a former
federal prosecutor.  But when a defendant voluntarily
surrenders, that's a clear indication and critical evidence
that he is committed to meeting these charges head-on, to
accept the jurisdiction of the Court.  No one wants to walk
into a law enforcement agency under those circumstances,
but he did, clearly demonstrating he's not a risk of
flight.

At all times in this case, Your Honor, he fully
complied with all law enforcement directives.  He has, to
say the least, very deep roots in this community where he
was born and raised, and basically lived his whole life
with the exception of one small stint in D.C.  The Court
obviously can and would, if it hasn't already, take
possession of his United States passport, his only
passport.  If the Court felt so inclined, the Court could
impose restrictions such as location monitoring.  I'm not

suggesting any of that is necessary. But what I'm stating,
Your Honor, is that as a practical matter, this is not a
defendant who is going to flee.

He is also not a danger to the community. The
testimony of Special Agent Faulkner was critical in this
respect. I asked him point-blank, as the Court may recall,
if law enforcement believed that he was truly a danger to
the community, not to mention to children, they could have
arrested him at any point in the last two years. And you
don't need testimony, the Court doesn't need testimony to
understand that. Instead, they didn't do that. And
Special Agent Faulkner acknowledged that they could have
done it, but they didn't do it. And the Court is well
aware that they could have done that, because the truth is
he's not a danger to the community.

He's been fully compliant with the law since the
warrants were executed, based on Officer Nguyen's
testimony. He'll stay with a custodian, if the Court
allows him to, and the Court can impose conditions wherein
he would have no contact with any minors. He would have no
unmonitored access, or access at all, to any sort of
internet or computer device.

The Court had the opportunity to see firsthand
Mr. and Mrs. Reber as viable third-party custodians. And
the Court asked important questions to both of them asking

them point-blank, "Are you actually going to make a phone call to the probation office before anything else if in fact there's any issues."  And I would hope the Court would be satisfied with what my assessment was, was that these law-abiding, stand-up, good people, who are willing to sacrifice so much personally to help this person and this family at this time of need, they are willing to commit to doing whatever the Court asks of them, and I think they are very credible in saying that.

So as the Court evaluates whether or not Mr. Duggar is a risk of flight or a danger to the community, I would encourage the Court to look past so much of an emphasis on what the government believes the evidence would establish if they proceeded to trial.  There will be a time and there will be a place to try this case.  A detention hearing is not that time or place.  Discovery is not even due until Friday, based on the Court's order, as far as the government.

So as we sit here, I would encourage the Court to consider our request for detention both because the law I think unambiguously warrants it and because the facts unambiguously justify it.  And I really appreciate the Court giving us all the time and the attention to address these important issues today.  It's obviously very important to Mr. Duggar, and that's ultimately why we are

1  here, is to protect his Constitutional rights.

2          THE COURT:  Thank you, Mr. Gelfand.

3          Mr. Duggar, are you still with us?

4          THE DEFENDANT:  Yes, Your Honor.

5          THE COURT:  All right.  We're going to take a

6  short break.  I know it's getting late and I'm not sure

7  where you're at inside the Washington County Detention

8  Center, but I can appreciate it's --

9          THE DEFENDANT:  Sitting on a metal stool, yes,

10  Your Honor.

11          THE COURT:  Okay.  Well, bear with us.

12          THE DEFENDANT:  Thank you.

13          THE COURT:  The Court is going to take a brief

14  recess to collect my thoughts and look through the

15  evidence, and I hope to be back with you shortly.  Court is

16  in recess.

17          (Recess taken)

18          COURTROOM DEPUTY GUERRERO:  Court is back in

19  recess.

20          THE COURT:  Give everybody a minute to join us.

21          Mr. Duggar, are you back with us?

22          MR. GELFAND:  I think you're muted, Josh.

23          THE COURT:  As soon as we know Mr. Duggar can

24  hear, we'll proceed.

25          MR. GELFAND:  Thank you, Your Honor.

1          MR. STORY:  I think they had to move Mr. Duggar
2    from where he was, probably because it's about time for
3    them to serve a meal, Your Honor, which is normally where
4    they have been having him for today.

5          THE COURT:  Mr. Story, in my experience, they
6    serve dinner about 2:00, but I could be wrong.

7          THE DEFENDANT:  All right.  I'm unmuted now.
8    Sorry.

9          THE COURT:  All right.

10          THE DEFENDANT:  I am here.  We've moved location
11    since the recess.

12          THE COURT:  All right.  Thank you, Mr. Duggar.
13    It's very important to me that you can hear, particularly
14    what is to come next.  So you mute yourself.

15          THE DEFENDANT:  Thank you, Your Honor.

16          THE COURT:  If you at any point can't hear me --

17          THE DEFENDANT:  I don't have control of the iPad
18    right now.  It's in a lockbox.

19          THE COURT:  Okay.  Can you mute yourself?

20          THE DEFENDANT:  I cannot.

21          THE COURT:  All right.  Okay.  Well, we'll
22    proceed, and if gets too noisy, then we will just deal with
23    that if it comes.

24          THE DEFENDANT:  Thank you, Your Honor.

25          THE COURT:  All right.  I'd like to start by

thanking counsel.  I appreciate the preparedness of all the counsel today.  I appreciate the meeting we had earlier to talk about procedure.  That was very helpful to the Court.

I have taken into consideration in making my decision today the pretrial report and the addendum that I thank Officer Nguyen for, the testimony of Mr. and Mrs. Reber, the proposed third-party custodians, Agent Faulkner's testimony was particularly helpful to the Court, as well as the Government's exhibits.  And I have also considered the defendant's pleading, which was filed last night, opposing continued detention.

As the parties know and have referred to today, this is a presumption of detention case, Mr. Duggar.  And that presumption was based on the seriousness of the charges that have been filed against you and returned in the indictment.  The presumption is rebuttable, and what that means for you, Mr. Duggar, is you can overcome it.  And I will share with you that the hurdle is very low.  You only had a burden of producing some evidence to convince the Court that it shouldn't be presumed that you stay in jail until your trial date.

I find that you have rebutted the presumption, but that's not the end of the inquiry.  Now, I've got to turn to all the factors that your counsel have referred to and that govern my decision that are found at 18 U.S.C.

3142(g). And it is my intention, Mr. Duggar, to talk to you about each of those factors and tell you how they influence my decision.

THE DEFENDANT: Thank you.

THE COURT: The first, which you've heard already, is the nature and circumstances of the offense charged against you. And I'm just going to remind you how serious these charges are. While you're presumed innocent, and I appreciate that and respect that and will ensure that that Constitutional right is observed when you're in this Court, Count One of the indictment carries a mandatory minimum five-year sentence.

Count Two, depending on the age of any victims introduced into evidence at trial, could carry a sentence of 20 years if you're convicted. So these are very serious charges, and the Court views them as very serious.

The Court is concerned about the evidence describing those charges. It is concerning to have an Agent testify that the "Daisy Destruction" download found on a computer in your business is some of the worst sexual abuse child pornography that he has seen in over 1,000 cases. That concerns the Court. The number of images concerns the Court. The prepubescent age of the victims in the images found during the execution of the search warrant, that concerns the Court. The sophistication of

the person who downloaded these images concerns the Court.
It's not the average defendant who can operate in the Black
Web, who can partition their computer, who can bypass
sophisticated monitoring devices.

You're presumed innocent of doing all that, but
the evidence that the Court has heard today is significant.
And frankly, the victims of your crime, if you committed
it, concern the Court. Children are involuntary victims of
pornography and sexual abuse. They are subject often to
human trafficking and other conditions that we don't even
have time to discuss. The propagation of child pornography
feeds the market for the production of more child
pornography. So while you are presumed innocent of Count
One and Count Two, know that the nature and circumstances
of these offenses weigh against your release back into the
community.

The weight of the evidence against you, I don't
need to recount the steps that the government elicited from
Agent Faulkner that the government took to corroborate and
to obtain search warrants. And the evidence that was
obtained in execution of the search warrants supports the
testimony of Agent Faulkner, that a significant effort was
made to download significant amounts of child pornography
in an effort to evade detection.

I am not expressing any opinion about the

admissibility of any of this evidence.  This is not a
suppression hearing.  This is not a pretrial motion.  I can
only address what I've heard here today from Agent
Faulkner.  But the weight of the evidence is not
insubstantial, and Mr. Duggar, that also weighs against you
in my evaluation.

The next category of evidence that I must review
is the evidence of your history and characteristics.  I
agree with Mr. Gelfand on this.  You have a long history in
Northwest Arkansas.  You've lived here most of your life,
except for kind of a high-profile detour to Washington,
D.C.  You're married.  You have a long marriage.  You have
children and extended family.  You've reported that you
have no alcohol or drug problems and there's no evidence
that you've been arrested for any drug or alcohol crimes.

It appears that you may have been involved in
several businesses in Northwest Arkansas, although the
Court really can't speak to that, the evidence is unclear.
Mr. Gelfand is also correct that since you turned yourself
in, you have not been involved in any other crimes.  To the
best of my knowledge and the evidence presented here today,
you have not been further obstructed to any investigation
of you or these alleged crimes.

I am cognizant, Mr. Duggar, of the Court's
obligation not to treat you any differently than it would

someone who was similarly situated to you in terms of
charges.  Do you understand that?

        THE DEFENDANT:  Yes, Your Honor.  Thank you.

        THE COURT:  There's a problem, though.  And that
is that your family and you have chosen to live a very
high-profile life out in the public.  And while you may not
be the architect of that decision, that's where we find
ourselves.  And although you have not ever been convicted
of any crimes, you have admitted to past conduct, touching
minor children, that concerns the Court.  That's a very
public admission.  I'm not telling anybody involved in this
hearing or you something that you don't know.  That is
concerning.  We're not here to adjudicate that.  We're not
here to punish you for that.  I just want to tell you that
it concerns me, when I have to make this decision, to know
that you have admitted to that conduct in the past.

        And what concerns me about it the most is the age
of your sisters when that conduct was admitted, and the age
of these children in the alleged evidence against you --
11, 10, 9, 5 -- that concerns the Court quite a lot.

        I am mindful, however, that this conduct happened
a long time ago, and it happened when you yourself were a
child, and so I have taken that into consideration as well.
And that fact, and that fact alone, are in your favor.
It's been a long time.

1    It is concerning to the Court that you have

2 publicly admitted that you may have a problem with

3 pornography.  Now, that's not to be confused with child

4 pornography addiction.  I have heard no evidence that you

5 have a child pornography addiction.  That may be the case;

6 it may not be.  What I have heard is that prior to images

7 being downloaded on your computer, Covenant Eyes was

8 installed on your computer, which appears to be a program

9 that acts as a deterrent.  And I've also heard some

10 testimony that your wife might have been your

11 accountability partner in that.  Again, I am not going to

12 delve deeply into that.  That is not dispositive of the

13 decision I'm making here today.  But it concerns the Court.

14    I am almost also greatly concerned that images

15 and approximate ages of children in these images are very

16 close to the ages of your children, and your nephews, and

17 your nieces, and your siblings' children.  We keep sort of

18 collapsing on itself.  I keep coming back to this

19 overriding concern that the Court has about the children

20 that you live and interact with on a daily basis and the

21 crimes that you're charged with.

22    The last category is the nature and the

23 seriousness of the danger to any person or the community

24 that may be posed.  You've heard the government argue that

25 you're a danger, and you have heard your own counsel argue

that you are not a danger.  The truth is, I don't know.
You have not been convicted of physically harming anybody.
You don't have any type of criminal convictions that would
suggest to me that you have continued in any pattern of
behavior towards any person that should be a red flag of
what you might do in the future.  I have identified for
you, there's no need to rehash it, the things that happened
in the past that concern the Court.  I will tell you that
your own children and your siblings' children and your
minor brothers and sisters, they are all part of the larger
society that the Court must consider in protecting from
you.

What I'm going to tell you, Mr. Duggar, is this
is a very close call, and I've thought about it a lot in
the days leading up to this hearing and I thought about it
as I listened to the evidence today.  And I hope you're not
going to prove my decision wrong.  But I'm going to find
that the United States has not presented clear and
convincing evidence that no release condition, or set of
conditions, would reasonably assure the safety of the
community.

It is my intention to release you, Mr. Duggar,
with a number of conditions, which the Court is going to
find to be the least restrictive conditions necessary to
ensure the safety of the community.  So I need you to

1  listen up, because we're going to go through them.

2          THE DEFENDANT:  Yes, Your Honor, I will.  Okay.

3          THE COURT:  And if you can't comply with any of

4  them, then you're going to stay right where you are, okay?

5          THE DEFENDANT:  Yes, Your Honor.

6          THE COURT:  First, I agree with Mr. Gelfand that

7  I haven't heard any evidence that you're a flight risk.

8  I'm going to impose some conditions that's going to make

9  traveling out of here pretty hard, so don't prove me wrong.

10          I am, however, going to reject Mr. Gelfand's

11  argument that you should go home.  I cannot in good

12  conscience send you home.  The pretrial services report

13  suggests that you live in a guest house on the property

14  owned by your parents.  That pretrial services report

15  suggests that there's five or six minor children that live

16  in your parents' house.  There are six minor children that

17  live in your house.  There are other minor children in and

18  out of their grandparents' house on a regular basis, and

19  I'm not going to return you there.  I can't.

20          The Court has heard the testimony of the Rebers.

21  It's clear to the Court that they are doing your family a

22  favor.  That's a favor that I hope you don't abuse.  If you

23  do, this Court may not be too interested in second chances.

24  Do you understand?

25          THE DEFENDANT:  Yes, Your Honor.

1          THE COURT:  All right.  So, therefore, it is

2     going to be my intention to release you tomorrow with the

3     following conditions:

4          Joshua Duggar shall be ordered to home

5     confinement in the custody of LaCount and Maria Reber, with

6     GPS electronic monitoring with the cost to be borne by

7     Mr. Duggar.

8          Mr. Duggar, you are restricted to this residence

9     at all times except for employment, education, religious

10    services, medical care and treatment, attorney visits,

11    court appearances, court-ordered obligations such as things

12    imposed by the U.S. Probation Office, or other activities

13    that have been approved in advance by the probation office.

14    "Approved in advance" means permission, not grace.

15          THE DEFENDANT:  Yes, Your Honor.

16          THE COURT:  So if there's something that you want

17    to do that's not on this list, you get permission from your

18    probation officer in advance.

19          You must submit to supervision and report to

20    supervision by the United States Probation Office.  You

21    will have an obligation in that respect tomorrow.  You must

22    not possess or view any pornography or erotica of any kind.

23          With respect to technology, I have explored

24    monitoring software, but frankly, the sophistication of the

25    evidence that I have heard here today concerns me that we

don't have enough technology to ensure your compliance, at

least we don't have the right kind.  Therefore, you are not

to possess, access, utilize, any internet capable device,

including computers, tablets, iPads, Smartphones, gaming

systems, smart T.V.s.  You are specifically ordered not to

ask or obtain the passwords for Mr. and Mrs. Reber or their

daughter.  Do you understand?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  You will be able to go to Target and

get yourself a Jitterbug phone so you can talk to your

counsel and run your business, and when you do, you take it

to the probation office and you get it approved by them.

Do you understand?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  All of the devices I'm going to order

for your third-party custodians to be password protected,

and I'm also going to order them not to share their

passwords with you.

Your travel is restricted to the Western District

of Arkansas, Fayetteville Division, unless you obtain

advanced permission from the probation office.  To be

clear, our division includes Washington, Benton, and

Madison Counties.  Do you understand?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  The next condition is one I feel the

strongest about.  You can have unlimited contact with your

children, so long as their mother is present.  However,

you're to have no contact with any other minor child,

including your minor siblings, nieces, nephews, children of

friends, people getting piano lessons.  Are we clear?

         THE DEFENDANT:  Yes, Your Honor.

         THE COURT:  This is not a condition, but it's a

recommendation.  I recommend that you govern your actions

by thinking about where you might go and who you might

encounter.  You might not ought to go to birthday parties,

family dinners, church activities, these things that might

risk violating this condition.  Do you understand?

         THE DEFENDANT:  Yes, Your Honor.

         THE COURT:  You must not use or unlawfully

possess any controlled substance.  You must not excessively

use alcohol.  You may not actually or constructively

possess a firearm.  That means there can be no firearms in

the Rebers' residence at any time; yours, theirs or anybody

else's.  Do you understand?

         THE DEFENDANT:  Yes, Your Honor.

         THE COURT:  You must, as soon as you reasonably

can, surrender your passport and obtain no new passports or

international travel documents.

         The general conditions of release include that

you cannot violate any federal, state or local law while on

release.  You must cooperate in the collection of a DNA
sample if it is required by 42 U.S.C. 14135a.  You must
appear in court as directed, and tomorrow, you must sign an
appearance bond.

Do you understand all of these conditions?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Mr. Roberts or Ms. Marshall, are you
aware of any legal reason why these conditions cannot be
imposed in connection with the defendant's release?

MR. ROBERTS:  No, Your Honor, we are not.  We
would request, and I understand the Court's ruling
regarding contact with his children.  We would be glad to
provide the Court more information about law enforcement's
attempts to have those kids forensically examined.
However, unlimited contact does give the government some
pause or concern, respectfully, Your Honor.  I understand
your ruling, though.

THE COURT:  Yeah.  I appreciate that,
Mr. Roberts.  Parental rights carry with them some great
requirements of due process, and I'm just not prepared
today to limit Mr. Duggar's, to further limit his contact
with his children, especially in light of the fact that
he's been living with them every day for the last 19
months, but I will note your concern.  Thank you, sir.

MR. ROBERTS:  Thank you, Your Honor.

1          THE COURT:  Mr. Gelfand, you and your client may

2    not agree with all these conditions.  I've intended for

3    them to be the least restrictive, but they are still

4    onerous.  Are you aware of any legal reason that I can't

5    impose these conditions in connection with the release of

6    Mr. Duggar?

7          MR. GELFAND:  No, Your Honor.  Thank you.

8          THE COURT:  Mr. Duggar, I now need to share with

9    you the penalties if you violate these conditions.

10         Violating any of the foregoing conditions of

11   release may result in immediate issue of a warrant for your

12   arrest, a revocation of your release, an order of

13   detention, a forfeiture of bond, prosecution for contempt

14   of court.  And violation alone could result in additional

15   imprisonment, a fine, or both.

16         Do you understand that, Mr. Duggar?

17         THE DEFENDANT:  Yes, Your Honor.

18         THE COURT:  You will be advised in the documents

19   you and your lawyers receive tomorrow that if you commit

20   any federal felony while you're out on release, an

21   additional prison term of not more than 10 years may be

22   imposed.  Do you understand?

23         THE DEFENDANT:  Yes, Your Honor.

24         THE COURT:  And if you commit a federal

25   misdemeanor, you may be exposed to an additional year in

1  prison.  Do you understand that?

2          THE DEFENDANT:  Yes, Your Honor.

3          THE COURT:  Importantly, any of those prison

4  sentences imposed for crimes committed on release will run

5  consecutively to any sentence you get in this case.  That

6  means they are going to be tacked on the end.  Do you

7  understand?

8          THE DEFENDANT:  Yes, Your Honor.

9          THE COURT:  I have full confidence in the United

10  States Marshals Service to find you if you decide not to

11  comply with these conditions of release, so don't make me

12  regret this decision.

13          THE DEFENDANT:  You won't, Your Honor.  Thank you

14  very much.

15          THE COURT:  Mr. Roberts, Ms. Marshall, is there

16  anything else that you need to bring to the Court's

17  attention before we adjourn today?

18          MS. MARSHALL:  No, Your Honor.  Thank you.

19          MR. ROBERTS:  Thank you, Your Honor.

20          THE COURT:  Mr. Gelfand?

21          MR. GELFAND:  No, Your Honor.  Thank you, Your

22  Honor.

23          THE COURT:  Mr. Story?  Anyone else?  Anything we

24  need to cover before we adjourn?

25          MR. STORY:  Thank you so much, Your Honor.

1          THE COURT:  All right.  Mr. Duggar, until

2    tomorrow, you will remain in the custody of the United

3    States Marshals Service.  We have a series of very

4    important paperwork that needs to be completed that cannot

5    be completed tonight.  We need to get you set up with a

6    probation officer to get your electronic monitoring and GPS

7    monitoring put in place.  So Mr. Story will be in touch.

8    We are adjourned.

9          THE DEFENDANT:  Thank you.

10          (proceedings concluded.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

     I, Paula K. Barden, CCR, RPR, RMR, Federal Official Court Reporter, in and for the United States District Court for the Western District of Arkansas, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically reported proceedings, transcribed from electronic media, held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

     Dated this 14th day of May 2021.



Paula K. Barden, CCR, RPR, RMR, # 700
Federal Official Court Reporter
Western District of Arkansas

