**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 5:21-CR-50014-001** |
| | ) | |
| **JOSHUA JAMES DUGGAR,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S MOTION TO SUPPRESS EVIDENCE**
**AND REQUEST FOR A *FRANKS* HEARING**

Defendant Joshua James Duggar ("Duggar"), by and through undersigned counsel, respectfully moves this Court pursuant to the Fourth Amendment of the United States Constitution and Federal Rules of Criminal Procedure 12(b)(3) and 41, to suppress all evidence seized from 14969 Wildcat Creek Road in Springdale, Arkansas, on November 8, 2019. Duggar also moves to suppress all evidence that was derived from information or items obtained during the search pursuant to the fruit of the poisonous tree doctrine. *See, e.g., Murray v. United States*, 487 U.S. 533, 536-37 (1988) (the fruit of the poisonous tree doctrine "bars evidence which, though not obtained in [an] illegal search, was derived from information or items in the search"). Finally, Duggar respectfully requests a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978).

## I.      Relevant Background

Duggar is charged in a two-count indictment alleging one count of receipt of child pornography and one count of possession of child pornography. (Doc. 1). Duggar has pleaded not guilty to both counts.

A.  The First Search Warrant for a Residence at 14993 Wildcat Creek Road

On October 29, 2019, the Government sought and obtained a federal search warrant for 14993 Wildcat Creek Road in Springdale, Arkansas (the "First Search Warrant"). That warrant was the result of an under-oath affidavit signed by HSI Special Agent Howard Aycock ("SA Aycock") stating that in May 2019, an "HSI Internet Crimes Against Children (ICAC) Task Force affiliate" (later identified by the Government in discovery as Little Rock Police Department Detective Amber Kalmer) "was conducting an online investigation on the BitTorrent Peer-to-Peer (P2P) file sharing network for offenders sharing child pornography." *See* First Search Warrant Affidavit (Exhibit 1). SA Aycock attested that, during the investigation, "multiple files were successfully downloaded from IP Address 167.224.196.113" and that "[w]ithin the files successfully downloaded was one (1) video file, title 'mov_0216.mp4' and one (1) zip file titled 'marissa.zip' which contained approximately sixty-five (65) image files." *Id*. The detective "then viewed portions of the files which were determined to be consistent with child pornography." *Id*.

More than 5 months later, SA Aycock stated in his affidavit that he "viewed two (2) files successfully downloaded by the HSI ICAC affiliate from IP address 167.224.196.113, specifically, the images contained within the file titled 'marissa.zip' and the one (1) video file titled 'mov_0216.mp4'." *Id*. SA Aycock stated the "file titled 'marissa.zip' contained approximately sixty-five (65) image files of a prepubescent female, many of which were consistent with child pornography." *Id*.

As set out in SA Aycock's affidavit in support of the First Search Warrant, the Government then obtained the subscriber information for the IP address at issue and the internet service provider ("ISP") stated it was assigned to Duggar at 14993 Wildcat Creek Road in Springdale, Arkansas.

*Id*. As further set out by SA Aycock, Ozark Electric Cooperative revealed an account service agreement assigned to Duggar "for the service address of 14993 Wildcat Creek Road." *Id*.

Seeking to search a residence at 14993 Wildcat Creek Road, SA Aycock also represented to the court that he "knows that individuals involved in the sexual exploitation of children through child pornography almost always keep copies of their sexual explicit material" and that "they are most often kept in a place considered secure, usually a residence, to avoid detection by law enforcement." *Id*.

On October 31, 2019, HSI went to execute the search warrant at 14993 Wildcat Creek Road but claim they did not execute the search warrant upon meeting the residents. On November 8, 2019, the Government filed a return with the Court indicating the search warrant was "not executed" and stating, "no devices searched." *See* Case Number 5:19-cm-1111-ELW (Doc. 3).

B.   The Second Search Warrant for a Business at 14969 Wildcat Creek Road

On November 4, 2019, the Government sought and obtained a federal search warrant for 14969 Wildcat Creek Road in Springdale, Arkansas (the "Second Search Warrant"). That warrant was the result of an under-oath affidavit signed by HSI Special Agent Gerald Faulkner ("SA Faulkner") stating that in May 2019, an "HSI Internet Crimes Against Children (ICAC) Task Force affiliate," subsequently identified in discovery as Little Rock Police Department Detective Amber Kalmer, "was conducting an online investigation on the BitTorrent Peer-to-Peer (P2P) file sharing network for offenders sharing child pornography." *See* Second Search Warrant Affidavit (Exhibit 2). SA Faulkner stated that, during the investigation, "two separate downloaded files were successfully obtained from IP Address 167.224.196.113" and that "[o]ne of the downloaded files was a '.zip' folder containing approximately sixty-five (65) images and the other downloaded file

was a single video." *Id*. SA Faulkner stated that the detective "then viewed portions of the downloaded files which were determined to be consistent with child pornography." *Id*.

More than 5 months later, SA Faulkner stated he personally "reviewed the two files successfully downloaded by the HSI ICAC affiliate computer from IP address 167.224.196.113." *Id*. He stated "the 'zip' folder contains approximately sixty-five (65) image files of a prepubescent female, many of which were consistent with child pornography." *Id*.

The affidavit in support of the Second Search Warrant omits any mention of the fact that the previously-issued First Search Warrant—which was predicated on representations that there was probable cause to believe evidence of child pornography would be found at a residence located at 14993 Wildcat Creek Road—was not executed and that no devices were searched pursuant to that warrant. *See id*. Rather, this time, SA Faulkner stated that a summons was issued to the ISP "for the specific dates and times the video and images of child pornography were successfully downloaded from the user." *Id*.

SA Faulkner then represented that he obtained the subscriber information for the IP address at issue and the ISP stated it was assigned to Duggar at 14993 Wildcat Creek Road in Springdale, Arkansas, and Ozark Electric Cooperative revealed an account service agreement assigned to Duggar "for the service address of 14993 Wildcat Creek Road." *Id*.

SA Faulkner represented to the court in support of the Second Search Warrant that, "[o]n October 31, 2019, contact was made with the residents at 14993 Wildcat Creek Road in Springdale, Arkansas 72762." *Id*. SA Faulkner then explained how there was an address error and that the address associated with the IP address "should be reflected as 14969 Wildcat Creek Road." *Id*. As set out in the affidavit, the Government then associated that address with other records associated

with Duggar. *See id*. SA Faulkner did not explain that the contact with the individuals at the residence was pursuant to the execution of the First Search Warrant.

SA Faulkner went on to state that on November 1, 2019, an "HSI Task Force Officer, acting in an undercover capacity, arrived at Wholesale Motorcars located at" 14969 Wildcat Creek Road and went into "the office" with Duggar and an employee named "Randy." *Id*. The undercover officer stated he observed Duggar use an Apple iPhone and "an unknown modeled laptop computer located on the desk." *Id*.

SA Faulkner stated that searching computer storage devices "can take up to several months to complete" and sought "authorization in this application to seize the items set forth in attachment 'B' that are found on the premises to be searched, in order to examine those items for evidence" and that "[i]f it is determined that data has been seized that does not constitute evidence of the crimes detailed herein, the government will return said data within a reasonable time." *Id*.

Using language identical to SA Aycock, SA Faulkner also represented to the magistrate judge that he "knows that individuals involved in the sexual exploitation of children through child pornography almost always keep copies of their sexual explicit material" and that "they are most often kept in a place considered secure, usually a residence, to avoid detection by law enforcement." *Id*.

C.  November 8, 2019: Execution of the Second Search Warrant

On November 8, 2019, HSI executed the Second Search Warrant at a business—a used car dealership—located at 14969 Wildcat Creek Road in Springdale, Arkansas.

From the business, the Government seized an Apple iPhone, a MacBook Pro, a Digital Video Recorder Drive, an HP Desktop Computer All-in-One, an 8GB thumb drive, a 16 GB SD

Card, an 8GB Micro SD Card, and a 4 GB Thumb Drive. *See* Case Number 5:19-cm-115-ELW (Doc. 3).

### D.  Subsequent Searches by Marshall Kennedy

Discovery reveals that since executing the Second Search Warrant, the Government has repeatedly searched—and continues to search—the items seized on November 8, 2019. For instance, the Government turned over discovery indicating HSI computer forensic analyst Marshall Kennedy conducted searches in 2019, throughout 2020, and as recently as April 2021.

### E.  Subsequent Searches by Bradley Gordon

Discovery also shows that United States Department of Justice examiner Bradley Gordon conducted searches on November 30, 2020 and February 22, 2021. However, by his own written admission, Gordon did *not* search the seized devices pursuant to the Second Search Warrant through which they were seized and through which the searches were, *arguendo*, authorized.

Instead, Gordon searched the devices pursuant to "search warrant case number 19-CM-111, signed by the Honorable Erin L. Wiedemann on October 29, 2019"—*i.e.,* the First Search Warrant—which the Government has represented to this Court was "not executed." *See* Case Number 5:19-cm-1111-ELW (Doc. 3).

## II.    The Government's May 2019 Use of Torrential Downpour Requires Suppression

Based on the limited discovery disclosed by the Government to date, this investigation originated in May 2019 based on Little Rock Police Department Detective Amber Kalmer's use of "Torrential Downpour," proprietary software created by law enforcement, for use by law enforcement, which is not commercially available. *See* Affidavit of Digital Forensics Expert Michele Bush at 5 (Exhibit 3).

Torrential Downpour has been the subject of various legal challenges focusing on its methodology as a general proposition. For example, the Eighth Circuit recently rejected a suppression challenge predicated on the argument "that because BitTorrent is a software that intentionally obscures the transmitted communication by encrypting the information and decentralizing the delivery system, [that defendant's] enhanced efforts to protect the privacy of the communications creates a reasonable expectation of privacy that might not exist with other file sharing programs." *United States v. Hoeffener*, 950 F.3d 1037, 1044 (8th Cir. 2020). The Eighth Circuit's rationale was straightforward: that defendant's "attempt to distinguish BitTorrent software from other peer-to-peer programs does not alter the fact that he allowed public access to the files on his computer." *Id*. This, however, is not the basis of Duggar's challenge.

In a somewhat related but different context, the Eighth Circuit has made clear that a warrant is required where law enforcement "sent computer code to the defendants' respective computers that searched those computers for specific information and sent that information back to law enforcement." *United States v. Horton*, 863 F.3d 1041, 1047 (8th Cir. 2017). The court reiterated what is now well accepted: "Even if a defendant has no reasonable expectation of privacy in his IP address, he has a reasonable expectation of privacy in the contents of his personal computer." *See id*; *see also United States v. Turner*, 839 F.3d 429, 434 (5th Cir. 2016) ("a privacy interest exists in the electronic contents of computers and cell phones"); *Riley v. California*, 573 U.S. 373, 395 (2014) ("it is no exaggeration to say that many of the more than 90% of American adults who own a cell phone keep on their person a digital record of nearly every aspect of their lives—from the mundane to the intimate").

In this case, HSI did not deploy Torrential Downpour. Rather, based on discovery, Detective Amber Kalmer with the Little Rock Police Department used Torrential Downpour and,

even after Duggar was indicted, SA Faulkner testified he had no idea what software Detective Kalmer used to allegedly identify the IP address and files at issue. At the May 2021 detention hearing, SA Faulkner was asked, "[t]he software that the detective was using, that you testified she used to identify an IP address, what software was that?" (Det. Hearing, Tr. at 63). His response was, "I'm not aware. I just know that she was able to connect to that IP address." (*Id.*). This testimony is remarkable given SA Faulkner's previous testimony that he supervised SA Aycock in his first investigation and SA Faulkner was therefore "personally involved in all aspects of this investigation." (*Id*. at 58).

To date, the Government has disclosed literally no discovery about the Little Rock Police Department's investigation with one important exception: the Government disclosed autogenerated Torrential Downpour logs related to May 14, 2019 and May 15, 2019 (the "Torrential Downpour Logs"). The Government also disclosed a screenshot that appears to be of SA Faulkner's computer screen reflecting an important fact: the May 14, 2019 torrent Detective Kalmer allegedly followed to download the video file from IP address 167.224.196.113 was associated with OzarksGo and the IP type was "residential." *See* Screenshot (Exhibit 4). Indeed, the screenshot also reveals a fact that remains unexplained: the torrent that was allegedly downloaded by Detective Kalmer at 10:42 p.m. UTC on May 14, 2019, was *also* downloaded by David Warren on that same date and time, and was *also* downloaded by Brandon King at 10:44 p.m. UTC on May 14, 2019. *See id*. As Torrential Downpour runs automatically and around the clock, if the software works as law enforcement would have courts believe, there is no obvious explanation for why the download dates and times by all three law enforcement entities were not identical. And as the Torrential Downpour connection is a direct "single source download" (*see* Exhibit 3 at 5)—in stark contrast to commercially-available Bit Torrent platforms which download

a file from many different sources simultaneously (*see* Exhibit 3 at 3-4)—there is no evident explanation for why two separate law enforcement entities were allegedly able to successfully download the same single video file at precisely the same time.

Furthermore, the autogenerated Torrential Downpour Logs for the May 15, 2019 download tell an important story. In contrast to what is reflected in the two search warrant affidavits, the Torrential Downpour Logs reveal that the "marissa.zip" file was *not* successfully downloaded by Detective Kalmer. (*See* Exhibit 3 at 7). Rather, the log reveals that Detective Kalmer spent 17 hours attempting 169 times to download the zip file but, even then, failed to download that zip file. (*See id.*). And, critically, the Torrential Downpour Logs reveal only 13 of 66 pieces of that zip file were downloaded, rendering it impossible for anyone to have viewed any actual image contained in the zip file. (*See id.*). As Ms. Bush explains, this is because the "file header" associated with the zip file was not successfully downloaded which rendered the 13 pieces actually downloaded entirely unusable. (*See id.*). Without the file header, "any system or software will render the file 'corrupted' and will be inaccessible to a user." (*See id.*). As such, SA Faulkner's claim that he "reviewed the two files successfully downloaded by the HSI ICAC affiliate computer from IP address 167.224.196.113" and, in particular, to conclude that "the 'zip' folder contains approximately sixty-five (65) image files of a prepubescent female, many of which were consistent with child pornography" was necessarily untrue according to Ms. Bush based on the Torrential Downpour Logs disclosed by the Government. (*See* Exhibits 2 and 3).

In other words, what effectively transpired and what is entirely missing from the affidavit in support of the search warrant is that law enforcement kept trying—169 times over a period of 17 hours—to maintain a connection and download this zip file but the Torrential Downpour Logs reveal there was no zip file available to download. (*See* Exhibit 3 at 7). Thus, law enforcement,

9

through this software, repeatedly tracked and tracked and tracked the device and, even then, downloaded less than 20% of the zip file, rendering it impossible to open and/or view without the file header. (*See id.*).

These Torrential Downpour Logs reveal that Torrential Downpour did more than simply act as a Bit Torrent platform to capture an IP address—which was the issue before the Eighth Circuit in *Hoeffener*. Instead, the Government used a law enforcement software tool that acted more like a GPS tracking device than a Bit Torrent platform. In other words, rather than simply identifying an IP address, law enforcement identified an IP address and then repeatedly tracked it for 17 straight hours. This matters because the Government did not obtain a warrant prior to its May 2019 activities.

As this Court has recognized, when law enforcement uses a device to track information— generally, but especially when the law enforcement device is located outside the judicial district where the device being tracked is located—a warrant is required. *See, e.g., United States v. Jean*, 207 F. Supp. 3d 920, 937 (W.D. Ark. 2016). Indeed, "[i]nternet crime and surveillance defy traditional notions of place" and a warrant is required to track "mere intangible 'information.'" *Id*. at 941 (citing Fed. R. Crim. P. 41(a)(2)(A)). In other words, law enforcement may use "electronic tracking tools and techniques" to identify where "a crime suspect—or evidence of his crime—may be located," but only by obtaining an NIT warrant. *Id*. Here, there is no dispute law enforcement did not obtain a warrant to conduct its May 2019 activities.

When Detective Kalmer's use of Torrential Downpour failed to successfully download the zip file the first time, the interaction between the two devices should have ended as it would have in the context of a traditional Bit Torrent platform—but law enforcement kept tracking this device and did so 169 times over the next 17 hours. (*See* Exhibit 3 at 7). As the Torrential Downpour

Logs reveal, law enforcement tried and tried to download the zip file, tracking this particular device in an effort to search it for files the device did not possess and thus *not* made available to the public. (*See* Exhibit 3 at 7). For if the device possessed these files and made them available to the public, law enforcement would have simply downloaded the entire file on its very first attempt. Instead, two HSI investigators falsely claimed in affidavits that the zip file had been successfully downloaded, further falsely claimed they each personally reviewed the 65 images contained on the successfully downloaded zip file, and by entirely hiding the fact that the zip file was not successfully downloaded even after 17 hours and 169 attempts. (*See* Exhibit 3 at 7).

At a minimum, the Government should be required to establish at a suppression hearing precisely how Torrential Downpour interacted with the device(s) at issue in this case in May 2019 in light of the evidence disclosed to date because suppression will turn on the specific factual inquiry of what law enforcement actually did. To be clear, this issue was not before the court in *Hoeffener* and this aspect of Duggar's motion turns on what factually transpired in this particular case.

### III.    The Second Search Warrant Was Not Supported by Probable Cause

In reviewing the validity of a search warrant issued by a magistrate judge, this Court must ensure "that the magistrate had a substantial basis for … [concluding] that probable cause existed." *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983) (internal quotation and citation omitted). Although reviewing courts give "great deference" to a magistrate judge's determination of probable cause, the bottom line remains that "[d]eference to the magistrate … is not boundless." *United States v. Leon*, 468 U.S. 897, 914 (1984).

"Probable cause exists, if under the totality of the circumstances, a showing of facts can be made sufficient to create a fair probability that evidence of a crime will be found in the place to be

searched." *United States v. Johnson*, 848 F.3d 872, 876 (8th Cir. 2017) (internal citations and quotations omitted). This Court must not only look at the totality of the circumstances, but must also consider timing: "[t]he date of the evidence in the affidavit is important to the probable cause determination because untimely information may be deemed stale." *United States v. Lemon*, 590 F.3d 612, 614 (8th Cir. 2010).

At its core, the entire basis offered to establish probable cause in the affidavit in support of the Second Search Warrant boils down to this: (1) a single video file with an innocuous name was allegedly successfully downloaded by law enforcement through the Bit Torrent network on May 14, 2019; (2) a 65-image zip file was allegedly successfully downloaded by law enforcement through the Bit Torrent network on May 15, 2019; and (3) the IP address is associated with a used car business that caters to the general public and has numerous employees on the premises at any given time.

To be clear, law enforcement applied for this Second Search Warrant on November 4, 2019—approximately *six months* after the Torrential Downpour download. (*See* Exhibit 2). The affidavit contains no nexus between those alleged downloads and any specific device and there is no evidence at all supporting the premise that evidence of child pornography would be found at this business location in November 2019. *See id.* To call the affidavit "bare bones" would be charitable.

The time that elapsed between the only basis for alleged child pornography and the application for the search warrant is significant. The Supreme Court has recognized for nearly a century that the "proof of probable cause [that] must be taken by the judge or commissioner…must be of facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time." *Sgro v. United States*, 287 U.S. 206, 210 (1932). "A warrant becomes stale if

the information supporting the warrant is not sufficiently close in time to the issuance of the warrant and the subsequent search conducted so that probable cause can be said to exist as of the time of the search." *Johnson*, 848 F.3d at 877 (internal citations and quotations omitted).

Duggar acknowledges that there is no set time applicable to every case and that courts have found a lack of staleness in certain child pornography cases given the nature of the offense. But a closer read of these cases reveals a theme: as here, law enforcement opined that "child pornographers commonly retain pornography for a lengthy period of time" and it is "most often kept in a place considered secure, *usually a residence*, to avoid detection by law enforcement." (*See* Exhibit 2) (emphasis added). *See also United States v. Estey*, 595 F.3d 836, 839 (8th Cir. 2010) (denying staleness challenge in child pornography case because "individuals in a one-story *house* are unlikely to either move or replace computers within such a short span") (emphasis added); *United States v. Manning*, 361 F. Supp. 3d 839, 852 (D. Minn. 2019) ("federal courts have recognized that, in child pornography investigations, information may be deemed not stale despite the passage of months or even years before the issuance of a warrant, due to the well-known habits of people possessing child pornography to collect or hoard such images in a secure, private environment such as computers or other electronic or digital media *in their homes*") (emphasis added). The same simply cannot be said for a business like a used car dealership that caters to the general public. And that is particularly true for a business with transient employees using a shared computer and transient customers where people can be onsite accessing the business' internet for months, weeks, days, or even an hour or two.

The bottom line is that there was no reason for the magistrate judge to conclude that evidence of child pornography would be found at a business (not a residence) simply because an unknown device allegedly contained two files approximately six months earlier (even if this Court

were to set aside the falsities in the affidavit). To state the obvious, when law enforcement applied for the warrant, the alleged child pornography could have been on a business device, a business owner's device, a customer's device, or a complete stranger's device using the business's Wi-Fi and, therefore, its IP address. (*See* Exhibit 3 at 2-3). That alone should not have given the Government *carte blanch* authority to storm into the business nearly six months later, seizing everything in sight. One can only imagine whether that basis for probable cause would have justified the search and seizure of every computer device and telephone at, for example, Fayetteville Autopark six months later. The Fourth Amendment protects precisely against such governmental overreach and this Court should say so here.

## IV.   The Thin Basis of Probable Cause Was Predicated on False Statements

While probable cause was lacking as discussed *supra*, even assuming for the sake of argument the affidavits offered in support of the warrants did contain enough information for the magistrate judge to conclude otherwise, it has become clear that false statements and omissions misled the judge. Had the affidavits been accurate, the magistrate judge would not have issued either warrant—including, for purposes of this motion, the Second Search Warrant. As such, Duggar respectfully requests a hearing pursuant to *Franks*.

In their affidavits in support of each warrant, SA Aycock and SA Faulkner curiously omit the fact that the Little Rock Police Department detective was using Torrential Downpour, software created by law enforcement for law enforcement that is not commercially available to the public. (*See* Exhibits 1 and 2). In many ways, Torrential Downpour remains a black box as the Government has historically fought tooth and nail to protect it from being meaningfully reviewed and understood by anyone outside of law enforcement. (*See* Exhibit 3 at 6). Using this software, the detective was allegedly able to learn that a device accessing a particular IP address was sharing

14

or possessing "torrents" which law enforcement believed to be suspected pornography based on prior, unrelated investigations.

To be clear, a "torrent" is a text file that contains instructions for torrent client software for downloading a file or sets of files on the Bit Torrent network. (*See* Exhibit 3 at 4). Torrent files *do not* contain the actual data such as images or videos. (*See id.*). Based on the info hash[1] of the torrent file, the detective in Little Rock assumed the suspected device had downloaded child pornography. Based only on this assumption, the detective utilized Torrential Downpour to directly connect to a particular device ("single source download") (*see id*. at 5) in a manner that ordinary users of the Bit Torrent network cannot do. (*See id.* at 3-4). This direct connection occurred without a warrant.

In this case, the Government claims to have downloaded a single video file titled "mov_0216.mp4" on May 14, 2019 and the Government also claims to have "successfully downloaded" a zip file titled "marissa.zip" containing 65 images on May 15, 2019. (*See* Exhibits 1 and 2). However, the Torrential Downpour Logs tell an altogether different story.

In spite of the Government's narrative, the Torrential Downpour Logs reveal that the "marissa.zip" file was *not* successfully downloaded. (*See* Exhibit 3 at 7). Rather, the Government downloaded only 13 of 66 pieces of that zip file and only did so after the software repeatedly attempted—unsuccessfully—to download the zip file for 17 straight hours. In other words, what effectively transpired is that law enforcement kept attempting to maintain a connection and download this zip file but the logs reveal it was unsuccessful in every single one of its 169 attempts. (*See id*. at 7). Thus, law enforcement, through this software, repeatedly tracked the device and, even then, downloaded less than 20% of the file. This necessarily meant that SA Faulkner's

---

[1] An "Info Hash" is a mathematical algorithm or hash value said to identify a torrent, though it is *not* the actual files the torrent would download if parsed. Thus, identifying the hash value of a torrent does *not* necessarily presuppose a suspected device possessed child pornography because none exists unless a torrent is parsed. (*See* Exhibit 3 at 4).

representation in the Second Search Warrant affidavit that he personally reviewed the zip file is plainly false—as Ms. Bush concludes based on the Torrential Downpour Logs, he did not because he could not have. (*See id*. at 7).

"A defendant is entitled to [a *Franks*] hearing if he 'makes a substantial preliminary showing that a false statement was knowingly and intentionally, or with reckless disregard for the truth, included by the affiant in the warrant affidavit,' and 'the allegedly false statements is necessary to the finding of probable cause.'" *United States v. Timley*, 443 F.3d 615, 623 (8th Cir. 2006) (quoting *Franks*, 438 U.S. at 155-56).

In the context of a *Franks* analysis, district courts "must also insist" that the magistrate judge who signed the search warrant did "not serve merely as a rubber stamp for the police." *See Aguilar v. Texas*, 378 U.S. 108, 111 (1964). Where, as here, a defendant's attack on the warrant is "more than conclusory" and is "supported by more than a mere desire to cross-examine," a *Franks* hearing is mandated. *Franks*, 438 U.S. at 155-56, 171. Here, there are "allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations [are] accompanied by an offer of proof." *Id*. at 171.

In this case, SA Faulkner signed an under-oath affidavit in support of the search warrant but repeatedly made false statements, stating that on May 15, 2019, the Little Rock detective *successfully downloaded* the "marissa.zip" file containing 65 images. (*See* Exhibit 2) (stating that "two separate downloaded files were successfully obtained from IP Address 167.224.196.113"; "[o]ne of the downloaded files was a '.zip' folder containing approximately sixty-five (65) images and the other downloaded file was a single video"; the detective "then viewed portions of the downloaded files which were determined to be consistent with child pornography"; SA Faulkner personally "reviewed the two files *successfully downloaded* by the HSI ICAC affiliate computer

16

from IP address 167.224.196.113" (emphasis added); "the 'zip' folder contains approximately sixty-five (65) image files of a prepubescent female, many of which were consistent with child pornography").

The truth is, the Torrential Downpour Logs reveal that the zip file was *not* successfully downloaded—and therefore could not have been reviewed by Detective Amber Kalmer, SA Aycock, or SA Faulkner. (*See* Exhibit 3 at 7). Rather, the Government downloaded only 13 of 66 pieces of that zip file and only did so after the software repeatedly attempted—unsuccessfully— to download the zip file for 17 straight hours. In other words, what transpired is that law enforcement kept trying to maintain a connection and download this zip file but, after 17 hours, gave up. But in seeking a search warrant, SA Faulkner falsely and repeatedly stated the zip file was "successfully downloaded." (*See* Exhibit 2). This is even more troubling given SA Faulkner's testimony at the detention hearing that he did not know what software Detective Kalmer used. *See* Tr. at 63 ("I'm not aware. I just know that she was able to connect to that IP address").

A *Franks* hearing is also necessitated where, as here, an agent omits facts. *See United States v. Allen*, 297 F.3d 790, 795 (8th Cir. 2002) (a defendant must establish "first that facts were omitted with the intent to make, or in reckless disregard of whether they make, the affidavit misleading, and, second, that the affidavit, if supplemented by the omitted information, could not support a finding of probable cause") (internal citations omitted).

In addition to falsely stating (a) that the zip file was successfully downloaded; (b) that Detective Kalmer reviewed the zip file; and (c) that he personally reviewed the zip file, SA Faulkner also made false statements about the underlying technology. Specifically, SA Faulkner stated that "only one (1) unique IP number can be assigned to a given customer's computer at any given time." (*See* Exhibit 2 at ¶ 10). This is not true. Rather, multiple devices can and often do

share a single IP address at any given time—*e.g.*, all desktop computers, laptop computers, tablets, and phones connected to WiFi in the same location. (*See* Exhibit 3 at 2-3). Additionally, SA Faulkner stated that the "SHA1 [hash] is called secure because it is computationally infeasible for two files with different content to have the same SHA1 hash value." (See Exhibit 2 at ¶ 18). In fact, this is an outdated and plainly untrue assertion as hash collision is feasible. (*See* Exhibit 3 at 4). Instead, in 2012, the National Institute of Standards and Technology "deprecated use of SHA-1 due to its susceptibility to hash collision. That is, when two different datasets or files produce the same hash. Therefore, relying on SHA-1 hash values to identify a file is no longer reliable because it is computationally possible for two unique files to have the same SHA-1 hash value." (*See id.*).

These false statements—individually and collectively—warrant a *Franks* hearing and ultimately suppression.

Furthermore, SA Faulkner omitted many facts, each of which individually warrants a *Franks* hearing and, ultimately, suppression—and when these omitted facts are considered collectively, the need for a hearing is all the more evident.

*First*, the affidavit omits that law enforcement used Torrential Downpour between May 2019 and November 4, 2019 (the date of the affidavit) to track this same IP address and found *no* subsequent indicia of child pornography. In a warrant where SA Faulkner (using verbatim language as SA Aycock the week before) represented to the court that he "knows that individuals involved in the sexual exploitation of children through child pornography almost always keep copies of their sexual explicit material" and that "they are most often kept in a place considered secure, usually a residence, to avoid detection by law enforcement," it would be significant that there was no further suspicious activity on the Bit Torrent network notwithstanding law

18

enforcement's repeated tracking. In fact, based on the screenshot disclosed by the prosecution, three separate law enforcement agencies were apparently monitoring this IP address and found nothing. To be certain, this omission of what transpired with Torrential Downpour was not based on the special agent's assumption that the software was reliable; rather, at Duggar's detention hearing, SA Faulkner made the stunning admission that he was "not aware" of the software used by the detective. *See* Tr. at 63 ("I'm not aware. I just know that she was able to connect to that IP address").

*Second*, the affidavit omits the fact that law enforcement previously applied for—and obtained—the First Search Warrant based on the very same alleged basis for probable cause and representations that this evidence would likely be found in a residence, but that law enforcement curiously opted not to even execute the First Search Warrant upon making contact with the residents at the house. (*See* Exhibit 2). If the magistrate judge had been educated to the fact that the previous warrant purportedly was issued without probable cause, this would have shaped her analysis of the existence or absence of probable cause with respect to the Second Search Warrant. Had HSI been upfront and honest with the magistrate judge, acknowledging that they had managed to convince her to sign a warrant authorizing a search at a location where even they concluded they were unlikely to find anything of evidentiary value, the magistrate judge presumably would have hit the pause button and questioned the reliability of verbatim assertions in the Second Search Warrant affidavit. But HSI hid the ball and deprived the magistrate judge of that opportunity.

*Third*, the affidavit entirely omits the fact that law enforcement used Torrential Downpour and there is absolutely no information about the computer program, how it operates, and whether false positives occur. These omissions are inherently misleading because false positives inevitably occur when investigating because the Bit Torrent network is a complex and anonymous file sharing

platform. Hiding from the judge how the technology works is, definitionally, misleading and prevents an informed decision. This is especially true where, as here, the affidavit falsely represented to the magistrate judge that a zip file was successfully downloaded when it was not. These glaring omissions are even more stunning when considered in combination with the false statements.

*Fourth*, the affidavit omits entirely that the used car dealership law enforcement sought to search was a business that regularly catered to the general public in May 2019 and that regularly had transient workers and employees at that time. As such, the magistrate judge was left completely in the dark as to the vast privacy interests at stake.

*Fifth*, the affidavit entirely omits that the used car dealership law enforcement sought to search may have had unsecured Wi-Fi in May 2019 and/or secured Wi-Fi where the password was widely known, disseminated, and used. Had this fact been disclosed, it would have necessarily lessened probable cause to believe evidence of a crime would exist six months later at a business with internet readily accessible by countless employees and customers.

*Sixth*, in his affidavit in support of a search warrant for a business predicated entirely on an IP address allegedly captured in May 2019, SA Faulkner omitted the fact that the ISP assigned this IP address to a *residential* account. When law enforcement sought a warrant to search a business based on allegedly suspicious activity utilizing a single IP address, disclosure to the magistrate judge that this IP address was assigned to a residential account—not a business—on the date at issue is significant. But the affiant also hid that fact from the magistrate judge.

These false statements and omissions were intentional or, at a minimum, the result of a reckless disregard for truth. SA Faulkner held himself out before this Court at the detention hearing as a veteran investigator of child pornography offenses involving computer technology. He knew

20

from the Torrential Downpour Logs that the zip file was not successfully downloaded (not even close), that Torrential Downpour tried to download it for 17 hours and still failed, and he nevertheless falsely stated in his affidavit and even went one step further claiming to have viewed images contained within the successfully-downloaded zip file. Moreover, SA Faulkner had access to a vast network of computer forensic experts from whom he could obtain information—his decision to not make use of this resource for no good reason (if that is what he claims happened) unquestionably amounts to a reckless disregard of the truth.

Individually and collectively, the purpose of these false statements and omissions was clear: to overstate and misrepresent the likelihood that Duggar's IP address had originally possessed numerous files on multiple days containing child pornography to persuade the magistrate judge to issue the Second Search Warrant. Without these false statements and omissions, the affidavit did not establish probable cause. Indeed, if these false statements and omissions were not included, all that would be left in this November 2019 affidavit is that a single file with an innocuous name was downloaded on May 14, 2019 for approximately one minute from an IP address at a car dealership that caters to the general public, that has transient employees and workers, and that may have had unsecured Wi-Fi. To underscore what should be painfully obvious to this Court, SA Faulkner clearly knew he had a problem with probable cause if he told the magistrate judge that the IP address was assigned to a *residential* account, even though he was seeking to search a business location.

V.    **The Searches of the Devices Including the HP Computer Were Warrantless As They Did Not Occur Until After the Warrant Expired**

"It is settled law that the search and seizure of evidence, conducted under a warrant, must conform to the requirements of that warrant." *United States v. Brunette*, 76 F. Supp. 2d 30, 42 (D. Me. 1999) (citing *Massachusetts v. Sheppard*, 468 U.S. 981, 988 n. 5 (1984)). "The element of

time can admittedly affect the validity of a search warrant." *United States v. Bedford*, 519 F.2d 650, 655 (3d Cir. 1975) (citing *U. S. ex rel. Beal v. Skaff*, 418 F.2d 430, 433 (7th Cir. 1969)).

In *Brunette*, the United States District Court for the District of Maine suppressed all evidence obtained by the Government's search of a computer after the deadline imposed in the search warrant. *Brunette*, 76 F. Supp. 2d at 42. That defendant was being investigated for child pornography offenses. *Id*. at 32. The Government applied for and obtained a search warrant on February 4, 1999, to search the defendant's home for items related to child pornography. *Id*. at 42. On February 9, 1999, the Government executed the search warrant and seized two computers from the home. *Id*. In the search warrant, recognizing the complexity of searching a computer, the magistrate judge indicated that the Government would be permitted an additional thirty days after the seizure of the computers to perform actual searches of the computers that were seized. *Id*. Then, on March 9, 1999, the day the additional thirty-day period was to expire, the Government applied for, and was granted, a thirty-day extension to complete its search of computers. *Id*. Nonetheless, despite having sixty days to investigate the defendant's computer, the Government failed to execute its search until two days after the deadline expired. *Id*. The court explained, "because the Government failed to adhere to the requirements of the search warrant and subsequent order, any evidence gathered from the...computer is suppressed." *Id*. The district court's analysis boiled down to a simple but legally critical underpinning: the search exceeded the temporal bounds of the warrant itself and it was therefore unconstitutional requiring suppression.

In this case, the search warrant was signed November 4, 2019 and expressly required that the warrant was executed by November 18, 2019. *See* Second Search Warrant (Exhibit 5) ("**YOU ARE COMMANDED** to execute this warrant on or before 11/18/19) (bold and capitalized lettering in original). The Government seized devices on November 8, 2019 (within the 14 days

22

permitted by the warrant), but did not search those devices and seize items pursuant to the limitations set out in Attachment B until months and even years after the deadline. (The Government did not request a subsequent deadline and the Court, therefore, did not grant one.) To this day, HSI has never filed a subsequent inventory of items seized from any subsequent search of any particular computer or electronic device or hard drive.

To be clear, the plain language of the warrant itself does not, and did not, permit HSI to seize all documents and data from the computers or electronic devices; rather, Attachment B includes a much more particularized subset of information that HSI may seize. In his affidavit in support of the Second Search Warrant, SA Faulkner stated that searching computer storage devices "can take *up to several months* to complete" and sought "authorization in this application to seize the items set forth in attachment 'B' that are found on the premises to be searched, in order to examine those items for evidence" and that "[i]f it is determined that data has been seized that does not constitute evidence of the crimes detailed herein, the government will return said data *within a reasonable time*." (*See* Exhibit 2) (emphasis added). However, after several months transpired, HSI did not request that the magistrate judge give it any additional time beyond the time frame specified in the warrant—and only requested that HSI be permitted to conduct the particularized searches offsite. As recent discovery reveals, government investigators have continued to perform searches of the devices—*years* later—including as recently as February 2021; and the examiner who performed that search did it pursuant to the invalid First Search Warrant that the prosecutors in this case maintain was never executed. *See* Case Number 5:19-cm-1111-ELW (Doc. 3).

The bottom line is this: HSI has acted as if the law permitted investigators to seize the computers and electronic media, to image them in their entirety, and to search them at any time thereafter with literally no temporal limitation. But that is not what the Fourth Amendment

requires. Exactly as in *Brunette*, the Government has failed to perform searches of the computers and other devices within the time allowed under the plain language of the warrant. Accordingly, this Court should suppress all evidence seized pursuant to any warrantless search of the computers.

Furthermore, Federal Rule of Criminal Procedure 41(e)(2)(B) does not change this analysis—but if this Court were to conclude it does, it is both facially unconstitutional and unconstitutional as applied to Duggar.

Federal Rule of Criminal Procedure 41 governs searches and seizures that are authorized by federal courts. In 2009, Rule 41 was amended and now provides,

> A warrant under Rule 41(e)(2)(A) may authorize the seizure of electronic storage media or the seizure or copying of electronically stored information. Unless otherwise specified, the warrant authorizes a later review of the media or information *consistent with the warrant*. The time for executing the warrant in Rule 41(e)(2)(A) and (f)(1)(A) refers to the seizure or on-site copying of the media or information, and not to any later off-site copying or review.

Fed. R. Crim. P. 41(e)(2)(B) (emphasis added).

In other words, Rule 41(e)(2)(B) purports to give law enforcement the ability to seize and copy computer data during the execution of a valid search warrant and then to perform the actual search of the data at some unspecified date in the future. However, as a matter of law, a rule of criminal procedure—while important in some capacities—does not and cannot circumvent an individual's constitutional rights. Indeed, the Rules of Criminal Procedure are promulgated pursuant to 28 U.S.C. § 2072, the Rules Enabling Act. This Act gives the Supreme Court "the power to prescribe general rules of practice and procedure and rules of evidence for cases in the United States district courts (including proceedings before magistrate judges thereof) and courts of appeals." 28 U.S.C. § 2072(a). However, the Act also commands, in language that is as clear as day, "[s]uch rules shall not abridge, enlarge or modify any substantive right." 28 U.S.C. § 2072(b).

Thus, as a matter of federal law, the Federal Rules of Criminal Procedure "shall not abridge, enlarge or modify any substantive right." *See* 28 U.S.C. § 2072(b). And in "prescrib[ing] general rules of practice and procedure and rules of evidence for cases in the United States district courts," neither the Supreme Court nor Congress has the power to amend the Constitution. *See* 28 U.S.C. § 2072(a). The rules are important but neither the rules nor the Constitution may be interpreted to—in any way—"abridge, enlarge or modify any substantive right." 28 U.S.C. § 2072(b). Thus, the question turns on whether a "substantive right" is implicated. *Id*.

In this case, there can be no meaningful dispute that a substantive right is implicated: the Fourth Amendment right to be free from unreasonable warrantless searches. Where, as here, the Government seizes a computer pursuant to a warrant, holds onto it indefinitely, and then takes the position that it has the authority to perform a particularized search of the computer from then until eternity, a defendant's constitutional rights are unquestionably violated. Thus, to the extent this Court were to read and interpret Rule 41(e)(2)(B) in such a broad capacity, the rule would undoubtedly be unconstitutional on its face. But the affidavit in this case expressly stated the search would take "several months" and that it would return the devices within a reasonable timeframe.

To be certain, the underlying basis for the 2009 amendment of Rule 41 appears reasonable. It was intended to address the practical difficulty that can accompany executing a search of a computer and to provide the Government a reasonable amount of time to conduct these searches. Specifically, in justifying the addition of subsection (e)(2)(B), the Committee Comments note,

> Computers and other electronic storage media commonly contain such large amounts of information that it is often impractical for law enforcement to review all of the information during execution of the warrant at the search location. This rule acknowledges the need for a two-step process: officers may seize or copy the entire storage medium and review it later to determine what electronically stored information falls within the scope of the warrant...While consideration was given to a presumptive national or uniform time period within which any subsequent off-site copying or review of the media or electronically stored information would take

place, the practical reality is that there is no basis for a 'one size fits all' presumptive period. A substantial amount of time can be involved in the forensic imaging and review of information. This is due to the sheer size of the storage capacity of media, difficulties created by encryption and booby traps, and the workload of the computer labs.

*See* Committee Comments to 2009 Amendments to Fed. R. Crim. P. 41.

While the drafters of Rule 41(e)(2)(B) resisted the temptation to craft a "one size fits all" period within which the search of a seized computer must occur, it cannot reasonably be argued that the amendment allows for the search of a computer *years* after its seizure—because, after all, that would constitute a "one size fits all" rule in which the "one size" is that there is no temporal limitation at all. Indeed, the Committee Comments make clear that the sole reason a hard and fast temporal limitation was not included in Rule 41(e)(2)(B) is because every computer is different. The Committee Comments also make clear that it was not the intention for Rule 41(e)(2)(B) to allow for searches of computers for years after they were seized. Critically, even if this were the intent of the amendment to Rule 41, the Rule itself would not withstand constitutional scrutiny.

For a search warrant to be valid under the Fourth Amendment, it must be based on probable cause that is not "stale." "If the police were allowed to execute the warrant at leisure, the safeguard of judicial control over the search which the fourth amendment is intended to accomplish would be eviscerated. Thus, a search pursuant to a 'stale' warrant is invalid." *Bedford*, 519 F.2d at 655; *see also United States v. Brewer*, 588 F.3d 1165, 1173 (8th Cir. 2009) ("because the Fourth Amendment and Rule-embodied policies at issue here are designed 'to prevent the execution of a stale warrant,' our analysis of the delay in executing the warrants considers only whether the delay rendered the warrants stale") (internal citation omitted). "A warrant becomes stale if the information supporting the warrant is not 'sufficiently close in time to the issuance of the warrant and the subsequent search conducted so that probable cause can be said to exist as of the time of

the search.'" *Id.* (emphasis added) (quoting *United States v. Palega*, 556 F.3d 709, 715 (8th Cir. 2009)). "[I]t is material that 'the facts in an affidavit supporting a search warrant must be sufficiently close in time to the issuance of the warrant *and the subsequent search conducted* so that probable cause can be said to exist as of the time of the search and not simply as of some time in the past.'" *Palega*, 556 F.3d at 715 (quoting *United States v. Wagner*, 989 F.2d 69, 75 (2d Cir. 1993) (emphasis added)). Thus, in this case, searches as late as 2020 and 2021 are unquestionably unconstitutional because there can be no meaningful argument that probable cause existed "at the time of the search." *Id.*

Moreover, even if this Court is not convinced that Rule 41(e)(2)(B) is *per se* unconstitutional, it is patently unconstitutional as applied to Duggar. As set out *supra*, the Fourth Amendment protects individuals from unreasonable searches and seizures. A search pursuant to a search warrant is reasonable if it is based on probable cause. This case epitomizes the need for a temporal limitation. It has been nearly two years since the computers were seized pursuant to a search warrant—and HSI is doing exactly what the constitution prohibits: sitting on seized evidence and waiting to conduct a search years after applying for a warrant and tailoring the searches not to the warrant, but instead to trial strategy.

## VI.    The November 2020 and February 2021 Searches By DOJ Examiner Bradley Gordon Were Warrantless and Should Be Suppressed

Two particular searches that occurred in November 2020 and February 2021 also require suppression for an entirely separate reason: they were conducted pursuant to an invalid warrant that law enforcement represented to this Court was "not executed." *See* Case Number 5:19-cm-1111-ELW (Doc. 3) (The Government filed a November 8, 2019 return indicating the First Search Warrant was "not executed" and stated, "no devices searched").

27

It is black letter law that a warrantless search of an electronic device is unconstitutional unless "it falls within a specific exception to the warrant requirement." *Riley*, 573 U.S. at 382.

Based on discovery, Department of Justice examiner Bradley Gordon conducted searches of seized computers and devices on November 30, 2020 and February 22, 2021. However, Mr. Gordon did not search the seized devices pursuant to the Second Search Warrant pursuant to which they were seized. Rather, by his own written admission, Gordon searched the devices pursuant to "search warrant case number 19-CM-111, signed by the Honorable Erin L. Wiedemann on October 29, 2019"—*i.e.*, the First Search Warrant.

This requires suppression of the results of his search along with the fruits of the poisonous tree. *See, e.g., Murray*, 487 U.S. at 536-37 (the fruit of the poisonous tree doctrine "bars evidence which, though not obtained in [an] illegal search, was derived from information or items in the search").

## VII.    Conclusion

Based on the foregoing, Duggar respectfully requests that this Court enter an Order (1) suppressing all evidence seized from 14969 Wildcat Creek Road in Springdale, Arkansas, on November 8, 2019; (2) suppressing all evidence that was derived from information or items obtained during the search pursuant to the fruit of the poisonous tree doctrine; and (3) setting this matter for an evidentiary hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978).

Respectfully submitted,

**Margulis Gelfand, LLC**

 */s/ Justin K. Gelfand*
JUSTIN K. GELFAND, MO Bar No. 62265*
7700 Bonhomme Ave., Ste. 750
St. Louis, MO 63105
Telephone: 314.390.0234
Facsimile: 314.485.2264
justin@margulisgelfand.com
*Counsel for Defendant*
*\*Admitted Pro Hac Vice*

*--- and ---*

**Story Law Firm, PLLC**

*/s/ Travis W. Story*
Travis W. Story, AR Bar No. 2008278
Gregory F. Payne, AR Bar No. 2017008
3608 Steele Blvd., #105
Fayetteville, AR 72703
Telephone: (479) 448-3700
Facsimile: (479) 443-3701
travis@storylawfirm.com
greg@storylawfirm.com

**<u>Certificate of Service</u>**

I hereby certify that the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon the Office of the United States Attorney.

                          <u>*/s/ Justin K. Gelfand*         </u>
                          JUSTIN K. GELFAND, MO Bar No. 62265*
                          7700 Bonhomme Ave., Ste. 750
                          St. Louis, MO 63105
                          Telephone: 314.390.0234
                          Facsimile: 314.485.2264
                          justin@margulisgelfand.com
                          *Counsel for Defendant*
                          *\*Admitted Pro Hac Vice*