EXHIBIT

1

exhibitsticker.com

ATTACHMENT C

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS

STATE OF ARKANSAS          :
                           :
                           :    ss.  **AFFIDAVIT**
                           :
COUNTY OF WASHINGTON       :

### Affidavit in Support of Application for Search Warrant

I, Howard Aycock, being duly sworn, depose and state as follows:

1.  I am a Special Agent with the U.S. Department of Homeland Security, Homeland Security Investigations ("HSI"), currently assigned to the Office of the Assistant Special Agent in Charge in Fayetteville, Arkansas. I have been so employed with HSI since April of 2015. Prior to being employed as a Special Agent, I was employed as a Border Patrol Agent from June of 2008 to April of 2015, with the U.S. Customs and Border Protection, Office of Border Patrol. I have completed the Criminal Investigator Training Program and HSI Special Agent training at the Federal Law Enforcement Training Center in Brunswick, Georgia. As part of my daily duties as an HSI Special Agent, I investigate criminal violations relating to child exploitation and child pornography including violations pertaining to the illegal production, distribution, online enticement, transportation, receipt and possession of child pornography, in violation of 18 U.S.C. §§ 2251, 2251A, 2422(b), 2252(a) and 2252A. I have received training in the area of child pornography and child exploitation, and have had the opportunity to observe and review numerous examples of child pornography (as defined in 18 U.S.C. § 2256) in all forms of media including computer media. I have also participated in the execution of numerous search warrants and arrest warrants, a number of which involved child exploitation and/or child pornography offenses. This

Joshua Duggar Discovery Provided 3-11-2021 1925

Affidavit is being submitted based on information from my own investigative efforts as well as information obtained from others who have investigated this matter and/or have personal knowledge of the facts herein.

2. This Affidavit is being submitted in support of an application for a search warrant for the premises located at **14993 Wildcat Creek Road, Springdale, Arkansas 72762,** the "SUBJECT PREMISES". As such, it does not include all of the information known to me as part of this investigation, but only information sufficient to establish probable cause for the requested search warrant.

### Statutory Authority

3. This investigation concerns alleged violations of Title 18, United States Code, Sections 2252 and 2252A, relating to material involving the sexual exploitation of minors, which has been defined in Title 18 U.S.C. 2256, as an individual under 18 years of age.

a. Under 18 U.S.C. Section 2252(a)(1) (transportation), 2252(a)(2) (receipt and distribution), and 2252(a)(4)(B) and 2252A(a)(5)(B) (possession), it is a federal crime for any person to transport, distribute, receive, and possess child pornography, as that term is defined by federal law. Further under 18 U.S.C. Section 2253(a)(3), a person who is convicted of an offense under 18 U.S.C. Section 2252 or 2252A, shall forfeit to the United States such person's interest in any property, real or personal, used or intended to be used to commit or to promote the commission of such offense.

### Computers and Child Pornography

4. Based upon my knowledge and experience in child exploitation and child pornography investigations, and the experience and training of other law enforcement officers with whom I have had discussions, I know that computers and computer technology have revolutionized

the way in which child pornography is produced, distributed and utilized. Prior to the advent of computers and the Internet, child pornography was produced using cameras and film, resulting in either still photographs or movies. The photographs required darkroom facilities and a significant amount of skill in order to develop ad reproduce the images. As a result, there were definable costs involved with the production of pornographic images. To distribute these images on any scale also required significant resources. The photographs themselves were somewhat bulky and required secure storage to prevent exposure to the public. The distribution of these wares was accomplished through a combination of personal contacts, mailings, and telephone calls, and compensation for these wares would follow the same paths. More recently, through the use of computers and the Internet, distributors of child pornography use membership-base/subscription-based websites to conduct business, allowing them to remain relatively anonymous.

5. In addition, based upon my own knowledge and experience in child exploitation and child pornography investigations, and the experience and training of other law enforcement officers with whom I have had discussions, I know that the development of computers has also revolutionized the way in which those who seek out child pornography are able to obtain this material. Computers serve four basic functions in connection with child pornography: production, communication, distribution, and storage. More specifically, the development of computers has changed the methods used by those who seek to obtain access to child pornography in these ways.

6. Producers of child pornography can now produce both still and moving images directly from a common video or digital camera. The camera is attached, using a device such as a cable, or digital images are often uploaded from the camera's memory card, directly to the computer. Images can then be stored, manipulated, transferred, or printed directly from the computer. Images can be edited in ways similar to how a photograph may be altered. Images can

be lightened, darkened, cropped, or otherwise manipulated. As a result of this technology, it is relatively inexpensive and technically easy to produce, store, and distribute child pornography. In addition, there is an added benefit to the pornographer in that this method of production does not leave as large a trail for law enforcement to follow.

7. The Internet allows any computer to connect to another computer. By connecting to a host computer, electronic contact can be made to literally millions of computers around the world. A host computer is one that is attached to a network and serves many users. Host computers are sometimes operated by commercial Internet Service Providers (ISPs) which allow subscribers to dial a local number and connect to a network which is, in turn, connected to the host systems. Host computers, including ISPs, allow e-mail service between subscribers and sometimes between their own subscribers and those of other networks. In addition, these service providers act as a gateway for their subscribers to the Internet or the World Wide Web.

8. The Internet allows users, while still maintaining anonymity, to easily locate (i) other individuals with similar interests in child pornography; and websites that offer images of child pornography. Those who seek to obtain images or videos of child pornography can use standard Internet connections, such as those provided by business, universities, and government agencies, to communicate with each other and to distribute child pornography. These communication links allow contacts around the world as easily as calling next door. Additionally, these communications can be quick, relatively secure, and as anonymous as desired. All of these advantages, which promote anonymity for both the distributor and recipient, are well known and are the foundation of transactions involving those who wish to gain access to child pornography over the Internet. Sometimes the only way to identify both parties and verify the transportation of

child pornography over the Internet is to examine the recipient's computer, including the Internet history and cache to look for "footprints" of the websites and images accessed by the recipient.

9. The computer's capability to store images in digital form makes it an ideal repository for child pornography. The size of the electronic storage media (commonly referred to as a "hard drive") used in home computers has grown tremendously with the last several years. Hard drives with the capacity of 160 gigabytes are not uncommon. These drives can store thousands of images at very high resolution. Magnetic storage located in host computers adds another dimension to the equation. It is possible to use a video camera to capture an image, process that image in a computer with a video capture board, and save that image to storage in another country. Once this is done, there is no readily apparent evidence at the "scene of the crime." Only with careful laboratory examination of electronic storage devices is it possible to recreate the evidence trail.

10. It should be noted that Internet Protocol (IP) numbers are unique identifiers leased to Internet customers by their ISP's. Although IP numbers are capable of changing over time, only one (1) unique IP number can be assigned to a given customer's computer at any given time. Logs of these leased IP's (and their assigned customer accounts) are stored by ISP's routinely.

11. Your Affiant knows from his own experience and the training and experience of other law enforcement officers that Internet computers identify each other by an Internet Protocol or IP address. These IP addresses can assist law enforcement in finding a particular computer on the Internet. These IP addresses can typically lead the law enforcement officer to a particular Internet service company and that company can typically identify the account that uses the address to access the Internet.

Joshua Duggar Discovery Provided 3-11-2021 1929

12. Law Enforcement uses specialized "peer to peer" (P2P) software to locate computers offering to participate in the distribution of child pornography images and files over P2P sharing networks in Arkansas. Millions of computer users throughout the world use P2P file sharing networks to share files containing music, graphics, movies and text. These networks have also become a popular way to download and distribute child pornography. Any computer user who can connect to the Internet can download P2P application software, which is typically free, and use it to share files through a P2P network.

13. The BitTorrent network is a very popular and publically available P2P file sharing network. Most computers that are part of this network are referred to as "peers" or "clients". A peer/client can simultaneously provide files to some peers/clients while downloading files from other peers/clients.

14. The BitTorrent network can be accessed by peer/client computers via many different BitTorrent network client (software) programs, examples of which include the BitTorrent client program, uTorrent client program, and Vuze client program, among others. These client programs are publically available and typically free P2P client software programs that can be downloaded from the Internet.

15. During the installation of typical BitTorrent network client programs, various settings are established which configure the host computer to share files via automatic uploading.

16. Typically, as users download files or pieces of files from other peers/clients on the BitTorrent network, other users (peers/clients) on the network are able to download the files or pieces of files from them, a process which maximizes the download speeds for all users on the network. Once a user has completed the download of an entire file or files, they can also continue

to share the file with individuals on the BitTorrent network who are attempting to download all pieces of the file or files, a process referred to as "seeding".

17. Files or sets of files are shared on the BitTorrent network via the use of "Torrents". A "Torrent" is typically a small file that describes the file(s) to be shared. It is important to note that "Torrent" files do not contain the actual file(s) to be shared, but information about the file(s) to be shared needed to accomplish a download.

18. The strength of a Peer to Peer Network is that it bases all of its file shares on the Secure Hash Algorithm (SHA1). This mathematical algorithm allows for the fingerprinting of files. Once you check a file with a SHA1 hashing utility capable of generating this SHA1 value (the fingerprint), that will be a fixed-length unique identifier for that file. The SHA1 hash is the current Federal Information Processing and Digital Signature Algorithm. The SHA1 is called secure because it is computationally infeasible for two files with different content to have the same SHA1 hash value.

19. This information includes things such as the name(s) of the file(s) being referenced in the "Torrent" and the "info hash" of the "Torrent". The "info hash" is a SHA-1 hash value of the set of data describing the file(s) referenced in the "Torrent". This set of data includes the SHA-1 hash value of each file piece in the torrent, the file size(s), and the file name(s). The "info hash" of each "Torrent" uniquely identifies the "Torrent" file on the BitTorrent network. The "Torrent" file may also contain information on how to locate file(s) referenced in the "Torrent" by identifying "Trackers".

20. "Trackers" are computers on the BitTorrent network that collate information about the peers/clients that have recently reported they are sharing the file(s) referenced in the "Torrent" file. A "Tracker" is only a pointer to peers/clients on the network who may be sharing part or all

Joshua Duggar Discovery Provided 3-11-2021 1931

of the file(s) referenced in the "Torrent". "Trackers" do not actually have the file(s) but are used to facilitate the finding of other peers/clients that have the entire file(s) or at least a portion of the file(s) available for sharing. It should also be noted that the use of "Tracker(s)" on the BitTorrent network are not always necessary to locate peers/clients that have file(s) being shared from a particular "Torrent" file. There are many publically available servers on the Internet that provide BitTorrent tracker services.

21. In order to locate "Torrent" files of interest and download the files that they describe, a typical user will use keyword searches on Torrent indexing websites, examples of which include isohhunt.com and the piratebay.org. Torrent indexing websites are essentially search engines that users on the BitTorrent network use to locate "Torrent" files that describe the files they are looking to download. Torrent indexing websites do not actually host the content (files) described by "Torrent" files, only the "Torrent" files themselves.

22. Once a "Torrent" file is located on the website that meets a user's keyword search criteria, the user will download the "Torrent" file to their computer. The BitTorrent network client program on the user's computer will then process that "Torrent" file in order to find "Trackers" or utilize other means that will help facilitate finding other peers/clients on the network that have all or part of the file(s) referenced in the "Torrent" file. It is again important to note that the actual file(s) referenced in the "Torrent" are actually obtained directly from other peers/clients on the BitTorrent network and not the "Trackers" themselves. Typically, the "Trackers" on the network return information about remote peers/clients that have recently reported they have the same file(s) available for sharing (based on SHA-1 "info hash" value comparison), or parts of the same file(s), referenced in the "Torrent", to include the remote peers/clients Internet Protocol (IP) addresses.

Joshua Duggar Discovery Provided 3-11-2021 1932

23. For example, a person interested in obtaining child pornographic images or videos on the BitTorrent network can go to a torrent indexing website and conduct a keyword search using a term such as "preteen sex" or "pthc" (pre-teen hardcore). The results of the keyword search are typically returned to the user's computer by displaying them on the torrent indexing website.

24. Based on the results of the keyword search, the user would then select a "Torrent" of interest to them to download to their computer from the website. Typically, the BitTorrent client program will then process the "Torrent" file.

25. Utilizing "trackers" and other BitTorrent network protocols, peers/clients are located that have recently reported they have the file(s) or parts of the file(s) referenced in the "Torrent" file available for sharing. The file or files are then downloaded directly from the computer(s) sharing the file or files.

26. Typically, once the BitTorrent network client has downloaded part of a file or files, it may immediately begin sharing the part of the file or files it has with other users on the network. The BitTorrent network client program succeeds in reassembling the file(s) from different sources only if it receives "pieces" with the exact SHA-1 hash value of that piece which is described in the "Torrent" file.

27. The downloaded file or files are then stored in an area (folder) previously designated by the user and/or the client program on the user's computer or designated external storage media. The downloaded file or files, including the torrent file, will remain in that location until moved or deleted by the user.

28. Law Enforcement can search the BitTorrent network in order to locate individuals sharing previously identified child exploitation material in the same way a user searches this

network. To search the network for these known torrents can quickly identify targets in their jurisdiction.

29. Law Enforcement receives this information from "Trackers" about peers/clients on the BitTorrent network recently reporting that they are involved in sharing digital files of known or suspected child pornography, based on "info hash" SHA-1 hash values of torrents. These torrents being searched for are those that have been previously identified by law enforcement as being associated with such files. There are BitTorrent network client programs which allow for single-source downloads from a computer at a single IP address, meaning that an entire file or files are downloaded only from a computer at a single IP address as opposed to obtaining the file from multiple peers/clients on the BitTorrent network. This procedure allows for the detection and investigation of those computers involved in sharing digital files of known or suspected child pornography on the BitTorrent network.

30. During the query and/or downloading process from a suspect BitTorrent network client, certain information may be exchanged between the investigator's BitTorrent client program and the suspect client program they are querying and/or downloading a file from. This information includes 1) the suspect client's IP address; 2) a confirmation from the suspect client that they have pieces of the file(s) being requested, in whole or in part, and that the pieces of the file(s) is being reported as shared from the suspect client program; and 3) the BitTorrent network client program and version being utilized by the suspect computer. The law enforcement has the ability to log this information.

31. It should be noted, during the downloading and installation of the publically available uTorrent client program, the license agreement for the software states the following: "Automatic Uploading. uTorrent accelerates downloads by enabling your computer to grab pieces

of files from other uTorrent or BitTorrent users simultaneously. Your use of the uTorrent software to download files will, in turn, enable other users to download pieces of those files from you, thereby maximizing download speeds for all users. In uTorrent, only files that you are explicitly downloading or sharing (seeding) will be made available to others. You consent to other users' use of your network connection to download portions of such files from you. At any time, you may uninstall uTorrent through the Add/Remove Programs control panel utility.

32.     In addition, you can control uTorrent in multiple ways through its user interface without affecting any files you have already downloaded thereby maximizing download speeds for all users. In uTorrent, only files that you are explicitly downloading or sharing (seeding) will be made available to others. You consent to other users' use of your network connection to download portions of such files from you. At any time, you may uninstall uTorrent through the Add/Remove Programs control panel utility. In addition, you can control uTorrent in multiple ways through its user interface without affecting any files you have already downloaded.

33.     Additionally, your Affiant knows that P2P software may display the Globally Unique Identifier (GUID) identification number of computers offering to share files on the network. A Globally Unique Identifier or GUID is a pseudo-random number used in software applications. This GUID number is produced when some P2P software applications are installed on a computer. While each generated GUID is not guaranteed to be unique, the total number of unique keys is so large that the probability of the same number being generated twice is very small. When comparing these GUIDs, your Affiant can quickly determine with a high degree of certainty that two different IP addresses that are associated with the same GUID are associated with the same computer.

Joshua Duggar Discovery Provided 3-11-2021 1935

## Summary of Investigation to Date

34. In May of 2019, a HSI Internet Crimes Against Children (ICAC) Task Force affiliate was conducting an online investigation on the BitTorrent Peer-to-Peer (P2P) file sharing network for offenders sharing child pornography. During the course of the online investigation, a connection was made between the HSI ICAC Task Force affiliate's investigative computer and a computer/device running BitTorrent software IP Address of **167.224.196.113**. During the investigation, multiple files were successfully downloaded from IP Address **167.224.196.113**. Within the files successfully downloaded was one (1) video file, titled "mov_0216.mp4" and one (1) zip file titled "marissa.zip" which contained approximately sixty-five (65) image files. The device at IP Address **167.224.196.113** was the only IP Address which shared the contents for the file downloaded, and as such, the file was downloaded directly from this IP Address. While connected to IP Address **167.224.196.113**, the HSI ICAC Task Force affiliate's investigative computer, at the time, captured multiple files being made available for public sharing within the network. The HSI ICAC Task Force affiliate then viewed portions of the files which were determined to be consistent with child pornography. The HSI Task Force affiliate then determined the IP Address was geo-located to Northwest Arkansas, at which time the lead information and download was forwarded to the HSI Assistant Special Agent in Charge Office in Fayetteville, Arkansas for further investigation. On October 15, 2019, your Affiant conducted additional record checks of IP Address **167.224.196.113** utilizing ICAC software tools. The search revealed that as of May 16, 2019, approximately ninety-three (93) files of investigative interest had been flagged as potential child exploitation material.

Joshua Duggar Discovery Provided 3-11-2021 1936

35. On October 21, 2019, your Affiant viewed two (2) files successfully downloaded by the HSI ICAC affiliate from IP Address **167.224.196.113,** specifically, the images contained within the file titled "marrisa.zip" and the one (1) video file titled "mov_0216.mp4". The file titled "marissa.zip" contained approximately sixty-five (65) image files of a prepubescent female, many of which were consistent with child pornography. Your Affiant more particularly described the files viewed as follows:

(a) File Name: **2203.jpg**

This image shows a prepubescent female approximately seven (7) to nine (9) years of age lying on her back and using her hands to expose her vagina and anus.

(b) File Name: **mov_0216.mp4**

This video is approximately two minutes and eleven seconds in length and depicts two (2) prepubescent females approximately seven (7) to nine (9) years of age. The prepubescent females are both completely naked laying on top of each other. A male subject then penetrated one of the prepubescent female's vagina with his erect penis.

36. An Internet search on the origin of the IP Address **167.224.196.113** found it to be issued to the Internet service provider Ozarks Go. A federal summons was issued to Ozarks Go in reference to IP Address **167.224.196.113** for the specific date and time the video and images of child pornography were successfully downloaded from the user. Documents received on or about October 7, 2019 from Ozarks Go identified the IP Address as being assigned to Joshua DUGGAR at 14993 Wildcat Creek Road, Springdale, Arkansas 72762, the SUBJECT PREMISES. A connection date of April 16, 2019 was listed for this account. Ozarks Go also provided PO BOX XXX, Tontitown, Arkansas 72770 as an additional mailing address to Joshua DUGGAR. Law enforcement queries revealed a 2004, R-Vision, Inc., model XMH motor home bearing Arkansas

license plate OMJKD and Vehicle Identification Number (VIN) 4UZAAHBS14CM99129 was registered to Joshua DUGGAR and Anna DUGGAR, PO BOX XXX, Tontitown, Arkansas 72770.

37. A federal summons was issued to Ozark Electric Cooperative in reference to address 14993 Wildcat Creek Road, Springdale, Arkansas 72762, the SUBJECT PREMISIS. Documents provided by Ozark Electric Cooperative on October 28, 2019, revealed an account service agreement assigned to Joshua DUGGAR, customer number 292144, for the service address of 14993 Wildcat Creek Road. An additional mailing address of PO BOX XXX, Tontitown, Arkansas 72770 was also linked to the account.

## Conclusion

38. *Necessity of On-site and Off-site examinations of entire computers or storage media.* Based on my experience and the training and experience of other agents, many of the items sought in this Affidavit may be stored electronically. Based on my experience and consultation with computer forensic experts, I know that electronic files can be easily moved from computer or electronic storage medium to another computer or medium. Therefore, electronic files downloaded to or created on one computer can be copied on or transferred to any other computer or storage medium at the same location. In addition, based on my experience, I know that searching computerized information for evidence of crime often requires special agents to seize most or all of a computer system's central processing unit (CPU), input/output peripheral devices, related software, documentation, and data security devices, including passwords, so that a qualified computer expert can accurately retrieve the system's data in a laboratory or other controlled environment. This is true because of the following:

(a) Volume of evidence: Computer storage devices such as hard disks, diskettes,

tapes and laser disks, can store the equivalent of thousands of pages of information. This sorting process can take up to several months to complete, depending on the volume of data stored. Therefore, it would also be impractical to attempt this type of data search on site.

(b) Technical requirements: Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert is qualified to analyze the system and its data. In any event, data search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to inadvertent or intentional destruction (both from external sources and from destructive code embedded in the system such as a "booby trap"), a controlled environment is essential to its complete and accurate analysis.

39.  Therefore, authorization is sought in this application to seize the items set forth in attachment "B" that are found on the premises to be searched, in order to examine those items for evidence. If it is determined that data has been seized that does not constitute evidence of the crimes detailed herein, the government will return said data within a reasonable time.

40.  Based on my experience and the training and experience of other agents involved with this investigation, your Affiant knows that individuals involved in the sexual exploitation of children through child pornography almost always keep copies of their sexual explicit material. Among the reasons copies are maintained is because child pornography is illegal to openly purchase, and the most common method of acquiring it is by trading with other people with similar interests. It is also known that due to the inherent illegality of these sexually explicit materials,

they are most often kept in a place considered secure, usually a residence, to avoid detection by law enforcement.

41. Based on the foregoing information, probable cause exists to believe there is located at **14993 Wildcat Creek Road, Springdale, Arkansas 72762**, the SUBJECT PREMISES, evidence of violations of Title 18, United States Code, Section 2522, et seq. Your Affiant prays upon his honorable court to issue a search warrant for the SUBJECT PREMISES for the items set forth in attachment "B" (which is attached hereto and incorporated herein by reference), that constitute evidence, fruits, and instrumentalities of violation of Title 18, United States Code, Section 2522, et seq.

_____
Howard Aycock, Special Agent
Homeland Security Investigations

Affidavit subscribed and sworn to before me this ___29th___ day of October, 2019

_____
Erin L. Wiedemann
Chief United States Magistrate Judge

Joshua Duggar Discovery Provided 3-11-2021 1940