IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 5:21-CR-50014-001 |
| ) | |
| JOSHUA JAMES DUGGAR, ) | |
| ) | |
| Defendant. ) | |

**DEFENDANT'S MOTION TO DISMISS FOR GOVERNMENT'S FAILURE TO PRESERVE POTENTIALLY EXCULPATORY EVIDENCE**

Defendant Joshua James Duggar ("Duggar"), by and through undersigned counsel, respectfully moves this Court to dismiss this case based on the Government's failure to preserve potentially exculpatory evidence: searches conducted by investigators of electronic devices belonging to certain people who, at various times, had access to Wholesale Motorcars at 14969 Wildcat Creek Road in Springdale, Arkansas (the "Car Lot") and the wireless internet at that location. Based on discovery, investigators searched these electronic devices in connection with this investigation—but the Government has admitted that law enforcement failed to preserve any evidence obtained during these searches, some of which were performed by federal computer forensics analysts.

The Due Process Clause requires law enforcement to preserve evidence that is either facially exculpatory or potentially exculpatory. *See California v. Trombetta*, 467 U.S. 479 (1984) ("[T]o safeguard that right, the Court has developed what might loosely be called the area of Constitutionally guaranteed access to evidence") (internal citations omitted). "Taken together, this group of constitutional privileges delivers exculpatory evidence into the hands of the accused,

thereby protecting the innocent from erroneous conviction and ensuring the integrity of our criminal justice system." *Id*.

## I. Relevant Background

Duggar is charged in a two-count indictment alleging one count of receipt of child pornography and one count of possession of child pornography. (Doc. 1). Duggar has pleaded not guilty to both counts.

During its investigation, the Department of Homeland Security's Homeland Security Investigations division ("HSI") searched electronic devices of certain people who, at various points, had access to Wholesale Motorcars at 14969 Wildcat Creek Road in Springdale, Arkansas (the "Car Lot") and the wireless internet at that location.

On November 4, 2019, HSI applied for and obtained a federal search warrant to search the Car Lot. In his affidavit in support of the search warrant, HSI Special Agent Gerald Faulkner ("SA Faulkner") expressly represented:

> Based on my experience and consultation with computer forensic experts, I know that electronic files can be easily moved from computer or electronic storage medium to another computer or medium. Therefore, electronic files downloaded to or created on one computer can be copied on or transferred to any other computer or storage medium at the same location.

*See* Exhibit 1 at ¶ 45 (November 2019 Search Warrant Affidavit). SA Faulkner explained:

> I know that searching computerized information for evidence of crime often requires special agents to seize most or all of a computer system's central processing unit (CPU), input/output peripheral devices, related software, documentation, and data security devices, including passwords, so that a qualified computer expert can accurately retrieve the system's data in a laboratory or other controlled environment.

*Id*. SA Faulkner explained this because of the volume of evidence and technical requirements and limitations; for instance, he elaborated, "[s]earching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment." *Id*. This

2

rationale was all used in support of HSI's request to seize electronic devices from the Car Lot, claiming an on-site search was insufficient to meaningfully capture any evidence. *See id*. (requesting permission to obtain a forensic image of all devices including cellular phones and to search those images in a controlled computer forensic laboratory environment). In his affidavit in support of a search warrant of a residence sought in October 2019, HSI Special Agent Howard Aycock ("SA Aycock") included precisely this same rationale. *See* Exhibit 2 (October 2019 Search Warrant Affidavit).

Approximately 5 weeks after executing the search of the Car Lot, HSI agents including SA Faulkner searched electronic devices of witnesses they interviewed. But HSI failed to preserve any evidence whatsoever in connection with these electronic devices they searched.

    A.    <u>Witness #1's[1] Electronic Device</u>

HSI interviewed Witness #1, on December 16, 2019, approximately one month *after* applying for and executing a search warrant at the Car Lot. Witness #1 admitted to investigators he worked at the Car Lot at various times and that, on several occasions, he even stayed at the Car Lot overnight without Duggar's knowledge or permission. HSI expressly noted in its official report that it was interviewing Witness #1 as a "person of interest to the investigation."

During this interview, HSI obtained Witness #1's verbal and written consent to search the cellular phone in his possession at the time of the interview. Based on HSI's official report, "[t]he cellular telephone was examined for evidence of child pornography by SA Aycock and SA Faulkner with negative results." Witness #1 admitted to viewing adult pornography through websites he accessed through the internet on his cellular phone and, when asked by these federal

---

[1] Given the nature of these proceedings, Duggar is using the pseudonyms "Witness #1," "Witness #2," and "Witness #3" in lieu of these individuals' names. However, Duggar has no objection to identifying each of them by name if the Court prefers.

agents, denied viewing child pornography. HSI preserved no evidence whatsoever from the search of Witness #1's phone including its contents and metadata.

      B.      Witness #2's Electronic Device

Four days later, on December 20, 2019, investigators interviewed Witness #2, in connection with this investigation. Witness #2 was read his *Miranda* rights before being interviewed. During this interview, Witness #2 provided verbal and written consent for investigators to search his cellular phone. Based on the official HSI report, "HSI CFA [Certified Forensic Examiner] Marshall Kennedy conducted an examination of the cellular phone with negative results." Despite the examination being conducted by the Government's computer forensics examiner, HSI preserved no evidence whatsoever from the search of Witness #2's phone including its contents and metadata.

      C.      Witness #3's Electronic Device

On November 8, 2019—the same day HSI executed the search warrant of the Car Lot and 4 days after SA Faulkner signed his affidavit in support of the search warrant—investigators interviewed Witness #3, in connection with this investigation. Witness #3 was read his *Miranda* rights before being interviewed. The official report HSI prepared contains a section entitled "INVESTIGATOR'S NOTE" (capitalized in original). That section states, "HSI Computer Forensic Analysts conducted a forensic examination of [Witness #3's] cellular phone at Wholesale Motorcars which revealed no evidence of criminal activity." Despite that examination being conducted by more than one Government computer forensics analyst, HSI preserved no evidence whatsoever from the search of Witness #3's phone including its contents and metadata.

      D.      HSI Preserved No Evidence From the Searches of at Least Three Electronic Devices

Based on clear disclosures in official HSI reports disclosed in discovery revealing that at least three devices were searched during the Government's investigation of this case—one belonging to what law enforcement described was a "person of interest to the investigation" and two searched by professional computer forensics examiners employed by HSI—the defense requested a copy of the evidence preserved from these searches (*e.g.*, computer forensic images and/or reports similar to the images and reports disclosed in connection with images seized from the Car Lot on November 8, 2019). The Government represented that "no forensic images of [these] devices [were] created and therefore they are not in the Government's possession" and further represented that there are no additional reports or discovery in connection with the searches of these devices.

      II.      **The Due Process Clause Requires Dismissal of This Case Based on the Government's Failure to Preserve This Potentially Exculpatory Evidence**

"Under the Due Process Clause…criminal prosecutions must comport with prevailing notions of fundamental fairness. We have long interpreted the standard of fairness to require that criminal defendants be afforded a meaningful opportunity to present a complete defense." *Trombetta*, 467 U.S. at 479. "[T]o safeguard that right, the Court has developed what might loosely be called the area of Constitutionally guaranteed access to evidence." *Id*. (internal citations omitted). "Taken together, this group of constitutional privileges delivers exculpatory evidence into the hands of the accused, thereby protecting the innocent from erroneous conviction and ensuring the integrity of our criminal justice system." *Id*.

Where the evidence the Government failed to preserve is facially exculpatory, the failure "to preserve and ultimately to disclose that evidence…constitutes a due process violation,

regardless of whether a criminal defendant…can show that the evidence was destroyed or concealed in bad faith." *Moldowan v. City of Warren*, 578 F.3d 351, 388 (6th Cir. 2009) (internal quotations and citations omitted). "[E]vidence that might be expected to play a significant role in the suspect's defense is exculpatory." *Trombetta*, 467 U.S. at 488. It has been long established that evidence that either supports a defense theory, or contradicts a government allegation, is exculpatory. *See, e.g., Youngblood v. West Virginia*, 547 U.S. 867, 868-69 (2006); *United States v. Gil*, 297 F.3d 93, 102-03 (2d Cir. 2002).

Where the evidence the Government failed to preserve is potentially exculpatory, dismissal is mandated if the Government acted in bad faith in destroying or failing to preserve the potentially exculpatory evidence. *See, e.g., Youngblood*, 488 U.S. at 58 (the bad faith requirement "limits the extent of the police's obligation to preserve evidence to…that class of cases where the interests of justice most clearly require it, *i.e.*, those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant").

As a matter of law, bad faith is not the same as malicious intent. In other words, the question before this Court is not whether law enforcement acted maliciously in failing to preserve potentially exculpatory evidence. For example, the Ninth Circuit dismissed a case where a federal agent allowed a video to be automatically recorded over instead of securing and storing it, thereby leading to the failure to preserve evidence as a result of standard agency procedure. *See United States v. Zaragoza-Moreira*, 780 F.3d 971 (9th Cir. 2015). Specifically, a United States Customs and Border Patrol agent allowed a surveillance video to be automatically recorded over instead of taking the necessary steps to preserve and secure it. In doing so, the federal agent failed to preserve this potentially exculpatory evidence solely as a result of standard agency procedure. Although the agent testified, and the district court found, that the agent was unaware of the exculpatory value of

6

the video, the Ninth Circuit dismissed the case based on the agency's destruction of the video footage because it supported a possible defense for the defendant. *Id*.

In this case, the electronic devices HSI searched on November 8, 2019 (Witness #3), December 16, 2019 (Witness #1), and December 20, 2019 (Witness #2) were—at a bare minimum—potentially exculpatory. This is a case that centers on computer forensics associated with people and devices that may have been present at the Car Lot during the time period at issue in this case. That these devices were potentially exculpatory is hardly controversial; indeed, HSI interviewed Witness #1 as a "person of interest to this investigation" and read *Miranda* rights to Witness #2 and Witness #3 prior to searching their devices pursuant to their consent. Moreover, with respect to two of these devices, HSI made sure to obtain verbal *and* written consent (anticipating the searches could constitute evidence) and HSI utilized the expertise of its in-house professional computer forensics analysts to perform the searches of the devices. The problem is that HSI may have not identified evidence of child pornography during the field examination of these devices—but failed to preserve other potentially exculpatory evidence. For example, the devices may have contained content as to whether these devices had any relevant internet search history, any evidence associated with the so-called "dark web" and/or the Bit Torrent network, any metadata that might pinpoint the whereabouts of the devices at various dates and times, and the list goes on.

At bottom, investigators purposefully searched these devices but did so in a way that failed to preserve any evidence for the defense's use. Instead, the Government only turned over documents with law enforcement's conclusion that these devices had "negative results" but that is far short of what the law requires: that "exculpatory evidence" be delivered directly "into the hands

of the accused" to "protect[] the innocent from erroneous conviction" and to "ensur[e] the integrity of our criminal justice system." *Trombetta*, 467 U.S. at 479.

In *Zaragoza-Moreira*, the indictment was appropriately dismissed based on a failure to preserve potentially exculpatory evidence. There, as here, federal agents failed to preserve potentially exculpatory evidence by not taking the necessary steps to preserve and secure it. *See Zaragoza-Moreira*, 780 F.3d at 971.

But the bad faith in this case is actually much more egregious. Less than two months before these devices were searched, both SA Faulkner and SA Aycock expressly represented to a federal court precisely how insufficient a field search of an electronic device is and precisely why it is necessary for law enforcement to image and subsequently search a device in a controlled laboratory environment. *See, e.g.,* Exhibit 1 at ¶ 45 ("Based on my experience and consultation with computer forensic experts, I know that electronic files can be easily moved from computer or electronic storage medium to another computer or medium. Therefore, electronic files downloaded to or created on one computer can be copied on or transferred to any other computer or storage medium at the same location"; "I know that searching computerized information for evidence of crime often requires special agents to seize most or all of a computer system's central processing unit (CPU), input/output peripheral devices, related software, documentation, and data security devices, including passwords, so that a qualified computer expert can accurately retrieve the system's data in a laboratory or other controlled environment"; "Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment"). If that was true approximately 5 weeks earlier, there is no good-faith explanation for why the same two HSI special agents failed to obtain a forensic image of all devices and to preserve that evidence so it could be searched by people with "expert skill" in "a properly

controlled environment." *Id*.; *see also* Exhibit 2 (substantially same representations made by SA Aycock in October 2019). This Court should not permit the investigative agents to speak out of both sides of their mouth—to say imaging and preserving digital evidence is not necessary when it comes to one set of devices and to say imaging and preserving digital evidence is justified when it comes to another set of devices in the same investigation.

Bad faith failure to preserve potentially exculpatory evidence is a rare occurrence because federal law enforcement generally preserves evidence. But in this case, law enforcement failed to preserve any record whatsoever of what these devices contained so that there is no method by which the defense—or anyone for that matter—can determine exactly what existed in terms of metadata and content. Federal agents clearly knew computer forensics evidence related to devices that could have accessed the Car Lot's internet network is potentially exculpatory and SA Aycock and SA Faulkner, who both interviewed Witness #1, characterized that individual as a "person of interest to the investigation." Similarly, trained computer forensic analysts clearly know that a cursory review of an electronic device coupled with a note that it has no evidentiary value does nothing to preserve the evidence.

What happened here is as clear as it is troubling: the Government concluded the three devices they searched did not further its case against Duggar and therefore deprived Duggar of the opportunity to access this potentially exculpatory evidence. Furthermore, to the extent any of these three witnesses testify at this trial, the Government failed to preserve possible impeachment evidence. *See Trombetta*, 467 U.S. at 488 ("[E]vidence that might be expected to play a significant role in the suspect's defense is exculpatory"); *see also United States v. Coppa*, 267 F.3d 132, 139 (2d Cir. 2001) ("The basic rule of *Brady* is that the Government has a constitutional duty to disclose favorable evidence to the accused where such evidence is 'material' either to guilt or to

punishment. Favorable evidence includes not only evidence that tends to exculpate the accused, but also evidence that is useful to impeach the credibility of a government witness"); *United States v. Bagley*, 473 U.S. 667, 676 (1985) ("[i]mpeachment evidence...as well as exculpatory evidence, falls within the *Brady* rule").

Indeed, "the Government's obligations under *Brady* encompass not only information that is admissible in its present form but also material information that could potentially lead to admissible evidence favorable to the defense." *United States v. Meregildo*, 920 F. Supp. 2d 434, 438–39 (S.D.N.Y. 2013), *aff'd sub nom*; *United States v. Pierce*, 785 F.3d 832 (2d Cir. 2015); *see also United States v. Rodriguez*, 496 F.3d 221, 225-26 (2d Cir. 2007) ("This obligation is designed to serve the objectives of both fairness and accuracy in criminal prosecutions"). The devices law enforcement searched here no doubt contained information that could potentially lead to admissible evidence favorable to the defense—for example, evidence reflecting on the technical abilities of the owners of these devices. Witness #1 even admitted to using his device to access adult pornography via the internet, but the Government failed to preserve the evidence of precisely how he accessed the pornography.

As such, the denial of Duggar's rights under the Due Process Clause arising from HSI's failure to preserve evidence from three electronic devices—one belonging to a "person of interest to this investigation" and the other two belonging to people they *Mirandized*—entails "the failure to observe that fundamental fairness essential to the very concept of justice." *Lisenba v. People of State of California*, 314 U.S. 219, 236 (1941).

The bottom line is this: there is no dispute the Government searched these three devices and failed to preserve any evidence whatsoever in connection with them. There is also no dispute that the Government twice represented to a federal court just before these searches how important

it is to preserve digital evidence so it can be meaningfully searched in a controlled laboratory environment by computer forensics experts.

Throughout the litigation of this case, the Government has gone to great lengths to criticize Duggar by calling this a "straight-forward" case. (Doc. 32). The truth is the case is not "straight-forward" when the evidence is considered and the Government knows it—but the law governing this motion, however, *is* straight-forward:

> Under the Due Process Clause…criminal prosecutions must comport with prevailing notions of fundamental fairness. We have long interpreted the standard of fairness to require that criminal defendants be afforded a meaningful opportunity to present a complete defense…[T]o safeguard that right, the Court has developed what might loosely be called the area of Constitutionally guaranteed access to evidence…Taken together, this group of constitutional privileges delivers exculpatory evidence into the hands of the accused, thereby protecting the innocent from erroneous conviction and ensuring the integrity of our criminal justice system.

*Trombetta*, 467 U.S. at 479.

### IV. Conclusion

Based on the foregoing, this Court should dismiss this case based on the Government's failure to preserve potentially exculpatory evidence. At a minimum, this Court should hold an evidentiary hearing to determine what can be determined based on the searches performed and to explore the possibility of alternative remedies.

Respectfully submitted,

**Margulis Gelfand, LLC**

*/s/ Justin K. Gelfand*
JUSTIN K. GELFAND, MO Bar No. 62265*
7700 Bonhomme Ave., Ste. 750
St. Louis, MO 63105
Telephone: 314.390.0234
Facsimile: 314.485.2264
justin@margulisgelfand.com
*Counsel for Defendant*
**Admitted Pro Hac Vice*


**Story Law Firm, PLLC**

*/s/ Travis W. Story*
Travis W. Story, AR Bar No. 2008278
Gregory F. Payne, AR Bar No. 2017008
3608 Steele Blvd., #105
Fayetteville, AR 72703
Telephone: (479) 448-3700
Facsimile: (479) 443-3701
travis@storylawfirm.com
greg@storylawfirm.com

12

## Certificate of Service

I hereby certify that the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon the Office of the United States Attorney.

                 */s/ Justin K. Gelfand*
JUSTIN K. GELFAND, MO Bar No. 62265*
7700 Bonhomme Ave., Ste. 750
St. Louis, MO 63105
Telephone: 314.390.0234
Facsimile: 314.485.2264
justin@margulisgelfand.com
*Counsel for Defendant*
**Admitted Pro Hac Vice*