EXHIBIT 2

ATTACHMENT C

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS

| | |
|---|---|
| STATE OF ARKANSAS : | |
| : | |
| : | ss. **AFFIDAVIT** |
| : | |
| COUNTY OF WASHINGTON : | |

### Affidavit in Support of Application for Search Warrant

I, Gerald Faulkner, being duly sworn, depose and state as follows:

1. I am a Special Agent with the Department of Homeland Security, Homeland Security Investigations (HSI), currently assigned to the Assistant Special Agent in Charge Office in Fayetteville, Arkansas. I have been so employed with HSI since April 2009. As part of my daily duties as an HSI Special Agent, I investigate criminal violations relating to child exploitation and child pornography including violations pertaining to the illegal production, distribution, online enticement, transportation, receipt and possession of child pornography, in violation of 18 U.S.C. §§ 2251, 2251A, 2422(b), 2252(a) and 2252A. I have received training in the area of child pornography and child exploitation, and have had the opportunity to observe and review numerous examples of child pornography (as defined in 18 U.S.C. § 2256) in all forms of media including computer media. I have also participated in the execution of numerous search warrants and arrest warrants, a number of which involved child exploitation and/or child pornography offenses. This Affidavit is being submitted based on information from my own investigative efforts as well as information obtained from others who have investigated this matter and/or have personal knowledge of the facts herein.

2. This Affidavit is being submitted in support of an application for a search warrant for the premises **Wholesale Motorcars located at 14969 Wildcat Creek Road, Springdale, Arkansas 72762** the "**SUBJECT PREMISES**". As such, it does not include all of the information known to me as part of this investigation, but only information sufficient to establish probable cause for the requested search warrant.

## Statutory Authority

3. This investigation concerns alleged violations of Title 18, United States Code, Sections 2252 and 2252A, relating to material involving the sexual exploitation of minors, which has been defined in Title 18 U.S.C. 2256, as an individual under 18 years of age.

   a. Under 18 U.S.C. Section 2252(a)(1) (transportation), 2252(a)(2) (receipt and distribution), and 2252(a)(4)(B) and 2252A(a)(5)(B) (possession), it is a federal crime for any person to transport, distribute, receive, and possess child pornography, as that term is defined by federal law. Further under 18 U.S.C. Section 2253(a)(3), a person who is convicted of an offense under 18 U.S.C. Section 2252 or 2252A, shall forfeit to the United States such person's interest in any property, real or personal, used or intended to be used to commit or to promote the commission of such offense.

## Computers and Child Pornography

4. Based upon my knowledge and experience in child exploitation and child pornography investigations, and the experience and training of other law enforcement officers with whom I have had discussions, I know that computers and computer technology have revolutionized the way in which child pornography is produced, distributed and utilized. Prior to the advent of computers and the Internet, child pornography was produced using cameras and film, resulting in either still photographs or movies. The photographs required darkroom facilities and a significant

amount of skill in order to develop ad reproduce the images. As a result, there were definable costs involved with the production of pornographic images. To distribute these images on any scale also required significant resources. The photographs themselves were somewhat bulky and required secure storage to prevent exposure to the public. The distribution of these wares was accomplished through a combination of personal contacts, mailings, and telephone calls, and compensation for these wares would follow the same paths. More recently, through the use of computers and the Internet, distributors of child pornography use membership-base/subscription-based websites to conduct business, allowing them to remain relatively anonymous.

5. In addition, based upon my own knowledge and experience in child exploitation and child pornography investigations, and the experience and training of other law enforcement officers with whom I have had discussions, I know that the development of computers has also revolutionized the way in which those who seek out child pornography are able to obtain this material. Computers serve four basic functions in connection with child pornography: production, communication, distribution, and storage. More specifically, the development of computers has changed the methods used by those who seek to obtain access to child pornography in these ways.

6. Producers of child pornography can now produce both still and moving images directly from a common video or digital camera. The camera is attached, using a device such as a cable, or digital images are often uploaded from the camera's memory card, directly to the computer. Images can then be stored, manipulated, transferred, or printed directly from the computer. Images can be edited in ways similar to how a photograph may be altered. Images can be lightened, darkened, cropped, or otherwise manipulated. As a result of this technology, it is relatively inexpensive and technically easy to produce, store, and distribute child pornography. In

addition, there is an added benefit to the pornographer in that this method of production does not leave as large a trail for law enforcement to follow.

7. The Internet allows any computer to connect to another computer. By connecting to a host computer, electronic contact can be made to literally millions of computers around the world. A host computer is one that is attached to a network and serves many users. Host computers are sometimes operated by commercial Internet Service Providers (ISPs) which allow subscribers to dial a local number and connect to a network which is, in turn, connected to the host systems. Host computers, including ISPs, allow e-mail service between subscribers and sometimes between their own subscribers and those of other networks. In addition, these service providers act as a gateway for their subscribers to the Internet or the World Wide Web.

8. The Internet allows users, while still maintaining anonymity, to easily locate other individuals with similar interests in child pornography; and websites that offer images of child pornography. Those who seek to obtain images or videos of child pornography can use standard Internet connections, such as those provided by business, universities, and government agencies, to communicate with each other and to distribute child pornography. These communication links allow contacts around the world as easily as calling next door. Additionally, these communications can be quick, relatively secure, and as anonymous as desired. All of these advantages, which promote anonymity for both the distributor and recipient, are well known and are the foundation of transactions involving those who wish to gain access to child pornography over the Internet. Sometimes the only way to identify both parties and verify the transportation of child pornography over the Internet is to examine the recipient's computer, including the Internet history and cache to look for "footprints" of the websites and images accessed by the recipient.

9.  The computer's capability to store images in digital form makes it an ideal repository for child pornography. The size of the electronic storage media (commonly referred to as a "hard drive") used in home computers has grown tremendously with the last several years. Hard drives with the capacity of 160 gigabytes are not uncommon. These drives can store thousands of images at very high resolution. Magnetic storage located in host computers adds another dimension to the equation. It is possible to use a video camera to capture an image, process that image in a computer with a video capture board, and save that image to storage in another country. Once this is done, there is no readily apparent evidence at the "scene of the crime." Only with careful laboratory examination of electronic storage devices is it possible to recreate the evidence trail.

10. It should be noted that Internet Protocol (IP) numbers are unique identifiers leased to Internet customers by their ISP's. Although IP numbers are capable of changing over time, only one (1) unique IP number can be assigned to a given customer's computer at any given time. Logs of these leased IP's (and their assigned customer accounts) are stored by ISP's routinely.

11. Your Affiant knows from his own experience and the training and experience of other law enforcement officers that Internet computers identify each other by an Internet Protocol or IP address. These IP addresses can assist law enforcement in finding a particular computer on the Internet. These IP addresses can typically lead the law enforcement officer to a particular Internet service company and that company can typically identify the account that uses the address to access the Internet.

12. Law enforcement uses specialized "peer to peer" (P2P) software to locate computers offering to participate in the distribution of child pornography images and files over P2P sharing networks in Arkansas. Millions of computer users throughout the world use P2P file

Joshua Duggar Discovery Provided 3-17-2021 011

sharing networks to share files containing music, graphics, movies and text. These networks have also become a popular way to download and distribute child pornography. Any computer user who can connect to the Internet can download P2P application software, which is typically free, and use it to share files through a P2P network.

13. The BitTorrent network is a very popular and publically available P2P file sharing network. Most computers that are part of this network are referred to as "peers" or "clients". A peer/client can simultaneously provide files to some peers/clients while downloading files from other peers/clients.

14. The BitTorrent network can be accessed by peer/client computers via many different BitTorrent network client (software) programs, examples of which include the BitTorrent client program, uTorrent client program, and Vuze client program, among others. These client programs are publically available and typically free P2P client software programs that can be downloaded from the Internet.

15. During the installation of typical BitTorrent network client programs, various settings are established which configure the host computer to share files via automatic uploading.

16. Typically, as users download files or pieces of files from other peers/clients on the BitTorrent network, other users (peers/clients) on the network are able to download the files or pieces of files from them, a process which maximizes the download speeds for all users on the network. Once a user has completed the download of an entire file or files, they can also continue to share the file with individuals on the BitTorrent network who are attempting to download all pieces of the file or files, a process referred to as "seeding".

17. Files or sets of files are shared on the BitTorrent network via the use of "Torrents". A "Torrent" is typically a small file that describes the file(s) to be shared. It is

important to note that "Torrent" files do not contain the actual file(s) to be shared, but information about the file(s) to be shared needed to accomplish a download.

18. The strength of a Peer to Peer Network is that it bases all of its file shares on the Secure Hash Algorithm (SHA1). This mathematical algorithm allows for the fingerprinting of files. Once you check a file with a SHA1 hashing utility capable of generating this SHA1 value (the fingerprint), that will be a fixed-length unique identifier for that file. The SHA1 hash is the current Federal Information Processing and Digital Signature Algorithm. The SHA1 is called secure because it is computationally infeasible for two files with different content to have the same SHA1 hash value.

19. This information includes things such as the name(s) of the file(s) being referenced in the "Torrent" and the "info hash" of the "Torrent". The "info hash" is a SHA-1 hash value of the set of data describing the file(s) referenced in the "Torrent". This set of data includes the SHA-1 hash value of each file piece in the torrent, the file size(s), and the file name(s). The "info hash" of each "Torrent" uniquely identifies the "Torrent" file on the BitTorrent network. The "Torrent" file may also contain information on how to locate file(s) referenced in the "Torrent" by identifying "Trackers".

20. "Trackers" are computers on the BitTorrent network that collate information about the peers/clients that have recently reported they are sharing the file(s) referenced in the "Torrent" file. A "Tracker" is only a pointer to peers/clients on the network who may be sharing part or all of the file(s) referenced in the "Torrent". "Trackers" do not actually have the file(s) but are used to facilitate the finding of other peers/clients that have the entire file(s) or at least a portion of the file(s) available for sharing. It should also be noted that the use of "Tracker(s)" on the BitTorrent network are not always necessary to locate peers/clients that have file(s) being shared from a

particular "Torrent" file. There are many publically available servers on the Internet that provide BitTorrent tracker services.

21. In order to locate "Torrent" files of interest and download the files that they describe, a typical user will use keyword searches on Torrent indexing websites, examples of which include isohhunt.com and the piratebay.org. Torrent indexing websites are essentially search engines that users on the BitTorrent network use to locate "Torrent" files that describe the files they are looking to download. Torrent indexing websites do not actually host the content (files) described by "Torrent" files, only the "Torrent" files themselves.

22. Once a "Torrent" file is located on the website that meets a user's keyword search criteria, the user will download the "Torrent" file to their computer. The BitTorrent network client program on the user's computer will then process that "Torrent" file in order to find "Trackers" or utilize other means that will help facilitate finding other peers/clients on the network that have all or part of the file(s) referenced in the "Torrent" file. It is again important to note that the actual file(s) referenced in the "Torrent" are actually obtained directly from other peers/clients on the BitTorrent network and not the "Trackers" themselves. Typically, the "Trackers" on the network return information about remote peers/clients that have recently reported they have the same file(s) available for sharing (based on SHA-1 "info hash" value comparison), or parts of the same file(s), referenced in the "Torrent", to include the remote peers/clients Internet Protocol (IP) addresses.

23. For example, a person interested in obtaining child pornographic images or videos on the BitTorrent network can go to a torrent indexing website and conduct a keyword search using a term such as "preteen sex" or "pthc" (pre-teen hardcore). The results of the keyword search are typically returned to the user's computer by displaying them on the torrent indexing website.

24.     Based on the results of the keyword search, the user would then select a "Torrent" of interest to them to download to their computer from the website. Typically, the BitTorrent client program will then process the "Torrent" file.

25.     Utilizing "trackers" and other BitTorrent network protocols, peers/clients are located that have recently reported they have the file(s) or parts of the file(s) referenced in the "Torrent" file available for sharing. The file or files are then downloaded directly from the computer(s) sharing the file or files.

26.     Typically, once the BitTorrent network client has downloaded part of a file or files, it may immediately begin sharing the part of the file or files it has with other users on the network. The BitTorrent network client program succeeds in reassembling the file(s) from different sources only if it receives "pieces" with the exact SHA-1 hash value of that piece which is described in the "Torrent" file.

27.     The downloaded file or files are then stored in an area (folder) previously designated by the user and/or the client program on the user's computer or designated external storage media. The downloaded file or files, including the torrent file, will remain in that location until moved or deleted by the user.

28.     Law Enforcement can search the BitTorrent network in order to locate individuals sharing previously identified child exploitation material in the same way a user searches this network. To search the network for these known torrents can quickly identify targets in their jurisdiction.

29.     Law Enforcement receives this information from "Trackers" about peers/clients on the BitTorrent network recently reporting that they are involved in sharing digital files of known or suspected child pornography, based on "info hash" SHA-1 hash values of torrents. These

torrents being searched for are those that have been previously identified by law enforcement as being associated with such files. There are BitTorrent network client programs which allow for single-source downloads from a computer at a single IP address, meaning that an entire file or files are downloaded only from a computer at a single IP address as opposed to obtaining the file from multiple peers/clients on the BitTorrent network. This procedure allows for the detection and investigation of those computers involved in sharing digital files of known or suspected child pornography on the BitTorrent network.

30. During the query and/or downloading process from a suspect BitTorrent network client, certain information may be exchanged between the investigator's BitTorrent client program and the suspect client program they are querying and/or downloading a file from. This information includes 1) the suspect client's IP address; 2) a confirmation from the suspect client that they have pieces of the file(s) being requested, in whole or in part, and that the pieces of the file(s) is being reported as shared from the suspect client program; and 3) the BitTorrent network client program and version being utilized by the suspect computer. The law enforcement has the ability to log this information.

31. It should be noted, during the downloading and installation of the publically available uTorrent client program, the license agreement for the software states the following: "Automatic Uploading. uTorrent accelerates downloads by enabling your computer to grab pieces of files from other uTorrent or BitTorrent users simultaneously. Your use of the uTorrent software to download files will, in turn, enable other users to download pieces of those files from you, thereby maximizing download speeds for all users. In uTorrent, only files that you are explicitly downloading or sharing (seeding) will be made available to others. You consent to other users'

use of your network connection to download portions of such files from you. At any time, you may uninstall uTorrent through the Add/Remove Programs control panel utility.

32. In addition, you can control uTorrent in multiple ways through its user interface without affecting any files you have already downloaded thereby maximizing download speeds for all users. In uTorrent, only files that you are explicitly downloading or sharing (seeding) will be made available to others. You consent to other users' use of your network connection to download portions of such files from you. At any time, you may uninstall uTorrent through the Add/Remove Programs control panel utility. In addition, you can control uTorrent in multiple ways through its user interface without affecting any files you have already downloaded.

33. Additionally, your Affiant knows that P2P software may display the Globally Unique Identifier (GUID) identification number of computers offering to share files on the network. A Globally Unique Identifier or GUID is a pseudo-random number used in software applications. This GUID number is produced when some P2P software applications are installed on a computer. While each generated GUID is not guaranteed to be unique, the total number of unique keys is so large that the probability of the same number being generated twice is very small. When comparing these GUIDs, your Affiant can quickly determine with a high degree of certainty that two different IP addresses that are associated with the same GUID are associated with the same computer.

## Summary of Investigation to Date

34. In May 2019, a HSI Internet Crimes Against Children (ICAC) Task Force affiliate was conducting an online investigation on the BitTorrent Peer-to-Peer (P2P) file sharing network for offenders sharing child pornography. During the course of the online investigation, a connection was made between the HSI ICAC Task Force affiliate's investigative computer and a

computer/device running BitTorrent software from an IP Address of **167.224.196.113**. In May 2019, two separate downloaded files were successfully obtained from IP Address **167.224.196.113**. One of the downloaded files was a ".zip" folder containing approximately sixty-five (65) images and the other downloaded file was a single video. The HSI ICAC Task Force affiliate then viewed portions of the downloaded files which were determined to be consistent with child pornography. The device at IP Address **167.224.196.113** was the only IP Address which shared the contents for the files downloaded, and as such, the files were downloaded directly from this IP Address. The HSI Task Force affiliate then determined the IP Address was geo-located to Northwest Arkansas, at which time the lead information and downloads were forwarded to the HSI Assistant Special Agent in Charge Office in Fayetteville, Arkansas for further investigation.

35. In October 2019, your Affiant reviewed the two files successfully downloaded by the HSI ICAC affiliate computer from IP Address **167.224.196.113**. Your Affiant more specifically described the files as follows:

(a) File Name: **marissa.zip**

This "zip" folder contains approximately sixty-five (65) image files of a prepubescent female, many of which were consistent with child pornography. One file within the folder entitled **2203.jpg**, is an image depicting a prepubescent female approximately seven (7) to nine (9) years of age lying on her back and using her hands to expose her vagina and anus.

(b) File Name: **mov_0216.mp4**

This video is approximately two minutes and eleven seconds in length and depicts two (2) prepubescent females approximately seven (7) to nine (9) years of age. The prepubescent

females are both completely naked laying on top of each other. A male subject is then seen penetrating one of the prepubescent female's vagina with his erect penis.

36. On October 15, 2019, your Affiant, utilizing ICAC software tools, conducted additional record checks of IP Address **167.224.196.113**. The search revealed that as of May 16, 2019, approximately ninety-three (93) files of investigative interest had been flagged as potential child exploitation material.

37. An Internet search on the origin of the IP Address **167.224.196.113** found it to be issued to the Internet service provider Ozarks Go. A federal summons was issued to Ozarks Go in reference to IP Address **167.224.196.113** for the specific dates and times the video and images of child pornography were successfully downloaded from the user. Documents received on or about October 7, 2019 from Ozarks Go identified the IP Address as being assigned to Joshua DUGGAR at 14993 Wildcat Creek Road in Springdale, Arkansas 72762. A connection or activation date of April 16, 2019 was listed for this account. Ozarks Go also provided a PO BOX number in Tontitown, Arkansas as an additional mailing address for DUGGAR. Law enforcement queries likewise revealed a 2004, R-Vision, Inc., model XMH motor home bearing Arkansas license plate OMJKD with a Vehicle Identification Number (VIN) ending in the last four digits 9129 was registered to DUGGAR and his wife at the same PO BOX number in Tontitown, Arkansas.

38. An additional federal summons was issued to Ozark Electric Cooperative in reference to address 14993 Wildcat Creek Road in Springdale, Arkansas 72762. Documents provided by Ozark Electric Cooperative on October 28, 2019 revealed an account service agreement assigned to DUGGAR, customer number 292144, for the service address of 14993

Wildcat Creek Road in Springdale, Arkansas 72762. A supplementary mailing address was also linked to the account at one and the same PO BOX number in Tontitown, Arkansas.

39. On October 31, 2019, contact was made with the residents of 14993 Wildcat Creek Road in Springdale, Arkansas 72762. During the encounter, HSI ICAC Special Agents and Task Force Officers determined that the residence had not been previously receiving internet services through Ozarks Go. However, per the residents of 14993 Wildcat Creek Road in Springdale, Arkansas, and based on the revealed subscriber information, they explained that DUGGAR did in fact own and operate a used car sale lot on the property adjacent to their residence. According to the home owner, he/she met with DUGGAR a few weeks prior to the law enforcement encounter and sold him a vehicle. While at the business, Wholesale Motorcars, the homeowner was informed the dealership has Internet serviced through Ozarks Go.

40. Based on the investigative findings, your Affiant contacted Ozarks Go and Ozarks Electric Cooperative who were able to determine that their internal system mapping of the Internet and electric services of the HSI subpoenaed subscribers did not properly differentiate the addresses in question. Ozarks Go and Ozarks Electric Cooperative representatives explained they utilized Washington County, Arkansas property records to identify the subpoenaed customer's address as opposed to physically determining the actual service sites. Further review by your Affiant showed Washington County, Arkansas online records currently showed only one residence located on approximately twenty-seven (27) acres of property with the listed address of 14993 Wildcat Creek Road in Springdale, Arkansas. According to the residents of 14993 Wildcat Creek Road in Springdale, Arkansas, encountered on October 31, 2019, half of the property on the approximate twenty-seven (27) acres was either sold or split years ago and the current public property records have not been updated to reflect the two separate lots. After the sale or split of the property,

Wholesale Motorcars was established and assigned or listed as a separate address. Your Affiant explained to Ozarks Go the investigative efforts made to clarify the correct subscriber address for internet services through IP Address **167.224.196.113**. Representatives from Ozarks Go confirmed the subscriber address listed in their system and on the returned subpoenaed documents to HSI was in error and they believed the proper address should be reflected as **14969 Wildcat Creek Road Springdale, Arkansas 72762 (SUBJECT PREMISES)** with the same registered subscriber of DUGGAR.

41. Additional Internet research of the car dealership revealed an online article published in November 2018 regarding the owner, DUGGAR, having alleged to operate the business, Wholesale Motorcars, without the proper permits. The article further explained, due to the lack of proper permits, the Washington County, Arkansas Fire Marshal addressed these issues in person with DUGGAR on multiple occasions.

42. On November 1, 2019, your Affiant contacted the Washington County, Arkansas Fire Marshal and requested documents related to his interactions with Wholesale Motorcars, its owner and their officially listed address. Shortly thereafter, your Affiant received and reviewed numerous documents provided by the Fire Marshal. A document entitled "Washington County Sheriff's Office Fire Marshal Division Inspection Form" revealed Wholesale Motorcars, with a listed "Owner or Manger" as being "Josh Dugger" was inspected by the department on July 11, 2018 at the physical location of **14969 Wildcat Creek Road Springdale, Arkansas 72762 (SUBJECT PREMISES)**. The Inspection Form was signed by DUGGAR on July 11, 2018 with a follow-up inspection scheduled in thirty days.

43. An additional document provided and reviewed by your Affiant from the Fire Marshal showed the Washington County, Arkansas Planning Board/Zoning Board of Adjustments

Joshua Duggar Discovery Provided 3-17-2021 021

sent letters in October 2018 to neighbors of Wholesale Motorcars alerting to an upcoming public meeting to review the proposed "Conditional Use Permit" for DUGGAR to operate a business in the immediate area. An attached spreadsheet of recipients showed the same resident encountered by HSI ICAC Special Agents and Task Force Officers on October 31, 2019 was mailed one of these letters to their listed address of 14993 Wildcat Creek Road in Springdale, Arkansas 72762. This mailed document further supports the distinction between the two properties in question and the fact Ozarks Go mapping system of Internet and electric subscriber services did not properly differentiate between the two addresses.

44. On November 1, 2019, a HSI Task Force Officer, acting in an undercover capacity, arrived at Wholesale Motorcars located at the **SUBJECT PREMISES** and entered the business office to inquire about potentially purchasing a used vehicle from the dealership. Upon entering the office, the undercover HSI Task Force Officer was met by an unknown employee who identified himself as "Randy" and another employee who identified himself as "Josh". The undercover HSI Task Force Officer was able to positively identify "Josh" as being DUGGAR and further witnessed him to retrieve a believed Apple iPhone from his person with an unknown modeled laptop computer located on the desk. Verbal arrangements were made to possibly purchase a vehicle from the dealership at a later date and at the conclusion, the undercover HSI Task Force Officer departed the scene.

### Conclusion

45. *Necessity of On-site and Off-site examinations of entire computers or storage media.* Based on my experience and the training and experience of other agents, many of the items sought in this Affidavit may be stored electronically. Based on my experience and consultation with computer forensic experts, I know that electronic files can be easily moved from computer or

electronic storage medium to another computer or medium. Therefore, electronic files downloaded to or created on one computer can be copied on or transferred to any other computer or storage medium at the same location. In addition, based on my experience, I know that searching computerized information for evidence of crime often requires special agents to seize most or all of a computer system's central processing unit (CPU), input/output peripheral devices, related software, documentation, and data security devices, including passwords, so that a qualified computer expert can accurately retrieve the system's data in a laboratory or other controlled environment. This is true because of the following:

(a) Volume of evidence: Computer storage devices such as hard disks, diskettes, tapes and laser disks, can store the equivalent of thousands of pages of information. This sorting process can take up to several months to complete, depending on the volume of data stored. Therefore, it would also be impractical to attempt this type of data search on site.

(b) Technical requirements: Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert is qualified to analyze the system and its data. In any event, data search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to inadvertent or intentional destruction (both from external sources and from destructive code embedded in the system such as a "booby trap"), a controlled environment is essential to its complete and accurate analysis.

46.     Therefore, authorization is sought in this application to seize the items set forth in attachment "B" that are found on the premises to be searched, in order to examine those items for evidence. If it is determined that data has been seized that does not constitute evidence of the crimes detailed herein, the government will return said data within a reasonable time.

47.     Based on my experience and the training and experience of other agents involved with this investigation, your Affiant knows that individuals involved in the sexual exploitation of children through child pornography almost always keep copies of their sexual explicit material. Among the reasons copies are maintained is because child pornography is illegal to openly purchase, and the most common method of acquiring it is by trading with other people with similar interests. It is also known that due to the inherent illegality of these sexually explicit materials, they are most often kept in a place considered secure, usually a residence, to avoid detection by law enforcement.

48.     Based on the foregoing information, probable cause exists to believe there is located at **Wholesale Motorcars at 14969 Wildcat Creek Road, Springdale, Arkansas 72762,** the **SUBJECT PREMISES**, evidence of violations of Title 18, United States Code, Section 2522, et seq. Your Affiant prays upon his honorable court to issue a search warrant for the **SUBJECT PREMISES** for the items set forth in attachment "B" (which is attached hereto and incorporated herein by reference), that constitute evidence, fruits, and instrumentalities of violation of Title 18, United States Code, Section 2522, et seq.

Joshua Duggar Discovery Provided 3-17-2021 024

Gerald Faulkner, Special Agent
Homeland Security Investigations

Affidavit subscribed and sworn to before me this ____4th____ day of November, 2019

Erin L. Wiedemann
Chief United States Magistrate Judge

Joshua Duggar Discovery Provided 3-17-2021 025