IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

UNITED STATES OF AMERICA

v.  CASE NO 5:21-CR-50014-001

JOSHUA JAMES DUGGAR

**UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS STATEMENTS AND REQUEST FOR EVIDENTIARY HEARING**

Comes now the United States of America, by and through Dustin Roberts and Carly Marshall, Assistant United States Attorneys for the Western District of Arkansas, and William G. Clayman, Trial Attorney for the United States Department of Justice, and for its Response to the Defendant's Motion to Suppress Statements and Request for an Evidentiary Hearing (Doc. 36), states:

**I.      Summary of the Argument**

At present, the defendant asks this Court to suppress "all statements allegedly made by Duggar after he asserted his right to counsel and after federal agents physically stopped him from communicating with his attorney." (Doc. 36, p.1). However, as set out below, the defendant's claims fail because he was never in custody for purposes of *Miranda* and the Fifth Amendment, neither initially when officers approached him nor subsequently when he consented to an interview. Moreover, his request to call a lawyer was in response to the announced search warrant, not an invocation of his right to have an attorney present during interrogation. Finally, after being informed of his rights to counsel and to remain silent, Duggar knowingly and voluntarily waived such rights in favor of making a statement. Consequently, Duggar's motion is without merit and should be denied.

1

## II.     The United States' Investigation

On November 4, 2019, Homeland Security Investigations (HSI) Special Agent (SA) Gerald Faulkner applied for and obtained a federal search warrant based on probable cause to believe that an individual utilizing an Internet Protocol (IP) address assigned to Wholesale Motorcars located at 14969 Wildcat Creek Road in Springdale, Arkansas, downloaded and/or possessed images of child pornography. Agents did not however obtain a federal arrest warrant for anyone connected to facts set out in the affidavit in support of the search warrant.

On November 8, 2019, at approximately 3:00 PM, HSI agents executed the search warrant on Wholesale Motorcars. Wholesales Motorcars is aptly described as a used car lot located between Springdale, Arkansas and Siloam Springs, Arkansas. The driveway leading up to the lot is gravel/unpaved, and there are only two (2) shed-like structures on the premises, the smaller of which serves as the main office. That day there were multiple vehicles apparently for sale present on the lot. When federal agents arrived on scene, they executed the search warrant using a "soft approach," meaning they were in plain clothes (not tactical gear) and their weapons were not drawn nor brandished. Upon arriving at the lot, four (4) agents, all dressed in plain clothes and protective vests bearing the insignia "police" or "homeland security," approached the defendant and two (2) other individuals who were all standing outside.

SA Faulkner and SA Howard Aycock, who were the lead agents in this case, exited their vehicles, identified themselves as federal law enforcement, and notified Duggar that they were there to execute a federal search warrant on the premises. Specifically, SA Faulkner explained to Duggar that he had a search warrant for the premises allowing for the seizure of items containing digital contraband, that it was *not* an arrest warrant, that neither him nor the other individuals were under arrest, and that they were free to leave. Directly thereafter, the defendant took out of his

pocket his cellular phone, an Apple iPhone, and stated he would like to call his lawyer. In response, SA Faulkner explained to the defendant that his device was covered by the search warrant and was being seized pursuant to the warrant. SA Faulkner then, using just one hand, took the phone out of Duggar's hand with minimal or no physical contact. Shortly thereafter, Duggar informed law enforcement that he might have to leave because his wife was pregnant and due to give birth at any moment. SA Faulkner acknowledged such and reaffirmed that it was fine for him to leave.

However, Duggar remained on the lot, during which time he was neither physically restrained nor guarded. After securing the premises and starting the search warrant process, SA Faulkner and SA Aycock approached the defendant and asked if he would be willing to discuss the details of the federal search warrant, to which the defendant agreed. Due to the ongoing search, the agents indicated that they could speak in SA Aycock's vehicle, and again Duggar agreed to speak with them. Of note, when speaking with Duggar outside of the vehicle, the agents did not have any firearms brandished nor did they physically direct or escort the defendant to SA Aycock's vehicle. In approaching the vehicle, SA Faulkner walked to and entered the driver's side front door, SA Aycock walked to and entered the driver's side rear door, and the defendant walked to the front passenger door, opened the door, and entered the vehicle. At no time when Duggar was inside SA Aycock's vehicle did law enforcement officers stand outside, block, or guard the door. Additionally, the doors to the vehicle were not locked during the interview.

Immediately after Duggar entered the vehicle, SA Aycock asked the defendant for his consent to record their conversation, which the defendant provided. After consenting to the recording but before SA Aycock could initiate the recording device, the defendant then turned in his seat and asked, "What is this about? Has somebody been downloading child pornography?"

3

(*Id.*) At that point, SA Aycock told the defendant to not ask any additional questions until he could start the recording device.

The recording begins with SA Aycock stating the date and time and then asking the defendant to state his name. Immediately, SA Aycock begins informing the defendant of his *Miranda* rights. Specifically, SA Aycock provided the defendant a copy of HSI's standard "Statement of Rights" form and read the form to the defendant aloud. (*Id.* at 28).

The following is the exchange between SA Aycock, SA Faulkner, and the defendant:

**SA Aycock:** …If you decide to answer questions now, you still have the right to stop the questioning at any time or to stop the questioning for the purposes of consulting an attorney, okay? All right. So what I'm going to ask you to do is sign right here. All that is saying is that you have been read your rights-
**Duggar:** Miranda?
**SA Aycock:** -- and you understand what your rights are.
**Duggar:** Okay? This is only for now. It's not for any other?
**SA Aycock:** Sure. Like it says, if you—if you decide to answer questions now, you still have the right to stop –
**Duggar:** Okay.
**SA Aycock:** -- at any time. But that's—that's just you saying
**Duggar:** This is U.S. CIA? Is this –okay?
**SA Aycock:** This is U.S. Immigrations and Customs Enforcement, Homeland Security Investigations, all right?
**Duggar:** Okay.
**SA Aycock:** But you have signed that you understand your rights.
**Duggar:** Yes.
**SA Aycock:** Okay. So now what I'm going to ask you is are you willing to speak with us now without an attorney present?
**Duggar:** I mean, I may not answer everything, I guess, but yes.
**SA Aycock:** Okay. All right.
**Duggar:** I have more questions than I would like.
**SA Aycock:** Sure. All right. So the time is 1540 on 11/8/2019. All right. So what you're going to do right now for the waiver is you're just going to print your name and sign, and all that's doing is saying – acknowledging what you just said you wanted to do, speak with us.
**Duggar:** (reading document). Into custody?
**SA Aycock:** No. So as we explained, this is a search warrant. This is not an arrest warrant, so you are free to leave at any time.
**Duggar:** Okay.
**SA Aycock:** All right?
**SA Faulkner:** Hey, don't worry about that.

4

**Duggar:** Okay.
**SA Faulkner:** That's just the common language in Arkansas.
**Duggar:** Okay
**SA Faulkner:** As a matter of fact, if need be, if you'd like, I can scratch that out.
**Duggar:** Okay. Yeah, that may be better, just to put – just go ahead and scratch it out.
**SA Faulkner:** Sure. I forgot about that. All right.

Thereafter, Duggar signed the form, acknowledging that he was voluntarily agreeing to make a statement.[1] During the interview, Duggar confirmed that there is internet service at the dealership, including wi-fi. Duggar identified his personal cellphone as an iPhone 11 that he purchased two or three months prior. According to Duggar, the cell phone has a passcode, but Duggar declined to provide it. Duggar stated that he owns a password-protected laptop computer located in an RV on the dealership. Duggar also stated that he owns a password-protected HP computer located in the main business office of the dealership and that the password for the device is written down in the office. He said that dealership employees use the computer.

Duggar also stated that he is familiar with file-sharing programs and torrent files but declined to get into specifics about his knowledge of those programs. He did state that his laptop, cell phone, and the desktop computer "may" have peer-to-peer file-sharing programs installed on them. Duggar also stated that "Tor" is on one device. Up until this point, law enforcement had no knowledge that Tor (which is an abbreviation for The Onion Router, and is an online network designed to provide users with anonymous access to the internet that is sometimes referred to as the dark web) was at issue in the investigation.

After being informed that the investigation involved child sexual abuse material (CSAM) being downloaded at his car lot, Duggar inquired whether something had been downloaded on one of his devices. He then inquired whether the IP address for the lot was "marked" and inquired

---

[1] The form itself reflects the custody section was marked through.

about the scope of the search warrant. Duggar later indicated that, to his knowledge, nothing was downloaded to or uploaded from any computer on site that would raise a "red flag" for the investigation. He also stated he was not "denying guilt," but was not going to say anything to incriminate himself. When asked directly if he had seen images of child pornography involving children five (5) to ten (10) years of age, Duggar stated "I'd rather not answer that question." The interview concluded and Duggar left before the search of the premises was complete. Law enforcement did not arrest any that day in connection with the search of the car lot.

### III.  Legal Analysis

#### A.  The Defendant's Voluntary Statements to Law Enforcement were Non-Custodial

While Duggar asserts that his conversation with law enforcement was the product of an "egregious and inexcusable" violation of his constitutional rights, his argument is wholly inconsistent with the long-standing case law of the Eighth Circuit regarding police interviews. Without question, the Fifth amendment and the Supreme Court's precedent in *Miranda v. Arizona*, 384 U.S. 436 (1966), "prohibit[] the government from introducing into evidence statements made by the defendant during a custodial interrogation unless the defendant has been previously advised of his … privilege against self-incrimination and right to an attorney." *United States v. Chipps*, 410 F.3d 438, 445 (8th Cir. 2005) (citing *Miranda*, 384 U.S. at 444). But *Miranda* warnings are due only when a suspect interrogated by the police is "in custody." *Thompson v. Keohane*, 116 S. Ct. 457, 460 (1995). A person is not in custody for *Miranda* purposes unless the person's "freedom of action is curtailed to a degree associated with formal arrest." *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984). And the Court must measure *Miranda's* custody requirement objectively, evaluating "how a reasonable person in the suspect's position would have understood the situation." *Id.* at 442. In other words, "the determination of custody depends on the objective

6

circumstances … not on the subjective view harbored by either the interrogating officers or the person being questioned." *Stransbury v. California*, 511 U.S. 318, 323 (1994).

In gauging whether an individual is in "custody" for purposes of *Miranda*, the Eighth Circuit has identified several factors, including:

> (1) whether the suspect was informed that the suspect was free to leave or that the suspect was not under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether police used strong-arm tactics or deceptive strategies during questioning; (5) whether the atmosphere of the questioning was police-dominated; and (6) whether the suspected was arrested at the end of the questioning.

*United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1999) The Eighth Circuit in *Griffin* likewise recognized that "[t]he most obvious and effective means of demonstrating that a person has not been taken into custody … is for the police to inform the suspect that an arrest is not being made and that the suspect may terminate the interview at will." *Id*.

As argued below, it is clear that the defendant was not in custody when SA Aycock and SA Faulkner initially approached him, which prompted him to produce his phone and stated he wanted to call his lawyer. He likewise was not in custody when he voluntarily made statements to law enforcement inside SA Aycock's vehicle. Lastly, even assuming *arguendo* that Duggar was in custody when he agreed to speak with two agents in SA Aycock's vehicle, his initial question as to whether someone had downloaded child pornography was unprompted and spontaneous and he was thereafter advised of and made a knowing and voluntary waiver of his Fifth Amendment rights.

    **B.**  **The Defendant was not in Custody on November 8, 2019**

A person is not in custody for *Miranda* purposes unless the person's freedom of action is curtailed to a degree associated with formal arrest. *Berkemer*, 468 U.S. at 440. Courts must

7

measure *Miranda*'s custody requirement objectively, evaluating "how a reasonable person in the suspect's position would have understood the situation." *Id*. at 442.

In applying the relevant factors outlined by the Eighth Circuit in *Griffin*, 922 F.2d at 1349, no reasonable person in Duggar's position would have concluded that his interview during the search of the car lot was custodial in nature.

### i.    Whether Duggar was Informed that he was Free to Leave or not Under Arrest

The defendant was told from the very beginning of the search of his business, and at every critical juncture thereafter, that he was not under arrest and was free to leave. When law enforcement first encountered Duggar on the lot, and directly before he produced his iPhone, he was told that law enforcement was on the premises pursuant to a search warrant, not an arrest warrant, and that he was free to leave. And shortly thereafter, Duggar told law enforcement that his wife was due to give birth at any time and that he might have to leave, which law enforcement again confirmed was perfectly fine. However, the defendant elected not leave.[2]

After initiating the search, agents approached him and inquired if he wanted to discuss the search warrant. Approximately two minutes and thirty seconds into the interview, while reading HSI's standard *Miranda* form, the defendant asked the special agents about the line on the form regarding him being taken into custody. SA Aycock replied, "No. So as we explained, this is a search warrant. This is not an arrest warrant, so you are free to leave at any time." (Int. p.4) Further, Special Agent Faulkner offered to scratch out the "in-custody" language on the standard *Miranda* form to clarify and confirm he was not in custody. In response to this offer, the defendant stated "Yeah, that may be better, just to put – just go ahead and scratch it out." And while Duggar

---

[2] To be clear, the agents did not confiscate Duggar's keys, nor did they stop him in any manner from leaving the lot. In fact, given that it was his car lot, Duggar had multiple vehicles available if he desired to leave.

8

represents in his motion that "agents refused to provide [him] with a complete copy of the search warrant until after the search was completed -further suggesting he was not free to leave and had to stay," the defense has apparently failed to realize that at the conclusion of the interview, Duggar did in fact leave the premises and instructed law enforcement to leave the return with his employee. (Doc. 36, p. 4).

Under these circumstances, there is no plausible claim that the defendant was not advised that he was free to leave the premises and that he was not under arrest.

### ii. Whether Duggar Possessed Unrestrained Freedom of Movement During Questioning

When the agents initially approached the defendant, they were executing the search warrant using a "soft approach," meaning they were in plain clothes (not tactical gear) and their weapons were not drawn nor brandished. They simply walked up to him, told him that they were there to execute a search warrant, and that he was free to leave. Even when he produced an iPhone, which is without question an item covered by the scope of the search warrant, law enforcement had minimal contact with him when lawfully seizing the device pursuant to the warrant. Thereafter, he told law enforcement he might need to leave due to his wife being pregnant and was told again by law enforcement that he could leave. At no time was the defendant handcuffed or restrained in any way. Even though he elected to stay on scene, he was not guarded by law enforcement and was allowed free "roam" of the premises.

When law enforcement approached him and asked if he wanted to discuss the warrant, he was still outside, not handcuffed, and not guarded. When he indicated that he was willing to speak with the agents, he freely walked—meaning no one touched him or physically escorted him—to

SA Aycock's vehicle. He simply walked there on his own volition, opened the door, and sat inside.[3] Therein, the doors to the vehicle were not locked, no guns were drawn, and the passenger's door through which Duggar entered the vehicle was not guarded. He was told he was free to leave while inside and at the conclusion of the interview he factually left while agents were still on scene. In similar circumstances, the Eighth Circuit has affirmed a district court's conclusion that a defendant was not in custody for purposes of *Miranda* when interviewed in a law enforcement vehicle. (See *United States v. Hoeffener*, 950 F.3d 1037, 1046 (8th Cir. 2020) (affirming finding that "[the defendant] was not in custody and entitled to *Miranda* warnings prior to his in-vehicle confession because [the defendant] willingly entered Sergeant Kavanaugh's vehicle, voluntarily responded to Sergeant Kavanaugh's questions, and presented no evidence that he was restrained as though he was under formal arrest or acquiesced because of a coercive or police dominated environment").

While the defendant does not address this factor, this Court should conclude that Duggar's movement was not limited, in any way, by law enforcement during his voluntary interview.

### iii. Whether Duggar Initiated Contact or Voluntarily Acquiesced to Official Requests to Respond to Questions

Law enforcement executed a search warrant on Duggar's car lot, and in doing so, encountered Duggar himself. When they approached him, he was outside his business and remained outside until the agents asked if he wanted to discuss the purposes of the search warrant. He consented. He was then told that the interview could happen in SA Aycock's vehicle, which was parked in close proximity to the main office, due to the ongoing search. Again, he walked on his own volition to the passenger side door, opened it, and entered the vehicle. And before the

---

[3] The defense states in their motion that "agents physically escorted him to a government vehicle[.]" (Doc. 36 at 4). The defendant does not cite to where he elicited this information, and the Government remains unaware of the basis of that claim, as it is incorrect.

agents could even begin recording the conversation, the defendant asked unprompted whether someone had been downloading child pornography. In this sense, the defendant took the initiative to make statements to law enforcement without any questioning, which cuts against a finding that the interview was custodial.

### iv. Whether Police Used Strong-Arm Tactics or Deceptive Strategies

When law enforcement approached Duggar, they informed him that they had a search warrant for the premises and that he was free to leave. This was a correct statement, as no arrest warrant was obtained by law enforcement prior to the search nor did the agents seek prior approval to arrest anyone that day.[4] When law enforcement approached the defendant, again, he was outside, and they simply asked him if he wanted to discuss the purpose of the search warrant. The remainder of law enforcement's conversation with the defendant is recorded, and the interviewing agents are professional and courteous throughout. When Duggar stated during the interview, numerous times, that he did not want to discuss certain topics, law enforcement acquiesced to his preference and did not press him further. There is no assertion by the defendant, nor are there facts to support, that law enforcement lied, misled, or engaged in any manipulative tactics in any way. Accordingly, on this record, the Court should conclude that the interviewing agents in this case did not use strong-arm tactics or deceptive strategies during their conversation, and the interview was therefore not custodial.

---

[4] In fact, at the point in which the agents encountered Duggar and even when they interviewed him, they only knew the facts outlined in the search warrant affidavit. The forensic evidence supporting his arrest was not discovered until after a subsequent off-site forensic examination of the HP computer seized from the defendant's office on the car lot.

### v.     Whether the Atmosphere of the Questioning was Police-Dominated

In his motion, the defendant claims that "officers swarmed the premises while executing the search warrant on November 8, 2019." (Doc. 36, p.4). But based on SA Faulkner's testimony at the detention hearing, that is not how the execution of the warrant occurred at all. Specifically, SA Faulkner described the "soft approach" that the four agents executing the warrant took that day, meaning that no weapons were drawn during the execution of the warrant and the agents calmly told the defendant upon their arrival that they were there pursuant to a federal search warrant, not an arrest warrant, and that he was free to leave. (See Det. Hr. Tr. pp. 19-20). While law enforcement was factually executing a search warrant, it's important to note that this was a public business, as opposed to a private residential setting, and the defendant was outside the entire time. And once inside SA Aycock's vehicle, Duggar was alone with two (2) agents who were not brandishing weapons and who repeatedly made it clear to Duggar that he was free to leave and did not have to answer any questions. Given the amount of leeway that the defendant had in moving about his car lot and deciding whether to speak to law enforcement, this Court should conclude that this fact also supports a finding that the defendant's interview was not custodial.

### vi.    Whether Duggar was Arrested at the End of the Questioning

Finally, it is indisputable that the defendant was not arrested at the end of questioning. In fact, he elected to leave the premises after his interview but before the search was complete.

Based on an analysis of the factors detailed above, this Court should conclude that Duggar was not in custody at any point on November 8, 2019.

### C.    Duggar's Request to Call a Lawyer was not in Response to Police Interrogation

The Supreme Court has emphasized that the rights afforded by *Miranda* and its progeny "only appl[y]" when a defendant has made, "at a minimum, some statement that can reasonably

be construed to be an expression of a desire for the assistance of an attorney *in dealing with custodial interrogation by the police.*" *McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991) (emphasis in original) (invocation of Sixth Amendment right to counsel during a judicial proceeding does not constitute an invocation of the right to counsel under *Miranda*). The United States Supreme Court later clarified that "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning." *Davis v. United States*, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed2d 362 (1994) (emphasis in original). As such, a suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id*. There is no requirement that an officer must ask clarifying questions when a suspect makes an ambiguous statement regarding counsel. *Id*. at 461.

Applying these principles, the Supreme Court in *Davis* held the statement "maybe I should talk to a lawyer" was equivocal, and not an invocation of the right to counsel for? purposes of Miranda and the Fifth Amendment. *Id*. at 462. Similarly, the Eighth Circuit held in *United States v. Havlik* that the defendant's statement to police of "I don't have a lawyer. I guess I need to get one, don't I?" was insufficient to trigger an obligation to cease questioning. 710 F.3d 818, 821 (2013).

Moreover, a defendant's purported invocation of his right to counsel must not only unambiguously reflect that the defendant is seeking the assistance of counsel, *see Davis*, 512 U.S. at 459, but the purported invocation must also unambiguously reflect that it is for the specific purpose of having counsel present during custodial interrogation, *see United States v. Doe*, 170 F.3d 1162, 1166 (9th Cir. 1999) ("*Miranda* applies only where a suspect requests 'the particular

13

sort of lawyerly assistance that is the subject of *Miranda*,' namely, assistance during interrogation, not assistance in the subsequent judicial process. A statement concerning an attorney made before interrogation begins is far less likely to be a request for attorney assistance during interrogation than a similar statement made during custodial interrogation.") (See also *United States v. Thompson*, 35 F.3d 100, 102-04 (2d Cir. 1994) (finding that an attorney's act of seeking records and filing a form "Notice of Entry of Appearance as Attorney or Representative" with the INS did not invoke the client's right not to respond to custodial interrogation without counsel present); *United States v. Giboney*, 863 F.3d 1022, 1030 (8th Cir. 2017) (finding invocation ambiguous where defendant failed to make clear that he wanted a lawyer present for the interview, as opposed to some other incident); *Grant–Chase v. Commissioner, New Hampshire Dep't of Corrections*, 145 F.3d 431, 436-37 (1st Cir. 1998), *cert. denied*, 525 U.S. 941 (1998) (not unreasonable application of Supreme Court precedent for state court to find that a defendant's pre-interrogation request to call counsel was "ambiguous as to purpose," that is, it was ambiguous as whether the defendant merely wanted advice from counsel regarding how to handle imminent questioning by the police, or whether the defendant was in fact invoking her *Miranda* right to have counsel present for interrogation); *United States v. LaGrone*, 43 F.3d 332, 338–39 (7th Cir. 1994) (asking to call an attorney for advice on whether to consent to a search did not invoke any right to counsel because a request for consent to search is not interrogation).

Applying the above principles here, when Duggar produced his cellular phone at the outset of the execution of the warrant and stated he wanted to call his lawyer, it was not in response to a custodial interrogation. In fact, law enforcement just arrived on the scene, and told the defendant they had a search warrant for the premises and that he was free to leave. At that point, SA Faulkner had not stated anything about conducting an interview, what the investigation entailed, or who the

investigation involved. In fact, SA Faulkner at that point had asked the defendant *no* questions. He simply stated why they were at the car lot that day. As such, while the defendant may have wanted to alert his attorney to the presence of federal agents on the premises, there is nothing about the context in which Duggar made this statement regarding his attorney that could rationally be interpreted to reflect that he did not wish to speak with federal agents that day without his counsel. And again, when agents did approach Duggar about speaking with them, he was apprised of his *Miranda* rights, signed a "Statement of Rights" form acknowledging that he understood these rights, and advised the interviewing agents in response to direct questioning that he was willing to speak with them without an attorney present but that he may not answer all their questions.

Under these circumstances, the defendant's initial statement regarding his attorney can only reasonably be interpreted as a response to the execution of the warrant and not a response to whether he was willing to give a statement to law enforcement. Accordingly, the defendant's invocation of his right to counsel, to the extent it can be described as such at all, was equivocal and ambiguous.

### D. Because Duggar Was not in Custody, He Could Not have Anticipatorily Invoked his *Miranda* Rights

Because it is clear that the defendant was not in custody on November 8, 2019, any notion that he invoked his *Miranda* rights is invalidated by his non-custodial status. As numerous courts have decided, a defendant's "anticipatory invocation" while not in custody in no way invokes one's *Miranda* rights because those rights do not attach to one not in custody. The Supreme Court held that the Sixth Circuit's interpretation of *Miranda* was "plainly wrong," for example, in a case where the circuit court found that law enforcement could not speak to a defendant upon his arrest because he previously invoked his *Miranda* rights in a chance, non-custodial encounter with law enforcement. *Bobby v. Dixon*, 565 U.S. 23, 25-28 (2011). In rejecting the Sixth Circuit's

15

conclusion, the Supreme Court noted that it "has 'never held that a person can invoke his *Miranda* rights anticipatorily, in a context other than 'custodial interrogation.'" *Id.* at 28 (citing *McNeil v. Wisconsin*, 501 U.S. 171, 182 n. 3 (1991)); *see also Montejo v. Louisiana*, 556 U.S. 778, 795 (2009) ("If the defendant is not in custody then [*Miranda* and its progeny] do not apply"). Similarly, in *United States v. Wyatt*, 179 F.3d 532, 537 (7th Cir. 1999), the Seventh Circuit held that:

> [t]he Fifth Amendment right to counsel safeguarded by *Miranda* cannot be invoked when a suspect is not in custody, *see United States v. LaGrone*, 43 F.3d 332, 337 (7th Cir.1994), even if in anticipation of future custodial interrogation, *see McNeil v. Wisconsin*, 501 U.S. 171, 182 n. 3, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991) ("We have in fact never held that a person can invoke his Miranda rights anticipatorily, in a context other than 'custodial interrogation.'"); *LaGrone*, 43 F.3d at 339 (noting that "in order for a defendant to invoke his Miranda rights the authorities must be conducting interrogation, or interrogation must be imminent"); *Alston v. Redman*, 34 F.3d 1237, 1249 (3d Cir.1994) (holding that suspect's confession to several robberies, given after the suspect had waived his Miranda rights during an earlier interrogation and had subsequently signed a form while not under interrogation refusing to answer further questions without an attorney present, was admissible because the invocation form was signed when the suspect "was not within 'the context of custodial interrogation' "). Because Wyatt could not invoke his *Miranda* right to counsel when he was not in custody, his reliance on *Edwards v. Arizona*, 451 U.S. 477, 485, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), is misplaced.

In light of this clear precedent, as well as the fact that the defendant was never taken into custody on November 8, 2019, his statement regarding an attorney at the outset of the execution of the search warrant has no bearing on whether law enforcement was permitted to speak to him later on during the execution of the warrant.

### E.     **Duggar Was Informed of and Validly Waived his *Miranda* Rights**

Even though the defendant was not in custody at any point during the search of his car lot, SA Faulkner and SA Aycock nevertheless went above and beyond their obligations given the circumstances and advised the defendant of his *Miranda* rights. While, in his motion, Duggar

16

asserts that "there is simply no evidence to suggest that Duggar knowingly, intelligently and voluntarily waived his constitutional rights," (Doc. 36, pp. 7-8), the defendant's own actions and statements during the search prove that he knowingly, intelligently, and voluntarily waived his rights and agreed to speak to law enforcement.

The defendant is correct that "waivers of constitutional rights not only must be voluntary, but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." *Brady v. United States*, 397 U.S. 742, 748 (1970). In *United States v. Vinton*, 631 F.3d 476, 483 (8th Cir. 2011) (internal citations omitted), the Eighth Circuit noted:

> There are "two distinct dimensions" to the inquiry whether a suspect's waiver of his *Miranda* rights was voluntary, knowing, and intelligent. First, the waiver "must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the suspect must have waived his rights "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."

In this case, there is no accusation, or supporting facts, to reflect that Duggar was coerced, threatened, or intimidated by law enforcement into waiving his rights. Indeed, his interview with law enforcement was recorded and produced to the defense, and the defendant has pointed to no instances in the recording in which law enforcement coerced or threatened him. And equally clear is that from the beginning of the interview, Duggar elicited information and asked questions to make sure he understood the rights he was waiving. At the outset of questioning, for example, Duggar was specifically read and provided a form advising him of his rights to remain silent and to an attorney, which he acknowledged and signed. As the recorded interview reveals, a mere one minute and twenty-four seconds into the recording, the defendant confirms with SA Aycock that the *Miranda* form and his waiver of rights only applied to the interview conducted that day. Thirty seconds later, the defendant tells the interviewing agents that he may not answer every question they ask. Further, the defendant had the agents cross out the section of the *Miranda* form regarding

17

him being taken into custody, reflecting a clear understanding on his part of the circumstances in which he was speaking to law enforcement and his constitutionally protected rights. And, just as he had indicated previously, Duggar repeatedly declined to answer certain questions during the interview—declinations that law enforcement respected—again reflecting that the defendant voluntarily waived his rights with a comprehensive understanding of his rights and what rights he was waiving.

Consequently, if the Court concludes that the defendant was in custody for the purposes of his interview with law enforcement, all available evidence indicates that he knowingly and voluntarily waived his *Miranda* rights, and his motion to suppress his statements should therefore be denied.

## CONCLUSION

WHEREFORE, for the foregoing reasons and authorities, the United States respectfully requests that this Court deny Defendant's Motion to Suppress.

        Respectfully submitted,

By: */s/ Dustin Roberts*
Dustin Roberts
Assistant United States Attorney
Arkansas Bar No. 2005185
414 Parker Avenue
Fort Smith, AR 72901
Office: 479-249-9034

*/s/ Carly Marshall*
Carly Marshall
Assistant United States Attorney
Arkansas Bar No. 2012173
414 Parker Avenue
Fort Smith, AR 72901
Office: 479-249-9034

AND

/s/ *William G. Clayman*
William G. Clayman
D.C. Bar No. 1552464
Trial Attorney
Child Exploitation and Obscenity Section
U.S. Department of Justice
1301 New York Avenue NW
Washington, D.C. 20005
Telephone: 202-514-5780
Email: william.clayman@usdoj.gov

**CERTIFICATE OF SERVICE**

I, Dustin Roberts, Assistant United States Attorney for the Western District of Arkansas, hereby certify that a true and correct copy of the foregoing pleading was electronically filed with the Clerk of Court using the CM/ECF System which will send notification of such filing to the following:

Justin Gelfand, Travis Story, Gregory Payne, Attorneys for the Defendant

/s/ *Dustin Roberts*
Dustin Roberts
Assistant United States Attorney