IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 5:21-CR-50014-001 |
| ) | |
| JOSHUA JAMES DUGGAR, ) | |
| ) | |
| Defendant. ) | |

**DEFENDANT'S REPLY IN SUPPORT OF MOTION TO DISMISS FOR GOVERNMENT'S FAILURE TO PRESERVE POTENTIALLY EXCULPATORY EVIDENCE**

Defendant Joshua James Duggar ("Duggar"), by and through undersigned counsel, respectfully replies in support of his motion to dismiss the indictment for the Government's failure to preserve potentially exculpatory evidence. (Doc. 40). Because the Government's response provides this Court with no legally justifiable grounds for denying Duggar's motion, and because discovery in this case reveals that the Government did act in bad faith in failing to preserve potentially exculpatory evidence, this Court should grant Duggar's motion.

**I.    The Evidence Obtained, But Not Preserved, By the Government Was Potentially Exculpatory**

In its response, the Government—for the first time in this entire litigation—takes the position that a search of an electronic device can be performed quickly and easily in the field. In stark contrast, in the affidavits submitted when law enforcement sought search warrants in this case, HSI Special Agents explained in great detail "that searching computerized information for evidence of crime often requires special agents to seize most or all of a computer system's central processing unit (CPU), input/output peripheral devices, related software, documentation, and data security devices, including passwords, so that a qualified computer expert can accurately retrieve

the system's data in a laboratory or other controlled environment." Doc. 40-1 at ¶ 45. SA Faulkner further explained, "[s]earching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment." *Id.*

Nonetheless, when it comes to electronic devices that do *not* allegedly belong to Duggar and/or Wholesale Motorcars, law enforcement's actions, and the Government's response, makes clear that a "manual[] review" of two witnesses' cell phones, and a forensic review of another witness's cell phone in the field, was sufficient. *See, e.g.,* Doc. 47 at 2-3. The Government offers no explanation for this glaring inconsistency.

While the Government asserts that it "did not seize the cell phones belonging to the three individuals" (Doc. 47 at 4), that the Government "cannot preserve what it does not have" (*Id.* at 5), and that the Government "had no obligation to take investigative steps based on what the defendant might want at some later date" (*Id.*), the evidence and the Government's response tells a different story. The Government *did* seize the three phones and law enforcement performed at least one "forensic analysis" of one of the phones. Duggar does not ask the Government to produce what it does not have—Duggar faults the Government for failing to preserve that which it previously possessed and which contained potentially exculpatory evidence.

The evidence reveals—and the Government's response makes clear—that the three individuals' cell phones *were* seized—just not for very long. Indeed, the Government acknowledges that law enforcement "manually reviewed" Witness #3's cell phone, but apparently opted not to use a "forensic tool" and "found no evidence of criminal activity on it, and returned the device to this individual." Doc. 47 at 2.[1] And the Government notes, with respect to Witness #1, that law enforcement did the very same thing. *Id.*

---

[1] The Government notes that Witness #3 told law enforcement that he began working at the business in June 2019. Doc. 47 at 1. However, the Government learned that he received his first paycheck on May 31, 2019. *Id.* at n.1. This

However, with respect to Witness #2, the Government cryptically explains that rather than "manually reviewing" his cell phone, Witness #2 "allowed law enforcement to examine his cell phone during the interview. Law enforcement observed no evidence of child sexual abuse material during this examination and returned the device to the individual afterwards. Law enforcement did not create a forensic report or a forensic image of the device." *Id* at 3. However, later in the Government's response, the Government clarifies, for the first time, that with respect to Witness #2's phone, "the examination *consisted of a forensic review*, which uncovered no evidence of child sexual abuse material and did not result in the creation of a forensic report or image copy of the data on the device." *Id.* at 8 (emphasis added).

This admission is stunning in several respects.

First, the Government cannot possibly be contending that a "forensic review" conducted by an HSI Certified Forensic Examiner Marshall Kennedy resulted in absolutely no record whatsoever. At a minimum, Duggar is entitled to an evidentiary hearing to determine what exactly transpired with respect to this forensic review by this computer forensics expert designated by the prosecution as an expert in this case.

Second, the Government attempts to narrowly—and incorrectly—frame the issue as whether the forensic examination of the device revealed "evidence of child sexual abuse material." *See* Doc. 47 at 3. But that is not the test for whether the device contained any potentially exculpatory evidence. For example, the device—and any report generated during its "forensic review"—may have contained evidence concerning whether the device had any relevant internet search history, any evidence associated with the so-called "dark web" and/or the Bit Torrent

---

establishes that Witness #3 lied to law enforcement and that he worked at the business in May 2019—when the criminal activity at issue in this case allegedly occurred. Nonetheless, law enforcement concluded that a manual review of his device was all that was necessary.

network, any metadata that might pinpoint the whereabouts of the device at various dates and times, and so on.

Indeed, throughout this litigation, the prosecution itself has taken the position that devices which do not, themselves, contain evidence of criminal activity, nonetheless have evidentiary value. For instance, the Government is well aware that not a single of Duggar's personal devices contained any "evidence of child sexual abuse material." *See* Doc. 47 at 3. But when it comes to Duggar's devices, the Government nevertheless asserts that Duggar's MacBook and iPhone contained pictures and text messages that the Government claims place him at the car lot at certain times. *See* Doc. 45 at 7. The test is not different for devices allegedly belonging to Duggar and devices allegedly belonging to others.

Similarly, despite representing in sworn affidavits and despite doubling down in its response to Duggar's motion to suppress that searches of electronic devices can take months and must be done in controlled environments, the Government defends its decision to "manually review" two of the cell phones at issue. This not only reveals serious flaws in the Government's investigation of this case—but it also makes clear that the Government had in its possession potentially exculpatory evidence and purposefully decided not to preserve it using precisely the same measures its two federal agents swore were necessary in affidavits.

While the Government asserts throughout its response there could not possibly have been any exculpatory evidence on the phones that it seized and searched, the fact remains that the Government's decision to return the phones to the witnesses without creating any record of the searches and without preserving the underlying evidence deprives Duggar of his "constitutionally guaranteed *access to evidence*." *California v. Trombetta*, 467 U.S. 479, 485 (1984) (emphasis added) (quoting *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982)).

What is particularly disturbing about the Government's response is that the prosecution clings to the fiction that only evidence of child pornography on the phone would be potentially exculpatory. But in doing so, the Government ignores the immense amount of other information contained on these witnesses' phones that is potentially exculpatory or, at a minimum, could lead to the discovery of exculpatory evidence. *See, e.g., United States v. Meregildo*, 920 F. Supp. 2d 434, 438–39 (S.D.N.Y. 2013) ("the Government's obligations under *Brady* encompass not only information that is admissible in its present form but also material information that could potentially lead to admissible evidence favorable to the defense." Law enforcement searched these devices for a reason. But when those searches did not serve the Government's interests, the same law enforcement officers who represented under oath just how important it is to preserve and search devices in controlled environments purposefully decided not to preserve this evidence. This matters—because, at a minimum, these devices would have provided evidence reflecting the technical abilities of the users.

Furthermore, the Government's response is silent with respect to Duggar's argument that he is entitled to impeachment evidence. *See* Doc. 40 at 9. If any report was generated by the "forensic review"—which, assuredly, there was—Duggar has been deprived of the ability to use it in the event Witness #2 testifies at trial.

In this case, the Government's decision to seize and "manually review" two witnesses' cell phones, and to "forensically review" one witness' device, while preserving absolutely no records for Duggar to review, deprives Duggar of his constitutionally guaranteed right of access to potentially exculpatory evidence. For this, Duggar is entitled to the remedy of dismissal if the Government's failure to preserve this evidence was in bad faith.

## II. The Government's Failure to Preserve Potentially Exculpatory Evidence Constitutes Bad Faith

The Government's failure to preserve any record of the forensic review and the manual reviews of the cell phones constitutes bad faith. As Duggar explained in his underlying motion, bad faith is not the same as malicious intent. *See* Doc. 40 at 6.

The Government argues that if the evidence described above was potentially exculpatory, Duggar has not established "official animus" or a "conscious effort to suppress exculpatory evidence." Doc. 47 at 9 (quoting *California v. Trombetta*, 467 U.S. 479, 488 (1984)). But he has. The Government set out in two under-oath affidavits before these searches just how critical it is to forensically-image devices and to search them in a controlled environment. The Government's failure to follow its own protocols epitomizes a "conscious effort to suppress exculpatory evidence." *See id*.

Furthermore, the Government should not be allowed to speak out of both sides of its mouth. If evidence from Duggar's personal devices that do not even arguably contain evidence of a crime nonetheless have some evidentiary value, the Government cannot disclaim that the same is true for other devices just because they happen to belong to people other than Duggar. To the extent the Government can explain this double standard at an evidentiary hearing, this Court can evaluate the Government's explanation with the benefit of cross-examination.

In considering the evidence on this issue, it is important to not lose sight of the fact that the question before this Court is not whether law enforcement acted maliciously in failing to preserve potentially exculpatory evidence. Rather, this Court should consider this issue similarly to the approach used by the Ninth Circuit. *See United States v. Zaragoza-Moreira*, 780 F.3d 971 (9th Cir. 2015). There, the Ninth Circuit dismissed a case where a federal agent allowed a video to be automatically recorded over instead of securing and storing it, thereby leading to the failure to

preserve evidence as a result of standard agency procedure. *See id*. In doing so, the federal agent failed to preserve this potentially exculpatory evidence solely as a result of standard agency procedure. Although the agent testified, and the district court found, that the agent was unaware of the exculpatory value of the video, the Ninth Circuit dismissed the case based on the agency's destruction of the video footage because it supported a possible defense for the defendant. *Id*.

In its response, the Government attempts to distance what transpired here from what happened in *Zaragoza-Moreira*. *See* Doc. 47 at 6. The Government argues that the issue in *Zaragoza-Moreira* was that law enforcement recorded over the video "despite [the defendant's] formal request to preserve it." *Id.* But what the Government leaves out is that law enforcement had recorded over the video prior to the defendant's request that the evidence be preserved. *See Zaragoza-Moreira*, 780 F.3d at 976–77 ("On February 23, 2012, Zaragoza's counsel filed a motion to compel discovery and preserve evidence, specifically referencing the video recordings at the Port of Entry. Following a hearing on February 27, 2012, the district court ordered the government to preserve the video evidence. In line with the court's order, on February 28, 2012, the United States Attorney's Office ("USAO") requested the Port of Entry video footage from the day of Zaragoza's arrest. However, U.S. Customs and Border Protection informed the USAO that the video footage from December 22, 2011, had been destroyed around January 21, 2012, after it had been automatically recorded over").

This is a distinction with a difference—because what happened in *Zaragoza-Moreira* happened here. Duggar requested from the Government a copy of the evidence from these searches and the Government responded that it had not made any copies. That the Government's decision to erase (or to never create a record in the first place) occurred prior to Duggar's request is of no moment. In *Zaragoza-Moreira*, the indictment was correctly dismissed based on law

enforcement's failure to preserve potentially exculpatory evidence. There, as here, federal agents failed to preserve potentially exculpatory evidence by not taking the necessary steps to preserve and secure it. *See Zaragoza-Moreira*, 780 F.3d at 971. The only other way the Government attempts to separate this case from *Zaragoza-Moreira* is by arguing "the government did not save over or delete the forensic image copies of the three phones because, as both parties know, there was no reason to create forensic images of those devices in the first place…" Doc. 47 at 6. But there was a reason to create forensic images in the first place—the precise reason Special Agents Faulkner and Aycock explained in under-oath affidavits just before these searches occurred.

In this way, the Government's bad faith is even more egregious. Before the three witnesses' devices were searched, both Special Agent Faulkner and Special Agent Aycock expressly represented to a federal court precisely how insufficient a field search of an electronic device is and why it is necessary for law enforcement to image and subsequently search a device in a controlled laboratory environment. *See, e.g.,* Doc. 40-1 at ¶ 45 ("Based on my experience and consultation with computer forensic experts, I know that electronic files can be easily moved from computer or electronic storage medium to another computer or medium. Therefore, electronic files downloaded to or created on one computer can be copied on or transferred to any other computer or storage medium at the same location"; "I know that searching computerized information for evidence of crime often requires special agents to seize most or all of a computer system's central processing unit (CPU), input/output peripheral devices, related software, documentation, and data security devices, including passwords, so that a qualified computer expert can accurately retrieve the system's data in a laboratory or other controlled environment"; "Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment").

If that was true approximately 5 weeks earlier, there is no good-faith explanation for why the same two HSI special agents failed to obtain a forensic image of all devices and to preserve that evidence so it could be searched by people with "expert skill" in "a properly controlled environment." *Id*.

The denial of Duggar's rights under the Due Process Clause arising from HSI's failure to preserve evidence from three electronic devices—one belonging to a "person of interest to this investigation" and the other two belonging to people they *Mirandized*—entails "the failure to observe that fundamental fairness essential to the very concept of justice." *Lisenba v. People of State of California*, 314 U.S. 219, 236 (1941).

### III. Comparable Evidence is Not Available to Duggar

The Government argues that even if the evidence from the three phones was potentially exculpatory and the Government's failure to preserve it was in bad faith, Duggar will have the "opportunity at trial to present evidence through cross-examination and his own case, should he choose to present one, establishing that he was not the only individual who had access to the lot." Doc. 47 at 11. The Government's response misses the mark entirely.

Rather, the amount of information contained on the three witnesses' cell phones is not limited to helping Duggar to establish that he was "not the only individual who had access to the lot." *See id*. The phones would establish a multitude of information relevant to his defense. Though not an exhaustive list, information from the phones would establish what these individuals' search for on the internet, whether they possess technical abilities in any manner related to (for example) setting up partitions on hard drives, using file sharing software, knowing the business' Wi-Fi password, and the list goes on.

The evidence the Government possessed—even if for a short time—was potentially exculpatory and is irreplaceable. The bottom line is that comparable evidence is not available to Duggar and his Sixth Amendment right to confront witnesses at trial does nothing to change that fact. The Due Process Clause mandates that exculpatory evidence be delivered into the hands of the accused and the right to a trial without that evidence constitutes a further injury, not a remedy.

IV.     Conclusion

Based on the foregoing, this Court should dismiss this case based on the Government's failure to preserve potentially exculpatory evidence.

Respectfully submitted,

**Margulis Gelfand, LLC**

 /s/ Justin K. Gelfand
JUSTIN K. GELFAND, MO Bar No. 62265*
7700 Bonhomme Ave., Ste. 750
St. Louis, MO 63105
Telephone: 314.390.0234
Facsimile: 314.485.2264
justin@margulisgelfand.com
*Counsel for Defendant*
**Admitted Pro Hac Vice*

**Story Law Firm, PLLC**

/s/ Travis W. Story
Travis W. Story, AR Bar No. 2008278
Gregory F. Payne, AR Bar No. 2017008
3608 Steele Blvd., #105
Fayetteville, AR 72703
Telephone: (479) 448-3700
Facsimile: (479) 443-3701
travis@storylawfirm.com
greg@storylawfirm.com

10

**Certificate of Service**

I hereby certify that the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon the Office of the United States Attorney.

 /s/ Justin K. Gelfand
JUSTIN K. GELFAND, MO Bar No. 62265*
7700 Bonhomme Ave., Ste. 750
St. Louis, MO 63105
Telephone: 314.390.0234
Facsimile: 314.485.2264
justin@margulisgelfand.com
*Counsel for Defendant*
**Admitted Pro Hac Vice*