## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF ARKANSAS
## FAYETTEVILLE DIVISION

**UNITED STATES OF AMERICA**                                                      **PLAINTIFF**

**V.**                          **CASE NO. 5:21-CR-50014**

**JOSHUA JAMES DUGGAR**                                                      **DEFENDANT**

## MEMORANDUM OPINION AND ORDER

Now before the Court are the following motions filed by Defendant Joshua James Duggar:  (1) Motion to Suppress Statements Made by Duggar on November 8, 2019 (Doc. 36); (2) Motion to Suppress Photographs of Duggar's Hands and Feet (Doc. 38); (3) Motion to Dismiss Indictment for Violation of the Appointments Clause (Doc. 39); and (4) Motion to Dismiss for Government's Failure to Preserve Potentially Exculpatory Evidence (Doc. 40).  All motions were **DENIED** from the bench following an in-person evidentiary hearing on September 27, 2021.  The Court has orally explained its reasons for denying the motions; the following Order provides further explanation.  To the extent anything in this Order differs from what was stated from the bench, this Order will control.

### I.  DISCUSSION

### A.  Doc. 36:  Motion to Suppress Statements Made by Duggar on 11/8/19

Mr. Duggar explains in his first motion that on November 8, 2019, federal agents entered his business located at 14969 Wildcat Creek Road in Springdale, Arkansas, to execute a federal search warrant.  The agents parked their vehicles, identified themselves to Mr. Duggar, and informed him why they were present.  At that point, Mr. Duggar pulled his iPhone 11 from his pocket and stated he would like to contact his attorney.  Department of Homeland Security Special Agent Gerald Faulkner testified at the motion

1

hearing that he took Mr. Duggar's iPhone from his hand before he could call his attorney and explained to him that the iPhone was covered by the search warrant and would be seized. Agent Faulkner then told Mr. Duggar he would have an opportunity to contact his attorney later and that he was not under arrest, so he could leave the premises if he liked. According to Agent Faulkner, Mr. Duggar responded that his wife was pregnant and that he might, indeed, need to leave to premises to check on her. Mr. Duggar did not leave the premises.

Five Homeland Security agents and three forensic computer analysts began searching the premises and inventorying and seizing computer equipment. Approximately ten to fifteen minutes later, Agent Faulkner and another special agent named Howard Aycock approached Mr. Duggar while he was standing outside the business office. The agents asked him if he would consent to be interviewed, and Mr. Duggar agreed. The agents then suggested that the interview take place in Agent Aycock's vehicle, which was located about twenty feet away. They told Mr. Duggar he should sit in the front passenger's side of the vehicle, and Agents Aycock and Faulkner would be seated in the driver's seat and the rear seat (on the driver's side) of the vehicle, respectively. Mr. Duggar approached the passenger's side door, opened it himself, sat down, and shut the door behind him. The door remained unlocked, and no one blocked the door from the outside. During the entirety of the ensuing conversation, the vehicle was idling with the engine on.

Once Agent Faulkner and Agent Aycock were seated in the vehicle, Agent Aycock asked Mr. Duggar for his consent to record the interview. Mr. Duggar agreed. According to Agent Faulkner's testimony at the hearing, Mr. Duggar immediately asked, "What is

2

this about? Has somebody been downloading child pornography?" And in response, Agent Aycock instructed Mr. Duggar to stop asking questions until he could start the recording device.

The entirety of the fifty-one-minute interview was played in open court during the hearing. The interview began with Agent Aycock reading Mr. Duggar *Miranda* warnings,[1] which were written on a form under the heading "Statement of Rights." (Gov. Ex. 5). Then, Agent Aycock handed the form to Mr. Duggar and asked him to sign the bottom section, titled "Waiver," to acknowledge Mr. Duggar had been read his *Miranda* rights, understood his rights, and agreed to waive them. Mr. Duggar responded by asking a number of questions about the waiver of his rights. This portion of the interview appears below:

> MR. DUGGAR: Sure. It says [the waiver is] only for now? It's for any other?
>
> AGENT AYCOCK: Sure. Like it says, if you decide to answer questions now, you still have the right to stop. This is you saying—
>
> MR. DUGGAR: This is U.S.C.I.A.—
>
> AGENT AYCOCK: This is U.S. Immigration and Customs Enforcement, Homeland Security Investigation. So you have signed that you understand your rights?
>
> MR. DUGGAR: Yes.
>
> AGENT AYCOCK: So, now, what I'm going to ask you is, are you willing to speak with us now without an attorney present?

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 475 (1966).

> MR. DUGGAR: I mean, I may not answer everything I guess, but, yes. I have more questions than—
>
> AGENT AYCOCK: Sure. So the time is 15:40 on 11/8/2019. So what you're going to do right now for the waiver is you're just going to print your name and sign. And all that's doing is saying—acknowledging what you said you wanted to do, speak with us.
>
> MR. DUGGAR: I'm in custody?
>
> AGENT AYCOCK: No. As we explained, this is a search warrant. This is not an arrest warrant, so you are free to leave at any time.
>
> MR. DUGGAR: Okay.

After that explanation, Mr. Duggar scratched through the last sentence of the "Waiver" portion of the form that mentioned being "taken into custody." Mr. Duggar signed the form, and Agents Aycock and Faulkner signed as witnesses.

In the motion now before the Court, Mr. Duggar contends he invoked his right to counsel when his iPhone 11 was first seized and that agents should not have approached him later seeking a waiver of his *Miranda* rights when he had already requested counsel.

The problem with Mr. Duggar's argument is that a person cannot anticipatorily invoke his *Miranda* rights when he is not subject to custodial interrogation.[2] *See United States v. Wyatt*, 179 F.3d 532, 537 (7th Cir. 1999); *Alston v. Redman*, 34 F.3d 1237, 1245–46 (3d Cir. 1994) ("[T]o be effective, a request for *Miranda* counsel must be made within 'the context of custodial interrogation' and no sooner."). A person who is "in

---

[2] During the hearing, Mr. Duggar's counsel conceded that "whether Mr. Duggar was in custody is a threshold issue that's necessary for us to prevail on this motion."

4

custody" is not free to leave. When viewing the facts from the perspective of a "reasonable person in [Mr. Duggar's] situation," *Yarborough v. Alvarado*, 541 U.S. 652, 662 (2004), the Court finds he was not in custody when agents first entered his business and he mentioned wanting to call his attorney. At that time, Mr. Duggar was free to leave the premises, but he chose not to do so. Although he points out that he did not have a vehicle at his disposal and could not drive away, he was perfectly capable of leaving on foot.[3]

The next question for the Court is whether Mr. Duggar was in custody later, when he agreed to be interviewed by Agents Aycock and Faulkner. According to the Eighth Circuit in *United States v. Griffin*, the "in custody" determination requires the Court to consider:

- whether the suspect was informed that he was free to leave or that he was not under arrest;

- whether the suspect possessed unrestrained freedom of movement during questioning;

- whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions;

- whether police used strong-arm tactics or deceptive strategies during questioning;

- whether the atmosphere of the questioning was police-dominated; and

- whether the suspected was arrested at the end of the questioning.

922 F.2d 1343, 1349 (8th Cir. 1999). As applicable here, the *Griffin* court also recognized that "[t]he most obvious and effective means of demonstrating that a person has not been

---

[3] The search warrant was executed at Mr. Duggar's business—a used car lot. Potentially, Mr. Duggar could have left in any number of used vehicles parked on the lot that day.

5

taken into custody . . . is for the police to inform the suspect that an arrest is not being made and that the suspect may terminate the interview at will." *Id.*

In analyzing the first *Griffin* factor, the Court finds that Mr. Duggar was informed by the federal agents when they first arrived on the scene that he was free to leave. Agent Faulkner's testimony was credible. Further, the recording of the interview confirms that Agent Aycock said to Mr. Duggar, "*As we explained [previously]*, this is a search warrant. This is not an arrest warrant, so you are free to leave at any time." This statement underscores the credibility of Agent Faulkner's claim that Mr. Duggar was informed from the start that he was not in custody. Finally, toward the end of the interview, Mr. Duggar makes a statement that underscores his knowledge that he was free to leave during the interview. He tells the agents, "I'll probably leave here sooner than later, but I just want to make sure you guys have access to everything you need." Accordingly, the first—and likely most critical—*Griffin* factor weighs in the Government's favor.

As to the second factor, it is undisputed that Mr. Duggar had unrestrained freedom of movement before he entered Agent Aycock's vehicle. After he entered the vehicle, his and the agents' tone and demeanor indicate that the interview was neither tense nor combative. Mr. Duggar often refused to answer the agents' questions or give them the information they requested, but the agents responded calmly and moved on to other questions. It is also undisputed that the passenger-side door next to where Mr. Duggar was seated remained unlocked throughout the interview. The Court therefore finds that Mr. Duggar was not restrained, and this factor weighs in the Government's favor.

Third, although Mr. Duggar did not initiate contact with the agents, he acquiesced to their questioning. The total circumstances surrounding the interview demonstrate Mr.

Duggar's understanding that he was free to refuse to answer questions and to stop the questioning when he chose. Moreover, as previously mentioned, the tone of the interview was conversational, not heated. Not only did Mr. Duggar sign a form demonstrating he understood he was waiving his right to counsel, but he also manifested a clear understanding of the waiver and the voluntariness of his actions by reminding the agents before questioning began that he "may not answer everything." This third factor therefore weighs in the Government's favor.

Fourth, there is no compelling evidence that the agents used "strong-arm" tactics during questioning, nor does the Court find that the interview was unnecessarily prolonged. Mr. Duggar points out that at times during the interview, the agents interrupted him. The Court reviewed the transcript with the audio recording played during the hearing and concludes that the participants were talking over (or into) each other. The Court does not believe the agents were attempting to silence or intimidate Mr. Duggar. Rather, the interruptions appear to be innocuous features of the back-and-forth conversation between Mr. Duggar and the agents. Mr. Duggar also draws the Court's attention to the moments in the interview when Agent Aycock questioned Mr. Duggar about his general knowledge of electronic devices, the Tor browser, and BitTorrent downloads. Mr. Duggar initially refused to answer, stating, "I'd rather not get into any specifics on knowledge." Agent Faulkner responded that he understood why Mr. Duggar was probably "[not] going to . . . answer too many more of [their] questions" on these topics. Mr. Duggar agreed and explained that "without legal counsel," he did not want to "say something" that would "get into entrapment of any sort." Agent Faulkner replied as follows:

AGENT FAULKNER:  Right.  And I don't want you to think also that we're keeping you from having an attorney. I know when we got here—

MR. DUGGAR:  Right.

AGENT FAULKNER:  --you said you wanted to call him.

MR. DUGGAR:  Right.

AGENT FAULKNER:  Obviously with your phone, we can't do that. We will call him. He can't come on scene right now while we're here, but we will at least alert him to the fact that we're here.[4]

Mr. Duggar contends that when Agent Faulkner stated that counsel could not "come on scene right now," this may have been a deceptive tactic designed by law enforcement to trick Mr. Duggar into believing he was required to continue answering questions and could not invoke his right to counsel.  The problem with Mr. Duggar's argument is that the recording of the interview tells a different story.  After Agent Faulkner made the statement about Mr. Duggar's attorney, Mr. Duggar continued to answer *and decline to answer* questions.  At one point he stated, "I mean, I can get in touch with my attorney—and see what he says."  At another point, he refused to give the agents the pin number to his iPhone "without talking to [his] attorney."  Mr. Duggar explained, "If [the attorney] says go ahead, then I'll say sure."  It is clear to the Court that Mr. Duggar understood the scope of his waiver and that no *Miranda* violation was committed.  Even so, the Court concedes that Agent Faulkner's statement could be seen as a deceptive

---

[4] Despite Agent Faulkner's assurances, neither he nor any other federal agent attempted to contact Mr. Duggar's attorney that day.

8

strategy—which Mr. Duggar did not fall for.  Therefore, the fourth *Griffin* factor weighs only slightly in favor of the Government.

The fifth *Griffin* factor considers whether the atmosphere of the questioning was police-dominated.  There were numerous police vehicles present at the scene, and there was only a single entry point onto the premises.  Upon arriving at Mr. Duggar's business several officers in tactical gear emerged from their vehicles and two of them approached him with a search warrant.  At the same time, no weapons were drawn, no one was placed in handcuffs, and Mr. Duggar and his employees were all told they were free to leave.  In other words, the scene painted here is standard fare for the execution of a federal search warrant. Nevertheless, on the whole, the atmosphere was police-dominated, and this factor weighs slightly in favor of Mr. Duggar.

Sixth and finally, Mr. Duggar was not arrested at the end of questioning.  Therefore, this factor also weighs in the Government's favor.

Considering all six factors, Mr. Duggar was not in custody on November 8, 2019. A factually similar case is *United States v. Muhlenbruch*, where the defendant was confronted by police at his apartment and, without knowing the reason for their presence, accompanied the officers in their vehicle to the police station for questioning.  634 F.3d 987 (8th Cir. 2011).  Muhlenbruch was told he was not under arrest, and when he arrived at the police station, he was not handcuffed and was informed he was free to leave at any time.  *Id.* at 996.  Later on, during questioning, he confessed to downloading child pornography. The court observed, "Given that Muhlenbruch was not 'in custody' at the time of the interview, his right to counsel under the Fifth Amendment is not implicated and we need not address Muhlenbruch's additional argument that the officers denied his

allegedly unambiguous request for counsel during the interview." *Id.* at 997.  The same reasoning applies here:  Even if Mr. Duggar unambiguously requested counsel at the time his cell phone was seized, he was not in custody then, and he was not in custody later when he submitted to police questioning.  Further, the fact that he was given *Miranda* warnings or asked to sign a form confirming his understanding of these warnings is not determinative of the in-custody inquiry.  "[G]iving a *Miranda* warning does not, in and of itself, convert an otherwise non-custodial interview into a custodial interrogation . . . ." *United States v. Bautista,* 145 F.3d 1140, 1147 (10th Cir.), *cert. denied*, 525 U.S. 911 (1998).

Because Mr. Duggar was never in custody, the protections under *Miranda* never attached and cannot serve as a basis to suppress Mr. Duggar's statements.  The Motion to Suppress Statements Made by Duggar on 11/8/19 (Doc. 36) is therefore  **DENIED**.

### B.  Doc. 38:  Motion to Suppress Photographs of Duggar's Hands and Feet

Mr. Duggar's second suppression motion concerns booking photographs of his hands and feet.  He self-surrendered to law enforcement on April 29, 2021.  Agent Faulkner testified that Mr. Duggar was surrendered that day by his attorney to agents at Homeland Security's Fayetteville office.  When his attorney departed, Mr. Duggar was taken to an interior room to conduct the booking process.  Agent Faulkner was seated behind a desk, about arms' length away from Mr. Duggar, while Agent Jeffrey Pryor took Mr. Duggar's fingerprints.  While this was going on, Agent Faulkner noticed a scar on Mr. Duggar's left thumb.  Agent Faulkner informed Agent Aycock about the scar, and Agent Aycock asked Mr. Duggar—without first contacting his attorney—if he consented to have his hands photographed.  Mr. Duggar consented, and he was directed to place his hands

flat on a table. Agent Aycock picked up a cell phone, leaned over the table so that the camera was positioned above Mr. Duggar's hands (and also captured his feet), and took a few photographs. Mr. Duggar now argues that the Government needed a warrant to photograph his hands and feet and therefore violated his Fourth Amendment rights. He also argues that the agents were obligated to ask Mr. Duggar whether he wanted to consult with counsel *before* he consented to the photographs, and this failure violated Mr. Duggar's Sixth Amendment rights.

There is no legal authority to suggest agents needed a warrant before they could photograph Mr. Duggar's hands and feet. Under *United States v. Dionosio*, Mr. Duggar lacks any Fourth Amendment protection in images of the physical characteristics he typically exposes to the public, such as his face, voice, hands, or feet. 410 U.S. 1, 14–15 (1973). The *Dionosio* court observed that the act of fingerprinting—which arguably is more physically intrusive than taking a photograph—"involves none of the probing into an individual's private life and thoughts that marks an interrogation or search." *Id.*; *see also Maryland v. King*, 569 U.S. 435, 461 (2013) ("[C]ourts have confirmed that the Fourth Amendment allows police to take certain routine administrative steps incident to arrest— *i.e.*, . . . book[ing], photograph[ing], and fingerprint[ing]."). Finally, even if a warrant were required in Mr. Duggar's situation, it is black letter law that "[a] warrantless search . . . is valid if conducted pursuant to the knowing and voluntary consent of the person subject to a search." *United States v. Morgan*, 842 F.3d 1070, 1075 (8th Cir. 2016). Mr. Duggar consented to being photographed. Therefore, no Fourth Amendment violation occurred.

As for the Sixth Amendment challenge, when government agents deliberately elicit incriminating statements from an accused after he has been indicted, outside the

presence of his counsel, such conduct will violate the accused's constitutional right to counsel. *See Fellers v. United States*, 540 U.S. 519, 523–24(1004). However, booking records, including fingerprints and photographs, are not considered testimonial statements, nor is the booking process considered a critical stage of the prosecution where the Sixth Amendment right to counsel attaches. *See United States v. Wade*, 388 U.S. 218, 227 (1967) (noting that taking blood and hair samples during booking is not done at a "critical stage" where the right to counsel attaches). For these reasons, the Motion to Suppress Photographs of Duggar's Hands and Feet (Doc. 38) is **DENIED**.

**C. Doc. 39: Motion to Dismiss Indictment for Violation of Appointments Clause**

Mr. Duggar's next motion explains that the federal agents who were involved in the investigation of his criminal charges were acting under the authority of Acting Secretary of Homeland Security Chad Wolf, but Secretary Wolf's immediate predecessor, Kevin McAleenan, was improperly appointed as Acting Secretary and therefore lacked authority to lead the agency. Mr. Duggar reasons that because Secretary Wolf's appointment to head the agency is deficient in some way, the entire criminal investigation into Mr. Duggar's conduct was undertaken in violation of the Appointments Clause of the Constitution, and the indictment must be dismissed.

This motion is frivolous. There is no legal support for Mr. Duggar's claim that an indictment handed down by a properly impaneled grand jury would be subject to dismissal due to an alleged Appointments Clause violation. Department of Homeland Security agents are sworn to enforce federal criminal statutes, and the Court is not aware of any reason why their authority to investigate crimes would somehow be undermined if the acting secretary of their agency were improperly appointed. All cases Mr. Duggar cites

12

in support of his motion are civil immigration cases involving the direct policymaking or rulemaking authority of the acting secretary of Homeland Security. These cases are inapposite to Mr. Duggar's. "An indictment returned by a legally constituted and unbiased grand jury . . . is enough to call for trial of the charge on the merits." *Costello v. United States*, 350 U.S. 359, 363 (1956). The Motion to Dismiss Indictment for Violation of Appointments Clause (Doc. 39) is **DENIED**.

### D. Doc. 40: Motion to Dismiss for Failure to Preserve Exculpatory Evidence

In Mr. Duggar's final motion, he complains that federal agents failed to preserve potentially exculpatory evidence because they did not perform forensic analyses of electronic devices possessed by certain key witnesses. First, Mr. Duggar points out that agents waited about five weeks after searching his business to start interviewing potential witnesses, and when they finally searched these witnesses' cell phones, they failed to preserve any evidence. Agent Faulkner confirmed during the motion hearing that the witnesses were interviewed and their cell phones manually searched for evidence of child pornography, but no child pornography was discovered. He asserts that for that reason, the cell phones were not forensically searched, inventoried, or imaged.

Failure to preserve evidence does not constitute a denial of due process unless law enforcement acted in bad faith, the evidence had apparent exculpatory value, and comparable exculpatory evidence was not reasonably available to the defendant. *California v. Trombetta,* 467 U.S. 479, 488–89 (1984). For evidence to have constitutional materiality, it must "possess an exculpatory value that was apparent before the evidence was destroyed"—or in the instant case, before agents failed to preserve a *lack* of evidence on the witnesses' cell phones. *Id.* at 489. Mr. Duggar's evidence of the Government's

bad faith is found in the affidavit attached to the search warrant, signed by Agent Faulkner. (Gov. Ex. 1). The affidavit claims that performing a forensic review of electronic devices is critical to law enforcement's determination of whether a crime occurred. Mr. Duggar observes that even though law enforcement understood that it was important to forensically review electronic devices, here, they only imaged Mr. Duggar's electronic devices and decided against imaging anyone else's devices.

The Court finds that law enforcement's decision not to forensically search and image certain electronic devices was made pursuant to a good-faith belief that such additional investigative steps were unnecessary. Valid reasons may exist to criticize law enforcement's thoroughness (or lack thereof) on cross-examination, but the Court is simply not persuaded that law enforcement's actions rise to the level of a constitutional deprivation of due process that would require the dismissal of the indictment against Mr. Duggar. Accordingly, the Motion to Dismiss for Failure to Preserve Exculpatory Evidence (Doc. 40) is **DENIED**.

## II. CONCLUSION

**IT IS THEREFORE ORDERED** that for the reasons stated herein and at the hearing on September 27, 2021, the following motions are **DENIED**: (1) Motion to Suppress Statements Made by Duggar on November 8, 2019 (Doc. 36); (2) Motion to Suppress Photographs of Duggar's Hands and Feet (Doc. 38); (3) Motion to Dismiss Indictment for Violation of the Appointments Clause (Doc. 39); and (4) Motion to Dismiss for Government's Failure to Preserve Potentially Exculpatory Evidence (Doc. 40).

**IT IS SO ORDERED** on this 13th day of October, 2021.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE