IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

UNITED STATES OF AMERICA                                                          PLAINTIFF

V.                              CASE NO. 5:21-CR-50014

JOSHUA JAMES DUGGAR                                                               DEFENDANT

**MEMORANDUM OPINION AND ORDER**

Now before the Court are Defendant Joshua James Duggar's Motion to Suppress Evidence and Request for a *Franks* Hearing (Doc. 37), the Government's Response (Doc. 45), and Mr. Duggar's Reply (Doc. 58). The Motion is **DENIED** for the reasons explained below.

**I. BACKGROUND**

Mr. Duggar moves to suppress evidence gathered during the execution of a search warrant on November 8, 2019, at his business, a used car dealership in Springdale, Arkansas. Agents seized, among other things, an HP desktop computer, Mr. Duggar's iPhone 11, and a MacBook laptop. These items were taken to a location off-site for imaging and processing. On November 22, 2019, Homeland Security Computer Forensic Analyst Marshall Kennedy created forensic copies of the three devices, but he did not submit his forensic report until June 24, 2020.[1] In October 2020, the case took another step forward when Mr. Kennedy duplicated his forensic copy of the devices and sent it to the Department of Justice for further analysis. Brad Gordon, a Digital

---

[1] The Government contends that the forensic analysis took longer than usual because of a lack of manpower and other delays occasioned by the COVID-19 pandemic. *See* Doc. 45, p. 37. This may be true, but it is immaterial to the Court's analysis of the issues raised in the Motion.

1

Investigative Analyst, received Mr. Kennedy's data, analyzed it, and wrote a forensic report in November 2020, followed by a supplemental report in February 2021. Mr. Duggar was indicted by a grand jury on April 28, 2021, and charged with one count of receiving child pornography, one count of possessing child pornography, and a forfeiture allegation. *See* Doc. 1. The indictment alleges that between May 14 and May 16, 2019, Mr. Duggar both received and possessed pornographic images of minors under the age of twelve. *Id.*

In the Motion now before the Court, Mr. Duggar criticizes the methods used by law enforcement to obtain the search warrant for his business and contends there was no probable cause to support the issuance of the warrant. First, he argues that material facts were omitted from the affidavit supporting the search warrant and these omissions are so serious that the Court should hold an evidentiary hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978).[2] Mr. Duggar believes law enforcement intentionally or recklessly excluded the following critical information from the affidavit: (1) that law enforcement downloaded suspected child pornography from his IP address using software called "Torrential Downpour," which Mr. Duggar contends is unreliable and produces "false

---

[2] It appears there were two search warrants issued with respect to this case. Ozarks Go, the internet service provider for the target IP address, initially supplied the wrong residential address to law enforcement, 14993 Wildcat Creek Road. Agents obtained the first search warrant (Doc. 37-1) and attempted to execute it on October 31, 2019. They made contact with the residents of that address and soon realized there had been an error. Ozarks Go re-checked its records and advised law enforcement that the correct address was really 14969 Wildcat Creek Road. The first warrant was returned unexecuted, and agents swore out a second search warrant (Doc. 37-2) listing the correct address. The mix-up about the addresses was fully disclosed to the magistrate judge in the affidavit supporting the second search warrant. *See id.* at p. 14. Though Mr. Duggar argues the mix-up tends to show the agents' recklessness, the Court finds that the mix-up was an innocent mistake. "Allegations of negligence or innocent mistake are insufficient" to invalidate a search warrant. *Franks*, 438 U.S. at 171.

positives," (Doc. 37, p. 19); (2) that the IP address was associated with a small business, rather than a residence, and the business may have used an unsecured wireless internet connection or a secured connection with a password known to multiple individuals; and (3) that law enforcement did not successfully download the entire .zip file described in the affidavit, and the portion of the file that was downloaded was "corrupted" and impossible to view, *id.* at p. 9.

Second, Mr. Duggar argues there was no probable cause to search his business because agents applied for a search warrant six months after downloading the suspected child pornography from his IP address. He believes this six-month delay made the evidence too stale to be reliable—especially given that: (1) the IP address was associated with a public business, not a residence, so there was no reason to think that evidence would still be present after six months, and (2) multiple devices could have connected to this same IP address, and law enforcement could not have known which device downloaded the suspected child pornography prior to applying for the search warrant, again making it unlikely evidence would be found on the premises.  Next, Mr. Duggar argues that any evidence of child pornography should be excluded because of how law enforcement obtained it.  He argues that Torrential Downpour operated "like a GPS tracking device" when it attempted to download the .zip file from his IP address several times over the course of many hours—without complete success.  Under these circumstances, Mr. Duggar believes federal agents needed a warrant to use Torrential Downpour, and since they never applied for one, the files they downloaded from his IP address using this software should be suppressed.

Third, Mr. Duggar argues that the Court should suppress the evidence obtained

from his seized electronic devices because it took investigators too long to perform their forensic analysis. Though the devices were seized within the time frame specified in the search warrant, the off-site forensic "search" of those devices took approximately sixteen more months. According to Mr. Duggar, since the investigators did not return to the magistrate judge during that sixteen-month period to explain why their forensic examination was taking so long, the court-authorized *seizure* of the devices became a "warrantless" *search* of their contents. He therefore asks the Court to suppress all evidence retrieved from his electronic devices under the fruit-of-the-poisonous-tree doctrine. *See Murray v. United States,* 487 U.S. 533, 536–37 (1988). Relatedly, he argues that if the Government attempts to rely on Federal Rule of Criminal Procedure 41(e)(2)(B) to excuse the lengthy search period, the Court should find the Rule unconstitutional on its face or as applied to Mr. Duggar's case.

Below, the Court will begin its discussion by explaining the legal standards that apply when considering a request for a *Franks* hearing and a motion to suppress. Then, the Court will turn to an analysis of each of Mr. Duggar's substantive arguments.

## II.  LEGAL STANDARDS

### A.  *Franks* Hearing and Probable Cause

To justify a *Franks* hearing, the defendant must make a "substantial preliminary showing" with specific allegations that the affidavit submitted in support of a search warrant included a "deliberate falsehood or . . . reckless disregard for the truth." *Franks*, 438 U.S. at 171). Such allegations "must be accompanied by an offer of proof." *Id.* Because an affidavit accompanying a search warrant carries with it "a presumption of validity . . . the challenger's attack must be more than conclusory and must be supported

by more than a mere desire to cross-examine." *Id.* Further, the defendant "must also show that the alleged false statement or omission was necessary to the finding of probable cause." *United States v. Gabrio*, 295 F.3d 880, 883 (8th Cir. 2002). "The substantiality requirement is not lightly met." *United States v. Williams*, 477 F.3d 554, 558 (8th Cir. 2007).

In general, "[a]n affidavit establishes probable cause for a warrant if it 'sets forth sufficient facts to establish that there is a fair probability that contraband or evidence of criminal activity will be found in the particular place to be searched.'" *United States v. Mutschelknaus*, 592 F.3d 826, 828 (8th Cir. 2010) (quoting *United States v. Snyder*, 511 F.3d 813, 817 (8th Cir. 2008)). Whether probable cause exists "is a 'commonsense, practical question' to be judged from the 'totality-of-the-circumstances.'" *United States v. Donnelly*, 475 F.3d 946, 954 (8th Cir. 2007) (quoting *Illinois v. Gates*, 462 U.S. 213, 230 (1983)). Without probable cause, a warrant may be invalidated and the evidence suppressed pursuant to the Exclusionary Rule; however, under the good-faith exception to the Exclusionary Rule, the evidence obtained from an invalid warrant "must not be suppressed if law enforcement's reliance on the warrant was objectively reasonable." *United States v. Jean*, 207 F. Supp. 3d 920, 944 (W.D. Ark. 2016), *aff'd*, 891 F.3d 712 (8th Cir. 2018) (citing *United States v. Leon*, 468 U.S. 897, 922 (1984)).

### B.  Searching Electronic Storage Media under Rule 41(e)(2)(B)

According to Federal Rule of Criminal Procedure 41(e)(2)(B):

> A warrant . . . may authorize the seizure of electronic storage media or the seizure or copying of electronically stored information. Unless otherwise specified, the warrant authorizes a later review of the media or information consistent with the warrant. The time for executing the warrant in Rule 41(e)(2)(A) and (f)(1)(A) refers to the seizure or on-site copying of the media or information, and not to any later off-site copying or review.

5

The above language was added to the Rule in 2009 to address the fact that "[c]omputers and other electronic storage media commonly contain such large amounts of information that it is often impractical for law enforcement to review all of the information during execution of the warrant at the search location." Fed. R. Crim. P. 41(e)(2) advisory committee's note to 2009 amendment. Accordingly, the amendment "acknowledges the need for a two-step process: officers may seize or copy the entire storage medium and review it later to determine what electronically stored information falls within the scope of the warrant." *Id.*

When a federal rule of criminal procedure is challenged as unconstitutional, the reviewing court must consider whether the rule "abridge[s], enlarge[s] or modif[ies] any substantive right." 28 U.S.C. § 2072(b).

### III.  DISCUSSION

#### A.  Alleged Material Omissions in the Search Warrant Affidavit

##### 1.  Omitted Facts about Torrential Downpour

Mr. Duggar believes the magistrate judge who signed the search warrant was misled by investigators because the affidavit supporting the warrant never explained that law enforcement used Torrential Downpour to monitor the BitTorrent peer-to-peer file-sharing network and to download images and videos shared by Mr. Duggar's IP address. Though Mr. Duggar is correct that the words "Torrential Downpour" do not appear in the affidavit, the document describes with specificity how a police officer working with the Internet Crimes Against Children Task Force downloaded child sexual abuse materials from Mr. Duggar's IP address. Paragraph 34 of the affidavit contains the following detailed information:

> In May 2019, a HSI Internet Crimes Against Children (ICAC) Task Force affiliate was conducting an online investigation on the BitTorrent Peer-to-Peer (P2P) file sharing network for offenders sharing child pornography. During the course of the investigation, a connection was made between the HSI ICAC Task Force affiliate's investigative computer and a computer/device running BitTorrent software from an IP Address of 167.224.196.113. In May 2019, two separate downloaded files were successfully obtained from IP Address 167.224.196.113. One of the downloaded files was a ".zip" folder containing approximately sixty-five (65) images and the other downloaded file was a single video. The HSI ICAC Task Force affiliate then viewed portions of the downloaded files which were determined to be consistent with child pornography. The device at IP Address 167.224.196.113 was the only IP Address which shared the contents for the files downloaded, and as such, the files were downloaded directly from this IP Address. The HSI Task Force affiliate then determined the IP Address was geo-located to Northwest Arkansas, at which time the lead information and downloads were forwarded to the HSI Special Agent in Charge Office in Fayetteville, Arkansas for further investigation.

(Doc. 37-2, pp. 11–12).

The above description provides probable cause to believe a crime was committed. The fact that the Task Force affiliate utilized Torrential Downpour to make a connection "between [her] investigative computer and a computer/device running BitTorrent software from an IP Address [assigned to Mr. Duggar]," *id.*, was not necessary to include in the affidavit. Accordingly, the omission of this fact was not material to the probable cause analysis and does not justify a *Franks* hearing.[3]

### 2. Omitted Facts about Mr. Duggar's Small Business

Next, Mr. Duggar complains:

> [T]he affidavit omits entirely that the used car dealership law enforcement sought to search was a business that regularly catered to the general public in May 2019 and that regularly had transient workers and employees at that time. As such, the magistrate judge was left completely in the dark as to the vast privacy interests at stake.

---

[3] Furthermore, as will be described in greater detail below, *see infra* pp. 13–14, the Eighth Circuit has determined that Torrential Downpour is a legitimate law enforcement tool to identify child pornography on the peer-to-peer network.

(Doc. 37, p. 20). To say the magistrate judge was "left completely in the dark" about the location where the search warrant was to be executed is false. Paragraph 40 of the affidavit describes in detail how investigators obtained the first search warrant that identified the wrong residential address on Wildcat Creek Road in Springdale. (Doc. 37-2, p. 14). This paragraph explains that when investigators visited that address, the residents informed them that "half of the property on the approximate [sic] twenty-seven (27) acres was either sold or split years ago and the current public property records have not been updated to reflect the two separate lots"; and "[a]fter the sale or split of the property, Wholesale Motorcars"—Mr. Duggar's small business—"was established and assigned or listed as a separate address." *Id.* at pp. 14–15.

Paragraphs 41–44 of the affidavit describe law enforcement's efforts to verify that the address associated with Wholesale Motorcars was the correct location to list on a new search warrant—before attempting to obtain that warrant. Officers already knew from Ozarks Go that the target IP address was assigned to Mr. Duggar. *See id.* at p. 13, ¶ 37. An officer went undercover to visit Wholesale Motorcars on November 1, 2019. *Id.* at p. 16, ¶ 44. The officer posed as a member of the public seeking to purchase a used car. He spoke with Mr. Duggar and an employee named Randy and observed electronic equipment in the business office and on Mr. Duggar's person. *Id.*

When law enforcement applied for the second search warrant, the area to be searched was described to the magistrate judge as "[a]ny and all structures, outbuildings and vehicles to include motor homes, or recreational vehicles (RV) located on the property or arriving on the property and curtilage of Wholesale Motorcars." (Doc. 45-2, p. 26). Photographs of the premises were also attached to the application. *Id.* at pp. 28–

8

29. Accordingly, the Court finds that the magistrate judge was provided all the facts she needed to make a finding that contraband or evidence of criminal activity would be found at the car lot. To suggest that the affidavit was misleading because it did not explicitly state that the business "regularly catered to the general public" or "may have had unsecured Wi-Fi," (Doc. 37, p. 20), is unpersuasive, given the details about the business that were included with the application.[4]

### 3. Omitted Facts about the Partial Download of the .zip File

Lastly, Mr. Duggar argues a *Franks* hearing is necessary because the affidavit supporting the warrant falsely described two suspected child pornography files as having been "successfully downloaded" by law enforcement from Mr. Duggar's IP address, when, in actuality, only one of the files completely downloaded while the other file partly downloaded. Setting aside for the moment the semantic question of whether a partly downloaded file could be described as "successfully downloaded," Mr. Duggar has failed to acknowledge the elephant in the room: Law enforcement *fully and successfully* downloaded one complete file—a video—from his IP address, and the description of that video alone provides probable cause to search his electronic devices for evidence of a

---

[4] Mr. Duggar also suggests the magistrate judge was not properly "educated" by law enforcement about the facts surrounding the earlier, unexecuted search warrant and was somehow hoodwinked into signing a second warrant without appreciating what had transpired previously. (Doc. 37, p. 19). This suggestion is plainly false—as well as a not-so-subtle attack on the magistrate judge's credibility. The same magistrate judge authorized both the first and second warrants, so she was well aware of the factual bases supporting each. Mr. Duggar claims the affidavits supporting the two warrants were identical—save for the wrong address. Again, this is false. The affidavit supporting the second warrant explained why the first warrant was returned unexecuted. The affidavit also explained the investigative efforts law enforcement undertook to verify that Wholesale Motorcars was indeed the correct address associated with the target IP. *See* Doc. 37-2, pp. 13–16, ¶¶ 37–44. The magistrate judge was not misled.

crime.  The fully downloaded video, labeled "mov_0216.mp4," is two minutes and eleven seconds in length and depicts

> two (2) prepubescent females approximately seven (7) to nine (9) years of age.  The prepubescent females are both completely naked laying on top of each other.  A male subject is then seen penetrating one of the prepubescent female's vagina with his erect penis.

(Doc. 37-2, pp. 12–13, ¶ 35(b)).

Though Mr. Duggar attempts to minimize this evidence by describing it as "a single video fie with an innocuous name," (Doc. 37, p. 12), he does not contest that it depicts what law enforcement claims it depicts, nor does he suggest that the video was not personally reviewed by the agent who signed the affidavit.  Instead, he directs the Court's attention to the second file, labeled "marissa.zip," which the affidavit explains is a folder containing "approximately sixty-five (65) image files of a prepubescent female."  *Id.* at ¶ 35(a).  Mr. Duggar offers the expert opinion of digital forensics analyst Michele Bush to support his claim that the partial download of "marissa.zip" was "in such an incomplete state that no user, including law enforcement, would have been able to successfully open or view any of the 65 images contained within the archive file." [5]  (Doc. 37-2, p. 7).

The Government responds that the agent who signed the search warrant affidavit personally reviewed the sixty-five images of the .zip file, just as he claimed.  In addition, the "Task Force affiliate" who is mentioned in the affidavit, Detective Amber Kalmer of the Little Rock Police Department, also personally reviewed the partly downloaded .zip file, and her supervisor, ICAC administrator Lenore Paladino, reviewed the file as well.  Their

---

[5] Ms. Bush makes this claim without having viewed the actual "marissa.zip" images in the Government's possession.  She bases her opinions on the Torrential Downpour log files.  *See id.* at p. 2.

affidavits are attached to the Government's Brief. See Docs. 45-4 & 45-5.  In addition, the Government offers the affidavit of Robert Erdely, (Doc. 45-6), who claims he helped develop the Torrential Downpour software and personally viewed the partial "marissa.zip" file that was "collected by Torrential Downpour . . . in the investigation." (Doc. 45-6, pp. 1 & 7).  Finally, the Government points to an email its counsel sent Mr. Duggar's counsel that memorializes a meeting between them on March 19, 2021, in which "the Government displayed the Marissa images and the video of child pornography downloaded by law enforcement to defense counsel," and "offered a review of all the child pornography images discovered during the forensic process, but that offer was declined." (Doc. 45-3, p. 1).

To state the obvious, the parties dispute whether the partial "marissa.zip" file that was downloaded from Mr. Duggar's IP address was viewable—and, thus, whether the affidavit in support of the search warrant falsely claimed that the affiant "reviewed the . . . file[]." (Doc. 37-2, p. 12, ¶ 35).  Assuming without deciding that this statement was indeed false, a Franks hearing is still not warranted because Mr. Duggar does not dispute that one complete video containing images of suspected child pornography was successfully downloaded by Detective Kalmer and later viewed by the affiant.  That video alone is enough to suggest a fair probability that evidence of criminal activity would be found at Mr. Duggar's business.  Accordingly, even if the information in the affidavit about the "marissa.zip" file was misleading or false, there was enough other evidence described in the affidavit to establish probable cause to issue the search warrant.

### B. Other Arguments Concerning a Lack of Probable Cause

#### 1. *Staleness of the Evidence Supporting the Warrant*

Mr. Duggar points out that agents applied for a search warrant approximately six months after the alleged child pornography was downloaded from his IP address. He contends this evidence became stale because too much time passed between law enforcement's collection of it and the issuance of a search warrant. At the same time, he acknowledges in his brief "that there is no set time applicable to every case and that courts have found a *lack of staleness* in certain child pornography cases given the nature of the offense." (Doc. 37, p. 13 (emphasis added)).

Staleness depends on "the nature of the criminal activity, and the kind of property subject to the search." *United States v. Estey*, 595 F.3d 836, 840 (8th Cir. 2010). Although, in general, "[a] warrant becomes stale if the information supporting the warrant is not sufficiently close in time to the issuance of the warrant and the subsequent search conducted so that probable cause can be said to exist as of the time of the search," *United States v. Brewer*, 588 F.3d 1165, 1173 (8th Cir. 2009) (citation omitted), that is not the rule when it comes to child pornography. The Eighth Circuit has found on numerous occasions that staleness was not an issue, even when child pornography files were downloaded many months prior to the issuance of search warrants. *See United States v. Lemon*, 590 F.3d 612, 615 (8th Cir. 2010) (eighteen-month delay); *Estey*, 595 F.3d at 840 (five-month delay); *United States v. Horn*, 187 F.3d 781, 786 (8th Cir. 1999) (three-month delay). Under the circumstances in the case at bar, the Court is not persuaded that the evidence was too stale to support the issuance of a search warrant.

Mr. Duggar makes a second, related point that "[t]here was no reason for the

magistrate judge to conclude that evidence of child pornography would be found at a business (not a residence) simply because an unknown device allegedly contained two files approximately six months earlier." (Doc. 58, p. 7). The trouble with this argument is that distinguishing Mr. Duggar's used car lot from a private residence is a difficult task, especially given the photographs of the site, which were included in the search warrant for the magistrate judge's review. The used car lot was situated in a remote area off a highway. The business itself was a gravel parking lot with two small outbuildings or sheds. When agents performed surveillance of the site prior to obtaining the search warrant, they observed Mr. Duggar there with only one other employee. It was reasonable under the circumstances for the magistrate judge to conclude child pornography might still be preserved at this location six months after the files were downloaded by law enforcement.

*2. Use of Torrential Downpour*

To the extent Mr. Duggar contends the use of Torrential Downpour was suspect, the Eighth Circuit has implicitly approved of its use, finding that it "only searches for information that a user had already made public by the use of [peer-to-peer] software." *United States v. Hoeffener*, 950 F.3d 1037, 1044 (8th Cir. 2020).

Mr. Duggar's related argument is that the magistrate judge should have been informed that the Task Force Affiliate's computer attempted to download one of the files being shared by Mr. Duggar's IP address through the BitTorrent network for seventeen hours but never fully downloaded all parts of the file. Though Mr. Duggar finds the omission of this detail suspicious, the Court does not. The probable cause analysis does not depend on the particulars of how the alleged child pornography was downloaded—

13

provided it was downloaded in a way that did not violate Mr. Duggar's constitutional rights. After the decision in *Hoeffener*, it is safe to say that Torrential Downpour is a tool law enforcement may lawfully use to identify the sharing of child pornography on the peer-to-peer network. Since "[a] defendant has no legitimate expectation of privacy in files made available to the public through peer-to-peer file-sharing networks," *id.*, law enforcement is not required to obtain a warrant before utilizing the software. In view of the above analysis, it is also clear that Torrential Downpour does not function as a "GPS tracking device," as Mr. Duggar contends. (Doc. 37, p. 10).

### C. Searches Made after the Warrant Expired; Constitutionality of Rule 41(e)

The Court now turns to Mr. Duggar's final argument, which focuses on the time it took the Government to forensically image and search his electronic devices after they were seized.[6] Both parties agree that the devices were seized before the expiration of the warrant but were forensically searched and inventoried much later.

Federal Rule of Criminal Procedure 41(e)(2)(B) contemplates a two-step process for seizing electronic equipment, wherein the physical seizure must occur by the deadline specified in the warrant, but the off-site copying or review of the contents of the electronic devices may take place "later" with no particular deadline specified. In Mr. Duggar's case, the relevant timeline is as follows: His electronic devices were seized and imaged in

---

[6] Mr. Duggar also separately criticizes DOJ examiner Bradley Gordon and contends that a scrivener's error on his part requires suppression. But this argument does not merit any serious consideration. According to Mr. Duggar, unspecified "discovery" suggests that Mr. Gordon's forensic records reference the first (unexecuted) search warrant directed to a neighboring property, instead of the devices actually seized during execution of the second warrant on the car lot. Mr. Duggar offers no authority for the proposition that a typographical error of this nature (inadvertently referencing 19-CM-111 instead of 19-CM-115) is of constitutional significance. The Court is not aware of any either.

November 2019; the forensic analyst who performed the imaging off-site submitted his report to the Department of Justice about seven months later; the Department of Justice's analyst submitted a report in November 2020—a year after the original seizure—and a supplemental report in February 2021; and Mr. Duggar was indicted in April 2021.

The 2009 amendments to Rule 41(e) addressed the fact that computers and other digital electronic storage media are different in kind than other types of contraband. Computers contain vast amounts of information—often password-protected, encrypted, booby-trapped, and generally difficult to access. Rule 41(e)(2) contemplates law enforcement seizing electronic devices within fourteen days of the issuance of a search warrant and then performing the forensic examination of the devices elsewhere, at a later date.[7] In Mr. Duggar's case, the search warrant had a return date of November 18, 2019, *see* Doc. 45-2, p. 26, but the affidavit attached to the warrant specified that any seized electronic devices would be searched off-site, which could "take up to several months to complete, depending on the volume of data stored," (Doc. 37-2, p. 17).

Mr. Duggar offers a facial challenge to the constitutionality of Rule 41(e)(2)(B). The argument is rather thinly constructed, but the Court will nevertheless address it. A facial challenge requires a showing that a law—or in this case, a rule of criminal procedure promulgated by the United States Supreme Court pursuant to the Rules Enabling Act—is "unconstitutional in all of its applications"; the challenge fails where the law (or rule) "has a plainly legitimate sweep." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (quotation marks and citations omitted). Though Rule

---

[7] The Eighth Circuit has cited to this two-step process without criticism. *See United States v. Beckmann,* 786 F.3d 672, 680 n.6 (8th Cir. 2015).

41(e)(2)(B) establishes no particular end-date for off-site review of electronic devices seized pursuant to a search warrant, the Rule is not unconstitutional in all its applications. Certainly, the open-ended nature of the deadline described in the Rule could be abused by law enforcement, but it would be up to the reviewing trial court to note those facts and consider whether the length of the search was unreasonable under the Fourth Amendment. Further, if the defendant's real concern were the delay in returning his electronic devices that did not contain any contraband, Rule 41(g) provides a remedy by which "[a] person aggrieved by . . . the deprivation of property may move for the property's return." In this Court's estimation, there is nothing about the later search of Mr. Duggar's devices that offends the Constitution.

Next, Mr. Duggar questions whether law enforcement should have applied for an extension of the warrant. He contends that law enforcement's failure to do so caused the sixteen-month forensic analysis of the devices to become "warrantless" and subject to suppression. The Court doubts that is true on the facts presented here. But even assuming (without deciding) that law enforcement erred in not seeking an extension of the warrant, suppression does not automatically follow as the remedy. The Court notes that in *United States v. Mutschelknaus*, a case involving an off-site examination of a computer seized pursuant to a search warrant, the Eighth Circuit held that "'noncompliance with Rule 41 does not automatically require exclusion of evidence in a federal prosecution. Instead, exclusion is required only if a defendant is prejudiced or if reckless disregard of proper procedure is evident.'" 592 F.3d 826, 829–30 (8th Cir. 2010) (quoting *United States v. Spencer,* 439 F.3d 905, 913 (8th Cir. 2006)).

In Mr. Duggar's case, he has not shown that federal agents acted with reckless disregard for proper procedure. And he certainly has not shown that the agents acted in bad faith. Moreover, Mr. Duggar cannot show that he was prejudiced by any delay; the devices remained in law enforcement's safe keeping throughout this time period,[8] and the probable cause warranting the initial seizure of the devices remained viable through the date of indictment. Accordingly, the Court will not suppress any evidence discovered during the forensic search of Mr. Duggar's seized electronic devices.

### IV. CONCLUSION

For the reasons stated, **IT IS ORDERED** that Defendant's Motion to Suppress Evidence and Request for a *Franks* Hearing (Doc. 37) is **DENIED.**

**IT IS SO ORDERED** on this 18th day of October, 2021.

TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE

---

[8] Mr. Duggar does not contend that the digital evidence was lost or became susceptible to degradation due to the passage of time. Nor does he contend that his own forensic analysis was compromised by the delay.