9:02AM

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION


UNITED STATES OF AMERICA                    PLAINTIFF

v.                CASE NO. 5:21-CR-50014

JOSHUA JAMES DUGGAR                          DEFENDANT

_____


TRANSCRIPT OF MOTIONS HEARING

BEFORE THE HONORABLE TIMOTHY L. BROOKS

SEPTEMBER 27, 2021

FAYETTEVILLE, ARKANSAS

_____

```
 1                    A P P E A R A N C E S

 2

 3   FOR THE PLAINTIFF:

 4   MR. DUSTIN ROBERTS
     MS. CARLY MARSHALL
 5   United States Attorney's Office
     414 Parker Avenue
 6   Fort Smith, Arkansas 72901
     (479) 783-5125
 7   dustin.roberts@usdoj.gov
     carly.marshall@usdoj.gov
 8

 9   Also Present:  Special Agent Gerald Faulkner

10

11   FOR THE DEFENDANT:

12   MR. JUSTIN K. GELFAND
     Margulis Gelfand
13   7700 Bonhomme Avenue, Suite 750
     St. Louis, Missouri 63105
14   (314) 390-0234
     justin@margulisgelfand.com
15
     MR. TRAVIS W. STORY
16   Story Law Firm
     2603 Main Drive, Suite 6
17   Fayetteville, Arkansas 72704
     (479) 443-3700
18   travis@storylawfirm.com

19

20

21

22

23

24

25
```

```
 1                           I N D E X

 2                                                    Page

 3   Preliminary Matters .............................   5

 4   SPECIAL AGENT GERALD FAULKNER

 5       Direct Examination by Mr. Roberts ............  18
         Cross Examination by Mr. Gelfand ............. 147
 6
     Motions Argument:
 7
     Document 36, Motion to Suppress Statements
 8
         By Mr. Gelfand ............................... 224
 9       By Mr. Roberts ............................... 239
         By Mr. Gelfand ............................... 244
10       By Mr. Roberts ............................... 245

11   Court's Ruling ................................... 246

12   Document 40, Motion Regarding Exculpatory Evidence

13       By Mr. Gelfand ............................... 263
         By Mr. Roberts ............................... 273
14       By Mr. Gelfand ............................... 279

15   Court's Ruling ................................... 281

16   Document 38, Motion to Suppress Photographs

17       By Mr. Gelfand ............................... 284
         By Ms. Marshall .............................. 289
18       By Mr. Gelfand ............................... 292

19   Court's Ruling ................................... 294

20   Document 39, Motion Regarding Appointments Clause

21       By Mr. Gelfand ............................... 297
         By Ms. Marshall .............................. 304
22
     Court's Ruling ................................... 305
23

24   Reporter's Certificate ........................... 308

25
```

E X H I B I T S

                                                          Received

Government Exhibit 1        Search Warrant                    21
                           with Attachments A-C

Government Exhibit 2        Photos of Car Lot                 24

Government Exhibit 3        Recording of Interview            38

Government Exhibit 4        Transcript of Interview           39

Government Exhibit 5        Statement of Rights Form         107

Government Exhibit 6        Check to Mr. Waller              118

Government Exhibit 7        Check to Steve Berry             118

Government Exhibit 8        Forensic Examination            136
                           5-13-19, 5-14-19

Government Exhibit 9        Forensic Examination            138
                           5-15-19, 5-16-19

Defendant Exhibit D        Report of Investigation          152

Defendant Exhibit T        Photo of Car Lot                 219

9:35AM  1            THE COURT:  The United States versus Joshua James

2    Duggar is now before the Court for a motion hearing.  The

3    Case Number here is 5:21-CR-50014, Defendant Number 1.

4            Carly Marshall and Dustin Roberts appear on

9:35AM  5    behalf of the United States.  I note Agent Faulkner is

6    present at government's table.

7            And then present is Mr. Duggar.  Thank you for

8    being here, Mr. Duggar.  And then representing Mr. Duggar

9    and present today, Travis Story.  Looking very svelte this

9:36AM 10    morning, Mr. Story.

11            MR. STORY:  Thank you, Your Honor.

12            THE COURT:  And Justin Gelfand.  Good morning,

13    Mr. Gelfand.

14            MR. GELFAND:  Good morning, Your Honor.

9:36AM 15            THE COURT:  I don't think that we have personally

16    met before.  I know you're from Missouri.  Glad to have you

17    in our court today.

18            MR. GELFAND:  Thank you very much, Your Honor.

19            THE COURT:  Let's begin with the mask rules for

9:36AM 20    the day.  If you're in the gallery, you need to have a mask

21    on.  If you are inside the rail and can maintain six feet

22    of social distancing, you can remove your masks.  If you

23    can't maintain six feet of social distancing, then the

24    rules are as follows:

9:36AM 25            You should be wearing a mask unless you are in a

1  speaking role at the time, in which case you may remove

2  your masks.  That same rule will apply to any witnesses.

3  They are free to remove their masks.  I'm not going to make

4  them do that, but I'll make the observation that it is

5  somewhat difficult -- I shouldn't say difficult -- I shall

6  say less than ideal when making assessments about the

7  witness's demeanor if you only have a third of their face

8  to go on.

9          Any questions about the mask rules?

9:37AM 10          MR. ROBERTS:  No, Your Honor.

11          MR. GELFAND:  No, Your Honor.  Thank you.

12          THE COURT:  So we have four motions to take up

13  today.  The motions are fully ripe.  The motions would be

14  found at -- these are all defense motions.  The first one

9:38AM 15  is at Document 36.  This is a motion to suppress statements

16  made by the defendant to law enforcement on the date that a

17  search warrant was executed.

18          Also, a motion that can be found at Document 38.

19  This has to do with the lawfulness or appropriateness of

9:38AM 20  photographing the defendant's hands and I guess feet at the

21  point in time when he was at the detention facility being

22  booked.

23          And then the defense motion at Document 39.  This

24  has to do with violation of the Appointments Clause, which

9:38AM 25  is a new substantive motion that this Court has not had the

9:39AM 1    opportunity to address previously.

2           And then also the defense motion at Document 40.

3    And this has to do -- this is a due process claim that

4    alleges that the government failed to preserve potentially

9:39AM 5    exculpatory evidence.

6           There is at least one other motion that is

7    outstanding.  That is the defense request for a Franks

8    hearing.  There's an underlying challenge as to the

9    accuracy or truthfulness of information contained in the

9:39AM10    search warrant application documents.  We're not going to

11    be taking that motion up today.  We'll reserve that one for

12    another day.

13           With regard to at least three of the motions

14    today that are seeking suppression or dismissal, the Court

9:40AM15    would be of the opinion that it would be the government's

16    burden -- even though it's the defendant's motion -- it's

17    the government's burden to establish that the evidence that

18    they gathered and intend to rely upon was lawfully gathered

19    in a Constitutional sense.  And the government's burden

9:40AM20    today is to persuade the Court by a preponderance of

21    evidence that there were no Constitutional violations in

22    the gathering of this evidence.

23           I assume that the same applies to the

24    Appointments Clause issue, although I'm not entirely

9:41AM25    certain.  That may just be a straight-up issue of law.  I

9:41AM 1  don't know how much fact-finding will be necessary here.  I

2  think the essential facts are undisputed.  But in any

3  event, I understand that the government is prepared to go

4  forward with an evidentiary hearing this morning, is that

9:41AM 5  correct?

6              MR. ROBERTS:  Your Honor, we are prepared to go

7  forward.  We do have a witness here at the table.

8              I believe the defense would like to address the

9  Court about one of the pending motions to dismiss, though.

9:41AM 10             THE COURT:  Okay.

11             MR. STORY:  Good morning, Your Honor.

12             THE COURT:  Good morning, Mr. Story.

13             MR. STORY:  Your Honor, this morning, in

14  conversations with the prosecution, we had realized that

9:41AM 15  during the drafting of our motion, the motion to dismiss

16  for the government's failure to preserve potentially

17  exculpatory evidence that's found at Document 40, there was

18  a previous client that I had represented, which we have

19  labeled as Witness 2.

9:42AM 20             During the time period that's at issue, Witness 2

21  was actually incarcerated.  My firm handled that -- me

22  personally and my firm -- handled that client.  And so I

23  hadn't put two and two together that the time period we

24  were talking about was actually the time period that he was

9:42AM 25  incarcerated.  And as such, we feel that it is very

9:42AM 1  appropriate to withdraw our motion as to Witness 2 only,

2  because he was incarcerated during the time period in

3  question.  And this was something that was brought up

4  today.  It had not been considered by me.  Even just the

9:43AM 5  fact that I had represented the client, Mr. Gelfand was

6  unaware of.  And so in putting this together this morning,

7  we're asking to withdraw as to Witness 2 the motion at

8  Document 40.

9       We do believe that the other two witnesses,

9:43AM 10  Witness 1 and Witness 3, are meritorious.  It's effectively

11  the same claim for three witnesses at three different

12  times.  And so after speaking with the government today,

13  their position is that we should have known this, and I

14  believe they are going to say it's bad faith.  I will take

9:43AM 15  full responsibility that I never put the dates together,

16  that this is what's happening.  Mr. Gelfand largely drafted

17  the motion.  And in reviewing it for everything, I hadn't

18  put that part together and had no intent to mislead the

19  Court or mislead the government on any of this.

9:44AM 20       THE COURT:  All right.  Let's add a little more

21  contextual facts there.  The search warrant was executed,

22  am I correct, November 8th of 2019?

23       MR. STORY:  Correct, Your Honor.

24       THE COURT:  The witness, or Person 1, Person 2,

9:44AM 25  and Person 3, were current or former employees of the used

9:44AM 1   car lot where the search warrant was executed, is that
       2   correct?
       3              MR. STORY:  Correct, Your Honor.
       4              THE COURT:  With regard to person -- well, with
9:44AM 5   regard to all of those persons, the issue that's raised in
       6   the motion at Document 40 is that -- and I'm not super
       7   clear on this -- either on November 8th or at some point
       8   presumably reasonably near November 8th, the government
       9   requested to examine the cell phones of these individuals.
9:45AM 10  They did examine them.  I guess there's still an
       11  outstanding question about the extent to which they
       12  examined them, but I think the government's motion
       13  indicates that it was a hand-held observation by the agent.
       14  They weren't like put on a bench and forensically tested,
9:45AM 15  or at least that's my understanding.  Could be wrong about
       16  that.
       17             So with regard to Person 2 -- and, incidentally,
       18  is there any reason why -- I mean, I appreciate for filing
       19  of documents that the person's name is not being revealed.
9:46AM 20  Is there some legal or procedural reason I'm not aware of
       21  why they need to be?
       22             MR. ROBERTS:  No, Your Honor.  The government
       23  intends to use actual names.  His name is Josh Williams,
       24  Your Honor.
9:46AM 25             THE COURT:  All right.  So relative to these

9:46AM 1  events that I have laid out, when was Josh Williams

2  incarcerated and where?

3        MR. STORY:  Your Honor, I haven't had a chance to

4  pull all that.  I believe that he was incarcerated during

9:46AM 5  the time in which the evidence -- during which the

6  government is saying the alleged material was downloaded at

7  the car lot's computer.

8        THE COURT:  Oh, okay.  That would have been

9  earlier in the year?

9:46AM 10        MR. STORY:  It would have been earlier in the

11  year.  So that's part of the issue of putting all the dates

12  together of when we're actually talking about.  The issue

13  would be whether or not that cell phone could have had

14  exculpatory evidence on it, even though I do believe he was

9:47AM 15  incarcerated during approximately that same time period

16  over those dates.

17        THE COURT:  All right.  So you're merely

18  conceding, for purposes of Mr. Williams, that there would

19  not have been any exculpatory information on his cell phone

9:47AM 20  related to the child pornography images that are at issue

21  in this case, and, therefore, you're withdrawing any due

22  process claims by the government's alleged failure to

23  preserve as it relates to Mr. Williams?

24        MR. STORY:  Yes, Your Honor.

9:48AM 25        THE COURT:  All right.  Fair enough.

9:48AM 1                MR. STORY:  Thank you.

2                MR. ROBERTS:  Your Honor, may I address the Court

3  on the topic?

4                THE COURT:  Yes.

9:48AM 5                MR. ROBERTS:  Your Honor, Mr. Williams was

6  sentenced by Judge Robin Green in Benton County on

7  April 15th, 2019.  He was released from the Benton County

8  Jail on 5-28, May 28th, 2019.  When he was sentenced,

9  Mr. Payne was the attorney that appeared in court.

9:48AM 10  Mr. Story was the attorney of record.

11                The government is asking this Court to dismiss

12  the entire motion.  It was brought in bad faith, in our

13  estimation.  We discovered this Saturday morning when we

14  pulled the judgment for Mr. Williams.  But for us

9:48AM 15  discovering that, this Court very likely could have made a

16  ruling based on what, at least the defense counsel should

17  know, was erroneous and materially false information.

18                And I take what Mr. Story is saying.  But, Your

19  Honor, we have provided reports identifying Josh Williams

9:49AM 20  by name.  We put in our response that he was in custody

21  during the time.  And last Thursday, before the reply was

22  sent, we actually sent those documents, minus the judgment

23  and commitment, to the defense as part of discovery before

24  the reply.

9:49AM 25                Now, even assuming Mr. Gelfand -- and I believe

9:49AM 1    him -- did not see those or talk to Mr. Story, this is five

2    days later.  And the government is not convinced that an

3    attorney who represented someone right around the time

4    frame that we have been talking about for months -- I mean,

9:49AM 5    we went through a lengthy detention hearing.  We went

6    through a lengthy set of motions.  We have argued these

7    facts to the last dime.  And now they are showing up on the

8    day of, and just because we brought it to their attention,

9    saying that, "Well, that was a mistake."

9:50AM 10           Your Honor, I don't believe that remedy is

11    appropriate.  I don't believe that they can just say, well,

12    ignore it as to our mistake.  The arguments here about the

13    exculpatory motion are evidence.  They are all dovetailed

14    within the motion itself.  They all kind of generally say,

9:50AM 15    well, it could have been.  It could have reflected this.

16    Your Honor, I don't believe them -- that they should just

17    be able to come up here, minus the fact that we discovered

18    this, and just say, well, it was a mistake and we'll

19    withdraw it as to that.

9:50AM 20           Your Honor, that doesn't seem like an appropriate

21    remedy to the government.  We would ask that this Court

22    dismiss it in total.  We believe it was brought in bad

23    faith.

24           THE COURT:  Well, what's the relationship between

9:50AM 25    the defendant's argument as to Josh Williams and the

9:50AM 1  defendant's argument as to Person 1 and Person 3?  I mean,

2  I realize we can talk about whether Mr. Story should have

3  known this and we can take up what appropriate remedies may

4  be for that, but why would that necessitate the dismissal

9:51AM 5  of this issue as to Persons 1 and 3?

6        MR. ROBERTS:  Your Honor, I understand that it's

7  a pretty -- or I wouldn't call it extraordinary, but I'm

8  asking this Court to take a position here, but I believe

9  that was a materially false statement filed.  I hear what

9:51AM 10  Mr. Story is saying.  The evidence does not look that way

11  to me.  I hear what he's saying, but I don't accept it.

12        The relationship between Witness 3, that's

13  Randall Berry.  That's the employee that was on the car lot

14  on November 8th when the warrant was signed.  It's simply

9:52AM 15  that Randall Berry was an employee at the time.  Josh

16  Williams was a former employee, I think back in 2018.  He

17  was also a friend of Mr. Duggar's.  In relation to

18  Mr. Mize, they discuss each other during their interview,

19  and they are friends, from what I understand based on the

9:52AM 20  reports.  But the relationship there as far as the overlap

21  of the exculpatory evidence, the individual or the precise

22  review of the evidence, it's very slight, admittedly.

23        But again, I'm asking for this remedy because I

24  believe the whole motion was brought in bad faith.  I just

9:52AM 25  don't accept that an ROI, specifically a report that we

9:52AM 1  turned over months ago, back in May, I believe, or maybe

2  sooner, that was titled, "Interview of Josh Williams" did

3  not raise a red flag.  I cannot fathom that our response

4  saying that Witness #2 was incarcerated, and then we

9:53AM 5  provide the actual record that says, "Josh Williams was

6  incarcerated."  It's just hard for me to wrap my mind

7  around.

8             THE COURT:  Well, the Court has teed up the four

9  motions.  One aspect of the motion at Doc 40 has been

9:53AM 10  withdrawn.  It does give the Court a tremendous amount of

11  pause for concern as to why, at least as late as when you

12  received the government's response, why that didn't connect

13  all of the dots.  But the Court is not going to dismiss the

14  issue as to the other persons of interest from the motion.

9:54AM 15  I don't think that would be the proper remedy here.

16             If the government believes that some sort of more

17  formal sanctions are necessary, they can certainly file a

18  motion to that effect after today.  It certainly gives the

19  Court pause for certain, but I'm not -- I don't believe --

9:54AM 20  I mean, I want to get on with what we are here to do today.

21             I can understand how Mr. Gelfand, up in Missouri,

22  if he's the one that is filing the motions and filing the

23  replies to the motions, I can kind of sort of understand

24  why there is a communications deficit between he and

9:54AM 25  Mr. Story.  Now, if Mr. Gelfand, as it turns out, was aware

9:55AM 1    of this as well, that would paint an entirely different

2    painting for the Court or portrait for the Court.  But I'm

3    assuming, Mr. Gelfand, that's not the case.

4              MR. GELFAND:  Your Honor, I can represent as an

9:55AM 5    Officer of the Court that I was not aware of this until

6    this morning.  And there's no ambiguity there whatsoever.

7              THE COURT:  So it's not good.  It's cost the

8    government a lot of time.  But as to these other two

9    interested persons, I'm not going to grant that remedy.

9:55AM 10   And if the government wants to file a motion for more

11   formal sanctions against counsel, they are free to do that,

12   but let's get on with what our hearing has been set for

13   today.

14             So let me kind of understand, just for our time

9:55AM 15   management purposes, the government has one witness?

16             MR. ROBERTS:  Your Honor, we have four potential

17   witnesses available.  We're intending at this point to call

18   one based on the facts as we know them today.  If something

19   changes during Agent Faulkner's testimony, we might elect

9:56AM 20   to call the others, but as it stands right now, we're

21   intending to call one witness.

22             THE COURT:  All right.  And, Mr. Gelfand, of

23   course, you have a right to see what the government puts

24   on, but do you presently anticipate that the defense will

9:56AM 25   be calling any witnesses?

9:56AM 1          MR. GELFAND:  Your Honor, I do not.  We have

2    exchanged some e-mail correspondence with government

3    counsel.  To the extent it becomes necessary based on the

4    testimony, the only other witness I could imagine

9:56AM 5    potentially calling is the other essentially co-lead

6    Special Agent, Mr. Aycock, who is physically present and

7    available to testify to the extent that that becomes

8    necessary.

9          THE COURT:  Thank you, Mr. Gelfand.  Well, the

9:57AM 10   Court has laid out the respective burdens here.  It is the

11   defense motion, but given the burdens, the Court would ask

12   the government to proceed with its evidentiary portion at

13   this time.  You may call your first witness.

14         MR. ROBERTS:  Thank you, Your Honor.  The

9:57AM 15   government calls Special Agent Gerald Faulkner to the

16   stand.

17         THE COURT:  Mr. Faulkner, would you please raise

18   your right hand to be sworn.

19         (Witness Sworn)

9:57AM 20         THE COURT:  Mr. Faulkner, if you would assume the

21   witness stand.

22         MR. ROBERTS:  May I proceed, Your Honor?

23         THE COURT:  You may proceed.

24         GERALD FAULKNER, having been first duly sworn,

9:57AM 25   testified as follows:

9:57AM 1                    DIRECT EXAMINATION

2    BY MR. ROBERTS:

3    Q.   Agent Faulkner, would you state your full name for the

4    record and explain to the Court how you're currently

9:58AM 5    employed?

6    A.   Yes, sir.  Gerald Faulkner, F-A-U-L-K-N-E-R.  I'm

7    currently a Special Agent with Homeland Security

8    Investigations based out of our Fayetteville, Arkansas,

9    field office.

9:58AM10    Q.   I'm going to refer to Homeland Security as HSI.  How

11    long have you been with HSI?

12    A.   Since April of 2009.

13    Q.   Are you assigned to a particular division within HSI?

14    A.   Yes, sir.  I'm currently assigned to the Internet

9:58AM15    Crimes Against Children Task Force, what we also refer to

16    as the ICAC.

17    Q.   Could you explain the role of the ICAC and the purpose

18    of the ICAC for the record?

19    A.   Yes, sir.  So the ICAC investigates cases that involve

9:58AM20    the sexual exploitation of minors to involve possession,

21    distribution, and production of images and videos of child

22    sexual abuse material, as well as other things such as sex

23    trafficking and the transportation of minors.

24    Q.   How long have you been working child sexual abuse

9:58AM25    cases?

9:58AM 1    A.   Since 2010.

2    Q.   Approximately how many online child pornography, and

3    specifically peer-to-peer cases, do you think you have

4    worked?

9:59AM 5    A.   Over the last 11 years, from being case agent or

6    assisting on other cases or reviewing other cases, I would

7    say well over 1,000.

8    Q.   Approximately how many child pornography offenders do

9    you think you have arrested?

9:59AM10    A.   Again, during that time span where I've either been

11    case agent or assisted, I'd say approximately over 50.

12    Q.   Hands-on offenders?

13    A.   Yes, sir.

14    Q.   With regard to child pornography offenders, just

9:59AM15    arrests for child pornography?

16    A.   I'd say maybe double that, again, where I've either

17    been case agent or assisted or reviewed and helped on.

18    Q.   Approximately how many minor victims have you

19    encountered and removed from that abusive situation based

9:59AM20    on child pornography and other federal child exploitation

21    offenses?

22    A.   I have one case right now where it's potentially going

23    to have 43 minor female victims.  So over the last 11

24    years -- I mean, that's not common to have that many in one

10:00AM25    case -- roughly 70, give or take.

10:00AM 1   Q.   Are you familiar with the investigation that led to

2   the indictment and arrest of Joshua Duggar?

3   A.   Yes, sir.

4   Q.   I want to direct your attention to the events

10:00AM 5   surrounding November 8th, 2019.  Now, did law enforcement

6   obtain and execute a search warrant on Wholesale Motors

7   owned by Mr. Duggar that day?

8   A.   That is correct.

9        MR. ROBERTS:  Your Honor, may I approach the

10:00AM10   witness?  We do have binders.  I can provide one to the

11   Court as well.  It's just copies of the exhibits.

12        THE COURT:  You may.

13        MR. ROBERTS:  Your Honor, if we may be permitted

14   for a minute, we can provide one to the defense also.  We

10:00AM15   had one, just overlooked it.

16        THE COURT:  That's fine.

17   Q.   (By Mr. Roberts.)  So we left off, you were saying

18   that you executed a search warrant on the car lot that day

19   on November 8th, is that correct?

10:01AM20   A.   That's correct.  Yes, sir.

21   Q.   Would you turn to what is marked as Government's

22   Exhibit 1 in your trial notebook there, your exhibit

23   notebook?

24   A.   Yes, sir.

10:01AM25   Q.   Can you identify Government's Exhibit 1?

10:01AM 1   A.   This is the application for a search warrant page for

2   14969 Wildcat Creek Road in Springdale, Arkansas, zip code

3   72762.  In other words, the Wholesale Motorcars used car

4   lot, which I applied for, for a search warrant.

10:02AM 5   Q.   Well, the entire document there, does it include the

6   application, the Attachments A, B, and C, and then

7   specifically the search warrant itself, is that correct?

8   A.   My apologies.  Yes, sir.  Attachment A, Attachment B,

9   and then what looks like the actual application.

10:02AM 10   Q.   And the search warrant is at the back, is that

11   correct?

12   A.   Yes, sir.

13          MR. ROBERTS:  Your Honor, I would move to

14   introduce Government's Exhibit 1.

10:02AM 15          MR. GELFAND:  No objection, Your Honor.

16          THE COURT:  Government's Exhibit 1, as described

17   with attachments, is received.

18          (Government's Exhibit No. 1 Received)

19   Q.   (By Mr. Roberts.)  To facilitate this hearing, will

10:02AM 20   you just summarize the overall criminal activity alleged in

21   the search warrant?

22   A.   Yes, sir.  So in May 2019, one of our ICAC task force

23   affiliates out of Little Rock, Arkansas, identified a

24   specific IP address that geolocated to the Northwest

10:02AM 25   Arkansas area that was participating in the sharing of

10:03AM 1   known images and videos of child pornography through the

2   BitTorrent peer-to-peer file-sharing network.  That lead

3   was later sent to the HSI office here in Fayetteville.

4        After doing so, I received subpoenaed information back

10:03AM 5   from the internet service subscriber that said that that

6   specific IP address was subscribed to Joshua Duggar at the

7   Wholesale Motor car lot.

8   Q.   Based on that information and based on what's

9   contained and known to law enforcement at that time, what,

10:03AM 10  when you executed the search warrant, specifically was law

11  enforcement looking for?

12  A.   We were looking for the actual device that it was

13  being conducted on and the person behind that device.

14  Q.   So would that purpose include looking for images of

10:03AM 15  child pornography to identify the device?

16  A.   Correct.  Yes, sir.

17  Q.   Would it include looking for the BitTorrent program?

18  A.   Correct.  Yes, sir.

19  Q.   Would it also be, or include looking for evidence

10:03AM 20  placing individuals on that car lot or in use of that IP

21  address on May 14th and 15th?

22  A.   That is correct.  Yes, sir.

23  Q.   Prior to executing the search warrant, did you obtain

24  an arrest warrant for anybody?

10:04AM 25  A.   No, sir.

10:04AM 1    Q.   At that time, did you have probable cause to obtain an

2    arrest warrant for anyone?

3    A.   No, sir.  Again, we did not know the device, nor the

4    user.

10:04AM 5    Q.   Approximately what time did you execute the search

6    warrant?

7    A.   It was on November 8th, 2019, at approximately 3:15 in

8    the afternoon.

9    Q.   Who within law enforcement was present when you

10:04AM 10   executed the warrant?

11   A.   There were four HSI Special Agents.  We had two HSI

12   computer forensic analysts, who we refer to as CFAs.  And

13   then we had one HSI task force officer, who was also a CFA.

14   Q.   Could you describe the overall car lot for the Court?

10:04AM 15   A.   Yes, sir.  It's a used car lot positioned off of

16   Highway 412 in between Siloam Springs and Springdale,

17   Arkansas.  There's an unpaved driveway leading up to the

18   lot where, on that particular day, I'd say approximately 30

19   cars or so were on site.  There were also two buildings,

10:05AM 20   one of which acted as the main office and I would best

21   describe it as a tollbooth.  And then the other was a

22   wooden building or shed, which appeared to be under

23   construction or being remodeled.

24   Q.   Would you turn in the government's exhibit book to

10:05AM 25   Exhibit 2, please?

10:05AM 1   A.   Yes, sir.

2   Q.   Can you identify Government's 2 for the Court?

3   A.   That is a picture of the Wholesale Motor car lot.

4   Q.   Was that taken on the day that the search warrant was

10:05AM 5   executed?

6   A.   Yes, sir.

7   Q.   Does it fairly and accurately depict the car lot as

8   you saw it that day?

9   A.   That is correct.

10:05AM10         MR. ROBERTS:  Your Honor, I would move to

11   introduce Government's Exhibit 2 into evidence.

12         MR. GELFAND:  No objection, Your Honor.

13         THE COURT:  Government's Exhibit 2 is received.

14         (Government's Exhibit No. 2 Received)

10:05AM15   Q.   (By Mr. Roberts.)  So could you identify, based on

16   your previous description, what we are looking at in

17   Government's Exhibit 2?

18   A.   Yes, sir.  That is the car lot as it appeared on

19   November 8th, 2019.  The main office building that I

10:06AM20   referred to as the "tollbooth" in nature has the Wholesale

21   Motorcars' emblem or title listed on it.  And then the

22   building next to it was the shed that was currently being

23   remodeled.

24   Q.   Was there any computer equipment -- or was that shed

10:06AM25   being remodeled?  Was it in use at all?

10:06AM 1    A.    It did not appear so.

2    Q.    When agents arrived on the scene, who was present at

3    the car lot?

4    A.    Joshua Duggar.  One of his employees, Randall Berry.

10:06AM 5    And another individual by the name of Richard Harrell.

6    Q.    Based on Government's Exhibit 2, where were they

7    standing?

8    A.    I'd say approximately 20 feet in front of that

9    building.

10:06AM 10   Q.    So we're talking -- we see a red van in Government's

11   Exhibit 2.  Are we talking about parallel with the van, or

12   closer?

13   A.    Yes, sir.  Give or take, right around there.

14   Q.    Could you describe for the Court how you and other

10:07AM 15   members of law enforcement went about executing this search

16   warrant?

17   A.    Yes, sir.  We arrived on scene, exited our vehicles.

18   We refer to it as a "soft approach," because nobody had any

19   guns brandished.  Myself and the case agent, Howard Aycock,

10:07AM 20   we had already agreed that we'd be the first to go speak

21   with Mr. Duggar and whoever else was present on scene while

22   the other agents cleared the rest of the property for agent

23   and task force officers' safety.  The CFAs, which are not

24   law enforcement commissioned, so they don't carry weapons,

10:07AM 25   they stayed back in our forensic van until the scene was

10:07AM 1    considered safe, at which time they approached the car lot.

2    Q.    What was the individual roles of the agents as they

3    approached Mr. Duggar and executed the search warrant?

4    A.    Again, myself and Agent Aycock were going to go up to

10:07AM 5    Mr. Duggar and whoever else was present to explain why we

6    were there while the other agents went through and cleared

7    the vehicles and buildings.

8    Q.    So specifically, to make sure I'm following, you and

9    Agent Aycock, you are the only two that approached

10:08AM 10   Mr. Duggar that day?

11   A.    As we arrived on scene, yes, sir.

12   Q.    At that time, you did not have guns drawn.  What were

13   you wearing?

14   A.    I had plain clothes on with what I refer to as a

10:08AM 15   bullet-resistent vest or a plate carrier.  And on that

16   plate carrier, on the chest panel, was a Velcro patch that

17   said, "Police, Special Agent."

18   Q.    Did you have like an automatic rifle or anything slung

19   over your shoulder?

10:08AM 20   A.    No, sir.

21   Q.    Upon approaching Mr. Duggar, who made contact?  Who

22   verbally made contact?

23   A.    I did.  I walked up to Mr. Duggar.  I properly

24   identified myself as a Special Agent with Homeland Security

10:08AM 25   Investigations.  I then notified him that, based on an

10:08AM 1  ongoing investigation, a federal search warrant had been

2  obtained for the property for items of evidentiary value

3  that possibly contained digital contraband.  I furthermore

4  told him, more importantly, that this is a federal search

10:09AM 5  warrant, not an arrest warrant, and he was free to leave if

6  he chose to do so.

7  Q.    At that point, have you said or asked any questions

8  -- let me break that in two -- have you asked him any

9  questions at that point?

10:09AM10  A.    No, sir.

11  Q.    Have you stated anything to him that you have not

12  recited to this Court?

13  A.    No, sir.

14  Q.    What happened the next moment?  Tell us what happened.

10:09AM15  A.    Mr. Duggar produced a cell phone.  I believe it was

16  from his pocket.  And it was, I believe, in his right hand.

17  And he informed me that he would like to or wanted to call

18  his attorney.

19  Q.    How did you respond?

10:09AM20  A.    I informed Mr. Duggar that pursuant to the federal

21  search warrant, that that phone was considered evidence and

22  that it was going to be seized pursuant to the federal

23  search warrant.  I then confiscated it.

24  Q.    At that point, had you asked him any questions?

10:09AM25  A.    No, sir.

10:09AM 1  Q.   When you took the phone itself, can you describe for

2  the Court what process you went about and how it was

3  presented to you from Mr. Duggar?

4  A.   Yes, sir.  Again, I believe he had it in his right

10:10AM 5  hand and I took my left hand and took it away from

6  Mr. Duggar.

7  Q.   So I want to make sure that the Court has the right

8  idea.  He removes the phone from his pocket, is that

9  correct?

10:10AM10  A.   No, sir, from his actual hand.  I touch -- I didn't

11  touch him.  I took the phone itself and confiscated it.

12  Q.   Did Mr. Duggar remove his phone from his pocket?

13  A.   Yes, sir.

14  Q.   And he brought it up to, what, chest level or higher?

10:10AM15  A.   He's a good bit taller than me, so I would say he was

16  almost eye level to where I was.  I took it with my left

17  hand.

18  Q.   When you told him that it was being confiscated, was

19  this after he raised the phone or was it during the same

10:10AM20  kind of motion?

21  A.   I'd say all in one.

22  Q.   All right.  When you did take the phone out of his

23  hand, did you come in contact with him in any way?

24  A.   No, sir, not that I believe.

10:10AM25  Q.   How long did all of this take?  From the moment you

10:10AM 1   approached Mr. Duggar, you got out of your car, you

2   approached Mr. Duggar, until the point that you removed his

3   phone, how long did that take?

4   A.   From when I first introduced myself to confiscating

10:11AM 5   the phone, I'd say approximately about a minute.

6   Q.   Approximately about a minute, is that correct?

7   A.   Yes.

8   Q.   What was his demeanor like right after you removed the

9   phone?

10:11AM10   A.   He really didn't have any visible reaction.  He did

11   state, though, however, that his wife was currently

12   pregnant and due possibly any day, that he might have to

13   leave the car lot to either go contact her or to make sure

14   that she wasn't trying to contact him.

10:11AM15   Q.   How did you respond?

16   A.   We said that was perfectly fine.

17   Q.   And at that point, are you reciting the only

18   statements made up until that point for the Court?

19   A.   From law enforcement side?

10:11AM20   Q.   From law enforcement side and from Mr. Duggar's side,

21   are you recounting the exact conversation?

22   A.   Yes, sir.  I mean, he became conversational after

23   that.  After explaining that he might have to leave, he

24   explained to us that he had some type of, I guess, a

10:11AM25   hesitation, I'd say, with either federal law enforcement or

10:11AM 1   the federal government based on some friends he had that

2   were indicted and I believe convicted by the FBI on some

3   public corruption case.

4   Q.    Now, the conversational aspect to his comments

10:12AM 5   regarding the public corruption case, did that come before

6   or after he said that he had a pregnant wife and he might

7   have to leave?

8   A.    That was after.  And to my point that he was just

9   conversational after that.

10:12AM10   Q.    Was that directly after you took the phone?

11   A.    Yes, sir, after he made the statement that he might

12   have to leave.

13   Q.    How long did this part of the interaction, from the

14   moment you spoke to Mr. Duggar, all the way until where

10:12AM15   we're talking about and he stated that he might have to

16   leave due to his pregnant wife?

17   A.    I'd say a few minutes, because while this was going

18   on, Agent Aycock and I were standing there.  The other

19   agents were still properly clearing the scene for safety

10:12AM20   reasons.

21   Q.    At this point, was he placed in cuffs?

22   A.    No, sir.

23   Q.    Was he guarded?

24   A.    No, sir.

10:12AM25   Q.    Is it accurate that he would have had free roam of the

10:12AM 1    entire lot?

2    A.   Yes, sir, to a certain extent.

3    Q.   Explain the extent.

4    A.   Obviously, wherever there was an electronic device, we

10:12AM 5    had individuals in there processing the scene, taking

6    photographs, documenting evidence.  So if that was

7    currently going on in one of those two buildings, he

8    probably would not have been able to go in there on his own

9    without an escort.

10:13AM10   Q.   Did he try to go into one of those buildings?

11   A.   No, sir.

12   Q.   So at any point, did anybody escort him?

13   A.   No, sir.

14   Q.   Did you confiscate his keys?

10:13AM15   A.   No, sir.

16   Q.   Did you confiscate the keys to all the vehicles on the

17   lot?

18   A.   No, sir.

19   Q.   What did you and Special Agent Aycock do next then?

10:13AM20   A.   We then assisted the other agents after the scene had

21   been deemed cleared in processing for photographs,

22   evidence, getting our evidence kits out, things of that

23   nature.

24   Q.   What was Mr. Duggar doing during this time frame?

10:13AM25   A.   I believe he was still standing with the other two

10:13AM 1  individuals around the same area that was shown in the

2  government's exhibit.

3  Q.   By placing Government's Exhibit 2 back on the Elmo and

4  displaying, could you tell us --

10:13AM 5  A.   Yes, sir.  I'd say the general area of where the red,

6  where that red van is.

7  Q.   So he was standing there with the other two

8  individuals you encountered, right?

9  A.   Correct.

10:14AM 10  Q.   Was anybody guarding those individuals?

11  A.   I'm sorry?

12  Q.   Was any member of law enforcement guarding those

13  individuals?

14  A.   No, sir.  Eric Cardiel, our supervisor, was on scene

10:14AM 15  and probably in that general area, but he was only there

16  for situational awareness.

17  Q.   Situational awareness, does that mean if something

18  went bad?

19  A.   Correct.

10:14AM 20  Q.   Did you have any further contact with Mr. Duggar that

21  day?

22  A.   Yes, sir.  I'd say 10 minutes, maybe a little bit more

23  after our initial contact with Mr. Duggar when we

24  approached him, Agent Aycock and I asked if he would be

10:14AM 25  willing to speak with us concerning further details

10:14AM 1  surrounding the issuance of the federal search warrant.

2  Q.    Was he still in the same area that you just described?

3  A.    Yes, sir, generally.

4  Q.    Did you have your gun out when you approached him?

10:14AM 5  A.    No, sir.

6  Q.    Did you place your hands on him?

7  A.    No, sir.

8  Q.    Put your cuffs on him?

9  A.    No, sir.

10:15AM10  Q.    How was his demeanor when you asked him the question,

11  or how did he respond is a better question?

12  A.    He agreed to speak with us.

13  Q.    I'm sorry?

14  A.    He agreed to speak with us.

10:15AM15  Q.    What was his demeanor like?

16  A.    Calm.

17  Q.    What happened next after he agreed?

18  A.    We then relocated to Agent Aycock's government

19  vehicle, which was a truck.  The truck was actually, the

10:15AM20  front of it was facing or pointing towards that main office

21  that we earlier referenced.  Myself and Agent Aycock, when

22  we got to the front of the vehicle, veered right.  I

23  entered the driver's side seat.  Agent Aycock entered the

24  rear driver's side seat.  Mr. Duggar had veered left.  He

10:15AM25  went to and opened the front passenger door, entered the

10:15AM 1   front passenger seat, and then closed the door behind him.

2   Q.   Why did you conduct the interview in the truck?

3   A.   For one thing, it was outside, so we know that we

4   usually record our interviews and we wanted to have a clean

10:15AM 5   recording.  And there was a lot going on in terms of people

6   talking, people walking back and forth.  And we were right

7   next to a busy highway in terms of 412.  So it was just an

8   easier, quieter place to have a conversation.

9   Q.   When you indicated that you could have the interview

10:16AM 10   in the truck, did Mr. Duggar pose any hesitation to you?

11   A.   No, sir.

12   Q.   When you physically turned to start walking to the

13   truck -- please first describe the setup of the truck.  Is

14   it a 4-door truck?  A 3-door truck?  One where you have

10:16AM 15   kind of the suicide door?  Or was it a 2-door truck?

16   A.   I believe that's the type.  It had -- it's got four

17   doors, but, for example, on the driver's side, to open the

18   rear door, you first have to open the front driver's side

19   door first.

10:16AM 20   Q.   Then it has kind of more or less a latch to open the

21   door, is that correct?

22   A.   Yes.

23   Q.   So when you made the decision and started in turn to

24   go sit in the truck, you approached the driver's side, is

10:16AM 25   that correct?

10:16AM 1    A.    Correct.

2    Q.    Agent Aycock got in the back seat of the driver's

3    side, is that correct?

4    A.    Same side as I was on, correct.

10:16AM 5    Q.    Who was walking with Mr. Duggar to the passenger side?

6    A.    No one.

7    Q.    Who was escorting Mr. Duggar to the passenger side?

8    A.    No one.

9    Q.    Upon entering the vehicle, did you lock the doors?

10:17AM10    A.    No, sir.

11    Q.    Was anybody standing outside the vehicle kind of

12    maintaining a guard position?

13    A.    Outside of the doors, no, sir.

14    Q.    So no one was blocking the doors?

10:17AM15    A.    Correct.

16    Q.    Tell us what happened next once you got into the car.

17    A.    Upon entering the vehicle, Agent Aycock had asked

18    Mr. Duggar for consent to record the interview.  After

19    receiving verbal consent from Mr. Duggar, he then turned

10:17AM20    and spontaneously asked, "What is this all about?  Has

21    somebody been downloading child pornography?"

22    Q.    Slow down a little bit.  So you sit in the car.  The

23    first thing said to Mr. Duggar is that, "Do you consent to

24    a recording of the interview," is that correct?

10:18AM25    A.    Correct.  Agent Aycock had asked Mr. Duggar.

10:18AM 1  Q.   Why are you recording the interview?

2  A.   We record all of our interviews.  That's for our

3  protection and for whoever we are interviewing that day's

4  protection also.

10:18AM 5  Q.   Is that an HSI policy or just a best practice for the

6  ICAC?

7  A.   The only policy for HSI would be if somebody were in

8  custody.  This is just for us so that we have a better

9  understanding of what was said and we can't say that

10:18AM10  somebody didn't say something that they did, and vice

11  versa.

12  Q.   So Mr. Duggar agreed to the recording, is that

13  correct?

14  A.   Yes, sir.  That's why Agent Aycock had asked for

10:18AM15  consent.

16  Q.   Were there any other questions posed to Mr. Duggar

17  other than, "Will you agree to the recording?"

18  A.   No, sir, not at that time.

19  Q.   So pick up there.  He agrees to the recording.  You're

10:18AM20  sitting in the front driver's seat?

21  A.   Correct.

22  Q.   You've got Agent Aycock behind you in the back seat?

23  A.   Correct.

24  Q.   Mr. Duggar in the passenger seat?

10:18AM25  A.   Correct.

10:18AM 1  Q.   You said that he turned.  He turned to face who?

2  A.   To face both of us, as best he could.

3  Q.   And what was his exact words?

4  A.   "What is this about?  Has somebody been downloading

10:19AM 5  child pornography?"

6  Q.   At that point, had you told him the purpose of the

7  search warrant?

8  A.   No, sir.

9  Q.   How did you respond then?  Or how did law enforcement

10:19AM 10  collectively respond?

11  A.   Agent Aycock had asked him, or explained to him,

12  "Before you ask us any more questions, let me get the

13  recording started and read you your Miranda."

14       MR. ROBERTS:  Give me one second, Your Honor.

10:19AM 15  Q.   (By Mr. Roberts.)  Special Agent Faulkner, I'm showing

16  you on the screen there what is marked as Government's

17  Exhibit 3.  Can you identify Government's Exhibit 3 for me?

18  A.   Yes, sir.  That is a recording of the interview of

19  Mr. Joshua Duggar taken by myself and Agent Aycock.

10:19AM 20  Q.   Have you listened to this specific recording and

21  ensured that it is a true and accurate capture of the

22  statement Mr. Duggar said that day?

23  A.   Yes, sir.

24       MR. ROBERTS:  Your Honor, I would move to

10:20AM 25  introduce Government's Exhibit 3.

10:20AM  1          MR. GELFAND:  No objection, Your Honor.

2          THE COURT:  Government's 3 is received.

3          (Government's Exhibit No. 3 Received)

4  Q.   (By Mr. Roberts.)  Special Agent Faulkner, will you

10:20AM  5  turn to Government's Exhibit 4 in the exhibit book?

6  A.   Yes, sir.

7  Q.   Is that a transcript of the interview contained on

8  Government's Exhibit 3?

9  A.   Yes, sir.

10:20AM 10  Q.   Is it true and accurate as to the transcription of

11  that interview?

12  A.   Yes, sir, I believe so.

13          MR. ROBERTS:  Move to introduce Government's

14  Exhibit 4, Your Honor.

10:20AM 15          MR. GELFAND:  I have no objection to the extent

16  that the Court or the parties use it as an aid.  I would

17  just ask that the recording itself be deemed the actual

18  evidence itself.

19          THE COURT:  That's fine.  The Court recognizes

10:20AM 20  that it is what the fact-finder hears and not the

21  transcript that is the evidence here.

22          That said, Mr. Gelfand, I take it you have had an

23  opportunity to review the transcript.  Are there any issues

24  that you're aware of that you would contend that the

10:21AM 25  transcript is inaccurate?

10:21AM 1          MR. GELFAND:  Your Honor, there's one in

2     particular, but I can draw that to the Court's attention

3     during cross examination.  It's not a reason to deprive the

4     Court of the benefit of the entire transcript.

10:21AM 5          THE COURT:  That's fine.  Government's 4, as

6     noted, will be received.

7          MR. ROBERTS:  Permission to publish, Your Honor.

8          THE COURT:  You may.

9          (Government's Exhibit No. 4 Received and Played)

10:21AM10          AGENT AYCOCK:  All right.  We have started the

11    recording.  The date is Friday, November 8th, 2019.  The

12    time is 1538 hours.  Present is Homeland Security

13    Investigations Special Agent Howard Aycock.  I am also with

14    HSI Special Agent Gerald Faulkner.

10:21AM15          And can you please state your name, sir?

16          JOSH DUGGAR:  Yes.  Joshua James Duggar.

17          AGENT AYCOCK:  Okay.  All right.  At this time,

18    I'm going to read you a statement of rights, all right?

19          JOSH DUGGAR:  Okay.

10:21AM20          AGENT AYCOCK:  Before we ask you any questions,

21    it is my duty to advise you of your rights.  You have the

22    right to remain silent.  Anything you say can be used

23    against you in court or other proceedings.

24          You have the right to consult an attorney before

10:21AM25    making any statement or answering any questions.  You have

10:21AM 1    the right to have an attorney present with you during

2    questioning.  If you cannot afford an attorney, one will be

3    appointed for you before any questioning if you wish.

4             If you decide to answer questions now, you still

10:21AM 5    have the right to stop the questioning at any time or to

6    stop the questioning for the purposes of consulting an

7    attorney.  Okay?

8             All right.  So what I'm going to ask you to do is

9    sign right here.  All that is saying is that you have been

10:21AM10    read your rights --

11             JOSH DUGGAR:  Miranda?

12             AGENT AYCOCK:  -- and you understand what your

13    rights are.

14             JOSH DUGGAR:  Okay.  This is only for now?  It's

10:21AM15    not for any other?

16             AGENT AYCOCK:  Sure.  Like it says, if you -- if

17    you decide to answer questions now, you still have the

18    right to stop --

19             JOSH DUGGAR:  Okay.

10:21AM20             AGENT AYCOCK: -- at any time.  But that's --

21    that's just you saying --

22             JOSH DUGGAR:  This is U.S. CIA?  Is this -- okay.

23             AGENT AYCOCK:  This is U.S. Immigrations and

24    Customs Enforcement, Homeland Security Investigations.  All

10:21AM25    right?

10:21AM 1                    JOSH DUGGAR:  Okay.

        2            AGENT AYCOCK:  But you have signed that you

        3  understand your rights.

        4            JOSH DUGGAR:  Yes.

10:21AM 5            AGENT AYCOCK:  Okay.  So now what I'm going to

        6  ask you is, are you willing to speak with us now without an

        7  attorney present?

        8            JOSH DUGGAR:  I mean, I may not answer

        9  everything, I guess, but, yes.

10:21AM10            AGENT AYCOCK:  Okay.  All right.

       11            JOSH DUGGAR:  I have more questions than I would

       12  like.

       13            AGENT AYCOCK:  Sure.  All right.  So the time is

       14  1540 on 11-8-2019.  All right.  So what you're going to do

10:21AM15  right now for the waiver is you're just going to print your

       16  name and sign, and all that's doing is saying --

       17  acknowledging what you just said you wanted to do, speak

       18  with us.

       19            JOSH DUGGAR:  (Reading document.)  Into custody?

10:21AM20            AGENT AYCOCK:  No.  So as we explained, this is a

       21  search warrant.  This is not an arrest warrant, so you are

       22  free to leave at any time.

       23            JOSH DUGGAR:  Okay.

       24            AGENT AYCOCK:  All right?

10:21AM25            AGENT FAULKNER:  Hey, don't worry about that.

10:21AM 1          JOSH DUGGAR:  Okay.

2          AGENT FAULKNER:  That's just the common language

3      in our --

4          JOSH DUGGAR:  Okay.

10:21AM 5          AGENT FAULKNER:  As a matter of fact, if need be,

6      if you'd like, I can scratch that out.

7          JOSH DUGGAR:  Okay.  Yeah, that may be better,

8      just to put -- just go ahead and scratch it out.

9          AGENT FAULKNER:  Sure.  I forgot about that.

10:21AM10          JOSH DUGGAR:  I feel better about that.  All

11      right.

12          AGENT FAULKNER:  And just so you know, by signing

13      this document, it's not admission of guilt to anything.

14          JOSH DUGGAR:  Yeah.

10:21AM15          AGENT FAULKNER:  It's basically, as you've seen

16      on police shows --

17          JOSH DUGGAR:  Yeah.

18          AGENT FAULKNER:  -- this is just what we have to

19      do so that we can open up a line of communication about why

10:21AM20      we're here today.

21          JOSH DUGGAR:  No, my brother's a cop, so I

22      understand.

23          AGENT FAULKNER:  Oh, really?  Where at?

24          JOSH DUGGAR:  Right here in Tontitown.

10:21AM25          AGENT FAULKNER:  How long's he been a cop?

10:21AM 1          JOSH DUGGAR:  He's also a constable.  Since

2    probably 2010, maybe.

3          AGENT FAULKNER:  Oh, wow.

4          JOSH DUGGAR:  So quite a while, yeah.

10:21AM 5          AGENT FAULKNER:  Okay.

6          JOSH DUGGAR:  Somewhere around there.

7          AGENT FAULKNER:  I apologize.  I'm looking at

8    something over here.

9          JOSH DUGGAR:  No, you're fine.

10:21AM10          AGENT AYCOCK:  I'm going to -- okay.  Let's see.

11    All right.  So your name, you said, was Joshua James

12    Duggar?

13          JOSH DUGGAR:  Mm-hmm.

14          AGENT AYCOCK:  Is that correct?

10:21AM15          JOSH DUGGAR:  Yep.

16          AGENT AYCOCK:  And what's your date of birth,

17    sir?

18          JOSH DUGGAR:  It's 3-3 of 1988.

19          AGENT AYCOCK:  3-3 of '88.

10:21AM20          Have you always lived here in Arkansas or --

21          JOSH DUGGAR:  No -- well, I've always been a

22    resident of Arkansas.  I did live in -- I also had a

23    residence in Maryland for a little while.

24          AGENT AYCOCK:  Okay.  Eastern Shore or what?

10:21AM25          JOSH DUGGAR:  Near D.C. in Oxon Hill, Maryland.

10:21AM 1          AGENT AYCOCK:  Okay.  All right.

2          JOSH DUGGAR:  Prince George's County.

3          AGENT AYCOCK:  Gotcha.  What's your social?  And

4  you can just give me the last four.

10:21AM 5          JOSH DUGGAR:  Okay.  9072.

6          AGENT AYCOCK:  9072?  Okay.  And what's your

7  address, your home address?

8          JOSH DUGGAR:  My home address is 5292 North

9  Graham Road, G-r-a-h-a-m.  That's Springdale --

10:21AM10          AGENT AYCOCK:  Springdale?

11          JOSH DUGGAR:  -- Arkansas.  The zip is 72762.

12          AGENT AYCOCK:  Okay.  And how long have you lived

13  at that address?

14          JOSH DUGGAR:  Not very long.  About six months or

10:21AM15  around there.

16          AGENT AYCOCK:  Okay.  Who else lives there with

17  you?

18          JOSH DUGGAR:  My wife and kids.

19          AGENT AYCOCK:  Okay.

10:21AM20          JOSH DUGGAR:  We're in the process of remodeling,

21  so we -- we spend some time there, sometimes at my parents'

22  place as well.

23          AGENT AYCOCK:  Okay.

24          JOSH DUGGAR:  So we're kind of split between the

10:21AM25  two, depending what we have going on over there.

10:21AM 1            AGENT AYCOCK:  I got you.  I hope you're not

2       doing the remodeling.  I mean, you got that.

3               JOSH DUGGAR:  I've got -- I got a big project up

4       there.  It's 8,000 square feet.

10:21AM 5           AGENT AYCOCK:  Oh, wow.

6               JOSH DUGGAR:  Yeah.

7               AGENT AYCOCK:  How many kids you got?

8               JOSH DUGGAR:  I have five kids.  My wife is due

9       with another one in three weeks.

10:21AM10           AGENT AYCOCK:  Oh, wow.  Okay.  Are you having a

11      girl or a boy?

12              JOSH DUGGAR:  A girl.

13              AGENT FAULKNER:  Congratulations.

14              AGENT AYCOCK:  Congrats.

10:21AM15           JOSH DUGGAR:  Yeah.

16              AGENT AYCOCK:  This guy here's got one on the

17      way.

18              JOSH DUGGAR:  Three and three.

19              AGENT FAULKNER:  Yeah.

10:21AM20           JOSH DUGGAR:  Make three and three for us.  I've

21      got --

22              AGENT FAULKNER:  Really?

23              JOSH DUGGAR:  I've got --

24              AGENT FAULKNER:  I'm not close to you, but I can

10:21AM25      still --

10:21AM 1          AGENT AYCOCK:  I've got two.  I've got a -- my

2    daughter's 10 and then my son is 1 1/2, so --

3          JOSH DUGGAR:  Yeah.

4          AGENT AYCOCK:  Kind of caught us by surprise.

10:21AM 5    What do you do for work?

6          JOSH DUGGAR:  I -- I own this business and then I

7    also do some real estate as well.

8          AGENT AYCOCK:  Okay.  What do you do?  You got

9    your real estate license?

10:21AM10          JOSH DUGGAR:  I do not.  No, we manage -- my dad

11    has commercial properties, so I help him with management of

12    that.

13          AGENT AYCOCK:  Okay.

14          JOSH DUGGAR:  I dabble in a lot of things.  This

10:21AM15    is -- you know, this is probably my primary income as far

16    as that goes.

17          AGENT AYCOCK:  Okay.  I got you.  And how long

18    did you say that you've had this, this here?

19          JOSH DUGGAR:  We moved here in June of last year,

10:21AM20    I believe it was.

21          AGENT AYCOCK:  Mm-hmm.  So June here at

22    Wholesale?

23          JOSH DUGGAR:  Yes.

24          AGENT AYCOCK:  Okay.  And your internet provider?

10:21AM25          JOSH DUGGAR:  Is OzarksGo.

10:21AM 1           AGENT AYCOCK:  Ozarks?  And how long have you had

2  them?

3           JOSH DUGGAR:  I don't exactly remember.

4           AGENT AYCOCK:  Okay.  And do you guys operate on,

10:21AM 5  like, a wi-fi here or --

6           JOSH DUGGAR:  So yes and no.  We've had several

7  different things.  In fact, last week I changed it because

8  we had three different -- we have -- I think there's three

9  routers in there right now.  I honestly can't remember.

10:21AM10  But we had it daisy-chained to where we had different -- so

11  we could send it out over the lot so we could get to each

12  edge to be able to take pictures and things like that and

13  post them up because our cell service is not real great

14  down here in the valley.

10:21AM15           So, but I think we -- right now, I think I

16  probably have two routers in there hooked up.  One's more

17  of a long-range and one's closer up.

18           AGENT AYCOCK:  Okay.  Two routers.  And are they

19  password-protected or secure?

10:21AM20           JOSH DUGGAR:  I believe one of them is.  The

21  other one I think was more like a guest network, but I

22  think that's the way I've got them separated right now.

23           AGENT AYCOCK:  All right.

24           JOSH DUGGAR:  And yet last week, I changed the

10:21AM25  configuration on the router because the one was open, the

10:21AM 1  one that said -- the main one that actually comes -- the

2  modem comes in.

3           AGENT AYCOCK:  Uh-huh.  Okay, okay.  And you said

4  you didn't have very good cell service here, huh?

10:21AM 5          JOSH DUGGAR:  Well, depending on the provider.

6           AGENT AYCOCK:  Who do you have for your cell

7  phone?

8           JOSH DUGGAR:  AT&T and Verizon -- well, I have --

9  I have Verizon, but --

10:21AM10          AGENT AYCOCK:  Okay.  That's on your --

11          JOSH DUGGAR:  -- we've had both.

12          AGENT AYCOCK:  That's on your personal phone or

13  --

14          JOSH DUGGAR:  Yes, on my personal phone.

10:21AM15          AGENT AYCOCK:  Okay.  And what's that number?

16          JOSH DUGGAR:  479-200-2681.

17          AGENT AYCOCK:  Okay.  And you said AT&T on

18  another one or --

19          JOSH DUGGAR:  I don't have any.  I used to, but

10:21AM20  AT&T is -- I know there's -- and then Sprint, we can't

21  really get any signal here for them.

22          AGENT AYCOCK:  Okay.  And how long -- and how

23  long have you had Verizon?

24          JOSH DUGGAR:  I don't know.  I don't recall.

10:21AM25          AGENT AYCOCK:  How about in your residence?

10:21AM 1   Electronics there?

2            JOSH DUGGAR:  Electronics?  What do you mean by

3   that?

4            AGENT AYCOCK:  Like computers, phone, other

10:21AM 5   phones, anything like that?

6            JOSH DUGGAR:  I mean, my wife has a phone.

7            AGENT AYCOCK:  Mm-hmm.

8            JOSH DUGGAR:  But not any more than I possess.

9            AGENT AYCOCK:  Okay.

10:21AM10            JOSH DUGGAR:  I mean, I have in the past, and

11   I've recently upgraded my phone.  So, I mean, as far as

12   that goes, I don't want to --

13            AGENT AYCOCK:  All right.  E-mail?  Do you have

14   e-mail accounts?

10:21AM15            JOSH DUGGAR:  Yes.

16            AGENT AYCOCK:  What would that be?

17            JOSH DUGGAR:  So my e-mail is

18   JoshuaDuggar@iCloud.com is my full name.

19            AGENT FAULKNER:  Sir, if you don't mind, I want

10:21AM20   to go back real quick to those electronics.  I know agent

21   had mentioned in your home residence, but for the reason of

22   why we're here today, what are we talking about electronics

23   on scene?

24            JOSH DUGGAR:  Okay.

10:21AM25            AGENT FAULKNER:  So you have your cell phone,

10:21AM 1  right?

2           JOSH DUGGAR:  Right, my cell phone, and then

3  there's a lap- -- there's a laptop in that RV over there.

4           AGENT FAULKNER:  Okay.  Now, let's do one by one.

10:21AM 5  The phone, that was one that you had in your pocket, right?

6           JOSH DUGGAR:  Right, in my pocket.

7           AGENT FAULKNER:  Who else has access to that

8  phone?

9           JOSH DUGGAR:  Well, depending on who's -- I mean,

10:21AM10  sometimes I have a guy that works with me.  He will take

11  pictures sometimes with the phone.

12           AGENT FAULKNER:  So outside of you, other people

13  possibly have -- is it password-protected?

14           JOSH DUGGAR:  Yeah, it's not -- not very secure.

10:21AM15  I mean, everybody knows it.

16           AGENT FAULKNER:  Okay.

17           JOSH DUGGAR:  My kids use it quite a bit, my

18  wife.  Mostly family and friends.

19           AGENT FAULKNER:  Got you.  Is it a swipe pass

10:21AM20  code or PIN, number, numeric?

21           JOSH DUGGAR:  It's a PIN.

22           AGENT FAULKNER:  What is the PIN number for it?

23           JOSH DUGGAR:  Am I required to give that to you?

24           AGENT FAULKNER:  You're not, but --

10:21AM25           JOSH DUGGAR:  Okay.  I'd rather not.

10:21AM 1           AGENT FAULKNER:  Okay.

2           JOSH DUGGAR:  Yeah.

3           AGENT FAULKNER:  We'll get a little bit more into

4 the forensic side of stuff.

10:21AM 5           JOSH DUGGAR:  No, that's fine.

6           AGENT FAULKNER:  You said a laptop.  That's the

7 one in the RV, right?

8           JOSH DUGGAR:  Yes.

9           AGENT FAULKNER:  So the lap --

10:21AM10           JOSH DUGGAR:  It is password-protected as well.

11           AGENT FAULKNER:  Is that yours?

12           JOSH DUGGAR:  Yes.

13           AGENT FAULKNER:  Who else would have access to

14 that?

10:21AM15           JOSH DUGGAR:  Same, same kind of deal.  We use it

16 for, you know, kids watching movies, you know, browsing

17 online, whatever.

18           AGENT FAULKNER:  Okay.  But it has --

19           JOSH DUGGAR:  It doesn't get used all that much.

10:21AM20           AGENT FAULKNER:  But it is password-protected?

21           JOSH DUGGAR:  Yes.

22           AGENT FAULKNER:  Just one password or multiple?

23           JOSH DUGGAR:  Well, so it's password-protected in

24 the fact that if you log in, I think it will automatically

10:21AM25 log you in --

10:21AM 1            AGENT FAULKNER:  Mm-hmm.

2            JOSH DUGGAR:  -- but if you are -- you know, if

3  you go to -- it sits idle, it will lock up sometimes.

4            AGENT FAULKNER:  Okay.

10:21AM 5            JOSH DUGGAR:  I don't know exactly how I have it

6  set.

7            AGENT FAULKNER:  But in terms of ownership, that

8  is your laptop; and in terms of the phone, that is your

9  phone?

10:21AM10            JOSH DUGGAR:  Yes.

11            AGENT FAULKNER:  We noticed inside of the

12  whatever -- I don't know which one is your office.

13            JOSH DUGGAR:  Yes.

14            AGENT FAULKNER:  But the one over here that has

10:21AM15  the open sign --

16            JOSH DUGGAR:  Mm-hmm.

17            AGENT FAULKNER:  -- that there was another elec-

18  -- computer in there?

19            JOSH DUGGAR:  Yes.  That's an HP.  That computer

10:21AM20  is -- it's now password-protected, but pretty much the guys

21  that work here are the ones that use it.

22            AGENT FAULKNER:  Okay.

23            JOSH DUGGAR:  And so there's, you know, different

24  --

10:21AM25            AGENT FAULKNER:  So there's currently a password

10:21AM 1    on it right now?

2           JOSH DUGGAR:  Yes, there is, yeah.  And the

3    password's written.  I mean, I have it written around so

4    the guys know.

10:21AM 5           AGENT FAULKNER:  I got you.

6           JOSH DUGGAR:  So it's not like -- I mean, it's

7    just mainly to keep somebody from breaking in and accessing

8    file stuff --

9           AGENT FAULKNER:  Oh, no, I understand.

10:21AM10           JOSH DUGGAR:  -- you know.

11           AGENT FAULKNER:  Right, right.

12           JOSH DUGGAR:  On customers, whatever.

13           AGENT FAULKNER:  And so computer in the office,

14    laptop in the RV?

10:21AM15           JOSH DUGGAR:  Yep.

16           AGENT FAULKNER:  Your cell phone and then your

17    coworker's cell phone?

18           JOSH DUGGAR:  Yeah.  And then there's also --

19    they reminded me there's a hard drive probably in the

10:21AM20    security system, which is up above.

21           AGENT FAULKNER:  Oh, for your surveillance?

22           JOSH DUGGAR:  Right, for surveillance system.

23           AGENT FAULKNER:  But you only use that to recover

24    --

10:21AM25           JOSH DUGGAR:  It's not even -- it's not active

10:21AM 1   right now.  I mean, I didn't tell anybody else that but I'm

2   just --

3           AGENT FAULKNER:  I promise we don't plan on

4   breaking in, so --

10:21AM 5           JOSH DUGGAR:  No, I'm just saying it's, you know

6   --

7           AGENT FAULKNER:  We won't give up your secret.

8           How long for your cell phone?  How long have you

9   had that?

10:21AM10           JOSH DUGGAR:  I bought it probably when it -- I

11   mean, a week after it came out, the iPhone 11.

12           AGENT FAULKNER:  So guesstimate.  I don't need an

13   exact day.

14           JOSH DUGGAR:  Two months, maybe.

10:21AM15           AGENT FAULKNER:  Two months ago?

16           JOSH DUGGAR:  Three months.  Yeah, two, three

17   months.

18           AGENT FAULKNER:  All right.  What about that

19   laptop?

10:21AM20           JOSH DUGGAR:  The laptop I've had for probably

21   five years?

22           AGENT FAULKNER:  Five years?  And that's the one

23   that's in the RV?

24           JOSH DUGGAR:  Yes.

10:21AM25           AGENT FAULKNER:  All right.  What about the

10:21AM 1   desktop that's in there?

2              JOSH DUGGAR:  The desktop?

3              AGENT FAULKNER:  The HP.

4              JOSH DUGGAR:  I think I've had that for two and a

10:21AM 5   half years, three years, something like that.

6              AGENT FAULKNER:  And then that hard drive, if you

7   can remember?

8              JOSH DUGGAR:  That's probably five -- seven years

9   maybe.  It's an old one.

10:21AM10             AGENT FAULKNER:  Okay.  That kind of helps us

11  narrow things down to what --

12             JOSH DUGGAR:  Right.  I don't think there's any

13  others in there.  I mean, honestly, I can't remember.  I

14  might have an old, you know, phone laying around or

10:21AM15  something somewhere.

16             AGENT FAULKNER:  In the RV or in the office?

17             JOSH DUGGAR:  I know there's an old phone in the

18  back of this Honda, but that's -- we found it in the car,

19  you know.  It's not like it's ours.

10:21AM20             AGENT FAULKNER:  What about any other type of --

21  I mean, now, we talk about electronics, I know a lot of it

22  people often just jump to cell phones, tablets, laptops,

23  things of that nature, but also electronic devices that

24  store dig- -- thumb drives?

10:21AM25             JOSH DUGGAR:  So there's -- there's a -- there's

10:21AM 1    probably more than one thumb drive in there.

2                    AGENT FAULKNER:  And --

3                    JOSH DUGGAR:  I don't know how many in the

4    office.

10:21AM 5            AGENT FAULKNER:  You're pointing to this one on

6    the right?

7                    JOSH DUGGAR:  In the office on the right.

8    There's also camera -- two cameras in there.  Both of those

9    have the ability to record, I think, on them.

10:21AM10            AGENT FAULKNER:  Mm-hmm.

11                   JOSH DUGGAR:  I don't know if any of them

12   actually have any SD cards or anything in there.  I don't

13   know.

14                   AGENT FAULKNER:  Right.  And those thumb drives,

10:21AM15  are those yours, are they your coworkers or --

16                   JOSH DUGGAR:  I don't know.  I don't know.  I

17   don't actually know because I don't think I have -- there

18   might be one in that laptop bag as well, but they would all

19   be -- like, they would all be -- I mean, if they are here,

10:21AM20  they are here.  I don't know.  We find stuff in cars all

21   the time.

22                   AGENT FAULKNER:  Oh, I can imagine.

23                   JOSH DUGGAR:  Yeah.  I mean, we find -- when he's

24   cleaning underneath the seats, he will find money.  I mean

10:21AM25  --

10:21AM 1          AGENT FAULKNER:  You name it, huh?

2          JOSH DUGGAR:  Yeah, pretty much everything.  I

3   don't want to say everything we find, but we --

4          AGENT FAULKNER:  That's more of a -- that's more

10:21AM 5   of a lost and found of thumb drives that's in the office

6   right now?

7          JOSH DUGGAR:  Right.

8          AGENT FAULKNER:  But then the one that --

9          JOSH DUGGAR:  I -- well, I mean, we may have

10:21AM10   wiped some of them and used them for -- because we do car

11   photos mostly is what we're doing.

12          AGENT FAULKNER:  Right.

13          JOSH DUGGAR:  And, you know, re- -- and

14   sometimes, you know, if we're researching something or

10:21AM15   whatever.  Who knows.

16          AGENT FAULKNER:  I got you.  I got you.  But the

17   one, the thumb drive that's in your laptop bag, that would

18   be yours or --

19          JOSH DUGGAR:  I don't even know if I have one in

10:21AM20   there.

21          AGENT FAULKNER:  If there is one?

22          JOSH DUGGAR:  Right, if there is one.

23          AGENT FAULKNER: Okay.  All right.

24          JOSH DUGGAR:  If there is.

10:21AM25          AGENT AYCOCK:  Thank you.

10:21AM 1                How about social media?

2                JOSH DUGGAR:  Do I have some?

3                AGENT AYCOCK:  Yeah, do you have any?

4                JOSH DUGGAR:  Is this for the business or me

10:21AM 5 personally?

6                AGENT AYCOCK:  Either one.

7                JOSH DUGGAR:  Yeah, we have -- we do have social

8 media.  We're not very active on it.  We do have Facebook.

9                AGENT AYCOCK:  Okay.

10:21AM10                JOSH DUGGAR:  Which, we use a Facebook page,

11 Twitter account.  I mean, I used to maintain an Instagram

12 until they closed it down.

13                AGENT AYCOCK:  Okay.

14                JOSH DUGGAR:  So --

10:21AM15                AGENT AYCOCK:  Okay.  How long ago were you

16 active on Instagram?

17                JOSH DUGGAR:  Well, my wife has an account, so I

18 was on there -- I was on there today.

19                AGENT AYCOCK:  Okay.

10:21AM20                JOSH DUGGAR:  Or yesterday.  Maybe today or

21 yesterday, yeah.

22                What is the -- what is the scope of this as far

23 as for me personally?

24                AGENT FAULKNER:  Say that again?

10:21AM25                JOSH DUGGAR:  What is the scope of as far as,

10:21AM  1   like, how -- I mean, answering some of these questions, I

         2   want to be truthful and up-front --

         3          AGENT FAULKNER:  Sure.

         4          JOSH DUGGAR:  -- or I just want to decline to

10:21AM  5   answer, but I'm just curious as far as scope.  Like, you

         6   know, is this related to me personally or is this something

         7   to do with the business?  I mean, it says business here,

         8   but I'm just curious --

         9          AGENT FAULKNER:  Correct, but --

10:21AM 10          JOSH DUGGAR:  -- as to scope.

        11          AGENT FAULKNER:  Basically, what this boils down

        12   to -- and we appreciate you being cooperative because a lot

        13   of the stuff that we had was just kind of biographical

        14   stuff we needed to get out of the way.

10:21AM 15          JOSH DUGGAR:  Yeah.  No, that's -- that's fine.

        16   I listened to transcripts for a lot of, yeah, my friend's

        17   case, so --

        18          AGENT FAULKNER:  And you --

        19          JOSH DUGGAR:  I know how they start out.

10:21AM 20          AGENT FAULKNER:  They are in federal custody now?

        21          JOSH DUGGAR:  Yeah.

        22          AGENT FAULKNER:  In the Western District?

        23          JOSH DUGGAR:  Yeah.

        24          AGENT FAULKNER:  What are their charges?

10:21AM 25          JOSH DUGGAR:  Conspiracy and I think some money,

```
10:21AM  1  you know, wire fraud, mail fraud, something like that.
         2            AGENT FAULKNER:  And you said you had --
         3            JOSH DUGGAR:  There may be an electronic count in
         4  there too.  I don't know.
10:21AM  5            AGENT FAULKNER:  And this is outside the scope.
         6  I'm just curious because you mentioned some of the FBI guys
         7  who I didn't -- I didn't recall.  Who were the FBI agents?
         8            JOSH DUGGAR:  Cessario.
         9            AGENT FAULKNER:  Cessario?
10:21AM 10            JOSH DUGGAR:  Cessario, I think is his name.
        11            AGENT FAULKNER:  And he's local?
        12            JOSH DUGGAR:  Little Rock, I believe.
        13            AGENT FAULKNER:  At least -- oh, Little Rock.
        14  That's probably why.  Okay.
10:21AM 15            JOSH DUGGAR:  But he was assigned to the case, I
        16  think, because it was public corruption.
        17            AGENT FAULKNER:  Ah.
        18            JOSH DUGGAR:  So I think that's why.
        19            AGENT FAULKNER:  Yeah.  Well, no, I will say
10:21AM 20  this, and I'll let, you know, the case agent kind of give
        21  you -- it's not about that.  And the scope of your
        22  involvement, the fact that and the reason why we want to
        23  talk to you first.  Obviously, as the business owner of
        24  where we have a federal search warrant which targets
10:21AM 25  anything that was on this property, we want to speak to
```

10:21AM 1   you, kind of give you some insight, get some basic details
     2   and then get into or give you an opportunity to maybe find
     3   out and give us an explanation as to why we're here.
     4          JOSH DUGGAR:  Okay.
10:21AM 5          AGENT FAULKNER:  But I'll let the case agent get
     6   into that.
     7          JOSH DUGGAR:  Yeah.  No, that's fine.
     8          AGENT AYCOCK:  So what are the hours here?  The
     9   business hours here are?
10:21AM10          JOSH DUGGAR:  We don't really have.  So it's
    11   10:00 to 6:00 is kind of our rule of thumb.
    12          AGENT AYCOCK:  10:00 to 6:00?  Okay.  Is there
    13   ever any time that you've stayed late, like -- or anybody,
    14   any of your employees?
10:21AM15          JOSH DUGGAR:  Oh, certainly, yeah.
    16          AGENT AYCOCK:  Okay.
    17          JOSH DUGGAR:  All the time.
    18          AGENT AYCOCK:  Like how late?
    19          JOSH DUGGAR:  Oh, all hours.
10:21AM20          AGENT AYCOCK:  Okay.
    21          JOSH DUGGAR:  I have a guy that used to work with
    22   me that runs a tree service.  He comes in whenever.  He
    23   stores some stuff back here and so he still has access to
    24   the building, knows all the passwords and all that stuff
10:21AM25   too, but -- and then I've got Randall here.  He's sometimes

10:21AM 1  here.  I'm here, depending on what I have going on.

2          There's another guy that has done some part-time

3  work for me.  So there's a lot of people that have access

4  but -- I mean, family members too.  They all have access.

10:21AM 5          AGENT FAULKNER:  Let's -- let's kind of go -- you

6  said the tree guy, what's his name?

7          JOSH DUGGAR:  I'd probably rather not get him --

8  get into that at this point.

9          AGENT FAULKNER:  Okay.  That's fine.  And, look.

10:21AM10  I don't want you to think that we're pressuring you or

11  pushing you.

12          JOSH DUGGAR:  No.

13          AGENT FAULKNER:  Anytime you don't feel the need

14  to answer it --

10:21AM15          JOSH DUGGAR:  Yep.

16          AGENT FAULKNER:  -- just let us know.

17          JOSH DUGGAR:  Okay.

18          AGENT AYCOCK:  Exactly.

19          AGENT FAULKNER:  So no to the tree guy or anybody

10:21AM20  else who might have access?

21          JOSH DUGGAR:  Yeah, I'd rather not identify

22  anybody else or rope them into this at this point --

23          AGENT FAULKNER:  Sure.

24          JOSH DUGGAR:  -- because I don't really know what

10:21AM25  the scope.

10:21AM 1          AGENT FAULKNER:  Good deal.

2          AGENT AYCOCK:  We're not trying to trick anybody

3   here; we're just asking straightforward questions.

4          JOSH DUGGAR:  Mm-hmm.

10:21AM 5          AGENT AYCOCK:  Okay.  So let me ask you again

6   about how long this lot's been here.  You said you thought

7   maybe June?  Could it have been maybe a little sooner --

8   or, excuse me, a little --

9          JOSH DUGGAR:  June of last year.

10:21AM 10         AGENT AYCOCK:  Okay.  Last -- okay.  Of 2018?

11         JOSH DUGGAR:  Mm-hmm.

12         AGENT AYCOCK:  Okay.  I got you.

13         JOSH DUGGAR:  Mm-hmm.

14         AGENT AYCOCK:  All right, all right, all right.

10:21AM 15         JOSH DUGGAR:  Like a year and a half, I want to

16   say, probably somewhere around there.

17         AGENT AYCOCK:  Can you -- can you tell me a

18   little bit about your knowledge of electronic devices like

19   Torrent files, uTorrent, stuff like that?

10:21AM 20         JOSH DUGGAR:  I'd rather not get into any

21   specifics on knowledge.

22         AGENT AYCOCK:  Okay.  All right.

23         Gerry, do you have anything else as far as that

24   goes?

10:21AM 25         JOSH DUGGAR:  Are you guys able to answer any

10:21AM 1   questions from me as far as anything?

2          AGENT FAULKNER:  I think we're probably going to

3   get to that point now where --

4          JOSH DUGGAR:  Okay.  Yeah.

10:21AM 5          AGENT FAULKNER:  Where -- and I can't speak on

6   your behalf --

7          JOSH DUGGAR:  Yeah.

8          AGENT FAULKNER:  -- that you're going to probably

9   not going to answer too many more of our questions.

10:21AM10          JOSH DUGGAR:  No, I understand.

11          AGENT FAULKNER:  Which, then, if that be the

12   case, obviously, we --

13          JOSH DUGGAR:  Well, I just -- without legal

14   counsel --

10:21AM15          AGENT FAULKNER:  I know.  No, no.

16          JOSH DUGGAR:  -- I don't want to --

17          AGENT FAULKNER:  And here's the --

18          JOSH DUGGAR:  -- say something.  And like I say,

19   everything that I've already said I'm going to say the best

10:21AM20   of my knowledge.  I'm trying to be straightforward with you

21   guys too.

22          AGENT FAULKNER:  Absolutely.

23          JOSH DUGGAR:  I'm trying to make that easier.

24          AGENT FAULKNER:  Look, we appreciate that.

10:21AM25          JOSH DUGGAR:  I just don't want to get into

10:21AM 1    entrapment of any sort.

2                AGENT FAULKNER:  Right, absolutely.

3                JOSH DUGGAR:  And I'm not saying that -- you

4    know, I don't want to say something that I just think of

10:21AM 5    right now and then not -- honestly.

6                AGENT FAULKNER:  Right.  And I don't want you to

7    think also that we're keeping you from having an attorney.

8    I know when we got here --

9                JOSH DUGGAR:  Right.

10:21AM10                AGENT FAULKNER:  -- you said you wanted to call

11    him.

12                JOSH DUGGAR:  Right.

13                AGENT FAULKNER:  Obviously, with your phone, we

14    can't do that.  We will call him.  He can't come on scene

10:21AM15    right now while we're here, but we will at least alert him

16    to the fact that we're here.

17                The next few questions --

18                JOSH DUGGAR:  Okay.

19                AGENT FAULKNER:  -- are what we're trying to get

10:21AM20    at.

21                JOSH DUGGAR:  Okay.

22                AGENT FAULKNER:  We're not here trying to point

23    fingers at anybody.

24                JOSH DUGGAR:  Yeah.

10:21AM25                AGENT FAULKNER:  We are trying to figure out what

10:21AM 1  led us to this business.

2           JOSH DUGGAR:  Okay.

3           AGENT FAULKNER:  That's going to involve stuff

4  that's been either uploaded or downloaded onto the

10:21AM 5  internet.  And I know Agent Aycock had mentioned just now

6  -- a while ago about uTorrent files.  Well, we'll play this

7  out question by question.

8           JOSH DUGGAR:  Yeah.

9           AGENT FAULKNER:  You tell me what you feel

10:21AM10  comfortable with.  Do you know or do you remember Napster

11  back in the day?  Napster was a file-sharing program where

12  millions of users throughout the world could get online and

13  download music files.  So if I had an entire album of, say,

14  Garth Brooks, I could upload it onto this, into Napster.

10:21AM15           JOSH DUGGAR:  I mean, I'm familiar.  It was

16  probably a little before my --

17           AGENT FAULKNER:  Right.

18           JOSH DUGGAR:  -- time, but, yeah.

19           AGENT FAULKNER:  I'm showing my age.

10:21AM20           AGENT AYCOCK:  You're not familiar with it.  Come

21  on.

22           JOSH DUGGAR:  31.

23           AGENT FAULKNER:  Yeah.  Well, I'm 41, so you got

24  me.

10:21AM25           But that was what was called a peer-to-peer

10:21AM 1  file-sharing network.

2             JOSH DUGGAR:  Okay.

3             AGENT FAULKNER:  And now it's evolved.  Over the

4  years --

10:21AM 5             JOSH DUGGAR:  Yeah.

6             AGENT FAULKNER:  -- it's turned into where these

7  particular programs not only share music files but they

8  share video files, software programs, documents, you name

9  it.

10:21AM10             Do you -- are you familiar with or do you know

11  anything about peer-to-peer file-sharing networks?

12             JOSH DUGGAR:  I mean, I'm familiar with, I guess

13  you could say.

14             AGENT FAULKNER:  Okay.  Have you ever used or do

10:21AM15  any of these electronics currently on the property have any

16  of those types of software downloaded onto them?

17             JOSH DUGGAR:  Yes.

18             AGENT FAULKNER:  Okay.  Which, which devices are

19  we talking about?

10:21AM20             JOSH DUGGAR:  Probably all of them.

21             AGENT FAULKNER:  All?  So, and I just want to --

22             JOSH DUGGAR:  Right.

23             AGENT FAULKNER:  -- make sure.  Again, we're not

24  here to put words in your mouth.  So when you say "all" and

10:21AM25  I'm thinking --

10:21AM 1          JOSH DUGGAR:  Well, okay.  I won't say all

2  because I'm going to say -- I'm going to say the laptop,

3  the phone, and the computer in the office.

4          AGENT FAULKNER:  Okay.  So laptop in the RV?

10:21AM 5          JOSH DUGGAR:  Yes.

6          AGENT FAULKNER:  Okay.  The phone, your phone or

7  --

8          JOSH DUGGAR:  I believe.  To the best of my

9  knowledge.

10:21AM10          AGENT FAULKNER:  That's fine.

11          JOSH DUGGAR:  Yeah.

12          AGENT FAULKNER:  Again --

13          JOSH DUGGAR:  I don't know if they actually all

14  have them or not.  I don't know.

10:21AM15          AGENT FAULKNER:  We're not here to pen you in a

16  corner --

17          JOSH DUGGAR:  Right.

18          AGENT FAULKNER:  -- on any of your answers.

19          JOSH DUGGAR:  Right.

10:21AM20          AGENT FAULKNER:  The laptop that's -- possibly on

21  the laptop in the RV?

22          JOSH DUGGAR:  Right.

23          AGENT FAULKNER:  Possibly on the phone that you

24  had on you, right, your phone, not Randall's?

10:21AM25          JOSH DUGGAR:  Mm-hmm, right.

10:21AM 1          AGENT FAULKNER:  And then possibly --

2          JOSH DUGGAR:  I don't know about Randall's.

3          AGENT FAULKNER:  Yeah.  We're going to -- we're

4    going to --

10:21AM 5          JOSH DUGGAR:  Yeah.

6          AGENT FAULKNER:  -- have a conversation very

7    similar to what we are having with you when we're done, if

8    he wants to talk to us.

9          And then possibly peer-to-peer networks on the HP

10:21AM10   that's in the --

11          JOSH DUGGAR:  Yes.

12          AGENT FAULKNER:  Okay.  And I guess that would --

13   that's what Agent Aycock was kind of getting to.

14          JOSH DUGGAR:  Like a TOR -- like a TOR browser or

10:21AM15   a TOR -- we upload stuff for our cars and things like that.

16   I've had a friend of mine that came and set up with

17   file-sharing so we could do, you know, more encrypted type

18   stuff.  He just said it's safer that way.  He got me onto

19   it.  It's safer.

10:21AM20          AGENT FAULKNER:  Now, I want to make sure we're

21   getting -- that we're clear.  When you say "TOR," my

22   definition, that's kind of a --

23          JOSH DUGGAR:  I don't -- I actually don't know

24   the definition, so I don't really want to --

10:21AM25          AGENT FAULKNER:  Well, because TOR, T-O-R stands

10:21AM 1    for The Onion Router, which stands for basically the Dark

2    Web and the deep web.

3               JOSH DUGGAR:  Okay.

4               AGENT FAULKNER:  I don't know if you've heard the

10:21AM 5    Dark Web?  That's --

6               JOSH DUGGAR:  I mean, I've heard people talk

7    about it.

8               AGENT FAULKNER:  Right, but then there's Torrent,

9    so two different things.

10:21AM10               JOSH DUGGAR:  Okay.

11               AGENT FAULKNER:  Peer-to-peer involves the

12    Torrent files.

13               JOSH DUGGAR:  So what are you --

14               AGENT FAULKNER:  So you have peer-to-peer files,

10:21AM15    which is software that you can download, and you can

16    exchange files with users all over the world.  TOR, T-O-R

17    --

18               JOSH DUGGAR:  Okay.

19               AGENT FAULKNER:  -- standing for The Onion Router

10:21AM20    is the Dark Web.  That's a program you -- that's where you

21    can surf the internet anonymously and get on all these

22    different sites.

23               JOSH DUGGAR:  Yeah.

24               AGENT FAULKNER:  So do you know --

10:21AM25               JOSH DUGGAR:  I don't know which -- I mean, I

10:21AM 1  don't know.  Just, he said "TOR," so I don't really know --

2          AGENT FAULKNER:  Okay.

3          JOSH DUGGAR:  -- which one.

4          AGENT FAULKNER:  That's fine.  I just want to

10:21AM 5  make sure I'm not -- when you say "TOR," I'm not thinking

6  Dark Web and while you're thinking peer-to-peer or vice

7  versa.

8          JOSH DUGGAR:  No, I don't -- so you're -- so are

9  you saying -- what -- I guess I'm still confused.

10:21AM10          AGENT FAULKNER:  In terms of the peer-to-peer --

11          JOSH DUGGAR:  Because you said you can download

12  -- I don't actually know.

13          AGENT FAULKNER:  Right.

14          JOSH DUGGAR:  So I guess I better not --

10:21AM15          AGENT FAULKNER:  Okay.

16          JOSH DUGGAR:  -- say if I don't understand.

17          AGENT FAULKNER:  And I'm not going to put words

18  in your mouth, but I'm assuming, because you said they have

19  peer-to-peer programs on these devices, that he was talking

10:21AM20  about Torrent files, not T-O-R.

21          JOSH DUGGAR:  TOR?

22          AGENT FAULKNER:  Torrent, T-o-r-r-e-n-t.

23          JOSH DUGGAR:  Oh, I don't know.

24          AGENT FAULKNER:  As opposed to T-O-R.  And there

10:21AM25  is a difference there.

10:21AM 1     JOSH DUGGAR:  So are you saying that TOR -- are

2 you saying -- is your question pertaining to which one?

3     AGENT FAULKNER:  I was just making sure that you

4 and I were on the same page as to what you're talking, but

10:21AM 5 I don't think you're seeing the difference between TOR.

6     JOSH DUGGAR:  I don't see any difference.

7     AGENT FAULKNER:  Okay.

8     JOSH DUGGAR:  As far as -- I mean, I don't know.

9     AGENT FAULKNER:  So your friend said that there's

10:21AM10 potentially on these devices.

11     JOSH DUGGAR:  Well, no, no.  I -- so I have

12 knowledge that there is something that says TOR on there.

13     AGENT FAULKNER:  Okay.

14     JOSH DUGGAR:  At least on one of them.

10:21AM15     AGENT FAULKNER:  Gotcha.  All right.

16     JOSH DUGGAR:  And then -- and that has been --

17 I'm just saying that was at his recommendation that I use

18 those and so a different -- and I don't know at what point

19 or -- right.

10:21AM20     AGENT FAULKNER:  Let's leave it at that point

21 based on your description of it.

22     JOSH DUGGAR:  Right.

23     AGENT FAULKNER:  And what would you say the usage

24 of the TOR that --

10:21AM25     JOSH DUGGAR:  I -- I don't recall.

10:21AM 1     AGENT FAULKNER:  Okay.

2     JOSH DUGGAR:  Yeah.

3     AGENT FAULKNER:  Is it more for the business or

4 is it personal?  Hey, look.  I promise you we're not --

10:21AM 5     JOSH DUGGAR:  I mean, most -- okay.  So I can't

6 --

7     AGENT FAULKNER:  We're not here --

8     JOSH DUGGAR:  I can't speak to that because, I

9 mean, I have -- you have my laptop; you have my phone.  So

10:21AM10 it's probably split, you know, down the middle.  The office

11 computer, probably the same thing.

12     AGENT FAULKNER:  All right.  And I don't want you

13 to think that we're here because --

14     JOSH DUGGAR:  No, and my --

10:21AM15     AGENT FAULKNER:  -- somebody's downloading music.

16 We wouldn't --

17     JOSH DUGGAR:  So what are you here for, then?

18     AGENT FAULKNER:  That's what we're getting at.

19     AGENT AYCOCK:  So part --

10:21AM20     AGENT FAULKNER:  Oh, I'm sorry.  Go ahead.

21     JOSH DUGGAR:  I mean, is somebody communicating

22 --

23     AGENT AYCOCK:  Part of -- we do a lot of things

24 with Homeland Security Investigation.

10:21AM25     JOSH DUGGAR:  Right.

10:21AM 1             AGENT AYCOCK:  We enforce over, like, 400

2    different federal statutes.

3             JOSH DUGGAR:  Okay.

4             AGENT AYCOCK:  Immigration, narcotics, gaming.

10:21AM 5             JOSH DUGGAR:  Yeah.

6             AGENT AYCOCK:  And part of the other stuff we do

7    is child exploitation.  So we kind of work with saving kids

8    essentially.

9             JOSH DUGGAR:  Yeah.

10:21AM10             AGENT AYCOCK:  A lot of times we'll find through

11   internet tips that people have, you know, downloaded child

12   pornography.

13             JOSH DUGGAR:  Okay.

14             AGENT AYCOCK:  You know, stuff like that.  And --

10:21AM15             JOSH DUGGAR:  So is that what you're saying -- is

16   that what you're saying's going on?

17             AGENT AYCOCK:  Well, what we -- what we're saying

18   is there is a possibility that there are pieces to this

19   puzzle where we might be able to help save children.  Okay?

10:21AM20             JOSH DUGGAR:  Okay.

21             AGENT AYCOCK:  That's what we're trying to --

22   that's what we're trying to do.

23             JOSH DUGGAR:  Okay.

24             AGENT AYCOCK:  All right?

10:21AM25             JOSH DUGGAR:  So what is -- what is the -- I

10:21AM 1   guess what is the scope is what I've been trying to say.

2   Like, is there some -- is there something going on on my

3   devices where that's been -- something's accessed or

4   something's downloaded or uploaded or something like that?

10:21AM 5           AGENT AYCOCK:  That's what led us here, yes.

6           JOSH DUGGAR:  Okay.

7           AGENT AYCOCK:  Okay.  So what we're trying to do

8   is hopefully find out exactly what happened so we can try

9   to use that information to put some pieces of the puzzle

10:21AM10  together --

11          JOSH DUGGAR:  So --

12          AGENT AYCOCK:  -- to help save --

13          JOSH DUGGAR:  Does it -- does it include -- so

14  did it mark this IP address?  Is that basically what you're

10:21AM15  saying?

16          AGENT AYCOCK:  Yeah.

17          JOSH DUGGAR:  Okay.  So does it -- so I guess in

18  the scope of your investigation, is there going to be, I

19  guess -- I mean, you'll narrow it down.  You'll be able to

10:21AM20  figure out probably which device or which thing -- or at

21  least know if it's any of these devices that are here?

22          AGENT AYCOCK:  Well, that's what -- that's what

23  you see all these other guys running around doing.  They

24  are our computer forensic analysts.  So, like, even, you

10:21AM25  know, even if something's on a computer that someone might

10:21AM 1    have downloaded and then deleted, they are going to be able

2    to find it, you know.

3                JOSH DUGGAR:  Yeah.  That's great.

4                AGENT AYCOCK:  They have been doing that.  That's

10:21AM 5    what they do, you know?

6                JOSH DUGGAR:  Yeah.

7                AGENT AYCOCK:  So, you know, with that being

8    said, we're just trying to get -- get to the bottom of it.

9                JOSH DUGGAR:  Exactly.  No, well, that helps me a

10:21AM10    lot to understand what you're -- what you're here for.  So

11    I understand that.  I respect that.  That's good.

12                So what other -- I guess, you know, they will do

13    their work and figure out what they can find, so --

14                AGENT FAULKNER:  Has there been anything, let's

10:21AM15    say within the last five to six months between yourself or

16    any of your employees or any of their associates that have

17    been on this property that has raised a red flag as to why

18    that search warrant -- or federal search warrant might have

19    been signed --

10:21AM20                JOSH DUGGAR:  Not at all.

21                AGENT FAULKNER:  -- as to why we're here?

22                JOSH DUGGAR:  No.

23                AGENT FAULKNER:  Nothing that might have been

24    accidentally or intentionally downloaded or uploaded from

10:21AM25    any of these networks or software programs that we've

10:21AM 1   talked about?

2                JOSH DUGGAR:  Not that I know of, no.

3                AGENT FAULKNER:  Okay.  In terms of what you were

4   talking about earlier, of possibly staying here late at

10:21AM 5   night with work, have there been times where anyone other

6   than yourself has stayed here or lived -- or slept

7   overnight on property in possibly some of these RVs or in

8   the office?

9                JOSH DUGGAR:  No.  I mean, other -- you know,

10:21AM10   other than the other people that come through.  I mean,

11   I've never slept in any RVs out here that I -- that I

12   recall.

13                AGENT FAULKNER:  Okay.  What about -- you said

14   Randall, right?

10:21AM15                JOSH DUGGAR:  Yes.

16                AGENT FAULKNER:  How long has he been working

17   here?

18                JOSH DUGGAR:  He started in May, I believe.

19                AGENT FAULKNER:  Okay.  And when --

10:21AM20                JOSH DUGGAR:  Maybe May or April, somewhere

21   around there.

22                AGENT FAULKNER:  Does he stay on property, say

23   past 6:00?

24                JOSH DUGGAR:  Not that I -- I mean, yes, there's

10:21AM25   times where he does.  I don't know for sure.

10:21AM 1          AGENT FAULKNER:  All right.  And in May, besides

     2  from yourself and Randall, who else?  And I know you

     3  mentioned, I don't -- if you don't want to give the names,

     4  that's fine.

10:21AM 5          JOSH DUGGAR:  Yeah, I'd rather not mention the

     6  names.

     7          AGENT FAULKNER:  Okay.

     8          JOSH DUGGAR:  There's probably -- I mean, there's

     9  --

10:21AM10          AGENT FAULKNER:  Let's say "tree guy."

    11          JOSH DUGGAR:  There's a number of other people.

    12          AGENT FAULKNER:  Let's just say "tree guy," for

    13  instance.  Back in May of 2019, would he have been here on

    14  property?

10:21AM15          JOSH DUGGAR:  I -- I would -- I don't know.

    16          AGENT FAULKNER:  Okay.

    17          JOSH DUGGAR:  I don't recall or I don't know.  I

    18  don't know the right way to answer that question.

    19          AGENT FAULKNER:  That's fine.  That's fine.

10:21AM20          In terms of electronic devices that have been

    21  here --

    22          JOSH DUGGAR:  Mm-hmm.

    23          AGENT FAULKNER:  -- that you personally owned or

    24  operated or had access to, are any of those now currently

10:21AM25  at your residence in Springdale?

10:21AM 1            JOSH DUGGAR:  No.

2            AGENT FAULKNER:  Has anybody from your residence

3    in Springdale accessed or used any of the devices here on

4    property?

10:21AM 5            JOSH DUGGAR:  You mean that reside at the

6    residence?  I mean, yes.  I mean, probably is -- yeah.  Yes

7    would be the answer.

8            AGENT FAULKNER:  Okay.  From where we're at right

9    now, and I'm going to -- and let's -- if you don't mind,

10:21AM10    I'm going to kind of give you the down-and-dirty as to

11    what's happened.

12            JOSH DUGGAR:  Okay.

13            AGENT FAULKNER:  Prior to doing --

14            JOSH DUGGAR:  What I've been waiting for.

10:21AM15            AGENT FAULKNER:  Prior to doing that -- well, I

16    mean, it's kind of a round -- we don't want to come out and

17    say it right at first.  We try to eliminate some things --

18            JOSH DUGGAR:  Yeah.

19            AGENT FAULKNER:  -- before getting to that point.

10:21AM20    And before I give you the down-and-dirty, is there anybody

21    that's worked for you, currently works for you, has been on

22    this property in, say, the last five to six months, the

23    person that would raise a red flag that may be involved in

24    doing something like this on your -- on any of your

10:21AM25    computers?

10:21AM 1     JOSH DUGGAR:  Yeah.  There's one guy that -- that

2 is a homeless guy that I mentioned before that spends quite

3 a bit of time here.

4     He shows up here.  I've asked him to leave, my

10:21AM 5 wife's asked him to leave, and he comes back.  He will sit

6 in the office.  He has the -- I found out last week that he

7 had the code to the office.

8     AGENT FAULKNER:  Okay.

9     JOSH DUGGAR:  I was not aware that he had that,

10:21AM10 but he came in and was sitting in there because it was

11 cold, and I was not at all in favor of it, but --

12     AGENT FAULKNER:  How did he have the code?

13     JOSH DUGGAR:  Well, my guys use it all day long

14 to get in and out, Randall, who's here, and so I think he

10:21AM15 just figured that out.  Or maybe he -- who knows.  I don't

16 really know.  He's -- he's the only one that I would think

17 of or know.

18     AGENT FAULKNER:  Where -- you say he's homeless.

19 So obviously he's -- you don't -- he's not going to have a

10:21AM20 residence.

21     JOSH DUGGAR:  He's usually here in Tontitown for

22 the most part, from what I gather.

23     AGENT FAULKNER:  Okay.

24     JOSH DUGGAR:  He's bought probably eight cars

10:21AM25 from me over time.

81

10:21AM 1           AGENT FAULKNER:  Back east?

2           JOSH DUGGAR:  Yes.

3           AGENT FAULKNER:  Okay.

4           JOSH DUGGAR:  Yes.

10:21AM 5           AGENT FAULKNER:  All right.

6           JOSH DUGGAR:  No.  I mean, back east you mean --

7           AGENT FAULKNER:  Towards where he might --

8           JOSH DUGGAR:  Towards --

9           AGENT FAULKNER:  Towards Tontitown is where he

10:21AM10  might be?

11           JOSH DUGGAR:  Yes, yes.

12           AGENT FAULKNER:  What is -- do you have a name on

13  him?

14           AGENT AYCOCK:  You said he's bought eight cars?

10:21AM15           JOSH DUGGAR:  Yeah.  He buys a car from me.  I

16  mean, he just bought one, a time ago.

17           AGENT AYCOCK:  And he's homeless?

18           JOSH DUGGAR:  His name -- last name is Mize,

19  M-i-z-e; first name is William.  And he had access to the

10:21AM20  wi-fi network, which I didn't realize, as well, and he had

21  been -- you know, he asked to borrow the computer a few

22  times and so we let him and then I guess it's just -- I

23  told -- I told Randall that I didn't know it was happening.

24           I had been -- I went out of town for a month.  I

10:21AM25  didn't realize he had been sitting in there in my office

10:21AM 1  while I was gone.  And I said, "Look, I'm just not

2  comfortable with him being around here."  And I'll just

3  leave it at that for -- for that.

4          AGENT AYCOCK:  How often do you go out of town?

10:21AM 5          JOSH DUGGAR:  A lot.

6          AGENT AYCOCK:  Like, do you recall, say, all the

7  way back to, like, April or May?

8          JOSH DUGGAR:  No.

9          AGENT AYCOCK:  I know it's kind of --

10:21AM10          JOSH DUGGAR:  I don't recall.

11          AGENT AYCOCK:  -- a silly question being that

12  it's --

13          JOSH DUGGAR:  I could look on my, you know,

14  calendar, but I wouldn't recall.

10:21AM15          AGENT AYCOCK:  Okay.

16          JOSH DUGGAR:  I travel a lot, but --

17          AGENT AYCOCK:  When you travel, is it typically

18  just like a day?  Are you gone a week?

19          JOSH DUGGAR:  It varies.

10:21AM20          AGENT AYCOCK:  Okay.

21          JOSH DUGGAR:  It varies.

22          AGENT AYCOCK:  All right.

23          AGENT FAULKNER:  What month was that when you

24  said he was -- the homeless guy was here?  Do you remember?

10:21AM25          JOSH DUGGAR:  He's been -- he has been here --

10:21AM 1          AGENT FAULKNER:  Well, the one when you were out

2   of town that was --

3          JOSH DUGGAR:  -- incessantly for two -- for two

4   years, ever since -- I mean, before then.  Three years

10:21AM 5   probably ago, he started -- he was doing some part-time

6   work driving cars for me and -- I mean on and off, and it's

7   been -- he moved north for a while and he came back, and he

8   just shows up.

9          And so, you know, the guy that used to work with

10:21AM10   me and this guy here, and I had a couple other guys that

11   have worked with me.  But anyway, I try to help him out.

12   He's --

13          AGENT FAULKNER:  Right.

14          JOSH DUGGAR:  I mean, you know, it is what it is.

10:21AM15          AGENT FAULKNER:  Does he have any electronic

16   devices that you're aware of?

17          JOSH DUGGAR:  He has -- he had several, yeah.

18          AGENT FAULKNER:  Do you remember what they were?

19          JOSH DUGGAR:  An iPhone, I know.  He had a

10:21AM20   Android last time he was trying to get me to help him with

21   some stuff on it.  And I didn't know first thing about it.

22   And he had -- and then he has, you know, several devices in

23   his car.  I don't know what all he does.

24          AGENT FAULKNER:  Okay.

10:21AM25          JOSH DUGGAR:  My wife -- anyway, I'll just leave

10:21AM 1    it at that.

2                    AGENT FAULKNER:  Okay.  That's fine.  So, and I

3    know Agent Aycock had kind of alluded to the fact that --

4    what we do, but we're part of a specialized task force and

10:21AM 5    that task force is called the internet Crimes Against

6    Children Task Force.

7                    JOSH DUGGAR:  Yeah.

8                    AGENT FAULKNER:  Based on an ongoing

9    investigation, we were able to directly connect --

10:21AM10    actually, one of our task force affiliates in the Eastern

11   District was able to directly connect to a certain IP

12   address that was participating in the uploading and sharing

13   of known videos and images of child pornography.

14                   JOSH DUGGAR:  Okay.

10:21AM15                   AGENT FAULKNER:  That information was then sent

16   to us because the IP geolocated back into the Western

17   District somewhere in Northwest Arkansas.

18                   JOSH DUGGAR:  So it was transmitting or

19   receiving?

10:21AM20                   AGENT FAULKNER:  At this point I probably -- it's

21   probably best that you just listen.  Okay?

22                   JOSH DUGGAR:  Okay.

23                   AGENT FAULKNER:  We were able to get from this IP

24   address one specific video of child pornography and one

10:21AM25   folder containing approximately 65 images of child

10:21AM 1    pornography from a specific IP address.

2                We then, once that information was turned over to

3    us because of the fact that it was geolocated in Northwest

4    Arkansas, we served a federal summons onto -- or for that

10:21AM 5    IP address.  That IP address came back to OzarksGo --

6                JOSH DUGGAR:  Okay.

7                AGENT FAULKNER:  -- with a subscriber of --

8                JOSH DUGGAR:  Yeah, my name.

9                AGENT FAULKNER -- Joshua Duggar, Duggar with cell

10:21AM10    phone.

11                JOSH DUGGAR:  Yeah.

12                AGENT FAULKNER:  I'm assuming that's personal

13    cell phone?

14                JOSH DUGGAR:  Mm-hmm.

10:21AM15                AGENT FAULKNER:  With that e-mail address that

16    you had just mentioned.

17                JOSH DUGGAR:  Yeah.

18                AGENT FAULKNER:  Now, it came back to a P.O. Box.

19                JOSH DUGGAR:  Yeah.

10:21AM20                AGENT FAULKNER:  We kind of briefly talked about

21    this when we got on scene.  So your -- their service

22    address --

23                JOSH DUGGAR:  Right.

24                AGENT FAULKNER:  -- from OzarksGo has you at --

10:21AM25                JOSH DUGGAR:  Right.

10:21AM 1          AGENT FAULKNER:  -- at this lady's house down the

2  street.

3          AGENT AYCOCK:  Down the road.

4          JOSH DUGGAR:  Well -- oh, that's -- that's where

10:21AM 5  it is?  Okay.

6          AGENT FAULKNER:  That's where it is because

7  Washington County property records have not updated or --

8          JOSH DUGGAR:  Right.

9          AGENT FAULKNER:  -- or separated your land from

10:21AM10  this lot.

11          JOSH DUGGAR:  Right.

12          AGENT FAULKNER:  So your actual physical address,

13  which we had to find out -- and OzarksGo does not have it;

14  they have corrected now because this poor lady keeps

10:21AM15  getting your mail -- as to what it is right now.

16          JOSH DUGGAR:  Okay.

17          AGENT FAULKNER:  Based on all that information,

18  we were able to determine that this was the business where

19  downloads of child pornography had occurred.

10:21AM20          JOSH DUGGAR:  Okay.

21          AGENT FAULKNER:  It came from -- or it occurred

22  on two separate dates, which I believe to be approximately

23  May 14th and May 15th of 2019, through a uTorrent software

24  and that's why I was asking you earlier to make sure we

10:21AM25  understood or were on the same page --

10:21AM 1          JOSHUA DUGGAR:  Right, right.

2          AGENT FAULKNER:  -- with what T-O-R is, TOR, and

3   what Torrent is.

4          JOSH DUGGAR:  Yeah.

10:21AM 5          AGENT FAULKNER:  And everything, again, was at

6   the late night hours, I want to say roughly between, from

7   what we can guesstimate, between 10:00 and 11:00.

8          JOSH DUGGAR:  Okay.

9          AGENT FAULKNER:  So based on all that

10:21AM10   information, a federal search warrant was obtained for the

11   property and everything on it to include the RVs, office

12   and vehicles to find out or look for electronic devices

13   that possibly were responsible for those downloads or

14   uploads of child pornography.

10:21AM15          JOSH DUGGAR:  Okay.

16          AGENT FAULKNER:  That's what's gotten us here

17   today and that's why you can see some of our questions were

18   tailored around electronics --

19          JOSH DUGGAR:  Right.

10:21AM20          AGENT FAULKNER:  -- who has access, who has

21   ownership, knowledge of certain softwares and forensic --

22   or peer-to-peer groups.  And, you know, at this stage, all

23   we're trying to do -- and I'll tell you this:  I didn't

24   know much about you leading up to this until I did, you

10:21AM25   know --

10:21AM 1          JOSH DUGGAR:  A little research?  Yeah.

2          AGENT FAULKNER:  -- some research in the last few

3      weeks.  Man to man, I don't know how you do it.  It is

4      amazing to me what the media is putting you through on a

10:21AM 5      daily basis all because of stuff which would be considered

6      speculation by most parts.

7          We don't want to speculate.  That's why we came

8      here.  We tried to be as courteous as possible and have a

9      one-on-one or a conversation to figure out who's doing this

10:21AM10      on this lot because these are not actors and actresses that

11      are in these videos and images that we know came from here.

12      Okay?

13          JOSH DUGGAR:  Okay.

14          AGENT FAULKNER:  These are somebody's little boy,

10:21AM15      little girl.

16          JOSH DUGGAR:  I agree.

17          AGENT FAULKNER:  At the end of the day, that's

18      our main objective is to find out who's doing it so that we

19      can -- or what electronic devices it's being done on so we

10:21AM20      can get those devices and take these images back off the

21      internet so that these kids aren't revictimized.

22          JOSH DUGGAR:  So they are being -- so, yeah.  I

23      guess I have -- I mean, I have quite a few questions about

24      it, but I don't know, you know, how much you can divulge,

10:21AM25      but I'm just, I'm curious.  You're saying there's images

10:21AM 1    being uploaded or images being downloaded?

2            AGENT FAULKNER:  That the IP address from this

3    lot had child pornography associated to it in a

4    peer-to-peer software program, and our task force affiliate

10:21AM 5    was able to download those, that video and images, from the

6    folder of the IP address going to this.

7            JOSH DUGGAR:  Okay.  Got you.

8            AGENT FAULKNER:  Now, on you, but I've got to ask

9    directly:  Have you -- and I'm going to ask whoever else is

10:21AM10   here that was around during that time:  Has there been any

11   time on any electronic devices, intentionally or

12   accidentally, where you've come across something of an

13   inappropriate nature on the internet and possibly got rid

14   of it?

10:21AM15           JOSH DUGGAR:  Well, I -- I can't answer that

16   question.

17           AGENT FAULKNER:  I've got to ask it.

18           JOSH DUGGAR:  Yeah.

19           AGENT FAULKNER:  I've got to ask it.

10:21AM20           JOSH DUGGAR:  At any time, you say.  That's

21   pretty broad.

22           AGENT FAULKNER:  Well, that's one of the things

23   too, and I know Agent Aycock had also spoke about this

24   briefly.  Those individuals you see walking around, we

10:21AM25   didn't just decide to wake up this morning and come here.

10:21AM 1    So we did our homework and we've been doing this for almost

2    a decade now.  We're pretty good at what we do.

3              JOSH DUGGAR:  Appreciate -- yeah, I appreciate

4    the work you guys do.

10:21AM 5              AGENT FAULKNER:  Thank you.

6              JOSH DUGGAR:  Yeah.

7              AGENT FAULKNER:  But these forensic guys are some

8    of the best in the country.

9              JOSH DUGGAR:  That's great.

10:21AM10              AGENT FAULKNER:  And what they do is they take

11    electronic devices and they, through third-party software

12    or through certain forensic software, without altering or

13    deleting anything that's on those electronic devices, can

14    go in and see a digital fingerprint of anything and

10:21AM15    everything that's ever happened.

16              So some -- if there's an electronic device -- and

17    that's why we're trying to get ahead of the game.  If

18    there's an electronic device that may possibly have these

19    videos or images or anything associated like that that's on

10:21AM20    it, we'd like to know now because once we leave here today,

21    it's kind of the end of our conversation and we wrap our --

22    wrap everything up then and we don't have anything else to

23    go on other than, "No, I don't know anything about it," and

24    then we see it and it's like, "Okay.  Well, we had an

10:21AM25    opportunity to talk about that."

10:21AM 1          JOSH DUGGAR:  Right.

2          AGENT FAULKNER:  "Why wasn't it addressed then."

3          JOSH DUGGAR:  Right.

4          AGENT FAULKNER:  You see what I'm getting at?

10:21AM 5          JOSH DUGGAR:  Right.

6          AGENT FAULKNER:  But as long as you're confident

7    that there's no -- or at least you --

8          JOSH DUGGAR:  I just don't want to get into any

9    -- I don't want to get into blanket statements about

10:21AM10    anything.

11          AGENT FAULKNER:  I get you.

12          JOSH DUGGAR:  I don't want to be -- I've watched

13    my friends, you know, answer things and they get them for

14    conspiracy or for something and I'm just, I'm not --

10:21AM15          AGENT FAULKNER:  I promise you --

16          JOSH DUGGAR:  I know federal statutes are broad

17    and there's a lot of things to it and I'm not going to say

18    anything that's going to --

19          AGENT FAULKNER:  We don't -- we don't -- that's

10:21AM20    not our intent.

21          JOSH DUGGAR:  -- incriminate me or anything at

22    all.  I don't want to -- I'm not a -- you know, I'm not

23    denying guilt, but I'm not saying that I'm -- you know, I

24    mean, as far as anything goes, I don't want to be -- I

10:21AM25    don't want to say the wrong thing.

10:21AM 1     AGENT FAULKNER:  Right.  At the end of the day,

2 you need to protect yourself.

3     JOSH DUGGAR:  Yeah, I don't want to -- I mean, I

4 don't want to -- I don't want to say that I'm guilty or

10:21AM 5 not.  I'm just not saying, you know, on search -- finding,

6 accessing inappropriate content at some point, at any point

7 in my life.  I'll say that.

8     AGENT FAULKNER:  Let me be a little bit more --

9 no, no.  Let me be a little more specific because the video

10:21AM10 and images that I'm specifically talking about is something

11 that not -- that cannot be misinterpreted as say, you know,

12 a 21-year-old who's dressed to act like a 15-year-old.

13     We're talking about children ranging in the ages,

14 I'd say between 5 and 10.  So has there been anything in

10:21AM15 the past that you, or maybe you've seen that somebody else

16 has been on their laptops, in passing by, that had

17 inappropriate, by definition, child pornography images of

18 kids ranging between 5 and 10 years of age?

19     JOSH DUGGAR:  I'd rather not answer that

10:21AM20 question.

21     AGENT FAULKNER:  Okay.  That's perfectly fine.

22     AGENT AYCOCK:  That's your right.

23     JOSH DUGGAR:  And I -- I mean, I can say -- I

24 guess I can say this:  I don't -- to my knowledge, there's

10:21AM25 not been anything accessed here.  Okay?  I just, I am a

10:21AM 1  little worried about, you know, as your -- I'm just saying

2  I am a little worried about some things that were left

3  undone and there were people on premises that I did not

4  realize had access to certain things.

10:21AM 5          AGENT FAULKNER:  Okay.

6          JOSH DUGGAR:  And I'll leave it at that.

7          AGENT FAULKNER:  Okay.  Okay.

8          JOSH DUGGAR:  And I don't know.  I mean, I really

9  don't know.  I really don't know.

10:21AM10          AGENT FAULKNER:  Let me ask this.

11          JOSH DUGGAR:  I'm not surprised.  I'm not

12  surprised at all.

13          AGENT FAULKNER:  Now, based on those forensics I

14  was talking to you about, they don't happen overnight,

10:21AM15  unfortunately.  There's a lot of stuff that --

16          JOSH DUGGAR:  Yes.

17          AGENT FAULKNER:  -- goes on with it.  It could

18  take anywhere from a week to a month to a year.  If at any

19  given point in time our forensic guys come to us and say,

10:21AM20  "Hey, look.  We know through our examinations that this

21  specific device downloaded all this on this date and time,"

22  which matches up to what we're seeing on the front end,

23  would you be willing to come back and talk to us and say,

24  "Hey, look.  Here's more of a better specific time frame

10:21AM25  who was around here at this point in time," or do you

10:21AM 1  recall any of this stuff?

2          JOSH DUGGAR:  I mean, it's so far back, I don't

3  know, I mean, I can get in touch with my attorney --

4          AGENT FAULKNER:  All right.  That's fine.

10:21AM 5          JOSH DUGGAR:  -- and see what he says, yeah.

6          AGENT FAULKNER:  That's fine.  That's -- that's

7  fair.  From here -- and, again, you're able to leave at any

8  point in time you want.  What we're going to do is we're

9  probably going to have a similar conversation with Randall.

10:21AM10          JOSH DUGGAR:  What about the devices?  Are you

11 guys going to take those with you?

12          AGENT FAULKNER:  Those are going to come with us.

13          AGENT AYCOCK:  Yes.

14          AGENT FAULKNER:  That's part of the search

10:21AM15 warrant.

16          JOSH DUGGAR:  So I can't have my phone.

17          AGENT FAULKNER:  Let me -- hold on.  So

18 Attachment B.

19          JOSH DUGGAR:  Okay.

10:21AM20          AGENT FAULKNER:  Now, nine times out of ten, what

21 we only have to do is give you this.

22          JOSH DUGGAR:  Okay.

23          AGENT FAULKNER:  This one piece of paper, but so

24 you have a better --

10:21AM25          JOSH DUGGAR:  Well, I appreciate -- no, I

95

10:21AM 1   appreciate that.  Thank you.

2              AGENT FAULKNER:  We're giving you a in-depth.

3              JOSH DUGGAR:  Yeah.  Okay.

4              AGENT FAULKNER:  So B gets into the specifics of

10:21AM 5   what we're searching for.  We can't do those forensic

6   examinations.  We can kind of do on-scene --

7              JOSH DUGGAR:  Okay.

8              AGENT FAULKNER:  -- previews, but we can't do --

9              AGENT AYCOCK:  Detailed.

10:21AM10              AGENT FAULKNER:  -- thorough, detailed.

11              JOSH DUGGAR:  Right.  Right.

12              AGENT FAULKNER:  So we're going to take those.

13   They're going to be seized.  You will get a property

14   receipt.

10:21AM15              Now, here's the thing.  If there's nothing on

16   those devices, I will get their --

17              AGENT AYCOCK:  I'll get them.

18              AGENT FAULKNER:  Agent Aycock will get them back

19   to you.

10:21AM20              JOSH DUGGAR:  Okay.

21              AGENT FAULKNER:  One of the things --

22              JOSH DUGGAR:  Do you know a time frame usually on

23   that?

24              AGENT AYCOCK:  That's what we just said.  Like --

10:21AM25              JOSH DUGGAR:  I mean, I just bought that phone,

10:21AM 1  so now I don't know what I'm going to do to get --

2          AGENT FAULKNER:  Here's the thing about that

3  phone, and it's tricky.  And, again, this is completely up

4  to you.

10:21AM 5          JOSH DUGGAR:  Well, I can't -- I can't give you

6  access to it without talking to my attorney.

7          AGENT FAULKNER:  Right.

8          JOSH DUGGAR:  So that's -- I know what you're

9  going -- I know where you're going with that.  No.

10:21AM10          AGENT FAULKNER:  What we do, though --

11          JOSH DUGGAR:  And I know you can get right past

12  it.  It's not a big deal.

13          AGENT FAULKNER:  Right, but sometimes that --

14          JOSH DUGGAR:  But I'm just saying it's an Apple

10:21AM15  device.

16          AGENT FAULKNER:  That's fine.

17          JOSH DUGGAR:  So it will lock after ten tries, so

18  --

19          AGENT FAULKNER:  We have devices that will --

10:21AM20  that will get through that.

21          JOSH DUGGAR:  I know.

22          AGENT FAULKNER:  But sometimes, based on that

23  intrusive -- because it's a little bit more of a thorough

24  exam than what we would, say, do on --

10:21AM25          JOSH DUGGAR:  I was telling him my friend works

```
10:21AM 1    for cyber crimes in FBI.  So I'm pretty --

        2             AGENT FAULKNER:  Oh, yeah.  What I'm saying --

        3             JOSH DUGGAR:  I mean, from just talking to him,

        4    I'm pretty familiar with it.

10:21AM 5             AGENT FAULKNER:  There are instances where those

        6    phones are -- cannot be, even if there's nothing on them,

        7    cannot be returned based on the fact that --

        8             JOSH DUGGAR:  I know, but you might destroy my

        9    phone is what you're basically saying, yeah.

10:21AM10             AGENT FAULKNER:  Right.  That is --

       11             JOSH DUGGAR:  And I understand that, but --

       12             AGENT FAULKNER:  Now, if you give the PIN -- if

       13    you don't to, that's fine.

       14             JOSH DUGGAR:  But I'll have to talk to my

10:21AM15    attorney first and then I can -- and then I can advise you.

       16             AGENT FAULKNER:  What I --

       17             JOSH DUGGAR:  If he says go ahead, then I'll say

       18    sure.  I just don't want -- I mean, there's a lot of --

       19    yeah.

10:21AM20             AGENT FAULKNER:  Your attorney's phone number is

       21    where?  You don't happen to know -- it's in your phone,

       22    right?

       23             JOSH DUGGAR:  Travis Story Law Firm.

       24             AGENT FAULKNER:  Travis Story?

10:21AM25             JOSH DUGGAR:  It's Story Law Firm in
```

10:21AM 1  Fayetteville, 443-something.

2              AGENT FAULKNER:  Okay.

3              JOSH DUGGAR:  I can't remember.

4              AGENT FAULKNER:  Tell you what we'll do here.

10:21AM 5      JOSH DUGGAR:  I have it on my phone, right?

6              AGENT FAULKNER:  Yeah.  And the only way for you

7  to get it would be for you to give me the PIN, so I'm not

8  going to trick you that way.  But what we'll do is --

9  unless you've got any additional questions?

10:21AM10          AGENT AYCOCK:  I do not.

11             AGENT FAULKNER:  No?  We'll break off here.

12             JOSH DUGGAR:  Okay.

13             AGENT FAULKNER:  I will call him.  What was it

14  you said?

10:21AM15          JOSH DUGGAR:  So what are -- Story Law Firm.

16             AGENT FAULKNER:  In Fayetteville?

17             JOSH DUGGAR:  Yes.

18             AGENT FAULKNER:  What's his first name?

19             JOSH DUGGAR:  Travis Story.

10:21AM20          AGENT FAULKNER:  Travis?  Now, is he -- would he

21  know you as Josh or --

22             JOSH DUGGAR:  Yeah, he would know me --

23             AGENT FAULKNER:  -- is it family?

24             JOSH DUGGAR:  He would know me as Josh, yeah.

10:21AM25          AGENT FAULKNER:  Hopefully he's still there.

10:21AM 1    I'll call them right now.

2                    JOSH DUGGAR:  Yeah.

3                    AGENT FAULKNER:  And what I'll do --

4                    JOSH DUGGAR:  Well, actually I have his cell

10:21AM 5    phone number.  8 -- 479-841 --

6                    AGENT FAULKNER:  Whoa.  Calm down.

7                    JOSH DUGGAR:  Yeah, I just remembered it.

8                    AGENT FAULKNER:  84?

9                    JOSH DUGGAR:  841-1881.

10:21AM10            AGENT FAULKNER:  1881?

11                   JOSH DUGGAR:  Yeah.

12                   AGENT FAULKNER:  And that's 479?

13                   JOSH DUGGAR:  Yeah.

14                   AGENT FAULKNER:  Perfect.  I will call him as

10:21AM15    soon as we get done here.  I'll give him the details of

16           what's going on, and, I mean, you're going to leave out of

17           here.

18                   JOSH DUGGAR:  Yeah.

19                   AGENT FAULKNER:  So I guess as soon as you get

10:21AM20    home tonight, you can give him a ring --

21                   JOSH DUGGAR:  Okay.

22                   AGENT FAULKNER:  -- and give him more of the

23           details from today.

24                   JOSH DUGGAR:  I'll probably leave here sooner

10:21AM25    than later, but I just want to make sure you guys have

10:21AM 1   access to everything you need --

2              AGENT FAULKNER:  Yeah.

3              JOSH DUGGAR:  -- you know, before, that way you

4   guys --

10:21AM 5              AGENT FAULKNER:  Also if you do decide to leave,

6   if you do decide to leave, just give us some guidance on

7   how you want this locked up.

8              AGENT AYCOCK:  Yeah.

9              JOSH DUGGAR:  Okay.  Well, I have -- well, my

10:21AM10   guy's here too but I need to -- yeah.  I mean, however we

11   want to -- make sure you guys have access to everything you

12   need there --

13              AGENT FAULKNER:  Perfect.

14              JOSH DUGGAR: -- first before I head out.  But I'm

10:21AM15   sure my wife, if she's tried to call me or something, I

16   mean, I want to let her know.

17              AGENT AYCOCK:  No, no.  Especially if you said --

18              JOSH DUGGAR:  Right.

19              AGENT AYCOCK:  -- she's due any day, that's the

10:21AM20   last thing we want to do.

21              JOSH DUGGAR:  Right.  Three weeks.

22              AGENT AYCOCK:  So we'll call this interview

23   completed at 1624.

24              JOSH DUGGAR:  Thank you, guys.  I appreciate it.

10:21AM25   No, it helps me to have a lot more -- I was -- I mean, I

10:21AM 1    figured it had to be something like that if you're saying

2    --

3                AGENT AYCOCK:  Yeah.

4                JOSH DUGGAR:  I'm like, has to be something along

10:21AM 5    those lines if it's -- either that or somebody's doing, you

6    know, all kinds of other stuff.  Who knows, right?

7                AGENT FAULKNER:  Yeah.  That's -- it's the

8    unfortunate truth of why we're here right now, but we do

9    appreciate you speaking with us because you didn't have to.

10:21AM10                JOSH DUGGAR:  Yeah.

11                AGENT FAULKNER:  And --

12                AGENT AYCOCK:  Is there anything else you want to

13    ask or say, any --

14                JOSH DUGGAR:  Is -- I mean, so in that, I mean,

10:21AM15    are you able to look at, like, IPs to see if -- I mean, I

16    don't know if they're ac- -- you know, if somebody's

17    accessed stuff off -- I mean, we know somebody's accessed

18    something from this point.  I don't -- it's not really

19    surprising to me.  Until last week, I actually changed the

10:21AM20    wi-fi network and put a password on the wi-fi network.

21                AGENT FAULKNER:  Okay.

22                JOSH DUGGAR:  Because when the guy came and set

23    it up with OzarksGo, it had just a basic setup with a guest

24    network and all that too.  So I actually went back and set

10:21AM25    it up.  I thought that I had locked it down, but I didn't,

10:21AM 1    and the guy that I was mentioning came here and was using

2    the wi-fi.

3              AGENT FAULKNER:  All the stuff?

4              JOSH DUGGAR:  Yeah, he was using the wi-fi over

10:21AM 5    here.  And so -- and he had been on my computer as well,

6    and he had been in there playing games on the computer and

7    doing stuff and I just said, look, I'm not comfortable with

8    him being in the office.

9              AGENT FAULKNER:  And that's been since OzarksGo

10:21AM10    came out, right, the last time?

11             JOSH DUGGAR:  Oh, he's off and on over time.  My

12    wife --

13             AGENT FAULKNER:  I'm saying when you reset the --

14             JOSH DUGGAR:  Oh, yeah.

10:21AM15             AGENT FAULKNER:  Okay.

16             JOSH DUGGAR:  Yeah, yeah, yeah.  That's -- I

17    mean, like literally this week, I think it was, or last

18    week.  But anyway, all that to say, you know -- I mean,

19    and, you know, the guy -- like I said, the guy used to work

10:21AM20    for me.  I just don't want to get a bunch of people roped

21    into it.  He's -- he's one that, you know, he's been around

22    lately and I'm just -- anyway, sold him a lot of cars.  So

23    -- thank you, guys.

24             AGENT FAULKNER:  I appreciate it, man.

10:21AM25             JOSH DUGGAR:  Appreciate y'all.  Yeah.

10:21AM  1    Appreciate -- thanks for -- thanks for explaining it all to

     2    me too.

     3              AGENT FAULKNER:  You got it.

     4              JOSH DUGGAR:  And I guess what is the process

10:21AM  5    from here as far as, is this a sealed -- I guess is this a

     6    sealed case, or what is the deal?

     7              AGENT FAULKNER:  Yes.  As it stands right now,

     8    this is --

     9              JOSH DUGGAR:  So how does this --

10:21AM 10             AGENT FAULKNER:  I believe the sealed case,

     11    correct?

     12             JOSH DUGGAR:  Okay.  So how does that work as far

     13    as disclosure of this?  Because just for me, if this is

     14    disclosed, I mean, it's going to be substantial.

10:21AM 15             AGENT FAULKNER:  We're trying to avoid that,

     16    obviously, because what I just told you.

     17             JOSH DUGGAR:  Because I would really -- I mean,

     18    can my attorney move for a motion to keep it sealed?  I

     19    mean, I don't -- even at some point -- like, the thing is,

10:21AM 20    even just the allegation for me --

     21             AGENT FAULKNER:  Oh, absolutely.

     22             JOSH DUGGAR:  -- is just horrendous.

     23             AGENT FAULKNER:  Absolutely.

     24             JOSH DUGGAR:  I mean, I can't imagine, you know.

10:21AM 25             AGENT FAULKNER:  This is what we'll do.  I'm

10:21AM 1  going to give you my name, number, and e-mail.

2          JOSH DUGGAR:  Okay.

3          AGENT FAULKNER:  And I'm going to give you the

4  U.S. attorney who's been assigned this case --

10:21AM 5          JOSH DUGGAR:  Okay.

6          AGENT FAULKNER:  -- to give to your attorney.

7          JOSH DUGGAR:  Is that Dak, or who is that?

8          AGENT FAULKNER:  No.  Dak is the overall U.S.

9  attorney.  One of the assistant U.S. attorneys.

10:21AM10          JOSH DUGGAR:  Assistants?  Okay.  Yeah.

11          AGENT FAULKNER:  Actually, do you have a card?

12          AGENT AYCOCK:  Yeah.

13          AGENT FAULKNER:  Oh, look at you.

14          JOSH DUGGAR:  Look at this guy.  He's got cards.

10:21AM15  Awesome.  There we go.

16          AGENT FAULKNER:  There you go.  You don't get my

17  stuff.

18          JOSH DUGGAR:  He's even got the shiny.

19          AGENT AYCOCK:  Yeah, man.  Came out of pock- --

10:21AM20          JOSH DUGGAR:  You got the big budget right there.

21          AGENT AYCOCK:  Came out of pocket for that.

22          JOSH DUGGAR:  Well, I -- I worked with Ken

23  Cuccinelli for a little while, too, who is the acting -- he

24  was the acting director of the USCIS, I guess.

10:21AM25          AGENT AYCOCK:  Mm-hmm.

10:21AM 1            JOSH DUGGAR:  But anyway, yeah, he's -- he was

2    the Attorney General up there in Virginia.  But, yeah,

3    anyway, I was think- -- he was telling me about how they

4    get all these -- you know, all their -- all their budgets

10:21AM 5    and all the things they waste money on; and then the things

6    that you really want, they don't get.

7            AGENT FAULKNER:  Nope.

8            AGENT AYCOCK:  That came out of my pocket.

9    That's not --

10:21AM10            JOSH DUGGAR:  Really?

11            AGENT AYCOCK:  That's not from Uncle Sam.

12            JOSH DUGGAR:  I like that.

13            AGENT FAULKNER:  Yeah.  That's why I'm on

14    loose-leaf still.

10:21AM15            AGENT AYCOCK:  All right.  We'll call it --

16            JOSH DUGGAR:  That's really nice.

17            AGENT AYCOCK:  We'll call it 1628 hours.

18            JOSH DUGGAR:  Okay.

19            AGENT AYCOCK:  All right.  Thank you.

10:21AM20            (End of Audio)

21            MR. ROBERTS:  May I inquire, Your Honor?

22            THE COURT:  You may.

23    Q.   (By Mr. Roberts.)  Agent, during the interview, and if

24    you will turn to page 4 of the transcript, there's a

11:12AM25    statement essentially, "That's common language in

11:12AM 1   Arkansas."  When I was listening to it, was that a correct

2   transcription?

3   A.    No, sir.

4   Q.    What did you actually say there?

11:12AM 5   A.    It should be our, O-U-R.  I got cut off

6   mid-conversation.  I did not say "Arkansas."

7   Q.    When you were interviewing Mr. Duggar, you asked him

8   questions of whether anybody stays late on the lot --

9   A.    Yes, sir.

11:13AM10   Q.    -- on the car lot.  Could you explain to the Court why

11   you were asking those questions?

12   A.    Initially, at that stage of the investigation, I had

13   changed or I had manipulated the download times to convert

14   from CST to, I think it was UTC, when I didn't need to.

11:13AM15   The original times were actually in Central Standard Time.

16   Q.    By changed, is that -- did you mistake --

17   A.    Yes, sir.

18   Q.    Were you mistaken in that the times reflected and

19   presented to you were the accurate times and you converted

11:13AM20   them to a different --

21   A.    I converted the times when I did not need to.

22   Q.    If you would turn in the government's exhibit book to

23   Government's Exhibit 5.

24   A.    Yes, sir.

11:13AM25   Q.    Can you identify 5 for the Court?

11:13AM 1    A.    Exhibit 5 is the U.S. Immigration and Customs

2    Enforcement Statement of Rights form.

3    Q.    Is this the Statement of Rights form that was read and

4    signed by Mr. Duggar on November 8th?

11:14AM 5    A.    Yes, sir.

6    Q.    Is this a true and accurate copy of that form?

7    A.    Yes, sir.

8            MR. ROBERTS:   Your Honor, I would move to

9    introduce Government's Exhibit 5.

11:14AM10            MR. GELFAND:   No objection.

11            THE COURT:   Government's 5 is received.

12            (Government's Exhibit No. 5 Received)

13    Q.    (By Mr. Roberts.)   Looking on the form at the bottom,

14    under the waiver, there's some lined-out language.   But

11:14AM15    initially you were filling it in or it was being filled in.

16    Can you tell us about that?

17    A.    Yes, sir.   So this is our standard form.   And we don't

18    have two separate types of forms with HSI in terms of when

19    we speak to individuals who are in custody versus people

11:14AM20    who are out of custody or not in custody.

21            When Agent Aycock was filling out the form, it's

22    customary to go through everything.   And he started to fill

23    out, I believe I can see the time and the date.   Mr. Duggar

24    brought that to our attention.   I told him, no, that's

11:14AM25    okay, you're not in custody.   And at that time, I scratched

11:14AM 1  it out, to which he felt better about.

2  Q.   Did you sign the form after you scratched it out?

3  A.   Yes, sir.

4  Q.   Did Mr. Duggar sign the form after you scratched it

11:15AM 5  out?

6  A.   Yes, sir.

7  Q.   Now, you're aware, being a law enforcement officer,

8  that Miranda rights are specific to someone in custody, is

9  that correct?

11:15AM 10  A.   That's correct.

11          MR. GELFAND:   Objection, Your Honor.   Calls for

12  improper legal opinion testimony.

13          THE COURT:   Well, I agree.   But you could

14  rephrase the question to ask him --

11:15AM 15  Q.   (By Mr. Roberts.)   Is it your typical practice to

16  provide Miranda rights to someone that is in custody?

17  A.   Yes, sir.   We do it on both sides.   Anybody that we

18  talk to in terms of investigation, getting an interview, we

19  Mirandize everybody.

20  Q.   To put a fine point on that, so it was your practice

21  to Mirandize all potential witnesses, whether they are in

22  custody or out of custody?

23  A.   If it's pertinent to the investigation, yes, sir.

24  Q.   During the interview, is it correct that Mr. Duggar,

11:15AM 25  he declined, from what I understand, to provide certain

11:16AM 1    witnesses such as "tree guy," is that correct?

2    A.    Yes, sir.

3    Q.    Now, connecting that loop, that "tree guy" is Joshua

4    Williams, is that correct?

11:16AM 5    A.    That is correct.

6    Q.    Declined to provide certain passwords to electronics,

7    is that correct?

8    A.    That is correct.

9    Q.    Declined to discuss his knowledge of electronic

11:16AM 10    devices, is that correct?

11    A.    Declined to speak about specific programs on

12    electronic devices.  Or knowledge of those programs, I'm

13    sorry.

14    Q.    And overall declined when asked to provide an answer,

11:16AM 15    or to answer when asked if he's viewed, or other people has

16    viewed on the lot, that he was aware of, images of child

17    pornography, is that correct?

18    A.    Yes, sir.

19    Q.    What happened directly after the interview was

11:16AM 20    concluded?

21    A.    Mr. Duggar was given Attachment A and Attachment B as

22    far as the search warrant.  He notified us that he would

23    probably be leaving, and if we had any, or needed any

24    assistance in locking up the office or securing anything on

11:17AM 25    the lot, that Randall Berry would not only accept our

11:17AM 1  inventory list, but help us with locking everything up.

2  Q.    Did he actually leave?

3  A.    Yes, sir, he did.

4  Q.    Were you done at that time or were you still working?

11:17AM 5  A.    No, sir.  We hadn't even talked to Randall Berry yet

6  and we weren't done processing the scene.

7  Q.    When he elected to leave, did you have to give him

8  anything, such as his keys or anything like that?

9  A.    No, sir.

11:17AM 10 Q.    Did you have to move law enforcement vehicles to allow

11  him to exit?

12  A.    I don't believe so, no, sir.

13  Q.    Based on his interview, did you consider him a

14  potential suspect for the crime outlined in the warrant?

11:17AM 15 A.    At that time, at that specific time, he was a likely

16  candidate to have downloaded the child pornography from

17  that business.  Again, that was just at that time.

18  Q.    Am I correct that law enforcement confiscated the HP

19  computer and ultimately his laptop and his phone, which

11:18AM 20 was -- subsequently all three were forensically examined,

21  right?

22  A.    Correct.  Yes, sir.

23  Q.    And the images produced from those forensic

24  examinations form or underpin the charges pending in this

11:18AM 25 case, is that correct?

11:18AM 1   A.   That is correct.   Yes, sir.

2   Q.   Were you aware of those images at that time?

3   A.   No, sir.

4   Q.   They had not been located on that computer?

11:18AM 5   A.   We did not locate any child pornography images on

6   scene that day.

7   Q.   Did you have any probable cause to arrest or detain

8   Mr. Duggar that day?

9   A.   No, sir.

11:18AM10   Q.   Moving forward, I want to discuss the interview with

11   Randall Berry and then ultimately William Mize.   To clarify

12   for the record, when you arrived on the scene, you said

13   there were three individuals present.   In the motion before

14   the Court, Mr. Berry is identified as Witness Number 3, is

11:19AM15   that correct?

16   A.   Yes, sir.

17   Q.   Did you conduct Mr. Berry's interview pretty much

18   directly after Mr. Duggar's?

19   A.   It would have been a few minutes, but, yes, we had to

11:19AM20   reset, get our paperwork together, and then we went and

21   asked Mr. Berry if he would talk to us.

22   Q.   Going into Mr. Berry's interview, did anything stand

23   out to you specifically about Mr. Duggar's statement?

24   A.   One of the things that stood out and kind of raised a

11:19AM25   red flag to us is the fact that his surveillance cameras

11:19AM 1  were not actually operational in terms of that they weren't

2  recording.

3  Q.   Am I correct that he stated that he didn't tell

4  anybody?

11:19AM 5  A.   That is correct.

6  Q.   Could you tell us about the interview with Mr. Randall

7  Berry?

8  A.   So Mr. Berry is -- I believe he was approximately

9  61 years of age.  And no offense to Mr. Berry, because he

11:20AM10  seemed like a genuinely good person, but he told us he had

11  trouble reading and writing and was basically illiterate.

12  And also when it came to computers, he was basically

13  illiterate.  I believe he said that he had to have his wife

14  set up his own e-mail account.

11:20AM15  Q.   Let me back you up a little bit.  On the outset, did

16  you provide him his Miranda warnings?

17  A.   Yes, sir, we did.

18  Q.   He agreed to make a statement?

19  A.   That's correct.  Yes, sir.

11:20AM20  Q.   Again, you were providing Miranda warnings to everyone

21  that day, correct?

22  A.   That's correct.  Yes, sir.

23  Q.   Did he make a statement with regard to when he came to

24  be employed at Wholesale Motors?

11:20AM25  A.   He explained to us he believed it was in June of 2019.

11:20AM 1   Q.   Now, you stated -- and you kind of beat me to the

2   punch -- but with regard to computers, he specifically told

3   you he's computer illiterate?

4   A.   He said he had trouble reading and writing and that he

11:21AM 5   was, on that end, somewhat illiterate.  And when it came to

6   computers, he didn't know how to operate them.

7   Q.   What about social media accounts, did he reference

8   that?

9   A.   He did.  He said that at one point in time, he had a

11:21AM10   Facebook account.  And then after logging on, within 20

11   minutes of using Facebook, he had gotten into an argument

12   with some unknown lady, then had to take his phone across

13   the street to a neighbor and have them delete the app off

14   his phone.

11:21AM15   Q.   With regard to peer-to-peer networks and Torrent

16   files, did you ask him about his knowledge of those two

17   things?

18   A.   He had no knowledge of those.

19   Q.   Did he make any statement about the computers located

11:21AM20   on the car lot?

21   A.   He did.  He said the HP laptop, or, I'm sorry, the HP

22   All-in-One desktop was primarily used by Mr. Duggar for

23   paperwork in reference to the vehicles.  He said he did not

24   believe he used it.  If he ever had, it would have been for

11:21AM25   playing games.

11:21AM 1   Q.   Did he reference the password to that HP desktop

2   computer?

3   A.   I believe he stated that Mr. Duggar had told him there

4   was a password and that it was somewhere in the office.  I

11:22AM 5   believe he said he couldn't find that password.

6   Q.   Did he make any statement in reference to the security

7   cameras in the office itself?

8   A.   Yes, sir.  He did think or believe that those cameras

9   were operational, meaning that anything that he did in and

11:22AM10   out of that office on the lot was being recorded by

11   Mr. Duggar.

12   Q.   This made sense based on what Mr. Duggar told you that

13   those cameras were not operational, but he didn't tell

14   anybody, is that correct?

11:22AM15   A.   Correct.  In terms of operational, I believe they were

16   showing a screen.  They just weren't recording or things of

17   that nature.

18   Q.   Based on your training and experience, was Mr. Berry's

19   statement believable?

11:22AM20   A.   Yes.

21           MR. GELFAND:  Objection, Your Honor.  Improperly

22   calls for him to --

23           THE COURT:  Sustained.

24           MR. GELFAND:  Thank you.

11:22AM25   Q.   (By Mr. Roberts.)  Any indication that Mr. Berry was

```
11:22AM  1   lying to you based on his demeanor?
         2             MR. GELFAND:  Same objection, Your Honor.
         3             THE COURT:  Overruled.
         4   A.    Based on the interview in its totality, no, sir, I did
11:23AM  5   not believe he was lying about his knowledge of computers.
         6   Q.    (By Mr. Roberts.)  Based on his interview, did you
         7   consider Mr. Berry a potential suspect?
         8   A.    No, sir, at that time, I did not.
         9   Q.    This is based on your training, experience, and
11:23AM 10   encounters with hundreds of possible witnesses in these
        11   cases, is that correct?
        12   A.    Yes.  Yes.
        13   Q.    Did law enforcement determine if Mr. Berry had a cell
        14   phone on the lot that day?
11:23AM 15   A.    He did.
        16   Q.    Was it examined for evidence pursuant to the warrant?
        17   A.    Yes, sir, it was.  Our task force officer, CFA, who
        18   was a veteran CFA, who is also qualified as an expert in
        19   his field, he did a manual triage of Mr. Berry's phone on
11:23AM 20   scene.  Based on our conversation with Mr. Berry and the
        21   fact that he -- our CFA did the manual examination, it was
        22   forensically and factually cleared and returned back to
        23   Mr. Berry.
        24   Q.    Let me slow you down a little bit.  So at the time, at
11:24AM 25   the conclusion of the interview or at the time on that day
```

11:24AM 1  on the lot, were the results reported to you regarding that

2  examination?

3  A.    Yes, sir.  The CFA explained that there was no

4  evidence related to the ongoing investigation or crime, and

11:24AM 5  that he went through the browsing history of the phone, any

6  online applications that might have been on it, pictures,

7  videos.  He did not find any child pornography, anything in

8  terms of peer-to-peer file-sharing networks or any evidence

9  putting Mr. Berry on the lot on May 14th or 15th of 2019.

11:24AM10  Q.    By "any evidence," you would say that there was photos

11  of, like, cars or the car lot itself, is that right?

12  A.    Yes, sir.  No child exploitation material.

13  Q.    Based on his -- in comparison of his interview and

14  what was reported to you by the CFA, is that essentially

11:25AM15  what you expected to find on his phone?

16  A.    That is correct.

17  Q.    At any point, did you factually, or did law

18  enforcement follow up to determine if Mr. Berry actually

19  worked on the car lot during the time frame May 14th,

11:25AM20  May 15th?

21  A.    Yes, sir, we did.  Agent Aycock, I believe it was,

22  subpoenaed records from Mr. Duggar's business for that time

23  frame.

24  Q.    So to be precise, Agent Aycock applied to the U.S.

11:25AM25  Attorney's Office for a Grand Jury subpoena that was sent

11:25AM 1  to Wholesale Motors, is that correct?

2  A.   Yes, sir.

3  Q.   Requiring them to turn over any and all employment pay

4  records for 2019, is that correct?

11:25AM 5  A.   Correct.

6  Q.   Those records were produced by Mr. Story, is that

7  correct?

8  A.   Yes, sir.

9  Q.   Certified by Mr. Duggar, is that correct?

11:25AM10  A.   Yes, sir.

11  Q.   Those records included every employee paycheck for the

12  entire year of 2019, at least that's what's represented, is

13  that correct?

14  A.   I believe so, yes, sir.

11:26AM15  Q.   Now, could you turn to Government's Exhibit 6?

16  A.   Yes, sir.

17  Q.   Can you identify Government's Exhibit 6?

18  A.   This is a Wholesale Motorcars' check made payable to

19  Matthew Waller in the amount of $1,500 dated on May 6th,

11:26AM20  2019.

21  Q.   Now, based on the production that we received -- well,

22  let me start with, was this presented to and turned over by

23  the defense in response to that Grand Jury subpoena?

24  A.   Yes, sir.

11:26AM25            MR. ROBERTS:  I would move to introduce

11:26AM 1  Government's Exhibit 6, Your Honor.

2          MR. GELFAND:  No objection.

3          THE COURT:  Government 6 is received.

4          (Government's Exhibit No. 6 Received)

11:26AM 5  Q.  (By Mr. Roberts.)  Could you read the memo section of

6  Government's Exhibit 6?

7  A.  Yes, sir.  It says, "Commissions for 3-30 dash

8  4-29-19.  11 sales."

9  Q.  Please turn to Government's Exhibit 7.

11:27AM10  A.  Yes, sir.

11  Q.  Can you identify Government's Exhibit 7?

12  A.  This is another Wholesale Motorcars' check made

13  payable to a Randall Steve Berry dated May 31st, 2019.

14          MR. ROBERTS:  Move to introduce Government's

11:27AM15  Exhibit 7 for the same reasons as 6, Your Honor.

16          MR. GELFAND:  No objection.

17          THE COURT:  Government's Exhibit 7 is received.

18          (Government's Exhibit No. 7 Received)

19  Q.  (By Mr. Roberts.)  Please read the memo section of

11:27AM20  that.

21  A.  "Commissions for week of 5-24 to 5-31."

22  Q.  Am I correct that in between Government's Exhibit 6

23  and 7, there were no responsive checks produced by the

24  defense to cover that time period, is that correct?

11:27AM25  A.  That is correct, for employees, yes, sir.

11:27AM 1    Q.    Based on this information, we do not believe that

2    there was any other employee at Wholesale Motors during

3    May 14th and May 15th other than Mr. Duggar, is that

4    correct?

11:28AM 5    A.    That is correct.  Yes, sir.

6    Q.    So when you interviewed Mr. Duggar, he identified a

7    homeless man named William Mize that was referenced as

8    Witness Number 1 in the defense file, is that correct?

9    A.    Yes, sir.

11:28AM 10   Q.    So were you able to, or was law enforcement able to

11   locate and interview Mr. Mize?

12   A.    We were.  We did have some trouble in doing so,

13   obviously, because he was homeless and residing in his

14   vehicle.  It wasn't somewhere we could go to a residence to

11:28AM 15   knock on a door to find him.  I know Agent Aycock had made

16   contact with local law enforcement in the Northwest

17   Arkansas area to be on the lookout for the last known

18   vehicle he knew to be living in or driving around.  It just

19   so happened, I believe it was on December 16th, 2019, Agent

11:29AM 20   Aycock had located Mr. Mize's vehicle somewhere in the

21   Rogers, Arkansas, area.  He then initiated mobile

22   surveillance of the vehicle.  He contacted me that morning

23   and asked if I could hurry up and get up to Rogers so that

24   we could make contact with Mr. Mize and see if we could

11:29AM 25   interview him.

11:29AM 1   Q.   So to put this into perspective, on December 16th, you

2   got information that he was at a particular location in

3   Rogers, is that correct?

4   A.   That is correct.

11:29AM 5   Q.   This is Agent Aycock?

6   A.   Correct.

7   Q.   He calls you and says, "Hey, I see him, I headed up

8   here, I have eyes on him," is that correct?

9   A.   That is correct.

11:29AM10   Q.   So you got in your vehicle and you drove up there to

11   him, right?

12   A.   That is correct.

13   Q.   Did a CFA or anybody else go with you?

14   A.   No, sir.  We didn't have time to dispatch a CFA with

11:29AM15   us.

16   Q.   Prior to arriving, or at that point in the

17   investigation, what did you know about the computer

18   forensic results on the HP computer and Duggar's cell phone

19   and laptop?

11:30AM20   A.   So in late November 2019, CFA Marshall Kennedy had

21   located child sexual abuse material on the HP All-in-One

22   desktop computer that was located in Mr. Duggar's main

23   office of the Wholesale car lot.

24   Q.   Now, when you interviewed -- when this interview

11:30AM25   ultimately took place with Mr. Mize, did you know anything

11:30AM  1    other than that child pornography was located on that HP
         2    computer?
         3    A.    No, sir.  We knew at that point in the investigation
         4    that we had the target device.  Now the investigation was
11:30AM  5    turned to putting somebody behind it on those dates.
         6    Q.    Did you have any idea that that target device, that HP
         7    computer, contained a Linux partition or that it had any
         8    program related to the Dark Web, TOR browser, or anything
         9    like that?
11:30AM 10    A.    No, sir, we did not.
        11    Q.    Where ultimately did you locate Mr. Mize specifically?
        12    A.    It was in Rogers, Arkansas, in his vehicle.
        13    Q.    Did you approach him?  Did you and Agent Aycock?
        14    A.    We did.
11:31AM 15    Q.    And subsequently interviewed him, is that correct?
        16    A.    That is correct.
        17    Q.    Could you please describe the interview for the Court?
        18    A.    Mr. Mize was also read his Miranda.  After consenting
        19    and waiving his rights, he spoke with us.  I think Mr. Mize
11:31AM 20    was approximately 65 years of age around that time when we
        21    spoke to him.  We asked him about peer-to-peer file-sharing
        22    networks.  He did not know what it was.  He actually tried
        23    to correlate -- when I was describing what it was, he tried
        24    to correlate peer-to-peer to either Facebook or Pandora
11:31AM 25    radio, which are nothing comparable.  He said that he had

11:31AM 1  been on the car lot and bought cars from Mr. Duggar in the

2  past.  He said the majority of his time on the lot was when

3  Mr. Josh Williams was working there.  He said that there

4  was an occasion, at least one occasion where he spent the

11:31AM 5  night on the lot, but in his vehicle, based on the fact

6  that the car that was sold to him had some mechanical

7  issue.  Randall Berry was the first person who saw him that

8  night, or the next morning that he spent the night, meaning

9  it would have been past Mr. Berry, or since Mr. Berry's

11:32AM 10  employment with Wholesale Motorcars.  He also believed that

11  the security cameras at the lot were operational too.

12  Q.   That was quite a bit of information.  Let me make sure

13  I'm checking off everything.  Did he state if he had ever

14  worked for Wholesale Motors?

11:32AM 15  A.   No, sir.  He said he had never worked for Wholesale

16  Motorcars.

17  Q.   Have we received any employment records reflecting

18  that he worked at Wholesale Motors?

19  A.   No, sir, not to date.

11:32AM 20  Q.   Outside of Mr. Duggar's statement, do we have any

21  evidence that he worked at Wholesale Motors?

22  A.   No, sir.

23  Q.   Is it accurate that he said he spent more time at the

24  lot when a former employee, Josh Williams, was employed

11:32AM 25  there, is that correct?

11:32AM 1    A.    That is correct.

2    Q.    Based on the investigation, Josh Williams' employment

3    terminated primarily in 2018, is that correct?

4    A.    I believe -- yes, sir, I believe September of 2018 is

11:33AM 5    when he said he last worked for Joshua Duggar.

6    Q.    Did he specifically deny ever being in the office

7    without employees present or using the main computer?

8    A.    That is correct.  He said he had been in the office,

9    but always with an employee present and that he had not

11:33AM10   accessed that HP desktop.

11   Q.    Did he make any statement with regard to Randall

12   Berry?

13   A.    He also believed Randall Berry was computer

14   illiterate, or at least not computer savvy.

11:33AM15   Q.    Now, you said that he equated peer-to-peer with

16   Facebook, and was that Pandora radio?

17   A.    Pandora radio, yes, sir.

18   Q.    Based on his demeanor, did you get the impression he

19   was lying to you?

11:33AM20   A.    No, sir.

21            MR. GELFAND:  Objection, Your Honor.

22            THE COURT:  Well, the question was phrased in

23   terms of his demeanor.  I understand he can't see inside

24   the person's head.  I get that part, but the objection is

11:33AM25   overruled.

11:33AM 1  Q.   (By Mr. Roberts.)  Based on that interview, did you

2  consider Mr. Mize a potential suspect?

3  A.   At that time, no, sir.

4  Q.   Finally, did law enforcement determine if he had a

11:34AM 5  cell phone on him?

6  A.   He did, yes, sir.

7  Q.   Did he indicate how long he had had that cell phone?

8  A.   He said he had purchased it in October of 2019.

9  Q.   October of 2019.  So that would be after the May time

11:34AM10  period that we're looking for, is that correct?

11  A.   That is correct.  Yes, sir.

12  Q.   So did you have any probable cause to seize that phone

13  or physically take that phone?

14  A.   Based on our interview and his lack of knowledge of

11:34AM15  peer-to-peer programs, no, sir.

16  Q.   Did you ask for his consent to review the phone?

17  A.   We did.

18  Q.   Why?

19  A.   We wanted to make sure that we were exhausting all

11:34AM20  avenues of the investigation.

21  Q.   So after -- I assume you asked for consent.  Did he

22  agree?

23  A.   Yes, sir.

24  Q.   Now, you previously testified that there was no CFA

11:35AM25  available.  It was kind of a spur-of-the-moment type thing,

11:35AM 1   is that correct?

2   A.    That is correct.

3   Q.    How did you go about examining that phone?

4   A.    Myself and Agent Aycock performed a manual

11:35AM 5   examination.

6   Q.    Describe a manual examination, please.

7   A.    We went through and examined the browsing history of

8   the phone, the photos and videos located within the phone,

9   or would have been located in the phone, and any online

11:35AM10   applications that had been downloaded to the phone.

11   Q.    Specific to browser history, what can you tell us

12   about?

13   A.    The only thing that I saw in terms of videos were

14   reruns of Sanford & Sons.

11:35AM15   Q.    Nothing connecting it to this case?

16   A.    No peer-to-peer file-sharing networks, no TOR

17   browsers, no child pornography.  And nothing, obviously,

18   since he had just gotten that phone October 2019, nothing

19   placing him on the lot on May 14th and 15th of 2019.

11:35AM20   Q.    Well, building on that statement, was it a new phone?

21   A.    Yes, sir.

22   Q.    Just how do you gauge that?

23   A.    Based on the fact that it had very little information

24   inside of it.

11:36AM25   Q.    Now, it's possible to sync new phones with old phones,

11:36AM 1    is that correct?

2    A.    That is correct.  And this phone was not synced.

3    Q.    Based on your review?

4    A.    Yes, sir.  I'm sorry.

11:36AM 5    Q.    Now, did this manual review create any kind of report?

6    A.    No, sir.  No forensic report.  The only thing, it was

7    notated in, I believe, Agent Aycock's report of

8    investigation.

9    Q.    Again, was there any probable cause after the review

11:36AM10    to seize the device for a later forensic examination?

11    A.    No, sir.  We had developed no probable cause for that

12    device.

13    Q.    Anything about that interview or the review of his

14    phone that in your mind incriminated Mr. Mize or provided

11:36AM15    exculpatory evidence?

16    A.    No, sir.

17    Q.    So, in summary, with respect to the two witnesses --

18    Mr. Berry and Mr. Mize -- is it true that our investigation

19    showed that neither was employed during May 14th and 15th?

11:37AM20    A.    That is correct.  Yes, sir.

21    Q.    Is it true that our investigation reflects that they

22    were not computer savvy?

23    A.    That is correct.  Yes, sir.

24    Q.    True that our investigation thought they were being

11:37AM25    recorded by the cameras in the office?

11:37AM 1   A.    Yes, sir.

2   Q.    True that our investigation reflected that they showed

3   no familiarity with peer-to-peer networks, is that correct?

4   A.    Correct.  Yes, sir.

11:37AM 5   Q.    They all denied having accessed child pornography

6   images?

7   A.    That is correct.

8   Q.    When you're interviewing these two individuals, are

9   you also taking into account the statement of Mr. Duggar?

11:38AM10   A.    Yes, sir.

11   Q.    Specifically that he told you he was not denying

12   guilt?

13   A.    That is correct.

14   Q.    So at this point, I want to review the evidence that

11:38AM15   we have before the Court in order to be able to gauge

16   potential exculpatory evidence.

17          Can you tell us about the examination of the HP

18   computer?

19   A.    Yes, sir.  Forensic examinations by the CFA concluded

11:38AM20   that Mr. Duggar had downloaded, viewed, and deleted images

21   and videos containing child sexual abuse material.

22   Q.    Before we get into specifics regarding the downloading

23   and viewing, deleting of child pornography, were there any

24   other programs of evidentiary value that the forensics

11:38AM25   located?

11:38AM 1   A.    Yes, sir.  A Linux partition and Covenant Eyes.

2   Q.    Please explain Covenant Eyes first.

3   A.    Covenant Eyes, as explained to us, is a software

4   program that acts as an accountability partner to where

11:39AM 5   individuals, as advertised, who have pornography addictions

6   can have a third party monitor their online usage.  That

7   third party can also receive reports of what they are doing

8   online.

9   Q.    So we found this program on what device again?

11:39AM10   A.    The HP desktop.

11   Q.    Did law enforcement send off any kind of legal process

12   to identify the subscribers of this service?

13   A.    Yes, sir, we did.

14   Q.    Tell us about the results of that.

11:39AM15   A.    The subscriber information for that particular account

16   on the HP was to Joshua and Anna Duggar.  It also logged

17   the same IP address that the ICAC affiliate had downloaded

18   from back in May of 2019.

19   Q.    What do you mean by "logged"?

11:39AM20   A.    Meaning that the same IP was being used by both

21   Covenant Eyes as the one that was being used to, or the

22   specific IP that was direct connected to for the downloads

23   of child pornography.

24   Q.    Make sure I'm asking the right question.  So both IP

11:40AM25   addresses were the same identified by Covenant Eyes.  And

11:40AM 1  did Covenant Eyes actually report that they logged

2  Mr. Duggar's use of that on the days in question?

3  A.    Yes, sir.  Yes, sir.

4  Q.    Turning to the Linux partition, can you tell us about

11:40AM 5  that?

6  A.    It was found on the HP desktop.

7  Q.    And what day was it created?

8  A.    The partition was created, I believe, May 13th of

9  2019.

11:40AM 10 Q.    Define or try to define for the Court what a Linux

11 partition or a partition in general is.

12 A.    Yes, sir.  So partitioning a computer basically takes

13 the hard drive of the computer and it separates it into two

14 independently working hard drives.  So you make one

11:40AM 15 computer, for all practical purposes, two computers with

16 two separate operating sides.

17 Q.    Would it be correct that what happens on one side of

18 the partition is not -- is unaffected by the other side of

19 the partition?

11:40AM 20 A.    That is correct.  Yes, sir.

21 Q.    Is it correct that what is accessible on one side of

22 the partition is not accessible from the other side of the

23 partition?

24 A.    That is correct, my understanding.

11:41AM 25 Q.    Was this Linux partition password protected?

11:41AM 1   A.   It was.

2   Q.   Please provide the password.

3   A.   Are we good with the entire password?

4   Q.   Please provide the password, yes, sir.

11:41AM 5   A.   Intel 1988.

6   Q.   What is the significance of "Intel 1988?"

7   A.   The last four digits are Mr. Duggar's birth year.

8   Q.   Did the Intel 1988 collected password provide

9   significance in this case?

11:41AM10   A.   Yes, sir.  It was also the same password that

11   Mr. Duggar used for his personal financial accounts.  I

12   believe for utility billing and records.  The same password

13   used for the family, some of the family social media

14   accounts.  And then believed to be the same password for

11:41AM15   the log-in to their Family Council Research Program.

16   Q.   On this password-protected side of the partition, what

17   did law enforcement locate?

18   A.   Two of the programs that were connected to the ongoing

19   child exploitation case; the BitTorrent peer-to-peer

11:42AM20   file-sharing network and the TOR, T-O-R, The Onion Router,

21   the Dark Web browser.

22   Q.   Were all the child pornography images located on that

23   partition side?

24   A.   Yes, sir.

11:42AM25   Q.   Was Covenant Eyes located on that partition side?

11:42AM 1  A.    No, sir, not on the partition side.

2  Q.    Could you tell the Court why?

3  A.    We reached out to representatives of Covenant Eyes and

4  they informed us that Covenant Eyes cannot be monitored on

11:42AM 5  a Linux partition.

6  Q.    Let's make sure we get that correctly.  So Covenant

7  Eyes does not work with respect to what happens on a Linux

8  partition, right?

9  A.    In terms of sending reports back to an accountability

11:42AM10  partner and being recorded, no sir, not on a Linux

11  partition.

12  Q.    With respect to TOR, what did the analyst find?

13  A.    That there were numerous files that had been

14  downloaded with child sexual abuse material.

11:43AM15  Q.    Now, during your interview, explain TOR.  Just for the

16  record, it's "The Onion Router" and it's used to access

17  what's commonly called the "Dark Web," is that correct?

18  A.    That's correct.  Yes, sir.

19  Q.    When was TOR created again?

11:43AM20  A.    On the Linux partition side, I believe it was May 13th

21  of 2019.

22  Q.    Let me ask you this question.  Mr. Duggar stated that

23  he was aware there was peer-to-peer on the HP computer, is

24  that correct, in his interview?

11:43AM25  A.    Yes, sir.

```
11:43AM  1  Q.   Where was the peer-to-peer program?

         2  A.   Also on the Linux partition side.

         3  Q.   And what particular program was that?

         4  A.   BitTorrent.

11:43AM  5  Q.   Is that the same program that our affiliate -- not our

         6  affiliate -- but the Little Rock affiliate ultimately

         7  downloaded child pornography from that started this

         8  investigation, is that correct?

         9  A.   Yes, sir.  That is correct.

11:43AM 10           MR. GELFAND:  Objection, Your Honor.  Calls for

        11  speculation.  He wasn't there when she allegedly did

        12  whatever she did.

        13           MR. ROBERTS:  Your Honor, I can reword.

        14           THE COURT:  Please do.

11:44AM 15  Q.   (By Mr. Roberts.)  Is the BitTorrent program the

        16  program you identified in your search warrant in this case?

        17  A.   Yes, sir.

        18  Q.   As the peer-to-peer?

        19  A.   Yes, sir.

11:44AM 20  Q.   During your investigation, is the BitTorrent

        21  peer-to-peer network the one that you were searching for in

        22  relation to the downloading or sharing of child

        23  pornography?

        24  A.   That is correct.  Yes, sir.

11:44AM 25  Q.   Did the forensics reveal what specifically the TOR
```

11:44AM 1  browser was used for?

2  A.   Yes, sir, for child sexual abuse material.

3  Q.   Could the analyst tell that it was both downloaded and

4  viewed based on the recently used logs?

11:44AM 5  A.   Yes, sir.

6  Q.   Turning to the BitTorrent program, what did the

7  forensics reveal?

8  A.   I believe the BitTorrent program was downloaded on

9  May 14th, 2019.  And between May 14th and May 15th, 2019,

11:45AM10  there were approximately nine Torrent files downloaded.

11  Q.   Overall, what were these Torrent files?  What did they

12  depict?

13  A.   Child sexual abuse material.  One of those included

14  the "marissa.zip" file.

11:45AM15  Q.   Could the analyst tell if these child sexual abuse

16  material files had been viewed?

17  A.   Yes, sir.

18  Q.   Could you tell us how?

19  A.   I'm sorry?

11:45AM20  Q.   Is it based on the recently used logs?

21  A.   Yes, sir.

22  Q.   Did the analysts locate any child pornography images

23  in the unallocated space of the computer?

24  A.   Yes, sir.  I believe it was approximately over 200

11:45AM25  files in the unallocated space.

11:45AM 1  Q.   Could you tell the Court and for the record what

2  unallocated space is?

3  A.   That's what happens to a file or where it goes after

4  it's been deleted and before it gets rewritten.

11:46AM 5  Q.   So for it to be there, someone would have had to, in

6  this case, download it and then delete it 200 plus times,

7  right?  Or one time for each respective file, is that

8  correct?

9  A.   Yes, sir, that's correct.

11:46AM10  Q.   Was Duggar's Mac, the MacBook, forensically examined?

11  A.   Yes, sir, it was.

12  Q.   Any programs of evidentiary value located on the

13  MacBook?

14  A.   It also contained Covenant Eyes and the BitTorrent

11:46AM15  peer-to-peer file-sharing network.

16  Q.   Is it correct he was syncing his phone, his iPhone

17  that you recovered, with his Mac?

18  A.   His iPhone 8, which he had previously had before the

19  iPhone 11, which we seized on scene.  So we had all the

11:46AM20  synced text messages, photos, e-mails, you name it, from

21  his old iPhone 8 and whatever we could get from the iPhone

22  11 to that Mac.

23  Q.   Did that information cover the May 14th and May 15th

24  time period?

11:47AM25  A.   Yes, sir, it did.

11:47AM 1   Q.   As part of your investigation, did you create an ROI

2   in which you combined the timeline created by the pictures

3   and text messages you've described with the forensics as

4   produced from the HP computer?

11:47AM 5   A.   Yes.

6   Q.   Would you turn in the exhibit book to Government's

7   Exhibit 12?

8   A.   I'm sorry?  What number?

9   Q.   12.  Oh, excuse me.  Should be 8 there.

11:47AM 10   A.   Yes, sir, I have an 8.

11   Q.   Could you identify Government's 8 for us?

12   A.   This is a forensic examination summary dated for dates

13   of May 13th, 2019, and May 14th, 2019.

14   Q.   Now, based on your investigation and the forensics

11:48AM 15   produced in this case, is this an accurate timeline?

16   A.   Yes, sir, it is.

17        MR. ROBERTS:  Your Honor, I move to introduce

18   Government's Exhibit 8 into evidence.

19        MR. GELFAND:  We don't have 8.

11:48AM 20        MR. ROBERTS:  It's marked 12 and 13.  We had to

21   adjust based on the Court's ruling this morning.

22        MR. GELFAND:  I see.  So 8 is 12?

23        MR. ROBERTS:  8 is 12.  9 will be 13.

24        MR. GELFAND:  For purposes of this hearing, Your

11:48AM 25   Honor, we have no objection.

11:48AM 1          THE COURT:  For purposes of this hearing,

2    Government's Exhibit 8 as described is received.

3          (Government's Exhibit No. 8 Received)

4    Q.   (By Mr. Roberts.)  Could you please explain and go

11:48AM 5    through Government's Exhibit 8 for the Court?

6    A.   Yes, sir.  So on May 13th, 2019 -- and this is based

7    off of the forensic examinations file data from the

8    MacBook, the iPhone 11, the iPhone 8, the HP All-in-One

9    desktop -- on May 13th, 2019, a Linux partition created on

11:49AM10    the HP computer located in Wholesale Motorcars' office.

11    Same date, TOR browser was installed on the partition side

12    of the HP computer.

13          On May 14, 2019, at approximately 4:14 p.m., an iPhone

14    utilized to take a picture of a vehicle at the Wholesale

11:49AM15    Motor car lot.  The image geolocates at or near to the

16    Wholesale Motorcars business.

17          4:20 p.m., iPhone utilized to take pictures of the HP

18    computer screen.  The image geolocated back to Wholesale

19    Motorcars.

11:49AM20          At 4:49 p.m., a text message sent from an iPhone,

21    Mr. Duggar's iPhone stating, "Got stuck here and still not

22    free yet.  I'm going to aim for tomorrow just after lunch."

23          At 4:58 p.m., TOR browser on the partition side of the

24    HP computer was utilized to access porn sites associated

11:49AM25    with rape and files associated with child pornography.

11:49AM 1  "Webcam-collection-prevs.7z" file was downloaded via the

2  TOR browser and viewed on the HP computer.

3      At 5:28 p.m. through 5:38 p.m., the user accessed the

4  BitTorrent websites.  Also downloaded the movie,

11:50AM 5  "_0214.mp4.torrent" file, and movie, "_216.mp4.torrent"

6  files, which were downloaded onto the HP computer.

7      From approximately 5:41 p.m. through 5:46 p.m., the

8  user of the HP computer accesses multiple TOR directory

9  sites and websites associated with BitTorrent.  At

11:50AM10  5:42 p.m., our Little Rock ICAC affiliate officer downloads

11  movie "_216.mp4" from that specific IP address.

12      5:48 p.m., iChat messages from Josh@championnwa.com

13  sent from the MacBook, "I have your Versa down here for

14  Carlin by the way", and "at my lot."

11:50AM15      6:01 p.m. to 6:05 p.m., iPhone takes multiple pictures

16  of vehicles at Wholesale Motorcars.

17  Q.   Would you please turn in the exhibit book to

18  Government's Exhibit 9.

19  A.   Yes, sir.

11:51AM20  Q.   What is Government's 9?

21  A.   This is a forensic examination summary of the date of

22  May 15th, 2019, and May 16th, 2019.

23  Q.   Is this summary and timeline true and accurate based

24  on your investigation?

11:51AM25  A.   Yes, sir.

11:51AM 1           MR. ROBERTS:   Move to introduce Government's

     2   Exhibit 9 for the same reasons as stated with 8, Your

     3   Honor.

     4           MR. GELFAND:   Your Honor, no objection for

11:51AM 5   purposes of this hearing.

     6           THE COURT:   For purposes of this hearing,

     7   Government's Exhibit 9 is received.

     8           (Government's Exhibit No. 9 Received)

     9   Q.   (By Mr. Roberts.)   Could you please go through

11:51AM10   Government's Exhibit 9.

    11   A.   Yes, sir.   So on May 15th, 2019, 11:15 a.m.,

    12   Mr. Duggar's iPhone sends a message saying, "I'm at my car

    13   lot now."

    14       11:30 a.m., "About TOR" website is bookmarked on the

11:51AM15   HP computer.

    16       11:35 a.m. through 11:41 a.m., HP computer user

    17   downloads three Torrent files associated with child

    18   pornography.   Titles are --

    19   Q.   Please just read them, yes.

11:52AM20   A.   "14yogirlsuckandfuck."   "Test.avi."

    21   "PussyPounded.mpg."

    22       3:20 p.m., iPhone takes a picture of a Tontitown fire

    23   truck.   Image geolocates to Wholesale Motorcars, or at or

    24   near Wholesale Motorcars.

11:52AM25       3:35 p.m., an iChat message sent from a MacBook to 22

11:52AM 1  members of the Duggar family stating, "Be praying for Mark,

2  older guy that was riding motorcycle on 412."

3      3:39 p.m., iPhone takes a picture of a vehicle

4  accident that occurred outside Wholesale Motorcars.

11:52AM 5      5:08 p.m. --

6  Q.   Agent, let me stop you there for a second.  The

7  vehicle accident referenced there, do you have any more

8  information regarding that vehicle accident?

9  A.   Yes, sir.  We confirmed with Arkansas State Police and

11:52AM10  Tontitown Police Department that there was, in fact, an

11  accident involving an individual driving a motorcycle that

12  occurred on Highway 412 almost directly across from where

13  Wholesale Motorcars lot is located.  We also actually spoke

14  to the victim, the motorcycle rider himself, and confirmed

11:53AM15  that that accident occurred that day.

16  Q.   The approximate time of that accident is approximately

17  around 3:30 on May 15th, 2019?

18  A.   Yes, sir.

19  Q.   Please continue picking up at 5:08 p.m.

11:53AM20  A.   5:08 p.m., message sent from iPhone stating, "I'm here

21  at the car lot, will be here til around 6:00 or so."

22      5:20 p.m., user of HP computer accesses the BitTorrent

23  website.

24      5:22 p.m., user of HP computer downloads

11:53AM25  "playtoysweetie.7z" Torrent file.

11:53AM 1     5:25 p.m., user of HP computer downloads "DD.torrent."

2  Q.  Agent, I need to stop you right there.  Are you

3  familiar with "DD.torrent?"

4  A.  Yes, sir, I am.

11:53AM 5  Q.  Please tell us how.

6  A.  "DD" is a known series of child pornography that's

7  been traded for years called "Daisy's Destruction."

8  Q.  What does it depict?

9  A.  It's, I believe, five total videos, series in total.

11:54AM 10  And it's child sexual abuse involving victims ranging from

11  18 months to, I believe, 15 years of age.

12  Q.  In the range of child sexual abuse material, is it

13  pretty bad?

14  A.  It's very bad.

11:54AM 15     MR. GELFAND:  Objection, Your Honor.  Calls for

16  improper opinion testimony.

17     THE COURT:  Well, that's sustained.  That's a

18  little relative.

19  Q.  (By Mr. Roberts.)  Please pick up at 5:25 p.m.

11:54AM 20  A.  Yes, sir.  I'm sorry, I thought I heard an objection.

21     5:25 through 5:30 p.m., user of HP computer accesses

22  website "homeadvisor.com" and inputs user name "Joshua" in

23  an autofill box connected to a review of a construction

24  company.

11:54AM 25  Q.  Agent, let me stop you there.  Tell us more about the

11:54AM 1  "homeadvisor.com" review.

2  A.    After locating that, I contacted the owner of that

3  construction company -- I believe it was Duane Swanson --

4  who confirmed that he had done some mold remediation work

11:55AM 5  for Mr. Duggar and his wife, and at the completion of that,

6  asked them to post a review on "homeadviser" to his site.

7  Q.    Thank you.  Please pick up at 5:30 p.m.

8  A.    5:30 p.m., "DD.torrent" file downloaded again to the

9  HP computer.

11:55AM10       5:32 p.m., user of HP computer downloads Torrent file

11  "asi se mama linda."

12       5:41 p.m., user of HP computer downloads the

13  "Marissa.zip.torrent" file.

14       5:48 p.m., message sent from iPhone, "Still have

11:55AM15  customers here" and "No problem, probably be here awhile."

16       6:45 p.m., "marissa.zip.torrent" file downloaded by

17  Little Rock detective from BitTorrent network.

18       6:51 p.m., user of iPhone takes picture of two notes

19  on the desk in the Wholesale Motorcars office.

11:55AM20       Jumping to May 16th, 2019, at 11:20 a.m., user of the

21  HP computer downloads Torrent file "Pedomom."

22       11:35 a.m., user of iPhone takes picture of the desk

23  in the main office of the Wholesale Motorcar lot.

24  Q.    Now, that desk in the main office, is that the same

11:56AM25  desk that you located the HP computer on ultimately when

11:56AM 1    you executed the search warrant?

2    A.    That is correct.  Yes, sir.

3    Q.    Turning your attention to the day in which Mr. Duggar

4    was arrested.

11:56AM 5              THE COURT:  Mr. Roberts, I need to find an

6    opportunity to take a break.  We've been going for almost

7    two and a half hours.  If you're close to finishing, we'll

8    do that.

9              MR. ROBERTS:  Your Honor, I believe I can be done

11:56AM10    in 10 minutes.

11             THE COURT:  That's fine.

12             MR. ROBERTS:  I would appreciate a break also.

13    Thank you, Your Honor.

14    Q.    (By Mr. Roberts.)  Can you tell us the date Mr. Duggar

11:56AM15    was arrested?

16    A.    I believe it was April 29th of 2021.

17    Q.    Could you tell us how he came to be in Homeland

18    Security's custody?

19    A.    Yes, sir.  So the attorneys on both sides had made

11:57AM20    arrangements for Mr. Duggar to turn himself in and

21    self-surrender to the HSI field office in Fayetteville,

22    Arkansas.  Prior to doing so, myself and Agent Aycock had

23    set up surveillance, basically a surveillance perimeter

24    around the Duggar home, to make sure that Mr. Duggar was,

11:57AM25    in fact, going to drive to that office.  We followed him to

11:57AM 1  the office, at which point he was met by his attorney.  He

2  was taken into custody and then brought back to our main

3  processing area for booking.

4  Q.   You said he was brought back for booking.  Can you

11:57AM 5  tell us overall, describe what booking entails?

6  A.   Booking includes taking fingerprints, biographical

7  information, photographs, things of that nature.

8  Q.   Specific to the fingerprints, can you tell us about

9  how you went about obtaining his fingerprints?

11:57AM10  A.   Yes, sir.  So the fingerprints of the system that we

11  have to use, it's a government system, which doesn't always

12  work as it should.  It is a digital fingerprint system.

13  There is an actual digital box that sits on a desk or table

14  in that processing area.  Right next to that box is

11:58AM15  connected to a computer.  With that computer, there's a

16  monitor and a mouse.  It's usually a two-person job.  One

17  person will have to physically take the individual or the

18  suspect's fingers and roll them on this digital box while

19  the other person sits on the other side or stands on the

11:58AM20  other side of this table and clicks to try to accept each

21  digital fingerprint into the computer system.

22  Q.   How close are you to the individual being

23  fingerprinted when this happens if you're sitting at that

24  desk?

11:58AM25  A.   Within an arm's length, and even at times closer,

11:58AM  1    because, of course, we did have problems with our

2    government system in getting them to accept every one of

3    Mr. Duggar's fingerprints.  Agent Jeffrey Pryor was there

4    taking the physical prints and I was assisting him trying

11:58AM  5    to get that digital box to actually read Mr. Duggar's

6    prints.

7    Q.    How far, when you were sitting at that computer, were

8    you from Mr. Duggar's hands?

9    A.    Again, an arm's length, if not closer.

11:59AM 10    Q.    Did you notice anything of evidentiary value about

11    Mr. Duggar's hands?

12    A.    Yes, sir.  While they were being rolled for

13    fingerprints, I noticed a scar on the -- scar or

14    identifiable mark on his left thumb.

11:59AM 15    Q.    Why is that significant?

16    A.    When doing my examination reports of going through all

17    of the relevant information to the case and putting

18    Mr. Duggar on the lot for those days, there was a check --

19    or, I'm sorry -- a picture of Mr. Duggar, we believed to be

11:59AM 20    of Mr. Duggar, that was holding a check in his left hand.

21    And on that left hand, on the left thumb, was an identical

22    scar.

23    Q.    After you noted that scar, tell us what occurred next.

24    A.    I informed Agent Aycock about the scar.  He then went

11:59AM 25    and asked Mr. Duggar if it was okay if he could take a

11:59AM 1 picture of his hands.  Mr. Duggar consented and the

   2 pictures were taken.

   3 Q.   Tell us about how he consented and how law enforcement

   4 went about taking the pictures.

11:59AM 5 A.   Agent Aycock asked.  Mr. Duggar consented.  He put his

   6 hands --

   7 Q.   Well, let me stop you there.  Did Agent Aycock say,

   8 "Hey, can I take a picture of your hands?"  Is that the

   9 words he used?

12:00PM10 A.   "Is it okay if we take a picture of your hands?"

   11 Q.   Mr. Duggar responded?

   12 A.   Yes.

   13 Q.   How did you go about doing that then?  Or how did

   14 August Aycock --

12:00PM15 A.   Agent Aycock took a cell phone and he was on the same

   16 side of the desk as I was across from Mr. Duggar and

   17 Mr. Duggar put his hands down.  Agent Aycock took the

   18 phone, placed it up at an elevated level, snapped the

   19 picture.

12:00PM20 Q.   And let's make sure we are giving everybody the

   21 correct picture.  So Mr. Duggar places his hands on a

   22 table?

   23 A.   Correct.

   24 Q.   Agent Aycock is on the opposite side of the table.  He

12:00PM25 leans over the table and snaps a picture, is that right?

12:00PM 1   A.    Yes, sir.  That is correct.

2   Q.    Does he ever come into contact with Mr. Duggar?

3   A.    No, sir.

4   Q.    Did you ever see Mr. Duggar to have to pose in an

12:00PM 5   unnatural position?

6   A.    No, sir.  As a matter of fact, the image of Mr. Duggar

7   holding that check was in a completely different position

8   than what his hands were in the photos that Agent Aycock

9   took.

12:01PM10   Q.    Have you been able to confirm that the pictures taken

11   while Mr. Duggar's hands were on the table actually depict

12   the scar that you're referencing from the image taken at

13   the lot?

14   A.    Yes, sir, it does.  After the pictures were taken, I

12:01PM15   compared them to the image of Mr. Duggar holding the check

16   and was able to identify the scar on both.

17   Q.    Finally, can you tell the Court if you have seen these

18   pictures of his hands at any location other than your file

19   or the criminal prosecution in this case?

12:01PM20   A.    Yes, sir.  After defense counsel filed the motions to

21   have Mr. Duggar's hands suppressed, the actual photograph,

22   the media outlets picked it up and it's now a searchable

23   picture on the internet.

24   Q.    By "searchable", do you mean if you plug into Google,

12:01PM25   say "Joshua Duggar's hands," those images come up?

12:01PM  1  A.    Yes, sir, more than likely.

         2           MR. ROBERTS:  Thank you.  One second, Your Honor.

         3  I'll pass the witness, Your Honor.

         4           THE COURT:  We're going to take a recess at this

12:02PM  5  time.  We're actually going to convert it into a short

         6  lunch break.  If we started back up at 12:45, would that be

         7  any problem for anyone?

         8           MR. GELFAND:  That would be fine, Your Honor.

         9           MR. ROBERTS:  Not for the government.  No

12:02PM 10  problem, Your Honor.

        11           THE COURT:  We'll start back up at 12:45.

        12           (Recess taken from 12:02 p.m. to 12:55 p.m.)

        13           THE COURT:  Mr. Gelfand, you may inquire.

        14           MR. GELFAND:  May I proceed, Your Honor?

12:55PM 15           THE COURT:  You may.

        16           MR. GELFAND:  Thank you.

        17                     CROSS EXAMINATION

        18  BY MR. GELFAND:

        19  Q.    Good afternoon, Special Agent.

12:55PM 20  A.    Good afternoon, sir.

        21  Q.    Agent Faulkner, you testified that you were involved

        22  in this investigation from its outset, is that correct?

        23  A.    Yes, sir, with Agent Aycock.

        24  Q.    And to be clear, Agent Aycock you have identified as

12:56PM 25  the lead agent of this investigation, is that correct?

12:56PM 1  A.    Yes, sir.  He's the case agent.

2  Q.    And when you say he's the case agent, though, this was

3  his first investigation of this nature, correct?

4  A.    That is correct, that I'm aware of.

12:56PM 5  Q.    So your role in this was essentially, among other

6  things, to train Special Agent Aycock, is that correct?

7  A.    To train him and assist him throughout the course of

8  the investigation.

9  Q.    In doing so, Agent Faulkner, is it fair to say, then,

12:56PM 10  that you are personally familiar with all aspects of this

11  investigation?

12  A.    Yes, sir, for the most part.

13  Q.    And I understand there may have been certain

14  interviews that you weren't a part of.  You couldn't have

12:56PM 15  been everywhere at once.  But, generally speaking, even

16  though Special Agent Aycock was the case agent, fair to say

17  that you were, for all intents and purposes, essentially

18  also a case agent on this case?

19  A.    Yes, sir.

12:56PM 20  Q.    Agent Faulkner, the investigation began, as you

21  briefly testified on direct examination, with a lead from

22  what you described as an affiliate in Little Rock,

23  Arkansas, is that correct?

24  A.    Yes, sir.

12:57PM 25  Q.    And to be clear, in October 2019, your unit received

12:57PM 1    lead information from an ICAC task force affiliate in
2    reference to the IP address that you later associated with
3    Wholesale Motorcars, correct?
4    A.    No, sir.
12:57PM 5    Q.    You drafted what you commonly refer to as ROIs in
6    connection with this case, is that correct?
7    A.    Correct, reports of investigation.
8    Q.    And a report of investigation is essentially the
9    Homeland Security version of, say, a 302 or an IRS MOI?
12:57PM10    It's essentially the official report, correct?
11    A.    I'm not sure what those are, but it is an official
12    report.
13    Q.    And it's important, Special Agent, to be honest and
14    accurate as to all details in your ROIs, correct?
12:57PM15    A.    Absolutely, yes, sir.
16             MR. GELFAND:  Your Honor, may I approach the
17    witness?
18             THE COURT:  You may.
19    Q.    (By Mr. Gelfand.)  Agent Aycock, do you see what's
12:58PM20    been premarked as Defense Exhibit D, as in David, in front
21    of you?
22    A.    Yes, sir.
23    Q.    Defense Exhibit D is an ROI that you drafted in
24    connection with this investigation, correct?
12:58PM25    A.    Yes, sir.

12:58PM 1   Q.   And, to be clear, we know that because it says
        2   "Reported by Gerald Faulkner, Special Agent," just below
        3   the exhibit sticker, correct?
        4   A.   That is correct.
12:59PM 5   Q.   And this was approved subsequently by your supervisory
        6   special agent in November of 2019, correct?
        7   A.   Yes, sir.
        8   Q.   So is it fair to say that you drafted this somewhere
        9   in approximately November of 2019 if it was approved
12:59PM10   November 25th of 2019?
       11   A.   In what time?  I'm sorry.  Repeat.
       12   Q.   The only date on this is the date that it's approved,
       13   correct?
       14   A.   Correct.
12:59PM15   Q.   It doesn't have the date that you drafted it, correct?
       16   A.   No, sir.
       17   Q.   Is it fair to assume that you drafted it somewhere
       18   reasonably close in proximity to the date that it was
       19   approved?
12:59PM20   A.   It would have been prior to the execution, or my
       21   application of the search warrant.
       22   Q.   Let's back up for a second.  This particular ROI
       23   references a date approved of November 25th of 2019,
       24   correct?
12:59PM25   A.   Yes, sir.

12:59PM 1  Q.   Now, do you see where it says, "Case opened

2  October 29th of 2019?"

3  A.   Yes, sir.

4  Q.   And do you see where it says, "Synopsis, in

1:00PM 5  October 2019, Homeland Security Investigations, special

6  agents and task force officers assigned to the assistant

7  special agent in charge office in Fayetteville, Arkansas,

8  internet" -- essentially ICAC Task Force -- "received lead

9  information from an ICAC Task Force affiliate in reference

1:00PM10  to an identified computer in the Northwest Arkansas area

11  utilizing a specific IP address?"

12        THE COURT:  Mr. Gelfand, we've gone beyond the

13  point of identifying the document.  If you're going to keep

14  reading from it, it needs to be received in evidence.  It

1:00PM15  would also be helpful to the Court.

16        MR. GELFAND:  Sure, Your Honor.  Absolutely, Your

17  Honor.

18  Q.   (By Mr. Gelfand.)  Agent Faulkner, is this particular

19  exhibit a true and correct copy of an ROI that you drafted

1:00PM20  in connection with this Duggar investigation?

21  A.   Yes, sir, it is.

22        MR. GELFAND:  Your Honor, at this point, I move

23  Exhibit D into evidence solely for purposes of this

24  hearing.

1:01PM25        MR. ROBERTS:  No objection as it's represented,

1:01PM 1  Your Honor.

2            THE COURT:  Exhibit D is received.

3            (Defendant's Exhibit D Received)

4            MR. GELFAND:  May I publish it on the Elmo?

1:01PM 5            THE COURT:  You may.

6  Q.   (By Mr. Gelfand.)  Do you see Exhibit D in front of

7  you?

8            THE COURT:  Do you have a copy of the whole

9  document for the Court?

1:01PM10            MR. GELFAND:  Your Honor, yes.  I think we might

11  be one copy short, unfortunately.

12            MR. ROBERTS:  I don't mind providing my copy.

13  Your Honor, may I approach?

14            THE COURT:  You may.  You may proceed.

1:01PM15            MR. GELFAND:  Thank you, Your Honor.

16  Q.   (By Mr. Gelfand.)  Agent Faulkner, do you see where we

17  reference the case opening date of 10-29 of 2019?

18  A.   Yes.

19  Q.   And that's here on the left, correct?

1:01PM20  A.   That is correct.

21  Q.   And then the synopsis that you just acknowledged

22  references that in October of 2019, your unit received lead

23  information from an ICAC Task Force affiliate in reference

24  to this particular IP address, is that correct?

1:02PM25  A.   Yes, sir, I see that.

1:02PM 1    Q.    Is that accurate or is that inaccurate?

2    A.    No, sir.  So this synopsis is something that's

3    generated -- a case agent opens the initial case in our

4    reporting system.  And that synopsis carries onto every

1:02PM 5    single report.  Agent Aycock made that synopsis.  And I

6    don't want to speak for him, but I would assume that he put

7    October, because that was when I turned the information

8    over to him to see if he wanted to actually work this case.

9    Q.    So to be clear, if I understand your testimony

1:02PM 10    correctly, the synopsis on each of the ROIs in this case is

11    incorrect as to the date that the lead information was

12    provided from Little Rock, Arkansas?

13            MR. ROBERTS:  Objection, Your Honor.  That is not

14    what the witness testified to.  It's assuming a fact that

1:03PM 15    the witness didn't produce.

16            THE COURT:  Rephrase your question.

17    Q.    (By Mr. Gelfand.)  Is the synopsis accurate as to the

18    date that the lead information was received by Homeland

19    Security from Little Rock, Arkansas?

1:03PM 20    A.    The date is not accurate as to when the lead, initial

21    lead information, was received by HSI.  It would be

22    somewhat accurate in terms of Agent Aycock, when he

23    received information from myself.

24    Q.    So to be clear, when specifically was lead information

1:03PM 25    originally transmitted from Little Rock to HSI?

1:03PM 1  A.   It would have been June or July of 2019.

2  Q.   And to be clear, do you remember whether it was June

3 or July?

4  A.   I believe that I received the initial downloads from

1:03PM 5 Detective Kalmer through the ICAC data system in June of

6 2019, but it wasn't until July of 2019 when I physically

7 downloaded to view those files.

8  Q.   Agent Faulkner, you testified about the execution of a

9 search warrant at Wholesale Motorcars on November 8th of

1:04PM10 2019, is that correct?

11  A.   Yes.

12  Q.   And prior to executing the search warrant, you

13 obtained a search warrant signed by a federal judge in this

14 district, correct?

1:04PM15  A.   Correct.  Yes, sir.

16  Q.   And the government introduced that search warrant into

17 evidence, correct?

18  A.   Yes, sir.

19  Q.   When you showed up on November 8th of 2019, you had a

1:04PM20 pre-op meeting prior to showing up on scene, correct?

21  A.   We had an operational briefing, yes, sir.

22  Q.   In other words, you had a game plan as to how you were

23 going to proceed when you showed up on site, correct?

24  A.   Yes, sir.  We do that with all law enforcement

1:04PM25 actions.

1:04PM  1  Q.   And to be clear, on site, there were how many law

2  enforcement officers and how many forensic examiners?

3  A.   So total, there were four HSI special agents.  One

4  arrived later on during the execution of the warrant.

1:05PM  5  There were three total computer forensic analysts, one of

6  which of those was a HSI task force officer.

7  Q.   So to be clear, it sounds like total, there were, if

8  my math is right, seven or eight individuals from law

9  enforcement present on the scene executing the search

1:05PM 10  warrant?

11  A.   In terms of the initial execution of the warrant, the

12  CFAs are not what we refer to as "gun-toters" so they don't

13  come onto the scene until it's actually cleared and made

14  safe by the actual special agents.

1:05PM 15  Q.   The phrase that you just used, can you repeat that

16  please for the record?

17  A.   Gun-toters?

18  Q.   Correct.

19  A.   Yes, meaning they don't carry weapons with them.

1:05PM 20  Q.   Understandable.  So the individuals who do carry

21  weapons that appeared on scene were initially four

22  individuals?

23  A.   Roughly, yes, sir.

24  Q.   And how many vehicles?

1:06PM 25  A.   I'd say approximately six.

1:06PM 1  Q.   Approximately six vehicles?

2  A.   Yes, sir, approximately.

3  Q.   And each of these six vehicles arrived at the same

4  time as planned, correct?

1:06PM 5  A.   Yes, sir.  Yes, sir.

6  Q.   And if I understood your testimony correctly on direct

7  examination, the intention was that you and Special Agent

8  Aycock would immediately make contact with Mr. Duggar,

9  correct?

1:06PM 10  A.   That is correct.

11  Q.   And you knew he was on scene when you arrived on

12  scene, correct?

13  A.   Yes, sir, I knew.

14  Q.   And how did you know he was on scene?

1:06PM 15  A.   Prior to the execution of the search warrant, I had

16  set up, or actually myself and Agent Aycock, had been

17  taking turns setting up surveillance on the Wholesale

18  Motorcar lot on the opposite side of Highway 412, I believe

19  it would be the eastbound lane, waiting for the owner of

1:07PM 20  the lot, the subscriber of the IP address, to show up.

21  Q.   So to be clear, you watched Mr. Duggar drive onto the

22  scene prior to executing the search warrant, correct?

23  A.   That is correct.  He arrived in an RV.

24  Q.   And when you say "He arrived in an RV", he was driving

1:07PM 25  alone in an RV vehicle that he drove up that driveway that

1:07PM 1   you testified about, correct?

2   A.    Yes, sir.

3   Q.    And he parked the RV prior to you arriving on scene,

4   correct?

1:07PM 5   A.    Correct.

6   Q.    Now, Agent, when you initially pulled up to execute

7   the search warrant, is it fair to say that there is a

8   single driveway leading into and out of Wholesale

9   Motorcars?

1:07PM 10   A.    There is a main unpaved driveway that leads into the

11   main lot, but there are other entrances and exits off that.

12   It's not an actual driveway, but it's a paved, level area

13   to where you can enter and exit off of that lot from other

14   points of egress.

1:08PM 15   Q.    But to cut to the chase, if a customer was driving

16   onto that lot, there's a driveway that brings them to the

17   business, and there's a driveway that they would leave

18   exiting the business, correct?

19   A.    Correct.

1:08PM 20   Q.    And you all approached this particular premises on

21   that same driveway, correct?

22   A.    I believe so, yes, sir.

23   Q.    And to be clear, as is typical in these matters, all

24   six or seven of these law enforcement vehicles were all

1:08PM 25   essentially caravaning and showing up at the same time to

1:08PM 1  execute the search warrant, correct?

2  A.   I believe that once we made contact with the other

3  agents and the CFAs that we had placed Mr. Duggar on scene,

4  there was obviously a time lapse for everybody to get from

1:08PM 5  wherever they were in the Northwest Arkansas area to the

6  general location.  Some time did pass.  We then met maybe a

7  mile or two down the road, made sure everybody was there,

8  then we entered onto the business collectively again

9  without that CFA van that stayed back.

1:09PM 10  Q.   To be clear, to execute a search warrant at a

11  business, the owner of the business does not have to

12  physically be present, correct?

13  A.   Technically, I suppose not, no, sir.

14  Q.   You wanted the owner of the business to be present

1:09PM 15  when you executed the search warrant in this case, correct?

16  A.   Yes, sir.

17  Q.   Your intention was to make contact with Mr. Duggar and

18  attempt to interview him, correct?

19  A.   Whoever the owner or subscriber of the IP address

1:09PM 20  would have been, yes, sir.

21  Q.   Let's be clear.  You knew prior to November 8th of

22  2019 that the owner of this business was Mr. Duggar,

23  correct?

24  A.   Yes.

1:09PM 25  Q.   And you had received evidence that the subscriber to

1:09PM 1  the IP address was Mr. Duggar from OzarksGo, correct?

2  A.   Correct.  Yes, sir.

3  Q.   And that was in response to an administrative agency

4  summons that you served prior to executing the search

1:09PM 5  warrant, correct?

6  A.   Correct.

7  Q.   Now, when you showed up on scene, as you have

8  testified a little bit to, all of the law enforcement

9  officers were wearing essentially clothing that identified

1:10PM 10  some sort of law enforcement insignia, correct?

11  A.   Not clothing.  They had bullet resistent or plate

12  carrier vest style that would have had the law enforcement

13  insignia on them.

14  Q.   To be clear, these were tactical vests, correct?

1:10PM 15  A.   Yes, sir, you could say they were tactical vests.

16  Q.   The agents coming onto scene to secure the scene were

17  armed, correct?

18  A.   Correct.

19  Q.   And that included yourself and Agent Faulkner,

1:10PM 20  correct?  Or, sorry.  Agent Aycock.  I apologize.

21  A.   Yes.

22  Q.   And when you approached Mr. Duggar when you arrived on

23  scene, approximately how far was he standing from where you

24  parked your vehicle?

1:10PM 25  A.   I'd say he was at the midway point of where our

1:10PM 1    vehicle was and where the main office was, so say 20 feet

2    either way.

3    Q.    So within a matter of seconds, you make your way to

4    Mr. Duggar, correct?

1:11PM 5    A.    Exit the vehicle, and then myself and Agent Aycock

6    walked up directly to Mr. Duggar and the two other

7    individuals that were around him.

8    Q.    At the point that you walked up to Mr. Duggar when you

9    initially laid eyes on him, his cellular telephone was in

1:11PM 10   his pocket, correct?

11   A.    I believe so.

12   Q.    And you watched Mr. Duggar take his phone physically

13   out of his pocket, correct?

14   A.    After we told him why, or that a federal search

1:11PM 15   warrant had been obtained for the property, yes, sir.

16   Q.    And when you watched Mr. Duggar take his phone out of

17   his pocket, he told you that he was doing so for the

18   purpose of contacting his attorney, correct?

19   A.    Yes, sir.

1:11PM 20   Q.    He was physically taking the phone towards his ear so

21   he could contact his attorney, correct?

22   A.    I wouldn't -- I wouldn't say it was going towards his

23   ear.  He was holding it up to show me that he wanted to, or

24   would like to call his attorney.

1:11PM 25   Q.    And before he could actually contact his attorney, if

1:11PM 1  I understood your testimony correctly, you physically took

2  the phone out of Mr. Duggar's hand, correct?

3  A.   I first explained that it was going to be seized

4  pursuant to the search warrant.  And I then confiscated it,

1:12PM 5  yes, sir.  I didn't grab it and then tell him.  I explained

6  why and then took it from Mr. Duggar.

7  Q.   To be clear, though, you readily admit and acknowledge

8  that you physically took the phone out of Mr. Duggar's hand

9  before he could actually contact his attorney, correct?

1:12PM 10  A.   Yes, sir.

11  Q.   He had no other phones on his person at this time,

12  correct?

13  A.   On his person?  No, sir, not that I'm aware of.

14  Q.   You never at any point offered Mr. Duggar to use your

1:12PM 15  phone to contact his attorney, correct?

16  A.   No, sir.  And I wouldn't have done that due to

17  attorney-client privilege.  He would have probably had to

18  have been out of earshot of myself.  I have government

19  sensitive applications on my phone to where, honestly, I

1:12PM 20  wouldn't have trusted anybody outside of myself to have

21  access to that without me watching it clearly.

22  Q.   When you knew that Mr. Duggar was attempting to

23  contact his attorney and you stopped him from doing so, did

24  you offer at that point to contact his attorney on his

1:13PM 25  behalf?

1:13PM 1    A.    It wasn't until later.

2    Q.    In other words, no, correct?

3    A.    No, sir.

4    Q.    Now, you're aware that the business does not have a

1:13PM 5    landline, correct?

6    A.    I'm not fully aware of that, no, sir.

7    Q.    I'm going to show you Government's Exhibit 2.  Do you

8    see that?

9    A.    Yes, sir.

1:13PM 10    Q.    Do you see a picture of a sign that says, "Car lot

11    office?"

12    A.    Yes, sir.

13    Q.    And a "479-879" phone number?

14    A.    Yes, sir.

1:14PM 15    Q.    Am I reading it correctly that above that number, it

16    says, "Call or text us at" that 479 number?

17    A.    Yes, sir.

18    Q.    Would you agree with me that a business phone number

19    that can receive text messages is not a landline?

1:14PM 20    A.    No, sir.  I only explained that or stated that because

21    one of the agents thought they had seen a base charger for

22    a cordless phone inside of the office.

23    Q.    You searched the entire premises that day, correct?

24    A.    I did not.  The other agents did.

1:14PM 25    Q.    Based on your knowledge of the investigation, was

1:14PM 1  there a landline based on your search of the entire

2  premises that day?

3  A.   I'm not aware.  We haven't figured that one out yet,

4  sir.

1:14PM 5  Q.   Now, you testified that when you pulled up, in

6  addition to Mr. Duggar, there were two other people on

7  scene at the car lot, correct?

8  A.   Yes, sir.

9  Q.   To be clear, that's Mr. Berry and Mr. Harrell,

1:14PM10  correct?

11  A.   Correct.

12  Q.   And you identified both of those individuals, correct?

13  A.   Yes, sir.

14  Q.   Mr. Berry, as you testified to, stayed around and

1:15PM15  eventually spoke with you, correct?

16  A.   Yes, sir.

17  Q.   Mr. Harrell, to this day, has refused to speak with

18  you, correct?

19  A.   Agent Aycock had approached Mr. Harrell after the

1:15PM20  interview of Mr. Berry, and he did not want to speak at

21  that time and left.

22  Q.   And to this day, you have not interviewed Mr. Harrell,

23  correct?

24  A.   No, sir, we have not.

1:15PM25  Q.   When you showed up and approached Mr. Duggar with

1:15PM 1   Special Agent Aycock, you did not show Mr. Duggar the

2   search warrant, correct?

3   A.   Yes, sir, I did.   I showed him a copy.

4   Q.   When you say a "copy" of the search warrant, what

1:15PM 5   specifically did you show Mr. Duggar?

6   A.   The front page of the search and seizure warrant.

7   Q.   Did you show him Attachment A that identified where

8   you were allowed to search?

9   A.   No, sir.

1:15PM 10   Q.   Did you show him Attachment B that identified what, if

11   anything, you were allowed to seize?

12   A.   No, sir.

13   Q.   Did you provide him with a copy of the search warrant

14   at that time?

1:15PM 15   A.   Of Attachments A and B?

16   Q.   Yes, sir.

17   A.   No, sir.

18   Q.   Did you tell him that to see the whole search warrant,

19   he had to stick around?

1:16PM 20   A.   No, sir.

21   Q.   Is it fair to say that you only showed him the entire

22   search warrant until the end of the recorded interview that

23   the government played into evidence?

24   A.   In terms of Attachment A and B, he was not given those

1:16PM 25   until at the conclusion of his interview.

1:16PM 1   Q.   In fact, he was not even shown those until after the

2   conclusion of his interview, correct?

3   A.   Attachments A and B.

4   Q.   Is that correct?

1:16PM 5   A.   Yes, sir, Attachments A and B.

6   Q.   Now, when you approached Mr. Duggar, you testified

7   that you told him that this investigation involved

8   allegations of, quote, "digital contraband," correct?

9   A.   Yes, sir.

1:16PM 10   Q.   And to be clear, that was a phrase that you used,

11   correct?

12   A.   That is a phrase that I used, correct.

13   Q.   That's not a phrase that Mr. Duggar used, correct?

14   A.   No, sir.

1:16PM 15   Q.   And you claim that he said at that point that his wife

16   was pregnant and he might have to leave, correct?

17   A.   That is correct.  Yes, sir.

18   Q.   Would you agree with me that that's not reflected

19   anywhere in your ROIs about that particular incidence, that

1:17PM 20   statement?

21   A.   I don't believe I offered the ROI for the search

22   warrant, sir.

23   Q.   Would you agree with me that that's not in any of the

24   ROIs that you have reviewed in connection with this case?

1:17PM 25   A.   I would have to go back and check, but I don't believe

1:17PM 1  so.

2  Q.    You testified that Mr. Duggar was not guarded when he

3  remained on site, correct?

4  A.    Yes, sir.  Correct.

1:17PM 5  Q.    But you admit that an armed special agent was near him

6  at all times, correct?

7  A.    Our supervisor was in the vicinity keeping situational

8  awareness.

9  Q.    And when you say "situational awareness," he was

1:17PM10  physically standing in close proximity to Mr. Duggar

11  outside of the office where he was standing, correct?

12  A.    Not in close proximity.  He would have had various

13  duties that day as our supervisor, make sure nobody else is

14  coming onto the lot while we're there, watching for traffic

1:17PM15  on Highway 412 for accidents, making sure that all the

16  agents were doing their jobs correctly that day.

17  Q.    Now, approximately how much time passed from the

18  moment you arrived on scene and took Mr. Duggar's phone to

19  the moment that you and Special Agent Aycock approached

1:18PM20  Mr. Duggar to ask to interview him?

21  A.    Roughly around 10 minutes or more.  No more than 15.

22  Q.    So somewhere in the approximate 10 to 15-minute range?

23  A.    I'd say so, yes, sir.

24  Q.    In other words, fair to say not a whole lot of time

1:18PM25  had passed in between those incidents, correct?

1:18PM 1  A.    No, sir.

2  Q.    And you would agree with me that during those 10 to 15

3  minutes, Mr. Duggar was not provided any mechanism to

4  contact his attorney, correct?

1:18PM 5  A.    Not that I'm aware of, no, sir.

6  Q.    You would be aware of that, correct?

7  A.    If he had made a phone call?

8  Q.    Yes.

9  A.    Yes, sir.

1:18PM 10  Q.    Now, you testified a minute ago that he arrived in an

11  RV, correct?

12  A.    Correct.

13  Q.    Immediately upon executing the search warrant, special

14  agents searched the RV that he arrived in, correct?

1:19PM 15  A.    Yes, sir.

16  Q.    And so to be clear, the RV was parked and special

17  agents go not only search the office, essentially a shed

18  that you've previously testified about --

19  A.    Yes, sir.

1:19PM 20  Q.    -- but also the RV that you watched via surveillance

21  Mr. Duggar arrive in, correct?

22  A.    Correct.  Yes, sir.

23  Q.    Mr. Duggar was not allowed to go back into that RV at

24  that time, correct?

1:19PM 25  A.    He would have been allowed, but he would have had to

1:19PM 1   have been escorted based on the fact that I think one of

2   the -- or his MacBook laptop was located in that RV.

3   Q.    Multiple agents were searching the RV, correct?

4   A.    I wouldn't say multiple.  It had already been cleared,

1:19PM 5   and then we had one of the CFAs go to start their work.

6   Q.    In other words, during the totality of time that had

7   elapsed from the time you arrived on scene to the time that

8   you interviewed Mr. Duggar in the vehicle, there was a law

9   enforcement officer or a forensic examiner in the RV,

1:20PM 10   correct?

11   A.    From the time we arrived on scene until we initiated

12   an interview, yes, sir, I'd say that.

13   Q.    So fair to say, if Mr. Duggar wanted to go hop in that

14   RV that he drove into and drive home, that wasn't an

1:20PM 15   option, correct?

16   A.    At that point in time, no, sir.

17   Q.    Based on your search of the premises, the keys to the

18   other vehicles in the car lot were stored in the office,

19   correct?

1:20PM 20   A.    I believe so.

21   Q.    And the office, let me show you Government Exhibit 2

22   again, just to get our bearings, is what we're looking at

23   that says "car lot office," correct?

24   A.    Yes, sir.

1:20PM 25   Q.    From the moment you arrived on scene to the moment

1:20PM 1 that Mr. Duggar was being interviewed in the government

2 vehicle, there were agents searching the office, correct?

3 A. Correct.  Yes, sir.

4 Q. Now, you testified that you and Special Agent Aycock

1:21PM 5 go about 10 to 15 minutes later and go make contact with

6 Mr. Duggar, correct?

7 A. Correct.  Yes, sir.

8 Q. You identified yourself when you initially got on

9 scene as HSI special agents, correct?

1:21PM10 A. Yes, sir.

11 Q. As did Special Agent Aycock in your presence, correct?

12 A. Correct.  Yes, sir.

13 Q. Now, you testified that you approached Mr. Duggar when

14 he was standing outside of the office, correct?

1:21PM15 A. Yes, sir.

16 Q. And approximately how far was the vehicle where you

17 interviewed him from where he was standing when you

18 approached him?

19 A. Again, probably that midway point, so I'd say 20 feet

1:22PM20 from the office where Mr. Duggar was and another maybe

21 20 feet to where Agent Aycock's vehicle was parked.

22 Q. It was your idea, not his -- meaning Mr. Duggar's --

23 to conduct this interview in the law enforcement vehicle,

24 correct?

1:22PM25 A. Yes, sir.  We suggested that's where we would like to

1:22PM 1  have the interview.

2  Q.   And as you testified, you relocated with Mr. Duggar to

3  Agent Aycock's truck, correct?

4  A.   Correct.  Yes, sir.

1:22PM 5  Q.   You directed Mr. Duggar where he should sit in that

6  vehicle, correct?

7  A.   No, sir.  We told him where the truck was and that we

8  would be seated in the front passenger or front driver's

9  side and the rear driver's side area.

1:22PM 10  Q.   To be clear, he didn't decide which seat he was

11  supposed to sit in, correct?

12  A.   No, sir.  When we took a position up on the right-hand

13  side, Mr. Duggar went to the left-hand side and entered the

14  front passenger seat.

1:22PM 15  Q.   Because you told him where to sit, correct?

16  A.   We told him he could sit there, correct.

17  Q.   During the entirety of the conversation, the truck was

18  on, correct?

19  A.   I believe it was on, correct.

1:23PM 20  Q.   Essentially it was idling, correct?

21  A.   I believe so.

22  Q.   What kind of vehicle was the truck?

23  A.   I think it was a Ford.

24  Q.   Now, to be clear, this was a law enforcement vehicle,

1:23PM 25  correct?

1:23PM 1   A.   Yes, sir.

2   Q.   There's aspects of what's inside the vehicle unique to

3   law enforcement that would differ from, say, my car?

4   A.   No, sir.  Not with government vehicles, no, sir.

1:23PM 5   Q.   During the entire time that you're in the vehicle with

6   Mr. Duggar, the doors are closed, correct?

7   A.   Correct.

8   Q.   He's sitting in the passenger seat and there's two law

9   enforcement agents in the truck with him; yourself and

1:23PM10   Agent Aycock, correct?

11   A.   Yes, sir.

12   Q.   During the whole time that you are with him in the

13   truck, you're both wearing firearms, correct?

14   A.   Correct.  Yes, sir.

1:23PM15   Q.   The firearms are visibly displayed, correct?

16   A.   Not once we were seated.

17   Q.   In other words, they are visibly displayed on your

18   body?

19   A.   Mine was on my hip.

1:24PM20   Q.   They are not concealed, correct?

21   A.   No, sir.

22   Q.   Was Special Agent Aycock's also on his hip?

23   A.   Correct.  Yes, sir.

24   Q.   Now, you testified that at that point, Special Agent

1:24PM25   Aycock asked for consent to record the interview, correct?

1:24 PM 1    A.    Yes, sir.

2    Q.    And you testified that you record interviews for your

3    own protection.  That's what you said on direct

4    examination, correct?

1:24 PM 5    A.    Yes, sir.

6    Q.    In other words, so that there's no ambiguity about

7    what's said or what's not said, correct?

8    A.    Correct.

9    Q.    And there is an accurate memorialization of whether

1:24 PM 10   someone said something or whether someone didn't say

11   something, is that fair to say?

12   A.    Yes, sir.

13   Q.    In fact, you testified that HSI policy is to record

14   when someone is in custody, correct?

1:24 PM 15   A.    We are only mandated to record an interview when

16   somebody is in custody.

17   Q.    And you have the discretion to record the interview

18   when someone is not in custody, correct?

19   A.    Correct.

1:25 PM 20   Q.    You testified that prior to essentially pushing the

21   record button on, if I understand your testimony correctly,

22   Mr. Duggar, you claim, made a spontaneous statement,

23   correct?

24   A.    Yes, sir.  We enter the vehicle.  Agent Aycock had

1:25 PM 25   received consent to record.  Mr. Duggar made the statement

1:25PM 1  and then Agent Aycock asked him to stop, hold off on any

2  more questions until he could start his recording device.

3  Q.   What specifically are you claiming that Mr. Duggar

4  said at that point?

1:25PM 5  A.   "What is this about?  Has somebody been downloading

6  child pornography?"

7  Q.   Now, you have listened to the approximately 51-minute

8  recorded interview prior to being in court today, correct?

9  A.   Yes, sir.

1:25PM 10  Q.   You also had the opportunity to listen to that

11  interview while sitting on the witness stand on direct

12  examination today, correct?

13  A.   Correct.  Yes, sir.

14  Q.   Would you agree with me that nowhere in the entire

1:25PM 15  51-minute recording did anyone ever circle back to that

16  statement that you claim was made?

17  A.   Correct.

18  Q.   In other words, at various times, would you agree with

19  me no one, for example, you or Special Agent Aycock, said,

1:26PM 20  "Mr. Duggar, you asked whether this was about child

21  pornography" or something along those lines, correct?

22  A.   No, sir.  When we, I think around the 25 to 30-minute

23  mark, started to explain the reason as to why that search

24  warrant was executed, it came out that it was about child

1:26PM 25  pornography.

1:26PM 1    Q.   But prior to that point, Mr. Duggar had asked several

       2    times what this was about, correct?

       3    A.   Yes, sir.

       4    Q.   And on the recording, Mr. Duggar did not say anything

1:26PM 5    about whether this was about child pornography, correct?

       6    A.   No, sir.  We had not told him yet at that point.

       7    Q.   And in response to those questions, you didn't say, or

       8    Agent Aycock didn't say, "Well, Mr. Duggar, you already

       9    asked about whether this was about child pornography," or

1:26PM10    reference anything in connection with this alleged

      11    spontaneous statement?

      12    A.   No, sir.

      13    Q.   You claim that this alleged spontaneous statement was

      14    before Mr. Duggar received any sort of Miranda warning,

1:27PM15    correct?

      16    A.   Correct.

      17    Q.   Now, the recording that we all listened to, I just

      18    want to get our bearings about a couple of things before we

      19    get into some details.  Okay?

1:27PM20    A.   Yes, sir.

      21    Q.   You would agree with me that that entire recording

      22    occurred approximately 10 to 15 minutes after Mr. Duggar

      23    tried to call his lawyer?

      24    A.   Yes, sir.

1:27PM25    Q.   You would agree with me that during that time period,

1:27PM 1  the only reason he could not call his lawyer was because

2  you physically took the phone from him?

3  A.   Not necessarily, no, sir.

4  Q.   How could he have called his lawyer?

1:27PM 5  A.   He was free to leave.

6  Q.   In what vehicle?

7  A.   Any of the 30 that were on the lot.

8  Q.   Where were the keys to those vehicles?

9  A.   In the office.

1:27PM10  Q.   Where special agents were searching, correct?

11  A.   All he had to do was ask and somebody would have

12  escorted him in there to get a set of keys.

13  Q.   Did you tell him that?

14  A.   No, sir.  He didn't ask.

1:28PM15  Q.   You seized a number of phones on site that day,

16  correct?

17  A.   Yes, sir.

18       MR. GELFAND:  Your Honor, to identify certain

19  photographs, would the Court prefer that I approach the

1:28PM20  witness or just show them on the Elmo?

21       THE COURT:  Since there's not a jury here, you

22  can just show them on the Elmo.

23       MR. GELFAND:  Thank you.  Your Honor, I'm happy

24  to provide my copy of this to the Court.

1:29PM25       MR. ROBERTS:  I'll provide all the copies to the

1:29PM 1   Court.   May I, Your Honor?

2          THE COURT:   Yes.   Thank you.

3   Q.   (By Mr. Gelfand.)   Do you see Exhibit V in front of

4   you?

1:29PM 5   A.   Yes, sir.

6   Q.   Do you recognize Exhibit V?

7   A.   It's a cell phone that I'm assuming was on the scene

8   that day.

9   Q.   Do you see a placard that was used by your team to

1:29PM10   identify evidence?

11   A.   Yes, sir.

12   Q.   Is it a true and correct copy of a picture that was

13   taken on the scene that day?

14   A.   I believe so.

1:29PM15          MR. GELFAND:   Your Honor, I move Defense Exhibit

16   V, as in victory, into evidence.

17          MR. ROBERTS:   Your Honor, I'm not sure of the

18   relevance yet.   We're here for a statement, and then

19   separately, if that phone belonged to Mr. Berry or -- I

1:29PM20   honestly don't know.   Right now, I would object to

21   relevance.

22          THE COURT:   Where are we going with all these?

23          MR. GELFAND:   Two things, Your Honor.   One, that

24   they took into possession phones that were on site that

1:29PM25   day, which goes to the ability to contact counsel.

1:30PM 1    Number two, I believe it also goes to the *Youngblood* issue,

2    Your Honor, separate and apart from this.

3            THE COURT:  Can you represent to the government

4    whose phone this is, to your knowledge?

1:30PM 5            MR. GELFAND:  I was going to ask the Agent if he

6    recognized which phone this is.

7    A.    I don't necessarily recognize the phone.  I know that

8    we did seize Mr. Duggar's iPhone 11 that day.

9    Q.    (By Mr. Gelfand.)  If I show you real quickly Exhibit

1:30PM10   X and Exhibit W, can you tell me which phone was

11   Mr. Duggar's?

12   A.    No, sir.

13   Q.    Did you seize all three of these phones?

14   A.    I'm aware of seizing Mr. Duggar's phone.

1:30PM15   Q.    Did law enforcement seize any other phones?

16   A.    On that particular day, I don't believe so.

17   Q.    Can you tell me why there's evidence placards near the

18   phones if they weren't seized?

19   A.    Photographs.

1:31PM20   Q.    Your testimony is you don't know whose phones are

21   reflected on Exhibits V, X, and W, correct?

22   A.    No, sir.  As I sit here, I'm unaware.  Or at least I

23   don't know right now.

24   Q.    During the interview that you conducted with

1:31PM25   Mr. Duggar, you expressly told him that his lawyer could

1:31PM 1  not physically come onto the scene, correct?

2  A.   Not while the search warrant was still being executed,

3  no, sir.

4  Q.   And during the entirety of that interview with

1:31PM 5  Mr. Duggar, the search warrant was being executed, correct?

6  A.   Correct.  Yes, sir.

7  Q.   Now, I want to play you a couple of portions, just

8  small snippets of the audio that we listened to that the

9  government introduced into evidence on the recording.

1:32PM 10  A.   Yes, sir.

11         (Audio Played)

12         AGENT FAULKNER:  It's basically, as you've seen

13  on police shows --

14         JOSH DUGGAR:  Yeah.

1:32PM 15         AGENT FAULKNER:  -- this is just what we have to

16  do so that we can open up a line of communication about why

17  we're here today.

18         (End of Audio)

19  Q.   (By Mr. Gelfand.)  Now, Agent Faulkner, this was the

1:32PM 20  beginning at approximately the 3-minute and 15-second

21  mark --

22  A.   Yes, sir.

23  Q.   -- where you were going over the Miranda statement of

24  rights form, correct?

1:32PM 25  A.   Yes, sir.

1:32PM  1   Q.   And is it fair to say that we just heard you tell

2   Mr. Duggar that signing this form is necessary to open a

3   line of communication as to why you are there that day?

4   A.   Could you repeat the question?

1:33PM  5   Q.   Is it fair to say that you told Mr. Duggar that it was

6   necessary for him to sign this form to open a line of

7   communication as to why you're there that day?

8   A.   I don't believe I said it was necessary, unless it's

9   different in the audio.  That is something that we do,

1:33PM 10   again, to protect ourselves and the other individuals for

11   us to have an open line of communication.

12   Q.   In other words, to tell Mr. Duggar why you were there

13   that day, it was your precondition that he had to sign this

14   statement of rights form, correct?

1:33PM 15   A.   No, sir.

16   Q.   When were you going to tell him if he didn't sign this

17   form?

18   A.   Tell him?

19   Q.   Why you were there that day.

1:33PM 20   A.   If he had declined and invoked his rights, we would

21   have explained exactly what was going on.

22   Q.   Did you tell him that?

23   A.   No, sir.

24   Q.   Agent, throughout this entire interview, he referenced

1:33PM 25   a desire to speak with his lawyer multiple times, correct?

1:34PM 1  A.   No, sir.

2  Q.   Let's listen to approximately the 19-minute and

3  40-second mark.

4         (Audio Played)

1:34PM 5         JOSH DUGGAR:  Everything that I've already said

6  I'm going to say the best of my knowledge.  I'm trying to

7  be straightforward with you guys too.

8         AGENT FAULKNER:  Absolutely.

9         JOSH DUGGAR:  I'm trying to make that easier.

1:34PM 10         AGENT FAULKNER:  Look, we appreciate that.

11         JOSH DUGGAR:  I just don't want to get into

12  entrapment of any sort.

13         AGENT FAULKNER:  Right, absolutely.

14         JOSH DUGGAR:  And I'm not saying that -- you

1:34PM 15  know, I don't want to say something that I just think of

16  right now and then not -- honestly.

17         AGENT FAULKNER:  Right.  And I don't want you to

18  think also that we're keeping you from having an attorney.

19  I know when we got here --

1:34PM 20         JOSH DUGGAR:  Right.

21         AGENT FAULKNER:  -- you said you wanted to call

22  him.

23         JOSH DUGGAR:  Right.

24         AGENT FAULKNER:  Obviously with your phone, we

1:34PM 25  can't do that.  We will call him.  He can't come on scene

1:34PM  1    right now while we're here.

     2                    (End of Audio)

     3    Q.   (By Mr. Gelfand.)   Agent Faulkner, you acknowledged

     4    that you knew at this point, approximately 19 minutes into

1:34PM  5    the interview, that Mr. Duggar had wanted to contact his

     6    attorney, correct?

     7    A.   Yes, sir.   That was based on our initial interaction

     8    when he had pulled out his phone.

     9    Q.   And you knew that throughout this interview, as you

1:35PM 10    told him on that recording that we just listened to, that

    11    he had not been able to contact his attorney because you

    12    took his phone, correct?

    13    A.   No, sir, I don't believe I told him he could not

    14    contact his attorney.

1:35PM 15    Q.   Could we listen?   We played it kind of quickly.

    16    19-minute and 40 seconds.

    17                    THE COURT:   Before you do that, can you confirm

    18    just the cross-reference for the record that in the

    19    transcript, we're on page 28, bottom half of the page?

1:36PM 20                    MR. GELFAND:   Yes, Your Honor, the bottom of

    21    page 28.

    22                    THE COURT:   Thank you.

    23                    MR. GELFAND:   Back up a little more for context

    24    to minute number 19.

1:36PM 25                    (Audio Played)

1:36PM 1    AGENT AYCOCK: -- knowledge of electronic devices

2 like Torrent files, uTorrent, stuff like that?

3    JOSH DUGGAR: I'd rather not get into any

4 specifics on knowledge.

1:36PM 5    AGENT AYCOCK: Okay. All right.

6    Gerry, do you have anything else as far as that

7 goes?

8    JOSH DUGGAR: Are you guys able to answer any

9 questions from me as far as anything?

1:36PM10    AGENT FAULKNER: I think we're probably going to

11 get to that point now where --

12    JOSH DUGGAR: Okay. Yeah.

13    AGENT FAULKNER: Where -- and I can't speak on

14 your behalf --

1:36PM15    JOSH DUGGAR: Yeah.

16    AGENT FAULKNER: -- that you're going to probably

17 not going to answer too many more of our questions.

18    JOSH DUGGAR: No, I understand.

19    AGENT FAULKNER: Which, then, if that be the

1:36PM20 case, obviously, we --

21    JOSH DUGGAR: Well, I just -- without legal

22 counsel --

23    AGENT FAULKNER: I know. No, no.

24    JOSH DUGGAR: -- I don't want to --

1:36PM25    AGENT FAULKNER: And here's the --

1:36PM 1              JOSH DUGGAR:  -- say something.  And like I say

2  --

3            (End of Audio)

4  Q.  (By Mr. Gelfand.)  At that point, Agent Faulkner, that

1:38PM 5  we just listened to, did you hear Mr. Duggar say, "Without

6  legal counsel," and then you kept interrupting him saying

7  "No, no?"

8  A.  Yes, sir.

9            (Audio Played)

1:38PM 10            JOSH DUGGAR:  Everything that I've already said

11  I'm going to say the best of my knowledge.  I'm trying to

12  be straightforward with you guys too.

13            AGENT FAULKNER:  Absolutely.

14            JOSH DUGGAR:  I'm trying to make that easier.

1:38PM 15            AGENT FAULKNER:  Look, we appreciate that.

16            JOSH DUGGAR:  I just don't want to get into

17  entrapment of any sort.

18            AGENT FAULKNER:  Right, absolutely.

19            JOSH DUGGAR:  And I'm not saying that -- you

1:38PM 20  know, I don't want to say something that I just think of

21  right now and then not -- honestly.

22            AGENT FAULKNER:  Right.  And I don't want you to

23  think also that we're keeping you from having an attorney.

24  I know when we got here --

1:38PM 25            JOSH DUGGAR:  Right.

1:38PM  1          AGENT FAULKNER:  -- you said you wanted to call

        2  him.

        3          JOSH DUGGAR:  Right.

        4          AGENT FAULKNER:  Obviously, with your phone, we

1:38PM  5  can't do that.  We will call him.  He can't come on scene

        6  right now while we're here, but we will at least alert him

        7  to the fact that we're here.

        8          (End of Audio)

        9  Q.   (By Mr. Gelfand.)  Agent, you told Mr. Duggar,

1:39PM 10  "Obviously, with your phone, we can't do that," meaning

       11  call his lawyer, correct?

       12  A.   With his specific phone, yes, sir.

       13  Q.   You then told him, "We will call him.  He can't come

       14  on scene right now while we're here," correct?

1:39PM 15  A.   Correct.  Yes, sir.

       16  Q.   But then the audio, if I heard it correctly -- but you

       17  tell me -- says, "But we will let you at least alert him to

       18  the fact that we're here."  But "let you" doesn't appear in

       19  the transcript.  Do you want to listen briefly again?

1:40PM 20  A.   Yes, sir.

       21          (Audio Played)

       22          JOSH DUGGAR:  I don't want to say something that

       23  I just think of right now and then not -- honestly.

       24          AGENT FAULKNER:  Right.  And I don't want you to

1:40PM 25  think also that we're keeping you from having an attorney.

1:40PM 1  I know when we got here --

2              JOSH DUGGAR:  Right.

3              AGENT FAULKNER:  -- you said you wanted to call

4  him.

1:40PM 5              JOSH DUGGAR:  Right.

6              AGENT FAULKNER:  Obviously, with your phone, we

7  can't do that.  We will call him.  He can't come on scene

8  right now while we're here, but we will at least alert him

9  to the fact that we're here.

10              (End of Audio)

11  Q.   (By Mr. Gelfand.)  Did you say, "We will let you at

12  least alert him to the fact that we're here?"

13  A.   No, sir.  I said that we would alert him.

14  Q.   Did you alert Mr. Duggar's counsel to the fact that he

1:40PM15  was here?

16  A.   No, sir, because by the time we had concluded

17  everything that evening, we were already notified that

18  Mr. Story had contacted the U.S. Attorney's Office.

19              THE COURT:  What was that again?

1:40PM20              THE WITNESS:  By the time we had wrapped up with

21  processing the scene and all the evidence, I had been

22  notified that Mr. Story had contacted the United States

23  Attorney's Office.

24  Q.   (By Mr. Gelfand.)  So to be clear, Agent Faulkner,

1:41PM25  throughout the entirety of your time on scene, you did not

1:41PM 1    actually call Mr. Story or any lawyer on behalf of

2    Mr. Duggar, correct?

3    A.    While on scene, no, sir.

4    Q.    Now, during the interview, you told him -- you

1:41PM 5    discussed the seizure and subsequent anticipated search of

6    Mr. Duggar's phone with him, correct?

7    A.    Correct.

8    Q.    You told him that a number of forensic analysts are

9    going to spend quite some time forensically evaluating the

1:41PM 10   devices, including the phone, correct?

11   A.    Yes, sir.  More specifically the phone since we were

12   not provided the password.

13   Q.    And like you said in your under-oath search warrant

14   affidavit introduced as Exhibit 1 by the government, doing

1:41PM 15   an accurate search of electronic devices requires taking it

16   to a laboratory, correct?

17   A.    Are you referencing paragraph 45, sir?

18   Q.    Yes.

19   A.    That's the necessity of on-site/off-site forensic

1:42PM 20   examinations.  And that is a true and correct statement,

21   but that is often the case.  Not always the case.

22   Q.    So to be clear, based on your training and your

23   experience, to meaningfully search an electronic device,

24   including a phone, analysts have to take it back to a

1:42PM 25   laboratory in a controlled environment, correct?

1:42PM 1   A.   Not always.  It depends on the complexity of the

2   device.

3   Q.   Can you search unallocated space in the field?

4   A.   I'm not aware, sir.

1:42PM 5   Q.   Now, with Mr. Duggar during this interview, you

6   discussed Randall Berry specifically, correct?

7   A.   Yes, sir.

8   Q.   And to be clear, Mr. Duggar told you that at various

9   times, Mr. Berry was on site at the car lot?

1:43PM10   A.   As an employee?

11   Q.   Yes.

12   A.   Yes, sir.

13   Q.   You actually interviewed Mr. Berry in connection with

14   this investigation as you testified later that day,

1:43PM15   correct?

16   A.   Yes, sir.

17   Q.   Mr. Berry told you positively that he was offered the

18   job by Mr. Duggar on June 11th, is that correct?

19   A.   That is correct.  Yes, sir.

1:43PM20   Q.   Of 2019, correct?

21   A.   Yes, sir.

22   Q.   And he told you positively that -- meaning Mr. Berry

23   told you positively -- that he remembered starting on

24   either June 12th or June 13th, correct?

1:43PM25   A.   I believe he said that he was offered the job the same

1:43PM 1  day he bought the truck on the 11th, but didn't officially

2  start until a few days later, correct.

3  Q.   And to be clear, when he said that, you and Special

4  Agent Aycock were interviewing him, correct?

1:43PM 5  A.   Correct.  Yes, sir.

6  Q.   And when Mr. Berry said that, you all kind of joked

7  with him a little bit saying something along the lines of,

8  "How is it you possibly remember the day you bought the

9  car", correct?

1:44PM 10  A.   Yes, sir.

11  Q.   In other words, you were kind of focusing,

12  hyper-focusing, with him on that date.  "Do you really

13  remember that being the date that you started," correct?

14  A.   Correct.

1:44PM 15  Q.   And he was very confident throughout the entire

16  interview with you that the date he started was plus or

17  minus June 11th or June 12th of 2019, correct?

18  A.   Yes, sir.

19  Q.   You later learned over the course of your

1:44PM 20  investigation that that was not accurate, correct?

21  A.   Correct.

22  Q.   You later learned over the course of your

23  investigation that he had actually started the month

24  earlier, correct?

1:44PM 25  A.   I believe his last check was May 31st.  Or his first

1:44PM 1    check was May 31st.  I'm sorry.

2    Q.    In other words, his confidence of when he started was

3    wrong, correct?

4    A.    He was incorrect on his dates, that is right.

1:44PM 5    Q.    He also told you that he was only paid salary when you

6    interviewed him, correct?

7    A.    He said Mr. Duggar wanted him to be commission when he

8    first started, but that he argued to be salary so that he

9    was a man on the clock and by the hour.

1:45PM10    Q.    And he told you that that was important to him because

11    if he only sold one car or couldn't sell any cars, then he

12    didn't have the security of a paycheck, correct?

13    A.    Correct.

14    Q.    In other words, he doubled down on that too, correct?

1:45PM15    A.    Yes, sir, after a discussion with Mr. Duggar.

16    Q.    I'm showing you what you all introduced as Government

17    Exhibit 7.

18    A.    I'm sorry.  You said 7?

19    Q.    Correct.  You can just look on the screen if it's

1:45PM20    easier.  Does this appear to be a May 31st check reflecting

21    commissions for the week of 5-24 to 5-31?

22    A.    Yes, sir.

23    Q.    Fair to say that over the course of the investigation,

24    certain things Mr. Berry had told you in your interview

1:45PM25    turned out to be inaccurate?

1:45PM 1  A.   My understanding, that would be probably the only

2  thing.

3  Q.   When he started working and whether he was paid salary

4  or commission?

1:46PM 5  A.   His start date.

6  Q.   You will agree with me that, at least per Government

7  Exhibit 7, he was paid commission, correct?

8  A.   Per the check, it says commission, but I believe

9  Mr. Berry was saying that that was what Mr. Duggar wanted

1:46PM10  him to do in the beginning, and then they had a

11  conversation about putting him as salary.

12  Q.   When you interviewed Mr. Duggar, he also discussed

13  Mr. Mize, correct?

14  A.   Yes, sir.

1:46PM15  Q.   And as you testified, you had a lengthy discussion on

16  that recording with Mr. Duggar about Mr. Mize, correct?

17  A.   Correct.  Yes, sir.

18  Q.   Mr. Duggar told you that he didn't know it at the

19  time, but he had learned that Mr. Mize sometimes shows up

1:46PM20  unannounced at the car lot, correct?

21  A.   Correct.

22  Q.   He told you that Mr. Mize had apparently obtained the

23  code to the office of the car lot, correct?

24  A.   Correct.

1:46PM25  Q.   He had told you that Mr. Mize had bought approximately

1:46PM 1  eight vehicles over the course of whatever period of time?

2  A.   Yes, sir, give or take.

3  Q.   A lot of vehicles, correct?

4  A.   A lot of vehicles, correct.

1:47PM 5  Q.   Mr. Duggar told you that Mr. Mize had access to the

6  wi-fi, correct?

7  A.   I believe so.

8  Q.   Mr. Duggar told you that he had asked to borrow the

9  computer, correct?

1:47PM 10  A.   I don't believe so.  Or at least I don't recall that.

11  Q.   Now, when you interviewed Mr. Berry -- let me jump

12  around a little bit chronologically.  You interviewed

13  Mr. Berry that day about a half an hour or so after you

14  interviewed Mr. Duggar, correct?

1:47PM 15  A.   Around that time.  It was immediately, or it was right

16  after Mr. Duggar's interview.

17  Q.   Mr. Berry told you that he had been arrested plenty of

18  times, correct?

19  A.   Yes, sir.

1:47PM 20  Q.   "He" being Mr. Berry, correct?

21  A.   Mr. Berry, correct.

22  Q.   He told you that he was basically illiterate when it

23  comes to computer devices, correct?

24  A.   Yes, sir.

1:48PM 25  Q.   You didn't independently verify that claim, correct?

1:48PM 1  A.    By -- I'm sorry?

2  Q.    You took that at face value, correct?

3  A.    Yes, sir.

4  Q.    And you would agree with me that his phone would have

1:48PM 5  evidence to corroborate or rebut the fact as to how text

6  savvy he is, correct?

7  A.    Yes, sir.

8  Q.    Mr. Berry admitted to you that he looked at what he

9  called smut, S-M-U-T, correct?

1:48PM10  A.    Yes, sir.

11  Q.    What was your understanding of what he meant by that

12  term?

13  A.    Adult pornography.

14  Q.    And specifically -- and I understand you explained

1:49PM15  that it was a time translation mistake -- you had asked

16  Mr. Berry about whether he was at the car lot on May 14th

17  and May 15th between 10 and 11:00 p.m., correct?

18  A.    That's correct.  Yes, sir.

19  Q.    Because at that time, you were asking him about that

1:49PM20  time because you were under the misimpression that those

21  were the relevant times, correct?

22  A.    Correct.  Yes, sir.

23  Q.    In fact, you never asked him whether he was there five

24  or six hours earlier on those dates, correct?

1:49PM25  A.    Not specifically.

1:49PM 1   Q.   Now, you testified that the cell phone that Mr. Berry
       2   had on his person was searched via a manual triage --
       3   A.   Yes, sir.
       4   Q.   -- by a forensic examiner on scene, correct?
1:49PM 5   A.   Yes, sir.
       6   Q.   To be clear, you would agree with me that Mr. Berry's
       7   cell phone being on site on the day you executed the
       8   warrant fell within the scope of the warrant?
       9   A.   Yes, sir.
1:49PM10   Q.   And you seized that phone consistent with that
      11   authority that you believed you had under the warrant,
      12   correct?
      13   A.   Correct.
      14   Q.   So you agree with me right here, right now, that it
1:50PM15   was your understanding you had every right to search
      16   Mr. Berry's cell phone that day, correct?
      17   A.   Pursuant to a federal search warrant, yes, sir.
      18   Q.   When you say a "manual triage," does that use
      19   software?
1:50PM20   A.   No, sir, not that I'm aware of.
      21   Q.   So is it your testimony that not a single report was
      22   generated by the CFA as manual triage?
      23   A.   A forensic report?
      24   Q.   Any report.
1:50PM25   A.   No, sir.

1:50 PM 1   Q.   Why not image it?

2   A.   I didn't have the phone, sir.

3   Q.   How long does it take to forensically image a cell

4   phone?

1:50 PM 5   A.   I couldn't tell you that, sir.

6   Q.   Mr. Berry, when you interviewed him, actually told you

7   that Mr. Mize had the code to the office of the car lot,

8   correct?

9   A.   He believed he thought he might have been -- well,

1:51 PM 10   actually, I think he was referring to the other individual

11   who had been behind him one day when he entered the code to

12   the main office.

13   Q.   Back up for a second, because I want to be very

14   precise.

1:51 PM 15   A.   I don't believe it was Mr. Mize.

16   Q.   Mr. Berry told you that Mr. Mize had obtained the code

17   to the office by watching someone punch it in, correct?

18   A.   It could possibly have been Mr. Berry -- I mean,

19   Mr. Mize that you're referring to.

1:51 PM 20   Q.   You would agree with me that paystubs don't tell us

21   when someone breaks into a place, correct?

22   A.   No, sir.

23   Q.   Now, you also interviewed Mr. Mize on December 16th of

24   2018, correct?

1:51 PM 25   A.   Correct.  Yes, sir.

1:51PM 1    Q.   When you interviewed Mr. Mize, you Mirandized him,

2    just as the other individuals that you testified about

3    today, correct?

4    A.   Yes, sir.

1:51PM 5    Q.   And Mr. Mize admitted to you that he had stayed at the

6    car lot, meaning Wholesale Motorcars?

7    A.   Yes, sir.

8    Q.   Without Mr. Duggar's knowledge or consent, correct?

9    A.   Correct.

1:52PM10    Q.   You would agree with me as a Special Agent in your own

11    words at this time trying to figure out who was behind the

12    computer, you would agree with me that it's not

13    insignificant that someone admitted to staying at a

14    location without the owner's knowledge or consent, correct?

1:52PM15    A.   That it's not?

16    Q.   That it is significant, correct?

17    A.   Yes, sir.

18    Q.   You would agree with me that that's not a fact that

19    you expected to hear, correct?

1:52PM20    A.   No, sir.  But the fact that he said that Randall Berry

21    was the individual that found him the next morning, now,

22    knowing what we know, shows that Mr. Berry or Mr. Randall

23    Berry had not been working there on our dates in question,

24    so that would have been after the fact.

1:52PM25    Q.   Let's be precise for a second.  When you testified

1:52PM 1  about this on direct examination, you testified that this

2  was December 16th of 2018.  And at this time --

3  A.   Yes, sir, at that time.

4  Q.   Correct.  And at that time, you knew that there was

1:53PM 5  what you described as child pornography on the desktop

6  computer, the HP All-in-One, correct?

7  A.   Correct.  Yes, sir.

8  Q.   And you would agree with me that at this time, you had

9  already determined with your team that there's not even a

1:53PM10  single forensic trace of child pornography on any of

11  Mr. Duggar's personal devices?

12  A.   I don't know if we knew at that time.  All I can tell

13  you is that the CFA had located child sexual abuse material

14  on the HP.

1:53PM15  Q.   But you testified that at that time, you did not know

16  about the Linux partition or the TOR browser, correct?

17  A.   Correct.

18  Q.   Where was the alleged child pornography?

19  A.   On the Linux side of the partition.

1:53PM20  Q.   Help me understand this.  You just testified that at

21  that time, you didn't know about the Linux partition?

22  A.   No, sir, I did not know.

23  Q.   No one told you?

24  A.   No, sir.  We were just informed in late November that

1:54PM25  child pornography had been located on the HP desktop.

1:54 PM 1    Q.   Mr. Mize initially denied to you and Special Agent

2    Aycock ever entering the business office, correct?

3    A.   Without an employee present.

4    Q.   He denied that, correct?

1:54 PM 5    A.   He denied entering the business office by himself.

6    Q.   But Mr. Berry told you that he had done that, correct?

7    A.   No, sir, I don't believe so.

8    Q.   Mr. Mize admitted to viewing pornography with his

9    phone, correct?

1:54 PM 10   A.   Yes, sir.

11   Q.   So just to be clear, both of these individuals,

12   Mr. Berry and Mr. Mize, both admitted to using their

13   cellular devices to view at least adult pornography,

14   correct?

1:54 PM 15   A.   Adult pornography.

16   Q.   In your manual searches, did you see any forensic

17   evidence that they had viewed adult pornography?

18   A.   No, sir, not on those devices.  At least on

19   Mr. Mize's.

1:54 PM 20   Q.   Even though they both admitted to you that they used

21   those devices for that purpose?

22   A.   Not those specific devices.

23   Q.   Did you ask them for their other devices?

24   A.   Those were the only ones they had on hand.

1:55 PM 25   Q.   You testified that Mr. Mize told you that his cell

1:55PM 1   phone was not purchased until October of 2019, correct?

2   A.   Correct.

3   Q.   Did you independently confirm whether that was true?

4   A.   No, sir.   But it was consistent with, during the

1:55PM 5   review of the time stamps, of how far it went back.

6   Q.   What was the make and model and year of the phone?

7   A.   I'm sorry?

8   Q.   What was the make, model, and year of the phone?

9   A.   Of Mr. Mize's phone?

1:55PM10   Q.   Yes.

11   A.   I'd have to go back and review that.

12   Q.   He gave you consent to search his phone, correct?

13   A.   Correct.

14   Q.   So you were asked a question on direct examination

1:55PM15   about whether you had probable cause.   With his consent,

16   would you agree that that's not an issue?

17   A.   We had consent to search.   We didn't have probable

18   cause to seize.

19   Q.   Did you ask him whether you could forensically image

1:55PM20   it?

21   A.   No, sir.   He gave us consent.

22   Q.   With respect to both of these phones, the Berry phone

23   and the Mize phone --

24   A.   Yes, sir.

1:56PM25   Q.   -- is there any record anywhere in the universe that

1:56PM 1  you all have about what was on these phones?

2  A.    No, sir.

3  Q.    Now, we have talked about Mr. Berry and Mr. Mize and

4  what you discussed with them and with Mr. Duggar in the

1:56PM 5  vehicle, correct?

6  A.    Yes, sir.

7  Q.    In the interview with Mr. Duggar, you told Mr. Duggar

8  -- you asked him about uTorrent software, correct?

9  A.    Correct.

1:56PM 10  Q.    And you previously testified on direct examination

11  elsewhere that uTorrent software, meaning BitTorrent

12  software, was relevant to your investigation, correct?

13  A.    Correct.

14  Q.    You would agree with me that BitTorrent software can

1:57PM 15  be Linux-based or Windows-based, correct?

16  A.    I'm not that familiar with the program.

17  Q.    Do you know whether the software that was on the HP

18  device, the BitTorrent software, was Linux-based or

19  Windows-based?

1:57PM 20  A.    No, sir, I do not.

21  Q.    So sitting here today, you don't know one way or the

22  other?

23  A.    No, sir.

24  Q.    That's not something any of the forensic experts that

1:57PM 25  you all have used have told you?

1:57PM 1    A.    I haven't asked.

2    Q.    And they haven't told you, correct?

3    A.    No, sir.

4    Q.    Now, if we look at approximately minute 43.

1:57PM 5              MR. GELFAND:  Your Honor, this would

6    cross-reference to page 58 of the transcript.

7              THE COURT:  Page 58 is time marker 1-minute-53?

8              MR. GELFAND:  No.  I'm sorry.  Minute 43

9    approximately.

1:58PM 10             (Audio Played)

11             AGENT FAULKNER -- forensics I was talking to you

12   about, they don't happen overnight, unfortunately.  There's

13   a lot of stuff that --

14             JOSH DUGGAR:  Yes.

1:58PM 15            AGENT FAULKNER:  -- goes on with it.  It could

16   take anywhere from a week to a month to a year.  If at any

17   given point in time our forensic guys come to us and say,

18   "Hey, look.  We know through our examinations that this

19   specific device downloaded all this on this date and time,"

1:58PM 20   which matches up to what we're seeing on the front end,

21   would you be willing to come back and talk to us and say,

22   "Hey, look.  Here's more of a better specific time frame

23   who was around here at this point in time," or do you

24   recall any of this stuff?

1:58PM 25            JOSH DUGGAR:  I mean, it's so far back, I don't

```
1:58PM  1   know, I mean, I can get in touch with my attorney --
        2              AGENT FAULKNER:  All right.  That's fine.
        3              JOSH DUGGAR:  -- and see what he says, yeah.
        4              AGENT FAULKNER:  That's fine.  That's -- that's
1:58PM  5   fair.  From here -- and, again, you're able to leave --
        6              (End of Audio)
        7   Q.  (By Mr. Gelfand.)  You would agree with me, Agent
        8   Faulkner, that again Mr. Duggar references getting in touch
        9   with his attorney, correct?
1:59PM 10   A.   Not at that specific moment.
       11   Q.   He says, "I can get in touch with my attorney and see
       12   what he says, yeah," correct?
       13   A.   Meaning that if down the line, if we had found out --
       14   once we find out some more of the specifics of the
1:59PM 15   forensics and if we had contacted him, if he would be
       16   willing to come back.
       17   Q.   Again, when he mentions getting in touch with his
       18   attorney, you interrupt him and say, "All right, that's
       19   fine, that's fine," correct?
1:59PM 20   A.   Yes, sir.
       21   Q.   And if we fast forward to minute, 45.
       22              MR. GELFAND:  Page 61, Your Honor.
       23              (Audio Played)
       24              AGENT FAULKNER:  That's fine.
2:00PM 25              JOSH DUGGAR:  So it will lock after ten tries, so
```

2:00PM 1    --
       2              AGENT FAULKNER:  We have devices that will --
       3    that will get through that.
       4              JOSH DUGGAR:  I know.
2:00PM 5              AGENT FAULKNER:  But sometimes, based on that
       6    intrusive -- because it's a little bit more of a --
       7              (Next Audio Portion)
       8              AGENT FAULKNER:  So B gets into the specifics of
       9    what we're searching for.  We can't do those forensic
2:00PM10    examinations.  We can kind of do on-scene --
      11              JOSH DUGGAR:  Okay.
      12              AGENT FAULKNER:  -- previews, but we can't do --
      13              AGENT AYCOCK:  Detailed.
      14              AGENT FAULKNER:  -- thorough, detailed.
2:00PM15              JOSH DUGGAR:  Right.  Right.
      16              AGENT FAULKNER:  So we're going to take those.
      17    They're going to be seized.  You will get a property
      18    receipt.
      19              Now, here's the thing.  If there's nothing on
2:00PM20    those devices, I will get their --
      21              AGENT AYCOCK:  I'll get them.
      22              AGENT FAULKNER:  Agent Aycock will get them back
      23    to you.
      24              JOSH DUGGAR:  Okay.
2:00PM25              AGENT FAULKNER:  One of the things --

2:00PM 1          JOSH DUGGAR:  Do you know a time frame usually on

2  that?

3          AGENT AYCOCK:  That's what we just said.  Like --

4          JOSH DUGGAR:  I mean, I just bought that phone,

2:00PM 5  so now I don't know what I'm going to do to get --

6          AGENT FAULKNER:  Here's the thing about that

7  phone, and it's tricky.  And, again, this is completely up

8  to you.

9          JOSH DUGGAR:  Well, I can't -- I can't give you

2:00PM 10  access to it without talking to my attorney.

11          AGENT FAULKNER:  Right.

12          JOSH DUGGAR:  So that's -- I know what you're

13  going -- I know where you're going with that.  No.

14          AGENT FAULKNER:  What we do, though --

2:00PM 15          JOSH DUGGAR:  And I know you can get right past

16  it.

17      (End of Audio)

18  Q.   (By Mr. Gelfand.)  Again, Mr. Duggar references giving

19  you access to something without talking to his attorney,

2:01PM 20  correct?

21  A.   He said until he could talk to his attorney, he

22  wouldn't consider giving us the PIN.

23  Q.   And then when he mentions attorney again, you

24  interrupt him, correct?

2:01PM 25  A.   No, sir.  I think we are both talking to one another

2:01PM 1  right at the same time.

2  Q.   And you immediately start talking about, what we do

3  is, I'm saying it's an Apple device, so on and so forth,

4  correct?

2:01PM 5  A.   Correct.

6  Q.   Fair to say, Agent Faulkner, that throughout this

7  entire interview with Mr. Duggar, you knew he wanted to

8  talk to his attorney?

9  A.   No, sir.

2:01PM10  Q.   You had no clue that Mr. Duggar wanted to talk to his

11  attorney throughout this interview?

12  A.   No, sir.  His initial response at the beginning was --

13  my impression that he wanted to let his attorney know that

14  law enforcement was present.

2:02PM15  Q.   You know that he tried, physically, to contact his

16  attorney?

17  A.   He pulled out his phone, yes, sir.

18  Q.   And you stopped him, correct?

19  A.   I seized the phone, correct.

2:02PM20  Q.   Now, you testified about the Miranda statement of

21  rights form, correct?

22  A.   Yes, sir.

23  Q.   Showing you what's been previously admitted as

24  Government Exhibit 5.  You see that in front of you?

2:02PM25  A.   Yes, sir.

2:02PM 1  Q.   Whose handwriting is reflected before it was crossed

2  out where it says, "I was taken into custody at 1540 on

3  11-8-2019?"

4  A.   The hour and the date?

2:02PM 5  Q.   Yes.

6  A.   Agent Aycock.

7  Q.   And you recognize Agent Aycock's handwriting, correct?

8  A.   Yes, sir.

9  Q.   And both you and Agent Aycock actually signed and

2:03PM 10  dated this form, correct?

11  A.   Yes, sir.

12  Q.   Now, there was some discussion with Mr. Duggar about

13  whether he was in, quote, "custody," correct?

14  A.   No, sir.

2:03PM 15  Q.   When it came to executing that statement of rights

16  form, there was some discussion with Mr. Duggar about

17  whether he was or wasn't in, quote, "custody," correct?

18  A.   Oh, yes, sir.  We told him he was not in custody and

19  free to leave.

2:03PM 20  Q.   You would agree that that term, being a term of art,

21  wasn't defined in any of those discussions, correct?

22  A.   Say that again.  I'm sorry.  The term what?  I didn't

23  hear you.  I'm sorry.

24  Q.   Custody.

2:03PM 25  A.   Custody.  No, sir.

2:03PM 1    Q.    Right.   Now, you testified that he couldn't obviously

2           leave in the RV because you were searching the RV, or your

3           team was searching the RV, correct?

4           A.    At the onset of the execution of the search warrant,

2:04PM 5    no, sir, because, again, we located I believe his MacBook

6           in that RV.   So of course we had to process the scene,

7           photograph it.   So, no, immediately he would not have been

8           able to leave in that RV.

9           Q.    So what car did Mr. Duggar ultimately leave in that

2:04PM10    day?

11          A.    I'm unaware.   I think we were speaking with Mr. Berry

12          when he left, so I didn't see.

13          Q.    Now, finally, Special Agent, you testified about the

14          forensic examination that you essentially summarized,

2:04PM15    correct, on direct examination?

16          A.    The sheets?   Yes, sir.

17          Q.    Now, you testified that there was a program called

18          "Covenant Eyes," correct?

19          A.    Correct.   Yes, sir.

2:04PM20    Q.    And you testified that that had the same IP address

21          associated with essentially the search warrant and the

22          OzarksGo administrative agency summons, correct?

23          A.    I believe so, yes, sir.

24          Q.    Now, you would agree with me that was a business's IP

2:05PM25    address, correct?

2:05PM 1   A.   Correct.

2   Q.   And based on your training and experience, any device

3   on wi-fi would be accessing that IP address, correct?

4   A.   Typically, yes, sir.

2:05PM 5   Q.   You also testified that there was a Linux partition on

6   the HP desktop, correct?

7   A.   Yes, sir.

8   Q.   And you testified that that was created on May 13th of

9   2019, correct?

2:05PM10   A.   Correct.

11   Q.   Now, the summaries that you provided, Exhibits, I

12   believe it was 8 and 9.  Showing you Exhibit 8, briefly.

13   A.   Yes, sir.

14   Q.   Do you see the little bit of information from May 13th

2:06PM15   of 2019?

16   A.   Yes, sir.

17   Q.   It says that the TOR browser was installed on the

18   partition side of the HP computer and the Linux partition

19   was created on the HP computer, correct?

2:06PM20   A.   Correct.

21   Q.   Just to be clear, we're talking about one computer,

22   this desktop computer that's at issue in this case,

23   correct?

24   A.   The HP, yes, sir.

2:06PM25   Q.   Would you agree with me that there's nothing on your

2:06PM 1   summary about Mr. Duggar's alleged whereabouts on May 13th

       2   of 2019?

       3   A.   On this particular document, no, sir.

       4   Q.   Just to be clear, Government's Exhibit 9 references

2:06PM 5   two later dates, May 15th and 16th, correct?

       6   A.   Yes, sir.

       7   Q.   Now, you testified about the password that you found

       8   significant, "Intel 1988," correct?

       9   A.   Yes, sir.

2:07PM 10  Q.   Based on your investigation, this password was used on

       11  family, meaning Duggar family, social media accounts,

       12  correct?

       13  A.   Correct.

       14  Q.   In other words, a lot of people had access to this

2:07PM 15  password, correct?

       16  A.   I don't know, sir.

       17  Q.   You testified about BitTorrent.  Are you familiar with

       18  software called "Transmission?"

       19  A.   No, sir, I don't believe so.

2:07PM 20  Q.   Was there anything you're aware of in connection with

       21  this investigation involving "Transmission?"

       22  A.   No, sir.

       23  Q.   You testified that on May 14th and May 15th,

       24  particular files, and particularly the "mov" image file and

2:07PM 25  the "marissa.zip" file referenced in your search warrant --

2:08PM 1   A.    Yes, sir.

2   Q.    -- were physically viewed, correct?

3         MR. ROBERTS:  Your Honor, I'm going to object at

4   this point.  Clearly, he's getting into the topic of the

2:08PM 5   Franks hearing.

6         MR. GELFAND:  I'm not, Your Honor.

7         MR. ROBERTS:  I don't believe it's relevant to

8   these proceedings.

9         MR. GELFAND:  Your Honor, on direct examination

2:08PM10   he asked -- he testified that these were viewed on May 14th

11   and May 15th.

12         THE COURT:  I think the timeline and what the two

13   summary exhibits, I don't know exactly where he's going,

14   but this is cross of that subject matter.  If you think

2:08PM15   he's running afoul down the road, you can reassert your

16   objection, but I don't think he's there yet.

17         MR. ROBERTS:  Thank you, Your Honor.

18   Q.    (By Mr. Gelfand.)  Do you remember the question?

19   A.    No, sir.  Can you repeat?  I'm sorry.

2:08PM20   Q.    Not your fault.  On May 14th and May 15th, you

21   testified that two particular files, the "mov" file

22   identified in your search warrant --

23   A.    Yes, sir.

24   Q.    -- and the "marissa.zip" file, or set of files,

2:08PM25   identified in your search warrant --

2:08PM 1   A.   Yes, sir.

2    Q.   -- were viewed on May 14th and May 15th, correct?  Is

3    that correct?

4    A.   Yes, sir.

2:09PM 5   Q.   Sorry, I couldn't hear you.  How were they viewed?

6    I'm just trying to understand your testimony.  Did someone

7    sitting at that computer double-click them?

8    A.   Yes, sir.  Whoever was behind the computer at that

9    time, who we believe to be Mr. Duggar, clicked on those

2:09PM10   files to view them.

11    Q.   So your testimony is that whoever viewed these files

12    was physically viewing them from sitting behind the desktop

13    computer, correct?

14    A.   Yes, sir.

2:09PM15   Q.   And that's what your understanding from the computer

16    forensics investigation that your team did in this case

17    reveals, correct?

18    A.   Correct.  Yes, sir.

19    Q.   You testified that the MacBook was seized?

2:09PM20   A.   Yes, sir.

21    Q.   From the RV, correct?

22    A.   I believe it was located in the RV, correct.

23    Q.   I'm sorry.  You said located where?

24    A.   I believe it was located in the RV, correct.

2:09PM25   Q.   The MacBook you testified also had a BitTorrent

2:09PM 1  platform on it, correct?

2      A.    Yes, sir.

3      Q.    Was that the same BitTorrent platform that was on the

4  partition side of the desktop?

2:10PM 5  A.    I don't know, sir.

6      Q.    Based on your investigation, was the MacBook

7  BitTorrent, what was that used for?  What kind of files?

8      A.    The MacBook BitTorrent?

9      Q.    Yes.

2:10PM10  A.    I don't know, sir.

11      Q.    You readily admit that there's no evidence that

12  MacBook was ever used to view or access or download or

13  upload child pornography, correct?

14      A.    On the MacBook itself, no, sir.

2:10PM15  Q.    If you know, how much time in total did the user view

16  these two files?

17      A.    I don't have that answer, sir.  I'm sorry.

18      Q.    Meaning the "mov_216" file and the "marissa.zip"

19  files?

2:10PM20  A.    I couldn't tell you, sir.

21      Q.    Would you agree with me that the Linux partition and

22  the BitTorrent setup on the partition side required a high

23  level of tech sophistication?

24      A.    I wouldn't say a high level, but you'd have to know

2:11PM25  about computers.

2:11PM 1   Q.   Now, you testified that on the date of Mr. Duggar's

2          arrest, there was an arrangement made between Mr. Duggar's

3          attorneys and the prosecutors for the United States

4          Attorney's Office to permit Mr. Duggar to self-surrender,

2:11PM 5   correct?

6          A.   Correct.

7          Q.   And just to be clear, self-surrender essentially means

8          show up where and when you're told as opposed to agents

9          coming into his house and putting handcuffs on him,

2:11PM10   correct?

11         A.   Based on the nature of the offense and the fact that

12         children most probably would have been present in the

13         residence, this was the best outcome we felt for everybody.

14         Q.   And to be clear, Mr. Duggar did exactly as he was

2:11PM15   expected to do with respect to the self-surrender, correct?

16         A.   Yes, sir.

17         Q.   And you know that because you were essentially

18         surveilling him the whole time, correct?

19         A.   Correct.  Yes, sir.

2:11PM20   Q.   Now, you testified that when Mr. Duggar showed up at

21         HSI, meaning at your office, at that point, he was taken

22         into custody in the presence of his counsel, Mr. Travis

23         Story, correct?

24         A.   Yes, sir.

2:12PM25   Q.   Would you agree with me that when Mr. Story -- first

2:12PM 1  of all, were you physically present for that?

2  A.   I was.

3  Q.   You actually spoke directly with Mr. Story, correct?

4  A.   I did.

2:12PM 5  Q.   Mr. Story was happy to speak with you, based on what

6  you observed, for as long as you requested, correct?

7  A.   Yes, sir, for a short time.

8  Q.   In other words, he wasn't running out or anything?

9  A.   No.  No, sir.

2:12PM10  Q.   During your entire interaction with Mr. Story, did you

11  tell Mr. Story, or Mr. Duggar in Mr. Story's presence, of

12  any intention of taking pictures of Mr. Duggar's hands

13  and/or feet?

14  A.   No, sir.  At that time, I had not seen anything on

2:12PM15  Mr. Duggar's hands.

16  Q.   Now, you testified that the booking process consisted

17  of fingerprints, photos, and some biographical information,

18  correct?

19  A.   Yes, sir.

2:13PM20  Q.   And you testified pretty extensively about this

21  digital fingerprint system, correct?

22  A.   Correct.

23  Q.   Now, to be clear, your testimony is that at that

24  point, you claim that you noticed a scar on Mr. Duggar's

2:13PM25  hand, correct?

2:13PM 1   A.   On his left thumb.  Or a mark, a scar or mark.

2   Q.   To be clear, when you made the decision to take

3   pictures of Mr. Duggar's hands, that was not part of the

4   normal booking process, correct?

2:13PM 5   A.   We do take photographs of certain things during

6   booking.  That particular instance, it would not have been.

7   That's why, when I alerted Agent Aycock, he asked for

8   consent.

9   Q.   Before we get there for a second, my question is very

2:14PM10   simple, though.  I understand you take photos of faces, for

11   example, in different positions.  You don't take pictures

12   from the top of someone's hands, correct?

13   A.   Normally, no, sir.

14   Q.   Have you ever in any other case taken pictures of the

2:14PM15   top of someone's hands?

16   A.   We've taken pictures of hands, just obviously

17   different situations with individuals who are hands-on

18   offenders.

19   Q.   Now, Agent, you testified that at that point, you

2:14PM20   claim that Mr. Duggar, quote, unquote, "gave you his

21   consent," correct?

22   A.   Agent Aycock asked and he verbally gave consent, yes,

23   sir.

24   Q.   You would agree with me you did not have any sort of

2:14PM25   warrant authorizing the photographs that were taken,

2:14PM 1  correct?

2  A.    No, sir.

3  Q.    And you're aware of the three photographs that we're

4  talking about, correct?

2:15PM 5  A.    Correct.

6  Q.    And those are the three photographs and only the three

7  photographs that you took, or that Agent Aycock took of his

8  hands, correct?

9  A.    Yes, sir.

2:15PM 10  Q.    So there's no dispute that there was no warrant,

11  correct?

12  A.    Right.

13  Q.    You would agree with me that there was no attempt to

14  discuss this with Mr. Duggar's counsel at the time,

2:15PM 15  correct?

16  A.    No, sir.

17  Q.    And you would agree with me that prior to that date,

18  you had actually met Mr. Story, and on at least, or on one

19  occasion, me, in connection with this case, correct?

2:15PM 20  A.    Prior to the date of Mr. Duggar's arrest?

21  Q.    Yes.

22  A.    Yes, sir.

23  Q.    In other words, you knew he was represented by counsel

24  and you knew who he was represented by, correct?

2:15PM 25  A.    Oh, yeah.  Yes, sir.  Yes, sir.

2:15PM 1   Q.    Mr. Duggar was in custody when you claim he consented,

2          correct?

3          A.    Correct.

4          Q.    Did you explain or did Special Agent Aycock explain to

2:15PM 5   him when you claim he consented that you would ordinarily

6          need a warrant for this?

7          A.    No, sir.

8          Q.    You testified that Special Agent Aycock essentially

9          leaned over the table and took photos, correct?

2:16PM10   A.    Yes, sir.

11         Q.    Now, to be clear, Mr. Duggar was told where to put his

12         hands, correct?

13         A.    Essentially, yes, sir.

14         Q.    Not essentially.  Literally, correct?

2:16PM15   A.    I believe the way it went, Agent Aycock asked, "Can we

16         take a picture of your hands?"  "Yes, sir."  "Okay.  Can

17         you just put them down?"

18              I don't think he said put them down in this certain

19         location.  He just said, "Put them down and I'll take a

2:16PM20   picture."

21         Q.    To be clear, Special Agent Aycock told Mr. Duggar to

22         put his hands on a particular table, correct?

23         A.    Again, just going back and forth on words, I don't

24         think he said a specific item for them to be placed on.  I

2:16PM25   could be wrong, but I don't believe that to be the case,

2:16PM 1   sir.  I just think he said, "We're going to take pictures

2   of your hands."

3   Q.   I'll ask this much simpler.

4   A.   Okay.

2:16PM 5   Q.   Much more simply.  Were Mr. Duggar's hands on the

6   table before Mr. Aycock asked if he could take these

7   pictures?

8   A.   In that position, no, sir.

9   Q.   The reason Mr. Duggar's hands ended up in that

2:17PM10   position is because Special Agent Aycock asked him to put

11   them there, correct?

12   A.   Yes, sir.

13   Q.   You would agree with me that you have reviewed those

14   photographs, correct?

2:17PM15   A.   Correct.  Yes, sir.

16   Q.   There are multiple photographs, some zooming at

17   different angles, correct?

18   A.   I believe so, yes, sir.

19   Q.   They are photographs focusing on both hands, not one

2:17PM20   hand, correct?

21   A.   Both hands.

22   Q.   And they are taken from an angle that's essentially

23   above the hands, regardless of where Mr. Aycock was

24   standing, correct?

2:17PM25   A.   Yes, sir.

2:17PM 1   Q.   To be clear, you took those photos because you

2   believed they had evidentiary value, or Agent Aycock took

3   those photos because you believed they had evidentiary

4   value for purposes of this investigation, correct?

2:18PM 5   A.   Correct.

6         MR. GELFAND:   Your Honor, may I have one minute,

7   please?

8         THE COURT:   You may.

9   Q.   (By Mr. Gelfand.)   Agent, I'm just going to show you

2:18PM10   one more picture, sir.

11   A.   Yes, sir.

12   Q.   Do you have Exhibit T, as in Tom, in front of you?  Do

13   you see that, Special Agent?

14   A.   Yes, sir.

2:19PM15   Q.   Does that appear to be a picture that law enforcement

16   took on November 8th of 2019 at the execution of the search

17   warrant at Wholesale Motorcars?

18   A.   Yes, sir, it appears so.

19   Q.   Does that appear to be a true and accurate copy of the

2:19PM20   photo?

21   A.   I would say so, yes, sir.

22   Q.   For purposes of the record -- and you can testify to

23   this -- I will represent that we zoomed in on a portion of

24   this.  Agent, I know you didn't do the zooming, but does

2:19PM25   this appear to be a zoomed-in portion of the same photo?

2:19PM 1  A.   Can you go back to the other photo?  I'm sorry.

2  Q.   Sure.

3  A.   Yes, sir.

4       MR. GELFAND:  Your Honor, at this point, I move

2:19PM 5 Defense Exhibit T into evidence.

6       MR. ROBERTS:  No objection at this point, Your

7 Honor.

8       THE COURT:  Defense Exhibit T is received.

9       (Defendant's Exhibit T Received)

2:19PM10 Q.   (By Mr. Gelfand.)  Agent, just to get our bearings for

11 a second, can you tell us what we're looking at on this

12 particular photo and the vantage point that it's taken

13 from?

14 A.   We're looking at the Wholesale Motorcars lot from what

2:20PM15 would be the north side, I think, of the lot facing back

16 toward the south side where you can see in the background

17 Highway 412.

18 Q.   Do you see where there's kind of an orange,

19 essentially diamond, near a telephone line or a power line?

2:20PM20 A.   Yes, sir.

21 Q.   Directionally, is that where the entrance/exit,

22 meaning that driveway that you testified about is?

23 A.   Roughly.

24 Q.   If we looked at the zoomed-in portion, do you

2:20PM25 recognize that officer that appears zoomed-in just under

2:20PM 1    that, or the agent that appears just under that orange

     2      placard?

     3      A.   No, sir.  I mean --

     4      Q.   It's tough to see.

2:21PM 5    A.   I possibly see two heads.  I don't know which one

     6      you're referring to.

     7      Q.   Do you see one where there's a big insignia of a flag,

     8      it appears, on the sleeve?

     9      A.   I believe so.

2:21PM10    Q.   Is that the uniform that certain individuals were

    11      wearing that day?

    12      A.   No, sir.

    13      Q.   Is that a law enforcement agent?

    14      A.   I believe so.

2:21PM15    Q.   Could you identify for us, if we look at the top, I'm

    16      just pointing to some vehicles.  Do you see a black pickup

    17      truck?

    18      A.   I see a pickup truck.

    19      Q.   Is that a law enforcement vehicle?

2:21PM20    A.   It would be hard to tell from this angle, sir.

    21      Q.   This vehicle in particular, do you recognize that

    22      vehicle?

    23      A.   Is that an Explorer?  Yes, sir.  That would be the

    24      vehicle that I was driving that day.  It's a Ford Explorer.

2:22PM25    Q.   Was this general vicinity where Special Agent Aycock's

2:22PM 1   vehicle was where you interviewed Mr. Duggar?

2   A.   It would have been around in the same area.

3   Q.   In other words, all the law enforcement vehicles

4   parked in the same area, correct?

2:22PM 5   A.   In the general same area.

6   Q.   Near the entrance/exit?

7   A.   I'd say it was past the driveway section.  It was more

8   onto the lot.

9           MR. GELFAND:  Your Honor, one minute, please.

2:22PM10           THE COURT:  That's fine.

11           MR. GELFAND:  Special Agent, I have no further

12   questions for you.

13           THE WITNESS:  I'm sorry?

14           MR. GELFAND:  I have no further questions for

2:23PM15   you.

16           MR. ROBERTS:  Your Honor, could I request a brief

17   recess just for a restroom break?

18           THE COURT:  Yeah.  But before we get off of

19   Exhibit T, I just want to get my bearings.  Could someone

2:23PM20   put that back up?

21           MR. GELFAND:  Yes.

22           THE COURT:  The structure that is in the very far

23   left portion of the image, do you know what that is?

24           THE WITNESS:  Yes, sir.  So the structure that

2:23PM25   you're seeing in the very far left is going to be the

2:23PM 1    wooden structure that was currently under renovation.

2           Right next to that would be what we refer to as the main

3           office, sir.

4                   THE COURT:  All right.  Thank you.  We'll be in

2:23PM 5    recess for 10 minutes, so until about 2:35.

6                   One more thing.  We discussed Exhibit V.  I don't

7           know that it was ever offered again after the Court engaged

8           counsel in a colloquy.

9                   MR. GELFAND:  Your Honor, no, I did not

2:24PM 10   subsequently offer it into evidence.

11                  THE COURT:  Thank you.  We'll be in recess until

12          2:35.

13                  (Recess taken from 2:24 p.m. to 2:36 p.m.)

14                  THE COURT:  Any follow-up, Mr. Roberts?

2:37PM 15           MR. ROBERTS:  No, Your Honor.

16                  THE COURT:  Agent, you may stand down.  I did

17          have one question.  Can you describe the interior of Agent

18          Aycock's extended cab pickup at the time of November of

19          2019?

2:37PM 20           THE WITNESS:  In terms of what was present

21          inside?

22                  THE COURT:  Yeah.

23                  THE WITNESS:  Nothing on the front seats.  In the

24          back seat, if I remember correctly, Agent Aycock would have

2:37PM 25   had what we call a dump pouch where he had some evidence

2:37PM 1  kits, search signs, things like that.  Nothing else really

2  outside of that, sir.

3            THE COURT:  There wasn't a cage that divided the

4  front from the back?

2:37PM 5            THE WITNESS:  No, sir.  It's a typical -- we call

6  it a government vehicle, but it's a civilian vehicle that

7  we just put lights and sirens on.

8            THE COURT:  There wasn't a shotgun mounted to the

9  floor --

2:37PM 10           THE WITNESS:  No, sir.

11           THE COURT:  -- or anything like that?

12           THE WITNESS:  No, sir.

13           THE COURT:  Okay.  All right.  Does that prompt

14  anything further?

2:38PM 15           MR. ROBERTS:  No, Your Honor.

16           THE COURT:  You may stand down.

17           MR. ROBERTS:  The government has no further

18  witnesses at this time, Your Honor.

19           THE COURT:  Thank you.  Mr. Gelfand, would the

2:38PM 20  defense like to call any witnesses?

21           MR. GELFAND:  No, Your Honor, we have no

22  witnesses.

23           THE COURT:  All right.  I think how I would like

24  to proceed is to take up the motions one at a time and let

2:38PM 25  ya'll go back and forth on those as opposed to just running

2:38PM 1   with all four motions at the same time.

2           The Court recognizes that it is the government's

3      burden to prove that its evidence was lawfully obtained,

4      but since this is the defendant's motion, I will permit

2:38PM 5   Mr. Gelfand to go first if he wishes.

6           MR. GELFAND:  Thank you, Your Honor.  Does the

7      Court have a preference in the order we take them in?

8           THE COURT:  Well, I think the most pivotal motion

9      is the one having to do where the issue really is whether

2:39PM10   he's in custody.  So the motion at Document 36, the

11     statements that Duggar made to law enforcement on

12     November 8th.

13          And then after that, we can take up -- logically,

14     it makes sense to take up failure to preserve exculpatory

2:39PM15   evidence.  That's Document 40.  And then the motion at

16     Document 38, the photographing of the hands and feet at the

17     time of arrest and booking in November, I'm sorry, multiple

18     months later.

19          MR. GELFAND:  Thank you, Your Honor.

2:40PM20        Your Honor, with respect to the suppression of

21     statements issue, I think that the important starting point

22     is that, as a practical matter, I don't think there is any

23     ambiguity as to whether Mr. Duggar invoked his right to

24     counsel at the outset of the execution of the search

2:40PM25   warrant.  And I think that's an important starting point,

2:40PM 1  because as a practical matter, the evidence is clear that

2  Mr. Duggar expressly annunciated a desire to contact his

3  attorney.  He physically tried to contact his attorney.

4  And the only reason he was unable to contact his attorney

2:40PM 5  was because the Special Agent physically took his phone out

6  of his hand and deprived him of the ability to contact

7  counsel.

8         THE COURT:  Assuming, without deciding that it

9  was not ambiguous, isn't the first hurdle to determine

2:41PM 10  whether he was in custody or not?

11         MR. GELFAND:  Yes, Your Honor.  And as the Court

12  is obviously aware, it's an objective standard.  And so

13  when the Court looks at the totality of the evidence at the

14  time and what it would be perceived as by a reasonable

2:41PM 15  person, I think there's a couple of facts that are

16  important to take into account.

17         Number one, law enforcement shows up with

18  approximately six to seven police vehicles and they

19  immediately get out of their vehicles when they arrive on

2:41PM 20  scene on November 8th of 2019, dressed in tactical vests,

21  as the Agent testified.  And two agents, Agent Aycock and

22  Agent Faulkner, immediately approach Mr. Duggar.

23         From that point forward, the evidence has

24  established that Mr. Duggar arrived at the location in an

2:42PM 25  RV that was subsequently, for all intents and purposes, not

2:42PM 1   available to him to leave in.

2          THE COURT:  How did he leave?

3          MR. GELFAND:  In a separate vehicle, Your Honor.

4          THE COURT:  That was on the car lot?

2:42PM 5   MR. GELFAND:  That was on the car lot where the

6   keys were in the office.

7          THE COURT:  Okay.

8          MR. GELFAND:  And I think what's important to

9   understand is that telling someone essentially the

2:42PM10  conclusory statement, "You're free to leave" when you

11  actually have no mechanism to do so is, I think, why these

12  Constitutional protections matter and why they exist.

13         What's particularly troubling about the Agent's

14  testimony is that this was not only something that was just

2:42PM15  kind of coincidentally the case where he shows up in the

16  RV, but they actually surveilled him.  They knew he shows

17  up in a vehicle.  They understandably essentially take

18  custody of that vehicle and search it.  And when I say

19  "understandably," I understand that when they are executing

2:43PM20  a search warrant, searching the vehicle that one of the

21  individuals that they are there to investigate was driving

22  in is an understandable law enforcement tactic.  But it's

23  also a very foreseeable and predictable law enforcement

24  tactic.

2:43PM25         And so from that point on, Mr. Duggar is -- first

2:43PM 1   of all, a very short period of time transpires, 10 to 15

2   minutes, as the Agent testified today, between the time

3   when agents initially essentially make this beeline to

4   Mr. Duggar and physically take his phone, which is, I would

2:43PM 5   submit, Your Honor, it's an unusual physical show of force

6   when the Court looks at the totality of the circumstances.

7   In other words, that's different from knocking on a door

8   and saying, "We're here to execute a search warrant."

9   Physically taking something out of someone's hand,

2:44PM10   regardless, by the way, of this, what I think is a

11   distinction without a difference.

12         THE COURT:  Can you imagine any law enforcement

13   purpose having to do with preservation of evidence why the

14   officer might have done that?

2:44PM15         MR. GELFAND:  Absolutely, Your Honor.  And to be

16   clear, I understand why the officer wanted to seize the

17   phone.  But from a reasonable person in Mr. Duggar's

18   vantage point, that's a different inquiry.  In other words,

19   both can be right.  The officer could have had every

2:44PM20   legitimate purpose in physically saying, "I don't want

21   anything to happen."  I mean, I don't mean to make light of

22   it, but this notion that there's, like, a kill switch on

23   phones or something like that is a little bit more kind of

24   Hollywoody.  But I understand why the officer doesn't want

2:44PM25   anyone to manipulate evidence.  I understand why the

2:44PM 1  officer wants to preserve the evidence.  But there was

2  nothing at that point stopping the officer from permitting

3  Mr. Duggar to contact his counsel or from permitting

4  Mr. Duggar to access some sort of other phone, or the

2:45PM 5  officer himself from calling counsel.

6         THE COURT:  There was a suggestion that I didn't

7  really understand that Mr. Story, before this relatively

8  short encounter was completed, did learn about the presence

9  of the officers at the car lot.  Was that part of the

2:45PM10  discussion today?  I have it marked.

11         MR. GELFAND:  My understanding, Your Honor, was

12  that that was after Mr. Duggar left the car lot, meaning

13  after the interview.

14         THE COURT:  Okay.

2:45PM15         MR. GELFAND:  I don't see how Mr. Story could

16  have been notified given the consistent testimony by the

17  agent that no one let him know.

18         THE COURT:  Hang on.  Well, that was why I was

19  confused.  It was at 13:40:45 today.

2:46PM20         "Question:  Did you alert Mr. Duggar's counsel to

21  the fact that he was here?"

22         "No, sir.  Because by the time we had concluded

23  that evening, we were already notified that Mr. Story had

24  contacted the U.S. Attorney's Office."

2:46PM25         The Court said "What was that again?"

2:47PM 1          The witness said, "By the time we had wrapped up

2   the processing of the scene and all the evidence, I had

3   been notified that Mr. Story had contacted the U.S.

4   Attorney's Office."

2:47PM 5          So reading that back, it sounds like that's

6   consistent with the testimony that Mr. Duggar did leave and

7   that law enforcement stayed and finished processing the

8   scene.  And in between leaving and processing the scene, a

9   phone call was apparently made to Mr. Story that in turn

2:47PM10   triggered a phone call to the U.S. Attorney's Office.

11          Did I interpret that correctly?

12          MR. GELFAND:  I think so, Your Honor, yes.

13          And our point is focusing, staying laser-focused

14   on the relevant time period, which was the time that law

2:47PM15   enforcement arrives on scene, to the time in this case, for

16   purposes of this motion, that Mr. Duggar finds himself in

17   the law enforcement vehicle with Special Agents Aycock and

18   Faulkner answering questions and discussing things with

19   them, that's the time that matters.  And that's the time

2:48PM20   where we would argue he was denied his right to consult

21   with counsel.

22          THE COURT:  Well, if Mr. Duggar wasn't in custody

23   during the relevant time, as you have framed it, did he

24   have a right to visit with counsel?

2:48PM25          MR. GELFAND:  Your Honor, we would concede that

2:48 PM 1   whether Mr. Duggar was in custody is a threshold issue

2   that's necessary for us to prevail on this motion.

3           THE COURT:  And so the physical removing of the

4   phone at the beginning of this vignette goes to which

2:48 PM 5   issue?  That that makes him in custody?

6           MR. GELFAND:  Yes, Your Honor.  It makes a

7   reasonable person who physically had a device taken from

8   their person feeling not free to leave.  It's not just that

9   issue, though.  It's the totality of -- it's a combination

2:49 PM 10  of factors.  It's law enforcement significantly

11  outnumbering Mr. Duggar and the two other individuals who

12  were on site.

13          THE COURT:  And when you say "factors," you're

14  referring to the factors that the Eighth Circuit has

2:49 PM 15  identified in *United States v. Griffin*?

16          MR. GELFAND:  Your Honor, and to be clear, I was

17  perhaps in-precise in my term "factor".  I was more talking

18  about the facts that would factor into those factors.  But

19  I think that there's a number of facts that establish under

2:49 PM 20  the *Griffin* factors and under the important precedent that

21  the Court has to guide its decision to establish custody.

22          As a practical matter, I think you have the

23  number of law enforcement on scene.  I think you have not

24  only the number of individuals, but the sheer volume and

2:50 PM 25  force of vehicles occurring at the same time.  I think you

2:50PM 1   have the immediacy of what they are wearing, all of which

2   is understandable.  None of this is even meant as a

3   criticism to law enforcement.  I understand why law

4   enforcement conducts these kinds of operations the way they

2:50PM 5   do.  But the fact that they do that has legal significance

6   and factual significance.

7         The fact that the law enforcement agents at all

8   times were armed.  Albeit not brandishing weapons, they are

9   visibly armed.  They were not wearing -- I understand the

2:50PM10   Agent clarified what he means.  I'm not suggesting that he

11   lied about this.  But I think his description of street

12   clothes would be a little different from my description of

13   street clothes.  I mean, they are wearing ballistic vests.

14   I understand there's perhaps more intense things they could

2:50PM15   have been wearing, but to the average Joe, they are not

16   wearing what I'm wearing.  They are not wearing what they

17   wear to court.

18         The fact that the first thing that happens within

19   seconds, as the Agent testified today, was essentially two

2:51PM20   agents making a beeline to Mr. Duggar personally singling

21   him out as they intended to, and physically, as we have

22   talked about, taking the phone.

23         Then a short period of time passes, about 10

24   minutes to 15 minutes, the Agent estimated, between the

2:51PM25   time that agents then approached Mr. Duggar again.  At all

2:51PM 1    times, there's law enforcement around.  He doesn't have

2    access to the vehicle that he drove in.  He doesn't have

3    access to any sort of phone.  And then they approach him.

4    They decide where to take him, which is a vehicle.  Any

2:51PM 5    explanation of, "We wanted it to be quiet to make a

6    recording," fair enough, but that doesn't somehow mitigate

7    the custodial nature of those circumstances.

8              They take him to a police vehicle, a truck.

9    There's two of them, two agents.  They are both visibly

2:51PM 10    armed.  They seat Mr. Duggar -- they tell Mr. Duggar which

11    seat he is to take.  The doors are closed.  The vehicle is

12    on.

13              What's interesting for purposes of the Court's

14    analysis is, to the extent -- and I think the Court

2:52PM 15    understands our argument here -- but to the extent that

16    this statement of rights form has any legal significance or

17    factual significance whatsoever, I think the Court has to

18    essentially compartmentalize the analysis with respect to

19    the alleged statement that Mr. Duggar makes before any sort

2:52PM 20    of statement of rights form was reflected.

21              THE COURT:  And so to be clear, is your position

22    that the statement about, "Why are you here, was somebody

23    downloading child pornography," is that the only statement

24    of substance that you're seeking to exclude with this

2:53PM 25    motion, or are you seeking to exclude all of the statements

2:53PM 1  made after he was Mirandized?

2     MR. GELFAND:  Both, Your Honor.  But I would

3  acknowledge to the Court that the analysis with respect to

4  the first statement is analytically different.  The reason

2:53PM 5  I would -- just to kind of deal with that I would say in

6  reverse order of what the Court asked.  The first statement

7  wasn't even arguably before any sort of Miranda warning was

8  administered.  I mean, that evidence is crystal clear.

9  There's no ambiguity to what happened.

2:53PM 10     The remainder of the statements, our position,

11  Your Honor, is that there's a difference, legally, between

12  an invocation of the right to counsel and an invocation of

13  the right to silence.  And it's an important distinction,

14  because what the case law that we cited in our pleadings

2:53PM 15  very clearly says is that when somebody in custody

16  essentially invokes the right to counsel --

17     THE COURT:  When did that happen?

18     MR. GELFAND:  When they were -- when they

19  immediately went on scene.  And kind of take it

2:54PM 20  compartmentalized, if the Court will bear with me for just

21  a second.  The case law clearly says that when there's an

22  invocation of the right to counsel, then counsel has to be

23  present.  In other words, a quote, unquote, "Miranda

24  waiver" matters if it's an invocation of the right to

2:54PM 25  silence, not if it's an invocation of the right to counsel.

2:54PM 1    And that makes sense, because the whole idea is, before you
       2    start "waiving rights," quote, unquote, when you want to
       3    talk to a lawyer, the law understandably gives you the
       4    right to talk to counsel.
2:54PM 5              Now, I think that the Court, to complicate things
       6    even more, is faced with a number of different scenarios.
       7    Our initial argument is that he invoked his right to
       8    counsel when he physically tried to call counsel when
       9    agents arrived on scene.
2:54PM 10            THE COURT:  But you would concede, I assume, that
      11    the law doesn't recognize anticipatory invocation?
      12             MR. GELFAND:  I would, Your Honor.  I don't
      13    believe that it's fair, when all is considered with this
      14    very small time frame that's considered and the
2:55PM 15   circumstances that were there to call that an anticipatory
      16    invocation.
      17             The Agent himself testified that the intention of
      18    waiting until Mr. Duggar was physically present and doing
      19    surveillance was to interview him.  And that was the goal.
2:55PM 20   And it's not a coincidence they didn't give him the
      21    opportunity to talk to his lawyer.  I mean, I think that's
      22    crystal clear.  They had a million ways that -- I know this
      23    isn't in the record, but I deal with in my practice all the
      24    time when agents understandably either call themselves or
2:55PM 25   let someone call.  It's not to have a whole conversation of

2:55PM 1  "Let's have a heart to heart about this," but your client

2         is -- "We're on scene, your client is here, he asked to

3         talk to you."  They chose not to do that.  And I think that

4         in the recording -- and we tried to highlight some of the

2:56PM 5  sections -- there's kind of a constant pattern and trend of

6         Mr. Duggar saying, admittedly in some different contexts,

7         some of those were conditional upon, you know, I would need

8         to talk to my lawyer before doing something in the future.

9         Some of those were a little more ambiguous, but the

2:56PM10  environment that I think the Court can hear from that

11        transcript and has heard is that Mr. Duggar is sitting

12        there constantly saying, you know, "I want to talk to my

13        lawyer, I need to talk to my lawyer."  And, you know, the

14        agents keep -- I would submit intentionally -- essentially

2:56PM15  interrupting him, and clearly with the goal that he

16        doesn't, what they would say, say the "magic words."  But I

17        think he already had.  And I think the Court can

18        reasonably --

19              THE COURT:  Which I get the part about taking the

2:57PM20  cell phone out of his hand when he has stated his desire to

21        call his lawyer.  And I get it that at several times,

22        three, four, five times during the course of the interview,

23        he makes reference to his lawyer.  In most of those,

24        though, that I am recalling, if not all of them, it relates

2:57PM25  back to what he said at the beginning, which was, "I don't

2:57PM 1    know that I can answer all of your questions," or, "There

2    may be some questions that I can't answer."  And then, sure

3    enough, there are certain questions where he just says,

4    "I'm not going to answer that.  I'm not going to get into

2:57PM 5    this.  I'm not going to give you my password.  I'm not

6    going to tell you about these other people."  And that is

7    in the same sound byte as the Agent reaffirming that he's

8    free to go, he doesn't have to talk to them anymore.

9            So other than the very, very beginning where he

2:58PM10    has the cell phone in his hand and he's saying, in effect,

11    "I'm wanting to call my lawyer," which other of these

12    statements are you pointing to as asking to have his lawyer

13    present before he answers any more questions?

14            MR. GELFAND:  I think that there is -- I think

2:58PM15    that when the Court considers a discussion on, just for

16    cheat sheet purposes, page 28 of Exhibit 4.

17            THE COURT:  I'm familiar with that one.

18            MR. GELFAND:  Even the Agent is articulating an

19    understanding that Mr. Duggar is clearly wanting to talk to

2:59PM20    his lawyer based on this continuation of events.  And

21    specifically, Your Honor -- and I'm just using the cheat

22    sheet on page 28 -- Agent Faulkner says, "You said you

23    wanted to call him.  Obviously, with your phone, we can't

24    do that.  He can't come on scene right now while we're

2:59PM25    here."  And so what they are saying to Mr. Duggar is

2:59PM 1   different from the, quote, unquote "Miranda waiver,"

2   whatever the formal term is of that statement, the

3   statement of rights form.  Because what they are

4   essentially saying to him is, now is the time we want to

2:59PM 5   interview you.  Your lawyer can't physically be present,

6   even if you want him to, because he can't come on scene.

7   And we know that you want to talk to your lawyer, because

8   you have made that crystal clear throughout this entire --

9   since the moment we got on scene.

2:59PM 10          And so I think this is an unusual situation for

11   the Court where the Court has to consider, at least we

12   would ask the Court to consider, all of the statements

13   within the continuity of everything that happens.  This is

14   different from, "Maybe I should talk to a lawyer.  I think

3:00PM 15   I might want to talk to a lawyer; what do you think?"  I

16   mean, we're all familiar with these cases that deal with

17   equivocation and perhaps ambiguity.  And I think that, as

18   the Agent himself admitted today -- and I credit the Agent

19   for admitting this, because I believe it's true -- there's

3:00PM 20   no question that even the Agent understood that Mr. Duggar

21   wanted to speak with his lawyer the whole time and didn't

22   give him the opportunity to.  And I don't think that the

23   statement of rights form changes that because it's the

24   invocation of the right to counsel and because it's not

3:00PM 25   knowing and voluntary.

3:00PM 1                      And I think that, as we cited in our -- I think

2       in the original brief, certainly in the reply brief --

3       there's important case law that says, you know, essentially

4       all efforts -- I'm paraphrasing -- but all efforts should

3:01PM 5       be taken to not find in favor of waiver unless it's crystal

6       clear.  And in this particular instance, I don't think

7       there was any knowing and voluntary waiver.

8                      I think what the Court is ultimately faced with,

9       Your Honor, is that everyone in this courtroom knows that

3:01PM10       if the agents had permitted Mr. Duggar to speak with any

11       lawyer, just giving reasonable advice under the

12       circumstances, the agents knew that they would be unable to

13       sit down with him and have the discussion that they had or

14       any sort of discussion.  And that is the spirit of the

3:01PM15       right to counsel.  And I think that when -- what

16       differentiates this case from relatively benign

17       circumstances where someone might sit down like the

18       *Hoeffener* case, for example, where law enforcement, as I

19       understand it only based on what's in the record, but shows

3:01PM20       up at someone's house, Mr. Hoeffener's house, and sits him

21       in the back, or in the front of a police car, whatever it

22       is, and they interview him.  You can't take out of this

23       equation the first thing that law enforcement did on scene,

24       which I would argue, Your Honor, effectively conveys to

3:02PM25       someone in Mr. Duggar's shoes, assert your rights all you

3:02PM 1  want, we're not going to respect them.  And then simply

2  saying, "But they waived their rights later," I don't think

3  that's a fair interpretation of the evidence that the Court

4  has before it.

3:02PM 5          And I think that, as a practical matter, they

6  took the risk in how they proceeded, hoping that the Court

7  would not suppress this.  And I think that the law requires

8  suppression.

9          THE COURT:  Thank you.  Mr. Roberts?

3:02PM 10          MR. ROBERTS:  Thank you, Your Honor.  Your Honor,

11  I'll be brief, because this is not a complicated matter.

12  This is simply a fact that Mr. Duggar was never in custody

13  at any point that day.

14          The defense attorney wants to start out his

3:03PM 15  argument by observing that law enforcement kind of laid in

16  wait.  They did visual surveillance to make sure that

17  Mr. Duggar was there.  That's good law enforcement.  Within

18  the warrant, you will see it's his name on the subscriber.

19  It's his name on the owner of the premises.  Of course they

3:03PM 20  waited until he was there.

21          When they went to execute the search warrant,

22  they arrived on scene.  They walked up to Mr. Duggar.  He

23  was outside.  He had freedom of movement.  That is a very

24  stark contrast to someone, when you hit their house at

3:03PM 25  6:00 a.m., go inside their residence and tell them the same

3:03PM 1    thing, you're not in custody, you're free to leave, but

2    you're inside a residence.  Yes, there's still case law

3    saying that that's not a custodial situation.  So

4    comparatively, I would argue that being outside is a factor

3:03PM 5    for the Court to consider.

6             One thing that the defense attorney missed -- and

7    I don't believe it's been brought up is -- there's two

8    parts of Miranda; custodial and interrogation.  Officers

9    exit the vehicle.  They walk up to Mr. Duggar and say, "We

3:04PM 10   have a federal search warrant for digital contraband,

11   you're free to leave."  There's been no question at all,

12   certainly no question designed to get an incriminating

13   response.  His response was to produce the phone and make a

14   statement.  Officers hadn't posed him anything.  We went

3:04PM 15   over and over again I believe with the Agent.  They had not

16   asked him a single question.  When he responded about the,

17   "Can I call an attorney," they say, "This is being seized

18   pursuant to the warrant.  You'll have a chance later."

19   Still zero questioning.  There's no interrogation there,

3:04PM 20   Your Honor.

21            The defense attorney also wants to point out,

22   when it comes to custody, that a person would feel, a

23   reasonable person would feel, once you physically removed a

24   phone from their hand, not free to leave.  But yet his own

3:05PM 25   client responded with the fact of, "Hey, I have a pregnant

3:05PM 1    wife, I might need to leave," which, again, if he had any

2    doubt, a reasonable person, it was resolved when the Agent

3    said, "That's fine."

4            We would point out through this whole process

3:05PM 5    that there are a lot of cars there.  He evidently left

6    ultimately in one of the other cars.  He never asked for

7    the keys.  He never referenced the keys.  Defense counsel

8    wants to point out, "Would you have let him use your

9    phone?"  Agent said, "No, my phone has law enforcement

3:05PM 10   sensitive programs."  He didn't ask.  He stayed around.

11   Law enforcement didn't guard him.

12           This is a noncustodial situation.  The entire

13   initial encounter is noncustodial.  And according -- if I

14   understand the defense counsel's argument right now -- I'm

3:05PM 15   not sure I did fully in the brief -- but if that was the

16   triggering event that created custody, not the argument

17   that, "Hey, that was a noncustodial situation, but it

18   became custodial when they got in the vehicle," then how

19   could he have been -- how could at any point that change

3:06PM 20   before they approached him again?  There was no

21   interrogation.  No questions.  When they did walk up to

22   him, again, he's standing outside, "Would you like to

23   discuss this matter in the vehicle?"

24           This is very similar from this point on with the

3:06PM 25   *Hoeffener* case that we cited to the Court, Your Honor.  I

3:06PM 1   mean, it's an interview that occurs in law enforcement's

2   vehicle.  But, again, he walked up.  He opened the door.

3   He sat down.  For belt and suspenders purposes, they read

4   him his rights.  Defense attorney wants to take umbrage

3:06PM 5   with the fact that when they got to the section about being

6   in custody, it's actually lined out.  I have never seen

7   probably a better example of someone -- for two things,

8   one, not being in custody, but, two, knowing and

9   voluntarily waiving their rights to the point where they

3:07PM10   are actually questioning, "Hey, I don't think your form is

11   right," and then they correct it and say, "No, you're

12   right, let us line this out."

13        The statement with regard to child pornography.

14   When he initially sat down -- again, there's two parts of

3:07PM15   Miranda, Your Honor.  There's custodial and interrogation.

16   I would say that when they walked up to him, their purpose

17   was to interrogate.  When he sat down in the car, again,

18   their purpose was to interrogate.  But at that point, the

19   only question they posed to Mr. Duggar was, "Can we record

3:07PM20   this statement?"  That is not a question designed to elicit

21   an incriminating response.  That is a question designed to

22   activate a recorder.  His turning to the Agent was -- I

23   believe the defense attorney even said -- spontaneous.  It

24   was not planned.  It was not in regards to a question by

3:08PM25   law enforcement.

3:08 PM 1          Your Honor, I won't belabor the point, but you

2     heard the recording over and over again.  Well, starting

3     out, very specifically, when they asked him about an

4     attorney, again, if he was so kind of distraught over the

3:08 PM 5     fact that he took the phone, again, they presented with an

6     option, "Hey, you can call an attorney.  You can have one

7     present.  You can leave."  They told him all that again.

8     We're not required, belt and suspenders, but they did.  His

9     response, as the Court noted, was something to the effect

3:08 PM 10    of, "Might not answer all your questions, but, sure."

11          From that point on, going forward, you heard the

12    recording.  He references an attorney, but he also

13    references that, "Hey, I might not answer this," or, "I

14    won't answer this, but I will."  Even towards the last of

3:08 PM 15    the interview, he's conversational, Your Honor.  He's

16    actually posing questions to law enforcement.  That's not

17    reflective of someone who is wanting to leave or invoke

18    their right to silence.

19          Very important -- and it's been highlighted in

3:09 PM 20    this hearing -- is the fact that when this interview was

21    concluded, he left.  That's exactly what is his right to

22    do.  He was not under arrest.  He got in a vehicle on the

23    car lot.  He left.  And now we know he left and he called

24    his attorney.  He had that right the entire time.  No one

3:09 PM 25    stopped him.  No one guarded him.  No one forced him into

3:09PM 1   that interview.

2          For those reasons, Your Honor, I believe this was

3   noncustodial from beginning to end.  In our brief, we lay

4   out kind of alternative arguments, but I think the Court's

3:09PM 5   obvious ruling here is that he was never in custody for any

6   purposes.  Thank you, Your Honor.

7          THE COURT:  All right.  Mr. Gelfand, I'll give

8   you the last word if you have anything to directly reply.

9          MR. GELFAND:  Thank you, Your Honor.

3:10PM 10          I think that when the Court is considering these

11  circumstances, I think saying he's free to leave without

12  acknowledging that he didn't have the physical ability to

13  do so without going into an office flooded by law

14  enforcement officers conducting a search, and they know

3:10PM 15  that because they surveilled him, it's meaningless to say

16  you're free to leave when you're not literally free to

17  leave without engaging with law enforcement at that point.

18          I think saying that he's free to call his lawyer,

19  but depriving him of the physical mechanism to do so and

3:10PM 20  saying that, even if you do, your lawer wouldn't be willing

21  to be on site, wouldn't be allowed to be on site here with

22  you, essentially deprives you of the actual rights.

23          I also think, Your Honor -- and I forgot to

24  mention this earlier, but I would like the Court to

3:10PM 25  consider it -- the facts that the Court heard about the

3:11PM 1   decision that law enforcement made to not give Mr. Duggar a

2   copy of the warrant that any business owner would be

3   legally entitled to until after they sat down with him, and

4   they made that conscious decision, it's a carrot that

3:11PM 5   essentially if you want to be entitled to the right that

6   you have to get this document that you're legally entitled

7   to, then you have to essentially stick around.  You're not

8   free to leave.  You've got to wait for it.  And I think

9   that that's inconsistent in the totality of circumstances

3:11PM 10  with freedom to leave.

11              And so I do think that this was custodial.  I

12  don't disagree with the prosecutor that that's a reasonable

13  analytical starting point.  But I think once the Court

14  concludes that the totality of circumstances from a

3:11PM 15  reasonable person vantage point reveals that it is

16  custodial, then the rest of the analysis is actually very

17  straightforward.

18              THE COURT:  Thank you, Mr. Gelfand.

19              MR. ROBERTS:  May I make one comment just to the

3:12PM 20  part that Mr. Gelfand raised first?

21              THE COURT:  Yes.

22              MR. ROBERTS:  Your Honor, to the extent that a

23  reasonable person would know that they are entitled to a

24  copy of the warrant, I think that's something for the Court

3:12PM 25  to consider.  That's assuming Mr. Duggar knew he was

3:12PM 1  entitled to a copy of the warrant keeping him on the lot.

2  I don't think a reasonable, normal citizen would know that.

3       That's all I had, Your Honor.

4       THE COURT:  So you're conceding that law

3:12PM 5  enforcement should have provided the entirety of the search

6  warrant when they first arrived?

7       MR. ROBERTS:  Absolutely not, Your Honor.  I was

8  just responding to the argument premised on the idea that a

9  reasonable person wouldn't feel free to leave because he

3:13PM 10  hasn't had his copy of the warrant.  That whole argument

11  assumes that a reasonable person, nonlawyer, knows that

12  he's entitled to a warrant.

13       THE COURT:  Well, I very much appreciate this

14  motion.  I think it is a very legitimate motion to be

3:13PM 15  raised.  It is certainly true that once a suspect has

16  asserted his right to counsel, he is not subject to further

17  interrogation by the authorities until counsel has been

18  made available to him unless the accused himself initiates

19  further communication or exchanges or conversations with

3:13PM 20  the police.  This is *Edwards v. Arizona*.

21       However, it is also true that a suspect can't

22  anticipatorily invoke either of his Miranda rights when he

23  is not at that moment in custody or subject to a custodial

24  interrogation.  So this is why I think that the pivotal

3:14PM 25  issue here is whether Mr. Duggar, in the sequence of these

3:14PM 1    events on November 8th, was ever in custody.  And if he

2    was, when did that happen.  And, obviously, the parties

3    here have differing viewpoints.

4           So the Court must look at the facts objectively,

3:14PM 5    not subjectively from either point of view, but

6    objectively.  And in the course of objectively looking at

7    the facts, the Court must take into account the totality of

8    the facts.

9           The Eighth Circuit in *United States v. Griffin*,

3:15PM 10   it's a 1999 Eighth Circuit decision, set forth a sundry

11   list of factors that the Court should consider.  No

12   particular factor is necessarily controlling.  The Court

13   looks at all the factors collectively and must make a

14   judgment about on which side they weigh more heavily.

3:15PM 15          Here, the facts really aren't in dispute.  I

16   think the parties largely agree as to what happened.  In

17   fact, there is a recording of the largest portion of the

18   events that day.  But I don't really think that there's

19   much disagreement about what happened before the recording

3:15PM 20   began, or for that matter, what happened after it ended or

21   after the interview was declared to be over.

22          To the extent that there is any dispute, the

23   Court would note that it does find Agent Faulkner to be a

24   very credible historian as to the events of that day.  The

3:16PM 25   Court finds that the accuracy of the events to which he

3:16PM 1    testified aligns and corresponds to all of the uncontested

2    events that day.

3              The Court also finds that from his demeanor and

4    mannerisms on the stand that he testified quickly with a

3:16PM 5    measured confidence about his testimony.  Again, that was

6    in accord with not only the record that was made, but as to

7    all the undisputed events that day.  So to the extent that

8    there are any disputed facts here, the Court does make a

9    finding that the Agent's testimony was credible.

3:17PM 10             But I really don't think that this is so much a

11    matter of disputed facts as it is the application of the

12    law to the facts.  So let's turn to the so-called *Griffin*

13    factors here.  One of the factors down the list is whether

14    the atmosphere of the questioning was police dominated.

3:17PM 15    And I don't know that there was anything particularly

16    unusual about this scene, and so to that extent, I don't

17    know that that weighs super heavily against the

18    government's point of view.  But, overall, this certainly

19    was a scene that was dominated by police, numerous

3:18PM 20    vehicles.  As the testimony indicated, they all come down a

21    single entry point to the property.  When they get out, law

22    enforcement is wearing tactical gear, and at least two of

23    the agents make a beeline for Mr. Duggar.  The questioning,

24    after some period of time, 10 or 15 minutes, the

3:18PM 25    questioning takes place in a police vehicle as opposed to

3:18PM 1   some other possibilities.  And so I would have to think

2   that, on balance, that particular factor weighs a little

3   bit more heavy in favor of the defendant.

4          Going to some of the other factors, though, the

3:19PM 5   first *Griffin* factor and the one that is suggested -- I

6   won't say most important, but I think it's described as the

7   most obvious or the most importantly obvious -- is whether

8   the suspect was informed that he was free to leave and/or

9   that he was not under arrest.  And, again, the facts here I

3:19PM 10  think are undisputed that that is true.  This was the very

11  first thing, or one of the very first things after law

12  enforcement announced their purpose of being there that

13  Mr. Duggar was told.  I, again, find Agent Faulkner's

14  testimony that he was told that before the recording, I

3:20PM 15  find that credible, because during the recording, he

16  references back to something to the effect of, "Like I told

17  you earlier."  And so the Court does find credible that one

18  of the very first things that Mr. Duggar was told was that

19  he was not under arrest and that he was free to leave.

3:20PM 20         Now, much argument is made about, there's a

21  difference between giving lip service to that right.  After

22  all, law enforcement knows the law and they kind of want to

23  plant that seed.  And so perhaps we should look more

24  substantively as to how Mr. Duggar could have exercised his

3:21PM 25  ability to leave since he was not under arrest if that's

3:21PM 1   what he wanted to do.  And the focus, as best I can tell,

2   is that the vehicle that he drove up in, the RV, was not

3   made available to him, and the Agent did concede that he

4   was not free to leave in the RV at that time; that time

3:21PM 5   being while it was being processed for evidence.

6          But the notion of not being under arrest and

7   being free to leave is larger than simply driving away in a

8   vehicle.  I mean, he was free to start walking if he wants

9   to.  Now, I recognize, just because the Court is familiar

3:22PM 10  with that stretch of highway, that, I think, is a divided

11  four-lane highway that runs in front of the business, so

12  I'm not suggesting that he could have walked down to a

13  sidewalk.  But the point is, he was free to leave and go

14  wherever he wanted by foot.  He could have gone and sat on

3:22PM 15  a car hood somewhere away from what law enforcement was

16  doing.  He could have walked to the edge of the property.

17  I'm not real clear on how close neighboring properties are,

18  but he could have walked to a neighboring property if he

19  wanted to.

3:22PM 20         So the Court believes that it's somewhat of a

21  false argument to say that being free to leave means that

22  he was free to drive away or that he wasn't free to drive

23  away in the vehicle that he came in.  He had lots of

24  different options.  And this isn't of-record evidence here,

3:23PM 25  but it is apparently conceded that he did have the ability,

3:23PM 1  when he did choose to leave, to leave in one of the

2  vehicles on the lot.  And there is testimony that there

3  were multiple dozens of such vehicles present.

4        Not only does the Court find that Mr. Duggar was

3:23PM 5  informed of this position that he was free to leave and

6  that he was not under arrest at the very beginning of the

7  encounter, but this is repeated in the recording several

8  times, at least three, maybe four or five times in the

9  recording, this is repeated.  And, in fact, it's repeated

3:24PM10  at every critical instance where there's a discussion

11  about, "I'm not going to answer that," or, "I'll have to

12  ask my lawyer before I give you that."  This is something

13  that is reinforced.

14        Another thing that the Court finds to be credible

3:24PM15  that Mr. Duggar understood that he was free to leave at any

16  time; two things.  One, he acknowledges fairly upfront once

17  the recording starts that he may not answer all their

18  questions, but he also does want law enforcement to know

19  that his wife is nearly at full term with her pregnancy and

3:24PM20  she may be needing to call him or he may need to check on

21  her or he may need to go home and he expresses concern.

22  And the response is, "Absolutely."  I mean, "Certainly, if

23  you want to do that."

24        The Court believes that this factor weighs

3:25PM25  heavily in the government's factor, and it is one of the

3:25PM 1  most importantly obvious factors.  And the Court believes

2  that it's somewhat of a false equivalent to suggest that

3  when you're told you're free to leave, that that means only

4  that -- that that has to mean that you're free to leave in

3:25PM 5  the vehicle that you came in.  The Court doesn't find that

6  to be true.

7          Another *Griffin* factor is whether the suspect

8  possessed unrestrained freedom of movement during the

9  question.  I think this is kind of a mixed bag, but it is

3:25PM10  unequivocally true at the beginning of the encounter and

11  during the first 10 to 15 minutes.  I mean, he was told

12  that he was free to leave and he literally could have.  He

13  could have walked off.  He could have gone and sat on the

14  property line.  He could have sat on a vehicle in the

3:26PM15  parking lot.  Could have literally walked away.  Could have

16  done whatever he wanted to do.  And so certainly in that

17  initial 10 to 15 minutes, there's no question that he

18  possessed unrestrained freedom of movement.

19          Then as we get to the part of the encounter where

3:26PM20  he's asked whether he would answer some further questions

21  about law enforcement's purposes for being there that day,

22  here we get to the part where, in the presence of multiple

23  law enforcement officers, while no physical force of any

24  kind was used, while no cuffing of any kind was used, he

3:27PM25  was more or less herded towards Agent Aycock's vehicle and

3:27PM 1  told to have a seat in the front passenger seat.  We know

2  that apparently the engine was idling.  We know that the

3  officers had their service weapons on their hips, in a

4  displayed mode on their hips.  But we also know that the

3:27PM 5  door wasn't locked.

6         The Court would observe that it is important to

7  listen to the recording, because the transcript does not

8  pick up the demeanor or manner of either the officers or

9  Mr. Duggar.  And when one listens to the actual recording,

3:28PM10  the encounter was not tense.  I mean, it may have been

11  tense.  No one likes to be in a car with two federal

12  agents, but the demeanor that Mr. Duggar possessed was very

13  calm, I thought, more calm than I think most people would

14  be when confronted with such circumstances.  The tone that

3:28PM15  the agents were using in their questioning was calm as

16  well.  There was give and take, both directions.  Sometimes

17  Mr. Duggar asserted his rights and would say, "I'm not

18  going to answer that," or, "I'm not going to give you the

19  password.  I realize you guys can probably get past that,

3:29PM20  but this is a question where I think I really need to get

21  the counsel of my lawyer before I just turn over the

22  password."  And there were a couple of other examples like

23  that.

24         Again, it's mentioned -- I think it's on the tape

3:29PM25  as well -- that he needs to -- he may need to leave to

3:29PM 1    check on his wife.  And, again, he's told he can do that.

2    I think that the placement in the front passenger seat, I

3    don't know, there wasn't a cage or anything in this

4    vehicle, apparently, but I think that being in the front

3:29PM 5    passenger seat is different than being in the back seat of

6    this vehicle inasmuch as I think that the officer would

7    have had to have gotten out of the vehicle and opened the

8    front door before the rear door could be unlatched.  And so

9    this is just an inference that the Court draws as to why

3:30PM 10    Mr. Duggar was placed in the front passenger seat, because

11    he wouldn't have been reliant upon the officers to gain

12    access to the latch that would allow the rear door of this

13    particular vehicle to open.

14          So while I can certainly see both sides of this

3:30PM 15    argument, I think that the scales here tip a little bit

16    more in favor of the government than they do in favor of

17    the defendant in terms of the fact that Mr. Duggar

18    possessed unrestrained freedom of movement during the

19    period of questioning.

3:30PM 20          Another factor is whether the suspect initiated

21    contact with authorities or voluntarily acquiesced to

22    official requests to respond to questions.  Well, here,

23    Mr. Duggar certainly didn't initiate the contact and so the

24    question really is whether he voluntarily acquiesced.  The

3:31PM 25    defense contends that he may have acquiesced, but it wasn't

3:31PM 1    voluntary, that if you look at the totality of the
2    circumstances, not only was he not genuinely free to leave,
3    but he was in a bind, so to speak, where he perhaps thought
4    that he didn't have any real choice, that he may have been
3:31PM 5    asked whether he would like to answer some questions, but
6    the defense is saying he really didn't have a choice not to
7    answer the questions.  But I don't find that to be
8    credible, because of the fact that there were several
9    questions that he did, in fact, refuse to answer.  He did,
3:32PM10    in fact, say that he may not answer all of the questions
11    that they had.  So it weighs in the defendant's favor that
12    he wasn't the one that initiated contact.  And some of
13    these cases that the parties have cited involve the suspect
14    going down to the police station or something, and that's
3:32PM15    certainly not the situation here.  But the Court finds that
16    here as well, while perhaps some of the facts can be viewed
17    in both directions, the Court finds that on balance, they
18    weigh more heavily for the government that the defendant's
19    submitting to the interview was voluntary.
3:33PM20            Another factor is whether the police used
21    strong-arm tactics or deceptive strategies during the
22    questioning.  Mr. Gelfand has pointed out -- I don't know
23    that he referred to it as a deceptive strategy, but that
24    was kind of the import of his argument being that,
3:33PM25    tactically, they conducted surveillance to make sure that

3:33PM 1    Mr. Duggar was there and that they made the beeline first
       2    to him and he was really the person that they wanted to
       3    speak with.  And maybe there is something to the notion
       4    that they knew that this was going to be their first, best,
3:33PM 5    and quite possibly last opportunity to visit directly with
       6    Mr. Duggar before he lawyered up, so to speak.  I get that.
       7    I get Mr. Gelfand's argument.  I don't know that it's a bad
       8    argument.  But, here again, I would point to the substance
       9    of the questions that were asked and answered.  I would
3:34PM 10   point to the tone, the demeanor, and the mannerisms and the
       11   way that the questions were asked and answered.  And while
       12   the police, by virtue of the fact that they are present on
       13   an investigation of a serious issue, gives them the upper
       14   hand in some respects, the Court doesn't find anything
3:34PM 15   about the actual questioning that was strong-armed.  He was
       16   never placed in cuffs.  He wasn't subjected to a prolonged,
       17   especially prolonged interrogation.  He wasn't threatened.
       18   Again, while they may have had a little bit of upper hand,
       19   there was a good measure of back and forth, give and take.
3:35PM 20          There's some suggestion by the defense that Agent
       21   Faulkner is interrupting him.  And I understand why they
       22   would say that.  And in the transcript, that doesn't
       23   necessarily come through.  I mean, you can see that there
       24   are transcript breaks that would suggest that the Agent was
3:36PM 25   interrupting him.  And in a sense, he was.  But if you

3:36PM 1   listen carefully, this is a conversation.  It's not a

2   deposition.  And conversationally, two or three times

3   especially, Mr. Duggar would be asserting a particular

4   position.  And when Agent Faulkner said, "No, no, no," that

3:36PM 5   wasn't, "No, no, no, you can't speak to a lawyer, no, no,

6   no, you can't leave."  It was, "No, no, no, don't

7   misunderstand, I'm not suggesting that your position is

8   wrong.  You are free to leave.  You are free to visit with

9   a lawyer."  So I don't take the "No, no, no" as a

3:36PM10   strong-arm tactic, nor do I find that it was a deceptive

11   strategy.

12          Again, the police have a little bit of the upper

13   hand just by the nature of why they are there and the

14   seriousness of why they are there.  But in the sense that

3:37PM15   this is a *Griffin* factor, the Court finds that this factor

16   weighs more heavily in the government's favor because I

17   don't find anything untoward.  I don't find any strong-arm

18   tactic.  That's not to say that they didn't have a tactic.

19   It's not to say that they didn't have a strategy.  But the

3:37PM20   Court doesn't find that there was anything strong-armed

21   about the tactic or the strategy, much less does the Court

22   find there was anything particularly deceptive about it,

23   certainly nothing substantively deceptive.

24          I did make one note here that I think deserves

3:38PM25   mention, and that is a point that is made for good reasons

3:38PM 1   by the defense.  This is the part of the conversation that

2   occurs at pages 27 and 28.  And the context is important.

3   I don't think that the context -- well, the bottom half of

4   page 28 needs to be read in the larger context of where

3:38PM 5   they were in the point of the conversation.  But this is

6   one of those instances where they are conversationally

7   speaking over each other and Mr. Duggar is trying to be

8   guarded in saying, "Yeah, I want to help you guys, I want

9   to talk to you guys, but I don't want to say something now

3:39PM 10   and then get hammered for it later."  And that's my

11   paraphrasing.  And Agent Faulkner acknowledges that and

12   acknowledges his right to counsel.  Mr. Duggar says,

13   "Right."  Agent Faulkner references back to the first part

14   of the conversation, "You said earlier that you wanted to

3:39PM 15   call him."  Mr. Duggar says, "Right."  And, again, they are

16   going back and forth conversationally here.  And Agent

17   Faulkner is referencing back to the very first portion of

18   the encounter, "Obviously, with your phone, we can't do

19   that.  We will call him.  He can't come on scene right now

3:40PM 20   while we're here, but we will at least alert him to the

21   fact that we're here."

22        Well, I didn't hear any evidence today that Agent

23   Faulkner told anyone else to get his lawyer on the phone or

24   that there was any inquiry at that particular point.  That

3:40PM 25   his lawyer was Travis Story, that came later.  "He can't

3:40PM 1    come on scene right now while we're here," that's probably
2    the strongest argument that Mr. Duggar has about being a
3    strong-arm tactic or a deceptive strategy.  I think it's
4    probably true, though.  I think that law enforcement
3:40PM 5    probably could exclude third persons from the scene while
6    they are gathering evidence, but I agree this probably was
7    a tactic going to the notion that this was the best and
8    probably last opportunity that they had.  So I think that's
9    a good point that weighs in favor of the defense.
3:41PM 10    But on balance and overall, if you listen to the
11    entire recording and you listen to the tone, I can't say
12    that there's any strong-arm tactic or deceptive strategy
13    that would weigh more heavily in the defense favor.  I
14    think by a little bit of a margin here, this factor weighs
3:41PM 15    more heavily in the government's favor.
16    We've already covered the police-dominated
17    atmosphere.  And I said at the very beginning that that
18    one, which is next in the order, in the *Griffin* order, and
19    I've already said that that one probably weighs more
3:42PM 20    heavily in the defense favor.
21    The final factor is whether the suspect was
22    arrested at the end of the questioning.  Here, he was not.
23    That happens quite some time later, and so this factor
24    obviously weighs in favor of the government.
3:42PM 25    So I think that on balance, in the totality of

3:42PM 1  the circumstances here, for the reasons that I've explained

2  and the evidence that I have found and for the reasons that

3  I've stated, I think that under the *Griffin* factors,

4  objectively viewed, looking at the totality of the

3:42PM 5  circumstances, that Mr. Duggar was not in custody at any

6  point during the encounter on November 8th of 2019.  And I

7  think that that finding drives a lot of the legal analysis

8  as to some of the other issues.

9       The fact that he was given Miranda rights and

3:43PM 10  asked to sign off on a Miranda form, ordinarily, the Court

11  would find that that would be kind of a nugget in the

12  defendant's favor, because it meant that in the law

13  enforcement's mind, he may very well have been in custody.

14  But here, Mr. Duggar himself noted in the form, apparently

3:43PM 15  reading, actually literally reading the form, says, "Well,

16  I'm not in custody," or words to that substance.  And law

17  enforcement says, "Well, that's right, we'll scratch that

18  part of the form out to comply and to make official the

19  fact that you're not in custody."

3:44PM 20       Some other case law, this is not exact, but

21  similar to *United States v. Hoeffener*.  That's an Eighth

22  Circuit, a recent case out of 2020.  And then there's a

23  whole line of cases that go to the notion about the Sixth

24  Amendment has to be an unambiguous expression.  I think

3:44PM 25  that Mr. Duggar has a pretty good argument that he was

3:44PM 1    making such an expression at the beginning.  But of course,

2    he was in custody, so that doesn't really play out in the

3    analysis.  But I did want to note that despite what the

4    rule is, and despite the spirit in which we would like to

3:45PM 5    think that the right is favor as opposed to doing something

6    that would prejudice the defendant, it's always better to

7    take the high road, I guess.  The law here is actually

8    pretty harsh.  The law says that there can't really be any

9    ambiguity whatsoever.  It has to be a very clear statement,

3:45PM 10   objectively viewed, that a reasonable officer in those

11   circumstances would understand the statement to be a

12   request for an attorney.

13          And, again, I think that Mr. Duggar, that initial

14   statement and having the phone taken away, that's pretty

3:46PM 15   good argument.  There's still some ambiguities in the

16   Court's mind, though, when the whole thing is viewed in

17   context.  But, again, doesn't matter, because the Court

18   finds this was not custodial.

19          The Court also finds in that same spirit, it

3:46PM 20   doesn't matter, but the law is quite clear that you can't

21   anticipatorily invoke your Miranda rights, your Fifth and

22   Sixth Amendment rights.  And while the entire occurrence on

23   November 8th was not particularly lengthy, there are two

24   clear vignettes here, the arrival, and then the later

3:47PM 25   interview and questioning in the vehicle.  And those are --

3:47PM 1  they may have only been separated by 10 or 15 minutes, but

2  the Court finds in the alternative here that, assuming that

3  there was a clear and unambiguous request for counsel, it

4  was anticipatory.

3:47PM 5         I would also like to state on the record that

6  it's been referred to as a belts and suspenders approach,

7  and it was.  But just because the government gives a

8  Miranda warning, that does not in and of itself make it

9  custodial.  And there wasn't anything wrong about

3:47PM10  prophylactically giving Miranda warnings.

11         In making these rulings, the Court has also

12  reviewed and considered its findings in light of the

13  Supreme Court decisions in *Davis v. United States*.  I think

14  that's 1994 Supreme Court.  Also, the Eighth Circuit

3:48PM15  decision from 2011, *U.S. v. Muhlenbruch*.  Also, a case out

16  of the Seventh Circuit, *U.S. v. Wyatt*.  It's a 1999

17  decision.  *United States v. Bautista*.  That's a case out of

18  the Tenth Circuit.  *Muhlenbruch* is M-U-H-L-E-N-B-R-U-C-H.

19  So for those reasons, the defendant's motion at Document 36

3:50PM20  will be denied.

21         Mr. Gelfand, if you would, let's next take up

22  your motion at Document 40 and the notion that the

23  government should have preserved for the defense

24  potentially exculpatory evidence, including other cell

3:50PM25  phones from the other persons on scene.

3:50PM 1     MR. GELFAND:  Thank you, Your Honor.

  2    As the Court is aware, I think both parties have

  3 briefed this issue fairly extensively.  I'll just highlight

  4 a couple of things based on the testimony that the Court

3:50PM 5 heard.  I think there's an important chronological starting

  6 point here.  And that chronological starting point is the

  7 representation by Special Agent Faulkner when applying for

  8 the search warrant that was at issue in this case that was

  9 executed on November 8th expressly emphasizing to the Court

3:51PM10 that when it comes to digital devices including, but not

  11 limited to, cellular telephones, which Courts have

  12 understandably recently analogized to essentially

  13 mini-computers in various contexts, that a cursory view on

  14 site; in other words, scrolling through the iPhoto app, for

3:51PM15 example, on a phone or the photo app, whatever it's

  16 technically called, or scrolling through text messages or

  17 web-browsing history, is insufficient compared to a

  18 meaningful computer forensic analysis.

  19    I think when the Court next considers the

3:51PM20 chronology of this, the evidence before the Court today

  21 established in no uncertain terms that Mr. Duggar himself

  22 identified both Mr. Berry and Mr. Mize when he was

  23 interviewed in the recording that the Court has obviously

  24 carefully considered in this case.  And he identified both

3:52PM25 of those individuals -- and I'm paraphrasing -- but,

3:52PM 1  broadly speaking, as individuals who at times either

2  during, before, or very close in proximity to this time

3  period that was being discussed, essentially May of 2019,

4  these were individuals who clearly had access at various

3:52PM 5  times to the car lot that was at issue here.  And what's

6  particularly interesting about the testimony that came out

7  today is that both of these individuals essentially made

8  statements to law enforcement, Mr. Berry on the same day of

9  the execution of the search warrant, about a half an hour

3:52PM 10  after Mr. Duggar was interviewed, that turned out to be

11  inaccurate.  And that's not meant as some sort of ad

12  hominem attack on this individual.  But he made statements,

13  for example, very confidently, as the Court may recall

14  Agent Faulkner's testimony, stating not only when he

3:53PM 15  started, when he was hired, the day he bought a car, he

16  said was June 11th, and that he started the next day

17  working there.  And he kind of doubled down on it.  He was

18  very confident in that.  And the Agent agreed with that,

19  appropriately.  That's what happened.

3:53PM 20        It turns out that even just by basic payroll

21  records, he was wrong.  He was confident, but he was wrong.

22  And it also turns out that even though he claims that he

23  was paid, you know, on a salary basis and the Agent

24  answered my questions on cross examination about why that

3:53PM 25  was important to him, so he didn't run the risk of

3:53PM 1    commission, the car sales type risks.  He wanted the

2    certainty and the security.  He was also at the very least

3    based on the exhibit that the government introduced into

4    evidence, that check, he was paid on commission.

3:54PM 5         The reason why all this matters is, because in

6    any investigation, just taking witnesses' statements at

7    face value and having full access to their cellular

8    telephones, at the search warrant in Mr. Berry's case --

9    and I'll get to Mr. Mize in a second -- I think that the

3:54PM 10   Agent's acknowledgment under oath, Your Honor, today that

11   that cell phone fell within the scope of the search

12   warrant, at least as the Agent understood it.  Based on the

13   Agent's understanding of executing the search warrant, he

14   had every ability to seize that phone, search that phone,

3:54PM 15   and forensically image that phone.

16        I think there's an important asterisk here, Your

17   Honor.  And that important asterisk is that, at the day,

18   with respect to Mr. Berry's phone, that the agents had it

19   physically in their possession and had full authority to

3:55PM 20   search it -- and there's no dispute that they did -- they

21   had not one, not two, but three computer forensic analysts

22   on site imaging digital devices.  That's what they were

23   there for.  It would have been effortless to image those

24   digital devices.

3:55PM 25        THE COURT:  So based on your argument today --

3:55 PM 1  and you made the same or similar argument in the

2  briefing -- I can certainly imagine, you know, significant

3  fodder for cross examination that the government in their

4  investigation on these issues may have been negligent from

3:55 PM 5  the defendant's perspective.

6           But doesn't it need -- don't you need to show

7  some sort of bad faith on the government's part?  And if

8  so, what do you point the Court to that their errors were

9  not merely negligent, but made in bad faith?

3:56 PM 10          MR. GELFAND:  Two things, Your Honor.  First of

11  all, I think that it's important to point to the fact that

12  when -- the search warrant predated -- the application of

13  the search warrant, not the affidavit -- predated either of

14  these instances.  And the Agent saying in the search

3:56 PM 15  warrant to the Court to get the search warrant, to the

16  Magistrate, just how important it is to forensically image

17  and search electronic devices in a controlled laboratory

18  environment.  And I would, instead of paraphrasing, just

19  direct the Court's attention to the language in the

3:56 PM 20  affidavit itself.

21          THE COURT:  Paragraph 45?

22          MR. GELFAND:  Paragraph 45, and there's a little

23  bit in paragraph 46, I believe.  The point, though, is it

24  sets out an entire scenario.  And when it comes to what I

3:56 PM 25  call a good faith/bad faith analysis, the standard

3:56PM 1    shouldn't differ for devices that they believe belong to

2    Josh Duggar and devices that they know belong to people

3    other than Josh Duggar.

4           And it's particularly important in this case when

3:57PM 5    it comes to that, because as a practical matter, I think as

6    the Court is well aware, there's no direct evidence that

7    the government alleges with respect to Josh Duggar and

8    downloading or possessing alleged child pornography.

9           Now, the government believes they have

3:57PM10    circumstantially kind of -- and we obviously disagree with

11    this -- but the government believes they have

12    circumstantially placed devices and individuals at various

13    places at various times.  And when it comes to that, the

14    irony of the government's whole --

3:57PM15           THE COURT:  Well, I've got to challenge you on

16    that.  By direct, you mean that they don't have an

17    eyewitness who can testify that they saw him downloading

18    these images?

19           MR. GELFAND:  Yes, Your Honor.  Yes, Your Honor.

3:58PM20    It's a circumstantial case in that sense.  Maybe I'm being

21    imprecise in my terminology, but --

22           THE COURT:  Well, the Court has tried a lot of

23    child porn cases, and rarely is it the case where someone

24    else -- that there's an eyewitness to it.  I mean, I guess

3:58PM25    there could be.

3:58PM 1           MR. GELFAND:  I understand that.  The point is

2      not -- look, this is neither the time nor the place to try

3      the case, and we're not trying to do that.  Obviously, just

4      leave it as there's two sides to every story.

3:58PM 5           But as a practical matter, the point here is that

6      the irony of the government's case against Josh Duggar is

7      that the government essentially takes what they would

8      submit are cellular phone devices, MacBook computers.  They

9      readily acknowledge, as they have no choice but to

3:58PM 10     acknowledge, that none of Mr. Duggar's personal devices, in

11     contrast to the HP desktop, even allegedly had a trace, a

12     forensic trace of child pornography or any sort of

13     contraband on it.

14           And what they would submit is that the

3:59PM 15     evidentiary value of all of these other devices, or some of

16     these other devices, is that they provide -- I keep using

17     the word circumstantial evidence, maybe there's a better

18     word for it -- but essentially circumstantial evidence that

19     they believe is relevant to placing humans in particular

3:59PM 20     locations, and certain statements that might reveal either

21     a sophistication or a lack of sophistication with

22     technology and certain things that are relevant to this

23     case.

24           The same analysis has to be true to these other

3:59PM 25     devices.  And I agree with you, Your Honor, that there's

3:59PM  1  real cross examination fodder as to the investigative

2  decisions that were made.  But one of the biggest problems

3  here is that there's also *Giglio* obligations and *Brady*

4  obligations when it comes to preserving evidence.  And

4:00PM  5  there is due process issues with *Trombetta* and *Youngblood*

6  when it comes to doing what they told the Court four days

7  earlier with respect to Mr. Berry's phone is necessary to

8  do with this kind of evidence.

9          And it's quite troubling, Your Honor, that I do

4:00PM 10  think the facts -- I still think -- I very much stand

11  behind our argument with respect to Mr. Mize's phone too.

12  But I think that the analysis is admittedly different when

13  you've got three computer forensic analysts on site and the

14  device at issue falls within the scope of the warrant, and

4:00PM 15  they choose not to image it.  And they choose not to do any

16  sort of report detailing what they looked for.  There's no

17  way of recreating the phone.  I don't think there's any

18  denial about that.  There's some case law in the kind of

19  *Youngblood/Trumbetta* line of cases where essentially if you

4:00PM 20  have the same evidence or the equivalent evidence, then as

21  a practical matter, there's courts that have said, you

22  know, perhaps it's a problem, perhaps it shouldn't have

23  been done, it's cross examination fodder, but there's no

24  due process violation, at least it doesn't rise to that

4:01PM 25  level.  That can't possibly be the case here and this isn't

4:01PM 1    the case here.  So I think it's particularly significant

2    when the Court analyzes these two scenarios to analyze them

3    separately.

4              With respect to Mr. Mize, I would note as the

4:01PM 5    chronology -- and I think this is factually undisputed --

6    that obviously the Mize interview occurs chronologically

7    after the same search warrant affidavit and after

8    Mr. Duggar references Mr. Mize.  What I think is

9    particularly important about today's testimony about

4:01PM10    Mr. Mize, in addition to, you know, the broad facts that we

11    were able to brief in advance of an evidentiary hearing, is

12    that what Special Agent Faulkner acknowledged today is that

13    Mr. Mize readily admitted at various times that he

14    accessed -- first of all, that he had spent the night.  He

4:02PM15    essentially stayed at the car lot without Mr. Duggar's

16    knowledge or consent, and that he accessed the office, the

17    term that I think the Court is familiar with that we're all

18    referring to as the car lot, that shed-type structure,

19    which is important because that's where the HP desktop was

4:02PM20    seized on November 8th of 2019.

21              And so you've got this witness where, as much as

22    the government wants to point to whether someone was

23    employed and their own theory about payroll records and

24    things like that, which, again, this is neither the time or

4:02PM25    the place to litigate the merits of that.  Everyone readily

4:02PM 1  acknowledges -- I wasn't meaning to ask kind of a sarcastic

2  question of, "Payroll records don't tell us when someone

3  breaks in."  But the point I think is clear there, Your

4  Honor, which is that, at the end of the day, when you're

4:02PM 5  trying to figure out who had access to the one device at

6  issue, then after they learn all of that and they get

7  Mr. Mize's consent to search, or at least do a review of

8  his phone, they essentially scroll through things.  And all

9  we have is Agent Faulkner's memory of what happens.  And

4:03PM 10  there's important questions there.  We don't know what the

11  devices were.  We know for sure that this witness admitted

12  to the kinds of facts that most witnesses wouldn't admit

13  to, breaking into the place at issue to law enforcement, to

14  federal law enforcement.  To that extent, that witness is

4:03PM 15  already, at least through one lens, incriminating himself,

16  perhaps not necessarily with the crime at issue in this

17  case, but with a crime.

18        And as a practical matter, the circumstances

19  here, this is not as simple -- and I think it's important

4:03PM 20  to realize this and to acknowledge this -- it's not as

21  simple as, we interview a million people, we looked at

22  phones.  They did look at other phones over the course of

23  this investigation.  We did not raise this issue just

24  throwing darts at a board.  They looked at a phone of

4:04PM 25  someone who did repairs for some vehicles.  They provided

4:04PM 1  some text message screen images in discovery of that

2  individual that law enforcement's request had sent.

3         The point is, I think there are scenarios where

4  you can ask to glance at a phone.  But in an alleged child

4:04PM 5  pornography investigation, I think as everyone in this

6  courtroom that has had experience with these cases readily

7  understands, the evidence at issue, even alleged CP --

8  child pornography -- is not ordinarily in the photo app.

9  It's not ordinarily in the browser history of an iPhone,

4:04PM10  for example.  Oftentimes, it's in -- one of the

11  witnesses -- Mr. Faulkner today used the phrase

12  "unallocated space."  Oftentimes, it's, you know, it's

13  sometimes app-based.

14         The only other point that I would make, Your

4:05PM15  Honor, as to why it's particularly important from a

16  potentially exculpatory standpoint is that evidence can be

17  potentially exculpatory even if it's not evidence of

18  alleged child pornography.  And I think that that's

19  important in a case where, for example, one's level of text

4:05PM20  sophistication is a relevant factor.  That's material to

21  the defense in this case given the nature of what the

22  government alleges was a partition hard drive with a Linux

23  operating system with a TOR browser and the various

24  allegations.  That's atypical, maybe not necessarily

4:05PM25  compared to all cases of this nature, but that's not --

4:05PM 1   I've had a number of cases that I've litigated in this
2   world and sometimes it really is as simple as a single
3   BitTorrent type platform.  That's not this case.  And so I
4   think that there's important evidence that is lost forever
4:06PM 5   that was failed to be preserved.  And I think what's
6   particularly relevant from a bad-faith standpoint in
7   *Youngblood* is, in your typical *Youngblood* case, you
8   ordinarily don't have the law enforcement agency's
9   under-oath representation before the incident saying, we
4:06PM10   need to do the opposite of what we did to adequately
11   preserve this evidence.  And that's exactly what this Court
12   has here, and that's Government Exhibit 1.
13          THE COURT:  Thank you, Mr. Gelfand.  We need to
14   work in a break at some point.
4:06PM15          MR. ROBERTS:  I'd certainly take a bathroom break
16   if you're offering one.
17          THE COURT:  We'll be in recess until 4:20.
18          (Recess taken from 4:06 p.m. to 4:24 p.m.)
19          THE COURT:  Mr. Roberts?
4:24PM20          MR. ROBERTS:  Thank you, Your Honor.
21          Your Honor, the defense motion, and even their
22   argument today, is more of a critique of law enforcement's
23   activities instead of actually a motion to compel possible
24   exculpatory evidence, or failure to preserve, rather.
4:25PM25          The three basic factors that we're looking at is,

4:25PM 1    one, it starts, it has to have apparent exculpatory value.

2    They fail with regard to both Mr. Mize's phone and

3    Mr. Berry's.  Comparable evidence, we make an argument, but

4    I'm going to focus on bad faith, the third factor.  To

4:25PM 5    establish a baseline -- and this is why the government came

6    in here and made such a big production of our evidence.

7    One of the references was, well, Mr. Mize could have broke

8    in there.  Well, the evidence that went unchecked before

9    this Court was, child sexual abuse material was downloaded

4:25PM10    at the car lot during the time when only Duggar was there,

11    or at least he was physically present there.  It was during

12    the day.  It wasn't at night.

13            The forensics on his phone and his MacBook show

14    that he was physically present, even behind the desk within

4:25PM15    minutes of child pornography being accessed.  That's the

16    timeline we presented to the Court.  It went unchecked.  We

17    know that --

18            THE COURT:  When was the government aware of

19    that, though?

4:26PM20            MR. ROBERTS:  Through forensic examination of the

21    devices, Your Honor.

22            THE COURT:  I know.  When relative to Mize being

23    found and the manual triage of his phone?

24            MR. ROBERTS:  Well after, Your Honor.  I concede

4:26PM25    that.  I understand it's apparent at the time.  But to

4:26PM 1    gauge the -- from the Agent's perspective and to inform

2    this Court, you still have to review the facts.  I mean,

3    we're making a determination now whether there's

4    potentially exculpatory evidence that the agents missed,

4:26PM 5    they overlooked.  Because their testimony is, hey, we had a

6    forensic examination done of one device, and the other

7    device was kind of an all-in-the-moment, we're going to run

8    up to Rogers and look at Mr. -- or talk to Mr. Mize, and he

9    happened to consent.  They had no authority.  They had no

4:26PM10    CFA available.  They did the best they could.  So, I mean,

11    gauging whether they missed something or did a bad act or

12    did a bad job, rather, you have to look at the facts.

13        And when we presented this to the Court, just as

14    the same as you're arguing that Mr. Mize could have broke

4:27PM15    in, well, that's not consistent with the facts, Your Honor.

16    I mean, we know through the facts, through what we

17    presented that went unchecked is that this Linux partition

18    was created.  Linux partition happens to be, at least a

19    partition that defeats Covenant Eyes, which is a program

4:27PM20    there that is designated or designed to monitor internet

21    porn activity and report that.  It is password-protected,

22    went unchecked, with "Intel 1988," his birth year,

23    Mr. Duggar's birth year, and something, went unchecked,

24    personal to him, including his bank account password.

4:27PM25            THE COURT:  But we're not here today to give

4:27PM 1    closing arguments to the jury.  And so I think more to the

2    point here is, as ya'll dialed in the forensics and dialed

3    in the timeline that at least, according to the government,

4    puts Mr. Duggar behind the keyboard of the computer, those

4:28PM 5    things weren't known, as I understand it, to law

6    enforcement at the time that a decision was made not to do

7    a deeper dive on Mize's phone or Berry's phone.  Is that

8    true?

9              MR. ROBERTS:  True, Your Honor.  But the purpose

4:28PM 10   of my argument is to say that they did make a determination

11   at that time.  They did manual examinations, found nothing

12   incriminating.  All the evidence since showed that there

13   was nothing incriminating on those phones.  It confirms

14   that they did actually do a good job.  They didn't miss

4:28PM 15   anything is my point.

16             And, Your Honor, something that hasn't been

17   highlighted and pinpointed is Duggar's own statement, not

18   with regard to the actual cell phones.  I mean, Mr. Duggar

19   told law enforcement he's not denying guilt, but yet the

4:29PM 20   defense is asking this Court to dismiss the entire case on

21   the premise that law enforcement missed exculpatory

22   evidence.  I mean, his own client stated, "I'm not denying

23   guilt."

24             THE COURT:  Well, I think the context of that

4:29PM 25   statement, you're putting a little too much weight on.  I

4:29PM 1   don't necessarily view that statement as the end-all,

2   be-all, but, whatever.

3          MR. ROBERTS:  I understand, Your Honor.  And

4   reasonable people can disagree there.  It stands out to the

4:29PM 5   government, as you can imagine.

6          THE COURT:  Well, in that same context, he's

7   basically saying, I want to be careful what I'm saying

8   here, because I don't know what I don't know.  And, you

9   know, there could be other people out there who, you know,

4:29PM10   are latching on to the wi-fi or whatever.  And so I'm not

11   going to say you're not going to find something on there.

12   And then there's the comment about not saying that I'm not

13   guilty.  But there's a broader context that is less

14   incriminating than how you would make your argument today

4:30PM15   is all I'm saying.

16          MR. ROBERTS:  Your Honor, I understand.  I'll

17   move on.

18          Specifically with respect to Mr. Mize and

19   Mr. Berry, there is just simply nothing, no evidence before

4:30PM20   this Court connecting them to the car lot on the days in

21   issue.  I mean, we did set out that we're talking about

22   May 13th, 14th, 15th and 16th.  The evidence before this

23   Court, again, this is confirming that the agents did a

24   thorough review and they didn't miss anything.  That means

4:30PM25   there was no exculpatory evidence that Mr. Berry didn't

4:30 PM 1   work there.  That's what he told them in the interview.

2          The Grand Jury subpoena produced records from the

3   defense.  He didn't work there during that time.  He might

4   have been off on a week or two, but not to -- it was kind

4:31 PM 5   of a trivial difference between what he said, June 9th, and

6   then I think it was May 26th, trivial as it didn't cover

7   the criminal activity.

8          Mr. Mize, again, he's a customer.  I think the

9   generic argument from the defense could be made with

4:31 PM 10  respect to every customer who ever walked onto that lot.

11  And also I do think the fact that the Court does have to

12  look at bad faith.  I do not see bad faith because an agent

13  places in a very standard search warrant language saying,

14  oftentimes, it requires to be removed to a forensics lab.

4:31 PM 15  That's not true to all cases.  And that's exactly what the

16  Agent testified.  The day they encountered Mr. Mize, they

17  had been trying to find him, trying to locate him.  As soon

18  as they did, they both got in their respective vehicles and

19  they drove up to Rogers.  So that's the opposite of bad

4:32 PM 20  faith.  And then they ask him for consent.  They had no

21  legal right.  They had no authority to take that.  They

22  simply asked for consent to make sure they were not missing

23  anything.  Again, opposite of bad faith.

24          Your Honor, I'm not going to belabor this.  The

4:32 PM 25  Court knows the facts.  It's very evident from a pretty big

4:32PM 1   production from the government.  We set out our arguments

2   and our case law in our response.  And for those reasons, I

3   believe that the Court should deny the motion to dismiss.

4           THE COURT:  Thank you.  Mr. Gelfand, anything to

4:32PM 5   reply to there?

6           MR. GELFAND:  Just briefly, Your Honor.

7           I think it's important to understand that

8   after-the-fact rationalizations are not the lens that we

9   have to look at this and that the Court has to look at

4:33PM10   this.  The Court has to look at the decisions that were

11   made on November 8th and December -- whatever the date was,

12   the 26th or approximately whatever the date in the record

13   was -- with respect to Mr. Berry in November and Mr. Mize

14   in December.

4:33PM15           The important legal distinction here is that

16   potentially exculpatory is not viewed through the lens of

17   the government's theory of prosecution.  I understand the

18   government in any criminal case -- and I was a former

19   prosecutor, Your Honor, I can stand up and say, but here's

4:33PM20   what we believe the facts are.  That's not the spirit of

21   delivering potentially exculpatory evidence into the hands

22   of the accused, which is what they failed to do here.

23           At the time that this happened, these agents

24   decided not to preserve this evidence.  And the whole thing

4:33PM25   is circular to basically say there's no evidence connecting

4:34PM 1   them to the car lot when they failed to preserve the

2   evidence that may very well have connected them to the car

3   lot.

4           The only other thing I would quickly note, Your

4:34PM 5   Honor -- well, two other things.  Paragraph 45 of Exhibit 1

6   does not hedge.  It doesn't say "sometimes."  It doesn't

7   say "oftentimes."  It says, with respect to this kind of

8   evidence, we are asking the Court to permit us, in

9   paragraph 46 in particular, to seize these devices so that

4:34PM 10  we can then do this whole controlled laboratory assessment.

11  And I think that's a very important distinction.

12          The only other thing I would note, Your Honor, is

13  that I heard nothing from the government with respect to

14  the circumstances under which Mr. Berry's phone was taken.

4:34PM 15  And that is that it was within the scope of the search

16  warrant with forensic analysts on site literally imaging

17  phones for this purpose consistent with what they said they

18  would do to the Magistrate Judge in Government Exhibit 1.

19          There's no good reason that this happened.  This

4:35PM 20  is a critique on the government's investigation, but that's

21  not what it's limited to.  In other words, the due process

22  clause, Your Honor, gives the defense access to exculpatory

23  evidence or potentially exculpatory evidence.  There's no

24  question that they failed to preserve it.  They all but

4:35PM 25  admit it today, as they have to.  And now the only question

4:35PM 1    for the Court becomes what the remedy is.  So I think it's

2    an important issue and I think that the bad faith is

3    demonstrated by Government Exhibit 1, but also the totality

4    of the circumstances under which they were looking at it at

4:35PM 5    the time.

6                 THE COURT:  All right.  Thank you.  The Court

7    appreciates this motion as well.  I think this is a very

8    substantive motion and very good argument has been made.

9                 There is a lot of case law out there to inform

4:36PM10    the Court's decision here on due process violation.  That

11    doesn't necessarily make the decision any easier because

12    this law has to be applied to the specifics in any given

13    case, including the case here.  But certainly *Arizona v.*

14    *Youngblood* is a case that sums up the law quite well,

4:37PM15    including its discussion of *Brady*, which is actually a

16    little bit of a different issue, but then also discusses

17    and expands on *Trombetta*.

18                 I think that the motion here does a very nice job

19    of spinning up an argument by comparing and contrasting

4:37PM20    what the government represented to the Magistrate Judge

21    when it wanted a search warrant of a particular property

22    versus what they did in perhaps failing to preserve the

23    absence, or at least what the government contends to be the

24    absence of evidence.

4:38PM25                 But while the motion does a good job of

4:38PM 1    correlating those two things, I think that kind of

2    distracts attention and focus from what the real issues

3    here are, and that is whether there's any bad faith on the

4    government's part and whether there's been any

4:38PM 5    identification of what the exculpatory value might be,

6    could be, would be, or whether that is just truly a, "We

7    don't know what we don't know" sort of case.

8              The Court here does not find there to be any

9    evidence or inference of bad faith.  And while this may

4:38PM 10   have the makings of cross examination fodder, there will

11   always be in almost every case some investigative measure

12   that law enforcement didn't take that they could have taken

13   if they wanted to.  So where do we draw the line?  What

14   "nth" degree of being proactive in preserving evidence that

4:39PM 15   the defense would have preserved with the benefit of

16   hindsight should the government be proactively

17   anticipating?

18             And, truly, the fact that they said one thing to

19   the Magistrate Judge in a *pro forma* sort of way, and the

4:39PM 20   fact that they didn't necessarily take that same view

21   towards these other persons' cell phones, again, that may

22   be fodder for cross examination, but it doesn't mean that

23   there was anything nefarious or anything rising to the

24   level of bad faith on law enforcement's part that formed

4:40PM 25   the basis for their actions.  It's certainly nothing that

4:40PM 1    rises to what the prevailing case law here say makes it of

2    a Constitutional dimension.

3         *Arizona v. Youngblood*, this is actually from the

4    syllabus, but it summarizes the holding here.  "Unless a

4:40PM 5    criminal defendant can show bad faith on the part of the

6    police, failure to preserve potentially useful evidence

7    does not constitute a denial of due process."  Again, they

8    reflect on *Trombetta*.  And the same was true in *Trombetta*.

9    And, again, we're not dealing here with a case even where

4:41PM 10   evidence was preserved and not tested, or whether known

11   evidence was destroyed as is how these due process cases

12   are sometimes framed.  We're dealing with not taking

13   additional investigative steps based on law enforcement's

14   good-faith belief or what the Court finds to be good-faith

4:41PM 15   belief here that there wasn't a need to take additional

16   investigative steps.

17         Now, the defense may disagree with that.  And

18   they are invited to make what they wish to make of that at

19   trial and let the fact-finder decide whether that rises to

4:42PM 20   the level of reasonable doubt.  But the Court -- while from

21   the defense point of view, there is room to be critical

22   with not taking additional investigative measures, while

23   there is room to argue that there's a double standard that

24   they have implemented vis-a-vis what they told the

4:42PM 25   Magistrate Judge, the Court simply finds that there's no

4:42PM 1   reasonable inference that the police acted in bad faith,

2   nor does the Court find that there has been any readily

3   apparent exculpatory evidence that was disregarded.  And

4   under *Youngblood*, under *Trombetta*, there's simply not the

4:43PM 5   Constitutional deprivation of due process that would

6   require dismissal or any further sanctions by the Court to

7   address a Fifth Amendment harm or a due process harm.  So

8   for those reasons, the defendant's motion at Document 40

9   will be denied.

4:43PM 10          Let's next take up the defendant's motion at

11   Document 38.  This is the motion to suppress the

12   photographs of Mr. Duggar's hands.

13          MR. GELFAND:  Thank you, Your Honor.

14          As we set out in our pleadings, and I think the

4:44PM 15   evidence that came out today pretty clearly ties this

16   together, our position is that law enforcement needed a

17   warrant under Eighth Circuit precedent to take these

18   photographs.  And the failure to get a warrant, which is

19   beyond dispute, requires suppression.  There's a couple of

4:44PM 20   facts.

21          THE COURT:  You mentioned the Eighth Circuit.

22   What's your best case that that's the law on the Eighth

23   Circuit?

24          MR. GELFAND:  *Merrell*, Your Honor.

4:44PM 25   M-E-R-R-E-L-L.

4:44PM 1          THE COURT:  *Merrell*?  Okay.

2          MR. GELFAND:  Yes, Your Honor.  I readily

3    acknowledge that *Merrell* presupposed a warrant.  *Merrell*

4    did not say under all circumstances you need a warrant.

4:44PM 5    But I think, as a practical matter, when you have case law

6    in the Eighth Circuit saying that taking pictures of

7    specific body views and photography of the defendant's

8    hands in the Eighth Circuit's decision in *Merrell*, it was

9    presupposed that they had a warrant.  I think what's

4:45PM10    interesting about the Eighth Circuit's opinion is, it's not

11    like the Eighth Circuit ever says, "And by the way, they

12    didn't even need a warrant, but they went out of their way

13    to get a warrant," or anything along those lines.  What I

14    think is particularly important here is the way in which --

4:45PM15    these were not booking photographs.  They required

16    Mr. Duggar to place his body parts in particular places in

17    particular ways.  The evidence is undisputed from the

18    hearing today as to that.  And they knew that if they

19    discussed this with counsel, any such argument as to,

4:46PM20    quote, unquote "consent," that Mr. Duggar would have had

21    the benefit of his legal counsel.

22          THE COURT:  Did they need a warrant to get

23    fingerprints?

24          MR. GELFAND:  No, Your Honor.

4:46PM25          THE COURT:  Did they need a warrant to explore

4:46PM 1   the nooks and crannies of the tips of his fingers by

2   printing?

3              MR. GELFAND:  Your Honor, I think it's well

4   settled that fingerprinting --

4:46PM 5              THE COURT:  Did they need a warrant to lift up

6   the sleeve on a short-sleeve shirt to get a photograph of a

7   tattoo?

8              MR. GELFAND:  Your Honor, I think it would depend

9   on the circumstances.  I think that it's not --

4:46PM10   fingerprints are clearly part of the booking process.  A

11   photo of, for example, a defendant's or someone in

12   custody's face is clearly part of the booking process.

13              THE COURT:  What about identifying marks?

14   Tattoos?

4:46PM15              MR. GELFAND:  I think as a practical matter, Your

16   Honor, I think under circumstances when the reason they are

17   getting them is for what they consider evidentiary value, I

18   do think that they need a warrant, or at the very least, a

19   court order.

4:47PM20              THE COURT:  So if there was a tattoo in plain

21   view and that was of evidentiary value because a witness

22   had mentioned seeing somebody with a distinct tattoo on

23   their arm, they would need a warrant to get a picture of a

24   tattoo that was openly displayed by the subject in plain

4:47PM25   view all the time?

4:47PM 1          MR. GELFAND:  Not necessarily, but I think

2    there's a distinction there.  Because a tattoo is

3    essentially a voluntary statement that a scar, or, you

4    know, essentially a --

4:47PM 5          THE COURT:  Well, they are both identifying

6    marks, right?

7          MR. GELFAND:  They can be, yes.  But I think the

8    premise of the Court's question was "in plain view." You

9    don't need to go have someone pose in a particular way if

4:48PM10    it's truly in plain view.  This wasn't in plain view.  It

11    was on a body part that might in some ways be in plain

12    view.  But what they really wanted and what they really did

13    is they needed Mr. Duggar to go like this with his hands on

14    a table, and then to essentially zoom in from a particular

4:48PM15    vantage point.  And that's a distinction with a difference.

16          THE COURT:  So if it had been a bigger scar or

17    mark on the body, would that make a difference?  If they

18    could have taken the photo from across the room without

19    telephoto?

4:48PM20          MR. GELFAND:  I think that the question becomes

21    whether or not the person in custody has to pose in a

22    particular way.  And I think that's what the *Merrell* case

23    particularly focuses on.  And I know the term "pose" can

24    mean different things to different people, but whether the

4:48PM25    defendant has to participate -- doesn't have to be the

4:48PM 1 defendant -- whether the person in custody has to

2 participate to essentially provide for the taking of the

3 photography.

4 I also think that the Court can and should take

4:49PM 5 into consideration all of the circumstances on that day.  I

6 mean, this was an arranged self-surrender.  There was

7 regular communication with legal counsel.  Legal counsel

8 was physically present.  And the government's best argument

9 here is that Mr. Duggar consented.  And as a practical

4:49PM10 matter, I think that's -- saying that there's some knowing

11 and voluntary waiver of rights when Mr. Duggar at that

12 point was clearly in custody and didn't have access to his

13 legal counsel, there's a reason they didn't pick up the

14 phone and call Mr. Story or call me.  There's a reason they

4:49PM15 didn't --

16 THE COURT:  Where was counsel at that time?  Were

17 they -- I know that it was a negotiated surrender.  Were

18 you or Mr. Story at the detention facility or wherever this

19 took place?

4:49PM20 MR. GELFAND:  I was physically in Missouri.

21 Mr. Story was physically at HSI where this took place.

22 THE COURT:  Okay.  In another room while the

23 booking process was going on?

24 MR. GELFAND:  Yes.  Mr. Story -- and I think that

4:50PM25 the evidence actually establishes today too.  Mr. Story was

4:50 PM 1    physically present when Mr. Duggar was taken into custody.

2    If it wasn't clear from the testimony, I think everyone

3    would agree that Mr. Duggar was taken into custody at the

4    HSI facility here in Fayetteville in Mr. Story's presence.

4:50 PM 5            THE COURT:  Mr. Story was readily available to

6    ask if Mr. Duggar would be willing to consent?

7            MR. GELFAND:  Yes.  Unambiguously.  That's what

8    I've got for you, Your Honor.

9            THE COURT:  All right.  Thank you.  Ms. Marshall?

4:50 PM 10           MS. MARSHALL:  Thank you, Your Honor.

11           Your Honor, first, I just want to clarify one

12   point.  I'm not sure that it was put in evidence today that

13   Mr. Story was readily available during that time that the

14   scar was noticed in the -- I'm not sure that that was the

4:51 PM 15   testimony that was given today.  Mr. Story was there at one

16   point, but it was not in evidence that Mr. Story was there

17   when the scar was noticed.

18           THE COURT:  Well, okay.  We can have a discussion

19   about whether it's in the record before the Court.

4:51 PM 20           Do you know whether Mr. Story was present at HSI

21   when Mr. Duggar surrendered himself?

22           MS. MARSHALL:  I believe he had left at that

23   point, Your Honor.

24           THE COURT:  Mr. Story had left?

4:51 PM 25           MS. MARSHALL:  Yes, Your Honor.

4:51PM 1          THE COURT:  All right.

2          MS. MARSHALL:  Just wanted to clear that up.

3          Your Honor, as to the defendant's challenges

4     under the Fourth, Fifth, and Sixth Amendments, under the

4:51PM 5     Fourth Amendment, as the Court is aware in the *Merrell*

6     case, the *Merrell* case does not stand for the proposition

7     that you have to have a search warrant in order to take

8     these photographs.  Yes, in the *Merrell* case there was a

9     search warrant, but what the defendant fails to consider is

4:52PM10     that you also have consent.  You can have a warrant for a

11     residence.  You can have consent for a residence.  You can

12     have a warrant for DNA.  You can have consent for DNA.

13     Here, we have consent.  And so to say that the *Merrell* case

14     stands for the proposition that you have to have a warrant

4:52PM15     in order to take photographs is not what that case stands

16     for.  And so I don't think that that is something that you

17     can stand on to say that's the Eighth Circuit precedent in

18     this set of facts, because that is not what *Merrell* stands

19     for.

4:52PM20          Under the Fifth Amendment, the defendant's

21     challenge fails as well.  This was the display of physical

22     characteristics, which are non-testimonial in nature, and

23     therefore, not subject to the Fifth Amendment privilege of

24     self-incrimination.  As stated in the *Anthony* case, to

4:52PM25     qualify for a Fifth Amendment privilege, communication must

4:52PM 1    be testimonial, incriminating, and compelled.

2               When we were talking about tattoos, tattoos can

3    be considered testimonial if there was something written on

4    them that you were saying, "Yes, I did it," or some sort of

4:53PM 5    gang symbol that you are looking to the content of it.  But

6    when you're not looking to the content of it, when you're

7    looking for identification purposes for tattoos, then that

8    is not considered testimonial.

9               As far as compelled, the Court in that same case

4:53PM10    said that photographing tattoos that are immediately

11    visible does not require any compulsion.  Here, his hands

12    are immediately visible.  That does not require compulsion.

13    Compulsion is not, "Hey, can we take a picture of your

14    hands," and he puts his hands down so that they can take a

4:53PM15    picture.  That is not compulsion.

16               And that leaves us with incriminating.  And just

17    because something is incriminating does not mean that his

18    Fifth Amendment challenge should be invoked.  So,

19    therefore, Your Honor, it fails under the Fifth Amendment

4:53PM20    challenge as well.

21               Under the defendant's Sixth Amendment challenge,

22    a right to counsel attaches at a critical stage in a

23    criminal proceeding.  As stated in the *Butler* case in our

24    response, the taking of Edwards' photograph was not a

4:54PM25    critical stage of the proceeding.  In that case, he had

4:54PM 1  been arrested.  They took his photographs after he had been

2  arrested.  And just like the case law cited in the *Edwards*

3  case, a handwriting sample was not a critical stage, a palm

4  print was not a critical stage, and a hair sample was not a

4:54PM 5  critical stage.  If those are not critical stages, then the

6  photographing of hands that are readily visible is not a

7  critical stage either.

8         And we can't discount the fact that Special Agent

9  Faulkner and Special Agent Aycock saw the scar.  We can't

4:54PM 10  take away the fact that they saw that.  They saw what was

11  there and nothing takes that away, Your Honor.  So I would

12  ask the Court to deny the defendant's motion.

13         THE COURT:  All right.  Mr. Gelfand, the

14  government says that whatever the sequence of events was

4:55PM 15  when Mr. Duggar self-surrendered, by the time they got

16  around to the actual booking part of it, Mr. Story was not

17  present.  Do you disagree?

18         MR. GELFAND:  Your Honor, obviously, I wasn't

19  there.  What I can represent to the Court is that Mr. Story

4:55PM 20  was there when Mr. Duggar turned himself in and was readily

21  available, even if he wasn't physically present, as

22  evidenced by the abundance of the coordination that the

23  Court is well aware it took to arrange for the

24  self-surrender between defense counsel and the Assistant

4:55PM 25  U.S. Attorneys.  There was regular communication.  And this

4:55PM 1   is 2021.  So I think whether or not Mr. Story was

2   physically present at the facility is really a distinction

3   in my opinion without a difference, because he was present

4   at the facility when Mr. Duggar self-surrendered himself,

4:56PM 5   which was the plan.  That was the intent.

6         As a practical matter, I think that the

7   government's entire position essentially boils down to,

8   there was consent.  And I think that consent has to be

9   considered when a defendant, Mr. Duggar in this instance,

4:56PM 10  is in custody separated from his counsel.  And when the

11  photographs themselves require him to do an action, and

12  essentially they zoom in, I think that one thing that's

13  important to note is that, as a practical matter, the

14  government essentially says they observed what they

4:56PM 15  observed, meaning the agents.

16        This is a motion to suppress the photographs, and

17  that's what we're talking about and I want to stay narrowly

18  focused on it.  And I do think that the Eighth Circuit in

19  *Merrell* and the District Court in *Merrell*, both of which we

4:57PM 20  cited in our pleadings, expressly went out of their way to

21  say, these were photographs of a defendant's hands taken

22  pursuant to execution of a valid search warrant.  And we

23  all have read a million cases by the Eighth Circuit and

24  other appellate courts, and district courts for that

4:57PM 25  matter, that understandably go out of their way to say,

4:57PM 1    yes, this was a valid search warrant, but by the way, I

2    find you don't need a search warrant for this.  That was

3    unnecessary.  And so props to the government, essentially,

4    for getting a search warrant.  That's not what happens

4:57PM 5    here, and I think that the Eighth Circuit case law does

6    help us here.

7            THE COURT:  All right.  Thank you.

8            Well, I don't think that *Merrell* necessarily

9    saves the day for the defense motion here.  I'm trying to

4:58PM 10   decide whether to explore the -- which issue to explore

11   first.  But, substantively, the scar or mark on the thumb

12   based on the Court's understanding of the testimony today

13   and what the parties have represented in their motion --

14   again, this is largely undisputed what occurred -- but this

4:58PM 15   is a non-testimonial identifying mark, not unlike a tattoo.

16   And the Court, based on its review of the Supreme Court

17   precedent and Eighth Circuit precedent, does not find that

18   under these circumstances that a search warrant under the

19   Fourth Amendment was required.  I understand the inference

4:59PM 20   that the defense relies on in *Merrell*, but that's not

21   exactly what *Merrell* says.

22           The Court would point to *United States v.*

23   *Dionisio*.  That's a Supreme Court case from 1973.  No

24   Fourth Amendment protection for physical characteristics

5:00PM 25   that are constantly exposed to the public.  I don't know of

5:00PM 1    a body part, other than perhaps one's face, that is more

2    constantly exposed to the public than one's hands.  It's

3    somewhat ironic -- and I was being somewhat facetious when

4    I was asking about needing a warrant to fingerprint -- but

5:00PM 5    it's somewhat ironic that, for identifying purposes, the

6    government wouldn't need a warrant to literally explore

7    microscopic nooks and crannies of the tips of one's

8    fingers, but for some odd reason, one would need to do that

9    for an equally unique scar or marking on one's hands that's

5:01PM10    even more visible than microscopic fingerprints.

11        *Maryland v. King*, 2013 decision, Supreme Court.

12    "In sum, there can be little reason to question the

13    legitimate interest of the government in knowing for an

14    absolute certainty the identity of the person arrested and

5:01PM15    knowing that he may be wanted elsewhere and ensuring his

16    identification in the event he flees prosecution.  To that

17    end, Courts have confirmed that the Fourth Amendment allows

18    police to take certain routine administrative steps

19    incident to the arrest."  This is referring to booking,

5:01PM20    photographing, and fingerprinting.  I'll agree that's in a

21    more traditional sense of the booking process, but, again,

22    this is an identifying mark.

23        Similar issue to the one here except it involves

24    a tattoo under the sleeve of the suspect, *United States v.*

5:02PM25    *Morgan*, Eighth Circuit 2016 case.  Quote, "A warrantless

5:02PM 1  search, while generally unreasonable, is valid if conducted

2  pursuant to the knowing and voluntary consent of the person

3  subject to a search." Here, there was consent. I don't

4  think that there's any dispute. Certainly, it's not a

5:02PM 5  disputed fact here that Mr. Duggar consented to being

6  photographed.

7          But transitioning to the Sixth Amendment argument

8  here, I don't know, or the Court finds that consent wasn't

9  even necessary. The right to counsel only attaches at

5:03PM 10  certain critical stages of proceedings, and the booking

11  process is not a critical proceeding. So the Court was

12  very curious about whether Mr. Story was actually present

13  at the HSI office when this was taking place, because it

14  would almost -- I agree with what Mr. Gelfand said about,

5:03PM 15  it would have been very easy to pick up the phone even if

16  he wasn't there. After all, they had been presumably

17  speaking on the phone or by electronic message in setting

18  up the surrender.

19          But it would have a whole different flavor to it

5:04PM 20  if literally Mr. Story were on the other side of a wall

21  when law enforcement just coincidentally decided to make

22  the request of Mr. Duggar instead of walking around to the

23  other side of the wall and asking Mr. Story. That's not

24  critical to the Court's analysis here, because the Court

5:04PM 25  finds that this is not an instance -- it's not a critical

5:04PM 1   stage where the right to counsel applies.  And in any

2   event, this was a non-testimonial identifying mark.  Much

3   has been made that this was staged.  I'm not even sure on

4   the facts here that I understand what that means.  He was

5:05PM 5   asked to present his hands for photographing and they took

6   three photos from varying closeness -- what's the word I'm

7   looking for -- various degrees of closeness in proximity,

8   various degrees of being zoomed-in or zoomed-out.  I don't

9   see how that is staging in the sense that a person is being

5:05PM 10   asked to recreate a pose to show to an eyewitness.  This

11   was an identifying mark.  They are trying to take a

12   photograph of it.  And I just do not believe that the

13   criticism here rises to a Constitutional dimension,

14   therefore, the motion at Document 38 will be denied.

5:06PM 15          This brings us to the Appointments Clause.

16   Mr. Gelfand?

17          MR. GELFAND:  Thank you, Your Honor.

18          We readily acknowledge, as we did in our brief,

19   that this is an unusual motion in the context of a federal

5:06PM 20   criminal case.  But it's a meritorious motion and it's an

21   important motion, because what is very clearly settled, not

22   only with the GAO report, but with the District Court in

23   Maryland in *Casa de Maryland v. Wolf* and with a number of

24   other cases that we cite in our reply brief, Mr. McAleenan

5:07PM 25   and Mr. Wolf held the position of Acting Department of

5:07PM 1    Homeland Security Secretary without lawful authority at a

2    time when HSI agents by definition working under the

3    authority of the Secretary of Homeland Security, or in this

4    case, the Acting Secretary of Homeland Security did not

5:07PM 5    have the lawful authority to hold that office.

6           And so as a practical matter, the government in

7    its response on the threshold issue of whether or not

8    there's an Appointments Clause violation relies heavily on

9    two affidavits that were submitted virtually verbatim in

5:08PM 10   the *Casa de Maryland* case and in a case in the Eastern

11   District of New York that were rejected outright by those

12   courts.  Those decisions effectively invalidated, at least

13   in the procedural context that they were held, the issues

14   in those cases that dealt with regulations.

5:08PM 15          THE COURT:  Rule-making.  Immigration

16   rule-making.  Immigration policy rule-making.

17          MR. GELFAND:  Yes, Your Honor.  Yes, Your Honor.

18          As a practical matter, the Appointments Clause

19   exists to make sure that government actors who are acting

5:08PM 20   under the authority of either who are principal officers or

21   who are acting as agents of principal officers, there has

22   to be structural integrity to the Constitutional framework

23   here.  And in this particular instance, to the extent that

24   the Court agrees -- and I think it should -- that there was

5:09PM 25   an Appointments Clause violation, then the question

5:09PM 1   becomes, is there any remedy in the context of a criminal

2   case for a defendant?

3          And there's an abundance of case law that says

4   that this is structural error.  There's an abundance of

5:09PM 5   case law that says that Appointments Clause violations are

6   too important to the structural integrity of the

7   Constitutional framework to just brush them aside.  And the

8   government's position in this instance is basically that

9   they are -- so what if there's a violation of the

5:09PM10   Appointments Clause?  And the Constitution and the law

11   demand otherwise.

12          Again, Your Honor, we readily acknowledge that

13   this is a novel motion, but it's a meritorious one and it's

14   an important one, and I think it's a well-cited one with

5:09PM15   respect to the legal authority that gives rise to our

16   position.  And so I know there's an abundance of legal

17   briefing.  This is not something that turns on facts.  I

18   don't think there is any factual dispute, Your Honor, as

19   far as who was holding office when or what ultimately

5:10PM20   happened.  Obviously, I'm happy to address those issues.

21   But I think that -- obviously, I'm happy to address any of

22   the Court's questions, but we would rely on our pleadings

23   that I think very carefully set out our position

24   methodically on this issue.

5:10PM25          THE COURT:  Well, if you're correct, what is the

5:10PM 1   logical extreme that could be drawn here?

2          MR. GELFAND:  I'm not sure that I understand the

3   Court's question.

4          THE COURT:  Well, as I understand your argument,

5:10PM 5   every law enforcement investigation of a federal law

6   enforcement agency under the HSI umbrella would be

7   invalidated if it took place during the window that there

8   were Appointments Clause violations, whether it's an ICAC

9   officer or any other drug investigations that occur, all

5:11PM 10   that would be invalidated if what you say is correct.

11          MR. GELFAND:  Perhaps, Your Honor.  I think that,

12   as a practical matter, there's a smaller subset of those

13   cases, albeit admittedly a very big subset of cases.

14          THE COURT:  HSI does a lot of investigations that

5:11PM 15   are brought to the Grand Jury in drug-trafficking cases in

16   this district.  I'm not sure about Missouri, but they do a

17   lot of drug-trafficking investigations in this district.

18          Are all of those investigations and perhaps

19   convictions invalidated if they occurred during this

5:12PM 20   window?

21          MR. GELFAND:  Your Honor, I'm here on behalf of

22   Mr. Duggar, but I think --

23          THE COURT:  No, no.  You can't come in here and

24   make an argument and not -- I mean, you're the one that's

5:12PM 25   talking about as a practical matter.

5:12PM  1          MR. GELFAND:  I'll happily respond to the Court's

2   question.  The answer is, yes, I believe if they were

3   exclusively HSI investigations during this time period.  I

4   believe that the Appointments Clause analysis would apply

5:12PM  5   in full force to every one of those cases.

6          Now, I think to answer the Court's question, if

7   there's already a conviction and something wasn't raised, I

8   mean, I think there would be deferential standards of

9   review and it gets more complicated.  But generally

5:12PM 10   speaking, yes, I think that the logical -- now that I

11   understand what the Court is asking, I think that the

12   logical extension of this would apply to a large subset of

13   cases.  That's not a reason not to grant this motion.

14          THE COURT:  The charge was brought, as I

5:13PM 15   understand it, by a duly-impaneled Grand Jury of the

16   Western District of Arkansas.  Do you take exception to

17   that?

18          MR. GELFAND:  No, Your Honor.

19          THE COURT:  Does this play into the analysis here

5:13PM 20   at all?

21          MR. GELFAND:  Your Honor, I don't think it does,

22   because I don't think that bringing an Appointments Clause

23   violation that's structural to a Grand Jury that ultimately

24   indicts the case cleanses the structural error

5:13PM 25   Constitutionally.  I think that, practically, the other

5:13 PM 1  thing that's important to recognize --

2        THE COURT:  Well, I think it is, because you're

3  saying that the appointment, an interim appointment, acting

4  appointment of a cabinet official is on the same par with a

5:14 PM 5  federal law enforcement officer that just so happens to

6  work in that executive branch agency, who was there long

7  before the acting secretary was, and presumably swore out

8  his own oath, and who presumably did not require a

9  Presidential appointment.  There's not an Appointments

5:14 PM 10  Clause issue with regard to the particular investigator.  I

11  don't understand that to be your argument.

12        Your argument is that the agency and all of its

13  law enforcement officers are tainted because of a

14  structural defect in the cabinet, the acting cabinet

5:15 PM 15  officer.  And the cases that you have cited all go to the

16  executive function of policy rule-making, not to criminal

17  investigations of this or any other nature.  I just don't

18  understand anything about your argument.

19        MR. GELFAND:  Well, hopefully, I can perhaps

5:15 PM 20  clarify a little bit.  Because I think that if we start

21  with the premise that the agents for HSI are not principal

22  officers, which they are not.

23        THE COURT:  That's a good place to start.

24        MR. GELFAND:  No one is suggesting that Special

5:15 PM 25  Agents Faulkner and Aycock, for example, were

5:15PM 1    Presidentially appointed or Senate confirmed.  The word
2    "Agent" has significance, because what they are -- not only
3    just rhetorically, but they are acting under the authority
4    of the principal officer.  Every federal employee, in
5:16PM 5    essence, is acting under the authority of a principal
6    officer.  And that's the Constitutional structure.  And so
7    when the principal officer lacks the authority to act with
8    lawful authority, the Agent acting under that person's
9    authority lacks authority.
5:16PM 10           And I think what's important here to realize is
11   that the large part of the investigation of this case
12   involved agency summonses in lieu of Grand Jury subpoenas.
13   There were a handful of Grand Jury subpoenas, but the
14   agency summonses were issued under the authority that is
5:16PM 15   given by law to the Secretary of Homeland Security to issue
16   those summons.  And as a practical matter, the fact that
17   this is arising in the context of a criminal case to me
18   weighs in support of our argument, not against our
19   argument.  Because when it comes to executive rule-making
5:17PM 20   or immigration policy and things like that, generally
21   speaking, in our Constitution system, a criminal
22   defendant's rights are due greater deference and greater
23   protection than kind of rule-making critique or regulatory,
24   you know, APA-type analysis.  And so as a practical matter,
5:17PM 25   I think that the Constitutional framework here is if there

5:17PM 1  is in fact an Appointments Clause violation, and I believe

2  that there is, then there has to be legal significance for

3  the non-principal actors acting under the authority of the

4  person or people who held the principal office, sometimes

5:17PM 5  called the PAS office, without lawful authority.  And in

6  this case, Mr. McAllenan and Mr. Wolf unambiguously held

7  that office without lawful authority.

8           THE COURT:  Thank you, Mr. Gelfand.  You get

9  extra credit for novelty.  Ms. Marshall?

5:18PM 10          MS. MARSHALL:  Thank you, Your Honor.

11          Your Honor, I'll just briefly speak because I

12  believe that our response covered the bulk of what we have

13  to say today, but just responding to a little bit of the

14  defendant's assertions that he made.

5:18PM 15          First of all, the Agents are acting under the

16  authority delegated by statute.  Whenever Agent Faulkner,

17  Agent Aycock, all the other agents in Homeland Security

18  swore to take an oath, they swore under the Constitution.

19  They didn't swear under Secretary Wolf, Secretary

5:18PM 20  McAleenan.  They swore to the Constitution to follow the

21  law and to do what they are imposed to do by statute.  They

22  don't swear under every new secretary that comes into

23  office.  Their authority is statutory authority.  That's

24  where their authority is derived from.

5:19PM 25          The defense cites all these cases, but as the

5:19PM 1  Court pointed out, these are civil cases that have policy

2  issues that those acting secretaries put into place.  They

3  are not -- that is what the civil cases are derived from.

4  There is nothing here to show that those acting secretaries

5:19PM 5  had anything to do with this case, that they had any sort

6  of say, that they had any sort of knowledge that anything

7  they did affected this case.  Therefore, those civil cases

8  have no authority and no bearing, because they are apples

9  and oranges.  It doesn't matter.

5:19PM 10       The defense talked about the affidavits being

11  verbatim.  Well, those declarations are what happened.

12  That is the history.  Those declarations were the

13  secretaries laying out who is in charge, laying out what

14  happened.  They don't change, because it's history about

5:20PM 15  what happened.

16       Your Honor, there was a validly unbiased Grand

17  Jury that was presented this case that returned a true

18  bill.  There was an Agent who got his authority from

19  statute and there were acting secretaries who are validly

5:20PM 20  appointed.  And, therefore, the defendant's motion should

21  fail, Your Honor, and it should be denied.

22       THE COURT:  Thank you, Ms. Marshall.

23       The defendant's motion at Document 39 will be

24  denied.  The Court finds that the HSI officers here were

5:20PM 25  statutorily vested and Constitutionally sworn to enforce

5:20PM 1   federal criminal statutes, and in this case specifically

2   related to the statutes that criminalize receipt,

3   possession, distribution, et cetera, of child sex abuse

4   material.

5:21PM 5        The Court believes that all of the cases cited by

6   the defense are in the realm of rule-making and the

7   structural defect does not transition across the divide in

8   those civil rule-making cases that have to do with policy

9   decisions and the sort of policy-making considerations that

5:22PM 10  are more in the realm of political rule-making.  There is

11  just simply no translation in this Court's estimation as to

12  how that would create a defect in a sworn law enforcement,

13  federal law enforcement officer acting under his statutory,

14  his or her statutory grant of authority, not to mention the

5:22PM 15  fact that the indictment here has been brought from a

16  properly-impaneled Grand Jury in the Western District of

17  Arkansas.  The Court finds no merit to this particular

18  motion, and therefore it is denied.

19        Any other matters that the defense would like to

5:22PM 20  take up today?

21        MR. GELFAND:  No, Your Honor, not with respect to

22  these four motions.

23        THE COURT:  Any other matters the government

24  would like to take up?

5:23PM 25        MR. ROBERTS:  No, Your Honor.

5:23PM  1                    THE COURT:  Very well.  We're adjourned.

        2           (proceedings adjourned at 5:23 p.m.)

        3

        4

        5

        6

        7

        8

        9

       10

       11

       12

       13

       14

       15

       16

       17

       18

       19

       20

       21

       22

       23

       24

       25

C E R T I F I C A T E

   I, Paula K. Barden, CCR, RPR, RMR, Federal Official Court Reporter, in and for the United States District Court for the Western District of Arkansas, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

   Dated this 9th day of November 2021.


_____
PAULA K. BARDEN, CCR, RPR, RMR #700
Federal Official Court Reporter
Western District of Arkansas

