IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION


UNITED STATES OF AMERICA                    PLAINTIFF

v.              CASE NO. 5:21-CR-50014

JOSHUA JAMES DUGGAR                         DEFENDANT

_____


TRANSCRIPT OF MOTIONS HEARING

BEFORE THE HONORABLE TIMOTHY L. BROOKS

NOVEMBER 29, 2021

FAYETTEVILLE, ARKANSAS

_____

```
 1                    A P P E A R A N C E S

 2

 3    FOR THE PLAINTIFF:

 4    MR. DUSTIN ROBERTS
      MS. CARLY MARSHALL
 5    United States Attorney's Office
      414 Parker Avenue
 6    Fort Smith, Arkansas 72901
      (479) 783-5125
 7    dustin.roberts@usdoj.gov
      carly.marshall@usdoj.gov
 8

 9    MR. WILLIAM G. CLAYMAN
      Department of Justice
10    1301 New York Avenue
      Washington, DC 20005
11    (202) 514-5780
      william.clayman@usdoj.gov
12

13    FOR THE DEFENDANT:

14    MR. JUSTIN K. GELFAND
      MR. IAN TALBOT MURPHY
15    Margulis Gelfand
      7700 Bonhomme Avenue, Suite 750
16    St. Louis, Missouri 63105
      (314) 390-0234
17    justin@margulisgelfand.com
      ian@margulisgelfand.com
18

19    MR. TRAVIS W. STORY
      Story Law Firm
20    2603 Main Drive, Suite 6
      Fayetteville, Arkansas 72704
21    (479) 443-3700
      travis@storylawfirm.com
22

23

24

25
```

I N D E X

                                                              Page

BOBYE HOLT

   Direct Examination by Ms. Marshall              7

   Cross Examination by Mr. Gelfand               35

   Redirect Examination by Ms. Marshall           59

JAMES ROBERT DUGGAR

   Direct Examination by Ms. Marshall             65

   Cross Examination by Mr. Gelfand               82

   Redirect Examination by Ms. Marshall           89

   Inquiry by the Court                           94

   Further Redirect Examination by Ms. Marshall   96

Government Rests                                  98

Defense Rests                                     98

Argument by Mr. Clayman                           98

Argument by Mr. Gelfand                          105

Court's Comments                                 117

Reporter's Certificate                           120

E X H I B I T S
(UNDER SEAL)                    Marked

Court's Exhibit No. 1   Notice Documents &          5
                        Summaries

Court's Exhibit No. 2   Victim Identification        6
                        Key

1           THE COURT:  The next matter on the Court's docket

2    today is the United States versus Joshua James Duggar.

3    Our case number is 5:21-CR-50014.  Appearing on behalf of

4    the United States, Dustin Roberts, Carly Marshall, and

5    William Clayman.  And on behalf of the defendant, Travis

6    Story, Justin Gelfand and Ian Murphy.

7           On November 1st, the Court conducted a pretrial

8    conference as this matter is scheduled to commence a jury

9    trial, tomorrow actually.  During the course of the

10   pretrial hearing, the Court took up two competing motions,

11   including the government's notice and motion at document

12   68 and the defendant's motion at document 72.  Both

13   motions seek an evidentiary ruling from the Court as to

14   the admissibility at trial of certain allegations that the

15   defendant previously committed an act or acts constituting

16   child molestation.

17          The government's motion affirmatively seeks to

18   include such evidence at trial for propensity and other

19   purposes under Rule 414 and for non-propensity purposes

20   under Rule 404(b).  The defense motion in limine seeks to

21   exclude any and all such references for any and all

22   purposes.  And the groundwork for the motion and the

23   positions taken by the parties was sketched out at the

24   hearing on November 18th.  But at the end of that hearing,

25   it was unclear to the Court what the specifics of the

1    allegations are and whether those allegations could be
2    found by a preponderance to constitute a child molestation
3    offense and so the Court ordered an evidentiary hearing.
4    And that is the purpose of today's hearing.
5            At our hearing on November 18th, the Court
6    marked -- I believe it was Court's Exhibit 1 -- the notice
7    -- well, the original notice of the allegations was set
8    out at document 68.  But in our hearing on November 18th,
9    the government indicated that it had provided a more
10   specific statement and summary to the defense, and the
11   Court asked for a copy of that and it was marked as
12   Court's Exhibit 1 under seal.  The Court didn't have an
13   opportunity to review those documents during the hearing,
14   but I have since reviewed the notice documents and the
15   summaries.  And that is Court's Exhibit 1 under seal.
16           (Court's Exhibit No. 1 marked)
17           THE COURT:  In preparation for our evidentiary
18   hearing today, the government has informed the Court that
19   there will potentially be testimony pertaining to four
20   alleged victims of child molestation offenses, who were
21   minors at the time.  And the Court believes for purposes
22   of our hearing today that these four alleged victims
23   should be anonymized.  And in that regard, the government
24   has prepared a victim identification key, which the Court
25   will mark as Court's Exhibit 2 under seal for purposes of

1   this hearing.  This document outlines the identities by

2   name and date of birth of the anonymized names.  The

3   reference that we will use will be Jane Does 1, 2, 3 and

4   4.  The name and corresponding date of birth is for the

5   Court's and potentially the witnesses' purposes, but will

6   not be stated publicly in court.

7           The Court in chambers understands that the

8   defense has stipulated to the accuracy of the name and

9   corresponding date of birth.

10          Is that correct, Mr. Story?

11          MR. GELFAND:  Mr. Gelfand, Your Honor.  Yes, we

12  have.

13          THE COURT:  Thank you, Mr. Gelfand.  So that's

14  Court's Exhibit 2.

15          (Court's Exhibit No 2 marked)

16          THE COURT:  Are there any other preliminary

17  matters that we need to take up?

18          MS. MARSHALL:  No, Your Honor.  Other than, may I

19  put a copy of the key at the witness stand?

20          THE COURT:  I have one.  I'll do that.

21          MS. MARSHALL:  Thank you, Your Honor.

22          THE COURT:  The government may call its first

23  witness.

24          MS. MARSHALL:  Your Honor, the government would

25  call Mrs. Bobye Holt.

1          THE COURT:  Mrs. Holt, if you would, please, come

2    through the gate.  If you would, pause about right there

3    and raise your right hand.

4          (Witness Sworn)

5          THE COURT:  Ma'am, if you would, please have a

6    seat in our witness box.

7          MR. GELFAND:  We would just invoke the Rule on

8    witnesses.

9          THE COURT:  The Rule has been invoked.  If there

10   are any other persons known to be witnesses at our hearing

11   today, they should step outside and wait until they are

12   called.

13         Our mask rule today is that everyone in a

14   nonspeaking role should be masked.  However, if your

15   function is that of a speaker in our proceedings, then you

16   may remove your mask when speaking.  And that applies to

17   you.  And I see that you have taken off your mask, so

18   thank you.

19         You may inquire, Ms. Marshall.

20         MS. MARSHALL:  Thank you, Your Honor.  Your

21   Honor, I believe we'll proceed.  Mr. Roberts stepped out.

22   There was one other person who exited the courtroom saying

23   they were a witness today.  Thank you, Your Honor.

24         BOBYE HOLT, having been first duly sworn,

25   testified as follows:

```
 1                    DIRECT EXAMINATION
 2   BY MS. MARSHALL:
 3   Q.    Mrs. Holt, will you please introduce yourself to the
 4   Court and spell your first and last name for the court
 5   reporter.
 6   A.    Yes.  My name is Bobye Holt.  B-O-B-Y-E.  H-O-L-T.
 7   Q.    And, Mrs. Holt, without stating your address, in what
 8   city do you live?
 9   A.    We live in Tontitown, Arkansas.
10   Q.    And do you know Joshua Duggar?
11   A.    Yes.
12   Q.    I'm going to have to ask you to speak up so that the
13   court reporter -- she's in charge of saying everything
14   that's said in court today, so she has to be able to hear
15   you.
16            THE COURT:  And you can just pull that
17   microphone.  And if you would speak directly into it, that
18   would help us.
19   Q.    (BY MS. MARSHALL)  First, how long have you known
20   Josh's parents, Jim Bob and Michelle?
21   A.    At least 36, 7 years.
22   Q.    Tell the Court how you came to know them.
23   A.    My husband knew Jim Bob from school and then he
24   introduced me to Jim Bob and Michelle when we were dating.
25   Q.    And who is your husband?
```

1   A.    Jim Holt.

2   Q.    And so you met Jim Bob and Michelle when you and your

3   husband, Jim, started dating, is that correct?

4   A.    Yes.

5   Q.    How long have you and Jim been married?

6   A.    34 and a half years.

7   Q.    Did you and the Duggars continue a friend

8   relationship after you and your husband were married?

9   A.    Yes.

10   Q.    Tell the Court a little bit about that.

11   A.    We went to church together.  We were pretty much best

12   friends all through the years.  We did lots of things

13   together.  We went on Silver Dollar City trips together.

14   We spent pretty much every day together.

15   Q.    And how come?  How come you spent every day together?

16   A.    Well, we loved them.

17   Q.    Do you and your husband have children?

18   A.    Yes.  We have 11.

19   Q.    Do Jim Bob and Michelle Duggar have children?

20   A.    Yes.

21   Q.    Were they -- were ya'll's children friends?

22   A.    Yes.  They are best friends, yeah.

23   Q.    Best friends?

24   A.    Yes.

25   Q.    Josh Duggar, can you tell the Court a little bit

1    about Josh Duggar's relationship with one of your

2    children?

3    A.    Our oldest daughter and Josh were boyfriend and

4    girlfriend for a period of time.

5    Q.    And tell the Court what that period of time would

6    have been.

7    A.    From November of 2002 until officially called off

8    March 30th, 2003.

9    Q.    So in November of 2002, how old would your daughter

10   have been?

11   A.    Can you repeat the question?

12   Q.    Yes.  In November of 2002, when you say they started

13   their dating relationship, how old would your daughter

14   have been?

15   A.    14.

16   Q.    And how old would Josh have been?

17   A.    14.

18   Q.    And how do you know that?

19   A.    They are two days apart.

20   Q.    In March of 2003, you say that they ended their

21   dating relationship?

22   A.    Yes.  Not really dating, but they liked each other.

23   Q.    Would you have considered them boyfriend and

24   girlfriend at the time?

25   A.    Yes.

1   Q.   So in March 2003, how old would your daughter have
2   been?
3   A.   15.
4   Q.   How old would Josh Duggar have been?
5   A.   15.
6   Q.   Now, you have been provided a key, right?  Do you see
7   that key up there at the witness stand?
8   A.   Yes, ma'am.
9   Q.   So when referring to victims today, if you will,
10  please, use that key in order to identify them without
11  stating their name or date of birth.  Okay?
12  A.   Okay.
13        THE COURT:  Ms. Marshall, I need to interrupt you
14  for a second.  I've lost this feed.  If you could help me.
15        (Off the Record)
16  Q.   (BY MS. MARSHALL)  Mrs. Holt, before we move on, I
17  want to ask you, you stated that the Duggars were really
18  good friends of yours, is that correct?
19  A.   Yes.
20  Q.   Would you have considered them best friends?
21  A.   Yes.
22  Q.   You also stated that you all went to church together,
23  is that correct?
24  A.   Yes.
25  Q.   How long did you all attend church together?

1    A.    I'll have to think about that for just a second.

2    1997 until 2006.

3    Q.    Whenever you attended church with the Duggars, did

4    you ever hold a position of authority within the church?

5    A.    No, ma'am.

6    Q.    Were you ever a pastor of the church?

7    A.    No, ma'am.

8    Q.    Were you ever an elder of the church?

9    A.    No, ma'am.

10   Q.    Were you ever on any sort of church council?

11   A.    No.

12   Q.    Did you hold any sort of role besides parishioner

13   within the church?

14   A.    No.

15   Q.    I'm going to take you -- you said that your daughter

16   and Josh ended their relationship in March of 2003.  Can

17   you please tell me what happened in March of 2003?

18   A.    Yes.

19          MR. GELFAND:  Your Honor, at this time, it's a

20   little tough to know if this is -- what the prosecutor is

21   eliciting, but I would object to the admission of any

22   statements under the clergy privilege.

23          I would object in particular to any statements

24   that this witness claims were made by Mr. Duggar, meaning

25   Josh Duggar, to her or to Jim Bob.  And we believe that

1    Federal Rule of Evidence 501 permits the development of
2    common law evidentiary privileges.  This privilege has
3    been recognized by the U.S. Supreme Court in *Trammel*,
4    T-R-A-M-M-E-L, *v. United States*.  That's 445 U.S. 40, 1980
5    case.  And we would direct the Court's attention to a
6    seminal case -- that we believe is a seminal case -- in
7    the Third Circuit*, In Re Grand Jury Investigation*, 918
8    F.2nd 374, Third Circuit, 1990, and to Arkansas Rule of
9    Evidence 505.
10         As a practical matter, so as to preserve and not
11   waive any privileged communications, we would ask the
12   Court to rule on this objection before this witness is
13   able to make any statements that would or might otherwise
14   be privileged.
15         THE COURT:  I understand the objection.  I'm
16   going to defer ruling on the objection until there has
17   been more foundation laid as to the context in which any
18   particular statements that she may testify about were made
19   by the defendant.
20         But upon establishing that foundation and before
21   you ask your subsequent questions about the contents of
22   the communications, let me know that you have finished
23   laying your foundation, Ms. Marshall, and the Court will
24   take up and rule on the objection at that time.
25         MS. MARSHALL:  Yes, Your Honor.

1   Q.   (BY MS. MARSHALL)   Mrs. Holt, let me ask you a

2   different question.

3        In March 2003, did you receive a call from Jim Bob

4   Duggar asking you to come to his house?

5   A.   He called my husband and asked us to come over, yes.

6   Q.   So he asked you and Mr. Holt to come over to his

7   residence, is that correct?

8   A.   Yes, ma'am.

9   Q.   Was it your understanding when you arrived there at

10  the residence -- first, who all -- without saying what

11  happened, who all was there at the residence when you

12  arrived?

13  A.   The only people I saw that I knew of was there were

14  myself, my husband, Jim Holt, Michelle Duggar, Jim Bob

15  Duggar and Joshua Duggar.

16  Q.   When you had -- did you subsequently have a

17  conversation that day with those parties?

18  A.   Yes.

19  Q.   When you had that conversation, were all of those

20  parties that you just mentioned -- Jim Bob Duggar,

21  Michelle Duggar, Josh Duggar, and your husband, Jim

22  Holt -- all present during that conversation?

23  A.   Yes.

24  Q.   Was it your understanding that that conversation was

25  happening because you were the parents of Joshua Duggar's

1   girlfriend?

2   A.    Yes.

3   Q.    And at that time, just to be clear, did you hold any

4   sort of position within the church as any sort of clergy

5   role or role within the church?

6   A.    No, ma'am, never.

7   Q.    Is that because you didn't want to or you were not

8   allowed to?

9   A.    Women weren't asked to be elders or pastors in our

10  church.

11          MS. MARSHALL:  Your Honor, I would ask to be able

12  to question the witness at this time regarding the

13  statements that were made.

14          THE COURT:  All right.  Does that change your

15  position, Mr. Gelfand?

16          MR. GELFAND:  No, Your Honor.  It enhances it.

17  In particular, just to add to what I previously said, this

18  was initiated by a call to Jim Holt, who I believe the

19  evidence will reveal -- both on direct examination thus

20  far and on cross examination, I anticipate the evidence

21  will reveal that Jim Holt was a member of the clergy, he

22  was a chaplain, he was a church elder, and that's why they

23  were there.

24          THE COURT:  Is it your position that Jim Holt was

25  the pastor of the church that has been testified to that

1    the Duggars and the Holts attended together?

2            MR. GELFAND:  It's my position that he was a

3    church elder at that church and as a matter of substantive

4    law was the equivalent of a pastor or a priest or a rabbi

5    if the Court may find.

6            THE COURT:  Okay.  Ms. Marshall?

7            MS. MARSHALL:  Your Honor, I believe the

8    testimony that has been elicited so far is that they were

9    called to the residence because they were the parents of

10   the girlfriend of Joshua Duggar, not because Mr. Holt was

11   an elder in the church.

12           Also, if there is any sort of privilege that's

13   being asserted, there were multiple people in that

14   conversation besides Mr. Holt, so any privilege that could

15   have been asserted would have been waived because there

16   were multiple people in that conversation, Your Honor.

17           And, Your Honor, I can elicit more testimony as

18   to what was said as to why they had called them there that

19   day if the Court would like without trying to get into any

20   sort of conduct.

21           THE COURT:  Well, please do that.  And, also, it

22   might be helpful if you inquired about whether there were

23   any ground rules for confidentiality that were either a

24   normal part of the dynamic or a specific part of the

25   dynamic that particular day.

1          MS. MARSHALL:  Yes, Your Honor.

2     Q.   (BY MS. MARSHALL)  Mrs. Holt, whenever you were

3     called to the Duggar household, you stated that you were

4     there as the parents of the girlfriend of Joshua Duggar,

5     is that correct?

6     A.   Yes.

7     Q.   Without talking about what was said that day, was it

8     your understanding that Jim Bob and Michelle Duggar had

9     called you all there to the home that day because they

10    believed what Josh Duggar was going to tell you would end

11    the relationship between your daughter and Josh Duggar?

12         MR. GELFAND:  Objection, Your Honor.  Calls for

13    speculation and hearsay if she didn't speak with them

14    directly.

15         THE COURT:  Rephrase the question.

16    Q.   (BY MS. MARSHALL)  During your conversation with

17    Joshua Duggar that day and Michelle Duggar and Jim Bob

18    Duggar as well as your husband, Jim Holt, is it your

19    understanding that what Joshua Duggar told you that --

20    what Joshua Duggar told you that day, did he think -- did

21    he state that it would end the relationship between him

22    and Caley?

23         MR. GELFAND:  Objection, Your Honor.  Same

24    objection.  Hearsay.

25         THE COURT:  He who?

```
1              MS. MARSHALL:  He, Joshua Duggar.
2              THE COURT:  Overruled.
3              MS. MARSHALL:  You can answer the question.
4   A.    Okay.  I'm going to have to ask you to ask it again.
5   Q.    (BY MS. MARSHALL)  Did Joshua Duggar tell you that
6   day after he made some disclosures to you that he thought
7   that this would end the relationship between himself and
8   your daughter?
9   A.    He did not, but Jim Bob did.
10  Q.    Now, you talked about as part of being in that
11  church, that elders -- women could not be elders?
12  A.    Correct.
13  Q.    Was there any -- if there was going to be some sort
14  of confidential communication with an elder in the church,
15  would a woman have been part of that confidential
16  communication with an elder and a member of the church?
17  A.    No.
18  Q.    Whenever you had the conversation that day with Jim
19  Bob Duggar and Michelle Duggar and Josh Duggar and your
20  husband, was there any ground rules that were laid out
21  beforehand regarding confidentiality or this being a part
22  of a church conversation?
23  A.    Not that I remember.
24  Q.    Again, it was your understanding that this
25  conversation was happening because your daughter and Jim
```

1   Bob and Michelle's son were in a dating relationship

2   together?

3   A.   Yes.

4   Q.   And as part of that dating relationship together, did

5   you have the understanding that at some point, your

6   daughter and Mr. Duggar would likely be married?

7   A.   Can you repeat the question?

8   Q.   Yes.  As part of that dating relationship that your

9   daughter and Mr. Duggar were in, was it the understanding

10  or the hope that maybe one day they would be married?

11  A.   Yes, when they turned an appropriate age.

12          MS. MARSHALL:  Your Honor, I can inquire further

13  if the Court would like.

14          THE COURT:  That's fine.  You may argue in

15  opposition to the defendant's privilege objection.

16          MS. MARSHALL:  Yes, Your Honor.

17          Your Honor, there was no statements made that day

18  that the witness has testified to that went to

19  confidentiality as to the conversation that was to take

20  place.  She has stated multiple times that this

21  conversation happened in the context of a dating

22  relationship between the parties and not in context of a

23  religious/clergical conversation that happened.  She

24  stated that if there was some sort of clergy counseling

25  that would occur, that a woman would not be allowed in

1  that conversation.  And Mrs. Holt has testified that there

2  were two women that were part of that conversation, Your

3  Honor.

4          THE COURT:  All right.  The Court will make a

5  ruling that -- a preliminary ruling that it will permit

6  the testimony of the conversations between the defendant

7  and this witness over the privilege objection that has

8  been asserted.

9          The Court would note that the Federal Rules of

10  Evidence do not have a clergy exception, although

11  Article V would point the Court to common law, federal

12  common law privileges or privileges that are recognized by

13  the federal common law.  The Court has not had an

14  opportunity to review the precedent cited by the defense

15  today, so that is the reason why the Court is making this

16  a preliminary finding.

17          But having said that, the Court has investigated

18  the -- to the extent that the federal common law would

19  point this federal court to the law of the state in which

20  it sits, the Court has investigated Arkansas law.

21  Arkansas has adopted Rule of Evidence 505, which is a

22  clergy exception.  And Courts in Arkansas have discussed

23  the clergy exception as it arises from time to time,

24  particularly in criminal cases.  One such case is *Magar*,

25  M-A-G-A-R, *v. State of Arkansas*, 308 Ark. 380.  It's a

1992 decision of the Arkansas Supreme Court.  There, they
take up this issue of the privilege and point to other
cases, including some federal cases, across the country as
to the rationale for the clergy exception in the first
place so they can understand whether it was proper or
improper to apply it in the case then before the Court.
In *Magar*, the Arkansas Supreme Court, quoting *Trammel*,
which is the case I think Mr. Gelfand pointed me to -- so
this is the Arkansas Supreme Court citing to the U.S.
Supreme Court's case in *Trammel*, and, parenthetically, the
Arkansas Supreme Court summarizes as follows:

     "It was emphasized that the privilege between
priest and penitent is limited to private communications,
a privilege recognizing 'the human need to disclose to a
spiritual counselor, in total and absolute confidence,
what are believed to be flawed acts or thoughts and to
receive priestly consolation and guidance in return',
which facts and circumstances were not present where the
challenged conversations related to business matters."

     *Magar* also cites to *Burger v. State of Georgia*
where it explains that, "The ministerial privilege was not
applicable to testimony of a reverend as a witness for the
state in a homicide prosecution relating to conversational
statements made to him by the defendant regarding the
defendant's intent to kill his wife where the record

showed that the statements made by the defendant to which
the witness testified were not made by the defendant in
professing religious faith or seeking spiritual comfort or
guidance."

  The context here is not in the context of a
confession and for priestly consolation.  The context is a
conversation between the heads of two families who were
best friends and who had children who were dating, or
whatever the term used was, and they were summoned not to
the church, but to their best friend's house to discuss
what no doubt was a serious matter.  But there's nothing
in the context here that would suggest that it was for the
purpose of the penitent, or a penitent seeking priestly
consolation.  Instead, the context here is more a
conversational statement in the context of this dating
relationship and the circumstances were such that the
content of the conversation apparently was of such a
nature that it was anticipated that it could lead to the
breakup of the couples' children.  That is not the sort of
context, as best I can tell from quick study, where the
clergy privilege would apply.

  Beyond that, there's no suggestion that Bobye
Holt was a clergy.  There's no suggestion that Jim Holt
was a pastor or reverend of the church.  It is suggested
that he was an elder, but the conversation teed up here is

1    not between the defendant and a church elder.  It's a

2    conversation in which the church elder's wife was invited.

3    And, arguably, that would render it a waiver, to the

4    extent that there was a privilege that extended to church

5    elders, which the Court doubts to be the case.

6           Also present was their friends, Jim Bob and

7    Michelle, so multiple people present.  This wasn't

8    strictly in the context of seeking penitence.  It was

9    parents talking about a significant issue involving their

10   respective children in the context of being long-time best

11   friends and in the context of these best friends having

12   children who were dating.

13          So barring the Court's ability to take a deeper

14   look at *Trammel* and some of the other cases in this

15   jurisprudence, the Court will make a preliminary finding

16   that there is no applicable privilege in this context.

17          And you may inquire.

18          MS. MARSHALL:  Thank you, Your Honor.

19   Q.   (BY MS. MARSHALL)  Mrs. Holt, did you have a

20   conversation with Joshua Duggar in March of 2003?

21   A.   Yes, ma'am.

22   Q.   Do you remember the date of that conversation?

23   A.   March 30th, 2003.

24   Q.   And this is the conversation that we've been speaking

25   about for a while now that both you, Mr. Holt, Jim Bob

1  Duggar, Michelle Duggar, and Josh Duggar were present for,

2  correct?

3  A.   Correct.

4  Q.   Can you please tell the Court what Joshua Duggar told

5  you in regards to him sexually touching minor females?

6  A.   Yes, ma'am.  When we went over, Jim Bob and Michelle

7  explained --

8         MR. GELFAND:  Objection, Your Honor.  I'm sorry.

9  I would object to any hearsay about what anyone said other

10 than Mr. Duggar, meaning Josh Duggar.

11        THE COURT:  Well, Ms. Marshall, it is potentially

12 hearsay what other persons said, to the extent that you're

13 offering that testimony for its truth.

14        At this point, there's not enough foundation for

15 the Court to understand where you're going, so I'll ask

16 you to rephrase and carefully delve into that.

17        MS. MARSHALL:  Yes, Your Honor.

18 Q.   (BY MS. MARSHALL)  Mrs. Holt, can you please tell me

19 what Joshua Duggar told you in regards to him sexually

20 touching minor females on March the 30th, 2003?

21 A.   Yes.  He explained that Jane Doe Number 4 was sitting

22 on his lap during Bible time and he touched her

23 inappropriately at that time.  And then he had said --

24 because we had asked him several questions about that.

25 And then he had said that he had previously, in previous

1  year, and years, that he inappropriately touched Jane Doe
2  Number 1, Jane Doe Number 2, and Jane Doe Number 3 as
3  well.
4  Q.   I want to go back to that first statement that you
5  made in regards to Jane Doe Number 4.
6  A.   Yes.
7  Q.   When did Josh Duggar tell you that he -- that
8  situation where he had inappropriately touched Jane Doe
9  Number 4 during Bible time had happened?
10  A.   He said it happened that day.
11  Q.   March the 30th, 2003?
12  A.   Correct.
13  Q.   When you say he "inappropriately touched her", what
14  did Josh Duggar say he had done to Jane Doe Number 4?
15  A.   On that day he tell us, or another day?
16  Q.   Yes, on that date.
17  A.   On that date, he told us that he touched her vaginal
18  area.
19  Q.   And what did he touch her vaginal area with?
20  A.   He did not tell me that day that he touched her under
21  her clothes at that point.  He told me he touched her over
22  the clothes at that point, but he told me he touched with
23  his hands.
24  Q.   And at that point in 2003, was it your understanding
25  that Joshua Duggar was more than three years older than

1    Jane Doe 4?

2    A.   Yes.  He was --

3    Q.   Without saying any --

4    A.   Yes.

5    Q.   You also stated that Joshua Duggar told you he had

6    previously touched other minor females in the past year,

7    and years, prior to March 30th, 2003, is that correct?

8    A.   Yes.

9    Q.   Did Josh Duggar tell you approximately how long he

10   had been touching those minor females?

11   A.   From what he told me was -- I don't know what age at

12   12, but it started at 12 until March 30th of 2003.

13   Q.   When he was 12 years old?

14   A.   Correct.

15   Q.   Can you please, by identifying them by the names you

16   have been given today, tell the Court who Josh Duggar

17   confessed to inappropriately touching besides Jane Doe 4?

18   A.   Jane Doe Number 1, Jane Doe Number 2 and Jane Doe

19   Number 3.

20   Q.   Can you please tell the Court specifically what

21   conduct Joshua Duggar confessed to doing to Jane Doe

22   Number 1?

23   A.   He said that he touched her breast area and her

24   vaginal area over the clothes.

25   Q.   Did he state if this had happened on more than one

1   occasion?

2   A.   I can't remember.

3   Q.   Can you please tell the Court what Joshua Duggar told

4   you in regards to the inappropriate touching of Jane Doe

5   Number 2?

6   A.   The same as Jane Doe Number 1, which was touching the

7   breast area and touching the vaginal area.

8   Q.   Was he using his hands to do that?

9   A.   Yes.

10   Q.   Can you please tell the Court what Josh Duggar told

11   you in regards to the inappropriate touching of Jane Doe

12   Number 3?

13   A.   The same as the other two, which was touching the

14   breast area and the vaginal area.

15   Q.   And, again, with his hands?

16   A.   Yes.

17   Q.   Can you give the Court a little bit of context of

18   what Josh Duggar told you as to when he would

19   inappropriately touch Jane Does 1, 2, 3 and then 4 to the

20   extent capable?

21   A.   Jane Doe 1, Jane Doe 2, Jane Doe 3 were all sometimes

22   asleep and sometimes awake when he touched them.

23   Q.   Did he state that he had touched them on multiple

24   occasions?

25   A.   Yes.

```
1   Q.   Did he tell you if he had disclosed this to his
2   parents before?
3   A.   Yes.
4   Q.   Can you tell me about that?
5   A.   In February of 2002, he had inappropriately touched
6   Jane Doe Number 1, and she went and told her parents what
7   he had done.  And then he told them.  He confessed, I
8   guess, to them.
9   Q.   Is it your understanding that Joshua Duggar
10  continued -- based off of what he told you, continued
11  inappropriately touching Jane Doe 1, Jane Doe 2, and Jane
12  Doe 3 after the disclosure of Jane Doe 1 in 2002?
13  A.   Not to my knowledge.
14  Q.   You don't know?
15  A.   I do not know.
16  Q.   It is your understanding that there was inappropriate
17  touching of Jane Doe 4 on March the 30th of 2003?
18  A.   Yes.
19  Q.   On March the 30th, 2003, would Jane Doe 1, Jane Doe
20  2, Jane Doe 3, and Jane Doe 4 all have been three years or
21  more younger than Joshua Duggar?
22  A.   Yes, ma'am.
23  Q.   Looking at the birth dates of -- do you know the
24  birth date of Josh Duggar?
25  A.   Yes.
```

1   Q.    What is his birth date?

2   A.    March 3rd, 1990 -- sorry -- March 3rd, 1988.

3   Q.    Is Josh Duggar at least three years older than Jane

4   Doe 1?

5   A.    Yes.

6   Q.    Did Joshua Duggar tell you anything else on that date

7   regarding the touching -- inappropriate touching of Jane

8   Does 1 through 4?

9   A.    Yes, but it wasn't involving the girls.

10  Q.    Was it in regards to another individual?

11  A.    Yes.

12  Q.    Was that individual less than three years -- or more

13  than three years younger than Josh Duggar?

14  A.    No.

15  Q.    Did you ever have any other conversations with Joshua

16  Duggar regarding him sexually assaulting, inappropriately

17  touching Jane Doe -- either Jane Doe 1, 2, 3, or 4?

18  A.    Yes.

19  Q.    Before we talk about that conversation, can you

20  please tell me when that would have been?

21  A.    The beginning of 2005, from January to, I believe,

22  maybe the middle of March or April of 2005, yeah.

23  Q.    Can you tell the Court where you were when this

24  conversation happened?

25  A.    Yes.  We were in Little Rock at our home during

1   session.  My husband had session, so he was with us.  He
2   stayed with us the whole time during session.
3   Q.   It's cutting out a little bit and I want to break it
4   down.  So you say "in session".  What does "in session"
5   mean?
6   A.   Legislative session.
7   Q.   Why were you there for a legislative session?
8   A.   My husband was a state senator for our area.
9   Q.   So you had a home there in Little Rock?
10  A.   We did.
11  Q.   You said "he" came to stay.  Who is "he"?
12  A.   Joshua Duggar.
13  Q.   So he came to stay with you and your husband while
14  you were in Little Rock?
15  A.   Yes, ma'am.
16  Q.   How come?
17  A.   Because we loved him.  And Caley and Josh still liked
18  each other and they were hoping to still be married one
19  day, so we wanted to give him that opportunity to be with
20  us and get to know him better and us be able to help him
21  if he had something he wanted to get off of his chest or
22  different ideas that he had had and temptations that he
23  wanted to confess, so we gave him that opportunity to be
24  that outlet for him.
25  Q.   In 2005, were you an elder of the church you were

1   attending?

2   A.   No, ma'am.

3   Q.   Were you and the Duggars still attending the same

4   church?

5   A.   Yes, ma'am.

6   Q.   Were you -- did you hold any sort of role in the

7   church in 2005?

8   A.   No, ma'am.

9   Q.   When Josh Duggar came to stay with you, was it

10  because you all were still family friends with the

11  Duggars?

12  A.   Yes, ma'am.

13  Q.   Is it because you had hoped that your daughter and he

14  could work out any sort of issues that they had and still

15  continue in a relationship?

16  A.   Yes.

17  Q.   Is it because you cared for Josh Duggar as a person

18  and as a family friend?

19  A.   Yes.  We love Josh.

20  Q.   You say that he could talk to you and talked about

21  things that -- to get off of his chest, is that right?

22  A.   Yes, ma'am.

23  Q.   Whenever you had conversations with Josh, would you

24  ever have those conversations just you and he?

25  A.   My husband was present, but sometimes he would fall

1    asleep because it would be in the evening after the

2    children were in bed.

3    Q.    In early 2005, when you say you had a conversation

4    with Josh Duggar, is it your memory that your husband had

5    fallen asleep whenever you had this conversation?

6    A.    Yes, ma'am.

7    Q.    So was it just you, as a family friend of Josh

8    Duggar, and Josh Duggar having this conversation?

9    A.    Yes, ma'am.

10   Q.    To be clear, there was no sort of clergical role that

11   you were fulfilling in having Josh Duggar at your home or

12   talking to him, is that --

13   A.    No.  Correct.

14   Q.    Can you please tell the Court what Josh Duggar told

15   you that evening?

16   A.    Yes, ma'am.  He was explaining the night of

17   March 30th, 2003, with Jane Doe Number 4, that during

18   Bible time, he had her sitting on his lap and he --

19   Q.    Mrs. Holt, there's some tissue behind you if you need

20   that.

21   A.    Thank you.  I'm sorry.

22   Q.    That's okay.  Take your time.

23   A.    While she was sitting on his lap, he put his hands

24   under her pantaloons and under her panties and he touched

25   her vagina.  And I asked him, I said, "Did you touch it?

1  Did you put your fingers in her vagina?"  And he said he

2  did both.

3  Q.   So he stated that he had penetrated her vagina with

4  his fingers?

5  A.   He said he put his fingers inside her vagina.

6  Q.   Was that the incident that led to the conversation in

7  March of 2003 --

8  A.   Yes, ma'am.

9  Q.   -- the initial conversation?

10  A.   Yes, ma'am.

11  Q.   Did he tell you anything in regards to disclosures by

12  Jane Doe 1?

13  A.   I'm sorry.  Can you repeat the question?

14  Q.   Did he tell you anything in regards to disclosures

15  made by Jane Doe 1?

16          MR. GELFAND:  I'm sorry.  I'd object on hearsay

17  grounds.

18          MS. MARSHALL:  It's what he told her.

19          MR. GELFAND:  You said in regards to disclosures

20  made by Jane Doe 1, which would be disclosures by Jane Doe

21  1.

22          THE COURT:  Rephrase.

23  Q.   (BY MS. MARSHALL)  Did Josh Duggar tell you -- what

24  did Josh Duggar tell you that Jane Doe 1 did in regards to

25  disclosing sexual conduct that he had done against her?

1   A.   He said that he went to her as she was sleeping and
2   that he was going up underneath her blankets to start to
3   touch her and that she woke up and hit him.
4   Q.   What did he say in regards -- I think earlier you
5   stated that Jane Doe 1 had disclosed this information to
6   his parents, is that correct?
7   A.   Yes.
8   Q.   Did he confirm that she had done that?
9   A.   Yes.  He told me she snitched on him.
10  Q.   I want to back up just a little bit.  First, I want
11  to ask you, did Josh Duggar tell you anything else that
12  day in regards to his sexually touching Jane Does 1, 2, 3,
13  or 4?
14  A.   Not that I can remember.
15  Q.   I want to back up a little bit to 2004.  Is it your
16  memory that in 2004, your husband went with Jim Bob and
17  Josh to the police station?
18  A.   Yes, ma'am.  State Trooper's office.
19  Q.   State Trooper's office.  And that during that
20  conversation -- that conversation was there to happen for
21  Josh to tell what he had done to those minors, is that
22  correct?
23  A.   Correct.
24        MR. GELFAND:  Objection.  Hearsay, Your Honor.
25  There's no foundation that she was there.

```
 1              THE COURT:  Rephrase.
 2   Q.   (BY MS. MARSHALL)  Was it your understanding that
 3   they were going to the State Trooper's office in order for
 4   Josh Duggar to talk to the trooper?
 5              MR. GELFAND:  Same objection, Your Honor.  Her
 6   understanding is based on hearsay statements.  It's the
 7   same objection.
 8              THE COURT:  Sustained.
 9              THE WITNESS:  Does that mean I can --
10              MS. MARSHALL:  No.  I'll move on, Your Honor.
11              May I have one moment, Your Honor?
12              THE COURT:  You may.
13              MS. MARSHALL:  I'll pass the witness, Your Honor.
14              THE COURT:  Mr. Gelfand, you may inquire when
15   you're ready.
16              MR. GELFAND:  Thank you, Your Honor.  May I
17   proceed, Your Honor?
18              THE COURT:  You may.
19                        CROSS-EXAMINATION
20   BY MR. GELFAND:
21   Q.   Good morning, Mrs. Holt.
22   A.   Good morning.
23   Q.   Mrs. Holt, you and I have never had an opportunity to
24   speak, correct?
25   A.   Correct.
```

1  Q.   And, in fact, you're aware that within the last

2  couple of weeks, an investigator working for the defense

3  came to your house and attempted to speak to you, correct?

4  A.   Correct.

5  Q.   You decided not to speak to that person, correct?

6  A.   Correct.

7  Q.   And you understood that that person was there to find

8  out some information about what you have testified about

9  today, correct?

10 A.   Yes.

11 Q.   Mrs. Holt, I want to take you back to the time period

12 that you have been testifying on direct examination.

13      During that time period, you testified that your

14 family and the Duggar family went to the same church, is

15 that correct?

16 A.   Correct.

17 Q.   And, to be clear, that church was the Bible Grace

18 Fellowship Church, correct?

19 A.   Correct.

20 Q.   This was a nondenominational church from a technical

21 standpoint, correct?

22 A.   Correct.

23 Q.   But for all intents and purposes, is it fair to say

24 that it was very closely aligned with the Baptist faith?

25 A.   I can't say that.

1   Q.   This was a church that was started by Clark Wilson in
2   1999, is that correct?
3   A.   I think so.
4   Q.   And at the time that you have testified you claim
5   these statements were made by Josh Duggar, you were all
6   members of this church through that entire time period,
7   correct?
8   A.   Which time period?
9   Q.   The time period -- the 2003 through 2005 period that
10  you claim my client, Josh Duggar, made statements to you.
11  A.   Yes.
12  Q.   And the Duggars were members of this church, correct?
13  A.   Yes.
14  Q.   There were three church elders, correct?
15  A.   I can't remember.
16  Q.   Clark Wilson was a church elder, correct?
17  A.   He was the pastor.
18  Q.   Your husband, Jim Holt, was a church elder, correct?
19  A.   An elder, yes.
20  Q.   And Jim Bob Duggar, Josh's father, was a church
21  elder, correct?
22  A.   Yes.
23  Q.   This was a church that met at homes, is that correct?
24  A.   Part of the time.
25  Q.   Was there a church building?

1   A.    At one point, yes.

2   Q.    During this time period in 2003 and 2005, was there a

3   church building?

4   A.    It was at homes, yes.  At homes.

5   Q.    In other words, there was no church building,

6   correct?

7   A.    Correct.

8   Q.    So if any church meeting had to take place, or church

9   activity, it had to occur at someone's home, correct?

10  A.    Yes.

11  Q.    Your husband, Jim Holt, you're obviously familiar

12  with his professional background, correct?

13  A.    Yes.

14  Q.    You have been married to Jim Holt, I think you said

15  well over 30 years, is that correct?

16  A.    Correct.

17  Q.    Jim Holt is an ordained Baptist minister, correct?

18  A.    Yes.

19  Q.    He was an ordained Baptist minister in 2003 and 2005

20  when these conversations you claim happened occurred,

21  correct?

22  A.    Yes.

23  Q.    He was also a chaplain for a living, correct?

24  A.    I don't believe he was in 2003.

25  Q.    Has he served as a chaplain over the course of his

1   career?

2   A.   Yes.

3   Q.   And what was your understanding -- well, let me back

4   up for a second.

5        Is it fair to say that serving as a chaplain is a

6   religious function?

7   A.   I wouldn't call it a function.

8   Q.   Is it a religious occupation?

9   A.   Yes.

10  Q.   And he also served as a counselor in his capacity as

11  a chaplain, is that correct?

12  A.   Not official.

13  Q.   When you say "not official", he often performed

14  counseling in his capacity as a chaplain, is that correct?

15  A.   Not with the church.

16  Q.   That wasn't what I was asking.  I was asking, in

17  general, with his occupation, did he often perform

18  counseling in his capacity as a chaplain?

19  A.   Unofficially.

20  Q.   Meaning he's not a licensed counselor?  Is that what

21  you're saying?

22  A.   Correct, yes.

23  Q.   Put aside licensure for a second.  He counseled

24  people in his capacity as a chaplain, correct?

25  A.   Yes.

1  Q.    Now, you testified that during this time period, this
2  was basically a home church, for lack of a better way of
3  putting it, correct?
4  A.    Correct.
5  Q.    And there were approximately how many families in
6  2003 and 2005 at the Bible Grace Fellowship Church?
7  A.    I don't remember.
8  Q.    Can you ballpark it for us?
9  A.    Six, seven, eight.  I'm not sure.
10 Q.    It was a small church?
11 A.    Yes.
12 Q.    You were there to witness some of the functions that
13 your husband, Jim Holt, performed as a church elder with
14 this church, correct?
15 A.    Describe "functions".
16 Q.    You understood what he did as a church elder,
17 correct?
18 A.    Yes.
19 Q.    This is a leadership role in the church, is it not?
20 A.    For him, yes.
21 Q.    It's a religious function within the church, is it
22 not?
23 A.    I'm not sure it would be considered a function.  I
24 mean, maybe I'm getting hung up on that word.
25 Q.    Fair enough.  I'll rephrase.  Maybe "function" is an

1    imprecise term.
2         He performed religious activities in his capacity as
3    a church elder?
4    A.   Yes.
5    Q.   That's the point of a church elder, correct?
6    A.   Yes.
7    Q.   It's a religious position, correct?
8    A.   Yes.
9    Q.   One of the functions he performed was counseling -- I
10   don't mean in a licensed way, but counseling parishioners,
11   correct?
12   A.   Yes.
13   Q.   People would regularly in 2003, 2004, and 2005 come
14   to your husband for religious and spiritual counseling,
15   correct?
16   A.   I can't remember.
17   Q.   I want to direct your attention to your daughter who
18   dated Josh.  They were approximately the same age,
19   correct?
20   A.   Two days apart.
21   Q.   And you said that they dated -- my term; perhaps
22   there's a better term for it -- between November of 2002
23   approximately and March of 2003 approximately, is that
24   correct?
25   A.   Yes.  They were boyfriend and girlfriend from

1  November 2002 to March 30th, 2003.

2  Q.   I don't mean this with any judgment at all, so please

3  don't take offense to this.  When you say "boyfriend and

4  girlfriend", there was a chaperone component to this,

5  correct?

6  A.   Yes.

7  Q.   In other words, this was more of an emotional and

8  less of a physical --

9  A.   Oh, yes, yes.

10  Q.   And that was consistent with your family's religious

11  custom and the Duggar family religious custom, correct?

12  A.   Yes.

13  Q.   They were, as I understand your testimony, interested

14  in each other, correct?

15  A.   Correct.

16  Q.   This is when they were both 14 or 15 years old

17  approximately, correct?

18  A.   Correct.

19  Q.   Now, you testified that in March of 2003, Jim Bob

20  Duggar -- just get our bearings for a second -- Jim Bob

21  Duggar, Josh's dad, correct?

22  A.   Correct.

23  Q.   Michelle Duggar, Josh's mom, correct?

24  A.   Correct.

25  Q.   You testified that Jim Bob, as you understand it,

1    called your husband, Jim Holt, and that's what initiated

2    this conversation, correct?

3    A.    Yes, but also Michelle talked to Jim as well.

4    Q.    In other words, all of the communication between Josh

5    Duggar's parents in 2003 before this meeting that we're

6    going to talk about in a second and your family occurred

7    from his parents to your husband, correct?

8    A.    I believe it was on speakerphone, so I heard the

9    whole conversation.  And they knew I was there.

10   Q.    They called Jim Holt, correct?

11   A.    Yes.

12   Q.    Now, you testified that there was a meeting, so to

13   speak, at the Duggars' home, correct?

14   A.    I wouldn't call it a meeting.

15   Q.    What would you call it?

16   A.    An information.  He was making it aware of what Josh

17   had done.

18   Q.    There was a time where you, Jim Holt, Jim Bob,

19   Michelle and Josh were all physically in the same room

20   together, correct?

21   A.    Yes.

22   Q.    Whether you use the word "meeting" or not, kind of

23   what I'm describing is a meeting, fair enough?

24   A.    Okay.

25   Q.    Just the five of you present, correct?

1    A.    Yes.

2    Q.    To be clear, Josh at the time is a minor, correct?

3    A.    Yes.

4    Q.    He's under 18?

5    A.    Yes.

6    Q.    He's there with his parents, correct?

7    A.    Yes.

8    Q.    And your husband is there and you're there, correct?

9    A.    Correct.

10   Q.    You were asked on direct examination by the

11   prosecutor whether there were any confidentiality ground

12   rules, and you testified -- if I wrote it down

13   correctly -- quote, "not that I remember", end quote.

14   Did I get that right?

15   A.    Yeah.  I do not remember that.

16   Q.    In other words, is it your testimony there may have

17   been confidentiality ground rules, there may not have

18   been, you just don't remember sitting here today?

19   A.    Can you repeat the question?

20   Q.    Yes.  Is it your testimony that there may have been

21   confidentiality ground rules, there may not have been

22   confidentiality ground rules, but you just don't remember

23   sitting here today?

24   A.    There may have been, but I do not remember, correct.

25   Q.    You are not denying that there were?  You're just --

1  you don't remember here 15 years later, or whatever it is,

2  correct?

3  A.    Right.

4  Q.    18 years later, correct?

5  A.    Correct.

6  Q.    Now, I want to break this down for a second.  You

7  testified that there's essentially two instances in which

8  you claim my client, Josh, made statements directly to you

9  about this subject matter, is that correct?

10  A.    Yes.

11  Q.    The first was on March 30th of 2003, correct?

12  A.    Correct.

13  Q.    And the second was this time on a date you don't

14  recall specifically in 2005, over the first couple of

15  months of 2005, correct?

16  A.    Yes.  Specifically -- about one person specifically.

17  But for the two years, it was off and on because we saw

18  each other every day.

19  Q.    What I'm asking you about, though, is you

20  testified -- if I heard your testimony correctly -- about

21  two specific statements, one in 2003 and one in 2005,

22  correct?

23  A.    Yes.

24  Q.    So let's talk about the March 30th, 2003, statement.

25  A.    Uh-huh.

1    Q.    Okay?

2    A.    Yes.

3    Q.    100 percent of what you claim Josh Duggar said to you

4    occurred in that discussion at the Duggars' home that you

5    previously testified about, correct?

6    A.    Yes.

7    Q.    During that discussion, religious prayers were said,

8    correct?

9    A.    Yes.

10   Q.    During that discussion, Bibles were open, correct?

11   A.    I can't remember.

12   Q.    Is it fair to say there was a religious undertone to

13   this discussion?

14   A.    Define "religious".

15   Q.    I don't want to define anything.  Let me ask it a

16   different way.

17   A.    Okay.

18   Q.    Religious prayers were said, correct?

19   A.    Prayers were said.

20   Q.    You don't remember whether Bibles were open, but they

21   may have been open, correct?

22   A.    I do not remember if Bibles were open.

23   Q.    Jim Holt was providing advice, correct?

24   A.    Yes.

25   Q.    And you were present physically while Jim Holt was

1    providing advice, correct?

2    A.    Yes.  We were both giving advice.

3    Q.    And you just beat me to it.  You both were giving

4    advice, correct?

5    A.    Yes.

6    Q.    In fact, that's a function that you sometimes served

7    as the wife of a church elder, correct?

8    A.    No.

9    Q.    You're testifying under oath that you were never

10   present, ever, when Jim Holt would counsel someone for

11   religious purposes and you would participate in that?

12   A.    No.  I'm saying that evening was not a function.  It

13   was a family-to-family function if you --

14   Q.    You're caught up on the word "function."  I'll avoid

15   the word "function".

16         There were times over the course of your life with

17   your husband together where the two of you would jointly

18   provide religious counseling to people who sought

19   religious counseling, is that correct?

20   A.    For females.

21   Q.    So let's talk about that for a second.  The truth is,

22   Jim Holt, as a religious elder, would not counsel females

23   in the church alone, correct?

24   A.    I don't believe he counseled any females inside the

25   church.  It was other people outside of our church that he

1    would counsel.

2    Q.    For religious purposes, correct?

3    A.    Yes.

4    Q.    And you were present for that, correct?

5    A.    Women, yes.

6    Q.    You participated in that, correct?

7    A.    Yes.

8    Q.    You were a necessary party in those counseling

9    sessions, correct?

10   A.    Outside the church, yes.

11   Q.    This was well known to the Duggars that you sometimes

12   participated in that capacity, correct?

13   A.    I don't know.  I really don't know if they knew that.

14   Q.    Even though you saw each other on a day-to-day basis,

15   you claim, and were best friends for 30-plus years?

16   A.    Yes.

17   Q.    Now, on March 30th of 2003, I want to break this down

18   with respect to what you claim Josh said.  When you got to

19   the Duggars' house, where were you meeting?

20   A.    Say that again.

21   Q.    When you got to the Duggars' house, where were you

22   all meeting, gathering, whatever word you want to use?

23   A.    In Jim Bob and Michelle's bedroom.

24   Q.    Where were you all sitting?

25   A.    I was sitting in a recliner beside Josh.  Joshua was

1    on the floor.  I believe Jim was in another chair.  Jim

2    Bob was pacing the floor and Michelle was sitting in

3    another chair.

4    Q.    How long was this discussion?

5    A.    Hours.

6    Q.    You testified that there was a prayer component.

7    What else happened?

8    A.    He told us what he did.  Not in detail, but he did

9    tell us what he did.

10   Q.    Specifically, you claim -- I want to be very precise.

11   Is it your testimony that you remember exactly what Josh

12   Duggar said to you on March 30th, 2003, as you sit here

13   today more than 18 years later?

14   A.    Yes.

15   Q.    You claim that Josh Duggar said to you that Jane Doe

16   Number 4 -- just to be clear, you're familiar with who

17   that is, correct?

18   A.    Yes.

19   Q.    You claim that Josh Duggar said to you that Jane Doe

20   Number 4 was sitting on his lap during Bible time.  And

21   what did he specifically say on March 30th, 2003, he did

22   to Jane Doe Number 4 as you claim?

23   A.    He said that he put -- he touched her inappropriately

24   on her vaginal area.

25   Q.    Specifically, if I understood your testimony earlier

1    correctly, you claim that he said at this first meeting
2    that that was over the clothes, correct?
3    A.    Correct.
4    Q.    And then you testified that with respect to Jane Doe
5    Number 2, Jane Doe Number 3, and Jane Doe Number 4 -- what
6    is it that you claim he said verbatim?
7    A.    He said that he touched their breast areas and their
8    vaginal areas sometimes on the clothes and sometimes under
9    the clothes.
10   Q.    What words did he use?
11   A.    Inappropriately touched their breast.
12   Inappropriately touched their -- I don't remember what he
13   used for vagina, but he used probably a bottom, front
14   bottom.
15   Q.    I don't want you to guess.  What words did Josh use
16   when he spoke with you on March 30th of 2003?
17   A.    I don't remember the specific term he used.
18   Q.    Truth is, you don't remember what Josh --
19   A.    I know what he told me.
20   Q.    You know the substance of what he told you --
21         MS. MARSHALL:  Objection, Your Honor.  She's
22   testified to what he told her.
23         THE COURT:  Well, this is cross examination.  My
24   only request, Mr. Gelfand, would be not to talk over each
25   other.

```
1              MR. GELFAND:  Absolutely, Your Honor.  You want
2    me to reframe the question?
3    A.    Please.
4    Q.    (BY MR. GELFAND)  The truth is, you don't remember
5    word for word what Josh Duggar said to you on March 30th
6    of 2003, correct?
7    A.    I do not remember the term he used for the vaginal
8    area.
9    Q.    And you said with respect to Jane Doe Number 1, Jane
10   Doe Number 2, and Jane Doe Number 3, he said -- you claim
11   he said what with respect to the three of them?  Because
12   he said it was the same for all three, if I heard you
13   correctly.
14   A.    He said he touched their breast areas and their
15   vaginal areas over the clothes and sometimes under the
16   clothes.
17   Q.    Hold on for a second.  You're saying in March of
18   2003, you claim that Josh said that he touched Jane Doe
19   Number 1, Jane Doe Number 2, Jane Doe Number 3 under the
20   clothes?
21   A.    Sometimes.
22   Q.    What phrase did he use?
23   A.    "I went under her dress and grabbed her breast."
24   Q.    I want to direct your attention to 2005.  You gave a
25   pretty broad date range.  I believe it was January to
```

1    March or April of 2005, correct?

2    A.    Yes.

3    Q.    And you testified that this was when you and your

4    family were in Little Rock during the legislative session,

5    correct?

6    A.    Yes.

7    Q.    At this time, Josh and your oldest daughter were not

8    dating anymore, correct?

9    A.    They weren't officially dating, but they were

10   definitely still interested in each other.

11   Q.    But they had broken up, correct?

12   A.    Officially, yes.

13   Q.    When you say officially versus unofficially, would

14   you have described them at this time period as boyfriend

15   and girlfriend the way that you described them in 2003?

16   A.    No.

17   Q.    There was a significant change in their relationship

18   status between this two-year period, correct?

19   A.    Yes.

20   Q.    You testified, when the prosecutor was asking you

21   questions, that you invited Josh to stay with your family

22   in Little Rock during this legislative session, correct?

23   A.    Yes.

24   Q.    You testified you wanted to give him the opportunity

25   to confess to temptations, correct?

1    A.    Yes.

2    Q.    Confession is a religious concept, is it not?

3    A.    No.

4    Q.    Help me understand what your testimony is.  You

5    wanted to give him the opportunity to, quote, "confess to

6    temptations," end quote, for what purpose?

7    A.    To help him get over his issues that he has.  I'm

8    confessing now.  This isn't a religious place.

9    Q.    Your understanding of what you are doing right now is

10   confessing?

11   A.    I feel like it is, yes.  I confessed he told me this.

12   Q.    You wanted to give him some spiritual guidance,

13   correct?

14   A.    If it came to that, yes.  I was his friend.  He

15   called me Aunt Bobye.

16   Q.    You used the word "confess" when you invited Josh to

17   come stay with you in Little Rock, correct?

18   A.    Explain what you mean by that question.

19   Q.    When you invited him to confess to temptations, that

20   was a word you used in communicating to the Duggars,

21   correct?

22   A.    We invited him to come live with us in Little Rock.

23   Q.    And you explained that one of the purposes, that he'd

24   have an opportunity to confess to temptations, correct?

25   A.    Yes.  He didn't come down just to confess to us, but

1    we gave him the opportunity to confess when he felt like

2    he needed to.

3    Q.   And my question -- I don't want to talk over each

4    other.  My question was simple and I think you answered

5    it, but I want to make sure.

6         You communicated that that was one of the purposes to

7    the Duggar family when you invited Josh to come to Little

8    Rock, correct?

9    A.   I'm not sure that we told that to Jim Bob and

10   Michelle, but we gave him that opportunity.  We told him,

11   you know, if you have anything you want to say to us,

12   you're welcome to tell us.

13   Q.   You told that to Josh in particular?

14   A.   Yes.

15   Q.   Before he came, correct?

16   A.   While he was there.  And maybe before.  I don't

17   remember if it was before, but for sure while he was

18   there.

19   Q.   It was definitely before he made any of the

20   statements that you claim he made in 2005, correct?

21   A.   The statements from 2005?

22   Q.   Yes.

23   A.   Yes.

24   Q.   You testified that Jim Holt was physically present in

25   the room when this happened.  What room were you in?

1    A.    Our bedroom.

2    Q.    Who was present in the room?

3    A.    Joshua, Jim Holt, and myself.

4    Q.    In other words, your daughter wasn't there, correct?

5    A.    Correct.

6    Q.    None of the other -- well, no one else was there,

7    correct?

8    A.    Correct.

9    Q.    About what time of day was this?

10   A.    It was in the evening.

11   Q.    As I understand your testimony, Jim Holt essentially

12   fell asleep during this conversation?

13   A.    Yes.

14   Q.    He wasn't asleep when the conversation began,

15   correct?

16   A.    Correct.

17   Q.    In other words, you didn't invite Josh into your

18   bedroom while your husband was sleeping --

19   A.    Correct.

20   Q.    -- and have a serious heart-to-heart with him with

21   your husband sound asleep, correct?

22   A.    He was wide awake when Josh entered.

23   Q.    He participated in the conversation before he fell

24   asleep, correct?

25   A.    Yes.

1   Q.   What is it word-for-word that you claim Josh said to

2   you with respect to Jane Doe Number 4 in 2005?

3   A.   He told me that while Jane Doe Number 4 was on his

4   lap during Bible time, that he put his hands under her

5   dress, under her pantaloons, under her panties, and

6   touched her vaginal area.  And I asked him, "Did you put

7   your fingers inside her vagina?"  And he said he did both,

8   not just touch it, but put his fingers inside her vagina.

9   Q.   Now, we have testified about this two-year time

10  period, essentially 2003 to 2005, correct?

11  A.   Correct.

12  Q.   Without getting into the details of anything, is it

13  fair to say that Jim Holt, your husband, regularly

14  counseled Josh during this time period?

15  A.   Yeah.  I would say yes.

16  Q.   So you testified to these essentially two -- your

17  word -- "confessions," quote, unquote, correct?

18  A.   Yes.

19  Q.   Now, when this all happened, who did you tell?

20  A.   I went to go tell Jim Bob and Michelle, but they said

21  they didn't want to hear it.

22  Q.   Who else did you tell?

23  A.   I told my husband.

24  Q.   Did you tell anyone else in the world?

25  A.   Did you say at this time?  Like during this time

1    frame?

2    Q.    Yes.

3    A.    No.

4    Q.    At some point, did that change?

5    A.    Yes.

6    Q.    When did you first tell someone other than your

7    husband and the Duggars?

8    A.    I can't remember.

9            MS. MARSHALL:  Your Honor, I would object.

10           MR. GELFAND:  On what grounds?

11           MS. MARSHALL:  Relevance, Your Honor.  I'm not

12   sure why it matters who she told these statements.

13           THE COURT:  Well, it could be a foundation for

14   inconsistency, so overruled.

15   Q.    (BY MR. GELFAND)  You can answer the question.

16   A.    Can you repeat it?

17   Q.    Sure.  Let's be organized for a second.  You've

18   testified that you told the Duggars and your husband --

19   all of you all were involved in what you claim happened in

20   2003 and 2005, correct?

21   A.    Yes.

22   Q.    After that point, is there someone out of that circle

23   that you told Josh allegedly made statements to you, these

24   statements?

25   A.    It began to be aware -- people began to be aware of

what happened, because something else happened in Little

Rock that year that made Josh leave our home.

Q.   I was just asking a very simple question.  Did you

tell anyone in the world what Josh Duggar, what you claim

Josh Duggar said to you in 2003 and 2005?

A.   Yes.

Q.   Who did you tell?

A.   I do not know.

Q.   Did you ever take any notes about what Josh said?

A.   I did not.

Q.   Did you ever write any e-mails or text messages about

what Josh said?

A.   I don't believe so.

          MR. GELFAND:  Your Honor, may I have one minute,

please?

          THE COURT:  Yes.

Q.   (BY MR. GELFAND)  Just one more question.  At any

time -- let me back up.

     These conversations that you claim happened in 2003

and 2005, during this time period, was Clark present

during any of these conversations?

A.   No.

          MR. GELFAND:  Your Honor, I have no further

questions.

          THE COURT:  Any redirect?

1          MS. MARSHALL:  Yes, Your Honor.
2                     REDIRECT EXAMINATION
3   BY MS. MARSHALL:
4   Q.   Mrs. Holt, during your meeting with Jim Bob and
5   Michelle Duggar and Josh Duggar and your husband in March
6   of 2003, did anyone ever ask you to leave that meeting?
7   A.   Not that I remember.
8   Q.   Did anyone ever say, "You're not an elder, you can't
9   be here?"
10  A.   No.
11  Q.   Did anyone ever say, "This is privileged, I need to
12  ask you to step out for a little bit?"
13  A.   No.
14  Q.   You stated that Josh called you Aunt Bobye?
15  A.   Correct.
16  Q.   Had you been in Josh's life his whole life?
17  A.   Yes, ma'am.
18  Q.   Did you talk to the other Duggar children about
19  things that were bothering them?
20          MR. GELFAND:  Objection, Your Honor.  Calls for
21  hearsay.
22          MS. MARSHALL:  Not asking what they said.  I'm
23  just asking if she asked.
24          MR. GELFAND:  That's fair.  I will withdraw the
25  objection if that's the scope of the question.

```
 1              THE COURT:  All right.  Overruled.
 2   A.    Yes.
 3   Q.    (BY MS. MARSHALL)  You stated that you all were best
 4   friends, is that correct?
 5   A.    Yes.  Yes.
 6   Q.    Mr. Gelfand asked you -- and I want to make sure that
 7   we're clear.  He asked you the 100 percent of the
 8   discussion from 2003 was disclosed -- or from 2005 was
 9   disclosed in 2003.  That's not correct, though, right?
10   There was additional details that Josh Duggar gave you in
11   2005, is that correct?
12   A.    Correct.  Correct.
13   Q.    When you and Josh alone were having a conversation,
14   is that correct?
15   A.    My husband was present, but he was asleep.
16   Q.    Right.  He was not engaging in the conversation?
17   A.    Correct.
18   Q.    Mr. Gelfand asked you about religious undertones
19   during the conversation in 2003 because you prayed during
20   the conversation.  Is it your routine to pray before a
21   meal?
22   A.    Yes.
23   Q.    Is it your routine to pray during the day?
24   A.    Yes.
25   Q.    Is it your routine to pray with children at bedtime?
```

```
 1   A.    Yes.
 2   Q.    Is it your routine to pray by yourself at bedtime?
 3   A.    Yes.
 4   Q.    Is it your routine to pray with others throughout the
 5   day if need be?
 6   A.    Yes.
 7   Q.    Just because you say a prayer before you do
 8   something, does that make it a religious conversation or
 9   ceremony?
10   A.    No.
11   Q.    On that note, you talked about confession.
12   Mr. Gelfand asked you that confession, if confession was a
13   religious concept.  Is it true that it can be a religious
14   concept?
15   A.    It can be.
16   Q.    Is it also true it can be a moral concept?
17   A.    Yes.
18   Q.    Is it true that someone can confess something to
19   someone because they feel guilty about what they have
20   done?
21   A.    Yes.
22   Q.    Just because someone confesses something to someone
23   else, does that mean it's a religious conversation?
24   A.    No.
25   Q.    Do you feel like this is a religious event here
```

1   today?

2   A.    No.

3   Q.    But you said you felt like you were confessing

4   something?

5   A.    Correct.

6   Q.    Mr. Gelfand asked you how you knew that Josh was

7   talking about the vaginal area when he was disclosing to

8   you what all he had done to Jane Does 1, 2, 3, and 4.

9   Tell the Court how you knew he was talking about the

10  vaginal area.

11  A.    He said he touched their vaginal area, but I can't

12  remember the specific word for vaginal area that he used.

13  But he said that he would touch their breast -- he did use

14  that word -- and their vaginal area, whatever word he used

15  at the time, sometimes on top of the clothes, sometimes

16  under the clothes.

17  Q.    Is there any sort of discrepancy about what he was

18  talking about?

19  A.    No.  It was understood.

20  Q.    You talked about that in 2005, something else

21  happened in Little Rock that made people aware.  What

22  happened in 2005?

23          MR. GELFAND:  Objection, Your Honor.

24          THE COURT:  What's the objection?

25          MR. GELFAND:  It exceeds the scope of the

1    hearing, first of all.  And, second of all, I think it

2    would invade a motion in limine ruling.

3            THE COURT:  I don't know what the other incident

4    in 2005 was so I don't have a way of understanding whether

5    it's within the scope of the purposes of this hearing.  I

6    can only suggest that our hearing is for the defined

7    purpose of having an evidentiary hearing to allow the

8    Court to make a ruling on the competing motions here.  So

9    you may go forward if you believe it's within that

10   context, but please don't if it's not.

11           MS. MARSHALL:  I want to clarify.

12   Q.   (BY MS. MARSHALL)  Was it in regards to inappropriate

13   touching, that event that happened in Little Rock in 2005?

14   A.   Can you repeat the question?

15   Q.   Yes.  You said that something else happened in Little

16   Rock that made people aware in 2005.  Was that event that

17   happened in Little Rock based off of inappropriate

18   touching by Josh Duggar against a minor?

19   A.   No.

20   Q.   Just to be clear, Mrs. Holt, you have never been an

21   elder in the church?

22   A.   Correct.

23   Q.   When we say "elder", what does that mean?

24   A.   Someone -- a man in the church that would perform

25   duties of, you know, calling to see how the sick people

1    were, or if someone didn't come to church, he would call

2    and see if everything was okay, if there was anything they

3    needed.

4    Q.    In your husband's role as an elder, would he have

5    conversations that you were not privy to?

6    A.    Yes.

7    Q.    Would he have duties that you were not allowed to

8    attend?

9    A.    Yes.

10   Q.    Were you allowed to attend the conversation in March

11   of 2003 with Josh Duggar?

12   A.    Yes.

13   Q.    Were you allowed to attend the conversation in 2005

14   that you individually had with Josh Duggar?

15   A.    Yes.

16           MS. MARSHALL:  May I have one moment, Your Honor?

17           THE COURT:  Yes.

18           MS. MARSHALL:  Pass the witness, Your Honor.

19           THE COURT:  Does that prompt any follow up,

20   Mr. Gelfand?

21           MR. GELFAND:  May I have one second?

22           We have no more questions, Your Honor.

23           THE COURT:  May this witness be excused?

24           MS. MARSHALL:  Yes, Your Honor.

25           THE COURT:  Ma'am, thank you for being here

```
 1    today.  You're free to go.
 2           MS. MARSHALL:  Your Honor, the government would
 3    call Jim Bob Duggar.
 4           THE COURT:  Mr. Duggar, if you would, please come
 5    forward.  If you would, pause about right there and raise
 6    your right hand.
 7           (Witness Sworn)
 8           THE COURT:  Please have a seat in our witness
 9    box.  As you're making your way, I will advise you that
10    you are permitted to remove your mask while testifying,
11    although you are not required to if you don't want to.
12           JAMES ROBERT DUGGAR, having been first duly
13    sworn, testified as follows:
14                    DIRECT EXAMINATION
15    BY MS. MARSHALL:
16    Q.   Good morning.  Can you please state your name for the
17    Court and spell your name for the court reporter?
18    A.   Okay.  It's actually James Robert Duggar.  So spell
19    the whole -- James?
20    Q.   Yes, please.
21    A.   Okay.  J-A-M-E-S.  Then Duggar, D-U-G-G-A-R.
22    Q.   And, Mr. Duggar, are you the father of Joshua Duggar?
23    A.   Yes.
24    Q.   And do you have other children besides Joshua Duggar?
25    A.   Yes.
```

1   Q.   Mr. Duggar, are you married?

2   A.   Yes.

3   Q.   Who is your wife?

4   A.   Michelle.

5   Q.   Michelle.  How long have you all been married?

6   A.   37 years.

7   Q.   And is Josh your oldest child?

8   A.   Yes.

9   Q.   How old is Josh?

10  A.   Josh is, what, 33, I think.

11  Q.   Do you remember the year that he was born?

12  A.   1988.

13  Q.   How long have you and Michelle lived in the Northwest

14  Arkansas area?

15  A.   I was born in Springdale and Michelle moved there

16  when she was, like, four or five, something like that.

17  Q.   Have you all raised your family in the Northwest

18  Arkansas area?

19  A.   Yes.

20  Q.   Particularly in the Tontitown/Springdale area?

21  A.   Correct.

22  Q.   In 2003 through 2005, did your family live in the

23  Tontitown area or Springdale area?

24  A.   In the Springdale area.

25  Q.   Can you explain to the Court the layout of your home?

1    A.    The house that we used to live in?

2    Q.    So that's a good question.  In 2002, where did you

3    live?

4    A.    Let's see.  I think we were living on Johnson Road.

5    That house is torn down now, but we lived there.

6    Q.    Can you explain to the Court the layout of that home

7    there on Johnson Road?

8    A.    It had three bedrooms, two baths.

9    Q.    In 2002, approximately how many children did you

10   have?

11   A.    In 2002, we probably had -- I think it was like 13.

12   Q.    You said it was a three-bedroom home?

13   A.    Correct.

14   Q.    Were the girls in one bedroom and the boys in another

15   bedroom?

16   A.    There was a point there we had, like, two bedrooms

17   for -- actually, we had four bedrooms originally, and then

18   we ended up making like one big boys' bedroom and one big

19   girls' bedroom.

20   Q.    At some point, did you move into a different home?

21   A.    Correct.

22   Q.    And when was that?

23   A.    We started working on it in '02 and it took three and

24   a half years to build it.  And so that was -- so that

25   would have been, I think, 2015 or '16, somewhere around

1    there.

2    Q.   You mean 2005 or 2006?  When did you move into the --

3    A.   No, I'm sorry.  It would have been -- yeah, 2000 --

4    probably 2005 or 6, something like that, yeah.  Probably

5    2006.

6    Q.   Whenever Josh came to you to talk about his

7    inappropriate touching of his sisters, did you live on

8    Johnson Road, or did you live in the new house?

9    A.   Johnson Road.

10       I'd like to say, too, that, you know, this was a --

11   something for a young man to come forward.

12   Q.   Yes.  Mr. Duggar --

13   A.   This is a juvenile --

14   Q.   -- we'll get to that in just a minute.

15   A.   It was a juvenile record that was sealed.

16   Q.   Mr. Duggar, if you would just listen to my questions,

17   then answer the questions that I ask you.  Okay?  That

18   way, we're not talking over each over.

19   A.   Right.  But you're taking into consideration this was

20   a sealed case that was expunged by Judge Zimmerman, right?

21            THE COURT:  Mr. Duggar, if there's an objection

22   that needs to be asserted, someone will assert it.  You

23   need to answer the questions.

24            THE WITNESS:  Okay.  I am.

25   Q.   (BY MS. MARSHALL)  Now, Mr. Duggar, during our

1    conversation today, there's a sheet that is in front of

2    you.  Do you see that sheet that is labeled "Victim

3    Identification Key?"

4    A.    Yes.

5    Q.    Now, during our conversation today, if you will,

6    please, refer to the people listed on that sheet by the

7    pseudonyms Jane Doe 1, Jane Doe 2, Jane Doe 3, and Jane

8    Doe 4.  Okay?

9    A.    Okay.

10   Q.    Mr. Duggar, do you remember making or doing an

11   interview with Megyn Kelly back in approximately 2015?

12   A.    Yes.

13   Q.    And during that interview, did you speak to Megyn

14   Kelly about things that Josh Duggar, your son, had done to

15   Jane Doe 1, Jane Doe 2, Jane Doe 3, and Jane Doe 4?

16   A.    Yes.  I had stated that --

17         MR. GELFAND:  Object.  There's no grounds to get

18   into prior, either consistent or inconsistent statements

19   at this point in the testimony.

20         THE COURT:  Overruled.

21   Q.    (BY MS. MARSHALL)  Go ahead.

22   A.    Can you restate the question?

23   Q.    Yes.  So I asked you if you remember having a

24   conversation with Megyn Kelly in regards to what Josh

25   Duggar had done in terms of inappropriate touching of Jane

1    Doe 1, Jane Doe 2, Jane Doe 3, and Jane Doe 4.

2    A.    Yes.

3    Q.    And then you were starting to move on and you can --

4    A.    That's it, yeah.

5    Q.    Is it true that Josh Duggar came to yourself and your

6    wife, Michelle, in approximately 2002 to disclose that he

7    had inappropriately touched a minor?

8    A.    Correct.

9    Q.    Can you please tell the Court what Josh told you?

10   A.    He had told me that he had touched some of the girls,

11   like, when they were sleeping, like, on the breast, like,

12   over their clothes.  They didn't wake up.

13   Q.    And you say "some of the girls."  In referring to the

14   identification key that you have been provided, can you

15   please tell the Court who Josh Duggar stated he had

16   touched?

17   A.    Yeah.  I think it was the -- yeah, I think it was the

18   1 through 4.

19   Q.    Jane Doe 1, Jane Doe 2, Jane Doe 3, and Jane Doe 4?

20   A.    Yes.

21   Q.    And Josh Duggar told you that in 2002?

22   A.    I don't know the time frame exactly, but somewhere

23   around there.

24   Q.    The first time that Josh Duggar came to you and told

25   you that he had inappropriately touched a minor, is that

1  the statement that he made to you?

2  A.   I mean, he didn't use that -- I don't remember

3  exactly the wording that he used.

4  Q.   But you stated that he had -- what did he state to

5  you?  Go ahead.

6  A.   I can't remember exactly how he said it.

7  Q.   Okay.  But what do you remember him saying?

8  A.   I can't recall exactly how he said it.

9  Q.   But just a minute ago, you said that he came to you

10  and said that he had inappropriately touched them on the

11  breast while they were sleeping?

12  A.   Correct.  But he didn't say it in that exact -- I

13  don't remember exactly how he said it, but that was the

14  synopsis of what happened, yes.

15  Q.   So he made those statements to you.  What did you do?

16  A.   I mean, it's been, like, 18, 19 years ago, so I don't

17  remember exactly all the details.  I mean, it's been a

18  long time ago.  But, I mean, there was a -- there was kind

19  of a sequence of what we did as parents.  And, I mean, we

20  were shocked that this had happened, but we were thankful

21  that he came on his own and told us, because we wouldn't

22  have known had he not told us.  So my wife and I got

23  together and we -- you know, over a period of time there,

24  we ended up -- we eventually ended up calling the elder of

25  our church.

1  Q.   I want to stop you there.

2  A.   Okay.

3  Q.   After Josh Duggar made this disclosure to you

4  regarding the inappropriate touching of Jane Does 1

5  through 4, of touching them on the breast while they were

6  sleeping, did you and Michelle take action in your home to

7  try to prohibit this from happening anymore?

8  A.   Yes.

9  Q.   So you took an overt act?  You believed that, what

10 Josh had told you?

11 A.   Yes.

12 Q.   Did Josh Duggar come to you again subsequent to that

13 conversation after you had put measures in place to

14 disclose that the inappropriate touching had continued?

15 A.   There was, yes, another incident that he told us

16 about at a later time.

17 Q.   Can you tell me when that was?

18 A.   I don't remember exactly, but it was after the first

19 incident.

20 Q.   Can you tell me --

21 A.   And that was actually at the point where we called --

22 Q.   Let me just --

23 A.   -- Jim Holt.

24 Q.   Let me ask my questions and you can answer my

25 questions.  Okay?

```
1          Can you tell me what Josh Duggar told you?
2    A.    I don't remember exactly how he said it, you know,
3    but he did some inappropriate touching he said.
4    Q.    You don't remember what Josh Duggar told you that he
5    had done to Jane Doe 1, Jane Doe 2, Jane Doe 3, or Jane
6    Doe 4?
7    A.    No.  I told you he said he had done some
8    inappropriate touching.  I don't remember exactly the
9    wording that he used as a child.  He was only like 14
10   years old.
11   Q.    What do you remember him telling you?
12          THE COURT:  Ms. Marshall, I can't have you all
13   talking over each other.  Please watch that.
14          MS. MARSHALL:  Yes, Your Honor, I apologize.
15   A.    Can you repeat the question?
16   Q.    (BY MS. MARSHALL)  What do you remember him telling
17   you in that subsequent disclosure that he made?
18   A.    Okay.  The way I remember it, it was, like, he'd
19   touched the breast when somebody was sleeping.  And I
20   don't remember which one or whatever, but anyway -- but
21   that did, yes.
22   Q.    Do you remember Josh telling you that he had touched
23   the vaginal area of one of those minors?
24   A.    No.
25   Q.    You don't remember that?
```

1   A.   No.

2   Q.   Do you remember talking to an investigator in 2006

3   regarding this incident?

4   A.   Well, we did eventually take Josh to the Arkansas

5   State Police on the recommendation of Jim Holt, and Jim

6   Holt went with me.

7   Q.   But in 2006 --

8   A.   And I'm not sure when that was.  We went and Josh

9   confessed everything to the State Trooper.  Okay.  I'm not

10  sure if he made a police report or not, but that's what

11  happened.

12  Q.   Do you remember talking to an investigator in 2006 at

13  the Children's Safety Center in Springdale?

14  A.   We did go, yes, yes.

15  Q.   Do you remember telling that investigator that there

16  was an incident where someone was sitting on the lap and

17  had touched the breast and vaginal area?

18  A.   I can't remember.  I didn't write the police report.

19  I don't remember what was stated.  And I haven't read that

20  police report in many, many years.

21          MS. MARSHALL:  May I approach, Your Honor?

22          THE COURT:  You may.

23          MR. GELFAND:  Your Honor, can we approach, side

24  bar, please?

25              (Bench Conference)

1          THE COURT:  Step up.  If you would please speak
2    into the microphone.
3          MR. GELFAND:  Thank you, Your Honor.  We would
4    object.  It's improper impeachment.  You can't impeach a
5    witness by a police report they didn't write, they didn't
6    acknowledge.  That's just a general matter of evidence.
7          Furthermore, with respect to this and why I
8    wanted to approach at side bar, the police report, as the
9    Court is well aware that we have and that exists is
10   heavily redacted.  It has the "In Touch" tabloid
11   demarcation on it.  I think this is totally inappropriate.
12   If they want to call the detective who wrote this or
13   whoever it was that authored this, they can, and that
14   would be appropriate.  But he didn't write this.
15         THE COURT:  Well, I don't know that it's
16   impeachment at this point.  Ms. Marshall?
17         MS. MARSHALL:  Your Honor, I think he can look at
18   this statement and see if he remembers making that
19   statement and if this refreshes his recollection as to his
20   statement that he's made.
21         THE COURT:  Yeah, this is an attempt to refresh
22   his recollection.  At this point, it's not being used to
23   impeach him.  It's just a document that may or may not
24   refresh his recollection.  So your objection is overruled.
25             (Bench conference concluded)

```
 1              MS. MARSHALL:  May I approach, Your Honor?
 2              THE COURT:  You may.
 3  Q.   (BY MS. MARSHALL)  Mr. Duggar, I'm going to show you,
 4  this is a Springdale Police Report.  Do you see that up at
 5  the top?
 6  A.   Okay.  If you are using an "In Touch" magazine
 7  tabloid article as your case --
 8              THE COURT:  Mr. Duggar?
 9              THE WITNESS:  -- I'm not going to allow that.
10  Are you allowing that?
11              THE COURT:  Mr. Duggar, what I am doing is
12  controlling this examination.
13              THE WITNESS:  Okay.
14              THE COURT:  All right.  She is showing you a
15  document and identifying what the document is that you're
16  being shown.  Then she's going to ask you some questions
17  about the document.  If there's a proper objection,
18  someone in the courtroom will make it, but it won't be
19  you.  You will answer the questions that are posed.
20              THE WITNESS:  Okay.
21  Q.   (BY MS. MARSHALL)  Do you see this report that I'm
22  showing you that says "Springdale Police Report?"
23  A.   Yes, with "In Touch" magazine across the front of it.
24  Q.   Do you see the name here that says "James Robert
25  Duggar" with a birth date July of '65?
```

1    A.    Yes.

2    Q.    Is that you?   Is that when your birth date is?

3    A.    Correct.

4    Q.    I'm going to read you --

5                MR. GELFAND:   Objection, Your Honor.   This is not

6    refreshing recollection.

7                THE COURT:   Sustained.

8    Q.    (BY MS. MARSHALL)   I'm going to have you read the

9    paragraph there starting "James said."

10   A.    Okay.

11   Q.    Will you please read that paragraph?

12   A.    I'm not going to do that.

13               MR. GELFAND:   Your Honor, I'm sorry.   Just from a

14   legal standpoint, if she wants to refresh his

15   recollection, she can show him something, he can read it

16   to himself.   She can ask whether that refreshes his

17   recollection and the answer will be what the answer will

18   be.

19               THE COURT:   I think that's what we were trying to

20   do.   I agree with you.

21               MR. GELFAND:   I was concerned that she was asking

22   him to read it out loud as opposed to himself.

23               THE COURT:   Oh, no, no.   That's not what I

24   understood.   Certainly that would not be appropriate.

25   Q.    (BY MS. MARSHALL)   Can you please read this paragraph

1   to yourself.

2   A.   I don't know.  I don't know anything about that.

3   Q.   Does that refresh --

4   A.   I did not write the police report.  I don't know what

5   all was put in that.  I don't know who put -- you know, I

6   don't know what investigator.  You will have to bring them

7   in and ask them.

8   Q.   Does that refresh your recollection as to whether

9   Josh Duggar told you that he had inappropriately touched

10   the vaginal area of Jane Doe 1, 2, 3, or 4?

11   A.   I don't know.  I don't remember.  I really don't

12   remember.  It's been many, many years ago and --

13          THE COURT:  There's no question on the table

14   right now.

15          THE WITNESS:  Okay.

16   Q.   (BY MS. MARSHALL)  Mr. Duggar, is it your testimony

17   under oath today that the only statements that Josh Duggar

18   ever made to you in regards to the inappropriate touching

19   on the breast or vaginal area of Jane Doe 1, Jane Doe 2,

20   Jane Doe 3, or Jane Doe 4 was that he inappropriately

21   touched their breast while they were sleeping?

22   A.   That's all I recall.

23   Q.   This wasn't a big event in your life that stands out

24   to you?

25   A.   That's all I recall.

```
 1              MS. MARSHALL:  May I have one moment, Your Honor?
 2              THE COURT:  You may.
 3   Q.  (BY MS. MARSHALL)  Mr. Duggar, we talked about this a
 4   little bit earlier, but do you recall doing an interview
 5   with Megyn Kelly in 2015?
 6   A.  Yes.
 7   Q.  Do you recall telling Megyn Kelly that something
 8   happened in 2003 to pull Josh out of the home?
 9   A.  I don't remember exactly what I said, but there was a
10   point there where we did, yes, pull Josh out of the home.
11   Q.  Why?
12   A.  We -- after talking to Jim Holt, who was working at
13   Piney Ridge, he was a chaplain at Piney Ridge, which is a
14   juvenile sex offender facility, and he was an elder of our
15   church, and counseled with him and Bobye Holt and then
16   also with Clark Wilson, who was another elder in our
17   church.  And we felt -- so Jim, when I asked him --
18   Q.  Mr. Duggar, I'm going to stop you right there.
19   A.  I was just going to explain -- you asked me about
20   pulling him out of the home, so I was going to tell you
21   that.
22   Q.  Let me follow up with that.
23   A.  Okay.
24   Q.  Do you remember telling Megyn Kelly that the third
25   time Josh came to us, you did something, you took action?
```

1   A.   No, I don't recall that.

2   Q.   Do you remember telling Megyn Kelly that some of your

3   best friends came over and you talked about it?

4   A.   Yes.   That was Jim Holt and Clark Wilson.

5   Q.   Your best friends?

6   A.   Yes.

7   Q.   Do you remember telling Megyn Kelly that you pulled

8   him out of the house after a situation with, I'm going to

9   just say at this point, Jane Doe 4?

10  A.   I can't remember exactly what was -- I mean, 2015,

11  six years ago, I don't remember.

12  Q.   You don't remember what happened with Jane Doe 4 that

13  you made your son leave your home?

14        MR. GELFAND:   Objection.   That misstates the

15  testimony.   The question was what he remembered telling

16  Ms. Kelly.

17        THE COURT:   Rephrase.

18  Q.   (BY MS. MARSHALL)   You don't remember what you told

19  Ms. Kelly?

20  A.   No.

21  Q.   Do you remember what Josh Duggar told you in 2003

22  that made you have him leave your home?

23  A.   No, I don't know what Josh said word-for-word.   I

24  mean, there was some inappropriate touching that happened,

25  and that's -- we tried to handle things in-house.   And

1  then after talking to Jim Holt, who is our fellow elder at
2  the church, and then him and Bobye were spiritual leaders
3  at our home -- I mean, of our church, and then also Clark
4  Wilson, who had been a prison guard for a while.  When we
5  talked about what to do in the situation, Jim said that
6  the -- basically, what happens, if you go to Piney Ridge,
7  what they would do is they would just basically -- they
8  didn't have some good solutions to help the kids.

9  Q.   Mr. Duggar, I'm going to stop you right there.

10 A.   Okay.

11 Q.   What did Josh Duggar tell you in 2003 that made you
12 have that conversation with Jim Holt?

13 A.   Yes.  He had inappropriately touched our girls.  And
14 so that's what we went and --

15 Q.   When you say "inappropriately touched," what
16 specifically did he tell you he did?

17 A.   I told you that.

18        MR. GELFAND:  That's been asked and answered.

19 Q.   (BY MS. MARSHALL)  I'm sorry?

20 A.   I've already told you that.

21        THE COURT:  Overruled.  One more time.

22 Q.   (BY MS. MARSHALL)  What specifically did Josh tell
23 you that he did?

24 A.   He said he did some inappropriate touching on the
25 breast and that was -- it was a very difficult time in our

1    family's life.  And it's -- I'll say this:  When we went

2    to the Child Safety Center, they told us all this would be

3    kept confidential.  And so for you guys to use a tabloid

4    to bring it back up, it's very unprofessional.

5    Q.    Mr. Duggar, do you understand that the hearing today

6    is in regards to charges that are brought forth against

7    your son for child pornography?

8              MR. GELFAND:  Objection, Your Honor.  This

9    exceeds the scope of the hearing.

10             THE COURT:  Sustained.  This is not a debate.

11             Mr. Duggar, I understand this is a difficult and

12   perhaps a very unfair situation that you're placed in.

13   I'm sorry.

14             THE WITNESS:  I appreciate that.

15             THE COURT:  This is a different proceeding, a

16   different forum, and I need you to answer the questions as

17   best as you can without editorial side comments.

18             MS. MARSHALL:  Your Honor, I will pass the

19   witness.

20             THE COURT:  Mr. Gelfand?

21             MR. GELFAND:  One minute, Your Honor.  May I

22   proceed, Your Honor?

23             THE COURT:  You may.

24                      CROSS EXAMINATION

25   BY MR. GELFAND:

1    Q.    Good morning, Mr. Duggar.

2    A.    Good morning.

3    Q.    Mr. Duggar --

4    A.    Lunchtime, I guess.

5    Q.    The prosecutor was asking you a lot of questions

6    about the 2002 through 2005 time period.  Do you recall

7    that?

8    A.    Yes.

9    Q.    Fair to say that was a long time ago?

10   A.    It was.  I mean, it's been, what, 18, 19 years ago,

11   something like that.

12   Q.    Now, I want to take you back to that time period for

13   a little bit of context.  Were you a member of any

14   particular church at that time?

15   A.    Yes.  We were a part of a -- Clark Wilson had moved

16   to this area to start a little Baptist church.  And we

17   started meeting in a little office trailer at first.  And

18   then later we started meeting in homes because there was

19   more room.  And several families joined together and we

20   met in our home part of the time and Jim and Bobye Holt's

21   home for quite a bit.

22   Q.    And just to get our bearings for a second, what was

23   the name of that church?

24   A.    Bible Grace Fellowship.

25   Q.    Is it fair to say that both you and your family and

1   the Holts were parishioners, if you will, or members of

2   the Bible Grace Fellowship Church from 2002 to 2005?

3   A.   Yes.  For many years, yes.

4   Q.   Is it a nondenominational church?

5   A.   Yes.  Nondenominational, but kind of a Baptist

6   origin, I think.

7   Q.   Were there church elders?

8   A.   Yes.  Clark Wilson, Jim Holt, and Jim Bob Duggar.

9   And then our wives also were spiritual leaders to -- we

10  believe they would help other women and the children and

11  then -- but, yes.  Jim and Bobye Holt were spiritual

12  leaders and then Clark and Denise Wilson.

13  Q.   You have known Jim Holt for decades, correct?

14  A.   Since 7th grade.

15  Q.   I won't ask you how old you are, but is it fair to

16  say decades?

17  A.   Yes.  We both graduated from Shiloh Christian School

18  together.

19  Q.   Was it your understanding in this 2002 through 2005

20  time period that Jim Holt was an ordained Baptist

21  minister?

22  A.   Correct.

23  Q.   Was it your understanding that he was also a chaplain

24  at a place called Piney Ridge?

25  A.   Yes.

1    Q.   Was it your understanding that he performed

2    counseling services in his capacity as a religious

3    chaplain?

4    A.   Yes.  And he counseled young people that had violated

5    someone sexually.

6    Q.   Without getting into too many details, during this

7    time period, you began to testify, when the prosecutor was

8    asking you questions, that there were times when you

9    sought some sort of guidance from Jim Holt and from Clark

10   Wilson, correct?

11   A.   Correct.

12   Q.   Is it fair to say that you did this for religious

13   purposes?

14   A.   Yes.  We really felt like that they -- that Josh --

15   we were thankful that he came and told us what had

16   happened, which that was a big step, because we didn't

17   catch him doing something, but he came and told us.  But

18   he had crossed some lines and he was right at that age of

19   curiosity of, you know, right at 14 years old where your

20   hormones start kicking in.

21        And I don't think -- so, anyway, we called Jim Holt

22   and Clark Wilson and they came over and met with Josh and

23   counseled him.  And then later, Josh went over to Jim and

24   Bobye Holt's house many times and counseled with them for

25   hours at a time, because they had -- they were just some

1  of our close friends and Jim had an expertise in this

2  area.

3  Q.   Josh was a child during this whole time period,

4  correct?

5  A.   Correct.

6  Q.   You were obviously and are his father, correct?

7  A.   Yes.

8  Q.   Was it your purpose -- your purpose in having Josh

9  speak with Jim Holt for religious and spiritual guidance

10  purposes?

11  A.   Oh, totally.

12         MS. MARSHALL:  Objection, Your Honor.  Relevance.

13         THE COURT:  Overruled.

14  Q.   (BY MR. GELFAND)  You can answer the question.

15  A.   Yes.  Josh really looked up to Jim and he was one of

16  the leaders in the church and -- Jim and Bobye both, they

17  were leaders in the church.  And we appreciated their

18  wisdom.  And Jim, being a chaplain, was just -- was able

19  to help work through a lot of these things and give us

20  good wisdom on how to conquer these challenges.

21  Q.   You were asked some questions about Megyn Kelly.  And

22  I know that you testified that you don't remember exact

23  details from that six or whatever it was years ago,

24  correct?

25  A.   Correct.

1   Q.   Do you remember whether or not you told Megyn Kelly
2   that you got spiritual counseling?
3   A.   I don't remember, really.  But I'm sure I did, we
4   did, yes.  We did actually get -- we got not only with Jim
5   Holt, but also all of our kids, the girls went and saw a
6   counselor over in Siloam and then --
7   Q.   Let me cut you off for one second.  Mr. Duggar, did
8   you, in fact, get spiritual counseling for Josh Duggar
9   from Jim Holt during this time period?
10  A.   Oh, yes, yeah.
11  Q.   To what extent, if any, did that involve Bobye Holt?
12  A.   Well, a lot of times when Josh would go over there,
13  he would go over to their house and they would counsel him
14  and try to help him to work through these things and --
15  anyway, Jim was -- came from the chaplain perspective and
16  then Bobye was kind of a spiritual leader that was able to
17  give a lot of wisdom also.  And together they are a good
18  team of counselors and so we encouraged Josh to go over
19  there and counsel with them.
20  Q.   Now, you were asked a number of questions about what
21  Josh said to you at various times in 2002 through 2003, 4
22  or 5, whatever it was, correct?
23  A.   Correct.
24  Q.   Sitting here today on the witness stand, do you
25  remember exactly what Josh said to you word-for-word?

```
 1   A.   I don't remember word-for-word what he said.  I'm
 2   trying to think.  It's probably like a childhood -- I
 3   think it was something that -- he was trying to do
 4   something --
 5   Q.   I don't want you to guess about anything.
 6   A.   No.
 7   Q.   Do you remember word-for-word what Josh said to you?
 8   A.   No.
 9          MR. GELFAND:  Your Honor, may I have one minute,
10   please?
11          THE COURT:  Certainly.
12          MR. GELFAND:  I just have one more question, Your
13   Honor.
14   Q.   (BY MR. GELFAND)  Mr. Duggar, was it your expectation
15   that the counseling sessions, so to speak, the
16   conversations that you were having Josh have with Bobye
17   Holt and Jim Holt would be kept confidential?
18   A.   Yes.  They said that they would keep it confidential
19   and they would -- as fellow Christians and spiritual
20   leaders.
21          MS. MARSHALL:  I would object to hearsay.  He's
22   talking about what Jim and Bobye Holt told him.
23          THE COURT:  Mr. Gelfand?
24          MR. GELFAND:  I said, was it your expectation
25   that these would be kept confidential, and I think he's
```

1    explaining.  He said, yes, it was his expectation, but the

2    "yes" is sufficient, Your Honor.

3         THE COURT:  The objection will be overruled, but

4    let's be careful not to solicit hearsay in any further

5    explanation.

6         MR. GELFAND:  Absolutely.

7    Q.   (BY MR. GELFAND)  I'll ask it very precisely.

8    Mr. Duggar, did you ask Bobye Holt and Jim Holt to keep

9    their discussions for spiritual counseling purposes with

10   Josh confidential?

11   A.   Yes.

12   Q.   Thank you.

13        MR. GELFAND:  Thank you.  Your Honor, I have no

14   further questions for this witness.

15        MS. MARSHALL:  Briefly, Your Honor.

16        THE COURT:  Yes, ma'am.

17                    REDIRECT EXAMINATION

18   BY MS. MARSHALL:

19   Q.   Mr. Duggar, was it your testimony with Mr. Gelfand

20   that Josh had counseled with Jim Holt on an individual

21   basis?

22   A.   It was normally with Jim and Bobye when he went to

23   their house.  I think at first -- on the first initial

24   situation, it was Clark Wilson and Jim Holt.

25   Q.   So there were conversations that Josh had without

1  Bobye Holt being there that he had with Jim --

2  A.   The first initial conversation was with Clark Wilson

3  and Jim Holt.  And then from there on, it was, I think --

4  it was actually both of them together from there on out.

5  Q.   Mr. Duggar, you talked about a spiritual leader.  Is

6  it true that a spiritual leader is not necessarily an

7  elder in the church?  There could be a spiritual leader

8  who is not an elder?

9  A.   There can be, but Jim and Bobye are kind of like

10  joint elders of the church and they would help with

11  spiritual things.  But they were actually official --

12  like, if there was voting, it was me and Michelle and Jim

13  and Bobye and Clark and Denise making the decisions for

14  the church.

15  Q.   So let me ask my question again.  Can there be a

16  spiritual leader in the church who is not an elder?

17  A.   Well, lot of times the people that are spiritual

18  leaders become elders.  But Jim was both, yeah.

19  Q.   Can there be a spiritual leader in the church who is

20  not a pastor?

21  A.   I mean, that's what we're all called to be.

22  Q.   Who is not the named pastor of a church?

23  A.   Yes, that's what we're all called -- we're all

24  supposed to step up and to be hopefully spiritual leaders

25  to others.

1   Q.    Were you the paid pastor of the Fellowship church?

2   A.    No, I did not receive any compensation at all from

3   the church.

4   Q.    Did you still consider yourself to be a spiritual

5   leader?

6   A.    I was an elder in the church.

7   Q.    Were there other people who were not elders in the

8   church that you considered to be spiritual leaders, in

9   your words?

10  A.    Not in that church.  It was a pretty small group.

11  Q.    And it's your testimony that your wife and Mrs. Holt

12  were leaders in the church as well, or they were -- tell

13  me what they were.

14  A.    Yes.  They would disciple other women and speak to

15  women's groups and encourage women and also young people

16  and help lead young people.

17  Q.    And they had a voting role in the church?

18  A.    Yes.

19  Q.    Could they have been a pastor, a paid pastor?

20  A.    No, neither one -- I mean, none of us were paid.

21  Q.    Could they have been?

22  A.    They could have been.

23  Q.    Has that happened before?

24  A.    I mean, we weren't paid, but, I mean, that happens.

25  Q.    In your church?

1    A.    I think probably Clark was paid some.  Jim, I think,

2    was paid some for speaking some, so -- but I wasn't.

3    Q.    Was Bobye Holt ever paid?

4    A.    I don't know.  I think they did reimburse them for

5    expenses and stuff, yeah.

6    Q.    Mr. Duggar, is it your testimony under oath today

7    that you remember that Josh Duggar went to counseling, but

8    not that you remember if he told you that he had touched

9    the vaginal area of Jane Doe 1, 2, 3, or 4?

10    A.    Say that again.

11    Q.    Is it your testimony under oath today that years

12    later, you can recall that Josh went to counseling and who

13    he went to counseling with and why and those exact

14    aspects, but you cannot recall if he told you that he

15    touched the vaginal area of Jane Doe 4?

16    A.    Correct.

17    Q.    Mr. Duggar, have you and I ever had a conversation

18    before today?

19    A.    I don't know.  Have we?

20    Q.    Do you remember ever having a conversation?

21    A.    I don't remember.

22    Q.    Have you ever talked with the defense counsel

23    regarding your testimony before today?

24    A.    The defense counsel?  Oh, Josh's attorneys?

25    Q.    Yes.

1  A.    Yes.  They told me just to go in and tell the truth

2  of what happened.

3  Q.    So you have spoken with them before?

4  A.    Yes.

5  Q.    But you declined to speak with myself before?

6  A.    Are you talking about -- I don't know if I met you

7  before.  Before today?  Had I met you before?

8  Q.    Did you decline to others to speak to counsel before

9  today?

10  A.    Did I decline?  I don't understand your question.

11  Q.    Were you asked if you wanted to speak with the

12  prosecutors in this case before the hearing today?

13  A.    Are you talking about right before it started?

14  Q.    Previous to that.

15  A.    I mean, they said they had a subpoena for me, so I

16  came by the Homeland Security office and met with some of

17  the Homeland Security people at their office, because they

18  had -- they had a subpoena for me.  And she asked if I

19  wanted to talk to anybody and I said no.

20        MS. MARSHALL:  Thank you.  No further questions,

21  Your Honor.

22        MR. GELFAND:  We have no further questions, Your

23  Honor.

24        THE COURT:  Mr. Duggar, was Clark Wilson the

25  pastor of Bible Grace Fellowship in 2002 and 2003?

```
 1              THE WITNESS:  It actually was -- there was three
 2    elders.  That's what we had -- instead of a pastor, it was
 3    three elders that ran the church.  And it was Clark Wilson
 4    and Jim Holt and myself.  There was three elders of the
 5    church.
 6              THE COURT:  So you didn't --
 7              THE WITNESS:  All three of us would share some of
 8    the responsibilities and everything.
 9              THE COURT:  So the elders or the leadership of
10    the church never called a specific person to fulfill the
11    singular role of the pastor or head pastor of the church?
12              THE WITNESS:  Clark would do some of the
13    preaching.  And then eventually Clark moved on and it was
14    Jim Holt and I and we led the church.  He moved back to
15    Mississippi.
16              THE COURT:  In this time frame that we're talking
17    about, 2002 and 2003, did you have a full-time job?
18              THE WITNESS:  Yes.  All of us had full-time jobs.
19              THE COURT:  That was my question.
20              THE WITNESS:  Clark did, too.  Clark did
21    construction.  Jim Holt did.  I did, yes.  I do real
22    estate.  Jim does tree work.  I'm not sure what he was
23    doing back then.
24              THE COURT:  The work that you, Jim Holt and Clark
25    Wilson were dedicating to the church was on the side?  It
```

1    was not your primary occupation?

2              THE WITNESS:  Well, it was -- on Sundays, you

3    know, it was a full-time job.  It was a full-time job on

4    Sundays.

5              THE COURT:  I didn't say --

6              THE WITNESS:  And throughout the week, anything

7    else that needed to be done.  You have people that have

8    needs, counseling.  We really focused on taking care of

9    the widows and fatherless, so --

10             THE COURT:  So would it be true that in 2002 and

11   2003, Bible Grace Fellowship did not have a singular

12   figurehead person that fulfilled the role of pastor or

13   preacher or whatever figurehead role or title?

14             THE WITNESS:  It did.  We had plural -- we had

15   three instead of just one.  Instead of just one pastor, we

16   had three --

17             THE COURT:  And they were called elders?

18             THE WITNESS:  -- elders.  It was like three

19   pastors.

20             THE COURT:  So as you use the term, "elder" is

21   synonymous with "pastor?"

22             THE WITNESS:  Correct.

23             THE COURT:  That helps me.  Thank you, sir.

24             Does that prompt anything else?

25             MS. MARSHALL:  One question, Your Honor.

1          THE COURT:  Yes.

2                REDIRECT EXAMINATION - CONTINUED

3  BY MS. MARSHALL:

4  Q.    Mr. Duggar, in your statement just now with the

5  Judge, you stated that Clark Wilson, Jim Holt, and Jim Bob

6  Duggar were the elders of the church, is that correct?

7  A.    That, along with our wives, correct.

8  Q.    But did you just state to the Judge that Clark

9  Wilson, Jim Holt, and Jim Bob Duggar were the elders of

10  the church?

11  A.    Yes, along with our wives.

12  Q.    Did you ever say the word "Bobye Holt" in the answer

13  to the Judge?

14  A.    Along with our wives.

15  Q.    Did you state just now to the Judge --

16          THE COURT:  Ms. Marshall, move on.

17          MS. MARSHALL:  No further questions, Your Honor.

18          MR. GELFAND:  I have no questions, Your Honor.

19          THE WITNESS:  I'll say this, we consider our

20  wives as much a part of the leadership as the husbands.

21  We're not -- we all were together.  I'm not a male

22  chauvinist.  I believe my wife is wiser than I am, so --

23          THE COURT:  Do they vote?

24          THE WITNESS:  Yes.

25          THE COURT:  So when you would vote on business

1  matters, there would be a total of six votes at that time?

2          THE WITNESS:  I mean, depends on what the vote

3  was.  Sometimes you would open it up to the whole church,

4  but --

5          THE COURT:  No.  I'm talking on business matters

6  that elders would vote on, not the church as a whole.

7          THE WITNESS:  We felt like that -- what we would

8  feel like is that we would pray about a situation together

9  as couples and then the couples together would decide

10 matters.  We believe in listening to the cautions of your

11 wife.  You know, a lot of times if a husband is out here

12 just making decisions and it negatively affects the whole

13 family or church, it's better to have a husband and wife

14 unified on decisions, and so that's how we look at things.

15         THE COURT:  When votes were tabulated, were there

16 three votes or six votes total?

17         THE WITNESS:  Depends on what the matter was.

18         THE COURT:  What does it depend on?

19         THE WITNESS:  Well, if you're deciding on whether

20 to buy, you know, folding chairs, it may just be one

21 person.  If you're deciding on where to meet the next

22 week, it's probably six votes.

23         THE COURT:  All right, sir.  Thank you very much

24 for your time in being here today.

25         THE WITNESS:  Thank you.  And I appreciate you,

1    Judge.  I know it's a difficult situation, but, anyway, I

2    appreciate you.

3              THE COURT:  Thank you.

4              THE WITNESS:  Am I free to leave?

5              THE COURT:  You are free to leave.

6              Government may call its next witness.

7              MS. MARSHALL:  Your Honor, the government has no

8    other witnesses.

9              THE COURT:  Mr. Gelfand, does the defense have

10   any witnesses?

11             MR. GELFAND:  We have no independent witnesses,

12   Your Honor, no.

13             THE COURT:  All right.  So back to the motions.

14   We received some argument back on November 18th.  I'll

15   entertain additional argument in light of the testimony

16   today.  There are competing motions, but I'll begin with

17   the government.

18             MR. CLAYMAN:  Thank you, Your Honor.  I'll be

19   doing the argument for the government.

20             Now that we've held an evidentiary hearing on

21   this evidence, as I see it, there are two or potentially

22   three outstanding issues based on the priest privilege

23   issue that was raised by the defense this morning.  The

24   other two are whether the defendant received adequate

25   notice of the government's intent to introduce this

1   evidence and whether the prior molestation conduct

2   actually satisfies the admissibility requirements under

3   Rule 414 or Rule 404 separately.

4        With respect to the notice requirement -- I'll

5   focus on that one first just briefly -- it wasn't raised

6   all that much at the hearing today, but I would just like

7   to outline that all that Rule 414(b) requires is that at

8   least 15 days before the trial, the government disclose

9   the evidence of prior molestation to the defense; this

10  disclosure come in the form of a summary of expected

11  testimony, or simply a description of any witness

12  statements the government seeks to introduce.  I think we

13  have plainly complied with that obligation here.  As we

14  proffered at the pretrial conference, the government

15  produced in discovery a redacted form of the police

16  report -- I think it's 33 pages in total -- documenting

17  the defendant's molestation conduct and his admissions

18  related to that conduct.  This was provided in March of

19  2021 to the defense.

20       With respect to that disclosure, Your Honor, I

21  think there's Eighth Circuit precedent saying that all

22  that Rule 414 requires is that the government disclose the

23  evidence, not necessarily the government's intent to

24  introduce that evidence.  We just simply have to make the

25  defendant aware of what the evidence is.  So based on that

1    precedent, we have likely satisfied Rule 414's notice
2    requirement.  But even if that was not sufficient, we
3    supplemented our notice on November 3rd with our motion in
4    limine that also sought to admit this evidence.  We
5    supplemented it again on November 15th by identifying
6    specifically for the defense which two witnesses we were
7    intending to elicit this evidence from and what they were
8    going to say generally.
9            The second issue, Your Honor, is to whether this
10   evidence is otherwise admissible.  As we argued in our
11   motion in limine, this evidence is admissible both under
12   Rule 414 and separately and independently under Rule
13   404(b).  Rule 414, however, as the Court knows, is much
14   broader than Rule 404(b), because it allows for this
15   evidence to be considered on any matter which is relevant
16   as opposed to the narrower scope of Rule 404(b), and so I
17   think the Court is right to focus its analysis chiefly on
18   Rule 414.
19           As the Court observed -- and that's why we are
20   here today -- there is a preliminary question when
21   determining whether to admit this evidence.  And that
22   question is whether there's sufficient evidence to support
23   a finding that the defendant actually engaged in this
24   child molestation conduct.  And that's based on Rule
25   104(b) I believe that the Court referenced earlier.

1        In addressing this question, Your Honor, Courts
2   apply a preponderance of the evidence standard, which is
3   simply whether it's more likely than not that this conduct
4   occurred.  Here, Your Honor, the Court has heard that the
5   defendant repeatedly confessed to molesting multiple minor
6   girls under the age of 12 when he was approximately 14 or
7   15 years old.  He also confessed to digitally penetrating
8   the vagina of a prepubescent minor when he was
9   approximately 15 years old.  There's been no evidence
10  offered that the defendant did not make those admissions.
11  Instead, what the defendant has tried to highlight is that
12  these admissions occurred a long time ago, around 17 years
13  ago, and that, therefore, somehow maybe everyone is
14  misremembering or is not exactly recalling what the
15  defendant said.
16        The problem, Your Honor, with that argument, as
17  the Court has heard today, is that Mrs. Holt does remember
18  the admissions the defendant made and she remembers them
19  quite clearly.  And this should not come as a surprise,
20  because, as she explained, she was very close family
21  friends with the Duggars, the defendant here was in a
22  relationship or was her daughter's boyfriend, and that
23  this was a very significant and obviously alarming event
24  for her.  Someone that she knew very well, she'd known the
25  defendant here since he was born, someone that she said

1  that she loved had told her that he digitally raped a

2  minor.  It's not surprising that she recalls this with

3  some specificity.

4       I think, Your Honor, Mrs. Holt's recollection is

5  also corroborated, at least in part, by what Mr. Duggar

6  said.  He vacillated somewhat, but he did confirm that the

7  defendant, in around 2002 and 2003, admitted to

8  inappropriately touching minors.  He admitted and

9  corroborated what Mrs. Holt said.  That as a result of

10  that admission to Mr. Duggar, the defendant was brought to

11  Mrs. Holt and that they discussed this.  In fact,

12  Mr. Duggar said, I believe at one point, that the Holts

13  were his best friends and that's why he brought his son to

14  discuss this issue with them, at least in part.

15       In sum, Your Honor, I think what the evidence has

16  shown is that the defendant admitted to this conduct on

17  multiple occasions, that his admissions were largely

18  consistent and that these admissions occurred multiple

19  times sometimes years apart.  We would submit it's as

20  close to a formal admission of guilt in a courtroom

21  setting as you can get without actually having something

22  like that.  The defendant admitted that he engaged in this

23  conduct multiple times.  And there's been no evidence to

24  suggest or any reason to believe at this point that

25  Mrs. Holt was lying about what the defendant told her or

1      that the defendant was lying to Mrs. Holt when he told her

2      those things.

3              The next, I guess, sub-inquiry for the Court to

4      engage in at this point is whether this evidence satisfies

5      the various other requirements of Rule 414.  The only

6      issue in dispute, as I understand it at this point, is

7      whether this prior conduct is child molestation conduct

8      within the definition of Rule 414, which would be any

9      crime under federal or state law involving contact between

10     any part of the defendant and the genitals or anus of a

11     minor.  We identified two Arkansas statutes at the last

12     hearing that we believed encompassed the defendant's

13     conduct here.  And I think based on the testimony that was

14     presented today, it is even more clear that what the

15     defendant did here does, in fact, satisfy the elements of

16     those two offenses that are sexual assault in the second

17     degree under the Arkansas code and the rape statute under

18     the Arkansas code.

19             I think with respect to the sexual assault crime,

20     Mrs. Holt testified that from 2002 or so continuing into

21     March of 2003, when the defendant was approximately 14 or

22     15 years old, he repeatedly grabbed or touched, I suppose,

23     the breasts and genital areas of four minor girls all who

24     were under the age of 12 at that time.  And he did this

25     both over their clothes and underneath their clothes.  To

the extent the defendant argues that this evidence does
not sufficiently prove that he actually touched the minor
girls' genitals as is required under Rule 414, I would
point the Court to Rule 414(d)(1)(F) which defines child
molestation to include any attempt to touch the anus or
genitals of any minor.  Here, I think what Mrs. Holt has
testified to plainly demonstrates that the defendant not
only attempted to, but did in fact touch the vaginas and
breasts of multiple minor girls.

       With respect to the rape conduct, Your Honor, you
have heard testimony that the defendant digitally
penetrated the vagina of a prepubescent girl in March of
2003 when he was approximately 15 years old.  I don't
think there can be any dispute that this conduct
constitutes rape under Arkansas law, although I would be
happy to address any concerns that the Court might have
regarding whether that conduct actually meets the rape
statute definition.

       THE COURT:  That's fine.  Thank you.

       MR. CLAYMAN:  Just like to note one other thing,
Your Honor, or I suppose two other things.  I don't think
the Court needs any argument regarding relevance.  That's
been throughly briefed.

       To the extent the Court has any concerns about
the prejudice, we would just submit that we believe any

1    potential prejudice by the admission of this evidence can

2    be cured through a jury instruction, both at the final

3    jury instructions and when this evidence is admitted at

4    trial.

5         And to the extent the Court has any concerns

6    about the clergy privilege issue, we would be happy to

7    offer a supplemental briefing or research on this issue if

8    the Court would like.

9         THE COURT:  All right.  Thank you.  Mr. Gelfand?

10        MR. GELFAND:  Thank you, Your Honor.  I want to

11   start with what I think is a natural kind of gatekeeping

12   function, and that's the privilege issue that the Court

13   has to grapple with.

14        We would direct the Court's attention -- and I

15   can provide the citation again, but I don't disagree that

16   perhaps supplemental briefing by both parties would

17   benefit the Court.  But there's a Third Circuit case that

18   I would submit is essentially the seminal case.  I always

19   hate using that phrase because that's subjective, but it's

20   generally perceived by other circuits, in our research, as

21   the seminal case on this issue.  It's entitled *In Re Grand*

22   *Jury Investigation*, which is not very helpful, but the

23   citation is 918 F.2nd 374.

24        And in particular, I would direct to the Court to

25   the pincite of page 383 of that 1990 Third Circuit

opinion.  What that does, without getting too into the
weeds of this, because I think everyone would benefit from
briefing, is it lays out the application of this clergy
privilege in the context of a federal case.  And it lays
out essentially what the elements are, so to speak, or at
least what the factors are that the Court has to consider.
Because I think that the testimony today -- it's a
combination of Jim Bob Duggar's testimony and Bobye Holt's
testimony -- clearly establishes, what we believe, the
requisite foundation to establish that there was a
privilege, that the intent is critical when you're
dealing -- and there's a little bit -- to complicate this,
there's a little bit of an interesting dynamic here,
because Josh at the time, as the Court is well aware, was
a juvenile.  He was a minor.  And Jim Bob's -- Jim Bob
Duggar's testimony is particularly important in the sense
that his parents' purpose in having his kid have these
conversations was for spiritual counseling.  That's
undisputed testimony.  The reason I'm putting the Court's
attention to that Third Circuit case is I think that it
addresses why it is that the subjective purpose of seeking
that conversation, of having that conversation, is so
critical.

          I would also note that there's case law -- and
we're happy to cite it -- that even the presence of a

1   necessary third party -- in other words, if the Court were

2   to hypothetically conclude that Bobye Holt herself was not

3   up to the caliber of a church elder, notwithstanding the

4   testimony from Jim Bob --

5           THE COURT:  Well, here's what I don't really

6   understand.  Paraphrasing what Mr. Duggar said today,

7   faith and his beliefs about the role of one's spirituality

8   guiding every aspect of one's life and how one runs their

9   family and runs their church and that it extends to all

10  decisions made by the church, and given his testimony

11  about the Holts, or Mr. Holt, in particular, being his

12  best friend, and I think there was also testimony that

13  Holt and Wilson were his best friends.  Does this mean

14  that a person who has very deeply-held beliefs, faith,

15  spirituality, can never have a conversation that wouldn't

16  be privileged?  It's kind of what I think is going on

17  here.

18          MR. GELFAND:  Of course not, Your Honor.  I would

19  push back, respectfully, Your Honor.  That's not our

20  position and that's not what --

21          THE COURT:  That's not your position that

22  Mr. Duggar does everything through the lens of

23  spirituality?

24          MR. GELFAND:  No.  I'm saying it's not our

25  position that every conversation between Mr. Duggar and

```
1   Mr. Duggar's kids and -- if they went to the baseball game
2   and talked about the Dodgers versus the Cardinals -- a
3   St. Louis team -- then, as a practical matter, of course,
4   that's not privileged.  There's law that governs the
5   purpose of the conversations and the context in which it
6   occurred.  And I think what's particularly --
7           THE COURT:  My question goes to the context.
8           MR. GELFAND:  And I think that what is
9   particularly important here is that what Jim Bob Duggar
10   testified to is that his purpose in reaching out to Jim
11   Holt, which, by the way, factually was consistent with
12   what Bobye Holt testified.
13           THE COURT:  I noticed that.  I noticed that.
14           MR. GELFAND:  That his purpose in reaching out to
15   Jim Holt was for a variety of things.  He was a chaplain.
16   He provides counseling.  And he was seeking religious and
17   spiritual counseling based on a situation that's obviously
18   not an everyday situation.
19           THE COURT:  If I call my best friend, who is also
20   spiritual and who is also a member of my church, does that
21   protect all conversations with my best friend if we begin
22   and end our conversation with a prayer and talk about
23   spiritual things?
24           MR. GELFAND:  No, Your Honor.  But I can also see
25   a universe where some of those conversations might be
```

privileged.  The point is that I think that's -- I mean,
the foundation here is from a religious liberty
standpoint.  And I don't claim to be a scholar on
religious liberty.  But from a religious liberty
standpoint, the foundation behind this privilege is to
protect circumstances where you can have a certain kind of
conversation in a way that isn't going to come out in a
courtroom.  And this is that conversation.  This is the
epitome of that conversation.  This isn't every day, we
were chatting about sports, or I was having best friend --
you know, I'm having difficulty with whatever, with my job
or things like that.  I think some of the cases -- and I
know the Court has not yet done the deep dive that is
perhaps necessary.  But on some of the cases -- and I'm
only taking what I heard the Court say earlier about some
state cases.  Those deal with business matters being
exceptions.  So, in other words, people where the context
could theoretically be privileged, but that's not this.
And I think that's what's so critically important here.

        And I think what is even more important about the
privilege issue, Your Honor, is that under Rule 414, Jim
Bob Duggar's testimony doesn't get the government there.
So this all ultimately boils down to Bobye Holt's
testimony.

        THE COURT:  Which is largely corroborated by Jim

Bob Duggar's testimony, not necessarily on every specific
fact, but the fact that there was inappropriate touching
and the fact that the defendant here did have
conversations about those matters with Bobye Holt.

MR. GELFAND:  Yes, Your Honor.  But I would draw
the Court's attention to the one exception that I think
matters here --

THE COURT:  I understand.  I understand that.

MR. GELFAND:  It's 414.  And forgive the
graphicness of this, but it's where on the body.

THE COURT:  I understand.

MR. GELFAND:  And so at the end of the day,
that's where Bobye Holt's testimony is critical in the
threshold question of whether or not if the Court were to,
for these purposes -- and I understand the Court is not
deciding whether to believe or disbelieve Bobye Holt for
purposes of how a jury will ultimately weigh things if
it's allowed.  But for purposes of evaluating whether this
even comes in in the first place, as a practical matter,
Bobye Holt is the only person that testifies to facts that
could even arguably fall within the scope of 414.

THE COURT:  Back on your clergy privilege.  Can
the clergy privilege -- I mean, if you go to your Catholic
priest in the little booth that you go into to confess
your sins, that's kind of the ultimate, I would think, in

1    the priest/penitent privilege.  If you walk out of the
2    confessional and go to the police station, does that waive
3    the statements that you make to the police?  Does that
4    waive the privilege?

5         MR. GELFAND:  No, Your Honor, I don't believe it
6    does.  And the reason why is because the testimony that is
7    purportedly being offered are specific statements that are
8    made.  They are not calling the police.  They can call the
9    police officer.  We wouldn't argue that whatever was said
10   to the police allegedly were privileged, but that doesn't
11   mean the priest can be subpoenaed to come in and testify,
12   to use the analogy.

13        I would also, to be hyper-technical, direct the
14   Court's attention to Arkansas Rule of Evidence 505 where
15   it includes a kind of catchall, so to speak, after dealing
16   with minister, priest, rabbis, Christian Science
17   practitioners, other similar functions.  It says "An
18   individual reasonably believed so to be by the person
19   consulting him."  And I just think that as a practical
20   matter -- the other thing, as a practical matter, is
21   that's really the Court's.  It's, are you seeking this
22   conversation?  Are you seeking this guidance, so to speak,
23   for religious purposes?  And I do think that the law
24   understandably and significantly protects this.  So I
25   think that this --

```
1           THE COURT:  Where is the intersection between
2   privilege and the obligations of mandatory reporters?
3   Which gives way to which?  What gives way to what?
4           MR. GELFAND:  I'm happy to brief that, Your
5   Honor.  I don't want to talk out of place.  I don't know
6   what mandatory reporting laws specifically would apply in
7   Arkansas.
8           THE COURT:  Well, you have researched the area of
9   the privilege, the clergy privilege.  And my question is,
10  are you aware of instances where that can give way and not
11  be observed in situations where the person receiving the
12  information has an obligation to report child sexual
13  abuse?
14          MR. GELFAND:  Very broadly, I understand that
15  there might be an exception under state law.  I don't want
16  to speak out of turn what the law is or isn't in Arkansas
17  as to that.  I don't want to mislead the Court in any way.
18          THE COURT:  That's fine.
19          MR. GELFAND:  I don't want to say something that
20  I can't stand behind.
21          I want to address just a couple of other issues,
22  even though I do think that this is kind of the threshold
23  issue.  In other words, I don't think the Court needs to
24  go any further if the Court agrees with us on the
25  privilege issue.  But we addressed this earlier.  I don't
```

1    need to belabor the point.  But the government is

2    essentially saying this is admissible under 414 and

3    404(b).  I think that's the tag -- the tail that wags the

4    dog, because under 404(b), if you are offering this for

5    the propensity, it's not allowed.  They are offering this

6    for propensity purposes.  They are saying they are

7    offering it for propensity purposes.  And I don't think

8    it's, well, if not then, then 404(b).  And I think the

9    Court should reject it.  It's expressly barred for those

10   purposes.

11          The only other thing I would say, Your Honor, and

12   I think this is important, is that --

13          THE COURT:  Well, you have -- the defense has

14   placed identity into issue here, at least what I can

15   gather from other motions that have been filed, wherein

16   part of the defense is the defendant was not the person

17   who was logged in when the images were being downloaded.

18   It was someone else.

19          Would identity, or lack of mistake or motive,

20   depending on what the defense theory ends up being,

21   conceivably could it be offered under 404(b) for a

22   non-propensity purpose, I guess is my question?

23          MR. GELFAND:  Academically, yes.  I don't think

24   that practically when the law is applied to -- I mean, the

25   Rules of Evidence are applied to the facts of this case,

that it would be appropriate.  But I could envision a
world in which this kind of evidence could be admissible
under 404(b), but not under 414.  I still think -- and I'm
not saying anything profound here -- 403 still enters in
the equation.  And I think when considering the 404(b) is
relevant, when weighing those, you know, potential to
confuse the jury and prejudice and all of those things.
To that end, the evidence is undisputed, now that the
Court has evidence -- and I don't think any of this was
really disputed going into this -- that the allegations,
even if credited, occurred approximately 19 years ago,
plus or minus.  They were obviously never charged, never
convicted.  Everyone was a juvenile at the time.  They are
not connected directly to any of the allegations in May of
2019 in Counts One and Two of this indictment.

              And I take to heart what the Court observed at
the November 18th hearing that case law in the Eighth
Circuit to some extent -- although it's not like this
happens every day -- to some extent, basically, Courts are
not generally reversed by letting in this evidence or this
kind of evidence.  But I still think the Eighth Circuit
case law is abundantly clear that Courts are extended
significant deference when it comes to 403 considerations.
And 403 is particularly important in the context of 414,
because that's the only reason that Federal Circuit Courts

have said this Rule of Evidence is even Constitutional in the first place is because it's subject to a 403 analysis, and a meaningful 403 analysis.

And that's where -- as much as I think the government wants to say it's relevant because it's relevant, I think that the burden is higher.  I think that the standard is higher, because I think what -- even if you take what Bobye Holt testified, and to some extent, what Jim Bob Duggar testified to at face value, that is a far cry from what's alleged in Counts One and Two, which is, did Josh Duggar knowingly receive or possess child pornography using a computer, essentially at Wholesale Motorcars, in May of 2019 over an approximately three-day period, May 14th to May 16th.  That's what the indictment says.

And so as a practical matter, there's still a huge disconnect between arguing that, even if the Court were to say, I believe Josh "confessed," quote, unquote, to this to Bobye Holt, or more specifically, that I believe a jury could consider that, then as a practical matter, there's still a disconnect between, okay, why under 403 should that be admissible?  And I don't think it should be admissible under 403.

The only other thing I just wanted to -- well, two other things, just briefly, Your Honor.  And I

1    addressed one of these issues on the 18th -- and I'm happy

2    to get into as much or as little detail as possible -- I

3    think it's critical that the Court not conflate the

4    specific allegations when evaluating Rule 414(d)(1)(C) in

5    particular.  In other words, the government is kind of

6    saying, through the testimony, there's inappropriate

7    touching, whatever that means.  There's breast touching.

8    There's alleged vaginal touching.  There's what they call

9    digital penetration.  They are not all the same for a Rule

10   414 analysis.  And I think that the Court's analysis of it

11   and of the sufficiency of the evidence has to be directed

12   at that.

13          The only other thing I'd say is they mentioned

14   for the first time today this notion of attempt under that

15   statute, or under the rule.  And I don't think that they

16   should be permitted to essentially move the goalpost.

17   That wasn't their argument.  That's not their notice.

18   What they said in their notice is that this is a violation

19   of second degree assault under Arkansas state law.  And

20   that's what we had an evidentiary hearing on.  And that's

21   what I think the Court needs to find.  And I don't think

22   they get there, but I think there's a lot of mountains

23   that they have to overcome to actually get there.

24          And I would ask the Court to exclude this from

25   trial.  Let's have a trial about what actually happened in

1   May of 2019.  That's what we're asking.

2              THE COURT:  All right.  Thank you, Mr. Gelfand.

3         I will request briefing on the clergy privilege

4    as it applies here.  I'll limit your briefing to no more

5    than five pages.  And I would like that to be submitted by

6    noon tomorrow, no later than noon tomorrow.

7         I realize we start our trial tomorrow, but I'll

8    ask for the briefing by noon tomorrow.  I do not

9    anticipate that, even in the best case scenario, we would

10   get to the evidentiary portion of the trial tomorrow.

11   Best case scenario, that would be Wednesday, but more

12   likely Thursday, so we have a little bit of time.  So I'll

13   ask for no more than five pages of briefing on the clergy

14   issue or the clergy privilege issue by no later than noon

15   tomorrow.

16        The Court will continue to take these competing

17   motions at Doc 68 and Doc 72 under advisement.  And until

18   such time as we can get an order out, the government will

19   not be permitted to reference any of these allegations in

20   front of the jury.  But, hopefully, we will have an order

21   out soon.

22        Later today, we will also be sending out a

23   revision to one of the preliminary instructions, or I

24   should say we will be giving you a definitive new set of

25   preliminary jury instructions given the back and forth

1  that we had over your comments by e-mail to the Court.  I

2  think in Ms. Marshall's last e-mail that she did ping on

3  an issue that I wanted to go back and look at a little bit

4  further.

5          And while we're talking about that, Mr. Gelfand,

6  do you concede that the government can prove the

7  interstate commerce nexus by proving either that the

8  images were -- that the contraband images that were

9  allegedly possessed were obtained through the use of a

10 computer connected to the internet or found on a computer

11 that had been manufactured and distributed in interstate

12 commerce?  Do they get the interstate commerce element if

13 they prove either hook?

14         MR. GELFAND:  Yes.

15         THE COURT:  And so would adding the second

16 possible hook be appropriate?

17         MR. GELFAND:  Your Honor, yes, with an asterisk.

18 The asterisk is an anonymity concern.  In other words --

19         THE COURT:  For purposes of preliminary

20 instructions, we wouldn't need to instruct on that.  But I

21 agree we would need to instruct on that in the final.

22         MR. GELFAND:  That's the only issue.

23         THE COURT:  Thank you, sir.  Anything else before

24 tomorrow?

25         MR. ROBERTS:  Your Honor, if we do go into

```
 1   Wednesday for jury selection, should we be prepared to
 2   bring witnesses in on Wednesday or will we be starting on
 3   Thursday?
 4           THE COURT:  I realize that this places ya'll in
 5   an unfair position of getting witnesses lined up, but
 6   that's just what we need to be ready to do.  I don't want
 7   to lose a day.  I just can't tell you that if we get a
 8   jury picked tomorrow, that we would delay starting until
 9   Thursday.  And I have no idea whether we can get a jury
10   picked tomorrow or not.
11           MR. ROBERTS:  Judge, I was meaning if we go into
12   Wednesday, we do not get a jury picked tomorrow, but we
13   have to do jury selection on Wednesday.
14           THE COURT:  I see your point.  I think you would
15   be pretty safe in saying that if we go into Tuesday, we
16   wouldn't begin -- if we go into Wednesday, we wouldn't be
17   able to begin until Thursday.
18           MR. ROBERTS:  Thank you, Judge.
19           THE COURT:  I didn't appreciate that nuance.
20           MR. GELFAND:  One question for the Court with
21   regard to voir dire.  Can we do that either at side bar?
22           THE COURT:  Yeah, we'll go off the record and you
23   can come back to chambers.  We'll do that right now.
24   We're in recess.
25                (Proceedings Concluded at 12:28 p.m.)
```

C E R T I F I C A T E

I, Paula K. Barden, CCR, RPR, RMR, Federal Official Court Reporter, in and for the United States District Court for the Western District of Arkansas, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 30th day of November 2021.



_____
PAULA K. BARDEN, CCR, RPR, RMR #700
Federal Official Court Reporter
Western District of Arkansas