IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION


UNITED STATES OF AMERICA                    PLAINTIFF

v.            CASE NO. 5:21-CR-50014

JOSHUA JAMES DUGGAR                    DEFENDANT

_____


JURY TRIAL

VOLUME 2 OF 8

BEFORE THE HONORABLE TIMOTHY L. BROOKS

DECEMBER 1, 2021

FAYETTEVILLE, ARKANSAS

_____

```
1                    A P P E A R A N C E S

2

3     FOR THE PLAINTIFF:

4     MR. DUSTIN ROBERTS
      MS. CARLY MARSHALL
5     United States Attorney's Office
      414 Parker Avenue
6     Fort Smith, Arkansas 72901
      (479) 783-5125
7     dustin.roberts@usdoj.gov
      carly.marshall@usdoj.gov
8

9     Also Present:  Special Agent Howard Aycock

10

11    FOR THE DEFENDANT:

12    MR. JUSTIN K. GELFAND
      Margulis Gelfand
13    7700 Bonhomme Avenue, Suite 750
      St. Louis, Missouri 63105
14    (314) 390-0234
      justin@margulisgelfand.com
15
      MR. TRAVIS W. STORY
16    Story Law Firm
      2603 Main Drive, Suite 6
17    Fayetteville, Arkansas 72704
      (479) 443-3700
18    travis@storylawfirm.com

19

20

21

22

23

24

25
```

```
1                           I N D E X

2                                                       Page

3    Rule Invoked                                        12

4    Jury Instructions by the Court                      13

5    Opening Statement by Mr. Roberts                    28

6    Opening Statement by Mr. Gelfand                    40

7    Alternate Juror Number 38 Dismissed                 61

8    AMBER KALMER

9        Direct Examination by Ms. Marshall              62

10       Cross Examination by Mr. Gelfand                82

11       Redirect Examination by Ms. Marshall           108

12   Lunch Recess                                       112

13   SPECIAL AGENT GERALD FAULKNER

14       Direct Examination by Mr. Roberts              122

15       Cross Examination by Mr. Gelfand               219

16   Reporter's Certificate                             263

17

18

19

20

21

22

23

24

25
```

```
 1                    E X H I B I T S

 2                                              Received

 3   Government's Exhibit 1    May 14th, 2019        69
                               Connection Log
 4
     Government's Exhibit 2    May 15th, 2019        72
 5                             Connection Log

 6   Government's Exhibit 3    File of 0216.mp4,     79
     Government's Exhibit 3A   65 images from
 7                             marissa.zip file

 8   Government's Exhibit 4    Search & Seizure Warrant   135

 9   Government's Exhibit 5    Aerial Photo, Wholesale    136
                               Motorcars
10
     Government's Exhibit 6    Aerial Photo, Wholesale    138
11                             Motorcars

12   Government's Exhibits     Photos from Wholesale      146
     7-19                      Motorcars Search Warrant
13
     Government's Exhibit 20   Joshua Duggar iPhone       151
14
     Government's Exhibit 21   Statement of Rights Form   158
15
     Government's Exhibit 22   Thumb Drive, Partial       160
16                             Transcript of Interview
                               with Joshua Duggar
17
     Government's Exhibit 23   Wholesale Motorcars        203
18                             Bank Records

19   Government's Ex. 23-1     Stipulation                204

20   Defendant's Exhibit 8     Torrential Downpour Log     95
                               May 14, 2019
21
     Defendant's Exhibit 9     Torrential Downpour Log     96
22                             May 15, 2019

23   Defendant's Exhibits      Search Warrant Photos      249
     19-34, 36-40
24
     Court's Exhibit 1         Transcript of Interview    162
25                             with Joshua Duggar
```

```
 1              (Outside the Jury's Presence)
 2              THE COURT:  We're ready to bring the Jury up.
 3      Were there any matters that counsel would like to take up
 4      before that?
 5              MR. ROBERTS:  No, Your Honor.
 6              MR. GELFAND:  No, Your Honor.  Thank you.
 7              THE COURT:  Thank you.  Please have the Jury
 8      brought up.
 9              While we're waiting on the Jury to come up, I
10      will remind counsel that the Rule was invoked, I think.
11      And I obviously don't know all of the witnesses so I will
12      need the assistance of counsel in policing the Rule.  I
13      understand that some agreements have been made about
14      experts, but I'm going to leave it to ya'll to be sure
15      that there's not a problem with that.
16              (Jury in at 9:06 a.m.)
17              THE COURT:  Members of the Jury, good morning.
18      Thanks for coming back.  I was a little bit concerned that
19      we had worked you so hard yesterday that people would say
20      "I don't want to come back."  So I appreciate all of your
21      work yesterday and I just feel horribly embarrassed that
22      we never took a lunch break or did anything to get ya'll
23      fed yesterday.  But I'm glad that we got through all of
24      that.  We would have had a real mess trying to do what we
25      did last night this morning, because at the same time, we
```

9:07AM (line 5)
9:09AM (line 10)
9:09AM (line 15)
9:12AM (line 20)
9:12AM (line 25)

9:13AM 1  would have had a secondary jury pool showing up and it
2  would have been real difficult to get all of that sorted
3  out.  So I very much appreciate you all staying late and I
4  hope that I did not misput you too much.

9:13AM 5       We will begin this morning with the Court reading
6  to you what are known as the preliminary jury
7  instructions.  "Preliminary" signifies that these are the
8  instructions given at the beginning of the trial.  And as
9  I will explain, a more comprehensive set will be given at
9:13AM 10 the end of the trial, but this is what is known as the
11 preliminary jury instructions, and then we will proceed to
12 hear the opening statements of counsel and then we will
13 receive testimony.

14       Ladies and Gentlemen, I will take a few moments
9:13AM 15 now to give you some initial instructions about this case
16 and about your duties as jurors.  At the end of the trial,
17 I will give you further instructions.  I may also give you
18 instructions during the trial.  Unless I specifically tell
19 you otherwise, all such instructions, both those I give
9:14AM 20 you now and those I give you later, are equally binding on
21 you and must be followed.

22       This is a criminal case brought against Joshua
23 James Duggar by the United States government.  Mr. Duggar
24 is charged with two counts in the indictment.  Count One
9:14AM 25 asserts that between on or about May 14, 2019, and on or

9:14AM 1  about May 16, 2019, Mr. Duggar knowingly received child

2  pornography over the internet.  Count Two asserts that

3  between on or about May 14, 2019, and on or about May 16,

4  2019, Mr. Duggar knowingly possessed material that

9:15AM 5  contained images of child pornography.

6        You should understand that these charges are

7  simply accusations.  They are not evidence of anything.

8  Mr. Duggar has pleaded not guilty and is presumed to be

9  innocent unless and until proved guilty beyond a

9:15AM 10  reasonable doubt.

11       It will be your duty to decide from the evidence

12  whether Mr. Duggar is guilty or not guilty of the crimes

13  charged.  From the evidence, you will decide what the

14  facts are.  You are entitled to consider that evidence in

9:15AM 15  the light of your own observations and experiences in the

16  affairs of life.  You may use reason and common sense to

17  draw deductions or conclusions from facts which have been

18  established by the evidence.  You will then apply those

19  facts to the law which I give you in these and in my other

9:16AM 20  instructions and in that way you will reach your verdict.

21       You are the sole judges of the facts, but you

22  must follow my instructions, whether you agree with them

23  or not.  You have taken an oath to do so.  Do not allow

24  sympathy or prejudice to influence you.  The law demands

9:16AM 25  of you a just verdict, unaffected by anything except the

9:16AM 1  evidence, your common sense, and the law as I give it to

2  you.  You should not take anything that I may say or do

3  during the trial as indicating what I think of the

4  evidence or what I think your verdict should be.

9:17AM 5        Finally, please remember that only Mr. Duggar and

6  not anyone else is on trial here, and that Mr. Duggar is

7  on trial only for the crimes charged and not anything

8  else.

9        As to the charge of receipt of child pornography,

9:17AM10  in order for Mr. Duggar to be found guilty on this charge,

11  the government must prove each of the following elements

12  beyond a reasonable doubt:

13        One, that between on or about May 14, 2019, and

14  on or about May 16, 2019, Mr. Duggar knowingly received

9:17AM15  visual images of child pornography.

16        Two, that Mr. Duggar knew the visual depictions

17  were of minors engaging in sexually explicit conduct.

18        And, three, that the visual depictions had been

19  transported by computer in interstate or foreign commerce.

9:18AM20        As to the charge of possession of child

21  pornography, in order for Mr. Duggar to be found guilty of

22  this charge, the government must prove each of the

23  following four elements beyond a reasonable doubt:

24        One, that between on or about May 14, 2019, and

9:18AM25  on or about May 16, 2019, Mr. Duggar knowingly possessed

9:18AM 1    visual images of child pornography.

2                   Two, that Mr. Duggar knew the visual depictions

3           were of minors engaging in sexually explicit conduct.

4                   Three, that Mr. Duggar knew that such items

9:19AM 5    contained child pornography which involved a prepubescent

6           minor, or a minor who had not attained the age of 12 years

7           of age.

8                   And, four, that the visual depictions were

9           either, one, produced under -- I'm sorry -- produced using

9:19AM10    materials that had been mailed, shipped, or transported

11          over the internet, or, two, mailed, shipped or transported

12          by computer in interstate or foreign commerce.

13                  You should understand, however, that what I have

14          just given you is only a preliminary outline.  At the end

9:19AM15    of the trial, I will give you a final instruction on these

16          matters and if there is any difference between what I just

17          told you and what I tell you in the instructions I give

18          you at the end of the trial, it will be the instructions

19          given at the end of the trial that must govern you and

9:20AM20    your verdict.

21                  Now, I have mentioned the word "evidence".

22          Evidence includes the testimony of witnesses, the

23          documents and other things that may be received as

24          exhibits, and any facts that I may tell you along the way

9:20AM25    have been stipulated.  By stipulated, I mean formally

9:20AM 1  agreed to by the parties and any facts that the Court may

2  judicially notice; that is, facts which I tell you that

3  you may, but are not required to accept as true, even

4  without evidence.

9:20AM 5        However, certain things are not evidence and I

6  need to make sure you understand these things that are not

7  evidence and I will list those for you now.  Number one,

8  the statements, arguments, questions and comments by

9  lawyers representing the parties in the case are not

9:21AM 10  evidence.

11        Number two, any objections that may be made are

12  not evidence.  Lawyers have a right to object when they

13  believe something is improper.  You should not be

14  influenced by the objection.  If I sustain an objection to

9:21AM 15  a question, you must ignore the question and must not try

16  to guess what the answer might have been.

17        Number three, testimony that I strike from the

18  record or tell you to disregard is not evidence and must

19  not be considered.

9:21AM 20        Number four, anything that you see or hear about

21  this case from outside the courtroom is not evidence

22  unless, for some reason, I specifically tell you otherwise

23  during the trial.  Furthermore, a particular item of

24  evidence is sometimes received for a limited purpose only.

9:22AM 25  That is, it can be used by you only for one particular

9:22AM 1  purpose and not for any other purpose.  I will tell you

2  when such instances arise and I will instruct you on the

3  purposes for which that particular piece of evidence may

4  be used by you and the other reasons for which it may not

9:22AM 5  be considered by you.

6        Finally, some of you may have heard the terms

7  "direct evidence" as contrasted to "circumstantial

8  evidence."  But I am instructing you that you should not

9  be concerned with those terms because the law makes no

9:22AM10  distinction between direct and circumstantial evidence.

11  You should give all evidence the weight and the value that

12  you believe it is entitled to receive.

13        Now, in deciding what the facts are, you may have

14  to decide what testimony you believe and what testimony

9:23AM15  you do not believe.  You may believe all of what a witness

16  says, or only part of what a witness says, or you may not

17  believe anything that a witness says.  In deciding what

18  testimony of any witness to believe, you should consider

19  the witness's intelligence, the opportunity the witness

9:23AM20  had to have seen or heard the things testified about, the

21  witness's memory, any motives that witness may have for

22  testifying a certain way, the manner of the witness while

23  testifying, whether that witness said something different

24  at an earlier time, the general reasonableness of the

9:24AM25  testimony, and the extent to which the testimony is

9:24AM 1   consistent with other evidence that you do believe.

2          At the end of the trial, you must make your

3   decision based on what you recall of the evidence.  You

4   will not have a written transcript to consult or to refer

9:24AM 5   back to and it may not be practical for the court reporter

6   to read back testimony, so you must pay close attention to

7   the testimony as it is given during the course of the

8   trial.  If you wish, however, you may certainly take notes

9   to help you remember what witnesses have said.  And I see

9:25AM 10  that Ms. Craig has handed everyone a notepad and pencils.

11  And if you need more, let us know.  But if you do take

12  notes, please keep them to yourself until such time as you

13  and your fellow jurors go to the jury room and have been

14  instructed to deliberate upon the case.

9:25AM 15         Another thing.  Be careful not to let note-taking

16  distract you from listening to witness testimony.  I have

17  observed over the course of years this phenomenon where

18  I'm trying to take notes, concentrating on not trying to

19  write sloppily, and I realize that I've missed the last

9:25AM 20  five or 10 seconds of what someone just said, so just be

21  aware of that phenomenon.  When you leave at night, you

22  must leave your notes here and they will be secured and

23  they will not be read by anyone.

24         During the trial, it may be necessary for me to

9:26AM 25  talk with the lawyers outside of your hearing either by

9:26AM 1   having bench conferences over here to the side of the
2   bench, or sometimes we may actually need to send you back
3   to the jury room where we can have a more fulsome
4   discussion here in court.  The purpose of these
9:26AM 5   conferences outside of your hearing is to allow the
6   parties and the Court to decide how certain evidence is to
7   be treated under the Rules of Evidence and to avoid
8   confusion and error.  We will, of course, do what we can
9   to keep the number and the length of these conferences to
9:26AM 10   a minimum as we are all very concerned about the value of
11   your time and we will not try to waste any of your time.
12          To ensure fairness, you, as jurors, must obey the
13   following rules.  And you will recall some of these rules
14   that I have already previewed for you during voir dire,
9:27AM 15   but these are the formal instructions on some of those
16   rules.
17          First, do not talk or communicate among
18   yourselves about this case or about anyone involved with
19   it until the end of the case when you go to the jury room
9:27AM 20   to decide on your verdict.  And this is perhaps a little
21   counterintuitive.  You've all been selected as jurors now.
22   You're going to be taking recesses and breaks.  What's the
23   harm in talking about the case while you're on recess?
24   Well, here's the harm.  The more you start talking about
9:27AM 25   evidence before you have heard all of the evidence, you

9:28AM 1    start to solidify in your mind your thoughts and opinions.
       2    And that's unfair, because only one party can go first.
       3    Some other party has to go second.  So do not talk with
       4    your fellow jurors about the case until the end of the
9:28AM 5    trial when I have instructed you that it's time to
       6    deliberate.
       7              Second, do not talk with anyone else about this
       8    case or about anyone involved with it until the trial has
       9    ended and you have been discharged as jurors.  Third, when
9:28AM 10   you are outside the courtroom, do not let anyone approach
       11   you and tell you anything about the case or about anyone
       12   involved with it.  And if someone tries to talk with you
       13   about the case during the trial, please report that as
       14   soon as possible to a courtroom security officer.  And if
9:29AM 15   you don't see one of those, then notify the court clerk
       16   staff and they will report it to me.
       17             Fourth, during the trial, you should not talk
       18   with or speak to any of the parties, their lawyers, or any
       19   witnesses involved in the case.  You should not even have
9:29AM 20   a discussion with them that involves passing the time of
       21   day, talking about the weather, or discussing the
       22   Razorbacks.  This is true because it is important not only
       23   that you do justice in this case, but also that you give
       24   the appearance of doing justice.  Think about this.  If a
9:29AM 25   person from one side of the lawsuit were to see you

9:29AM 1    talking to a person from the other side, even if it was

2    simply about the weather or the Razorbacks, an unwarranted

3    and unnecessary suspicion about your fairness might be

4    aroused because it wouldn't be obvious to them that you

9:30AM 5    were talking about the weather or the Razorbacks.

6            So if any lawyer, party, or witness does not

7    speak to you when they pass in the hall or for some reason

8    when they might have to ride the elevator up with you, if

9    they don't speak to you, if they look at their shoes and

9:30AM 10   don't look you in the eye, it's not because they are being

11   rude or disrespectful.  It's because they know that they

12   are not supposed to speak to you, and they are just trying

13   to awkwardly figure out a way not to speak to you.

14           Fifth, it may be necessary for you to tell your

9:30AM 15   family, close friends, teachers, coworkers, or employer

16   about your participation in this trial.  And you can

17   certainly explain to them the times that you're required

18   to be in court and you can also discuss with them the fact

19   that you can't talk to them about the case or tell them

9:31AM 20   anything that you know about the case or that they think

21   that they know about the case.  And you can tell them that

22   they should not discuss the case in any manner whatsoever

23   in your presence.  You must not communicate with anyone or

24   post any information about the parties, the witnesses, the

9:31AM 25   participants, the claims, the charges, the evidence, or

9:31AM 1   anything else related to this case.  You must not tell
2   anyone anything about the Jury's deliberations when we get
3   to that point until after I accept your verdict or until I
4   give you specific permission to do so.

9:31AM 5          If you were to discuss the case with someone
6   other than your fellow jurors, and then only during
7   deliberations, it could create the perception that you
8   have already clearly decided the case or that you may be
9   influenced in your verdict by the opinions of others.
9:32AM 10  That simply would not be fair to the parties and it may
11  result in the verdict having to be thrown out and the case
12  having to be retried.  During the trial, while you are in
13  the courthouse, and after you leave for the day, do not
14  provide any information to anyone by any means about this
9:32AM 15  case.  Just to be clear, this means no face-to-face
16  conversations, no use of electronic messages or conveyance
17  of information by electronic device or media such as a
18  cell phone or a computer or any application that goes over
19  the internet or text messaging or Snapchats or blogs or
9:33AM 20  websites or social media applications like Facebook,
21  Instagram, YouTube, Twitter.  There are many others, but
22  you get the idea.  Bottom line, do not in any way
23  communicate to anyone any information about this case
24  until I have accepted your verdict.
9:33AM 25         Sixth, do not do any research about this case,

9:33AM 1  whether it be searches on the internet, whether it be
2  going to libraries, whether it be consulting newspapers or
3  in any other way.  You are not to make any investigation
4  about this case on your own.  And you must not visit or
9:33AM 5  view any place that may be discussed in the case, either
6  physically or on the internet by going to applications
7  where you can look up and see aerial views of locations.
8          Also, do not do any research about any
9  information pertaining to the case.  And that includes
9:34AM10  what the law is.  That includes who the people are that
11  may be involved or participating in the case.  It includes
12  looking up -- a prohibition on looking up anything about
13  the parties, the witnesses, the lawyers, or even the
14  Judge.
9:34AM15          Seventh, do not read any news stories or articles
16  in print, whether old-fashioned hard print or
17  new-fashioned digital print on any type of electronic
18  device.  Do not look at any news stories that may appear
19  in any form medium or type on the internet or that may
9:35AM20  appear in any type of a blog or social media application.
21  You simply cannot read stories about this case in any
22  shape, form, or fashion or about anyone involved with it,
23  nor may you listen to any news stories on the radio, or
24  any news television reporting about the case or anyone
9:35AM25  involved with it.

9:35AM 1          In fact, until the trial is over, I suggest that
2    you avoid reading any newspapers or consulting any medium
3    that has news feeds or streams at all and avoid listening
4    to any television or radio newscasts.

9:35AM 5          I do not know the extent to which there might be
6    any news reports about the case, but to the extent that
7    there are, you can understand how you might inadvertently
8    find yourself reading or listening to something before you
9    would have a chance to turn your eyes or to delete it or
9:36AM 10   what have you.  So the better practice that I would
11   recommend is that you just not read news or watch news for
12   the balance of this trial.

13          Obviously, if you want, you can have your spouse
14   or a friend clip out any stories or electronically save
9:36AM 15   stories and set them aside for you until after the trial
16   is over.  That said, let me assure you, you have the best
17   seat in the house.  You will hear the testimony, you will
18   see the exhibits, and you're going to know a lot more than
19   any reporter is able to condense and put into a news item.

9:36AM 20          The parties have a right to have the case decided
21   only on evidence that they know about and that has been
22   introduced here in court.  If you were to do some research
23   or some investigation or some experiment that we don't
24   know about, then your verdict could be influenced by
9:37AM 25   inaccurate, incomplete, or misleading information that has

9:37AM 1   not been tested by the trial process, which involves

2   humans coming to court, swearing out an oath, testifying,

3   and then subjecting their testimony to cross examination.

4   That is the only type of evidence that you may consider in

9:37AM 5   terms of witness testimony.

6         And with regard to exhibits, the exhibits can

7   only be received in evidence if they cross all of the

8   hurdles involved in getting through the Federal Rules of

9   Evidence, and that's not easy.  So you can see and

9:38AM 10   hopefully understand why you should avoid any other

11   information sources and why you must avoid any other

12   information sources and only decide the case based on the

13   evidence received in this courtroom.

14         All of the parties are entitled to a fair trial

9:38AM 15   rendered by an impartial jury and you must conduct

16   yourself so as to maintain the integrity of the trial

17   process.  If you decide a case based on any information

18   that was not presented in this courtroom, then you will

19   have denied the parties a fair trial in accordance with

9:38AM 20   the rules of this country and you will have done an

21   injustice.  It is very important that you abide by these

22   rules.  Remember, you have taken an oath to abide by these

23   rules and you must do so.  In fact, failure to follow

24   these instructions could potentially result in the case

9:39AM 25   having to be retried and theoretically could result in you

9:39AM 1  being held in contempt.

2         Eighth, do not make up your mind during the trial

3  about what the verdict should be.  You must keep an open

4  mind until you have gone to the jury room to decide the

9:39AM 5  case and you have been instructed to deliberate with your

6  fellow jurors and have discussed all of the evidence.

7         The trial will proceed as follows:  First, the

8  government's attorney will make an opening statement.

9  Next, Mr. Duggar's attorney may make an opening statement.

9:39AM10  Remember, an opening statement is not evidence, but rather

11  simply a summary of what the respective attorneys think

12  the evidence will be.

13         Next, the government will present its evidence

14  and counsel for Mr. Duggar may cross-examine.  Following

9:40AM15  the government's case, Mr. Duggar may, but does not have

16  to, present evidence, testify, or call witnesses.  If

17  Mr. Duggar does call witnesses, then the government may

18  cross-examine them.  After presentation of the evidence,

19  the attorneys will make their closing arguments to

9:40AM20  summarize and interpret the evidence for you.  Just as

21  with opening statements, the closing arguments are not

22  evidence.

23         Immediately before the closing arguments, I will

24  provide you with the final jury instructions on the case.

9:40AM25  And after you have heard the closing summations, then you

9:40AM 1   will retire to deliberate your verdict.

2              At this time, the Court will receive the opening

3   statement of the government.

4              MR. ROBERTS:   Thank you, Your Honor.

9:40AM 5              Ladies and Gentlemen, throughout this trial you

6   are going to see images of minors.   Not actors.   Not

7   actors.   Children.   Some as young as seven years of age.

8   These children are being sexually abused.   They are being

9   sexually violated.   They are being sexually exploited.

9:41AM10   Throughout this trial, you are going to hear file names,

11   video file names, such as "playtoysweetie," "Daisy's

12   Destruction," "14-year-old girl suck" -- and pardon my

13   language -- "fuck."   But as you will see throughout this

14   trial, these are the very images and files that this

9:41AM15   defendant, Joshua James Duggar, was downloading on his

16   work computer, his HP computer on May 14th, 15th, and 16th

17   of 2019.   And it's this act of downloading, receiving from

18   the internet, and this act of possession of these child

19   pornography images as he viewed them on that HP computer,

9:42AM20   that we will ask you to hold him accountable for at the

21   close of this trial and find him guilty.

22              You will see that this investigation started on

23   May 14th, 2019.   There was a Little Rock detective.   That

24   detective's name is Amber Kalmer.   She will come in here

9:42AM25   and testify that on that day, she was conducting online

9:42AM 1    investigations into the trafficking, the trading of child
       2    pornography over what's called the BitTorrent peer-to-peer
       3    network.  Now, BitTorrent is a version.  It's a type of
       4    peer-to-peer network.  But a peer-to-peer network is
9:42AM 5    essentially a free program that an individual downloads to
       6    his device.  That program connects him to all the other
       7    individuals who have that same program downloading, allows
       8    them to trade files.  Detective Kalmer will tell you that
       9    this is one of the most common ways known to law
9:43AM 10   enforcement to trade images of child pornography.
       11           On that day, May 14th, her law enforcement
       12   computer -- the peer-to-peer network is so known to trade
       13   images of child pornography, they have actually developed
       14   law enforcement programs to detect known images of child
9:43AM 15   pornography being sent across this network.  On that day,
       16   on May 14th, her law enforcement program was doing just
       17   that.  It detected and made a direct connection with a
       18   user in Northwest Arkansas.  She's out of Little Rock.  On
       19   a one-to-one connection, she downloaded a movie file,
9:44AM 20   mov_0216.  You will see this movie file.  It's
       21   approximately two to three minutes long.  It depicts two
       22   seven to nine-year-old females nude, one of which is
       23   vaginally penetrated by an adult male.
       24           The following day, May 15th, 2019, her law
9:44AM 25   enforcement computer again connects to the same user in

9:44AM 1    Northwest Arkansas.  Downloads a file, marissa.zip.  This
       2    one contains 65 still images depicting a seven to
       3    eight-year-old girl.  You will see these images.  They
       4    start out with her posing nude.  Proceed to her exposing
9:44AM 5    her vagina and anus to the camera.  Show graphic pictures
       6    of violence.  And culminates with her being put in a cage,
       7    a dog kennel, precisely.
       8            Now, Detective Kalmer, being out of Little Rock,
       9    after she made these downloads, she reached out to
9:45AM10    Homeland Security Special Agent Jerry Faulkner.  Now,
      11    Special Agent Faulkner will testify that he's kind of the
      12    senior investigator on the Northwest Arkansas Internet
      13    Crimes Against Children Task Force.  This task force made
      14    up of federal and state investigators have one job, to
9:45AM15    investigate online child exploitation cases.
      16    Approximately the middle of June 2019, Detective Kalmer
      17    reaches out to him, see if he will adopt the case.  He
      18    agrees.  Early July 2019, he accepts the case, gets the
      19    images and the information.
9:45AM20            By the end of July, he has determined that the
      21    internet service provider, OzarksGo, was the internet
      22    service for this user in Northwest Arkansas that Detective
      23    Kalmer made the downloads from.  So he issues a federal
      24    summons, a federal process to OzarksGo to find that
9:46AM25    customer, find that user from Northwest Arkansas.  In

9:46AM 1  approximately early October of 2019, they hadn't got back

2  to him, so he calls them and they return the information.

3  Joshua James Duggar of Wholesale Motorcars.

4        Now, Wholesale Motorcars is a car dealership

9:46AM 5  that's located along Highway 412.  It's actually outside

6  of Tontitown as you're headed to Siloam Springs.  Smaller

7  car dealership, 30 to 40 used cars.  It's kind of in a

8  field, has a gravel area leading up to kind of a

9  shed-style office.  Special Agent Faulkner obtains a

9:46AM 10  search warrant for Wholesale Motorcars.

11        On November 8th, 2019, they execute the search

12  warrant.  Special Agent Faulkner, along with Special Agent

13  Howard Aycock, arrive on the scene, a few other special

14  agents with them and some computer forensic examiners.

9:47AM 15  When they do, they get out of their vehicles and they

16  approach Mr. Duggar.  He's standing out in front of this

17  shed-style office.  He's standing next to one of his

18  employees, Randall Berry.  Next to Randall Berry is

19  another individual named Chris Harrell.  He's a customer.

9:47AM 20  They walk up to Mr. Duggar directly and say, "We have a

21  federal search warrant allowing for the seizure of digital

22  contraband."  Mr. Duggar produces an iPhone out of his

23  pocket.  The agent seizes it.

24        The agent tells Mr. Duggar, "You are all free to

9:47AM 25  leave.  You are not under arrest."  Mr. Duggar responds,

9:47AM 1    "My wife is pregnant, I might leave the premises."  They

2    say, "That's fine."  Now, the agents go about securing the

3    scene and starting the search process.  After about 10 or

4    15 minutes, they see that Mr. Duggar is still on the

9:48AM 5    premises, so they re-approach him.  They tell him, "If you

6    would like to discuss the nature of this investigation,

7    what brought us here to the car lot, we can do that now."

8    And he agrees.  Now, this interview is conducted in a law

9    enforcement truck that's on the premises there.  You will

9:48AM 10   see that Special Agent Aycock is sitting in the back seat,

11   driver's side of the truck.  Special Agent Faulkner gets

12   in the driver's seat.  Mr. Duggar walks to the passenger

13   side, gets in, sits down.

14         Now, as soon as they are in there, Special Agent

9:48AM 15   Aycock starts requesting permission, "Can we record this

16   interview?"  Mr. Duggar agrees.  And at that very moment,

17   he turns to them, actually pivots in his seat to the

18   agents and looks at them and says, "So what, guys, is

19   someone downloading child pornography?"  Now, Special

9:48AM 20   Agent Faulkner will testify that at this stage in the

21   investigation, they have not told Mr. Duggar why they are

22   there.  From that point on, they stop him.  They said,

23   "Hey, let us record it."  They then go through his Miranda

24   rights.  He signs off on a form, asked the agents to alter

9:49AM 25   some language on there, which you will see.  It's

9:49AM 1    scratched out.  Then they proceed.  Now, this is about an
2    hour long interview.  Some of it is relevant for this
3    trial; some of it is not.  But you will see that initially
4    they get his biographical information, his name, his date
9:49AM 5    of birth, March 3, 1988, where does he work.  He owns
6    Wholesale Motorcars.  They then proceed to ask him which
7    devices are yours that we're going to locate on this
8    premises.  He identifies his Apple iPhone, a laptop, a
9    MacBook laptop that's located in an RV that's there on the
9:49AM 10    premises.  And then he identifies the HP computer, says
11    he's owned it for two and a half, three years.  That's in
12    the main business, the desktop, of the shed-style office.
13        Next, they start asking him, "Well, let's talk
14    about peer-to-peer networks."  He says that peer-to-peer
9:50AM 15    networks are on all three of his devices.  Then he brings
16    up TOR browser.  Now, you're going to hear from Agent
17    Aycock, or Agent Faulkner, this confused him.  He thought
18    the defendant was confused at this point, because TOR
19    browser is a means to access the Dark Web.  It is not
9:50AM 20    BitTorrent.  Those are two separate.  Agent Faulkner will
21    tell you at this stage in the investigation they did not
22    know TOR browser was involved.  You will hear on the audio
23    that Agent Faulkner actually tries to correct the
24    defendant saying, "Look, are you confusing TOR with TOR
9:50AM 25    browser?"  And they just can't get it resolved.  At some

9:50AM 1  point, you will hear Agent Faulkner say, "Okay, let's

2  accept your definition and go."  After that he asked him

3  directly, "How is your use per device?  Is it mainly

4  personal or is it mainly work?"  And he says it's split

9:51AM 5  down the middle with respect to all three devices,

6  personal and work.

7        Next, they start telling him the investigation,

8  the details, the downloading of this child pornography

9  from the car lot that was traced to the car lot.  And at

9:51AM 10  the end of that conversation, you will hear the defendant

11  say, "I'm not denying guilt, I just don't want to say if

12  I'm guilty or not."

13        Shortly after that, the interview ends.

14  Mr. Duggar leaves the car lot.  After the interview and

9:51AM 15  during the investigation, law enforcement, they actually

16  get all the employee pay records for 2019 from Wholesale

17  Motorcars.  You will see these.  Those pay records will

18  indicate that from January until end of April, there's an

19  individual named Matthew Waller who worked and was paid by

9:52AM 20  Mr. Duggar.  From the end of April until almost all the

21  way to the end of May, there is no one paid by Mr. Duggar.

22  Starting at the end of May, you will see paychecks to an

23  individual named Randall Berry.  Now, you will be hearing

24  from Mr. Waller, who will tell you during his time there,

9:52AM 25  from January through April, he only saw two people using

9:52AM 1    that HP computer, himself and Josh Duggar.

2            You will also hear from Mr. Berry.  Now,

3    Mr. Berry is about a 65-year-old man.  He's from Oklahoma.

4    He'll come in here, and no disrespect to Mr. Berry, but he

9:52AM 5    will tell you that he's, for the most part, illiterate.

6    He has problems reading and writing.  He will tell you

7    that he is computer illiterate.  That the only time he

8    ever used that HP computer, he was pushing a button to

9    play games.  He will tell you that the only other person

9:53AM 10   he saw using that computer is Joshua Duggar.

11           Now, the HP computer, the Apple iPhone and that

12   laptop that Mr. Duggar identified as his was all taken

13   back to Homeland Security Investigations here in

14   Fayetteville for a forensic analysis and a basic forensic

9:53AM 15   analysis was done.  However, it was all shipped to

16   Washington, D.C., the High Technology Investigative Unit

17   for the Department of Justice for further forensics.

18           Now, the director of this entire unit in

19   Washington, D.C., is an individual named Director James

9:53AM 20   Fottrell.  Now, Director Fottrell will testify in this

21   trial.  He will tell you that he conducted an examination

22   of that HP computer.  He will tell you that that

23   examination revealed that the HP computer was password

24   protected, "JoshuaJJD."  He will tell you that he located

9:54AM 25   a program called Covenant Eyes on that computer with a

9:54AM 1   user name "Joshua Duggar."  You will learn that Covenant
2   Eyes is an internet pornography accountability program.
3            He will also tell you that on May 13th, a Linux
4   partition was created on that device.  Now, a partition is
9:54AM 5   simply a program you download that separates a device, any
6   computer into two separate systems.  What happens on one
7   side is not detected or does not influence the other side.
8   He will tell you on that Linux partition side, he did not
9   find Covenant Eyes.  He will tell you that on that Linux
9:54AM 10  partition side, he found TOR browser.  He found separately
11  uTorrent, which is a BitTorrent client.  He will tell you
12  that he examined system files indicating that child
13  pornography was being downloaded and viewed from TOR
14  browser, but also the BitTorrent uTorrent client.
9:55AM 15           He will testify in this court that he conducted a
16  forensic examination of all three devices.  And a summary
17  of those three devices is as follows:
18           On May 13th, 2019, at 1:43 p.m., the Linux
19  partition was downloaded on that HP computer.  2:03,
9:55AM 20  approximately 20 minutes later, the TOR browser is
21  downloaded and installed on that computer.  Approximately
22  3:06 p.m., Mr. Duggar's iPhone is utilized to take a
23  picture of a car on the lot itself.
24           The following day, May 14th, 2019, 4:14 p.m.,
9:55AM 25  Mr. Duggar's iPhone is used to take a picture of a vehicle

9:55AM 1  on the car lot.  At 4:20 p.m., Mr. Duggar's iPhone is used
2  to take a picture of the HP computer itself documenting
3  mechanic, might have been a carburetor or something like
4  that.  You'll see the picture.  4:49 p.m., Mr. Duggar's
9:56AM 5  iPhone is used to send an iMessage, "Got stuck here, still
6  not free yet, I'm going to aim for tomorrow just after
7  lunch."  5:11 p.m., webcam-collection-prevs is downloaded
8  from the TOR browser.  You will see all these files are
9  consistent with child sexual abuse material.
9:56AM 10          Approximately 20 minutes later, mov_0214 is
11  downloaded.  5:38, mov_0216.mp4 is downloaded from the
12  BitTorrent network.  5:42 p.m., the Little Rock officer,
13  Detective Amber Kalmer, downloads that mov_0216, four
14  minutes after it was downloaded to the HP computer.
9:57AM 15  5:48 p.m., "I have your Versa down here" -- a minute later
16  -- "at my car lot," the messages are sent.  6:04 p.m.,
17  Mr. Duggar's iPhone is utilized to take a picture of a
18  vehicle on the car lot.
19          May 15th, 2019, a message is sent, "I'm at my car
9:57AM 20  lot now."  11:15 in the morning.  20 minutes later,
21  14-year-old girl is downloaded.  11:37, test.avi.
22  11:41 -- excuse my language -- PussyPounded is downloaded.
23  5:08 p.m., "I'm here at the car lot.  Will be here around
24  6:00 or so."  14 minutes later, playtoysweetie is
9:57AM 25  downloaded from the BitTorrent network.  5:25, 5:30,

9:58AM 1    Daisy's Destruction is downloaded twice from the
       2    BitTorrent network.  5:32, asi se mama linda is downloaded
       3    from the BitTorrent network.  5:41, the marissa.zip
       4    Torrent files are downloaded from the BitTorrent network.
9:58AM 5    At 5:58, a message is sent, "Still have customers here."
       6    At the same time, Director Fottrell will testify that that
       7    HP computer is being utilized to open and view the
       8    contents of marissa.zip.  6:51 p.m., Mr. Duggar's iPhone
       9    again is utilized to take a picture.  In this case, it's
9:58AM10    two Post-it notes, sticky notes, on the very desk that
      11    holds the HP computer.
      12         The following day, May 16th, 2019.  11:21 a.m.,
      13    pedomom is downloaded from the BitTorrent network.
      14    11:35 p.m., Mr. Duggar's iPhone is utilized to take a
9:59AM15    picture.  This time it's a separate sticky note on the
      16    same desk that holds the HP computer.
      17         Now, Director Fottrell will also tell you that
      18    that Linux partition, it had its own password, Intel 1988.
      19    He will tell you when conducting the forensic examination
9:59AM20    of Mr. Duggar's devices, he found his Apple note section.
      21    And inside that Apple note section, he lists his passwords
      22    to various online accounts including his bank account;
      23    Intel 1988.  Director Fottrell will tell you that he found
      24    BitTorrent peer-to-peer program on the defendant's laptop
9:59AM25    computer.  And on his iPhone, he found the TOR browser.

10:00AM 1    In fact, it was used the very day law enforcement executed

2    the search warrant and interviewed Mr. Duggar.

3          Next, you are going to be hearing from a Covenant

4    Eyes' representative. He will tell you that that Covenant

10:00AM 5    Eyes user name is Joshua Duggar, registered to a Joshua

6    and Anna Duggar, the defendant's wife. He will tell you

7    that Covenant Eyes is a program for internet

8    accountability to live a porn-free life. The way it works

9    is that once you subscribe to the service and download it

10:00AM10    to a device, it monitors your internet, and every so

11    often, it sends kind of a report via e-mail to your

12    accountability partner. This Covenant Eyes'

13    representative will tell you that Mr. Duggar's

14    accountability partner is Anna Duggar, his wife.

10:00AM15    Importantly, he will tell you that their service does not

16    work with Linux-based operating systems, so what's done on

17    that Linux partition side is not recorded by Covenant Eyes

18    nor reported to Ms. Duggar.

19          Next, you're going to hear from an individual

10:01AM20    named Clint Branum. Clint Branum is an individual of

21    Northwest Arkansas that's known Mr. Duggar in a personal

22    association for a long time. He will tell you that he has

23    had direct conversations with Mr. Duggar about how to

24    bypass internet filtration security such as Covenant Eyes

10:01AM25    by downloading a partition.

10:01AM 1            Next, you're going to hear from an individual

2       named Jim Holt.  Jim Holt will testify that he's known

3       Josh Duggar his entire life.  Duggar used to date his

4       daughter.  He views him as a son.  Several years back, he

10:01AM 5       was part of a conversation where Mr. Duggar asked

6       specifically how to download a Linux partition.

7            Ladies and Gentlemen, that's a summary of the

8       case before you.  Our case is based on fact, it's based on

9       evidence, and it's based on common sense.  At the end of

10:02AM10       this trial, we will ask you to hold him accountable for

11       his actions, accountable for downloading, receiving these

12       images of child sexual abuse, accountable for viewing and

13       possessing these images depicting minors engaged in

14       sexually explicit conduct.  We'll ask you to find him

10:02AM15       guilty based on that evidence.  Thank you.

16            THE COURT:  Thank you, Mr. Roberts.

17            Mr. Gelfand, you may deliver the defense opening

18       statement when you're ready.

19            MR. GELFAND:  Thank you, Your Honor.  May I

10:02AM20       proceed, Your Honor?

21            THE COURT:  You may.

22            MR. GELFAND:  Good morning, Ladies and Gentlemen.

23       If you like a good mystery, then this is the case for you,

24       because over the course of this trial, over the course of

10:03AM25       the next several days, you're going to be sitting in this

10:03AM 1    jury box asking yourself two overriding critical

2    questions.  First, why is the government saying this had

3    to be Josh Duggar, this was Josh Duggar, when the actual

4    computer forensic trail that we will walk you through over

10:03AM 5    the course of this case presents more questions than

6    answers and clearly does not establish beyond a reasonable

7    doubt that it was Josh Duggar.  And, second, why did the

8    government bury their heads in the sand for their 30-month

9    investigation failing to investigate suspects with

10:04AM10    opportunity and access that we're going to talk about in

11    this courtroom over the course of this trial.

12          I want to be clear at the outset.  Members of the

13    Jury, over the course of this trial, you're going to see

14    some disturbing images.  That's not what this trial is

10:04AM15    about.  What this trial is about, Members of the Jury,

16    this is a classic, old-fashioned "whodunit."  That's what

17    we're here for.  That's what I want you to be focused on

18    throughout the course of this trial.

19          So let's talk about the timeline.  May of 2019,

10:04AM20    Detective Amber Kalmer is in Little Rock, Arkansas.

21    May 14th and May 15th, she downloads two files, she

22    claims.  Those files, the prosecutor explained to you.

23    Ms. Kalmer is going to admit to you that all she has at

24    that point, using software that they have, law enforcement

10:05AM25    only software called Torrential Downpour, it isolates

10:05AM 1    something called an IP address.  It's a term you may have

2    heard before.  An IP address alone is just a series of

3    numbers, but it's very easy to link an IP address to a

4    specific location.  Ms. Kalmer will admit to you that the

10:05AM 5    IP address that she identifies does not tell you what

6    device or devices were connected to it.  You're going to

7    learn that 10 devices at a Wi-Fi at a Starbucks, for

8    example, will all link to the same or identify the same IP

9    address.  And she's also going to tell you that what you

10:05AM 10    need to do to isolate that IP address is you need to go to

11    something called the internet service provider, the ISP.

12    Simple English, the cable company, AT&T.  In this case,

13    OzarksGo.  You ask for it.

14          You are going to learn that she waits an entire

10:06AM 15    month before sending this case to Homeland Security

16    Investigations to Special Agent Faulkner in Northwest

17    Arkansas.  You're going to see over the course of this

18    trial that between June 2019 and October 2019, federal

19    agents do virtually nothing in this case.  Halloween 2019,

10:06AM 20    October 31st, HSI obtains a federal search warrant for a

21    house after telling a Judge, "Based on the IP address, we

22    believe that whatever device did this is in the house."

23    They show up at the house in full force.  They realize

24    though -- bear in mind, at this time, they have no clue

10:06AM 25    what device or devices were used.  They have no clue

10:06AM 1  whether there's any alleged child pornography or child

2  pornography on these devices.  They show up at the house.

3  They realize very quickly, well, this is not Joshua

4  Duggar's house, this is not the reality T.V. star we're

10:07AM 5  excited to investigate, so they choose not to search the

6  house.

7          A few days later, they send an undercover agent

8  into Wholesale Motorcars.  The undercover agent pretends

9  to be a customer.  The undercover agent meets with Josh

10:07AM10  Duggar and Randall Berry.  The undercover agent is there

11  for fairly obvious reasons; what devices does Joshua

12  Duggar use?  And the undercover agent documents -- bear in

13  mind, this is a few days before the search warrant at the

14  car lot -- that Josh Duggar uses a MacBook Pro laptop

10:07AM15  computer and an iPhone.  No mention at all of Joshua

16  Duggar on this HP computer, which we will talk about in a

17  few minutes.

18          November 8th of 2019, federal agents storm into

19  Wholesale Motorcars to execute the search warrant.  You're

10:08AM20  going to learn over the course of this trial critically

21  that they seized nine devices.  Let's talk about those for

22  a second, because details matter in federal criminal

23  cases, and we're going to be talking a lot over the course

24  of this trial about the details.  You're going to see that

10:08AM25  Josh has two personal devices, both of which are Apple

10:08AM 1   products.  You may remember commercials, "I'm a Mac, I'm
2   an Apple, I'm a PC."  The fights between them are actually
3   pretty entertaining.  Josh is a Mac guy.  You are going to
4   see testimony over the course of this trial that the
10:08AM 5   laptop, the MacBook Pro, it's an Apple product.  The
6   iPhone, an Apple product.  These were devices that Josh
7   used personally.  You are going to hear that the MacBook
8   Pro laptop, based on computer forensics, was Josh Duggar's
9   personal computer from November of 2014 to November of
10:09AM 10  2019, the day that the feds took it from him.  This was
11  his regularly used laptop that he used on a virtual daily
12  basis, probably literally a daily basis based on the
13  computer forensics.
14          You are going to see over the course of this
10:09AM 15  trial that the government spent hours -- days, months,
16  years -- looking at those devices.  The two devices their
17  undercover agent said, "These are the devices Josh used,
18  let's try to find even a forensic trace, an artifact, of
19  child pornography on these devices."  Because you are
10:09AM 20  going to learn that computer forensics in this trial, even
21  if an image of anything -- a basketball, child
22  pornography -- if it's deleted, computer forensic experts
23  can still find artifacts that it exists on the device.
24  There's no such thing as deleting it forever.
10:10AM 25          You are going to hear important testimony over

10:10AM 1    the course of this trial that there was not a trace of

2    child pornography on any of Josh Duggar's personal

3    devices, because it was never there, it was never

4    downloaded, it was never opened, it was never even viewed

10:10AM 5    on the screen.  Because computer forensic experts are

6    going to tell you that if it was, they would have

7    identified it and they would be putting it right in front

8    of you as if it's a giant billboard.

9            You are going to hear that the business computer

10:10AM10    was a PC, was a desktop computer.  You are going to hear

11    the term.  It's called an All-in-One.  In other words,

12    it's not like the old school tower with the separate

13    monitor, but it's a big desktop computer that literally

14    plugs into the wall.  It was seized from the office,

10:10AM15    meaning the fairly small shed-like office -- that's a fair

16    description -- at Wholesale Motorcars.  You are going to

17    see pictures of that office.  We are going to show you

18    them if the government doesn't.  There's windows all

19    around.  It's a fish bowl.  And this computer, the HP

10:11AM20    computer, the desktop, like all desktops, was literally

21    plugged into the wall.

22            Members of the Jury, over the course of this

23    trial, you're going to learn that in computer crimes cases

24    such as this, computer forensics is as close to DNA as you

10:11AM25    get.  It's a science.  It's based on facts.  There's a

10:11AM 1    trail of evidence and it's not about guesswork.  Members

2    of the Jury, you are going to hear important testimony

3    from a woman named Michele Bush.  She is a computer

4    forensics expert based in Arizona who works nationally and

10:11AM 5    has for the past decade, plus or minus.  She's going to

6    tell you that she, on a near daily basis, works on these

7    cases.  She doesn't work for the government.  She works on

8    these cases.  What she's going to tell you is that she did

9    what the government did not do in this case.  And she's

10:12AM 10   going to walk you through this critical testimony and this

11   evidence in the course of this trial, that she followed

12   the computer forensic trail and found important evidence

13   that either the government never looked for or the

14   government ignored.  But this is the trial of Josh Duggar

10:12AM 15   and this is where it's going to come out.  So let me

16   preview that for you.

17           Number one, she's going to tell you what I just

18   did.  She's going to tell you that she independently

19   looked at the images, meaning the exact equivalent --

10:12AM 20   we'll talk about that in a second -- but basically the

21   MacBook Pro that the government seized and provided her a

22   forensic copy of.  And she looked at the HP computer under

23   certain parameters that is necessary under federal law.

24   And she looked at the iPhone.  She also looked at a number

10:13AM 25   of other devices over here.  She's going to tell you

10:13AM 1    plainly and simply, there never was a trace of child
         2    pornography, even alleged child pornography, on any of
         3    Josh Duggar's personal devices.  So she's going to take
         4    you where the investigators, to some extent, are taking
10:13AM 5    you in this case, to this HP computer.  But she's going to
         6    tell you something very important, that the trail of
         7    evidence in this case actually begins on May 13th, 2019,
         8    when a Linux partition was installed.
         9            Let me break this down, because this is really
10:13AM10    important for this trial.  A Linux partition was installed
        11    on the desktop, the computer, the work computer that was
        12    plugged in.  You are going to hear testimony, by the way,
        13    that a number of people used this work computer.  You're
        14    going to hear testimony that this work computer had
10:14AM15    software called Frazer on it.  Frazer is essentially the
        16    fuel that makes the used car lot, Wholesale Motorcars,
        17    run.  It's the only software that inventories.  It's the
        18    software that anyone selling a car at this business had to
        19    use.  You are going to hear testimony that others had
10:14AM20    access to it and used it.  This was the business computer.
        21    It literally has a decal for credit card payments on it.
        22    It has a decal for Wholesale Motorcars on it.  You will
        23    see it in evidence.
        24            But here's what's important here.  The HP
10:14AM25    computer had kind of a Windows side, what may be more

10:14AM 1  familiar to most of us.  But where the government would

2  say the bad stuff happened, the focus of this trial, that

3  all happens on this Linux side.  You're going to hear that

4  Linux is this unusual, complicated interface.  It's not

10:14AM 5  common.  It's not totally unheard of.  But it's not as

6  common as, say, a Mac operating system for Windows that

7  are a lot more ubiquitous.  What you are going to hear is

8  that during the installation -- and this is critical --

9  somebody physically plugged in a thumb drive.  If you're

10:15AM 10  not familiar with it, sometimes people refer to thumb

11  drives as USB drives.  Sometimes they are on little

12  keychains, flash drives.  They're all saying the same

13  thing.  Somebody physically plugged in a drive that

14  stores, a small drive that stores files into the "F" port

10:15AM 15  or the "F" drive on the desktop computer.  Simple English,

16  someone took a thumb drive and plugged it into the

17  desktop, wherever the desktop was, presumably in the

18  office where it was plugged in at Wholesale Motorcars.

19       You are going to hear important evidence that

10:15AM 20  between 12:53 p.m. and 12:56 p.m. on the day that the

21  Linux partition was installed, while the Linux partition

22  was installed, somebody opened three files from that thumb

23  drive.  One is called "jeremy_model-mesh pics.docx."  One

24  is called "UK Cardiff final-background lighter.pptx."  One

10:16AM 25  is called "Quiz 1.docx."  Two Microsoft Word documents,

10:16AM 1  one PowerPoint document, opened computer forensically.

2  DNA, in essence, 12:53 to 12:56 p.m., during the

3  installation of the Linux partition.  You're going to

4  learn that the reason this is so important is because

10:16AM 5  someone physically had to be there to plug this thumb

6  drive in.

7       And here's what's so important that you're going

8  to learn over the course of this trial from Ms. Bush.

9  First of all, the government seized five thumb drives and

10:16AM10  SD cards, essentially portable devices, over the course of

11  this case.  We're going to introduce those into evidence

12  if they don't.  They are important, because what they are

13  going to show you is that those thumb drives, the ones

14  that were actually at Wholesale Motorcars on the day that

10:17AM15  the feds executed the search warrant, those were not any

16  of the thumb drives, meaning the thumb drive that was used

17  was not any one of those thumb drives that was plugged

18  into this computer when Linux was being installed.  But

19  realize something more important.  That may sound easy.

10:17AM20  Okay.  Where did the thumb drive go?  It's a thumb drive.

21  Here's what's more important.  Thumb drives, you can't

22  create a Microsoft Word document, as you are going to

23  learn, or a PowerPoint, on a thumb drive.  That just

24  stores the documents.  So computer forensic trail.

10:17AM25  Where's the device that those files were created on, were

10:17AM 1    saved on, were opened?  You can't possibly tell me that
2    that's not an important clue, so to speak, to follow for
3    who was there.  You're going to learn from Michele Bush
4    that those three files, those two Microsoft Word documents
10:18AM 5    and that PowerPoint document, were not in any way
6    connected to any of Josh's devices ever.  They were not
7    created on those devices.  They were not saved on those
8    devices.  They were not opened on those devices even from
9    a computer forensic artifact standpoint by documenting
10:18AM10    that they were opened from a thumb drive, for example,
11    being plugged in.

12         Members of the Jury, this is the equivalent of
13    the trail of blood from a murder scene.  It's a computer
14    forensic trail you follow.  They didn't follow it.  We're
10:18AM15    not here to tell you where this evidence leads.  We're not
16    the United States government.  We don't have an Army of
17    investigators.  But we are here to show you over the
18    course of this trial from that witness stand and from this
19    computer forensic expert, Michele Bush, that it does not
10:19AM20    lead to Josh Duggar.  And that's the ball game, Members of
21    the Jury.  That's what brings us here.

22         Number four, Michele Bush is going to tell you
23    that the Linux partition, this place where, for lack of a
24    better way of putting it, where the bad stuff happens,
10:19AM25    that has a single user account.  It's called Dell,

10:19AM 1   D-E-L-L, underscore one, O-N-E.  One is spelled out.  This

2   is a default user name, or you're going to hear that it's

3   likely a default user name.  In other words, no one says,

4   "I'm want to be called Dell_One."  You're going to learn

10:19AM 5   over the course of this trial that this likely means that

6   whoever installed Linux began with a Dell.  Dell is a

7   large computer PC manufacturer.  Huge online operation.

8   It's like HP or Mac or Apple.

9           The prosecution, Members of the Jury, has no clue

10:19AM10  who the Dell user is because they didn't look.  But,

11  again, what we're going to show you over the course of

12  this trial is there is no evidence on earth, because it

13  doesn't exist, that Josh Duggar was a Dell user.  He was

14  the Mac guy.  Even the one PC for work was an HP.  There's

10:20AM15  no Dell anywhere to be found, or even evidence of a Dell,

16  anywhere to be found in this trial.

17          Number five, she's going to tell you about

18  command codes.  I'm sure you're excited to learn more

19  computer forensics over the course of this trial, but this

10:20AM20  is really important and I want to break this down for you

21  so you'll understand what to listen for.  She's going to

22  tell you that whoever installed Linux, Ms. Bush is going

23  to tell you, had to type in complicated command codes.

24  This is the equivalent of a foreign language.  You either

10:20AM25  know how to do it or you don't.  You either have the

10:20AM 1    command codes or you don't.  The reason why is because
2    she's going to tell you that from a forensic standpoint,
3    no installer was located.  Installer means you can just
4    basically double-click on something and essentially it
10:21AM 5    preloads the command codes.  She's going to tell you that
6    whoever did this had to manually type in complicated
7    command codes.
8            So what are you going to learn about Josh Duggar
9    over the course of this trial?  Josh is a great guy.  He's
10:21AM 10   a father of seven.  He's got a very close and large
11   family.  But you're going to learn that when it comes to
12   formal education, computer sophistication, he was
13   homeschooled by his parents, Jim Bob Duggar and Michelle.
14   At 16 years old, he earned his GED and never received any
10:21AM 15   additional formal education.  He's done well for himself.
16   He opened a used car lot.  He sold cars.  But, Members of
17   the Jury, here's the important thing.  There's no evidence
18   on earth that Josh knew what these command codes were,
19   because he didn't.  That's important, because, remember,
10:21AM 20   we are trying to follow the computer forensic trail.  And
21   that's what we're going to do over the course of this
22   trial.
23            Number six, Michele Bush is going to tell you
24   about the TOR browser and the BitTorrent network.  As the
10:22AM 25   prosecutor explained, they sound similar, TOR, but they

10:22AM 1    are totally different.  You are going to learn that like

2    millions of Americans, Josh used the TOR browser.  Here's

3    the kicker, though.  He used it since 2017.  When we

4    actually talk details of the computer forensics, you are

10:22AM 5    going to learn that the TOR browser was installed on

6    Josh's personal MacBook since December of 2017.  Remember,

7    it was never used to download, view, or access child

8    pornography.  Because had it been used to do that on his

9    personal device, there would be evidence, what computer

10:22AM 10    forensic experts call artifacts, even if the images

11    themselves are not on the device anymore.  And there's

12    not.

13          You are going to learn that investigators like to

14    say "Dark Web."  You are going to learn that the TOR

10:23AM 15    browser is put out by something called the TOR Project.

16    It's a Massachusetts nonprofit organization.  Millions of

17    users use it.  It provides enhanced privacy and enhanced

18    security, in contrast to other web browsers like Safari or

19    Firefox or others that you may be more familiar with.

10:23AM 20    It's precisely the kind of protection and privacy and

21    security that when you have media and paparazzi chasing

22    you every time you go to Starbucks or dinner with your

23    family, you benefit from, you use.

24          BitTorrent.  Let's talk details.  Details matter.

10:23AM 25    Josh's personal devices, his MacBook to be precise, had

10:24AM 1   two BitTorrent peer-to-peer applications.  BitTorrent --
        2   you might remember Napster music, file sharing.  There's
        3   nothing intrinsically wrong or illegal or anything about
        4   BitTorrent or the TOR browser.  These can be used for
10:24AM 5   things that are illegal.  But, forgive the analogy, it's a
        6   little like a knife.  It's not illegal unless or until you
        7   stab someone with it.
        8           Here's what's interesting that you are going to
        9   see over the course of this trial.  Josh used two software
10:24AM10   applications to access the BitTorrent network in 2017 from
       11   his MacBook, his laptop.  He used an application called
       12   Transmission -- that's the name of the software -- and an
       13   application called qBittorrent, both to download
       14   commercial movies.  One literally a Chevy Chase movie, and
10:24AM15   one literally a kid's movie involving planes and
       16   firetrucks or whatever it was.  You'll actually see the
       17   name of these movies in evidence.  Here's the point,
       18   though.  The Linux partition where BitTorrent was
       19   apparently used to access alleged child pornography had
10:25AM20   Transmission preinstalled on it.  What this means in
       21   English is, it's like Safari on your iPhone.  You
       22   literally just use it.  If you want to access it, you
       23   double-click on it.  You don't have to do anything
       24   complicated to install software.  But whoever went onto
10:25AM25   that partition chose not to use the Transmission software

10:25AM 1    that Josh already knew how to use since 2017.  Instead --
2    listen to what actually happened, Michele Bush is going to
3    explain this to you -- somebody downloaded something
4    called uTorrent, which is a Windows-based BitTorrent
10:25AM 5    application, bypassing the double-clicking on what's
6    already there.  There's literally an icon.  You just click
7    on it.  To download and install uTorrent on this Linux
8    partition, there was yet another layer of command codes
9    that had to be input.  And Michele Bush is going to walk
10:26AM 10   you through it.

11           The point is, this was complicated.  And there's
12   no evidence on earth, and I mean no disrespect to Josh,
13   who I have tremendous respect for.  He is not a computer
14   genius.  He is not the IT tech support you call from the
10:26AM 15   Geek Squad at Best Buy or whatever you may use.  He's got
16   a GED and he owns a car lot.  No disrespect at all.  But
17   it matters when we look at the sophistication that was
18   necessary to pull this off.

19           The videos, the alleged child pornography videos,
10:26AM 20   the investigators, you're going to hear over the course of
21   this trial, they like the shock and awe of them; the
22   names, the description.  They are awful.  They are
23   terrible.  I'm going to encourage you to look at them from
24   a different direction, computer forensic trail.  How were
10:27AM 25   they played on the HP computer?  You're going to learn

10:27AM 1    that they were played through something called a VLC
2    player.  That's unremarkable.  A VLC player is one of the
3    most common, if not the most common, free downloadable
4    players that's ubiquitous throughout the country.  But
10:27AM 5    they weren't just double-clicked on to play locally the
6    way that somebody with regular and consistent access to
7    the device would.  They were streamed through the internet
8    like Netflix.  What this means, Michele Bush will explain
9    to you, is that that's consistent with a remote user.
10:27AM 10   She's not going to tell you that that necessarily
11   happened.  There's no way of knowing.  But the government
12   has to rule out that possibility.  And what Michele Bush
13   is going to tell you -- and she's going to explain this a
14   lot more than I am in opening statement -- is that
10:28AM 15   something called UPnP, Universal Plug and Play, was
16   enabled on the router, the Wi-Fi box, at the car lot at
17   the time leaving the network entirely vulnerable.
18            Lastly, she's going to tell you that at the end
19   of the day, less than one minute after the last alleged
10:28AM 20   child pornography file was streamed through the internet,
21   instead of just doubled-clicked on, all of these files
22   were deleted essentially permanently from the user
23   standpoint, not from a computer forensic standpoint.  They
24   weren't accessible.
10:28AM 25            Now, Members of the Jury, the computer forensic

10:28AM 1   trail, the DNA, if you will, it leaves more questions than

2   answers, but it points to someone other than Josh.  And at

3   a minimum, we're not here to prove to you anything.  We

4   are the defense in a criminal case.  We don't have an Army

10:29AM 5   of investigators.  It raises serious reasonable doubts.

6   And that's the ball game.

7         So I want to talk for just a few minutes about

8   the investigation.  You're going to learn over the course

9   of this trial that investigators chose to forensically

10:29AM10  image Josh's devices and the Wholesale Motorcar device,

11  but no one else's devices that they had literally in their

12  hands.  You are going to hear that on November 8th, 2019,

13  there's three forensic techs working for HSI for one

14  purpose, to image devices.  They had Randall Berry's phone

10:29AM15  in their possession.  They chose not to image it.

16  Remember that name.  We'll get back to it in a second.

17         You're going to hear that in December of 2019,

18  they chose not to image William Mize's phone, even though

19  he fully consented for them to search it literally by

10:29AM20  signing a form.  Remember that name.  The point is, they

21  failed to preserve important evidence and we're going to

22  talk about that.

23         Randall Berry, you are going to hear that he

24  talked to the feds twice.  First, November 8th of 2019,

10:30AM25  the day they executed the search warrant.  He confidently,

10:30AM 1    on a recording, by the way, told them, "I didn't even
       2    start working at this car lot until June of 2019."  The
       3    agents investigating said, "Great, couldn't have been you,
       4    weren't there."  The pay records clearly revealed that he
10:30AM 5    was there in May of 2019 at the earliest.  Agents go back
       6    to him.  And he says, "All right, May 20th, that's the
       7    date," on a recording, by the way.  Members of the Jury,
       8    you are going to see in evidence a picture time-stamped of
       9    Randall Berry at the car lot on May 16th of 2019, squarely
10:30AM10    within the window of time that matters.
      11            William Mize, he told agents, "I'm just a
      12    homeless guy with no computer sophistication."  They said,
      13    "Great, we don't need to hear anymore, thanks for your
      14    time."  You're going to learn over the course of this
10:31AM15    trial he bought eight cars, approximately five to eight
      16    cars, from Wholesale Motorcars, that he was regularly at
      17    the car lot, that he worked there on occasion to make
      18    extra cash.  And you are going to hear from a witness who
      19    is going to testify from that witness stand that he
10:31AM20    personally observed Mr. Berry sitting in a van regularly
      21    outside a McDonald's accessing the McDonald's Wi-Fi.  It
      22    was so remarkable to this witness that they literally gave
      23    him a nickname, "McLoiterer."  You can't make this up.
      24            Caleb Williams.  You're going to see evidence
10:31AM25    that he sold a car as a salesperson at the lot in March of

10:31AM 1  2019, that he regularly printed shipping labels from the

2  HP computer at the center of this case for his own eBay

3  business that had nothing to do with Josh and nothing to

4  do with Wholesale Motorcars.  You are going to hear that

10:32AM 5  he's so tech savvy that he runs his own e-commerce

6  business where he accepts Bitcoin, in addition to other

7  forms of payment.  Investigators first interviewed him 30

8  months into this investigation several weeks ago.  To this

9  day, they have never looked at his devices.  He sends a

10:32AM 10  text message we're going to introduce into evidence in

11  this case to Josh on May 7th of 2019, just before this

12  time period that matters.  And he says he's available to,

13  quote, "Watch the lot," end quote, in the upcoming week.

14        Members of the Jury, there's so much more to this

10:32AM 15  case than the prosecution wants you to believe.  All I'm

16  asking you at this point is to keep an open mind, because

17  we are going to investigate this case together because

18  they didn't.  We're going to ask important questions that

19  they chose not to ask.  We're going to bring out

10:32AM 20  reasonable doubts that exist.

21        Thank you for your time.  Thank you for your

22  attention.  There's nobody who appreciates it more than

23  Josh.  Thank you.

24        THE COURT:  Thank you, Mr. Gelfand.

10:33AM 25        So I explained to you yesterday that we would be

10:33AM 1   taking a morning and an afternoon recess.  And it's about

2   10:30.  Now is the most logical time for us to take our

3   morning recess.  When you come back from the recess, we

4   will start hearing testimony from witnesses.

10:33AM 5           Let me remind you of the recess instruction.  You

6   have heard some of these rules in the instructions I gave

7   a few moments ago, but this is also the instruction that I

8   gave you last night and I just want to hit some of the

9   highlights of it as we take this first recess.

10:33AM 10          Remember that what you just heard is not

11  evidence.  It's just the lawyers' summary of what they

12  expect the evidence will show.  You are not to discuss the

13  case.  You're not to discuss what you just heard in

14  opening statements among yourselves or with anyone else

10:34AM 15  while we're on this recess.  And you're not to conduct any

16  research.  You're not to conduct any searches for news or

17  anything like that.  This is very important and I just

18  reemphasize it once again here.  And I will likely be

19  doing so before every recess.

10:34AM 20          So we're going to be in recess for about 15

21  minutes.  And we will have the court security officer

22  bring you back up right around 10 minutes before 11:00.

23          We're in recess.

24          (Recess taken from 10:34 a.m to 10:54 a.m.)

10:34AM 25          (Outside the presence of the Jury)

10:54AM 1          THE COURT:  Please have the Jury brought up.

2    While we're bringing the Jury up, I wanted to put on the

3    record that over the break, the Court was alerted about a

4    minor medical issue that one of our jurors, Juror

10:55AM 5    Number 38, had happen this morning.  And after conferring

6    with counsel for each side, it was agreed that we would

7    release Mr. Juror Number 38.  He was an alternate juror

8    and we still have three alternates left, so I think we're

9    in really good shape, but I just wanted to put that on the

10:55AM10    record that he was released by agreement.

11          (Jury in at 10:57 a.m.)

12          THE COURT:  Members of the Jury, one of your

13    colleagues, Juror Number 38, had a minor medical issue

14    arise and the Court has excused him and I didn't know if

10:58AM15    you were aware of that or not.  But in case you were

16    wondering why there's an empty seat on the second row, I

17    thought I should tell you.

18          We are ready for what we call the evidentiary

19    portion of our trial.  The government may call its first

10:59AM20    witness.

21          MS. MARSHALL:  Your Honor, the government would

22    call Detective Amber Kalmer.

23          THE COURT:  Detective, if you would please come

24    inside the rail.  And if you would pause about right there

10:59AM25    and raise your right hand.

```
10:59AM  1              (Witness Sworn)
         2              THE COURT:  Ma'am, if you would please have a
         3    seat in our witness box.  While you're getting yourself
         4    situated, a few things.  Number one, you may remove your
10:59AM  5    mask while testifying, although you're not required to do
         6    so.  And while testifying, please try to position the
         7    microphone so that you can speak directly into it so that
         8    we can hear your testimony.
         9              THE WITNESS:  Yes, sir.
10:59AM 10              THE COURT:  You may inquire.
        11              MS. MARSHALL:  Thank you, Your Honor.
        12              AMBER KALMER, having been first duly sworn,
        13    testified as follows:
        14                        DIRECT EXAMINATION
10:59AM 15    BY MS. MARSHALL:
        16    Q.   Will you please introduce yourself to the Jury and
        17    spell your last name for the court reporter?
        18    A.   Detective Amber Kalmer.  Last name, K-A-L-M-E-R.
        19    Q.   And where are you employed?
11:00AM 20    A.   Little Rock Police Department.
        21    Q.   And how long have you been employed there?
        22    A.   About 13 years.
        23    Q.   What did you start off doing there at Little Rock
        24    Police Department?
11:00AM 25    A.   I worked patrol for about six years and then went to
```

11:00AM 1    undercover narcotics for two years.  And then ever since,
2    I've been on vice, and I do Internet Crimes Against
3    Children and human trafficking.
4    Q.   Are you part of some sort of task force for that?
11:00AM 5    A.   Yes.  I'm on the FBI task force and the ICAC Arkansas
6    task force.
7    Q.   What is the ICAC Arkansas task force?
8    A.   The Internet Crimes Against Children task force,
9    which gives us our NCMEC cyber tips.
11:00AM10    Q.   Explain to the Jury a little bit about what the ICAC
11    task force investigates and does.
12    A.   Yes.  We do investigations for cyber tips from the
13    National Center for Missing & Exploited Children, which
14    are based off of users sharing content on different
11:01AM15    platforms, such as Google and Yahoo.  Once they share
16    child pornography, it alerts and they give us those cyber
17    tips to work.  And we also do peer-to-peer and then online
18    enticement investigations.
19    Q.   So as part of being a task force officer with the
11:01AM20    ICAC, do you investigate these types of cases?
21    A.   Yes, ma'am.
22    Q.   What sort of training have you had as part of the
23    ICAC?
24    A.   I've had numerous training.  Went to multiple classes
11:01AM25    for peer-to-peer training as well as numerous ICAC and

11:01AM 1   human trafficking courses and certifications.

2   Q.   Did you most recently get a certification for

3   forensic examination of devices?

4   A.   Yes.

11:01AM 5   Q.   Tell the Jury a little bit about that.

6   A.   I went through 200 hours of training to become a

7   forensic computer examiner, as well as cell phones.

8   Q.   You talked to the Jury a little bit about

9   peer-to-peer cases.  You said that was part of what you

11:02AM 10  investigated, part of the caseload that you had as a task

11  force officer, is that right?

12  A.   That is correct.

13  Q.   Explain to the Jury a little bit about what a

14  peer-to-peer investigation, what that means.

11:02AM 15  A.   Peer-to-peer is a software such as BitTorrent, eMule,

16  or Freenet.  It's publicly available.  Once you install it

17  and download it, it allows your computer to share files

18  such as files, videos, and images to other computers

19  utilizing the same software.

11:02AM 20  Q.   So those programs that you mentioned -- Freenet,

21  BitTorrent, eMule -- those are free programs that anyone

22  is able to download, is that correct?

23  A.   That is correct.

24  Q.   Why, as law enforcement, then would you be interested

11:02AM 25  in doing those sorts of investigations?

11:02AM 1    A.    Peer-to-peer is one of the most common investigations

2    to share child pornography amongst users.

3    Q.    One of the most common ways to do that?

4    A.    Yes, ma'am.

11:03AM 5    Q.    In your training and experience, that's what you have

6    seen?

7    A.    That is correct.

8    Q.    So you said it's a publicly available program.  So

9    how, as law enforcement, do you go about investigating

11:03AM 10   peer-to-peer program, or peer-to-peer investigations?

11   A.    Once we went through training, we are given a law

12   enforcement software that does the same thing for

13   BitTorrent, eMule, and Freenet.  And then we run that

14   software looking for people sharing child pornography.

11:03AM 15   Q.    So law enforcement has its own software that's been

16   developed to help investigate these cases?

17   A.    That is correct.

18   Q.    What is different about a law enforcement software

19   program than a typical user's program who has downloaded

11:03AM 20   BitTorrent?

21   A.    The law enforcement version does not share the child

22   pornography images or videos or files.  A lot of the

23   peer-to-peer programs do what they call a tit-for-tat, so

24   they want you to share content in order to download it

11:04AM 25   from other users.

11:04AM 1   Q.   So as part of the law enforcement program, law

2   enforcement is not sharing child pornography, they are

3   just receiving child pornography, is that correct?

4   A.   Yes, ma'am.

11:04AM 5   Q.   Can you explain to the Jury about how a typical

6   peer-to-peer investigation on BitTorrent would work for

7   you?

8   A.   Yes.  I would run the program on my law enforcement

9   computer and it would reach out to users who are sharing

11:04AM10   known files that contain child pornography.  Once I reach

11   out to computers and make connections, it then gathers

12   information in regards to their IP address, geolocation,

13   and then the hash value of the file I'm attempting to

14   download.  Once the connection is made and completed, I

11:04AM15   then look at the geolocation of where that IP is at and

16   then send legal service off of that IP to see where it

17   comes back to.

18   Q.   I want to break down some of the things that you

19   said.  So you said that it's reaching out and searching

11:05AM20   for known images of child pornography.  What does that

21   mean when you say a "known image of child pornography"?

22   A.   A known image of child pornography is something that

23   has -- it's a -- the person has been identified in that

24   image and it is known to the National Center for Missing &

11:05AM25   Exploited Children and law enforcement.

11:05AM 1    Q.    You also talked about a hash value.  How are hash
      2    values associated with known images of child pornography?
      3    A.    Each image and video of child pornography is given a
      4    hash value and that's how it's traced.  It's somewhat --
11:05AM 5    some people compare it to like a thumbprint.  So you are
      6    able to follow it whenever it's shared on a platform.
      7    Q.    So each individual image of child pornography or
      8    video has its own unique hash value, is that right?
      9    A.    That is correct.
11:05AM10    Q.    So you said that it searches for known images and it
     11    connects and it downloads.  Explain to the Jury a little
     12    bit about that.
     13    A.    The computer software will ask -- it will find the
     14    peers who have a file which contains child pornography.
11:06AM15    That computer will acknowledge, yes, I do have that image
     16    or video, and then it will allow my computer to start
     17    downloading the process of that.
     18    Q.    When your computer downloads that process, if there
     19    is a complete or a partial download, are you then able to
11:06AM20    view that child pornography that you received from that
     21    other user?
     22    A.    I am.
     23    Q.    Were you using your law enforcement computer for the
     24    BitTorrent network on May the 14th, 2019?
11:06AM25    A.    Yes, ma'am.

11:06AM 1 Q. Can you tell us if anything significant pertaining to

2 this case happened on that date?

3 A. I made connection with an IP that geolocated back to

4 Springdale, Arkansas, and began downloading.

11:06AM 5 Q. What is the program called that you use, your law

6 enforcement program?

7 A. It's BitTorrent.  We have Torrential Downpour, I

8 believe.

9 Q. As part of that program, if you make a connection

11:07AM10 with another user, does it generate a log?

11 A. Yes.

12 Q. What sort of things are on that log?

13 A. On the log, it will say the connection time that I

14 made with the peer, as well as that peer's IP address and

11:07AM15 port number.  And then it will verify the hash value of

16 the file that I'm attempting to download.

17 Q. You stated that there was a connection that was made

18 on May the 14th, 2019, between your computer and an IP

19 address geolocating to the Northwest Arkansas area, is

11:07AM20 that correct?

21 A. That is correct.

22 Q. When it made that connection, did your program

23 generate a log?

24 A. Yes.

11:07AM25 Q. I want to turn your attention, if you will please

11:07AM 1   open your notebook to Government's Exhibit 1.  Can you

2   please tell me what Government's Exhibit 1 is?

3   A.    This was a log from one of the connections on

4   May 14th.

11:08AM 5   Q.    May 14th of what year?

6   A.    2019.

7   Q.    Is this the log of the connection that you made with

8   the IP address geolocating back to the Northwest Arkansas

9   area on that date?

11:08AM 10   A.    Yes, ma'am.

11   Q.    Can you please tell me what the IP address was for

12   that?

13   A.    167.224.196.113.

14   Q.    Is this a true and accurate copy of the log that was

11:08AM 15   generated from your connection with that IP address on May

16   the 14th, 2019?

17   A.    Yes, ma'am, minus the highlights.

18   Q.    The highlights have been added.  But other than that,

19   it is true and accurate?

11:09AM 20   A.    Yes, ma'am.

21          MS. MARSHALL:  Your Honor, the government would

22   move to introduce Government's Exhibit 1 into evidence.

23          MR. GELFAND:  No objection.

24          THE COURT:  Government's 1 is received.

11:09AM 25          (Government's Exhibit 1 Received)

11:09AM 1             MS. MARSHALL:  Your Honor, may I publish

2   Government's Exhibit 1 to the Jury?

3             THE COURT:  You may.

4   Q.   (BY MS. MARSHALL.)  Detective Kalmer, I want to turn

11:09AM 5   your attention -- as you stated, there are a couple of

6   things that are highlighted in this log.  The first line

7   that is highlighted, can you please read what that states?

8   A.   "Started download thread at local time, Tuesday,

9   May 14th, 2019, at 5:41:48 p.m."

11:09AM10   Q.   What does that mean?

11   A.   That was the time that it began connecting with the

12   other computer.

13   Q.   The time that your computer started connecting with

14   the other computer?

11:09AM15   A.   Yes, ma'am.

16   Q.   The second line that's highlighted, can you please

17   tell the Jury what that highlighted portion that starts

18   with "9C3" reads?

19   A.   Yes.  That's the hash value for that specific movie

11:10AM20   file that is known, a known image or video of child

21   pornography.

22   Q.   And the hash value again is what?

23   A.   It's a way to follow what's being shared.  It's a

24   thumbprint.

11:10AM25   Q.   The third line that is highlighted in this exhibit,

11:10AM 1    the 167.224.196.113, what is that?

2    A.   That is the IP address I was connected to and made

3    the download from.

4    Q.   That's the other user?

11:10AM 5    A.   Yes, ma'am.

6    Q.   Then the line below that, the mov_0216, what is that?

7    A.   That is the file that belongs to the hash value above

8    that was downloaded.

9    Q.   That is the name of the file?

11:11AM 10   A.   Yes, ma'am.

11   Q.   And then the last line that's highlighted, the date

12   is 2019-05-14.  What is that?

13   A.   That's when the downloaded file was completed.

14   Q.   What does that mean?

11:11AM 15   A.   That it was able to complete the entire file of the

16   mov_0216.

17   Q.   I'm going to turn your attention to May 15th, 2019.

18   Was your law enforcement computer running with the

19   BitTorrent network on May the 15th, 2019?

11:11AM 20   A.   Yes, ma'am.

21   Q.   Can you tell the Court and the Jury if anything

22   significant pertaining to this case happened on that date?

23   A.   I was -- my computer made contact with the same IP

24   address.

11:11AM 25   Q.   I'm going to ask you to turn to Government's Exhibit

11:11AM 1    2 in your binder.  Do you recognize Government's Exhibit

2    2?

3    A.    Yes, ma'am.

4    Q.    What is Government's Exhibit 2?

11:12AM 5    A.    It's a log for the download for that day.

6    Q.    And what date was that?

7    A.    May 15th, 2019.

8    Q.    Is this the same sort of log from May the 14th, 2019?

9    A.    Yes, ma'am.

11:12AM10    Q.    Is this log also generated from your computer

11    program?

12    A.    Yes, ma'am.

13    Q.    So this is a log that you would get if a connection

14    was made with another user?

11:12AM15    A.    Yes, ma'am.

16    Q.    Is this a true and accurate copy minus the highlights

17    that have been added of the log from your connection on

18    May the 15th, 2019?

19    A.    Yes, ma'am.

11:12AM20         MS. MARSHALL:  Your Honor, I would move to

21    introduce Government's Exhibit 2 into evidence.

22         MR. GELFAND:  No objection.

23         THE COURT:  Government's Exhibit 2 is received.

24         (Government's Exhibit 2 Received)

11:12AM25         MS. MARSHALL:  Permission to publish to the Jury,

11:12AM 1    Your Honor.

2                   THE COURT:   You may.

3    Q.   (BY MS. MARSHALL.)   Let's walk through this log with

4    the Jury.   So the first line that is highlighted, what is

11:12AM 5    the date of that?

6    A.   May 15th, 2019.

7    Q.   And what does it read?

8    A.   "Started download thread at local time, Wednesday,

9    May 15th, 2019, at 6:00 p.m."

11:13AM 10   Q.   So, again, what does that mean?

11   A.   That's when the computers started making contact with

12   one another.

13   Q.   The second line that is highlighted, "Torrent info

14   hash."   What is that?

11:13AM 15   A.   That, again, is just the way to follow the file with

16   the thumbprint.

17   Q.   That's the hash value of that file?

18   A.   Yes, ma'am.

19   Q.   The third line that is highlighted that starts with

11:13AM 20   an "I" with a little symbol above it and it ends with

21   "Torrent 3.5.5."   What does that mean?

22   A.   That is the version of BitTorrent that the peer that

23   I'm connected to is using.

24   Q.   There might be different versions, but that's the

11:13AM 25   version that that user has?

11:13AM 1   A.   Yes, ma'am.

2   Q.   The next line that's highlighted, what is that?

3   A.   That, again, is the IP that my law enforcement

4   computer is connected to.

11:14AM 5   Q.   And what is that IP address?

6   A.   167.224.196.113.

7   Q.   Is that the same IP address from your log from May

8   the 14th, 2019?

9   A.   Yes, ma'am.

11:14AM 10   Q.   The next line that's highlighted, "marissa.zip."

11   What is that?

12   A.   That is the file that I'm attempting to download.

13   Q.   Is that the name of the file?

14   A.   Yes, ma'am.

11:14AM 15   Q.   And that's the file associated with the hash value

16   that's highlighted above, is that right?

17   A.   Yes, ma'am.

18   Q.   Two lines down, now, that part is not highlighted.

19   But two lines down where it says, "Completed session with

11:14AM 20   remote client; 13 pieces were downloaded and written."

21   What does that mean?

22   A.   That my computer was able to download and complete

23   those 13 pieces.

24   Q.   Pieces.  What does "pieces" mean with this program?

11:14AM 25   A.   Each image and video are made up of different amount

11:15AM  1    of pieces that you are able to view those, so I was able
         2    to make a partial download of 13 pieces.
         3    Q.   Does "pieces" necessarily correlate with pictures, or
         4    could there be a different number of pieces for a
11:15AM  5    different number of pictures?
         6    A.   Yes, different number.  Just because there was 13
         7    downloaded doesn't mean that that only meant 13 images.
         8    It was just 13 pieces that make up images within that
         9    file.
11:15AM 10    Q.   Then the last line that's highlighted, what is the
        11    date on that line?
        12    A.   May 16th, 2019.
        13    Q.   And what does that line read?
        14    A.   "The download was incomplete."
11:15AM 15    Q.   What does that mean?
        16    A.   That it wasn't able to get the rest of the pieces to
        17    make up the entire file.
        18    Q.   Does that mean that you weren't able to view anything
        19    from that connection?
11:15AM 20    A.   No, I was still -- I had a partial download.  I was
        21    still able to view what was downloaded.
        22    Q.   Now, just to be clear, the law enforcement computer
        23    that you have and then the user that you connect to, is it
        24    a one-on-one connection?
11:16AM 25    A.   Yes.  It's known as a single source download where my

11:16AM 1    computer will connect and it's only going to download
       2    files from that specific computer rather than a network of
       3    different people.
       4    Q.    So what you get from that download is from one
11:16AM 5    specific user?
       6    A.    Yes, ma'am.
       7    Q.    Not from multiple users, just from one user only?
       8    A.    That is correct.
       9    Q.    So after your computer makes these connections,
11:16AM10    during your investigative process, what is the next thing
     11    that you do?
     12    A.    I observe the log that says I connected with an IP.
     13    I then view the content to make sure it does contain child
     14    pornography.  In this case, I noticed that it geolocated
11:17AM15    back to Springdale, Arkansas, so I made contact with
     16    Special Agent Gerald Faulkner, who I know, who does ICAC
     17    investigations as well.
     18    Q.    Let's break that down a little bit.  You said after
     19    you do the downloads, then you view the content to verify
11:17AM20    that it's child pornography?
     21    A.    Yes, ma'am.
     22    Q.    Does that happen all at once?  Do you get the
     23    downloads and then immediately view the child pornography?
     24    A.    No, ma'am.
11:17AM25    Q.    Explain to the Jury a little bit about that.

11:17AM 1    A.   I have my peer-to-peer running on my law enforcement
       2    machine.  While it's running, I'm also doing my other
       3    cases, investigations that I have going on.  And then I
       4    will go back to my computer, look at downloads, and then
11:17AM 5    go from there.
       6    Q.   So when you go back to look at your downloads, is
       7    that when you view to verify that your download from a
       8    user is child pornography?
       9    A.   Yes, ma'am.
11:18AM10    Q.   I'm going to turn your attention to Government's
      11    Exhibit 3.  What is Government's Exhibit 3?
      12    A.   It is the file of the 0216.mp4.
      13    Q.   Does it also contain images from the marissa.zip
      14    file?
11:18AM15    A.   Yes, ma'am.
      16    Q.   So when you were able to make that connection with
      17    that IP address, can you tell the Jury that on the
      18    May 14th, 2019, what was that that you were able to
      19    download?
11:18AM20    A.   A video file.
      21    Q.   A movie?
      22    A.   Yes.
      23    Q.   On May 15th, 2019, what was it that you were able to
      24    download?
11:18AM25    A.   Approximately 65 images on the marissa.zip file.

11:19AM 1    Q.    So on May 14th, it's a video.  But on May 15th, it's

        2    images, is that correct?

        3    A.    Yes, ma'am.

        4    Q.    Did you go back and view that movie and the images to

11:19AM 5    verify that they were, in fact, child pornography?

        6    A.    Yes, ma'am.

        7    Q.    Pertained on Government's Exhibit 3, have you had a

        8    chance to look at the content of the flash drive of

        9    Government's Exhibit 3 prior to today's court date?

11:19AM10    A.    Yes, ma'am.

       11    Q.    The contents on Government's Exhibit 3, does it

       12    contain the movie that you downloaded from that IP address

       13    on May 14th, 2019, as well as the 65 images that you

       14    downloaded from that IP address on May the 15th, 2019?

11:19AM15    A.    Yes, ma'am.

       16    Q.    Is it a true and accurate copy of that movie and

       17    those images?

       18    A.    Yes.

       19    Q.    Now, to be clear, on the disk, are the images titled

11:20AM20    "3-A" when you view them?

       21    A.    Yes.

       22    Q.    So just to differentiate between the movie and the

       23    images.

       24          MS. MARSHALL:  Your Honor, I would move to

11:20AM25    introduce into evidence Government's Exhibit 3 that

11:20AM  1    contains 3-A and 3.

         2              MR. GELFAND:  No objection, Judge.

         3              THE COURT:  Government's Exhibit 3 as described

         4    is received.

11:20AM  5              (Government's Exhibit 3 Received)

         6              MS. MARSHALL:  Your Honor, I would like

         7    permission to publish first the movie to the Jury.

         8              THE COURT:  So just to keep the record straight,

         9    is this file 3 or 3-A?

11:20AM 10             MS. MARSHALL:  I apologize.  It's 3-A.  No, it's

        11    3, Your Honor.

        12             THE COURT:  All right.  You may.  The Court has

        13    instructed that the gallery monitors be turned off.

        14             MS. MARSHALL:  Your Honor, for record purposes,

11:21AM 15    the government is playing the first four seconds of the

        16    movie.  Then we will pause the video and move to the

        17    1 minute, 20 second mark, play approximately one to two

        18    seconds of that.

        19             THE COURT:  That's fine.

11:21AM 20    Q.   (BY MS. MARSHALL.)  Before we publish this to the

        21    Jury, can you describe to the Jury what this video shows?

        22    A.   Yes.  The video is two prepubescent females, both

        23    nude, zoomed in on their vaginal areas being penetrated by

        24    an adult male's erect penis.

11:21AM 25             MS. MARSHALL:  Permission to publish, Your Honor.

11:21AM 1          THE COURT:  You may.

       2          MS. MARSHALL:  It's coming up here.

       3          MS. CRAIG:  He instructed me to turn just those

       4   off.

11:21AM 5          THE COURT:  The gallery.

       6          MS. MARSHALL:  Okay.  But I can see it on this.

       7          THE COURT:  Just turn it off, then.  You can turn

       8   your monitor off.

       9          MS. MARSHALL:  Just turn it off.  Okay.

11:22AM10          (Excerpt of Government's Exhibit 3 Published)

      11   Q.   (BY MS. MARSHALL.)  Will you please move to the

      12   1 minute, 20 second mark.  Move to Government's 3-A.  Can

      13   you please explain to the Jury the images that are

      14   depicted in Government's 3-A?

11:22AM15   A.   Yes.  The video that we just -- that I just viewed?

      16   Q.   The images.

      17   A.   The images.  The images are of a prepubescent female,

      18   nude, and doing different poses with the focus being on

      19   the vaginal area.

11:22AM20   Q.   And approximately how many images are depicted?

      21   A.   65.

      22          MS. MARSHALL:  Your Honor, permission to publish

      23   Government's 3-A.

      24          THE COURT:  You may.

11:23AM25          (Government's Exhibit 3-A Published)

11:23AM 1    Q.   (BY MS. MARSHALL.)  You stated that after you viewed
       2    the contents verifying that it is child pornography, that
       3    you looked to see where the IP address geolocates, is that
       4    right?

11:23AM 5    A.   Yes, ma'am.

       6    Q.   And you said that in this instance, that it
       7    geolocated where?

       8    A.   To Springdale, Arkansas.

       9    Q.   So what did you do because of that?

11:23AM10   A.   I contacted Special Agent Gerald Faulkner with HSI.

      11    Q.   So you're a detective in Little Rock, but your
      12    computer is still able to download from someone in the
      13    Northwest Arkansas area?

      14    A.   Yes, ma'am.

11:23AM15   Q.   How come?

      16    A.   You have the -- you can pick different states, and I
      17    did the whole State of Arkansas to get downloads for our
      18    entire state.

      19    Q.   So you said that you contacted Gerald Faulkner.  What
11:24AM20   happened next?

      21    A.   I contacted him, advised that I had downloads for an
      22    IP in his area and asked if he wanted to take the case if
      23    I sent them.  And he stated he would.

      24    Q.   Do you remember approximately what date that was?

11:24AM25   A.   The date that I sent the content to Special Agent

11:24AM 1   Gerald Faulkner was on June 17th.  So I made contact with

2   him prior to that, approximately June 14th.

3   Q.   So would you have verified that it was child

4   pornography and then notified Special Agent Faulkner

11:24AM 5   approximately in the same time frame?

6   A.   No.  Usually view it first, contact, and then a

7   couple of days to get him the information.

8   Q.   And so you said that you notified him.  What do you

9   do with those files then that we saw?

11:25AM10   A.   The files that I download as well as the logs, I will

11   send those through our ICAC data system.  And then I will

12   notify our ICAC commander to send those files to who I

13   want them to go to.  In this case, it was Special Agent

14   Faulkner.

11:25AM15          MS. MARSHALL:  May I have one moment, Your Honor?

16          THE COURT:  You may.

17          MS. MARSHALL:  I'll pass the witness, Your Honor.

18          THE COURT:  Thank you.  Mr. Gelfand, you may

19   inquire.  Is it okay to turn the monitors back on?

11:25AM20          MR. GELFAND:  Yes, Your Honor.

21                    CROSS EXAMINATION

22   BY MR. GELFAND:

23   Q.   Good morning, Detective Kalmer.

24   A.   Good morning.

11:25AM25   Q.   Detective, you are and were at the time employed as a

11:25AM 1    detective with the Little Rock Police Department, is that

2    correct?

3    A.    I was, yes.

4    Q.    And you still are, correct?

11:26AM 5    A.    That is correct.

6    Q.    In fact, you've been employed as a law enforcement

7    officer with that department since all the way back to

8    2009, is that correct?

9    A.    Yes, sir.

11:26AM 10   Q.    One of your primary responsibilities in 2019 was to

11   investigate possible computer crimes, is that correct?

12   A.    Yes, internet crimes against children.

13   Q.    Now, as a law enforcement officer, would you agree

14   with me that it's important to be thorough?

11:26AM 15   A.    Yes, sir.

16   Q.    It's important to be fair?

17   A.    Yes, sir.

18   Q.    It's important to keep an open mind, correct?

19   A.    That is correct.

11:26AM 20   Q.    It's important to follow all leads, correct?

21   A.    If able to, yes, sir.

22   Q.    It's important to at least try to follow all leads,

23   correct?

24   A.    Yes, sir.

11:26AM 25   Q.    It's important to accurately document your work as a

11:26AM 1    police officer or as a detective, correct?

2    A.   Yes, sir.

3    Q.   And it's important to act quickly, within reason at

4    least, because in these kinds of cases, evidence can

11:26AM 5    disappear, correct?

6    A.   Possibly.

7    Q.   In other words, would you agree that -- I don't mean

8    within minutes, but that it's important to act as quickly

9    as possible?

11:27AM10    A.   Yes, sir.

11    Q.   Now, in criminal cases like this, details matter,

12    correct?

13    A.   Yes, sir.

14    Q.   I want to just get our bearings for a second.  You

11:27AM15    testified just in talking about what you generally do

16    about something called cyber tips, correct?

17    A.   Yes, sir.

18    Q.   That's not what we're talking about in this case,

19    correct?

11:27AM20    A.   That is correct.

21    Q.   So cyber tips are a totally different way that cases

22    like this can originate within law enforcement, correct?

23    A.   Yes, sir.

24    Q.   And that's where Google, for example, or whatever it

11:27AM25    may be, Bing, for example, may give some sort of a tip to

11:27AM 1    law enforcement saying you may want to investigate

2    something, correct?

3    A.    Yes, sir.

4    Q.    To be clear, that didn't happen here, correct?

11:27AM 5    A.    There was no cyber tip, no, sir.

6    Q.    This case fell into the paradigm that you testified

7    about involving peer-to-peer investigations, is that

8    correct?

9    A.    Yes, sir.

11:28AM10    Q.    And just so we're kind of speaking the same language,

11    peer-to-peer investigations are cases that involve the

12    BitTorrent network, correct?

13    A.    BitTorrent, eMule, and Freenet are the ones that I

14    use.

11:28AM15    Q.    To be clear, these are file-sharing platforms,

16    correct?

17    A.    Yes, sir.

18    Q.    To be clear, as file-sharing platforms, the

19    BitTorrent network is not limited to sharing illegal

11:28AM20    images, correct?

21    A.    That is correct.

22    Q.    In other words, there's a ton of legal stuff that

23    happens on the BitTorrent network, correct?

24    A.    Yes, sir.

11:28AM25    Q.    Music sharing, commercial movie sharing, those kind

11:28AM 1    of things, correct?

2    A.   Yes, sir.

3    Q.   Now, I want to go back to May of 2019.  You testified

4    that you were using a program called Torrential Downpour,

11:28AM 5    is that correct?

6    A.   Yes, sir.

7    Q.   And Torrential Downpour is a law enforcement only

8    program, is that correct?

9    A.   The version that I use, yes, sir.

11:29AM10    Q.   Torrential Downpour, in general, is a law enforcement

11    only program, correct?

12    A.   I do not know the answer to that one.

13    Q.   Torrential Downpour creates auto-generated logs,

14    correct?

11:29AM15    A.   Yes, logs of connection.

16    Q.   And you testified about two of those auto-generated

17    logs, Government's Exhibits 1 and 2, correct?

18    A.   Yes, sir.

19    Q.   So just to show you, for example, Government's

11:29AM20    Exhibit 2.

21         MR. GELFAND:  If I may publish this, Your Honor.

22         THE COURT:  You may.

23    Q.   (BY MR. GELFAND.)  Can you see Government's Exhibit 2

24    in front of you, Detective?

11:30AM25    A.   Yes, sir.

11:30AM 1    Q.    This is one of those auto-generated logs reflecting

2    that you were using Torrential Downpour version 1.44, is

3    that correct?

4    A.    Yes, sir.

11:30AM 5    Q.    You testified a few minutes ago, when the prosecutor

6    was asking you questions, that this log identified the

7    version of BitTorrent that was being used on the other

8    end, is that correct?

9    A.    That is correct.

11:30AM10    Q.    What is the version of BitTorrent that this log

11    reflects was being used on the other end?

12    A.    The 3.55.   3.5.5.

13    Q.    And that's what we see here at the 18:45:12 time

14    stamp, correct?

11:30AM15    A.    That is correct.

16    Q.    6:45, that's 1845, correct?

17    A.    Yes, sir.

18    Q.    And is that local time?

19    A.    Yes, sir.

11:30AM20    Q.    Now, this particular log reflects that you began at

21    6:00 p.m. on May 15th of 2015, is that correct?

22    A.    That is correct.

23    Q.    Now, were you physically at your computer using

24    Torrential Downpour at this time, or does this basically

11:31AM25    run in the background?

11:31AM 1    A.    Its best practice is to have it running on your law

2    enforcement 24/7.

3    Q.    So I appreciate that it's best practices.  What were

4    you doing here?

11:31AM 5    A.    Best practices.

6    Q.    So you were -- to be clear, this is running 24/7,

7    correct?

8    A.    Yes.  It's on my desk where it's password protected.

9    And once I leave for the day, it's locked, but it can

11:31AM10    still run the program in the background.

11    Q.    When did you start running Torrential Downpour in a

12    way that it would have picked up any known hash values, as

13    you testified, from this IP address?

14    A.    When did I start running the program?  Can you

11:31AM15    restate your question?

16    Q.    Sure.  My understanding, if I understand your

17    testimony correctly, is that it's running 24/7 essentially

18    every day, correct?

19    A.    Yes, sir.

11:32AM20    Q.    So to be clear, it was running on May 11th, correct?

21    A.    I would have to go back and look at the logs to know

22    when it was running.

23    Q.    Did you do that prior to testifying today?

24    A.    No, sir.

11:32AM25    Q.    Was it running May 13th?

11:32AM 1   A.   I would have to go back and look to see when the

        2   computer was running.

        3   Q.   Was it running at any time between May 15th of 2019

        4   and November 8th of 2019?

11:32AM 5   A.   Most likely, yes.

        6   Q.   Definitely, correct?

        7   A.   Yes.

        8   Q.   And it was likely running throughout the vast

        9   majority of that time period, correct?

11:32AM10   A.   Yes, sir.

       11   Q.   And the truth is, during the entire time period

       12   between May 15th, 2019, and November 8th of 2019,

       13   Torrential Downpour did not identify a single known hash

       14   value from this same IP address beginning with 167,

11:33AM15   correct?

       16   A.   It made connection due to a known hash value.

       17   Q.   In other words, there were no other connections

       18   between the last date reflected here and the day of the

       19   search warrant, November 8th of 2019, correct?

11:33AM20   A.   I believe so.

       21   Q.   Because there was no other alleged child pornography

       22   from that IP address during that time period, correct?

       23   A.   I would have to see if the computer was up and

       24   running to know if there was any other attempted

11:33AM25   connections.

11:33AM 1    Q.    But as a practical matter, meaning your computer was

2    up and running, correct?

3    A.    Again, I would have to go look at my computer to see

4    if it was.

11:33AM 5    Q.    But you testified that it was best practice to keep

6    it running 24/7, and you do best practice, correct?

7    A.    During that time, yes.  I haven't had it up and

8    running in the last probably six months.

9    Q.    Now, in fact, Detective, the logs that are generated

11:34AM10    are actually more extensive than the logs that have been

11    introduced into evidence as Government's Exhibits 1 and 2,

12    is that correct?

13    A.    There's other logs that come with it, yes, sir.

14    Q.    I'd like to direct your attention.  There's a defense

11:34AM15    exhibit binder that's next to you or in front of you.

16    Do you see that?  Not the government one.

17    A.    Do what?

18    Q.    Do you have the defense exhibit binder in front of

19    you?

11:34AM20    A.    I believe so, yes.

21    Q.    Could you turn to Defense Exhibits 8 and 9 and just

22    take a quick look at that to yourself, please.

23          Have you had a chance to look at Defendant's

24    Exhibit 8 and Defendant's Exhibit 9?

11:35AM25    A.    Yes, sir.

11:35AM 1    Q.   Are these the remainder of the logs that are

2    associated with the two downloads on May 14th and May 15th

3    that you testified to?

4    A.   No, sir.

11:35AM 5    Q.   Your testimony under oath is that Defendant's

6    Exhibit 8 and Defendant's Exhibit 9 are not the logs

7    associated with the downloads on May 14th and May 15th?

8    A.   The first pages are not until it gets to the actual

9    logging of the connection.

11:35AM10          MR. GELFAND:  Your Honor, may we approach

11    briefly?

12          THE COURT:  Yes.

13          (Bench Conference)

14          MR. GELFAND:  Your Honor, we made a discovery

11:36AM15    request for the logs in totality associated with these two

16    downloads.  These are the logs, Defendant's Exhibit 8 and

17    9, that were provided to us by the government.

18          MS. MARSHALL:  Her testimony is that is not the

19    log.

11:36AM20          MR. GELFAND:  Then why were these provided to us

21    when we asked for the logs?

22          MS. MARSHALL:  I'm not the one testifying.

23          MS. CRAIG:  Judge, she can't hear Carly.

24          THE COURT:  You need to speak up.

11:36AM25          MS. MARSHALL:  I said, I'm not the one

11:36AM 1    testifying.

2         MR. GELFAND:  Well, I'm asking government counsel

3    what these are, if they are not the logs, because they

4    were represented to us to be the logs, which is what we

11:37AM 5    have provided to our expert, what we have been relying on.

6    We don't have independent access to logs.

7         THE COURT:  Well, this is what has been provided

8    to you in discovery.  I don't know if you can -- what she

9    may know about that.  I would suggest you ask her if she

11:37AM10    recognizes what the first -- get her to identify where

11    what she is defining as the logs begin, ask her whether

12    she knows what the preliminary pages are and go from

13    there.  I mean, if there's a discovery issue to take up,

14    we can take that up, but we can't take it up with this

11:37AM15    witness.

16         MR. GELFAND:  I guess to cut to the chase, will

17    the government stipulate to the admissibility of

18    Defendant's Exhibits 8 and 9, which is my real goal in

19    doing this, because these were provided by them.  We asked

11:37AM20    for the logs.

21         THE COURT:  You can ask them.

22         MS. MARSHALL:  No.

23         MR. GELFAND:  You guys e-mailed this to us in

24    response for discovery requests.

11:38AM25         THE COURT:  Authenticating what the exhibit is in

11:38AM 1   the courtroom is different than whether there is a

2   discovery issue.  So you need to make whatever progress

3   you can make with this witness and we can take up

4   discovery issues later.  But perhaps you will get some

11:38AM 5   idea of what the issue is by differentiating between the

6   first few pages and the page that she says is where the

7   actual download or whatever she said begins.

8           MR. GELFAND:  Okay.

9           (Bench Conference Concluded)

11:39AM 10  Q.  (BY MR. GELFAND.)  Detective, let's take this one

11  step at a time.  Defendant's Exhibit 8, do you recognize

12  the first page of that?

13  A.  No, sir.

14  Q.  You don't recognize the page that is the first page

11:39AM 15  of Defendant's Exhibit 8?

16  A.  That is correct.

17  Q.  By page number, can you tell me the first page that

18  you recognize as the logs?

19  A.  Nine.

11:39AM 20  Q.  Is that the page beginning with, "Torrential Downpour

21  Version 1.44?"

22  A.  That is correct.

23           MR. GELFAND:  Your Honor, at this point, I would

24  move Defendant's Exhibit 8 into evidence.  And I will for

11:39AM 25  current purposes remove the first eight pages.

11:40AM 1           THE COURT:  Any objection to the receipt of

2       Defendant's Exhibit 8 as described?

3           MS. MARSHALL:  Your Honor, can we verify, it

4       starts at eight through what page?  Is it the rest of the

11:40AM 5   document that the witness recognizes, or only a portion of

6       it?

7           THE COURT:  Will the witness explain whether all

8       the inclusive pages through the end of the exhibit are

9       part of the log that she has referenced.

11:40AM10          THE WITNESS:  Page 9 is not.

11          THE COURT:  All right.  We're going to begin

12      with -- just be sure everyone is on the same page.  You

13      have said that the page at the top that begins with

14      "Torrential Downpour Version 1.44," that is part of the

11:40AM15  log that you recognize, is that right?

16          THE WITNESS:  Yes, sir.

17          THE COURT:  Now, paging through, can you point

18      out other pages that you do not recognize or associate as

19      being part of your log?

11:41AM20          THE WITNESS:  Just the following page, on page 9.

21          THE COURT:  So the page right after the first

22      page should be removed as we're defining things for this

23      exhibit, is that right?

24          THE WITNESS:  Yes, sir.

11:41AM25          THE COURT:  So I'm going to do that.  What about

11:41AM 1    the remaining pages through the end of the exhibit?

2                    THE WITNESS:  The remaining are good.

3                    THE COURT:  Ms. Marshall, removing page 9 as the

4    witness has just described, what is your position on

11:41AM 5    receiving the balance of the pages as Defendant's

6    Exhibit 8?

7                    MS. MARSHALL:  The government has no objection,

8    Your Honor.

9                    THE COURT:  All right.  The Court will receive

11:42AM10    Defendant's Exhibit 8 as described.

11                    (Defendant's Exhibit 8 Received)

12                    THE COURT:  Counsel are directed to confer at the

13    next recess to make certain that the Court's copy is the

14    same as you understand Exhibit 8 to be, and then the Court

11:42AM15    will assist counsel in -- well, you should paginate each

16    page and put counsel initials on it or something to verify

17    for the record so there's no question later, but we can

18    take care of that at the break.  You may proceed.

19                    MR. GELFAND:  Thank you, Your Honor.

11:42AM20    Q.    (BY MR. GELFAND.)  If I direct your attention to

21    Defendant's Exhibit 9, is it fair to say, Detective, that

22    if we remove that first page, that the remainder are true

23    and authentic Torrential Downpour logs in connection with

24    your download on May 15th of 2019?

11:43AM25    A.    Yes, sir.

11:43AM 1               MR. GELFAND:  Your Honor, at this point, I move

2       Defendant's Exhibit 9 with the exception of the previously

3       marked first page into evidence.

4               MS. MARSHALL:  No objection, Your Honor.

11:43AM 5               THE COURT:  Defense Exhibit 9, as described, will

6       be received.  Counsel are directed at the next recess to

7       follow the same procedure.

8               (Defendant's Exhibit 9 Received)

9               MR. GELFAND:  Thank you.  May I publish both

11:43AM10       exhibits, Your Honor?

11               THE COURT:  You may.

12       Q.   (BY MR. GELFAND.)  The government exhibit that you

13       showed us, let's just start with Government Exhibit 1.

14       This is a single page log, correct?

11:44AM15       A.   Yes, sir.

16       Q.   Now, if we look at -- just to be clear, this is a

17       single page log that correlates with May 14th, 2019,

18       correct?

19       A.   Yes.  That's a summary log.

11:44AM20       Q.   Now, if we look at Defendant's Exhibit 8, this

21       provides substantially more detail, correct?

22       A.   Yes.  It's called a detailed log.

23       Q.   Substantially more information, correct?

24       A.   Same information, just goes through more steps.

11:44AM25       Q.   In particular, it time stamps and date stamps what

11:44AM 1    happens and when, even to the second, correct?

2    A.    Yes, sir.

3    Q.    And similarly, Defendant's Exhibit 9 correlates with

4    Government Exhibit 2 related to May 15th, correct?

11:44AM 5    A.    Yes, sir.

6    Q.    And again, Defendant's Exhibit 9 provides

7    significantly more detail as to what was going on and

8    when, correct?

9    A.    Yes.  One is a summary log and the other one is a

11:45AM 10   detail log.

11   Q.    This detailed log for May 14th and the detailed log

12   for May 15th, these are auto-generated by the system,

13   correct?

14   A.    Yes, sir.

11:45AM 15   Q.    In other words, you don't personally input anything

16   or not input anything, correct?

17   A.    I do not.

18   Q.    So on May 14th, showing you Defendant's Exhibit 8,

19   you made a direct connection to the IP address that you

11:45AM 20   previously identified, correct?

21   A.    Yes, sir.

22   Q.    And that began at 1741?  In other words, 5:41 p.m.,

23   correct?

24   A.    Yes, sir.

11:45AM 25   Q.    Now, at that time, you testified that you downloaded

11:45AM 1   a video file entitled mov_0216.mp4, is that correct?

2   A.   Yes, sir.

3   Q.   Now, at that time that you downloaded that video, are

4   you personally behind the computer, or is this just

11:46AM 5   happening in the background?

6   A.   It's happening in the background.  It's automated

7   through the program.

8   Q.   When is the first time that you know that the program

9   downloaded this video from this IP address?

11:46AM10   A.   When I go look at my undercover computer.

11   Q.   When was that?

12   A.   I can't tell you a date on that.

13   Q.   Did you document it anywhere?

14   A.   When I noticed it and I observed it is when I

11:46AM15   contacted Special Agent Gerald Faulkner.

16   Q.   You testified just a few minutes ago that that was

17   actually in June as opposed to in May, correct?

18   A.   That is correct.

19   Q.   So basically, if I understand your testimony

11:46AM20   correctly, this all sat undetected with no one looking at

21   this computer for a month?

22   A.   Yes, sir.

23   Q.   At the time that you identified it in June of 2019,

24   you could not identify a specific location where the

11:47AM25   device that participated in this encrypted handshake

11:47AM 1    occurred, is that correct?

2    A.    A specific location, no, sir.

3    Q.    In other words, all you have at that point is an IP

4    address, correct?

11:47AM 5    A.    Yes, sir.

6    Q.    So you can't identify from your station, so to speak,

7    from your vantage point, you can't identify where the

8    device connecting is, correct?

9    A.    That is correct.

11:47AM10    Q.    And you actually can't identify even what kind of

11    device or what device it is, correct?

12    A.    Not on the program, no, sir.

13    Q.    In fact, you can't identify whether there's actually

14    a human on the other side of this device, so to speak,

11:47AM15    correct?

16    A.    Correct.

17    Q.    Now, in fact, you've had tremendous experience with

18    BitTorrent peer-to-peer investigations, correct?

19    A.    Yes, sir.

11:47AM20    Q.    Oftentimes, BitTorrent, just like on your side,

21    BitTorrent applications are running, quote, unquote, "in

22    the background," correct?

23    A.    If the user allows it, yes, sir.

24    Q.    And as a practical matter, what that means is that if

11:48AM25    you're downloading something from another device using

11:48AM 1    Torrential Downpour, as you did on May 14th and May 15th,
        2    you don't know one way or the other whether there's
        3    actually a human being on the other end, correct?
        4    A.   Correct.
11:48AM 5    Q.   In fact, it wouldn't be uncommon that there wouldn't
        6    be a human being on the other end, correct?
        7    A.   I can't say for that.
        8    Q.   I'm sorry.  I couldn't hear you.
        9    A.   I said, I can't say for that one way or the other.
11:48AM10    Q.   There are scenarios where there's no one on the other
       11    end, correct?
       12         MS. MARSHALL:  Objection, Your Honor.  Calls for
       13    speculation.
       14         MR. GELFAND:  I'll withdraw the question, Your
11:48AM15    Honor.
       16         THE COURT:  Very well.  Sustained.
       17    Q.   (BY MS. GELFAND.)  Now, as a practical matter,
       18    May 15th of 2019 -- showing you Defendant's Exhibit 9 --
       19    there's also a direct connection with that same IP
11:48AM20    address, correct?
       21    A.   Correct.
       22    Q.   Similar to what I just asked you with respect to
       23    May 14th, at this time, all you know is you have connected
       24    to a device using an IP address.  You have no clue where
11:49AM25    the IP address is or what device that is, correct?

11:49AM 1    A.    Correct.

2    Q.    And you have no clue whether there's a human being

3    actually sitting --

4          MR. GELFAND:  I didn't even ask the question yet,

11:49AM 5    Your Honor.

6          THE COURT:  You may ask the question and then we

7    will pause to see if there's an objection.

8          MR. GELFAND:   Thank you.

9    Q.    (BY MR. GELFAND.)  On May 15th, when your computer

11:49AM10    participated in a handshake, is there anything on this log

11    that would tell you whether there was a human being

12    sitting behind the other device?

13    A.    No, sir.

14    Q.    Now, let's talk times for a second.  What time of day

11:49AM15    does Torrential Downpour, your law enforcement, start to

16    interact with this computer or this device, I should say,

17    on May 15th of 2019?

18    A.    6:00 p.m.

19    Q.    Were you physically present when this happened, or

11:50AM20    was this again running in the background?

21    A.    I can't answer that one.

22    Q.    You just don't know?

23    A.    I do not know, no, sir.

24    Q.    Between 6:00 p.m. and 6:39 p.m., is it fair to say

11:50AM25    that Torrential Downpour, meaning your law enforcement

11:50AM 1    device, attempted repeatedly to connect to this device on

     2    the other end, but failed?

     3    A.    Yes, sir.

     4    Q.    In other words, all of those attempts over the course

11:50AM 5    of approximately 40 minutes -- 39 minutes, to be

     6    precise -- were unsuccessful, correct?

     7    A.    Correct.

     8    Q.    At 6:45 p.m., there's a successful connection,

     9    correct?

11:50AM10    A.    Yes, sir.

     11    Q.    And you testified that at that time, 13 of 66 pieces

     12    were downloaded, correct?

     13    A.    Correct.

     14    Q.    At 6:45, Torrential Downpour sent 168 requests for

11:51AM15    data.  What does that mean?

     16    A.    Requesting the files and the pieces to download.

     17    Q.    168 times?

     18    A.    Yes, sir.

     19    Q.    In fact -- and you can look through this, but I think

11:51AM20    you have before -- for the next 17 hours, your law

     21    enforcement device attempted to connect to this IP

     22    address 160 additional times, isn't that correct?

     23    A.    I wouldn't be able to -- I haven't went through the

     24    log to count them, sir.

11:51AM25    Q.    You were never able to download the remainder of the

11:52AM 1  file, correct?

2  A.   Only the 13 pieces.

3  Q.   How do you explain that?

4  A.   My computer downloaded the 13 pieces that were

11:52AM 5  available by the IP.

6  Q.   Does that mean that the remainder, in other words, if

7  there's -- how many pieces were there total?  66?

8  A.   Yes, sir.

9  Q.   So does that mean that the remaining 53 pieces were

11:52AM 10  not available?

11  A.   I wasn't able to download them.

12  Q.   Now, when did you first view these files?

13  A.   The log files or --

14  Q.   No, the images themselves that you downloaded.

11:52AM 15  A.   I would have viewed those the day that I contacted

16  Special Agent Gerald Faulkner.

17  Q.   And what day was that?

18  A.   It would be -- I forwarded it to him on the ICAC data

19  system on June 17th.  And I would have made contact with

11:53AM 20  him prior, two to three days before that.

21  Q.   So somewhere in the vicinity of June 14th or

22  June 15th of 2019 is the first time that you viewed those

23  images or those videos, correct?

24  A.   I can't say with certainty, but around that time.

11:53AM 25  Q.   Do you document, as a law enforcement officer, when

11:53AM 1    you perform investigative steps in connection with a case?

2    A.    No.   I called Special Agent Faulkner over the phone

3    to see if it was an investigation that he would want.

4    Q.    Did you document a single thing that you did in a

11:53AM 5    police report?

6    A.    I did not do anything on my end, sir.

7    Q.    Now, you testified that what you knew is that the IP

8    address geolocated to Northwest Arkansas, correct?

9    A.    Correct.

11:53AM 10   Q.    So that's why you contacted Special Agent Faulkner

11   with Homeland Security Investigations, correct?

12   A.    Yes, sir.

13   Q.    And to be clear, you told Detective -- I'm sorry --

14   Agent Faulkner that you used Torrential Downpour and

11:54AM 15   downloaded two files, correct?

16   A.    I don't know what our conversation was.   It was, I

17   got downloads for an IP in his location, if he wanted it

18   to investigate.

19   Q.    Is Torrential Downpour the only software that you

11:54AM 20   used?

21   A.    In this investigation?

22   Q.    Yes.

23   A.    Yes, sir.   BitTorrent.

24   Q.    And when you say BitTorrent, BitTorrent is a network,

11:54AM 25   correct?

11:54AM 1   A.   BitTorrent is the software.  You have to use uTorrent

2   and stuff to view the torrents that you download.

3   Q.   So let's talk about that for a second.  From any of

4   the logs or anything else you did in your part of this,

11:54AM 5   quote, unquote, "investigation" that you conducted, were

6   you able to identify what software application was being

7   used on the other end on May 14th and May 15th to access

8   the BitTorrent network?

9   A.   No, sir.  Just his version of BitTorrent.

11:54AM10   Q.   So in other words, you don't know whether it was

11   uTorrent or Transmission or qBittorrent or anything along

12   those lines, correct?

13   A.   No, sir.  That's correct.

14   Q.   You're familiar, though, based on your training and

11:54AM15   experience that those are all ways, among others, to

16   access the BitTorrent network, correct?

17   A.   Yes, sir.

18   Q.   Now, you have a lot of experience independently

19   investigating these kinds of cases, correct?

11:55AM20   A.   I have experience, yes, sir.

21   Q.   How do you connect an IP address to a physical

22   location?

23   A.   By sending legal process for the IP for the date and

24   time.

11:55AM25   Q.   In other words, you know who the ISP, the internet

11:55AM 1    service provider, is from your end, correct?

2    A.    Yes.

3    Q.    You can access that, anyone can access that

4    essentially by Googling it, correct?

11:55AM 5    A.    Yes, sir.

6    Q.    So that takes two seconds to find out, correct?

7    A.    Yes, sir.

8    Q.    And then all that needs to happen to figure out the

9    physical location of where an IP address is associated is

11:55AM10    to ask for it from the ISP, the internet service provider,

11    correct?

12    A.    Correct.

13    Q.    Whether that's AT&T or OzarksGo, that's all that has

14    to happen, correct?

11:55AM15    A.    Yes, sir.

16    Q.    Now, sitting here today, Detective Kalmer, is it fair

17    to say that you don't have any firsthand knowledge of what

18    device or devices you connected with?

19    A.    Correct.

11:56AM20    Q.    You do not know who, if anyone, was using any device

21    that you connected with, correct?

22    A.    They had to use a device to be able to get the

23    content, but I don't know what that device was.

24    Q.    But you don't know the "who" either, correct?

11:56AM25    A.    The "who?"  No, sir.

11:56AM 1    Q.    You don't know, as you just testified, what software
        2    that person was using, is that correct?
        3    A.    Just the version of BitTorrent.
        4    Q.    Is it fair to say, based on your training and your
11:56AM 5    experience, that these cases require intense computer
        6    forensic evaluations?
        7    A.    Yes, sir.
        8    Q.    Is it important in investigating these cases to
        9    follow all of the evidence and see where it leads?
11:56AM10    A.    Just like any investigation, yes, sir.
       11    Q.    And just to be clear, you didn't personally
       12    participate in the subsequent investigation of this case,
       13    correct?
       14    A.    That is correct.
11:57AM15    Q.    So you don't know personally what happened with
       16    respect to the rest of the investigation, correct?
       17    A.    Correct.
       18          MR. GELFAND:  Your Honor, may I have one minute,
       19    please?
11:57AM20          THE COURT:  Certainly.
       21          MR. GELFAND:  Thank you.  I have no more
       22    questions, Detective.
       23          THE COURT:  Any redirect, Ms. Marshall?
       24          MS. MARSHALL:  Just briefly, Your Honor.  May I
11:57AM25    have a moment?

```
11:57AM  1              REDIRECT EXAMINATION
         2   BY MS. MARSHALL:
         3   Q.    Detective Kalmer, the defense asked you about
         4   BitTorrent and stated that it's not limited to sharing
11:58AM  5   illegal images, is that correct?
         6   A.    That is correct.
         7   Q.    Now, your law enforcement program that you have, you
         8   talked about it's looking for known images, is that right?
         9   A.    That is correct.
11:58AM 10   Q.    So is the law enforcement program specifically
        11   looking for child pornography?
        12   A.    Yes, ma'am.
        13   Q.    It's not out looking for documents or anything like
        14   that?
11:58AM 15   A.    No.  It only looks for hash values of known images
        16   that contain child pornography.
        17   Q.    And it's not looking into someone's computer, it's
        18   looking to see what someone is sharing from their
        19   computer, is that correct?
11:59AM 20   A.    That is correct.
        21   Q.    They also asked you about May 15th, 2019, talking
        22   about between 6:00 p.m. and 6:39 p.m. that it attempted to
        23   connect to the device, but failed.  In your training and
        24   experience, why would something attempt to connect, but
11:59AM 25   fail?
```

11:59AM 1   A.   Due to the computer being shut off or the program

2   being not used or utilized.  Multiple different things

3   like that.

4   Q.   Now, is it true that to download videos or images

11:59AM 5   from another user, those videos or images have to be on

6   that other user's device?

7   A.   Yes.  Usually the way BitTorrent or any of the

8   peer-to-peer works is when you make connection with that

9   computer, they give you access to a folder that has

12:00PM10   images, videos, and files in it and they are giving

11   permission for others to download specifically what's in

12   that file.

13   Q.   So you would expect to see those images or videos on

14   that other person's device if you then looked at it?

12:00PM15   A.   Yes, ma'am.

16   Q.   Going back to the logs that we talked about,

17   Government's Exhibit 1 and Government's Exhibit 2, is it

18   true that you contacted, on both of those days, a device

19   that was running the same version of BitTorrent both days?

12:00PM20   A.   Yes, ma'am.

21   Q.   It was from the same IP address?

22   A.   Yes, ma'am.

23   Q.   And on each day, you downloaded child pornography

24   from that specific device, from that IP address?

12:00PM25   A.   That is correct.

12:00PM 1    Q.    The defense also asked you about internet service

2    providers and he said all you have to do is ask for it.

3    Is it that easy to get something from an internet service

4    provider is just ask for it?

12:01PM 5    A.    Normally, I have to take legal process and have an

6    open investigation or a reasoning that you're requesting

7    that information.

8    Q.    And what is that legal process normally?

9    A.    A subpoena.

12:01PM 10   Q.    So you have to send them something?  You don't just

11   pick up the phone and call them?

12   A.    That is correct.

13   Q.    Were you the end-all, be-all of this investigation?

14   A.    No, ma'am.

12:01PM 15   Q.    Were you just one part of it?

16   A.    Yes, ma'am.

17   Q.    Do you have all the answers about what happened?

18   A.    Absolutely not.

19           MS. MARSHALL:  No further questions, Your Honor.

12:01PM 20          THE COURT:  Does that prompt anything further,

21   Mr. Gelfand?

22           MR. GELFAND:  No, Your Honor.

23           THE COURT:  May this witness be excused?

24           MR. GELFAND:  Your Honor, may we just briefly

12:01PM 25   approach on that issue?

12:01PM 1           THE COURT:  Yes.

2            (Bench Conference)

3           MR. GELFAND:  Before excusing her, we need to

4  understand if it's not this witness who can authenticate

12:02PM 5  those additional logs that were provided in discovery,

6  because our understanding all along based on discovery is

7  that it was her.

8           MS. MARSHALL:  Why she did not --

9           MR. GELFAND:

12:02PM 10           THE COURT:  No.  No, but you need to find out --

11  go back and look at your discovery production to find your

12  source for the entirety of the document so that you can

13  provide a chain of where it came from --

14           MS. MARSHALL:  Yes, Your Honor.

12:02PM 15           THE COURT:  -- so that that can perhaps explain

16  why she does not recognize it and you need to provide that

17  information to the defense.

18           MS. MARSHALL:  Yes, Your Honor.

19           THE COURT:  I would suggest that we leave this

12:03PM 20  witness technically under subpoena and you need to counsel

21  her that she can't discuss her testimony with anyone, but

22  that we let her leave.  And if she needs to be recalled,

23  then the defense could provide reasonable notice that she

24  needs to come back.

12:03PM 25           MR. GELFAND:  Sure.

12:03PM 1          THE COURT:  Are we in agreement on that?

2          MR. ROBERTS:  She's in Northwest Arkansas for

3     this week, so no problem.

4          MR. GELFAND:  Thank you.

12:03PM 5          (Bench Conference Concluded)

6          THE COURT:  Ma'am, you may step down for the time

7     being and counsel will explain any further

8     responsibilities that you may have with regard to your

9     subpoena.

12:03PM10          THE WITNESS:  Okay.

11          THE COURT:  We do appreciate your time.

12          THE WITNESS:  Thank you, sir.

13          THE COURT:  Members of the Jury, we are going to

14     take our lunch recess at this time.  Some of you may not

12:03PM15     be familiar with the downtown area and the restaurants and

16     cafes and that sort of thing, so we're going to take an

17     hour and 15 minutes today.  And if you could be in the

18     jury room and ready to come back out at 1:20, that's when

19     we will call for you.  Everyone please stand as the Jury

12:04PM20     exits.

21          (Jury out at 12:04 p.m.)

22          THE COURT:  I would ask that everyone else remain

23     in the courtroom until our jurors have cleared the fifth

24     floor elevator lobby.  And I will pause here on the record

12:04PM25     with you and let you know when you are free to leave.

12:05PM  1          Counsel, I would suggest this protocol with

        2    regard to Defense Exhibits 8 and 9.  I would propose that

        3    you take the Court's courtesy copy of the exhibits, that

        4    you number each page, for example, 8-1, 8-2, 8-3.  Similar

12:05PM  5    numbering scheme for Exhibit 9, with the second number

        6    representing the page in sequence of each exhibit.  After

        7    you have done that, I would like for one attorney for each

        8    side to initial right next to the page number.  If you

        9    will then give that exhibit back to Ms. Craig, she will

12:05PM 10    make copies so that everyone has a copy of the same

       11    exhibit with the same pagination system.

       12          Any questions about that?

       13          MS. MARSHALL:  No, Your Honor.

       14          MR. GELFAND:  No, Your Honor.

12:06PM 15          THE COURT:  Best I can tell, the Jury has cleared

       16    the lobby, so we're in recess.  We'll start back up at

       17    1:20.

       18          (Lunch recess taken, 12:04 p.m. to 1:20 p.m.)

       19          (In-Chambers Proceeding)

12:06PM 20          THE COURT:  What's up?

       21          MR. ROBERTS:  Two issues.  One, I think we

       22    resolved the defense exhibit.  That was produced, although

       23    the copy was not Bates stamped.  We verified that it is

       24    generated out of the Torrential Downpour program, however,

1:31PM 25    it is not something that Amber Kalmer looks at, knows, is

1:31PM 1    familiar with.  So we're willing to -- and I think the

2    defense is in agreement -- stipulate that those are

3    generated from the Torrential Downpour program.  They're

4    actually called something different, data something,

1:31PM 5    written files or something.

6              THE COURT:  Okay.

7              MR. GELFAND:  I think the best way to do it, even

8    though this would be a little bit out of order is, we'll

9    try to reach this evening a written stipulation to fairly

1:32PM 10   characterize what they are and what the stipulation is.

11   And then perhaps, I don't know, at whatever appropriate

12   time, the Court can read that to the Jury.

13             MR. ROBERTS:  If you want to just read that.

14   Move to introduce Defendant's Exhibit 8-B or something

1:32PM 15   like that, we're not going to object.  I mean, I'm good

16   either way.  Whatever the Court's preference.

17             MR. GELFAND:  Sure.  I understand.  I prefer that

18   it not sit for three days, but we can figure that out.

19             THE COURT:  Yeah, and I think -- I mean, the Jury

1:32PM 20   heard the attempt at a foundation and may have some

21   question marks, and so if there is a sentence or two

22   that's part of the stipulation that explains why it's now

23   being received, especially if it's going to be another

24   part of an exhibit number, they need to have that so they

1:32PM 25   can understand that.  So just get some language agreed to,

1:33PM 1   short and sweet, but contextual.

2          MR. GELFAND:  Sure.  We'll do that this evening.

3          MR. ROBERTS:  Second thing.  The next witness,

4   we'll be introducing sections of the defendant's

1:33PM 5   statement.  We're going into kind of a Rule of

6   Completeness argument.  We're glad to put it on the

7   record.  We just kind of wanted to give you the option.  I

8   understand the defendant is intending to play possibly,

9   depending on the testimony, sections of the interview that

1:33PM10   we are not introducing.

11          THE COURT:  You're not going to introduce

12   everything and you're wanting, on cross, to introduce more

13   sections?

14          MR. GELFAND:  Correct, Your Honor.

1:33PM15          THE COURT:  And no one is going to enter a

16   section that would offend the motion in limine ruling?

17          MR. GELFAND:  Correct, Your Honor.

18          THE COURT:  Okay.

19          MR. GELFAND:  The parties are on the same page on

1:33PM20   that issue.

21          MR. ROBERTS:  Yes.

22          MR. GELFAND:  I think that their only

23   objection -- I don't want to speak for them -- is whether

24   or not we are entitled, under either the Rule of

1:34PM25   Completeness or impeachment, to play other parts of that

1:34PM 1   interview.

2                THE COURT:  I see.

3                MR. ROBERTS:  Impeachment might come up, Your

4   Honor.  Our argument actually right now is Rule of

1:34PM 5   Completeness.  I think we are at least entitled to know

6   exactly what they want to put in where we can evaluate and

7   argue against it.  You did show me all the sections,

8   however, you caveated some just might be for impeachment.

9   I need to know.

1:34PM 10               THE COURT:  Well, so here's the issue.  Under the

11   Rule of Completeness, you're obviously entitled to fill in

12   parts that naturally go together.  But if it's a part

13   that's completely self-serving that is not connected by

14   the Rule of Completeness, then it doesn't come in.

1:34PM 15               MR. GELFAND:  No, we understand.  We're very

16   familiar with the Rule of Completeness.  I wasn't going

17   to, even though technically under the Rule, we can move

18   for the admission at the time on direct.  I don't think

19   that would be the Court's preference.

1:35PM 20               THE COURT:  Well, I'm not going to be able to

21   make a ruling contextually on whether it comes in under

22   the Rule of Completeness or whether it is separate and

23   doesn't come in because it's not an admission by a party

24   opponent.  I can't do that on the spot.

1:35PM 25               MR. GELFAND:  Sure.  What I can say, to be very

1:35PM 1   clear, we've provided segments that we believe come in all

2   under the Rule of Completeness.  However, we think on top

3   of that, there's also segments that would independently be

4   admissible for impeachment, depending on the nature of the

1:35PM 5   testimony of Special Agent Faulkner.

6          MR. ROBERTS:  Now, by provided, you haven't

7   provided to us, have you?

8          MR. GELFAND:  What do you mean?

9          MR. ROBERTS:  You showed me a transcript of

1:36PM10   highlights five minutes ago, but you didn't present it to

11   us prior to today?

12          MR. GELFAND:  Well, as far as isolating the

13   snippets, I don't know what your witness is going to

14   testify to.

1:36PM15          MR. ROBERTS:  Judge, I can address the

16   appropriate objection with the impeachment part.  I'm fine

17   with that.  It's the Rule of Completeness that I think

18   that we're at least entitled to.  I understand they are

19   not going to try to play it during the middle of my direct

1:36PM20   examination, so that resolves some of my issues.  We're

21   still going to object, particularly to the third-party

22   guilt.  We will not be touching on that in direct

23   examination.

24          MR. GELFAND:  When you say third party --

1:36PM25          MR. ROBERTS:  Third parties who had access to the

1:36PM 1  lot.  We will not be touching on that.

2         THE COURT:  Look, I don't have my head wrapped

3  around this.  I mean, if ya'll had brought this to my

4  attention before, I would take the transcript, I would

1:36PM 5  tell you to put what you all are going to play in one

6  color, what you all want to play in another color, mark

7  the excerpts so that I could then make a ruling on, does

8  it come in under the Rule of Completeness or does it not

9  come in, or is it impeachment, what have you.  But I

1:37PM 10  can't -- I mean, this is interesting that you have this

11  disagreement, but I can't be of any help because I don't

12  have it in front of me.  So we're just going to have to do

13  the best we can.  And if you feel like you need to make a

14  motion to receive something, or I guess I should say if

1:37PM 15  you feel like you need to object to something that they

16  are wanting to play, all I would ask is that you

17  choreograph while we're in the courtroom before you go

18  there with a witness what the next snippet is that you're

19  wanting to play so that he has a basis to make an

1:37PM 20  objection, and I'll just have to do the best that I can.

21         MR. GELFAND:  I understand.  If I'm understanding

22  the government's position correctly, it seems like, to

23  state the obvious, there's no issue with the authenticity

24  or the accuracy.  It's just whether or not the sections

1:37PM 25  come in under the Rule of Completeness.

1:37PM 1          MR. ROBERTS:  You have not addressed that issue.

2  Have you shown the snippets to the witness?

3          MR. GELFAND:  To your lead Special Agent?  No, I

4  have not shown that.  You guys provided -- 100 percent of

1:38PM 5  the recordings that you guys provided in discovery and you

6  played for the Court at the suppression hearing, that's

7  the audio that we're going off of.

8          THE COURT:  Okay.  Another issue, do you have

9  transcripts of the clips that you're playing?

1:38PM 10          MR. ROBERTS:  Yes, Your Honor, specific.  I

11  believe they have been provided to the Court.  If not, I

12  have one right here and I will provide it.

13          THE COURT:  But I mean individual?

14          MR. ROBERTS:  Yes, sir.  I'm going to be passing

1:38PM 15  those out to the Jury tentatively.  I know that it's going

16  to be Court's exhibit, whatever the appropriate exhibit.

17          THE COURT:  So are you playing one long --

18          MR. ROBERTS:  No, sir.

19          THE COURT:  -- that's been edited or are you

1:38PM 20  playing nine snippets?

21          MR. ROBERTS:  I'm playing three sections.  We

22  necessarily had to cut some of the stuff out based on the

23  defense motion, that's why we did provide it to the

24  defense to make sure we were not running afoul of that.

1:38PM 25  We represented we would just agree.  And I think we're in

1:39PM 1   agreement that none of those sections are coming in, but

2   necessarily, we had to divide it up.

3           THE COURT:  Okay.  Well, we'll just have to do

4   the best we can.  Have you all reached an agreement to

1:39PM 5   disclose who your witnesses are the night before or the

6   day before or something like that?

7           MR. GELFAND:  We've asked for the batting order.

8   We haven't done anything formally.

9           MR. ROBERTS:  Yes, we will talk about that, Your

1:39PM10  Honor.

11          THE COURT:  Because this is what's happening.  If

12  you had told them last night that you're calling Faulkner,

13  then they could have anticipated this issue and ya'll

14  could have let us know and I could have been prepared.

1:39PM15  But if we're trying to just hide behind the log on who our

16  witnesses are, it makes it more difficult on everyone.

17  And I told the Jury -- I need ya'll's help with this.  I

18  told the Jury we were going back on the record at 1:20.

19  They are now down there twiddling their thumbs trying to

1:40PM20  come up to talk about something that doesn't involve this

21  case for 20 minutes.  And I promised them that I wouldn't

22  waste their time.  And we're getting off to a start where

23  they are thinking to themselves, "That Judge is wasting

24  our time."  I do not like to be put in that position.

1:40PM25  Ya'll need to -- so you need to -- and what's sauce for

1:40PM 1    the goose is sauce for the gander.  Either by, I would say
     2      by 6:00 every night, you need to get them a list of
     3      witnesses that will take you through for sure the next
     4      day.  And when it's the defense case, you need to do the
1:40PM 5    same.  You need to be communicating with them about when
     6      you are going to finish so everyone is on the same page so
     7      that he can get you their witness list, and if there are
     8      evidentiary issues that you think you can spot, you need
     9      to let us know about them in advance so we don't have
1:41PM10    downtime so that I'm in a position where I can make a
     11     better ruling.  All right?
     12            MR. ROBERTS:  Yes, Your Honor.
     13         (In-Chambers Hearing Concluded)
     14         (Jury in at 1:47 p.m.)
1:41PM15            THE COURT:  Members of the Jury, I asked you to
     16     be ready to come back up at 1:20 and it is now almost
     17     1:50, and I apologize.  I do not want to get off to a bad
     18     start with you thinking that when I say we're coming back
     19     at 1:20, you develop the opinion that I don't mean what I
1:47PM20    say.  I do mean what I say.  And what we had happen was,
     21     there's some exhibits where some issues arose.  Exhibits
     22     will be coming up this afternoon and there was an
     23     unanticipated issue that we were trying to resolve and it
     24     took longer than we thought to get it resolved.  I am
1:48PM25    hopeful that the time that we took to make the efforts

1:48PM 1    that we did will lessen the delay that otherwise would

2    have been caused, but regardless, I apologize.  I'll try

3    to do my best to make sure that we do not waste any more

4    of your time.

1:48PM 5        The government may call its next witness.

6        MR. ROBERTS:  Thank you, Your Honor.  The

7    government calls Special Agent Gerald Faulkner to the

8    stand.

9        THE COURT:  Agent Faulkner, if you would please

1:48PM 10    come inside the rail and approach the bench.  If you would

11    pause about right there and raise your right hand.

12        (Witness Sworn)

13        THE COURT:  Please have a seat in the witness

14    box.  While testifying, you may remove your mask, but

1:49PM 15    you're not required to.  Pull the microphone and situate

16    it such that you can speak directly into it.

17        Mr. Roberts, you may inquire.

18        MR. ROBERTS:  Thank you, Your Honor.

19        GERALD FAULKNER, having been first duly sworn,

1:49PM 20    testified as follows:

21                    DIRECT EXAMINATION

22    BY MR. ROBERTS:

23    Q.   Agent Faulkner, would you state your full name, spell

24    your last name for the court reporter?

1:49PM 25    A.   Yes, sir.  Gerald Faulkner.  F-A-U-L-K-N-E-R.

1:49PM 1    Q.    Can you tell the Jury how you're currently employed?

2    A.    Sure.  I'm a Special Agent with Homeland Security

3    Investigations -- we also refer to it as HSI -- here in

4    our Fayetteville, Arkansas, office.

1:49PM 5    Q.    Could you explain to the Jury what HSI, what type of

6    investigations HSI looks into?

7    A.    Yes, sir.  The general public often associates HSI

8    strictly with immigration enforcement actions.  And that's

9    common because we do fall under the broad umbrella of

1:50PM 10   Immigration and Customs Enforcement, or ICE.  But in

11   reality, we are the largest investigative arm of the

12   Department of Homeland Security and enforce over 400

13   federal statutes to include child exploitation violations

14   over the internet.

1:50PM 15   Q.    How long have you been with HSI?

16   A.    Since April of 2009.

17   Q.    Are you assigned to a particular area within Homeland

18   Security?

19   A.    Yes, sir.  I'm currently assigned to the Internet

1:50PM 20   Crimes Against Children Task Force, so we refer to it as

21   the ICAC.  I also hold a collateral duty as an operator on

22   one of HSI's 17 special response teams where we are often

23   called out to execute high-risk search warrants, high-risk

24   arrest warrants, respond to domestic terrorist threats,

1:50PM 25   active shooters.  Any and all high-level threat dangers to

1:50PM 1  the United States.

2  Q.   Could you explain the role of HSI in Northwest

3  Arkansas as related to the Internet Crimes Against

4  Children Task Force?

1:51PM 5  A.   Yes, sir.  So, again, the ICAC, we investigate child

6  exploitation-based offenses that occur over the internet.

7  The majority of these investigations usually revolve

8  around the possession and distribution of images and

9  videos of child pornography.  The production of images and

1:51PM 10  videos of child pornography by hands-on offenders.  Those

11  usually take priority.  We also receive numerous cyber

12  tipline reports from the National Center for Missing &

13  Exploited Children.  That's, I'd say, the bulk of our

14  caseload.  We also receive leads from our HSI C3, or the

1:51PM 15  cyber crime center headquartered in Virginia.  We work

16  peer-to-peer file network sharing investigations,

17  undercover chat online investigations, as well as the sex

18  trafficking of minors.

19  Q.   How long have you been assigned to the Internet

1:51PM 20  Crimes Against Children Task Force?

21  A.   Approximately 2010.

22  Q.   Within that role since 2010, approximately how many

23  child exploitation cases can you estimate that you've

24  worked?

1:52PM 25  A.   In terms of being the case agent, co-case agent, peer

1:52PM 1    review, assisting, lead undercover agent on an online chat

2    operation, I'd say somewhere approximately over 1,000

3    cases in the last 11 years.

4    Q.   How many cases with respect to just specifically

1:52PM 5    online child pornography cases do you think you have

6    worked?

7    A.   Hundreds of hundreds.  Again, that's being case agent

8    or co-case agent or reviewing.

9    Q.   How many times do you think you have testified in

1:52PM 10   federal court?

11   A.   Several times.

12   Q.   Are you familiar with the investigation that led to

13   the indictment and arrest of the defendant, Joshua Duggar?

14   A.   Yes, sir.

1:52PM 15   Q.   Could you tell us how Mr. Duggar came to Homeland

16   Security's attention, your attention in this case?

17   A.   Correct.  In May of 2019, Detective Amber Kalmer of

18   the Little Rock Arkansas Police Department was conducting

19   an online investigation in the BitTorrent peer-to-peer

1:53PM 20   file-sharing network, at which time she identified a

21   specific IP address that was participating in the sharing

22   and downloading of known images and videos containing

23   child pornography.  Detective Kalmer was able to geolocate

24   that IP address to the Northwest Arkansas area.  She then

1:53PM 25   contacted me and asked if I would be willing to further to

1:53 PM 1    look into the lead, to which I agreed and accepted the

2    lead.

3    Q.    A few things we need to define for the Jury.  Can you

4    tell them, make sure that we are understanding.  What do

1:53 PM 5    you mean by "IP address?"

6    A.    An IP address, also known as an Internet Protocol

7    Address, is basically numbers that show where and how a

8    computer is connecting to the internet.

9    Q.    In general, are these types of cases referred to as

1:53 PM 10   peer-to-peer investigations?

11   A.    Yes, sir.

12   Q.    Can you walk the Jury through a general peer-to-peer

13   investigation?

14   A.    Sure.  So, typically, the first step is, you are

1:54 PM 15   going to have to flag or tag a known IP address that's

16   participating in one of these networks to be sharing

17   images and videos of child pornography.  Once that's done,

18   you then have to either download or acquire the files of

19   child pornography from that specific IP address in order

1:54 PM 20   to view them and confirm that they are in fact child

21   pornography by either federal or state statute.  Once

22   that's done, you need to locate the internet service

23   provider of that IP address.  What you need to find out is

24   basically where is this internet being housed out of?

1:54 PM 25   Once that's located, then you send a federal summons to

1:54PM 1    the internet service provider.  They will return documents

2    for the subscriber of who is actually paying for that

3    internet, where is this internet coming from.  Once that's

4    done, we put all that information into a probable cause

1:54PM 5    affidavit that we submit to a Federal Magistrate Judge.

6    If that Judge finds that we have enough probable cause,

7    then we then go forward on a search warrant.

8    Q.    When you execute the search warrant, what generally,

9    on a peer-to-peer case, are you looking for?

1:55PM 10   A.    So on peer-to-peer investigations, the three main

11   things that we look for is, one, any and all electronic

12   devices that contain the peer-to-peer file-sharing network

13   program.  Two, any and all electronic devices that contain

14   child pornography on it.  And then, three, any and all

1:55PM 15   electronic devices where we can put somebody behind the

16   computer during the dates and times that the crime

17   actually occurred.

18   Q.    You have stated that Detective Kalmer reached out to

19   you regarding her downloads.  Can you provide us a little

1:55PM 20   more specifics on those?  On what specific days did those

21   downloads occur?

22   A.    The downloads that Detective Kalmer had identified or

23   connected to were on May 14th and May 15th of 2019.

24   Q.    When she reached out to you, did you agree to work

1:55PM 25   the lead?

1:55PM 1    A.    Yes, sir.

2    Q.    Can you tell us your steps involved in agreeing to

3    work that lead?

4    A.    Once I agreed, Detective Kalmer then sent me that

1:56PM 5    lead in a law enforcement ICAC software program.  It's

6    encrypted so we can in fact send each other child

7    pornography over the internet through that program, or

8    that portal.  That was sent to me on June 17th of 2019.

9    And then in July of 2019, I accepted the case and then

1:56PM 10   downloaded the files and viewed them to in fact also be

11   images of child pornography.

12   Q.    What happened next in the investigation after you

13   determined that the images fit with what you believed was

14   child pornography?

1:56PM 15   A.    On, I believe it was July 31st, 2019, we had also

16   identified that the specific IP address was registered to

17   the internet service provider of OzarksGo.  So on July

18   31st, 2019, I sent a federal summons, served a federal

19   summons onto OzarksGo for the subscriber information to

1:56PM 20   that specific IP address.

21   Q.    Now, when you serve a federal summons for subscriber

22   information, by subscriber information, are you generally

23   referring to customer type information?

24   A.    So the typical information we're looking for and what

1:57PM 25   we receive from an internet service provider is going to

1:57 PM 1   be the subscriber's name, the dates of their service, the

2   types of service, and the physical address of where that

3   internet is being housed.

4   Q.   Once you serve a summons on an internet service

1:57 PM 5   provider such as OzarksGo, what is a time frame that you

6   typically run into in your cases for a response?

7   A.   In terms of receiving responses, it varies.  It can

8   be anywhere from three to four days to three to four

9   months.

1:57 PM 10   Q.   When did OzarksGo, or did OzarksGo respond in this

11   case?

12   A.   They did not.  In early October 2019, I ended up

13   reaching out to OzarksGo since I had not received a

14   response to my subpoena, or summons, I'm sorry.  They

1:58 PM 15   informed me that on August 9th, and again I believe on

16   August 15th, they did attempt to serve me those documents.

17   Unfortunately, I believe they left the "N" out of my last

18   name in my e-mail address, and, therefore, I never

19   received them.  Again, after speaking with them and

1:58 PM 20   learning this, on or about October 7th of 2019, they did

21   deliver those requested documents.

22   Q.   Can you describe the documents that they returned to

23   you?

24   A.   Yes, sir.  So the subscriber on record for that

1:58 PM 25   specific IP address that Detective Kalmer had connected to

1:58PM 1   was registered to a Joshua Duggar at 14993 Wildcat Creek

2   Road in Springdale, Arkansas.

3   Q.    Based on this response, can you explain to the Jury

4   what happened next?

1:58PM 5   A.    Yes, sir.  We then obtained a federal search warrant

6   for the property located at 14993 Wildcat Creek Road in

7   Springdale, Arkansas.

8   Q.    Did you attempt to execute that search warrant?

9   A.    Yes, sir.  On the morning of October 31st, 2019, we

1:59PM 10   attempted to execute the federal search warrant at the

11   home.  Upon making contact with the residents, though, we

12   learned that they did not --

13          MR. GELFAND:  Objection, Your Honor.  I'm sorry.

14   I would object to any hearsay from any statements made by

1:59PM 15   any third parties.

16          THE COURT:  Mr. Roberts?

17          MR. ROBERTS:  Your Honor, this is going to be

18   course of conduct to explain how he got from that

19   residence to the defendant's car lot.

1:59PM 20          THE COURT:  Objection overruled.  Not offered for

21   its truth under 801(c).

22   Q.    (BY MR. ROBERTS.)  Agent, I asked you the question

23   of, could you explain the circumstances of if you went

24   about executing that warrant?

1:59PM 25   A.    Yes, sir.  Again, so on the morning of October 31st,

1:59PM 1   2019, we attempted to execute that warrant.  But, again,

2   making contact with the residents, we learned that they

3   did not have internet access through OzarksGo.  They also

4   informed us that they did not, or that Mr. Duggar did not

1:59PM 5   ever live at that residence.  Further communications with

6   the people there told us that their property, which used

7   to be approximately 27 acres and identified as one

8   property, had been recently split into two separate

9   properties.  They had their property, and then they

2:00PM 10   informed us that there was associated, or another business

11   that had opened up on the lot next to them.  That was

12   Wholesale Motorcars that was owned and operated by Joshua

13   Duggar.

14        Based on that information, I then went back to

2:00PM 15   OzarksGo.  I informed them of the error in their subpoena

16   service.  They did in fact inform me that 14969 should be

17   the proper address for the subscriber of Joshua Duggar.

18   However, since they were still relying on outdated or old

19   mapping records, they did not have anything on file that I

2:00PM 20   could have concretely to show that.

21   Q.   So how did you proceed?

22   A.   I did some online research and I found out that when

23   Mr. Duggar was attempting to open his car lot, that he had

24   applied for some permits with the Washington County,

2:01PM 25   Arkansas, fire marshal.  I reached out to the fire marshal

2:01PM 1  who then provided me with documents that he had in fact

2  met with Joshua Duggar at 14969 Wildcat Creek Road in

3  Springdale, Arkansas, the business address for Wholesale

4  Motorcars in Springdale, Arkansas.  Furthermore, to

2:01PM 5  establish that that was our correct address, in early

6  November, I believe November 1st, 2019, we sent an HSI

7  undercover task force officer to the business who met and

8  identified Joshua Duggar inside of the office, so to

9  speak, there.

2:01PM 10        THE COURT:  Excuse me.  Excuse me.

11        MR. GELFAND:  I'm sorry.  I'd just object to this

12  hearsay of whatever this undercover officer told him.  The

13  undercover can testify.

14        THE COURT:  Mr. Roberts?

2:01PM 15        MR. ROBERTS:  Your Honor, I haven't heard him say

16  that the task force officer said.  He is saying that

17  Homeland Security, explaining the investigation, sent an

18  undercover task force officer into the dealership.

19        THE COURT:  Well, let's back up.  I'm going to

2:02PM 20  sustain the objection to the extent that Agent Faulkner

21  has testified to what some other agent said.  So rephrase

22  your question, we'll try again, but let's avoid the

23  hearsay.

24        MR. ROBERTS:  Yes, Your Honor.

2:02PM 25  Q.   (BY MR. ROBERTS.)  Now, Agent, will you explain the

2:02PM 1    steps that Homeland Security took to determine that Josh

2          Duggar controlled or operated Wholesale Motorcars for the

3          purposes of obtaining your search warrant?

4     A.    I'm sorry.  Say that again, sir.

2:02PM 5    Q.    You were testifying regarding that you sent in, or

6          Homeland Security sent in an undercover agent, or an agent

7          in an undercover capacity?

8     A.    Correct.

9     Q.    Now, not with regard to what he stated, could you

2:02PM10    tell us the steps in your investigation picking up from

11         there?

12    A.    We were able to determine that Mr. Duggar was in

13         possession of an Apple iPhone inside of that office and

14         that there was also a laptop seen inside of that office.

2:03PM15          MR. GELFAND:  Your Honor, I would object.  Same

16         objection.

17              THE COURT:  Mr. Roberts?

18              MR. ROBERTS:  Your Honor, again, I'm not

19         eliciting hearsay.  I'm simply explaining how this

2:03PM20    Detective, or this investigator, Special Agent, went about

21         obtaining a search warrant for the defendant's property.

22         This is not offered for the truth of the matter asserted.

23              THE COURT:  I'm going to overrule the objection

24         and explain to the Jury that the Agent's testimony at this

2:03PM25    point is being offered to explain a course of events that

2:03PM  1    caused the investigation in this case to take the

        2    sequential steps that he is testifying to.  You may not

        3    use it as a substitute for what some other Agent may have

        4    actually observed or actually seen or have said at the

2:04PM  5    time.  You may proceed.

        6            MR. ROBERTS:  Thank you, Your Honor.

        7    Q.   (BY MR. ROBERTS.)  After the Agent in the undercover

        8    capacity went to the car lot, can you tell us your steps

        9    next in order to obtain a search warrant?

2:04PM 10    A.   Yes, sir.  In terms of securing the next step search

       11    warrant, I applied for and received a search warrant for

       12    the businesses located, or the business of Wholesale

       13    Motorcars located at 14969 Wildcat Creek Road in

       14    Springdale, Arkansas.

2:04PM 15    Q.   Ultimately, after obtaining this search warrant,

       16    could you tell us what happened next?

       17    A.   We conducted surveillance prior to the execution of

       18    that search warrant to ensure that on the day that we did

       19    execute, or decide to execute, that the owner of the

2:05PM 20    business was present, also as well as the subscriber to

       21    the IP address was present.

       22    Q.   And on what day did this occur?

       23    A.   November 8th of 2019.

       24    Q.   Now, will you turn in the government's exhibit book

2:05PM 25    to Government's Exhibit 4.

2:05PM 1    A.    I'm sorry, 4?

2           Q.    Four, yes.

3           A.    Yes, sir.

4           Q.    Could you identify Government's Exhibit 4?

2:05PM 5    A.    This is the search and seizure warrant that I applied

6           for, for 14969 Wildcat Creek Road in Springdale, Arkansas,

7           that was signed by the Federal Magistrate Judge on

8           November 4th of 2019.

9           Q.    Is that a true and accurate copy of the search

2:05PM10    warrant you obtained in this case?

11          A.    Of just the search and seizure warrant page.

12                MR. ROBERTS:   Your Honor, I move to introduce the

13          one-page search and seizure warrant in this case.

14                MR. GELFAND:   No objection.

2:06PM15                THE COURT:   The exhibit will be received.

16                (Government's Exhibit 4 Received)

17          Q.    (BY MR. ROBERTS.)   Now, could you describe for the

18          Jury where Wholesale Motorcars is located?

19          A.    Yes, sir.   It is positioned off Highway 412 in

2:06PM20    between Springdale, Arkansas, and Siloam Springs,

21          Arkansas.   It's approximately seven to eight miles off of

22          Interstate 49, if you're coming from the Springdale side.

23          And when you arrive, it's just a few minutes past

24          Tontitown.

2:06PM25    Q.    Agent, let me back you up for a second.   I skipped

2:06PM 1  over a question I wanted to ask you.  Now, with regard to

2  Government's Exhibit 4, is there anywhere on this document

3  that you detail the nature of the investigation involved?

4  A.   No, sir.  There is no language involving child

2:06PM 5  pornography on this page.

6  Q.   We were describing where Wholesale Motorcars is

7  located.  Could you turn to Government's Exhibit 5 and 6

8  in the exhibit book?

9  A.   Yes, sir.

2:07PM 10  Q.   With regard to Government's Exhibit 5, could you

11  describe that?

12  A.   Yes, sir.  So this is an aerial view of the Northwest

13  Arkansas area, specifically in the Springdale/Tontitown

14  area.  It is geographically correct in terms of compass.

2:07PM 15  The top is north, bottom is the south.  The yellow line

16  running north and south on the far right side of this

17  picture is Interstate 49.  The yellow line running east

18  and west is Highway 412.  On the left side of the image is

19  a red indicator, and that was the position of Wholesale

2:08PM 20  Motorcars at 14969 Wildcat Creek Road in Springdale,

21  Arkansas.

22  Q.   Does Government's Exhibit 5 truly and accurately

23  depict where Wholesale Motorcars are located within that

24  layout of that map?

2:08PM 25  A.   In November of 2019, yes, sir.

2:08PM 1          MR. ROBERTS:  Your Honor, I move to introduce

2          Government's Exhibit 5 into evidence.

3          MR. GELFAND:  No objection.

4          THE COURT:  Government's 5 is received.

2:08PM 5          (Government's Exhibit 5 Received)

6   Q.   (BY MR. ROBERTS.)  With respect to Government's 5,

7   can you orient the Jury to what you just described?

8   A.   Yes, sir.  Again, in terms of a directional compass,

9   it is accurate.  The top of the page is going to be north,

2:08PM10   the bottom being south.  That yellow line running down the

11   right-hand side north to south is going to be Interstate

12   49.  The yellow line running east to west is going to be

13   Highway 412.  And on the left-hand side of that image, the

14   red indicator is where Wholesale Motorcars was located at

2:08PM15   14969 Wildcat Creek Road in Springdale, Arkansas, on the

16   date of November 8th, 2019.

17   Q.   So, Agent, from the interstate intersection with 412

18   all the way to 14969 Wildcat Creek Road, could you

19   approximate the distance there?

2:09PM20   A.   Yes, sir.  It was approximately seven to eight miles.

21   Q.   Would you please turn in the government's exhibit

22   book to Government's Exhibit 6?

23   A.   Yes, sir.

24   Q.   Do you recognize Government's Exhibit 6?

2:09PM25   A.   Yes, sir.

2:09PM 1    Q.    Could you tell me what Government's Exhibit 6 is?

2    A.    This is another aerial photograph that was taken of

3    the Wholesale Motorcars car lot.  This is not a law

4    enforcement image.  We did not take this pursuant to the

2:09PM 5    search warrant.  But this is an overview of where the lot

6    was associated and appears to have the vehicles on the

7    lot.  Again, you can see Highway 412 in this.  You can

8    also see Wildcat Creek Road running north and south past

9    the car lot.

2:10PM10   Q.    Does that aerial photograph truly and accurately

11    represent the location of Wholesale Motorcars in 2019 when

12    you executed the warrant?

13    A.    Correct, the location of where it was in November of

14    2019.

2:10PM15             MR. ROBERTS:  Your Honor, I would move to

16    introduce Government's Exhibit 6.

17             MR. GELFAND:  No objection.

18             THE COURT:  Government's 6 is received.

19             (Government's Exhibit 6 Received)

2:10PM20   Q.    (BY MR. ROBERTS.)  Again, will you orient the Jury to

21    this Government's Exhibit 6?

22    A.    Yes, sir.  Again, compass-wise, the top of the

23    photograph is north, the bottom is south.  You can see

24    Highway 412 running east to west.  Wildcat Creek Road is

2:10PM25    running slightly northwest.  And the gravel lot, what you

2:10PM  1    are seeing is what was Wholesale Motorcars in the image.

2    Q.    All right.  So I want to direct your attention to how

3    you and other members of the Internet Crimes Against

4    Children Task Force go about executing child exploitation

2:11PM  5    search warrants.  Can you give the Jury some insight to

6    that?

7    A.    Basically, we have individuals that have prearranged

8    duties for that day.  And for this particular warrant,

9    myself and the case agent, Agent Howard Aycock, we were

2:11PM 10    already planning to encounter or go and speak with whoever

11    was present on the lot, inform them of what was going on,

12    while the other officers that were assisting us that day

13    cleared the scene for agent safety.  We also have what's

14    called computer forensic analysts that accompany us on all

2:11PM 15    of these search warrants, obviously because it deals with

16    electronic devices, two of which that were there that day,

17    they are not law enforcement commissioned, meaning they

18    don't carry firearms, so they will stay back in what we

19    refer to as a forensic van until the scene is deemed

2:11PM 20    cleared and safe and then they will approach and assist

21    with the search warrant.

22    Q.    Now, prior to executing this warrant, did you engage

23    in visual surveillance of the car lot?

24    A.    Yes, sir.  Again, we -- myself and Agent Aycock took

2:12PM 25    up a position on Highway 412, I believe in what would be

2:12PM 1    the eastbound lane.  Again, we were wanting the owner of

2          the lot and the subscriber of the IP address and the

3          individual who had been seen with electronic devices

4          inside of the office to be present when we executed the

2:12PM 5    warrant.

6    Q.    By doing visual surveillance, is there also a

7          component to officer safety?

8    A.    Yes, sir.  Since this was a business and it was

9          obviously, the majority of it was outside, myself and

2:12PM10    Agent Aycock during our course of surveillance, we could

11          see, through binoculars, the individuals who were on the

12          lot.  We didn't see any firearms brandished.  We didn't

13          even see, or we did not see any immediate threats to where

14          we needed to execute this as a high-risk warrant.  Since

2:12PM15    this was, again, an outside business, it's unlike we're

16          going into a residential structure or something where we

17          don't know what's behind a door or we can't see into a

18          deep corner.

19    Q.    So in child exploitation cases in general, do you

2:13PM20          have a protocol or a particular pattern that you follow in

21          addressing the individuals you find on the premises?

22    A.    Yes, sir.  Again, for that particular day, myself and

23          Agent Aycock were going to approach the individuals who

24          were, or whatever individuals were on the lot, while our

2:13PM25          remaining agents cleared the scene and our CFAs remained

2:13PM 1   waiting to enter onto the scene.

2          Q.   Do you typically tell them that you're there for a

3      child pornography search warrant?

4          A.   Oh, no, sir.  I'm sorry.  A common practice with our

2:13PM 5   search warrants is, when we first arrive on scene and we

6      make contact with somebody, we do not tell them the type

7      of case we are specifically investigating; rather, we tell

8      them the type of evidence we are lawfully searching for.

9      This common practice is often done because, most times,

2:14PM 10  when you tell individuals the case specifics of a detail

11     or law enforcement details prior to attempting to obtain a

12     statement, they will then include those law enforcement

13     details in their statement as opposed to providing an

14     unbiased or uninfluenced statement.  It's a common

2:14PM 15  practice that we do in attempts to gain the truth.

16         Q.   So when you arrive on scene, are you dressed in

17     insignia that indicates "Internet Crimes Against Children

18     Task Force?"

19         A.   No, sir, we do not have that.  That day, we were all

2:14PM 20  in plain clothes.  We were all wearing what you call

21     bullet resistant vests or plate carriers.  On the front of

22     those plate carriers, it either said, "HSI," "Police" or

23     "Special Agent."  Nothing in terms of "ICAC, Internet

24     Crimes Against Children Task Force."

2:14PM 25         Q.   Did you identify yourself as an ICAC or Internet

2:14PM 1    Crimes Against Children Task Force officer?

2    A.    No, sir.

3    Q.    How are you identified?

4    A.    I'm sorry?

2:14PM 5    Q.    How are you identified?  What do you tell the

6    individuals you encounter your role is, your job is?

7    A.    That we are Special Agents with Homeland Security

8    Investigations.

9    Q.    So with regard to this specific warrant on Wholesale

2:15PM10    Motorcars on November 8th, 2019, could you tell the Jury

11    what your goal in executing the search warrant was?

12    A.    Yes, sir.  Again, the goal, as we previously

13    discussed in these peer-to-peer file-sharing

14    investigations is, one, find and locate any and all

2:15PM15    electronic devices that contain the peer-to-peer

16    file-sharing program on it.  Two, locate and find any and

17    all electronic devices that contain child pornography on

18    them.  Three, locate any and all electronic devices that

19    can put somebody, for this instance, on the car lot and

2:15PM20    behind the computer when the crime was committed.

21    Q.    And in this case, the crime, the span of time that

22    you're looking for, what would those days be?

23    A.    At that point in time, on November 8th, 2019, we were

24    aware of May 14th and May 15th of 2019.

2:16PM25    Q.    With regard to digital devices you encounter on the

2:16PM 1    premises, what was the plan?  How were you going to go

     2    about handling those?

     3    A.    Again, we had those computer forensic analysts, or

     4    the CFAs, we had three total that day.  One was an HSI

2:16PM 5    task force officer.  The other two were HSI employees.

     6    Once we clear that scene for safety reasons, they then

     7    come on scene.  They search or find any and all the

     8    electronic devices with us, and then they start to perform

     9    on-scene forensic previews of digital electronics.

2:16PM10    Q.    Now, can you do on-scene forensic previews of all

    11    electronic devices?

    12    A.    Yes, but it's not common.

    13    Q.    Are some devices more complex wherein that you would

    14    need to examine those back at the Homeland Security

2:17PM15    facility or in a lab?

    16    A.    Yes, sir.  That is often the case.

    17    Q.    On the opposite end of the spectrum, if something is,

    18    say, available to be forensically cleared on scene, what

    19    would happen in that case?

2:17PM20    A.    If it is forensically cleared of those three things

    21    that I previously discussed, that item, even though it's

    22    seized, gets remitted back to that person.

    23    Q.    So forensically cleared means it has no evidence of

    24    child pornography on it?

2:17PM25    A.    No child pornography.  And in this situation, no

2:17PM  1    peer-to-peer file-sharing networks and nothing that would

2    put somebody on the car lot on the days in question.

3    Q.   Approximately what time did you execute the search

4    warrant on Wholesale Motorcars car lot?

2:17PM  5    A.   It was around 3:15 in the afternoon.

6    Q.   Can you describe for the Jury how you went about

7    executing that warrant?

8    A.   Yes, sir.  So as we previously discussed, we did not

9    see any immediate threat from our surveillance.

2:18PM 10   Therefore, we approached in what we refer to as a "soft

11   approach," meaning we did not have any guns brandished, we

12   were not pointing guns at anybody.  We arrived on scene.

13   Myself and Agent Aycock, again, approached Mr. Duggar.

14   There were two other individuals on the lot that day.  As

2:18PM 15   we were speaking with them, the other agents cleared it

16   for safety reasons while our CFAs stayed back in that

17   forensic van.

18   Q.   Who were the other two individuals on the lot other

19   than Mr. Duggar?

2:18PM 20   A.   Employee, Randall Berry, and customer, Richard

21   Harrell, who we later determined not to be involved in

22   this investigation.

23   Q.   When executing a search warrant, is it common to take

24   pictures of the premises?

2:18PM 25   A.   Yes, sir.  We often take pictures at the beginning of

2:18PM 1    the search warrant and at the end of a search warrant.  In

2           doing so, we want to record the nature and position of

3           where potential evidence is located when we first see it

4           or recognize it.

2:18PM 5    Q.   When executing the search warrant in this specific

6           case, were there images or pictures taken?

7           A.   Yes, sir.

8           Q.   I direct your attention to Government's Exhibit 7

9           through 19 in the government's exhibit book.

2:19PM 10   A.   Yes, sir.

11          Q.   In preparation for this trial today, have you already

12          reviewed 7 through 19?

13          A.   I have.

14          Q.   Are those true and accurate representations of

2:19PM 15   pictures taken on November 8th, 2019?

16          A.   In relation to all except I believe for Exhibit 7.

17          Q.   Let me ask that a different way.  Are those true and

18          accurate representations of Wholesale Motorcars as existed

19          on November 8th, 2019?

2:19PM 20   A.   That is correct.  Yes, sir.

21               MR. ROBERTS:  Your Honor, I would move to

22          introduce Government's Exhibits 7 through 19.

23               MR. GELFAND:  No objection, Judge.

24               THE COURT:  Government's Exhibits 7 through 19

2:19PM 25   are received.

2:19PM 1          (Government's Exhibits 7-19 Received)

2    Q.   (BY MR. ROBERTS.)   Starting with Exhibit 7, can you

3    please tell the Jury what we're looking at here?

4    A.   Yes, sir.   So that is a picture taken from a bit of a

2:20PM 5    distance of the Wholesale Motorcars lot.   Obviously, you

6    can see on the mailbox the 14969 physical address on

7    Wildcat Creek Road.   In the background, past the sign, you

8    will see two buildings.   The one on the left was a wooden

9    shed, which at the time of the search warrant was in the

2:20PM10    process of being remodeled, or refurbished, I guess.   And

11    the building on the right is a metal building which I have

12    referred to as a tollbooth in terms of size.   And that

13    acted as the main office for Wholesale Motorcars.

14    Q.   Moving to Government's Exhibit 6, could you orient

2:20PM15    the Jury -- excuse me -- Government's Exhibit 8, could you

16    orient the Jury to Government's Exhibit 8?

17    A.   Yes, sir.   So this is in fact a search warrant photo

18    from November 8th of 2019 when we arrived at the Wholesale

19    Motorcars lot.   This would have been taken at the

2:21PM20    beginning of our search warrant.   As you can see, again,

21    those are the two buildings I previously referenced.   And

22    you can see the Wholesale Motorcars signs with the phone

23    number and the car lot office phone line attached to that

24    metal building.

2:21PM25    Q.   Government's Exhibit 9, could you do the same?

2:21PM  1    A.    That is a close-up of the metal building, which we
        2    were made aware of was the main office.  Again, you can
        3    see the Wholesale Motorcars title, the phone number, the
        4    address of 14969.  Two other things of interest on this is
2:21PM  5    the warning signs that were attached to the front that,
        6    "security cameras in use."  There's one attached to the
        7    main window, and then one at the bottom right-hand corner
        8    of the building.
        9    Q.    With respect to Government's Exhibit 10, could you do
2:21PM 10    the same?
       11    A.    Yes, sir.  This is just a side angle of those same
       12    two buildings.  The open door that you see was the main
       13    entrance into the metal building or the main office.
       14    Q.    Moving to Government's Exhibit 11, could you orient
2:22PM 15    the Jury?
       16    A.    Yes, sir.  This is the initial picture taken of the
       17    inside of the office.  Of note in this is the keypad on
       18    the door handle going into the office.  And then you can
       19    start to see some of the devices and equipment and
2:22PM 20    business filings that were inside of the office that day.
       21    Q.    With respect to Government's 12, could you orient the
       22    Jury?
       23    A.    Yes, sir.  Again, this is another picture inside of
       24    the office.  What you're seeing on the desk is an HP
2:22PM 25    All-in-One Desktop computer.  Above that is a surveillance

2:22PM 1    camera.  To the right of that HP desktop computer on the

2      windowsill is another surveillance camera.  And then

3      obviously paperwork, assorted paperwork throughout the

4      office.

2:23PM 5    Q.    With regard to Government's 13, could you orient the

6      Jury?

7      A.    This is a close-up picture of a surveillance camera,

8      or the screen that the surveillance cameras were

9      live-streaming to.

2:23PM10    Q.    Was this a -- this picture was taken when you were

11     there, is that correct?

12     A.    That is correct, yes, sir.

13     Q.    So those screens and that surveillance was working

14     when you were there?

2:23PM15    A.    That picture was taken on November 8th, 2019.

16     Q.    With respect to Government's 14?

17     A.    This, again, is the front side of that HP All-in-One

18     Desktop computer.  As you can see, the background is

19     Mr. Duggar and his family, and then assorted paperwork

2:23PM20    around the computer.

21     Q.    With respect to Government's 15, could you orient the

22     Jury?

23     A.    Back outside, and, again, looking at those two

24     buildings, the one on the right, obviously, the main

2:23PM25    office, and the one on the left, the wooden shed that was

2:23PM 1  being remodeled.

2  Q.   Government's 16, could you orient the Jury?

3  A.   That is inside of the wooden shed.  Again, it

4  appeared to us on that date that it was in the process of

2:24PM 5  being worked on.

6  Q.   Government's 17, could you do the same?

7  A.   This is a picture on what would be the left-hand side

8  of these two buildings.  We're now looking southwest, I

9  believe.  In the background, you can see Highway 412.  In

2:24PM 10 the middle of the picture is an RV that was on the lot

11 that day.

12 Q.   Government's 18, could you do the same?

13 A.   Yes, sir.  We're still on the lot.  We're now looking

14 northwest.  And this is the RV that we -- myself and Agent

2:24PM 15 Aycock -- observed Mr. Duggar arrive on the scene that day

16 in.

17 Q.   Government's 19, could you orient the Jury?

18 A.   This is an HP laptop that was located inside of that

19 RV.

2:24PM 20 Q.   Now, you just stated that that's an HP laptop, is

21 that correct?

22 A.   I'm sorry.  I'm sorry.  That's a MacBook laptop.  My

23 apologies.

24 Q.   We're done with 19.  Thank you.  Now, taking you back

2:25PM 25 to when you first arrived on scene, where was Mr. Duggar

2:25PM 1    located?  Where was he at?

2    A.    Mr. Duggar and the other two individuals were

3    approximately, I'd say, 20 feet from in front of those two

4    buildings to about 20 feet of where we parked the front of

2:25PM 5    our vehicles.

6    Q.    So they were standing outside?

7    A.    Correct.  Yes, sir.

8    Q.    Could you describe for the Jury how you went about

9    approaching Mr. Duggar?

2:25PM 10   A.    Yes, sir.  Myself and Agent Aycock approached

11   Mr. Duggar.  I properly identified myself as a Special

12   Agent with Homeland Security Investigations.  I then

13   informed him that, based on an ongoing investigation, a

14   federal search warrant had been obtained for the property

2:25PM 15   for items of evidentiary value that possibly contained

16   digital contraband.  Furthermore, I told Mr. Duggar and

17   the other individuals there that this was a federal search

18   warrant, this was not an arrest warrant, and they were

19   free to leave if they chose to do so.

2:26PM 20   Q.    At that time, did Mr. Duggar produce anything?

21   A.    Yes, sir.  He took a cell phone out of his, what I

22   believe, right pocket.

23          MR. ROBERTS:  Your Honor, may I approach?

24          THE COURT:  You may.

2:26PM 25   Q.    (BY MR. ROBERTS.)  We're missing the exhibit sticker,

2:26PM 1  however, I'm handing you what is about to be marked

2  Government's Exhibit 20.  Can you identify Government's

3  Exhibit 20 for me?

4  A.   Yes, sir.  This is the phone that Mr. Duggar produced

2:27PM 5  from his pocket.

6  Q.   Is that phone in the same or similar condition as

7  when you confiscated it?

8  A.   Yes, sir, I believe so.

9      MR. ROBERTS:  Your Honor, I would move to

2:27PM 10  introduce Government's 20.

11      MR. GELFAND:  No objection.

12      THE COURT:  Government's 20 is received.

13      (Government's Exhibit 20 Received)

14  Q.   (BY MR. ROBERTS.)  So you approach Mr. Duggar.  You

2:27PM 15  tell him that you're looking for digital contraband.  He

16  produces the phone.  At any point, did you tell him he was

17  being detained?

18  A.   No, sir.

19  Q.   What exactly with regard to detention did you tell

2:27PM 20  him?

21  A.   That he was free to leave, as well as the other

22  individuals if they wanted to.

23  Q.   At any point in this interaction, did you tell him

24  that this was regarding a child pornography investigation?

2:28PM 25  A.   No, sir.

2:28PM 1    Q.    Did you ask him any questions at this point?

       2    A.    No, sir.

       3    Q.    So you approach him, tell him you're looking for

       4    digital contraband.  You identify yourself.  He produces a

2:28PM 5    phone.  Can you describe how you seized the phone?

       6    A.    Mr. Duggar had it in his right hand.  I reached out

       7    with my left hand and seized the phone without touching

       8    Mr. Duggar.

       9    Q.    Throughout this interaction, what was his demeanor

2:28PM 10   like?

      11    A.    Calm.  No visible reaction.

      12    Q.    How long did this overall interaction occur, or take?

      13    A.    Just a few minutes.

      14    Q.    After taking the phone, did Mr. Duggar say anything

2:28PM 15   to you with regard to whether he was going to stay on the

      16    premises or leave?

      17    A.    He stated that his wife was pregnant and that he may

      18    have to leave the car lot to either contact her or have a

      19    way for her to contact him.

2:29PM 20   Q.    What was your response?

      21    A.    That was perfectly fine.

      22    Q.    Again, at this point, you have not -- have you told

      23    him the purpose of the investigation at his car lot?

      24    A.    No, sir.  Again, we do not say the specific details

2:29PM 25   of the case we were investigating on the onset of the

2:29PM 1    search warrant.

2            Q.    So after you confiscated the phone in this initial

3            interaction, was Mr. Duggar detained in any way?

4            A.    No, sir.

2:29PM 5    Q.    Is it fair to say that he had free roam of the car

6            lot or even to leave?

7            A.    He could have left.  I wouldn't say free roam,

8            meaning he couldn't enter the RV or the building, the

9            office that we were currently searching it.  If he had

2:29PM10    asked, we would have escorted him into it.  But for all

11           practical purposes, if he wanted to leave, he could have

12           left.

13           Q.    Now, just to explain that, is that just common

14           practice?  Could you explain that to the Jury?

2:29PM15    A.    Yes, sir, that is.  Again, that's for officer safety

16           reasons.

17           Q.    Would it also be a potential, if you let suspects

18           walk into where you're searching, they could actually

19           remove items of evidentiary value?

2:30PM20    A.    That is correct.  In the past, during the execution

21           of search warrants, we have had individuals attempt to

22           take hammers to hard drives, throw them out of windows,

23           commit factory resets.  So, yes, we obviously keep an eye

24           on an individual if they enter a secure scene that we were

2:30PM25    searching.

2:30PM 1    Q.    Is that also the reason that you confiscated the

2          phone directly when he produced it out of his pocket?

3    A.    Yes, sir.  I did not want there to be any chance to

4          potentially contaminate any digital evidence that would be

2:30PM 5    located on the phone by altering, deleting, or destroying

6          anything that was potentially on it.

7    Q.    After Mr. Duggar indicated that he might leave to

8          check on or to attend his pregnant wife, could you tell us

9          what happened next?

2:30PM10    A.    Myself and Agent Aycock then started assisting the

11         other agents processing the scene, making sure photographs

12         were being taken, and that evidence was being located.

13    Q.    Did you have any further contact with Mr. Duggar that

14         day?

2:31PM15    A.    Yes, sir.  Again, about 10, 15 minutes later, myself

16         and Agent Aycock re-approached Mr. Duggar and asked if he

17         would be willing to accompany us to Agent Aycock's

18         government vehicle to further discuss the details

19         surrounding the issuance of the federal search warrant.

2:31PM20    Q.    When you say "re-approach," where was Mr. Duggar

21         standing during this time?

22    A.    Roughly around the same area when we first

23         encountered him.

24    Q.    So precisely what did you explain to Mr. Duggar when

2:31PM25    you re-approached him?

2:31PM 1    A.    We asked him if he would be willing to discuss

2           further details surrounding the issuance of the federal

3           search warrant.

4     Q.    Better question.  At that point, did you tell him

2:31PM 5    that the federal search warrant was for child pornography,

6           child exploitation, or anything similar?

7     A.    No, sir.

8     Q.    When you approached him, what was his demeanor like?

9     A.    Still visibly no reaction.  He was calm.

2:32PM10    Q.    Did he agree to make a statement?

11    A.    He did.

12    Q.    Where did that occur?

13    A.    We relocated to Agent Aycock's truck.  It was a Ford

14          truck, I believe.  Myself and Agent Aycock entered the

2:32PM15    driver's side portion of the vehicle.  I sat in the

16          driver's seat.  Agent Aycock sat in the back rear seat on

17          the driver's side.  Mr. Duggar went around to the

18          passenger side.  He opened the passenger door on his own,

19          he entered the truck, and he closed the door of the

2:32PM20    passenger side front seat on his own.

21    Q.    So was he physically escorted into the car?

22    A.    No, sir.

23    Q.    Now, you said it's a Ford truck.  Now, is this like

24          an outfitted police truck, or could you describe it for

2:32PM25    us?

2:32PM 1   A.   No, sir.  It's a civilian truck and we just retrofit

2          it with lights and sirens.  There's no cage or anything

3          like that inside of the truck.

4          Q.   Upon entering the truck, were the doors locked?

2:33PM 5   A.   No, sir.

6          Q.   Anyone guarding Mr. Duggar outside the doors?

7          A.   No, sir.

8          Q.   Tell us what happened upon Mr. Duggar entering the

9          vehicle.

2:33PM 10  A.   Upon entering the vehicle, Agent Aycock asked and

11         received verbal consent to record our interview.  Upon

12         receiving verbal consent, Mr. Duggar turned in his chair

13         facing both myself and Agent Aycock and then asked, "What

14         is this about?  Has somebody been downloading child

2:33PM 15  pornography?"

16         Q.   I'm going to stop you there.  Now, you say that he

17         turned in his seat.  Can you show us what you're talking

18         about?

19         A.   Yes, sir.  So if myself and Agent Aycock were seated

2:33PM 20  on the left-hand side of where I am in the jury box, he

21         turned and positioned to where he was facing the both of

22         us, myself in the front driver's seat and Mr. Aycock, or

23         Agent Aycock, in the back rear driver's seat.

24         Q.   To be clear, at this point, had you told Mr. Duggar

2:34PM 25  you were there regarding a child pornography

2:34PM 1    investigation?

2    A.    No, sir.

3    Q.    So when he told you or asked you the question

4    regarding child pornography, how did you respond?

2:34PM 5    A.    Agent Aycock had asked him to stop before asking any

6    more questions to let him get the recording device

7    started, and then he then read him his Miranda rights.

8    Q.    Agent, if you do need a tissue, I understand.  It's

9    right behind you.  So you stopped him from asking

2:34PM10    questions and you started recording, is that correct?

11    A.    That is correct.

12    Q.    Overall, how long did that recorded interview portion

13    take?

14    A.    The interview in its entirety?

2:35PM15    Q.    Yes, in its entirety, beginning to end.

16    A.    Approximately 51 minutes, I believe.

17    Q.    On the onset of the interview, did you explain

18    Mr. Duggar his Miranda rights?

19    A.    Yes, sir, we did.

2:35PM20    Q.    Could you tell the Jury generally what those are?

21    A.    It's basically acknowledging the fact that Mr. Duggar

22    knows that he does not have to talk to us if he does not

23    want to, or if he would like an attorney present, that he

24    can have one present.

2:35PM25    Q.    Would you turn to Government's Exhibit 21?

2:35PM 1    A.    Yes, sir.

2           Q.    Could you identify Government's Exhibit 21?

3           A.    This is the United States Immigration and Customs

4    Enforcement statement of rights form.  This is the form

2:36PM 5    that we utilized that afternoon at the Wholesale Motorcars

6    lot.  Mr. Duggar's signature is here above and below the

7    waiver, as well as myself and Agent Aycock's signature as

8    witnesses.

9           Q.    Is that a true and accurate copy of the form that was

2:36PM 10   executed on the day regarding Mr. Duggar's Miranda rights?

11          A.    Yes, sir, it is.

12                MR. ROBERTS:  Your Honor, move to introduce

13   Government's Exhibit 21.

14                MR. GELFAND:  No objection.

2:36PM 15               THE COURT:  Government's 21 is received.

16                (Government's Exhibit 21 Received)`

17          Q.    (BY MR. ROBERTS.)  Could you orient the Jury to

18   Government's Exhibit 21?

19          A.    Yes, sir.  Again, that is the U.S. Immigration and

2:36PM 20   Customs Enforcement Statement of Rights Form.  It's a

21   standard form that I commonly use.  As you can see, the

22   statement of rights are at the top.  Then that is a

23   signature by Mr. Duggar.  There's then a waiver, and

24   underneath that, a printed signature, or Mr. Duggar's

2:36PM 25   printed signature, and then he signed on the line next to

2:36PM 1    it.  And then at the bottom, the two witnesses of myself

2      and Agent Aycock.

3    Q.    Now, Agent, I might have missed it, I was looking at

4    my next question.  Did you explain why there is two lines,

2:37PM 5    or the last line of the waiver section is lined out?

6    A.    Yes, sir.  So, again, Mr. Duggar was not in custody,

7    as we had informed him.  While Agent Aycock was filling

8    out this form, it was brought, or Mr. Duggar brought it to

9    our attention about being in custody.  And we explained to

2:37PM10    him, no, he was not.  And to make him feel better, that we

11    were going to scratch that part out of the waiver.

12    Q.    And so you testified that the overall interview was

13    approximately 51 minutes.  Would it be say to say that

14    throughout that interview, some parts were relevant for

2:37PM15    this trial and some not, is that correct?

16    A.    Yes, sir.

17    Q.    In the beginning of the interview, did you cover

18    things like his background, date of birth?

19    A.    We did.

2:37PM20    Q.    Did you cover how he's employed?

21    A.    We covered the ownership, or his ownership of the

22    Wholesale Motorcars lot.  And then we also covered his

23    ownership and access to electronic devices that were

24    currently on the lot.

2:38PM25    Q.    Do you recall if he provided his date of birth?

2:38PM 1   A.   Yes, sir.  March 3rd, 1988.

       2   Q.   Agent, I will direct your attention to Government's

       3   22.  Would you turn in the exhibit book to Government's

       4   22?

2:38PM 5   A.   Yes, sir.

       6   Q.   Can you identify Government's 22 for the Jury?

       7   A.   This is a thumb drive which I have previously

       8   reviewed that contains three portions or sections of our

       9   interview with Mr. Duggar.

2:38PM10   Q.   Now, when you previously reviewed it, did you verify

      11   that it accurately and truly captures what was said on

      12   November 8th, 2019, by Mr. Duggar?

      13   A.   Yes, sir.

      14            MR. ROBERTS:  Your Honor, move to introduce

2:38PM15   Government's Exhibit 22.

      16            MR. GELFAND:  No objection, Your Honor.

      17            THE COURT:  Government's Exhibit 22 is received.

      18            (Government's Exhibit 22 Received)

      19            MR. ROBERTS:  Thank you, Your Honor.  Your Honor,

2:39PM20   I also have transcripts that I would like to pass out to

      21   the Jury.  I believe it would assist them in listening to

      22   the audio.

      23            THE COURT:  This is the version that contains all

      24   three sections that you provided earlier?

2:39PM25            MR. ROBERTS:  It is, Your Honor.

2:39PM 1              THE COURT:  That is fine.  You may pass those

2              out.

3                   Members of the Jury, as you have heard, there is

4              a transcript of the recording that you are going to hear,

2:39PM 5       or at least certain portions that you are going to hear.

6              And this is a transcript of those portions and three

7              sections.  This transcript also undertakes to identify the

8              speakers engaged in the conversation.  The transcript that

9              you are being provided now is for the limited purpose of

2:40PM10       helping you to follow the conversation as you listen to

11             the recording and also to help you keep track of the

12             speakers.  Differences in meaning between what you hear in

13             the recording and what you read in the transcript may be

14             caused by such things such as the inflection in a

2:40PM15       speaker's voice.  This is important.  It is what you hear

16             that is evidence, not what you read.  Whether the

17             transcript correctly or incorrectly reflects the

18             conversation or the identity of the speakers is entirely

19             for you to decide based upon what you hear on the

2:41PM20       recording and what you have heard here about the

21             preparation of the transcript and upon your own

22             examination of the transcript in relation to what you hear

23             on the recording.  If you decide that the transcript is in

24             any respect incorrect or unreliable, you should disregard

2:41PM25       it to that extent.

2:41PM 1                One more thing.  This is a demonstrative aid to

2        assist you for the reasons that I've just explained.  The

3        recording is in evidence.  If during your deliberations,

4        for example, you want to re-listen to the recording, that

2:41PM 5        could be possible.  The transcript is not being received

6        into evidence so you will not have the transcript

7        available in the jury room.  The Court will, however, mark

8        the transcript as Court's Exhibit 1.  You may proceed.

9                (Court's Exhibit 1 Received)

2:42PM 10            MR. ROBERTS:  Thank you.

11   Q.   (BY MR. ROBERTS.)  Prior to playing section one, can

12   you tell the Jury overall what they are about to hear?

13   A.   Again, this is going to be the section where we

14   establish Mr. Duggar being the owner and operator of the

2:42PM 15   Wholesale Motorcars lot, as well as establishing the

16   ownership and access to certain devices that were located

17   on the lot.

18            MR. ROBERTS:  Please play section one.

19            (Section One played as follows:)

2:42PM 20            AGENT AYCOCK:  What do you do for work?

21            JOSH DUGGAR:  I -- I own this business and then I

22   also do some real estate as well.

23            AGENT AYCOCK:  Okay.  What do you do?  You got

24   your real estate license?

2:42PM 25            JOSH DUGGAR:  I do not.  No, we manage -- my dad

2:42PM 1    has commercial properties, so I help him with management

      2    of that.

      3              AGENT AYCOCK:  Okay.

      4              JOSH DUGGAR:  I dabble in a lot of things.  This

2:42PM 5    is -- you know, this is probably my primary income as far

      6    as that goes.

      7              AGENT AYCOCK:  Okay.  I got you.  And how long

      8    did you say that you've had this, this here?

      9              JOSH DUGGAR:  We moved here in June of last year,

2:42PM10    I believe it was.

     11              AGENT AYCOCK:  Mm-hmm.  So June here at

     12    Wholesale?

     13              JOSH DUGGAR:  Yes.

     14              AGENT AYCOCK:  Okay.  And your internet provider?

2:42PM15              JOSH DUGGAR:  Is OzarksGo.

     16              AGENT AYCOCK:  Ozarks?  And how long have you had

     17    them?

     18              JOSH DUGGAR:  I don't exactly remember.

     19              AGENT AYCOCK:  Okay.  And do you guys operate on,

2:42PM20    like, a Wi-Fi here or --

     21              JOSH DUGGAR:  So yes and no.  We've had several

     22    different things.  In fact, last week I changed it because

     23    we had three different -- we have -- I think there's three

     24    routers in there right now.  I honestly can't remember.

2:42PM25    But we had it daisy-chained to where we had different --

2:42PM 1    so we could send it out over the lot so we could get to

2    each edge to be able to take pictures and things like that

3    and post them up because our cell service is not real

4    great down here in the valley.

2:42PM 5         So, but I think we -- right now, I think I

6    probably have two routers in there hooked up.  One's more

7    of a long-range and one's closer up.

8         AGENT AYCOCK:  Okay.  Two routers.  And are they

9    password-protected or secure?

2:42PM 10         JOSH DUGGAR:  I believe one of them is.  The

11    other one I think was more like a guest network, but I

12    think that's the way I've got them separated right now.

13         AGENT AYCOCK:  All right.

14         JOSH DUGGAR:  And yet last week, I changed the

2:42PM 15    configuration on the router because the one was open, the

16    one that said -- the main one that actually comes -- the

17    modem comes in.

18         AGENT AYCOCK:  Uh-huh.  Okay, okay.  And you said

19    you didn't have very good cell service here, huh?

2:42PM 20         JOSH DUGGAR:  Well, depending on the provider.

21         AGENT AYCOCK:  Who do you have for your cell

22    phone?

23         JOSH DUGGAR:  AT&T and Verizon -- well, I have --

24    I have Verizon, but --

2:42PM 25         AGENT AYCOCK:  Okay.  That's on your --

2:42PM 1            JOSH DUGGAR:  -- we've had both.

      2            AGENT AYCOCK:  That's on your personal phone or

      3     --

      4            JOSH DUGGAR:  Yes, on my personal phone.

2:42PM 5            AGENT AYCOCK:  Okay.  And what's that number?

      6            JOSH DUGGAR:  479-200-2681.

      7            AGENT AYCOCK:  Okay.  And you said AT&T on

      8     another one or --

      9            JOSH DUGGAR:  I don't have any.  I used to, but

2:42PM10     AT&T is -- I know there's -- and then Sprint, we can't

     11     really get any signal here for them.

     12            AGENT AYCOCK:  Okay.  And how long -- and how

     13     long have you had Verizon?

     14            JOSH DUGGAR:  I don't know.  I don't recall.

2:42PM15            AGENT AYCOCK:  How about in your residence?

     16     Electronics there?

     17            JOSH DUGGAR:  Electronics?  What do you mean by

     18     that?

     19            AGENT AYCOCK:  Like computers, phone, other

2:42PM20     phones, anything like that?

     21            JOSH DUGGAR:  I mean, my wife has a phone.

     22            AGENT AYCOCK:  Mm-hmm.

     23            JOSH DUGGAR:  But not any more than I possess.

     24            AGENT AYCOCK:  Okay.

2:42PM25            JOSH DUGGAR:  I mean, I have in the past, and

2:42PM 1    I've recently upgraded my phone.  So, I mean, as far as

2          that goes, I don't want to --

3              AGENT AYCOCK:  All right.  E-mail?  Do you have

4     e-mail accounts?

2:42PM 5              JOSH DUGGAR:  Yes.

6              AGENT AYCOCK:  What would that be?

7              JOSH DUGGAR:  So my e-mail is

8     JoshuaDuggar@iCloud.com is my full name.

9              AGENT FAULKNER:  Sir, if you don't mind, I want

2:42PM10    to go back real quick to those electronics.  I know agent

11    had mentioned in your home residence, but for the reason

12    of why we're here today, what are we talking about

13    electronics on scene?

14             JOSH DUGGAR:  Okay.

2:42PM15             AGENT FAULKNER:  So you have your cell phone,

16    right?

17             JOSH DUGGAR:  Right, my cell phone, and then

18    there's a lap- -- there's a laptop in that RV over there.

19             AGENT FAULKNER:  Okay.  Now, let's do one by one.

2:42PM20    The phone, that was one that you had in your pocket,

21    right?

22             JOSH DUGGAR:  Right, in my pocket.

23             AGENT FAULKNER:  Who else has access to that

24    phone?

2:42PM25             JOSH DUGGAR:  Well, depending on who's -- I mean,

```
2:42PM  1    sometimes I have a guy that works with me.  He will take

        2    pictures sometimes with the phone.

        3              AGENT FAULKNER:  So outside of you, other people

        4    possibly have -- is it password-protected?

2:42PM  5              JOSH DUGGAR:  Yeah, it's not -- not very secure.

        6    I mean, everybody knows it.

        7              AGENT FAULKNER:  Okay.

        8              JOSH DUGGAR:  My kids use it quite a bit, my

        9    wife.  Mostly family and friends.

2:42PM 10              AGENT FAULKNER:  Got you.  Is it a swipe pass

       11    code or PIN, number, numeric?

       12              JOSH DUGGAR:  It's a PIN.

       13              AGENT FAULKNER:  What is the PIN number for it?

       14              JOSH DUGGAR:  Am I required to give that to you?

2:42PM 15              AGENT FAULKNER:  You're not, but --

       16              JOSH DUGGAR:  Okay.  I'd rather not.

       17              AGENT FAULKNER:  Okay.

       18              JOSH DUGGAR:  Yeah.

       19              AGENT FAULKNER:  We'll get a little bit more into

2:42PM 20    the forensic side of stuff.

       21              JOSH DUGGAR:  No, that's fine.

       22              AGENT FAULKNER:  You said a laptop.  That's the

       23    one in the RV, right?

       24              JOSH DUGGAR:  Yes.

2:42PM 25              AGENT FAULKNER:  So the lap --
```

2:42PM 1          JOSH DUGGAR:  It is password-protected as well.

2          AGENT FAULKNER:  Is that yours?

3          JOSH DUGGAR:  Yes.

4          AGENT FAULKNER:  Who else would have access to

2:42PM 5 that?

6          JOSH DUGGAR:  Same, same kind of deal.  We use it

7 for, you know, kids watching movies, you know, browsing

8 online, whatever.

9          AGENT FAULKNER:  Okay.  But it has --

2:42PM 10          JOSH DUGGAR:  It doesn't get used all that much.

11          AGENT FAULKNER:  But it is password-protected?

12          JOSH DUGGAR:  Yes.

13          AGENT FAULKNER:  Just one password or multiple?

14          JOSH DUGGAR:  Well, so it's password-protected in

2:42PM 15 the fact that if you log in, I think it will automatically

16 log you in --

17          AGENT FAULKNER:  Mm-hmm.

18          JOSH DUGGAR:  -- but if you are -- you know, if

19 you go to -- it sits idle, it will lock up sometimes.

2:42PM 20          AGENT FAULKNER:  Okay.

21          JOSH DUGGAR:  I don't know exactly how I have it

22 set.

23          AGENT FAULKNER:  But in terms of ownership, that

24 is your laptop; and in terms of the phone, that is your

2:42PM 25 phone?

2:42PM 1               JOSH DUGGAR:  Yes.

2               AGENT FAULKNER:  We noticed inside of the

3  whatever -- I don't know which one is your office.

4               JOSH DUGGAR:  Yes.

2:42PM 5               AGENT FAULKNER:  But the one over here that has

6  the open sign --

7               JOSH DUGGAR:  Mm-hmm.

8               AGENT FAULKNER:  -- that there was another elec-

9  -- computer in there?

2:42PM10               JOSH DUGGAR:  Yes.  That's an HP.  That computer

11  is -- it's now password-protected, but pretty much the

12  guys that work here are the ones that use it.

13               AGENT FAULKNER:  Okay.

14               JOSH DUGGAR:  And so there's, you know, different

2:42PM15  --

16               AGENT FAULKNER:  So there's currently a password

17  on it right now?

18               JOSH DUGGAR:  Yes, there is, yeah.  And the

19  password's written.  I mean, I have it written around so

2:42PM20  the guys know.

21               AGENT FAULKNER:  I got you.

22               JOSH DUGGAR:  So it's not like -- I mean, it's

23  just mainly to keep somebody from breaking in and

24  accessing file stuff --

2:42PM25               AGENT FAULKNER:  Oh, no, I understand.

2:42PM 1        JOSH DUGGAR:  -- you know.

2          AGENT FAULKNER:  Right, right.

3          JOSH DUGGAR:  On customers, whatever.

4          AGENT FAULKNER:  And so computer in the office,

2:42PM 5  laptop in the RV?

6          JOSH DUGGAR:  Yep.

7          AGENT FAULKNER:  Your cell phone and then your

8  coworker's cell phone?

9          JOSH DUGGAR:  Yeah.  And then there's also --

2:42PM10  they reminded me there's a hard drive probably in the

11  security system, which is up above.

12          AGENT FAULKNER:  Oh, for your surveillance?

13          JOSH DUGGAR:  Right, for surveillance system.

14          AGENT FAULKNER:  But you only use that to recover

2:42PM15  --

16          JOSH DUGGAR:  It's not even -- it's not active

17  right now.  I mean, I didn't tell anybody else that but

18  I'm just --

19          AGENT FAULKNER:  I promise we don't plan on

2:42PM20  breaking in, so --

21          JOSH DUGGAR:  No, I'm just saying it's, you know

22  --

23          AGENT FAULKNER:  We won't give up your secret.

24  How long for your cell phone?  How long have you

2:42PM25  had that?

2:42PM 1     JOSH DUGGAR:  I bought it probably when it -- I

2 mean, a week after it came out, the iPhone 11.

3     AGENT FAULKNER:  So guesstimate.  I don't need an

4 exact day.

2:42PM 5     JOSH DUGGAR:  Two months, maybe.

6     AGENT FAULKNER:  Two months ago?

7     JOSH DUGGAR:  Three months.  Yeah, two, three

8 months.

9     AGENT FAULKNER:  All right.  What about that

2:42PM10 laptop?

11     JOSH DUGGAR:  The laptop I've had for probably

12 five years?

13     AGENT FAULKNER:  Five years?  And that's the one

14 that's in the RV?

2:42PM15     JOSH DUGGAR:  Yes.

16     AGENT FAULKNER:  All right.  What about the

17 desktop that's in there?

18     JOSH DUGGAR:  The desktop?

19     AGENT FAULKNER:  The HP.

2:42PM20     JOSH DUGGAR:  I think I've had that for two and a

21 half years, three years, something like that.

22     AGENT FAULKNER:  And then that hard drive, if you

23 can remember?

24     JOSH DUGGAR:  That's probably five -- seven years

2:42PM25 maybe.  It's an old one.

2:42PM 1          AGENT FAULKNER:  Okay.  That kind of helps us

2          narrow things down to what --

3          JOSH DUGGAR:  Right.  I don't think there's any

4     others in there.  I mean, honestly, I can't remember.  I

2:42PM 5     might have an old, you know, phone laying around or

6     something somewhere.

7          AGENT FAULKNER:  In the RV or in the office?

8          JOSH DUGGAR:  I know there's an old phone in the

9     back of this Honda, but that's -- we found it in the car,

2:42PM10     you know.  It's not like it's ours.

11          AGENT FAULKNER:  What about any other type of --

12     I mean, now, we talk about electronics, I know a lot of it

13     people often just jump to cell phones, tablets, laptops,

14     things of that nature, but also electronic devices that

2:42PM15     store dig- -- thumb drives?

16          JOSH DUGGAR:  So there's -- there's a -- there's

17     probably more than one thumb drive in there.

18          AGENT FAULKNER:  And --

19          JOSH DUGGAR:  I don't know how many in the

2:42PM20     office.

21          AGENT FAULKNER:  You're pointing to this one on

22     the right?

23          JOSH DUGGAR:  In the office on the right.

24     There's also camera -- two cameras in there.  Both of

2:42PM25     those have the ability to record, I think, on them.

2:42PM 1              AGENT FAULKNER:  Mm-hmm.

       2              JOSH DUGGAR:  I don't know if any of them

       3     actually have any SD cards or anything in there.  I don't

       4     know.

2:42PM 5              AGENT FAULKNER:  Right.  And those thumb drives,

       6     are those yours, are they your coworkers or --

       7              JOSH DUGGAR:  I don't know.  I don't know.  I

       8     don't actually know because I don't think I have -- there

       9     might be one in that laptop bag as well, but they would

2:42PM10     all be -- like, they would all be -- I mean, if they are

      11     here, they are here.  I don't know.  We find stuff in cars

      12     all the time.

      13              AGENT FAULKNER:  Oh, I can imagine.

      14              JOSH DUGGAR:  Yeah.  I mean, we find -- when he's

2:42PM15     cleaning underneath the seats, he will find money.  I mean

      16     --

      17              AGENT FAULKNER:  You name it, huh?

      18              JOSH DUGGAR:  Yeah, pretty much everything.  I

      19     don't want to say everything we find, but we --

2:42PM20              AGENT FAULKNER:  That's more of a -- that's more

      21     of a lost and found of thumb drives that's in the office

      22     right now?

      23              JOSH DUGGAR:  Right.

      24              AGENT FAULKNER:  But then the one that --

2:42PM25              JOSH DUGGAR:  I -- well, I mean, we may have

2:42PM 1    wiped some of them and used them for -- because we do car

2           photos mostly is what we're doing.

3                   AGENT FAULKNER:  Right.

4                   (End of Section One)

2:42PM 5    Q.   (BY MR. ROBERTS.)  Now, Agent, in that section, you

6           ask him about the digital devices, the digital contraband

7           that he owns.  I want to make sure that we are referring

8           to the right devices.  Excuse me, digital devices, not

9           digital contraband.

2:51PM10    A.   Yes, sir.

11          Q.   With regards to Government's Exhibit 14.

12          A.   Yes, sir.

13          Q.   Now, is that the desktop, the HP computer, that

14          Mr. Duggar was referring that he owned for two and a half,

2:52PM15    three years?

16          A.   Yes, sir, that is it.

17          Q.   With regard to Government's Exhibit 19, is that the

18          laptop that he referred to that he owned?

19          A.   That is correct, yes, sir.

2:52PM20    Q.   Finally, with regard to Government's Exhibit 20,

21          that's the phone that's up there by you.  Is that the

22          phone he was referring to?  Please speak into the mic.  I

23          couldn't catch you.

24          A.   Correct.  Yes, sir, this phone.

2:52PM25    Q.   Now, with respect to Government's Exhibit 13, please

2:52PM 1    pull that up.  Is that the surveillance system that

2      Mr. Duggar stated they had?

3      A.    That is.  And what we're seeing here is a live stream

4      from the surveillance system.  But as told to us by

2:52PM 5    Mr. Duggar during the interview that he was not recording

6      this, and that none of his other employees were aware of

7      that, that these cameras were not recording the day-to-day

8      operations or interactions on this lot.

9      Q.    With respect to Government's Exhibit 12, are those

2:53PM 10   the security cameras that Mr. Duggar referenced inside the

11     building?

12     A.    Correct.  Those, again, were live streaming to a

13     screen, but they were not recording.

14     Q.    So they were checked and there was no recording like

2:53PM 15   an SD card, anything to keep a recording on them, is that

16     correct?

17     A.    According to our CFAs, that is correct.

18     Q.    They were cleared?

19     A.    Yes, sir.

2:53PM 20   Q.    I'm going to direct your attention to the second

21     audio portion of the interview.  Could you please tell us

22     the topic of this section?

23     A.    In this section, myself and Agent Aycock speak with

24     Mr. Duggar about his knowledge of peer-to-peer

2:53PM 25   file-sharing networks.

2:53PM 1    Q.    Please play the second section.

       2              (Section Two played as follows:)

       3              AGENT FAULKNER:  We are trying to figure out what

       4    led us to this business.

2:54PM 5              JOSH DUGGAR:  Okay.

       6              AGENT FAULKNER:  That's going to involve stuff

       7    that's been either uploaded or downloaded onto the

       8    internet.  And I know Agent Aycock had mentioned just now

       9    -- a while ago about uTorrent files.  Well, we'll play

2:54PM10    this out question by question.

      11              JOSH DUGGAR:  Yeah.

      12              AGENT FAULKNER:  You tell me what you feel

      13    comfortable with.  Do you know or do you remember Napster

      14    back in the day?  Napster was a file-sharing program where

2:54PM15    millions of users throughout the world could get online

      16    and download music files.  So if I had an entire album of,

      17    say, Garth Brooks, I could upload it onto this, into

      18    Napster.

      19              JOSH DUGGAR:  I mean, I'm familiar.  It was

2:54PM20    probably a little before my --

      21              AGENT FAULKNER:  Right.

      22              JOSH DUGGAR:  -- time, but, yeah.

      23              AGENT FAULKNER:  I'm showing my age.

      24              AGENT AYCOCK:  You're not familiar with it.  Come

2:54PM25    on.

2:54PM 1          JOSH DUGGAR:  31.

2          AGENT FAULKNER:  Yeah.  Well, I'm 41, so you got

3    me.

4          But that was what was called a peer-to-peer

2:54PM 5    file-sharing network.

6          JOSH DUGGAR:  Okay.

7          AGENT FAULKNER:  And now it's evolved.  Over the

8    years --

9          JOSH DUGGAR:  Yeah.

2:54PM 10          AGENT FAULKNER:  -- it's turned into where these

11    particular programs not only share music files but they

12    share video files, software programs, documents, you name

13    it.

14          Do you -- are you familiar with or do you know

2:54PM 15    anything about peer-to-peer file-sharing networks?

16          JOSH DUGGAR:  I mean, I'm familiar with, I guess

17    you could say.

18          AGENT FAULKNER:  Okay.  Have you ever used or do

19    any of these electronics currently on the property have

2:54PM 20    any of those types of software downloaded onto them?

21          JOSH DUGGAR:  Yes.

22          AGENT FAULKNER:  Okay.  Which, which devices are

23    we talking about?

24          JOSH DUGGAR:  Probably all of them.

2:54PM 25          AGENT FAULKNER:  All?  So, and I just want to --

2:54PM 1          JOSH DUGGAR:  Right.

2          AGENT FAULKNER:  -- make sure.  Again, we're not

3    here to put words in your mouth.  So when you say "all"

4    and I'm thinking --

2:54PM 5          JOSH DUGGAR:  Well, okay.  I won't say all

6    because I'm going to say -- I'm going to say the laptop,

7    the phone, and the computer in the office.

8          AGENT FAULKNER:  Okay.  So laptop in the RV?

9          JOSH DUGGAR:  Yes.

2:54PM 10         AGENT FAULKNER:  Okay.  The phone, your phone or

11   --

12         JOSH DUGGAR:  I believe.  To the best of my

13   knowledge.

14         AGENT FAULKNER:  That's fine.

2:54PM 15         JOSH DUGGAR:  Yeah.

16         AGENT FAULKNER:  Again --

17         JOSH DUGGAR:  I don't know if they actually all

18   have them or not.  I don't know.

19         AGENT FAULKNER:  We're not here to pen you in a

2:54PM 20   corner --

21         JOSH DUGGAR:  Right.

22         AGENT FAULKNER:  -- on any of your answers.

23         JOSH DUGGAR:  Right.

24         AGENT FAULKNER:  The laptop that's -- possibly on

2:54PM 25   the laptop in the RV?

1939

```
2:54PM  1              JOSH DUGGAR:  Right.

        2              AGENT FAULKNER:  Possibly on the phone that you

        3   had on you, right, your phone, not Randall's?

        4              JOSH DUGGAR:  Mm-hmm, right.

2:54PM  5              AGENT FAULKNER:  And then possibly --

        6              JOSH DUGGAR:  I don't know about Randall's.

        7              AGENT FAULKNER:  Yeah.  We're going to -- we're

        8   going to --

        9              JOSH DUGGAR:  Yeah.

2:54PM 10              AGENT FAULKNER:  -- have a conversation very

       11   similar to what we are having with you when we're done, if

       12   he wants to talk to us.

       13              And then possibly peer-to-peer networks on the HP

       14   that's in the --

2:54PM 15              JOSH DUGGAR:  Yes.

       16              AGENT FAULKNER:  Okay.  And I guess that would --

       17   that's what Agent Aycock was kind of getting to.

       18              JOSH DUGGAR:  Like a TOR -- like a TOR browser or

       19   a TOR -- we upload stuff for our cars and things like

2:54PM 20   that.  I've had a friend of mine that came and set up with

       21   file-sharing so we could do, you know, more encrypted type

       22   stuff.  He just said it's safer that way.  He got me onto

       23   it.  It's safer.

       24              AGENT FAULKNER:  Now, I want to make sure we're

2:54PM 25   getting -- that we're clear.  When you say "TOR," my
```

2:54PM 1    definition, that's kind of a --

2           JOSH DUGGAR:  I don't -- I actually don't know

3       the definition, so I don't really want to --

4           AGENT FAULKNER:  Well, because TOR, T-O-R stands

2:54PM 5    for The Onion Router, which stands for basically the Dark

6       Web and the deep web.

7           JOSH DUGGAR:  Okay.

8           AGENT FAULKNER:  I don't know if you've heard of

9       the Dark Web?  That's --

2:54PM 10   JOSH DUGGAR:  I mean, I've heard people talk

11      about it.

12          AGENT FAULKNER:  Right, but then there's Torrent,

13      so two different things.

14          JOSH DUGGAR:  Okay.

2:54PM 15   AGENT FAULKNER:  Peer-to-peer involves the

16      Torrent files.

17          JOSH DUGGAR:  So what are you --

18          AGENT FAULKNER:  So you have peer-to-peer files,

19      which is software that you can download, and you can

2:54PM 20   exchange files with users all over the world.  TOR, T-O-R

21      --

22          JOSH DUGGAR:  Okay.

23          AGENT FAULKNER:  -- standing for The Onion Router

24      is the Dark Web.  That's a program you -- that's where you

2:54PM 25   can surf the internet anonymously and get on all these

2:54PM 1    different sites.

2           JOSH DUGGAR:  Yeah.

3           AGENT FAULKNER:  So do you know --

4           JOSH DUGGAR:  I don't know which -- I mean, I

2:54PM 5    don't know.  Just, he said "TOR," so I don't really know

6           --

7           AGENT FAULKNER:  Okay.

8           JOSH DUGGAR:  -- which one.

9           AGENT FAULKNER:  That's fine.  I just want to

2:54PM10    make sure I'm not -- when you say "TOR," I'm not thinking

11          Dark Web and while you're thinking peer-to-peer or vice

12          versa.

13          JOSH DUGGAR:  No, I don't -- so you're -- so are

14          you saying -- what -- I guess I'm still confused.

2:54PM15          AGENT FAULKNER:  In terms of the peer-to-peer --

16          JOSH DUGGAR:  Because you said you can download

17          -- I don't actually know.

18          AGENT FAULKNER:  Right.

19          JOSH DUGGAR:  So I guess I better not --

2:54PM20          AGENT FAULKNER:  Okay.

21          JOSH DUGGAR:  -- say if I don't understand.

22          AGENT FAULKNER:  And I'm not going to put words

23          in your mouth, but I'm assuming, because you said they

24          have peer-to-peer programs on these devices, that he was

2:54PM25    talking about Torrent files, not T-O-R.

2:54 PM 1          JOSH DUGGAR:  TOR?

2          AGENT FAULKNER:  Torrent, T-o-r-r-e-n-t.

3          JOSH DUGGAR:  Oh, I don't know.

4          AGENT FAULKNER:  As opposed to T-O-R.  And there

2:54 PM 5  is a difference there.

6          JOSH DUGGAR:  So are you saying that TOR -- are

7  you saying -- is your question pertaining to which one?

8          AGENT FAULKNER:  I was just making sure that you

9  and I were on the same page as to what you're talking, but

2:54 PM 10  I don't think you're seeing the difference between TOR.

11          JOSH DUGGAR:  I don't see any difference.

12          AGENT FAULKNER:  Okay.

13          JOSH DUGGAR:  As far as -- I mean, I don't know.

14          AGENT FAULKNER:  So your friend said that there's

2:54 PM 15  potentially on these devices.

16          JOSH DUGGAR:  Well, no, no.  I -- so I have

17  knowledge that there is something that says TOR on there.

18          AGENT FAULKNER:  Okay.

19          JOSH DUGGAR:  At least on one of them.

2:54 PM 20          AGENT FAULKNER:  Gotcha.  All right.

21          JOSH DUGGAR:  And then -- and that has been --

22  I'm just saying that was at his recommendation that I use

23  those and so a different -- and I don't know at what point

24  or -- right.

2:54 PM 25          AGENT FAULKNER:  Let's leave it at that point

2:54PM 1    based on your description of it.

2         JOSH DUGGAR:  Right.

3         AGENT FAULKNER:  And what would you say the usage

4    of the TOR that --

2:54PM 5         JOSH DUGGAR:  I -- I don't recall.

6         AGENT FAULKNER:  Okay.

7         JOSH DUGGAR:  Yeah.

8         AGENT FAULKNER:  Is it more for the business or

9    is it personal?  Hey, look.  I promise you we're not --

2:54PM10         JOSH DUGGAR:  I mean, most -- okay.  So I can't

11    --

12         AGENT FAULKNER:  We're not here --

13         JOSH DUGGAR:  I can't speak to that because, I

14    mean, I have -- you have my laptop; you have my phone.  So

2:54PM15    it's probably split, you know, down the middle.  The

16    office computer, probably the same thing.

17         AGENT FAULKNER:  All right.  And I don't want you

18    to think that we're here because --

19         JOSH DUGGAR:  No, and my --

2:54PM20         AGENT FAULKNER:  -- somebody's downloading music.

21    We wouldn't --

22         JOSH DUGGAR:  So what are you here for, then?

23         AGENT FAULKNER:  That's what we're getting at.

24         AGENT AYCOCK:  So part --

2:54PM25         AGENT FAULKNER:  Oh, I'm sorry.  Go ahead.

2:54PM 1          JOSH DUGGAR:  I mean, is somebody communicating

2          --

3          AGENT AYCOCK:  Part of -- we do a lot of things

4     with Homeland Security Investigation.

2:54PM 5          JOSH DUGGAR:  Right.

6          AGENT AYCOCK:  We enforce over, like, 400

7     different federal statutes.

8          JOSH DUGGAR:  Okay.

9          AGENT AYCOCK:  Immigration, narcotics, gaming.

2:54PM 10          JOSH DUGGAR:  Yeah.

11          AGENT AYCOCK:  And part of the other stuff we do

12     is child exploitation.  So we kind of work with saving

13     kids essentially.

14          JOSH DUGGAR:  Yeah.

2:54PM 15          AGENT AYCOCK:  A lot of times we'll find through

16     internet tips that people have, you know, downloaded child

17     pornography.

18          JOSH DUGGAR:  Okay.

19          AGENT AYCOCK:  You know, stuff like that.  And --

2:54PM 20          JOSH DUGGAR:  So is that what you're saying -- is

21     that what you're saying's going on?

22          AGENT AYCOCK:  Well, what we -- what we're saying

23     is there is a possibility that there are pieces to this

24     puzzle where we might be able to help save children.

2:54PM 25     Okay?

2:54PM 1            JOSH DUGGAR:  Okay.

2            AGENT AYCOCK:  That's what we're trying to --

3      that's what we're trying to do.

4            JOSH DUGGAR:  Okay.

2:54PM 5            AGENT AYCOCK:  All right?

6            JOSH DUGGAR:  So what is -- what is the -- I

7      guess what is the scope is what I've been trying to say.

8      Like, is there some -- is there something going on on my

9      devices where that's been -- something's accessed or

2:54PM 10     something's downloaded or uploaded or something like that?

11           AGENT AYCOCK:  That's what led us here, yes.

12           JOSH DUGGAR:  Okay.

13           AGENT AYCOCK:  Okay.  So what we're trying to do

14     is hopefully find out exactly what happened so we can try

2:54PM 15     to use that information to put some pieces of the puzzle

16     together --

17           JOSH DUGGAR:  So --

18           AGENT AYCOCK:  -- to help save --

19           JOSH DUGGAR:  Does it -- does it include -- so

2:54PM 20     did it mark this IP address?  Is that basically what

21     you're saying?

22           AGENT AYCOCK:  Yeah.

23           JOSH DUGGAR:  Okay.  So does it -- so I guess in

24     the scope of your investigation, is there going to be, I

2:54PM 25     guess -- I mean, you'll narrow it down.  You'll be able to

2:54PM 1    figure out probably which device or which thing -- or at

2          least know if it's any of these devices that are here?

3                    AGENT AYCOCK:  Well, that's what -- that's what

4          you see all these other guys running around doing.  They

2:54PM 5    are our computer forensic analysts.  So, like, even, you

6          know, even if something's on a computer that someone might

7          have downloaded and then deleted, they are going to be

8          able to find it, you know.

9                    JOSH DUGGAR:  Yeah.  That's great.

2:54PM 10           AGENT AYCOCK:  They have been doing that.  That's

11         what they do, you know?

12                   JOSH DUGGAR:  Yeah.

13                   AGENT AYCOCK:  So, you know, with that being

14         said, we're just trying to get -- get to the bottom of it.

2:54PM 15           JOSH DUGGAR:  Exactly.  No, well, that helps me a

16         lot to understand what you're -- what you're here for.  So

17         I understand that.  I respect that.  That's good.

18                   So what other -- I guess, you know, they will do

19         their work and figure out what they can find, so --

2:54PM 20           AGENT FAULKNER:  Has there been anything, let's

21         say within the last five to six months between yourself or

22         any of your employees or any of their associates that have

23         been on this property that has raised a red flag as to why

24         that search warrant -- or federal search warrant might

2:54PM 25    have been signed --

2:54 PM 1           JOSH DUGGAR:  Not at all.

2           AGENT FAULKNER:  -- as to why we're here?

3           JOSH DUGGAR:  No.

4           AGENT FAULKNER:  Nothing that might have been

2:54 PM 5  accidentally or intentionally downloaded or uploaded from

6  any of these networks or software programs that we've

7  talked about?

8           JOSH DUGGAR:  Not that I know of, no.

9           (End of Section Two)

2:54 PM 10  Q.   (BY MR. ROBERTS.)  Now, during that section of the

11  audio, Mr. Duggar specifically said they had peer-to-peer

12  software installed, I believe his laptop phone and

13  computer in the office.  Again, that's the HP we have seen

14  the picture of, is that correct?

3:02 PM 15  A.   Yes, sir.

16  Q.   The iPhone that you have there at the stand, is that

17  correct?

18  A.   Correct.  Yes, sir.

19  Q.   And the laptop with the American flag?

3:02 PM 20  A.   The MacBook laptop, yes, sir.

21  Q.   Now, during the interview, Mr. Duggar referenced the

22  TOR browser.  At this point in your investigation, did you

23  have any reason to believe the TOR browser was involved?

24  A.   On November 8th of 2019, we had no knowledge the TOR

3:03 PM 25  browser or the Dark Web, so to speak, was involved in this

3:03PM 1    investigation.

2    Q.    Now, you attempted to in the interview, but could you

3    explain to the Jury what the TOR browser is?

4    A.    So TOR, T-O-R, stands for "The Onion Router."  And

3:03PM 5    it's basically a network that users can surf the internet

6    on anonymously, meaning that their IPs cannot be tracked

7    or it's very difficult to track them.

8    Q.    So as opposed to a peer-to-peer network where you

9    could see the IP, law enforcement can see the IP, on this

3:03PM10   network, you cannot, is that true?  Law enforcement

11   generally cannot see that IP address?

12   A.    It's very, very difficult.

13   Q.    So within your occupation as a Special Agent, do you

14   often see or work cases involving TOR?

3:03PM15   A.    Yes, sir, I have.

16   Q.    What kind of cases?

17   A.    The majority, obviously, with the ICAC is child

18   exploitation based where individuals are surfing this

19   network anonymously.  They are trading images and videos

3:04PM20   of child pornography.  They are downloading images and

21   videos of child pornography.  There's websites that I've

22   come across where you can actually buy a child in terms of

23   sex-trafficking websites.

24   Q.    And so this is just accessible to this TOR browser

3:04PM25   program that you download, is that right?

3:04PM 1    A.    Correct, in terms of what we investigate.

2    Q.    That's a free program?

3    A.    Yes, sir.

4    Q.    Within law enforcement, is the TOR browser or the

3:04PM 5    Dark Web a known source of child pornography?

6    A.    Yes, sir, it is.

7    Q.    Now, during the interview, Mr. Duggar stated that

8    they would upload stuff for cars and things like that to

9    the TOR, using the TOR browser.  Does that make sense to

3:04PM10    you as an investigator?

11    A.    Common sense of it, no, sir.

12    Q.    Could you explain?

13    A.    Again, people enter, for most parts, the Dark Web to

14    remain anonymous to where nobody knows who you are or

3:05PM15    especially where you are.  If a business is uploading

16    photographs for a car lot in order to sell them at a

17    specific location, I would not think that the Dark Web

18    would be the best place to do that.

19    Q.    In your experience using the Dark Web, have you ever

3:05PM20    been able to access something like a car lot website?

21    A.    Honestly, I don't think I have ever attempted.

22    Q.    Just never dawned on you?

23    A.    Not to look for a car lot on the Dark Web, no, sir.

24    Or purchase a vehicle on the Dark Web.

3:05PM25    Q.    You've never purchased one?

3:05PM 1    A.    Not on the Dark Web.

2    Q.    What other things, known to law enforcement, is

3    available on the Dark Web?

4            MR. GELFAND:  Your Honor, I object on relevance

3:06PM 5    and 403.

6            THE COURT:  Mr. Roberts?

7            MR. ROBERTS:  Your Honor, my response

8    specifically is that this case involves the TOR browser,

9    which is accessible to the Dark Web.  I think the Jury is

3:06PM 10   entitled to know what the Dark Web specifically entails in

11   law enforcement investigations.

12           THE COURT:  Well, overruled.  But let's move on

13   from those sorts of personal anecdotal questions.

14   Q.    (BY MR. ROBERTS.)  So at this point in your

3:06PM 15   investigation, did you know if Mr. Duggar had TOR browser

16   on his personal iPhone or his personal laptop?

17   A.    No, sir, not on November 8th of 2019.

18   Q.    At this point in the investigation, did you know if

19   TOR browser was on the HP computer?

3:07PM 20   A.    On November 8th, 2019, no, sir.

21   Q.    Now, directing your attention to the third audio

22   portion.  Can you tell the Jury what topic is discussed in

23   this section?

24   A.    Yes, sir.  So this section, myself and Agent Aycock

3:07PM 25   give Mr. Duggar the specific details as to why the federal

3:07PM 1    search warrant was actually issued.

2                    THE COURT:  Can I see counsel at side bar,

3    please?

4                    (Bench Conference)

3:07PM 5                THE COURT:  I want to go back to the ruling on

6    the last objection.  The last thing that I heard Agent

7    Faulkner talking about had to do with the question about

8    whether he had ever purchased vehicles on the Dark Web and

9    kind of what sort of sense that would be.  And right on

3:08PM 10   the heels of that, there was an objection.  And I thought

11   that the objection was to the relevance of these sort of

12   personal anecdotal deals.  But just looking at the

13   real-time transcript, you had actually began a question

14   that was shifting away from that.  Your question was to

3:08PM 15   the effect of, "Are there other law enforcement objectives

16   that are pursued on the Dark Web?"  And, technically, that

17   is the point where the objection was made.

18                   If you had more questions about whether he buys

19   personal vehicles on the Dark Web, you need to move on

3:08PM 20   from that.  But if you had questions that relate to, "Are

21   there other law enforcement objectives on the Dark Web," I

22   did not mean to tell you that you had to move on from

23   that.

24                   MR. ROBERTS:  I understand.  That was where I was

3:09PM 25   trying to go, Your Honor, but it's not a big point.  I

3:09PM 1   don't need to revisit it.

2          THE COURT:  I just want to be clear.

3          (Bench Conference Concluded)

4   Q.   (BY MR. ROBERTS.)  Now, Agent, I lost my place a

3:09PM 5   little bit, but I believe where we were at is directing

6   your attention to the third audio portion.  Could you

7   remind us what that section deals with?

8   A.   Yes, sir.  That section, myself and Agent Aycock

9   explained to Mr. Duggar the specific details as to why the

3:09PM 10  federal search warrant was issued.

11         MR. ROBERTS:  I would ask to play section three

12  at this time.

13         (Section Three played as follows:)

14         AGENT FAULKNER:  So, and I know Agent Aycock had

3:10PM 15  kind of alluded to the fact that -- what we do, but we're

16  part of a specialized task force and that task force is

17  called the Internet Crimes Against Children Task Force.

18         JOSH DUGGAR:  Yeah.

19         AGENT FAULKNER:  Based on an ongoing

3:10PM 20  investigation, we were able to directly connect --

21  actually, one of our task force affiliates in the Eastern

22  District was able to directly connect to a certain IP

23  address that was participating in the uploading and

24  sharing of known videos and images of child pornography.

3:10PM 25         JOSH DUGGAR:  Okay.

3:10PM 1           AGENT FAULKNER:  That information was then sent

2    to us because the IP geolocated back into the Western

3    District somewhere in Northwest Arkansas.

4           JOSH DUGGAR:  So it was transmitting or

3:10PM 5    receiving?

6           AGENT FAULKNER:  At this point I probably -- it's

7    probably best that you just listen.  Okay?

8           JOSH DUGGAR:  Okay.

9           AGENT FAULKNER:  We were able to get from this IP

3:10PM10    address one specific video of child pornography and one

11    folder containing approximately 65 images of child

12    pornography from a specific IP address.

13           We then, once that information was turned over to

14    us because of the fact that it was geolocated in Northwest

3:10PM15    Arkansas, we served a federal summons onto -- or for that

16    IP address.  That IP address came back to OzarksGo --

17           JOSH DUGGAR:  Okay.

18           AGENT FAULKNER:  -- with a subscriber of --

19           JOSH DUGGAR:  Yeah, my name.

3:10PM20           AGENT FAULKNER -- Joshua Duggar, Duggar with cell

21    phone.

22           JOSH DUGGAR:  Yeah.

23           AGENT FAULKNER:  I'm assuming that's personal

24    cell phone?

3:10PM25           JOSH DUGGAR:  Mm-hmm.

3:10PM 1          AGENT FAULKNER:  With that e-mail address that

2    you had just mentioned.

3          JOSH DUGGAR:  Yeah.

4          AGENT FAULKNER:  Now, it came back to a P.O. Box.

3:10PM 5          JOSH DUGGAR:  Yeah.

6          AGENT FAULKNER:  We kind of briefly talked about

7    this when we got on scene.  So your -- their service

8    address --

9          JOSH DUGGAR:  Right.

3:10PM 10          AGENT FAULKNER:  -- from OzarksGo has you at --

11          JOSH DUGGAR:  Right.

12          AGENT FAULKNER:  -- at this lady's house down the

13    street.

14          AGENT AYCOCK:  Down the road.

3:10PM 15          JOSH DUGGAR:  Well -- oh, that's -- that's where

16    it is?  Okay.

17          AGENT FAULKNER:  That's where it is because

18    Washington County property records have not updated or --

19          JOSH DUGGAR:  Right.

3:10PM 20          AGENT FAULKNER:  -- or separated your land from

21    this lot.

22          JOSH DUGGAR:  Right.

23          AGENT FAULKNER:  So your actual physical address,

24    which we had to find out -- and OzarksGo does not have it;

3:10PM 25    they have corrected now because this poor lady keeps

3:10PM 1   getting your mail -- as to what it is right now.

2        JOSH DUGGAR:  Okay.

3        AGENT FAULKNER:  Based on all that information,

4   we were able to determine that this was the business where

3:10PM 5   downloads of child pornography had occurred.

6        JOSH DUGGAR:  Okay.

7        AGENT FAULKNER:  It came from -- or it occurred

8   on two separate dates, which I believe to be approximately

9   May 14th and May 15th of 2019, through a uTorrent software

3:10PM 10   and that's why I was asking you earlier to make sure we

11   understood or were on the same page --

12        JOSHUA DUGGAR:  Right, right.

13        AGENT FAULKNER:  -- with what T-O-R is, TOR, and

14   what Torrent is.

3:10PM 15        JOSH DUGGAR:  Yeah.

16        AGENT FAULKNER:  And everything, again, was at

17   the late night hours, I want to say roughly between, from

18   what we can guesstimate, between 10:00 and 11:00.

19        JOSH DUGGAR:  Okay.

3:10PM 20        AGENT FAULKNER:  So based on all that

21   information, a federal search warrant was obtained for the

22   property and everything on it to include the RVs, office

23   and vehicles to find out or look for electronic devices

24   that possibly were responsible for those downloads or

3:10PM 25   uploads of child pornography.

3:10PM 1           JOSH DUGGAR:  Okay.

2           AGENT FAULKNER:  That's what's gotten us here

3   today and that's why you can see some of our questions

4   were tailored around electronics --

3:10PM 5           JOSH DUGGAR:  Right.

6           AGENT FAULKNER:  -- who has access, who has

7   ownership, knowledge of certain softwares and forensic --

8   or peer-to-peer groups.  And, you know, at this stage, all

9   we're trying to do -- and I'll tell you this:  I didn't

3:10PM10   know much about you leading up to this until I did, you

11   know --

12           JOSH DUGGAR:  A little research?  Yeah.

13           AGENT FAULKNER:  -- some research in the last few

14   weeks.  Man to man, I don't know how you do it.  It is

3:10PM15   amazing to me what the media is putting you through on a

16   daily basis all because of stuff which would be considered

17   speculation by most parts.

18           We don't want to speculate.  That's why we came

19   here.  We tried to be as courteous as possible and have a

3:10PM20   one-on-one or a conversation to figure out who's doing

21   this on this lot because these are not actors and

22   actresses that are in these videos and images that we know

23   came from here.  Okay?

24           JOSH DUGGAR:  Okay.

3:10PM25           AGENT FAULKNER:  These are somebody's little boy,

3:10PM 1  little girl.

2          JOSH DUGGAR:  I agree.

3          AGENT FAULKNER:  At the end of the day, that's

4  our main objective is to find out who's doing it so that

3:10PM 5  we can -- or what electronic devices it's being done on so

6  we can get those devices and take these images back off

7  the internet so that these kids aren't revictimized.

8          JOSH DUGGAR:  So they are being -- so, yeah.  I

9  guess I have -- I mean, I have quite a few questions about

3:10PM10  it, but I don't know, you know, how much you can divulge,

11  but I'm just, I'm curious.  You're saying there's images

12  being uploaded or images being downloaded?

13         AGENT FAULKNER:  That the IP address from this

14  lot had child pornography associated to it in a

3:10PM15  peer-to-peer software program, and our task force

16  affiliate was able to download those, that video and

17  images, from the folder of the IP address going to this.

18         JOSH DUGGAR:  Okay.  Got you.

19         AGENT FAULKNER:  Well, that's one of the things

3:10PM20  too, and I know Agent Aycock had also spoke about this

21  briefly.  Those individuals you see walking around, we

22  didn't just decide to wake up this morning and come here.

23  So we did our homework and we've been doing this for

24  almost a decade now.  We're pretty good at what we do.

3:10PM25         JOSH DUGGAR:  Appreciate -- yeah, I appreciate

3:10PM 1    the work you guys do.

2                    AGENT FAULKNER:  Thank you.

3                    JOSH DUGGAR:  Yeah.

4                    AGENT FAULKNER:  But these forensic guys are some

3:10PM 5    of the best in the country.

6                    JOSH DUGGAR:  That's great.

7                    AGENT FAULKNER:  And what they do is they take

8    electronic devices and they, through third-party software

9    or through certain forensic software, without altering or

3:10PM10   deleting anything that's on those electronic devices, can

11   go in and see a digital fingerprint of anything and

12   everything that's ever happened.

13                   So some -- if there's an electronic device -- and

14   that's why we're trying to get ahead of the game.  If

3:10PM15   there's an electronic device that may possibly have these

16   videos or images or anything associated like that that's

17   on it, we'd like to know now because once we leave here

18   today, it's kind of the end of our conversation and we

19   wrap our -- wrap everything up then and we don't have

3:10PM20   anything else to go on other than, "No, I don't know

21   anything about it," and then we see it and it's like,

22   "Okay.  Well, we had an opportunity to talk about that."

23                   JOSH DUGGAR: Right.

24                   AGENT FAULKNER:  "Why wasn't it addressed then."

3:10PM25   JOSH DUGGAR:  Right.

3:10 PM 1            AGENT FAULKNER:  You see what I'm getting at?

2            JOSH DUGGAR:  Right.

3            AGENT FAULKNER:  But as long as you're confident

4    that there's no -- or at least you --

3:10 PM 5            JOSH DUGGAR:  I don't want to be -- I've watched

6    my friends, you know, answer things and they get them for

7    conspiracy or for something and I'm just, I'm not --

8            AGENT FAULKNER:  I promise you --

9            JOSH DUGGAR:  I know federal statutes are broad

3:10 PM10    and there's a lot of things to it and I'm not going to say

11    anything that's going to --

12            AGENT FAULKNER:  We don't -- we don't -- that's

13    not our intent.

14            JOSH DUGGAR:  -- incriminate me or anything at

3:10 PM15    all.  I don't want to -- I'm not a -- you know, I'm not

16    denying guilt, but I'm not saying that I'm -- you know, I

17    mean, as far as anything goes, I don't want to be -- I

18    don't want to say the wrong thing.

19            AGENT FAULKNER:  Right.  At the end of the day,

3:10 PM20    you need to protect yourself.

21            JOSH DUGGAR:  Yeah, I don't want to -- I mean, I

22    don't want to -- I don't want to say that I'm guilty or

23    not.  I'm just not saying, you know, on search -- finding,

24    accessing inappropriate content at some point, at any

3:10 PM25    point in my life.

3:10PM 1          (End of Section Three)

2  Q.   (BY MR. ROBERTS.)  Now, Agent, during that section,

3  you explained to Mr. Duggar that these downloads occurred

4  at late night hours.  Could you explain that to the Jury?

3:16PM 5  A.   Yes, sir.  So when I initially received the lead from

6  Detective Kalmer, I, in error, converted the times -- I

7  think I put them ahead six hours or so -- into a

8  different, or I converted to a time zone when I didn't

9  need to.  They were already in Central form.  So at that

3:17PM 10  time in November 8th, 2019, I was under the impression, as

11  well as Agent Aycock, that the download times in question

12  were in the mid to late hours of the evening.

13  Q.   So when Mr. Duggar, at the outset of this interview,

14  asked you this question regarding whether someone has been

3:17PM 15  downloading child pornography, is it correct that the only

16  time that you actually told him someone was downloading

17  child pornography was the subsequent conversation, the one

18  that we have heard?

19  A.   That is correct.

3:18PM 20  Q.   Now, what happened after this interview was concluded

21  with Mr. Duggar?

22  A.   Mr. Duggar left the property and we ended up giving

23  the copies of the search warrant return, things that we

24  seized, to his employee, Randall Berry.

3:18PM 25  Q.   Now, in an effort to further identify employees who

3:18PM 1    had access to Wholesale Motorcars on May 14th, 15th, did

       2    law enforcement obtain the Wholesale Motorcars employee

       3    pay records?

       4    A.    Yes, sir.

3:18PM 5    Q.    I'd like to reference you to Government's Exhibit 23.

       6    A.    Yes, sir.

       7    Q.    Can you identify and have you previously reviewed

       8    Government's Exhibit 23?

       9    A.    Yes, sir, I have.  This is a Wholesale Motorcars'

3:18PM 10   check -- I'm sorry, there's a glare -- made out to a

       11   Joshua Williams in the amount of $150.

       12   Q.    Well, Agent, before you go through all of them.

       13   Collectively, all the checks that are a part of

       14   Government's Exhibit 23, are they true and accurate copies

3:19PM 15   of the records that you obtained from Wholesale Motorcars

       16   reflecting the employee pay records of 2019?

       17   A.    They are true and correct as to what we received.

       18         MR. ROBERTS:  Your Honor, I would move to

       19   introduce Government's Exhibit 23 into evidence.

3:19PM 20         MR. GELFAND:  We have no objection.  Can I confer

       21   with opposing counsel for just one second?

       22         THE COURT:  Yes.

       23         (Off-the-record discussion)

       24         MR. ROBERTS:  Your Honor, may we briefly

3:20PM 25   approach?

3:20PM  1              THE COURT:  Yes.

        2              (Bench Conference)

        3              MR. ROBERTS:  The stipulation finally came

        4    together, Your Honor, and it's signed regarding the

3:20PM  5    records.  We would ask, perhaps if it's appropriate, to be

        6    a Court exhibit.

        7              MR. GELFAND:  We join in that request, Your

        8    Honor.

        9              THE COURT:  This is what?

3:20PM 10              MR. GELFAND:  I said we join in that request,

       11    Your Honor.

       12              THE COURT:  Okay.

       13              MR. ROBERTS:  The stipulation is in regard to one

       14    of the motions, the pretrial motions that was filed.

3:20PM 15              THE COURT:  Yes.  Okay.  All right.

       16              MR. GELFAND:  Mark it as Court Exhibit 1 or

       17    whatever.

       18              THE COURT:  So we'll mark it as a Court exhibit.

       19    Are you asking that the Court read this at this time?

3:20PM 20              MR. ROBERTS:  Your Honor, on behalf of the

       21    government, yes, sir.

       22              MR. GELFAND:  We have no objection.

       23              THE COURT:  And if it's received as a Court's

       24    exhibit, it does not go back to the jury room.  That is

3:21PM 25    the default way that it would be handled.  If the parties

3:21PM  1   want the stipulation to go back to the jury room, you need

        2   to mark it as a sub-exhibit or an associated exhibit to

        3   the bank records.

        4           MR. ROBERTS:  Your Honor, I would rather mark it

3:21PM  5   as an exhibit that does go back to the jury room.

        6           MR. GELFAND:  We're fine with that.  However the

        7   Court wants to handle that.

        8           THE COURT:  Thank you.

        9           (Bench Conference Concluded)

3:21PM 10           THE COURT:  The Court will receive Government's

       11   Exhibit 23, which are the bank records, essentially

       12   canceled checks from Wholesale Motorcars.

       13           (Government's Exhibit 23 Received)

       14           THE COURT:  After conferring with counsel, the

3:21PM 15   Court is also going to receive and mark, I'm going to

       16   refer to it just for housekeeping purposes as Government's

       17   Exhibit 23-1, but this is actually a stipulated exhibit

       18   that contains a written stipulation of the parties that

       19   pertains to this exhibit.  And I would like to read the

3:22PM 20   stipulation to you now, and this has to do with how these

       21   bank records were procured.

       22           "The United States, by and through its counsel,

       23   and defendant, Joshua James Duggar, by and through his

       24   counsel, hereby stipulate and agree that the following

3:22PM 25   fact is true and must be accepted as true by you as if

3:23PM 1  otherwise established through other witnesses that would

2  have to be called."

3       "On or about April 29, 2020, a federal subpoena

4  was issued to FiveStone Group, LLC, that does business as

3:23PM 5  Wholesale Motorcars.  The subpoena requested copies of any

6  and all IRS forms, 1099, and copies of all employee

7  paychecks issued for the time period January 1, 2019,

8  through December 31, 2019."

9       "On or about May 5 of 2020" -- so about one week

3:23PM 10  later -- "FiveStone Group, LLC" -- again, this LLC does

11  business as Wholesale Motorcars -- "provided responsive

12  documents consisting of all IRS forms, 1099, and all

13  employee paychecks in the business's possession, custody,

14  and control issued by FiveStone Group, LLC, doing business

3:24PM 15  as Wholesale Motorcars between the dates of January 1,

16  2019, through December 31, 2019.  The records provided by

17  FiveStone Group, LLC, doing business as Wholesale

18  Motorcars, are true and authentic business records of

19  FiveStone Group, LLC."

3:24PM 20       And this has been signed by counsel for both

21  parties and you will have this stipulation in the jury

22  room.  It's a jointly made stipulation, but it's been

23  marked as Government's 23-1 to indicate that it goes with

24  the records that are received as Government's Exhibit 23.

3:24PM 25       (Government's Exhibit 23-1 Received)

3:24PM 1     THE COURT:  You may proceed.

2     MR. ROBERTS:  Thank you, Your Honor.

3 Q.   (BY MR. ROBERTS.)  Now, with regard to Government's

4 Exhibit 23, those are the employee pay records section,

3:25PM 5 not the IRS 1099s, is that correct?

6 A.   Correct.

7     MR. ROBERTS:  Your Honor, I would move to publish

8 Government's Exhibit 23.

9     THE COURT:  You may.

3:25PM 10 Q.   (BY MR. ROBERTS.)  Please just orient the Jury.

11 A.   Again, that is a Wholesale Motorcars' check made out

12 to Joshua Williams with a date of January 12th, 2019, in

13 the amount of $150.

14 Q.   Next page.

3:25PM 15 A.   Wholesale Motorcars' check made out to Matthew

16 Waller, the date of January 26th, 2019, in the amount of

17 $264.

18 Q.   Agent, instead of going check by check, would it be

19 accurate that all the next several checks leading up to

3:25PM 20 the end of April would be made out to Matthew Waller and

21 the same description that you've already provided?

22 A.   That is correct.  Yes, sir.

23 Q.   Please go forward to the end of April.  Stop there.

24 One forward, please.  Now, with regard to what's on the

3:26PM 25 screen before the Jury, is that last paycheck issued to

3:26PM 1    Matthew Waller per the records that we have obtained?

2    A.   That is correct.  Yes, sir.

3    Q.   And at the bottom, could you read the memo section to

4    make sure the Jury can understand?

3:26PM 5    A.   Yes, sir.  It says, "Commissions for 3-30 - 4-29-19,

6    11 sales."

7    Q.   Now, in your investigation, did Homeland Security

8    locate Mr. Waller and interview him?

9    A.   Yes, sir.  We sent a collateral request of

3:26PM10    investigation to our St. Paul, Minnesota, office.  Agents

11    out of that office located and interviewed Mr. Waller.

12    Q.   Please go forward to the next page.  Now, Agent, will

13    you orient the Jury to this page?

14    A.   Again, this is a Wholesale Motorcars' check made out

3:27PM15    to Randall Steve Berry from May 31st, 2019, in the amount

16    of $450.

17    Q.   Now, Agent, was there any records, employee pay

18    records, produced by Wholesale Motors for the time period

19    covering May 14th, 15th, and 16th?

3:27PM20    A.   No, sir, not that I'm aware of.

21    Q.   Now, Mr. Berry, you have testified, was on scene that

22    day, is that correct?

23    A.   Yes, sir.

24    Q.   Did you interview Mr. Berry?

3:27PM25    A.   We did.

3:27PM 1    Q.    Was his cellular phone forensically reviewed?

2    A.    One of our computer forensic analysts did a manual

3    triage, basically a manual examination, on Mr. Berry's

4    phone.

3:28PM 5              MR. ROBERTS:  Your Honor, may I have a moment?

6              THE COURT:  You may.

7              MR. ROBERTS:  Pass the witness.

8              THE COURT:  Thank you.  I think that we're going

9    to go ahead and take our afternoon recess.  We'll be in

3:28PM 10   recess until 3:50, so for 20 minutes.  If you would be

11   ready to go, we'll call for you at 3:50.  If everyone

12   would please stand while the Jury is in recess.

13              (Jury out at 3:28 p.m.)

14              THE COURT:  You may be seated, but I would ask

3:29PM 15   that you remain in the courtroom while the Jury clears the

16   elevator lobby.  I'll pause with you here and let you know

17   when you may leave the courtroom.

18              While we're waiting, the issue that we took up in

19   chambers at the tail end of the lunch hour, I have now had

3:30PM 20   an opportunity to correlate Court's Exhibit 1, which is

21   the transcript that was handed out to the Jury of the

22   audio recordings that were received into evidence.  And

23   I've correlated those to the complete transcript that was

24   received in earlier proceedings.  And for members of the

3:30PM 25   gallery, you're free to go.  The Jury has cleared the

3:30PM 1    elevator lobby.  And so I can tell you that section one

2    can be found at page 8, beginning at line 25, and goes

3    through page 20, line 12.

4         Section two goes from page 29, line 9, through

3:31PM 5    page 40, line 25.

6         And with a couple of exceptions, section three

7    goes from page 48, line 7, to page 56, line 24.  The two

8    exceptions are some internal gaps within that page range,

9    specifically page 53/21, to page 54, line 9.  And

3:31PM10   secondly, page 55, line 24, through page 56, line 2.

11   Those two gaps contain very short sets of questions that

12   go to the Fifth Amendment issue that the Court precluded

13   in its motion in limine rulings about the transcript.

14        To the extent, Mr. Gelfand, that you are wanting

3:32PM15   to introduce additional portions of the recording pursuant

16   to Rule 106, I need you to identify for me from the

17   original transcript the page and line references.  And I

18   also need you to be prepared to explain why the contents

19   of the excluded passages would be relevant to one of the

3:32PM20   issues at trial and to also identify for the Court how

21   those excluded portions would either explain or provide

22   context to the portions that were admitted by the

23   government or that would be necessary to avoid misleading

24   the Jury or for some reason to ensure fairness and

3:33PM25   impartiality and a correct understanding of the evidence.

3:33PM 1  And I realize we only have 20 minutes, but just giving you

2  a heads-up as to where my scorecard is so far so you can

3  help me correlate that.

4        MR. GELFAND:  I'm prepared to do that whenever

3:33PM 5  the Court would like, Your Honor.

6        THE COURT:  All right.  You can tell me now.

7        MR. GELFAND:  First of all, for organization

8  purposes, Your Honor, in light of just keeping this

9  organized, we've marked essentially sub-exhibits by giving

3:33PM10  them separate defense exhibit numbers so that we can at

11  least have a clear record of what we're all talking about.

12        I will note for the record that the clips I

13  potentially intend to play that are included within the

14  government clips are Defendant's Exhibits 68, 69, 71, 72,

3:33PM15  and 75.  In other words, that's not something that falls

16  within what the Court just asked.

17        THE COURT:  You are going to replay --

18        MR. GELFAND:  Very small snippets from this.

19        THE COURT:  -- vignettes within what's already

3:34PM20  before the Jury?

21        MR. GELFAND:  Correct, Your Honor.

22        THE COURT:  68, 69.

23        MR. GELFAND:  71, 72, and 75.  There is a clip

24  that we have identified for identification purposes as

3:34PM25  Defendant's Exhibit 76.  It's on page 57 of what I think

3:34PM 1    the Court is referring to as kind of the master

2    transcript.  And it begins with line 16 and ends with line

3    25.  And to be clear, this is a direct follow-up to this

4    suggestion that Mr. Duggar's statement, "I'm not denying

3:34PM 5    guilt" has some sort of significance when he expressly

6    denies guilt.

7            THE COURT:  That comes on the heels of the very

8    end of section three?

9            MR. GELFAND:  Yes, Your Honor, with the exception

3:35PM 10    of an excluded portion due to the Court's in limine.

11            MR. ROBERTS:  What was the end of that section

12    that you are referring to?  What end are you going to?

13            MR. GELFAND:  25.

14            THE COURT:  What else?

3:35PM 15            MR. GELFAND:  Defendant's Exhibit 70 is on

16    page 25 of the master transcript, Your Honor, beginning

17    with line 1 going to line 11.  This provides context to

18    the government's clips that they played about Mr. Duggar

19    identifying the devices as his and that he had access to

3:36PM 20    it when Mr. Duggar states very clearly that others had

21    access too.

22            The next one is Defendant's Exhibit 73, which is

23    on page 41 of the master transcript, line 11 through line

24    23, referring specifically to Mr. Berry and also referring

3:37PM 25    to these explained, but confusing questions, about being

3:37PM 1    there past 6:00 p.m. in light of the Special Agent's time

2    translation confusion.

3              THE COURT:  What was the time translation

4    confusion?

3:37PM 5              MR. GELFAND:  That he asked Mr. Duggar

6    essentially, "Are you here late at night," as the Special

7    Agent, as I understood his testimony, essentially

8    miscalculated, for whatever reason thought 5:00 p.m. was

9    11:00 p.m. or whatever the specific testimony was.

3:37PM 10             THE COURT:  Right.  Okay.

11             MR. GELFAND:  And then there's one additional

12   clip.  And that's Exhibit 74, which is on page 43 of the

13   master transcript.  This one is a little bit longer, Your

14   Honor.  It begins on page 43, line 20.  And it goes

3:38PM 15  through page 48, line 3.  And this all directly relates to

16   William Mize and specifically access to the car lot.

17             THE COURT:  So it's relevant.  How does it

18   explain or give context to the portions of the recording

19   that have already been received?

3:38PM 20             MR. GELFAND:  I think it deals with the Agent's

21   subsequent investigation and it explains why he goes to

22   William Mize.  And then the failure to forensically image

23   Mr. Mize's devices.

24             THE COURT:  So you are saying this is

3:39PM 25  impeachment?

3:39PM 1          MR. GELFAND:  It's potential impeachment,

2    depending on what the Agent testifies to.  I realize the

3    Agent is on the witness stand right now.

4          THE COURT:  I understand.  Sorry.

3:39PM 5          MR. GELFAND:  I'm just trying to be a little bit

6    cryptic.  Depending on what the Agent testifies to, it may

7    be relevant; it may not be.

8          THE COURT:  I understand.  Anything else?

9          MR. GELFAND:  I think that's it.

3:39PM10          THE COURT:  Will the government please take a

11   look at those right now and send word back if you have any

12   objections to these passages coming in under 106?

13          MR. ROBERTS:  Your Honor, we will.

14          THE COURT:  Thank you.  We're in recess.

3:39PM15          (Recess taken from 3:39 p.m. to 3:55 p.m.)

16          (Outside the Presence of the Jury)

17          THE COURT:  Does the government have a position?

18          MR. ROBERTS:  Yes, Your Honor.  We are going to

19   move to exclude the mentioned portions under the Rule of

3:55PM20   Completeness.  We don't believe they provide context.

21          With respect to page 57, the identified portions,

22   line 16 through 25, if you look at the preceding section,

23   that is the exact section the government took out because

24   of the defense motion.  And that section gives context to

3:56PM25   the sections that they are trying to introduce.  That's

3:56PM 1    actually a Rule of Completeness within a Rule of

2    Completeness challenge.

3         THE COURT:  So if Defendant's Exhibit 76, if the

4    Court were going -- would the government be agreeable if

3:56PM 5    it required the defense to also play from page 56, line

6    25, through page 57, line 11?

7         MR. ROBERTS:  Your Honor, we would not, just

8    because that's not the answer to the question that's

9    posed.  I just think it gives the Jury a false sense of

3:56PM10    what was discussed that day.  That's not, in fairness, of

11    what completes the actual audio interview.  That's

12    actually, in the government's perspective, the opposite.

13    It's giving the wrong impression.

14         THE COURT:  To be clear, I'm talking about where

3:57PM15    Faulkner says, "Let me be a little more specific because

16    video images that I'm specifically talking about is

17    something that's not -- cannot be misinterpreted as a

18    21-year-old dressed up like a 15-year-old," et cetera, et

19    cetera, et cetera.  "These are very clearly 5 to

3:57PM20    10-year-olds."  We would have to exclude line 12, where

21    Josh says, "I would rather not answer that question."

22    Faulkner says, "That's perfectly fine."  Aycock says,

23    "That's your right."  And then Josh Duggar says the five

24    or six lines that they are wanting.

3:57PM25         So you're saying you don't -- even if the Court

3:58PM 1    required them to include the question, you don't want that

2    answer?

3              MR. ROBERTS:  Your Honor, we didn't even

4    challenge the defense on their motion.  We took out the

3:58PM 5    entire section.  Now we're talking about putting sections

6    of the challenged section back in just to satisfy this --

7              THE COURT:  I'm not saying you have to.  I'm

8    asking if you want to.

9              MR. ROBERTS:  I do not, Your Honor.

3:58PM 10             THE COURT:  What about the next one, page 25,

11    1 through 11?

12             MR. ROBERTS:  Your Honor, again, we don't believe

13    it adds clarity.  We played a clip talking about the

14    ownership of the devices that Mr. Duggar had.  We didn't

3:58PM 15    play any clip about others who had access to it.

16             THE COURT:  And then what about page 41, lines 11

17    through 23?

18             MR. ROBERTS:  Your Honor, we did discuss

19    Mr. Berry, but not during the audio.  We separately did

3:58PM 20    him through the employee pay records.

21             THE COURT:  What about if the Court required them

22    to play the section right above that, page 41, lines 1

23    through 10?  I may have my notes off for some reason.

24    Yeah, they are wanting 11 through 23.  So if we included

3:59PM 25    anything above line 11, would that resolve any of the

3:59PM 1    government's position?

2           MR. ROBERTS:  One moment.  Make sure I'm tracking

3    what the Court is referring to.

4           THE COURT:  Where Faulkner says, "In terms of

4:00PM 5    what you were talking about earlier of possibly staying

6    here late at night with work, have there been times where

7    anyone other than yourself stayed here, lived here?"

8    Duggar says, "No, I mean, you know, other than" -- he

9    says, "No, other than the other people that come through.

4:00PM 10   I've never slept in any RVs out here that I recall."

11          MR. ROBERTS:  Your Honor, again, the government's

12   position, we just didn't play anything with regard to

13   Randall Berry.  I don't believe we played anything with

14   regard to who would sleep here at night.  There was a

4:01PM 15   reference to late night, but not who stayed here.

16          THE COURT:  What about Exhibit 74, which they are

17   wanting this five pages, or four and a half pages, about

18   Mize and perhaps others?

19          MR. ROBERTS:  Your Honor, for the same reason, we

4:01PM 20   didn't play or touch on Mize.  And specifically Mize is

21   even in a different category because he was not even an

22   employee of Wholesale Motorcars.  So that's a totally

23   different topic, one we did not broach.  I don't see how

24   it gave any context to what we played.

4:01PM 25          THE COURT:  Okay.  The Court has read all of the

4:01PM 1    transcripts that correspond to Defense Exhibits 76, 70, 73

2    and 74.  If the government were okay with adding some

3    questions before the clip at page 57, line 16 through 25,

4    the Court would have required the defendant to do that.

4:02PM 5         But the Court agrees with the government that

6    this particular clip is not adding any explanation or

7    clarification.  What it's doing is, it's directly

8    responsive to a question that was not played.  And so I

9    don't understand how a question that is responsive to

4:02PM 10   something that wasn't played can properly be considered

11   under 106.

12        As to defendant's transcript at Exhibit 70, this

13   is 10 or 11 lines that are a complete island in the middle

14   of the overall transcript and there's no question on the

4:03PM 15   table.  So, again, we would have to -- the government

16   would have to figure out some sort of compromise so that

17   there's at least a question on the table.  And they say

18   that they are not willing to do that, so the Court will

19   find that this is the same thing.  It doesn't explain or

4:03PM 20   add context or clarify.  It's just some additional nuggets

21   that the defense would like to get in.  And they can call

22   Mr. Duggar to the stand if they want to, but it's

23   inappropriate to allow self-serving testimony to come in

24   under the guise of the Rule of Completeness, so the Court

4:03PM 25   will not permit that, unless there is some other basis, if

4:04PM 1    there's an impeachment basis or something like that.  My

2    rulings are just going to whether it is appropriate under

3    106.

4          With regard to the portions under Exhibit 73,

4:04PM 5    again, it would be unfair to include lines 11 through 23

6    of page 43 of the main transcript -- I'm sorry -- page 41,

7    lines 11 through 23 because there's no question on the

8    table.  Well, there is a question, but it's a follow-up.

9    Agent Faulkner says, "What about, you said Randall,

4:05PM 10   right?"  Well, there's no context to why Agent Faulkner

11   transitions to Randall, and there really needs to be.

12   Again, if the government wanted, beginning at page 1, line

13   10 to come in, that would be one thing.  But these are all

14   follow-up questions to the original question at

4:05PM 15   lines 1 through 6, and that is not necessary to explain or

16   clarify or to avoid confusion.

17          With regard to the proposed transcript at

18   Exhibit 74 -- you can go ahead and have the Jury come up,

19   please -- this is four and a half pages that the defendant

4:06PM 20   is wanting of the main transcript of this interview,

21   page 43, line 20, to page 48, line 3.  And this is four

22   and a half pages of an island all to its own among the

23   portions of the recording that have been played for the

24   Jury.  And it goes to Mize and the homeless guy.  And, I

4:06PM 25   mean, it's just basically five pages of self-serving

4:07PM 1    testimony, self-serving in the sense that it goes to the

2    defense theory of the case.  But it is not necessary to

3    explain or to put into context any other admitted

4    portions.  So the government's objections to these clips

4:07PM 5    corresponding to those defense exhibits will be sustained.

6           MR. GELFAND:  Your Honor, understanding the

7    Court's ruling with respect to these clips, I was still

8    intending to get into investigative activities with

9    respect to some of these other people.  I assume that's

4:07PM10    not encompassed in --

11          THE COURT:  You can cross-examine him.  All I'm

12    saying is, there was this issue about whether you could

13    play for the Jury audio clips under 106, and that's the

14    extent of my ruling.

4:07PM15          MR. GELFAND:  I understand.  Thank you.

16          (Jury in at 4:07 p.m.)

17          THE COURT:  Members of the Jury, I have done

18    little to improve my credibility with you about the

19    Court's ability to start back on time.  And not that this

4:09PM20    may make any difference to you, but during our last break,

21    including past the time that we told you we would start

22    back up, the Court and the attorneys have been working on

23    some exhibit issues.  None of us took any break

24    whatsoever.  So we've been working.  And although it may

4:09PM25    not seem like it, we're actually saving time here.  So

4:10PM 1    give me one more chance, all right?

2                   Mr. Gelfand, you may inquire.

3                        CROSS EXAMINATION

4    BY MR. GELFAND:

4:10PM 5    Q.   Good afternoon, Special Agent Faulkner.

6    A.   Good afternoon, sir.

7    Q.   Agent Faulkner, you testified that you performed a

8    significant role in this investigation involving Josh

9    Duggar, correct?

4:10PM10    A.   That is correct.  I was assisting Agent Aycock in his

11   first ICAC investigation.

12   Q.   So to be clear, Special Agent Howard Aycock was what

13   you would call the lead agent on this case, is that

14   correct?

4:10PM15    A.   Yes, sir.

16   Q.   This was his first investigation of this nature,

17   correct?

18   A.   Yes, sir, that I'm aware of.

19   Q.   You trained him, correct?

4:10PM20    A.   As best I could.

21   Q.   You acted essentially as a co-lead agent, so to

22   speak.  Is that fair to say?

23   A.   Yes, sir.

24   Q.   Now, you would agree with me, would you not, that

4:10PM25    anytime you're investigating a case like this, it's

4:10PM 1   critical that law enforcement be thorough, correct?

2   A.   Absolutely, yes, sir.

3   Q.   Fair?

4   A.   Yes, sir.

4:11PM 5   Q.   Keep an open mind throughout the investigation?

6   A.   Yes, sir.

7   Q.   Follow all leads?

8   A.   Yes, sir.

9   Q.   Not rush to judgment until you have all relevant

4:11PM 10   evidence?

11   A.   Correct.

12   Q.   Be honest and accurate in reports?

13   A.   Yes, sir.

14   Q.   Work as quickly as possible before memories fade and

4:11PM 15   evidence disappears?

16   A.   I don't know if I could necessarily agree with that

17   based on forensic examinations.

18   Q.   So let's break that down for a second.  If I

19   understand your testimony correctly, forensic

4:11PM 20   examinations, and let's be clear, computer forensic

21   examinations can take quite some time, correct?

22   A.   Correct.  Yes, sir.

23   Q.   Those only happen once law enforcement actually has a

24   device in its hand, correct?

4:11PM 25   A.   In terms of the lengthy forensic examinations, that's

4:11PM 1   more so when it gets back to our forensic lab at the

2   office.

3   Q.   In other words, that's at the point of the

4   investigation, if you ever get to that point, where

4:11PM 5   there's actually a device; a phone, a computer, a tablet,

6   an iPad, whatever it may be, correct?

7   A.   Yes, sir.

8   Q.   So up until that point, before you have seized any

9   device or devices, it's important to act quickly, correct?

4:12PM 10   A.   Depending on the nature of the investigation.

11   Q.   This investigation.  This kind of investigation.

12   A.   In terms of ICAC cases, there are different levels of

13   the severity that we deal with, so we have to put some in

14   priority order.

4:12PM 15   Q.   Was this shuffled to kind of the bottom of the deck?

16   A.   I wouldn't say it was shuffled to the bottom of the

17   deck, no, sir.

18   Q.   Not the highest priority?

19   A.   At this time, and since I received the initial lead

4:12PM 20   prior to giving it to Agent Aycock, between April and

21   September of 2019, I had received an unrelated cyber

22   tipline report from the National Center for Missing &

23   Exploited Children where I located and identified a

24   previously registered sex offender who was actively

4:13PM 25   producing child pornography on two 8 and 9-year-old little

4:13PM 1    boys.  That individual was residing at the time, or we

2    luckily found him in Holiday Island, Arkansas.  Throughout

3    the course of that investigation, which obviously was a

4    priority because we had a hands-on offender with two

4:13PM 5    little boys, I was able also to identify another believed

6    hands-on producer in Mexico City based on going through

7    search warrants of the individual's accounts.  I then had

8    to coordinate with our attaché office in Mexico to make

9    sure that that individual was also being investigated.

4:13PM 10       Since we solely focus what we do for children, it

11   didn't stop that particular investigation after we

12   arrested the individual.  We wanted to make sure that

13   these kids were being put into a correct safe home and

14   that they were properly getting the services that they

4:13PM 15   truly needed.  I think the last interaction that I had

16   with the National Center for Missing & Exploited Children

17   on that unrelated case would have been sometime

18   mid-September of 2019.

19   Q.   So bottom line -- and I understand why cases like

4:14PM 20   that would take priority -- those cases took priority over

21   this case, correct?

22   A.   In terms of the two children, yes.

23   Q.   Now, let's rewind the clock for a second.  You

24   testified that this investigation began, albeit not with

4:14PM 25   HSI, in May of 2019, correct?

4:14 PM 1    A.    Correct.

2    Q.    And you testified that Detective Amber Kalmer, as you

3    understood it, was conducting an online investigation

4    using software on the BitTorrent network, correct?

4:14 PM 5    A.    Yes, sir.

6    Q.    You were not involved in the investigation at that

7    time, correct?

8    A.    No, sir.

9    Q.    In fact, this was not a federal investigation at that

4:14 PM 10   time, correct?

11   A.    I'm unaware if Detective Kalmer -- I know she was a

12   federal task force officer, not with HSI at that time.  I

13   believe it was with the FBI.  I'm not sure if she was in

14   May of 2019.  But it was not -- to answer your question,

4:14 PM 15   sir, it was not an initial HSI federal case, no, sir.

16   Q.    It did not come to HSI's attention until June,

17   approximately 17th of 2019, correct?

18   A.    That's when Detective Kalmer had sent me the initial

19   lead through our ICAC software program.

4:15 PM 20   Q.    And when did she first contact you in connection with

21   the case?

22   A.    It probably would have been sometime around the same

23   time.

24   Q.    I'm sorry.  I mis-heard the end.  You said sometime

4:15 PM 25   around when?

4:15 PM 1    A.    Sometime around then, around June 17th.

2    Q.    So plus or minus June 17th is when this case hits

3    HSI's desk, correct?

4    A.    Roughly, yes, sir.

4:15 PM 5    Q.    You prepared a whole number of memoranda called

6    reports of investigation in connection with this case,

7    correct?

8    A.    Myself and Agent Aycock had, yes, sir.

9    Q.    You're aware that every single official report in

4:15 PM 10   this case says that HSI received lead information in

11   October 2019 for the first time, correct?

12   A.    Yes, sir.

13   Q.    That's false, correct?

14   A.    No, sir.

4:15 PM 15   Q.    So that's accurate, HSI received lead information for

16   the first time in October 2019?

17   A.    Am I allowed to explain?

18   Q.    Absolutely.

19   A.    Thank you.  So initially, when I received the lead

4:16 PM 20   from Detective Kalmer in June of 2017, or 2019, I had not

21   handed the lead over or had received any information,

22   obviously because of the other case, to Agent Aycock until

23   October of 2019.  Agent Aycock, acting as the case agent,

24   he opened our initial investigation into that specific IP

4:16 PM 25   address.  In our reporting system for HSI, at the

4:16PM  1    beginning -- I'm not a fan of it -- but at the beginning

2    of every case opening, you put a general synopsis

3    paragraph into it.  And that general synopsis paragraph

4    carries over into every single report of investigation

4:16PM  5    that we upload into this system.  So, no, it is not

6    accurate as to when I initially received the lead from

7    Detective Kalmer.  But it is accurate as to when I turned

8    that lead over to Special Agent Aycock to start working

9    the lead.

4:16PM 10    Q.   So let's break this down, just facts.  June 2017, HSI

11    gets the case, correct?

12    A.   Yes, sir.

13    Q.   October 2019, you turn over the case to Special Agent

14    Aycock to make this essentially his first lead

4:17PM 15    investigation of this nature, correct?

16    A.   That was correct.  I believe it was after I received

17    the summons, the initial summons from OzarksGo on or about

18    October 7.

19    Q.   Now, let's back up to OzarksGo.

4:17PM 20    A.   Yes, sir.

21    Q.   All you had from Detective Kalmer was an IP address

22    in connection with her two purported downloads on May 14th

23    and May 15th of 2019, correct?

24    A.   From Detective Kalmer, we had a specific IP address

4:17PM 25    believed to be connected to a computer, yes, sir.

4:17PM 1   Q.   Now, an IP address, as you explained briefly, it's a

2   series of numbers, correct?

3   A.   Yes, sir.

4   Q.   You testified on direct examination when the

4:17PM 5   prosecutor was asking you questions that it tells us where

6   and how a computer is connected to the internet, correct?

7   A.   Essentially, yes, sir.

8   Q.   Let's break that down for a second.  The numbers of

9   an IP address alone mean virtually nothing, correct?  In

4:18PM10   other words, you can't do anything with just the numbers

11   unless you go to an ISP provider, correct?

12   A.   Correct.  We do not know who or where specifically

13   the target is when we get an IP address.

14   Q.   In other words, an IP address itself leads us to the

4:18PM15   internet service provider, the cable company, for example,

16   correct?

17   A.   Correct.  Yes, sir.

18   Q.   That company -- in this case, OzarksGo -- can tell

19   you who had the IP address at any given time, correct?

4:18PM20   A.   Yes, sir.

21   Q.   That company can tell you whether the IP address was

22   static or dynamic at that time, correct?

23   A.   They should be able to.

24   Q.   When you just have an IP address and downloads on

4:18PM25   Torrential Downpour or any software on the BitTorrent

4:19PM 1    network, you don't know what device, if any, was actually

2    connected, correct?

3    A.    Just to be clear.  I'm not certified or approved to

4    do direct connect, what we call direct connect

4:19PM 5    investigations on the BitTorrent network that Detective

6    Kalmer can do.  I will agree with you, but I don't know

7    that for certain.

8    Q.    That's fair enough.  Multiple devices can be

9    associated with an IP address at any given time, correct?

4:19PM 10    A.    Yes, sir.

11    Q.    And you are familiar with that based on your 10 years

12    or so of investigations of this nature, correct?

13    A.    Yes, sir.

14    Q.    So a laptop at my house, an iPhone at my house, they

4:19PM 15    could both be connected to the same IP address through

16    Wi-Fi, correct?

17    A.    Correct.

18    Q.    An IP address obviously doesn't tell us who is using

19    a particular device at any given time, correct?

4:19PM 20    A.    No, sir.

21    Q.    In June of 2019, did you contact OzarksGo to find out

22    what this IP address, where it was associated?

23    A.    In June of 2019?

24    Q.    Yes.

4:20PM 25    A.    No, sir.

4:20PM 1   Q.   In fact, it was not until the last day of July of
2   2019, July 31st, that you sent this administrative
3   summons, this legal process, so to speak, to OzarksGo,
4   correct?
4:20PM 5   A.   That is correct.  Yes, sir.
6   Q.   Just so we all understand, we're talking about
7   OzarksGo is the internet service provider, essentially the
8   company that provides internet, correct?
9   A.   For this particular investigation, yes, sir.
4:20PM 10  Q.   And fairly widely throughout the region, correct?
11  A.   I'm sorry.  I didn't hear you.
12  Q.   And fairly widely throughout the region, correct?
13  A.   I believe at the time when this case first started,
14  they were fairly new, but they have expanded since.
4:20PM 15  Q.   You did not, at the time that you applied for either
16  of the two search warrants, have a Mac address identifying
17  a particular address, correct?
18  A.   No, sir, we were not provided with a Mac address.
19  Q.   Tell the Jury if you would what a Mac address is.
4:21PM 20  A.   In correlation to what an IP address of showing where
21  internet is coming from, the Mac address would show you
22  what device was actually connected.
23  Q.   In other words, the IP address tells us where the
24  internet is, but doesn't isolate the device.  A Mac
4:21PM 25  address actually identifies a particular device, correct?

4:21PM 1    A.    Yes, sir.

      2     Q.    Is that fair?

      3     A.    Yes, sir.

      4     Q.    Now, you testified that when it comes to a

4:21PM 5    peer-to-peer investigation, you essentially have what you

      6     described as three goals.  Do you remember that?

      7     A.    Yes, sir.

      8     Q.    And when we say peer-to-peer, that's synonymous --

      9     that's the same thing as a BitTorrent investigation,

4:21PM10    correct?

      11    A.    BitTorrent is a peer-to-peer file-sharing network.

      12    Q.    So we're saying the same thing, correct?

      13    A.    Yes, sir.

      14    Q.    So in a BitTorrent, or a peer-to-peer investigation,

4:21PM15    you want to identify all devices that have the program

      16    that was used to access the BitTorrent network, correct?

      17    A.    Correct.

      18    Q.    You want to identify, obviously, any device with

      19    alleged child pornography on it, correct?

4:22PM20    A.    Correct.

      21    Q.    And you testified that you want to identify any

      22    device that would put someone -- your words -- quote,

      23    "behind the computer," end quote, correct?

      24    A.    Yes, sir, on the dates in question.

4:22PM25    Q.    Now, at the beginning of an investigation before you

4:22PM 1   have all of the facts, is it fair to say that you're not

2   always going to know what's important?

3   A.   Before having all the facts, not knowing what's

4   important.

4:22PM 5   Q.   I asked a terrible question.  Let me rephrase that.

6   At the beginning of an investigation, you don't know all

7   the details that might come out over the course of an

8   investigation, correct?

9   A.   That is correct.  Yes, sir.

4:22PM 10   Q.   There may be facts that would be significant in terms

11   of clues or evidence that you wouldn't even know of at the

12   beginning of an investigation, correct?

13   A.   Yes, sir.

14   Q.   There may be software on a device that you don't even

4:22PM 15   know to look for at the beginning of an investigation,

16   correct?

17   A.   Yes, sir.

18   Q.   There may be Microsoft Word documents or PowerPoints

19   that you don't even know to look for at the beginning of

4:23PM 20   an investigation, correct?

21   A.   Correct.

22   Q.   That's why it's important to get your hands on all of

23   the evidence so that you can gradually look back at it

24   over time and investigate, correct?

4:23PM 25   A.   In terms of grabbing everything that we can and

4:23PM 1    executing a search warrant, that's why we bring our

2    computer forensic analysts, to decide what needs to come

3    with us and what does not need to come with us.

4    Q.    To image devices, correct?

4:23PM 5    A.    No, sir.  I'm not a computer forensic analyst,

6    obviously, so in terms of having to image something on

7    scene, I don't know if that was something that they would

8    absolutely have to do.

9    Q.    Let's back up for a second.  Halloween, October 31st?

4:23PM10    A.    Yes, sir.

11    Q.    You and your team execute the first search warrant at

12    the house that was not the car lot, correct?

13    A.    No, sir, not correct.  We did not execute that

14    warrant on October 31st, 2019.

4:24PM15    Q.    Did you obtain a search warrant?

16    A.    Agent Aycock did, yes, sir.

17    Q.    And you were supervising Agent Aycock?

18    A.    Yes, sir.

19    Q.    Did you show up with your team to execute the search

4:24PM20    warrant?

21    A.    We did show up to execute the search warrant, but we

22    did not execute the warrant after making contact with the

23    residents.

24    Q.    What time of day did you show up?

4:24PM25    A.    It was 6:00 in the morning.

4:24 PM 1    Q.    Did you knock on the door?

2    A.    Knocked on the door.

3    Q.    Did you have computer forensic analysts prepared to

4    assist in the event that you were going to execute the

4:24 PM 5    search warrant?

6    A.    Yes, sir.  Again, they would not have been initially

7    at the front door with us when we knocked and announced.

8    They stay back until a scene is cleared.

9    Q.    You're familiar with the search warrant, correct?

4:24 PM 10   A.    Yes, sir.

11   Q.    You all thought there would be evidence of the crime

12   that began with Detective Kalmer's investigation at this

13   house on Halloween day of 2019, correct?

14   A.    Yes, sir.  Based on the initial response from

4:25 PM 15   OzarksGo, we had no reason not to believe that 14993 was

16   not the correct subscriber address.

17   Q.    You told the Judge that people who commit these kinds

18   of crimes most often keep child pornography at their

19   houses, correct?

4:25 PM 20   A.    In the particular paragraph, I believe it's 47 in our

21   search warrant affidavit, it's stated that it's often the

22   case, but not always.

23   Q.    Which is what I asked.  It's often the case that

24   people store child pornography at their houses, correct?

4:25 PM 25   A.    Yes, sir.

4:25PM 1    Q.    That's what you told the Judge when you were trying

2    to go search the house, correct?

3    A.    Correct, in the first one.

4    Q.    At that point in the investigation, you had no reason

4:26PM 5    to believe that Josh Duggar was a suspect?

6    A.    No, sir.

7    Q.    So you show up at the house.  You learn very quickly

8    that Josh Duggar does not live there, correct?

9    A.    Correct.

4:26PM 10    Q.    You leave?

11    A.    When we further speak with the residents, they

12    informed us about the -- that they also did not have,

13    obviously, the internet services.  They explained to us

14    how the property had been split, which then informed us as

4:26PM 15    to Mr. Duggar owning a used car lot adjacent to their

16    property.  And then we left, yes, sir.

17    Q.    So you leave?

18    A.    Yes, sir.

19    Q.    You don't search any devices, correct?

4:26PM 20    A.    No, sir.  We did not search any devices at that

21    residence.

22    Q.    You have a search warrant in hand, but you don't

23    execute it, correct?

24    A.    Correct.

4:26PM 25    Q.    You testified, briefly, that an undercover agent was

4:26PM 1    sent in by your team to Wholesale Motorcars, correct?

2    A.    Yes, sir.  We were trying to further the probable

3    cause submitted to the Federal Magistrate Judge to make

4    sure that we had the right place.

4:27PM 5    Q.    On November 1 of 2019, you sent in an undercover

6    agent, correct?

7    A.    Yes, sir.

8    Q.    You actually prepared the search warrant affidavit a

9    few days later for what would become the search execution

4:27PM10    on November 8th of 2019, correct?

11    A.    Yes, sir.

12    Q.    You told the Judge that the undercover agent observed

13    Josh Duggar use two devices, correct?

14    A.    No, sir.  I believe, without getting into hearsay,

4:27PM15    that the undercover had stated he saw Mr. Duggar with an

16    Apple iPhone and then noticed a laptop in the main office.

17    Q.    So let me rephrase that.  You identified two and only

18    two electronic devices, correct?

19    A.    Yes, sir.

4:27PM20    Q.    Both Apple products, correct?

21    A.    I don't believe he gave an actual model description

22    on the laptop.  It was an Apple iPhone.

23    Q.    But it was a laptop and it was an Apple iPhone,

24    correct?

4:27PM25    A.    Right.  Yes, sir.

4:27PM 1  Q.   No mention at all of any sort of HP desktop, correct?

2  A.   Not from the undercover, no, sir.

3  Q.   You would have put that in your search warrant

4  affidavit if you learned that, correct?

4:28PM 5  A.   Yes, sir.

6  Q.   You would agree with me that an All-in-One Desktop

7  plugged into the wall is a very different kind of device

8  than a portable laptop, correct?

9  A.   Yes, sir, in appearance.

4:28PM10  Q.   Now, November 4th, you get your search warrant that

11  was introduced into evidence, correct?

12  A.   Correct.   Yes, sir.

13  Q.   November 8th of 2019, you and your team are

14  conducting surveillance of Wholesale Motorcars, correct?

4:28PM15  A.   Myself and Agent Aycock, yes, sir.

16  Q.   And the reason you're conducting surveillance is

17  because you want to make sure that Josh Duggar is there

18  when you execute the search warrant at this business,

19  correct?

4:29PM20  A.   Not specifically Mr. Duggar.   We wanted the owner on

21  record of the car lot or the business to be present, as

22  well as we wanted the subscriber of the IP address to be

23  present.

24  Q.   So I think we're saying the same thing.   You knew

4:29PM25  that Josh Duggar was the subscriber of the IP address,

4:29PM 1  correct?

2  A.   Yes, sir.  I apologize.  If it would have been

3  another name, it would have been the same thing is what I

4  was, I guess, trying to get at.

4:29PM 5  Q.   But it wasn't another name, correct?

6  A.   Yes, sir.

7  Q.   It was Josh Duggar, correct?

8  A.   Correct.

9  Q.   You were waiting for Josh Duggar to be present at the

4:29PM10  car lot when you executed the search of the business,

11  correct?

12  A.   Correct.

13  Q.   You testified that at some point, Josh shows up,

14  correct?

4:29PM15  A.   Correct.  Yes, sir.

16  Q.   Driving what?

17  A.   An RV.

18  Q.   You watch, through binoculars, Mr. Duggar drive the

19  RV into the business parking lot, so to speak, correct?

4:29PM20  A.   Yes, sir.

21  Q.   You watch, through binoculars, that there's other

22  people present, correct?

23  A.   There are two other individuals, yes, sir.

24  Q.   Randall Berry was present, correct?

4:30PM25  A.   Yes, sir.

4:30PM 1    Q.    Had you identified who he was at this point in your

2    investigation?

3    A.    We did not.  All we knew from the undercover was

4    there was another employee named, I think he said Randy or

4:30PM 5    Randall.  I think it was Randy.

6    Q.    But when you were looking at binoculars, I presume

7    you wouldn't have known who that was?

8    A.    We did not know who he was at that time, no, sir.

9    Q.    And then Richard Harrell was present, correct?

4:30PM10    A.    Correct.  Yes, sir.

11    Q.    You all had a pre-op meeting, correct?

12    A.    Yes, sir.

13    Q.    Tell the Jury what a pre-op meeting is, just

14    generally.

4:30PM15    A.    Before any HSI law enforcement action, we have an

16    operational briefing where we assign jobs to each of the

17    Special Agents who will be attending the search warrant,

18    as well as notifying what we're looking for, where we are

19    going to be, so that the computer forensic analysts have a

4:30PM20    better idea of what equipment to bring for forensic

21    examinations or previews on scene.

22    Q.    Showing you Government Exhibit 6.

23          MR. GELFAND:  May I publish Exhibit 6?

24          THE COURT:  You may.

4:31PM25    Q.    (BY MR. GELFAND.)  You identified Exhibit 6 as kind

4:31PM 1   of an aerial map that reflected what the car lot looked

2   like from the sky on that day, correct?

3   A.   No, sir, not from that day.

4   Q.   Does it approximately look like what it would have

4:31PM 5   looked like on that day?

6   A.   Give or take.  Again, we're zoomed out a little bit.

7   I just want to make sure that I see, or would be able to

8   see the two office businesses, or the two office

9   buildings, which is blurred.  So I would assume if they

4:31PM10   were there, then that's an accurate representation of

11   Wholesale Motorcars.

12   Q.   For our purposes, forget about the office buildings

13   for a second.  Where are you doing surveillance from to

14   see the car lot and who is present?

4:31PM15   A.   So I would have been set up a little further east

16   outside of the frame of this picture off of the emergency

17   lane on Highway 412.

18   Q.   So somewhere in kind of this area?

19   A.   I'm sorry.  West.  West, I'm sorry.  Left-hand side.

4:32PM20   Q.   Somewhere in this area?

21   A.   Yes, sir.

22   Q.   Is that fair?

23   A.   Yes, sir.

24   Q.   Just to the left of the frame; yes?

4:32PM25   A.   Yes, sir.

4:32PM 1    Q.    Now, how many agents are with you when you pull up to

2    the car lot?

3    A.    After we made a positive confirmation that Mr. Duggar

4    had arrived, we actually had to call everybody because

4:32PM 5    they were in different areas of the Northwest Arkansas

6    area.  We then rallied about, I'd say a half a mile

7    outside of the business.  We had, in total, four HSI

8    Special Agents, one HSI task force officer, who was also a

9    computer forensic analyst, and then two HSI computer

4:33PM 10    forensic analysts.

11    Q.    In other words, you've got, if I count right.

12    A.    Six total.

13    Q.    How many agents?  How many analysts?

14    A.    Four agents.  Three analysts.  Seven.

4:33PM 15    Q.    Seven total, three of whom are there for one purpose,

16    and that's computer forensic analysis, correct?

17    A.    Yes, sir.

18    Q.    And those individuals, that's not you.  They are

19    trained to do computer forensic analysis, correct?

4:33PM 20    A.    Correct.

21    Q.    The reason you have so many of them there is because

22    in cases of this nature, that's often the ball game,

23    correct?

24    A.    Yes, sir.

4:33PM 25    Q.    And you knew that going into this, correct?

4:33PM 1    A.    Very rarely.  I think it's only happened one time in

2    my 11 years of working these types of peer-to-peer cases

3    have we actively entered a residence and caught somebody

4    red-handed behind a computer downloading child

4:33PM 5    pornography.  So these cases heavily rely on forensic

6    examinations.

7    Q.    They are computer forensic investigations, correct?

8    A.    Yes, sir.

9    Q.    You show up.  You and your team immediately identify

4:34PM10    the three people who are present as Josh Duggar, Randall

11    Berry, and Richard Harrell, correct?

12    A.    Yes, sir.

13    Q.    You tried to talk to Richard Harrell that day,

14    correct?

4:34PM15    A.    I did not.

16    Q.    Your team did, correct?

17    A.    Agent Aycock I believe did.

18    Q.    He refused to speak with --

19            MR. ROBERTS:  Your Honor, objection.  Hearsay.

4:34PM20            MR. GELFAND:  I asked he refused to speak to him.

21    There's no hearsay.

22            MR. ROBERTS:  Your Honor, it calls for hearsay.

23    The Agent testified he did not speak with him.

24            THE COURT:  Well, he hasn't asked him what anyone

4:34PM25    said yet.  He's just asking him what he did.  So rephrase,

4:34PM 1    please, Mr. Gelfand.

2    Q.    (BY MR. GELFAND.)   You all did not speak with

3    Mr. Harrell that day, correct?

4    A.    Agent Aycock, to my knowledge, briefly spoke with

4:34PM 5    Mr. Harrell and then he left.

6    Q.    After that, you never interviewed Mr. Harrell,

7    correct?

8    A.    We have, yes, sir.

9    Q.    You have?

4:35PM 10    A.    We've spoken to him leading up to this trial.

11    Q.    When?

12    A.    This month.   Well, I apologize.   Last month.

13    Q.    Who was present?

14    A.    Myself, Agent Aycock, and Agent William Devito,

4:35PM 15    D-E-V-I-T-O.

16    Q.    You testified that you approached Josh Duggar and

17    physically took a phone from him, correct?

18    A.    Yes, sir.

19    Q.    You testified that you told him at that point that

4:35PM 20    your investigation involved allegations of, quote,

21    "digital contraband," correct?

22    A.    Correct.   Yes, sir.

23    Q.    And to be clear, that was your phrase that you used,

24    "digital contraband," correct?

4:36PM 25    A.    Yes, sir.

4:36PM 1    Q.    In fact, you told him that you were seizing items of
       2    evidentiary value that possibly contained digital
       3    contraband, correct?
       4    A.    Correct.
4:36PM 5    Q.    You searched the office at Wholesale Motorcars,
       6    correct?
       7    A.    No, sir.  I did not personally.
       8    Q.    Let's back up for a second.  You're aware of the
       9    office at Wholesale Motorcars, correct?
4:36PM10    A.    Yes, sir.
      11    Q.    I'm going to show you Government's Exhibit 9.  Do you
      12    see that in front of you?
      13    A.    Yes, sir.
      14    Q.    That's the office at Wholesale Motorcars when you
4:36PM15    executed the search warrant on November 8th of 2019,
      16    correct?
      17    A.    Yes, sir.
      18    Q.    Just from a vantage point standpoint, if I'm walking
      19    up to that office, is what I'm looking at the picture?  In
4:37PM20    other words, if I'm a customer and I'm walking up to that
      21    office, is this the front of the office as it would face
      22    the car lot?
      23    A.    If you entered through the main driveway, this would
      24    most probably be the side of the building that you would
4:37PM25    most commonly first encounter.

4:37PM 1    Q.   In other words, this is the front with the big sign,

2    "Wholesale Motorcars," the phone number?

3    A.   Yes, sir.  I would assume that to be the front.

4    Q.   The advertisements, "Call or text at this number,"

4:37PM 5    correct?

6    A.   Correct.  Yes, sir.

7    Q.   There's a giant window in the front of the office,

8    correct?

9    A.   Yes, sir.

4:37PM 10    Q.   And, in fact, if we look at Government's Exhibit 10,

11    you testified this is essentially the side-view, correct?

12    A.   Yes, sir.

13    Q.   There's also a window on the side next to the door,

14    correct?

4:38PM 15    A.   Yes, sir.

16    Q.   In fact, there's a window on the other side as well,

17    correct?

18    A.   On the back side, yes, sir.

19    Q.   It's a fish bowl of sorts, correct?

4:38PM 20    A.   I'm sorry.  What?

21    Q.   It's a fish bowl of sorts, correct?

22    A.   I would call it a tollbooth, but, yes, sir.

23    Q.   This building, you learned over your investigation

24    that the building next to what you call the tollbooth was

4:38PM 25    not there in May of 2019, correct?

4:38PM 1    A.    That building was not at the lot in May of 2019?

2    Q.    The one that's next to what you call the tollbooth,

3    the office?

4    A.    I'm not aware what was on the lot in May of 2019 in

4:38PM 5    terms of that specific building, sir.

6    Q.    You didn't investigate what was there in May of 2019?

7    A.    May of 2019?

8    Q.    Yes.

9    A.    No, sir.

4:38PM 10   Q.    I'm going to show you Government's Exhibit 16.  You

11   identified this for the Jury when the prosecutor was

12   asking you questions.  Can you tell us what that is?

13   A.    That is the inside of the wooden building.

14   Q.    In other words, this is the inside of the building I

4:39PM 15   was just asking you about, correct?

16   A.    Correct.

17   Q.    Under construction?

18   A.    Yes, sir.

19   Q.    Unfinished?

4:39PM 20   A.    Yes, sir.

21   Q.    Literally construction equipment on the floor that

22   you executed the search warrant?

23   A.    Correct.

24   Q.    In fact, you took, or identified, I should say, a

4:39PM 25   number of photographs at the search warrant, correct?

4:39PM 1   A.   Yes, sir.  Well, I did not take the photographs, but

2   photographs were taken at the search warrant.

3   Q.   And you're familiar with the photographs?

4   A.   Yes, sir.

4:39PM 5   Q.   Correct?

6   A.   Yes, sir.

7   Q.   And you're aware that those photographs are true and

8   accurate?

9   A.   Yes, sir.  I'm just clarifying that I didn't take the

4:39PM10   photographs.

11   Q.   So Government Exhibit 17, you testified, is an RV,

12   correct?

13   A.   Yes, sir.

14   Q.   In fact, that's the same as Government Exhibit 18,

4:40PM15   just from a different angle, correct?

16   A.   No, sir.

17   Q.   Different RV?

18   A.   Yes, sir.

19   Q.   Which one did Josh pull up in?

4:40PM20   A.   The one on top that you have underneath, or that one.

21   Q.   Exhibit 18?

22   A.   Yes, sir.

23   Q.   You testified that Josh Duggar was driving that RV

24   when you watched him pull into the car lot, correct?

4:40PM25   A.   Correct.

4:40PM 1   Q.   Now, let's look at 19.  Can you tell us what that is?

2   A.   That is the MacBook laptop that was located inside of

3   the RV that Mr. Duggar arrived in.

4   Q.   The RV that Josh was driving in?  In other words,

4:40PM 5   this was with Josh in the RV, correct?

6   A.   Yes, sir.

7   Q.   This is the MacBook Pro that you seized that day,

8   correct?

9   A.   Correct.

4:40PM 10  Q.   Can you tell me what the placard indicates, the

11  number 8?

12  A.   No, sir, not offhand.  I didn't place the placard

13  there, and, again, didn't take the photograph.  Special

14  Agent Jeffery Pryor did that.  I would assume it's for

4:41PM 15  identification purposes for him taking the photograph.

16  Q.   In other words, evidentiary collection purposes?

17  A.   Yes, sir.

18  Q.   Government Exhibit 12, you identified.  Do you see

19  that in front of you?

4:41PM 20  A.   Yes, sir.

21  Q.   Let's zoom in for a second.  That's the HP computer,

22  correct?

23  A.   Yes, sir.

24  Q.   Would you agree with me, Special Agent, that there's

4:41PM 25  Wholesale Motorcars stickers, for lack of a better way of

4:41PM 1    putting it, on the end face that customers would look at?

2    A.   Yes, sir.

3    Q.   And there's credit card placards, so to speak, that

4    customers would look at on the back of the computer,

4:41PM 5    correct?

6    A.   Yes, sir.

7    Q.   It's located on a desk physically plugged into a

8    wall, correct?

9    A.   Yes, sir.

4:42PM 10   Q.   It's next to a big window, correct?

11   A.   Yes, sir.

12   Q.   And it's next to a router, in other words, a Wi-Fi

13   box?

14   A.   Yes, sir.

4:42PM 15   Q.   And it was accessing this Wi-Fi on the day that you

16   executed the search warrant, correct?

17   A.   I believe so.

18   Q.   That Wi-Fi was correlated with OzarksGo, correct?

19   A.   Yes, sir.

4:42PM 20   Q.   Now, in fact, if we look at Government's Exhibit 13,

21   you identified this as the live-feed security monitor,

22   correct?

23   A.   Correct.  Yes, sir.

24   Q.   Do you have any clue whether that was there and

4:43PM 25   operational in May of 2019?

4:43 PM 1    A.    I believe so, based on other witness testimony, or

2    statements.

3    Q.    Let's look at where that is.  I asked you whether a

4    customer would be facing into this big, giant window in

4:43 PM 5    the front of Wholesale Motorcars, the office?

6    A.    Yes, sir.

7    Q.    Is this the other end, kind of the inside looking out

8    of that same window?

9    A.    Correct.  Yes, sir.

4:43 PM 10    Q.    And there happens to be a red van right in front

11    there, correct?

12    A.    Yes, sir.

13    Q.    But it essentially looks out to the highway, correct?

14    A.    Yes, sir.

4:44 PM 15    Q.    I want to ask you to look, if you would, in the

16    defense exhibit binder at Defendant's Exhibits 19 through

17    34 and 36 through 40.

18    A.    I'm sorry.  What were the numbers again, sir?

19    Q.    19 through 34 and 36 through 40.  If you could, will

4:44 PM 20    you look at them, just evaluate them for whether they are

21    true and accurate pictures taken at the search warrant on

22    November 8th of 2019?

23    A.    19 through 34?

24    Q.    19 through 34 and 36 through 40.  In other words, 19

4:45 PM 25    through 40, with the exception of 35.

4:45PM 1   A.    They appear to be accurate.

2          MR. GELFAND:  Your Honor, at this point, I would

3   move each of those exhibits, 19 through 34 inclusive and

4   36 through 40 into evidence, please.

4:45PM 5          MR. ROBERTS:  Your Honor, the government has no

6   objection.

7          THE COURT:  Defense Exhibits 19 through 34 and 36

8   through 40 are received.

9          MR. GELFAND:  Thank you.

4:45PM 10         (Defendant's Exhibits 19-34 and 36-40 Received)

11  Q.    (BY MR. GELFAND.)  Before I publish those, I'm going

12  to show you Government's Exhibit 14.  This is a picture of

13  the front of the HP computer that was taken on

14  November 8th of 2019, correct?

4:46PM 15  A.    Yes, sir.

16  Q.    And to be clear, you testified about this when the

17  prosecutor was asking you questions in this case, correct?

18  A.    Correct.

19  Q.    I want to zoom in for a second.  Do you see on the

4:46PM 20  desktop, and it may be a little difficult to see with the

21  resolution.  Do you see an icon with a big "F" in yellow?

22  A.    Yes, sir.

23  Q.    Does that appear to be an icon for software called

24  Frazer?

4:46PM 25  A.    Again, it's hard to make out, but I believe so.

4:46PM 1    Q.   Now, I'm not going to go through all of these with

2    you, but I want to show you a couple of different

3    exhibits.  The day that you execute the search warrant,

4    you all show up in daylight as opposed to nighttime,

4:47PM 5    correct?

6    A.   Correct.

7    Q.   I'm showing you Defendant's Exhibit 20.  This was

8    taken November 8th of 2019, correct?

9    A.   I believe so, yes, sir.

4:47PM 10   Q.   For our bearings, this looks out onto the highway,

11   correct?

12   A.   Highway 412, correct.

13   Q.   This is a used car lot, like virtually any car lot

14   that is on a large traffic-way, correct?

4:47PM 15   A.   Yes, sir.

16   Q.   Caters to the general public to come in and buy cars,

17   correct?

18   A.   It's not in a very heavy populated area, but if

19   somebody from the general public wanted to drive by and

4:47PM 20   possibly purchase a vehicle, they would.

21   Q.   It's a car lot, correct?

22   A.   Yes, sir.

23   Q.   Now, Exhibit 22, these are all defense exhibits.

24   That's the front door into that office, correct?

4:47PM 25   A.   Yes, sir.

4:48PM 1    Q.    There's additional credit card insignia, correct?

2    A.    Yes, sir.

3    Q.    And there's a combination lock on the door to get in,

4    correct?

4:48PM 5    A.    Yes, sir.

6    Q.    In the course of your investigation, were you able to

7    determine what that combination was?

8    A.    I don't believe so.

9    Q.    Showing you Defendant's Exhibit 28.  Can you tell me

4:48PM10    what that is?

11    A.    Yes, sir.  That is Mr. Duggar's phone that was seized

12    that day.

13    Q.    The reason you seized that phone was to do computer

14    forensic analysis, correct?

4:48PM15    A.    Yes, sir.

16    Q.    Showing you Exhibit 29.  Can you see that in front of

17    you?

18    A.    Yes, sir.

19    Q.    What's Exhibit 29?

4:49PM20    A.    A phone that was located on the lot, I'm assuming in

21    the main office.

22    Q.    Did you all analyze that phone?

23    A.    I did not, no, sir.

24    Q.    Did you all seize that phone?

4:49PM25    A.    No, sir.  It's my understanding that a CFA or one of

4:49PM 1   our computer forensic analysts had manually triaged that

2   phone.

3   Q.    You used that word a couple of times.

4   A.    Manually examined, I'm sorry.

4:49PM 5   Q.    In other words, not actually taking an image, a copy

6   of the phone, correct?

7   A.    Not connecting it -- not connecting it to a forensic

8   tool.

9   Q.    Not preserving it so that you could look at it today

4:49PM10   if you wanted to?

11   A.    Correct.

12   Q.    Defendant's Exhibit 30, that's the HP computer,

13   correct?

14   A.    Yes, sir.

4:49PM15   Q.    There's a receipt book right next to it, correct?

16   A.    Yes, sir.

17   Q.    Did you seize the receipt book?

18   A.    I'm sorry?

19   Q.    Did you seize the receipt book?

4:50PM20   A.    No, sir, I do not believe we did.

21   Q.    Defendant's Exhibit 33 is a bag or a briefcase,

22   correct?

23   A.    Yes, sir.

24   Q.    Whose?

4:50PM25   A.    I'm sorry?

4:50PM 1    Q.    Whose?

      2     A.    I don't recall, sir.

      3     Q.    I'll make it easy for you.  Do you see a name tag on

      4     it?

4:50PM 5    A.    Yes, sir.

      6     Q.    Whose?

      7     A.    It has the name "Josh" on it.

      8     Q.    What was in there?

      9     A.    I didn't search the RV, sir.

4:50PM 10   Q.    Is that a better question for Mr. Pryor?

      11    A.    Yes, sir.  We were conducting interviews while that

      12    was going on.

      13    Q.    You all seized a number of thumb drives, correct?

      14    A.    Correct.

4:51PM 15   Q.    I'm going to show you just by way of example

      16    Defendant's Exhibit 36.

      17    A.    Yes, sir.

      18    Q.    Do you see that?

      19    A.    Yes, sir.

4:51PM 20   Q.    Is that a thumb drive, just by way of example?

      21    A.    Yes, sir.

      22    Q.    Thumb drive is commonly called the USB drive or a

      23    flash drive, correct?

      24    A.    Can be, yes, sir.

4:51PM 25   Q.    It can literally be on a keychain, correct?

4:51PM  1   A.    Correct.

2   Q.    Thumb drives can actually be quite important in

3   investigations, correct?

4   A.    Yes, sir.

4:51PM  5   Q.    Now, you all were on scene for quite some time,

6   correct?

7   A.    I believe we arrived approximately 3:15 and I believe

8   we departed approximately 5:45.

9   Q.    Showing you Defendant's Exhibit 39.  Was it nighttime

4:51PM 10   when you left?

11   A.    It was getting to that point, yes, sir.

12   Q.    Defendant's Exhibit 40, also nighttime?

13   A.    Yes, sir.

14   Q.    Fair to say you had as much time as you needed on

4:52PM 15   site, correct?

16   A.    Give or take.  Since this was a known operating

17   business, we don't like to stay on scene more than what we

18   need to so that we're keeping a business from operating.

19   Q.    But you were there until the nighttime, basically,

4:52PM 20   correct?

21   A.    5:45, approximately.

22   Q.    If you needed to stay until 9:00 p.m., you would have

23   stayed, correct?

24   A.    If the situation presented itself, we would have.

4:52PM 25   Q.    No one kicked you out, correct?

4:52PM 1    A.    No, sir.

2    Q.    No one was in a position to kick you guys out,

3    correct?

4    A.    No, sir.

4:52PM 5    Q.    You chose when you left, correct?

6    A.    Correct.

7    Q.    Now, you testified that you showed up initially and

8    you testified that Josh Duggar made a comment to you, and

9    I'm paraphrasing, about maybe needing to leave because his

4:53PM10    wife was pregnant, correct?

11    A.    Yes, sir.

12    Q.    And you testified that you told him essentially, "No

13    problem," correct?

14    A.    Correct.

4:53PM15    Q.    That statement that you claim Josh made is not in any

16    of your reports, correct?

17    A.    I did not author the search warrant report for that

18    day, but I do not believe it's in there.

19    Q.    So that's correct?

4:53PM20    A.    Correct.  Yes, sir.

21    Q.    Now, you testified that you conducted an approximate

22    one-hour interview with Mr. Duggar, is that correct?

23    A.    Yes, sir.

24    Q.    And you claim that prior to turning on the recording

4:53PM25    device, Josh said, "What is this about, has somebody been

4:53PM 1   downloading child pornography?"  Did I hear your testimony
       2   correctly?
       3   A.    Yes, sir.
       4   Q.    Let me get this straight for a second.  What you're
4:53PM 5   claiming is that Josh said, "What is this about, has
       6   somebody been downloading child pornography," and that's
       7   the second before you turn on the recording device?
       8   A.    This was right after Agent Aycock had received verbal
       9   consent to record the interview, correct.
4:54PM10   Q.    In other words yes?
      11   A.    Yes, sir.
      12   Q.    So you claim this statement is made and then the
      13   recording device is immediately turned on, correct?
      14   A.    Agent Aycock tells him to stop before asking any more
4:54PM15   questions and then turns on the recording device.
      16   Q.    The rest of the interview as you claim happened, or
      17   whatever word you want to use for it, was captured on a
      18   recording device, correct?
      19   A.    Yes, sir.
4:54PM20   Q.    And the Jury had an opportunity to hear some snippets
      21   or excerpts from that, correct?
      22   A.    That is correct.
      23   Q.    You record interviews so that there's no ambiguity
      24   about what's said and what's not said, correct?
4:54PM25   A.    Yes, sir.

4:54PM 1   Q.   You record them for your own protection, correct?

2   A.   For both ours and the individuals that we are

3   interviewing.

4   Q.   In other words, so that we're not debating whether

4:55PM 5   something was said or whether something wasn't said.  We

6   have a memorialization of it, correct?

7   A.   Correct.  Yes, sir.

8   Q.   It beats someone's memory, right?

9   A.   Yes, sir.

4:55PM 10   Q.   It doesn't make us guess about context, correct?

11   A.   Correct.

12   Q.   You record so that there's an accurate

13   memorialization of whether someone said something or

14   didn't, correct?

4:55PM 15   A.   Yes, sir.

16   Q.   Over the next 51 minutes, did you ever circle back

17   around so that you had it captured on a recording and say,

18   "Hey, Josh, remember when you said, what's this about, has

19   somebody been downloading child pornography," or anything

4:55PM 20   along those lines?

21   A.   No, sir.  We did not directly verbatim ask him about

22   that question or statement, but we did cover the topic.

23   Q.   You covered the topic of child pornography, correct?

24   A.   Yes, sir.

4:55PM 25   Q.   But you never once covered the topic of even

4:55PM 1  suggesting on the recording that he had said this to you

2  before there was a recording, correct?

3  A.   Not verbatim, no, sir.

4  Q.   When you say "not verbatim," not at all.  Did you

4:56PM 5  ever circle back around and say, "Josh, remember when you

6  asked this question?  Now the recording device is on."

7  A.   No, sir, not directly.

8  Q.   Throughout the 51-minute recording; that's how long

9  it is, correct?

4:56PM 10  A.   Yes, sir.

11  Q.   You describe Josh's demeanor as calm, correct?

12  A.   Correct.  Yes, sir.

13  Q.   In fact, you describe Josh's demeanor as calm from

14  the moment you arrived on site, correct?

4:56PM 15  A.   Yes, sir.

16  Q.   Now, during this recording, the Jury heard some

17  excerpts of the discussion that you had with Mr. Duggar,

18  correct?

19  A.   Yes, sir.

4:56PM 20          THE COURT:  Mr. Gelfand, for our planning

21  purposes, it's almost 5:00.  If you can wrap up in the

22  next 10, 15 minutes, we might do that, but if you have a

23  lot more to go, then perhaps it would be a good idea for

24  you to find a convenient stopping point and we'll start

4:57PM 25  again in the morning.

4:57PM 1    MR. GELFAND:  This is a perfectly fine stopping

2 point, Your Honor, as far as topics, but I would defer to

3 the Court as far as how long the Court wanted to go.

4    THE COURT:  Well, if this is a good stopping

4:57PM 5 point, then we will stop now.

6    MR. GELFAND:  Sure.

7    THE COURT:  Members of the Jury, we will take our

8 evening recess.  And I would like to start tomorrow

9 morning at 8:30.  Would that be okay with everyone?  In an

4:57PM 10 attempt to make up for today and our delays, I'm informed

11 that the Court Clerk is going to have some breakfast

12 sandwiches or something like that, so if you wanted to

13 come a little bit early, there will be some coffee.  I'm

14 not saying it's bacon and eggs or anything, but there will

4:58PM 15 be something for you to munch on.  But we will call for

16 you at 8:30 in the morning.  And I need to read you the

17 recess instruction before you go today, though.

18    Remember that during every recess, including this

19 evening recess, you must remember that you may not discuss

4:58PM 20 this case with anyone, including your fellow jurors or

21 members of your family or people involved in the trial or

22 anyone else.  And you must not allow anyone to discuss the

23 case with you or within your hearing, because only you

24 have been chosen as jurors in this case and only you have

4:58PM 25 sworn to uphold the law.  No one else has been chosen to

4:58 PM 1  do this.  You should not even talk among yourselves about

2  the case before you have heard all of the evidence and the

3  case has been submitted to you by me for deliberations,

4  because if you were to do that, it would start solidifying

4:59 PM 5  in your mind your opinions or what you believe the facts

6  are.  And if anyone were to try to talk to you about the

7  case, you should let me know that immediately by conveying

8  that information to a court security officer or to the

9  Court Clerk.  And, again, when I say don't discuss, that's

4:59 PM 10  through any form; in person, electronically, what have

11  you.

12       Do not read any newspaper accounts.  Do not

13  listen or watch any television or radio accounts of the

14  trial.  Do not get online.  Do not look at your phones to

4:59 PM 15  see if there are Tweets or Instagrams or whatever the case

16  may be.  You must keep your mind free of outside

17  influences that may be reporting on the case or commenting

18  on the case.  And you must do this because your decision

19  has to be made solely on the evidence that comes in in the

5:00 PM 20  four walls of this courtroom and not from any outside

21  information, and this is very important.

22       The same is true with regard to doing outside

23  research.  You can't do that.  Whether it's about the

24  subject matter of the case or the law in the case or

5:00 PM 25  locations or people that have been discussed, you can't do

5:00 PM 1   any research on your own.

2          So this is the recess instruction.  You've taken

3   an oath to comply with that.  Please do so.  We will see

4   you tomorrow morning at 8:30.  Everyone please stand as

5:00 PM 5   the Jury is in recess.  I would ask that everyone in the

6   gallery remain in the gallery until the jurors have

7   cleared.  If you would leave your transcripts that you

8   were handed out just in your chair, we will take care of

9   those.  Everyone in the gallery, please remain in the

5:01 PM 10  gallery until the Jury has cleared the lobby.

11          (Jury out at 5:01 p.m.)

12          THE COURT:  Everyone may be seated.  So, counsel,

13  I think we have discussed earlier in chambers that we're

14  going to start a practice whereby the side, when it's your

5:01 PM 15  turn to present evidence, will be disclosing your

16  witnesses the evening before that will get you through the

17  next day.  Let's be sure that we do that by an agreed

18  time.  To the extent that in preparing for the next day's

19  witnesses there are issues that come up, please e-mail us.

5:02 PM 20  And if you need -- if you know tonight that you need to

21  get something on the record, then just plan to be early.

22  And kind of the default would be if there's something that

23  we need to take up, be here at 8:00.  If you think it's

24  something that's going to take longer than that, I'll come

5:02 PM 25  in as early as we need to.  But we need to call the Jury

5:02PM 1    up at 8:30 tomorrow or I'm going to lose all credibility

2    with them.  So are there any issues that we can take up

3    now?

4              MR. ROBERTS:  No, Your Honor.

5:02PM 5              THE COURT:  Mr. Gelfand, any issues?

6              MR. GELFAND:  We have no issues, Your Honor.

7              THE COURT:  All right.  Ya'll get some sleep

8    tonight.  We'll see you in the morning.

9              (proceedings adjourned at 5:03 p.m.)

C E R T I F I C A T E

I, Paula K. Barden, CCR, RPR, RMR, Federal Official Court Reporter, in and for the United States District Court for the Western District of Arkansas, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 16th day of January 2022.



_____
PAULA K. BARDEN, CCR, RPR, RMR #700
Federal Official Court Reporter
Western District of Arkansas