IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION


UNITED STATES OF AMERICA                    PLAINTIFF

v.               CASE NO. 5:21-CR-50014

JOSHUA JAMES DUGGAR                    DEFENDANT

_____


JURY TRIAL

VOLUME 3 OF 8

BEFORE THE HONORABLE TIMOTHY L. BROOKS

DECEMBER 2, 2021

FAYETTEVILLE, ARKANSAS

_____

```
 1                    A P P E A R A N C E S

 2

 3    FOR THE PLAINTIFF:

 4    MR. DUSTIN ROBERTS
      MS. CARLY MARSHALL
 5    United States Attorney's Office
      414 Parker Avenue
 6    Fort Smith, Arkansas 72901
      (479) 783-5125
 7    dustin.roberts@usdoj.gov
      carly.marshall@usdoj.gov
 8

 9    Also Present:  Special Agent Howard Aycock

10

11    FOR THE DEFENDANT:

12    MR. JUSTIN K. GELFAND
      Margulis Gelfand
13    7700 Bonhomme Avenue, Suite 750
      St. Louis, Missouri 63105
14    (314) 390-0234
      justin@margulisgelfand.com
15
      MR. TRAVIS W. STORY
16    Story Law Firm
      2603 Main Drive, Suite 6
17    Fayetteville, Arkansas 72704
      (479) 443-3700
18    travis@storylawfirm.com

19

20

21

22

23

24

25
```

```
1                           I N D E X

2                                                        Page

3    SPECIAL AGENT GERALD FAULKNER

4        Cross Examination (cont'd) by Mr. Gelfand        272

5        Redirect Examination by Mr. Roberts             311

6        Recross Examination by Mr. Gelfand              325

7        Redirect Examination by Mr. Roberts             329

8    MATTHEW WALLER

9        Direct Examination by Mr. Roberts               333

10       Cross Examination by Mr. Story                  341

11       Redirect Examination by Mr. Roberts             350

12       Recross Examination by Mr. Story                355

13       Redirect Examination by Mr. Roberts             355

14       Recross Examination by Mr. Story                357

15       Redirect Examination by Mr. Roberts             357

16   JEFFREY WOFFORD

17       Direct Examination by Mr. Roberts               360

18       Cross Examination by Mr. Gelfand                369

19       Redirect Examination by Mr. Roberts             375

20   SPECIAL AGENT JEFFERY PRYOR

21       Direct Examination by Mr. Roberts               376

22       Cross Examination by Mr. Story                  384

23       Redirect Examination by Mr. Roberts             393

24

25
```

```
 1                    I N D E X (cont'd)

 2                                                   Page

 3    MARSHALL KENNEDY

 4       Direct Examination by Mr. Clayman            398

 5       Cross Examination by Mr. Gelfand             411

 6       Redirect Examination by Mr. Clayman          441

 7       Recross Examination by Mr. Gelfand           443

 8    JAMES FOTTRELL

 9       Direct Examination by Mr. Clayman            445

10    Reporter's Certificate                          561

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                          E X H I B I T S

2                                                          Received

3       Court's Exhibit 2          Transcript of Interview      271
                                   with Joshua Duggar
4
        Government's Exhibit 26    HP All-in-One Desktop         382
5                                  Computer

6       Government's Exhibit 27    MacBook Pro Laptop            383

7       Government's Exhibit 28    Windows Print Screens,        459
                                   Testimony of James Fottrell
8
        Government's Exhibit 30    Ubuntu Print Screens,         471
9                                  Testimony of James Fottrell

10      Government's Exhibit 31    Thumbnail images from         502
                                   "normal" folder (CSAM)
11
        Government's Exhibit 32    EXIF Information from          505
12                                 "normal" folder

13      Government's Exhibit 33    Thumbnail images from         509
                                   "large" folder (CSAM)
14
        Government's Exhibit 34    EXIF Information from          516
15                                 "large" folder

16      Government's Exhibit 35    CSAM Material found in         522
                                   unallocated space with
17                                 matching thumbnail images

18      Government's Exhibit 36    Other CSAM Material found      523
                                   in unallocated space
19
        Government's Exhibit 37    TOR Firefox Bookmarks         525
20
        Government's Exhibit 38    "Recently Used" File Data     527
21
        Government's Exhibit 39    Torrent Files                 530
22
        Government's Exhibit 40    Print Screens from            535
23                                 Torrent file editor

24      Government's Exhibit 41    Summary Exhibit of            537
                                   Torrent files
25
```

```
 1              E X H I B I T S (cont'd)

 2                                                    Received

 3   Government's Exhibit 42   Internet Explorer        539
                               Cache Records
 4
     Government's Exhibit 43   File Contents of         542
 5                            VLC Media Player Log

 6   Government's Exhibit 44   Spreadsheet Summary       542
                               of Government's
 7                            Exhibit 43

 8   Government's Exhibit 45   Thumb Drive Containing    549
                               Videos, (CSAM)
 9                            Government's Exhibits
                               45, 47, 49, 51, 53, 55, 57
10
     Government's Exhibit 46   Storyboard (CSAM)         550
11
     Government's Exhibit 47   Video File (CSAM)         549
12
     Government's Exhibit 48   Storyboard (CSAM)         550
13
     Government's Exhibit 49   Video File (CSAM)         549
14
     Government's Exhibit 50   Storyboard (CSAM)         550
15
     Government's Exhibit 51   Video File (CSAM)         549
16
     Government's Exhibit 52   Storyboard (CSAM)         550
17
     Government's Exhibit 53   Video File (CSAM)         549
18
     Government's Exhibit 54   Storyboard (CSAM)         550
19
     Government's Exhibit 55   Video File (CSAM)         549
20
     Government's Exhibit 56   Storyboard (CSAM)         550
21
     Government's Exhibit 57   Video File (CSAM)         549
22
     Government's Exhibit 58   Storyboard (CSAM)         550
23
     Government's Exhibit 59   Spreadsheet of            552
24                            "recently used"
                               .xbel file
25
```

```
1                    E X H I B I T S (cont'd)

2                                                   Received

3   Defendant's Exhibits       Thumb Drives and SD      385
    3-7                         Cards Seized
4
    Defendant's Exhibit 43     Search Warrant Return     295
5
    Defendant's Exhibit 44     Placard/Room Descriptions  387
6
    Defendant's Exhibit 68     Audio Excerpt of          280
7                               Joshua Duggar Interview

8   Defendant's Exhibit 69     Audio Excerpt of          284
                                Joshua Duggar Interview
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

7:59AM 1                (Outside the Presence of the Jury)

2                THE COURT:  Yesterday, the Court made extensive

3        reference to the transcript of the interview with

4        Mr. Duggar incident to the execution of the search

8:29AM 5        warrant.  We received audio clips of three sections of

6        that, but the Court made extensive reference to page

7        numbers from the entire transcript, so I'm going to mark

8        that as Court's Exhibit Number 2 for purposes of the trial

9        record.  Obviously, that's not for the Jury, but it is for

8:30AM 10       the record.  So Court's Exhibit 2 is the entire interview

11       transcript from November 8th, 2019.

12                (Court's Exhibit 2 Received)

13                (Jury in at 8:29 a.m.)

14                THE COURT:  Everyone may be seated.  Good

8:33AM 15       morning.  Thank you for coming back.

16                You will recall that when we recessed last

17       evening, Mr. Gelfand was in the middle of his cross

18       examination of Special Agent Faulkner, who is on the stand

19       this morning again.

8:33AM 20                Although I know I don't need to, I will just, for

21       purposes of the record, remind you that you remain under

22       the oath that you took yesterday.

23                THE WITNESS:  Yes, sir.

24                THE COURT:  And, Mr. Gelfand, when you're ready,

8:33AM 25       you may finish your cross examination this morning.

8:33AM  1           MR. GELFAND:  Thank you, Your Honor.

        2           GERALD FAULKNER, having been previously duly

        3    sworn, testified as follows:

        4                   CROSS EXAMINATION (cont'd)

8:33AM  5    BY MR. GELFAND:

        6    Q.    Good morning, Agent Faulkner.

        7    A.    Good morning, sir.

        8    Q.    Agent, when you were testifying yesterday, you

        9    testified about the events that happened on November 8th

8:34AM 10    of 2019, correct?

       11    A.    Yes, sir.

       12    Q.    And just so we're all on the same page from a time

       13    standpoint, November 8th of 2019 was approximately six

       14    months after May 14th, May 15th, and May 16th of 2019,

8:34AM 15    correct?

       16    A.    Yes, sir, approximately.

       17    Q.    And so fair to say that the execution of the search

       18    warrant at Wholesale Motorcars was approximately six

       19    months, less a week, after the dates at issue in this

8:34AM 20    trial?

       21    A.    Yes, sir, give or take.

       22    Q.    You testified yesterday that during the execution of

       23    this search warrant, you participated in an approximately

       24    51-minute interview with Josh Duggar, correct?

8:34AM 25    A.    Yes, sir.

8:34AM 1    Q.    And the Jury had the opportunity to hear some clips,
2    so to speak, or some excerpts from that interview,
3    correct?
4    A.    Yes, sir.
8:34AM 5    Q.    During that interview, you're in a truck that is what
6    you described as basically a law enforcement vehicle, but
7    not one with cages and shotguns and things like that,
8    correct?
9    A.    Correct.  It's a civilian Ford truck that we add
8:35AM 10   audio and visual lights and sirens to.  There's nothing
11   significant about it being law enforcement in terms of
12   cages or shotgun racks or anything like that.
13   Q.    You're in the driver's seat, correct?
14   A.    Yes, sir.
8:35AM 15   Q.    The vehicle is on throughout the entirety of the
16   interview, correct?
17   A.    Correct.
18   Q.    Special Agent Aycock, sitting here at government
19   counsel's table, is in the back seat, correct?
8:35AM 20   A.    Behind me, correct.
21   Q.    And Josh is in the front passenger seat, correct?
22   A.    Yes, sir.
23   Q.    Now, during this interview, you testified yesterday
24   that the reason that you record interviews is to make sure
8:35AM 25   that there's no ambiguity, correct?

8:35AM 1   A.   Correct.

2   Q.   In other words, when it's on a recording, we know

3   what's said, we know what's not said, correct?

4   A.   Yes, sir.

8:36AM 5   Q.   We can hear tone, we can hear questions, we can hear

6   answers, correct?

7   A.   Yes, sir.

8   Q.   Now, during the course of this interview, in one of

9   the excerpts that you played yesterday, that the

8:36AM10   prosecution played yesterday for the Jury, Josh told you

11   that someone who worked with him would take pictures using

12   his phone, correct?

13         MR. ROBERTS:  Objection, hearsay, Your Honor.

14         MR. GELFAND:  Your Honor, at this point, I'll

8:36AM15   withdraw the question.  I'll move Defendant's Exhibit 68

16   into evidence, which is an excerpt from what's already in

17   evidence.

18         THE COURT:  Well, I'm going to overrule the

19   objection and allow you to continue making a foundation.

8:36AM20   I think that you were directing him to his testimony.  I

21   mean, to the extent that you have a follow-up question

22   that's going to elicit hearsay, please don't do that, but

23   I didn't think that that's what he was doing quite yet.

24         MR. ROBERTS:  Your Honor, may I explain?

8:37AM25         THE COURT:  Yes.

8:37AM 1            MR. ROBERTS:  That statement was not in evidence,

2    Your Honor.  That's what he's referencing, a statement not

3    in evidence made by the defendant.

4            MR. GELFAND:  Your Honor, may we approach?

8:37AM 5            THE COURT:  Yes.

6            (Bench Conference)

7            MR. ROBERTS:  Your Honor, may I explain my

8    objection a little further?

9            THE COURT:  Well, I understand it now.  I was

8:37AM10    assuming that Mr. Gelfand in good faith was referring to a

11    passage that was played for the Jury yesterday, and you're

12    saying that that's not accurate?

13            MR. GELFAND:  It is accurate, Your Honor.

14            MR. ROBERTS:  Your Honor, I don't believe it is.

8:37AM15    If I'm wrong, I'll withdraw the objection.  I don't

16    believe it is.

17            THE COURT:  Hang on one second.  Sheri, can I get

18    Court's Exhibit 1, please?

19            MR. GELFAND:  Your Honor, page 13.  Do you have

8:38AM20    the master exhibit?

21            THE COURT:  I can.  What page?

22            MR. ROBERTS:  Your Honor, I've been pointed to

23    it.  Evidently, it escaped my attention.  I'll withdraw my

24    objection.

8:38AM25            THE COURT:  Okay.

8:38AM 1             MR. GELFAND:  Your Honor, while we're all here,

2    I'll just note for the record, we intend to introduce

3    Exhibit 68, 69 and 71, 72, 75 and 77.  They are all in

4    evidence.  They are excerpts.  And the reason we exhibited

8:39AM 5    these is to avoid issues of claiming things are not in

6    evidence and to avoid --

7             THE COURT:  Have you provided these clip

8    transcripts?

9             MR. GELFAND:  We have provided the page number

8:39AM10    and --

11             MR. ROBERTS:  Not transcripts, Your Honor.  They

12    provided a thumb drive, which I haven't viewed it.  More

13    importantly, the Agent hasn't reviewed it.

14             MR. GELFAND:  They are in their transcripts.

8:39AM15    These are all in.

16             THE COURT:  No, I get that.  But two things.  You

17    keep referring to it as an exhibit.  And that's good for

18    identification, especially if you've correlated for the

19    government the page and lines within the master

8:39AM20    transcript.  A transcript itself is not coming into

21    evidence.  You can play the portions, but I need to mark

22    as a Court's exhibit what you have been referring to so

23    that I have those transcripts.

24             MR. GELFAND:  Meaning this master transcript?

8:40AM25             THE COURT:  No.  Analogous to what the government

8:40AM 1   prepared.

2          MR. STORY:  This is the exhibit number.  These

3   were -- our intern put numbers --

4          MR. GELFAND:  These are the excluded so far.

8:40AM 5          MR. STORY:  These are master transcript

6   locations, which is correlated with what Your Honor is

7   using.

8          THE COURT:  I would suggest that you refer to it

9   with the column of this information, because the master

8:40AM 10  transcript is now Court's Exhibit Number 2.  This is going

11  to get confusing for the Jury, because they are not going

12  to know -- I mean, you are going to be talking about 68.

13  They're going to put that in their notes.  They're going

14  to go to the jury room and there's not going to be --

8:41AM 15         MR. GELFAND:  My intention was to introduce these

16  as excerpts just like the government did.

17         THE COURT:  The audio?

18         MR. GELFAND:  The audio.  And so 68 is the audio.

19         MR. ROBERTS:  Your Honor, the thing we're running

8:41AM 20  into is having reviewed the audio with the witness --

21         MR. GELFAND:  He's on the witness stand in the

22  middle of his testimony.

23         MR. ROBERTS:  -- prior to his testimony.

24         THE COURT:  I understand you to be representing

8:41AM 25  that these are subsets of what you played, or sub-exhibits

8:41AM 1   of your exhibit, and that's fine.

2                   MR. ROBERTS:  If he can lay the foundation that

3   they are part of the clip with the witness, I am good with

4   that.

8:41AM 5                   MR. GELFAND:  Do you want to confirm that with

6   me?

7                   MR. ROBERTS:  Yes, if I can have a copy of that.

8                   MR. GELFAND:  That's what we talked about to

9   avoid this issue.

8:41AM 10                   MR. ROBERTS:  May I have this?

11                   MR. GELFAND:  Sure.

12                   MR. ROBERTS:  Do you need more copies?  Are you

13   good?  Thank you, Judge.

14                   (Bench Conference Concluded)

8:42AM 15                   THE COURT:  You may proceed, Mr. Gelfand.

16                   MR. GELFAND:  Thank you, Your Honor.  Your Honor,

17   at this point, I would move Defendant's Exhibit 68 into

18   evidence.  It's a subset of what is already in evidence.

19                   MR. ROBERTS:  Your Honor, to the extent that it's

8:42AM 20   already in evidence, I have no objection.  Anything that

21   is outside of what has already been introduced, I would

22   object.

23                   MS. CRAIG:  Just to clarify, have we been

24   provided copies, or is this just something that's in

8:42AM 25   Court's Exhibit 1?

8:43AM 1          MR. GELFAND:  It's a digital excerpt of what's

2     been admitted into evidence as, I believe it was

3     Government's Exhibit 22.

4          THE COURT:  So do you have a thumb drive or what

8:43AM 5     is it that you are offering?

6          MR. GELFAND:  It will be on a thumb drive, Your

7     Honor.

8          THE COURT:  Okay.

9          MR. GELFAND:  It's literally just subsets.

8:43AM 10          MR. ROBERTS:  Your Honor, if I may, is that the

11     only thing on the thumb drive?

12          THE COURT:  We can confirm all this later.  But I

13     do need you for the record to identify the metes and

14     bounds of page numbers for defense 68.

8:43AM 15          Ms. Esterbrook, would you retrieve a copy of that

16     from Mr. Roberts and make copies?  The Court needs one

17     too.

18          With reference to Court's Exhibit 1, can you --

19          MR. GELFAND:  Yes, it was on that.

8:44AM 20          THE COURT:  We're waiting for a copy.  Counsel,

21     these are the sorts of issues, based on our conversation

22     yesterday, that I was hoping we would have worked out

23     before we get to the courtroom, so let's be thinking about

24     that going forward.

8:45AM 25          MR. GELFAND:  Your Honor, Defendant's Exhibit 68

8:45AM 1    is a portion of Government's Exhibit 22.  In the master

2    transcript, page 13, line 1, to page 13, line 13.

3                THE COURT:  Thank you.

4                MR. ROBERTS:  No objection, Your Honor.

8:46AM 5    THE COURT:  It's received.

6                MR. GELFAND:  Thank you, Your Honor.

7                THE COURT:  Defense 68 is received as described.

8                (Defendant's Exhibit 68 Received)

9                MR. GELFAND:  Thank you, Your Honor.  May we play

8:46AM10   that for the Jury?

11               THE COURT:  You may.

12               (Defendant's Exhibit 68 played as follows:)

13               AGENT FAULKNER:  Okay.  Now, let's do one by one.

14   The phone, that was one that you had in your pocket,

8:46AM15   right?

16               JOSH DUGGAR:  Right, in my pocket.

17               AGENT FAULKNER:  Who else has access to that

18   phone?

19               JOSH DUGGAR:  Well, depending on who's -- I mean,

8:46AM20   sometimes I have a guy that works with me.  He will take

21   pictures sometimes with the phone.

22               AGENT FAULKNER:  So outside of you, other people

23   possibly have -- is it password-protected?

24               JOSH DUGGAR:  Yeah, it's not -- not very secure.

8:46AM25   I mean, everybody knows it.

8:46AM 1          (End of Defendant's Exhibit 68)

2    Q.   (BY MR. GELFAND.)   Agent Faulkner, Josh Duggar told

3    you what we just heard in the interview that you

4    conducted, correct?

8:46AM 5    A.   Yes, sir.

6    Q.   The phone that you referenced yesterday that you

7    seized that the prosecutor showed you, the physical phone

8    itself, that was the phone that you were referring to,

9    correct?

8:47AM 10   A.   Correct.  Yes, sir.

11   Q.   And that is the only physical phone that you seized

12   in connection with this case, correct?

13   A.   That is correct.

14   Q.   To be clear, that phone, based on your investigation,

8:47AM 15   was Josh Duggar's phone, correct?

16   A.   Yes, sir.

17   Q.   That you physically took from his hand, so to speak?

18   A.   Correct.  Yes, sir.

19   Q.   Now, over the course of the interview that you

8:47AM 20   conducted with Mr. Duggar, you also discussed an HP

21   computer, correct?

22   A.   Yes, sir.

23   Q.   And you had an opportunity to physically see the HP

24   computer at Wholesale Motorcars, correct?

8:47AM 25   A.   Yes, sir, I saw it that day.

8:47AM 1    Q.   The HP computer at Wholesale Motorcars, when you saw

2    it on November 8th of 2019, was physically plugged into

3    the wall, correct?

4    A.   In terms of a power source?

8:48AM 5    Q.   Yes.

6    A.   Yes, sir.

7    Q.   And if I show you Defendant's Exhibit 25 --

8          MR. GELFAND:   Which is already in evidence, Your

9    Honor.

8:48AM 10   Q.   Do you see Defendant's Exhibit 25?

11   A.   Yes, sir.

12   Q.   The computer is right next to the wall.  If we look

13   at the screen, that's essentially what's in the bottom

14   right corner of Defendant's Exhibit 25, correct?

8:48AM 15   A.   That's the HP, correct.

16   Q.   And it's just next to this router by the window,

17   correct?

18   A.   Yes, sir.

19   Q.   What's a router?

8:48AM 20   A.   It's a device normally provided by an internet

21   service provider which allows a residential or business

22   area to accept internet from that and then spread it to

23   electronic devices.

24   Q.   Routers store data, correct?

8:49AM 25   A.   I'm not aware.

8:49AM 1   Q.   When you chose what to seize over the course of this
      2   investigation, who, from the government's investigative
      3   team standpoint, made the decision of what to take and
      4   what not to take?
8:49AM 5   A.   It would have been a collective effort and
      6   conversation as to what we seized that day.
      7   Q.   Who was ultimately responsible for making the
      8   decision of whether to seize something or not seize
      9   something that day?
8:49AM10   A.   Myself, Agent Aycock, and Special Agent Jeffery
     11   Pryor.
     12   Q.   You all did not seize the router that we see in
     13   Defendant's Exhibit 25, correct?
     14   A.   No, sir.
8:49AM15   Q.   That was a decision that was made by who?
     16   A.   By the three that I just mentioned; myself, Agent
     17   Aycock and Agent Pryor.
     18   Q.   So is it fair to say that because you did not seize
     19   it on that day -- to be clear, you've never seized it,
8:50AM20   correct?
     21   A.   Correct.  Yes, sir.
     22   Q.   It's never been analyzed, correct?
     23   A.   No, sir.
     24   Q.   Now, with respect to the HP computer, you discussed
8:50AM25   that, in part, in one of the sections that was played for

8:50AM 1    the Jury yesterday with Josh, correct?

2    A.    Yes, sir.

3          MR. GELFAND:  Your Honor, I would direct the

4    Court's attention to Defendant's Exhibit 69.  Master

8:50AM 5    transcript, page 15, line 11, through page 16, line 5, and

6    ask the Court to receive Defendant's Exhibit 69 into

7    evidence.

8          MR. ROBERTS:  No objection, Your Honor.

9          THE COURT:  Defendant's Exhibit 69, an audio file

8:50AM10    as described, is received.

11          (Defendant's Exhibit 69 Received)

12          MR. GELFAND:  Thank you.  May we publish that for

13    the Jury?

14          THE COURT:  You may.

8:51AM15          (Defendant's Exhibit 69 played as follows:)

16          AGENT FAULKNER:  We noticed inside of the

17    whatever -- I don't know which one is your office.

18          JOSH DUGGAR:  Yes.

19          AGENT FAULKNER:  But the one over here that has

8:51AM20    the open sign --

21          JOSH DUGGAR:  Mm-hmm.

22          AGENT FAULKNER:  -- that there was another elec-

23    -- computer in there?

24          JOSH DUGGAR:  Yes.  That's an HP.  That computer

8:51AM25    is -- it's now password-protected, but pretty much the

8:51AM 1    guys that work here are the ones that use it.

2              AGENT FAULKNER:  Okay.

3              JOSH DUGGAR:  And so there's, you know, different

4    --

8:51AM 5              AGENT FAULKNER:  So there's currently a password

6    on it right now?

7              JOSH DUGGAR:  Yes, there is, yeah.  And the

8    password's written.  I mean, I have it written around so

9    the guys know.

8:51AM 10             AGENT FAULKNER:  I got you.

11             (End of Defendant's Exhibit 69)

12   Q.   (BY MR. GELFAND.)  Those were accurate statements

13   made by Josh to you and statements made by you to Josh,

14   correct?

8:51AM 15   A.   Correct.

16   Q.   And just so that we all have our bearings -- and I

17   apologize if it's not clear to me -- the Agent who is

18   speaking in that segment, is that you or Special Agent

19   Aycock?

8:51AM 20   A.   That was me.

21   Q.   So you're personally discussing what we just heard on

22   this clip, Defendant's Exhibit 69, with Josh, correct?

23   A.   Correct.  Yes, sir.

24   Q.   Now, you testified yesterday about the TOR browser,

8:52AM 25   correct?

8:52AM 1   A.   Yes, sir.

2   Q.   And you used the phrase "Dark Web," correct?

3   A.   Yes, sir.

4   Q.   You testified that you're familiar with the TOR

8:52AM 5   browser, correct?

6   A.   In my employment with Homeland Security, I am.

7   Meaning I don't use it personally.  I know it through my

8   work experiences.

9   Q.   My question was pretty simple, which is, are you

8:52AM 10   familiar with the TOR browser?

11   A.   Yes, sir.

12   Q.   The TOR browser is a browser, correct?

13   A.   Yes, sir.

14   Q.   So let's get down to basics for a second.  You're

8:52AM 15   familiar, based on your training and experience, that

16   other browsers, for example, might be Firefox or Safari,

17   correct?

18   A.   Within the Dark Web?

19   Q.   No.

8:52AM 20   A.   I'm sorry.  Could you repeat the question?  I don't

21   think I completely understood.

22   Q.   Is Firefox a browser?

23   A.   Yes, sir.

24   Q.   Is Safari a browser?

8:53AM 25   A.   Yes, sir.

8:53AM 1    Q.    All a browser does is enable someone to access the
       2    internet, correct?
       3    A.    Right.  Yes, sir.
       4    Q.    The TOR browser enables someone to access the
8:53AM 5    internet, correct?
       6    A.    Yes, sir.
       7    Q.    The truth is, Special Agent, you could buy something
       8    on Amazon on the TOR browser, correct?
       9    A.    From a browser, yes, sir.
8:53AM10    Q.    You could go to Google on the TOR browser, correct?
      11    A.    On the TOR browser, yes, sir.
      12    Q.    The TOR browser, as you are aware, is used by
      13    millions of people, correct?
      14    A.    Correct.
8:53AM15    Q.    There's nothing illegal in and of itself in using or
      16    accessing the TOR browser, correct?
      17    A.    No, sir.
      18    Q.    Now, you testified yesterday -- and we covered this a
      19    little bit before we broke -- that you claim Josh made the
8:54AM20    statement to you -- I'm paraphrasing -- "What's this
      21    about, did somebody download child pornography" seconds
      22    before you started the recording, correct?
      23    A.    That is correct.  Yes, sir.
      24    Q.    And, in fact, as you testified yesterday, never once
8:54AM25    did you circle back around to this alleged statement in

8:54AM 1    the entire 51-minute recording, correct?

2    A.    Again, from yesterday's testimony, we did not

3    specifically repeat the question or the statement, but we

4    did cover the topic.

8:54AM 5    Q.    In section two of the portion that you played for the

6    Jury yesterday -- let's back up for a second.  Section two

7    is a portion of Government's Exhibit 22, for the record,

8    correct?

9    A.    Yes, sir.

8:54AM10    Q.    In section two that we heard yesterday, at one point,

11    Josh Duggar asks, "So what are you here for then,"

12    correct?

13    A.    Yes, sir.

14    Q.    And you say, "That's what we're getting at," correct?

8:55AM15    A.    Yes, sir.  I'll take your word for that.

16    Q.    If Josh really said minutes earlier, "What are you

17    here for, did someone download child pornography," why

18    wouldn't you reference that back on this recording

19    memorializing what was said?

8:55AM20          THE COURT:  Mr. Gelfand, I'll give you a little

21    bit of leeway here because your cross-exam is straddling

22    our evening recess, but you've covered this yesterday, so

23    let's move on to something we haven't covered yet.

24    Q.    (BY MR. GELFAND.)  Agent, the bottom line is, in the

8:55AM25    section that we just talked about, you never said anything

8:56AM 1  like that, correct?

2  A.    About revisiting the initial statement?

3  Q.    Yes.

4  A.    No, sir.  Again, we did not specifically requote the

8:56AM 5  question or statement, but we did cover the topic.

6  Q.    Now, in the discussion that was played for the Jury

7  yesterday, you referred specifically to the computer

8  forensic analysts on site, correct?

9  A.    Yes, sir.

8:56AM10  Q.    And specifically you were referring to a team of

11  three computer forensic analysts that were on site,

12  correct?

13  A.    Correct.

14  Q.    And that includes an Agent Marshall Kennedy, correct?

8:56AM15  A.    Yes, sir.

16  Q.    Now, the computer forensic analysts on site came with

17  a forensic van, correct?

18  A.    Yes, sir.

19  Q.    They had full forensic capabilities, correct?

8:57AM20  A.    To an extent.  And just to be clear, sir, if I may,

21  we call it a forensic van because it's the van that

22  carries our computer forensic analysts to a site.  There's

23  no big computer programs that's sitting inside of this

24  van.  It's basically a 16-passenger van where we have

8:57AM25  converted the seats to where they can sit in it

8:57AM 1   comfortably while on scene and not have to be inside of a

2   residence or a structure to where they can take devices

3   and then go ahead and preview those on scene.

4   Q.   And they have the capability, as you know, and did

8:57AM 5   that day, to actually image a phone or tablet or computer,

6   correct?

7   A.   Depending on what electronic software tools they

8   brought, yes, sir.

9   Q.   Now, over the course of that day -- let me rephrase

8:57AM 10   that.  Over the course of your interview with Josh, as you

11   testified yesterday, you expressly told Josh that whatever

12   happened here at the car lot happened between 10:00 and

13   11:00 p.m., correct?

14   A.   That is correct.

8:58AM 15   Q.   And the reason you did that is because you apparently

16   miscalculated the time, correct?

17   A.   I did.  That is my Achilles' heel.  We receive so

18   many leads from so many different agencies, not only

19   domestically, internationally from Interpol, Australia.  I

8:58AM 20   will spend literally an hour --

21   Q.   Agent, can you just answer my questions?

22   A.   Yes, sir.  I made the mistake of erroneously

23   converting the time and I shouldn't have.

24   Q.   The point, though, is, notwithstanding your

8:58AM 25   mistake -- which I don't doubt was in good faith -- you

8:58AM 1    told Josh that whatever you were investigating happened

2    between 10:00 and 11:00 p.m., correct?

3    A.    Yes, sir.  On that date, November 8th, 2019, that is

4    correct.

8:58AM 5    Q.    So what you were talking about with Josh over the

6    course of that interview in your police vehicle, or in the

7    truck that you described, all related as you were asking

8    him to this belief that you had that something happened

9    between 10:00 and 11:00 p.m. at night, correct?

8:59AM 10   A.    Correct.

11   Q.    And, in fact, you readily admit right now nothing

12   happened between 10:00 and 11:00 p.m. at night, correct?

13   A.    No, sir.

14   Q.    If you properly computed the time, as you explained

8:59AM 15   your mistake, this was actually approximately six hours

16   earlier, correct?

17   A.    Five or six hours earlier, correct.

18   Q.    In other words, what, 4:00 to 5:00 p.m.?  4:00 to

19   6:00 p.m.?

8:59AM 20   A.    Mid-day, late day.

21   Q.    On business days?

22   A.    On business days, correct.

23   Q.    At the car lot?

24   A.    At the car lot.

8:59AM 25   Q.    While the car lot was open for business?

8:59AM 1    A.   I don't particularly know if they were open those
       2    days, but it would have been weekdays when it should have
       3    been open.
       4    Q.   And to be clear, at no point when you were asking
9:00AM 5    Mr. Duggar questions did you say to him, "We want to know
       6    what happened during normal business hours," because you
       7    had made this mistake?
       8    A.   I think we generalized.  But, again, my understanding
       9    at that time, that the downloads happened at around 10:00
9:00AM10    at night.
      11    Q.   And, in fact, you made that same mistake with other
      12    interviews you conducted that day, correct?
      13    A.   That is correct.  With another individual by the name
      14    of Randall Berry.
9:00AM15    Q.   Just to be clear, so that we're on the same page, you
      16    told Randy Berry -- and I'm paraphrasing -- that
      17    essentially we're investigating something that happened
      18    here at night, 10:00 to 11:00 p.m.?
      19    A.   Correct.
9:00AM20    Q.   And the context was basically, "Are you here at
      21    night?"
      22    A.   Again, overall, I think we discussed a broader time
      23    frame, but we focused on at night because that's when we
      24    initially thought the downloads had occurred.
9:01AM25    Q.   At the end of section three of Government's Exhibit

9:01AM 1    22 -- if you want to refer back if it helps you to the
       2    demonstrative transcript, you're welcome to.  Do you have
       3    that in front of you?
       4    A.    I don't have a transcript, but we can go forward.
9:01AM 5    Q.    Josh Duggar says to you, "Yeah, I don't want to -- I
       6    mean, I don't want to -- I don't want to say that I'm
       7    guilty or not.  I'm just not saying, you know, on search,
       8    finding, accessing inappropriate content at some point at
       9    any point in my life.  I'll say that."  Is that what Josh
9:02AM10    said to you?
      11    A.    Yes, sir.
      12    Q.    Just to be clear, chronologically, that happened
      13    after you told him that you were investigating this 10:00
      14    to 11:00 p.m. mistake that you made?
9:02AM15    A.    This came from section three, correct?
      16    Q.    Yes.
      17    A.    Yes, sir.
      18    Q.    You're aware that "inappropriate content" means
      19    different things to different people?
9:02AM20    A.    Yes, sir.
      21    Q.    You're aware based on your 30-month investigation of
      22    Josh Duggar that Josh is and was an intensely religious
      23    man, correct?
      24    A.    I'm sorry.  What?
9:02AM25    Q.    You're aware that Josh is and was an intensely

9:02AM 1  religious man, correct?

2  A.    Somewhat, in terms of my knowledge of Mr. Duggar.

3  Q.    You don't doubt that, though, correct?

4        MR. ROBERTS:  Your Honor, I will object.  This is

9:02AM 5  way outside the --

6        MR. GELFAND:  I'll withdraw that, Your Honor.

7        THE COURT:  Yeah, there's no 602 foundation here.

8        MR. GELFAND:  I'll withdraw.

9  Q.    (BY MR. GELFAND.)  You talked about the devices that

9:02AM10  were on site.  You identified a couple of them when the

11  prosecutor asked you questions, correct?

12  A.    Yes, sir.

13  Q.    And to be clear, you actually inventoried over the

14  course of your investigation exactly what you seized,

9:03AM15  correct?

16  A.    I believe Agent Pryor did that, but I'm aware that we

17  did seize items that day.

18  Q.    You actually filed an inventory with the Court after

19  the search was conducted, correct?

9:03AM20  A.    Yes, sir.

21  Q.    I'm going to direct your attention, if I could, to

22  Defendant's Exhibit 43 in the defense binder in front of

23  you.

24  A.    Yes, sir.

9:03AM25  Q.    Do you recognize Defendant's Exhibit 43?

9:03AM 1    A.    Yes, sir.  This is the search warrant return.  Would

2    you like me to go through the --

3    Q.    Not yet.  Do you recognize this as something that you

4    prepared, signed, and filed with the Court?

9:03AM 5    A.    Yes, sir.

6          MR. GELFAND:  Your Honor, at this point, I would

7    move Defendant's Exhibit 43 into evidence.

8          MR. ROBERTS:  No objection at this point, Your

9    Honor.

9:04AM10          THE COURT:  Defense Exhibit 43 is received.

11          MR. GELFAND:  May I publish it, Your Honor?

12          THE COURT:  You may.

13             (Defense Exhibit 43 Received)

14    Q.    (BY MR. GELFAND.)  Do you see Defendant's Exhibit 43

9:04AM15    in front of you, Special Agent?

16    A.    Yes, sir.

17    Q.    This is a return, if we go to the second page, that

18    contains your signature and your printed name, correct?

19    A.    Correct.

9:04AM20    Q.    You filed this with the Court, correct?

21    A.    Yes, sir, after the completion of the search warrant.

22    Q.    And just to be clear, this references the date of the

23    search warrant as being executed on November 8th, 2019, at

24    5:00 p.m., correct?

9:04AM25    A.    No, sir.  I believe the execution is when we were

9:04AM 1    going to call a seizure on that, the 5:00 p.m. time.  They

2    executed the search warrant at 3:15.  That would be our

3    seizure time.

4    Q.   Fair enough.  My point, though, is that this is

9:04AM 5    clearly referencing the search that we're talking about,

6    correct?

7    A.   Yes, sir.  I just wanted to clarify because I see

8    5:00, and that's obviously not the time that the warrant

9    was executed.  That would be the time we seized the items.

9:05AM 10   Q.   So you seized the Apple iPhone at 5:00?

11   A.   Collectively.  Everything that we see in this list.

12   Q.   That's when you took it from Josh's hand?

13   A.   It was confiscated shortly after arriving on scene.

14   And after doing an inventory of what we were going to take

9:05AM 15   that day, we collectively seized everything at

16   approximately 5:00 p.m. that day.

17   Q.   Let's go through this list for a second.  You seized

18   the iPhone with case.  That's Josh's iPhone that you

19   talked about, correct?

9:05AM 20   A.   Yes, sir.

21   Q.   You seized a MacBook Pro computer that you identified

22   in pictures yesterday, correct?

23   A.   Correct.  I believe that was from the RV.

24   Q.   And that's the American flag one that was in the

9:05AM 25   briefcase, correct?

9:05AM 1    A.    Yes, sir.

2    Q.    You seized a recorder drive, correct?

3    A.    Yes, sir.

4    Q.    You seized a desktop computer?  That's the one that

9:05AM 5    you've identified as being plugged in in that physical

6    office at Wholesale Motorcars, correct?

7    A.    Correct, the HP.

8    Q.    And then you seized five thumb drives and SD cards.

9    To be more precise, three SD cards and two thumb drives,

9:06AM 10   correct?

11   A.    Correct.  Yes, sir.

12   Q.    And you chose to seize all of these items because you

13   believed each of them could have evidentiary value,

14   correct?

9:06AM 15   A.    Potentially, yes, sir.

16   Q.    And as you understood your authority that day, you

17   had the authority to seize and forensically image anything

18   that was on site, correct?

19   A.    That is correct, yes, sir, electronically.

9:06AM 20   Q.    Including thumb drives, phones, tablets, computers,

21   whatever you found, correct?

22   A.    Yes, sir.

23   Q.    You seized these items because these kinds of

24   searches need to occur in a properly-controlled

9:06AM 25   environment by experts, correct?

9:06AM 1    A.    Oftentimes, yes, sir.

2    Q.    And, in fact, you told that to the Court when you

3    applied for the search warrant, correct?

4    A.    In going back to, I believe it's paragraph 45 in our

9:07AM 5    search warrant affidavit, it's labeled the necessity of

6    on-site and off-site electronics.  The last sentence in

7    that paragraph states that is often the case, but that's

8    not always the case.

9    Q.    So the answer to the question is yes, though?

9:07AM10    A.    Yes, sir.

11    Q.    At this point in this investigation, the Josh Duggar

12    investigation, November 8th of 2019, you didn't yet know

13    everything that would be important that might be found on

14    devices, correct?

9:07AM15    A.    Correct.  Yes, sir.

16    Q.    A single file name appearing on another device could

17    be the smoking gun in a case, correct?

18    A.    I'm sorry.  Repeat that.  A single?

19    Q.    A single file name, a single software application --

9:07AM20    the point is, in this case, anything that you're later

21    going to search for could be the smoking gun in a case,

22    correct?

23    A.    Through what we seized, correct.

24    Q.    During the search warrant, you had Randall Berry's

9:08AM25    phone in your hand, correct?

9:08AM 1   A.   No, sir, I did not.  But it was seized by agents on

2   scene and a computer forensic analyst.

3   Q.   In other words, your team had Randall Berry's phone

4   in its hands during this search warrant on November 8th of

9:08AM 5   2019, correct?

6   A.   Yes, sir.

7   Q.   Did you create any sort of inventory of the files

8   that were accessed on that phone?

9   A.   I didn't conduct the forensic analysis of the phone,

9:08AM 10   but as far as I know, there is no report.  The CFA who did

11   do the -- am I good to explain?

12   Q.   Sure.

13   A.   The computer forensic analyst who seized or conducted

14   a manual triage, or as we said last night, that manual

9:09AM 15   examination of Mr. Berry's phone looked for those three

16   components that we discussed; if the device contained any

17   child pornography, if the device contained anything

18   related to a peer-to-peer file-sharing network, and if

19   that device put Mr. Berry on the Wholesale Motorcars lot

9:09AM 20   on May 14th, May 15th, 2019.  None of that was found on

21   the phone by the CFA.  It was then remitted back to

22   Mr. Berry based on being forensically cleared.  And

23   also -- not getting into hearsay -- but our conversation

24   that we had, myself and Agent Aycock, with Mr. Berry.  It

9:09AM 25   was forensically and factually cleared that day and

9:09AM 1    remitted back to him.

2    Q.    Let's be clear for a second.  You had authority to

3    seize devices even if it didn't belong to Wholesale

4    Motorcars or to Josh Duggar, correct?

9:09AM 5    A.    If they were located on that property that day.

6    Q.    This was one of the devices located on the property

7    that day, correct?

8    A.    Yes, sir.

9    Q.    Just to be clear, because you're familiar with this

9:10AM10   investigation as the co-lead Agent, like you testified

11   yesterday.

12   A.    Yes, sir.

13   Q.    There's no report anywhere in the government's

14   possession that details what was on Randall Berry's phone,

9:10AM15   correct?

16   A.    Correct.

17   Q.    There's no image of the phone so someone could go

18   back and look now, or a month ago, or two months ago, for

19   specific files or documents, correct?

9:10AM20   A.    Correct.

21   Q.    You referenced just a minute ago a discussion that

22   you had with Mr. Berry, correct?

23   A.    Yes, sir.

24   Q.    On that day, November 8th of 2019, what was your

9:10AM25   understanding as to when Mr. Berry started working at

9:10AM  1  Wholesale Motorcars?

2                MR. ROBERTS:  Your Honor, it calls for hearsay.

3                MR. GELFAND:  Your Honor, I'm not admitting it

4       for the truth of the matter asserted.  It's not true.

9:10AM  5                MR. ROBERTS:  That's exactly what he's proposing

6       for, Your Honor.

7                MR. GELFAND:  Your Honor, that's by definition

8       not hearsay.

9                THE COURT:  Well, if he learned the information

9:11AM 10       from Mr. Berry, it would be hearsay.

11                MR. GELFAND:  Your Honor, it's not hearsay if

12       it's not admitted for the truth of the matter asserted.  A

13       statement that someone didn't tell the truth to someone is

14       not hearsay.

9:11AM 15                THE COURT:  Well, what are you offering the

16       evidentiary value of his answer for?

17                MR. GELFAND:  To explain his subsequent failure

18       to investigate on the subsequent investigation.

19                THE COURT:  I'll allow it for that purpose.

9:11AM 20                MR. ROBERTS:  May I respond?

21                THE COURT:  Yes.

22                MR. ROBERTS:  He already testified that he

23       interviewed him and factually cleared him.  He's trying to

24       explain something he's already covered by introducing what

9:11AM 25       otherwise would be hearsay under the guise of, this is to

9:11AM 1    explain his course of conduct, which he's covered.

2          THE COURT:  Well, I understand the purpose of the

3    question to be, what was Agent Faulkner's understanding of

4    the times that he would have potentially been at the car

9:12AM 5    lot and how what he understood played into his subsequent

6    investigation.  And I think that's fair grounds for cross,

7    so your objection is overruled.

8          MR. ROBERTS:  Understand.

9    Q.    (BY MR. GELFAND.)  You can answer the question.

9:12AM10    A.    And without -- I have to tow the line.  Not what he

11    told us, but it was our understanding based on the

12    conclusion of our interview with Mr. Berry that he began

13    working for Wholesale Motorcars in early June of 2019.

14    Q.    Specifically June 11th, correct?

9:12AM15    A.    Yes, sir.

16    Q.    And when you left the car lot on that day,

17    November 8th of 2019, you believed that, correct?

18    A.    Correct.

19    Q.    Now, after that date, when is the next time, just

9:13AM20    date, approximately, that you spoke with Mr. Berry?

21    A.    I don't recall the exact date, but it would have been

22    within the last couple of months.

23    Q.    After charges were filed in this case?

24    A.    Correct.

9:13AM25    Q.    Now, Agent Faulkner, just approximate date, when is

9:13AM 1    the first time you spoke with an individual named Caleb

2    Williams?

3    A.    We're in December now, so last month.

4    Q.    I'm sorry.  You said December now, so last month,

9:14AM 5    meaning, without looking at the calendar, November of --

6    A.    Of 2021.

7    Q.    I'm sorry.  We were talking over each other and

8    that's my fault.  But it's November of this year, correct?

9    A.    November of 2021, yes, sir.

9:14AM 10    Q.    So within the last couple of weeks, correct?

11    A.    Correct.

12    Q.    Over the course of your entire investigation, your

13    team did not search a single one of Caleb Williams'

14    electronic devices, correct?

9:14AM 15    A.    No, sir.  Throughout the entire course of our

16    investigation, through all the witness interviews, witness

17    statements, and more importantly, forensic examinations,

18    Caleb Williams has not come up.  It wasn't until defense

19    counsel filed paperwork about Caleb Williams that we knew

9:14AM 20    who he was, and then we followed up with Caleb Williams

21    and have determined that he was in the State of Illinois

22    at the time frame that we're focusing on in May of 2019.

23    Q.    Agent, I understand that you want to say a lot.  My

24    question was simple and I'm going to ask it again.  Over

9:15AM 25    the course of your investigation, did you search a single

9:15AM 1    one of Caleb Williams' electronic devices, phones,

2    computers, anything along those lines?

3    A.    No, sir.

4    Q.    Over the course of your investigation, did you

9:15AM 5    investigate Caleb Williams' e-commerce business?

6    A.    No, sir.

7    Q.    Are you aware that he accepts Bitcoin?

8    A.    No, sir.

9    Q.    Did you investigate Caleb Williams' graphic design

9:15AM 10   company?

11          MR. ROBERTS:  Your Honor, at this point, I'm

12   going to object to relevance.  The witness has clearly

13   stated that he was not in the State of Arkansas during the

14   time frame we're looking at.  He has not connected this in

9:15AM 15   any way.

16          MR. GELFAND:  We will, Your Honor.  And we can

17   recall this witness, but I was taking the Court's

18   instruction pretrial to cover territory.

19          THE COURT:  Well, and that's fine.  But we're

9:16AM 20   running into 602 issues here.  I mean, if you have a good

21   faith belief that he knows, that he has personal knowledge

22   of the questions that you're asking him, that's fine.  But

23   if you haven't established that he has 602 knowledge, then

24   it's not.  So you need to first make sure we have a

9:16AM 25   foundation, but then you may inquire if you can do that.

9:16AM 1          MR. GELFAND:  Okay.

2    Q.   (BY MR. GELFAND.)  Did you investigate, over the

3    course of your entire investigation, Caleb Williams'

4    employment history?

9:16AM 5    A.   Employment history?  No, sir.

6    Q.   Did you investigate, over the course of your

7    investigation, what, if any, electronic devices Caleb

8    Williams had in 2019?

9    A.   Yes and no.  Again, we haven't spoken, or we just

9:17AM10    spoke to Mr. Williams last month.  And during our

11   conversation -- without getting into hearsay -- we are

12   aware that he was -- he had an electronic device at the

13   time that was actually active on the internet during our

14   times in question, so he had a device.  A cellular device,

9:17AM15   I'm sorry.

16   Q.   During your investigation, did you determine evidence

17   that Caleb Williams sold a car at Wholesale Motorcars as

18   the car salesperson in March of 2019?

19          MR. ROBERTS:  Your Honor, I'm going to object to

9:17AM20   relevance.

21          THE COURT:  And here's where we're getting a 602

22   problem.  You can't, through the predicate of your

23   question, attempt to get in evidence unless you have a

24   good faith reason to know that he would know that one way

9:18AM25   or the other.  So you need to ask him questions and not

9:18AM 1   testify through your questions.

2        MR. GELFAND:  Your Honor, that's fair.  I do have

3   a good faith basis.

4        THE COURT:  Well, you need to ask him what he

9:18AM 5   knows as opposed to you trying to get into evidence facts.

6   And the Jury is instructed to remember the Court's

7   instructions that the questions of the lawyers are not

8   evidence.

9   Q.   (BY MR. GELFAND.)  What, if any, evidence did you

9:18AM 10   come across over the course of your investigation

11   involving whether or not Caleb Williams sold cars?

12   A.   I did not come across any of that information.

13   Q.   That's your testimony under oath?

14   A.   That I did not come across any information during the

9:18AM 15   course of our investigation that Caleb Williams -- again,

16   me, personally -- sold any vehicles in March of 2019 at

17   the Wholesale Motorcars lot.  That information was not

18   revealed to myself until, again, last month when the

19   filings were made.

9:19AM 20   Q.   Did you, in fact, ask Caleb Williams any questions

21   about that topic?

22   A.   Yes, sir, last month.

23   Q.   Did you show Mr. Williams any documents in connection

24   with that topic?

9:19AM 25   A.   I don't believe I showed him any documents, no, sir.

9:19AM 1   Q.   Now, you testified yesterday about Government's

2   Exhibit 23, correct?  You can see it on the screen in

3   front of you.

4   A.   Oh.  Yes, sir.

9:19AM 5   Q.   You explained that these were paychecks provided by

6   Wholesale Motorcars, correct?

7   A.   Correct.  Yes, sir.

8   Q.   This document does not tell us who was present at the

9   car lot, but not paid a paycheck, correct?

9:20AM 10   A.   Correct.

11   Q.   This document does not tell us who, if anyone, was

12   paid in cash, correct?

13   A.   Correct.

14   Q.   Each of these checks -- and I believe you explained

9:20AM 15   that there's some checks with Matthew Waller.  Do you

16   recall going through these before you testified today?

17   A.   Yes, sir.

18   Q.   Each of these checks that we're looking at reflect

19   that they are commissions, correct?

9:21AM 20   A.   Yes, sir, it appears so.

21   Q.   Commissions to Matthew Waller, commissions to Randall

22   Berry, correct?

23   A.   Yes, sir.

24   Q.   Do you know what Transmission is?

9:21AM 25   A.   I am not -- I was not initially aware of what

9:21AM 1    Transmission was.  I am -- I've heard of it since this
       2    investigation.
       3    Q.    Two months ago, you had no clue what Transmission
       4    was, correct?
9:21AM 5    A.    Yeah.  September, I believe, is when I first heard of
       6    Transmission, of this year.
       7    Q.    Now, Agent Faulkner, you testified yesterday, you
       8    used the phrase several times that one of the things you
       9    were looking for in this case was who is behind the
9:21AM10    keyboard, correct?
      11    A.    Correct.  Yes, sir.
      12    Q.    And you mean literally who is behind the keyboard,
      13    correct?
      14    A.    Correct.
9:22AM15    Q.    Now, you testified a few minutes ago -- showing you
      16    Defendant's Exhibit 25 -- that this router was never
      17    seized or analyzed, correct?
      18    A.    That is correct.  Yes, sir.
      19    Q.    The truth is, during your investigation, you did not
9:22AM20    even consider the possibility of remote access, did you?
      21    A.    We waited, or awaited, our computer forensic analysts
      22    to complete their thorough investigation.  At that point,
      23    the evidence that they presented did not detail or dictate
      24    anything about remote access or hacking or anything along
9:22AM25    those lines, so, no, sir.

9:22AM 1   Q.    You did not even consider the possibility that

2   someone didn't have to be behind the computer when

3   investigating this case?

4   A.    Again, I relied on the evidence and reports produced

9:23AM 5   by our computer forensic analyst.  And, no, to date, that

6   has not been a defense that they have found.

7   Q.    Over the course of your investigation, at any point

8   did you have William Mize's phone in your possession?

9   A.    Per a consent to search, yes, sir.

9:23AM10   Q.    In other words, William Mize gave you consent to

11   search his phone, correct?

12   A.    Yes, sir.

13   Q.    Did you forensically image that phone?

14   A.    No, sir.  And if I may explain.

9:23AM15   Q.    It's yes or no question.  Did you forensically image

16   that?

17   A.    No, sir.  No, sir, it was not forensically imaged.

18   Q.    In fact, Special Agent Faulkner, just like you

19   testified with respect to Mr. Berry's phone, is there any

9:23AM20   report anywhere that you're aware of in connection with

21   this case that details what was on that phone?

22   A.    No, sir.

23   Q.    And similar to what I asked you with respect to

24   Mr. Berry, is there any image or virtual image of that

9:24AM25   phone such that it can be looked at now?

9:24AM 1    A.    No, sir.

2                MR. GELFAND:  Your Honor, may I have one minute,

3          please?

4                THE COURT:  You may.

9:24AM 5    Q.   (BY MR. GELFAND.)  Quick question, Special Agent

6          Faulkner.

7          A.    Yes, sir.

8          Q.    Who physically did the manual triages that you have

9          testified about with respect to the phones that were not

9:24AM10   seized and not imaged?

11         A.    On November 8th of 2019?

12         Q.    Yes.

13         A.    It was our HSI task force officer, Andy Higdon.

14         Q.    Andy Higdon is the person who would have knowledge

9:25AM15   about what, if anything, was on and Randall Berry's phone?

16         A.    Correct.  Yes, sir.

17         Q.    Who, if anyone, did any sort of manual triage with

18         respect to William Mize's phone?

19         A.    That would have been myself and Agent Aycock.

9:25AM20   Q.    That was in December of 2019, correct?

21         A.    December 16th of 2019, correct.

22         Q.    What, if any, qualifications do you have to do a

23         manual triage of a phone?

24         A.    I am not qualified, again, as a computer forensic

9:25AM25   analyst, but over the last 11 years within my training and

9:25AM 1    experience, I have basically looked over the shoulder of

2    all of our CFAs.  I own a phone myself, so I know how to

3    look at my own browsing history and what's in or what's

4    not in a phone.  So I base a lot of that between the

9:26AM 5    personal and training on what needs to be looked for.

6    Q.    How about unallocated space, do you know how to look

7    for that?

8    A.    I do not without a forensic tool.

9    Q.    Fair to say you didn't look for unallocated space

9:26AM10    when you conducted the search of Mr. Mize's phone?

11    A.    Yes, sir.  We did not have a forensic tool.  Again,

12    I'm not a certified CFA.

13    Q.    CFA refers to computer forensic analyst?

14    A.    Yes, sir.

9:26AM15    Q.    You have certified forensic analysts that work

16    full-time for HSI, correct?

17    A.    Again, yes, sir, we do.

18            MR. GELFAND:  Your Honor, I have no further

19    questions.  Thank you.

9:26AM20            THE COURT:  Thank you, Mr. Gelfand.  Redirect?

21                        REDIRECT EXAMINATION

22    BY MR. ROBERTS:

23    Q.    Agent, if there was evidence of hacking, would you

24    have investigated it?

9:26AM25    A.    Yes, sir.

9:26AM 1   Q.   If there was evidence of remote access, would you

2   have investigated it?

3   A.   Yes, sir.

4   Q.   If there was evidence supporting that Caleb Williams

9:26AM 5   was on the car lot during your time frame, would you have

6   investigated it?

7   A.   Yes, sir.  Yes, sir, and based within the last month

8   of our interactions with Mr. Williams --

9        MR. GELFAND:  Your Honor, I'm sorry.  I'd object

9:27AM 10   on hearsay grounds.  The question was fine, but he's about

11   to now talk about what he learned from Mr. Williams.

12        THE COURT:  Well, rephrase the question, please.

13   Q.   (BY MR. ROBERTS.)  Based on your investigation of

14   Mr. Williams, why didn't you investigate him?

9:27AM 15   A.   I'm sorry.  Could you say that again?

16   Q.   Based on this investigation, why didn't you

17   investigate Mr. Williams?

18   A.   None of our interviews, nor our forensic

19   examinations, put Mr. Williams on the car lot on our dates

9:27AM 20   in question in May 2019.

21   Q.   Based on this investigation, why didn't you seize

22   Randall Berry's phone?

23   A.   Again, our CFA went through the three things on scene

24   that we were looking for; child porn, peer-to-peer

9:27AM 25   network, and putting him on the car lot May 14th and

9:27AM 1    May 15th.  None of those were found on the device, as well

2    as the statement that we had, or interview we had with

3    Mr. Berry.  That phone, that day, was forensically and

4    factually cleared and remitted back to him.

9:28AM 5    Q.    When you were interviewing Mr. Berry, if he would

6    have given you reason to doubt or to seize his phone,

7    would you have?

8    A.    We would have kept it, yes, sir.

9    Q.    Mr. Gelfand asked you if you searched any of

9:28AM 10   Mr. Williams' devices.  Did you have legal cause to do it?

11   A.    Caleb Williams?

12   Q.    Yes.

13   A.    No, sir.  Again, we need probable cause in order to

14   take a law enforcement action against somebody's personal

9:28AM 15   property, and we don't have that with regard to Caleb

16   Williams.

17   Q.    Now, in your investigations in general, when you run

18   into a device that contains evidence, is that device

19   usually maintained, seized by law enforcement?

9:29AM 20   A.    Correct.  Yes, sir.

21   Q.    Mr. Gelfand asked you about the TOR browser and he

22   related it to just a browser.  Is it just a browser?

23   A.    Again, referring to what I do for a living, I don't

24   see it that way, no, sir.

9:29AM 25   Q.    Well, is it accurate that it will allow a user to

9:29AM 1   access what we call the surface web, something you could

2   Google search, is that correct?

3   A.    You can.  You can access the internet that we do on a

4   normal day-to-day basis also through the Dark Web.  You

9:29AM 5   are just doing is without anybody knowing who you are or

6   where you are doing it from.

7   Q.    But the TOR browser specifically allows you to access

8   the surface web and the Dark Web, right?

9   A.    Correct.

9:30AM 10  Q.    And that's the difference between Google, Firefox,

11  and these other browsers, is that correct?

12  A.    That is correct.

13  Q.    And so in your experience, when you access the Dark

14  Web, what have you run across?

9:30AM 15  A.    When I access the Dark Web in terms of my --

16         MR. GELFAND:  Objection, Your Honor, on relevance

17  and 403.

18         THE COURT:  Overruled.

19  Q.    (BY MR. ROBERTS.)  Please answer.

9:30AM 20  A.    When I access in terms of my employment?

21  Q.    Yes.

22  A.    It is strictly for illegal-based purposes.

23  Q.    Well, what are the types of things that you run into

24  when you access the Dark Web?

9:30AM 25  A.    Again, you can find sites, ".onion" sites are what

9:30AM 1   they are called, where you can purchase child pornography.

2   You can trade child pornography with millions of users

3   online.  And as I think I said yesterday, there's actually

4   sites on there where you can purchase children from

9:30AM 5   trafficking sites.

6   Q.   So is the Dark Web a known source of child

7   pornography to law enforcement?

8   A.   It's where we see a trend, unfortunately, of the

9   majority of the people that we investigate through the

9:31AM 10   ICAC are heading to because of the fact that they can, for

11   all practical purpose, remain anonymous and remain unknown

12   as to where they are.

13   Q.   So Mr. Gelfand asked you if there was nothing illegal

14   about the TOR browser, but in your experience, is that TOR

9:31AM 15   browser used as a tool to obtain illegal things?

16   A.   Again, that's what I was trying to explain in terms

17   of personally and my employment.  Employment-wise, I never

18   see a viable reason to be on the Dark Web.  Personally, if

19   somebody were to go on Amazon and try to shop, then it's

9:31AM 20   accessible, but, again, I don't see that personally being

21   a reason for somebody to get onto the Dark Web.

22   Q.   Mr. Gelfand asked you -- he played a clip where the

23   defendant said that the password of the computer, HP

24   computer, was "written around."  Did you find that?

9:31AM 25   A.   There was a password -- without getting ahead of

9:32AM 1  ourselves -- there was a password to a side of the

2  computer.

3  Q.    Specifically, do you remember the password?

4  A.    It was JoshuaJJ.

9:32AM 5  Q.    It was not Intel 1988?

6  A.    No, sir, it was not.

7  Q.    Mr. Gelfand asked you about the router.  Why, in your

8  experience and training, did you not seize the router?

9  A.    Again, we're looking for the electronic device at

9:32AM 10 that point that has child pornography on it and the

11 peer-to-peer file-sharing network.  The router, if the

12 CFAs that day had said they thought it would have been

13 beneficial to take, we would have taken it.  But in cases

14 previous, it just hasn't been.  It hasn't tied anything

9:32AM 15 that we have worked to outside of a computer.

16 Q.    Mr. Gelfand asked you about what you chose to seize

17 that day, is that correct?

18 A.    Yes, sir.

19 Q.    The choice to seize a device or not, was that made

9:33AM 20 entirely by you?

21 A.    Again, it was collectively made by the team.

22 Q.    And collectively the team understood the three things

23 you're explaining to the Jury?

24 A.    Yes, sir.  Our CFAs relate back to their findings or

9:33AM 25 their non-findings and then we evaluate what happens

9:33AM 1   during our interviews.  Then we collectively decide what's

2   going to be seized and return back to our office.

3   Q.    Mr. Gelfand asked you about six months from the time

4   frame from when Detective Kalmer downloaded until you

9:33AM 5   executed.  Now, will you tell the Jury, is this typical

6   for a peer-to-peer investigation, this time frame?

7   A.    The time delay?

8   Q.    Yes.

9   A.    Yes and no.  Yes and no.  Honestly, it heavily relies

9:33AM 10  upon how fast we can get the subscriber information back

11  from the internet service provider.  Some can get it back

12  to us in three days.  Some get it back to us in three

13  months.  We are at their mercy.  Also, it all kind of

14  really depends on what we have going on at that point

9:34AM 15  work-related in terms of cases that we're currently

16  working at the ICAC.

17  Q.    One of those cases you were currently working at the

18  time in the six-month period you described yesterday, was

19  that the hands-on offender against two young men?

9:34AM 20  A.    Yes, sir.  Two eight and nine-year-old brothers.

21  Q.    I am correct that, or am I correct that in ROIs,

22  reports of investigation, Mr. Berry's phone and Mr. Mize's

23  phone was documented as cleared, is that correct?

24  A.    That is correct.  And I'm sorry if I misunderstood

9:34AM 25  that from Mr. Gelfand.  There's no forensic report, but it

9:34AM 1   is documented in an official report of investigation.

2   Q.   You're aware those are turned over to the defense,

3   right?

4   A.   That is correct.  Yes, sir.

9:35AM 5   Q.   Mr. Gelfand asked you, or he's made statements

6   referencing that you took Mr. Duggar's phone, but you

7   didn't take these other two phones, right?

8   A.   Correct.  Yes, sir.

9   Q.   Now, in the audio interview, did Mr. Duggar give you

9:35AM10   the passcode to his phone?

11   A.   No, sir, he did not.

12   Q.   Would that prohibit you from doing an on-scene manual

13   triage?

14   A.   That is correct, especially with an Apple device.

9:35AM15   Q.   Did anybody else deny or say they wouldn't give you

16   the password?

17         MR. GELFAND:  Objection, Your Honor.  Invades the

18   pretrial ruling.

19         MR. ROBERTS:  Your Honor, I don't know that I

9:35AM20   understand that.

21         THE COURT:  I don't either.

22         MR. GELFAND:  May we approach?

23         THE COURT:  Yes.

24         (Bench Conference)

9:36AM25         MR. GELFAND:  There were many sections excluded

9:36AM 1  by our motion in limine on Fifth Amendment grounds in

2  which the agents asked Mr. Duggar for the password for the

3  phone.  He said, "I want to talk to my lawyer, I'd rather

4  not give it."

9:36AM 5        THE COURT:  The part about, "I'd rather not give

6  you my password" was played for the Jury yesterday.

7        MR. GELFAND:  In the very limited part about

8  that, there were -- what I'm concerned about is that the

9  Agent, who expands on his answers, is going to testify to

9:36AM10  things about how, you know, especially in regards to did

11  anyone else deny you that, and then they asked Mr. Duggar

12  repeatedly.  He said, "I want to talk to my lawyer first,

13  if my lawyer says it's okay."

14        THE COURT:  Well, you filed a motion.  That

9:37AM15  particular question was not part of your motion.  It is

16  now in evidence.  I obviously would require the government

17  not to tread upon those Fifth Amendment issues that he has

18  raised.  And even if he hasn't raised them, that would be

19  inappropriate.  But to the extent that it's already in

9:37AM20  evidence, that's not a problem.

21        MR. ROBERTS:  Your Honor, that's the only thing.

22  I'm not introducing another statement.  I was specifically

23  not referring to that.

24        MR. GELFAND:  Does the Agent know that?

9:37AM25        MR. ROBERTS:  I will make sure we don't step on

9:37AM 1 that.

2     THE COURT:  Okay.  Overruled.

3     (Bench Conference Concluded)

4     MR. ROBERTS:  May I proceed, Your Honor?

9:38AM 5     THE COURT:  You may.

6 Q.   (BY MR. ROBERTS.)  Agent, I want to be very precise.

7 In the audio that we heard yesterday, Mr. Duggar declined

8 to give you the passcode to his phone, is that correct?

9 A.   Correct.  Yes, sir.

9:38AM 10 Q.   On the scene, when you were speaking with the other

11 individuals and you had the phones in your hand, were you

12 able to examine those phones?

13 A.   Correct.  Yes, sir.

14 Q.   Is it your experience oftentimes that if you do not

9:38AM 15 have the passcode to a phone, that you cannot conduct an

16 on-scene investigation or analysis?

17 A.   You can, but we don't have the budget to get that

18 software on scene, so we have to take it back to our lab.

19 Q.   So in this case, if you didn't have the password, you

9:39AM 20 couldn't have done it right there on the car lot?

21 A.   No, sir.

22 Q.   You testified about the forensics and that you waited

23 for them.  Now, computer forensics, is that something that

24 comes back to you in a day?

9:39AM 25 A.   No, sir.

9:39AM 1   Q.   Could you explain the normal process there?

2   A.   Without getting too technical, our CFAs will make a

3   true and accurate copy of the device.  And that is so that

4   they are not altering or deleting the original piece of

9:39AM 5   evidence in its natural state.  And what they do is they

6   then work off that copy and they do their forensics off

7   that copy, just in case if anything happens to it, the

8   copy is destroyed and nothing is done to the original

9   piece of evidence.  They then run whatever type of device,

9:39AM 10  whether it be a laptop, a CPU, cellular telephone through

11  multiple different types of forensic software tools and

12  they are able to generate a forensic report that gives

13  them further in-look or detail as to what's ever been on

14  that computer, even deleted stuff.

9:40AM 15  Q.   Would it be accurate to say that forensics are kind

16  of dependent on the complexity of the overall case?

17  A.   Oh, absolutely.  I think I discussed last night with

18  peer-to-peer cases, there's only been one occasion that I

19  can remember in the last 11 years where we have physically

9:40AM 20  entered a residence and caught somebody redhanded behind

21  the computer watching child pornography.  The majority of

22  our peer-to-peer cases heavily rely on forensic

23  examinations.

24  Q.   Mr. Gelfand made a point to ask you multiple times

9:40AM 25  actually of whether you repeated Mr. Duggar's statement

9:40AM 1  about, "Has someone been downloading child pornography,"

2  is that correct?

3  A.  Yes, sir.

4  Q.  He actually referenced that, "Now we're debating

9:41AM 5  about it."  Is there any debate?  Did he say it?

6  A.  That he made the statement?

7  Q.  Yes.

8  A.  No, sir.

9  Q.  Did he say those exact words?

9:41AM 10  A.  No, sir.  Myself and Agent Aycock actually were

11  caught offguard and surprised by the comment.

12  Q.  Let me make sure that you're answering my question.

13  Did Mr. Duggar say those exact words?

14  A.  Those exact words that I've previously stated, "What

9:41AM 15  is this about, has somebody been downloading child

16  pornography."

17  Q.  You stated that you covered the topic of child

18  pornography after, you just didn't repeat back to him his

19  own statement, is that correct?

9:41AM 20  A.  That is correct.  Yes, sir.

21  Q.  Did you document that or has it been documented in a

22  report?

23  A.  Yes, sir.  I believe Agent Aycock reported or

24  documented that in his report of investigation outlining

9:41AM 25  the interview of Mr. Duggar.

9:41AM 1    Q.    And, again, that was provided in discovery to the

2    defense, right?

3    A.    Yes, sir.

4    Q.    Mr. Gelfand has brought up the fishbowl, describing

9:42AM 5    the car lot main office there, several times.  Do you

6    remember that reference?

7    A.    Yes, sir.

8    Q.    I want to direct your attention to Government's

9    Exhibit 6, if I may bring up Government's 6.  Now, in your

9:42AM 10   response, you said that it's not heavily populated.  I

11   would ask you to describe, once we get Government's 6 up.

12   At the kind of top left of the screen, there is a

13   building.  Could you tell us what that is?

14   A.    So the brown building that runs somewhat parallel to

9:42AM 15   Highway 412, that's an abandoned, like, what we would call

16   a chicken house.

17   Q.    And what are these buildings over here?

18   A.    Those I think were outbuildings or sheds to the

19   residence that you see just directly north of the picture.

9:43AM 20   Q.    And, again, how far is this outside of the Springdale

21   area?

22   A.    From Interstate 49, approximately seven to

23   eight miles.

24   Q.    When you were on scene, did any customers show up to

9:43AM 25   try to get out there?

9:43AM 1    A.    No, sir.  And if they had, because it was an active

2    search scene, they wouldn't have been allowed to anyway.

3    Q.    But did they show up to try to?

4    A.    No, sir, not to my knowledge.

9:43AM 5    Q.    Turn our attention to Exhibit 12.  With regard to a

6    fishbowl, can you tell me what these white things are

7    right here?  I believe they are circled.

8    A.    They appear to be window blinds, or shades.

9    Q.    And what happens when you pull down a window blind?

9:43AM 10    A.    It covers the window.

11    Q.    Let's turn to Exhibit 13.  When someone is sitting at

12    that HP computer, are they facing this window?

13    A.    Yes, sir, they could be.

14    Q.    Was that accurate -- does the desk or the chair

9:44AM 15    behind that desk, would that be facing the window?

16    A.    That's the front window facing out.

17    Q.    And what is outside that window?  What do you have a

18    view of?

19    A.    In this picture, you see the red van.  And then

9:44AM 20    beyond that would be where the main gravel driveway into

21    the lot was.  And then beyond that, a short brush line and

22    then Highway 412.

23    Q.    So if someone was sitting behind the chair, assuming

24    the van was not there, they would have a clear view of the

9:44AM 25    main entrance?

9:44AM 1    A.    Yes, sir, so to speak.

       2            MR. ROBERTS:  Your Honor, may I have a moment?

       3            THE COURT:  You may.

       4            MR. ROBERTS:  Pass the witness, Your Honor.

9:45AM 5            THE COURT:  Does that prompt anything further,

       6    Mr. Gelfand?

       7            MR. GELFAND:  Briefly, if I may, Your Honor.

       8            THE COURT:  You may.

       9                    RECROSS EXAMINATION

9:45AM10    BY MR. GELFAND:

      11    Q.    Agent Faulkner, the prosecutor just asked you whether

      12    you needed -- whether you would have needed some sort of

      13    legal basis to search someone's phone in an investigation,

      14    correct?

9:45AM15    A.    Correct.

      16    Q.    You can also ask for their consent, correct?

      17    A.    Correct.

      18    Q.    You did that in this case with William Mize, correct?

      19    A.    Correct.

9:45AM20    Q.    Did you do that with Caleb Williams?

      21    A.    I've never met Caleb Williams.

      22    Q.    You testified that the reason you didn't seize the

      23    router is because if the CFAs, meaning the computer

      24    forensic analysts, on site on November 8th thought it

9:45AM25    would be beneficial to take, you would have taken it,

9:45AM 1    correct?

2    A.    Correct.

3    Q.    Beneficial to your investigation, correct?

4    A.    Beneficial to who was committing the crimes on that

9:45AM 5    lot in May of 2019.

6    Q.    So just so I understand it, is it your testimony that

7    the general consensus was that there would be no

8    evidentiary -- no possible evidence on that router?

9    A.    Again, based on the CFAs on scene, they did not --

9:46AM10    they did not tell us to take the router, no, sir.

11    Q.    But you just testified a few minutes ago that it

12    wasn't the CFAs' choice as to what to seize, it was this

13    group of three agents.  My question for you is, was it

14    your testimony, is it your testimony, that the reason you

9:46AM15    didn't take the router is because you believed there was

16    no possible evidence on the router?

17    A.    Correct.  Collectively, we did not believe there was

18    going to be evidence on the router to seize.

19    Q.    You were asked a few minutes ago about whether or not

9:46AM20    there's documents, ROIs, reports of investigation,

21    indicating that Mr. Berry's phone and Mr. Mize's phone

22    were, quote, "cleared," correct?

23    A.    I believe so, yes, sir.

24    Q.    Are there documents that say that they are, quote,

9:46AM25    "cleared?"

9:47AM 1    A.    There's not forensic documents, no, sir.

2    Q.    In fact, sitting here today, can you tell us what

3    Microsoft Word documents were opened on either of those

4    phones?

9:47AM 5    A.    No, sir.

6    Q.    Could you tell us what PowerPoint documents were

7    opened on either of those phones?

8    A.    No, sir.

9    Q.    And the truth is, because they weren't imaged or

9:47AM10   seized, there's no way of looking at that right now,

11   correct?

12   A.    As we sit here today, no, sir.

13   Q.    You testified that this statement you claim

14   Mr. Duggar made that you've talked about, before there was

9:47AM15   a recording, was reported or reflected in a report of

16   investigation.  Do you recall that question just a minute

17   ago?

18   A.    Yes, sir.

19   Q.    Just to be clear, the government writes that report,

9:47AM20   correct?

21   A.    Yes, sir.

22   Q.    That's a memorialization that essentially comes from

23   one side.  We have no say in what goes in a report,

24   correct?

9:47AM25   A.    I hope not, no, sir.

9:48AM 1    Q.    You hope not because of why?

2    A.    No, I'm just saying in terms of somebody else having

3    access to our reports.

4    Q.    The truth is, those reports are reports that --

9:48AM 5    A.    That we author, correct.

6    Q.    That you author.  No one else gets to edit them,

7    correct?

8    A.    Outside of our supervisors, no, sir.

9    Q.    Was your supervisor there?

9:48AM10    A.    Special Agent Eric Cardiel was on scene that day,

11    November 8th, 2019.

12    Q.    Was he there to hear Mr. Duggar allegedly make this

13    comment?

14    A.    He was not in the truck, no, sir.

9:48AM15    Q.    So what good is it to have him review the report?

16    A.    For truthful and accurateness between myself and

17    Agent Aycock.

18    Q.    Even though he doesn't know what happened?

19    A.    Based on our conversations and what we alert him to

9:48AM20    as to what happened on scene that day.

21    Q.    Finally, you were shown Exhibit 13.  Could the

22    government pull that up for one sec what you just showed

23    the witness?  Do you see Exhibit 13?

24    A.    Yes, sir.

9:49AM25    Q.    This is the front window that you testified about,

9:49AM 1    correct?

2    A.   Correct.  Yes, sir.

3    Q.   Where is the blind?

4    A.   I don't believe there's a blind on that front window,

9:49AM 5    or at least I don't see one.

6    Q.   Because there isn't one, correct?

7    A.   Again, I don't see one, sir.

8    Q.   Were there blinds on the side windows in May of 2019?

9    A.   I don't know.

9:49AM 10       MR. GELFAND:  Your Honor, I have no more

11   questions.

12            THE COURT:  Thank you.

13            MR. ROBERTS:  Your Honor, I do have a few.

14            THE COURT:  All right.  Briefly.

9:49AM 15                 REDIRECT EXAMINATION

16   BY MR. ROBERTS:

17   Q.   Mr. Mize gave you consent to search, is that correct?

18   A.   Correct.  Yes, sir.

19   Q.   Can you explain what that consent entailed?

9:49AM 20   A.   Basically, it's us asking him permission to go

21   through this phone.  And at any point and given time he

22   wants to rescind that consent, then we stop.

23   Q.   To do that, would you have to have his passcode?

24   A.   Yes, sir.

9:49AM 25   Q.   Did he give you consent to take it back to the

9:49AM 1   Homeland Security and have it submitted to the forensics
       2   lab?
       3   A.   No, sir.  He gave us consent to search it there while
       4   we were in the vehicle.  Again, we didn't have probable
9:50AM 5   cause to take it at that point.
       6   Q.   Now, by "probable cause", is that legal cause to take
       7   it from him?
       8   A.   Again, it did not fit, or nothing that was located
       9   fit those three aspects that we have been talking about,
9:50AM10   so, no, sir, we did not have probable cause or legal
      11   authority to take that phone.
      12   Q.   If there was evidence of this crime on that phone,
      13   would you have legal cause at that point?
      14   A.   We would have seized the phone and then applied for a
9:50AM15   separate federal search warrant to continue forensic
      16   examinations into that phone.
      17   Q.   Now, not asking you forensically, but in your
      18   experience working these cases, does a router play into
      19   it?
9:50AM20   A.   No, sir.  Again, that's just based on my experience
      21   in working these cases.  Here, locally, we have not had a
      22   router involved in a peer-to-peer case that took us
      23   somewhere else that we shouldn't have been, or that did
      24   not lead us outside from the computer.
9:50AM25   Q.   Mr. Gelfand asked you if you reviewed the PowerPoint

9:51AM 1   or Microsoft documents on a phone.  Does that have any

2   relevance to those three things that you were

3   investigating?

4   A.    No, sir.

9:51AM 5   Q.    With reference to the statement Duggar made, "Was

6   someone downloading child pornography," are you

7   100 percent sure he said it?

8   A.    It stuck out so much that I can remember him saying

9   it right now.

9:51AM 10          MR. ROBERTS:  I'll pass the witness, Your Honor.

11          MR. GELFAND:  No more questions, Your Honor.

12          THE COURT:  Can this witness be excused?

13          MR. ROBERTS:  Yes, Your Honor.

14          MR. GELFAND:  Yes, Your Honor.

9:51AM 15          THE COURT:  Thank you for your time, Agent.

16   You're free to go.

17          Ladies and Gentlemen, we're going to take our

18   morning recess a little bit earlier than we might

19   otherwise.  We have a technical issue with one of the jury

9:51AM 20   box monitors that we are going to address over this break.

21   If you could be ready to come back out at 10 minutes after

22   10:00, we will call for you at that time.

23          Everyone please stand as the Jury exits.  And if

24   you would remain -- excuse me -- excuse me.  Whoever is

9:52AM 25   leaving, come back in the courtroom.  I need everyone in

9:52AM 1   the gallery to remain in the courtroom until the Jury has

2   cleared the elevator lobby.  Unless you're a Marshal, in

3   which case you may leave.  Sorry.

4              (Jury out at 9:52 a.m.)

9:53AM 5         THE COURT:  You may be seated.  We'll pause here

6   on the record.  Any other issues we need to take up?

7         MR. ROBERTS:  Not from the government.

8         THE COURT:  Next witness is Waller?

9         MR. ROBERTS:  Yes, sir.  We have him ready.  He's

9:53AM10   available.

11         THE COURT:  We'll start back up at 10 after.

12         (Recess taken from 9:54 a.m. to 10:32 a.m.)

13         THE COURT:  Please stand as we bring the Jury in.

14         (Jury in at 10:32 a.m.)

10:34AM15         THE COURT:  The government may call its next

16   witness.

17         MR. ROBERTS:  Thank you, Your Honor.  The

18   government will call Matthew Waller.

19         THE COURT:  Mr. Waller, if you would please come

10:34AM20   forward, approach the bench.  If you would pause about

21   right there, sir, and raise your right hand.

22           (Witness Sworn)

23         THE COURT:  Have a seat in our witness box.  I

24   will advise you that while testifying, you may remove your

10:35AM25   mask, although you're not required to.  Please pull up and

10:35AM 1    speak directly into the microphone.  You can move the

2    microphone.  You may inquire.

3              MR. ROBERTS:  Thank you, Your Honor.

4              MATTHEW WALLER, having been first duly sworn,

10:35AM 5    testified as follows:

6                         DIRECT EXAMINATION

7    BY MR. ROBERTS:

8    Q.    Would you state your name for the record?  Please

9    spell your last name.

10:35AM10    A.    Matthew Waller.  W-A-L-L-E-R.

11    Q.    Mr. Waller, where do you currently live?  Just city

12    and state is fine.

13    A.    Harris, Minnesota.

14    Q.    How long have you lived in Harris, Minnesota?

10:35AM15    A.    About two years.

16    Q.    Do you remember the approximate month you moved

17    there?

18    A.    I moved there around May, I guess.  So, correction.

19    I was -- I was -- we built our house in Harris, Minnesota,

10:35AM20    so we were actually kind of commuting between, I guess it

21    was -- I believe it was Frederic, Wisconsin, to Harris,

22    Minnesota.

23    Q.    Would it be correct that you moved there in May of

24    2019?

10:36AM25    A.    Correct, uh-huh.

10:36AM 1    Q.    Just wanted to verify the year.  You said May.

2    A.    2019.  Correct, uh-huh.

3    Q.    Prior to moving to Minnesota, where did you live?

4    A.    I was in, I guess it's Tontitown, Arkansas.

10:36AM 5    Q.    Did you work in Tontitown or around that area?

6    A.    I did.  Yes, I did.

7    Q.    Could you tell the Jury where you worked?

8    A.    I worked at Wholesale Motorcars.

9    Q.    I'm going to refer you to Government's Exhibit 23.

10:36AM10   Give me one second and it will come up on the screen in

11   front of you.  Second page, starting with the second page,

12   please.

13   A.    Sorry.  I have a blank screen here.

14   Q.    I actually do too.

10:37AM15   A.    It's just the desktop, I guess.  I think it's coming

16   now.

17   Q.    Tell you what, we'll come back to it.  Would it be

18   correct that you're the Matthew Waller listed in paychecks

19   from, say, January through the end of April of 2019?

10:37AM20   A.    Yeah, that's correct.

21   Q.    Who was your boss at Wholesale Motorcars?

22   A.    Josh Duggar.

23   Q.    I'm sorry.  One more time.

24   A.    Josh Duggar.

10:37AM25   Q.    How do you know Mr. Duggar?

10:37AM 1    A.    I'm not sure exactly when I met him, but I am

2    somewhat related to him through, I guess, my sister-in-law

3    is -- my sister-in-law's sister is Anna Duggar.

4    Q.    Is it correct you're part of the Duggar family,

10:38AM 5    extended family?

6    A.    Like once or twice removed or whatever.  I don't know

7    what the technical terms are for that.

8    Q.    I think we understand.  Once we get the exhibit up,

9    does January sound about right the time that you started

10:38AM10    working at Wholesale Motorcars?

11    A.    That sounds like the time.  I think as far as I

12    recalled earlier, it was February.  But, yeah, I believe

13    it was around that time, early February or January,

14    something like that.

10:38AM15    Q.    When did you stop working at Wholesale Motors?  Make

16    sure we got those bookends.

17    A.    Yeah.  It was in kind of mid-to-late April.

18    Q.    Mid-to-late April?

19    A.    Of 2019.

10:38AM20    Q.    Instead of projecting them, will you just turn in the

21    government's exhibit book to Exhibit 23?

22    A.    This book here?

23    Q.    It's labeled Government's exhibit book, yes, sir.

24         MS. CRAIG:  Mr. Roberts, do you want to use the

10:39AM25    Elmo for documents?

10:39AM 1          MR. ROBERTS:  If I can, yeah.

2     Q.   (BY MR. ROBERTS.)  Let's just do this manually.

3     A.   There you go.  23, you said?  There you go.

4     Q.   Are you Matthew Waller?

10:39AM 5     A.   I am.

6     Q.   Is that correct?

7     A.   Uh-huh.  That's correct.

8     Q.   Is this what your paychecks looked like when you

9     worked there?

10:39AM10     A.   Yeah, I believe so.

11     Q.   Does January 26 match up to the time you generally

12     started working there?

13     A.   Uh-huh.  Yes, sir.

14     Q.   This would be February paycheck, is that correct?

10:39AM15     A.   That is correct.

16     Q.   Were you working on commission during this time

17     frame?

18     A.   I don't recall if I was, on this specific check, if

19     that was commission based or if that was hourly.  I

10:39AM20     started out hourly, but it does say commissions for the

21     week of.  That could have been -- yeah, that was probably

22     commissions based.  That makes sense.

23     Q.   We'll move through these.  February 23rd, you're that

24     Matthew Waller, correct?

10:40AM25     A.   Yes.

10:40AM 1    Q.    Another one on February 23rd?

2    A.    Yes, sir.

3    Q.    May 11th?

4    A.    That's March.

10:40AM 5    Q.    Is that you?

6    A.    That was March 11th, not May.

7    Q.    Excuse me.  March 11th.  Thank you.  April 3rd, is

8    that you?

9    A.    That is -- that is me.

10:40AM10    Q.    Now, this is on May 6th, 2019, for commissions from

11    3-30 until 4-29-19, is that correct?

12    A.    That's what it says, yes.

13    Q.    That corresponds with your final, or the end of your

14    employment at Wholesale Motorcars, is that right?

10:40AM15    A.    I believe so, yes.

16    Q.    So who else worked with you at Wholesale Motorcars?

17    A.    Just Josh Duggar and I.  I believe that's -- yeah,

18    that was all the employees I knew about.

19    Q.    You and Josh Duggar?

10:41AM20    A.    Yes, sir.

21    Q.    Could you tell us about the office setup there?  When

22    you enter the office, how do you get in the door?

23    A.    There's a keypad entry that you put in, yeah.  I

24    don't recall the code for that, but --

10:41AM25    Q.    Please pull up Exhibit 12.  Now, so you enter the

10:41AM 1   door.  Did you ever give anybody that key code to allow

2   yourself to get into the door?

3   A.   Not that I remember, no.

4   Q.   Who did you ever see using that key code?

10:41AM 5   A.   Josh Duggar and I.  I don't recall anybody else using

6   it.  I don't know.  There could have been, but I don't --

7   Q.   Sir, I want to stop you.  Please answer my question.

8   Who did you see using the key code?

9   A.   I, for sure, saw Josh using it, and I, for sure, saw

10:42AM 10   myself using it, I guess.

11   Q.   Thank you, sir.  Now, when you worked there,

12   Government's Exhibit 12, is that approximately how the

13   office looked, not exactly, but approximately?

14   A.   Approximately, uh-huh, yes.

10:42AM 15   Q.   That computer there on the desk, did you use that

16   computer?

17   A.   I did, yes.

18   Q.   Sir, who did you see, besides yourself, using that

19   computer?

10:42AM 20   A.   Josh Duggar.

21   Q.   How did you gain access to that computer?  Was there

22   a password?

23   A.   There was a password, yes.

24   Q.   Do you remember the password?

10:42AM 25   A.   I don't recall the password.  It may sound familiar

10:42AM 1   if you told it to me, but I don't recall the password.

2   Q.   That's fine.  Did you give anybody that password?

3   A.   No, sir.

4   Q.   Now, in Government's Exhibit 12, tell me what --

10:42AM 5   well, let me see.  Hang on one sec.  There's a white and a

6   black camera.  Were those there when you were there?

7   A.   I don't recall which one.  I'm pretty sure the black

8   one was there.  I couldn't say -- I just -- I know there

9   was -- I know there was a camera in there, I guess.

10:43AM 10   Q.   What was your understanding of those cameras?

11   A.   My understanding -- it may have been an assumption --

12   but I just assumed, you know, the highest technology,

13   right, that it was able to be accessed remotely, I guess.

14   Q.   Well, let me make sure.  Did you believe Josh Duggar

10:43AM 15   was able to log-in and view you while you were in that

16   office?

17   A.   As far as I understood.  I don't know that he

18   couldn't, in other words.

19   Q.   Is that your understanding, sir?

10:43AM 20   A.   Uh-huh, that's my understanding.

21   Q.   Why did you leave employment at Wholesale Motorcars?

22   A.   I'm sorry.  Could you say that again?

23   Q.   Why did you leave your employment at Wholesale

24   Motorcars?

10:43AM 25   A.   Yeah, I was going to go help my parents with a house

10:44AM 1    build that they were working on.

2    Q.    Did you have occasion at the end of April, early May,

3    to attend a conference with Mr. Duggar?

4    A.    I did, yes.

10:44AM 5    Q.    Could you tell us about that, the purpose of the

6    conference?

7    A.    It's a homeschool conference.  I don't know exactly

8    what all to say about it.  There's speakers that come in

9    and you listen to messages.

10:44AM10    Q.    How long does it last?

11    A.    It lasts about five to six days or something, about a

12    week or whatever.

13    Q.    I'm sorry.  Could you speak a little louder?

14    A.    About five to six days, about a week or so.

10:44AM15    Q.    When would that conference have been over?

16    A.    Either Friday or Saturday.  I believe that's the 3rd

17    or the 4th.

18    Q.    May 3rd or 4th?

19    A.    Of May of 2019, yeah.

10:44AM20         MR. ROBERTS:  May I have one second, Your Honor?

21         THE COURT:  You may.

22         MR. ROBERTS:  Actually, Your Honor, I thought of

23    one further question.

24    Q.    (BY MR. ROBERTS.)  Are you familiar with the

10:45AM25    defendant and do you know who the defendant is married to?

10:45AM 1   A.    Yeah.

2   Q.    Can you provide her name?

3   A.    Anna Duggar.  Is that what you're talking about?

4   Like the defendant being Josh Duggar.  His wife is Anna

10:45AM 5   Duggar, yes.

6            MR. ROBERTS:  May I have one moment, Your Honor?

7            THE COURT:  Yes.

8            MR. ROBERTS:  Pass the witness, Your Honor.

9            THE COURT:  Mr. Story, you may inquire when

10:45AM10   you're ready.

11            MR. STORY:  Thank you, Your Honor.

12                      CROSS EXAMINATION

13   BY MR. STORY:

14   Q.    Good morning, Mr. Waller.  How are you?

10:45AM15   A.    I'm doing good.

16   Q.    You were employed with Wholesale Motorcars in 2019,

17   correct?

18   A.    I was, yes, correct.

19   Q.    And we've previously established with Mr. Roberts the

10:45AM20   dates you were there, basically until the end of April

21   2019, correct?

22   A.    Uh-huh.  That's correct.  That's correct.

23   Q.    You said you went to the homeschool conference?

24   A.    Uh-huh.  Yes.

10:46AM25   Q.    Where was that located?

10:46AM 1    A.    East Texas.

2    Q.    Mr. Waller, were you homeschooled?

3    A.    I was, yes.

4    Q.    Do you know if the defendant, Josh Duggar, was

10:46AM 5    homeschooled?

6              MR. ROBERTS:  Your Honor, objection.  Outside the

7    scope of direct.

8              THE COURT:  Well, as the Court explained its mode

9    and order of interrogation, it's going to allow this

10:46AM10    testimony because the defense could call him back in their

11    case, so I don't recognize the scope objection here.  You

12    may inquire.

13             MR. STORY:  Thank you, Your Honor.

14    Q.    (BY MR. STORY.)  You can answer the question,

10:46AM15    Mr. Waller.

16    A.    Okay.  The question.  Yeah, he was.  I believe he was

17    homeschooled, yes.

18    Q.    Do you know if Josh Duggar was homeschooled?

19    A.    Yes.  Yes, sir.

10:46AM20    Q.    Do you know if Josh Duggar received his GED?

21    A.    I do not know.

22    Q.    Do you know if Josh Duggar ever had any college

23    experience?

24    A.    I don't know for sure.

10:47AM25    Q.    When you were at the car lot, what was your primary

10:47AM 1    responsibility?

2    A.    So my responsibility was primarily to sell cars, just

3    what a salesman would do, I guess, with cars.  I

4    believe -- I'm not sure if it was my initiative or him

10:47AM 5    telling me to, I went ahead and detailed cars and just

6    tried to stay busy, basically.

7    Q.    You would do whatever needed to be done, is that what

8    you're saying?

9    A.    Correct.  Correct, yeah.  Sometimes mechanic jobs,

10:47AM10    too, sometimes.

11    Q.    As part of all of those duties, you said you would

12    sell cars, so people would come purchase a car?

13    A.    Right.

14    Q.    What would you do to complete the transaction?

10:47AM15    A.    Basically, I mean, they need all the paperwork filled

16    out, so you've got to -- that would require using the

17    computer, because you're printing off the bill of sale.  A

18    lot of the stuff was "as is," you know, I guess, for the

19    cars and stuff, but you would print off the whole bill of

10:48AM20    sale and all that kind of stuff.

21    Q.    When you printed it off, you would use the computer

22    in the office, is that correct?

23    A.    Correct.  Correct, yeah.

24    Q.    That computer had a specialized software on it just

10:48AM25    for car sales?

10:48AM 1   A.   Yeah.  To keep track of the car sales, yeah, uh-huh.

2   Q.   Is that the Frazer software?

3   A.   Yes.  I believe so, yes.

4       MR. ROBERTS:  Your Honor, I'm going to object.

10:48AM 5  If he is going to direct the witness, he should at least

6  be using non-leading questions.

7       THE COURT:  That is correct.  The Court will

8  sustain the leading objection.

9       MR. STORY:  I apologize, Your Honor.

10:48AM10   Q.  (BY MR. STORY.)  Mr. Waller, can you tell me the name

11  of the software you used to sell the cars?

12   A.   Frazer software, yeah.

13   Q.   And when you would use the Frazer software -- show

14  you what's previously been introduced as Defendant's 24 --

10:49AM15  would you use that computer in the office?

16   A.   That's the computer I remember using, correct.

17   Q.   And that had the Frazer software on it?

18   A.   That's what I remember, yes, correct.

19   Q.   Now, Mr. Roberts had asked you if you remember the

10:49AM20  password?

21   A.   Uh-huh.

22   Q.   You said you didn't.  Does Intel 1988 ring a bell?

23   A.   Yeah, Intel, faintly, very faintly rings a bell.

24   Q.   When you were at the car lot, you stated that you

10:49AM25  worked there, Josh worked there?

10:49AM 1   A.    Uh-huh.

2   Q.    Would it be fair to say you were the only two

3   full-time employees, so to speak?

4   A.    That's as I understood it, correct, yeah, uh-huh.

10:50AM 5   Q.    Were there other people who would come onto the car

6   lot and be around?

7   A.    Yeah, off and on.  Yeah, lots of people come by.  I

8   mean, lots of customers, right.  But as far as, like,

9   people that we knew, yeah, there were people that came by.

10:50AM 10  Q.    Do you know who William Mize is?

11  A.    I do, yes.

12  Q.    Who is William Mize?

13  A.    He was a gentleman that came by.  I believe he's like

14  a Vietnam vet or some kind of ex-military guy or whatever.

10:50AM 15  I don't know too much about him.  I don't know.

16  Q.    Would he come by the lot frequently?

17  A.    Every once in a while.  I mean, it wasn't uncommon to

18  see him at the lot.  So, yeah, he was there, you know,

19  every once in a while, uh-huh.

10:51AM 20  Q.    Did he ever do any kind of, say, odd jobs, like

21  transport a car or do something from auction?  Little

22  things, not necessarily sell a car.

23  A.    Yeah.  Not that I recall, no.

24  Q.    Are you familiar with anyone named Josh Williams?

10:51AM 25  A.    Yes, I am.

10:51AM 1    Q.    Who is Josh Williams?

2    A.    I mean, he runs -- I believe he runs a tree service.

3    I know he used to work for Josh Duggar before I was there.

4    I don't remember exactly when that time frame would have

10:51AM 5    been, but I heard he was a good salesman.  That's all.

6    Q.    While you were at the lot early 2019 to the end of

7    April 2019, would Josh Williams, did he ever come on the

8    lot that you remember?

9    A.    I don't recall.  I don't recall if Josh -- again, I

10:52AM10    guess, like, there's a few -- there's a few of the

11    Williamses.  I don't recall exactly.  Sometimes I may have

12    gotten mixed up between Josh and Caleb and I think the

13    other name was David.  I know some of them were there at

14    the lot.  I know Josh Williams' truck was at the lot.  His

10:52AM15    truck is a white -- it was a white 2010 to 2014 body style

16    pickup truck, Ford pickup truck.

17    Q.    When you were at the lot -- I'm going to show you

18    what's previously been marked as Government's Exhibit 10.

19    Do you recognize the office in that picture?

10:52AM20    A.    No, that looks different.

21    Q.    Does it look different?

22    A.    I'm sorry.  That looks -- it looks red to me in that

23    picture.  The one in front -- there's two offices, right.

24    It looks like there's two offices.  The one in the back

10:53AM25    was not there when I was there.  The one in the front,

10:53AM 1    that could have been.

2    Q.   The one in the front was there when you were there

3    during that early 2019 period?

4    A.   That could have been the one.  It looks red, though.

10:53AM 5    I believe it was, like, gray or white.  The color looks a

6    little bit --

7    Q.   I think that's mainly the picture.

8    A.   Sure.  Okay.

9    Q.   But specifically about the building in the back, the

10:53AM10    one with the porch, was that there during your time at

11    Wholesale Motorcars?

12    A.   It was not, no.

13    Q.   Were there other people you ever saw actually in the

14    office?

10:53AM15    A.   There were, uh-huh.

16    Q.   Who would some of those people have been?

17    A.   I mean, again, anybody who came to buy a car, they

18    would come to the office.  As far as people that were

19    just, I don't know, maybe you're thinking about people

10:54AM20    that would hang out.  William Mize, depending on if it was

21    a cold day or not.  I mean, it's kind of like whether or

22    not somebody would actually want to be sitting in the

23    office, because it's a very small office.

24    Q.   I'm going to show you, just for clarity sake,

10:54AM25    Government's Exhibit 15.

10:54AM 1    A.    That looks more like it there.

2    Q.    Does that more accurately reflect the color of the

3    building that you remember?

4    A.    Yes.  Yes.

10:54AM 5    Q.    And, again, the --

6    A.    The one on the right.

7    Q.    -- the shed with the porch, that was not there during

8    your time?

9    A.    No, I don't recall seeing that.

10:54AM10    Q.    When it was just the office, do you remember if there

11    were blinds on any of the windows in the office?

12    A.    Blinds?  I don't recall, no.

13    Q.    Would it get sunny and hot during your time in the

14    office while you were working at Wholesale Motorcars?

10:55AM15    A.    Was it what?  Hot?

16    Q.    Would it get hot or would it ever be hard to see the

17    computer screen if, like, the sun was beating in on you?

18    A.    Oh, I got you.

19              MR. ROBERTS:  Your Honor, I'll object to leading

10:55AM20    again.

21              THE COURT:  Yeah, let's try to watch that.

22    Rephrase.

23              MR. STORY:  I'll withdraw the question.

24    Q.    (BY MR. STORY.)  You don't remember if there were

10:55AM25    blinds or not during your time?

10:55AM 1    A.    Okay.  So I don't recall for sure.  I know there

2    was -- I recall there being sunshine coming in, but, I

3    mean, I don't know if you can take that --

4    Q.    Mr. Waller, during your time at Wholesale Motorcars,

10:55AM 5    was there internet service?

6    A.    Yes, there was, uh-huh.

7    Q.    And specifically, when you first got to Wholesale

8    Motorcars, do you remember what kind of internet service

9    the company had?

10:56AM 10   A.    I believe it was satellite internet.  I'm not

11   100 percent on that, but that's what I understood it was,

12   I think.

13   Q.    At some point, did that change?

14   A.    Yes, it did.  Yes.

10:56AM 15   Q.    And do you know what it changed to?

16   A.    It was some sort of hardline, I guess, internet that

17   they got fixed into it.

18   Q.    Do you remember who actually provided that internet

19   service?

10:56AM 20   A.    I do not, no.  I remember them installing it, I

21   guess.

22   Q.    Do you remember approximately when they installed it?

23   A.    It would have been -- that would be tough.  I mean,

24   it would be probably around, you know, maybe early April.

10:56AM 25   Q.    Was it fair to say --

10:56AM 1   A.   I couldn't say for sure.

2   Q.   -- during your time, they installed the internet

3   service to the hardline?

4   A.   Yes.  Yes.  I don't know for sure that we began using

10:57AM 5   the internet service.  I can't remember exactly for sure

6   on that, but I do know they installed the internet when I

7   was there.

8           MR. STORY:  If I can have a moment, Your Honor.

9           THE COURT:  You may.

10:57AM 10          MR. STORY:  Pass the witness, Your Honor.

11                   REDIRECT EXAMINATION

12   BY MR. ROBERTS:

13   Q.   Mr. Waller, we had a conversation before coming into

14   court, didn't we?

10:57AM 15   A.   Uh-huh.

16   Q.   Told you I thought you were hiding something from me,

17   didn't I?

18   A.   The conversation before the conversation that we had,

19   yes.

10:57AM 20   Q.   I asked you specifically, was there something you

21   were intending to testify to that you were not telling me,

22   is that right?

23   A.   Correct.

24   Q.   And you did not tell me a word about Intel 1988, did

10:57AM 25   you?

10:57AM 1    A.    No, I did not.

2    Q.    You were interviewed by law enforcement.  You didn't

3    tell them a word about Intel 1988, did you?

4    A.    I didn't recall it at the time.

10:58AM 5    Q.    You didn't recall it when you were talking to a

6    special agent from Homeland Security?

7              THE COURT:  Stop.  Stop.  What's the objection?

8              MR. STORY:  Your Honor, he's testifying as to

9    what he told the witness specifically and I believe we

10:58AM10   even had a pretrial order regarding that.

11             THE COURT:  I'm not sure what you're referring

12   to, Mr. Story.

13             MR. STORY:  The objection is also relevance as to

14   the question of the witness, Your Honor.

10:58AM15             THE COURT:  Well, you're the one that brought up

16   whether -- the extent to which he recalled there being a

17   password on the desktop computer, and I believe this is

18   fair follow-up on that, so your objection is overruled.

19   Q.    (BY MR. ROBERTS.)  Where I was at, you didn't recall

10:58AM20   when you were talking to agents of Homeland Security, but

21   you're recalling today, is that correct?

22   A.    That's correct.

23   Q.    After you talked to agents of Homeland Security, you

24   met and talked to the defense, didn't you?

10:59AM25   A.    So I didn't --

10:59AM 1  Q.   Sir, yes or no.

2  A.   I'm just saying -- I'm trying to answer.  Can I

3  answer the question before?

4  Q.   Did you meet with the defense?

10:59AM 5  A.   Can I answer the question before?

6  Q.   You can answer yes or no, sir.

7  A.   Okay.  Can you repeat the question?  I'm sorry.

8  Q.   You spoke with the defense attorneys and/or their

9  investigators after speaking to Homeland Security, is that

10:59AM10  correct?

11  A.   Yes, sir.  Yes.

12  Q.   In fact, when Homeland Security agents were out on

13  the Duggar residence recently, you asked them to leave,

14  didn't you?  Yes or no, sir?

10:59AM15  A.   They were on private property.

16  Q.   Yes or no, sir?

17  A.   So, yes, I asked them politely if they would leave.

18  Q.   So you're up here testifying under oath that you

19  didn't tell the agents, you didn't tell the federal

10:59AM20  prosecutor that asked you multiple times, but yet on the

21  stand, you're saying Intel 1988 is vaguely familiar?

22  A.   It's vaguely familiar.

23  Q.   Vaguely familiar?

24  A.   Very faintly familiar.

11:00AM25  Q.   As what?

11:00AM 1  A.   As, yeah, it's familiar.  It sounds faintly familiar,

2  if you know what I mean, for --

3  Q.   No, sir, I don't know what you mean.  Faintly

4  familiar as a --

11:00AM 5  A.   It could have been a password that was used for the

6  computer.  We didn't have to use -- I didn't have to

7  remember the password, so I never actually tried to

8  remember the password.

9  Q.   So is your testimony that it's vaguely familiar that

11:00AM10  it was the password for the actual HP computer itself?

11  A.   I couldn't -- I couldn't place for sure whether it

12  was or whether it wasn't.

13  Q.   Was it vaguely familiar as the password for Mr. Josh

14  Duggar's bank account?

11:00AM15  A.   I've never had the password for that, so I don't see

16  how that would be.

17  Q.   Have you ever given out the password to your bank

18  account?

19  A.   I don't believe I have.

11:00AM20  Q.   Other than your wife?

21  A.   I don't have a wife, so I guess probably not.  I have

22  brothers, though.

23  Q.   Now, you stated on -- it was direct or cross

24  examination, I'm not sure which -- that there would be

11:01AM25  people inside the office depending on whether it's a cold

11:01AM 1   day or not.  Do you remember saying that?

2   A.    Yeah.  There's definitely been people in the office

3   whether it was cold or not for sure.

4   Q.    No.  I believe it was cross examination, you said

11:01AM 5   that there would be more or less people inside the office

6   depending on whether it's cold or not.  You caveated it

7   that it's a small office.  Do you remember that?

8   A.    Right.  So, basically, yeah, if it's a cold day.

9   Q.    Do you remember that, sir?

11:01AM 10          THE COURT:  Mr. Roberts, let's try not to talk

11   over.  If you have a question, let him answer.  We need to

12   avoid talking over each other.

13          MR. ROBERTS:  May I restate the question, Your

14   Honor?

11:02AM 15          THE COURT:  You may.

16   Q.    (BY MR. ROBERTS.)  Yes or no, do you remember saying

17   that?

18   A.    I remember saying that, yes.

19   Q.    In May, is it typically hot or cold?

11:02AM 20   A.    In May?  I would say, I don't know.  I'm not from

21   Arkansas.  I haven't really been there too much in May.  I

22   would say it's about the right temperature, though.  It's

23   comfortable.

24          MR. ROBERTS:  Your Honor, I'll pass this witness.

11:02AM 25          THE COURT:  Thank you, Mr. Roberts.  Mr. Story,

11:02AM 1  anything?

2                          RECROSS EXAMINATION

3  BY MR. STORY:

4  Q.   Mr. Waller, did the government ever expressly ask you

11:02AM 5  about Intel 1988 being a password used?

6  A.   I don't recall.  I don't recall for sure.  I mean,

7  there's been a lot of -- it's hard to remember which ones

8  sometimes, like, who is the government lawyer and who is

9  the defense attorney, I guess, sometimes.  I'm just now,

11:03AM10  like, starting to get that straight, so everything --

11  after you talk to somebody, then you're, like, you think

12  about stuff and then sometimes you boot up more stuff, but

13  then you forget.  I didn't know if I was supposed to

14  contact.  It's not that I forgot.  It's just I didn't know

11:03AM15  if I was supposed to contact you or if that's kind of your

16  job and you're supposed to ask me, I guess.

17  Q.   When the defense talked to you, did we tell you

18  whatever your testimony is, just to come in and tell the

19  truth?

11:03AM20  A.   Correct.  Yes.

21              MR. STORY:  No further questions.

22              MR. ROBERTS:  May I, Your Honor?

23              THE COURT:  You may.

24                          REDIRECT EXAMINATION

11:03AM25  BY MR. ROBERTS:

11:03AM 1    Q.   So you didn't tell me because what?  Were you hiding
2            it from me?
3            A.   No, sir.
4            Q.   Were you hiding it from federal agents?
11:03AM 5    A.   No.
6            Q.   You just didn't think to tell us?
7            A.   Yeah.  I mean, it's a lot of stuff in the case that's
8            hard to remember every last minute.  I was trying to think
9            of stuff.  And especially when somebody is looking at you,
11:03AM 10   it's hard to remember everything.
11           Q.   Sir, do you remember specifically being asked, what
12           was the password to the computer?
13           A.   I don't remember who asked me, but, yes, it was
14           asked.
11:04AM 15   Q.   And you never mentioned Intel 1988 to anybody,
16           federal agent or federal prosecutor?
17           A.   I didn't know the password.  When somebody said Intel
18           98, I mentioned that it was -- it was just faintly
19           familiar.  The word "Intel" was faintly familiar.  The
11:04AM 20   1998, I didn't know.
21           Q.   Sir, who said it to you?  I didn't.
22           A.   If it wasn't the prosecution lawyers, then it
23           probably would have been the defense attorney.
24           Q.   So the defense told you information you didn't
11:04AM 25   otherwise remember?

11:04AM 1    A.    Yeah, correct, I guess.

2              MR. ROBERTS:  I'll pass the witness, Your Honor.

3              THE COURT:  May this witness be excused?

4              MR. STORY:  One moment, Your Honor.

11:04AM 5                     RECROSS EXAMINATION

6    BY MR. STORY:

7    Q.   Mr. Waller, when you were speaking to the defense,

8    did we tell you what to say or did we ask you questions?

9    A.    Speaking to the defense.  You asked me questions.

11:05AM10   Q.   And when we asked you if that password meant

11   anything, did it seem to ring a bell?

12   A.    Just a faint bell, yes.  I remember the word "Intel."

13   I don't -- you know, 1998, there's lots of numbers that go

14   through a car lot, but the word "Intel" just faintly,

11:05AM15   faintly rang a bell, I guess.

16             MR. STORY:  Thank you.

17             THE COURT:  Mr. Roberts, we can only beat this

18   horse so many times.

19             THE WITNESS:  I don't mean to be difficult.

11:05AM20            MR. ROBERTS:  Your Honor, I'll be as brief as I

21   can.

22                     REDIRECT EXAMINATION

23   BY MR. ROBERTS:

24   Q.    Sir, you were asked specifically, "The password to

11:06AM25   the HP computer is."  What is it?

11:06AM 1    A.    I don't know what the password is.

2    Q.    This is a password you used every day as part of your

3    job to log onto it, but you don't know what it is?

4    A.    Not necessarily every single day.  And there was

11:06AM 5    always the sticky note on the left on the wall, so that's

6    what I would refer to anytime I needed to log-in.

7    Q.    So this password you used all the time, you can't

8    remember, but you can remember vaguely Intel 1988, but you

9    don't know where it's from?

11:06AM 10   A.    No, sir.  I vaguely remember or faintly remember

11   hearing the word "Intel" potentially as a password.

12   Q.    Could that have been when Josh Duggar was talking to

13   someone on his bank?

14   A.    I don't recall.

11:06AM 15   Q.    Could it have been when Josh Duggar was discussing

16   what was in his Apple notes section on his iPhone?

17   A.    Yeah, I don't know.

18   Q.    Could it have been when he was speaking to his wife?

19   A.    I don't know.

11:07AM 20            MR. ROBERTS:  Thank you, Your Honor.

21            THE COURT:  May this witness be excused?

22            MR. STORY:  Yes, Your Honor.

23            MR. ROBERTS:  Yes, Your Honor.

24            THE COURT:  Sir, thank you very much for your

11:07AM 25   time in being here today.  You're free to go.

11:07AM 1          THE WITNESS:  Thank you.

        2          MS. MARSHALL:  Your Honor, may we have one moment

        3   to confer?

        4          THE COURT:  Yes.

11:07AM 5          MR. ROBERTS:  Your Honor, may we approach?

        6          (Bench Conference)

        7          MR. ROBERTS:  Your Honor, we're going to intend

        8   to take our witnesses out of order.  I don't trust a

        9   single one that has talked to the defense now.  We're

11:08AM10   going to go directly to the ones that have not.  So we

       11   will be altering the witness order that we provided to the

       12   Court and the defense.  We want to go directly to

       13   Mr. Wofford, who is a records custodian for Covenant Eyes.

       14          THE COURT:  Okay.  Was he on your -- one of your

11:08AM15   witness lists?

       16          MR. ROBERTS:  List today, yes, sir.

       17          THE COURT:  That's fine.

       18          (Bench Conference Concluded)

       19          THE COURT:  The government may call its next

11:08AM20   witness.

       21          MR. ROBERTS:  Your Honor, the government calls

       22   Jeff Wofford to the stand.

       23          THE COURT:  Sir, if you would please come forward

       24   and approach the bench.  If you would stop and pause about

11:09AM25   right there and raise your right hand.

11:09AM 1          (Witness Sworn)

2          THE COURT:  If you would have a seat in our

3     witness box.  As you're getting situated, I will let you

4     know that while testifying, you may remove your mask.

11:09AM 5     You're not required to do so, though.  If you would,

6     please pull up and adjust the microphone so that you can

7     speak into it directly so that we can best hear your

8     testimony.

9          Mr. Roberts, you may inquire.

11:09AM10          MR. ROBERTS:  Thank you, Your Honor.

11          JEFFREY WOFFORD, having been first duly sworn,

12     testified as follows:

13                    DIRECT EXAMINATION

14     BY MR. ROBERTS:

11:09AM15     Q.   Would you state your name for the record?  Please

16     spell your last name for our court reporter.

17     A.   My name is Jeffrey Mark Wofford.  Last name is

18     W-O-F-F-O-R-D.

19     Q.   Would you tell the Jury how you're currently

11:09AM20     employed?

21     A.   I work for a company called Covenant Eyes.  I am the

22     Vice President of Technology for Covenant Eyes.

23     Q.   Could you explain what Covenant Eyes is to the Jury?

24     A.   Covenant Eyes is a software service.  You install it

11:10AM25     on your computers, your devices.  And our service monitors

11:10AM 1    your activity on those devices.  And as you sign up with
        2    it, you identify somebody that you trust and love, a
        3    family member, perhaps, or a friend, give us their e-mail
        4    address.  And if we detect any behavior on that device
11:10AM 5    that is perhaps objectionable, we will notify that person,
        6    what we call an accountability partner.
        7    Q.    So what's the primary purpose that people install
        8    Covenant Eyes on their devices for?
        9    A.    Primarily, it would be for controlling temptations to
11:10AM10    look at pornography, either by one's self or perhaps a
       11    family member in the household.
       12    Q.    You referenced the accountability partner.  How does
       13    that actually work?  If pornography is detected, could you
       14    tell us how that accountability partner is notified or how
11:11AM15    does that process work?
       16    A.    Yes.  So our software monitors activity on the
       17    device.  And as I said, it identifies activity that looks
       18    like it might be problematic or objectionable.
       19    Pornography, for example.  And from time to time, our
11:11AM20    software systems examine that information from your
       21    devices and forms an e-mail, what we call a report, that
       22    is then sent to any accountability partner that you have
       23    identified just through the ordinary e-mail address.
       24    Q.    Now, sir, I'm going to reference you to Government's
11:11AM25    Exhibit 69 and 70.  I'm not introducing those at this

11:11AM 1    time, but there's a binder up there with "government's

       2    exhibits" on the front of it.

       3    A.    Is it this one?

       4    Q.    Yes.  If you will turn to 69 and 70, but be careful

11:12AM 5    not to show the Members of the Jury those exhibits.

       6    A.    I'm getting there.  62.

       7    Q.    Exhibit 69 and 70, please.

       8    A.    I see it.  69.

       9    Q.    All right.  Now, prior to testifying today, have you

11:12AM10    reviewed this document?  Was it provided to you via

      11    e-mail?

      12    A.    Yes.

      13    Q.    Now, what is the nature of this document?  Can you

      14    describe generally what this document would be?

11:13AM15    A.    Yes.  This would appear to be one of the e-mailed

      16    reports that I described a moment ago, the sort of report

      17    that we send to an accountability partner about a user.

      18    Q.    Would these accountability reports include topics

      19    such as "activity for review?"

11:13AM20    A.    Yes.

      21    Q.    Would it include topics as "incidents?"

      22    A.    Yes.

      23    Q.    Would it include, depending on filtration levels,

      24    "blocked web content?"

11:13AM25    A.    Yes.

11:13AM  1   Q.   Am I correct that Covenant Eyes does not maintain

         2   these accountability reports for an extended period of

         3   time, is that correct?

         4   A.   That's correct.

11:13AM  5   Q.   In reviewing Government's 69 and 70, is that

         6   consistent with the Covenant Eyes' accountability reports

         7   that were sent in the respective dates?

         8   A.   Yes.

         9   Q.   And please don't show them to the Jury.

11:14AM 10   A.   I understand.  Yes.

        11   Q.   Was that a "yes" to my question, they are consistent?

        12   A.   They are consistent with the reports we send.

        13   Q.   Now, in this case, did you obtain, or did you

        14   receive, Covenant Eyes receive, a subpoena from Special

11:14AM 15   Agent Howard Aycock requesting records for a user name

        16   Joshua Duggar and Anna Duggar?

        17   A.   Yes.

        18   Q.   Did Covenant Eyes respond to that subpoena request?

        19   A.   Yes, we did.

11:14AM 20   Q.   Now, was this request essentially subscriber records

        21   showing accountholders and information such as that?

        22   A.   That would be fair to say.

        23   Q.   For the purposes of this trial, were you designated

        24   custodian of those records?

11:14AM 25   A.   Yes.

11:14AM 1    Q.    Could you tell the Jury, with regard to user name

2    Joshua Duggar, when that individual first subscribed to

3    Covenant Eyes?

4    A.    Offhand, my recollection would be 2013.

11:15AM 5    Q.    Do you remember the user name and specific e-mail?

6    A.    The user names -- there were two user names that I

7    recall.  Joshua Duggar's and Anna Duggar's were the two.

8    E-mail addresses, I recall there being two or three.  And

9    I don't recall them offhand.

11:15AM 10   Q.    I might circle back to that.  Do you recall, based on

11   those records, who the accountability partner for the user

12   Joshua Duggar was, the ally?

13   A.    Yes, I think I understand the question.  Yes, I

14   believe that Anna Duggar was designated as the

11:15AM 15   accountability partner for Joshua Duggar's.

16   Q.    So does that mean if there was objectionable content

17   that would be caught by Covenant Eyes, Ms. Duggar would be

18   notified in this situation for this account?

19   A.    Yes.

11:16AM 20   Q.    Could you describe for the Jury the different

21   internet filtering options that someone has within

22   Covenant Eyes?

23   A.    Well, I'll begin to answer and if I'm on the wrong

24   line, I'm sure you will let me know.  So we have in a

11:16AM 25   sense two different aspects to what we do.  One is what we

11:16AM 1    call accountability and the other is what we call

2    filtering.  Accountability is where we're not going to

3    stop you from going where you want to go, but we are going

4    to let your accountability partner know where you went.

11:16AM 5    So this helps you to have -- use your own self-discipline.

6    And normally our users have that option.

7         The other mode that our software works in is what we

8    call filtering.  And in this mode, we, in fact, prevent

9    you from going to places that our software detects you

11:17AM 10   ought not to be going.  Is that the sort of thing you

11   intended to hear about?

12   Q.   Yes, sir, it was.  Could you describe the rating

13   process that Covenant Eyes uses?

14   A.   Yes.  So I suppose I should be clear that our

11:17AM 15   software today, in 2021, doesn't work quite like it did in

16   2019 or prior, but I'll describe what was current at the

17   time.

18   Q.   In 2019, please.

19   A.   Yes.  At that time, our software primarily looked at

11:17AM 20   your network traffic.  So that means places that you went

21   with your browser, URLs as they are called, and other

22   network activity.  And our software had a rather complex

23   system of analyzing the sort of "badness" of those network

24   addresses, URLs.  Some addresses would be very clearly bad

11:17AM 25   and we would rate those as "highly mature," was our term

11:18AM 1    for that.  And other addresses would be quite innocent,

2    and we would rate those as "everyone," similar to a

3    television rating system.

4         So as a person would go about and use their computer,

11:18AM 5    our software would be examining how mature or innocent,

6    you might say, that network activity appeared to us.  A

7    person, a user, could say sort of how bad they wanted to

8    be permitted to go to.  They could say, I only want to be

9    able to see "everyone" material.  Or they could say, I

11:18AM10    want to be able to see material that would be appropriate

11    for a mature teen.  Or they could say, I want to be able

12    to see material that's valid for highly mature material.

13    I want to be able to see that.  They could say that.  So

14    those were the rating options.

11:18AM15    Q.    Do you recall the rating option applying to the

16    Joshua Duggar user?

17    A.    Yes.  If I remember correctly -- and I believe it's

18    indicated in this report, if I can say that -- his report

19    sensitivity level was "mature teen."

11:19AM20    Q.    What does that entail?

21    A.    Oh, it's fairly common.  Many users use this one.

22    Q.    Well, let me ask you specifically.  If you were

23    looking up pornography of any type, would your software

24    catch that activity and report it back to the

11:19AM25    accountability user with the "mature teen" level rating?

11:19AM 1    A.    Right.  The "mature teen" level would certainly not

2    want to permit any pornography access.

3    Q.    Would your accountability software report and

4    identify the use of TOR browser?

11:19AM 5    A.    Yes, it might.

6    Q.    And if it did, would it report back to the

7    accountability partner?

8    A.    Yes.

9    Q.    Are you familiar with peer-to-peer file-sharing

11:19AM10    software?

11    A.    I'm reasonably familiar with it.

12    Q.    Would it detect and catch any use of peer-to-peer

13    file-sharing software?

14    A.    Perhaps not any use, but, in general, yes, we would

11:20AM15    seek that and attempt to report that.

16    Q.    And that would go to the accountability partner

17    again, right?

18    A.    Correct.

19    Q.    I want to turn your attention to the -- let's find a

11:20AM20    better way to say that.  Hypothetically, if a Linux

21    partition was downloaded on a device, how would Covenant

22    Eyes interact with that?

23    A.    This is rather technical, so I'll try to make it

24    simple.  A partition in a sense is a separate computer on

11:20AM25    a computer, if you will.

11:20AM 1    MR. GELFAND:  Your Honor, I'm sorry.  I would

2 object to any sort of expert testimony.  If he wants to

3 explain what Covenant Eyes does, I have no objection to

4 that.  But broad testimony about what a partition is and

11:20AM 5 things like that, I would object to.  He's not designated

6 as an expert.

7    THE COURT:  Well, perhaps you could ask a few

8 more questions to lay a foundation to bring it in under a

9 701 lay opinion, that would be fine, but you're going to

11:21AM 10 have to establish a little bit more of a foundation.

11    MR. ROBERTS:  Yes, Your Honor.  I'll try to do

12 that.

13 Q. (BY MR. ROBERTS.)  Now, does Covenant Eyes work with

14 Windows operating system?

11:21AM 15 A. Yes.

16 Q. Does it work with Linux operating system?

17 A. No.

18 Q. So if you had, say, a device that's divided in two,

19 like a Windows side and a Linux side, what would Covenant

11:21AM 20 Eyes catch from this Linux side?

21 A. Nothing.

22 Q. So if Covenant Eyes didn't catch anything from the

23 Linux side, would anything be reported to, say, an

24 accountability partner?

11:21AM 25 A. Not from the Linux side, no.

11:21AM 1          MR. ROBERTS:  Thank you.  I'll pass the witness,

2     Your Honor.

3               THE COURT:  Thank you, Mr. Roberts.  Mr. Gelfand?

4     Excuse me.  You marked two exhibits.

11:21AM 5          MR. ROBERTS:  Your Honor, I just had him

6     identify.  I did not introduce at this point.

7               THE COURT:  All right.  Thank you.

8               MR. GELFAND:  May I proceed?

9               THE COURT:  You may proceed.

11:22AM10          MR. GELFAND:  Thank you.

11                         CROSS EXAMINATION

12    BY MR. GELFAND:

13    Q.   Mr. Wofford, good morning.

14    A.   Hello.

11:22AM15   Q.   We have never spoken before, correct?

16    A.   That's correct.

17    Q.   You had an opportunity to meet several times, or at

18    least speak several times, with the government in

19    connection with your testimony, correct?

11:22AM20   A.   Correct.

21    Q.   And that includes -- well, backing up for a second.

22    Let's talk about what Covenant Eyes is and what Covenant

23    Eyes isn't.  Covenant Eyes is a resource that people can

24    use if they choose to, correct?

11:22AM25   A.   Correct.

11:22AM  1    Q.    It's a subscriber model, correct?

        2    A.    That's right.

        3    Q.    And so people who want to have this added what you

        4    called accountability or perhaps filtering component to

11:22AM  5    their online or internet activity can choose to buy a

        6    subscription to Covenant Eyes, correct?

        7    A.    That's right.

        8    Q.    Subscribers pay a monthly fee, correct?

        9    A.    Correct.

11:23AM 10    Q.    And a subscriber can choose to cancel at any time?

       11    A.    Yes.

       12    Q.    In other words, in that way -- I don't mean the

       13    service -- but in that way, it's no different than, say,

       14    Netflix or something like that, correct?

11:23AM 15    A.    That's a good analogy.

       16    Q.    Now, your software provides a mechanism for those who

       17    choose to use it, correct?

       18    A.    Correct.

       19    Q.    To use the software, you download your software onto

11:23AM 20    your electronic device, correct?

       21    A.    Right.

       22    Q.    So if I purchase a Covenant Eyes subscription, the

       23    onus is on me to actually put the software on whatever

       24    devices I want to be monitored, correct?

11:23AM 25    A.    That's right.

11:23AM 1    Q.   So to state the obvious -- and I understand that this

2    may not be your business model -- but to state the

3    obvious, if I want Covenant Eyes to monitor one device,

4    but not to monitor another device, I just don't put the

11:24AM 5    software on the other device, correct?

6    A.   That's correct.

7    Q.   There's nothing Covenant Eyes can do to police that,

8    correct?  Yes?

9    A.   Yes.

11:24AM 10   Q.   Now, you testified that you designate an ally to

11   receive reports of your monitored screen activity,

12   correct?

13   A.   I'm sorry.  Would you repeat the question?

14   Q.   Sure.  If I understood your testimony correctly --

11:24AM 15   and if I didn't, please correct me -- you designate an

16   ally, meaning the subscriber designates an ally, to

17   receive reports of their monitored screen activity?

18   A.   Right.

19   Q.   And those reports are basically sent by e-mail to the

11:24AM 20   ally, correct?

21   A.   Yes.

22   Q.   And the idea there is self-accountability, correct?

23   A.   I suppose that would be fair, yes.

24   Q.   You advertise on your website that, "Your allies will

11:24AM 25   be there to pick you up when you fall down and cheer you

11:24AM 1    on when you succeed," correct?

2    A.    Yes.

3    Q.    Is that a fair -- I know it's a little marketing, but

4    is that a fair synopsis for what the service is?

11:25AM 5    A.    It's accurate, yes.

6    Q.    Over the last 18 years, your company has generated

7    over 100 million accountability reports for its customers,

8    correct?

9    A.    It's a fair approximation.  I don't know, really.

11:25AM 10   Q.    I will tell you I got that off your website.  Does

11   that sound accurate?

12   A.    I trust you, yes.

13   Q.    In other words, let me make this very simple for a

14   second.  There's a ton of people who use your service,

11:25AM 15   correct?

16   A.    Yes.

17   Q.    Now, Covenant Eyes does not monitor a device where

18   the subscriber does not install the software, correct?

19   A.    Correct.

11:25AM 20   Q.    And so to be clear, when we talk about devices, that

21   can include computers, correct?

22   A.    Yes.

23   Q.    Phones?

24   A.    Yes.

11:25AM 25   Q.    Tablets?

11:25AM 1    A.    Yes.

2    Q.    Ipads is a form of a tablet, correct?

3    A.    Correct.

4    Q.    So if I'm your customer and I want to circumvent

11:26AM 5    Covenant Eyes, I just walk into a Best Buy and buy a

6    device, correct?

7    A.    That's right.

8    Q.    It's that easy, correct?

9    A.    Right.

11:26AM10    Q.    Now, you testified that Covenant Eyes does not

11    monitor certain operating systems.  Did I hear that

12    correct?

13    A.    Yes.

14    Q.    And the prosecutor asked you about Windows, for

11:26AM15    example, as something that it does monitor, correct?

16    A.    Correct.

17    Q.    And Linux as something that it does not, correct?

18    A.    Correct.

19    Q.    Why does Covenant Eyes not monitor Linux?

11:26AM20    A.    There are not that many Linux users.

21    Q.    Linux is less commonly used than, say, Windows or

22    macOS, correct?

23    A.    Correct.

24    Q.    And Linux is more technical, correct?  If you know.

11:26AM25    A.    I think I see what you mean.  It tends to appeal to a

11:27AM 1     more technical user.

2     Q.    A more sophisticated user?

3     A.    Yes.

4     Q.    Now, you're here to testify about Covenant Eyes and

11:27AM 5     kind of what it does generally, correct?

6     A.    Right.

7     Q.    And you testified about Covenant Eyes providing --

8     about the Duggars subscribing to Covenant Eyes, correct?

9     A.    Right.

11:27AM10     Q.    And you testified that that subscription began in,

11     I think you said approximately 2013, plus or minus?

12     A.    That's my recollection.

13     Q.    Fair to say that, as you sit here testifying today,

14     you have no firsthand knowledge one way or the other as to

11:27AM15     whether anybody downloaded or viewed child pornography in

16     May of 2019?

17     A.    True.

18          MR. GELFAND:  Your Honor, may I have one minute,

19     please?

11:27AM20          THE COURT:  You may.

21          MR. GELFAND:  I have no more questions, sir.

22     Thank you.

23          MR. ROBERTS:  Your Honor, I have one.

24          THE COURT:  That's fine.

11:28AM25          MR. ROBERTS:  May I, Your Honor?

11:28AM 1              THE COURT:  That's fine.

2                      REDIRECT EXAMINATION

3    BY MR. ROBERTS:

4    Q.   Mr. Wofford, to be clear, to circumvent Covenant

11:28AM 5    Eyes, an individual could go buy a device.  Is that one

6    way?

7    A.   Yes.

8    Q.   If it's not installed?  Or they could download a

9    Linux partition to a device.  Is that another way?

11:28AM10    A.   Yes.

11              MR. ROBERTS:  Thank you.

12              THE COURT:  May this witness be excused?

13              MR. ROBERTS:  Yes, Your Honor.

14              MR. GELFAND:  Yes, Your Honor.

11:28AM15              THE COURT:  Sir, thank you very much for your

16    time in being here.  You're free to go.

17              THE WITNESS:  Thank you.

18              THE COURT:  The government may call its next

19    witness.

11:28AM20              MR. ROBERTS:  Your Honor, the government calls

21    Jeff Pryor to the stand.  Your Honor, for planning

22    purposes, it shouldn't be more than 30 minutes.

23              THE COURT:  Thank you.

24              MR. ROBERTS:  Agent Pryor, go about halfway up

11:29AM25    and they'll swear you in.

11:29AM 1          THE COURT:  Sir, if you would pause about right

2     there.  Thank you.

3          (Witness Sworn)

4          THE COURT:  You can have a seat in our witness

11:29AM 5     box.  While testifying, you may remove your mask, although

6     you're not required to.  Please be sure, while testifying,

7     to adjust the microphone so that you're speaking directly

8     into it.

9          THE WITNESS:  Yes, Your Honor.

11:29AM10          THE COURT:  Mr. Roberts, you may inquire.

11          MR. ROBERTS:  Thank you, sir.

12          JEFFERY PRYOR, having been first duly sworn,

13     testified as follows:

14                    DIRECT EXAMINATION

11:29AM15     BY MR. ROBERTS:

16     Q.   Agent Pryor, will you state your full name for the

17     Jury and spell your last name for the court reporter.

18     A.   Certainly.  It's Jeffery Pryor.  That's P-R-Y-O-R.

19     Q.   How are you currently employed?

11:29AM20     A.   I'm currently a Special Agent with Homeland Security

21     Investigations, which is a component of the Department of

22     Homeland Security.

23     Q.   How long have you been -- first, where are you

24     assigned to?

11:30AM25     A.   Currently, I'm assigned to our Ft. Smith office

11:30AM 1    because I'm serving in an acting capacity as the resident

2    agent in charge.  Outside of that, I'm permanently

3    assigned to our Fayetteville, Arkansas, office.

4    Q.    How long have you been with Homeland Security?

11:30AM 5    A.    I started with Homeland Security in May of 2007.

6    Prior to that, I was with the United States Border Patrol

7    from September 2001, when it was still the Department of

8    Justice, and then it became Homeland Security.

9    Q.    Approximately how many times have you been the lead

11:30AM10    agent in a federal case?

11    A.    Over 100.

12    Q.    How many times have you testified in court?

13    A.    Several.  I couldn't put a number on it, but several.

14    Q.    Are you familiar with the investigation leading to

11:30AM15    the execution of the search warrant on November 8th, 2019,

16    at Wholesale Motorcars?

17    A.    Yes, I am.

18    Q.    Were you present that day?

19    A.    Yes, I was.

11:31AM20    Q.    Were you a part of the team that executed this search

21    warrant?

22    A.    Yes, I was.

23    Q.    Could you explain for the Jury what your role was?

24    A.    Absolutely.  On that particular day, I was assigned

11:31AM25    as the assistant team leader, but more specifically, as

11:31AM 1   the search team leader.  And as the search team leader, my
2   role was to oversee the actual searching of the premises
3   where we were legally allowed to search.  And so that
4   would include, on this particular day, taking photographs
11:31AM 5   of the car lot, the Wholesale car lot, along with
6   identifying any potential items of interest and ultimately
7   removing those from the property if removal was warranted.
8   Q.   Can you provide us with a list of the devices you
9   encountered that day overall?  You don't have to be
11:32AM 10  specific.
11  A.   Certainly.  There was -- I'll be general.  Of course,
12  if you need more specifics.  But there was a laptop, a
13  MacBook Pro laptop that was detained as evidence.  There
14  was an Apple iPhone.  There was an HP All-in-One Desktop
11:32AM 15  computer.  And then there was a few thumb drives or flash
16  drives and SD cards.  And then I believe there was a Zmodo
17  DVR, or digital video recording device, that would
18  typically be hooked up to a camera system.
19  Q.   So if I understand your role right, you were there
11:32AM 20  for documenting evidence and seizing evidence, is that
21  correct?
22  A.   Yes.
23  Q.   Documenting evidence, you took the pictures that we
24  have been seeing, at least in the government's exhibit
11:32AM 25  book, is that fair?

11:32AM 1    A.    That's fair, yes.

2    Q.    Now, when you seized an item of evidence, could you

3    tell us about that process?

4    A.    Certainly.  The first step in that is to identify

11:33AM 5    that you have a potential item of importance.  When we are

6    on scene, we utilize a process that I'll call the totality

7    of the circumstances.  And what that refers to is, once we

8    find an item, we are applying a lot of different factors

9    to whether or not we're going to actually remove that item

11:33AM 10   from the scene where we're at.  And that process includes

11   certain things like, what do we know about the occupant or

12   residence of the location where we are at?  What do we

13   know at this point about the case?  Is a computer forensic

14   analyst able to be present on scene to examine that device

11:33AM 15   on scene?  Is the device itself even capable of being part

16   and parcel to the offense that's being investigated?

17        And then ultimately we also look at whether or not

18   the individual that possesses that device, if it is

19   possessed by an individual, if they were able or were

11:34AM 20   potentially even present when the time or the date that a

21   potential crime occurred.

22   Q.    Say you find an item of evidentiary value that law

23   enforcement wants to maintain.  Can you describe -- is

24   that transported in a secure way?  Could you describe that

11:34AM 25   process for us?

11:34AM 1   A.   Yes, certainly.  So if we identify a piece of
        2   evidence that is going to be removed from the scene, as
        3   the lead search person, also the evidence custodian, that
        4   item is identified, it's bagged, and then it's transported
11:34AM 5   to our Fayetteville office, which is a secure container,
        6   meaning it's not open to the public.  And once there, it's
        7   input into our evidentiary system.  It's assigned a piece
        8   of evidence number.  It's assigned a case number.  And
        9   then that item is ultimately transferred into our evidence
11:34AM10   room or to the computer forensic analyst, if they are able
       11   to begin their examination at that moment when it's being
       12   seized.
       13   Q.   Is it handled in a secure manner to maintain the
       14   integrity of the data?
11:35AM15   A.   Absolutely.
       16   Q.   Maintained in a secured Homeland Security building?
       17   A.   Yes.
       18   Q.   Now, I'm going to direct your attention to
       19   Government's Exhibit 14, if we can bring up 14.  Do you
11:35AM20   recognize Government's 14?
       21   A.   Yes, I do.
       22   Q.   Did you encounter that device on November 8th, 2019?
       23   A.   Yes, I did.
       24   Q.   Did you seize that device on November 8th, 2019?
11:35AM25   A.   Yes, that device was seized.

11:35AM 1    Q.    Was it seized, transported, and securely maintained

2    within Homeland Security all the way up through trial

3    today?

4    A.    Yes.

11:35AM 5    Q.    Now, it's large, so I'm going to direct your

6    attention -- and if you need to get off the witness stand

7    to make sure you can see my exhibit -- to Government's

8    Exhibit 26.

9            THE WITNESS:  May I view, Your Honor?

11:35AM 10           THE COURT:  Yes.

11    Q.    (BY MR. ROBERTS.)  Do you recognize 26?

12    A.    Yes, I do.

13    Q.    Is that the computer in the picture of Government's

14    14 we just saw?

11:36AM 15    A.    Yes, it is.

16    Q.    Is it in substantially the same condition as when you

17    seized it that day?

18    A.    Yes, it is.

19    Q.    Now, you're the one that wrapped it, am I correct?

11:36AM 20    A.    That's correct, specifically to ensure it didn't

21    break.  It was too large for a box.

22    Q.    Thank you, Agent.

23            MR. ROBERTS:  Move to introduce Government's

24    Exhibit 26, Your Honor.

11:36AM 25            MR. STORY:  No objection, Your Honor.

11:36AM 1          THE COURT:   Government's 26 is received.

2               (Government's Exhibit 26 Received)

3   Q.   (BY MR. ROBERTS.)   Now, Agent, are you familiar with

4   trademark inscriptions?

11:36AM 5   A.   I am.

6   Q.   And stamps of origin?

7   A.   I am.

8   Q.   Did you inspect Government's 26 for a trademark

9   inscription or a stamp of origin?

11:36AM10   A.   Yes, I did.

11   Q.   Could you tell us about that?

12   A.   On the bottom of the computer stand, what is

13   currently on the floor, there is a sticker.   And on that

14   sticker, it has various types of information to include

11:37AM15   serial number and so on.   And in there, it states, "Made

16   in China."

17   Q.   So does that indicate to you the device was made in

18   China?

19   A.   That's correct.

11:37AM20   Q.   Directing your attention to Government's 19.   Can you

21   tell us what 19 is?

22   A.   Yes.   This is the Apple MacBook Pro that was located

23   on the premises.

24   Q.   Did you seize this device on November 8th, 2019?

11:37AM25   A.   Yes.

11:37AM 1    Q.   Did you transport it in the same manner that we

      2    previously discussed with the HP computer?

      3    A.   Yes.

      4    Q.   Is it in substantially the same condition as when you

11:37AM 5    seized that device?

      6    A.   Yes.  If need to be shown, that's fine as well, but,

      7    yes.

      8          MR. ROBERTS:  Your Honor, may I approach?

      9          THE COURT:  You may.

11:38AM10    Q.   (BY MR. ROBERTS.)  Is that the laptop that you seized

     11    out of the RV on November 8th, 2019?

     12    A.   Yes, that is correct.

     13          MR. ROBERTS:  I would move to introduce

     14    Government's 27, Your Honor.

11:38AM15          MR. STORY:  No objection, Your Honor.

     16          THE COURT:  Government's 27, the MacBook

     17    computer, as described, is received.

     18          (Government's Exhibit 27 Received)

     19          MR. ROBERTS:  One second, Your Honor.

11:38AM20          THE COURT:  You may.

     21    Q.   (BY MR. ROBERTS.)  So, Agent, your understanding, if

     22    a device is made in China, it has to travel in interstate

     23    commerce to arrive in Arkansas, is that correct?

     24    A.   That's correct.  It would have had to come into the

11:39AM25    United States.

11:39AM 1          MR. ROBERTS:  I'll pass the witness, Your Honor.

2     Your Honor, may the attorneys have one moment?  We went

3     out of order on the witness and I think the defense needs

4     a few exhibits from our box.

11:39AM 5          THE COURT:  Yes.  Counsel, if this is going to

6     take a little while, we could --

7          MR. GELFAND:  We're on the last one, Your Honor.

8          THE COURT:  That's fine.

9                    CROSS EXAMINATION

11:42AM 10   BY MR. STORY:

11    Q.   Special Agent Pryor, sorry about that.  We had to

12    make sure we marked all the exhibits.

13    A.   No problem.

14    Q.   When you were on the Wholesale Motorcars lot on

11:42AM 15   November 8th, 2019, you also collected various SD cards

16    and USB drives, is that correct?

17    A.   Yes.

18    Q.   As part of your collection of everything, you

19    actually took various SD cards and thumb drives into

11:43AM 20   evidence that day, did you not?

21    A.   You mean remove them from the lot?  Yes.

22    Q.   Took them into evidence?

23    A.   Yes.

24         MR. STORY:  May I approach, Your Honor?

11:43AM 25         THE COURT:  You may.

11:43AM 1          MR. ROBERTS:  Your Honor, the government has no

2     objection to these exhibits, so foundation is not

3     necessary.

4          THE COURT:  Well, it is necessary for the record,

11:43AM 5     but I appreciate your cooperation.

6     Q.   (BY MR. STORY.)  Do you recognize what we have marked

7     Defendant's Exhibits 3, 4, 5, 6 and 7?

8     A.   Yes, I do.

9     Q.   Are those the thumb drives and SD cards we were

11:44AM10    previously talking about?

11    A.   Yes, that's correct.

12          MR. STORY:  Your Honor, we would move the

13    introduction of Defendant's Exhibits 3 through 7 at this

14    time.

11:44AM15          THE COURT:  Defendant's Exhibits 3, 4, 5, 6 and

16    7, as described without objection, are received.

17          MR. STORY:  Thank you.

18          (Defendant's Exhibits 3, 4, 5, 6 and 7 received)

19          THE WITNESS:  May I set these up here, Your

11:44AM20    Honor?

21          THE COURT:  You may.

22    Q.   (BY MR. STORY.)  During your time on the car lot,

23    were you tasked with inventorying various items that were

24    in various locations?

11:44AM25    A.   Yes.  We photograph them.  And, ultimately, if they

11:44AM 1   left the lot, we leave an inventory for the occupants.

2   Q.   As part of that, if you could turn in the black book,

3   the defendant's black book, to Exhibit 44.

4   A.   This one, correct, Your Honor?

11:45AM 5   Q.   It's the other one.  It would be tab 44.

6   A.   Yes, I'm there.

7   Q.   Do you recognize Defendant's Exhibit 44?

8   A.   Yes, I do.

9   Q.   What are those?

11:45AM 10   A.   These are room placards that we apply when we are

11   doing a search.  And it's simply to differentiate --

12   Q.   One second.  Let me ask another question.  Sorry

13   about that.

14   A.   I'm sorry.

11:45AM 15   Q.   As part of your normal job, you fill these out and it

16   appears that you signed each of these placards, is that

17   correct?

18   A.   Yes, that's correct.

19          MR. STORY:  Your Honor, we would move for the

11:45AM 20   admission of Defendant's Exhibit 44 at this time.

21          MR. ROBERTS:  Has the witness verified that those

22   are his?

23          THE WITNESS:  I have, yes.

24          MR. ROBERTS:  No objection.

11:45AM 25          THE COURT:  These are the pages that say "Room A,

11:45AM 1   B, C?"

2          MR. STORY:  Correct, Your Honor.

3          THE COURT:  Defendant's Exhibit 44 is received.

4          (Defendant's Exhibit 44 Received)

11:46AM 5          MR. STORY:  May I publish that to the Jury, Your

6   Honor?

7          THE COURT:  You may.

8   Q.   (BY MR. STORY.)  This is what we're looking at,

9   correct, Special Agent?

11:46AM10   A.   Yes, it is.

11   Q.   The description "office west," do you know what that

12   refers to?

13   A.   Yes.

14   Q.   What does that refer to?

11:46AM15   A.   That is the shed that is located just west of what I

16   would consider the main office.

17   Q.   And searched by -- obviously, you're number 2 --

18   Pryor, correct?

19   A.   Yes.

11:46AM20   Q.   And that's your signature at the bottom?

21   A.   That is.

22   Q.   That shows that nothing was found in that room?

23   A.   That's correct.

24   Q.   Same with "Room B, office east," where is that?

11:46AM25   A.   That would be what I would consider the main office

11:46AM 1   for the Wholesale car lot.

2   Q.   And that contained some of the DVR thumb drives,

3   various SD cards, and the HP computer and a cell phone, is

4   that correct?

11:47AM 5   A.   Yes.

6   Q.   Which cell phone is that?

7   A.   That appears to be most likely associated to a cell

8   phone that was not removed from the premises as it was

9   cleared both forensically and factually on scene, is my

11:47AM 10  understanding.

11  Q.   How do I tell that from this?

12  A.   Well, this is not an official record.  This is simply

13  something that we have on the door to notate if there's

14  something found.  It may or may not leave the premises by

11:47AM 15  the time the search is done.

16  Q.   Likewise, Room C, the Hurricane RV?

17  A.   Yes, sir.

18  Q.   And that's where you found flash SD cards, two of

19  them, and the laptop, is that correct?

11:48AM 20  A.   Yes, sir, that's correct.

21  Q.   Ultimately, there was a return on what you actually

22  collected that day, is that correct?

23  A.   Yes, that's correct.

24  Q.   I'm going to show you what's previously been marked

11:48AM 25  Exhibit 43.

11:48AM 1    A.     Sorry.  Did you say 43?

2    Q.     Yes.  I'm going to put it on the screen for you.

3    A.     Okay.  Perfect.

4    Q.     Can we zoom that?

11:48AM 5         THE COURT:  This is in evidence?

6         MR. STORY:  Yes, Your Honor.

7         THE COURT:  Thank you.

8    Q.     (BY MR. STORY.)  Can you see that?

9    A.     Yes, I do.

11:48AM10    Q.     I believe that's the actual inventory of what was

11    actually seized?

12    A.     That is correct.

13    Q.     And does that seem to be a fair and accurate

14    representation, to the best of your knowledge, of what was

11:48AM15    actually taken that day?

16    A.     Yes, it does.

17    Q.     I'm going to show you what's previously been marked

18    Defendant's Exhibit 28.  Do you recognize that photo?

19    A.     Yes, I do.

11:49AM20    Q.     What is that photo?

21    A.     That is an Apple iPhone that was seized from the

22    premises and belonged to Mr. Duggar.

23    Q.     The yellow number 1, what does that signify?

24    A.     Again, that's -- it's a placard, obviously, that's

11:49AM25    numbered.  It's there to itemize that as a potential item

11:49AM 1  of evidence.  And it designates it for when we look at the

2  pictures that we know -- if you have to take several in

3  succession, it allows us to know what we're looking at.

4  Q.   Does each piece of evidence get a placard and a

11:50AM 5  picture taken?

6  A.   Yes.

7  Q.   I'm going to show you what's already been admitted as

8  Defendant's Exhibit 29.  Do you recognize that photo?

9  A.   Yes, I do.

11:50AM 10  Q.   What is that a photo of?

11  A.   It's of a cellular telephone.

12  Q.   Do you know whose phone that is?

13  A.   No, I do not.

14  Q.   Do you know where that phone was found?

11:50AM 15  A.   Yes, I do.

16  Q.   Where was that phone found?

17  A.   That was in a portion of the desk, the main desk in

18  the office, just below or just to the side of where the HP

19  All-in-One Desktop computer was located.

11:51AM 20  Q.   I'm going to show you what's already been received

21  into evidence as Defendant's Exhibit 33.  Do you recognize

22  that photo?

23  A.   Yes, I do.

24  Q.   What is that photo?

11:51AM 25  A.   That is a photo of an attaché case that was in the

11:51AM 1    Hurricane RV that was present on the lot that day.

2    Q.    Do you know whose attaché case that was?

3    A.    Definitively, no, but there was a passport in it.

4    Q.    Is there also a tag on the case?

11:51AM 5    A.    As you point out, yes, I see there's a tag.

6    Q.    Did you find anything inside that attaché case?

7    A.    Yes, I believe the -- or, yes.

8    Q.    What was in the case?

9    A.    I believe the MacBook was seated in the case, along

11:52AM 10   with the SD cards.

11   Q.    And just to be clear, that's got the number 8 tag on

12   it?

13   A.    Yes.

14   Q.    I'm going to show you what's also been admitted as

11:52AM 15   Defendant's 44.  Do you recognize that photo?

16   A.    Yes, I do.

17   Q.    What is that photo?

18   A.    That is the MacBook Pro.

19   Q.    It's also got the 8 on it.  What is the significance

11:52AM 20   of that?

21   A.    Well, as I was explaining a little bit earlier, we

22   take pictures to identify how an item is found initially

23   so that it can be memorialized.  In this case, we utilized

24   the number 8 for anything of significance within that

11:53AM 25   attaché case to be able to show that it was within that

11:53AM 1    when found, so that's why you see the number 8 on both.

2    But to be clear, that number is not going to correlate to

3    what is ultimately the number that we use for a seizure

4    within our system.

11:53AM 5    Q.   Correct.  But it would indicate that the laptop was

6    in the attaché case?

7    A.   Correct.

8    Q.   I'm going to show you what's previously been admitted

9    as Defendant's Exhibit 25.  Do you recognize that photo?

11:53AM 10    A.   Yes, I do.

11    Q.   What is that photo of?

12    A.   That was a photo that I took to document the

13    existence of the modem that you can see in the middle of

14    the picture.

11:53AM 15    Q.   That right there?

16    A.   Yes.  Thank you.

17    Q.   What is a modem?

18    A.   I can give you a very lay definition, but I'm not a

19    forensic --

11:54AM 20    Q.   Is it fair to say a modem connects the computer

21    network to the outside internet?

22    A.   Yes.

23    Q.   Part of your job as the seizing agent is to collect

24    anything that might have evidentiary value, correct?

11:54AM 25    A.   Well, that's a simplification of it.  It's to

11:54AM 1    identify things that may have evidentiary value and then

2    work through that process I described to determine if it

3    needs to leave the premises.

4    Q.    Can a modem have evidentiary value?

11:54AM 5    A.    I would have to refer that to our computer forensic

6    analysts.  I don't know.

7    Q.    As part of the search warrant that you had executed

8    that day, did you have authority to take modems?

9    A.    I believe the authorization extended to that.

11:54AM10   Q.    And you're familiar with the search warrant executed

11   that day, are you not?

12   A.    Yes.

13   Q.    As far as -- ultimately, the modem wasn't collected?

14   A.    No.  No, it was not removed.

11:55AM15   Q.    Was that after making a determination with the CFAs

16   on site?

17   A.    Well, the CFAs, the case agents.  Again, assuming

18   that information.

19          MR. STORY:  One second, Your Honor.  No further

11:55AM20  questions, Your Honor.

21          MR. ROBERTS:  Your Honor, just one.

22          THE COURT:  All right.

23                      REDIRECT EXAMINATION

24   BY MR. ROBERTS:

11:55AM25   Q.    So you said that an item was seized based on the

11:55AM 1  totality of the circumstance.  Would that include the
2  ability to commit the crime that you're investigating?
3  A.    Yes.  As I said, it would have to be part and parcel
4  to be even possible to do that, yes.
11:56AM 5  Q.    While you were on scene, was it accurate that if a
6  device was not seized and taken off the premises, it was
7  cleared by the investigators and CFAs, the computer
8  forensic analysts?
9  A.    Yes.
11:56AM10          MR. ROBERTS:  Thank you.
11          THE COURT:  May this witness be excused?
12          MR. STORY:  Yes, Your Honor.
13          MR. ROBERTS:  Yes, Your Honor.
14          THE COURT:  Thank you much for your time today.
11:56AM15  You're excused.
16          THE WITNESS:  Your Honor, should I remove the
17  evidence from here?
18          THE COURT:  It would be helpful if you could take
19  it down and give it to Mr. Roberts.
11:56AM20          MR. ROBERTS:  May I approach, Your Honor?
21          THE COURT:  You may.  We will take our lunch
22  recess at this time.  An hour and 15 minutes like
23  yesterday, or would you prefer an hour?  An hour and 15?
24  All right.  We will call for you at 1:15.
11:57AM25          Remember the recess instruction.  You can't talk

11:57AM  1   with anyone or let anyone attempt to talk to you about the

        2   case, the subject matter, the parties, the witnesses.  And

        3   you can't do any research about the case or read any news

        4   about the case or any postings about the case.  That's an

11:57AM  5   abbreviation of it, but you remember the full recess

        6   instruction that I've been giving.  You must comply with

        7   all of it.

        8            Everyone please stand as the Jury is in recess

        9   and I would ask everyone to remain in the courtroom until

11:57AM 10   the Jury has cleared the elevator lobby.  I'll pause here

       11   with you on the record to let you know when you're free to

       12   exit the courtroom.

       13            (Jury out at 11:57 a.m.)

       14            THE COURT:  You may be seated.  Any other matters

11:58AM 15   that we need to take up?

       16            MR. ROBERTS:  No, Your Honor.

       17            MR. GELFAND:  No, Your Honor.

       18            THE COURT:  If something comes up over the lunch

       19   hour, like it did yesterday, will you please alert

11:58AM 20   chambers as soon as you're aware that there's an issue?

       21            MR. ROBERTS:  Yes, Your Honor.

       22            THE COURT:  Do we have an afternoon lineup of

       23   witnesses?

       24            MR. ROBERTS:  To be determined, Your Honor.

11:59AM 25            MS. MARSHALL:  Your Honor, they will be witnesses

11:59AM 1    that we provided yesterday.

2                    MR. ROBERTS:  It will be within the group, yes.

3                    THE COURT:  Okay.  That's fine.  We're in recess

4    until 1:15.

12:51PM 5                    (Lunch Recess taken from 11:59 a.m. to 1:15 p.m.)

6                    MR. GELFAND:  Number one, we wanted to put on the

7    record what we previously agreed on outside of the record,

8    which is that opposing experts, in our case, Michele Bush,

9    will be in the courtroom for expert testimony.  It's our

1:17PM 10   understanding that the Government's next two witnesses are

11   expert witnesses.  Ms. Bush is in the back of the

12   courtroom, obviously available to take notes and assist us

13   as necessary.

14                    THE COURT:  That's fine, correct?

1:18PM 15                    MR. ROBERTS:  Yes, Your Honor.  That's fine.

16                    MR. GELFAND:  I just wanted to note that for the

17   record in light of the 615 order.

18                    THE COURT:  Exactly.

19                    MR. GELFAND:  And then the other thing is, we've

1:18PM 20   reached a stipulation with the parties with respect to the

21   Torrential Downpour log exhibit issue.  What we have done,

22   if it's okay with the Court, just to keep things kind of

23   organized is, we have -- the parts of the exhibit that

24   were not previously admitted we have marked separately as

1:18PM 25   Defense Exhibits 8-A and 9-A.  And we have entered a

1:18PM 1    written stipulation as to the nature of those exhibits

2    being auto-generated logs, in a sense, if I could

3    paraphrase.

4            THE COURT:  You want to hand that up and then let

1:18PM 5    me know when you would like the Court to read it?

6            MR. GELFAND:  Yes.  Thank you.

7            THE COURT:  Everyone please stand as the Jury is

8    getting ready to enter.

9            (Jury in at 1:21 p.m.)

1:23PM 10           THE COURT:  The government may call its next

11   witness.

12           MR. CLAYMAN:  The government calls Marshall

13   Kennedy, Your Honor.

14           THE COURT:  Mr. Kennedy, if you would please come

1:24PM 15   forward.  Sir, if you would pause about right there and

16   raise your right hand.

17           (Witness Sworn)

18           THE COURT:  And then if you would please come

19   forward and have a seat in our witness box.  I will inform

1:24PM 20   you that while testifying, you are permitted to remove

21   your mask, although you're not necessarily required to.

22   While testifying, if you would please try to situate the

23   microphone so that you can speak directly into it.

24           MR. CLAYMAN:  May I proceed?

1:25PM 25           THE COURT:  Yes, sir, you may proceed.

1:25PM 1          MARSHALL KENNEDY, having been first duly sworn,

2     testified as follows:

3                    DIRECT EXAMINATION

4     BY MR. CLAYMAN:

1:25PM 5     Q.    Please state and spell your name for the record.

6     A.    Marshall Kennedy.  M-A-R-S-H-A-L-L.  K-E-N-N-E-D-Y.

7     Q.    Where do you work?

8     A.    Homeland Security Investigations.

9     Q.    Is that sometimes referred to as HSI?

1:25PM10    A.    Yes, sir.

11    Q.    Do you work within a particular section or unit of

12    HSI?

13    A.    Internet Crimes Against Children Task Force.

14    Q.    What's your job title within that task force?

1:25PM15    A.    Computer forensic analyst.

16    Q.    How long have you been a computer forensic analyst on

17    that task force?

18    A.    Since March of 2017.

19    Q.    Did you hold any other roles in HSI before that time?

1:25PM20    A.    No, sir.

21    Q.    What were you doing before then?

22    A.    I was a student at the University of Arkansas.

23    Q.    Could you just explain briefly for the Jury how you

24    came to work at HSI then?

1:25PM25    A.    Like how I got the job itself?

1:25PM 1    Q.    Yes.

       2    A.    Thank you.  Essentially, there was a program for

       3    veterans to get the job.  For short, it's Human

       4    Exploitation Rescue Operative, or HERO Corps.  And then

1:26PM 5    from there, they take people like me to go become a

       6    computer forensic analyst with HSI.  You spend almost a

       7    year, the training plus the internship.  And when I say

       8    internship, you're not just doing menial tasks.  You're

       9    actually doing the job itself.  And then from there, if

1:26PM10    you show that you are good or you want to continue working

      11    there, you will be offered a job to do so from that point.

      12    Q.    And so as a computer forensic analyst, what's your

      13    primary job responsibility?

      14    A.    To, like, make sure, preserve, and examine any

1:26PM15    additional evidence that's been seized.  So that

      16    additional evidence could be computers, tablets, mobile

      17    phones, disk drives.  Anything that can hold any

      18    electronic data.

      19    Q.    How many investigations have you been a part of at

1:26PM20    HSI?

      21    A.    Approximately 40 cases, and that's not including

      22    every local and state law enforcement agency that I

      23    assisted on.

      24    Q.    That's just 40 federal cases?

1:27PM25    A.    Yes, sir.

1:27PM 1    Q.   And if you had to estimate, how many digital devices

2    have you forensically examined at HSI?

3    A.   Well over 100.

4    Q.   So how frequently are you handling digital devices

1:27PM 5    and forensic evidence as part of your job?

6    A.   Almost daily.

7    Q.   Have you received any training to be able to conduct

8    these sort of forensic examinations?

9    A.   Yes, sir.

1:27PM 10   Q.   Can you explain for the Jury what kind of training

11   you've received?

12   A.   So I went through basic computer evidence recovery

13   training, BCERT.  That's with our cyber crime center, as

14   well as the advanced computer evidence recovery training,

1:27PM 15   the Magnet Forensic's AX100 forensic fundamentals.  The

16   Forensic Toolkit boot camp.  Mobile forensics, Cellebrite,

17   UFED for PC and Physical Analyzer Training.  There's more.

18   Everything that's our standard, as well as specialized

19   forensic tools, is what I have been trained through.

1:27PM 20   Q.   So you said you received basic computer evidence

21   recovery training, is that right?

22   A.   Yes, sir.

23   Q.   Approximately how long was that training?

24   A.   That was roughly 320 hours.

1:28PM 25   Q.   Then you said advanced computer training after that?

1:28 PM 1    A.    Yes, sir.

2    Q.    And how long, approximately, was that?

3    A.    80 hours.

4    Q.    And what kind of things were you focusing on in those

1:28 PM 5    trainings?

6    A.    Just everything from the ins-and-outs of the

7    computers itself, and then of course how to use the

8    forensic tools, the different software.  How to actually

9    conduct the forensics themselves by taking, say, for

1:28 PM 10   example, the hard drive from a computer and then what to

11   do from that point by, like, making a forensic image.  And

12   then what to do with the forensic image by using our

13   forensic software tools and so forth.  And also with that

14   is also like how to properly preserve the data to make

1:28 PM 15   sure nothing will ever happen to it and it's stored

16   properly as well.

17   Q.    I believe you also said you received training in

18   Magnet forensics, Forensics Toolkit, UFED, Cellebrite.

19   All those all just forensic tools that you use?

1:28 PM 20   A.    They are.  Some are, like the AXIOM is kind of more

21   of a standard, basic forensic tools, as well as Cellebrite

22   itself is more into the -- specializes in the mobile

23   forensics, meaning mobile phones and tablets.

24   Q.    Let's walk the Jury through a typical computer

1:29 PM 25   forensic examination.  So if HSI were to seize a laptop

1:29PM 1  during a search and hand it over to you to be forensically

2  examined, what's the first thing you would do?

3  A.   The first thing is sign for it to maintain the chain

4  of custody.  And then from there, for all intents and

1:29PM 5  purpose, just remove the hard drive, the internal hard

6  drive itself from the laptop.  And then from there, I

7  would use what's called a -- one of them is a Tableau TX1

8  Forensic Imager, the forensic imager itself.

9        THE COURT:  You need to slow down a little bit.

1:29PM 10  She's trying to type everything that you say.

11  A.   I apologize.  Anyways, the Tableau TX1 Forensic

12  Imager, what its purpose is, like the name implies, is to

13  make a forensic image of the hard drive.  You will take

14  the target, which is the internal hard drive from the

1:29PM 15  computer, plug it into that imager.  From there, it would

16  split and what you would do is write-block it.  What that

17  means is it's going to make sure that nothing can happen

18  to that disk.  It is what's referred to as "read only."

19  No information can be transferred to or from, or onto that

1:30PM 20  disk itself.  And you will take another drive that you

21  want that forensic image to be stored on, plug that in on

22  the opposite side.  From there, it's going to start making

23  the image.  The image itself is actually just a copy of

24  what's on that disk.

1:30PM 25  Q.   And so is a forensic image an exact copy of whatever

1:30PM 1    disk or drive you're examining?

2    A.    Yes, sir.

3    Q.    And how are you able to confirm that this forensic

4    image is in fact an exact copy?

1:30PM 5    A.    So whether it's that Tableau TX1 or using from some

6    sort of forensics, or, excuse me, imaging software, it's

7    going to use hash values.  A hash value is just a

8    cryptographic hash, like just a cryptographic number.  And

9    from there, it's just going to make a number from the

1:30PM10    actual target disk.  And from that, once it makes the

11    image from the other one, it will have a number from it.

12    And once the image is complete, you will have a text form,

13    just basically a form that imager will produce, again,

14    whether the software or that TX1, and you will see whether

1:31PM15    those numbers match.  If they match, then it's a correct

16    copy.  If not, then that means that something happened.

17    Q.    So just to be clear, the full contents of a hard

18    drive, for example, will have its own unique hash value?

19    A.    Yes, sir.

1:31PM20    Q.    And if you successfully create a forensic image, an

21    exact copy, it will have the same hash value.  Is that

22    what you're saying?

23    A.    Yes, sir.

24    Q.    And if you were to alter, for example, just one

1:31PM25    document on the forensic image, delete one document,

1:31PM 1    remove it, what would happen to the hash value of that

2    forensic image?

3    A.    It would change the hash value.

4    Q.    So it would no longer match?

1:31PM 5    A.    Yes, sir.

6    Q.    The original hard drive?

7    A.    Yes, sir.

8    Q.    How long can this imaging process take to image a

9    laptop or a computer?

1:31PM 10   A.    They go from a couple hours to a couple days,

11   depending on the size of the drive itself.

12   Q.    So where do you typically create forensic images?

13   A.    Like in my --

14   Q.    Where, physically, are you typically?

1:32PM 15   A.    In my office.

16   Q.    And what's the importance of creating a forensic

17   image for the purposes of your examination?

18   A.    So that way, again, like I was talking about,

19   everything on that target disk being write-blocked or

1:32PM 20   therefore "read only," nothing could happen to that disk

21   itself.  We'll just keep using that hard drive as an

22   example.  So that way, nothing can happen to it.  Then

23   from there, I will take that forensic image and then use

24   the tools themselves to conduct an examination on that.

1:32PM 25   And if something were to ever happen from just the

1:32PM 1    storage, that it got corrupted or anything else, you can

2    always go back and redo and make another image.  That way,

3    again, nothing will ever happen to the evidence itself.

4    Q.   So you mentioned using tools.  Is the forensic image

1:32PM 5    after you create it readable to you?

6    A.   No, sir.

7    Q.   So what do you need to do to be able to examine it?

8    A.   You would have to use your forensic tools, so, again,

9    going back to the AXIOM or anything like that, just to

1:32PM10    make sure you can open it and start processing it, and

11    then you can start conducting your analysis.

12    Q.   Just generally speaking, do you follow a similar

13    procedure when you conduct all of your forensic

14    examinations?

1:33PM15    A.   Yes, sir.

16    Q.   So you've done this hundreds of times?

17    A.   Yes, sir.

18         MR. CLAYMAN:  Your Honor, at this point, I would

19    offer Marshall Kennedy as an expert in computer forensic

1:33PM20    examinations.

21         MR. GELFAND:  We have no objection to that, Your

22    Honor.

23         THE COURT:  Members of the Jury, there will be

24    certain witnesses, perhaps, that will testify in this case

1:33PM25    who have developed special expertise, either through

1:33PM 1    education, training, or experience.  These witnesses are

2    entitled to testify as to their expert opinions in the

3    fields in which they are recognized as an expert.  And you

4    are to treat their testimony, given their expertise, and

1:34PM 5    give weight to their testimony to whatever extent you deem

6    to be appropriate.  Obviously, this witness has testified

7    as to his background and credentials in the area of

8    computer forensics and you may consider his testimony and

9    his opinions with regard to that area of expertise.

1:34PM 10          You may proceed.

11          MR. CLAYMAN:  Thank you, Your Honor.

12  Q.    (BY MR. CLAYMAN.)  Now, switching gears, are you

13  familiar with the investigation of an individual named

14  Joshua Duggar?

1:34PM 15  A.    Yes, sir.

16  Q.    How are you involved with that investigation?

17  A.    I am the computer forensic analyst for the

18  investigation.

19  Q.    So did you examine devices as part of your

1:34PM 20  involvement with this case?

21  A.    Yes, sir.

22  Q.    What kinds of devices did you examine, just

23  generally?

24  A.    Computers, phone.  Excuse me, iPhone.  Thumb drives,

1:35PM 25  SD cards, stuff like that.

1:35PM 1   Q.   I'd like to direct your attention to what's already
2   been admitted as Government's Exhibit 26, I believe.  It's
3   a little big, but it's right here.  Do you recognize this
4   exhibit?
1:35PM 5   A.   Yes, sir.
6   Q.   How do you recognize it?
7   A.   That is the HP All-in-One.
8   Q.   And is this a device that you examined in connection
9   with this case?
1:35PM10   A.   Yes, sir.
11   Q.   And as part of your examination of this HP computer,
12   did you create a forensic image of the device's hard
13   drive?
14   A.   Yes, sir.
1:35PM15   Q.   And do you recall what tools, if any, you used
16   forensically to create that image?
17   A.   Yes, sir.  I started with removing the internal hard
18   disk drive from the device itself.  From there, I used the
19   Tableau TX1 Forensic Imager to make a EO1 forensic file
1:35PM20   image of the hard disk drive that was removed.  And then
21   from there, had took that EO1, the forensic file image and
22   --
23          THE REPORTER:  I'm sorry, could you slow down?
24          THE COURT:  Just take a big, deep breath.  Give
1:36PM25   our ears time to catch up to what you're saying, okay?

1:36PM 1          THE WITNESS:  Yes, sir.

2    A.    Took the forensic file image and put it through

3    AXIOM.  Put it through my forensic tool, AXIOM.  And from

4    there to process and examine what was on the forensic file

1:36PM 5    image.

6    Q.    (BY MR. CLAYMAN.)  And you said you created the

7    forensic image.  Did you do the hash value comparison to

8    confirm its accuracy?

9    A.    Yes, sir.

1:36PM 10    Q.    And what was the result of that comparison?

11    A.    They matched.

12    Q.    Now, there should be an exhibit up there next to you

13    in a plastic bag marked Government's Exhibit 27.  Do you

14    see that?  It's already been admitted.  It's a laptop.

1:36PM 15    A.    Yes, sir.

16    Q.    Do you recognize that exhibit?

17    A.    Yes, sir.

18    Q.    How do you recognize it?

19    A.    It is the MacBook.

1:36PM 20    Q.    Is it a MacBook that you examined in connection with

21    this case?

22    A.    Yes, sir.

23    Q.    And what, if anything, did you do to the hard drive

24    of this MacBook?

1:37PM 25    A.    Similar to the HP All-in-One.  I removed the internal

1:37PM 1    solid state drive from the MacBook, and, again, used the

       2    Tableau TX1 Forensic Imager to make a forensic file image

       3    of the solid state drive.  And, again, used the AXIOM

       4    forensic tools to process the forensic file image of the

1:37PM 5    MacBook.

       6    Q.   And did you confirm the accuracy of this forensic

       7    image that you created?

       8    A.   Yes, sir.

       9    Q.   And what was the result of that comparison?

1:37PM10    A.   The hash values matched.

      11    Q.   And, finally, I think there should be an exhibit up

      12    there in another plastic bag that's been admitted as

      13    Government's Exhibit 20.  Do you see that exhibit?

      14    A.   Yes, sir.

1:37PM15    Q.   What is it?

      16    A.   It is the iPhone 11.

      17    Q.   And do you recognize this iPhone?

      18    A.   Yes, sir.

      19    Q.   How do you recognize it?

1:37PM20    A.   As the iPhone from the case that I worked.

      21    Q.   From this case here?

      22    A.   Yes, sir.

      23    Q.   And did you examine this device?

      24    A.   Yes, sir.

1:37PM25    Q.   What did you do to get data off of this device to

1:37PM 1   examine it?

2   A.   Used the GrayKey to make a -- after first unlocked

3   partial file system extraction.  And from there, used

4   AXIOM to process the extraction.

1:38PM 5   Q.   You said GrayKey.  Can you just describe for the Jury

6   what GrayKey is?

7   A.   GrayKey is just another tool that we have that is

8   meant mainly primarily for Apple products.  And from

9   there, they can either do the iPhone or the tablets,

1:38PM 10  iPads, and to do -- either try to get what's referred to

11  as before first unlock, after first unlock.  I won't

12  elaborate further, but file system extractions to get some

13  form of data off there, if not all the data, depending on

14  whether it's locked or unlocked.  And then from there,

1:38PM 15  take that partial or full file system extraction and then

16  conduct forensics with it with whichever tool.

17  Q.   Have you used the GrayKey tool before?

18  A.   Yes, sir.

19  Q.   Based on your experience, is it a reliable law

1:38PM 20  enforcement forensic tool?

21  A.   Yes, sir.

22  Q.   You said you created a partial extraction, is that

23  correct?

24  A.   Yes, sir.

1:38PM 25  Q.   Why couldn't you create a full extraction?

1:38PM 1  A.   Because the phone itself was PIN-locked and we did

2  not have the PIN for it.

3  Q.   Were you successful in creating this partial

4  extraction?

1:39PM 5  A.   Yes, sir.

6  Q.   So now after you created the forensic images of this

7  HP computer, the MacBook, and the iPhone we just

8  discussed, did you send those images to anyone?

9  A.   Yes, sir.

1:39PM10  Q.   Who did you send them to?

11  A.   I sent them off to Jim Fottrell.  The first being the

12  HP All-in-One itself to Jim Fottrell at the CEOS at DOJ.

13  And then also had sent them all, too, for the defense.

14  Q.   By DOJ, do you mean the Department of Justice?

1:39PM15  A.   Yes, sir.

16       MR. CLAYMAN:  One moment, Your Honor.  I'll pass

17  the witness, Your Honor.

18       THE COURT:  Thank you.  Mr. Gelfand, when you're

19  ready.

1:39PM20       MR. GELFAND:  Thank you, Your Honor.

21                    CROSS EXAMINATION

22  BY MR. GELFAND:

23  Q.   Good afternoon.  Is it Mr. Kennedy?  Agent Kennedy?

24  What do you prefer to be?

1:39PM25  A.   It's just Mister.  I'm not a Special Agent.

1:39PM 1    Q.    Mr. Kennedy, how are you doing today?

2    A.    I'm doing well.  How about yourself?

3    Q.    Doing okay.  Thank you.  Mr. Kennedy, you testified

4    that you're a full-time employee for Homeland Security,

1:40PM 5    correct?

6    A.    Yes, sir.

7    Q.    And so 100 percent of your job is related to law

8    enforcement computer forensic investigations, correct?

9    A.    Yes, sir.

1:40PM10    Q.    You've never served as a computer forensic analyst or

11    expert outside of law enforcement, is that correct?

12    A.    That is correct.

13    Q.    You began as an intern, as you described in 2017,

14    correct?

1:40PM15    A.    Yes, sir.

16    Q.    Then you went through some training over the

17    following year, correct?

18    A.    I went to training before the internship as well as

19    after.

1:40PM20    Q.    Fair enough.  And your work in this case involving

21    allegations against Josh Duggar began, what, approximately

22    two years or so into the job?

23    A.    A little over two years, yes, sir.

24    Q.    Now, being a computer forensic analyst with HSI, is

1:40PM25    it fair to say that you have significant resources at your

1:40PM 1  disposal to do what you need to do to get things right?

2  A.   Yes, sir.

3  Q.   Now, in May of 2019, when this investigation began,

4  you were not personally involved in that, correct?

1:41PM 5  A.   That is correct.

6  Q.   Your first involvement with this investigation began

7  on the day that HSI seized the devices that you've

8  testified about, correct?

9  A.   Yes, sir.

1:41PM 10  Q.   And that was November 8th of 2019, correct?

11  A.   Correct.

12  Q.   You were physically present at Wholesale Motorcars

13  the day that the search warrant was executed, correct?

14  A.   Correct.

1:41PM 15  Q.   And you were there to serve the purpose of computer

16  forensic analysis, kind of a non-special agent

17  computer-related expertise function there, correct?

18  A.   Yes, sir.

19  Q.   Is that fair to say?

1:41PM 20  A.   That's fair.

21  Q.   Now, you were there, to be more precise, to seize

22  computers, phones, tablets, thumb drives.  I believe you

23  said anything -- if I wrote it down correctly -- anything

24  that can hold electronic data, is that correct?

1:42PM 25  A.   Yes, sir.

1:42PM  1    Q.    And to be clear, when you say electronic data, you

2    are not just talking about computers or phones or tablets,

3    correct?

4    A.    Correct.

1:42PM  5    Q.    You're talking about thumb drives in certain cases,

6    correct?

7    A.    Correct.

8    Q.    You are talking about SD cards in certain cases,

9    correct?

1:42PM 10    A.    Correct.

11    Q.    And when you execute a search warrant like the one

12    that you did in this case, you're looking in particular

13    for those kinds of devices, correct?

14    A.    Correct.

1:42PM 15    Q.    Now, in this particular instance, you had a team of

16    three total, including yourself, computer forensic

17    analysts with you that day, correct?

18            MR. CLAYMAN:  Your Honor, I would object.  I

19    understand Your Honor's ruling on the scope of direct and

1:42PM 20    their ability to do it.  I believe this is going beyond

21    the scope of my direct, so the questions should not be

22    framed in a leading format at this point.

23            THE COURT:  Well, that's correct, Mr. Gelfand.

24    Whenever you exceed the scope of direct, you need to

1:43PM 25    convert the form of your questions to non-leading

1:43PM 1    questions.

2               MR. GELFAND:  That's fair.

3               THE COURT:  Thank you.

4    Q.    (BY MR. GELFAND.)  How many forensic analysts were

1:43PM 5    present on November 8th of 2019 when you executed the

6    search warrant?

7    A.    Four, including myself.

8    Q.    Four, including yourself?

9    A.    Yes, four total.

1:43PM 10   Q.    Who was present in addition to yourself?

11   A.    It was computer forensic analyst Benjamin Kemp, Sam

12   Shanehite, as well as task force officer --

13              THE COURT:  What was the last name?

14              THE WITNESS:  Sorry.  I'm going to mess up his

1:43PM 15   name altogether.  Shanehite.  And then task force officer,

16   which is also a computer forensic analyst, Andy Higdon.

17   Q.    (BY MR. GELFAND.)  I'm sorry.  I might have mis-heard

18   the first.  Was that three or four people?

19   A.    That was three, plus myself.

1:43PM 20   Q.    I'm sorry.  I mis-heard the first.  I heard

21   Shanehite, Andy Higdon.  Who was the first?

22   A.    Benjamin Kemp.

23   Q.    Thank you.  Were each of you present to perform the

24   same function that you performed?

1:44PM 25   A.    Yes, sir.

1:44 PM 1   Q.   Prior to the execution of this search warrant, had

2   you previously conducted similar roles in other cases?

3   A.   Yes, sir.

4   Q.   When you were there on November 8th of 2019, did you

1:44 PM 5   know everything that was ultimately going to become

6   important from a computer forensic standpoint about this

7   case?

8   A.   Would you ask that question again?  I don't

9   understand exactly.  Do you mean every piece of evidence

1:44 PM 10  that was going to be seized?  I don't fully understand

11  what you're asking.

12  Q.   Let me ask it this way.  You testified that you

13  participated in seizing particular devices that day,

14  correct?

1:45 PM 15  A.   Correct.

16  Q.   And the prosecutor had you identify certain devices

17  that you seized, correct?

18  A.   That I examined.  I was not there for every single

19  piece of evidence on scene.  That's why we have more than

1:45 PM 20  one CFA.

21  Q.   Are you familiar with what was seized that day?

22  A.   After the fact, yes.

23  Q.   In other words, fair to say that on the day itself,

24  you may not have been familiar with everything seized, but

1:45 PM 25  since then, before you testified today, you've become

1:45PM 1  familiar with that, correct?

2  A.   Correct.

3  Q.   You testified that you imaged three devices, correct,

4  on direct examination?

1:45PM 5  A.   You mean the HP All-in-One, the MacBook, and then the

6  file system extraction of the iPhone?

7  Q.   Yes.

8  A.   Yes, sir.

9  Q.   There were five additional devices you imaged as

1:45PM 10  well, correct?

11  A.   Correct.

12  Q.   If I could show you -- I don't know if you still have

13  it in front of you -- Defense Exhibits 3 through 7?

14  A.   No, sir.

1:46PM 15        MR. GELFAND:  May I approach, Your Honor?

16        THE COURT:  Yes.

17  Q.   (BY MR. GELFAND.)  Do you have Exhibits 3 through 7

18  in front of you, sir?

19  A.   Yes, sir.

1:46PM 20  Q.   Do you recognize those exhibits?

21  A.   Yes, sir.  They are SD cards and thumb drives from

22  the investigation.

23  Q.   Did you image these exhibits as well as the exhibits

24  that you previously testified to?

1:47PM 25  A.   Yes, sir.

1:47PM 1    Q.    Did you also provide these exhibits to the defense

2    computer forensic expert and to Mr. Fottrell?

3    A.    Yes, sir.

4    Q.    Now, Mr. Kennedy, in addiiton to -- well, let's back

1:47PM 5    up.  You testified about the process of imaging, of

6    creating these computer forensic images, correct?

7    A.    Correct.

8    Q.    And the idea here is to create essentially an exact

9    copy of the device itself that can be reviewed and

1:47PM 10   explored, correct?

11   A.    Correct.

12   Q.    And the whole idea is that reviewing and exploring a

13   device can actually impact the data on that device in the

14   future, correct?

1:48PM 15   A.    Could you rephrase that?  I'm sorry.

16   Q.    Sure.  This provides a mechanism for law enforcement

17   and defense computer forensic experts to review devices

18   without tampering with or messing with the actual device

19   that's seized itself, correct?

1:48PM 20   A.    Correct.

21   Q.    So the whole idea is you have access through the

22   image to the equivalent of the device, but the original

23   evidence stays intact, correct?

24   A.    Correct.

1:48PM 25   Q.    And that's important because if original evidence, in

1:48PM  1    the form of computers or tablets or iPads or anything

2    along those lines, is ultimately even turned on, it can

3    affect the data on that device, correct?

4    A.    It can.

1:48PM  5    Q.    Now, in this particular investigation, in addition to

6    imaging devices, did you actually analyze the devices?

7    A.    Yes, sir.

8    Q.    Did you analyze the MacBook Pro laptop that you

9    identified?

1:49PM 10    A.    Yes, sir.

11    Q.    Did you find any evidence at all of child pornography

12    on that laptop?

13    A.    No, sir.

14    Q.    Did you image the iPhone -- I'm sorry -- did you look

1:49PM 15    at the iPhone image that you reviewed?

16    A.    Yes, sir.

17    Q.    Did you find any evidence of child pornography on the

18    iPhone?

19    A.    No, sir.

1:49PM 20    Q.    To be clear, did you look for images?

21    A.    Like pictures?

22    Q.    Yes.

23    A.    Yes, sir.

24    Q.    Did you look for videos?

1:49PM 25    A.    Yes, sir.

1:49PM 1    Q.    Did you also look for artifacts of the existence of

2           those items if they had been on these devices and were

3           deleted?

4           A.    Yes, sir.

1:49PM 5    Q.    Is it fair to say, based on your analysis, that there

6           never was child pornography on the MacBook laptop and the

7           iPhone?

8           A.    Based on my analysis, I did not find any evidence of

9           child pornography on those pieces of evidence.

1:50PM 10   Q.    Did you spend some time looking for it?

11          A.    Yes, sir.

12          Q.    How much time?

13          A.    Days.  It takes time for it to process, and then from

14          there, I actually do the examination as well.

1:50PM 15   Q.    I'm sorry.  Could you just pull the microphone just a

16          little bit closer?  I may just be having trouble hearing.

17          Can you repeat what you just said?

18          A.    It can take up to days.  Depends on how big -- how

19          everything is, to process as well as examine.

1:50PM 20   Q.    Did you review the image of the HP computer?

21          A.    Yes, sir.

22          Q.    Based on your review, was there any indicia that this

23          was a business computer?

24          A.    Yes, sir.

1:50PM 25   Q.    What indicia?

1:50PM 1   A.   Like, to let me know that it was also a business

2   computer?

3   Q.   Yes.

4   A.   Well, foremost, on the outside of the computer, it

1:50PM 5   does name the business itself.  And then on the Windows

6   operating side, it has the different software for the

7   business itself, i.e., the Frazer software.

8   Q.   You identified Frazer software?

9   A.   Yes, sir.

1:51PM 10   Q.   For the benefit of the court reporter, is that

11   F-R-A-Z-E-R?

12   A.   Yes, sir.

13   Q.   What is Frazer?

14   A.   It's just a way to track, like, auto sales.

1:51PM 15   Q.   Based on your evaluation, did the HP computer have

16   partitions on it?

17   A.   Yes, sir.

18   Q.   How many?

19   A.   Two.  One for the Windows and one for another

1:51PM 20   operating system.

21   Q.   Did the Windows side have multiple partitions?

22   A.   No, sir.

23   Q.   On the Windows side, did you look for any evidence of

24   child pornography?

1:51PM 25   A.   Yes, sir.

1:51PM 1    Q.    Did you find any?

       2    A.    No, sir.

       3    Q.    And like I asked you with the other devices, did you

       4    find any forensic trace or artifact of child pornography?

1:52PM 5    A.    No child pornography, no, sir.

       6    Q.    You testified that there was a Linux partition,

       7    correct?

       8    A.    Yes, sir.

       9    Q.    Were you able to determine when Linux was installed?

1:52PM10    A.    Yes, sir.

      11    Q.    When?

      12    A.    Around May 11th.

      13    Q.    Just to be clear, is it your testimony that Linux was

      14    installed, meaning the partition was installed, on

1:52PM15    May 11th of 2019?

      16    A.    I believe so.  And I say that because I don't have my

      17    report in front of me.

      18    Q.    Were you able to determine whether, on May 13th of

      19    2019, any thumb drive was plugged into the computer on

1:52PM20    which Linux was installed?

      21    A.    I knew there was -- I couldn't tell you when a thumb

      22    drive was plugged in on that day, no.

      23    Q.    Did you look?

      24    A.    Yes.

1:53PM25    Q.    Were you able to determine whether, on that computer,

1:53PM 1   any files were opened from the thumb drive when it was

2   plugged in?

3   A.   I didn't see when a certain thumb drive was plugged

4   in, so, no.

1:53PM 5   Q.   You've identified a few minutes ago Defense Exhibits

6   3 through 7.  Those consist of thumb drives and SD cards,

7   correct?

8   A.   Correct.

9   Q.   Could you explain to the Jury what a thumb drive is?

1:53PM 10   A.   It's also referred to as a flash drive.  It's just a

11   storage device for files, pictures, videos, music, any

12   electronic data.

13   Q.   Is it fair to say a thumb drive stores files, but

14   does not create them?

1:54PM 15   A.   Correct.

16   Q.   So in other words, if a thumb drive had a Microsoft

17   Office, Microsoft Word document or a PowerPoint on it, is

18   it fair to say that it wasn't created on the thumb drive,

19   but it might be stored on that thumb drive?

1:54PM 20   A.   Correct.

21   Q.   What's an SD card?

22   A.   It's similar.  It's another form of flash drive.

23   Most of the time, it's either used with mobile devices or

24   cameras to do the same thing.  For camera's sake,

1:54PM 25   obviously store pictures, as well as for any other

1:54 PM 1    electronic data like we mentioned before.

2    Q.   Can a thumb drive, Mr. Kennedy, be physically plugged

3    in to this HP desktop computer that was entered into

4    evidence?

1:54 PM 5    A.   Yes.

6    Q.   Does the HP computer contain any sort of computer

7    forensic artifacts when a thumb drive is plugged in?

8    A.   I'm sorry.  Could you repeat that again?

9    Q.   Sure.  Does the HP computer itself contain any

1:54 PM 10   computer forensic artifacts when a thumb drive is plugged

11   in?

12   A.   No.

13   Q.   Does the HP computer contain any sort of computer

14   forensic artifacts when a document is opened on that

1:55 PM 15   computer from a thumb drive?

16   A.   No.

17   Q.   Is it fair to say that's your understanding of

18   computer forensics?

19   A.   Yes, sir.

1:55 PM 20   Q.   Based on your evaluation of Defense Exhibits 3

21   through 7, those thumb drives and SD cards that you

22   seized, was there any evidence of child pornography on

23   them?

24   A.   No, sir.

1:55 PM 25   Q.   Were you able to determine if the Linux operating

1:55PM 1  system had something called a user account?

2  A.   Yes, sir.

3  Q.   What is a user account?

4  A.   Just the name of an account that you have for,

1:55PM 5  whether it be Windows, Mac, or any of the operating

6  systems that are for your computer.  It's just for

7  somebody to log into and then store whatever on that said

8  account.

9  Q.   What was the user account that you found on this HP

1:56PM10  computer that's entered into evidence in this case?

11  A.   All lower case, dell, d-e-l-l, underscore one, O-N-E.

12       THE COURT:  I'm sorry.  Dell underscore one?

13       THE WITNESS:  Yes, sir.  I was just spelling it

14  out.

1:56PM15       THE COURT:  Okay.

16       MR. GELFAND:  Your Honor, if it helps for the

17  record, it's one spelled out, O-N-E.

18  Q.   (BY MR. GELFAND.)  Is that correct?

19  A.   Yes, sir.

1:56PM20  Q.   Is that what is sometimes referred to in your

21  profession as a default user name?

22  A.   No, sir.

23  Q.   Your testimony is your understanding is that that's

24  not a default user name?

1:56PM25  A.   That's not a default.

1:56PM 1   Q.   What, if any, significance is there to you as an

2   expert as to the fact that it's called Dell, D-E-L-L,

3   underscore one?

4   A.   None.

1:56PM 5   Q.   Does it in any way reference the computer

6   manufacturer Dell?

7   A.   Could be.  Could be whatever the person puts it.

8   Q.   Based on your investigation, did you attempt to

9   determine whether there was a TOR browser on the MacBook?

1:57PM10   A.   Yes, sir.

11   Q.   Was there a TOR browser on the MacBook?

12   A.   No, sir, not that I remember.

13   Q.   So your testimony is there was not a TOR browser on

14   the MacBook?

1:57PM15   A.   As far as I remember.

16   Q.   Did you look?

17   A.   Yes, sir.

18   Q.   Did you assess the MacBook to determine whether there

19   was any sort of computer program that would enable access

1:57PM20   to something called the BitTorrent network?

21   A.   Yes, sir.

22   Q.   What is the BitTorrent network?

23   A.   It's just what's referred to as a peer-to-peer.  It's

24   a means of sharing movies, videos, images, with other

1:58PM25   people.

1:58PM 1   Q.   What, if any, BitTorrent applications, meaning

2   software applications, did you find on the MacBook based

3   on your assessment?

4   A.   The qBittorrent.

1:58PM 5   Q.   I'm sorry.  You said Q, as in the letter Q,

6   BitTorrent?

7   A.   Yes, sir.

8   Q.   Did you find evidence that qBittorrent was used?

9   A.   Yes, sir.

1:58PM 10   Q.   When?

11   A.   In 2017.

12   Q.   For what?

13   A.   Downloading movies.

14   Q.   I'm sorry.  I'm having trouble hearing you.

1:58PM 15   A.   Downloading movies.

16   Q.   What movies?

17   A.   Let's see.  Planes, Fire & Rescue, and Three Amigos.

18   Q.   Hollywood movies?

19   A.   Yes, sir.

1:58PM 20   Q.   Fair to say not child pornography?

21   A.   Correct.

22   Q.   Did you find any evidence of any other BitTorrent

23   enabling applications?

24   A.   No, sir.

1:58PM 25   Q.   And to be clear, we're talking about the MacBook?

1:58PM 1    A.    Correct.

2    Q.    What, if any, BitTorrent enabled applications did you

3    find on the Linux partition side of the hard drive of the

4    HP computer?

1:59PM 5    A.    UTorrent.

6    Q.    What is uTorrent?

7    A.    It's another BitTorrent program.

8    Q.    Is that a Windows-based program?

9    A.    It can be, or is also a Linux program as well.

1:59PM10    Q.    Was the version of uTorrent that you found on the HP

11    the Linux version or the Windows version?

12    A.    Windows.

13    Q.    So just to be clear so we don't confuse things, there

14    is a Windows side of the HP computer, and a Linux side of

1:59PM15    the HP computer, correct?

16    A.    Correct.

17    Q.    If I understand your testimony correctly, the

18    uTorrent application was on the Linux side, not the

19    Windows side, correct?

1:59PM20    A.    Correct.

21    Q.    But it was the Windows version of uTorrent on the

22    Linux side.  Did I just say that correctly?

23    A.    Correct.

24    Q.    Did you find any other BitTorrent enabling

2:00PM25    applications on the HP computer?

2:00PM 1  A.   Only on the Linux side, and that was just the

2    uTorrent.

3  Q.   Did you look for something called Transmission?

4  A.   No, sir.

2:00PM 5  Q.   Do you know what Transmission is?

6  A.   No, sir.

7  Q.   Because you don't know what it is, is it fair to say

8  you did not look for Transmission on any of the other

9  devices?

2:00PM10  A.   Correct.

11  Q.   Including the MacBook?

12  A.   Correct.

13  Q.   Did you examine the uTorrent application on the Linux

14  partition?

2:00PM15  A.   I'm sorry.  Could you repeat that?

16  Q.   Yes.  Did you examine the uTorrent application that

17  you just testified about on the Linux partition?

18  A.   Yes, sir.

19  Q.   Were you able to determine how it was connected to

2:00PM20  the network?

21  A.   No, sir.

22  Q.   Were you able to determine whether it was connected

23  through the business's Wi-Fi?

24  A.   No, sir.

2:00PM25  Q.   Did you investigate anything related to something

2:01PM 1    called Universal Plug and Play?

2           A.    No, sir.

3           Q.    Do you know what Universal Plug and Play is?

4           A.    No, sir.

2:01PM 5    Q.    Did you evaluate the MacBook computer beyond what we

6           have talked about right now?

7           A.    No, sir.

8           Q.    Did you find any evidence on the MacBook computer

9           itself as to when it began to be used chronologically,

2:01PM 10   just dates?

11          A.    Yes, sir.

12          Q.    When?

13          A.    I did, but I don't remember off the top of my head.

14          It wasn't relevant to the case at the moment.

2:01PM 15   Q.    Meaning when you were looking at it, it wasn't

16          relevant?

17          A.    Yes, sir.

18          Q.    Would you have any reason to agree or disagree with

19          2014?

2:01PM 20   A.    No, sir.

21          Q.    Based on your evaluation of the MacBook, were there

22          computer forensic -- was there computer forensic evidence

23          that it was used on a very regular basis?

24          A.    Yes, sir.

2:02PM 25   Q.    A near daily basis?

2:02PM 1    A.    Near daily, yes, sir.

       2    Q.    On the MacBook, how many image files were there?

       3    A.    Do you mean like pictures of the family, or are you

       4    talking about just what forensic file images I made?

2:02PM 5    Q.    Let's back up for a second.  From a computer forensic

       6    standpoint, can you easily determine just the number of

       7    image files on a device?

       8    A.    After it's processed, yes, sir.

       9    Q.    And did you process this device?

2:02PM10    A.    Yes, sir.

      11    Q.    How many images were on this device?

      12    A.    I don't know.  I can't remember off the top of my

      13    head.

      14    Q.    Are you similarly able, after it's processed, to

2:03PM15    determine the number of video files on a device?

      16    A.    Yes, sir.

      17    Q.    Yes?

      18    A.    Yes.

      19    Q.    How many video files were on this device?

2:03PM20    A.    I couldn't tell you right here off the top of my

      21    head.

      22    Q.    Are you familiar with something called a Torrent

      23    file?

      24    A.    Yes, sir.

2:03PM25    Q.    What is a Torrent file, just generally speaking?

2:03PM 1   A.   It's just a file that comes from BitTorrent.

2   Q.   Does a Torrent file actually contain the underlying

3   files?  So, for example, if there is a Torrent file

4   related to an image, does it contain the image?

2:03PM 5   A.   If you have the complete Torrent file, yes.

6   Q.   Over the course of your investigation, did you

7   specifically identify five Torrent files as fragments with

8   no viewable content?

9   A.   Yes, sir.

2:04PM10   Q.   Did you note that in a report that you prepared?

11   A.   Yes, sir.

12   Q.   Do you remember what those files were?

13   A.   Like the file names?

14   Q.   Yes.

2:04PM15   A.   Pedomom.  And I'd have to look at my report.  I don't

16   remember off the top of my head.  I remember Pedomom.

17   Q.   Would it refresh your recollection if I showed you

18   your report?

19   A.   I'm sorry.  What's that?

2:04PM20   Q.   Would it refresh your recollection if I showed you

21   your report?

22   A.   Yes.

23         MR. GELFAND:  May I approach, Your Honor?

24         THE COURT:  You may.

2:04PM25   A.   Dd.torrent.

2:04PM 1            THE COURT:  Just read it to yourself, then he
       2    will have some additional questions for you.
       3    Q.   (BY MR. GELFAND.)  Does that refresh your
       4    recollection?
2:05PM 5    A.   Yes, sir.
       6    Q.   Can you please identify those devices, I'm sorry,
       7    those files?
       8    A.   The file names again?
       9    Q.   Yes, please.
2:05PM10    A.   DD.torrent, DD1.torrent, pedomom, 14-year-old fuck
      11    and suck, and playsweetie.  Have to be honest with you, I
      12    glanced over it real quick.  Just remember.
      13    Q.   Is the other one, just for the record,
      14    playtoysweetie.7z.torrent?
2:05PM15    A.   Yes, sir.
      16    Q.   And just to be clear, did you identify these five
      17    Torrent files as fragments with no viewable content?
      18    A.   Yes, sir.
      19    Q.   What does that mean?
2:05PM20    A.   Means they were incomplete downloads.
      21    Q.   What does that mean with respect to whether they were
      22    viewable to anyone?
      23    A.   Means they weren't viewable at the time.
      24    Q.   Did you form conclusions as to the evidentiary value
2:06PM25    of the devices that you searched?

2:06PM 1    A.    Yes, sir.

2    Q.    What did you conclude with respect to whether the

3    iPhone had any relevant evidence?

4    A.    It had no relevant evidence.

2:06PM 5    Q.    What did you conclude with respect to whether the

6    MacBook, the laptop, had any relevant evidence?

7    A.    It didn't have any relevant.

8    Q.    What did you conclude with respect to whether each of

9    the thumb drives and SD cards in Defendant's Exhibits 3

2:06PM 10   through 7 that you have in front of you had any relevant

11   evidence?

12   A.    It did not have any relevant evidence.

13   Q.    Based on your review of the MacBook, did it appear to

14   be a business device?  A personal device?  How would you

2:07PM 15   characterize that?

16   A.    Mostly personal.  I didn't see any business, but it

17   could have been.

18   Q.    And are you basing the fact that you believe it was

19   mostly personal based on computer forensic evidence that

2:07PM 20   you reviewed?

21   A.    Yes, sir.

22   Q.    Is it fair to say that computer forensics is a

23   science?

24   A.    It's referred to that, yes, sir.

2:07PM 25   Q.    It's what?  I'm sorry.

2:07PM 1    A.    Referred to that.

2    Q.    Is it fair to say that it's about finding actual

3    evidence?

4    A.    Yes, sir.

2:07PM 5    Q.    Following trails of evidence?

6    A.    Yes, sir.

7    Q.    Following all leads?

8    A.    Yes, sir.

9    Q.    And seeing where they go, correct?

2:07PM 10   A.    Correct.

11   Q.    I want to show you what's been previously admitted

12   into evidence as Defendant's Exhibit 29.

13          MR. GELFAND:   Could I publish this, Your Honor?

14   Q.    (BY MR. GELFAND.)   Do you recognize Defendant's

2:08PM 15   Exhibit 29?

16   A.    No, sir.

17   Q.    Based on your knowledge, was a computer forensic

18   analysis or imaging ever conducted on Defendant's Exhibit

19   29?

2:08PM 20   A.    No, sir.

21          MR. CLAYMAN:   Objection, Your Honor.   He just

22   said he doesn't recognize it.

23          THE COURT:   You have to lay a 602 foundation

24   first.

2:08PM 25   Q.    (BY MR. GELFAND.)   Do you know whether a computer

2:08PM 1   forensic analysis was ever done on this device?

2   A.   I do not know.

3   Q.   Did you perform any sort of computer forensic

4   analysis on that device?

2:08PM 5   A.   No, sir.

6   Q.   You testified that some devices were seized from

7   Wholesale Motorcars on November 8th of 2019 and brought

8   back to your office, correct?

9   A.   Correct.

2:08PM 10   Q.   Is that because you can do a lot more from a computer

11   forensic standpoint in a laboratory or a computer forensic

12   laboratory environment?

13   A.   Yes, as well as time.

14   Q.   In other words, can you do more in your office when

2:09PM 15   you brought these back than you can do just looking at the

16   device in the field?

17   A.   Yes, sir.

18   Q.   What's a manual triage, if you know?

19   A.   Like physically going through the phone itself.

2:09PM 20   Referring to a mobile device, physically, meaning just the

21   same as anybody else would be, opening their phone and

22   fingering through the phone itself.

23   Q.   Does that enable you to access the same level of

24   knowledge of what's on the phone than you can do in your

2:09PM 25   laboratory?

2:09PM 1   A.    Not everything, but most.

2   Q.    Can you identify any deleted images or files with a

3   manual triage?

4   A.    No, sir.

2:10PM 5   Q.    I want to show you what's been previously admitted as

6   Defendant's Exhibit 25.  Do you recognize on Defendant's

7   Exhibit 25 a computer that's reflected in the bottom right

8   corner of the exhibit that I just circled on the screen?

9   A.    Yes, sir.

2:10PM 10   Q.    What computer is that?

11   A.    HP All-in-One.

12   Q.    And to be clear, is that this computer right here?

13   A.    Yes, sir.

14   Q.    Is this a mobile device?

2:10PM 15   A.    No, sir.

16   Q.    To even turn it on, does it have to be plugged into a

17   wall?

18   A.    It does.

19   Q.    So to no fault of anyone, I don't see a plug here,

2:10PM 20   but to use this, is it fair to say there would actually

21   have to be a plug and a power outlet?

22   A.    Yes, sir.

23         THE COURT:  Mr. Gelfand, for the benefit of the

24   record, when you said "this," what --

2:10PM 25         MR. GELFAND:  The HP.  I forgot what government

2:10PM 1   exhibit.

2            MR. ROBERTS:  26.

3            THE COURT:  26.  Thank you.

4            MR. GELFAND:  Thank you.

2:11PM 5   Q.   (BY MR. GELFAND.)  Is that different from a MacBook

6   laptop?

7   A.   Yes, sir.

8   Q.   Does a MacBook laptop have to be plugged into the

9   wall to be operated?

2:11PM 10   A.   Not every time.  If the battery is dead, then I would

11   say it would have to be plugged in.

12   Q.   In other words, to state the obvious, a laptop is a

13   portable device, correct?

14   A.   Correct.

2:11PM 15   Q.   Now, Mr. Kennedy, on Defendant's Exhibit 25, you

16   identified the HP that you just testified about.  If you

17   know, what's next to the HP?

18   A.   Appears to be a router.

19   Q.   What is a router from a computer forensic standpoint?

2:11PM 20   A.   A router is just a means for somebody to connect to

21   the internet.

22   Q.   When you say a "means to connect to the internet," is

23   a router a physical device?

24   A.   Yes, sir.

2:12PM 25   Q.   And that is the box that's circled on the screen on

2:12PM 1    Defendant's Exhibit 25?

2          A.    Yes, sir.

3          Q.    Does a router, based on your training and your

4    experience, contain any electronic data?

2:12PM 5    A.    Contains very small data, yes.

6          Q.    But it does contain electronic data?

7          A.    Yes.

8          Q.    Did you ever review or analyze the data on the router

9    that is reflected in Defendant's Exhibit 25?

2:12PM10   A.    No, sir.

11         Q.    Why not?

12         A.    Most -- if any data is stored on the actual router

13   itself, you have to log into the admin account or user

14   account of the router, so you have to use the IP address.

2:12PM15   And from there, it's password protected.  And even then,

16   most of the information is just log files of maybe, maybe

17   the internet connections or anything like that.  Beyond

18   that, not much.  It's never really relevant in most cases.

19         Q.    You used the term "log file."  Could you tell the

2:13PM20   Jury what that is?

21         A.    It's just a digital file that keeps like the names of

22   like log of whenever -- like, maybe connection -- sorry --

23   connection times.  Maybe devices connected, maybe,

24   depending on the manufacturer and if the router itself is

2:13PM25   possible of doing that.  And even then, it's sometimes

2:13PM 1    very small how much storage any router can hold.

2    Q.   Is a log file in a router auto-generated?

3    A.   Yes, sir.

4    Q.   In other words, it's not something a human types in

2:13PM 5    or chooses to keep, correct?

6    A.   Correct.

7    Q.   Is a log file -- does a log file contain history as

8    to dates and times of connectivity to the network?

9    A.   Not every one, meaning it stays there for a short

2:13PM10    period of time.

11    Q.   Can it?

12    A.   It can.

13    Q.   Do you know sitting here today what log files, if

14    any, were on this router?

2:14PM15    A.   No, sir.

16    Q.   What, if anything, did you do in your work as a

17    computer forensic analyst on this case to eliminate the

18    possibility of remote access into the HP computer?

19    A.   Like what I look for to see if anybody remote

2:14PM20    accessed the computer?

21    Q.   Yes.  Or the network.

22    A.   For the network, nothing with the network.

23    Q.   So nothing?

24    A.   Nothing with the network, no, sir.

2:14PM25    Q.   How about the computer?

2:14PM 1  A.    No, sir.

2              MR. GELFAND:  Your Honor, may I have one minute,

3  please?

4              THE COURT:  Certainly.

2:15PM 5         MR. GELFAND:  I have no more questions for this

6  witness.  Thank you, Mr. Kennedy.

7              THE COURT:  Thank you.  Mr. Clayman, does that

8  prompt anything further?

9              MR. CLAYMAN:  Just briefly, Your Honor.

2:15PM 10                REDIRECT EXAMINATION

11  BY MR. CLAYMAN:

12  Q.    Mr. Kennedy, you were asked if there was anything of

13  evidentiary value on the iPhone, the MacBook, the SD

14  cards, and the thumb drives during your cross examination.

2:15PM 15  Do you recall that?

16  A.    Yes, sir.

17  Q.    And you said no.  Do you remember that?

18  A.    Yes, sir.

19  Q.    What were you looking for that you would consider

2:16PM 20  evidentiary value?

21  A.    Any child pornography or remnants of that, if it had

22  possibly been deleted.

23  Q.    So all you were saying is there was no child

24  pornography that you found on those devices?

2:16PM 25  A.    Yes, sir.

2:16PM 1    Q.    Just to be clear, could someone have at one point
     2    viewed child pornography on the iPhone or the MacBook and
     3    you would not have been able to recover that information?
     4    A.    Could they have?
2:16PM 5    Q.    Yes.
     6    A.    Yes.
     7    Q.    Mr. Kennedy, who did you say you sent these images
     8    to, the forensic images of the devices that you created?
     9    A.    I sent them to Jim Fottrell at the CIOS, which is at
2:16PM10    the Department of Justice, as well as to the defense.
    11    Q.    Do you know if Mr. Fottrell works at the High
    12    Technology Investigative Unit of the Department of
    13    Justice?
    14    A.    Yes, sir.
2:16PM15    Q.    Is he the director of that unit?
    16    A.    I believe so.
    17    Q.    And what did you understand Mr. Fottrell was going to
    18    do with those images once you sent them?
    19    A.    Conduct secondary analysis.
2:17PM20    Q.    Conduct secondary analysis?
    21    A.    Yes, sir.
    22    Q.    He was going to examine them himself for additional
    23    evidence?
    24    A.    Yes, sir.
2:17PM25         MR. CLAYMAN:  One moment, Your Honor.

2:17PM 1    Q.   (BY MR. CLAYMAN.)   Do you know how much experience

2           Mr. Fottrell has?

3     A.   A lot of experience.

4     Q.   More than you, is that fair to say?

2:17PM 5    A.   Definitely fair.

6               MR. CLAYMAN:  Nothing further, Your Honor.

7               MR. GELFAND:  Briefly follow up, Your Honor?

8               THE COURT:  Okay.

9                         RECROSS EXAMINATION

2:17PM10   BY MR. GELFAND:

11    Q.   The prosecutor just asked you a question about

12    whether it's possible that someone could have viewed child

13    pornography on the devices you examined, but where you

14    could not find any evidence of that.  Do you remember that

2:17PM15   question?

16    A.   Yes, sir.

17    Q.   How is it possible that there wouldn't be a computer

18    forensic artifact if that had happened?

19    A.   There's still other programs that could help clear

2:18PM20   off those, we'll say artifacts, whether it had been

21    deleted or fully taken off.

22    Q.   What programs?

23    A.   There is at least one.  Could be like CCleaner,

24    depending on how far you have it to set to go into the

2:18PM25   disk drive itself to clear out any of that evidence.

2:18PM 1    Q.    Did you see any evidence that that was ever used on

2          any of these devices?

3    A.    No, sir.

4    Q.    Did you look?

2:18PM 5    A.    Yes, sir.

6              MR. GELFAND:  I have no further questions.

7              MR. CLAYMAN:  Nothing further, Your Honor.

8              THE COURT:  May this witness be excused?

9              MR. CLAYMAN:  Yes, Your Honor.

2:18PM10              MR. GELFAND:  Yes, Your Honor.

11              THE COURT:  Thank you for being here today and

12   for your time.  You're free to go.

13              THE WITNESS:  Thank you, sir.

14              THE COURT:  You may call your next.

2:18PM15              MR. CLAYMAN:  Our next witness will take several

16   hours, Your Honor, if you want to do a break.

17              THE COURT:  We can do a break in the middle.

18              MR. CLAYMAN:  Understood.  The United States

19   calls James Fottrell.

2:19PM20              THE COURT:  Mr. Clayman, kind of be looking

21   around 3:00 for a convenient time to break.

22              Mr. Fottrell, please approach the bench.  Pause

23   about right there and raise your right hand.

24              (Witness Sworn)

2:19PM25              THE COURT:  You may have a seat in our witness

2:19PM 1    box.  As you are doing so, I will tell you that you may

2           remove your mask while testifying, although you're not

3           required to.  I would also ask that you position the

4           microphone and your chair such that you can speak directly

2:20PM 5    into the microphone so we can all hear you.

6                   Mr. Clayman, when you're ready, you may inquire.

7                   MR. CLAYMAN:  Thank you, Your Honor.

8                   JAMES FOTTRELL, having been first duly sworn,

9           testified as follows:

2:20PM 10                          DIRECT EXAMINATION

11          BY MR. CLAYMAN:

12          Q.    Can you please state and spell your name for the

13          record?

14          A.    My name is James Michael Fottrell.  The last name is

2:20PM 15          F, as in Frank, O-T-T-R-E-L-L.

16          Q.    And where do you work?

17          A.    I work for the Department of Justice, the Child

18          Exploitation and Obscenity Section, in Washington, D.C.

19          Q.    And do you work within any particular unit in the

2:20PM 20          Child Exploitation and Obscenity Section?

21          A.    Yes.  I am the Director.  I work in the High

22          Technology Investigative Unit.

23          Q.    Is that sometimes referred to as HTIU?

24          A.    Yes, it is.

2:20PM 25          Q.    You said you're the Director.  Can you describe for

2:20PM 1  the Jury your duties as Director of HTIU?

2  A.   As the Director of the High Tech Unit, I oversee a

3  number of what we call digital investigative analysts who

4  work with the prosecutors and our federal, state, and

2:21PM 5  local law enforcement partners, specifically in child

6  exploitation cases.  We basically work with our law

7  enforcement partners analyzing evidence, writing reports,

8  and testifying in court.

9  Q.   You said you investigate child exploitation crimes,

2:21PM 10  is that right?

11  A.   Yes.

12  Q.   Can you elaborate for the Jury, what are some of the

13  crimes that you typically investigate?

14  A.   The most common child exploitation crimes are

2:21PM 15  trafficking in child pornography, receiving, distributing,

16  possessing, transporting child pornography.  We also get

17  involved in production of child pornography if child

18  pornography is being produced.  We also get involved in --

19  those are the main crimes that we get involved in.

2:21PM 20      There's also crimes of traveling in interstate and

21  foreign commerce to have sex with a minor, so we get

22  involved in those types of cases as well.

23  Q.   When did you join the High Technology Investigative

24  Unit?

2:21PM 25  A.   In July of 2002.

2:21PM 1    Q.    So how many child exploitation investigations like
       2    the ones you just described have you been a part of since
       3    joining HTIU?
       4    A.    Quite a large number.  I'm probably involved in about
2:22PM 5    100 different investigations per year, a smaller number
       6    myself, and the ones that I assign to my staff.
       7    Q.    Have you ever testified in federal court before about
       8    child exploitation investigations?
       9    A.    Yes.
2:22PM10    Q.    Approximately how many times?
      11    A.    Probably approximately 30 to 34 times.
      12    Q.    Have you ever been qualified as an expert in federal
      13    court before?
      14    A.    Yes, I have.
2:22PM15    Q.    If you had to guess, approximately how many times?
      16    A.    Approximately 20 or 25 times.
      17    Q.    Do you perform computer forensic examinations as part
      18    of your job?
      19    A.    Yes, I do.
2:22PM20    Q.    Can you describe for the Jury, just generally, what a
      21    computer forensic examination is?
      22    A.    The first part of an examination would be the
      23    evidence collection, working with our law enforcement
      24    partners to go on scene seizing evidence.  Then we
2:22PM25    basically use our forensic tools to make a forensic image

2:22PM 1   of the items that were seized.  We put the original

2      evidence away.  We conduct our examination on the image

3      copies that we made.  We write reports, and then we are

4      testifying in court.

2:23PM 5   Q.   What types of devices do you typically examine?

6      A.   Typically, it's computer devices, desktop computers,

7      laptop computers, cell phones, any kind of storage device,

8      like a CD or a DVD, a thumb drive.  Any type of device

9      that can store information.

2:23PM10   Q.   Now, as the Director of HTIU, do you also train

11      others how to conduct forensic examinations?

12      A.   Yes, I do.

13      Q.   And when did you start doing that?

14      A.   Probably, since the beginning, from probably at least

2:23PM15   like 2003, 2004.

16      Q.   And if you had to estimate, approximately how many

17      electronic evidence items, devices, have you been involved

18      with forensically examining?

19      A.   Thousands.  It's kind of hard to examine.  Like a

2:23PM20   typical case might have, like, 30 or 40 evidence items on

21      them.  There's some extreme cases where there's thousands

22      of evidence items, so there's a large volume of digital

23      media throughout my career.

24      Q.   What kinds of tools do you typically use in your --

2:23PM25   the process of conducting your examinations?

2:24PM 1    A.    I would categorize our tools into two different

2           categories, what I would call general purpose tools.  And

3           the general purpose tools that we use are EnCase by

4           Guidance Software.  And now it's changed the name to

2:24PM 5    OpenText.  And there's another software called FTK,

6           Forensic ToolKit, from AccessData.  Those are the general

7           purpose tools that are used in any type of criminal

8           investigation and those are popular tools that are used

9           throughout the world.

2:24PM 10           There's also specialized tools that we use.  For

11          example, there's a company called Magnet Forensics that

12          makes Internet Evidence Finder and AXIOM.  Those are tools

13          specifically used to extract internet-based evidence and

14          use it.  There's other tools called Griffeye that are used

2:24PM 15   in child exploitation cases to match images.  And in the

16          mobile arena, there's Cellebrite and GrayKey and some

17          other tools that are specifically used for mobile devices.

18                  So I've kind of categorized that as just some general

19          purpose tools that we use and some special purpose tools

2:25PM 20   that we use.

21          Q.    Are you certified to use those tools?  Have you

22          received trainings?

23          A.    I've received training on some.  Yeah, I've been

24          doing this for a while.  I probably have not done any of

2:25PM 25   their recent trainings and certifications in the last 10

2:25 PM 1 or 15 years.  But, yeah, I have some certifications, yes.

2 Q. You said as part of your examination process, you

3 sometimes write reports, is that right?

4 A. Yes, I do.

2:25 PM 5 Q. What do these reports typically contain?

6 A. These contain the findings.  When we write computer

7 forensic reports, we are -- the target, the audience of

8 our reports is for the prosecutors.  And the idea is to

9 identify all of the evidence that's relevant in the

2:25 PM 10 investigation so that the prosecutor has enough

11 information to indict a case.

12 Q. How many of these examination reports would you

13 estimate you've written in the course of your role at

14 HTIU?

2:25 PM 15 A. Hundreds.

16 Q. How many of the investigations that you have

17 participated in involve sexually explicit images of

18 minors?

19 A. Almost all of them.

2:25 PM 20 Q. How frequently would you say you view or handle

21 evidence containing sexually explicit images of minors?

22 A. Pretty much on a daily basis, or, you know, if not a

23 daily basis, three or four times a week.

24 Q. Just to be clear, that includes both images and

2:26 PM 25 videos?

2:26PM 1    A.    Yes.

2           Q.    And what are the typical age ranges you see in the

3           files you view?

4           A.    Certainly, in the last 10 years, there's been an

2:26PM 5    explosion of younger images.  Typically, the ages would be

6           prepubescent minors; eight to 12, eight to 14 years old is

7           typical.  Certainly, unfortunately, in the last eight to

8           10 years, there's been an explosion of, you know, infants

9           and toddlers, even age like zero to five, so there's

2:26PM 10   certainly been an explosion of younger content in the last

11          few years.

12          Q.    In the course of your training and your experience at

13          HTIU, have you come across terminology associated with

14          child exploitation material?

2:26PM 15   A.    Yes, I have.

16          Q.    How familiar would you say you are with these terms?

17          A.    I think I'm fairly familiar with a lot of the terms

18          associated with child exploitation cases.

19          Q.    Just to be clear, these are terms used by offenders

2:27PM 20   to describe various things?

21          A.    Yes.

22          Q.    Can you describe your educational background as it

23          relates to computer forensics?

24          A.    I have a degree in computer science and a minor in

2:27PM 25   mathematics from the State University of New York at

2:27PM 1    Oswego in 1985.

2           MR. CLAYMAN:  Your Honor, at this time, I would

3    move to admit Mr. Fottrell as an expert in computer

4    forensic examinations.

2:27PM 5           MR. GELFAND:  No objection.

6           THE COURT:  Ladies and Gentlemen of the Jury, you

7    will hear testimony from Mr. Fottrell.  He's been

8    described as an expert.  What this means is, he's a person

9    who, by knowledge, skill, training, education or

2:27PM10   experience has developed expertise in the particular field

11   that he's just described.  And this means that in this

12   courtroom, he may state his opinions on matters that are

13   within his field of expertise and he may also state his

14   reasons for those opinions.

2:28PM15           Expert testimony, as it is known, should be

16   considered by you just like any other testimony, which is

17   to say that you may accept or reject it and you may give

18   it as much weight as you think it deserves considering the

19   witness's education and experience, the soundness of the

2:28PM20   reasons given for the opinion, the acceptability of the

21   methods used and all the other evidence in the case.

22           Now you may inquire.

23           MR. CLAYMAN:  Thank you, Your Honor.

24   Q.   (BY MR. CLAYMAN.)  Mr. Fottrell, are you familiar

2:28PM25   with an investigation of an individual named Joshua

2:28PM 1    Duggar?

2    A.    I am.

3    Q.    What role did you play in that investigation?

4    A.    I was involved in the examination of some evidence

2:28PM 5    that was sent to us and I was supervising an employee who

6    worked with me writing a report.  And I am familiar with

7    that case.

8    Q.    Do you recall who sent you the evidence to be

9    examined and reviewed?

2:28PM 10   A.    Sure.  It's Marshall Kennedy from HSI.

11   Q.    And so what did you understand your role compared to

12   Marshall?  Were you assisting Mr. Kennedy?

13   A.    Yes.  So they executed a search warrant.  They seized

14   a computer.  And there was some information related to

2:29PM 15   child pornography in that computer and they asked for my

16   assistance in reviewing the findings on there.

17   Q.    Did you review Mr. Kennedy's findings?

18   A.    Yes, I did.

19   Q.    Did you also supplement Mr. Kennedy's findings with

2:29PM 20   your own examination?

21   A.    Yes, I did.

22   Q.    So you testified to receiving evidence.  In what form

23   did this evidence come that you received from Mr. Kennedy?

24   A.    So it was a hard drive with an image of an HP desktop

2:29PM 25   computer.

2:29PM 1    Q.    Did you receive any other images at any point?

       2    A.    Later on, I received other images as well.  There was

       3    an image -- I first received the HP desktop.  And then a

       4    few months later, I received a MacBook computer, a number

2:29PM 5    of thumb drives, and an iPhone 11.

       6    Q.    So what did you do after receiving these images?

       7    A.    Using my forensics tools, I conducted an examination.

       8    I looked for relevant evidence and we write a report about

       9    that.

2:30PM 10   Q.    And what kinds of tools, if you recall, did you use?

      11    A.    So with respect to the MacBook and the HP desktop,

      12    EnCase is my go-to tool, so I would have used that

      13    primarily.  I would have also used a specialized tool,

      14    AXIOM, Internet Evidence Finder, to specifically find

2:30PM 15   internet-based artifacts.  Those are the primary tools I

      16    would have been using.

      17          With respect to the cell phone, we would use --

      18    Cellebrite has a tool called Physical Analyzer and AXIOM

      19    also provides support for mobile devices.

2:30PM 20   Q.    Now, as part of your training and experience, are you

      21    familiar with something called virtualization software?

      22    A.    Yes, I am.

      23    Q.    What is that?

      24    A.    So it's relatively new in the last seven or eight

2:30PM 25   years or so.  It's the ability for computer forensics

2:30PM 1   people, when we seize a defendant's computer, we can

2   convert the forensic image that we make back to a virtual

3   machine, and I can boot up that virtual machine in a

4   forensics environment and look at the computer exactly as

2:31PM 5   it looked from when it was seized.  So it's just a method

6   to visualize what the computer looked like at the moment

7   in time it was seized by law enforcement.

8         And it's helpful just to get an understanding as to

9   what the desktop looked like, how different programs were

2:31PM 10   configured, just to kind of help understand how that

11   computer was being used at the moment it was seized.

12   Q.   Just to be clear, does this virtualization software

13   change the image at all or do anything like that?

14   A.   It doesn't change the original, how the original

2:31PM 15   image was created.  We just use a copy of that image just

16   to demonstrate what it looks like.

17   Q.   Have you used this type of software before in your

18   investigations?

19   A.   Yes, I have.

2:31PM 20   Q.   Did you use it as part of your examination in this

21   case?

22   A.   Yes, I did.

23   Q.   Can you describe how you used it?

24   A.   So, again, taking the image, for example, of the HP

2:31PM 25   desktop computer, I converted -- the virtualization

2:31PM 1   software that we use is called Oracle VirtualBox.  It's a

2   very popular piece of virtualization software.  I

3   converted the forensic image into a format that Oracle

4   VirtualBox can use.  I configured a virtual machine under

2:32PM 5   VirtualBox to, as closely as I could, match the

6   configuration of the desktop computer and then booted it

7   up.

8   Q.   Can you please look in the black government binder

9   there next to you and find what's been previously marked

2:32PM 10   as Government's Exhibit 28?

11   A.   Okay.

12   Q.   Do you recognize this exhibit?

13   A.   Yes.

14   Q.   What is it?

2:32PM 15   A.   Government Exhibit 28 is a series of print screens

16   that I created of the virtual machine that I created just

17   to kind of document what the desktop of the computer

18   looked like at certain points when I was running the

19   virtual machine.

2:33PM 20   Q.   Can you describe for the Jury what a print screen is?

21   A.   So one of the features of the software is, once you

22   boot it up, you're seeing something on the screen, you can

23   just hit the print screen button and then it saves what

24   the screen looks like to a file.  This is just a number of

2:33PM 25   print screens that I would save as I'm navigating around

2:33PM 1  on the computer looking at different things.

2  Q.   Is this exhibit a true and accurate copy of the print

3  screens created using this virtualization software you've

4  described?

2:33PM 5  A.   Yes, it is.

6       MR. CLAYMAN:  Your Honor, at this time, we would

7  move to admit Government's Exhibit 28 into evidence.

8       MR. GELFAND:  Can I clarify one thing with

9  opposing counsel?

2:33PM 10       THE COURT:  Yes.

11     (off-the-record discussion)

12       MR. CLAYMAN:  I'll ask a few more questions, Your

13  Honor, before moving to admit.

14  Q.   (BY MR. CLAYMAN.)  Mr. Fottrell, does the

2:34PM 15  virtualization software create an accurate copy of what

16  the device looks like at the time it was seized, in your

17  experience?

18  A.   So I can be clear, we take the forensic image that

19  was created at the moment in time the forensic image was

2:34PM 20  created.  I convert that into a virtual machine and then I

21  boot it up.  It's not perfect, so when I boot it up, it's

22  going to reflect the date and time the computer boots up

23  and it's booting up when I created the virtual machine and

24  it's going to reflect dates and times that are not

2:34PM 25  reflected when the defendant had the computer.  So there's

2:34PM 1    going to be some things that are going to change.  And
       2    sometimes I guess incorrectly.  There may have been a
       3    CD-ROM attached.  There may have been one hard drive.
       4    There may have been two hard drives.  So sometimes certain
2:34PM 5    peripherals that existed on the device may not exist in my
       6    virtual machine.  But for what I care about from the
       7    operating system is more the files.  Those are accurately
       8    reflected as what it looked like at the point in time that
       9    it was seized.
2:35PM 10   Q.   You said the date and time might be different.  Do
       11   you mean like the date and time reflected like in the
       12   corner of the desktop?
       13   A.   Yes.  And the other mistake that sometimes -- it
       14   might be the screen resolution.  So when the defendant had
2:35PM 15   the computer, the screen resolution might have been
       16   such-and-such.  And when I created the virtual machine, it
       17   might have a slightly different screen resolution.  But
       18   the desktop icons and things like that are still accurate
       19   and complete.
2:35PM 20   Q.   So the files are the same?
       21   A.   Yes.
       22   Q.   All the data associated with the files you find on
       23   the device are the same?
       24   A.   Yes.
2:35PM 25   Q.   As obtained from the image?

2:35PM 1   A.    Yes.

2          MR. CLAYMAN:   Your Honor, we would move at this

3    time to admit Government's Exhibit 28.

4          MR. GELFAND:   No objection.

2:35PM 5          THE COURT:   Government's 28 is received.

6          (Government's Exhibit 28 Received.)

7          MR. CLAYMAN:   Permission to publish, Your Honor.

8          THE COURT:   You may.

9    Q.   (BY MR. CLAYMAN.)   Mr. Fottrell, what's shown in the

2:36PM10   first page of this exhibit?

11   A.   So this is -- when I boot up the virtual machine --

12   this is a Windows 10 computer, so this is the first screen

13   that you would see when you turn on the computer.  And if

14   you look on the lower left, it has the date at 2:34 on

2:36PM15   Thursday, April 1st, so that is when I booted up the

16   virtual machine.  But the rest of the things that you are

17   seeing on the page are what you would see when you turn on

18   the computer.

19   Q.   Just to be clear, this is the HP computer we're

2:36PM20   talking about?

21   A.   The HP desktop computer, correct.

22   Q.   What kind of operating system are you seeing here on

23   this screen?

24   A.   This is the Windows 10 operating system.

2:36PM25   Q.   Can you explain for the Jury, just in general terms,

2:36PM 1  what an operating system is?

2  A.   So the operating system is the collection of programs

3  that allows the computer to talk to the different devices

4  that are out there.  It sends information to the screen.

2:36PM 5  It takes keyboard inputs from the keyboard and the mouse.

6  It recognizes peripherals like storage devices and hard

7  drives.  And it just provides a graphical user interface

8  for the user to use the computer and to interact with it.

9  It certainly provides for internet connectivity for

2:37PM 10  computers that are connected to the internet.  It's just a

11  unified tool to link the resources of this computer in an

12  easy-to-use format.

13  Q.   So if you were to sit down at the defendant's HP

14  computer, what would you need to do to get to the screen

2:37PM 15  with the Windows operating system?

16  A.   Just turn it on.  So if you turn on the computer, all

17  of the peripherals are plugged in, this is what you would

18  see when you turn on the computer.

19  Q.   Turning to page two, can you describe for the Jury

2:37PM 20  what's shown on this page?

21  A.   So this is the log-in page.  This is like the next

22  page that you would hit if you hit the enter key or you

23  hit the log-in.  So this tells me that there is one user

24  account named Wholesale NWA.  It's a password-protected

2:37PM 25  account and there's a logo associated with it.  This is

2:37PM 1    the log-in screen for the Windows 10 computer.

2          Q.    Would that Wholesale NWA account be a default or

3          would that be a user input account name?

4          A.    So when the Windows operating system was installed,

2:38PM 5    during the installation process, it would prompt the user,

6          who is doing the installation, enter your user name, who

7          is the user of this computer.  That's entered by the user

8          when they install the operating system.  It doesn't come

9          from the factory like that.  That gets set up when the

2:38PM 10   user turns on the computer for the first time.

11         Q.    You said this account was password protected?

12         A.    Yes, it was.

13         Q.    Turning to page three now, what's shown there?

14         A.    That's the screen that you see right after that as

2:38PM 15   soon as you type in the password correctly.

16         Q.    Do you recall what the password was for this account?

17         A.    Yes.  It was JoshuaJJD.

18         Q.    How about on page four?

19         A.    This is the page that you would see of the desktop.

2:38PM 20   This is like the default desktop of the computer.  There's

21         certainly going to be programs that load automatically,

22         but this is -- I just hit the print screen immediately

23         just to show what the desktop of the computer looks like.

24         Q.    And what kind of icons do you see there on the

2:39PM 25   left-hand side?

2:39PM 1    A.    So this is pretty typical of a Windows computer.   On

2          the upper left-hand side, there's a recycle bin.   There's

3          an icon for Adobe Acrobat.   There's some icons for some --

4          Frazer software, which is business software.   There's an

2:39PM 5    icon for games.   There's a folder for desktop folder.

6          These are typical icons that you would see on the desktop

7          of a Windows computer.

8          Q.    Turning to page five, what's depicted here?

9          A.    So this is a logo associated with Covenant Eyes.

2:39PM10    This Covenant Eyes software was installed on the Windows

11          10 computer, so every time the computer boots up, the

12          Covenant Eyes software loads and it displays this logo

13          when it's loading and running.   Not permanently running,

14          but when it first starts to run, it displays this logo.

2:39PM15    Q.    Just to be clear, this happened automatically when

16          you turn on the computer?

17          A.    Yes, it does.

18          Q.    If we could turn to page six.   What's this?

19          A.    So on the -- if I could draw a little red line on the

2:40PM20    bottom of the screen, there's the logo for the Covenant

21          Eyes software that matches the logo over here, so I just

22          clicked on that logo on the task tray on the lower

23          right-hand side and it brings up a log-in dialogue for the

24          Covenant Eyes software, so I just took a print screen of

2:40PM25    that screen.

2:40PM 1    Q.    And what user name is listed there in the Covenant
       2    Eyes software box?
       3    A.    I'm sorry.  Could you say that again?  I'm sorry.
       4    Q.    What user name is listed in the Covenant Eyes box?
2:40PM 5    A.    Joshua Duggar.
       6    Q.    Turning to page seven, what's shown here?
       7    A.    This is Google Chrome dashboard and so basically just
       8    loading up Google Chrome.  There is the Covenant Eyes
       9    dashboard.  This is the page that gets saved.  It was
2:40PM10    saved and it shows the page associated with the Covenant
      11    Eyes dashboard.
      12    Q.    If we could go to the next page, what's shown there?
      13    A.    So this is where I navigated to the control panel and
      14    I wanted to just document the programs that are installed
2:41PM15    on the computer.  So if you can look at the top of the
      16    page, I'm under the control panel, programs, programs and
      17    features.  I just want to get a sense as the -- of which
      18    programs are installed on the computer.  And I'm just kind
      19    of highlighting the Covenant Eyes software.  It shows the
2:41PM20    Covenant Eyes software with the date of 10-31-2019.
      21    That's just showing computer programs that are installed.
      22          What that doesn't mean is that Covenant Eyes was only
      23    installed on 10-31.  What typically happens is, the
      24    software might have been installed much earlier, months
2:41PM25    earlier or years earlier, but the vendor has updates to

2:41PM 1    the software periodically.  And as those updates are

2         distributed by the vendor, they get basically reflected in

3         here.  So the date of 10-31-2019 reflects the most recent

4         time the Covenant Eyes software had been updated.

2:41PM 5    Q.   Based on the other dates you're seeing on this page,

6         what, if anything, can you say about how long this Windows

7         account had been active or used?

8         A.   So there's certainly dates from 2017, 2018.  I think

9         it goes back even like to 2016.  So it was clear that this

2:42PM10   computer was being used for a number of years prior.

11        Q.   If we could please turn to the next page.

12        Mr. Fottrell, can you describe for the Jury what's

13        depicted here?

14        A.   So on the bottom of the toolbar, on the bottom,

2:42PM15   there's this program called File Explorer.  I loaded up

16        the -- I opened up the File Explorer program, and on the

17        left-hand side, these are like the quick access bar, which

18        just shows recently accessed documents.  So I was just

19        trying to illustrate what are some examples of files that

2:42PM20   were recently accessed by this computer.  And a review of

21        these things are typically, you know, business-related,

22        work-related documents.

23        Q.   Will you please turn to page 10.  What's depicted

24        here?

2:42PM25   A.   So one of the other buttons on the bottom of the

2:43PM 1   screen is the mail program.  And I basically just opened

2    up the mail program just to kind of look at, from a

3    configuration point of view, who is using this computer.

4    So there's an e-mail account and it shows

2:43PM 5   WholesaleNWA@gmail.com, so that's an e-mail account that's

6    associated with the person who is using this computer.  I

7    was just kind of looking to show -- and it has the dates

8    of November 8th, 2019.  So this computer was used to

9    exchange e-mail messages using that WholesaleNWA@gmail.com

2:43PM 10  e-mail account.  So just kind of an identity, like who is

11   using this computer, what is it being used for.

12   Q.   And if we could please turn to page 11.  What's shown

13   here?

14   A.   So I just highlighted a message and I just wanted to

2:43PM 15  show here's a message and it's basically, you know,

16   clearly a response to -- clearly Joshua Duggar is

17   basically using this computer to send e-mail messages and

18   communicating with Lisa Reeves.

19   Q.   How do you know -- what e-mail account is Joshua

2:44PM 20  Duggar sending this from?  Where does it say that?

21   A.   So on the bottom, it's WholesaleNWA@gmail.com.  It

22   shows it right here.  I'm sorry.  I circled it there.

23   WholesaleNWA@gmail.com.

24   Q.   Turning to page 12, where on the Windows side of the

2:44PM 25  computer are you here?

2:44 PM 1    A.   So if you look at the top of the page, again, I'm at

2    the File Explorer program on the bottom of the page.   And

3    I'm looking at the downloads folder.   So this is the

4    default folder when you are using a web browser to

2:44 PM 5    download files or download information.   Those files get

6    downloaded by default.   They get saved in a downloads

7    folder.

8    Q.   And what item is highlighted there at the bottom of

9    the downloads folder?

2:44 PM 10   A.   So kind of in the middle there, there is a file

11   that's dated on November 11th, 2019, at 5:47 p.m.   It's

12   the Ubuntu-18.04.02 desktop-AMD 64.   It is the

13   installation software associated with the Ubuntu operating

14   system.

2:45 PM 15   Q.   I'm sorry.   Did you say May 11th or November 11th?

16   A.   I'm sorry.   May 11th, 2019.

17   Q.   What is the Ubuntu operating system?

18   A.   So the Ubuntu operating system is a different

19   operating system from the Windows operating system.   It's

2:45 PM 20   certainly not as popular as Windows.   It's certainly not

21   as popular as the Macintosh operating system, but it's

22   actually a close third.   It's an open source.   It's a free

23   operating system, so you're not paying like you have to

24   pay for the Windows operating system.   It is a graphical

2:45 PM 25   user interface.   It's just another operating system, if

2:45PM 1   you will, that has the same functionality.  You can
2          communicate with the peripheral devices.  You can surf the
3          web.  It's just another operating system that is popular,
4          somewhat popular.
2:46PM 5   Q.    What, if anything, does Ubuntu have to do with Linux?
6          A.    So I'm going to probably use those terms
7          interchangeably.  Linux is a generic term for this
8          operating system.  There's probably 15 or 20 different
9          versions of Linux.  In my opinion, Ubuntu is probably the
2:46PM 10  most popular, but there's another one called Debian.
11         There's another one called Red Hat.  There's another one
12         called Gen2.  So there's probably about 15 or 20 other
13         versions of the Linux operating system that have pretty
14         much the same function -- I would characterize them as
2:46PM 15  having pretty much the same functionality.  Those vendors
16         might disagree with me a little bit, but they all provide
17         the same basic functionality.  And Ubuntu is clearly a
18         very popular Linux-based operating system.
19         Q.    You may have already covered this, so I apologize.
2:46PM 20  What, if anything, is the significance of the date next to
21         the Ubuntu file there?
22         A.    So that is the date that it was downloaded.  The
23         person was using a web browser, you know, to basically go
24         and download the Ubuntu operating system software.  I'm
2:47PM 25  familiar with doing this.  I've installed Ubuntu certainly

2:47PM 1    a number of times.  You need to go out to the vendor's

2    website.  You download the operating system software and

3    the item below that is this Rufus software.  So the Rufus

4    software allows me to take that disk image, take that

2:47PM 5    image and to copy it onto a thumb drive so that I can take

6    that thumb drive and install the operating system on a

7    computer.  It's the preliminary steps that you need in

8    order to install the Ubuntu operating system on a

9    computer.

2:47PM 10    Q.   So this Rufus program is just another program you

11    would need to install the Ubuntu program or operating

12    system?

13    A.   It's not a requirement.  You have two different ways

14    to do that.  If you wanted to use a thumb drive, you would

2:47PM 15    use Rufus to do that.  But the vendor originally just

16    wants people to burn it onto a DVD.  If you go to Ubuntu's

17    website, here's the image copy -- it's a disk image copy.

18    It's an image of a disk.  You would burn that image disk

19    to a CD-ROM, and then boot off of the CD-ROM to install

2:48PM 20    the operating system.  Many people don't like to use

21    CD-ROMs anymore, so they just basically have a thumb

22    drive.  And that's where the Rufus program comes in.

23    Instead of burning it to a CD, you can use a thumb drive

24    and install it from a thumb drive.

2:48PM 25    Q.   Could you install the Ubuntu operating system on this

2:48PM 1    computer here?

2    A.    Say that again.  I'm sorry.

3    Q.    Would you be able to install the Ubuntu operating

4    system on the HP computer, even though there's already a

2:48PM 5    Windows operating system?

6    A.    Yes, it is possible.

7    Q.    How would that work exactly?

8    A.    So a hard disk is broken down into a number of

9    partitions, so it's -- certainly in my case, I have a

2:48PM 10   computer.  I have three or four different disk partitions.

11   I might have Microsoft Windows on one partition.  I could

12   have Ubuntu on another partition.  I can install macOS on

13   another partition.  So certainly the capability exists to

14   install multiple operating systems on one physical disk

2:48PM 15   and you have the ability to switch between them.

16   Q.    If we could please turn to page 13.  What's being

17   shown here?

18   A.    This is just, again, at the Windows, the File

19   Explorer program.  I am just going to the desktop.  If you

2:49PM 20   look here, it's just at the desktop folder.  And I'm

21   listing them, the contents by date in reverse format, the

22   most recent documents first.  I'm just looking at the file

23   names associated with the desktop just to kind of show

24   who's using this, what are some of the documents

2:49PM 25   associated with it.

2:49PM 1    Q.    And what kind of documents did you find in this

2           folder?

3           A.    Pictures of cars, credit card information, certainly

4           business-related things associated with selling cars.

2:49PM 5    Q.    Did you recognize any of the names in the titles of

6           these files?

7           A.    Yes.  So, for example, right here, there is Josh

8           Duggar's driver's license and there's, like, a photo of it

9           as well.  So there's certainly some names associated with

2:49PM 10   Joshua Duggar.

11          Q.    If we could turn to the next and final page of this

12          exhibit, what's shown here?

13          A.    This is -- if I clicked on that file, the PDF format,

14          this is kind of what gets us -- I clicked on that file,

2:50PM 15   the PDF file, to open it up, and it is a copy of Joshua

16          Duggar's driver's license.

17          Q.    What's the birth year listed on this license?

18          A.    1988.

19          Q.    So we can take this down now.  Mr. Fottrell, just

2:50PM 20   generally speaking, based on your examination, what was

21          the Windows side of this computer used for?

22          A.    So business-related things.  So basically had this

23          Frazer software that's used to keep track of an inventory

24          of cars that you have.  There are documents.  There are

2:50PM 25   photos of cars.  So it's clearly used in the normal course

2:50PM 1    of business for selling, buying and selling cars.

2       Q.    Now, this was the Windows operating system.  Did you

3    find a Linux operating system on this computer as well?

4       A.    Yes, I did.

2:50PM 5    Q.    And did you use your virtualization software with

6    that operating system?

7       A.    Yes, I did.

8       Q.    I'd like to direct your attention to the same black

9    binder.  If you could find what's been marked as

2:50PM 10   Government's Exhibit 30.

11      A.    Okay.

12      Q.    Do you recognize this exhibit?

13      A.    Yes, I do.

14      Q.    What is it?

2:51PM 15   A.    These are a series of print screens that I created in

16   the same way showing the -- not the Windows partition on

17   the computer, showing what the Ubuntu Linux partition

18   looks like.

19      Q.    Are these true and accurate print screens of the

2:51PM 20   Linux partition on this computer?

21      A.    Yes, they are.

22            MR. CLAYMAN:  Your Honor, I would move to admit

23   Government's Exhibit 30 at this time.

24            MR. GELFAND:  No objection.

2:51PM 25            THE COURT:  Government's 30 is received.

2:51PM 1     (Government's Exhibit 30 Received)

2     MR. CLAYMAN:  Permission to publish, Your Honor.

3     THE COURT:  You may.

4 Q.   (BY MR. CLAYMAN.)  Mr. Fottrell, what's shown on the

2:51PM 5 first page here?

6 A.   This is, when I configured it to boot off of the

7 other partition, this is the first screen that you see.

8 If you wait three seconds, it's just going to continue on

9 to the boot process, but I just wanted to create a print

2:51PM10 screen of the first thing that you're seeing.  And it

11 shows that it's an Ubuntu operating system.

12 Q.   So just to be clear, this is on the same HP desktop

13 computer as the Windows operating system we were just

14 looking at?

2:51PM15 A.   It's on the same physical hard drive.  There's

16 multiple partitions.  One partition boots up Windows; one

17 partition boots up Ubuntu.  This is what it looks like

18 when you boot off of the Ubuntu partition.

19 Q.   Would these two partitions have any interaction or

2:52PM20 would they be separate?

21 A.   So they're separate.  You can't boot -- it's

22 impossible to boot both operating systems simultaneously.

23 So when you turn on the computer, the default operating

24 system is Windows.  So if I don't touch any keys, I turn

2:52PM25 on the computer, it's going to boot up under the Windows

2:52PM 1    computer.  If I wanted to boot up off of the other
       2    computer, you have to bring up the boot menu.  So when you
       3    turn it on, there's a function key.  And I'm going to get
       4    this wrong.  It's either going to be, like, F9 or F10.
2:52PM 5    There's some function key for HP where if I hit the F9
       6    key, it's going to bring up a boot menu.  Do you want to
       7    boot off of the regular operating system or do you want to
       8    boot off of the Ubuntu operating system?  And I'll have to
       9    use the arrow keys to select the other operating system
2:52PM10    and then it would boot up the Ubuntu partition.
      11    Q.   So just to be clear, are you saying someone would
      12    have to be physically present at the computer to access
      13    the Linux partition side?
      14    A.   So when -- yeah.  So when the computer -- if the
2:52PM15    computer is turned on, it's going to boot up Windows.  And
      16    if you wanted to boot the other operating system, you have
      17    to shut the Windows computer down and restart the
      18    computer, hit that boot menu key to select the other
      19    operating system.  Yes, you have to physically be present
2:53PM20    to boot the other operating system.
      21    Q.   And based on your experience, is it typical for an HP
      22    computer to come with two operating systems installed?
      23    A.   No, it doesn't come that way by default.
      24    Q.   So how would a Linux operating system like this one
2:53PM25    get installed on an HP computer?

2:53 PM 1   A.   It would have to be installed by the computer user.

2   Q.   If we could please turn to the next page of this

3   exhibit.  What's shown here?

4   A.   This is the next page that you would see.  It shows

2:53 PM 5   that there is one user account installed.  And the user

6   account is dell_one.  And it's a password protected

7   account as well.

8   Q.   Is that user name, dell_one, auto-generated based on

9   your experience with Linux, or would this be a user

2:53 PM 10  created user name?

11  A.   It is not generated by default.  It is user

12  generated.  So during the installation process of the

13  Ubuntu operating system, it's going to display, who is the

14  user of this computer.  It's a blank field, there's

2:54 PM 15  nothing filled in.  You would have to type in the name in

16  order for that name to be recognized.  So there is no

17  default name.

18  Q.   You've done that yourself before?

19  A.   Many times.

2:54 PM 20  Q.   Turning to page three, what's depicted here?

21  A.   So this is what happens when I type in the password

22  for the account.

23  Q.   And what was the password for this account?

24  A.   Intel 1988.

2:54 PM 25  Q.   And that was different than the password for the

2:54PM 1    Windows side?

2    A.    Yes.   The Windows side was JoshuaJJD.

3    Q.    Now, focusing on page four, can you describe what's

4    depicted here?

2:54PM 5    A.    So this is the desktop of the Ubuntu partition.   This

6    is what you would see when you first turn it on after

7    you've logged in successful.   This is kind of what the

8    desktop looks like.   What's different on Ubuntu from the

9    Windows computer is all of the icons are on the left side

2:54PM 10   of the screen, whereas in the Windows environment, they

11   put all of those icons on the bottom of the screen.   It's

12   called a task bar.   On Windows, the task bar is on the

13   bottom of the screen by default.   In Ubuntu, the icons,

14   the task bar, if you will, is on the left-hand side.

2:55PM 15   Q.    And this background screen, is this the default for a

16   Linux operating system background?

17   A.    No.   The Ubuntu 18 operating system comes with a very

18   generic orange background, so the computer user must have

19   changed to this password at a particular point in time.

2:55PM 20   Q.    What icons are pinned on the left-hand side there?

21   A.    So the first icon, the green globe, is an icon for

22   the TOR browser bundle.   This icon below that is for

23   Mozilla Thunderbird.   It's an e-mail program.   The next

24   one is the file manager.   It's called Nautilus, but I just

2:55PM 25   call it file manager.   I think the next one is for this

2:55PM 1  Rhythm Box, which is a music player.  This is for

2  LibreOffice or OpenOffice, which is a word processer.

3      The next guy with the A is the -- it's for

4  applications, or the App Store, so the Ubuntu operating

2:56PM 5  system is very similar to -- iPhones and mobile devices

6  have an App Store where you can install additional

7  applications.  Here is the App Store, if you will, for the

8  Ubuntu operating system.  This is the help button if you

9  want to get help on certain things.  And Firefox is a

2:56PM 10  browser, is a web browser that comes with the Ubuntu

11  operating system.

12      And on the bottom of the screen, you can't really see

13  that so clearly, but there's nine dots.  There's like

14  three rows by three columns.  There's a little icon there.

2:56PM 15  And if you click on that icon, it just displays a list of

16  all of the applications that are installed on the Ubuntu

17  machine.

18  Q.   For the avoidance of confusion, let's just refer to

19  this as the Linux side, Linux operating system.

2:56PM 20  A.   Sorry.

21  Q.   Would these icons come auto-loaded here?  Would this

22  be the standard icons you would find when you installed

23  the Linux operating system?

24  A.   So with the exception of TOR, so TOR would not be

2:57PM 25  there by default.  But, yes, Thunderbird, all these other

2:57PM 1    ones here are default icons that come with the Ubuntu

2           operating system.

3       Q.    So how would the TOR icon get there?

4       A.    Somebody would have to install that.  That would have

2:57PM 5    to be installed.

6       Q.    Turn to page five, please.  What's shown here?

7       A.    This is the same print screen that's for this laptop,

8           but I tried to create -- change the resolution so it

9           closely matched the resolution of the HP desktop computer.

2:57PM10    Q.    Turning to page six, where did you go after that?

11      A.    So if you look at the lower left-hand corner of those

12          screens, there's those nine dots that I was talking about.

13          If you click on those nine dots, it just brings up a list

14          of the applications that are installed by default.

2:57PM15    There's a solitaire game.  Amazon.  There's a calculator

16          program, a calendar program.  These are just all of the

17          programs that come with the operating system by default,

18          the file manager, web browser.  LibreOffice, which is a

19          word processing program.  These are all -- Mahjong is a

2:58PM20    game.  These are just all of the typical programs that

21          come preinstalled on the Linux operating system.

22      Q.    How about on the next page?

23      A.    On the next page, some of them are not.  For example,

24          the TOR browser bundle is not installed by default, and so

2:58PM25    that would have to be installed.  Transmission is a

2:58PM 1    BitTorrent client that does come preinstalled on the

2      Ubuntu partition.  It's very similar to the uTorrent

3      program, which is over here.  Somebody had to install the

4      uTorrent program.  That does not come preinstalled by

2:58PM 5    default.

6          Here is the Ubuntu software installer that I was just

7      talking about, which kind of matches that icon over there.

8      That's the graphical user interface tool that you would

9      use to install these types of programs like uTorrent and

2:58PM 10    TOR and VLC.  VLC is a media player.  Does not come

11     installed by default.  The user would have to install that

12     different video player.

13     Q.   I'd like to go into a little detail, if we can go

14     back, about some of these icons.  You said the TOR

2:59PM 15    browser.  Can you describe for the Jury just generally

16     what the TOR browser is?

17     A.   So the TOR browser, TOR stand for "The Onion Router."

18     The term onion is significant.  The term onion is like a

19     layer, right, so an onion has multiple layers.  And the

2:59PM 20    way that the TOR browser works is it encrypts your

21     traffic.  So basically if I have the TOR browser installed

22     on my computer, when I run it up, it's going to create a

23     circuit, if you will.  It's going to connect to three

24     other computers on the network.  And each layer that I

2:59PM 25    connect to is going to be an encrypted tunnel, so it's

2:59PM 1    three layers of encryption.  And so basically I'm going to
      2    connect to the TOR network to connect to three random
      3    nodes on the TOR network.  And then at some point, I'm
      4    going to exit the TOR network.

2:59PM 5        And the purpose of that is to be anonymous.  So when
      6    I exit the TOR network, I could be in the United States, I
      7    could be in Germany, I can be in some other country.  So
      8    if I go to a website, that website that I go to is not
      9    going to know my true location.  It's going to know the
3:00PM 10   location of where I exited the TOR network, not where I
      11   really am.  So people use the TOR browser to be anonymous.
      12   I don't want to say that I'm in Arkansas connecting to a
      13   website.  I want to basically hide my identity and appear
      14   like I'm coming from somewhere else.  So TOR provides that
3:00PM 15   capability.

      16       So from my point of view, you know, when I go to my
      17   local newspaper, washingtonpost.com, the newspaper knows
      18   my IP address.  It knows geographically where I'm coming
      19   from and it might send me advertisements, to the local car
3:00PM 20   dealer, the local flower shop.  The website knows my
      21   location and it can tailor ads and customizations for me.
      22   So if you don't want to have those customizations, you
      23   don't want the websites to know where you're coming from,
      24   you could use TOR to hide your location.  You're coming
3:00PM 25   from a location that they don't know about.

3:00PM 1    Q.    So you can use TOR to go on websites like Google or

2    washingtonpost.com?

3    A.    Yes.

4    Q.    Does TOR operate at the same speed as a browser like

3:01PM 5    Firefox or Internet Explorer?

6    A.    No.  So TOR is substantial slower, because you are

7    going through three nodes and it has to encrypt traffic at

8    each of those layers.  So you're very used to going to a

9    website and the page refreshes very quickly, but when you

3:01PM 10   are using TOR, it's noticeably slower.  It's slower for

11   pages to be fetched.  It's slower for them to be rendered.

12   So it's just a little bit of a noticeably slower user

13   experience when you are using TOR.

14   Q.    So is it fair to say that the anonymity TOR offers is

3:01PM 15   one of the benefits of using the software?

16   A.    Yes.

17   Q.    Is there anything else that you can do with TOR that

18   you can't do with other internet browsers?

19   A.    So TOR allows you to be anonymous.  Another feature

3:01PM 20   of the TOR network is not only are the websites, you know,

21   hidden and impossible to trace, but the second feature of

22   TOR is a concept of a hidden service.  I could have a

23   website on TOR.  I can have a website on a TOR hidden

24   service and it's impossible to know the true location of

3:02PM 25   that website.  And so offenders on TOR are using the

3:02PM 1    second part, not the first part, it's just a web browser,

2    but the second part is having a website on TOR where it's

3    very difficult, if not impossible, to find the true

4    location of a server.

3:02PM 5    Q.   Do these hidden services on TOR have web addresses

6    like www.google.com?

7    A.   No, they don't.  They have a very unique naming

8    convention.  So these hidden services on TOR, instead of

9    having a .com, a .edu, a .org, they have a .onion as the

3:02PM10    address.  Anytime you see an address with a .onion, that's

11    specifically related to a TOR hidden service.

12         Another feature is that they have -- it's not a

13    simple name like Google or Facebook or whatever.  It's a

14    mishmash of like 26 characters.  And then now in Version

3:02PM15    3, it's a mishmash of like 56 characters.  So it's just 56

16    random characters, if you will, .onion to reference a

17    hidden service on TOR.

18    Q.   So if the hidden services have these mishmash of

19    characters as their addresses, how do TOR users find where

3:03PM20    they want to go typically?

21    A.   So there are indexing sites.  There are indexing

22    sites.  There are Wiki sites that basically provide

23    insight on that.

24    Q.   What is the icon right beneath --

3:03PM25              THE COURT:  Mr. Clayman, at your complete

3:03PM 1    discretion, would you find a convenient stopping point in

2    the next five or 10 minutes?

3          MR. CLAYMAN:  Now is perfectly fine, Your Honor.

4    We can stop now.

3:03PM 5          THE COURT:  We will take our afternoon recess.

6    Members of the Jury, remember the research instruction.

7    Do not talk about the case with your fellow jurors or

8    anyone else during this recess.  Don't do any research.

9    Don't allow anyone else to be approached by you and all

3:03PM10    the other aspects of the recess instruction that I've

11    previously given you.  Always bear that in mind.

12          We will be in recess until 3:25.  We'll call for

13    you at that time.  Everyone please stand as the Jury is in

14    recess.  For those in the gallery, please remain in the

3:04PM15    gallery until the Jury has cleared the elevator lobby, and

16    I will tell you when that is.

17          (Jury out at 3:04 p.m.)

18          THE COURT:  You may be seated.  Mr. Clayman, are

19    you anticipating that during this examination, there will

3:05PM20    be introduction or display of CSAM?

21          MR. CLAYMAN:  Yes, Your Honor.  And I can flag

22    the Court beforehand.

23          THE COURT:  Yes.  If you would give us a trigger

24    warning, that would be good.  We will turn off the gallery

3:05PM25    monitors.  You will be responsible for turning off your

3:05PM 1   monitor and the attorneys will be responsible for turning

2   off their monitors.  We'll be in recess until 3:25.

3         (recess taken from 3:05 to 3:25 p.m.)

4         THE COURT:  Mr. Clayman, you may continue.

3:29PM 5   Q.   (BY MR. CLAYMAN.)  Pull up Exhibit 30 on page seven.

6   Mr. Fottrell, you were just discussing the TOR browser

7   before we left.  What's the icon right underneath the TOR

8   browser?

9   A.   Right underneath the TOR browser, there's an icon for

3:30PM 10   uTorrent.

11   Q.   And what is uTorrent?

12   A.   UTorrent is a very popular Torrent program.  It's a

13   tool that is used with a Torrent file and it's a program

14   that is used to go out and fetch the files that are

3:30PM 15   specified in that Torrent file and then download them to

16   the person's computer.

17   Q.   When you received the evidence in this case, was it

18   your understanding that this investigation involved the

19   BitTorrent peer-to-peer network?

3:30PM 20   A.   Yes, it did.

21   Q.   Was it also your understanding that the HSI examiner

22   didn't have much experience with the BitTorrent

23   peer-to-peer network investigations?

24   A.   Yes.

3:30PM 25   Q.   So what were you offering as your role as an examiner

3:30PM 1    in this case?

2    A.    So many times, I'm dealing with HSI agents around the

3    country, the forensic examiners.  They are very good at

4    their job, but I would classify them as generalists.  One

3:30PM 5    day they are doing a child exploitation search warrant and

6    seizing evidence.  They might be doing drugs.  They might

7    be doing money laundering.  There's all different kinds of

8    crime types that HSI is investigating and they are

9    generalists that are in that area.

3:31PM 10        I am a specialist.  I specialize primarily in child

11    exploitation cases.  I am very familiar with the

12    technologies that offenders are using to commit their

13    crimes, and so I'm asked to use my specialized knowledge

14    to help these agents gain more experience in this specific

3:31PM 15    crime type.

16    Q.    So the uTorrent program operates in the BitTorrent

17    peer-to-peer network, is that right?

18    A.    Yes, it does.

19    Q.    What about the program to the right of TOR, what is

3:31PM 20    that?

21    A.    This is the Transmission program.  It is another

22    BitTorrent client.  It's the BitTorrent client that --

23    excuse me.  It's the BitTorrent client that comes

24    preinstalled on the Linux operating system.

3:31PM 25    Q.    How about to the right of that one?

3:31PM 1   A.   It's the Ubuntu software program.  It's the program

2   that allows you to install additional programs.

3   Q.   Could you use this installation program to install

4   TOR, for example?

3:32PM 5   A.   Yes.

6   Q.   UTorrent?

7   A.   Yes.

8   Q.   How about the icon on the far right?

9   A.   That is the VLC, Videoland Corporation.  It's a media

3:32PM10   player that plays different audio formats and video movie

11   formats.

12   Q.   Does this VLC media player come preinstalled on the

13   Linux operating system?

14   A.   No, it does not come preinstalled.  It would have to

3:32PM15   be installed by the computer user.

16   Q.   Just to be clear, which ones of these do not come

17   preinstalled on the Linux operating system?

18   A.   TOR browser, VLC, and uTorrent.

19   Q.   If we could turn to the next page, what's depicted

3:32PM20   here?

21   A.   This is the uTorrent program.  I clicked on the

22   uTorrent program to display it.  And this is kind of what

23   it looks like connected.  This is what the program looks

24   like.  In the title bar at the top of the page, it's

3:32PM25   showing the version number.  It's uTorrent Version 3.55.

3:32PM 1  This is what the uTorrent program would look like when

2  you're running it.

3  Q.   Can you describe for the Jury, the box on the top

4  left-hand corner of the uTorrent program, what is that

3:33PM 5  information?

6  A.   So this box in the upper left-hand corner has the

7  status of Torrent file.   So if I was connected to the

8  BitTorrent network and I was in the process of downloading

9  multiple files, there would be -- the downloading folder

3:33PM 10  would have the ones that are currently being downloaded.

11  The seating folder would have the ones that have completed

12  downloading already and I'm now sharing it with other

13  people and then active versus inactive.   They are just

14  sorting and organizing the Torrents that are there.

3:33PM 15     The distinction that I want to make is, when I

16  created the virtual machine for these exhibits, the

17  virtual machine is not connected to the internet.   It's on

18  my forensics network.   It's not connected to the internet,

19  so none of my exhibits would be displaying any content

3:33PM 20  from the website.   This is as if your network connection

21  was unplugged.   There's no network connectivity.

22  Q.   On that note, what is the box in the lower left-hand

23  corner?   What is that one?

24  A.   So the uTorrent program has an advertising box.   The

3:34PM 25  way that they generate revenue is the software is free to

3:34 PM 1   download, but advertisements are going to be displayed in

2   this white box while you're using this software.  And

3   that's how the vendor makes money is by selling

4   advertisements for these boxes.

3:34 PM 5   Q.   And where do these advertisements come from?  Are

6   they from the internet or somewhere else?

7   A.   So from the internet.  So, like, basically through

8   the protocol, there is -- you know, through an Internet

9   Explorer, you know, cache is how those advertisements get

3:34 PM 10  displayed in this window.

11  Q.   Just want to be clear for the Jury.  Does the

12  uTorrent program that operates on the BitTorrent

13  peer-to-peer network operate over the internet?

14  A.   Yes, it does.

3:34 PM 15  Q.   Turning to the next page, what's shown here?

16  A.   So this is, I clicked on the little "about" button

17  and it just basically shows me again the version number,

18  so it's uTorrent Version 3.55.

19  Q.   And if we could please pull up alongside this exhibit

3:34 PM 20  what's already been admitted as Government's Exhibit 2.

21  Mr. Fottrell, do you recognize Government's Exhibit 2?

22  A.   Yes, I do.

23  Q.   What is it?

24  A.   It is a Torrential Downpour log associated with the

3:35 PM 25  downloading of the marissa.zip file.

3:35PM 1   Q.    And what version of uTorrent or BitTorrent did the

2   undercover officer download from?

3   A.    So the undercover officer -- like that little symbol

4   is the MU symbol, but it shows the same version, uTorrent

3:35PM 5   3.55.

6   Q.    That's the same version that was found on the Linux

7   side of the HP computer?

8   A.    Yes, it is.

9   Q.    We can take Government's Exhibit 2 down.  Turning to

3:35PM 10  the next page.  What's shown here on page 10?

11  A.    So this is, I went to the TOR browser button on the

12  upper left-hand corner, the TOR browser.  I'm not

13  connected to the TOR network because I'm not connected to

14  anything, but I just wanted to look at the bookmarks, the

3:35PM 15  saved bookmarks that the browser allows you to store.  And

16  there's a number of bookmarks that are stored.

17        And you can see the -- what I was talking about a

18  little bit earlier -- the name of the website ends with a

19  .onion, and it has a bunch of gibberish characters, you

3:36PM 20  know, it's not really easy to remember.  They are much

21  more difficult to remember names.

22  Q.    Which bookmark is highlighted here?

23  A.    It's for Candle, so it lists a website and that

24  website is associated with Candle.

3:36PM 25  Q.    Do you know what Candle is on TOR?

3:36PM 1   A.   Candle is a TOR-based search function.  It's a very

2   primitive version of Google search.  I certainly wouldn't

3   compare it to the robustness of a Google search, but it's

4   a very primitive search engine.

3:36PM 5   Q.   Would this Candle search engine come bookmarked on

6   TOR or would someone have to manually do this?

7   A.   That does not come by default.  The user of the

8   computer would have to bookmark this.  It does not come

9   pre-bookmarked.

3:36PM 10   Q.   And if we could turn to page 11.  What's highlighted

11   there?

12   A.   So the next one is just another bookmark for VLS.  It

13   has the list associated with it.

14   Q.   Page 12?

3:37PM 15   A.   Is another one, the Onion link directory.  This is

16   kind of what I was referring to before.  Many times on the

17   TOR network, there is no effective Google search, so

18   there's these link sites that are very popular.  And so

19   this one and the one next to it, it's very popular to --

3:37PM 20   these are bookmarks that -- you would bookmark this page

21   and then there would be further bookmarks that you would

22   basically be able to reference.  This is just all kinds of

23   activity on TOR.  It's mostly criminal activity, so, for

24   example, there might be links for drugs and guns and all

3:37PM 25   kinds of credit card scams and things like that.  And

3:37PM 1    certainly there's going to be links associated with child

2    exploitation material.

3    Q.    If we could turn to the next page.

4    A.    That's the Hidden Wiki.  Again, I'm very familiar

3:37PM 5    with the Hidden Wiki.  I've been going there on and off

6    for about 10 years.  It's mostly criminal activity.  It's

7    an indexing site of all types of criminal activity; guns,

8    drugs, credit card scams, murder for hire, all kinds of

9    crazy stuff.  And then there's a certain part of that that

3:38PM 10   deals with my subject matter, child exploitation material.

11   Q.    And do any of these sites that are bookmarked here

12   come as default bookmarks or were they all user generated?

13   A.    These were all -- the last one about TOR certainly

14   would come with the operating system, but the other ones

3:38PM 15   would have to be done by the computer user.

16   Q.    Turn to the next page.  What's shown here?

17   A.    So now I'm not on TOR anymore.  If you look on the

18   left-hand side on the task bar, I'm bringing up the

19   Firefox browser that does come preinstalled on the Linux

3:38PM 20   partition.  Again, I'm just looking at the -- I'm not

21   connected to the internet.  That's why it's giving me the

22   message that I'm not connected to anything.  But I'm

23   basically just showing the list of bookmarks that the

24   person had created for this browser.

3:38PM 25   Q.    Turning to the next page.  What's shown there on

3:38PM 1    page 15?

2    A.    On page 15 is the home folder.  If you look on the

3    task bar on the left-hand side, I'm bringing up the file

4    manager program, and I'm just displaying the contents of

3:39PM 5    the home directory.  This is just typically what you would

6    see on a computer.  It's going to create a desktop folder,

7    documents, downloads, music, pictures, public.  These are

8    the folders that are automatically created by the

9    operating system when the users are installed.

3:39PM 10    Q.    And would all of these folders or icons normally be

11    visible to the user?

12    A.    No.  One of the distinctions that I made is I wanted

13    to be able to see files that are hidden.  And by default,

14    the Linux operating system hides file names that begin

3:39PM 15    with a period.  So all of the file names that begin with a

16    period wouldn't show up when the user does that, when the

17    user navigates to this folder.  But I wanted to look at

18    everything, so I'm displaying even the hidden ones.

19          It's very similar to the Windows operating system.

3:39PM 20    The Windows operating system has icons that are hidden

21    from the user.  It just gets in the way.  It's kind of

22    clutter.  So there's a way of just not bothering the user

23    by displaying that, but I chose to display everything.

24    Q.    So that first one you circled, the .cache folder,

3:39PM 25    what would typically be in a folder like that?

3:40PM 1    A.    So that is -- a cache folder is used by the different
       2    programs and the operating system itself to store files,
       3    to store thumbnail images, to store cached web pages, to
       4    store all kinds of temporary data that the operating
3:40PM 5    system needs while the computer user is using different
       6    programs.
       7    Q.    Can you please turn to page 16.  And, Mr. Fottrell,
       8    could you describe for the Jury what's shown here?
       9    A.    It's the same thing.  It's the desktop folder.  I
3:40PM10    just went to the menu and I said, list it in display
      11    format instead of icons view.  And the reason I wanted to
      12    do that is if you just look at these folders, the
      13    downloads, music, pictures, public, those folders were all
      14    created on May 13th, 2019, at approximately 1352, which is
3:40PM15    1:52 p.m.  And I generally use that as the born-on date
      16    for this computer.  So when the person installed the
      17    operating system, these folders get created by default, so
      18    this is just a generic way for me to note, when was this
      19    operating system installed.  It could be off by five
3:41PM20    minutes or so, but, generally speaking, at 1:52 p.m. is
      21    when the operating system was installed, because during
      22    that process, it creates these folders by default.
      23    Q.    You testified previously that the Ubuntu Linux
      24    associated file was downloaded to the Windows side on
3:41PM25    May 11th, I believe at around 5:47 or so.  What's

3:41PM 1  happening here then on May 13th?

2  A.   On May 13th is when it's being installed, so

3  basically somebody has taken that image on the 13th,

4  installed it on the computer, booted the computer off of

3:41PM 5  that image, and then installed the operating system.  So

6  May 13th reflects the date, approximately 1352, 1:52 p.m.,

7  when the operating system was installed.

8  Q.   The Linux operating system?

9  A.   Yes.

3:41PM 10  Q.   And would someone have to physically be present at

11  the HP computer to do that?

12  A.   Yes.

13  Q.   And could you just describe generally how they would

14  do that?

3:42PM 15  A.   So, again, there's two different scenarios.  If you

16  downloaded that disk image, scenario number one is you

17  would burn that onto a CD and boot off of that CD.

18  Scenario number two is you would use that Rufus software

19  that was also downloaded.  The Rufus software would allow

3:42PM 20  you to take that disk image, instead of burning it to a

21  CD, you burn it to a thumb drive and then you would boot

22  the computer off of a thumb drive.

23  Q.   So someone would have to physically be there to do

24  the thumb drive version?

3:42PM 25  A.   Yes.   You have to physically be physically present at

3:42PM 1    the computer to plug in the thumb drive, number one.  And,

2    number two, when you turn on the computer, you have to hit

3    the F9 key or whatever that function key is to bring up

4    the boot menu and say, instead of booting off of the hard

3:42PM 5    disk, boot off of the thumb drive, and it would boot off

6    of the thumb drive to begin the installation process.

7    Q.    Then you would have to hit that same key every time

8    you wanted to access the Linux system after it was

9    installed, is that right?

3:42PM 10   A.    Correct.  The computer is only configured to

11   auto-boot one operating system.  It automatically boots

12   the Windows computer.  If you want to boot the other

13   computer, you have to hit that -- you have to physically

14   be present to hit that key to select the other operating

3:43PM 15   system.

16   Q.    So is it fair to say that whoever was using the Linux

17   operating system on this computer had to be in the office

18   where the computer was every single time?

19   A.    Yes, just for that -- absolutely, for that boot

3:43PM 20   process.  In order to boot up the Linux machine, you have

21   to physically be present.

22   Q.    Turning to page 17, what's shown here?

23   A.    This is -- we're at the cache folder, just showing

24   the different folders that are in here.  And this is just

3:43PM 25   temporary files that the operating system used.  So, for

3:43PM 1  example, we are going to see some exhibits associated with

2  things that are in the thumbnail folder.  There's a

3  temporary folder associated with the TOR browser.  So

4  these are just temporary folders that the operating system

3:43PM 5  uses to store files in the normal course of its operation.

6  Q.   What kind of files would be in the thumbnails folder

7  that you circled?

8  A.   So in the thumbnails folder -- if you are using the

9  File Explorer program on the left-hand side and you

3:44PM 10  navigate to a folder like this, just like that's being

11  displayed in thumbnails view, if there was an image, like

12  a JPEG image or a photographic quality, what the operating

13  system is going to do, it's going to create a

14  thumbnail-sized version, so the picture might be very big,

3:44PM 15  but the thumbnail version is very small.  It's going to go

16  out and generate that small thumbnail image and display

17  that thumbnail image.  Instead of this little folder image

18  that's being displayed right here, it would actually be a

19  thumbnail version of whatever that image is.  And the

3:44PM 20  computer does that automatically in the normal course of

21  its business.

22  Q.   So turning to page 18.  Can you describe for the Jury

23  where you are here?

24  A.   I just navigated to the cache folder and then TOR

3:44PM 25  browser.  Then there's a folder called download.

3:44PM 1   Q.   How about on page 19?

2   A.   I'm in a different folder.  I'm basically in a folder

3   called local share.  And that's just a folder where other

4   additional stuff is located.  From me, from an

3:44PM 5   investigative point of view, the file that's significant

6   is the file called "recently-used.xbel."  That's the file

7   that's automatically created by the operating system of

8   recently viewed files.  So like if you're viewing an image

9   or you're viewing a picture, that information of what you

3:45PM 10  viewed recently gets saved in this file.  So from an

11  investigative point of view, that's valuable.  I'm just

12  illustrating as to where that file is located.

13  Q.   And you said that happens automatically, this file is

14  created?

3:45PM 15  A.   Yes.

16  Q.   Turning to page 20, what's shown on this page?

17  A.   This is the gobbledegook associated with it, as I

18  affectionately call it.  If I view the contents of that

19  recently-used file, this is what it looks like in its

3:45PM 20  native format.  You can kind of see that there's a file

21  that's located on the desktop.  There's a file named

22  webcam-collection.prevs.7z.  It has a date that is in --

23  with a Z for Zulu time zone so it's in like GMT format.

24  It's not in the local time zone.  This is kind of how it's

3:45PM 25  stored by the computer.  This is the raw data, if you

3:46PM 1    will, of recently-accessed files on the computer.

2           We're going to see a cleaned-up, easier-to-read

3      version of the same information, but I'm just trying to

4      demonstrate what that underlying data looks like in its

3:46PM 5    native format.

6      Q.    Skipping ahead to page 22.  Can you describe for the

7      Jury what's shown here?

8      A.    Another program on the Ubuntu -- Linux side, excuse

9      me -- was this VLC video player.  And the VLC media player

3:46PM10   keeps track of recently played videos.  And so -- and it

11     basically has a list of eight most recently played videos

12     and just lists information about them.  And so certainly

13     this can be in different formats.  Sometimes it'll display

14     file names of a file that was being viewed.  But in this

3:46PM15   case, they were streaming.  So it's just another way,

16     another protocol or another format that the VLC program is

17     allowed to play.  It can play streaming files, streaming

18     format of files that are stored on this computer.  It's

19     just another protocol that VLC supports to view videos on

3:47PM20   the computer.

21     Q.    Turning to the next page.  Can you describe for the

22     Jury what's shown here?

23     A.    On the File Manager program on the left-hand side, I

24     go to the documents folder and there's only one document

3:47PM25   there.  And, if I'm pronouncing it correctly, it's

3:47PM 1    aguilar.4runner.odt.  It's open desktop format, so it's a

2    Word document that was stored in the documents folder in

3    the Linux partition.

4    Q.    And was this the only document you found in the

3:47PM 5    documents folder?

6    A.    Yes, it is.

7    Q.    Did you find any other documents really anywhere on

8    this Linux side of the computer?

9    A.    No, I did not.  This is the only document that I

3:47PM 10    pretty much found.  This is the only user-generated

11    document I found on this device, on this partition.

12    Q.    Turning to page 24, what's shown there?

13    A.    I just clicked on it to open it up so you can see the

14    word processer software is open on the left-hand side.

3:47PM 15    It's just displaying the contents of this document.

16    Q.    Can you describe for the Jury, what does it say in

17    the top left-hand corner?

18    A.    In the top left-hand corner, it says, "Wholesale

19    Motorcars, 14969 Wildcat Creek Road, Springdale,

3:48PM 20    Arkansas."

21    Q.    And what does this document appear to be?

22    A.    It's a document that reflects that the person has

23    received $1000 of a nonrefundable deposit for a car.

24    Q.    What's the agreement there, agreement date there on

3:48PM 25    the bottom?

3:48PM 1    A.    So it has the buyer's name listed.  And it has an

2    agreement date of June 22nd, 2019.  And it lists the sale

3    agent as "Josh."

4    Q.    Finally, could we please turn to page 25 of this

3:48PM 5    exhibit.  Mr. Fottrell, can you describe for the Jury

6    what's shown here?

7    A.    So I'm at the same thing.  I'm looking at the same

8    document as well.  If you go to the menu and choose

9    document properties, it displays the document properties

3:48PM10    for this document and it just kind of gives some summary

11    information.  So this document was created on June 22nd,

12    2019, at 12:18 p.m. and it was last modified at 12:28 p.m.

13    So it took -- the document was edited for approximately a

14    10-minute window of time, and it even shows that.  Total

3:49PM15    editing time, nine minutes and 53 seconds.

16    Q.    I just want to be clear for the Jury.  The only

17    document you found on this side of the computer, on the

18    Linux side, lists the sales agent name as Josh, is that

19    correct?

3:49PM20    A.    That's correct.

21    Q.    Thank you.  We can take this exhibit down.

22    Mr. Fottrell, you mentioned earlier that there were

23    thumbnail folders or thumbnail files that could be stored

24    in the cache folder.  Do you recall that?

3:49PM25    A.    Yes, I do.

3:49PM 1   Q.   Did you examine the content of that folder?

2   A.   Yes, I did.

3   Q.   And what was in that folder?

4   A.   So within the thumbnails folder, there was two

3:49PM 5   folders of specific interest.  One of them is called

6   normal for normal-sized thumbnail images.  And another one

7   was called large for large-sized thumbnails.  So those two

8   folders contained a number of thumbnail-size images that

9   contained sexually explicit content.

3:50PM 10   Q.   That contained what?  I'm sorry.

11   A.   Sexually explicit content.

12   Q.   Can you just describe for the Jury how a thumbnail

13   image would be created in that folder again?

14   A.   So it's very similar to the Windows side of the

3:50PM 15   computer.  On the Ubuntu side of the computer, if I use

16   the File Explorer program and navigate to a folder and I

17   tell the computer to -- there's different ways you can

18   view it.  You can view it in list format, which doesn't

19   display any icons, or you can say, display it in

3:50PM 20   thumbnails view.  So if you say, I want to view this

21   folder in thumbnails view, the computer has to go out and

22   generate the thumbnail images for all of those -- there's

23   a full-size image.  It's going to look at that full-size

24   image, generate just a small thumbnail, and then display

3:50PM 25   that thumbnail in the window.  So that happens very

3:50PM 1    quickly, it happens automatically on the computer, but the

2    computer actually has to go do some work.  It has to go

3    load that image, generate a thumbnail image, and then

4    display it in the window.  That only happens -- it doesn't

3:51PM 5    happen by default.  It only happens when the user

6    navigates to a folder and chooses to display that folder

7    in thumbnails view.

8    Q.    So the existence of a thumbnail file, what does that

9    tell you about the larger full-sized image associated with

3:51PM 10   that file?

11   A.    So from a forensics point of view, the existence of a

12   thumbnail file is evidence that the full-sized version of

13   that file did exist on that computer at that location at a

14   particular point in time.  There's no way that the

3:51PM 15   computer could create that thumbnail unless the full-sized

16   version of it didn't previously exist or does previously

17   exist at that moment in time.

18   Q.    You said there was a normal-sized folder within the

19   thumbnail folder?

3:51PM 20   A.    Yes.

21   Q.    Did you examine the contents of that folder?

22   A.    Yes, I did.

23   Q.    If you could turn to the white binder and find what's

24   been marked as Government's Exhibit 31.

3:51PM 25        MR. CLAYMAN:  For the Court's knowledge, this

3:51PM 1   exhibit will contain material, contraband.

2          THE COURT:  Sheri, monitors, gallery monitors.

3   Q.   (BY MR. CLAYMAN.)  Do you recognize this exhibit,

4   Mr. Fottrell?

3:52PM 5   A.   Yes, I do.

6   Q.   What is it?

7   A.   So this is a four-page exhibit.  I printed out four

8   rows by four columns, so there's 16 images per page.  I

9   printed out all of the thumbnail images that were in the

3:52PM10   normal folder on the Linux partition.

11   Q.   Is Government's Exhibit 31 a true and accurate copy

12   of the contents of this normal folder?

13   A.   Yes, it is.

14          MR. CLAYMAN:  Your Honor, at this time, I would

3:52PM15   move to admit Government's Exhibit 31.

16          MR. GELFAND:  No objection.

17          THE COURT:  Government's 31 is received.

18          (Government's Exhibit 31 Received)

19          MR. CLAYMAN:  Thank you, Your Honor.

3:52PM20   Q.   (BY MR. CLAYMAN.)  Before we publish, Mr. Fottrell,

21   when you say a folder is called "normal," what does that

22   mean?

23   A.   So normal means normal size.  So, like, when you're

24   viewing thumbnails, there's a setting that the operating

3:52PM25   system considers the standard size, the normal size.  And

3:52PM 1   there's another feature for large or larger size.  So

2   these are the ones that are called large, are called

3   normal, excuse me.

4   Q.   Do these thumbnail files have titles?

3:53PM 5   A.   Yes, they do.

6   Q.   What are the titles?

7   A.   So the titles are the hash value.  So the program,

8   when it creates the thumbnail image, it doesn't care what

9   the original file name was.  It creates a thumbnail and it

3:53PM 10  names the thumbnail with the hash value of the thumbnail

11  that's being created.  That's just a feature of the

12  operating system.  It doesn't care what the original file

13  name was.  It basically bases it on a hash value.  A hash

14  value is a unique way to identify a file on a computer, so

3:53PM 15  the file names are just their hash value.

16  Q.   In looking at the first page of the exhibit you have,

17  what do the thumbnail files depict in this folder?

18  A.   So there's multiple pictures of a minor girl,

19  approximately like eight to 10 years old, eight to 12

3:53PM 20  years old.  Some of the pictures are very sexually

21  explicit.  She's naked.  There's an adult penis next to

22  her vagina.  There's other images of an adult male

23  performing oral sex on a minor female.  Pictures of a

24  minor girl on a toilet.  Pictures of a minor girl lying on

3:54PM 25  a bed with her dress hiked up and there's an adult male

3:54 PM 1    penis next to her vagina.  Very sexually explicit images.

2    Q.   Are there any thumbnails in this folder that aren't

3    of this girl?

4    A.   On the lower left on the first page, there's one that

3:54 PM 5    is not.  So there's -- it's related to a different set of

6    series.  But the other ones are of the same series of

7    girls, correct.

8    Q.   Have you seen the girl depicted in these images

9    before?

3:54 PM 10    A.   Yes, I have.

11    Q.   Where have you seen that?

12    A.   So these are, generally speaking, like the marissa

13    series.  There's a very well-known, well-traded series of

14    images.  The offender community calls that the melissa

3:54 PM 15    series, marissa series, excuse me.  And those are pretty

16    popularly-traded images.

17         MR. CLAYMAN:  Your Honor, at this time, I would

18    ask for permission to briefly publish to the Jury.

19         THE COURT:  You may.

3:55 PM 20    Q.   (BY MR. CLAYMAN.)  Mr. Fottrell, were you able to

21    find any other kind of information or artifacts associated

22    with these thumbnail files in the normal folder?

23    A.   Yes, I did.

24    Q.   What kind of information did you find?

3:55 PM 25    A.   It's called EXIF information, E-X-I-F.  It's extra

3:55PM 1    information that the computer generates and stores when it

2    creates those thumbnail images.

3    Q.    If you could please turn now to the black binder at

4    what's been marked previously as Government's Exhibit 32.

3:55PM 5    A.    Okay.

6    Q.    Do you recognize this exhibit?

7    A.    Yes, I do.

8    Q.    What is it?

9    A.    It's a two-page exhibit that I created that lists the

3:56PM10    EXIF information associated with the thumbnail images in

11    the normal folder.

12    Q.    The images that were just displayed?

13    A.    Yes.

14    Q.    And this information came from the Linux side of the

3:56PM15    computer, is that correct?

16    A.    That is correct.

17    Q.    Is this a true and accurate copy of the EXIF

18    information for these thumbnail files from the computer?

19    A.    Yes, it is.

3:56PM20         MR. CLAYMAN:  Your Honor, I would move to admit

21    Government's Exhibit 32 into evidence.

22         MR. GELFAND:  No objection.

23         THE COURT:  Government's 32 is received.

24         (Government's Exhibit 32 Received)

3:56PM25         MR. CLAYMAN:  Permission to publish, Your Honor?

3:56PM 1     THE COURT:  You may.

2 Q.   (BY MR. CLAYMAN.)  Mr. Fottrell, can you describe for

3 the Jury what each column here represents?

4 A.   So it has three columns.  The first column is the

3:56PM 5 modified date.  That's the date that the thumbnail image

6 was created.  The second column is the file name, as I

7 just mentioned.  It has the hash value that uniquely

8 identifies it.  And the third column is the thumbnail URL,

9 so that's the location of the full-size image that existed

3:57PM 10 when it created the thumbnail image.

11   So with respect to the first one, on May 14th, 2019,

12 we are at the home, the dell_one computer at the desktop.

13 There's another folder called webcam-collection-prevs, and

14 then another sub-folder webcam-collection-1-prevs.  And

3:57PM 15 then in a sub-folder, there's a file named B194 -- excuse

16 me -- B1944.jpg, and that's where the full-size image

17 existed for the thumbnail that was created in the first

18 line.

19 Q.   And that file name, is that file name associated with

3:57PM 20 a thumbnail file?

21 A.   Yes, the file name is associated with the name of the

22 thumbnail.  And in this column is the name of the original

23 full-sized version of it.

24 Q.   And do you recall which thumbnail from the normal

3:57PM 25 folder this one on the top row was associated with?

3:57PM 1   A.    It was on the first page in the lower left corner,

2   which was different from the rest.    That was a different

3   image.

4   Q.    The only one that wasn't of the minor girl?

3:57PM 5   A.    Yes.

6   Q.    How about all the other thumbnail files here, where

7   were they stored?

8   A.    So the other one, if you look at the location where

9   the full-size images were stored were on the dell_one

3:58PM 10   folder, the desktop folder.    There's a folder, there's a

11   sub-folder named "marissa."    And then underneath the

12   folder marissa, there's just a bunch of file names that

13   are numbered 2224, 2207, et cetera.    They are just the

14   file names that are in that folder.    And that's where

3:58PM 15   those thumbnail, the corresponding thumbnail images were

16   created.    So the person using the computer navigated to

17   the marissa folder, just chose to display the contents of

18   that folder in thumbnail's view, and at that moment in

19   time, the thumbnails were created.

3:58PM 20   Q.    And when, based on your review of this exhibit, did

21   that happen?

22   A.    At 5:58 p.m. on May 15th, 2019.

23   Q.    If we could please turn to page two of this exhibit.

24   What's shown there?

3:58PM 25   A.    It's just the additional one.    So these are all

3:58 PM 1  created at 5:58 p.m.  All of these files are in the

2  marissa folder and these are the file names that are

3  associated with them.

4  Q.   These files that you just marked, these are the

3:59 PM 5  full-sized images associated with the thumbnail files we

6  just viewed?

7  A.   Yes.

8  Q.   Now, did you find any other thumbnail files during

9  your examination?

3:59 PM 10  A.   Yes.

11  Q.   We can take this exhibit down.  What other thumbnail

12  files did you find?

13  A.   Besides the normal folder, there's another folder

14  called "large," which has larger-sized versions of it as

3:59 PM 15  well.  So I look in the large size folder, it's very

16  similar.  There's going to be a number of thumbnail images

17  in the large size folder.

18  Q.   If you could find in the white binder what's

19  previously been marked as Government's Exhibit 33.

3:59 PM 20  A.   Okay.

21  Q.   Do you recognize that exhibit?

22  A.   Yes, I do.

23  Q.   What is it?

24  A.   It's a printout.  This time there were larger images,

3:59 PM 25  so I printed out two rows by two columns, so there's four

3:59PM 1    images per page.  These are the contents of all of the

2    thumbnail images that were in the large folder.

3    Q.    Is Government's Exhibit 33 a true and accurate copy

4    of the contents of these thumbnail images?

4:00PM 5    A.    Yes, it is.

6          MR. CLAYMAN:  Your Honor, at this time, I would

7    move to admit Government's Exhibit 33.

8          MR. GELFAND:  No objection.

9          THE COURT:  Government's 33 is received.

4:00PM10          (Government's Exhibit 33 Received)

11          MR. CLAYMAN:  Your Honor, again, if we could

12    please hold off on publishing.

13    Q.    (BY MR. CLAYMAN.)  Mr. Fottrell, just to be clear,

14    when you say this is the large folder, what do you mean by

4:00PM15    that?

16    A.    So this is thumbnails that are created where a person

17    navigated to a folder, doesn't have to be the same folder,

18    it could be two or three different folders, but they

19    navigated to different folders and they chose to select,

4:00PM20    "view large thumbnails."  So this is a little bit larger

21    than the normal size.  And then the computer generated

22    these larger thumbnail images when the person navigated to

23    those particular folders.

24    Q.    So these were created the same way as the normal size

4:00PM25    thumbnails?

4:00PM 1    A.    Yes.

2    Q.    Just in larger form?

3    A.    Yes.

4    Q.    Looking at the exhibit, how many pages is it?

4:00PM 5    A.    It's 14 pages long.

6    Q.    How many images are on a page?

7    A.    Four images per a page.

8    Q.    And what are the titles of these thumbnail images

9    that you found?

4:00PM10   A.    Very similar to -- the file names are titled by the

11    hash value that the program generated when it created the

12    thumbnail image.

13    Q.    Can you describe for the Jury some of the thumbnail

14    images you see on the first page?

4:01PM15   A.    So these are going to be thumbnail images associated

16    with the webcam-collections previews that we have seen

17    some evidence about.  So there are a number of images that

18    are associated with that.  These are the thumbnails

19    associated with the contents of this

4:01PM20   webcam-collection-prevs file that was downloaded.

21    Q.    Based on your review of the thumbnail, what were the

22    full-sized images from that file depicting?

23    A.    Based on the thumbnail images, these are previews for

24    child pornography images and videos.  These are child

4:01PM25   sexual abuse materials.  They are previews.  If you look

4:01PM 1   at the previews, this is very common in the offender

2   community.  When I have a video, if I want to tell

3   somebody about what a video is, I'm going to create what's

4   called a storyboard.  It takes a sample of that video at

4:01PM 5   intervals and it just kind of gives the person just

6   looking at a piece of paper, what is the content displayed

7   in that video.  It's called storyboarding.  It's very

8   popular.  And at the top of the storyboard, it might have

9   the name of the file, the duration of the video, the

4:02PM 10   resolution of the video.  So these images, these

11   storyboard images, are just an effective way to convey

12   what is being depicted in a movie without having to

13   download the entire video.

14   Q.   Can you flip through the next couple pages and just

4:02PM 15   describe for the Jury what thumbnail files are depicted

16   there?

17   A.   So the majority of these images are sexually explicit

18   images of minors, but there's also, mingled within that is

19   a bunch of benign pictures.  There's some pictures

4:02PM 20   associated with a screen saver on the Ubuntu machine, so

21   there's going to be some flowers and some regularly

22   non-explicit pictures that come preinstalled with the

23   Linux operating system.  Everything else is sexually

24   explicit images of minors.

4:02PM 25   Q.   How about if you focus on page four, do you see any

4:02PM 1    thumbnail file that you found investigatively relevant

2    there?

3    A.    Yes.

4    Q.    Which one?

4:03PM 5    A.    So on page four, for example, there is a thumbnail in

6    the lower right-hand corner.  And that thumbnail image is

7    associated with a video that we're going to see more

8    evidence about.  I'm very familiar with the video.  The

9    name of the video is "pedomom."  And so this is the

4:03PM10    thumbnail that is created associated with that video,

11    pedomom.

12    Q.    So just to be clear, what is the existence of this

13    pedomom thumbnail tell you about the pedomom video?

14    A.    So the existence of the thumbnail is evidence that

4:03PM15    the file existed at a particular moment in time.  The only

16    way that the thumbnail could be generated is if the

17    underlying file existed previously.  So here's the

18    thumbnail that's being created.  That is evidence that the

19    underlying file, the referenced file, existed on the

4:03PM20    computer at the moment in time the thumbnail was created.

21    Q.    And based on your training and experience, what do

22    you understand the term "pedo" to mean?

23    A.    Pedo is pedophile, like a sexualized interest in

24    preteens.  You know, generally speaking, a pedophile has a

4:03PM25    sexualized interest in preteens, girls or boys, generally

4:03PM 1   speaking, eight to 14 years old.

2   Q.   Have you reviewed the pedomom video before today?

3   A.   Yes, I have.

4   Q.   What does it depict?

4:04PM 5   A.   So it's a long video.  Most of the videos here are

6   very short.  They are two to three minutes each.  The

7   pedomom video is approximately 30 minutes long.  In a

8   nutshell, it is an adult woman nude taking a shower.

9   There's an adult male in kind of -- somewhat off camera,

4:04PM10   but you can see his penis in certain parts of the camera.

11   The woman gets out of the shower, goes into the bedroom.

12   There's a girl lying on the bed watching a little T.V.

13   And so then later on, the adult woman and man are having

14   sex.  After that, the woman is basically giving a massage

4:04PM15   to the girl lying on a bed.  And then there is some sexual

16   activity.  The woman is spreading the girl's legs, putting

17   her finger near her vagina and very sexually explicit

18   poses of the minor.

19   Q.   If you could turn to page six of this exhibit.  Were

4:04PM20   there any thumbnails on this page that you found

21   investigatively relevant?

22   A.   Yes.  The top of page six in the upper left-hand

23   corner, there's the video associated -- it's a thumbnail

24   associated with the video that we're going to see.  It's

4:05PM25   called "14-year-old girl fuck and suck."  Excuse me.

4:05PM 1     It's a picture of a girl outdoors basically in the

2    woods or in an outdoor setting.  She's basically taking

3    down an adult male's pants and performing oral sex on an

4    adult male penis.

4:05PM 5    Q.   How about on page eight of this exhibit?

6    A.   On page eight in the upper right-hand corner, we're

7    going to see a video called "movie-0216."  And this is a

8    frame from that video.  It's two girls lying on a green

9    bed.  The girls are approximately, like, eight to 10 years

4:05PM 10    old.  And then that's just the frame from that video.

11         Also, on this page in the lower right-hand corner,

12    there's a frame, the thumbnail associated with a movie

13    called "test.avi."  It has a very distinctive bedspread

14    with a plaid pattern on it.  It's clearly a minor girl

4:06PM 15    performing sex with an adult male.

16    Q.   How about on page nine?

17    A.   On page nine, there is another icon in the upper

18    right-hand corner associated -- I can't remember the name

19    of the file.  I can't remember the name of the file, but

4:06PM 20    it's one of the other videos that we have the thumbnail

21    image for.

22    Q.   And if we can, just finally, on page 10, anything of

23    an investigative --

24    A.   On page 10, in the lower right-hand corner, that's

4:06PM 25    the other movie file, "movie-0214" that we referenced.

4:06PM 1   That is a still from that video.  Again, it's the same two

2   minor girls.  It clearly depicts the minors' genitals.

3   And that's the thumbnail that's created for that video.

4   Q.   How do you know, just to be clear again, that this

4:06PM 5   thumbnail is associated with that video?

6   A.   So I can look at them side by side.  I can look at

7   the thumbnail image.  I can play the movie and I can match

8   up exactly where that thumbnail is being generated from.

9   That's exactly what I did in this case.  We certainly have

4:06PM10   the full-size version.  I can look at the movie.  I can

11   look at the thumbnails that are being generated.  I can

12   show that, yep, this frame that gets generated is a frame

13   that's from that movie by visual inspection.

14          MR. CLAYMAN:  Your Honor, at this time, I'd ask

4:07PM15   for permission to briefly publish this exhibit to the

16   Jury.

17          THE COURT:  The gallery monitor should be off, so

18   you may publish.

19   A.   This is "pedomom" in the lower right.  This is

4:07PM20   "14-year-old girl fuck and suck" in the upper left.  This

21   is "216."  "Test.avi."  This is -- I can't remember the

22   name of that one.  This is "214."

23   Q.   (BY MR. CLAYMAN.)  Did you find, Mr. Fottrell, any

24   other information about these thumbnail files during your

4:08PM25   examination?

4:08PM 1    A.    Yes, I did.

2    Q.    If you could turn, please, to what's been previously

3    marked as Government's Exhibit 34 in the black binder.

4    A.    Yes.

4:08PM 5    Q.    What is this exhibit?

6    A.    These are the EXIF information, just like we saw in

7    Government Exhibit 32.  This is the EXIF information for

8    the contents of the thumbnail images in the large folder.

9    Q.    Is this a true and accurate copy of the EXIF

4:08PM10   information for these thumbnail files?

11   A.    Yes, it is.

12          MR. CLAYMAN:  Your Honor, at this time, I would

13   move to admit Government's Exhibit 34.

14          MR. GELFAND:  No objection.

4:08PM15          THE COURT:  Government's 34 is received.

16          (Government's Exhibit 34 Received)

17          MR. CLAYMAN:  Permission to publish, Your Honor?

18          THE COURT:  You may.  And the gallery monitors

19   should be on.

4:08PM20   Q.    (BY MR. CLAYMAN.)  Is this spreadsheet similar to the

21   EXIF information spreadsheet for the normal-sized folder?

22   A.    Yes.  So there's three columns.  The first one is the

23   date that the thumbnail image is created.  And the second

24   column is the name of the hash value of the thumbnail

4:09PM25   image that was created in the large folder.  And then it

4:09PM 1   has the thumbnail URL which shows the original location

2   and the original file name of the thumbnail that was

3   created.  So if you look at the ones for the first -- on

4   most of this page, you can see that we're on the desktop

4:09PM 5   folder.  There's a folder called webcam-collections-prevs,

6   webcam-collections-1-prevs.  And then, for example, the

7   first file is named "11Ybathroom-3M53.jpeg."  And that's

8   just pretty common.  In this case, the "3M53" means three

9   minutes, 53 seconds long.  So it's 11YO in the bathroom.

4:09PM 10   This is the thumbnail for the underlying video that's

11   three minutes and 53 seconds in length.  Some of them are

12   just simple names like 11YO, for years old.  13YO.  Here's

13   another one, "13yo-records-herself-cums-in-shower.jpeg."

14   So these are just the original file names associated with

4:10PM 15   these images, the thumbnail images that are created.

16   Q.   And what date were these thumbnail images in the

17   webcam-collection-prevs folder created?

18   A.   So the person went to this webcam-collection-1-prevs

19   folder on May 14th, 2019, at 5:11 p.m.

4:10PM 20   Q.   And on that date, the full-sized images associated

21   with these thumbnails existed in that folder?

22   A.   Yes.

23   Q.   How about on page two?

24   A.   On page two, we are looking at -- these are all -- we

4:10PM 25   are still at 5:12 on May 14, 2019.  We're still in the

4:10 PM 1   same webcam-collection, webcam-collection-2-prevs.  These

2   are more images with the same file name structure that

3   we're seeing.  "12yo horny on omegle," for example.  Down

4   here in the bottom, "girl white panties webcam 408.jpeg."

4:11 PM 5   Right below that, "hot jb teen masturbates 2.jpeg," where

6   "jb" stands for jailbait.

7       And then right below that, on the bottom of the page,

8   are three videos.  Now we're in a different location at

9   the bottom of the page.  We are at this uTorrent common

4:11 PM 10   wine drive dell_one downloads.  And this is the one of

11   those video files that I was talking about that we just

12   saw.  So "14yo girl suck and fuck," that video existed in

13   this folder on that date in time, on 5-15-2019.  So that's

14   where the video was located in order for the thumbnail

4:11 PM 15   image to be generated.

16       The one below that is "mov-_0214."  That's the

17   location where the video was when that corresponding

18   thumbnail was created.  And finally, on the bottom of the

19   page, the next video, "mov_2-0216" is another video.

4:12 PM 20   Q.   So what about the location where these last three

21   files are saved, what does that tell you about how they

22   were downloaded?

23   A.   So clearly, they are associated with the uTorrent

24   program.  So their folder structure is

4:12 PM 25   "home/dell_one/snap/uTorrent/common/wine/drive_c," blah,

4:12PM 1    blah, blah.  This the folder structure for the uTorrent
       2    program to store all of its configuration files and all of
       3    its temporary files, including the files that are being
       4    downloaded.
4:12PM 5    Q.    So when were the thumbnail files associated with
       6    these uTorrent downloads created?
       7    A.    On May 15th, 2019, at 11:50 a.m.
       8    Q.    And just to be clear, the webcam collection
       9    thumbnails were created the day before, is that right?
4:12PM10    A.    That's correct.  The other ones on the page one and
      11    the top of page two, those were all on the 14th.  Only the
      12    last three on the bottom were on May 15th at 11:50 a.m.
      13    Q.    If we could please turn to page three.  What about
      14    the top three entries on this page?
4:13PM15    A.    So the first two are May 15th, 2019, at 11:50 a.m.,
      16    the same as the date on the previous page that we just
      17    saw.  We're in the same uTorrent downloads folder.
      18    There's another video that's named "pussy pounded."  And
      19    then below that, there's another video that's named
4:13PM20    "test.avi."
      21         The third one, the next entry is the next day.  It's
      22    on May 16th, 2019, at 11:33 a.m.  Same folder, same
      23    directory.  This is where that "pedomom.wmv" file existed
      24    at that date and time when the thumbnail was created.
4:13PM25    Q.    What about the remaining entries on this page here?

4:13PM 1    What does that tell you?

2    A.   If you look at -- these ones on June 22nd, 2019, if

3    you look at the folder structure where we are, we're in

4    the "user/share/backgrounds" folder, so these are the

4:13PM 5    other background images that the user could have chosen to

6    display as the wallpaper on the computer.  So at the

7    moment in time when the computer was seized by law

8    enforcement, this is the image -- if I can do this

9    correctly -- this is the image that was selected as the

4:14PM10    wallpaper.  "On Top of Rubihorn by Matthias Niess," that

11    was the wallpaper image that was the selected wallpaper

12    when the computer was seized by law enforcement.

13    Q.   So that date indicates to you that someone accessed

14    the Linux side of this computer on June 22nd, is that fair

4:14PM15    to say?

16    A.   Correct.  Correct.

17    Q.   Did you find any documents from June 22nd, 2019, that

18    were accused as well?

19    A.   Yes.  That's the same date as the Aguilar document

4:14PM20    that was in the documents folder that listed the

21    salesman's name as Josh.

22    Q.   Mr. Fottrell, you just went over the thumbnail files.

23    Where else on the computer did you look to see if there

24    were any images of minors?

4:14PM25    A.   So normally, in the forensic examination, I'm going

4:14PM 1   to look anywhere I can look.  And so the next places that
2   I would look is in unallocated space.  This is the only
3   location where CSAM, child sexual abuse material images,
4   were stored in the file system.  I'm going to use my
4:14PM 5   forensic tools to see if I can recover images that are in
6   unallocated space.  They used to exist in the file system
7   somewhere, but the user deleted them, and through my
8   forensic tools, I have various levels of success in being
9   able to recover them.  And so, yes, I searched for child
4:15PM 10  sexual abuse materials in unallocated space and I found
11  quite a bit.
12  Q.    And were you searching the unallocated space
13  associated with either side, or both sides?
14  A.    So in this case, I was looking only on the Linux
4:15PM 15  partition.  So it's completely separate and not looking at
16  the Windows partition.  I'm looking at unallocated space,
17  specifically on the Linux partition.
18  Q.    I'd like to direct your attention to what's
19  previously been marked as Government's Exhibit 35 in the
4:15PM 20  white binder.  Do you recognize this exhibit?
21  A.    Yes, I do.
22  Q.    What is it?
23  A.    So this is a 10-page exhibit that I created.  So I
24  searched for child sexual abuse images in unallocated
4:15PM 25  space and I found quite a bit.  So the first thing that I

4:16PM 1   did is, I said, hey, out of all of the images that I

2   found, the full-size images that I found in unallocated

3   space, how many of those images matched the thumbnail

4   image that was in the normal folder?  And there is 10

4:16PM 5   pages of that, so I printed out four images per page, so

6   roughly 40 images, full-size images from unallocated

7   space, exactly matched the thumbnail-size image that was

8   recovered.

9   Q.    So what does that tell you about those images from

4:16PM 10  unallocated space?

11  A.    They previously existed on the computer in the file

12  system with a particular file name.

13  Q.    Is Government's Exhibit 35 a true and accurate copy

14  of these images that you found from the unallocated space?

4:16PM 15  A.    Yes, they are.

16          MR. CLAYMAN:  Your Honor, at this time, I would

17  move to admit Government's Exhibit 35.

18          MR. GELFAND:  No objection.

19          THE COURT:  Government's 35 is received.

4:16PM 20          (Government's Exhibit 35 Received)

21          MR. CLAYMAN:  Permission to briefly publish this

22  exhibit as well, Your Honor.

23          THE COURT:  Yes, confirming that the gallery

24  monitors are off, you may publish.

4:17PM 25  Q.    (BY MR. CLAYMAN.)  What else did you find in the

4:17PM 1    unallocated space of the Linux partition?

2    A.    So there was other images, sexually explicit images

3    of minors, in unallocated space that did not match the

4    normal folder or the large folder.  So these were just

4:17PM 5    other images, sexually explicit images of minors, that did

6    not match anything.  So I printed them out, four images

7    per page, and there's just a large number of those.

8    Q.    Are you talking right now about Government's Exhibit

9    36?

4:17PM 10   A.    Yes, I am.

11   Q.    And is Government's Exhibit 36 a true and accurate

12   copy of these additional images from the unallocated space

13   of the defendant's computer?

14   A.    Yes.

4:17PM 15            MR. CLAYMAN:  Your Honor, we don't intend to

16   publish this, but I would move to admit Government's

17   Exhibit 36 into evidence at this time.

18            MR. GELFAND:  No objection.

19            THE COURT:  Government's 36 is received.

4:18PM 20            (Government's Exhibit 36 Received)

21   Q.    (BY MR. CLAYMAN.)  Mr. Fottrell, can you describe

22   what appears to be depicted in Government's Exhibit 36 in

23   those images?

24   A.    Those are -- so it's the same images in the normal

4:18PM 25   folder.  These are the other images of the "marissa"

4:18PM 1    series that we have been talking about.  So these are much

2    more -- much more complete list of the other marissa

3    images that were recovered.

4    Q.    How many pages long is this other exhibit of images

4:18PM 5    from the unallocated space?

6    A.    It's 14 pages long.  And I printed out four rows by

7    four columns, so there's 16 images per page.

8    Q.    And those are, by and large, all from the "marissa"

9    series that we've been discussing?

4:18PM 10   A.    Yes.

11   Q.    After you found these images in the thumbnail files

12   and the unallocated space, did you try to determine where

13   these images came from?

14   A.    Yes.

4:19PM 15   Q.    Were you able to determine where they came from?

16   A.    Yes.

17   Q.    And where did you determine they came from?

18   A.    Through the use of the uTorrent program.

19   Q.    And anywhere else?

4:19PM 20   A.    Yeah.  The two technologies that are used in this

21   case are the use of the uTorrent program and the use of

22   the TOR browser.

23   Q.    I'd like to focus on the TOR browser first.  Can you

24   please find what's been marked previously as Government's

4:19PM 25   Exhibit 37 in the black binder?

4:19PM 1   A.   Okay.

2   Q.   What is this exhibit?

3   A.   This exhibit is a list of all of the TOR bookmarks,

4   I'm sorry, the TOR Firefox bookmarks that were on the

4:19PM 5   Linux partition.

6   Q.   And is this a true and accurate copy of the TOR

7   Firefox bookmarks that you found from the partition?

8   A.   Yes.

9        MR. CLAYMAN:  Your Honor, at this time, I would

4:19PM10  move to admit Government's Exhibit 37.

11        MR. GELFAND:  No objection.

12        THE COURT:  Government's 37 is received.

13        (Government's Exhibit 37 Received)

14        MR. CLAYMAN:  Permission to publish, Your Honor.

4:20PM15        THE COURT:  You may.

16   Q.   (BY MR. CLAYMAN.)  Can you describe for the Jury

17   what's shown in this exhibit?

18   A.   So these, the TOR browser was installed and the TOR

19   browser basically uses a version of Firefox.  There's a

4:20PM20  number of saved bookmarks that we have.  So if we look at

21   the top part of the page, for the first number of them --

22   menu, toolbar, tags, et cetera -- those all reflect the

23   same date at 2:03 p.m. on May 13th.  That indicates when

24   the TOR browser was installed.  As soon as the TOR browser

4:20PM25  gets installed, it creates those bookmarks by default.

4:20PM 1 The user doesn't have to do that.  And so that date

2 reflects when the TOR browser was installed.

3  And even like the one below that, for

4 "torproject.org," certainly that's the one that comes, and

4:20PM 5 the one below that, those are the ones -- actually, the

6 first, up until here, with the same date of 2:03:45, those

7 are the ones that come preinstalled with the TOR browser.

8  But then a little bit further down, the ones that

9 don't come preinstalled.  So there's a TOR browser for

4:21PM10 Candle that we talked about recently.  VLC, Onion link

11 directory, and the Hidden Wiki, those are the ones that

12 the user would have to bookmark themselves.  They don't

13 come pre-bookmarked by default.

14 Q. And what date were those user-selected ones created?

4:21PM15 A. On May 14th, 2009 (sic).  The first one is at 4:58

16 p.m.  The next one is at 5:40, 5:41 p.m., 5:41 p.m.

17 Q. And just to be clear, you testified previously that

18 the Linux partition was created on May 13th, is that

19 correct?

4:21PM20 A. Yes.

21 Q. That was around 1:50 or so p.m., is that right?

22 A. That's correct.

23 Q. So how long after that was the TOR browser installed?

24 A. Very quickly.  Like within a 20-minute window of

4:21PM25 time, the TOR browser was installed.

4:21PM 1   Q.   Did you find evidence that the user of this computer

2   downloaded anything over the TOR browser?

3   A.   Yes.

4   Q.   If I could direct your attention to the next exhibit,

4:22PM 5   Government's Exhibit 38 in the black binder.  Do you

6   recognize that?

7   A.   Yes, I do.

8   Q.   What is it?

9   A.   So this is one of the files that I found, I talked

4:22PM 10   about.  There's this file named "recently-used.xbel" which

11   keeps track of recently viewed documents on the Linux

12   partition.  And there's an entry associated with the

13   TOR -- it contains one entry associated with the use of

14   the TOR browser to download a file.

4:22PM 15   Q.   Don't get into the contents.  Is this a true and

16   accurate copy of that recently used file data?

17   A.   Yes.

18        MR. CLAYMAN:  Your Honor, I would move to admit

19   Government's Exhibit 38 at this time.

4:22PM 20        MR. GELFAND:  No objection, Your Honor.

21        THE COURT:  Government's 38 is received.

22        (Government's Exhibit 38 Received)

23        MR. CLAYMAN:  Permission to publish, Your Honor.

24        THE COURT:  You may.

4:22PM 25   Q.   (BY MR. CLAYMAN.)  Now, can you please explain to the

4:22PM 1    Jury, Mr. Fottrell, what you're seeing here?

2    A.    So at the top, I'm just listing the location of where

3    this file was located.  So, clearly, we're on the dell_one

4    partition, the local share, TOR browser.  Bunch of other

4:23PM 5    folder names.  And then we get under a recently used dot

6    file.  And then that file contains a single entry.  The

7    date is May 14th, 2019, at 5:05 p.m.  And the file that

8    gets downloaded is in a downloads folder.  And the name of

9    that file is "webcam-collections-prevs.7z."  And 7 zip,

4:23PM 10    it's a compression format, like a zip file format.  It's a

11    way to store multiple files in one archive file.  So 7 zip

12    is just a common archive format to store multiple files in

13    one file.

14    Q.    If we could please pull up alongside this exhibit

4:23PM 15    what's already been admitted as Government's Exhibit 34.

16    Mr. Fottrell, have you seen this "webcam collection prevs"

17    name anywhere else before?

18    A.    Yes.  So clearly the -- on May 14th at 5:05 p.m. is

19    when it was basically being downloaded.  And then there's

4:24PM 20    other evidence of it being viewed.  It was downloaded at

21    5:05 p.m.  A few minutes later, at 5:11 p.m., the contents

22    of it were extracted on the desktop.  It makes a folder

23    called "webcam-collection-prevs," the same file name that

24    we're seeing here without the .7 zip extension.  That's

4:24PM 25    where the contents of this archive file were extracted.

4:24PM 1    So the contents of this archive file were extracted to the

2    desktop computer sometime before 5:11 p.m., because at

3    5:11 p.m., the person navigated to that folder and

4    displayed the contents of them in large view.

4:24PM 5    Q.   Just to be clear, could this be done automatically or

6    would a user have to do this?

7    A.   The computer would have to do this.  The computer

8    does not know where to extract them to.  That requires

9    human intervention.  A human had to say, "Extract the

4:24PM10   contents of that folder on my desktop."

11   Q.   We can take these exhibits down.  Thank you.

12   How else, Mr. Fottrell, did the user of this computer

13   download child pornography on the Linux partition side?

14   A.   Using the uTorrent program.

4:25PM15   Q.   If you could find the next exhibit in the black

16   binder, Government's Exhibit 39.  Do you recognize that

17   one?

18   A.   Yes, I do.

19   Q.   What is it?

4:25PM20   A.   These are lists of Torrent files that I was able to

21   identify on the Linux partition.

22   Q.   Is this a true and accurate list of the Torrent files

23   that you found on the Linux partition?

24   A.   Yes.

4:25PM25           MR. CLAYMAN:  Your Honor, at this time, I would

4:25PM 1   move to admit Government's Exhibit 39.

2                   MR. GELFAND:   No objection.

3                   THE COURT:   Government's 39 is received.

4                   (Government's Exhibit 39 Received)

4:25PM 5             MR. CLAYMAN:   Permission to publish, Your Honor.

6                   THE COURT:   You may.

7    Q.   (BY MR. CLAYMAN.)   Before going into too much detail,

8    Mr. Fottrell, can you explain for the Jury what a Torrent

9    file is?

4:25PM10   A.   I never do a good job of doing this.   All right.   So

11   a Torrent file is, it's a small file that contains

12   instructions that the BitTorrent program needs to go out

13   and fetch those files from the network, from the

14   BitTorrent network.   I try to come up with a good analogy.

4:25PM15   So one analogy that I come up with is, it's not like a

16   cake.   It's like a recipe for a cake.   So basically the

17   Torrent file is similar to a recipe.   If you do this and

18   you add milk and flour and all the ingredients and you

19   stir it and bake it, those are the instructions it needs

4:26PM20   to bake a cake.   And so that's what a Torrent file is.   A

21   Torrent file contains instructions that the uTorrent

22   program needs to go out and fetch the files that are

23   referenced in the Torrent file from the other computers

24   that are sharing that file on the BitTorrent network.

4:26PM25   Q.   So to be clear, does a Torrent file have any content,

4:26PM 1    any image or video associated with it?

2    A.    The Torrent file does not contain the video.  It's

3    not viewable.  You can't view the contents of a video.

4    It's just -- it lists the name of the file, it lists the

4:26PM 5    name of the video, but it contains instructions that are

6    not readable by a human.  It's readable by the uTorrent

7    program.  And those instructions tell it how to go out and

8    fetch that file from the other computers on the internet

9    that are sharing that file and making it available.

4:27PM 10    Q.    So is it fair to say that the only purpose of a

11    Torrent file is to retrieve whatever image or video or

12    file is associated with it on the network?

13    A.    Yes.  So it's clearly directions to go fetch the

14    contents of a file.

4:27PM 15    Q.    When were the Torrent files on the Linux partition

16    created based on this exhibit?

17    A.    So the earliest one was on May 14th, 2019, at

18    5:28 p.m.  The same day at 5:38 p.m.  Then some of them

19    are on, the majority of them are on May 15th, 2019,

4:27PM 20    ranging from 11:35 a.m.  11:41, then there's a break until

21    5:22, 5:25, 5:30, 5:41.  And then the last one, "pedomom,"

22    is on the next day, May 16th, 2019, at 11:21 a.m.

23    Q.    The Torrent file names, did you come across those

24    file names in other parts of your investigation,

4:27PM 25    Mr. Fottrell?

4:27PM 1    A.    Yes.

2    Q.    Where have you seen those before?

3    A.    Could you repeat the question?  I don't quite

4    understand what you're saying.

4:28PM 5    Q.    Did you recognize any of these file titles from the

6    EXIF information associated with the thumbnails?

7    A.    Yes.  Clearly, these Torrent files reference specific

8    videos.  And those videos are corresponding to the

9    thumbnail images that existed in the normal and large

4:28PM 10   folder, correct.

11   Q.    The Torrent file about halfway through, there's "DD"

12   and "DD.1."  What is the significance of those two?

13   A.    So "DD," I'm very familiar with this Torrent file.

14   "DD" stand for "Daisy's Destruction."  It's probably one

4:28PM 15   of the most offensive videos and series of images that I'm

16   familiar with in my career.

17              MR. GELFAND:  Your Honor, may we approach,

18   please?

19              THE COURT:  Yes.  The objection is going to be

4:28PM 20   sustained.  The Jury will disregard.  You will recall that

21   there's certain things that are not evidence.  And

22   something that is not evidence is any testimony that I

23   tell you to disregard.

24              The reason that I'm telling you to disregard this

4:29PM 25   is because "worst" is relative.  And if you don't have an

4:29 PM 1    understanding or a concept, you could attach something

2    that's not intended.  So you are to disregard the

3    testimony about relative "bad" or "worse" or what have

4    you.  Disregard this testimony.  You may proceed.

4:29 PM 5    Q.   (BY MR. CLAYMAN.)  Without using any qualitative

6    descriptions, do you know what "DD" is associated with?

7    A.   Yes.  "DD" is associated with the name "Daisy's

8    Destruction."  It's a series of videos that depict an

9    infant, approximately three or four months old, being

4:29 PM 10   sexually abused, being tortured, being hung by her hands

11   and feet, having hot wax dripped on her.  And the infant

12   is in visible pain and crying and screaming throughout the

13   videos.

14   Q.   What is the significance of the ".1" after the second

4:30 PM 15   DD file?

16   A.   The first entrance is at 5:25 p.m.  The person

17   downloads the DD Torrent.  Five minutes later, at 5:30

18   p.m., the person, whatever website they are, downloads the

19   same Torrent file again.  It knows the Torrent file

4:30 PM 20   previously exists, so it just adds a ".1" to the file

21   name.  So this is an instance where the same Torrent file

22   was downloaded multiple times.  It was first downloaded at

23   5:25 p.m., and then it was also downloaded, the exact same

24   Torrent file, at 5:30 p.m.

4:30 PM 25   Q.   During your examination, were you able to determine

4:30PM 1   exactly what files these Torrent files can retrieve on the

2   BitTorrent network?

3   A.   Yes.

4   Q.   How did you go about doing that?

4:30PM 5   A.   So there is a program called Torrent file editor.

6   It's a forensic's tool.  It's a generally available tool

7   to everybody.  And you can use this Torrent file editor to

8   view the contents of that Torrent file, and it tells the

9   contents of it, what's the name of the files that are

4:31PM 10   referenced by this Torrent file.

11   Q.   If I could direct your attention to what's been

12   previously marked as Government's Exhibit 40 in the white

13   binder.

14   A.   Yes.

4:31PM 15   Q.   Do you recognize that exhibit?

16   A.   Yes, I do.

17   Q.   What is it?

18   A.   These are a collection of print screens or captures

19   that I created using that program that I'm talking about,

4:31PM 20   Torrent file editor.  And I'm going to be looking at each

21   of those Torrent files and then displaying the list of

22   file names that are referenced in those Torrent files.

23   And it lists the information as hash value, other

24   information that's normally stored in the Torrent file.

4:31PM 25   Q.   Mr. Fortrell, is Government's Exhibit 40 a true and

4:31PM 1   accurate copy of these print screens from the Torrent

2   editor file program you've described?

3   A.   Yes.

4          MR. CLAYMAN:   Your Honor, I would move to admit

4:32PM 5   Government's Exhibit 40 into evidence.

6          MR. GELFAND:   One second, Your Honor.   No

7   objection, Your Honor.

8          THE COURT:   Government's Exhibit 40 is received.

9          (Government's Exhibit 40 Received)

4:32PM10          MR. CLAYMAN:   Permission to publish, Your Honor.

11          THE COURT:   You may.

12   Q.   (BY MR. CLAYMAN.)   Mr. Fottrell, can you explain for

13   the Jury what's being shown here?

14   A.   Sure.   So I'm just trying to illustrate that I'm

4:32PM15   using this Torrent file editor program.   I'm looking at

16   the Torrent file that's named

17   "14yogirlsuckandfuck.flv.torrent."   This program tells me

18   that it contains one video file with the same name .flv.

19   It lists how many pieces are in the Torrent file, what the

4:33PM20   size is, et cetera.   So this file is 8.6 megabytes in

21   size.   This file has a unique hash value associated with

22   it, and this is the unique hash value for that Torrent

23   file and for this video.   And then the last field is like

24   the magnet link.   And a magnet link is like a one-click

4:33PM25   download.   So if you click on the magnet link, it's the

4:33 PM 1   same information, but it's just a rapid way to download

2   the contents of a Torrent file.

3   Q.   Just want to be clear.  You said the hash value

4   you're seeing here is associated both with the Torrent

4:33 PM 5   file and the actual video in the Torrent file?

6   A.   Yes.

7   Q.   Did you do this for all of the Torrent files that you

8   found on the defendant's Linux partition side of the

9   computer?

4:33 PM 10   A.   Yes, I did.

11   Q.   Did any of these files contain more than one image or

12   video file?

13   A.   Only the DD.torrent file.  That one contained four

14   videos.  All of the rest contained a singular video.

4:34 PM 15   Q.   I'd like to direct your attention now to what's been

16   marked previously as Government's Exhibit 41 in that same

17   binder.  Do you see that?

18   A.   Yes, I do.

19   Q.   What is it?

4:34 PM 20   A.   So this is what I call like a summary exhibit.  It's

21   a list of why -- I looked at the information that we just

22   saw in that exhibit and I just consolidated it into a

23   table.  It lists the Torrent file name, the name of the

24   files that are contained in the Torrent, and the hash

4:34 PM 25   value, and then the magnet link.  So it's just a one-page

4:34PM 1   summary of all of the information associated with the

2   Torrent files that were on the Linux partition.

3   Q.   And is this exhibit a true and accurate copy of that

4   information?

4:34PM 5   A.   Yes.

6       MR. CLAYMAN:  Your Honor, we would move to admit

7   Government's Exhibit 41 at this time.

8       MR. GELFAND:  No objection.

9       THE COURT:  Government's 41 is received.

4:35PM 10       (Government's Exhibit 41 Received)

11       MR. CLAYMAN:  Permission to publish.

12       THE COURT:  You may.

13   Q.   (BY MR. CLAYMAN.)  Can you just explain for the Jury

14   what's shown in this spreadsheet here?

4:35PM 15   A.   So the first column is the Torrent file that was

16   referencing.  And then the second column is the file name

17   of the files that are contained in that Torrent file.  The

18   third column is the hash value associated with that video.

19   And then the fourth column is the magnet link information,

4:35PM 20   which is pretty much similar information.  And so you

21   could see the difference for that -- I didn't calculate

22   the hash values -- but for the DD Torrent, that's the only

23   one that contains four videos.  So those are the names of

24   the four videos -- I'm sorry -- there's five, the five

4:35PM 25   videos that were in that DD Torrent.  That's the Torrent

4:35PM 1    that contained five videos.  The rest of the Torrent files

2    contained a singular file.

3    Q.    How about the one right below the last DD file that

4    you were just discussing?

4:35PM 5    A.    The marissa.zip.torrent.  So that is a Torrent file

6    that contains one zip file, marissa.zip.  Even though the

7    Torrent file contains just one file, that zip file is an

8    archive file.  That archive file can contain numerous

9    images, and it contains numerous images.

4:36PM 10   Q.    Have you viewed all of the files here listed in the

11   second column before today?

12   A.    Yes.

13   Q.    Mr. Fortrell, did you find any forensic evidence

14   showing that the uTorrent program had actually been used

4:36PM 15   or utilized on the Linux side of this computer?

16   A.    Yes.

17   Q.    Where did you find that evidence?

18   A.    Basically looking at the web-browsing activity,

19   internet cache records.  I testified previously that there

4:36PM 20   was this advertising logo that shows up when the uTorrent

21   program is being run, so I was looking for evidence of

22   advertisements that were being displayed when that

23   uTorrent program was being run.

24   Q.    If you could direct your attention to what's been

4:36PM 25   marked as Government's Exhibit 42 in that black binder.

4:37PM 1  Do you recognize this exhibit?

2  A.    Yes, I do.

3  Q.    What is it?

4  A.    These are what I'm calling the internet cache

4:37PM 5  records.  These are the records that are automatically

6  maintained by the Linux operating system associated with

7  the uTorrent program.  So the uTorrent program was serving

8  up ads in that window.  The computer tracked that and

9  logged that information, so these are the dates and times

4:37PM10  of when those ads -- I don't know what the ad looked like,

11  I don't have the ad itself, but I just have information

12  about an ad being displayed in that window.

13  Q.    And is Government's Exhibit 42 a true and accurate

14  copy of those internet cache Explorer records that you

4:37PM15  were just describing?

16  A.    Yes.

17        MR. CLAYMAN:  Your Honor, we would move to admit

18  Government's Exhibit 42 at this time.

19        MR. GELFAND:  No objection.

4:37PM20        THE COURT:  Government Exhibit 42 is received.

21        (Government's Exhibit 42 Received)

22        MR. CLAYMAN:  Permission to publish, Your Honor.

23        THE COURT:  You may.

24  Q.    (BY MR. CLAYMAN.)  Mr. Fortrell, can you explain for

4:37PM25  the Jury what's shown here?

4:37PM 1    A.    Sure.   There's two columns of information.   The first
2    column is the date and time.   And then the second time is
3    the URL that is referenced.   And so even though this looks
4    like gibberish, let me see if I can walk you through that.
4:38PM 5    So if I pick this line a little bit, you can see we're at
6    a website that says "bt.co."   It's for "bittorrent.co."
7    There's something called "ads.hdml," which is an ad
8    server.   And, basically, if you look at some other crazy
9    fields that are on here, it shows, "client data equals
4:38PM10   uTorrent 3.55."   And that's kind of what we're seeing.   So
11   the version of uTorrent that was on the Linux partition
12   was uTorrent 3.55.   So here is just the web page link that
13   is displaying an advertisement in the uTorrent program.
14   So this is just evidence that certainly at these dates and
4:38PM15   times, the uTorrent program was active, it was
16   communicating to the network.   And then the advertisements
17   were being downloaded and being displayed to the person
18   using the uTorrent program.
19   Q.    If we could pull up alongside this exhibit what's
4:39PM20   already been admitted as Government's Exhibit 39.   What,
21   again, is Government's Exhibit 39, Mr. Fortrell?
22   A.    This is the Torrent file and the location for the
23   Torrent files that were recovered.
24   Q.    So when was the first Torrent file in that exhibit
4:39PM25   downloaded?

4:39PM 1    A.   If you look at the first two Torrent files, they were

2    downloaded at 5:28 p.m. and 5:38 p.m.  And this is very

3    similar on Government Exhibit 42.  There is dates,

4    certainly within the 5:28 time period, the same time

4:39PM 5    period.  5:37 p.m., which is -- this one on the left-hand

6    side is 5:38 p.m.  Here's an advertisement that's being

7    served to the uTorrent program at 5:37 p.m.  So there's

8    clear evidence that the uTorrent program was being active

9    at this time when those two movie files were being -- when

4:40PM 10   those two movie files, Torrent files, were downloaded and

11   extracted, run.

12   Q.   Is it fair to say the uTorrent program is active when

13   most of these Torrent files are downloaded?

14   A.   Yes.

4:40PM 15   Q.   Finally, Mr. Fottrell, did you look to see if there

16   was evidence that anyone had actually viewed the content

17   associated with these Torrent files on this computer?

18   A.   Yes, I did.

19   Q.   Where did you look for that?

4:40PM 20   A.   With the VLC program.

21   Q.   If I could direct your attention to Government's

22   Exhibit 43 and 44.  Do you recognize those exhibits?

23   A.   Yes, I do.

24   Q.   What is Government's Exhibit 43?

4:40PM 25   A.   Government Exhibit 43 is the contents of a file

4:40PM 1   that's named "vlc-qt-interface.conf."  It's a

2   configuration file that contains information about

3   recently viewed files in the VLC program.

4   Q.    What is Government's Exhibit 44?

4:40PM 5   A.    So Government Exhibit 44 is a kind of cleaned-up

6   version of that.  I dumped it into a spreadsheet.

7   Government Exhibit 43 is a little bit difficult to read

8   and parse through.  Government Exhibit 44 is a summary of

9   that.  It contains information of the name of the entry in

4:41PM 10  the recents folder, the hash value, and then the

11  corresponding file name.  So it's just a more unified

12  exhibit listing the videos that were viewed through the

13  VLC program.

14  Q.    And are Government's Exhibit 43 and Exhibit 44 true

4:41PM 15  and accurate copies of this VLC media player logs?

16  A.    Yes.

17         MR. CLAYMAN:  Your Honor, at this time, I would

18  move to admit Government's Exhibit 43 and 44.

19         MR. GELFAND:  No objection.

4:41PM 20        THE COURT:  Government's Exhibit 43 and

21  Government's Exhibit 44 are received.

22         (Government's Exhibits 43-44 Received)

23  Q.    (BY MR. CLAYMAN.)  If we could please publish 44.

24  Mr. Fortrell, can you describe for the Jury what's shown

4:41PM 25  here?

4:41 PM 1  A.   Sure.  So in the first column, there is the raw

2  information, if you will, from the VLC recents folder.

3  The second column over is the stream ID.  And if I look at

4  this column, there's a stream ID field here.  It says

4:41 PM 5  stream ID equals one, stream ID equals two.  So I'm just

6  extracting that entry from the left-hand side to list the

7  stream ID.

8       The next thing is the hash value.  And I'm just

9  referencing the hash value that's referenced in the first

4:42 PM 10  part of the string, which I'm kind of highlighting there.

11  And then the last column is the corresponding file name

12  that's associated with that.  So, for example, on the next

13  first column, the hash value that begins with "5C33"

14  corresponds with the file named "movie_0214."

4:42 PM 15  Q.   And focusing for a second on the file information in

16  the first column, all the entries end with the word

17  "streaming."  What is the significance of that?

18  A.   So the VLC program is robust.  It's developed over

19  time.  And so when it first came out, it was only allowed

4:42 PM 20  to view files that are selected on the computer.  Now,

21  with streaming services, you can receive things that are

22  streaming, so it supports the ability for streaming from

23  sites that are streaming movies, like Disney Plus and Hulu

24  and other sites that are streaming things.  Certainly the

4:43 PM 25  VLC program contains the technology that supports those

4:43PM 1   streaming protocols to stream those movies.  In this case,

2   those movies are certainly not being streamed from Netflix

3   or Disney Plus.  These movies are being streamed from the

4   computer itself.  And that's being referenced where you

4:43PM 5   see all of these little lines, where it has an "@" sign,

6   "@127.0.0.1," that does not mean Netflix or Hulu or some

7   other vendor.  That references this computer, the computer

8   that's running, the Linux computer that's running.  That

9   is the naming convention that the computer uses to

4:43PM 10  reference itself.  So even though it says "streaming,"

11  it's not really streaming in the sense that it's streaming

12  from another site.  It's using the streaming protocol to

13  display the video that exists on this computer.

14  Q.    So just to be clear, this is not streaming these

4:44PM 15  videos from the internet.  That's not what this means?

16  A.    Yes, that is not happening.  So, clearly, 127.0.0.1

17  does not mean the internet.  It means this computer.

18  Q.    So these videos were being played locally from the HP

19  computer on the Linux partition side?

4:44PM 20  A.    Yes.

21  Q.    Now, were you able to obtain the files that are

22  listed there in the fourth column, the "file name" column?

23  A.    Yes, I was.

24  Q.    How were you able to determine that you obtained

4:44PM 25  those exact files?

4:44PM 1   A.    So through other investigations, other BitTorrent

2   investigations that I am involved with over the years, I'm

3   very familiar with those images.  I'm very familiar with

4   some of my peers and some of my partners in the law

4:44PM 5   enforcement community.  And they can basically, if I

6   didn't have access to them, I could say, "Hey, here's a

7   Torrent file, here's a hash value."  Certainly the law

8   enforcement community has the ability to aggregate some of

9   those videos.  So I was able to identify all of the images

4:44PM 10   in those Torrent files and then get access to the

11   underlying content.  I'm certainly not going to use the

12   uTorrent program to go out and fetch them.  I'm going to

13   go through my law enforcement channels to get the contents

14   of those Torrent files.

4:45PM 15   Q.    So just to be clear, you're referring to images, but

16   the first row is actually a zip file, correct?

17   A.    Yes.

18   Q.    And what about the next seven rows?

19   A.    So the first one is a zip file.  And then, video

4:45PM 20   file, video file, video file.  The rest of them are video

21   files.

22   Q.    And just to be clear, would a zip file open in the

23   VLC player?

24   A.    No.  So VLC plays video files, and

4:45PM 25   "playtoysweetie.7zip" is not a video file.  So if the

4:45PM 1    person tried to view that, it's not viewable in the VLC

2    program.

3    Q.    How about the other seven files you see there?

4    A.    The other seven files are viewable in the VLC

4:45PM 5    program.

6    Q.    And you said you did retrieve these seven video files

7    from a law enforcement partner?

8    A.    Yes.

9    Q.    If we could keep this exhibit up.  Mr. Fortrell, if

4:45PM10    you could please turn to what's been marked in the white

11    binder as Government's Exhibit 45.

12    A.    Okay.

13    Q.    Do you recognize that exhibit?

14    A.    Yes, I do.

4:46PM15    Q.    What is it?

16    A.    It's a thumb drive.  It's a thumb drive that I have

17    that contains certain exhibits.  It contains these other

18    videos.  So these videos, the full-size versions of those

19    videos is stored on this thumb drive.

4:46PM20    Q.    Have you reviewed the contents of that thumb drive

21    before your testimony today?

22    A.    Yes, I have.

23    Q.    Just to be clear for the record, does this thumb

24    drive contain what's been marked as Government's Exhibit

4:46PM25    45, 47, 49, 51, 53, 55 and 57?

4:46PM 1    A.    Yes, it does.

2    Q.    And, Mr. Fottrell, are these seven video files that

3    are identified in Government's Exhibit 44 contained on

4    that thumb drive?

4:46PM 5    A.    Yes.

6    Q.    Just to be abundantly clear for the Jury, how do you

7    know that these video files on this thumb drive are the

8    exact video files that were viewed on the defendant's

9    computer?

4:47PM 10   A.    So I copied these video files onto this thumb drive

11   and I verified that these video files are on this thumb

12   drive.

13   Q.    And using the hash values, were you able to determine

14   that these were the exact video files?

4:47PM 15   A.    Yes.   Using the hash values, these are the exact --

16   by hash value analysis, they are the exact same contents,

17   correct.

18          MR. CLAYMAN:   Your Honor, at this time, I would

19   move to admit the thumb drive containing Government's

4:47PM 20   Exhibit 45, 47, 49, 51, 53 and 55.

21          MR. GELFAND:   Could we take one second to

22   organize ourselves for one second?

23          THE COURT:   Yes.

24          MR. GELFAND:   Can you say those numbers one more

4:47PM 25   time?

4:47PM 1     MR. CLAYMAN:  Sure.  45, 47, 49, 51, 53, 55.  And

2 I apologize.  I left off 57.

3     MR. GELFAND:  We have no objection, Your Honor.

4     THE COURT:  To be sure that I'm clear,

4:48PM 5 Mr. Clayman, the thumb drive that he has referenced is a

6 single thumb drive that contains all of the individual

7 files or exhibits that you've identified?

8     MR. CLAYMAN:  Yes.  And I would be happy to put

9 on the record which exhibit is which video if the Court

4:48PM10 would like.

11     THE COURT:  But there's one thumb drive that's

12 coming into evidence?

13     MR. CLAYMAN:  That's correct, Your Honor.

14     THE COURT:  And the one thumb drive contains the

4:49PM15 seven files that you referenced?

16     MR. CLAYMAN:  Yes, Your Honor.

17     THE COURT:  Which are cross-referenced to all but

18 the first file on Government's Exhibit 44?

19     MR. CLAYMAN:  That's correct, Your Honor.

4:49PM20     THE COURT:  All right.  The Court will receive --

21 what sticker number is on this thumb drive?

22     MR. CLAYMAN:  I believe it's marked with each

23 exhibit number on the thumb drive, Your Honor.

24     THE COURT:  The Court will receive the omnibus

4:49PM25 exhibit that contains all of the individual video exhibits

4:49PM 1    as identified, which again are Government's Exhibit 45,

      2    47, 49, 51, 53, 55, and 57.

      3            (Government's Exhibits 45, 47, 49, 51, 53, 55 and

      4        57 Received)

4:50PM 5    Q.   (BY MR. CLAYMAN.)  Mr. Fottrell, did you create

      6    storyboards of these seven video files?

      7    A.   Yes, I did.

      8    Q.   Can you explain for the Jury again what a storyboard

      9    is?

4:50PM10    A.   A storyboard is a utility, a program.  It's a common

    11    technique where, instead of having the video, I can create

    12    a storyboard.  And it's going to have four rows by four

    13    columns that are sampled periodically through the video so

    14    it shows stills of the video.  And you can kind of get a

4:50PM15    sense as to what's being depicted in the video by just

    16    looking at those snapshot pictures along the way.  It

    17    certainly contains information about the file name, the

    18    duration of the video, the resolution of the pictures.  So

    19    it's just a simple way to look at a piece of paper to see

4:50PM20    sample frames from that video and get a sense as to what

    21    the video depicts.

    22    Q.   Can you look in the white binder you have in front of

    23    you there and please find Government's Exhibits 46, 48,

    24    50, 52, 54, 56 and 58?

4:51PM25    A.   Yes, I do.

4:51PM 1    Q.    Do you recognize those exhibits?

2    A.    Yes, I do.

3    Q.    What are they?

4    A.    These are the storyboards that I created for these

4:51PM 5    videos that are referenced in Government Exhibit 44.

6    Q.    And are these storyboards true and accurate

7    reflections of the contents of those videos?

8    A.    Yes, they are.

9           MR. CLAYMAN:  Your Honor, at this time, I would

4:51PM10    move to admit Government's Exhibit 46, 48, 50, 52, 54, 56,

11    and 58.

12           MR. GELFAND:  No objection.

13           THE COURT:  Are these hard copy?

14           MR. CLAYMAN:  Yes, these are each individual

4:51PM15    paper copies of these exhibits, Your Honor.

16           THE COURT:  All right.  The individual separate

17    exhibits, the storyboards as described, will be received,

18    which is to say the Court is receiving Government's

19    Exhibits 46, 48, 50, 52, 54, 56, and 58.

4:52PM20           (Government's Exhibits 46, 48, 50, 52, 54, 56,

21            and 58 Received)

22           MR. CLAYMAN:  Your Honor, would it be possible to

23    turn off the T.V.s to the gallery?  Thank you.

24           THE COURT:  I'm confirming that the gallery

4:52PM25    monitors are turned off.

4:52PM 1     MR. CLAYMAN:  I would ask permission to publish

2 these storyboards, Your Honor, and I'll go one at a time.

3     THE COURT:  You may.

4 Q.  (BY MR. CLAYMAN.)  Pull up Government's Exhibit 46.

4:52PM 5 Mr. Fortrell, which video is this a storyboard of?

6 A.  The name of it is "mov_0214."

7 Q.  How long is this video?

8 A.  20 seconds in duration.

9 Q.  Please pull up what's been marked as Government's

4:52PM10 Exhibit 50.

11 A.  This is the video "pedomom.wmv."  The duration is 29

12 minutes, 51 seconds.

13 Q.  Government's Exhibit 52?

14 A.  This is named "asi se mama linda."  The duration of

4:53PM15 this video is 12 minutes.

16 Q.  Can you describe for the Jury what's depicted in this

17 storyboard?

18 A.  It's a minor female engaged in oral sex and sex with

19 an adult male.

4:53PM20 Q.  Government's Exhibit 54?

21 A.  The name of this is "14yogirlsuckandfuck."  The

22 duration of this video is three minutes and 30 seconds.

23 Q.  Exhibit 56?

24 A.  The name of this video is "pussy pounded."  It's two

4:53PM25 minutes and 46 seconds in duration.

4:53PM 1    Q.    What about Government's Exhibit 58?

2    A.    The name of this is "test.avi."  It's one minute and

3    10 seconds long.

4    Q.    Thank you.  We can take these exhibits down.

4:54PM 5    Now, we were just discussing videos.  I'd like to switch

6    gears and focus on images on the Linux partition side of

7    this HP computer.  Did you find any evidence showing that

8    image files were viewed on the Linux partition?

9    A.    Yes.

4:54PM 10   Q.    If I could direct you to the black binder, what's

11   been previously marked as Government's Exhibit 59.

12   A.    Okay.

13   Q.    Do you recognize this exhibit?

14   A.    Yes, I do.

4:54PM 15   Q.    What is it?

16   A.    This is a spreadsheet that I created listing the

17   contents of a recently used .xbel file from the Linux

18   partition of the defendant's computer.

19   Q.    And is this a true and accurate copy of the data

4:54PM 20   associated with that recently used file?

21   A.    Yes, it is.

22         MR. CLAYMAN:  Your Honor, I would move to admit

23   Government's Exhibit 59.

24         MR. GELFAND:  No objection.

4:54PM 25         THE COURT:  Government's Exhibit 59 is received.

4:55PM 1           (Government's Exhibit 59 Received)

2          MR. CLAYMAN:  Permission to publish, Your Honor.

3          THE COURT:  Yes, you may.  And the gallery

4  monitors may be turned on.

4:55PM 5  Q.   (BY MR. CLAYMAN.)  Mr. Fortrell, can you describe for

6  the Jury what's shown here?

7  A.   At the top of the page, we're under the home dell_one

8  local share.  In that folder, there's a file named

9  "recently-used.xbel."  I extracted the contents of that

4:55PM10  file.  It lists a date that the person viewed that file

11  and it lists the corresponding file name.

12      So the first entry is on May 14th, 2019, at 5:00 p.m.

13  It shows, for example, that on the desktop folder, there

14  is the file that's named "webcam-collection-prevs.7zip."

4:55PM15  Q.   Let me stop you there, Mr. Fortrell.  Where have you

16  seen that file before?

17  A.   So previously, we have an exhibit that shows that it

18  was in the TOR browser bundle downloaded folder.  So

19  here's the example where that file gets copied from that

4:55PM20  downloads folder, and at 5:09 p.m., it is on the desktop.

21  And then the next entries that we see starting at

22  5:11 p.m. is where the contents of that 7 zip file are

23  being extracted.  So now we have the folder

24  webcam-collections-prevs, and then we have the other

4:56PM25  sub-folder, 1, and then the contents of it.  So this is

4:56PM 1    evidence that on 5:11 p.m., the contents of this 7 zip
       2    file were extracted to the desktop of the Linux partition.
       3    Q.    When you say extracted, what do you mean by that
       4    exactly?
4:56PM 5    A.    So the 7 zip is an archive file, and it just contains
       6    the images.  In order to view the images that are in
       7    there, they have to be extracted from that archive.  So
       8    the process of opening up an archive file and extracting
       9    images is what I'm referring to.  So the person using the
4:56PM 10   computer extracted the contents of that archive file on
       11   the desktop of their computer.
       12   Q.    How about the -- rather, when were those files
       13   visited based on this exhibit?
       14   A.    So this all happened on May 14th at approximately
4:57PM 15   5:11 p.m.
       16   Q.    Do you see any information about the following day?
       17   A.    Right below that, on the next day, on May 15th at
       18   5:53 p.m., showing the same location on the desktop of the
       19   folder -- excuse me -- the desktop folder, there's an
4:57PM 20   archive file called "marissa.zip."  And then at 5:53 p.m.,
       21   that zip file exists on the desktop folder.  And then a
       22   few minutes later, at 5:58 p.m., the contents of that
       23   marissa.zip file are extracted to the desktop.  It makes a
       24   sub-folder called "marissa," and then all of the files
4:57PM 25   that are included in that archive are extracted at 5:58

4:57 PM 1   p.m.

2   Q.   What's the name of the first file that was extracted

3   there right below marissa.zip?

4   A.   The name of it is "2_pthc ultra hard pedo pedofilia

4:57 PM 5   (new) 065."

6   Q.   Based on your experience and your training, what does

7   "PTHC" stand for?

8   A.   PTHC stands for "preteen, hard core."

9   Q.   And what is that generally associated with?

4:58 PM 10   A.   So it's minors.  It's minors, aged eight to 12 years

11   old engaged in sexual activity.  So it's not naked kids.

12   Hard core means sexual acts:  Oral sex, vaginal sex, anal

13   sex.  So hard core depicts sexual activity.

14   Q.   Going through this exhibit, what are on the next 12

4:58 PM 15   or so pages?

16   A.   So the next few pages are all of the images

17   associated with the marissa folder.

18   Q.   What date is associated with all of these marissa

19   images?

4:58 PM 20   A.   May 15th, 2019, at 5:58 p.m.

21   Q.   So what does that tell you the computer user did on

22   May 15th at around 5:58?

23   A.   So at 5:58, the user extracted all of the images that

24   were in that marissa.zip file, approximately 400 of them.

4:59 PM 25   Q.   Did the user do anything with the files?  Did they

4:59PM 1    access them or view them in any way?

2    A.    This does not -- yeah, this just says -- yeah, they

3    were used.  Basically, the computer is recognizing that

4    they were extracted at this point in time.

4:59PM 5    Q.    How about the last four or so entries on this exhibit

6    on page 13, what's happening there?

7    A.    This is, again, the computer is just keeping track of

8    recently used files.  So this is that Aguilar 4 Runner

9    document we have.  So on June 22nd, 2019, at 12:28 p.m.,

4:59PM 10   it's basically showing that this "Aguilar 4 Runner.odt"

11   document was referenced.

12   Q.    And that's the document where the sales agent name is

13   listed as Josh?

14   A.    Yes.

4:59PM 15   Q.    That's the only document you found on the Linux

16   partition side of this HP computer?

17   A.    Yes.

18          MR. CLAYMAN:  Your Honor, this would be a good

19   stopping point, although I'm happy to continue if Your

5:00PM 20   Honor would like.

21          THE COURT:  No, I was just getting ready to ask

22   you for the same thing.

23          So we will take our evening recess.  Everybody

24   good with coming back tomorrow at 8:30?  Since you may

5:00PM 25   have forgotten the recess instruction, I'm going to read

5:00PM 1    it again, just because I'm supposed to.

2           During this recess and every other recess, you

3    must not discuss this case with anyone, including other

4    jurors or members of your family or people involved in the

5:00PM 5    trial or anyone else.  Do not allow anyone to discuss the

6    case with you or within your hearing.  Only you have been

7    chosen as jurors in this case.  Only you have sworn to

8    uphold the law.  No one else has been chosen to do this.

9    You should not even talk among yourselves about the case

5:01PM10    before you have heard all the evidence and the case has

11    been submitted to you by me for deliberations because it

12    may affect your final decision.

13          If anyone tries to talk to you about the case,

14    please let me know about that immediately through a court

5:01PM15    security officer or one of the Court clerk staff members.

16    Again, when I say you must not discuss the case with

17    anyone, I mean, do not discuss it orally, verbally, or by

18    e-mail, text message, blog, or engage in any other form of

19    written, oral, or electronic communication as I have

5:01PM20    instructed you before.  Again, do not read any newspaper

21    or other written account, whether that be actual hard copy

22    newspaper or any type of digital news content.  Do not

23    watch any televised account or news content.  Do not

24    listen to any radio news content about this trial.

5:02PM25          You must not conduct any internet research or

5:02PM 1   consult with any other sources of any kind about this

2   case.  You must not conduct or view or post anything on

3   social media about the case.  And all of these admonitions

4   apply, not only to the case, but to the people involved in

5:02PM 5   the case or its general subject matter.  All of this is

6   because you must keep your mind open and free of outside

7   information.  Only in this way will you be able to decide

8   the case fairly based solely on the testimony, the

9   evidence presented in the courtroom, and my instructions

5:02PM 10   to you on the law.  If you were to decide this case on

11   anything else, you will have done an injustice.  It would

12   be a violation of your oath for you to base your decision

13   on some reporter's view or opinion, or upon other

14   information that you acquire from outside the courtroom.

5:03PM 15   It is very important that you follow these instructions.

16   I may not repeat this instruction in its entirety

17   at each of our recesses, but this full instruction applies

18   equally at every recess.

19   With that, we will adjourn for the evening.  We

5:03PM 20   should have, again, some sort of treat in the morning if

21   you want to come a few minutes early for some coffee or

22   whatever and a breakfast treat.  But we will call for you

23   and resume court at 8:30 in the morning.

24   Everyone please stand as the Jury is in recess.

5:03PM 25   Everyone in the gallery please remain in the gallery until

5:03PM 1    the Jury has cleared the elevator lobby.  I'll let you

2    know when that is.

3              (Jury out at 5:03 p.m.)

4              THE COURT:  Everyone may be seated.  Those in the

5:05PM 5    gallery may leave at this time if you like.  Court will

6    remain in session.  I would ask counsel to please remain

7    here for a minute.

8              Any other matters that the government would like

9    to take up?

5:06PM 10             MR. ROBERTS:  No, Your Honor.

11             THE COURT:  Any other matters that the defense

12    would like to take up?

13             MR. GELFAND:  No, Your Honor.  I guess one

14    logistical question.  We had raised with your staff that

5:06PM 15    we have the need for potentially a translator.  I think we

16    have coordinated.  I just wanted to kind of plant the

17    seed.  We're willing, if it helps the Court and if the

18    government is agreeable, to take that witness out of order

19    if that becomes necessary.  I just wanted to plant that

5:06PM 20    seed.

21             THE COURT:  So you have lined up an interpreter?

22             MS. CRAIG:  It's our responsibility.  And I have

23    Debbie Monday between 9:00 and noon, and if I could narrow

24    that down for her, or tell her to be here at 9:00.

5:06PM 25             THE COURT:  If she has the whole morning cleared

5:07PM 1    up, it would be best that we reserve the flexibility.

2    We'll just pay her for the half day.  She can just be on

3    stand-by until we need her.

4            MS. CRAIG:  That's fine.  I'll let her know.

5:07PM 5            THE COURT:  Would that be a problem, if for some

6    reason the government is still presenting testimony, to

7    let this witness be called out of order?

8            MR. ROBERTS:  Your Honor, I prefer not in the

9    government's case.  However, I believe we're going to be

5:07PM 10   done by end of day Friday.

11           THE COURT:  Well, let's put a pin in that and

12   let's discuss that again tomorrow afternoon.

13           MR. ROBERTS:  Yes, Your Honor.

14           MR. GELFAND:  Just wanted to flag that.  No other

5:07PM 15   issues.

16           THE COURT:  Thank you.  We're in recess for the

17   evening.  See you in the morning.

18           (Proceedings adjourned at 5:07 p.m.)

19

20

21

22

23

24

25

C E R T I F I C A T E

      I, Paula K. Barden, CCR, RPR, RMR, Federal Official Court Reporter, in and for the United States District Court for the Western District of Arkansas, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

      Dated this 7th day of January 2022.



_____
PAULA K. BARDEN, CCR, RPR, RMR #700
Federal Official Court Reporter
Western District of Arkansas