```
IN THE UNITED STATES DISTRICT COURT
    WESTERN DISTRICT OF ARKANSAS
        FAYETTEVILLE DIVISION


UNITED STATES OF AMERICA                    PLAINTIFF

v.              CASE NO. 5:21-CR-50014

JOSHUA JAMES DUGGAR                         DEFENDANT

_____


                    JURY TRIAL

                  VOLUME 4 OF 8

      BEFORE THE HONORABLE TIMOTHY L. BROOKS

              DECEMBER 3, 2021

            FAYETTEVILLE, ARKANSAS

_____
```

Paula Barden, RPR, RMR, Federal Official Court Reporter
35 East Mountain Street, Fayetteville, Arkansas 72701

```
 1                    A P P E A R A N C E S

 2

 3    FOR THE PLAINTIFF:

 4    MR. DUSTIN ROBERTS
      MS. CARLY MARSHALL
 5    United States Attorney's Office
      414 Parker Avenue
 6    Fort Smith, Arkansas 72901
      (479) 783-5125
 7    dustin.roberts@usdoj.gov
      carly.marshall@usdoj.gov
 8

 9    Also Present:  Special Agent Howard Aycock

10

11    FOR THE DEFENDANT:

12    MR. JUSTIN K. GELFAND
      Margulis Gelfand
13    7700 Bonhomme Avenue, Suite 750
      St. Louis, Missouri 63105
14    (314) 390-0234
      justin@margulisgelfand.com
15
      MR. TRAVIS W. STORY
16    Story Law Firm
      2603 Main Drive, Suite 6
17    Fayetteville, Arkansas 72704
      (479) 443-3700
18    travis@storylawfirm.com

19

20

21

22

23

24

25
```

```
1                          I N D E X

2                                              Page

3   In-Chambers Hearing with Juror Number 18     566

4   JAMES FOTTRELL (Cont'd)

5       Direct Examination by Mr. Clayman        584

6       Cross Examination by Mr. Gelfand         673

7       Redirect Examination by Mr. Clayman      822

8       Recross Examination by Mr. Gelfand       862

9       Redirect Examination by Mr. Clayman      880

10  Reporter's Certificate                       893

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                        E X H I B I T S

2                                                    Received

3   Court's Exhibit 3          Victim Identification Key    570

4   Government's Exhibit 61    Print Screens from          591
                               MacBook Examination
5
6   Government's Exhibit 63    Apple Notes Information      606

7   Government's Exhibit 64    E-mails from MacBook         608

    Government's Exhibit 66    Torrent files from          610
8                              MacBook

9   Government's Exhibit 69    Covenant Eyes e-mail         612

10  Government's Exhibit 70    Covenant Eyes e-mail         612

11  Government's Exhibit 71    Photos and EXIF             622
                               Data from iPhone 8
12
    Government's Exhibit 72    Text Messages from          625
13                             iPhone 8

14  Government's Exhibits      Photos & Messages           635
    73-81                      from iPhone 8
15
    Government's Exhibit 83    TORsec Media History         665
16
    Government's Exhibit 85    Fottrell Summary Exhibit     668
17
    Defendant's Exhibit 48     Caleb Williams e-mails       728
18

19

20

21

22

23

24

25
```

8:21AM 1    (In-Chambers Hearing)

2    THE COURT:  So Sheri got word that one of the

3 jurors wanted to pass along some information to me.  She

4 went down.  It was Mr. Juror Number 18.  Mr. Juror

8:21AM 5 number 18 said that he's been thinking about -- this is

6 third hand by this point -- thinking about social media

7 contacts and he wasn't sure, and somehow he's figured out

8 that when he first started watching the show or something

9 like that, he did something to become Facebook friends

8:21AM10 with -- I don't know how this works -- either the show or

11 Josh, not sure which.  He said it's just in his friends.

12 He said he didn't have any communication, didn't ever use

13 it, it's been a long time ago, blah, blah, blah.  That's

14 all I know.

8:21AM15    Juror Number 18 is front, center, Brandon Wayne

16 Davis.  Brandon Wayne Davis on the venire list.  Lists job

17 as "communications."  He's 38 years old.  I did a rough

18 search of the real-time transcript.  The only responsive

19 question that I could find -- well, there are a couple of

8:21AM20 responsive during voir dire on the questions about, of

21 those that had watched reality programming, he

22 characterized his viewing as "occasionally."  I don't show

23 that he responded to any other particular question that I

24 had, but he was the person that Ms. Marshall chose to pick

8:21AM25 on about what they had for breakfast.  And protein shake.

8:21AM  1    Then you came back to him and asked to pick on him again
        2    and you asked what he did for a living.  I'm in telephone
        3    communications.  I work for -- and this is rough --
        4    Cricket, sales executive, over all of the retail locations
8:21AM  5    in northwest Arkansas and River Valley.  So managing or
        6    working on phones is what your job is?  More in the
        7    management role.  I travel around, visit all the
        8    locations, make sure they are complying with all the
        9    trainings, make sure they are treating our customers
8:21AM 10    right, make sure the stores look good and that type of
       11    thing.
       12            What's the favorite part of your job?
       13    Relationships.  Something, something, get to know
       14    different people, getting out and about in the stores
8:21AM 15    daily and getting to build relationships with everyone.
       16    Something was -- I can't really read Ms. Marshall's
       17    question, but his response was -- maybe what you don't
       18    like about the job.  Having to tell people when they are
       19    not doing the right thing and then having to correct them
8:22AM 20    and guide them in that direction.  And that's all the
       21    references that I could find in a quick word search.
       22            What would you all like to do?  I'm happy to
       23    bring him up here so that we can further voir dire him
       24    about Facebook postings.
8:22AM 25            MR. GELFAND:  Clarify one thing, Your Honor.  Did

8:22AM 1  he self-report this?

2        THE COURT:  Yes.

3        MR. ROBERTS:  That was weighing on me also.  I

4  like the fact that he self-reported it.  Can we confer?

8:22AM 5        THE COURT:  Yes.

6       (off-the-record discussion)

7        MR. ROBERTS:  Judge, you are not going to believe

8  it.  We're in agreement.

9        THE COURT:  Halleluiah, praise the Lord.  What do

8:24AM10  you want to do?

11        MR. GELFAND:  What we would like to jointly

12  propose is that the Court bring this juror up for a very

13  limited, just kind of follow-up voir dire on this one

14  issue with the Court -- just to add one thing -- with the

8:24AM15  Court doing all of the questioning so there's no

16  questioning by counsel.  And then based on those answers,

17  I think we can easily both give our opinion.

18        THE COURT:  Okay.

19        MS. MARSHALL:  Just for Facebook knowledge

8:25AM20  background, do you want me to explain to you maybe --

21        THE COURT:  Yeah.

22        MS. MARSHALL:  It could be that he "liked" the

23  page --

24        THE COURT:  That's what I don't understand.

8:25AM25        MS. MARSHALL:  -- 19 Kids and Counting 10 years

8:25AM 1  ago or something like that.

2       MR. GELFAND:  My question would be perhaps on

3  Facebook -- and feel free to chime in -- as a user, if I'm

4  on Facebook, I can interact with content, so I can click

8:25AM 5  "like" or "share" or things like that.  So I think -- and

6  he may not know the answer to this off the top of his

7  head.  But is it just that you happened to have become

8  Facebook friends, so to speak, 10 years ago?

9       MR. STORY:  If he just "liked" the page, that's a

8:26AM 10  common thing to do with those.  When you have -- "liking"

11  the Duggar page is different than befriending the page.

12  You're just "liking" the page.  And then, you know, that

13  would -- there's millions of people who have done that.

14  That's different than me saying, like, "Judge Brooks,

8:26AM 15  would you be my friend?"

16       MR. ROBERTS:  I would like that brought out if

17  he's friends with Josh Duggar or --

18       THE COURT:  I'm going to let him say everything

19  that he wanted to let us know about, and then I'll ask

8:26AM 20  some follow-up questions as appropriate.

21       While we're waiting on him to come up, can we

22  agree on the same naming convention for the victims?

23       MS. MARSHALL:  Yes, Judge.  I just printed more

24  copies this morning in the event that that's what we

8:26AM 25  decided to do.

8:27AM 1          MR. GELFAND:  Yes, I think we can, assuming that

2     the testimony is similar.  Obviously, she'll say what she

3     says on the stand, but assuming that it doesn't create any

4     issues, at which point, we can address them.

8:27AM 5          THE COURT:  I'm going to mark that victim

6     identification key, the same one, as Court's exhibit next

7     in order, which I think is 3.

8              (Court's Exhibit 3 Received)

9          MS. MARSHALL:  She will be later today in

8:27AM10    testimony.

11         MR. ROBERTS:  Your Honor, I also provided this

12    morning one additional exhibit the government intends to

13    introduce as the very last exhibit.  It's familiar, but

14    Mr. Fottrell took that and made it his own.  It will

8:27AM15    summarize the --

16         THE COURT:  1006?

17         MR. ROBERTS:  Yes, sir.  It will summarize the

18    interaction of all three devices.

19         MR. GELFAND:  Your Honor, we need to confirm.  We

8:27AM20    just got this, so we need to confirm what's on it.

21         MR. ROBERTS:  I think we're about an hour away

22    from addressing it, once the testimony starts anyway, so

23    you will have some time to digest it.

24         THE COURT:  Is this new or was this in the

8:28AM25    exhibits that you have already provided?

8:28AM  1          MR. ROBERTS:  It was not in the exhibit book,

        2   Your Honor.

        3          MR. GELFAND:  Then there's one other question.  I

        4   don't know if it's through Mr. Fottrell or someone else,

8:28AM  5   but the government has marked two exhibits related to the

        6   TOR browsing history on the phone.

        7          THE COURT:  Yes.

        8          MR. GELFAND:  We were going to propose, in lieu

        9   of objecting to the totality of the exhibits, redacting

8:28AM 10   the names of the files.  In other words, as I understand

       11   it, the government's proffered purpose for introducing

       12   this is familiarity with the software.  But the names,

       13   which are all adult pornography legal names are --

       14          THE COURT:  Is this in the Covenant Eyes exhibits

8:29AM 15   that you marked?

       16          MR. ROBERTS:  No, sir.  I believe you actually

       17   questioned the government making sure it didn't run afoul

       18   of the pretrial ruling.  And I clarified it at the

       19   pretrial hearing, that the TOR browser that was located on

8:29AM 20   the defendant's phone was looking up what would be adult

       21   pornography sites on the day that the warrant was

       22   executed.  And that's, I believe, the exhibit that they

       23   are referring to.  They are wanting to get rid of the

       24   content.

8:29AM 25          MR. GELFAND:  At the time it was referenced, it

8:29AM 1   was just referenced by exhibit number.  We didn't yet have

2   the government's exhibits so we didn't know what you were

3   talking about.  And so now that we do, I mean, our

4   concern, Your Honor, is that there's no relevance to the

8:29AM 5   fact that in October and November of 2019, someone on

6   Mr. Duggar's phone is looking up --

7          THE COURT:  I got that part.  But what is it

8   about the exhibit that we need to do?

9          MR. ROBERTS:  I think the defense is generally

8:30AM 10   objecting to the exhibit detailing the pornography part.

11   The government believes it's relevant.  And it's not my

12   witness and I believe Bill Clayman has a prepared argument

13   for this, why it's relevant.

14          THE COURT:  Which witness does it come up with?

8:30AM 15          MR. ROBERTS:  It will come up with Mr. Fottrell.

16          THE COURT:  Let's take care of number 18, then we

17   will circle back.  Which exhibit number is it?

18          MR. ROBERTS:  Off the top, I don't have my

19   exhibit book.  It's towards the end.  It's towards the

8:30AM 20   very end, Judge.

21          MR. STORY:  It's right in there somewhere.  It

22   came up yesterday.

23          (Juror Number 18 Enters Chambers)

24          THE COURT:  Mr. Juror 18.  This is a bunch of

8:31AM 25   lawyers.

8:31AM 1            JUROR NUMBER 18:  Recognize you all from the past

2    few days, yes.

3            THE COURT:  So I understand -- let me say just a

4    little bit.  My understanding is that you asked to speak

8:31AM 5    to the Court Clerk this morning?

6            JUROR NUMBER 18:  Yes, sir.

7            THE COURT:  Is that correct?

8            JUROR NUMBER 18:  Yes, Your Honor.

9            THE COURT:  Could you just tell us from the time

8:31AM10  you got here --

11           JUROR NUMBER 18:  Yeah.

12           THE COURT:  -- how all that happened --

13           JUROR NUMBER 18:  Sure.

14           THE COURT:  -- up to the point, what you told her

8:31AM15  and up to the point of coming in here?

16           JUROR NUMBER 18:  Sure, yes.  So I got here this

17    morning, went and checked into the jury room.  Went to the

18    bathroom, came back and asked one of the officers outside

19    the door if Ms. Sheri was available.  And he said, yes,

8:31AM20  she's here today.  And I said, I'd just like to speak with

21    her for a moment.  So he called her up, and she came up a

22    few minutes later.  And I shared with her that, so last

23    night, I just -- I had a feeling yesterday that I needed

24    to check my Facebook friends list.  It was just something

8:32AM25  yesterday, I had never -- it hadn't come to my remembrance

8:32AM 1    until yesterday that there was a possibility that I may

2    have been Facebook friends with Joshua Duggar.  So I

3    didn't search him at all.  I went straight to my Facebook

4    list after yesterday evening, scrolled through my list,

8:32AM 5    hoping not to see the name.  And it was there.  And I knew

6    then, it was like, I've got to say something.  I was

7    like -- and it wasn't -- I've never had any interaction

8    with Joshua Duggar at all, not through Facebook, not

9    through anything.  From just laying in bed, not being able

8:32AM 10   to sleep last night thinking about it, it was probably

11   from, my wife and I, when they were in the high of their

12   celebrity, we watched the show and probably just local

13   celebrity, followed him on Facebook and never thought

14   another thing about it.  And then it hit me yesterday.  So

8:32AM 15   I went to look to verify because I knew if I didn't, it

16   was going to eat at me.  When I saw it was, I thought,

17   I've got to tell you guys.  So I met with her this

18   morning.

19          THE COURT:  Thank you so much for doing that.  I

8:33AM 20   just want to be sure I understand.  One of the questions

21   that I had for you in voir dire, had for everyone, was

22   whether ya'll had watched any reality show programming.

23          JUROR NUMBER 18:  Yes, uh-huh.

24          THE COURT:  And then how you would characterize

8:33AM 25   the frequency.

8:33AM 1    JUROR NUMBER 18:  Yes.

  2    THE COURT:  And you had a positive response to

  3 that and you characterized, according to my notes, that

  4 you watched some episodes "occasionally."

8:33AM 5    JUROR NUMBER 18:  Occasionally, yes.  My wife was

  6 a lot more into it than I was, but I would catch some

  7 episodes with her.

  8    THE COURT:  So as best you can recall as it

  9 relates to being -- whatever button you clicked on, were

8:33AM10 you indicating that you "liked" some content or did you

 11 actually send out a "friend" request?

 12    JUROR NUMBER 18:  So he's on my Facebook friends,

 13 so I assume it was an "add friend."  I don't know if it

 14 popped up on like suggested friends or something and I was

8:34AM15 like, oh, that's Joshua Duggar, you know.  And so it

 16 wasn't on like a subscription like a "like" where you

 17 follow.  It was an actual friend on my friends list.

 18    THE COURT:  Okay.

 19    JUROR NUMBER 18:  I can't remember ever seeing

8:34AM20 anything posted by him, ever interacting with him.  I just

 21 wanted to verify that yesterday so I could either forget

 22 about it and be like, okay, it wasn't, or to notify you

 23 guys if there was something there.

 24    THE COURT:  Now, just to be clear, this wasn't

8:34AM25 being friends with him in an account for one of the

8:34AM 1   reality shows, but actually friends with Josh Duggar, the

2   person?

3            JUROR NUMBER 18:  So the account just says his

4   name, so I assume that's the case.

8:34AM 5            THE COURT:  All right.  Any idea of what year

6   this would have been or how long ago it would have been?

7            JUROR NUMBER 18:  No.  I was trying to think

8   about that.  Like I said, I didn't even remember.  I mean,

9   just trying to think.  I haven't watched that show or

8:35AM10   really anything about the Duggars in years.  I couldn't

11   even tell you when their show started.  Eight, nine years

12   ago, maybe, 10 years ago.  I'm not 100 percent sure.

13            THE COURT:  So I don't really understand what the

14   significance of being "friends" in terms of what the

8:35AM15   interaction is after that happens.  Can you explain that

16   to me?

17            JUROR NUMBER 18:  Yeah.  So, I mean, people in my

18   personal life that I'm friends with tag each other, we see

19   each others' posts, things like that, "like" things,

8:35AM20   "share" things with people that I'm friends with.  None of

21   that ever occurred in this instance.  Like I said, I

22   completely -- I've got almost 1,000 friends on Facebook.

23   I completely forgot that this friendship, Facebook

24   friendship, even existed until I went and scrolled through

8:35AM25   all the way down through the Js, and, unfortunately, saw

8:35AM  1    it.

2          THE COURT:  If you're Facebook friends with

3    somebody, does that mean that when one is browsing or when

4    you are browsing your own Facebook page or updating it or

8:36AM  5    what have you, that -- I guess what I'm asking is, do the

6    things that your friends post on Facebook, does that pop

7    up on your Facebook page?

8          JUROR NUMBER 18:  Yeah, the ones that I interact

9    with the most.  I think -- I don't know the logistics.

8:36AM 10   Facebook has algorithms, if you don't talk with somebody

11   or you don't view their stuff, the people that you view

12   posts most often are what you see.  I probably see the

13   same 10 or 20 people that I'm closest to every day.

14         THE COURT:  Since you hit the "friends" button,

8:36AM 15   do you recall reading content that Josh Duggar would have

16   posted to his Facebook page or that was disseminated to

17   friends?

18         JUROR NUMBER 18:  Nothing that I -- nothing that

19   I recall, no, sir.

8:37AM 20         THE COURT:  Okay.  All right.  Any other things

21   that are bothering you about contacts with Josh Duggar?

22         JUROR NUMBER 18:  No, not at all.  Not at all.

23         MS. MARSHALL:  No questions.

24         THE COURT:  All right.  Thank you so much.  Why

8:37AM 25   don't you have a seat right outside the door.  I'll be

8:37AM  1    back with you.

        2                    JUROR NUMBER 18:  Thank you all so much.

        3                 (Juror Number 18 exits)

        4                    MR. ROBERTS:  We're fine with it.  I think we're

8:37AM  5    in agreement again.  We're fine with it, Your Honor.

        6                    MR. GELFAND:  Your Honor, we agree.

        7                    THE COURT:  Very good.  So do we need to take

        8    care of this other issue out there?

        9                    MR. ROBERTS:  Judge, I think it's just going to

8:38AM 10    be a relevance, or not quite a relevance.  Well, that

       11    section of it.  I'll tell you what.

       12                    THE COURT:  What takes it outside the scope of

       13    our motion in limine ruling?

       14                    MR. ROBERTS:  Your Honor, the motion in limine

8:38AM 15    was with regard to statements Duggar made regarding

       16    pornography.  This is not a statement.  This is actually

       17    things he was doing when they executed the search warrant.

       18    And the overall basis of why we think it's relevant, we

       19    introduced clips of that statement.  He said, I'm familiar

8:38AM 20    with peer-to-peer.  I've heard of TOR.  These are not

       21    exact quotes, but that was the general nature of it.

       22                    It was more than "I've heard of TOR."  It was

       23    more than, "I've heard of peer-to-peer."  They were on his

       24    device and it was actively being used that day.  There are

8:39AM 25    probably more arguments that I believe Mr. Clayman could

8:39AM 1  make.

2         THE COURT:  That day being what day?

3         MR. ROBERTS:  November 8th, 2019, the day the

4  warrant was executed and the day of the interview.

8:39AM 5         THE COURT:  There's forensic evidence that he was

6  watching so-called adult pornography?

7         MR. ROBERTS:  Via the TOR browser.

8         THE COURT:  On which device?

9         MR. ROBERTS:  His phone.

8:39AM 10         THE COURT:  On the TOR application?

11         MR. ROBERTS:  Yes, sir.

12         MR. GELFAND:  Your Honor, the main issue is the

13  significant prejudicial value of the names of the files,

14  which I don't think are necessary to include for the

8:39AM 15  government to basically get its point across.  And I

16  apologize for the graphic nature of this that's in this

17  trial, but some of these files will be names like "anal

18  fisting," just things that might evoke the same concerns

19  about just visceral objections on conduct that's not even

8:40AM 20  alleged to be illegal.  And it's not necessary if they

21  want to establish the fact that someone was using the TOR

22  browser on the iPhone, even to look at adult pornography.

23         THE COURT:  So one solution that you might be

24  amenable to would be to redact the file name from the

8:40AM 25  exhibit?

8:40AM 1          MR. GELFAND:  Yes, Your Honor.  And I'm sorry.

2    Even if it keeps -- because there's two columns.  I'm

3    going off memory, but there's two columns.  One is the

4    file names, in essence, the descriptive terms.  The other

8:40AM 5    is the websites, which clearly establish that these are

6    commercial U.S.-based adult porn websites; Pornhub, things

7    like that.  And so I think just basically redacting or

8    eliminating that column, the name column, would accomplish

9    what the government's argument is without inflaming the

8:41AM 10   Jury as to the names.

11          MR. ROBERTS:  Specifically why that's relevant --

12   it came back to me -- in Duggar's statement that we

13   introduced, he said that he uses TOR browser and it's

14   50/50 work/personal.  I don't believe that list shows

8:41AM 15   anything work.  The fact that he's using that, we've

16   already had testimony, he's saying that it was work

17   purposes.  You cross-examined Jerry Faulkner over car

18   lots, other uses of the TOR browser.  Jerry Faulkner

19   testified, I don't know of any other use.  But the

8:41AM 20   question of his use of that TOR browser, he stated to law

21   enforcement that day, 50/50.  But he was using it that day

22   only for one thing.  It goes to whether he's being

23   upfront, truthful, honest with law enforcement.

24          THE COURT:  I haven't heard any relevance to the

8:42AM 25   file name itself.

8:42AM 1          MR. ROBERTS:  Well, Your Honor, he's saying he

2     uses it for work.  We introduced testimony saying that

3     there is --

4          THE COURT:  Why can't you elicit testimony that,

8:42AM 5     although the file name is redacted, was this business?

6     No.  In fact, what was it?  It was pornography.

7          MR. ROBERTS:  Pornography.  So it's the content,

8     the descriptive column that you are --

9          MR. GELFAND:  Yes, as opposed to adult

8:42AM10     pornography.

11          MR. ROBERTS:  I think we could probably work with

12     that.  That was a clarification I didn't catch the first

13     time.  We might need a minute to correct that exhibit, if

14     we can do it, but I don't think it will take more than --

8:42AM15     actually, I'll bet I can get my assistant to do it.

16          MR. GELFAND:  Just make sure we're on the same

17     page and clarify.  To the extent you are going to elicit

18     that testimony, whatever it may be, it's so-called adult

19     pornography.  I don't want the Jury to be under the wrong

8:42AM20     impression.

21          MR. ROBERTS:  Oh, we're not going to give the

22     wrong impression.

23          MS. MARSHALL:  No.

24          THE COURT:  Was Covenant Eyes on the phone?

8:43AM25          MR. GELFAND:  Yes.

8:43AM  1          THE COURT:  Well, there wasn't a Linux partition

    2    on the phone.

    3          MR. GELFAND:  Precisely.

    4          THE COURT:  Would that have generated a -- or was

8:43AM  5    that one of your exhibits?

    6          MR. ROBERTS:  The Linux partition on the phone?

    7          THE COURT:  If he had been looking at adult

    8    pornography that day, would that not have generated --

    9          MR. ROBERTS:  A Covenant Eyes report?

8:43AM 10          THE COURT:  Yeah.  I don't want to create issues

   11    where there aren't any.

   12          MR. ROBERTS:  Yes, sir.

   13          THE COURT:  I'm just kind of being -- never mind.

   14    Not an issue that I need to get involved in.

8:43AM 15          MR. GELFAND:  I think both parties have their

   16    perspective on identifying that issue.

   17          THE COURT:  So you're going to look at this?

   18          MR. GELFAND:  Is this being proposed under 1006,

   19    the summary?

8:43AM 20          MR. ROBERTS:  Yes.

   21          MR. GELFAND:  Or as a demonstrative?

   22          MR. ROBERTS:  An actual substantive exhibit under

   23    1006.

   24          MR. GELFAND:  We need to verify the information,

8:43AM 25    then.

8:43AM 1          MR. ROBERTS:  Director Fottrell put the exhibit

2     and the exact lines that they corroborate, or that his

3     entries corroborate.

4          THE COURT:  And this is a summary of what,

8:44AM 5     exactly?  I'm talking about Government's proposed Exhibit

6     85.

7          MR. ROBERTS:  The various exhibits, kind of

8     voluminous exhibits of his examination of the HP computer

9     and all the system files, what they indicate.  The various

8:44AM 10     exhibits that we're going to introduce of the MacBook,

11     what all of those indicate.  And then finally the various

12     exhibits of the iPhone itself, what they indicate.

13          THE COURT:  Okay.

14          MR. GELFAND:  And all we're saying, Your Honor,

8:44AM 15     is, we just got this this morning.  I recognize that it's

16     identified by exhibits and in some cases, even page

17     number.  We need to verify that before we can -- under

18     1006, before we can take a position on it.

19          THE COURT:  All right.  Thank you.

8:44AM 20          (In-Chambers Hearing Concluded)

21          THE COURT:  The Jury is on their way up, so I

22     will have you stand when they get a little closer.  Can we

23     go ahead and get our witness back on the stand?

24          (Jury in at 8:57 a.m.)

9:00AM 25          THE COURT:  Good morning, Members of our Jury.

9:00AM 1    I'd like to apologize for getting a half hour, as it turns

2    out, late start this morning.  In every trial, it's

3    inevitable that some things that you don't plan for pop up

4    and it's just part of the trial process, and we had one of

9:00AM 5    those things come up this morning.  And it's not that big

6    of a deal.  It just happens.  But I do realize that we're

7    running a little bit behind this morning and I very much

8    appreciate your patience and understanding.

9        Yesterday, when we left, James Fottrell was on

9:00AM10    direct examination and he is on the witness stand again

11    this morning on direct examination.

12        Mr. Fortrell, I'll remind you that you remain

13    under oath that you took yesterday.

14        THE WITNESS:  Yes, Your Honor.

9:01AM15        THE COURT:  And, Mr. Clayman, you may proceed.

16        MR. CLAYMAN:  Thank you, Your Honor.

17        JAMES FOTTRELL, having been previously duly

18    sworn, testified as follows:

19            DIRECT EXAMINATION (Cont'd)

9:01AM20    BY MR. CLAYMAN:

21    Q.   Mr. Fottrell, yesterday you were testifying about the

22    Linux partition on the HP computer from the defendant's

23    office.  Was the Covenant Eyes software installed on that

24    partition?

9:01AM25    A.   No, it was not.

9:01AM 1    Q.    Based on your review of all of the evidence that you
       2    found on the partition, what was the user of the Linux
       3    partition doing on TOR on May 14th of 2019?
       4    A.    Downloading the webcam-collections-prevs zip archive
9:01AM 5    file.
       6    Q.    What did they do with that file, based on your
       7    review?
       8    A.    The file was downloaded through the TOR browser
       9    bundle.  It was extracted to the desktop.  Thumbnail
9:01AM10    images were created of the images contained in that
      11    archive file.
      12    Q.    Based on your review of the thumbnail images, what
      13    did those images depict?
      14    A.    Those images depicted minors engaged in sexually
9:02AM15    explicit conduct.
      16    Q.    And what was the user of the Linux partition doing on
      17    uTorrent or May 14th, 15th, and 16th of 2019?
      18    A.    On May 14th, 15th, and 16th, the uTorrent program was
      19    used to access and download Torrent files.  Contents of
9:02AM20    those Torrent files was fetched through the BitTorrent
      21    protocol.  There was evidence that the videos existed on
      22    those -- on the computer.  Thumbnails were created and
      23    stored indicating that the files existed on that computer.
      24    Furthermore, there's evidence in the VLC program that the
9:02AM25    videos were played and displayed by the computer user.

9:02AM 1    Q.    And where did you find the actual child sexual abuse
      2    images on the Linux partition?
      3    A.    Very -- in a minimal place.  They were only in the
      4    thumbnails files.  We didn't recover the full-size images
9:02AM 5    in the file system.  They were deleted from the file
      6    system at the time the computer was seized by law
      7    enforcement a few months later.  I was able to recover
      8    some full-size images from unallocated space on the device
      9    on that partition, but the full-size images and the videos
9:03AM10   were not in the file system at the time it was seized.
     11    Q.    Based on your experience, is this common to see in
     12    child exploitation investigations?
     13    A.    Well, yeah, this is one common scenario.  One common
     14    scenario is typically where people would download and
9:03AM15   amass a large collection of illegal material and that
     16    would be their collection or that library of material.
     17          A phenomenon that probably happened maybe five or
     18    seven years ago, we generally call it the Netflix effect.
     19    Generally, if I go back 20 years, when my kids were
9:03AM20   little, we had a bunch of VHS tapes for Barney the
     21    Dinosaur, Thomas the Tank Engine, and we would have a
     22    bunch of videos that my kids would watch for movies.
     23    Maybe if you fast forward a decade, then I was collecting
     24    DVDs of certain movies, so I would have a stack of DVDs in
9:04AM25   my house and I could watch those movies through those

9:04AM 1    DVDs.

2          With the advent of Netflix and streaming services,

3    most people don't need to keep a library of videos in

4    their house.  It's just available online for free.  And

9:04AM 5    the same thing is happening with the child exploitation

6    arena.  The offenders understand, some offenders

7    understand that it's dangerous to possess a lot of this

8    material, so there's a phenomenon where they are going to

9    download it, view the material, and then delete it so it's

9:04AM 10   not on their computer.

11         So I'm certainly involved in a number of cases where

12   the offenders are downloading it, viewing the material,

13   and then deleting it.  Those cases are a little bit more

14   forensically challenging to look for the artifacts that we

9:04AM 15   have here.  We have thumbnail images.  We have evidence

16   that they were viewed.  We have evidence in unallocated

17   space, but you don't have that large library of images

18   that you would have in other cases.

19   Q.    Mr. Fottrell, did you look into whether someone not

9:04AM 20   present at the car lot could have been using this computer

21   to download this material?

22   A.    Yes.

23   Q.    And what did you find based on your review?

24   A.    So based on my review of a number of things, there's

9:05AM 25   a Windows partition, there's a Linux partition.  And the

9:05AM 1    tools that allowed for remote control and for remote
2    desktop, it's just not fitting the pattern of somebody
3    remotely connecting to the computer and doing that.  The
4    computer, the person using the computer, using the TOR
9:05AM 5    browser bundle, using the uTorrent program, that's not
6    happening behind the screens.  The uTorrent program, when
7    it's being run, would be visible on the desktop.  It's
8    just actually being used.  Once the images are downloaded,
9    they are viewed through the VLC program, so that's very
9:05AM 10    indicative of a person at the computer, using the
11    computer, viewing that kind of stuff.  It's not very
12    consistent with a remote exploit or a remote access to the
13    computer.  Somebody needs to be physically there.
14         I talked about yesterday, the act of installing the
9:05AM 15    Ubuntu Linux operating system, you need to install a thumb
16    drive, you need to boot the computer off of the media to
17    install that.  The same thing when the computer first
18    turns on, you have to choose one operating system.  By
19    default, it's either going to boot up into the Windows
9:06AM 20    environment or it's going to boot up into the Linux
21    environment.  You can't boot both.  You have to choose
22    one.  And the default setting was for the Windows
23    environment.  So in order for the Linux partition to boot
24    up when you turn on the computer, you would have to hit a
9:06AM 25    function key to select the other operating system to boot

9:06AM 1  it.  To me, you can't do that remotely.  The computer is

2  turned off.  There needs to be a physical presence, a

3  person physically there in order to make that selection

4  when the computer is turned on.

9:06AM 5  Q.   Do you typically look for evidence of remote access

6  in these sort of forensic examinations?

7  A.   Yes.  Generally speaking, it's hard to be exhaustive

8  in every single case, I do that.  But there are remote

9  desktop tools and remote access tools that are common

9:06AM10  nowadays.  And so just to look at evidence associated with

11  them, I would typically do that, yes.

12  Q.   Based on your experience training other law

13  enforcement officers, would someone with less experience

14  than you necessarily look for this sort of evidence?

9:07AM15  A.   Probably not.  I think I'm -- I don't mean to brag,

16  but I'm --

17        MR. GELFAND:  Your Honor --

18        THE COURT:  There's an objection.

19        MR. GELFAND:  Objection, Your Honor.  Calls for

9:07AM20  speculation about whether someone else would do something.

21        THE COURT:  I will sustain the objection to the

22  extent of requiring a little bit more foundation to

23  establish a 701 lay opinion, combined with the expert 702

24  that you have already laid.  You could just go back and

9:07AM25  establish either how he has this knowledge under 701

9:07AM 1   within his profession, or establish a 702 opinion and what

2   he's relying on, then you may proceed.

3   Q.   (BY MR. CLAYMAN.)   Mr. Fottrell, how do you know to

4   look for remote access in these sort of investigations?

9:08AM 5   A.   Just through experience.   Through experience in a

6   number of cases, experience about the way that offenders

7   are using that, the way that they communicate using that.

8   I'm just familiar with certain users who do remote access

9   and how they have done it.   And then I look from a

9:08AM 10   forensics point of view, what are the forensic artifacts

11   that are associated with that that I would typically

12   expect to see when somebody was using a remote desktop or

13   remote control program.

14   Q.   If you were training a newer analyst, as you do

9:08AM 15   sometimes, would you advise them to do this?

16   A.   Yes, I would advise them to do that.

17   Q.   Switching gears, Mr. Fottrell, did you examine any

18   other devices in connection with this case?

19   A.   Yes, I did.

9:08AM 20   Q.   Which devices?

21   A.   The MacBook and an iPhone.

22   Q.   Did you use virtualization software with one of those

23   devices?

24   A.   Yes, I did.

9:08AM 25   Q.   Which one?

9:08AM 1   A.   The MacBook.

2   Q.   If you could please look in the black binder at

3   what's been previously marked as Government's Exhibit 61.

4   A.   Okay.

9:09AM 5   Q.   Do you recognize that exhibit?

6   A.   Yes, I do.

7   Q.   What is it?

8   A.   These are a series of print screens that I created

9   using the virtualization software that I talked about

9:09AM 10   yesterday, Oracle VirtualBox, with respect to the MacBook

11   that was seized from the defendant.

12   Q.   And are these true and accurate copies of those print

13   screens?

14   A.   Yes, they are.

9:09AM 15            MR. CLAYMAN:   Your Honor, at this time, I would

16   move to admit Government's Exhibit 61.

17            MR. GELFAND:   No objection.

18            THE COURT:   Government's Exhibit 61 is received.

19            (Government's Exhibit 61 received)

9:09AM 20            MR. CLAYMAN:   Permission to publish, Your Honor.

21            THE COURT:   You may.

22   Q.   (BY MR. CLAYMAN.)   Mr. Fottrell, can you explain for

23   the Jury what's shown on the first page here?

24   A.   This is the page that you would see when you first

9:10AM 25   boot up the virtual machine.   It's a Macintosh environment

9:10AM 1   by some of the icons that are on the bottom of the page.

2   There is two user accounts associated with it.  There's a

3   user account named "Joshua Duggar."  There's another user

4   account named "internet."  So those are the two user

9:10AM 5   accounts that are set up for this Macintosh MacBook

6   operating system.

7   Q.   Turning to page two, what's shown here?

8   A.   So this is the page that you would see if I clicked

9   on the "Joshua Duggar" user name.  It has the icon

9:10AM 10  associated with it.  And it's prompting for a password

11  that this is a password protected account.  And it's just

12  showing me the password, showing me where I need to enter

13  the password for this account.

14       If you look at the background of the page, the whole

9:10AM 15  page, it looks -- appears to be that there's a Vizio T.V.

16  and it looks like somebody set the wallpaper or the

17  backdrop for this MacBook with a picture from a video --

18  you know, from a Vizio T.V.

19  Q.   Do you recall what the password was for this account?

9:11AM 20  A.   Yes, I do.

21  Q.   What was it?

22  A.   JoshuaJJD.

23  Q.   If we could turn to page three, please.

24  A.   This is what you would see after you type in the

9:11AM 25  password correctly.  There's a little spinning icon and

9:11AM 1    it's basically booting up the operating system, logging in

2    to the user account.

3    Q.    How about page four?

4    A.    This is just another print screen a moment later

9:11AM 5    where it's logging in.

6    Q.    And page five?

7    A.    Page five is just -- the computer remembers where it

8    was, you know, certain programs that were run when it was

9    shut down most recently.  So these are some of the icons

9:11AM10    that show up.  So you will see the file manager is up and

11    running.  And this is just showing that the person was at

12    the documents folder the last time it was powered down and

13    they were navigated to this folder where the logos folder

14    were, so that window automatically reopened when the

9:11AM15    machine booted up.  There was some alarm setting or some

16    notebook setting and so that little window is showing up,

17    Lowe's credit card period ends on November 12th, 2019, so

18    that little window popped up as well.

19         So there's another window behind there and it's just

9:12AM20    the normal window, the normal opening up of programs that

21    have been previously saved on this computer.

22    Q.    What date and time are reflected there at the top?

23    A.    So the date and time is Tuesday, November 2nd at

24    12:40 p.m.  That's the date and time that I booted up this

9:12AM25    virtual machine and created these print screens.

9:12AM 1   Q.   What name is right next to that date and time?

2   A.   Joshua Duggar.

3   Q.   Turning to page six, can you describe what you see

4   here?

9:12AM 5   A.   So in the lower left-hand corner of the screen,

6   there's the "finder" icon, which is kind of like the file

7   manager equivalent in the Windows computer.  And I just

8   wanted to get a sense as to which applications are

9   installed on this computer, so I clicked on the file

9:12AM10   manager logo.  And then I basically chose applications on

11   the upper left-hand corner and it's showing me a listing

12   of all of the applications that are installed.

13   Q.   If we could turn to page seven.  What is this?

14   A.   I changed the view to be thumbnails view just to make

9:13AM15   it a little bit easier view to see what was going on.  And

16   just in my mind, I'm getting a sense as to what are some

17   of the programs that are installed on this computer.  So

18   clearly in the first row and maybe the second row, these

19   are a bunch of Adobe programs, Abode Creative Cloud,

9:13AM20   Illustrator, certainly file-editing documents that are

21   very popular that are out there.  Most of these are by

22   default installed by the operating system.

23       For example, the App Store is the Macintosh

24   application that you use when you want to install a new

9:13AM25   application.  If you want to go out and install some

9:13AM 1   program, you would basically do that through the App

2   Store.  A lot of these are books, calculator, calendar.  A

3   lot of these would come preinstalled on the operating

4   system.  Here's the instance where Covenant Eyes is

9:13AM 5   installed on the computer.  That did not come with the

6   operating system by default.  Some of these, the user

7   installed these programs.  I believe CSR Racing doesn't

8   come with the operating system by default and so there's

9   just different programs that have been installed by the

9:14AM 10   user of the computer over time.

11   Q.   Before moving on, Mr. Fottrell, you said you changed

12   these to thumbnail view, is that right?

13   A.   Yes.

14   Q.   And is that what you were describing yesterday with

9:14AM 15   the user of the Linux partition changing to thumbnail

16   view?

17   A.   Yes.

18   Q.   Are you able to walk the Jury through the next couple

19   of pages of this exhibit?

9:14AM 20   A.   Sure.  If you look on the right-hand side, that's

21   called a scroll bar.  I'm just scrolling down a little bit

22   further documenting some of the different programs that

23   are installed.  I see that Google Chrome is involved.

24   That's a very popular web browser, so I'm certainly going

9:14AM 25   to look into that a little bit further.  Most of these

9:14AM 1    other ones are kind of generic default ones that come with

2    the computer.

3        If you go the next page, a little bit further down,

4    some of the things that are -- these are pretty common

9:14AM 5    applications.  Keynote, Kodi, these are all pretty -- Open

6    Office is another word processing program that's

7    available.  Nothing too exciting stood out here.

8        We can go to the next page.  On this page, Safari

9    TextEdit.  Nothing too significant here.  These are the

9:15AM 10   normal things that I would expect to see on a Macintosh

11   environment.  And then finally, on the bottom of the page,

12   we see the VLC program that we talked about yesterday.

13   That's certainly something that does not come on the

14   Macintosh machine.  It needs to be installed.

9:15AM 15   Q.   Sorry to interrupt for a second.  You said we talked

16   about it yesterday.  Where did we see the VLC program

17   yesterday?

18   A.   On the Linux partition on the HP desktop computer.

19   One of the things that I would just look for here, and I

9:15AM 20   didn't see, so I didn't see the TOR browser bundle

21   installed.  Like if TOR was installed at the moment in

22   time it was seized by law enforcement, there would be a

23   TOR browser icon.  There's no uTorrent here, so I don't

24   see the uTorrent icon.  So I'm just getting a sense as to

9:15AM 25   what programs are installed and what programs are not

9:15AM 1  installed at the point in time it was seized by law

2  enforcement.

3  Q.   If we could turn to the next page.  What is shown

4  here?

9:16AM 5  A.   So I saw VLC on the last page, so I brought up VLC

6  and I'm just curious to see, what are the recent videos

7  that were displayed or viewed by the computer user.  And

8  it lists like two movies, the movies Planes and Planes,

9  Fire & Rescue.  I did a little bit of research.  Those are

9:16AM 10  just children's movies and children's videos that are

11  available, so clearly, the VLC program was used to display

12  these children videos.

13  Q.   How about on page 13?

14  A.   So next, I go on -- if you look at the very bottom of

9:16AM 15  the page, there's the Chrome, Google Chrome icon.  Google

16  Chrome is a popular web browser.  And I'm just trying to

17  get a sense as to who's using the computer and what they

18  are using it for, so I bring up the Google Chrome program,

19  and then I go under the settings.  And then there's --

9:16AM 20  Google Chrome has the ability to be a password manager, so

21  it manages and remembers the passwords that you use on a

22  number of different sites that you go to.  So I wanted to

23  look at the saved passwords on Chrome to see if they

24  related to the passwords on some of the other devices that

9:17AM 25  were seized.

9:17AM 1  Q.   Can you walk the Jury through the next couple pages

2  of this exhibit and explain what stood out about the

3  passwords that you saw?

4  A.   So these are the password manager saved passwords for

9:17AM 5  Google Chrome.  And it just shows you, for example,

6  there's the Amazon.  There is the user name associated

7  with the Amazon account and then there's the password

8  associated with it.  So I was certainly looking for

9  passwords that have Intel 1988, the same password that was

9:17AM10  used on the Linux partition.  So here's a password for

11  IntelJJD1988.  It's not exactly the same, but it contains

12  parts of it.  It contains Intel and it contains 1988.  So

13  just scrolling through this to get a sense of ownership

14  and identity and who is the person responsible.  So,

9:17AM15  clearly, these are passwords that Joshua Duggar is using,

16  it's saved on his computer, and I'm just looking for those

17  examples.

18     So, again, just looking down at other ones, some of

19  them are very related.  Some of them are very different.

9:18AM20  Some of them are just completely random, but other ones

21  are very similar.  Intel 1988 exclamation mark.  And so

22  just kind of trying to document the saved passwords in the

23  Google Chrome password manager.

24  Q.   Did you find any personal accounts where Intel 1988

9:18AM25  was the password here?

9:18AM 1   A.   Yes.  So here's this Arvest Bank, Arvest.com, and it

2   has the password as Intel 1988 exclamation mark.

3   Q.   Just to be clear, did you see 1988 appear frequently

4   in these passwords?

9:18AM 5   A.   Yes.

6   Q.   Did you see the word Intel appear frequently in these

7   passwords?

8   A.   Yes.

9   Q.   If we could go to page 22 now.  What is shown here?

9:18AM 10   A.   So this, if you go to the upper left-hand corner on

11   the screen, there's a little Apple logo.  And I just

12   clicked on that and it just tells me the version of the

13   operating system that this Mac laptop is running.  And

14   it's running macOS Mojave.  It's 10.14.3.  And so this is

9:19AM 15   the Macintosh operating system.  Underneath -- the

16   Macintosh operating system is very similar to the Linux

17   operating system.

18        The history of the Macintosh operating system over

19   the last 20 years is very similar to the history of the

9:19AM 20   Linux operating system over the last 20 years.  They are

21   children related of the same parent.  They have the same

22   code base, the same environment.  They are very similar

23   operating systems.  They just have a shared history, if

24   you will.

9:19AM 25   Q.   What's on the next page?

9:19AM 1   A.   I clicked on -- on the bottom of the page, there is

2   the settings.  There's a little settings icon on the

3   bottom of the page for the different settings that are

4   there.  So I'm bringing up the system preferences and I'm

9:19AM 5   going to click on "users and groups" to kind of give me

6   information about who is using this computer, what is the

7   account associated with it.

8   Q.   And what did you find?

9   A.   So I clicked on that "user settings" and it shows the

9:20AM 10  user name, "Joshua Duggar," which is the name that shows

11  up on the top of the page for the user.  That is

12  associated with an e-mail account "josh@championNWA.com."

13  That's the e-mail account that the user of the computer

14  used to associate with their name.

9:20AM 15  Q.   Turn to the next page.  Could you describe for the

16  Jury where we are here?

17  A.   So one of the things -- I'm just using the "finder"

18  application again on the top of the page.  And I am just

19  navigating to the user's folder, the main folder, the

9:20AM 20  library folder.  One of the things that was significant to

21  my investigation of the Macintosh computer is this -- on

22  the right-hand column, under application support, there is

23  this thing called Mobile Sync.  One of the features of the

24  Macintosh operating system, it allows you to make a backup

9:20AM 25  copy of your iPhone.  So this is what happened in this

9:21AM 1   case.  On the Macintosh laptop computer, there was a
2   backup copy of an iPhone 8 that had been previously backed
3   up onto that computer.  So now I'm just illustrating on
4   the MacBook where the location of those backup files are
9:21AM 5   located, because I'm going to export those files.  I'm
6   going to be now able to do an analysis on that iPhone 8
7   that had been backed up to the MacBook computer.  So the
8   law enforcement officers didn't seize an iPhone 8, but I
9   have a backup copy of an iPhone 8 that was saved to the
9:21AM 10   MacBook.  I'm certainly going to do an analysis on that
11   iPhone 8 that I found.
12   Q.  Before moving on, in the column where Mobile Sync is
13   highlighted, do you see a qBittorrent folder a little
14   beneath that?
9:21AM 15   A.  Yes.  So the other thing that was valuable here is,
16   if you look under application support, the next folder
17   that we have, here was Mobile Sync where the backups were,
18   but there's a couple of things that are valuable.  There's
19   something here called qBittorrent and TOR browser data.
9:22AM 20   There's a folder named TOR browser data.  So that is
21   evidence to me that at some point previously, the TOR
22   browser bundle had been installed on the Macintosh, but at
23   the time it was seized by law enforcement, the application
24   was deleted, but there may be remnants or evidence
9:22AM 25   associated with the TOR browser in that folder.

9:22AM 1      Same thing with the qBittorrent.  QBittorrent is

2   another one of those Torrent programs, just like uTorrent

3   and Transmission, so I'm certainly going to look for

4   evidence of this Torrent program on this MacBook as well.

9:22AM 5   Q.   So just to be clear, based on these folders here, it

6   appears that TOR and a BitTorrent application program had

7   at one point been installed on the defendant's MacBook?

8   A.   Yes.

9   Q.   If we could go to the next page.

9:22AM 10   A.   And so this is just where the backup data is for the

11   iPhone 8, so I'm going to certainly extract all of that

12   information and conduct an examination of the iPhone 8

13   data.  And I'm just illustrating where I found that.

14   Q.   What is shown here on page 32 of this exhibit?

9:23AM 15   A.   If you look down at the very bottom of the center

16   page on the task bar for the Macintosh, there's the

17   contact list or the address book.  So I fire up the

18   address book, and the first contact in there is Anna

19   Duggar.  And it just basically has her contact

9:23AM 20   information, has her phone number, it has spouse of Joshua

21   Duggar, blah, blah, blah, password, just all of the other

22   information.  So it's just an illustration of who is using

23   this computer.  Yes, Joshua Duggar.  If I look at the

24   contacts, the contacts are similar to the contacts that he

9:23AM 25   would have.  He would certainly have his wife's contact

9:23AM  1   information in there, and so that's just being reflected

2   here.

3   Q.   If we could skip ahead to page 35.  Can you describe

4   for the Jury where we are here?

9:23AM  5   A.   Sure.  So if you look at the very bottom of the page,

6   there is -- we're under Apple Notes.  Apple Notes comes

7   with the Macintosh operating system.  It allows for the

8   user to create notes and save like little sticky notes, if

9   you will.  And so I basically brought up the Notes

9:24AM 10   program.  There was lots and lots of notes, and so I

11   wanted to filter that.  So if you look on the upper

12   right-hand corner, I typed in "Intel 1988."  So I wanted

13   to search through all of the hundreds of notes that were

14   out there, just display the notes that contained the text

9:24AM 15   "Intel 1988," and you can see that it saved one, two,

16   three, four, five of them.  So there was five notes that

17   contained the word "Intel 98" and I'm just going to

18   display that.  So the first one is being displayed for,

19   here's a website, shop.LKQcorp.com.  It lists the log-in

9:24AM 20   name of wholesaleNWA@gmail.com, and then the password is

21   Intel 1988.

22        If I scroll down to the second one, this one lists

23   Carroll Electric account.  It lists a log-in, an account

24   number and a log-in, it lists a number for it, and it

9:24AM 25   lists the password as 1988.

9:25AM  1          Going back to the next one, in 2015, with the website

     2    GovDeals.com, it has a log-in name and it has the password

     3    of Intel 1988.  The fourth one, this is back on

     4    October 8th of 2014.  It's the Chase QuickPay and it lists

9:25AM  5    the name of Josh Duggar 1 and it lists the same password,

     6    Intel 1988.  And then finally, another one on October 6th,

     7    2014, for AT&T Premier, lists the log-in name of

     8    ChampionNWA and lists the same password of Intel 1988.

     9          So I was just trying to match up those instances

9:25AM 10    where I found evidence of that password on the Macintosh

    11    computer, which was the same password associated with the

    12    Linux partition on the HP desktop.

    13    Q.   Based on your review of this evidence, Mr. Fottrell,

    14    approximately how long has the defendant been using the

9:25AM 15    password Intel 1988?

    16    A.   So from -- approximately five years, from 2014 to

    17    2019, there's instances where the defendant is using the

    18    password Intel 1988.

    19    Q.   Turning to the next page.  Where are you here?

9:26AM 20    A.   So, again, I'm just drilling back to library

    21    application support.  I'm in the folder, qBittorrent.

    22    There's a folder called BT_backup, GeoIP, and logs, and so

    23    I'm going to drill down into that folder and see what's in

    24    there.  So I drill down into the logs folder.  There's a

9:26AM 25    file called "qBittorrent.log" and it's being displayed on

9:26AM 1    the right-hand side.  Now I'm going to open that up.

2        So, here, I am displaying the contents of that

3    qBittorrent log.  And it's a little bit hard to read, but

4    the date is 2017, January 17th.  It lists a time.  And

9:26AM 5    it's basically just saying that the qBittorrent program

6    has started.  There's some log messages.  And you can see

7    a little bit further down here with respect to

8    qBittorrent, the file Planes, Fire & Rescue 2014 was added

9    to the download list.  So this is evidence that the person

9:27AM10    using the computer was using the qBittorrent program to

11    download a Torrent file associated with this movie,

12    Planes, Fire & Rescue.

13    Q.   You saw a similar file name in the VLC "recently

14    played" information, is that correct?

9:27AM15    A.   Yes.  So with respect to the VLC recently played,

16    there is clearly evidence that the qBittorrent was used to

17    download that associated movie and to view it on the

18    MacBook with the VLC program.

19    Q.   So I'd like to focus on some of the information you

9:27AM20    just discussed in these print screens.  Mr. Fottrell, did

21    you extract the Apple Notes from the MacBook?

22    A.   Yes, I did.

23    Q.   Can you please turn to what's been previously marked

24    as Government's Exhibit 63?

9:28AM25    A.   Yes.

9:28AM 1   Q.    Do you recognize this exhibit?

2   A.    Yes, I do.

3   Q.    What is it?

4   A.    This a two-page printout that I created extracting

9:28AM 5   the information from the Apple Notes associated with the

6   password Intel 1988.

7   Q.    Is this a true and accurate copy of the data from the

8   Apple Notes application?

9   A.    Yes.

9:28AM10            MR. CLAYMAN:  Your Honor, at this time, we would

11   move to admit Government's Exhibit 63.

12            MR. GELFAND:  No objection.

13            THE COURT:  Government's Exhibit 63 is received.

14            (Government's Exhibit 63 received)

9:28AM15            MR. CLAYMAN:  Permission to publish, Your Honor?

16            THE COURT:  You may.

17   Q.    (BY MR. CLAYMAN.)  Was this first page similar to

18   what we saw on the print screens, Mr. Fottrell?

19   A.    Yes.  This is just kind of how I would like at it

9:28AM20   after I've extracted it forensically.  It's pretty much

21   the same information that we were just looking.  There's a

22   note title.  There's a folder listing for it.  These are

23   all just under the Notes folder.  Then there's a date when

24   this note was created and last changed.  And then there's

9:28AM25   the body of the message.  So it contains pretty much the

9:28AM 1    same information that we were just seeing, but it's

2    extracted in a forensics format.

3    Q.    Turning to page two, is this first entry different

4    than the one we saw in your print screens?

9:29AM 5    A.    Yes, because this is showing the entire entry.  So

6    there was a note that's labeled "passwords."  And this

7    just has more information.  So there's just clearly --

8    this is the Arvest, Walmart, just showing multiple

9    different accounts that are being used.

9:29AM10    Q.    Just to be clear, what was the password for the

11    Arvest Josh account based on this exhibit?

12    A.    So the password is Intel 1988 exclamation mark.

13    Q.    You can take this down.  Mr. Fottrell, did you find

14    any other artifacts or forensic evidence on the

9:29AM15    defendant's MacBook showing that he used the password

16    Intel 1988?

17    A.    Yes, I did.

18    Q.    If I could direct you to what's been marked

19    Government's Exhibit 64.  Do you recognize that exhibit?

9:29AM20    A.    Yes, I do.

21    Q.    What is it?

22    A.    These are a series of e-mail messages that I found on

23    the MacBook computer that contain the text that includes

24    Intel 1988.

9:30AM25    Q.    Are these true and accurate copies of the e-mails

9:30AM 1    that you recovered from the MacBook?

2    A.    Yes.

3            MR. CLAYMAN:  Your Honor, we would move to admit

4    Government's Exhibit 64 into evidence.

9:30AM 5            MR. GELFAND:  No objection.

6            THE COURT:  Government's Exhibit 64 is received.

7            (Government's Exhibit 64 received)

8            MR. CLAYMAN:  Permission to publish, Your Honor.

9            THE COURT:  You may.

9:30AM10    Q.    (BY MR. CLAYMAN.)  So just looking at the first page

11    here, Mr. Fottrell, when is this e-mail from?

12    A.    This e-mail is to Jim Bob Duggar,

13    duggardad@gmail.com.  Oh, I'm sorry.

14    Q.    What date was it from?

9:30AM15    A.    Oh, what date was it from.  It was from

16    February 13th, 2014.

17    Q.    And what does it say the e-mail that was linked to

18    this account is at the bottom there, or halfway through?

19    A.    The e-mail link to this account is

9:30AM20    joshuaduggar@me.com.

21    Q.    And what's the password identified there on the first

22    page?

23    A.    It lists the password as Intel 1988.

24    Q.    Go to page six of this exhibit.  What do you see

9:31AM25    here?

9:31AM  1    A.    So here's a message from Josh Duggar,

        2    josh@Ez14Us.com.  It's to josh@championNWA.com with a

        3    carbon copy to josh@Ez14Us.com.  It lists the information,

        4    log-in info, motor546, and it lists the password as Intel

9:31AM  5    1988.

        6    Q.    What's the subject of the e-mail?

        7    A.    USAePay app.

        8    Q.    We can take this exhibit down.  You discussed

        9    earlier, Mr. Fottrell, finding the qBittorrent application

9:31AM 10    on this computer.  Did you find any Torrent files on the

       11    MacBook?

       12    A.    Yes, I did.

       13    Q.    If I could direct you to what's been previously

       14    marked as Government's Exhibit 66.  Do you see that?

9:32AM 15    A.    Yes, I do.

       16    Q.    What is that exhibit?

       17    A.    It's a list of four Torrent files that I found on the

       18    Macintosh computer.

       19    Q.    Is this a true and accurate copy of the Torrent files

9:32AM 20    you found on the computer?

       21    A.    Yes, it is.

       22          MR. CLAYMAN:  Your Honor, at this time, we would

       23    move to admit Government's Exhibit 66 into evidence.

       24          MR. GELFAND:  No objection.

9:32AM 25          THE COURT:  Government Exhibit 66 is received.

9:32AM 1          (Government Exhibit 66 Received)

2          MR. CLAYMAN:  Permission to publish, Your Honor?

3          THE COURT:  You may.

4  Q.  (BY MR. CLAYMAN.)  Can you describe for the Jury what

9:32AM 5  this exhibit shows, Mr. Fottrell?

6  A.  So there's two events that are occurring.  So the

7  first column is name.  There's a creation date, file

8  created, and then the pass.  You can see that there's two

9  entries.  So the first one happens on January 17th, 2017.

9:32AM 10  The next two happen pretty much the same time on

11  April 14th, 2017.

12     So in the first entry, that Planes, Fire & Rescue

13  Torrent file was stored in the downloads folder on the

14  computer, so under user main downloads.  That's where you

9:33AM 15  would expect a downloaded Torrent file to go.  It's

16  clearly in that folder.  The exact same file moments later

17  is in the user's main library, application, support,

18  qBittorrent, BT_backup.  Then it renames the file based on

19  its hash value, because that's what qBittorrent looks at.

9:33AM 20  It doesn't care about the file name.  It just references

21  it by its hash value.

22     We see the exact same thing associated with the entry

23  on 4-17.  There's a Torrent file that's in the downloads

24  that has a hash value.  And if we look into the user's

9:33AM 25  main library Transmission -- this is using not

9:33AM 1    qBittorrent, this is using Transmission -- there's a

2    folder called Torrents.  And in there there's a Torrent

3    file associated with the movie Three Amigos.

4    Q.    You said Transmission.  Is that another type of

9:33AM 5    peer-to-peer software?

6    A.    Yes.

7    Q.    Did you find Transmission installed in the

8    applications folder?

9    A.    No, I did not.  So this is clearly evidence that it

9:33AM10    existed back in 2017, but by the time the laptop was

11    seized by law enforcement in November of 2019, the

12    Transmission program was no longer installed.

13    Q.    So based on this exhibit, is it fair to say that the

14    defendant's MacBook was used to download content over two

9:34AM15    different types of peer-to-peer software?

16    A.    Yes.  It's clear that the person was using

17    qBittorrent and the person was using Transmission.

18    Q.    Finally, you discussed the Covenant Eyes application

19    on this MacBook.  Did you find any evidence related to the

9:34AM20    Joshua Duggar Covenant Eyes account on the MacBook?

21    A.    Yes, I did.

22    Q.    Could you describe what you found?

23    A.    I found e-mail messages associated with reports

24    associated with Joshua Duggar's use of Covenant Eyes.

9:34AM25    Q.    If you could take a look at what's been marked as

9:34AM 1   Government's Exhibit 69 and 70 in the black binder.

2   A.    Okay.

3   Q.    What are those exhibits?

4   A.    Those are two e-mail messages that I recovered from

9:34AM 5   the MacBook associated with the Covenant Eyes software.

6   Q.    Are these true and accurate copies of the e-mails

7   that you recovered?

8   A.    Yes, they are.

9         MR. CLAYMAN:  Your Honor, we would move to admit

9:35AM 10   Government's Exhibits 69 and 70 into evidence.

11        MR. GELFAND:  No objection.

12        THE COURT:  Government's Exhibit 69 and

13   Government's Exhibit 70 are received.

14        (Government's Exhibit 69-70 Received)

9:35AM 15        MR. CLAYMAN:  Permission to publish Exhibit 69,

16   Your Honor?

17        THE COURT:  You may.

18   Q.    (BY MR. CLAYMAN.)  Looking at the first page here,

19   Mr. Fottrell, when was this e-mail sent?

9:35AM 20   A.    There's an e-mail that's dated Saturday the 22nd of

21   April, 2017.

22   Q.    And what e-mail account was it sent to?

23   A.    It was sent to -- it lists the name Anna Duggar, but

24   the associated account is joshuaduggar@iCloud.com.

9:35AM 25   Q.    Who is the mail from?

9:35AM 1    A.    It's from Covenant Eyes reports.  It lists the

2    address report@covenanteyes.com.

3    Q.    So in the body of the e-mail, what does it say this

4    is exactly?

9:35AM 5    A.    It says "accountability report."

6    Q.    Who is the user identified?

7    A.    Joshua Duggar.

8    Q.    And what does it say that the sensitivity level is

9    set at?

9:36AM 10   A.    The sensitivity level is set for "mature teen."

11   Q.    Go back one second.  What time frame does it say that

12   this accountability report covers?

13   A.    It covers a time period of April 15th through

14   April 22nd of 2017.  And it lists the filter as "mature

9:36AM 15   teen."

16   Q.    Now, turning to page two.  What does it say at the

17   bottom of the page, right underneath this red bar?

18   A.    So it says -- under the red bar, there's a -- it says

19   "web searches."  And then it says, "web searches from

9:36AM 20   Joshua showing searches rated MT, mature teen."  And so it

21   lists a Google search, if you look at the very bottom, it

22   says that the user went to Google and typed in the phrase

23   "download Torrent Mac," and the software said, "That's

24   rated M," and it would not allow him -- it would not allow

9:37AM 25   that to occur, so it's just blocking that activity.  So

9:37AM 1    this is just a report showing that Covenant Eyes detected

2    that activity and prevented it from happening.

3    Q.   And when does it say that search occurred?

4    A.   Saturday, April 15th, at 12:13 a.m.

9:37AM 5    Q.   Turning to page three.  What are the additional

6    searches there at the top?

7    A.   "Download Torrent Mac."  The next one is, "How to

8    keep iTunes rented movies on a Mac, how to keep iTunes

9    rented movies on a Mac."

9:37AM10    Q.   And a little further down on this page, what does it

11    say below the red bar there?

12    A.   There is another instance for mature teen, so it's

13    referencing the website called "Fmovies.SE" and it says,

14    "Watch Three Amigo 1986 online."  And it says, "Viewed

9:37AM15    page on Safari, Saturday, April 15th, at 12:16 a.m."

16    Q.   This is marked as activity for review, is that

17    correct?

18    A.   Yes.

19    Q.   Turning to the next page.  What activity was flagged

9:38AM20    on Google.com for review?

21    A.   On Google.com the person typed in the Google search

22    term "download Torrent Mac."  It lists the website.  And

23    that happened April 15th at 12:13 a.m.  Right below that,

24    the same thing, Googled "Torrent Mac," and then that's the

9:38AM25    entries.

9:38AM 1    Q.    Finally, on page five, what web activity was flagged
       2    and blocked there at the top?
       3    A.    UTorrent.com.  Basically, it's showing
       4    "uTorrent.com/download/Mac."  And it's saying that page is
9:38AM 5    blocked.  Then basically going to
       6    "download-new.uTorrent.com," that page is blocked.  Same
       7    thing with the third page, "download-new.uTorrent.com,"
       8    web content blocked because it's rated "M" for "mature."
       9    Q.    Do you know what you would be able to do if you go to
9:38AM10    uTorrent.com/downloads?
      11    A.    You would be able to download the uTorrent program
      12    for whatever operating system you are running, the
      13    Macintosh or whatever version.  Yeah, so that's one way of
      14    getting the uTorrent software is getting it from the
9:39AM15    vendor's website.
      16    Q.    So the user of the MacBook was trying to download
      17    uTorrent, is that fair to say?
      18    A.    Yes.
      19    Q.    That's on top of having qBittorrent and Transmission
9:39AM20    already on the MacBook at some point?
      21    A.    Yes.
      22    Q.    If we could take this down and please publish
      23    Government's Exhibit 70.  What is this exhibit?
      24    A.    This is the same type of an e-mail message.  It's a
9:39AM25    different date and time.  Now we're looking at the time

9:39AM 1   period between May 6th and May 13th, 2017, and we are

2   going to see similar entries.

3   Q.   If we could go to the next page, page three.  What

4   does it say below the red bar there?  What's subject of

9:39AM 5   the e-mail is this, or portion?

6   A.   So it's showing "activity for review."  And it's

7   listing "Instagram."  So clearly, there was some things

8   associated with Instagram and it was rating that as

9   "mature teen."

9:40AM 10   Q.   If we could turn to page four.  What activity was

11   marked for review and actually blocked right in the middle

12   of the page there?

13   A.   So in the middle of the page, again, May 9th of 2017,

14   the person goes to "uTorrent.com/download/Mac," and,

9:40AM 15   again, that page was being blocked.

16   Q.   So someone was trying to download uTorrent again on

17   the MacBook?

18   A.   Yes.

19   Q.   Mr. Fottrell, what BitTorrent peer-to-peer software

9:40AM 20   did your find on the Linux partition on the defendant's

21   work computer?

22   A.   The uTorrent program.

23   Q.   You were also discussing during the virtualization

24   print screens we showed earlier finding a backup of an

9:40AM 25   iPhone, is that right?

9:40AM 1    A.    Yes.

2    Q.    Did you review the data in that backup?

3    A.    Yes, I did.

4    Q.    What kind of information did you look at?

9:40AM 5    A.    So I was -- with that iPhone backup that I found on

6    the MacBook, I was primarily interested in two things.  I

7    was interested in photos that were taken on that iPhone,

8    and I was interested on messages, text messages that were

9    sent and received on that iPhone.

9:41AM10    Q.    So based on your review of that information, whose

11    iPhone was this that was backed up to the MacBook

12    computer?

13    A.    Joshua Duggar's iPhone.

14    Q.    When you were reviewing the texts and the photos,

9:41AM15    what kind of information were you looking for?

16    A.    So I was looking for, like, identity information,

17    like who is the person talking, who is the person

18    communicating.  And then with respect to the photos, most

19    modern iPhones, in this case it was an iPhone 8, it has

9:41AM20    the ability to take photos.  And the format of these

21    photos is an HEIC format, which is an Apple proprietary

22    format.  And the reason I was interested in that format is

23    it contains a lot of EXIF information.  We heard EXIF

24    information yesterday.

9:41AM25         What was valuable to me about the EXIF information,

9:42AM 1    when somebody is taking a picture is it has the GPS

2    coordinates of where you were when that picture was taken.

3    So I can look at the photos that were taken on that

4    iPhone, and I don't really care about the photos per se,

9:42AM 5    but it just shows where the person who had the camera was

6    at particular moments in time.  And that's what I was

7    focused on.

8    Q.    So if you could find in the black binder what's been

9    marked as Government's Exhibit 71.

9:42AM 10    A.    Yes.

11    Q.    Do you recognize that exhibit?

12    A.    Yes, I do.

13    Q.    What is it?

14    A.    These are a number of print screens -- I'm sorry --

9:42AM 15    of photos that I printed out associated with the iPhone 8

16    with respect to the date May 11th, 2019.

17    Q.    Do these exhibits include any metadata associated

18    with these images?

19    A.    Yes, they do.

9:42AM 20    Q.    Is this a true and accurate copy of these images and

21    the associated metadata from the iPhone backup you found?

22    A.    Yes, they are.

23          MR. CLAYMAN:  Your Honor, at this time, we would

24    move to admit Government's Exhibit 71 into evidence.

9:42AM 25          MR. GELFAND:  Your Honor, may we approach

9:43AM 1  briefly?

2            THE COURT:  You may.

3         (Bench Conference)

4            MR. GELFAND:  Thank you, Your Honor.  We would

9:43AM 5  object to any expert testimony in the admission of these

6  exhibits as it relates to geolocation for a couple of

7  reasons.  Number one, this expert is not qualified to

8  offer testimony as to geolocation and there's been no

9  notice that he would offer testimony related to

9:43AM 10  geolocation.  There's an abundance of case law citing that

11  this kind of EXIF data related to geolocation in

12  particular is unreliable.  In fact, in the *Crawford* case

13  in the Western District of New York just this year, the

14  government itself asserted that the EXIF data was

9:44AM 15  unreliable.  And in the *B-O-Y-A-J-I-A-N* case in the

16  Central District of California in 2012 -- I'm sorry, I

17  just misquoted the case -- it was the *Gutierrez* case, a

18  2015 case, government expert witnesses, they examined the

19  metadata or EXIF data related to pictures embedded

9:44AM 20  regarding geolocation.  And the whole idea is that this

21  kind of testimony has been deemed unreliable by the

22  government and by courts.  And so to the extent that the

23  photos speak for themselves, so be it, but for them to

24  rely on the EXIF data is improper expert testimony.

9:44AM 25          THE COURT:  Mr. Clayman?

9:44AM 1          MR. CLAYMAN:  Your Honor, as an initial matter, I

2     don't believe this is expert testimony.  He's essentially

3     going to say that there are GPS coordinates associated

4     with the image that you can plug into a map, like Google

9:44AM 5     maps, and Your Honor is permitted to take judicial notice

6     of the accuracy of something like that.

7          With respect to the unreliability, Mr. Gelfand

8     can certainly cross-examine the witness, but right now,

9     there's no evidence that these are unreliable.  I think

9:45AM 10    the witness will be able to testify to what he did with

11    the EXIF information that he found.

12          THE COURT:  All right.  The Court will overrule

13    the objection.  At the end of the day, I think that this

14    is an issue that goes to weight and credibility, not

9:45AM 15    admissibility.  And certainly the defense will be able to

16    cross-examine him on the reliability, how close the

17    geolocation algorithm principles can be, how reliable they

18    are, et cetera.

19          As to the issue of whether it's an expert

9:45AM 20    opinion, the government says that it's not, and the Court

21    tends to agree.  This witness has testimony, both as a

22    fact witness in his role as a computer forensic examiner.

23    He has been qualified as a 702 expert as well and can

24    offer expert opinions when asked to do so under 702.  But

9:46AM 25    this type of question comes in under 701.  The fact that

9:46AM 1 he has special expertise in his profession does not

2 transcend 701 testimony into 702.  To come in under 701,

3 it merely has to be, there has to be a foundation that the

4 testimony is based on an opinion that is rationally based

9:47AM 5 on the witness's perception.

6    Here, the witness has testified that he does this

7 type of forensic investigation all the time.  I would like

8 there to be some additional foundation laid that, as part

9 of his work in the field that he has described, that this

9:47AM 10 is a common technique that he uses in his profession.  But

11 assuming he testifies to that, the Court would otherwise

12 find that there's a basis that this lay opinion is based

13 on what he rationally perceived during the course of his

14 investigation and analysis of the phone.  So that's the

9:47AM 15 Court's ruling.  Please lay that additional foundation.

16    (Bench Conference Concluded)

17    THE COURT:  You may proceed.

18 Q. (BY MR. CLAYMAN.)  Mr. Fottrell, do you commonly use

19 EXIF information that you find in images during the course

9:48AM 20 of your investigations?

21 A. Yes, I do.

22 Q. What do you use it for?

23 A. Just to establish an identity and establish location.

24 So if the images are taken, I'm looking at a number of

9:48AM 25 EXIF information.  What is the make and model of the

9:48AM 1    camera that was used to take that picture.  Then,

2    number two, the GPS coordinates, where was the camera at

3    the point in time that this photo was taken.

4    Q.   Have you had the opportunity at times to look at the

9:48AM 5    photo, look at the EXIF information about location, and

6    confirm that they are generally accurate?

7    A.   Yes.  So there's certainly checks and balances.  I

8    can look at the raw data that has the GPS coordinate in

9    latitude and longitude.  I can copy and paste that into a

9:49AM 10   Google maps program and display it in Google maps and just

11   verify that it's basically accurate.  I have been doing

12   that for a long time.  I do that consistently in many

13   cases.

14          MR. CLAYMAN:  Your Honor, at this time, we would

9:49AM 15   move to admit Government's Exhibit 71.

16          THE COURT:  The objection is noted, but it's

17   otherwise received.

18          (Government's Exhibit 71 Received)

19          MR. CLAYMAN:  Permission to publish, Your Honor.

9:49AM 20          THE COURT:  You may.

21   Q.   (BY MR. CLAYMAN.)  Mr. Fottrell, just to be clear,

22   this came from the iPhone 8 backup you were describing, is

23   that correct?

24   A.   Yes.

9:49AM 25   Q.   What date and time was this image on the first page

9:49AM 1    taken?

2    A.    So it shows the date and time of May 11th, 2019, at

3    5:58 p.m.

4    Q.    What device was this picture taken with?

9:49AM 5    A.    The device is an iPhone 8 Plus.

6    Q.    Do you know where this picture was taken?

7    A.    Yes.  So if you look at the map that's in the lower

8    left-hand corner, I displayed -- the program that I'm

9    using on my forensics machine automatically is associated

9:50AM 10   with Bing maps, so it's bringing up the Bing maps.  It's a

11   map of the Arkansas area.  It shows Route 412.  And if I

12   zoom in a little bit further, that geolocates to the car

13   lot.

14   Q.    Did you independently confirm, based on the GPS

9:50AM 15   information and the EXIF information on this photo, that

16   that is generally in the area of the car lot we are

17   discussing?

18   A.    Yes, I did.  For a number of images, I would

19   basically just take the coordinates, load them into Google

9:50AM 20   maps, verify that that's where the images were located.

21   This is just a simple way to kind of show that

22   information, but I did verify the GPS coordinates

23   generally matched what this map shows.

24   Q.    What's this a picture of?

9:50AM 25   A.    It's a picture of, looks like a Chevy Blazer.

9:50AM 1  Q.   Based on all the evidence you see in this exhibit on

2  page one, what can you say about where the defendant's

3  iPhone 8 was at the time this picture was taken?

4  A.   At the car lot.  So at May 11th, 5:58 p.m., the

9:51AM 5  defendant's iPhone was at the car lot.

6  Q.   How about on page two of Government's Exhibit 71?

7  A.   This is just a moment later at 5:59 p.m.  It's the

8  same iPhone 8.  It's the same location at the car lot.

9  Q.   Page three?

9:51AM 10  A.   Same time, 5:59, in the same minute, same iPhone 8 at

11  the same location.

12  Q.   If we could return to page one of this exhibit, and

13  pull up alongside it what's already been admitted as

14  Government's Exhibit 28 on page 12.  Mr. Fottrell, what is

9:51AM 15  Government's Exhibit 28 again?

16  A.   This is the print screens that I created with the

17  Windows partition.  And it shows that the Ubuntu software

18  was installed -- I'm sorry -- was downloaded into the

19  downloads folder on May 11th, 2019, at 5:47 p.m.

9:52AM 20  Q.   And this is the HP computer from the car lot, is that

21  right?

22  A.   That is correct.

23  Q.   So approximately how long before this picture in

24  Government's Exhibit 71 was taken with the defendant's

9:52AM 25  iPhone at the car lot was that Linux installation software

9:52AM 1  downloaded onto the defendant's computer at the car lot?

2  A.   So this was at 5:47 p.m. is when the download

3  occurred.  Roughly 10 minutes later is when the picture

4  was taken.

9:52AM 5  Q.   We can take these exhibits down.  Now, you also

6  mentioned looking at texts that you found on the iPhone 8,

7  is that right?

8  A.   That's correct, text messages or multimedia messages.

9  Q.   Please turn to what's been marked as Government's

9:52AM10  Exhibit 72.  Do you recognize that exhibit?

11  A.   Yes, I do.

12  Q.   What is it?

13  A.   These are text messages that were sent and received

14  on May 11th.

9:52AM15  Q.   Are these all of the messages or just a portion of

16  them?

17  A.   Just a sample of them.

18  Q.   But is it a true and accurate copy of these messages

19  that you found on the defendant's iPhone?

9:53AM20  A.   Yes.

21       MR. CLAYMAN:  Your Honor, at this time, we would

22  move to admit Government's Exhibit 72 into evidence.

23       MR. GELFAND:  No objection.

24       THE COURT:  Government's Exhibit 72 is received.

9:53AM25       (Government Exhibit 72 Received)

9:53AM 1              MR. CLAYMAN:  Permission to publish 72, Your

2    Honor?

3             THE COURT:  You may.

4    Q.   (BY MR. CLAYMAN.) Looking at page two of this

9:53AM 5    exhibit, who are the participants on page two of

6    Government's Exhibit 72?

7    A.   On here?

8    Q.   If we could move to page two.

9    A.   So on page two, there's a list with a person that

9:53AM10    says "Josh Williams," and then the "local user."

11    Q.   And when are these messages from?

12    A.   May 11th, 2019, at 5:58 p.m., 5:59 p.m., 5:59 p.m.

13    Q.   Just to clarify for the Jury, what does "local user"

14    mean?

9:53AM15    A.   That would be the local user of the iPhone, the local

16    user of the device.

17    Q.   Can you read the first two messages sent there?

18    A.   Sure.  It lists the name "Josh Williams."  The text

19    says, "This is Joshua's mom.  I have two people asking

9:54AM20    about a green Tahoe.  Do you still have that?"  And the

21    response is, "No, but I have the black one."  And then

22    there's a "year," question mark.  And then the response

23    is, "It's a 1999" -- I'm sorry -- "Is it a 1999?"  Then

24    the response is some attached images of the Tahoe.

9:54AM25    Q.   On the next page, what does he send?

9:54AM 1 A. At the very bottom of the page, it has the dollar

2 amount, $2250.

3 Q. Are these the images we just reviewed in the last

4 exhibit?

9:54AM 5 A. Some of them are the same images, yes.

6 Q. We can take this down.  And, Mr. Fottrell, if you

7 could take a minute and review what's been marked as

8 Government's Exhibit 73 through 81 in the black binder you

9 have in front of you.

9:55AM10 A. Through 80 --

11 Q. Through 81, Mr. Fottrell.

12 A. Okay.

13 Q. Do you recognize those exhibits?

14 A. Yes, I do.

9:55AM15 Q. What are they?

16 A. These are a series of photos and the associated

17 messages with different dates.  Specifically May 13th,

18 May 14th, May 15th, and then June 22nd.  They are just a

19 series of dates where I have a number of images and a

9:55AM20 number of messages corresponding to those days.

21 Q. These were recovered from the backup of the iPhone 8?

22 A. Yes.

23 Q. Are these true and accurate copies of these images

24 and messages from that iPhone?

9:56AM25 A. Yes, they are.

9:56AM 1           MR. CLAYMAN:  Your Honor, at this time, we would

2    move to admit Government's Exhibit 73 to Government's

3    Exhibit 81.

4           MR. GELFAND:  Your Honor, could I incorporate the

9:56AM 5    same objections we raised at side bar with no additional

6    objections, just, among other things, improper expert

7    testimony on this subject matter.

8           THE COURT:  The Court's ruling will be the same

9    as it was.  Let me see counsel at the bench, please.

9:56AM 10           (Bench Conference)

11           THE COURT:  Mr. Clayman, what is the government's

12    position in response to the objection as to these exhibits

13    to the extent that it would differ from your earlier

14    position, if any?

9:57AM 15           MR. CLAYMAN:  Your Honor, that was the first I

16    heard of their objection regarding the metadata so I

17    haven't had an opportunity to look into any of the case

18    law, but we would maintain our previous position that this

19    is not expert testimony that would require any sort of

9:57AM 20    expert certification.  He's simply looking at GPS

21    coordinates and plugging them into a map, confirming that

22    that is where he saw -- that is the location he found.

23           THE COURT:  Well, the Court's ruling that this

24    comes in under 701 with regard to these exhibits on the

9:57AM 25    table will be the same.  And the Court's analogy here

9:57AM 1    would be, if instead of computer forensics, we were

2    talking about a trauma surgeon in an operating room when a

3    patient is just brought in and you are trying to figure

4    out clues from what is going on in their body and their

9:58AM 5    vital statistics in order to form an opinion in the course

6    of your factual connection to the case, that's a 701

7    opinion, not necessarily a 702 opinion.  And my

8    understanding of this witness's connection to the case is

9    that, in the chain of custody of the evidence in the case

9:58AM 10   after the CFA locally looked at the materials, they were

11   then transmitted to this person who works in law

12   enforcement for a secondary, more specialized review.  And

13   so he is testifying about how he went about searching the

14   device's -- in this case, a phone -- for clues, and the

9:59AM 15   Court finds that all of the requirements under 701 are

16   met.

17        Separate and apart from that, and to the extent

18   that one could argue that his opinions here are of such a

19   technical nature that it really requires a 702 opinion,

9:59AM 20   and therefore taking it out of the realm of 701, to that

21   extent, the Court finds that this witness has already been

22   qualified as an area in computer forensics analysis and

23   that this opinion is adequately supported by all of the

24   criteria under 702.  And this information was added in the

10:00AM 25  supplemental foundation that Mr. Clayman laid with regard

10:00AM 1    to the prior exhibit.  So I would expand the Court's

2    analysis as a supplementary basis for allowing the prior

3    exhibit regarding the black Tahoe picture and its location

4    when and where it was taken.

10:00AM 5         As to the notice objection, certainly this

6    witness has been disclosed as an expert in this area.

7    He's been disclosed that he was going to be offering

8    opinions in this area.  The question of whether notice was

9    given that he would be specifically opining about

10:01AM10   geolocation pictures, the Court finds the objection to

11   lack of notice to be a little bit off inasmuch as the

12   government has identified for several days, if not --

13   well, I think at the time of the pretrial conference, all

14   of these exhibits had been disclosed.  They had been

10:01AM15   disclosed to the Court, I think, on the day of the

16   pretrial conference.  When were they disclosed to the

17   defense?

18        MR. ROBERTS:  They were uploaded the week of

19   Thanksgiving, Your Honor, to USA index.

10:02AM20        THE COURT:  Well, first of all, the Court finds

21   that surely they were given notice that this witness would

22   be called as an expert witness based on his review of the

23   cell phone, is that correct?

24        MR. ROBERTS:  Yes, Your Honor.

10:02AM25        THE COURT:  Is that correct, Mr. Gelfand?

10:02AM 1          MR. GELFAND:  Yes, Your Honor.  This issue is

2     limited to geolocation testimony, Your Honor.

3          THE COURT:  When did you receive the exhibit

4     that's already been received and the exhibits that are on

10:02AM 5     the table now?

6          MR. GELFAND:  Essentially over the Thanksgiving

7     holiday, approximately before -- essentially over the

8     Thanksgiving holiday, perhaps the day before.  The

9     government can correct me on this.  I think it was the

10:03AM10     Wednesday before Thanksgiving.

11          MR. ROBERTS:  My recollection it was Tuesday

12     before.  Tuesday or Wednesday before Thanksgiving, Your

13     Honor.

14          THE COURT:  Is it your position that you could

10:03AM15     not -- that one cannot tell from the face of this exhibit

16     that the point of it is geolocation?

17          MR. GELFAND:  Your Honor, I wouldn't go that far,

18     because that's not fair.  However, our understanding,

19     based on the expert notice, was that these were being

10:03AM20     admitted for purposes of time-stamping it as opposed to

21     geolocation, which is a difference.  And in prior pretrial

22     hearings, obviously for different purposes, the

23     government's emphasis has always been on time-stamping as

24     opposed to any sort of geolocation testimony.

10:03AM25          MR. ROBERTS:  Can I address that, Your Honor?

10:03AM 1          THE COURT:  Yes.

2          MR. ROBERTS:  We entered -- during the

3    suppression hearing that we had on September 29th, we

4    specifically, with Special Agent Jerry Faulkner, went over

10:03AM 5    an outline, a bullet point outline, that included pictures

6    that geolocate to Northwest Arkansas, geolocate to the car

7    lot.  That is not correct.  This has been part of the

8    case.  As a matter of fact, we introduced that in the

9    detention hearing in May.

10:04AM 10          THE COURT:  Well, the Court finds that there's

11    both general notice, and in the proceedings occurring

12    prior to today, both in the form of prior testimony and in

13    the form of the actual trial exhibits, that it would be

14    apparent that this would be a component part of the

10:04AM 15    witness's testimony based on the map and that sort of

16    thing that is reflected on the exhibit.  Certainly the

17    Court didn't have anywhere near the context that the

18    parties had, and when I reviewed the exhibits, that was

19    fairly obvious to me being the point that was to be

10:05AM 20    established here.  So the Court will overrule the notice

21    aspect and permit this testimony on the proposed exhibits,

22    as well as the exhibit just received, both under 701 and

23    under 702.

24          MR. GELFAND:  Can I, for the record?

10:05AM 25          THE COURT:  You may.

10:05AM 1          MR. GELFAND:  I understand the Court's ruling,

2     but just so that we have a comprehensive record.  Our

3     position which is very precise is that this is

4     inadmissible under 901 as well and under expert opinion.

10:05AM 5     There's case law.  We would refer the Court to the

6     *Crawford* case in the Western District of --

7          THE COURT:  Let's take up 901.  901 is

8     authentication, is the exhibit what it purports to be.

9     What is your objection under 901?

10:05AM 10          MR. GELFAND:  That there's case law that says

11    that the government will need to provide an expert witness

12    to explain and support the methods used by Google, or in

13    this case I guess Bing maps, to obtain the geolocation

14    data if it intends to use it as evidence at trial.  And

10:06AM 15    the Court went on to say, "It will be insufficient to call

16    a Google representative to authenticate the records based

17    only on accuracy under Federal Rule of Evidence 901."  So

18    it's a combination, the way the Court analyzed it, as

19    expert opinion and 901.  And so this witness has

10:06AM 20    authenticated the documents in front of him are what they

21    purport to be, but embedded within the document is

22    geolocation data that has to be actually supported by

23    expert testimony concerning where that data came from.

24    And the Court in the Western District of New York even

10:06AM 25    went so far as saying, even a Google representative would

10:07AM 1   be insufficient to say, "We, Google, produced this

2   record."  And I don't think this witness has laid any

3   foundation or could lay any foundation that he knows how

4   Bing maps or Google maps -- I didn't catch the exact

10:07AM 5   detail of which service he was using -- but how

6   essentially the internet map service actually computes the

7   geolocation data, because that's what he's testifying.

8          MR. CLAYMAN:  Your Honor, if I could respond.

9   Just reviewing it, it's dealing with cell tower analysis.

10:07AM10   This is not cell tower analysis.  This is the metadata in

11   the images.  And Your Honor is permitted to take judicial

12   notice of things like Google maps, Bing maps, and the

13   accuracy of those sort of online services.

14          THE COURT:  Well, not only is the Court entitled

10:07AM15   to do that, and I'm not saying that the Court is taking

16   judicial notice because I don't know that I need to take

17   judicial notice.  What the Court in the case that the

18   defense cites may not have had available in evaluating the

19   reliability of this testimony is the additional text

10:08AM20   messaging data that shows a vehicle for sale.  The

21   defendant, by evidence in this case as the defense

22   explained in opening statement, is a used car salesman,

23   and there's evidence that his used car lot is at the

24   location where the geolocating data purports to show it.

10:08AM25   And the Court believes that the opinion being offered

10:08AM 1    here, lay expert or otherwise, is reliable.  And in its

2    gatekeeping function, the Court does not believe that it

3    would be inappropriate to admit this testimony, nor would

4    it lead to any sort of confusion of the issue.  So I

10:09AM 5    understand the objection.  It will be overruled for the

6    dual bases that the Court has articulated.

7              MR. GELFAND:  Thank you.

8              MR. ROBERTS:  Thank you, Your Honor.

9              (Bench Conference Concluded)

10:09AM10              MR. CLAYMAN:  At this time, Your Honor, we would

11    again move to admit Government's Exhibit 73 through 81.

12              THE COURT:  Those exhibits are received.

13              (Government's Exhibit 73-81 Received)

14              MR. CLAYMAN:  Permission to publish 73, Your

10:09AM15    Honor.

16    Q.   (BY MR. CLAYMAN.)  Mr. Fottrell, when was this image

17    taken?

18    A.   May 13th, 2019, at 3:06 p.m.

19    Q.   Based on your review of the metadata and the GPS

10:10AM20    coordinates associated with the image that you found,

21    approximately where is the defendant's iPhone when this

22    was taken?

23    A.   I kind of zoomed the map a little bit to show the

24    location of the car lot, and you can see where it says,

10:10AM25    "Wildcat Creek Road."  And then Route 412 is right next to

10:10AM 1   that, so it's geographically located at the car lot.

2   Q.   What's it a picture of?

3   A.   It's a picture of what appears to be a scale that

4   displays the weight, 1 pound, 5.7 ounces.

10:10AM 5   Q.   Can we please pull up alongside this exhibit what's

6   already been admitted as Government's Exhibit 30 and go to

7   page 16.  Mr. Fottrell, what is Government's Exhibit 30

8   again?

9   A.   It's the print screens that I created associated with

10:10AM10   restoring the Linux partition on the computer.  We are at

11   the desktop folder.  And I'm, again, just highlighting the

12   downloads folder, music folder, pictures folder.  And just

13   as a ballpark figure to illustrate when the operating

14   system, the Linux operating system was installed.  It was

10:11AM15   installed at approximately 1:52 p.m.

16   Q.   And you testified yesterday, is it correct, that

17   someone had to be physically present on the HP computer to

18   install the Linux operating system?

19   A.   Yes.

10:11AM20   Q.   So approximately how long after this operating system

21   was installed was the defendant's phone used to take a

22   picture at the car lot where that computer is located?

23   A.   From 1:52 to 3:06 p.m., which is approximately about

24   an hour and 15 minutes later.

10:11AM25   Q.   If we could take down Government's Exhibit 30 and

10:11AM 1    pull up what's already been admitted as Government's

2    Exhibit 37.  What's Government Exhibit 37 again,

3    Mr. Fottrell?

4    A.   These are the TOR Firefox bookmarks that were

10:11AM 5    automatically created.  And you can see some of them were

6    created automatically when the TOR program was installed.

7    So the first few of them are at 2:03 p.m. in the

8    afternoon, which is approximately like an hour later --

9    I'm sorry -- an hour before when the picture of the scale

10:12AM 10   was taken.

11   Q.   We can take these exhibits down.  If we could please

12   pull up what's been admitted as Government's Exhibit 74.

13   Mr. Fottrell, when was this picture taken on the iPhone?

14   A.   This picture was taken on the 14th at 11:30 in the

10:12AM 15   morning, 11:31.

16   Q.   And where does the phone appear to be based on the

17   metadata?

18   A.   It says the location of Tontitown, if I'm pronouncing

19   that correctly.  It's not at the car lot.

10:12AM 20   Q.   What is it a picture of?

21   A.   It appears to be the picture of cement ground with an

22   oil stain on the ground and it's a gray Croc, a foot with

23   a gray Croc in the lower center of this image.

24   Q.   Turning to page two, when was this picture taken?

10:13AM 25   A.   Same time, 11:31 a.m.  And it shows a foot inside, a

10:13AM 1    left foot inside a Croc.

2    Q.    Does it appear to be in the same location?

3    A.    Yes.

4    Q.    How about on page three, when was this picture taken?

10:13AM 5    A.    This picture was taken a little bit later on in the

6    afternoon at 4:14 p.m.  But if you look at the GPS

7    coordinates, this picture does appear to be taken at the

8    car lot.

9    Q.    And what's it a picture of?

10:13AM10    A.    A Volkswagen four-door sedan.

11    Q.    How about on page four of this exhibit?

12    A.    On page four, the picture was taken on the 14th at

13    4:20 p.m.  And it appears to be a picture of somebody

14    taking a picture of the computer screen of the HP computer

10:13AM15    in the car lot.  They are certainly bringing up YouTube.

16    They are looking at a YouTube video for a cam position

17    sensor on a Chevrolet.

18         If you look at the very bottom of the page, it is the

19    same background that we saw on the background for the HP

10:13AM20    desktop computer.  It has the family photo on it.  If you

21    look at the bottom of that family photo, that image --

22    that part of it on the bottom of the image matches the

23    desktop computer of the HP computer.

24    Q.    That's the Windows side of the computer in the car

10:14AM25    lot's office?

10:14AM 1    A.    Yes, the Windows side.

2    Q.    Mr. Fottrell, do you see a reflection on the screen

3    in this image?

4    A.    Yes, I do.  It's kind of hard to see.

10:14AM 5    Q.    Zoom in on that.

6    A.    If you zoom in on this a little bit, you can see a

7    reflection in the picture is somebody wearing a hat.  And

8    it's kind of red, but it's the logo for the car lot,

9    Champion, Champion -- we'll see this logo in a second.  It

10:14AM10    appears to be the reflection of a person wearing a hat

11    associated with the car lot.

12    Q.    It appears to be someone taking the picture, their

13    reflection there in the screen?

14    A.    Yes.

10:14AM15    Q.    Go to the next page, page five.  When was this

16    picture taken?

17    A.    A few minutes later at 4:25 p.m.

18    Q.    And where was the phone when this picture was taken?

19    A.    At the car lot.

10:14AM20    Q.    How about on page six?

21    A.    A little bit later, at 6:01 p.m.  It's a picture of a

22    Ford pickup truck and it's at the same location.

23    Q.    Focusing on this picture for a second.  First of all,

24    what is it a picture of?

10:15AM25    A.    A Ford pickup truck.

10:15AM 1    Q.   Can we please pull up what has already has been

2    admitted as Government's Exhibit 39.  When was this

3    picture taken again, Mr. Fottrell?

4    A.   This picture was taken on May 14th at 6:01 p.m.

10:15AM 5    Q.   And what, again, is Government's Exhibit 39?

6    A.   39 is the Torrent file location, so it lists a number

7    of Torrent files on the Linux partition.  And it shows two

8    entries associated with -- right around the same time

9    frame on May 14th.  One of -- the movie_0214 was

10:15AM10   downloaded at 5:28 p.m.  And roughly 10 minutes later, at

11   5:38 p.m., the Torrent file for movie_0216.

12   Q.   Do you recall what content was associated with these

13   two Torrent files?

14   A.   Those were videos of minor girls, two minor girls,

10:16AM15   approximately eight to 10 years old.

16   Q.   And which portion of the HP computer did you say

17   these Torrent files were found on?

18   A.   On the Linux partition.  So it's under home dell_one,

19   indicates that it was on the Linux partition.

10:16AM20   Q.   And that's the partition that someone has to be

21   physically present to boot up, is that correct?

22   A.   Yes.

23   Q.   Based on Government's Exhibit 74, when was the

24   defendant's iPhone -- or, excuse me, let me rephrase.

10:16AM25   How long after these Torrent files were downloaded to the

10:16AM 1    Linux partition was the defendant's iPhone used to take a

2    photo at the car lot?

3    A.    Approximately half an hour later.  From 5:30 to

4    6:01 p.m., approximately half an hour later a photo was

10:16AM 5    taken with the defendant's phone at the car lot.

6    Q.    We can take down 39.  What about on page seven of

7    Exhibit 74?

8    A.    Here's another photo on May 14th, just a few minutes

9    later, at 6:04 p.m., and we are still at the car lot.

10:17AM 10   Q.    Page eight?

11   A.    6:07 p.m., still at the car lot.

12   Q.    And looking at page nine.

13   A.    This is a little bit later on in the evening at

14   8:14 p.m.  We are not at the car lot.  I think we are at

10:17AM 15   the Lowe's store, which is a little bit farther away.

16   Q.    What's it a picture of?

17   A.    It appears to be Anna Duggar at the Lowe's looking at

18   some doors.

19   Q.    How about on page 10?

10:17AM 20   A.    More pictures.

21   Q.    Finally, on page 11?

22   A.    It's kind of a selfie of Justin (sic) and Anna at the

23   Lowe's.  This is where you could clearly see the hat that

24   we saw the reflection of in the previous image of the

10:17AM 25   Wholesale Motorcars logo, so a very similar hat was taken

10:17AM  1  in that picture a few hours ago.

2  Q.    We can take down Government's Exhibit 74 and publish

3  what's already been admitted as Exhibit 75.  When are

4  these messages from, Mr. Fottrell?

10:18AM  5  A.    These are from the 14th, May 14th, at approximately

6  4:49 p.m.

7  Q.    And what is the local user saying there?

8  A.    "Got stuck here and still not free yet.  I'm gonna

9  aim for tomorrow just after lunch."

10:18AM 10  Q.    Just to clarify again for the Jury, the local user

11  means what exactly?

12  A.    The person using the iPhone.  And the other would be

13  the other person that they are messaging with.

14  Q.    Based on your review of the images from the

10:18AM 15  defendant's iPhone on this date, where did you understand

16  the "got stuck here" to be referring to?

17  A.    To the car lot.

18  Q.    Can we please pull up alongside this exhibit what's

19  already been admitted as Government's Exhibit 34.

10:18AM 20  Mr. Fottrell, what is Government's Exhibit 34 again?

21  A.    Government's Exhibit 34 is the EXIF information

22  associated with the thumbnail images that were located in

23  the large folder.

24  Q.    When were these thumbnail images created based on

10:19AM 25  Exhibit 34?

10:19AM 1    A.    At 5:11 p.m. on the 14th.

2    Q.    Just to be clear, what were these thumbnail images

3    depicting?

4    A.    These were the thumbnail images associated with the

10:19AM 5    storyboards in the web-collections-prevs that had been

6    extracted to the desktop computer on the Linux partition.

7    Q.    Would someone need to view those images or open a

8    folder containing those images in order for these

9    thumbnail images to be created?

10:19AM10    A.    Yes.

11    Q.    Approximately how long after the defendant said, "got

12    stuck here and still not free yet" were these thumbnail

13    files created on the Linux partition in the car lot?

14    A.    So this happened at 4:49 p.m., and the things were

10:19AM15    created at 5:11 p.m., so I would estimate around 20

16    minutes later.

17    Q.    If we could take down 34.  Direct you to page two of

18    75.  What's the local user saying here?

19    A.    At 5:48 p.m., the user is saying, "I have your Versa

10:20AM20    down here for Carlin by the way".  And then a moment

21    later, "At my car lot."

22    Q.    If we could please pull up what's already been

23    admitted as Government's Exhibit 1.  Do you recognize that

24    exhibit, Mr. Fottrell?

10:20AM25    A.    Yes, I do.

10:20AM 1   Q.    What is it?

2   A.    This is a Torrential Downpour log associated with the

3   downloading of the movie_0216.

4   Q.    And when did this undercover download start?

10:20AM 5   A.    It started on May 14th at 5:41 p.m. and it finished

6   at 5:42 p.m.

7   Q.    Approximately how long after this undercover download

8   finished did the defendant say, "I have your Versa down

9   here at my car lot"?

10:21AM 10   A.    Approximately eight minutes later.

11   Q.    Just to be clear, Mr. Fottrell, in order for this

12   undercover download to happen, what would need to be on

13   the Linux partition at the car lot?

14   A.    The Linux partition would have to be the partition

10:21AM 15   that's active.  The uTorrent program would have to be

16   running and active at that point in time.  That's the way

17   that the undercover is going to be able to access this

18   computer through its use of the uTorrent program.

19   Q.    And if this movie_0216 was not completely downloaded

10:21AM 20   to the defendant's Linux partition, would the undercover

21   officer have been able to complete a download of that

22   file?

23   A.    No.  The undercover downloaded the complete movie

24   from this connection.

10:21AM 25   Q.    If we could take these down and please pull up what's

10:21AM 1    already been admitted as Government's Exhibit 76.

2    When was this picture taken, Mr. Fottrell?

3    A.    This picture was taken on May 15th at 3:20 p.m.  If

4    we look at the GPS coordinates, it's not exactly at the

10:22AM 5    car lot.  The car lot would probably be more over here to

6    the left a little bit, so it's a little bit to the right

7    or a little bit east of the car lot.

8    Q.    How about on page two?

9    A.    On page two, the image is taken at 3:39 p.m.  Again,

10:22AM 10   we are not at the car lot.  We are a little bit away from

11   the car lot.  We're in, if I'm pronouncing that correctly,

12   Siloam Springs.

13   Q.    And what's this a picture of?

14   A.    It's a picture of a pavement with, like, an "only"

10:22AM 15   sign, and we see a gray Croc in the lower right-hand

16   corner of the screen.

17   Q.    How about on page four?

18   A.    On page four, the picture is taken at 5:47 p.m.  If

19   we look at the GPS coordinates, it does correspond to

10:22AM 20   being at the car lot.  Somebody is taking a picture of a

21   bottle of herbicide.

22   Q.    Stop here for a second.  If we could pull up what's

23   already been admitted as Government's Exhibit 39.  What,

24   again, is Government's Exhibit 39, Mr. Fottrell?

10:23AM 25   A.    These are the Torrent file locations, so there's a

10:23AM 1    number of Torrent files and it lists the dates and times

2    that they were downloaded.  So on the right-hand side, the

3    picture was taken of this herbicide at 5:47 p.m.  And we

4    see at 5:22 p.m. is this "playtoysweetie.7zip.torrent"

10:23AM 5    file downloaded.  5:25, the "DD."  At 5:30,

6    "DD.1.torrent."  5:32 is "asi se mama linda."  And 5:41 is

7    "marissa.zip.torrent," all within a close period of time

8    to this data.

9    Q.    To be exact, approximately how long after the

10:23AM10    "marissa.zip.torrent" file was downloaded was this picture

11    taken at the defendant's car lot?

12    A.    Approximately six minutes later, from 5:41 to 5:47.

13    Q.    If we could take down Government's Exhibit 39.  Turn

14    to page five of this exhibit, Exhibit 76.  When was this

10:24AM15    picture taken?

16    A.    The picture was taken on May 15th, 2019,

17    approximately 6:51 p.m.  And the location does correspond

18    to being the car lot.  What we see is somebody is taking a

19    picture of two Post-it notes.  And you can see a foot with

10:24AM20    what appears to be a gray Croc.

21    Q.    If we can take down Government's Exhibit 76 and pull

22    up what's been admitted as Exhibit 77.  When are these

23    messages from, Mr. Fottrell?

24    A.    These messages are dated May 15th, 2019.  The first

10:24AM25    one is at 11:15 a.m.

10:24AM 1    Q.   Just to be clear, these were from the defendant's

2    iPhone 8 backup on his MacBook?

3    A.   Yes, they are.

4    Q.   What does the defendant say in the first two

10:24AM 5    messages?

6    A.   At 11:15 a.m., "I'm at my car lot now.  I can come by

7    later or you can drop back in here.  I should be around

8    until 1:00 p.m., then gone for an hour or so."

9    Q.   So these messages predate, by a little bit, the

10:25AM10    images we just saw from the same date?

11    A.   Yes, they do.

12    Q.   If we could pull up alongside this exhibit what's

13    been admitted as Government's Exhibit 39 again.

14    Mr. Fottrell, what Torrent file is identified in the third

10:25AM15    row of Exhibit 39?

16    A.   The third row, on May 15th, 2019, at 11:35 p.m. is a

17    Torrent file named "11yogirlsuckandfuck."

18    Q.   Is it 11yo or 14yo?

19    A.   I'm sorry.  14yo.

10:25AM20    Q.   How many Torrent files were downloaded between

21    11:00 a.m. and noon on May 15th on the Linux partition

22    side of the computer?

23    A.   One, two, three.  Three.

24    Q.   Have you reviewed the content associated with these

10:26AM25    Torrent files?

10:26AM 1   A.   Yes, I have.

2   Q.   How would you describe it?

3   A.   Those are images of minors engaged in sexually

4   explicit conduct.

10:26AM 5   Q.   Approximately how long after the defendant said, "I'm

6   here at my car lot now" was the Linux partition on his HP

7   computer used to download the "14yogirlsuckandfuck"

8   Torrent file?

9   A.   The message is at 11:16 a.m. and the 14yogirl is at

10:26AM10   11:35 a.m., which is approximately 20 minutes later.

11   Q.   If we could take down Exhibit 39.  What is the local

12   user saying at the bottom on this page?

13   A.   At the bottom of the page at 11:43, he says, "Okay,

14   thanks, man.  Holler at me in a little bit."

10:26AM15   Q.   If we could pull up alongside this exhibit what's

16   already been admitted as Government's Exhibit 34, page

17   two.  What is Government's Exhibit 34 again, Mr. Fottrell?

18   A.   This is the EXIF information associated with the

19   thumbnail images that were in the large folder on the

10:27AM20   Linux partition.

21   Q.   And what are the files in the bottom three rows

22   identified as?

23   A.   So the bottom three rows of this exhibit show the

24   movies 14yogirlsuckandfuck, movie_0214, and movie_0216 at

10:27AM25   approximately 11:50 a.m. on the 15th.

10:27AM 1    Q.    So what does that mean the user of the Linux

2    partition was doing with respect to these downloads at

3    this time?

4    A.    Navigating to that folder and displaying the contents

10:27AM 5    of that folder in thumbnails view.

6    Q.    Approximately how long after the defendant said,

7    "Okay, thanks, man, holler at me in a little bit" did the

8    user of the Linux partition navigate to that folder?

9    A.    So it's from 11:43 a.m. to 11:50 a.m., so it's

10:28AM10    approximately seven minutes later.

11    Q.    You can take down Exhibit 34.  Turn to page three of

12    Exhibit 77.  Mr. Fottrell, can you read the first message

13    there?

14    A.    The first message is dated at approximately 3:55 p.m.

10:28AM15    "Be praying for Mark, (older guy that was riding a

16    motorcycle on 412).  I helped stabilize and pray for him

17    for a little while before the ambulance arrived."

18    Q.    Did you find any images on the iPhone backup

19    associated with these messages?

10:28AM20    A.    Yes, I did.

21    Q.    Which ones were those?

22    A.    Those were images of the Croc on the concrete end

23    there was a photo of the motorcycle accident on the road.

24    There was pictures associated with that.

10:28AM25    Q.    Those were the ones that were taken just outside the

10:28AM 1    car lot?

2    A.    Yes.

3    Q.    Turning to page four of this exhibit, what are the

4    first two messages there?

10:29AM 5    A.    At 5:08 p.m., the message is, "I'm here at the car

6    lot," smiley face.  Then at 5:08 p.m., little bit further

7    along, "Will be here until around 6:00 or so."

8    Q.    And who is sending those messages?

9    A.    Excuse me?

10:29AM10    Q.    Who is sending those messages?

11    A.    The user of the iPhone.

12    Q.    Can we please pull up alongside this exhibit what's

13    already been admitted as Government's Exhibit 39.

14    Mr. Fottrell, what Torrent files were downloaded between

10:29AM15    5:00 and 6:00 p.m. on the Linux partition based on

16    Government's Exhibit 39?

17    A.    On the 15th, between 5:00 and 6:00 p.m., it's used

18    one, two, three, four, five -- playtoysweetie, DD, DD.1,

19    asi se mama and marissa.zip were downloaded between 5:00

10:29AM20    and 6:00 on the 15th.

21    Q.    So how long after the defendant said, "Will be here

22    until around 6:00 or so," referring to his car lot, did he

23    download, for example, the DD.torrent file?

24              MR. GELFAND:  Objection to the way that's framed,

10:30AM25    Your Honor.

10:30AM  1          MR. CLAYMAN:  I can rephrase the question, Your

         2  Honor.

         3          THE COURT:  Please rephrase.

         4  Q.   (BY MR. CLAYMAN.)  How long after the local user of

10:30AM  5  the iPhone backup sent, "Will be here until around 6:00 or

         6  so, I'm here at the car lot" were the Torrent file

         7  "DD.torrent" downloaded to the Linux partition?

         8  A.   So from 5:08 p.m.  The DD was at 5:15 and at 5:30, so

         9  approximately 15 to 20 minutes later.

10:30AM 10  Q.   We can take down Government's Exhibit 39.  Please

        11  turn to page five of Government's Exhibit 77.  When were

        12  these messages sent, Mr. Fottrell?

        13  A.   On the 15th, approximately 5:58 p.m., 5:59 p.m.

        14  Q.   Can you read the messages that were sent?

10:30AM 15  A.   At 5:58 p.m., "Still have customers here."  And then

        16  at 5:59, "No problem, probably be here for a while."  A

        17  little bit further down at 6:00 it says, "Okay, cool, see

        18  you soon."

        19  Q.   If we could pull up alongside this exhibit what's

10:31AM 20  already been admitted as Government's Exhibit 2.  Do you

        21  recognize this exhibit, Mr. Fottrell?

        22  A.   Yes, I do.

        23  Q.   What is it?

        24  A.   This is the Torrential Downpour log from the

10:31AM 25  undercover agent on May 15th, 2019, at 6:00 p.m.

10:31AM 1   associated with the files in the marissa.zip file.

2   Q.    When did this undercover download begin?

3   A.    May 15th, 2019, at 6:00 p.m.

4   Q.    Exactly the same time that the local user of the

10:31AM 5   defendant's iPhone backup said, "Okay, cool, see you

6   soon"?

7   A.    Yes.

8   Q.    We can take down these two exhibits.  If we can pull

9   up what's been admitted as Government's Exhibit 78.  When

10:32AM 10  was this picture taken?

11  A.    This picture was taken on May 16th at 11:35 a.m.  And

12  the location for this is at the car lot.

13  Q.    If you could pull up alongside this exhibit what's

14  already been admitted as Government's Exhibit 34,

10:32AM 15  page three.  What is Exhibit 34 again, Mr. Fottrell?

16  A.    It's the EXIF information for the thumbnail images

17  that were created in the large folder on the Linux

18  partition.

19  Q.    What are the top three lines there?  What do those

10:32AM 20  indicate in this exhibit?

21  A.    The first two are dated on the 15th at 11:50.  The

22  first one references "pussy pounded."  The second one

23  references "test.avi."  But the third line corresponds

24  with the 16th at 11:33 a.m. associated with the video

10:32AM 25  "pedomom.wmv."

10:32AM 1   Q.   So approximately how long after this picture in

2   Exhibit 78 was taken at the car lot did the thumbnail

3   files for pussy pounded.mpg and test.avi get created on

4   the Linux partition?

10:33AM 5   A.   So I think that's incorrect.   So pussy pounded was on

6   the 15th, and the first two were on the 15th.   So the one

7   that I care about is the 16th.   So this picture is the

8   16th at 11:35 a.m., which corresponds to the 16th at 11:33

9   a.m., pedomom, within a two-minute window.

10:33AM 10   Q.   Yes, that's correct.   So pedomom, the thumbnail file

11   was created two minutes before this picture was taken at

12   the car lot?

13   A.   Yes.

14   Q.   Again, just to be clear, how would a thumbnail file

10:33AM 15   get created on the Linux partition?

16   A.   The user of the computer would have to use the

17   program to navigate to that folder and display the

18   contents of the folder in large thumbnails view.

19   Q.   So two minutes before this picture was taken with the

10:33AM 20   defendant's iPhone at the car lot, what was the computer

21   at the car lot doing?

22   A.   Displaying the contents of the folder where

23   pedomom.wmv was located.

24   Q.   If we can take these exhibits down and publish what's

10:34AM 25   been admitted as Government's 79.   When are these chats

10:34AM 1   from, Mr. Fottrell?

2   A.   These are also on the 16th.  I'm sorry.  May 16th,

3   2019.  The first entry is at 12:56 p.m.

4   Q.   So that's a couple hours after that image that we

10:34AM 5   just saw with the Post-it note?

6   A.   Yes.

7   Q.   And what's the message say?

8   A.   "Well, I guess I'm not going to Lowe's right away.  I

9   have a customer at the lot to buy a car hopefully."

10:34AM10   Q.   Who sent that message?

11   A.   The local user, the user of the iPhone.

12   Q.   If we could take this down and publish what's been

13   admitted as Government's Exhibit 80.  Mr. Fottrell, when

14   was this picture taken?

10:34AM15   A.   This picture was taken on June 22nd, 2019, at

16   approximately 4:47 p.m. in the afternoon.

17   Q.   Where was it taken?

18   A.   At the car lot.

19   Q.   What's it a picture of?

10:35AM20   A.   It appears to be a selfie of Joshua Duggar taking a

21   picture of himself at the car lot.

22   Q.   Is there anyone in the background of the image?

23   A.   Nobody else visible.

24   Q.   How about on page two of this exhibit?

10:35AM25   A.   It's just another picture just a few moments later.

10:35AM 1    It's another selfie, if you will, at the car lot at

2    4:47 p.m.

3    Q.   Do you see anyone in the background?

4    A.   Just Joshua Duggar.

10:35AM 5    Q.   If we could take this down and publish what's been

6    admitted as Government's Exhibit 81.  When are these

7    messages from, Mr. Fottrell?

8    A.   These are text messages dated on the same date,

9    June 22nd, 2019.

10:35AM 10   Q.   Just a few hours before those selfies were taken that

11   we just saw?

12   A.   Yes.

13   Q.   Can you read the messages from the local user?

14   A.   At 1:23, "I will connect you with my friend."  Then a

10:35AM 15   few moments later, there's a phone number that's listed.

16   At 1:24, "His name is Kelly Williams, (yes, he)".  At

17   1:25, "He knows where to buy them in Germany, too.  Just

18   text him".  And then at 1:25 p.m., "He is at my car lot

19   now and we are talking about you."

10:36AM 20   Q.   Will you please pull up alongside this exhibit what's

21   been admitted as Government's Exhibit 30 and go to

22   page 25.  Mr. Fottrell, what is Government's Exhibit 30

23   again?

24   A.   Government Exhibit 30 is some of the print screens

10:37AM 25   that I created of the Linux partition.  I'm navigating to

10:37AM 1    the documents folder where this Aguilar 4runner document

2    is.  I'm displaying the document properties, which tells

3    me that this document was created on the 22nd at

4    12:18 p.m. and it was last edited at 12:28 p.m., so for

10:37AM 5    approximately a 10-minute window of time is when that

6    document was edited on the Linux partition.

7    Q.    You can see there just at the bottom, who is

8    identified as the sales agent on this document?

9    A.    Josh.

10:37AM10    Q.    So approximately how long after this document was

11    last edited did the local user of the defendant's phone

12    send the message, "He is here at my car lot now and we

13    were talking about you"?

14    A.    This one is at 1:25 p.m. versus 1:28 p.m., so it's

10:37AM15    within a three-minute window.

16    Q.    Is that 1:28 or 12:28, Mr. Fottrell?

17    A.    I'm sorry.  12:28.

18    Q.    So approximately an hour?

19    A.    Approximately an hour.  I'm sorry.

10:38AM20    Q.    We can take these down now.  Did you review any other

21    devices in connection with your work on this case?

22    A.    Yes, I did.

23          THE COURT:  Mr. Clayman, we need to take a

24    morning recess.  Would now be a good time?

10:38AM25          MR. CLAYMAN:  That would be perfect, Your Honor.

10:38AM 1          THE COURT:  We will take our morning recess and

2      go back on the record at 11:00.

3          Let me remind you of the recess instruction.  Do

4      not discuss the facts of the case with your fellow jurors

10:38AM 5      or anyone else on this recess.  Don't do any research of

6      any kind.  Don't let anyone approach you and speak to you

7      about the case.

8          We'll go back on the record and call for you at

9      11:00 a.m.  Everyone please stand while the Jury is in

10:38AM10      recess.

11          (Jury out at 10:38 a.m.)

12          THE COURT:  Everyone please remain in the gallery

13      until the jurors have cleared the elevator lobby.  I will

14      let you know when that is.  You may be seated.

10:39AM15          Mr. Gelfand, if the defense is going to have any

16      problems with the 1006 summary that we discussed earlier,

17      would you try to let me know before we go back on the

18      record?

19          MR. GELFAND:  Yes, Your Honor.  We've been -- our

10:40AM20      team has been working on it.

21          THE COURT:  Great.  Thank you.  We're in recess

22      until 11:00.

23          (Recess from 10:40 a.m. to 10:59 a.m.)

24          (Outside the presence of the Jury)

10:59AM25          THE COURT:  You all want to be take up the 1006

10:59AM 1    summary?  This is proposed Government's Exhibit 85.

2            MR. GELFAND:  Yes, Your Honor.  Mr. Story is

3    going to address the Court if he could.

4            THE COURT:  All right.  That's fine.

10:59AM 5            MR. STORY:  Your Honor, I've been attempting to

6    review all of these during our last session.  I found four

7    what I would consider inaccuracies or things that are

8    misleading about the proposed Exhibit 85, and so we would

9    object based on the fact that, both in the representation

10:59AM10   actually listed on the proposed Government Exhibit 85 is

11   inaccurate as to the words on the page, and also as to the

12   testimony that has been previously given this morning.

13           THE COURT:  Can you identify the four

14   inaccuracies by date and time-marker?

11:00AM15           MR. STORY:  I can, Your Honor.  The May 13th,

16   2019, dell_one on Linux, it's confusing in the sense that

17   Exhibit 30, page 16, doesn't ever say "dell_one."  It's

18   simply a screenshot of what looks to be a computer -- it's

19   effectively the computer directory.

11:00AM20           THE COURT:  Looks to me like it's saying that the

21   "dell_one" user set up the Linux partition at 1:52 on

22   May 13, and the backup document is Exhibit 30, page 16.

23   Is that what you're saying is inaccurate?

24           MR. STORY:  I'm saying it doesn't seem that

11:00AM25   page 16 of Exhibit 30 -- he's got the quotes "dell_one" in

11:01AM 1    there.  It doesn't appear that there's anything that says

2    "dell_one" on that particular page of that particular

3    exhibit.  And that seems to be misleading and inaccurate.

4              THE COURT:  What's the next one?

11:01AM 5              MR. STORY:  The next one is also on May 13th,

6    which is the 3:06 p.m.  It's Exhibit 73.  Exhibit 73 is

7    listed on the proposed Government Exhibit 85 as, "iPhone

8    utilized to take picture of vehicle at car lot."  If you

9    look at photo, or Government's Exhibit 73, which was

11:01AM10    admitted and testified to, it's actually a picture of a

11    scale, not a picture of a car on the car lot.

12              THE COURT:  Gotcha.

13              MR. STORY:  The May 14th time-stamps, the one

14    that is 5:42 p.m., Little Rock detective downloads, quote,

11:02AM15    "mov_0216.mp4," quote, which is their Exhibit 1, using

16    this convention would -- that they have been using would

17    actually happen at 5:41 p.m. also, not 5:42.

18              And then on May 15th on page two, Your Honor, of

19    proposed Government Exhibit 85 at the 5:58 p.m., it says,

11:03AM20    quote, "marissa.zip unzipped and viewed, Exhibit 32."  I

21    believe what I heard this morning was that they were

22    unzipped at that time, but not viewed.  And I don't know

23    if the EXIF data would tell us that they were actually

24    viewed, just that they were indeed all unzipped.

11:03AM25    Specifically because they were all done at the exact same

11:03AM 1  time, I don't know that they could have all been unzipped

2  and viewed at the same time.  And so our specific

3  objection would be to the word, "and viewed."

4          THE COURT:  Mr. Clayman, are you in a position to

11:04AM 5  respond?

6          MR. CLAYMAN:  I believe so, Your Honor.

7          THE COURT:  One more question.  Is this exhibit

8  going to come up in this next session?

9          MR. CLAYMAN:  Yes, Your Honor.  With respect to

11:04AM10  the first objection, I believe that was the May 13th,

11  1:52 p.m. time-stamp, the totality of Exhibit 30 makes

12  clear the dell_one user is being set up.  It's, I believe,

13  mentioned on page one or two.  I think, to the extent

14  page 16 does not also make it clear, that that's

11:04AM15  approximately when the account was set up.  We can

16  certainly remove page 16 and then instruct the Jury that

17  throughout Exhibit 30, that's what's indicated there.

18          With respect to the second one, the May 13th

19  3:06 p.m. time-stamp, that does appear to be an error.  We

11:04AM20  can either correct it on the record or we can simply

21  remove it from the exhibit.

22          With respect to the third one, the 5-14

23  5:42 p.m. download, I believe Exhibit 1 indicates that the

24  download was initiated by the undercover at 5:41, which I

11:05AM25  believe is what Mr. Story was referencing.  The bottom of

11:05AM 1   that page says that the download has completed at 5:42.

2   That's what that's referring to.

3   And then at 5-15 at 5:58 p.m., that was the final

4   objection they raised.  I believe their issue was that the

11:05AM 5   EXIF thumbnail information, in their estimation, does not

6   indicate that the files were viewed.  I would disagree

7   with that, because I think, as Mr. Fottrell testified, a

8   thumbnail is created when an individual navigates to the

9   folder and views it.  So the individual necessarily had to

11:05AM10   see what was in that folder, he viewed these files, and

11   that's what's indicated in the summary exhibit we have

12   provided.

13   THE COURT:  And what does Exhibit 32 say about

14   viewing?

11:06AM15   MR. CLAYMAN:  Exhibit 32 lists the thumbnail EXIF

16   information.  And in order for those thumbnails to be

17   created, that means someone had to view the folder

18   containing those thumbnails.  They had to see what those

19   images were.

11:06AM20   THE COURT:  All right.  So the Court would

21   require, based on these objections, that the government

22   amend the May 13 at 1:52 p.m. entry to delete the page

23   reference so it just references Exhibit 30.

24   On the 3:06 p.m., that you change "vehicle" to

11:06AM25   "scale."

11:06AM 1           On May 14 at -- well, you're telling me that

2  Exhibit 1 shows download activity at 5:42?

3         MR. CLAYMAN:  Download is completed at 5:42.

4         THE COURT:  I think that that is a fair enough

11:07AM 5  summary.  I don't think there is anything misleading about

6  starting at 5:41 and associating the word "download" with

7  5:42 when it's completed.  So that part of the objection

8  is overruled.

9         On May 15, the entry at 5:58 p.m., "unzipped and

11:07AM10  viewed," based on Mr. Clayman's explanation, which the

11  Court recalls was explained, about what it means when

12  there's a thumbnail there, the Court will not require any

13  modification there.  Obviously, there can be cross

14  examination about that, but the Court believes that that

11:07AM15  is a fair summary.

16         Can you make those changes before you tender?

17         MR. CLAYMAN:  We can, Your Honor.

18         THE COURT:  All right.  So it's really just the

19  two entries on May 13th, small changes?

11:08AM20         MR. CLAYMAN:  Yes, Your Honor.

21         THE COURT:  Please call the Jury up.

22         (Jury in at 11:12 a.m.)

23         THE COURT:  I find myself apologizing once again

24  for the delay in getting started.  I do want to assure you

11:13AM25  that we weren't just lollygagging while you were waiting.

11:13AM 1   We were actually resolving an issue with a potential

2   exhibit.  And had we not done it over the last 20 minutes,

3   we would have had a long side bar and we felt like it

4   would be better to resolve it before we brought you up.

11:13AM 5   So, again, I appreciate your ongoing patience and

6   understanding.

7           You may continue, Mr. Clayman.

8           MR. CLAYMAN:  Thank you, Your Honor.

9   Q.   (BY MR. CLAYMAN.)  Mr. Fottrell, did you review any

11:13AM10   other devices as part of your investigation in this case?

11   A.   Yes, I did.  I examined an iPhone 11 that was seized

12   from the defendant, an imaged copy of the iPhone 11.

13   Q.   And what did you learn based on your review of that

14   device?

11:13AM15   A.   That there was -- it was just -- the different

16   applications that were used on the device.

17   Q.   Did you find any applications of particular interest

18   during your examination of that device?

19   A.   Yes, I did.

11:14AM20   Q.   What application was that?

21   A.   The TOR, the TORsec application.  So on the iPhone

22   11, there was an Apple version of the TOR program on the

23   iPhone 11 seized from the defendant.

24   Q.   Can you explain for the Jury TORsec?  Is it the same

11:14AM25   as TOR?

11:14AM 1     A.    Right.  So we talked about TOR and the TOR browser

2     bundle that was installed on the Linux partition.  TORsec

3     is just the brand or the name of the TOR program that is

4     available on the App Store for Apple devices and that

11:14AM 5     application -- there's evidence that that application was

6     installed and used on the iPhone 11.

7     Q.    Can you please find what's been previously marked as

8     Government's Exhibit 83 in the black binder you have in

9     front of you?

11:14AM 10    A.    Okay.

11    Q.    Do you recognize this exhibit?

12    A.    Yes, I do.

13    Q.    What is it?

14    A.    It's a four-page exhibit of TORsec media history.  So

11:14AM 15    there's web-browsing activity associated with the use of

16    the TORsec program.  And I extracted that information and

17    printed it out.

18    Q.    Is this exhibit redacted that you have in front you?

19    A.    Yes, it is.  The title of the URL that is being

11:15AM 20    referenced in column three is redacted.

21    Q.    Is it otherwise a true and accurate copy of the

22    TORsec media history that you recovered from the iPhone

23    11?

24    A.    Yes, it is.

11:15AM 25          MR. CLAYMAN:  Your Honor, at this time, we would

11:15AM 1   move to admit Government's Exhibit 83.

2                    MR. GELFAND:   No objection, Judge.

3                    THE COURT:   Government Exhibit 83 is received.

4                    (Government Exhibit 83 Received)

11:15AM 5            MR. CLAYMAN:   Permission to publish, Your Honor.

6                    THE COURT:   You may.

7       Q.   (BY MR. CLAYMAN.)   Can you explain for the Jury what

8       is shown here, Mr. Fottrell?

9       A.   This is on the iPhone, the TORsec media history, so

11:15AM10   there's a database file.   There's information that

11      contains websites visited by the computer, by the mobile

12      phone user.   It lists date and time of when it starts and

13      when it ended.   So in the October 16th, 2019, time frame,

14      the user was basically browsing websites using the TOR

11:16AM15   browser.

16      Q.   If I could stop you there for a second.   Is this the

17      full TORsec media history as far as you know?

18      A.   Yeah.   I don't have a lot of information, so there's

19      only four pages.   There's -- we don't have cumulative all

11:16AM20   of the web-browsing activity through the extraction that

21      was generated.   I only have this fragment of evidence.

22      Q.   So is it possible that the TOR application was used

23      prior to October 16th on the phone?

24      A.   Yes.

11:16AM25   Q.   Now, did you review the information that's redacted

11:16AM 1  before it was redacted?

2  A.   Yes, I did.

3  Q.   Did you find any automobile-related URLs or

4  work-related URLs?

11:16AM 5  A.   No, I did not.

6  Q.   Was the TOR browser used exclusively to view adult

7  pornography?

8  A.   Yes.

9  Q.   Can you walk through for the Jury what these time

11:16AM10  entries here are on the first page?

11  A.   So the software keeps track.  For example, on the

12  first entry, it shows the time frame of 2:15 a.m.  And

13  another -- another -- a few seconds later, a second later,

14  but it lists a duration of this session being used for 13

11:17AM15  minutes and 19 seconds.  So there's just starting and

16  start times that are kind of just reflected in this

17  information.  But the significant column for me is the

18  duration for how long the person was using the TORsec

19  program on the iPhone 11.

11:17AM20  Q.   Turning to page two, what dates are reflected there?

21  A.   October 16th, October 17th, October 19th,

22  October 19th.

23  Q.   How about on page three?

24  A.   On page three, it's the 19th, 21st, 22nd,

11:17AM25  October 30th, November 2nd, November 7th.

11:17AM 1    Q.    On page four?

2    A.    Continuing on November 7th.  And then on

3    November 8th, 2019.

4    Q.    Mr. Fottrell, do you know what happened in connection

11:18AM 5    with this case on November 8th of 2019?

6    A.    Yes.  On November 8th of 2019, approximately a few

7    hours later in the afternoon is when the HSI agents

8    executed the search warrant at the car lot.

9    Q.    Thank you.  We can take this down.  Now,

11:18AM10    Mr. Fottrell, you've discussed a lot of forensic evidence

11    over the course of the past two days.  How many devices,

12    again, did you examine?

13    A.    The HP desktop computer, the MacBook, and the images

14    of the iPhone 8 that were also stored on the MacBook, and

11:18AM15    the iPhone 11.

16    Q.    How many exhibits, if you had to guess, have

17    you prepared?

18    A.    Probably 50 or 60 exhibits.

19    Q.    Did you prepare a summary in connection with those

11:18AM20    exhibits?

21    A.    Yes, I did.

22          MR. CLAYMAN:  Your Honor, may I approach the

23    witness?

24          THE COURT:  You may.

11:18AM25    Q.    (BY MR. CLAYMAN.)  Mr. Fottrell, I just handed you an

11:19AM 1   exhibit that's been marked as Government's Exhibit 85.

2   Do you recognize that?

3   A.   Yes, I do.

4   Q.   What is it?

11:19AM 5   A.   It's a timeline that I created kind of summarizing

6   all of the exhibits that we went to.  My intention and my

7   goal was to organize the relevant exhibits and the

8   relevant evidence on particular days that are significant

9   in this case.

11:19AM 10  Q.   Does this timeline fairly and accurately summarize

11  the forensic evidence that you recovered from these three

12  devices you just mentioned?

13  A.   Yes, it does.

14        MR. CLAYMAN:  Your Honor, at this time, we would

11:19AM 15  move to admit Government's Exhibit 85 into evidence.

16        MR. GELFAND:  One second, Your Honor.

17        THE COURT:  That's fine.

18        MR. GELFAND:  No objection, Judge.

19        THE COURT:  Government Exhibit 85 is received.

11:20AM 20        (Government Exhibit 85 Received)

21        MR. CLAYMAN:  Permission to publish, Your Honor?

22        THE COURT:  You may.

23  Q.  (BY MR. CLAYMAN.)  Mr. Fottrell, can you just explain

24  for the Jury what you created here in this timeline?

11:20AM 25  A.   My intention was to create a timeline of exhibits and

11:20AM 1   significant events on particular days.  So I have on

2   May 11th, May 13th, May 14th, May 15th.  And on page two,

3   we have the 16th and June 22nd.  So it's just listing days

4   that are significant to the case, and then events that are

11:20AM 5   occurring during those periods of time.

6   Q.    So why is May 11th significant for the case?

7   A.    Excuse me?

8   Q.    Why is May 11th significant for the case?

9   A.    May 11th was when, on the HP computer, the Ubuntu

11:20AM10   software was downloaded at 5:47 p.m.  Then at 5:58 p.m. is

11   the user of the iPhone 8 took a picture at the car lot.

12   Q.    How about May 13th?

13   A.    May 13th is when the Ubuntu partition and the Ubuntu

14   operating system was installed, so at approximately

11:21AM15   roughly 1:52 p.m. is when the user dell_one was set up on

16   the Linux partition, so that's kind of the born-on date

17   for the Linux partition.  That's when it was up and

18   running.

19       A little bit later at 2:03 p.m. is when the TOR

11:21AM20   browser system was installed and created the bookmarks

21   associated with the installation of the TOR browser.

22   Approximately half an hour later at 3:06 p.m. is when the

23   iPhone was used to take a picture of a scale at the car

24   lot.

11:21AM25   Q.    The Linux partition, you testified earlier, someone

11:21AM 1   had to be physically present at the car lot to install

2   that, is that right?

3   A.   Yes.

4   Q.   How about May 14th?

11:21AM 5   A.   So May 14th, there is a lot of activity.  It's

6   starting off at 4:14 p.m.  The iPhone is used to take a

7   picture of a vehicle at the car lot.  At 4:20, there's

8   another picture of the HP computer screen.  At 4:49 p.m.,

9   there's an iMessage that says, "Got stuck here and still

11:22AM 10   not free yet."  A little bit later, at 4:58 p.m., the

11   Candle bookmark associated with the TOR browser was

12   created on the Linux partition.  A few minutes later, at

13   5:05 p.m., the webcam-collections-prevs.7zip archive file

14   was downloaded through the TOR browser on the Linux

11:22AM 15   partition.

16       A few minutes later, at 5:11 p.m., the

17   webcam-collections-prevs images were viewed in thumbnail

18   view on the Linux partition.  5:28 p.m., the movie_0214

19   Torrent file was downloaded.  Approximately 10 minutes

11:22AM 20   later, at 5:38 p.m., movie_0216 was downloaded on the

21   Linux partition.

22       A little bit later at 5:41 p.m., the TOR bookmarks

23   for the Hidden Wiki was created.  A minute later, at 5:42,

24   is when the Little Rock detective downloaded the

11:23AM 25   movie_0216 from the defendant's computer.  A few minutes

11111

11:23AM 1   later, at 5:48 p.m., messages were sent, "I have your

2   Versa down here at the car lot for Carlin, by the way."

3   At 5:49 p.m., there's another iMessage that says, "At my

4   car lot."  At 6:04 p.m., a photo was taken, the phone was

11:23AM 5   used to take a photo of a vehicle at the car lot.  A few

6   minutes later, at 6:07, another photo was taken.  At

7   8:14 p.m., there's a picture of Anna Duggar at the Lowe's

8   store.

9       Further down, the next day, on the 15th, we have

11:23AM10   activity in the morning at 11:15 a.m.  There's an iMessage

11   that says, "I'm at my car lot now."  A few minutes later,

12   at 11:35 a.m., the Torrent file associated with

13   14yogirlsuckandfuck was downloaded on the Linux partition.

14   Two minutes later, at 11:37 a.m., the test.avi Torrent

11:24AM15   file was downloaded on the Linux partition.  At

16   11:41 a.m., the Pussy Pounded Torrent file was downloaded.

17   At 11:50 a.m., thumbnails were created for

18   14yogirlsuckandfuck and movie_0214, movie_0216, Pussy

19   Pounded, and test.avi on the Linux partition.

11:24AM20       A little bit later in the afternoon, at 3:20 p.m.,

21   the user of the iPhone takes a picture of a firetruck near

22   the car lot.  At 3:39 p.m., the iPhone was used to take a

23   picture of a vehicle accident near the car lot.  At

24   3:55 p.m., there's a message that says, "Be praying for

11:24AM25   Mark (older guy that was riding a motorcycle on 412)."

11:24AM 1    And at 5:08 p.m., there's a message that was sent, "I'm

2    here at the car lot, will be here until around 6:00 or

3    so."

4         Continuing on page two, at 5:22 p.m., the Torrent

11:25AM 5    file playtoysweetie.7zip archive file was downloaded on

6    the Linux partition.  At 5:25 p.m., the DD Torrent was

7    downloaded.  Five minutes later at 5:30, it was downloaded

8    again with the DD.1.  At 5:32 p.m., asi se mama linda, the

9    Torrent file was downloaded.  At 5:41 p.m., the

11:25AM10    marissa.zip Torrent was downloaded.  At 5:58 p.m., a

11    message was sent, "Still have customers here."  At 5:58,

12    the same time, the marissa.zip file was unzipped and the

13    thumbnails were created indicating that it was viewed at

14    5:58 p.m.

11:25AM15         Finally, on the 15th at 6:51 p.m., the iPhone was

16    used to take a picture in the car lot office.

17    Q.   If you would walk us through the 16th.

18    A.   On the 16th, at 11:21 a.m., the pedomom Torrent file

19    was downloaded.  Approximately a few minutes later, at

11:26AM20    11:33 a.m., the thumbnail of pedomom.wmv was created.  At

21    11:35 a.m., the iPhone was used to take a picture in the

22    car lot office.

23         And then finally on June 22nd, at 12:18 p.m., is when

24    the Aguilar 4runner document was created.  At 1:25 p.m.,

11:26AM25    there's a message that's sent, "He's at my car lot now and

11:26AM 1  we are talking about you."  And then finally, at

2  4:47 p.m., the iPhone is used to take a picture of Joshua

3  Duggar at the car lot.

4  Q.    So, Mr. Fottrell, based on your review of all the

11:26AM 5  evidence in this case, who was present at the car lot

6  every single time child pornography was downloaded to the

7  Linux partition?

8  A.    Joshua Duggar.

9             MR. CLAYMAN:  I'll pass the witness, Your Honor.

11:26AM10             THE COURT:  Thank you, Mr. Clayman.

11             MR. GELFAND:  Your Honor, can I take a minute to

12  get organized?

13             THE COURT:  That's perfectly fine.

14             MR. GELFAND:  Can I proceed, Judge?

11:27AM15             THE COURT:  You may.

16                      CROSS EXAMINATION

17  BY MR. GELFAND:

18  Q.    Good morning, Mr. Fottrell.

19  A.    Good morning.

11:27AM20  Q.    Mr. Fottrell, you are a full-time employee for the

21  U.S. Department of Justice, correct?

22  A.    Yes, I am.  Have been for approximately 20 years.

23  Q.    And so as a full-time employee for the Department of

24  Justice, is it fair to say that 100 percent of your job is

11:28AM25  assisting prosecutors with their cases?

11:28AM 1    A.    Yes.   Assisting prosecutors with performing training,
2    performing training for law enforcement officers, so I
3    certainly work with prosecutors and my law enforcement
4    partners around the country and around the world.
11:28AM 5    Q.    You do not perform any sort of computer forensic
6    evaluation outside of government, correct?
7    A.    Correct.
8    Q.    And you never have, correct?
9    A.    No.
11:28AM10    Q.    Now, you also have a full-time team of computer
11    forensic analysts that work under you, correct?
12    A.    That is correct.
13    Q.    Your section handles approximately 30 to 40 cases per
14    year?
11:28AM15    A.    I'm guessing my HTIU has been averaging about 100
16    cases per year.
17    Q.    What this means is that you have essentially
18    unlimited resources to get this right, correct?
19    A.    I don't think that's true.   That's your assessment.
11:28AM20    We are a government agency.   We are struggling for
21    funding.   I wish I had more people.   We are doing the best
22    with the limited resources we have.   I think that's a more
23    fair conception of what I do on a daily basis.
24    Q.    Did you feel constrained with resources in this case
11:29AM25    such that you couldn't get it right?

11:29AM 1   A.   There's -- in every case, there is always more
       2   analysis you could do.  I would always love to do more
       3   analysis.  I think we did the right amount of analysis in
       4   this case.  It's certainly not perfect.  It's certainly
11:29AM 5   not exhaustive.  I did a -- what I consider a
       6   comprehensive analysis in this case.
       7   Q.   Let's talk about that.  You were not personally
       8   involved in May 2019 when this investigation began,
       9   correct?
11:29AM10   A.   Correct.
      11   Q.   So you testified briefly about some Torrential
      12   Downpour logs that you referenced yesterday when the
      13   prosecutor was asking questions, correct?
      14   A.   Yes.
11:29AM15   Q.   You were not personally involved, though, in any
      16   Torrential Downpour activity, correct?
      17   A.   Certainly not.
      18   Q.   You used the term this morning, "The undercover
      19   officer".  Are you referring to the officer, quote,
11:29AM20   unquote, using the Torrential Downpour application?
      21   A.   Her name is Amber.  I forget her last name.  I knew
      22   her name was Amber.  That was impolite to say, so I just
      23   said undercover officer, because I couldn't remember her
      24   last name.
11:30AM25   Q.   That's okay.  Amber Kalmer, correct?

11:30AM 1    A.    Yes.

2    Q.    You also had no personal involvement with this case

3    between May of 2019 and November 8th of 2019 when HSI

4    executed a search warrant at Wholesale Motorcars?

11:30AM 5    A.    Correct.   Correct.

6    Q.    And to be clear, your section, so to speak, at the

7    Department of Justice was not involved in this case at

8    that time, correct?

9    A.    I wouldn't know the answer to that.   I know what my

11:30AM10    HTIU people are involved in.   There are trial attorneys in

11    my office, and there may have been trial attorneys that

12    have been reaching out to the U.S. Attorney's office in

13    the Western District of Arkansas.   I would not be aware of

14    that.

11:30AM15    Q.    You are not aware of any involvement, correct?

16    A.    Correct.

17    Q.    You were not present when the search warrant was

18    executed and devices were seized and imaged, correct?

19    A.    Absolutely correct.

11:30AM20    Q.    You did not personally forensically image any of the

21    devices that you have had access to in this case, correct?

22    A.    Absolutely correct.

23    Q.    And to this day, you have never conducted an

24    examination of the devices themselves, only the forensic

11:31AM25    images that you addressed yesterday, correct?

11:31AM 1    A.    That is correct.

2    Q.    And the reason why is because the forensic images are

3    supposed to essentially take a snapshot frozen in time of

4    when the image is created, correct?

11:31AM 5    A.    Correct.  During the imaging process, it creates a

6    forensic snapshot of the evidence that is being imaged and

7    there is checks and balances.  There's a hash value check

8    that verifies that it completed successfully.  So once

9    that check has happened correctly, we can put the original

11:31AM10    evidence away.  I can do my analysis on the image that's

11    created.  I can look at those hash values and that gives

12    me the comfort that I know that the image that I'm looking

13    at is exactly the same as when the person made the

14    original image.

11:31AM15    Q.    By having access to an image, you can go back to that

16    image and look for additional potential evidence or do

17    additional tests, as it may be, over the course of your

18    entire analysis, correct?

19    A.    Correct.  Once I have that image, I can look at it as

11:32AM20    much as I need to and examine as much as I need to and

21    extract whatever I feel is relevant.

22    Q.    Without that image, you can't do any of that,

23    correct?

24    A.    Correct.  Absolutely.

11:32AM25    Q.    Without the device in law enforcement's hands, you

11:32AM 1   can't image it, correct?

2   A.    Yeah.  Yeah, so law enforcement has to have the

3   device in order for them to create the forensic image,

4   that's correct.

11:32AM 5   Q.    So would you agree with me, based on all of your

6   training and experience that you went through yesterday,

7   that the best practice in cases like this is to

8   forensically image each and every device that law

9   enforcement has the legal right to image?

11:32AM10   A.    I don't think that's true anymore.  I mean, that

11   might have been true like 20 years ago, but certainly not

12   today in what I would call modern times.

13   Q.    Why would you not want to preserve the evidence for

14   later?

11:32AM15   A.    No.  So law enforcement -- and I'm involved in this

16   all the time -- we are executing search warrants at

17   peoples' residences.  We are -- law enforcement officers

18   are trying to be sensitive.  We don't want to come in

19   there and seize the paint off of the wall.  There might be

11:33AM20   five or six people at the house, a husband, a wife,

21   children.  These people are using their devices, their

22   laptops, their devices and we don't want to -- we might

23   have the legal authority to seize everything, but law

24   enforcement officers are trying to be responsible.  They

11:33AM25   are trying to find where the critical evidence is,

11:33AM 1  certainly seize that critical evidence.

2       Part of my job on scene is to clear evidence that

3  doesn't have evidentiary value.  So in a typical case, for

4  example, if there was a minor child who was doing their

11:33AM 5  homework and they had a laptop computer, if I was on

6  scene, my responsibility would be to preview that device,

7  make a determination that it's not relevant to the

8  criminal case that we're here for, and to let that device

9  not be seized to minimize the impact of harm to the other

11:33AM 10  residents at that location.

11  Q.   You were not personally involved in this case in the

12  decision of making those kinds of triage-type decisions?

13  A.   Correct, I was not involved in this particular case.

14  I'm just talking more generally in the cases that I have

11:34AM 15  been involved in.

16  Q.   Data and information on electronic devices can be

17  hidden, correct?

18  A.   Yes.

19  Q.   In fact, virtually your entire testimony about the HP

11:34AM 20  computer focused on data that was not readily apparent

21  without doing forensic analysis of the device, correct?

22  A.   It's certainly readily apparent to me.  It might not

23  be readily apparent to the computer user.  Might not be

24  readily apparent to an average person using it.  But, to

11:34AM 25  me, my training and experience, there's lots of relevant

11:34AM 1    data that I can find in plain view.

2    Q.    That's true with phones, correct?

3    A.    Yes.

4    Q.    That's true with tablets, correct?

11:34AM 5    A.    Yeah.  So mobile devices are a little bit different

6    from PCs and thumb drives and some other devices, but,

7    yeah, so those devices have the ability to store

8    information as well.

9    Q.    And information can be hidden, correct?

11:34AM10    A.    Yes.

11    Q.    In other words -- I'm not trying to trick you or

12    anything.  Tell me if I'm wrong.

13    A.    Yes, the possibility exists, absolutely.

14    Q.    If you look at my iPhone right now, Mr. Fottrell, and

11:35AM15    you look at, you know, the photo app.

16    A.    Yeah.

17    Q.    You'd agree with me, would you not, that you are not

18    confident you're seeing every photo that's on the iPhone?

19    A.    Correct.  Like if I had unlimited time and unlimited

11:35AM20    money and unlimited resources to examine every single

21    item, I could exhaustively answer those questions.  But

22    the realities are, hard-working law enforcement officers

23    have limited time, limited resources to conduct their

24    examination, so they are using their best judgment, their

11:35AM25    best-trained judgment to make determinations on what

11:35AM 1    devices are seized and what devices don't get seized.

2    Q.    You testified yesterday at the beginning of your

3    examination about the steps of an investigation, correct?

4    A.    Yes.

11:35AM 5    Q.    You testified that the first step, at least as you

6    described it, was evidence collection, correct?

7    A.    Correct.

8    Q.    You were not involved in evidence collection in this

9    case, correct?

11:35AM10    A.    Correct.  There are certainly thousands of

11    well-trained law enforcement officers around the country

12    who can do that.  I don't need to get involved in that.

13    Q.    I'd appreciate it if you could just answer my

14    questions.  If you want to elaborate on something, I will

11:36AM15    let you, but --

16    A.    Okay.

17    Q.    You testified that the second step was image copying,

18    correct?

19    A.    Correct.

11:36AM20    Q.    You were not involved in image copying in this case,

21    correct?

22    A.    That's correct.

23    Q.    You have used the phrase "forensic tools," correct?

24    A.    Yes.

11:36AM25    Q.    Some of those forensic tools -- well, let's back up.

11:36AM 1    Forensic tools are computer forensic tools that are

2    available to people like you and other computer forensic

3    experts to perform analysis on devices, correct?

4    A.    Yeah.   So these are tools that are generally

11:36AM 5    available to the public.   Anybody can buy EnCase who has

6    the money to pay for it.   Anybody can buy the devices.   So

7    most of the tools that we use, the tools that I use, are

8    publicly available tools that we buy.

9    Q.    And forensic tools enable you to look into certain

11:36AM 10   data and essentially peek behind this curtain, so to

11   speak, of devices, correct?

12   A.    Yes.

13   Q.    You testified about EnCase, correct?

14   A.    Yes.

11:37AM 15   Q.    Are you certified in EnCase?

16   A.    I went through the certification process probably in

17   the year 2000, but I probably have not been involved in it

18   in the last 20 years.

19   Q.    So the answer is, no, you are not certified?

11:37AM 20   A.    I am not certified.   I've been using it for 30 years.

21   Q.    If you can just answer my question.   You are not

22   certified?

23   A.    That's not true.   I think I did get the certification

24   in 2000 when EnCase Version 3 was released.   I can testify

11:37AM 25   that I attended the EnCase training in roughly 2000 or

11:37AM 1    2001 with respect to the training.  Did I pay attention to

2    my certification?  It was not important to me.

3    Q.    FTK, are you familiar with that?

4    A.    AccessData's Forensics Toolkit, yes, I am.

11:37AM 5    Q.    Are you certified in FTK?

6    A.    No.

7    Q.    Cellebrite, are you familiar with that?

8    A.    Yes.

9    Q.    Are you certified in Cellebrite?

11:37AM10    A.    I don't really do Cellebrite anymore.  I have my

11    employees do that.

12    Q.    Did you use EnCase, FTK, or Cellebrite in this case?

13    A.    I used EnCase and I used AXIOM.

14    Q.    Is Windows Photo Viewer a forensic tool?

11:38AM15    A.    No, but it comes built with the Windows operating

16    system.

17    Q.    You testified about EXIF data this morning when you

18    talked about geolocation and time-stamps, correct?

19    A.    Yes.

11:38AM20    Q.    We're going to get to that a little bit later, but

21    tell the Jury what tool were you using that's reflected on

22    those devices for geolocation data and time-stamps?

23    A.    I was using just the Windows 10 operating system, is

24    what my forensic's workstation uses.  I have all my

11:38AM25    forensic tools and I was just using the Windows Photo

11:38AM 1    Viewer that is associated with the Windows 10 operating

2    system.

3    Q.    And that's exactly the software that I just asked you

4    about that you said was not a forensic tool, correct?

11:38AM 5    A.    Yes.

6    Q.    Now, you testified yesterday that your goal is to

7    give prosecutors enough to indict.  Do you recall that

8    testimony?

9    A.    Yes, I do.

11:38AM 10   Q.    Your audience, you testified, is prosecutors,

11   correct?

12   A.    Prosecutors, defense attorneys, and judges, correct.

13   Q.    Now, to accomplish -- let's back up for a second.

14   Why is the goal to get enough to indict as opposed to

11:39AM 15   actually understand everything you can about these

16   devices?

17   A.    Good.  That's a great question.  The answer is, like,

18   when we're conducting our forensic examinations, we have

19   limited time and limited resources.  I would love to say I

11:39AM 20   have five years to work on this case so that I can do a

21   comprehensive forensic examination to look at every

22   possible defense that could be raised, but I just don't

23   have the time and resources to do that.

24        The way that I structure my team to do reports is, we

11:39AM 25   have reports that provide a specific function.  And our

11:39AM 1    generic computer forensic report, our general purpose
2    report, is designed to give the prosecutor enough
3    information they need to get the case indicted.
4         If something comes up like a virus defense or some
11:39AM 5    other person did it, we would do a supplemental report.
6    Okay, now, the defense is raising a particular issue, I
7    may need to go back and do additional forensic examination
8    to target a particular defense that is being raised.  Am I
9    going to waste my time doing that in every single case?
11:40AM 10   No, it's not an efficient use of my time to do that.  I
11   make a business decision that our forensic reports are
12   targeting the information that prosecutors need to make
13   their case.  If we need to go back and do a supplemental
14   report for some issue, we will gladly do that.
11:40AM 15   Q.   A business decision?
16   A.   A business decision based on time; time and money.
17   We have people that are doing cases.  I am trying to
18   effectively work on as many cases as I can.
19   Q.   Mr. Fottrell, you're also limited by what is seized
11:40AM 20   before you even get involved in a case, correct?
21   A.   That is correct.
22   Q.   So it's not just time and resources, even though you
23   have the federal government at your disposal, it's also
24   what happened before you get involved, correct?
11:40AM 25   A.   Correct.

11:40AM 1   Q.    You can't do anything about that, correct?

2   A.    Right.  I can't be everywhere at the same time.  I'm

3   only limited in what I can do.

4   Q.    You said a typical case yesterday could have 30 to 40

11:41AM 5   devices, correct?

6   A.    Yeah.

7   Q.    How many devices were involved in this case?

8   A.    A smaller number.  There was the HP desktop computer,

9   there was a MacBook, there was number of thumb drives that

11:41AM10   were seized, and there was an iPhone that was seized, to

11   my recollection.

12   Q.    Did you analyze the thumb drives?

13   A.    I received the imaged copies of the thumb drives,

14   yes, I did.

11:41AM15   Q.    Did you look at them?

16   A.    Yes, I did.

17   Q.    How about the SD cards, did you look at those?

18   A.    Yes, I believe I did.

19   Q.    You concluded, based on your review of the thumb

11:41AM20   drives and the SD cards, that they have no relevance to

21   this case, correct?

22   A.    Yeah, minimal investigative value.  They are family

23   photos.  There's pictures of hunting, hunting-related,

24   things associated with a trail camera.  Things that were

11:41AM25   completely not relevant to my child exploitation

11:41AM 1    investigation.

2    Q.    The devices that were seized in this case, you

3    testified yesterday, were initially imaged by Marshall

4    Kennedy, correct?

11:42AM 5    A.    Yes.

6    Q.    And you testified that essentially you have a lot

7    more experience than Mr. Kennedy, correct?

8    A.    That would be a fair assessment.

9    Q.    You don't supervise Mr. Kennedy, correct?

11:42AM 10   A.    Not at all, no.

11   Q.    You didn't supervise Mr. Kennedy or participate as a

12   member of his team or him as a member of your team on the

13   date that the search warrant was executed, correct?

14   A.    No, I'm not.  No, I did not.

11:42AM 15   Q.    You're aware that his job is to be on an ICAC task

16   force, correct?

17   A.    I thought he was an HSI agent.  He's associated with

18   HSI, and that HSI office is affiliated with an ICAC task

19   force.

11:42AM 20   Q.    Those computer forensic analysts on an ICAC task

21   force specialize in this kind of investigation, correct?

22   A.    Correct.

23   Q.    In other words, they are trained to understand what

24   it is forensic analysts are supposed to look for in these

11:42AM 25   investigations, correct?

11:42AM 1  A.   I don't know the specific training that he took.  I

2  don't know what his specific training is.

3  Q.   The devices that were seized in this case included

4  two Apple products, correct?

11:43AM 5  A.   An Apple phone and an Apple MacBook, correct.

6  Q.   And you testified about both of those this morning,

7  correct?

8  A.   Yes.

9  Q.   Based on your computer forensic analysis, the two

11:43AM10 Apple products, the phone and the MacBook, were Josh's

11 personal devices, correct?

12 A.   That would be a fair -- yes, that would be fair to

13 say that.

14 Q.   And you know that because you did a very deep dive

11:43AM15 into these devices, correct?

16 A.   Yes.

17 Q.   On those devices, was there even a forensic trace of

18 child pornography?

19 A.   No.

11:43AM20 Q.   And the truth is, you looked long and hard to find it

21 if it was there, did you not?

22 A.   Correct.

23 Q.   And you're confident in your skills that if it was

24 there, you would find it, correct?

11:43AM25 A.   If it was there, I would find it.

11:43AM 1    Q.    You would look for things like hash values and the

2    forensic artifacts that you testified about, correct?

3    A.    Correct.

4    Q.    And to be clear, you would find evidence that child

11:44AM 5    pornography ever existed on either of these personal

6    devices, even if it was deleted, correct?

7    A.    Well, to an extent.  The answer is, yes, if it's

8    deleted and recoverable, I would certainly do that.

9    Again, I don't have perfect information.  The computer --

11:44AM10    the MacBook could have been wiped and reinstalled the

11    operating system.  So, again, I don't have access to

12    perfect information.  I only have access to the image that

13    was created at the time law enforcement created the image.

14    Q.    Let's back up.  When a computer is wiped and an

11:44AM15    operating system is installed, there's a computer forensic

16    artifact of that, correct?

17    A.    Well, depends how it's wiped.  If you follow the DOD

18    specifications for wiping a hard drive, there is nothing

19    to recover.  So when I say, "wiping a hard drive", that is

11:44AM20    to initialize it like a blank piece of paper.  There is

21    nothing there.  So I could run a computer, do bad things,

22    wipe the computer, and there would be no evidence for

23    anybody to recover.  That capability exists and you just

24    can't ignore that.

11:45AM25    Q.    Did that happen here?

11:45AM 1   A.   I have no evidence that it happened here.

2   Q.   And you would have evidence that it happened here?

3   A.   No, there's no way I could have evidence that it

4   happened.  There's no way that I would be able to

11:45AM 5   determine if that happened.

6   Q.   Do you have consistent data from November 2014 to

7   November of 2019?

8   A.   That tells me that the computer was certainly used

9   between 2014 and 2019, but it doesn't tell me what

11:45AM10   happened before 2014.

11   Q.   So let's back up, then.  Let's limit it to between

12   December -- I'm sorry -- November of 2014 and November of

13   2019.  You'd agree with me right here, right now, that

14   this computer wasn't wiped, correct?

11:45AM15   A.   I didn't find any evidence of that between those two

16   dates.

17   Q.   And you would, correct?

18   A.   And I would?

19   Q.   You would find evidence of that if it happened,

11:45AM20   correct?

21   A.   Yes, there would be evidence.  There would be gaps in

22   the timeline, correct.

23   Q.   Computer forensics is a science, correct?

24   A.   There's lots of discussion about that.  Sometimes

11:45AM25   it's an art.  Sometimes it's a science.  I would prefer

11:45AM 1   not to debate that with you.  I would say somewhere it's a

2   combination of an art and a science.

3   Q.   It's based on facts, correct?

4   A.   Based on facts.

11:46AM 5   Q.   It's based on following trails of evidence, correct?

6   A.   Absolutely correct.

7   Q.   It's based on actually identifying what the evidence

8   is on a computer or on an electronic device and seeing

9   what it says and --

11:46AM 10   A.   Understanding what it says.  Being able to apply your

11   knowledge and experience, what does this artifact mean.

12   Having the -- having to be able to apply knowledge to the

13   facts you're observing.

14   Q.   It's not about guesswork, correct?

11:46AM 15   A.   Absolutely not about guesswork.

16   Q.   It's not about just making up anything.  It's about

17   actually following the evidence, correct?

18   A.   Absolutely correct.

19   Q.   Now, as a practical matter, you also testified that

11:46AM 20   you spent some time reviewing the HP computer -- let's

21   back up for a second.

22        Your real time, as I understand your testimony, that

23   you spent on this case was reviewing the HP computer, the

24   iPhone, and the MacBook Pro, is that correct?

11:47AM 25   A.   Yes.

11:47AM 1    Q.    And so your real focus in the time that you spent was

2    on those three devices, and to be more precise, the

3    forensic images of those devices, correct?

4    A.    Yeah.

11:47AM 5    Q.    You used virtualization software that you

6    described -- let me rephrase that -- that you at least

7    implicitly described yesterday, correct?

8    A.    Yes.

9    Q.    Specifically, you used Oracle, correct?

11:47AM10    A.    Oracle VirtualBox, correct.

11    Q.    And Oracle is virtualization software that isn't

12    obviously displayed that you used it on the --

13    essentially, the images that you walked through of the

14    devices, correct?

11:47AM15    A.    Correct.

16    Q.    But you readily acknowledge here that that's what you

17    used even though it's not clear on those documents,

18    correct?

19    A.    Yes, I used Oracle VirtualBox to create those print

11:47AM20    screen exhibits.

21    Q.    In using Oracle, is it fair to say that you can --

22    well, let's back up.  You're not connected to the

23    internet, correct?

24    A.    Correct.

11:48AM25    Q.    And one of the big reasons you're not connected to

11:48AM 1 the internet, Mr. Fottrell, is because the virtualized

2 device, so to speak -- maybe there's a better way of

3 phasing it -- that you're looking at has what you believe

4 is alleged child pornography, correct?

11:48AM 5 A. Correct.

6 Q. You don't want child pornography on the internet as

7 an employee of the U.S. Department of Justice, correct?

8 A. Correct.

9 Q. You're also not installing software on the

11:48AM10 virtualized mirror image, if you will?

11 A. Well, you need to -- when you're installing

12 VirtualBox, you need to install the VirtualBox drivers so

13 that the virtual machine will recognize that it's a

14 virtual machine.  So the first step in installing the

11:48AM15 virtualization software is installing the Oracle

16 VirtualBox drivers that allow me to control the virtual

17 machine.

18 Q. Can you break this down, because this is very

19 important.  You walked through a number of software

11:48AM20 applications on each of these devices that were introduced

21 into evidence yesterday and this morning, correct?

22 A. Correct.

23 Q. You're not messing with that software, correct?

24 A. Correct.  I'm trying -- I'm just basically not --

11:49AM25 trying to be very passive, not doing anything, just

11:49AM 1  documenting what's there.  So the purpose in me in

2  creating these Oracle VirtualBox exhibits is not so much

3  for my forensic analysis.  It's more of a way to help me

4  illustrate and demonstrate that to jurors.

11:49AM 5  Q.   You're not adding new software to these devices, so

6  to speak, correct?

7  A.   Correct.  That's my intention, correct.

8  Q.   Well, did you do that here?

9  A.   Again, you have to install -- when I install the

11:49AM 10  VirtualBox drivers, I have to install the guest additions

11  in order for the virtual machine to work, so I have to

12  take that step to make my virtual machine work.

13  Q.   So let's back up for a second.  Other than Oracle,

14  are you installing any software?

11:49AM 15  A.   Nothing else, correct.

16  Q.   So we have got a very clear, delineated line, because

17  I appreciate your clarification.  Oracle is tied to

18  actually just being able to look at this through a

19  virtualized mirror, correct?

11:50AM 20  A.   Absolutely correct.

21  Q.   Other than Oracle, you are not installing uTorrent

22  applications or anything like that?

23  A.   Certainly correct.

24  Q.   You are not updating applications, you are not

11:50AM 25  modifying applications, correct?

11:50AM 1   A.   Correct.

2   Q.   Because that would compromise the entirety of your

3   forensic work in a case like this, correct?

4   A.   Well, so, it's compromising the virtual machine that

11:50AM 5   I make.  It's certainly not going to compromise the

6   forensic image that was created earlier.  I could always

7   go back to that forensic image.  The process of me booting

8   up the virtual machine is going to change date and

9   time-stamps like I testified about.  It is going to make

11:50AM10   some changes to the Windows event viewer logs and the

11   normal housekeeping functions associated with an operating

12   system.  I'm just aware of that.  The fact that I'm

13   running the program is going to have an impact.  It's

14   going to make changes to log files, et cetera, et cetera.

11:50AM15   Q.   But it's not updating software?

16   A.   I'm not changing programs, that's correct.

17   Q.   Period?

18   A.   Period.

19   Q.   Now, when you're installing Oracle, are you doing

11:51AM20   that by connecting the virtualized device, so to speak, to

21   the internet, or are you plugging in a driver?

22   A.   I'm not connecting it to the internet.  I'm not sure

23   if I understand the question.  Can you repeat it?

24   Q.   Let me ask it better.  Let me ask you, how are you

11:51AM25   installing the driver for Oracle?  In other words, this

11:51AM 1    very limited subset of software you are actually adding

       2    that you testified about.

       3    A.    Yeah.

       4    Q.    How are you adding it?

11:51AM 5    A.    So can I take a moment just to walk through that, a

       6    little bit of a verbiage?

       7    Q.    Sure.

       8    A.    You start off with the forensic image that was

       9    created by the law enforcement officer.  My next step is I

11:51AM10    use AccessData FTK imager.  I convert that EnCase EO1

      11    format into what's called DD format or raw format, which

      12    is an intermediary step.  Then I use the VirtualBox

      13    software, VBox.  I convert that raw image into what's

      14    called a VDI, virtual disk image, that the Oracle

11:52AM15    VirtualBox software uses.

      16         I'm almost ready to go, right.  Once I have that disk

      17    image that Oracle can read, I go into the Oracle box

      18    software and I try to mimic the exact configuration of the

      19    machine.  It has such-and-such number of CPUs.  It has

11:52AM20    eight gigabytes of RAM.  It has a CD-ROM attachment.  So I

      21    try to guess correctly what the configuration of the

      22    machine is.  I say, network connection, no.  Pretend that

      23    there's no network connection.  And then I boot that up.

      24    And so the computer boots up off of the virtual machine.

11:52AM25    Now, my virtual machine is not exactly the same as what

11:52AM 1    the real machine is.

2        So once the virtual machine boots up, you go to the

3    menu and you say -- there's a choice that says, "Install

4    VirtualBox additions."  That installs the device drivers,

11:52AM 5    the Windows device drivers, on the Windows machine so that

6    my virtual machine can look at the Windows resolution.  It

7    understands my mouse and keyboard.  It understands the

8    peripherals.  So it just loads the device drivers that the

9    operating system needs to talk to my computer through the

11:53AM10    virtual machine.  That's the best way I can explain that.

11    Q.   Does anything that you just described in detail

12    update software applications?

13    A.   No.

14    Q.   Does anything that you just described in detail add

11:53AM15    or remove software applications?

16    A.   It adds the VirtualBox additions.  Besides that, no.

17    Q.   I'm going to use the phrase, to make things a little

18    more understandable right now, "the device," quote,

19    unquote, when I ask you questions about these devices.

11:53AM20    A.   Okay.

21    Q.   Can we understand that we're on the same page that

22    I'm referring to the virtualized image of the device that

23    you testified about?

24    A.   Sure.

11:53AM25    Q.   To be clear, just so the Jury understands, you have

11:53AM 1    never actually analyzed the physical devices themselves?

2    A.    Correct.

3    Q.    Meaning you have never literally turned on the HP

4    computer, sat behind it, and typed anything in, correct?

11:54AM 5    A.    That is correct.

6    Q.    The same is true with the MacBook, the phone, et

7    cetera?

8    A.    That is correct.

9    Q.    So are we fine if I just call it "the device" with

11:54AM 10   that caveat?

11   A.    Yes.

12   Q.    The first device that you went through yesterday in

13   terms of your analysis was the HP desktop computer,

14   correct?

11:54AM 15   A.    Correct.

16   Q.    Your understanding is that this was seized from an

17   office at Wholesale Motorcars, correct?

18   A.    Yes.

19   Q.    Your understanding is that this was an actual

11:54AM 20   desktop, meaning it's literally plugged in the wall, it's

21   not portable?

22   A.    Correct.

23   Q.    In contrast to a laptop or a phone or an iPad, things

24   like that, correct?

11:54AM 25   A.    Correct.

11:54AM 1  Q.   Now, you testified that there is essentially the
     2  Windows side and what I'm going to call the Linux side, is
     3  that fair?
     4  A.   Yes.
11:54AM 5  Q.   And to be clear, the Windows side has a number of
     6  partitions on it, correct?
     7  A.   Yes.
     8  Q.   Five, to be precise?
     9  A.   That is correct.
11:55AM10  Q.   And there's an additional partition with the Linux
    11  side, correct?
    12  A.   Yes.
    13  Q.   Each of those partitions has a specified amount of
    14  space on the hard drive, correct?
11:55AM15  A.   Yes.
    16  Q.   Tell the Jury, if you would, what the significance of
    17  hard drive space is.  In other words, what are the
    18  delimiting factors?
    19  A.   It's the size of the hard drive.  So the hard drive
11:55AM20  is rated for a certain size.  If I recall correctly, this
    21  was a one terabyte hard drive, 1,000 gigabyte hard drive.
    22  If I remember correctly, the Windows partition was about
    23  900 gigabytes.  So the majority, 9/10ths of the disk space
    24  on that one terabyte hard drive was for the Windows
11:55AM25  partition.  There were a few other smaller partitions that

11:55AM 1    you mentioned as well.

2         The Linux partition was relatively small.  I can't

3    remember the exact number, like 10 gigabytes in size, or

4    relatively small size compared to the overall size of the

11:56AM 5    disk.

6    Q.    When somebody creates a partition like the Linux

7    partition, the person or people who do that, in other

8    words, just hypothetically, someone who is doing that,

9    decides how big the partition is going to be based on

11:56AM 10   obviously how much space is available?

11   A.    Correct.

12   Q.    And, in fact, when Linux is installed as a partition,

13   the system essentially makes it very easy to choose how

14   much space on the HP will be allocated to the Linux

11:56AM 15   partition, correct?

16   A.    Correct.

17   Q.    So you would agree with me then, would you not,

18   Mr. Fottrell, that whoever installed the Linux partition

19   on this device chose for the partition to be very small

11:56AM 20   compared to the rest of the computer?

21   A.    Correct.

22   Q.    And we know that because that's a fact.  That's based

23   on actual evidence, correct?

24   A.    Absolutely correct.

11:56AM 25   Q.    Now, based on your forensic analysis of the Windows

11:57AM 1  side of the HP computer, would you agree with me that this

2  was clearly a business computer?

3  A.    Yes.

4  Q.    It had Frazer software on it, correct?

11:57AM 5  A.    Yes.

6  Q.    That's F-R-A-Z-E-R, correct?

7  A.    Yes.

8  Q.    You're familiar, at least based on this

9  investigation, with what Frazer is, correct?

11:57AM 10  A.    Correct.

11  Q.    Frazer software is essentially the fuel that runs a

12  car lot, correct?

13  A.    Correct.  It's an application that allows a car lot

14  to have an inventory of cars and to have all of the

11:57AM 15  different databases associated with the acquisition,

16  buying, selling, paperwork associated with buying and

17  selling cars.  So it is the car lot software, if you will.

18  It's the go-to tool that I'm guessing car dealers use when

19  they are buying and selling cars.  It seems to be a very

11:57AM 20  popular program.

21  Q.    You ever buy a car?

22  A.    Yes, I did.

23  Q.    Lot of paperwork involved?

24  A.    Yes.

11:57AM 25  Q.    Frazer essentially auto-generates that paperwork,

11:58AM 1   correct?

2   A.   Yes.

3   Q.   In other words, you, as a car buyer, may be signing

4   20 pages, getting a bill of sale.  It's not like someone

11:58AM 5   is typing that up every time, correct?

6   A.   Correct.  There's automated programs that generate

7   those forms.

8   Q.   And Frazer is that program on this device, correct?

9   A.   Yes, that's correct.

11:58AM10   Q.   For a car to be sold, Frazer is used, correct?

11   A.   Yes.

12   Q.   And you saw forensic evidence of that based on your

13   investigation, correct?

14   A.   Yes.

11:58AM15   Q.   On the Windows side of the HP computer, just like I

16   asked you with respect to Josh's personal devices, the two

17   Apple products, was there even a forensic trace of child

18   pornography or alleged child pornography?

19   A.   No.

11:58AM20   Q.   So to be clear, 100 percent of the alleged child

21   pornography that you have identified in your computer

22   forensic examination in this case was on the Linux

23   partition side of the HP desktop computer at Wholesale

24   Motorcars, correct?

11:59AM25   A.   Yes.

11:59AM 1    Q.    Is that fair?

2    A.    Yes.

3    Q.    The Linux partition -- let's back up for a second.

4    Was this computer, the HP, on any sort of a network in

11:59AM 5    2019, in particular in May of 2019?

6    A.    When you say "network", do you mean like internet

7    network or local network?  I'm not really sure what you

8    mean by that.

9    Q.    Let's talk about both.  Was it on any sort of a local

11:59AM10    network?  If you know.

11    A.    I'd have to look at those search warrant photos.

12    There was a router there.  I know it was hardwired into a

13    router.  I don't know what other devices were plugged into

14    that.  I know it was plugged into a router.

11:59AM15    Q.    The router would tell you that, correct?

16    A.    Correct.

17    Q.    I want to show you what's been marked as Defendant's

18    Exhibit 25.

19            MR. GELFAND:  It's already in evidence, Your

11:59AM20    Honor, if I may publish it?

21            THE COURT:  That's fine.

22    Q.    (BY MR. GELFAND.)  Can you see that okay, sir?

23    A.    Yes.

24    Q.    Do you see Defendant's Exhibit 25?

12:00PM25    A.    Yes, I do.

12:00PM 1    Q.   Just so we can get our bearings, I want to make sure
      2    we're talking about the same thing, you testified that
      3    this HP computer that I just circled in the bottom
      4    right-hand corner of the screen was connected to a router
12:00PM 5    against the wall, is that correct?
      6    A.   Yes, that's correct.
      7    Q.   And because it was connected to a router against the
      8    wall, the router itself interacted with this HP computer,
      9    correct?
12:00PM10    A.   Yes.
     11    Q.   Explain to the Jury, if you would, what function,
     12    from a computer forensic standpoint, a router serves.
     13    A.   So the router is the connectivity to the internet.
     14    So basically the service is coming in through the
12:01PM15    provider.  In this case, it's OzarksGo.  So the internet
     16    service comes into the location and basically it goes into
     17    the router.  And then basically all of the devices plugged
     18    into the router, typically they are wired connections, and
     19    it also supports wireless connections.  So I may have some
12:01PM20    number of devices that are in my office.  All of those
     21    devices connect through that router and then are sharing
     22    that internet connectivity to the router.  So I could have
     23    one, five, 10, 100 devices in this location.  All of those
     24    devices are connecting to the router, getting an IP
12:01PM25    address, and using that router to fetch pages and fetch

12:01PM 1    information from the internet.

2    Q.   Let's back up for a second.  I want to break down

3    those terms, because they are very important.  You

4    referenced IP address.  That's also the shorthand for an

12:01PM 5    internet protocol address, correct?

6    A.   Correct.

7    Q.   An IP address itself is just a set of numbers that

8    alone you can't really do a whole lot with, correct?

9    A.   Correct.  An IP address is just a number.  And I use

12:01PM 10   analogy, just like a telephone number.  So an IP address

11   is an address that identifies a particular computer, just

12   like a telephone or a mobile phone will have a phone

13   number associated with it.  So a phone number is

14   associated with a phone.  An IP address is associated with

12:02PM 15   a computer.

16   Q.   But multiple computers or devices or phones or

17   tablets connected to Wi-Fi or physically connected to the

18   same router would share an IP address, correct?

19   A.   Would share the external forward-facing IP address,

12:02PM 20   yes.

21   Q.   The IP address captured by software like Torrential

22   Downpour?

23   A.   Correct.

24   Q.   So in other words, an IP address, we agree, does not

12:02PM 25   identify a particular device, correct?

12:02PM 1    A.   An IP address does identify a particular device.  In

        2    this case, the external IP address is the address of the

        3    router.  Is that what you're talking about?

        4    Q.   Fair enough.  Let me break that down, because what

12:02PM 5    you just said is very important.  The IP address is

        6    associated to the router itself as opposed to the computer

        7    or phone or iPad using the router, correct?

        8    A.   Correct.

        9    Q.   And so in a classic Wi-Fi context, if we were all

12:03PM10    logged on to the Wi-Fi in this courtroom, right now.

       11    A.   Yeah.

       12    Q.   The IP address that we are all logging on to will be

       13    the same related to whatever router is being used?

       14    A.   Correct.

12:03PM15    Q.   And that's pretty basic computer forensics, correct?

       16    A.   Well, it's network forensics, but, yes.

       17    Q.   Pretty elementary, right?

       18    A.   Yes.

       19    Q.   The router itself contains logs revealing what, if

12:03PM20    any, devices were connected to it at any given time,

       21    correct?

       22    A.   Correct.

       23    Q.   And the router keeps those auto-generated logs,

       24    correct?

12:03PM25    A.   For a period of time, yes.

12:03PM 1    Q.   You have never, to this day, as you sit here on the

      2    witness stand in this courtroom, done any computer

      3    forensic analysis on the router that is reflected in

      4    Defendant's Exhibit 25, correct?

12:03PM 5    A.   Correct.

      6    Q.   And the reason why is because it was never seized by

      7    law enforcement, correct?

      8    A.   Correct.  Law enforcement doesn't typically seize

      9    routers.

12:04PM10    Q.   The reason why you have not evaluated it is because

     11    when you got involved in this case, even if you wanted to,

     12    you couldn't, correct?

     13    A.   Correct.

     14    Q.   A router would tell us, would it not, what devices,

12:04PM15    if any, were connected to the router physically on any

     16    given date for which it has logs, correct?

     17    A.   You've got -- I think you're starting to become a

     18    little misleading.  The router does not contain voluminous

     19    information.  The router's job is to -- if a computer

12:04PM20    connects says, hey, give me IP address, I want to

     21    basically connect to the internet, the router is going to

     22    say, this iPhone, for example, connected to me, it wants

     23    to connect to the internet.  It knew the Wi-Fi password.

     24    I'm going to let it connect to the internet, so I'm going

12:05PM25    to give it one of my internal IP addresses to do that.

12:05PM 1    The router is only storing the Mac address, media access

2    control.  It's this gobbledegook 32-character number that

3    uniquely identifies the network card that the phone had.

4         The reason that the router does that is because, a

12:05PM 5    day goes by, two days goes by.  If that same phone comes

6    by the next day, the router knows, hey, that guy came by

7    yesterday and wanted an IP address.  I gave it to him.

8    I'm going to give him the same IP address.  So the router

9    contains the router table of devices that were connected

12:05PM 10   to it.  Never forever, generally, in my experience.  It's

11   for like a 30-day window of time.

12   Q.   Let's back up for a second, because I'm not trying to

13   mislead anyone and I don't want you to, either.

14        How long did the router logs on the router displayed

12:05PM 15   on Defendant's Exhibit 25 hold in terms of --

16   A.   I don't know the answer to that.

17   Q.   So we just established a few minutes ago that this is

18   not a guessing game.

19   A.   Right.

12:05PM 20   Q.   So let's not guess.

21   A.   Okay.

22   Q.   You reason you don't know how long the logs go back

23   is because law enforcement in this case never seized the

24   router, correct?

12:06PM 25   A.   Correct.

12:06PM 1    Q.    You have never looked at the router, correct?

       2    A.    I did not look at the router in this case.

       3    Q.    Because you've never even had the opportunity to look

       4    at it if you wanted to, correct?

12:06PM 5    A.    Correct.

       6    Q.    You used Mac address.  You described it as

       7    gobbledegook.

       8    A.    It's not a random.  It's a sequence of unique

       9    identifiers for a network card.

12:06PM10    Q.    A Mac address, for all intents and purposes, actually

      11    identifies a device, correct?

      12    A.    A network device, correct.

      13    Q.    As opposed to an IP address, which just identifies

      14    essentially either one or multiple devices, correct?

12:06PM15    A.    Correct.

      16    Q.    So a Mac address is actually pretty important,

      17    correct?

      18    A.    Correct.  It uniquely identifies a network device.

      19    Q.    And a network device, to be clear, could be a phone,

12:06PM20    it could be a computer, it could be an iPad, it could be

      21    any of those things, correct?

      22    A.    Correct.  So even with a computer, a desktop computer

      23    might have two network connections.  You could have a

      24    wired connection and a Wi-Fi connection.  So it's

12:07PM25    certainly popular for many devices to include two Mac

12:07 PM 1  addresses, because there's two network cards in it; one

2  wired and one wireless.

3  Q.   The router keeps a record of the Mac address, as you

4  just described, correct?

12:07 PM 5  A.   Yes.

6  Q.   And the Mac address can be directly associated to a

7  physical device?

8  A.   Yes.

9  Q.   That device is available, correct?

12:07 PM 10  A.   Correct.

11  Q.   So when it comes to computer forensics and tracing

12  activity back to a device, a Mac address can actually be

13  very significant in investigations, correct?

14  A.   It depends on the case.  Sometimes it can be

12:07 PM 15  significant; sometimes not.

16  Q.   But the bottom line is, you have no clue what Mac

17  addresses connected to this router in 2019, correct?

18  A.   Correct.

19  Q.   You used the phrase, "internet network" and I believe

12:07 PM 20  you used, "land network".  I might have just interpreted

21  it that way.

22  A.   Local area network.  Wide area network.

23  Q.   We talked generally about wide area network, very

24  generally, correct?

12:08 PM 25  A.   Yes.

12:08PM 1   Q.   Tell the Jury what a local area network is.

2   A.   In a typical router in your home or at the car lot,

3   the local area network are all of the devices that are

4   connected.  So if you're in a house, it might be the T.V.

12:08PM 5   is connected, your computer, and a number of laptops are

6   connected.  All of those devices are the local area

7   network.  And so, for example, in my house, I have a

8   printer, and so like my computer can access that printer

9   and my kids' computer can access that printer.  That's the

12:08PM 10   local area network, are the devices that are in my house.

11   That's how I differentiate the local area network.  And

12   the wide area network is the internet connection.

13   Q.   On the dates in May that you testified about, in

14   2019, with respect to this HP computer that you have

12:08PM 15   offered testimony about, can you tell us with certainty

16   what other devices, if any, were connected to the local

17   area network at Wholesale Motorcars or to the wide area

18   network at Wholesale Motorcars?

19   A.   I just have information with the HP desktop computer.

12:09PM 20   That's what I was focusing on.

21   Q.   In other words, no, you can't tell us that, correct?

22   A.   I can't tell about other devices, correct.

23   Q.   Let's talk about the Linux partition.  I'm sorry,

24   before we do, you showed -- I'm not going to go through

12:09PM 25   every one of these documents.

12:09PM 1          MR. GELFAND:  Your Honor, may I publish

2    Government Exhibit 28?

3          THE COURT:  You may.

4          MR. GELFAND:  Portions of it, I should say.  Your

12:09PM 5    Honor, I will note for the record, I don't have enumerated

6    pages, so I'll just do my best to identify them.

7          THE COURT:  That's fine.

8    Q.   (BY MR. GELFAND.)  Do you see the top page of

9    Exhibit 28 in front of you?

12:09PM10   A.   Yes, I do.

11   Q.   Do you recognize what this is?

12   A.   These are the print screens that I created associated

13   with the HP partition of -- I'm sorry -- the Windows

14   partition of the HP computer.

12:10PM15   Q.   When did you create these?

16   A.   April 1st, 2021, at 2:34 p.m.

17   Q.   And so the entirety of what's in here was created in

18   kind of one sitting?

19   A.   No, probably multiple times.

12:10PM20   Q.   So the truth is, you kept going back to this,

21   correct?

22   A.   Yes.

23   Q.   So let's talk about the first page.  This is

24   April 1st -- you might have just this and I missed it --

12:10PM25   of what year?

12:10 PM 1    A.    2:34.

2    Q.    But what year?

3    A.    This year, 2021.

4    Q.    So just about, whatever it is, seven months ago?

12:10 PM 5    A.    Yes.

6    Q.    Now, you walked through -- this is the Windows side,

7    correct?

8    A.    Correct.

9    Q.    And, in fact, I direct your attention to a screen

12:10 PM 10   with the time 11:45 a.m., June 2nd of 2021 at the bottom.

11   A.    Yes.

12   Q.    With the Duggar family in the background, correct?

13   A.    Yes.

14   Q.    Can you identify what I've circled, the icon on the

12:11 PM 15   left with the "F" and then I guess the "Z?"

16   A.    That's the Frazer.  That's an icon for the Frazer

17   software that you were talking about.

18   Q.    Now, you testified -- so we keep going through it --

19   that when you booted on, essentially Covenant Eyes loads

12:11 PM 20   on, correct?

21   A.    Yes.  When it boots up, the Covenant Eyes software

22   was configured to automatically load and it displayed that

23   logo during the boot process.

24   Q.    And, in particular, there's a screen that you

12:11 PM 25   captured and testified about that just for identification

12:11PM 1    purposes includes a sign-in box, correct?

2    A.    Right.  Yes.

3    Q.    And the sign-in box is for Covenant Eyes, correct?

4    A.    Yes.

12:11PM 5    Q.    The prosecutor asked you yesterday what the user name

6    is, correct?

7    A.    Yes.

8    Q.    So as you're using this device to enable Covenant

9    Eyes, the user has to input a password, correct?

12:12PM 10    A.    Say that again.

11    Q.    To enable Covenant Eyes as you're using this device,

12    the user has to type in a password, correct?

13    A.    I think that's incorrect.

14    Q.    Well, what are we looking at on the screen?

12:12PM 15    A.    If you look at the logo for Covenant Eyes that is

16    displayed right here, what I was doing is that same logo

17    is in the task bar on the lower right-hand corner of the

18    screen.  I was not familiar with that.  I was not familiar

19    with that icon.  I wasn't -- this is the first time I'm

12:12PM 20    working in a case that used Covenant Eyes.  So I clicked

21    on that icon in the lower right-hand corner and this is

22    the Covenant Eyes log-in that -- the log-in screen that

23    comes up next.

24    Q.    And so, in other words, to log in, you have to log

12:12PM 25    in, correct?

12:12PM 1    A.   Yes.  That doesn't mean the program is not running.
      2    The program is doing whatever it's doing.  I don't
      3    represent the vendor, I'm not representing what the
      4    computer vendor is doing.  But in order to log in, yes,
12:12PM 5    you have to log in, but that's deceptive to say that the
      6    program is not running.  By default, the program is
      7    configured to auto start whenever you start up the
      8    program.
      9         I don't know exactly what happens when you log in
12:13PM10    here.  I am not that familiar with the program.  I just am
     11    documenting the fact that this program, Covenant Eyes
     12    software, was installed and this is what happened if I
     13    clicked on that little box on the bottom of the page.
     14    Q.   When you click on the box on the bottom of the page,
12:13PM15    it asks you for a password, correct?
     16    A.   Correct.
     17    Q.   And what you are doing, as you described yesterday,
     18    is accessing this the way you described it the way a user
     19    would see it, correct?
12:13PM20    A.   Yes.  Yes.  Different type of user.  I'm not sure
     21    which type of user you are referring to, but a certain
     22    type of user, yes.
     23    Q.   There's two options.  Sign in and cancel, correct?
     24    A.   Correct.
12:13PM25    Q.   This is the most obvious question on Earth, I think,

12:13PM 1  but you tell me if I'm wrong.  If I don't want Covenant

2  Eyes to be running on this computer, can I turn it off?

3  A.   No, I don't think you can turn it off.

4  Q.   If I don't want Covenant Eyes to be running on this

12:13PM 5  computer, can I cancel Covenant Eyes?

6  A.   I don't believe you could.  It's going to always be

7  running.

8  Q.   Always running forever?

9  A.   On this partition.

12:13PM 10  Q.   That's your understanding?

11  A.   That's my understanding of how it works.

12  Q.   It's not a subscription-based model?

13  A.   Well, yeah.  Well, I'm sure -- yes -- well, I don't

14  know.  I'm not -- I'm certainly familiar with the vendor.

12:14PM 15  I'm sure the vendor charges a subscription to use that

16  service.

17  Q.   What are you basing this on, this notion that

18  Covenant Eyes is running regardless of whether I sign in,

19  regardless of whether I turn it off, regardless of whether

12:14PM 20  I cancel it?

21  A.   Probably more so on my analysis of the Macintosh

22  computer, because the Macintosh computer had two different

23  log-ins.  Remember it said, like, "internet" and "Joshua

24  Duggar."  And I didn't have administrative access on the

12:14PM 25  Macintosh computer and I was frustrated by that because I

12:14PM 1  didn't know what the internet user's password was.  So

     2  there is a supervisor versus user.  The supervisor, if you

     3  will, has permission to install programs that a regular

     4  user does not have access to.

12:14PM 5  Q.   I don't know that you just answered my question.

     6  Do you know one way or the other whether what you said a

     7  minute ago is true, that Covenant Eyes runs no matter

     8  what?

     9  A.   I know that Covenant Eyes loads automatically when

12:15PM 10  the Windows partition boots up.

    11  Q.   And then it asks for a password, correct?

    12  A.   Say that again.

    13  Q.   I'm just going by what we're looking at.  It asks for

    14  a password, correct?

12:15PM 15  A.   If you click on the icon, it brings up that window.

    16  That prompts for a password, that's correct.

    17  Q.   Then what happens if I type "cancel?"

    18  A.   It just goes back to the task tray.

    19  Q.   What happens if I type in the wrong password?

12:15PM 20  A.   I don't know.

    21       THE COURT:  Mr. Gelfand, I need to find a spot to

    22  take a lunch break.  I don't mean to interrupt you if you

    23  are not finished with this line of inquiry.

    24       MR. GELFAND:  We can take a lunch break.

12:15PM 25       THE COURT:  Would this be good?

12:15PM 1     MR. GELFAND:  Sure.

2     THE COURT:  All right.  So we will take our lunch

3 recess at this time.  If you will please remember the

4 recess instruction.  Do not speak to anyone about the

12:15PM 5 facts of the case, including your fellow jurors.  Don't do

6 any research.  Don't talk to anyone else about the case.

7 Don't consume any news sources or any other type of

8 research about the case.

9     Let's start back up at 1:30 this afternoon.

12:16PM 10 That's just about an hour and 15 minutes now.  So if

11 everyone would please stand, the Jury is in recess.

12 Everyone in the gallery, please remain in the gallery

13 until I give you the all clear.

14     (Jury out at 12:17 p.m.)

12:16PM 15     THE COURT:  You may be seated.  Anything else the

16 parties would like to get on the record?

17     MR. GELFAND:  Not for the defense.

18     MR. ROBERTS:  Not from the government.

19     THE COURT:  I really would like to start promptly

12:17PM 20 at 1:30, so if there are any issues that come up over our

21 lunch recess, please notify me about that so we can go on

22 the record at 1:00 or 1:15.  We're in recess until 1:30.

23     (Lunch recess taken from 12:17 p.m. to 1:39 p.m.)

24     (Jury in at 1:39 p.m.)

12:17PM 25     THE COURT:  I would ask that the witness and

1:39PM 1    counsel, on both sides, assist the Court in making a good

2    record by being self conscious not to talk over each

3    other.  You may inquire.

4              MR. GELFAND:  Thank you, Your Honor.

1:39PM 5                   CROSS EXAMINATION (cont'd)

6    BY MR. GELFAND:

7    Q.    Good afternoon, Mr. Fottrell.

8    A.    Good afternoon.

9    Q.    Mr. Fottrell, as you may recall, before the lunch

1:39PM 10   break, we were discussing your virtualized screenshots of

11   the Windows side of the HP computer.  Do you recall that?

12   A.    Yes.

13   Q.    And specifically, we were walking through portions of

14   Government's Exhibit 28, correct?

1:40PM 15   A.    Yes.

16   Q.    So if we continue going through a couple of these

17   pages.

18              MR. GELFAND:  Your Honor, if I may publish,

19   continue publishing portions of 28?

1:40PM 20              THE COURT:  Yes, sir.

21   Q.    (BY MR. GELFAND.)  Do you see that in front of you?

22   A.    Yes.

23   Q.    Do you need context to see that this is part of 28,

24   or do you recognize it?

1:40PM 25   A.    No, I recognize that.

1:40PM 1   Q.   What we see on this screen is a list of programs,

2   correct?

3   A.   A list of installed programs, correct.

4   Q.   And you testified that essentially the reason you

1:40PM 5   printed this screen is to establish Covenant Eyes, or at

6   least to reflect that Covenant Eyes was loaded onto the

7   Windows side of the partition, correct?

8   A.   Yes.

9   Q.   And you testified that there's an installed date of

1:40PM10   10-31-2019, correct?

11   A.   Correct.

12   Q.   You testified that that doesn't necessarily mean that

13   that's the date that it was installed, correct?

14   A.   Yes.

1:40PM15   Q.   When was it installed on this device?

16   A.   I don't know that specific date.

17   Q.   Didn't look?

18   A.   I didn't look.

19   Q.   When software -- broadly speaking -- when software is

1:41PM20   updated, software can have different versions, so to

21   speak, correct?

22   A.   Yes.

23   Q.   And you're familiar with that in your line of work,

24   correct?

1:41PM25   A.   Yes.

1:41PM 1    Q.    And software can also, even within versions, have

2    different build numbers, correct?

3    A.    Yes.

4    Q.    And you're familiar with the concept of a build

1:41PM 5    number, correct?

6    A.    Yes.

7    Q.    Software companies, for example in this case like

8    Covenant Eyes, may release a version or a build number at

9    a particular date, correct?

1:41PM10    A.    Yes.

11    Q.    And those dates are available usually on the software

12    manufacturer's website or some other resource, correct?

13    A.    Yes.

14    Q.    In other words, you agree with me, in your expert

1:41PM15    opinion, the version of software and the build number are

16    available to experts such as you, correct?

17    A.    Yes.

18    Q.    Now, I take it from your testimony that you don't

19    know when it was installed.  Do you know what version or

1:42PM20    build number of Covenant Eyes was installed on the date

21    that this was seized?

22    A.    On the date -- no, not the date.  Excuse me.  On the

23    date that it was seized, no.

24    Q.    How about on the dates of May, say, 13th or 11th

1:42PM25    through 17th or 16th of 2019?

1:42PM 1    A.    No.  I mean, the only thing I know is, at the point

2    that it was seized, the version number showing is the

3    date 10-31-19, and the version number is listed as 8.1.7.

4    Q.    And so one could, you would agree with me in your

1:42PM 5    line of work, even just a layperson, could back into a

6    version number from the manufacturer's information,

7    correct?

8    A.    Yes.

9    Q.    And that's a fairly common thing to do in computer

1:42PM 10   forensics, correct?

11   A.    It's available.  Yes, it is.

12   Q.    I'm sorry?

13   A.    It's available.  Yes, it is.

14   Q.    You have done that before in your work, correct?

1:42PM 15   A.    Occasionally, yes.

16   Q.    In other words, not to overcomplicate this, but you

17   might look on a website of a company to see what version

18   and build number was released at a given time, correct?

19   A.    Usually a developer's forum would have release date

1:43PM 20   information on when particular updates were happening, and

21   I'm just trying to figure out which version I have.  I

22   would be able to refer to that reference material to get

23   accurate information.

24   Q.    And so for big companies, that's often available

1:43PM 25   online, correct?

1:43PM 1    A.    Yes.

2    Q.    In other words, you literally just Google it,

3    correct?

4    A.    I guess so, yes.

1:43PM 5    Q.    Now, if we go to the next page of this exhibit, this

6    references that you were accessing this on 4-1 of 2021, or

7    am I misreading that?

8    A.    That's correct.

9    Q.    So you were looking at this on April 1st of 2021 at

1:43PM10    approximately 2:36 p.m., correct?

11    A.    Yes.

12    Q.    Where?

13    A.    Where was I physically located?

14    Q.    Yes.

1:44PM15    A.    In my office in Washington, D.C.

16    Q.    So you're in your lab or your office, whatever you

17    would call it, correct?

18    A.    Yeah.

19    Q.    Do you refer to where you do this kind of work as a

1:44PM20    laboratory environment or office?

21    A.    My office.

22    Q.    Now, this lists a whole number of documents that you

23    identified as recent files on the Windows side of the HP,

24    correct?

1:44PM25    A.    Yes.

1:44PM 1    Q.   You went through a couple of these, but would you

2    agree with me that these, at least by what they are

3    titled, appear to be work-related documents?

4    A.   Yes.

1:44PM 5    Q.   And to be clear, you opened them as well -- not on

6    the witness stand -- but you were able to access that

7    these were in fact work-related documents, correct?

8    A.   Yes.  I opened them, not through the virtualization

9    software; through my forensic software.  But, yes, I would

1:44PM10   have reviewed these documents.

11   Q.   And in particular, you have pathways that say, for

12   example, "important dealer files" and things like that,

13   correct?

14   A.   Correct.  So on the desktop, there's a sub-folder

1:45PM15   called "important dealer files," and those files were in

16   there.  I was just going to the quick access menu on the

17   top of the page in the upper left and displaying what was

18   in the quick access menu.

19   Q.   And so this includes documents related to Champion

1:45PM20   Motorcars, correct?

21   A.   Yes.

22   Q.   And related to Wholesale Motorcars, correct?

23   A.   Yes.

24   Q.   Are you aware that those are two different locations?

1:45PM25   A.   Yes.

1:45PM 1  Q.   If we look at the next page, you testified that you

2  essentially looked at the inbox as it existed on

3  November 8th of 2019, correct?

4  A.   Yes.

1:45PM 5  Q.   And let's be very clear to get our bearings for a

6  second.  And just to be clear, for the record, does this

7  appear to be the inbox list beginning with "Lisa Reeves,

8  Life's Journey" at the top?

9  A.   Yes.

1:46PM 10  Q.   Can you tell us what e-mail account this references?

11  A.   So if you look at the very bottom of the page --

12  you've kind of cut it off -- at the bottom of the task

13  bar, right here is the mail icon, the e-mail icon that's

14  on the task tray on the bottom of the screen.  So that's

1:46PM 15  the e-mail -- that's what the Microsoft Windows makes

16  available.  I clicked on that to look at what is the mail

17  program associated with Windows 10, and it listed the

18  account, wholesaleNWA@gmail.com.

19  Q.   So just to be clear -- and I appreciate the

1:46PM 20  explanation -- but what we're looking at is the inbox of

21  wholesaleNWA --

22  A.   Correct.

23  Q.   -- @gmail.com?

24  A.   Yes.

1:46PM 25  Q.   Just to make the court reporter's job easier, if you

1:46PM 1  could just let me finish my question and then answer it,

2  that way, it's easier for her to take things down.

3      You testified that the reason you did this, when you

4  testified yesterday, is because you wanted to see who was

1:47PM 5  using this e-mail account, correct?

6  A.    Yes.

7  Q.    You wanted to figure out whether there was computer

8  forensic evidence of who used this particular e-mail

9  account that's on this particular device at various dates

1:47PM 10  and times, correct?

11  A.    I would say that it's not the particular e-mail

12  account.  I'm looking to see who is using the computer.

13  And the user of the computer was using this e-mail

14  account.  I'm looking for, who was using the computer.

1:47PM 15  Q.    But just to be clear, you picked an e-mail on the

16  next page that begins with the phrase, "Thanks, Josh,"

17  correct?

18  A.    Yes.

19  Q.    And this responds to a "Sincerely," essentially a

1:47PM 20  signature block that says Josh Duggar with a cell phone

21  number, correct?

22  A.    Yes.

23  Q.    And the reason you were highlighting this is to say,

24  look, it appears, at least just based on the e-mail, that

1:47PM 25  Josh is using this, right?

1:47PM 1    A.    Yes.

2    Q.    Is that fair?

3    A.    Yes.

4    Q.    So I presume during your computer forensic

1:48PM 5    investigation, you also reviewed e-mails prior to May of

6    2019 that were on this device?

7    A.    Yes.

8    Q.    And in particular, you reviewed e-mails, did you not,

9    that included shipping labels from Caleb Williams,

1:48PM 10    correct?

11    A.    I'm sure I did review all e-mail messages, yes.

12    Q.    If I could direct your attention -- do you have the

13    defense exhibit binder right next to you?

14    A.    Yes, I do.

1:48PM 15    Q.    To Defendant's Exhibit 48.

16    A.    Okay.

17    Q.    Please take a look at that and tell me if those are

18    e-mails that were found on this same device in the same

19    wholesaleNWA@gmail.com?

1:48PM 20    A.    Yes, they appear to be.

21    Q.    I'm sorry.  Did you say yes?

22    A.    Yes.

23         MR. GELFAND:  Your Honor, at this point, I move

24    Defendant's 48 into evidence.

1:49PM 25         MR. CLAYMAN:  Your Honor, we're going to object

1:49PM 1    on hearsay grounds.  These are not, according to the

       2    defense attorney, e-mails from Mr. Duggar.

       3              MR. GELFAND:  Your Honor, this goes directly to

       4    what the witness testified about, identifying the identity

1:49PM 5    and tieing it to Mr. Duggar.  I think it's fair for

       6    impeachment purposes, at the very least right now.

       7              THE COURT:  Well, Mr. Gelfand, you're not trying

       8    to prove the truthfulness of any of the statements,

       9    declarations, inside these documents?

1:49PM10              MR. GELFAND:  Correct.  It's identity.

      11              THE COURT:  Mr. Clayman?

      12              MR. CLAYMAN:  I'm going to object on, really,

      13    relevance.

      14              THE COURT:  Well, if it's relevance, it's

1:49PM15    overruled.  You may inquire.

      16              MR. GELFAND:  Thank you.  May I publish portions

      17    of Defendant's 48, please?

      18              THE COURT:  You may.  Defendant's Exhibit 48 is

      19    received.

1:49PM20              (Defendant's Exhibit 48 Received)

      21              MR. GELFAND:  Thank you.

      22    Q.   (BY MR. GELFAND.)  Mr. Fottrell, you can either look

      23    on the screen or at the exhibit in front of you.  It's the

      24    same.  Whatever is easiest for you, okay?

1:50PM25    A.   Okay.

1:50PM 1   Q.   Just to be clear, do you have Defendant's Exhibit 48

2   in front of you?

3   A.   Yes, I do.

4   Q.   Does this appear on the top page to be an e-mail from

1:50PM 5   Caleb Williams to wholesaleNWA@gmail.com?

6   A.   It does.

7   Q.   Referencing an eBay shipping label?

8   A.   It does.

9   Q.   And I'm going to quickly just go through these.  Just

1:50PM10   tell me, and just so we can make it clear for dates, was

11   that March 24th, 2019, at 4:42 p.m.?

12   A.   Yes.

13   Q.   Is the next page March 24th, 2019, at 4:38 p.m.?

14   A.   Yes.

1:50PM15   Q.   Is the next page March 24th, 2019, at 4:36 p.m.?

16   A.   Yes.

17   Q.   Is the next page March 24th, 2019, at 4:30 p.m.?

18   A.   Yes.

19   Q.   Is the next page March 27th, 2019, at 2:22 p.m.?

1:50PM20   A.   Yes.

21   Q.   All referencing shipping labels, correct?

22   A.   Yes.

23   Q.   And then the following pages, do they include

24   essentially the attachments, the shipping labels?

1:51PM25   A.   Yes, the shipping labels.

1:51PM 1    Q.   Does that appear to read "Caleb?"

2    A.   Yes, it does.

3    Q.   Just so the Jury sees it, can you just identify the

4    shipping labels by date.  Does this appear to be

1:51PM 5    March 25th of 2019?

6    A.   I'm sorry.  Could you say that a little bit louder?

7    Q.   Yeah.  Does this appear to be dated March 25th, 2019?

8    A.   Yes, it does.

9    Q.   Same date on the next page?

1:51PM10    A.   Yes.

11    Q.   Same date on the next page?

12    A.   Yes.

13    Q.   Same date on the following page?

14    A.   Yes.

1:51PM15    Q.   Same date on the next page?

16    A.   Yes.

17    Q.   March 26th, 2019, on the following page?

18    A.   Yes.

19    Q.   And April 11th, 2019, on that last page?

1:51PM20    A.   Yes.

21    Q.   I'm sorry, on the second to last page.  And

22    March 25th, 2019, on the last page, correct?

23    A.   Yes.

24    Q.   And we don't need to read them into the record, but

1:51PM25    all to different recipients, correct?

1:52 PM 1    A.    Correct.

2    Q.    Now, you testified to the downloads folder, going

3    back to Exhibit 28 for record purposes.  Do you recognize

4    what's on the screen as a portion of Exhibit 28?

1:52 PM 5    A.    I do.

6    Q.    Again, this is that same Windows partition that we've

7    been talking about for the last few minutes?

8    A.    Yes.

9    Q.    And here what you testified or are identifying is

1:52 PM 10    that on May 11th, 2019, the Ubuntu desktop file, if you

11    will, is downloaded onto the Windows side of the HP,

12    correct?

13    A.    That is correct.

14    Q.    And so just to be crystal clear, this is not the date

1:52 PM 15    that Linux -- also known as Ubuntu -- was installed,

16    correct?

17    A.    Correct.  It was installed two days later on the

18    13th.

19    Q.    So let's be crystal clear for a second so that

1:52 PM 20    there's no confusion.  You agree that Linux is downloaded

21    on the Windows side on May 11th of 2019?

22    A.    Yes.

23    Q.    As reflected on the exhibit in front of you, correct?

24    A.    Yes.

1:53 PM 25    Q.    And then as you later testified -- and we'll get to

1:53 PM 1  it in a minute -- on May 13th, it was actually installed,

2  correct?

3  A.   Yes.

4  Q.   And you went through yesterday, when you were talking

1:53 PM 5  about this exhibit, software that you identified as Rufus,

6  R-U-F-U-S, correct?

7  A.   Yes.

8  Q.   And Rufus, as I understood your testimony, is

9  basically a way to use a thumb drive to install Linux,

1:53 PM 10  perhaps among other things?

11  A.   Yes.

12  Q.   And as I understood your testimony, this basically

13  modernizes kind of a CD-ROM approach, correct?

14  A.   Correct.

1:53 PM 15  Q.   And so what Rufus tells you, does it not, is that

16  Linux was installed using a thumb drive based on the

17  computer forensic trail of evidence that you have

18  detailed?

19  A.   Yeah.  There's certainly evidence to suggest that the

1:54 PM 20  Rufus software was used to create a thumb drive to install

21  the Ubuntu Linux partition.

22  Q.   And so let's talk about the installation of the Linux

23  partition.  That was installed May 13th of 2019, correct?

24  A.   Yes.

1:54 PM 25  Q.   And if I heard your testimony correctly yesterday,

1:54 PM 1    the approximate time of that was 1:00-ish?

2    A.    Yes.

3    Q.    Now, you were able to learn, through your computer

4    forensic examination, that somebody physically plugged in

1:54 PM 5    a thumb drive into this HP computer between 12:53 and

6    12:56 p.m., correct?

7    A.    I'm not sure if I had those dates.  I don't

8    understand specifically those times.

9    Q.    Could you look at Defendant's Exhibit 52?  Does

1:55 PM 10   Defendant's Exhibit 52 appear to be data extracted from

11   the computer forensics you reviewed in this case?  If it

12   helps, I can direct your attention to LI, or whatever it

13   is, 004?

14   A.    Say that again one more time.  Sorry.

1:55 PM 15   Q.    To the item paths.

16   A.    I'm sorry.  One more time.

17   Q.    To the file paths, the item paths?

18   A.    Oh, item path, yes.  So the evidence items listed is

19   line item 4, which appears to be the HP computer, the

1:56 PM 20   image file of the HP computer, correct.

21   Q.    Does this appear to be a true and accurate set of

22   data extracted from the 004 evidence path that you had in

23   your lab?

24   A.    This is certainly something that I --

1:56 PM 25            MR. CLAYMAN:  Your Honor, he's not extracted this

1:56PM 1  data himself.  I don't know where this is coming from, and

2  neither does witness.

3        MR. GELFAND:  First of all, he doesn't have to

4  have extracted it himself.  He just testified that it

1:56PM 5  comes from the item path that is the HP.

6        MR. CLAYMAN:  That's not what he testified.

7        THE COURT:  Well, let him finish laying a 602

8  foundation and if the witness knows what it is, that's one

9  thing.  If the witness doesn't, that's another.  Let him

1:56PM10  finish laying the foundation.  Can you rephrase,

11  Mr. Gelfand, to get us back on track?

12        MR. GELFAND:  Sure.

13  Q.  (BY MR. GELFAND.)  The exhibit that you have in front

14  of you, Defendant's Exhibit 52?

1:56PM15  A.  Yes.

16  Q.  Do you recognize this exhibit?

17  A.  I recognize information in the exhibit.  I don't know

18  if I recognize all of the information in this exhibit.

19  Q.  Can you tell us whether each of the items of

1:56PM20  information comes from the forensic image that you

21  analyzed in your laboratory?

22  A.  Can I -- say that again.

23  Q.  Can you tell us whether each of the items in this

24  exhibit comes from the image of the HP computer that you

1:57PM25  examined in your laboratory?

1:57 PM 1    A.   I can't be certain on every single one.  I can be

2    certain on, some of these information looks consistent,

3    but I don't know if I would be able to memorize, that I'm

4    familiar with every single one of them.

1:57 PM 5    Q.   Have you ever reviewed this data that's on here?

6    A.   Have I ever reviewed what?

7    Q.   The data that's reflected on Defendant's Exhibit 52?

8    A.   I reviewed the HP laptop computer.  I'm not sure what

9    specifically you're asking me.

1:57 PM 10        THE COURT:  Stop.  You need to establish 602

11    foundation as to what the document is, where it came from,

12    on the computer or otherwise.  And once you establish

13    that, then we can go further.  But I think the confusion

14    at this point is, you have not established what this page

1:58 PM 15    is.

16    Q.   (BY MR. GELFAND.)  Do you recognize, Mr. Fottrell,

17    what this document is?  What it's extracted from?

18    A.   I don't recognize the entirety of this exhibit.  Like

19    it looks like rows and columns of information, certainly

1:58 PM 20    information that's reflective of some of the ones.  I'm

21    not familiar with all of the information, every line and

22    every column and every row in this report.

23        MR. GELFAND:  Your Honor, I will move on right

24    now.

1:58 PM 25    Q.   (BY MR. GELFAND.)  Let me ask you based on your

1:58PM 1    forensic examination.  Was a thumb drive plugged into the

2    HP computer on May 13th of 2019 based on the actual

3    computer forensic evidence trail?

4    A.    Yes.

1:59PM 5    Q.    Was it specifically assigned letter "F?"

6    A.    Yes.

7    Q.    Can you explain to the Jury what that designation

8    means?  In other words, when computer forensics tells us

9    that a thumb drive was assigned letter "F," what does that

1:59PM 10    indicate to you as a computer forensic analyst?

11    A.    When a thumb drive is plugged into the computer, it's

12    basically going to be mounted as a file system.

13    Typically, the Windows partition is drive letter "C."  As

14    additional peripherals are installed, for example, a CD

1:59PM 15    might be drive letter "D."  A thumb drive might be drive

16    letter "F" or drive letter "G."  So there's a thumb drive

17    that's being installed.  The operating system detected the

18    thumb drive correctly, detected there was a file system on

19    it, and it mounted that file system as a particular drive

1:59PM 20    letter.  And in this case, it was drive letter "F."

21    Q.    And to take this one step further, when a thumb drive

22    is physically plugged into a device such as the HP

23    computer, there is actually an artifact within the

24    computer forensic data that you have at your disposal to

2:00PM 25    find out what was plugged in, what drive it was assigned,

2:00PM 1    and when, correct?

2           A.    Yes.

3           Q.    So in other words, this is hard data, correct?

4           A.    Yes.

2:00PM 5    Q.    On May 13th of 2019, were you able to determine from

6           your computer forensic analysis whether any files were

7           open from that mounted thumb drive assigned letter "F?"

8           A.    Yes.

9           Q.    Am I right that those files were opened between 12:53

2:00PM 10   and 12:56 p.m.?

11          A.    I'm sorry.  Which day are you referring to?

12          Q.    May 13th of 2019.

13          A.    13th.  Yes.  Okay, I'm with you.

14          Q.    And that those files were entitled -- and I'm going

2:01PM 15   to say this slowly for the court reporter --

16          jeremy_model-mesh pics.docx; UK Cardiff-final-background

17          lighter.pptx; and Quiz 1.docx, is that correct?

18          A.    Yes.

19          Q.    And we know from the computer forensic evidence trail

2:01PM 20   that somebody, at 12:53 to 12:56 p.m. on May 13th of 2019,

21          had to physically plug in a thumb drive to the "F" drive,

22          so to speak --

23          A.    Yes.

24          Q.    -- on the HP computer, correct?

2:01PM 25   A.    Yes.

2:01PM 1    Q.   So I'm going to start simple.  If I can show you --
       2    I'm happy to show you them if the actual drives themselves
       3    help -- but are you familiar with Defendant's Exhibits 3
       4    through 7, which were the thumb drives and SD cards for
2:02PM 5    which I believe you received images in this case?
       6    A.   Yes.  So I'm not looking at your exhibits, but, yes,
       7    I did receive image copies of all of the thumb drives in
       8    this case.
       9    Q.   Just so that we're clear for the record, those are
2:02PM10    the five, and only five, thumb drives and SD cards that
      11    were seized in this case, correct?
      12    A.   That is correct.
      13    Q.   And you testified a few minutes ago that you had an
      14    opportunity to review those thumb drives, correct?
2:02PM15    A.   I did.
      16    Q.   Let's start simple.  Can we agree that there's no
      17    computer forensic evidence that any of those thumb drives
      18    were the thumb drive that was plugged in on May 13th,
      19    2019, between 12:53 and 12:56 p.m.?
2:02PM20    A.   Yes, we can agree.  A review of those thumb drives, I
      21    did not find any document named jeremy_model or UK Cardiff
      22    or Quiz 1.
      23    Q.   And you looked for those, correct?
      24    A.   I'm sorry?
2:03PM25    Q.   I'm sorry.  You looked for that, correct?

2:03PM 1 A. Yes, I did.

2 Q. And you looked for that because part of tracing the

3 kind of "who" in the equation -- let me rephrase that.

4 You looked for that because there's evidentiary

2:03PM 5 significance to those files, correct?

6 A. Yes.

7 Q. Now, part of what you do in your professional life is

8 trace thumb drives, correct?

9 A. Examine and analyze thumb drives, correct.

2:03PM 10 Q. Each thumb drive has a unique serial number, correct?

11 A. Yes.

12 Q. And, in fact, you can identify a thumb drive by its

13 serial number, correct?

14 A. Yes, that's one way.

2:03PM 15 Q. And you can identify a thumb drive by every computer

16 it's ever plugged into, correct?

17 A. The computers that are plugged into support the

18 ability to record the serial number, yes.

19 Q. So in other words -- I might have asked that in a

2:04PM 20 poor way, and I apologize.  Let me rephrase that if I

21 understand your answer.

22  If you have a computer, you can determine whether a

23 particular thumb drive was ever plugged into that

24 computer, correct?

2:04PM 25 A. Certainly from modern operating systems such as

2:04PM 1   Windows 10 and macOS and Linux, the answer to that is yes.

2   Q.   So the operating systems that we're talking about in

3   this case, correct?

4   A.   Yes.

2:04PM 5   Q.   In other words, I understand if you are talking about

6   the 1980s or something, that may not be the case.

7   A.   Yeah, other technologies may not have that, correct.

8   Q.   But for our purposes for this trial and everything

9   we've talked about and you've testified about, on those

2:04PM 10   operating systems, you can extract that information from a

11   computer forensic standpoint, correct?

12   A.   Yes.

13   Q.   Now, we've established, if I understand your

14   testimony correctly, that the thumb drives that you have

2:04PM 15   in evidence were not the thumb drive that was plugged in

16   to the device on May 13th, correct?

17   A.   That is correct.

18   Q.   And, in fact, the three files that you have

19   identified were opened on that thumb drive?

2:05PM 20   A.   Yes.

21   Q.   You can tell from computer forensics that those files

22   were physically opened --

23   A.   Yes.

24   Q.   -- between 12:53 and 12:56 p.m. on May 13th of 2019,

2:05PM 25   correct?

2:05PM  1    A.    Yes.

        2    Q.    Essentially when the Linux partition is being

        3    installed, correct?

        4    A.    Yes.

2:05PM  5    Q.    Where is the thumb drive?

        6    A.    It was not seized by law enforcement.

        7    Q.    To this day, is it fair to say you have no clue what

        8    thumb drive was plugged in there, correct?

        9    A.    Yeah, I have no clue.  I don't see the thumb drive.

2:05PM 10    I have never seen a thumb drive that corresponds to those

       11    three files listed.

       12    Q.    But even without the thumb drive, you can follow the

       13    trail of evidence with respect to the files themselves,

       14    correct?

2:05PM 15    A.    Yes.

       16    Q.    Those files, based on your computer forensic

       17    analysis, were never opened on the MacBook, correct?

       18    A.    Yes.

       19    Q.    Those files were never opened on the iPhone, correct?

2:06PM 20    A.    Yes.

       21    Q.    Those files were never opened on the Windows side of

       22    the HP as opposed to off of the mounted thumb drive,

       23    correct?

       24    A.    Say that -- they were opened.  This is the evidence

2:06PM 25    that they were opened.  You're saying outside of this

2:06PM 1    evidence?

2    Q.    They were opened from the thumb drive, correct?

3    A.    Correct.

4    Q.    They were opened from drive "F," like you previously

2:06PM 5    testified, correct?

6    A.    That's correct.

7    Q.    They were not opened from anywhere else on that

8    document, correct?

9    A.    Not that I could identify, correct.

2:06PM10    Q.    So is it fair to say those files, the two Microsoft

11    Office documents and the one PowerPoint document, based on

12    your computer forensic analysis, have no connection at all

13    to any of Josh's devices that you examined in this case?

14    A.    I didn't find the thumb drive that contains those

2:07PM15    documents, so I don't have any other information about

16    those documents.

17    Q.    And you didn't find any artifact that those documents

18    were ever opened on any of Josh's --

19    A.    On any of the other devices, that would be true.

2:07PM20    Q.    There's no evidence that those documents have ever

21    been viewed on any of Josh's devices, correct?

22    A.    Correct.

23    Q.    So sitting here today, can you tell us where those

24    files originated?

2:07PM25    A.    No.

2:07PM 1    Q.   Would you agree with me that those kinds of files --

2      let's back up.  You're familiar with those kinds of files,

3      pretty traditional Microsoft Office documents and

4      PowerPoints?

2:07PM 5    A.   Yes.

6    Q.   I might have just misspoken, but Microsoft Word

7      documents, .docx, correct?

8    A.   Yes, correct.

9    Q.   And PowerPoint is .pptx.  Those are the file

2:08PM10    extensions, correct?

11    A.   That is correct.

12    Q.   And you are intimately familiar with those kinds of

13      documents, correct?

14    A.   Yes.

2:08PM15    Q.   Those are fairly common documents, correct?

16    A.   Yes.

17    Q.   Those files cannot possibly be created on a thumb

18      drive, correct?

19    A.   Certainly they can.  If I start a blank thumb drive,

2:08PM20    I start typing a document, I say, "Save to the thumb

21      drive," it's going to be saved onto the thumb drive.

22      I'm not -- you're asking me, it can be saved to a thumb

23      drive.

24    Q.   I think you just said, "Saved to a thumb drive."  I

2:08PM25    want to differentiate that from, "Created on a thumb

2:08PM 1    drive."  Do those kinds of documents have to be created on
       2    some other device, like a computer?
       3    A.    Oh, well, yeah.  I'm not sure if I understand your
       4    question correctly, but, like, can the thumb drive just
2:08PM 5    miraculously create a file?  No, it has to be plugged into
       6    a computer.  The computer processes it and you can save
       7    it, and save it to a thumb drive, but the thumb drive does
       8    not have an operating system or the word processer program
       9    to create a file.
2:08PM 10   Q.    Precisely.  So a thumb drive can save files of this
      11    nature, but it cannot create files of this nature?
      12    A.    Yes.
      13    Q.    So sitting here today, you have no clue what device
      14    those files were created on, correct?
2:09PM 15   A.    Correct.
      16    Q.    You have no clue where the thumb drive is?
      17    A.    Yep.
      18    Q.    But we know for sure that the thumb drive is not one
      19    of the ones you seized and the files were not opened on
2:09PM 20   Josh's devices?
      21    A.    Correct.
      22    Q.    You testified about the Linux operating system.
      23    Well, let's back up for one second.
      24          You spent a lot of your testimony, when Mr. Clayman
2:09PM 25   was asking you questions, giving opinions -- and we're

2:09PM 1    going to get to this in a second -- but about whether

2         someone had to physically be present at the HP at any

3         given time, correct?

4    A.    Yes.

2:09PM 5    Q.    Would you agree with me that somebody had to

6    physically be present to plug in this thumb drive on which

7    these three files were opened --

8    A.    Yes.

9    Q.    -- on May 13th of 2019?

2:10PM10    A.    Yes.

11    Q.    And that was approximately the same time that you

12    testified somebody had to physically be present to install

13    the Linux partition using a thumb drive, correct?

14    A.    Yes.

2:10PM15    Q.    Now, the Linux operating system, as you testified,

16    had a single user account, correct?

17    A.    Yes, it did.

18    Q.    I'm going to show you portions --

19          MR. GELFAND:  If I may, Your Honor, of what's

2:10PM20    already been admitted as Government's Exhibit 30.  May I

21    publish this, Your Honor?

22          THE COURT:  You may.

23    Q.    (BY MR. GELFAND.)  Just so we get our bearings, do

24    you see the top page of Exhibit 30?

2:10PM25    A.    Yes, I do.

2:10PM 1   Q.   And can you remind us, just because it's been about a

2   day since you went through this on direct, as to what

3   Exhibit 30 is, just generally?

4   A.   So Government Exhibit 30 are the print screens that I

2:10PM 5   created associated with booting up the HP computer with

6   the Linux partition.

7   Q.   Exhibit 30, if we go to the second page, references

8   the single user account that you identified on the Linux

9   partition side that was installed on May 13th of 2019,

2:11PM10   correct?

11   A.   Yes.

12   Q.   And that is, just so we're on the same page, it's

13   Dell, D-E-L-L, underscore one, O-N-E, correct?

14   A.   Yes.

2:11PM15   Q.   That is the sole user account, correct?

16   A.   Yes.

17   Q.   And so we know, the date on the top -- I know there's

18   a hole punch in mine, so I apologize -- but does that

19   appear to say Monday at 7:37?

2:11PM20   A.   Yes, it does.

21   Q.   What does that reference?

22   A.   That's the date that I booted up the virtual machine

23   and hit the print screen button to create this page.

24   Q.   Monday when?

2:11PM25   A.   I don't recall specifically.

2:11PM 1   Q.   What year?

2   A.   This year, 2021.

3   Q.   What month?

4   A.   In preparing for this trial, I don't know whether

2:12PM 5   it's sometime between July and September.

6   Q.   In your office, did you have unfettered access to the

7   HP forensic image that you reviewed in this case?

8   A.   Yes.

9   Q.   And the reason you had access to it is because you

2:12PM10   work for the government, right?

11   A.   Yes.

12   Q.   You're aware that people who do not work for the

13   government, but have a need to access it, like forensic

14   examiners that don't work for the government, have to go

2:12PM15   to a government facility to access that?

16   A.   Right.  There's a law that says that child

17   pornography, child sexual abuse material, has to be in the

18   care, custody, and the control of the government at all

19   times.  That's the law.

2:12PM20   Q.   Sure.  And so I understand the rationale.  It makes

21   sense.  But just to be blunt, you have unfettered access

22   to it.  Those who don't work for the government don't,

23   correct?

24   A.   They have access to it as well.

2:13PM25   Q.   But they have to go to a government facility,

2:13PM 1   correct?

2   A.   Yes.

3   Q.   Now, dell_one, did you run any forensic tests on

4   setting up this version of Linux Ubuntu?

2:13PM 5   A.   Yes.

6   Q.   And based on your forensic tests, did you attempt to

7   create a user account with an underscore character in it?

8   A.   Yes.

9   Q.   Is it your testimony under oath that you were able to

2:13PM10   create a user account with an underscore in it?

11   A.   Yes, it is.

12   Q.   So your understanding -- let me rephrase that -- your

13   opinion, is that somebody picked dell_one as the name of

14   the user account?

2:13PM15   A.   Yes.

16   Q.   As opposed to it being essentially imported or

17   default imported, correct?

18   A.   Correct.  During my analysis of installing this

19   version of the Ubuntu, when you get to the point where it

2:14PM20   asks you to enter your name, it's a blank field.  It

21   doesn't auto-populate with any information.  The user has

22   to type in whatever they want their user name to be.

23   Q.   And someone chose dell_one?

24   A.   Somebody chose dell_one.

2:14PM25   Q.   If you look at this page, can you tell us -- the

2:14 PM 1    other one said Monday.  This refers to Wednesday, correct?

2    A.    Yes.

3    Q.    Just like you testified earlier, this exhibit,

4    Government Exhibit 30, is actually a consolidation of

2:14 PM 5    screen prints from the virtualized HP from a whole bunch

6    of different days, correct?

7    A.    That's correct.

8    Q.    So it's not like, on any of these exhibits that you

9    introduced related to the virtualized machines or devices

2:15 PM 10   that you analyzed, it's not like you just got in there,

11   spent 20 minutes, screen-shotted some stuff.  You kept

12   going back to them, correct?

13   A.    Correct.  So the first time I went through there, I

14   hit "print screen" like a mad fool every couple of

2:15 PM 15   minutes.  And then after I reviewed them, I'm going, geez,

16   I should have done this, I should have done that.  And so

17   I would go back periodically to create additional print

18   screens for things that I forgot to do the first time

19   around, or even forgot to do the second time around.  So I

2:15 PM 20   certainly rebooted the virtual machine multiple times to

21   get to the point to illustrate the things that I thought

22   were effective to illustrate.

23   Q.    I'm going to show you the next page.  You testified

24   that this essentially reflects some -- I know there's

2:16 PM 25   multiple pages of this, but some of the software

2:16PM  1   applications that were on the Linux Ubuntu side, correct?

2   A.   Yeah.  Yes.  Excuse me.

3   Q.   What's Remmina?  R-E-M-M-I-N-A.

4   A.   I'm not familiar with that.  I don't remember.

2:16PM  5   Q.   Would you be surprised to learn that it deals with

6   remote access?

7   A.   No.

8   Q.   If you look at the next page.  You testified that

9   some of the files on here -- I'm sorry -- some of the

2:16PM 10   software applications on here came essentially preloaded

11   or preinstalled, and some were installed by a user doing

12   something to install them, correct?

13   A.   Yes.

14   Q.   And so let's break that down for a second.  On this

2:16PM 15   document, the TOR browser was installed as opposed to

16   preinstalled, correct?

17   A.   Yes.

18   Q.   We'll talk about that in a second.  The uTorrent

19   application was installed as opposed to preinstalled,

2:17PM 20   correct?

21   A.   Yes.

22   Q.   And the VLC Media Player was installed as opposed to

23   preinstalled, correct?

24   A.   Yes.

2:17PM 25   Q.   Transmission, that came preinstalled on the system,

2:17PM 1    correct?

2    A.    Yes.

3    Q.    Transmission provides access to the BitTorrent

4    network, correct?

2:17PM 5    A.    Yes.

6    Q.    And just so you and I are speaking the same language,

7    when software like Transmission comes preinstalled on an

8    operating system -- like Linux, for example -- what that

9    means functionally is that the user, from the moment they

2:17PM10    first log into the system, can use that software, correct?

11    A.    Yes.

12    Q.    They don't have to do anything to go out onto the

13    internet or plug in a thumb drive or whatever it may be to

14    get new software, correct?

2:17PM15    A.    Yes.

16    Q.    They literally just double-click on it, correct?

17    A.    Yes.

18    Q.    Transmission you testified you're familiar with,

19    correct?

2:18PM20    A.    Yes.

21    Q.    Transmission is one of the software applications that

22    somebody can use to access the BitTorrent network,

23    correct?

24    A.    Yes.

2:18PM25    Q.    UTorrent, which we will get to in a minute, is

2:18PM 1    another application that somebody can use to access the

2    BitTorrent network, correct?

3    A.    Yes.

4    Q.    And qBittorrent, which you identified this morning, I

2:18PM 5    believe, is another application somebody can use to access

6    the BitTorrent network, correct?

7    A.    Yes.

8    Q.    Each of these are different software applications

9    that basically get you to the same place, correct?

2:18PM10    A.    Yes.

11    Q.    So I'm not great with analogies, but is it kind of

12    fair to say that they are essentially three doors into the

13    same house?

14    A.    Yeah, three doors into the same -- I kind of use the

2:18PM15    same analogy.  It's like Coke versus Pepsi versus RC Cola.

16    They're three different soft drinks that are basically

17    soft drinks.  They're three different versions of soda.

18    And some people prefer Coke, some people prefer Pepsi.

19    Some people prefer Transmission, some people prefer

2:19PM20    uTorrent.  So it's just a preference to what flavor of a

21    program a particular person might like.

22    Q.    I'm going to butcher the analogy, but unlike Coke or

23    Pepsi, you actually get to the same product here.  You get

24    to the same place, correct?

2:19PM25    A.    Correct.

2:19PM 1    Q.    So hence my -- and if I'm wrong, I'm wrong -- but
      2    three doors to the same house, you get to the same place
      3    just by going there through a different path, correct?
      4    A.    Yes.
2:19PM 5    Q.    Is that fair?
      6    A.    Yes.
      7    Q.    So I want to be crystal clear for a second.  If I
      8    want to get to the BitTorrent network and access the
      9    universe, the gazillions of files that exist on the
2:19PM10    BitTorrent network, I get to the same set of possible file
     11    folders through any of these software applications,
     12    correct?
     13    A.    Well, can I offer a little bit of clarification?
     14    Q.    Sure.
2:19PM15    A.    So the clarification is, all of the tools that you're
     16    mentioning -- Transmission, uTorrent, and qBittorrent --
     17    those are the engines, if you will.  They go out -- if you
     18    have a Torrent file, these are the tools that will go
     19    fetch the contents of the things that are referenced in
2:20PM20    those Torrent files.  You were a little bit unclear.
     21    Accessing all of those Torrent files, that generally is
     22    not done through these programs.  That would be generally
     23    happening through a web browser.  So I would go to Firefox
     24    or Safari.  I would go to a website that has those Torrent
2:20PM25    files, download those Torrent files.  Once those Torrent

2:20PM 1  files are downloaded, then these tools go to work going

2      out and fetching the contents of it.  So I just wanted to

3      clarify the actual fetching part of it, and then getting

4      the Torrent files from wherever your Torrent files are

2:20PM 5  being downloaded from.

6  Q.   Let me it ask this a different way.  Can someone

7      using Transmission get files through the BitTorrent

8      network from someone using uTorrent?

9  A.   Yeah, so there are certain versions of it, so I don't

2:20PM10  remember what the evolution is.  Some of these Torrent

11      programs are more robust than others and they provide a

12      searching capability to go search for different Torrent

13      files.  So depending on the client program that you're

14      using, some of them are robust and provide the features

2:21PM15  that you're talking about.  Others are less robust and

16      don't provide those features.

17  Q.   I want to show you the next page.  Let's back up, I'm

18      sorry, before I do.  The document we're looking at is from

19      the HP Linux partition, correct?

2:21PM20  A.   Yes.

21  Q.   But you also mentioned Transmission this morning when

22      you testified about the MacBook personal laptop, correct?

23  A.   Yes.

24  Q.   And would you agree with me that based on your

2:21PM25  computer forensic analysis, Transmission was used on the

2:21PM 1   MacBook Pro in 2017 to download a Hollywood movie?

2   A.   Yes.

3   Q.   Not to download any sort of child pornography or

4   anything like that?

2:21PM 5   A.   Yes.

6   Q.   And you would also agree with me that whoever was

7   using the HP computer on the Linux side chose not to use

8   Transmission at all for anything, based on your forensic

9   analysis, correct?

2:22PM10   A.   That would be correct.

11   Q.   Now, instead, that person used uTorrent, based on

12   your analysis, correct?

13   A.   Yes.

14   Q.   In particular, if we go to the next page of your

2:22PM15   exhibit, you specifically captured a screenshot reflecting

16   the uTorrent version 3.5.5 that you testified about

17   yesterday, correct?

18   A.   Yes.

19   Q.   And the prosecutor asked you to match that with the

2:22PM20   same uTorrent version that's on the Torrential Downpour

21   logs that you compared to yesterday, correct?

22   A.   That is correct.

23   Q.   And this screen that's in front of you, part of

24   Exhibit 30, expressly states the build number that is on

2:23PM25   your virtualized HP, correct?

2:23 PM 1    A.    Yes.

2    Q.    Can you please read for the benefit of the Jury and

3    for the record what the build number is?

4    A.    Build 45828.

2:23 PM 5    Q.    Go to the next page.  Can you tell us what we're

6    looking at here?

7    A.    I clicked on one of the "about."  I clicked on the

8    "about" button and it's showing me the same information,

9    uTorrent version 3.55, build 45828.

2:23 PM 10    Q.    So just to be clear, they are both in the same

11    exhibit, but this references build 45828, uTorrent version

12    3.5.5 on the top page that I just showed you.  And on the

13    next page that you clicked on the "about," it references

14    the exact same version and build number that I previously

2:24 PM 15    showed you, correct?

16    A.    Yes.

17    Q.    This version and build number is copyrighted the year

18    2020, correct?

19    A.    Yes.

2:24 PM 20    Q.    This version and build number was not available by

21    uTorrent until after the date that this device was seized,

22    Mr. Fottrell, isn't that true?

23    A.    I don't think I agree with that.  Could you --

24    Q.    Did you look in the uTorrent website to figure out

2:25 PM 25    when this build number was made available?

2:25 PM 1    A.    No.

2            Q.    Not for admission, but would it help if you looked at

3       it?

4            A.    No, I don't think so.  Why would it help?  What would

2:25 PM 5    help about it?

6            Q.    To determine, like you previously testified, when

7       this version and build number were even released?

8            A.    I'm looking at the forensic artifacts that I have in

9       front of me that shows the software reflected with a date

2:25 PM 10   and a build number.  I'm going with the evidence that I

11      have in front of me.  Why do I -- I don't need to go to

12      another third-party site to get additional information.

13      I'm looking at the forensic artifact that I have, seized

14      from the defendant's residence.

2:25 PM 15   Q.    The residence?

16           A.    Lot.  Excuse me.

17           Q.    Let me get this straight for a second.  Can you

18      explain, as a general matter, how it would be possible for

19      a software version and build number of uTorrent to appear

2:26 PM 20   on a virtualized screenshot if it wasn't yet released?

21           A.    That does not make sense to me.  That would not make

22      sense to me.

23           Q.    In other words, to even appear on this virtualized

24      machine, a software update would have to come from the

2:26 PM 25   internet, correct?

2:26PM 1    A.    Correct.

2           Q.    And you have sworn to this Jury that this was not

3     plugged into the internet?

4           A.    Correct.

2:26PM 5    Q.    Or it would have to otherwise be manually loaded with

6     additional software, correct?

7           A.    Correct.

8           Q.    And with the exception of the Oracle explanation that

9     you gave earlier this morning, you have testified that you

2:27PM10    did not add any software or modify uTorrent?

11          A.    I did not add any software.

12          Q.    Would it surprise you to learn that this version and

13    build number wasn't released until after this device was

14    seized?

2:27PM15    A.    That would be -- interest me, yes.

16          Q.    It would be very significant, would it not?

17          A.    I'm not sure it would be very significant.  It would

18    be significant.

19          Q.    It would mean that something happened to this

2:27PM20    evidence that you can't explain, correct?

21          A.    Yeah, it could be -- I'm not sure if the -- yeah, it

22    could be a host of information that I would have to do

23    more research to analyze.

24          Q.    You testified about a number of bookmarks related to

2:28PM25    the TOR browser, correct?

2:28PM 1  A.    Yes.

2  Q.    You testified that Hidden Wiki involves mostly

3  criminal activity, and then you listed guns, drugs, murder

4  for hire.  I think you said something about credit card

2:28PM 5  fraud.  Do you remember that testimony yesterday?

6  A.    Yes, I do.

7  Q.    You would agree with me that nothing in this case has

8  to do with guns, drugs, murder for hire, credit card

9  fraud, anything along those lines, correct?

2:28PM 10  A.    That's correct.

11  Q.    Now, you're familiar with the TOR browser, correct?

12  A.    Yes, I am.

13  Q.    The TOR browser can be downloaded, for free, by

14  typing in "TOR browser" into Google, correct?

2:29PM 15  A.    That's one way, correct, yes.

16  Q.    In other words, one does not have to do something

17  particularly complex to get the TOR browser, correct?

18  A.    Yes, that is correct.  It's very easy to get and

19  download.

2:29PM 20  Q.    TOR's purpose and function is that it provides more

21  privacy and security than other internet browsers,

22  correct?

23  A.    Yes.

24  Q.    And you actually used an example yesterday that your

2:29PM 25  local newspaper, for example, I believe the Washington

2:29PM 1    Post, I assume?

2    A.   Yes.

3    Q.   That that generates -- you go on the Washington Post

4    website, that essentially generates advertisements of

2:29PM 5    every restaurant that you didn't want to go to, but now

6    you all of a sudden do, correct?

7    A.   Yes.

8    Q.   Because other web browsers literally collect, and,

9    candidly, sell information, correct?

2:30PM 10   A.   No.  I think that the Washington -- in the example of

11   the Washington Post, when I go to the Washington Post

12   website, they get my IP address where I'm connecting from.

13   They can geolocate that IP address to Arlington, Virginia,

14   where I live, and they can use that information to target

2:30PM 15   me with advertisements in my local area.

16   Q.   And that's how companies make a lot of money?

17   A.   That's how companies make money.

18   Q.   They are smarter than we are, correct?

19   A.   Yes.

2:30PM 20   Q.   Some people don't want that kind of targeted

21   advertisement, correct?

22   A.   Yes.

23   Q.   A lot of people don't want that kind of targeted

24   advertisement, correct?

2:30PM 25   A.   Yes.

2:30PM 1   Q.   Some people want to take extra steps to protect

2   privacy, correct?

3   A.   Yes.

4   Q.   Can you think of a reason, Mr. Fottrell, why a public

2:30PM 5   figure, regularly chased by the paparazzi, would want to

6   take steps to protect privacy?

7   A.   I can see why somebody would want to take steps to

8   protect their privacy.

9   Q.   Not totally crazy, right?

2:31PM 10   A.   No.

11   Q.   Who developed TOR routing?

12   A.   Say that again.  Sorry.

13   Q.   Who developed TOR routing?

14   A.   Say that again.  Sorry.

2:31PM 15   Q.   Who developed TOR routing?

16   A.   The TOR Project, an organization called the TOR

17   Project.

18   Q.   It's a Massachusetts nonprofit, correct?

19   A.   Yes, it is.

2:31PM 20   Q.   The point here is, you made the TOR browser sound

21   super sinister.  It's used by millions of people, correct?

22   A.   If it's used by millions, I don't know specifically.

23   I don't have specific knowledge of millions of people

24   using it.  I know it's widely used by lots of people.

2:31PM 25   Q.   Not everyone who uses the TOR browser uses it to get

2:31PM 1    onto these murder-for-hire, buying children stuff that you

2          testified about yesterday, correct?

3     A.    That is correct.

4     Q.    Is it fair to say that, like many things, it's a

2:31PM 5    mechanism one can use for bad, but it's also a mechanism

6          that one can use for totally normal, legal, benign things,

7          correct?

8     A.    That is a correct statement.

9     Q.    Kind of like a knife?

2:32PM10    A.    Like a knife.

11     Q.    Josh's personal MacBook had the TOR browser installed

12          on it, based on your forensic examination, since December

13          of 2017, correct?

14     A.    At some point in 2017, correct.

2:32PM15    Q.    And when you say at some point, is it that you don't

16          remember or that you couldn't identify the date?

17     A.    No, I know that there was evidence that it was

18          installed and being used in January of 2017.  There was a

19          time period later on when it was removed, and I don't know

2:32PM20    the time period of when the TOR browser was removed from

21          the MacBook.

22     Q.    I don't think you meant this, but I just want to make

23          sure that we're clear.  You said January of 2017.  Did you

24          intend to say December of 2017?

2:32PM25    A.    Yes.  I know it was in 2017.

2:32PM 1    Q.   So based on your investigation, the TOR browser was

2           on the MacBook in 2017, correct?

3           A.   Yes.

4           Q.   And as you previously testified, in 2017, there was

2:33PM 5    not a single trace of child pornography in any way, shape,

6           or form ever being opened on that MacBook, correct?

7           A.   Yes.

8           Q.   You also testified this morning that the TOR browser,

9           or an application essentially of the TOR browser, was on

2:33PM 10   Josh's phone that was seized, correct?

11          A.   Yes.

12          Q.   And you identified in your investigation that in

13          October and November of 2019, it was used to access adult

14          pornography, correct?

2:33PM 15   A.   Yes.

16          Q.   And just to be clear, without getting into any of the

17          details, this was adult pornography on, for lack of a

18          better way of putting it, normal adult pornography

19          websites, correct?

2:33PM 20   A.   Yes.

21          Q.   The same websites that you could access on Safari or

22          Firefox or whatever, correct?

23          A.   Yes.

24          Q.   Now, we know, do we not, from the computer forensics

2:34PM 25   that the TOR browser was installed on the Linux partition

2:34PM 1    on May 13 of 2019 at 2:03 p.m.?

2    A.   Yes.

3    Q.   So let's get very specific for a second.   You

4    testified earlier that somebody plugs in that thumb drive

2:34PM 5    and opens those three files between 12:53 and 12:56 p.m.,

6    correct?

7    A.   Yes.

8    Q.   Essentially immediately thereafter, the Linux

9    partition is installed, correct?

2:34PM 10   A.   Yes.

11   Q.   And essentially immediately thereafter the Linux

12   partition is installed, the TOR browser is installed,

13   correct?

14   A.   Yes.

2:34PM 15   Q.   Is that a fair chronology if we just kind of sum this

16   up?

17   A.   Yes.

18   Q.   And we know that from your computer forensics,

19   correct?

2:35PM 20   A.   Yes.

21   Q.   Because that's actually detailed analysis, facts,

22   based on what's in the computer forensic trail that you

23   looked at in this case, correct?

24   A.   Yes.

2:35PM 25   Q.   Now, when the TOR browser was installed -- let's back

2:35PM 1    up for a second.  When the TOR browser that you testified

2          about this morning -- I forgot the app you described on

3          the phone -- was that called TORsec?

4      A.    TORsec.

2:35PM 5    Q.    How do you get TORsec?

6      A.    Go to the App Store.

7      Q.    Let me get this straight for a second.  To get TORsec

8          on your phone, you literally just go to the Apple App

9          Store, correct?

2:35PM10    A.    Yes.

11      Q.    The same place I would go to access virtually any app

12          that I could get, literally, any app that I could get on

13          my iPhone?

14      A.    Yeah.

2:35PM15    Q.    And Apple, as you know, operates the App Store,

16          correct?

17      A.    Correct.

18      Q.    And you download TORsec the exact same way you

19          download any other app, correct?

2:36PM20    A.    Yes.

21      Q.    Here's what gets interesting, though.  On the HP,

22          were you able to forensically locate an installer related

23          to the installation of the TOR browser on the Linux

24          partition?

2:36PM25    A.    I don't know what you mean by that.  Was I able to

2:36PM 1  locate an installer?  Can you be -- I'm not sure what you

2       mean by that.

3       Q.    Let's back up for a second.  If I download software

4       online, in other words, I go to a website and I want to

2:36PM 5  download here iOS 5 or iOS 10, whatever it is, I can

6       download an installer which basically pre-inputs command

7       codes, correct?

8       A.    Yes.

9       Q.    Let's break this down, because this is pretty

2:36PM10  important.  What's a command code?

11      A.    The command line, or the command shell, if you will,

12      it's the feature of the operating system that allows the

13      user to go out to a command prompt and type textual

14      commands into a window as opposed to using the graphical

2:37PM15  user interface to point and click on things.  So the

16      command prompt that he's referencing is just the ability

17      to access the computer at a much more fundamental level.

18      Q.    Command lines, is that the word?  I use code.  Maybe

19      I was imprecise.  Is it command lines?

2:37PM20  A.    Yeah.  I'm sorry.  I would use the term command line.

21      Q.    That's fine.  Command lines are essentially the

22      equivalent of a foreign language, correct?

23      A.    I'm very familiar with that foreign language, so it's

24      not very foreign to me, but it's probably foreign to other

2:37PM25  people.

2:37PM 1    Q.    How about to non-computer forensic analysts, is it

2          pretty foreign?

3          A.    Yeah, to a non-forensics person, it would be pretty

4          foreign.

2:37PM 5    Q.    In other words, it's not intuitive.  You don't just

6          write in "car" or "install."  You have to know, like, --

7          A.    You have to know the commands.

8          Q.    -- colons and slashes and dashes and acronyms, things

9          like that, correct?

2:38PM 10   A.    Correct.

11         Q.    The point is, it has to be learned somewhere,

12         correct?

13         A.    That's correct.

14         Q.    It requires a level of sophistication with system

2:38PM 15   technology, correct?

16         A.    Yes.

17         Q.    Before we went into that tangent, we were talking

18         about installers.

19         A.    Correct.

2:38PM 20   Q.    Installers that many of us may be familiar with just

21         from downloading any software essentially provide a

22         shortcut so that we don't have to type in complicated

23         command codes, right?

24         A.    That's correct.

2:38PM 25   Q.    So what an installer effectively does, even though --

2:38PM 1  from a user standpoint, you just essentially double-click
2      install, adopt the user agreement, whatever it may be,
3      correct?
4      A.    That is correct.
2:38PM 5  Q.    What's really happening on the back end, even though
6      the user may not realize this is, it's essentially
7      inputting command lines for you?
8      A.    Correct.
9      Q.    Is that correct?
2:38PM10  A.    Yes.
11      Q.    So here's my question.  From a computer forensic
12      standpoint, where is the installer for the TOR browser on
13      the HP Linux partition side?
14      A.    It doesn't exist, because there's other ways to
2:39PM15  install software besides the two ways that you mentioned.
16      The Ubuntu software has the equivalent of an App Store,
17      just like the iPhone does.  The Ubuntu software installer
18      icon is the equivalent of the App Store.  I can go to the
19      App Store on the Ubuntu software, type in TOR, it will
2:39PM20  bring up the TOR program.  I click install and it
21      installs.  I can go to the installer and type in VLC.
22      It's going to show me the application for VLC.  I click on
23      the install button and it would install.  Go to the App
24      Store on the Ubuntu machine, type in uTorrent, and it will
2:39PM25  download and install the uTorrent program for me, just

2:39PM 1   like it does on the Macintosh.

2   Q.   Did you find computer forensic evidence that that is

3   actually what happened here with the TOR browser?

4   A.   I looked.  I didn't see those installer files that

2:40PM 5   you referenced, so I don't see that as an option.  I

6   looked for the bash command history.  There is no command

7   history to say that somebody typed in the commands to do

8   that.  I am left with the third alternative that the

9   person used the App Store to install the applications.

2:40PM 10  Q.   So let me get this straight, because we talked before

11  about how we want to focus on evidence, not guessing,

12  correct?

13  A.   Okay.

14  Q.   My question, and I'll ask it again is, did you find

2:40PM 15  evidence, computer forensic evidence, that the TOR browser

16  was installed by going to the App Store on the Linux

17  partition; yes or no?

18  A.   The overall evidence that I see is consistent with

19  that.  I didn't see an installer file.  I didn't see bash

2:40PM 20  command line histories.  I did not see evidence of those

21  techniques, which leads me to believe the only other

22  alternative is they went through the App Store to install

23  it.

24  Q.   You keep saying "bash files."  Let's talk about that

2:41PM 25  for a second.  There was no bash history on this device,

2:41PM 1    correct?

2    A.    Correct.

3    Q.    What is bash history?  Let's put this into English

4    for a second.

2:41PM 5    A.    Sure.  What was your question?  I'm sorry.

6    Q.    What is bash history?  Let's put this in English.

7    A.    This goes back to 1980.  The Unix operating system

8    comes with a command prompt called the shell prompt.  In

9    AT&T Bell Labs, it was developed by a man named Stephen

2:41PM 10   Bourne and so it was known as the Bourne Shell.  So in the

11   80s and 90s, I was certainly using the Bourne Shell.  That

12   was the command line program that you would use to access

13   Unix machines.  Later on, during the open-source movement,

14   the GNU software foundation wrote a public domain version

2:41PM 15   of the Bourne Shell, and they named it bash, which stands

16   for Bourne Again Shell.  It's a cute little name to show

17   the open-source name.  And that command line tool is still

18   being used today.  It's been used for about 20, 25 years

19   now.  It's a very popular, very full-featured programming

2:42PM 20   shell, and that's the Bourne Again Shell, the bash shell.

21        One of the features of that shell is that it keeps

22   track of all the commands that you type.  So if I type a

23   command, I type some other commands, and I want to go back

24   to a command and redo it, you can redo previous commands.

2:42PM 25   And the only way that it allows you to do that is if it

2:42PM 1   remembers that.  And that's what the bash history is, it's

2   the operating system's way of recording the previous

3   commands you typed into the bash prompt.

4   Q.   So I tried to make that simpler, and I think I

2:42PM 5   failed.

6           MR. CLAYMAN:  Your Honor, can I ask for a side

7   bar?

8           THE COURT:  Yes.

9           (Bench Conference)

2:43PM 10          MR. CLAYMAN:  Your Honor, it was brought to my

11   attention that the defendant's expert is sitting behind

12   Mr. Gelfand and passing him notes during his cross

13   examination.  I did not understand that to be consistent

14   with the Court's ruling or any understanding of what our

2:43PM 15   experts were going to do during our expert testimony.

16           MR. GELFAND:  She's here to assist with the

17   defense.  That's the whole idea.

18           MR. CLAYMAN:  She was here to assist --

19           THE COURT:  Excuse me?

2:43PM 20          MR. GELFAND:  I don't see anything at all that

21   would be improper from using a defense expert that's

22   permitted in the courtroom to assist with the defense in

23   complicated computer forensics issues.  That's the whole

24   idea.

2:43PM 25          MR. CLAYMAN:  Our understanding, Your Honor, was

2:43PM 1  that she was here so she could comment when she testifies,

2  if she chooses to, if they choose to call her, about

3  things she heard from Mr. Fottrell's direct examination.

4  I didn't understand that we would be passing notes.

2:44PM 5        THE COURT:  Well, the permission that the Court

6  gave was for the parties' experts to sit in the courtroom.

7  It was never suggested to the Court that she would sit at

8  counsel table.  It was never suggested to the Court that

9  she would be handing notes.  She is certainly a

2:44PM 10  consultant, and if you want to speak with her at night and

11  have questions for her, if you want to speak with her on

12  breaks and have questions for her, but I do agree that

13  it's improper to be handing notes back and forth to

14  someone sitting in the gallery, unless it's counsel of

2:44PM 15  record.

16        MR. GELFAND:  I did not mean anything by that.  I

17  hope the Court understands that.  She's literally given me

18  one note.  My intention was not in any way, shape, or form

19  to violate the Court's permission.  She handed me one

2:44PM 20  note.  Candidly, I'm not sure I even understand what the

21  point is.

22        THE COURT:  Well, please ask her not to do that

23  and ya'll can speak on the breaks if you like.

24        MR. GELFAND:  Can I just whisper to her?

2:45PM 25        THE COURT:  Yes.

2:45PM  1          (Bench Conference Concluded)

       2          MR. GELFAND:  May I continue?

       3          THE COURT:  You may proceed.

       4   Q.  (BY MR. GELFAND.)  We were talking about the bash

2:45PM  5   history.  Let me see if I can simply this, but I don't

       6   want to oversimplify this.  It's a history that is

       7   auto-logged of command lines that are typed into the

       8   system, correct?

       9   A.    Yes.

2:45PM 10   Q.    Can bash history be deleted?

      11   A.    Yes.

      12          MR. GELFAND:  If I can continue to publish

      13   portions of Government Exhibit 30, Your Honor?

      14          THE COURT:  Yes.

2:46PM 15   Q.  (BY MR. GELFAND.)  This is the virtualized screenshot

      16   that you testified you pulled straight off the Linux

      17   partition, correct?

      18   A.    That is correct.

      19   Q.    What's the bash history that I see here?

2:46PM 20   A.    That is me going out to the command prompt, as I

      21   testified earlier, in order to -- one of the first steps I

      22   needed to install a virtual machine is I needed to install

      23   the guest additions.  And I needed to go out to the

      24   command prompt to install the Oracle VirtualBox guest

2:46PM 25   additions to get those drivers loaded correctly.  So that

2:46PM 1  bash history reflects me installing the Oracle VirtualBox

2      and does not reflect activity associated with what the

3      defendant was using, or the computer user was using.

4      Q.   So to cut to the chase, even though this says bash

2:47PM 5  history on here, as I understand your testimony, we can

6      agree that this does not reflect any bash history of

7      command lines actually put in to this HP Linux partition

8      side, correct?

9      A.   Say that again.

2:47PM10  Q.   Sure.  The bash history here is stuff you did, not

11     stuff anyone --

12     A.   Yes.

13     Q.   -- who had access to this HP computer in May or June

14     or whatever of 2019 did, correct?

2:47PM15  A.   Yes, because you can see all of these VirtualBox

16     things are associated with me installing my VirtualBox

17     additions in order for my virtual machine to work

18     correctly.  So there's lots of artifacts associated with

19     that.

2:47PM20  Q.   Sure.  When was the bash history deleted?

21     A.   When was which bash history deleted?

22     Q.   When was the bash history that was on this device

23     deleted?

24     A.   I have no evidence that the bash history was deleted.

2:47PM25  At the moment in time it was seized by law enforcement,

2:47PM 1  there was no bash history.  There is no -- I have no

2  forensic evidence that it existed previously and was

3  deleted.  I don't have any information about that.

4  Q.   If we look at the next page, you testified that this

2:48PM 5  is essentially a list of file folders from the home

6  screen, correct?

7  A.   Yes.

8  Q.   And you identified a number of file folders that were

9  modified in May of 2019, correct?

2:48PM10  A.   Yes.

11  Q.   And you kind of made the point, if I understood your

12  testimony correctly, that this corresponds, in your expert

13  opinion, with the date and approximate time that this was

14  installed, correct?

2:48PM15  A.   Yes.  So at 1352, at 1:52, generally speaking,

16  somewhere in the midpoint of the installation process,

17  that's when these folders are being created.  That's a

18  decent ballpark figure for when the operating system was

19  installed.

2:49PM20  Q.   Did you use computer forensic tools to actually

21  determine, instead of ballparking, when it was installed?

22  A.   There is a log file associated with that on the

23  computer as well, and I looked at that.

24  Q.   Based on that log file, when was that installed?

2:49PM25  A.   On the same day, May 13th.

2:49PM 1    Q.    At what time?

2          A.    So the log file is kind of long.  It's voluminous.

3          And there's a time at the beginning and there's a time at

4          the end.  And, generally speaking, the time at the end

2:49PM 5    reflects around that time, 1352.  The problem I have with

6          the beginning of the log file is that when the Ubuntu

7          software is booted up, the program is running, the

8          operating system did not go out to a reference clock and

9          basically get an accurate time.  So I am less reliable

2:49PM 10   about the dates and times that are reflected at the

11         beginning of that installation log file.  But about

12         somewhere in the middle of it, you will see an entry for

13         the network time protocol where it goes out to a reference

14         clock and gets a date and time.  I am much more confident

2:50PM 15   after that event occurs that the dates after that event

16         occur.  So I am not exactly sure when it began, but the

17         log file reflects exactly when it completed, which is

18         about this time.

19         Q.    So just to be clear -- and that's what I wanted to

2:50PM 20   clarify -- when you say that this was installed at

21         approximately this time, you're not saying that that's

22         when the beginning of the installation occurred, correct?

23         A.    Correct.  Correct.  It could be five or 10 minutes

24         before, five or -- there's a window of accuracy that I

2:50PM 25   have, to answer that question.

2:50PM 1  Q.   The folders at the bottom, the column that we were

2  just looking at is the modified date, correct?

3  A.   Correct.

4  Q.   Do you see the modified date of the folders at the

2:50PM 5  bottom, including the cache folder, being October 2020?

6  A.   Yes.

7  Q.   January of, I presume, 2021?

8  A.   Yes.

9  Q.   These were -- what we're looking at on the screen

2:51PM 10  were modified --

11  A.   Yes.

12  Q.   -- after the device was seized?

13  A.   This is the virtual machine.  If we go back to the

14  EnCase original evidence, it's going to have the date and

2:51PM 15  times reflected of when it was seized.  Things are

16  changing.  Remember I testified, as I boot it up, I'm

17  looking around.  I'm going under Thunderbird and looking

18  at it.  The act of me looking at something changes it.  It

19  changes the dates and times when I do that.  Those dates

2:51PM 20  and times are reflected in those dates that you see in

21  this exhibit.

22  Q.   But to be clear, and I understand you keep saying we

23  could go back to EnCase, et cetera.  Is it fair to say

24  that you did not testify about a single piece of evidence

2:51PM 25  generated from EnCase?

2:51PM 1  A.    These spreadsheets, all of the -- so I use the
2          demonstrative exhibits, the print screens that I created,
3          as an illustrative tool to show what is in there in an
4          easy-to-understand format.  I go back to my forensic
2:52PM 5  tools, I extract the raw data, and those exhibits we'll
6          see in those spreadsheets and those printouts that I
7          created, those are the exhibits that are coming from my
8          EnCase forensic software.  So I'm combining two different
9          things.  I'm combining an easy-to-present format in using
2:52PM10   Oracle VirtualBox, and then the underlying forensic
11         evidence.
12         Q.    But can you answer my question?  Is there any
13         evidence that you testified about that came from EnCase?
14         A.    Is there any evidence that -- say that again.
2:52PM15   Q.    Any evidence that we have seen that came from EnCase?
16         A.    Yes.  The spreadsheet exhibits came from EnCase.
17         Q.    Just the spreadsheet exhibits?
18         A.    Yes.  Well, the thumbnails.  The same thing with the
19         thumbnails.  I export the thumbnails.  When I created the
2:52PM20   thumbnails with all of the CSAM images, that came from
21         EnCase.  When I recovered the images from unallocated
22         space, I exported them.  That was using the forensic tools
23         that I had.  That was not using the virtual machine.
24         Q.    Now, you testified to various files that were
2:53PM25   streamed on VLC, correct?

2:53PM 1    A.    Yes.

2    Q.    Before we get there for a second, we have talked

3    about the TOR browser, correct?

4    A.    Yes.

2:53PM 5    Q.    Let's talk about BitTorrent, okay?

6    A.    Okay.

7    Q.    Is it your testimony, to cut to the chase, that the

8    only BitTorrent software used in connection with alleged

9    child pornography activity in this case was uTorrent?

2:53PM 10   A.    I'd have to go back and look at that exhibit.  There

11   might have been -- let me look at that exhibit.  There

12   might have been a folder where another program was used.

13   Q.    Take as much time as you need.

14   A.    Got it.  Government Exhibit 39.  Can you repeat the

2:54PM 15   question?

16   Q.    Yes.  It was just a simple question.  I don't know

17   exactly how I phrased it.  But was uTorrent the only

18   BitTorrent software used in connection with any alleged

19   child pornography activity in this case?

2:54PM 20   A.    Yes.  Yes.

21   Q.    So just to be clear, you have testified in total

22   about three BitTorrent applications.  We talked a minute

23   ago about Transmission, correct?

24   A.    Yes.

2:54PM 25   Q.    So whoever used the Linux partition chose not to use

2:54PM 1    Transmission and used uTorrent, correct?

2           A.    UTorrent.   That is correct.

3           Q.    And Transmission was on the MacBook Pro related to

4           the commercial video, correct?

2:55PM 5    A.    Yes.

6           Q.    And we know for sure that was used by the user of the

7           MacBook Pro in 2017 for that commercial video purposes,

8           correct?

9           A.    Yes.

2:55PM 10   Q.    Kid's movie, whatever it was, correct?

11          A.    Yes.

12          Q.    I'm sorry.   And Three Amigos, correct?

13          A.    Yes.

14          Q.    And we know that qBittorrent was used on the personal

2:55PM 15   laptop, the MacBook Pro, also in 2017, to access the

16          Planes, Trains, whatever it was, correct?

17          A.    Correct.

18          Q.    So uTorrent, let's talk about that.   This is a Linux

19          operating system that uTorrent is installed on, correct?

2:55PM 20   A.    Yes.

21          Q.    UTorrent, however, is Windows-based, correct?

22          A.    UTorrent is -- what was that?

23          Q.    UTorrent is Windows-based?

24          A.    It's Windows-based.   It's a Windows 32 application,

2:56PM 25   correct.   It's a Windows 32-bit application.

2:56PM 1    Q.    Linux is different from Windows, correct?

2    A.    That is correct.

3    Q.    And in fact, one of the things that you have made

4    very clear is that there's the Windows side and the Linux

2:56PM 5    side, correct?

6    A.    That's correct.

7    Q.    So to install Windows-based software, in particular

8    uTorrent on the Linux side, somebody had to first install

9    virtualization software, correct?

2:56PM 10   A.    Yes.

11   Q.    And then after installing virtualization software,

12   can you tell from your -- let's back up.  Just so everyone

13   understands, what's virtualization software?

14   A.    Can I clarify that?  I don't think virtualization

2:56PM 15   would be the term that I would use.  I think the term I

16   would use is emulation software.  So there's -- Ubuntu has

17   this -- Linux has this thing called "Wine."  It's a

18   Windows emulation software.  So to clarify, you would have

19   to install this Windows emulator software on the Ubuntu

2:57PM 20   side in order for Windows applications to run correctly on

21   the Ubuntu partition.

22   Q.    And, in fact, essentially there's two steps.  Once

23   you're on the Linux side, if you want to -- instead of

24   using Transmission by double-clicking it, if you want to

2:57PM 25   use uTorrent, you've got to install Wine, correct?

2:57PM 1    A.    Correct.

2           Q.    So that's step one, correct?

3           A.    Yes.

4           Q.    And then once you have installed Wine, this, I think

2:57PM 5    you said emulation software?

6           A.    Yes.

7           Q.    Then you have to actually install uTorrent, correct?

8           A.    Yes.

9           Q.    How was uTorrent actually installed on the Linux

2:57PM 10   partition?

11          A.    So, again, I don't have perfect information.  It

12          appears that it would be -- there is no installer file for

13          Wine.  There's no installer file for uTorrent.  So it

14          appears to me somebody went to the App Store and did a

2:57PM 15   search for uTorrent.  They see the application and they

16          clicked on it to install the uTorrent through the App

17          Store.

18          Q.    Do you have evidence that that's actually --

19          A.    Yes, I do.  I have an exhibit that demonstrates me

2:58PM 20   doing exactly that, with this exact version of the

21          operating system.

22          Q.    That wasn't my question.  I'm asking what --

23                THE COURT:  Can I call a timeout?  It would be

24          very helpful if you, sir, let him finish his question

2:58PM 25   before you answer so that we can make a good record,

2:58PM  1    because our court reporter can't report when both people

        2    are talking at the same time.  You may proceed.

        3           MR. GELFAND:  Thank you.

        4    Q.   (BY MR. GELFAND.)  I'm not asking what you did.  I'm

2:58PM  5    asking whether there's computer forensic evidence in this

        6    case that you can point us to with specificity that tells

        7    us how uTorrent and Wine were installed on this device.

        8    And if the answer is no, the answer is no.  That's all I'm

        9    asking.

2:58PM 10    A.   The answer is, I don't have perfect information.

       11    There's no installer that you speak of, so I don't have

       12    perfect information as to how it was installed.  I know

       13    what is likely, but I don't know what's certainly

       14    installed, how it was certainly done.

2:59PM 15    Q.   In other words, you're making kind of an educated

       16    guess?

       17    A.   An experienced, educated guess.

       18    Q.   I don't want you to guess.  I want you to tell us

       19    what the facts show from your forensic analysis, correct?

2:59PM 20    Fair?

       21    A.   Yes.

       22    Q.   Now, we know that whoever installed uTorrent, based

       23    on your testimony, installed it on May 14th at

       24    approximately 5:25 p.m., correct?

2:59PM 25    A.   That sounds correct.

2:59PM 1    Q.    I believe you testified yesterday that uTorrent also
       2    has kind of a Mac-based application, correct?
       3    A.    Yes.
       4    Q.    And so whoever installed uTorrent here chose the
2:59PM 5    Windows-based application, correct?
       6    A.    Yes.
       7    Q.    Could have chosen the Mac-based application?
       8    A.    The Mac-based application on the Ubuntu?  I'm not
       9    sure if that would work.  I don't know if that would work.
3:00PM 10   Q.    By examining the uTorrent application on the Linux
       11   partition, were you able to determine how it was connected
       12   to the network?
       13   A.    No.  It was connected to the network through the
       14   network connection.  I didn't know specifically how it was
3:00PM 15   done.
       16   Q.    Meaning through the business's Wi-Fi?
       17   A.    Yeah.  Well, the HP desktop was hard-coded into the
       18   router, so it was a hard-coded connection.  I wouldn't
       19   characterize that as Wi-Fi.  I would characterize that as
3:00PM 20   a wired connection.
       21   Q.    Was it connected through a Universal Plug and Play
       22   host?
       23   A.    I don't know what you mean by that.
       24   Q.    Do you know what Universal Plug and Play is?
3:00PM 25   A.    Yes, I do.

3:00PM 1    Q.   Universal Plug and Play is a setting on a router,
       2    correct?
       3    A.   So Universal Plug and Play, there's a whole host of
       4    things associated with computers for Universal Plug and
3:00PM 5    Play.  And there's also things associated with Universal
       6    Plug and Play for a router, yes.  So both of those things
       7    are true.
       8    Q.   Universal Plug and Play leaves a computer network
       9    more vulnerable than if it's not enabled, correct, from a
3:01PM10    security standpoint?
      11    A.   I think what you're -- Universal Plug and Play
      12    port-mapping protocol.  So the port-mapping protocol
      13    leaves the router more vulnerable than if you were not
      14    using Universal Plug and Play port-mapping, correct.
3:01PM15    Q.   To be clear, when we say port-mapping Universal Plug
      16    and Play, we're talking about more vulnerable to outside
      17    intrusions, to security risks?
      18    A.   Yes.
      19    Q.   Were you able to determine, in your computer forensic
3:01PM20    examination, whether or not Universal Plug and Play was
      21    enabled in May of 2019 with respect to this network and
      22    this device?
      23    A.   No, I was not able to look at the router so I didn't
      24    have any information to analyze that.
3:01PM25    Q.   Would you agree with me that if Universal Plug and

3:01PM 1    Play was enabled, then the network on which the device was

2    accessing the internet was more vulnerable?

3    A.    Was more vulnerable?  Yes, more vulnerable than if it

4    was not.  That's a correct statement.

3:02PM 5    Q.    Now, you have identified, in Government's Exhibit 30,

6    that the videos that were played were played on a VLC

7    application, correct?

8    A.    Yes.

9    Q.    VLC is a very common video player, correct?

3:02PM10    A.    Yes.

11    Q.    Ubiquitously used, correct?

12    A.    It's very popular.

13    Q.    Perhaps one of the most popular video players

14    available, correct?

3:02PM15    A.    Probably is the most popular one, yes.

16    Q.    Literally the most popular, correct?

17    A.    I don't have information about that, but I would

18    agree with you.

19    Q.    Now, I want to show you Government's Exhibit 30.  Can

3:03PM20    you see that clearly in front of you?

21    A.    Yes, I can.

22    Q.    This is an exhibit you testified about yesterday,

23    correct?

24    A.    Yes.

3:03PM25    Q.    And what this shows us -- and there were a couple

3:03PM 1    different exhibits that basically show us the same

2    thing -- is that the videos that were played were played

3    through streaming, correct?

4    A.    It was a streaming protocol, that is correct.

3:03PM 5    Q.    And what that functionally means is that somebody

6    decided to stream these videos instead of playing them

7    locally without streaming them, correct?

8    A.    Correct.  Somebody chose to play them via the

9    streaming protocol as opposed to clicking on the file and

3:03PM10    opening it through the open file dialogue, correct.

11    Q.    Now, the streaming protocol functionally means that

12    it is played essentially through a connection that leaves

13    the HP device itself, correct?

14    A.    Say that again.  Say that.

3:04PM15    Q.    The streaming protocol means that the videos, or the

16    data that is streamed, leaves the connection of the HP

17    computer itself?

18    A.    No, I don't agree with that statement.

19    Q.    So your statement is that the data that is streamed

3:04PM20    on the HP computer, even though it's streamed as opposed

21    to just double-clicked, stays in the HP computer and

22    doesn't in any way travel through any sort of local access

23    network or internet connection?

24    A.    Yes, that is correct.

3:04PM25    Q.    That's your testimony?

3:04PM 1    A.    Yes, it is.

       2    Q.    So why stream?

       3    A.    I don't know.  That's an option.  I don't know why

       4    the person chose the streaming protocol.  There's many

3:04PM 5    ways that can do it, but it's just one that was chosen.

       6    It's certainly -- I don't have perfect information.

       7    uTorrent supports streaming.  VLC supports streaming.  So

       8    it's just as simple as copy and paste from uTorrent.  You

       9    copy in uTorrent and you paste into VLC.  It's as simple

3:05PM 10   as a copy and paste.  It could be as simple as that.

       11   Q.    Streaming requires configuration, correct?

       12   A.    What do you mean by that?  It's configured by

       13   default.  I don't understand what you mean by it requires

       14   configuration.

3:05PM 15   Q.    Your testimony is that streaming does not require

       16   configuration using the VLC platform?

       17   A.    My testimony is that I can use VLC.  I download a

       18   video.  I can choose right mouse click, stream.  Go into

       19   VLC, choose paste, and the movie starts playing.

3:05PM 20   Q.    You testified yesterday that that would basically lag

       21   because of buffering compared to just opening it locally,

       22   correct?

       23   A.    I don't know the answer to that.  The answer is both

       24   of these are efficient streaming protocols.  I don't know

3:06PM 25   which one is more efficient than the other.  Both of these

3:06PM 1 ways are certainly ways of viewing the same content.

2 Q. What's the default if you just double-click on the

3 file?

4 A. Just to open the file.

3:06PM 5 Q. As opposed to streaming?

6 A. Correct.

7 Q. Now, streaming means that data at one physical

8 location can be accessed by a user at a different

9 location, correct?

3:06PM10 A. Generally speaking, that is a true statement.  But it

11 also means that the two destinations are the same.  The

12 place that I'm streaming it from and the place that I'm

13 viewing it is the same computer.  That possibility exists

14 as well.

3:06PM15 Q. Hold on for a second.  I appreciate that.  You have

16 testified about one possibility.  I'm asking you about

17 another.

18   Streaming means that data at one physical location

19 can be accessed by a user at a different location,

3:07PM20 correct?

21 A. Yes, that is correct.

22 Q. In fact, let me ask you point-blank.  From a computer

23 forensic standpoint, can you rule out the possibility that

24 these files were streamed from this HP computer to another

3:07PM25 device?

3:07PM 1    A.    There's forensic evidence that the videos were played

2    locally through the streaming protocol.  I'm not sure if I

3    understand your question comprehensively.

4    Q.    Can you rule out, from a computer forensic standpoint

3:07PM 5    from the evidence, that these videos were not

6    accessible -- meaning streamed -- to another device?

7    A.    The answer to that question is, by default, the

8    Ubuntu operating system doesn't come with the streaming

9    service to stream videos.  So I would -- without having

3:08PM 10   perfect information, I would say that's false.  In order

11   for that to happen, there would need to be streaming

12   software installed on the Ubuntu Linux partition in order

13   for it to stream movies.  So that doesn't happen for free.

14   It may happen built in, but there needs to be software

3:08PM 15   that provides that streaming service.  It's not just

16   magical.  There has to be a service that's running to

17   stream videos.

18   Q.    UTorrent streaming?

19   A.    Say that again.

3:08PM 20   Q.    UTorrent streaming?

21   A.    UTorrent streaming.

22   Q.    That streams the videos, according to your testimony?

23   A.    Yes.

24   Q.    Can you rule out the possibility that those streamed

3:08PM 25   videos were accessible by another device?

3:08PM 1   A.    Yeah, I have no evidence to show that.  I have no
2   evidence about that.
3   Q.    Do you have evidence that rules out that possibility?
4   A.    I have no evidence that those videos were streamed to
3:09PM 5   another device.  I think that's what I'm trying to say.
6   No evidence that I was able to see that those videos were
7   streamed outside of this device.
8   Q.    I'm not trying to be difficult, but you're answering
9   kind of the opposite of the question I'm asking you.
3:09PM10   You're saying, I have no evidence that it was streamed to
11   another device.  I'm asking you whether you have evidence
12   that it wasn't?
13   A.    No, I don't have perfect information.  I don't have
14   evidence associated with that.
3:09PM15   Q.    Now, is it possible to restart a computer remotely?
16   A.    Yes, it is.
17   Q.    Is it possible to restart a computer remotely and get
18   back into the operating system that was last running?
19   A.    Yes.
3:09PM20   Q.    The point here is, one does not need a physical
21   button to restart a dual-booted computer, correct?
22   A.    When you restart a dual-booted computer, you hit the
23   restart command, the computer reboots.  Now the operating
24   system is no longer running.  You're relying on the BIOS.
3:10PM25   The BIOS on the computer tells the computer what operating

3:10PM 1    system to boot.  That is either the Windows partition or

2    the Linux partition.  Whatever the machine was configured

3    to boot, that's the one that it's going to boot by

4    default.  I'm not familiar with the ability to remotely

3:10PM 5    reboot a computer and tell it to boot off of another

6    partition.  I'm just probably not familiar with that.

7    Q.   You said BIOS.  That's the Basic Input/Output System,

8    correct?

9    A.   Yes.

3:10PM 10   Q.   The BIOS would tell us whether it would default to

11   Windows or Linux on a reboot, correct?

12   A.   Yes.

13   Q.   Did you check the BIOS here?

14   A.   No.

3:11PM 15   Q.   What that means is, you don't know what the boot

16   order is for the BIOS, correct?

17   A.   The evidence that I have, the multiple times the

18   computer was rebooted, it's booting up under the Windows

19   environment.

3:11PM 20   Q.   That wasn't my question.  You don't know what the

21   boot order is if you don't check the BIOS, correct?

22   A.   Correct.

23   Q.   As a computer forensic analyst, you have access to

24   the BIOS?

3:11PM 25   A.   Well, BIOS is on the physical computer itself.  I did

3:11PM 1    not have access to the physical computer.  I only had

2    access to the forensic image that was created.

3    Q.    Now, we have used this term "reboot," kind of a fancy

4    way of saying turning an operating system off and

3:11PM 5    restarting it again?

6    A.    Yes.

7    Q.    Sometimes users are essentially prompted to reboot to

8    install an update or something like that, correct?

9    A.    Yes.

3:12PM10   Q.    Operating systems, including Linux, can be rebooted

11    remotely, correct?

12    A.    Yes.

13    Q.    Now, you testified this morning about various

14    thumbnail images, correct?

3:12PM15   A.    Yes.

16    Q.    The thumbnails in this case you testified you went to

17    because the files themselves, the alleged child

18    pornography files, were deleted, correct?

19    A.    Yes.

3:12PM20   Q.    When were they deleted?

21    A.    I don't have the forensic artifacts to reflect that.

22    Q.    You don't know when the files were deleted?

23    A.    Yes.

24    Q.    When was the trash emptied?

3:12PM25   A.    I don't recall.

3:13 PM 1   Q.    You don't know?

2   A.    Don't know.

3   Q.    Would you agree with me that that's important

4   information, evidence, to find in a computer forensic

3:13 PM 5   analysis?

6   A.    No, not particularly.  I don't agree with you.

7   Q.    So you're investigating a case where everything

8   happens, based on your testimony, over about two and a

9   half, three days, correct?

3:13 PM 10   A.    Yes.

11   Q.    Your testimony is that files are downloaded, for lack

12   of a better way of saying it, on the TOR network and

13   BitTorrent, correct?

14   A.    Correct.

3:13 PM 15   Q.    And then they are totally gone when the device is

16   seized, correct?

17   A.    Yes.

18   Q.    But you don't want to know, from a computer forensic

19   analysis standpoint, when they are deleted?

3:13 PM 20   A.    No.  So they're deleted.  And so the answer is, like,

21   the recycle bin is a constraint.  It's not really a

22   recycle bin.  When files are deleted, they are just moved

23   into the recycle bin, so they are still in a file, in a

24   file system that exists completely, and I would have found

3:14 PM 25   them if they were in the recycle bin.  So they are not in

3:14 PM 1   the recycle bin.  And the fact that the recycle bin has

2   been emptied doesn't give me any more forensically useful

3   artifact.  The file either exists at the time it was

4   seized or it doesn't exist at the time that it was seized.

3:14 PM 5   And it was not in the recycle bin at the time it was

6   seized.

7   Q.    Wouldn't the records of when a file is deleted

8   provide information that we don't have?

9   A.    So the reason I don't really focus on that is because

3:14 PM 10  it's going to keep track of other things that are deleted

11  and other things that are not really significant to me.

12  So I just don't really spend much time worrying about

13  dates and times in the recycle bin.

14  Q.    Now, you testified about remote access.  And you were

3:15 PM 15  asked whether it fits the pattern in this case, correct?

16  A.    Yes.

17  Q.    Let's start simple for a second.  You didn't

18  personally author any expert reports in this case,

19  correct?

3:15 PM 20  A.    No.

21  Q.    You essentially adopted or supervised a couple of

22  expert reports written by someone, Bradley Gordon, who

23  worked under you, correct?

24  A.    Yes.

3:15 PM 25  Q.    You have reviewed those expert reports, correct?

3:15PM 1    A.    Yes, I did.

2    Q.    You would agree with me that there's not a single

3    reference in any of your expert reports to remote access,

4    correct?

3:15PM 5    A.    Correct.

6    Q.    You testified that in your expert opinion this

7    morning, that what we see here in this case doesn't fit

8    the pattern of remote access, correct?

9    A.    Yes.

3:15PM10    Q.    Would you agree with me that having a desktop tool on

11    the Ubuntu Linux side of the partition called Remmina is

12    consistent with a pattern of remote access?

13    A.    It possibly could be.  Possibly could be, but there

14    would be forensic log records associated with that.

3:16PM15    Q.    You testified a few minutes ago you didn't know what

16    this is?

17    A.    Correct, but there would be -- I certainly look in

18    the log folder and all of the log files that were created.

19    That's where the operating system stores log files.  I

3:16PM20    certainly reviewed them.  I didn't see Remmina, whatever

21    the name, Remmina logs in there.  That's why it was not

22    familiar with me.

23    Q.    So let's back up for a second.  I just asked you

24    whether -- and I think you said yes -- whether having a

3:16PM25    remote access app would be consistent with remote access?

3:16PM 1    A.    Say that again.

2    Q.    I asked you whether having a remote access app would

3    be consistent with remote access.  And I believe you said

4    yes.

3:16PM 5    A.    Yes.

6    Q.    Would having UPnP enabled be consistent -- meaning

7    Universal Plug and Play -- be consistent with remote

8    access?

9    A.    I don't know the answer to that.

3:17PM 10   Q.    Would evaluating the router and determining, like you

11   testified this morning, whether any other devices were on

12   the network that this device was on help you answer

13   questions about remote access?

14   A.    It might provide more information, but -- it might

3:17PM 15   provide more information, yes.

16   Q.    Would choosing to have an extremely small partition,

17   meaning you can't save a lot of files, meaning video, big

18   data, heavy files, be consistent with a remote access

19   user?

3:17PM 20   A.    I don't know the answer to that.

21   Q.    Would streaming as opposed to just double-clicking

22   and opening it be consistent with remote access?

23   A.    I don't think so, because what's the point of

24   streaming it if I'm not really there?  The point of

3:17PM 25   viewing the video is if I'm sitting in front of the

3:18PM 1   computer screen.  What would be the point of remotely

2   streaming the video?  That's a very inefficient way to

3   watch a movie.  That would be slow.  When you're using

4   VLC, you are sitting at the computer viewing a video.

3:18PM 5   Q.   Would deleting all of these files less than a minute

6   after the last one is streamed be consistent with remote

7   access?

8   A.   I don't think so, no.  I'm not sure what the

9   correlation is.

3:18PM 10   Q.   Do you recall this morning testifying about some

11   passwords that you were able to identify off of your

12   computer forensics?

13   A.   Yes.

14          THE COURT:  Mr. Gelfand, I've been looking for an

3:18PM 15   opportunity to take the afternoon recess.  I don't want to

16   interrupt your flow.  Is this a good point?

17          MR. GELFAND:  It is, Your Honor.

18          THE COURT:  We will take our afternoon recess at

19   this time for 20 minutes.  So if you would be ready to

3:19PM 20   come back out at 3:40, that's when we will call for you.

21          Would everyone please stand as the Jury is in

22   recess.  As the Jury is filing out, I will remind you of

23   the recess instruction.  Do not talk about the case with

24   your fellow jurors or with anyone else.

3:19PM 25          (Jury out at 3:19 p.m.)

3:19PM 1               THE COURT:  We're in recess until 3:40.

2               (Recess taken from 3:21 p.m to 3:42 p.m.)

3               (Jury in at 3:42 p.m.)

4               THE COURT:  You may be seated.  Mr. Gelfand, you

3:42PM 5 may continue your inquiry.

6               MR. GELFAND:  Thank you.

7  Q.  (BY MR. GELFAND.)  Mr. Fottrell, just before the

8 break, you were referencing something called Wine files,

9 correct, or Wine?

3:42PM10  A.  Yes.

11  Q.  I'm going to show you Government's Exhibit 34.  Do

12 you recognize Exhibit 34?

13  A.  Yes, I do.

14  Q.  If we look at the uTorrent data at the bottom.  You

3:43PM15 created this exhibit, correct?

16  A.  Yes.

17  Q.  Does the .wine reference the -- you had a different

18 word for it -- but virtualization or emulation?

19  A.  Windows emulation.

3:43PM20  Q.  Is that what that's referenced in that exhibit?

21  A.  Yes.

22  Q.  And, in fact, all of the uTorrent evidence in this

23 case involved that Wine process, correct?

24  A.  Yes.

3:43PM25  Q.  Because it had to because it involved uTorrent as the

3:43PM 1  software application, correct?

2  A.   Yes.

3  Q.   Now, you testified about the MacBook, and I'm going

4  to show you --

3:44PM 5           MR. GELFAND:   If I may publish portions of

6  Government Exhibit 61, Your Honor.

7           THE COURT:   That's fine.

8  Q.   (BY MR. GELFAND.)   Just to show the top page.  Does

9  61 reference essentially your view, if you will, of the

3:44PM10  MacBook?

11  A.   Yes.

12  Q.   Like the other virtualization exhibits that you

13  testified about involving the HP, the MacBook also, as a

14  practical matter, involved you going back to it at

3:44PM15  different days, correct?

16  A.   Yes.

17  Q.   I want to show you in particular, cutting to the

18  chase, one of the pages that you reference where it says,

19  "open recent" in the VLC Media Player here?

3:44PM20  A.   Yes.

21  Q.   When we looked at the similar screen in the VLC Media

22  Player on the HP that you just testified about, the file

23  names indicated that it was streamed, correct?

24  A.   Yes.

3:45PM25  Q.   This file references the Planes, Fire & Rescue, the

3:45PM 1    kid's movie, correct?

2    A.    Say that again.

3    Q.    This references Planes, Fire & Rescue, the kid's

4    movie, correct?

3:45PM 5    A.    Yes, it does.

6    Q.    We can tell from your exhibit here that that was not

7    streamed on the MacBook personal laptop, correct?

8    A.    That's correct.

9    Q.    Instead of being streamed on the personal laptop, the

3:45PM 10   user just double-clicked on Planes, Fire & Rescue and

11   that's what was played, correct?

12   A.    Correct.

13   Q.    Even though there was a streaming exporting wizard as

14   an option, correct?

3:45PM 15   A.    Correct.

16   Q.    Now, you testified about a number of passwords that

17   you identified from various sources of your forensic

18   evaluation, correct?

19   A.    Correct.  From the Google Chrome saved password

3:46PM 20   manager, correct.

21   Q.    Among other places.  E-mails too, correct?

22   A.    Yes.  From Apple Notes and other locations, that is

23   correct.

24   Q.    And let's call it what it is.  You were looking for

3:46PM 25   the Intel 1988 password or any variation of it, correct?

3:46PM 1    A.    Correct.

2    Q.    And you found that that password was ubiquitously

3    used in a number of different accounts, correct?

4    A.    Yes.

3:46PM 5    Q.    So, for example, continuing to show you portions of

6    the laptop, it's tied to Arvest, correct?

7    A.    Yes.

8    Q.    It's tied to eBay, correct?

9    A.    Correct.  Intel 1988, exclamation mark.

3:47PM10    Q.    Tied to Strategic Group 1?

11    A.    That would be the user name, the log-in to the eBay

12    site.  That would be correct.

13    Q.    Yes.  And the eBay site password is Intel 1988, in

14    this case with an exclamation point, correct?

3:47PM15    A.    Yes.

16    Q.    And just to be clear, give us some time context.  Is

17    this what is saved as of the date that the device is

18    seized?

19    A.    Yes.  So I don't know when the Google Chrome

3:47PM20    initially saved that password, but what's stored on the

21    device is the password database and that is what was in

22    the password database at the point it was seized.

23    Q.    So as of November 8th, 2019, approximately when it

24    was imaged, these were the passwords that were on the

3:47PM25    device, but you can't tell us what passwords were or were

3:47PM 1    not on the device or otherwise in use at any other time,

     2    correct?

     3    A.    Yes.

     4    Q.    We go to the next page of this, you called it the

3:47PM 5    password manager?

     6    A.    Yes.

     7    Q.    Naturalstateeco, correct?

     8    A.    Yes.

     9    Q.    Referencing business and contracts, also Intel 1988

3:48PM10    with an exclamation point, correct?

    11    A.    Yes.

    12    Q.    Go to the next page.  The bottom of the page,

    13    there's, if you remember, motion hosting?

    14    A.    Yeah.

3:48PM15    Q.    Tied to wholesaleNWA.com, correct?

    16    A.    Yes.

    17    Q.    And then you also pulled a number of e-mails by

    18    essentially searching the search term of -- I'm sorry, not

    19    e-mails -- of Note files by using that same search term,

3:49PM20    "Intel 1988," correct?

    21    A.    Yes.

    22    Q.    So in that same exhibit, that's what we're looking at

    23    here, correct?

    24    A.    Yes.

3:49PM25    Q.    And this references wholesaleNWA@gmail.com, correct?

3:49PM 1    A.    Yes.

2    Q.    And the password Intel 1988, correct?

3    A.    Yes, it does.

4    Q.    And the date on this is April 24th of 2018, correct?

3:49PM 5    A.    Correct, at 3:27 p.m.

6    Q.    In fact, this references a GovDeals note, correct?

7    A.    Yes.

8    Q.    With the same password, going all the way back,

9    April 10th, 2015, I'll give you the time-stamp, at

3:50PM10    10:02 p.m., correct?

11    A.    Yes.

12    Q.    GovDeals is a government website, correct?

13    A.    Say that again.

14    Q.    GovDeals is a government website, correct?

3:50PM15    A.    I don't know the answer to that.  I don't know.

16    Q.    You don't know what it is?

17    A.    I'm not familiar with it.

18    Q.    Then you identified, going back to October 6th of

19    2014, a championNWA account with password Intel 1988,

3:50PM20    correct?

21    A.    Yes.

22    Q.    Now, we looked a few minutes ago when I was showing

23    you the passwords at Arvest, do you recall that?  I can

24    show you again if you don't.

3:50PM25    A.    Yes, I recall that.

3:50PM 1    Q.    I am going to show you Defendant's Exhibit 25.  You

2    identified this exhibit earlier when we were talking in

3    the context about the router that you never searched,

4    correct?

3:51PM 5    A.    Yes.

6    Q.    Right next to the router, do you see Arvest Banking

7    information for the business?

8    A.    Yes, I see an account number.  I see Wholesale Motors

9    account, correct.

3:51PM 10   Q.    Literally on a sticky note on the wall?

11   A.    Correct.

12   Q.    You also introduced some e-mails with the password,

13   Government Exhibit 64, correct?

14   A.    Yes.

3:51PM 15   Q.    Show you some of those.  Do you see Exhibit 64 in

16   front of you, sir?

17   A.    I do.

18   Q.    You were asked about a couple of these.  Can you tell

19   us the date on this top e-mail?

3:51PM 20   A.    The date of this message is February 13th, 2014.

21   Q.    And does this appear to say that's the password for

22   the Duggar family Instagram account?

23   A.    Yes, it does.

24   Q.    And we know that because it's literally forwarding an

3:52PM 25   Instagram password change, correct?

3:52PM 1   A.    Yes.

2   Q.    If we go to the next page, that may be duplicative.

3   February 13th of 2014, correct?

4   A.    Yes.

3:52PM 5   Q.    And this is the password for the Duggar family

6   Twitter account, correct?

7   A.    Yes.

8   Q.    And we know that because there's a Twitter forwarded

9   e-mail reflecting a change of password, correct?

3:52PM10   A.    Yes.

11   Q.    April 17th of 2014, there's a password for a USAePay

12   app, correct?

13   A.    Yes.

14   Q.    Are you aware that that's a credit card processor

3:53PM15   that Wholesale used?

16   A.    I'm not familiar with that website, or that

17   organization.

18   Q.    Did you investigate that at all in connection with

19   your investigation?

3:53PM20   A.    No, I did not.

21   Q.    Then towards the end of this, can you tell me the

22   date of this e-mail?

23   A.    On November 11th, 2014, at 11:16 a.m.

24   Q.    From Josh Duggar at a work, at the time, e-mail

3:53PM25   account, correct?

3:53 PM 1   A.   Yes.

2   Q.   Referencing a Paul Ryan account with that same

3   password, correct?

4   A.   Yes.

3:53 PM 5   Q.   Who is Paul Ryan?

6   A.   He's a Representative of Congress.

7   Q.   Former Vice Presidential candidate?

8   A.   Yes.

9   Q.   Then February 20th of 2015, different account, same

3:54 PM 10   password, correct?

11   A.   Yes.

12   Q.   Fair to say that, based on your computer forensic

13   investigation, this password was ubiquitously used and

14   sent to a ton of different people going all the way back

3:54 PM 15   to 2014?

16   A.   Yes, it was.  It was definitely a password that he

17   was familiar with using going back for many number of

18   years.

19   Q.   And your research reflected dates of 2014, 2015,

3:54 PM 20   2017, and 2018, correct?

21   A.   Yes.

22   Q.   Perhaps among others, correct?

23   A.   Correct.

24   Q.   Now, you also testified about some images located on

3:55 PM 25   the MacBook in the backup file, correct?

3:55PM 1   A.   Yes, I did.

2   Q.   So let's be very precise for a second.  There was a

3   phone that you actually did a forensic, or had a forensic

4   image of that was an iPhone 11, correct?

3:55PM 5   A.   Correct.

6   Q.   And as you understand it, that was the phone

7   physically seized by Homeland Security agents on

8   November 8th of 2019, correct?

9   A.   That is correct.

3:55PM10   Q.   Then there were also images and text messages, in

11   essence, that you're associating with a phone, but it's

12   actually of an earlier version of an iPhone, correct?

13   A.   Correct, an iPhone 8.

14   Q.   And the iPhone 8 itself is not something that you

3:56PM15   have ever analyzed, because it was an old phone, correct?

16   A.   Correct.  Law enforcement never seized an iPhone 8.

17   We just have the forensic evidence that an iPhone 8

18   previously existed by the presence of the backup files on

19   the Macintosh.

3:56PM20   Q.   So to be clear, just to cut to the chase, you're

21   looking in the MacBook backup file for backup files

22   related to the earlier iPhone 8, correct?

23   A.   That is correct.

24   Q.   Which provides you more limited information about the

3:56PM25   data on that phone than the phone itself would, correct?

A.    Yes.

Q.    So, for example, to determine whether at any given time the phone, date, and time were accurate, you would actually have to have the phone, correct?

A.    No.  I mean, most modern phones automatically synchronize with a clock and they are accurate.  I mean, when I travel here from the Eastern Time Zone to the Central Time Zone, my iPhone automatically corrects to the correct time zone.  I have not seen any instances where an iPhone that has connectivity to the internet and has connectivity to the cellular network is off by any significant amount of time.  Clocks and phones are generally very reliable.

Q.    Are devices synchronized in time to each other?

A.    Devices are synchronized to a reference clock.

Q.    In other words, a MacBook or an HP may have a time or a date that's different from a phone, correct?

A.    I don't understand the question.

Q.    Sure.  My iPhone can say that it's 3:58 p.m.  My HP can say that it's 3:56 p.m.

A.    Correct.  Two computers, two watches, can have different times on them.  If that's the statement that you're making, yes, it's possible for two devices to have different dates and times.

Q.    And what you're doing is basically relying on date

3:58PM 1  and time data that's extracted from the device that the

2  data came from, correct?

3  A.   Correct.

4  Q.   So if an image came from an iPhone 8, you are relying

3:58PM 5  on the date and time info that comes off that image,

6  correct?

7  A.   Correct.  I'm relying on the EXIF information

8  associated with that image.  It records the date and time

9  that the image was taken.  That depends on the accuracy of

3:58PM10  that iPhone 8.

11  Q.   And if you are taking a BitTorrent record, for

12  example, and the EXIF data that you testified about,

13  that's not being populated from the same clock as the

14  phone, that's being populated from, for example, the HP

3:58PM15  computer that it came from, correct?

16  A.   Correct.

17  Q.   Now, as a practical matter, an image in the iPhone 8

18  backup can come as an SMS attachment, correct?

19  A.   It is possible to attach an image to an SMS message.

3:58PM20  Q.   It can be something saved online, like a selfie on

21  social media or something?

22  A.   Yes, you can take a picture and then upload that

23  picture to social media.  That's certainly possible.

24  Q.   And what you can do from the backup is basically, and

3:59PM25  what you testified to this morning, is identify an image

3:59PM 1    and pull what, in your opinion at least, is the EXIF data,

2    correct?

3    A.    Yes.

4    Q.    And that's what you walked through this morning with

3:59PM 5    respect to certain images, correct?

6    A.    Yes.

7    Q.    Let me show you, just by way of example, Government's

8    Exhibit 76.  Do you recognize this as one of the images --

9    A.    Yes, I do.

3:59PM10    Q.    -- that you testified about?

11    A.    Yes, I do.

12    Q.    Start simple for a second.  Have you ever been to the

13    location where Wholesale Motorcars was in 2019?

14    A.    No.

3:59PM15    Q.    Have you ever been to Champion Motorcars?

16    A.    No.

17    Q.    Have you ever been to that area of Arkansas?

18    A.    No.

19    Q.    The geolocation on this, just so we're clear, this is

4:00PM20    the top page of 76.  It's a fire truck picture, right?

21    A.    Yes.

22    Q.    Fair description?

23    A.    Yes.

24    Q.    And we know this came from the iPhone 8 backup

4:00PM25    because it actually came from your computer as designated

4:00PM 1    by the H:Duggar-iPhone-backup, correct?

2    A.   Yes.

3    Q.   In other words, that folder path is actually just how

4    this was saved on your computer, correct?

4:00PM 5    A.   That is correct.

6    Q.   At work, correct?

7    A.   Yes.

8    Q.   What does "Source, this PC" mean?

9    A.   The file is physically located on my forensics

4:00PM 10   computer in that folder when I viewed it and displayed the

11   GPS coordinates.

12   Q.   Can you tell me where that geolocates to?

13   A.   So it's in Arkansas.  I'm very familiar with -- I've

14   been looking at this map now for a few months.  This over

4:00PM 15   here on this is pretty much close to where the car lot is.

16   And this is where there's a repair shop, S&S Auto around

17   the corner.  So it's -- I don't know exactly the distance,

18   but it's a little bit east of the car lot.

19   Q.   Approximately how many miles?

4:01PM 20   A.   I don't know the answer to that, but it's got to be a

21   few miles.  I can't imagine it being more than two or

22   three miles.  I just don't know specifically, but it's not

23   going to be 50 miles away.  It's going to be a mile or

24   two, or a few miles away.

4:01PM 25   Q.   How precise is the geolocation data on the records

4:01PM 1  that you introduced into evidence?

2  A.   So it has the ability to zoom in.  So the answer is,

3  I could move my mouse there and zoom in and it would give

4  me more detail.  I was playing around with that to zoom

4:01PM 5  in, to zoom out, to make it an effective exhibit to show

6  where it's located.  The tool has the ability to zoom in

7  and zoom out to a higher degree of accuracy.  I was just

8  trying to convey the location that was significant in this

9  case.

4:02PM 10  Q.   So I don't know the answer to my question, but how

11  precise is geolocation data?

12  A.   So generally speaking, when it's an outside photo,

13  it's probably 10 meters.  It could be -- it's pretty --

14  you know, 20 feet in diameter.  They can be pretty

4:02PM 15  accurate.  Depending on the cell phone coverage and

16  nearest cell phone towers and a couple of other factors,

17  these could be pretty accurate locations.

18  Q.   Was this taken at Champion Motorcars?

19  A.   I don't know.

4:02PM 20  Q.   You testified earlier about the tool that you're

21  using here in all of these exhibits.  And I can show you

22  more, but I think you will agree it's the same tool,

23  correct?

24  A.   It's a?

4:02PM 25  Q.   The same tool, correct?

4:02PM 1   A.   Same tool, correct.

2   Q.   And that's Windows image viewer, correct?

3   A.   It's Windows Photo Viewer.  It says "Photos" is the

4   name of the application.

4:03PM 5   Q.   Windows Photo Viewer?

6   A.   Yes.

7   Q.   You testified this is not a computer forensic tool,

8   correct?

9   A.   This is a general purpose tool that anybody can use

4:03PM 10   on a Windows operating system.

11   Q.   When it comes to EXIF data, that's a term of art,

12   E-X-I-F, correct?

13   A.   It's a term that describes what that information is,

14   yes.

4:03PM 15   Q.   There are forensic tools that one can get certified

16   in to actually extract specific EXIF data, correct?

17   A.   Correct.

18   Q.   Those forensic tools that one can use to extract EXIF

19   data will identify specific dates and times as it relates

4:03PM 20   to UTC, correct?

21   A.   Correct.  Yeah, depending on the device, it would

22   store it in the local time zone or it would store it in

23   the UTC.  But, correct, it's going to store date and

24   time-stamp information according to some standard.

4:04PM 25   Q.   UTC is the common standard when it comes to

4:04 PM 1    time-stamps in computer forensics, correct?

2    A.    Generally speaking, yes.

3    Q.    Because it's universal.   In other words, it's adapted

4    based on where you are with time zones, daylight saving's

4:04 PM 5    times, correct?

6    A.    Yes.

7    Q.    And when you're dealing with time-stamping based on

8    metadata, it's important that everyone is on the same page

9    from a consistency standpoint, talking about the date and

4:04 PM 10   time as it existed at any particular time and location

11   based on time zone, daylight savings, et cetera, correct?

12   A.    Yes.

13   Q.    The photographs that are date and time-stamped that

14   were introduced into evidence does not have any of the

4:04 PM 15   forensic UTC data that a forensic tool would actually

16   provide, correct?

17   A.    No.   This just has the -- from the Windows Photo

18   program how Windows Photo displayed it in the current time

19   zone that it was taken in.

4:05 PM 20   Q.    Now, to be clear, Cellebrite is one tool that could

21   be used to extract EXIF data?

22   A.    Yes.

23   Q.    EnCase can be used to extract EXIF data?

24   A.    Yes.

4:05 PM 25   Q.    There are a number of other forensic tools that can

4:05PM 1    be used to extract EXIF data, correct?

2    A.    Yes.

3    Q.    You testified -- and I can show you if you want --

4    but to some text messages where there was someone on the

4:05PM 5    other end entitled, "To be salesman."  Do you recall that?

6    A.    Yes, I do.

7    Q.    Yes, you do?

8    A.    Yes, I recall.

9    Q.    Who was that?

4:05PM 10    A.    I don't know.

11    Q.    Now, two more topics.  One is super quick.

12    Defendant's Exhibit 29.  Do you see that in front of you?

13    A.    Yes, I do.

14    Q.    Did you ever forensically analyze this phone?

4:06PM 15    A.    No, I did not.

16    Q.    Do you have any clue what was on this phone?

17    A.    No.

18    Q.    Any clue whose phone it is?

19    A.    No.

4:06PM 20    Q.    Did you ever forensically analyze a phone belonging

21    to Randall Berry?

22    A.    No, I did not.

23    Q.    Did you ever analyze a phone belonging to William

24    Mize?

4:06PM 25    A.    William, what was the last name?

4:06PM  1    Q.    Mize.

        2    A.    No.

        3    Q.    Did you ever analyze any devices belonging to Caleb

        4    Williams or anyone -- well, Caleb Williams first.

4:06PM  5    A.    No.

        6    Q.    Did you ever analyze any devices belonging to anyone

        7    on earth in this case other than Josh Duggar and Wholesale

        8    Motorcars?

        9    A.    No.  Those are the devices that I -- the devices I

4:07PM 10    analyzed were the HP desktop, the MacBook, and the iPhone.

       11    Q.    So sitting here today, can you tell us one way or the

       12    other whether the UK Cardiff PowerPoint is on a device

       13    belonging to any of those people?

       14    A.    I can't tell you that.

4:07PM 15    Q.    Because you didn't look, correct?

       16    A.    I didn't have access to that, correct.

       17    Q.    Now, let me ask you this.  This phone, Defendant's

       18    Exhibit 29, does this appear to be in a drawer?

       19    A.    Yes, it does.

4:07PM 20    Q.    Are you aware that this was a drawer literally next

       21    to the HP?

       22    A.    Next to the HP?  No, I'm not aware of that.

       23    Q.    If you were on site on November 8th of 2019, would

       24    you have imaged this?

4:07PM 25    A.    I would have certainly previewed it.  I would have

4:07PM 1  looked at it.  I would have tried to make -- just as the
      2  agents would have done, I would have made a determination,
      3  is this something I need to seize or something that I can
      4  clear and leave behind.  I don't have -- I would do that
4:08PM 5  in any on-scene experience.
      6  Q.   But nobody asked you in this case, correct?
      7  A.   I was not on the on-scene in this case.
      8  Q.   Now, finally, you testified about a number of Torrent
      9  files.  Do you recall that?
4:08PM10  A.   Yes.
     11  Q.   Now, you used an analogy, I believe it was of a cake?
     12  A.   Yes.
     13  Q.   A Torrent file, to use your analogy, is basically a
     14  recipe, but not the ingredients for the cake, correct?
4:08PM15  A.   Correct.  So the Torrent file is just like a recipe.
     16  If I follow the instructions in the recipe and gather the
     17  ingredients, the end product, I will have a cake.  With a
     18  Torrent file, if I -- if the uTorrent program -- not a
     19  baker -- if the uTorrent program looks at the information
4:08PM20  in that Torrent file, it has the information it needs to
     21  go out onto the BitTorrent network and fetch the files
     22  consisted of that video.  And so that's why I use that
     23  analogy.  It's just a way of getting the content specified
     24  in a Torrent file.  The Torrent file is not the cake.  You
4:09PM25  can't eat a Torrent file.  You can't eat a recipe.  You

```
4:09PM  1   have to eat the cake.  That's what the recipe allows you
        2   to make, is the cake.
        3   Q.   A device can have a Torrent file without having the
        4   cake, correct?
4:09PM  5   A.   Say that again.
        6   Q.   A device can have a Torrent file without having the
        7   cake, correct?
        8   A.   Vice?  A device?  Say that again.
        9   Q.   A device can have evidence of a Torrent without
4:09PM 10   having the cake?
       11   A.   Ah, bingo, yes.  Oh, yes.  Yes, the device can have
       12   the Torrent file, but it doesn't have the contents of that
       13   Torrent file.
       14   Q.   In other words, having a Torrent file is not the same
4:09PM 15   as having the contents of that file, correct?
       16   A.   That is correct.
       17   Q.   If a Torrent file is connected to pornography, child
       18   pornography, whatever it may be, having the Torrent file
       19   is not the same as having pornography or child
4:09PM 20   pornography, correct?
       21   A.   That is correct.
       22   Q.   On this particular device, the HP, you found
       23   artifacts of Torrent files, correct?
       24   A.   Yes.
4:10PM 25   Q.   But in some cases, the files themselves were not able
```

4:10PM 1  to be located on the device, correct?

2  A.   Yes.

3  Q.   And, in fact, you were in court yesterday when the

4  Jury saw a number of those files, correct?

4:10PM 5  A.   Yes.

6  Q.   What you called storyboards that you created,

7  correct?

8  A.   Yes.

9  Q.   And to be clear, you went into videos and you picked

4:10PM10  images to basically go onto those storyboards, X number

11  per page, and you created essentially a synopsis of what

12  was on the videos, correct?

13  A.   Yes.  There's tools that automate that process, but,

14  yes.

4:10PM15  Q.   But let's be clear about something.  The files that

16  we're talking about, the category of Torrent files where

17  you basically took hash values, but didn't actually find

18  the videos on the HP, you went to your database to get

19  those images, correct?

4:11PM20  A.   Yes.

21  Q.   For lack of a better way of putting it, you brought

22  that alleged child pornography from Washington, D.C., to

23  this courtroom, correct?

24  A.   Yes.

4:11PM25  Q.   It didn't come from any device that was seized in

4:11PM 1   evidence, correct?

2   A.   I used those images, those videos, to match

3   thumbnails that existed on the defendant's HP computer.

4   Those thumbnails, the existence of those thumbnails could

4:11PM 5   only happen if the underlying file existed.  There is

6   evidence that those videos existed on the defendant's

7   computer at an earlier time at the time when those

8   thumbnails were created.  At a later time, they were

9   deleted and they were not on the defendant's computer.

4:12PM 10   But the existence of the thumbnails is evidence that the

11   videos existed at the point in time that the thumbnails

12   were created.

13   Q.   I understand your process, but my question is very

14   simple.  The actual images and videos that were played

4:12PM 15   yesterday related to these Torrent files came from

16   somewhere other than the devices in evidence?

17   A.   So with respect to the video, you are correct.  But

18   with respect to the marissa.zip Torrent file that we were

19   talking about, we do have the full-size versions of those

4:12PM 20   images, of some of those other images that I was able to

21   recover from unallocated space.  So if you look at the

22   unallocated space exhibit that matched the normal folder,

23   and then the other images on unallocated space, those are

24   images consistent with ones that are in the marissa.zip

4:12PM 25   file.

4:12PM 1    Q.    You testified yesterday, Mr. Fottrell, that you took

       2    the Torrents, you reached out to law enforcement contacts,

       3    and you got the videos, correct?

       4    A.    Yes.   The videos and the zip file.

4:13PM 5    Q.    In other words, those images that did not come off

       6    the devices, or the device, to be specific, the HP in

       7    evidence in this trial, came from other cases?

       8    A.    Yes.

       9          MR. GELFAND:   Your Honor, may I have one minute,

4:13PM10    please?

      11          THE COURT:   Certainly.

      12          MR. GELFAND:   I have no further questions,

      13    Mr. Fottrell.   Thank you.

      14          THE COURT:   Thank you, Mr. Gelfand.   Mr. Clayman,

4:14PM15    when you're ready.

      16                    REDIRECT EXAMINATION

      17    BY MR. CLAYMAN:

      18    Q.    Mr. Fottrell, you were asked on your cross

      19    examination about the virtual machine software that you

4:14PM20    used.   Do you recall that?

      21    A.    Yes, I do.

      22    Q.    Can you explain for the Jury again in a little more

      23    detail the process of creating a virtual machine?

      24    A.    It's to work with the original EnCase image that was

4:15PM25    created.   I make a copy of that.   I convert it to a

4:15PM 1    virtual machine, and I boot up that virtual machine.  That

2    still leaves the original evidence files intact and it's

3    just the image copy that I'm creating and booting up and

4    trying to create demonstrative exhibits based on what it

4:15PM 5    looks like.

6    Q.    So what is your intention with respect to the Jury

7    when you create virtual machine print screens to use as

8    exhibits?

9    A.    So, generally speaking, if it's going to be Windows

4:15PM10    10 or a Macintosh environment, those virtual print screens

11    are probably similar to what jurors would be familiar with

12    if they were using a computer and they were using some of

13    the programs that are associated with that.

14    Q.    And you created three virtual print screen exhibits

4:15PM15    in this case, is that correct?

16    A.    Yes.

17    Q.    I believe you introduced Government's Exhibits 28

18    through 85 in your direct testimony, is that right?

19    A.    Yes, it is.

4:16PM20    Q.    So only three out of that range of exhibits came from

21    the virtual machine?

22    A.    Yes.

23    Q.    Where did all the other exhibits come from?

24    A.    From the forensic analysis.  From the EnCase, the

4:16PM25    extractions, and from the other forensics tools that I was

4:16 PM 1    using.

2    Q.   So those came, at least in part, from the actual

3    forensic image copies of the devices that you were

4    examining?

4:16 PM 5    A.   Yes.

6    Q.   Is there any reason to doubt the accuracy of the

7    forensic images you examined?

8    A.   No.

9    Q.   Were the forensic images that you examined hash-value

4:16 PM 10   compared to confirm that they were exact copies of the

11   items that were seized from the defendant's business?

12   A.   Yes.  When I received the images, I loaded them up,

13   and there's this verification process that ran and

14   completely showed, and completed successfully, that showed

4:16 PM 15   me that the images that I had were true and accurate and

16   complete copies of the devices that were imaged.

17   Q.   And just to be clear then, the vast majority of the

18   evidence you admitted came from the forensic images that

19   you described as accurately copied, is that right?

4:17 PM 20   A.   That is correct.

21   Q.   So the cache thumbnail files that depicted child

22   pornography, those came from the forensic exact copies of

23   the defendant's device, is that right?

24   A.   That is right.

4:17 PM 25        MR. GELFAND:  I'm sorry.  I would object as

4:17PM 1   phrased.

2              THE COURT:   Leading, or what is the objection?

3              MR. GELFAND:   Leading, and it assumes a

4   conclusion.

4:17PM 5              THE COURT:   Rephrase.

6   Q.   (BY MR. CLAYMAN.)   Mr. Fottrell, Government's Exhibit

7   31, the thumbnail images from the cache/thumbnail/normal

8   folder, where did that exhibit come from?

9   A.   That came from the forensic image that I received of

4:17PM10   the HP computer.

11  Q.   Government's Exhibit 33, the thumbnail images from

12  cache/thumbnail/large, where did that exhibit come from?

13  A.   That came from the forensic image of the HP desktop

14  computer.

4:17PM15  Q.   What did you find in those thumbnail files?

16  A.   Sexually explicit images of children.  CSAM, child

17  sexual abuse material images.

18  Q.   The EXIF information for both of those thumbnails

19  files identifying the names associated with those

4:18PM20  thumbnail files of the full-sized images or videos, where

21  did that information come from?

22  A.   Came from the EnCase image that I examined.

23  Q.   The TOR bookmarks that we looked at, where did that

24  information come from?

4:18PM25  A.   From the forensic image that I examined.

4:18PM 1    Q.    So is it fair to say that your analysis was based on

2    the forensic image?

3    A.    Yes.

4    Q.    On cross, Mr. Gelfand asked you about the uTorrent

4:18PM 5    program on the print screens of the virtual machine of the

6    Linux partition on the HP computer.  Do you remember that?

7    A.    Yes, I do.

8    Q.    He pointed out that there was a copyright from 2020

9    or 2021.  Do you recall?

4:18PM 10    A.    Yes, I do.

11    Q.    How would something like that happen?

12    A.    So I've been thinking about that a little bit.  What

13    I recall is, normally, I would not connect the computer to

14    the internet when I'm running my virtual machine exhibits.

4:19PM 15    But in this case, the first step that I would need to do

16    is install the Oracle VirtualBox guest additions.  And in

17    this case, I had problems doing that, getting that to

18    install correctly because I was missing some predefined

19    programs.  So in that case, I needed to connect it to the

4:19PM 20    internet in order to load the software that would allow me

21    to load the Oracle VirtualBox guest additions.  So that's

22    the explanation that I could think of that makes the most

23    sense as to why I would have connected it to the internet,

24    just to get those extensions installed correctly.

4:19PM 25    Q.    So by connecting it briefly to the internet, what

4:19PM 1    would happen to the uTorrent program on the virtual

2    machine, to be clear?

3    A.    So I had to do the commands to update all of the

4    programs, just do an update to update the operating

4:19PM 5    system.  So any programs that needed -- that were updated

6    during that lapse of time would have been updated.

7    Q.    Outside of that one update to the uTorrent program on

8    your virtual machine, did you notice any significant

9    changes to the virtual machine based on that connection to

4:20PM 10   the internet?

11   A.    No.  It didn't change any of the Torrent files or

12   locations of the Torrent files.  It didn't change the TOR

13   bookmarks.  It didn't change the other significant

14   exhibits in any meaningful way.

4:20PM 15   Q.    Would connecting the virtual machine just briefly to

16   the internet somehow put child exploitation material on

17   the defendant's devices?

18   A.    No.

19   Q.    Would it put that material on the forensic images of

4:20PM 20   those devices?

21   A.    No, it would not.

22   Q.    Based on your opinion, what, if any, impact did that

23   brief connection to the internet on the virtual machine

24   have on the evidence in this case?

4:20PM 25   A.    Just a minimum impact in order to get my tools to

4:20PM 1  load correctly in order to create these exhibits with a

2  fair and accurate recollection of what the screen looked

3  like.

4  Q.   You were also asked on cross -- just to follow-up on

4:21PM 5  that, Mr. Fottrell.  As far as you know, were these

6  forensic images of these devices examined prior to the

7  creation of your virtual machines?

8  A.   Yes.

9  Q.   Did those forensic examinations of these devices that

4:21PM10  occurred prior to your creation of the virtual machine

11  find evidence of child sexual abuse material?

12  A.   Yes, they did.

13  Q.   In fact, did your forensic examination of these

14  devices largely match the forensic examination of these

4:21PM15  devices that occurred prior to your creation of the

16  virtual machine?

17  A.   Yes, they did.

18  Q.   So, again, just to be clear, what does that tell you

19  about the impact that this virtual machine connecting to

4:21PM20  the internet had on the results of your forensic

21  examination, or any other forensic examinations of the

22  devices in this case?

23  A.   It's not a significant impact at all.

24  Q.   Now, you were also asked on cross quite a bit about

4:22PM25  the router in the car lot.  Do you recall that?

4:22PM 1    A.    Yes, I do.

2    Q.    If we could pull up what's been admitted as

3    Government's Exhibit 12.  Can you identify on this exhibit

4    where the router is?

4:22PM 5    A.    Right there.

6    Q.    Based on your experience, are routers significant in

7    child exploitation investigations?

8    A.    No, they are not.  They are not significant when we

9    have devices that we seize.

4:22PM10    Q.    And why is that?

11    A.    Because we're looking for the different devices.

12    We're looking for a computer.  We're looking for the

13    different devices if we see them.  If we go to a location

14    and there's no computers, there's no laptops, then we are

4:22PM15    realizing, uh-huh, there's supposed to be a computer here,

16    let's go look at the router that is here, maybe it will

17    tell me which devices were here that I need to go try to

18    look for.  But in this case, there's plenty of devices.

19    There's an HP computer sitting there, so I don't need to

4:22PM20    go looking for devices that I can't see.  There's plenty

21    of devices that are there.

22    Q.    Do you recall, what was the nature of the

23    investigation at this point?  What was the basis for the

24    search warrant?

4:23PM25    A.    It was a uTorrent investigation.  A law enforcement

4:23PM 1    officer downloaded, through the BitTorrent protocol,

2    movies, and they were looking for evidence of BitTorrent

3    activity.

4    Q.    And the files that that undercover officer downloaded

4:23PM 5    were actually recovered from this device, the HP computer,

6    is that right?

7    A.    That's correct.

8    Q.    So the router then would have no meaningful

9    information, is that right?

4:23PM10    A.    Yes, that is correct.  In this case, the router is

11    containing no other useful information that I'm not also

12    able to get off of the HP desktop computer.

13    Q.    Mr. Gelfand asked you about the kind of information

14    that might be saved on a router.  What kind of information

4:23PM15    might be saved on a router?

16    A.    So the information is the database table of the

17    devices that are connected to the router.  It's going to

18    keep track of what kind of a device it is.  And it doesn't

19    recognize it by a name, it recognizes it by a MAC address.

4:24PM20    And so the router just keeps track of the devices that are

21    connected to it in case it connects again a few days

22    later, it will remember the devices that were most

23    recently connected.

24    Q.    How long, based on your experience, does a router

4:24PM25    typically keep these logs or maintain this sort of

4:24PM 1  information for?

2  A.    So most modern routers today generally keep those

3  reservations for like a 30-day window of time.  If the

4  router is basically saying, hey, I haven't seen this

4:24PM 5  device in 30 days, I'm probably not going to see it again,

6  there's no sense for me remembering that device.  If it

7  comes into my range again, I'll just add it later on.  So

8  there's no benefit for the router to store that

9  information for any longer period of time.

4:24PM 10  Q.    To be clear, if you had the router and you examined

11  it, would that alter in any way your conclusions with

12  respect to how the HP computer was used?

13  A.    No.

14  Q.    It wouldn't alter your conclusion that a Linux

4:24PM 15  partition was installed on that device?

16  A.    No, it would not.

17  Q.    And it wouldn't alter your conclusion that someone

18  downloaded child pornography on that Linux partition?

19  A.    No, it would not.

4:25PM 20  Q.    Speaking of the Linux partition, Mr. Fottrell, you

21  were also asked on your cross examination about a thumb

22  drive, or the absence of a thumb drive.  Do you recall

23  that?

24  A.    I do.

4:25PM 25  Q.    You determined, based on your evaluation of this

4:25PM 1    evidence, that a thumb drive was plugged into the computer

2    during the installation of the Linux software, is that

3    correct?

4    A.    Around the same time of the installation, yes.

4:25PM 5    Q.    Can you explain again for the Jury that process, how

6    that happened, based on your examination of this device?

7    A.    So, yeah.  On the Windows partition, there was a

8    thumb drive that was plugged in.  And the operating system

9    keeps track of that automatically and it will assign a

4:25PM 10   drive letter to that.  There is information on "recently

11   played" and "recently viewed" documents.  And he was

12   correct, there was a Word document, or two Word documents

13   and a PowerPoint document that were viewed or accessed

14   from that thumb drive on the Windows partition.  Those

4:26PM 15   files don't exist on the Windows partition.  They existed

16   on the thumb drive.  But there is evidence that they were

17   accessed on the computer from the thumb drive.

18        A search for those files was conducted.  I did not

19   find those files on any of the media that was seized.

4:26PM 20   It's not on the HP, it's not on the thumb drive, it's not

21   on the Macintosh.  Those files that were referenced on

22   that thumb drive, I couldn't find them in any of the

23   materials that were seized.

24   Q.    One of the files had the word "quiz" in it, is that

4:26PM 25   right?

4:26PM 1    A.    Yes.

2    Q.    Please publish Government's Exhibit 61.  It's already

3    been admitted.

4              THE COURT:  You may.

4:26PM 5    Q.    (BY MR. CLAYMAN.)  Page five.  Do you see any

6    documents on this MacBook that have the word "quiz" in

7    them?

8    A.    Yes, I do.  You can see it on the upper right-hand

9    corner.  It's titled, "Quiz Mommy Amy King D-U-G," and

4:27PM10    then it breaks off from there and it ends with "e 2019."

11    Right below that, there's another "Quiz Mommy Amy"

12    document.

13    Q.    So could those somehow be related to the "quiz"

14    document on the thumb drive?

4:27PM15              MR. GELFAND:  Objection, Your Honor.  First of

16    all, it calls for speculation.  Second of all, they're not

17    the same document.

18              THE COURT:  Second of all what?

19              MR. GELFAND:  They are not the same document.

4:27PM20              THE COURT:  Well, you can follow up on that.

21    Overruled.

22    Q.    (BY MR. CLAYMAN.)  As far as you know, could those be

23    related?

24    A.    They may be related.  I don't know, correct.

4:27PM25    Q.    Is that because the files on that thumb drive have no

4:27PM 1   real significance based on your evaluation?

2   A.   Yes, they have no real significance.

3   Q.   If we could take this down.  Did you find other

4   evidence indicating to you who downloaded and installed

4:27PM 5   this Linux partition?

6   A.   Yes.

7   Q.   What did that evidence tell you?

8   A.   The evidence tells me that Joshua Duggar was the

9   person who installed the Linux operating system and

4:28PM 10   installed the TOR browser and was using the uTorrent

11   program during those days in question, May 13th, 14th,

12   15th, and 16th.

13   Q.   Is that based at least in part because his unique

14   password was the password to this partition?

4:28PM 15   A.   In part by that, and it's the totality of the

16   evidence.  It's certainly the password.  It's certainly

17   the GPS coordinates of images that were taken around the

18   same time, and it's certainly evidence of just content of

19   what's happening on that device.

4:28PM 20   Q.   If you could actually publish Government's Exhibit 85

21   and turn to page two.  We were talking about GPS

22   coordinates.  Can you describe again what May 16th shows?

23   A.   May 16th at 11:21, the pedomom.torrent is downloaded

24   on the Linux partition.  The thumbnail of pedomom is

4:29PM 25   created at 11:33.  And at 11:35 a.m., the iPhone is used

4:29PM 1    to take a picture of the car lot.

2    Q.    And what iPhone was that?

3    A.    The iPhone 8.

4    Q.    That was backed up to the defendant's MacBook?

4:29PM 5    A.    Yes.

6    Q.    That had the defendant's text messages in it?

7    A.    Yes.

8    Q.    And had selfies of the defendant on it?

9    A.    Yes, it did.

4:29PM 10    Q.    Mr. Fottrell, based on your experience and in your

11    opinion, which would be more valuable for you to determine

12    who was using this Linux partition:  This information

13    showing that the defendant was near the Linux partition

14    within two minutes of when it was being accessed, or the

4:29PM 15    thumb drive?

16    A.    This information is much more significant and much

17    more valuable.

18    Q.    In fact, if the thumb drive had somehow been

19    recovered, does that necessarily provide you any

4:29PM 20    information?

21    A.    No.

22    Q.    You were also asked a little bit about different

23    BitTorrent applications during your cross examination.  Do

24    you recall that?

4:30PM 25    A.    Yes, I do.

4:30PM 1    Q.    So in the Linux partition, which application for

2    BitTorrent was installed?

3    A.    The uTorrent program.

4    Q.    There was also Transmission, is that right?

4:30PM 5    A.    That comes preinstalled by the operating system,

6    correct.

7    Q.    So which one did the user of that device seek out

8    specifically?

9    A.    Utorrent.

4:30PM10    Q.    And on the defendant's MacBook, his personal

11    computer, did you find evidence that BitTorrent

12    applications had been installed?

13    A.    Yes, the qBittorrent application was installed on the

14    defendant's MacBook.

4:30PM15    Q.    Had Transmission maybe at some point also been

16    installed?

17    A.    Yes.

18    Q.    Did you also find e-mails indicating that the

19    defendant, or someone using his computer, repeatedly tried

4:30PM20    to install uTorrent?

21    A.    Yes.  The Covenant Eyes' e-mail messages, there was

22    evidence of the uTorrent program trying to be downloaded

23    on the Macintosh computer.

24    Q.    So based on your evaluation of the MacBook, does

4:30PM25    whoever uses that device like various types of BitTorrent

4:31PM 1    software?

2    A.    Yes.

3    Q.    Like to experiment with multiple softwares?

4    A.    Yes.

4:31PM 5    Q.    They might even like uTorrent, right?

6    A.    Yes.

7    Q.    You were also asked briefly whether it would make

8    sense for someone who has been perhaps hounded by the

9    paparazzi to use TOR.  Does that make any sense to you,

4:31PM 10   Mr. Fottrell?

11   A.    No, it does not really make sense to me because the

12   use of uTor -- I'm sorry -- the use of TOR has to do with

13   the websites that I'm visiting.  The websites that I'm

14   visiting don't know my true location as to where I'm

4:31PM 15   coming from.  It doesn't have to do with my -- if I'm

16   being hounded by the paparazzi in a certain location, I'm

17   not sure how TOR affects that, basically.  TOR is used to

18   protect your anonymity when you are online on the websites

19   you're going.  It has nothing to do with your physical

4:31PM 20   presence where you are at a point in time.

21   Q.    Can paparazzi serve legal process on ISPs to

22   determine where IP addresses locate to?

23   A.    Yeah, I'm not familiar with that.

24   Q.    Did you find a little bit of evidence about how the

4:32PM 25   defendant was using TOR?

4:32PM 1    A.    Yes.

2    Q.    What did you find on the Linux partition side?

3    A.    There was the bookmarks associated with --

4          MR. GELFAND:  Objection, Your Honor.  I'd object

4:32PM 5    to the way that it's phrased of how the defendant is using

6    TOR.

7          THE COURT:  I can't hear you, Mr. Gelfand.

8          MR. GELFAND:  I'd object to the way that that

9    question is phrased, Your Honor.

4:32PM10          THE COURT:  "What did you find on the Linux

11    partition side?"

12          MR. GELFAND:  No, that was the follow-up to the

13    question, Your Honor.

14          THE COURT:  Well, why don't you rephrase,

4:32PM15    Mr. Clayman.  I'm not following.  Just rephrase.

16    Q.    (BY MR. CLAYMAN.)  Did you find evidence on the

17    defendant's devices about how those devices were used to

18    access TOR?

19    A.    Yes.

4:32PM20    Q.    So what did you find on the Linux partition side of

21    the HP computer the defendant identified as his own in his

22    business?

23    A.    There were the Hidden Wiki, the Candle, and these

24    other websites that are referenced, those were the

4:33PM25    bookmarks that were saved on the TOR browser for the Linux

4:33PM 1    partition of the HP computer.

2    Q.    And, again, what kind of content -- well, let me

3    rephrase.  Have you ever been on Hidden Wiki?

4    A.    Yes, I have.

4:33PM 5    Q.    Is there anything on Hidden Wiki that would advise

6    you how to avoid the paparazzi?

7    A.    Not that I remember seeing, no.

8    Q.    What kind of content is on Hidden Wiki?

9    A.    It's just a list of different types of criminal

4:33PM10    activity and websites associated with criminal activity

11    that individuals can go to.

12    Q.    Did Hidden Wiki at one point identify child

13    pornography hidden services?

14    A.    Yes.

4:33PM15    Q.    If we could pull up what's been admitted as

16    Government's Exhibit 38.  What else do we know that the

17    defendant's device was used to do on TOR?

18    A.    So we know that on May 14th, 2019, the person went to

19    a website on TOR.  I don't know the website that they went

4:34PM20    to, but they downloaded a file named

21    webcam-collection-prevs.7zip, and it's located in the

22    downloads folder.

23    Q.    Is this the only download you found related to TOR?

24    A.    Yes, it is.

4:34PM25    Q.    So is it safe to say, or fair to say, that this is

4:34PM 1  the only thing the defendant was using TOR for?

2  A.   It's the only thing that I have evidence that the

3  user of the computer was downloading through TOR.

4  Q.   Mr. Gelfand also asked you on your cross a little bit

4:34PM 5  about command lines.  Do you recall that?

6  A.   Yes, I do.

7  Q.   It seems to be that he was suggesting that command

8  lines were used to download software.  Is that what you

9  understood him to be asking?

4:34PM 10  A.   Yes.  So he was saying the fact that these were

11  complicated software programs and that the only way that

12  they could be installed was through a series of command

13  line commands.

14  Q.   Based on your examination and your experience as an

4:35PM 15  examiner, is that correct?

16  A.   No.  So as I was trying to explain, there is the

17  version of the App Store on Ubuntu which provides the same

18  functionality without having to use command level prompts.

19  Q.   So based on your experience, would a user be more

4:35PM 20  likely to use command level prompts or to access

21  essentially the App Store on Ubuntu?

22  A.   The App Store would be more popular and more easy to

23  use.

24  Q.   Do you have to be technologically sophisticated to

4:35PM 25  use the App Store on Ubuntu?

4:35PM  1    A.    No, it's very simple.  You bring up the application,

     2    you type something in the search bar, you see the results,

     3    you click on the install button, and it's installed.

     4    Q.    If we could actually pull up what's been admitted as

4:35PM  5    Government's Exhibit 30.  Turn to page four.  Is the App

     6    Store visible here in this screenshot?

     7    A.    It is.

     8    Q.    So it's literally on the desktop of the computer?

     9    A.    Yes, it is.

4:36PM 10    Q.    That's how easy it would be to go and install TOR?

    11    A.    Yes.

    12    Q.    That's how easy it would be to go and install

    13    uTorrent?

    14    A.    Yes.  And VLC.

4:36PM 15    Q.    You were also asked a little bit about the uTorrent

    16    program on this partition in particular.  Do you remember

    17    that?

    18    A.    Yes.

    19    Q.    There was some discussion of an emulation that was a

4:36PM 20    little complicated.  Do you recall that?

    21    A.    Yes.

    22    Q.    Did you try to install uTorrent using the Linux

    23    software on the App Store?

    24    A.    Yes, I did.

4:36PM 25    Q.    Were you able to install the Windows version in that

4:36PM 1    way?

2    A.    Yes, I was.

3    Q.    So what does that tell you about the manner in which

4    uTorrent was installed on the defendant's Linux partition?

4:36PM 5    A.    It's very easy to go to the App Store, type in

6    uTorrent.  The uTorrent application is displayed and it

7    says uTorrent, and it has Wine in parentheses, which is

8    the emulator.  I don't have to pay attention to that

9    nonsense.  I just click the install button and it

4:37PM 10   installs.

11   Q.    There was testimony, if I recall correctly, about an

12   emulation software having to be installed, is that right?

13   A.    Yes.

14   Q.    But if you do it through the application program,

4:37PM 15   does that have to happen?

16   A.    No, it happens automatically behind the scenes.  You

17   never see it.  It just happens automatically.

18   Q.    You were also asked on your cross, Mr. Fottrell,

19   about whether the Linux partition could be accessed

4:37PM 20   remotely.  Do you recall that?

21   A.    Yes, I do.

22   Q.    Based on your examination, could the Linux partition

23   be accessed remotely?

24   A.    The possibility exists that it could be accessed

4:37PM 25   remotely, but I just don't see evidence of that.

4:37PM 1  Q.   Would the Linux partition need to be running in order

2  to access it remotely?

3  A.   Absolutely.

4  Q.   Can you explain for the Jury what you mean by that?

4:37PM 5  A.   So it's one computer.  It can only be running one

6  operating system at a time.  When you turn it on, you

7  choose Windows or you choose Ubuntu.  It can't be running

8  both operating systems simultaneously.  And so that's kind

9  of what I mean.  In order for somebody to connect to the

4:38PM 10  Ubuntu machine, it has to be running the Ubuntu machine.

11  It can't connect to it if the other operating system is

12  running.

13  Q.   So if I understand your testimony correctly, the HP

14  computer would have to be turned on in the car lot and

4:38PM 15  running on the Linux operating side in order for someone

16  who is not at the car lot to log-in remotely, is that

17  correct?

18  A.   Yes, that's correct.

19  Q.   Based on your review of the evidence, could that have

4:38PM 20  happened here?

21  A.   No, there's no evidence that I can see of that

22  happening.

23  Q.   Actually, pull up what's been marked as Government's

24  Exhibit 74 and turn to page four.  Do you recall this

4:39PM 25  exhibit?

4:39PM 1    A.    I do.

2    Q.    When was this image taken?

3    A.    May 14th at 4:20 p.m.

4    Q.    And what's the image of?

4:39PM 5    A.    It's the picture of the HP desktop computer running

6    the Windows operating system, because you can see the

7    wallpaper of the family photo.  And the browser is loaded.

8    You can see that the YouTube is loaded and the person is

9    taking picture -- the user is taking picture, and you can

4:39PM 10   see the person is wearing the Wholesale Motorcars cap

11   reflected in the screen.

12   Q.    You said this is running the Windows operating system

13   at this point?

14   A.    Yes.

4:39PM 15   Q.    That's at 4:20 p.m. on May 14th?

16   A.    Yes.

17   Q.    If we could pull up alongside this exhibit what's

18   been marked as Government's Exhibit 38.  What's

19   Government's Exhibit 38 again?

4:40PM 20   A.    It's the webcam-collections being downloaded through

21   the TOR browser bundle at 5:05 p.m.

22   Q.    On what date?

23   A.    May 14th.

24   Q.    So the same date that this picture was taken of the

4:40PM 25   computer running in the Windows operating system?

4:40PM 1   A.   Correct.

2   Q.   In fact, it's approximately 45 minutes later, is that

3   right?

4   A.   Yes.

4:40PM 5   Q.   So, Mr. Fottrell, how would someone be able to

6   transfer from the Windows operating system, when this

7   picture is taken on the HP computer, to the Linux

8   operating system 45 minutes later where someone is

9   downloading this webcams-collection-prevs file?

4:40PM 10   A.   They would have to reboot the computer, and then on

11   the boot process, select the Linux partition to boot

12   instead of the Windows partition.

13   Q.   Could someone access this computer remotely while

14   it's running this YouTube video on the Windows partition

4:40PM 15   side and force it to transfer to the Linux side?

16   A.   No, they cannot do that.  That's not possible to

17   switch the operating system from one to the other.

18   Q.   Someone would have to be there?

19   A.   Someone would physically have to be there.

4:41PM 20   Q.   And based on this image here, whose device do we know

21   was in the office at that time?

22   A.   Joshua Duggar's iPhone 8 Plus.

23   Q.   Ask a few more questions about the remote access

24   idea.  If someone were sitting at the HP computer in the

4:41PM 25   car lot while someone else was remotely accessing it, what

4:41PM 1   would that person sitting there see?

2   A.   They would see, depending on how they're connected,

3   they would see the remote connectivity.  So it's like just

4   remote control.  Like I can remote control into my work

4:41PM 5   computer, and if I was sitting in my work station, you

6   would see the mouse move, you would see Windows open, you

7   would see programs being run.  If you were sitting in my

8   chair when I wasn't there, you would see what I was doing

9   remotely.

4:41PM10   Q.   But if I was sitting there in the car lot while

11   someone was apparently remote accessing the Linux

12   partition, I would see them navigating around?

13   A.   Yes.

14   Q.   We would see them accessing child pornography?

4:42PM15   A.   Yes.

16   Q.   If we could pull up again what's been admitted as

17   Government's Exhibit 78.  What is this exhibit?

18   A.   Here's a photo that was taken on May 16th at

19   11:35 a.m.  The coordinates come back to the car lot.

4:42PM20   It's a picture of a Post-it note.

21   Q.   It appears to be inside the car lot, is that right?

22   A.   Yes, it does.  There's a desk behind the background.

23   Q.   If we could pull up again what's been marked as

24   Government's Exhibit 34 and turn to page three.  Looking

4:42PM25   at the third line of this exhibit, what happened two

4:42PM 1   minutes before this picture was taken?

2   A.   So two minutes before this picture was taken on the

3   Ubuntu partition, somebody is using the uTorrent program

4   to download pedomom.wmv.  I'm sorry.  The thumbnail was

4:43PM 5   created.  Excuse me about that.  The thumbnail was created

6   in the large folder associated with the video file

7   pedomom.wmv.

8   Q.   That's on the Linux partition side?

9   A.   Yes, it is.

4:43PM10   Q.   So does that mean someone would be navigating to the

11   downloads folder where there would be a file of child

12   pornography called "pedomom" visible?

13   A.   Yes, a thumbnail associated with that image would be

14   visible.

4:43PM15   Q.   And they would see that would be happening two

16   minutes before this picture was taken by using the

17   defendant's iPhone inside the car lot?

18   A.   Yes.

19   Q.   You were also asked a little bit, Mr. Fottrell, about

4:43PM20   the password that was used for the Linux partition.  What

21   was that password again?

22   A.   Intel 1988.

23   Q.   Did you find examples of the defendant using that

24   password for other things?

4:43PM25   A.   Yes.

4:43PM 1   Q.   What kind of accounts did you see where the defendant

2   was using that password?

3   A.   For Twitter accounts, for e-mail, website accounts,

4   banking accounts.  Other kinds of accounts that he was

4:44PM 5   using it for.

6   Q.   If we could pull up what's been admitted as

7   Government Exhibit 63, turn to page two.  Looking here,

8   what's the password for Arvest Josh?

9   A.   The password is Intel 1988 exclamation mark.

4:44PM 10   Q.   What's the password for this other Arvest account?

11   A.   JoshuaJJD1998.

12   Q.   Is this other account identified as Josh Duggar's

13   account?

14   A.   It says Anna Duggar.

4:44PM 15   Q.   So this Intel 1988 password is unique to Josh, is

16   that fair to say?

17   A.   That's fair to say.

18   Q.   You were also asked about e-mails in which the

19   defendant sent out the Intel 1988 password.  Do you

4:44PM 20   remember that?

21   A.   Yes, I do.

22   Q.   Did you find any examples of anyone sending the

23   defendant the Intel 1988 password?

24   A.   No, I did not.

4:44PM 25   Q.   Who was the one using this password consistently?

4:44PM 1    A.    The defendant was using that password and sending

2    information associated with those passwords to other

3    people.

4    Q.    How long had he been using this password?

4:45PM 5    A.    Approximately five years, going back to 2014.

6    Q.    If we could actually pull up Government's Exhibit 64.

7    A.    It shows February 13th, 2014, for the Instagram

8    account for the duggarfam.  It's using the password Intel

9    1988.

4:45PM 10    Q.    If we could turn to page seven.  What is this e-mail?

11    A.    There's an e-mail to David Christensen at frc.org,

12    and he is basically telling him about -- has the social

13    media account for Representative Paul Ryan's Instagram

14    account.  And so he's listing the Instagram accounts, he's

4:45PM 15    listing a log-in name, and then he's listing the password

16    as Intel 1988.  And he signs it, "Hope this helps,

17    sincerely, Josh Duggar."

18    Q.    He also tells him to change the password if they want

19    this account, right?

4:46PM 20    A.    Yes.

21    Q.    And subsequent to this e-mail being sent, the

22    defendant was using this password for his Arvest bank

23    account, is that right?

24    A.    Yes.

4:46PM 25    Q.    Is it safe to say he thought it was secure?

4:46PM 1    A.    Yes.

2    Q.    You were also asked about Torrent files.  Do you

3    recall that?

4    A.    Yes.

4:46PM 5    Q.    Mr. Fottrell, what is the only use of a Torrent file?

6    A.    The Torrent file is the recipe, if you will, that the

7    BitTorrent program uses to go out and fetch the files

8    specified in the Torrent and download them to the

9    computer.

4:46PM 10   Q.    They have no other purpose?

11   A.    They have no other purpose.

12   Q.    Do devices ever come with Torrent files preloaded

13   onto them?

14   A.    Not that I'm familiar with, no.

4:46PM 15   Q.    In your experience, are Torrent files accurately

16   named?

17   A.    Yes.

18   Q.    So the Torrent file "14yogirlsuckandfuck," based on

19   your experience, what would you expect that Torrent file

4:47PM 20   to have?

21   A.    I would expect it to be a 14-year-old girl engaged in

22   sexually explicit conduct.

23   Q.    Did you review the content associated with that

24   Torrent file?

4:47PM 25   A.    I did.

4:47PM 1   Q.   And what was it?

2   A.   It was sexually explicit content of an underage girl.

3   Q.   That Torrent file was found on the defendant's HP

4   computer on the Linux partition side, is that right?

4:47PM 5   A.   That is correct.

6   Q.   In fact, you found evidence that that video had been

7   viewed.  Is that fair to say?

8   A.   Yes.

9   Q.   So what does that tell you about what the user of the

4:47PM 10   Linux partition did with that Torrent file?

11   A.   They downloaded the contents of it and viewed the

12   video associated with it.

13   Q.   On that point, you were asked about where you

14   retrieved the videos that you used to make storyboards

4:47PM 15   that we showed to the Jury.  Do you recall that?

16   A.   I do.

17   Q.   Mr. Fottrell, were you able to determine if those

18   videos, those exact videos, had existed on the Linux

19   partition at any point in time?

4:47PM 20   A.   Yes, I did.

21   Q.   How were you able to determine that?

22   A.   By the hash value analysis.  The file names have a

23   unique hash value.  No two files have the same -- no two

24   different files have the same hash value, so those files

4:48PM 25   are exactly the same based on the referenced hash value.

4:48PM 1    Q.    So these weren't just random files that you asked

       2    for, is that fair to say?

       3    A.    Right.   These were very specific files that I know

       4    had at some point existed on the defendant's hard drive.

4:48PM 5    Q.    You were also asked about the reliability of EXIF

       6    information.   Do you recall that?

       7    A.    I do.

       8    Q.    If you could pull up for one second what's been

       9    marked as Government's Exhibit 74 and turn to page four.

4:48PM10    Generally speaking, Mr. Fottrell, in your experience, is

      11    EXIF information reliable?

      12    A.    Yes.

      13    Q.    And what kind of information do you get in EXIF

      14    information?

4:48PM15    A.    Certainly dates and times that the photo was taken.

      16    Make and model of the camera that was used.   It talks

      17    about the shot that was taken, some photographic qualities

      18    of it.   There's going to be EXIF information associated

      19    with it.   So there's just a wealth of information that

4:48PM20    exists in EXIF information.   Some of it I care about, some

      21    of it I don't forensically care about, but a lot of it is

      22    just good information.

      23    Q.    The EXIF information with this photo told you that

      24    the photo geolocated to the car lot, is that right?

4:49PM25    A.    Yes.

4:49PM 1    Q.    What can you say about the content of the photo, was

2    this taken in the car lot?

3    A.    Yes, it appears to be.  It appears to be taken

4    standing in front of the HP monitor.  There's the

4:49PM 5    background on it.  The person is looking at a YouTube

6    video and taking a picture of it.  You can see the

7    reflection of somebody wearing a Wholesale Motorcars hat

8    in the background.

9    Q.    You were also asked about the reliability of the time

4:49PM10    in EXIF information.  Do you recall that?

11    A.    Yes, I do.

12    Q.    If we could please pull up what's been marked as

13    Government's Exhibit 80, turn to page on1.  What time did

14    the EXIF information say this photo was taken?

4:49PM15    A.    At 4:47 p.m.

16    Q.    Do you see anything in the photo indicating what time

17    it is?

18    A.    There's a clock in the window that displays the time,

19    4:51.

4:49PM20    Q.    Where does it say that this photo was geolocated to?

21    A.    To the car lot.

22    Q.    Based on just looking at this photo, where does it

23    appear to be taken?

24    A.    At the car lot.

4:50PM25    Q.    Is it fair to say, based on your review of the EXIF

4:50PM  1    information and these images, that you concluded that they

         2    were accurate?

         3    A.    Yes.

         4    Q.    You were also asked about VLC streaming.  Do you

4:50PM  5    recall that, Mr. Fottrell?

         6    A.    Yes.

         7    Q.    Once again, it was a little bit of a technical

         8    discussion.  Can you explain to the Jury what you meant

         9    when you said that VLC players can stream videos locally?

4:50PM 10    A.    Yeah, so VLC is a player.  It's not a server.  So VLC

        11    has the ability to stream files locally.  It can view

        12    files that are being streamed.  There would be a different

        13    VLC program if I wanted to stream videos.  And then just

        14    looking at convenience, I think it's simpler, if I have

4:50PM 15    the uTorrent program up where the Torrent files download,

        16    it's just less -- it's quicker just to select the video,

        17    do a right mouse click, choose copy stream, go over to the

        18    window into VLC and choose paste.  That certainly seems

        19    quicker opposed to, I have to bring up the file browser,

4:51PM 20    navigate to where that download folder is, and then click

        21    on it.  That's going to take numerous key clicks and a

        22    little bit more time to do.  Certainly just the copy and

        23    paste through the streaming mechanism is an efficient

        24    shortcut way of viewing the video that exists locally on

4:51PM 25    the computer.

4:51PM 1   Q.   Did you confirm that yourself?

2   A.   Yes, I did.

3   Q.   There was a suggestion that streaming implies that

4   this video is somehow streaming on the internet or

4:51PM 5   streaming over the internet.  Based on your examination,

6   is that accurate?

7   A.   That's not accurate.

8   Q.   If we could pull up what's been marked as

9   Government's Exhibit 44.  Mr. Fottrell, what is this

4:51PM 10   exhibit again?

11   A.   These are the VLC configuration file listing the

12   streams, the recent streams that were viewed, that the

13   user viewed.  And it has them using the streaming

14   protocol.  It has the hash value.  Those hash values

4:52PM 15   correspond to particular movies that are on the computer.

16   Again, just to be clear, the reference to 127.0.0.1 is the

17   computer's way of using the English equivalent of "me."

18   If I say "me," the computer is referencing itself.  So

19   when a computer is referencing an IP address of 127.0.0.1,

4:52PM 20   it doesn't mean the internet, it doesn't mean external

21   location.  It's just the computer's way of saying the word

22   "me," the English equivalent of the word "me."  So it's

23   streaming this file from itself, from the current

24   computer, if I'm trying to be clear about that.

4:52PM 25   Q.   So this information tells you that this was not in

4:52PM 1    fact streaming over the internet, is that what you're

2    trying to say?

3    A.    Correct.  It's telling -- evidence of these

4    127.0.0.1s tell me that it's streamed from "me," from this

4:53PM 5    computer, and nowhere else.

6    Q.    Does it make sense, Mr. Fottrell, from a forensic

7    point of view to remotely access a computer to then stream

8    something?

9    A.    No, that doesn't really make any sense.  If I'm going

4:53PM10    to remotely connect to a computer and then stream it from

11    another source, that seems to be an extra step.  It would

12    make more sense to just stream it from that other source.

13    Why would I go through an intermediary -- why would I

14    connect to an intermediary computer to stream it?  It's

4:53PM15    much more efficient to stream it from that original

16    source, so it just doesn't really make a lot of common

17    sense.

18    Q.    In fact, if you were remotely accessing a computer,

19    you could just double-click a file like you could

4:53PM20    normally, is that fair to say?

21    A.    Yes.

22    Q.    Mr. Fottrell, did you find any evidence that this

23    computer had been remotely accessed during the time frame

24    in question?

4:53PM25    A.    No.

4:53PM 1   Q.   Did you look for that evidence?

      2   A.   I did.

      3   Q.   I'd like to return for a brief second to the

      4   virtualization software exhibits.

4:54PM 5   A.   Okay.

      6   Q.   You said on your cross that the uTorrent copyright

      7   date 2020/2021 was significant.  Was that significant to

      8   the investigation, or was that significant to you, James

      9   Fottrell?

4:54PM10   A.   Just to me, correct.  It certainly doesn't matter to

     11   the investigation.  It's certainly just significant to me

     12   in understanding what's happening with the different

     13   programs.

     14   Q.   Is it significant because you realized that you had

4:54PM15   accessed the internet briefly using the virtualization

     16   software?

     17   A.   Yes, I realized that I must have accidentally

     18   accessed the internet to update that program when I was

     19   updating the program to install the Oracle VirtualBox

4:54PM20   extensions.

     21   Q.   But it wasn't significant to any of your

     22   conclusions --

     23   A.   Certainly not.

     24   Q.   -- with respect to whether child pornography had been

4:54PM25   downloaded using the defendant's computer?

4:54 PM 1   A.    That's correct.

2   Q.    If we could pull up what's been marked as

3   Government's Exhibit 85, and admitted as 85.  Was it

4   significant, Mr. Fottrell, to any of your conclusions on

4:54 PM 5   this timeline?

6   A.    No.

7   Q.    Nothing about the virtualization software accessing

8   the internet changed, for example, that the Linux

9   installation program was downloaded on May 11th and that

4:55 PM 10  the defendant was at that car lot 10 minutes later?

11  A.    No.

12  Q.    Does it change anything about what happened on

13  May 13th?

14  A.    No.

4:55 PM 15  Q.    May 14th?

16  A.    No.

17  Q.    May 15th?

18  A.    No.

19  Q.    It has no impact on your conclusions with respect to

4:55 PM 20  what happened in this case, is that fair to say?

21  A.    That's fair to say.

22        MR. CLAYMAN:  May I have one moment, Your Honor?

23        THE COURT:  Yes.

24        MR. CLAYMAN:  I'll pass the witness, Your Honor.

4:55 PM 25        THE COURT:  Could I see counsel at side bar,

4:55PM 1   please?

2              (Bench Conference)

3              THE COURT:  What's your estimate on re-cross, if

4   any?

4:56PM 5       MR. GELFAND:  15 minutes.

6              THE COURT:  What is this witness's travel

7   situation?  Is he here for the duration?

8              MR. ROBERTS:  Yes, sir.

9              THE COURT:  Do you feel really good about that 15

4:56PM 10  minutes?

11             MR. GELFAND:  Two answers, Your Honor, because

12  I'm an Officer of the Court.  I do feel really good about

13  those 15 minutes, but I have never been right about

14  estimates.

4:56PM 15      THE COURT:  Do you all have any problem with me

16  letting the Jury decide?  I mean, it's late on Friday.  My

17  mind is mush.  It's been a full day of super-technical

18  information.  On the one hand, I think they may want to

19  get him on and off the stand so they can make progress.

4:57PM 20  I'm just going to let them give me guidance on that.

21             MR. GELFAND:  That sounds good.  I don't have any

22  problem with you telling them plus or minus 15 minutes.

23  Could be a little shorter, could be a little longer.  I

24  don't mind, I'll give deference to the Court, but I don't

4:57PM 25  mind the Court telling them my estimate of approximately

4:57PM 1   15 minutes if that helps them make that decision.

2              THE COURT:  Next question.  I would like to give

3   them a progress report on where we are in terms of

4   duration of the trial.  My thought is we're behind.  Are

4:57PM 5   we now into Wednesday?  Is that what we're thinking?

6              MS. MARSHALL:  I think so, Your Honor, yes.

7              THE COURT:  Are we beyond Wednesday?

8              MR. GELFAND:  Do you still anticipate the same?

9              MR. ROBERTS:  Yes.  Yes, we do.  So our

4:58PM 10   guesstimate would be the government closing their case on

11   Monday, probably early afternoon, my estimate, but I would

12   take the same caveat as Mr. Gelfand.

13              MR. GELFAND:  We intend at this point to put on a

14   defense case, obviously without committing to anything.

4:58PM 15   But for planning purposes, we do intend to put on a

16   defense case if it helps.

17              THE COURT:  It will take us a full day?  Monday

18   afternoon?

19              MR. GELFAND:  Probably about a day.  And quite

4:58PM 20   candidly, longer if Mr. Duggar chooses to testify.

21              THE COURT:  Right.

22              MR. GELFAND:  And Michele Bush is going to be

23   testifying.  And then there's some fact witnesses, none of

24   whom are particularly lengthy.

4:58PM 25              THE COURT:  All right.  Thanks.

4:58PM 1           (Bench Conference Concluded)

2          THE COURT:  I have some intelligence that I would

3  like to share with the Members of the Jury.

4          We're very near the end of this witness's

4:59PM 5  testimony, but the lawyers still have some questions.

6  It's likely that Mr. Gelfand's turn to follow up is going

7  to be 15 to 20 minutes.  That's probably going to prompt

8  three to five minutes -- maybe not -- but in my

9  experience, another five minutes from the government, and

4:59PM10  then this witness could be on and off the stand.  So to

11  call it safe, 20 on the short end; 30 minutes on the long

12  end.  It's been a long day, been a lot of technical

13  testimony.  I could understand why, if your ability to

14  keep retaining information is kind of bursting at the

5:00PM15  seams here.

16          Regardless of whether you would like to stay

17  longer today and get this witness off the stand, I don't

18  think that's going to affect how long the overall trial

19  is.  It is possible that we could get the case to you

5:00PM20  Tuesday afternoon, but more realistically, Wednesday.

21  That's where we are.  And that's not going to change

22  whether we finish up today or not.  So I think the real

23  decision that I would like your input on is whether you

24  want to stay here on a Friday afternoon and plow through

5:01PM25  this witness, or whether you would, all things considered,

5:01PM 1    just like to come back Monday morning and pick up where we

2    left off.  And ya'll can talk amongst yourselves.

3              JUROR:  Ask a question?

4              THE COURT:  Yes.

5:01PM 5              JUROR:  Does that mean he gets to go home this

6    weekend?

7              THE COURT:  I think that this witness is probably

8    here for the duration.  I specifically inquired whether he

9    had any flights that he's going to miss today, and I'm

5:01PM 10   told that he does not.

11             (Jurors discussing)

12             JUROR:  I think we're good to continue today,

13   Judge.

14             THE COURT:  Go ahead and finish up?  All right.

5:02PM 15   Thank you very much.  Mr. Gelfand?

16             MR. GELFAND:  Thank you.  May I proceed, Your

17   Honor?

18             THE COURT:  You may.

19                     RECROSS EXAMINATION

5:02PM 20   BY MR. GELFAND:

21   Q.   Mr. Fottrell, do you remember how many times I asked

22   you on cross examination whether you connected your

23   virtualized machine to the internet?

24   A.   Yeah, many times.

5:02PM 25   Q.   And do you remember telling this Jury under oath

5:03PM 1  confidently that you did not?

2  A.   Correct.  I made a mistake.  I forgot.

3  Q.   And you told them and you told me that the reason you

4  did not is because this device has alleged child

5:03PM 5  pornography on it and you don't want to connect that to

6  the internet?

7  A.   Correct.

8  Q.   And you said that this device was never updated in

9  terms of software applications, correct?

5:03PM 10  A.   Correct.

11  Q.   And you said that you were positive -- and I used

12  uTorrent as the example -- that uTorrent was not updated,

13  correct?

14  A.   Correct.

5:03PM 15  Q.   But the truth is, now you're readily admitting that

16  you connected this device, this virtualized version of the

17  HP computer, Linux partition at issue, to the internet

18  during your forensic evaluation, correct?

19  A.   Yes.

5:03PM 20  Q.   And your testimony -- and I wrote it down, you tell

21  me if I'm wrong -- is that has, quote, "minimum impact,"

22  end quote, on the evidence, correct?

23  A.   On the overall evidence, correct.  I needed to update

24  the software to get the Oracle VirtualBox extensions

5:04PM 25  installed and I needed to connect to the internet to get

5:04PM 1    that to work.  And I forgot -- I didn't recall that when
       2    we spoke earlier.
       3    Q.   How on earth do you accidentally access the internet
       4    when you are looking at a virtualized device with alleged
5:04PM 5    child pornography on it?
       6    A.   There's a setting in the Oracle box software for all
       7    of the different devices.  Do you want to turn on
       8    networking, do you want to turn off networking.  And I
       9    always turn it off.  I must have turned it on to do that.
5:04PM10    Q.   How long were you connected to the internet?
      11    A.   Probably for about a five-minute window of time to
      12    get the VirtualBox extensions and other updates installed.
      13    Q.   Long enough to be detected by Torrent Downpour?
      14    A.   No, not at all, because I'm not sharing any content.
5:04PM15    I'm not sharing any child pornography.
      16    Q.   Mr. Fottrell, the bottom line is the exhibit that the
      17    Jury has in evidence, Exhibit 30, that's not actually the
      18    same as what was seized from Wholesale Motorcars on
      19    November 8th of 2019, correct?
5:05PM20    A.   Those print screens that I created are not accurate
      21    because it has that updated reference to the uTorrent
      22    program being updated, that's correct.
      23    Q.   It's not the same as what was seized on November 8th
      24    of 2019, correct?
5:05PM25    A.   Correct.  That's the demonstrative exhibit I created

5:05 PM 1    to try to be persuasive as to what the desktop looked like

2    at the moment in time that it was seized.

3    Q.    I'm not asking you to be persuasive.  I'm asking you

4    facts about this case on your forensic evaluation, okay?

5:05 PM 5    A.    Okay.

6    Q.    Mr. Fottrell, you testified about the router.  You

7    said you didn't want to look for other devices when you

8    had enough devices.  Did I hear that testimony correctly?

9    A.    Correct.  We had the right computer.  The information

5:05 PM 10   that we had on the computer with the marissa.zip and the

11   movies matched the undercover.  We're not on wild goose

12   chase looking for the appropriate computer.  We have the

13   right computer.  It has information that matched what the

14   undercover was looking for.  Why do I need to go look for

5:06 PM 15   something else when I found what I was looking for?

16   Q.    Let's back up for a second.  When the devices were

17   seized on November 8th of 2019 -- first of all, you

18   weren't involved, correct?

19   A.    I was not there, correct.

5:06 PM 20   Q.    Second of all, even if you were involved, you would

21   readily acknowledge, you had no clue what was on those

22   devices the day they were seized, correct?

23   A.    Correct.

24   Q.    So when the decision is made to seize or not to seize

5:06 PM 25   certain devices, to preserve or not preserve evidence --

5:06PM 1    A.   Correct.

2    Q.   -- on that day, no one has a clue whether they have

3    the "right computer," quote, unquote, or not, correct?

4    A.   Well, they know they have a computer, and so like the

5:06PM 5    person was using uTorrent 3.5.5 on a Windows version of

6    Torrent.  They come to a location that has a Windows

7    computer.  They don't know if it has the uTorrent or not,

8    but they have a computer that's consistent with the

9    preliminary information that they had going in.  So

5:06PM 10   there's certainly some information that they are in the

11   right place at the right time with the right computer in

12   front of them.

13   Q.   Did you find the right device with the UK Cardiff

14   PowerPoint and the Quiz 1.docx and the

5:07PM 15   jeremymodel-meshpics.docx?  Did you find that?

16   A.   We never found that thumb drive.  I never found that

17   thumb drive.

18   Q.   Or the device that those files were saved on and

19   created on, correct?

5:07PM 20   A.   Correct.

21   Q.   But we know for sure, like you testified earlier,

22   that even though you have no clue what device that is, it

23   isn't one of Josh's devices, correct?

24   A.   Correct.  I have no evidence to say that it was

5:07PM 25   Josh's device, correct.

5:07PM 1    Q.   In fact, you have evidence to show that those files

2    were never opened on any of Josh's devices?

3    A.   Say that -- are you talking about the Quiz and the

4    uTorrent?

5:07PM 5    Q.   Yes.

6    A.   They were opened on his device.  They were opened on

7    the Windows partition.  That's why they show up there.  So

8    the HP computer in the car lot, I'm saying that's one of

9    Joshua's devices.  There is evidence that those files were

5:07PM10    opened on that computer showing me the exhibit that you

11    were showing me.

12    Q.   They were opened from the thumb drive, correct?

13    A.   From the thumb drive, correct.

14    Q.   There's no evidence that they were opened from the

5:08PM15    actual hard drive of the HP, correct?

16    A.   Yes.  You're using a word that was misleading.  There

17    was no evidence that those files were copied to the

18    computer and opened on the computer.  Yes, there's no

19    evidence of that.

5:08PM20    Q.   I'm not misleading you at all.  There was no evidence

21    that that was on the MacBook, correct?

22    A.   Correct.

23    Q.   There was no evidence that that was on the iPhone,

24    correct?

5:08PM25    A.   Yes.

5:08PM 1   Q.   The thumb drive itself, we know for sure that it was
       2   plugged into the HP computer while Linux was being
       3   installed, while the partition was being installed,
       4   correct?
5:08PM 5   A.   Correct.
       6   Q.   We know that somebody with access to that thumb drive
       7   and those files physically plugged in the thumb drive
       8   while Linux was being installed, correct?
       9   A.   Correct.  Or before Linux was being installed.  Not
5:08PM10   at the same time.  Before.
      11   Q.   Just before, correct?
      12   A.   Correct.
      13   Q.   And we talked about that time-stamp, 12:53 to 12:56
      14   p.m., correct?
5:08PM15   A.   Correct.  Before the installation, correct.
      16   Q.   That's hard data, correct?
      17   A.   Yes.
      18   Q.   And that was just before the installation was
      19   completed, correct?
5:09PM20   A.   Correct.
      21   Q.   And we clarified the whole middle, beginning,
      22   completion of installation time frame of just after 1:00,
      23   correct?
      24   A.   That is correct.
5:09PM25   Q.   Now, we know -- you were asked about other files with

5:09PM 1 the name "quiz" on it, correct?

2 A. Yes.

3 Q. Was that the same file?

4 A. No, they were not the same file, but they were file

5:09PM 5 names that began with the same word, "quiz."

6 Q. Do you agree with me that whoever has that thumb

7 drive, or had that thumb drive, installed Linux?

8 A. What was -- yeah, the person who has that thumb drive

9 was basically at the car lot at the same time, correct.

5:09PM10 That thumb drive was not recovered, but that thumb

11 drive -- there certainly is evidence that that thumb drive

12 was installed right before that Linux partition was

13 installed.

14 Q. So if you want to solve the mystery of who installed

5:10PM15 Linux, instead of just guessing, you follow the evidence

16 to those files and to that thumb drive, correct?  Yes or

17 no?

18 A. It's too late.  Law enforcement executes a search

19 warrant on November 8th.  This installation happened in

5:10PM20 May 11th.  A number of months have gone by.  How do the

21 law enforcement officers know on November 8th, when they

22 walk in the door, what existed in May?  They don't have

23 perfect information.  You want to say that we have perfect

24 information, but the law enforcement officers deal with

5:10PM25 the information that they have.  Yes, it would be perfect

5:10PM 1    if we had access to a thumb drive, but the reality is that

2    we don't.  It existed sometime in May.  We don't know

3    anything about it after that May time frame.

4    Q.    But the more devices that you have, the more likely

5:10PM 5    it is that you are going to find those files, correct?

6    A.    Correct.

7    Q.    You testified that the TOR network would not make

8    sense for someone being hounded by the paparazzi, correct?

9    A.    Yeah, I just don't understand that.  It's fair to say

5:11PM10    that I don't understand your analogy of using TOR to stay

11    away from the paparazzi.  It doesn't make a lot of sense

12    to me.

13    Q.    Let's get a couple things straight.  When I asked you

14    that on cross examination, you actually agreed that that

5:11PM15    made sense.  Do you remember that?

16    A.    In some sense.  If I want to basically not let people

17    know which websites that I'm going to, and I'm trying to

18    hide my location, that might have some value.  I don't

19    understand it has any realistic value.  But if you think

5:11PM20    that that's helpful to stay away from paparazzi --

21    Q.    Information is sold, correct?

22    A.    Information is?

23    Q.    Sold?

24    A.    Yes.

5:11PM25    Q.    We talked about how people smarter than you and I --

5:11PM 1     A.     Make money on selling.

2     Q.     -- make a lot of money selling personal information,

3     correct?

4     A.     Yes.

5:11PM 5     Q.     And you can't think of a single reason why somebody

6     trying to protect their privacy doesn't want their

7     information sold?

8     A.     So it has to do with what information we're talking

9     about.  The information we're talking about is just my

5:12PM 10    location, the computer's IP address.  I'm hiding my

11    location, my physical location.  I'm not hiding what web

12    browser I'm using.  I'm not hiding other attributes.  You

13    are just using TOR to hide your location with respect to

14    the sites you're visiting.

5:12PM 15    Q.     Let's talk about this for a second.  You readily

16    admitted that on the MacBook laptop, the TOR browser had

17    existed on that at least in 2017 and you don't know when

18    it ceased to exist, correct?

19    A.     Yes.

5:12PM 20    Q.     But you told me for sure that if there was -- if that

21    browser on the MacBook was ever used to access child

22    pornography, you would find a forensic artifact of that,

23    correct?

24    A.     No, that's not true.  Say that again.  I'm not sure I

5:12PM 25    heard you correctly.

5:12PM 1    Q.   If that browser on that device -- in other words, if

2    child pornography was viewed on that device, you would

3    know from your forensic investigation.  You said that,

4    correct?

5:13PM 5    A.   If there was forensic artifacts of that, I would have

6    found it, but the TOR browser is designed not to store

7    lots of information.  So people that use the TOR browser

8    are using it because it doesn't store information.  So

9    you're right, the answer to your question is, there is no

5:13PM 10    evidence that the Mac was used to download child

11    pornography material.

12    Q.   In other words, there is evidence that the TOR

13    browser was used differently on the Mac than the TOR

14    browser was used on the Linux partition, correct?

5:13PM 15    A.   Correct.  Yeah, we have very little information as to

16    how it was used on the Mac.  We know exactly how it was

17    used in the Linux partition.

18    Q.   But we know for sure it was used differently,

19    correct?

5:13PM 20    A.   Yes.

21    Q.   In a way, that's kind of the ball game, child

22    pornography, for this trial, correct?

23    A.   Yes.

24    Q.   You talked to us a few minutes ago about command

5:13PM 25    lines.  Do you recall that testimony?

5:13PM 1  A.    I do.

2  Q.    What evidence -- I don't want you to guess.  We're

3  not here to guess.  What evidence can you point to that

4  tells me exactly how uTorrent was installed on the Linux

5:14PM 5  partition?

6  A.    There is no exact answer to your question.  There is

7  circumstantial answer to your question.  The

8  circumstantial evidence, the lack of the existence of a

9  bash.doc history file is indicative that the person used

5:14PM 10  it through the App Store.  The lack of the installation

11  files in the download folder is evidence that the person

12  used the App Store to do that.  So there's no specific

13  answer to your question.  It's circumstantial evidence.

14  The circumstantial evidence, no bash history, no

5:14PM 15  downloaded files, that is circumstantial evidence that the

16  person used the App Store to download and install these

17  apps.

18  Q.    Can bash be deleted?

19  A.    Excuse me?

5:14PM 20  Q.    Can bash history be deleted?

21  A.    Yes, it can, if you know how to do it.

22  Q.    Did you go contact the folks that run the Linux App

23  Store and find out?

24  A.    No.

5:15PM 25  Q.    You testified, when talking about this --

5:15PM 1     MR. GELFAND:  This is a portion of Exhibit 30, if

2 I may publish it, Your Honor.

3     THE COURT:  You may.

4 Q.  (BY MR. GELFAND.)  You pointed, you circled,

5:15PM 5 actually, like I just did, the App Store, right?

6 A.  Yes.

7 Q.  You said you just double-click on it.  Why would

8 anyone not just double-click on it and instead do

9 something complicated, right?

5:15PM 10 A.  Correct.  It seems to be the most logical thing that

11 somebody would do, the simpler thing as opposed to the

12 more complicated thing.

13 Q.  Just double-click instead of do something more

14 complicated, right?  Is that your testimony?

5:15PM 15 A.  Yes.  It's certainly easier to use the App Store than

16 to use the command line history.

17 Q.  The same logic, then, would apply to just

18 double-clicking on Transmission than downloading uTorrent

19 and the Wine emulator that you testified to.  Both can't

5:16PM 20 be right, right?

21 A.  No, these programs are different.  So the features

22 associated with Transmission are different than the

23 features that are associated with it.  I used the analogy

24 of Coke versus Pepsi.  Some people are familiar with one

5:16PM 25 program versus another.  My personal preference is to use

5:16PM  1    uTorrent.  Another person's personal preference and their

        2    familiarity is with Transmission.  It's just a preference

        3    people have.  Some people prefer one program over another.

        4    I don't have a -- it doesn't matter to me what their

5:16PM  5    preference is.  There's certainly evidence in this case

        6    that the preference was to use the uTorrent program.

        7    Q.    Well, in fact, if you look at the MacBook, what was

        8    the preference used to download Three Amigos in 2017?

        9    A.    It was this qBittorrent, a different program.

5:16PM 10    Q.    It was Transmission, correct?

       11    A.    Yes.  Transmission and qBittorrent, correct.

       12    Q.    Transmission was actually used to download the

       13    Planes, Trains, whatever it was, correct?

       14    A.    Yes.  Correct.

5:17PM 15    Q.    So the preference was actually Transmission in 2017

       16    in January for Three Amigos, correct?

       17    A.    Yes.

       18    Q.    Now, you testified -- and I just wrote this down,

       19    tell me if I'm right and I heard you right -- when you

5:17PM 20    were asked about remote access, you used the phrase, "The

       21    possibility exists."  Did I hear that right?

       22    A.    Yes.

       23    Q.    Now, you said, hold on, let's go back to this BIOS,

       24    B-I-O-S, that we talked about for a few minutes on cross

5:17PM 25    examination, correct?

5:17PM  1    A.    Yes.

        2    Q.    And, in fact, you said you have never once looked at

        3    the BIOS because it's on the actual device, correct?

        4    A.    Yes.

5:17PM  5    Q.    It's in the courtroom today, correct?

        6    A.    Yes.

        7    Q.    That would have answers for us that you don't know,

        8    correct?

        9    A.    Correct.

5:17PM 10    Q.    That would tell us the reboot order, correct?

       11    A.    Yes.

       12    Q.    And you can't tell us what those answers are because

       13    you have never looked at it, correct?

       14    A.    Well, I didn't -- I don't think I need to look at it.

5:18PM 15    I can look at the Window -- look at the image that I

       16    created, look at the Windows event viewer log, the

       17    totality of the Windows computer.  That's the operating

       18    system that's being used most of the time.  That's the

       19    software for the Frazer software for the business.  So the

5:18PM 20    evidence, the totality of the evidence, tells me pretty

       21    obviously that the Windows is the default partition for

       22    this device.

       23    Q.    Does it tell you that forensically or are you just

       24    guessing again?

5:18PM 25    A.    It tells me just on the totality of the evidence.

5:18PM 1    The computer is clearly used for Windows for the majority
       2    of his multi-years at the car lot.
       3    Q.    Can you point me to something that you used from a
       4    forensic tool that you extracted that tells me that?
5:18PM 5    A.    The Windows operating system and all of the files
       6    that are in it and all of the documents show that that
       7    computer was being used for multiple years in the Windows
       8    environment.  That tells me that that's the default
       9    environment.  When you turn on the computer, it's going to
5:19PM10    boot up Windows.  That certainly was the environment up
      11    until May 13th, way before -- for multiple years before
      12    May 13th, when you turn on the computer, that was the only
      13    operating system that was installed.  It was the only one
      14    that it could boot to.  It was certainly the default prior
5:19PM15    to May 13th, 2019.
      16    Q.    Mr. Fottrell, the prosecutor showed you some
      17    documents -- and I can show you them again -- related to
      18    Arvest.  Do you recall that?
      19    A.    Yes.
5:19PM20    Q.    Those were from 2017, correct?
      21    A.    I'll take your word for it, yes.
      22    Q.    You don't have to take my word for anything.
      23    A.    That's okay.  Yes.
      24    Q.    Because those were from 2017, do you have a clue what
5:19PM25    the passwords were for the Arvest business account in 2018

5:20PM 1    or 2019?

2    A.    No.

3    Q.    Did you ask Arvest?

4    A.    No, I did not.

5:20PM 5    Q.    You testified about streaming a few minutes ago,

6    correct?

7    A.    Yes, I did.

8    Q.    I'm going to show you Government's Exhibit 43,

9    correct?  Do you see that in front of you?

5:20PM 10    A.    I do.

11    Q.    Do you recognize that?

12    A.    I do.

13    Q.    I just highlighted just the top artifact of

14    streaming, and there appears to be a series of, I'd like

5:20PM 15    to say virtually identical artifacts, but relating to

16    different files, correct?

17    A.    Yes.

18    Q.    Is it fair to say that this one is kind of an

19    example, a fair reflection of what the rest of this

5:20PM 20    document shows related to other files?

21    A.    Yes.

22    Q.    Now, this begins with an http://pairing designation,

23    correct?

24    A.    Yes.

5:20PM 25    Q.    When this file was streamed, was it accessible to

5:21PM 1    anyone other than somebody behind the HP keyboard?  Can
2    you say for sure?  Can you answer my question; yes or no?
3    A.    Could you repeat the question a little slower?
4    Q.    Yes.  When this file was streaming as opposed to just
5:21PM 5    double-clicked like the Planes, Trains, whatever thing,
6    that you testified earlier, was it accessible to somebody
7    anywhere on earth other than sitting behind the keyboard
8    of the HP computer?
9    A.    I mean, what this is telling me, it's being streamed
5:21PM10    from local host.  It's being streamed from the computer
11    itself.  You're asking me if now somebody else on the
12    planet in some other location could be accessing this
13    video from this computer, if I understand your question
14    correctly.
5:21PM15    Q.    Yes.  Can you rule that out?
16    A.    I think the answer to that is that it's extremely
17    unlikely that that would happen, because it would take a
18    number of things for that to happen.  This computer, the
19    VLC player, or the uTorrent thing, would have to be
5:22PM20    streaming.  The router would have to be configured to
21    allow that streaming to occur.  There's just a number of
22    steps that would need to occur.  While it is possible, I
23    don't think it's likely.
24    Q.    So the answer is, it is possible, correct?
5:22PM25    A.    It's possible, but not likely.

5:22PM 1    Q.    And you would want to know what the router showed,
       2    right?
       3    A.    If I was interested in answering that question, the
       4    router would give me answers to that question.
5:22PM 5    Q.    But you're not interested in answering that question?
       6    A.    I'm not interested in answering that question.  It
       7    does not seem relevant to me.  Clearly, there's evidence
       8    that the file was being viewed by the computer at this
       9    location at that point in time.
5:22PM10          MR. GELFAND:  Your Honor, one minute, please.
      11    Your Honor, I have no further questions.
      12          THE COURT:  Thank you.  Mr. Clayman?
      13          MR. CLAYMAN:  Briefly, Your Honor.  Could we
      14    switch to the other display?
5:23PM15                    REDIRECT EXAMINATION
      16    BY MR. CLAYMAN:
      17    Q.    Mr. Fottrell, let's start with that last topic first.
      18    The defendant, again, is suggesting that perhaps someone
      19    remotely accessed the computer and streamed it.  Does that
5:23PM20    seem likely to you?
      21    A.    Does not seem likely to me.
      22    Q.    Again, I want to clarify.  If someone was remotely
      23    accessing this Linux partition on the HP computer, what
      24    would someone in the car lot office see on the screen of
5:23PM25    that computer?

5:23PM 1  A.    They would see the VLC video player playing that

2  video.

3  Q.    So you are saying if Josh Duggar is in the car lot

4  office and someone is remotely accessing his computer, he

5:24PM 5  would see someone viewing child pornography on it?

6  A.    Yes.  If you are using the VLC program to stream that

7  video, it is being displayed in that VLC window on the

8  Linux partition at the car lot.

9  Q.    Not only that, he wouldn't just see someone streaming

5:24PM 10  child pornography.  He would see someone on a Linux

11  partition that he apparently didn't even know about?

12  A.    Yes.

13  Q.    Does that seem likely to you, Mr. Fottrell?

14  A.    No, it does not.  That does not seem likely.

5:24PM 15  Q.    You were also asked about BIOS and the boot order on

16  this recross.  You are qualified as an expert in computer

17  forensic examinations in this case, is that right?

18  A.    Yes, it is.

19  Q.    So you have decades of experience?

5:24PM 20  A.    Yes.

21  Q.    How long have you been using the Ubuntu Linux

22  operating system?

23  A.    Probably 20 years.

24  Q.    So based on your opinion, based on your expert

5:24PM 25  opinion, what was the boot order for the HP computer?

5:24PM 1   A.   It would boot up Windows first.   That seems -- that's

2   the default boot order.   That's my belief as to what the

3   operating system would boot to.

4   Q.   And if Linux was the default boot, what would happen

5:24PM 5   every time someone in the car lot turned on the computer?

6   A.   It would boot up the Ubuntu partition.

7   Q.   It wouldn't go to the Windows partition?

8   A.   No.

9   Q.   So if anyone in the car lot, other than the

5:25PM 10   defendant, turned on the computer, it would go to this

11   Linux partition?

12   A.   Yes.

13   Q.   Where child pornography is being downloaded?

14   A.   Yes.

5:25PM 15   Q.   And where there's no Frazer app for them to conduct

16   their business?

17   A.   Yes.

18   Q.   Does that seem likely to you, Mr. Fottrell?

19   A.   That does not seem likely.

5:25PM 20   Q.   You were asked again about command lines.   Is it fair

21   to say that if someone downloaded TOR using command lines

22   and then knew to go to the bash history file and delete

23   the bash history, that would leave the same amount of

24   forensic artifacts on the computer as if someone went to

5:25PM 25   the App Store and simply clicked on downloading TOR?

5:25PM 1    A.    Yes.

2    Q.    Mr. Fottrell, based on your decades of experience,

3    which one is more likely?

4    A.    It's more likely that somebody is using the App

5:25PM 5    Store.  It's point and click.  It's a graphical user

6    interface.  It's very easy for novice users to use.  The

7    most likely option is to use the App Store graphical user

8    interface.

9    Q.    Is there any benefit to using command lines?

5:26PM 10   A.    No, not that I can -- no.  No.

11   Q.    If you were somehow remotely accessing the computer,

12   would you only be able to use command lines?

13   A.    No, you should be able to access the graphical user

14   interface.

5:26PM 15   Q.    So does the idea that someone was using command lines

16   to download TOR make sense to you based on your expert

17   opinion?

18   A.    No.

19   Q.    You were also asked whether the user of the MacBook,

5:26PM 20   the defendant's MacBook, had a preference for

21   Transmission.  Do you recall that?

22   A.    Yes, I do.

23   Q.    How many different peer-to-peer softwares did you see

24   on the defendant's MacBook?

5:26PM 25   A.    Two.  There was Transmission and qBittorrent.

5:26PM 1   Q.   And Transmission was used once, is that right?

2   A.   Yes.

3   Q.   QBittorrent was also used once?

4   A.   Yes.

5:26PM 5   Q.   But the user of the defendant's MacBook repeatedly

6   searched to download uTorrent, is that right?

7   A.   Yes.   There was multiple searches for the user trying

8   to download uTorrent for the Mac.

9   Q.   In multiple months, actually, April and May of 2017,

5:26PM 10   is that right?

11   A.   That is correct.

12   Q.   And he was blocked from doing that, is that right?

13   A.   Yes.

14   Q.   Based on those multiple searches, do you think the

5:27PM 15   MacBook user at that point might have a preference for

16   uTorrent?

17   A.   Yes.

18   Q.   You were asked again on recross whether there would

19   be any forensic artifacts on the MacBook if someone had

5:27PM 20   used TOR to access child pornography on the TOR network.

21   Do you recall that?

22   A.   Yes, I do.

23   Q.   Is it possible that someone could have used TOR to

24   access child pornography on a hidden service and you would

5:27PM 25   not find any forensic artifacts of that?

5:27PM 1   A.    Yes, it is possible.

2   Q.    Why is that?

3   A.    Because the TOR browser, when it's installed, it

4   stores all of its temporary files in ram.  It's

5:27PM 5   specifically designed not to allow those forensic

6   artifacts to exist.  So even today, the use of the TOR

7   browser, the forensic artifacts that we are -- we're not

8   getting browser history.  We're not getting all of the

9   normal artifacts that you would expect to see.  We only

5:27PM10   get very little.  We get the TOR browser bookmarks, which

11   are stored on the hard drive.  Everything else, the

12   activity that's happening, just does not get logged.  The

13   person could have been using the TOR browser to go to

14   child pornography websites and view child pornography.

5:28PM15   You don't need to download it.  Go to a TOR hidden service

16   where you can see child pornography.  As long as you don't

17   download something, nothing is going to get saved.  There

18   would be no forensic artifacts associated with that type

19   of browsing activity.

5:28PM20   Q.    So we know that the user of the Linux partition was

21   using TOR to download child pornography, is that right?

22   A.    Yes.

23   Q.    Could the user of the MacBook been using TOR to view

24   child pornography?

5:28PM25   A.    That's possible.  And it's possible that there's no

5:28PM 1  forensic artifacts recoverable associated with that.

2  Q.   We simply don't know what the defendant's MacBook was

3  used to do on TOR, is that fair to say?

4  A.   Correct.  We just have no information as to what was

5:28PM 5  happening on TOR, the use of TOR on the MacBook.

6  Q.   You were also asked about the virtualization software

7  again.  Mr. Fottrell, when you briefly connected to the

8  internet, was there any chance child pornography would be

9  shared?

5:28PM 10  A.   No, there was no child pornography being shared.

11  Q.   How do you know that?

12  A.   Because the uTorrent program was not run.  I was just

13  basically installing the software.  So in order for that

14  to happen, I would have to have the uTorrent program up

5:29PM 15  and running.  There would have to be child pornography in

16  a file system that was being shared.  And we already

17  talked about it's in unallocated space and in a thumbnail

18  file.  It's in no folder that's associated with the

19  uTorrent program.  So it's just not a realistic option.

5:29PM 20  Q.   Mr. Gelfand referred to this use of the

21  virtualization software as part of your forensic

22  examination.  Is it fair to say that the forensic

23  examination had already really occurred before this

24  virtualization software?

5:29PM 25  A.   Yeah.  So, yeah, the virtualization is not

5:29PM 1   technically part of my forensic examination.  It's just

2   part of my illustration of preparing trial exhibits to try

3   to find a way to illustrate to the Jury what was happening

4   on the machine.  It's certainly not impacting my forensic

5:29PM 5   analysis.  It's like, hey, can I use this virtualization

6   to explain a technical artifact in a more

7   easy-to-understand manner.

8   Q.    So by the time you're running virtualization

9   software, you already know what the forensics show, is

5:29PM 10  that right?

11  A.    Absolutely correct.

12  Q.    You're simply doing that to help the Jury out in

13  understanding the evidence?

14  A.    Yes.

5:30PM 15  Q.    You were also asked again, Mr. Fottrell, about a

16  thumb drive on recross.  Do you recall that?

17  A.    Yes, I do.

18  Q.    The defense made a big deal about how we need to know

19  who has this thumb drive in order to know who installed

5:30PM 20  the Linux partition.  Do you recall that?

21  A.    I do recall that.

22  Q.    Is that true?

23  A.    No, I don't think that's helpful.  I mean, that's

24  just one artifact out of hundreds of other artifacts.  We

5:30PM 25  have lots of good evidence as to who installed the Ubuntu

5:30PM 1   partition.  We have lots of good evidence as to when those

2   things occurred.  The existence of this thumb drive and

3   any information contained on that thumb drive is pretty

4   inconsequential.

5:30PM 5   Q.   You reviewed other thumb drives that were found at

6   the defendant's car lot, is that right?

7   A.   I did.

8   Q.   Some of those thumb drives had random pictures on it,

9   is that right?

5:30PM 10   A.   Some of them had family photos.  Some of them had

11   pictures, what I would classify as like a hunting trail

12   camera, pictures of the woods where there's animals

13   walking by, so I'm not really sure, some kind of a trail

14   camera.  And just family photos.  One of them was empty,

5:31PM 15   like it doesn't have anything on that.  So there was just

16   nothing of investigative value on all of the thumb drives

17   that were seized by law enforcement at the car lot.

18   Q.   Is it possible this thumb drive with this Quiz 1

19   document was just found on the car lot?

5:31PM 20   A.   Say that again.

21   Q.   Is it possible that this thumb drive was just found

22   on the car lot?

23   A.   Yes.

24        MR. GELFAND:  Objection, Your Honor.  It calls

5:31PM 25   for speculation.

5:31PM 1              THE COURT:  Well, I think there's actually --

2              MR. GELFAND:  I'll withdraw the objection, Judge.

3    Q.  (BY MR. CLAYMAN.)  Is it possible the thumb drive was

4    taken off the car lot afterwards?

5:31PM 5    A.   Yes.

6    Q.   Is it possible the thumb drive was destroyed?

7    A.   Yes.

8    Q.   Does the existence or location of this thumb drive

9    change your conclusion with respect to who downloaded and

5:31PM10   installed the Linux partition on the HP computer?

11   A.   Not at all.

12              MR. CLAYMAN:  Nothing further, Your Honor.

13   Actually, Your Honor, one moment.

14   Q.  (BY MR. CLAYMAN.)  So two clarifications,

5:32PM15   Mr. Fottrell.  Does the TOR application sometimes store

16   browser history?

17   A.   Say again.

18   Q.   Does the TOR browser sometimes store browser history?

19   A.   Yes, in ram, but not in a file.  Not in a file in the

5:32PM20   file system.

21   Q.   You found browser history on the defendant's iPhone

22   11 related to TOR, is that right?

23   A.   That's from a different application.  That's from the

24   TORsec application on a mobile device, which is different

5:32PM25   from the TOR application on Ubuntu or a PC.

5:32PM 1  Q.    So we know that the defendant was using TOR on his

2  iPhone 11 based on what you found?

3  A.    Yes.

4  Q.    And you know he was viewing adult pornography based

5:32PM 5  on the media, or the browser history, is that right?

6  A.    Yes.

7  Q.    We just don't know what the defendant was using TOR

8  for on the MacBook?

9  A.    Yes.

5:33PM 10  Q.    Returning to the thumb drive, is it possible that

11  whoever installed this partition handed the thumb drive

12  off to someone else?

13  A.    That's possible.  Lots of things are possible.  We

14  just don't have perfect information to answer every

5:33PM 15  possibility.

16            MR. CLAYMAN:  Nothing further, Your Honor.

17            MR. GELFAND:  I have no more questions, Judge.

18            THE COURT:  All right.  You may stand down.

19            Members of the Jury, it is very important,

5:33PM 20  especially on the weekend, for me to read this recess

21  instruction that by now is very familiar to you.

22            During this recess, and every other recess, you

23  must not discuss this case with anyone, including the

24  other jurors, members of your family, people involved in

5:33PM 25  the trial or anyone else.  Do not allow anyone to discuss

5:33PM 1    the case with you or within your hearing.  Only you have

2    been chosen as jurors in this case and only you have been

3    sworn to uphold the law.  No one else has been chosen and

4    no one else can do this for you.

5:34PM 5         You should not even talk among yourselves about

6    the case before you have heard all the evidence and the

7    case has been submitted to you by me for deliberations

8    because it may or could affect your final decision.  If

9    anyone tries to talk to you about the case, please let me

5:34PM10    know that immediately through a court security officer.

11         When I say you must not discuss the case with

12    anyone, I of course mean not orally or verbally as well as

13    not in any written or digital context or in any type of

14    medium.  Do not read any newspaper or other written

5:34PM15    account, watch any televised account, or listen to any

16    radio program about this trial.  Do not conduct any

17    internet research or consult with any sources of any kind

18    about this case, the people involved in this case, or its

19    general subject matter.  You must keep your mind open and

5:34PM20    free of outside information.  Only in this way will you be

21    able to decide the case fairly based solely on the

22    testimony, the evidence presented in this courtroom, and

23    my instructions on the law.  If you were to decide this

24    case on anything else, you will have done an injustice.

5:35PM25    It would be a violation of your oath for you to base your

5:35PM 1  decision on some reporter's view or opinion, or upon

2  information that you acquire outside the courtroom.  It is

3  very important that you follow these instructions.

4        You are recessed for the weekend.  We will see

5:35PM 5  you Monday morning at 8:30.

6        MS. CRAIG:  Can I remind you all to leave your

7  notebooks and pencils in the jury room.

8        (Jury out at 5:35 p.m.)

9        THE COURT:  Everyone please remain in the gallery

5:35PM10  until the jurors have cleared the elevator lobby and I'll

11  let you know when that is.

12        Anything else counsel would like to get on the

13  record today?

14        MR. ROBERTS:  No, Your Honor.

5:36PM15        MR. GELFAND:  Not from the defense.

16        THE COURT:  We're in recess until Monday morning

17  at 8:30.  I would like to visit with counsel here at side

18  bar off the record before you get on your way.

19        (Proceedings recessed at 5:38 p.m.)

20

21

22

23

24

25

5:41PM

C E R T I F I C A T E

     I, Paula K. Barden, CCR, RPR, RMR, Federal Official Court Reporter, in and for the United States District Court for the Western District of Arkansas, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

     Dated this 8th day of January 2022.



_____
PAULA K. BARDEN, CCR, RPR, RMR #700
Federal Official Court Reporter
Western District of Arkansas