IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION


UNITED STATES OF AMERICA                    PLAINTIFF

v.               CASE NO. 5:21-CR-50014

JOSHUA JAMES DUGGAR                         DEFENDANT

_____


JURY TRIAL

VOLUME 5 OF 8

BEFORE THE HONORABLE TIMOTHY L. BROOKS

DECEMBER 6, 2021

FAYETTEVILLE, ARKANSAS

_____

Paula Barden, RPR, RMR, Federal Official Court Reporter
35 East Mountain Street, Fayetteville, Arkansas 72701

```
 1                      A P P E A R A N C E S

 2

 3    FOR THE PLAINTIFF:

 4    MR. DUSTIN ROBERTS
      MS. CARLY MARSHALL
 5    United States Attorney's Office
      414 Parker Avenue
 6    Fort Smith, Arkansas 72901
      (479) 783-5125
 7    dustin.roberts@usdoj.gov
      carly.marshall@usdoj.gov
 8

 9    Also Present:  Special Agent Howard Aycock

10

11    FOR THE DEFENDANT:

12    MR. JUSTIN K. GELFAND
      Margulis Gelfand
13    7700 Bonhomme Avenue, Suite 750
      St. Louis, Missouri 63105
14    (314) 390-0234
      justin@margulisgelfand.com
15
      MR. TRAVIS W. STORY
16    Story Law Firm
      2603 Main Drive, Suite 6
17    Fayetteville, Arkansas 72704
      (479) 443-3700
18    travis@storylawfirm.com

19

20

21

22

23

24

25
```

<pre>
 1                        I N D E X

 2                                                 Page

 3   In-Chambers Hearing                            898

 4   CLINTON BRANHAM

 5       Direct Examination by Mr. Roberts          916

 6       Cross Examination by Mr. Story             921

 7       Redirect Examination by Mr. Roberts        927

 8       Recross Examination by Mr. Story           928

 9       Redirect Examination by Mr. Roberts        930

10   JAMES HOLT

11       Direct Examination by Mr. Clayman          931

12       Cross Examination by Mr. Gelfand           935

13       Redirect Examination by Mr. Clayman        940

14       Recross Examination by Mr. Gelfand         941

15   BOBYE HOLT

16       Direct Examination by Ms. Marshall         945

17       Cross Examination by Mr. Gelfand           957

18       Redirect Examination by Ms. Marshall       963

19   Government Rests                               966

20   Defendant's Motion for Acquittal under Rule 29 966

21   MICHELE BUSH

22       Direct Examination by Mr. Gelfand          967

23   Argument by Mr. Gelfand as to Rule 29 Motion  1037

24   Argument by Ms. Marshall as to Rule 29 Motion 1038

25   Court's Ruling on Rule 29 Motion              1039
</pre>

```
 1                        E X H I B I T S

 2                                                    Received

 3   Defendant's 8(a) and 9(a)  Prefatory Pages to       1127
                                Torrential Downpour
 4                              Logs

 5   Defendant's Exhibit 51     Metadata Regarding       1150
                                Photo
 6
     Defendant's Exhibit 52     Screenshot from           992
 7                              HP Computer,
                                Windows Partition
 8
     Defendant's Exhibit 60     Screenshot from          1021
 9                              HP Computer

10   Defendant's Exhibit 61     Screenshot of MacBook     1116
                                Laptop
11
     Defendant's Exhibit 62     Screenshot of            1121
12                              iPhone

13   Defendant's Exhibit 81     Adam Walsh Exam           978
                                Worksheet
14
     Defendant's Exhibit 82     Screenshot from HP       1050
15                              Computer

16   Defendant's Exhibit 83     EnCase Screenshot         987
                                From HP Computer
17
     Defendant's Exhibit 84     Screenshot from HP       1012
18                              Computer Re: dell_one

19   Defendant's Exhibit 85     Screenshot from HP       1053
                                Computer
20
     Defendant's Exhibit 87     Screenshot from          1056
21                              archive.org website

22

23

24

25
```

```
 1              (In-Chambers Hearing)
 2              THE COURT:  Mr. Gelfand first.
 3              MR. GELFAND:  Thank you.  Judge, as I think the
 4    Court is aware, one of the witnesses we intend to call at
8:19AM 5    this trial is Caleb Williams.  Caleb Williams, by way of
 6    context, some of the stuff we anticipate proving through
 7    his testimony, some of the stuff is already in evidence.
 8              THE COURT:  Caleb Williams is the brother of Josh
 9    Williams?
8:19AM10              MR. GELFAND:  Correct.
11              THE COURT:  Josh Williams was one of the people
12    that ya'll said he was kind of lumped in there with Mize
13    and Berry at one point?
14              MR. GELFAND:  Correct.  But Caleb independently
8:19AM15    was using the Wholesale office motor account to send
16    e-mail correspondence for shipping labels and eBay, things
17    like that.  He actually sold a car as the salesperson from
18    Wholesale in March.  That's not in evidence yet, but I
19    anticipate Caleb will authenticate that.
8:20AM20              THE COURT:  And he's the guy that Faulkner
21    testified about?
22              MR. GELFAND:  Yes, correct.
23              MR. ROBERTS:  Yes, sir.
24              MR. GELFAND:  He claimed that they "confirmed,"
8:20AM25    quote, unquote, that he was out of state.  We challenge
```

8:20AM 1   that factually, but that's neither here nor there.

2          Last night, we got an e-mail from the government

3   that Caleb Williams had apparently sent to the government

4   on November 30th, the first day of trial, the jury

8:20AM 5   selection day, at night.  For whatever reason, we didn't

6   get that until last night.  In that e-mail, Caleb Williams

7   expressly mentions, among other things, quote, "I've also

8   found a few more passwords if you all want them," end

9   quote.  And Caleb is referring -- Caleb Williams -- is

8:20AM10   referring in that e-mail to, among other contexts,

11   "Controlling Duggar social media accounts" and things

12   along those lines.

13          Mr. Williams also provides bizarre photos, just

14   to give the Court context.  We don't have any metadata

8:21AM15   based on any of this, but there's a photo of checks that

16   he apparently took for whatever purpose, apparently

17   attempting to reflect payments from the Duggars.  He

18   provides a non-date or time-stamped photograph, Your

19   Honor, this one in particular, of him apparently at the

8:21AM20   Wholesale Motorcars' office reflecting, what appears to

21   reflect Mr. Duggar -- Josh Duggar, that is -- using the

22   MacBook laptop that's at issue in this case.

23          By way of context, we have been attempting

24   through an investigator to speak with Mr. Williams for

8:22AM25   months.  Mr. Williams has, with the exception of a very

8:22AM 1   short conversation with our investigator, Kevin McClain,

2   has essentially refused to speak to the defense.  We can't

3   control that, obviously.  But to learn now when things

4   like access to passwords, when he's in our opinion front

8:22AM 5   and center as a significant witness, to learn now that the

6   government has been sitting on this for the entirety of

7   its case-in-chief, and to get this e-mail last night after

8   Mr. Williams -- and the government knew this -- he resides

9   out of state, after he left and came here, we e-mailed the

8:23AM10   government last night asking -- Mr. Williams says, "I've

11   also found a few more passwords if you all want them."  We

12   have no disclosure as to any passwords that Mr. Williams

13   has, if he previously provided them.

14           Mr. Williams also, in a separate e-mail that we

8:23AM15   got just before trial that was sent to the government at

16   about 11:40 p.m., plus or minus, the night before

17   Thanksgiving to Mr. Clayman, he essentially acknowledges,

18   among other things, potentially being at the car lot when

19   he was in town around -- Mr. Williams' way of phrasing

8:23AM20   it -- May 9th to May 11th.  There's a text message from

21   Mr. Williams that we intend to introduce into evidence,

22   assuming Mr. Williams authenticates it -- he gave it to

23   the government -- that offers to "Watch the lot," end

24   quote, that he sends to Josh Duggar on May 7th referencing

8:24AM25   that week.  This is front and center at the heart of this

8:24AM 1    case and we were stunned to get this last night.

2            Two things, among others.  Number one, if

3    Mr. Williams provided passwords that he had access to to

4    the government, that's a very big deal in light of the

8:24AM 5    government's theory as to the password being a big part of

6    their case-in-chief, essentially mocking the defense for

7    suggesting that anyone would have access to these

8    passwords over the course of this trial.

9            And second of all, the government had in their

8:24AM10    possession evidence that a third party clearly had access

11    to Duggar family social media passwords, et cetera, which

12    clearly, at least circumstantially, gives rise to the

13    argument that others had access to the Intel 1988

14    password, perhaps among others.  And so to make a long

8:25AM15    story short, a lot of what we intend to ask Mr. Williams

16    will be the first time we've ever had a chance to speak

17    directly with Mr. Williams.  He did speak, just full

18    disclosure, to our investigator.  He wouldn't let our

19    investigator record anything.  And he spoke to the

8:25AM20    investigator in a way that he was very anxious, very

21    nervous, wouldn't, according to the investigator --

22    obviously, I wasn't there -- wouldn't -- was worried that

23    the Ring doorbell system on Caleb Williams' own patio

24    would somehow capture what they were talking about.  He

8:25AM25    was very paranoid.  He's been sending these unsolicited

8:25AM 1   e-mails to the government.  He's apparently been tracking

2   the case.  And there's more evidence, and I don't think --

3   I hate to phrase this, but I'm happy to show as many of

4   our cards as we need to, but I don't think we should have

8:26AM 5   to show all of our cards.

6         THE COURT:  What relief are you asking for?  Is

7   this just a heads-up or what?

8         MR. GELFAND:  It's a tough situation because

9   there's no relief directly related to Caleb Williams that

8:26AM 10   would make any sense.  The government never really

11   investigated Caleb Williams.  It's not like they want to

12   put Caleb Williams on the witness stand.  And so we intend

13   to.  We would seek some sort of relief as far as exclusion

14   of government evidence or something along those lines

8:26AM 15   that's not related to Caleb Williams.

16         THE COURT:  Do you think that this is *Brady*?

17         MR. GELFAND:  I do.  I think it's unambiguously

18   *Brady*.

19         THE COURT:  And how is it *Brady*?

8:26AM 20         MR. GELFAND:  Access to passwords when the

21   government's entire -- they literally -- when one of the

22   witnesses, Matthew Waller testified, Your Honor, as the

23   Court may recall, the prosecutor literally essentially

24   mocked the notion that Josh Duggar would have given his

8:26AM 25   private passwords to a third party, when they had in their

8:27AM 1    possession literally from the night before, because that's

2    when Mr. Waller testified --

3              THE COURT:  I mean, I understood the evidence, at

4    least from Mr. Fottrell was that this password, the one

8:27AM 5    involving Intel 1988 and various deviation or derivatives

6    of that, was a password that had been used for four or

7    five years on various accounts that are associated with

8    Josh Duggar, which I took to be circumstantial evidence

9    that points to Josh Duggar as the person that created the

8:27AM 10   accounts where a similar password is used.  I don't know

11   that -- I don't know what passwords that this witness,

12   Caleb Williams, claims to know.  And I don't know whether

13   the fact that even if he knew that Intel 1988 was a

14   password, that that is necessarily exculpatory of Josh

8:28AM 15  Duggar.  I mean, in a metaphysical sense, I can understand

16   where you might say, at the extreme, anyone who knows that

17   password could be responsible for it.

18             But in any event, is this the issue that you're

19   wanting is for the Court to declare this to be exculpatory

8:29AM 20  evidence and a *Brady* violation?

21             MR. GELFAND:  Yes, Your Honor.  And just to be

22   crystal clear, the government's theory as to the password

23   is essentially, "No one else could have done this."  I'm

24   going to phrase it my way, but the government's theory, as

8:29AM 25  they have said it to the Jury is basically, "Give me a

8:29AM 1    break, Josh used his personal password on the Linux

2           partition."  Mr. Williams --

3                  THE COURT:  Well, I recall some evidence that he

4           was sharing this with a vice presidential candidate.  So

8:29AM 5    obviously --

6                  MR. GELFAND:  Which we brought out.

7                  THE COURT:  Obviously, others knew it.  So I

8           don't --

9                  MR. GELFAND:  There's a picture, Your Honor, of

8:29AM 10   Caleb Williams at the Wholesale office.

11                 THE COURT:  A picture of Caleb Williams at the

12          Wholesale office?

13                 MR. GELFAND:  I'm sorry.  There's a picture taken

14          by Caleb Williams of Josh Duggar at the Wholesale office.

8:30AM 15   We have no metadata.  We have no way of time-stamping

16          that.  It was given to us last night.  There is

17          pictures --

18                 THE COURT:  Hang on.  Does the government have

19          metadata?

8:30AM 20                MR. ROBERTS:  No, Your Honor.  We have none of

21          these things that he's asking for.  We have not spoken to

22          Caleb since the beginning of this trial.

23                 THE COURT:  Hang on.

24                 MR. ROBERTS:  Yes, Your Honor.

8:30AM 25                MR. GELFAND:  The point, though, Your Honor, and

8:30AM 1   I say this to some extent wearing my old hat as a federal

2   prosecutor.  When you get an e-mail that says, "I have

3   more passwords," you ask.  You don't bury your head in the

4   sand.  You don't pretend not to see it.  You don't hold it

8:30AM 5   back from the defense until the defense's case-in-chief.

6   It's so obvious to me that you immediately say, "What

7   passwords do you have?"  I mean, it's the classic old

8   Supreme Court case; you can strike hard blows, but not

9   foul ones.  And this is exculpatory any way you see it.

8:31AM 10          THE COURT:  So we're going to go forward with the

11   trial.  We'll use the record that we're making now as a

12   placeholder for the fact that you raised this *Brady* issue.

13   And I think that at some other point when the Jury is not

14   waiting for us you can collect your thoughts and we can

8:31AM 15   mark exhibits to your motion so that we have a better

16   understanding and you can perhaps lay out your argument in

17   a little bit better detail for the record.

18          But what is the government's position as to why

19   it waited several days to disclose this?

8:31AM 20          MR. ROBERTS:  Your Honor, one, these were

21   unsolicited e-mails.  We didn't ask Mr. Williams to send

22   these e-mails.  We got it in the middle of a trial.  We've

23   been in trial all week.  We honestly did not review it

24   until Sunday.  That's when we met to discuss, okay, this

8:32AM 25   is what we're going to do for the rest of our case.  What

8:32AM 1   are they going to do?  And, okay, they are going to try to

2   call Caleb Williams.  Let's look at that e-mail.

3         We looked at the e-mail.  We do not have

4   metadata.  We have not discussed passwords as he's

8:32AM 5   requesting.

6         THE COURT:  Who were the e-mails directed to?

7         MR. ROBERTS:  I think Mr. Clayman.  How he chose

8   Mr. Clayman, we don't know.  This is a defense witness.

9   This was never our witness.  And that's the issue I wanted

8:32AM 10  to bring before the Court regarding third-party guilt.  It

11  kind of dovetails into that.  When the investigator,

12  defense investigator, went out -- again, we didn't look at

13  Caleb Williams at all, because there was nothing pointing

14  that he was on the car lot or had access to this computer

8:32AM 15  during the time frame in question.  When the defense

16  investigator went out there, he notes -- and this is part

17  of the defense exhibits -- that Mr. Williams told him that

18  he was not in the state during this time frame.

19        Going forward, when he sees his name or whoever

8:33AM 20  alerts him -- actually, I think it's a member of the

21  Duggar family -- sees his name in a filing regarding

22  third-party guilt, he contacts an attorney to reach out to

23  the government and offers to provide, "Hey, I wasn't

24  here."  We generically told him through his attorney,

8:33AM 25  "Provide any pictures, any documentation."  And every time

8:33AM 1  we get that, even though it's not our witness, we are

2  sending it to the defense.  That's exactly what we were

3  doing.

4        But the point of my issue with third-party guilt,

8:33AM 5  if they have something connecting him, placing him in

6  Arkansas, they have not disclosed it.  We have disclosed

7  overwhelming, including pictures taken of him in Illinois

8  on November (sic) 12th, 13th, 14th, 15th, 16th, 17th.

9        THE COURT:  Of this year?

8:34AM 10        MR. ROBERTS:  Of 2019.

11        THE COURT:  When the search warrant was executed?

12        MR. ROBERTS:  No.  Excuse me, I said November.

13  May.  Yes, sir.  So the entire time frame --

14        THE COURT:  You have pictures of Williams with

8:34AM 15  metadata that shows that he was in Illinois during May 14

16  to 16?

17        MR. ROBERTS:  Yes.

18        MR. GELFAND:  Not with metadata.  Not with

19  metadata.

8:34AM 20        MR. ROBERTS:  We have -- showing time-stamps, and

21  then we have a witness who will say, "I took this picture

22  of him on November (sic) 12th."

23        THE COURT:  A witness on rebuttal?

24        MR. ROBERTS:  Yes, Your Honor.  And then

8:34AM 25  separately, he does a live-stream.  He does some kind of

8:34AM 1    engraving, this huge, like glass engraving.  He does
2    live-streams.  We have turned this over to the defense.
3    He does live-streams of his engraving and we turned over
4    screenshots on May 13th, on May 14th, on May 15th.  That
8:34AM 5    engraving machine, this huge machine, is in Illinois.  So
6    that's why we are saying, if you have a good faith basis
7    to call him, just let us know.  But right now, we are
8    unaware through the defense's own exhibits and anything we
9    produced that places him anywhere outside of Illinois
8:35AM 10   during the time frame at issue.  And Mr. Gelfand has
11   now -- we have been waiting for it -- but in opening, he
12   locked himself in, he says May 13th, you have to be behind
13   the computer.
14          THE COURT:  The day that it was -- that the
8:35AM 15   partition was downloaded, or set up?
16          MR. ROBERTS:  Yes, Your Honor.
17          MR. GELFAND:  May I respond, Your Honor?
18          THE COURT:  Just a second.  Back on the *Brady*
19   issue, Mr. Clayman, this e-mail that you disclosed last
8:35AM 20   night that came in several days ago, my understanding is
21   that you just realized that you had this e-mail and viewed
22   its contents last night?
23          MR. CLAYMAN:  We reviewed its contents together
24   last night, yes.
8:35AM 25          THE COURT:  And within what period of time did

8:35AM 1    you forward that on to the defendant?

2                MR. CLAYMAN:  Did that last night at around

3        6:00 p.m. after we had reviewed it together.

4                THE COURT:  So between the time ya'll opened it

8:36AM 5    and discussed it and sent it was how long?

6                MR. CLAYMAN:  If I could confer.  I don't recall

7        exactly.

8                MR. ROBERTS:  Hours, generally.  An hour at best.

9        We also looked for metadata.  There was none there.

8:36AM 10   MS. MARSHALL:  Your Honor, we were able to fully

11       sit down and talk about everything.

12               THE COURT:  And the e-mail attached some of the

13       pictures that you were showing?

14               MS. MARSHALL:  Yes, Your Honor.

8:36AM 15   MR. ROBERTS:  Not all the pictures.  There's one

16       there with the date and time-stamps that I was referring

17       to regarding third-party guilt.  He's in Illinois on

18       May 12th.  That came from the witness, rebuttal witness.

19               MR. GELFAND:  There's no metadata.  Caleb

8:36AM 20   Williams claims to be in Illinois at the time.  That's a

21       factual dispute.  I'm reading verbatim from Caleb Williams

22       himself.  That's not metadata.

23               MR. ROBERTS:  That is exactly metadata.

24               MR. GELFAND:  We can agree to disagree on that.

8:37AM 25   But Caleb Williams says, quote, to the government, "I was

8:37AM 1   completely mistaken about not being at the Wholesale

2   Motorcars' lot during the time I was in Arkansas

3   between" -- and he says -- "May 8th, 2019, to May 11th,

4   2019.  I do not know if I was on the lot computer or even

8:37AM 5   if I ended up going there.  It looks like during my time

6   there I did odd work for the guys and maybe even Josh

7   Duggar."

8         And then there's a text message from Caleb

9   Williams that week saying that he's going to, "Watch the

8:37AM 10   lot," meaning Wholesale Motorcars' lot.  The point is,

11   there's a factual dispute here.  If the government wants

12   to factually argue with that, so be it.

13         THE COURT:  Well, so the third-party guilt issue,

14   sometimes known as alternative perpetrator issue, is an

8:37AM 15   issue that I'm sure you all are familiar with.  The

16   government made this the subject of a motion in limine.

17   You all responded.  The Court ruled that it would not

18   prohibit Mr. Duggar to point the finger at someone else,

19   but the Court also noted that that was not a license to

8:38AM 20   offer speculative testimony.  And there's some case law

21   out there.  There's the *Holmes* case that the government

22   cited.  That's a Supreme Court case.  There's a Tenth

23   Circuit case, *Jordan*.  And then there's the Tenth Circuit

24   case in the *Tim McVeigh* case, the Oklahoma City bombing

8:38AM 25   case.  And these cases all refer to this idea that there

8:38AM 1   has to be some demonstrable nexus of proof that links the
2   alternative perpetrator to the crime.  And then there's
3   also this concept that the greater the strength of the
4   evidence of the government pointing to the defendant
8:39AM 5   relative to the strength of this nexus, that that weighs
6   into part of the Court's analysis as to whether it will
7   include or permit or exclude that.
8          I have no idea what Caleb Williams is going to
9   say, so I'm not going to say that Caleb Williams can't be
8:39AM10   called as a witness.  But I am going to say that I will
11   not let him testify to anything speculative.  And I will
12   not allow him to testify to any facts without a 602
13   foundation.
14          MR. GELFAND:  And that's fully our intention,
8:40AM15   Your Honor.
16          THE COURT:  So if he says he wasn't there, you
17   can't talk about what happened.
18          MR. ROBERTS:  May I add one layer to that?
19          THE COURT:  Yes.
8:40AM20          MR. ROBERTS:  Mr. Williams', a long-time friend
21   of the Duggars, is also a sex offender.  If they bring
22   that up prior to connecting him to the possibility, doing
23   this nonspeculative nexus, then the whole point of not
24   calling him is shot.
8:40AM25          THE COURT:  Yeah.  Well, you are not going to get

8:40AM 1  into that until you ask permission from the bench.

2          MR. GELFAND:  Fair enough, Your Honor.  But just

3  to be clear, our full intention is to walk him through a

4  document trail that links him through facts.

8:41AM 5          THE COURT:  Well, you've got to establish 901

6  foundation on the documents as well.

7          MR. GELFAND:  Absolutely.  And some of these

8  documents, to be blunt, he provided to the government.

9  And so, like, a text message from him.

8:41AM 10         THE COURT:  What is your evidence that he's

11  present between May 13th and May 16th?

12         MR. GELFAND:  Your Honor, as a practical matter,

13  we have circumstantial evidence that he comes from

14  Illinois to Arkansas towards the end of the week before.

8:41AM 15  And he says he's going to, quote, "Watch the lot."

16         THE COURT:  That's not good enough to place him

17  on the lot.

18         MR. GELFAND:  What I'm saying, Your Honor, is

19  that we also have significant evidence, and the Court is

8:41AM 20  going -- I understand the Court is a little bit in the

21  dark on this, to no fault of anyone, but the Court is

22  going to hear significant evidence from Michele Bush today

23  of the possibility of remote access, and in fact, the

24  likelihood of remote access.  So this notion of being on

8:42AM 25  the lot, other than at very discrete times, is really in

8:42AM 1  our opinion a red herring.  And as a practical matter,

2  Caleb Williams regularly had access to the entire computer

3  system related to Wholesale Motorcars.  He controlled a

4  lot.  He sold his own eBay shipping stuff off of that

8:42AM 5  computer, literally, within a month or so of the alleged

6  crime.  And he physically puts himself at the lot around

7  that time period.  This notion that he claims that he was

8  away, he takes pictures of pictures.

9       THE COURT:  We need to get out there.  I can't

8:42AM 10  make a speculative ruling based on testimony that I

11  haven't heard.  I will let it go forward and we'll take it

12  one step at a time.  And if the government believes that

13  there's not appropriate 602 or 901 or that any of the

14  dominoes that would fall after that aren't there, you need

8:43AM 15  to ask to approach the bench.  Under no circumstances are

16  you to get into any prior sex offense history that he has

17  without approaching the bench.

18       MR. GELFAND:  Can I ask the government to clarify

19  for the record whether -- Caleb Williams says more

8:43AM 20  passwords.  That implies that he provided passwords.  We

21  have asked them via e-mail -- we got no response --

22  whether he provided any passwords.

23       MR. ROBERTS:  We have not spoken to him since he

24  sent that e-mail.  We have provided you everything that he

8:43AM 25  has -- again, not our witness.  Unsolicited e-mails, we

8:43AM 1   keep sending their way.  He reached out to us through an

2   attorney.  The extent that we ever discussed passwords,

3   Agent Faulkner asked him if he knew the defendant's

4   banking password and he said no.  That's the extent I've

8:44AM 5   ever spoken to him about that.  That was a non-leading

6   way, a non-telling way, to ask him if he knew Intel 1988

7   because they are the same password.  But we didn't tell

8   him the password.

9          Your Honor, one thing I think will help the Court

8:44AM 10  when gauging this testimony.  Are we all in agreement that

11  even your witnesses claim you have to be there May 13th?

12         MR. GELFAND:  I'm not sure exactly what you're

13  asking.  Ms. Bush is going to testify that somebody who

14  plugged in a thumb drive had to be there on May 13th, but

8:44AM 15  she's going to explain in a lot more detail what the

16  computer forensics actually show.

17         MR. ROBERTS:  Well, your theory is that Caleb

18  Williams was the person that plugged in that thumb drive

19  on May 13th, is that correct?

8:44AM 20         MR. GELFAND:  Our theory is Caleb Williams -- our

21  theory is a lot of things with Caleb Williams, but I don't

22  think we need to -- I'm happy to address it if the Court

23  wants to, but I don't think we need to spar over this in

24  chambers.

8:45AM 25         THE COURT:  What is she going to testify about

8:45AM 1  whether you can boot to the Linux partition?

2          MR. GELFAND:  That you can do it remotely, yes.

3          THE COURT:  And what if it normally comes up in

4  Windows, how would you --

8:45AM 5          MR. GELFAND:  She's going to say that to even

6  answer that question -- this is what I anticipate she's

7  going to say -- that you would have to access the BIOS.

8  And there's either default settings or there's a number of

9  different settings.  She's going to disagree with

8:45AM 10  Mr. Fottrell on that.

11          THE COURT:  As to what the BIOS settings were?

12          MR. GELFAND:  No.  As to whether it was possible

13  to essentially reboot or get into the Linux system

14  remotely.

8:45AM 15          THE COURT:  All right.  Let's go.

16          (End of In-Chambers Hearing)

17          (Jury in at 8:52 a.m.)

18          THE COURT:  Good morning, Members of our Jury.

19  Everyone have a reasonably good weekend?  Fairly nice

8:52AM 20  weather.  Just wanted you to know that the attorneys and I

21  have been working on some evidence issues since about

22  8:00 morning.  We weren't just lollygagging while ya'll

23  were waiting to come out.  And I, once again, appreciate

24  your continued patience with us when these issues arise.

8:53AM 25          This is the second week of our trial.  The

8:53AM 1   government is still putting on its evidence and it

2   continues to do so this morning.  You may call your next

3   witness.

4         MR. ROBERTS:  Thank you, Your Honor.  The

8:53AM 5   government calls Clint Branham.

6          THE COURT:  Mr. Branham.

7          (Witness Sworn)

8          THE COURT:  On your way, I will let you know

9   that, while testifying, you are permitted to remove your

8:54AM10   mask, although you're not absolutely required to.  Please

11   adjust the microphone, so you can speak directly into it.

12         Mr. Roberts, you may inquire.

13         MR. ROBERTS:  Thank you.

14         CLINTON BRANHAM, having been first duly sworn,

8:54AM15   testified as follows:

16                DIRECT EXAMINATION

17   BY MR. ROBERTS:

18   Q.   Mr. Branham, will you state your full name and spell

19   your last name for the court reporter?

8:54AM20   A.   Clinton Branham.  B-R-A-N-H-A-M.

21   Q.   Mr. Branham, can you explain your occupation to the

22   Jury?

23   A.   I am a technical expert in cyber security at Walmart.

24   I act kind of as a technical resource team lead for a team

8:54AM25   that deals with secure computing for the security

8:54AM 1   department there.

2   Q.   How long have you been doing that type of work, cyber

3   security?

4   A.   About seven years now.

8:54AM 5   Q.   Are you familiar with the defendant, Josh Duggar?

6   A.   Yes.

7   Q.   Could you explain to the Jury how so?

8   A.   I first met Josh about 20 years ago, thereabouts, at

9   a fundraiser for a campaign event.  He was running the

8:55AM 10   media in the back and I had an interest in media at the

11   time and so we kind of got to talking about that type of

12   thing.  We've run in the same circles for years.  We are

13   both about the same age, homeschooled, that type of thing.

14   Q.   You said that you were homeschooled?

8:55AM 15   A.   Yes.

16   Q.   Did you all, based on that initial interaction,

17   develop a friendship?

18   A.   I'd say more of like a close acquaintance type thing.

19   We would see each other occasionally and were friendly.

8:55AM 20   Q.   When you did see each other, what was usually the

21   topic of conversation?

22   A.   Usually something technology-related.  Sometimes

23   politics.

24   Q.   When you are speaking about technology, you're a

8:55AM 25   cyber security expert.  Was the defendant usually lost in

8:55AM 1   that conversation?

2   A.   Not to my recollection.

3   Q.   How would you gauge his understanding of technology

4   based on the conversations you had?

8:56AM 5   A.   I would say he was generally what I would consider

6   like a power user.

7   Q.   A power user, is that what you said?

8   A.   A power user.  That would be somebody who is more

9   advanced than an average user, somebody that understands

8:56AM10   more of the details on how it's going on, more comfortable

11   with how the system operates, that kind of thing.

12   Q.   By "system", you mean computer systems?

13   A.   Yes.

14   Q.   Under this definition of power system, would that be

8:56AM15   someone that could, say, install their own programs?

16   A.   Yes.  Install programs, comfortable modifying

17   hardware, if need be, like installing hardware or even

18   building their own computer.

19   Q.   I want to turn your attention to the topic of

8:56AM20   internet filtration and the vulnerability of internet

21   filtration.  First, can you tell us what "internet

22   filtration," what that service entails?

23   A.   Generally, with internet filtration, most people

24   would be familiar with it in a corporate context.  So if

8:57AM25   you are at work and you try to access inappropriate sites,

8:57AM 1   you will get a blocked message on your computer.  That's

2   facilitated by an internet filter.  And, generally, at a

3   corporate environment, that's at a network level, so any

4   device on there is protected.  There's also where you can

8:57AM 5   install it locally with specific software.

6   Q.    Some of that locally software available to

7   individuals, would that include Covenant Eyes?

8   A.    Yes.

9   Q.    Is that a form of internet filtration?

8:57AM 10   A.    It is.

11   Q.    Could you tell the Jury about any conversations you

12   had with the defendant about the vulnerability of that

13   internet filtration?

14   A.    Sometime in the summer of about 2010, Josh and I were

8:58AM 15   having a conversation about the internet filtration.  And

16   I had recently become interested in ways of getting around

17   it and how to stop people from getting around Covenant

18   Eyes, which is what both of our families used.  And so the

19   conversation that we had was specifically around

8:58AM 20   installing a secondary operating system.  And what would

21   happen then, since Covenant Eyes is installed locally on

22   the computer, if you have a second computer effectively

23   running on the same hardware, then on that operating

24   system, it would not be present.  It wouldn't be doing its

8:58AM 25   filtering job.

8:58AM  1   Q.    Would an example of a secondary operating system be a
        2   partition?
        3   A.    You would require a partition to have a secondary
        4   operating system.
8:58AM  5   Q.    Now, when you're having this conversation, how did
        6   Mr. Duggar respond to your suggestion?
        7   A.    My recollection is that he was mostly disinterested
        8   in what we were talking about.  I don't specifically know
        9   why.  But he did seem -- the conversation specifically was
8:59AM 10   around how to stop people from getting around that type of
       11   filtration bypass, so we were talking about network-level
       12   filtering.
       13   Q.    So you were talking to him about the possibility that
       14   someone could get around Covenant Eyes by installing this
8:59AM 15   kind of secondary operating system, is that correct?
       16   A.    Yes.
       17   Q.    And would it be correct that his version that he
       18   liked was actually having Covenant Eyes on every device as
       19   opposed to the network, in general, that you connect to?
8:59AM 20   A.    For most home users, that is a simpler setup, and so
       21   that's what most people would prefer for their home.
       22   Q.    To be clear, the vulnerability of that setup where
       23   Covenant Eyes is on every device, you were telling him it
       24   was easy to get around that by installing a secondary
9:00AM 25   operating system, is that correct?

9:00AM 1 A. Installing a secondary operating system or simply
2 just having a device that you don't install Covenant Eyes
3 on.
4    MR. ROBERTS:  Your Honor, may I have one moment?
9:00AM 5    THE COURT:  Yes.
6 Q.  (BY MR. ROBERTS.)  So to clarify, was Mr. Duggar
7 disinterested in the conversation or disinterested in the
8 suggestion you had about putting Covenant Eyes on the
9 network as a whole?
9:00AM 10 A. From what I recall, he was not interested in the
11 network-level filtering.  He felt like the Covenant Eyes
12 being installed locally was good enough.
13    MR. ROBERTS:  Thank you.  I'll pass the witness,
14 Your Honor.
9:00AM 15    THE COURT:  When you're ready, Mr. Story.
16        CROSS EXAMINATION
17 BY MR. STORY:
18 Q. Good morning, Mr. Branham.  How are you?
19 A. Doing well.
9:01AM 20 Q. Mr. Roberts just asked you, does Covenant Eyes work
21 on a network-level system?
22 A. It does not.
23 Q. So to have a network-level system, you've got to have
24 something that's like almost at the router level or the
9:01AM 25 internet level in order to filter out things at that --

9:01AM 1   with that level of technical ability?

2   A.   Yes.

3   Q.   When you were talking to Mr. Duggar, what time frame

4   are we talking about?

9:01AM 5   A.   I don't recall the exact time frame.  It was sometime

6   around the summer of 2010.

7   Q.   As for context, where were you?

8   A.   We were, I believe, at a coffee shop in Springdale.

9   This would have been either at the end of the U.S. Senate

9:01AM 10   campaign in 2010 or right after.

11   Q.   Was it just you and Mr. Duggar or was anybody else

12   there?

13   A.   Mr. Holt was there as well, at least for the

14   beginning of the conversation.

9:02AM 15   Q.   Were you there all the time when Mr. Holt was there?

16   A.   I don't recall if I walked up in the middle of the

17   conversation or if we were all there when the conversation

18   started.  But for the -- specifically about the technology

19   portion, I was there the whole time.

9:02AM 20   Q.   While everybody was talking about technology, you

21   were there for the entire part of that?

22   A.   Yes.

23   Q.   And who is Jim Holt?

24   A.   Jim Holt is a long-term friend of mine.  The event

9:02AM 25   that I met Josh at was a campaign event for when he was

9:02AM 1   running for, I believe, the Arkansas House of

2   Representatives, and it was his U.S. Senate campaign.

3   Q.   And did you and Mr. Duggar, I'll say work, but it may

4   be helped with that campaign?

9:02AM 5   A.   Yes, we did.

6   Q.   And did you both spend a lot of time with each other

7   around that?

8   A.   Not a lot of time.  We spent some time there.  I was

9   more involved than Josh was.

9:03AM 10  Q.   And when you were talking about this internet-level

11  filtering, is that something you were familiar with at the

12  time?

13  A.   It was something that I had seen done at like a

14  corporate level.  And I was in the process of researching

9:03AM 15  it, figuring out how to do it.

16  Q.   When you say, "At a corporate level", where were you

17  working at the time?

18  A.   At the time, I had just taken a new job as a vendor

19  for Walmart.  I was familiar with it at the church that I

9:03AM 20  had worked at before the campaign.

21  Q.   And the church you had worked at had put in an

22  internet-level system?

23  A.   Yes.

24  Q.   So, in other words, at that point, it didn't matter

9:03AM 25  which devices were used or what programs it had, but that

9:03AM 1    would actually do the filtering at that high level?

2    A.    Correct.

3    Q.    And did you help install that system?

4    A.    I did not.  It was there when I started working

9:04AM 5    there.

6    Q.    Were you learning about what that system was?

7    A.    Not while I worked there.  It was more I knew that it

8    was a thing that could be done.  I was not familiar with

9    the specifics of how it worked.

9:04AM 10   Q.    And it's true that you and Josh were talking about

11   how to potentially do it at that point, wasn't it?

12   A.    Yes.

13   Q.    When you were discussing this with Mr. Duggar, you

14   kind of had a couple of options, like he didn't want to

9:04AM 15   know, maybe he didn't.  Was there a third option that he

16   was kind of not following what you were saying?

17   A.    I didn't get the impression that he wasn't following.

18   It was just that he -- my impression was he either did not

19   understand the importance of it or he just didn't care.

9:04AM 20   Q.    So understanding the importance is something that is

21   pretty technical in nature to figure out how that would

22   actually work, and even more so, how you would implement

23   it.  Would you agree with that?

24   A.    Not really.  It's fairly easy to understand the

9:05AM 25   reason that it would be important without understanding

9:05AM 1   the technical details of how to do it.

2   Q.   Do you think Josh understood at that moment how to do

3   it?

4        MR. ROBERTS:  Objection, Your Honor.

9:05AM 5   Speculation.

6        THE COURT:  Sustained, unless there's more

7   foundation.

8        MR. STORY:  I'll rephrase.

9   Q.   (BY MR. STORY.) Mr. Branham, when you were talking

9:05AM10   about this in 2010, did you run Covenant Eyes on your

11   personal systems?

12   A.   We had in the past.  I don't recall if I was

13   specifically using it at that moment.

14   Q.   Do you know in 2010 what Mr. Duggar was using?

9:05AM15   A.   He was using Covenant Eyes.

16   Q.   How do you know that?

17   A.   Because he told me as part of that conversation.

18   Q.   And when you were discussing the different options,

19   were you specifically talking about kind of like the

9:06AM20   router level, the router level internet filtering?

21   A.   That was the approach that I had taken when I was

22   doing my research.

23   Q.   In 2010, did Josh ever ask you or really just in the

24   whole conversation, did the subject of, like, a Linux

9:06AM25   operating system come up?

9:06AM 1    A.    It came up as part of that conversation.  The

2    specific, I guess, vulnerability that I discussed was

3    using a Windows alternate operating system.  But as part

4    of that conversation, Linux was mentioned as a potential

9:06AM 5    that could also be used.

6    Q.    Your current occupation in cyber security, you would

7    agree that's a pretty technical job?

8    A.    Yes.

9    Q.    You referred to Josh as a power user.  Does a power

9:07AM 10   user know how to write their own code, in your mind?

11   A.    Some do.  I wouldn't say that that's a requirement to

12   be a power user, but it wouldn't be unexpected.

13   Q.    Do you know if Josh knows how to write command lines?

14   A.    It wouldn't surprise me.

9:07AM 15   Q.    But you don't actually know, do you?

16   A.    I have not seen him specifically write any code, no.

17   Q.    He's never told you that he knows how to write code

18   or use command lines to install things, has he?

19   A.    Using command lines to install things is very

9:07AM 20   different than writing code.

21   Q.    Has he told you that he knows how to do that or he

22   has done that?

23   A.    Not specifically, no.

24        MR. STORY:  One moment, Your Honor.

9:08AM 25        THE COURT:  That's fine.

9:08AM 1   Q.  (BY MR. STORY.)  Mr. Branham, one of -- while you

2   were discussing this with Mr. Duggar at the coffee shop,

3   you said one of the vulnerabilities to Covenant Eyes was

4   just to buy another device, right?

9:08AM 5   A.  If you were to hook any device up that doesn't have

6   Covenant Eyes installed, that doesn't do anything,

7   obviously.

8   Q.  So could you do that with, like, a cheap laptop or an

9   iPad?

9:08AM10   A.  Any device that doesn't have Covenant Eyes installed

11   is not protected by Covenant Eyes.

12   Q.  And you're familiar with Covenant Eyes because you

13   used it, correct?

14   A.  Yes.

9:09AM15   Q.  And it's a user-subscribed model that they use.  In

16   other words, you have to want to have Covenant Eyes

17   running on your device?

18   A.  Correct.

19       MR. STORY:  I'll pass the witness.

9:09AM20       MR. ROBERTS:  Your Honor, brief follow-up.

21              REDIRECT EXAMINATION

22   Q.  (BY MR. ROBERTS.)  Mr. Branham, would it be accurate

23   to describe you as the so-called tech person within your

24   family when you were growing up?

9:09AM25   A.  Yes.

9:09AM 1    Q.    Based on your knowledge of Mr. Duggar, was he the
       2    tech person in his family?
       3    A.    Yes.
       4    Q.    So you were asked about command lines.  Could you
9:09AM 5    please finish your statement about command lines?
       6    A.    So there's a very large difference between writing
       7    code and writing a command line.  Writing code is
       8    generally telling a computer to do new things that no one
       9    may have ever told a computer to do before.  Writing a
9:10AM10    command line is simply running existing code that other
      11    people have written.  So most power users, I would say,
      12    have used a command line at least once.  There's
      13    multiple -- you can find tutorials online and you just
      14    copy what it says and paste it directly in to do lots of
9:10AM15    things.
      16    Q.    And you are saying that in your estimation, based on
      17    your experience, Mr. Duggar is a power user?
      18    A.    Yes.
      19    Q.    Thank you.
9:10AM20          MR. ROBERTS:  I'll pass the witness, Your Honor.
      21          MR. STORY:  One second, Your Honor.
      22                    RECROSS EXAMINATION
      23    Q.    (BY MR. STORY.)  Mr. Branham, I think we're all
      24    talking about the same thing, but entering command lines
9:11AM25    would be like to install -- to install software, to

9:11AM 1   install something.  Is that my -- do I understand that

2   correct, at least one of the uses?

3   A.   It could be used that way, yes.

4   Q.   So if I was doing that, you said you're installing

9:11AM 5   something somebody else had previously created?

6   A.   Correct.

7   Q.   Where do you normally find that?  How do you figure

8   that out?

9   A.   There's a variety of sources.  Sometimes if you

9:11AM 10  download software from the internet, the install

11  instructions will say to run this command line to install

12  it.  Sometimes if you're familiar with how the software or

13  the manufacturer works, you can just run it that way.

14  There's just a variety of ways that you might find that

9:11AM 15  information.

16  Q.   Do most of the time you have to actually -- I'll just

17  say, do you go to Google and search for it?

18  A.   That's one of the best ways to find stuff, yeah.

19  Q.   And so if you went to Google and searched for it,

9:12AM 20  typically, there's a record of what you're looking for in

21  your history, is that correct?

22  A.   Not always.  It depends on how things are set up.

23  Q.   But if you go and -- would you agree with me that the

24  easiest way is to go find it on the internet and then

9:12AM 25  that's how you would actually execute the command lines?

9:12AM 1    A.    If you are completely unfamiliar, yes.

2    Q.    Thank you.

3              MR. ROBERTS:  Your Honor, I have one question.

4                      REDIRECT EXAMINATION

9:12AM 5    Q.    (BY MR. ROBERTS.)  Mr. Branham, if you're using

6    command lines to essentially install an app, is an

7    alternative to that, say, go to the App Store?

8    A.    It could be.  Not everything is going to be available

9    in the App Store, but, yeah.

9:12AM10    Q.    If it is available in the App Store, you just go to

11    the App Store?

12    A.    Yes.

13    Q.    Thank you.

14              THE COURT:  May this witness be excused?

9:13AM15              MR. ROBERTS:  Yes, Your Honor.

16              MR. STORY:  Yes, Your Honor.

17              THE COURT:  Sir, thank you for your time and

18    being in court today.  You're free to go.

19              THE WITNESS:  Thank you.

9:13AM20              THE COURT:  The government may call its next

21    witness.

22              MR. CLAYMAN:  Your Honor, the United States calls

23    Jim Holt.

24              THE COURT:  Mr. Holt, please come forward and

9:14AM25    approach the bench.  If you would pause about right there

9:14AM 1    and raise your right hand to be sworn.

2                    (Witness Sworn)

3                    THE COURT:  Sir, you may have a seat in our

4    witness box.  While testifying, you are permitted to

9:14AM 5    remove your mask.  If you would please try to speak

6    directly into that microphone.  And it's flexible, you can

7    move it around as you wish.

8                    Mr. Clayman, you may inquire.

9                    MR. CLAYMAN:  Thank you, Your Honor.

9:14AM 10                   JAMES HOLT, having been first duly sworn,

11   testified as follows:

12                    DIRECT EXAMINATION

13   BY MR. CLAYMAN:

14   Q.    Good morning, sir.

9:14AM 15   A.    Good morning.

16   Q.    Can you please state your name and spell it for the

17   record?

18   A.    Jim Holt, or James Holt.  J-I-M, H-O-L-T.

19   Q.    And what do you do for a living, Mr. Holt?

9:14AM 20   A.    Well, we've had a tree business, so we're

21   self-employed.

22   Q.    Without giving away your street address, where do you

23   currently live?

24   A.    In Tontitown, Arkansas.

9:15AM 25   Q.    Can you tell the Jury a little bit about yourself?

9:15AM 1   Are you married?

2   A.   Yes, sir.

3   Q.   Who is your wife?   Who is your wife?

4   A.   Bobye Holt.

9:15AM 5   Q.   And do you all have any children?

6   A.   Yes, sir.

7   Q.   How many?

8   A.   We have 11.

9   Q.   Are you familiar with the defendant here, Joshua

9:15AM10   Duggar?

11   A.   Yes, sir.

12   Q.   How are you familiar with him?

13   A.   We've been family friends for, before he was born.

14   He was born March 3rd and my daughter was born March 1st.

9:15AM15   They are two days apart.   When I come back from the

16   military, we'd drop by and see them sometimes before we'd

17   see our own family.

18   Q.   So is it fair to say that you have known the Duggar

19   family for decades?

9:15AM20   A.   Oh, yes, sir.   Since I was 12, I've known Jim Bob.

21   Q.   And you have known Joshua Duggar his entire life?

22   A.   Yes, sir.

23   Q.   At any point, did the defendant work for you in any

24   capacity?

9:16AM25   A.   Well, if you mean work by getting paid, no.   He

9:16AM 1   helped volunteer on some campaigns and things.

2   Q.   Do you recall when he helped out on your campaigns?

3   A.   Yes, sir.  He worked hard, but he didn't get paid.

4   Q.   Understood.  Approximately when did that happen?

9:16AM 5   A.   The first time we ran in 2000, I think he helped

6   there, but he was only 12.  In '04, he helped.  In '06, he

7   helped.  His family has always helped.  In 2010, he didn't

8   help as much, because he stayed here and had a family to

9   take care of and had his own business, but he did help a

9:16AM 10  little bit.  Trying to remember if he contributed.  I

11  don't remember or not, but he helped.

12  Q.   And you interacted with the defendant when he was

13  helping out on your campaigns?

14  A.   Yes, sir.

9:16AM 15  Q.   And just to be clear, we're talking about campaigns

16  for political office?

17  A.   Yes, sir.

18  Q.   Do you recall any conversations with the defendant

19  while he was helping out with your campaigns about Linux

9:17AM 20  partitions?

21  A.   Yes, sir.

22  Q.   Do you remember approximately when that conversation

23  occurred?

24  A.   Well, it was 2010.  And we were in Springdale.  And I

9:17AM 25  want to say it may have been at a fundraiser or some type

9:17AM 1   of rally, but it was in Springdale.  And he and Clint

2   Branham were talking.  And I walked up and they were

3   talking about computer systems.  And I was telling that

4   where I used to work at Ft. Meade or NSA, there were

9:17AM 5   certain systems that we used that didn't even compare with

6   what was out in the civilian word.  And I said, it seems

7   like every system out there now is still a slave to DOS.

8   And Clint had told me about there was a thing called

9   Linux.  And I said, yeah, I got something in the mail

9:18AM 10   about it.  It was Linux, I called it Linux, but Linux.

11   And he said, you could set that up and it actually is true

12   multi-tasking.  And I talked to him about applications,

13   like, that are on the market that it would work together

14   with.  And he said something along the lines, well,

9:18AM 15   there's not a lot.  And he said, but if you want to try it

16   out, you could set up a separate partition on a computer.

17   And I said, well -- I thought, well, I'm not really

18   interested in that.  And then Joshua said, well, how would

19   I set that up?  And they started talking about it.  And I

9:18AM 20   walked off and started mingling with some other people.

21   Q.   So just to be clear, the defendant asked how to set

22   up a Linux partition?

23   A.   Yes, sir.

24   Q.   And then you walked away?

9:18AM 25   A.   Yes, sir.

9:18AM 1          MR. CLAYMAN:  Can I have one moment, Your Honor?

2          THE COURT:  Yes.

3          MR. CLAYMAN:  I'll pass the witness.

4          THE COURT:  Mr. Gelfand, when you're ready.

9:19AM 5                    CROSS EXAMINATION

6    BY MR. GELFAND:

7    Q.   Good morning, Mr. Holt.

8    A.   Morning, sir.

9    Q.   Mr. Holt, you testified that you have 11 children

9:19AM10   with your wife, Bobye Holt?

11   A.   Yes, sir.

12   Q.   Keep you busy?

13   A.   What's that?

14   Q.   Keep you busy?

9:19AM15   A.   Oh, yes, sir.

16   Q.   Mr. Holt, you testified that this conversation that

17   you had with Mr. Duggar also included Clint Branham,

18   correct?

19   A.   Yes, sir.

9:19AM20   Q.   And just to be clear, you're talking about a single

21   conversation, correct?

22   A.   Yes, sir.  That thing about Linux partition has been

23   brought up before with other people, because I was at NSA

24   and we had access to some pretty good stuff.

9:19AM25   Q.   But I'm asking -- and I appreciate you volunteering

9:19AM 1    kind of your life.  I'm just asking specifically about the

2    conversation that you testified about.

3    A.    Yes, sir.

4    Q.    So just so we're on the same page, there's one

9:19AM 5    conversation and it includes you, Mr. Branham, and Josh

6    Duggar, correct?

7    A.    Yes, sir.

8    Q.    And as I understand it, you testified that this

9    conversation occurred somewhere around 2010, correct?

9:20AM 10   A.    Well, it was January to March of 2010, yes, sir.

11   Q.    When you say January or March of 2010, you're saying

12   that because you're kind of time-stamping that, so to

13   speak, based on your campaign?

14   A.    Yes, sir, but also I know when we announced.  And

9:20AM 15   then things heated up and then the primary between January

16   and February.  And so I don't know if you have ever been

17   on a campaign, but when you're campaigning, you're going

18   nonstop.  And so it's just, you know, all the functions

19   together.  You remember conversations, but sometimes it's

9:20AM 20   just a blur because you are going so quickly, but not

21   individual conversations.

22   Q.    But I just want to focus your attention on the

23   conversation that you are here to testify about, okay?

24   A.    Yes, sir.

9:20AM 25   Q.    My understanding is you said a few minutes ago that

9:20AM 1  this occurred at either a rally or a fundraiser, correct?

2  A.    Yes, sir.  It was a campaign function.

3  Q.    It was a campaign function, correct?

4  A.    Yes, sir.

9:20AM 5  Q.    Not just like a private meeting with just the three

6  of you, correct?

7  A.    Yes, sir.

8  Q.    You testified that this conversation about a Linux

9  partition is something, if I heard you right, that Clint

9:21AM10  Branham brought up?

11  A.    I believe he said -- yeah, he was actually talking

12  about, well, you know there's a Linux partition, so, yes.

13  Q.    So, in other words, the idea of a Linux partition is

14  something that Clint Branham brought up in this

9:21AM15  conversation, correct?

16  A.    I believe that's true, yes.

17  Q.    And then you testified that the conversation

18  essentially continued between Clint Branham and Josh about

19  that subject matter.  And if I understood you correctly,

9:21AM20  did you walk away or what happened?

21  A.    Well, yeah.  What had happened was, I was talking

22  about, there's nothing out there that's not a slave to

23  DOS.  And Clint being -- he's pretty computer savvy --

24  said, well, there is something out there, it's called

9:21AM25  Linux.  And I said, I heard about it.  I thought it was

9:21AM 1  Linux.  He was talking about setting up a separate
2  partition, because I didn't know if anything would match
3  on the application or how much apps are out there.  And he
4  said, that way you can try it out.  And that's when Josh
9:22AM 5  said, well, how do I set that up?  Tell me more about the
6  Linux partition.
7  Q.    And just to be clear, this was in 2010, correct?
8  A.    Yes, sir.
9  Q.    Fair to say, based on your experience, Clint Branham
9:22AM10  is a lot more tech savvy than either you or Josh?
11  A.    Definitely more than me.  Don't know about Josh.  I
12  haven't really talked with him much since -- we talked a
13  little bit in 2010 quite a bit, but campaign related.  I
14  guess the last time we stopped talking with him as much
9:22AM15  was around November of 2006.
16  Q.    So to be clear, your conversations with Josh in
17  particular were a long time ago, correct?
18  A.    I don't know how old you are, Mr. Gelfand.  But when
19  you get my age, 10 years doesn't seem like much.  So it
9:22AM20  was a while back, but not -- it doesn't seem that long
21  ago, no.
22  Q.    But let me be more precise, because that's fair.  I'm
23  younger than you are.  But this was about 10 or more years
24  ago, correct?
9:23AM25  A.    Yes, sir.

9:23AM 1    Q.    Now, finally, Mr. Holt, you testified that, if we

2    roll back the clock quite a bit, Josh volunteered on your

3    campaigns as a kid, correct?

4    A.    Yes, sir.  We put up signs.

9:23AM 5    Q.    And so the nature of that work, for example, in 2000

6    when Josh was approximately 12 years old, what was he

7    doing to volunteer on the campaign?

8    A.    Putting up signs.

9    Q.    In other words --

9:23AM10    A.    Upload some graphics.  I mean, he might have handed

11    out some literature, but that wasn't just him.  That was a

12    lot of people.

13    Q.    Grassroots politics?

14    A.    I'm sorry?

9:23AM15    Q.    Grassroots politics?

16    A.    Yes, sir.

17    Q.    And during that time period, Josh was a little kid

18    helping out, correct?

19    A.    Well, 2000, the first time I ran, he would have been

9:24AM20    12.  So, yes, sir.

21               MR. GELFAND:  Your Honor, one minute, please.

22               THE COURT:  You may.  No further questions.

23    Thank you.

24               MR. CLAYMAN:  Just briefly, Your Honor.

9:24AM25               THE COURT:  That's fine.

                              REDIRECT EXAMINATION

9:24AM 1

2    Q.   (BY MR. CLAYMAN.)   Mr. Holt, I just want to make sure

3    I heard you correctly.   Did you say that Josh Duggar would

4    help out with graphics on your campaign?

9:24AM 5    A.   He said grassroots, but sometimes he would do little

6    graphics, yes.   He would help out with some of the

7    campaign literature and artwork.

8    Q.   Like on the computer, that sort of stuff?

9    A.   Yes, sir.

9:25AM 10   Q.   Mr. Holt, would you say that you were close with the

11   Duggars?

12   A.   Oh, yes.   Well, he did a commercial that we never

13   aired.   He put that together, did a good job on that.

14   But, yes, sir, we were -- I don't know if you could be

9:25AM 15   closer.

16   Q.   The defendant, Joshua Duggar, helped edit a

17   commercial for you?

18   A.   Yes, sir.

19   Q.   Did he do that on the computer?

9:25AM 20   A.   He actually put it together, yes, sir.

21   Q.   Do you know how old he was when he did that?

22   A.   That was 2004 and 2006, so he would have been 14 and

23   16 at the time.

24   Q.   So he was a minor and he was using a computer to help

9:25AM 25   put together a commercial for your campaign?

9:25AM 1    A.    Yes, sir.

2    Q.    Just want to be clear.  You said that the defendant,

3    Joshua Duggar, asked how to set up a Linux partition in

4    the conversation you were a part of, is that right?

9:25AM 5    A.    Yes, sir.  And he was 16 and 18.  In '04, yeah, 16

6    and 18.  Sorry.

7    Q.    Mr. Holt, is there any doubt in your mind that Joshua

8    Duggar asked about the Linux partition?

9    A.    Oh, there's absolutely no doubt.  No doubt.

9:26AM 10           MR. CLAYMAN:  I'll pass the witness.

11           MR. GELFAND:  Very briefly, Your Honor.

12           THE COURT:  You may.

13                  RECROSS EXAMINATION

14    Q.    (BY MR. GELFAND.)  This whole thing about this

9:26AM 15    commercial.  Do you know whether Josh was using a Mac or a

16    PC?

17    A.    At that time, he was using a Mac.

18           MR. GELFAND:  Thank you.  Nothing further.

19    A.    Made the pop-up ads easier.  He actually wrote an ad

9:26AM 20    called "Pop Up" and it was easier to put it together on a

21    Mac.

22           MR. GELFAND:  Thank you.

23           THE COURT:  Is this witness free to go?

24           MR. GELFAND:  Yes, Your Honor.

9:26AM 25           MR. CLAYMAN:  Yes, Your Honor.

9:26AM 1          THE COURT:  Sir, thank you very much for your

2     time in being here today.  You're excused.

3          THE WITNESS:  Thank you, Your Honor.

4          THE COURT:  The government can call its next

9:27AM 5     witness.

6          MS. MARSHALL:  Your Honor, the United States

7     would call Bobye Holt.

8          THE COURT:  Ms. Holt, if you would please

9     approach the bench.  Pause about right there and raise

9:27AM 10    your right hand.

11          (Witness Sworn)

12          THE COURT:  Have a seat in our witness box,

13    please.  While testifying, you are permitted to remove

14    your mask.

9:27AM 15         MS. MARSHALL:  Your Honor, may I approach the

16    witness stand?

17          THE COURT:  You may.

18          MS. MARSHALL:  Your Honor, would the Court like a

19    copy as well?

9:28AM 20         THE COURT:  I have a copy.  Reference is made to

21    Court's Exhibit 3.

22          MS. MARSHALL:  Your Honor, may we approach?

23          THE COURT:  Yes.

24          (Bench Conference)

9:28AM 25         MS. MARSHALL:  Your Honor, for purposes of this

9:28AM 1    hearing, would the Court like the government to provide

2    the Jury a copy of the key as well?

3              THE COURT:  No.

4              MS. MARSHALL:  Just wanted to confirm, Your

9:28AM 5    Honor.

6              THE COURT:  Well, that wasn't my intent.  Is the

7    defense aware of any reason why that would be necessary?

8              MR. GELFAND:  No.

9              MS. MARSHALL:  Just for their age, Your Honor.

9:28AM 10     THE COURT:  Pardon?

11             MS. MARSHALL:  Just for their age, Your Honor.

12             THE COURT:  Well, either during or in the lead-up

13    to the evidentiary hearing that we had on November 29th,

14    the defense stipulated that the date of birth on what is

9:29AM 15    now marked as Court's Exhibit 3 accurately corresponded to

16    the name of the pseudonyms Jane Does 1 through 4.  Is that

17    still the defense stipulation?

18             MR. GELFAND:  Yes, Your Honor.

19             THE COURT:  Then those ages are established for

9:29AM 20    the benefit of the record.  You may inquire about relative

21    ages without specifically referring to dates of birth --

22             MS. MARSHALL:  Yes, Your Honor.

23             THE COURT:  -- of the Jane Does, to the extent

24    that's necessary.

9:29AM 25             MR. GELFAND:  Your Honor, just to clarify, so

9:29AM 1   that we're all just on the same page.  If the Court's

2   purpose is, and the government's purpose, is to

3   essentially conceal the identity, relative ages -- in

4   other words, if they say so-and-so was blank years older,

9:30AM 5   given the public nature of the family, that's not going to

6   serve that purpose.

7          THE COURT:  Well, it's not perfect.  There is an

8   argument that I think the government has made, but some of

9   this is running together, about the age of Jane Does 1

9:30AM10   through 4 as it compares to the ages of some of the

11   objects of the child sex abuse material.  Am I correct

12   that the government has made that argument?

13          MS. MARSHALL:  Yes, Your Honor.  In the motions

14   hearing, the first motions hearing about the testimony,

9:30AM15   yes, Your Honor.

16          THE COURT:  Do you intend to make something of

17   that argument in this trial?

18          MS. MARSHALL:  Not just -- yes, yes.

19          THE COURT:  Then it's -- I will let you do that

9:31AM20   with this witness.  But at the same time, let's be

21   sensitive to not further gratuitously add in detail that

22   would otherwise identify the Jane Does.

23          MS. MARSHALL:  Yes, Your Honor.

24          MR. GELFAND:  Your Honor, can we ask that the

9:31AM25   government not use the word "victim" given that we are

9:31AM  1    just using pseudonyms?

        2              THE COURT:  I don't have enough information to

        3    know whether the context in which the reference would be

        4    made would be appropriate or not.  But I would agree that

9:32AM  5    you should tread lightly in that area and not just

        6    gratuitously alternatively refer to them as "Victim one,

        7    two, three, four" or something like that.

        8              MS. MARSHALL:  Yes, Your Honor.

        9              (End of Bench Conference)

9:32AM 10              THE COURT:  Ms. Marshall, you may inquire.

       11              MS. MARSHALL:  Thank you, Your Honor.

       12              BOBYE HOLT, having been first duly sworn, was

       13    examined and testified as follows:

       14                         DIRECT EXAMINATION

9:32AM 15    BY MS. MARSHALL:

       16    Q.    Will you please state your name and spell your last

       17    name and your first name for the court reporter?

       18    A.    Yes.  My name is Bobye Holt.  B-O-B-Y-E, H-O-L-T.

       19    Q.    And Mrs. Holt, what city do you live in?

9:33AM 20    A.    We live in Tontitown.

       21    Q.    And how do you know the defendant, Joshua Duggar?

       22    A.    He was born to our friends from a long time ago, so

       23    he's their son.

       24    Q.    And who are your friends?

9:33AM 25    A.    Jim Bob and Michelle Duggar.

9:33AM 1   Q.   And you said that Josh is their son?

2   A.   Yes.

3   Q.   How long have you been friends with Jim Bob and

4   Michelle Duggar?

9:33AM 5   A.   Approximately 36, 37 years.

6   Q.   And who is your husband?

7   A.   Former State Senator, Jim Holt.

8   Q.   Mr. Holt and Mr. Duggar, are they long-time friends?

9   A.   Yes.  They went to school together when they were 12

9:33AM10   years old to graduation.

11   Q.   How would you describe the relationship between

12   yourself and your husband and Michelle and Jim Bob Duggar

13   in the past 20 years?  Were you all close growing up?

14   A.   Jim and Jim Bob were best friends.  And then Jim,

9:34AM15   when we started to date, he introduced me to both of them

16   more formally.  And so we became very good friends

17   throughout the years, even became best friends.

18   Q.   Do you have children?

19   A.   We do.

9:34AM20   Q.   Do Jim Bob and Michelle Duggar have children?

21   A.   Yes.

22   Q.   Were your children friends?

23   A.   Yes, they were very best friends.

24   Q.   When you say "Very best friends", what does that

9:34AM25   mean?

9:34AM 1   A.   Well, we did everything together.  We were with each
     2   other pretty much every day.  And then our oldest became
     3   boyfriend and girlfriend with Josh Duggar.
     4   Q.   Your oldest.  You said your oldest became
9:34AM 5   boyfriend/girlfriend with Josh Duggar?
     6   A.   She was his girlfriend.
     7   Q.   When did that occur?
     8   A.   That became, kind of formally, in November of 2002.
     9   Q.   Do you know when Josh Duggar was born?
9:35AM10   A.   Yes, ma'am.
    11   Q.   When was that?
    12   A.   March 3rd, 1988.
    13   Q.   And so you said that that became kind of formal in
    14   2002?
9:35AM15   A.   Yes, November.
    16   Q.   And so how old was he then?
    17   A.   He was 14.
    18   Q.   And how old was your daughter?
    19   A.   14.
9:35AM20   Q.   At some point, did you all have an occasion -- did
    21   Jim Bob and Michelle Duggar call you to their house to
    22   talk about something that they said was very important?
    23   A.   Yes.  Yes.
    24          MS. MARSHALL:  Your Honor, at this time --
9:35AM25          THE COURT:  Members of the Jury, it's the Court's

9:36AM 1  understanding that you are about to hear evidence that the

2  defendant may have previously committed another offense,

3  or I should say an offense of child molestation.  Please

4  understand that the defendant here is not charged with

9:36AM 5  this other offense.  You may consider this evidence, which

6  is to say the testimony of this witness, only if you

7  unanimously find that it is more likely true than not

8  true.  You decide that by considering all of the evidence

9  and deciding what evidence is more believable.  The

9:37AM 10  standard of more likely true than not true is a lower

11  standard of proof than proof beyond a reasonable doubt.

12      If you find that the offense that you are about

13  to hear testimony on has not been proved, you must

14  disregard it.  If you find that this offense has been

9:37AM 15  proved, then you may consider it to help you decide any

16  matter to which it is relevant.  You should give it the

17  weight and value you believe it is entitled to receive.

18  You may consider the evidence of such other offense of

19  child molestation for its tendency, if any, to show the

9:38AM 20  defendant's propensity to engage in child molestation, as

21  well as its tendency, if any, to determine whether the

22  defendant committed the acts that are charged in the

23  indictment and to determine the defendant's intent.

24      Remember, the defendant is only on trial for the

9:38AM 25  two crimes charged in the indictment that I have

9:38AM 1    previously instructed you about.  You may not convict a

2    person on those charges simply because you believe that he

3    may have committed a similar act in the past.

4           You may proceed.

9:38AM 5    MS. MARSHALL:  Thank you, Your Honor.

6    Q.  (BY MS. MARSHALL.)  Mrs. Holt, before we go forward,

7    do you see up there on the witness stand a piece of paper

8    that has a victim identification key?

9    A.  Yes, ma'am.

9:38AM 10   Q.  Mrs. Holt, I would ask you that during your testimony

11   today, if you will refer to any minors that you discuss

12   through the pseudonyms listed on that victim

13   identification key, which I believe is marked as Court's

14   Exhibit 3.  Can you do that?

9:39AM 15   A.  Yes.

16   Q.  Can you tell the Jury about the phone call that you

17   received in 2003?

18   A.  Yes.

19          MR. GELFAND:  Your Honor, we object on hearsay.

9:39AM 20          MS. MARSHALL:  Your Honor, it's for course of

21   conduct, not for the truth of the matter asserted.

22          THE COURT:  Overruled.

23   Q.  (BY MS. MARSHALL.)  Go ahead.

24   A.  Yes.  Sunday evening, March 30th, 2003, we were

9:39AM 25   getting ready to head back to session, because my husband

9:39AM 1    was the State Senator then.  And Mr. Duggar's father

2    called my husband and said it was a very important matter,

3    that he needed us to come over and talk to them.  And so

4    we went over and they took us to their bedroom.  And

9:40AM 5    Joshua was sitting on the floor.  And Jim Bob and Michelle

6    were dispersed in their bedroom.  And so I sat in the

7    chair beside Josh.

8    Q.    So your husband gets a call and Josh's father says,

9    there's something important, we need you all to come over,

9:40AM 10    is that correct?

11    A.    Yes.

12    Q.    And so was it you and your husband that went over?

13    A.    Yes.

14    Q.    And where did you all go?

9:40AM 15    A.    We went to Jim Bob and Michelle's house.

16    Q.    And when you got there, who all was there?

17    A.    In the room or at the house?

18    Q.    In the room.

19    A.    In the room, it was Jim Bob and Michelle, myself, my

9:40AM 20    husband, and Joshua Duggar.

21    Q.    What did Joshua Duggar tell you that day?

22    A.    Excuse me.  He told us that evening, he was having

23    bible time with the children he was babysitting.  And that

24    he had Jane Doe number 4 on his lap during bible time and

9:41AM 25    that he touched her private part, or touched her breast

9:41AM 1    area and her bottom area.

2    Q.    And that had occurred that day?

3    A.    Yes.

4    Q.    Approximately how old would Josh have been on March

9:41AM 5    the 30th of 2003?

6    A.    He was 15.

7    Q.    And where did he tell you that he had touched Jane

8    Doe 4?

9    A.    The top area, the breast area, and the private area.

9:41AM 10    Q.    And what did he tell you he had touched the breast

11    area with?

12    A.    His hand.

13    Q.    And what did he tell you he had touched?  When you

14    say "private area", what do you mean by "private area?"

9:42AM 15    A.    Vagina.

16    Q.    What did he tell you he had touched the private area

17    with?

18    A.    His hand.

19    Q.    Did Josh tell you if this was the first time that

9:42AM 20    something had happened like this?

21    A.    No.  He ended up confessing that off and on since he

22    was 12 years old, that he had touched Jane Doe number 1,

23    Jane Doe number 2, Jane Doe number 3.

24    Q.    Where did he tell you that he had touched Jane Doe

9:42AM 25    number 1, Jane Doe number 2, and Jane Doe number 3?

9:42AM 1   A.   He said that he touched their breast area and their

2   private area on top of their clothes and sometimes under

3   their clothes.

4   Q.   When would he do that?  When did he say that he would

9:43AM 5   touch them?

6   A.   When they were sleeping.

7   Q.   Did he tell you approximately how long that had been

8   occurring?

9   A.   He was 15 when he told us, so I don't know how old,

9:43AM10   like how far into his 12th year he was, but he said from

11   12, 13, 14, and 15.

12   Q.   The ages of Jane Doe number 1, Jane Doe number 2,

13   Jane Doe number 3, and Jane Doe number 4, were they

14   between three and 10 years younger than the defendant?

9:43AM15   A.   Yes.

16   Q.   So if Mr. Duggar, Josh Duggar, would have been 15

17   years old at the time, then one of those would have been

18   five years old at the time, approximately?

19   A.   Jane Doe number 4 was five.

9:44AM20   Q.   You stated that your daughter was

21   boyfriend/girlfriend with Josh at that time, is that

22   right?

23   A.   Yes.

24   Q.   By boyfriend/girlfriend, did you all expect that they

9:44AM25   would be married?

9:44AM 1    A.    Well, that was what they had said at the beginning,

2    that that was what they would hope for eventually, yes.

3    Q.    Is that why you all were called over there that

4    night, because of their relationship?

9:44AM 5    A.    Yes, only for that reason.

6    Q.    Tell me about that.

7    A.    Mr. Duggar, Jim Bob, called and said that it was an

8    emergency, so we went over.  And that's what he said.  He

9    said, I had to tell you, because our oldest daughter is

9:44AM10    going to have to know why the relationship is called off.

11    Q.    What happened after Josh told you those things that

12    night?  Where did Josh go?

13    A.    My husband advised the Duggars to get him out of the

14    house right then.  So he and Jim Bob took him down to a

9:45AM15    facility in Little Rock for troubled youth.

16    Q.    Did you see Josh Duggar again after that?

17    A.    You mean that day or --

18    Q.    Yes.  After March 30th, 2003, did you see Josh Duggar

19    again?  Did you all remain family friends?

9:45AM20    A.    Oh, yes, yes.

21    Q.    Sorry.  That was a bad question.  Did you still love

22    Josh Duggar?

23    A.    Yes, I still love Josh.

24    Q.    You still love Josh.  Your families, are your

9:45AM25    families still close?

9:45AM 1    A.    Yes.

2    Q.    Did you have another conversation with Josh Duggar

3    about the events that he initially told you about on

4    March 30th, 2003?

9:45AM 5    A.    Can you repeat the question?

6    Q.    Yes.  Did you ever have any other conversations with

7    Josh Duggar about the events that he initially told you

8    about on March 30th, 2003?

9    A.    Yes.

9:46AM 10   Q.    Tell the Jury about that.

11   A.    Okay.  In 2005, Josh came down to Little Rock with

12   us.  He stayed in another building, slept in another

13   building, but during the day, he was with us.  And he

14   would come often in the evening and talk to us about

9:46AM 15   things that he struggled with that day or whatever he

16   wanted to confess, this or that, or get things off his

17   mind.  We wanted to be his outlet of his thoughts so that

18   he could just not have to be pinned up all the time.

19         So one of those evenings, my husband had fallen

9:46AM 20   asleep while we were talking.  And Josh had went into more

21   detail about what actually happened on March 30th of 2002.

22   I'm sorry.  March 30th, 2003.  So this was now 2005.

23         Do you want me to continue?

24   Q.    What did he tell you?

9:47AM 25   A.    He told us -- me, he told me, my husband was

9:47AM 1  asleep -- that he had actually went under her pantaloons.

2  Jane Doe number 4, he had went under her pantaloons and

3  under her panties and touched her vagina.  And I had asked

4  him questions.  I said, "Did you touch her vagina or did

9:47AM 5  you put your fingers inside of her vagina?"  And he said

6  he did both.

7  Q.    And was he referring to the event that took place on

8  March the 30th, 2003, that caused ya'll to come to the

9  Duggar residence to begin with?

9:47AM 10  A.    Yes.

11  Q.    You said pantaloons.  What are pantaloons?

12  A.    Pantaloons are an additional coverage of your legs

13  when you wear a dress so girls can go play or ride bikes

14  or whatever when they are little and not have to worry

9:48AM 15  about their panties showing.  They go from your knees up

16  to your waist.

17  Q.    You have your panties on and then your pantaloons?

18  A.    Correct.

19  Q.    And so he told you that he had reached under both of

9:48AM 20  those?

21  A.    Yes.

22  Q.    Pantaloons are like bike shorts, sometimes referred

23  to as bike shorts?

24  A.    They are loose, yeah.

9:48AM 25  Q.    Just to be clear, so that was in reference to Jane

9:48AM 1    Doe number 4?

2    A.    Yes.

3    Q.    Mrs. Holt, tell me a little bit about how you feel

4    about being here today.  How is this for you?

9:49AM 5            MR. GELFAND:  Objection, Your Honor, relevance

6    and 403.

7            THE COURT:  What's the relevance?

8            MS. MARSHALL:  Your Honor, I believe it goes to

9    her credibility.

9:49AM10            THE COURT:  I'll allow you a small amount of

11    leeway.

12    Q.    (BY MS. MARSHALL.)  Mrs. Holt, are you good -- were

13    you good friends with the Duggar family?

14    A.    Yes.

9:49AM15    Q.    Did you love -- do you love Josh?

16    A.    I do.

17    Q.    Is this easy for you to talk about?

18    A.    No, ma'am.  No.

19    Q.    Is this something that you want to talk about?

9:49AM20    A.    No.

21            MS. MARSHALL:  May I have one moment, Your Honor?

22            THE COURT:  You may.

23    Q.    (BY MS. MARSHALL.)  Mrs. Holt, one more question.  I

24    want to make sure that the record is clear.  The incident

9:50AM25    that you said that Josh Duggar told you about in 2005, is

9:50AM 1  that the incident where he was 15 at the time?

2  A.   Yes, ma'am.

3  Q.   And the minor was approximately 10 years younger than

4  he was?

9:50AM 5  A.   Correct.

6        MS. MARSHALL:  I'll pass the witness, Your Honor.

7        THE COURT:  Thank you, Ms. Marshall.

8        Mr. Gelfand, when you're ready.

9        MR. GELFAND:  Thank you, Your Honor.

9:50AM 10              CROSS EXAMINATION

11  BY MR. GELFAND:

12  Q.   Good morning, Ms. Holt.

13  A.   Good morning.

14  Q.   Ms. Holt, we are here about allegations that occurred

9:50AM 15  in May of 2019 at a business called Wholesale Motorcars.

16  You don't have any first-hand knowledge of what, if

17  anything, happened there, correct?

18  A.   No.

19  Q.   Now, the events that you testified about, a couple of

9:51AM 20  weeks after you brought this to the attention of the

21  government, meaning the prosecutors or the agents, an

22  investigator for the defense came to your house, correct?

23  A.   Yes.

24  Q.   And you chose not to speak to that investigator when

9:51AM 25  you learned that that person wasn't working on behalf of

9:51AM 1    the prosecution or law enforcement, correct?

2    A.    That is not my motive, no.

3    Q.    But it's correct that you chose -- when you learned

4    that, that you chose not to speak to that investigator

9:51AM 5    about what you talked about today, correct?

6    A.    Correct.

7    Q.    And that never changed?  You never spoke to that

8    investigator, correct?

9    A.    No, no.  He never came back.

9:51AM10    Q.    And that was consistent with your request, correct?

11    A.    No, I didn't ask him to not come back.

12    Q.    But you told him you were unwilling to speak with

13    him, correct?

14    A.    I said I would pass.

9:52AM15    Q.    Now, Ms. Holt, you testified about essentially two

16    conversations today, is that correct?

17    A.    Yes.

18    Q.    I want to break that down for one second.  It's my

19    understanding that your oldest daughter and Josh started,

9:52AM20    quote, unquote, "dating" in 2002, is that correct?

21    A.    November 2002, yes.

22    Q.    And to be clear, in your family culture, in your

23    family tradition, was that a physical relationship?

24    A.    No.

9:52AM25    Q.    In fact, there are actually chaperones around kids

9:52AM  1   that age when they are courting each other, correct?

2   A.   Yes.

3   Q.   And your understanding is that was consistent with

4   the Duggar family tradition as well, correct?

9:52AM  5   A.   Correct.

6   Q.   And the idea that you and Jim had and Josh and your

7   daughter had and Jim Bob and Michelle had was that these

8   kids would eventually get married, correct?

9   A.   That was talked about, yes.

9:53AM 10   Q.   And they were 14 years old at the time, correct?

11   A.   When we talked about that?

12   Q.   When they started dating.

13   A.   Yes.

14   Q.   Now, you testified about what I'm going to call

9:53AM 15   conversation number one, which is March 30th of 2003,

16   correct?

17   A.   Yes.

18   Q.   And if I understand your testimony correctly, what

19   you're claiming is that there's essentially a meeting, if

9:53AM 20   you will, a discussion at Josh's parents' house, correct?

21   A.   Correct.

22   Q.   Josh is a kid at the time, correct?

23   A.   He's 15.  I'm sorry, 14 at that time.  Wait.  Which

24   night are we talking about?

9:53AM 25   Q.   The first conversation.

9:53AM 1   A.    Okay.  Yes.  He's 15.

2   Q.    So he's a 15-year-old child, correct?

3   A.    He's 15.

4   Q.    Are you fighting me on whether a 15-year-old is a

9:53AM 5   child?

6   A.    No, I'm just saying he's 15.

7   Q.    And you claim that he made these statements to you

8   about Jane Doe number 1, number 2, number 3 and number 4,

9   correct?

9:54AM10   A.    Yes.

11   Q.    And if I understand your testimony correctly, your

12   claim is that he made these statements about actions that

13   would have occurred, if I'm following you correctly, when

14   he was between 12 and 15 years old himself, correct?

9:54AM15   A.    Yes.

16   Q.    So just mathematically, we're talking plus or minus

17   20 years ago, correct?

18   A.    Yeah.

19   Q.    Now, the second conversation, as I understand it,

9:54AM20   happens in Little Rock, if I'm following you correctly,

21   correct?

22   A.    Yes.  2005.

23   Q.    And that's 2005.  Do you remember when in 2005?

24   A.    Sometime between January and probably the beginning

9:54AM25   of April.

9:54AM 1    Q.   When you say January and the beginning of April, are

2    you giving such a big range because it's connected to a

3    campaign or being -- not the campaign, I'm sorry --

4    legislative session?

9:55AM 5    A.   Yes.

6    Q.   And as I understand it correctly, this is about two

7    years, plus or minus, after your daughter broke up with

8    Josh, correct?

9    A.   She didn't break up with him.  It was called off by

9:55AM 10    all of us involved.

11    Q.   After they were no longer dating, correct?

12    A.   Correct.

13    Q.   And this is about two years after that, correct?

14    A.   Yes.

9:55AM 15    Q.   And you and your husband invite Josh to come spend a

16    lot of time with you in Little Rock, correct?

17    A.   Correct.

18    Q.   Now, this conversation that you claim, the second

19    conversation happened.  Who is present?

9:55AM 20    A.   My husband, Joshua, and myself.

21    Q.   And your husband is Jim Holt?

22    A.   Yes.

23    Q.   And Jim Holt was, among other things, a legislator at

24    the time, correct?

9:56AM 25    A.   Yes.

9:56AM 1    Q.    So you, Josh, and Jim Holt are at your place in

2    Little Rock, correct?

3    A.    Correct.

4    Q.    You're there not only with Josh, but with your how

9:56AM 5    many children?

6    A.    Have to count how many we had then.  Seven children,

7    maybe eight at the time.

8    Q.    And you don't have to get into too many details, but

9    that's a combination of daughters and sons, correct?

9:56AM10    A.    Yes.

11    Q.    Multiple daughters?  Multiple sons?  Yes?

12    A.    Yes.

13    Q.    And if I'm understanding what you're saying, it's

14    that Josh then comes to you, his ex-girlfriend's mother,

9:56AM15    on a nightly basis to, quote, "Confess his thoughts?"

16    A.    He came to Jim and myself anytime he wanted to about

17    this situation.  But this specific discussion was in the

18    evening, because he was with Jim during the day at the

19    Capitol and then he would come home and have dinner -- not

9:57AM20    come home.  He would come to our house and have dinner

21    with us.  And then we would put the kids to bed and if he

22    wanted to talk, he would talk then.

23    Q.    Do you know anything at all about what happened in

24    May of 2019 personally?

9:57AM25    A.    I know a little bit, yes.

9:57AM 1   Q.    Were you at the car lot?

2   A.    No.

3   Q.    I'm not asking what you have read.  I'm not asking

4   what you heard.  I'm asking if you have any first-hand

9:57AM 5   knowledge about what happened at Wholesale Motorcars in

6   May of 2019?

7   A.    No, sir.

8          MR. GELFAND:  Your Honor, may I have one minute,

9   please?

9:57AM10          THE COURT:  You may.

11          MR. GELFAND:  I have no more questions.

12          THE COURT:  Thank you, Mr. Gelfand.

13          Ms. Marshall, you may follow up.

14          MS. MARSHALL:  Thank you, Your Honor.

9:58AM15                    REDIRECT EXAMINATION

16   BY MS. MARSHALL:

17   Q.    Mrs. Holt, is it true that the government was the one

18   who reached out to you regarding this event?

19   A.    Yes, ma'am.

9:58AM20   Q.    Did you not reach -- why did you not speak to the

21   investigator?

22   A.    Because I hadn't been given permission to speak with

23   anybody yet.

24   Q.    In the last 10, 15 years, have you been approached by

9:58AM25   people asking you to talk about this?

9:58AM 1    A.    Yes.

2    Q.    Have you been offered money to talk about this?

3    A.    Yes.

4    Q.    Does that cause you concern in who you talk to this

9:58AM 5    about?

6    A.    For sure.  For sure.

7    Q.    Are you aware that you can talk to whoever you want

8    to?

9    A.    Now I can, yeah.

9:59AM10    Q.    Has anyone told you not to talk to someone?

11    A.    Outside of the trial?

12    Q.    Right.

13    A.    No.

14    Q.    You're aware that until you are on a witness stand,

9:59AM15    you can talk to whoever you want or not talk to whoever

16    you want?

17    A.    Yes.

18    Q.    Those two conversations that you had with Josh

19    Duggar, was that a pretty big life event in your life?

9:59AM20    A.    Very much.  You don't forget something like that.

21    Q.    How come?

22    A.    Because it completely affected our families.

23         MS. MARSHALL:  Pass the witness, Your Honor.

24         MR. GELFAND:  No further questions.

9:59AM25         THE COURT:  May this witness be excused?

9:59AM 1            MS. MARSHALL:  Yes, Your Honor.

2            MR. GELFAND:  Yes, Your Honor.

3            THE COURT:  Ma'am, thank you for your time in

4    being here today.  You're excused.  You're free to go.

10:00AM 5            Call your next.

6            MR. ROBERTS:  Your Honor, I believe we have

7    reached a point where the government is contemplating

8    resting.  If we can have just a few moments to reconcile

9    our exhibits and make sure we got everything in.  I think

10:00AM10   that's been done last night, but I just want a chance to

11   confirm.

12            THE COURT:  That's fine.

13            MR. ROBERTS:  Your Honor, we are actually seeing

14   one discrepancy we didn't catch beforehand.

10:01AM15            THE COURT:  What's the question, or which

16   exhibit?

17            MR. ROBERTS:  Your Honor, should we approach?

18            THE COURT:  Well, we could.

19            (Bench Conference)

10:01AM20            MR. ROBERTS:  Your Honor, if we could have one

21   more minute, it looks like we were mistaken.  Your Honor,

22   we're back to good.  I apologize.

23            THE COURT:  Thank you.

24            MR. GELFAND:  Your Honor, if they are going to

10:02AM25   rest right now, we will want to make a motion pursuant to

10:02AM 1    Rule 29 outside the Jury's presence.  I don't know what

2    the Court's preference is, but while we're up here, I just

3    wanted to raise that.

4           THE COURT:  So my preference -- tell me if this

10:02AM 5    is acceptance to you -- would be to show that at this

6    point in the trial, you're making a motion for judgment of

7    acquittal pursuant to Rule 29.  And that placemarker is

8    here.  There's no requirement under Rule 29 as to any

9    particular point during the trial when that motion has to

10:02AM10    be made, but I'll show a postmarker here.  I will

11    provisionally deny that motion, but at our next

12    opportunity when the Jury is out of the courtroom, I'll

13    allow you to make a more fulsome argument on the record

14    and we'll have the rest of you all's arguments in a more

10:03AM15    fulsome manner at that time.  Is that acceptable?

16           MR. GELFAND:  Absolutely fine.

17           THE COURT:  Thank you.

18           (Bench Conference Concluded)

19           MR. ROBERTS:  Your Honor, on the record, the

10:03AM20    government rests.

21           THE COURT:  All right.  The government has rested

22    its case.  Does the defense wish to put on any evidence?

23           MR. GELFAND:  We do, Your Honor.  We would call

24    our first witness, Michele Bush.

10:04AM25           THE COURT:  Ms. Bush, if you would please come

10:04AM 1   forward.  If you would pause about right there and raise

2   your right hand.

3            (Witness Sworn)

4            THE COURT:  Ma'am, you may have a seat in our

10:04AM 5   witness box.  While testifying, you are permitted to

6   remove your mask.  I'd ask that you help us be able to

7   hear you by situating the microphone and speaking directly

8   into it.  Thank you.

9            Mr. Gelfand, you may inquire.

10:04AM10            MR. GELFAND:  Thank you.

11             MICHELE BUSH, having been first duly sworn,

12   testified as follows:

13                        DIRECT EXAMINATION

14   BY MR. GELFAND:

10:04AM15   Q.    Good morning.  Will you please state and spell your

16   full name for the benefit of the court reporter?

17   A.    Michele Bush.  M-I-C-H-E-L-E, B-U-S-H.

18   Q.    Ms. Bush, how are you currently employed?

19   A.    I am a digital forensics expert and owner of a firm,

10:05AM20   Loehrs Forensics.

21   Q.    What does a digital forensics expert or a computer

22   forensic analyst do?

23   A.    We collect electronic data from electronic devices,

24   analyze it, and report on it in civil and criminal cases

10:05AM25   to essentially rebuild or reconstruct a digital crime

10:05AM 1    scene.

2    Q.    How long have you been a computer forensic analyst?

3    A.    I was certified in 2013, but I've been conducting

4    forensic exams since 2011.  2010, 2011.

10:05AM 5    Q.    What is the name of your business?

6    A.    It's Loehrs, L-O-E-H-R-S, Forensics.

7    Q.    And where is your business located?

8    A.    We are based in Phoenix, Arizona, but work all over

9    the country.

10:06AM 10   Q.    Generally speaking, what is a digital forensic

11   examination?

12   A.    It's analyzing the data that we have collected, so

13   taking everything that exists on a particular device and

14   finding information that's relevant to the investigation

10:06AM 15   and answering the "who, what, why, when, where," all the

16   questions we can about that data.

17   Q.    What is your educational background?

18   A.    I graduated from the University of Arizona with a

19   bachelor of science in psychology with a criminal justice

10:06AM 20   emphasis.

21   Q.    What, if any, specialized training do you have in the

22   field of computer forensics?

23   A.    I mean, hundreds of hours of private training through

24   vendors and accreditation services that provide

10:06AM 25   specialized training in digital forensics.

10:06AM 1  Q.   Do you hold any certifications or licenses specific

2  to the field of digital forensics?

3  A.   Yes.   So I have vendor certifications, which means

4  software specific which shows proficiency in that

10:07AM 5  particular application.   So I am an EnCase-certified

6  examiner.   That's proctored through OpenText -- it used to

7  be Guidance Software -- which allows me to use the EnCase

8  software application.   I'm also an AccessData certified

9  examiner, which is the Forensic Toolkit application.   And

10:07AM10  then I'm also a certified Cellebrite operator and

11  certified Cellebrite physical analyst, which shows

12  proficiency in the Cellebrite tool, which is for mobile

13  forensics.

14      Then I have vendor-neutral certifications, so

10:07AM15  certified computer examiner, certified computer forensics

16  examiner, and certified mobile forensics examiner, which

17  just shows the training and competence in just the general

18  field of digital forensics.

19  Q.   What do you have to do to obtain those

10:07AM20  certifications?

21  A.   In some of them, you actually have to apply for it.

22  So you put in an application that shows you have a certain

23  number of investigative hours, that you have conducted so

24  many forensic exams.   If you're accepted, then you take

10:08AM25  typically a written test that you have to pass with, like,

10:08AM 1    75 to 80 percent.  Then they will give you practical

2    exams.  So the CCE actually administers three different

3    practical exams on different types of evidence that you

4    have to pass, so giving you evidence, you report on it and

10:08AM 5    you submit that.  And then others, you take a week-long

6    training course and if you pass the test at the end of

7    that, they give you the certification.  So different

8    certifications do different things.

9    Q.    Let me ask you this.  Why do you keep these

10:08AM10    certifications up to date?

11    A.    Because technology advances so rapidly that -- in

12    fact, with the CCE, you have to show that you have

13    continued to do this and continued your education to show

14    that you understand technology as it exists today.

10:08AM15    Because being certified in 2010 has a totally different

16    meaning to it than 2021, because the technology that

17    exists today might not have existed in 2010.  It just

18    shows that I have continued to keep up on what's relevant

19    with digital forensics today.

10:09AM20    Q.    Are you a member of any professional organizations in

21    your field?

22    A.    Yes.  I am a member of the Forensic Expert Witness

23    Association, which just verifies that I'm an expert

24    witness and that I am who I say I am.  I'm also a member

10:09AM25    of the International Society of Forensic Computer

10:09AM 1  Examiners, which is a group of individuals who have passed

2  the CCE certification process and training.

3      I am also a member of the Scientific Working Group on

4  Digital Evidence, which is a nonprofit group of 100

10:09AM 5  members, up to 100 members around the world, mostly law

6  enforcement and some private sector, like myself, that

7  actually set the standards for digital forensics.

8  Q.   So just to be clear, that last organization that you

9  testified about, that's an organization consisting of

10:09AM10  approximately 100 law enforcement and private sector

11  computer forensic analysts that you are a part of?

12  A.   Yeah.  And it actually has like a ratio, so I think

13  it's, like I think maybe 80 percent law enforcement, and

14  then there has to be some attorneys and there has to be

10:10AM15  some private sector.  So I'm their primary private sector

16  representative.  And it's up to 100 members, so it can't

17  be more than that.

18  Q.   Have you ever attended any training conferences in

19  the field of digital forensics also attended by law

10:10AM20  enforcement?

21  A.   Yes, I have.

22  Q.   Just broadly, generally explain to the Jury what you

23  have attended.

24  A.   So some of the vendors, they will hold like week-long

10:10AM25  conferences.  So I've been to the EnCase one.  It was

10:10AM 1    given by Guidance Software at that time.  And then

2    AccessData conferences.

3    Q.    Now, have you ever presented at conferences or other

4    professional events related to digital forensics?

10:10AM 5    A.    Yes, I have.

6    Q.    Approximately how many forensic examinations have you

7    performed?

8    A.    I would say upwards of 500.

9    Q.    Approximately how many devices were involved in those

10:11AM 10   examinations?

11   A.    Hundreds, if not thousands.

12   Q.    Over the course of your career, do those 500-plus

13   examinations include a combination of computers, phones,

14   storage devices like thumb drives, routers, and tablets?

10:11AM 15   A.    Yeah.  Anything that was seized with a power button,

16   we can get.

17   Q.    Where do those forensic examinations generally take

18   place?

19   A.    The evidence can be made available in my forensics

10:11AM 20   lab where I'm provided either the original devices that I

21   can acquire myself or I'm provided the forensic images

22   created of those devices.  The evidence can also be

23   provided to me in child sexual exploitation cases at law

24   enforcement's facility.

10:11AM 25   Q.    Describe your laboratory, just generally.

10:11AM 1    A.   It's a two-story office space.  The upstairs is very

2    modern, giant open concept with lots of white desks and

3    work stations, servers, stand-alone equipment that we're

4    using, multiple networks.  So just a giant space with all

10:12AM 5    the equipment and technology that we need to conduct these

6    exams.

7    Q.   How many of those 500-plus forensic examinations have

8    involved allegations of child pornography?

9    A.   I'd say around or more than 50 percent of them.

10:12AM 10   Q.   Have you previously testified as an expert in the

11   field of computer and digital forensics?

12   A.   Yes, I have.

13   Q.   Approximately how many times?

14   A.   I think 23 now.

10:12AM 15   Q.   Have you ever been qualified by a Court as an expert

16   witness in this field?

17   A.   Yes, I have.

18   Q.   Approximately how many times?

19   A.   23.

10:12AM 20         MR. GELFAND:  Your Honor, at this time, I would

21   ask the Court to recognize Ms. Bush as an expert witness

22   in the field of computer and digital forensics.

23         MR. CLAYMAN:  No objection, Your Honor.

24         THE COURT:  Members of the Jury, persons who by

10:13AM 25   knowledge, skill, training, education, or experience, have

10:13AM 1    gained expertise in some field, are permitted to state

2    their opinions on matters in that field and may also state

3    the reasons for their opinions.  Here, the witness has

4    testified about such training and experience in the field

10:13AM 5    of computer and digital forensics.  However, expert

6    testimony should be considered just like any other

7    testimony in the sense that you may accept or reject it.

8    and you may give it as much weight as you think it

9    deserves considering the witness's education and

10:13AM10    experience as well as the soundness of the reasons given

11    for the opinion, the acceptability of the methods used,

12    and all the other evidence in the case.  You may proceed.

13            MR. GELFAND:  Thank you.

14    Q.   (BY MR. GELFAND.)  Ms. Bush, approximately when did

10:14AM15    you first become involved in this case involving

16    allegations against Josh Duggar?

17    A.   April of this year.

18    Q.   To be clear, in April of this year, were you retained

19    by the defense in this case to assist with this

10:14AM20    investigation?

21    A.   Yes, I was.

22    Q.   During the course of your work on this case, did you

23    have an opportunity to review forensic images of devices

24    that were seized by law enforcement in this case?

10:14AM25    A.   Yes, I did.

10:14AM 1   Q.   What devices did you review vis-a-vis the forensic

2   images?

3   A.   Yeah, the forensic images of the MacBook laptop, the

4   iPhone, the desktop computer, and several storage devices.

10:15AM 5   I think five storage devices.

6   Q.   When you say "Storage devices," can you just explain

7   to the Jury what you mean by that?

8   A.   Thumb drives and SD cards.

9   Q.   Now, what is a forensic image?  In other words, when

10:15AM10   you were looking at a forensic image, can you explain to

11   the Jury what it was you were provided by law enforcement?

12   A.   Yeah.  For a computer, it's called a bit-for-bit

13   copy, meaning it's actually taking the 1s and Os from the

14   hard drive and putting it into a file.  It looks kind of

10:15AM15   like a Word document file, but it's a giant file that

16   could be one terabyte in size and we actually load that

17   into forensic software.  We can verify that it's an exact

18   duplicate of an original device.  And with mobile

19   forensics, it's communicating with the device to try to

10:15AM20   extract as much of the file system as possible, but not

21   necessarily a bit-for-bit copy, but still a duplicate of

22   the evidence that existed on the device itself.

23   Q.   So to be clear, were the forensic images that you

24   were provided represented to you to be essentially, in a

10:16AM25   forensic way, identical copies of the devices that were

10:16AM 1   seized?

2   A.   Exactly.

3   Q.   And is that what happens in the ordinary course of

4   your work in hundreds of other cases?

10:16AM 5   A.   Yes.

6   Q.   Now, with respect to the MacBook laptop, the iPhone,

7   and the five thumb drives and SD cards, were you provided

8   images to review those in your laboratory?

9   A.   Yes.   Those were sent to me directly from the

10:16AM10   government to my lab in Phoenix, Arizona.

11   Q.   What, if anything, does that indicate to you?

12   A.   Well, because it's a case that's involving suspected

13   child pornography, it means they don't contain child

14   pornography.   Otherwise, it would be illegal for me to

10:17AM15   possess them.

16   Q.   Now, were you also able to conduct a review of the

17   forensic image of the HP computer that was seized in this

18   case?

19   A.   Yes, I was.

10:17AM20   Q.   What, if any, parameters were placed on your review

21   of that image based on the allegation that it contains

22   evidence of child pornography?

23   A.   So that forensic image was actually provided to me at

24   law enforcement's facility, specifically Homeland

10:17AM25   Security, where I go and I travel to their office in their

10:17AM 1    working hours with my own mobile forensic equipment where
       2    I can extract data, non-contraband data, from that device.
       3    Q.    And to be clear, because that device is alleged to
       4    contain evidence of alleged child pornography, are you
10:17AM 5    limited in the sense that you have to go, understandably,
       6    see it at a government facility?
       7    A.    Exactly.
       8    Q.    And did you do that in this case?
       9    A.    Yes, I did.
10:18AM10    Q.    Approximately how many days did you spend at an HSI
      11    facility reviewing the forensic image of the HP computer?
      12    A.    Five days total.
      13    Q.    Prior to reviewing the HP computer at Homeland
      14    Security, do you have to sign any sort of agreement?
10:18AM15    A.    Yeah.   They give me what's called an Adam Walsh exam
      16    worksheet, which basically outlines that I'm agreeing
      17    to -- I'm not going to extract or take child pornography
      18    with me or do anything that could potentially expose or
      19    allow that child pornography to leave the control and
10:18AM20    custody of the government.
      21          MR. GELFAND:   Your Honor, at this time, I would
      22    ask -- I'm sorry --
      23    Q.    (By MR. GELFAND.)   Ms. Bush, do you have in front of
      24    you a defense exhibit binder?
10:18AM25    A.    Yes, I do.

10:18AM 1    Q.    Could you turn, please, to Defendant's Exhibit 81 and

2    tell me if you recognize that document.

3    A.    Yes, I do.

4    Q.    Just generally, what is that document?

10:19AM 5    A.    That's the Adam Walsh exam worksheet dated 6-23-2021

6    that I signed while at HSI.

7    Q.    And was that signed by you and HSI in connection with

8    this case?

9    A.    Yes, it was.

10:19AM10    Q.    Is it in the same or substantially similar condition?

11    A.    Yes.

12    Q.    Is this actually a photo that you took?

13    A.    Yeah, because I don't have any equipment.  I don't

14    have a printer or scanner or anything with me.  I just

10:19AM15    take a photo of the exam worksheet so I have got a copy.

16         MR. GELFAND:  Your Honor, at this time, I move

17    Defendant's 81 into evidence, please.

18         MR. CLAYMAN:  No objection, Your Honor.

19         THE COURT:  Defendant's 81 is received.

10:19AM20         (Defendant's Exhibit 81 Received)

21         MR. GELFAND:  May I publish it, please?

22         THE COURT:  You may.

23    Q.    (BY MR. GELFAND.)  Ms. Bush, if you can look either

24    at the exhibit you have in front of you or on the screen

10:19AM25    in front of you.  Just to be clear, the signature on the

10:20AM 1    top.  Do you see that on top?

2    A.    Yes.

3    Q.    Is that your signature above two HSI personnel's

4    signature?

10:20AM 5    A.    Yes.  And that's my initials as well above that.

6    Q.    What was your understanding of essentially what this

7    contract or what this agreement placed as far as

8    limitations on you?

9    A.    Well, the agreement overall is, again, to show that I

10:20AM10    am not going to remove any suspected child pornography

11    from the control and custody of the government.  So this

12    is explaining that because I'm bringing in my own

13    equipment, that I'm going to actually forensically destroy

14    the hard drive before I leave, that while I have access to

10:21AM15    the child pornography, I'm not connecting it to the

16    internet, that I'm not taking it with me, I'm not copying

17    it to any external devices.  Just establishing that I am

18    closed off, in office, just reviewing it for the purpose

19    of this case and nothing else is going to happen with the

10:21AM20    child pornography.

21    Q.    To state the obvious, did you comply with the

22    parameters?

23    A.    Absolutely.

24    Q.    Now, were you in the courtroom when the government's

10:21AM25    two computer forensic experts, Mr. Kennedy and

10:21AM 1  Mr. Fottrell, testified at this trial?

2  A.    Yes.

3  Q.    And were you able to hear and observe the entirety of

4  each of their respective testimony?

10:21AM 5  A.    Yes, I was.

6  Q.    Based on your review of the MacBook Pro laptop

7  computer and the iPhone, were you able to determine from

8  the data on those devices who those appeared to belong to?

9  A.    Yes.  My examination of all of the data collectively

10:22AM 10  on those devices was consistent with belonging to

11  Mr. Duggar.

12  Q.    Based on your review of the HP computer, were you

13  able to determine from the data on that device who it

14  belonged to?

10:22AM 15  A.    Yes.  Again, based on my own analysis and the data

16  that exists on that device, it seemed consistent with

17  Wholesale Motorcars and Mr. Duggar.

18  Q.    What kinds of devices were the personal devices?

19  A.    Apple manufactured devices.

10:22AM 20  Q.    What kind of device was the work computer?

21  A.    A PC or Windows-based device.

22  Q.    Did you review the personal devices, meaning the

23  laptop computer and the iPhone, to determine whether there

24  was any evidence of alleged child pornography on those

10:22AM 25  devices at any time in history?

10:22AM 1   A.    Yes.

2   Q.    And what did you find?

3   A.    No evidence of that.

4   Q.    To be clear, based on your training and experience,

10:23AM 5   would you have found evidence of that if it was there?

6   A.    Yes.  Because when a user conducts any sort of

7   activity on a computer, we kind of describe it as a

8   shotgun effect.  One click of a button can create forensic

9   remnants or artifacts on multiple different places on a

10:23AM10   hard drive.  So even if the existence of one or a couple

11   of those artifacts is missing, we can typically still tell

12   from other pieces of information that would be created as

13   well.

14   Q.    When you refer to forensic artifacts, are you

10:23AM15   referring to data that you extract from devices

16   themselves?

17   A.    Yeah.  Typically, it's information created by

18   software or the system and not necessarily user data.

19   Q.    So to be clear, this is not information that you

10:23AM20   control, correct?  It's either there or it's not there?

21   A.    Correct.

22   Q.    If any alleged child pornography was on the personal

23   devices, but deleted, would there be an artifact of it?

24   A.    Yeah.  Just like on the Linux side, there's going to

10:24AM25   be thumbnail images or there will be link files showing

10:24AM 1    that files had been opened or viewed or activity within

2    the internet browser.  There are going to be different

3    things that we are looking for that would suggest they had

4    once existed.

10:24AM 5    Q.    Based on your review of the MacBook laptop, what was

6    your understanding as to how long the user, meaning Josh

7    Duggar, used it?

8    A.    Approximately five years.  I think from November 2014

9    to the date of the search warrant, November of 2019.

10:24AM10    Q.    And are you basing that five-year time period of use

11    based on computer forensics?

12    A.    Yes.

13    Q.    Explain to the Jury how you reach that.

14    A.    Well, there's a lot of different things I'm looking

10:24AM15    at, but one of them to start to figure out when was the

16    first time this computer was used, I'm looking at when was

17    the hard drive actually partitioned.  When was this hard

18    drive formatted and when was the operating system

19    installed initially.  And I found that through the

10:25AM20    forensic evidence, it was installed and the MacBook was

21    created essentially in November of 2014.  And then the

22    user account activity occurred consistently up until the

23    last access date, which would have been around the date of

24    the search warrant.

10:25AM25    Q.    So to be clear, based on your computer forensic

10:25AM 1    examination, have you reached a conclusion or formed an
       2    opinion as to whether that device was used before November
       3    of 2014?
       4    A.    I found no evidence to suggest that it was.  In fact,
10:25AM 5    I don't know that the model number of that Mac was even
       6    manufactured prior to then.
       7    Q.    You used the phrase "partition".  That's obviously a
       8    phrase the parties have used a lot in this case.  When you
       9    refer to the partition on the laptop, can you please
10:26AM10    explain to the Jury what you're referring to?
      11    A.    Yeah.  Every computer has to have some sort of
      12    organization to separate how the system is going to store
      13    and use data, and that's done through partitioning.  So
      14    the Mac operating system, if there's only one operating
10:26AM15    system, will contain, in newer Macs, one partition per
      16    that operation system and there might be multiple
      17    different volumes to separate data.
      18         But on a Windows machine, there's going to be
      19    additional partitions.  The manufacturer can make a
10:26AM20    partition.  For instance, a Dell or an HP device might
      21    create their own section on the hard drive basically just
      22    allocating that data to information that the manufacturer
      23    needs.  So for an HP or Dell, they'll create a recovery
      24    partition that you can actually boot into if something
10:26AM25    were to happen to your system, and it can re-create it, it

10:26AM 1   can restore your computer to a healthy state.  So those

2   partitions are just organizing the data.

3   Q.   I want to transition -- well, before doing so, bottom

4   line, no artifact of child pornography on the personal

10:27AM 5   devices, correct?

6   A.   Correct.

7   Q.   I want to transition to the HP computer.  Explain to

8   the Jury, if you would, what, if anything, you found with

9   respect to the structural makeup of the HP computer.

10:27AM10   A.   Well, again, I kind of start with the formatting.

11   How is this computer set up?  And the first thing I notice

12   is that there were six total partitions.  And some of

13   those partitions are totally normal, nothing that would

14   really jump out at me.  There was the default HP recovery

10:27AM15   partition, which is created by the manufacturer itself.

16   There were the Windows partitions, so the partition that

17   actually houses the operating system, but also reserved

18   partitions that Windows creates by default.  I also found

19   the sixth and final partition, which was dedicated to a

10:28AM20   Linux operating system.

21   Q.   Is it typical for a PC computer like this HP to have

22   multiple partitions -- in other words, outside of the

23   Linux stuff -- straight out of the box?

24   A.   Yes, absolutely.

10:28AM25   Q.   On the Windows side of the HP computer, did you

10:28AM 1  evaluate through computer forensics whether there was ever

2  any trace of alleged child pornography?

3  A.   I looked for that, but I did not find anything.

4  Q.   Explain to the Jury what you did with respect to the

10:28AM 5  Windows side of the partition before we get to the Linux

6  partition.

7  A.   Again, same thing I did with the MacBook.  Just

8  looking for the different artifacts that would exist if

9  suspected child pornography had ever been searched for,

10:28AM10  looked at, downloaded, opened, viewed, deleted.  Any

11  indication that that type of activity had occurred.  And I

12  did not find anything.

13  Q.   I want to be clear for a second.  If any sort of

14  image or video file is viewed, is there a computer

10:29AM15  forensic artifact of it?

16  A.   Most of the time.  And that's why computer forensics

17  is used in these cases, because when data is deleted,

18  using a forensic science, we can go back, and, again,

19  reconstruct this crime scene that shows, even if we don't

10:29AM20  have the actual existence of child pornography, we can

21  show what had happened leading up to the point that it had

22  been downloaded and to the point that it had been deleted.

23  Q.   You testified that you found a sixth partition on the

24  HP running a Linux operating system, is that correct?

10:29AM25  A.   Yes.

10:29AM 1    Q.    What, if anything, did you do to determine the size

2    of that partition?

3    A.    The file system on the hard drive will actually store

4    information about how many -- it's called sectors.  Think

10:29AM 5    of it like the pages of a book.  How many total pages are

6    in this book.  Looking at that, it will tell me there are

7    this many total sectors.  And you can calculate that up to

8    a size.  So in this case, the Linux partition was a total

9    of about, I think 11 gigabytes.  And within that, it will

10:30AM10    actually tell you how much of that total space that its

11    dedicated to that system is being used versus how much is

12    free and available for the user to save data to.

13    Q.    Who decides how big a Linux partition is when it's

14    installed on an HP computer?

10:30AM15    A.    When it's running kind of parallel to another

16    operating system, meaning a dual boot system, the user

17    will decide how they want to dedicate the drive storage.

18    So in this case, the user would have decided how big or

19    small they wanted that partition to be.

10:30AM20    Q.    Why were you looking, as part of your computer

21    forensic evaluation, at the size of the partition?

22    A.    Because if this partition is being used to store

23    data, I would expect that a certain amount of data would

24    be allocated to that system to show that a user's

10:31AM25    intention for creating this system was to store

10:31AM 1   information.  Kind of like if you buy a thumb drive

2   because you want to put your photos on it, a backup, and

3   you know you have got 128 gig phone, you are probably

4   going to want something comparable to that so you know you

10:31AM 5   have enough space.  So just looking to see, how did the

6   user, when they created this, intend to access and use

7   that system.

8   Q.   I want to direct your attention to Defendant's

9   Exhibit 83, please.  Do you see that in the binder in

10:31AM 10  front of you?  If it's easier, Ms. Bush, you're welcome to

11  -- provided it's okay with the Judge -- to take the binder

12  in front of you.

13  A.   Yeah.  Thank you.  I have that.

14  Q.   Do you recognize Defendant's Exhibit 83?

10:31AM 15  A.   Yes, I do.

16  Q.   Can you tell us, just generally, what it is?

17  A.   This is a screenshot that I took within the EnCase

18  forensic software of evidence from the HP desktop.

19  Q.   Is it true and accurate?

10:32AM 20  A.   Yes, it is.

21       MR. GELFAND:  Your Honor, I move Defendant's 83

22  into evidence, please.

23       MR. CLAYMAN:  No objection.

24       THE COURT:  Defendant's Exhibit 83 is received.

10:32AM 25       (Defendant's Exhibit 83 Received)

10:32AM 1             MR. GELFAND:  If I may publish it, Your Honor.

2             THE COURT:  You may.

3  Q.   (BY MR. GELFAND.)  I'm going to zoom in on this for

4  you, Ms. Bush.  Can you just tell me, before we get into

10:32AM 5  some of the technical stuff, tell the Jury what this

6  document actually is.  What are we looking at?

7  A.   This is the actual forensic software, one of many of

8  the tools that I will use.  So this is EnCase

9  specifically.  It's showing you there's a little evidence

10:32AM10  tab at the top there showing that I am looking at a

11  forensic image of evidence.  And in this case, I'm looking

12  at an image file called "line item 004_redacted."

13  Q.   To be clear, what does "line item 004" mean to you?

14  A.   That's the HP desktop computer.  It's the naming

10:33AM15  convention that was assigned by, I think, HSI.

16  Q.   Now, to be clear, is the information on here

17  information that you type in or information that your

18  forensic tool, EnCase, extracts directly from the forensic

19  image, meaning from the HP?

10:33AM20  A.   Yeah.  This is -- using forensic software, I opened

21  the original evidence and this is information that came

22  from the forensic image provided to me by the government,

23  so it's coming directly from that bit-for-bit copy of the

24  hard drive that was installed in the HP.

10:33AM25  Q.   So if we look down, could you please tell us what

10:33AM 1    total capacity means?

2    A.    Yeah.   Total capacity is actually taken from total

3    sectors, but it just means the total number of bytes that

4    the system is allowed to use on the hard drive.   And if

10:34AM 5    you calculate and convert the bites to gigabytes, it

6    totals to 11.3 gigs is the total size for that system to

7    use.

8    Q.    To break that down, is that broken down into

9    allocated and unallocated space?

10:34AM 10    A.    Yes, it is.

11    Q.    So you referenced the unallocated space and the

12    allocated space, is that correct?

13    A.    Correct.

14    Q.    What does the allocated space refer to here?

10:34AM 15    A.    Allocated means the amount of data that's already

16    being used on that system, so it means it's reserved.

17    It's already being taken up by some data that's saved to

18    that system.

19    Q.    What does that mean in kind of English as it applies

10:35AM 20    to this Linux partition?

21    A.    It means 8.8 gigs of the total 11.3 is already being

22    used and would be unavailable for a user to download data.

23    Q.    In other words, it's being used by the operation of

24    the system itself, meaning of Linux?

10:35AM 25    A.    Yeah.   So in analyzing the Linux partition, there was

10:35AM 1    really no user data downloaded or on that system at the
        2    time that it was seized, so there wasn't going to be a lot
        3    of user data already creating that.  And I know from my
        4    experience that the Ubuntu operating system, by default,
10:35AM 5    takes up about 8 gigs of space, because each operating
        6    system creates their own set of files.  In this case,
        7    Ubuntu would be using about 8 gigs of that on its own just
        8    to run.
        9    Q.    You used the phrase Ubuntu.  What does that mean?
10:35AM10    A.    That's the operating system that had actually been
       11    installed on this partition.
       12    Q.    In other words, is Ubuntu synonymous with Linux for
       13    our purposes?
       14    A.    Yes, it is.
10:36AM15    Q.    What does the unallocated space refer to?
       16    A.    Unallocated means it's the data that -- it's the
       17    sectors and the bytes that are not currently being
       18    reserved by the file system.  So there can still be data
       19    in there, but the user has that available to save data.
10:36AM20    So it's kind of like if you have a thumb drive and it's 16
       21    gigs, and you have 10 gigs saved there, you have four gigs
       22    left.  So that 4 gigs is your unallocated.  It can contain
       23    deleted data, but you have that available to write new
       24    data.
10:36AM25    Q.    In comparison to the total size of the hard drive on

10:36AM 1   the HP computer, how big was the Linux partition in terms

2   of the space available to save data, in other words, to

3   save documents, movies, images, those kinds of things?

4   A.   There was only 2.5 gigs available to write data,

10:36AM 5   which is smaller than most thumb drives you can buy today.

6   Q.   And in comparison to the total hard drive on the HP,

7   what was the approximate percentage of that amount of

8   space available to save data?

9   A.   The entire hard drive was one terabyte, so this is

10:37AM 10   less than one percent of the entire hard drive.

11   Q.   For context, approximately how many Hollywood movies,

12   if I were to download one online, can a 2.5 gigabyte hard

13   drive hold?

14   A.   Zero.  A Hollywood film typically, like if you go buy

10:37AM 15   a DVD, it's on a Blu-ray disc, that's about 7 gigs worth

16   of data.  So if you were to compare that to a movie that

17   you can get on a CD, it's 7 gigs, so it wouldn't even save

18   one of those files.

19   Q.   Based on your review of the HP image at Homeland

10:37AM 20   Security, were you able to determine when Linux was

21   installed?

22   A.   Yes, I was.

23   Q.   When was it installed?

24   A.   May 13, 2019, around 1:43 p.m.

10:38AM 25   Q.   I'm going to show you Exhibit 52.  Do you have that

10:38AM 1    in front of you?

2    A.    Government's Exhibit?

3    Q.    Defendant's Exhibit.

4    A.    Yes, I do.

10:38AM 5    Q.    Can you tell us if you recognize Defendant's Exhibit

6    52?

7    A.    Yes, I do.  It's a screenshot of data, again,

8    extracted from the HP desktop computer.

9    Q.    Is it true and accurate?

10:38AM 10   A.    Yes, it is.

11              MR. GELFAND:  Your Honor, I move Defendant's

12   Exhibit 52 into evidence, please.

13              MR. CLAYMAN:  No objection.

14              THE COURT:  Defendant's Exhibit 52 is received.

10:38AM 15              (Defendant's Exhibit 52 Received)

16              MR. GELFAND:  May I publish it.

17              THE COURT:  You may.  Mr. Gelfand, after you

18   finish your questioning about this exhibit, we need to

19   look for a place to take our morning recess.

10:38AM 20              MR. GELFAND:  Sure.  We're going to spend a

21   little time on this, so if the Court would prefer, we can

22   break now.  Whatever the Court prefers.

23              THE COURT:  Let's do that if it won't interrupt

24   your flow.

10:39AM 25              MR. GELFAND:  No problem at all.

10:39AM 1          THE COURT:  Members of the Jury, we will take our

2    morning recess.  If you could be ready to come back out,

3    we'll restart at 11:00 a.m.  Let me remind you of the

4    recess instruction.  Do not speak with anyone about the

10:39AM 5    case, including your fellow jurors.  Don't do any

6    research.  Don't let anyone attempt to communicate with

7    you about the case.

8          If everyone would please stand while the Jury

9    exits.  Everyone in the gallery should remain in the

10:39AM10   gallery until I tell you that the Jury has cleared the

11   elevator lobby.

12          (Jury out at 10:39 A.M.)

13          THE COURT:  Everyone may be seated.  The Court's

14   plan would be to take up a Rule 29 record over, or at the

10:40AM15   beginning of the lunch recess.  We'll take a little bit of

16   an extended lunch recess today.

17          For members of our gallery, we appreciate you

18   being here today.  If you bring in water bottles or cups

19   of coffee or those sort of things, which we don't normally

10:40AM20   allow, but I guess we are in this case, please take your

21   trash with you when you leave.  We're in recess until

22   11:00.

23          (Recess taken from 10:41 a.m. to 11:05 a.m.)

24          (Jury in at 11:05 a.m.)

11:05AM25          THE COURT:  Mr. Gelfand, you may inquire.

11:05AM 1          MR. GELFAND:  Thank you.

2    Q.   (BY MR. GELFAND.)  Ms. Bush, before we broke --

3          MR. GELFAND:  Your Honor, I believe that the

4    Court received 52 into evidence, is that correct?

11:05AM 5          THE COURT:  52 is received.

6          MR. GELFAND:  Thank you.  If I may publish that.

7    Q.   (BY MR. GELFAND.)  Can you take a look at that in

8    front of you, Ms. Bush?  Can you just remind us, please,

9    as to just, generally speaking, what Exhibit 52 is.  In

11:05AM10   other words, what are we looking at?

11   A.   This is a screenshot of data extracted from the HP

12   computer, the Windows partition specifically.

13   Q.   And how did you extract this data?

14   A.   From the forensic image that I was provided by the

11:05AM15   government at HSI, using my forensic software, I'm able to

16   extract non-contraband data.  And this is part of that

17   information I extracted.

18   Q.   And to be clear, do you recall what forensic tool you

19   used to extract this data?

11:06AM20   A.   Yes.  EnCase Version 21.

21   Q.   Thank you.  Now, I want to direct your attention to

22   the left column.  Can you tell us, just generally

23   categorically what's on the left column under name?

24   A.   Yeah.  So to give a little context, I guess, these

11:06AM25   are specifically what we call link files.  So when a file

11:06AM 1    is opened on a Windows system, when a user double-clicks
2    something, Windows will actually create its own separate
3    file with a .lnk extension that details the file that was
4    opened.  So the left-hand column, this name column, is
11:06AM 5    detailing the name of the file that had been
6    double-clicked or opened.  And some of them are like
7    applications, so you can see like row 75 isn't the name of
8    a file, but it's still the name of whatever was opened.
9  Q.    So to be clear, is this link file depository, so to
11:07AM 10   speak, something that is forensically available when you
11   know how to look for it and have the right tools?
12  A.    Yes, in the Windows recent folders.  Like Forensics
13   101, that's one of the first places we look for, one of
14   the first locations we look at because it tells us what
11:07AM 15   data is being accessed by a user.
16  Q.    Now, before we get into details for a second, can you
17   just tell us, generally speaking, what the item path
18   column refers to?
19  A.    This is the source of the information, so the item
11:07AM 20   path is listing the exact location where I found this
21   information.  So starting with LI004, line item four,
22   which is the naming convention of the HP desktop, "E,"
23   which is the Windows partition that we talked about, the
24   user's folder, and then the wholesaleNWA account under app
11:07AM 25   data, which is a hidden Windows system directory, roaming,

11:07AM 1   Microsoft, Windows, and then the recent folder.  And then

2   the last section is going to be pretty much duplicative of

3   the name.  It's going to actually show you the link file

4   that I'm referencing.

11:08AM 5   Q.   And then finally, just generally speaking, what is

6   the symbolic link column on the right of this?

7   A.   That's the information that Windows is recording of

8   where that file was opened, so what the user actually

9   clicked on.  So the artifact itself is stored in that

11:08AM10   hidden recent folder, but the symbolic link tells us what

11   was opened.  So, for instance, the F:\jeremy_model-mesh

12   pics is showing me that a file had been opened from an "F"

13   drive.

14   Q.   So we'll talk about that in a second.  We direct your

11:08AM15   attention to the jeremy_model-mesh pics file.  Can you

16   tell us when that file was physically opened on the HP

17   computer?

18   A.   Yeah.  The file created date column is going to be

19   representative of when that file was first opened.  So

11:09AM20   when a user is -- a user double-clicks a file and Windows

21   creates that link file, we know the creation of the link

22   file coincides with when the user opened it.

23   Q.   What is that date and time?

24   A.   May 13th, 2019, at 12:53:40 p.m.

11:09AM25   Q.   If we follow along, what is the symbolic link column

11:09AM 1  tell us with respect to this particular file?

2  A.   The symbolic link is telling me that the file that

3  was double-clicked actually came from an external device,

4  meaning that F:\ is a drive letter that Windows uses to

11:09AM 5  assign devices that are mounted to the machine.  It can be

6  other things, but also double-checking with other areas on

7  the computer, I'm able to confirm that that was, in fact,

8  a thumb drive.  So this symbolic link is confirming that a

9  file had been opened from a thumb drive that was

11:10AM10  physically mounted to the HP desktop.

11  Q.   That was at 12:53, correct?

12  A.   Correct.

13  Q.   At 12:54, was a filed opened?

14  A.   Yes, it was.

11:10AM15  Q.   What was that file name?

16  A.   UK Cardiff-final-background lighter.

17  Q.   And to be clear, you testified that this .lnk

18  references that this is the link file that we're looking

19  at, correct?

11:10AM20  A.   Right.  It tells me that Windows created a file for

21  this file that had been opened.

22  Q.   Were you able to determine what that file was

23  actually?

24  A.   Yeah.  From the symbolic link, I was able to

11:10AM25  determine it was actually a PowerPoint file.

11:10AM 1    Q.    Is that referenced by the .pptx?

2    A.    Exactly.

3    Q.    And similarly with the jeremy_model.x, what does

4    .docx reference?

11:11AM 5    A.    It's a Microsoft Word document.

6    Q.    So, similarly, we see the F: on the UK Cardiff

7    PowerPoint.  What does that tell you?

8    A.    That that file was opened from the same drive that

9    had been physically mounted to the HP computer.

11:11AM10   Q.    At 12:56 p.m., was a file opened from that same

11   drive?

12   A.    Yes, it was.

13   Q.    And what was that file called?

14   A.    Quiz 1.

11:11AM15   Q.    If we look at the symbolic link column, can you

16   explain to the Jury what that reveals to us?

17   A.    Again, because the symbolic link is showing me that

18   "F" path, I know that this file was also opened from that

19   external thumb drive that had been mounted as drive letter

11:11AM20   "F" and that this is a Microsoft Word document.

21   Q.    So is it fair to say that between 12:53 and

22   12:56 p.m., your computer forensics have determined that

23   two Microsoft Word documents and one PowerPoint file,

24   documents, so to speak, were opened from the "F" drive, or

11:12AM25   however you explained it, from a thumb drive plugged in?

11:12AM 1    A.    Exactly.

2    Q.    Now, to be clear, if we look at the symbolic link,

3    you've identified F -- just, for example, I circled the

4    wrong one -- but the jeremy_model-mesh, correct?

11:12AM 5    A.    Correct.

6    Q.    What, if any, observations did you have about the

7    remainder of this column other than the F: referencing the

8    external thumb drive?

9    A.    What stood out to me is the other files that are

11:12AM10   being opened.  For instance, right below the F:\Quiz1.doc,

11   there's a file that was opened from the HP desktop.  I

12   know because it says user is wholesaleNWA\desktop\carpics,

13   or documents.  So that's telling me that this file is

14   actually opened from the computer itself.  But,

11:13AM15   interestingly, it doesn't have C: user, which would

16   indicate to me the Windows partition.  This backslash,

17   backslash, and then desktop, that's the name of the

18   computer, and the presence of those two backslash indicate

19   that this computer was on a network, so it's a shared

11:13AM20   device.

21   Q.    Let's back into that for a second.  You testified

22   that there's an F:, referencing a thumb drive.  Based on

23   your training and experience, if this computer was not

24   networked, would there be any sort of letter enumeration?

11:13AM25   I'm sure there's a better way of asking that, but I think

11:13AM 1  you know what I mean.

2  A.    Yeah.  The local partition is going to be assigned --

3  especially Windows -- is going to be assigned C.  So like

4  A and B were actually reserved for floppy disks back in

11:14AM 5  the day.  And then C is reserved for the actual operating

6  system that you are currently running.  And then D was

7  typically reserved for CD-ROMs.  And then everything after

8  that could be network drives, they could be physical thumb

9  drives.  In this case, we're seeing because it didn't

11:14AM10  assign it "C," it's actually opening it from a networked

11  computer.

12  Q.    If this was not a networked computer, what would you

13  expect to see, for example, on any of these backslash,

14  backslash, desktop files?

11:14AM15  A.    I would expect --

16         MR. CLAYMAN:  Your Honor, object.  I would ask

17  for a brief side bar.

18         THE COURT:  Okay.

19         (Bench Conference)

11:14AM20         MR. CLAYMAN:  Your Honor, this goes well beyond

21  the scope of anything described in Ms. Bush's Rule 16

22  expert notice.  We have received no heads-up that this is

23  something she would be testifying about and it's not

24  described at all in her almost 100-page report.  This is

11:15AM25  simply not something that was noticed properly under

11:15AM 1   Rule 16.

2           THE COURT:  How would you categorically describe

3   what it is that she is testifying about?  I mean, I've

4   heard the words that she has used to testify, but what

11:15AM 5   category would you have expected to have been placed on

6   notice of that this testimony falls outside of?

7           MR. CLAYMAN:  This appears to be the bases for an

8   opinion that this computer was network connected somehow.

9   That bases was never provided in the report that they gave

11:15AM10   us prepared by Michele Bush.

11          THE COURT:  Is there not testimony in the

12   record -- I mean, I guess it depends on how you define

13   network, but my understanding is that it's undisputed that

14   the HP was connected, hard connected to the OzarksGo

11:16AM15   router.  Is that what network means?

16          MR. CLAYMAN:  It's hard for me to say, Your

17   Honor, because her report has never mentioned anything

18   about backslash, backslash, backslash, what the

19   significance of that is.  And what her opinion is right

11:16AM20   now, I have no idea what she's testifying about because it

21   was never provided to us.  I don't know where she's

22   getting this information from.

23          THE COURT:  Mr. Gelfand?

24          MR. GELFAND:  That's totally inaccurate, Your

11:16AM25   Honor.  We provided a 106-page expert report, plus a Rule

11:16AM 1  16 disclosure.  This exhibit has been provided to the

2  government well in advance of trial.  This exhibit is

3  actually referenced in her report as like a screenshot.

4  And what she's testifying about is the possibility of

11:16AM 5  remote access network vulnerability.  She's not going to

6  link that right now to this, but she is providing factual

7  foundation.  This is all from the government's discovery.

8  And as a practical matter, the possibility of remote

9  access, UPnP, which I'm sure the Court has heard in

11:17AM 10  Mr. Fottrell's testimony, all of that is laid out very

11  precisely in the expert report.

12         Candidly, Your Honor, I'm surprised by this

13  objection because the expert notices we got from the

14  government were they thin.  We provided a 106-page

11:17AM 15  document to avoid any of these issues.

16         THE COURT:  Well, here's what we're going to do.

17  It is impossible for the Court to be able to determine

18  whether this testimony is outside the required scope of

19  the expert disclosures.  Mr. Clayman, if you think, after

11:17AM 20  she's been cross-examined, that we need to explore that

21  further, then you've made a timely objection and we can

22  take it up further later.  But I will allow her testimony

23  to continue provided, Mr. Gelfand, that you go back and

24  lay more foundation to define this term "network" that she

11:18AM 25  seems to be keying off and how she is defining that term

11:18AM 1    for purposes of her findings.

2                    MR. GELFAND:  Sure.

3                    THE COURT:  Thank you.

4                    (Bench Conference Concluded)

11:18AM 5                    MR. GELFAND:  May I proceed, Your Honor?

6                    THE COURT:  You may.

7    Q.    (BY MR. GELFAND.)  Ms. Bush, you used the term

8    "network" in kind of a term of art.  Can you explain what

9    it is you mean by that term as it applies to this exhibit?

11:18AM10    A.    Yeah.  Network is a community of devices.  And

11   typically it's over a Wi-Fi network.  So it just means

12   multiple devices connected to each other through some sort

13   of internet connection.

14   Q.    Can that be either wired or Wi-Fi?

11:19AM15    A.    Yes.

16   Q.    So is it fair to say that by "network," what you're

17   referring to is basically just one or multiple devices

18   that are accessing the internet through the same common,

19   central hub?

11:19AM20    A.    Exactly.  It's like if you're sitting in a public

21   location and you start to see other devices show up on

22   your device, or maybe at home and it shows up that you

23   have a printer nearby.  It's just showing that you have

24   devices nearby that can be connected to each other.

11:19AM25    Q.    So you were explaining a few minutes ago, if you

11:19AM 1  could, what the significance of this backslash, backslash,
      2  desktop refers to?
      3  A.   It tells me that the desktop computer, the HP
      4  desktop, was part of a network of devices.
11:19AM 5  Q.   To be clear, is it the absence of the C: that tells
      6  you that?
      7  A.   Exactly.
      8  Q.   On Exhibit 52, there's a file that you testified
      9  about called Quiz 1.docx.  Do you see that?
11:20AM10  A.   Yes.
     11  Q.   Were you are able to determine if any of the three
     12  files -- jeremy_model-mesh pics, UK
     13  Cardiff-final-background lighter PowerPoint, or Quiz 1 --
     14  in other words, if those two Microsoft Office, I'm sorry,
11:20AM15  Microsoft Word documents and that one PowerPoint were ever
     16  opened on any of Josh Duggar's personal devices?
     17  A.   I looked for that evidence, but I did not find
     18  anything.
     19  Q.   In other words, would there be a computer artifact, a
11:20AM20  forensic artifact, if they were opened?
     21  A.   Yes, there would.  Just like we have a computer
     22  artifact that they were opened from the thumb drive, there
     23  would be artifacts that suggest the same file had been
     24  opened using a different path, or from a different path.
11:21AM25  Q.   I want to show you what's been previously admitted as

11:21AM 1    Government's Exhibit 61.

2              MR. GELFAND:  For record purposes, Your Honor,

3    it's page five of a long exhibit.

4    Q.    (BY MR. GELFAND.)  Do you see files on this

11:21AM 5    government exhibit that have the word "Quiz?"

6    A.    Yes, I do.

7    Q.    Is that the same file that we saw on Quiz 1 related

8    to that "F" drive?

9    A.    No.  Not only does it have a different file name, but

11:21AM10    it's also a completely different file format.  One is a

11    PDF file and then the other one is a PhotoShop file.

12    Q.    And is that in contrast to what you just showed us as

13    a docx file?

14    A.    Exactly.

11:22AM15    Q.    Based on your review of -- let's back up.  Over the

16    course of your forensic examination, did you review the

17    contents and the make and model of the thumb drives and SD

18    cards that were seized in evidence in this case?

19    A.    Yes, I did.

11:22AM20    Q.    Based on your review of those five thumb drives and

21    SD cards, were you able to determine whether any of those

22    were the thumb drive that was -- appears to be plugged in

23    on May 13th of 2019?

24    A.    Yes.  Using several identifiers and the actual data

11:22AM25    contained on those devices, I was able to exclude them as

11:22AM 1    devices that are matching the "F" drive.

2    Q.    Now, just to be clear, I asked you before, I think

3    imprecisely, whether there was any forensic evidence that

4    any of those three files -- the Microsoft documents and

11:23AM 5    the PowerPoint -- were ever opened on any of Josh's

6    personal devices.  Is it also your testimony that there is

7    no forensic evidence that they were created on any of

8    those devices?

9    A.    Yes.  There would, again, be forensic artifacts if

11:23AM10    they had existed on that device as well.  Probably more

11    artifacts if they had existed on those devices.

12    Q.    Explain to the Jury, if you would, what you mean by

13    "more artifacts".  In other words, just in your

14    profession, why might you find more artifacts for certain

11:23AM15    instances versus less in others?

16    A.    Because when you're creating data, you're causing the

17    system to have to work harder.  And by having the system

18    work harder, it's going to create more forensic artifacts.

19    So opening up the Word document application, typing in

11:24AM20    content, saving the file somewhere, there's going to be a

21    plethora of artifacts that are created throughout that

22    process of creating the document.  Whereas if you open it,

23    you might get several artifacts that you can reference

24    back to, but creating, there's going to be a bunch of

11:24AM25    different ones over a period of time.

11:24AM 1   Q.   Were you able to determine over the course of your
        2   work in this case whether the Linux partition had any user
        3   accounts?
        4   A.   Yes.
11:24AM 5   Q.   What is a user account for purposes of the Linux
        6   partition?
        7   A.   It's a way for the system to differentiate data for
        8   the user.  So if you want to have multiple users, it's
        9   essentially just a folder that says, everything for this
11:24AM10   user is going to be stored in this location on the system,
       11   and any data created for this user is going to be stored
       12   in this folder.  So it's just a way to organize the
       13   material.
       14   Q.   How many user accounts were on this Linux, I keep
11:25AM15   saying partition, but on the Linux operating system on
       16   that HP device?
       17   A.   Only one.
       18   Q.   And do you recall what that was called?
       19   A.   Yeah.  It was dell_one.
11:25AM20   Q.   Now, to be clear, and I'm going to show you a portion
       21   of Government's Exhibit 30.
       22            MR. GELFAND:  It's page two, for the record, Your
       23   Honor.
       24   Q.   (BY MR. GELFAND.)  Do you agree, based on your
11:25AM25   investigation, that the user account, the only one created

11:25AM 1    on the Linux partition, was called dell_one?

2    A.    Yes.

3    Q.    What, if any, significance did this user name, the

4    naming convention, have to you over the course of your

11:25AM 5    investigation?

6    A.    Well, a couple things.  One just being it's an

7    unusual user name if you look at the patterns of the other

8    devices in this case.  It's not a name.  It doesn't

9    describe anything.  And Dell, to me, indicates the

11:25AM10    manufacturer of Dell devices.  And dell_one specifically

11    seems like a kind of default naming convention that that

12    manufacturer would use.  Also, the existence of the

13    underscore in these systems is kind of a controversial

14    character, so to speak.  It can cause problems.  So the

11:26AM15    underscore character itself is often not allowed when

16    creating user accounts, because it can actually confuse

17    the system.

18    Q.    What, if anything, did you do at your forensic

19    laboratory to determine whether this name was or was not

11:26AM20    user-generated?

21    A.    I just recreated the entire system.  So taking the

22    ISO file from the Windows computer, I actually bought an

23    HP computer, put in a hard drive, and created a dual boot

24    system using that ISO from a thumb drive and creating user

11:26AM25    accounts.  And in that testing, I was unable to use the

11:27AM 1    underscore character.

2    Q.    What is an ISO?

3    A.    ISO is a file format that essentially mimics a CD.

4    So traditionally, if you wanted to install software, you

11:27AM 5    had to go out and buy a CD, plug it into your computer,

6    and then run the application and it would start

7    installing.  But an ISO can now be a file format that can

8    be used on a thumb drive rather than burning it to a CD.

9    Q.    Were you able to -- let's back up.  Did you

11:27AM10    essentially recreate in your laboratory environment the

11    system using the same specifications that you evaluated at

12    the HSI facility?

13    A.    Yeah.  I tried to mimic it the best that I could.

14    Q.    I want to show you Defendant's Exhibit 84.  Do you

11:27AM15    have that in front of you?

16    A.    Yes, I do.

17    Q.    Can you tell me, just generally, what Defendant's 84

18    is?

19    A.    This is one of the screenshots I took through me

11:28AM20    trying to recreate the system.  This one particularly was

21    using virtualization software.  When I entered in the

22    dell_one user account as it existed in this case, I

23    actually got an error message that says it was an

24    unapproved character and that I had to use lower case

11:28AM25    letters.  And --

11:28AM 1    Q.    I'm sorry to interrupt you.  Is Exhibit 84 in the

2    same or substantially similar condition as when you

3    initially created it?

4    A.    Yes.

11:28AM 5         MR. GELFAND:  Your Honor, I move Defendant's 84

6    into evidence.

7         MR. CLAYMAN:  Your Honor, I would raise the same

8    objection we raised at side bar regarding the notice.

9         THE COURT:  That objection, as the Court

11:28AM10    understands it from the previous side bar, is overruled

11    subject to the Court's same comments and subject to a

12    further foundation as to what it is that is generating the

13    message that is captured in Defendant's Exhibit 84.

14         MR. GELFAND:  Sure.

11:29AM15    Q.    (BY MR. GELFAND.)  Without getting into specific

16    details, could you tell us what, if anything, you did

17    prior to receiving the message that appears on the face of

18    Defendant's Exhibit 84?

19    A.    In addition to the actual system I created, I also,

11:29AM20    in order to take screenshots, I created a virtual machine

21    of a Linux partition or a Linux system.  And using that

22    virtualization software, you can enter in user names,

23    passwords, and create the system.  And this screenshot

24    demonstrates that virtual machine that was created to

11:29AM25    install Ubuntu.

11:30AM 1    Q.   Did the message that appears on the face of
        2    Defendant's Exhibit 84 appear after you attempted to
        3    create a user account entitled -- that's reflected on the
        4    screen?
11:30AM 5    A.   Yes.
        6         MR. GELFAND:  Your Honor, at this point, I move
        7    84 into evidence.
        8         THE COURT:  Is the VMware Workstation error
        9    message being generated by the virtualization software, or
11:30AM10    is it being generated by the forensic computer image?
       11         THE WITNESS:  The virtualization software.
       12         MR. GELFAND:  Your Honor, may we approach?
       13         THE COURT:  Yeah.
       14         (Bench Conference)
11:31AM15         MR. GELFAND:  Your Honor, because this device had
       16    to stay in the confines of HSI, the only thing any private
       17    computer forensic expert can do is what she's testifying
       18    to here, which is recreate the system and essentially test
       19    it in that capacity.  Literally, she can't do what
11:31AM20    Mr. Fottrell apparently tried to do because she doesn't
       21    have that kind of access to these devices.  And so as a
       22    practical matter, all she's demonstrating here is that it
       23    doesn't -- it's an invalid user name that doesn't take
       24    underscore.  She can be cross-examined on it, but I think
11:31AM25    that it's sufficient foundation.

11:31AM 1          THE COURT:  Well, 901 requires that the exhibit,

2      that there be foundation that the exhibit is what it

3      purports to be.  And what I was pinging on is, I don't

4      understand what it is that it purports to be.  She has now

11:32AM 5      testified that this is generated by -- that this is a

6      screen print of an error message that was thrown up

7      while -- was thrown up specifically by the virtualization

8      software.  And I think that's fine if that's what -- I

9      mean, that's what she has testified and I will now let it

11:32AM10      in.  But before answering that, it wasn't clear to me what

11      it was that it purports to be.

12          MR. GELFAND:  That's fair.  I didn't understand.

13      I was trying to lay a different foundation for a different

14      purpose.  Fair enough.  Thank you.

11:32AM15          THE COURT:  Thank you.

16          (Bench Conference Concluded)

17          MR. GELFAND:  May I proceed, Judge?

18          THE COURT:  You may.

19          MR. GELFAND:  May I publish Defendant's Exhibit

11:33AM20      84 now that it's received?

21          THE COURT:  Yes.  To be clear, Defendant's

22      Exhibit 84 is received, subject to Mr. Clayman's comments.

23      And you may display.

24          (Defendant's Exhibit 84 Received)

11:33AM25   Q.   (BY MR. GELFAND.)  Can you please tell me -- first of

11:33AM 1   all, do you see Defendant's Exhibit 84 in front of you?

2   A.   Yes, I do.

3   Q.   Can you tell us what it is we're looking at as far as

4   the personalized Linux full name and user name?

11:33AM 5   A.   So in the virtualization software, I'm setting up

6   Linux and telling it how to create the user name and set

7   the password.  And when I enter dell_one, I received that

8   error message.

9   Q.   So to be clear, the error message, can you please

11:33AM 10   read that into the record?

11   A.   It states, "You have entered an invalid user name.  A

12   user name must only consist of lower case characters,

13   numbers zero to nine, or dashes."

14   Q.   So to be clear, is it your testimony, based on your

11:34AM 15   expert opinion, that this user message -- I'm sorry --

16   this error message is being generated because you typed an

17   underscore?

18   A.   Correct.

19   Q.   Now, what is a Dell?

11:34AM 20   A.   Well, Dell is a manufacturer of typically PCs, so

21   Windows-based machines, mostly desktops and laptops.

22   Q.   To the best of your knowledge, were any Dell devices

23   seized in connection with this case?

24   A.   No.

11:34AM 25   Q.   Now, can a user name be generated by any process

11:35AM 1   other than somebody choosing it and typing it in?

2   A.   Yeah, especially on networks.  So, for instance,

3   Microsoft Server is one of the biggest ones.  There's

4   Active Directory.  And you can actually, as an

11:35AM 5   administrator, create user accounts for other people and

6   then those can be used to log-in to physical devices.  So

7   the user name can be set from one physical device and then

8   adopted by another once that device is set up.

9   Q.   What, if any, significance is there to you that this

11:35AM10   user name is entitled dell_one?

11   A.   Well, in combination with the fact that it just

12   doesn't seem consistent with the other user names that

13   we've seen and the fact that it's describing a Dell user

14   and the fact that it's using an underscore, to me, seems

11:36AM15   like it would have been auto-generated by some

16   application, some software.

17   Q.   Now, were you able to determine how, if at all, the

18   HP computer that was seized in this case accessed the

19   internet?

11:36AM20   A.   Yes.

21   Q.   Did it access the internet?

22   A.   Yes, it did.

23   Q.   How do you know that?

24   A.   Because within the Windows registry, which is a

11:36AM25   portion of the Windows operating system that records all

11:36AM 1   of the system settings, it will also record the internet

2   settings, the network interfaces.  And in reviewing that

3   Windows registry, I was able to determine that it had been

4   connected to the internet through a router with a specific

11:36AM 5   network Mac address.

6   Q.    To be clear, when you say a router, I'm going to show

7   you what's been previously admitted as Defendant's Exhibit

8   25.  Do you see Defendant's Exhibit 25?

9   A.    Yes, I do.

11:37AM10   Q.    Can you tell us just what kind of device this is?

11   A.    That's a router.

12   Q.    What is a router?

13   A.    It is a combination of software and hardware that

14   actually provides internet service.  So it is an internet

11:37AM15   access point.

16   Q.    Were you able to determine -- let's back up for a

17   second.  When you say an internet access point, is it fair

18   to say that some company, like OzarksGo, brings internet

19   to a physical location?

11:37AM20   A.    Yes.  And it can be in different forms.  You can get

21   the hot spot devices that you can travel with.  There's

22   routers that can be installed in a residence or a

23   business, so this is one of those pieces of hardware.

24   Q.    What are the ways that a device, for example, a

11:37AM25   desktop or a laptop or an iPhone, using the internet

11:37AM 1    service provider's internet, OzarksGo internet, for

2    example, would be able to access the internet through the

3    router?

4    A.    So it would need to go through the router.  If it's

11:38AM 5    not using -- a cell phone using cell service, it would

6    have to go through a router like this, some sort of

7    internet access point.

8    Q.    How can it access the router?  In other words, how

9    can there be a connection between the device over here and

11:38AM10    the router over here?

11    A.    Either hardwired, typically through ethernet, or

12    through wireless connections.

13    Q.    When you say ethernet, can you explain to the Jury

14    what that means?

11:38AM15    A.    It's just a cable that is used to transmit network

16    data.

17    Q.    The picture in Defendant's Exhibit 25 appears to have

18    a whole bunch of wires, correct?

19    A.    Yes.

11:38AM20    Q.    Can you tell us, if you know, what those wires appear

21    to reflect?

22    A.    It's hard to tell from the picture, but it looks like

23    ethernet cables connected to different devices.

24    Q.    Were you able to determine in May of 2019, based on

11:39AM25    computer forensics, how this device accessed the OzarksGo

11:39AM 1    IP address internet?

2    A.    Yes, through a network.

3    Q.    And explain what you mean in more detail, please.

4    A.    Again, within the Windows registry, it will store the

11:39AM 5    network, like, Wi-Fi names and network names.  So by

6    reviewing that, I was able to compile the list of all the

7    different internet access points that that computer had

8    connected to, either wired or wirelessly, to gain internet

9    access.

11:39AM 10   Q.    Were you able to review the router in this particular

11   case?

12   A.    No, I was not.

13   Q.    Why not?

14   A.    It was not provided to me.

11:39AM 15   Q.    In other forensic examinations that you've conducted,

16   have you reviewed routers?

17   A.    Yes.  And in cases specifically involving the

18   internet, including these peer-to-peer programs, we are

19   provided information about the router, whether that's

11:40AM 20   triage information on site when law enforcement will go

21   and access information accessible on the router, whether

22   that's volatile data, stuff that's going to change over

23   time, and also information that's stored in memory.  So if

24   you unplug it and acquire it, you can obtain additional

11:40AM 25   information.

11:40AM 1    Q.    From a computer forensic standpoint, how is it that a

2    router could be important?

3    A.    Well, in an internet investigation, it's extremely

4    important, because that's the device that actually

11:40AM 5    identifies or is hosting that IP address that was

6    initially identified.  So the router is going to tell you

7    the network configuration settings.  Specifically running

8    a command like netstat would tell you what, on that

9    network, if anything, could be vulnerable.  If there were

11:40AM 10   open ports that were accessible from the outside, what

11   devices were connecting to it and how often.  That

12   information can be extremely helpful in understanding what

13   devices are we looking for as the potential causes for

14   this internet traffic.

11:41AM 15   Q.    Do routers store information?

16   A.    Yes.  They have both volatile data and nonvolatile,

17   meaning information that's captured live that has to be

18   accessed live, and also nonvolatile data, which is stored

19   in the actual memory, like router logs.

11:41AM 20   Q.    Do routers maintain logs?

21   A.    Yes, they do.

22   Q.    What is Universal Plug and Play?

23   A.    Universal Plug and Play is just a network protocol.

24   So what I mean by that is it's a set of rules, so

11:41AM 25   essentially think of it like a language.  Like English,

11:41AM 1   Spanish, French, there's rules.  And information exchanged

2   over UPnP is just communication.  So it was designed for

3   home networks to essentially advertise itself that devices

4   can discover and connect to each other.  So your phone

11:42AM 5   being able to see Ring and your computer being able to see

6   your printer and your computer being able to see your

7   gaming console or your smart T.V.  But there are also

8   vulnerabilities, because it's assuming that all devices

9   within its close proximity are trusted.  So it's kind of

11:42AM 10   giving all of those devices authorized privileges or

11   authorization and elevated privileges to take control over

12   the network.

13       So in a home network, it would kind of be like

14   advertising its physical location and that all of its

11:42AM 15   doors are unlocked.  That anybody who comes near that

16   house, they can come in and do whatever they want with it

17   because they have elevated privileges and they are

18   automatically trusted.

19   Q.   Without the router, were you able to determine in

11:42AM 20   this case if Universal Plug and Play was enabled on this

21   router in May of 2019?

22   A.   Yes, I was.

23   Q.   How?

24   A.   Within the specific setting file that uTorrent

11:43AM 25   creates, so any time a software application is installed,

11:43AM 1    it actually contains a set of files that it uses to run

        2    properly.  And with uTorrent specifically, because it so

        3    heavily involves internet traffic, it details a lot of

        4    configurations.  And within that settings.dap file, I was

11:43AM 5    able to determine that uTorrent had specifically been

        6    enabled to connect to the internet through UPnP from net

        7    router, which tells me on the date that uTorrent was being

        8    used, UPnP had been enabled on that network making it

        9    extremely vulnerable.

11:43AM 10   Q.   I want to show you what's been marked as Defendant's

        11   Exhibit 60.  Can you tell me if you recognize Defendant's

        12   Exhibit 60?

        13   A.   Yes, I do.

        14   Q.   What is Defendant's Exhibit 60?

11:43AM 15   A.   This is another screenshot depicting evidence that

        16   was extracted from the HP desktop, both on the Windows

        17   side and the Linux side.

        18   Q.   Did you extract what's reflected in Defendant's

        19   Exhibit 60?

11:44AM 20   A.   Yes, I did.

        21   Q.   Did you use a computer forensics tool?

        22   A.   Yes, I did go.

        23   Q.   Which tool?

        24   A.   Actually, I used two.  I used AccessData's Registry

11:44AM 25   Viewer, which is a part of Forensic Toolkit that

11:44AM 1    specifically shows me information embedded within the
        2    Windows registry.  I also used an open source tool called
        3    Bin-Code-Editor, which specifically looks at BitTorrent
        4    files and it decodes it from a binary format, meaning
11:44AM 5    1s and 0s, into information that I can more easily
        6    understand.
        7    Q.    Is Defendant's Exhibit 60 true and accurate?
        8    A.    Yes, it is.
        9          MR. GELFAND:  Your Honor, I move Defendant's
11:44AM10    Exhibit 60 into evidence, please.
        11          MR. CLAYMAN:  No objection.
        12          THE COURT:  Defendant's Exhibit 60 is received.
        13          (Defendant's Exhibit 60 Received)
        14          MR. GELFAND:  May I publish it, Your Honor?
11:44AM15          THE COURT:  You may.
        16    Q.    (BY MR. GELFAND.)  Do you see Defendant's Exhibit 60
        17    on the screen in front of you?
        18    A.    Yes, I do.
        19    Q.    This is super tiny, so let's break this down, maybe
11:45AM20    from left to right.  Can you tell us, just generally
        21    speaking, what we're looking at on the left side of this?
        22    A.    So this is the AccessData registry viewer forensic
        23    tool.  And what I have done on the bottom here -- I don't
        24    know if I can mark on this thing -- the path is showing me
11:45AM25    that I have opened the system registry key.  And I know

11:45AM 1    that this is from line item 04, the HP desktop.  And I

2    browsed that file path.  It's kind of long, but control

3    set, control, network setup to interfaces, then this long

4    identifier, and then kernel.  And within this registry

11:45AM 5    key, it's going to tell me information here about what --

6    information about the network setup.  So this permanent

7    address here gives me the Mac address of the network card

8    for this computer, which was connected to the router.

9  Q.    So if we look -- and just to be clear, 30,000 feet in

11:46AM 10    the air, Ms. Bush, are you just following forensic

11    evidence that's contained within the computer?

12  A.    Yes.

13  Q.    And then you testified about the settings file.  Is

14    that what we see on the settings .dat, D-A-T?

11:46AM 15  A.    Exactly.

16  Q.    Is that what we see on the right side of Defendant's

17    Exhibit 60?

18  A.    Yes.  This was the portion that was extracted from

19    the Linux side within the uTorrent program.

11:46AM 20  Q.    So to be clear, this is evidence within the forensic

21    image of the HP computer that was made available to you at

22    Homeland Security?

23  A.    Correct.

24  Q.    Could you tell us, in the middle of the page, do you

11:46AM 25    see approximately four entries, well, exactly four entries

11:46AM 1  that include the phrase UPnP?

2  A.   Yes.

3  Q.   Can you tell the Jury what those entries indicate?

4  What does that mean?

11:47AM 5  A.   This is telling me that the uTorrent program

6  specifically was connecting to the BitTorrent network

7  through Universe Plug and Play at this external IP

8  address, using these ports for -- it's two different

9  protocols, TCP and UDP.  And that it's connecting to UNP

11:47AM 10  through this cached host, which is at local IP address

11  192.168.1.1 at port 5431.  And that IP address is

12  typically assigned to a router.

13  Q.   So to be clear, you mentioned that this is in

14  connection with the uTorrent player.  Is that reflected in

11:47AM 15  the data itself where it says equal sign uTorrent player?

16  A.   Correct.

17  Q.   And what do those entries indicate to you?

18  A.   It's telling me that streaming is enabled through

19  uTorrent player.

11:47AM 20  Q.   So can you say conclusively, based on this forensic

21  evidence, whether or not UPnP was enabled when uTorrent

22  was used in May of 2019 on this Linux partition?

23  A.   Yes.  In fact, it's not shown here, but the settings

24  .dat file will also have a file created and last written

11:48AM 25  date through the Linux operating system.  In looking at

11:48AM 1    those dates and looking to see when was the last time the

2    settings file was changed, because if it was changed long

3    after the activity, I can't definitively say these were

4    the settings at the time that the files were downloaded.

11:48AM 5    But because the last written date was, I think, May 16th,

6    the last date that Torrents were downloaded, I know that

7    these were the settings at the time the files had been

8    downloaded.

9    Q.    What, if any, significance does it have from a

11:48AM10    computer forensic standpoint that UPnP was enabled when

11    uTorrent specifically was used in May of 2019?

12    A.    It tells me that this is an extremely vulnerable

13    network.  Also, knowing that it was at a business, not a

14    closed-off residence, and that I would really need to

11:49AM15    review additional information from the router to determine

16    how this setting could have affected the integrity of the

17    evidence here.

18    Q.    How many times have you seen forensic evidence of

19    UPnP, Universal Plug and Play, being enabled in the

11:49AM20    500-plus other cases you testified you worked?

21    A.    Sitting here today, I don't know that I have seen

22    UPnP enabled in uTorrent like this on any other case.

23    Q.    Did this jump off the page to you?

24    A.    Yes, it did.

11:49AM25    Q.    Moving our attention to the Linux operating system,

11:49AM 1  were you able to determine whether this version of Linux

2  comes with any default apps?

3  A.    Yes.

4  Q.    Does it come with any default apps to access the

11:50AM 5  BitTorrent network?

6  A.    Yes, it does.

7  Q.    What apps or app?

8  A.    The Ubuntu 18.04 operating system that was found on

9  the HP desktop comes preinstalled with a tool called

11:50AM10  Transmission, which is an open source Linux-based

11  BitTorrent application.  So as soon as the operating

12  system is installed, it's automatically there to just

13  double-click and open, just like on a Windows machine

14  being able to open up the Windows or Microsoft Edge

11:50AM15  browser.  It's already pre-configured and ready to use.

16  Q.    So right out of the box, if a user wants -- I said

17  the box, but you know what I mean -- if a user wants to

18  access the BitTorrent network the moment Linux is

19  installed, what does the user have to do?

11:50AM20  A.    Just open the application and import the Torrent that

21  they found.

22  Q.    In other words, double-click Transmission?

23  A.    Correct.

24  Q.    To use Transmission, does the user have to download

11:51AM25  or install any additional software?

11:51AM 1    A.    No.

2    Q.    In your laboratory environment, what, if anything,

3    did you do to test or to demonstrate exactly what you just

4    described, in other words, how Transmission would be

11:51AM 5    accessed?

6    A.    Well, I just wanted to confirm that it would as easy

7    as just opening it up.  So in the system that I had

8    created to mimic this system, I opened up Transmission and

9    downloaded a Torrent.

11:51AM10    Q.    And did you create any sort of video demonstrative

11    exhibit to help us understand how you did that?

12    A.    Yes, I did.

13    Q.    If I can direct your attention to the thumb drive

14    reflected as Defendant's Exhibit 53.  It's in an envelope

11:51AM15    or folder in the front of the binder.

16    A.    I don't see a folder.  It was hiding.  Found it.

17    Q.    Can you just tell us if that includes Defendant's

18    Exhibit 53 that you created?

19    A.    Yes, it does.

11:52AM20         MR. GELFAND:  Your Honor, at this time, I would

21    ask that we be permitted as a demonstrative to show

22    Defendant's Exhibit 53.

23         THE COURT:  Mr. Clayman?

24         MR. CLAYMAN:  Your Honor, I'm not sure I

11:52AM25    understand the relevance of Transmission's usage at this

11:52AM 1    point.  There's been no allegation that child sexual abuse

2    material has been downloaded through Transmission.  I

3    don't really understand what the benefit to the Jury would

4    be, or the relevance of it.

11:52AM 5            THE COURT:  If the only objection is relevance,

6    that's overruled.  To be clear, Mr. Gelfand, this is for

7    demonstratively purposes only?

8            MR. GELFAND:  Correct, Your Honor.

9            THE COURT:  Members of the Jury, sometimes a

11:53AM 10   witness is permitted to use a demonstrative aid to assist

11   their explanation or to assist in their presentation of

12   their testimony to the Jury, to aid the Jury's

13   understanding of the witness's testimony.  This apparently

14   is such a demonstrative type of exhibit.

11:53AM 15           The difference between a demonstrative exhibit

16   and a piece of evidence is that this won't actually be

17   received into evidence.  It will not be available to you

18   in the jury room.  It is simply an aid, like a chalkboard

19   might be an aid if we were studying algebra or something.

11:54AM 20   It's a demonstrative aid only.  You may proceed.

21           MR. GELFAND:  Thank you.

22   Q.    (BY MR. GELFAND.)  Can you please just tell us what

23   we're looking at?

24   A.    Yes.  I'm opening the Transmission app.  Sorry.  It

11:54AM 25   might move a little fast.  I opened the Transmission app

11:54AM 1 just that was preloaded on the Ubuntu operating system.

2 And then I accessed the Mozilla Firefox web browser.  And

3 I'm going to archive.org just for the purpose of grabbing

4 a Torrent file with no copyright issues, so just a free

11:55AM 5 video file that I can get online.  And I'm going to browse

6 to find a Torrent.

7 So here I just select Charlie Chaplain's, The Good

8 for Nothing silent film, and it gives me a bunch of

9 information about what it is.  And I'm going to search for

11:55AM 10 the Torrent download.  So I click that link and it

11 automatically wants me to open that with the Transmission

12 application, which is, you can see in parentheses, the

13 default.  So I go ahead and hit okay.  And now when I

14 minimize, you can see that it presented me with the

11:55AM 15 Torrent information.  I'm going to hit okay.  And

16 Transmission begins the download of the video.

17 And, again, this is downloading content through the

18 BitTorrent network.  Now it gives me notification it

19 completed.  I'm going to open and browse to my downloads

11:56AM 20 folder, which is sitting right here.  And then you can see

21 that there's my video and all the associated information

22 that was downloaded through my Torrent.

23 Q.   Thank you.  Take that down.  So just to clarify a

24 couple of things there.  Were you doing this off

11:56AM 25 essentially a recreated model of the same system at issue

11:56AM 1  here in your laboratory environment?

2  A.   Yes.   I'm not using the actual evidence, because I

3  can't connect the evidence to the network and download

4  Torrent, so this was just a separate system that I had

11:57AM 5  created with the exact same operating system.

6  Q.   Now, the beginning of the demonstrative, do you

7  literally just double-click on Transmission?

8  A.   Yes.   I just open up the little dots icon, which

9  shows me my applications that are available, and then go

11:57AM 10  to Transmission and click that and open it.

11  Q.   Did you do anything to make Transmission the default

12  application that auto-prompted up or that prompted up?

13  A.   No.   In fact, if you see in that video, uTorrent had

14  already been installed on my system that I had kind of

11:57AM 15  mimicked from the other one, but it had still recognized

16  Transmission as my default BitTorrent application.

17  Q.   Were you able to determine whether Transmission had

18  been used on the HP computer in this particular case?

19  A.   I looked for any evidence that it had been and I did

11:58AM 20  not find any.

21  Q.   Were you able to determine whether any other

22  BitTorrent applications were used on the uTorrent

23  computer -- I'm sorry -- on the -- let me rephrase that.

24        Were you able to determine whether any other

11:58AM 25  BitTorrent applications were used on the HP computer in

11:58AM 1    this case?

2    A.    Yes.  There was only one other application,

3    BitTorrent application installed, and that was uTorrent.

4    Q.    Were you able to determine whether Transmission was

11:58AM 5    used on any other devices that you evaluated in this case?

6    A.    Yes.  It was installed on the MacBook.

7    Q.    When?

8    A.    I think April 2017.  I know it was in 2017.

9    Q.    And do you recall, just generally, what it was used

11:58AM 10    for and how many times?

11    A.    Yeah.  It was used to download at least one Hollywood

12    film.

13    Q.    And just to be clear, that was on the MacBook laptop,

14    the personal device that you testified before?

11:59AM 15    A.    Yes.

16    Q.    Now, over the course of your evaluation of the

17    devices in this case, and in particular the HP device,

18    were you able to determine if the Linux partition had the

19    TOR browser installed on it?

11:59AM 20    A.    Yes, it did.

21    Q.    Were you able to determine if the Linux partition had

22    uTorrent installed on it?

23    A.    Yes, I did.

24    Q.    Were you able to determine if the HP Linux partition

11:59AM 25    had VLC on it?

11:59AM 1    A.    Yes.

2    Q.    What is the universe of ways in which an app that

3    doesn't come preinstalled, like Transmission, can be

4    installed on this version of Linux?

11:59AM 5    A.    There are three main ways that I've seen.  The first

6    one would be finding the application from the developer's

7    website directly.  So for instance, if you wanted to

8    install uTorrent, opening up a web browser, searching for

9    uTorrent, going to their download page, and selecting the

12:00PM 10   proper download installer file for the operating system

11   you are looking for.

12          The other way is to go through any sort of

13   application stores, so another app already installed in

14   the system.  For instance, on a Microsoft system, you

12:00PM 15   might go to the Windows store, or on a Mac system, you

16   might go to the App Store.

17          And then the third way on a Linux system would be to

18   install it through command line.

19   Q.    Were you in court -- let me ask it this way.  Do you

12:00PM 20   agree with Mr. Fottrell that an installer could have been,

21   but was not used in this case?

22   A.    Yes.

23   Q.    Did you independently verify that?

24   A.    Yes.

12:00PM 25   Q.    How did you independently verify that?

12:00PM 1  A.   Looking for any web traffic to websites that housed

2  installer files, like the uTorrent program or a TOR

3  website.  And then whether or not -- if the user had

4  clicked download, it would create the actual physical

12:01PM 5  installer file, typically in your downloads folder.  So

6  the presence of those two things would tell me that this

7  is somebody who is actually browsing the internet to find

8  the application they want to install and then selecting

9  download.

12:01PM 10  Q.   So if I understand your testimony correctly, does

11  that basically leave two possibilities; the App store, so

12  to speak, or command lines?

13  A.   Yes.

14  Q.   What is the App Store called on the Linux system?

12:01PM 15  A.   It's actually called Snap Store.  It's a little

16  confusing.  But it's just another application that you can

17  open and it will give you a list of Linux software

18  applications available to a user.

19  Q.   What, if any, familiarity do you have, based on your

12:01PM 20  training and your experience, as to the Snap Store,

21  whatever the shorthand word would be for it?

22  A.   Just that it operates similarly to the other

23  applications, but notably in this case, I found that when

24  I tried to find the uTorrent program, it didn't show up.

12:02PM 25  And then in my research, I was not able to find that it

12:02PM 1    was advertised during the date range of this case.

2    Q.   In other words, is it your testimony that a user

3    could not download uTorrent from the Snap Store?

4            MR. CLAYMAN:  Your Honor, I would object.  Again,

12:02PM 5    this is the same notice grounds.

6            MR. GELFAND:  Your Honor, may we approach?

7            THE COURT:  Yes.

8            (Bench Conference)

9            THE COURT:  Yes.

12:02PM10            MR. CLAYMAN:  Ms. Bush's report affirmatively

11    omits the Snap Store.  She did not either know about it or

12    include it in her report.  She only mentioned command

13    lines and downloading from the internet.  At 11:00 p.m.

14    yesterday night, we received some exhibits that appear to

12:02PM15    be related to the Snap Store and what Ms. Bush is about to

16    testify to.  We have not received any explanation as to

17    what her anticipated testimony is beyond the exhibits,

18    these exhibits that we got approximately 12 hours ago.

19            MR. GELFAND:  Your Honor, two things.  First of

12:03PM20    all, the expert notice unambiguously explained that it was

21    her expert opinion that command lines were used.

22    Mr. Fottrell opined -- by the way, without any notice --

23    but Mr. Fottrell opined that the Snap Store was what he

24    called the most logical and the obvious choice.  And this

12:03PM25    is directly responsive to that topic that the government

12:03PM 1    injected into this trial, with full notice, as to what

2    Ms. Bush is basing her opinion on.  She is ruling out the

3    alternatives.  Their expert gave one alternative, which

4    isn't true.

12:03PM 5            THE COURT:  So where would we find -- in the

6    expert disclosures that the defense made, under what

7    umbrella or category would we find the opinions that she

8    is now or getting ready to provide?

9            MR. GELFAND:  We disclosed several things.  Her

12:04PM10    conclusion that command lines were used to install these

11    apps, we disclosed actually a demonstrative video that the

12    Court has as well in advance of trial that shows how

13    command lines would be used.  And what she's saying about

14    the Snap Store is directly responsive to Mr. Fottrell's

12:04PM15    opinion that that's what was used here.

16            THE COURT:  So this testimony is part of the

17    basis of her opinion that command lines as opposed to some

18    other method were utilized?

19            MR. GELFAND:  Yes, Your Honor.  They both agree,

12:04PM20    both experts, that there's three possibilities.  She's

21    going to the same exercise that Mr. Fottrell did as to

22    what she proposed.

23            THE COURT:  And so what was it that you sent last

24    night, late?

12:04PM25            MR. GELFAND:  We sent some exhibits showing that

12:04PM 1   the App Store that Mr. Fottrell opined was most likely was

2   not even an option and there's no evidence of it.

3           THE COURT:  Is this something that you went in

4   search of after you heard Mr. Fottrell's testimony or is

12:05PM 5   it something that you have been laying behind the log

6   with?

7           MR. GELFAND:  No, not at all.  It's something

8   that we looked for precisely because of Mr. Fottrell's

9   testimony.

12:05PM 10          THE COURT:  After you heard his testimony?

11          MR. GELFAND:  Yes.

12          THE COURT:  The objection is overruled.

13          MR. GELFAND:  Your Honor, just for housekeeping

14   purposes, I'm about to get into kind of a big topic.  I'm

12:05PM 15  happy to do it.  I also don't know when the Court wants to

16   break for lunch so I just wanted to raise that.

17          THE COURT:  We'll go ahead and do it now.

18          (Bench Conference Concluded)

19          THE COURT:  Members of the Jury, we are going to

12:05PM 20  take our lunch recess.  I anticipate that the attorneys

21   and I will be taking up various issues over the lunch

22   break, so this will be a longer-than-normal lunch break.

23   And so I would propose that we will call you up at 1:40.

24   If you could be back and ready to come back here at 1:40,

12:06PM 25  that's when we will resume testimony.

12:06PM  1          Let me remind you of the recess instruction.  Do

        2  not speak with anyone about the facts of the case, not

        3  even your fellow jurors.  Do not let anyone approach you

        4  and attempt to speak with you about the case.  If someone

12:06PM  5  does that, please report that to a court security officer

        6  or a member of the court clerk staff, and they will relay

        7  that information to me.

        8          On this recess and every recess, you must not do

        9  any research on your own.  You must not conduct any

12:07PM 10  investigation on your own.  You must not read any news

       11  accounts or watch or listen to any news accounts.

       12          So that's the recess instruction.  It's very

       13  important that you comply with it.  We're in recess until

       14  1:40.  Everyone please stand as the Jury exits.  Those in

12:07PM 15  the gallery remain in the gallery until I've given you the

       16  all clear.

       17          (Jury out at 12:04 p.m.)

       18          THE COURT:  Ma'am, you may stand down.  Remember,

       19  if you brought a water bottle or any other material into

12:09PM 20  the gallery, we would very much appreciate you depositing

       21  that in the trash bin in between the elevators when you

       22  leave.

       23          The gallery is dismissed.  The attorneys should

       24  remain here and Court will remain in session, but the

12:09PM 25  gallery may leave at this time.

12:09PM 1         Counsel, while we're working here, a member of

2  our IT department is going to be moving some cables around

3  and specifically around the defense table.  There's a

4  gremlin in the Elmo that's causing it to flicker and we're

12:10PM 5  trying to figure out the cause and so Tyler is going to be

6  addressing that, as quietly as he can.

7         The Court has held a placemarker at the end of

8  the government's case for a Rule 29 motion that the

9  defendant had made and I promised that at the next

12:10PM 10  reasonable opportunity, outside of the Jury's presence, we

11  would take that up in a more fulsome manner.

12         Mr. Gelfand, or whoever is going to present the

13  argument, you may make that -- you may argue that motion

14  at this time.

12:11PM 15         MR. GELFAND:  Thank you, Your Honor.  Can I take

16  30 seconds?

17         THE COURT:  Sure.

18         MR. GELFAND:  Thank you, Your Honor.  At this

19  time, and just to be more precise for the record, at the

12:11PM 20  close of the government's case, we would move this Court

21  to enter a judgment of acquittal as to both Counts One and

22  Count Two of the indictment.  We acknowledge at this stage

23  in the proceedings that the Court must consider the

24  evidence in the light most favorable to the government.

12:11PM 25  We would make a general Rule 29 motion as to each and

12:12PM 1   every element of both counts.

2           In particular, with respect to the receipt count,

3   we would ask the Court to find that there's insufficient

4   evidence of actual knowing receipt by Mr. Duggar of any

12:12PM 5   child pornography.

6           And with respect to Count Two, we would ask the

7   Court to find that there's insufficient evidence as to

8   actual knowing possession of visual depictions of child

9   pornography.

12:12PM 10          As a practical matter, I would also direct the

11  Court's attention to the fact that the alleged child

12  pornography in this case was contained within the cache

13  file, which is insufficient to establish knowing

14  possession of images.

12:12PM 15          I'm happy to address any questions by the Court,

16  but for purposes of preserving the record and all other

17  purposes, I would just ask the Court to enter a judgment

18  of acquittal at this time.

19          THE COURT:  Thank you, sir.  Who would like to

12:13PM 20  respond for the government?

21          MS. MARSHALL:  I will, Your Honor.

22          Your Honor, I believe that evidence sufficient to

23  be given to the Jury has been heard in the government's

24  case.  In particular, with regards to the receipt count,

12:13PM 25  the defense claims not actual knowing receipt by the

12:13PM 1   defendant.  There was testimony by Detective Amber Kalmer

2   that she connected to an IP address that geolocated to the

3   car lot.  She downloaded from that IP address a movie

4   file, which the Jury saw in the marissa.zip images, which

12:13PM 5   the Jury also saw those images, and that movie was found

6   on the defendant's device, on the HP laptop.  She

7   testified that it was a one-to-one connection, that the

8   BitTorrent program was found on the HP laptop.  There was

9   also testimony that Torrent files were found on the device

12:14PM 10   that goes to the BitTorrent program, including those two

11   images from Detective Kalmer.  Director Fottrell walked us

12   through that forensic evidence in the Torrent files that

13   were found on the device.

14         In regards to the possession element, Your Honor,

12:14PM 15   there was testimony that the TOR browser was used.  There

16   was the webcam-collection-prevs that was found on the

17   defendant's device.  There was also the VLC player where

18   the recently viewed was shown, showing that the defendant

19   had dominion and control over those images, or videos, and

12:14PM 20   viewed those images or videos, and that the system files

21   were created by the opening of those images.  I believe

22   that the government has put on sufficient evidence to show

23   that Mr. Duggar was familiar with the BitTorrent program,

24   with the TOR browser, and that these images were found on

12:15PM 25   his device and that we have connected him to the device at

12:15PM 1    issue, Your Honor.

2            THE COURT:  All right.  Thank you.  With regard

3    to Count One, which is the receipt count, the Court finds

4    that a reasonable jury here could find that the government

12:15PM 5    had met its burden of proof as to the elements of Count

6    One, receipt of child pornography.

7            The Court's finding is based on the totality of

8    the evidence presented in the government's case-in-chief

9    and reasonable inferences that can be drawn from that

12:15PM 10   evidence, but in particular, I would note the testimony of

11   Detective Kalmer, Mr. Kennedy, to a small extent, in

12   establishing the chain of custody, but also Mr. Fottrell's

13   testimony, as well as the CSAM image evidence itself.

14           Collectively, all of this evidence and the

12:16PM 15   reasonable inferences to be drawn from the evidence, it's

16   the Court's ruling that each of the elements has been

17   established, including the first element of knowing

18   receipt.  This is established, at a minimum, by the files

19   that Detective Kalmer testified were downloaded by her law

12:16PM 20   enforcement computer in a peer-to-peer connection with the

21   computer hooked up to the internet protocol or the ISP

22   that was associated with the car lot office.

23           There was evidence and testimony not only from

24   Detective Kalmer, but also Mr. Fottrell.  He was on the

12:17PM 25   stand a long time and testified about these matters

12:17PM 1    extensively.  But towards the end of his testimony, he

2    went back and summarized all of the various exhibits and

3    also referenced what has been received as Government

4    Exhibit 85.  This shows that certain movies and images

12:18PM 5    were, A), downloaded to the Linux partition, somewhere

6    between nine and 11 different either videos or sets of

7    images containing CSAM type material.  Beyond the fact of

8    his testimony, they were downloaded to the Linux side, and

9    included file names that in many instances would have put

12:18PM 10   the user on notice as to what they were receiving.

11           There is also evidence, according to

12   Mr. Fottrell, that many of those images -- five, I

13   think -- that he found that thumbnails had been created on

14   the Linux partition, and he explained what that meant.

12:19PM 15   And the Court believes that that process of going through

16   the functions to create the thumbnails would have put a

17   user on notice as to what they were receiving.

18   Mr. Fottrell further testified with regard to the

19   webcam-collection-prevs that it was actually viewed on

12:19PM 20   May 14th at 5:11 p.m., so certainly aware of that.  And

21   the same is true with regard to the marissa.zip material.

22   It was viewed, I believe, on May 15th at approximately

23   5:58 p.m.  The cross reference to the viewing would be

24   Exhibit 32.

12:20PM 25           So the Court believes that, collectively, there

12:20PM 1    is well more than sufficient evidence from which a

2    reasonable jury could find that the government had

3    established the first element.  The same for the second

4    element.  And I don't really -- well, the second element

12:20PM 5    is that he knew that these were minors that were engaged

6    in sexually explicitly conduct.  For the same reasons, but

7    also with reference to the images themselves, a jury would

8    certainly be reasonable in concluding that those were

9    minors engaged in sexually explicit conduct.

12:20PM 10        Third is the interstate commerce nexus.  Here,

11   there is in fact evidence that these were transmissions

12   going across the internet, at a minimum.  Detective Kalmer

13   explained the peer-to-peer connection that she had made

14   with her investigative computer.  Mr. Fottrell talked

12:21PM 15   about other downloads that were made with software

16   installed on the Linux partition that allowed access to

17   the TOR browser and/or uTorrents that were fetched.  And

18   so all of that implicates internet commerce.  So with

19   regard to the receipt count, the Rule 29 motion is denied.

12:21PM 20        For much of the same reasoning, the Court will

21   also find that a reasonable jury could find that the

22   government met its burden of proof as to each of the

23   elements in Count Two, which is the possession of child

24   pornography count.  This, too, is based on all of the

12:22PM 25   totality of the evidence introduced in the government's

12:22PM 1    case-in-chief, as well as reasonable inferences to be

2    drawn from that evidence.  But, again, I would point to

3    Detective Kalmer's testimony, Mr. Kennedy for the chain of

4    custody, and Mr. Fottrell's testimony, as well as the CSAM

12:22PM 5    images received into evidence.

6            The Court finds that, collectively, there is

7    evidence from which a reasonable jury could find as to the

8    first element that between the relevant dates here,

9    May 14th and May 16th of 2019, that Mr. Duggar knowingly

12:23PM10    possessed computer files on an HP All-in-One Desktop

11    computer that contained, during that time frame, multiple

12    visual depictions of child pornography.

13            Mr. Gelfand has argued that the evidence here is

14    that the images were only in the cache.  I don't think

12:23PM15    that that is the -- certainly not the totality of the

16    evidence here.  And while the Court recognizes that if the

17    only evidence presented at trial was that the defendant

18    viewed the images on the internet only, and that those

19    images were stored only in the temporary cache file, and

12:24PM20    if there was no evidence that the defendant could access

21    the hard drive where the cache files had been saved or

22    couldn't otherwise download those images, then perhaps if

23    all of those things are true, then that would not be

24    enough to proceed on a possession count or to establish a

12:24PM25    possession count.  But that's not the Court's

12:24PM 1   understanding of the evidence here.

2           Again, Mr. Fottrell's testimony, which went on

3   for the better part of a day, but at the end he summarized

4   it with reference to Government's Exhibit 65 (sic).  The

12:24PM 5   Court understands that, I think, 11 -- I have a question

6   about one of them -- but somewhere between nine and 11

7   different files containing CSAM were actually downloaded

8   to the Linux during the time alleged in the indictment.

9   And at least as the Court understands it, Mr. Fottrell

12:25PM 10  explained that they were downloaded and not simply

11  available for viewing in the sense that the only activity

12  would be viewing from a streaming service over the

13  internet.  There was testimony about the video, the VCL or

14  whatever it's called, that it was in a streaming type of

12:26PM 15  presentation.  But I didn't understand that at all to mean

16  that these videos were merely streamed on the internet.

17  Far from it.  My understanding is that they were

18  downloaded and that the artifacts recovered were from the

19  unallocated portion of the hard drive, which means that

12:26PM 20  they had been on the hard drive, i.e, downloaded to the

21  hard drive at some point in time.  And that point in time

22  was opined to be within the time frame alleged within the

23  indictment.  So there's that testimony that it was

24  actually downloaded to the Linux side of the partition and

12:26PM 25  later deleted and then later recovered using the forensic

12:27PM 1    software.

2            There was also testimony with respect to, I

3    think, five of these different sets of images that

4    thumbnails were created.  So given Mr. Fottrell's

12:27PM 5    explanation of the thumbnails, normal thumbnails, large

6    thumbnails and all of that explanation, there is a

7    plethora of evidence here to suggest to a reasonable jury

8    from which it could find that there was possession.

9            As to this cache issue, the Court has reviewed

12:27PM 10   and consulted relevant case law including *United States v.*

11   *Moberg*, M-O-B-E-R-G.  It's an Eighth Circuit case, I

12   believe, from 2018, among other cases including a Ninth

13   Circuit case called *United States v. Flyer* from 2011.  The

14   Court believes that a reasonable jury could find well more

12:28PM 15   than sufficient evidence given the Court's standard of

16   review here for the second element, which is that

17   Mr. Duggar knew that the visual depictions were of a minor

18   engaging in sexually explicit conduct and that is evident

19   from the images that have been introduced themselves.

12:28PM 20   The same is true with regard to the third

21   element, which is a qualifier, that such items included

22   prepubescent minors and that's obvious from the images

23   that are in evidence.

24   And then fourth is the interstate commerce nexus.

12:29PM 25   And the Court finds that there is certainly interstate

12:29PM 1  commerce, either looking at the origin of the HP computer

2  that was storing the computer file, trade inscription

3  being from China.  That means that it would have had to

4  have moved in both foreign and interstate commerce to make

12:29PM 5  its way to Arkansas.  Or if we characterize the images as

6  being contained in the computer files that Mr. Fottrell

7  testified about, those images and the testimony that

8  explained how they arrived on the computer and how they

9  were shared over the peer-to-peer connection with

12:30PM 10  Detective Kalmer, all of that implicated use of a computer

11  in interstate commerce.

12  So the Court believes that there's sufficient

13  evidence to proceed and for those reasons, the Rule 29

14  motion is denied with respect to both counts.

12:30PM 15  Any other matters that the parties would like to

16  take up?

17  MR. ROBERTS:  No, Your Honor.

18  MR. GELFAND:  No, Your Honor.

19  THE COURT:  We'll be in recess until 1:40 p.m.

12:30PM 20  Ms. Esterbrook and I are continuing to work on jury

21  instructions and we will be e-mailing the Court's

22  discussion draft.  Just for our planning purposes, I guess

23  it really doesn't matter.  We'll get the Court's

24  discussion draft out to you as soon as we reasonably can

12:31PM 25  with further instructions.  And we're in recess until

12:31PM 1    1:40.

2                    (Lunch recess taken from 12:31 to 1:45 p.m.)

3                    (Jury in at 1:45 p.m.)

4                    THE COURT:  Mr. Gelfand, you may continue your

1:45PM 5    inquiry.

6                    MR. GELFAND:  Thank you, Your Honor.

7    Q.    (BY MR. GELFAND.)  Ms. Bush, before the lunch break,

8    you testified about the three ways that these apps -- the

9    TOR browser, the uTorrent software, and VLC -- could have

1:46PM10   been installed on this version of Linux Ubuntu, correct?

11   A.    Yes.

12   Q.    And I believe you testified -- but correct me if I'm

13   wrong -- that you ruled out, just as Mr. Fottrell did, the

14   use of an installer, correct?

1:46PM15   A.    Yes.

16   Q.    And just so that we have context, remind us how it

17   was that you ruled out the use of the installer, that

18   first option?

19   A.    Because there would be forensic remnants of that

1:46PM20   activity referring to internet activity of somebody

21   browsing to the manufacturer or vendor's site to download

22   the installer file, and also the presence of that

23   installer's file.  So within the downloads folder, I would

24   expect to see some sort of installer file there or

1:47PM25   deletion of that file.

1:47PM 1   Q.   So remind us, if you would, what are the remaining

2   two possibilities of ways that these apps could have been

3   installed on the Linux partition?

4   A.   By browsing available applications within the Snap

1:47PM 5   Store and also running command line.

6   Q.   Prior to trial, did you form an opinion as to which

7   of those two options had occurred?

8   A.   Yes.  The evidence led me to believe that it was

9   through command line.

1:47PM 10   Q.   Let's talk first, before we get to command line,

11   about, I'm going to call it the App Store, but is it

12   technically the Snap Store?

13   A.   Yes.

14   Q.   What, if anything, did you do, as a computer forensic

1:47PM 15   examiner, to determine -- and just to be clear, including

16   this weekend -- to determine that it wasn't the App Store?

17   A.   Well, first of all, opening the App Store within the

18   environment that I had created to determine if I had

19   searched for Torrent, what BitTorrent programs would be

1:48PM 20   available to me in the Snap Store from that version of

21   Ubuntu.  And it didn't show up, so that led me to believe,

22   based on my own experience, that it wasn't available.  I

23   also looked up the -- well, let me back up -- Linux

24   store's application history within a particular artifact,

1:48PM 25   a system file, that's maintained by Ubuntu that will

1:48PM 1  actually detail which applications are being run.  I

2  reviewed that file and it did not include the Snap Store,

3  which, again, led me to believe that application had not

4  been executed, because, otherwise, it would have been in

1:48PM 5  that file.  And then I also went to the Snap Store just

6  through a web browser to look at what applications were

7  available.  And I used archive.org, which is a tool that

8  allows you to go back in time online to see what a website

9  was advertising.  So using that tool, I looked up uTorrent

1:49PM10  to try to find the first date that uTorrent had ever been

11  published, and the farthest back I could go was before --

12  I'm sorry -- after uTorrent had been installed on this

13  case.  I think it was in June of 2019.

14  Q.    So I want to direct your attention first to the

1:49PM15  defense exhibit binder in front of you to Defendant's

16  Exhibit 82.  Can you just tell me if you recognize 82?

17  A.    Yes, I do.

18  Q.    What is Exhibit 82?

19  A.    This is a screenshot, again, of the data from the HP

1:49PM20  desktop pulled into the forensic software AccessData FTK

21  Imager.

22  Q.    Is this a screenshot that you extracted personally?

23  A.    Yes.

24  Q.    Is it true and accurate?

1:49PM25  A.    Yes.

1:49PM 1            MR. GELFAND:  Your Honor, I move Defendant's 82

2    into evidence, please.

3            MR. CLAYMAN:  No objection.

4            THE COURT:  Defendant's Exhibit 82 is received.

1:50PM 5            (Defendant's Exhibit 82 Received)

6            MR. GELFAND:  May I publish?

7            THE COURT:  You may.

8  Q.   (BY MR. GELFAND.)  Do you see Exhibit 82 in front of

9  you?

1:50PM10  A.   Yes, I do.

11  Q.   Directing your attention to the top, you've mentioned

12  over the course of your testimony some forensic tools that

13  you used.  Does this tell us what tool you used in this

14  particular instance?

1:50PM15  A.   Yeah.  In this instance, I'm using the AccessData

16  FTK, which is Forensic ToolKit Imager.  And it's just the

17  tool that was available to me at the time to open up this

18  data.

19  Q.   And is Forensic ToolKit through AccessData one of the

1:50PM20  forensic tools that you've testified you're certified in?

21  A.   Yes.

22  Q.   If we look at this document, could you please tell us

23  specifically what it is we're looking at?

24  A.   So, again, I imported data that was extracted from

1:50PM25  the Linux partition of the HP desktop.  And on the left

1:50PM 1   pane, that's the folder structure.  And I browsed to the

2   home folder under the dell_one user in the local share,

3   and then Gnome shell folder.  And then --

4   Q.   I'm sorry, let me stop you there for one second.  If

1:51PM 5   we look at the left column, are you starting with the

6   LI004, referencing the HP?

7   A.   Exactly.

8   Q.   And then you're going to the dell_one folder,

9   correct?

1:51PM10   A.   Correct.

11   Q.   And then you're going to the local share folder,

12   correct?

13   A.   Correct.  There are two, but, yes, two different

14   folders, but, correct.

1:51PM15   Q.   And then you identified, you are going to one of

16   these Gnome shell, I'm sorry, to the Gnome shell folder?

17   A.   Correct.

18   Q.   What is the Gnome shell folder?

19   A.   Gnome is the software that's installed for Linux so

1:51PM20   that there's a graphical user interface, or as we call it

21   a GUI, which essentially makes it pretty for a user where

22   you can click on icons and it's easier to use versus

23   booting on the computer and it's just a black screen where

24   you can type in commands, so this allows it a little bit

1:52PM25   easier for the user to navigate the operating system.  So

1:52 PM 1   the Gnome shell, specifically that folder, is housing a

2   file called "application state," which stores the history

3   of the applications that are being used.

4   Q.   So you're looking in the Gnome shell folder for the

1:52 PM 5   applications that are being used on this device?

6   A.   Correct.

7   Q.   And could you please explain what it is you see from

8   a forensic evidence standpoint as reflected on this

9   exhibit?

1:52 PM 10   A.   It lists two applications, not including the Snap

11   Store or App Store, so that's where I came to the

12   conclusion that this was likely not used to download the

13   installers for the applications.

14   Q.   In other words, based on your training and

1:52 PM 15   experience, is it your opinion that if the Snap Store was

16   used to download these three applications you have

17   identified, it would appear here?

18   A.   Yes.  And I tested it to confirm that as well.

19   Q.   Showing you Defendant's Exhibit 85.  Could you take a

1:53 PM 20   look at that, please?

21   A.   Okay.

22   Q.   Do you recognize Exhibit 85?

23   A.   Yes, I do.

24   Q.   And just generally, can you just tell us what 85 is?

1:53 PM 25   A.   This is a screenshot of the system, again, that I

1:53PM 1  created through the virtualization software I was using of

2  the Ubuntu operating system.

3  Q.   And to be clear, is this a screenshot of the

4  virtualized workstation like the previous exhibit you

1:53PM 5  testified about?

6  A.   Yes.

7  Q.   Does this screenshot relate to your testimony about

8  the Gnome history?

9  A.   Yes, it's just to confirm what information would be

1:53PM10  stored in that file.

11  Q.   Does Exhibit 85 fairly and accurately reflect what

12  you recreated with respect -- in your virtual workstation

13  with respect to this issue?

14  A.   Yes.

1:54PM15        MR. GELFAND:  Your Honor, at this point, I move

16  Defendant's 85 into evidence.

17        MR. CLAYMAN:  Your Honor, ask a clarification

18  question.  Is this from the HP computer that she testified

19  to, or her own creation?

1:54PM20        MR. GELFAND:  Her own virtualized.  She doesn't

21  have access to the HP computer.

22        MR. CLAYMAN:  No objection.

23        THE COURT:  Defendant's Exhibit 85, as described,

24  is received.

1:54PM25        (Defendant's Exhibit 85 Received)

1:54 PM 1          MR. GELFAND:  May I publish it, Your Honor?

2          THE COURT:   You may.

3    Q.   (BY MR. GELFAND.)  Just to clarify for a second, the

4    Gnome history in Defendant's 82 that you testified about,

1:54 PM 5    is this all information that you received directly from

6    the HP image itself?

7    A.   Yes.

8    Q.   In contrast, is Defendant's Exhibit 85 an exhibit

9    reflecting what you did in your laboratory environment

1:54 PM 10   essentially attempting, as best you could, to recreate the

11   systems and the software?

12   A.   Yes.

13   Q.   Could you please explain what Exhibit 85 shows us if

14   we begin directing your attention to the "application

1:55 PM 15   state?"

16   A.   Yes.  Using the Nautilus file browser, I went to the

17   same location that you saw in the previous exhibit.  So

18   I'm going to my users local share Gnome shell folder, and

19   within that folder is an application state file.  And when

1:55 PM 20   I opened that on my own system to see what sort of

21   application history I saw, you can see it actually lists

22   different applications, including this bottom one here,

23   the Gnome software.desktop and that correlates to the Snap

24   Store application.

1:55 PM 25   Q.   So what does this recreation in the context of your

1:55PM 1    own environment tell you with respect to the Gnome issue?

2    A.   It's just confirming that when I actually clicked the

3    little App Store icon, it did populate an entry within

4    that Linux artifact as being opened by the user.

1:56PM 5    Q.   Now, did you also look at specifically when uTorrent

6    was available for download, so to speak, from the Snap

7    Store?

8    A.   Yes, I did some internet research.

9    Q.   And is the kind of internet research you did the kind

1:56PM10   of research that you rely on in your field?

11   A.   Yes.

12   Q.   Explain to the Jury what you're looking for.

13   A.   Well, specifically with archive.org, again, that's an

14   organization that captures websites at a moment in time,

1:56PM15   so it allows you to go back and see what a website was

16   advertising at a particular point in time.  So using that

17   tool, I'm going back to the Snap Store online rather than

18   the application to confirm the first time that I could see

19   that uTorrent was ever available.  Because kind of like

1:56PM20   with the Windows App Store, you can select from apps, but

21   it's not an all-inclusive list of everything that you

22   could possibly install on that operating system.  So just

23   going to their store online and looking to see, can I find

24   if this was available as of May 2019 specifically.

1:57PM25   Q.   Directing your attention to Defendant's Exhibit 87.

1:57PM 1    A.    Okay.

2    Q.    Please tell me if you recognize that.

3    A.    Yes, I do.

4    Q.    Just generally, what is 87?

1:57PM 5    A.    This is a screenshot of archive.org's preservation of

6    the Snap Store uTorrent website, or web page.

7    Q.    Does this simply reflect the database that you went

8    to to support your opinion?

9    A.    Yes.

1:57PM10          MR. GELFAND:  Your Honor, at this point, I move

11    Defendant's Exhibit 87 into evidence.

12          MR. CLAYMAN:  No objection.

13          THE COURT:  Defendant's Exhibit 87 is received.

14          (Defendant's Exhibit 87 Received)

1:57PM15    Q.    (BY MR. GELFAND.)  Just to be clear, you've testified

16    about a lot of forensic tools.  This is literally going to

17    the internet, correct?

18    A.    Correct.

19    Q.    And can you tell us what it is this exhibit shows?

1:58PM20    A.    Well, starting kind of up here, this actually tells

21    me the date range that archive.org has captured this web

22    page as being active.  And you can see right here that

23    October of 2019, it's grayed out because there was no

24    captures available prior to what I have highlighted here.

1:58PM25    So November 12th of 2020 is the first time that

1:58PM 1    archive.org had really identified this as an active

2    website.  And then going down here, I looked for all the

3    latest installations of this, what they call Snap, and the

4    first time that I could see that this was ever published

1:58PM 5    was June 6th of 2019.

6    Q.   So, in other words, is it your testimony that a user

7    anywhere in May of 2019 could not have downloaded the

8    uTorrent application that was on the HP Linux partition

9    through the Snap Store?

1:59PM 10   A.   I didn't find any evidence that would suggest they

11   could.

12   Q.   Based on your training and experience, would that

13   evidence likely be here if it was?

14   A.   Yes.

1:59PM 15   Q.   So given the combination, the totality of the

16   evidence that you have described to the Jury, have you

17   formed an opinion as to how these apps were installed on

18   the Linux partition?

19   A.   Everything led me to believe it would have been done

1:59PM 20   through command line.

21   Q.   Let's back up for a second.  What is command line?

22   What does that term mean to you as an expert as you use

23   it?

24   A.   It's a way to instruct a system to perform certain

1:59PM 25   tasks.  So from a user's perspective, we're used to

1:59PM 1  clicking on icons, clicking buttons, and relying on the

2  GUI, again, of the operating system to allow us to

3  navigate it and operate it.  But command line is telling

4  the operating system what to do through essentially

2:00PM 5  programming language.  It's manually directing the

6  operating system to conduct a task.

7  Q.   You have been a computer forensics expert for

8  approximately a decade, whatever the math is.  When you

9  arrived at this conclusion, did you attempt to recreate

2:00PM 10  installation of these apps through command line?

11  A.   Yes, I did.

12  Q.   Did you know, just being the expert that you are,

13  what commands to type in?

14  A.   No.  And I have a general idea of what they would be,

2:00PM 15  but I still have to go look up the exact formatting and

16  characters that I would need to use.

17  Q.   How do you look that up?

18  A.   Just Google it.

19  Q.   Did you look to see on the devices that you have

2:00PM 20  whether there was any browser history on any of these

21  devices indicating that any of the users of these devices

22  ran those kinds of Google searches for these command

23  lines?

24  A.   I looked for that evidence.  I think there were

2:01PM 25  thousands of web-browsing artifacts that I could go

2:01PM  1   through, and I didn't find any evidence of online research

        2   for Linux commands or anything related to executing

        3   command line.

        4   Q.   Is command line intuitive, like "install uTorrent" or

2:01PM  5   is it basically -- could you just explain why it is, if

        6   this is your conclusion, that you would need to look it up

        7   somewhere to get it?

        8   A.   Yeah.  I mean, if you look at it after it's all said

        9   and done, some of it is a little intuitive, but you have

2:01PM 10   to run the exact terms in the correct order with the

       11   correct kind of like punctuation.  So even though, sure,

       12   you might use the word "install," you have to preface it

       13   with the sudo command to get administrative privileges and

       14   you have to direct it to do ATP.  So it still requires, in

2:02PM 15   my opinion, research to remember how to formulate that.

       16   It's kind of like, unless you're speaking it every day,

       17   even though I took two semesters of French, I'm not fluent

       18   in it.  I still have to go back and reference something.

       19   Q.   We're going to come back to command lines, but let's

2:02PM 20   talk about the two other apps, or three apps that you've

       21   identified.  Based on your review, did the Linux partition

       22   have the TOR browser on it?

       23   A.   Yes, it did.

       24   Q.   Are you familiar with the TOR browser?

2:02PM 25   A.   Yes, I am.

2:02PM 1    Q.    What is the TOR browser?

2          A.    It's just an internet browser application like

3    anything else, Firefox, Google Chrome, but it has added

4    security features where it's actually routing your

2:02PM 5    internet traffic through proxies to allow the user to have

6    some anonymity, and for their internet data to essentially

7    not be sold.

8          Q.    Can you use the TOR browser to buy a pair of shoes on

9    Amazon?

2:03PM10    A.    Yes.

11          Q.    Can you use the TOR browser in the same way you use

12    any other internet browser?

13          A.    Yes, and I use it.

14          Q.    Back up for a sec.  Is using the TOR browser illegal?

2:03PM15    A.    No.

16          Q.    Why do you use the TOR browser?

17          A.    Well, being in this industry, I understand what kind

18    of data is stored on a computer and the information that's

19    available and information collected by our ISPs, so I just

2:03PM20    use it because I know what's out there and I like to have

21    a little added security.

22          Q.    Do you use it to do terrible things like buy

23    children?

24          A.    No.

2:03PM25    Q.    When was the TOR browser installed on the Linux

2:03PM 1    partition?

2    A.    It was installed, I think at 2:03 p.m. on May 13th of

3    2019.

4    Q.    Based on your forensic examination, were you able to

2:03PM 5    determine, as you have previously alluded to, how this

6    specific app was installed?

7    A.    Again, through the ways that I already described, the

8    evidence led me to believe that it was installed through

9    command line.

2:04PM 10   Q.    What is the "terminal command history?"

11    A.    It's just a key logger of everything you have typed

12    in as a command, meaning it just takes exactly what was

13    typed in and transcribes it into a file to record what had

14    been typed.

2:04PM 15   Q.    Why is it -- first of all, in your forensic

16    examination in this case, did you look for the terminal

17    line history in connection with this case?

18    A.    Yes.  It's called .bash_history which records the

19    command line input.

2:04PM 20   Q.    Now, you reference the .bash history.  Is terminal

21    command history, for our purposes, at least, kind of the

22    same as the bash history?

23    A.    Yes.

24    Q.    What does the bash history, just as a general

2:05PM 25   proposition, tell you as a forensic examiner examining a

2:05PM 1   device like this one?

2   A.   Well, one of the first things I look for, because it

3   will tell me the user's technical abilities, because Linux

4   natively is already very command-based, even though it

2:05PM 5   does have a GUI through Gnome, pretty much techies use

6   Linux because you have ultimate control through command

7   line.  So looking at that bash history will tell me kind

8   of a user's abilities.  In some cases, I see a lot of

9   trial and error, somebody putting in an input, it's

2:05PM 10   incorrect, they try again.  Or if somebody gets in and

11   they run all their commands and it's perfect, that tells

12   me that this is probably somebody who is pretty fluent.

13   So looking at it gives me a really good idea of the user's

14   abilities.

2:05PM 15   Q.   Is the bash history something that is auto-generated

16   by the operating system?

17   A.   Yes.

18   Q.   What do we mean by that when we say it's

19   auto-generated?

2:06PM 20   A.   The system creates it automatically.

21   Q.   Were you able to recover the bash history with

22   respect to the Linux operating system on the HP that you

23   examined in this case?

24   A.   No, I was not.

2:06PM 25   Q.   Explain to the Jury what you did to try to recover

2:06PM 1    the bash history.

2           A.    I ran searches through unallocated space and the

3           allocated space, even, to look for patterns that would

4           tell me that there were commands, so things like sudo

2:06PM 5    space or APT install, so stuff like that to see if I could

6           recover any of that information.

7           Q.    Did it jump to your attention that you were not able

8           to recover the bash history in this case?

9           A.    Well, I think the absence of the bash history jumped

2:07PM10    out at me, not necessarily the fact that I couldn't

11          recover it, because unallocated space was so small.  But

12          the lack of that file certainly jumped out at me, because,

13          again, in almost every single Linux case I've worked, that

14          bash history is there, unless of course somebody is

2:07PM15    deleting it.

16          Q.    So let's back up for a second.  Is one possibility

17          when the bash history does not exist on the system that it

18          was manually deleted?

19          A.    Yes.

2:07PM20    Q.    Are there other possibilities?

21          A.    Yeah.  If I suppose somebody never ran any commands,

22          it could not be created, but, again, because of Linux's

23          nature and the fact that it is so heavily based on command

24          line, for even the testimony you heard before about

2:07PM25    running and creating a virtual system, the bash history

2:07PM 1    will get created.  So it's unlikely to see that it's not

2           created.

3           Q.    So I want to show you Government's Exhibit 30.

4                 MR. GELFAND:  It's page 15 for the record, Your

2:07PM 5    Honor.

6           Q.    (BY MR. GELFAND.)  Were you in court when

7           Mr. Fortrell testified about this exhibit?

8           A.    Yes, I was.

9           Q.    This exhibit shows a .bash history?

2:08PM 10   A.    Correct.

11          Q.    Was the .bash history -- just to be clear, this is

12          the virtualized system that he testified about, correct?

13          A.    Yes.  This is the actual forensic image of the HP

14          that I believe was booted virtually.

2:08PM 15   Q.    Was the bash history that appears on this image in

16          the computer image, the forensic image of the HP that you

17          examined in this case, on the actual HP?

18          A.    No, it was not.

19          Q.    Does even booting something virtually create bash

2:09PM 20   history?

21          A.    Yeah.  Again, because the nature of Linux requires

22          somebody to kind of have an understanding of command line

23          because it's so often needed to operate the system, to run

24          it, to use the system.  So it's pretty common that you

2:09PM 25   would see the bash history get created just through

2:09PM 1   normal, routine use of the Ubuntu system.

2          Q.   Are there reasons on Linux that one -- let me back up

3          for a second.  The bash history that you've been

4          testifying about, when you were looking for the terminal

2:09PM 5   command history, was that what you were looking for?

6          A.   Yeah, it's the same thing.  The bash history is the

7          terminal command history.

8          Q.   What is the BitTorrent network?

9          A.   Again, it's another network protocol, so just a set

2:09PM 10  of rules that allow computers on the internet to connect

11         to each other to share data.

12         Q.   You testified earlier in that demonstrative exhibit

13         about your efforts to download a Charlie Chaplin movie, I

14         believe?

2:10PM 15  A.   Yes.

16         Q.   Did you do that through the BitTorrent network?

17         A.   Yes, I did.

18         Q.   Explain to the Jury what's happening on the back end.

19         In other words, how is that Charlie Chaplin video, just by

2:10PM 20  way of example, ending up on your computer?

21         A.   The BitTorrent network is different from traditional

22         peer-to-peer file-sharing where you might traditionally

23         think things like Napster where if I connect to your

24         computer and you have a file, I'm only getting it from

2:10PM 25  you.  BitTorrent changed that and it essentially allows

2:10PM 1    users who have files to share little bits and pieces so

2          that if I want a file and you each have, let's say it's a

3          10-page book, and you each have one page, you can all give

4          me one page and then my software will compile that into

2:10PM 5    the book that I was looking for.  And it does it that way

6          so that it can be very quick.  It doesn't bog down any one

7          person's bandwidth.  It allows to transfer very small

8          pieces of data quickly and efficiently rather than

9          downloading one giant movie from one person.  So it's just

2:11PM10   allowing or facilitating the transfer of this data in a

11         more efficient manner.

12         Q.    You testified that Transmission was default and what

13         you used in that particular instance, correct?

14         A.    Correct.

2:11PM15   Q.    Are there multiple software applications that one can

16         use to get to the BitTorrent network?

17         A.    Yes, there's many.

18         Q.    No matter what software application you use, do you

19         get to the same place?

2:11PM20   A.    Yeah, you're -- yeah, you're connecting to the same

21         network to download and essentially parse Torrent files.

22         Q.    So, in other words, is it fair to say that if a user

23         uses uTorrent and accesses the BitTorrent network and

24         another user uses Transmission, they are still getting to

2:11PM25   the same universe of files?

2:11PM 1    A.    Yes.

       2    Q.    Now, based on your forensic investigation, what

       3    BitTorrent application was used on the Linux partition in

       4    this case?

2:12PM 5    A.    UTorrent.

       6    Q.    Was that the only BitTorrent application that was

       7    used for anything on the Linux partition in this case?

       8    A.    Yes.

       9    Q.    Does uTorrent have different versions?

2:12PM10    A.    Yeah, it does.  It has many different versions.

      11    Q.    Does uTorrent also have different build numbers?

      12    A.    Yes, it does.

      13    Q.    Explain to the Jury what a version and what a build

      14    number indicates to you.

2:12PM15    A.    They are kind of the same thing.  For a layperson, it

      16    just means a modification was made to that particular

      17    software application, but rather than changing the entire

      18    version, maybe it's not substantive enough.  They will

      19    just change the build and say, we made this minor

2:12PM20    modification and we update the build number just so that

      21    the software developers can kind of track what they are

      22    doing with that particular software application.  But

      23    the -- it's kind of like -- it's just another way to

      24    identify or further identify a specific version.

2:13PM25    Q.    From a computer forensic standpoint, can the build

2:13PM 1   number and the version number affect the computer forensic

2     analysis?  Is that a bad question?

3   A.   Yeah, I'm not sure I understand it.

4   Q.   Let me rephrase it.  From a computer -- just talking

2:13PM 5   generally about software -- from a computer forensic's

6   standpoint, does it matter, ever, what version number and

7   build number is used on a particular device?

8   A.   Oh, of course.  Especially when that's the tool that

9   was used to obtain suspected child pornography.

2:13PM10   Identifying the version and the build will tell you any

11   potential bugs that that particular program has, how much

12   it's updated, and it allows you to identify if that

13   program is the same as what was identified in the

14   investigation with these BitTorrent cases.

2:14PM15   Q.   I'm showing you what's been previously admitted as

16   Government's Exhibit 30, page nine.  Do you see this

17   references build number 45828?

18   A.   Yes, I do.

19   Q.   Was that the build number that was actually on the HP

2:14PM20   Linux partition in May of 2019?

21   A.   No, it was not.

22   Q.   Was uTorrent on any of Josh's personal devices that

23   you testified about in this case?

24   A.   No, it was not.

2:14PM25   Q.   And, specifically, did you look to see whether

2:14PM 1  uTorrent was on the MacBook or any sort of uTorrent app on

2  the iPhone?

3  A.  Yes, I did, because even if the program had been

4  uninstalled, oftentimes, residual data still sits on the

2:15PM 5  computer that doesn't ever get deleted.  So finding

6  instances of, say a settings.dat file sitting somewhere in

7  the system could tell me that uTorrent once was installed,

8  but I did not find any remnants to suggest that it had

9  been.

2:15PM 10  Q.  Given your conclusion that command lines were used to

11  install these applications on the Linux partition, what,

12  if anything, did you do in the context of your laboratory

13  setting to determine how that -- essentially, what would

14  have been required to actually install these apps by the

2:15PM 15  user?

16  A.  I wanted to do it myself and see how complex it would

17  be and how it would appear to a user.

18  Q.  Tell the Jury your process for recreating that

19  environment when you say you wanted to do it yourself.

2:16PM 20  A.  Again, taking that ISO file from the Windows side of

21  the HP desktop, using that same version of Ubuntu and

22  creating a dual boot system with Windows 10 and Ubuntu on

23  an HP desktop computer.  Logging into the Ubuntu side and

24  executing command lines based on research to get to -- to

2:16PM 25  get the computer to the point with the correct programs as

2:16PM 1   it existed when law enforcement seized the computer.

2   Q.    So did you essentially mimic what you believe, in

3   your opinion, would have been necessary for whoever was

4   installing this to do?

2:16PM 5   A.    Yes.

6   Q.    Did you create any sort of demonstrative to help us

7   understand what that process looked like?

8   A.    Yes, I did.

9   Q.    Direct your attention to the thumb drive in there.

2:16PM10   Do you see Exhibit 59?

11   A.    The same thumb drive?

12   Q.    Yes.

13   A.    Yes, it's here.

14          MR. GELFAND:  Your Honor, at this point, I would

2:17PM15   ask that we be permitted to publish portions of Exhibit 59

16   for demonstrative purposes only, similar to the previous

17   exhibit.

18          MR. CLAYMAN:  No objection.

19          THE COURT:  Members of the Jury, once again, what

2:17PM20   you are about to see is a demonstrative aid that will

21   assist you in understanding this witness's testimony.  But

22   to be clear, although it's referenced for the record as

23   Exhibit 59, it's not being received into evidence, so you

24   will not have this demonstrative aid available to you in

2:17PM25   the jury room.  You will only have it now.  You may

2:17PM 1   proceed.

2          MR. GELFAND:  Thank you.

3   Q.   (BY MR. GELFAND.)  Can you tell us, Ms. Bush, just

4   what we're looking at?

2:17PM 5   A.   This is the log-in screen for my virtual system.

6   Q.   And just to be clear, so everyone is on the same

7   page, even though you couldn't use the underscore, did you

8   still call it dell one with no underscore?

9   A.   Yeah, I did.

2:18PM 10  Q.   Just to be clear, we're looking at your recreated

11  system, not at the HP, which you couldn't do this on

12  because you didn't have access to it, correct?

13  A.   Correct.

14          MR. GELFAND:  Mr. Story, could we play it?

2:18PM 15  Q.   (BY MR. GELFAND.)  Could you tell the Jury what we're

16  looking at right now?

17  A.   So I'm browsing to show applications and I'm just

18  going to run through the default applications.  This is a

19  fresh install so I'm just showing what was on the system

2:18PM 20  without me doing anything.

21  Q.   To be clear, we see Transmission, but we do not see

22  these three applications you've testified about?

23  A.   Correct.  So I'm just opening the default photos

24  application, which shows you that this a photo viewer that

2:19PM 25  comes preinstalled with the Linux, or Ubuntu operating

2:19PM 1  system.  The Transmission application, which comes

2  preinstalled.  And the default videos application.  Again,

3  that comes preinstalled.  So now I'm going to open the

4  terminal application where I can now begin to run

2:19PM 5  commands.  So just for the sake of creating an audit of

6  what we're doing so you can see it when we're done, this

7  is my first command.  It's obviously not an actual command

8  so it gives me an error.  So I'm going to paste in to what

9  I found was a repository to download the TOR browser.  And

2:20PM 10  you can see it actually suggests that it looks like I'm

11  looking for the TOR browser, but it has since moved, so it

12  directs me to a new repository.  And here you can see it

13  didn't install anything.

14        So I hit enter to continue.  And it completed reading

2:20PM 15  package list.  And I'm just showing that nothing was

16  installed, because that was not a command that allowed me

17  to install TOR, even though it was one of the commands

18  that I was prompted to run.  So I'm going to browse to the

19  new repository where TOR browser is currently located as

2:20PM 20  of the date of me doing this.  And it shows, confirms that

21  I'm looking for TOR browser.  I hit enter.  It's reading

22  package lists, but, again, showing me that nothing was

23  installed here.  So I'm still running through the process

24  of getting this installed.

2:21PM 25        And now I'm going to update my whole system.  I'm

2:21PM 1    afraid that maybe my previous command had not worked

2          because my system wasn't updated, so this is kind of like

3          a general Ubuntu system update.  And then I'm going to run

4          another just sudo APT update.  So, again, downloading any

2:21PM 5    updates that are available from my system.

6    Q.    Can we pause for one second, please.  It appears on

7          the screen that you are essentially pasting commands that

8          you previously copied?

9    A.    Yeah.  Just for the purpose of not having you sit

2:21PM10    here and watch me type them in, I had it up on a different

11          screen so that when I knew which command I needed to run,

12          I would pull them from somewhere and just paste them in

13          rather than typing them.

14    Q.    Thank you.  Continue, please.

2:22PM15    A.    So still nothing is installed, or not the TOR

16          browser.  Now I'm going to run the sudo APT install TOR

17          browser launcher now that I have the correct files to have

18          that actually install on my computer, but it gave me an

19          error that my system was locked, so where it needed to

2:22PM20    actually create the files, it didn't have permission, so I

21          needed to restart my computer so it would open that

22          directory back up and allow terminal to write to it.  So

23          I'm going to open that back up and retry that command.

24          And here, I'm just typing it for convenience, or to show

2:22PM25    you.  So I hit yes, to continue, and it starts to download

2:23PM 1   at the bottom there.  So it looks like it completed.  I go
       2   back to my applications.  And you can see now I have the
       3   TOR browser in the settings.
       4   Q.   But to be clear, did you have to -- even you -- have
2:23PM 5   to look up the command lines to type in or to paste, in
       6   this case, from the internet?
       7   A.   Yes, I did.
       8   Q.   What's happening next?
       9   A.   So I'm going to run another command and I'm going to
2:23PM10   install Snap.  And Snap is just the package manager, so
      11   think of it kind of like the control panel for programs.
      12   It allows you to install, update, repair, uninstall the
      13   different programs available.
      14   Q.   How did you know you have to install Snapped?
2:24PM15   A.   Well, because my system -- although some applications
      16   or some versions of Ubuntu already have Snap, because I'm
      17   installing these kind of secondary programs, I need to
      18   make sure it's completely updated.  So it was one of the
      19   recommended commands to make sure that your system was
2:24PM20   ready to basically install all of those different
      21   applications.
      22   Q.   What are you doing now?
      23   A.   Now, I'm just going to check to see what was
      24   installed, and you can see nothing beyond the TOR browser
2:24PM25   shows up, even though I confirmed now that Snap is fully

2:24 PM 1  installed and updated on my system.  So now I'm going to

2  run a command to install Wine.  And I'm going to do both

3  different architecture of Wine.  Hit "yes."  Now it's

4  going to install.  And Wine is a compatibility layer that

2:25 PM 5  allows users to install Windows-based versions of

6  applications.  It actually stands for Wine is not an

7  emulator.  It just allows Windows-based applications, kind

8  of like there's another version called Darling which

9  allows Mac-based versions doing the same technology, or

2:25 PM 10  using the same technology.

11  Q.   As this is loading, would it be possible to install

12  uTorrent, which is Windows-based, without first installing

13  Wine?

14  A.   No, it requires Wine.

2:25 PM 15  Q.   Why?

16  A.   Because, again, it's a Windows-based application.

17  And there actually isn't a Linux architecture of uTorrent.

18  It's only Windows or Mac or a web version, meaning you

19  just go to a web browser and access it.  So because there

2:26 PM 20  isn't a Linux version, you would have to install either

21  Windows or Mac's version, and if you select to install

22  Windows, it requires Wine to set up the system so that it

23  can properly read the Windows file.

24  Q.   Can a Mac version of uTorrent be installed on a Linux

2:26 PM 25  Ubuntu operating system?

2:26PM 1    A.    Yes, using the Darling, it's called Darling
       2    compatibility layer.  That is specifically for Mac
       3    applications where you can do essentially the same thing.
       4    Q.    What are we looking at on the screen?
2:26PM 5    A.    So it's just fetching data from servers to download
       6    the Windows version of Ubuntu, and it just takes a little
       7    while.  But you can see at the bottom of the screen where
       8    it's downloading and there's a percentage and shows you
       9    the megabytes that are being downloaded.
2:27PM 10   Q.    When you type in command lines for Wine, as is
      11    happening here, are those a different set of command lines
      12    than you typed in for the TOR browser?
      13    A.    Yes.  You don't need Wine for the TOR browser so you
      14    wouldn't need to run that command prior to installing TOR.
2:27PM 15   Q.    So did you have to look up on Google, if you will,
      16    this new second set of command lines like you did first
      17    with the TOR browser?
      18    A.    Yeah, just to help guide me through the proper
      19    language to include in my commands, I did reference some
2:27PM 20   articles.
      21    Q.    So we see that it's coming to the 99 percent,
      22    everyone's favorite percentage.  What is happening now on
      23    the screen in front of us?
      24    A.    So now it's actually running through the
2:28PM 25   installation, so it's unpacking all of the data that it

2:28PM  1    downloaded and adding it to my computer.

        2    Q.   Once Wine is on the computer, what, if anything, can

        3    you do to install a Windows-based application?

        4    A.   Now you can install Windows-based applications once

2:28PM  5    that's successfully on the system.  If you wanted to run

        6    the Microsoft Windows version of, probably a lot of

        7    different applications, you can now do that using this

        8    compatibility layer.

        9    Q.   With the compatibility layer, can you essentially

2:28PM 10    run, for all intents and purposes, any application that

       11    can just run on Windows?

       12    A.   Yes.

       13    Q.   What are we looking at here?

       14    A.   It's almost done.  It's at 99 percent.  And once that

2:28PM 15    completes, we should have Wine installed.  So now I will

       16    go to the "all applications" and scroll through just to

       17    show what it looks like to a user.  So, still, we don't

       18    have any additional icons.

       19    Q.   Is that because Wine doesn't actually create an icon,

2:29PM 20    it's just a necessary step behind the scenes?

       21    A.   Yes.

       22    Q.   What are you typing in now?

       23    A.   So now I'm running a command to install uTorrent.  So

       24    you can see it says, "ensure prerequisites."  Now it's

2:29PM 25    downloading Snap.

2:29PM 1    Q.   You use the word "Snap."  Is that the same as the

       2    Snap Store?

       3    A.   Yeah.  So it's -- well, because it's the overall

       4    program manager, it's just like if you were to say program

2:29PM 5    files for Windows.  It's just the way that Ubuntu manages

       6    all the different applications installed.

       7    Q.   In other words, does this mean that you're going to

       8    the Snap Store?

       9    A.   No, not necessarily.

2:30PM10    Q.   In fact, in this case, you're not, correct?

      11    A.   I don't know.  This was done well after May of 2019.

      12    It's possible that it did, but at this point, I'm not

      13    using the Snap Store interface to do it.

      14    Q.   You're typing in command lines?

2:30PM15    A.   Correct.

      16    Q.   What are you typing in here?

      17    A.   So uTorrent, I think I had went and shown that that

      18    was now installed.  So now I'm going to install -- sorry,

      19    gives you a punch of pop-ups.  So now I'm going to install

2:30PM20    VLC.  And I misspell install just to show how picky it is.

      21    And then I also put in VLC, all caps, which is technically

      22    how to spell it.  Again, it says it's not a valid command

      23    because of how case sensitive it is.  So then I run the

      24    normal active command and it starts to download VLC.

2:31PM25    Q.   To be clear, you identified a few minutes ago that

2:31PM 1   there's a default audio and video player, so to speak, on

2      this version of Ubuntu, correct?

3   A.    Correct.

4   Q.    Is VLC essentially an alternative to that?

2:31PM 5   A.    Yes, it is.

6   Q.    In your training and experience, is VLC popular?

7   A.    One of the most popular, yes.

8   Q.    Does VLC exist across platforms, meaning Mac,

9   Windows?

2:31PM10   A.    Yes.  It's a cross-platform viewer, meaning you can

11   install it on virtually any operating system.

12   Q.    Are you continuing to type in commands?

13   A.    So that completed, and I'm going to go and browse to

14   my applications again and show that now I have TOR, VLC,

2:31PM15   and uTorrent.  And just for the purpose of closing the

16   loop, I'll run one more command just so we can see that

17   that is definitely the last command that I ran.

18   Q.    So to be clear, notwithstanding the happy face, are

19   you basically just documenting this to create a bookmark

2:32PM20   of a beginning point and an end point?

21   A.    Yeah, I just wanted a unique marker to show the whole

22   history of what we just went through.

23   Q.    What are we looking at here?

24   A.    So now I'm going to go to my bash history file.  And

2:32PM25   you can see, this is my first command.  I even restarted

2:32PM 1   my computer and it shows everything I ran, including the

2      ones that weren't actual commands and the ones that didn't

3      execute because I misspelled install and I included VLC in

4      all caps.  So you can just see, this is a really good

2:32PM 5   depiction of a user's abilities, and like I said before,

6      the kind of trial and error.  If you look at this bash

7      history and you see a bunch of different commands that

8      aren't actual commands, it could tell you this is not a

9      well-versed user in Linux versus if you have a pretty

2:33PM10   clear-cut, these commands were executed and they executed

11     properly, you've got a pretty sophisticated user.

12     Q.    Thank you.  Does that wrap up this demonstrative?

13     A.    Yes, it does.

14            MR. GELFAND:  We can take this down, Mr. Story.

2:33PM15   Thank you.

16     Q.    (BY MR. GELFAND.)  Now, were you able to determine

17     how alleged child pornography video files were played

18     through the VLC system?

19     A.    Yeah, they were streamed through a network URL.

2:33PM20   Q.    Let's pause for a second.  What does streaming mean

21     as it applies to what happened on the VLC system based on

22     your computer forensic analysis?

23     A.    Streaming means viewing content on the fly.  And,

24     typically, it means the content that you're viewing is in

2:34PM25   one physical location and where you are doesn't have that

2:34PM 1   actual data.  So think of Netflix or Hulu.  The reason you

2          stream on Netflix is because you don't have all seasons of

3          The Office, and so you actually pull it from the service

4          host, whether that's Hulu or Netflix or now Peacock, and

2:34PM 5   then you're viewing it on the fly on your T.V.  So it's

6          actually broadcasting that information live to your

7          device, which is why sometimes you have issues with

8          buffering and maybe it's a little pixilated because it's

9          trying to decode the material from one server and provide

2:34PM 10  it on a different device.

11         Q.   Based on your analysis -- first of all, were all of

12         the video files that were downloaded actually played?

13         A.   Well, they were -- not all of the Torrent files were

14         streamed, but all of the files that there was evidence

2:35PM 15  that they were opened in VLC were all streamed.

16         Q.   So let's break that down for a second.  Let me even

17         back up one more step.  What's a Torrent file as opposed

18         to a video?

19         A.   A Torrent file is just a metafile.  It provides

2:35PM 20  information about files on the BitTorrent network.  So in

21         some instances, it can be analogized as a recipe to a cake

22         that you're baking.  Sometimes I use an analogy, it's kind

23         of old school, but like a library index card.  It tells

24         you that a book exists out in the library and where to go

2:35PM 25  get it.  So it doesn't actually contain the contents that

2:35PM 1  you're looking for, but it helps you go find it.

2  Q.   Using the BitTorrent network, for example

3  Transmission or uTorrent or qBittorrent or countless

4  other applications, can you ultimately attempt to get the

2:35PM 5  file when you have the Torrent?  In other words, can you

6  get the cake when you have the recipe?

7  A.   Yes.

8  Q.   Does having the recipe necessarily mean you have the

9  cake?

2:36PM 10  A.   No.

11  Q.   Explain that to the Jury.

12  A.   Just because you have the means to go find these

13  files doesn't necessarily mean that they were downloaded.

14  For instance, with what you could call Torrenting, what we

2:36PM 15  see often is Torrents will contain other Torrents to try

16  to promote data.  So you can download, let's say, a

17  Torrent for a music album and that Torrent will go and

18  fetch the full music album, but maybe it also says, well,

19  because you downloaded this, we think you're also going to

2:36PM 20  want this.  It will give you the Torrent for the next

21  music album.  It doesn't necessarily mean you downloaded

22  it, but now you have the means to go find it.  So just

23  because there's the existence of a Torrent doesn't

24  necessarily mean the contents ever existed.

2:36PM 25  Q.   So of the Torrents that were played, the video files

2:37PM 1  that were played on this HP Linux partition between

2  May 14th and May 16th, 2019, were you able to determine

3  how each and every one of those was played?

4  A.    Yes.  They were all streamed using a network URL.

2:37PM 5  Q.    I'm going to show you what's been admitted, if I may

6  publish it, Your Honor, as Government's Exhibit 43.

7         THE COURT:  That's fine.

8  Q.    (BY MR. GELFAND.)  Do you see Exhibit 43 in front of

9  you, Ms. Bush?

2:37PM 10  A.    Yes, I do.

11  Q.    Can you tell me if you recognize what this Government

12  exhibit is?

13  A.    Yes.  It's a VLC system file that's created by the

14  application that existed on the Linux partition.

2:37PM 15  Q.    And were you also able to independently, just as

16  Mr. Fottrell did, access this from the forensic file?

17  A.    Yes, I was.

18  Q.    What is this?  Before we get into some of the

19  details, kind of in common English, what are we looking

2:38PM 20  at?

21  A.    We're looking at a configuration file.  So it's

22  containing data that's used by VLC, so it's the underlying

23  data.  Where a user sees the pretty graphical user

24  interface, this is the actual source of where it's pulling

2:38PM 25  some of the information to run properly.

2:38PM 1    Q.    I want to direct your attention to each of these

2          entries that begin with http: and end with streaming.

3          What do each of those, just broadly speaking, reference?

4          A.    References a Uniform Resource Locator.  It's a URL

2:38PM 5    for content that exists.

6          Q.    So let's back up for a second.  Is each of these

7          entries, if we kind of oversimplify -- and there may be

8          multiple for one -- but reference streaming of a

9          particular video file?

2:39PM 10   A.    A particular Torrent, yes.

11         Q.    And, specifically, do these reflected in here

12         reference all of those files that were streamed on VLC

13         between May 14th and May 16th?

14         A.    Yes.

2:39PM 15   Q.    Can you walk us through what this means to those of

16         us that don't read that?

17         A.    Yeah.  So just like if you were to go to a website

18         and you would type in potentially http:\\www.google.com,

19         that is a Uniform Resource Locater, a URL, so you can go

2:39PM 20   communicate with Google servers and access their content.

21         In the same manner, this is using an http protocol, which

22         is a network protocol to communicate online, and it is

23         pairing with an info hash value that we were able to track

24         back to a particular Torrent.  And it's communicating at a

2:40PM 25   local IP address, here, 127.0.1, at a very specific port,

2:40PM 1  63835.  And then it lists -- it's using it as a proxy, and

2  then it identifies it as file number four.  And the token

3  is, again, the info hash value and then it just indicates

4  that the information is being streamed.

2:40PM 5  Q.   Cut to the chase.  What does that tell you?

6  A.   It tells me that when a file was opened with VLC,

7  rather than just double-clicking or even hitting control

8  S, somebody actually had to enter in this network URL in

9  order for VLC to go find the content and then stream it,

2:40PM 10  meaning on the fly, decoding the contents so that it can

11  be viewed.

12  Q.   Does this mean that the file had to actually leave

13  the device?

14  A.   In my experience, yes.  Because it's communicating

2:41PM 15  over a network, it doesn't necessarily go to a different

16  device -- it could -- but what it's saying is it's using a

17  network protocol through IP addresses to kind of go in a

18  circle.  So it's leaving the computer, to the router, and

19  then coming back based on this local IP address.

2:41PM 20  Q.   So does this tell you, at a minimum, that each of

21  these files had to travel, digitally, of course, from the

22  HP computer on the Linux partition to the router?

23  A.   Yeah.  It's going through some sort of network which

24  would be provided by or provided through the router.

2:41PM 25  Q.   And then once it's at the router, what is that file

2:41PM 1    accessible to, based on your expert opinion?

2    A.    I mean, any device that's connected.

3    Q.    So to be clear, is it possible that this device was

4    streamed in the sense of went from -- this video was

2:42PM 5    streamed in the sense that it went from the router and

6    then back to the HP?

7    A.    Potentially, yes.

8    Q.    Is it equally possible that this was streamed from

9    the HP to the router and went to a different device?

2:42PM 10    A.    Potentially, yes, because this 127 IP address, it's

11    just an internal IP.  It doesn't uniquely identify

12    anything.  It's just identifying software.  So, yes, I

13    don't necessarily know what device was actually viewing

14    the streamed material.  I just know that it was streamed

2:42PM 15    through that protocol.

16    Q.    So let's talk about this for one second.  Is there

17    any computer forensic tool, without having the router

18    itself, that can tell you what other devices, if any, had

19    access to this particular file that was streaming at the

2:43PM 20    time that it was streaming?

21    A.    The best source of evidence would be the router.

22    Q.    And is it fair to say you have not had access to that

23    because it was not seized?

24    A.    Correct.

2:43PM 25    Q.    Now, is streaming an option on VLC, and in

2:43PM 1   particular -- let me back up for a second.  During your

2          analysis, were you able to determine -- did you look at

3          the specific VLC program that was used in this particular

4          case in May of 2019?

2:43PM 5   A.   Yes, I did.

6          Q.   Were you able to familiarize yourself with the

7          options that were available as to how one can play a video

8          if a Torrent received a file and was ultimately

9          downloaded?

2:43PM 10  A.   Yes.

11         Q.   What were the options of how a video could be played

12         using this VLC version and build that was on the HP

13         computer in May of 2019?

14         A.   There's a lot of different possibilities, one of

2:44PM 15  which would just be double-clicking the file and the

16         Ubuntu operating system would prompt you, kind of like we

17         saw in the first demonstrative video, to select which

18         application you want to open that file with.  The other

19         thing is within VLC itself, you could click to open file

2:44PM 20  and then go browse to it.  You can also hit stream file,

21         or control S, but it would still pop up a prompt to say,

22         how do you want to stream it.  And the first option would

23         be stream a local file, stream a file.  And you can go and

24         click on the file that you want to stream.  And if you do

2:44PM 25  that, the path here would still indicate the local device.

2:44 PM 1        So, for instance, it would say,

2        file\home\delloneuser\documents, or downloads, so it would

3        actually give me the local path of the computer, even

4        though it's streaming.  But in order to stream it and get

2:45 PM 5        this exact forensic evidence, you would actually have to

6        specifically go into the network URL setting and put that

7        network URL in for it to stream over this http protocol.

8        Q.   So is it your testimony based on the actual computer

9        forensics that this was not just double-clicked?

2:45 PM 10       A.   Correct.

11       Q.   If it was double-clicked, would the forensic trail

12       just look different?

13       A.   Yes.  Again, it would give me a local file path, even

14       if it was a streamed file.

2:45 PM 15       Q.   Ms. Bush, each of these entries reflects streaming.

16       And I skipped over a couple, but do each of those reflect

17       the streaming of a different file?

18       A.   A different Torrent, yes.

19       Q.   And so if we look at the next page, for example, this

2:46 PM 20       VLC interface references that every single one of these

21       Torrents was streamed as opposed to double-clicked on,

22       correct?

23       A.   Correct.

24       Q.   Ms. Bush, in your entire career, have you ever seen a

2:46 PM 25       case where videos of this nature were streamed instead of

2:46PM 1    just played locally on VLC?

2      A.    No.   I have worked on hundreds of cases involving VLC

3      and I have not seen that particular forensic evidence

4      where somebody entered in a network URL.

2:46PM 5    Q.    Did this jump off the page to you?

6      A.    Yes, it did.

7      Q.    Explain to the Jury why.

8      A.    Just because, again, it shows a level of complexity

9      with the evidence.   If this was just a generic user

2:46PM10    creating this partition to quickly get in and access

11     content, you would think that it would just be in the

12     normal course of action to double-click a file.   You have

13     to go through so many extra steps to create this forensic

14     evidence, and that's why it stood out, because in

2:47PM15    combination with everything else, it's again showing me

16     another advanced level for this user to have streamed the

17     files rather than just opened them.

18     Q.    What, if any, significance is there to the

19     combination of Universal Plug and Play, as you previously

2:47PM20    testified about, and streaming?

21     A.    Well, because streaming is specifically going over

22     the network and following that protocol and you can see

23     using an IP address and a specific port, part of the

24     vulnerabilities with UPnP is port forwarding, meaning

2:47PM25    ports are open to any device on the network.   So for the

2:47PM 1    fact that this information to be utilizing that network

2    traffic where it's already vulnerable to UPnP tells me,

3    this should probably be looked into a little further.

4    Q.    Now, let's back up for a second.  Let's talk dates.

2:48PM 5    Based on your computer forensic investigation, was Linux

6    installed on May 13th and was the TOR browser installed on

7    May 13th of 2019?

8    A.    Yes.

9    Q.    What, if anything, happened on May 13th that in your

2:48PM10    opinion had to have happened physically at the computer as

11    opposed to remotely?

12    A.    The attaching a thumb drive to the physical HP

13    machine and opening those files.

14    Q.    Could the TOR browser, in your opinion, have been

2:48PM15    installed either by someone sitting at the desktop

16    computer at Wholesale Motorcars or accessing the device

17    remotely?

18    A.    Yes.

19    Q.    Explain to the Jury why it is you conclude that.

2:48PM20    A.    Because one of the things I'm looking for in this

21    analysis is to rule out remote access.  If part of the

22    issue in this case is who had access to the computer and

23    who could have conducted this activity, I'm looking for

24    how is this system configured, who would have had access

2:49PM25    to the system.  And with Linux, one of the things it does

2:49PM 1    is it stores very, very detailed logs.  There are system
       2    logs, kernel logs, authorization logs.  And by analyzing
       3    those collectively, you could determine if this was a
       4    secure network and if nobody else had access to it
2:49PM 5    remotely.  But because that information was no longer
       6    available because of the lapse in time between when this
       7    activity occurred and when the computer was seized, I
       8    wasn't able to rule it out through those logs.  And
       9    because I don't have the router, I can't, again, determine
2:49PM10    whether or not this network had open and vulnerable ports
      11    or if other devices were accessing it at the same time as
      12    the uTorrent downloads.  So because I'm not able to
      13    eliminate that possibility, it's just as likely that
      14    activity occurred, in combination with the fact that we
2:49PM15    know the network had UPnP, and we know that the files were
      16    being streamed over the network.
      17            MR. GELFAND:  Your Honor, I'm sorry.  One of the
      18    jurors, I think, wants the Court's attention.
      19            THE JUROR:  May I be excused for a moment?
2:50PM20            THE COURT:  Yes.  We'll be in recess for 20
      21    minutes, so everyone please stand as the Jury is in
      22    recess.  I would ask the Jury to remember our recess
      23    instruction.
      24            (Jury out at 2:50)
2:50PM25            THE COURT:  Everyone in the gallery please remain

2:50PM 1    in place.  We're in recess until 10 minutes after 3:00.

2           (Jury in at 3:16 p.m.)

3           THE COURT:  Mr. Gelfand, you may resume your

4    examination.

3:16PM 5           MR. GELFAND:  Thank you, Your Honor.

6    Q.   (BY MR. GELFAND.)  Ms. Bush, before we just took a

7    brief recess, you were testifying about May 13th of 2019,

8    correct?

9    A.   Yes.

3:17PM10    Q.   Based on your forensic examination, did the Linux

11    partition have any software applications on it that enable

12    remote access if a user wants to use it for remote access?

13    A.   Yes, it did.

14    Q.   I'm going to show you a portion, if I may publish it,

3:17PM15    Your Honor, of Government's Exhibit 30.  It's page 6.  Can

16    you see that in front of you?

17    A.   Yes.

18    Q.   What is Remmina?  R-E-M-M-I-N-A.

19    A.   It's remote desktop software.

3:17PM20    Q.   What does that mean?

21    A.   It means it allows the user to easily configure

22    remote access through that application.

23    Q.   Just to be clear, is that the only way one can remote

24    access into a device?

3:18PM25    A.   No.

3:18PM 1    Q.   What are other ways that one can remote access into a

     2    device?

     3    A.   I mean, again, using command line.  Using other

     4    third-party tools.  There's several ways.

3:18PM 5    Q.   I want to direct your attention back to Government's

     6    Exhibit 43.  Before we get there for a second, I want to

     7    direct your attention to May 14th.  On May 14th, were you

     8    able to determine alleged child pornography activity for

     9    the first time on this device?

3:18PM10    A.   Yes.

    11    Q.   Now, I want to direct your attention first to

    12    Government's Exhibit 38.  Can you tell us what Exhibit 38

    13    is, if you know?

    14    A.   Yeah.  It's the recently used file that's created by

3:19PM15    the Linux operating system and TOR browser storing the

    16    recent history for the TOR browser application.

    17    Q.   So is it fair to say that this file references a

    18    file -- well, this document references a file referred to

    19    as the webcam collection in short?

3:19PM20    A.   Yes.

    21    Q.   What is 7Z?

    22    A.   It's an archive file, so it's a file format that

    23    allows a single file to hold a bunch of files.  So it's

    24    really convenient for downloads or transferring files,

3:19PM25    because rather than having to download all individual

3:19PM 1   files, you can just download one file and extract it

2   later.

3   Q.   How is that one file extracted, just generally

4   speaking?  I mean, if something is compact within a zip

3:19PM 5   file, what does 7Z do?

6   A.   If you click on it and open it using the correct

7   software, it will open to a folder.  And then within the

8   folder, which will be titled webcam-collection-previews,

9   will contain the contents of that 7Z file.

3:20PM10   Q.   And the software to extract, is that also called 7Z?

11   A.   Yes.

12   Q.   Now, on May 14th, per the Government's Exhibit 38,

13   there's TOR activity at 5:05 p.m., correct?

14   A.   Correct.

3:20PM15   Q.   Again showing you Exhibit 39.  There's uTorrent

16   activity at 5:28 and 5:38 p.m., correct?

17   A.   Correct.

18   Q.   Were both of the videos referenced on May 14th

19   streamed?

3:21PM20   A.   Yes, they were.

21   Q.   And were you able to determine that through the

22   computer forensic trail that you followed in this case?

23   A.   Yes.  I was able to match the Torrent info hash for

24   those two videos files to the info hash that was contained

3:21PM25   within that VLC configuration file to determine that those

3:21PM 1   videos would have been streamed using those info hash

2   values.

3   Q.   I want to direct your attention back to Government's

4   Exhibit 43.  This was that streaming http document you

3:21PM 5   previously testified about.

6   A.   Yes.

7   Q.   Does this reference port numbers anywhere?

8   A.   Yes, it does.  These are the port numbers.

9   Q.   What, if any, significance is there to you as to the

3:22PM10   port numbers you see that were used to stream Torrent

11   files in this case?

12   A.   I noticed the port numbers, which should coincide

13   with how the programs are connecting to the BitTorrent

14   network, are changing.  Changing ports is -- can be a way

3:22PM15   to mask your activity, to hide your true identity.  So the

16   fact that these ports are changing tells me that whoever

17   is doing this has some sort of control over the port

18   forwarding, which is part of what UPnP does.

19   Q.   Let's back up.  Can you explain to the Jury the

3:22PM20   connection, if any, between ports, routers, and UPnP?

21   A.   Yeah.  So the port is kind of like a door.  It's a

22   way to access the internet.  And when you have multiple

23   devices connected to the internet, the router has to

24   understand how to route that traffic.  And one of the ways

3:22PM25   it does that is using ports.  So local IP addresses, in

3:23PM 1    combination with a port, will tell the router, this device
       2    here, let's say is connected to YouTube, but it's also
       3    connected to the BitTorrent network.  It will assign a
       4    port for YouTube so that the traffic that comes through it
3:23PM 5    knows to send to that particular application, and then it
       6    will also route the information from the BitTorrent
       7    network separately using that port.  So, again, it's a lot
       8    of ways to organize data.  So these ports are just
       9    designating when the computer is communicating over the
3:23PM10    network, it's going to designate these ports as a way to
      11    communicate.  And for them to be changed, that's a pretty
      12    sophisticated level to kind of obfuscate your activity, to
      13    mask where you're actually coming from.  And it's actually
      14    a method that's used by Torrential Downpour to prevent
3:23PM15    being identified as a leech, meaning not actually
      16    uploading any content.  So changing ports will help a user
      17    stay anonymous.
      18    Q.   What's the connection, if any, between ports and
      19    Universal Plug and Play?
3:24PM20    A.   Well, because the vulnerabilities in Universal Plug
      21    and Play are specifically related to port forwarding, that
      22    tells me that these two very well could be connected.  By
      23    the very nature of UPnP, these ports become integral to
      24    our analysis to understand were these ports open on the
3:24PM25    router, and if they were open, who had access to them.

3:24PM 1    Q.    So from Government's Exhibit 43, are you able to

2    determine whether multiple different ports on this

3    particular router were open in connection with the files

4    that were streamed on May 14th, 15th, and 16th?

3:24PM 5    A.    Yes.  It looks like at least three.

6    Q.    And just to be clear, does that continue through

7    multiple days?

8    A.    Yes, it does, and there are additional ports.

9    Q.    So for the entirety of the streaming activity that

3:25PM 10   occurred from May 14th to May 16th of 2019, did they use

11   multiple ports throughout that whole time period?

12   A.    Yes, they did.

13   Q.    And based on the uTorrent file that you previously

14   testified about, was UPnP enabled for uTorrent?

3:25PM 15   A.    Yes.

16   Q.    For the entire time period?

17   A.    Yes, it was.

18   Q.    And we know that for sure from computer forensics?

19   A.    Correct.

3:25PM 20   Q.    Now, the activity that's reflected related to alleged

21   child pornography on May 14th all happens between 5:05 and

22   approximately 5:40 p.m., correct?

23   A.    Correct.

24   Q.    Did any of that activity that happened on May 14th of

3:26PM 25   2019 have to happen by somebody physically at the HP

3:26PM 1    computer behind the keyboard?

2    A.    No.

3    Q.    Why do you say that?

4    A.    Because I'm not able to exclude that as an option.

3:26PM 5    Again, through my analysis, I'm looking for, can I prove

6    that this is somebody with physical access and I'm doing

7    that through an analysis, an extensive analysis, of all

8    the log files that are created.  But because I don't have

9    some of that evidence and because some of the log files

3:26PM 10   are no longer available to me, and the fact that these

11   are, again, being streamed over a network and the ports

12   are changing tells me that I really cannot exclude that as

13   a possibility here.  In fact, the evidence leads me to

14   believe that's a very viable possibility.

3:27PM 15   Q.    I want to direct your attention to May 15th.  See

16   Government's Exhibit 39?

17   A.    Yes, I do.

18   Q.    May 15th, there's some activity in a short,

19   approximately 10 to 15-minute period in the morning,

3:27PM 20   correct?

21   A.    Correct.

22   Q.    To be clear, based on your investigation, were each

23   of these Torrents actually streamed?

24   A.    I believe they were.  I don't remember off the top of

3:27PM 25   my head, but I believe they were all streamed.

3:27PM 1    Q.    To be clear, let me break down, because I'm not

2    trying to quiz you.  Was every video file that was played

3    streamed?

4    A.    Yes.

3:28PM 5    Q.    But not every Torrent was viewed?

6    A.    Exactly.

7    Q.    So, in other words, nothing was double-clicked,

8    correct?

9    A.    Correct.

3:28PM10    Q.    But there are some Torrents that were not actually

11    ever viewed, based on the computer forensic analysis,

12    correct?

13    A.    Correct.

14    Q.    Now, similarly, if we move down the page, there's, we

3:28PM15    just talked about this plus or minus 10 to 15-minute

16    period in the morning, correct?

17    A.    Correct.

18    Q.    And then later in the day, is it fair to say, on the

19    15th, that there's an approximately -- not necessarily

3:28PM20    reflected here -- but 40 or so minute period?

21    A.    I think it's less than 40, but, yes.

22    Q.    Now, I want to break that down for a second.  Did you

23    hear testimony from Mr. Fortrell about the DD Torrent and

24    DD.1 Torrent files?

3:29PM25    A.    Yes, I did.

3:29PM 1    Q.    Based on your computer forensic investigation, were

2    those files ever actually played on this Linux partition?

3    A.    Not just not played, but no evidence that they were

4    downloaded.

3:29PM 5    Q.    So how can you have a Torrent, the recipe, but not

6    the file?

7    A.    Because, again, you can have -- you can obtain a

8    Torrent from whatever source you're getting Torrents from

9    without actually processing it, so using the instructions

3:29PM10    or the index card to go find the content.  So that Torrent

11    sitting there tells me it, for some reason, had been

12    loaded into the uTorrent program.  But if the content had

13    actually been downloaded, I would see the same references

14    we see with the other files; the recently used artifacts

3:29PM15    when the folder was opened that contents existed.  That

16    the thumbnails would be cached for the DD folder, or DD

17    folder corresponding to that Torrent.  So the absence of

18    those artifacts tells me there was no evidence that it was

19    opened.  And because of the absence of any thumbnails, it

3:30PM20    may not have ever been downloaded.

21    Q.    So is it your testimony that there's no remnant on

22    the actual device of the actual files associated with DD

23    Torrent and DD.1 Torrent?

24    A.    Right.  With the exception of the actual Torrent file

3:30PM25    itself, I did not find any indication that the contents of

3:30PM 1    those Torrents were downloaded.

2    Q.    Now, is it fair to say, then, that on May 15th, all

3    of the alleged child pornography activity at issue happens

4    essentially in this 10 to 15-minute period in the morning,

3:30PM 5    and then in this approximately plus or minus 40-minute

6    period, or 36-minute period in the afternoon?

7    A.    Correct.

8    Q.    Evening.  I'm sorry.  Yes?

9    A.    Yes.

3:31PM 10    Q.    Did anything related to this that happened on

11    May 15th have to happen by somebody physically at the HP

12    computer behind the keyboard?

13    A.    No.

14    Q.    Is there any reason to believe that what happened on

3:31PM 15    this day was done remotely?

16    A.    For the same reasons as the other day, because the

17    files were streamed, because we know UPnP was enabled,

18    because the ports were changing, yes, I think there's

19    evidence to suggest this was remote.

3:31PM 20    Q.    Now, you referred to some term "thumbnail."  Can you

21    tell the Jury what a thumbnail is in your expert opinion?

22    A.    It's a small image file that corresponds to a media

23    file, whether that's an image or a video, that can be

24    displayed to the user so they don't actually have to

3:31PM 25    physically open the file.  So, for instance, on an iPhone,

3:31PM 1  think of your camera roll.  You can scroll through your

2  camera roll with all the little tiny thumbnail images.

3  Those are being created on the system for the user's ease

4  of access.  You can scroll through them very quickly

3:32PM 5  rather than each and every photo that's saved, or video

6  that's saved.  So these thumbnail images are being

7  automatically, we call cached, or created, by the system

8  in a hidden system directory just for the purpose of

9  allowing the user interface to be more accessible and user

3:32PM10  friendly.

11  Q.    Did you find evidence in your computer forensic

12  investigation of thumbnails?

13  A.    Yes.

14  Q.    Are thumbnails visible necessarily to the user at a

3:32PM15  device?

16  A.    Not unless they have sophisticated knowledge in how

17  to go find them.  It's in a hidden location and you would

18  have to go several folders deep to go find them.  And

19  then, again, they have this innocuous file name so it

3:32PM20  wouldn't be readily apparent to a user that these random

21  file names correspond to images or videos that once

22  existed on a system.

23  Q.    What is cache?  C-A-C-H-E.

24  A.    Cache refers to the creation of data, but by a

3:33PM25  software or a system as opposed to a user.  A user can

3:33PM 1   create data, but the system, for the most part caches

2   data.  It's being created unbeknownst to a user and beyond

3   their control.

4   Q.   Does a user necessarily know that there is cache data

3:33PM 5   if there is cache data?

6   A.   Most people don't.

7   Q.   Does a user go access cache data?

8   A.   Not unless they are very sophisticated.

9   Q.   What, if anything, does cache data indicate to you in

3:33PM 10   connection with your evaluation in this case?

11   A.   It tells me that material once existed on the system

12   and it captured that automatically, but that the lack of

13   corresponding files means that they no longer exist.

14   Q.   Now, we talked about May 15th.  On May 16th, was

3:34PM 15   there one -- actually, I'm sorry, before we get there.

16   May 15th, we have talked about the videos that were

17   streamed, correct?

18   A.   Correct.

19   Q.   And then there was a marissa.zip Torrent, correct?

3:34PM 20   A.   Correct.

21   Q.   What, if anything, did you evaluate over the course

22   of your analysis to determine the dates and times that

23   those files were extracted?

24   A.   Using the artifact "recently used" through the Linux

3:34PM 25   operating system, it will record when a file is extracted,

3:34PM 1    an archive file.  So in reviewing that file, it does show

2    that the marissa.zip file had been extracted.

3    Q.    Were you in court when Mr. Fottrell testified about

4    essentially a chart of all of those images being extracted

3:35PM 5    at the same time?

6    A.    Yes.

7    Q.    What does that signify to you?

8    A.    That it's an automated process.  Once the archive

9    file is extracted, within seconds or sometimes

3:35PM10    immediately, at the same second, all of the files will be

11    created.  So, like I said, it will create the folder and

12    then the files will be created in that folder.  So for the

13    dates and times to be down to the exact second tells me

14    that the date recorded suggests the date that they were

3:35PM15    extracted.  But if the files had actually been

16    double-clicked on and opened once they were extracted, a

17    separate record would have been created.

18    Q.    So I'm going to show you Government Exhibit 32.  Do

19    you recognize Exhibit 32?

3:35PM20    A.    Yes, I do.

21    Q.    What is Exhibit 32?

22    A.    These are the -- looks like -- it's hard to tell

23    because there's no path, but I believe this is the

24    embedded data within the thumbnails that have a date stamp

3:36PM25    and a file path.

3:36PM 1    Q.   Is it your testimony that there would be a separate
     2    forensic artifact if an extracted jpeg image from a file
     3    were opened as opposed to just extracted?
     4    A.   Right.  So this tells me that these files were
3:36PM 5    extracted and the system automatically at the exact same
     6    time cached a thumbnail for each one of them, not that
     7    necessarily each thumbnail was viewed.  But, separately, I
     8    was also referring to that recently used file that will
     9    contain separate artifacts of a user actually
3:36PM10    double-clicking the file.
    11    Q.   And the Jury has that file in evidence, correct?
    12    A.   I believe so.
    13    Q.   You saw it in court the other day?  Better question.
    14    A.   Yes, I did.
3:37PM15    Q.   So is it your testimony, based on your review of that
    16    exhibit -- do you have an opinion as to whether or not
    17    these images were opened versus just extracted?
    18    A.   The evidence leads me to believe they had only ever
    19    been extracted, so the actual files contained within the
3:37PM20    archive weren't ever actually opened.
    21    Q.   Is that because there would be an actual computer
    22    forensic artifact if they were opened?
    23    A.   Yes, there would be.
    24    Q.   Did you independently look for that artifact?
3:37PM25    A.   Yes, I did.

3:37PM 1    Q.    And you did not find it, correct?

2    A.    I found the same extracted references, but nothing

3    suggesting it had been opened beyond that.

4    Q.    Now, we talked about May 14th and May 15th.

3:37PM 5    On May 16th, was there a single Torrent file that was

6    downloaded at approximately 11:21 a.m.?

7    A.    Yes.

8    Q.    Were you able to determine when this file was

9    streamed?

3:38PM10    A.    Yes, I was.  The other files, I don't have a date and

11    time-stamp because VLC doesn't mark the date and time.

12    But based on the metadata, meaning the dates and times

13    associated with the actual VLC file, that configuration

14    file, it had been last written on 5-16 at 11:33, I think,

3:38PM15    36.  At 11:33 a.m., I know that, I think 36.  So that

16    tells me that because the last time the VLC configuration

17    file had been written, that was the actual date and time,

18    or very close to, that that file had been streamed.

19    Q.    Were you in court when Mr. Fottrell testified that

3:38PM20    this movie is approximately 30 minutes?

21    A.    Yes.

22    Q.    Do you independently have any reason to agree with

23    that or disagree with that?

24    A.    No.  I haven't seen it, but I have no reason to

3:39PM25    disagree.

3:39PM 1    Q.    You take it at face value, correct?

2    A.    Yeah.

3    Q.    Were you able to determine when, if ever, that file

4    was deleted?

3:39PM 5    A.    Yes.  I don't have the exact date and time that it

6    was deleted, but I did find a reference to that file, the

7    pedomom.wmv file within the index of the trash, and that

8    the trash folder had been last written at 11:33:50 a.m.

9    And what that means is, the trash folder, when you delete

3:39PM10    something, just like you send something to the recycle

11    bin, in Ubuntu, when you delete something, it sends it to

12    the trash.  And when you send it to the trash, the trash

13    folder itself will actually record a forensic artifact

14    within itself with the name of the file.  And even if the

3:39PM15    trash is cleared, that name will still sit there, and

16    forensically, I can extract that.

17         So when I reviewed the index of the trash folder, I

18    saw that the pedomom.wmv had been sent to the trash, and

19    that based on the last written date of the entire folder,

3:40PM20    meaning the last time the trash had ever been cleared, was

21    at 11:33:50, so about 29 seconds after that video had been

22    streamed.

23    Q.    So just to be clear, is it your testimony that that

24    video, that 30-minute video, was deleted 29 seconds after

3:40PM25    streaming began?

3:40PM 1    A.    That's correct.

2    Q.    What, if any, significance did that have to you in

3    conducting your forensic analysis, meaning the timing of

4    the deletion?

3:40PM 5    A.    It tells me that whoever streamed that file, at

6    least, or at most, 29 seconds later deleted it and hadn't

7    viewed the full file.

8    Q.    To what extent, if any, does the timing of the

9    deletion of the entire trash folder impact or affect your

3:40PM10    analysis as to the possibility or likelihood of a remote

11    user using this device as opposed to sitting behind it?

12    A.    It kind of follows the patterns and characteristics.

13    This tells me that this is potentially somebody with

14    intermittent access to the computer.  And with remote

3:41PM15    users, that's one huge indicator.  We call it kind of a

16    hit-and-run.  When somebody finds a computer that they can

17    attack or use for their own purposes, they are not going

18    to sit there for years or months because the chances of

19    them getting caught or their identify being revealed is

3:41PM20    greater.  So they get in, they get the material they want,

21    and then they get out.

22    Q.    Let's talk about remote access for a second.  If

23    somebody is remotely accessing a computer at a particular

24    location, just generally speaking, does the person, if

3:42PM25    there is a person, behind that computer necessarily see

3:42 PM 1  what the person controlling that device remotely is doing?

2  A.   Not necessarily.  You would see it if it was

3  happening through the Gnome application interface.  So

4  remember we talked about how Linux does have a GUI.  There

3:42 PM 5  is an ability to see things on the screen like you would

6  with a Mac or Windows computer, but, again, there's also

7  the possibility of running command line behind the scene

8  which is operations that the user wouldn't necessarily see

9  on the screen.  So if it had been conducted kind of

3:42 PM 10  through a back door or on the back end, you wouldn't

11  necessarily see the actual content on the screen as if you

12  were using the graphical user interface.

13  Q.   Have you formed an opinion -- well, first of all, is

14  it consistent with your individual forensic examination

3:42 PM 15  that there was no alleged child pornography activity after

16  May 16th at 11:33 a.m.?

17  A.   Yes.  No evidence material had been streamed or

18  downloaded, nothing.

19  Q.   So are we talking about essentially a three-day

3:43 PM 20  period with the last day being approximately 12 minutes?

21  A.   Yes.

22  Q.   Have you formed an opinion as to whether all of the

23  alleged child pornography activity could have been

24  conducted by someone physically outside the office at

3:43 PM 25  Wholesale Motorcars?

3:43PM 1    A.    Yes.  As far as the suspected child pornography, I

2    can't rule out remote access.

3    Q.    Have you formed an opinion as to the extent to which

4    remote access is likely?

3:43PM 5    A.    Yes.  The activity that I have seen so far seems to

6    meet the patterns and characteristics of a remote user,

7    because when you look at it all as a collection, so if you

8    take each individual piece and analyze it solely based on

9    that one artifact, maybe it doesn't suggest remote access.

3:44PM10    But when you take the whole collection of the evidence and

11    you compile that, you've got UPnP enabled on a network

12    which means it's highly vulnerable.  You've got a very

13    short time frame of activity, kind of a hit-and run, so to

14    speak.  You have a very small Linux partition, which tells

3:44PM15    me this wasn't a partition created to store data over

16    time.  It was kind of used for a very specific purpose at

17    a very short interval.  And then you also have the

18    immediate deletion of these files.  Well, before that, you

19    also have the streaming of the files.  Rather than just

3:44PM20    double-clicking and opening, they are going through the

21    internet, essentially going through a protocol to stream

22    the material.  And then you have the almost immediate

23    deletion of at least one of the files which tells me the

24    user didn't actually open or view the full file.

3:45PM25    Q.    If you had the router, could you answer more

3:45 PM 1    questions?

2    A.    It would certainly give me a lot more clarity, yes.

3    Q.    Were you able to determine whether this particular HP

4    device was connected to Wi-Fi at any given time?

3:45 PM 5    A.    Yes, through the Windows registry.

6    Q.    So to be clear, is there actual computer forensic

7    evidence that this device was connected to the internet,

8    meaning to the router, wirelessly perhaps in addition to

9    or at separate times to wired ethernet cable?

3:45 PM 10   A.    Yeah.  The Windows registry has its own key to store

11   all the different Wi-Fi networks so that if you go back to

12   a particular location, it can auto-add that wireless

13   network.  So if you, for instance, look at my computer,

14   there's probably 50 different wireless networks that you

3:45 PM 15   could go back and track and see my location at this

16   airport or this office.  And with this computer, I did the

17   same thing to see what different wireless networks had

18   been connected to this computer.

19   Q.    And just generally speaking, what were you able to

3:46 PM 20   conclude?

21   A.    That it was connected to a Wholesale, I think, or

22   over the river, I think network account, that I was able

23   to match back to the actual router in this case based on

24   the Mac addresses.  And that it was also accessed by at

3:46 PM 25   least one other internet access point during the dates and

3:46PM 1    times of interest.

2    Q.    In other words, multiple internet access points over

3    Wi-Fi?

4    A.    Yes.

3:46PM 5    Q.    Let's change our focus for a sec away from the HP to

6    the laptop.  Were you able to determine the dates of use

7    for that laptop as you previously testified?

8    A.    Yes.

9    Q.    What were those dates again?

3:46PM 10    A.    November 2014 to November 2019.

11    Q.    From a computer forensic standpoint, was there any

12    data that you were able to use to determine whether the

13    laptop was used frequently, infrequently, thrown in a

14    garage, found off a shelf, anything along those lines?

3:47PM 15    A.    Yeah, doing an overall timeline analysis of the

16    activity that exists.  I also brought it into a tool

17    called AXIOM, which is developed by Magnet Forensics,

18    which gives you a really good synopsis of what exists on

19    that computer.

3:47PM 20    Q.    What did you determine?

21    A.    That it had a lot of activity consistently.

22    Q.    When you received -- let's back up for a second.  You

23    testified that on the HP, you were understandably, as is

24    typical, but you were constrained because you had to do

3:47PM 25    what you did within the HSI facility, correct?

3:47PM 1    A.    Correct.

2    Q.    The MacBook, on the other hand, HSI sent you a

3    forensic image of, correct?

4    A.    Yes.

3:47PM 5    Q.    Now, were you able to determine from that forensic

6    image the date that the MacBook laptop was last accessed?

7    A.    Yes, I was.

8    Q.    What was that date?

9    A.    I believe it was November 12th of 2019.

3:48PM 10   Q.    What, if any, significance did that have to you?

11   A.    It tells me that while the device was in custody of

12   law enforcement, it had been accessed.

13   Q.    Now, to be clear, does that necessarily mean that

14   anything nefarious happened?

3:48PM 15   A.    No.

16   Q.    What does it mean?

17   A.    It just means whoever collected that evidence didn't

18   properly preserve it.  That the computer had booted on and

19   connected to the system, which as soon as that happens,

3:48PM 20   the data will change.  And even if the user doesn't

21   actually do anything, hundreds of files could be affected.

22   Q.    How?  In other words, if the user doesn't --

23   literally just turns it on and doesn't do anything

24   nefarious or intentional, how does that affect the

3:48PM 25   integrity of the laptop?

3:48PM 1    A.   Because even if the user doesn't see it, as soon as

2    you turn on your computer, it's running a bunch of

3    commands on the back end.  It's doing all kinds of tasks

4    in order to load up your computer or load your user

3:49PM 5    account.  And that's reflected forensically, so even

6    though a user might not see all that activity, it's

7    happening on the back end.

8    Q.   Were you able to identify personal and professional

9    activity on this laptop throughout this five-year period

3:49PM 10   on a virtual everyday basis?

11   A.   Yes.

12   Q.   Now, based on your review, did the laptop have

13   something called "boot camp" on it?

14   A.   Yes, it did.

3:49PM 15   Q.   Tell the Jury if you would what "boot camp" is in the

16   context of a Mac.

17   A.   Boot camp is a native application that comes

18   preinstalled with Mac operating systems that allows users

19   to create a dual boot system.  It is basically a user

3:49PM 20   friendly wizard, so to speak.  You open the application

21   and it will run you through the steps on, here's how you

22   create a parallel system with your Mac operating system.

23   And they did that so that they could try to -- well, Mac

24   developed it so they could try to get Windows users, in my

3:50PM 25   opinion, because it allows people to create a Mac system

3:50PM 1    and then it allows them to create a Windows system, or

2    some secondary system that they can use in conjunction

3    with their Mac operating system.

4    Q.    When that happens, does that effectively function as

3:50PM 5    a partition would?

6    A.    Yeah, it's the same thing.  You could shut down your

7    Mac and boot into your Windows side and have an entirely

8    different computer.  In fact, I use that because I like to

9    have Mac-based forensic tools and Windows-based forensic

3:50PM10    tools, so it gives me the convenience of having

11    essentially two computers mobile with me at all times.

12    Q.    To install that, quote, unquote, "partition," do you

13    need to do anything with command lines or anything?

14    A.    No.  Because it's actually an application installed,

3:50PM15    it's like a wizard.  It gives you instructions on exactly

16    how to do it.

17    Q.    To be clear, based on your forensic examination, was

18    boot camp used on the Mac?

19    A.    No.

3:51PM20    Q.    Were you able to determine the portfolio, meaning

21    just data of images, videos, et cetera, on the actual

22    MacBook laptop?

23    A.    Yes, I was.

24    Q.    Could you please look at Defendant's Exhibit 61 and

3:51PM25    tell me if you recognize it?

3:51PM 1   A.   Yes, I do.

2   Q.   What is 61?

3   A.   This is a screenshot of the AXIOM software

4   application looking at the MacBook forensic image that I

3:51PM 5   was provided by the government.

6   Q.   Is it true and accurate?

7   A.   Yes, it is.

8         MR. GELFAND:  Your Honor, at this point, I move

9   Defendant's Exhibit 61 into evidence, please.

3:51PM10         MR. CLAYMAN:  No objection, Your Honor.

11         THE COURT:  Defendant's Exhibit 61 is received.

12         (Defendant's Exhibit 61 Received)

13         MR. GELFAND:  Thank you.  May I publish it?

14         THE COURT:  You may.

3:51PM15   Q.   (BY MR. GELFAND.)  Do you see Exhibit 61 in front of

16   you?

17   A.   Yes, I do.

18   Q.   Just generally speaking, can you just educate us as

19   to what tool you used to access this data related to the

3:52PM20   MacBook laptop?

21   A.   Yes.  It's AXIOM, which was developed by Magnet

22   Forensics.  It's one of the many publicly available

23   forensic tools out there.

24   Q.   Specifically, do you essentially apply that forensic

3:52PM25   tool to a subset of data from the image that you get from

3:52 PM 1    the government related to this laptop?

2    A.    Yeah.  Because I actually had the forensic image of

3    the MacBook, I was able to take this tool, load the full

4    bit-for-bit image of the Mac hard drive and tell this

3:52 PM 5    tool, find every possible forensic artifact that you think

6    would be relevant, including web data, media data, e-mail

7    content.  So anything you think could be relevant, give me

8    a summary and extract that.

9    Q.    So given the fact that this computer was provided to

3:52 PM 10   you, obviously without any alleged child pornography, were

11   you able to do more forensically in your laboratory than

12   you would be on site in a government building?

13   A.    Absolutely.

14   Q.    Let's look at this particular exhibit.  Are you able

3:53 PM 15   to determine from this exhibit a total number of images on

16   this particular device?

17   A.    Yes.

18   Q.    And what is the total number of images?

19   A.    There are 523,771.

3:53 PM 20   Q.    How many videos were on this MacBook?

21   A.    There are 6,767.

22   Q.    To be clear, none of those over half-million images

23   and videos are alleged child pornography, correct?

24   A.    Correct.

3:54 PM 25   Q.    Over a five-year period, correct?

3:54 PM 1   A.    Correct.

2   Q.    Were you also able to identify browser history in

3   connection with the MacBook?

4   A.    Yes, I was.

3:54 PM 5   Q.    Specifically, explain to the Jury what you mean by

6   browser history, if you would?

7   A.    Meaning looking for instances of URLs, whether that's

8   carved from unallocated space or in system files.   And

9   also parsing history files for installed web browsers.   So

3:54 PM 10  looking for Chrome data and Mozilla Firefox data and

11  Safari data and pulling the information from those

12  applications to get a better picture of the user's

13  internet usage.

14  Q.    Was there any search history related to installation

3:55 PM 15  of a Linux partition?

16  A.    No, there was not.

17  Q.    Was there any search history related to installation

18  of the apps that you've testified about on a Linux

19  partition?

3:55 PM 20  A.    No, there was not.

21  Q.    Was there any search history related to command lines

22  like you showed the Jury in your demonstrative?

23  A.    No, there was not.

24  Q.    Was there search history related to the green light

3:55 PM 25  on the MacBook?

3:55PM 1   A.   Yes.   There was a Google search trying to figure out
2   how to turn off the green light on the MacBook.
3   Q.   Was that in 2019?
4   A.   Yes.
3:55PM 5   Q.   Were you able to identify -- you've previously
6   testified extensively about Transmission.  Was qBittorrent
7   installed on the MacBook?
8   A.   Yes, it was.
9   Q.   Was it installed in January of 2017?
3:55PM 10   A.   That sounds correct.
11   Q.   What, if anything, was it used for?
12   A.   To download a commercial movie, non-pornographic.
13   Q.   Planes, Fire & Rescue?
14   A.   Yes.
3:56PM 15   Q.   Was the TOR browser installed on the MacBook, the
16   laptop?
17   A.   Yes, it was.
18   Q.   When?
19   A.   I believe it was in 2017.
3:56PM 20   Q.   Was it in December of 2017?
21   A.   That sounds correct.
22   Q.   Were you able to see computer forensic artifacts
23   establishing that the TOR browser was actually installed
24   on this device?
3:56PM 25   A.   Yes.

3:56PM 1    Q.   Fair to say that the TOR browser on the MacBook was

2    not used to access child pornography?

3    A.   Yes.

4    Q.   Tell the Jury how you know that.

3:56PM 5    A.   The same reason we were able to find artifacts on the

6    Linux partition.  Anytime you use an application, even

7    with heightened security features like TOR, there is going

8    to be forensic remnants that get left behind if it's used

9    to access data.  So when we are looking at the totality of

3:57PM 10   all the Mac activity, we are looking for anything that

11   might lead us back to the TOR browser.  Well, lead us back

12   to anything that would suggest child pornography, but

13   specifically with the TOR browser, I did not find any

14   artifacts that would suggest it had been used to download

3:57PM 15   that type of material or access it.

16   Q.   And are you confident that if the government believed

17   it was there, they would have not sent it to you in your

18   lab?

19   A.   Yes.

3:57PM 20   Q.   Over the course of your analysis, did you conduct an

21   analysis of an iPhone that was seized in connection with

22   this case from Josh Duggar?

23   A.   Yes, I did.

24   Q.   Were you able to determine from a computer forensic

3:57PM 25   standpoint whose device that was, the phone?

3:57 PM 1    A.    It was consistent with Mr. Duggar.

2    Q.    How do you know?

3    A.    Because looking through the phone, you get an Apple

4    ID.  The Apple ID went back to Josh.  You have text

3:57 PM 5    messages that identify the person that's using the phone.

6    You have personal photos, internet activity.  So just the

7    totality of the indicia led me to Mr. Duggar.

8    Q.    Were you able to take that iPhone and extract certain

9    data related to images and videos?

3:58 PM 10    A.    Yes, I was.

11    Q.    I'm going to show you, please, if you can look in the

12    binder Defendant's Exhibit 62.  Tell me if you recognize

13    it, please.

14    A.    Yes, I do.

3:58 PM 15    Q.    What is Exhibit 62?

16    A.    This is a screenshot of the forensic image I was

17    provided of the iPhone in the Cellebrite forensic tool.

18    Q.    Is it true and accurate?

19    A.    Yes, it is.

3:58 PM 20            MR. GELFAND:  Your Honor, I move Defendant's

21    Exhibit 62 into evidence, please.

22            MR. CLAYMAN:  No objection.

23            THE COURT:  Defendant's Exhibit 62 is received.

24            (Defendant's Exhibit 62 Received)

3:58 PM 25            MR. GELFAND:  May I publish it?

3:58PM 1          THE COURT:  You may.

2    Q.   (BY MR. GELFAND.)  To be clear, like the MacBook, was

3    the phone forensic image also sent to you at your lab as

4    opposed to only made available at HSI?

3:58PM 5    A.   Yes, it was.

6    Q.   What tool did you use to extract, or whatever the

7    word would be, Exhibit 62?

8    A.   Analyze.  I pulled it into the Cellebrite physical

9    analyzer tool.

3:59PM 10   Q.   What does that mean, in English?

11   A.   It's another forensic software application that's

12   specific to mobile forensics, so it's the leading industry

13   tool for analyzing mobile devices and tablets.

14   Q.   Direct your attention -- now that I figured out the

3:59PM 15   auto focus button -- can you see in front of you anything

16   that indicates the amount of images on this particular

17   device?

18   A.   Yes.  It looks like there were over 290,000 images.

19   Q.   290,663?

4:00PM 20   A.   Yes.  Thank you.

21   Q.   And how many videos are there?

22   A.   18,647.

23   Q.   To be clear, none of those were alleged child

24   pornography, correct?

4:00PM 25   A.   Correct.

4:00PM 1   Q.   Is it fair to say that between the phone and the

2   MacBook, the personal devices, there's over a million

3   images and videos and not a single forensic trace of child

4   pornography?

4:00PM 5   A.   Yes.

6   Q.   Over a five-year period?

7   A.   Yes.

8   Q.   To be clear, when you refer to images and videos

9   using these forensic tools, are you just referring to the

4:00PM10   kinds of images and videos that a user might take, so if I

11   use my phone to actually take a picture of my family or

12   video something, or does it capture anything else?

13   A.   This is every image or video that our forensic tool

14   was able to extract from the image.  So that would include

4:00PM15   user data, a picture that you take with your phone, or a

16   picture you download from the internet.  But it's also

17   going to include data that's cached by the system or

18   software.  So, for instance, images or videos that are

19   displayed in a web browser that get automatically

4:01PM20   downloaded to the computer.  Images and videos accessed

21   through applications installed on the phone, like social

22   media, or, again, internet browsers.  So those images

23   represent a ton of system data, software data, and the

24   user data collectively.

4:01PM25   Q.   Do the images and videos on a phone in particular

4:01PM 1   also include images and videos that are sent from someone

2   to another?  I just asked a terrible question.  If

3   somebody texts me a picture, "Hey, Justin, here's my

4   family," does that image appear on this forensic tool?

4:01PM 5   A.   Yes, it will get automatically created to your phone

6   within a specific directory that would be identified as

7   like an SMS attachment.  And it can also, if a user sends

8   you a text, you could certainly save it to your camera

9   roll or to your phone's files app.

4:02PM 10   Q.   How about if I download a picture or a video from the

11   internet?

12   A.   Yes.

13   Q.   Did the iPhone, based on your review, have something

14   called the Torsec application?

4:02PM 15   A.   Yes, it did.

16   Q.   What is the Torsec application?

17   A.   It's the IOS version of the desktop TOR browser

18   application.  It works identically.

19   Q.   For all intents and purposes, is it basically the TOR

4:02PM 20   browser on the iPhone?

21   A.   Yes.

22   Q.   Based on your investigation, just generally speaking,

23   was it used?

24   A.   Yes.

4:02PM 25   Q.   For what purpose?

4:02PM 1    A.    Adult pornography.

       2    Q.    From major commercial websites?

       3    A.    Yes, that are still active today.

       4    Q.    Now, are you familiar with something called

4:02PM 5    Torrential Downpour?

       6    A.    Yes, I am.

       7    Q.    What is Torrential Downpour?

       8    A.    Torrential Downpour is the law enforcement version of

       9    BitTorrent software -- well, one of them -- where law

4:03PM10    enforcement took the idea of publicly available BitTorrent

      11    versions, and most of those are open source so they could

      12    actually change the source code to fit law enforcement's

      13    purposes.  So, for instance, it will only, or it's

      14    supposed to only download suspected child pornography.  It

4:03PM15    won't re-upload that material back to the BitTorrent

      16    network.  It logs all of the activity.  And, trying to

      17    think.  There's another change, but it's fit for law

      18    enforcement's investigation specifically, and it's a law

      19    enforcement only tool.

4:03PM20    Q.    When you say law enforcement only tool, other than in

      21    rare instances, is it available to forensic experts like

      22    you who are not employed by law enforcement?

      23    A.    No, it is not.

      24    Q.    Have you still, nonetheless, had an opportunity to

4:03PM25    review Torrential Downpour in prior versions?

4:04PM 1    A.    Yes.  In my work involving hundreds of these

     2    BitTorrent cases, I've had the opportunity to test two

     3    specific versions of Torrential Downpour, limited testing.

     4    Q.    Did you review auto-generated logs in connection with

4:04PM 5    this case?

     6    A.    Yes, I did.

     7    Q.    Do you know how to review those logs?

     8    A.    Yes, I do.

     9         MR. GELFAND:  Your Honor, at this time, I would

4:04PM10    ask that the Court accept into evidence, by stipulation,

    11    and read the stipulation related to Defendant's Exhibits

    12    8(a) and 9(a).  This was the remainder of those exhibits,

    13    the Court may recall.

    14         THE COURT:  Members of the Jury, you will recall

4:04PM15    that previously, the Court has received what was marked

    16    and described as Defendant's Exhibit 8 and Defendant's

    17    Exhibit 9.  You might recall that when the foundation was

    18    being laid to receive those, the witness on the stand

    19    didn't recognize some of the initial pages so those pages

4:05PM20    were taken off.  And we marked and added specific page

    21    numbers to Defendant's Exhibit 8 and Defendant's Exhibit

    22    9.

    23         The Court has now been tendered those prefatory

    24    pages as Defendant's Exhibit 8(a) and Defendant's

4:05PM25    Exhibit 9(a) and the parties have agreed that these

4:05PM 1    additional pages be introduced.  And here specifically is

2    their agreement:

3           "The United States, by and through its counsel,

4    and Defendant, Joshua James Duggar, by and through his

4:06PM 5    counsel, hereby stipulate and agree that the following

6    fact is true and must be accepted as true as if otherwise

7    proven."

8           "Torrential Downpour, the software used by law

9    enforcement in this case, automatically creates logs

4:06PM 10   documenting its activity.  Included in these automatically

11   generated logs are, quote, 'Torrential Downpour data

12   written information,' close quote.  Defense Exhibits 8(a)

13   and 9(a) were provided by the government to the defense in

14   this case and are true and authentic records consisting of

4:07PM 15   Torrential Downpour data written information associated

16   with the May 14, 2019, and May 15, 2019, downloads by

17   Detective Amber Kalmer."  That's been signed by counsel.

18          MR. GELFAND:  Thank you, Your Honor.  If I may

19   publish.

4:07PM 20          THE COURT:  The Court will receive Defendant's

21   Exhibits 8(a) and 9(a) by stipulation, and you may

22   publish.

23          MR. GELFAND:  Thank you, Your Honor.

24          (Defendant's Exhibits 8(a) and 9(a) Received)

4:07PM 25   Q.   (BY MR. GELFAND.)  Ms. Bush, I'm going to show you

4:07PM 1   first, just generally, Torrential Downpour logs consisting

2   of Defendant's Exhibit 8 and Defendant's Exhibit 8(a).

3   Are these associated with May 14th activity, 2019, that

4   you reviewed in this case?

4:08PM 5   A.   Yes.

6   Q.   I want to direct your attention specifically to the

7   top of Exhibit 8.  Does this reference an auto-generated

8   log created by Torrential Downpour version 1.44?

9   A.   Yes, it does.

4:08PM 10   Q.   Can you tell us what this is showing us as you

11   understand the logs to be?

12   A.   Torrential Downpour documents the communication

13   that's being exchanged between its software and the

14   suspect device.  So when you're connecting to a computer

4:08PM 15   through a network, what's essentially happening is it's

16   just a conversation.  So this log is detailing that

17   conversation and the connection that occurred between law

18   enforcement software, Torrential Downpour 1.44, and the

19   device located at the IP address and port identified here.

4:09PM 20   Q.   Now, to be clear, do Torrential Downpour logs

21   identify a specific device or just an IP address?

22   A.   Just an IP address and port.

23   Q.   When you say IP address and port, as you previously

24   testified, does that refer back to a router as opposed to

4:09PM 25   any specific device?

4:09PM 1    A.    Yes.   It's an internet access point, so most commonly
       2    a router.
       3    Q.    Now, if we look at Exhibit 9, just take this one step
       4    at a time.   Does 9 refer to May 15th using the same
4:09PM 5    Torrential Downpour version, that is, May 15th of 2019?
       6    A.    Yes.
       7    Q.    Walk us through, if you would -- first of all, what's
       8    the difference between 9 and 9(a)?   And I'll show you
       9    9(a).   Just for our bearings, what's 9(a)?
4:10PM 10   A.    9(a), my understanding is the data written, which is
      11    an XML file that is automatically generated by Torrential
      12    Downpour, along with the other file that we found or the
      13    other file you showed me.   Because when Torrential
      14    Downpour makes a connection, it actually generates a set
4:10PM 15   of logs.   There's like five or six different files that
      16    are created.   This is one of them, along with the details
      17    or summary dot text file.
      18    Q.    Explain to us if you would as we walk through
      19    Exhibit 9 what's happening here in terms of date and time.
4:11PM 20   A.    So on May 15th at 2019, Torrential Downpour
      21    identifies this IP address and port as somehow advertising
      22    the Torrent info hash, which is detailed.   And it's going
      23    to attempt to connect to that device at that IP address
      24    and port to try to download the contents of that Torrent.
4:11PM 25   And so here you see the first time that it tries to

4:11PM 1    attempt to connect to remote client at that IP address,
       2    and it fails.  And then it continues to do this every
       3    seven minutes, it looks like.  Well, a set duration, which
       4    it actually changes.
4:11PM 5    Q.   Does it continue to fail to connect until
       6    approximately 40 minutes later?
       7    A.   Yes.  At 6:45 p.m., it's able to complete a
       8    handshake, which just means the software says "Hi," and
       9    the remote client says "Hi" back, and they establish a
4:12PM 10   conversation.
       11   Q.   Then what happens?
       12   A.   When they communicate with each other, each software
       13   application kind of has to give each other information
       14   about who they are, and this is detailing that.  So this
4:12PM 15   extended handshake right here is just giving us more
       16   information about the remote client, the fact that they
       17   are using this specific version of uTorrent.  So it's just
       18   providing us additional information about the device it's
       19   connecting to.
4:12PM 20   Q.   As we go to the next page, can you walk us through
       21   what's happening?
       22   A.   The first line indicates that the remote client, so
       23   whatever device at that IP address, actually sent a
       24   message to Torrential Downpour saying, I have a portion of
4:13PM 25   this, but only 11 of 66 pieces.  So what we kind of talked

4:13PM 1    about before, when files are transferred on this network,

2    it's done so in little pieces.  So rather than getting one

3    full file from one person, it's actually divided into a

4    bunch of little pieces.  Torrential Downpour will only

4:13PM 5    download -- well, it's designed to only download from one

6    person, so it's going to try to get all 66 pieces from

7    this one user.  And this message specifically says the

8    user only has 11 of 66.  Regardless, it's going to

9    continue to try to download those pieces.  So it creates

4:13PM10    this uninitialized file, which is just a container.  It

11    says, I recognize from this Torrent that it's going to

12    create a zip file if I'm able to get all 66 pieces, so it

13    will create a blank file that it will slowly write the

14    data to.  And then here you can see it starts to slowly --

4:13PM15    well, not slowly, but over time, within milliseconds,

16    downloading the different pieces that are available.

17    Q.    Then do we start to see attempts and failures to

18    connect beginning approximately two minutes later?

19    A.    Yes.  What happened is, after it received those

4:14PM20    pieces, the remote client actually said it has no more

21    pieces so there was nothing more to do, so it goes to

22    sleep.  And then it's going to sleep for a set amount of

23    time and it will continue to try to track that computer to

24    download that file.

4:14PM25    Q.    So what date and time are we at now?

4:14PM 1   A.   We are -- May 15th at 6:47 when it says, failed to

2   connect.  And down here, you are now at 7:21 p.m.

3   Q.   Does it continue to attempt to connect repeatedly

4   throughout the night?

4:15PM 5   A.   Yes, it does.

6   Q.   Do we see a series of going to sleep, attempting to

7   connect, failing to connect?

8   A.   Yes.

9   Q.   Over and over and over?

4:15PM 10   A.   Yes.

11   Q.   Does this continue throughout the night over and

12   over?

13   A.   Yes, it does.

14   Q.   Does it continue into the next day?  Now, we're just

4:15PM 15   past midnight.

16   A.   Yes, it does.

17   Q.   Does it continue throughout the morning, 1:00 a.m.,

18   2:00 a.m., 3:00 a.m.?

19   A.   Yes.

4:15PM 20   Q.   Virtually every seven minutes, or six minutes is it,

21   maybe?

22   A.   Yes.

23   Q.   Does it continue all the way throughout the night to

24   attempt to connect and reconnect?

4:16PM 25   A.   Yes.

4:16PM 1   Q.   Does it continue until the very next day to attempt

2   to connect and reconnect?

3   A.   Yes.

4   Q.   What time does it finally either give up or succeed,

4:16PM 5   and what happens?

6   A.   It finally gives up.  It's unable to get the

7   contents, and that is at the next day at 11:35 a.m.

8   Q.   These are auto-generated logs, correct?

9   A.   Yes.  It's transcribed by the program while it's

4:16PM10   happening automatically.

11   Q.   To be clear, because it's propriety software, you

12   don't know one way or the other whether it's accurate or

13   not, but you were kind of explaining what they say,

14   correct?

4:17PM15   A.   Yes.  Based on my limited understanding -- well,

16   based on my access or testing, limited testing of that

17   program, that's my understanding of those logs.

18   Q.   Is it fair to say that on May 15th -- first of all,

19   on May 14th, a file is identified and successfully

4:17PM20   downloaded?

21   A.   Yes.

22   Q.   Then is it fair to say that on May 15th, 13 of 66

23   pieces are downloaded.  And for the next 17 hours, it

24   attempts to connect to the work IP address 160 additional

4:17PM25   times?

4:17PM 1   A.   Yes, that sounds correct.

2   Q.   Can these Torrential Downpour logs in any way, shape,

3   or form tell us whether any person was physically behind a

4   device or a computer on May 14th or May 15th?

4:17PM 5   A.   No.  In fact, all the communication that it's

6   documenting is software to software.  This isn't something

7   that a user is doing or a user is communicating.  It's

8   just logging software information.

9   Q.   Can anything on these Torrential Downpour logs tell

4:18PM 10   us one way or the other whether someone is physically, if

11   at all, accessing a device or if a device is accessed,

12   accessing it remotely?

13   A.   No.

14   Q.   Do these basically just tell us that there was an IP

4:18PM 15   address and some sort of software-to-software connection?

16   A.   In the second log, attempted connection, but, yes.

17   Q.   You testified about the possibility of remote access.

18   I want to talk about dual boot systems for a second.  Can

19   somebody boot from one side of a partition, so to speak,

4:18PM 20   to another remotely?

21   A.   Yes.

22   Q.   Explain to the Jury what it is you mean and how that

23   happens.

24   A.   With system management, that's actually a really

4:19PM 25   important feature because if you want to configure a bunch

4:19PM 1    of devices, sometimes you have to do it while they are

2    powered off.  And there is a setting within the BIOS, the

3    Basic Input/Output System, which is the physical hardware

4    on a computer.  You can set a setting called wake-on-LAN,

4:19PM 5    which essentially allows the computer, even in a

6    powered-off state, to receive network packets.  And you

7    can send what's called a magic packet which will wake the

8    computer and then you can boot it on remotely.  And in

9    that boot process, now that you're in the BIOS, you can

4:19PM 10   set the boot sequence and select which partition you want

11   to go into.

12   Q.   You referred to the BIOS.  Where is the BIOS actually

13   located?

14   A.   It's actually hardware on the actual computer.  So

4:19PM 15   it's not something that can be extracted from the hard

16   drive.  It's something that has to be accessed using the

17   physical hardware.

18   Q.   I want to show you -- Ms. Bush, this is Government's

19   Exhibit 26, the actual HP computer.

4:20PM 20   A.   Yes.

21   Q.   First of all, have you ever personally evaluated the

22   physical device versus the image made available to you at

23   HSI?

24   A.   No, I wasn't provided access to the physical original

4:20PM 25   evidence.

4:20PM 1    Q.   To access the BIOS, what would you have to do to
       2    physically find that out on the device itself?
       3    A.   I would need to power on the device, so connect it to
       4    power, probably put in the keyboard and access it that
4:20PM 5    way.  Because at this point, it's not connected to a
       6    network or anything, so if I wanted to get into it -- and
       7    this is something that we do in a lot of our evidence
       8    collection.  Anytime we get a computer that we acquire,
       9    whereas in this case, I was provided forensic images, I
4:21PM 10   will remove the hard drive, connect the computer to power,
      11    and boot it on and go into the BIOS to document the BIOS
      12    version, the settings, the boot sequence, because that can
      13    provide a lot of information about how that system was
      14    running.
4:21PM 15   Q.   So based on your training and your experience, do you
      16    agree or disagree with Mr. Fottrell's conclusion that
      17    somebody had to physically press a button to boot on to
      18    Linux from this device?
      19    A.   I disagree.
4:21PM 20   Q.   Explain to the Jury, just kind of summing up, why it
      21    is you disagree with that conclusion.
      22    A.   There are probably a couple of ways to do it, maybe
      23    ways that I'm not familiar with, but I do know that that
      24    wake-on-LAN setting specifically is a remote access for
4:21PM 25   the BIOS.  It is allowing a device in a powered-off state

4:21PM 1   to receive network traffic so that you can boot it on.  We
       2   use it.  My office uses it.  It's often used with system
       3   management, so it's definitely possible.
       4   Q.    Have you ever personally remotely logged on or booted
4:22PM 5   up, so to speak, a dual boot system remotely?
       6   A.    I don't know that I've actually done a dual boot, but
       7   I know I have remotely booted a computer.  Whether it has
       8   multiple partitions or not, at that point, once I am able
       9   to boot it on, I could select the partition that I want to
4:22PM10   boot into.
      11   Q.    In other words, you can do the same thing remotely
      12   that you could sitting at the computer, correct?
      13   A.    Yes.
      14   Q.    So it's not that you literally have to push a button.
4:22PM15   It's that you have to essentially push the button, so to
      16   speak, but you can do that remotely?
      17   A.    Yeah.  And pushing a button is one way.  There are
      18   other ways.
      19   Q.    Now, are you familiar with EXIF data?
4:22PM20   A.    Yes, I am.
      21   Q.    Did you hear some testimony about EXIF data with
      22   respect to photographs and perhaps text messages, things
      23   like that?
      24   A.    Yes, I did.
4:23PM25   Q.    What is EXIF data?

4:23PM 1    A.    It's embedded information that is created by a camera

2    or a software application within a media file to give --

3    to document more information about how that media file was

4    captured.  So whether that's resolution, the make and

4:23PM 5    model of the camera, the dates and times, geolocation

6    data.  There's a lot of information that's included within

7    that EXIF data that's all embedded in the photo or video

8    itself.

9    Q.    Some people use the phrase metadata.  Is EXIF data a

4:23PM10    form of metadata?

11    A.    Yeah, I think it can be.

12    Q.    Let's start simple for a second.  If I take a picture

13    of a picture and send it to you, do you have any way of

14    accessing the metadata of the underlying picture, meaning

4:24PM15    the picture in the picture?

16    A.    No, I can't think of a way I would be able to do

17    that.

18    Q.    But you would be able to -- with the native picture

19    if I sent it to you, you would be able to access the

4:24PM20    metadata through forensic tools, correct?

21    A.    Yes.  If the EXIF data remains intact, then, yes, I

22    can.

23    Q.    Now, were you in court and able to see, at least on

24    the screen, the government's exhibits reflecting dates and

4:24PM25    times and purported geolocation?

4:24PM 1    A.    Yes, I was.

2    Q.    I want to show you, just by way of example, one of

3    those documents.  I'm going to show you Government's

4    Exhibit 76, the top page.  Can you see that?

4:25PM 5    A.    Yes, I do.

6    Q.    This was the fire truck photo on May 15th at

7    3:20 p.m.  Do you see that?

8    A.    Yes.

9    Q.    Do you recognize the software that appears to be

4:25PM 10   depicted in this photo?

11   A.    Yes, I do.

12   Q.    What is that software?

13   A.    It's the default Windows photos application that

14   comes installed with Windows 10.

4:25PM 15   Q.    Then was your observation consistent with what

16   Mr. Fottrell explained it was, meaning the software that

17   was used?

18   A.    Yes.

19   Q.    Is that forensic software?

4:25PM 20   A.    No, it's not.

21   Q.    What does that mean?  What is the significance of

22   this not being forensic software?

23   A.    Forensic software is accounting for all the possible

24   data that's available to a user.  It's looking at binary

4:26PM 25   information.  So whereas this tool is showing a user

4:26PM 1   information it might think is important, forensic software

2   is actually looking at every byte that encompasses that

3   file that forensic examiners and experts can use to

4   identify more information or extract more information

4:26PM 5   beyond what is shown here and also verify it.

6   Q.   Now, this document purports to reflect that this was

7   taken on May 15th, 2019, at 3:20 p.m. at some location

8   reflected on this, quote, unquote "map."  Do you see that?

9   A.   Yes.

4:26PM 10   Q.   Do you have an opinion as to whether the EXIF data on

11   the documents that Mr. Fottrell testified using this same

12   Windows image viewer is reliable or unreliable?

13   A.   In this form, it's unreliable, and I would be unable

14   to make any --

4:27PM 15              MR. CLAYMAN:  Your Honor, I would object at this

16   point.  The same notice objections we raised previously.

17              MR. GELFAND:  Your Honor, may we approach?

18              THE COURT:  Yes.

19              (Bench Conference)

4:27PM 20              MR. CLAYMAN:  Your Honor, we previously asked

21   specifically what about metadata Ms. Bush would be

22   testifying about, and we got no response.  We have not

23   received any notice about what her reliability opinion is

24   based on, and that's part of what is required here under

4:27PM 25   Rule 16.  We simply don't know.  And we inquired, what

4:27PM 1    about metadata is she going to comment on?  What is she

2    opining on?  And we got no response.

3          THE COURT:  Just a second.  Did your expert

4    report for Mr. Fottrell identify that he would be opining

4:28PM 5    about metadata from pictures as was eventually several of

6    them introduced?

7          MR. CLAYMAN:  We need to go back and look at the

8    notice.  I believe we said he was going to be opining on

9    location information from the devices.

4:28PM 10         THE COURT:  Okay.  Mr. Gelfand?

11         MR. GELFAND:  No, it didn't.  But as a practical

12   matter, as the Court may recall, we were up at side bar.

13   I actually objected to the admission of these exhibits on

14   the grounds that we didn't get expert notice, and as I

4:28PM 15   recall the Court's ruling --

16         THE COURT:  Well, I thought you objected based on

17   unreliability and you showed me a case from the East Coast

18   or something like that, but it may have been for notice as

19   well.  I don't recall.

4:28PM 20         MR. GELFAND:  It was for both, Your Honor.  But

21   as a practical matter, we didn't get notice on geolocation

22   other than the government argued we essentially got it by

23   getting these documents a week before trial.  As a

24   practical matter, she's responding to the government's

4:29PM 25   exhibits.  And to be blunt, all I anticipate she's going

4:29PM 1    to say is that using this tool is unreliable.  It could be

2    accurate, it could not be accurate, but there are other

3    forensic tools.  We did also respond and she is going to

4    provide her own EXIF data for a defense exhibit that we

4:29PM 5    provided you that's an unrelated picture.  And we included

6    this in our expert notice.

7        THE COURT:  What is the relevance of her opinion

8    that it could be accurate, might not be accurate?  I mean,

9    are you disagreeing to the mapping information that is on

4:29PM 10   the photos?  In other words, photos that have a picture of

11   the tollbooth in them that geolocate to where the

12   tollbooth exists along Highway 412.  I mean, it's

13   interesting philosophically to have a debate about the

14   extent to which they are reliable and how close they are

4:30PM 15   and the different conditions and where is the nearest set

16   of cell phone towers.  I mean, we could have all of this

17   discussion, but at the end of the road, is there a dispute

18   over the location itself?  And if not, how is this even

19   relevant?

4:30PM 20       MR. GELFAND:  There's a dispute over the

21   reliability of the evidence that the government is basing

22   this case on.

23       THE COURT:  Is there a dispute over the

24   reliability of this evidence?

4:30PM 25       MR. GELFAND:  Of the precision of it, yes.  As

4:30PM 1   far as there's certain photos, Your Honor, that no

2   question were taken at Wholesale Motorcars and we're not

3   focusing as much on geolocation here.

4          THE COURT:  On the fire truck, was it in a

4:30PM 5   different state or something or what's the point?

6          MR. GELFAND:  No, but it wasn't at Wholesale

7   Motorcars.

8          THE COURT:  It wasn't represented to be at

9   Wholesale Motorcars.

4:30PM10          MR. GELFAND:  I understand, but there's no

11   evidence as to where it was.

12          THE COURT:  Yes, there is.  There is evidence

13   that it was two or three miles to the east.

14          MR. GELFAND:  Your Honor, I think that --

4:31PM15          THE COURT:  I mean, that's fine if you want to

16   cross-examine over, there's a debate about whether it was

17   half a mile or a debate about whether it was 10 miles.

18   But I just don't see the relevance and I question the

19   bases of her opinion unless you actually dispute that the

4:31PM20   geolocation information is wrong.

21          MR. GELFAND:  She's going to testify, if the

22   Court lets her, that the evidence that the government is

23   basing this EXIF data on is not based on any recognized

24   tool within computer forensics.

4:31PM25          THE COURT:  How is that relevant, unless you're

4:32 PM 1    disputing it?  I mean, if it's reliable here, what is the

2    relevance to you saying it's unreliable in other cases?

3            MR. GELFAND:  Because saying that it's reliable

4    with respect to an image or five images doesn't make it

4:32 PM 5    necessarily reliable for all the images the government

6    wants to base it on.

7            THE COURT:  Why is that not going to confuse the

8    Jury and why shouldn't the Court sustain a 403 objection?

9            MR. GELFAND:  Because I think that we have a

4:32 PM 10   right to --

11           THE COURT:  Confuse the Jury?

12           MR. GELFAND:  No, Your Honor.  No, Your Honor.  I

13   think her testimony is offering -- they offered expert

14   testimony on reliability, among other things, of this

4:32 PM 15   metadata.  I think we are entitled to offer expert

16   testimony on the lack of reliability of this metadata.

17           THE COURT:  What about the geolocation data on

18   the fire truck picture do you contend is not accurate?

19           MR. GELFAND:  It's the dates and times of where

4:33 PM 20   they are pulled from.  It's what she already testified to

21   by way of foundation that her forensic tools, which she

22   actually uses forensic tools, pulls from a variety of

23   different factors not based on what is locally pulled from

24   Windows image for her.

4:33 PM 25           THE COURT:  Well, she's also testified that one

4:33PM 1   of the tools that she uses is Google search, so I don't

2   understand that point.

3        MR. GELFAND:  EXIF data is complicated.  It's

4   metadata.  There are tools in the profession that are

4:33PM 5   known as reliable, and recognized and used as reliable.

6   She, for example, is going to authenticate a photo that

7   was provided in discovery -- and the government is well

8   aware of it -- to establish the EXIF data using her

9   forensic tool as to that photo.  And as a practical

4:34PM 10  matter, I think that she should be entitled to offer an

11  opinion on whether this exhibit metadata is reliable or

12  not reliable.

13       MR. CLAYMAN:  Your Honor, if she has conducted

14  her own analysis and has determined that there is some

4:34PM 15  unreliability of one picture, I'm sure she can testify to

16  that.  But she's just generally throwing out that she

17  doesn't think this is reliable without any specific belief

18  that any of the images are unrelable.  And as we have

19  shown through the texts and the actual content of the

4:34PM 20  images, there's very good reason to believe that

21  information is reliable.  I think Your Honor flagged this,

22  it's just going to confuse the Jury.

23       THE COURT:  Well, I think some of the opinion

24  testimony -- well, let me put it this way.  It's one thing

4:35PM 25  for an expert to opine that, with regard to a given issue,

4:35PM 1   there's a certain universe of possibilities that can cause

2   "X" to result in "Y."  But when she has an opinion, an

3   expert opinion, as to which of those possibilities

4   something is, she has to state that to a probability, more

4:35PM 5   likely than not.  She can't opine that her opinion as to

6   what happened or what something is, is a mere possibility.

7   And as pertinent here, she can't either opine that the

8   geolocation data here is wrong because sometimes it is

9   wrong in some cases on some images.  And I think that

4:36PM10   allowing her to do that when you're not even contending

11   that there's anything incorrect about the geolocation data

12   is misleading to the Jury.  Grossly misleading.

13       If your point is that the government's expert has

14   used tools that she doesn't recognize as being

4:36PM15   scientifically forensic, then she can make that opinion.

16   I think she already has.  I think she has already

17   testified that she doesn't consider EXIF data as it

18   relates to images as not being evidence of good expert

19   forensic analysis.  Fine.  But unless you are going to

4:37PM20   contend that the geolocation data on these images or this

21   fire truck picture, the one we are on now, is wrong, I'm

22   not going to let you confuse or mislead the Jury based on

23   her speculation about whether it's correct or not

24   sometimes in some other case.

4:37PM25       MR. GELFAND:  I'll move on, Your Honor.  As far

4:37PM 1    as the -- just so the Court knows where we are going.

2    This may sound similar.  It's not.  We're going to show

3    her a defense exhibit, which is a photo that she extracted

4    metadata from using her computer forensic tools.

4:38PM 5            THE COURT:  A defense exhibit that's a photo?

6            MR. GELFAND:  Correct.  It's a photo.  It's

7    actually a photo that's in evidence and it's embedded

8    within a text message that the government introduced.  And

9    all she's going to do is authenticate that metadata from

4:38PM10   it using her forensic tools.

11           THE COURT:  If it's already in evidence, which

12   photo is it?

13           MR. GELFAND:  It's a photo embedded within --

14   it's a photo in a text message on May 16th of 2019.

4:38PM15           THE COURT:  What's the photo of?

16           MR. GELFAND:  It's of a truck being repaired,

17   Randall Berry's truck being repaired.

18           MS. MARSHALL:  Not in evidence, Your Honor.

19           MR. GELFAND:  Yes, it is in evidence.  It's in

4:38PM20   the May 16 iPhone text messages.

21           MR. ROBERTS:  We submitted the text messages.

22   Not the --

23           MR. GELFAND:  No, that's why -- the photo is in

24   evidence.

4:39PM25           THE COURT:  We can run that part of it down, but

4:39PM 1    what I'm interested in, you're saying that there is a

2    digital image associated with that picture that she's able

3    to look behind, extract metadata, and run that metadata

4    through some forensic software that she has and offer an

4:39PM 5    opinion about --

6             MR. GELFAND:  Date and time.

7             THE COURT:  -- the date and time that it was

8    taken?

9             MR. GELFAND:  Yes.  The exhibit reflects the

4:39PM 10   metadata using her forensic tool.

11            THE COURT:  Okay.  Is this photo in evidence?

12   Can ya'll figure that part out?

13            MR. GELFAND:  Yes.  The government exhibit is the

14   May 16th text message.

4:40PM 15            THE COURT:  What's the number?  That would help

16   us.

17            MR. GELFAND:  Our exhibit is 57.  I'm sorry.  51.

18            MR. ROBERTS:  I don't think we have introduced

19   it.

4:40PM 20            MR. GELFAND:  It's in your direct.  Mr. Fottrell

21   testified about the dates.

22            THE COURT:  We need the government exhibit number

23   that I can compare it.

24            MR. GELFAND:  79.

4:41PM 25            THE COURT:  Government's 79?

4:41PM 1          MR. GELFAND:  Yeah.

2          THE COURT:  Sheri, is Government's 79 in

3  evidence?

4          MS. CRAIG:  Yes.

4:41PM 5          MR. ROBERTS:  Second to the last page, Your

6  Honor.

7          THE COURT:  Mr. Gelfand is correct.

8          MR. ROBERTS:  It is within the text stream, Your

9  Honor.  The image, we did not introduce.

4:41PM 10          THE COURT:  Well, yes, you did.  It's in your

11  text stream.

12          MR. ROBERTS:  Didn't mean it quite like that.

13          THE COURT:  Okay.

14          MR. GELFAND:  The irony of this whole thing is,

4:41PM 15  all she's going to testify about, all that we want her to

16  testify to is that the metadata is consistent with what is

17  on here.  I don't understand why we are fighting over

18  this.

19          THE COURT:  Well, I don't either.  I thought you

4:42PM 20  were going to point out that it was wrong.

21          MR. GELFAND:  No.

22          MR. CLAYMAN:  I just think we should be careful

23  in terms of how she describes the tools she uses to try to

24  imply, like Your Honor was flagging earlier, that there is

4:42PM 25  something unreliable about ours without any sort of proof

4:42PM 1    that there is anything to confirm --

2                    THE COURT:  Well, if you hear something

3    objectionable, you can object.

4                    MR. CLAYMAN:  Thank you, Your Honor.

4:42PM 5            (Bench Conference Concluded)

6                    THE COURT:  You may inquire.

7                    MR. GELFAND:  Thank you.

8    Q.   (BY MR. GELFAND.)  You testified to EXIF data.  Did

9    you also pull EXIF data or metadata in connection with an

4:42PM10   image in this case?

11   A.   Yes, I did.

12   Q.   Could I direct your attention to Defendant's Exhibit

13   51, please?

14   A.   Okay.

4:43PM15   Q.   Do you recognize Defendant's Exhibit 51?

16   A.   Yes, I do.

17   Q.   Could you tell us just generally, just by way of

18   category, what Defendant's Exhibit 51 is?

19   A.   This is metadata extracted using EnCase from an image

4:43PM20   from the MacBook Pro.

21   Q.   Is it true and accurate?

22   A.   Yes, it is.

23                   MR. GELFAND:  Your Honor, at this point, I move

24   Defendant's Exhibit 51 into evidence.

4:43PM25                   MR. CLAYMAN:  No objection.

4:43PM 1         THE COURT:  Defendant's Exhibit 51 is received.

2         (Defendant's Exhibit 51 Received)

3         MR. GELFAND:  May I publish it, Your Honor?

4         THE COURT:  You may.

4:43PM 5  Q.  (BY MR. GELFAND.)  Could you describe, just generally

6  speaking, what it is the first page reflects?

7  A.  The first page is the metadata that's associated with

8  the actual image itself on the system.  So this is created

9  written access dates associated with this file as it

4:44PM 10  exists on the MacBook.

11  Q.  When you say as it exists on the MacBook, does this

12  reflect that it was a photo taken on an iPhone 8 Plus?

13  A.  Yes.

14  Q.  And is this metadata auto-generated by your forensic

4:44PM 15  tool that you used?

16  A.  Yes.  It's information that's extracted from the

17  evidence.

18  Q.  Are you able to tell the original date and time that

19  this photograph was taken, at least per the EXIF data that

4:44PM 20  you pulled?

21  A.  Yes.  It would be these two here.

22  Q.  Could you just tell the Jury what that is?

23  A.  That's May 16, 2019, at 19:03:34, which would be

24  7:03.

4:44PM 25  Q.  We're not going to go through this all, but if we go

4:45PM 1   through the rest of the exhibit, does it pull a whole

2   bunch of other information?

3   A.    Yeah.   It's all the information that would be

4   available within -- all the EXIF data that would be

4:45PM 5   available within that image itself.

6   Q.    So if we go to the next page.   Does that just

7   continue all the data that's in the image itself?

8   A.    Yeah, it's a continuation of the same EXIF data.

9   Q.    Now, Ms. Bush, you have testified that you have done

4:45PM 10   a computer forensic review of the HP computer, the MacBook

11   Pro laptop, the iPhone, and five thumb drives/SD cards,

12   correct?

13   A.    That's correct.

14   Q.    To the best of your knowledge, is that the totality

4:46PM 15   of the digital evidence that was seized in this case that

16   can be reviewed?

17   A.    Yes.

18         MR. GELFAND:   Your Honor, may I have one minute,

19   please?

4:46PM 20         THE COURT:   You may.

21         MS. GELFAND:   I have no further questions.   Thank

22   you, Ms. Bush.

23         THE WITNESS:   Thank you.

24         THE COURT:   Thank you, Mr. Gelfand.

4:47PM 25         Mr. Clayman, do you anticipate that your cross is

4:47PM 1  going to be considerably longer than 12 minutes?

2           MR. CLAYMAN:  I do, Your Honor.

3           THE COURT:  For some reason, I thought you were

4  going to say that.  I think it would be a good idea to go

4:47PM 5  ahead and recess for the day a little bit earlier.

6  Otherwise, he's just going to get started with something

7  and we'll have to quit right in the middle of it, so we

8  will recess for the day.

9           I would like to read to you the complete recess

4:48PM 10  instruction because of its importance in this case.

11  During this recess, and every other recess, you must not

12  discuss this case with anyone, including the other jurors,

13  members of your family, people involved in the trial, or

14  anyone else.  Do not allow anyone to discuss the case with

4:48PM 15  you or within your hearing.  Only you have been chosen as

16  jurors in this case and only you have been sworn to uphold

17  the law.  No one else has been chosen to do this.

18           You should not even talk among yourselves about

19  the case before you have heard all the evidence and the

4:48PM 20  case has been submitted to you by me for deliberations,

21  because to do otherwise could affect your decision.

22           If anyone tries to approach you or to talk to you

23  about the case, please let me know about that immediately

24  by informing a court security officer or a member of the

4:49PM 25  court clerk staff.  When I say you must not discuss the

4:49PM  1    case with anyone, I obviously mean you must not do this

        2    either orally, verbally, electronically, digitally, or

        3    writing in any form or fashion, including e-mails, text

        4    messages, blogs, Tweets, or engaging in any form of

4:49PM  5    written or oral communication as I have previously

        6    instructed you.  Also, remember that you must not read any

        7    newspaper or other written account, watch any televised

        8    account, or listen to any radio program about this trial.

        9    And you must not conduct any internet research or consult

4:49PM 10    with any other sources about this case, the people

       11    involved in this case or its general subject matter.  This

       12    is because you are required to keep your mind open and

       13    free of outside information.  Only in this way will you be

       14    able to decide the case fairly based solely on the

4:50PM 15    testimony, the evidence presented within the four walls of

       16    this courtroom, and my instructions to you on the law.  If

       17    you were to decide this case on anything else, you will

       18    have done an injustice.  It would be a violation of your

       19    oath for you to basis your decision on some reporter's

4:50PM 20    view or opinion on upon information that you acquire from

       21    outside the courtroom.  It is very important that you

       22    follow these instructions.

       23            So we will start back up at 8:30 in the morning

       24    and we will call for you at that time.  Fingers crossed

4:50PM 25    that we can do so tomorrow morning.  Everyone please stand

4:51PM 1  as the Jury is in recess.  Court will remain in session.

2  Everyone in the gallery, please stay put.

3          (Jury out at 4:51 p.m.)

4          THE COURT:  Members of our gallery, if you

4:52PM 5  brought water or anything that is now trash, please take

6  that with you, and you may leave.  The attorneys should

7  stay.  We'll remain on the record.  Let's take up just a

8  couple of issues.

9          So I think that we're fairly safe in moving a

4:53PM10  formal jury instruction conference off to tomorrow

11  evening.  So anybody think the case could be submitted to

12  the Jury tomorrow?

13          MR. GELFAND:  I think it's unlikely, but I don't

14  want to be the bad guy in the room if it is.

4:53PM15          THE COURT:  Here's what we're going to do.  We

16  are very, very close to pushing out what I call our

17  discussion set of instructions.  I do need for ya'll to

18  look at those this evening.  You will have those before

19  5:30, hopefully.  We're close.  We've been working on them

4:54PM20  during every break, so just kind of refining them.

21          So what I need for you to do is to look at those

22  and then e-mail us back when you can, but hopefully

23  tonight, and let us know that you are good with all of

24  these, or you're good with all of these except this

4:54PM25  instruction and that instruction, and here, we would

4:54 PM 1   request this language be removed or that language be added

2   and here is our reasoning and legal authorities in

3   support.

4           If there are omitted instructions, the cover

4:54 PM 5   e-mail that Ms. Esterbrook will be sending you will

6   contain an explanation with regard to some omitted

7   requested, but disputed instructions, but not necessarily

8   all of them.  If we have not included an instruction that

9   you are seeking, then you need to tender the instruction

4:55 PM 10  or resubmit it to us and you need to explain why the

11  instruction should be included, and, again, what legal

12  authorities you are relying on.  And that will give us the

13  ability to absorb your comments and to incorporate those

14  comments in the Court's final set of jury instructions,

4:55 PM 15  final in the sense that it will be the set of jury

16  instructions going into the final jury instruction

17  conference that I would anticipate we will have tomorrow

18  evening at this point.  Not to say that the Court won't

19  make changes based on comments during the formal jury

4:56 PM 20  instructions conference, but more or less, the final jury

21  instruction conference will be what you are making your

22  record against.  So we will do what I just said.  We will

23  get our version out to you.  If you could comment back to

24  us tonight, I know you have a lot to do, but it will help

4:56 PM 25  us if you could get us something back tonight, regardless

4:56PM 1    of the time.  And then we will push out a more final set

2    either later tonight or tomorrow, depending on what you

3    all have to say.

4              Are there any other matters that the government

4:56PM 5    would like to take up?

6              MR. ROBERTS:  No, Your Honor.

7              THE COURT:  Mr. Gelfand, any other matters you

8    would like to take up?

9              MR. GELFAND:  No, Your Honor.  Thank you.

4:56PM10              THE COURT:  We're in recess.

11              (Proceedings recessed at 4:56 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

I, Paula K. Barden, CCR, RPR, RMR, Federal Official Court Reporter, in and for the United States District Court for the Western District of Arkansas, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 10th day of January 2022.

_____
PAULA K. BARDEN, CCR, RPR, RMR #700
Federal Official Court Reporter
Western District of Arkansas

