```
 1              IN THE UNITED STATES DISTRICT COURT
                 WESTERN DISTRICT OF ARKANSAS
 2                    FAYETTEVILLE DIVISION

 3

 4   UNITED STATES OF AMERICA                    PLAINTIFF

 5   v.                CASE NO. 5:21-CR-50014

 6   JOSHUA JAMES DUGGAR                         DEFENDANT

 7   ------------------------------------------------------------

 8

 9                        JURY TRIAL

10                      VOLUME 6 OF 8

11          BEFORE THE HONORABLE TIMOTHY L. BROOKS

12                    DECEMBER 7, 2021

13                  FAYETTEVILLE, ARKANSAS

14   ------------------------------------------------------------

15

16

17

18

19

20

21

22

23

24

25
```

Paula Barden, RPR, RMR, Federal Official Court Reporter
35 East Mountain Street, Fayetteville, Arkansas 72701

```
 1                 A P P E A R A N C E S

 2

 3    FOR THE PLAINTIFF:

 4    MR. DUSTIN ROBERTS
      MS. CARLY MARSHALL
 5    United States Attorney's Office
      414 Parker Avenue
 6    Fort Smith, Arkansas 72901
      (479) 783-5125
 7    dustin.roberts@usdoj.gov
      carly.marshall@usdoj.gov
 8

 9    Also Present:  Special Agent Howard Aycock

10

11    FOR THE DEFENDANT:

12    MR. JUSTIN K. GELFAND
      Margulis Gelfand
13    7700 Bonhomme Avenue, Suite 750
      St. Louis, Missouri 63105
14    (314) 390-0234
      justin@margulisgelfand.com
15
      MR. TRAVIS W. STORY
16    Story Law Firm
      2603 Main Drive, Suite 6
17    Fayetteville, Arkansas 72704
      (479) 443-3700
18    travis@storylawfirm.com

19

20

21

22

23

24

25
```

```
 1                    I N D E X

 2                                          Page

 3   MICHELE BUSH

 4      Cross Examination by Mr. Clayman      1163

 5      Redirect Examination by Mr. Gelfand   1265

 6         (Voir Dire outside Jury's presence)

 7         Voir Dire by Mr. Gelfand           1312

 8         Voir Dire by Mr. Clayman           1318

 9      Redirect Examination by Mr. Gelfand (cont'd)   1323

10      Recross Examination by Mr. Clayman    1332

11      Redirect Examination by Mr. Gelfand   1339

12   DANIEL WILCOX

13      Direct Examination by Mr. Gelfand     1340

14      Cross Examination by Mr. Roberts      1351

15   Defendant Advised of Right to Testify    1366

16   Defense Rests                            1369

17   JAMES FOTTRELL (rebuttal)

18      Direct Examination by Mr. Clayman     1370

19      Cross Examination by Mr. Gelfand      1397

20      Redirect Examination by Mr. Clayman   1428

21   Rule 29 Motion Renewed by Defense        1433

22   Jury Instructions Conference (In-Chambers)   1434

23   Reporter's Certificate                   1494

24

25
```

```
                              E X H I B I T S

                                                            Received

  Government's Exhibit 86    Print Screens                    1375
                             Fottrell Rebuttal
                             (Re-marked Court's
                              Exhibit 4)

  Government's Exhibit 87    Print Screens                    1382
                             Fottrell Rebuttal
                             Testimony
                             (Re-marked Court's
                              Exhibit 5)

  Court's Exhibit 4         Demonstrative Aid                 1415
                             (Govt Exhibit 86)

  Court's Exhibit 5         Demonstrative Aid                 1415
                             (Govt Exhibit 87)

  Court's Exhibit 6         Signed Stipulation                1432
                             Re: Deft's Exhibits
                             8(a) and 9(a)

  Court's Exhibit 7(A-E)    7-A, Discussion Draft             1434
                             of Jury Instructions
                             7-B, e-mail, Erika
                             Esterbrook
                             7-C, e-mail, Judge
                             Brooks
                             7-D, e-mail, Mr. Murphy
                             7-E, e-mail, Ms. Marshall

  Court's Exhibit 8(A-B)    8-A, Final Jury                   1434
                             Instructions
                             8-B, Track Change Version
                             of Jury Instructions

  Court's Exhibit 9(A-E)    9-A, Defense Proffered            1434
                             Instruction 5
                             9-B, Defense Proffered
                             Instruction 6
                             9-C, Defense Proffered
                             Instruction 7
                             9-D, Defense Proffered
                             Instruction 8
                             9-E, Defense Proffered
                             Instruction 9
```

8:38AM  1          (Jury in at 8:37 a.m.)

      2          THE COURT:  Good morning, everyone.  You will

      3  recall that when we recessed yesterday, Ms. Bush was

      4  testifying on direct exam.  This morning, we will begin

8:38AM  5  with the government's cross examination.

      6          Ms. Bush, I will remind you that you remain under

      7  the oath that you took yesterday.  And you may remove your

      8  mask if you like.

      9          Mr. Clayman, you may inquire.

8:38AM 10          MR. CLAYMAN:  Thank you, Your Honor.

     11          MICHELE BUSH, having been previously duly sworn,

     12  testified as follows:

     13                    CROSS EXAMINATION

     14  BY MR. CLAYMAN:

8:38AM 15  Q.   Good morning, Ms. Bush.

     16  A.   Good morning.

     17  Q.   You were hired by the defendant to look at digital

     18  evidence in this case, is that right?

     19  A.   Yes.

8:38AM 20  Q.   So that includes the HP All-in-One Desktop computer

     21  from the office on the defendant's car lot?

     22  A.   Yes.

     23  Q.   And we sent an image of that device to Arizona where

     24  you work so you could examine it, is that right?

8:39AM 25  A.   Correct.

8:39AM 1   Q.   And you could examine it whenever you wanted at a

2   government facility, is that fair to say?

3   A.   Well, I still have to coordinate with the agents at

4   HSI, so it would also depend on their schedule, but, yes.

8:39AM 5   Q.   Were you ever denied access to it?

6   A.   No.

7   Q.   So you had access to it wherever you wanted?

8   A.   Yes.

9   Q.   You also examined the defendant's personal MacBook,

8:39AM10   is that right?

11   A.   Yes.

12   Q.   And you were actually given a copy of that device for

13   you to examine at your lab whenever you wanted?

14   A.   That's correct.

8:39AM15   Q.   And this MacBook had a backup of his personal iPhone

16   on it, is that right?

17   A.   Correct.

18   Q.   And you reviewed that content as well?

19   A.   Yes.

8:39AM20   Q.   You also examined the contents of the defendant's

21   iPhone 11, is that right?

22   A.   Yes.

23   Q.   Just like the MacBook, you received an actual copy of

24   that to examine whenever you wanted at your lab, right?

8:39AM25   A.   The forensic image, yes.

8:39AM 1    Q.    Before getting into your examination, I'd like to

2    talk a little bit about your background.  Where did you

3    say you went to school?

4    A.    University of Arizona.

8:40AM 5    Q.    And you studied psychology, is that right?

6    A.    That's correct.

7    Q.    And you graduated undergrad in 2015, is that right?

8    A.    That's correct.

9    Q.    You said on your direct that you have been examining

8:40AM 10    devices since 2010?

11    A.    That's correct.

12    Q.    So this was before college we're talking about?

13    A.    Yes.

14    Q.    Ms. Bush, this is the first time you have been

8:40AM 15    qualified as an expert in a trial in federal court, right?

16    A.    No.  Well, in federal court?  Maybe.  I'd have to

17    refer to my CV, but I have testified as an expert in

18    trial.

19    Q.    In federal court?

8:40AM 20    A.    I'd have to look at my CV.  It may have been a state

21    case.

22    Q.    So you don't know if you ever testified in a federal

23    trial before?

24    A.    Yeah, I don't.  I can't recall.  I'd have to refer to

8:40AM 25    my CV.

8:40AM 1    Q.    You discussed peer-to-peer programs in your testimony

2    yesterday.  Do you recall that?

3    A.    Yes.

4    Q.    You haven't received any formal training in the

8:41AM 5    forensics of BitTorrent peer-to-peer applications, is that

6    fair to say?

7    A.    I think I've took courses about it.  I don't know

8    what you mean by formal training, but I've taken courses.

9    Q.    Like hour-long courses?

8:41AM10    A.    Yeah, like at conferences when they provide training

11    and you go through different courses.

12    Q.    You also testified about Torrential Downpour

13    yesterday, is that right?

14    A.    That's correct.

8:41AM15    Q.    That's the undercover software that law enforcement

16    uses to download child pornography files over the

17    BitTorrent peer-to-peer network?

18    A.    That's my understanding, yes.

19    Q.    You haven't received any training in Torrential

8:41AM20    Downpour, is that fair to say?

21    A.    Only my experience and testing.

22    Q.    You said you conducted two limited tests of

23    Torrential Downpour?

24    A.    Correct.  That were a motion -- or an order from the

8:41AM25    Court and a motion to compel.

8:41AM 1    Q.    You said that gave you a limited understanding of how
      2    Torrential Downpour works?
      3    A.    Well, I think I corrected myself.  It gives me a much
      4    better understanding of how Torrential Downpour works even
8:41AM 5    with the limited testing.  And I think that's what I was
      6    trying to distinguish there.
      7    Q.    Right.  And you have received no training on how
      8    Torrential Downpour works otherwise?
      9    A.    I'm not permitted, no.
8:42AM 10   Q.    Now, you said you've participated in over 500
     11    investigations, is that correct?
     12    A.    That's correct.
     13    Q.    Are we talking about since 2010?
     14    A.    No, probably since 2011.  That's when I really
8:42AM 15   started working on civil and criminal cases, rather than
     16    private investigation cases.
     17    Q.    You said 50 percent of those involved child
     18    exploitation cases?
     19    A.    At least, yeah.
8:42AM 20   Q.    At least 250 cases involving specifically child
     21    exploitation material?
     22    A.    Correct.
     23    Q.    Of those cases, is it fair to say that Windows is the
     24    most common operating system you encounter?
8:42AM 25   A.    Yeah, it's the majority of them.

8:42AM 1    Q.    Then Mac would probably be the next most common, is

2    that fair?

3    A.    That's correct.

4    Q.    So Linux is not as common as those two?

8:42AM 5    A.    Yes.  It's a more specialized operating system.

6    Q.    So how many of the 250 or so cases that you've worked

7    on involving child exploitation material was Linux the

8    primary operating system you were investigating?

9    A.    I'd say maybe 10.

8:43AM 10    Q.    Ten, including this case?

11    A.    Sure.  Yeah.  I mean, around 10.

12    Q.    So is it fair to say that you have more experience

13    investigating Mac operating systems or Windows operating

14    systems than the Linux operating system?

8:43AM 15    A.    Certainly, because that's going to be the majority,

16    but I have examined Linux.

17    Q.    Just not as much as the other two, right?

18    A.    Right.

19    Q.    I was looking at your resume.  You have not received

8:43AM 20    any training in the use of Linux operating systems, is

21    that correct?

22    A.    It's not listed there specifically, but it was

23    included in some of the training for my certification, so

24    in the CCE and the CCFE, those include other operating

8:43AM 25    systems, including Linux.

8:43AM 1    Q.   You just didn't put it on your resume, but you have

2           received the training, is that what you're saying?

3           A.   It's not explicitly defined in the CV, but it was

4           included in the training with those certifications.

8:43AM 5    Q.   You explicitly defined receiving training in the Mac

6           operating system, is that right?

7           A.   Yeah, because it has its own -- because it was a

8           course that was designated to that.  It had its own name,

9           so that's why it was listed.

8:44AM10    Q.   So you haven't received a course or attended a course

11          dedicated to Linux operating system, is that what you're

12          saying?

13          A.   Not a stand-alone course, but I have, again, received

14          training in it.  It just wasn't named that.

8:44AM15    Q.   You also listened in on Mr. Fottrell's testimony from

16          last week, is that correct?

17          A.   Yes.

18          Q.   You created new exhibits for your testimony yesterday

19          based on what Mr. Fottrell said, is that right?

8:44AM20    A.   In part, yes.

21          Q.   And your testimony yesterday was shaped, at least in

22          part, by what Mr. Fottrell said during his direct

23          testimony, is that right?

24          A.   In part.

8:44AM25    Q.   Now, you prepared a report in connection with your

8:44AM 1    work on this case, is that right?

2    A.    Yes, I did.

3    Q.    Your report is close to 100 pages long, is that fair

4    to say?

8:44AM 5    A.    Yes.

6    Q.    And that's on top of some unrelated affidavits that

7    you prepared throughout this litigation, is that right?

8    A.    Correct.

9    Q.    Ms. Bush, how many hours would you say you spent

8:44AM10    working on this case?

11    A.    I'd say probably over 200.

12    Q.    200 hours?

13    A.    Yes.

14    Q.    That includes five days, you said, where you were

8:45AM15    specifically examining the HP desktop computer?

16    A.    Yes.  That includes my time at Homeland Security.

17    Q.    In your report that we're talking about, this

18    100-pager, you summarize all of your relevant findings, is

19    that right?

8:45AM20    A.    Yes.

21    Q.    So if you didn't put something in there, in that

22    report, it's because when you were drafting it, you didn't

23    think it was relevant?

24    A.    Not necessarily.  It could mean that I didn't get to

8:45AM25    it.

8:45AM 1    Q.   You omitted relevant information from your report is
2    what you're saying?
3    A.   Not that I eliminated it, but I'm trying to do the
4    best I can with the time that I've got, so the summary of
8:45AM 5    findings is what I have done to that point and what I had
6    come up with, with the evidence that I had analyzed.
7    Q.   So you omitted relevant information from your report
8    is what you're saying?
9    A.   I wouldn't have known it was relevant at the time I
8:45AM 10   drafted the report, if it's relevant today.
11   Q.   I'd like to walk through some of your findings,
12   because I think we agree on quite a bit here and I think
13   it would be helpful for the Jury to understand what's not
14   really in dispute.
8:46AM 15       But before getting into too much forensic detail, you
16   agree, Ms. Bush, that the three main devices that we're
17   focusing on are the defendant's HP desktop computer, his
18   MacBook laptop, and his iPhone 11?
19   A.   Yes, with the SD cards and thumb drives.  But, yeah,
8:46AM 20   those were the three primary operating system devices.
21   Q.   Those three devices all belong to the defendant, is
22   that right?
23   A.   The two Macs belong, or Apple devices, belong to the
24   defendant, and the HP was the company computer, the
8:46AM 25   Wholesale Motorcars that was also used by Mr. Duggar.

8:46AM 1 Q. Well, you listened to his recorded interview with law

2 enforcement, didn't you?

3 A. No.

4 Q. You didn't listen to that at all?

8:46AM 5 A. No, I was not provided an interview.

6 Q. So you wouldn't know that he said in that interview

7 that the HP desktop was his?

8 A. I don't rely on the interviews, because I let the

9 evidence speak for itself, so I did not review that.

8:46AM 10 Q. Just to be clear, you don't consider any evidence

11 outside of the forensic evidence when you're drafting your

12 reports?

13 A. No, because I like to provide an objective analysis

14 and objective opinions, so I don't listen to necessarily

8:47AM 15 statements that were made.  I want to extract data from

16 the evidence itself and come up with a conclusion

17 completely independent of anything that was said.

18 Q. So contextual evidence about where devices were

19 found, who was using them, that sort of stuff isn't

8:47AM 20 relevant to your analysis?

21 A. No, it can be relevant, but it's still information I

22 can get from the devices themselves.

23 Q. You can figure out that the defendant told people he

24 used the device based on your examination of the device

8:47AM 25 itself?

8:47AM 1   A.   No, but I can look for indicia on the device that

2   would suggest that the device owner was a specific person,

3   like looking at the Apple ID or the text messages that

4   were sent or the majority of the images that were taken.

8:47AM 5   Q.   Notwithstanding the defendant's statement to law

6   enforcement that the HP computer was his, that he had been

7   using it for two years, you determined that the HP

8   computer was used by Josh Duggar, right?

9   A.   Correct.

8:47AM10   Q.   If we could please pull up what's been admitted

11   already as Government's Exhibit 85.  You saw this exhibit

12   when you were sitting in on Mr. Fottrell's testimony,

13   right, Ms. Bush?

14   A.   Yes.

8:48AM15   Q.   So you agree that on May 11th, 2019, a little before

16   6:00 p.m., the Linux installation program was downloaded

17   to the defendant's HP computer, is that right?

18   A.   Yeah, the ISO installer, that's correct.

19   Q.   That's what we're seeing right here?

8:48AM20   A.   Correct.

21   Q.   This was the computer in the small office on the

22   defendant's used car lot, is that right?

23   A.   Yes, it was the HP at Wholesale Motorcars.

24   Q.   And to be clear, have you or have you not reviewed

8:48AM25   the search warrant photos from the execution of the search

8:48AM 1  warrant in this case?

2  A.   I only saw photos of the router.  I haven't been

3  provided the entirety of the search warrant photos.  I'm

4  assuming more were taken, but I was only looking for

8:48AM 5  information relevant to the devices.

6  Q.   Well, if we could pull up what's been admitted as

7  Government's Exhibit 14.  Is this the HP computer?

8  A.   It appears so, yes.

9  Q.   You haven't seen this photo before?

8:49AM 10  A.   I have not.

11  Q.   This is relevant to the devices you examined, right?

12  A.   I mean, it depicts the device.  I don't know that

13  it's relevant to necessarily my examination.  I can tell

14  from the forensics that that was the wallpaper.  I already

8:49AM 15  know what was on the desktop, so that's all stuff that I

16  extract from the evidence.

17  Q.   So you didn't see this picture before your testimony

18  today?

19  A.   No, I have not.

8:49AM 20  Q.   You just testified about the desktop.  This is the

21  desktop that you saw and the Windows operating system on

22  this computer?

23  A.   Correct.

24  Q.   It's a picture of the defendant and his family?

8:49AM 25  A.   Correct.

8:49AM 1   Q.   Ms. Bush, was this computer running the Windows

2   operating system when it was seized?

3   A.   I don't know the answer to that question.

4   Q.   If this was how it was found when it was seized,

8:49AM 5   would it be running the Windows operating system at that

6   time, or would it be accessing the Linux partition?

7   A.   If this is how it was seized, it's accessing the

8   Windows partition.

9   Q.   Wouldn't you want to know how it was running when it

8:50AM 10   was seized?

11   A.   Not necessarily, because the activity of interest was

12   in May of 2019, so months prior, so that was the date

13   range that I was focused on.

14   Q.   So you wouldn't be interested in how this device was

8:50AM 15   used after that activity occurred in your analysis?

16   A.   I mean, unless it was used to download additional

17   suspected child pornography, it would certainly be

18   relevant.  But, again, my analysis was really focusing on

19   starting with the dates of interest, and then working my

8:50AM 20   way out as I need to.

21   Q.   So it's your testimony today that if the Linux

22   partition were accessed after the dates of interest, that

23   just really wouldn't be of interest to you, would it?

24   A.   It could be relevant.  But, again, I'm focused on the

8:50AM 25   offending activity.

8:50AM 1    Q.   So who was using the Linux partition would maybe be
       2    relevant to your analysis?
       3    A.   Yes, it would be relevant who was using it
       4    specifically on those dates and times.
8:50AM 5    Q.   And would it be relevant after those dates and times,
       6    Ms. Bush?  Who was using the Linux partition on this
       7    device would not be relevant to your analysis?
       8    A.   It could be.  It doesn't necessarily -- even if a
       9    user is accessing the Linux partition months later, it
8:51AM10    doesn't necessarily mean that that was the same user that
      11    had access to it within the three-day time frame that
      12    we're looking at.
      13    Q.   The user name and the account on this Windows
      14    operating system was wholesaleNWA, is that right?
8:51AM15    A.   That's correct.
      16    Q.   The password to access that account was JoshuaJJD, is
      17    that right?
      18    A.   That sounds correct.
      19    Q.   There was actually a hint for that password in case
8:51AM20    the user forgot it, correct?
      21    A.   Yes, there was.
      22    Q.   That hint was, quote, "The initial thought of Josh is
      23    good," right?
      24    A.   That sounds correct.
8:51AM25    Q.   Is it safe to say that that's referring to Joshua

8:51AM 1   Duggar?

2   A.    Sounds like it.

3   Q.    Ms. Bush, would you agree that this information is

4   relevant to showing who set up the Windows operating

8:51AM 5   system on this computer?

6   A.    Yes.  And I think I included that in my report.

7   Q.    It's actually pretty significant to who set up the

8   Windows operating system?

9   A.    Yes.  It was consistent with being used by Mr. Duggar

8:52AM 10  and set up for the purpose of the Wholesale Motorcars lot.

11  Q.    You're talking about because the password was

12  JoshuaJJD and the hint was, "The first thought of Josh is

13  good," it's fair to assume Josh Duggar set up the Windows

14  operating system, right?

8:52AM 15  A.    Certainly.

16  Q.    Now, the Windows side that we just saw that was

17  running when the defendant's computer was seized from the

18  car lot, that was the side of the computer that the

19  business activity was conducted on, right?

8:52AM 20  A.    Correct.

21  Q.    That was the side that had the software related to

22  running the car business on it?

23  A.    Yes.  Frazer was installed.

24  Q.    It had the defendant's driver's license scanned and

8:52AM 25  saved in it, correct?

8:52AM 1   A.   Yes.

2   Q.   This HP computer's default operating system was

3   Windows, right?

4   A.   Yes.

8:52AM 5   Q.   You described that in your report.  You said the

6   default operating system for this device would be Windows,

7   right?

8   A.   Yes.

9   Q.   So when this computer was turned on, it would likely

8:53AM 10   default to running the Windows operating system, is that

11   right?

12   A.   It could.  That would be when it was set up initially

13   just to have the Windows.  That would be the only

14   operating system that could boot on.  Depending on the

8:53AM 15   boot sequence, it could have been set to Linux, I don't

16   know.  But, generally speaking, because that was the

17   primary operating system, it could have been the default.

18   Q.   So you think it's possible that it would default to

19   running Linux when it's turned on?

8:53AM 20   A.   It's possible.

21   Q.   I just want to make sure we're clear then.  So the

22   computer was running Windows when it was seized based on

23   this picture, right?

24   A.   Correct.

8:53AM 25   Q.   All the software necessary for the business was

8:53AM 1   running Windows?

2   A.    Correct.

3   Q.    There's no Frazer software on the Linux side, right?

4   A.    Correct.

8:53AM 5   Q.    The Windows operating system, I think in your report

6   you said was installed quite a bit before the Linux

7   operating system on this computer, right?

8   A.    Yes.

9   Q.    You wrote in your report that the log-on count for

8:53AM 10   the Windows side was like over 600, is that right?

11   A.    That sounds correct.

12   Q.    The Windows side was actually much larger than the

13   Linux side in terms of space and size, right?

14   A.    Yeah, took up the majority of the hard drive.

8:54AM 15   Q.    You have already said today most of the activity was

16   on the Windows side, right?

17   A.    Correct.

18   Q.    So you would agree, wouldn't you, that if this

19   computer defaulted to booting up the Linux side, then

8:54AM 20   whoever turned the computer on in the morning would just

21   suddenly see the Linux operating system, right?

22   A.    Yes, they would.

23   Q.    You would agree, given that sort of context, that it

24   would be very unusual for the Linux side to be the default

8:54AM 25   boot order, right?

8:54AM 1    A.   I don't know that I would say it was unusual, but
2    certainly if somebody wasn't expecting it, it would be a
3    surprise.  And, yes, the primary operating system seemed
4    to be Windows.
8:54AM 5    Q.   So it makes sense that Windows would be the default
6    boot system, right?
7    A.   That's likely.
8    Q.   If we could pull back again Government's Exhibit 85.
9    You also agree, Ms. Bush, that on May 13th, 2019, a little
8:55AM 10   before 2:00 p.m., the Linux operating system was installed
11   on the defendant's HP computer, is that right?
12   A.   That's correct.
13   Q.   And this is what we're referring to as the Linux
14   partition for this case?
8:55AM 15   A.   Correct.
16   Q.   Now, you discussed in your direct, I think, that you
17   installed your own Linux operating system as part of your
18   analysis in this case?
19   A.   Yeah.  I both used virtualization software to create
8:55AM 20   a Linux operating system, and then I also actually took a
21   physical HP desktop computer and installed the hard drive
22   with both Windows 10 and the Ubuntu operating system.
23   Q.   This virtualization software, that was the VNware
24   Workstation, is that right?
8:55AM 25   A.   Correct.

8:55AM 1    Q.    How long did that installation process take?

2    A.    Probably somewhere between 15 to 30 minutes.

3    Q.    Now, you wrote in your report that the Linux

4    installation process on the defendant's computer took over

8:55AM 5    five hours, is that right?

6    A.    Well, the system log first logged activity, I think

7    it was like 8:00 a.m., but the actual installation date

8    would have been around 1:43.  So depending on the

9    accuracies of that 8:40 or 8:00-something time-stamp, it

8:56AM 10   could have been 5:00 and disrupted.  It could have just

11   been a miscalculated time-stamp.  It's kind of unclear at

12   this point.

13   Q.    You wrote in your report that the installation

14   process began at 8:00 in the morning?

8:56AM 15   A.    Yeah, that's when the log file had initially

16   time-stamped it.

17   Q.    Now you're saying that that's probably not right?

18   A.    Well, no.  I'm saying that we know that the actual

19   installation process completed at 1:43, so that's the date

8:56AM 20   and time that we're going to really rely on.

21   Q.    So is it your testimony today that it could have

22   taken five hours for the Ubuntu system to install on this

23   computer if it started at 8:00 and finished at 2:00?

24   A.    It's possible.

8:56AM 25   Q.    That would be consistent with your 20-minute setup

8:56AM 1    time?

2    A.   Well, if there was something that had happened, maybe

3    network connection failure, or, I don't know, maybe there

4    was an issue with the ISO file.  There's a lot of things

8:56AM 5    that can go wrong installing, especially when you're

6    talking about a dual boot system.  It's pretty complex.

7    So there is a possibility that something happened and it

8    took longer than expected.  It's also possible that that

9    time-stamp was inaccurate.

8:57AM 10    Q.   You just have no idea?

11    A.   Yeah.  At this point, it wasn't super relevant.  I

12    was focused on when was Linux actually installed.

13    Q.   But you put that in your report, right?

14    A.   Yeah, because it was part of the system installation

8:57AM 15    log.

16    Q.   You just have no idea how long it took on this

17    program, on this device?

18    A.   Well, I know it would have been max between that time

19    frame, so I know it didn't take three days.  But, yes, it

8:57AM 20    would have been somewhere within that time.

21    Q.   We can move on.  Regardless of how long it took, you

22    agree that the installation had to have been done by

23    someone who was physically present at the car lot, is that

24    right?

8:57AM 25    A.   Yes.  Not -- I mean, most likely it was, because we

8:57AM 1   also know that the same thumb drive that was plugged in at

2   the time right before the Linux operating system was

3   installed, so putting it in context, it looks like a

4   physical user was at the keyboard, but --

8:58AM 5   Q.   How would the thumb drive get plugged in if someone

6   was not at the keyboard?

7   A.   Exactly.  And that's what I'm saying.  Because of

8   that, it does appear consistent with a physical access.

9   Q.   Is there any way that someone could have plugged it

8:58AM 10   in without physically being there, Ms. Bush?

11   A.   No.

12   Q.   So someone was physically there to install the Linux

13   partition, right?

14   A.   Yes, that's what it seems.

8:58AM 15   Q.   That's what it seems or that's what it is?

16   A.   That's what the evidence tells me, it was physical

17   access.

18   Q.   Just want to make sure.  There's no other way that

19   someone could have plugged in the thumb drive to the

8:58AM 20   computer, right, other than physically being there?

21   A.   Correct.

22   Q.   If we could pull up alongside Government's Exhibit 85

23   what's already been admitted as Government's Exhibit 12.

24   Have you seen this image before, Ms. Bush?

8:58AM 25   A.   I don't believe I have, no.

8:58AM 1    Q.    Well, this is the router right there, right?

2    A.    Correct.

3    Q.    So you weren't shown that image?

4    A.    I was shown an image of it more close up so I could

8:59AM 5    see the label, because that's what I was looking for was

6    identifying information.  So I have not seen this

7    zoomed-out image.

8    Q.    This is where the HP computer was found, right?

9    A.    It looks like it, yes.

8:59AM10    Q.    So someone was physically in this office plugging in

11    a thumb drive to install the Linux partition, is that your

12    testimony?

13    A.    Correct.

14    Q.    And based on what you just said, that process could

8:59AM15    have taken anywhere from five hours to maybe 15 minutes,

16    right?

17    A.    Correct.

18    Q.    You testified yesterday that the Linux partition was

19    very small in size, is that right?

8:59AM20    A.    That's correct.

21    Q.    That it couldn't hold that many files, correct?

22    A.    That's correct.

23    Q.    That would not be a problem for someone who wants to

24    download, view, and then delete child exploitation

8:59AM25    material, right?

8:59AM 1    A.    Well, that depends.   I mean, like we talked about, if

2    somebody is downloading a single movie, it could be

3    anywhere from two to seven gigs.   So even downloading one

4    file could potentially exceed the total free space on that

9:00AM 5    partition.

6    Q.    Well, let's discuss that.   So you said, I believe

7    yesterday, that a Hollywood movie on Blu-ray might not fit

8    on this partition, is that right?

9    A.    Correct, as an example.

9:00AM 10   Q.    And it couldn't hold more than, was it seven

11   gigabytes you said?

12   A.    Well, like a Blu-ray is generally about seven gigs,

13   six to seven gigs.   And the free space on the Linux

14   partition was only about two and a half gigs, so that was

9:00AM 15   an example of how small that partition really was.

16   Q.    Did you review the size of any of the child

17   exploitation material files in this case?

18   A.    Well, the files that were defined by those Torrents

19   didn't exist on the partition, so I don't have their file

9:00AM 20   sizes from the evidence.

21   Q.    You didn't see the movie_0216.mp4 video?

22   A.    No, because it doesn't exist on the computer anymore,

23   so I've actually never seen that video.

24   Q.    You didn't review the undercover downloads in this

9:01AM 25   case?

9:01AM 1    A.    They were not provided to me.

2    Q.    Would it surprise you to learn that that

3    movie_0216.mp4 video was 96 megabytes in size?

4    A.    No, that wouldn't surprise me.

9:01AM 5    Q.    So it could easily fit on this Linux partition,

6    right?

7    A.    Yes, that could.

8    Q.    You also testified that the user name of the Linux

9    partition was dell_one, is that right?

9:01AM 10   A.    Correct.

11   Q.    You agree that the password to the account is Intel

12   1988, is that also right?

13   A.    Correct.

14   Q.    Now, Ms. Bush, that password did not come up in your

9:01AM 15   testimony at all, is that correct?

16   A.    I don't recall testifying to that.

17   Q.    You didn't mention it anywhere in your 100-page

18   report that you prepared in connection with this case, is

19   that right?

9:01AM 20   A.    The password?

21   Q.    Right.

22   A.    Correct.

23   Q.    You just left that out?

24   A.    Yeah.  I included the hash of the password itself,

9:01AM 25   but I didn't decrypt that shot, I think, 512, I think it

9:02AM 1   was, hash.  So the government had already indicated the

2   password, so I felt --

3   Q.   It wasn't relevant to your analysis?

4   A.   Not that it wasn't relevant, but it had already been

9:02AM 5   established, so I moved on to parts of my exam that had

6   not been explored yet.

7   Q.   If we could pull up alongside this exhibit what's

8   been admitted as Government Exhibit 63.  Have you seen

9   this exhibit before, Ms. Bush?

9:02AM10   A.   Yes, I have.

11   Q.   These are the Apple notes from the defendant's

12   MacBook that you examined, correct?

13   A.   That's my understanding.

14   Q.   Did you find these notes yourself?

9:02AM15   A.   They would have been available.

16   Q.   Have you seen them before?

17   A.   I've seen this exhibit before, yes.

18   Q.   But you didn't come across the notes during your

19   examination?

9:02AM20   A.   I probably did.  I can't personally recall, but I'm

21   sure that I saw them.

22   Q.   And it lists passwords here, Intel 1988, that matched

23   the password to the Linux operating system, right?

24   A.   That's correct.

9:03AM25   Q.   You just did not note that in your report?

9:03AM  1    A.    Correct.

     2    Q.    You didn't bring it up in your testimony yesterday,

     3    is that right?

     4    A.    It wasn't asked.

9:03AM  5    Q.    We can take down Government's Exhibit 63.  You would

     6    agree that shortly after the Linux partition was created

     7    on this device that the TOR browser was installed on that

     8    Linux partition, right?

     9    A.    That's correct.

9:03AM 10    Q.    You testified, I believe, that you have worked cases

    11    before involving the TOR network, is that correct?

    12    A.    That's correct.

    13    Q.    You said you have done 500 investigations, 50 percent

    14    of which are child exploitation.  So of the 250 child

9:03AM 15    exploitation cases, how many that you personally worked on

    16    involve TOR?

    17    A.    I'd estimate maybe between 30 to 40.

    18    Q.    So you understand, generally, that the TOR browser is

    19    designed to allow users to hide their IP addresses on the

9:03AM 20    internet, is that right?

    21    A.    It can.  But in the investigations that I worked on

    22    or the cases that I worked on, the IP address actually was

    23    part of what they had identified through the TOR network

    24    through a network investigative technique.

9:04AM 25    Q.    One of the benefits of TOR, though, is generally it's

9:04AM 1   supposed to allow you to access the internet anonymously,

2   right?

3   A.   Yeah, because it's using proxies.

4   Q.   The point of that is, a law enforcement agent, for

9:04AM 5   example, can't subpoena your internet provider to figure

6   out which IP address you're using, because it's being

7   routed through multiple proxies, right?

8   A.   Well, in those investigations, law enforcement

9   typically uses that network investigative technique to

9:04AM 10   find the public IP address.  But, yeah, if you just took

11   the IP address of the last proxy that was used, it

12   wouldn't give you anybody's internet service provider

13   account.

14   Q.   And that's one of the benefits of TOR for many

9:04AM 15   people, right?

16   A.   Yes.

17   Q.   You also know that TOR network hosts its own websites

18   called hidden services, is that right?

19   A.   Yeah.  The .onion sites, yes.

9:04AM 20   Q.   These end in ".onion" as opposed to ".com?"

21   A.   Correct.

22   Q.   And the web addresses consist of random letters and

23   numbers basically, right?

24   A.   Yes.  It's a unique alphanumeric string.

9:05AM 25   Q.   Usually like 56, or 16 letters, is that right?

9:05AM 1    A.   I don't remember the exact value, but there's a

2    new -- there's Version 3, which would be longer.  But,

3    yeah, they vary depending on the security.  So as the --

4    those -- the algorithms that generate those strings as

9:05AM 5    they become -- they collide, meaning we have duplicates,

6    then they will move to a longer string to make it more

7    secure.

8    Q.   And you would agree that the user of the defendant's

9    Linux partition bookmarked multiple TOR hidden services on

9:05AM 10   May 14th of 2019, right?

11   A.   Correct.

12   Q.   If we could pull up alongside this exhibit

13   Government's Exhibit 37.  These are the TOR bookmarks from

14   the Linux partition, right?

9:06AM 15   A.   Yes, they are.

16   Q.   You found this evidence as well during your

17   examination, didn't you?

18   A.   Yes, I did.

19   Q.   And Hidden Wiki is the name of one of the bookmarks

9:06AM 20   there, right?

21   A.   Yes, it is.

22   Q.   That's a hidden service too?

23   A.   Correct.

24   Q.   Have you ever heard of Hidden Wiki before

9:06AM 25   Mr. Fottrell's testimony the other day?

9:06AM 1   A.   Yes, I have.

2   Q.   Has it come up in cases that you have worked on?

3   A.   Yes, I'm working on one right now and actually

4   visited it like two to three weeks ago.

9:06AM 5   Q.   You understand it's a TOR directory site?

6   A.   Exactly.

7   Q.   You understand that previously, there were child

8   exploitation links posted on the directory site, right?

9   A.   Yeah, there's a lot of information on the directory

9:06AM10   site.  It gives you links to pretty much as much .onion

11   URLs as possible so that you can browse the network.

12   Q.   That was a yes or no question.  Child exploitation

13   hidden services are posted on this directory site; yes or

14   no?

9:06AM15   A.   Yes.

16   Q.   We can take down Government's Exhibit 37.  You were

17   able to determine that someone downloaded something using

18   the TOR browser on the Linux partition, right?

19   A.   Correct.

9:07AM20   Q.   If we could pull up Government's Exhibit 38.  Someone

21   downloaded a file called webcam-collections-prevs.7z,

22   right?

23   A.   Correct.

24   Q.   You testified yesterday that this 7z is a zip file?

9:07AM25   A.   Correct.

9:07AM 1    Q.   Means it's a file that contains other files,

2    potentially images, videos that can be extracted from it?

3    A.   Exactly.

4    Q.   The contents of this zip file were unzipped to a

9:07AM 5    folder on the desktop of the computer on the Linux

6    partition side entitled "webcams-collections-prevs," is

7    that right?

8    A.   Yes.  It would create a folder with the name of the

9    zip file, so it's going to be identical to the .7z

9:07AM10    version.

11    Q.   And that happened in this case, correct?

12    A.   Yes, it was extracted.

13    Q.   You agree that someone viewed files in that

14    webcam-collection-prevs folder, right?

9:07AM15    A.   Well, nobody double-clicked on the files within it,

16    because the dates and times I don't think were changing

17    from the recently used.

18    Q.   You wrote they were open in the image viewer, right?

19    A.   They were extracted and then opened in Nautilus.

9:08AM20    Q.   And then image viewer as well?

21    A.   I'd have to -- I don't remember.  I'd have to look at

22    my report.

23    Q.   You don't remember if someone accessed the files in

24    this zip file?

9:08AM25    A.   Well, I know that it was extracted and I know that

9:08AM 1   the folder was opened, but what I can't recall is whether

2   or not the actual files within that zip file had been

3   double-clicked, because I know there were two zip files

4   and I can't remember if the files within this particular

9:08AM 5   zip had been double-clicked.

6   Q.   Do you recall a file within this folder called "13yo

7   records herself cums in shower.jpg?"

8   A.   I don't personally recall that name, no.

9   Q.   If it was listed in your report as a file that had

9:08AM 10  been opened, would that surprise you?

11   A.   No, it would not.

12   Q.   At some point after this file was unzipped and these

13   images were put into this folder, whoever was viewing them

14   removed them from the computer, right?

9:09AM 15  A.   Correct.

16   Q.   But thumbnail files associated with those full-sized

17   images that were extracted were also found on the Linux

18   partition, correct?

19   A.   Yes.  The Nautilus application, because the folder

9:09AM 20  had been opened and the file had been extracted, the

21   thumbnails were automatically cached.

22   Q.   So the existence of the thumbnail files confirmed

23   that someone went to this folder and saw what was in it?

24   They saw them in thumbnail view?

9:09AM 25  A.   Correct.

9:09AM 1  Q.    Have you reviewed any of those thumbnails before

2  today?

3  A.    I saw them during the course of my examination.

4  Q.    Would you agree that many of them appear to depict

9:09AM 5  minors?

6  A.    Yes.

7  Q.    Minors engaged in sexually-explicit conduct?

8  A.    Yes.

9  Q.    You would also agree that the uTorrent program was

9:09AM10  used to download child sexual abuse material on the Linux

11  partition, right?

12  A.    That's correct.

13  Q.    So these downloads happened over the course of three

14  days.  It was May 14th, May 15th, and May 16th.  Do you

9:10AM15  agree?

16  A.    Yes.

17  Q.    I want to go through some of those.  So in the

18  evening of May 14th of 2019, the user of the Linux

19  partition downloaded two Torrent files, right?

9:10AM20  A.    Correct.

21  Q.    That's mov_0214.mp4.torrent and mov_0216.mp4.torrent,

22  right?

23  A.    Correct.

24  Q.    Those were downloaded about 10 minutes apart?

9:10AM25  A.    Correct.

9:10AM 1    Q.    That second one, the 0216 Torrent file is the same

2    one that law enforcement downloaded from the defendant's

3    IP address that night, right?

4    A.    Correct.

9:10AM 5    Q.    These two files were then viewed using the VLC player

6    on Linux, is that right?

7    A.    Yes, they were streamed.

8    Q.    Streaming would be viewing them?

9    A.    Somebody, yes.

9:10AM10    Q.    They could be streamed locally, right?

11    A.    It could be, but that's not what the evidence

12    suggests.

13    Q.    Someone was viewing these files, Ms. Bush?  Yes?

14    A.    Yes.  These files were streamed.

9:11AM15    Q.    And streaming is a function of viewing, correct?

16    A.    Yes.  To some computer, yes.

17    Q.    We'll get to the streaming later, Ms. Bush.

18    Thumbnail files associated with these videos were created

19    on the Linux partition, right?

9:11AM20    A.    That's correct.

21    Q.    The following day, starting at around 11:00 a.m., the

22    user of the Linux partition downloaded three Torrent

23    files, right?

24    A.    That's correct.

9:11AM25    Q.    Those are 14yogirlsuckandfuck.fov.torrent,

9:11AM 1   test.avi.torrent and Pussy Pounded.mpg.torrent, right?

2   A.   Correct.

3   Q.   Those file titles would be evident to the person

4   downloading them, right?

9:11AM 5   A.   Yeah, certainly the first one.

6   Q.   The videos from these Torrent files were also viewed

7   on the VLC player, correct?

8   A.   Correct.

9   Q.   The thumbnail files associated with these videos were

9:11AM10   created on the Linux partition as well?

11   A.   That's correct.

12   Q.   That indicates that the user of the partition

13   navigated to the folder where they were stored?

14   A.   Correct.

9:12AM15   Q.   Later in the day on May 15th at around 5:30 p.m., if

16   we could go to page two of this exhibit, the user of the

17   Linux partition downloaded over the course of roughly 20

18   minutes five Torrent files, right?

19   A.   Correct.

9:12AM20   Q.   These are playtoysweetie.7z.torrent, DD.torrent,

21   DD.1.torrent, asi se mama linda.mp4.torrent and

22   marissa.zip.torrent, is that right?

23   A.   Yes.

24   Q.   The video called asi se mama linda was played using

9:12AM25   the VLC player, right?

9:12AM 1    A.    Correct.

2    Q.    The zip file, the marissa.zip file that we've

3    discussed in this case was unzipped and those images were

4    placed in a marissa folder on the desktop of the Linux

9:12AM 5    partition, right?

6    A.    Correct.

7    Q.    That happened all on May 15th of 2019?

8    A.    Yes.

9    Q.    You wrote in your report that these images from the

9:12AM10    marissa folder were then accessed, right?

11    A.    They were extracted, yes.

12    Q.    And you wrote that they were opened in image viewer,

13    correct?

14    A.    Well, they were -- yes, the recently used file shows

9:13AM15    that they were opened in image viewer all at the exact

16    same time and second, which tells me that that was likely

17    a time-stamp that was recorded just from the extraction.

18    Q.    Actually, you wrote that one of these images was open

19    for around three minutes, right?  There was an image

9:13AM20    called 2_PTHC ultra hard pedo -- pedophilia 20 (new)

21    065.jpg, right?

22    A.    If you are reading from my report, probably, yes.

23    Q.    You wrote in your report that that image was opened

24    in the image viewer for around three minutes, right?

9:13AM25    A.    I don't -- I can't tell how long an image is viewed,

9:13AM 1  so I can't say that.  But if you're looking at two

2  different time-stamps, it might indicate that a file had

3  been opened once and then opened a second time.

4  Q.    So this one could have been opened twice, this PTHC

9:14AM 5  file is what you're saying?

6  A.    If there are two different time-stamps, yes.

7  Q.    Would it surprise you to learn that this PTHC image

8  depicts a girl inserting an object into her vagina?

9  A.    I have not seen it personally, so I don't know.

9:14AM10  Q.    Would that be consistent with what you seen from the

11  marissa series?

12  A.    I don't know what the marissa series is, so I don't

13  know.  But I did see that the thumbnails were of suspected

14  child pornography.

9:14AM15  Q.    Of a minor girl?

16  A.    I don't remember the gender, but it sounds correct.

17  Q.    Thumbnail files of these marissa images were also

18  created on the Linux partition, is that right?

19  A.    Correct.

9:14AM20  Q.    After viewing these images, whoever was doing that

21  decided to remove them from the Linux partition, right?

22  A.    Correct.

23  Q.    They downloaded, viewed, and then presumably deleted?

24  A.    Yeah.  The trash file does list exactly which files

9:15AM25  had been sent to the trash, meaning actually deleted.  But

9:15AM 1   notably, there were some files that were missing from that
2   that no longer exist on the system that could suggest
3   files being moved as opposed to deleted.  But, yes, none
4   of the files currently exist on the system.
9:15AM 5   Q.    You found a number of the marissa series images in
6   the unallocated space, though, right?
7   A.    Again, I don't know what the marissa series is.  I
8   know that suspected child pornography was found in
9   unallocated space and I confirmed that, but I can't
9:15AM10   confirm exactly which series they came from.
11   Q.    Would it be relevant to your analysis of whether the
12   defendant received child pornography to know what the
13   images he received are?
14   A.    Well, to confirm that they are illegal, sure.  But
9:15AM15   I'm not trying to go in and specifically match it to a
16   particular victim or series.
17   Q.    In order to show that he downloaded the marissa
18   series, wouldn't you need to know what the marissa series
19   is?
9:15AM20   A.    Not necessarily.  I'm just looking for -- confirming
21   the presence of suspected child pornography.
22   Q.    So it doesn't matter to you what's in this
23   marissa.zip file, is that what you're saying?
24   A.    It's not that it doesn't matter.  It's, I can tell
9:16AM25   that there is suspected child pornography, so I --

9:16AM 1    Q.   And you didn't confirm that it came from the marissa
2    series that was downloaded in this zip file?
3    A.   Well, I can't confirm it, because I don't have access
4    to that file.  I don't have a law enforcement database
9:16AM 5    that I can go and access, so I'm only able to see what's
6    in the evidence itself.
7    Q.   You know we made it available to the defense in
8    discovery in this case, right?
9    A.   Through the HP laptop, and that's what I'm looking
9:16AM10   at.  But I can't, from the evidence, confirm that that
11   image is from the marissa series because it's in
12   unallocated.  So it's not like unallocated space gives me
13   a file name or an origin.  I just see a picture.  So that
14   file or the files that I saw in unallocated space could be
9:16AM15   any number of these files.  I can't confirm which one.
16   Q.   So the thumbnail files from the marissa series had
17   file names, right?
18   A.   Yes, they did.
19   Q.   Could have confirmed it that way, right?
9:16AM20   A.   By visually comparing the thumbnails to the
21   unallocated space files?
22   Q.   By looking at the EXIF information that has the
23   thumbnail file names?
24   A.   Well, I did look at the EXIF data in the thumbnails,
9:17AM25   but I would still have to visually match, because I don't

9:17AM 1   have that same information in unallocated space.  So I

2   would actually have to take side-by-side each image from

3   the marissa series thumbnail, assuming it's big enough to

4   see it, and compare it to the image that was found in

9:17AM 5   unallocated space to try to match it.

6   Q.    And you just didn't do that in this case?

7   A.    That would be very time-consuming, so once I saw and

8   confirmed that there was suspected child pornography, I

9   moved on to analyzing the "who, what, where, when and

9:17AM 10   why."

11   Q.    Just to be clear, you could have asked law

12   enforcement to see a copy of the undercover download in

13   this case, right?

14   A.    No, because the agent that was facilitating my review

9:17AM 15   wasn't directly involved in this case.  So I think I had

16   even asked him a couple of questions about evidence and he

17   -- he's like, I just -- I got this drive and this is what

18   they gave me.

19   Q.    You never followed up with us?

9:18AM 20   A.    Did I follow up with you?

21   Q.    Ask for the marissa series that was downloaded in

22   this case from his IP address?

23   A.    No, I did not ask for the child pornography from

24   Torrential Downpour.

9:18AM 25   Q.    You actually prepared an affidavit in connection with

9:18AM 1 the Torrential Downpour activity, right?

2 A. Yes, I did.

3 Q. In that affidavit, you opined that whatever was

4 downloaded was not accessible and viewable to law

9:18AM 5 enforcement, is that right?

6 A. Well, if I can explain.

7 Q. You said that it was not accessible and viewable to

8 law enforcement, is that right?

9 A. Based on my review of the log files, that's correct.

9:18AM 10 Q. You didn't ask for a copy of the undercover download

11 to confirm that?

12 A. If I can explain my answer.  It's not that I said

13 that the entire zip file that was downloaded by Torrential

14 Downpour was necessarily unviewable, but looking at the

9:18AM 15 log files themselves, because I don't have the actual

16 child pornography available to me, I'm reading the logs.

17 And the logs showed that only 13 pieces of 66 total pieces

18 had been downloaded, so that tells me that of the entire

19 zip file, only a small portion had been downloaded.  Yes,

9:19AM 20 if they received the last piece, there is a part of a zip

21 file that can be used to extract the entire zip file, but

22 you would still only get the small portions of the file

23 that was actually downloaded.

24 Q. That's not what you said in your affidavit, Ms. Bush,

9:19AM 25 is that right?

9:19AM 1    A.    Yes.  My initial impression from reading the

2    affidavit was that the complete zip file had been

3    downloaded.  It wasn't until after I prepared my first

4    affidavit that I think we learned that that zip file

9:19AM 5    actually contained over 100 images, so I think there was a

6    little bit of confusion in the language that I was

7    reviewing versus what had actually happened, because I can

8    only -- I could only base my opinions reading the logs,

9    which showed me an incomplete download.

9:19AM10    Q.    You would agree that the user of the Linux partition

11    downloaded a Torrent file on the morning of May 16th of

12    2019, correct?

13    A.    Correct.

14    Q.    That Torrent was pedomom.wmv.torrent, right?

9:20AM15    A.    That's correct.

16    Q.    This video was viewed as well, right?

17    A.    Yes, it was streamed.

18    Q.    You said it was streamed for 20 seconds, is that

19    right?

9:20AM20    A.    I think about 29 seconds would have been the max

21    amount of time.

22    Q.    Have you reviewed the first 20 seconds of this video?

23    A.    No, because it did not exist in the evidence.

24    Q.    It's admitted into evidence in this case, though,

9:20AM25    right?

9:20AM 1    A.    I don't have access to that.

2    Q.    Would it surprise you to learn that in the first 29

3    seconds, there's no child pornography depicted?

4    A.    I don't know how to answer that.  It doesn't surprise

9:20AM 5    me, but --

6    Q.    That would make sense for why the user deleted it

7    after viewing it for 29 seconds, if they were searching

8    for child pornography, right?

9    A.    No, I disagree.  It could be that somebody knew

9:20AM10    exactly what this file was, because it even says

11    "pedomom," so viewing it for 29 seconds doesn't

12    necessarily mean that somebody did or didn't know what was

13    in the file.  I think the point of testimony was just that

14    it was deleted very shortly after the file had been

9:20AM15    streamed.

16    Q.    You have no idea what the person who viewed this file

17    did with it?

18    A.    I know that it was sent to the trash, so I know it

19    was deleted.

9:21AM20    Q.    A thumbnail file was created on the Linux partition

21    associated with this video, right?

22    A.    That's correct.

23    Q.    I just want to make sure we're also clear in agreeing

24    on the technology that was used in this case, Ms. Bush.

9:21AM25    So TOR was used to download child sexual abuse material on

9:21AM 1   the Linux partition of the defendant's computer, right?

2   A.   Correct.

3   Q.   TOR was also used on the defendant's personal

4   MacBook, is that right?

9:21AM 5   A.   That's correct.

6   Q.   It was also used on his personal iPhone, is that

7   right?

8   A.   That's correct.

9   Q.   So all three of the defendant's devices had TOR

9:21AM10   installed on them, correct?

11   A.   Correct.

12   Q.   UTorrent was also used to download child sexual abuse

13   material on the Linux partition of the defendant's

14   computer, right?

9:21AM15   A.   Correct.

16   Q.   If we can pull up what's already been admitted as

17   Government's Exhibit 69.  You found this during your

18   review of the MacBook, right?

19   A.   Yes, I did review some e-mails.

9:22AM20   Q.   Did you review this e-mail?

21   A.   I'm sure it came up.  I don't personally recall it,

22   but I'm sure I saw it.

23   Q.   It just wasn't relevant to your analysis?

24   A.   It's not that it -- well, it didn't relate to the

9:22AM25   child pornography activity that I focused on.

9:22AM 1   Q.   You didn't care about this e-mail?

2   A.   I wouldn't say I didn't care about it.  It was just

3   -- my analysis, I have finite time.  We all do.  So we

4   kind of have to start with what's most important and

9:22AM 5   prioritize our time with the analysis surrounding the

6   child pornography.  So like I said, I'll start there and

7   then kind of work my way out.

8   Q.   So can you say with any certainty, do you remember

9   viewing this e-mail, Ms. Bush?

9:22AM 10   A.   I don't have a personal recollection of it, but I'm

11   sure I came across it.

12   Q.   This is an e-mail from Covenant Eyes, right?

13   A.   That's correct.

14   Q.   Covenant Eyes is an internet filtration system, is

9:22AM 15   that right?

16   A.   It's an accountability software, yes.

17   Q.   The main purpose is to prevent someone from viewing

18   pornography, right?

19   A.   That's my understanding.

9:23AM 20   Q.   And it was installed on the defendant's HP computer

21   on the Windows side, is that right?

22   A.   That's correct.

23   Q.   It was also installed on his MacBook, correct?

24   A.   That's correct.

9:23AM 25   Q.   If we could please turn to page five of this exhibit.

9:23AM 1  According to this e-mail, Ms. Bush, in April of 2017, the

2  Joshua Duggar Covenant Eyes account was flagged for trying

3  to download uTorrent, is that right?

4  A.    That's correct.

9:23AM 5  Q.    That's what would happen if you go to

6  uTorrent.com/download/mac, you would be able to download

7  uTorrent?

8  A.    Yes, specifically the Mac version of uTorrent.

9  Q.    The user was blocked from doing that based on this

9:23AM10  e-mail?

11  A.    It looks like it.

12  Q.    If you will pull this one down and put up what's been

13  admitted as Government's Exhibit 70.  Fair to say you

14  maybe reviewed this e-mail as well?

9:23AM15  A.    Yeah, same answer.  I'm sure I came across it.

16  Q.    This is another Covenant Eyes e-mail?

17  A.    That's correct.

18  Q.    If we could turn to page four of this exhibit.  This

19  one says that the Joshua Duggar Covenant Eyes account

9:24AM20  tried to download uTorrent again in May of 2017, right?

21  A.    Yes, the Mac version of uTorrent.

22  Q.    And they were blocked once again?

23  A.    It appears that way.

24  Q.    Just to be clear then, uTorrent was on the Linux

9:24AM25  partition and someone was repeatedly trying to download it

9:24AM 1    on the defendant's MacBook, is that right?

2    A.    Yeah, looks like maybe they didn't know how to get it

3    or just went to the installer file on the website, which

4    is actually what I was looking for on the Linux side to

9:24AM 5    see if somebody did the same thing, going to uTorrent,

6    going to downloads, looking for the installer.

7    Q.    Ms. Bush, please answer the question that's posed.

8    UTorrent was installed on the Linux partition and someone

9    on the MacBook repeatedly tried to download it, correct?

9:24AM 10   A.    Yes.

11   Q.    Finally, all the child exploitation videos we have

12   discussed, those were streamed or played using the VLC

13   player, right?

14   A.    That's correct.

9:24AM 15   Q.    VLC player was specifically installed on the Linux

16   partition, is that right?

17   A.    That's correct.

18   Q.    Which was also specifically installed on the

19   defendant's MacBook, is that right?

9:25AM 20   A.    That's correct.

21   Q.    So it sounds like, then, we're in general agreement

22   that someone repeatedly downloaded child sexual abuse

23   material on the Linux partition using TOR and uTorrent, is

24   that right?

9:25AM 25   A.    Correct.

9:25AM 1   Q.   Will you agree that this happened over the course of
     2   multiple days in May of 2019?
     3   A.   Correct.
     4   Q.   The file was viewed -- it was downloaded, it was
9:25AM 5   viewed and deleted, and then that happened over and over
     6   again, right?
     7   A.   Some of them were viewed, correct.  And it happened,
     8   I think there was a total of maybe 12 files.
     9   Q.   Over the course of three days?
9:25AM 10  A.   Correct.
     11  Q.   I'd like to move on and discuss a couple of other
     12  topics with you.  In your report, you wrote that, "The
     13  most common ways to install TOR on Ubuntu is by
     14  downloading the installer from TOR's website or it can
9:25AM 15  installed by executing a series of commands at terminals,
     16  such as the following."  And then you go on to demonstrate
     17  some commands, is that right?
     18  A.   That's correct.
     19  Q.   So according to the report you wrote that you
9:25AM 20  prepared in connection with this case, the two most common
     21  ways to install TOR on Linux are through the TOR website
     22  where you can download an installation file or through
     23  command lines, is that right?
     24  A.   Correct.
9:26AM 25  Q.   You testified yesterday that there was a third way,

9:26AM 1   this Snap Store, is that right?

2   A.   That's correct.

3   Q.   By Snap Store, you're referring to the Ubuntu

4   Software Center, is that right?

9:26AM 5   A.   That's correct.

6   Q.   You did not include the Snap Store in your original

7   report, right?

8   A.   That's correct.

9   Q.   You didn't mention it at all in your report, is that

9:26AM10   fair to say?

11   A.   Not in my report.

12   Q.   Will you please pull up Government's Exhibit 30 and

13   go to page seven.  Ms. Bush, this icon that I'm circling

14   right here, that's the Ubuntu Software Center, right?

9:26AM15   A.   That's correct.

16   Q.   It's also pinned right here on the desktop?

17   A.   That's correct.

18   Q.   And within the Ubuntu Software Center is the Snap

19   Store that you were discussing, right?

9:26AM20   A.   That's correct.

21   Q.   You said this pretty much functions like an App Store

22   for an iPhone, basically?

23   A.   Correct.

24   Q.   Now, you can install TOR from the Snap Store, right?

9:27AM25   A.   Yes, you can.

9:27AM 1    Q.    You can also install VLC player this way?

2    A.    That's correct.

3    Q.    Ms. Bush, you testified earlier that you don't deal

4    with Linux as much as you deal with Mac and Windows, is

9:27AM 5    that right?

6    A.    Yeah.  I mean, those two operating systems are much

7    more prevalent, so, yes, the majority of my work would

8    involve those operating systems.

9    Q.    You didn't mention the Snap Store in your report,

9:27AM 10   right?

11   A.    That's correct.

12   Q.    You didn't mention it at all until you heard

13   Mr. Fottrell testify last week, is that right?

14   A.    That's correct.

9:27AM 15   Q.    Did you know about the Snap Store before

16   Mr. Fottrell's testimony?

17   A.    Yes, I did.

18   Q.    So why didn't you put it in your report, Ms. Bush?

19   A.    Because when I had conducted my testing, I had

9:27AM 20   actually ran searches through the Snap Store for uTorrent

21   and it didn't come up.

22   Q.    This is TOR we're talking about, Ms. Bush.

23   A.    Oh.

24   Q.    TOR is downloaded through the Snap Store, right?

9:27AM 25   A.    It can be, yes.

9:27AM 1   Q.   And you didn't include that in your report?

2   A.   No, because I started with uTorrent, and so when I

3   had searched for uTorrent, it kind of led me off a

4   different path to look at different ways that somebody

9:28AM 5   would have done this, so I did not include TOR.

6   Q.   You did not thoroughly investigate how to download

7   TOR on Linux, is that what you're saying?

8   A.   I'm sorry.  What was the question?

9   Q.   You did not thoroughly investigate how someone can

9:28AM10   download TOR on Linux, is that what you're saying?

11   A.   No.  I still considered that, like looking at the

12   gnome shell application state file to look to see if that

13   application had been run.

14   Q.   Ms. Bush, that's not what we're talking about.  You

9:28AM15   said the two most common ways to download TOR are through

16   the website or through command line histories, but you can

17   also download it through the Snap Store, right?

18   A.   That's correct.

19   Q.   And you did not put that in your report, correct?

9:28AM20   A.   Correct.

21   Q.   Did you look at the Ubuntu Software Center when you

22   examined his HP computer, Ms. Bush?

23   A.   Well, it's an internet-based application, so I'm

24   looking at evidence of whether that application had been

9:28AM25   executed, but I am not familiar with being able to look

9:28AM 1    through activity or data being held by the Snap Store

2    because it's web-based, so I'd have to look through their

3    servers to see the data that's in that store.

4    Q.    Did you try to confirm whether anything was

9:29AM 5    downloaded through the Snap Store?

6    A.    Yes, I did.

7    Q.    There's a folder in the Linux partition called Snap,

8    right?

9    A.    That's correct.

9:29AM 10   Q.    Content downloaded from the Snap Store would go to

11   that folder, right?

12   A.    And if it was downloaded, I mean, really through

13   anything, because it's the general program manager.  So

14   just like in my demonstration, running it through command

9:29AM 15   line would still put it in the Snap directory.

16   Q.    You specifically put in commands for Snap, right?

17   A.    Yes, because that is the program manager for the

18   Ubuntu application, or Ubuntu operating system.

19   Q.    So regarding the command lines, your testimony

9:29AM 20   yesterday was that you didn't find any history of command

21   lines being used on the Linux partition, correct?

22   A.    Correct.

23   Q.    Those would be in what is called a bash history file,

24   is that right?

9:29AM 25   A.    That's correct.

9:29AM 1    Q.    And there was no bash history file on the Linux

2    partition that you examined, right?

3    A.    That's correct.

4    Q.    You also testified -- I just want to be clear -- that

9:30AM 5    you couldn't find the uTorrent program in the Snap Store,

6    is that right?

7    A.    That's correct.

8    Q.    So you looked for uTorrent, you couldn't find it.

9    Did you look for TOR in VLC as well or did you just assume

9:30AM10    they also weren't available?

11    A.    I think I did, but --

12    Q.    You didn't include it in your report, is what you're

13    saying?

14    A.    Yeah, after -- this was after I had authored my

9:30AM15    report, I went back and looked for TOR and VLC.

16    Q.    So you did other research and didn't supplement your

17    report?

18    A.    I did not have time.

19    Q.    Now, you know that uTorrent has been around since

9:30AM20    2005 or so, is that right?

21    A.    Yes.

22    Q.    Even though it's been around since 2005, you just

23    couldn't find it in the Snap Store?

24    A.    Well, uTorrent doesn't actually have a Linux-based

9:30AM25    version.  It's one of the very few that doesn't.  Well, I

9:30AM  1    don't want to say very few, but there are a lot of

        2    Linux-based BitTorrent applications, and uTorrent is one

        3    that does not create an architecture for Linux.

        4    Q.   Ms. Bush, my question was, you could not find

9:31AM  5    uTorrent in the Snap Store, correct?

        6    A.   Correct, when I searched for it.

        7    Q.   And you were searching in the virtual machine that

        8    you set up using VMware Workstation?

        9    A.   That's correct.

9:31AM 10    Q.   After you couldn't find it, you tried to do some

       11    Googling, is that right?  That's what you said yesterday

       12    in your testimony?

       13    A.   Well, I Googled the command lines to help me

       14    understand the specific commands that I would need to run.

9:31AM 15    Because I had a general idea, but I wanted to make sure

       16    that I had the exact right commands.

       17    Q.   You also Googled the Wayback Machine archive.org to

       18    see what was going on?

       19    A.   Yes, I did check the Snap Store in the archive.org

9:31AM 20    site.

       21    Q.   All you could find was going back to November of

       22    2020, right?

       23    A.   Correct.

       24    Q.   Ms. Bush, I just want to make sure we're very clear

9:31AM 25    about what your testimony is.  If the version of uTorrent

9:31AM 1    on the defendant's Linux partition was available for

2    download in the Snap Store, would you say that it was more

3    likely that the user installed it on the Snap Store or

4    would your testimony still be that he likely used the

9:32AM 5    command line prompts and then deleted his bash history to

6    hide all of that?

7    A.   I wouldn't necessarily say it's more likely, but it's

8    certainly a possibility if it had been in the Snap Store

9    at the time.

9:32AM10    Q.   You are not willing to say it's more likely that the

11    Snap Store was used than someone would use command lines

12    and then hide their tracks by deleting a rare bash history

13    file?

14    A.   Well, I guess if you look at everything collectively

9:32AM15    from the patterns and characteristics found on the

16    MacBook, we know that somebody was Googling the uTorrent

17    Mac download installer.  So that's, to me, the most common

18    way is to actually go and look up through the internet the

19    software that you want to download and find the installer

9:32AM20    and go that way.  So that would be the most likely, in my

21    opinion, in this case.

22    Q.   You found no evidence of that, right?

23    A.   Correct.

24    Q.   So I just want to make sure we understand.  Your

9:33AM25    testimony today is that all of these apps -- uTorrent TOR,

9:33AM  1  VLC -- if they all could be downloaded in the Snap Store,
        2  you still think it's equally possibly that someone used
        3  command lines and then just deleted the bash history, is
        4  that right?

9:33AM  5  A.   Well, they would have had to delete the bash history,
        6  but also the application state doesn't show that that
        7  program had been used either.

        8  Q.   Well, the application state didn't show that TOR had
        9  been used either, right?

9:33AM 10  A.   That's correct.

       11  Q.   Or uTorrent?

       12  A.   That's correct.

       13  Q.   Or VLC player?

       14  A.   That's correct, which we know were used.

9:33AM 15  Q.   So the application state didn't have all the
       16  applications that were used, right?

       17  A.   It looks like potentially either the activity was not
       18  going through the user interface, because that
       19  specifically records gnome applications.

9:33AM 20  Q.   Or that that was incomplete information, right?

       21  A.   Or that it had been deleted.

       22  Q.   You just don't know?

       23  A.   Correct.

       24  Q.   You can't say?

9:33AM 25  A.   Well --

9:33AM 1    Q.    You're speculating, is that right?

2    A.    No, because we know that those applications had been

3    used.  We know that VLC was used, we know that uTorrent

4    was used, and we know that TOR was used.  So for them to

9:33AM 5    not be in that file tells me that they either potentially

6    weren't done through the gnome interface, the GUI, and

7    could be executed through command line.

8    Q.    You just can't say, can you, Ms. Bush?

9    A.    If it had been done through the graphical user

9:34AM 10   interface, I would expect that file to be full of

11   information, so it leads me to believe this was done

12   through command line.

13   Q.    You know, Ms. Bush, that there was a document on the

14   Linux partition, right?

9:34AM 15   A.    Yes.

16   Q.    That document was edited?  It was a text document?

17   A.    An ODT file, yes.

18   Q.    That also wasn't in the application history, right?

19   A.    You mean like this application here, the Word

9:34AM 20   processing program?

21   Q.    Right.

22   A.    Correct.

23   Q.    Whoever was doing that was also doing it through

24   command lines?

9:34AM 25   A.    Well, potentially, yes.

9:34AM 1    Q.    Just didn't log that information, correct?

2    A.    Or it took that information from whatever system

3    copied or moved or created that file.

4    Q.    You also said in your testimony, Ms. Bush, that the

9:35AM 5    person who set up the Linux partition was likely using a

6    Dell computer because the dell_one user name was the user

7    name, right?

8    A.    That, in combination with other artifacts.

9    Q.    There's no actual forensic evidence showing, though,

9:35AM 10   that the Linux partition was set up by someone using a

11   Dell?

12   A.    No.  That information is no longer available because

13   of the lapse in time.

14   Q.    So you are just inferring, based on the dell_one user

9:35AM 15   name, that someone was using a Dell, right?

16   A.    It just -- it's giving me an indication that whoever

17   was doing this used the term "Dell" and that can't be

18   ignored.

19   Q.    But you ignored the password, right?

9:35AM 20   A.    No, I didn't ignore it.  It was already known.  It

21   was already established that that was the password.

22   Q.    As was dell_one, correct?

23   A.    Yes.

24   Q.    Now, you said you set up the Linux operating system

9:35AM 25   in your analysis, right?

9:35AM 1    A.    Yes.

2    Q.    You set it up in the virtual machine to use?

3    A.    Correct.

4    Q.    How many times before this case had you set up a

9:36AM 5    Linux operating system?

6    A.    Maybe 50 times.

7    Q.    Fifty times.  Had the Linux operating system ever

8    told you or had it ever auto-generated a name for you?

9    A.    Not in the way that I'm doing it, no.

9:36AM10    Q.    You said you used a program called VMware Workstation

11    to install the partition, right?

12    A.    Correct.

13    Q.    That's just essentially a virtual machine software

14    program, is that right?

9:36AM15    A.    Correct.

16    Q.    And VMware assists you with the installation process,

17    right?

18    A.    Correct.

19    Q.    It automates it for you?

9:36AM20    A.    Correct.

21    Q.    Have you ever installed a Linux operating system

22    outside of the VMware software?

23    A.    Many times.

24    Q.    When you were setting up a Linux operating system

9:36AM25    using this VM Workstation, a user name wasn't

9:36AM 1   auto-generated, right?

2   A.   Correct.  I input the user name to mimic this system

3   specifically, because I'm not going through any sort of

4   active directory or management server to create it.  I'm

9:37AM 5   just using a stand-alone machine that's not connected to a

6   network.

7   Q.   So you had to pick one and type it out, right?

8   A.   Specifically for the purpose of this testing, yes.

9   Q.   You testified that you couldn't set up a Linux user

9:37AM 10   name that contains an underscore like dell_one, is that

11   right?

12   A.   Correct.

13        MR. CLAYMAN:  If I could have access to the Elmo,

14   publish what's been admitted as Defendant's Exhibit 84.

9:37AM 15   Q.   (BY MR. CLAYMAN.)  You recognize this, right,

16   Ms. Bush?

17   A.   Yes, I do.

18   Q.   You cropped out the date and time, but you made this

19   exhibit after hearing Mr. Fottrell's testimony, is that

9:38AM 20   correct?

21   A.   I had done this previously, but that's when I took

22   the screenshot, that's correct.

23   Q.   Because he said in his testimony that he could create

24   a Linux user name that contained an underscore, right?

9:38AM 25   A.   Correct.

9:38AM 1  Q.   And based on your experience with Linux and what you

2  know about the operating system, you just didn't think

3  that was possible, right?

4  A.   It's not that I don't think it's possible.  It's that

9:38AM 5  when I did it in testing, clearly there is an issue with

6  the underscore.  Like I said, it's kind of a controversial

7  character because it's used so natively within the system.

8  For the same reason, Linux doesn't let you use dots

9  because it reserves the dot character for hidden files

9:38AM10  like we saw the .local or .cache or .bash history,

11  .bash_history.  Underscore is a character commonly used by

12  that operating system, so sometimes it will reserve that

13  for the system and not let the user have it.

14  Q.   You said VMware automates the installation process,

9:39AM15  right?  That's part of what we are seeing in this exhibit?

16  A.   It can, yeah.

17  Q.   This is not what the native Linux installer looks

18  like, right?

19  A.   Correct.  This screenshot is through VMware.

9:39AM20  Q.   This exhibit is actually showing that VMware is

21  telling you that you can't use an underscore, right,

22  saying VMware Workstation is where the error is coming

23  from?

24  A.   Correct, but specifically for personalizing Linux.

9:39AM25  Q.   You actually testified yesterday this error message

9:39AM 1   was generated by the virtualization software, right?

2   A.   Yeah.  You can see that I'm within VMware.

3   Q.   As part of your analysis in this case, did you use

4   any other virtualization software to try to set up a Linux

9:39AM 5   operating system?

6   A.   Not Linux, no.  Because these are paid tools, so we

7   don't purchase, typically, multiple of the same tool if

8   one can get the job done.

9   Q.   You said you set up the Linux operating system on a

9:39AM 10   HP computer, right?

11   A.   That's correct.

12   Q.   Could you put an underscore in that user name?

13   A.   To my recollection, I could not.

14   Q.   Do you remember if you tried or not?

9:40AM 15   A.   Yes.

16   Q.   And to your recollection, you couldn't?

17   A.   Correct.

18   Q.   You didn't take a screenshot of that, though, right?

19   A.   No, because I don't have an actual running operating

9:40AM 20   system yet, I would have to just take a picture with my

21   phone, and for government exhibits, it looks pretty

22   sloppy.  So that's why I used the VMware just for the ease

23   of making a clean exhibit.

24   Q.   I just want to make sure we're clear on your

9:40AM 25   testimony, Ms. Bush.  If a user could create a user name

9:40AM 1    with an underscore, would that change your opinion at all

2    that the individual who set up this account had an

3    auto-generated dell_one user name?

4    A.    No.

9:40AM 5    Q.    You also testified yesterday about the manner in

6    which the child sexual abuse material was accessed, do you

7    recall that?  This is regarding the streaming on the VLC

8    player, is that right?

9    A.    Correct.

9:40AM10    Q.    You testified that the fact that the videos were

11    locally streamed may mean that someone was broadcasting

12    these videos over the internet, is that right?

13    A.    That's correct.

14    Q.    You said that even though these videos were

9:41AM15    downloaded to the HP partition, or the Linux partition on

16    the HP computer, is that right?

17    A.    Correct.

18    Q.    If I was understanding your testimony correctly, you

19    were saying that someone on the network could have been

9:41AM20    streaming the content, is that right?

21    A.    Correct.

22    Q.    And by "network," do you mean the Wi-Fi network?

23    A.    Yeah.  I mean the local area network.

24    Q.    If you could please pull up what's been admitted as

9:41AM25    Government's Exhibit 5.  Ms. Bush, this is the car lot

9:41AM 1    over here.  You're saying someone within this Wi-Fi

2    network could have been streaming the video?

3    A.    The computer within that, yeah, Wi-Fi or that network

4    would have been hosting the material through VLC.

9:41AM 5    Q.    So someone on the network, meaning over here, is who

6    you are talking about streaming it, right?

7    A.    Correct.

8    Q.    Ms. Bush, if someone was remotely accessing the HP

9    Linux partition, they wouldn't need to stream the content

9:42AM10   either, is that right?  They could simply double-click the

11   video as if they were sitting there locally playing the

12   video?

13   A.    They could, unless they were trying to get in and out

14   quicker.

9:42AM15   Q.    Would it be quicker just to double-click the video

16   when you are remotely accessing it, is that your

17   testimony?

18   A.    Well, no, because if you wanted to watch a 30-minute

19   video, you know that you're going to have to sit there and

9:42AM20   actually watch it visually on the screen.  So if you are

21   somebody who wants to get in and out of this computer

22   quicker, that might be a way to host it without actually

23   having to sit on that computer.

24   Q.    So someone who is remotely accessing the defendant's

9:42AM25   computer could double-click and play it, just as if they

9:42AM 1    were sitting there at the defendant's actual computer, is

2    that right?

3    A.   They could, yeah.

4    Q.   Ms. Bush, are you familiar with a function on

9:42AM 5    uTorrent called copy stream URL?

6    A.   Yes, I am.

7    Q.   So you know that copy stream URL is just another way

8    to play a video that is being downloaded from TOR, or from

9    Torrent?

9:43AM 10   A.   It would take a few steps, but, yes.

11   Q.   This video would be downloading to your actual

12   computer, right?

13   A.   Correct.

14   Q.   You could play it from your actual computer using

9:43AM 15   copy stream URL?

16   A.   Correct.

17   Q.   So you have done this before, is that right?

18   A.   Correct.

19   Q.   All you have to do, Ms. Bush, is right click the

9:43AM 20   downloading file, select copy stream URL, and then paste

21   that URL in the VLC player to play the video, is that

22   right?

23   A.   Pasting it into the player, meaning you'd have to go

24   into the streaming and specifically go into your network

9:43AM 25   stream and make sure that you have the correct URL input,

9:43AM 1    yes.

2    Q.    So you couldn't just paste it into the VLC player,

3    that's your testimony?

4    A.    Again, if you're browsing to the correct

9:43AM 5    configuration, yes.

6    Q.    You couldn't just click copy stream URL, open VLC and

7    click paste, is that what you're saying today?

8    A.    Well, I don't know what you mean by clicking paste in

9    VLC because it would have to have -- you would have to

9:44AM 10   find some input in order to paste.  You mean like a drag

11   and drop?

12   Q.    I mean pasting it, Ms. Bush.

13   A.    Well, there would have to be some sort of input, so

14   it would require you to input the stream URL that you just

9:44AM 15   copied into some form.

16   Q.    So you're unfamiliar with what I'm talking about, is

17   that right?

18   A.    Well, I know that the network stream URL, if you go

19   to the streaming service within VLC, it will ask if you

9:44AM 20   want to select a file or if you want to input a network

21   URL.  And if you want to put in a network URL, then that's

22   where you can go in and paste your stream.

23   Q.    So you aren't familiar with what I'm talking about

24   about pasting into VLC, is that what you're saying,

9:44AM 25   Ms. Bush?

9:44AM 1    A.    Yes.

2    Q.    Moving to a different topic.  You testified yesterday

3    that you think someone could have been remotely accessing

4    the Linux partition and downloading child sexual abuse

9:44AM 5    material, is that right?

6    A.    Correct.

7    Q.    Now, a computer log -- there would be computer logs

8    logging this sort of activity, right, if someone was

9    remotely accessing the computer?

9:45AM10    A.    Absolutely.

11    Q.    You didn't find any log files documenting that, did

12    you, Ms. Bush?

13    A.    It's not that I didn't find them.  It's that the

14    information that I'm looking for would be within the

9:45AM15    kernel logs, the system logs, the authorization logs.  But

16    because the activity happened in such a short amount of

17    time in May, by the time the computer is seized in

18    November, all of that information had been overwritten by

19    new system information.

9:45AM20    Q.    So you didn't find any evidence that the computer had

21    been remotely accessed, is that what you're saying?  No

22    evidence existed on the computer showing that it had been

23    remotely accessed, correct?

24    A.    The evidence that I would need to make that

9:45AM25    conclusion is no longer available to me.

9:45AM 1    Q.    So you did not find it, is that your testimony?

2    A.    It does not exist.

3    Q.    If you found it, that would be the very first piece

4    of evidence you would point the Jury to, correct?

9:45AM 5    A.    That's one of the first things I looked for was the

6    system logs to determine that, because I'm looking to

7    exclude remote access as a possibility.  So by reviewing

8    those logs, in combination with information from the

9    router, I would be able to exclude that as a possibility

9:46AM 10   and then look at who had physical access to this machine.

11   Q.    It's possible, Ms. Bush, that those logs just never

12   existed, right?

13   A.    No.  Those are pertinent system logs that are

14   recorded by the operating system that you can't just --

9:46AM 15   you can't just stop the system from making those there.

16   It's like telling Windows that it can't use Windows event

17   logs.  It's something that's native to the operating

18   system.

19   Q.    You have no idea if there would be any evidence that

9:46AM 20   someone remotely accessed the computer in those logs,

21   correct?

22   A.    Well, I know that those logs would be the ones that

23   contained that --

24   Q.    But you have no idea what's contained within those

9:46AM 25   logs, correct?

9:46AM 1   A.   Well, I know what's contained in them now, but not

2   what would have shown in May, because it's been

3   overwritten.

4   Q.   So you have no idea if this computer was remotely

9:46AM 5   accessed in May of 2019, is that right?

6   A.   Correct.  The evidence doesn't exist.

7   Q.   Just to be clear, this evidence would have to exist

8   both on the Windows side and the Linux side, right?

9   A.   No, not necessarily.  If somebody is remoting into

9:47AM10   the computer using the Linux side specifically, it would

11   be on that side of the operating system, because remember

12   this is like two separate computers in one.  So if

13   somebody is only using that one partition as the host,

14   that's where your evidence is going to reside.

9:47AM15   Q.   But you did look for evidence if someone had remotely

16   accessed the Windows side, is that right?

17   A.   Sorry.  Say that question again.

18   Q.   You did look for evidence during your analysis to see

19   if someone had remotely accessed the Windows side of this

9:47AM20   computer, correct?

21   A.   I don't know that I did, because that wasn't the

22   infected side of the computer, so I didn't do an extensive

23   timeline analysis to determine if the remote access ever

24   had occurred on the Windows side of the partition --

9:47AM25   Q.   Well, you documented in your report --

9:47AM 1            THE COURT:  Mr. Clayman, let's be careful not to

2     speak over each other.  It makes the court reporter's job

3     very difficult.

4     Q.   (BY MR. CLAYMAN.)  You documented in your report,

9:48AM 5     Ms. Bush, that AnyDesk, Teamviewer, and VNC Viewer were

6     installed on the Windows side, right?

7     A.   Yeah.  I was looking for third-party applications

8     that were installed that would allow remote access and I

9     did find three different programs.

9:48AM 10    Q.   But you found no evidence that those programs had

11    been used to remotely access the Windows partition, right?

12    A.   Those specifically.  But like I would be looking for

13    the Linux systems logs, I would be looking for the Windows

14    event logs, which I did not have time to go through and

9:48AM 15    review.

16    Q.   You did not review to see if anyone had remotely

17    accessed the Windows side of this computer, correct?

18    A.   Correct.  I did not find any evidence from what I

19    have seen.

9:48AM 20    Q.   I just want to be very clear for the Jury.  You found

21    no evidence that anyone remotely accessed the Windows side

22    of the computer?

23    A.   Correct.  Well, sorry.  Not during the dates of

24    interest.

9:48AM 25    Q.   Correct.  The Linux side would equally have evidence

9:48AM 1    of remote access, these log files, correct?

2    A.    Yes, it could, unless somebody is really good at

3    covering their tracks.

4    Q.    So if you found these log files showing remote

9:49AM 5    access, you would certainly point the Jury to them, right?

6    A.    If I had done that extensive analysis, yes.

7    Q.    You did not find any log files showing that the Linux

8    partition had been remotely accessed on May 13th, 14th,

9    15th, or 16th of 2019, right?

9:49AM 10    A.    Well, no.  The log files on the Linux partition no

11    longer exist, so it's not that -- the information that I

12    would have needed from the Linux side just doesn't exist.

13    It's been overwritten.

14    Q.    You couldn't find it?

9:49AM 15    A.    No, I know exactly where it is.  I just -- it's been

16    overwritten.

17    Q.    So you don't know what's contained in it, right?

18    A.    Not at the time in May, because the way that the logs

19    work is it logs in chronological order.  And as older

9:49AM 20    information -- or as new information gets logged, it

21    overwrites the older information so that it's not bogging

22    down your computer with a ton of system data.

23    Q.    In your report, Ms. Bush, you didn't mention any

24    remote access applications on the Linux side of the

9:50AM 25    computer, is that right?

9:50AM 1    A.   I think in the Linux side, I had only maybe detailed

2    the applications that were of interest to the viewing and

3    downloading of child pornography.

4    Q.   So you didn't document any remote access applications

9:50AM 5    on the Linux side is what you're saying, correct?

6    A.   Correct.   I did not mention Remmina.

7    Q.   You mentioned Remmina, though, in your testimony

8    yesterday, is that correct?

9    A.   Yeah.   It was shown in government's exhibits, so --

9:50AM 10   Q.   Just to be clear, you found no evidence that Remmina

11   had ever been used in May of 2019, is that right?

12   A.   Again, the evidence doesn't exist because that

13   information would be overwritten.

14   Q.   So you can't tell the Jury which application you

9:50AM 15   think might have been used to remotely access the Linux or

16   Windows side of this computer, is that right?

17   A.   And it doesn't even need to be an application.   But,

18   yes, I cannot exclude remote access, but I can't prove it

19   either.

9:51AM 20   Q.   So the most that the forensic evidence shows is that

21   child sexual abuse material was downloaded repeatedly

22   during business hours on the Linux partition on May 14th,

23   15th, and 16th, is that right?

24   A.   Yeah, repeatedly, meaning, I think, 11 or 12 files

9:51AM 25   within three days, yes.

9:51AM 1   Q.   The 14th through the 16th are business days, right?

2   A.   I believe so.  I'd need to look at a calendar, but I

3   think they were.

4   Q.   You didn't look up what those days were in your

9:51AM 5   analysis?

6   A.   I think I did, I just -- I couldn't tell you right

7   now on the stand what days they would have been.  I don't

8   know if it was a Sunday through a Wednesday or Thursday.

9   I would have to look.

9:51AM10   Q.   Would it be relevant in your analysis to know if

11   those were business days or if they were weekends?

12   A.   Well, not necessarily, because if it's a car lot,

13   they might be open on the weekend.

14   Q.   Did you do that analysis to see if it was open on the

9:51AM15   days?

16   A.   On which days?

17   Q.   The 14th through the 16th, the days in question.

18   A.   Yeah.  I know that those are the dates in question.

19   Q.   Did you determine that the car lot was certainly open

9:52AM20   on those dates?

21   A.   No, I don't know the business hours of the car lot.

22   Q.   Ms. Bush, I want to be clear.  If the Linux operating

23   system was running the Linux partition, the Windows side

24   of the computer would not be operational, is that correct?

9:52AM25   A.   Correct.  They are not -- they can't be run parallel.

9:52AM 1  They would have to be run independently.

2  Q.   If someone is on the Linux side, the Windows side

3  cannot be accessed, is that right?

4  A.   Correct.

9:52AM 5  Q.   That's regardless of whether someone is remotely

6  accessing or accessing natively or locally, they just

7  can't be running at the same time on the computer?

8  A.   Correct.  You have to switch.

9  Q.   If we could pull up what's been admitted as

9:52AM 10  Government's Exhibit 74 and go to page four.  You saw this

11  picture when you were sitting in on Mr. Fottrell's

12  testimony last week, is that right?

13  A.   Yes.

14  Q.   Did you find it during your own examination of the

9:52AM 15  devices?

16  A.   Don't have personal recollection, but I'm sure it was

17  there.

18  Q.   You don't recall if you were looking for images from

19  May 14th in your examination?

9:53AM 20  A.   Well, there was over a million media files, so it

21  would take me a long time to get through all those.  But,

22  no, I did not go through every picture and video.

23  Q.   You didn't try to sort those by dates?

24  A.   No, because I was first looking for ways to exclude

9:53AM 25  remote access, because if I can exclude that, then I move

9:53AM 1   to physical access.  And at that point, the evidence had

2   pointed me to remote access, so I hadn't determined who

3   was physically there.

4   Q.   The lack of evidence is what you're talking about,

9:53AM 5   correct?

6   A.   In part.  In part, because you also have the

7   streaming, the UPnP enabled, the really small partition,

8   the small time frame, the immediate deletion.  So the

9   collection of all of that is what led me to really explore

9:53AM 10   remote access further.

11   Q.   We'll get to UPnP in a second, but this image was

12   taken on May 14th of 2019, right?  That's what it appears

13   to say in this exhibit?

14   A.   That's what this application says.

9:54AM 15   Q.   It was taken at 4:20 p.m.?

16   A.   That's what this application says.

17   Q.   It appears to be in the car lot, is that right?

18   A.   Yes, it appears to be.

19   Q.   This actually appears to be the Windows partition of

9:54AM 20   the HP computer, right?

21   A.   Yes.

22   Q.   So we can see right here, this is the desktop, the

23   picture of the defendant and his family.  That appears to

24   be the same picture, right?

9:54AM 25   A.   Yeah, assuming there's no other computer that he set

9:54AM 1   with his family picture as the background.

2   Q.   It would be important for you to know who was at the

3   car lot during the time frame in question, right,

4   Ms. Bush?

9:54AM 5   A.   Not necessarily.

6   Q.   You wouldn't want to see who has access to this

7   computer, is that what your testimony is?

8   A.   Well, I think I knew Mr. Duggar had access because I

9   could see on the computer that he was obviously using it.

9:54AM10   But looking for remote access was first.  And then also

11   even if I was able to prove that he was at the car lot, it

12   doesn't tell me who else was at the car lot.

13   Q.   You'd want to know everyone who was at the car lot at

14   the relevant times, right?

9:55AM15   A.   Correct.

16   Q.   If we could zoom in on this picture, this screen

17   there.  You must have been here when we were discussing

18   it.  There's a reflection in this picture, correct?

19   A.   It appears so.

9:55AM20   Q.   Appears to be someone wearing a hat with some sort of

21   red or orange logo right here, is that right?

22   A.   Yeah, I guess I can see that.  Yeah, looks like maybe

23   wearing sunglasses or something.

24   Q.   Right here is the logo.  Here's the bill of the hat.

9:55AM25   You can see that?

9:55AM 1   A.    Yeah, I see where you're going with that.

2   Q.    If we could go to Government's Exhibit 74, this same

3   one, and go to page 11.  This picture was also taken on

4   May 14th of 2019, right?

9:55AM 5   A.    That's what the application shows, yes.

6   Q.    It was taken later in the day, correct?

7   A.    That's what the application shows, yes.

8   Q.    Taken at a different location?

9   A.    Correct.

9:56AM10   Q.    It's of the defendant, right?

11   A.    Correct.

12   Q.    It's a selfie of the defendant and what appears to be

13   his wife?

14   A.    Correct.

9:56AM15   Q.    The defendant is wearing what appears to be the same

16   hat that was reflected in the screen, right?

17   A.    Yeah, the business hat.

18   Q.    The Wholesale Motorcars, correct?

19   A.    Correct.

9:56AM20   Q.    Take down the left side here.  Pull up what's already

21   been admitted as Government's Exhibit 38.  So, Ms. Bush,

22   less than an hour after this image on the right was taken,

23   someone was using the HP computer on the Linux partition

24   side to download files from TOR, is that right?

9:56AM25   A.    Yes, assuming the information depicted in the Windows

9:56AM 1   photo screen shot is accurate, then, yeah, it was within

2   an hour.

3   Q.   You haven't independently confirmed the accuracy of

4   this image?

9:56AM 5   A.   No, not personally.

6   Q.   If we can take down Government's Exhibit 38 and pull

7   up 39.   That same night, someone was downloading multiple

8   Torrent files associated with child sexual abuse material

9   well into the 5:00 hour, right?

9:57AM 10   A.   Correct.

11   Q.   And we know, because we have discussed, that these

12   two Torrent files can be used to view child sexual abuse

13   material, is that correct?

14   A.   Sorry.   What can be used?

9:57AM 15   Q.   These two Torrent files can be used to fetch and view

16   child sexual abuse material?

17   A.   Correct.

18   Q.   Ms. Bush, based on your theory that someone not

19   present at the car lot was downloading this child sexual

9:57AM 20   abuse material, at some point after the defendant took

21   this image where he's using the Windows partition of the

22   HP computer, someone would have to shut the computer down

23   and remotely access the Linux side, correct?

24   A.   Correct.

9:57AM 25   Q.   And they'd somehow have to boot it up to the Linux

9:57AM 1    after restarting the computer, is that right?

2    A.    Correct.  They would have to restart it into Linux.

3    Q.    The defendant would see that his computer was

4    restarting if he was present at the car lot, right?

9:58AM 5    A.    If he was there, presumably he would see that the

6    computer does restart into Linux.

7    Q.    He would see that it's accessing the Linux partition

8    side?

9    A.    Correct.

9:58AM10    Q.    Then they would have to actually log into the Linux

11    side using the password that we saw on the defendant's

12    Notes applications, right?

13    A.    Correct.

14    Q.    Just to be clear, you did not find any evidence of

9:58AM15    this remote access?  You said it doesn't exist, right?

16    A.    Correct.  I'm not able to exclude that as a

17    possibility here.

18    Q.    So just going a step farther, less than an hour after

19    this picture was taken, after remotely logging into this

9:58AM20    Linux partition side, someone would then have to use it to

21    repeatedly download child sexual abuse material, is that

22    right?

23    A.    Yeah.  On 5-14, the two Torrents within 10 minutes.

24    Q.    Right.  And the TOR zip file earlier in that night,

9:58AM25    right, at 5:05 p.m.?

9:59AM 1   A.    Correct.

2   Q.    And those files were accessed.  That's what the data

3   shows, right?

4   A.    Correct.

9:59AM 5   Q.    So they would be accessing them on this computer,

6   right?

7   A.    Yes.  The zip file had been extracted, I think at

8   5:11 p.m.  And I don't think we have any dates of when the

9   two videos would have been played, so it could have been

9:59AM 10  that day.  It could have been a different day.  It could

11  have been 5-15.  But, for instance, we know that the

12  folder that contained those two videos hadn't been opened

13  that day.  So really what we know for sure is that the zip

14  file had been extracted.

9:59AM 15  Q.    If someone was remotely accessing the Linux partition

16  and doing this on May 14th, May 15th, and 16th, the same

17  thing would be happening over and over again, correct?

18  The computer would be shutting down, Linux would be

19  booting up, someone would be logging in, downloading child

9:59AM 20  pornography and all of this would be visible on the

21  computer screen?

22  A.    Not all of it necessarily, but, yes, you would see

23  the computer switching operating systems.

24  Q.    And we can see here, this almost always happened

10:00AM 25 during business hours, right?

10:00AM 1    A.    I don't know their business hours, but, yeah, it

2    looks like somewhere around 11:30 to noon, and then after

3    5:00.

4    Q.    If they were streaming the videos and there was sound

10:00AM 5    on, that sound would be playing on the defendant's

6    computer, correct?

7    A.    No, not necessarily.  Again, with VLC, if the

8    computer was being used to host the material, by default

9    actually, the "display locally" box is unchecked, so if

10:00AM10    this was a host for the material, it wouldn't actually be

11    playing it.  Kind of like with Netflix, when they are

12    hosting the material, it's not like Netflix has screens up

13    that's showing everything we're watching at home.

14    Q.    It would certainly be visible on the screen, though,

10:00AM15    right?

16    A.    No.  And that's what that "display locally" check-box

17    does, so not necessarily.

18    Q.    But it could be?

19    A.    But the Linux partition would be up.

10:00AM20    Q.    The Linux partition would be up and visible on the

21    screen in that small office we saw earlier?

22    A.    Correct.

23    Q.    Just to be clear, again for the Jury, you cannot

24    identify for them which application you think was used to

10:01AM25    remotely access the Linux partition, is that right?

10:01AM 1    A.    And it doesn't have to be an application necessarily,

2    but, correct, the information that I would need to rely on

3    to determine that has since been overwritten.

4    Q.    Now, you were also asked quite a bit about the

10:01AM 5    router.  Do you recall that?

6    A.    Yes.

7    Q.    Now, you said you didn't listen to the defendant's

8    interview, but in that interview, he said he set up the

9    router.  Is that relevant to you?

10:01AM10    A.    No, because I'd be looking at the router itself to

11    tell me how it was set up, just like I did with the two

12    operating systems.

13    Q.    He said it was secure and password protected.  Is

14    that relevant to you?

10:01AM15    A.    Well, by default, typically, they are.  So

16    determining whether the password was the same as the

17    default password that comes with the router, the one

18    that's printed on the side of the router or if it was

19    changed to something more secure, but that's information

10:01AM20    that I would try to gather from the router itself.

21    Q.    The defendant was telling law enforcement about this,

22    right?

23    A.    I don't know.  I wasn't there.

24    Q.    Would it be relevant to you if he told law

10:02AM25    enforcement that he reconfigured the router the week

10:02AM 1    before the interview?

2    A.    Not necessarily, because that would show

3    forensically.

4    Q.    That would indicate that he was in control of the

10:02AM 5    router, right?

6    A.    Certainly.  We know it was his name on the billing,

7    so we -- yes.

8    Q.    You testified that law enforcement never seized the

9    router, right?

10:02AM10    A.    I don't know.  It was not provided to me and that's

11    my understanding.

12    Q.    Did you ever ask the defendant to see the router?

13    A.    No, I don't speak to the defendant directly.

14    Q.    Did you ever ask defense counsel if he still had the

10:02AM15    router?

16    A.    No, my analysis -- my analysis is the evidence that

17    was seized by the government that is being used in the

18    case, so I'm not going out to try to find additional

19    evidence.  My job is to analyze what was the evidence here

10:02AM20    that brought the charges to answer the questions.

21    Q.    So you never asked if the router could be examined,

22    is that right?

23    A.    No, I did not.

24    Q.    Now, regarding the Universal Plug and Play, Ms. Bush,

10:03AM25    whether or not Universal Plug and Play was enabled has

10:03AM 1    nothing to do with who was physically present installing

2    the Linux partition on the computer on May 13th, is that

3    right?

4    A.    Correct.

10:03AM 5    Q.    Those are two totally separate concepts, right?

6    A.    Correct.  One is just the network security, and

7    another, we were able to show that somebody physically had

8    access to that computer on May 13th.

9    Q.    It's also totally separate from the remote access

10:03AM10    applications we're talking about, right?  Remmina,

11    AnyDesk, that has nothing to do with whether UPnP is

12    enabled, correct?

13    A.    Not necessarily, but, yeah, typically, if you are

14    using an actual installed application, it's going to

10:03AM15    configure all the remote access for you so you wouldn't

16    necessarily need or rely on UPnP.  But if you are not

17    using an application and you're going through command

18    line, UPnP could help an attacker gain elevated privileges

19    and access to a device remotely.

10:04AM20    Q.    Attacker is what you're saying.  And that's because

21    if you are using an app, that's installed on your

22    computer, it's installed on the other computer.  It's not

23    really an attack, it's already been installed and you are

24    just logging in remotely, right?

10:04AM25    A.    Well, I guess it depends on your term, your

10:04AM 1  definition of attack.  If it's not somebody that you want

2  access to your computer, then it is, even if it is

3  configured.

4  Q.   So what we're talking about with UPnP when you talk

10:04AM 5  about vulnerability and attacks, we are talking about a

6  hacker, is that right?

7  A.   A hacker or somebody who has access to the car lot

8  intermittently and wants to use that computer to conduct

9  activity when they don't have physical access to it.

10:04AM10  Q.   You're saying they want to hack into the computer

11  when they are not there, correct?

12  A.   Yeah, they want to use the computer when they don't

13  have physical access to it.  Kind of like I want to use my

14  computer back at work even when I'm traveling.

10:04AM15       MR. ROBERTS:  Your Honor, I believe one of the

16  jurors is indicating something.

17            THE JUROR:  See if I can request a break.

18            THE COURT:  Certainly.  We'll take our morning

19  recess at this time.  We'll be in recess until 10:25.  If

10:05AM20  everyone would please stand as the Jury exits.  The Court

21  also reminds the Jury of the recess instruction.

22            (Jury out at 10:05 a.m.)

23            THE COURT:  Our gallery should remain situated

24  until I give the all clear.

10:05AM25            (Recess taken from 10:05 a.m. to 10:29 a.m.)

10:29AM 1            (Jury in at 10:29 a.m.)

2          THE COURT:  Members of the Jury, two things.

3  One, my methodology is to attempt to take the morning and

4  afternoon break halfway in between when we begin and the

10:29AM 5  lunch hour, and same for the afternoon.

6          Number two, if you need to take a break for any

7  reason whatsoever, please do.  Just raise your hand and

8  let me know, and it's not a problem.  Don't feel like

9  you're having to wait for the Judge to get to the halfway

10:30AM10  point.  Just let me know.  And I want to empower you to

11  understand, you're doing a service to the community and we

12  can certainly take a recess when we need to to accommodate

13  you, so don't be hesitant to ever do that.

14         Mr. Clayman, you may proceed.

10:30AM15         MR. CLAYMAN:  Thank you, Your Honor.

16  Q.   (BY MR. CLAYMAN.)  Ms. Bush, before the break, we

17  were discussing the Universal Plug and Play information,

18  is that right?

19  A.   Yes.

10:30AM20  Q.   And you said that the Universal Plug and Play, the

21  fact that it was enabled would leave the network

22  vulnerable to hackers essentially, is that correct?

23  A.   Correct.  It's giving elevated privileges to anybody

24  with access to that network.

10:30AM25  Q.   And that is totally distinct from the idea of using

10:30AM 1    remote access software applications installed on two

2    different devices, right?

3    A.    Not necessarily.  The two can play hand in hand.  I

4    mean, if you have a vulnerable network, then that leaves

10:31AM 5    your network vulnerable to remote attackers or to somebody

6    to have control over that network.

7    Q.    That's totally irrelevant to whoever installed the

8    Linux partition on May 13th, correct, because that person

9    had to be physically present?

10:31AM10    A.    Maybe there's two different questions there.  I do

11    think it's very relevant, especially because we know

12    uTorrent used UPnP.  But, yes, we know also that whoever

13    installed the Linux operating system was probably

14    physically present at the time because of the thumb drive.

10:31AM15    Q.    So the installation of the Linux system has nothing

16    to do with whether UPnP was enabled, correct?

17    A.    Not the exact installation of it, but the use of it.

18    Q.    When you said vulnerabilities, you were talking about

19    hacking.  That's what you said, right?

10:32AM20    A.    Yeah, that's a term that people will use.

21    Q.    Some sort of cyber attack?

22    A.    Sure.

23    Q.    And by "network," you mean the Wi-Fi network, is that

24    right?

10:32AM25    A.    Yes.  That's where it would start, because there's

10:32AM 1    the local area network and the wide area network, so it

2    would start with the internet access point, which would be

3    the router.

4    Q.   If we could pull up what's been admitted as

10:32AM 5    Government's Exhibit No. 6.  This is the car lot,

6    Ms. Bush.  You're talking about the Wi-Fi network for this

7    car lot would be vulnerable to cyber attacks?

8    A.   That's what it shows, yes.

9    Q.   You don't have any training in cyber security, right?

10:32AM10    A.   Well, I, again, have training that gives me network

11    forensics or trains me in network forensics.  But, no, I

12    don't have like a specific certification in that.

13    Q.   Right.  You have no certifications in anything

14    related to cyber security, correct?

10:32AM15    A.   Just computer forensics, which can include network

16    forensics.

17    Q.   Cyber security and computer forensic examinations are

18    different concepts, correct?

19    A.   No, not necessarily.  Because, for instance, network

10:33AM20    forensics may be just looking at a network and not even

21    looking at the devices at all, but computer forensics is

22    kind of a combination.  We're looking at devices that are

23    also connected to networks, so we have to consider both of

24    those.

10:33AM25    Q.   So let's discuss what you did here.  Did you find any

10:33AM 1    evidence of any sort of hacking on the Linux partition?

2    A.   Well, that's part of the problem.  The information

3    that would tell me if somebody did have remote access,

4    even if it's somebody who has access to the car lot, that

10:33AM 5    would be within those logs that no longer exist.

6    Q.   I want to be clear on that topic too.  If someone had

7    remote accessing applications installed on their software

8    and they never used them, those logs would never exist

9    either, correct?

10:33AM10    A.   For instance, if somebody used Remmina and conducted

11    activity, sure, there should be information specific to

12    that application.  But if somebody was also doing it

13    through command line, it would be mostly represented, but

14    also Remmina activity would be represented in the Linux

10:34AM15    system logs.

16    Q.   That was not my question, Ms. Bush.  I was asking if

17    Remmina was installed, but no one on the Linux partition

18    ever used Remmina, there would also be no log files

19    reflecting that, correct?

10:34AM20    A.   Presumably, yeah.

21    Q.   So you don't know or you can't say whether no one

22    ever used Remmina or the log files were overwritten,

23    correct?

24    A.   Correct.

10:34AM25    Q.   You just don't know?

10:34AM 1    A.    Correct.

2    Q.    Just to clarify, outside of the use of Remmina, did

3    you find any evidence of any sort of hacking, cyber

4    attack?

10:34AM 5    A.    Well, I think the UPnP settings within uTorrent tell

6    me that it's on a vulnerable network, which could leave

7    that computer open to what you call a cyber attack.  And

8    --

9    Q.    I'm sorry.  I didn't mean to interrupt.  Continue.

10:34AM 10   A.    Just that that tells me that this computer was being

11   used on a network that did have the capability of somebody

12   taking over the network.

13   Q.    Again, Ms. Bush, that was not my question.  My

14   question was, did you find any evidence that any sort of

10:35AM 15   cyber attack had occurred?

16   A.    No, because that information would be in the logs

17   that have since been overwritten, but the evidence I did

18   find suggested that it is certainly possible and likely.

19   Q.    Those log files also may never have existed, correct?

10:35AM 20   A.    No.  And I don't mean to be confusing.  The log files

21   that I'm talking about are the Linux system logs.  Again,

22   the authorization, the kernel logs, those are something

23   that's generated automatically by the system.  So if that

24   activity occurred, it would absolutely be in those logs.

10:35AM 25   Q.    And you did not find those log files, so you cannot

10:35AM 1    say if that activity occurred?

2    A.    I found the log files.  The activity has just been

3    overwritten by activity later that's irrelevant to the

4    actual suspected child pornography.

10:35AM 5    Q.    So fair to say there were no other cyber attacks that

6    occurred in the log files you saw?

7    A.    Correct.  After May 16th, there was -- I did not find

8    anything that would lead me to believe that that computer

9    had been used remotely to download, view child

10:36AM10    pornography.

11    Q.    I just want to be very clear here for the Jury

12    because it's becoming a little convoluted.  You found no

13    evidence that there had been any sort of cyber attacks in

14    the log files, correct?

10:36AM15    A.    It does not exist anymore, that's correct.

16    Q.    Have you ever been to this car lot, Ms. Bush?

17    A.    No, I have not.

18    Q.    If we can take this exhibit down.  Now, you said at

19    the very beginning of this case your role was to focus on

10:36AM20    the forensic evidence, right?

21    A.    Correct.

22    Q.    So you don't consider any of the other factual

23    evidence unrelated to what is exactly on the devices,

24    correct?

10:36AM25    A.    Right.  I let the forensic evidence speak for itself

10:36AM 1    and that's what I rely on.

2    Q.   So you never incorporate any sort of factual

3    contextual evidence in your analysis, correct?

4    A.   I review some discovery like, for instance, reviewing

10:36AM 5    the investigation details to tell me -- give me an idea of

6    what I'm looking for, so that I know I'm looking for

7    BitTorrent activity and looking for these Torrent files.

8    So I do consider information from the investigation.

9    Q.   You also stated the first thing you looked for was

10:37AM10    remote access, correct?

11    A.   Well, I'm looking to exclude it, yeah.  So in order

12    to determine who could have done this, that's one of the

13    first things we do is look at, is there any evidence to

14    suggest this could have been a remote user.

10:37AM15    Q.   Now, you said before, you did not listen to the

16    defendant's interview in this case?

17    A.   Correct.

18    Q.   You didn't incorporate any of what he said to law

19    enforcement into your report?

10:37AM20    A.   No, I did not.

21    Q.   Didn't affect any of your analysis whatsoever?

22    A.   No, it does not.

23    Q.   So you don't know that the defendant discussed using

24    Torrent/BitTorrent with law enforcement?

10:37AM25    A.   I know he used TOR, because I found it on his

10:37AM 1   computer.  And I know that he uses BitTorrent, because I

2   found two applications on the computer.

3   Q.   You know that he was using TOR the day of the search,

4   correct?

10:37AM 5   A.   Right, from the evidence.

6   Q.   You also know that he attempted to download

7   BitTorrent onto his computer, correct?

8   A.   I found the searches of somebody trying to figure out

9   how to install the Mac-based uTorrent and then that

10:38AM10   qBittorrent and Transmission had been installed.

11   Q.   And that didn't affect your analysis at all?

12   A.   It did.  I mean, it tells me what somebody is trying

13   to do on their computer.  And to me, when I look at the

14   timeline, it tells me somebody tried to install uTorrent

10:38AM15   and either couldn't figure out how to do it, couldn't

16   circumvent the software, so then they downloaded

17   Transmission and qBittorrent to download kid movies or

18   Hollywood films, non-pornography material.

19   Q.   Actually, Ms. Bush, he attempted to download uTorrent

10:38AM20   after those downloads occurred, correct?

21   A.   I don't know the time frame, but I just know that

22   clearly somebody was trying to install it and it wouldn't

23   work or couldn't work and the other tools had been used in

24   lieu of uTorrent.

10:38AM25   Q.   Those other tools were used previously to uTorrent

10:38AM 1   for all you know, correct?

2   A.   That's possible.

3   Q.   Then the user went out to find uTorrent.  You just

4   don't know the timeline?

10:38AM 5   A.   Yes, the Mac-based version, that's correct.

6   Q.   And he was blocked from doing that, correct?

7   A.   That's what it appears.

8   Q.   You also left out that the defendant told law

9   enforcement that he had been configuring the router on his

10:39AM 10  car lot, correct?

11  A.   I don't know that, no.

12  Q.   It was included in the interview, but you didn't

13  review the interview, right?

14  A.   If it was included in the interview, then I would

10:39AM 15  think the router would have really important information

16  on it that I would need to review.

17  Q.   But you don't know, because you didn't listen to the

18  interview, correct?

19  A.   No.

10:39AM 20  Q.   You didn't discuss in your report or any of your

21  direct testimony the password to the Linux partition,

22  right?

23  A.   Well, the password was included in the DOJ reports

24  that I did review.

10:39AM 25  Q.   You know the password is Intel 1988, right?

10:39AM 1    A.    Correct.

2    Q.    You know that's a password unique to the defendant,

3    correct?

4    A.    I know that that password was also found in other

10:39AM 5    areas on the computer that, yes, were saved to the

6    defendant's computers.

7    Q.    You know that 1988 is his year of birth, correct?

8    A.    I did not know that prior to the trial, but that's

9    what it seems to be.

10:39AM10    Q.    So you didn't consider that sort of information in

11    your analysis, correct?

12    A.    I mean, it's considered.  I'm not refuting that

13    that's the password.

14    Q.    But you didn't know it, so you didn't consider it in

10:40AM15    forming your opinion, correct?

16    A.    I knew it.  I just didn't go any further because we

17    knew that that was the password.  We knew that there was

18    auto-fill information or saved log-in information from the

19    Notes that clearly that password had been known to

10:40AM20    Mr. Duggar, had been known to other people.  I just left

21    it at that.

22    Q.    You didn't know his birth year was 1998, though.

23    That's what you said, right?

24    A.    I didn't recall that personally.  I know that his

10:40AM25    driver's license was saved there, but I didn't inspect it

10:40AM 1    close enough, I guess, to know.

2    Q.    If we could pull up what's been admitted as

3    Government's Exhibit 64.  Did you review these e-mails

4    where the defendant is sending his password out to other

10:40AM 5    people?

6    A.    I'm sure I saw them, but -- they were included in the

7    evidence I had, so, yes.

8    Q.    This e-mail is from 2014, right?

9    A.    Correct.

10:40AM10    Q.    You testified earlier with respect to the Windows

11    operating system that the password information was

12    relevant for determining who set up that operating system,

13    right?

14    A.    It can be.

10:41AM15    Q.    Do you know that the defendant had asked other people

16    how to set up a Linux operating system?

17    A.    I have no knowledge of that, no.

18    Q.    You didn't consider that in your analysis, correct?

19    A.    Well, no.  Again, I'm using the evidence to tell me

10:41AM20    the story.

21    Q.    You also discussed in some detail a thumb drive that

22    had been plugged in to the HP computer on May 13th.  Do

23    you recall that testimony?

24    A.    That's correct.

10:41AM25    Q.    Would it surprise you to learn that the defendant

10:41AM 1   told law enforcement in his interview that his business is

2   a repository for things like thumb drives because they

3   find various things in the used cars on the lot?

4   A.   I don't know how to answer that question.  It

10:41AM 5   wouldn't surprise me.  It could surprise me.  I don't

6   know.  It's possible that that's a possibility here.

7   Q.   You have no idea that he said that to law enforcement

8   and it didn't influence your analysis at all?

9   A.   No, the defendant's statements don't affect my

10:41AM10   analysis.  It's an objective analysis of the evidence.

11   Q.   But your analysis hinged on what was found on that

12   thumb drive, correct?

13   A.   Well, my analysis told me that at the time Linux was

14   installed, a physical thumb drive had been mounted.  And

10:42AM15   so when I found that evidence, I'm looking to compare that

16   to the other devices that were seized to see if I can

17   match that up.

18   Q.   If you had known that the defendant finds thumb

19   drives on his car lot, you would know that potentially he

10:42AM20   just found this thumb drive in a car and was plugging it

21   in to see what was on it, correct?

22   A.   It's one of many, many possibilities.

23   Q.   That just didn't influence your analysis because you

24   didn't listen to the interview, correct?

10:42AM25   A.   Well, it doesn't influence my analysis because I rely

10:42AM 1   on the data.

2   Q.   Not the interview, correct?

3   A.   Right, not statements.

4   Q.   Ms. Bush, it would be important for you to know who

10:42AM 5   was at the car lot on May 11th, 13th, 14th, 15th, and

6   16th, correct?

7   A.   It could.  May 13th specifically, yes.

8   Q.   That's the date the Linux partition was installed,

9   right?

10:42AM 10  A.   Correct.

11  Q.   You didn't mention in your report looking at any of

12  the defendant's text messages from those dates, though,

13  correct?

14  A.   Correct.

10:43AM 15  Q.   You didn't talk about it in your testimony, correct?

16  A.   I was not asked.

17  Q.   You didn't mention anything in any of your reports

18  about looking at the images from the defendant's phone on

19  those dates, correct?

10:43AM 20  A.   I briefly looked through the images for suspected

21  child pornography, but, no, not for just normal day-to-day

22  images.

23  Q.   Not to see if he was on the car lot on May 11th,

24  13th, 14th, 15th, or 16th, correct?

10:43AM 25  A.   Yeah, the physical access on the 14th, 15th, and 16th

10:43AM 1  at that point in my analysis was not super pertinent,

2  because I started with the remote access.

3  Q.   And you didn't look to see if he was there on the

4  13th?

10:43AM 5  A.   I think I looked at the phone, but even if I was able

6  to show his physical location, it doesn't exclude other

7  people being there.  So even if I did find that, it's not

8  to say that that's the only person who had access to that

9  computer at that date and time.

10:43AM10  Q.   So it didn't play a big role in your analysis here?

11  A.   Yeah.

12  Q.   Those texts also provide information about who else

13  is on the car lot, though, correct?

14  A.   I don't know.  I think maybe there were some that

10:44AM15  mentioned customers or something, but I don't know

16  specific people.

17  Q.   And you don't know because you didn't review those

18  text messages in detail, correct?

19  A.   Well, I would be looking for mostly devices of other

10:44AM20  people who may have had access, so employees or people who

21  I could analyze the data to cross compare to information

22  we have from the devices that were already seized.

23  Q.   You didn't really review the texts to figure out who

24  was on the car lot on May 13th is what you're saying,

10:44AM25  correct?

10:44AM 1    A.   I reviewed them, correct.  But whether that tells me

2    who was sitting at the keyboard, it's kind of -- it

3    doesn't tell me enough information about that.

4    Q.   You also just mentioned you didn't really look at the

10:44AM 5    images on the phone, is that right?

6    A.   I did briefly.

7    Q.   If we could pull up what's been admitted as

8    Government's Exhibit 80.  This is a picture found from the

9    defendant's iPhone, right?

10:45AM 10   A.   I don't know.  The folder path says it came from

11   H-cases-Duggar trial exhibits.

12   Q.   The device says iPhone 8 Plus, correct?

13   A.   Correct.

14   Q.   It's dated June 22nd, 2019, correct?

10:45AM 15   A.   That's what this says.

16   Q.   At 4:47 p.m., correct?

17   A.   That's what this says, yes.

18   Q.   It geolocates to the car lot, correct?

19   A.   It appears so.

10:45AM 20   Q.   And the picture actually is at the car lot, correct?

21   A.   That's what it appears to be.

22   Q.   If we could pull up alongside this exhibit what's

23   been admitted as Government's Exhibit 30 and turn to page

24   24.  Ms. Bush, this document on the left was the only

10:45AM 25   document found in the Linux partition side of the

10:45AM 1   computer, correct?

2   A.   Correct.

3   Q.   It was last edited on June 22nd, correct?

4   A.   Yes.  I believe that was the embedded metadata.

10:46AM 5   Q.   The same date that this picture was taken, correct?

6   A.   According to the photos app, yes.

7   Q.   This document is related to Wholesale Motorcars,

8   correct?

9   A.   Correct.

10:46AM 10   Q.   It's not some document from a Russian hacker, right?

11   A.   Correct.

12   Q.   Right here at the bottom of this document lists the

13   sales agent as Josh, correct?

14   A.   That's what it says.

10:46AM 15   Q.   Did you consider this in your analysis?

16   A.   Yes, I did.

17   Q.   So the only document -- the only document that

18   existed on the Linux partition was accessed the day the

19   defendant was on the car lot and it lists his name,

10:46AM 20   correct?

21   A.   A date, yeah, after all the child pornography

22   activity had ceased and that no child pornography was

23   accessible to a user.

24   Q.   So you think the defendant might have had access to

10:46AM 25   Linux after the child pornography was downloaded, is that

10:46AM 1    your testimony?

2    A.    Potentially, yes.

3    Q.    So he knows about the Linux partition?

4    A.    It's possible.

10:46AM 5    Q.    You can take these both down.  You said that you were

6    concerned that the texts wouldn't tell you who was sitting

7    at the keyboard just now, correct?

8    A.    Correct.

9    Q.    If we could pull up again Government's Exhibit 74 and

10:47AM10    turn to page four.  You recall this image, correct,

11    Ms. Bush?

12    A.    Yes, I do.

13    Q.    This appears to be a photo of someone literally

14    sitting at the keyboard, correct?

10:47AM15    A.    It appears to be.

16    Q.    It was taken on May 14th, 2019, right?

17    A.    That's what this says.

18    Q.    Taken at 4:20 p.m.?

19    A.    That's what it says.

10:47AM20    Q.    Shortly before child pornography was downloaded to

21    the computer?

22    A.    Yes.

23    Q.    Shortly before the Linux partition was accessed?

24    A.    Yes.

10:47AM25    Q.    You know who is shown here in that reflection, right?

10:47AM 1    A.    No, I do not.

2    Q.    You saw a picture of the defendant wearing that exact

3    hat a few hours later, correct?

4    A.    Yeah, it's a company hat, so I can't say that that's

10:47AM 5    Mr. Duggar.

6    Q.    You didn't mention this image once in your report,

7    did you?

8    A.    No.  No, I did not.

9    Q.    You didn't mention it once in any of your testimony

10:47AM10    yesterday, did you?

11    A.    No, I was unable to talk about this particular image.

12    Q.    Even though this image shows someone literally behind

13    the keyboard?

14    A.    Correct.

10:48AM15    Q.    Just didn't make it into your report?

16    A.    Correct.

17          MR. CLAYMAN:  If I could have one moment, Your

18    Honor.

19          THE COURT:  You may.

10:48AM20          MR. CLAYMAN:  Pass the witness.

21          THE COURT:  Thank you, Mr. Clayman.  When you're

22    ready, Mr. Gelfand, you may proceed.

23          MR. GELFAND:  Can I take one minute to get

24    organized?

10:48AM25          THE COURT:  That's fine.

10:49AM 1         MR. GELFAND:  May I proceed, Your Honor?

2         THE COURT:  You may.

3            REDIRECT EXAMINATION

4  BY MR. GELFAND:

10:49AM 5  Q.   Good morning, Ms. Bush.

6  A.   Good morning.

7  Q.   Ms. Bush, you were asked a lot of questions about

8  what the forensic evidence showed and did not show about

9  the possibility of remote access.  Do you recall that this

10:49AM10  morning?

11  A.   Yes.

12  Q.   When did you first become involved in this particular

13  investigation or analysis?

14  A.   April of 2021.

10:49AM15  Q.   Based on your understanding of the case, was that

16  approximately six, or 18 months, after the devices that

17  you reviewed were seized by law enforcement?

18  A.   Yes.

19  Q.   To state the obvious, were you limited in your

10:50AM20  analysis to reviewing what law enforcement preserved in

21  November of 2019?

22  A.   Yes.

23  Q.   Were you limited in what law enforcement chose not to

24  preserve in November of 2019?

10:50AM25  A.   Yes.

10:50AM 1  Q.   You began to explain several times something

2  important about Linux log files.  Can you explain to the

3  Jury, please, why it is you were unable to review any

4  Linux log files from May of 2019 based on what was

10:50AM 5  actually preserved and not preserved by law enforcement?

6  A.   Yes.  The Linux log files exist on the Linux

7  partition of the HP desktop.  And it's a running list, a

8  detailed list of everything that's happening on the

9  system.  And there are a collection of different logs that

10:50AM10  are being stored.  One of the most important is the system

11  log.  It kind of details everything that's happening on

12  the system at the time.  There are also authorization

13  logs, which are giving you information about how the

14  computer is being accessed, kernel logs.  So reviewing

10:51AM15  that information tells me what's happening on the system.

16      But with Linux, because that can be a lot of data

17  over time, it will overwrite older material.  So it's kind

18  of like a DVR system is only going to keep so much footage

19  because it has to use the space to write new data.  So

10:51AM20  because that information had been overwritten, I'm just

21  unable to confirm one way or another what had happened

22  specifically on the system, but I know that those logs

23  would have, if the evidence had been seized shortly

24  thereafter, shortly after the activity, that information

10:51AM25  would have been in those logs.

10:51AM 1    Q.   The Torrential Downpour files that you were asked
       2    about reflect dates of May 14th and May 15th of 2019, is
       3    that correct?
       4    A.   Yes.
10:52AM 5    Q.   If, hypothetically, the law enforcement agents in
       6    this case had seized, meaning preserved the HP computer in
       7    June or July of 2019, would you have then been able to
       8    review the logs, those auto-generated kernel logs,
       9    everything you just described, related to May of 2019
10:52AM10    activity?
      11    A.   Yes.  The sooner a device is seized and preserved,
      12    the better the evidence.  Because there is a lot of
      13    volatile data, meaning data that can get deleted or
      14    changed just through the normal course of an operating
10:52AM15    system's activity, so the sooner the better.
      16    Q.   Was it your decision that law enforcement acted with
      17    the time frame that they acted in?
      18    A.   No.
      19    Q.   You were asked questions about the router as it
10:52AM20    replies to remote access.
      21    A.   Yes.
      22    Q.   If law enforcement had preserved the router, would
      23    you have wanted to review it?
      24    A.   Absolutely.
10:53AM25    Q.   Now, to be clear, you were asked questions by

10:53AM 1    Mr. Clayman about alleged statements that Mr. Duggar, Josh

2    Duggar, made November 8th of 2019, correct?

3    A.   Correct.

4    Q.   Are you aware that's the same day that law

10:53AM 5    enforcement chose not to preserve the router in this case?

6    A.   I assume would be the day that they executed the

7    search warrant.

8    Q.   Now, Ms. Bush, rewinding the clock a little bit to

9    earlier this morning, you were asked a couple of questions

10:53AM 10   right at the outset by Mr. Clayman about Torrential

11   Downpour.  Would you like to have unlimited access to

12   Torrential Downpour?

13   A.   Yes, it would --

14           MR. CLAYMAN:  Objection, Your Honor, relevance.

10:53AM 15           THE COURT:  Well, it was brought up on cross, so

16   I will allow Mr. Gelfand to explore that.  But at a

17   certain point, it does become not relevant.  So the

18   objection is sustained without prejudice to reraising if

19   you contend that it's become not relevant.  You may

10:54AM 20   proceed.

21           MR. GELFAND:  Thank you.  I'm sorry.  The

22   objection is overruled or --

23           THE COURT:  The objection is overruled, but

24   Mr. Clayman is free to reraise it, depending on how far

10:54AM 25   you go down this path.

```
10:54AM  1              MR. GELFAND:  Thank you.
         2   Q.   (BY MR. GELFAND.)  You can answer that question.
         3   A.   Yes, because it would allow me to understand the data
         4   better, which it why we asked to test it.  For the same
10:54AM  5   reason we like to use the same tools that law enforcement
         6   is using and vice-versa, it allows both sides to
         7   understand the data that's being generated by a particular
         8   tool.
         9   Q.   Now, you were asked some questions about the
10:55AM 10   frequency in forensic examinations that you conduct about
        11   Windows, Mac, Linux, correct?
        12   A.   Correct.
        13   Q.   Ms. Bush, are you familiar with Linux?
        14   A.   Yes.
10:55AM 15   Q.   Do you understand Linux?
        16   A.   Yes.
        17   Q.   Are you testifying about Linux based on a
        18   comprehensive expert understanding of how Linux operates?
        19   A.   Yes.  And not just Linux, but file systems and
10:55AM 20   software applications.  It's a collection of all those
        21   things.
        22   Q.   Ms. Bush, you were asked questions about your report
        23   in this case.  Did you prepare a report in this case?
        24   A.   Yes, I did.
10:55AM 25   Q.   And approximately how long was your report?
```

10:55AM 1   A.    It was, I think around 100 pages.  Maybe a little

2   less, a little more.

3   Q.    Did it include an abundance of very detailed

4   information that you computed as of the date you wrote it?

10:55AM 5   A.    Yeah.  I tried to include as much evidence as I could

6   in that report so that the reader could understand the

7   evidence.

8   Q.    Without getting into the content of them, did you

9   review the government's computer forensic reports in this

10:56AM 10  case?

11  A.    Yes, I did.

12  Q.    As part of your analysis, correct?

13  A.    Yes.

14  Q.    Just approximately how long were those reports?

10:56AM 15  A.    I think one was three pages with like a fourth page

16  that was just a signature, and then the other one I think

17  was two pages.

18  Q.    Fair to say, you documented remarkably more

19  information than the government did?

10:56AM 20  A.    If you're using pages, yes, I included a lot more in

21  my report.

22  Q.    You testified that your focus and your work focuses

23  on the data itself, the computer forensic data, the

24  artifacts, correct?

10:56AM 25  A.    Correct.

10:56AM 1    Q.    Explain to the Jury why that's your focus.

2    A.    Because that's my expertise.  My expertise is

3    analyzing data and telling me what it -- analyzing it and

4    letting it tell me what happened.  It's kind of like any

10:56AM 5    other forensic science; blood spatter, ballistics.  Once

6    you process the data and analyze it, it's going to tell

7    you what happened.  So I'm not listening to what anybody

8    had said or allowing external factors to affect my overall

9    opinion.  I am looking at the actual data and what does it

10:57AM 10   tell me.

11   Q.    And based on that review, are you following a trail

12   of forensic evidence found within the devices themselves?

13   A.    Yeah.  So I start with what was the offending

14   activity, where is the suspected child pornography, and

10:57AM 15   then I follow the trail of bread crumbs.

16   Q.    And to be clear, when you said the trail of bread

17   crumbs, are you guessing?

18   A.    No, I'm using the data to work backwards essentially.

19   Q.    You were asked by Mr. Clayman about software called

10:57AM 20   Frazer.  Did you become familiar with that software over

21   the coarse of your analysis?

22   A.    Yes, I did.

23   Q.    What is Frazer?

24   A.    It's a car dealership software management program.

10:57AM 25   Q.    And was Frazer Windows-based?

10:58AM 1    A.    Yes, it was.

2    Q.    Was there forensic evidence that Frazer was

3    regularly, or at least frequently, used on this HP

4    computer on the Windows side of the partition?

10:58AM 5    A.    Yes, there was.

6    Q.    Based on your understanding, does Frazer have things

7    like promissory notes, bills of sale, just the car

8    documents that exist in connection with the sale of a car?

9    A.    Yes, there was a lot of that.

10:58AM10    Q.    Now, you were asked whether Windows was a default

11   operating system and you mentioned boot sequence.  Can you

12   explain to the Jury what boot sequence is and why that's

13   so important to your analysis in this case?

14   A.    Yeah, because it tells me how the computer is going

10:58AM15   to start by default.  So, for instance, I use a MacPro

16   laptop by -- hardware, but I actually have Windows

17   installed, and that's my default operating system.  So

18   even though looking at the hardware itself, you would

19   think it's primarily a Mac system.  If you actually look

10:59AM20   at the boot sequence, you would see that Windows is the

21   primary partition.  So understanding that -- looking at

22   the boot sequence, you just have to consider, how is the

23   hardware used to access the actual operating systems.

24   Q.    Where is -- where would you find the boot order?

10:59AM25   A.    It would be in the BIOS, which is on the actual

10:59AM  1    device itself.  It would not be within the data extracted

2    from a hard drive.

3    Q.    And is it your understanding that the device itself

4    has been in the custody of law enforcement in this case

10:59AM  5    for over two years as we sit here today?

6    A.    That's my understanding.

7    Q.    Has it ever been in your custody?

8    A.    No.

9    Q.    You were asked about the size of the partition and

10:59AM 10    you were asked questions about Blu-ray and things like

11    that.  Why were you focusing on the relative and actual

12    size of the Linux partition on this particular device in

13    analyzing the actual trail of bread crumbs?

14    A.    Because if it's being used to house files, media

11:00AM 15    files that are being downloaded from the BitTorrent

16    network, in my experience, the BitTorrent network actually

17    allows or facilitates the mass download of this data.

18    Because a Torrent can define one file, it can define many

19    files, kind of like the marissa.zip contains a bunch of

11:00AM 20    images.  So typically what I'm seeing is if a particular

21    partition, drive, storage drive, whatever it is is being

22    used to store that data, it has to have sufficient memory

23    or storage to have that data.  So in this case seeing that

24    the available space was so minimal at least just is

11:00AM 25    something to consider when opining on how this partition

11:00AM 1    was being used.

2    Q.    Did it factor in to your analysis at the outset of

3    your work in this case as to whether there was a

4    possibility of remote access?

11:01AM 5    A.    Yes.

6    Q.    Ms. Bush, let's back up for a second.  In computer

7    forensic investigations that you've conducted over the

8    years, are you often able to rule out the possibility of

9    remote access?

11:01AM10    A.    Yes, and I do that on many.

11    Q.    And, in fact, are you often able -- when you're

12    retained by defense teams in criminal cases in state and

13    federal court, do you rule out the possibility of remote

14    access when that's where the actual evidence leads you?

11:01AM15    A.    Yes.  And sometimes I have to argue with the

16    attorneys and tell them, this is not a defense, don't try.

17    Q.    Now, to be clear, Ms. Bush, in this particular

18    instance, based on your training and experience, why are

19    you looking at remote access as even a possibility, much

11:01AM20    less a probability in the first place?

21    A.    Well, partly because of how quick the activity

22    occurred and the fact that it's occurring on a vulnerable

23    system and on an operating system that's heavily command

24    line based, meaning it's a lot more possible.  So the

11:02AM25    likelihood is something that I had to consider.

11:02AM 1    Q.   Now, Ms. Bush, you were asked questions about

      2    dell_one.  Do you recall that?

      3    A.   Yes.

      4    Q.   I'm going to show you what the prosecutor showed you.

11:02AM 5    If I can publish this, please, Defendant's Exhibit 84.

      6    When you testified about this yesterday, you testified

      7    that this was generated when you attempted to run -- to

      8    install Linux on your virtual machine, correct?

      9    A.   Correct.

11:02AM10    Q.   Explain to the Jury if you would what led to this

      11   particular exhibit, what your understanding is as to why

      12   this error message was generated.

      13   A.   Virtualization software is just allowing somebody to

      14   create a system, just like you would with physical

11:03AM15   hardware, but without having the physical hardware.  So in

      16   this case, I'm using software to load that ISO file to

      17   generate an operating system that I can then use.  And so

      18   this wizard is trying to allow the virtualization software

      19   to set up Ubuntu.  And when I entered the user name, it

11:03AM20   gave me the error message about the allowed characters

      21   versus unallowed characters.

      22   Q.   Based on your training and experience, is this error

      23   message the result of the virtualization software or

      24   Linux?

11:03AM25   A.   My understanding would be that it's pulling from

11:03AM 1    regular expression rules from Linux.

2    Q.    Explain to the Jury what you mean by that and why.

3    A.    Well, regular expression is the way that a system

4    defines how something can be named.  So it looks -- like

11:03AM 5    if you read it, it looks like a bunch of jumbled letters

6    and characters, but it actually tells you, you can use A

7    through Z, you can use 0 through 9, you can use this

8    character, you can use that, but you can't use this one.

9    So it's just setting a rule.  Kind of like when you create

11:04AM10    a password and it says it has to have this many

11    characters, it has to have this many numbers.  That's

12    regular expression.  It's just setting a rule.

13    Q.    Can you use programs like Microsoft Word on

14    virtualization software?

11:04AM15    A.    Yes.

16    Q.    Can you use the underscore symbol or character?

17    A.    Of course.  Within Microsoft Word?  Yes.

18    Q.    Does that generate the VMware Workstation error

19    message you got here?

11:04AM20    A.    No.

21    Q.    Ms. Bush, why were you testing this in the first

22    place?

23    A.    Because I wanted to mimic the system to see how

24    complex it would be, how long would it take, what did a

11:04AM25    user have to do.  So I'm just trying to recreate that in

11:04AM 1  different ways.

2  Q.   Did dell_one, when you initially saw that, intrigue

3  you?

4  A.   Yeah, because with everything else we're seeing, in

11:05AM 5  my experience looking at hundreds of different devices,

6  typically what you see is the user name is something that

7  can kind of be attributed to a person.  Even if it's

8  something, we see a network of computers or somebody's

9  personal devices and they like to use Marvel characters or

11:05AM10  maybe superheroes, I don't know, we can actually see a

11  pattern.  Or maybe they always use their first and last

12  name or their first name and their kid's birthday.  Just

13  following those patterns tells us, okay, this is a naming

14  convention that's consistent with this one particular

11:05AM15  user.  But in this case, for everything to kind of be user

16  names that are general to who is using it and then this to

17  say dell_one seemed inconsistent.

18  Q.   Did you know whether you could use the underscore

19  when setting up a user name in the version of Linux Ubuntu

11:05AM20  that is at issue in this case?

21  A.   Not until testing it multiple times.

22  Q.   And is that what you do as a forensic analyst?

23  A.   Yeah, just to understand it on a deeper level.

24  Q.   Do you know when you construct a test like this what

11:06AM25  the answer is going to be?

11:06AM 1  A.    No.

2  Q.    Is the point to find out where the evidence actually

3  leads?

4  A.    Yes.

11:06AM 5  Q.    And what did you find out here based on your actual

6  testing that you constructed multiple times?

7  A.    Just that it was complex.  Yes, there are some things

8  that might be easier to do than others, but it still takes

9  time.  It still takes knowledge.  It is a complex process.

11:06AM10  Q.    And what were you able to conclude, if anything,

11  based on the error message that was generated when you

12  used the underscore character, at least in the simulation

13  that you ran?

14  A.    Just that that's one more factor to consider, that a

11:06AM15  character that is typically not allowed in these systems

16  was seen in this system.  So that could mean that somebody

17  set the underscore to be an allowed character manually.

18  It's just another interesting thing to consider when

19  talking about the complexity of the system.

11:07AM20  Q.    When reaching conclusions in this case or in any

21  case, for that matter, are you relying on just one

22  artifact or the totality of artifacts?

23  A.    The totality.

24  Q.    Is this one piece of that totality?

11:07AM25  A.    Yes.

11:07AM 1   Q.   Now, Mr. Clayman asked you whether you included any

2   reference to the password "Intel 1988" in your 100-plus

3   page report, correct?

4   A.   Correct.

11:07AM 5   Q.   And you indicated that you did not, correct?

6   A.   Correct.  I included the hash of the password, which

7   is essentially the password.  I just didn't decode it,

8   because we already knew what it was.

9   Q.   Prior to getting involved in this case -- well, prior

11:07AM10   to doing the real work you did in this case, but after

11   getting involved, were you able to identify that the

12   government had identified the password for the Linux

13   partition as 1988?

14   A.   Yes.

11:07AM15   Q.   Was your focus on what the government did or was it

16   primarily on everything the government didn't do in their

17   investigation?

18   A.   Yes, it was to answer all the questions we still

19   didn't know the answers to.  So we knew what the

11:08AM20   government had found.  We knew that there were thumbnails.

21   We knew that the password had been set, so I'm looking for

22   everything beyond that.

23   Q.   Now, you were asked about the TOR browser, correct?

24   A.   Correct.

11:08AM25   Q.   And they showed you Exhibit 38.  I can show it to

11:08AM 1   you, but that's the single instance of May 14th that shows

2   7z at the end.  Do you recall that document?

3   A.   Yes.

4   Q.   You testified that based on your investigation, these

11:08AM 5   files were extracted, but not double-clicked on, correct?

6   A.   Correct.

7   Q.   Explain to the Jury what it is you mean by that and

8   what you're basing that conclusion on.

9   A.   To access data within a zip file, you have to extract

11:08AM 10   it, because it's one file.  So that one file, even if it

11   contains one video, you still have to pull it out of that

12   archive.  So by double-clicking the zip file, you're not

13   actually accessing any content, you're just extracting it.

14   So once you double-click on that, it appears from the

11:09AM 15   forensic evidence that the system actually recorded a date

16   for every file that was in that zip file within the same

17   second.  So that's just telling me that the file had been

18   extracted, but the actual files within it, like the

19   images, the videos, hadn't actually been double-clicked on

11:09AM 20   and opened.

21   Q.   Now, explain how thumbnails are automatically cached

22   as they were in this case.

23   A.   Thumbnails is the way for the system to show a user

24   what exists in a folder without actually going through

11:09AM 25   them.  So those are created automatically by the system

11:09AM 1   for the ease of the user rather than having to go in and
2   open every file, but are created automatically.  So for
3   instance, if you open a folder and it contains 400 images,
4   you might only see the first five, but it's actually going
11:10AM 5   to create all 500 within the same second.  So it's not
6   necessarily to say that you know what all 500 of those
7   photos are, but now they all exist on your computer, even
8   if you delete the file.
9   Q.    I want to direct your attention to uTorrent in
11:10AM10   particular.  Based on your forensic analysis that you
11   conducted in this case, was every video that was played
12   streamed through VLC?
13   A.    Yes.
14   Q.    Explain to the Jury specifically what it is you found
11:10AM15   and you have concluded with respect to the streaming and
16   how that enters into your opinion as to remote access?
17   A.    The fact that it is going over a network, the fact
18   that it's using a URL to actually broadcast the
19   information.  And with my understanding of VLC, even if
11:10AM20   you streamed a local file, let's say you just like
21   streaming, it's a convenient way to look at data.  You can
22   stream a local file, but it will still give you the path
23   of where that file was located on your computer rather
24   than a URL.  So that, to me, is just telling me this is
11:11AM25   somebody who is broadcasting material over a network as

11:11AM 1  opposed to just double-clicking and watching a video.

2  Q.   What's the significance of it being broadcast over a

3  network as opposed to just being double-clicked on a

4  computer?

11:11AM 5  A.   It tells me the chance that somebody else was

6  watching that video is much greater.

7  Q.   You identified yesterday the http designation on the

8  government's exhibit reflecting streaming, correct?

9  A.   Correct.

11:11AM10  Q.   And you walked through that file path, correct?

11  A.   Correct.

12  Q.   What does the "http" designation indicate to you?

13  A.   That it's a network protocol.  So, for instance, if

14  I'm packet-capturing on that computer and I want to look

11:12AM15  at all network activity, that should show up, that

16  broadcast.  So it's just a way for information to be

17  exchanged over the internet.

18  Q.   Now, you testified that the pedomom Torrent file was

19  deleted approximately 29 seconds after it was downloaded,

11:12AM20  correct?

21  A.   Correct.

22  Q.   And you were asked questions about whether you've

23  asked to watch that file, correct?

24  A.   Correct.

11:12AM25  Q.   To say the least, have you watched that file?

11:12AM 1    A.    No.

2    Q.    Ms. Bush, what did you specifically find with respect

3    to the trash folder that you were asked about this morning

4    as it applies not only to this file, but to other files in

11:12AM 5    this case?

6    A.    The trash bin is a file in and of itself.  Even

7    though to a user, it's just a folder, from a forensic

8    perspective, it's a file with information that we have to

9    analyze.  So within the trash bin, even though it was

11:13AM10    completely void of files, if you power up the computer and

11    go to the trash bin now, there's nothing there.  But if

12    you look at it forensically, you can actually see the

13    files that used to be in there.  And that included some of

14    the videos and zip files -- well, one of the zip files

11:13AM15    that had been downloaded in this case.  But,

16    interestingly, it was absent the web-collection-preview

17    zip file and a couple of other files, which indicate they

18    weren't sent to the trash, they weren't deleted.  But we

19    know they were deleted because they don't exist, so it's

11:13AM20    possible that those files could have been moved.

21    Q.    What do you mean by moved?  Explain that to the Jury.

22    A.    Meaning they no longer exist, but they don't exist in

23    the trash, so they could have been cut and pasted, or they

24    could have been moved through some sort of file transfer

11:13AM25    protocol.  So the fact that they were not registered by

11:13AM 1    the trash as a deleted file like the other ones is another

2    thing to consider about, where did those files go then and

3    why aren't they in the trash.

4    Q.   To what extent, if any, does that factor into your

11:14AM 5    opinion as to the possibility or even the probability of

6    remote access?

7    A.   It tells me that those files might exist somewhere

8    else, some other device that we don't have.

9    Q.   To be clear, as you testified yesterday, there is no

11:14AM 10   evidence of any of those files or any child pornography

11   files on Josh's personal devices, correct?

12   A.   Correct.

13   Q.   You were asked questions about an affidavit you

14   prepared in this matter regarding Torrential Downpour.  Do

11:14AM 15   you recall that?

16   A.   Yes.

17   Q.   Based on your review of the Torrential Downpour log

18   files from May 15th, was the entirety of that file

19   successfully downloaded?

11:15AM 20   A.   No, it was not.

21   Q.   Explain to the Jury what you observed based on the

22   actual log files you reviewed prior to drafting that

23   affidavit.

24   A.   Because the BitTorrent is transferring data in little

11:15AM 25   pieces, I'm looking at, did it get -- well, how many total

11:15AM 1  pieces are in that Torrent and did the software download

2  all those pieces.  And in the Torrential Downpour log

3  file, it reported only getting, I think it was like 11 or

4  13 total pieces of the 66 that actually made up the zip

11:15AM 5  file.  So that tells me, I think, whatever that math is,

6  I'm not great at that, whatever that percentage is, like

7  less than 10 percent of the actual zip file had ever

8  actually been downloaded by Torrential Downpour.

9  Q.    In drafting that affidavit, were you stating an

11:15AM 10  opinion as to Special Agent Faulkner's under-oath

11  representation that that file was successfully downloaded?

12  A.    Correct, that was my understanding from reading that

13  affidavit.

14  Q.    Were you saying that based on what you observed, it

11:16AM 15  was not successfully downloaded, correct?

16  A.    Right.  I'm saying that it's a single archive file

17  and they were not able to get that archive file.

18  Q.    You were asked about Covenant Eyes, and in

19  particular, some e-mails, Exhibit 70, for example, by the

11:16AM 20  government related to 2017.  Do you recall those exhibits?

21  A.    Yes.

22  Q.    First of all, would you agree with me that those

23  e-mails from Covenant Eyes were dated 2017?

24  A.    Correct.

11:16AM 25  Q.    Now, you testified briefly that those e-mails were in

11:16AM 1   connection to a Mac version?

2   A.   Yes.

3   Q.   Could you explain to the Jury what it is you

4   concluded based on those e-mails?

11:16AM 5   A.   The uTorrent, if you go to that URL, if you visit the

6   uTorrent website, it will give you options to download

7   their program.  And the three options are Mac-based,

8   Windows-based, or the web client version, which basically

9   just means you can access uTorrent through a web browser

11:17AM 10   like Google Chrome or Safari.  So I was just noting that

11   the user who was looking to download uTorrent was

12   specifically looking to download the Mac version of that

13   program, because the Linux version doesn't exist.

14   Q.   And to be clear, does that appear to be associated

11:17AM 15   with the personal laptop belonging to Josh that has

16   nothing to do with child pornography?

17   A.   Correct.

18   Q.   Does the Mac version of uTorrent that appears in

19   those e-mails work on Linux?

11:17AM 20   A.   No, it does not.  There is no Linux version.

21   Q.   Let me rephrase that, because I may have misstated

22   that.  Can you run a Mac version of Linux -- I'm sorry --

23   a Mac version of uTorrent on Linux?

24   A.   Oh, yes, you can, using -- just like the Windows

11:17AM 25   version was installed through the capability layer Wine,

11:18AM 1    the Mac version can be installed through the compatibility

2    layer Darling.

3    Q.    In 2017, you see e-mails on Josh's personal laptop

4    reflecting an attempt to download or at least a search to

11:18AM 5    download the Mac version of uTorrent, correct?

6    A.    Correct.

7    Q.    Is the Mac version of uTorrent running Darling what

8    was actually downloaded and used on the Linux partition of

9    the HP two years later?

11:18AM 10   A.    No, it was the Windows-based version.

11   Q.    You also testified that there was a reference in

12   those e-mails to an installer file, but weren't able to

13   finish your testimony.  Could you explain what you mean by

14   that?

11:18AM 15   A.    Yeah.  That tells me that the user who was trying to

16   install uTorrent didn't go to the App Store.  That's a

17   default application on a Mac operating system.  To

18   download the Mac version of uTorrent, they actually went

19   to the uTorrent site through an internet browser to

11:19AM 20   download the installer.

21   Q.    Now, you testified extensively yesterday that you

22   agree with Mr. Fottrell -- correct me if I'm wrong -- that

23   there are three possibilities, or essentially three ways

24   that uTorrent could have been installed, at least

11:19AM 25   academically, on the HP Linux side, correct?

11:19AM 1    A.   Correct.

2    Q.   And you agree with Mr. Fottrell that you both ruled

3    out, forensically, any sort of installer, correct?

4    A.   Correct.

11:19AM 5    Q.   That's black and white, right?

6    A.   Yes.

7    Q.   But the installer was what was being searched for by

8    the user of the personal Mac device in 2017 based on those

9    Covenant Eyes e-mails, correct?

11:19AM 10   A.   Correct.

11   Q.   How, if at all, is that significant to your opinion?

12   A.   The patterns and characteristics of the Mac user

13   versus the Linux user are inconsistent.

14   Q.   You testified about the TOR installation this

11:20AM 15   morning.  Do you recall being asked some questions about

16   that?

17   A.   Yes.

18   Q.   And to be clear, you were asked a question about the

19   Snap Store, the App Store icon on Government's Exhibit 30,

11:20AM 20   page seven, correct?

21   A.   Correct.

22   Q.   First of all, let's get our bearings for a second.

23   You were in court when Mr. Fottrell testified about

24   Government's Exhibit 30, correct?

11:20AM 25   A.   I don't remember what that one was specifically, but,

11:20AM 1  yes.

2  Q.   And I can show you, but is it the virtualized -- hold

3  on a second.  I'll show you.  Can you see that?

4  A.   Yes.

11:20AM 5  Q.   Were you in court when Mr. Fottrell walked through

6  all of these pages of Government's Exhibit 30?

7  A.   Yes.

8  Q.   To be clear, within this exhibit, are there forensic

9  artifacts that don't exist on the actual evidence that was

11:21AM10  seized on the HP computer in this case?

11  A.   Yes.

12  Q.   The bash history, correct?

13  A.   Correct.

14  Q.   A version of uTorrent that didn't even exist at the

11:21AM15  time the device was seized, correct?

16  A.   Correct.

17  Q.   Now, if somebody wants to type on the Linux or to

18  enter the Linux Snap Store, do you just double-click?

19  A.   Yeah.  The application icon?  Yes.

11:21AM20  Q.   You were asked about the TOR installation and the

21  possibility that TOR was installed using the Snap Store.

22  Do you recall that?

23  A.   Yes.

24  Q.   Is it even possible, forensically or based on

11:21AM25  anything else, that the uTorrent application was installed

11:22AM 1   through the Snap Store in May of 2019?

2   A.    Not that I found.

3   Q.    Why?

4   A.    Because I'm looking at a collection of evidence.  So

11:22AM 5   there was the file that shows that the application hadn't

6   been run.  I had also looked at the Snap Store through

7   archive.org to show the earliest that that would have been

8   advertised.  So I did not find any evidence to support

9   that the App Store or Snap Store had actually been used to

11:22AM 10   download that application, nor was it advertising or

11   available through the Snap Store.

12   Q.    Is it your conclusion based on that that that leaves

13   one option, command lines?

14   A.    Correct.

11:22AM 15   Q.    And is that what you walked through yesterday through

16   a demonstrative in that kind of lengthy video that you

17   narrated through exactly what you were doing to install it

18   through command lines?

19   A.    Correct.

11:22AM 20   Q.    Now, you were asked by Mr. Clayman this morning about

21   the Ubuntu Software Center, correct?

22   A.    Correct.

23   Q.    Were you able to access the Ubuntu Software Center on

24   this HP device?

11:23AM 25   A.    Not on this particular evidence item, because I

11:23AM 1    didn't have access to it to virtually boot, but I did on

2    my own system.

3    Q.    With respect to the actual as opposed to anything

4    that you simulated in your laboratory environment, with

11:23AM 5    respect to the actual HP image, that was the one that was

6    made available to you at HSI, correct?

7    A.    Correct.

8    Q.    Does making sense of any evidence as it would relate

9    to the Ubuntu Software Center require accessing the

11:23AM 10   internet?

11   A.    Yes.

12   Q.    Were you allowed at HSI to do what Mr. Fottrell did

13   and plug this device into the internet?

14   A.    No.  I'd probably be arrested.

11:23AM 15   Q.    Why did you look for the bash history?

16   A.    Because the evidence led me to believe that command

17   line had been used and that would be the artifact that

18   would tell me the history of commands that had been

19   entered, kind of like I showed in the demonstrative video.

11:24AM 20   Q.    To be clear, when looking for the bash history, as

21   you explained in the demonstrative yesterday, that's

22   auto-generated when command lines are input, correct?

23   A.    Correct.  It's not something that the user is

24   initiating.  It's something the system is doing

11:24AM 25   automatically and typically unbeknownst to a user.

11:24AM 1   Q.   And you demonstrated that by essentially bookending,
2   ending with a happy face, right?
3   A.   Correct.
4   Q.   And the whole idea there was to show that you
11:24AM 5   immediately click on it and everything you did as far as
6   commands appears there automatically.  You didn't go,
7   again, type in or copy and paste, correct?
8   A.   Right.  Everything I type, even if it's not an
9   accurate command.
11:25AM10   Q.   You testified about the significance of the user
11   interface evidence.  Can you explain to the Jury what you
12   were focusing on with the GUI?  And I won't even begin to
13   spell the acronym.
14   A.   Yeah, it's G-U-I.  It's the graphical user interface.
11:25AM15   So because Linux is so command based, most of it is done
16   through command line.  But Gnome allows Linux to have a
17   pretty operating system with buttons just like Windows and
18   Macs that a user can easily navigate everything rather
19   than having to manually enter commands to do everything.
11:25AM20   So Gnome is the graphical user interface that would record
21   information about how the user actually used that part of
22   the system.
23   Q.   So what specifically were you looking for and why
24   when you were looking at that data?
11:25AM25   A.   The Gnome application state, which would tell me

11:25AM 1  which applications within Gnome were being used.

2  Q.   In a nutshell, if the Snap Store was used, would that

3  have appeared in the Gnome?

4  A.   Yes.

11:26AM 5  Q.   And did you actually test that yourself?

6  A.   Yes, I did.

7  Q.   Now, I want to get a little deeper into what

8  Mr. Clayman asked you this morning about streaming.  You

9  used the phrase "local action network."  Can you explain

11:26AM 10  to the Jury what you mean by that?

11  A.   Yeah, local area network.

12  Q.   Sorry.

13  A.   No problem.  It means the devices that are connected

14  to a network internally.  So it would be like in a home

11:26AM 15  having everybody's phones, computers, gaming systems,

16  everything connected to that one network.  That's your

17  local area network.  But that also then would connect out

18  to the open internet, the public internet, where you can

19  communicate with servers likes Facebook, Netflix, YouTube,

11:26AM 20  whatever.

21  Q.   So to be clear, there's the LAN and there's the WAN,

22  correct?

23  A.   Correct.

24  Q.   What's the WAN?

11:27AM 25  A.   Wide area network, which is the public internet.  It

11:27AM 1  means anything that's outside of your local network.

2  Q.   Now, let's back up for a second.  You also testified

3  with respect to streaming yesterday.  I'm going to show

4  you Government's Exhibit 43.  Do you see that in front of

11:27AM 5  you?

6  A.   Yes.

7  Q.   And you walked us through -- I asked you briefly

8  about this portion of it this morning -- but you walked us

9  through what follows this 127, but, in particular, 6385,

11:27AM10  13412, and so on and so forth on this exhibit, correct?

11  A.   Correct.

12  Q.   What do those reflect, the actual forensic data?

13  A.   It's a way of locating which -- what's hosting this

14  material.  So that is a local IP address that's going to

11:27AM15  identify software.  So this is just saying on the network,

16  look for this particular -- look for this application,

17  look for this port number.  And that way, it can collect

18  the data that's being streamed.

19  Q.   When evaluating the possibility of remote access as

11:28AM20  you were asked about this morning and considering the

21  streaming evidence, what, if any, significance is there to

22  the different ports?

23  A.   The ports changing, again, is just another example of

24  how this activity is suspicious, I'll call it.  By

11:28AM25  default, uTorrent doesn't change the port.  Once you have

11:28AM 1    been assigned a port, that's where it's going to go.  It's

2    kind of like if you think of the IP address as being an

3    address and the port being the apartment number, you are

4    not going to move apartments all the time.  You are going

11:28AM 5    to just stay there and that way it can communicate to you.

6    So the fact that somebody is constantly changing ports

7    tells me this could be some form of obfuscation.

8    Q.    And to be clear, the evidence that the ports are

9    changing appears directly in this Government's Exhibit 43,

11:29AM10    correct?

11    A.    Correct.

12    Q.    So it starts with port number 6385, correct?

13    A.    Correct.

14    Q.    Then port number 13412, correct?

11:29AM15    A.    Correct.

16    Q.    Then port number 27386, correct?

17    A.    Correct.

18    Q.    And I may be skipping over.  Then we go 63835, 13412,

19    27386, correct?

11:29AM20    A.    Correct.

21    Q.    And this is directly related to uTorrent files,

22    correct?

23    A.    Correct.

24    Q.    On three days ever; May 14th, May 15th and May 16th

11:29AM25    of 2019, correct?

11:29AM 1   A.   Correct.

2   Q.   And yet over those three days, that small time

3   period, really 12 minutes on May 16th, the ports keep

4   changing, the apartment number keeps changing?

11:30AM 5   A.   Correct.

6   Q.   Now, you were asked this morning by Mr. Clayman about

7   UPnP.  That's Universal Plug and Play, correct?

8   A.   Yes.

9   Q.   I'm going to show you Defendant's Exhibit 60.  Does

11:30AM10   this exhibit reflect that UPnP was enabled on the router

11   when uTorrent was used in May of 2019?

12   A.   Yes.

13   Q.   So you were asked questions about alleged statements

14   this morning about configuration of the router the week

11:30AM15   before November of 2019, correct?

16   A.   Right.

17   Q.   Would that have any relevance at all to how the

18   router was configured in May of 2019 when uTorrent was

19   operated based on the forensic evidence and UPnP was

11:31AM20   enabled?

21   A.   No.  And also, although not depicted in this

22   screenshot, the settings.dat maintains dates and

23   time-stamps.  So I know that the last time that this file

24   had ever been changed or altered was May 16th when the

11:31AM25   last Torrent had been downloaded.  So I can confirm that

11:31AM 1   during the time that uTorrent was being used to download

2   those files, that UPnP was, in fact, enabled and hadn't

3   been changed during the time, or within the time that the

4   computer hadn't been used up until the search warrant.

11:31AM 5   Q.   And to be clear, this particular exhibit references a

6   UPnP port of 63835, correct?

7   A.   Correct.

8   Q.   Going back to Government's Exhibit 43, is that the

9   exact same port of many that appears on Government's

11:32AM 10   Exhibit 43?

11   A.   Correct.

12   Q.   In other words, the port you identified as being used

13   while UPnP was enabled is the same port the government has

14   identified on its exhibit when files were streamed,

11:32AM 15   correct?

16   A.   Correct.

17   Q.   Based on this evidence, is it your conclusion that

18   UPnP was enabled on the dates at issue, May 14th through

19   May 16th of 2019?

11:32AM 20   A.   Yes.

21   Q.   So what does that mean in combination with all this

22   other evidence?

23   A.   It means that the network was extremely vulnerable at

24   the time.

11:32AM 25   Q.   And so what does that allow?

11:32AM 1    A.    It allows somebody to take control over the network.

2    So if somebody gained access to that Wi-Fi, that business

3    Wi-Fi, even for five minutes, if they were able to

4    determine that that Wi-Fi had UPnP enabled, they can

11:33AM 5    control the entire network and essentially the devices

6    that are connected to it.

7    Q.    At any point in the future, correct?

8    A.    Correct.  Yes, if the configurations haven't changes.

9    Q.    And to be clear, in other words, if the ports are

11:33AM10    open because of UPnP, all the doors of the house are open.

11    They can walk in?

12    A.    Correct.

13    Q.    And all that has to happen to walk in is they had to

14    have had access to the network at some point prior to

11:33AM15    walking in the doors?

16    A.    Correct.

17    Q.    Even for two minutes?

18    A.    Correct?

19    Q.    With access to the network and UPnP, if that same

11:34AM20    person or same device were to then remote in at some

21    subsequent date using command lines or some sort of app,

22    where would they have to be?

23    A.    They could be anywhere.  As long as they have

24    essentially got the key, once they have received that,

11:34AM25    once they have set it up, you don't have to physically be

11:34AM 1    within the local area network at that point.

2    Q.    So to be clear, you were shown a map.  If that chain

3    of events had happened, someone had access to the Wi-Fi

4    for 10 seconds at the business -- customer, employee,

11:34AM 5    whatever -- UPnP is enabled, as you forensically proved it

6    is, the ports are open, as you forensically proved they

7    were, and at any point thereafter until or unless the

8    configuration is changed, they can be in Paris and access

9    this network, correct?

11:35AM 10   A.    Correct.

11   Q.    They don't have to be in the circle that Mr. Clayman

12   circled around the map this morning, correct?

13   A.    Correct.

14   Q.    Now, you were asked about copy stream URL, correct?

11:35AM 15   A.    Yes.

16   Q.    What is that?

17   A.    That's the network URL that would be generated by

18   uTorrent in order to stream content.

19   Q.    When you were testifying this morning, you were

11:35AM 20   trying to explain why that didn't change your opinion as

21   it relates to streaming on the VLC app that you testified

22   about and you were asked about, correct?

23   A.    Right.

24   Q.    Explain to the Jury why that doesn't factor into the

11:35AM 25   equation or change your conclusion.

11:35AM 1  A.   Well, I still know that the content was being
2  streamed and that's what I was focused on.  That's what's
3  important.  Whether that network URL came from uTorrent
4  directly doesn't change my opinion that content was being
11:36AM 5  streamed over a network.
6  Q.   Based on your training and experience and your
7  hundreds of forensic investigations, have you ever seen
8  UPnP enabled in a case like this?
9  A.   No, I have not seen those settings in uTorrent with
11:36AM 10  the UPnP.
11  Q.   Have you ever seen the kind of streaming forensic
12  evidence that you have identified in this case?
13  A.   No, I have not.
14  Q.   To say the least, have you ever seen that combination
11:36AM 15  of the two?
16  A.   No, I have not.
17  Q.   Why is that just so fundamentally significant to your
18  conclusions in this case?
19  A.   It tells me that this is probably somebody, a very
11:36AM 20  advanced user.  I have worked on hundreds of these cases.
21  And even with the most tech-savvy clients or defendants,
22  I've seen that these settings were not enabled.  So it
23  jumped out at the page at me because it tells me this is a
24  very sophisticated user.
11:37AM 25  Q.   In any of the government's expert reports, were these

11:37AM 1    topics even addressed, streaming UPnP?

2    A.    Not to my knowledge, no.

3    Q.    In other words, the ones you reviewed?

4    A.    Correct.

11:37AM 5    Q.    To the best of your knowledge, you have reviewed

6    every report that a government expert generated in this

7    case, correct?

8    A.    Yes.

9    Q.    So when you started focusing your efforts, did you

11:37AM10    spend a lot of time chasing down where this evidence would

11    go?

12    A.    Yeah.  I'm following these leads.

13    Q.    Did you know when you started following the streaming

14    lead, the UPnP lead, where you would end up?

11:37AM15    A.    No.

16    Q.    Do you sometimes follow leads like this and spend a

17    lot of time and candidly a lot of money and hit a wall?

18    A.    Yes.

19    Q.    Do you sometimes lead somewhere that's bad for the

11:37AM20    defendant?

21    A.    Absolutely.

22    Q.    That didn't happen here, did it?

23    A.    No.

24    Q.    You testified that you know forensically that because

11:37AM25    these videos were streamed, you know for sure that means

11:38AM 1    they weren't double-clicked, so to speak, and played

2    locally, correct?

3    A.   Correct.

4    Q.   Can you think of any reason, based on your expertise

11:38AM 5    and your experience, as to why someone behind the computer

6    at Wholesale Motorcars would choose to stream this instead

7    of just double-clicking it?

8    A.   I thought about that.  The only thing I could

9    possibly think of is if they didn't know where the files

11:38AM10    were, but we already know from the forensic evidence that

11    somebody opened the folder where the files were, so we

12    know the user knew where they were at, so I can't think of

13    a reason why somebody would stream them.  If they have

14    already opened the folder and seen the video sitting in

11:38AM15    that folder, why they wouldn't either stream that local

16    file or double-click that file.

17    Q.   As opposed to do what was done here?

18    A.   Correct.

19    Q.   What was done here, does it not, would enable someone

11:39AM20    to actually access that file from somewhere other than

21    Wholesale Motorcars using this computer as the host?

22    A.   Yes.

23    Q.   Now, you were asked whether you can prove for sure

24    that somebody used remote access on the Linux partition,

11:39AM25    correct?

11:39AM 1    A.    Correct.

2    Q.    Based on your analysis in this case, what is your

3    conclusion, if any, as to how likely it is that remote

4    access was in play here?

11:39AM 5    A.    It seems very probable.

6    Q.    Not only possible, but probable, correct?

7    A.    Yes.

8    Q.    Why?

9    A.    Because of the combination of everything, taking the

11:40AM10    totality of the evidence and looking at everything rather

11    than isolating one piece of information.  If you

12    collectively look at everything that we have here, it

13    leads me to believe remote access.

14    Q.    Does that include UPnP?

11:40AM15    A.    Correct.

16    Q.    What else?

17    A.    The small partition size, the short time frame that

18    this partition had been used, the streaming, the immediate

19    deletion, the use of controversial characters.  The name

11:40AM20    being something that seems unrelated to the user, to

21    Mr. Duggar, his devices.  So the combination of that.

22    Q.    To be clear, you're not being exhaustive there, but

23    there's a lot of forensic artifacts that lead somewhere

24    else, correct?

11:40AM25    A.    Correct.  It's just what I found between July and

11:40AM 1  now.

2  Q.   If you had the log files, if this device were seized

3  and the evidence were preserved in June, if it was there,

4  could you prove it?

11:41AM 5  A.   Yes.

6  Q.   If you had the router, if it was preserved on

7  November 8th of 2019, could you prove what devices had

8  access to this device at that time?

9  A.   Yes, it would show me which devices were accessing

11:41AM 10  the network.

11  Q.   Do you wish you had those?

12  A.   Yes.

13  Q.   You were asked about this concept of dual boot

14  rebooting, so to speak, correct?

11:41AM 15  A.   Yes.

16  Q.   And you were asked about whether both programs,

17  meaning Linux and Windows, can run at the same time,

18  correct?

19  A.   Correct.

11:41AM 20  Q.   And the answer is they can't, correct?

21  A.   Correct.

22  Q.   Can they run sequentially?  In other words, one after

23  the other?

24  A.   Yes.

11:42AM 25  Q.   And that's often what happens with a dual boot

11:42AM 1  system, correct?

2  A.    Yes.  I guess I'm confused by the question.

3  Q.    Sure.  In other words, I'm just drawing a fairly

4  simple distinction and I'm failing at it.  Your testimony

11:42AM 5  that they can't literally run at the exact same moment,

6  can they run at different moments?  Can you have Linux

7  running at 1:00 p.m. and Windows running at 3:00 p.m.?

8  A.    Yes.  And I switch between my operating systems all

9  the time.  So I can be in Macintosh at one moment and

11:42AM10  three minutes later be using Windows.

11  Q.    You testified this morning about the "display

12  locally" box on VLC?

13  A.    Yes.

14  Q.    Can you explain in more detail what specifically you

11:42AM15  were referring to and the significance of it, if any?

16  A.    Yeah.  So if VLC -- because it can be used as a media

17  server, so kind of like using it as Netflix.  If the

18  material was being hosted through VLC, there's an option

19  to display locally.  And if you're streaming the material

11:43AM20  from VLC as the host, the default is to not display

21  locally, because if you're streaming, it's probably

22  because you want to access it from some other physical

23  device, so no need to show it on this one.  So that

24  check-box would tell you whether or not the content being

11:43AM25  streamed would actually be displayed.

11:43AM 1    Q.    So what is your opinion as to whether it was likely

2    displayed or not displayed?

3    A.    Well, because the default is to not be selected, that

4    would be my assumption.

11:43AM 5    Q.    Now, you were asked a question about a portion of

6    Government's Exhibit 74.

7              MR. GELFAND:   I believe it's page 4 of 74, Your

8    Honor.

9    Q.    (BY MR. GELFAND.)   Do you recall testimony?

11:43AM10    A.    Yes.

11    Q.    Do you recall -- just to get our bearings,

12    Exhibit 74.   Do you see a face in the reflection here?

13    A.    I don't see it, no.

14    Q.    You were asked about this particular exhibit and the

11:44AM15    metadata associated with the exhibit this morning,

16    correct?

17    A.    Correct.

18    Q.    Have you verified this EXIF data?

19    A.    No, not independently.   It would be available in the

11:44AM20    evidence.   I don't have the evidence with me now at the

21    time that I knew that this is an exhibit, but I could.

22              MR. GELFAND:   Your Honor, may we approach just

23    very briefly?

24              THE COURT:   Yes.

11:44AM25              (Bench Conference)

11:44AM 1         MR. GELFAND:  Your Honor, based on the questions

2    this morning about the metadata on this exhibit and what

3    Ms. Bush was alluding to, I believe they opened the door

4    to ask for her opinion about the reliability of that.  And

11:45AM 5    I want to, but I didn't want to do that without asking the

6    Court first.

7         THE COURT:  The reliability of what aspect of the

8    data?

9         MR. GELFAND:  Of the time-stamp of it.  In other

11:45AM10    words, of the Windows media.  She was asked this morning

11    to opine on dates and times using this particular exhibit

12    and I think I should be entitled to ask her about that.

13         THE COURT:  Proffer what her explanation or

14    opinion would be.

11:45AM15         MR. GELFAND:  Well, I've been in court so I

16    haven't spoken with her since yesterday about the nature

17    of her testimony.

18         THE COURT:  So you're just -- what do you

19    anticipate her testimony would be?

11:45AM20         MR. GELFAND:  I would anticipate her testimony

21    would be that that data can be compiled from a variety of

22    different sources.  And in particular, the question was

23    asked this morning about iPhone 8.  And I think that she

24    would testify that there's a whole collection of data --

11:46AM25    and I'm not going to do justice to what she would say --

11:46AM 1    but that the iPhone 8 data doesn't necessarily mean that

2    the photo was taken from the device as opposed to on the

3    device.

4              THE COURT:  Say that last part one more time.

11:46AM 5              MR. GELFAND:  Sure.  That it doesn't necessarily

6    mean -- I think Mr. Story is a little more tech savvy and

7    he can take a stab at that.

8              MR. STORY:  Your Honor, the issue with metadata

9    is there are multiple -- inside metadata, there are ranges

11:46AM 10   of dates.  There are dates when things are actually

11   created and things are inserted locally on a computer or a

12   phone.  And so it has to do with not the accuracy of one

13   date, but which date the various metadata is pulled from.

14             THE COURT:  Does the defense dispute that the

11:47AM 15   time-stamp on the photo of this particular exhibit or any

16   of the similar such exhibits is inaccurate?

17             MR. GELFAND:  The answer is that we don't agree

18   that it isn't -- we don't stipulate that it's accurate.

19             THE COURT:  Well, in one of the photos, there's a

11:47AM 20   time, a neon time clock, digital time clock, that's within

21   four minutes of the time on the device.  So under 403, I'm

22   not going to let you lead the Jury by throwing out some

23   theoretical notion that some people disagree that this is

24   or could be inaccurate unless your position is that the

11:47AM 25   times on these photographs are inaccurate.

11:48AM 1              MR. GELFAND:  Your Honor, we are not -- to be

2      blunt, we don't stipulate to the times.  It's a factual

3      issue for the Jury.  And she was asked to opine on the

4      time of this exhibit.  Expressly, I was surprised, in

11:48AM 5      light of the Court's ruling yesterday, that they opened

6      the door on this point.

7              THE COURT:  The time on the exhibit is in

8      evidence.  So why did that surprise you?

9              MR. GELFAND:  Because she was asked to opine on

11:48AM10      the time and how it affects her opinion.  And I think that

11      it's only fair to let us follow up with her on her

12      opinions and her understanding as to how that time is

13      generated.

14              THE COURT:  All right.  What's the government's

11:48AM15      position?

16              MR. CLAYMAN:  Your Honor, Mr. Fottrell testified

17      that he independently verified the metadata.  The defense

18      could have looked at the metadata on this image.  They

19      certainly had access to it.  They have no idea if it's

11:48AM20      inaccurate or not.  And Mr. Fottrell has already said he

21      looked at the metadata, he knows where this came from,

22      it's all accurately reflected on this exhibit.  I think,

23      like you said, they are injecting this misleading

24      suggestion that perhaps it's inaccurate, but they actually

11:49AM25      don't even know.  And they have no idea at this point

11:49AM 1  whether or not -- they don't even really know what she's

2  going to say other than it could be inaccurate, but she

3  has not tested it.  I think that would be grossly

4  misleading and I think it would make people confused and

11:49AM 5  it's also just not consistent with the testimony of

6  Mr. Fottrell who said he did look at the metadata and

7  independently confirmed the accuracy of these exhibits.

8       THE COURT:  To be clear, has she independently

9  looked at the metadata of this photograph?

11:49AM 10       MR. GELFAND:  I don't know.

11       MR. CLAYMAN:  She just said she did not recognize

12  this exhibit.

13       THE COURT:  Here's what we're going to do.  We're

14  going to recess for lunch and you both can voir dire the

11:49AM 15  witness.  That way, you will have a record and I can make

16  a ruling and we'll go from there after the lunch break.

17       (Bench Conference Concluded)

18       THE COURT:  So we're going to take our lunch

19  break a little bit early, because we need to continue

11:50AM 20  working on some of those issues that I explained to you

21  would come up from time to time that we just had to --

22  need to resolve outside of your presence.  So rather than

23  you all just cooling your jets in the jury box, we're

24  going to take our lunch break early.  But considering that

11:50AM 25  we will be working for part of that, we will probably need

11:50AM 1   to take a little bit longer of a break.

2           We are going to take an hour and a half lunch

3   again today.  If you could please be ready to come back up

4   at 1:20, that is when we will call for you.

11:51AM 5           I'll remind you of the recess instruction.

6   Please do not discuss the facts of the case with anyone,

7   including your fellow jurors.  Do not read any news

8   accounts, online or otherwise.  Don't watch any news

9   accounts.  Don't listen to any news accounts.  Don't watch

11:51AM10  blogs or Instagram or any type of social media about the

11  case.  Don't let anyone approach you to discuss the case

12  with you.  And if someone does, please report that to me

13  through a court security officer or a member of the court

14  clerk staff.  We'll be in recess until 1:20.

11:51AM15          Everyone please stand.  The gallery should remain

16  in place until I give you the all clear.

17              (Jury out at 11:51 a.m.)

18          THE COURT:  The gallery may be seated if they

19  want to.  It will take them about a minute to clear the

11:53AM20  lobby and I'll let you know when that is.

21          Remember, if you're in the gallery and you

22  brought something with you that is trash, if you would

23  please deposit that in the trash bin by the elevators, I

24  would appreciate it.  If you're in the gallery and would

11:53AM25  like to leave, you may do so at this time.  Court is going

11:54AM 1    to remain in session, but we will pause for anyone who

2    wants to leave to leave.

3            The record will reflect that we are proceeding

4    outside the presence of the Jury.  As the side bar record

11:54AM 5    will reflect, there is an issue that Mr. Gelfand would

6    like to develop with this witness and he's asked

7    permission to do that at side bar.  It wasn't exactly

8    clear to the Court what the testimony would be and

9    therefore the Court was not in a position to make a good

11:55AM 10   ruling.  So the Court is going to allow Mr. Gelfand and

11   Mr. Clayman to voir dire the witness prior to the Court

12   making its ruling.  You may proceed.

13           MR. GELFAND:  Thank you.  Your Honor, I'll

14   represent to the Court what I'm showing the witness is a

11:55AM 15   page out of Government's Exhibit 74 reflecting a YouTube

16   video on the screen.

17           THE COURT:  Okay.

18                       VOIR DIRE

19   BY MR. GELFAND:

11:56AM 20   Q.    Ms. Bush, do you see this portion of Government's

21   Exhibit 74 in front of you?

22   A.    Yes, I do.

23   Q.    From this exhibit, are you able to identify what

24   tool, so to speak, or what software, so to speak, was used

11:56AM 25   to display this?

11:56AM 1    A.    Yes, Windows Photos.

2    Q.    And what is Windows Photos?

3    A.    It's the default photos application that comes

4    preinstalled on a Windows 10 operating system.

11:56AM 5    Q.    Based on your training and experience, is Windows

6    Photos a forensic tool analogous to some of the tools that

7    you testified about in your direct examination?

8    A.    No, it is not.

9    Q.    Do you see on the left of this photo there appears to

11:56AM10    be certain metadata, including a date, a time?  Do you see

11    that?

12    A.    Yes.

13    Q.    And do you see that there is a device listed that

14    says "iPhone 8 Plus?"

11:57AM15    A.    Yes.

16    Q.    Is it your understanding that this exhibit was

17    generated from a file in the iPhone 8 backup on the

18    MacBook Pro laptop computer that you reviewed a forensic

19    image of in this case?

11:57AM20    A.    That was my understanding, yes.

21    Q.    Are you familiar with, just generally speaking at the

22    outset, with how metadata is extracted from an image?

23    A.    Yes, very.

24    Q.    Explain, just by way of background, how it is you're

11:57AM25    familiar with how metadata is extracted from an image of

11:57AM 1    this nature.

2    A.    Embedded EXIF data, or metadata, for an image is just

3    additional information that's stored within the file

4    itself.  The file is just a container.  So the image has a

11:58AM 5    header and a footer, and then everything in between that

6    is the actual image contents.  But there's additional

7    information beyond the actual image itself that's stored

8    within that container, and that is the EXIF data that

9    forensic analysts have to extract.

11:58AM 10   Q.    With respect to dates and times, can metadata include

11   multiple dates and times?

12   A.    Yes, it almost always does.

13   Q.    Explain if you would to the Court what you mean by

14   that in terms of, "It almost always does?"

11:58AM 15   A.    When a photo or -- mostly a photo is captured, it

16   will record dates and times of how that file was created.

17   So if there are multiple cameras, there might be multiple

18   dates.  For instance, an iPhone has multiples cameras in

19   it.  But also, if you edit a file, it can edit the

11:58AM 20   metadata.  So if I crop the file, if I add a filter,

21   depending on what I do with it, it can add dates and

22   time-stamps to that EXIF data.  So oftentimes, we have to

23   look at the totality of the EXIF to figure out the exact

24   date created versus a date modified or edited or filtered

11:59AM 25   or cropped.  For instance, if it's a video file, making

11:59AM 1   sure we are not pulling a date from the audio versus the
2   media file itself.  So just understanding which date and
3   time-stamp you're advertising or which date and time-stamp
4   you're using as the creation date.
11:59AM 5   Q.   With respect to this particular image, are you
6   familiar with how Windows -- I forgot what you called
7   it -- Windows Photo?
8   A.   Am I familiar with how it works?
9   Q.   No, I'm saying is this program called Windows Photo?
11:59AM10   A.   Oh, yes.  Photos, yes.
11   Q.   Windows Photos, are you familiar with how that works?
12   A.   Yeah.
13   Q.   Can you determine from Windows Photos where this
14   particular date reflected on the face of this exhibit is
11:59AM15   extracted from as far as multiple dates like you testified
16   about?
17   A.   No, I don't have enough context about what date and
18   time it's pulling from or even time zone information.
19   Q.   And explain what you mean as to how time zone
12:00PM20   information could enter into the calculus.
21   A.   The time-stamps that are recorded can be in different
22   formats.  In most cases, it will be in like a month, date,
23   year format as opposed to maybe epoch.  But when a date
24   and time-stamp is recorded, it will identify whether it is
12:00PM25   Zulu time, UTC time, or if it's local time.  So

12:00PM 1    understanding the embedded EXIF data, the program or

2    software that recorded that, and which time zone it was

3    using so it can be properly offset to understand when a

4    particular photo in a particular place was taken.

12:00PM 5    Q.    Given that this photo appeared within an iPhone

6    backup file on a MacBook computer, is it possible -- well,

7    I'll ask this way.  Does it necessarily mean that this is

8    a photo taken by the user of the iPhone?

9    A.    No, not necessarily.

12:01PM 10   Q.    Explain, if you would, what the alternatives would be

11   or what you mean.

12   A.    Well, the location of this photo is going to be very

13   important as well, because, for instance, with iPhones

14   specifically and with other devices, if I text a photo to

12:01PM 15   somebody else and they save that photo to their phone, it

16   will retain the information from my device, so it will now

17   look like that person was wherever I'm at.  So it's

18   important to put the image -- not only confirm the EXIF

19   data, but put it in context to confirm that the location

12:01PM 20   of this photo wasn't from some SMS attachment that came

21   from another iPhone 8 and to determine that there is

22   enough evidence to support it came from this actual

23   device.

24   Q.    So to be clear, when you say "SMS", is that

12:02PM 25   another -- for our purposes, is that another word for text

12:02PM 1    message?

2    A.    Yes.   Sorry, text.

3    Q.    So if somebody were to have hypothetically -- we'll

4    refer to this iPhone 8 for our purposes as Josh's iPhone.

12:02PM 5    If somebody else were to have hypothetically texted this

6    photo to Josh, can you tell from the metadata on here

7    whether or not that happened or whether or not this was

8    taken by the user of Josh's iPhone?

9              THE COURT:   When you say "on here", what is

12:02PM10    "here"?

11             MR. GELFAND:   On the exhibit that's in front --

12    Exhibit 74, the portion that reflects the YouTube portion,

13    Your Honor.

14             THE COURT:   Thank you.

12:02PM15    A.    No, I cannot.

16    Q.    (BY MR. GELFAND.)   Based on your training and

17    experience, is Windows images reliable to determine dates

18    and times as far as metadata?

19    A.    No, because it's not a forensic tool.   I can't rely

12:03PM20    on this as the actual metadata within that file.   What I

21    would need to look at is, for instance, maybe a screenshot

22    within the Cellebrite application, which would tell me the

23    source of the file, where it was located, different dates

24    and time-stamps, time zones.   So using that forensic

12:03PM25    software, it gives me enough information and contextual

12:03PM 1    background to confidently say, this is what this means.

2    Q.   Are you able to tell, based on this exhibit that

3    appears in front of you, whether or not this particular

4    photo with YouTube on it -- for record purposes, Your

12:03PM 5    Honor -- was taken by the user of the iPhone or sent to

6    the user of the iPhone?

7    A.   No, I cannot.

8         MR. GELFAND:   Your Honor, may I just have one

9    minute?

12:03PM 10        THE COURT:   Yes.

11        MR. GELFAND:   I have no more questions.

12        THE COURT:   Mr. Clayman?

13                    VOIR DIRE

14   BY MR. CLAYMAN:

12:04PM 15   Q.   Ms. Bush, you testified right before we took the

16   lunch break that you don't recall examining this photo

17   before your testimony, right?

18   A.   Correct.   Yeah, I don't have enough information to --

19   Q.   That's not the question.   You didn't examine this

12:04PM 20   photo in any sort of forensic tool before your testimony

21   today, right?

22   A.   Well, if it was in the backup, I did look at it.   I

23   don't have personal recollection necessarily of this file,

24   but, yes, it would have been available to me.

12:04PM 25   Q.   It would have been available to you is what you're

12:04PM 1  saying?

2  A.    Yes.

3  Q.    In the MacBook we provided?

4  A.    Correct.

12:04PM 5  Q.    Did the defense provide you the exhibits that we

6  provided in advance of trial?

7  A.    I think I got them like on Thanksgiving and I didn't

8  have time to go back through, because I would have to

9  actually extract that backup, load it into my software, so

12:05PM 10  that would take some time.

11  Q.    So you had this exhibit, you had all the data.  You

12  could have confirmed whether or not these times were

13  accurate, correct?

14  A.    Yeah, if I had enough time.

12:05PM 15  Q.    And you didn't in this case, right?

16  A.    I did not have enough time.

17  Q.    You have no idea whether or not this date and time

18  accurately reflect the metadata, correct?

19  A.    Correct.  I don't know one way or another.

12:05PM 20  Q.    You have no opinion?  You can't say?

21  A.    Correct.

22  Q.    You heard the testimony of Mr. Fottrell.  He said

23  that he independently confirmed the metadata in these

24  photos.  Do you remember that?

12:05PM 25  A.    Using forensic software or just through the photos?

12:05PM 1    Because I heard him testify that this is the information

2    from the photos app, but I don't know that he testified to

3    using actual EXIF data viewers within forensic tools.

4    Q.   If he testified that he independently took the GPS

12:05PM 5    location information from the metadata to confirm it,

6    would that answer that question for you?

7    A.   My recollection is his testimony is that he took the

8    geolocation data and plugged into a Mac program to confirm

9    what was actually displayed here.  But I don't know that

12:06PM 10   he clarified that the dates that were taken was recorded

11   in a specific time zone or that it was taken from a very

12   specific part in the EXIF data.

13   Q.   Ms. Bush, do you remember Government's Exhibit 80?

14   It's a picture of Mr. Duggar at the car lot, a selfie.

12:06PM 15   A.   Yes.

16   Q.   That time is -- there's a clock reflected behind him.

17   Do you recall that?

18   A.   Yes.

19   Q.   You matched up the date and the clock, the time on

12:06PM 20   the clock to the time in this photo and it was pretty much

21   consistent, right?

22   A.   Yeah.  I think there was a couple minutes off, but,

23   yes.

24   Q.   So the bottom line is, you have no basis to question

12:06PM 25   the date and time here.  You just don't know?

12:06PM 1    A.    Well, this is a month earlier, over a month earlier.

2    Q.    Do you have any basis to question the date and time

3    here, or do you not know whether or not this is accurate?

4    A.    Well, my basis is that this isn't a forensic tool, so

12:06PM 5    I would need more information to authenticate what it's

6    depicting.

7    Q.    So you do not know is your testimony?

8    A.    I don't know.

9          MR. CLAYMAN:  One moment, Your Honor.  Nothing

12:06PM10    further.

11         THE COURT:  Ma'am, looking at the particular page

12    out of Exhibit 74 that is on the screen, it's depicting

13    something about a camshaft position sensor.  Do you have

14    an opinion as to whether or not the time-stamp data in the

12:07PM15    left-hand panel, 4:20 p.m. on May 14th, 2019, is

16    materially accurate or not?

17         THE WITNESS:  I don't know.

18         THE COURT:  You do not have an opinion?

19         THE WITNESS:  No, I do not.

12:07PM20         THE COURT:  In fact, you have not examined the

21    data that you would need to form an opinion?

22         THE WITNESS:  Correct.  I would need to go back

23    to that file, try to locate it and analyze the EXIF data

24    to put it in context.

12:07PM25         THE COURT:  All right.  It will be the Court's

12:08 PM 1   ruling under 403 that it will not allow this witness to go

2   down a path that would lead, at its end, to speculative

3   testimony about whether the date and time displayed in the

4   left-hand panel of the photograph is accurate or not.

12:08 PM 5          What I understand the sum and substance of her

6   testimony here is, contrary to the foundations at the

7   beginnings of her testimony that she starts with facts and

8   follows them to a conclusion, here, she knows the

9   conclusion that she wants to reach and she looks to

12:09 PM 10  possibilities upon possibilities to back into that.  And I

11  won't allow that.  This is speculation.  And she hasn't

12  examined the data.  She was aware of its existence, hasn't

13  examined the data.  And the only purpose that going down

14  this path can lead to is to mislead and to confuse the

12:09 PM 15  Jury when neither this witness has an opinion as to

16  whether it is accurate, nor has the defense suggested --

17  and I confirmed this at side bar -- that they either agree

18  or disagree with the accuracy here.  So this is really not

19  relevant.  And to the extent that it is relevant, it's

12:10 PM 20  inadmissible under 403.

21          Now, what I will allow is a little bit different

22  testimony, which is that the fact that this image winds up

23  on the iPhone 8 is not in itself confirmatory that the

24  image was taken on the iPhone 8.  I think that's fair.

12:10 PM 25          So any further record that you would like to make

12:10PM 1    on that, Mr. Gelfand?

2                    MR. GELFAND:  No, Your Honor.  We would just

3       obviously preserve the issue, but we respect the Court's

4       ruling and we'll proceed accordingly with that limited

12:11PM 5    testimony about the origin of the image.

6                    THE COURT:  The purpose of the voir dire was to

7       preserve your record.

8                    MR. GELFAND:  Understand.  That's all I'm saying,

9       Your Honor.  I have nothing further to preserve.

12:11PM10                    THE COURT:  Anything else from the government?

11                    MR. CLAYMAN:  No, Your Honor.

12                    THE COURT:  We'll be in recess until 1:20.

13                    (Lunch Recess taken from 12:11 p.m. to 1:24 p.m.)

14                    (Jury in at 1:24 p.m.)

1:26PM15                    THE COURT:  We were on redirect examination at

16      the recess and we'll continue with redirect.  Mr. Gelfand,

17      you may proceed.

18                    MR. GELFAND:  Thank you, Your Honor.

19                        REDIRECT EXAMINATION (cont'd)

1:26PM20    BY MR. GELFAND:

21      Q.   Ms. Bush, before we broke for lunch, you were

22      testifying about this portion of Government's Exhibit 74.

23      Do you see that on the screen in front of you?

24      A.   Yes.

1:27PM25    Q.   Do you see where it references a device?

1:27PM 1    A.    Yes, I do.

2    Q.    And what does the division say?

3    A.    IPhone 8 Plus.

4    Q.    And do you see under the device it references a

1:27PM 5    folder path?

6    A.    Yes, I do.

7    Q.    And what does that folder path reference?

8    A.    An iPhone 8 backup.

9    Q.    Ms. Bush, does the fact that this image that you

1:27PM10    testified about previously was on an iPhone 8 backup on

11    the Mac in and of itself confirm that it was taken by the

12    user of that phone?

13    A.    No.

14    Q.    Explain to the Jury what you mean by that, please.

1:27PM15    A.    Just because an image exists on a device doesn't mean

16    that it captured the device.  So you can receive messages

17    through text messaging or social media, any sort of

18    internet-based messaging applications or cell-service

19    based messaging applications.  So if I were to text a

1:28PM20    picture to a friend and they saved that picture, it's

21    going to preserve the data from my phone now on their

22    phone.  So it's going to look like they took the picture

23    with the phone, especially if we are using a similar type

24    of phone model.  So just because the photo exists doesn't

1:28PM25    mean the phone took it.

1:28PM 1   Q.   Thank you.  Now, moving on to a different topic, you

2   testified several times that you were obviously unable to

3   examine the information contained within the router

4   because it was not preserved by being seized, correct?

1:28PM 5   A.   Correct.

6   Q.   Let's talk about what's outside of the router.  Were

7   you able to determine whether the password that was used

8   for Wi-Fi at any given time was the same as the password

9   written on the outside of the router?

1:29PM 10   A.   No.

11   Q.   Why not?

12   A.   Because I don't have enough information from the

13   router to make that determination.

14   Q.   Is that something that you would need the router as

1:29PM 15   well for?

16   A.   That's, yeah, a source of information that I could

17   use.

18   Q.   In other words, could there be information on the

19   physical box itself in addition to the voluminous

1:29PM 20   information within the router, meaning log files,

21   everything you testified before?

22   A.   Yes.

23   Q.   You were asked questions by Mr. Clayman about network

24   forensics.  Can you explain to the Jury what network

1:29PM 25   forensics is?

1:29PM 1    A.    Rather than analyzing the actual devices themselves,
     2    you would be analyzing network information.  So whether
     3    that's packets or network devices, systems, so it would
     4    just take kind of a combination of computer forensics
1:30PM 5    which are still needed to operate a network and actually
     6    analyzing the network configuration and the information
     7    exchanged on that network.  So a lot of it is analyzing
     8    packet captures.
     9    Q.    And do you have training and experience in network
1:30PM 10   forensics as part of your training and experience as a
    11    computer forensic?
    12    A.    Yes, I do.
    13    Q.    And could you explain to the Jury what the nature of
    14    that training and experience is?
1:30PM 15   A.    Through the CCE program, CCFE and CMFE programs, the
    16    certified computer examiner, certified computer forensics
    17    examiner, and certified mobile forensics examiner, I'm
    18    taught how to identify network information that would be
    19    pertinent in analyzing these devices, as well as analyzing
1:30PM 20   actual packets, the different tools that are available,
    21    whether that's wire shark or network minor to actually
    22    analyze information that's exchanged over a network to
    23    understand what was being communicated between devices.
    24    Q.    Is that something -- meaning network forensics --
1:31PM 25   that you look into on a day-to-day basis in your job and

1:31PM 1    working on these kinds of cases, in addition to this case?

2    A.    Yes, it's included.   Just like software analysis

3    isn't the actual analysis of devices, but it's included in

4    the entire field of digital forensics.

1:31PM 5    Q.    Now, you testified about some aspects of the network

6    earlier, meaning the LAN, the WAN, and the ports and UPnP.

7    You testified that in some instances, UPnP can enable a

8    device to have heightened administrative privileges?

9    A.    Yes.

1:31PM 10   Q.    Explain to the Jury if you would, please, what that

11   means.

12   A.    UPnP doesn't have a process for verifying trusted

13   devices.   So whereas a lot of applications or protocols

14   make you kind of prove that you have authorized access to

1:32PM 15   that system, UPnP, it's just announcing itself and saying,

16   hey, I'm available if you need my service, here's where

17   I'm at and here's how you connect to me.   And the other

18   device, as long as it can communicate with it, can then

19   get information from that UPnP service and review all of

1:32PM 20   the information that it's advertising, whether that's the

21   device information, model number, serial numbers,

22   connected devices, ports available.   And it gives it

23   elevated privileges to go in and change it or alter it or

24   use those services.

1:32PM 25   Q.    And as you previously testified before our lunch

1:32PM 1  break, that would apply, would it not, to literally any

2  device that's ever been connected to this network?

3  A.   Correct.

4  Q.   I'm going to show you what's been previously admitted

1:32PM 5  as Government's Exhibit 64.  Do you see that in front of

6  you, Ms. Bush?

7  A.   Yes, I do.

8  Q.   Do you recall that Mr. Clayman asked you some

9  questions about passwords?

1:33PM 10  A.   Yes.

11  Q.   In Government's Exhibit 64, you were asked

12  specifically about this top page, I believe, referring to

13  the Intel 1988 password being used for the Duggar family

14  Instagram since 2014, is that correct?

1:33PM 15  A.   Correct.

16  Q.   If we look at the next page, 2014, same password for

17  the Duggar family Twitter account, correct?

18  A.   Correct.

19  Q.   If we look at the next page, same password for the

1:33PM 20  USAePay app, correct?

21  A.   Correct.

22  Q.   That was since 2014?

23  A.   That's correct.

24  Q.   If we look at the next page, same password

1:33PM 25  for Congressman Paul Ryan's Instagram account, correct?

1:34PM 1   A.   That's correct.

2   Q.   Based on your forensic review of these documents --

3   or let me just be more blunt -- based on your review of

4   these documents, does it appear that this same password

1:34PM 5   was ubiquitously used?

6   A.   Yes.

7   Q.   Since a very long time ago?

8   A.   Yes.

9   Q.   Now, you were asked questions about what, if

1:34PM 10   anything, you knew about whether there were others on the

11   car lot during this time period, correct?

12   A.   Correct.

13   Q.   Would you have any way of knowing whether a customer

14   was on the car lot at any given time?

1:34PM 15   A.   No.

16   Q.   Would you have any way of knowing whether an employee

17   or part-time employee was there at any given time?

18   A.   No.

19   Q.   Did you have the opportunity to review any evidence

1:34PM 20   in connection with this matter, meaning devices that

21   belonged to other people that HSI chose not to preserve

22   and image?

23   A.   So, no, I was not provided any additional images or

24   forensic images.

1:35PM 25   Q.   So to be clear, were you ever provided the

1:35PM 1    opportunity to review Randall Berry's cell phone or an

2    image of it?

3    A.    No, I was not.

4    Q.    William Mize's cell phone or an image of it?

1:35PM 5    A.    No.

6    Q.    Any of Caleb Williams' devices?

7    A.    No.

8    Q.    Are you familiar with the term "manual triage?"

9    A.    Yeah, I've heard it.

1:35PM10    Q.    What's your understanding of what that means?

11    A.    It just means looking at the phone or a device live,

12    just like any other normal user would look at it.

13    Q.    What, if any, limitations are there of a manual

14    triage when it comes to an investigation or analysis like

1:35PM15    this?

16    A.    Serious limitations.  The reason we use forensic

17    tools and the reason we actually have triage forensic

18    tools is because when you're just looking at a device

19    within the graphical user interface, it's only going to

1:36PM20    show you what the system thinks you want to see.  So

21    there's ways to hide that data, but also information that

22    would be extremely relevant in an investigation, just like

23    thumbnails or recently used files wouldn't be available

24    within a manual triage.

1:36PM25    Q.    Would unallocated space be accessible in a manual

1:36PM 1    triage?

2    A.    No.   The majority of the data wouldn't be available

3    in a manual triage.

4    Q.    In other words, do you need actual forensic tools?

1:36PM 5    A.    Yes, because that's going to be able to pull system

6    data, software data, unallocated space, in addition to the

7    user's data.

8    Q.    Can somebody remotely access a network or a device

9    without being a Russian hacker?

1:36PM 10   A.    Yes.

11   Q.    When you use the term "remote access" in connection

12   with your opinions in this particular case, can you

13   explain to us what you mean, practically?  What does that

14   mean somebody has the capability of doing?

1:37PM 15   A.    It just means accessing a device that you don't have

16   physical access to.  So I remote access my computers all

17   the time because I don't have physical access to them.

18   It's not that I'm hacking them, it's just allowing me a

19   convenient way to access data without having to physically

1:37PM 20   go to the machine and use it.

21   Q.    Ms. Bush, for all of the reasons that you testified

22   about yesterday, this morning, and briefly this afternoon,

23   does it remain your opinion in this case that remote

24   access was not only possible, but probable?

1:37PM 25   A.    Yes.

1:37PM 1          MR. GELFAND:  Your Honor, may I just have one

2  minute, please?

3          THE COURT:  You may.

4          MR. GELFAND:  Your Honor, I have no more

1:38PM 5  questions for Ms. Bush.

6          THE COURT:  Thank you.  Mr. Clayman?

7          MR. CLAYMAN:  Just briefly, Your Honor.

8               RECROSS EXAMINATION

9  BY MR. CLAYMAN:

1:38PM10  Q.   Will you please pull up what's been admitted as

11  Government's Exhibit 74, page four.  Ms. Bush, you were

12  asked about this image just a few minutes ago.  Do you

13  recall that?

14  A.   Yes.

1:38PM15  Q.   You were asked whether you could say this image was

16  taken by the phone, correct?

17  A.   Correct.

18  Q.   And you said that may be the case or it may have been

19  sent in a message or something like that, correct?

1:38PM20  A.   Correct.

21  Q.   You have this image in your possession, right?

22  A.   The iPhone backup, yes.

23  Q.   You said you did in your cross earlier today,

24  correct?

1:38PM25  A.   Yes, I have the iPhone backup.

1:38PM 1    Q.    You said you examined it as part of your examination

2    in this case?

3    A.    Yes, I did.

4    Q.    And sitting here today, can you say whether or not

1:39PM 5    this image was taken by the iPhone?

6    A.    No, I can't.

7    Q.    You don't know at all, do you?

8    A.    No.

9    Q.    You were also asked whether you know if any other

1:39PM 10   customers or employees were on the car lot at the time.

11   Do you recall that?

12   A.    Yes.

13   Q.    You said you don't know?

14   A.    Correct.

1:39PM 15   Q.    You have no way of knowing, right?

16   A.    Correct.

17   Q.    You do know that we obtained employee records from

18   the defendant's business, correct?

19   A.    No, I did not know that.

1:39PM 20   Q.    So you weren't provided those during your analysis?

21   A.    Employee records?

22   Q.    Employee records showing who was working on which

23   days?

24   A.    No.  I had information from the Frazer software that

1:39PM 25   tells me potential different employees at the time, but I

1:39PM 1   don't think I got employee records.

2   Q.   You didn't incorporate that Frazer software data or

3   these employee records into your analysis?

4   A.   The Frazer records I had, but I didn't get employee

1:39PM 5   records, so that would not have been part of my analysis.

6   Q.   Did you incorporate based on the Frazer records who

7   was working on the dates in the time frame that's been

8   charged in the indictment?

9   A.   Yes.   I don't know that there was any actual activity

1:40PM 10   that I was able to see within the date range, so it was

11   kind of inconclusive.

12   Q.   Would it surprise you that the employee records show

13   that there was no other employees other than the defendant

14   during the time frame in question?

1:40PM 15   A.   I don't know that it would surprise me.   I have no

16   way to say one way or another.

17   Q.   Ms. Bush, you prepared a 100-page report in

18   connection with your work on this case, right?

19   A.   Yes, I did.

1:40PM 20   Q.   You said you spent hundreds of hours working on this

21   case, is that fair to say?

22   A.   Yes.

23   Q.   Spent five days at a government facility examining

24   the HP desktop computer?

1:40PM 25   A.   Correct.

1:40PM 1    Q.    During your examination, you said you didn't focus on

2    the defendant's long-used password to the partition

3    because everyone already knew that was the password, is

4    that correct?

1:40PM 5    A.    Correct.

6    Q.    But you testified earlier that the password for the

7    Windows partition was relevant to determining who set up

8    the partition, correct?

9    A.    I said that was one thing that you could consider to

1:40PM 10    determine who may have set it up, but we're also looking

11    at other information.

12    Q.    And you reviewed texts from the defendant's iPhone,

13    correct?

14    A.    Correct.

1:41PM 15    Q.    But they didn't really significantly factor into your

16    assessment, is that fair to say?

17    A.    Yeah, because I was looking for remote access rather

18    than physical.

19    Q.    And you also looked at images from the iPhone?

1:41PM 20    A.    Yes.

21    Q.    You said those didn't factor into your analysis for

22    the same reason?

23    A.    Yes.

24    Q.    You just said you were focusing on remote access, is

1:41PM 25    that fair to say?

1:41PM 1    A.    Correct.

2    Q.    So you looked at the command lines, correct?

3    A.    Well, I attempted to, but they were no longer on the

4    system.

1:41PM 5    Q.    They were no longer on the system or they never

6    existed on the system, correct?

7    A.    I guess that could be a possibility, yes.

8    Q.    So you have no way of knowing right now, sitting here

9    today, whether they were deleted by the user or whether

1:41PM10    they never existed because no one ever used command lines

11    on this computer, correct?

12    A.    Well, based on my knowledge of how Linux operates and

13    also seeing the collection of evidence that existed, like

14    the fact that I wasn't able to show that uTorrent was in

1:42PM15    the Snap Store at the time that it was used, would lead me

16    to believe that it had been, command line had been

17    executed.  So the lack of that file would suggest to me it

18    had been deleted rather than just never existing.

19    Q.    You have no actual forensic evidence showing that

1:42PM20    command lines were used, correct?

21    A.    Correct.

22    Q.    You also looked at remote access applications,

23    correct?

24    A.    Yes.

1:42PM25    Q.    And you found that there were applications that could

1:42PM 1   permit remote access on the Windows side and the Linux

2   side of the HP computer, correct?

3   A.   Correct.

4   Q.   But you found no logs confirming that remote access

1:42PM 5   applications were used on either side of the computer,

6   correct?

7   A.   Well, I was able to show that remote access software

8   had been used on the Windows side, but I don't think it

9   was in the date range of interest.  And then the log files

1:42PM 10  for the Linux side just no longer exist.

11  Q.   They either no longer existed or they never existed

12  in the first place because remote access applications

13  weren't used, correct?

14  A.   Right.  We don't know if the logs, had they provided

1:42PM 15  activity during the date range, what they would have

16  shown.

17  Q.   They could have not even existed, correct?

18  A.   Well, they have to exist because it's an integral

19  part of the Linux operating system, but whether it showed

1:43PM 20  remote access, I don't know.

21  Q.   You have no idea?

22  A.   Correct.

23  Q.   You also focused on VLC streaming, is that right?

24  A.   Yes.

1:43PM 25  Q.   Sitting here today, can you say 100 percent whether

1:43PM 1    or not the videos that were played in the VLC player were

2    played locally or whether they were streamed to another

3    computer?

4    A.   Well, I know they were streamed.  Whether or not

1:43PM 5    another computer had access to that stream, I can't say.

6    Q.   You have no idea, correct?

7    A.   Correct.

8    Q.   Ms. Bush, you said earlier that you followed the

9    truth and you followed the evidence, correct?

1:43PM 10   A.   Yes.

11   Q.   You want to figure out "the who, the what, the when,

12   the where, the why" of the crime that's charged, correct?

13   A.   Correct.

14   Q.   And while focusing, Ms. Bush, on all that nonexistent

1:43PM 15   evidence we just discussed, you failed to make one mention

16   of this picture here in this exhibit in your report, is

17   that correct?

18   A.   I don't know that I failed to mention it.  It wasn't

19   included in my report.

1:43PM 20   Q.   Because you didn't think it was relevant to your

21   analysis, correct?

22   A.   Yeah.  It was not something that I felt was a

23   priority to put in my report over the 100 pages that I

24   included in my report.

1:44PM 25          MR. CLAYMAN:  Pass the witness, Your Honor.

1:44PM 1          THE COURT:  Thank you.  Does that prompt any

2     follow-up?

3          MR. GELFAND:  Just one brief follow-up, Your

4     Honor.

1:44PM 5                    REDIRECT EXAMINATION

6     BY MR. GELFAND:

7     Q.   You were asked again about this whole command lines

8     Snap Store, et cetera.  Based on your research, could

9     uTorrent, the version that was actually on the HP Linux

1:44PM10     partition side, have been downloaded from the Snap Store?

11     A.   My research suggests no.

12     Q.   And do you agree with Mr. Fottrell and your previous

13     testimony that it definitely wasn't an installer because

14     there would be a forensic artifact?

1:45PM15     A.   Correct.

16     Q.   So does that leave one and only one option, command

17     lines?

18     A.   Yes.

19          MR. GELFAND:  I have nothing further.

1:45PM20          MR. CLAYMAN:  Nothing further, Your Honor.

21          THE COURT:  Thank you for being here, Ms. Bush.

22     You are free to stand down.  Defense may call its next

23     witness.

24          MR. GELFAND:  Your Honor, at this time, we call

1:45PM25     Daniel Wilcox.

1:45PM 1        THE COURT:  Mr. Wilcox, if you would please come

2  forward.  If you would pause about right there and raise

3  your right hand to be sworn.

4        (Witness Sworn)

1:46PM 5        THE COURT:  You may have a seat in our witness

6  box.  Mr. Wilcox, while testifying, you may remove your

7  mask if you choose.

8        THE WITNESS:  Thank you.

9        THE COURT:  You may inquire, Mr. Gelfand.

1:46PM10        MR. GELFAND:  Thank you, Your Honor.

11        DANIEL WILCOX, having been first duly sworn,

12  testified as follows:

13                DIRECT EXAMINATION

14  BY MR. WILCOX:

1:46PM15  Q.   Could you please introduce yourself to the Jury and

16  state and spell your full name for the benefit of the

17  court reporter?

18  A.   My name is Daniel Wilcox.

19  Q.   And for the benefit of the court reporter, is that

1:46PM20  W-I-L-C-O-X?

21  A.   Yes, sir.

22  Q.   Mr. Wilcox, how are you currently employed?

23  A.   I work for the Walmart corporate office, home office.

24  Q.   And just very generally, what do you do for Walmart?

1:46PM25  A.   I'm a senior manager for the threat assessment team

1:46PM 1    and we mitigate all threats to the company and our

2    associates.

3           THE COURT:   Mr. Wilcox, will you adjust that

4    microphone so that you're speaking directly into it for

1:46PM 5    me?

6    Q.   (BY MR. GELFAND.)   How long have you been working for

7    Walmart, just approximately?

8    A.   Since May of this year.

9    Q.   What did you previously do for a living?

1:47PM 10    A.   I was a law enforcement officer for the Rogers, City

11    of Rogers Police Department.

12    Q.   Were you also cross-designated as an HSI task force

13    officer?

14    A.   Yes, sir.

1:47PM 15    Q.   Just generally speaking, what is an HSI task force

16    officer?

17    A.   I went through Title 19 training where I was a

18    certified customs officer in January of 2021.   I switched

19    over to HSI where I was tasked out and attached to the

1:47PM 20    HIDTA group where we investigate drug-trafficking

21    organizations.

22    Q.   I want to direct your attention to 2019.   What is it

23    that you did for a living in 2019?

24    A.   I was a Rogers Police Department narcotics officer

1:47PM 25    and a task force officer for Homeland Security

1:47PM 1   Investigations.

2   Q.   Did you perform a limited role in this investigation

3   in your capacity as an HSI task force officer?

4   A.   Yes, sir.

1:47PM 5   Q.   I'm sorry.  And a Rogers Police Department officer?

6   A.   Yes, sir.

7   Q.   I want to direct your attention to October 31st,

8   Halloween, of 2019.  Were you designated to assist in a

9   limited capacity in this investigation?

1:48PM 10   A.   Yes, sir.

11   Q.   And what specifically did you do generally?

12   A.   I called a number on the -- I was tasked to see if I

13   could find Mr. Duggar at the business and I was tasked to

14   call the number on the side of the business and try to

1:48PM 15   arrange to purchase a vehicle from the business to see if

16   Mr. Duggar was there.

17   Q.   Let me back up for a second.  Prior to calling the

18   phone number, did you participate in a limited capacity in

19   a search warrant that was not executed at a residence?

1:48PM 20   A.   Oh, yes, sir.

21   Q.   And just generally speaking, what was your role with

22   respect to the search warrant that was not executed at the

23   residence?

24   A.   I was just on the perimeter team.

1:48PM 25   Q.   What is the perimeter team?

1:49PM 1    A.   You set up around the residence to make sure that
2    nobody runs out the back, or if there is fire upon contact
3    or approach, that you can help.
4    Q.   And did that occur sometime in the morning of
1:49PM 5    October 31st of 2019?
6    A.   I believe so, yes.
7    Q.   And that was a search warrant that was not executed
8    at a residence, not associated with Mr. Duggar?
9    A.   Yes, sir.
1:49PM 10   Q.   But in connection with this investigation, correct?
11   A.   Yes, sir.
12   Q.   Later that day or the following day, were you asked
13   to participate in any sort of undercover capacity?
14   A.   Yes, sir.
1:49PM 15   Q.   Just backing up by way of background.  As an
16   undercover officer, what are you doing in an event like
17   this or in a capacity like this?
18   A.   So you play a role.  At this, for this investigation,
19   I was playing like I was trying to purchase a vehicle from
1:50PM 20   the car lot.
21   Q.   Were you previously involved in any substantive way
22   in this investigation?
23   A.   No, sir.
24   Q.   And to be clear, at the time that you performed the
1:50PM 25   role of an undercover officer -- well, the role of a

1:50PM 1    customer in your capacity as an undercover officer, were

2    you assigned to investigate allegations of child

3    pornography or anything along those lines?

4    A.    No, sir.

1:50PM 5    Q.    Was the idea that you would just perform an

6    undercover role and essentially not be recognized?

7    A.    Yes, sir.

8    Q.    Tell us if you would, please, what you first did in

9    your capacity as an undercover customer with respect to

1:50PM 10   Wholesale Motorcars.

11   A.    I called the number on the sign of the business.

12   Q.    Prior to calling the number, what was your

13   understanding of your role, your objective in this

14   undercover investigation?

1:51PM 15   A.    I was trying to see if Mr. Duggar was at the business

16   or associated to the business.

17   Q.    And to be clear, do you recall whether this was on

18   October 31st or November 1st of 2019?

19   A.    I do not know.  I don't recall, sir.

1:51PM 20   Q.    But you were specifically trying to make contact with

21   Josh Duggar, correct?

22   A.    Yes, sir.

23   Q.    Even though you don't recall the exact date, was it

24   either the same day or very soon thereafter after that

1:51PM 25   perimeter search warrant?

1:51PM 1    A.    I think it was shortly after.

2    Q.    When you said you called the main number of the

3    business, where did you obtain the main number?

4    A.    From the side of the building that was actually at

1:51PM 5    the car lot.

6    Q.    What happened when you called that main number?

7    A.    I played -- I had a voicemail, I left a voicemail,

8    voice message saying my name and that I was interested in

9    a vehicle that was on the lot.

1:51PM 10   Q.    And to be clear, had you previously identified a

11   vehicle from a website or some sort of social media?

12   A.    Yeah, I got on the website and found a vehicle that I

13   was going to attempt to purchase.

14   Q.    As in any undercover, were you role-playing?

1:52PM 15   A.    I'm sorry?

16   Q.    As in any undercover operation, were you playing the

17   role of a customer, even though you were a cop?

18   A.    Yes, sir.

19   Q.    Did you receive a call back in response to your

1:52PM 20   voicemail?

21   A.    I did, sir.

22   Q.    What happened next?

23   A.    So there was -- there was two meetings, or we set up

24   a meeting.  I don't know which one happened first.  I

1:52PM 25   spoke to Mr. Duggar on the phone and he had set a time to

1:52PM 1    meet at the lot.  And when I showed up at the lot, there

2    was a gentleman there by the name of Randy who said that

3    he was expecting me and that Mr. Duggar was busy.  And so

4    I made up an excuse and got out of there.  And then there

1:52PM 5    was another occasion when Mr. Duggar was actually at the

6    lot and I spoke to him.

7    Q.   Let's focus on each of those times sequentially.  Was

8    the first time where you met with somebody named Randy and

9    then made up an excuse and got out of there?

1:53PM10    A.   I don't recall which of the two instances happened

11    first.

12    Q.   At that time, did you know who Randy was?

13    A.   I did not.

14    Q.   Were you asked to find out information about Randy or

1:53PM15    was the goal to only find out information about Josh?

16    A.   Josh.

17    Q.   Now, the second time, were you able to actually

18    physically go to the business again?

19    A.   Yes, sir.

1:53PM20    Q.   And was the business an operational used car lot?

21    A.   Yes, sir.

22    Q.   Did it appear to have a lot of cars?

23    A.   It did have cars, yes, sir.

24    Q.   When you happened to be there, were other customers

1:53PM25    around?

1:53 PM 1     A.    No, sir.

2     Q.    When you showed up, did you meet with any

3     individuals?

4     A.    Yes.  I met with Randy and Josh.

1:53 PM 5     Q.    And where did you meet with Randy and Josh?

6     A.    Inside the office.

7     Q.    And what, if anything, was your understanding as to

8     Randy's role or position at the car lot?

9     A.    I didn't really talk to him.  We introduced who we

1:54 PM 10    were to each other, but that was it.  I was speaking with

11    Josh.

12    Q.    Did Randy, based on your experience, appear to work

13    at the car lot?

14    A.    He did.

1:54 PM 15    Q.    Did you actually go into the office at Wholesale

16    Motorcars?

17    A.    Yes, sir.

18    Q.    And did you meet with any individuals there?

19    A.    Randy and Josh.  They were both inside the office.

1:54 PM 20    Q.    Was it just the three of you?

21    A.    Yes, sir.

22    Q.    Were the three of you able to meet in that office?

23    A.    Yes, sir.

24    Q.    Approximately how long was that meeting?

1:54 PM 25    A.    Not very long.  Couple minutes.  I walked in.  We

1:54PM 1  exchanged greetings.  I was inquiring about a car.  Josh

2  went over to the desk and he retrieved a piece of paper.

3  I assume -- I couldn't see what was on it from where I was

4  standing -- but I assume that it had details of the cars

1:54PM 5  that were on the lot because we were going on what price I

6  was willing to spend.  We were looking on the list to see

7  what I could afford.

8  Q.   Were you sitting in the office where you observed, or

9  were you standing in the office where a customer would

1:55PM 10  stand or sit?

11  A.   We were all standing.

12  Q.   And you were discussing possible cars?

13  A.   Yes, sir.

14  Q.   And at this time, is it fair to say that based on

1:55PM 15  everything you observed, no one there except you knew that

16  you were a cop, correct?

17  A.   Yes, sir.

18  Q.   Was it your understanding that Josh was focusing on

19  cars to walk out to the lot and show you those cars?

1:55PM 20  A.   Yes, sir.  He was the one that was looking up the

21  prices and the mileage.

22  Q.   Did it appear the objective was to take you for a

23  test drive or show you the cars?

24  A.   I mean, I assume that he was trying to sell a car

1:55PM 25  like I was trying to buy one.

1:55PM 1    Q.    In other words, was this interaction like any other

2    car-buying interaction you've had over the course of your

3    life?

4    A.    Yes, sir.

1:55PM 5    Q.    Was Randy there the entire time?

6    A.    Yes, sir.

7    Q.    How did the interaction end?  I assume you didn't buy

8    a car?

9    A.    No, sir.  The interaction ended.  My "out" was that

1:56PM 10   my father was going to help me pay for the car and I was

11   going to have to speak with him to approve to him to give

12   me the portion of the money to help purchase the car.

13   Q.    In other words, when you say your "out," was that the

14   way of not shelling out government cash for a car?

1:56PM 15   A.    Yes, sir.

16   Q.    And is that what you told Josh and Randy?

17   A.    Yes, sir.

18   Q.    And at that point, did you leave?

19   A.    Yes, sir.

1:56PM 20   Q.    At any point during this operation, did you do any

21   sort of audio or visual recording?

22   A.    I don't recall.  I don't believe so, because we

23   weren't trying to -- it was not like we were doing a drug

24   deal or something to that effect.  We were just seeing if

1:56PM 25   he was in the business.

1:56PM 1    Q.    So in other words, in your previous experience, if

2    you do an undercover operation in like a drug buy or

3    something totally different from what we are here for, do

4    undercover officers have the capability of recording,

1:57PM 5    video and audio people without them knowing?

6    A.    Yes, sir.

7    Q.    But you didn't utilize that here because the goal was

8    basically, target Josh, find Josh, talk to Josh?

9    A.    I don't recall if we had a recording or not.

1:57PM 10    Q.    But was the goal find Josh, talk to Josh?

11    A.    Yes, sir.

12    Q.    Focus entirely on Josh?

13    A.    Yes, sir.

14    Q.    And is that what you were asked to do by the agents

1:57PM 15    investigating this investigation?

16    A.    Yes, sir.

17    Q.    After you left, did you provide information to those

18    agents?

19    A.    Yes, sir.

1:57PM 20    Q.    Specifically, did you provide information about any

21    observations you had during your time at the car lot?

22    A.    Yes, sir.

23    Q.    Did you tell them that you observed Josh use a laptop

24    computer and an iPhone?

1:57PM 25    A.    He had a computer, yes, sir, and he had an iPhone,

1:58PM 1   yes.

2   Q.   After that, did you have any further involvement with

3   this investigation?

4   A.   No, sir.

1:58PM 5   Q.   And just to be clear as far as dates, did this entire

6   undercover operation that you did at the car lot occur in

7   the range of October 31st and November 1st of 2019?

8   A.   I believe so.

9   Q.   Definitely not after a search warrant was executed at

1:58PM 10   the car lot, correct?

11   A.   No, sir.

12   Q.   Was it your understanding that this was in

13   anticipation of a search warrant at the car lot?

14   A.   I don't know what the -- what their plan was for what

1:58PM 15   they were doing.

16   Q.   You took no further role with this investigation,

17   correct?

18   A.   No, sir.

19           MR. GELFAND:  Your Honor, may I have one minute,

1:58PM 20   please?

21           THE COURT:  Certainly.

22           MR. GELFAND:  Thank you.  I have no further

23   questions.

24                   CROSS EXAMINATION

1:59PM 25   BY MR. ROBERTS:

1:59PM 1   Q.   I'm used to calling you Detective Wilcox.

2   Mr. Wilcox, so you were part of the team that secured the

3   residence that was right next to the car lot when ya'll

4   were attempting to execute a search warrant prior to the

1:59PM 5   date you went into the car lot, is that right?

6   A.   Yes, sir.  It's just adjacent to the property.

7   Q.   So when ya'll went to that residence, you were aware

8   that the subpoena results showing the IP that was

9   downloading this child pornography came back to

1:59PM10   Mr. Duggar, right?

11   A.   I knew he was the target, yes, sir.

12   Q.   And when you got to the residence, you understood

13   that he didn't live there and they had nothing to do with

14   that, is that correct?

1:59PM15   A.   Yes, sir.

16   Q.   And they are the ones that told you, "He has the car

17   lot next door," is that right?

18   A.   Yes, sir.

19   Q.   And because they had the car lot next door, they sent

1:59PM20   you in to verify Mr. Duggar was there, right?

21   A.   Yes, sir.

22   Q.   That's the top and the bottom of your involvement,

23   isn't it?

24   A.   That's it.

2:00PM25   Q.   Thank you.

2:00PM 1          MR. GELFAND:  No further questions, Your Honor.

2          THE COURT:  May this witness be excused?

3          MR. GELFAND:  Yes, Your Honor.

4          MR. ROBERTS:  Yes, Your Honor.

2:00PM 5          THE COURT:  Thank you for your time in being

6  here.  You're excused, free to go.

7          MR. GELFAND:  May we have a brief side bar, Your

8  Honor?

9          THE COURT:  Yes.

2:01PM 10          (Bench Conference)

11          MR. GELFAND:  Our intention was to call Caleb

12  Williams as our next witness.  Two things that are

13  unrelated.  One, Mr. Roberts told me in advance of the

14  trial reconvening after lunch that he wanted to raise an

2:01PM 15  issue with the Court, so I wanted to give him that

16  opportunity.

17          Number two, I was hoping we could, at risk of

18  inconveniencing everyone, have two minutes with our client

19  to determine whether we're going to call the witness based

2:02PM 20  on what Michele Bush testified to.

21          THE COURT:  All right.  So let's take up

22  Mr. Roberts' issue, but certainly you may, and if you

23  want, you can step out into the vestibule hallway to

24  chambers and do that.

2:02PM 25          MR. GELFAND:  Thank you.

2:02PM 1                 MR. ROBERTS:  Your Honor, based on our previous

2         conversation and what I understand the Court's order to be

3         is that, in order for him to get into any facts in

4         evidence that Mr. Williams, Caleb Williams knows, he's

2:02PM 5         going to have to establish, and Ms. Bush has already

6         testified, you've got to be there May 13th.  If he's not,

7         I don't see any relevance.  And that's -- I mean, is that

8         a precondition?

9                 THE COURT:  Well, the Court stands by what it

2:02PM10         ruled earlier.  And the big picture issue here is evidence

11         of an alternative perpetrator.  And the Court will not

12         allow speculative testimony or speculative argument about

13         alternative perpetrators.  I don't know what this witness,

14         I don't know what their knowledge was.  I don't know what

2:03PM15         they are being called for, so all I can do is flag the

16         issue based on what I know.  And I can tell you that he's

17         going to have to establish 602 personal knowledge.  And to

18         the extent that he tries to introduce documents or to the

19         extent documents are attempted to be introduced, you will

2:03PM20         have to be in a position to establish 901 and 602 basis to

21         admit documents.  Other than that, I can't make an

22         advisory opinion.

23                 MR. ROBERTS:  Your Honor, can we ask the defense

24         attorney to at least verify he has a good faith belief

2:04PM25         this guy, some evidence indicating that he was here during

2:04PM 1    that time frame?

2           MR. GELFAND:  Can I proffer what I anticipate the

3    testimony to be?

4           THE COURT:  Yes, that would be helpful.

2:04PM 5           MR. ROBERTS:  That would be very helpful.

6           MR. GELFAND:  With one caveat, Your Honor, and

7    that's that -- we have not -- Mr. Williams exercised his

8    right not to speak to our investigator, and so all we can

9    do is issue a subpoena to a witness just as a due process

2:04PM10   matter.

11          We anticipate that he will testify that he has

12   previously worked at Wholesale Motorcars in various

13   capacities.  We anticipate that he will authenticate a

14   March 27th, 2019, sales contract listing him as the --

2:04PM15         THE COURT:  March 29?

16          MR. GELFAND:  March 27 of 2019, so basically six

17   weeks before this, listing him as the salesperson.  He

18   signed it.  My understanding -- correct me if I'm wrong --

19   is the government actually showed him that and he

2:05PM20   verified.

21          MR. ROBERTS:  I did not show him that, no.

22          MR. GELFAND:  I believe your agents.  It's in

23   your ROI.  Well, whatever.  Doesn't matter.  He'll either

24   authenticate that or not.  He'll identify Frazer computing

2:05PM25   at the bottom of that document, which references Frazer on

2:05PM 1    the HP computer.  That he had involvement with eBay sales.

2           There's already in evidence, Defendant's Exhibit 48, which

3           are e-mails and shipping labels that he'll testify, I

4           anticipate, are associated directly to him.  He's used the

2:05PM 5    Duggars' parents -- meaning Jim Bob and Michelle's --

6           address as his home in that March and I think April 2019

7           time period.

8                   And then critically, March 7th of 2019, he sends

9           a text message that he turns over to the government, the

2:05PM 10   government then turns over to us.  That's where we got it

11          from.  And the text message that he sends to Josh Duggar

12          on May 7th of 2019 says, "Should be able to help you a

13          couple days this week, happy face, watch the lot."  The

14          lot we believe refers to Wholesale Motorcars' lot and

2:06PM 15   that's the May 7th time period.

16                  THE COURT:  Did he watch the lot?

17                  MR. GELFAND:  He has, in response in discovery

18          provided by the government, he said he -- initially, he

19          denied going to the lot, and then he took -- he said he

2:06PM 20   didn't mean to mislead anyone, he may have watched the

21          lot.  He may have used the computer.  He says he doesn't

22          remember, according to the government.

23                  THE COURT:  That's not 602.

24                  MR. GELFAND:  This is all according to what the

2:06PM 25   government disclosed in discovery.

2:06PM 1          MR. ROBERTS:  Your Honor, there's more that --

     2    I'm sorry.  I didn't mean to cut you out.

     3          MR. GELFAND:  On May 9th of 2019, according to

     4    the government's ROI, he spends the night at Champion

2:06PM 5    Motorcars.

     6          THE COURT:  And where is Champion Motors?

     7          MR. GELFAND:  A mile or --

     8          MR. ROBERTS:  It's where the fire truck was at,

     9    Your Honor.

2:07PM10          THE COURT:  And Champion is a parent company

    11    to --

    12          MR. ROBERTS:  It's his brother's company.

    13          THE COURT:  His brother's company.

    14          MR. GELFAND:  Jed Duggar's company.  Ownership

2:07PM15    might technically be different, but essentially, it's

    16    Jed's car lot.  So he spends the night there on May 9th.

    17    He said he might have done odd jobs for the Duggars or for

    18    the guys.

    19          MR. ROBERTS:  No, he said Jed, specifically.  But

2:07PM20    go ahead.

    21          MR. GELFAND:  We're going, again, based on

    22    government discovery.  And then he, in what we got with

    23    what we believe was disclosure of *Brady*, he turns over an

    24    undated, un-time-stamped photo that presumably he took

2:07PM25    from an iPhone 8, it appears, in the Wholesale Motorcars'

2:07PM 1   lot of Josh using the MacBook laptop that was seized in

2   this case.

3         THE COURT:  Taken when?

4         MR. ROBERTS:  How on earth did you say it was an

2:08PM 5   iPhone 8?  There's no metadata.

6         MR. GELFAND:  Oh, I'm sorry.  It's on a different

7   -- Your Honor, I misspoke.  It's on a different photo that

8   he turned over that shows he has an iPhone 8.  I don't

9   know if that photo was taken on an iPhone 8.  We have no

2:08PM10   metadata for anything.

11       He has denied being at the lot to the government.

12   He's provided information, which the government has not

13   asked him for follow-up on, that's impossible to verify

14   any metadata on.  They are literally pictures of pictures,

2:08PM15   like pictures of a computer screen.  And as a practical

16   matter --

17         THE COURT:  When you say he's denied being on the

18   lot, does that mean denied being on the lot May 14 through

19   16?  Is that what you mean?

2:09PM20         MR. ROBERTS:  He told our investigator that too.

21         MR. GELFAND:  He said that to our investigator

22   when he didn't know what he was being asked and the

23   investigator didn't ask him specifically about that.  And

24   as a practical matter, he made a statement to the

2:09PM25   government readily acknowledging that he has had access to

2:09PM 1    passwords in connection with the Duggars, including Josh,

2           and that he's done some social media work selling cars for

3           the various car lots, I believe including Wholesale and

4           possibly Jed's lot.

2:09PM 5               MR. ROBERTS:  Your Honor, may I add to?

6               THE COURT:  Yes.

7               MR. ROBERTS:  We have also turned over

8           unsolicited e-mails when he reached out through his

9           attorney that he left Jed Duggar's car lot on May 11th,

2:09PM 10   stopped in St. Louis and got a new iPhone, which we have

11          the receipt and the Apple representative here verifying

12          that he was there.  He then drove to his mother's house on

13          May 11th.  On May 12th, Mother's Day, we have his mother

14          here who said, "By the way, I took a video of him," which

2:10PM 15   we turned over the stills, "moving furniture," which she

16          will identify.  And then on May 13th, he does engraving, I

17          mentioned, and this is a huge machine that his mom will

18          verify also that he is in Illinois this entire time frame.

19          It corroborates exactly what he said all the way up to the

2:10PM 20   16th where they left, as a family, in a van for a wedding.

21               I mean, this is a rabbit trail.  And, Your Honor,

22          I mean, the only obvious reason why the defense is wanting

23          to call him is because he's a sex offender.  I mean, this

24          has been the reason why --

2:10PM 25               THE COURT:  Does he have a conviction?

2:10 PM 1          MR. ROBERTS:  After this conduct.

2          THE COURT:  He has a 609 applicable conviction?

3          MR. ROBERTS:  Yes, Your Honor.  He was convicted

4  in early 2020 of having sex with his, whatever they call

2:10 PM 5  girlfriends in this belief system.

6          THE COURT:  Is the relevance -- I mean, is the

7  core relevance purpose, overriding purpose for which

8  you're calling or would seek to call Mr. Williams to be

9  able to make an argument that he was an alternative

2:11 PM 10  perpetrator of the offense conduct on May 14 through 16,

11  either in person or remotely?

12          MR. GELFAND:  Yes, but not exclusively, because

13  he also has circumstantial evidence that shows, for

14  example, even just the fact that he sold a car as a

2:11 PM 15  salesperson at the car lot shows that there were other

16  sales people other than is reflected in the employment

17  records.

18          THE COURT:  Okay.

19          MR. ROBERTS:  Your Honor, may I add a layer to

2:12 PM 20  that?

21          THE COURT:  Yes.

22          MR. ROBERTS:  If they are wanting to call him

23  solely for that, then I would move under 403 just to

24  exclude the prior conviction and then we're good.

2:12 PM 25          THE COURT:  I'm not sure that we can.

2:12PM 1          MR. ROBERTS:  Your Honor, the reason, Mr. Gelfand

2          has already represented to the defense, or to the Jury

3          that he is blaming this guy.  You can't walk that back and

4          then try to put him up as, "Oh, we're just calling him to

2:12PM 5          see about passwords."  It's already out there.

6                 MR. GELFAND:  We said he wasn't investigated,

7          which is true.

8                 MR. ROBERTS:  It accomplishes the same thing you

9          are trying to in that case.

2:12PM 10                THE COURT:  "Must be admitted subject to 403 in a

11         civil case, or in a criminal case in which the witness is

12         not a defendant."  So 403 does overlay on top of 609,

13         correct?  If he were a defendant, then the 403 balancing

14         test is worded differently, and that's in 609(a)(1)(B).

2:13PM 15         But here, he is a witness in a criminal case.

16         609(a)(1)(A) applies and 403 lies on top of that.

17                MR. GELFAND:  I don't have any reason to disagree

18         with that, Your Honor.  But I do think that, as a

19         practical matter, to the extent to which impeachment, any

2:13PM 20         grounds, including 609, would be appropriate, I would

21         assume that even any application of 403 would have to be

22         based on consideration of how he testifies, what he says,

23         how the Court observes him.

24                THE COURT:  Right, yeah.  So to the extent that

2:14PM 25         the overarching relevance and purpose of calling this

2:14PM 1  witness is to establish so-called alternative perpetrator

2  evidence, based on this proffer, the Court will not allow

3  Caleb Williams to be associated with so-called alternative

4  perpetrator evidence or argument.

2:14PM 5  *Holmes v. South Carolina*, 547 U.S. 319, "The

6  critical inquiry concerns the strength of the

7  prosecution's case.  If the prosecution's case is strong

8  enough, the evidence of third-party guilt is excluded,

9  even if that evidence, if viewed independently, would have

2:15PM 10  great probative value, and even if it would not pose an

11  undue risk of harassment, prejudice, or confusion of the

12  issues."

13  *U.S. v. Jordan*, 485 F.3d 1214, Tenth Circuit,

14  2007, "Courts may properly deny admission of alternative

2:15PM 15  perpetrator evidence that fails to establish, either on

16  its own or in combination with other evidence in the

17  record, A)" -- and here's the money quote --

18  "nonspeculative nexus between the crime charged and the

19  alleged perpetrator."

2:15PM 20  There's a similar line of analysis from *United*

21  *States v. Timothy McVeigh*, Oklahoma City bomber, Tenth

22  Circuit 1998.  "Although there is no doubt that a

23  defendant has a right to attempt to establish his

24  innocence by showing that someone else did the crime" --

2:16PM 25  that was the basis of the Court's motion in limine ruling

2:16PM 1    that was substantially in the defendant's favor -- "a

2          defendant still must show that his proffered evidence on

3          the alleged alternative perpetrator is sufficient on its

4          own or in combination with other evidence in the record to

2:16PM 5    show a nexus between the crime charged and the asserted

6          alternative perpetrator.  It is not sufficient for a

7          defendant merely to offer up unsupported speculation that

8          another person may have done the crime.  Such speculative

9          blaming intensifies the grave risk of jury confusion and

2:16PM10    it invites the jury to render its findings based on

11         emotion or prejudice."

12               Against that background, you may ask, you may

13         call Mr. Williams and you may establish background of who

14         he is and what his connection is.  You may discuss the

2:17PM15    dates of his employment.  You must ask him whether or not

16         he has knowledge or recollection of being present on the

17         car lot on or about May 13 through May 16.  Defense

18         conduct is May 14 through 16, but there's evidence that

19         the Linux partition was installed on the 13th.  And you

2:18PM20    may inquire if he ever remoted in to the office machine,

21         and if so, the time periods in which he would have remoted

22         in.  If he establishes that he was present or that he had

23         remoted in, then we can take this one step further and you

24         can ask these other questions and the Court wouldn't have

2:18PM25    enough information to make an analysis against these cases

2:18PM 1    that I discussed a moment ago until I hear that.

2           However, assuming, as the government seems to be

3      indicating, that he wasn't present on the lot -- and I

4      don't know whether they know whether he's ever remoted in

2:19PM 5    or not -- but assuming he testifies that he's never

6      remoted in, that's as far as you are going to get and the

7      Court would find in that instance under 403 that the 609

8      conviction that you have discussed should not be allowed,

9      because at that point, the primary purpose or objective of

2:19PM10   calling the witness will have failed, and the Court is not

11     going to allow speculative testimony that he was the

12     alternative perpetrator.  And so under 403, it would not

13     be allowed because of confusing the issues and the balance

14     and test considerations.  So you may have a few minutes to

2:20PM15   discuss it.

16          MR. GELFAND:  Sure.  Can I make a suggestion?  I

17     don't want to control the Court's docket.

18          THE COURT:  I appreciate that.

19          MR. GELFAND:  If we don't call Mr. Williams,

2:20PM20   subject to a consultation with our client, I anticipate

21     that we're going to rest.  And this may also be a time to

22     take a recess and have the Court do the colloquy with our

23     client.

24          THE COURT:  Let's take it one step at a time.

2:20PM25   Let's find out the answer to question one, whether you are

2:20PM 1    going to call Caleb Williams.  How long will that take?

2           MR. GELFAND:  Just a few minutes.

3           THE COURT:  We'll wait.

4           MR. GELFAND:  You said it was okay to step into

2:20PM 5    the hallway?

6           THE COURT:  Yes, it is.

7           (pause, 2:20 p.m. to 2:23 p.m.)

8           MR. GELFAND:  Thank you for the opportunity to

9    consult privately with our client.  Based on the Court's

2:23PM10   ruling, excluding the anticipated testimony that we were

11   intending to attempt to elicit and with the understanding

12   of that record of what was previously filed in advance of

13   trial, we will not call Caleb Williams for the very

14   limited purpose that the Court would allow us to.

2:23PM15          Furthermore, Mr. Duggar has elected not to

16   testify in his defense.  And my plan at this point is to

17   rest the defense's case-in-chief.

18          THE COURT:  All right.  Thank you.  That helps me

19   understand.

2:24PM20          (Bench Conference Concluded)

21          THE COURT:  Members of the Jury, thank you for

22   your patience.  There is one more issue that I need to

23   take up not just at side bar, but out of the Jury's

24   presence.  And I would like to give you an option of how

2:25PM25   you would like to handle this.  We could take a 10 to

2:25PM 1    15-minute break.  Ya'll could go back to the jury room and

2      the additional three or four-minute journey to and from

3      would be involved.  Or if you give me about five more

4      minutes, approximately, I can take up this matter in

2:25PM 5    chambers and ya'll can just sit here and wait.  I really

6      think I can do it in five minutes, so probably in less

7      time than it would take you to get to the jury room and

8      come back up and that's why the second option would be my

9      preference, but if ya'll would rather hang out in the jury

2:26PM10    room, we can do it that way as well.

11            Any opposition to just hanging out for five

12     minutes where you are?  I'm seeing a lot of shaking head

13     nos, so the Jury is going to remain in the box,

14     technically.  We're going to have a side bar conversation

2:26PM15    in chambers and we will be right back.

16            Could I see all of the parties in chambers,

17     please?

18            (In-Chambers Hearing)

19            THE COURT:  So the record will reflect that we

2:28PM20    are proceeding in chambers and outside the presence of the

21     Jury.  Counsel of record that have been trying the case

22     are present.  Joshua Duggar is present.  Thank you for

23     coming back here, sir.

24            I wanted to engage you in a direct conversation

2:28PM25    just to make sure that it's perfectly clear on the record

2:28PM 1   that you understand some very important rights that you

2        have at this juncture of the trial.

3                Number one, you have the absolute right to

4        testify in your defense.

2:28PM 5               THE DEFENDANT:  Yes.

6                THE COURT:  And that's just an absolute right

7        that you have.  Do you understand that?

8                THE DEFENDANT:  Yes, Your Honor.

9                THE COURT:  Now, this issue is framed most of the

2:29PM10   time under the second point that I want to make.  And that

11       is, under the Fifth Amendment, no one can force you to

12       testify.  Not the Court, not the government.  No one can

13       force you to take the witness stand in this trial and make

14       self-incriminating statements or put yourself in a

2:29PM15   position where you would be called upon to make

16       self-incriminating statements.  And that's your right that

17       you enjoy under the Fifth Amendment.  Do you understand

18       that right?

19               THE DEFENDANT:  Yes, Your Honor, I do.

2:29PM20          THE COURT:  The object of point one was, you can

21       waive your Fifth Amendment right and testify if you want

22       to.  And you expressed that you understand that, correct?

23               THE DEFENDANT:  I understand that, yes.

24               THE COURT:  Now, when a person in your situation

2:30PM25   is confronted with whether they should stand on their

2:30PM 1    Fifth Amendment right or to testify, there are a couple of
       2    things that you should consider.  One of those things is
       3    that if you requested, I would advise the Jury as part of
       4    the jury instructions that the Jury may not consider the
2:30PM 5    fact that you did not testify as evidence of anything.  In
       6    fact, they shouldn't even mention that in their
       7    deliberations, okay?  You should also -- obviously, you've
       8    hired very good lawyers and you should listen to their
       9    explanation of these rights.  Have they explained these
2:30PM 10   two rights to you?
       11              THE DEFENDANT:  Yes, very clearly.
       12              THE COURT:  Have they answered any and all
       13   questions that you may have had?
       14              THE DEFENDANT:  Yes.
2:30PM 15              THE COURT:  With the benefit of their
       16   explanation, do you believe that you understand both your
       17   right not to testify as well as your right to waive the
       18   Fifth Amendment and testify?
       19              THE DEFENDANT:  Yes.
2:31PM 20              THE COURT:  Have you made a decision as to
       21   whether you would like to testify or whether you would
       22   prefer not to testify?
       23              THE DEFENDANT:  I would prefer not to testify at
       24   this time.
2:31PM 25              THE COURT:  All right.  Do you understand that,

2:31PM 1    while it is important to listen to your lawyers and to ask
       2    them questions, that at the end of the day, it's not your
       3    lawyer's decision as to whether you should testify or not.
       4    It's your decision.
2:31PM 5              THE DEFENDANT:  Yes, Your Honor, I understand
       6    that.
       7              THE COURT:  And so the decision that you have
       8    made not to testify, can you verify for me that that is
       9    your decision after consulting with your lawyers, but that
2:31PM10    it is your decision?
      11              THE DEFENDANT:  Yes, it's my decision.
      12              THE COURT:  I don't think you are going to have
      13    any more questions of me, but do you have any questions
      14    about waiving your rights or any questions about your
2:32PM15    right not to testify?
      16              THE DEFENDANT:  I think those questions have been
      17    answered by my attorneys.
      18              THE COURT:  Thank you.  That's all I wanted to
      19    tell you.
2:32PM20              (End of In-Chambers Hearing)
      21              THE COURT:  The defense may call its next
      22    witness.
      23              MR. GELFAND:  Your Honor, at this time, the
      24    defense rests.
2:34PM25              THE COURT:  Members of the Jury, the defense has

2:34PM 1    now rested its case.  Does the government wish to put on

       2    any rebuttal evidence?

       3              MR. CLAYMAN:  We do, Your Honor.

       4              THE COURT:  Who is your first witness?

2:34PM 5              MR. CLAYMAN:  James Fottrell.

       6              THE COURT:  Fottrell?

       7              MR. CLAYMAN:  Mr. Fottrell.

       8              THE COURT:  I'm sorry.  How could I forget?

       9              MS. MARSHALL:  Your Honor, they went to get him.

2:35PM 10             MR. CLAYMAN:  We do have exhibits for

      11    Mr. Fottrell.

      12              THE COURT:  You may approach and put them in the

      13    box.  Mr. Fottrell, you may come forward and resume the

      14    witness stand.

2:35PM 15             Mr. Fottrell, you have previously provided

      16    testimony in the government's case-in-chief.  Do you

      17    understand that you remain under oath?

      18              THE WITNESS:  Yes, I do, Your Honor.

      19              THE COURT:  All right.

2:35PM 20             JAMES FOTTRELL, having been previously duly

      21    sworn, testified as follows:

      22                        DIRECT EXAMINATION

      23    BY MR. CLAYMAN:

      24    Q.   Good afternoon, Mr. Fottrell.

2:35PM 25    A.   Good afternoon.

2:35PM 1   Q.   You testified previously in this case, correct?

      2   A.   Yes, I did.

      3   Q.   And following your testimony, did you have an

      4   opportunity to observe any defense witness testimony?

2:36PM 5   A.   Yes, I did.  Michele Bush.

      6   Q.   And you prepared virtual machine print screens of the

      7   defendant's digital devices for use in your prior

      8   testimony, is that correct?

      9   A.   That's correct.

2:36PM10   Q.   Have you prepared any additional print screens?

    11   A.   Yes, I have.

    12   Q.   And how did you go about preparing these print

    13   screens?

    14   A.   In a similar manner to the other print screens that I

2:36PM15   created.  I was just booting up a virtual machine, I was

    16   capturing print screens along the way, and then just

    17   printing these out.

    18   Q.   And if I could direct your attention to what's been

    19   marked as Government's Exhibit 86.  Do you have that there

2:36PM20   in front of you?

    21   A.   I do.

    22   Q.   Are these print screens you prepared?

    23   A.   Yes, they are.

    24   Q.   And you prepared these print screens, just to be

2:36PM25   clear, using a virtual machine installation of Linux,

2:36PM 1    correct?

2           A.    That is correct.

3           Q.    Is this the same version as the defendant's version

4           of Linux?

2:36PM 5    A.    It's the exact same version of the Ubuntu software

6           that the defendant had downloaded to the HP desktop

7           computer.

8           Q.    Just again to be clear, is this a virtual machine of

9           the forensic image of the defendant's computer?

2:37PM10    A.    It's an installation of that Ubuntu software.  It's

11          just demonstrating what would it look like to install that

12          version of the Ubuntu software.

13          Q.    But this is not the defendant's forensic image of his

14          computer?

2:37PM15    A.    Correct.  Yeah, this has nothing to do with the

16          defendant's image.  I'm sorry.  This is just a stand-alone

17          environment that I created.

18          Q.    Are these print screens true and accurate copies of

19          the print screens you prepared before your testimony

2:37PM20    today?

21          A.    Yes, it is.

22                MR. CLAYMAN:  Your Honor, we would move to admit

23          Government's Exhibit 86.

24                MR. GELFAND:  Your Honor, may we approach

2:37PM25    briefly?

2:37PM 1                THE COURT:  Yes.

       2                (Bench Conference)

       3                MR. GELFAND:  Your Honor, we just got these

       4       exhibits literally as he was walking up to the witness

2:38PM 5       stand.  I have no idea what these are and we're on the

       6       spot regarding authentication issues.  Can the government

       7       just proffer what these are so that we can --

       8                THE COURT:  Well, the witness has just testified

       9       that Government's 86 is a true and accurate set of screen

2:38PM10       prints from him uploading the Ubuntu operating system on a

      11       stand-alone computer.  Is that accurate?

      12                MR. CLAYMAN:  Yes, Your Honor.

      13                THE COURT:  That's what I understand.  I just got

      14       them as well.

2:38PM15                MR. GELFAND:  When were these created?

      16                MR. CLAYMAN:  Over the past couple of days.

      17                MR. GELFAND:  Since he testified?

      18                MR. CLAYMAN:  Yes.

      19                MR. GELFAND:  Is that the case with all of the

2:38PM20       exhibits he has?

      21                MR. CLAYMAN:  One of them is his resume, but I

      22       don't intend to introduce that.

      23                MR. GELFAND:  What's this?

      24                MR. CLAYMAN:  That is a screenshot of AccessData

2:39PM25       FTK imager.

2:39PM 1          MR. GELFAND:  Basically, to make a long story

2    short, 86, 87, and 88 he created since he testified, and

3    89 is a screenshot from --

4          MR. CLAYMAN:  Created since he testified.

2:39PM 5          MR. GELFAND:  Your Honor, I guess let's take it

6    one step at a time, but I'm a little in the dark on any of

7    this because we just got these 10 seconds ago.

8          THE COURT:  Well, so did the Court, but this is

9    the nature of rebuttal testimony.  The Court would note

2:39PM10    for the record that he's been sitting in the courtroom

11    during Ms. Bush's testimony, which was the stipulated

12    arrangement.  So, obviously, the only purpose for which

13    Mr. Fottrell -- the only reason why you would have

14    stipulated to allow Mr. Fottrell to be in the courtroom

2:40PM15    during Ms. Bush's testimony would be recognizing that

16    there may be an appropriate rebuttal case in which he

17    would present testimony.

18          MR. GELFAND:  Your Honor, my issue is with the

19    new exhibits that we have had no time to review, not with

2:40PM20    the testimony or the nature of rebuttal testimony.  But we

21    will take it one step at a time.

22          THE COURT:  Yes.  I will just remark that the

23    Court will provisionally receive these exhibits based on a

24    901 foundation that they are what they purport to be and

2:40PM25    assuming that other foundation components are laid.  But

2:40PM 1    if for some reason you develop through your inquiry on

2          cross examination there's something inappropriate about

3          the exhibits that was not apparent to you until his

4          testimony or until your cross examination, you may move to

2:40PM 5    strike the exhibits, and if appropriate, I will certainly

6          do that, along with an appropriate admonition to the Jury.

7                    MR. GELFAND:  Thank you.

8                    (Bench Conference Concluded)

9                    THE COURT:  You may inquire.

2:41PM 10             MR. CLAYMAN:  We would move to admit Government's

11         Exhibit 86.

12                   THE COURT:  I'm sorry.  Yes, Government's 86 is

13         received subject to the Court's comments at side bar.

14                   (Government's Exhibit 86 Received)

2:41PM 15             MR. CLAYMAN:  Permission to publish, Your Honor?

16                   THE COURT:  You may.

17    Q.    (BY MR. CLAYMAN.)  Mr. Fottrell, can you describe

18         what's depicted here in Government's Exhibit 86?

19    A.    Sure.  Let me just take a moment just to kind of give

2:41PM 20    a little bit of background as to how I get to this point.

21         So basically, I used a virtualization software called

22         Microsoft -- I'm sorry -- Oracle VirtualBox.  It's free to

23         anybody to use.  I've been using it for many years.  I'm

24         also familiar with VM player that Ms. Bush uses.

2:42PM 25    Everybody has a personal preference for which tool they

2:42PM  1    use.  So I used Oracle VirtualBox and I just basically

2    used the exact same ISO file that was on the defendant's

3    computer that he had downloaded at that date.  And I

4    basically said, I want to see what it's like to install

2:42PM  5    this software on a computer.  And that's kind of what

6    these print screens are, just walking through what a

7    generic version of installing that software would look

8    like on a computer.

9        So this is actually the first screen that you would

2:42PM 10    see when that thumb drive is plugged in and it boots up.

11    And basically, it's showing me that I have the ability to

12    try the Ubuntu software without installing, or you can go

13    ahead and install with it.  So I'm pretty much going to go

14    with the default answers just to look at what would happen

2:42PM 15    by default when the person is installing this software.

16    And this is the first page that I see.

17    Q.   If we turn to page two, what's shown there?

18    A.   Then the Ubuntu logo is kind of scrolling while it's

19    loading, so I took a picture of that.

2:43PM 20    Q.   How about page three?

21    A.   This is the first screen where I can log in and do

22    something.  And so you can see there's just one user ID.

23    It's called "live session user."  That's what I would see

24    at the next screen.

2:43PM 25    Q.   Turning to the next page.

2:43PM 1   A.   I just click on that.  There is no user name and

2   password.  I would just click on that and this is the

3   desktop that I would see.  This is the Ubuntu desktop that

4   allows me to install the Ubuntu software.  So it has the

2:43PM 5   ability to, on the upper left-hand corner, just to install

6   the Ubuntu software.

7   Q.   Go to page five of this exhibit.

8   A.   So this is what happened if I click on that install

9   Ubuntu icon.  The other point of clarification that I want

2:43PM 10   to make is this virtual machine is connected to the

11   internet during this process, very similar to the

12   defendant's computer that was hard-wired to connect to

13   that router.  This virtual machine is by default

14   configured to connect to the internet if it needs to.  And

2:44PM 15   so the next screen is just the welcome.  It's asking me

16   what language and what type of keyboard I'm selecting, so

17   I pick a U.S. keyboard.  And it's asking me, what do I

18   want to do.  I'm just basically -- it's giving me a few

19   options; normal, minimal.  So I'm going with the defaults.

2:44PM 20   It says, normal installation.  And then the other

21   check-box that was checked by default is, "download

22   updates while installing."  I'm just going with those

23   default actions.

24   Q.   How about on the next page?

2:44PM 25   A.   Then it's asking me about the hard drive.  Do you

2:44PM 1   want to erase the entire disk and install Ubuntu?  Do you

2   want to encrypt it?  Do you want to do something else?

3   It's just giving me some options on the hard drive that

4   I'm trying to install this operating system on.  The

2:44PM 5   software is going to create a partition and install the

6   Linux operating system onto that partition.  We've heard

7   evidence about that.  So this is just telling the computer

8   to use the entire disk partition that I've created to

9   install the Ubuntu operating system.

2:45PM 10   Q.   Mr. Fottrell, if I can ask, what is the significance

11   of this last one here?

12   A.   So that would be something that in this case, the

13   defendant would have to do, because if the defendant said,

14   "use the entire disk," that would have erased the Windows

2:45PM 15   partition and it would have removed it and it would have

16   just replaced it with Ubuntu.  So the person would have

17   had to choose something else because they wanted to be

18   able to dual-boot, mix and match both operating systems at

19   a time.

2:45PM 20   Q.   Go to the next page.

21   A.   Then it's just basically showing, do you want to

22   write these changes to disk?  Are you sure you want to

23   erase the entire disk?  I said yes.  The next question

24   that it asks me is, where are you?  I was in Arkansas.  So

2:45PM 25   it shows me the right time zone.  I'm in the Chicago time

2:45PM 1    zone and I'm continuing.

2          Q.    Now if we go to the next page.

3          A.    So this is kind of the important question that I was

4    kind of trying to explain.  It's asking me who you are.

2:46PM 5    So you're going to fill in a display name on the top line,

6    then it's going to ask you to fill in your computer name.

7    You pick a user name, then you pick a password for that.

8    So it's asking me multiple things, like what's my name?

9    Jim Fottrell.  What's my computer name?  Whatever I want

2:46PM 10   to name the computer.  I would type in a user name.  So in

11   this case, in the relevant case, the user name was

12   dell_one.  And I would pick a password associated with

13   that.

14         Q.    Just to be clear --

2:46PM 15   A.    This is what the Ubuntu software looks like.

16         Q.    Just to be clear, based on your understanding, is

17   this how it would have appeared on the defendant's HP

18   desktop when they were setting up the Linux partition?

19         A.    Yes.  This is the default installation media, yes.

2:46PM 20   Q.    So turning to page 13, what's shown there?

21         A.    So what I did in this case, I basically just tried to

22   mimic the facts that were in this case.  On the Ubuntu

23   partition, there was a user named dell_one, so I typed

24   that and it has a little check-box because that's okay.

2:46PM 25   But then the software is trying to name the computer as

2:47PM 1   well.  It's trying to give the computer a name and it

2   basically is using a combination of my name and then it's

3   adding a dash VirtualBox.  And this is where it's

4   complaining, it's saying it doesn't like the underscore

2:47PM 5   for the computer name and it says the computer name can

6   only contain letters, digits, hyphens, and dots.  So

7   clearly, it doesn't like the fact that I have an

8   underscore in the computer's name, but the user name,

9   dell_one, that seems to be okay.

2:47PM 10       I typed in the password, Intel 1988.  I typed it in

11  twice and it calculated that to be a fair password.  And

12  it won't let me continue unless I changed it.  In reality,

13  I just highlighted this error message, but then I changed

14  the underscore to a dash, just like the other dash.  I

2:47PM 15  renamed the computer to dell-one-virtualbox and then it

16  was okay with that and then I can move on to the next

17  page.

18  Q.   What's on page 14?

19  A.   And so now it's going through that process of

2:47PM 20  installing the Ubuntu software.  Generally speaking, it

21  takes about 10, 15 minutes to do that.

22  Q.   Go to the next page.

23  A.   Taking a few snapshots along the way just to show

24  what the process is.  And then a few moments later, it

2:48PM 25  says installation has finished, you can continue testing

2:48PM 1    it if you want to, but if you want to restart your
       2    computer, you just click on the restart now button and you
       3    can restart it.
       4    Q.    And so what did you do on the next page?
2:48PM 5    A.    I restarted the computer.  And now it's showing me
       6    the log-in page with the dell_one user name.
       7    Q.    You can take this exhibit down.  Is it fair to say
       8    you did not have any difficulty putting an underscore in
       9    the user name, Mr. Fottrell?
2:48PM 10   A.    No, I did not.
       11   Q.    Did you prepare any other print screens in connection
       12   with your testimony today?
       13   A.    Yes, I did.
       14   Q.    If I could direct you to Government's Exhibit 87.  Do
2:48PM 15   you recognize that exhibit?
       16   A.    Yes, I do.
       17   Q.    Are these print screens that you made in advance of
       18   your testimony today?
       19   A.    Yes, I did.
2:48PM 20   Q.    Did you make these print screens in the same way that
       21   you made the last ones we just discussed?
       22   A.    Yes, I did.
       23   Q.    Are these true and accurate copies of the print
       24   screens you made in anticipation of your testimony today?
2:49PM 25   A.    Yes, I did.

2:49PM 1          MR. CLAYMAN:  Your Honor, at this time, we would

2          move to admit Government's Exhibit 87.

3          MR. GELFAND:  No objection, subject to the same

4     conversation at side bar.

2:49PM 5          THE COURT:  Government's Exhibit 87 will be

6     received subject to the Court's comments at the earlier

7     side bar.

8          (Government's Exhibit 87 Received)

9          MR. CLAYMAN:  Permission to publish, Your Honor?

2:49PM 10          THE COURT:  You may.

11     Q.   (BY MR. CLAYMAN.)  What's shown here on page one,

12     Mr. Fottrell?

13     A.   This is the same sample installation that I have.

14     And I tried to create it to be mimicked exactly what the

2:49PM 15     defendant's was.  And all I did in that case was to change

16     the wallpaper to be the same wallpaper that was used

17     previously.  And now I'm just going to walk through the

18     process of using the Ubuntu Software Center, the Snap

19     Store, if you will, to install some applications.

2:49PM 20     Q.   And can you point out where the Ubuntu Software

21     Center is here?

22     A.   My pointer is not working at the moment.  Hold on one

23     second.

24     Q.   Is it this orange box here?

2:50PM 25     A.   Yes.

2:50PM 1   Q.   If we could go to page two.  What's shown there?

2   A.   So this, on page two, if I click on the orange box to

3   bring up the Software Center, this is showing me the

4   Ubuntu Software Center and it has that icon in the upper

2:50PM 5   left-hand corner, Ubuntu software.

6   Q.   And on page three?

7   A.   So there's a little search bar on the top of it and

8   I'm beginning to type in the word "T-O-R," and it's

9   basically doing a little search.  It's searching for all

2:50PM10   of the applications that are available in the App Store

11   that begin with T-O-R.

12   Q.   If we go to the next page, what did you find?

13   A.   After I typed in "TOR browser," it's giving me a list

14   of applications that are installed.  And there's two on

2:50PM15   the bottom; the TOR browser, and then the TOR browser

16   launcher settings.  Those are just two applications that

17   are available in the App Store when I typed in the search

18   term "TOR browser."

19   Q.   How about the next page?

2:51PM20   A.   I clicked on the TOR browser and this is showing me,

21   if you want to install it, you would basically click on

22   the install button right below the green logo and that

23   would basically initiate the process of installing the TOR

24   browser software.

2:51PM25   Q.   If we go to the next page?

2:51PM 1    A.    That's after it finished installing correctly.   Now I

2          have the ability to launch it or remove it.   But now that

3          it's installed, I'm going to click on the launch button.

4          Q.    I just want to be clear.   At this point,

2:51PM 5    Mr. Fottrell, had any installation bundles been downloaded

6          to the computer?

7          A.    No.

8          Q.    Did you use command lines at all to get to this

9          point?

2:51PM10    A.    No, I did not.

11          Q.    If we could go to the next page.   What's shown there?

12          A.    This is the TOR browser.   In the upper left-hand

13          corner, you can see the icon for the TOR browser, so the

14          program is running.   And basically it's connecting for the

2:51PM15    first time.   So this is at the moment, the first time I'm

16          running it, it needs to connect to the TOR network.   And

17          this is what it's about to do at this point in the

18          process.

19          Q.    How about on the next page, page nine?

2:52PM20    A.    This is probably a few seconds later, maybe 10 to 15

21          seconds later.   It successfully connects me to the TOR

22          network.   And this is the default page that comes up

23          associated with the TOR browser.

24          Q.    Page 10 here?

2:52PM25    A.    I go to the website, www.justice.gov, just to show

2:52PM 1   that the TOR browser is working correctly.  So now I've

2   used the TOR browser to connect to the DOJ website, and

3   the DOJ website would not be able to find my true IP

4   address of where I'm connecting from.

2:52PM 5   Q.   And if we go to page 11, what did you search for

6   next?

7   A.   Then I go back to the Snap Store and I basically

8   searched for the word "uTorrent."  And the top entry is

9   uTorrent with Wine in parentheses.  It's available in the

2:52PM10   App Store to download and install.

11   Q.   That Wine, what does Wine mean again?

12   A.   Wine is the emulator software that the Ubuntu

13   software needs to run Windows applications.  And it's just

14   the emulator software.  The name stands for "Wine is not

2:53PM15   an emulator."  It's kind of just a joke.  It's a

16   recursive name.  It is an emulator.  It's the emulator

17   that allows it to run Windows software.

18   Q.   So when you searched the Snap Store, you found

19   uTorrent, correct?

2:53PM20   A.   Yes.

21   Q.   You found it with Wine, I guess, built into the

22   uTorrent app?

23   A.   Yes.

24   Q.   Turning to the next page, what's shown there?

2:53PM25   A.   I typed in the install button to do that and it asks

2:53PM 1   me -- I needed administrative privileges to do that so I

2        need to type in the password "Intel 1988."  And I

3        basically do that to authenticate.  And then it's going to

4        install the Wine software.

2:53PM 5   Q.    How about on the next page?

6   A.    I'm sorry.  The uTorrent software, including the

7        Wine.

8   Q.    Mr. Fottrell, you said you created this virtual

9        machine using the same version of Ubuntu Linux found on

2:53PM10        the defendant's computer, is that right?

11   A.    Yes.

12   Q.    I just want to be clear.  This was created this week

13        in anticipation of your testimony, right?

14   A.    Correct.

2:54PM15   Q.    It's not from back in 2019?

16   A.    Correct.  Correct, this is from in the last week, in

17        the last few days.

18   Q.    But as far as you're aware, how long has uTorrent

19        been available for download?

2:54PM20   A.    UTorrent has been available to download through the

21        Snap Store, through the App Store, for approximately four

22        years.

23   Q.    What's shown here on page 14?

24   A.    This is the installation process of the uTorrent

2:54PM25        program.  So there's a little status bar in the middle of

2:54 PM 1   the top of the page, and it is just progressing along as

2       the software is being installed.

3   Q.    If we could skip to page 17, please.  What is shown

4   here?

2:54 PM 5   A.    After the uTorrent program is installed, I click on

6   it to launch it and this is what it looks like when it

7   first launches and runs.

8   Q.    Turn to the next page.  What's shown on page 18?

9   A.    I go back to the App Store and I type in "VLC" for

2:55 PM 10   the Videoland Project media player and it's available in

11   the store.

12   Q.    This was the media player that was found on the Linux

13   partition, is that correct?

14   A.    Yes.

2:55 PM 15   Q.    Turning to page 19, what's shown there?

16   A.    After I select it, it's going to give me a button to

17   install it and it's just giving me the information about

18   the VLC program and the ability to install it.

19   Q.    Page 20?

2:55 PM 20   A.    Again, it's prompting me for the password to

21   authenticate and install this program, and I'm doing that.

22   Q.    And what about on page 21?

23   A.    Just capturing a print screen of the status of the

24   installation of VLC.

2:55 PM 25   Q.    And page 22 here?

2:55PM 1   A.    Now that it's finished, I can basically click the

2          launch button to view it.

3          Q.    If we go to the next page, page 23, what's shown

4          here?

2:55PM 5   A.    The VLC player is loading in kind of a small window

6          in the center of the page.  It's giving me a privacy and

7          network access policy.  And basically, I click on the

8          continue button and move it out of the way a little bit

9          and now it's just showing that the VLC program is

2:56PM10   installed on the Linux partition.

11         Q.    If we could go to page 24, this is what you're

12         describing?

13         A.    Yes.

14         Q.    And on page 25?

2:56PM15   A.    Just what I'm showing is, I go under the media.  And

16         then towards -- there's a grayed out area under -- below

17         where it says "Open location from clipboard," it's kind of

18         grayed out.  It says, "Open recent media."  And the reason

19         it's grayed out, because there is no recent media.

2:56PM20   There's nothing that's been viewed yet, so that's why it's

21         grayed out, because nobody has played a video with it yet.

22         Q.    So if we turn to page 26, what did you do next?

23         A.    So again, I want to look at, basically the process of

24         downloading a Torrent file.  And so I basically went to a

2:56PM25   website.  There's a movie called, "It's a Wonderful Life."

2:56PM 1  The copyright on it is expired for some reason, so it's in
       2  the public domain.  So I'm going to a website that has
       3  "It's a Wonderful Life," and it has Torrent files
       4  available.  And it shows that there's a 720 DPI version of
2:57PM 5  it.  That's 700 megabytes that's available for download.
       6  And then it has a larger Blu-ray version, 1080p higher
       7  resolution that's two gigabytes in size.  And so I
       8  basically am going to choose the smaller one just to
       9  download the smaller version of that movie.
2:57PM 10  Q.   When you say it's in the public domain, does that
      11  mean it's legal to download this movie over uTorrent?
      12  A.   Yes.
      13  Q.   If we turn to the next page, page 27, what's shown
      14  there?
2:57PM 15  A.   This is showing me, after I clicked on that link,
      16  it's basically saying I want to download that file.  It's
      17  basically showing me that it's going to the user's
      18  dell_one download folder.  So by default, this is being
      19  downloaded to the downloads folder.
2:57PM 20  Q.   So this is showing how a Torrent file would be used
      21  to download on uTorrent, is that right?
      22  A.   Yes.
      23  Q.   And just to be clear, this is a 32-bit version of
      24  uTorrent, is that correct?
2:58PM 25  A.   Yes.

2:58PM 1    Q.    And that was the version on the defendant's HP
     2    computer, is that right?
     3    A.    That's correct.
     4    Q.    If we turn to the next page, what's shown there?
2:58PM 5    A.    So this is showing the beginning of the download
     6    process.  It's showing the location of the downloads
     7    folder.  It has the name of the movie, "It's a Wonderful
     8    Life."  This Torrent file contains four items, it looks
     9    like.  It looks like the movie.  There's going to be
2:58PM10    subtitles.  There's going to be a photo.  So this is an
    11    example of a Torrent file that doesn't contain just a
    12    single movie, it contains the movie and three other small
    13    objects, or a couple of other objects.
    14    Q.    If we turn to page 29, what's shown there?
2:58PM15    A.    So this is just a few moments later, we are looking
    16    at what the uTorrent program looks like.  If you see the
    17    status bar in the center, there's a blue line and it says,
    18    "Downloading 84.2 percent."  So we're in the process of
    19    downloading the video.  And then you can see some
2:58PM20    statistics that are going on.  So it shows me the download
    21    speed at 4.6 megabytes per second.  There's an upload
    22    speed.  The ETA is 27 seconds.  It's going to take about
    23    27 seconds to get this movie.  More importantly, down in
    24    the bottom, the status is all of the different files that
2:59PM25    are associated with it.  The one that we care the most

2:59PM 1   about is the top entry, which is the MP4 format.  And it's

2   just showing me the size is 699 megabytes, et cetera,

3   et cetera, how many pieces it is.

4       What's relevant for us is this streamable column.

2:59PM 5   There's a streamable column the third from the right and

6   that one is -- yeah, so basically this supports the

7   streaming protocol.  And so we'll see that in a little

8   bit, but this is just the progress of the file being

9   downloaded.

2:59PM 10  Q.   If we turn to page 30, what's shown there?

11  A.   This is when it completes.  So now, a few moments

12  later, it basically shows what it looks like when it's

13  completely downloaded.  It shows the status as "seeding,"

14  which means you don't need to download it, you have

3:00PM 15  downloaded it all.  Seeding is making it available to

16  other people on the BitTorrent network.  If they need to

17  get copies from me, my computer is going to tell them, I

18  have the whole movie, if you want to get the movie, you

19  can get the whole movie from me.

3:00PM 20  Q.   If we could pause there.  Does that mean, for

21  example, Torrential Downpour could then download the

22  content from a target computer at that point?

23  A.   Yeah.  So once this computer -- once a computer has

24  the entire file, it says it's seeding.  That's the link

3:00PM 25  that Torrential Downpour needs to say, hey, this person is

3:00PM 1  just advertising or just broadcasting that they have the

2  entire file available for download, for transfer.

3  Q.   And if we turn to page 31, what's shown there?

4  A.   So again, I'm just clicking to show back on the lower

3:00PM 5  side what files.  I'm just showing all of the files on the

6  bottom of the page that it's completely downloaded.  We

7  have all 700 pieces.

8  Q.   How about on page 32?

9  A.   So on page 32, I'm basically highlighting the movie

3:00PM10  file.  And then I'm doing a right mouse click.  And since

11  it said it was streamable in the other column, I'm just

12  doing a right mouse click.  And it says "copy stream URL,"

13  so I'm going to select that.  I select "copy stream URL."

14  Q.   And if we go to the next page, page 33, what did you

3:01PM15  do next?

16  A.   Then on the left-hand side of the screen where the

17  cone is, I basically clicked on VLC to open that up.

18  Q.   You're saying you clicked right here?

19  A.   Yes.

3:01PM20  Q.   If we go to page 34, what's happening on this page?

21  A.   I move my cursor into that field.  I hit control V,

22  which is the paste command.  And it's basically saying it

23  just automatically is pasting that URL.  And it's showing

24  me, here's the stream.  And if I basically would click the

3:01PM25  play button, it's going to begin to play the movie.

3:01PM 1    Q.   Just to be clear, you just push control V to access

      2    this page?

      3    A.   Yes.  Control C is the copy command and control V is

      4    the paste command, V as in Victor.  So I do control V,

3:01PM 5    which is the paste command.  I control C from one window,

      6    control V to the other.  It's just copying and pasting.

      7    Q.   If we go to page 35, what happens there?

      8    A.   I just froze -- I took a snapshot very quickly, but

      9    basically, VLC displays the link, whether I clicked on a

3:02PM10   file name to play a file, or I clicked on -- whatever it's

     11    referencing, it is basically showing what I am pasting

     12    into the window.  So this is what is pasted into the

     13    window.

     14    Q.   Just to be clear, you're playing this video locally,

3:02PM15   correct?

     16    A.   Yes.

     17    Q.   This is not streaming out over the internet to

     18    someone else?

     19    A.   Not streaming out over the internet.  I'm playing it

3:02PM20   locally on this virtual machine.

     21    Q.   And if we go to page 36, what's shown there?

     22    A.   This is the beginning logo of the movie.  It's

     23    Liberty Films.  There's like a little bell that's ringing

     24    and the movie is starting to play.

3:02PM25   Q.   How about on page 37?

3:02PM 1    A.    This is the opening scene.  It's Frank Capra's, "It's

2    a Wonderful Life."  And now the movie is playing.  I can

3    hear the sound.  I can watch the video.  It's available.

4    I'm viewing it on my virtual machine.

3:03PM 5    Q.    How about if we go to page 38, what's shown there?

6    A.    Then I go back to the media and I clicked on "open

7    recent media."  And I'm just documenting what it

8    recognizes.  And this -- it just has this number of

9    characters, service equals streaming URL.  That's what

3:03PM10   it's referencing what I most recently did.

11   Q.    And if we could now go to page 39, the next page,

12   what is shown here?

13   A.    In this case, we have been talking about that

14   VLC-Qt-interface.comp file.  This is what is in that comp

3:03PM15   file after I played that movie.

16   Q.    And if you could look at these last lines on the

17   bottom here, what is this?

18   A.    So this is the URL.  It has the same browser string

19   that we were talking about.  "Http" stands for hypertext

3:03PM20   transport protocol.  Colon slash slash is a pairing.

21   There's going to be a hash value associated with it.  The

22   "at" sign 127.0.0.1 is local host.  That means it's my

23   computer.  It's generating a port number.  The port number

24   is 25616.

3:04PM25   Q.    Mr. Fottrell, if I could interrupt right there.  Can

3:04PM  1    you explain for the Jury the significance of this port
         2    number?
         3    A.    So the port number is, every service, or every
         4    program that's running on a computer that needs to
3:04PM  5    communicate has a port number.  And there's lots of common
         6    port numbers on computers.  So we talk about http,
         7    typically, that happens on port number 80.  And if it's
         8    secure http, that happens on port 443.  If we're talking
         9    about e-mail, that happens on port 25, which is the SMTP,
3:04PM 10    mail transport protocol.  And if we talk about another
        11    e-mail protocol is post office protocol, POP.  That
        12    happens on port 10.  It's just kind of a crazy way.
        13    There's lots of different ways that a computer can
        14    communicate, and so each of those ways that it
3:05PM 15    communicates takes a different port.  So that number
        16    ranges from 0 to 65,000, so there's like 65,000 possible
        17    ports that you can connect to.  And so basically this is
        18    just a port number associated with the streaming protocol.
        19    Q.    Does the port number, or the existence of the port
3:05PM 20    number, necessarily mean that someone else is accessing
        21    the computer?
        22    A.    No, it just means that that's a port that this
        23    software is configured to use to stream this movie.
        24    Q.    I just want to be clear for the Jury.  Did you use
3:05PM 25    any command lines at any point to get to this stage here?

3:05PM 1    A.    No, I did not.

2    Q.    Take this down for one moment and pull up what's

3    already been admitted as Government's Exhibit 44.  These

4    URLs here match what we just saw, correct?

3:05PM 5    A.    Yes.

6    Q.    So whoever played these videos could have done what

7    we just saw, is that right?

8    A.    That is correct.

9    Q.    And does anything about these port numbers to you,

3:05PM10   Mr. Fottrell, right here indicate or prove that someone

11   was remotely viewing these videos?

12   A.    No.

13   Q.    Is there any significance to these port numbers that

14   you can describe for the Jury?

3:06PM15   A.    No, they are just standard port numbers.  They are

16   standard port numbers.  Sometimes they repeat and

17   sometimes they are different.  That's just the way that

18   the streaming protocol allows for it to select random

19   ports.

3:06PM20            MR. CLAYMAN:  If I could have one moment, Your

21   Honor?

22            THE COURT:  You may.

23            MR. CLAYMAN:  Your Honor, I'll pass the witness.

24            THE COURT:  Thank you, Mr. Clayman.

3:07PM25            MR. GELFAND:  May I proceed, Your Honor?

3:07PM 1          THE COURT:  You may.

2                        CROSS EXAMINATION

3    BY MR. GELFAND:

4    Q.   Mr. Fottrell, let's get a couple things clear.  These

3:07PM 5    exhibits that you just testified about you have prepared

6    since the last time you testified in this case, correct?

7    A.   No.  The first one that I did of the Ubuntu install I

8    did on Thanksgiving morning.

9    Q.   You just decided not to share that with any of us

3:07PM10    when you testified the first day and a half?

11    A.   I do a lot of things that I -- but I don't know if

12    it's relevant or not.  I'm just trying to help in any way

13    that I can.

14    Q.   So let's back up.  When you say the first one you

3:07PM15    did, that's Exhibit 86?

16    A.   Yes.

17    Q.   Your testimony is that you spent Thanksgiving morning

18    creating Exhibit 86, correct?

19    A.   Yes.  No, yeah, look at page three.  It has

3:07PM20    Wednesday, 1343.  If my memory serves me correctly, I

21    could be wrong, was Wednesday.

22    Q.   Wednesday is not Thanksgiving.

23    A.   So it might have been the day before Thanksgiving.

24    I'm sorry.

3:08PM25    Q.   Let's be accurate, though, in what we say, okay?

3:08PM 1   A.    Okay.

2   Q.    When did you prepare this?

3   A.    In the last two weeks.

4   Q.    And you just decided not to share this with us for

3:08PM 5  the day and a half you were on the witness stand, correct?

6   A.    Yes.

7   Q.    Let's talk about these new exhibits.  To be clear,

8  you did kind of what you did with Exhibit 30, but this is

9  not related to the HP.  Exhibit 30 is the virtualized

3:08PM10  exhibit that you testified about the HP image, correct?

11   A.    Yes.

12   Q.    Exhibit 30 is the one that you first said, didn't

13  plug into the internet, this is exactly what was on the

14  defendant's computer, was on the HP computer, and then you

3:08PM15  came around and kind of changed that story, correct?

16   A.    That's correct.

17   Q.    These exhibits, too, you were plugged into the

18  internet, correct?

19   A.    Yes.

3:08PM20   Q.    When you plug into the internet, you're getting

21  information that would not have been available in May of

22  2019, correct?

23   A.    Yes.  At the point I plugged it in, I'm getting the

24  information that's available at that moment.

3:09PM25   Q.    So you're not really simulating this the way that a

3:09PM 1    forensic scientist would, correct?

2    A.   I don't see how a forensic scientist could use a time

3    machine to go back to May of 2019.

4    Q.   There's no reason to use a time machine when you

3:09PM 5    actually have forensic artifacts, correct?

6    A.   Correct.

7    Q.   So let's talk about what you created here.  You

8    testified that Exhibit 86, you wanted to see what it's

9    like to install this software on a computer, correct?

3:09PM 10   A.   I wanted to demonstrate what it looks like to install

11   the Ubuntu software.

12   Q.   In 2021, correct?

13   A.   In 2021.

14   Q.   To be clear, when did you first actually become

3:10PM 15   involved in this case?

16   A.   Probably when I received the evidence from Marshall

17   Kennedy, I believe it was in October.  I don't remember --

18   October of 2020, I believe, if I remember exactly.

19   Q.   So you became involved in this case approximately six

3:10PM 20   months before it was charged, correct?

21   A.   That's probably -- yeah, I don't recall specifically,

22   but, yes.

23   Q.   Over a year ago, correct?

24   A.   Yes.

3:10PM 25   Q.   The first time you wanted to see what it would look

3:10PM 1    like to install this version of Ubuntu was about a week
       2    before trial, the week of trial?
       3    A.    Yes.
       4    Q.    You testified that this is what you got when you
3:10PM 5    installed it, correct?
       6    A.    I went with the default.  I chose the top one, erase
       7    disk and install Ubuntu.
       8    Q.    But the bottom one would actually be the partition
       9    one, correct?
3:11PM10    A.    Yes.  If I clicked on something else, it will bring
      11    up a partition manager and allow me to look at this disk,
      12    configure partitions, and slice and dice that disk up
      13    however I wanted to do that.
      14    Q.    In other words, choose the size of the partition,
3:11PM15    correct?
      16    A.    Yes.
      17    Q.    You testified last time you testified that the size
      18    of the partition being small is consistent with remote
      19    access.  Your opinion change?
3:11PM20    A.    I don't think I said.  I said that the size of a
      21    partition is related to remote access?  Could you -- I
      22    don't think I recall that.
      23    Q.    You're denying that you said that?
      24    A.    I just don't recall that.
3:11PM25    Q.    The user picks the size of the partition, right?

3:11PM 1  A.   Yes, the user who is doing this installation is the

2  one who makes a decision on the size of the partition.

3  Q.   Is 2.5 gigabytes of actual usable space to save files

4  on a lot?

3:11PM 5  A.   So the entire partition was 11 gigabytes in size.  At

6  the time that it was seized by law enforcement five months

7  later, there was only two gigabytes of free space.  But at

8  the time the operating system was installed, the size was

9  11 gigabytes in size.

3:12PM 10  Q.   Do you disagree that approximately eight of those

11  gigabytes is the operating system itself?

12  A.   Yes.  A large chunk of it is the operating system and

13  the log files associated with the operating system,

14  correct.

3:12PM 15  Q.   How much?

16  A.   Excuse me?

17  Q.   How much?

18  A.   Out of the -- probably closer to five to seven

19  gigabytes was the journal of the journaling file system.

3:12PM 20  Q.   So by the time that you install this, before you do

21  anything, meaning before you actually download any apps or

22  type in anything, but you have successfully installed

23  Linux, how much space do you have left on an 11 gigabyte

24  partition?

3:12PM 25  A.   So I chose 10 gigabytes.  I didn't look at the file

3:12PM 1  size that I've done, but that process does not take a lot
2  of space.  The Ubuntu install is only two gigabytes, so I
3  would anticipate that the file system with all of the
4  files are generally going to be around two gigabytes in
3:13PM 5  size.  So when I install the operating system, generally
6  speaking, it's going to only take the same size as the
7  installation media.  So it's approximately two gigabytes
8  to install the operating system.
9  Q.   Do you disagree with Ms. Bush -- you were in court
3:13PM 10 when she testified, right?
11 A.   Yes.
12 Q.   Do you disagree with Ms. Bush that well over half of
13 the 11 gigabyte, approximately, Linux partition was
14 occupied before anyone could save anything to it?
3:13PM 15 A.   I disagree with that statement.
16 Q.   Got anything to show us that would prove that?
17 A.   I have knowledge.  I did a forensic examination of
18 that.  And she talked about the log files and she talked
19 about some other things.  The Ubuntu operating system has
3:13PM 20 what's called an EXT4 file system, which is the fourth
21 generation of it.  It's called a journaling file system.
22 And that's just a fancy way that the computer kind of
23 keeps a book, it keeps a log of when it's writing to the
24 disk.  That log file was huge.  There was a lot of things
3:14PM 25 in that journal log.  And I spent a significant amount of

3:14 PM 1    time looking through that journal log in my examination.

2    So that journal log is large.  And I can't remember the

3    exact size, whether it's like five or seven gigabytes, but

4    it was pretty large.  That just has voluminous information

3:14 PM 5    about when the machine is booted, what devices it detects,

6    et cetera, et cetera.  And I examined those log files.

7    Q.    Let's look at Defendant's Exhibit 83, please.  Do you

8    recognize this?

9    A.    Yes, I do.

3:14 PM 10   Q.    Is it accurate?

11   A.    It appears -- scroll to the top.  It appears to be.

12   Q.    This is actual forensic data from the HP that we're

13   talking about in this case, correct?

14   A.    Yes.

3:14 PM 15   Q.    This is forensic data using forensic ToolKit,

16   correct?

17   A.    No, it's using EnCase.

18   Q.    I'm sorry.  Using EnCase, correct?

19   A.    EnCase.

3:15 PM 20   Q.    You heard that Ms. Bush is certified in EnCase.

21   Remind me.  You're not, right?

22   A.    No, I'm not.  I've been using EnCase for like 25

23   years.  I think I'm pretty adapt at using it without any

24   certification to tell me so.

3:15 PM 25   Q.    You agree that the amount of actual usable space on

3:15PM 1   the date that it was seized was 2.5 gigabytes, correct?

2   A.   That's correct.

3   Q.   You agree that the allocated space was 8.8 gigabytes,

4   correct?

3:15PM 5   A.   That is correct.

6   Q.   We talked about log files this morning, do you recall

7   that?

8   A.   I do.

9   Q.   Linux writes over log files, correct?

3:15PM 10   A.   Some, yes.  Yes, absolutely.

11   Q.   In other words, if you actually want to preserve

12   evidence on a Linux device, you've got to get there

13   quickly, right?

14   A.   Yeah.  If you want to preserve evidence from a

3:15PM 15   particular date, the sooner you can get to that thing is

16   where those log records are going to be, correct.  So as a

17   general statement, if you want to preserve records, the

18   closer you are to the date that you want to preserve, the

19   more records you are going to naturally collect.

3:16PM 20   Q.   But in contrast to Windows or Mac OS operating

21   systems, for example, Linux actually writes over older

22   files sooner rather than later, correct?

23   A.   Exactly the same way that the Macintosh operating

24   system does.  They have the same basic kernel underneath,

3:16PM 25   so the same logs that we're talking about being

3:16PM 1    overwritten also happen in the Macintosh environment.

2    Q.   So the May logs, the auto-generated logs, did they

3    exist on the device when it was seized in November of

4    2019?

3:16PM 5    A.   So I think you're a little misleading.  So if you

6    look at -- the log files on the Linux machine are put into

7    a folder called "var" logs and then there's certain

8    sub-folders within there.  And there's this -- I can't

9    remember, it's a round robin.  It recycles them.  So like

3:16PM10    it's going to have a log file, and then like the next day,

11    it's going to just add a dot one, a dot two, a dot three.

12    So it's keeping some of the older logs.  So those logs

13    exist.  When you're saying that they don't exist, the

14    computer automatically generates logs.  The computer

3:17PM15    discards and deletes them after a certain period of time,

16    like 30 days or 60 days.  So there are logs, but the

17    normal housekeeping of the computer discards logs after a

18    period of time because they are less valuable than more

19    recent logs are.

3:17PM20    Q.   Mr. Fottrell, where were you on the Wednesday before

21    Thanksgiving?

22    A.   At my brother-in-law's house in Philadelphia.

23    Q.   And that's when you created this Exhibit 86?

24    A.   Yes.

3:17PM25    Q.   Why does it say that you're in Chicago?

3:17PM 1  A.    So remember, I was trying to -- I was trying to be

2  exactly like this case was.  And the time zone that's

3  relevant in this case is Chicago.  The user name dell_one

4  is not my name, it's the name that was relevant to this

3:18PM 5  case.  So when I was doing the installation, I was

6  choosing relevant things that matched evidence in this

7  case.

8  Q.    Now, you claim that you were trying to match the

9  evidence in this case.  That's what you're saying, right?

3:18PM 10  A.    Yes.

11  Q.    Let's look at Exhibit 87.

12          THE COURT:  Mr. Gelfand, I'm very, very hesitant

13  to interrupt you.  We have been going about two hours.

14          MR. GELFAND:  Totally fine.

3:18PM 15          THE COURT:  So if you have five minutes or so to

16  go, I'll let you finish up.  If now is a convenient point

17  to break, we could do that.

18          MR. GELFAND:  We have a little more to talk about

19  so now is a fine time to break.

3:18PM 20          THE COURT:  So Members of the Jury, we will take

21  our afternoon recess for 20 minutes, so if you could be

22  prepared to come back out at 3:40, we will call for you at

23  3:40.  Please remember the recess instruction.  Do not

24  discuss the case or anything about it on this break or do

3:19PM 25  any research or read any articles or what have you.

3:19PM 1    Everyone please stand as the Jury is in recess.

2                      (Jury out at 3:19 p.m.)

3                      THE COURT:  We are in recess until 3:40.

4                      (In-Chambers Hearing)

3:20PM 5              THE COURT:  The record shall reflect that we are

6      in chambers.  The attorneys have requested to speak with

7      the Court outside the presence of the Jury.  Mr. Gelfand?

8              MR. GELFAND:  Thank you.  Your Honor, we wanted

9      to raise with the Court, we learned over the course of

3:41PM10   Mr. Fottrell's testimony and a brief conversation with

11     opposing counsel over the break, these exhibits, Exhibits

12     86 and 87, were not new, as Mr. Fottrell testified.  He

13     created them before trial, the week before trial.  They

14     were never disclosed to us in any capacity.  By

3:41PM15   definition, they are not forensics from what was made

16     available.  They are exhibits that he created and they

17     were the subject of his testimony.  It's a Rule 16

18     violation.  It's a *Jencks* violation, and possibly other

19     discovery violations.  But it's, A), very frustrating,

3:41PM20   and, B), very prejudicial to our client.

21             THE COURT:  What's the government's position?

22             MR. ROBERTS:  Your Honor, the government was

23     unaware that the screenshots occurred prior to his

24     testimony last week.  We all saw him putting the exhibit

3:42PM25   together and that's what we represented to the Court.  And

3:42PM 1    that is accurate.  I've verified it.  He put the exact

2    exhibit together after his testimony.  It makes sense when

3    he says, "I made a screenshot, I didn't know what was

4    going to be relevant."  That is, I believe, if you voir

3:42PM 5    dire the witness, what he would say.  He put the exhibit

6    together.  If he can show us why these screen prints would

7    be some kind of *Jencks* that he hasn't already been turned

8    over, I'll address that, but I don't see that issue.

9              MR. GELFAND:  Your Honor, it's discoverable in a

3:42PM10    bunch of different ways.  This was the subject of expert

11    testimony.  It was the subject, generally speaking, some

12    of these positions about dell_one and things like that was

13    the subject of his original expert testimony.  We should

14    have had discovery that was available before

3:43PM15    cross-examining him, before putting our own expert on the

16    stand and releasing her from trial, and before they were

17    admitted into evidence and suggested at side bar,

18    notwithstanding the distinction, that these were

19    essentially created, essentially, this is new.  He came up

3:43PM20    with these over the weekend.  He didn't.  He had them in

21    his hands since before trial.

22              THE COURT:  So if, in the absence of these

23    exhibits, do you agree that it would be proper rebuttal

24    testimony for him to counter Ms. Bush's testimony about

3:43PM25    dell_one and that it can in fact be entered not as the

3:43 PM 1    computer name, but as the user name or however it was that

2    he just explained it?  Would that be appropriate rebuttal?

3           MR. GELFAND:  It would be, but it also would have

4    been necessary to disclose before he testified in the

3:44 PM 5    government's case-in-chief if he had these.  And so it's

6    not the scope of rebuttal that we're addressing here, Your

7    Honor.  It's the discovery violation.

8           THE COURT:  So why wouldn't this be

9    demonstrative?  I mean, if these had been received,

3:44 PM 10   marked, and used as demonstrative aids, what would your

11   argument be?

12          MR. GELFAND:  Well, first of all, I still think

13   it should have been disclosed given the nature of the

14   expert testimony.

3:44 PM 15          THE COURT:  Were there some things that your

16   expert didn't disclose?

17          MR. GELFAND:  Nothing that were previous.

18          THE COURT:  What?

19          MR. GELFAND:  I don't know what the Court is

3:44 PM 20   asking about, but as far as the exhibits that were

21   introduced --

22          THE COURT:  I recall having several side bars

23   about stuff that wasn't in her report.  I can't remember

24   what her testimony was about her virtualization software

3:45 PM 25   that the Court read the demonstrative aid instruction

3:45PM 1  about.  All of that was disclosed?

2         MR. GELFAND:  That was all disclosed.  And,

3  candidly, Your Honor, I'm happy to show the Court the

4  106-page disclosure.  The government brought up issues

3:45PM 5  about networking.  That was abundantly throughout.  UPnP

6  was in her report.  What she testified about was

7  disclosed.  What was added was this uTorrent App Store

8  stuff which was solely in response to Mr. Fottrell's

9  testimony.  And she correctly testified that this was

3:45PM10  something she assembled literally over the weekend.

11         My point, Your Honor, is it's a discovery

12  violation, plain and simple.  And we were led to believe

13  at side bar that these were new, that they fell into the

14  same category, when they weren't.

3:45PM15         MR. ROBERTS:  You sent us exhibits the other

16  night.  Are you saying that she didn't create those

17  exhibits before she testified?

18         MR. GELFAND:  I'm not sure what you're referring

19  to.  Our understanding is that the exhibits that were new,

3:46PM20  that were represented to be new, were literally created

21  over the weekend.  That is our understanding.

22         But the point here, Your Honor, is that as a

23  practical matter, we were led to believe at side bar in

24  this case that this was new.  It's not.

3:46PM25         THE COURT:  The exhibits, as I understand it, are

3:46PM 1  new in the sense that he has selected the print screens to

2  put together?

3        MR. ROBERTS:  Yes.  My conversation with him just

4  now is, the print screens he's been doing like throughout

3:46PM 5  preparation of testimony, he didn't know what was

6  relevant.  When it all went down, he put them together to

7  make a rebuttal exhibit.

8        THE COURT:  So the screenshots may have been

9  printed on the Wednesday before Thanksgiving, but the

3:46PM10  exhibits in terms of the sequencing and what has been

11  included in the -- the screenshots that have been included

12  in the exhibits in that sense have been put together since

13  he left the stand?

14        MR. ROBERTS:  That's my understanding and that's

3:47PM15  what I have seen.  I've seen him put these together.  And

16  you've been working closely with him, correct?

17        MR. CLAYMAN:  Yes.  I didn't realize he printed

18  these print screens prior to trial.  We have been working

19  since he testified on how to present this evidence.

3:47PM20        THE COURT:  So here would be what the Court would

21  suggest that we do.  And I'm kind of thinking about this

22  as I was listening to him testify about these exhibits.  I

23  would propose that we leave these marked as the exhibits

24  that they are, but that I instruct the Jury that they are

3:48PM25  actually demonstrative exhibits that were used to aid his

3:48PM 1   testimony and they will not -- they are not actually

2   received into evidence and they will not have them

3   available in the jury room.  I propose -- and this has

4   already been included in our discussions at our jury

3:48PM 5   instructions -- there's instruction about how they are to

6   deal with demonstrative exhibits.  They will be remarked

7   as Court's exhibits, so for purposes of the record, they

8   will be there for you to make whatever appeal record you

9   would like to make.  But that would be my suggestion as to

3:48PM 10  how we handle this.  I don't understand why slides used

11  for demonstrative purposes that are not evidence in the

12  case itself would violate *Jencks*, especially in the

13  context of rebuttal evidence.  That would be my suggested

14  way of handling it.  I'll let you respond.

3:49PM 15          MR. GELFAND:  Your Honor, we appreciate the

16  Court's suggested way of handling it.  We would formally

17  move to strike the exhibits and move to strike his

18  testimony in association with the exhibits and ask that

19  the Jury be instructed as such.  In the alternative, if

3:49PM 20  the Court were not going to do that, then we would ask for

21  the Court's proposed remedy.

22          THE COURT:  Well, I'm not -- thank you.  I will

23  deny that motion.  I'm not going to strike his testimony.

24  The *Jencks* disclosure thing is an issue that is really

3:50PM 25  unmanageable to think through in nuanced detail here on

3:50 PM 1    the fly, but stepping back from this, the witness provided
2    very proper direct rebuttal testimony on two or three
3    points.  These exhibits respectively are one or two points
4    each and he could have testified to these things using his
3:50 PM 5    mouth orally and there would be no problem.  So why he
6    would be prohibited from using these exhibits as a
7    demonstrative aid to his testimony, I don't know what
8    prejudice the defendant suffers, so I'm not going to
9    strike his testimony.  I am going to re-mark them as
3:50 PM 10   Court's exhibits instead of exhibits received in evidence
11   and I will explain that to the Jury accordingly.
12           MR. GELFAND:  Can we formally -- I think it's
13   been implied throughout the entirety of trial that both
14   sides have moved for *Jencks*.  For the record, we disclosed
3:51 PM 15   expert *Jencks*, so to speak, 26.2 to the government related
16   to Ms. Bush.  Is there any additional *Jencks*, including
17   any notes that he took, similar to what we provided to
18   you?
19           MR. CLAYMAN:  We can provide his notes.  I
3:51 PM 20   believe he took notes during Ms. Bush's testimony.  I
21   didn't have time during the break, so I can get those
22   right away, provide those.
23           MR. GELFAND:  I would appreciate that.
24           THE COURT:  And for the record, the Court didn't
3:51 PM 25   have anything to do with excusing Ms. Bush.

3:51PM 1           MR. GELFAND:  I don't mean excusing Ms. Bush.

2      She was naturally excused after her testimony.  In other

3      words, it's not like we get to put on a surrebuttal.

4                 MR. CLAYMAN:  May I have a minute to figure out

3:52PM 5      the notes?

6                 THE COURT:  Yes.

7                 (End of In-Chambers Hearing)

8                 (Jury in at 3:56 p.m.)

9                 THE COURT:  Members of the Jury, I did want to

3:56PM 10      explain a correction that I have made with regard to

11      Government's Exhibits 86 and Government's Exhibit 87 that

12      Mr. Clayman introduced a few minutes ago through

13      Mr. Fottrell.  You'll recall that he described these as

14      screenshots that he had made using the virtualization

3:57PM 15      software.  In the moment, I received those as actual

16      exhibits, which would mean that they would be actual

17      evidence and that they would be available to you in the

18      jury room.  I should have, and I now do find it proper to

19      treat these two exhibits as demonstrative aids.  And I

3:57PM 20      find that what was marked as Government's 86 and

21      Government's 87 will be received as Court's Exhibit 4 and

22      5 respectively.

23                 You may use these screenshots as an aid to this

24      witness's testimony to the extent that you believe it is

3:58PM 25      useful to do so.  There will be more instructions about

3:58PM 1    how to use demonstrative aids in the final set of jury
2    instructions, but for now, I just wanted to clarify for
3    the record that those were for demonstrative use to aid
4    the witness's testimony and they are not being received
3:58PM 5    into evidence.
6         Mr. Gelfand, you may continue your inquiry.
7         (Court's Exhibits 4-5 Received)
8         MR. GELFAND:  Thank you, Your Honor.  May I
9    publish portions of Demonstrative 87?
3:58PM 10        THE COURT:  You may.
11   Q.   (BY MR. GELFAND.)  Mr. Fottrell, before the break, we
12   were talking about the first exhibit or demonstrative that
13   you testified about that you created the Wednesday before
14   Thanksgiving, correct?
3:59PM 15   A.   Yes.
16   Q.   I want to show you 87.  Can you tell us when you
17   created this one?
18   A.   Some of these have Thursday as the date and the last
19   few pages have a Monday as the date.
3:59PM 20   Q.   What Thursday?  What Monday?
21   A.   That's a good question.  Certainly within the last
22   few weeks.  Guessing it was -- I'm losing track of the
23   time.  The most recent day is Tuesday.  It was probably
24   last Thursday.
3:59PM 25   Q.   Was it while you were on the witness stand?

3:59PM 1    A.    No.  5:30 in the morning.  I don't think -- no.

2    Yeah, I don't recall.  I don't think it was the

3    Thursday -- it wasn't the Thursday of Thanksgiving.  I

4    know that's not correct.  So it was within the last two

4:00PM 5    weeks.  I don't remember exactly when it was.

6    Q.    Mr. Fottrell, did you create this exhibit in the

7    middle of your direct examination?

8    A.    I did.

9    Q.    And you decided to share it with us today?

4:00PM10    A.    Yes.

11    Q.    Mr. Fottrell, 87 was, again, created by plugging into

12    the internet, correct?

13    A.    Yes, it was.

14    Q.    So if we look at your testimony regarding the

4:00PM15    uTorrent software, would you agree with me that this

16    version and this build literally did not exist in May of

17    2019?

18    A.    Correct, it was probably a different build.  It was

19    probably the same version, 3.55, but a different build

4:00PM20    number.

21    Q.    So to be clear, you're using and displaying for

22    demonstrative purposes software that literally didn't

23    exist in terms of the version and build number on the HP

24    computer that was seized into evidence and taken into

4:01PM25    evidence, correct?

4:01PM 1   A.   I'm demonstrating what was installed recently in the
     2   last two weeks.  The uTorrent software, that version 3.55
     3   was available in the App Store for a long period of time
     4   going -- the different versions of it going back at least
4:01PM 5   four years.
     6   Q.   But let's talk about this for a second, because I
     7   know there's a lot you want to say, but I would appreciate
     8   it if you would answer my questions.
     9        My question was simple, which is, the software that
4:01PM10   appears on this demonstrative exhibit, Exhibit 87 that you
    11   created in the last two weeks at some point while you were
    12   testifying, that literally, in terms of version and build
    13   number, didn't exist on the HP computer that's in evidence
    14   in this case, correct?
4:01PM15   A.   Correct.  That build number did not exist, that is
    16   correct.
    17   Q.   And build numbers refer to changes within software,
    18   correct?
    19   A.   They can, yes.
4:02PM20   Q.   Now, the Snap Store also changes on a daily basis,
    21   correct?
    22   A.   Correct.  As applications are added to the App Store,
    23   they are now available.
    24   Q.   In other words, when you plugged into the Snap Store
4:02PM25   a week ago or whatever it was, what this displays is what

4:02PM 1  was available as of 2021 in November or December, correct?

2  A.   That's correct.

3  Q.   It doesn't tell us what was available in November --

4  I'm sorry -- in May of 2019, does it?

4:02PM 5  A.   No, it does not.

6  Q.   You testified that uTorrent was available in the Snap

7  Store since, you said for several years, correct?

8  A.   Correct.  Approximately four years.

9  Q.   Were you in court when Ms. Bush testified and we

4:02PM 10  showed the Jury her archive research showing the exact

11  opposite in an actual document?

12  A.   I saw those confusing exhibits.  I didn't really

13  understand them completely.  She goes to archive.org and

14  is looking up information.  That's not how I did my

4:03PM 15  research to know that it was available for the last four

16  years.

17  Q.   Do you have anything to show us?

18  A.   No, I don't have any exhibits, but I can testify

19  about what I did.

4:03PM 20  Q.   Of the many screenshots you took in this case,

21  including while you were literally on the witness stand at

22  5:00 in the morning, you didn't screenshot that?

23  A.   No.  Say that again.

24  Q.   You didn't screenshot that?

4:03PM 25  A.   No.

4:03PM 1   Q.   So to be clear, this "It's a Wonderful Life"

2   testimony that you offered, this also all relates to a

3   version and build of uTorrent that wasn't available, it

4   didn't exist in May of 2019, correct?

4:03PM 5   A.   Certainly the version that I demonstrated did not

6   exist in 2019, but a prior version did exist in the App

7   Store in May of 2019.

8   Q.   And if you actually want to look for evidence related

9   to May of 2019, would you agree with me, Mr. Fottrell,

4:04PM 10   that the better place to look would be actual computer

11   forensics as opposed to things you create while testifying

12   at trial?

13   A.   Could you repeat the question, the first part of your

14   question?

4:04PM 15   Q.   Yeah.  If you actually want to know what happened

16   from a scientific standpoint in May of 2019, would you

17   agree with me that the better evidence is the forensic

18   evidence of what's actually available from May of 2019, as

19   opposed to screenshots you take while testifying on the

4:04PM 20   witness stand?

21   A.   I think the more information you have, the better.

22   I'm not going to be blinded by just looking at the

23   computer.  I'm going to look at as much information as I

24   can that's available to me.  And if doing online research

4:04PM 25   and if looking at information provides more insight, I

4:04PM 1   think I'm going to do that.

2   Q.   Let's talk about that.   You testified on Exhibit 87,

3   demonstrative 87 -- can you see that?

4   A.   Yes, I do.

4:05PM 5   Q.   The printed copy I have isn't great, but can you make

6   enough sense of that?

7   A.   Yes.

8   Q.   You testified to this streaming demonstrative related

9   to something you did last week, correct?

4:05PM 10   A.   Yes.

11   Q.   Thursday at 6:09, is that what that says?

12   A.   Yes, it does.

13   Q.   Was that last Thursday or when?

14   A.   I don't know which Thursday it was.   It was probably

4:05PM 15   last Thursday.

16   Q.   Was it Thanksgiving?

17   A.   I don't think it was Thanksgiving, no.   I was

18   enjoying my time with my family, so I don't think it was

19   Thanksgiving.

4:05PM 20   Q.   Was it before Thanksgiving?

21   A.   It was not before Thanksgiving.

22   Q.   That leaves one Thursday, right?

23   A.   Yes, it does.

24   Q.   The Thursday that you started testifying in this

4:06PM 25   case?

4:06PM 1    A.    Yes.

2    Q.    Now, you testified to what you identified as a port

3    number, correct?

4    A.    Yes.

4:06PM 5    Q.    You testified broadly that port numbers can mean a

6    lot of things, correct?

7    A.    Yes.

8    Q.    Port numbers can refer to e-mail port numbers, it can

9    refer to internet-based port numbers, whole nine yards,

4:06PM10    correct?

11    A.    Yes.

12    Q.    Port numbers can also refer to ports on a router,

13    correct?

14    A.    Yes.  A router is just a type of computer.  Every

4:06PM15    computer that has an IP address has those ports, so, yes.

16    Q.    A router is a type of computer, correct?

17    A.    Yes.

18    Q.    With data, correct?

19    A.    Yes.

4:06PM20    Q.    With information, correct?

21    A.    Yes.

22    Q.    With information that would be useful to a forensic

23    scientist looking at computer forensics, correct?

24    A.    In some cases, yes.

4:06PM25    Q.    Just not in this case, right?

4:06PM 1   A.   Not in this case.

2   Q.   You heard Ms. Bush's testimony about the router,

3   correct?

4   A.   Yes.

4:06PM 5   Q.   You're still sticking to it.  Router totally useless,

6   even though you have never seen it in this case?

7   A.   It's not critical evidence.  Yes, it's helpful, but

8   it's not critical.  It's certainly not serious.

9   Q.   The router wouldn't tell you what devices were

4:07PM10   connected to the network in May of 2019, correct?

11   A.   It would tell you the devices that were connected in

12   May of 2019.

13   Q.   It would, wouldn't it, correct?

14   A.   Correct.

4:07PM15   Q.   That's not critical?

16   A.   But it would lose that information.  If I turned on

17   the router in 2021, it's not going to preserve that

18   information.  So it's only going to preserve information

19   for a relatively short window of time.  It does not have a

4:07PM20   voluminous amount of storage to store records.

21   Q.   Routers actually --

22   A.   For a short period of time.

23   Q.   Routers actually maintain memory of known users,

24   correct?

4:07PM25   A.   Yes.

4:07PM 1    Q.    In other words, we've all had situations where a

       2    router or a Wi-Fi will recognize a device, correct?

       3    A.    Correct.

       4    Q.    And the way that -- what's really happening behind

4:07PM 5    the scenes in the box, so to speak, is that the router is

       6    recognizing the device from previous memory, correct?

       7    A.    That is correct.

       8    Q.    Because it's stored within the device, correct?

       9    A.    That's true.

4:07PM10    Q.    And that device was previously connected to the

      11    network, correct?

      12    A.    Yes.

      13    Q.    And what that means in English is that that device

      14    was connected to the same router as other devices that

4:08PM15    were connected to that router, correct?

      16    A.    Yes.

      17    Q.    You testified previously that UPnP would be -- would

      18    make a network vulnerable, but you didn't know whether

      19    UPnP was enabled.  Do you recall that testimony?

4:08PM20          MR. CLAYMAN:  I object to scope.  Your Honor,

      21    this is a limited rebuttal witness, limited to direct.

      22          THE COURT:  Yes.  What in his testimony is this

      23    in response to?  It needs to stay within the scope.

      24          MR. GELFAND:  Your Honor, he testified

4:08PM25    specifically -- and I think it is within scope

4:08PM 1    specifically to essentially the streaming component of VLC

2    and what that means for possible remote access.  That's

3    where I'm going with it, Your Honor.

4              THE COURT:  I agree.  You may proceed.

4:08PM 5              MR. GELFAND:  Thank you.

6    Q.   (BY MR. GELFAND.)  You can answer that question.

7    A.   Could you repeat the question?

8    Q.   Yes.  You testified previously that UPnP -- Universal

9    Plug and Play -- would be relevant to whether or not a

4:09PM 10   network was vulnerable, but you just didn't know whether

11   UPnP was enabled, correct?

12   A.   No, I think I -- the evidence is clear that Universal

13   Plug and Play was enabled on these devices.

14   Q.   And to be clear, you agree that Universal Plug and

4:09PM 15   Play was enabled when files were streamed from uTorrent in

16   May of 2019 from the HP computer at issue, correct?

17   A.   Yes.

18   Q.   And so with respect to your testimony about

19   streaming, you testified -- and I can show it to you again

4:09PM 20   if you want -- but on the Demonstrative 87 to that port

21   number that was on there, correct?

22   A.   Correct.

23   Q.   Torrential Downpour captures port numbers as well,

24   correct?

4:09PM 25   A.   Yes.

4:09PM 1   Q.   And Torrential Downpour captures port numbers from
2   the router, correct?
3   A.   Yes.  The port number goes through the router to the
4   actual computer, correct.
4:10PM 5   Q.   In other words, Torrential Downpour is actually
6   capturing the IP address and the port number from the
7   router before being able to identify a specific device,
8   for example, by a Mac address, correct?
9   A.   I'm probably not the Torrential Downpour expert so I
4:10PM 10  probably don't know if you are referring to the port on
11  the router versus the port on the computer.  I'm not the
12  expert to know the answer to that question.
13  Q.   You offered an opinion a few minutes ago on what the
14  port number means on that VLC streaming file, correct?
4:10PM 15  A.   Correct.
16  Q.   And if I can show you Government's Exhibit 43.  This
17  is not what you created last week, but what the forensics
18  actually showed, if I understood your testimony, correct?
19  A.   Yes.
4:10PM 20  Q.   And this specifically references a port number
21  related to the streaming, correct?
22  A.   Yes.  Port number is 63835.
23  Q.   And if we go to the bottom, there's different port
24  numbers, correct?
4:11PM 25  A.   Yes.

4:11PM  1    Q.    And what is that port number at the bottom?

        2    A.    27386.

        3    Q.    I'm going to show you what's been entered into

        4    evidence as Exhibit 8(a).  I'm sorry, 8(1), or Exhibit 8,

4:11PM  5    page one.  Can you tell me what port number appears?

        6    A.    27386.

        7    Q.    What that means is that if we look at the streaming

        8    file, it actually goes to the router, regardless of

        9    whether it comes back to the HP or goes to another device,

4:11PM 10    correct?

       11    A.    Say that again.  It goes through the -- all

       12    communication goes through the router.  So the router goes

       13    from the Torrential Downpour computer through the router

       14    to the computer.

4:11PM 15    Q.    But I'm talking about the VLC files that we're

       16    looking at reflected in Exhibit 43.  When those stream,

       17    that goes through the same port reflected on the router in

       18    the Torrential Downpour records, correct?

       19    A.    It uses the same port.  I'm not sure what you're

4:12PM 20    saying.

       21    Q.    That it leaves the HP computer and goes to the

       22    router, correct?

       23    A.    I don't understand the evidence -- I don't understand

       24    the evidence of that.  What goes through the router?  Is

4:12PM 25    it like the movie playing or the file transfer?

4:12 PM 1   Q.   The video that is streaming right here is streamed

2   through a router, port number 63835, correct?

3   A.   It's being -- it's being streamed through that port

4   number, that is a correct statement.

4:12 PM 5   Q.   Meaning it goes from the computer to the router,

6   correct?

7   A.   Yes.

8   Q.   And that means when Universal Plug and Play is

9   enabled, that any device that has access to any of those

4:12 PM 10  ports on that router has access to this video, correct?

11  A.   Yes.  Yes.  Yes, that it's being streamed on port

12  127001.  But you're saying any computer attached to that

13  network at that moment in time, had streaming software,

14  they could also be watching the movie at the same time?

4:13 PM 15  If that's your point, I would agree with that.

16  Q.   So sitting here today, is it fair to say that you

17  still cannot rule out remote access?

18  A.   I'm not sure how remote access is related to what

19  we're talking about.

4:13 PM 20  Q.   That wasn't the question.

21  A.   The access is remotely controlling, that does not --

22  it's not consistent with the evidence we're seeing.

23  Q.   That wasn't my question.  When you testified

24  previously, you admitted that you could not rule out the

4:13 PM 25  possibility of remote access?

4:13PM 1   A.    In a generic sense, there always is a possibility of

2   remote access.   That's a remote possibility in many cases.

3   Q.    And is that possibility greater with UPnP?

4   A.    Than non-UPnP, that possibility is greater.

4:13PM 5   Q.    Thank you.

6          MR. GELFAND:  May I have one minute, Your Honor?

7          THE COURT:  You may.

8          MR. GELFAND:  Thank you.  I have no further

9   questions, Your Honor.

4:14PM 10         MR. CLAYMAN:  Just briefly, Your Honor.

11         THE COURT:  Thank you, Mr. Clayman.

12                 REDIRECT EXAMINATION

13   BY MR. CLAYMAN:

14   Q.    Mr. Fottrell, based on your expert opinion, did the

4:14PM 15   user of the Linux partition have to use command lines to

16   install any software?

17   A.    No.

18   Q.    Did they have to use command lines at all?

19   A.    No.

4:14PM 20   Q.    Did you find any evidence that the Linux partition

21   was remotely accessed?

22   A.    No, I did not.

23   Q.    Based on listening to Ms. Bush's testimony, did the

24   defense find any evidence that the partition was remotely

4:14PM 25   accessed?

4:14PM 1    A.    No, they did not.

2    Q.    And so based on your expert opinion, was someone at

3    the computer physically downloading child sexual abuse

4    material during the relevant time frame here?

4:15PM 5    A.    Yes.

6    Q.    Mr. Fottrell, who did you determine, based on your

7    expert opinion and your review of the forensic evidence in

8    this case, was in the room with the computer very close in

9    time to when the child sexual abuse material was being

4:15PM 10   downloaded here?

11   A.    Joshua Duggar.

12              MR. CLAYMAN:    Pass the witness.

13              MR. GELFAND:    I have no further questions, Your

14   Honor.

4:15PM 15              THE COURT:    Thank you, Mr. Fottrell.    You may

16   stand down.    Any further rebuttal testimony?

17              MR. ROBERTS:    No, Your Honor.

18              THE COURT:    Very well.    Members of the Jury, all

19   of the evidence has now been received.    The next step in

4:15PM 20   the trial process is for the Court to instruct you as to

21   the law, then we will receive closing arguments and then

22   the case will be submitted for you to deliberate and

23   return your verdicts.

24              It is 4:15.    We are still working on finalizing

4:16PM 25   the jury instructions to be read to you.    I don't know how

4:16PM 1    long the closing arguments are going to be, but by the

2    time that we got the jury instructions together and began

3    closing arguments, it would be a few hours from now, so

4    we're going to recess for the evening.  Tomorrow morning,

4:16PM 5    I would like to start at 9:00 a.m., and we will call for

6    you at 9:00 a.m. and have everything buttoned up by that

7    point so we can start promptly at 9:00 a.m.  The Court

8    will read the jury instructions to you and then we will

9    receive the closing arguments.

4:16PM 10           I need to read the recess instruction to you one

11    more time.  During this recess and every other recess, you

12    must not discuss this case with anyone, including the

13    other jurors, members of your family, people involved in

14    the trial or anyone else.  Do not allow anyone to discuss

4:17PM 15    the case with you or within your hearing.  Only you have

16    been chosen as jurors in this case and only you have sworn

17    to uphold the law.  No one else has been chosen to do

18    this.  You should not even talk among yourselves about the

19    case before you have heard all the evidence and the case

4:17PM 20    has been submitted to you by me for deliberations because

21    that could affect your final decision.  And if anyone were

22    to attempt to approach you to talk to you about the case,

23    please let me know about that immediately through a court

24    security officer or a member of the court clerk staff.

4:17PM 25           When I say you must not discuss this case with

4:17PM 1   anyone, I also mean do not e-mail, send text messages, or

2   blog or Tweet or engage in any form of social media or

3   other written or electronic communication.

4           And remember that you must not read any newspaper

4:18PM 5   or other written accounts.  Do not watch any televised

6   accounts.  Do not listen to any radio program about this

7   trial.  And remember as well that you must not conduct any

8   internet research or consult with any other souces about

9   this case, the people involved in the case, or its general

4:18PM 10  subject matter.

11          You must keep your mind open and free of outside

12  information.  Only in this way will you be able to decide

13  the case fairly based solely on the testimony, evidence

14  presented in the courtroom, and my instructions to you on

4:18PM 15  the law.  If you were to decide the case on anything else,

16  you will have done an injustice.  And it would be a

17  violation of your oath for you to base your decision on

18  some reporter's view or opinion or upon some information

19  that you have acquired outside the courtroom.  It is very

4:18PM 20  important that you follow these instructions.

21          With that, we will be in recess.  We'll see you

22  at 9:00 in the morning.  Everyone please stand as the Jury

23  exits.  Everyone in the gallery, please stay put until I

24  give you the all clear.

4:19PM 25          (Jury out at 4:19 p.m.)

4:20PM 1          THE COURT:  The Jury has cleared the lobby.  If

2    you're in the gallery, you may exit at this time.  And

3    I'll pause to let anyone that wants to leave, leave, and

4    there's just a few housekeeping matters that we need to

4:21PM 5    take care of.

6          One housekeeping matter was that the Court read

7    the parties' stipulation as it related to Exhibits 8(a)

8    and 9(a) and I'm going to mark the signed stipulation that

9    I read to the Jury as what would now be Court's Exhibit 6.

4:21PM 10          (Court's Exhibit 6 Received)

11          THE COURT:  With regard to the jury instruction

12    conference, I think we have pretty much absorbed the

13    comments that you had e-mailed overnight to the Court and

14    we have the next iteration, the proposed final set of jury

4:22PM 15    instructions.  We can hand that out to you.  I would like

16    to have our jury instruction conference on the record, but

17    otherwise informally around my conference table in

18    chambers.  I would like to let ya'll have a break to

19    gather your thoughts and logistically do whatever it is

4:22PM 20    that you need to do.  Ms. Esterbrook, do you have copies

21    made?  Are we ready to go on our end?  How much time do we

22    need?

23          MS. ESTERBROOK:  Like five minutes.

24          THE COURT:  So could ya'll kind of finish up

4:23PM 25    whatever you need to do logistically to get things

4:23PM 1    buttoned up here in the courtroom and then come back to
       2    chambers at about 4:45 and we can have our formal jury
       3    instruction.  We're just going to be informally talking
       4    through the changes that the Court has made, and then we
4:23PM 5    will go from there.  I'm not saying that this will be your
       6    last opportunity to make comments, but our next meeting
       7    about jury instructions will be at 4:45 unless that
       8    doesn't work for ya'll.  Is that good for the government?
       9              MS. MARSHALL:  Yes, Your Honor.
4:23PM10              THE COURT:  Mr. Gelfand, is that okay with you?
      11              MR. GELFAND:  It is, Your Honor.  I just wanted
      12    to, separate from jury instructions --
      13              THE COURT:  Pardon?
      14              MR. GELFAND:  Separate from jury instructions, I
4:24PM15    just wanted to raise one other issue with the Court.
      16              THE COURT:  Yes.
      17              MR. GELFAND:  Your Honor, now that the entirety
      18    of the evidence has closed, I just wanted to renew our
      19    motion pursuant to Rule 29 incorporating previous
4:24PM20    arguments.  I'm happy to elaborate on anything or answer
      21    the Court's questions, but just for record purposes, I
      22    wanted to make that motion.
      23              THE COURT:  To the extent that that is necessary
      24    under Rule 29, the record will reflect that the Rule 29
4:24PM25    motion has been renewed and it will be denied for the same

4:24PM 1    reasons previously stated by the Court.

2           MR. GELFAND:  Thank you, Your Honor.  Nothing

3    further on this end.

4           THE COURT:  We will see you in chambers in 20

4:24PM 5    minutes at 4:45.

6           (Recess taken from 4:24 p.m. to 4:53 p.m.)

7           (In-Chambers Hearing)

8           (Court's Exhibits 7A, 7B, 7C, 7D, 7E; 8A, 8B; 9A,

9                9B, 9C, 9D, 9E Marked and Received)

4:24PM 10          THE COURT:  The record will reflect that we are

11   in chambers, outside the presence of the Jury, for what I

12   will refer to as the Court's formal jury instruction

13   conference, but let me define that a little bit.  As long

14   as we don't talk over each other, this can be informal in

4:56PM 15   the sense that it can be more conversational.  We just

16   need to be careful not to speak over each other.

17          Secondly, unless we all reach an agreement, it's

18   not necessarily my intent that this would be the very,

19   very last opportunity that you would have to address

4:56PM 20   something or to make a record, but I do hope to advance

21   the ball pretty close to the finish line.  And if we

22   can't, if our discussion does not resolve the issues, then

23   we will at least narrow the battleground and we will have

24   some homework when we leave and we'll have to get it

4:56PM 25   figured out overnight.

4:56PM 1          So I'd like to begin my marking some exhibits.
     2    First is a series of exhibits that will be Court
     3    Exhibit 7, but I've actually marked them -- well, I'll
     4    just identify them as I'm going through them.   Court
4:57PM 5    Exhibit 7-A is the Court's discussion draft of jury
     6    instructions dated December 6th that we e-mailed to you
     7    last night.   The e-mail, and there were actually two
     8    e-mails.   The first one I've marked as Court's
     9    Exhibit 7-B.   This is the e-mail to counsel from Ms.
4:57PM 10   Esterbrook last night at 7:49 p.m.
     11          Next, I've marked as Court's Exhibit 7-C a
     12   supplemental e-mail that I personally forwarded to counsel
     13   at 11:04 p.m. with some additional thoughts about the law
     14   and the instructions.
4:58PM 15          Next, I've marked as Court's Exhibit 7-D the
     16   e-mail that I received from Mr. Murphy at 2:31 a.m.   Big
     17   shout out to Mr. Murphy for that.
     18          MR. MURPHY:   Thank you, Your Honor.
     19          THE COURT:   And hoping that she didn't stay awake
4:58PM 20   all night to send this e-mail, but at 7:50 a.m., we heard
     21   from the government through Ms. Marshall's e-mail, and
     22   that I have marked as Court Exhibit 7-E.   So the
     23   Defendant's response, 7-D.   The government's response,
     24   7-E.   Those will be your comments, your objections,
4:59PM 25   whatever is in your positions as of those times are

4:59PM 1   preserved in the record through these Court's exhibits.

2        And Exhibit 7-D and 7-E are the comments that the

3   Court absorbed over the course of today and which has led

4   the Court to provide to counsel Court's Exhibit 8, which

4:59PM 5   I've actually divided into Court Exhibit 8-A and Court

6   Exhibit 8-B.  Court Exhibit 8-A is the Court's final set

7   of jury instructions as opposed to a discussion set

8   dated 12-7.  Exhibit 8-B is a track change version.  So

9   Exhibit 8-B shows word tracking of changes and the

5:00PM 10   progression from Exhibit 7-A to 8-A.

11        I have also marked a series of exhibits in Court

12   Exhibit 9.  They are presently marked 9-A, 9-B, 9-C, and

13   9-D.  But these would be what I think, but we'll have to

14   wait to hear from Mr. Murphy, would be the Defendant's

5:01PM 15   proffered instructions because they weren't accepted in

16   the version that is now Exhibit 8-A.  So we'll take those

17   up one by one.

18        So just working through, probably easiest to

19   start with the government's position from Court

5:01PM 20   Exhibit 7-E.  The government indicated that they are good,

21   I take it meaning they have no objections to the Court's

22   discussion set, which is Exhibit 7-A.

23        MS. MARSHALL:  That is correct, Your Honor.

24        THE COURT:  So now going to where there are some

5:02PM 25   comments or some objections.  And this would be

5:02PM 1  Mr. Murphy's, from Mr. Murphy's e-mail, which is Court

2  Exhibit 7-D.

3          So in Mr. Murphy's e-mail, he has several bolded

4  line items.  The first was with respect to instruction

5:02PM 5  10-A, which is the elements instruction on Count Two,

6  which is the possession count.  And there, requested some

7  slight language changes as explained on Exhibit 7-D.  And

8  the Court has accepted those changes and they are now

9  reflected in Court Exhibit 8.

5:03PM 10          Final instruction 11-A.  11-A has to do with the

11  definitions of terms and words that are used in the

12  elements instructions and in other instructions.  And the

13  defense is asking that reference to bestiality, I guess

14  that's part of the definition of lasciviousness or

5:03PM 15  explicit content, one of those definitions.  In any event,

16  the Court has removed that term.  Appears to be no

17  evidence of bestiality here.

18          Also, Mr. Murphy correctly points out that it

19  would be more clear if we removed redundant language

5:04PM 20  pertaining to visual depiction.  The Court agreed and has

21  accepted that request.

22          Then Mr. Murphy has raised an objection to

23  instruction 11-B from the Court's discussion set.  11-B

24  had to do with the "on or about" instruction which was --

5:05PM 25  so in the discussion set, the Court had instructed on "on

5:05PM 1   or about" in paragraph 3 of instruction 11-B.  Mr. Murphy

2   explains why they don't think "on or about" is appropriate

3   in this case.  As far as I know, the Court always gives

4   the "on or about" instruction, and as far as I can

5:06PM 5   remember, the defense has never objected to it so kind of

6   had to take a fresh look at this.  I continue to believe

7   that in most cases, "on or about" continues to be proper.

8   It's innocuous.  I don't see any reason in not giving it.

9          Here, the Court was persuaded to remove this

5:06PM 10   additional explicit instruction because the evidence on

11   both sides is so concrete that the -- I mean, it's

12   charged -- it is charged as "on or about," but there's no

13   evidence that any alleged illegal activity occurred

14   outside May 14th through May 16th.  There are facts that

5:07PM 15   occur outside that window -- the download and installation

16   of the Linux partition -- but the downloading of the Linux

17   partition isn't part of the charged conduct in the

18   indictment.  So the Court has agreed with the defense.

19   It's still explained as "on or about" because that is what

5:07PM 20   was charged in the indictment, but we are just not giving

21   this additional language.

22          I'm going to circle back, Ms. Marshall, to you,

23   obviously, to make any further record that you might like,

24   but let me just kind of walk through these.

5:08PM 25          So now we're down to Mr. Murphy's, what he refers

5:08PM 1   to as disputed final instructions 5 through 9.  So

2   disputed final instruction number 5 -- I got that number

3   from Mr. Murphy's e-mail -- is an instruction on a prior

4   inconsistent statement.  Did I correctly mark that,

5:08PM 5   Mr. Murphy?

6              MR. MURPHY:  Yes, Your Honor.

7              THE COURT:  So Defendant's -- so I have marked as

8   Court Exhibit 9-A defendant's proffered final instruction

9   number 5.  And this has to do with prior inconsistent

5:09PM 10  testimony.  And the proposed instruction speaks for

11  itself, but I've never given this instruction before.

12  There is an instruction on credibility of witnesses.  It's

13  instruction number 5.  In pertinent part, instruction

14  number 5 explains that the Jury may consider whether the

5:10PM 15  witness in question said something different at an earlier

16  point in time.  And that addresses a prior inconsistent

17  statement specifically.  And instruction number 5 explains

18  that this is one of the badges of credibility that they

19  may consider when they evaluate a witness's credibility.

5:10PM 20  I don't know, and I'll give Mr. Murphy an opportunity to

21  further explain, but I'm assuming that this instruction is

22  mainly geared towards Mr. Fottrell, who on some issues had

23  inconsistent testimony and/or statements either from his

24  report to his direct testimony or largely from his direct

5:11PM 25  testimony to the admissions on cross examination.  And so

5:11PM 1    perhaps this proffered instruction number 6 is being

2    offered to take that on.

3           Still don't think that that is a good enough

4    reason.  We also have jury instruction number 6 that

5:11PM 5    pertains to the opinion evidence of expert witnesses.  And

6    as part of instruction number 6, it explains the expert

7    testimony is to be treated just like the testimony of any

8    other witness.  And so that ties it to instruction

9    number 5.  And I just do not see any good reason to

5:11PM 10   provide an instruction that highlights an issue that is

11   already adequately covered by the Court's instructions.

12          Was there anything else that you were wanting to

13   argue on that, Mr. Murphy?

14          MR. MURPHY:  Yes, just briefly, Your Honor.  With

5:12PM 15   respect to, as you noted, I guess we're calling this

16   Court's Exhibit 9-A, this language is pulled straight out

17   of the first circuit pattern instructions, Section 2.02.

18   And as noted, I believe in the authority section of the

19   instruction, this was used in two Eastern District of

5:12PM 20   Missouri cases, one before the Honorable Judge Autrey, and

21   one before the Honorable Judge Audrey Fleissig.  To be

22   clear, in the matter before Judge Autrey, the entire

23   verbatim instruction was included at that trial.

24          In the matter before Judge Fleissig, what she

5:12PM 25   opted to do was to include a portion of this instruction

5:13PM 1    within, I believe the exact same credibility of witness

2    instruction that this Court has labeled final instruction

3    number 5 at the end of the second paragraph of this

4    instruction.  And we just believe that the language is

5:13PM 5    more clear in this.  Whereas we acknowledge what the Court

6    has said with respect to reference within final

7    instruction number 5 to, quote, "whether that witness said

8    something different at an earlier time could be considered

9    with respect to credibility."  However, with respect to

5:13PM10    this proposed instruction, it's just a little bit more

11    clear.  It fleshes that out.  It talks about how a jury

12    has the power to consider whether a prior statement was

13    not consistent with the witness's testimony at the trial

14    and then to expressly decide whether that affects the

5:13PM15    believability of that witness's testimony at trial.  And,

16    Your Honor, I believe with respect to the witnesses that

17    ended up testifying at this trial, I do believe that this

18    most specifically applies to the testimony of

19    Mr. Fottrell.

5:14PM20            THE COURT:  All right.

21            MS. MARSHALL:  Your Honor, the government

22    believes that the credibility of witnesses is covered by

23    the model Jury instruction 3.04 as included in the Court's

24    conference instructions.  It talks about testifying and

5:14PM25    the witness testifying and how they can take that into

5:14 PM 1    consideration, and the government would believe that it's

2    fully covered based on that instruction and also the

3    expert testimony instruction.  It states, "You should

4    consider expert testimony just like any other testimony

5:14 PM 5    and give it the weight you think it deserves."

6          THE COURT:  So I think we can -- the Court can

7    pretty definitively rule that it's not going to give

8    defendant's proffered instruction number 5 as reflected in

9    the Court Exhibit 9-A for the reasons that I have alluded

5:15 PM 10   to.  But, specifically, that instructions number 5 and 6

11   adequately cover the issue being addressed by the

12   defendant's proffered instruction.  Certainly, in closing

13   argument, you can highlight the same point that you're

14   making in the proffered instruction.  No problem with

5:15 PM 15   arguing that whatsoever.  But I find that the defendant's

16   proffered instruction number 5 would be cumulative to

17   Court's instructions 5 and 6.  The proffered instruction

18   is preserved for the record, though.

19          Next, I guess it may make more sense,

5:16 PM 20   Ms. Marshall, to kind of check these off so we're going to

21   have to circle back to them, so I apologize for some

22   disorganization here.  But going back to final instruction

23   10-A, the Court had adopted those minor language changes

24   that Mr. Murphy had requested.  Does the Court's inclusion

5:16 PM 25   of that language cause the government any heartache?

5:16PM  1          MS. MARSHALL:  No, Your Honor.  The government is

        2   good with that suggested language.

        3          THE COURT:  And then on final instruction 11-A,

        4   are you okay with removing the term "beastiality?"

5:17PM  5          MS. MARSHALL:  Yes, Your Honor.

        6          THE COURT:  And removing the double inclusion

        7   defining visual depiction?

        8          MS. MARSHALL:  Yes, Your Honor.  The government's

        9   only suggestion was going to be to state as defined in

5:17PM 10   paragraph 1, if the Court wanted to keep that in so that

       11   the whole definition is included.  It may make -- in

       12   keeping with the pattern instruction, it may be good just

       13   to keep it there and have that caveat to refer them to

       14   visual depiction above so that it is clear.

5:18PM 15          THE COURT:  Where are you proposing to insert

       16   that?

       17          MS. MARSHALL:  Yes, Your Honor.  On the stricken

       18   part right now in the Court discussion draft, the term

       19   "visual depiction," then just put, comma, "As defined in

5:18PM 20   paragraph one above," comma, includes --

       21          THE COURT:  So I see in final instruction 11-A,

       22   terms 1 and 2?

       23          MS. MARSHALL:  Yes, sir.

       24          THE COURT:  I'm proposing to strike that portion

5:19PM 25   in paragraph 2 where it says the term, "Visual depiction

5:19PM 1   includes."  What are you wanting me to do?

2              MS. MARSHALL:  Yes, sir.  I was just going to

3   say, the only suggestion that the government would have,

4   if we were to keep that, so to keep the pattern

5:19PM 5   instruction intact would be to say, "The term visual

6   depiction, comma, as defined in paragraph 1 above, comma,

7   includes a photograph, film, picture, et cetera."

8              THE COURT:  I need to see that visually because

9   I'm still not understanding what you're saying.

5:19PM10              MS. MARSHALL:  Yes, sir.

11              THE COURT:  So, Mr. Murphy, she's saying that the

12   second sentence in child pornography would read, "The term

13   visual depiction is defined in paragraph 1 above."

14              MR. MURPHY:  Just to make sure I understand it,

5:20PM15   are you saying it would say, "As defined above," and then

16   restate the "includes photograph" element, just stop

17   there?

18              THE COURT:  That may have been what she said, but

19   what I would propose is that --

5:20PM20              MS. MARSHALL:  I understand what the Court is

21   saying, and I think that that would be appropriate as

22   well, Your Honor.

23              MR. MURPHY:  We don't have any strong feelings

24   about that, Your Honor.  I just thought it was a redundant

5:21PM25   sentence.  I'm happy with however the Court decides to

5:21PM 1  handle this particular issue.

2            THE COURT:  Now, what is the government's

3  position on removing the "on or about" definition?

4            MR. ROBERTS:  Your Honor, we're contemplating.

5:21PM 5  We just never had it not be included, so I'm trying to

6  contemplate the possibilities of it burning me if it's

7  not.

8            THE COURT:  Well, certainly I would not allow the

9  defense to argue that facts that are part of the

5:22PM10  circumstantial evidence that come from outside the 14th to

11  the 16th can't be considered.

12            MR. GELFAND:  No, I think both parties intended

13  to argue the facts.

14            MS. MARSHALL:  We're fine with it, Your Honor,

5:23PM15  with it coming out.  Famous last words, maybe.

16            THE COURT:  Now we're to, really, the bullet

17  points that Mr. Murphy has labeled number 6 and number 7.

18  I have pulled what I think -- the final proffered

19  instructions that he's referring to, I've marked those as

5:23PM20  Exhibits 9-B and 9-C.  Is that accurate?

21            MR. MURPHY:  Yes, Your Honor.

22            THE COURT:  So one of them says, one of the

23  issues, or defendant's proffered instruction number 6 --

24  this is Court's Exhibit 9-B says -- one of the issues in

5:24PM25  this case is whether Mr. Duggar personally knowingly

5:24PM 1    possessed or received child pornography between on or

2    about May 14th and May 16th as charged in the indictment.

3    If you have a reasonable doubt from careful and impartial

4    consideration of all the evidence or from a lack of

5:24PM 5    evidence as to whether the prosecution proved this

6    element, you must find Mr. Duggar not guilty of both

7    counts.

8           Defendant's proffered instruction number 7 reads,

9    "The mere presence of Mr. Duggar at or near a location

5:24PM 10   where alleged child pornography was found is not

11   sufficient to establish beyond a reasonable doubt that he

12   knowingly possessed or received child pornography as

13   charged in the indictment."  Big picture here, theory of

14   defense instructions are appropriate when warranted by the

5:25PM 15   law and the facts and not otherwise covered by the Court's

16   other jury instructions.  In my view -- and I'm happy to

17   hear you out on this -- in my view, both of these theory

18   of defense instructions are jury arguments.  And my fear

19   is that giving a separate instruction paves the way for an

5:26PM 20   argument that the Court has instructed you that you must

21   follow the Court's instructions on the law.  Here's the

22   Court's instruction that I want to draw your attention to.

23   It's Court instruction number whatever and number whatever

24   that I've marked as Court Exhibit 9-B and 9-C.  And

5:26PM 25   therefore, it adds some sort of direct, indirect, or

5:26PM 1    subliminal weight to the notion that this is the Court

2    endorsing the defense's jury argument.  And I don't think

3    that that is appropriate to the extent that other jury

4    instructions adequately cover it.

5:27PM 5            And, here, with regard to proffered instruction

6    number 6, individually and collectively, the Court's

7    instructions on proof of intent and knowledge, instruction

8    11-B-1, and instruction 11-B-2, the elements of the

9    instruction, which are instructions 9-A and 10-A, the

5:27PM 10   reasonable doubt instruction, which is instruction 12, the

11   duty of the jury instruction, which is instruction 2, and

12   the burden of proof instruction, which is I think

13   instruction 7 can all -- collectively, those all cover

14   this theory of defense instruction that you're seeking in

5:28PM 15   proffered number 6.

16           Proffered number 7, I have the same feelings

17   about.  It's just a jury argument that has been dressed up

18   as a jury instruction that somehow gives the illusion that

19   the Court is endorsing a theory of defense.  The concept

5:28PM 20   here is otherwise adequately covered by the possession

21   instruction, which is 11-B, and it is covered by the

22   reasonable doubt instruction, which is instruction 12, and

23   it is covered by the instructions that license the jury to

24   use their common sense, especially the common sense part.

5:29PM 25   Proffered instruction number 7 is merely saying, ladies

5:29PM 1  and gentlemen, use your common sense.  A person, just

2  because they are there, doesn't mean that someone else

3  couldn't be responsible and you argue the facts.  So I'm

4  not inclined to endorse jury arguments in the form of a

5:29PM 5  jury instruction and I'm not aware of any law that this is

6  instructing the jury on that is not otherwise covered by

7  the instructions.  That's my position.

8          What do you say, Mr. Murphy?

9          MR. MURPHY:  Well, with respect to the

5:30PM 10  defendant's instruction number 6, which the Court has

11  marked as Exhibit 9-B, we would just note that the Eighth

12  Circuit model criminal jury instruction, section 9.05, it

13  does expressly provide that a criminal defendant is

14  entitled to have the jury instructed on a defense theory

5:30PM 15  if a timely submission is made and the instruction

16  correctly states the law and is supported by the evidence,

17  and it cites several Eighth Circuit cases in support of

18  that notion.  And it's our position that this is a correct

19  statement of the law and it is supported by the evidence.

5:30PM 20  And it is, Your Honor, in our view a converse instruction

21  and we wouldn't believe that that would be -- I certainly

22  understand the Court's position, but I don't believe that

23  simply including this instruction with the Court's final

24  jury instructions would somehow be tantamount to this

5:30PM 25  Court giving a wink and a nod to the Jury that this is

5:31PM 1    somehow being suggested by the Court.  I do believe this

2    is a proper instruction supported by the law.

3              THE COURT:  Ms. Marshall?

4              MS. MARSHALL:  Your Honor, the government

5:31PM 5    believes that these elements are already covered in the

6    instructions as proposed by the Court.  Specifically, as

7    the Court noted, the proof of intent or knowledge for

8    possession and the reasonable doubt instructions.

9              THE COURT:  Well, the Court is not going to give

5:31PM10    defendant's proffered theory of defense instructions 6 and

11    7, but in making that ruling, the Court recognizes, as the

12    Eighth Circuit stated in *United States v. Hoffman*, that a

13    defendant has a right to have an instruction read

14    reflecting his or her theory of the case.  So what

5:31PM15    Mr. Murphy states is correct as far as it goes.  But the

16    *Hoffman* case goes on to say that that is true provided

17    that the request is made in time and that the instruction

18    is supported by the evidence and correctly states the law.

19    So that's what *Hoffman* says.  However, a defendant is not

5:32PM20    entitled to such an instruction, quote, "Where the

21    instructions given adequately and correctly cover the

22    substance of the requested instruction."

23              And that's the Court's position, that for the

24    reasons that I have stated and for the other instructions

5:32PM25    that I have pointed out, it's this part of *Hoffman* that

the Court believes renders these proffered instructions unnecessary because they are adequately covered by other instructions.

I would also note that in *United States v. Christy*, which is a 2008 Eighth Circuit case, 647 F.3d 768, there's some choice nuggets there.  The Eighth Circuit said, quote, "The entitlement to a theory of defense instruction, however, is only a general proposition."  The Court also said, quote, "The defendant is not entitled to a particularly worded instruction or to a," quote, "judicial narrative of his version of the facts even though such a narrative is in one sense of the phrase a theory of defense," close quote.  And that's what I was describing earlier is these instructions being really jury arguments.  In the *Christy* Court's terminology, that would be a judicial narrative of the defendant's version of the facts.  The *Christy* Court also went on to say, quote, "Even where the Court declines to give an instruction on a theory of defense that is supported by the evidence, there is no error if the instructions as a whole by adequately setting forth the law afford counsel an opportunity to argue the defense theory and reasonably ensure that the jury appropriately considers it."  And certainly, by the Court's ruling, the Court is not saying that you can't make the jury arguments.  You can, most definitely.  The

5:34 PM 1   Court is just not going to appear to be endorsing those or

2   including a judicial narrative of the defense version of

3   the facts.

4        The *Christy* Court also went on to say, quote, "No

5:34 PM 5   specific instruction was necessary to alert the jury

6   that" -- internal quote -- 'one of the issues in this case

7   is whether the defendant was present at the time and place

8   of the alleged crime, or that the jurors must find Christy

9   not guilty if they had a reasonable doubt whether he was

5:35 PM 10   present.'"  So that's kind of the money quote from the

11   *Christy* case because it pretty well sums up the two

12   requested instructions and suggests that it was not

13   necessary for the Court to give the instruction.

14        MR. GELFAND:  Your Honor, I'm sorry to interrupt.

5:35 PM 15   Could we just be heard on one alternative request with

16   respect to the mere presence instruction, understanding

17   that the Court isn't declined to give it?

18        THE COURT:  Yes.

19        MR. GELFAND:  I understand the Court's concern

5:35 PM 20   about kind of, for lack of a better way of putting it,

21   endorsing the instruction as kind of a stand-alone

22   instruction, but I'm wondering if the Court would consider

23   adding one sentence about mere presence in the element

24   instruction.  In other words, so it's not flagging it, but

5:35 PM 25   it still correctly instructs the Jury on a correct

5:36PM 1    statement of law.

2              One of the concerns here, Your Honor, is that

3    there's a lot of testimony and evidence about allegations

4    of Mr. Duggar's physical whereabouts near certain

5:36PM 5    locations at various times.  And I don't want the Jury to

6    be under the impression that it's enough to convict him of

7    either offense if he was, hypothetically speaking, at the

8    car lot showing a car and had nothing to do with this.

9    And that's where I think there's an alternative to a

5:36PM10    stand-alone instruction to still accurately convey the

11    statement of law.

12              THE COURT:  Ms. Marshall?

13              MS. MARSHALL:  The government would object to

14    that, Your Honor.  Possession is defined in the

5:36PM15    instructions and there is ample evidence to show that the

16    defendant had dominion and control over the images in

17    question.

18              THE COURT:  I appreciate the alternative.  I'm

19    not going to give that.  I think that what it does is,

5:37PM20    again, create a judicial narrative that would unfairly

21    neuter circumstantial evidence in the case.  His presence,

22    as you say -- and you're correct in saying this and you

23    would be correct in arguing it -- the fact that he was

24    there doesn't prove anything by itself, but it is one

5:37PM25    brick on the wall.  It is one circumstantial piece of

5:37PM 1    evidence on the wall of proof that they have to build, and

2    I think that giving that instruction would unfairly neuter

3    that piece of circumstantial evidence.  You're free to

4    argue that all you want, but I'm not going to, as the

5:38PM 5    *Christy* Court said, create a judicial narrative.

6    Next is proposed instruction number 8, which has

7    to do with this notion of the cache files, proposed --

8    defendant's proffered number 8, I think is what the Court

9    has marked as Court's Exhibit 9-D, is that right?

5:38PM 10   MR. MURPHY:  That's correct, Your Honor.

11   THE COURT:  It reads, "Presence of child

12   pornography images in a computer's temporary cache file is

13   not sufficient to establish the defendant's knowing

14   possession of the images."  So I'm interested in hearing

5:39PM 15   you explain your interpretation of the current state of

16   the evidence as to what would make this instruction

17   proper.

18   MR. MURPHY:  Thank you, Your Honor.  Just to

19   orient the Court, if it's not already clear, this is

5:39PM 20   pulled directly from notes on use number 1 within Section

21   6.18.2252, which is the Eighth Circuit pattern instruction

22   on these offenses.  The reason we think this is important

23   is because the evidence in this case shows that any

24   evidence that was allegedly located in the computer was

5:39PM 25   deleted shortly after being downloaded, and in certain

5:40 PM 1    instances, was not even child pornography, but instead

2    Torrent files without the substantive evidence.  As the

3    experts explained, a Torrent file is more akin to a

4    recipe, but yet has not yet assembled the ingredients to

5:40 PM 5    make the cake, is I believe the analogy that was used

6    often throughout this trial.  This Court, or I believe it

7    was perhaps in the e-mail from Ms. Esterbrook as Court's

8    7-B did point us to the *United States v. Moberg* case --

9    that's M-O-B-E-R-G -- 888 F.3d 966, Eighth Circuit 2018.

5:40 PM 10   I would just note for the record that there, the facts are

11   pretty readily distinguishable.  And this is a quote from

12   the case.  "The defendant had admitted that he had viewed

13   child pornography on his computer and that the last time

14   he had viewed child pornography was five months prior to

5:41 PM 15   the interview."  And then he continues to go on to

16   describe what was in some of these interviews.

17           And to state the obvious, in this case, there's

18   been no admissions by Mr. Duggar to having certainly ever

19   viewed or downloaded or received or possessed any of these

5:41 PM 20   images or video files.  So I think that just based on the

21   unique evidence in this case where the evidence was

22   exclusively in a cache file, to my understanding, this is

23   an important instruction that we would like to have

24   included in some manner.

5:41 PM 25           THE COURT:  So help me understand the

5:41PM 1  difference -- not you, personally -- but what the evidence

2  tells us is the difference between the cache file that

3  you're referring to and the fact that certain files were

4  downloaded.  And I recall that both Mr. Fottrell and

5:42PM 5  Ms. Bush testified that files were downloaded.

6            MR. MURPHY:  I could be mistaken, and feel free

7  to speak up if I'm speaking out of turn, but I'm not sure

8  that I heard evidence of, other than perhaps

9  circumstantial evidence, that there was actually

5:42PM 10  downloaded child pornography or Torrent files on this

11  computer.  The evidence --

12            THE COURT:  You don't think Ms. Bush said that,

13  or you don't think Mr. Fottrell said that, or that you

14  don't think either one of them said that?

5:42PM 15            MR. MURPHY:  I don't believe that it's expressly

16  stated by either.  What is clear from the evidence is that

17  this Torrential Downpour law enforcement tool extracted

18  certain files from the computer, so the uploading of the

19  files, there is evidence to support that.

5:42PM 20            There is, I believe, a theoretical world in which

21  these things could be on the computer in a way that wasn't

22  downloaded.  Torrent files, as I already described, is --

23  a Torrent is, as I understand it, a text file, the recipe

24  for the cake before you get the ingredients.  And there is

5:43PM 25  more than one way for a Torrent file to get onto a

5:43PM 1  computer.  Certainly I understand that the government's

2  position in this case is that these files were downloaded

3  from the Torrent network.

4          THE COURT:  And then deleted and the remnant is

5:43PM 5  the recipe?

6          MR. MURPHY:  Correct.  And that would have been

7  located within the cache of the computer.

8          MR. GELFAND:  Can I add one fact that I think

9  matters?

5:43PM 10          THE COURT:  Please.

11          MR. GELFAND:  There's a distinction -- the

12  indictment doesn't specifically allege what file or what

13  image necessarily supports each allegation, and I think

14  that's critical here, in addition to some other issues,

5:43PM 15  because there's undisputed evidence that some Torrents

16  were, quote, unquote, "downloaded" but where there was no

17  image that was downloaded.  One was the Daisy's

18  Destruction Torrent.  The other was the Daisy's

19  Destruction.1 or DD.1 -- I'm just going off memory,

5:44PM 20  whatever it was called -- Torrent.  And so we think it's

21  important that the Jury is instructed as to this issue

22  because in the absence of that, the Jury is not

23  specifically directed, and I know the Court will raise

24  this in a direct context subsequently, but the Jury is not

5:44PM 25  specifically directed to a particular image or to a

5:44 PM 1    particular file.  And when all of the images forensically

2    were extracted from the cache file, that was the

3    motivation before trial for asking for this instruction

4    that's even more important based on the evidence that came

5:44 PM 5    out at trial.

6         THE COURT:  So if the Court were to give this

7    instruction, what do you argue to the Jury constitutes

8    being in the cache file such that that is not an offense?

9    Everything was only in the cache file?  How do you argue

5:45 PM 10   to the Jury what you're saying was located in the

11   temporary cache file, and since that is not sufficient to

12   establish a knowing possession, you can't consider it?

13        MR. GELFAND:  Well, because mens rea, first of

14   all.  And so I think it's important --

5:45 PM 15        THE COURT:  I know it goes to the mens rea.  When

16   you're arguing to the Jury which images were in the

17   computer's temporary cache, how do you argue that?  Do you

18   say all 11, 12, whatever it is, images were exclusively

19   located in the cache, and therefore, they don't

5:46 PM 20   constitute -- can't constitute possession under

21   defendant's proffered instruction 8?

22        MR. GELFAND:  No, Your Honor.  If the Jury were

23   to find that that's the only evidence, then I think that

24   would be a true statement.  And I think that as it applies

5:46 PM 25   to certain Torrents, that's an undisputed statement.  In

5:46PM 1   other words, at least -- and this is a little more

2   academic -- but if the Jury is hypothetically only

3   convinced that the DD file was, quote, "knowingly

4   downloaded by Josh Duggar at a particular date and time,"

5:47PM 5   then this instruction would appropriately tell them that

6   that's insufficient to convict.

7          THE COURT:  If it was only downloaded?

8          MR. GELFAND:  If the DD file was only -- if the

9   Jury hypothetically, academically speaking, was not

5:47PM10   convinced that Josh Duggar had anything to do with any

11   file other than the DD file, then based on the undisputed

12   evidence, that would be insufficient to convict because

13   there was no -- there was a cache remnant of the Torrent

14   without any evidence of any actual file there.  And so I

5:47PM15   think that the analysis would apply differently to some of

16   the different images.  I don't think -- for example, I

17   think the government would be free to argue -- without

18   conceding anything on behalf of Mr. Duggar -- but I think

19   the government would be free to argue that if there's

5:48PM20   evidence that certain files were streamed, and if they can

21   link that to Mr. Duggar, then there's at least -- they can

22   at least argue circumstantially that they were viewed as

23   opposed to just in the temporary cache, but that doesn't

24   apply to every image.

5:48PM25          THE COURT:  I can imagine a world where the Jury

5:48PM 1    is deliberating and they get to defendant's proffered

2    number 8 and they say, "What's a temporary cache file?

3    What do you all recall about that?"  And then two hours

4    later we get a note, "What is meant by temporary cache

5:48PM 5    file?"  What are you going to tell me to write in the note

6    back to them what temporary cache file means?

7                MR. GELFAND:  We elicited testimony about that

8    expressly.

9                THE COURT:  Okay.  Well, define it for me now, as

5:48PM 10   best you can.  I'm not asking you to craft the

11   instruction.  I'm just asking you to educate me and

12   recall, help me recall what we're talking about.

13               MR. STORY:  I believe what Ms. Bush testified

14   was, those would be the remnant images that, once were

5:49PM 15   pulled off, came through the download, it auto-creates all

16   of the little pictures, so to speak.  Those are the ones

17   she would say sometimes she could see what they were,

18   sometimes she could tell what they were, sometimes they

19   were just really small.  Those are effectively kind of

5:49PM 20   like the thumbnail versions that are in the cache file.

21   That's where they are saved.

22               It's the same thing that would come through if I

23   did a Google search and looked for a basketball.  It loads

24   images, it loads up a whole lot of images.  I didn't

5:49PM 25   necessarily go on and download all those images thinking I

5:49PM 1   was getting all those different pictures of the basketball

2   that I was looking for, but it loaded them into my cache

3   file because it's displaying them on the screen.  But then

4   when I get rid of them, it effectively puts them into my

5:50PM 5   cache file because they are no longer needed.  I didn't

6   actually download that image and keep it.

7             That's what I think is kind of, when Ms. Bush is

8   testifying to, that's what was actually on the actual

9   device.

5:50PM 10            THE COURT:  So if we substitute, for temporary

11   cache, "The presence of child pornography images that were

12   not downloaded."

13            MR. STORY:  They are downloaded.

14            THE COURT:  You agree that they are downloaded?

5:50PM 15            MR. STORY:  We would agree that they had been on

16   the computer, but they are not currently on the computer

17   other than in that thumbnail cache file.

18            THE COURT:  Okay.

19            MR. GELFAND:  I think the problem here -- sorry

5:51PM 20   to confuse things even more -- is that we can't talk about

21   these images holistically because some evidence applies to

22   some images that don't apply to other images.  And that's

23   one of the things that's a result of the way that the case

24   is charged is that it's not image specific.  And the way

5:51PM 25   that the evidence came out is very image specific in the

5:51PM 1    sense of timing and circumstantial evidence and things

2    like that.  So this is not just an academic issue.  It's a

3    real one.

4          THE COURT:  Who wants to take this one?

5:51PM 5          MS. MARSHALL:  I will, and you can jump in if you

6    need to.  Judge, there's a difference between unallocated

7    space and cache images.  And that was testified to.  Cache

8    images, as Mr. Story explained, when you're scrolling

9    through a website, it sees it, that way it can pull it up

5:51PM 10   faster the next time.  That is totally different than

11   unallocated space, which was testified to, which talks

12   about deleted images, deleted content from the computer

13   that is then in unallocated space.  That's what we're

14   dealing with here with these images.  And besides the DD

5:52PM 15   Torrent file, that's not the only Torrent file that there

16   was.  We know that there was content on the computer

17   because the undercover download was able to occur.  There

18   was testimony that that would only occur if that content

19   was on the computer.  They get the content from a

5:52PM 20   one-to-one connection, so she wouldn't be able to see it

21   if she didn't get that content from that computer.  And so

22   we know from that testimony that there was content on the

23   computer.  It was not just temporary cache files from

24   somebody scrolling through the internet.

5:52PM 25         We had the TOR application, the TOR browser.  We

5:52PM 1  had multiple different things besides just cache images as

2  that note application is in reference to.

3          MR. ROBERTS:  Your Honor, also, that was grouped

4  --

5:52PM 5          THE COURT:  Just so that we're clear, the images

6  that Detective Kalmer and her software picked up, that was

7  the webcam-collection-prevs?

8          MS. MARSHALL:  No.  That was the movie_0216 and

9  the marissa.zip file, Your Honor.

5:53PM 10          THE COURT:  The 216?

11          MS. MARSHALL:  Yes, Your Honor, from May 14th.

12          THE COURT:  And marissa?

13          MS. MARSHALL:  Yes, from May 15th, for marissa.

14          THE COURT:  And so those were viewed?

5:53PM 15          MS. MARSHALL:  Yes.  They have to be on the

16  computer.  And there was testimony, I believe, that at

17  least one of the marissa images was viewed for

18  approximately two minutes from the testimony that was

19  elicited.

5:54PM 20          THE COURT:  Marissa is the one where the defense

21  expert says only 11 of 60-something --

22          MS. MARSHALL:  She talked about pieces, Your

23  Honor, not images.  She talked about pieces.  And there

24  was testimony that pieces do not correlate to images.

5:54PM 25          THE COURT:  The government's position is that

5:54 PM 1   it's universally true that all 11 file remnants were

2   recovered from the unallocated space on the Linux

3   partition and that that, according to the government's

4   theory, means that they had been downloaded?

5:54 PM 5          MR. CLAYMAN:  A little more complicated than

6   that, Your Honor.  I think, with respect to the DD

7   Torrent, I candidly don't understand why we are discussing

8   that in the context of cache history.  The Torrent file

9   itself was discovered on the computer, as were all the

5:54 PM 10  Torrent files.  They actually existed.  I believe

11  Ms. Bush's testimony was that there was no evidence that

12  the DD Torrent in particular was then used in a uTorrent

13  application to fetch the associated content.  So she's

14  saying there are no images or videos from DD.torrent.

5:55 PM 15  There would be no images in the cache history.  That just

16  simply isn't relevant to the DD.torrent.  Her testimony

17  was it just wasn't used.

18          All the other Torrents, we would submit, were

19  used to download the associated content and that content

5:55 PM 20  existed on the computer.  We have evidence that the videos

21  were viewed in the VLC player.  Both Mr. Fottrell and

22  Ms. Bush testified about that.  And the existence of the

23  thumbnail files which existed in a -- it's not the same

24  cache folder.  I think that --

5:55 PM 25          THE COURT:  There's no testimony that all of the

5:55PM 1    files were viewed, is there?

2              MR. CLAYMAN:  All of them that were videos were

3    played in VLC player.  I believe there's the marissa.zip

4    file, and there's evidence that it was unzipped and opened

5:55PM 5    and viewed.  That's the existence of the thumbnail files.

6    And there was a playtoysweetie.7Z that's a zip file.  I

7    think that was played in the VLC player.  I don't think

8    that would necessarily display anything, but that's what

9    the evidence is.  But back to Ms. Marshall's point, I

5:56PM10    think this instruction is designed to address when a

11    possession count should be charged as access with intent

12    to view.  This is talking about when you're scrolling

13    through the internet and you happen across an image and

14    suddenly that image is created in your temporary cache

5:56PM15    folder so you don't even know you possess it, it's just

16    down there in some folder on your computer that you don't

17    really know about and you keep scrolling.  That should be

18    charged as access with intent to view because you're

19    viewing it, you're not knowingly possessing what the

5:56PM20    computer just automatically creates.

21              THE COURT:  That's Mr. Story's example of looking

22    for basketballs at Academy and it pulls up 57 different

23    basketballs and you don't actually click.  Where would

24    that -- if that's the analogy -- where would that end up

5:56PM25    being found on the computer forensically 18 months later?

5:57PM 1          MR. CLAYMAN:  I don't specifically recall.

2          THE COURT:  The cache?

3          MR. CLAYMAN:  If you -- what was the analogy

4     again, exactly?

5:57PM 5          THE COURT:  Mr. Story wants to buy a basketball

6     and he goes to academy.com, types in "basketball," and it

7     pulls up 57 different types of basketballs.  Then he gets

8     distracted and doesn't ever click into any other --

9     doesn't click into any of the thumbnails that are pulled

5:57PM 10     up.

11          MR. CLAYMAN:  Right.  So with the caveat that I'm

12     not a forensic expert, my understanding is that would go

13     in a temporary internet cache folder, whereas what we are

14     talking about here is someone downloading the images from

5:57PM 15     the internet to exist on their computer.  So they existed

16     there at some point in time, which we're alleging is

17     May 14th through the 16th.  I think the point of the

18     instruction is, when you don't download them, but the

19     images nevertheless exist in your cache folder, so you

5:57PM 20     never really intended to possess them, but nevertheless

21     they are somehow stored in some remnant on your computer.

22          THE COURT:  From the defense theory of the case,

23     did Ms. Bush testify that some of the charged images were

24     only in that temporary cache file like the basketball

5:58PM 25     analogy?

5:58PM 1          MR. CLAYMAN:  If I understood her testimony, and

2     I certainly understood Mr. Fottrell's testimony to say the

3     existence of the thumbnail files in the cache folder,

4     which is separate from the internet temporary cache,

5:58PM 5     necessarily means they existed on the computer on the hard

6     drive, you know, in reality, that they existed and were

7     downloaded.  They were then removed, but we know they

8     existed because there would be thumbnail images that exist

9     and those can only exist when the corresponding file

5:58PM 10    existed at one point.

11          MR. ROBERTS:  Your Honor, the files we're talking

12    about, the thumbnails, they are only created when you

13    possess the image and you scroll to the little side and

14    you can actually view the contents of the file you

5:59PM 15    downloaded, whereas in Mr. Story's analogy -- I understand

16    you don't agree with me, but this is the testimony --

17    Mr. Story's analogy is, you never downloaded it in the

18    first place.  You are just scrolling through the internet.

19    It doesn't become your own.  You don't bring it down to

5:59PM 20    your device.  I think that's the big distinction.

21          Mr. Fottrell testified that these were brought,

22    downloaded to the device, that someone navigated to that

23    particular file, clicked on it, hit thumbnail view to view

24    the contents.  That's what created those thumbnail images.

5:59PM 25          THE COURT:  What's the harm in giving the

5:59PM 1  instruction, assuming that there would be a way to define
2  what is meant by temporary internet cache file or internet
3  temporary cache file?

4  MR. ROBERTS:  It has absolutely nothing to do
5:59PM 5  with this case, and this is a very complex kind of
6  technology case.  It adds another layer.  This does not
7  involve internet temporary cache files.

8  THE COURT:  Certainly not from the government's
9  point of view, but what did Ms. Bush testify to that?

6:00PM 10  MR. ROBERTS:  Well, your Honor, it couldn't
11  involve internet temporary cache files.  It involves
12  BitTorrent being downloaded.  It doesn't give you an
13  option to like view it on the internet and then maybe
14  download.  You only see them once you download it.  You
6:00PM 15  get the recipe; it fetches the content.  It's not like
16  you're scrolling through on the internet.  You got the
17  recipe, it goes and pulls the content.

18  THE COURT:  But what if you only had the recipe
19  card?

6:00PM 20  MR. ROBERTS:  Well, that's a straightforward
21  argument for them.  I mean, I think that's what Ms. Bush
22  was saying.  You only have the recipe card and two, so you
23  can't possess those two.  But if you give that
24  instruction, it sounds like you -- for the ones that we
6:00PM 25  have the full recipe and the cake, it confuses the issue.

6:01PM 1          THE COURT:  What is the government going to argue

2    about whether -- about which images go with the receipt

3    count and which images go with the possession count and/or

4    are you going to say they all apply to both?

6:01PM 5          MS. MARSHALL:  Well, I think we can specifically

6    say there was the one marissa image.

7          THE COURT:  Say that again.

8          MS. MARSHALL:  Sorry.  There was the one --

9    specifically, there was the one marissa image that was

6:01PM10   shown to, I think Mrs. Bush specifically.

11          MR. ROBERTS:  I don't think she saw it.  I think

12   she testified about it.

13          MS. MARSHALL:  She testified about.  That was in

14   the marissa series where she was inserting an object into

6:01PM15   her vagina.  That the one that we can show was opened, and

16   that I think Mrs. Bush agreed that it was open for

17   approximately two minutes, or two times, she said today,

18   two separate times.  That, specifically, we can show

19   possession and receipt.

6:02PM20          MR. ROBERTS:  Well, also, you have a number of

21   files.  The 14-year-old is also -- I won't repeat the rest

22   of it -- it's also in the recently viewed files.  Again,

23   that's only created by downloading the content and opening

24   it to view.  It is not a hidden file like what they are

6:02PM25   talking about, temporary internet file.  That's a system

6:02PM 1    creating that versus someone actually viewing an image in

2    thumbnail view.

3        THE COURT:  What I'm really trying to understand

4    is, no specific images were alleged in the indictment.

6:02PM 5    Both counts have the same time period.  So either you're

6    going to have to argue this image goes with receipt and

7    these images go with possession, or you're going to argue

8    that all the images that you have heard about constitute

9    both receipt and possession.

6:03PM 10        MS. MARSHALL:  Judge, in contemplating this

11    issue, we have discussed that if the Jury were to return a

12    verdict of guilty on both counts, that the government

13    would elect to dismiss the possession charge prior -- at

14    sentencing so that there is not this situation, the lesser

6:03PM 15    included situation, as the Court contemplated in the

16    e-mail last night.

17        THE COURT:  You would dismiss which one?

18        MS. MARSHALL:  The possession, Your Honor.

19        THE COURT:  Why don't you dismiss it now?

6:04PM 20        MR. ROBERTS:  Can we not wait until they come

21    back and take this up?

22        MR. GELFAND:  That is the double jeopardy issue,

23    though.

24        MR. ROBERTS:  Well, we have that accounted for.

6:04PM 25    But I think the government can clearly argue that, like in

6:04PM 1  marissa, that file was received, separately possession.

2  All the ones that were streamed were viewed.  They were

3  possessed because they were downloaded from BitTorrent,

4  from uTorrent.  The recipe, the cake, all of it, is right

6:04PM 5  there and it's being viewed.  I mean, those are two

6  separate -- you can't view the marissa through VLC player.

7  It's a zip file.  I don't think that added clarity, but I

8  intended to.

9        THE COURT:  So I asked you whether -- you said

6:05PM 10  what you would do to ameliorate it, theoretically, at

11  sentencing.  What are you going to argue to the Jury?

12        MS. MARSHALL:  I think we can argue that -- well,

13  there is the marissa and those images.  There's also the

14  TOR browser and the images that were streamed and

6:05PM 15  downloaded through there.  So there's two separate

16  programs.

17        THE COURT:  Which ones go with receipt, which

18  ones go with possession, or is it going to be your

19  argument that all 11 files were received and possessed?

6:05PM 20        MS. MARSHALL:  I think all.

21        THE COURT:  And the Jury only has to figure out

22  which ones involve, or whether there was one that involved

23  a 12-year-old?

24        MS. MARSHALL:  All, Your Honor.

6:05PM 25        THE COURT:  Same image, conviction of both

6:05 PM 1    offenses?

2            MS. MARSHALL:  Yes.

3            THE COURT:  Okay.

4            MR. GELFAND:  Our position is that that violates

6:06 PM 5    the double jeopardy clause.  And the remedy for that is

6            not wait until sentencing in the event of conviction.

7            It's not to subject the defendant to double jeopardy.

8            MR. ROBERTS:  Well, only until the Court accepts

9            the Jury's verdicts.

6:06 PM 10   THE COURT:  Well, it would be either -- it

11           wouldn't be double jeopardy until either the conviction,

12           which would be upon return of the Jury's verdict, or when

13           the Court enters judgment, which would be after

14           sentencing.  At the moment, I'm not sure.  I can't work

6:06 PM 15   through which one of those events would trigger it.  But

16           is everyone in agreement that it would be double jeopardy?

17           MR. ROBERTS:  Ultimately.  Just not at the stage

18           when it comes to be.

19           MR. CLAYMAN:  It attaches when the judgment is

6:07 PM 20   entered from Your Honor.  If the images are the same that

21           he possessed as the receipt, I think we would -- receipt

22           is probably a lesser included offense.  I think there's a

23           caveat, potentially, for the under 12 enhancement, but we

24           don't think it's worth exploring that.  So when Your Honor

6:07 PM 25   is prepared to enter judgment, we would be prepared to

6:07PM 1    just dismiss Count Two, the possession count, assuming we

2    get there.

3              MS. MARSHALL:  Your Honor, it's my understanding

4    that this is a practice that is done in the Eastern

6:07PM 5    District of Virginia or other districts, that that is how

6    it is handled.  Not that I'm saying you have to handle it

7    that way.

8              MR. GELFAND:  I was just going to say, having

9    briefly done a stint in the U.S Attorney's Office in the

6:07PM10    Eastern District of Virginia, not everything is handled

11    correctly in the Eastern District of Virginia.

12              THE COURT:  Well, we kind of went --

13              MR. GELFAND:  Could we do some research tonight

14    on the double jeopardy issue, now that we are on the same

6:08PM15    page on the issue, and we can narrow it on the timing

16    applications with that?

17              THE COURT:  Yeah.  But we're still left with this

18    cache issue.  I think, based on what I have read, that the

19    government is correct.  That cache referring -- it's even

6:08PM20    in your proposed instruction, that it's the temporary

21    cache.  It is the basketball analogy, but my

22    understanding, both experts testified that based on how it

23    was accessed based on the remnants and where they were

24    found in the unallocated space, that a download occurred.

6:09PM25    Files were -- thumbnails were created and stored.  And in

6:09PM 1    the case law that Ms. Esterbrook pointed you to, I think

2    that that distinguishes it.  *Moberg* says, "The charge of

3    possession of child pornography was based on six thumbnail

4    images found in the thumbnail database cache area of a

6:09PM 5    computer."  In other words, the evidence in *Moberg* -- this

6    is not *Moberg*, this is our summary.  The evidence in

7    *Moberg* was located exclusively in the cache file.  And in

8    that regard, the Eighth Circuit held, quote, "The relevant

9    question was whether Moberg knowingly possessed the

6:10PM 10    original files in the first instance.  At trial, the

11    government presented evidence that in order for the

12    thumbnail images to be present in the thumbnail database

13    cache, a computer user must purposely save or download a

14    file onto the computer's hard drive."  And my

6:10PM 15    understanding is that's what the evidence is here.

16             Is that not what the evidence is here?  Is the

17    evidence only that it was like our basketball image that

18    was pulled up, 57 basketballs pulled up, but no one ever

19    clicked on?

6:11PM 20             MR. GELFAND:  I think with the -- please accept

21    the caveat, I'm not a computer expert.

22             THE COURT:  Well, you've done a pretty good job

23    of faking it.

24             MR. GELFAND:  I've learned a little bit.  My

6:11PM 25    understanding is that that analysis would be image

6:11PM 1    specific.  There are files that a reasonable jury could

2    conclude were downloaded.

3            THE COURT:  Which image wouldn't apply?

4            MR. GELFAND:  I think some of the -- there was

6:11PM 5    some testimony in connection with the TOR as opposed to

6    the BitTorrent-related images.  I believe it was the

7    webcam collection, that those were found, as I understand

8    it, exclusively in thumbnail form and that is an internet

9    browser's --

6:12PM 10           THE COURT:  Were all the files' remnants found in

11    the unallocated space?

12           MR. GELFAND:  No files were found in the

13    allocated space, but I think -- please don't -- Judge, I'm

14    trying to articulate this correctly.  No files were found

6:12PM 15    in the allocated space.  The fact that files are found in

16    the unallocated space doesn't necessarily differentiate

17    whether they are cache files or non-cache files.  There

18    can be files that are full images in the unallocated

19    space.  There can be temporary cache files in the

6:12PM 20    unallocated space.  So I think what's really happening

21    here, Your Honor, is that there's a dispute between the

22    parties, and by extension, the experts -- in reverse

23    order, obviously -- as to specific images and where they

24    were from a forensic -- the phrase used was "forensic

6:13PM 25    carving."  And forensic carving is they literally -- the

6:13 PM 1    analogy explained to me is essentially it's a piece of

2    paper shred into a million pieces that a forensic tool

3    puts together.  So the Court can't just say there's

4    necessarily an image located somewhere when carving tools

6:13 PM 5    are used to basically put it back together.  So I think

6    that the elephant in the room is that it's file specific.

7    And I think that the flaw with the government's position,

8    and the problem with it is that, again, it comes back to

9    the same problem, which is that it's not like the

6:13 PM 10   indictment directs the Jury's attention to, we're only

11   talking about these files and we can have a more specific

12   concrete explanation here.

13          THE COURT:  To the extent that it's true that

14   it's image specific, then what are you suggesting that

6:13 PM 15   this -- your proposed instruction number 8, does that

16   solve our problem of the issue being image specific?

17          MR. GELFAND:  You're saying does the temporary

18   cache instruction solve it?

19          THE COURT:  You have a criticism that the problem

6:14 PM 20   here is that the issues are going to be image specific.

21   What is your proposal for how we instruct the Jury?

22          MR. GELFAND:  That instructing the Jury on this

23   issue, consistent with what we have proposed, and then the

24   Jury can base their conclusions by applying the law, which

6:14 PM 25   is accurate there, to the facts as they find them based on

6:14PM 1   the testimony at trial.  And to be crystal clear, I don't

2   anticipate that this will be a significant -- and that's

3   an understatement -- part of the defense theory in closing

4   argument.  I mean, at its core, this is a possession case.

6:15PM 5   Obviously, possession and receipt, but to borrow the

6   phrase from opening, it's a "whodunit" case.  That's what

7   the Court can expect to hear a lot of in closing argument.

8   But I think because of the nature of the forensics and

9   some of the technical issues and the image specificity, it

6:15PM 10   is important to instruct the Jury on the law here.

11         MR. ROBERTS:  But that doesn't clarify the law.

12   It actually confuses the technology and it provides

13   another layer of the law that is not applicable to this

14   case.

6:15PM 15         THE COURT:  Well, I mean, the Court has to make a

16   decision so that we can move forward.  We've given a lot

17   of thought to it.  It's a complex area.  The Court wishes

18   that it were more of an expert in this area, but it's just

19   going to have to do the best that it can.

6:16PM 20         What I find persuasive is *United States v. Flyer*,

21   which is a Ninth Circuit case from 2011, 633 F.3d 911 at

22   918.  And the Eighth Circuit, in their wisdom, tries to

23   define some of these terms.  And it explains cache files

24   as follows:  Quote, "Unallocated space is a space on a

6:16PM 25   hard drive that contains deleted data usually emptied from

6:16PM 1    the operating system's trash or recycle bin folder that
       2    cannot be seen or accessed by the user without the use of
       3    forensic software.  Such space is available to be written
       4    over to store new information.  Even if retrieved, all
6:17PM 5    that can be known about a file in unallocated space, in
       6    addition to its contents, is that it once existed on the
       7    computer's hard drive.  All other attributes, including
       8    when the file was created, accessed, or deleted by the
       9    user cannot be recovered.  Files in unallocated space
6:17PM10    differ from cache files, which are a set of files kept by
      11    a web browser to avoid having to download the same
      12    material repeatedly so that the same images can be
      13    redisplayed quickly when you go back to them.  Cache files
      14    are located in an area to which the internet browser
6:17PM15    automatically stores data to speed up future visits to the
      16    same websites.  The user does not manually save the cache
      17    files, but can access them and print, rename, or save the
      18    files elsewhere, the same thing he or she could do with
      19    any other file."
6:18PM20            So as best that I can figure, the note on use 1
      21    from the model jury instruction is referring to the
      22    computer's temporary internet cache files, which is
      23    something different.  And I agree that this cache file
      24    instruction would be appropriate in an access case or an
6:18PM25    intent to access case and not in a possession case where

6:19PM 1  there is testimony from both experts that the images were

2  retrieved from -- the remnants were identified because

3  they had been deleted and were recovered from the

4  unallocated space.

6:19PM 5          And to bring this back to the Eighth Circuit,

6  *Moberg* says that the -- speaking to the District Court in

7  this context, "The relevant question was whether Moberg

8  knowingly possessed the original files in the first

9  instance.  At trial, the government presented evidence

6:19PM 10  that, in order for the thumbnail images to be present in

11  the thumbnail database cache, a computer must purposely

12  save or download a file onto the computer's hard drive."

13          And so I read that there was evidence in *Moberg*,

14  such as there is evidence here, that the CSAM files in

6:20PM 15  question were saved or downloaded purposely by the user,

16  not simply automatically stored in the cache as a

17  background function.  And so the Court's decision will be

18  that it is not necessary to give the cache instruction

19  because it is inapplicable to the possession offense based

6:20PM 20  on the evidence before the Court.

21          So that's the Court's ruling on defendant's

22  proposed, or defendant's proffered Exhibit Number 8, which

23  is Court's Exhibit 9-D.

24          On attempt and on unanimity, Mr. Murphy explains

6:21PM 25  in proffered instruction --

6:21PM 1          MR. MURPHY:  This is defendant's 9, Your Honor.

2          THE COURT:  Defendant's 9, which I'm not finding.

3  I'll mark defendant's proffered final instruction

4  number 9.  I'll mark that as Court's Exhibit 9-E.

6:22PM 5          So some fair points are made here.  This goes to

6  the possession count.  And the Court's proposed solution

7  was to include some language.  I'm at that point in the

8  day where I have so many papers in front of me that I

9  can't find what I'm looking for.  The Court's proposed

6:23PM 10  solution was, in the possession instructions, which are

11  instructions 10-A, B, C.

12          MR. MURPHY:  Just to be clear, Your Honor, I

13  believe that at least intended for this instruction to

14  apply to both the possession and the receipt.  They are

6:23PM 15  both charged as substantive completion of each offense and

16  an attempt to complete the offense.

17          THE COURT:  Yes.  So we did that for both counts.

18  I'm sorry.  Did we not?

19          MR. MURPHY:  You did.

6:23PM 20          THE COURT:  Yeah.  So Mr. Murphy is correct.  It

21  was crafted in such a way that Counts One and Counts Two

22  in the indictment have the "and attempted to" language at

23  the end of the charging language.  And so one solution

24  here would be for the government to just say, we're not

6:24PM 25  pursuing the attempted component on the assumption that

6:24 PM 1    they won't do that, although that option is still
        2    available.  The Court has crafted instructions 9-A, B, and
        3    C and 10-A, B, and C.  And the idea, this also modifies
        4    instruction 7 where the Court explains in instruction 7
6:24 PM 5    that the defendant has been charged with two different
        6    crimes.  Count One charges, committed the crime of receipt
        7    and attempted receipt.  Count Two charges, possession and
        8    attempted possession.  So we added an explanation to the
        9    Jury that each count involves both substantive offense and
6:25 PM 10   the attempted offense.  And then when we get over to the
        11   elements instructions.  The first element has been
        12   modified to say, knowingly received or attempted to
        13   receive, knowingly possess or attempted to possess.
        14           Did we not get the parallel changes made?
6:26 PM 15           MS. ESTERBROOK:  Not on 9.  Only on 7.
        16           THE COURT:  The knowing receipt and attempted to
        17   receive, we do have that instruction in 9-A.  And then we
        18   give the model attempt instruction and the required model
        19   substantial step instruction as 9-A, B, and C.  We may
6:26 PM 20   have erred in our draft of 10-A in the first element
        21   because we didn't pick up the "and attempted," but what we
        22   have included in 10-A is this unanimity idea as between,
        23   they have to be unanimous that the same image was a
        24   prepubescent minor and that it impacted interstate
6:27 PM 25   commerce.

6:27PM 1         So, Mr. Murphy, as presently crafted and compared

2  to what you have proposed, what criticisms do you have of

3  what's on the table in Court's Exhibit 8?

4         MR. MURPHY:  Your Honor, I'll start, I want to be

6:27PM 5  very specific with this Court's final instruction

6  number 9-A, which is the elements instruction with respect

7  to the Count One, receipt, child pornography charge.  As

8  you note in the first element, it does say that Mr. Duggar

9  knowingly received or attempted to receive.  Then of

6:28PM 10  course as you noted in 9-B and 9-C, attempt and

11  substantial step are defined.  Our concern is that this,

12  as read by a juror, doesn't solve the problem that I'm

13  attempting to solve, which is that, as written, I could

14  see a juror believing, or the Jury in total, believing

6:28PM 15  that he's guilty of Count One if he either actually

16  received or attempted to receive, which could create the

17  problem where six jurors believe that he attempted to

18  receive and six jurors believe that he actually received

19  and they put their heads together and that counts as

6:28PM 20  element one being proved beyond a reasonable doubt.

21         And I don't think I need to repeat what I said

22  there because I believe that that would apply to this

23  Court's instruction 10-A with respect to Count Two, the

24  elements instruction on Count Two, which is the

6:29PM 25  possession, assuming that my understanding is that the

6:29PM 1   Court is intending to include the "or attempted to

2   possess" language somewhere within that first element.  I

3   think that that creates the same problem where a jury

4   believes that all we need to find is either attempt or

6:29PM 5   completion.  And we agree that they need only find one,

6   but we want to make very clear that all 12 of them would

7   have to agree as to whether attempt had been proven beyond

8   a reasonable doubt, or all 12 would need to agree with

9   respect to actual completion of each substantive offense.

6:29PM 10   In all honesty, with respect to our instruction number 9,

11   which this Court I believe has as 9-E, we're not

12   necessarily married to this language.  I'm trying to come

13   up with a way, we would be certainly willing to hear

14   suggestions as to how to make this perhaps more concise or

6:30PM 15   a little more clear, but that's the problem that we are

16   trying to solve, which I do believe is a problem.  And

17   this *Smith* case which was referenced, I believe at the

18   bottom of certain instructions --

19       THE COURT:  Just looking, it says, "Even if some

6:30PM 20   jurors found that he attempted to receive or possess and

21   others found he in fact received or possessed, the jury

22   unanimously found violations of 2252."

23       MR. MURPHY:  That's correct in that case, Judge,

24   but there, what was happening was, on plain error review,

6:30PM 25   the Court concluded a reversal was not warranted because

6:30PM 1    there was overwhelming evidence of both attempt and

2    successful completion of the substantive offense.  The

3    Court explained pretty clearly -- and this is a direct

4    quote from that case -- first, they note that this is not

6:31PM 5    improper duplicity, meaning this is not -- we're not

6    arguing that this count needs to be dismissed for

7    duplicity grounds.

8           THE COURT:  And you're not arguing that either?

9           MR. MURPHY:  No.  No, we're not saying that this

6:31PM10    is improperly charged.  We're just trying to avoid the

11    issue of essentially six jurors finding attempt and six

12    jurors finding completion.  And in that case -- and this

13    is a direct quote -- the Court noted, "If a count

14    permissively joins conspiracy or attempt and the

6:31PM15    substantive offense as in this case, any risk of unfair

16    duplicity to the defendant can be cured in various ways,

17    for example, by the government electing to pursue only one

18    of the alternatives charged, or by jury instructions and a

19    verdict form to protect the defendant's right to a

6:31PM20    unanimous jury."

21           So we do concede that that case, on plain error

22    review, wasn't reversed because of the overwhelming

23    evidence of guilt in that case, but pretty clearly, I

24    believe the Eighth Circuit is saying, the better practice,

6:31PM25    if this issue is spotted in time, would be to, as the

6:32 PM 1   Court noted, either elect one or the other with respect to

2   each count, or to come up with something that makes clear

3   to the Jury that they need all 12 agree on whether it's

4   attempt or successful completion.  That's all that we are

6:32 PM 5   trying to accomplish with instruction 9.

6        THE COURT:  That's fair.  Ms. Marshall, which one

7   do you want to dismiss?

8        MR. ROBERTS:  Which one do you want to plead to?

9        MS. MARSHALL:  Well, the government would argue

6:32 PM 10   that there is substantial evidence to support both here in

11   this case as well.  I think that the argument could be

12   made that, for the Torrent files that they are saying you

13   can't play, but there are the remnants or the parts of,

14   could be considered an attempted receipt whereas the ones

6:32 PM 15   that can be played can be considered a receipt.  That is

16   an argument that could be made.  I don't believe that a

17   unanimity -- I hope we don't have to say that in court --

18   instruction is needed in this case because I believe that

19   there is substantial evidence to show that he knowingly

6:33 PM 20   attempted to and did receive and also attempted to and did

21   possess child pornography.

22        THE COURT:  Then why not just instruct them they

23   have to be unanimous?

24        MS. MARSHALL:  In addition to the possession

6:33 PM 25   unanimity instruction, Your Honor?

6:33 PM 1           THE COURT:  Yeah.

2           MR. ROBERTS:  Your Honor, I have never seen any

3  case law, and I've reviewed what you're talking about in

4  the *Smith* case, saying that they have to be unanimous.  My

6:33 PM 5  understanding, and, I mean, we're subject to more, I get

6  that's not authoritative, is that they can pick and

7  choose.  I mean, there's no unanimity required.

8           THE COURT:  In other words, you agree with Judge

9  Logan, is that what you're saying, or are you telling me

6:34 PM 10  something else?

11           MR. ROBERTS:  I agree, yes, Your Honor.  Try not

12  to disagree.

13           THE COURT:  And what persuades you about Judge

14  Logan's reasoning that six can find the substantive

6:34 PM 15  offense and six can find attempt?

16           MR. ROBERTS:  Because the same statute can be

17  violated either way.  It's not a separate charge.  It's

18  the same statute.  It's no different than saying the

19  interstate nexus can be violated in these multiple ways.

6:34 PM 20  There's no unanimity required, requirement there.  It's

21  simply it had to effect interstate and foreign commerce in

22  one of these three options.  Same thing here.

23           THE COURT:  Just on the receipt and attempted

24  receipt count, what's your response, Mr. Murphy?

6:34 PM 25           MR. MURPHY:  With respect to just the receipt and

6:34PM 1    attempted receipt?

2                THE COURT:  Yeah.

3                MR. MURPHY:  I'm not sure I follow.

4                THE COURT:  Does there need to be a unanimity,

6:35PM 5    any further -- does there need to be a unanimity provision

6    for the receipt count?

7                MR. MURPHY:  Yes, I do believe so.  It think that

8    *Smith* is clear.  It's saying that the government should

9    either elect or the jury instructions and verdict form

6:35PM 10   should protect the defendant's right to a unanimous jury.

11   And this is -- to Mr. Roberts' point about interstate

12   commerce, that's a correct statement of the law as I

13   understand it with respect to -- specific to this case, I

14   believe that they have to satisfy the interstate commerce

6:35PM 15   element by saying either that the use of the internet was

16   involved or that the computer traveled in interstate

17   commerce.  That element doesn't need a unanimity

18   instruction.

19                The problem here is that, what's happening is

6:35PM 20   that each of these substantive counts, both Count One and

21   Count Two, are charged as both attempting to do these

22   things and actually doing these things.  And I really do

23   believe that *Smith* stands strongly in favor of a verdict

24   form and a jury instruction, perhaps, for a unanimity

6:36PM 25   instruction.  I believe it will solve the problem in some

6:36PM 1    form because a defendant has a right to a unanimous

2    verdict, meaning that this isn't about an interstate

3    commerce element.  This is about whether 12 reasonable

4    jurors have been convinced beyond a reasonable doubt all

6:36PM 5    as to the same theory of the prosecution.  Not that some

6    were persuaded by one theory of the prosecution or the

7    other.

8           THE COURT:  We're going to have to give a little

9    bit more look to this issue.  I don't know that I've had a

6:36PM 10   chance to look at these other cases that you cite.  I know

11   that I haven't had a chance to discuss it with

12   Ms. Esterbrook.  *Smith* says what *Smith* says, but it was on

13   plain error review.  I've looked at a lot of these cases

14   lately so I won't swear to this, but was *Smith* the one

6:37PM 15   where there was a confession?  Or I just recall from *Smith*

16   that the evidence wasn't as contested as it is here.

17          So unless the government has an easy-button

18   solution, which would either be to pursue only one or the

19   other, or to agree on unanimity, I'm going to have to

6:37PM 20   table my ruling on this and look at it and get back to

21   you.

22          MS. MARSHALL:  May we table this, Your Honor, and

23   discuss and we'll let you know if it changes sooner rather

24   than later?

6:38PM 25          THE COURT:  Yes.  So to kind of go back, tell me

6:38PM 1   what all is wrong with 10, Mr. Murphy, from your point of

2   view.

3         MR. MURPHY:   10-A, is that the question, Your

4   Honor?  I think you noted correctly that just with respect

6:38PM 5   to the first element, that it would be better to insert --

6         THE COURT:   "Or attempted."

7         MR. MURPHY:   Correct.  Correct.  And then with

8   respect to the reading of the elements instructions

9   themselves, and of course the following attempt and

6:38PM 10  substantial attempt definitions, those in and of

11  themselves aren't problematic from our point of view.  It

12  would just be, we believe that these concerns that the

13  Court is raising would be solved by inclusion of

14  defendant's proposed instruction number 9 or something.

6:39PM 15  It's again --

16        THE COURT:   I think your proposed instruction

17  number 9 is too convoluted, and I appreciate you saying

18  you are not married to that.  What could we add -- so what

19  you're down to is you have the same problem with 10 as you

6:39PM 20  do with 9?

21        MR. MURPHY:   Correct.

22        THE COURT:   So how could we encapsulate -- I

23  mean, we could just instruct the Jury that they had to be

24  unanimous versus the substantive offense or the attempt.

6:39PM 25  That could be a sentence or two.

6:39PM 1    MR. MURPHY:  Certainly.  And whether that's

2 included within the verdict instruction or something --

3 or, excuse me -- the elements instruction or somewhere

4 else, to be honest.  But literally, Your Honor, something

6:39PM 5 as simple as, "All 12 of you need to agree with respect to

6 Count One."

7    THE COURT:  So we could deal with it in an

8 interrogatory.

9    MR. MURPHY:  I would think that probably a

6:40PM10 special interrogatory would work.  Don't you?

11    MR. GELFAND:  I think that a sentence in the

12 instruction coupled with a special interrogatory would

13 solve that problem.

14    THE COURT:  It's one or the other.

6:40PM15    MR. GELFAND:  I think a special interrogatory

16 could work.

17    THE COURT:  So we're back to the same issue.  Why

18 don't you all discuss that.

19    MS. MARSHALL:  Yes, Your Honor.

6:40PM20    THE COURT:  Ya'll could only pursue one of them,

21 or you could agree, or you could make a more substantive

22 response to Mr. Murphy's position.

23    MS. MARSHALL:  Yes, Your Honor.

24    THE COURT:  No one really responded to my e-mail.

6:41PM25 What am I to make of that?

6:41PM 1            MR. MURPHY:  If I may, Your Honor.  I think you

2    spotted an important issue, to be perfectly candid.  It's

3    come up somewhat in our conversation tonight that the

4    indictment and each count doesn't specify specific images

6:41PM 5    or movie files or anything like that.  And so this

6    *Muhlenbruch*, if I'm pronouncing it correctly.  For the

7    court reporter, it's M-U-H-L-E-N-B-R-U-C-H.  In this case,

8    it notes that that was a case involving a charge of both

9    receipt of child pornography and possession of child

6:41PM 10    pornography.  And the Court noted that, after explaining

11    why, that this -- where the convictions are based on the

12    same facts and images, it made no attempt to point the

13    jury with respect to certain images to certain counts,

14    that these were -- convictions for both counts were

6:42PM 15    violative of the double jeopardy clause.  The test, as the

16    Court states it is -- and this is a quote from the case --

17    "The test to be applied to determine whether there are two

18    offenses or only one is whether each provision requires

19    proof of a fact which the other one does not."

6:42PM 20            And, Your Honor, in your e-mail, I think you

21    issue-spotted something, which is that normally possession

22    would be a lesser included of the receipt count.  Here,

23    because of the government's attempt to get the heightened

24    punishment for images involving a minor --

6:42PM 25            THE COURT:  We wind up with the weird situation

6:42PM 1   where the lesser included has more elements than the --

2           MR. MURPHY:  Correct.  Correct.  And it's an

3   interesting point, because, obviously, to hit that element

4   with respect to the possession count, there would need to

6:43PM 5   be a unanimous finding that all the jurors would agree

6   that one of these, one specific image, at least, or more

7   than one image or movie involves a minor under the age of

8   12.  But that's, again, because there isn't any specific

9   images or movies tethered to Count One or Count Two, it

6:43PM10   creates the problem where, let's say, for example, just to

11   keep it simple, that the Jury finds that one image is the

12   problem in this case, and it's a minor under the age of

13   12.  That's going to be sufficient to establish guilt

14   beyond a reasonable doubt under Count One or Two, which

6:43PM15   falls squarely within the problem spotted in this

16   *Muhlenbruch* case, which is there's really only one

17   offense, because there's one fact that matters,

18   essentially, and that's going to result in two

19   convictions.  And it's a violation of the double jeopardy

6:44PM20   clause.

21           MR. ROBERTS:  At what point does it become a

22   violation of the double jeopardy clause?  And our position

23   is it comes at sentencing when you pronounce judgment.  We

24   expressed that we intend to move to dismiss the lesser

6:44PM25   included if he's convicted of both counts.  We can try to

6:44PM 1   provide -- we can do some research or something like that

2   and provide the Court some direction there to make sure

3   we're right.

4          THE COURT:  And ya'll are wanting to do that as

6:44PM 5   well?

6          MR. GELFAND:  We do, I think.  But what we want

7   to laser focus, narrow in on, perhaps among other issues,

8   is that -- because the law is abundantly clear that double

9   jeopardy attaches at the point when the jury is sworn.

6:44PM 10  And so the question is when the violation of double

11  jeopardy, when properly and timely raised with the Court,

12  requires a remedy.  And so that's -- if I phrased that

13  somewhat articulately, maybe there's a better way to

14  phrase it.  I think that's the million dollar question.

6:45PM 15         THE COURT:  Good luck finding that.  So we're

16  going to have to table this issue as well.  I do

17  appreciate the government recognizing that it is a

18  legitimate double jeopardy issue and you just have to let

19  us know.  The Court -- we can narrow it down that the

6:45PM 20  Court needs to decide at what point it attaches.

21         MS. MARSHALL:  Yes, Your Honor.

22         THE COURT:  So let's just recap what our homework

23  is.  I think we ruled on almost everything.  We have this

24  double jeopardy issue that ya'll are going to get back

6:46PM 25  with us on.  And the government is going to confer about

6:46PM 1    whether there's -- your position on how to deal with the

2    substantive and attempted versions of Counts One and Two

3    and let us know something.

4           MS. MARSHALL:  Yes, Your Honor.

6:46PM 5           THE COURT:  Any other homework?

6           MR. GELFAND:  I don't believe so.

7           MS. ESTERBROOK:  Instruction 7, the violative

8    part about whether --

9           MR. GELFAND:  We are requesting inclusion of

6:46PM 10   that.

11           MR. MURPHY:  Correct.

12           MS. ESTERBROOK:  Included?

13           MR. MURPHY:  Yes, please.

14           THE COURT:  Off the record.

6:46PM 15           (In-Chambers Hearing Concluded)

16           (Proceedings recessed at 6:47 p.m.)

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

I, Paula K. Barden, CCR, RPR, RMR, Federal Official Court Reporter, in and for the United States District Court for the Western District of Arkansas, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 15th day of January 2022.


_____
PAULA K. BARDEN, CCR, RPR, RMR #700
Federal Official Court Reporter
Western District of Arkansas

