```
 1              IN THE UNITED STATES DISTRICT COURT
                  WESTERN DISTRICT OF ARKANSAS
 2                    FAYETTEVILLE DIVISION

 3

 4   UNITED STATES OF AMERICA                    PLAINTIFF

 5   v.                 CASE NO. 5:21-CR-50014

 6   JOSHUA JAMES DUGGAR                         DEFENDANT

 7   _____

 8

 9                       JURY TRIAL

10                     VOLUME 7 OF 8

11       BEFORE THE HONORABLE TIMOTHY L. BROOKS

12                  DECEMBER 8, 2021

13               FAYETTEVILLE, ARKANSAS

14   _____

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    A P P E A R A N C E S

 2

 3    FOR THE PLAINTIFF:

 4    MR. DUSTIN ROBERTS
      MS. CARLY MARSHALL
 5    United States Attorney's Office
      414 Parker Avenue
 6    Fort Smith, Arkansas 72901
      (479) 783-5125
 7    dustin.roberts@usdoj.gov
      carly.marshall@usdoj.gov
 8

 9    Also Present:   Special Agent Howard Aycock

10

11    FOR THE DEFENDANT:

12    MR. JUSTIN K. GELFAND
      Margulis Gelfand
13    7700 Bonhomme Avenue, Suite 750
      St. Louis, Missouri 63105
14    (314) 390-0234
      justin@margulisgelfand.com
15
      MR. TRAVIS W. STORY
16    Story Law Firm
      2603 Main Drive, Suite 6
17    Fayetteville, Arkansas 72704
      (479) 443-3700
18    travis@storylawfirm.com

19

20

21

22

23

24

25
```

```
 1                           I N D E X

 2                                                    Page

 3   In-Chambers Hearing, Jury Instructions           1498

 4   Instructions Read by the Court                   1509

 5   Closing Argument by Ms. Marshall                 1523

 6   Closing Argument by Mr. Gelfand                  1542

 7   Closing Argument by Mr. Roberts                  1578

 8   Jury Retires to Deliberate                       1598

 9   Alternate Juror Number 6 Dismissed               1600

10   In-Chambers Hearing with Reporter                1603

11   Note from Jury                                   1612

12   Government's Exhibit 22 Played for Jury          1617

13   Jury Request for Calendar                        1648

14   Jury Retires to Continue Deliberations           1649

15   Jury Dismissed for the Day                       1653

16   Reporter's Certificate                           1655

17

18

19

20

21

22

23

24

25
```

```
 1                    E X H I B I T S

 2                                              Received

 3    Court's Exhibit 7-E      E-mail Traffic w/counsel    1499

 4    Court's Exhibit 10       Annotated Jury Instructions 1499

 5    Court's Exhibit 11       Final Set of Jury           1499
                               Instructions
 6
      Court's Exhibit 12       Records Produced in         1603
 7                             In-Chambers Hearing
                               Re: Reporter Issue
 8
      Court's Exhibit 13       Note From Jury              1612
 9                             Re: Government Exhibit 22

10    Court's Exhibit 14       Note to Jury Re:
                               Calendar Request            1650
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

8:10AM 1          (In-Chambers Hearing)

2          (Court's Exhibits 7-E, 10 and 11 marked and

3           received)

4          THE COURT:  We are on the record outside the

8:27AM 5   presence of the Jury and actually in chambers.  This will

6   be a supplement conference to the final jury instruction

7   conference that we held last night.  The record will

8   reflect the homework assignments, so to speak, that

9   everyone had when we broke last night.

8:28AM 10          Subsequent to our conference last night, the

11   Court received an e-mail from Ms. Marshall indicating that

12   it was the government's intent to withdraw their request

13   for instructions related to attempt to commit receipt and

14   possession, and so that resolved a lot of the issues that

8:29AM 15   we had been talking about.

16          Just to confirm, Mr. Clayman, that is correct?

17          MR. CLAYMAN:  Yes, that's correct, Your Honor.

18          THE COURT:  So by withdrawing the attempt

19   components of the two counts, the Court was basically just

8:29AM 20   able to go back to all of the various instructions that

21   that impacted, including instruction 7, instructions in 9

22   and instructions in 10 and remove all of the attempt

23   components.  There were some other revisions that we had

24   discussed both immediately before or during our jury

8:29AM 25   instruction conference last night and a couple of

8:29AM 1    decisions that the Court made after the jury instruction
2    conference last night and notified counsel.  And all of
3    these changes that I am discussing were captured in what I
4    call the Court's final-final annotated jury instructions
8:30AM 5    that was e-mailed to counsel last night.
6           On behalf of the government, do you have an
7    objection that the final-final annotated jury instructions
8    accurately capture all of the parties' positions and the
9    Court's rulings?
8:30AM 10          MR. CLAYMAN:  Yes, Your Honor.  We agree and have
11   no objection with the final-final version.
12          THE COURT:  Mr. Murphy?
13          MR. MURPHY:  Your Honor, same position.  We have
14   no issues and I believe this reflects everything that was
8:30AM 15   discussed.  I don't want to cause any trouble at all, but
16   I just noticed one "and" that I believe with respect to
17   page 12 on the elements of Count Two.  I just noticed that
18   the "and" is after the second element.  It may want to
19   just be moved after the third.  That's me having OCD.
8:31AM 20   This is on page 12 of the final-final instructions.  It's
21   quite trivial.
22          THE COURT:  Okay.  I'm looking at the set that
23   I'm going to read from, and when I read it, I'm not going
24   to say that.  And after the third, I'm going to insert
8:31AM 25   "and."

8:31AM 1              MR. MURPHY:  That's perfectly fine.  I think

2    that's the only issue.

3              THE COURT:  You good with that, Mr. Clayman?

4              MR. CLAYMAN:  No objection.

8:31AM 5              THE COURT:  And so then after we sent that out,

6    we have taken all the annotations off and we've provided

7    counsel this morning, I think, with the jury version.

8    Each of the jurors will have their own copy of the

9    instructions.  That version has been marked as Court's

8:32AM10   Exhibit 11.  And it's identical except for the annotations

11   are missing.  And we also provided last night counsel with

12   the verdict forms for Count One and Two.

13             Any objections to the verdict forms, Mr. Clayman?

14             MR. CLAYMAN:  No objection from the government.

8:32AM15             THE COURT:  Mr. Murphy?

16             MR. MURPHY:  No objection from the defense, Your

17   Honor.

18             THE COURT:  So last night, we made a record about

19   an additional issue that had popped up as the Court was

8:33AM20   working through its jury instructions.  That issue was

21   flagged as described in Court's Exhibit 7-C from last

22   night.  This has to do with kind of an interesting,

23   somewhat novel issue in some respects about the fact that

24   Counts One and Two as indicted and as prosecuted and as

8:33AM25   tried in this case reflect the same group of images and

8:33AM 1   the same alleged period of offense conduct without any

2   specific delineation of particular images or particular

3   dates to either the receipt or the possession count.  So

4   the issue, after it was teed up last night, was whether

8:34AM 5   that constitutes a double jeopardy clause problem.  And in

6   our discussion on the record last night, the government

7   conceded that there was an issue, but there was left for

8   discussion about the timing of when the double jeopardy

9   problem, to the extent that there is one, would occur.

8:34AM10  And one of the homework assignments was the parties were

11  going to do further research to confirm the government's

12  thought that they would simply move to dismiss the

13  possession count at sentencing, obviously, to the extent

14  that there were convictions on both counts at trial, which

8:35AM15  no one is obviously presupposing, but we are planning for

16  it because given the case law, I think that we should have

17  a game plan.  And that game plan involves the government's

18  agreement or stipulation that they, in the event of a

19  conviction on both counts, the government intends and they

8:35AM20  will move to dismiss the possession issue at sentencing.

21        Is that correct?

22        MR. CLAYMAN:  Yes, Your Honor.  Assuming there

23  are convictions returned on both counts, we would move to

24  dismiss the possession count at the time of sentencing.

8:36AM25        THE COURT:  So I did want to mark some additional

8:36AM 1    e-mail traffic between the parties last night collectively

2    as Court's Exhibit 7-E.  The first was an e-mail from the

3    Court at 10:41 discussing the *Ball v. United States* case,

4    and the second page is Mr. Clayman's e-mail response

8:36AM 5    stating the government's position, which was consistent

6    with what they had stated on the record last night.

7          And then I also received an e-mail that I've

8    included here from Mr. Murphy stating that the defendant

9    agrees with the outline that we had discussed on the

8:37AM10    record last night.  And the e-mail speaks for itself, but

11    basically, there's a couple of caveats that follow *Ball*

12    and *Muhlenbruch*.

13          Do your e-mails from last night again accurately

14    capture your position at this time, Mr. Clayman?

8:37AM15          MR. CLAYMAN:  Yes, Your Honor.

16          THE COURT:  Mr. Murphy?

17          MR. MURPHY:  Yes, Your Honor.

18          THE COURT:  So I'm going to make some findings

19    here.  I am going to find that the following law applies.

8:37AM20    This is the law that the Court would be using to pursue

21    the course of action that we are sketching out here.

22          The Supreme Court in *Ball v. United States* held

23    that the defendant's convictions for both receipt and

24    possession of the same firearm -- that was a Section 922

8:38AM25    case -- they held that convictions for the same firearm

8:38AM 1   violated the double jeopardy clause.  The Court held,

2   quote, "While the government may seek a multiple count

3   indictment against a felon for violations of 922(h) and

4   1202(a) involving the same weapon, where a single act

8:38AM 5   establishes the receipt and possession, the accused may

6   not suffer two convictions or sentences on that

7   indictment." And here's kind of the pertinent part for us.

8            The Court said, and I'm still quoting, "If upon

9   the trial the District Judge is satisfied that there is

8:38AM 10  sufficient proof to go to the jury on both counts, the

11  Court should instruct the jury as to the elements of each

12  offense.  Then should the jury return guilty verdicts on

13  each count, the District Judge should enter judgment on

14  only one of the statutory offenses."  And that's *Ball* at

8:39AM 15  page 865.

16           In the Eighth Circuit, the Court observes that in

17  *United States v. Carpenter*, the Court held, quote, "While

18  a defendant may be tried for lesser and greater offenses

19  during the same trial, a judgment of conviction and

8:39AM 20  punishment for both would violate the double jeopardy

21  clause.  Because Carpenter was convicted and sentenced on

22  both counts, we must remand to the District Court so it

23  can vacate both Carpenter's judgment of conviction and his

24  sentence for the lesser offense."  And that is *Carpenter*,

8:39AM 25  page 747.

8:39AM 1            The Court is also relying upon *United States v.*

2   *Muhlenbruch*, Eighth Circuit case.  This case established

3   possession of child pornography is a lesser included

4   offense to receipt, and therefore, defendant's convictions

8:40AM 5   for both receipt and possession of child pornography based

6   on the same facts and images violate the double jeopardy

7   clause.

8            Similarly, the Court would note the case of

9   *United States v. Zaveski*, another Eighth Circuit case from

8:40AM 10   2016.  The important quote there would be, "Possession of

11   child pornography is a lesser included offense to receipt

12   of child pornography.  Convictions for both possession and

13   receipt of the same image violate the double jeopardy

14   clause," close quote.

8:40AM 15            The Court in *Muhlenbruch* concluded this line of

16   issues by saying, quote, "Following *Ball*, we find it

17   appropriate to permit the District Court, where sentencing

18   responsibility resides, to exercise its discretion to

19   vacate one of the underlying convictions and to resentence

8:41AM 20   *Muhlenbruch*."  The pinpoint cite there is *Muhlenbruch* at

21   page 1004.

22            The Court is also relying on *United States v.*

23   *Robertson*, Eighth Circuit 2014.  Quoting from this case,

24   "The jury found Robertson guilty of both possession and

8:41AM 25   receipt of child pornography.  At sentencing, the

8:41AM 1    government requested and the Court granted a motion to

2    dismiss the possession count as a lesser included offense

3    of the receipt count."  That's from *Robertson* at page 629.

4          The Court also notes another Eighth Circuit

8:41AM 5    decision from 2016.  It's *United States v. Harvey*.  The

6    holding there was that the defendant's convictions for

7    both receipt and possession of child pornography that were

8    based on the same act or transaction violated the double

9    jeopardy clause.  The pertinent quote would be, quote, "At

8:42AM 10   oral argument, the United States conceded that both of

11   Harvey's convictions violate the double jeopardy clause,

12   thus we reverse and remand to the District Court to

13   exercise its discretion to vacate one of the underlying

14   convictions and to resentence Harvey," close quote.  And

8:42AM 15   that's from *Harvey* at page 591.  And I would note that

16   many of these cases are quoting *Ball*.

17         Finally, *United States v. Richardson*, this is a

18   District Court decision out of the Northern District of

19   Illinois from July of 2018.  The cite is 2018 WL 3533321.

8:43AM 20   Quote, "Even if the images and/or videos underlying Counts

21   One and Two of the indictment were the same, the

22   government may submit to the jury both a receipt and

23   possession count based on the same conduct, but request

24   that the Court vacate or stay the possession conviction if

8:43AM 25   there is a receipt conviction for duplicate conduct.  In

8:43AM 1    other words, the government is entitled to charge the

2    defendant under two different theories for the same

3    conduct and determine after the jury has rendered its

4    verdict on which count defendant should be sentenced."

8:43AM 5    And that was a quote from the District Court's case in

6    *Richardson* at page three.

7            So all of this law informs the Court that it has

8    an opportunity to address this issue and map out a pathway

9    for dealing with it before the case is submitted to the

8:44AM 10   Jury so that everyone understands what would happen.  And

11   the Court believes that doing this will avoid the need of

12   that issue having to be brought to the Eighth Circuit's

13   attention and then remanded and all of that.

14           So against this background of cases, the

8:44AM 15   following three things would happen.  First of all, the

16   government has affirmed its agreement just a few moments

17   ago on the record here that, should there be convictions

18   on both counts, it will move to dismiss the possession

19   count at sentencing.

8:44AM 20           Secondly, and actually before that, in the event

21   of a conviction on both counts, the Court would

22   immediately stay the Jury's conviction on the possession

23   count pending the government's motion to dismiss, which is

24   contemplated being made at sentencing.

8:45AM 25           And then third, the Court will state its intent

8:45AM 1  here on the record that it will grant the government's

2  motion to dismiss the possession count at sentencing.

3  And, again, all of this assumes that the Jury would even

4  find a way to convict the defendant, but I do believe it's

8:45AM 5  important to have all of this game plan in place at this

6  stage of the proceedings.

7       Is the government in agreement with the Court's

8  intended course of action?

9       MR. CLAYMAN:  Yes, Your Honor.

8:46AM 10      THE COURT:  Is the defendant in agreement with

11  the Court's intended course of action?

12      MR. MURPHY:  Yes, Your Honor.

13      THE COURT:  All right.  Anything else we need to

14  discuss?

8:46AM 15      MR. CLAYMAN:  Nothing from the government.

16      MR. MURPHY:  Not from the defense, Your Honor.

17      THE COURT:  All right.  Exactly 8:45.

18       (In-Chambers Conference Concluded)

19      THE COURT:  Bring the jurors up, please.

9:04AM 20      (Jury in at 9:04 a.m.)

21      THE COURT:  Good morning, everyone.  As I

22  explained yesterday afternoon, all of the evidence is now

23  received.  And this morning, I will be instructing you as

24  to the law and then we will be receiving arguments from

9:09AM 25  the attorneys representing the parties.  The Court's

9:09AM 1   instructions will be immediately followed by the
       2   government's initial argument.  Each side is being given
       3   about one hour to make their final arguments, but since
       4   the government has the burden of proof, they get to make
9:09AM 5   an opening argument and then a second argument after the
       6   defense has made their closing argument.  So we will be
       7   taking a break, our morning break, after the Court has
       8   read the jury instructions and after the government's
       9   opening closing argument.
9:09AM 10          Members of the Jury, the instructions I gave you
      11   at the beginning of the trial and during the trial remain
      12   in effect.  I now give you some additional instructions.
      13   You must, of course, continue to follow the instructions I
      14   gave you earlier, as well as those I give you now.  You
9:10AM 15  must not single out some instructions and ignore others
      16   because all are important.  And this is true even though
      17   some of those I gave you at the beginning of the trial are
      18   not repeated here.
      19          The instructions that I am about to give you now,
9:10AM 20  as well as those I gave you earlier, are in writing and
      21   will be available to you in the jury room.  I emphasize,
      22   however, that this does not mean they are more important
      23   than my earlier instructions.  Again, all instructions,
      24   whenever given and whether in writing or not, must be
9:10AM 25  followed.

9:10AM 1          Now, when you sat down in your chairs just now,

2     you should have found your own personal copy of the jury

3     instructions.  You will be permitted to take this version

4     with you to the jury room, and so to the extent that you

9:11AM 5     desire to take notes on there, you are welcome to do it.

6     It is your copy of the instructions to do with as you

7     like.

8          Instruction number 2:  It is your duty to find

9     from the evidence what the facts are.  You will then apply

9:11AM 10     the law as I give it to you to those facts.  You must

11     follow my instructions on the law, even if you thought the

12     law was different or even if you think it should be

13     different.

14          Do not allow sympathy or prejudice to influence

9:11AM 15     you.  The law demands of you a just verdict, unaffected by

16     anything except the evidence, your common sense, and the

17     law as I give it to you.

18          Now, I have mentioned this word evidence.  The

19     evidence in this case consists of the testimony of the

9:12AM 20     witnesses, the documents and other things that have been

21     received as exhibits, and the facts that have been

22     stipulated, that is, formally agreed to by the parties.

23          You may use reason and common sense to draw

24     deductions or conclusions from facts which have been

9:12AM 25     established by the evidence in the case.  But certain

9:12AM 1  things are not evidence and I will list those things again

2  for you now.

3       Number one:  The statements, arguments,

4  questions, and comments by the lawyers representing the

9:13AM 5  parties in this case are not evidence.

6       Number two:  Any objections that have been made

7  and that you have heard are not evidence.  Lawyers have a

8  right to object when they believe something is improper.

9  You should not be influenced by the making of an

9:13AM10  objection.  If I sustain an objection to a question, you

11  must ignore the question and you must not try to guess at

12  what the answer might have been.

13       Number three:  Any testimony that I struck from

14  the record, or that I told you to disregard, is not

9:13AM15  evidence and must not be considered.

16       Number four:  Anything that you saw or heard

17  about this case from outside the four walls of this

18  courtroom is not evidence.

19       Finally, if you were instructed during the course

9:14AM20  of the trial that some evidence was received for a limited

21  purpose only, you must follow that instruction.

22       Instruction number 4:  Now, you will remember

23  that what we call a summary exhibit was admitted into

24  evidence.  I believe that's Government's Exhibit 85.

9:14AM25  That's in evidence and you may use this summary as

9:14AM 1   evidence.  However, it is for you to decide how much

2   weight, if any, that you will give to the summary, and in

3   making that decision, you should consider all of the

4   testimony you heard about the way in which it was

9:14AM 5   prepared.

6          A little bit differently than that, you will also

7   recall that you have viewed or that it was provided for

8   your viewing certain what we call demonstrative aids and

9   they were shown to you, and I explained to you when they

9:15AM 10  were shown that those demonstrative aids were available to

11  help explain, for example, expert testimony that was

12  presented and the records and other underlying evidence in

13  the case.  Those demonstrative aids are and were used for

14  convenience.  They are not themselves evidence or proof of

9:15AM 15  any facts.

16         Number 5:  So in deciding what the facts are in

17  this case, you may have to decide what testimony you

18  believe as well as what testimony you do not believe.  You

19  may believe all of what a witness said or you may believe

9:16AM 20  only part of what a witness said, or it may be that you

21  don't believe anything that a witness said.  And in

22  deciding what testimony to believe, you should consider

23  the witness's intelligence, the opportunity the witness

24  had to have seen or heard the things testified about, the

9:16AM 25  witness's memory, any motives the witness may have for

9:16AM 1   testifying a certain way, the manner of the witness while

2   testifying, whether that witness said something different

3   at an earlier time, the general reasonableness of the

4   testimony, and the extent to which the testimony is

9:16AM 5   consistent with any other evidence that you do believe.

6            In deciding whether or not to believe a witness,

7   you should keep in mind that people sometimes hear or see

8   things differently or sometimes forget things.  You need

9   to consider, therefore, whether a contradiction is an

9:17AM 10  innocent misrecollection or a lapse of memory or an

11  intentional falsehood.  And that may depend on whether it

12  has to do with an important fact or only a small detail.

13           Instruction number 6:  You have heard testimony

14  from persons that have been described as experts.  Persons

9:17AM 15  who, by their knowledge, skill, training, education or

16  experience, have become expert in some field may state

17  their opinions in court on matters in that field and may

18  also state the reasons for their opinions.  But expert

19  testimony should be considered by you just like any other

9:18AM 20  testimony.  You may accept it or reject it, and you may

21  give it as much weight as you think it deserves,

22  considering that witness's education and experience, the

23  soundness of the reasons given for the opinion, the

24  acceptability of the methods used, and all of the other

9:18AM 25  evidence in the case.

9:18AM 1          Instruction number 7:  The indictment in this

2     case charges Mr. Duggar with two different crimes.  Count

3     One charges that Mr. Duggar committed the crime of receipt

4     of child pornography in violation of federal law.  Count

9:19AM 5     Two charges that Mr. Duggar committed the crime of

6     possession of child pornography in violation of federal

7     law.  Mr. Duggar has pleaded not guilty to these charges.

8          And the indictment is simply the document that

9     formally charges Mr. Duggar with the crimes for which he

9:19AM 10     is on trial here.  The indictment itself, though, is not

11     evidence.  Thus, at the beginning of the trial, I

12     instructed you that you must presume Mr. Duggar to be

13     innocent.  And in this manner, he began the trial with a

14     clean slate with no evidence against him.  You are

9:20AM 15     instructed that the presumption of innocence alone is

16     sufficient to find Mr. Duggar not guilty and that

17     presumption can only be overcome if the government proved,

18     during the trial, beyond a reasonable doubt, each element

19     of a crime charged.

9:20AM 20          Keep in mind that each count charges a separate

21     crime.  You must consider each count separately and return

22     a verdict for each count.  Please also remember that only

23     Mr. Duggar, and not anyone else, is on trial here and that

24     Mr. Duggar is only on trial for the two crimes charged,

9:21AM 25     and not for anything else.

9:21AM 1          There is no burden on Mr. Duggar to prove that he

2     is innocent.  Instead, the burden of proof remains on the

3     government throughout the trial.  Accordingly, the fact

4     that Mr. Duggar did not testify must not be considered by

9:21AM 5     you in any way, or even discussed in arriving at your

6     verdicts.

7          Number 8:  Now, you did hear evidence that the

8     defendant may have previously committed another offense of

9     child molestation, but the defendant is not charged with

9:21AM10     this other offense.  So you may consider this evidence

11     only if you unanimously find that it is more likely true

12     than not true.  You decide that by considering all of the

13     evidence and deciding what evidence is more believable.

14     This is a lower standard of proof than proof beyond a

9:22AM15     reasonable doubt.  If you find that this offense has not

16     been proved, you must disregard it.  If you find that this

17     offense has been proved, you may consider it to help you

18     decide any matter to which it is relevant.  You should

19     give it the weight and value you believe it is entitled to

9:22AM20     receive.  You may consider the evidence of such other acts

21     of child molestation for its tendency, if any, to show the

22     defendant's propensity to engage in child molestation as

23     well as its tendency, if any, to consider whether the

24     defendant committed the acts charged in the indictment and

9:23AM25     to determine the defendant's intent.  But remember, the

9:23AM 1  defendant is only on trial for the crimes charged here and

2  you may not convict a person simply because you might

3  believe that he committed similar acts in the past.

4        Number 9:  The crime of receipt of child

9:23AM 5  pornography as charged in Count One of the indictment has

6  three elements, which are:

7        First, that between on or about May 14, 2019, and

8  on or about May 16, 2019, Mr. Duggar knowingly received

9  visual depictions of child pornography.

9:24AM10        Second, that Mr. Duggar knew that the visual

11  depictions were of a minor engaging in sexually explicit

12  conduct.

13        And third, that the visual depictions had been

14  mailed, shipped, or transported by any means, including by

9:24AM15  computer, in interstate or foreign commerce.

16        If all of these elements have been proved beyond

17  a reasonable doubt as to Mr. Duggar, then you must find

18  Mr. Duggar guilty of the crime charged under Count One,

19  but otherwise, you must find Mr. Duggar not guilty of

9:25AM20  Count One.

21        Instruction number 10:  The crime of possession

22  of child pornography, as charged here in Count Two of the

23  indictment, has four elements, which are:

24        First, that between on or about -- I'm sorry.

9:25AM25  Let me start over.  First, that between on or about

9:25AM 1    May 14, 2019, and on or about May 16, 2019, Mr. Duggar

2    knowingly possessed computer files on an HP All-in-One

3    Desktop computer that contained multiple visual depictions

4    of child pornography.

9:26AM 5            Second, that Mr. Duggar knew that the visual

6    depictions were of a minor engaging in sexually explicit

7    conduct.

8            Third, that Mr. Duggar knew that such items

9    contained child pornography which involved a prepubescent

9:26AM 10   minor or a minor who had not attained the age of 12 years

11   of age.

12           And fourth, that the HP computer, or the computer

13   files containing the visual depictions, had been shipped

14   or transported using any means or facility of interstate

9:26AM 15   or foreign commerce, or affected interstate or foreign

16   commerce by any means, including by computer.

17           In this case, you have heard evidence of more

18   than one visual depiction involved in the offense, so you

19   must agree unanimously that at least one specific visual

9:27AM 20   depiction possessed by Mr. Duggar involved a minor under

21   the age of 12 years old and that this specific visual

22   depiction was possessed using or affecting interstate or

23   foreign commerce by any means.

24           If all of these elements have been proved beyond

9:27AM 25   a reasonable doubt as to Mr. Duggar, then you must find

9:27AM 1   Mr. Duggar guilty of the crime charged under Count Two,

2   however, otherwise, you must find Mr. Duggar not guilty of

3   this crime under Count Two.

4         Instruction 11A, these are some definitions of

9:28AM 5   terms.  Some of the terms used in the elements of the

6   offenses and elsewhere in these instructions are defined,

7   or further explained as follows:

8         First, the term visual depiction.  As used in

9   these instructions, the term visual depiction includes any

9:28AM 10   photograph, film, video, picture, or computer or

11   computer-generated image or picture, whether made or

12   produced by electronic, mechanical, or other means.

13         Second, the term child pornography.  The phrase

14   child pornography means any visual depiction of a minor

9:29AM 15   engaging in sexually explicit conduct where the minor was

16   engaged in the sexually explicit conduct during the

17   production of the depiction.

18         Third, the term minor means any person under the

19   age of 18 years.

9:29AM 20         Number four, the term sexually explicit conduct.

21   This means actual or simulated sexual intercourse,

22   including genital to genital, oral to genital, anal to

23   genital, or oral/anal, whether between persons of the same

24   or opposite sex.

9:30AM 25         It also means masturbation, sadistic or

9:30AM  1    masochistic abuse, or lascivious exhibition of the

        2    genitals or pubic area of any person.

        3             So the fifth term defined here is lascivious.

        4    Whether a visual depiction of the anus, genitals, or pubic

9:30AM  5    area of any person constitutes a lascivious exhibition

        6    requires a consideration of the overall content of the

        7    material.  You may consider such factors as, one, whether

        8    the focal point of the picture is on the minor's anus,

        9    genitals, or pubic area.  Two, whether the setting of the

9:31AM 10    picture is sexually suggestive, that is, in a place or

       11    pose generally associated with sexual activity.  Three,

       12    whether the minor is depicted in an unnatural pose or in

       13    an inappropriate attire considering the age of the minor.

       14    Four, whether the minor is fully or partially clothed or

9:31AM 15    nude.  Five, whether the picture suggests sexual coyness

       16    or a willingness to engage in sexual activity.  Six,

       17    whether the picture is intended or designed to elicit a

       18    sexual response in the viewer.  Seven, whether the picture

       19    portrays the minor as a sexual object.  And eight, the

9:32AM 20    captions on the pictures.

       21             It is for you to decide the weight or lack of

       22    weight to be given to any of these factors.  And to be

       23    clear, a picture need not involve all of these factors to

       24    constitute a lascivious exhibition of the genitals or

9:32AM 25    pubic area.

9:32AM 1          Number six, the term computer.  The term computer

2     as used in this instruction means an electronic, magnetic,

3     optical, electrochemical, or other high-speed data

4     processing device performing logical, arithmetic, or

9:33AM 5     storage functions, and includes any data storage facility

6     or communications facility directly related to or

7     operating in conjunction with such a device.  But such

8     term does not include an automated typewriter or

9     typesetter or a portable handheld calculator or some other

9:33AM10     similar device.

11          Number 7, the term interstate or foreign

12     commerce.  The phrase interstate commerce means commerce

13     between any combination of states, territories, and

14     possessions of the United States, including the District

9:34AM15     of Columbia.  The phrase foreign commerce means commerce

16     between any state, territory, or possession of the United

17     States and a foreign country.

18          The term commerce includes, among other things,

19     travel, trade, transportation, and communication.  Images

9:34AM20     transmitted or received over the internet have moved in

21     interstate or foreign commerce.  It is for you to

22     determine, however, if the HP computer had been shipped or

23     transported using any means or facility of interstate or

24     foreign commerce or if the computer files containing

9:34AM25     visual depictions had been transmitted or received over

9:35AM 1    the internet.

2               Instruction 11B is an explanation of some

3    additional terminology.  Number one, proof of intent or

4    knowledge.  Intent or knowledge may be proved like

9:35AM 5    anything else.  You may consider any statements made and

6    acts done by the defendant and all the facts and

7    circumstances in evidence which may aid in a determination

8    of the defendant's knowledge or intent.  You may, but are

9    not required to, infer that a person intends the natural

9:35AM10    and probable consequences of acts knowingly done or

11    knowingly omitted.

12               Number two, the term possession.  The law

13    recognizes several kinds of possession.  A person may have

14    actual possession or constructive possession.  A person

9:36AM15    may have sole or joint possession.  A person who knowingly

16    has direct physical control over a thing at a given time

17    is then in actual possession of it.

18               A person who, although not in actual possession,

19    has both the power and the intention at a given time to

9:36AM20    exercise dominion or control over a thing, either directly

21    or through another person or persons, is then in

22    constructive possession of it.

23               If one person alone has actual or constructive

24    possession of a thing, possession is sole.  If two or more

9:37AM25    persons share actual or constructive possession of a

9:37AM 1  thing, possession is joint.

2          Whenever the word possession has been used in
3  these instructions, it includes actual as well as
4  constructive possession and also sole as well as joint
9:37AM 5  possession.

6          Number 12, reasonable doubt is doubt that is
7  based upon reason and common sense and not doubt based on
8  speculation.  A reasonable doubt may arise from careful
9  and impartial consideration of all the evidence or from a
9:38AM10  lack of evidence.  Proof beyond a reasonable doubt is
11  proof of such a convincing character that a reasonable
12  person, after careful consideration, would not hesitate to
13  rely and act upon that proof in life's most important
14  decisions.  Proof beyond a reasonable doubt is proof that
9:38AM15  leaves you firmly convinced of the defendant's guilt.
16  Proof beyond a reasonable doubt does not mean proof beyond
17  all possible doubt.

18          Now, instruction number 13 is what I call the
19  deliberation instruction, and this is basically a list of
9:39AM20  how you will go about the deliberation process.  And that
21  being the case, I'm going to save this instruction until
22  just before I send you to deliberations and that will be
23  after we have heard all of the closing arguments.  And
24  when I go over the deliberation instruction with you, I
9:39AM25  will also be reviewing with you the verdict forms and

9:39AM  1  explaining what you would do with the verdict forms in

2  terms of completing the information.

3          At this time, we will receive the initial closing

4  argument from the government.

9:40AM  5          MS. MARSHALL:  Thank you, Your Honor.  Is this

6  really a "whodunit?"  His car lot.  His office.  His

7  computer.  His family on the desktop background.  His

8  password.  The evidence in this case points to Joshua

9  Duggar.  The evidence in this case shows that Joshua

9:41AM 10  Duggar was the person behind the HP computer who was

11  receiving, viewing, possessing, and deleting the images

12  and videos of child sexual abuse material that you saw

13  during the course of this trial.

14          You all heard a lot of information in this trial

9:41AM 15  the past week.  You have heard a lot of terminology.

16  You've heard a lot of opinions.  You've heard a lot about

17  forensics.  But I'm going to take you back to last week,

18  the last time you and I got to speak to each other during

19  voir dire, and ya'll made some promises during voir dire.

9:41AM 20  You promised that you would judge the credibility of

21  witnesses.  You promised that you wouldn't leave your

22  common sense at the door.  And you promised that you would

23  take the facts that were given to you from that witness

24  stand and apply them to the law that the Judge gives you,

9:42AM 25  and that he just gave you.

9:42AM 1          As Mr. Roberts told you in opening, this is a

2    case based off of facts, based off of evidence, and based

3    off of common sense.  You first heard in this trial from

4    Detective Amber Kalmer from the Little Rock Police

9:42AM 5    Department.  Detective Kalmer talked about her role in the

6    ICAC Task Force.  She talked about the different kinds of

7    investigations that she's involved with, and one of those

8    types of investigations was peer-to-peer investigations.

9    She told you about peer-to-peer investigations, how one of

9:42AM 10   those is BitTorrent.  She talked to you about what

11   BitTorrent is.  It's a free program that anyone can

12   download, widely available, but that law enforcement does

13   these investigations because BitTorrent is a very common

14   way for people to go out and get child pornography.  So

9:43AM 15   law enforcement has created this program that they use,

16   and that program goes out, when it's connected to the

17   BitTorrent application, it goes out searching for known

18   images of child pornography.  Known because of the hash

19   value, right?  That unique identifier.

9:43AM 20        Detective Kalmer talked to you about the training

21   that she had received in doing this and how on May 14th,

22   2019, that she was running that program.  She talked to

23   you about how it's a one-to-one connection, right?  So

24   when you connect to another user, what you get from them

9:43AM 25   are what they have on their computer, one-to-one.  She

9:43AM 1    showed you the logs from May 14th, 2019.  She showed you
       2    that she made a connection with the computer with the IP
       3    address 167.224.196.113.  She told you that she was able
       4    to do a download, mov_0216.  It was a video that involved
9:44AM 5    two prepubescent minors, and one of them was engaged in
       6    sexual intercourse.  And you saw clips of that video.  I
       7    want to show you a couple of still shots from that video
       8    that you saw that day.
       9            (images displayed)
9:44AM10            MS. MARSHALL:  You saw Detective Kalmer's logs
      11    from the next day, May 15th, 2019.  She talked about that
      12    she made a connection again that next day with that same
      13    IP address.  That she had a download, she was able to
      14    obtain approximately 65 images from that other user with
9:45AM15    that IP address.  And you saw those images from the
      16    marissa series, she said.  I'm going to show you those
      17    images here again.
      18            (images displayed)
      19            MS. MARSHALL:  Detective Kalmer testified that
9:45AM20    she viewed those images.  She confirmed that they were
      21    child pornography.  That she saw that the IP address
      22    geolocated to the Northwest Arkansas area.  And so what
      23    did she do?  She reached out to Special Agent Faulkner
      24    with Homeland Security here in Fayetteville.  He agreed to
9:45AM25    take the case.  She sent him what she had and he took the

9:45AM 1    case from there.  Special Agent Faulkner talked to you
     2    about his experience in law enforcement.  He had been a
     3    Special Agent for approximately, since 2009.  He's a
     4    Senior Special Agent here in the Fayetteville office.  He
9:46AM 5    talked about being on the response, the SWAT team.  He
     6    talked about his involvement with all of the cases from
     7    the ICAC here.  He talked about receiving a lead from
     8    Detective Kalmer and how he sent that federal summons to
     9    OzarksGo so he could figure out, who is that IP address
9:46AM10    associated with.  He testified that he sent the summons
    11    and then he waited for a little bit and he hadn't received
    12    anything back, so he reached out, figured out that they
    13    had sent it to the wrong place and so he got it from them.
    14            He talked about that when they got that address,
9:46AM15    they went to that address.  Turned out to be a residence.
    16    And that when they got there, they knew something is not
    17    right.  They didn't execute that warrant, but what did
    18    they do?  The defense talked to you a lot about following
    19    the trail of evidence, right?  Follow the trail.  Where
9:47AM20    does it go?  That's what they did.  They followed the
    21    trail.  They realized that the outdated information from
    22    OzarksGo didn't tell them that where that IP address was
    23    located was on the plot next to that residence.  So on
    24    November 8th, 2019, Homeland Security executed the federal
9:47AM25    search warrant there at that location, Wholesale

9:47AM 1  Motorcars, the IP subscriber from that location of Joshua

2  Duggar.

3        Special Agent Faulkner testified regarding the

4  protocols in search warrants.  When they get there, they

9:47AM 5  don't say anything about child pornography.  They told

6  them that they were there to seize digital evidence.  He

7  talked about the fact that they did this search warrant

8  with a soft approach, meaning they didn't come out with

9  guns up.  That they came out, nothing on their jackets

9:48AM 10  signifying child pornography.  It was a soft approach.

11  And you heard the words of Joshua Duggar himself through

12  Special Agent Faulkner from November the 8th, 2019.  He

13  testified that Mr. Duggar agreed to speak to them, so they

14  went to Special Agent Aycock's vehicle.  That they were

9:48AM 15  getting ready to do the recording to start the interview,

16  and that Mr. Duggar turned to them and said, "What is this

17  about, has somebody been downloading child pornography?"

18        Now, let's think about that.  The agents are

19  there at a business.  They told him they are executing a

9:48AM 20  search warrant on his business, a car lot.  No one has

21  mentioned child pornography.  The only words they

22  mentioned is digital contraband.  And where does

23  Mr. Duggar's thoughts go?  What does he first think of?

24  What does he ask them?  Who is the first one to bring up

9:49AM 25  child pornography?  Joshua Duggar.

9:49AM 1            Think about what else you heard from him from his

2       interview.  He's familiar with Torrent, peer-to-peer.

3       He's familiar with the TOR browser.  And listen again to

4       Joshua Duggar's own words.

9:49AM 5            (Audio played as follows:)

6            JOSH DUGGAR:  I'm not denying guilt, but I'm not

7       saying that I'm -- you know, I mean, as far as anything

8       goes, I don't want to be -- I don't want to say the wrong

9       thing.

9:49AM 10       AGENT FAULKNER:  Right.  At the end of the day, you

11      need to protect yourself.

12           JOSH DUGGAR:  Yeah, I don't want to -- I mean, I

13      don't want to -- I don't want to say that I'm guilty or

14      not.  I'm just not saying, you know, on search -- finding,

9:49AM 15      accessing inappropriate content at some point, at any

16      point in my life.

17           (End of Audio Clip)

18           MS. MARSHALL:  You heard other important evidence

19      from Special Agent Faulkner.  He talked to you about the

9:49AM 20      goals in their investigation, locate and seize devices.

21      Locate and seize devices with child pornography.  Find and

22      locate devices with peer-to-peer programs.  And find and

23      locate devices to show who was at the car lot and who was

24      behind the computer.  A methodical process that they do in

9:50AM 25      every case to locate relevant evidence.

9:50AM 1          Special Agent Faulkner told you that through the

2  investigation that they were able to achieve that fourth

3  goal with other people.  Now, the defense talked in

4  opening, mentioned some names.  But the only testimony

9:50AM 5  that you heard from those names was through Special Agent

6  Gerald Faulkner.  And what did he tell you about those

7  people?  Randall Berry.  Randall Berry was on the car lot

8  the day that the search warrant was executed, but his

9  phone was cleared.  And the records, the employment

9:50AM 10  records that are introduced into evidence that you will

11  have, show that Randall Berry did not start working at

12  Wholesale Motorcars until after the dates in question.

13          William Mize.  Special Agent Faulkner told you

14  his phone was also cleared.  Caleb Williams.  Special

9:51AM 15  Agent Faulkner told you that their investigation showed

16  that Caleb Williams wasn't even in the state during the

17  dates in question.

18          You also heard from Special Agent Jeff Pryor.  He

19  talked to you about the evidence relating to goal one,

9:51AM 20  right?  Locate and seize devices.  He talked to you about

21  that process and what they seized during that search

22  warrant.  The devices that they seized included the HP

23  computer, the MacBook Pro, and the iPhone from the

24  defendant.

9:51AM 25          You heard from computer forensic analyst Marshall

9:51AM 1   Kennedy.  He testified that he had been hired due to a

2   program, the HERO program.  That he had started working

3   for Homeland Security in 2017, so just approximately two

4   years before this investigation.  He walked you through

9:52AM 5   his job of making forensic images, exact copies of the

6   devices that are seized.  He talked to you about why

7   that's important, preserving the evidence.

8           He talked to you about the analysis that he did

9   on the seized devices.  He told you that he found child

9:52AM10   pornography on the HP computer behind the Linux partition.

11   And he made conclusions based off of his two years,

12   approximately, of experience and knowledge in forensic

13   examinations.

14           But because details matter, a secondary analysis

9:52AM15   was done by Director James Fottrell from the High

16   Technology Investigative Unit for the Department of

17   Justice in Washington D.C.  Director Fottrell has not only

18   been working in this field for approximately 30 years, but

19   he testified that it's part of his job to teach other

9:53AM20   forensic analysts, examiners, how to do their job.  And

21   what did Director Fottrell tell you?  Well, because

22   details matter, Director Fottrell spent a lot of time

23   walking ya'll through the evidence, walking you through

24   the forensics, through the details, through the ins and

9:53AM25   outs of these days at issue.  And he showed you directly

9:53AM 1    from the devices in the forms of photographs, in the forms

2    of forensic evidence, in the forms of messages from the

3    defendant himself, because details matter.  So let's look

4    at those details.

9:53AM 5          This is Government's Exhibit 85, the timeline

6    that we have talked about.  Let's start with May 11th,

7    2019.  May 11th, 2019, 5:47 p.m.  We see that the Linux

8    installation program is downloaded to that HP desktop

9    computer.  That computer that's in Josh Duggar's office at

9:54AM 10   his car lot with his family there in the background and

11   that who you learned the password to that HP computer was

12   JoshuaJJD.

13         Eleven minutes later, we see that there's a

14   picture taken there at the car lot, Joshua Duggar's phone.

9:54AM 15   His car lot, his office, his computer, his password, his

16   phone.  Turn our attention to the next day at issue, May

17   13th, 2019.  What do we see on that date?  We see at

18   1:52 p.m. that the dell_one user is set up on the Linux

19   partition.  Director Fottrell showed you what that would

9:55AM 20   look like.  The dell_one user with a password of Intel

21   1988.  Now, where did we see Intel 1988 before?  From Josh

22   Duggar's notes and from his e-mails.  Evidence showed that

23   he had been using this password, or some variation of it,

24   for approximately at least five years before 2019.  He was

9:55AM 25   comfortable with that password.  He knew that password

9:55AM 1  because he had used it over and over and over again.  We

2  also heard from Director Fottrell -- and I think that

3  Ms. Bush also testified to this -- that whoever set up

4  this partition had to be physically present that day,

9:55AM 5  May 13th, to set up that partition because they had to

6  plug that thumb drive in.  You can't plug that thumb drive

7  in remotely.  You have to be on the car lot to plug the

8  thumb drive into the computer to set up that partition.

9          And who was at the car lot that day?  Eleven

9:56AM 10  minutes later, we see something else that both Director

11  Fottrell and Ms. Bush agree on.  The TOR browser system

12  installation and that bookmarks were created on the Linux

13  partition; Hidden Wiki and the Onion link directory.  Now,

14  Ladies and Gentlemen, why do you create a bookmark?

9:56AM 15  Whether it's physically putting a bookmark in a book or

16  doing it on a web browser, why do you do that?  Because

17  you want to go back to it.  You want to have easy access

18  for the next time.  Does that sound like a hacker who

19  wants to go in one time, get something, delete it, and

9:57AM 20  move on?  Or does that sound like somebody who puts in a

21  password that they know and that they use and then they

22  create bookmarks so that they can go back to it and visit

23  it again.

24          3:06 p.m., picture, Josh Duggar's phone at the

9:57AM 25  car lot.  His car lot, his office, his computer, his

9:57AM 1   password, his phone.  What about May 14th, 2019?  What do
2   we see that day?  4:14 p.m., picture at the car lot from
3   Josh Duggar's phone.  4:20 p.m., there's the picture.  You
4   see the HP computer background at the bottom of the
9:57AM 5   picture.  And you see a reflection of a person with a hat
6   on on that screen.  Whose reflection is that?  Who does
7   that point to being at the car lot that day?  Not only do
8   we have this picture, but we have messages from Josh
9   Duggar himself.  4:49 p.m., "Got stuck here and still not
9:58AM 10   free yet.  I'm going to aim for tomorrow just after
11   lunch."  Then just nine minutes later, at 4:58 p.m., we
12   have activity again behind the Linux partition, the Candle
13   bookmark is created.  And just seven minutes after that,
14   the webcam-collection-prevs.7z is downloaded through the
9:58AM 15   TOR browser.
16          5:11 p.m., the webcam collection is viewed.
17   Director Fottrell stated that the contents of that were
18   extracted to the desktop, that you had to go into that
19   folder, and that it would show in thumbnail view, that it
9:59AM 20   required human intervention in order to do that.
21          5:28 p.m., mov_0214 Torrent downloaded on the
22   Linux partition.  5:38 p.m., mov_0216 Torrent downloaded
23   on the Linux partition.  And 5:42 p.m., Detective Kalmer
24   is able to download this movie from the defendant's IP
9:59AM 25   address and able to view it.  She saw it.  You saw it.  It

9:59AM 1   was on the defendant's computer.

2          Six minutes after that download was complete,

3   Joshua Duggar sends a text.  "I have your Versa down here

4   for Carlin, by the way."  Where?  At my car lot.  "Here"

10:00AM 5   is at my car lot.  Where is Joshua Duggar?  He is at his

6   car lot where that HP computer is, where that movie file

7   had been sent through the BitTorrent network to Detective

8   Amber Kalmer.  That is what the evidence shows.

9          8:35 p.m., we see Joshua Duggar with that hat on,

10:00AM10   that same hat we saw earlier in the day right before the

11   activity on the TOR browser.  May 15th, 2019, 11:15 a.m.

12   "I'm at my car lot now."  11:35 a.m., 20 minutes later,

13   14yogirlsuckandfuck.fov.torrent is downloaded on the Linux

14   partition.  The Linux partition on the HP computer in Josh

10:01AM15   Duggar's office at his car lot.  11:37 a.m.,

16   test.avi.torrent is downloaded to the Linux partition.

17   11:41 a.m., pussypounded.mpg.torrent downloaded on the

18   Linux partition.  11:50 a.m., we see the thumbnails

19   created on the Linux partition in the large folder.  It's

10:01AM20   Government's Exhibit 34.  How do we get those thumbnails?

21   Someone gets the material, opens it, sees what it is, what

22   they have, what they possess.  That's what Director

23   Fottrell testified to.

24          You all saw the storyboards of that.  He talked

10:01AM25   about that he had seen the thumbnail images and he went

10:01AM 1  out and got the CP that's associated with that hash value.

2  And ya'll saw the storyboards associated with those

3  videos.  You also saw those hash values where?  In the VLC

4  player, the recently viewed videos.  The recently viewed

10:02AM 5  videos from behind the Linux partition with the

6  defendant's password on his computer, in his office, in

7  his car lot.  I'm going to show you the 14-year-old that

8  you saw.

9          (image displayed)

10:02AM 10         MS. MARSHALL:  Later that day at 5:08 p.m., "I'm

11  here at the car lot."  Who is here at the car lot?  Josh

12  Duggar.  That's what his messages say.  5:22 p.m.,

13  playtoysweetie.7z.torrent is downloaded.  5:25, DD is

14  downloaded.  5:30, DD.1.  5:32, asi se mama linda.  5:41,

10:03AM 15  marissa.zip.torrent is downloaded.  And at 5:58, it is

16  unzipped and it's viewed.  You saw the images, the marissa

17  images.  And I would submit to you that the testimony

18  showed that this is a prepubescent minor.  The evidence

19  shows she is a prepubescent minor.  I'm going to show you

10:03AM 20  the thumbnails from those images.

21         (images displayed)

22         MS. MARSHALL:  I would submit that the bottom

23  left image shows sexually explicit conduct, a minor

24  engaged in sexual intercourse with an adult male.  A minor

10:04AM 25  under the age of 12, a prepubescent minor as that evidence

10:04AM 1  shows.  I would submit to you that that is an image that

2  you can consider.  That's from Exhibit 35.

3       6:51 p.m., a photo of a sticky note at the car

4  lot taken from Josh Duggar's phone.  May 15th, 2019.  Who

10:04AM 5  is there before, during, and after child sexual abuse

6  material is viewed and downloaded?  What does the evidence

7  show who was there?  Joshua Duggar is there.  His car lot,

8  his office, his computer, his password, his phone, his

9  messages.  Joshua Duggar's.  May 16th, 2019, 11:21 a.m.,

10:04AM 10  pedomom.wmv.torrent downloaded to the Linux partition.

11  11:31 a.m., a thumbnail is created of pedomom.

12  11:35 a.m., two minutes later, a picture of a sticky note

13  taken by Josh Duggar's phone at his car lot, two minutes

14  later.

10:05AM 15       Let's go to June 22, 2019.  That's the next time

16  that we have evidence of activity behind the partition.

17  What do we see behind that partition?  We saw Government's

18  Exhibit 30, the Aguilar 4runner document.  Appears to be a

19  business related document as ya'll saw.  It's a document

10:05AM 20  on his computer, behind a partition, with a password he

21  has used for years, with his name on the document.  And a

22  little over an hour later, we see that Josh's phone, the

23  text, he texts someone putting himself at the car lot.

24  And we see him at the car lot later that day.

10:06AM 25       Ladies and Gentlemen, who is at the car lot every

10:06AM 1    time that partition is accessed?  Who is at the car lot
2    every time child pornography is received, possessed, and
3    viewed?  The evidence shows that Josh Duggar is at that
4    car lot every single time.  In opening, the defense talked
10:06AM 5    about Josh Duggar and the fact that he was homeschooled
6    and maybe he wouldn't have the knowledge for these
7    technological matters.  But is that the testimony we
8    heard?  Think about who you heard from.  Clint Branham and
9    Jim Holt, and think about what they said.  Clint Branham
10:07AM10    told you that he knew Josh Duggar.  He had known him for a
11    while and he considered him to be a power user.  Power
12    user meaning that people could probably come to him and
13    ask him questions because he had knowledge in computers.
14    Think about the conversation that they testified that they
10:07AM15    had with Josh Duggar.  They were talking about network
16    security, ways to bypass it.  Network security like
17    Covenant Eyes.  What did we see on Josh Duggar's devices?
18    Covenant Eyes.  Think about that conversation.
19          In looking at the elements of these offenses that
10:07AM20    the Judge read to you in the jury instructions, the
21    evidence shows beyond a reasonable doubt that we have
22    proven these elements of these offenses.  But let's go
23    through these elements together.  Element one of the
24    receipt count, that between on or about May 14th, 2019,
10:08AM25    and on or about May 16th, 2019, Mr. Duggar knowingly

10:08AM 1    received visual depictions of child pornography.  What is
2    the evidence that we have to that?  We have the use of the
3    Torrent program.  The use of the TOR browser.  His
4    knowledge that he talked about of those.  And his repeated
10:08AM 5    downloads those three days through those programs.  It
6    shows his knowledge.
7            The second element, that he knew the visual
8    depictions were of a minor engaging in sexually explicit
9    conduct.  You saw those images.  You saw those videos.
10:08AM10    Some of the titles even say it.  Those are videos and
11    images of children engaged in sexually explicit conduct.
12    That element is proven.
13            And third, that the visual depictions had been
14    moved, so they had been mailed, shipped, transported in
10:09AM15    interstate or foreign commerce, including by computer.
16    Remember that instruction that the Judge read to you that
17    the internet is a means of interstate commerce.  Remember
18    the testimony that the TOR browser, the BitTorrent
19    program, they are internet connected, right?
10:09AM20    Peer-to-peer, getting something from someone else.  The
21    TOR browser, the web browser.  It's the internet.  The
22    evidence shows that this element has been met.
23            Let's go to Count Two, the possession charge.
24    The first element in Count Two, the defendant knowingly
10:09AM25    possessed the computer files.  How do we show that?

10:09AM 1   Because we show that he possessed them and we can show

2   that he viewed those images, right?  The testimony was

3   that the thumbnails showed that he viewed those images.

4   The VLC player.  The recently streamed videos shows that

10:10AM 5   he viewed those.  He viewed them.  He possessed them.  He

6   knew that he had them.

7           Count Two, the minors.  Again, the evidence shows

8   that that element has been proven.  We talked about the

9   under the age of 12.  We talked about an image for you to

10:10AM10   consider, if you all want to consider that image, that

11   that minor is under the age of 12.  She's prepubescent.

12   The evidence shows that that element has been met.

13           And the fourth element, that the HP computer or

14   the computer files containing the visual depictions had

10:10AM15   been shipped or transported by any means in interstate or

16   foreign commerce.  Think about the testimony that you

17   heard from Special Agent Pryor.  He talked about this HP

18   computer and that there's a trade inscription on the

19   bottom.  That trade inscription says, "made in China."

10:11AM20   It's made in China.  Mr. Duggar had it here in Arkansas.

21   I submit that the evidence shows that it traveled in

22   interstate and foreign commerce and that element is met.

23   You can also consider the internet.  Remember we talked

24   about the Torrent, the TOR browser, the internet.  The

10:11AM25   evidence shows that that element has been met.

10:11AM 1          Ladies and Gentlemen, I think that the defense is

2    probably going to come up here and tell you that we just

3    don't know who is responsible for receiving and possessing

4    these images.  We just can't know.  But is that really the

10:11AM 5    case?  Does the evidence show that this is a hacking case?

6    Does the evidence show that this is a remote access case?

7    Remember the evidence about remote access being in the

8    Wi-Fi?  Is that really what this evidence shows?  Or does

9    the evidence show that Joshua Duggar was behind that

10:12AM10    computer receiving, possessing, viewing these images and

11    videos of child pornography.

12          Details matter, Ladies and Gentlemen.  The car

13    lot, the security system that you could see in those

14    pictures that appeared to be working.  The lack of other

10:12AM15    employees on the car lot at the time.  Mr. Duggar's use

16    and knowledge of Torrent programs and the TOR browser.

17    His statement to law enforcement.  His password on the

18    Linux partition that contained the child pornography that

19    he had used over and over again for half a decade.

10:13AM20    Details matter.  The pictures, the texts, the locations.

21    They all matter.  Details matter.  You can't rely on

22    possibilities in this case.  The details show the facts,

23    the evidence, the common sense shows beyond a reasonable

24    doubt that Joshua Duggar was the person behind that HP

10:13AM25    computer on his car lot, in his office, with his password

10:13AM 1    in his location there, that he is the person responsible

2    for receiving and possessing the child pornography.

3            The defense is going to argue their case and then

4    Mr. Roberts will have a chance to get up and respond.  And

10:13AM 5    at the end of that, we are going to ask you to hold

6    Mr. Duggar accountable and find him guilty for receiving

7    and possessing those sexually explicit images of children.

8            Thank you, Your Honor.

9            THE COURT:  Thank you, Ms. Marshall.  Members of

10:14AM 10   the Jury, this is the most logical time to take our

11   morning recess, but since we haven't been going very long,

12   I'm going to make it a little bit shorter if it's okay

13   with you.  We will have a 15-minute recess and we will

14   call for you promptly at 10:30.  This will also be the

10:14AM 15   last time that I will need to remind you about the recess

16   instruction, which obviously provides that it's not time

17   yet to start discussing the case or deliberating with your

18   fellow jurors.  I have not submitted the case to you, yet.

19   But I will after we have heard all the closing arguments,

10:14AM 20   but not yet.  So please don't discuss the facts of the

21   case.  Obviously, don't let anyone approach you to try to

22   talk to you about the case, and if someone were to try to

23   do that, I would ask that you report that to a court

24   security officer.

10:15AM 25           Would everyone please stand while the Jury is in

10:15AM 1   recess?

2          (Jury out at 10:15 a.m.)

3          THE COURT:  You may be seated, but maintain your

4   seats while we wait for the Jury to clear the elevator

10:16AM 5   lobby.  We are in recess until 10:30.

6          (Recess taken from 10:15 a.m. to 10:35 a.m.)

7          (Jury in at 10:35 a.m.)

8          THE COURT:  Mr. Gelfand, you may proceed when

9   you're ready.

10:35AM10          MR. GELFAND:  Thank you.  Good morning, Ladies

11   and Gentlemen.  What the Judge said to you this morning

12   when we gathered here is so fundamentally important.  The

13   defendant in any criminal case, Josh Duggar in this case,

14   has no burden of proving anything.  Now, what that means,

10:35AM15   Members of the Jury, is that all of the evidence has to

16   come from the prosecution.  And when there are reasonable

17   doubts raised by this evidence, questions raised by this

18   evidence, they must dispel those reasonable doubts, each

19   of them.  They must dispel those doubts, not one of them,

10:36AM20   not 10 of them, not 50 of them.  But every reasonable

21   doubt that remains in your mind at the end of this case

22   has to somehow disappear unanimously.

23          Now, the Judge told you what proof beyond a

24   reasonable doubt means.  He instructed you on what that

10:36AM25   standard is and just how high it is.  And I want to

10:36AM 1  highlight two sections of that for you, because it

2  underlies what jury service, what the role of jury service

3  is really about.

4       First of all, what the Judge told you -- if you

10:36AM 5  can put it up, Mr. Story -- is that a reasonable doubt may

6  arise from careful and impartial consideration of all the

7  evidence or from a lack of evidence.  And then the Court

8  told you something critical.  That proof beyond a

9  reasonable doubt is proof of such a convincing character

10:37AM10 that a reasonable person, after careful consideration,

11 would not hesitate to rely and act upon that proof in

12 life's most important decisions.

13      So as you consider this case when you go back to

14 that jury room, think about that for a second.  Life's

10:37AM15 most important decisions.  Whether to let a child go under

16 the knife for a serious operation.  That's the gravity

17 that we're talking about here.  I want to say something to

18 you that's very important to me.  That is that each one of

19 you has the power to say no if a single reasonable doubt

10:38AM20 remains in your mind at the end of this case.  Each one of

21 you has the right and the power and the responsibility to

22 have the courage to say no.

23      So I want to talk about the many reasonable

24 doubts that we have seen in this case.  I told you at the

10:38AM25 beginning of this trial in no uncertain terms what this

10:38AM 1   case was about and what this case was not about.  I told

2   you that we would follow the forensic trail.  That in a

3   computer crimes case, as Michele Bush explained to you,

4   this is a field of trying to reconstruct the crime scene,

10:38AM 5   so to speak.  Maybe there's a better way to think about

6   it, but the idea is this, as you heard.  Computer

7   forensics is as close to DNA as you get in a case like

8   this.  It's a science.  There's a trail of evidence.  You

9   don't guess.  You don't make business decisions.  You

10:39AM 10   follow the evidence no matter where it goes, wherever it

11   leads.  I told you that's what we would be doing in this

12   case together.

13            And I want to start with something that Ms. Bush

14   explained to you in no uncertain terms.  I want to start

10:39AM 15   by talking about remote access.  The reason why is there's

16   a lot more complexity to this case, and we're going to

17   talk about that over the course of today.  But at the end

18   of the day, realize one fundamental premise with the

19   government's case, Members of the Jury.  They have put

10:39AM 20   themselves in a corner.  They have committed to you to

21   proving beyond a reasonable doubt that Josh Duggar, first

22   of all, did this, but second of all, had to physically be

23   behind the keyboard.  Realize, Members of the Jury, the

24   prosecution's entire case is predicated on the premise

10:40AM 25   that somebody had to physically be behind the keyboard of

10:40AM 1  this HP computer on the three days that matter,

2  March 14th, March 15th, and March 16th of 2019.  And if

3  that's not true, the prosecution's entire case crumbles

4  like a house of cards.  And it's not true.  So let's talk

10:40AM 5  about what we saw over the course of this trial.

6  Realize, Members of the Jury, there's a lot that

7  the experts, Michele Bush and James Fottrell, disagree on,

8  and we're going to talk about that.  But there's actually

9  one thing that they agreed on.  And that one thing is the

10:40AM 10  most glaring reasonable doubt that can end your

11  deliberations right at the start.  And that is this.  That

12  both experts agree that the possibility of remote access

13  is real.  That it's a possibility.  Where they disagree is

14  whether it's a probability.  But Mr. Fottrell admitted on

10:41AM 15  cross examination that even he acknowledges it's a

16  possibility.  It's a possibility that they can't dispel

17  and that they haven't dispelled.

18  Members of the Jury, what Michele Bush told you

19  based on following the actual computer forensics in this

10:41AM 20  case is that it's not only a possibility, it's a

21  probability.  And she gave you six reasons why.  Not by

22  guessing.  Not by speculating.  Not by opining just

23  because she wants to.  She told you point-blank, she

24  investigates a lot of cases where she does similar

10:42AM 25  analysis and is able to rule out remote access.  But she

10:42AM 1    wasn't able to do it here.  And more importantly, she told

2    you where the forensic trail actually leads.  So let's

3    talk about those six reasons.

4           First, UPnP, Universal Plug and Play.  Here's why

10:42AM 5    this matters.  What you learned over the course of this

6    trial is that there is something called UPnP.

7    Mr. Fottrell, as you may recall, rewinding the clock to

8    last week, when I asked him initially, would UPnP make a

9    network like this more vulnerable?  He readily conceded it

10:42AM10    would, but didn't look to see whether UPnP was enabled.

11    Ms. Bush walked us through the actual forensic trail and

12    the evidence is unambiguous.  For those of you taking

13    notes, it's Defendant's Exhibit 60.  What you saw over the

14    course of this trial is that UPnP was unambiguously

10:43AM15    enabled at the time that streaming through uTorrent

16    occurred in May of 2019.  Members of the Jury, this is

17    real computer forensics.  It's not fancy.  It's actually

18    quite confusing.  It's the zeros and the ones and the

19    dashes.  But it's not gobbledygook or whatever word

10:43AM20    Mr. Fottrell told you.  It's important evidence.  It's

21    real evidence and it's a trail that we followed.

22           So you see in Defendant's Exhibit 60,

23    unambiguous, undisputed, by the way, evidence that UPnP

24    was enabled when certain video files were streamed through

10:44AM25    the uTorrent player.  I know a lot of this exhibit may be

10:44AM 1    difficult to make sense of, but it unambiguously

2    indicates, as Ms. Bush explained to you, UPnP streaming

3    uTorrent.  It's time-stamped to May of 2019.

4           So why does this matter?  What does it mean?  Why

10:44AM 5    are we talking about Universal Plug and Play, UPnP, in

6    this federal criminal trial?  We're talking about UPnP

7    because, as Ms. Bush explained this to you, what this

8    establishes is that the HP computer that's at issue in

9    this case, the only real device that gives rise to any

10:44AM10    allegation by the government, was literally connected to a

11    router.  That router had Universal Plug and Play enabled.

12    What Ms. Bush explained to you is that this is the

13    equivalent of a house with every door unlocked, and it's

14    even more extreme.  It's a house with every door unlocked

10:45AM15    and it's a billboard telling the world through the

16    internet, come on in.  Come on in through one of the

17    ports.  Come on in through one of the doors.  Ms. Bush

18    told you that she has literally never seen this in the

19    500-plus forensic examinations that she has conducted.

10:45AM20    She told you that it jumped off the page, as it should.

21    Because what this means from a forensic standpoint, even

22    though Mr. Fottrell apparently decided never to look into

23    this, for reasons that are inexcusable, is that this

24    entire network where this HP computer was connected was

10:46AM25    vulnerable.  But the analysis doesn't end there.  We move

10:46AM 1   to streaming.  And the reason why we naturally move to

2   streaming is that the HP computer streams through the

3   router with UPnP enabled.

4           Now, let's talk about what is undisputed by the

10:46AM 5   experts in this case as to this issue.  It's undisputed

6   that every video file of alleged child pornography that

7   was actually played in May of 2019, literally every video

8   file at issue in this case that was actually played was

9   streamed.  Where they disagree to some extent is what this

10:46AM10   actually means.  But, again, look at the evidence.  Look

11   at the forensic evidence.  What Ms. Bush told you is so

12   important.  I'm directing your attention to the

13   Government's exhibit here, Government's Exhibit 43.  What

14   Ms. Bush explained to you is that this was not blah, blah,

10:47AM15   blah or gobbledygook, as Mr. Fottrell had the gall to

16   explain to you.  This is real data.  It's confusing, but

17   it's critical.  And she explained to you what this means.

18   She explained to you that the http language at the

19   beginning of each of these streaming forensic artifacts,

10:47AM20   on the government's own exhibit, by the way, reveals that

21   there was some sort of transmission through the network.

22   Mr. Fottrell told you in his initial testimony, it didn't

23   leave the HP computer.  He walked that back yesterday, as

24   you may recall when he testified by finally admitting it

10:48AM25   had to go to the router when we walked through the ports.

10:48AM 1   So let's talk about that for a second.  The ports on

2   here -- and this is critical -- Government's Exhibit 43

3   reveals videos that are streamed over a three-day period,

4   May 14th, May 15th, May 16th of 2019.  And it reveals

10:48AM 5   three router ports.  The one you see on the screen in

6   front of you is 63835.  The two others in the exhibit,

7   13412 and 27386.  Here's why this matters.  If you look at

8   the Torrential Downpour forensic evidence, the log files

9   that you have in evidence, Exhibits 8 and 9.  And I

10:48AM 10  believe it's 8(a) and 9(a), but the bottom line is 8 and

11  9, what you see is that same port number.  The reason that

12  matters is because that port number does not refer to the

13  abstract ports that Mr. Fottrell explained yesterday, a

14  computer can have ports like 80.  E-mails can have ports.

10:49AM 15  Torrential Downpour only identifies an IP address from a

16  router, as Mr. Fottrell acknowledged to you yesterday.

17  This is a port number belonging to the router that the HP

18  was connected to with UPnP enabled.

19          So here's what's interesting.  These videos are

10:49AM 20  streamed.  They leave the HP computer.  They go to the

21  router.  Then essentially two roads diverge.  They either

22  make a u-turn and go back to the HP computer to be viewed,

23  or they are accessible to some other device anywhere in

24  the world that has ever, even for 10 seconds, connected to

10:50AM 25  this network at this business, with UPnP enabled.

10:50AM 1          So Ms. Bush is criticized by the prosecutors
2    saying, well, why can't you -- can you tell us
3    definitively?  Can you tell us where this went?  And she
4    told you in no uncertain terms what we kept trying to ask
10:50AM 5    the government investigators in this case.  She told you
6    that the real evidence that you would need to follow the
7    forensic trail from a scientific standpoint, which is her
8    field, is in the router.  Mr. Fottrell even yesterday --
9    as much as they want to downplay this router because they
10:50AM10    don't have it, they didn't preserve it -- Mr. Fottrell
11    actually explained the router was like a computer.  That's
12    the word he chose, because it has log files, it has data.
13    Don't be tricked into believing that the router in
14    Defendant's Exhibit 25 that you see plainly and clearly --
10:51AM15    that's a government search warrant photo that they took
16    November 8th of 2019 -- somehow doesn't matter.  It is
17    critical.  Don't be tricked into believing routers don't
18    store information.  Judge told you, you can use your
19    common sense.  You can use your life experience, and we
10:51AM20    encourage you to do that.  That's why juries are so
21    special, because it's not all just what happens in the
22    courtroom with legal rules and evidence and formalities.
23    Too much is at stake for Josh in this case.  You can use
24    your common sense.  Do you plug in a password every time,
10:51AM25    every 30 days when you go to a known Wi-Fi access point

10:51AM 1   like your house Wi-Fi or your friend's Wi-Fi or your work

2   Wi-Fi?   No.   Routers store information of known devices.

3   That evidence would tell us what other devices were

4   connected to the router in May of 2019 when the HP was

10:52AM 5   connected to the router, based on undisputed evidence in

6   this case.

7           So why don't we have the router?   It's not

8   Ms. Bush's fault.   We don't have the router because

9   Mr. Kennedy, the government's first expert witness that

10:52AM10   testified in this case, who stunningly admitted to you

11   under oath that despite his extensive work on the case

12   before Mr. Fottrell got it, he literally did nothing to

13   even consider the possibility of remote access here.   He

14   is an ICAC officer.   They try to downplay, well, HSI

10:52AM15   agents do a lot of things, how would he know to get the

16   router, et cetera.   He's assigned, as you learned over the

17   course in this trial, to this team that focuses on

18   computer crime investigations.   They want to beef that up

19   when it's helpful to them, but they want to ignore it when

10:53AM20   they need an excuse for why they chose not to preserve the

21   router and all of its log files.

22           Members of the Jury, even Mr. Fottrell admitted

23   to you, when pressed, as you may recall from his testimony

24   from that witness stand, that he cannot rule out the

10:53AM25   possibility that this was viewed by another device.   Well,

10:53AM 1   Members of the Jury, that's the ball game.  When their

2   entire case is premised on the notion that's no more

3   complicated than, there's alleged child pornography

4   associated with an HP computer -- and we're going to talk

10:53AM 5   about this, because it's not as simple -- but their

6   theory, Josh was there.  And we are going to talk about

7   that in detail.  But that's their theory in a nutshell.

8   Even if you take it at face value just for our purposes,

9   the bottom line, Members of the Jury, is that at the end

10:54AM 10  of the day, this doesn't explain away the possibility that

11  both experts agree of remote access, that this was viewed

12  by another device.  And Ms. Bush, like UPnP, told you she

13  has literally never seen streaming in 500-plus forensic

14  examinations.  This is the forensic evidence that jumped

10:54AM 15  off the page.  Did you notice in the government's argument

16  this morning, no discussion of forensic evidence.  No

17  discussion of the real forensic evidence.  Even yesterday

18  when they bring Mr. Fottrell back after approximately a

19  day and a half or whatever it was of Michele Bush's

10:54AM 20  extensive testimony, Mr. Fottrell told you -- he was in

21  the courtroom for the entirety of it, just like Michele

22  Bush was for the entirety of his testimony.  Did you

23  notice, all they come back with is not real forensics, but

24  demonstrative exhibits of new files he apparently created

10:55AM 25  the day before Thanksgiving and while on the witness

10:55AM 1   stand.  Members of the Jury, this is too important, way

2   too important, to treat Josh's life with this level of

3   apathy that they are.

4           Number three for remote access.  The small size

10:55AM 5   of the partition.  The evidence is undisputed.  It's

6   forensics.  It's less than one percent of the total amount

7   of gigabytes on the hard drive of the HP computer.  You

8   have that in evidence.  It's on the screen in front of

9   you.  Total capacity, 11.3 gigs.  Unallocated space, at

10:56AM10   least as of the date that it was seized, 2.5 gigs.  Minor

11   disagreement between the experts.  Candidly, it's an

12   immaterial disagreement between the experts as to how many

13   gigs the actual system itself of Linux occupies.  Is it

14   eight gigs?  It is five gigs?  Is it three gigs?  The

10:56AM15   point is, this is a very small partition.  But here's

16   what's important.

17           You heard undisputed evidence that it's the user

18   who sets up the partition that chooses the size of the

19   partition.  It's a choice.  So what this means is that

10:56AM20   whoever set up this partition knew it was not big enough

21   to keep images and videos.  Realize, don't let the

22   government talk out of both sides of their mouth, Members

23   of the Jury.  On the one hand, they want you to believe

24   that Josh is this computer genius that we will talk about

10:56AM25   in a second based on a coffee shop or campaign event

10:57AM 1  conversation from over 10 years ago.  We'll talk about

2  that.  But they want you to believe that Josh is this

3  computer genius.  And their theory is that he would go to

4  such and extreme to set up this hidden place for child

10:57AM 5  pornography, and at the outset, set it up so that it's not

6  even big enough to keep images and videos.  The point

7  here, Members of the Jury, is not whether it's 2.5

8  gigabytes of unallocated space or five or even seven.  You

9  heard that a typical Hollywood film ranges from five to

10:57AM 10  seven.  Here's the point.  The point, Members of the Jury,

11  is that this activity, as Ms. Bush explained to you, is

12  totally inconsistent with somebody like Josh who has

13  unfettered access to a computer in the first place and

14  hundreds of gigabytes to spare.  It literally makes no

10:58AM 15  sense when you apply common sense to it and think about

16  it.

17          So let's move on to number four, the short time

18  period.  Here's the undisputed evidence.  Everything

19  happens on three days in May of 2019.  But it's not that

10:58AM 20  simple.  May 14th, 5:05 to 5:11 p.m.  5:28 to 5:38 p.m.

21  Total of 16 minutes.  That, by the way, is directly pulled

22  from Government's Exhibit 85, their summary.

23          May 15th, 11:35 to 11:50 a.m., 15 minutes.  5:22

24  to 5:58 p.m., 36 minutes.  51 minutes total.

10:58AM 25          May 16th, 11:21 a.m. to 11:33 a.m.  12 minutes

10:59AM 1    total.

2                    Three days, May 14th, May 15th, May 16th.  A

3    total over those three days of one hour and 19 minutes of

4    relevant activity.

10:59AM 5                    What Ms. Bush told you is also important.  It's

6    not just Ms. Bush.  The government's first witness, Amber

7    Kalmer, told you that Torrential Downpour was actually

8    continuing to monitor, at least through June of 2019, when

9    she actually apparently pulled this file or whatever it

10:59AM10    was.  And as you may recall, she was basically saying that

11    to explain why is there such a delay from May to June when

12    HSI Agent Aycock -- I'm sorry -- Agent Faulkner is

13    contacted.  So we know Torrential Downpour is monitoring,

14    but there's no activity from this IP address after

10:59AM15    May 15th of 2019.  We also know from both experts that

16    there's not a shred of computer forensic evidence on any

17    activity after 11:33 a.m. on May 16th.  Members of the

18    Jury, both sides, at least as of this morning, believe --

19    and it's true that details matter.  I want you to look at

11:00AM20    the actual details, at the actual forensic evidence.

21    Because when you consider these details, what Michele Bush

22    told you is that this is more akin to the phrase she used

23    of a hit and run.  It's totally inconsistent with someone

24    who has regular and consistent access to this device.

11:00AM25    Realize, they sent in an undercover agent in November,

11:00AM 1    November 1st of 2019 to Wholesale Motorcars.  We called

2    him to the stand yesterday.  And we'll talk about him in

3    more detail in a few minutes.  But realize it's not like

4    anyone had any reason to believe, oh, the feds must be on

11:01AM 5    to me.  Yet there's no activity at all after 11:33 a.m. on

6    May 16th of 2019.

7              But there is something critical that happens at

8    that very date and that very time.  This is number five on

9    Ms. Bush's list.  Immediate deletion.  You'll recall, and

11:01AM 10   even if you look at the government's summary, Exhibit 85.

11   One related event happens on May 16th.  11:21, the pedomom

12   BitTorrent file is referenced.  11:33, it's downloaded.

13   It's on their evidence.  It's the forensics.  And you know

14   what happens? And this is critical.  Mr. Fottrell

11:02AM 15   explains to you, because he's apparently watched it

16   extensively, that this is a 30-minute movie.  30 minutes,

17   downloaded at 11:33 a.m.  29 seconds after it's

18   downloaded, and in that time, it's sent to the trash,

19   forensically extracted by Ms. Bush, meaning the trash

11:02AM 20   file, and it's deleted forever.  But this gets even more

21   interesting.  Really interesting.  What Ms. Bush told you

22   is that when you look at what was in the trash, there were

23   a lot of other related files that were deleted forever

24   from the user vantage point.  They can be forensically

11:02AM 25   carved by people like Mr. Fottrell and Ms. Bush, but they

11:03AM 1    are deleted forever from the user's vantage point.  But

2    not all of the files were in the trash, as you may recall

3    Ms. Bush telling you.  But they are also -- meaning the

4    files that were not in the trash -- they are also not on

11:03AM 5    the computer.  That's undisputed by both of the experts.

6    Ms. Bush gives you an explanation, the only explanation

7    offered to you over the course of this trial as to what

8    that could mean.  That they were moved, consistent with

9    the concept of remote access.  Any response from the

11:03AM10    government on that?  Deafening silence, because the

11    forensic trail leaves that critical question from them

12    unanswered.  From Ms. Bush, even though we have no burden

13    of proving to you anything in this case, clearly answered.

14              Now, finally, number six on the issue of remote

11:04AM15    access.  This is undisputed for all intents and purposes.

16    For a five-year period on Josh's personal MacBook that HSI

17    seized, Government Exhibit 27, and for the time period

18    that this iPhone 11, Government Exhibit 20 was utilized,

19    there is not a single forensic trace of any alleged child

11:04AM20    pornography, ever.  Ever being downloaded, viewed,

21    deleted, anything along those lines.  Remember when there

22    was some suggestion by Mr. Fottrell, who was even kind of

23    hesitant, could have been.  Could have been.  Could have

24    been wiped clean.  Come on.  There's no evidence of any of

11:05AM25    that.  But more importantly what Ms. Bush told you, they

11:05AM 1    sent her images of these devices.  She told you that it
2    would be illegal to have an image of these devices if they
3    thought they contained any trace of child pornography.
4    That's why she had to go to see that forensic image to HSI
11:05AM 5    under essentially lock and key, understandably.  There's
6    nothing on any of the personal devices.  And what's
7    interesting is, realize the forensic evidence shows you,
8    and Ms. Bush explained it to you.  Mr. Fottrell didn't
9    disagree with this.  These devices, in particular the
11:05AM 10   laptop computer, were regularly used on a near-daily basis
11   by Josh for five years.  They have the TOR browser on
12   them.  Yet no trace, ever, of any sort of child
13   pornography.
14          So what does that leave us with in addition to
11:06AM 15   what we have talked about?  It leaves us with the
16   constantly changing ports -- 63835, 13412, 27386 -- all
17   over three days, all on that important exhibit.  Not
18   gobbledygook.  Evidence, real evidence, important
19   evidence.  It leaves us with evidence, or at least the
11:06AM 20   suggestion, that files were moved because they are not on
21   the device and they are not deleted in the trash based on
22   the actual forensics.  It leaves us with this bizarre
23   unusual combination of UPnP, Universal Plug and Play, and
24   streaming that Ms. Bush has told you she has never seen
11:06AM 25   over the course of her career.  But put Ms. Bush aside for

11:07AM 1   a second.  Literally, put her aside for a second.  Use

2   your common sense.  There's no good reason why somebody

3   with regular physical access to the computer, who by the

4   way, wants, under their theory, to conceal this activity,

11:07AM 5   would go about it this way.  You heard their own expert

6   tell you, streaming leads to buffering, streaming leads to

7   complications.  Let's go send it to a router, then have

8   the router send it back, instead of, what?

9   Double-clicking.  They say that whoever did this is behind

11:07AM 10  the keyboard.  You know what someone behind the keyboard

11  would do?  Use your common sense, what you would do.  You

12  would double-click on the thing.  And the best response

13  that Mr. Fottrell gives you is, when Michele Bush explains

14  to you that you actually have to configure the IP

11:07AM 15  configurations, he says, well, you can actually just copy

16  and paste it if you look in this.  Why don't you just

17  double-click?  It makes no sense, but it is consistent

18  with a remote user.

19          Now, Members of the Jury, we have never stood

11:08AM 20  here and said, we're going to prove to you anything.  That

21  turns the Constitution on its head.  We're not an army of

22  investigators.  They have to dispel these possibilities.

23  And they have to do so beyond that heavy burden of beyond

24  a reasonable doubt.  So they have the gall, when Ms. Bush

11:08AM 25  is testifying to keep asking, have you proven remote

11:08AM 1   access?  Can you show me the log files?  Putting aside how

2   much that should outrage every one of you

3   Constitutionally, it should outrage you evidentiarily, if

4   that's even a word.  There's two places that the evidence

11:08AM 5   would be to prove this one step further, as Ms. Bush

6   explained it to you.  The Linux system files, which are

7   literally written over because HSI waited six months from

8   May of 2015 (sic) to November 8th of 2019 to act on this

9   case.  And critically, the router, because they chose not

11:09AM 10   to preserve it in 2019.  Don't let them blame Michele Bush

11   for their failure to do their job in investigating this

12   case.

13            Now, Members of the Jury, I want to talk about

14   Mr. Fottrell's testimony for a second.  He basically says,

11:09AM 15   remote access possible.  He just says, I don't see it.

16   Never mind the actual forensic evidence, but something

17   happened in this courtroom that doesn't really happen that

18   often in real life courtrooms, but it did here.  He took

19   that witness stand, he took an oath to tell the truth

11:09AM 20   right in front of you, and he lied.  How many times did I

21   ask him, in a non-leading way, by the way, Exhibit 30,

22   this forensic image of the HP.  Did you plug it into the

23   internet?  Did you add new software?  Remember, he kept

24   fighting me a little bit, saying, I added the Oracle

11:10AM 25   software, so I did add new software, but, no, never would

11:10AM 1    have plugged it into the internet.  It has alleged child

2    pornography on it.  From his office, by the way, at the

3    Department of Justice, High Technology section or whatever

4    it's called.  Well, do you add other software?  Do you

11:10AM 5    update software?  Do you modify software?  I even said --

6    little bit of a lawyer trick -- but I even said, uTorrent,

7    you change that?  TOR, you change that?  He said no.  But

8    you learned what he did.  Exhibit 30, he plugged into the

9    internet for five minutes.  And the only reason you know

11:10AM10    that is because he got caught while on the witness stand,

11    because it has software, a uTorrent copyright in 2020,

12    version and build number, that literally didn't exist at

13    the time that this device was seized, and certainly not in

14    May of 2019.

11:11AM15            Now, Members of the Jury, I want you to contrast

16    that with Ms. Bush's testimony.  She walked you through

17    what she did in her forensic laboratory environment.  She

18    told you that she conducted tests.  She doesn't know

19    what's going to happen, but she did what scientists do,

11:11AM20    what other forensic experts do in different fields.  You

21    construct tests using the same systems, the same versions,

22    the same build numbers, the actual forensic data.  It's

23    not fancy.  You don't put mountains on backgrounds to make

24    it look the same.  You actually model it and you see where

11:11AM25    the evidence leads you.

11:12AM 1          So we told you at the outset what this fight was

2     about and what this wasn't about.  And instead of engaging

3     with the forensic evidence, what does the government do

4     throughout the course of this trial?  They repeatedly play

11:12AM 5     you disturbing videos and images.  Members of the Jury,

6     remember what Mr. Fottrell told you?  Many of those images

7     that you have seen over the course of this trial, the

8     actual images themselves, they didn't come off that

9     device.  They weren't on there.  He brought them with him

11:12AM10     on a jump drive from Washington, D.C. from other cases.

11     Members of the Jury, this was designed to inflame you, to

12     make you mad, and it should make you mad.  But not at

13     Josh.  The focus here should be on answering these

14     questions, not dodging them.

11:13AM15          The TOR browser.  They actually sat there and

16     testify, you can buy a child on it.  You can buy guns on

17     it, drugs on it.  None of which has anything to do with

18     this case.  They readily acknowledge that the TOR browser,

19     as Ms. Bush explained to you, though it may not be as

11:13AM20     common to some of us in our lives, is just a web browser.

21     You can buy coffee from Amazon on it, as Ms. Bush

22     explained it to you.  But here's what's critical.  They

23     want to make the TOR browser this big, bad, evil, sinister

24     thing.  It's the ticket to the Dark Web.  It's the highway

11:13AM25     to the Dark Web.  But they want to ignore the fact that

11:13AM 1    the TOR browser was on Josh's personal devices, including

2    his MacBook, since 2017 and was never used by forensic

3    evidence to do anything bad.  You want to talk about the

4    actual evidence in this case?  That's really interesting,

11:14AM 5    because if the TOR browser was just this ticket to evil,

6    this ticket to this underworld, you would see evidence of

7    that on here.  And you don't, because it wasn't used for

8    that.

9          So I want to talk about the thumb drive.

11:14AM10    Probably thought more about thumb drives in this case than

11    you thought you ever would.  Let's talk about it.  This is

12    real forensics.  You know that between 12:53 and

13    12:56 p.m., a thumb drive -- Defendant's Exhibit 52

14    reflects this -- was plugged in to the "F" drive, or

11:14AM15    whatever you call it, on the HP computer and three files

16    were opened in that three-minute period; jeremy_model-mesh

17    pics, a Microsoft Word document; UK Cardiff, a PowerPoint

18    document; and Quiz 1, a Microsoft Word document.  You also

19    know that the reason this matters is because these files

11:15AM20    were not created by Josh, they were not viewed by Josh,

21    and they have no connection to Josh.

22          So I ask Mr. Fottrell, where is it?  Where is the

23    thumb drive?  They speculate.  They guess.  They point to

24    a statement that Josh made on November 8th saying,

11:15AM25    sometimes there's a little bit of a depository of thumb

11:15AM 1    drives at the car lot.  They speculate.  Maybe it was just

2    one of those.  They seized the thumb drives.  We

3    introduced them into evidence.  They didn't.  Defendant's

4    Exhibits 3 through 7, these physical thumb drives won't do

11:15AM 5    you a whole lot of good, but Ms. Bush's testimony and

6    Mr. Fottrell's testimony about what is on these, which is

7    nothing in connection to these files or this case is

8    relevant.  But it's not just the thumb drive.  It's the

9    files on the thumb drive.  Think of all the devices they

11:16AM 10   claim they did a manual triage for.  It really means they

11   are opening the photos app on a phone, seeing if there's

12   child pornography, giving it back.  Not doing real

13   forensics.  Do we know, sitting here right now, whether

14   any of those devices had ever opened these documents?  No.

11:16AM 15           Members of the Jury, don't let them flip the

16   Constitution on its head.  Their response to us is, well,

17   can you prove where the thumb drive is?  Can you prove

18   where these files are?  Members of the Jury, they need to

19   dispel the fact that on May 13th, literally minutes before

11:17AM 20   the Linux partition is installed, someone is sitting there

21   plugging a thumb drive into this device, the HP, the "F"

22   drive.  We showed you this because it's important.  This

23   is a trail of bread crumbs.  This is a forensic trail of

24   evidence that they didn't want to follow and they chose

11:17AM 25   not to follow.  But we know one thing, and even though we

11:17AM 1   have no burden of proving anything to you, they have to

2   prove beyond a reasonable doubt that this somehow doesn't

3   matter.  We have proven to you beyond all possible doubt,

4   with no burden to do so, that the documents on this thumb

11:17AM 5   drive have no connection to any of Josh's personal

6   devices, ever, based on computer forensics, and that this

7   thumb drive is not one of the thumb drives that were

8   seized from the car lot by HSI when they show up

9   unannounced.

11:18AM 10          So Members of the Jury, we then start getting

11   into some other issues in this case.  Dell_one.  Michele

12   Bush tells you, she constructed an actual forensic

13   experiment to try to plug in dell_one.  She told you it

14   piqued her attention.  She didn't know what the answer

11:18AM 15   would be.  She showed you the error message that it

16   generated on her virtualized device.  She showed you it

17   didn't work for her.  Mr. Fottrell claims that it worked

18   for him.  Here's the point, though.  This is not a fight

19   about, at the end of the day, whether the underscore

11:18AM 20   character necessarily works or doesn't work, even though

21   Ms. Bush explained to you and showed you evidence as to

22   the actual error message she got.  Here's what's

23   important.  This is so bizarre.  The user name is dell_one

24   and there is no Dell device in any way, shape, or form

11:19AM 25   connected to Josh Duggar.  You can be sure, Members of the

11:19AM 1   Jury, based on what they did from that witness stand, if

2   there was a single e-mail referencing a Dell product, you

3   can be sure you would have seen it in evidence with some

4   suggestion that it was profound.  If there was a single

11:19AM 5   text message, a photo with a Dell product, you would have

6   seen it.  You heard.  This may sound 30,000 feet in the

7   air.  It is, but it's real life.  Josh is a Mac guy.

8   There's a reason you have a MacBook Pro with five years of

9   history in evidence, an iPhone 11 in evidence, an iPhone 8

11:19AM 10  backup set of files on the MacBook Pro.

11           So then this gets more interesting.  The apps

12  that were used.  UTorrent, TOR, VLC.  There's the

13  threshold question, did whoever did this have to actually

14  type in command lines?  Realize, Members of the Jury,

11:20AM 15  Michele Bush walked you through two pieces of evidence

16  that are critical that show you command lines had to have

17  been used to install the uTorrent browser.  She walked you

18  through that demonstrative -- probably not the most

19  exciting video, but an important one -- to demonstrate the

11:20AM 20  point.  And that's that those command lines, it's like a

21  foreign language.  Sudo colon, whatever it was.  Here's

22  the point though, Members of the Jury.  The command lines

23  that Michele Bush told you had to be used, both experts

24  agree, no evidence of an installer.  Rule out option

11:20AM 25  number one.  That's beyond dispute.  So then there's the

11:20AM 1   App Store, the Snap Store, or command lines.  Ms. Bush
        2   showed you actual evidence that the Snap Store literally
        3   didn't have uTorrent as an option.  Mr. Fottrell comes
        4   back yesterday and says, I swear it's been there for four
11:21AM 5   years.  Can you show us something?  The evidence suggests
        6   otherwise.  No, I can testify to it.  Helpful.
        7           But that's not where the analysis ends.  Real
        8   forensics, remember what Ms. Bush walked you through, that
        9   gnome history.  Such a weird name that it probably stands
11:21AM10   out.  There's actual forensic evidence that the App Store
       11   wasn't used, because that would appear in the gnome
       12   history.  Don't be distracted by this bizarre testimony
       13   from more than 10 years ago from Clint Branham and Jim
       14   Holt claiming that Josh was some "power user" with some
11:21AM15   level of sophistication.  One of them remembered this
       16   happening at a coffee shop.  One of them remembered this
       17   happening at a campaign event.  I'm not sitting here
       18   saying they came into court maliciously and tried to lie
       19   to you.  The point is, when you are considering the
11:22AM20   importance of what's at stake here, look at the actual
       21   evidence here.  Look at what Michele Bush told you.  She
       22   needed to actually find the command lines, even doing what
       23   she does for a living.  You don't memorize these.  She
       24   needed to literally Google it.  It took her just a few
11:22AM25   minutes.  If she's not a power user, by the way, I don't

11:22AM 1    know who is.  But here's what's critical.  The browser
       2    history on any of these devices reveals no searches by
       3    Josh for command lines, for installation of a Linux
       4    partition.  The browser history, as she told you, reveals
11:22AM 5    a search for, "Why is the green light not going off on my
       6    MacBook."  Come on.
       7            Now, Members of the Jury, the choice of
       8    applications gets even more interesting.  The BitTorrent
       9    network is not software.  The BitTorrent network is a
11:23AM10    place that you can access to trade files or exchange
      11    files, music, songs, et cetera, by using software.  You
      12    know for sure that on this personal MacBook computer, Josh
      13    used Transmission in 2017 -- Three Amigos -- and
      14    qBittorrent in 2017 -- planes, trains, whatever it's
11:23AM15    called.  I might be mixing those two up.  The point is
      16    Transmission, qBittorrent, the Mac.  Whoever decided to do
      17    what happened here uses uTorrent, the Windows-based
      18    uTorrent on the Linux partition.  So why is this
      19    interesting?  Why does that matter?  You saw that first
11:24AM20    shorter demonstrative video from Michele Bush looking at
      21    how easy it is to just double-click on Transmission.  Just
      22    double-click on Transmission.  She got that Charlie
      23    Chaplin video or whatever it was and then she literally
      24    clicks on it and it's the default on the Linux version and
11:24AM25    build that is at issue here.

11:24AM 1        You also saw, Members of the Jury, that as a

2   practical matter, what happened here instead was someone

3   had to download this Wine emulator -- ironically called

4   "not an emulator" software -- to even be able to run

11:24AM 5   Windows-based software in the first place.  There is a Mac

6   equivalent, but whoever did this decided not to use the

7   Mac equivalent.  Now, Members of the Jury, what that shows

8   you is that for whatever reason -- and each of these are

9   pieces of a puzzle that you have to put together -- what

11:25AM 10  that shows you is that someone decided not to use

11  Transmission when you have actual evidence that Josh knew

12  how to use Transmission.

13          Then let's talk about this Covenant Eyes sideshow

14  with two e-mails in 2017 appearing that Josh searched for

11:25AM 15  uTorrent, the Mac version.  That's not the point, Members

16  of the Jury.  The point is that someone decided to make

17  this really complicated using PC Windows-based software,

18  which is totally inconsistent with everything you have

19  heard about Josh Duggar's actual use of software from

11:25AM 20  years before there ever was an investigation.  Years

21  before there was even an alleged crime.  That's the real

22  evidence.

23          Now, Members of the Jury, the bash history,

24  pretty important.  Technical, but important.  Totally

11:26AM 25  missing from the forensic evidence on the Linux partition.

11:26AM 1   Ms. Bush told you what this means is that someone had to

2   delete it intentionally.  It's not visible to the user.

3   You would have to even know what it is, much less where to

4   go to delete it and how to delete it.  But you saw that

11:26AM 5   the bash history auto-populates for Ms. Bush's

6   demonstrative where she ended with that happy face.  She

7   bookended it to demonstrate to you that this

8   auto-captures.  You don't just type things in.  It's not

9   there.

11:26AM 10          The MacBook.  Remember what Ms. Bush told you.

11   Seized, November 8th, 2019.  You heard that from the

12   government's law enforcement witnesses.  Accessed, turned

13   on, while in law enforcement custody, after it was seized.

14   You saw first-hand how that impacts data.  Mr. Fottrell

11:27AM 15   claims that he forgot that he plugs his virtualized Linux

16   system, Government's 30, into the internet for five

17   minutes and it all of a sudden creates a bash history that

18   literally he acknowledges didn't exist without it.  No

19   response.

11:27AM 20          Dual boot.  First they say you had to push a

21   button on a keyboard.  Ms. Bush tells you that's outdated.

22   That's a misunderstanding of real computer technology.

23   You can reboot remotely.  She told you she does it all the

24   time.  They say, okay, but then the default would be

11:27AM 25   Windows.  We know that for sure.  Then they finally admit

11:27AM 1    what both experts actually agree on.  The boot order is
        2    literally inside that government exhibit.  It's been in
        3    their possession for over two years.  It's in the BIOS,
        4    and no one decided to look.

11:28AM 5            So let's talk about what this case really is,
        6    this investigation.  Let's call it what it is.  Members of
        7    the Jury, they were so starstruck at the possibility of
        8    investigating and prosecuting Josh Duggar that they
        9    refused to let the actual evidence get in the way.  How do
11:28AM 10   you know that?  They get a search warrant to search a
        11   house.  Realize, at this point, all they have is
        12   Torrential Downpour.  They have an IP address, literally,
        13   and a location.  They believed at the time it was this
        14   house.  They show up.  Josh Duggar doesn't live there.
11:28AM 15   They don't want to search.  By the way, it's very close in
        16   proximity, as you heard, to the car lot.
        17           They send an undercover agent in.  He no longer
        18   works for law enforcement.  You got some really
        19   interesting testimony yesterday, which is why we called
11:29AM 20   him.  What were you asked to do?  At this point, they have
        21   no reason to believe that this is Josh Duggar or anyone
        22   else in connection with this IP address at this car lot.
        23   He doesn't want to meet with Randy.  He's told -- he knows
        24   nothing about this case, other than he's the undercover
11:29AM 25   guy.  You heard him testify.  He's told, laser focus on

11:29AM 1  Josh Duggar.  So blinded by that focus that they refuse to

2  look for anything else that when they have Randall Berry's

3  phone in their possession, they choose not to look at it.

4  By the way, look at those checks that the government put

11:29AM 5  into evidence.  The Randall Berry checks are all

6  commission checks.  They don't establish start dates and

7  end dates.  They establish when this gentleman was paid

8  for commission.  You think a car lot has one person

9  working there at any given time?  What if someone shows up

11:30AM 10  off the street?  No one is there?  I mean, come on.  You

11  think there's no customers that are out there?  People

12  that hang out?  People that detail cars?  Come on.

13       Members of the Jury, let's call this what it is.

14  They have excuses for every decision they make.  Why did

11:30AM 15  you wait six months?  Agent Faulkner, let me tell you

16  about my other case that wasn't this one.  Sounds like an

17  important case, but it has nothing to do with what we are

18  talking about.  Why didn't you do a full forensic

19  examination before prosecuting this man?  Mr. Fottrell, it

11:30AM 20  was a business decision.  It was a mic drop moment.  A

21  business decision for the United States Department of

22  Justice to not do the real forensic work?  Why didn't you

23  seize the router?  Agent Faulkner, well, that was up to

24  the CFAs, the computer forensic analysts, the three that

11:30AM 25  were on site, by the way.  Mr. Kennedy, well, that was

11:31AM 1    really up to the agents.  Why didn't you execute the first

2    search warrant?  Agent Faulkner, Josh Duggar wasn't there.

3    Amber Kalmer, Detective Kalmer, let's talk about the

4    Torrential Downpour logs.  I don't even know what

11:31AM 5    Defendant's Exhibits 8(a) and 9(a) are, even those these

6    are the auto-generated logs from her Torrential Downpour,

7    what they keep calling their undercover operation.

8            What's on the phone next to the computer?

9    Defendant's Exhibit 29.  Whose phone is it?  The

11:31AM10    government doesn't know.  Members of the Jury, realize one

11    thing.  All of the evidence that was seized in this case

12    by law enforcement without exception on November 8th of

13    2019 belonged either, in one instance to Wholesale

14    Motorcars, and in every other instance, or I guess in the

11:31AM15    jump drives to Wholesale Motorcars, but in terms of

16    individuals to Josh Duggar.  So what do they do to

17    distract you?  The day after their case crumbles with

18    Mr. Fottrell's testimony, they dig up allegations from 20

19    years ago when Josh was a child, literally going through

11:32AM20    puberty and they try to get you to focus on that instead

21    of on the three days in May of 2019.  They try to get you

22    to give significant weight to Bobye Holt's testimony that

23    Josh Duggar, as a teenager, went to his ex-girlfriend's

24    mom every night to confess things to her.  And they try to

11:32AM25    get you to focus on that, regardless of whether you

11:32AM 1    believe that it happened or not.  That's not why we are

2    here, but that's what they want you to focus on instead of

3    what actually happened.  We told you at the beginning of

4    this case that we would follow the evidence.  We would

11:33AM 5    investigate this case together.  You have evidence in your

6    possession.  You have shipping labels in evidence showing

7    that Caleb Williams printed shipping labels from the

8    computer at issue related in no way, shape, or form to

9    Wholesale Motorcars.  It's Defendant's Exhibit 34.  It's

11:33AM10   in evidence.  They include dates in March and April of

11   2019.

12          You have evidence that the iPhone 8 backup,

13   because of its forensic limitations, doesn't necessarily

14   mean that the images on there were taken by the user as

11:33AM15   opposed to, for example, sent by text messages or accessed

16   by social media.  Something that they, by the way, never

17   responded to after Ms. Bush told you that.  And you have

18   the timeline.  So now we get to May 13th.  Because they

19   want you to believe that there's all these text messages

11:34AM20   and photos and let's jump to all these conclusions.  Let's

21   look at May 13th.  Their attempt to connect Josh to the

22   car lot on May 13th of 2019 is through one photo.  One

23   photo.  Look at it.  It's in evidence.  It's Government's

24   Exhibit 73.  It's a photo of a scale.  No context.

11:34AM25   Extracted in the same way from that iPhone 8 backup

11:34AM 1   approximately an hour and a half to two hours after the
       2   installation occurs.  Approximately two to three hours,
       3   two to two and a half hours, whatever the math is, three
       4   hours, whatever it is, after the thumb drive is plugged in
11:35AM 5   and those files are opened.  That's their smoking gun.
       6   May 13th of 2019.
       7         Members of the Jury, I want to point you to their
       8   timeline, Government's Exhibit 85.  I want to point you to
       9   May 15th.  By the way, notice on their timeline there is
11:35AM 10  nothing about the thumb drive.  There's nothing about
       11  12:53 to 12:56.  Let's focus on May 15th for a second.
       12  5:08, they show you a text message, Government's Exhibit
       13  85, "I'm here at the car lot, I will be here until around
       14  6:00 or so."  It's Exhibit 77.  Let's look at Exhibit 77.
11:35AM 15  There's a response, customer David Tyler.  "Okay, I will
       16  head your way in about 10 minutes."  Same date and
       17  time-stamp convention, May 15th, 5:10.  Use your common
       18  sense.  Customer is about to show up 10 minutes later,
       19  5:20.  So then what happens according to the government?
11:36AM 20  Starting at 5:22, exactly when Josh is expecting a
       21  customer, there's this constant progression.  5:22,
       22  playtoysweetie.  5:25, DD Torrent.  5:30, DD.1 Torrent.
       23  5:32, asi se mama.  5:41, marissa.zip.  Members of the
       24  Jury, you want to talk about the real timeline?  They want
11:36AM 25  to make this a case about physically being present at the

11:36AM 1    car lot and they want to suggest that the evidence
2    actually suggests it's Josh.  This is the very time in the
3    fishbowl office with windows all over the place using a
4    desktop computer literally plugged into a wall.  This is
11:36AM 5    the time that he's expecting a customer to show up at any
6    moment.  Members of the Jury, there's a reason that's not
7    on their timeline.
8            Aguilar.  June.  Frazer is on the Windows
9    partition.  You know that it was opened for nine minutes.
11:37AM 10   You heard testimony about that.  So what's their theory?
11   It's essentially a promissory note or a receipt, the kind
12   of documents that are on Frazer on the Windows side.  So
13   their theory is that Josh logs into the Linux partition
14   after going to extremes to hide everything about it.  I'll
11:37AM 15   use dell_one as a user name.  And then their theory is
16   that instead of using the automated software, he sits and
17   types up the same kind of document that's automated and
18   available on the same computer on the Windows partition
19   related to this weird Aguilar document in June, on a day
11:37AM 20   when nothing else of interest happens, and then writes
21   "Josh."  Are you kidding me?  Members of the Jury, the
22   existence of that document on the Linux partition raises
23   more questions than answers.  It's totally inconsistent
24   with their theory of prosecution, no matter how much they
11:38AM 25   want to suggest otherwise.

11:38AM 1          So I want to talk to you about something

2     critical.  When you go back into that jury room to

3     deliberate, you're going to ask yourself whether they have

4     proven this case beyond a reasonable doubt.  The question

11:38AM 5     is not, Members of the Jury, whether you think it's

6     possible Josh did this.  That's not enough.  The question

7     is not whether you even think it's probable Josh did this.

8     That's not enough.  If you agree with the government's own

9     expert that remote access was possible, that's a

11:38AM10     reasonable doubt.  And I submit to you, Members of the

11     Jury, that the evidence of remote access that you heard

12     over the course of this trial is so overwhelmingly great

13     that it's not only possible, it's probable.  But the point

14     here is, it doesn't have to be.  If you even think that

11:39AM15     that's a possibility when you go back and deliberate, the

16     law demands that you return a verdict of not guilty.

17          Members of the Jury, the prosecution gets the

18     last word, as the Judge told you and as Ms. Marshall told

19     you.  But as I think you have seen over the course of this

11:39AM20     trial, you know I have a response to what they are trying

21     to sell you.  I'm not going to be able to give you that

22     response.  So I want you to listen to carefully to what

23     they have to say, and I appreciate you listening very

24     carefully to what we have all had to say.  Too much is at

11:39AM25     stake.  What I want you to listen critically to, I want

11:39AM 1   you to ask yourself, what would we say about it?  What

2   questions would we ask?  How would we respond to it,

3   because we're not going to have that opportunity.  Members

4   of the Jury, what you're about to do cannot be

11:40AM 5   understated.  There is nobody who appreciates the time and

6   the attention that you have paid to this case and willing

7   to actually engage with this evidence more than Josh

8   Duggar.  Everything is on the line.  The stakes don't get

9   any higher.  And we ask that you find him not guilty on

11:40AM10   both counts.  Thank you.

11          THE COURT:  Thank you very much, Mr. Gelfand.

12   Mr. Roberts, when you're ready.

13          MR. ROBERTS:  Thank you, Your Honor.  I can

14   actually tell you exactly what Mr. Gelfand would be saying

11:40AM15   while I'm speaking.  Don't look at the facts.  Don't look

16   at the evidence.  And Ladies and Gentlemen, do not use

17   your common sense, because those three things, from the

18   beginning to the end of this trial, convicts Josh Duggar.

19   We have spent a week and a half listening to Mr. Gelfand

11:41AM20   trying to divorce you from your common sense.  Trying to

21   divorce you from reason.  Obscuring the truth in favor of

22   a fantasy and now blaming the government from trying to

23   disprove the boogeyman.

24          When we started in openings, Ladies and

11:41AM25   Gentlemen, I told you this case was about common sense.  I

11:41AM 1    presented to you the facts that we were going to prove.
2    Look what's in evidence now, the very timeline I put in
3    front of you.  Mr. Gelfand went a different way.
4    Mr. Gelfand treated the truth like something he would
11:41AM 5    throw against the wall and see what sticks.  He's thrown
6    out themes.  Bad cops, stuck their head in the sand.
7    16-year-old homeschooled boy couldn't do this.  Fish bowl.
8    All these themes to get you looking anywhere but the
9    facts.  But let's take a look at the facts before we get
11:42AM 10   into this fantasy.
11          Now, this is not a complicated case.  It's about
12   a man who owns a car lot.  The car lot, as you can see,
13   has signs saying, you are being recorded.  Surveillance.
14   This surveillance system, as we know from Josh Duggar
11:42AM 15   himself, he hasn't told anybody that it's not working.  Go
16   back one, please.  Does that look like a place that's
17   going to be the target of a high-end cyber attack?
18          Next slide.  What else do we know about this?
19   We know that Covenant Eyes is on there.  Now, Mr. Gelfand
11:43AM 20   just does not have an answer to Covenant Eyes, does he?
21   And why is that important?  Next slide, please.  This
22   Linux partition.  We have been hearing so much about when
23   it was installed, how it was installed.  Have we stopped
24   to ask why?  Why it was installed.  There's only one
11:43AM 25   reason.  Why would some hacker go to the trouble of

11:43AM 1    installing a Linux partition.  It benefits one person.
       2    And there he sits.  One person.  I'm actually going to
       3    talk a lot about that, so wait for it.  Something else I
       4    noticed last night, and Mr. Gelfand just spoke to you a
11:44AM 5    lot about.  Hasn't made sense to me until last night.
       6    Dell_one.  Why would you contest dell_one?  We know it
       7    works, because it worked in this case.  Why do that?  Look
       8    what's right under dell_one.  That's where you put the
       9    password.  That's where Intel 1988 is.  What a good way to
11:44AM10    get you talking about something other than this critical,
       11    crucial, cannot-get-beyond kind of fact.  Because Intel
       12    1988, which barely came out of his mouth, came out of
       13    Michele Bush's zero.  Zero times on direct.  Zero times in
       14    her report, because they can't get beyond it.  That is the
11:44AM15    common sense block.  It all stops there.  Her testimony
       16    about ports, about routers, that's all if you believe the
       17    possibility that someone is doing this.  Not the
       18    probability, not the possibility, but the possibility as
       19    it relates to reasonable doubt.  Ladies and Gentlemen, you
11:45AM20    don't get past that.  That is common sense.
       21         Now, when we're looking at this and we're
       22    actually thinking about the why, and then we realize that
       23    Intel 1988 has got to be put in there.  And now Mr.
       24    Gelfand again missed it.  He wants to treat this password
11:45AM25    as, oh, it's not secretive.  You remember every witness he

11:45AM 1  got he put up there, we sent it to Jim Bob Duggar.  They

2  sent it to Jim Bob Duggar.  They sent it to Paul Ryan.

3  But here's the punch line, Ladies and Gentlemen.  It's not

4  the secrecy.  It's never been the secrecy.  It's the

11:45AM 5  habit.  Every one of you, anybody that logs online, they

6  have a password they put in.  You got it in your mind.

7  It's your kids.  It's your grandkids.  It's your dog or

8  it's a variation of your birthday, but that becomes your

9  signature password.  You do a variation of it.  Well,

11:46AM 10  guess what is Josh Duggar's signature password?  Intel

11  1987 (sic).  It's on his bank account.  It's on his

12  electric account.  It's on his government.deals account.

13  Chances are, if Josh Duggar makes an account, Intel 1987

14  (sic) is going to play a part of it.  And how does that

11:46AM 15  make sense?  Someone breaks in the car lot, installs a

16  partition that benefits Josh Duggar, password protects it

17  with something that's his signature password.  How does

18  that make sense?  Well, for a defense attorney, it

19  presents as a problem.  So what do you do?  How could Josh

11:47AM 20  Duggar be at his car lot, on his computer, with all this

21  signature Josh Duggar stuff, and still not be guilty?  How

22  do you do that?

23  Well, the only way possible in the whole world

24  for that to be true and then Josh Duggar not to be guilty

11:47AM 25  is remote access, is hacking.  So Mr. Gelfand, as I said

11:47AM 1  in opening, he started throwing facts against the wall.

2  You are going to hear "bad cops."  They stuck their head

3  in the sand.  You are going to hear "fish bowl" and all

4  these other things.  So let's take it one by one.  Bad

11:47AM 5  cops.  Now, see, he made a little bit of a miscalculation

6  here.  Bad cops works in some kind of cases.  Child

7  exploitation cases, not so much.  Take Amber Kalmer, for

8  example.  Day in, day out, she is working on the ICAC Task

9  Force.  Day in, day out, she is downloading these child

11:48AM 10  sexual abuse material images that you have seen now.  And

11  Ladies and Gentlemen, you can't un-see them.  It's like

12  one of those images that hits you in your gut, in your

13  heart, and you can't look away, but you don't want to look

14  at them, either.  She does that for a living every day

11:48AM 15  when she goes to work.  Why?  Because she is dedicated.

16  Because she cares about putting men like Josh Duggar in

17  prison.  She gets a lead that's outside of her

18  jurisdiction.  She doesn't say, delete, I don't care.  She

19  takes the extra effort to call up Special Agent Jerry

11:48AM 20  Faulkner of Homeland Security that lives in Northwest

21  Arkansas and says, "Hey, will you work this lead?  Will

22  you find this bad guy?"

23  And then you hear from Special Agent Jerry

24  Faulkner.  Works a thousand cases in his career, a

11:49AM 25  thousand of these, looking at these kind of images.  He

11:49AM 1   tells you about the subpoena process and the search
        2   warrant process, and it takes months to get this back.
        3   Now, guess whose the lawyer that's criticizing that, that
        4   understands this legal process, and he weaponizes it
11:49AM 5   before you.  He tries to say, oh, my goodness, law
        6   enforcement sat on their hands.  He knows how long this
        7   takes.  He knows how hard it is to get a search warrant.
        8   You don't just kick in the door like T.V.  You go through
        9   the legal process.
11:49AM 10          Director Fottrell, been doing this for 20 years.
        11  You heard Ms. Bush when she was testifying, Mr. Clayman
        12  would ask her questions.  She was like, well, I don't have
        13  a certificate, I've been to training.  When she goes to
        14  training, it's people like Jim Fottrell that's teaching
11:50AM 15  the training.  He is the expert training the experts.
        16  They want to make a big deal about an honest mistake.  You
        17  saw his reaction.  No one was more embarrassed.  That was
        18  an honest mistake.  But was that bad law enforcement or is
        19  this a group of individuals that have some of the hardest
11:50AM 20  jobs imaginable doing a very admirable job of it.  They do
        21  their best, and what their goal is is to protect kids.
        22          Another thing.  Fish bowl.  I'm really glad
        23  Mr. Gelfand said that again.  He said it in opening and
        24  then he said it with Jerry Faulkner.  Fish bowl.  How did
11:50AM 25  we defeat this fish bowl?  This, again, throwing it

11:51AM 1   against the wall, see if it would stick.  How did we

2   defeat it?  Pictures.  Oh, by the way, his car lot is out

3   in the middle of nowhere.  It's got chicken houses next to

4   it, outbuildings.  By the way, inside the actual building

11:51AM 5   itself, the shed, it's got shades.  The one window that

6   doesn't have a shade looks at the main entrance.  As if

7   there couldn't be enough privacy for this man to look up

8   pornography while he's there.  But wait a minute, on his

9   phone, with the TOR browser, he's doing it all day, every

11:51AM 10   day.

11       16-year-old, homeschooled.  That has been one of

12   my favorites through here.  Mr. Gelfand says, oh, don't

13   consider the witness testimony.  Don't think about

14   Mr. Holt's testimony that's known him his whole life.

11:51AM 15   Like he would come in here and make this up.  Don't

16   consider Clint Branham's testimony, the power user.  Known

17   him for 20 years.  No axe to grind.  He's just coming in

18   here and testifying.  And Clint Branham, by the way, was

19   one of those witnesses that we called and he testified

11:52AM 20   that power user, that Josh has specifically been in

21   conversations with him about bypassing internet filtration

22   by installation a secondary operating system, just like

23   Linux partition.  And then Mr. Story was cross-examining,

24   and what did he do?  He stumbled into, well, you say power

11:52AM 25   user, but not a command line kind of guy.  And Mr. Branham

11:52AM 1  says, oh, yeah, exactly, that's what it is.  I have no

2  doubt.  That's what that kind of thing is.

3       Now, some of the new ones today, boot order.

4  Mr. Gelfand -- and during this trial, it came up, what is

11:53AM 5  the boot order of that?  This amazed me.  It's been so

6  hard sitting there.  If Mr. Gelfand is right and the boot

7  order is for the Linux to pop up, how do they do work?

8  Everything is on the Windows side.  That makes no sense.

9  Every day they get to work and they are sitting there

11:53AM10  looking at a screen, and it's a Linux partition, and only

11  Josh Duggar has the password.  It makes no sense.

12       Thumb drives.  He wants to keep throwing up these

13  thumb drives.  They don't match those.  Well, Josh Duggar

14  told you, it's a lost and found of thumb drives.  And

11:53AM15  what's the other thing a thumb drive can do?  You can use

16  it, you can pass it to a friend, you can share it.  We

17  could find it 10 people down, but it doesn't change the

18  facts of what happened on that computer.

19       TOR browser.  He wants to make you think this is

11:54AM20  normal.  You can go shopping on it.  Well, you know a

21  little bit about TOR browser now.  It's anonymous.  You go

22  shopping on it, you put your credit card information, you

23  just defeated the purpose of TOR browser.  But what does

24  TOR browser allow you to do that all these other, Firefox,

11:54AM25  all these other browsers doesn't allow you to do?

11:54AM 1   Download child porn.  Lets you buy a child.  This is the
2   TOR browser, the Dark Web.  It could have a legitimate
3   purpose.  According to Special Agent Jerry Faulkner, can't
4   think of one, but it could.

11:54AM 5          Size of the hard drive.  Mr. Gelfand argued to
6   you, it's small.  Why would someone owning the computer
7   set up a small hard drive?  Maybe for downloading,
8   viewing, and deleting child pornography.  Not planning on
9   storing it.  Director Fottrell told you about that.  It's
11:55AM 10  very common.  Happens all the time.  No child pornography
11  on the laptop.  Well, Ladies and Gentlemen, it has
12  Covenant Eyes, and his family typically uses it.  You saw
13  the information.  Anna Duggar is all over it.  This is
14  someone that has Covenant Eyes on every one of their
11:55AM 15  devices with their wife being the person, the
16  accountability partner.  Do you really not think logically
17  that she's paying attention to what he's doing online?
18  That is pornography filtration software.  You heard a
19  representation from Covenant Eyes.  That's the purpose.

11:55AM 20         Good old-fashioned whodunit.  Josh Duggar owns
21  that computer.  He told us that.  That's not a Mac.  So
22  Michele Bush comes in here, and this is the real crux of
23  the case.  Follow the forensic trail, right?  She said --
24  and when she made her presentation with Mr. Gelfand, it
11:56AM 25  all made sense.  It sounded so good, until Mr. Clayman

11:56AM 1    stood up and started testing it against the facts, asking

2    her, you say the totality of the circumstance led you to

3    this conclusion.  Did you consider his statement?  No, I

4    didn't look at that.  Did you consider any of the pictures

11:56AM 5    taken on the crime scene?  No, I didn't look at that.  Did

6    you consider that there were no other employees during

7    this time frame?  Well, I didn't know that.  And then he

8    actually goes to the digital evidence, the stuff she

9    should know.  Why didn't you mention Intel 1988?  Well,

11:56AM10    the government covered that.  It's an all-stop kind of

11    fact.  Why didn't you look at the text messages saying,

12    "I'm on the car lot" to determine who was on the car lot?

13    Well, I was looking at remote access.  Why didn't you look

14    at the pictures that geolocate to the car lot taken in the

11:57AM15    time frame that you're talking about?  Well, I was looking

16    at remote access.  What would happen in the remote access?

17    The coin flips.  So the user of the HP, assuming this

18    happened, or at Wholesale Motorcars, assuming this

19    happened, would be stuck with no computer all of a sudden.

11:57AM20    Makes no sense.

21          There is not a level of objectively coming from

22    Michele Bush.  She told you she had one primary purpose

23    when she started her examination, and that is looking for

24    remote hacking.  So let's test this against the facts.

11:57AM25    Let's see how long her theory -- let's assume it's

11:57AM 1   right -- lasts with logic.  May 11th, what happens on

2   May 11th?  Someone comes down and downloads the

3   instructions, the thumb drive, for the Linux partition.

4   Wait a minute.  So this hacker, this elite hacker who --

11:58AM 5   and it was subject to, based on the Universal Plug and

6   Play, it was subject to vulnerabilities, undisclosed

7   vulnerabilities.  But this elite-level hacker out here

8   comes in and downloads a partition, a Linux partition,

9   that is personal to Josh.  Wait a minute.  It's personal

11:58AM 10  to Josh.  How on earth did they know that Covenant Eyes

11  was on there?  How on earth -- or why, better question,

12  why would they care to bypass it?  Well, there goes half

13  of the defense.  Do you really think some cyber-hacker,

14  some unknown guy hacked his way in and then said, oh, this

11:59AM 15  guy's got Covenant Eyes.  I bet his wife will find out.

16  Let me go down to the lot on May 11th and download this.

17  Not reasonable, Ladies and Gentlemen.

18       And then look at the next date.  May 13th.  They

19  not only download it.  On May 11th, they've got to be

11:59AM 20  there to get the thumb drive.  But they say, hmm, I'll

21  come back on May 13th and plug it in and create it.

22  Logic, Ladies and Gentlemen.  This is not a situation

23  where you have to have forensics to disprove.  Battling

24  experts.  Common sense and logic does this.  May 14th,

11:59AM 25  iPhone utilized to take a picture.  IPhone takes a picture

11:59AM 1  of the HP screen.  This is the one with the baseball cap.

2  This is one of my favorite sections here.  Right after the

3  baseball cap, we've got, "Got stuck here."  And then from

4  4:58 to 5:42, you've got stuff happening on the Linux

12:00PM 5  partition.  And by stuff, I mean downloading and viewing

6  of child pornography.  Josh Duggar is at the car lot the

7  whole time.  Did he not notice that his computer screen

8  just went to Linux for a whole almost hour?  You remember

9  Michele Bush even said, it's one or the other.  You flip

12:00PM 10  the coin on, you flip it to its head, you flip it to its

11  tail.  You can't do both.

12       May 15th actually is a perfect example of this.

13  I think I actually finally agree with Mr. Gelfand about

14  something.  May 15th, early in the morning, "I'm at my car

12:00PM 15  lot."  All these 14-year-old girl, test avi, all that is

16  downloaded.  Then look at 3:20, 3:39, 3:55.  Look at the

17  geolocation information on those.  He's not there.  And

18  guess what's happening?  Nothing.  The bad stuff is not

19  happening.  The bad stuff only happens when he's at the

12:01PM 20  car lot.

21       Comes back, says, "I'm at my car lot now."  And

22  look what picks up for the rest of the evening;

23  playtoysweetie, Daisy's Destruction, asi se mama linda.

24  "I'm still here at the car lot," 5:58.  And moving on

12:01PM 25  along, Ladies and Gentlemen, May 16th, you've got a

12:01PM 1    similar situation.  Then June 22nd, Mr. Gelfand says,

2    don't let it confuse you.  How is that confusing?  This

3    elite-level hacker, this person who came in here and did

4    this just decided to do a little work for Wholesale

12:01PM 5    Motors?  It's like, hmm, I'm bored with downloading child

6    pornography, let me just do a little work for Wholesale

7    Motors.  Makes no sense.

8            Those are not facts, or those are facts their

9    theory does not match up to them.  It doesn't hold water

12:02PM10   when compared to it.  But here's you a fact that holds

11   water from the first day of testimony this was taken.

12            (Audio played as follows:)

13            AGENT FAULKNER:  Over the years --

14            JOSH DUGGAR:  Yeah.

12:02PM15            AGENT FAULKNER:  -- it's turned into where these

16   particular programs not only share music files but they

17   share video files, software programs, documents, you name

18   it.

19            Do you -- are you familiar with or do you know

12:02PM20   anything about peer-to-peer file-sharing networks?

21            JOSH DUGGAR:  I mean, I'm familiar with, I guess

22   you could say.

23            AGENT FAULKNER:  Okay.  Have you ever used or do

24   any of these electronics currently on the property have

12:02PM25   any of those types of software downloaded onto them?

12:02PM 1          JOSH DUGGAR:  Yes.

2          AGENT FAULKNER:  Okay.  Which, which devices are

3  we talking about?

4          JOSH DUGGAR:  Probably all of them.

12:02PM 5          AGENT FAULKNER:  All?  So, and I just want to --

6          JOSH DUGGAR:  Right.

7          AGENT FAULKNER:  -- make sure.  Again, we're not

8  here to put words in your mouth.  So when you say "all"

9  and I'm thinking --

12:02PM 10         JOSH DUGGAR:  Well, okay.  I won't say all

11  because I'm going to say -- I'm going to say the laptop,

12  the phone, and the computer in the office.

13         (end of audio)

14         MR. ROBERTS:  First day of trial.  Second

12:03PM 15 witness.  Josh Duggar's statement.  Where is the

16  peer-to-peer in the office?  It's only in one place.  It's

17  behind the partition.  Josh Duggar just told law

18  enforcement that there's peer-to-peer software on all

19  three of his devices.  And there is.  And we know he knows

12:03PM 20 what it is.  He's been using it since 2017.  But if

21  there's any confusion about it, he doubled down on it.

22  Let's play the second one.

23         (Audio played as follows:)

24         AGENT FAULKNER:  And what would you say the usage

12:03PM 25 of the TOR that --

```
12:03PM  1            JOSH DUGGAR:  I -- I don't recall.

         2            AGENT FAULKNER:  Okay.

         3            JOSH DUGGAR:  Yeah.

         4            AGENT FAULKNER:  Is it more for the business or
12:03PM  5    is it personal?  Hey, look.  I promise you we're not --

         6            JOSH DUGGAR:  I mean, most -- okay.  So I can't

         7    --

         8            AGENT FAULKNER:  We're not here --

         9            JOSH DUGGAR:  I can't speak to that because, I
12:03PM 10    mean, I have -- you have my laptop; you have my phone.  So

        11    it's probably split, you know, down the middle.  The

        12    office computer, probably the same thing.

        13            (end of audio)

        14            MR. ROBERTS:  The office computer, probably the
12:04PM 15    same thing.  He specifically told you, and it's been in

        16    front of you from the first day, peer-to-peer is on that

        17    office computer.  TOR is on that office computer.

        18            Ladies and Gentlemen, from the first day this has

        19    been in front of you.  And from the first day, Mr. Gelfand
12:04PM 20    has been trying to keep you from evaluating this evidence,

        21    to keep you from using your common sense.  At the end of

        22    that interview, they go through all the facts of the case

        23    leading up to Mr. Duggar saying, I'm not denying guilt, I

        24    just don't want to say if I'm guilty or innocent.  Well,
12:04PM 25    Ladies and Gentlemen, we have come to the time of the
```

12:04PM 1   trial.  Mr. Duggar has had his day in court.  He's had a

2   fair and impartial Jury.  He's had his attorney.  We're no

3   longer asking if he is denying guilt.  We're no longer

4   looking to him.  Now it's time to hold him accountable.

12:05PM 5   It's common sense that has always dictated whether this

6   case was going to end in conviction or not.  Whether

7   Mr. Gelfand can take you, divorce you from that basic

8   reasoning that you all have.  But now you know all the

9   facts.  Now you have seen all the evidence.  And this

12:05PM 10  theory of the invisible man crumbles when compared to him.

11  It does not survive the scrutiny that is the truth.

12          For those reasons, it's time to convict Josh

13  Duggar.  Thank you.

14          THE COURT:  Thank you, Mr. Roberts.

12:05PM 15          Members of the Jury, this is instruction

16  number 13.  It is now time to deliberate.  And in

17  conducting your deliberations and returning your verdict,

18  there are certain rules you must follow.  I will list

19  those rules for you now.

12:06PM 20          First, when you go to the jury room, you must

21  select one of your members as your foreperson.  That

22  person will preside over your discussions and speak for

23  you here in court.

24          Second, it is your duty as jurors to discuss this

12:06PM 25  case with one another in the jury room.  You should try to

12:06PM 1  reach an agreement if you can do so without violence to

2  individual judgment, because a verdict, whether guilty or

3  not guilty, must be unanimous.  And to be clear, unanimous

4  means that all 12 of you must agree.

12:07PM 5        Each of you must make your own conscientious

6  decision, but only after you have considered all the

7  evidence, discussed it fully with your fellow jurors, and

8  listened to the views of your fellow jurors.  Do not be

9  afraid to change your opinions if the discussion persuades

12:07PM 10  you that you should.  But do not come to a decision simply

11  because other jurors think it is right or simply to reach

12  a verdict.

13        Third, if the defendant is found guilty, the

14  sentence to be imposed is my responsibility.  You may not

12:07PM 15  consider punishment in any way in deciding whether the

16  government has proved its case beyond a reasonable doubt.

17        Fourth, if you need to communicate with me during

18  your deliberations, you may send a note to me through the

19  court security officer.  And there will be a court

12:08PM 20  security officer posted outside the jury room at all

21  times.  You can send me a note through the court security

22  officer and it can be signed by one or more jurors.  I

23  will respond as soon as possible either in a written note

24  back to you, or I may have you come back to the courtroom

12:08PM 25  and I will respond orally in open court.  Whenever you are

12:08 PM 1    communicating in this way, I would ask you that you not

2    include in your notes how the Jury stands in their vote

3    numerically.

4         Fifth, your verdict must be based solely on the

12:09 PM 5    evidence and on the law which I have given to you in my

6    instructions.  The verdict, whether guilty or not guilty,

7    must be unanimous.  Nothing I have said or done is

8    intended to suggest what your verdict should be.  That is

9    entirely for you to decide.

12:09 PM 10   Finally, the verdict form that you will be

11   provided is simply the written notice of the decisions

12   that you will reach in this case.  You will take these

13   forms to the jury room, and actually the court clerk staff

14   member will be bringing the verdict forms to you.  And

12:10 PM 15   when each of you has agreed on the verdict, your

16   foreperson will fill in the form and the foreperson will

17   sign and date it.  And when you have completed both

18   verdict forms, you should advise the court security

19   officer that you have arrived at your verdicts and that

12:10 PM 20   you're ready to return to the courtroom.  But don't give

21   the court security officer the actual verdict forms, and

22   don't tell the court security officer what your verdict

23   is.  You should just bring the forms back to the courtroom

24   and I will instruct you from there.

12:10 PM 25   Now, let's talk about the actual verdict forms.

12:10PM 1   There are two.  They are relatively straightforward.

2   There is one verdict form for each count.  The first

3   verdict form applies to Count One.

4          And it simply says, On the crime of receipt of

12:11PM 5   child pornography as charged in Count One of the

6   indictment, We, the Jury, find the defendant, Joshua James

7   Duggar, and then there's a line.  And right below the

8   line, it tells you what your options are.  Your only

9   options on your verdict is either guilty or not guilty.

12:11PM10   Your decision on which of those options must be unanimous.

11   Your foreperson will fill in the blank.  Your foreperson

12   will sign and date the verdict form.

13          The second verdict form is exactly like the first

14   one, except it pertains to Count Two, which is the

12:11PM15   possession of child pornography count and you fill it in

16   the same way that you filled in the first verdict form.

17          Now, I mention that the court clerk staff will be

18   bringing the verdict forms to you.  And while you each

19   have your own set of instructions, I only want one version

12:12PM20   of the verdict form circulating in the jury room so that

21   there's not ever any confusion.  The court clerk staff

22   member will also be bringing you all of the evidence, the

23   exhibits, that have been received into evidence.  I need

24   to give you a little bit further instruction about that,

12:12PM25   though.

12:12PM 1        There is an index that you will receive, and the
2        index, there's one for the exhibits for the United States.
3        There's another exhibit list of exhibits introduced by the
4        defendant.  You will have most all of these exhibits
12:13PM 5        physically with you in the jury room, but not all of them.
6        Logistically, there are some exhibits that we can't bring
7        down to the jury room, like the HP computer, like the
8        laptop computer, like the thumb drives.  And obviously, we
9        cannot bring down any of the images that have been
12:13PM 10       introduced into evidence.  We have made our best effort to
11       shade on the index in a different color the exhibits that
12       you won't have available to you in the jury room.

13       So what does this mean?  You can't look at the
14       other evidence that's going to be left here in the
12:14PM 15       courtroom?  No.  You have the right to review every
16       exhibit that has been introduced.  It's just that if you
17       would like to review exhibits that are not brought to you
18       in the jury room, you need to send us a note saying that
19       you would like to look at that, we'll bring you back here
12:14PM 20       to the courtroom and you can examine any of these
21       exhibits, but only in the Court's presence.

22       The same is true for the images that you won't
23       have in the jury room.  If there are elements in the
24       counts that you are deliberating upon and you need to see
12:14PM 25       these images, let us know.  We'll bring you back to the

12:14PM 1   courtroom.  They are available to you, is the point I'm

2   trying to make.

3        I understand that the court clerk's office gave

4   you a lunch menu and we will be -- it may even be there by

12:15PM 5   the time you get back.  And so all your meals going

6   forward are on the Court.  A question that may come up is,

7   well, how long can we deliberate?  Well, you can

8   deliberate as long as you want or need to deliberate.

9   Well, what if we need to deliberate past 5:00?  Well,

12:15PM10   basically, you're in charge completely at this point.  If

11   you want to stay and deliberate past 5:00, we'll stay here

12   with you.  No problem.  We actually do it all the time.

13   If you've had a lot and your brain needs a break and you

14   want to go home overnight because you haven't reached a

12:16PM15   verdict today, that's fine too.  Just let us know that's

16   what you want to do and we'll discuss a time to come back

17   tomorrow and you can pick up your deliberations tomorrow.

18   I just want to underscore the fact that, at this point,

19   we're completely 100 percent at your disposal and however

12:16PM20   you want to do things going forward is up for you to

21   decide.  You just need to give us some reasonable insight

22   as to what you would like to do in terms of continuing

23   your deliberations.

24        So when I recess you at this time, I do need for

12:16PM25   our three alternates to hang back.  So Mr. Juror

12:17PM 1    Number 51, Ms. Juror Number 20, and Ms. Juror Number 6, if

2    ya'll would please just remain in the courtroom, I'll give

3    you instructions about your duties as alternate jurors at

4    that time.  So if everyone would please stand, our 12

12:17PM 5    Members of the Jury will recess and retire to deliberate

6    their verdict.  If everyone in the gallery would please

7    remain in the gallery until I give you the all clear

8    signal.

9               (Jury Retires to Deliberate at 12:17 p.m.)

12:18PM 10              THE COURT:  Everyone may be seated.  So to our

11   alternate jurors.  And this is always somewhat of a

12   difficult conversation.  You've poured your heart and soul

13   into listening to the evidence the last week or so.

14   You've taken super great notes.  You have been with all

12:18PM 15   the other jurors during our breaks.  Under the law in this

16   type of a case, a Jury that deliberates is a Jury of 12.

17   The reason that we impanel alternates is because

18   sometimes, and not that infrequently during the course of

19   a trial, something happens to one of the 12 jurors and we

12:19PM 20   have to replace that juror with an alternate.  And if we

21   didn't have an alternate, we wouldn't be able to complete

22   the trial.  So the work of an alternate carries all of the

23   responsibility of being a regular juror without the

24   ability in some cases to actually complete the assignment

12:19PM 25   that you were given originally, and that's what makes the

12:19PM 1   role of an alternate such a tough thing.  So the question

2   here is whether I should just release you to go on home

3   and be completely released of your responsibilities, or

4   whether we should retain you because you might still get

12:20PM 5   called up.  And what I have decided to do in this case is,

6   I'm going to allow what originally was our fourth

7   alternate, Ms. Juror Number 6, to go.  I'm going to

8   release you from your responsibilities with one caveat,

9   and so you're free to go.  What I would ask is that you

12:20PM 10   remain subject to the Court's admonition about not talking

11   to anyone about the facts of the case, not letting anyone

12   talk to you about the facts of the case, until the Jury

13   has returned its verdict.  And if you will give your best

14   contact information to Ms. Craig, she will call you and

12:21PM 15   you will be the first to know that a verdict has been

16   reached.  And once you have been given that information,

17   if you want to, you can talk to whoever you want to.  You

18   will be fully released from your obligations.  There is a

19   lunch for you if you would like it.

12:21PM 20          As for our other two alternates, Mr. Juror

21   Number 51 and Ms. Juror Number 20, I'm going to ask you to

22   stick around.  And here's why.  I've actually had a couple

23   of cases where something happens to a juror during

24   deliberations.  We tried a case in Harrison several years

12:21PM 25   ago where the Jury had deliberated literally from noon

until about 6:00 at night.  We got a note and one of the
jurors received word that her grandmother had died.  And
on the one hand, she wanted to finish what she started,
but on the other hand, she couldn't stop crying.  So we
released her.  Well, if we didn't have an alternate
waiting to substitute in, a week and a half long trial
could have been at jeopardy.  So that's why we need to
retain some alternates just in case.  And just in case,
I'd like to have two.

Here's another hard part about being an
alternate.  We have to sequester you from everyone else
that's hanging around the courthouse, because if you're
just hanging out in the hallway, it would be too difficult
to avoid hearing other people talk about the case and that
sort of thing.  So we have some very nice sequestration
rooms for you.  And we'll bring you reading materials that
don't offend the Court's rules or whatever we need to do
to occupy your time.  We will check on you.  We have meals
for you.  We won't forget about you.  If there's ever any
business that the Court needs to conduct in the courtroom,
we'll bring you back for that.  But I need you to stay
here.  And, again, the tough part about the responsibility
of an alternate juror.

Ms. Craig will show you where you need to go, and
if you have any questions or issues, you can feel free to

12:24PM 1    visit with her about those logistical issues about what

2    you need to do and where you need to stay as an alternate.

3           We will be in recess in just a moment and we will

4    be in recess until there is a note or a verdict.  Does the

12:24PM 5    government have any further matters that they would like

6    to put on the record?

7           MR. ROBERTS:  No, Your Honor.

8           THE COURT:  Does the defendant have any further

9    issues they would like to put on the record?

12:24PM 10          MR. GELFAND:  No, Your Honor.  Thank you.

11          THE COURT:  We are in recess.

12          MS. CRAIG:  Can I ask that I get the exhibits and

13    the alternate jurors down before you let everybody out of

14    the courtroom?

12:24PM 15          THE COURT:  If you all will just pause in place

16    so that we can get the exhibits down and get the

17    alternates situated before members of the gallery leave.

18          I would ask that counsel provide at least one

19    cell phone number to the court clerk staff where you can

12:25PM 20    be reached.  Be sure that your cell phone is turned on so

21    that if we need to reach you, we can.  Please, I mean,

22    you're free to go wherever you want within the building or

23    the immediate grounds, but please try to be somewhere that

24    you can -- if there's a note or a verdict, you can get

12:25PM 25    back to the courtroom within about five minutes.

12:25PM 1          Over the normal mealtimes, like right now and

2   then later for an evening meal, if you want to go

3   somewhere else, that's fine, just let us know that you're

4   leaving the building and where you're going so that we

12:26PM 5   will know how to track you down if we need you.

6          We're in recess.

7           (Recess taken from 12:26 p.m. to 2:23 p.m.)

8           (In-Chambers Hearing with Reporter Teresa Roca

9            at 1:41 p.m.)

12:26PM 10         (Court's Exhibit 12 Received)

11      THE COURT:  He can't find any recordings of this

12   trial, but lots of recordings of the Zoom pretrial stuff

13   that was before Judge Comstock, so a long time ago.  So

14   I'm just going to get her in here and talk to her, and

1:41PM 15   depending on what she has to say, but I'm probably going

16   to ban her from this federal courthouse for the rest of

17   the trial.  Probably keep her recording device until we

18   can get a copy of what's on there and then take the rest

19   of the matter under advisement until this kind of is in

1:41PM 20   the rear-view mirror and figure out what to do about it.

21      MR. GELFAND:  Is it your understanding that the

22   recordings are of trial proceedings or collateral matters?

23      MARSHALL THOMAS:  They are Zoom hearings of

24   actual -- from Judge Comstock, all pretrial hearings.

1:42PM 25      MR. GELFAND:  I see.

1:42PM 1          MR. ROBERTS:  Detention hearing, I would imagine.

2          MARSHALL THOMAS:  I'm sorry?

3          MR. ROBERTS:  Detention hearing, it sounds like.

4    I think that was the only one via Zoom.

1:42PM 5          MR. GELFAND:  The arraignment?

6          MR. ROBERTS:  I guess the arraignment.

7          THE COURT:  She's supposedly sitting in the

8    courtroom.  Would you mind getting her?  And if she has

9    some representative or whatever that wants to come with

1:42PM10   her, that's fine too.  I'm not envisioning ya'll playing

11   any role.  I just wanted observers.

12         MR. GELFAND:  Could we go off the record one

13   second?

14             (off-the-record discussion)

1:42PM15        THE COURT:  Teresa Roca?  Would you mind sitting

16   down here?  I don't mean to frighten you in any way.

17         REPORTER ROCA:  No.  I'm so sorry.

18         THE COURT:  This is our court reporter and she's

19   taking down everything that is being said right now.  And

1:43PM20   then I have one of the attorneys from each of the parties

21   here, and this is my attorney over here.  You've already

22   met Deputy Thomas.

23         So my understanding from visiting with Deputy

24   Thomas is that when your bag was x-rayed coming into the

1:44PM25   building this morning, that there was a recording device?

1:44PM 1     REPORTER ROCA:  Yes.

2     THE COURT:  Is that right?

3     REPORTER ROCA:  Yeah.

4     THE COURT:  Let me preface our conversation with,

1:44PM 5 I'm not going to swear you in or anything like that, but I

6 am going to ask you questions in my capacity as a federal

7 official, so it would be important that you not lie to me.

8     REPORTER ROCA:  No, I wouldn't lie.

9     THE COURT:  And if you did, there could be either

1:44PM 10 contempt or criminal sanctions for that, so it would be

11 important that you not lie.

12     Secondly, I'm not going to compel you to talk to

13 me if you don't want to.  You're free to go and you're not

14 required to speak with me.  Do you understand that?

1:45PM 15     REPORTER ROCA:  Yes.

16     THE COURT:  So my understanding is that there was

17 a recording device found in your bag?

18     REPORTER ROCA:  Yeah.

19     THE COURT:  Do you want to tell me about why

1:45PM 20 that's so?

21     REPORTER ROCA:  Yeah.  So after court hearings,

22 sometimes they do like press statements.  The lawyers will

23 say, like, how they feel about what the verdict was.  So I

24 had it in my bag to give to my photographer for when that

1:45PM 25 happens after the court hearing and I forgot to give it to

1:45PM 1  him.  And then it went off.  And when it went off, I

2  forgot to give it to the photographer.  I never meant to

3  bring it in the building at all.  It was an accident.  And

4  if you look at my notes, I have like -- I have no reason

1:45PM 5  to record.  Like, I have pages, almost a whole notebook of

6  notes from the hearing.  I would never record.  I'm sorry.

7          THE COURT:  So the next question, and I do see

8  your notes there, very extensive.  Have you brought that

9  recorder in the courthouse on any other day besides today?

1:46PM 10          REPORTER ROCA:  Yeah, I did twice accidentally.

11  I did maybe Tuesday.  Last week, after I did the court

12  hearing, we'll -- me and the photographer will just try to

13  get interviews with the family so I always have my

14  recorder on me every single day just in case we get an

1:46PM 15  interview.  That day, I had interview plans after.  I

16  always give it to my photographer.  And those two days, I

17  forgot.  When I come in in the morning, I always want to

18  be here on time, so sometimes I rush.

19          THE COURT:  So you got the recording device past

1:46PM 20  the x-ray machine on prior days?

21          REPORTER ROCA:  No, they caught it.

22          THE COURT:  They caught it every day?

23          REPORTER ROCA:  I think so, yeah.

24          MARSHALL THOMAS:  Yeah.

1:46PM 25          REPORTER ROCA:  I gave it to my photographer.

1:47PM 1    It's just on those two days, I forgot it was in my bag.

2    Sometimes I have overnights and I forgot about it.

3            THE COURT:  So is that what happened today, is

4    they caught it at the x-ray machine?

1:47PM 5            MARSHALL THOMAS:  On the second time when she was

6    coming back.

7            THE COURT:  So the Marshal seized your recording

8    device today.

9            REPORTER ROCA:  Yes, I know.

1:47PM 10           THE COURT:  Have you been at the trial every day?

11           REPORTER ROCA:  I've been here since -- I've been

12   here since the jury selection.

13           THE COURT:  Where are you from?

14           REPORTER ROCA:  New York City, Staten Island.

1:47PM 15           THE COURT:  So some earlier proceedings in this

16   case were before the Magistrate Judge and they were held

17   over Zoom.  Did you record any of those proceedings on

18   your device?

19           REPORTER ROCA:  Yes, I recorded it.  It was going

1:47PM 20   really quickly and I was taking notes.  And I just -- the

21   stuff is very sensitive and I wanted to get it accurately

22   and correct.  So I recorded it just because I didn't want

23   to get the information incorrect.  They were talking

24   really quickly.  I just wanted to get everything correct.

1:48PM 25   I didn't want to report, you know, 67 images if it was 65

1:48PM 1    images.  I didn't send it to anyone.  It was just to go

2    back and make sure all the numbers were correct.  I didn't

3    send it to anyone.  It's still on my recorder, as you saw.

4    I just want to be honest.

1:48PM 5            THE COURT:  Well, that's good.  That's good.

6    Were you aware that at the beginning of those Zoom

7    proceedings that there's an advisory that recording is

8    strictly prohibited?

9            REPORTER ROCA:  Yeah.  I saw something, I thought

1:48PM10   that if it was for accuracy reasons, that it would be okay

11   as long as it wasn't given, but obviously, I was wrong.

12           THE COURT:  Well, you're not too far off base.

13   There is a provision in our general rules that upon

14   application to the Court and with the Court's express

1:49PM15   permission, a reporter may record, but that is not just a

16   blanket rule.  You actually have to apply.  The Court has

17   to evaluate your credentials.  The purpose of applying is

18   that you have to certify that you're not going to use the

19   recordings for any commercial purpose or to play them and

1:49PM20   that they will be strictly for your notes.  And the

21   purpose of the application process is, we make you sign

22   off on those requirements, and then if an audio does

23   surface somewhere, then you could be in big trouble.  So I

24   believe you, okay?

1:49PM25           REPORTER ROCA:  I'm so sorry.

1:50PM 1          THE COURT:  Nothing bad is going to happen to

2  you, okay?

3          REPORTER ROCA:  Okay.

4          THE COURT:  I don't want you to be super alarmed

1:50PM 5  or concerned about this.  But separate and apart from

6  recording Zoom hearings, there actually was an express

7  order in this case that you can't bring --

8          REPORTER ROCA:  I know.

9          THE COURT:  -- recording devices.  That's posted

1:50PM10  at the front door.

11          REPORTER ROCA:  I know.  It was an accident.  It

12  was an accident.

13          THE COURT:  So here's what I'm going to do.  I'm

14  just going to kind of propose this and I'll let you speak

1:50PM15  if you think that this is wrong or inappropriate.  I'll

16  certainly hear your side out.  But what I'm going to do is

17  I'm not going to make any decisions today about whether

18  your conduct, all things considered, should be the subject

19  of a contempt proceeding, but I do need to retain your

1:51PM20  recording device.

21          REPORTER ROCA:  That's fine.

22          THE COURT:  At least long enough that we can get

23  a copy.

24          REPORTER ROCA:  That's fine.

1:51PM25          THE COURT:  And destroy whatever recordings that

1:51PM 1    are pertinent to this proceeding.

2           REPORTER ROCA:  That's fine.  You can keep it.

3           THE COURT:  And then, secondly, there has to be

4    some sort of sanction for you violating the Court's

1:51PM 5    advisories on Zoom and recording anyway without

6    permission.

7           REPORTER ROCA:  Okay.

8           THE COURT:  So my sanction is going to be to ban

9    you from this trial until it's over.  Do you think that's

1:51PM 10   unfair?

11          REPORTER ROCA:  Can I explain?

12          THE COURT:  Yes, ma'am.

13          REPORTER ROCA:  I just -- I've been in Arkansas

14   since last Monday working really hard just writing all

1:52PM 15   these notes and everything accurately.  I just don't want

16   to get fired because if I miss the verdict, that's the

17   most important part of a trial.  I just don't want to get

18   fired from my job.  You approved my application.  I don't

19   know if you remember.

1:52PM 20          THE COURT:  Yes.  And actually, I'm going to mark

21   as a Court's exhibit to our little collateral hearing the

22   Court's order from November 19th prohibiting electronic

23   devices being brought into the courthouse.  And you've

24   been having some e-mail correspondence with the Court

1:52PM 25   Clerk, Jamie Giani, and I've had her send me that e-mail

1:52 PM 1    traffic.  I don't know that every one of them is here, but

2    most of that e-mail traffic.  And we were glad to have you

3    reporting.  We gave you a reserved spot.

4          REPORTER ROCA:  I know.  I know.  That's why I

1:53 PM 5    would never.  I just --

6          THE COURT:  If all you had done was

7    unsuccessfully attempt to bring a recording device into

8    the courthouse, I wouldn't be nearly as concerned.

9          REPORTER ROCA:  I know.  I know.  I'm not trying

1:53 PM 10    to make excuses.  I was home.  I was in my pajamas.  I was

11    watching the Zoom.  So many numbers were being given, I

12    just wanted to make sure it was accurate.  I never gave it

13    to anyone.  I'm, like, a very good person.  I follow the

14    rules.  I really just did it because I didn't want to get

1:53 PM 15    anything incorrect.

16          THE COURT:  Anything else you would like to say?

17          REPORTER ROCA:  I don't know.  I guess I would

18    just like to ask if I would be able to see the verdict so

19    I don't get fired from my job.

1:54 PM 20          THE COURT:  What about if we moved you to the

21    overflow room?

22          REPORTER ROCA:  That's fine.  That's fine.

23          THE COURT:  That's what the sanction will be, is

24    that you can't be in the courtroom.

1:54 PM 25          REPORTER ROCA:  Okay.  That's fine.

1:54 PM 1            THE COURT:  But you can be in the overflow room.

2            REPORTER ROCA:  That's fine with me.  Thank you.

3       I appreciate that.

4            THE COURT:  I don't know if this will go into

1:54 PM 5       tomorrow or not, but don't try to bring a recording

6       device.

7            REPORTER ROCA:  Again, you can keep that.  I'm

8       not even going to -- thank you.  I appreciate it.  Thank

9       you so much.

1:54 PM 10           THE COURT:  Have you enjoyed Arkansas?

11           REPORTER ROCA:  I like Fayetteville.  It's really

12      pretty.

13           THE COURT:  All right.  Water under the bridge,

14      okay?

1:54 PM 15           REPORTER ROCA:  Thank you.  I just want to

16      apologize.  I know you guys are busy and I'm sure you guys

17      don't have time to hear this, so I apologize.  Thank you.

18           MR. GELFAND:  Good luck.

19           MR. ROBERTS:  Good luck.

1:54 PM 20           THE COURT:  Thank you, ma'am.

21            (In-Chambers Hearing Concluded)

22           THE COURT:  Everyone may be seated.  The Court

23      received a few moments ago a note from the Jury that I

24      have marked as Court's Exhibit 13.

2:24 PM 25            (Court's Exhibit 13 Received)

2:24PM 1     THE COURT:  The note reads, "Government Exhibit

2 Number 22, we would like to hear in entirety."  It is

3 signed by two jurors.  Copies have been provided to

4 counsel.  Obviously, as I explained to the Jury earlier,

2:24PM 5 they are permitted to review whatever evidence has been

6 received.  We don't have the ability to let them listen to

7 this recording in the jury room so I will in fact need to

8 bring them back up here to let them do that.  And that

9 would be my intended course of action.  Is there any

2:25PM 10 objection to that?

11     MR. ROBERTS:  No, Your Honor.

12     MR. GELFAND:  No, Your Honor.

13     THE COURT:  Does the government have the

14 transcript that the Jury had in hand when they listened to

2:25PM 15 it the first time?

16     MR. ROBERTS:  We do not have multiple copies.  We

17 do have the transcript.

18     MS. MARSHALL:  I have the multiple copies.  They

19 are downstairs.

2:25PM 20     THE COURT:  Can you send someone to retrieve

21 them?

22     MS. MARSHALL:  I'll go get them.

23     THE COURT:  And my intended course of action

24 there would be to ask the Jury whether they would find the

2:25PM 25 transcript beneficial.  And if so, we'll hand it out.  If

2:25PM 1   they are not interested in the transcript, then I won't.

2          Is there any objection to that procedure?

3          MS. MARSHALL:  No, Your Honor.

4          MR. ROBERTS:  No, Your Honor.

2:25PM 5   MR. GELFAND:  No, Your Honor.

6          THE COURT:  If you would please retrieve the

7    transcript copies so we're ready.  And if you would go

8    ahead and have them bring the Jury up.

9          MS. MARSHALL:  Yes, sir.

2:26PM 10  MR. ROBERTS:  Your Honor, may I access the

11   system?

12         THE COURT:  Yes.

13         MR. ROBERTS:  Can we have five minutes to kind of

14   situate this?

2:26PM 15  THE COURT:  Yes, you may.  Would you please have

16   them bring the Jury up?

17         MR. STORY:  I just wanted to make sure we're real

18   clear, because I think Mr. Roberts and I are on the same

19   page.  But the government has provided me their actual

2:32PM 20  Exhibit 22, which I believe is the three files that are in

21   the actual exhibits.  I'm going to play them from the

22   defense table just out of convenience, but I just wanted

23   to make sure we had a record that we're just taking the

24   evidence and playing it.  That's all my intent is.

2:33PM 25  THE COURT:  Right.  And you are just going to

2:33PM 1  play the three segments back to back to back?

2        MR. STORY:  I'm just going to play them back to

3  back.  When one is done, I will open the next one and play

4  it again.  When that one is done, I'll open the next one

2:33PM 5  and play it again.  And just kind of go straight through.

6  I just wanted clarity before we started that was the

7  Court's intent.

8        THE COURT:  Yes.  Thank you for doing that.

9        (Jury in at 2:33 p.m.)

2:33PM 10       THE COURT:  So we have received a note from two

11  of our jurors and we have reconvened court.  All counsel

12  and the defendant are present.  We've marked your note as

13  Court's Exhibit 13.

14       The note is in regard to Government Exhibit 22.

2:34PM 15  It says, "We would like to hear it in its entirety."  It's

16  signed by two jurors.  So as I told you before, we will

17  accommodate that.  And it's just that we don't have the

18  ability where you can play it in the jury room so we have

19  to bring you back here, obviously.  And we're going to

2:34PM 20  play that.

21       Exhibit 22 is actually in three sections.  And so

22  my interpretation is that you want to hear all three

23  sections and so that's what we're going to do.  You will

24  recall that when these recordings were received during the

2:35PM 25  course of the trial, you had been provided with a

2:35PM 1   transcript to aid you in following.  If you would like to

2   consult the transcript again as you listen, we can make

3   that available, but if you don't want to, we won't.  What

4   would be your preference?

2:35PM 5           JUROR:  Please.

6           THE COURT:  Please.  So I would ask that the

7   government hand out copies, and hopefully we still have 14

8   copies.  I know that I donated my copy.  Yes, sir?

9           JUROR:  With regards to the alternates and why

2:36PM 10  we're here, they are not privy to why we are here.

11          THE COURT:  Yes.

12          JUROR:  So they just -- can they be made --

13          THE COURT:  No, no, no.  And you bring up a good

14   point, which is that you are here to listen to this

2:36PM 15  evidence, but not to deliberate in our presence.  And so

16   therefore, we don't need to excuse the alternates.  They

17   can be here and listen as well just as spectators at this

18   point, if nothing else.  I would note, though, if you are

19   consulting the transcript and there are any passages that

2:37PM 20  you would like to hear again for whatever reason, if you

21   marked those on the transcript, we might be able to cue it

22   up to those particular portions.  So as you're listening,

23   keep that in mind.

24          I also need to give you an instruction about what

2:37PM 25  you can use the transcript for.  The transcript is for the

2:37PM 1    limited purpose of helping you follow the conversation as
2           you listen to the recording and also to help you keep
3           track of the speakers.  Differences in meaning between
4           what you hear in the recording and read in the transcript
2:37PM 5    may be caused by such things as infliction in a speaker's
6           voice.  It is what you hear, however, and not what you
7           read in the transcript that is the evidence.  Whether the
8           transcript correctly or incorrectly reflects the
9           conversation or the identity of the speakers is entirely
2:38PM 10   for you to decide based upon what you hear on the
11          recording and what you have heard here about the
12          preparation of the transcript and upon your own
13          examination of the transcript in relation to what you hear
14          on the recording.  If you decide that the transcript is in
2:38PM 15   any respect incorrect or unreliable, you should disregard
16          the transcript to that extent.
17                  And if we would, can we please play all three
18          sections back to back to back.
19                  (Government's Exhibit 22 played as follows)
2:38PM 20           (Section One)
21                  AGENT AYCOCK:  What do you do for work?
22                  JOSH DUGGAR:  I -- I own this business and then I
23          also do some real estate as well.
24                  AGENT AYCOCK:  Okay.  What do you do?  You got
2:38PM 25   your real estate license?

2:38PM 1            JOSH DUGGAR:  I do not.  No, we manage -- my dad

2            has commercial properties, so I help him with management

3            of that.

4                 AGENT AYCOCK:  Okay.

2:38PM 5            JOSH DUGGAR:  I dabble in a lot of things.  This

6            is -- you know, this is probably my primary income as far

7            as that goes.

8                 AGENT AYCOCK:  Okay.  I got you.  And how long

9            did you say that you've had this, this here?

2:38PM 10           JOSH DUGGAR:  We moved here in June of last year,

11           I believe it was.

12                AGENT AYCOCK:  Mm-hmm.  So June here at

13           Wholesale?

14                JOSH DUGGAR:  Yes.

2:38PM 15           AGENT AYCOCK:  Okay.  And your internet provider?

16                JOSH DUGGAR:  Is OzarksGo.

17                AGENT AYCOCK:  Ozarks?  And how long have you had

18           them?

19                JOSH DUGGAR:  I don't exactly remember.

2:38PM 20           AGENT AYCOCK:  Okay.  And do you guys operate on,

21           like, a Wi-Fi here or --

22                JOSH DUGGAR:  So yes and no.  We've had several

23           different things.  In fact, last week I changed it because

24           we had three different -- we have -- I think there's three

2:38PM 25           routers in there right now.  I honestly can't remember.

2:38PM 1   But we had it daisy-chained to where we had different --

2        so we could send it out over the lot so we could get to

3        each edge to be able to take pictures and things like that

4        and post them up because our cell service is not real

2:38PM 5   great down here in the valley.

6              So, but I think we -- right now, I think I

7        probably have two routers in there hooked up.  One's more

8        of a long-range and one's closer up.

9              AGENT AYCOCK:  Okay.  Two routers.  And are they

2:38PM10   password-protected or secure?

11             JOSH DUGGAR:  I believe one of them is.  The

12       other one I think was more like a guest network, but I

13       think that's the way I've got them separated right now.

14             AGENT AYCOCK:  All right.

2:38PM15             JOSH DUGGAR:  And yet last week, I changed the

16       configuration on the router because the one was open, the

17       one that said -- the main one that actually comes -- the

18       modem comes in.

19             AGENT AYCOCK:  Uh-huh.  Okay, okay.  And you said

2:38PM20   you didn't have very good cell service here, huh?

21             JOSH DUGGAR:  Well, depending on the provider.

22             AGENT AYCOCK:  Who do you have for your cell

23       phone?

24             JOSH DUGGAR:  AT&T and Verizon -- well, I have --

2:38PM25   I have Verizon, but --

2:38PM 1    AGENT AYCOCK:  Okay.  That's on your --

2           JOSH DUGGAR:  -- we've had both.

3           AGENT AYCOCK:  That's on your personal phone or

4    --

2:38PM 5    JOSH DUGGAR:  Yes, on my personal phone.

6           AGENT AYCOCK:  Okay.  And what's that number?

7           JOSH DUGGAR:  479-200-2681.

8           AGENT AYCOCK:  Okay.  And you said AT&T on

9    another one or --

2:38PM 10   JOSH DUGGAR:  I don't have any.  I used to, but

11   AT&T is -- I know there's -- and then Sprint, we can't

12   really get any signal here for them.

13          AGENT AYCOCK:  Okay.  And how long -- and how

14   long have you had Verizon?

2:38PM 15   JOSH DUGGAR:  I don't know.  I don't recall.

16          AGENT AYCOCK:  How about in your residence?

17   Electronics there?

18          JOSH DUGGAR:  Electronics?  What do you mean by

19   that?

2:38PM 20   AGENT AYCOCK:  Like computers, phone, other

21   phones, anything like that?

22          JOSH DUGGAR:  I mean, my wife has a phone.

23          AGENT AYCOCK:  Mm-hmm.

24          JOSH DUGGAR:  But not any more than I possess.

2:38PM 25   AGENT AYCOCK:  Okay.

2:38PM 1          JOSH DUGGAR:  I mean, I have in the past, and

2          I've recently upgraded my phone.  So, I mean, as far as

3          that goes, I don't want to --

4          AGENT AYCOCK:  All right.  E-mail?  Do you have

2:38PM 5   e-mail accounts?

6          JOSH DUGGAR:  Yes.

7          AGENT AYCOCK:  What would that be?

8          JOSH DUGGAR:  So my e-mail is

9   JoshuaDuggar@iCloud.com is my full name.

2:38PM 10          AGENT FAULKNER:  Sir, if you don't mind, I want

11   to go back real quick to those electronics.  I know agent

12   had mentioned in your home residence, but for the reason

13   of why we're here today, what are we talking about

14   electronics on scene?

2:38PM 15          JOSH DUGGAR:  Okay.

16          AGENT FAULKNER:  So you have your cell phone,

17   right?

18          JOSH DUGGAR:  Right, my cell phone, and then

19   there's a lap- -- there's a laptop in that RV over there.

2:38PM 20          AGENT FAULKNER:  Okay.  Now, let's do one by one.

21   The phone, that was one that you had in your pocket,

22   right?

23          JOSH DUGGAR:  Right, in my pocket.

24          AGENT FAULKNER:  Who else has access to that

2:38PM 25   phone?

2:38PM 1           JOSH DUGGAR:  Well, depending on who's -- I mean,

2      sometimes I have a guy that works with me.  He will take

3      pictures sometimes with the phone.

4           AGENT FAULKNER:  So outside of you, other people

2:38PM 5  possibly have -- is it password-protected?

6           JOSH DUGGAR:  Yeah, it's not -- not very secure.

7      I mean, everybody knows it.

8           AGENT FAULKNER:  Okay.

9           JOSH DUGGAR:  My kids use it quite a bit, my

2:38PM 10  wife.  Mostly family and friends.

11          AGENT FAULKNER:  Got you.  Is it a swipe pass

12     code or PIN, number, numeric?

13          JOSH DUGGAR:  It's a PIN.

14          AGENT FAULKNER:  What is the PIN number for it?

2:38PM 15          JOSH DUGGAR:  Am I required to give that to you?

16          AGENT FAULKNER:  You're not, but --

17          JOSH DUGGAR:  Okay.  I'd rather not.

18          AGENT FAULKNER:  Okay.

19          JOSH DUGGAR:  Yeah.

2:38PM 20          AGENT FAULKNER:  We'll get a little bit more into

21     the forensic side of stuff.

22          JOSH DUGGAR:  No, that's fine.

23          AGENT FAULKNER:  You said a laptop.  That's the

24     one in the RV, right?

2:38PM 25          JOSH DUGGAR:  Yes.

2:38PM 1          AGENT FAULKNER:  So the lap --

       2          JOSH DUGGAR:  It is password-protected as well.

       3          AGENT FAULKNER:  Is that yours?

       4          JOSH DUGGAR:  Yes.

2:38PM 5          AGENT FAULKNER:  Who else would have access to

       6    that?

       7          JOSH DUGGAR:  Same, same kind of deal.  We use it

       8    for, you know, kids watching movies, you know, browsing

       9    online, whatever.

2:38PM 10         AGENT FAULKNER:  Okay.  But it has --

       11         JOSH DUGGAR:  It doesn't get used all that much.

       12         AGENT FAULKNER:  But it is password-protected?

       13         JOSH DUGGAR:  Yes.

       14         AGENT FAULKNER:  Just one password or multiple?

2:38PM 15         JOSH DUGGAR:  Well, so it's password-protected in

       16    the fact that if you log in, I think it will automatically

       17    log you in --

       18         AGENT FAULKNER:  Mm-hmm.

       19         JOSH DUGGAR:  -- but if you are -- you know, if

2:38PM 20    you go to -- it sits idle, it will lock up sometimes.

       21         AGENT FAULKNER:  Okay.

       22         JOSH DUGGAR:  I don't know exactly how I have it

       23    set.

       24         AGENT FAULKNER:  But in terms of ownership, that

2:38PM 25    is your laptop; and in terms of the phone, that is your

2:38PM 1  phone?

2         JOSH DUGGAR:  Yes.

3         AGENT FAULKNER:  We noticed inside of the

4  whatever -- I don't know which one is your office.

2:38PM 5         JOSH DUGGAR:  Yes.

6         AGENT FAULKNER:  But the one over here that has

7  the open sign --

8         JOSH DUGGAR:  Mm-hmm.

9         AGENT FAULKNER:  -- that there was another elec-

2:38PM 10  -- computer in there?

11         JOSH DUGGAR:  Yes.  That's an HP.  That computer

12  is -- it's now password-protected, but pretty much the

13  guys that work here are the ones that use it.

14         AGENT FAULKNER:  Okay.

2:38PM 15         JOSH DUGGAR:  And so there's, you know, different

16  --

17         AGENT FAULKNER:  So there's currently a password

18  on it right now?

19         JOSH DUGGAR:  Yes, there is, yeah.  And the

2:38PM 20  password's written.  I mean, I have it written around so

21  the guys know.

22         AGENT FAULKNER:  I got you.

23         JOSH DUGGAR:  So it's not like -- I mean, it's

24  just mainly to keep somebody from breaking in and

2:38PM 25  accessing file stuff --

2:38PM 1    AGENT FAULKNER:  Oh, no, I understand.

2    JOSH DUGGAR:  -- you know.

3    AGENT FAULKNER:  Right, right.

4    JOSH DUGGAR:  On customers, whatever.

2:38PM 5    AGENT FAULKNER:  And so computer in the office,

6 laptop in the RV?

7    JOSH DUGGAR:  Yep.

8    AGENT FAULKNER:  Your cell phone and then your

9 coworker's cell phone?

2:38PM 10    JOSH DUGGAR:  Yeah.  And then there's also --

11 they reminded me there's a hard drive probably in the

12 security system, which is up above.

13    AGENT FAULKNER:  Oh, for your surveillance?

14    JOSH DUGGAR:  Right, for surveillance system.

2:38PM 15    AGENT FAULKNER:  But you only use that to recover

16 --

17    JOSH DUGGAR:  It's not even -- it's not active

18 right now.  I mean, I didn't tell anybody else that but

19 I'm just --

2:38PM 20    AGENT FAULKNER:  I promise we don't plan on

21 breaking in, so --

22    JOSH DUGGAR:  No, I'm just saying it's, you know

23 --

24    AGENT FAULKNER:  We won't give up your secret.

2:38PM 25 How long for your cell phone?  How long have you

2:38PM 1    had that?

2           JOSH DUGGAR:  I bought it probably when it -- I

3    mean, a week after it came out, the iPhone 11.

4           AGENT FAULKNER:  So guesstimate.  I don't need an

2:38PM 5    exact day.

6           JOSH DUGGAR:  Two months, maybe.

7           AGENT FAULKNER:  Two months ago?

8           JOSH DUGGAR:  Three months.  Yeah, two, three

9    months.

2:38PM 10          AGENT FAULKNER:  All right.  What about that

11   laptop?

12          JOSH DUGGAR:  The laptop I've had for probably

13   five years?

14          AGENT FAULKNER:  Five years?  And that's the one

2:38PM 15   that's in the RV?

16          JOSH DUGGAR:  Yes.

17          AGENT FAULKNER:  All right.  What about the

18   desktop that's in there?

19          JOSH DUGGAR:  The desktop?

2:38PM 20          AGENT FAULKNER:  The HP.

21          JOSH DUGGAR:  I think I've had that for two and a

22   half years, three years, something like that.

23          AGENT FAULKNER:  And then that hard drive, if you

24   can remember?

2:38PM 25          JOSH DUGGAR:  That's probably five -- seven years

2:38PM 1  maybe.  It's an old one.

2          AGENT FAULKNER:  Okay.  That kind of helps us

3  narrow things down to what --

4          JOSH DUGGAR:  Right.  I don't think there's any

2:38PM 5  others in there.  I mean, honestly, I can't remember.  I

6  might have an old, you know, phone laying around or

7  something somewhere.

8          AGENT FAULKNER:  In the RV or in the office?

9          JOSH DUGGAR:  I know there's an old phone in the

2:38PM10  back of this Honda, but that's -- we found it in the car,

11  you know.  It's not like it's ours.

12          AGENT FAULKNER:  What about any other type of --

13  I mean, now, we talk about electronics, I know a lot of it

14  people often just jump to cell phones, tablets, laptops,

2:38PM15  things of that nature, but also electronic devices that

16  store dig- -- thumb drives?

17          JOSH DUGGAR:  So there's -- there's a -- there's

18  probably more than one thumb drive in there.

19          AGENT FAULKNER:  And --

2:38PM20          JOSH DUGGAR:  I don't know how many in the

21  office.

22          AGENT FAULKNER:  You're pointing to this one on

23  the right?

24          JOSH DUGGAR:  In the office on the right.

2:38PM25  There's also camera -- two cameras in there.  Both of

2:38PM 1    those have the ability to record, I think, on them.

2           AGENT FAULKNER:  Mm-hmm.

3           JOSH DUGGAR:  I don't know if any of them

4    actually have any SD cards or anything in there.  I don't

2:38PM 5    know.

6           AGENT FAULKNER:  Right.  And those thumb drives,

7    are those yours, are they your coworkers or --

8           JOSH DUGGAR:  I don't know.  I don't know.  I

9    don't actually know because I don't think I have -- there

2:38PM10    might be one in that laptop bag as well, but they would

11    all be -- like, they would all be -- I mean, if they are

12    here, they are here.  I don't know.  We find stuff in cars

13    all the time.

14           AGENT FAULKNER:  Oh, I can imagine.

2:38PM15           JOSH DUGGAR:  Yeah.  I mean, we find -- when he's

16    cleaning underneath the seats, he will find money.  I mean

17    --

18           AGENT FAULKNER:  You name it, huh?

19           JOSH DUGGAR:  Yeah, pretty much everything.  I

2:38PM20    don't want to say everything we find, but we --

21           AGENT FAULKNER:  That's more of a -- that's more

22    of a lost and found of thumb drives that's in the office

23    right now?

24           JOSH DUGGAR:  Right.

2:38PM25           AGENT FAULKNER:  But then the one that --

2:38PM 1          JOSH DUGGAR:  I -- well, I mean, we may have

2    wiped some of them and used them for -- because we do car

3    photos mostly is what we're doing.

4          AGENT FAULKNER:  Right.

2:38PM 5          (End of Section One)

6          (Section Two)

7          AGENT FAULKNER:  We are trying to figure out what

8    led us to this business.

9          JOSH DUGGAR:  Okay.

2:38PM 10          AGENT FAULKNER:  That's going to involve stuff

11    that's been either uploaded or downloaded onto the

12    internet.  And I know Agent Aycock had mentioned just now

13    -- a while ago about uTorrent files.  Well, we'll play

14    this out question by question.

2:38PM 15          JOSH DUGGAR:  Yeah.

16          AGENT FAULKNER:  You tell me what you feel

17    comfortable with.  Do you know or do you remember Napster

18    back in the day?  Napster was a file-sharing program where

19    millions of users throughout the world could get online

2:38PM 20    and download music files.  So if I had an entire album of,

21    say, Garth Brooks, I could upload it onto this, into

22    Napster.

23          JOSH DUGGAR:  I mean, I'm familiar.  It was

24    probably a little before my --

2:38PM 25          AGENT FAULKNER:  Right.

2:38PM 1                    JOSH DUGGAR:  -- time, but, yeah.

2                    AGENT FAULKNER:  I'm showing my age.

3                    AGENT AYCOCK:  You're not familiar with it.  Come

4          on.

2:38PM 5                    JOSH DUGGAR:  31.

6                    AGENT FAULKNER:  Yeah.  Well, I'm 41, so you got

7          me.

8                    But that was what was called a peer-to-peer

9          file-sharing network.

2:38PM 10                   JOSH DUGGAR:  Okay.

11                   AGENT FAULKNER:  And now it's evolved.  Over the

12         years --

13                   JOSH DUGGAR:  Yeah.

14                   AGENT FAULKNER:  -- it's turned into where these

2:38PM 15  particular programs not only share music files but they

16         share video files, software programs, documents, you name

17         it.

18                   Do you -- are you familiar with or do you know

19         anything about peer-to-peer file-sharing networks?

2:38PM 20                   JOSH DUGGAR:  I mean, I'm familiar with, I guess

21         you could say.

22                   AGENT FAULKNER:  Okay.  Have you ever used or do

23         any of these electronics currently on the property have

24         any of those types of software downloaded onto them?

2:38PM 25                   JOSH DUGGAR:  Yes.

2:38PM  1              AGENT FAULKNER:  Okay.  Which, which devices are
        2     we talking about?
        3              JOSH DUGGAR:  Probably all of them.
        4              AGENT FAULKNER:  All?  So, and I just want to --
2:38PM  5              JOSH DUGGAR:  Right.
        6              AGENT FAULKNER:  -- make sure.  Again, we're not
        7     here to put words in your mouth.  So when you say "all"
        8     and I'm thinking --
        9              JOSH DUGGAR:  Well, okay.  I won't say all
2:38PM 10     because I'm going to say -- I'm going to say the laptop,
       11     the phone, and the computer in the office.
       12              AGENT FAULKNER:  Okay.  So laptop in the RV?
       13              JOSH DUGGAR:  Yes.
       14              AGENT FAULKNER:  Okay.  The phone, your phone or
2:38PM 15     --
       16              JOSH DUGGAR:  I believe.  To the best of my
       17     knowledge.
       18              AGENT FAULKNER:  That's fine.
       19              JOSH DUGGAR:  Yeah.
2:38PM 20              AGENT FAULKNER:  Again --
       21              JOSH DUGGAR:  I don't know if they actually all
       22     have them or not.  I don't know.
       23              AGENT FAULKNER:  We're not here to pen you in a
       24     corner --
2:38PM 25              JOSH DUGGAR:  Right.

2:38PM 1     AGENT FAULKNER:  -- on any of your answers.

2     JOSH DUGGAR:  Right.

3     AGENT FAULKNER:  The laptop that's -- possibly on

4 the laptop in the RV?

2:38PM 5     JOSH DUGGAR:  Right.

6     AGENT FAULKNER:  Possibly on the phone that you

7 had on you, right, your phone, not Randall's?

8     JOSH DUGGAR:  Mm-hmm, right.

9     AGENT FAULKNER:  And then possibly --

2:38PM 10     JOSH DUGGAR:  I don't know about Randall's.

11     AGENT FAULKNER:  Yeah.  We're going to -- we're

12 going to --

13     JOSH DUGGAR:  Yeah.

14     AGENT FAULKNER:  -- have a conversation very

2:38PM 15 similar to what we are having with you when we're done, if

16 he wants to talk to us.

17     And then possibly peer-to-peer networks on the HP

18 that's in the --

19     JOSH DUGGAR:  Yes.

2:38PM 20     AGENT FAULKNER:  Okay.  And I guess that would --

21 that's what Agent Aycock was kind of getting to.

22     JOSH DUGGAR:  Like a TOR -- like a TOR browser or

23 a TOR -- we upload stuff for our cars and things like

24 that.  I've had a friend of mine that came and set up with

2:38PM 25 file-sharing so we could do, you know, more encrypted type

2:38PM 1  stuff.  He just said it's safer that way.  He got me onto

2  it.  It's safer.

3          AGENT FAULKNER:  Now, I want to make sure we're

4  getting -- that we're clear.  When you say "TOR," my

2:38PM 5  definition, that's kind of a --

6          JOSH DUGGAR:  I don't -- I actually don't know

7  the definition, so I don't really want to --

8          AGENT FAULKNER:  Well, because TOR, T-O-R stands

9  for The Onion Router, which stands for basically the Dark

2:38PM10  Web and the deep web.

11          JOSH DUGGAR:  Okay.

12          AGENT FAULKNER:  I don't know if you've heard of

13  the Dark Web?  That's --

14          JOSH DUGGAR:  I mean, I've heard people talk

2:38PM15  about it.

16          AGENT FAULKNER:  Right, but then there's Torrent,

17  so two different things.

18          JOSH DUGGAR:  Okay.

19          AGENT FAULKNER:  Peer-to-peer involves the

2:38PM20  Torrent files.

21          JOSH DUGGAR:  So what are you --

22          AGENT FAULKNER:  So you have peer-to-peer files,

23  which is software that you can download, and you can

24  exchange files with users all over the world.  TOR, T-O-R

2:38PM25  --

2:38PM 1                    JOSH DUGGAR:  Okay.

       2                    AGENT FAULKNER:  -- standing for The Onion Router

       3     is the Dark Web.  That's a program you -- that's where you

       4     can surf the internet anonymously and get on all these

2:38PM 5     different sites.

       6                    JOSH DUGGAR:  Yeah.

       7                    AGENT FAULKNER:  So do you know --

       8                    JOSH DUGGAR:  I don't know which -- I mean, I

       9     don't know.  Just, he said "TOR," so I don't really know

2:38PM 10    --

       11                   AGENT FAULKNER:  Okay.

       12                   JOSH DUGGAR:  -- which one.

       13                   AGENT FAULKNER:  That's fine.  I just want to

       14    make sure I'm not -- when you say "TOR," I'm not thinking

2:38PM 15    Dark Web and while you're thinking peer-to-peer or vice

       16    versa.

       17                   JOSH DUGGAR:  No, I don't -- so you're -- so are

       18    you saying -- what -- I guess I'm still confused.

       19                   AGENT FAULKNER:  In terms of the peer-to-peer --

2:38PM 20                   JOSH DUGGAR:  Because you said you can download

       21    -- I don't actually know.

       22                   AGENT FAULKNER:  Right.

       23                   JOSH DUGGAR:  So I guess I better not --

       24                   AGENT FAULKNER:  Okay.

2:38PM 25                   JOSH DUGGAR:  -- say if I don't understand.

2:38PM 1    AGENT FAULKNER:  And I'm not going to put words

2 in your mouth, but I'm assuming, because you said they

3 have peer-to-peer programs on these devices, that he was

4 talking about Torrent files, not T-O-R.

2:38PM 5    JOSH DUGGAR:  TOR?

6    AGENT FAULKNER:  Torrent, T-o-r-r-e-n-t.

7    JOSH DUGGAR:  Oh, I don't know.

8    AGENT FAULKNER:  As opposed to T-O-R.  And there

9 is a difference there.

2:38PM 10    JOSH DUGGAR:  So are you saying that TOR -- are

11 you saying -- is your question pertaining to which one?

12    AGENT FAULKNER:  I was just making sure that you

13 and I were on the same page as to what you're talking, but

14 I don't think you're seeing the difference between TOR.

2:38PM 15    JOSH DUGGAR:  I don't see any difference.

16    AGENT FAULKNER:  Okay.

17    JOSH DUGGAR:  As far as -- I mean, I don't know.

18    AGENT FAULKNER:  So your friend said that there's

19 potentially on these devices.

2:38PM 20    JOSH DUGGAR:  Well, no, no.  I -- so I have

21 knowledge that there is something that says TOR on there.

22    AGENT FAULKNER:  Okay.

23    JOSH DUGGAR:  At least on one of them.

24    AGENT FAULKNER:  Gotcha.  All right.

2:38PM 25    JOSH DUGGAR:  And then -- and that has been --

2:38PM 1   I'm just saying that was at his recommendation that I use

2   those and so a different -- and I don't know at what point

3   or -- right.

4        AGENT FAULKNER:  Let's leave it at that point

2:38PM 5   based on your description of it.

6        JOSH DUGGAR:  Right.

7        AGENT FAULKNER:  And what would you say the usage

8   of the TOR that --

9        JOSH DUGGAR:  I -- I don't recall.

2:38PM 10        AGENT FAULKNER:  Okay.

11        JOSH DUGGAR:  Yeah.

12        AGENT FAULKNER:  Is it more for the business or

13   is it personal?  Hey, look.  I promise you we're not --

14        JOSH DUGGAR:  I mean, most -- okay.  So I can't

2:38PM 15   --

16        AGENT FAULKNER:  We're not here --

17        JOSH DUGGAR:  I can't speak to that because, I

18   mean, I have -- you have my laptop; you have my phone.  So

19   it's probably split, you know, down the middle.  The

2:38PM 20   office computer, probably the same thing.

21        AGENT FAULKNER:  All right.  And I don't want you

22   to think that we're here because --

23        JOSH DUGGAR:  No, and my --

24        AGENT FAULKNER:  -- somebody's downloading music.

2:38PM 25   We wouldn't --

2:38PM 1             JOSH DUGGAR:  So what are you here for, then?

2             AGENT FAULKNER:  That's what we're getting at.

3             AGENT AYCOCK:  So part --

4             AGENT FAULKNER:  Oh, I'm sorry.  Go ahead.

2:38PM 5             JOSH DUGGAR:  I mean, is somebody communicating

6  --

7             AGENT AYCOCK:  Part of -- we do a lot of things

8  with Homeland Security Investigation.

9             JOSH DUGGAR:  Right.

2:38PM 10           AGENT AYCOCK:  We enforce over, like, 400

11  different federal statutes.

12             JOSH DUGGAR:  Okay.

13             AGENT AYCOCK:  Immigration, narcotics, gaming.

14             JOSH DUGGAR:  Yeah.

2:38PM 15           AGENT AYCOCK:  And part of the other stuff we do

16  is child exploitation.  So we kind of work with saving

17  kids essentially.

18             JOSH DUGGAR:  Yeah.

19             AGENT AYCOCK:  A lot of times we'll find through

2:38PM 20  internet tips that people have, you know, downloaded child

21  pornography.

22             JOSH DUGGAR:  Okay.

23             AGENT AYCOCK:  You know, stuff like that.  And --

24             JOSH DUGGAR:  So is that what you're saying -- is

2:38PM 25  that what you're saying's going on?

2:38PM 1           AGENT AYCOCK:  Well, what we -- what we're saying

2           is there is a possibility that there are pieces to this

3           puzzle where we might be able to help save children.

4           Okay?

2:38PM 5           JOSH DUGGAR:  Okay.

6           AGENT AYCOCK:  That's what we're trying to --

7           that's what we're trying to do.

8           JOSH DUGGAR:  Okay.

9           AGENT AYCOCK:  All right?

2:38PM 10          JOSH DUGGAR:  So what is -- what is the -- I

11          guess what is the scope is what I've been trying to say.

12          Like, is there some -- is there something going on on my

13          devices where that's been -- something's accessed or

14          something's downloaded or uploaded or something like that?

2:38PM 15          AGENT AYCOCK:  That's what led us here, yes.

16          JOSH DUGGAR:  Okay.

17          AGENT AYCOCK:  Okay.  So what we're trying to do

18          is hopefully find out exactly what happened so we can try

19          to use that information to put some pieces of the puzzle

2:38PM 20          together --

21          JOSH DUGGAR:  So --

22          AGENT AYCOCK:  -- to help save --

23          JOSH DUGGAR:  Does it -- does it include -- so

24          did it mark this IP address?  Is that basically what

2:38PM 25          you're saying?

2:38PM 1               AGENT AYCOCK:  Yeah.

2               JOSH DUGGAR:  Okay.  So does it -- so I guess in

3 the scope of your investigation, is there going to be, I

4 guess -- I mean, you'll narrow it down.  You'll be able to

2:38PM 5 figure out probably which device or which thing -- or at

6 least know if it's any of these devices that are here?

7               AGENT AYCOCK:  Well, that's what -- that's what

8 you see all these other guys running around doing.  They

9 are our computer forensic analysts.  So, like, even, you

2:38PM10 know, even if something's on a computer that someone might

11 have downloaded and then deleted, they are going to be

12 able to find it, you know.

13               JOSH DUGGAR:  Yeah.  That's great.

14               AGENT AYCOCK:  They have been doing that.  That's

2:38PM15 what they do, you know?

16               JOSH DUGGAR:  Yeah.

17               AGENT AYCOCK:  So, you know, with that being

18 said, we're just trying to get -- get to the bottom of it.

19               JOSH DUGGAR:  Exactly.  No, well, that helps me a

2:38PM20 lot to understand what you're -- what you're here for.  So

21 I understand that.  I respect that.  That's good.

22               So what other -- I guess, you know, they will do

23 their work and figure out what they can find, so --

24              AGENT FAULKNER:  Has there been anything, let's

2:38PM25 say within the last five to six months between yourself or

2:38PM 1    any of your employees or any of their associates that have

2    been on this property that has raised a red flag as to why

3    that search warrant -- or federal search warrant might

4    have been signed --

2:38PM 5              JOSH DUGGAR:  Not at all.

6              AGENT FAULKNER:   -- as to why we're here?

7              JOSH DUGGAR:  No.

8              AGENT FAULKNER:  Nothing that might have been

9    accidentally or intentionally downloaded or uploaded from

2:38PM10   any of these networks or software programs that we've

11   talked about?

12             JOSH DUGGAR:  Not that I know of, no.

13             (End of Section Two)

14             (Section Three)

2:38PM15             AGENT FAULKNER:  So, and I know Agent Aycock had

16   kind of alluded to the fact that -- what we do, but we're

17   part of a specialized task force and that task force is

18   called the internet Crimes Against Children Task Force.

19             JOSH DUGGAR:  Yeah.

2:38PM20             AGENT FAULKNER:  Based on an ongoing

21   investigation, we were able to directly connect --

22   actually, one of our task force affiliates in the Eastern

23   District was able to directly connect to a certain IP

24   address that was participating in the uploading and

2:38PM25   sharing of known videos and images of child pornography.

2:38PM 1     JOSH DUGGAR:  Okay.

2     AGENT FAULKNER:  That information was then sent

3 to us because the IP geolocated back into the Western

4 District somewhere in Northwest Arkansas.

2:38PM 5     JOSH DUGGAR:  So it was transmitting or

6 receiving?

7     AGENT FAULKNER:  At this point I probably -- it's

8 probably best that you just listen.  Okay?

9     JOSH DUGGAR:  Okay.

2:38PM 10     AGENT FAULKNER:  We were able to get from this IP

11 address one specific video of child pornography and one

12 folder containing approximately 65 images of child

13 pornography from a specific IP address.

14     We then, once that information was turned over to

2:38PM 15 us because of the fact that it was geolocated in Northwest

16 Arkansas, we served a federal summons onto -- or for that

17 IP address.  That IP address came back to OzarksGo --

18     JOSH DUGGAR:  Okay.

19     AGENT FAULKNER:  -- with a subscriber of --

2:38PM 20     JOSH DUGGAR:  Yeah, my name.

21     AGENT FAULKNER -- Joshua Duggar, Duggar with cell

22 phone.

23     JOSH DUGGAR:  Yeah.

24     AGENT FAULKNER:  I'm assuming that's personal

2:38PM 25 cell phone?

2:38PM 1    JOSH DUGGAR:  Mm-hmm.

2    AGENT FAULKNER:  With that e-mail address that

3 you had just mentioned.

4    JOSH DUGGAR:  Yeah.

2:38PM 5    AGENT FAULKNER:  Now, it came back to a P.O. Box.

6    JOSH DUGGAR:  Yeah.

7    AGENT FAULKNER:  We kind of briefly talked about

8 this when we got on scene.  So your -- their service

9 address --

2:38PM10    JOSH DUGGAR:  Right.

11    AGENT FAULKNER:  -- from OzarksGo has you at --

12    JOSH DUGGAR:  Right.

13    AGENT FAULKNER:  -- at this lady's house down the

14 street.

2:38PM15    AGENT AYCOCK:  Down the road.

16    JOSH DUGGAR:  Well -- oh, that's -- that's where

17 it is?  Okay.

18    AGENT FAULKNER:  That's where it is because

19 Washington County property records have not updated or --

2:38PM20    JOSH DUGGAR:  Right.

21    AGENT FAULKNER:  -- or separated your land from

22 this lot.

23    JOSH DUGGAR:  Right.

24    AGENT FAULKNER:  So your actual physical address,

2:38PM25 which we had to find out -- and OzarksGo does not have it;

2:38PM 1   they have corrected now because this poor lady keeps

2          getting your mail -- as to what it is right now.

3                 JOSH DUGGAR:  Okay.

4                 AGENT FAULKNER:  Based on all that information,

2:38PM 5   we were able to determine that this was the business where

6          downloads of child pornography had occurred.

7                 JOSH DUGGAR:  Okay.

8                 AGENT FAULKNER:  It came from -- or it occurred

9          on two separate dates, which I believe to be approximately

2:38PM10   May 14th and May 15th of 2019, through a uTorrent software

11         and that's why I was asking you earlier to make sure we

12         understood or were on the same page --

13                JOSHUA DUGGAR:  Right, right.

14                AGENT FAULKNER:  -- with what T-O-R is, TOR, and

2:38PM15   what Torrent is.

16                JOSH DUGGAR:  Yeah.

17                AGENT FAULKNER:  And everything, again, was at

18         the late night hours, I want to say roughly between, from

19         what we can guesstimate, between 10:00 and 11:00.

2:38PM20                JOSH DUGGAR:  Okay.

21                AGENT FAULKNER:  So based on all that

22         information, a federal search warrant was obtained for the

23         property and everything on it to include the RVs, office

24         and vehicles to find out or look for electronic devices

2:38PM25   that possibly were responsible for those downloads or

2:38PM 1   uploads of child pornography.

2        JOSH DUGGAR:  Okay.

3        AGENT FAULKNER:  That's what's gotten us here

4   today and that's why you can see some of our questions

2:38PM 5   were tailored around electronics --

6        JOSH DUGGAR:  Right.

7        AGENT FAULKNER:  -- who has access, who has

8   ownership, knowledge of certain softwares and forensic --

9   or peer-to-peer groups.  And, you know, at this stage, all

2:38PM10   we're trying to do -- and I'll tell you this:  I didn't

11   know much about you leading up to this until I did, you

12   know --

13        JOSH DUGGAR:  A little research?  Yeah.

14        AGENT FAULKNER:  -- some research in the last few

2:38PM15   weeks.  Man to man, I don't know how you do it.  It is

16   amazing to me what the media is putting you through on a

17   daily basis all because of stuff which would be considered

18   speculation by most parts.

19        We don't want to speculate.  That's why we came

2:38PM20   here.  We tried to be as courteous as possible and have a

21   one-on-one or a conversation to figure out who's doing

22   this on this lot because these are not actors and

23   actresses that are in these videos and images that we know

24   came from here.  Okay?

2:38PM25        JOSH DUGGAR:  Okay.

2:38PM 1          AGENT FAULKNER:  These are somebody's little boy,

2          little girl.

3          JOSH DUGGAR:  I agree.

4          AGENT FAULKNER:  At the end of the day, that's

2:38PM 5   our main objective is to find out who's doing it so that

6   we can -- or what electronic devices it's being done on so

7   we can get those devices and take these images back off

8   the internet so that these kids aren't revictimized.

9          JOSH DUGGAR:  So they are being -- so, yeah.  I

2:38PM 10  guess I have -- I mean, I have quite a few questions about

11  it, but I don't know, you know, how much you can divulge,

12  but I'm just, I'm curious.  You're saying there's images

13  being uploaded or images being downloaded?

14         AGENT FAULKNER:  That the IP address from this

2:38PM 15  lot had child pornography associated to it in a

16  peer-to-peer software program, and our task force

17  affiliate was able to download those, that video and

18  images, from the folder of the IP address going to this.

19         JOSH DUGGAR:  Okay.  Got you.

2:38PM 20         AGENT FAULKNER:  Well, that's one of the things

21  too, and I know Agent Aycock had also spoke about this

22  briefly.  Those individuals you see walking around, we

23  didn't just decide to wake up this morning and come here.

24  So we did our homework and we've been doing this for

2:38PM 25  almost a decade now.  We're pretty good at what we do.

2:38PM  1           JOSH DUGGAR:  Appreciate -- yeah, I appreciate

        2  the work you guys do.

        3           AGENT FAULKNER:  Thank you.

        4           JOSH DUGGAR:  Yeah.

2:38PM  5           AGENT FAULKNER:  But these forensic guys are some

        6  of the best in the country.

        7           JOSH DUGGAR:  That's great.

        8           AGENT FAULKNER:  And what they do is they take

        9  electronic devices and they, through third-party software

2:38PM 10  or through certain forensic software, without altering or

       11  deleting anything that's on those electronic devices, can

       12  go in and see a digital fingerprint of anything and

       13  everything that's ever happened.

       14           So some -- if there's an electronic device -- and

2:38PM 15  that's why we're trying to get ahead of the game.  If

       16  there's an electronic device that may possibly have these

       17  videos or images or anything associated like that that's

       18  on it, we'd like to know now because once we leave here

       19  today, it's kind of the end of our conversation and we

2:38PM 20  wrap our -- wrap everything up then and we don't have

       21  anything else to go on other than, "No, I don't know

       22  anything about it," and then we see it and it's like,

       23  "Okay.  Well, we had an opportunity to talk about that."

       24           JOSH DUGGAR:  Right.

2:38PM 25           AGENT FAULKNER:  "Why wasn't it addressed then."

2:38PM 1          JOSH DUGGAR:  Right.

2          AGENT FAULKNER:  You see what I'm getting at?

3          JOSH DUGGAR:  Right.

4          AGENT FAULKNER:  But as long as you're confident

2:38PM 5  that there's no -- or at least you --

6          JOSH DUGGAR:  I don't want to be -- I've watched

7  my friends, you know, answer things and they get them for

8  conspiracy or for something and I'm just, I'm not --

9          AGENT FAULKNER:  I promise you --

2:38PM 10          JOSH DUGGAR:  I know federal statutes are broad

11  and there's a lot of things to it and I'm not going to say

12  anything that's going to --

13          AGENT FAULKNER:  We don't -- we don't -- that's

14  not our intent.

2:38PM 15          JOSH DUGGAR:  -- incriminate me or anything at

16  all.  I don't want to -- I'm not a -- you know, I'm not

17  denying guilt, but I'm not saying that I'm -- you know, I

18  mean, as far as anything goes, I don't want to be -- I

19  don't want to say the wrong thing.

2:38PM 20          AGENT FAULKNER:  Right.  At the end of the day,

21  you need to protect yourself.

22          JOSH DUGGAR:  Yeah, I don't want to -- I mean, I

23  don't want to -- I don't want to say that I'm guilty or

24  not.  I'm just not saying, you know, on search -- finding,

2:38PM 25  accessing inappropriate content at some point, at any

2:38PM 1    point in my life.

2                    (End of Section Three)

3                    THE COURT:  All right.  That is the entire

4    content of the interview that was received in evidence.

3:02PM 5    Is that good for everyone?  All right.

6                    I will dismiss, or I'll recess the Jury back to

7    their deliberation in the jury room.  Once again, if our

8    two alternates would hang back for just a minute, we'll

9    take care of you all separately.  Everyone please stand

3:03PM 10   while the 12 jurors are in recess.  And if you would just

11   leave the transcripts there on the rail or your chair,

12   please.

13                   MS. CRAIG:  She's asking for a calendar.

14                   THE COURT:  You are Ms. Juror Number 22?

3:03PM 15          JUROR NUMBER 22:  Uh-huh.

16                   THE COURT:  And you're requesting a calendar?

17                   JUROR NUMBER 22:  I'm asking if we could have

18   one.

19                   THE COURT:  And what period of time would like

3:03PM 20   the calendar?

21                   JUROR NUMBER 22:  I guess from May to today.

22                   THE COURT:  From May 2019 to the present?

23                   JUROR NUMBER 22:  Uh-huh.

24                   THE COURT:  Okay.  Yes, ma'am.  I'll take that up

3:04PM 25   with the attorneys and I'll either send it back or I'll

3:04PM send you a note explaining my decision not to, okay?

(Jury out at 3:04 p.m)

THE COURT: Ms. Juror Number 22 on the record in open court requested a calendar. I would interpret that 3:05PM to mean a generic calendar from May 2019 to the present date.

What would the government's position be?

MR. ROBERTS: Your Honor, I'm torn. Protecting the record, I don't think that would be appropriate. It's 3:05PM not in evidence.

THE COURT: What's the defense position?

MR. GELFAND: I happen to agree for the same reasons, Your Honor. It's not that I think either party feels particularly strongly, but only evidence should go 3:06PM back to the Jury.

THE COURT: Okay. I have sketched out a responsive note just to articulate, for the consideration and approval by counsel, and then I would propose having this typed up.

3:09PM "Ms. Juror Number 22 made a request for a calendar reflecting the months of May 2019 to the present. I need to decline this request. Certain rules of court procedure necessitate that your deliberations and your verdict be based only on the evidence received during the 3:10PM evidentiary portion of the trial. Signed by Judge Timothy

3:10PM 1   Brooks."

2                MR. ROBERTS:  Good with the government.

3                MR. GELFAND:  Likewise, Your Honor.

4                THE COURT:  We'll get that typed up and I will

3:10PM 5   give you all a copy of it.  And assuming that you both

6   consent after you see the written version, then I will

7   have a CSO take it down to them.

8                Be back with you in just a minute, but I intend

9   on doing that off the record.  We won't come back on the

3:10PM10   record.  I'm just going to bring it out and hand it to you

11   and get you both to agree that that's appropriate.

12                (Recess taken from 3:15 p.m. to 3:20 p.m.)

13                THE COURT:  We have typed up the response that I

14   dictated earlier.  The typed version is marked as Court's

3:15PM15   Exhibit 14.  And I will ask that the clerk get this to the

16   CSOs to take to the jury room.  Both sides are good?

17                (Court's Exhibit 14 Received)

18                MR. CLAYMAN:  Yes, Your Honor.

19                MR. GELFAND:  Yes, Your Honor.

4:57PM20                (Jury in at 4:57 p.m.)

21                THE COURT:  Members of the Jury, it's 5:00.  I'm

22   wondering if you all had discussed your preferences in

23   either continuing on tonight or recessing for the evening

24   and coming back tomorrow?

4:58PM25                JUROR:  Yes, sir, we have.

4:58PM  1             THE COURT:  What is the preference?

2             JUROR:  Our preference is to recess for the day

3 and reconvene in the morning at 8:30.

4             THE COURT:  At 8:30.  That's what we will do.  So

4:58PM  5 couple things about this.  I do need to read the full

6 recess instruction.  It will be modified a little bit, but

7 the main take-away here is that, obviously, I've told you

8 to deliberate and have been deliberating this

9 afternoon.  But conceptionally, it's very important that

4:59PM 10 you understand that you can only deliberate as a group of

11 12.  So as you're leaving today, as you're gathering

12 tomorrow, you can't deliberate unless it's during periods

13 of time that have been sanctioned by the Court and that I

14 know that all 12 of you are present.  So the procedure

4:59PM 15 that we will go through is very similar to what we have

16 been doing, which is you will report a few minutes early

17 or several minutes early, whatever your preference is.  At

18 8:30, when all of you are present, I need to call you back

19 to the jury room, visualize all 12 of you, and then send

5:00PM 20 you back down to deliberate.  And I realize that seems

21 like logistically silly, but it's just something that I

22 need to do.  So you can't discuss the facts of the case

23 after I recess you for this evening.  And you can't

24 discuss the facts of the case until we have reconvened in

5:00PM 25 court tomorrow morning and I send you back downstairs.

5:00PM 1    Then when all 12 of you are present, you can commence your

2    deliberations.  Does that make sense to everyone?

3         So during this recess and until I tell you to go

4    back and deliberate tomorrow morning, you must not discuss

5:00PM 5    this case with any of your fellow jurors.  And at no time

6    until I have discharged you from your responsibilities may

7    you discuss the case with anyone else, including members

8    of your family, people involved in the trial or anyone

9    else.  Do not allow anyone to discuss the case with you or

5:01PM 10   within your hearing.  Only you have been chosen as jurors

11   in this case.  Only you have been sworn to uphold the law.

12   No one else has been chosen to do this.

13        If anyone tries to approach you or to talk to you

14   about the case, please let me know about that immediately

5:01PM 15   through one of the court security officers or court staff

16   members.  And when I say you must not discuss the case

17   with anyone, I mean either orally, verbally, in writing,

18   through electronic form such as e-mails or text messages

19   or blogs or Tweets or whatever type of social media

5:01PM 20   platform you might ordinarily use.  You simply cannot do

21   that.  Also remember that you must not read any newspaper

22   or other written accounts of the trial or watch any

23   televised accounts of the trial or listen to any radio

24   program about the trial.  You must not conduct any

5:02PM 25   internet research or consult with any other sources about

5:02PM 1   this case, the people involved in the case, or its general

2   subject matter.  You must keep your mind open and free of

3   outside information.  Only in this way will you be able to

4   decide the case fairly, based solely on the testimony,

5:02PM 5   evidence presented in the courtroom, and my instructions

6   on the law.  If you were to decide this case on anything

7   else, you will have done an injustice.  It would be a

8   violation of your oath for you to base your decision on

9   some reporter's view or opinion or upon other information

5:02PM10  acquired from outside the four walls of this courtroom.

11  It is very important that you follow these instructions.

12         And with that, we are in recess and we will call

13  for you at 8:30 in the morning.  Have a good evening.

14         (Jury out at 5:02 p.m.)

5:02PM15        MS. CRAIG:  We need to hold everyone until they

16  leave the building.

17         THE COURT:  We will maintain a hold here longer

18  than normal, yes.  Everyone in the courtroom should remain

19  in the courtroom.  You may be seated.

5:03PM20        For any of members of our gallery that weren't

21  here, we probably covered this on the first day of trial

22  during jury selection.  One of our COVID precautions is to

23  use the second floor jury room because it is more spacious

24  than our jury room that's right across the hallway.  We

5:04PM25  can barely get 12 people in that jury room on a good day,

5:04PM 1   and so we wanted to give them more space in light of
       2   COVID.  But as you may have experienced, there is a
       3   logistical delay in moving 12 or 14 or 15 people on our
       4   jury in the elevators and that's why every time we talk
5:04PM 5   about convening court at a certain time, we are calling
       6   for the Jury, but it takes five minutes to get them up
       7   here.
       8        I think the idea that they were conveying just
       9   now is they have jackets and coats and purses and whatever
5:05PM 10  in the jury room.  So they need to leave the courtroom,
      11   get off on the second floor jury room, gather their
      12   things, and they would like to be off the property.  That
      13   way, they don't have to encounter other people, which is
      14   very commonsensical and I appreciate someone actually
5:05PM 15  thinking about that.  So all of that to say, if you would
      16   please pause with me a little bit longer than we normally
      17   might.  We're in recess until 8:30.
      18        (Proceedings recessed at 5:09 p.m.)
      19
      20
      21
      22
      23
      24
      25

C E R T I F I C A T E

     I, Paula K. Barden, CCR, RPR, RMR, Federal Official Court Reporter, in and for the United States District Court for the Western District of Arkansas, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

     Dated this 16th day of January 2022.

_____
PAULA K. BARDEN, CCR, RPR, RMR #700
Federal Official Court Reporter
Western District of Arkansas

