**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Criminal No. 5:21-CR-50014-001** |
| | ) | |
| **JOSHUA JAMES DUGGAR** | ) | |

## UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL OR NEW TRIAL

The United States of America, by and through undersigned counsel, hereby files this response in opposition to the defendant's motion for a judgment of acquittal or for a new trial. (Doc. 131). For the reasons below, the defendant's motion should be denied.

## INTRODUCTION

The defendant was charged in a two-count Indictment with receipt and possession of child pornography. At the trial on these charges, the jury learned that the defendant's password was used to create a secret partition on his computer that bypassed internet-monitoring software, child sexual abuse material was repeatedly downloaded to the partition, and the defendant was at or by the computer every time this happened. The defendant, for his part, claimed that someone else did it, but his attempts to scapegoat others collapsed under the mildest scrutiny. His own expert largely agreed with government's explanation of the facts and, when given the chance to rebut evidence placing the defendant at the computer, conceded that she could not. Further, when given the chance to substantiate his speculative defense with other witnesses, the defendant instead rested his case. On December 9, 2021, a jury found the defendant guilty of both counts in the Indictment.

The defendant now asks the Court to overturn the jury's verdict, claiming there is no evidence he personally viewed child pornography, but his barebones argument ignores the ample

proof beyond any reasonable doubt that he repeatedly downloaded and viewed this material on a password-protected partition and that the files had titles indicative of their illegality.

The defendant also asks the Court to grant the extraordinary remedy of ordering a new trial for a variety of reasons, but these arguments fail, too. He claims that the Court prevented him from calling as a witness Caleb Williams—a man who could not have committed these crimes based on the defendant's own evidence but who he nevertheless sought to implicate—and criticizes the timing of the disclosure of emails from Mr. Williams. But contrary to his misleading framing, he was not prevented from calling Mr. Williams; he simply opted not to when told he would need to satisfy the Federal Rules of Evidence before improperly injecting Mr. Williams's prior sex offense into the trial. Further, the emails at issue are wholly immaterial, but they were still disclosed promptly after they were reviewed and in time for the defendant to attempt to utilize them at trial.

He also argues that a new trial is warranted because the timing of the disclosure of the government's demonstrative rebuttal exhibits allegedly violated Rule 16 and the Jencks Act, and because the testimony about iPhone metadata from James Fottrell, Director of the Department of Justice's High Technology Investigative Unit, was improper expert testimony. The demonstratives merely illustrated Director Fottrell's testimony from the government's case-in-chief, however; they were not witness statements and did not contain new information material to the preparation of the defense. Moreover, the case he relies on to claim that Director Fottrell's review of metadata is expert testimony is inapposite. To the extent it was expert testimony, Director Fottrell was qualified to provide it and the defendant received adequate notice of it. Indeed, he had the inapposite caselaw readily available at trial to object to the testimony he now claims he could not have anticipated. Accordingly, his request for a new trial on these grounds should be denied.

2

The defendant last tells this Court it must dismiss Count Two of the Indictment with prejudice. While undeveloped, his argument appears to misapprehend the Court's prior guidance and controlling precedent. The defendant's motion should therefore be denied in its entirety.

## RELEVANT PROCEDURAL BACKGROUND

On April 28, 2021, a grand jury returned an Indictment charging the defendant with (1) receiving child pornography between May 14, 2019, and May 16, 2019, and (2) possessing child pornography during the same timeframe. Pursuant to Federal Rule of Criminal Procedure 16(a)(1)(G), the government provided the defense with its expert notice on July 16, 2021. *See* Ex. 1. The notice explained that Director Fottrell may testify about his examination of the defendant's devices and that either Director Fottrell or Marshall Kennedy, a computer forensic analyst at Homeland Security Investigations ("HSI"), may testify about images containing metadata— including geolocation information—from the defendant's laptop, which was documented in other discovery provided to the defense.

On August 20, 2021, the defendant filed a motion to dismiss, claiming the government did not preserve potentially exculpatory evidence that may have implicated three others, none of whom were Caleb Williams. Doc. 40. He partially withdrew his motion after the government informed him that his own counsel represented one of the three individuals in a different case that resulted in the individual's incarceration during the charged timeframe, and the Court ultimately denied the motion. Doc. 61. Because he attempted to blame others for his crimes based on demonstrably false speculation, the government moved to preclude the defendant from introducing an unsubstantiated "alternative perpetrator" theory at trial absent a non-speculative nexus between the crimes and the alleged perpetrator. Doc. 67. The Court denied the motion but noted that it would not permit him to present speculative testimony or purely speculative arguments to the jury. Doc. 93 at 7.

3

## ARGUMENT

Before the Court is the defendant's motion to overturn the jury's verdict and enter a judgment of acquittal or order a new trial, or to dismiss Count Two of the Indictment with prejudice. Under Federal Rule of Criminal Procedure 29 ("Rule 29"), a court can only enter a judgment of acquittal if no rational jury could have found the defendant guilty, even when viewing the evidence in the light most favorable to the government. Similarly, a court should exercise its authority to order a new trial under Federal Rule of Criminal Procedure 33 ("Rule 33") sparingly and with caution, and only where it is convinced that doing so is necessary to prevent a miscarriage of justice. Neither standard is met here, where the evidence of the defendant's guilt is clear and overwhelming. And finally, the government's previously agreed-upon representation that it will move to dismiss Count Two at sentencing is consistent with controlling precedent. Accordingly, the Court should deny the defendant's motion in its entirety.

## A.   THE DEFENDANT IS NOT ENTITLED TO A JUDGMENT OF ACQUITTAL

The defendant first argues that the jury's verdict should be thrown out and a judgment of acquittal entered because there was no evidence he "personally" viewed child sexual abuse material, which he claims is an essential element of the offenses. Doc. 131 at 2-3. Pursuant to Rule 29, a defendant may move a court to set aside a guilty verdict and enter a judgment of acquittal for any "offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). The court, however, "has very limited latitude to do so and must not assess witness credibility or weigh evidence." *United States v. Hassan*, 844 F.3d 723, 725 (8th Cir. 2016). When reviewing such a motion, the Court must resolve all evidentiary conflicts in the government's favor and accept all reasonable inferences that support the verdict. *United States v. Weaver*, 554 F.3d 718, 720 (8th

Cir. 2009). A Rule 29 motion should only be granted "if no reasonable jury could have found the defendant guilty beyond a reasonable doubt." *Id.* (internal quotation marks omitted).

The crux of the defendant's motion is that there was no evidence he personally viewed the child sexual abuse material at issue, which he claims is necessary to prove he "knew that the visual depictions were of a minor engaging in sexually explicit conduct." Doc. 131 at 3. The defendant's motion not only ignores the ample evidence proving he viewed this material, but it also critically misstates the element the jury considered when determining his guilt. The government did not need to provide evidence that he personally viewed the material to convict him of receiving and possessing child pornography, it only had to prove that he knew the material was of minors engaging in sexually explicit conduct. Doc. 118 at 11-12; *see also United States v. Kuhnel*, --- F.4th ---, 2022 WL 301606, at *3 (8th Cir. 2022) ("A person knowingly receives child pornography under 18 U.S.C. § 2252(a)(2) when he intentionally views, acquires, *or* accepts child pornography on a computer from an outside source." (emphasis added) (internal alterations removed)); *United States v. Morrissey*, 895 F.3d 541, 549-50 (8th Cir. 2018) (upholding conviction for receipt based on files in "thumbnail cache database" and folder that "indicated user interaction").

On this point, the jury heard testimony from multiple witnesses, including his own expert, proving that: the child sexual abuse material was downloaded to a password-protected Linux partition on his computer using two different programs and he knew the programs existed on his computer; the files had names indicative of child sexual abuse material; and many files were, at a minimum, viewed in thumbnail format or played as videos. Interpreting this evidence in the light most favorable to the government and drawing all inferences to support the verdict, there can be no doubt—let alone a reasonable one—that the defendant knew the visual depictions he received and possessed were of minors engaging in sexually explicit conduct.

The government's first witness, Detective Amber Kalmer, testified that she downloaded child sexual abuse material using a law enforcement version of peer-to-peer software from the user of an Internet Protocol ("IP") address on May 14 and 15, 2019. Trial Transcript ("Tr.") at 68-80. The jury then learned that the IP address was assigned to the defendant's used car lot in Springdale, Arkansas. Tr. at 125-34. HSI Special Agent Gerald Faulkner testified about the interview of the defendant during the search of the lot on November 8, 2019. As he explained, the defendant asked unprompted: "What is this about? Has somebody been downloading child pornography?" Tr. at 156. The jury then heard clips of the interview in which the defendant said the desktop computer at the car lot was his and peer-to-peer software and something related to The Onion Router ("Tor") network—also referred to as the Dark Web—were on the computer. Tr. at 177-79, 180-83.

The jury also heard from Director Fottrell, who testified that the computer's hard drive was divided into a partition running the default Windows operating system that would boot up automatically and a partition running the Linux operating system that a user had to take affirmative steps to access. Tr. at 472-73. Director Fottrell explained that the Linux partition was created on May 13, 2019, by someone physically present at the defendant's computer. Tr. at 493. The defendant's expert, Michele Bush, conceded this fact on cross-examination. Tr. at 1182-83. Director Fottrell also testified that the default Windows partition contained work material and an internet-monitoring software known as Covenant Eyes, while the Linux partition contained the Tor browser bundle and the uTorrent peer-to-peer software but not Covenant Eyes. Tr. at 463-64, 475-78, 584. The Tor browser and uTorrent—two programs the defendant said were on his computer—were only installed on the Linux partition, and a Covenant Eyes representative explained that the defendant could bypass internet monitoring on the Windows partition by using the Linux side. Tr. at 360-68. The jury learned that username to the Linux partition was "dell_one"

6

and the password was "Intel1988," which was not the same password to the Windows side but was one the defendant had consistently used for years. Tr. at 474, 598, 604. And as other witnesses explained, the defendant had long been curious about the Linux operating system and partitioning hard drives to bypass programs like Covenant Eyes. Tr. at 919-20, 925-26, 933-34.

Director Fottrell then explained that someone repeatedly downloaded child sexual abuse material to the Linux partition using Tor and uTorrent on May 14, 15, and 16, 2019, including files with titles like "14yo girl suck and fuck," "pedomom," and "2_pthc ultra hard pedo pedofilia (new) 065."[1] Tr. 545-55. The "14yo girl suck and fuck" and "pedomom" files were downloaded using uTorrent, which is a multi-step process. Typically, the user would first have to find torrent files associated with the videos—which, in this case, revealed the titles "14yo girl suck and fuck" and "pedomom"—and would then use the torrent files to download the videos via uTorrent. Tr. at 530-31; Gov. 39. Ms. Bush agreed that these titles would be evident to the person downloading them. Tr. at 1195-96. Director Fottrell also testified, and Ms. Bush also agreed, that these two videos and five others—all of which depicted minors engaged in sexually explicit conduct—were played on the Linux partition after being downloaded at different times, and that the user of the partition navigated to folders and viewed child sexual abuse images in thumbnail format. Tr. at 542-52, 1193-1203. The two experts also agreed that the only document on the Linux side was a payment record from the car lot that listed the defendant as the sales agent. Tr. at 556, 1261-62.

Director Fottrell last testified about images and messages from a back-up of the defendant's iPhone on his laptop. Tr. at 616-18. Images taken by an iPhone are saved in Apple's proprietary format and have EXIF information, or metadata, including GPS coordinates of where the iPhone

---

[1] "PTHC" stands for "preteen, hard core," and is generally used to describe material depicting prepubescent minors engaged in penetrative sexual acts or sexual acts with others. Tr. at 555.

was when the images were taken. Tr. at 617-18. Director Fottrell testified that he commonly used metadata to establish identity and location and that, in this case, he plotted the GPS coordinates to verify the accuracy of the exhibits. Tr. at 621-23. Based on his review of the images and messages, Director Fottrell testified that the defendant was by or at the computer every time child sexual abuse material was downloaded and accessed on May 14, 15, and 16, 2019, as well as when the document with his name on the Linux partition was created.[2] Tr. at 635, 668-73.

This evidence satisfies the elements of the offenses for which the jury found the defendant guilty, and in particular that he knew the material he received and possessed was of minors engaging in sexually explicit conduct. Because the defendant has failed to show that no reasonable jury could have found him guilty, his motion for a judgment of acquittal should be denied.[3]

## B.    THE DEFENDANT IS NOT ENTITLED TO A NEW TRIAL

The defendant next asks this Court to overturn the jury's verdict and order a new trial. Rule 33 allows a court to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). While a court need not view the evidence in the light most favorable to the verdict when deciding a Rule 33 motion, the Eighth Circuit has instructed that courts should exercise this authority "sparingly and with caution." *United States v. McClellon*, 578 F.3d 846,

---

[2] Despite Director Fottrell's testimony that he reviewed "photos that were taken on the iPhone," Ms. Bush claimed that the metadata was unreliable because she did not know if the defendant took the images on his iPhone or if they were taken on another device and sent to the iPhone. Tr. at 617-18, 1318. Ms. Bush later admitted that she could have determined whether they were taken on the iPhone but did not. Tr. at 1319. As the Court observed, contrary to her representation that "she starts with facts and follows them to a conclusion," Ms. Bush knew here "the conclusion that she want[ed] to reach and she look[ed] to possibilities upon possibilities to back into that," and she was not permitted to offer her speculative testimony on this topic. Tr. at 1322.

[3] Given the strength of the evidence, the defendant's request for a new trial under Rule 33 on these grounds should be denied for the same reasons. Doc. 131 at 24-25; *United States v. Starr*, 533 F.3d 985, 999 (8th Cir. 2008) ("A district court may grant a new trial under Rule 33 only if the evidence weighs so heavily against the verdict that a miscarriage of justice may have occurred.").

857 (8th Cir. 2009). Courts "may grant a new trial under Rule 33 only if the evidence weighs so heavily against the verdict that a miscarriage of justice may have occurred." *Id*. Rule 33 motions are "generally disfavored," and "[u]nless the district court ultimately determines that a miscarriage of justice will occur, the jury's verdict must be allowed to stand." *United States v. Campos*, 306 F.3d 577, 579 (8th Cir. 2002) (reversing district court's grant of Rule 33 motion).

1.     **The Defendant Was Not Precluded from Calling Caleb Williams as a Witness**

The notion that Caleb Williams committed these offenses is pure fiction—a story advanced by the defense for the sole purpose of casting blame, regardless of evidence to the contrary, on a sex offender. Yet the defendant now claims he is entitled to a new trial because the Court precluded him from calling Mr. Williams as an alternative-perpetrator witness. Doc. 131 at 11-18. A review of the record reveals the opposite: the Court allowed the defendant to call Mr. Williams to develop this theory but simply limited his ability to introduce evidence of Mr. Williams's prior sex offense pursuant to the Federal Rules of Evidence until he established a non-speculative nexus between Mr. Williams and the crimes.[4] Faced with the certainty that he could not establish the nexus needed to trot out the witness's sex-offender status, the defendant elected not to call him. His failure to call Mr. Williams was therefore a strategic decision made with counsel, not a limitation imposed by this Court, and his motion should be denied.

---

[4] The defendant's true complaint appears to be that he was limited from impeaching Mr. Williams as a sex offender prior to establishing the relevance of his testimony, as opposed to an overall limitation on calling him as a witness. His dissatisfaction with the Court's analysis under Federal Rule of Evidence 403 regarding the impeachment of a witness fails to establish "a miscarriage of justice" sufficient to warrant a new trial under Rule 33. "In considering whether to admit evidence of a prior conviction to impeach a witness, '[t]he weighing of probative value against prejudicial effect is committed to the sound discretion of the trial court.'" *United States v. Chaika*, 695 F.3d 741, 744 (8th Cir. 2012)(quoting *United States v. Foley*, 683 F.2d 273, 278 (8th Cir. 1982)). Yet, again, the mere reference of this limitation further highlights the defendant's true intention in advancing Mr. Williams as an alternative perpetrator: to mislead the jury with his prior sex offense.

As the Supreme Court explained in *Holmes v. South Carolina,* 547 U.S. 319, 327 (2006) (internal citations omitted), it is widely accepted that "[t]he accused may introduce any legal evidence tending to prove that another person may have committed the crime with which the defendant is charged," but such evidence "may be excluded where it does not sufficiently connect the other person to the crime, as, for example, where the evidence is speculative or remote, or does not tend to prove or disprove a material fact in issue at the defendant's trial." Thus, "courts may properly deny admission of alternative perpetrator evidence that fails to establish, either on its own or in combination with other evidence in the record, a non-speculative 'nexus' between the crime charged and the alleged perpetrator." *United States v. Jordan,* 485 F.3d 1214, 1219 (10th Cir. 2007) (quoting *United States v. McVeigh,* 153 F.3d 1166, 1191 (10th Cir. 1998)); *United States v. Hendricks,* 921 F.3d 320, 331 (2d Cir. 2019) ("A court must … ensure that the defendant shows a sufficient nexus between the crime charged and the asserted 'alternative perpetrator.'"); *United States v. Hicks*, 307 F. App'x 758, 761 (4th Cir. 2009) (affirming exclusion of evidence that alternative perpetrator placed child pornography on computer where defendant could not "demonstrate a nexus between the crime charged and the alleged alternative perpetrator"). Put differently, a defendant seeking to introduce such evidence cannot "merely … offer up unsupported speculation that another person may have done the crime" because "[s]uch speculative blaming intensifies the grave risk of jury confusion, and it invites the jury to render its findings based on emotion or prejudice." *McVeigh*, 153 F.3d at 1191 (citing Fed. R. Evid. 403).

### a.     The defendant's decision not to call Caleb Williams as a witness

A month prior to trial, the government filed a motion *in limine* regarding alternative-perpetrator evidence.[5] Doc. 67. In response, the defendant identified for the first time Mr. Williams as a potential alternative perpetrator who he may call as a witness at trial. Doc. 84. The defendant claimed that Mr. Williams "regularly used the desktop computer in the months and weeks leading up to May 2019[,] … sold a car on behalf of Wholesale Motorcars on March 27, 2019, and used the HP desktop computer to print shipping labels." *Id.* at 11. The Court denied the government's motion but advised that it would not allow the defendant "to present speculative testimony or make purely speculative arguments to the jury." Doc. 93 at 7

During his opening statement, defense counsel described this case as a "classic, old-fashioned 'whodunit,'" and identified three potential culprits other than his client:

> Randall Berry, you are going to hear that he talked to the feds twice. First, November 8th of 2019, the day they executed the search warrant. He confidently on a recording, by the way, told them, "I didn't even start working at this car lot until June of 2019." The agents investigating said, "Great, couldn't have been you, weren't there." The pay records clearly revealed that he was there in May of 2019 at the earliest. Agents go back to him. And he says, "All right, May 20th, that's the date," on a recording, by the way. Members of the Jury, you are going to see in evidence a picture time-stamped of Randall Berry at the car lot on May 16th of 2019, squarely within the window of time that matters.
>
> William Mize, he told agents, "I'm just a homeless guy with no computer sophistication." They said, "Great, we don't need to hear anymore, thanks for your time." You're going to learn over the course of this trial he bought eight cars, approximately five to eight cars, from Wholesale Motorcars, that he was regularly at the car lot, that he worked there on occasion to make extra cash. And you are going to hear from a witness who is going to testify from that witness stand that he personally observed Mr. Berry sitting in a van regularly outside a McDonald's

---

[5] As described above, the defendant moved to dismiss the Indictment for failure to preserve allegedly exculpatory evidence that he speculated would implicate three others. *Supra* p.3. While the defendant withdrew the motion with respect to one individual in response to his counsel's admission that he should have known this individual could not have committed the crimes, the two others and Mr. Williams were subpoenaed but not called as defense witnesses at trial.

accessing the McDonald's Wi-Fi. It was so remarkable to this witness that they literally gave him a nickname, "McLoiterer." You can't make this up.

Caleb Williams. You're going to see evidence that he sold a car as a salesperson at the lot in March 2019, that he regularly printed shipping labels from the HP computer at the center of this case for his own eBay business that had nothing to do with Josh and nothing to do with Wholesale Motorcars. You are going to hear that he's so tech savvy that he runs his own e-commerce business where he accepts Bitcoin, in addition to other forms of payment. Investigators first interviewed him 30 months into this investigation several weeks ago. To this day, they have never looked at his devices.  He sends a text message we're going to introduce into evidence in this case to Josh on May 7th of 2019, just before this time period that matters. And he says he's available to, quote, "Watch the lot," end quote, in the upcoming week. Members of the Jury, there's so much more to this case than the prosecution wants you to believe.

Tr. at 41, 57-59.

The defendant's insistence that this case was more complicated than it seemed, however, could not be squared with the evidence. Specifically, Director Fottrell explained, and Ms. Bush conceded, that whoever set up the Linux partition had to be physically present at the defendant's computer on May 13, 2019. *Supra* p.6. After Ms. Bush's concession, defense counsel told the Court that he intended to call Mr. Williams but wanted to first address objections from the government and consult with his client in light of Ms. Bush's testimony. Tr. at 1353. When the government then questioned whether the defense had a good-faith basis to believe that Mr. Williams was in Arkansas between May 13 and May 16, 2019—the timeframe set by the defendant's own expert—defense counsel proffered, among other things, that Mr. Williams: previously worked at Wholesale Motorcars; could authenticate records from March 2019; had familiarity with the computer; texted the defendant on May 7, 2019, offering to help "watch the lot"; and spent the night at the defendant's brother's car lot on May 9, 2019. Tr. at 1355-58.

In response, the government proffered that Mr. Williams denied to both a defense investigator and the government that he was in Arkansas during that timeframe and sent the

12

government an unsolicited email reflecting that he left Arkansas on May 11, 2019, and stopped at an Apple store in Missouri. Tr. at 1359. The government also advised that an Apple representative was present to verify Mr. Williams's receipt from the store and his mother was present to testify that he was in Illinois starting on May 12, 2019. *Id.* Based on these facts, the government argued that the only conceivable interest the defendant had in calling Mr. Williams at that point was to improperly introduce his sex-offender status in front of the jury. *Id.*

After hearing the parties' proffers, the Court inquired of defense counsel whether the "overriding purpose" of calling Mr. Williams was to argue that he "was an alternative perpetrator of the offense conduct." Tr. at 1360. Defense counsel advised that it was, "but not exclusively," at which point the government moved to exclude evidence of his prior conviction under Rule 403, prompting the following exchange between the Court and defense counsel:

Court:         … So 403 does overlay on top of 609, correct? If he were a defendant, then the 403 balancing test is worded differently, and that's in 609(a)(1)(B). But here, he is a witness in a criminal case. 609(a)(1)(A) applies and 403 lies on top of that.

Gelfand:     I don' t have any reason to disagree with that, Your Honor. But I do think that, as a practical matter, to the extent to which impeachment, any grounds, including 609, would be appropriate, I would assume that even any application of 403 would have to be based on consideration of how he testifies, what he says, how the Court observes him.

Tr. at 1360-61.  The Court then explained the relevant precedent requiring a non-speculative nexus between the crime charged and any alleged alternative-perpetrator and ruled:

Against that background, you may ask, you may call Mr. Williams and you may establish background of who he is and what his connection is. You may discuss the dates of his employment. You must ask him whether or not he has knowledge or recollection of being present on the car lot on or about May 13 through May 16. [Offense] conduct is May 14 through 16, but there's evidence that the Linux partition was installed on the 13th. And you may inquire if he ever remoted in to the office machine, and if so, the time periods in which he would have remoted in. If he establishes that he was present or that he had remoted in, then we can take this one step further and you can ask these other questions and the Court wouldn't have

enough information to make an analysis against these [alternative perpetrator] cases that I discussed a moment ago until I hear that. However, assuming, as the government seems to be indicating, that he wasn't present on the lot—and I don't know whether they know whether he's ever remoted in or not—but assuming he testifies that he's never remoted in, that's as far as you are going to get and the Court would find in that instance under 403 that the 609 conviction that you have discussed should not be allowed, because at that point, the primary purpose or objective of calling the witness will have failed, and the Court is not going to allow speculative testimony that he was the alternative perpetrator. And so under 403, it would not be allowed because of confusing the issues and the balance and test considerations. So you may have a few minutes to discuss it.

Tr. p. 1363-64. After consulting with his client, defense counsel declined to call Mr. Williams and rested without calling any of the three alternative perpetrators identified in his opening statement.

> **b.    The Court's ruling on Caleb Williams does not entitle the defendant to a new trial**

The defendant could not—and still cannot—establish a non-speculative nexus between Mr. Williams and the offenses, or even a nexus between him and the state of Arkansas during the charged timeframe. The defendant's theory that Mr. Williams remotely accessed Duggar's computer to set up this partition and download child pornography was disproven by his own expert, who conceded that someone had to be physically present at the computer on May 13, 2019. Since Mr. Williams was not in Arkansas then, the only conceivable purpose in calling him was to confuse the jury with evidence that a sex offender had peripheral contact with the defendant's car lot outside of the charged timeframe.[6] Regardless, it was not the Court that prevented the defendant from calling Mr. Williams as an alternative perpetrator, it was his own assessment of the facts. While he might have hoped or even represented otherwise, there was no evidence to suggest that

---

[6] The defendant had evidence that other individuals had access to his car lot. Matthew Waller, for example, testified that he worked at the car lot two weeks prior to the offense conduct, had access to the defendant's computer, and was "vaguely" familiar with the password "Intel1988," although he later admitted the familiarity may have come from his conversations with defense counsel. Tr. at 334, 338, 352, 357-58. The defendant never once suggested that Waller, who had not been convicted of a sex offense, was a viable alternative perpetrator.

Mr. Williams was in Arkansas between May 13 and May 16, 2019, to commit the offenses. The most generous reading of the defendant's opening statement and his counsel's proffer to the Court is that the defense may have been able to show Mr. Williams worked on the car lot in March 2019 and that he operated an online business, both of which are irrelevant and in no way lend themselves to support a credible alternative-perpetrator theory.

Yet, in his motion, the defendant claims that the Court's ruling regarding Mr. Williams was "arbitrary" and "violated [his] rights" Doc. 131 at 14. He underpins this misguided assertion by claiming that the ruling "was ostensibly premised… on an apparent misreading of *Holmes v. South Carolina,* 547 U.S. 319 (2006)." *Id.* But it is the defendant, not the Court, who misreads *Holmes*. In *Holmes*, 547 U.S. at 329, the Supreme Court vacated a decision to exclude a defendant's third-party guilt evidence because it was improperly based on the strength of the government's case and not "on the probative value or the potential adverse effects of admitting the defense evidence…." In arriving at this conclusion, however, the Court expressly held that:

> well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury. … A specific application of this principle is found in rules regulating the admission of evidence proffered by criminal defendants to show that someone else committed the crime with which they are charged. Such rules are widely accepted, and neither petitioner nor his *amici* challenge them here.

*Id.* at 326-27 (internal citations omitted).

The widely accepted principle that speculative third-party guilt evidence may be excluded is rooted in the basic rules of evidence, namely Federal Rules of Evidence 401 and 403, which allow for the admission of only probative relevant evidence and has been recognized by cases already cited by this Court. Tr. at 1362 (citing *United States v. Jordan*, 485 F.3d 1214 (10th Cir. 2007); *United States v. McVeigh*, 153 F.3d 1166 (10th Cir. 1999)). In adopting this established

framework, the Court properly placed the onus on the defendant to show that the testimony he sought to put forth would be relevant and probative, as all parties must do when seeking to introduce evidence. And when given the opportunity to establish the relevance and probative value of this testimony, the defendant considered that Mr. Williams was in Illinois on May 13, 2019, and that the government had two corroborating witnesses, and elected not to call him.

The defendant next relies on *United States v. Crosby*, 75 F.3d 1343 (9th Cir. 1996), to claim that he was unjustly prevented from calling into question the quality of the police work in this case by implicating Mr. Williams. A closer examination of *Crosby*, however, reveals that the Ninth Circuit found as a threshold matter that "the excluded evidence"—alleged evidence that the victim's husband and not the defendant could have assaulted the victim—"showed that someone other than Crosby had the opportunity, ability, and motive to commit the crime." *Id.* at 1347. Here, the defendant's own expert narrowed the field of individuals who had "the opportunity, ability or motive" to commit the offenses to those with physical access to his computer on May 13, 2019. As the government proved at trial, all evidence pointed to the defendant. Conversely, all evidence with respect to Mr. Williams placed him outside Arkansas between May 13 and May 16, 2019. The defendant's insistence that he was improperly precluded from calling Mr. Williams—and only Mr. Williams—at trial not only rewrites his own tactical decision not to call the witness, but it also exposes his true interest in dragging Mr. Williams's name into this case: to inflame, confuse, and mislead the jury with Mr. Williams's sex-offender status. His claim that Mr. Williams had any involvement with the instant offenses is nothing more than rank speculation, and it was rightfully excluded from the trial based on well-established precedent and the Federal Rules of Evidence.

### 2.    The Government Did Not Violate *Brady* or *Giglio*

The defendant next requests a new trial based on the government's alleged "failure to timely disclose material exculpatory evidence related to Caleb Williams," which he claims violated *Brady* and *Giglio*. Doc. 131 at 4. He references two emails from Mr. Williams, both of which were disclosed promptly after they were reviewed and before the defendant made the decision not to call him as a witness and argues that the timing of the disclosure "deprived the defense of the ability to impeach [the government's] witnesses with evidence that yet another person had access to passwords," presumably referring to the password to his Linux partition. Doc. 131 at 7. The chief issue with the defendant's claim is that Mr. Williams never claimed to know the defendant's password; rather, he claimed to have found a few passwords to a couple of the defendant's siblings' social media accounts while reiterating that he was outside Arkansas on May 13, 2019. And even so, the government reviewed and provided these emails with ample time for the defense to utilize them at trial. Plainly stated, the contents of the emails about which the defendant now complains are not exculpatory, material, or even relevant to any issue at trial. They were nevertheless provided to the defendant, who later opted to rest his case-in-chief instead of calling Mr. Williams as a witness. Accordingly, the defendant's motion should be denied.

To establish a violation under *Brady v. Maryland*, 373 U.S. 83 (1963), "a defendant must show that the government suppressed exculpatory evidence that was material either to guilt or to punishment." *United States v. Almendares*, 397 F.3d 653, 664 (8th Cir. 2005). "Evidence is material under *Brady* if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different," with the critical question being "whether the defendant received a trial resulting in a verdict worthy of confidence." *Id.*; *see also United States v. Flores-Mireles*, 112 F.3d 337, 340 (8th Cir. 1997) ("Reasonable probability

is defined as a probability sufficient to undermine confidence in the outcome." (internal quotation marks omitted)). The government has no duty to disclose "evidence that is 1) neutral, speculative or inculpatory, 2) available to the defense from other sources, 3) not in the possession of the prosecutor, or 4) over which the prosecutor has no actual or constructive control," *Flores-Mireles*, 112 F.3d at 340, and the defendant bears the burden of "showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict," *United States v. Gonzales*, 90 F.3d 1363, 1368 (8th Cir. 1996) (quoting *Kyles v. Whitley* 115 S.Ct. 1555, 1566 (1995)).

Here, Mr. Williams was not identified as a possible suspect or witness by law enforcement. As Special Agent Faulkner explained at trial, "[t]hroughout the entire course of [the] investigation, through all the witness interviews, witness statements, and more importantly, forensic examinations, Caleb Williams [did] not come up." Tr. at 303. His name first arose on November 10, 2021, a few weeks before trial, when the defendant identified him as an alternative perpetrator in his response to the government's motion *in limine*. Doc. 84. The defense later told the Court at trial that they had been trying to speak to Mr. Williams for months but had been unsuccessful, which raises serious concerns about the defense's claims that he was a viable alternative perpetrator and further underscores the merits of the government's request to exclude this speculative theory at trial. Tr. at 899.

After the defendant's manufactured and unfounded insertion of Mr. Williams into this case, law enforcement spoke with him and his attorney by telephone on November 16, 2021. Mr. Williams said that he traveled to Northwest Arkansas for a medical appointment on or about May 9, 2019 and stayed on another car lot operated by one of the defendant's brothers. He advised that he left Arkansas on May 11, 2019, stopped briefly at an Apple store in St. Louis, Missouri, and

then returned home to Illinois, where he remained through the timeframe charged in the Indictment. Mr. Williams also provided images to verify his statements. This information was documented in a Report of Investigation, which the government provided to the defense the next day. *See* Ex. 2. On November 24, 2021, Mr. Williams contacted the U.S. Attorney's Office and asked that a member of the prosecution team return his call. Later that day, Assistant U.S. Attorney Dustin Roberts and Special Agent Faulkner spoke by telephone with Mr. Williams, who stated that he had been reading about the case in the press and wanted to clarify a few minor facts, including the brand of the defendant's computer.

That night, at around 11:46 p.m., Mr. Williams sent an unsolicited email to the prosecution team in which he stated that he did not "know if he was on the lot computer" or even if he "ended up going [to the defendant's car lot]" between May 8 and May 11, 2019. Doc. 131-1 at 1. He said that, based on his review of his messages, it "look[ed] like" he did "odd work for the guys and maybe even Josh Duggar," but reiterated that he was in Missouri on May 11, 2019, and Illinois and Indiana after that. *Id.* Despite the defendant's misleading framing, Mr. Williams's email provided no reason to conclude that he had access to the defendant's computer between May 13 and May 16, 2019 or could have committed the offenses. If anything, the most likely explanation for Mr. Williams's communication was to confirm this and refute the defendant's baseless accusation. He attached to his email images and messages to corroborate his timeline. Doc. 131-1 at 2-42. These included messages he sent to the defendant, which would have been in the defendant's possession and in the discovery produced to the defense long prior to this email. And even though this information was not exculpatory or even relevant, the government produced the email on November 27, 2021, just three days later and prior to the start of trial. Doc. 131-2. In short, the government did not violate its obligations under *Brady*. *See Almendares*, 397 F.3d at 664

("Under the rule in our circuit *Brady* does not require pretrial disclosure, and due process is satisfied if the information is furnished before it is too late for the defendant to use it at trial.").

Likely alarmed by the defendant's continued attempts to publicly blame him for child-exploitation crimes he did not commit, Mr. Williams sent a second unsolicited email to the prosecution team on November 30, 2021, at around 10:30 p.m., stating, among other things:

> Attached are a few more documents I uncovered. There is also a couple pictures from 2018 that jogged my memory about the computer in his office.
>
> I've also found a few more passwords if you all want them.
>
> At some point several of the Duggar guys asked me to run the back ends of some of their social media to help them sell cars. Jed, Josiah, and Joseph I do believe. I still have access to Jed's fake account and Josiah's account.

Doc. 131-4. He attached to this email various images of paychecks from other members of the Duggar family in 2017 and 2018, invoices from the defendant in 2018, a 2019 IRS form 1099 from the defendant's brother, and two undated pictures of the defendant using what appears to be his personal laptop in what appears to be his car lot in Siloam Spring, before he moved the business to Springdale, Arkansas.[7] *Id.* at 1-8. As the government advised the Court, it produced this email to the defense during the trial promptly after reviewing it. Tr. at 905-06.

Seizing on the word "passwords" in the email, the defendant now claims that he is entitled to a new trial because he was "deprived . . . of the ability to impeach" the government's witnesses with that reference, which he argues "was a cornerstone of the prosecution's case." Doc. 131 at 6-7. He provides no explanation as to how he would impeach any witnesses with this email without violating Federal Rule of Evidence 602, as his counsel did repeatedly at trial. *See* Tr. at 305 ("And

---

[7] The background of the picture shows a large pole over the defendant's shoulder, which appears to be the billboard adjacent to the location of the defendant's used car business before he relocated it to Springdale in approximately 2018.

here's where we're getting a 602 problem. You can't, through the predicate of your question, attempt to get in evidence unless you have a good faith reason to know that [the witness] would know that one way or the other."). Moreover, the email does not refer to the defendant's passwords. It refers to social media passwords used by a few members of the defendant's famously large family. This email is irrelevant at best, and likely inculpatory when viewed with the prior email because it confirms Mr. Williams did not have access to the defendant's computer between May 13 and May 16, 2019, and did not claim to know the defendant's password. This is exactly what Special Agent Faulkner explained when the defendant asked about law enforcement's failure to investigate Mr. Williams to his liking, and nothing in this email would have yielded a different answer at trial. Tr. at 303 ("[W]e followed up with Caleb Williams and have determined that he was in the State of Illinois at the time frame that we're focusing on in May of 2019.").

Unsatisfied with this plain reading of the email, the defendant now hypothesizes ways in which it might be exculpatory, suggesting it is "[e]vidence that Williams…possessed 'more passwords' (implying that he had previously provided passwords to the Government, which, to this day, have not been disclosed) is itself exculpatory." Doc. 131 at 10. But the defendant does not need to speculate as to whether Mr. Williams ever provided passwords because the government already laid his speculation to rest during trial, advising that:

> The extent that we ever discussed passwords, Agent Faulkner asked him if he knew the defendant's banking password and he said no. That's the extent I've ever spoken to him about that. That was a non-leading way, a non-telling way, to ask him if he knew Intel 1988 because they are the same password.

Tr. at 914. Again, despite the defendant's wishful thinking, this email is not evidence that Mr. Williams knew the password "Intel1988" or that he could have committed the charged crimes, let alone that the government withheld that sort of information. To the extent Mr. Williams did know

the defendant's password, it would have likely been the defendant who shared it with him, meaning this information would have been available to the defense throughout trial.

Relatedly, the defendant's recurring claim that the government's case hinged on the secrecy of "Intel1988"—that this was the "cornerstone of the prosecution's case"—is a red herring. It is a theory crafted by the defendant in the hopes that the government would adopt it so he could present evidence to the contrary. The government did not take the bait, and instead introduced at trial evidence showing that the defendant shared the "Intel1988" password with others, including his father and former vice-presidential candidate Paul Ryan. *See* Gov. 64. The Court noted the same, responding to the defendant's efforts to reshape the government's theory of its case by recalling "some evidence that he was sharing this with a vice presidential candidate." Tr. at 904. In its closing, the government made that clear, explaining that this case has "never been [about] the secrecy [of the password]. It's the habit" the defendant had in using it. Tr. at 1581.

It is also worth noting that on the morning of December 6, 2021, in the middle of trial, the defendant raised this alleged *Brady* violation with the Court, stating:

> Two things, among others. Number one, if Mr. Williams provided passwords that he had access to the government, that's a very big deal in light of the government's theory as to the password being a big part of their case-in-chief, essentially mocking the defense for suggesting that anyone would have access to these passwords over the course of this trial. And second of all, the government had in their possession evidence that a third party clearly had access to Duggar family social media passwords, et cetera, which clearly, at least circumstantially, gives rise to the argument that others had access to the Intel 1988 password, perhaps among others.

Tr. at 901. Without addressing that defense counsel connected the defendant's brothers' passwords to the Linux partition's password based on nothing but his own *ipse dixit*, the Court inquired what relief the defense sought. Defense counsel said that "[i]t's a tough situation because there's no relief directly related to Caleb Williams that would make sense," but reaffirmed that he intended to call Mr. Williams and suggested "some exclusion of evidence … that's not related to Caleb

22

Williams." Tr. at 902. In other words, in the middle of trial, while all options to use the email that the government disclosed remained available, the defense believed the appropriate remedy was a vague limitation on the admission of unspecified evidence unrelated to Mr. Williams. He did not ask for an opportunity to further cross-examine any of the government's witnesses, all of whom were still available, or elicit additional testimony about law enforcement's failure to investigate Mr. Williams to his liking. Accordingly, his current complaint about what the timing of the disclosure purportedly deprived him of—opportunities to somehow highlight allegedly bad police work using an email about unrelated social media passwords from an individual he elected not to call as a witness—can hardly now be deemed so fundamental to his defense and his right to a fair trial as to warrant overturning the jury's verdict.

At base, the defendant's claim involves two emails from an individual he later declined to call as a witness, neither of which contain exculpatory or relevant information and both of which were disclosed in time for him to utilize at trial. This disclosure in no way constitutes a *Brady* violation or undermines the jury's verdict, and his motion should be denied.

### 3.  The Government Did Not Violate Rule 16 or the Jencks Act

The defendant next claims that the Court should order a new trial because the disclosure after the defendant's case-in-chief of the government's demonstrative rebuttal exhibits violated Federal Rule of Criminal Procedure 16 ("Rule 16") and the Jencks Act. Doc. 131 at 18-22. Specifically, he complains that the demonstratives show that someone could input the "dell_one" username in Linux and install uTorrent using Linux's "App Store," and then asserts that this disclosure violated Rule 16 and the Jencks Act, presumably because his expert testified incorrectly about these facts. Ms. Bush, however, heard Director Fottrell provide the exact same information in the government's case-in-chief that the defendant now claims was only disclosed through the

demonstratives, and it had no impact on her testimony. Nor do the demonstratives, which are essentially screenshots of a computer screen, meet any definition of a statement under the Jencks Act. Accordingly, the defendant's motion for a new trial should be denied.

Rule 16(a)(1)(E)(i) states that "the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places . . . if the item is within the government's possession, custody or control and . . . is material to preparing the defense."[8] Something is material under Rule 16 if it is "helpful to the defense." *United States v. Jean*, 891 F.3d 712, 715 (8th Cir. 2018) (citation omitted). A showing of materiality cannot be satisfied, however "by a mere conclusory allegation that the requested information is material to the preparation of the defense." *Id.* (internal citations omitted).

A conclusory allegation is precisely what the defendant offers here, asserting with no explanation that it is beyond dispute that these demonstratives were material. Since the ability to input the "dell_one" username and download uTorrent using Linux's "App Store" cuts against his strange theory that it was impossible to do either, however, the demonstratives could not have been helpful to his defense.[9] And even if the Court reads Rule 16 more expansively than the Eighth Circuit to cover inculpatory information, these demonstratives would still be immaterial to the preparation of his defense. His own expert heard Director Fottrell unequivocally testify in the government's case-in-chief that he knew from his years of experience that someone needed to

---

[8] The defendant makes no argument with respect to the other two provisions of Rule 16(a)(1)(E).

[9] The defendant never provided a cohesive explanation as to why this theory was exonerating. Ultimately, there was no dispute that the username to his Linux partition was in fact "dell_one" and that uTorrent was in fact installed on the partition. He appeared to argue in his opening statement that he did not have the technical sophistication to set up the partition or install uTorrent, but all evidence introduced at trial, including from witnesses who had known him for years, contradicted that claim. This theory also ignores the ample evidence described above, including his statements to law enforcement, showing that he created and accessed the partition.

manually input the "dell_one" username when setting up the Linux partition and that uTorrent was downloaded using Linux's "App Store." Tr. 474, 476-78, 484-85, 748, 768-69. She still testified later that neither was possible. Tr. 1008-09, 1049. In fact, when asked whether it would change her opinion that the defendant's "dell_one" username was autogenerated if she knew that "a user could create a username with an underscore," like "dell_one," she answered bluntly: "No." Tr. at 1224. As the Court noted elsewhere, Ms. Bush knew "the conclusion that she want[ed] to reach," and neither Director Fottrell's testimony nor the demonstratives were going to dissuade her. Tr. at 1322. Because the information from these demonstratives was already known to the defense and had no impact on the cross-examination of Director Fottrell or testimony of the defendant's witnesses, there is no plausible argument that the demonstratives are material under Rule 16.

The defendant also claims that the disclosure of these demonstratives violated the Jencks Act. Doc. 131 at 21-22. The Jencks Act states that "[a]fter a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement … of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified." 18 U.S.C. § 3500(b). The act further defines a statement as, among other things, "a written statement made by said witness and signed or otherwise adopted or approved by him" or "a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously [.]" *Id.* at § 3500(e).

The defendant does not explain—nor can he—how these demonstratives qualify as statements under the Jencks Act. As he acknowledges, they were simply print screens of a "virtual machine" running the Linux operating system, similar to the virtual machine his own expert attempted to create. Doc. 131 at 18. To the extent he believes that Director Fottrell's testimony on rebuttal qualifies as Jencks material, Director Fottrell provided that same testimony repeatedly and

unequivocally during the government's case-in-chief. In other words, even assuming that the defendant's characterization of these demonstratives as Jencks material was correct—which it is not—this information was disclosed during Director Fottrell's direct testimony in the government's case-in-chief and he has not identified any prejudice warranting a new trial.[10]

### 4.    Director Fottrell's Testimony Was Appropriate and Properly Noticed

The defendant last asks this Court to order a new trial based on what he claims was Director Fottrell's "impermissible" expert testimony regarding his review of EXIF information from the defendant's iPhone. Doc. 131 at 22-24. Director Fottrell testified that he reviewed the EXIF information in images taken by the defendant's iPhone for GPS coordinates showing where the images were taken, which he then plotted using Google Maps. *Supra* pp. 7-8. The defendant claims that this constituted expert testimony, Director Fottrell was not qualified to opine on this topic, and the government failed to notice this expert testimony. He is mistaken on all counts.

First, the case he relies on to argue that Director Fottrell's plotting of GPS coordinates from images' metadata constitutes expert testimony—*United States v. Crawford*, 19-CR-170, 2021 WL 2367592, *3 (W.D.N.Y. Jan. 14, 2021)—is inapposite. Doc. 131 at 22-23. In *Crawford*, the court found that testimony about geolocation information sourced from an email address's historical Wi-Fi access points provided by Google required expert analysis. To be sure, other courts addressing similar cell record data have ruled differently. *See, e.g.*, *United States v. Baker*, 496 F. App'x 201, 204 n.1 (3rd Cir. 2012) (finding discussion of geolocation information based on cell tower records

---

[10] The defendant also asserts in a single sentence that the government violated Federal Rule of Evidence 705. Doc. 131 at 19 n.2. Rule 705 states: "Unless the court orders otherwise, an expert may state an opinion—and give the reasons for it—without first testifying to the underlying facts or data. But the expert may be required to disclose those facts or data on cross-examination." Fed. R. Evid. 705. For the reasons above—including that Director Fottrell testified about the exact information illustrated in the demonstratives in his direct testimony in the government's case-in-chief—the defendant's motion for a new trial on this ground should be denied.

was not expert testimony). But, in any event, Director Fottrell's testimony had nothing to do with interpreting third-party Wi-Fi access points or cell-tower data. He testified that he found GPS coordinates in the EXIF information of images taken by the defendant's iPhone and mapped out the location of those coordinates, which he has done for years. As the Court observed, Director Fottrell was testifying about what he rationally perceived through a commonly used technique during his forensic examination and was therefore offering an opinion on a topic within his personal knowledge under Federal Rule of Evidence 701. Tr. at 620-21, 628-29.

As the Court also observed, to the extent this was expert testimony, Director Fottrell was thoroughly qualified to offer it and his testimony about geolocation metadata and its reliability was adequately supported under Rule 702. Tr. at 629-30. Indeed, Director Fottrell explained that the metadata in an image saved in Apple's proprietary format contains reliable GPS coordinates showing where that image was taken, that he commonly uses this information to establish location, and that he used other resources to verify the accuracy of the data he reviewed in this case.[11] Tr. at 617-18, 621-22. When given the opportunity to challenge the reliability of this information, the defendant's expert testified only that she did not take the time to check whether the images were taken by the defendant's iPhone or someone else's, tacitly acknowledging that iPhone images contain reliable geolocation metadata. Tr. 1312-17. Nor could Ms. Bush have reasonably questioned the reliability of this metadata because, as Director Fottrell testified, many of the

---

[11] The defendant's claim that the government "has taken opportunistically inconsistent positions" on the reliability of this data reflects, at best, a misunderstanding of the caselaw on which he relies. Doc. 131 at 23 (citing *United States v. Boyajian*, No. CR 09-933, 2012 WL 4094977, *16 (C.D. Cal. 2012)). As the court explained just below the defendant's cherry-picked quote from *Boyajian*, the government was concerned about the reliability of the EXIF data in that case because the data came from "a standalone camera (as opposed to a camera phone)" and, unlike a camera phone, a standalone camera's "dates and times . . . must be set by the user." 2012 WL 4094977, at *17. The metadata here, of course, came from an iPhone camera, and the defendant's claim about the government's position in his motion and before the Court at trial, (Tr. at 619), is wrong.

images that he geolocated to the defendant's car lot through metadata plainly depicted the lot, and the defendant's messages further corroborated that his iPhone was there. *See, e.g.*, Tr. at 654:20 ("It appears to be a selfie of Joshua Duggar taking a picture of himself at the car lot."). This should come as no surprise; the process by which iPhones automatically capture geolocation data is well documented and typically not the subject of any meaningful dispute. *See United States v. Post*, 997 F. Supp. 2d 602, 603 (S.D. Tex. 2014) (describing process).

Finally, the defendant's suggestion that he did not receive adequate notice that Director Fottrell may testify about geolocation information is incorrect. The government noticed "geolocation information" from "digital photos" taken by the defendant as a potential subject of expert testimony, relied on this geolocation information at the suppression hearing, and, as the Court observed, provided exhibits in advance of trial that made clear Director Fottrell would provide this testimony. Ex. 1; Tr. at 630-32. The defendant even came to trial prepared with the inapposite caselaw discussed above to use in his planned objection, demonstrating his understanding that Director Fottrell would provide the testimony that he now claims he could not anticipate. Accordingly, the defendant's motion for a new trial on this ground should be denied.

## C.   THE GOVERNMENT WILL MOVE TO DISMISS COUNT TWO OF THE INDICTMENT AT SENTENCING

The defendant last instructs the Court that it must dismiss Count Two with prejudice if it denies his other requests. Doc. 131 at 25. Contrary to his motion, there is no "binding case law" that compels this. *Id.* The Court already addressed the relevant precedent, explaining that double jeopardy attaches at sentencing, and that "the government is entitled to charge the defendant under two different theories for the same conduct and determine after the jury has rendered its verdict on which count defendant should be sentenced." Tr. at 1503-07 (citing cases). Consistent with its

prior representation—which the defense previously agreed with—the government will move to dismiss Count Two of the Indictment at sentencing.

**<u>CONCLUSION</u>**

For the foregoing reasons, the Government respectfully requests that the Court deny the defendant's motion for a judgment of acquittal or for a new trial.  (Doc. 131).

Respectfully submitted,

By:    /s/ *Dustin Roberts*

Dustin Roberts
Assistant United States Attorney
Arkansas Bar No. 2005185
414 Parker Avenue
Fort Smith, AR 72901
Office: 479-783-5125

/s/ *Carly Marshall*

Carly Marshall
Assistant United States Attorney
Arkansas Bar No. 2012173
414 Parker Avenue
Fort Smith, AR 72901
Office: 479-783-5125

AND

/s/ *William G. Clayman*

William G. Clayman
D.C. Bar No. 1552464
Trial Attorney
Child Exploitation and Obscenity Section
U.S. Department of Justice
1301 New York Avenue NW
Washington, D.C. 20005
Telephone: 202-514-5780

## **CERTIFICATE OF SERVICE**

       I, Dustin Roberts, Assistant United States Attorney for the Western District of Arkansas, hereby certify that a true and correct copy of the foregoing pleading was electronically filed with the Clerk of Court using the CM/ECF System which will send notification of such filing to the following:

       Justin Gelfand, Travis Story, Ian Murphy, Attorneys for the Defendant

*/s/ Dustin Roberts*
Dustin S Roberts
Assistant United States Attorney
