## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF ARKANSAS
## FAYETTEVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 5:21-CR-50014-001** |
| v. | ) | |
| | ) | |
| JOSHUA JAMES DUGGAR, | ) | |
| | ) | |
| **Defendant.** | ) | |

### DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR JUDGMENT OF ACQUITTAL OR, IN THE ALTERNATIVE, MOTION FOR NEW TRIAL

Defendant Joshua Duggar ("Duggar"), by and through undersigned counsel, respectfully replies in support of his motion for judgment of acquittal or, in the alternative, motion for new trial. (Doc. 131).

This is the rare case where a criminal defendant was deprived of significant constitutional rights and the law requires a new trial. But it is easy to lose sight of that when reading the Government's response. (Doc. 134). Instead of actually grappling with the core of Duggar's arguments, the Government sidesteps the issues and mischaracterizes Duggar's arguments in an attempt to more readily refute them. But the Government's silence on the real issues speaks volumes.

### I.      This Court Should Enter a Judgment of Acquittal on Both Counts

In its response, the Government mischaracterizes Duggar's argument: that to obtain a conviction on either count, the Government had to introduce sufficient evidence demonstrating Duggar "knew that the visual depictions were of a minor engaging in sexually explicit conduct." (*See* Doc. 131 at 3) (quoting 8th Cir. Model Crim. Jury Instr. § 6.18.2252; Doc. 118 at 12). But the Government failed to do so. Thus, faced with an insufficient evidentiary record to support its

convictions, the Government claims that Duggar argues "there was no evidence he 'personally' viewed child sexual abuse material, which he claims is an essential element of the offenses." (Doc. 134 at 4). The Government then asserts that Duggar "critically misstates the element the jury considered when determining his guilt." (Doc. 134 at 5).

To be clear, in the context of this Court's Rule 29 analysis—viewing the evidence in the light most favorable to the Government—evidence that Duggar actually viewed the visual depictions allegedly recovered from the Wholesale Motorcars desktop computer may very well be legally sufficient to indicate knowledge that the desktop contained visual depictions "of a minor engaging in sexually explicit conduct." (*See* Doc. 131 at 3) (quoting 8th Cir. Model Crim. Jury Instr. § 6.18.2252; Doc. 118 at 12). However, the evidentiary record is insufficient to sustain a conviction on either count in that regard. Instead, the undisputed evidence at trial revealed that many of the files allegedly recovered from the desktop computer were never viewed by any user of the computer and *all* of the files at issue were deleted shortly after they were allegedly downloaded. (Doc. 131 at 3).

Against this backdrop, the only response the Government provides to Duggar's actual argument—that no evidence was introduced to demonstrate Duggar's knowledge that the visual depictions were allegedly on the desktop at any given time—is that a user of the computer played certain videos with titles that "would be evident to the person downloading them" and that a "user of the partition navigated to folders and viewed child sexual abuse images in thumbnail format." (Doc. 134 at 7). To be clear, Duggar is *not* arguing that certain images introduced by the Government at trial do not meet the legal definition of child pornography. The threshold question raised in this post-trial motion for judgment of acquittal is whether, even in the light most favorable to the Government, the evidence was sufficient to establish Duggar's knowledge that the visual

depictions were on the computer during the three days alleged in the indictment. And to that end, the Government's argument boils down to the theory that the partition was accessible only through a password that had been associated with Duggar in the past for other purposes and that therefore he must have been the user who accessed this material notwithstanding the undisputed evidence that this password was also known by employees, family members, and other acquaintances of Duggar. (*See id*.).

The Government then identifies two files by name, arguing that these two videos were actually viewed by a user of the computer as opposed to being deleted before being opened like many of the other files allegedly recovered from the computer. (*See id*.).

Specifically, the Government identifies a video entitled "pedomom" which was allegedly recovered from the Wholesale Motorcars desktop computer and which was allegedly played by a user of the computer. (*Id.*). However, at trial, the Government went out of its way to emphasize that only the first 29 seconds of this video was ever played by a user of this computer before it was deleted and, *critically*, that the first 29 seconds of the video contained no visual depictions of minors engaged in sexual conduct. (*See* Transcript, Vol. 6, at 1203-04) (AUSA Clayman: "would it surprise you to learn that in the first 29 seconds, there's no child pornography depicted?"). As such, even if this Court were to conclude for purposes of this post-trial motion for judgment of acquittal that, in the light most favorable to the Government, Duggar played the first 29 seconds of this video, that does nothing to establish the *mens rea* element as to either count. And with respect to the only other video identified by name in the Government's response, the Government introduced no evidence whatsoever concerning how long that video was played and whether the portion played contained any depiction of child pornography. (*See* Doc. 134 at 7).

Ultimately, Duggar maintains his innocence and does not seek to relitigate this entire case in the context of a Rule 29 motion for judgment of acquittal. But that does not change the bottom line: the Government failed to introduce any evidence that would allow a reasonable jury to conclude that Duggar knew that visual depictions allegedly recovered from the Wholesale Motorcars desktop computer were of a minor engaging in sexually explicit conduct.

Instead, the Government mischaracterizes Duggar's argument and, in doing so, fails to provide this Court with any grounds for concluding otherwise. As such, this Court should enter a judgment of acquittal on both counts.

**II.     In the Alternative, this Court Should Grant Duggar a New Trial**

A.     The Government's *Brady* and *Giglio* Violations Require a New Trial

Throughout its response, the Government fails to meaningfully address evidence that it deliberately played games with its obligation to disclose *Brady* and *Giglio* materials. Just as at trial when the defense raised this issue outside the presence of the jury, the Government repeatedly asserts that it disclosed emails from Caleb Williams ("Williams") "promptly after they were *reviewed*" (*see* Doc. 134 at 2, 17, 20), careful not to represent that the emails had been disclosed promptly after they were *received*.

The chronology paints an important picture. Williams called and emailed Government counsel on November 24, 2021, making numerous statements relevant and material to the case which were potentially exculpatory, yet the Government kept this information to itself for the next three days, turning it over the evening of the Saturday before trial. (*See* Doc. 131-2). In that email, Williams wrote, "I was completely mistaken about not being at the Wholesale Motorcars lot during the time I was in Arkansas (AR) between May 8, 2019 – May 11, 2019." (Doc. 131-1). He added, "I apologize for the mistake; I had no intention to mislead you all." (*Id.*).

Trial then began on November 30, 2021, and the Government presented evidence over the next several days. However, during almost its entire case-in-chief, the Government failed to disclose to the defense that it had received yet another email from Williams on the first day of trial. (*See* Doc. 131-4). In fact, it was not until Sunday, December 5, 2021 at 6:38 p.m.—the evening before the Government rested—that the Government finally disclosed the November 30, 2021 email from Williams to the defense. (*See* Doc. 131-3). In that email, Williams wrote, among other things, "I've also found a few more passwords if you all want them." (Doc. 131-4).

Tellingly, the Government does not even attempt to justify this pattern of deliberately delaying disclosure of material exculpatory evidence related to Williams in its response—and there is no excuse. This matters because Duggar was unfairly prejudiced by these eleventh-hour disclosures. Specifically, at trial, two issues of paramount import included: (1) whether any person other than Duggar was present on the car lot on certain days in May 2019; and (2) whether any person other than Duggar who had physical or remote access to the Wholesale Motorcars desktop computer was familiar with the password "Intel1988."

The two Williams emails—which place him on the lot (at least in the May 8 to May 11 timeframe) and which unambiguously indicated his familiarity with Duggar family passwords—drew him further into the crosshairs as someone who should have been meaningfully investigated. But instead of disclosing these emails upon receipt as the Constitution requires, the Government hid this information from the defense until it was too late for Duggar to effectively utilize it at trial.

Rather than addressing the clear-cut discovery violations, the Government attempts to downplay the significance of the two Williams emails by offering several conclusions it claims to have unilaterally reached after reviewing them: "Williams never claimed to know the defendant's password" (Doc. 134 at 17); "Williams's email provided no reason to conclude that he had access

to the defendant's computer between May 13 and May 16, 2019 or could have committed the offenses" (*Id.* at 19); Williams sent the email on the first day of trial because he was "[l]ikely alarmed by the defendant's continued attempts to publicly blame him" for crimes he did not commit (*Id.* at 20); and Williams' email "confirms Mr. Williams did not have access to the defendant's computer between May 13 and May 16, 2019, and did not claim to know the defendant's password." (*Id.* at 21). The elephant in the room is that these possible conclusions are not the prosecution's to make in a federal criminal trial—they are the jury's.

Contrary to the Government's self-serving conclusions, Williams expressly acknowledges in the two emails he sent to the Government that he had misled law enforcement about when he was on Duggar's car lot in May 2019 and that he had "more passwords" he was willing to provide if the Government was interested in hearing about them—but the entire prosecution team buried their heads in the sand.

"Under *Brady* and its progeny, prosecutors have a duty to disclose to the defense all material evidence favorable to the accused, including impeachment and exculpatory evidence." *United States v. Robinson*, 809 F.3d 991, 996 (8th Cir. 2016) (citing *Kyles v. Whitley*, 514 U.S. 419, 432-34 (1995) and *United States v. Bagley*, 473 U.S. 667, 676 (1985)). "This duty extends not only to evidence of which a prosecutor is aware, but also to material 'favorable evidence known to the others acting on the government's behalf in the case, including the police.'" *Id*. (quoting *Kyles*, 514 U.S. at 437). "Such evidence is 'material' only if there is a reasonable probability that, had it been disclosed, the result of the proceeding would have been different." *Id*. (internal citations omitted). However, the "question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id*.

6

Had this evidence been timely disclosed, Duggar would have had the ability to cross examine law enforcement witnesses concerning their failure to, among other things, follow up with Williams about "more passwords" that he had found. The Government claims to have not even reviewed Williams' email concerning "more passwords" until the evening before it rested its case—making clear that, rather than investigating what Williams knew and did not know, the Government buried its head in the sand and withheld this information long enough to ensure that Duggar's trial firepower would be irreparably impaired. Indeed, as Government counsel acknowledged the morning after Williams' email was finally disclosed, "[w]e have not spoken to [Williams] since he sent that email." (Tr. at 913).

Instead, the Government simply claims that, at some point before Williams emailed to say he had "found a few more passwords if you all want them," Agent Faulkner purportedly asked Williams whether "he knew the defendant's banking password and he said no." (Doc. 134 at 21) (quoting Tr. at 914). Government counsel then concluded, "[t]hat's the extent I've ever spoken to him about that. That was a non-leading way, a non-telling way, to ask him if he knew Intel 1988 because they are the same password." (*Id.*). There are at least two problems with this line of reasoning.

First, asking Williams whether he knew Duggar's banking password is actually not the same as investigating whether he was familiar with the password "Intel1988." And perhaps more importantly, completely ignoring Williams' offer to provide "more passwords" that he had found eliminated any possibility that the Government might learn that Williams was, in fact, in possession of the password that was central to its case. Purposefully turning a blind eye to the possibility that Williams may have known the password to the partition on the work computer is an abdication of the duty "to seek justice within the bounds of the law, not merely to convict."

Prosecution Function, Criminal Justice Standards, American Bar Association, Standard 3-1.2, "Functions and Duties of the Prosecutor" (4th Ed. 2017); *see also Kyles*, 514 U.S. at 439 (*Brady* and its progeny are predicated on a view of "the prosecutor as the representative of a sovereignty whose interest in a criminal prosecution is not that it shall win a case, but that justice shall be done") (citations and ellipses omitted).

In this day and age, it strains credulity to believe that a prosecution team of three federal prosecutors waited days to *read* unsolicited emails from a witness they anticipated the defense would call each time they *received* them—and even the prosecution team clings to the verb *reviewed* every time this issue has been raised. Instead, the question before this Court should be why they waited so long to disclose those emails to the defense and the chronology paints a clear picture: the Government held the two Williams emails from the defense long enough to ensure that Duggar was unable to make effective use of the information at trial including when cross-examining the Government's lead agent on topics that included law enforcement's insufficient investigation and singular focus on Duggar instead of on other possible suspects.

Indeed, a central theme of Duggar's defense was the inadequate investigation performed by law enforcement and the Government's unwillingness to consider any possibility that anyone other than Duggar could have committed the offenses charged. Had the defense been aware that Williams had offered to provide "more passwords" to the prosecution team and that the prosecutors and law enforcement agents had refused to take him up on his offer, Duggar could have meaningfully impeached Special Agent Faulkner on this topic after he testified as a Government witness during the Government's case-in-chief. This is precisely why *Giglio* requires disclosure sufficiently in advance of trial to enable the defense to adequately make use of it at trial: in this case, before cross-examining Agent Faulkner.

Faced with this clear-cut constitutional violation, the Government broadly asserts that impeaching Government witnesses with this email would somehow present a problem under Federal Rule of Evidence 602. (*See* Doc. 134 at 20). Rule 602 provides, in relevant part, "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." But this is a complete red herring for the Government's discovery violation. Indeed, Special Agent Faulkner had asked (albeit insufficiently) Williams about passwords and had been on the call when the prosecutors spoke to Williams following his first email to the Government. Agent Faulkner could undoubtedly have been asked whether he was aware of an email sent by Williams on the first day of trial stating that he had "found a few more passwords" and what, if any, investigative steps he had taken in response to that new information. (To this day, the Government has not disclosed what passwords Williams had and Williams repeatedly refused to speak with the defense's investigator prior to trial). But the prosecution failed to disclose even the existence of this email until after Agent Faulkner had finished testifying even though it was sitting in each prosecutor's inbox throughout the entirety of his testimony.

"The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Robinson*, 809 F.3d at 996 (quoting *Strickler v. Greene*, 527 U.S. 263, 289-90 (1990)). "A prosecutor has a duty to disclose evidence known by police officers, even if not known by the prosecutor, because a prosecutor has a duty to learn of such information." *United States v. Tyndall*, 521 F.3d 877, 882 (8th Cir. 2008). "This attendant duty to learn of material and favorable exculpatory or impeachment evidence necessarily

anticipates that a prosecutor will have an opportunity to discover such evidence through the exercise of reasonable diligence." *Robinson*, 809 F.3d at 996.

Here, of course, the prosecution itself knew of exculpatory or, at a minimum, impeachment evidence, but withheld it from the defense. If a prosecutor has a duty to discover such evidence even if not personally known, this duty is only heightened where, as here, the prosecutor has this information in his or her actual possession.

In its response, the Government then advances a different argument—asserting that the emails were of no use to the defense because the Government had purportedly arranged for a representative from Apple and Williams' mother to testify that Williams was not in Arkansas on May 13, 2019. (*See* Doc. 134 at 13). As an initial matter, this Court has no evidentiary basis whatsoever as to what, if any, testimony a witness from Apple and/or Williams' own mother would have provided. But again, there is a deeper problem: these are not conclusions for the prosecution to make—they are questions for the jury. At a bare minimum, Williams' bizarre emails to Government counsel just before and during trial made clear that Williams' purported timeline was a moving target. In fact, Williams worked at Wholesale Motorcars; sold vehicles there; had familiarity with the work computer and its software; sent a text message to Duggar offering to watch the lot for him in the days after May 7, 2019; and slept at Duggar's brother's car lot just down the road on May 9, 2019. (*See* Tr. at 1355-58). While a jury could have concluded that Williams was not in Arkansas on certain relevant dates, the jury could have easily concluded he was.

"[S]uppression of material evidence justifies a new trial irrespective of the good faith or bad faith of the prosecution." *Giglio v. United States*, 405 U.S. 150, 153 (1972). "If the undisclosed evidence is material, a new trial is required." *United States v. Andrews*, 532 F.3d 900, 905 (D.C.

Cir. 2008)) (internal citations omitted). "Evidence is material if the undisclosed information could have substantially affected the efforts of defense counsel to impeach the witness, thereby calling into question the fairness of the ultimate verdict." *United States v. Cuffie*, 80 F.3d 514, 517 (D.C. Cir. 1996)) (internal citations omitted). In this case, the Government's pattern of withholding material evidence substantially affected Duggar's ability to impeach Government witnesses and calls into question the fairness of the verdict in this case. As such, this Court should grant Duggar a new trial for the Government's failure to timely disclose *Brady* and *Giglio* evidence to the defense.

### B.   Duggar Was Prevented from Calling a Necessary Witness

In its response, the Government argues, "[t]he notion that Caleb Williams committed these offenses is pure fiction." (Doc. 134 at 9). But setting aside the fact that whether evidence involving Williams would have injected reasonable doubt is a question for the jury, not the prosecution, that is not the issue before this Court. Whether inadvertently or strategically, the Government misstates Duggar's actual argument.

Specifically, the Government incorrectly argues that Duggar's theory was that Williams "remotely accessed Duggar's computer to set up this partition" and that this was "disproven by his own expert." (Doc. 134 at 14). But this is a strawman. There is absolutely nothing in the record that would support the Government's assertion that Duggar ever advanced a theory that whoever allegedly set up the partition on the work computer did so remotely. To the contrary, Duggar's theory is—and always was—that Duggar was not the only person who had the opportunity and access necessary to create the partition allegedly found on the work computer. But that is the point: as is particularly relevant here, Williams had the requisite opportunity, access, and motive to do so, notwithstanding his protestations to the contrary.

11

Premised on the fiction that Duggar's theory was that Williams could have remotely set up this partition, the Government repeatedly argues throughout its response that Duggar's only purpose in calling Williams to testify was to introduce evidence that Williams was a convicted sex offender. (*See* Doc. 134 at 9, 13, 14). To the contrary, Duggar sought to call Williams as a witness because he had the opportunity, the know-how, and the motive to commit the charged offenses— and, depending on his responses to questions posed at trial, Williams' credibility was readily impeachable. In short, Duggar sought to introduce evidence that Williams may have lied—or been mistaken—about his whereabouts at certain times. Indeed, Williams made clear to the Government in one of the two belatedly-disclosed emails that he *had* misled law enforcement concerning his whereabouts, even if inadvertently.

Thus, while the Government claims to have concluded that Williams was not in Arkansas on May 13, 2019, this should not have precluded Duggar from adducing evidence that Williams may have been mistaken or lying about his location on certain dates. At trial, the defense proffered outside the presence of the jury (and the gallery) that it would establish through Williams' testimony, among other things, that he: worked at Wholesale Motorcars; sold vehicles there; had familiarity with the work computer and its software; sent a text message to Duggar offering to "watch the lot" for him in the days after May 7, 2019; and had slept at Duggar's brother's car lot just down the road on May 9, 2019. (*See* Tr. at 1355-58). And, as the defense proffered, even if Williams denied being on the car lot on May 13, 2019, this was an assertion which should be subject to impeachment because the only evidence to the contrary were documents Williams had provided to the Government which concealed all metadata, and apparently, his mother's willingness to say he was not there. (*See id.*).

12

However, in the Government's view, this was all a "fiction" (Doc. 134 at 9) because Williams denied to investigators that he was in Arkansas during that timeframe, because he had a receipt from an Apple Store in St. Louis, Missouri dated May 11, 2019 which could be verified by an Apple representative, and because Williams' mother was willing to testify that he was in Illinois starting on May 12, 2019. (*See id.* at 12-13). But the fact that this evidence is disputed underscores Duggar's point: this was an issue for the jury, who should have had access to all of this evidence.

To be clear, Duggar had a constitutional right to call Williams at trial. However, this Court ruled that if Williams denied having the opportunity to commit the offenses charged, the defense would not be permitted to impeach this witness' credibility with his sex offense conviction. Given the Court's ruling, the defense was left with no actual choice. Putting a witness on the stand who revealed himself as someone who closely monitored the pleadings filed in the case, who would assuredly deny committing the crimes for which Duggar was on trial, and whose credibility could not be impeached, would not have been in Duggar's best interest.

In fact, if Williams had been called to testify and admitted he was physically present on the car lot during the relevant timeframe and/or that he remoted into the work computer, there would not have been any need to impeach his credibility. Requiring Duggar and, by extension, the jury to simply take at face value Williams' assertions that he was not the one who committed these crimes constituted an unambiguous violation of Duggar's Fifth and Sixth Amendment rights.

The Compulsory Process Clause of the Sixth Amendment "embodies a substantive right to present criminal defense evidence before a jury." *Taylor v. Illinois*, 484 U.S. 400, 422 (1988) (Brennan, J., dissenting). And the Supreme Court has explained,

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the

prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

*Washington v. Texas*, 388 U.S. 14, 19 (1967). "The Compulsory Process clause protects the presentation of the defendant's case from unwarranted interference by the government, be it in the form of an unnecessary evidentiary rule, a prosecutor's misconduct, or an arbitrary ruling by the trial judge." *Gov't of Virgin Islands v. Mills*, 956 F.2d 443, 445 (3d Cir. 1992).

While Williams may have denied being in Arkansas on the dates in question (the emails and phone calls he placed to the Government before and during trial made clear that he was closely following the proceedings), this should not have precluded the defense from asking him questions and, depending on his responses, impeaching his credibility with his own statements, documents that he had given to the Government, and his prior conviction for a sex offense against a minor. That an Apple representative was apparently prepared to authenticate a receipt dated May 11, 2019 and that Williams' mother was apparently willing to say that he was in Illinois does nothing to change the fact that Duggar had a right to call Williams, to impeach his credibility if necessary, and for the jury to make a factual finding based on the credibility of the witnesses. And, to be clear, because of the geographic proximity of Arkansas, Missouri, and Illinois, it was entirely possible that the jury could credit the testimony of the Apple representative and Williams' mother and *still* conclude that Williams may have been in Arkansas on a specific date or multiple dates in question.

Furthermore, the Government's response appears to misconstrue Duggar's burden. Duggar was not required to prove that Williams was the perpetrator of this crime—and no criminal defendant would willingly take on that burden. Instead, as the Constitution provides, Duggar had a right to draw out and accentuate evidence establishing reasonable doubt in the minds of the jury. And one way in which this could be accomplished—and which Williams' testimony would have

14

furthered—was to introduce evidence demonstrating that a more thorough investigation may have revealed that someone other than Duggar could have committed the charged offenses. Stated simply, even if the jury did not believe that Williams *was* the perpetrator of either charged offense, the prosecution's failure to rule out the *possibility* that Williams *could have* committed either charged offense was itself reasonable doubt.

In his motion, Duggar directed this Court's attention to *United States v. Crosby*, 75 F.3d 1343 (9th Cir. 1996)—a case entirely ignored by the Government in its response and particularly important in this context. There, the defendant was denied an opportunity to cast doubt on the Government's case by demonstrating that the investigation was careless. However, because the district court had excluded evidence concerning another individual's opportunity to have committed the crime, the Ninth Circuit noted:

> Crosby couldn't fully argue his sloppy investigation theory. While he could point out what the police hadn't done, he could suggest no exculpatory evidence the police might have found had they conducted a more thorough investigation…Rather than being limited to poking holes in the prosecution's case, Crosby's counsel could have plausibly argued that a more thorough investigation would have produced evidence incriminating [another individual].

*Crosby*, 75 F.3d at 1347-48. The court concluded, "[t]he excluded evidence could thus have caused the jury to develop a reasonable doubt by suggesting that someone other than the defendant was in a position to have [committed the crime], that a competent investigation might have identified that person, and that [the victim] was lying when she pointed the finger at Crosby." *Id.* at 1349. The *Crosby* court then concluded, "the court should not attempt to decide for the jury that this doubt is purely speculative and fantastic but should afford the accused every opportunity to create that doubt." *Id.* (quoting 1A John Henry Wigmore, Evidence in Trials at Common Law § 139 (Tillers rev. 1983)).

Here, however, the Government boldly advocates that this Court should "decide for the jury that this doubt is purely speculative and fantastic." (*See id.*). And the Government asks this Court to adopt the Government's view of the facts as opposed to safeguarding Duggar's constitutional right to a jury trial, asserting that Duggar's theory is "pure fiction" (Doc. 134 at 9), that "there was no evidence to suggest that Mr. Williams was in Arkansas between May 13 and May 16, 2019," and that "all evidence with respect to Mr. Williams placed him outside Arkansas[.]" But if, in fact, there was no evidence that Williams may have committed the crimes charged or that a more meaningful investigation would have revealed the possibility that someone other than Duggar committed these crimes, the Government should not have hidden the actual evidence concerning Williams from the jury—it should have embraced it. Indeed, if it was so confident in its position, the Government should have had no concerns about Williams' credibility being impeached by his own statements and his prior record. *See United States v. Espinoza*, 880 F.3d 506, 517 (9th Cir. 2018) ("That the defense's theory may be speculative is not a valid reason to exclude evidence of third-party culpability") (citing *United States v. Stever*, 603 F.3d 747, 754 (9th Cir. 2010)); *United States v. Vallejo*, 237 F.3d 1008, 1023 (9th Cir. 2001) ("it is the role of the jury to consider the evidence and determine whether it presents all kinds of fantasy possibilities, as the district court concluded, or whether it presents legitimate alternative theories for how the crime occurred") (internal quotation marks omitted).

This Court's ruling concerning Williams' testimony deprived Duggar of the opportunity to present relevant, material favorable evidence in his favor and this ruling was disproportionate to any legitimate or evidentiary purpose. As such, it violated Duggar's Fifth and Sixth Amendment rights and this Court should grant him a new trial. *See, e.g., Rock v. Arkansas,* 483 U.S. 44, 56 (1987).

C.      Jencks Act and Rule 16 Violations by the Government

In some ways, the trial in this case boiled down to a battle of the experts. The Government's expert, James Fottrell, and the defense's expert, Michele Bush, disagreed about many facts, but also agreed about certain things, and, even within areas of agreement, occasionally reached different conclusions. At trial, a critical dispute arose: whether the username "dell_one" could be manually input as the username on the Linux partition of the work computer, and whether the software, "uTorrent", could be downloaded from the Linux "Snap Store."

When he testified during the Government's case-in-chief, Fottrell concluded that the username could be manually created and that the uTorrent program could be downloaded from the Snap Store. (*See* Doc. 134 at 25) (citing trial transcript). During the defense case, Bush testified that she disagreed with Fottrell's conclusions on these points. (*See id.*).

Thus, when the defense rested its case, the jury was left with the option of determining which expert's testimony was more credible. But the story did not end there.

The Government opted to put on a rebuttal case and recalled Fottrell to the stand. During his direct examination, the Government sought to introduce screen shots that Fottrell had created which he claimed showed that he was able to manually input the username and to download the uTorrent program from the Snap Store. (*See* Tr. at 1371).

When the defense objected to the use of these screen shots on the basis that they had not been disclosed, the prosecution expressly represented to this Court outside the presence of the jury that they had been created after Fottrell testified during the Government's case-in-chief and therefore did not constitute Jencks or Rule 16 material. (*See* Tr. at 1373).

However, on cross examination, Fottrell testified that he had created these screen shots before trial. (*See* Tr. at 1397-98). The defense then formally moved to strike the exhibits and to

17

strike Fottrell's testimony in connection with the exhibits and for an instruction to the jury regarding this. (*See id.* at 1412). This Court denied the motion. (*Id.*).

Because the screen shots were created in advance of trial and were material to preparing Duggar's defense, the Government was required to disclose them. *See* Fed. R. Crim. P. 16(a)(1)(E)(i). In its response, the Government argues the screen shots were not discoverable because they were not "helpful to the defense." (Doc. 134 at 24) (quoting *United States v. Jean*, 891 F.3d 712, 715 (8th Cir. 2018)). However, the Government takes a fatally-flawed narrow view of what is considered "helpful to the defense."

Heading into the defense's case, Bush was confident based on her own analysis that manually creating the username and downloading the uTorrent program on the Snap Store was not possible, notwithstanding the fact that Fottrell had testified that these things could be done. If the Government had done what Rule 16 requires—disclose documents and photographs in its possession that are material to the defense—Bush would have been able to further test Fottrell's theory and could have provided more pointed testimony about why his conclusions were incorrect or, alternatively, formed a different opinion, thus shifting the defense strategy on these two particular points. Had the Government complied with Rule 16 and not hidden this evidence from the defense, trial would have been different. Thus, the real question before this Court is whether the Government had the right to withhold these documents and pictures.

Furthermore, the Government argues the screenshots prepared by Fottrell in advance of trial were somehow "inculpatory" and argues that, in the Eighth Circuit, prosecutors need not turn over inculpatory information pursuant to Rule 16. (*See* Doc. 134 at 24). But the Government's position is as surprising as it is wrong. First, the screen shots are, by no means, inculpatory. But this notwithstanding, the Eighth Circuit *does* consider Rule 16 to cover inculpatory evidence—

indeed, the Government would characterize most Rule 16 evidence as inculpatory in any given case. As a matter of law, this Court need look no further than *Jean,* a case cited by the Government in its response.

In *Jean*, the Eighth Circuit explained, "[a] defendant may discover certain documents and tangible objects upon a showing that they are material to the preparation of his defense." *Jean*, 891 F.3d at 715 (internal quotation marks and citation omitted). "Inculpatory and exculpatory evidence can assist in the preparation of the defendant's defense." *Jean*, 891 F.3d at 715 (internal quotation marks omitted; quoting *United States v. Marshall*, 132 F.3d 63, 67 (D.C. Cir. 1998)). Indeed, in *Marshall*, the D.C. Circuit explained,

> The rule as written does not compel the conclusion that inculpatory evidence is immune from disclosure. Inculpatory evidence, after all, is just as likely to assist in "the preparation of the defendant's defense" as exculpatory evidence. In other words, it is just as important to the preparation of a defense to know its potential pitfalls as it is to know its strengths.

*Marshall*, 132 F.3d at 67 (D.C. Cir. 1998).

A new trial is the appropriate remedy for a Rule 16 violation if the remedy offered by the district court was inadequate to provide the defendant with a fair trial. *See, e.g., United States v. Miller*, 199 F.3d 416, 420 (7th Cir. 1999). Here, the remedy offered by the Court—receiving the exhibits as demonstratives and thereby permitting the jury to consider them but not to receive them as substantive evidence—was inadequate to provide Duggar with a fair trial. In other words, the remedy for a discovery violation by the prosecution is not that the undisclosed discovery should be admitted as demonstrative exhibits and considered by the jury—that is an injury, not a remedy. The law required a different remedy, but the Court failed to provide one.

The Government's failure to disclose Fottrell's screenshots also violated the Jencks Act. In response, the Government argues that the screenshots do not constitute "statements" so as to

bring them within the purview of the Jencks Act. The Government is mistaken. The Jencks Act provides, in pertinent part,

> After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified.

18 U.S.C. § 3500(b).

In *Simmons v. United States*, 390 U.S. 377, 387 (1968), the Supreme Court explained, "[t]he legislative history of the Jencks Act does confirm that photographs must be produced if they constitute a part of a written statement." And the Government's response makes clear that these screenshots, prepared in advance of trial, unquestionably constitute part of Fottrell's statement.

Specifically, the Government confidently asserts that Fottrell "provide[d] the exact same information in the government's case-in-chief" (Doc. 134 at 23) and that Fottrell testified that "he knew from his years of experience that someone needed to manually input the 'dell_one' username when setting up the Linux partition and that uTorrent was downloaded using Linux's 'App Store.'" (Doc. 134 at 24-25). Fottrell testified in this manner during direct examination and he created the screen shots in advance of trial. As such, the photographs constitute a part of his written statement in the Government's possession in advance of trial and, therefore, they had to be produced pursuant to the Jencks Act. The remedy for violations of the Jencks Act is as follows:

> If the United States elects not to comply with an order of the court under subsection (b) or (c) hereof to deliver to the defendant any such statement, or such portion thereof as the court may direct, the court shall strike from the record the testimony of the witness, and the trial shall proceed unless the court in its discretion shall determine that the interests of justice require that a mistrial be declared.

18 U.S.C. § 3500(d). Under the Jencks Act, the remedy for the Government's failure to disclose is to strike the witness' testimony (a request timely made by the defense and denied by this Court)

or a mistrial. *See id.* The remedy is not to accept the undisclosed materials as demonstrative exhibits for the jury's consideration.

For this reason, Duggar respectfully requests that this Court grant him a new trial.

D.      Impermissible Expert Testimony on Geolocation

In response to Duggar's argument that testimony concerning geolocation is expert testimony and that the Government did not provide notice that Fottrell would opine on this subject, the Government argues that this is not expert testimony and that, even it was, Fottrell was qualified to provide it and it was appropriately noticed.

The Government argues that *United States v. Crawford*, 1:19-CR-170, 2021 WL 2367592 (W.D.N.Y 2021), a case cited in Duggar's motion, is inapposite. There, the district court concluded, "the Government will need to provide an expert witness to explain and support the methods used by Google to obtain the geolocation data if it intends to use it as evidence at trial. It will be insufficient to call a Google representative to authenticate the records based only on accuracy under Fed. R. Evid. 901." *Id.* at *3. In its response, the Government notes that Fottrell testified that he reviewed EXIF data captured from an iPhone, and input coordinates on Google Maps. (*See* Doc. 134 at 26). The Government does not claim that Fottrell understands how Apple creates this data or how Google interprets it. Nonetheless, attempting to distinguish this case from *Crawford*, the Government simply argues that Fottrell had utilized this technique for years. (*Id.* at 27). But this does nothing to alter the fact that the *Crawford* court wisely concluded that even producing a representative from Google (and also Apple in this case) to authenticate the records spit out by the technologies would be insufficient. The Government must do more to explain how these technologies function.

Additionally, the Government accuses Duggar of "cherry-pick[ing]" a quote from *United States v. Boyajian*, No. CR 09-933, 2012 WL 4094977 (C.D. Cal. 2012) concerning the reliability of EXIF data. (*See* Doc. 134 at 27 n.11). While the Government points out the *Boyajian* court drew a distinction between stand-alone cameras and camera phones, it did so for a different reason: namely that standalone camera EXIF data must be manually entered whereas camera phones automatically create EXIF data. But this does not mean that EXIF data cannot be manipulated by a user even when it is automatically created by a camera phone—a simple internet search reveals exactly how this can be done by even the most novice user. Thus, Duggar's point that EXIF data is inherently unreliable is in no way weakened by the Government's own cherry-picked quote from *Boyajian*.

Finally, the Government argues that the subject of this testimony was noticed by the Government in its Rule 16(a)(1)(G) disclosures. But this is simply not the case. Specifically, in its disclosures, the Government provided notice that Marshall Kennedy might testify about digital photos including geolocation information. (*See* Doc. 134-1). However, with respect to Fottrell, the Government did not provide notice that he was going to offer testimony on this subject but, instead, that Fottrell would "confirm[] and/or independently convey[] any and all of the disclosures/opinions listed above under CFA Kennedys [sic] expert disclosure section." (*See id.*). But this is not a sufficient expert disclosure.

"At the defendant's request, the government must give to the defendant a written summary of any testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence during its case-in-chief at trial." Fed. R. Crim. P. 16(a)(1)(G). "The summary...must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications." *Id*. The Advisory Committee Note to the 1993 amendment states that the

required production under Rule 16 is intended to be comprehensive and "should cover not only written and oral reports, tests, and investigations, but any information that might be recognized as a legitimate basis for an opinion under Federal Rule of Evidence 703, including opinions of other experts." *See United States v. Cerna,* 2010 WL 2347406 *1 (N.D. Cal. 2010) (unpublished) ("[T]he bases and reasons must be sufficient to allow counsel to frame a *Daubert* motion (or other motion in limine), to prepare for cross-examination, and to allow a possible counter-expert to meet the purport of the case-in-chief testimony").

The scope of the expert notice is significant. Federal courts have been clear that conclusory letters or reports are insufficient. *See, e.g. United States v. Caputo*, 382 F. Supp. 2d 1045 (N.D. Ill. 2005) ("It is exceedingly difficult to cross-examine a scientific expert witness about the results of a scientific test without an opportunity to first review the test giving rise to the results"); *United States v. Robinson*, 44 F. Supp. 2d 1345, 1346 (N.D. Ga. 1997) ("If a defendant does not have the bases for the government's opinion, there is no way the defendant's counsel can effectively cross-examine the expert. It is this issue, which goes to the fairness of the trial, that the court must always keep in mind in dealing with discovery issues in a criminal case"); *United States v. Wilkerson*, 189 F.R.D. 14, 16 (D. Mass. 1999) ("[M]ore is required than a statement to the effect that such and such examiner will testify" about the test results).

Saying, essentially, that Fottrell might also talk about some of the same topics as another Government expert simply does not comply with Rule 16(a)(1)(G).

The Government also notes that Duggar must have had notice of this area of testimony as the defense came prepared with case law for lodging a formal objection to its introduction. (*See* Doc. 134 at 28). But the Government misses the mark entirely. That the defense came to trial prepared for multiple contingencies including legal authority for its position that this subject of

expert testimony was beyond what Fottrell was authorized to provide does not somehow transform the Government's insufficient Rule 16 disclosure into an adequate one—instead, it merely indicates that the defense anticipated that the Government might attempt to violate Rule 16 as it did.

"When the district court has erroneously admitted or excluded prejudicial evidence, we remand for a new trial. We do so even if the district court errs by failing to answer a threshold question of admissibility. We have no precedent for treating the erroneous admission of expert testimony any differently." *United States v. Wells*, 879 F.3d 900, 924 (9th Cir. 2018) (quoting *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 466 (9th Cir. 2014)).

In this case, the Government's theory of prosecution was that because he was allegedly present at the car lot on certain specific dates and times, Duggar was necessarily the person who perpetrated the offenses charged in the indictment. Fottrell's testimony, and the associated exhibits, cut directly to the core of that issue, allegedly placing Duggar at the lot at those times. But this was expert testimony and the Government failed to establish that Fottrell was qualified to render an opinion on these topics.

As such, Duggar is entitled to a new trial on this ground as well.

### III.   In the Alternative, This Court Should Dismiss Count Two Before Sentencing

To be clear, the parties agree that Count Two must be dismissed. (*See* Doc. 134 at 28-29) ("…the government will move to dismiss Count Two of the Indictment at sentencing"). And whether Count Two is dismissed on a Government motion or a defense motion is a distinction without a difference—because the result (the dismissal of one count) is the same.

The issue is *when* Count Two will be dismissed—and that is why Duggar raised this alternative request for relief in his post-trial motion. If this Court were to deny Duggar's motion

for judgment of acquittal and Duggar's motion for new trial, the next procedural occurrence in this case is sentencing. And the Presentence Investigation Report (PSR), the advisory Sentencing Guidelines computations, and the statutory range of possible punishment would all be impacted by the dismissal of Count Two. Thus, to the extent this Court were to conclude that this case is proceeding to sentencing, the Double Jeopardy Clause prohibits Duggar from being sentenced on both counts. As such, Duggar asks this Court to dismiss Count Two—if and only if the post-trial motions are denied—in advance of sentencing so that the record is clean with respect to the PSR, the statutory range of possible punishment, and the advisory Sentencing Guidelines computations by the time the parties show up at the sentencing hearing.

## IV.     Conclusion

Based on the foregoing, Duggar respectfully requests that this Court grant him a judgment of acquittal pursuant to Rule 29(c). In the alternative, Duggar respectfully requests that this Court enter an order granting Duggar a new trial. Only in the event this Court denies those motions, Duggar requests that this Court dismiss Count 2 with prejudice as it is a lesser included offense of Count 1.

Respectfully Submitted,

**Margulis Gelfand, LLC**

 */s/ Justin K. Gelfand*
JUSTIN K. GELFAND, MO Bar No. 62265*
IAN T. MURPHY, MO Bar No. 68289*
7700 Bonhomme Ave., Ste. 750
St. Louis, MO 63105
Telephone: 314.390.0234
Facsimile: 314.485.2264
justin@margulisgelfand.com
ian@margulisgelfand.com
*Admitted Pro Hac Vice*

*--- and ---*

**Story Law Firm, PLLC**

*/s/ Travis W. Story*
Travis W. Story, AR Bar No. 2008278
2603 Main Drive, Suite 106
Fayetteville, AR 72704
Telephone: (479) 448-3700
Facsimile: (479) 443-3701
travis@storylawfirm.com

## Certificate of Service

I hereby certify that this pleading was filed using this Court's CM/ECF system and that a copy was provided to all counsel of record including the United States Attorney's Office for the Western District of Arkansas.

          */s/ Justin K. Gelfand*
JUSTIN K. GELFAND, MO Bar No. 62265*
7700 Bonhomme Ave., Ste. 750
St. Louis, MO 63105
Telephone: 314.390.0234
Facsimile: 314.485.2264
justin@margulisgelfand.com
ian@margulisgelfand.com
*Counsel for Defendant*
*Admitted Pro Hac Vice*