IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | CASE NO.   5:21-CR-50014-001 |
| | ) | |
| | ) | |
| JOSHUA JAMES DUGGAR | ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM

Comes now the United States of America, by and through Dustin Roberts and Carly Marshall, Assistant United States Attorneys for the Western District of Arkansas, and William G. Clayman, Trial Attorney for the United States Department of Justice, and files its Sentencing Memorandum. For all matters relevant, the Government states the following:

## OVERVIEW AND SENTENCE RECOMMENDATION

On or about April 28, 2021, the defendant, Joshua James Duggar (Duggar), was named in a two-count Indictment filed in the Western District of Arkansas. The Indictment charged Duggar with Receipt and Possession of Child Pornography. (Doc. 146, PSR ¶ 1). On or about December 9, 2021, after an approximately eight-day jury trial, Duggar was convicted on both counts. (PSR ¶ 19). Thereafter, the Court accepted the jury verdict, ordered a Pre-Sentence Report (PSR) to be completed, and remanded Duggar into custody.

The offense conduct overall reflects that Duggar, over a four-day period, set up a hidden partition on his work computer and installed both The Onion Router (Tor, sometimes referred to as the dark web) browser and separately a BitTorrent Peer-to-Peer file-sharing client on the partition in order to download and view child pornography. At present, U.S. Probation's

1

calculation under the United States Sentencing Guidelines (Guidelines) set out in the final PSR reflects an advisory range of imprisonment of 360 months to life, which will be capped by the offense maximum of 240 months set by statute for Count One in the Indictment.[1] (PSR ¶ 139).

The Government made one guideline determinative objection to the initial PSR regarding the total image count and multiple objections clarifying Duggar's offense conduct, all of which have been remedied in the final PSR.

The defense objected to eighty-five (85) of the one-hundred and sixty-eight (168) paragraphs in the initial PSR, including, but not limited to, all offense conduct attributed to Duggar set out in paragraphs 25 through 88, all prior acts of sexual abuse committed by Duggar set out in paragraphs 99 and 114, and the application of the following enhancements under the Guidelines: the two-level distribution enhancement under U.S.S.G. § 2G2.2(b)(3)(F); the four-level enhancement for visual depictions of sadistic and masochistic conduct under U.S.S.G. § 2G2.2(b)(4); the five-level enhancement for engaging in a pattern of activity under U.S.S.G. § 2G2.2(b)(5); and, the determination of the number of images involved in the offense, which he contends is 127 images and therefore requires the application of the two-level enhancement under U.S.S.G. § 2G2.2(b)(7)(B). (Doc. 144 at pp. 2 – 4). The final PSR correctly applies these four enhancements over the defendant's objections. (PSR ¶¶ 95 – 108).

With respect to the defense objections, the Government submits that the conduct established at trial supports the application of all contested enhancements and establishes that the offense involved 600 or more images, warranting the application of a five-level enhancement under U.S.S.G. § 2G2.2(b)(7)(D) as correctly reflected in the final PSR. Accordingly, the

---

[1] It is anticipated that Count Two, Possession of Child Pornography, will be dismissed at sentencing.

applicable total offense level under the Guidelines should be 42, which would call for a sentencing range of 360 months to life based on Duggar's placement in criminal history category I, capped at the 240-month maximum sentenced permitted by statute in Count One. U.S.S.G. § 5G1.1(a). While the facts established at trial provide a sufficient basis to overrule all pending defense objections to the offense conduct and support the PSR's guidelines calculation, the United States could potentially call Special Agent Gerald Faulkner, U.S. Probation Officer Diem Nguyen, and, if necessary, Springdale Detective Darrell Hignite[2] as witnesses during the sentencing hearing currently scheduled for May 25, 2022. Their testimony would take approximately one hour.

Based on all the facts of the case, including Duggar's prior sexual exploitation of multiple minors discussed herein, and in consideration of the extraordinary efforts Duggar took to obtain and view child sexual abuse material (CSAM), the nature of the CSAM he obtained and viewed, his efforts to conceal his criminal conduct, and his refusal to take accountability for or acknowledge any of his criminal conduct, the Government *recommends the Court impose a guideline term of imprisonment of 240 months*.

## I.   PENDING GUIDELINES OBJECTIONS LODGED BY DEFENDANT

Duggar has raised a litany of objections to the enhancements in the PSR, primarily arguing that the evidence is insufficient to support their application under the Guidelines. (Doc. 144 at pp. 5 – 8). For sentencing purposes, however, a "court 'need only find facts … by a preponderance of the evidence,' and may consider any relevant information, even if it would be admissible at trial, 'provided that the information has sufficient indicia of reliability to support its probable accuracy." *United States v. Clark*, 999 F.3d 1095, 1097 (8th Cir. 2021) (internal citations omitted); *see also*

---

[2] Det. Hignite was the lead investigator in the 2006 case involving the defendant's sexual molestation of the minor female victims discussed herein.

*United States v. Mitchell*, 825 F.3d 422, 425 (8th Cir. 2016) (explaining that application of enhancement must be supported by a preponderance of the evidence). In other words, to apply a sentencing enhancement, a court need only find that it is "more likely than not" that the defendant engaged in the requisite conduct based on all relevant information. *United States v. Starr*, 533 F.3d 985, 1000 (8th Cir. 2008). As discussed below, the evidence presented at trial and in pre-trial hearings is more than sufficient to satisfy the preponderance-of-the-evidence standard with respect to all the sentencing enhancements in the PSR, and Duggar's objections should be overruled.

### A.    The Enhancement for Distribution of Child Pornography

Duggar first objects to the application of the two-level distribution enhancement pursuant to U.S.S.G. § 2G2.2(b)(3)(F). In support of his objection, he claims "there was absolutely no evidence that Duggar 'knowingly' distributed any materials." (Doc. 144, p.6). Despite such claim, the evidence introduced at trial establishes that: Duggar was a very savvy computer user who was familiar with peer-to-peer file-sharing programs and the Tor network; had personally installed such programs on his computer as part of his offense conduct, including the uTorrent peer-to-peer file sharing software he used to download CSAM and through which he distributed CSAM to Detective Amber Kalmer; and, had a long history of utilizing the same or similar file-sharing programs on his personal laptop to download material from others. Given the evidence of Duggar's sophisticated understanding of peer-to-peer programs and computers generally, the two-point distribution enhancement is correctly applied.

As an initial consideration, Duggar notes, in lodging his objection to the distribution enhancement, that he was not charged with distribution. (Doc. 144, p. 2). The Guidelines, however, clearly permit the consideration of non-charged conduct in applying the enhancements. Specifically, U.S.S.G. § 1B1.3(a) - Relevant Conduct (Factors that Determine the Guideline

4

Range) - states:

> Unless otherwise specified, (i) the base level where the guideline specifies more than one base offense level, (ii) specific offense characteristics and (iii) cross references in Chapter Two, and (iv) adjustments in Chapter Three, shall be determined on the basis of the following:
>
> (1)(A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant

Turning to the substantive objection lodged by Duggar, he claims the distribution enhancement is misapplied because the evidence does not reflect that he "knowingly" distributed child pornography. As applicable here, U.S.S.G. § 2G2.2(b)(3)(F) calls for a two-level enhancement if the methods of distribution outlined in § 2G2.2(b)(3)(A)–(E) do not apply. Application Note 1 of the same section defines "distribution" as "any act, including possession with intent to distribute, production, transmission, advertisement, and transportation, related to the transfer of material involving the sexual exploitation of minors."

The Eighth Circuit has provided ample guidance on the application of this provision of U.S.S.G. § 2G2.2, all of which supports its application here. In *United States v. Dodd*, for example, the Eighth Circuit held that "[a]bsent concrete evidence of ignorance, … a factfinder may reasonably infer that a defendant knowingly employed a file sharing program for its intended purpose," namely, "to share, [or] in other words, to distribute." 598 F.3d 449, 452 (8th Cir. 2010). Similarly, in *United States v. Durham,* the Eighth Circuit held that if a defendant uses a file-sharing program, a factfinder may reasonably infer he intended to distribute files, unless there is "concrete evidence of ignorance." 618 F.3d 921, 931-32 (8th Cir. 2010). Consequently, the two-point enhancement should apply in cases where the defendant had knowledge of computers and file-sharing programs. *See United States v. Glassgow*, 682 F.3d 1107, 1110 (8th Cir. 2012) (distribution enhancement applied where the defendant built the computer used to download child pornography,

as well as uploaded and downloaded files and programs); *see also United States v. Estey*, 595 F.3d 836, 843 (8th Cir. 2010) (distribution enhancement applied where the defendant "placed an internet peer-to-peer file-sharing programs on his computer, knew how the program operated, and shared images with other network users").

In this case, without question, Duggar factually distributed CSAM through a peer-to-peer network. On May 14 and May 15, 2019, Detective Amber Kalmer downloaded via the BitTorrent file-sharing network the files "mov_0216.mp4" and "marissa.zip," respectively, from Duggar at his car lot. (Govt. Ex. 1, 2, and 3). As introduced and published to the jury at trial, the video file and many of the images from the "marissa.zip" file depict child pornography as defined by federal law. Forensic evidence introduced at trial likewise established that this video and these images were not only downloaded by Duggar, but viewed by him on his computer located on the car lot. (Govt. Ex., 31-32, 36, 39, 44, and 45).

Turning to the evidence supporting Duggar's "knowledge" of how a peer-to-peer program works, of importance, Government witness Clint Branham, a cyber security expert who testified that he had known Duggar for approximately twenty (20) years, described Duggar's computer abilities as being that of a "power user," denoting someone who is more advanced with computers than the average user. (Trial Transcript (Tr.) pp. 916-918). Per Branham, a "power user" like Duggar can install programs, modify hardware and, if need be, install hardware or build their own computer. (Trial Tr. p. 918). A "power user" like Duggar, in Branham's estimation, may also know how to write their own computer code and use command line prompts. (Trial Tr. p. 926). Another Government witness who had also known Duggar for years, Jim Holt, likewise testified about Duggar's advanced computer skills. Specifically, Holt testified that Duggar edited commercials and produced literature and graphics for Holt's political campaign as a teenager and was familiar

with the concept of a Linux partition as far back as 2004. (Trial Tr. pp. 940-941).

Supporting Branham's and Holt's testimony, Duggar's offense reflects that he is a highly sophisticated and experienced computer user. Notably, prior to downloading CSAM, Duggar downloaded and installed a Linux partition on his work computer in order to circumvent the internet-monitoring software, Covenant Eyes, installed on the default Windows partition of the computer. (Trial Tr. pp. 364, 368, 463-464). That act itself is reflective of not only Duggar's ability to install computer programs, but also his elevated understanding of computer operating systems and how operating systems and computer programs work, in order to circumvent such. Thereafter, Duggar downloaded, installed, and utilized both the Tor browser and BitTorrent peer-to-peer file-sharing programs on the Linux partition side of the computer to obtain CSAM. With respect to the installation of the Tor browser and the BitTorrent client program, it is Duggar's position, per his own computer expert, that he would have had to use command-line prompts to do so, which by her estimation and per her demonstration, requires a high level of computer sophistication and is akin to speaking another language.[3] (Trial Tr. pp. 1055-1061).

Finally, it is significant in gauging his knowledge of how peer-to-peer programs work that Duggar has a history of using, or attempting to use, peer-to-peer programs dating back to at least 2017. At trial, the government's forensic expert, Director James Fottrell of the High Technology Investigative Unit in the Department of Justice, testified that peer-to-peer programs were installed and used to download movies on Duggar's personal MacBook seized by law enforcement. (Govt. Ex. 66, 67, and 68). Additionally, Director Fottrell located evidence in the form of Covenant Eyes

---

[3] In fact, a major theme of the defense at trial was that the individual who committed these crimes is a very sophisticated computer user. In other words, even under Duggar's theory of the case that was rejected by the jury, he possessed all the requisite knowledge to understand that his use of peer-to-peer programs would distribute content to others, which is consistent with Branham's and Holt's description of Duggar based on their decades-long relationships.

reports that Duggar tried on two (2) occasions in April and May 2017 to download the exact BitTorrent client, namely uTorrent, that he used to obtain CSAM in this case. (Govt. Ex. 69 and 70). Finally, Director Fottrell testified that Duggar not only had the Tor browser installed on his iPhone, but that he was using it the very day his car lot was searched to view pornography. (Govt. Ex. 83, Trial Tr. pp. 665-666).

In summary, the above facts established at trial reflect that Duggar is a very sophisticated computer user with a history of downloading, installing, and utilizing peer-to-peer file-sharing programs and an understanding that his use of those program would—and, indeed, did—result in the distribution of material to others. Given the total absence of "concrete evidence of ignorance" on the part of Duggar, *Dodd*, 598 F.3d at 452, the two-level distribution enhancement should apply.

### B. The Enhancement for Material that Portrays Sadistic or Masochistic Conduct or Other Depictions of Violence

Next, the defense objects to the application of the four-level enhancement pursuant to U.S.S.G. § 2G2.2(b)(4), which applies in cases where "the offense involved material that portrays (A) sadistic or masochistic conduct or other depictions of violence or (B) the sexual abuse or exploitation of an infant or toddler." In lodging their objection, the defense simply claims, "the evidence does not even arguably support the application of this enhancement."[4] (Doc. 144, pp. 2 and 6). Duggar's barebones objection to this enhancement should be denied because the evidence produced at trial, which included visual depictions from Duggar's computer of prepubescent girls being vaginally penetrated and bound with rope, easily satisfies the requirements to apply this enhancement. *See United States v. Parker,* 267 F.3d 839, 847 (8th Cir. 2001) (holding that images

---

[4] Notably, despite his current objection, the defendant sought a pretrial ruling prohibiting law enforcement witnesses from commenting on the graphically violent nature of certain material at issue in this case as compared to other CSAM.

8

of the sexual penetration of a minor girl using a large carrot were depictions of violence or sadism warranting the four-level increase in § 2G2.2(b)(3)); *see also United States v. Diaz,* 368 F. 3d 991 (8th Cir. 2004) (finding that images showing an adult male engaging or attempting to engage in intercourse or oral sex with a minor were included within the provision's scope); *United States v. Hall,* 312 F.3d 1250, 1261-63 (11th Cir. 2002) (holding that images showing vaginal or anal penetration of a prepubescent minor by either an adult male or a foreign object is sadistic within the meaning of § 2G2.2(b)(3))

As its first witness at trial, the Government called Detective Kalmer and introduced via her testimony Government's Exhibit 3, which contains the two (2) files Duggar distributed to law enforcement in May of 2019, namely "mov_0216.mp4" and "marissa.zip". (Trial Tr. p. 77). With respect to the "mov_0216.mp4" file downloaded on May 14, 2019, this video depicts, among other things, the vaginal penetration of two prepubescent females by the erect penis of an adult male. (Govt Ex. 3, at approximate 1 minute and 20 second mark). Said video, and the identified section, was published to the jury. (Trial Tr. pp. 79-80). With respect to the "marissa.zip" file on Government's Exhibit 3 (designated 3a on the drive), this zip file contains sixty-five (65) images depicting an approximately seven to eight-year-old female, including the following:

- Image 2400 located on page 3 of Exhibit 3a, which depicts a very young prepubescent female being vaginally penetrated by an erect adult penis;

- Image 2349 located on page 3 of Exhibit 3a, which depicts the very young prepubescent female forced to perform oral sex on an erect adult penis;

- Image mar37010.jpg located on page 6 of Exhibit 3a, which depicts a close-up of a very young prepubescent minor female being anally penetrated by a dildo; and,

- Image mar37004 located on page 6 of Exhibit 3a, which depicts a close-up of a very young prepubescent minor female being anally penetrated by a dildo.

At trial, the Government also presented the testimony of Director Fottrell, who confirmed that Duggar utilized his computer to download and view both the "mov_0216.mp4" file (Trial Tr. pp. 546-547, Govt. Ex. 44 and 47) and the images from the "marissa.zip" file (Trial Tr. pp. 554-555). Of note, Government's Exhibit 31, which contains the thumbnail images created when Duggar opened and viewed the contents of the "marissa.zip" file, includes thumbnail images of the same approximately 7 or 8 year old described above being: anally penetrated by an adult male's finger (page 1 of 4, row 2, image 2); anally penetrated by a dildo (page 1 of 4, row 4, image 3); vaginally penetrated by a vibrator (page 2 of 4, row 3, image 4); and, locked in a cage (page 4 of 4, row 2, image 1). Additionally, the Government introduced Exhibit 35 and 36, which per Director Fottrell contained images of CSAM from that same "marissa.zip" file located in the unallocated space of Duggar's computer. (Trial Tr. p. 522). Exhibit 35 contains approximately 39 images of CSAM depicting this same minor girl, including images of the minor lying nude on a bed with her legs spread apart to expose her vagina and her hands bound to the headboard, huddling nude while locked in a dog's cage, and being vaginally penetrated by an adult male's penis with her abdomen covered in a substance that resembles blood. (Govt. Ex. 35, pp. 4, 7, and 10). Exhibit 36 contains approximately 220 images of the same minor recovered from Duggar's computer, including the images described in Exhibit 35 as well as images of this minor: lying nude on a bed with the words "cut me," "slut," and "hurt me" written on her in a blood-like substance and a knife pointed at her vagina; huddling nude in a cage; lying nude on a bed with her hands bound behind her back; and, lying nude on a bed while being whipped with what appears to be a cat o' nine tails whip. (Govt. Ex. 36, pp. 2, 5-6, 7, and 11-12).

Lastly, the Government introduced evidence regarding the torrent files recovered on Duggar's computer and the corresponding images or videos that can be downloaded using these torrent files through the BitTorrent network, including the following:

- The "mov_0216.mp4.torrent" file downloaded on May 14, 2019, which Duggar used to download a video depicting the vaginal penetration of two prepubescent females (Govt. Ex. 39, 44, and 47);

- The "DD.torrent" file downloaded twice on May 15, 2019, which is associated with video files titled "DD-bdsm2.mp4," "Lux_Leak 3.mp4," "Lux_Leak 4.mp4," "Pthc OPVA 2013 Rape Ultrrra.mp4," and "intro-DD.mp4" (Govt. Ex. 39 and 41). This file was described by Director Fottrell as one of the most offensive series of CSAM that he has seen in his career, depicting adults sexually abusing a toddler, hanging the infant by their hands and feet, and dripping hot wax on the infant. (Trial Tr. pp. 532-533); and,

- The "Asi se mama linda.mp4.torrent" file downloaded on May 15, 2019, which Duggar used to download a video depicting the vaginal penetration of a prepubescent female (Govt. Ex. 39, 44, and 51).

Based on the above-cited case law and a review of the evidence produced at trial, the application of the sadistic/masochistic enhancement under U.S.S.G. § 2G2.2(b)(4) is warranted here. *See United States v. Belflower*, 390 F.3d 560, 562 (8th Cir. 2004) (holding that images involving the sexual penetration of the vagina of a minor girl or the anus of a minor girl or boy by an adult male "are *per se* sadistic or violent" within the meaning of the Guidelines); *see also United States v. Corp*, 668 F.3d 379, 390 (6th Cir. 2012) (approving application of identical enhancement in § 2G2.1 where material objectively depicts activity that is "inflicting physical pain, emotional suffering, or humiliation on a [a] minor"). The defense's meritless objection to the application of this enhancement should therefore be denied.

### C. The Enhancement for Engaging in a Pattern of Activity Involving the Sexual Abuse of Minors

At present, Duggar objects to U.S. Probation's inclusion of the five-level enhancement

pursuant to U.S.S.G. § 2G2.2(b)(5) for engaging in a pattern of activity involving the sexual abuse or exploitation of a minor based on his prior molestation of multiple minors. Duggar argues that the Court should find that these acts of molestation did not occur and that, even if they did, the Court should disregard them because they occurred years ago. (Doc. 144 at p. 7). Contrary to Duggar's claims, however, evidence produced during pretrial hearings and at trial, including the testimony of his father, Jim Bob Duggar, and his long-time family friend, Bobye Holt, reflect that Duggar engaged in the exact conduct he now denies occurred and is more than sufficient to support the application of this enhancement based on a preponderance of the evidence.

Section 2G2.2(b)(5) of the Guidelines applies when a "defendant engaged in a pattern of activity involving the sexual abuse or exploitation of a minor." Application Note 1 of the Commentary to U.S.S.G. § 2G2.2 defines "pattern of activity involving the sexual abuse or exploitation of a minor" as "any combination of two or more separate instances of the sexual abuse or sexual exploitation of a minor by the defendant, whether or not the abuse or exploitation (A) occurred during the course of the offense; (B) involved the same minor; or (C) resulted in a conviction for such conduct." The term "sexual abuse or exploitation" is further defined to include, as relevant here, any conduct described in section 18 U.S.C. §§ 2241 or 2242,[5] a state offense that

---

[5] Section 2241(c) prohibits, in relevant part, an individual from knowingly engaging in a sexual act with another person who has not attained the age of 12 years. Section 2242(2) prohibits, in relevant part, an individual from engaging in a sexual act with another person if that other person is "incapable of appraising the nature of the conduct" or "physically incapable of declining participation in, or communicating unwillingness to engage in, that sexual act."

For purposes of both provisions, a "sexual act" includes "the penetration, however slight, of the anal or genital opening of another by a hand or finger or by any object, with an intent to … arouse or gratify the sexual desire of any person" or "the intentional touching, not through the clothing, of the genitalia of another person who has not attained the age of 16 years with an intent to … arouse or gratify the sexual desire of any person." 18 U.S.C. § 2246(2).

would be equivalent to these federal offenses if committed in an area of exclusive federal jurisdiction,[6] or an attempt to commit any of these crimes.

In the instant case, the United States elicited testimony both at a pretrial hearing held on November 30, 2021, and at trial regarding Duggar's repeated acts of child molestation that qualify as "the sexual abuse or exploitation of a minor" under U.S.S.G. § 2G2.2. Specifically, the Government called as a witness Duggar's long-time family friend Bobye Holt at the pretrial hearing and at trial. As relevant here, Ms. Holt testified that on March 30, 2003, Duggar's parents, Jim Bob and Michelle, called her husband and asked for the Holts to come over to their residence. (11/29/2021 Hearing Tr. p.14). Holt testified that when they arrived, she, her husband, Duggar, and Duggar's parents all had a conversation. (*Id*. at pp. 23-24.). Holt testified that during that conversation, Duggar explained that earlier that day, Jane Doe 4 was sitting on his lap during "Bible time" and he touched her inappropriately on her vaginal area over her clothes with his hands. Holt testified that Duggar also confessed that he touched the "breast areas" and "vaginal areas" of Jane Doe 1, Jane Doe 2, and Jane Doe 3 "sometimes on the clothes and sometimes under the clothes." (*Id.* at p. 50). Holt elaborated that Duggar admitted to doing this to Jane Doe 1, Jane 2, and Jane Doe 3 on multiple occasions, both when they were asleep and awake. (*Id.* at p. 27). As

---

[6] The Government previously flagged the applicable state criminal statutes for purposes of Duggar's prior molestation conduct in its Notice pursuant to Federal Rule of Evidence 414. (Doc. 68). These statutes include sexual assault in the second degree, codified at Ark. Code Ann. § 5-14-125 and rape, codified at Ark. Code Ann. § 5-14-103(a)(3)(A). Under Arkansas law, an individual is guilty of sexual assault in the second degree if that person engages in sexual contact—defined in pertinent part as "[a]n act of sexual gratification involving the touching, directly or through the clothing, of the sex organs, buttocks, or anus or the breast of a female," Ark. Code Ann. § 5-14-101(11)—with another person who is less than fourteen years of age and not the person's spouse. Ark. Code Ann. § 5-14-125(5)(A). Rape under 5-14-103(a)(3)(A) involves deviate sexual activity with another person who is less than fourteen (14) years of age. Deviate sexual activity, in pertinent part, is defined as any act of sexual gratification involving the penetration, however slight, of the labia majora of a person by any body member manipulated by another person. Ark. Code Ann. § 5-14-101(1)(B).

established during the pretrial hearing and at trial, in March 2003, Jane Doe 1, Jane Doe 2, Jane Doe 3, and Jane Doe 4, were all at least three years younger than Duggar.[7] Holt testified that Duggar told her he had been touching these individuals since he was approximately 12 years old, which would have been in 2000 to 2001. (*Id.* at p. 26).

Bobbye Holt also testified that Duggar had another conversation with her regarding Jane Doe 4 in 2005. (*Id.* at p. 29). Holt testified that during that conversation, Duggar elaborated on his molestation of Jane Doe 4 on March 30, 2003, explaining that he put his hands under her "pantaloons" and under her panties and touched her vagina. (*Id.* at pp. 33-34). Per Holt, Duggar confessed to digitally penetrating Jane Doe 4's vagina. (*Id.*).

Also, at the pretrial hearing, the Government called as a witness Duggar's father, Jim Bob Duggar (Jim Bob). While Jim Bob demonstrated a somewhat selective memory of the incidents at issue, he confirmed that Duggar inappropriately touched the four (4) minor victims identified by Ms. Holt. Of importance, Jim Bob testified that in 2002 Duggar disclosed to him and his wife that he touched the four (4) minors "when they were sleeping, like, on their breast, like, over their clothes. They didn't wake up." (*Id.* at p. 70). Additionally, Jim Bob testified that Duggar's conduct eventually prompted them to contact and subsequently disclose Duggar's molestation to Bobye Holt and her husband. (*Id.* at pp. 80-81, 85-86).[8] As the Court determined in pretrial litigation, the

---

[7] The identities and exact ages of Duggar's minor victims are set forth in Court's Exhibit 2, which was submitted under seal at the November 29 hearing. *See* Doc. 106 at 11 n.4.

[8] As refenced during his testimony, in 2015, Jim Bob and his wife Michelle were interviewed about Duggar's molestation conduct on Fox News by Megyn Kelly. During the interview, Jim Bob and Michelle Duggar specifically recalled, among other instances, that Duggar admitted on three different occasions to inappropriately touching multiple minors' breast and vaginal areas while they were asleep. *See Exclusive: The Duggars open up about molestation allegations on 'The Kelly File'*, Fox News (January 26, 2017, 9:50 AM EST), www.foxnews.com/transcript/exclusive-the-duggars-open-up-about-molestation-allegations-on-the-kelly-file.amp.

corroborated and effectively unrebutted testimony of Bobye Holt is sufficient to establish by a preponderance of the evidence that Duggar did in fact engage in the above criminal conduct. (Doc. 106 at 11 ("Based on Mrs. Holt's credible testimony, the Court finds by a preponderance of the evidence that Defendant committed a previous act or acts of child molestation, as defined by Rule 414.")).

Of additional significance and as the Court is aware, in 2017, members of the Duggar family sued various Arkansas state and local law enforcement agencies in federal court for disclosing police reports documenting the sexual molestation at issue. Approximately one month after the suit was filed, Duggar, by and through his attorney, Travis Story, who likewise represents him in the instant criminal case, sought to intervene and join the claims. (*See* WDAR 5:17-CV-5089, Doc. 11). Ultimately, Duggar withdrew his motion and filed a separate suit in federal court. (*See* WDAR 17-CV-5125). In doing so, Duggar, by and through his counsel, again Mr. Story, included in his publicly filed complaint a "statement of facts" that Duggar attested to, verifying that all the statements were true and correct. (*Id.*, Doc. 1). Therein, the complaint specifically details that in 2006, members of Duggar's family were interviewed by law enforcement and all made disclosures regarding instances of sexual abuse attributed to Duggar.[9] (*Id.* at pp.15-16).

In addition to claiming that his corroborated and well-documented confession to engaging in multiple acts of child sexual abuse is insufficient to support the pattern-of-activity enhancement, Duggar also objects to its application because his other acts of child sexual abuse occurred when he was a minor and did not result in a conviction. (Doc. 144 at pp. 6-7). Despite Duggar's claims to the contrary, ample case law supports the application of the enhancement in these circumstances.

---

[9] At no point in the approximately 72-page complaint did the defendant, nor his counsel, dispute the veracity of the police reports or the sexual abuse described therein.

In *United States v. Woodard*, for example, the Eighth Circuit denied the defendant's claim that his juvenile adjudication for second-degree sexual abuse could not form the basis for the enhancement. 694 F.3d 950, 953 (2012) (overruled on other grounds). The Court honed in on the "two or more separate instances" phrase of the enhancement, highlighting that the Guidelines allowed for the enhancement whether or not the abuse or exploitation resulted in a conviction. *Id.* The Eighth Circuit also emphasized that this enhancement "contains no temporal limitation that would prevent [the defendant's] sexual abuse that occurred 19 years earlier from triggering the enhancement." *Id.* at 953-954 (citing cases). All other circuits that have considered this issue have similarly held that a defendant's juvenile conduct involving the sexual abuse or exploitation of a child, even from years prior and even when based on similar testimonial evidence, was sufficient to trigger the application of the pattern-of-activity enhancement under the Guidelines. *See United States v. Olfano*, 503 F.3d 240, 243 (3rd Cir. 2007) (applying enhancement in child-pornography case based on decades-old incidents where defendant penetrated minor's vagina at age 15 and touched half-sister's vaginal area at age 17).[10]

Consequently, the five-level pattern-of-activity enhancement is correctly applied in this case based on the unrebutted and corroborated testimony of Mrs. Holt. Specifically, Mrs. Holt's testimony that Duggar admitted in 2003 to touching the vaginal areas of multiple minors "under

---

[10] *See also United States v. Reingold*, 731 F.3d 204 (2d Cir. 2013) (finding district court erred when it declined to apply enhancement based on defendant's "minority, lack of temporal proximity, and inadequate supervision" at time of conduct); *United States v. Montierth*, 839 F. App'x 184, 185 (9th Cir. 2021) (Mem.) (affirming enhancement "based on conduct that began when [defendant] was a juvenile and ended decades before his sentencing" that was "based on testimony about the abuse"); *United States v. Alberts*, 859 F.3d 979, 983-85 (11th Cir. 2017) (relying on 30-year-old juvenile conduct to support the pattern-of-activity enhancement); *United States v. Lucero*, 747 F.3d 1242, 1249 (10th Cir. 2014) (noting that nine other circuits have determined that "§ 2G2.2(b)(5) can apply based on a pattern of activity that occurred far in the past).

the clothes" and admitted in 2005 to digitally penetrating the vagina of a five-year-old prove by a preponderance of the evidence that Duggar committed multiple acts of sexual abuse of a minor. More specifically, they constitute multiple instances in which Duggar attempted to and did in fact engage in conduct described in 18 U.S.C. §§ 2241 and 2242 by engaging in a sexual act, as defined by 18 U.S.C. § 2246(2)(C) and (D), with a minor. This evidence is also sufficient to establish by a preponderance of the evidence that Duggar attempted to and did commit sexual assault in the second degree, codified at Ark. Code Ann. § 5-14-125, and/or rape, codified at Ark. Code Ann. § 5-14-103(a)(3)(A)—a conclusion that this Court has already reached, at least in part. (Doc. 106 at 11). As such, the pattern-of-activity enhancement under U.S.S.G. § 2G2.2(b)(5) is appropriately applied in this case.

Additionally, while the Government is not seeking an upward departure or variance in light of the correctly calculated Guidelines range, it is clear that the United States Sentencing Commission envisioned a defendant's history of engaging in sexually abusive and exploitative conduct with minors, regardless of whether it qualifies for the enhancement under U.S.S.G. § 2G2.2(b)(5), as being an aggravating factor for a sentencing court's consideration**.** Specifically, Application Note 9 of § 2G2.2, entitled Upward Departure Provision, states, as relevant here, that

> [i]f the defendant engaged in the sexual abuse or exploitation of a minor at any time (whether or not such abuse or exploitation occurred during the course of the offense or resulted in a conviction for such conduct) and *__the pattern-of-activity enhancement] does not apply, an upward departure maybe warranted__*. In addition, an upward departure may be warranted if the defendant received an enhancement under **[the pattern-of-activity enhancement] but that enhancement does not adequately reflect the seriousness of the sexual abuse or exploitation.**

### D.    The Enhancement Based on the Number of Images Involved in the Offense

Lastly, Duggar claims that his offense only involved 127 images and argues that the two-level enhancement under U.S.S.G. § 2G2.2(b)(7)(A) for offenses involving at least 10 but fewer

than 150 images must therefore apply. Contrary to Duggar's objection, however, the evidence presented at trial proves that Duggar's offense involved over 600 images, [11] warranting the application of the five-level enhancement under § 2G2.2(b)(7)(D).

Specifically, the evidence presented at trial established that Duggar used the Tor browser on May 14, 2019, to download a zip file titled "Webcam-Collections-prevs.7z," which contained approximately thirty-three (33) images, if not more, and then extracted those images from the zip file into a folder on the desktop of the Linux partition. (Govt. Ex. 31-34 and 38). The evidence presented at trial further established that, on May 15 and 16, 2019, Duggar downloaded eleven torrent files associated with child pornography images and videos and used the uTorrent file-sharing program to download the images and videos referenced in at least nine of those torrent files. The list of the eleven torrent files, over 200 images, and at least seven videos Duggar received in this manner are as follows:

- Duggar downloaded the "mov_0214.mp4.torrent" file on May 14, 2019, obtained the "mov_0214.mp4" video through uTorrent, and viewed the approximately 20-second video (See Govt. Ex. 39, 44, and 45);

- Duggar downloaded the "mov_0216.mp4.torrent" file on May 14, 2019, obtained the "mov_0216.mp4" video through uTorrent, and viewed the approximately two-minute-and-twelve-second video (See Govt. Ex. 39, 44, and 47);

- Duggar downloaded the "14yo girl Suck and Fuck.flv.torrent" file on May 15, 2019, obtained the "14yo girl Suck and Fuck.flv" video through uTorrent, and viewed the approximately three-minute-and-thirty-second video (See Govt. Ex. 39, 44, and 53);

- Duggar downloaded the "test.avi.torrent" file on May 15, 2019, obtained the "test.avi" video through uTorrent, and viewed the approximately one-minute-and-ten-second video (See Govt. Ex. 39, 44 and 57);

---

[11] Pursuant to Application Note 4(B)(ii) in U.S.S.G. § 2G2.2, a video file is the equivalent of 75 still images, and an upward departure may be warranted if the length of the video is substantially more than five minutes.

- Duggar downloaded "PussyPounded.mpg.torrent" file on May 15, 2019, obtained the "Pussy Pounded.mpg" video through uTorrent, and viewed the approximately two-minute-and-forty-six-second video (See Govt. Ex. 39, 44, and 55);

- Duggar downloaded the "playtoysweetie.7z.torrent" file on May 15, 2019, obtained the "playtoysweetie.7z" zip file through uTorrent, and attempted to access the file through the VLC player on the Linux partition (See Govt. Ex. 39 and 44);

- Twice on May 15, 2019, Duggar downloaded the "DD.torrent" file, which is associated with five video files titled "DD-bdsm2.mp4," "Lux_Leak 3.mp4," "Lux_Leak 4.mp4," "Pthc OPVA 2013 Rape Ultrrra.mp4," and "intro-DD.mp4" (See Govt. Ex. 39 and 41);

- Duggar downloaded the "Asi se mama linda.mp4.torrent" file on May 15, 2019, obtained the "Asi se mama linda.mp4" video through uTorrent, and viewed the approximately twelve-minute video (See Govt. Ex. 39, 44, and 51);

- Duggar downloaded the "marissa.zip.torrent" file on May 15, 2019, obtained the "marissa.zip" file through uTorrent, and extracted at least approximately fifty-eight (58) images from this zip file into a folder on the desktop of his computer, with approximately 215 images from the "marissa.zip" file found in the unallocated space on his computer (See Govt. Ex. 31-32, 36 and 39); and,

- Duggar downloaded the "pedomom.wmv.torrent" file on May 16, 2019, obtained the "pedomom.wmv" video through uTorrent, and viewed the approximately thirty-minute video (See Govt. Ex. 39, 44, and 49).

That Duggar attempted to delete some of these files after viewing them—and that some of these files were identified through, among other forensic evidence, thumbnail images from Duggar's computer as a result—is of no consequence here. The Eighth Circuit addressed a similar scenario in *United States v. Nissen*, in which the government presented evidence that thumbnail images recovered from the defendant's computer reflected that 40 to 50 videos of child sexual abuse associated with those thumbnail images had at one point existed on that computer and were played by the defendant. 666 F.3d 486, 491 (8th Cir. 2012). These facts, the Court determined, were sufficient to support the inference that the defendant's offense therefore involved more than 600 images. *Id.*; *see also Glassgow*, 682 F.3d at 1111 (applying number-of-images enhancement over defendant's objection that he "should not be punished for the total number of images because

he tried to delete them"); *United States v. Ardolf*, 683 F.3d 894, 902 (8th Cir. 2012) ("An image counts [for purposes of the Guidelines] if Ardolf possessed it at some point."); *United States v. Paquin*, 339 F. App'x 983, 984-85 (11th Cir. 2009) (affirming application of enhancement based on deleted images found in "unallocated file space"). The facts adduced at trial prove that Duggar's offense conduct involved over 600 images based on the hundreds of images and at least seven video files discussed above, and the Court should follow the Eighth Circuit's guidance in *Nissen* and apply the five-level enhancement under U.S.S.G. § 2G2.2(b)(7)(D) here.

## II.     APPLICATION OF THE 3553(a) FACTORS

After calculating the applicable Guidelines range, a sentencing court must consider that range, as well as the sentencing factors set forth in 18 U.S.C. § 3553(a), and determine an appropriate and reasonable sentence. *Nelson v. United States*, 555 U.S. 350, 351 (2009). Based on the facts of this case and as described below, the Government submits that a Guidelines sentence of 240 months is sufficient but not greater than necessary here.

### A.     The Nature and Circumstances of the Offense

In May of 2019, an Arkansas Internet Crimes Against Children taskforce officer downloaded two files of CSAM from the user of Duggar's IP address at his used car business. (Trial Tr. at pp. 68-80, 125-134). Law enforcement officers with the Department of Homeland Security, Homeland Security Investigations ("HSI") executed a federal warrant to search the premises on November 8, 2019 and encountered Duggar on the property. (*Id*. at 144). Prior to being formally interviewed, Duggar asked if someone had been downloading child pornography despite no outward indication of the nature of the search. (*Id.* at 156). During a later post-*Miranda* interview, Duggar admitted to being familiar with peer-to-peer programs, specifically mentioned Tor, and acknowledged that both were on his computer at the car lot. (*Id.* at 177-179, 180-183). At

20

that point, law enforcement was unaware that Duggar had also downloaded CSAM via Tor. A forensic examination of Duggar's computer in the office on the lot uncovered evidence that he had installed a password-protected Linux partition on the device and had used the partition to download CSAM using both uTorrent and Tor. (*Id.* at 475-483). Significantly, the default Windows partition contained an internet-monitoring software known as Covenant Eyes but not the Tor browser or uTorrent, while the Linux partition contained the Tor browser and uTorrent but not Covenant Eyes. (*Id.* at 463-464, 475-478, 584). Additional forensic evidence recovered from Duggar's seized Apple iPhone and Apple MacBook laptop confirmed that Duggar was the individual using the computer to download CSAM, including evidence showing that the password to the Linux partition is one that Duggar used for years on his personal accounts. (*Id.* at 474, 598, 604-673).

Put simply, Duggar went to great lengths to obtain CSAM. The mere fact that he downloaded, specifically, a Linux partition on his work computer reflects his desire to obtain CSAM and at the same time conceal and therefore prolong his ability to engage in this conduct. At the very least, Duggar had to conduct research in order to determine that a Linux partition was required to defeat Covenant Eyes' internet monitoring. And then, he went through the effort to download, install, and password protect the partition—all to avoid detection. Duggar, perhaps more than any other individual presented to this Court, was willing to go through exhaustive efforts to obtain CSAM without detection. Duggar's criminal activity was also deliberate and precise. Almost as soon as he set up the Linux partition, he downloaded and installed the Tor browser, which he promptly used to download and view CSAM. He next downloaded and installed uTorrent, which he promptly and repeatedly used to do the same. Duggar also downloaded the "VTC Player" to view his CSAM. And after he viewed them, Duggar deleted all videos and images to further conceal his crimes. While his efforts to delete evidence may have succeeded to some

extent, the forensic examination of his devices makes at least one thing clear: Duggar did not stumble across CSAM on the internet accidentally. To the contrary, the evidence reflects an individual who went to great lengths to conceal his online activity and who had the specific purpose of seeking out, downloading, and viewing CSAM. In light of Duggar's considerable and targeted efforts to engage in the criminal conduct he has been convicted of, the Government submits that a sentence consistent with the Guidelines range is appropriate here.

### B.       Duggar's History and Characteristics

At present, Duggar is a 34-year-old male with no criminal history. (PSR ¶ 113). However, the facts produced in pretrial hearings and at trial establish that he has previously molested four (4) minor females, either while they were sleeping (hence incapacitated) or too young to understand what Duggar was doing or defend themselves from his criminal behavior. And while Duggar is not before the Court to be sentenced specifically for this conduct, his past behavior nevertheless provides an alarming window into the extent of his sexual interest in children that the Court should consider at sentencing. This past conduct, when viewed alongside the conduct for which he has been convicted, makes clear that Duggar has a deep-seated, pervasive, and violent sexual interest in children, and a willingness to act on that interest. A guidelines sentence is warranted to appropriately account for his history and characteristics.

### C.       The Need for the Sentence to Reflect the Seriousness of the Offense

It is beyond dispute that crimes involving the trafficking of child pornography are incalculably serious and warrant significant sanctions. As the Victim Impact Statement submitted with the PSR shows, and as "[l]ong-term studies" confirm, "sexual abuse is grossly intrusive in the lives of children and is harmful to their normal psychological, emotional and sexual development in ways which no just or humane society can tolerate." *United States v. Irey*, 612

F.3d 1160, 1207 (11th Cir. 2010) (en banc) (collecting authority). The fact that Duggar's conduct of conviction does not involve him committing hands-on acts of child sexual abuse does not lessen the significance of his predatory and criminal behavior, particularly in light of his past conduct described above. Contrary to what some defendants may suggest, trafficking in child pornography inherently involves the sexual abuse of children, even if no new child pornography is produced. *See New York v. Ferber*, 458 U.S. 747, 759 (1982). Indeed, far from being victimless, trafficking in child pornography "harms children in part because it drives production [of child pornography], which involves child abuse." *Paroline v. United States*, 572 U.S. 434, 439 (2014).

Trafficking in child pornography also results in perpetual harm to the children who have already been sexually abused, all of whom are grappling with the indelible trauma caused by that abuse. (*See Id.* at 440). As another court noted, "[i]t is well established that children featured in child pornography are harmed by the continuing dissemination and possession of that pornography. Such images are 'a permanent record of the children's participation and the harm to the child is exacerbated by their circulation.'" *United States v. Burgess*, 684 F.3d 445, 459 (4th Cir. 2012) (quoting *Ferber*, 458 U.S. at 759). Accordingly, "[e]very instance of viewing images of child pornography represents a renewed violation of the privacy of the victims and a repetition of their abuse." Adam Walsh Child Protection and Safety Act of 2006, Pub. L. No. 109-248, § 501(2)(D), 120 Stat. 587, 624 (2006) (codified at 18 U.S.C. § 2251 note); *see also United States v. Sherman*, 268 F.3d 539, 547 (7th Cir. 2001) (recognizing that "[t]he possession, receipt and shipping of child pornography directly victimizes the children portrayed by violating their right to privacy, and in particular violating their individual interest in avoiding the disclosure of personal matters"). These children, "who must live with the knowledge that adults like [the defendant] can pull out a picture or watch a video that has recorded the abuse of [them] at any time," "suffer a

23

direct and primary emotional harm when another person possesses, receives or distributes the material." *Sherman*, 268 F.3d at 547-548.

It is therefore unsurprising that when one "[m]ention[s] the term [child pornography] to your average American[,] … he responds with immediate disgust and a sense of unease." *United States v. Cunningham*, 680 F. Supp. 2d 844, 847 (N.D. Ohio 2010), *aff'd*, 669 F.3d 723 (6th Cir. 2012). But as the *Cunningham* court warned, "once it enters the legal system, child pornography undergoes sterilization … far beyond properly removing emotion from sentencing decisions." *Id.* "Images are described in the most clinical sense. Victims all too often remain nameless. The only emotions on display are those of defendants, sorry that their actions were discovered by law enforcement." *Id.* Thus, while the written excerpt below cannot fully capture the suffering Duggar's crimes have inflicted, it is important to highlight the pain his predation caused in the words of his victims (or, in this case, their parents).

As the parent of one of the victims depicted in the CSAM the defendant downloaded explained, her daughter became an "anxious and fretful shadow of her former self" after being sexually abused. (Doc. 146-2 at p. 4). And when addressing the harm caused by offenders like Duggar, who traffic in images depicting the worst moments of her daughter's life, she wrote:

> I can find no words to express the fury I feel at those who participate in this evil, or my scorn for any attempt to minimize the responsibility by feeble claims that the crime was "victimless". My daughter is a real person. She was horribly victimized to provide this source of "entertainment". She is exploited anew each and every time an image of her suffering is copied, traded or sold. While the crime is clearly conscienceless, it is hardly "victim-less".

> I asked my daughter what she most wanted to ask of the judge. Her request: "Please, don't let them pretend no-one's getting hurt!"

> She had some words for the defendant as well: "don't you know no one should do that to a little girl! Don't you know it hurts!"

> As the mother of a child victimized by this crime, I would ask that the court take

> into consideration the damage done by this heartless crime to my daughter and others like her (including those children who still wait for someone to rescue them from their exploitation, and have no-one here today to speak for them) and impose a sentence that takes into account the full impact of the crime on the victims.

*Id.*

Those are the words of just one parent of just one victim. There are many more victims of Duggar's crimes, all of whom were subjected to extreme and unimaginable instances of sexual abuse and violence. Some of the victims depicted in the CSAM he downloaded and possessed, like the victim described above, have been identified and rescued. Others have not, and the pain and trauma they have experienced as a result of Duggar's conduct will go unvoiced at the sentencing hearing. Considering the extremely serious nature of the defendant's offenses and the irreparable harm he has caused to the victims of his conduct, the Government submits that a Guidelines-compliant sentence is appropriate here.

### D.     The Need for the Sentence to Afford Adequate Deterrence and Protect the Public from Further Crimes

The sentence in the instant case, if nothing else, must further the goal of protecting the public—specifically the most vulnerable members of the public, children—from future crimes committed by Duggar and others like him. Indeed, as a general matter, "the deterrence objective of sentencing is 'particularly compelling in the child pornography context.'" *Irey*, 612 F.3d at 1211 (citation omitted). "[I]mposing a lighter sentence on one convicted of a child pornography offense 'tends to undermine the purpose of general deterrence, and in turn, tends to increase (in some palpable if unmeasurable way) the child pornography market.'" *Id.* (citation omitted); *accord United States v. Garthus*, 652 F.3d 715, 721-722 (7th Cir. 2011); *see also Osborne v. Ohio*, 495 U.S. 103, 109-110 (1990) ("It is also surely reasonable for the State to conclude that it will decrease the production of child pornography if it penalizes those who possess and view the product, thereby

decreasing demand."). And the need for specific deterrence is particularly high here. Although it has been widely reported and acknowledged by Duggar and his family in the public sphere, and yet still particularly contested throughout this prosecution, Duggar sexually abused multiple children when he was a juvenile. His victims, four in total, were all prepubescent females, including several who were significantly younger than Duggar. And now, similarly, the victims depicted in the CSAM that Duggar has been convicted of downloading and possessing were all girls, all of similar age, and all being sexually exploited. This is not coincidental. Instead, it should be seen as the singular most important factor for the Court to consider in imposing sentence.

As argued above, Duggar's guideline calculation includes an enhancement for engaging in pattern of activity involving child sexual abuse. The referenced "pattern" that Duggar has followed, and which is now before this Court, involves his hands-on abuse of minor females followed up by his acts to obtain imagery reflecting the hands-on abuse of minor females. At base, this pattern reflects a clear and long-standing sexual interest in prepubescent females. And troublingly, this sexual interest in children has gone and will likely continue to go—based on Duggar's conduct throughout this case—unacknowledged and thus untreated. To be sure, Duggar certainly has a right to trial and a right to maintain his innocence, but this Court is now presented with an offender who has a history of sexually abusing minors, who has not received any treatment or therapy for this conduct to speak of, who appears unlikely to ever seek out or meaningfully participate in treatment or therapy to address this conduct, and who continues to deny any responsibility for his past or present crimes.[12] There is simply no indication that Duggar will ever

---

[12] Indeed, while it is not uncommon for defendants in online child-pornography cases to claim that someone else committed the crimes, Duggar's efforts to pin the blame for his conduct on others were particularly pronounced leading up to and at trial. Even post-trial, Duggar continues to blame others for the crimes he has been found guilty of committing beyond a reasonable doubt, going so far to specifically identify and publicly blame a family friend for his crimes despite all evidence

take the steps necessary to change this pattern of behavior and address his predilection for minor females. Given these circumstances, this Court should be particularly mindful in crafting its sentence of the likelihood that Duggar reoffends upon his release from incarceration and what his reoffending conduct will entail.

Of particular concern with respect to Duggar's likelihood of recidivating is the content of the CSAM he downloaded and possessed. Distressingly, the market for child pornography has continued to grow, and to become more depraved, in recent years. That depravity is evident here. As noted above, Duggar sought out images and videos depicting prepubescent minors being subjected to sadistic and masochistic abuse. And while the Court has undoubtedly (and unfortunately) encountered other cases in which the sadistic-or-masochistic-conduct enhancement applies, it must be acknowledged that the enhancement applies to a range of material. And the material Duggar sought out falls on the far end of that range. The CSAM he received and possessed not only depicted minors with similarities to his prior hands-on victims, but it also depicted minors forced into bondage, placed in cages, and subjected to extreme acts of violence, including being whipped and posing nude with what appears to be simulated blood and a knife. In fact, the forensic evidence presented at trial included multiple torrent files related to a series of CSAM that has repeatedly been described by law enforcement as being among the worst of the worst.

The need for effective deterrence through a significant sentence is therefore essential here. After all, as the Supreme Court reasoned, "[t]he most expeditious if not the only practical method of law enforcement [to halt the exploitation of children] may be to dry up the market for [child pornography] by imposing severe criminal penalties on persons selling, advertising, or otherwise promoting the product." *Ferber*, 458 U.S. at 760. A Guidelines sentence is additionally appropriate

---

showing that this individual did not—and could not—commit these crimes.

given the "grave concerns over the high rate of recidivism among convicted sex offenders and their dangerousness as a class." *Smith v. Doe*, 538 U.S. 84, 103 (2003); *see also Cunningham*, 680 F. Supp. 2d at 855-56, 859-860 (discussing recidivism studies). There is no reason to think that Duggar is a "low risk" to recidivate. All his perverse activities were carried out in secret, and it is clear that he receives sadistic pleasure from the sexual exploitation of minors. But even if he could be described as a "low risk" to recidivate, "[a] low risk is not the same as no risk." *Irey*, 612 F.3d at 1216-1217. "Adequate protection is a function of two variables: the level of risk that conduct will occur and the level of harm that will be inflicted if that conduct does occur." *Id.* at 1217; *see also Garthus*, 652 F.3d at 720 ("The sadistic nature of much of the child pornography consumed by the defendant is another reason to worry about his being on the loose."). Given Duggar's history of sexually abusing minors and the sadistic nature of the CSAM he downloaded and viewed in this case, it is imperative that the Court's sentence be designed to ensure he does not reoffend. A Guidelines-compliant sentence of 240 months will best ensure that outcome.

### E.   The Need to Avoid Unwarranted Sentencing Disparities and Provide a Just Punishment

Given the specific facts of this case and Duggar's history of committing hands-on offenses against minors, the Government submits that a sentence of 240 months is warranted here to avoid unwarranted sentencing disparities with similarly situated or less aggravated offenders.

By way of comparison to other cases that have come before this Court, in *United States v Brion Carey* (Case No. 5:19-CR-50011-001), the defendant, who was convicted by a jury of Transportation of and Access with Intent to View Child Pornography, was sentenced to 180 months imprisonment. In *Carey*, the defendant emailed himself, from one email account to a second email account, images of CSAM—conduct for which he did not receive an enhancement for distribution. Notably, *Carey*, like Duggar, did receive the pattern-of-activity enhancement.

Specifically, when he was 19 years old, *Carey* was convicted in state court of a crime similar to production of child pornography involving an approximately 16-year-old victim. While admittedly similar with respect to guideline enhancements, there are several aggravating factors present in the instant case that were not in the *Carey* case, including: first, as noted above, the defendant did not distribute CSAM to others, and thereby perpetuate the exploitation of the minors depicted in the CSAM, as Duggar did; second, the offense conduct in *Carey* involved approximately 100 still images of child pornography, as opposed to Duggar, who downloaded multiple video files, including video files depicting adult men vaginally penetrating prepubescent minors; third, the evidence produced at trial reflects that Duggar sexually abused four separate minor females over an extended period of time, as opposed to *Carey*, whose conduct, however offensive, was limited to a single minor victim.

Though less similar, in *United State v. Jeremy Kelley* (Case No. 5:15-CR-50085-001), the defendant was convicted by a jury of multiple counts of receipt and possession of child pornography and was sentenced to serve 124 months imprisonment and 15 years of supervised release. *Kelley*, like Duggar, used a peer-to-peer program to download multiple videos (approximately 19 distinct videos were introduced at trial) depicting CSAM. Importantly, while *Kelley* had a criminal history score of one (1), he had no prior conduct involving the sexual abuse of minors and therefore did not receive the pattern-of-activity enhancement that is applicable here. And lastly, in *United States v. Robert Davis* (Case No. 5:17-CR-50032-001), the defendant, an approximately 20-year-old male with no criminal history, *pleaded guilty* to one count of receipt of child pornography and was sentenced to 100 months imprisonment. In particular, *Davis* exchanged images via a social media application/internet community that depicted minors as young as five years of age, and also maintained an organized collection of CSAM.

Duggar's conduct is marked by a number of aggravating factors not present in the above cases. As an initial matter, Duggar used multiple means—uTorrent and Tor—to search for and download CSAM of a sadistic nature, including CSAM depicting prepubescent minors being subjected to violent abuse. Moreover, he went to great lengths to conceal his conduct from others, presumably so he could engage in it undetected and undeterred. As described above, over multiple days, he downloaded and installed a partition to his work computer in order to bypass internet-monitoring software, and then exclusively used that partition to surreptitiously download and install programs to obtain CSAM. When viewed alongside his molestation conduct from approximately 2003, Duggar's offense conduct here makes clear that he became a savvier child sex offender in the intervening years, using sophisticated techniques to conceal and presumably prolong his ability to engage in this behavior. Fortunately, he was caught and convicted, but it appears that he is more likely to view his conviction as evidence that he needs to learn more sophisticated techniques to avoid detection in the future as opposed to an opportunity to reflect on his years-long pattern of criminality and abuse. Accordingly, to provide a just punishment and avoid unwarranted sentencing disparities with similar offenders in the Western District of Arkansas, the United States submits that a Guidelines sentence of 240 months is appropriate here.

## CONCLUSION

Based on all the reasons discussed above, including Duggar's history of sexually abusing minors and the grave risks associated with his potential to recidivate, the United States submits that a Guidelines-compliant sentence of 240 months is appropriate here.


Respectfully submitted,

DAVID CLAY FOLWKES
UNITED STATES ATTORNEY

By:    /s/ Dustin Roberts

Dustin Roberts
Assistant United States Attorney
Arkansas Bar No. 2005185
414 Parker Avenue
Fort Smith, AR 72901
Office: 479-783-5125

/s/ Carly Marshall

Carly Marshall
Assistant United States Attorney
Arkansas Bar No. 2012173
414 Parker Avenue
Fort Smith, AR 72901
Office: 479-783-5125

and,

/s/ William G. Clayman

William G. Clayman
D.C. Bar No. 1552464
Trial Attorney
Child Exploitation and Obscenity Section
U.S. Department of Justice
1301 New York Avenue NW
Washington, D.C. 20005
Telephone: 202-514-5780

31

## <u>CERTIFICATE OF SERVICE</u>

     I, Dustin Roberts, Assistant United States Attorney for the Western District of Arkansas, hereby certify that a true and correct copy of the foregoing pleading was electronically filed with the Clerk of Court using the CM/ECF System which will send notification of such filing to the following:

     Justin Gelfand, Travis Story, Ian Murphy, and Gregory Payne Attorneys for the Defendant

               */s/ Dustin Roberts*
               Dustin Roberts
               Assistant United States Attorney