# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF ARKANSAS
### FAYETTEVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 5:21-CR-50014-001 |
| | ) | |
| JOSHUA DUGGAR, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD VARIANCE

Defendant Joshua Duggar ("Duggar"), by and through undersigned counsel, respectfully submits this memorandum to assist this Court in fashioning a sentence that is "sufficient, but not greater than necessary." 18 U.S.C. § 3553(a). Given the unique circumstances of this case, Duggar respectfully requests a sentence of 60 months' imprisonment.[1]

The 34-year-old father of seven who stands before this Court for sentencing has lived an admirable life while navigating unique challenges associated with being in the public spotlight since childhood. Duggar pleaded not guilty and proceeded to trial. He now stands convicted of a serious offense and, as such, this Court must pronounce a sentence. However, in determining the appropriate sentence in this case, Duggar asks this Court to recognize him for the person he is and the person he can become.

Prior to this case, Duggar had never been charged with, let alone convicted of, a single criminal offense throughout his entire life. In stark contrast, he worked exceptionally hard, has

---

[1] Duggar's motion for judgment of acquittal or, in the alternative, motion for new trial and Duggar's alternative motion to dismiss the possession of child pornography count pursuant to the Double Jeopardy Clause remain pending before this Court. Nevertheless, Duggar is timely submitting this sentencing memorandum by the deadline set by this Court in the event this Court denies the pending motions in whole or in part.

always been fully devoted to his family, and exemplified selfless acts outside of the public spotlight that speak to his true character. Indeed, as letters from his family and friends demonstrate,[2] the real Josh Duggar is not the caricature often portrayed in the public spotlight to sell a tabloid or to generate internet traffic—it is a profoundly hardworking man committed with every grain in his body to his family, his faith, and to helping those around him at any cost. That is the man who stands before this Court for sentencing.

Even before this Court pronounces its sentence, Duggar's life has already been shattered. His reputation, career, and family have all suffered. However, what speaks to Duggar's true character is that his family remains firmly by his side and they yearn for the day when he can return home to them. His seven children and loving wife are struggling to make do without him but eagerly await the day when he will return to care for them, to love them, and to provide for them. As his wife Anna shares, "the happiest part of the day by far is when Daddy comes home from work, and his cheerful voice fills the house." And with the love and support of his family, Duggar will lead a productive and lawful life following any sentence imposed by this Court.

As Congress and the Supreme Court acknowledge, this Court is charged with the responsibility of evaluating Duggar as an individual in crafting an appropriate sentence that is tailored particularly to him. *See Koon v. United States*, 518 U.S. 81, 113 (1996) ("It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue"). Indeed, the Supreme Court has "emphasized that '[h]ighly relevant—if not essential—to [the] selection of an appropriate sentence is the possession of the fullest information possible concerning the

---

[2] The letters referenced herein are being submitted contemporaneously with this memorandum for this Court's consideration.

defendant's life and characteristics.'" *Pepper v. United States*, 562 U.S. 476, 487-88 (2011) (citations omitted).

Thus, while he maintains his innocence and intends to exercise his right to an appeal, Duggar accepts that the crime for which he is being sentenced is serious and that this Court must impose a punishment. But in crafting that punishment, Duggar asks that this Court consider this crime within its proper context and consider the person Duggar really is. It is against this backdrop that Duggar respectfully requests that this Court sentence him to 60 months' imprisonment as that is "sufficient, but not greater than necessary." 18 U.S.C. § 3553(a). As evidenced by his perfect performance on pretrial bond, no matter what sentence is ultimately imposed, this is a defendant who will never find himself before this, or any other, Court ever again and a defendant who will abide by whatever conditions of supervised release this Court imposes.

## I.      Procedural Background

On April 28, 2021, a grand jury in the Western District of Arkansas returned a two-count indictment, alleging one count of receipt of child pornography and one count of possession of child pornography. (Doc. 1). Duggar pleaded not guilty to both counts and proceeded to trial.

Trial commenced on November 30, 2021. On December 6, 2021, the Government rested its case and the defense rested its case the following day. Before this Court provided its final instructions to the jury, the parties agreed—based on the indictment and the evidence presented at trial—that if the jury returned a verdict of guilty as to both counts, one count would be dismissed as failing to dismiss one count would violate Duggar's constitutional rights under the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution.

On December 9, 2021, following a deliberation that lasted two days, the jury returned a verdict of guilty as to both counts. (Doc. 119). As it stands, neither count has been dismissed. This

issue was addressed in Duggar's post-trial motion for judgment of acquittal or, in the alternative, new trial. (*See* Doc. 131).

On February 11, 2022, the United States Probation Office issued its initial disclosure Presentence Investigation Report ("PSR").  (Doc. 135). On March 4, 2022, Duggar filed objections to the PSR, as did the Government. (Docs. 143 and 144). On March 18, 2022, the Probation Office issued its final PSR. (Doc. 146). Sentencing is scheduled for May 25, 2022.

## II.     Legal Standard

As this Court is aware, Congress has mandated that the sentence imposed in this case be "sufficient, but not greater than necessary" to achieve the objectives of punishment. 18 U.S.C. § 3553(a). The United States Sentencing Guidelines, while advisory, "are no longer mandatory." *United States v. Ture*, 450 F.3d 352, 356 (8th Cir. 2006); *see also United States v. Booker*, 543 U.S. 220, 224 (2005).

As the United States Court of Appeals for the Eighth Circuit has established, the methodology this Court should follow post-*Booker* is the following:

> In sentencing a defendant, a district court must first determine the advisory sentencing range as recommended by the Guidelines . . .. Next, the district court should decide if any applicable Guidelines provisions permit a traditional "departure" from the recommended sentencing range . . .. The term "departure" is "a term of art under the Guidelines and refers only to non-Guidelines sentences imposed under the framework set out in the Guidelines" . . .. The calculation of the initial advisory Guidelines range, along with any applicable departures, results in a "final advisory Guidelines sentencing range" . . .. Finally, in determining the actual sentence that should be imposed, a district court must consider whether the factors in 18 U.S.C. § 3553(a) justify a "variance" outside the final advisory Guidelines sentencing range . . .. As opposed to a "departure," a "variance" refers to a "non-Guidelines sentence" based on the factors enumerated in Section 3553(a).

*United States v. Lozoya,* 623 F.3d 624, 625-26 (8th Cir. 2010) (citations omitted).

## III.    Advisory Sentencing Guidelines

Duggar renews his objections to the initial disclosure PSR (*see* Doc. 144) and, as is

4

particularly relevant here, Duggar maintains that the PSR incorrectly calculates the advisory Sentencing Guidelines.

For the sake of brevity, Duggar will not relitigate (but expressly does not waive) all his objections to the PSR, but it is critical to emphasize several advisory Guidelines issues that remain unresolved.

### A.    The Enhancement for Distribution Should Not Apply

The final PSR continues to apply a 2-level enhancement premised on the conclusion that Duggar "knowingly" engaged in distribution. (Doc. 146 at ¶ 97) (citing USSG §2G2.2(b)(3)(F)). But this enhancement does not apply based on the facts and evidence in this case.

As with all sentencing enhancements, the Government bears the burden of proving by a preponderance of the evidence that a distribution enhancement is warranted. *See United States v. Durham*, 618 F.3d 921, 931 (8th Cir. 2010) (citing *United States v. Dodd*, 598 F.3d 449, 452 n.2 (8th Cir. 2010)). At trial, there was absolutely no evidence presented that Duggar "knowingly" distributed anything. To the contrary, even in the light most favorable to the Government, the evidence demonstrated, at most, that the visual depictions at issue in this case were possessed for a particularly short period of time and were deleted shortly after allegedly being downloaded. No testimony or evidence suggested any knowing distribution. Although file-sharing software was allegedly utilized on the computer at issue, the Eighth Circuit has "explicitly rejected any suggestion we automatically apply a distribution enhancement based merely on a defendant's use of a file-sharing program." *Id.* (citing *United States v. Ultsch*, 578 F.3d 827, 830 (8th Cir. 2009)).

But rather than meaningfully engaging with Duggar's objection, the final PSR did precisely that—it automatically applied a distribution enhancement because a file-sharing program was allegedly used. (Doc. 146-1 at 10). Because there is no evidence of knowing distribution and black

letter law cited by Duggar establishes that utilization of file sharing software, without more, is insufficient for inclusion of this enhancement, it should not apply.

> B.    The Enhancement for Sadistic and Masochistic Conduct Should Not Apply

Duggar objected to inclusion of a 4-level enhancement where "the offense involved material that portrays sadistic or masochistic conduct or other depictions of violence." (*See* Doc. 146 at ¶ 98) (citing USSG §2G2.2(b)(4)(A)). Duggar noted the "guideline does not define sadistic, masochistic, or violent conduct." *United States v. Dodd*, 598 F.3d 449, 453 (8th Cir. 2010) (citing USSG §2G2.2, comment. (n.2)). And, as Duggar argued, under any definition, the evidence adduced in this case does not support inclusion of this sentencing enhancement.

In response, the Probation Office argues inclusion of this significant enhancement is warranted because, *inter alia*, "the Marissa series has many images that portray this type of conduct[.]" (*See* Doc. 146-1 at 10). However, even the evidence in the light most favorable to the Government at trial suggested that only a portion of the Marissa series was ever allegedly downloaded—and the Government does not challenge this premise. (*See, e.g.,* Doc. 143 at 2) ("The defendant downloaded the 'marissa.zip.torrent' file on May 15, 2019, obtained the 'marissa.zip' file through uTorrent, and extracted at least approximately fifty-eight (58) images from this zip file…"). As such, there is an insufficient evidentiary basis for inclusion of this 4-level enhancement.

> C.    There Should Be No Enhancement for Duggar's Uncharged Alleged Conduct as a Child

The inclusion of a 5-level enhancement for an alleged "pattern of activity involving the sexual abuse or exploitation of a minor" is entirely unwarranted. (*See* Doc. 146 at ¶ 99) (citing USSG 2G2.2(b)(5)). In his objections, Duggar noted the initial PSR did not expressly indicate the basis for inclusion of this enhancement, but assumed it was based on uncharged allegations that

6

Duggar allegedly inappropriately touched certain of his sisters approximately 20 years ago when he, himself, was a child. The Probation Office confirmed the basis of this enhancement (*See* Doc. 146-1 at 11). But to be clear, this was "reported" by a tabloid magazine after it obtained a copy of a sealed police report. The Government contends that these allegations were "corroborated" by Bobye Holt at trial. (*Id.*).

The sealed police report that was obtained by a tabloid magazine was drafted in 2006, concerning allegations that allegedly occurred at some point in 2002 or 2003, and led to no criminal charges. And while the Government introduced the testimony of Bobye Holt concerning her view as to the veracity of these uncharged allegations, this Court should not find, by a preponderance of the evidence, that the Government has proved that these allegations are, in fact, true. The Government has provided no direct evidence that this conduct occurred. Instead, the Government offered only the testimony of Holt who admitted having absolutely no firsthand knowledge concerning the allegations.

But even if this Court were to credit Holt's testimony and conclude this conduct occurred based solely on that testimony, that should not be the end of this Court's analysis. The advisory Guidelines define "pattern of activity involving the sexual abuse or exploitation of a minor" as "any combination of two or more separate instances of the sexual abuse or sexual exploitation of a minor by the defendant, whether or not the abuse or exploitation (A) occurred during the course of the offense; (B) involved the same minor; or (C) resulted in a conviction for such conduct." *See* USSG §2G2.2, App. Note 1. Here, this Court should also take into consideration that this conduct allegedly occurred more than 20 years ago when Duggar himself was a child. This cannot possibly be reasonably construed to constitute a "pattern of activity" sufficient to warrant a significant increase of 5 offense levels. And to be clear, it is not only the length of time that transpired between

the two alleged incidents; it is also the fact that Duggar was a child at the time of the first alleged incident. Research has revealed no case law supporting application of this substantial enhancement to conduct that occurred when a defendant was, himself, a juvenile—and this Court should not extend this Guideline to include such a circumstance.

### D.     The Number of Images is in Dispute

Duggar objected to the initial PSR which asserted the computer at issue in this case contained 392 unlawful images, noting that the information on which the PSR purported to rely revealed that only 127 images were allegedly located. (*See* Doc. 144 at 7-8). Thus, Duggar argued, at most a 2-level enhancement for the number of images at issue was called for—not a 4-level enhancement as set out in the initial PSR. (*Id.*).

But the Government also objected to paragraph 101. (*See* Doc. 143 at 1-2). According to the Government, a 5-level enhancement was warranted because the offense allegedly involved 600 or more images. (*Id.*).

The final PSR incorporated the Government's position, increasing the enhancement from 4 levels to 5. (*See* Doc. 146-1 at 11-12).

But the inclusion of this enhancement is flawed in several critical respects. Specifically, in attempting to convince the Probation Office that it should conclude the offense involved 600 or more images, the Government points to several problematic files. Specifically, the Government argues, "[t]he defendant downloaded the "playtoysweetie.7z.torrent" file on May 15, 2019, obtained the 'playtoysweetie.7z' zip file through uTorrent, and *attempted to access the file* through the VLC player on the Linux partition." (Doc. 143 at 2) (emphasis added). But attempting to access a zip file does not mean that any images or videos were actually obtained.

The Government also argues, "the defendant downloaded the "DD.torrent" file, which is

8

associated with five video files titled "DD-bdsm2.mp4," "Lux_Leak 3.mp4," "Lux_Leak 4.mp4," "Pthc OPVA 2013 Rape Ultrrra.mp4," and "intro-DD.mp4." (*Id.*). But notwithstanding the Government's soundbites before trial about this particular video, the undisputed evidence at trial clearly established that "torrent" files are *not* image or video files. As the Government's expert witness, Mr. Fottrell, testified, torrent files are more akin to a "recipe" which allows a computer to attempt to locate the actual substantive file for download. As such, the Government's argument regarding a torrent file "which is associated with five video files" lends no strength to its position.

And finally, the Government argues, "[t]he defendant downloaded the 'pedomom.wmv.torrent' file on May 16, 2019, obtained the 'pedomom.wmv' video through uTorrent, and viewed the approximately thirty-minute video." (*Id.*). This is, however, directly contradicted by the evidence presented at trial. Instead, at trial, the Government went out of its way to emphasize that only the first 29 seconds of this video was ever played by a user of this computer before it was deleted and, *critically*, that the first 29 seconds of the video contained no visual depictions of minors engaged in sexual conduct. (*See* Transcript, Vol. 6, at 1203-04) (AUSA Clayman: "would it surprise you to learn that in the first 29 seconds, there's no child pornography depicted?").

This Court should not find by a preponderance of the evidence that the offense allegedly committed in this case involved 600 or more images or even that it involved 300 or more images. Instead, according to the Government's own forensic report, only 127 images were allegedly located. As such, assuming for the sake of argument that the Government's own forensic report is accurate, an increase of 2 offense levels—not 4, and certainly not 5—is warranted as the offense allegedly involved "at least 10 images, but fewer than 150." *See* USSG §2G2.2(b)(7).

Based on the foregoing, the adjusted offense level and the total offense level in this case

is, at most, 28—not 42 as the final PSR now concludes. Because the offense level in this case is at most 28, Duggar maintains his initial objections and lodges the same objections to the above-noted paragraphs along with paragraphs 105, 108, 139, and 163—because the advisory Guidelines imprisonment range is 78 to 97 months.

**IV.     Motion for Downward Variance**

As a matter of law, this Court must make an individual assessment of the 18 U.S.C. § 3553(a) factors based on all the facts presented. *Gall v. United States*, 552 U.S. 38, 50 (2007). Based upon a consideration of the statutory sentencing factors set out in 18 U.S.C. § 3553(a), a sentence of 60 months is warranted in this case—regardless of the Guideline range this Court ultimately computes.

Section 3553(a) sets forth a general directive to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. Section 3553(a) then lists numerous factors that a sentencing court must consider. Especially relevant to this case, and supportive of the argument that a sentence of 60 months is sufficient, are the following factors:

**A.     The History and Characteristics of the Defendant – 18 U.S.C. § 3553(a)(1)**

Duggar is a 34-year-old man who is recognized by those who know him best as a man deeply devoted to his family, his faith, and to those around him. His wife and 7 children adore and respect him and cannot wait until he comes home.

Duggar was born in Fayetteville, Arkansas and, other than a short stint in Washington, D.C., has spent his entire life in Northwest Arkansas. Duggar maintains an extremely close bond with his parents and his siblings. Indeed, prior to his arrest in this case, Duggar and his wife and children were residing at his parents' home while his family's home was undergoing renovations. Duggar and his wife, Anna, married in 2008 and they are profoundly committed to one another

and to providing their 7 children with a safe and caring home.

By any measure, Duggar's childhood was atypical. As a child, Duggar and his family had the unique experience of being thrust into the spotlight from the success of a reality show, "17 Kids and Counting," which subsequently became "18 Kids and Counting," and, ultimately, "19 Kids and Counting." And the truth is, this presented challenges for Duggar. It was hard growing up in front of television cameras and being recognized virtually everywhere he went in public. Indeed, one can hardly imagine the challenges associated with being a child whose everyday life is viewed by the public and, in certain instances, being criticized by the media and complete strangers. Even into early adulthood, living under the microscope and being judged and criticized by the media took its toll on Duggar and certainly complicated aspects of everyday life for him and his family. But, notwithstanding this atypical life, Duggar has worked hard to become his own man, separate and apart from the fleeting fame that comes from starring in a reality television show.

Throughout his life, Duggar has worked extremely hard to provide for his family. Following in his father's footsteps, Duggar has worked in auto sales and real estate investment and, more recently, in building and renovating homes. While Duggar's work pursuits are certainly impressive, he is far from one dimensional and the letters from his family and friends make this abundantly clear.

Anna describes her husband as "considerate, respectful, quick to forgive, patient, and genuinely the kindest person I know." She shares that he "is an engaged dad who gladly throws a football with his sons, listens to our daughters play a new song they have learned on the piano, helps answer homework questions, or lends a hand sweeping up spilled crackers. He is a kind, loving, supportive, and caring father and husband—his primary focus in life."

And Anna is not alone in her reflections of the man Duggar is. Instead, her observations are corroborated by the many other letters submitted for this Court's consideration. Nicole Burress shares, "Josh's life pursuit has been raising a delightful family, and he has been diligent to raise extraordinary children" and that his children "are deeply grieved by his absence[.]" As Raphael Perez frames it, "[w]hen you see the family together you witnessed the genuine love that they share for one another. The kids roaming about playing, but always returning to their daddy for guidance, comfort, and love." Anna's father explains that his son-in-law "is truly a fantastic Daddy and he truly loves his family." Duggar's mother, Michelle, notes, "Joshua is a loving and patient man, striving to be a blessing and provide for his family! He has also spent quality time with his wife and children learning life skills together and going on family outings. Side by side, Joshua and his family have built forts, learned how to work on bicycles and other vehicles, gone camping, hiked, fished, and played countless games and sports—together!"

In addition to being a wonderful father and husband, what stands out about Duggar is the extent to which he has selflessly, for decades, served others—not only financially but with actual boots on the ground.

Anna notes that Duggar is "a man who frequently volunteers his time, services, and resources, striving to contribute to our community and people in need." She explains that a close friend of theirs passed away 4 years ago and Duggar decided to financially support this widow and their young children—completely beyond the public's view despite living a life largely in the public spotlight. Anna explains, "[f]or the past 4 years, Joshua has quietly and faithfully made significant financial contributions to meet their needs. This was not because we have excess income, but because Joshua has a compassionate heart, and he is willing to make personal sacrifices for the benefit of others." The recipient of these contributions has shared with

undersigned counsel the profound impact that Duggar's generosity has had on her life. This reflects who Duggar really is—no matter how strangers or the Government choose to portray him.

For Duggar, generosity comes naturally, and not only in the form of money. As Pastor David Waller explains, "[i]t was Joshua Duggar who offered to help me finish a large deck project for our in-laws giving of his time and money during Christmas week to complete a large deck with a handicap accessible ramp." LaCount Reber, the gentleman with whom Duggar resided while on pretrial bond, noted that "[i]n every situation [Duggar] always looked for ways to be helpful…On his own accord he would see a situation that needed some help and would voluntarily pitch in to try to fix it." His mother explains, "Joshua has a tender heart and he is compassionate toward others. If someone is having a difficult time, he is one of the first to encourage or try to help them in a tangible way. He and his wife and children have helped many others by doing cleaning and repair projects and lending a helping hand."

At his core, Duggar is a good person who cares deeply for the wellbeing of all those around him. These stories—and the many others contained within the letters submitted for this Court's consideration—reflect a lifetime of charitable acts and good citizenship. And this should factor into this Court's determination of an appropriate sentence in this case.

Federal courts routinely recognize a defendant's record of charity and benevolence as warranting a reduced sentence. Perhaps most notably, the United States Court of Appeals for the Seventh Circuit recently affirmed the probation sentence H. Ty Warner, the billionaire creator of Beanie Babies, received for evading $5.6 million in federal taxes by hiding assets in a Swiss bank account. *See United States v. Warner*, 792 F.3d 847, 850 (7th Cir. 2015). The sentencing court acknowledged Warner's "private acts of kindness, generosity and benevolence" and emphasized that "many of them took place long before Warner knew he was under investigation." *Id*. at 854.

Duggar's lifetime—long before this investigation—is one of genuine and sincere kindness, generosity, and benevolence.

Each and every letter submitted for this Court's consideration makes clear that Duggar cares deeply for his wife and his children. While the reality that Duggar is going to be sentenced to federal prison is undoubtedly frightening for Duggar himself, it has paralyzed his family with fear. As Anna explains, "[m]y children and I rely on Joshua for financial, emotional, and physical support." David Waller notes that he heard Duggar's children "cry themselves to sleep wanting their daddy to be home" and respectfully asks this Court to "consider how much his wife and seven children need him in their lives; to be nearby for visits, accessible for communication, and brought back home to provide not just the financial, but spiritual guidance of his family." Stated simply, any punishment imposed on Duggar is also a punishment imposed on his family.

Federal courts have historically recognized extraordinary family circumstances as an appropriate basis for a downward departure pursuant to U.S.S.G. §5H1.6 or a downward variance, which Duggar seeks in this case. In the context of a departure, Section 5H1.6 provides that "family ties and responsibilities are not *ordinarily* relevant in determining whether a departure may be warranted." (emphasis added). However, the Sentencing Commission and federal courts interpreting this Guideline consistently recognize that "a downward departure may be appropriate where *extraordinary* family circumstances exist." *United States v. Blackwell*, 897 F. Supp. 586, 588 (D.D.C. 1995) (emphasis in original); *see also United States v. Big Crow*, 898 F.2d 1326, 1331–32 (8th Cir. 1990) (affirming district court's below-Guidelines range sentence pursuant to USSG §5H1.6); *United States v. Johnson*, 964 F.2d 124, 129 (2d Cir. 1992) ("Extraordinary family circumstances are widely accepted as a valid reason for departure"); *United States v. Alba*, 933 F.2d 1117, 1122 (2d Cir.1991) (defendant and his wife cared for their four- and eleven-year-old

daughters and the defendant's disabled father and paternal grandmother. Noting the special situation of this "close-knit family whose stability depends on [the defendant's] continued presence," the Court let stand the sentencing court's finding that "incarceration in accordance with the Guidelines might well result in the destruction of an otherwise strong family unit" and its conclusion "that these circumstances were sufficiently extraordinary in this case to support a downward departure"); *United States v. Pena*, 930 F.2d 1486, 1494 (10th Cir. 1991) (Court affirmed district court's decision to depart downward from Guideline range of 27 to 33 months to a term of probation on grounds that "Defendant is a single parent of a two-month old child and is the sole support for herself and her infant child. In addition, she has been steadily employed for a long time and is providing for the financial support of her 16–year old daughter who, herself, is a single parent of a two-month old child. Therefore, should the Defendant be incarcerated for an extended period of time, two infants would be placed at a potential risk. Defendant has no prior record of drug abuse, nor other felony criminal convictions and has held long-term employment. She poses no threat to the public and would be justly punished, sufficiently deterred and adequately rehabilitated by a sentence of probation with community confinement as a special condition. Accordingly, a downward departure to a term of probation is appropriate as the Defendant does not now need to be incarcerated to protect the public from other crimes"). And these cases governing downward departures are particularly instructive in the context of variances because many were handed down prior to *Booker* when the Guidelines were mandatory, not advisory.

In *United States v. Spero*, 382 F.3d 803, 804 (8th Cir. 2004), the Eighth Circuit affirmed the district court's conclusion that "Spero's family circumstances qualify as exceptional and therefore warrant granting him a downward departure." The court noted, "Spero is married and has four children, ranging in age from ten to two. One of his children, Ari, suffers from a variety

of developmental disorders." *Id.* The Court continued, "[t]he type of care Ari requires is intense and hands-on. Spero's wife stays at home with Ari and cares for him while Spero is at work. Mrs. Spero identified Spero's involvement with Ari as a 'very important part of [Ari's] home life.' Specifically, Spero's nighttime routine with his son is a key component of Ari's care. Mrs. Spero indicates that 'the slightest change in [Ari's] daily routine can cause him to become extremely upset and violent.'" *Id.* at 804-05 (internal citations omitted). The Court concluded, "[w]e are convinced that a long-term departure of Spero from his son's life would cause an extreme setback for Ari and the rest of the family. When one parent is critical to a child's well-being, as in this case, that qualifies as an exceptional circumstance justifying a downward departure." *Id.* at 805. Given that Duggar has 7 children and provides essential daily care and is the sole provider for the family, Duggar respectfully requests that this Court take this extraordinary family circumstance into consideration when fashioning an appropriate sentence under the Section 3553(a) factors—especially because this Court can impose conditions of supervised release in lieu of a prolonged prison sentence.

The bottom line is that Duggar's family and friends—the people who know him best—remain extremely supportive while fully aware of the conviction that brings him before this Court, and that speaks to the character of any person. Duggar has immense support that will enable him to make the most of the rest of his life and to work hard to ensure that his children's lives are impacted as little as is possible by the situation in which he finds himself.

B.     <u>The Nature and Circumstances of the Offense – 18 U.S.C. § 3553(a)(1)</u>

Let there be no doubt: while he maintains his innocence, the offense for which Duggar is being sentenced is extremely serious. That said, even accepting the allegations as true for purposes of sentencing and, of course, recognizing the jury's verdict, it is important to place what allegedly

occurred here into context.

The Government alleges that the entire offense occurred over a three-day time period. Every allegedly illicit visual depiction was permanently deleted from the computer and no further attempt was ever made to acquire any additional illicit materials. Indeed, nearly six months passed between the date the on which Duggar allegedly received child pornography and the date the search warrant was executed. However, despite no one having any idea there was an ongoing federal investigation, absolutely no illegal activity occurred during these six months. Stated simply, this is not the typical case in which a defendant amasses child pornography, continues to seek it out, and holds onto it indefinitely. (*See, e.g.,* Doc. 37-2 (Search Warrant Affidavit) ("child pornographers commonly retain pornography for a lengthy period of time")); *United States v. Manning*, 361 F. Supp. 3d 839, 852 (D. Minn. 2019) (discussing "the well-known habits of people possessing child pornography to collect or hoard such images").

Instead, even accepting the allegations as true for purposes of sentencing, what allegedly occurred in this case sets this case apart from the heartland of cases involving similar allegations: someone accessed this material, viewed *some* of it, deleted *all* of it within a few days, and then never sought anything like it ever again.

To be clear, none of this is said in an attempt to minimize the seriousness of the offense of which Duggar stands convicted—or to suggest that there are not real victims of these crimes (there are). But in crafting an appropriate sentence, it is only fair that this Court place the allegations into the context of cases of this nature and, in that way, this is less severe than the lion's share of child pornography cases that end up in federal court.

        C.     The Need for the Sentence Imposed – 18 U.S.C. § 3553(a)(2)

This Court must fashion a sentence to reflect the seriousness of the offense, to promote

respect for the law, to provide just punishment, to afford adequate deterrence, to protect the public from future crimes, and to provide a defendant with necessary treatment. *See* 18 U.S.C. § 3553(a)(2). A sentence of 60 months' imprisonment accomplishes these sentencing objectives.

When considering the unique circumstances presented by this case—especially the extremely short period of time during which the offense was allegedly committed with no further attempt to commit any unlawful activity afterwards even with no idea that an investigation was ongoing—makes clear that a sentence of 5 years in federal prison is sufficient.

A sentence of this length reflects the seriousness of the offense and will certainly deter and protect the public from future criminal conduct. Duggar is simply not a defendant who will commit any crime in the future. Prior to being charged with this offense, Duggar was on the right track and, thankfully, that right track eagerly awaits him upon his release. The support of Duggar's immediate family along with the support of his large extended family is as unique as it is powerful. Upon his release, Duggar will not be in a position to fail—he will land in a position to succeed and he will seize that opportunity and work tirelessly to ensure that his family never has to go another day without him by their side.

Furthermore, while Duggar maintains his objections to the advisory Guidelines calculations as set out in the final PSR as discussed *supra*, it is important to note that many courts and scholars have long noted that the Guidelines applicable to child pornography charges in particular are excessively harsh. When Chief United States District Judge M. Casey Rodgers testified before the United States Sentencing Commission in February 2012, she explained that she and the other judges in her district "most often" concluded that the recommended guideline range was consistent with the factors set out in 18 U.S.C. § 3553(a). *Statement of Chief United States District Judge M. Casey Rodgers before the United States Sentencing Commission* (Feb. 15, 2012),

18

at 1-2.[3] However, she testified that this was "not the case in the area of child pornography offenses," noting that many district court judges are "increasingly imposing below-guideline sentences based on a concern over the integrity and reliability of [the child pornography] guidelines." *Id*. at 3. The central flaw, she noted, is that "the cumulative effect over time from Congress's directives, direct amendments, and the enactment of a mandatory minimum for receipt, coupled with the Commission's efforts to comply with those directives" has been "ever increasing sentences...that ferries the ordinary offender to the high end of the statutory sentencing range." *Id*. at 7. In particular, the "specific" offense characteristics that result in higher sentences are not so specific—rather, they are found in nearly every case. *Id*. at 7-10.

Judge Rodgers is not alone in her observations. She is joined by numerous federal district and appellate courts—and even by the United States Sentencing Commission itself. As the United States Court of Appeals for the Second Circuit observed with respect to the child pornography Sentencing Guidelines applicable in this case, the guideline "is fundamentally different from most in that, unless applied with great care, [it] can lead to unreasonable sentences that are inconsistent with what section 3553 requires." *United States v. Dorvee*, 616 F.3d 174, 184 (2d Cir. 2010).

In this case, the final PSR concludes that Duggar should receive enhancements because the material allegedly involved a prepubescent minor, allegedly involved sadistic or masochistic conduct, because a computer was used, and because the offense involved 600 or more images. (*See* Doc. 146 at ¶¶ 96, 98, 100, 101). But, as the Second Circuit importantly recognized, these enhancements that increase Duggar's advisory Guidelines range by 13 offense levels apply in the overwhelming majority of cases:

> many of the § 2G2.2 enhancements apply in nearly all cases. Of all sentences under
> § 2G2.2 in 2009, 94.8% involved an image of a prepubescent minor (qualifying for

---

[3] Available at: https://www.ussc.gov/sites/default/files/pdf/amendment-process/public-hearings-and-meetings/20120215/Testimony_15_Rodgers.pdf (last accessed May 10, 2022).

> a two-level increase pursuant to § 2G2.2(b)(2)), 97.2% involved a computer
> (qualifying for a two-level increase pursuant to § 2G2.2(b)(6)), 73.4% involved an
> image depicting sadistic or masochistic conduct or other forms of violence
> (qualifying for a four-level enhancement pursuant to § 2G2.2(b)(4)), and 63.1%
> involved 600 or more images (qualifying for a five-level enhancement pursuant to
> § 2G2.2(b)(7)(D)).

*Dorvee*, 616 F.3d at 186. Indeed, these same concerns are echoed in a recently issued United States

Sentencing Commission report, published in June 2021, which notes that in fiscal year 2019,

"nearly every offense (99.4%) included prepubescent victims."[4] The same report noted that in

2019, "over 95 percent of non-production child pornography offenders received enhancements for

use of a computer and for the age of the victim (images depicting victims under the age of 12)"

and that "the enhancements for images depicting sadistic or masochistic conduct or abuse of an

infant or toddler (84.0% of cases) or having 600 or more images (77.2% of cases) were also applied

in most cases."[5] The Sentencing Commission summarized,

> Constrained by statutory mandatory minimum penalties, congressional directives,
> and direct guideline amendments by Congress in the PROTECT Act of 2003,
> §2G2.2 contains a series of enhancements that have not kept pace with
> technological advancements. Four of the six enhancements—accounting for a
> combined 13 offense levels—cover conduct that has become so ubiquitous that they
> now apply in the vast majority of cases sentenced under §2G2.2.[6]

Making matters worse, these enhancements are stacked on top of an already drastically

increased base offense level for receipt of child pornography. Specifically, in 1991, the base

offense level for this offense was 13—but today it is 22. *See Dorvee*, 616 F.3d at 186. The gradual

increase of the base offense level for this charge, as federal courts have aptly recognized, was not

the result of research or empirical evidence but was, rather, the result of the Sentencing

---

[4] United States Sentencing Commission, *Federal Sentencing of Child Pornography Non-Production Offenses*, June 2021 at 4 (available at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20210629_Non-Production-CP.pdf) (last accessed May 10, 2022).
[5] *Id.*
[6] *Id.*

Commission's well-intentioned, but problematic, attempt "to square the Guidelines with Congress's various directives." *Id.*; *see also United States v. Phinney*, 599 F. Supp. 2d 1037, 1042-43 (E.D. Wis. 2009).

What is particularly notable and unusual is that the Sentencing Commission openly and adamantly opposed many of the changes directed by Congress—and, in particular, some of the enhancements arguably applicable to Duggar. *See, e.g., United States v. Stern*, 590 F. Supp. 2d 945, 960 (N.D. Ohio 2008) (internal citations omitted):

> The Court is particularly troubled that the Guidelines for sentencing those who possess child pornography "have been repeatedly raised despite evidence and recommendations by the [United State Sentencing] Commission to the contrary." Indeed, "[t]he most recent changes [to the Guidelines] apparently came from two lawyers in the Justice Department who persuaded a novice Congressman to add them to the popular Amber Alert bill." ... this Court concludes that "the guideline provisions relating to child pornography offenses of this nature do not reflect the kind of empirical data, national experience, and independent expertise that are characteristic of the Commission's institutional role."

Perhaps most astutely, the Second Circuit in *Dorvee* drew a parallel between the Guidelines applicable in this case and the analysis employed by the United States Supreme Court with regard to the crack cocaine Sentencing Guidelines:

> In keeping with these principles, in *Kimbrough,* the Supreme Court held that it was not an abuse of discretion for a district court to conclude that the Guidelines' treatment of crack cocaine convictions typically yields a sentence "greater than necessary" to achieve the goals of § 3553(a), because those particular Guidelines "do not exemplify the Commission's exercise of its characteristic institutional role." *Kimbrough,* 552 U.S. at 109–10. As we have explained here, the same is true for the child pornography enhancements found at § 2G2.2. Following *Kimbrough*, we held that "a district court may vary from the Guidelines range based solely on a policy disagreement with the Guidelines, even where that disagreement applies to a wide class of offenders or offenses." *Cavera,* 550 F.3d at 191. That analysis applies with full force to § 2G2.2.

*Dorvee*, 616 F.3d at 188.

Because the majority of the enhancements which drastically drive Duggar's advisory

Sentencing Guidelines range upwards apply in virtually every child pornography case, they have absolutely no unique significance to the punishment decision in this case and contravene what Section 3553(a) statutorily requires.

Specifically, in this day and age, the fact that an offender convicted of child pornography offenses did so through the use of a computer is meaningless. Even in 2009—and computers and mobile electronic devices have only become more ubiquitous since then—97.2% of offenders sentenced for child pornography offenses received the use of a computer enhancement. *See Dorvee*, 616 F.3d at 186. The fact that Duggar allegedly used a computer has absolutely no significance.

With respect to the enhancement for material depicting sadistic or masochistic conduct, the justification can only be that such images cause more harm to the victims of child pornography. But while that would perhaps be understandable, the interesting reality is that is actually not the purpose for which the enhancement was promulgated. As the United States Court of Appeals for the First Circuit explained,

> That an image 'portrays sadistic or masochistic conduct' does not require that it depict actual sadistic conduct; if that were the Sentencing Commission's intent, there would be express language to that effect. The language it did choose is to the contrary. Webster's Third New International Dictionary defines 'portray' as 'to represent by drawing, painting, engraving,' 'to describe in words,' and to 'enact.' The Guidelines simply do not require the image to be an accurate documentation of real sadistic conduct.

*United States v. Hoey*, 508 F.3d 687, 692 (1st Cir. 2007). In other words, the purpose behind the enhancement was predicated on the notion that an image that *portrays* sadistic conduct justifies a more severe sentence, regardless of whether sadistic conduct ever actually occurred.

Ultimately, the result of the compilation of values assigned to the offense characteristics in Duggar's case—which are largely the same ones found in all child pornography cases—results in

22

an advisory Guidelines range radically higher than without the "specific offense characteristics" being included.

Duggar does not dispute that 60 months' imprisonment is the minimum allowable sentence in this case—and that is the below-Guidelines sentence he expressly asks this Court to impose. However, even today—pursuant to the drastically-increased base offense level and "specific" offense characteristics (that apply in virtually all cases)—a sentence of 60 months is just barely below the advisory Guidelines range.

Specifically, if the "specific" offense characteristics enhancements (that apply in virtually all cases) were not applied, Duggar's total offense level would be 29, resulting in a Guidelines range of 87 to 108 months. Indeed, as the Sentencing Commission notes in its most recent report concerning fiscal year 2019, "less than one-third (30%) of non-production offenders received a sentence within the guideline range" and the "majority (59%) of non-production child pornography offenders received a variance below the guideline range."[7]

And if this Court were to correctly conclude that a 2-level enhancement for "knowing" distribution and a 5-level increase for an alleged "pattern of activity" are not applicable, Duggar's total offense level would be 22, resulting in a Guidelines range of 41 to 51 months. As such, a sentence of 60 months would actually constitute an upward variance.

Further, if Duggar had been sentenced for his crimes in 1991 as opposed to 2020, the base offense level of 13 would result in a Guidelines range of 12 to 18 months' imprisonment. Through that lens, the sentence requested by Duggar—60 months—is fair but, by no stretch, lenient. Rather, it is sufficient, but not greater than necessary, which is precisely what the law requires.

---

[7] United States Sentencing Commission, *Federal Sentencing of Child Pornography Non-Production Offenses*, June 2021 at 5 (available at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20210629_Non-Production-CP.pdf) (last accessed May 10, 2022)

Despite the courts' and the Government's most well-intentioned and aggressive efforts, in cases such as this, the ever-increasing prison sentences meted out since the 2003 amendments to the Sentencing Guidelines have had no discernable impact on deterring the exponential growth of the problem. *See* Motivans, M. & Kyckelhahn, T, Bureau of Justice Statistics Special Report, Federal Prosecution of Child Sex Exploitation Offenders, 2006.[8] The United States Department of Justice itself acknowledged that "prison sentences are unlikely to deter future crime" and that "prisons actually may have the opposite effect." "Five Things About Deterrence," U.S. Department of Justice (July 2014). Based on the Department of Justice's research, "[i]ncreasing the severity of punishment does little to deter crime." *Id.*

To be clear, while no one seeks to minimize the seriousness of the crime for which Duggar is being sentenced, it is important for this Court to fully consider a full picture of Duggar's character and the bases—both legal and factual—that warrant the sentence Duggar is requesting.

Indeed, the final PSR concludes, at the Government's urging, that this offense involved 725 images. (*See* Doc. 146 at ¶ 101). Duggar, of course, objects to this conclusion, but it is again important to place this number into context, even accepting it as accurate for the sake of argument.

In addition to observing that the enhancement for having 600 or more images was applied in 77.2% of cases in 2019, the Sentencing Commission also noted that the median number of images possessed by offenders in 2019 was 4,265, "with some offenders possessing and distributing millions of images and videos."[9] Again, not to minimize the seriousness of the offense at issue in this case, it is important to understand that even accepting the allegations as true for the purpose of sentencing, the offense here was far less egregious than the lion's share of "similar"

---

[8] Available at: https://www.bjs.gov/content/pub/pdf/fpcseo06.pdf (last accessed May 10, 2022).
[9] United States Sentencing Commission, *Federal Sentencing of Child Pornography Non-Production Offenses*, June 2021 at 4 (available at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20210629_Non-Production-CP.pdf) (last accessed May 10, 2022)

cases.

The bottom line is that with a lifetime of sex offender registration requirements and the inherent shame and humiliation that comes with this history in a Google era, Duggar will have to suffer the consequences of his conviction for the rest of his life—regardless of how long he is in prison. *See, e.g., United States v. Nesbeth*, 188 F.Supp.3d 179, 188 (E.D.N.Y. 2016) (noting that collateral consequences may be considered as bearing on just punishment and accordingly factoring such consequences into a Section 3553(a) analysis). The fact that he will be a registered sex offender carries with it severe punishment. The ramifications of supervised release, and the corresponding limitations on his freedom, are intrinsically punitive and, in some ways in the context of convicted sex offenders, are actually worse than jail.

A sentence of 60 months undoubtedly reflects the seriousness of the offense, promotes respect for the law, provides just punishment, affords adequate deterrence, and protects the public from future crimes. And, in this case, a sentence of 60 months is sufficient, but not greater than necessary—and that is what the law requires.

D.      The Kinds of Sentences Available – 18 U.S.C. § 3553(a)(3)

Duggar's performance while on pretrial bond was unblemished. He complied with all requirements without exception. This is confirmed by the final PSR (*see* Doc. 146 at ¶ 24) and by a letter submitted to this Court by LaCount Reber, the individual with whom Duggar resided while on bond. Mr. Reber noted, "Joshua was conscientious about following the rules that were set by the court during his stay with us. He was given very specific guidelines relating to times of departure and return from work. He would set his alarm to make sure that he left exactly during the window that he was given." Stated simply, Duggar is a man who will happily abide by any and all conditions of release, without exception. Conditions of release can replace the need for a longer

period of incarceration in this case.

The United States Supreme Court observed that probation is a "substantial restriction of freedom." *Gall*, 552 U.S. at 44; *see also Warner*, 792 F.3d at 860 (affirming term of probation as "a sufficiently serious sentence"); *United States v. Coughlin*, No. 06-20005, 2008 WL 313099, at *5 (W.D. Ark. Feb. 1, 2008) (recognizing that "probation can be severe punishment[], hugely restrictive of liberty, highly effective in the determent of crime and amply retributive," and that "[n]ot all defendants must be sentenced to imprisonment to be duly punished"); *United States v. Brady*, No. 02-CR-1043 (JG), 2004 WL 86414, at *8 (E.D.N.Y. Jan. 20, 2004) (noting that probation is "a punitive measure"). Congress and the Sentencing Commission have similarly recognized that probation, "a sentence in and of itself," may constitute an appropriate alternative to incarceration that meets fully the statutory purposes of sentencing. *See* U.S.S.G., Ch. 5, pt. B, Intro. Cmt. (citing 18 U.S.C. § 3561). Probationers remain subject to "several standard conditions that substantially restrict their liberty," including restraints on their ability to associate freely or to leave the judicial district. *Gall*, 552 U.S. at 48. The Court can also impose a variety of "discretionary conditions" to probation, 18 U.S.C. § 3563(b), and the violation of any condition can be grounds for revocation.

While the law requires Duggar to be sentenced to a term of imprisonment, Duggar respectfully submits that conditions of release following any term of custodial imprisonment imposed in this case can supplant any need for a more lengthy than necessary period of incarceration. The felony conviction alone has hit Duggar hard, and the collateral consequences are real.

E.   The Need to Avoid Unwarranted Sentence Disparities – 18 U.S.C. § 3553(a)(6)

Finally, the law requires this Court to seek to avoid unwarranted sentencing disparities

among similarly situated defendants throughout the country. *See* 18 U.S.C. § 3553(a)(6). The United States Sentencing Commission recently explained, "[t]he sentences for 52 similarly situated receipt offenders ranged from 37 months to 180 months though these 52 receipt offenders had the same guideline calculation through the application of the same specific offense characteristics and criminal history category."[10]

In June 2021, this Court was tasked with pronouncing a sentence for a defendant who pleaded guilty to receipt of child pornography. *See United States v. Welch*, 5:20-CR-50047 (W.D. Ark. 2021). There, the defendant pleaded guilty in exchange for the Government's agreement to dismiss 3 other counts related to child pornography and the parties agreed that his offense involved 82,405 images. That defendant had apparently organized his images, saved useful search terms, and had held onto his collection for a long period of time. He, like Duggar, had no criminal history. And, of course, while the defendant in *Welch* received a reduction in his offense level for acceptance of responsibility and the Probation Office had not opted to include an enhancement for a "pattern of activity," this Court ultimately pronounced a sentence of 83 months' imprisonment.

Here, the PSR concluded, over Duggar's objection, that his offense involved 725 images. The number of images involved in *Welch* was, therefore, more than 113 times greater than the number of images allegedly involved here. And, according to the Sentencing Commission, the median number of images involved in these types of cases is 4,265—nearly 6 times as many images as were allegedly involved here. Also, the evidence is undisputed that the depictions in this case were only on the computer for a matter of days and were all deleted shortly after they were allegedly downloaded. This is, according to law enforcement and case law, unheard of as offenders

---

[10] United States Sentencing Commission, *Federal Sentencing of Child Pornography Non-Production Offenses*, June 2021 at 7 (available at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20210629_Non-Production-CP.pdf) (last accessed May 10, 2022)

who commit these crimes tend to hold onto the images indefinitely and use the images in online child pornography communities to acquire more and more images. There are absolutely no allegations or evidence that anything of that ilk occurred in this case.

Where sentences for receipt of child pornography exceed 60 months, the facts are unequivocally far more troubling than those allegedly at issue in this case. For example, in *United States v. Tanksley*, 1:09-CR-38 (S.D. Ind. (2009), the defendant was convicted of two counts of receipt of child pornography and one count of possession of child pornography. Tanksley was sentenced to 80 months' imprisonment where, according to the Department of Justice, he was an active participant in two internet-based bulletin board groups dedicated to the trading of child pornography. According to a Department of Justice press release, members of the groups were required to post child pornographic images into pre-established categories based on the type of material and the defendant admitted that he was an active participant for many months and that he "commented on the quality of the child pornography he received from other members; expressed his gratification upon seeing the images or videos; and described the sexual acts the children, some younger than approximately 6 years old, engaged in."[11]

In *United States v. Verastigui*, 1:21-CR-409 (D.D.C. 2022), the defendant was sentenced to 151 months' imprisonment for receipt of child pornography. However, the facts at issue there were particularly disturbing and so entirely dissimilar to any allegation at issue in the present case. There, the defendant was active in an online group devoted to trading child pornography and discussing child sexual abuse. The defendant shared videos and made numerous troubling comments about sexually abusing children. According to the Government, the defendant "indicated his preference for babies, saying they were his 'absolute favorite,' and solicited another

---

[11] *See* https://www.justice.gov/opa/pr/indiana-man-sentenced-child-pornography-charges (last accessed May 10, 2022).

28

group member for videos of babies being raped. The other group member promptly sent [the defendant] a video of a baby being raped, to which [the defendant] responded enthusiastically. The other group member then sent [the defendant] numerous other videos of child pornography."[12] The extremely upsetting facts at issue in *Verastigui* are of such a fundamentally different type than any allegation made by the Government in this case.

Indeed, sentences of 60 months' imprisonment in receipt of child pornography cases are far from uncommon—even with far more egregious conduct than the conduct allegedly at issue in Duggar's case. *See, e.g., United States v. Sipult*, 1:18-CR-328 (E.D. Va. 2019) (defendant sentenced to 60 months for receipt in case involving more than 4,000 child pornography images and/or videos where Government sought sentence of at least 97 months' imprisonment);[13] *United States v. MacKinnon*, 1:10-CR-10227 (D. Mass. 2011) (defendant sentenced to 60 months after pleading guilty to 5 counts of receipt and attempted receipt of child pornography, one count of possession of child pornography, and where defendant admitted purchasing child pornography movies and possessing images of child pornography that he personally produced);[14] *United States v. Fuguet,* 4:16-CR-43 (N.D. Fl. 2017) (defendant sentenced to 60 months for receipt of more than 230 images, many of which involved children under the age of 12, stored on multiple computers);[15] *United States v. Foster*, 3:16-CR-30078 (S.D. Ill. 2017) (defendant sentenced to 60 months for receipt of multiple videos of child pornography); *United States v. Welsh*, 8:20-CR-208 (D. Neb. 2022) (defendant sentenced to 60 months for convictions for receipt *and* distribution of 248 images

---

[12] *See* https://www.ice.gov/news/releases/ice-hsi-investigation-lands-washington-dc-man-federal-prison-more-12-years-receipt (last accessed May 10, 2022).

[13] *See* https://www.justice.gov/opa/pr/virginia-man-sentenced-prison-receipt-child-pornography (last accessed May 10, 2022).

[14] *See* https://www.justice.gov/opa/pr/massachusetts-man-sentenced-60-months-prison-child-pornography-charges (last accessed May 10, 2022).

[15] *See* https://www.justice.gov/usao-ndfl/pr/tallahassee-man-sentenced-60-months-prison-receipt-child-pornography (last accessed May 10, 2022).

and 8 videos of child pornography).[16]

Against this backdrop, sentencing Duggar to 60 months in prison, to be followed by a term of supervised release, would accomplish the statutory mandate of avoiding unwarranted sentencing disparities—and that is what the law requires.

## V.      Conclusion

As the age-old adage goes, "justice must be tempered with mercy." Duggar accepts that he is before this Court for sentencing for a serious crime and that this Court must impose a penalty. That is justice. But Duggar also appeals to this Court's discretion to temper that justice with mercy.

If ever there were a defendant standing before this Court who is as committed to never finding himself anywhere close to this situation again, it is Duggar. As he moves forward into the next chapter of his life, Duggar continues to have so much good to offer the world. We ask that this Court give him that opportunity.

For all the reasons set forth in the PSR, in this memorandum, and in the numerous letters submitted for this Court's consideration, Duggar asks this Court to impose a sentence of 60 months to be followed by a term of supervised release. Under the circumstances of this case, such a sentence will be sufficient to satisfy all the purposes of sentencing and is appropriate under Section 3553(a).

/

/

/

/

/

---

[16] *See* https://www.justice.gov/usao-ne/pr/omaha-man-sentenced-distribution-and-receipt-child-pornography (last accessed May 10, 2022).

Respectfully Submitted,

**Margulis Gelfand, LLC**

 */s/ Justin K. Gelfand*
JUSTIN K. GELFAND, MO Bar No. 62265*
IAN T. MURPHY, MO Bar No. 68289*
7700 Bonhomme Ave., Ste. 750
St. Louis, MO 63105
Telephone: 314.390.0234
Facsimile: 314.485.2264
justin@margulisgelfand.com
ian@margulisgelfand.com
*Admitted Pro Hac Vice*

--- and ---

**Story Law Firm, PLLC**

*/s/ Travis W. Story*
Travis W. Story, AR Bar No. 2008278
2603 Main Drive, Suite 106
Fayetteville, AR 72704
Telephone: (479) 448-3700
Facsimile: (479) 443-3701
travis@storylawfirm.com

**<u>Certificate of Service</u>**

I hereby certify that the foregoing was filed electronically with the Clerk of the Court, and

that all parties will receive notice of this filing through this Court's electronic filing system.

<u>*/s/ Justin K. Gelfand*</u>
JUSTIN K. GELFAND, MO Bar No. 62265*
IAN T. MURPHY, MO Bar No. 68289*
7700 Bonhomme Ave., Ste. 750
St. Louis, MO 63105
Telephone: 314.390.0234
Facsimile: 314.485.2264
justin@margulisgelfand.com
ian@margulisgelfand.com
*Admitted Pro Hac Vice*