**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION**

UNITED STATES OF AMERICA                                                        PLAINTIFF

V.                                      CASE NO. 5:21-CR-50014

JOSHUA JAMES DUGGAR                                                        DEFENDANT

<u>**MEMORANDUM OPINION AND ORDER**</u>

On December 9, 2021, a jury convicted Defendant Joshua James Duggar of one count of receipt of child pornography and one count of possession of child pornography. Before the jury returned its verdict, Mr. Duggar's counsel made two oral motions for acquittal under Federal Rule of Criminal Procedure 29(a)—one at the conclusion of the Government's case-in-chief, and the other at the conclusion of the defense's case-in-chief.  The Court denied both motions from the bench.

Now, Mr. Duggar brings a post-trial Motion for Judgment of Acquittal Under Rule 29(c) (Doc. 131).  He argues "there was no evidence of *mens rea* from which the jury could base its guilty verdict as to each count."  *Id.* at p. 3.  In the alternative, he requests a new trial under Rule 33(a) due to the Government's alleged failure to timely disclose certain evidence and the Court's rulings on witness testimony.

The Government filed a Response in Opposition to the Motion (Doc. 134), and Mr. Duggar filed a Reply (Doc. 142).  For the following reasons, the Motion is **DENIED**.

### I.  LEGAL STANDARDS

Rule 29(a) requires the Court, on a defendant's motion, to "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." However, "a district court has very limited latitude to do so and must not assess witness

credibility or weigh evidence, and the evidence must be viewed in a light most favorable to the government." *United States v. Hassan*, 844 F.3d 723, 725 (8th Cir. 2016).  When reviewing the sufficiency of the evidence to support a conviction, the Court must resolve evidentiary conflicts in the Government's favor and accept all reasonable inferences from the evidence that support the verdict.  *See United States v. Weaver*, 554 F.3d 718, 720 (8th Cir. 2009).  "A verdict will only be overturned if no reasonable jury could have found the defendant guilty beyond a reasonable doubt."  *Id.*

Alternatively, Rule 33(a) states that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." "[T]he court has broad discretion in deciding motions for new trial, and its decision is subject to reversal only for a clear and manifest abuse of discretion."  *Hassan*, 844 F.3d at 725. "Also in contrast to Rule 29, in considering a motion for new trial, the court need not view the evidence in the light most favorable to the verdict and it is permitted to weigh the evidence and evaluate the credibility of the witnesses."  *Id.* at 725–26.  "Nonetheless, motions for new trials based on the weight of the evidence generally are disfavored, and the district court's authority to grant a new trial should rarely be exercised."  *Id.* at 726. "The district court will only set aside the verdict if the evidence weighs heavily enough against the verdict that a miscarriage of justice may have occurred."  *United States v. Serrano-Lopez*, 366 F.3d 628, 634 (8th Cir. 2004) (internal quotation marks omitted) (quoting *United States v. Rodriguez*, 812 F.2d 414, 417 (8th Cir. 1987)).

## II.  DISCUSSION

### A.  Request for Judgment of Acquittal Under Rule 29(c)

Mr. Duggar argues the Court should enter a judgment of acquittal as to both counts of conviction because the jury was not presented evidence sufficient to show he actually viewed any child pornography.  He claims proof of viewing is necessary to establish the *mens rea* needed to support convictions for receipt and possession of child pornography. To be clear, he agrees the images presented at trial meet the definition of child pornography.  *See* Doc. 142, p. 2.  His argument is that no reasonable jury could have found he knowingly received and possessed child pornography because there is insufficient evidence that he, or anyone else for that matter, viewed the images.

Mr. Duggar's argument lacks merit, as there is ample evidence he viewed the images of child pornography that had been downloaded to his business computer.  The Government's first witness, Detective Amber Kalmer, testified that on May 14, 2019, she established an online, peer-to-peer connection with a computer associated with an IP address located in Northwest Arkansas.  *See* Doc. 124, pp. 60–63; Gov. Ex. 1.  This IP address shared a video on the peer-to-peer network, and Detective Kalmer downloaded it.  The two- or three-minute video, titled mov_0216, depicted an adult male vaginally penetrating two prepubescent girls. The following day, May 15, Detective Kalmer made a connection with the same IP address and downloaded another file titled marissa.zip.  *See* Doc. 124, pp. 64–67; Gov. Ex. 2.  This file contained 65 still images of a prepubescent girl posing nude and displaying her genitals for the camera.   The final frames of marissa.zip showed the same girl being locked in a dog kennel.

Both mov_2016 and marissa.zip were introduced into evidence at Mr. Duggar's trial and published to the jury.   *See* Gov. Ex. 3.   Detective Kalmer testified that she reported the illegal downloading activity to the Department of Homeland Security's office in Northwest Arkansas.   *See* Doc. 124, p. 74.   HSI Special Agent Gerald Faulkner was tasked with following up on Detective Kalmer's lead.   He discovered that the target IP address was registered to Joshua James Duggar at his business, Wholesale Motorcars, in Springdale, Arkansas.   *See id.* at pp. 124–25.   Federal agents executed a search warrant on the business and seized Mr. Duggar's HP desktop computer for forensic analysis.

The Government's investigating computer expert, James Fottrell, testified in detail about his forensic analysis of an exact copy he made of the HP computer's hard drive. *See* Doc. 125, p. 129.   He observed that the computer's user had partitioned the hard drive into two sections.   One side of the hard drive was the "business side" of the computer; this side booted up to the Windows 10 operating system and contained business records and applications needed to operate Wholesale Motorcars. *See id.* at pp. 207–08. The Windows side also had an application installed called "Covenant Eyes," which monitored the user's internet searches for pornography and reported those searches to an "accountability partner."[1]  (Doc. 125, p. 98).

The other side of the hard drive appears to have been set up for the purpose of downloading and viewing child pornography; this side booted up to Ubuntu, a Linux-based

---

[1] The Vice President of Technology for Covenant Eyes, Jeffrey Wofford, testified that Mr. Duggar's "accountability partner" was his wife, Anna Duggar.  (Doc. 125, p. 101).  She would receive an emailed report generated by the software whenever it "caught" Mr. Duggar searching the internet for pornography.  *Id.*

operating system, that was locally installed on the computer on May 13, 2019, at approximately 1:52 p.m. *Id.* at p. 230. Mr. Fottrell's forensic imaging of the computer revealed that child pornography was first downloaded on May 14, 2019, the day after the user installed the Linux operating system. *Id.* at p. 243.

Mr. Fottrell testified that the Linux operating system did not come pre-installed; the user purposely installed it on a partition of the computer's hard drive. *Id.* at pp. 210–11. Mr. Fottrell also explained to the jury that it would have been impossible for the user to boot up both operating systems at once. The default operating system was Windows, which was used to run the business. If the user wanted to boot up the Linux operating system, he would "have to bring up the boot menu" and press a function key. *Id.* at p. 210. In other words, the user needed to be physically present at the computer to boot up and access the Linux side of the hard drive. *Id.* at pp. 209–10.

Mr. Fottrell's forensic analysis first identified a number of thumbnail files depicting child pornography. He testified that the existence of a thumbnail file proved "that the full-sized version of that file did exist on that computer at that location at a particular point in time." *Id.* at p. 238, pp. 211–12.[2] The Government published to the jury multiple thumbnail images taken from the HP desktop. These images were of minors engaging in sexually explicit conduct, including the marissa.zip images that had been accessed on

---

[2] Since all child pornography had been deleted from the computer by the time it was seized, Mr. Fottrell analyzed the hard drive to determine whether child pornography had, at one time or another, been downloaded and viewed by a user prior to deletion. Mr. Fottrell testified that he recovered thumbnail image files depicting child pornography and explained to the jury how and why such thumbnail images may remain on the hard drive after child pornography is deleted. He also explained the other investigative tools he used to determine how the user downloaded and then played child pornography videos before deleting them. *See* Doc. 125, pp. 253–59.

the peer-to-peer network by Detective Kalmer.  *See* Gov. Exs. 31–34.  Mr. Fottrell testified that the user of the HP computer downloaded child sexual abuse materials on May 14 and 15, then purposely navigated to the file folders containing those downloads and chose to view "large thumbnails" of the images in these folders.  (Doc. 125, p. 246; Doc. 126, p. 92 (noting that a thumbnail file is created when a user "navigate[s] to that folder *and display[s] the contents of the folder in large thumbnail view*.") (emphasis added)).

Mr. Fottrell next testified that he located several "thumbnail images associated with the webcam-collections previews" file.  (Doc. 125, p. 247).  Those thumbnail images included a single frame from the mov_0216 video that Detective Kalmer downloaded from Mr. Duggar's IP address on May 14.  *See id.* at p. 256.  Mr. Fottrell's expert opinion was that the thumbnail images were created because the user "view[ed] those images or open[ed] a folder containing the images."  (Doc. 126, p. 82).

In addition to the thumbnail files, Mr. Fottrell found evidence of child pornography in the unallocated space of the Linux side of the hard drive.  He explained to the jury that files located in unallocated space "used to exist in the file system somewhere, but the user deleted them."  (Doc. 125, p. 258).  Government's Exhibit 35 is copy of 40 full-sized images that Mr. Fottrell recovered from unallocated space, all of which "exactly matched the thumbnail-size image[s] that [were] recovered" from other folders in the HP computer. *Id.* at p. 259.  Mr. Fottrell testified that, based on his training and expertise, these explicit images of children engaging in sex acts "previously existed on the computer in the file system with a particular file name."  *Id*.  For example, images from the marissa.zip series also appeared in unallocated space on the Linux side of the hard drive.  *See id.* at pp. 260–61; Gov. Ex. 36.

Finally, Mr. Fottrell testified that the user of the HP computer utilized the VLC media player to watch at least seven videos containing child pornography. *See* Doc. 125, p. 281. First, Mr. Fottrell examined the Torrent files he located on the HP computer. According to his testimony, a Torrent file does not contain the video itself but instead "contains instructions . . . readable by the uTorrent program . . . . [that] tell [uTorrent] how to go out and fetch that [video] from the other computers on the internet that are sharing that file and making it available." (Doc. 125, p. 268). The Government introduced Exhibit 39, a list of the Torrent files located on the Linux partition, organized by the date the user downloaded each of the files. Next, Mr. Fottrell explained that he used a forensic tool called "Torrent File Editor" to view the contents of the Torrent files and display the file names and hash values of the videos that were referenced in those Torrent files. (Doc. 125, p. 271). The Government introduced Exhibit 44, a list of file names and hash values corresponding to the videos uTorrent had "fetched" using the "instructions" in the Torrent files. Mr. Fottrell testified he "was able to identify all of the images in those Torrent files and then get access to the underlying content." (Doc. 125, p. 282). That content—the full-length child pornography videos that had been viewed using the VLC player—was downloaded to a thumb drive labeled Exhibit 45 and introduced into evidence at trial.[3]

Mr. Fottrell testified he was certain the user "actually viewed the content" of these videos on the HP desktop. (Doc. 125, p. 278).[4] Mr. Duggar's expert witness, Michele Bush, agreed with Mr. Fottrell that the computer's user actually viewed the downloaded

---

[3] The jury viewed these videos in "storyboard" format.

[4] Mr. Fottrell examined the VLC program's "streaming protocols," which confirmed that the user played the videos locally from the Linux side of the computer. *See* Doc. 125, p. 281.

images of child pornography.  For example, Ms. Bush conceded during cross-examination that the marissa.zip images were unzipped, placed in a folder on the desktop, and then "opened in image viewer all at the exact same time and second . . . ." (Doc. 128, p. 39). She further testified that, according to her analysis of the HP desktop, the user of that computer "viewed" approximately 12 files of child pornography from May 14 to May 16, 2019.  *Id.* at p. 51.

Evidence of child pornography was only found on the Linux side of Mr. Duggar's computer.  The Covenant Eyes software is not compatible with Linux-based operating systems and was not installed or operating on the Linux side of the partition.  *See* Docs. 125, p. 105 and 126, p. 23.  Thus, viewed in the light most favorable to the jury's verdicts, there is a reasonable inference that Mr. Duggar is the user who installed and used the Linux partition for the purpose of searching and viewing internet content that would otherwise have been reported to his wife by Covenant Eyes.

The coup de grâce is Government's Exhibit 85.  This exhibit, introduced through Mr. Fottrell's testimony, is a timeline summarizing 50 or 60 exhibits of forensic evidence recovered from Mr. Duggar's HP desktop, iPhone 11, iPhone 8, and MacBook.  The evidence summarized in Exhibit 85 places Mr. Duggar at the car lot on May 13, 2019, during the local installation of the Linux partition and operating system, and during May 14–16, 2019, at the times child pornography was downloaded to the HP desktop.  *See* Doc. 126, pp. 106-112.

Based on the Court's discussion of the trial evidence above, there is no merit to Mr. Duggar's argument in favor of acquittal.  There was significant evidence presented at trial to convince a reasonable jury that Mr. Duggar was physically present during the

offense conduct and that he had the *mens rea* to commit these crimes. Accordingly, his request for relief under Rule 29 is **DENIED**.

## B. Request for New Trial Under Rule 33(a)

### 1. Alleged Brady and Giglio Violations

Mr. Duggar's first argument in favor of a new trial under Rule 33 is that he was materially prejudiced by the Government's delay in disclosing certain pre-trial communications with a possible defense witness named Caleb Williams.  Mr. Williams was one of several individuals Mr. Duggar's attorney identified by name during opening statement as having had the motive and opportunity to commit these crimes.  In fact, defense counsel told the jury the case was a "classic, old-fashioned 'whodunit'" and suggested they would "investigate this case together" because law enforcement failed to do so.  (Doc. 124, pp. 34 & 52).  Counsel emphasized that case agents "bur[ied] their heads in the sand for their 30-month investigation, failing to investigate suspects with opportunity and access . . . ."  *Id.* at p. 34. In the end, however, the defense's promise of an alternative perpetrator came to nothing, as the evidence at trial showed that Mr. Duggar—and only Mr. Duggar—was physically present at the car lot when child pornography was being downloaded.[5]  *See* Government's Exhibit 85 and Doc. 126, pp. 106-112.

---

[5]  The defense's theory of an alternative perpetrator did come with a potential twist: that someone may have *remotely* accessed the desktop from a different physical location and downloaded child pornography that way.  To support this theory, the defense asked the computer experts whether it was theoretically possible for someone to have remotely accessed the desktop; or, said another way, they asked whether the experts could "rule out remote access." (Doc. 127, p. 197).  The defense also pointed out that the password to the Linux partition was one that Mr. Duggar commonly used for online banking and other online applications, so a remote hacker might have known the password or been able to figure it out.  Unfortunately for the defense, there was no forensic evidence to

Several days prior to the start of trial, on November 24, 2021, Mr. Williams contacted AUSA Dustin Roberts and Special Agent Faulkner by telephone and made certain statements to them relevant to the case.  Then, later that same day, Mr. Williams sent an unsolicited email to AUSA William Clayman, writing:

> I was completely mistaken about not being at the Wholesale Motorcars lot during the time I was in Arkansas (AR) between May 8, 2019–May 11, 2019. I do not know if I was on the lot computer or even if I ended up going there. It looks like during my time there, I did odd work for the guys and maybe even Josh Duggar. In the messages between Josh Duggar and I, while I was in AR, as attached in one of these screenshots I am providing, I tell Josh I was planning to come to the lot a couple of days. I apologize for the mistake; I had no intention to mislead you all.

(Doc. 131-1).

The Government disclosed the telephone communication and the November 24 email from Mr. Williams to the defense on November 30, 2021, the day before the evidentiary portion of the trial commenced.

Mr. Williams sent a second unsolicited email to the Government's counsel on November 30, 2021.  This email was disclosed to the defense on the evening of December 5, which was towards the end of the Government's case-in-chief.  This email stated:

> I've also found a few more passwords if you all want them. At some point several of the Duggar guys asked me to run the back ends of some of their social media to help them sell cars. Jed, Josiah, and Joseph I do believe. I still have access to Jed's fake account and Josiah's account.

(Doc. 131-4).

---

indicate the Linux side of the hard drive was *ever* remotely accessed—by anyone.  *See* Doc. 128, p. 179.

Mr. Duggar describes the November 24 and November 30 emails from Mr. Williams as "exculpatory and/or impeachment evidence" and argues the Government had a duty to disclose them under *Brady*[6] and its progeny but did so too late to be useful to the defense.  (Doc. 131, p. 8).  Mr. Duggar's counsel also characterizes the emails as *Giglio*[7] material that could have affected how the jury viewed the reliability of the Government's testifying agents and the credibility of Mr. Williams (had he testified).  "When the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within this general rule."  *Giglio*, 405 U.S. at 154.

### a.  November 24 Email

The evidence presented at trial showed that child pornography was downloaded on the HP desktop computer at Wholesale Motorcars during a three-day period in May 2019, specifically May 14, 15, and 16.  The Court agrees with Mr. Duggar that Mr. Williams's potential physical presence at the car lot several days before the downloads occurred was relevant to the defense.  The Government acted appropriately in disclosing the November 24 email.

Mr. Duggar does not explain or quantify the nature of any prejudice associated with the five or six day delay in the Government's disclosure of this email on November 30, 2021. The November 24 email states that Mr. Williams was possibly present at Wholesale Motorcars from May 8 to May 11, 2019, several days before any child pornography downloads took place.

---

[6] *Brady v. Maryland*, 373 U.S. 83 (1963).

[7] *Giglio v. United States*, 406 U.S. 150 (1972).

More to the point, this information was not substantively new to the defense.  By at least November 11, 2021, Mr. Duggar had identified Mr. Williams as a potential witness and later subpoenaed him to testify at trial.  A Court filing the day before explains why. *See* Doc. 84, p. 11.  Mr. Duggar expressly identifies Mr. Williams as a potential alternative perpetrator that the Government had failed to thoroughly investigate. *Id.*  Mr. Duggar states his knowledge that "Caleb Williams regularly used the desktop computer in the months and weeks leading up to May 2019, [and that] he also sold a car on behalf of Wholesale Motorcars on March 27, 2019, and used the HP desktop computer to print shipping labels." *Id.*  For these reasons, the Government's disclosure of this email (before the trial began) may have bolstered what Mr. Duggar already knew, but the delay in disclosing it did not prejudice the defense in any material way nor violate Mr. Duggar's rights under *Brady* or *Giglio*.

### b.  November 30 Email

Assuming Mr. Williams's second email was discoverable under *Brady*, the Government had an obligation to disclose it "before it [was] too late for the defendant to use it at trial." *United States v. Szcerba,* 897 F.3d 929, 941 (8th Cir. 2018) (citing *United States v. Almendares*, 397 F.3d 653, 664 (8th Cir. 2005)).  There is no constitutional requirement to disclose *Brady* evidence before the trial begins. *See id.*  A *Brady* violation is only established when "the government's delay in disclosing the evidence deprived [the defendant] of its usefulness and . . . this deprivation materially affected the outcome of his trial." *Id.*  To demonstrate materiality, a defendant must show a probability that if the evidence had been disclosed earlier during the trial, "the result of the proceeding would

have been different." *Id.* The burden to establish a *Brady* violation rests with the defendant. *Masten v. United States*, 752 F.3d 1142, 1146 (8th Cir. 2014).

For the sake of argument, the Court will assume the November 30 email contained information favorable to the defense. The Court draws the line, though, at finding the email "exculpatory," as Mr. Duggar contends. The email states that Mr. Williams knew "a few more passwords" for social media accounts used by Mr. Duggar's brothers, Jed, Josiah, and Joseph. It does not contain any information that would suggest Mr. Williams was physically present at the car lot when child pornography was downloaded, and the defense was unable to point the jury to *any* forensic evidence of remote access on the Linux side of the computer.[8]

Mr. Duggar argues that if his counsel had only known about the November 30 email on the first day of trial, he might have been able "to impeach [the case agents] with evidence that yet another person had access to passwords." (Doc. 131, p. 7). Mr. Duggar maintains he would have pointed out to the jury—if he had the email in hand—that the case agents failed to investigate all leads and seriously consider evidence of an alternative perpetrator like Mr. Williams.

Contrary to Mr. Duggar's assertions, defense counsel did, in fact, cross-examine the case agents and attempt to impeach them regarding the thoroughness of their investigation and their search for alternative perpetrators. During the Government's case-in-chief, Special Agent Faulkner testified that no agent followed up with Mr. Williams to

---

[8] Mr. Duggar's expert, Ms. Bush, testified there was no evidence that anyone had ever remotely accessed the Linux side of the hard drive. Further, she was certain no one had ever remotely accessed the Windows side of the hard drive at any point during the relevant dates in May. *See* Doc. 128, pp. 70–73, 178–79.

ask him about passwords because Mr. Williams "was in the State of Illinois" when child pornography was downloaded at Wholesale Motorcars. (Doc. 125, p. 40). Mr. Duggar's counsel vigorously cross-examined Special Agent Faulkner on this point. *See id.* at pp. 40–49. Special Agent Faulkner also admitted on the stand that he first spoke with Mr. Williams approximately a month before trial began, around the time the Government confirmed that Mr. Williams was one of Mr. Duggar's proposed alternative perpetrators. *See id.* at p. 40. The Court concludes the November 30 email is not impeachment evidence with respect to the case agents. Their credibility could not have been impeached for "failing" to ask Mr. Williams to list all the Duggar-family passwords he knew because the evidence was clear that Mr. Williams could not have committed these crimes.

As for whether this email could have been used to impeach Mr. Williams, there is no dispute that the defense was in possession of the email two days before they planned to call Mr. Williams to the stand. *See* Doc. 128, p. 195. In addition, as will be explained in further detail below, Mr. Duggar's counsel made the strategic decision not to call Mr. Williams to the stand, though he could have done so. Accordingly, the Government's delayed disclosure of the November 30 email did not violate *Brady* or *Giglio*.

### 2. Defense's Ability to Call Caleb Williams as a Witness

Mr. Duggar's second argument in favor of a new trial is that he was constitutionally deprived of the ability to call Caleb Williams as a necessary witness. The Government moved prior to trial to bar Mr. Duggar from introducing evidence of an alternative perpetrator, arguing such evidence was too speculative, and, if introduced, would only confuse the jury. *See* Doc. 67. The Court denied the motion on November 17, 2021, noting:

> It is the Government's burden to prove that Defendant committed the crimes set forth in the indictment beyond a reasonable doubt, and Defendant is entitled to create reasonable doubt in the jury's minds by pointing the finger at others who may have possibly committed the crimes.

(Doc. 93, p. 7).  At the same time, the Court cautioned Mr. Duggar's counsel that it would not "permit the defense to present speculative testimony or make purely speculative arguments to the jury."  *Id.* at n.1.  In other words, the Court's order placed Mr. Duggar's counsel on notice *at least two weeks prior to trial* that he would need to establish a non-speculative evidentiary foundation through witnesses with personal knowledge, consistent with Federal Rules of Evidence 602 and 403, before he could identify and argue that some particular person was an alternative perpetrator.[9]

On December 6, 2021, the Court met with counsel in chambers to discuss, among other things, Mr. Williams's expected testimony.  The Court reiterated its liminal ruling that Mr. Duggar was free to suggest to the jury that someone else might have committed these crimes; however, the evidence needed to meet a certain minimum threshold of reliability and could not be tantamount to wild finger-pointing.  *See* Doc. 127, p. 17.  The Court advised the parties of the correct legal standard used to evaluate the introduction of third-party perpetrator evidence at trial:

> THE COURT: Well, so the third-party guilt issue, sometimes known as alternative perpetrator issue, is an issue that I'm sure you all are familiar with. The government made this the subject of a motion in limine. You all responded. The Court ruled that it would not prohibit Mr. Duggar to point the finger at someone else, but the Court also noted that that was not a license to offer speculative testimony. And there's some case law out there. There's

---

[9]  The Court's ruling here was a straight-forward paraphrasing of the holding in *Holmes v. South Carolina*, 547 U.S. 319, 327 (2006), which both parties had cited in support of their respective liminal arguments. (Third-party guilt evidence may be excluded under Rule 403 "where it does not sufficiently connect the other person to the crime . . . [such as where it is] speculative or remote, or does not tend to prove or disprove a material fact in issue at the defendant's trial." *Id.*).

the *Holmes* case that the government cited. That's a Supreme Court case. There's a Tenth Circuit case, *Jordan*. And then there's the Tenth Circuit case in the *Tim McVeigh* case, the Oklahoma City bombing case. And these cases all refer to this idea that there has to be some demonstrable nexus of proof that links the alternative perpetrator to the crime. And then there's also this concept that the greater the strength of the evidence of the government pointing to the defendant relative to the strength of this nexus, that that weighs into part of the Court's analysis as to whether it will include or permit or exclude that. I have no idea what Caleb Williams is going to say, so I'm not going to say that Caleb Williams can't be called as a witness. But I am going to say that I will not let him testify to anything speculative. And I will not allow him to testify to any facts without a 602 foundation.

*Id.* at pp. 17–18.  Notably, Mr. Duggar's lead trial counsel responded, "And that's fully our intention, Your Honor"—indicating he both understood and agreed with the Court's recitation of the law on this point.

In that same meeting in chambers, the Government advised the Court that Mr. Williams had recently been convicted of a sex offense. According to the Government, the defense team possessed no non-speculative evidence that Mr. Williams was in Arkansas on the dates in question.  Instead, the Government argued the only reason Mr. Duggar wanted to call Mr. Williams to the stand was to reveal to the jury the recent sex offense conviction and leave the false impression that he might be a viable alternative perpetrator. *Id.* at p. 18.

The Court inquired of defense counsel what facts he expected to introduce to show Mr. Williams was present at the car lot during the relevant downloading dates in May. The following colloquy ensued:

DEFENSE COUNSEL: Your Honor, as a practical matter, we have circumstantial evidence that he comes from Illinois to Arkansas towards the end of the week before. And he says he's going to, quote, "Watch the lot."

THE COURT: That's not good enough to place him on the lot.

DEFENSE COUNSEL: What I'm saying, Your Honor, is that we also have significant evidence, and the Court is going—I understand the Court is a little bit in the dark on this, to no fault of anyone, but the Court is going to hear significant evidence from Michele Bush today of the possibility of remote access, and in fact, the likelihood of remote access. So, this notion of being on the lot, other than at very discrete times, is really in our opinion a red herring. And as a practical matter, Caleb Williams regularly had access to the entire computer system related to Wholesale Motorcars. He controlled a lot. He sold his own eBay shipping stuff off of that computer, literally, within a month or so of the alleged crime. And he physically puts himself at the lot around that time period. This notion that he claims that he was away, he takes pictures of pictures.

THE COURT: We need to get out there [to the courtroom]. I can't make a speculative ruling based on testimony that I haven't heard. *I will let it go forward and we'll take it one step at a time.* And if the government believes that there's not appropriate 602 or 901 [foundations] or that any of the dominoes that would fall after that aren't there, you need to ask to approach the bench. Under no circumstances are you to get into any prior sex offense history that he has without approaching the bench.

*Id.* at pp. 19–20 (emphasis added).

The next day, December 7, Mr. Duggar's counsel requested a side bar to discuss further his intention of calling Mr. Williams as the defense's next witness. The Government's counsel asked the Court for an advisory opinion as to the foundational facts the defense needed to introduce before this witness could be asked about his sex offense conviction.  The Court responded:

Well, *the Court stands by what it ruled earlier*. And the big picture issue here is evidence of an alternative perpetrator. And the Court will not allow speculative testimony or speculative argument about alternative perpetrators. I don't know what this witness, I don't know what their knowledge was. I don't know what they are being called for, so all I can do is flag the issue based on what I know. And I can tell you that he's going to have to establish 602 personal knowledge.

(Doc. 128, p. 196, emphasis added).

Defense counsel then offered to proffer to the Court what Mr. Williams's expected testimony would be.  *Id.* at p. 197.  Counsel stated that Mr. Williams would testify he

previously worked at Wholesale Motorcars in various capacities. He would authenticate a document showing he sold a car. He would testify about his involvement in "eBay sales" and "e-mails and shipping labels that . . . are associated directly to him." *Id.* at p. 198. He would be asked to explain whether he used Mr. Duggar's parents' home address as his own during March and April of 2019. He would be asked whether he "watched the lot" during the "May 7th time period" and used the office computer then. *Id.* Finally, defense counsel planned to ask Mr. Williams whether he spent the night about a mile away from Wholesale Motorcars on May 9, 2019, and did "odd jobs for the Duggars or for the guys" around this time. *Id.* at p. 199. None of those topics were objectionable, and the Court did not prohibit counsel from calling Mr. Williams to ask those questions.

Counsel for the Government responded with its own proffer. The Government intended to offer proof that Mr. Williams left Arkansas on May 11, 2019, and traveled to St. Louis, where he "got a new iPhone." *Id.* at p. 201. The jury would be shown the receipt for the new iPhone, and the Apple representative would testify that Mr. Williams bought the phone. *Id.* The Government would then prove Mr. Williams "drove to his mother's house" in Illinois "on May 11th." *Id.* Mr. Williams's mother would testify that her son spent May 12 with her, and a video would be played for the jury showing Mr. Williams moving furniture in his mother's house that day. Then, the Government would introduce a video taken on May 13 that depicted Mr. Williams doing some engraving work on a large, identifiable engraving machine located in Illinois. *Id.* Lastly, the Government would present witness testimony that Mr. Williams was still in Illinois on May 16 and traveled with his family to a wedding that day.

The Court asked defense counsel directly whether the core purpose for calling Mr. Williams to the stand was "to make an argument that he was an alternative perpetrator of the offense conduct on May 14 through 16, either in person or remotely." *Id.* at p. 202. Counsel responded, "Yes, but not exclusively." *Id.*  The Court advised:

> So, to the extent that the overarching relevance and purpose of calling this witness is to establish so-called alternative perpetrator evidence, based on this proffer, the Court will not allow Caleb Williams to be associated with so-called alternative perpetrator evidence or argument.

*Id.* at pp. 203–04.   The Court then *expressly permitted* Mr. Duggar's counsel to call Mr. Williams to the stand. The Court suggested asking him preliminary questions to establish a "background of who he is and what his connection is" to Mr. Duggar's case as well as "the dates of his employment."   *Id.* at p. 205. The Court *reserved ruling* on whether defense counsel would be permitted to take his questions a step farther and suggest Mr. Williams may have committed these crimes.  Before counsel could do this, the Court required that he lay an appropriate foundation:

> You must ask [Mr. Williams] whether or not he has knowledge or recollection of being present on the car lot on or about May 13 through May 16. Defense conduct is May 14 through 16, but there's evidence that the Linux partition was installed on the 13th. And you may inquire if he ever remoted into the office machine, and if so, the time periods in which he would have remoted in.

*Id.*

The defense now argues that the Court relied on the wrong legal standard when issuing these rulings at sidebar.  That is incorrect.  At the time, the undersigned had highlighted several passages from one of the relevant cases—*Holmes v. South Carolina*—and inadvertently read the wrong passage into the record during the sidebar conference.  However, immediately after reading the *Holmes* passage, the Court read

from two other leading cases, *United States v. Jordan*, 485 F.3d 1214 (10th Cir. 2007),

and *United States v. McVeigh*, 153 F.3d 1166 (10th Cir. 1998), both of which correctly

recited the legal standard the Court relied on when making its ruling:

> *U.S. v. Jordan*, 485 F.3d 1214, Tenth Circuit, 2007, "Courts may properly
> deny admission of alternative perpetrator evidence that fails to establish,
> either on its own or in combination with other evidence in the record, A)"—
> and here's the money quote—"nonspeculative nexus between the crime
> charged and the alleged perpetrator."
>
> There's a similar line of analysis from *United States v. Timothy McVeigh*,
> Oklahoma City bomber, Tenth Circuit 1998. "Although there is no doubt that
> a defendant has a right to attempt to establish his innocence by showing
> that someone else did the crime"—that was the basis of the Court's motion
> in limine ruling that was substantially in the defendant's favor—"a defendant
> still must show that his proffered evidence on the alleged alternative
> perpetrator is sufficient on its own or in combination with other evidence in
> the record to show a nexus between the crime charged and the asserted
> alternative perpetrator. It is not sufficient for a defendant merely to offer up
> unsupported speculation that another person may have done the crime.
> Such speculative blaming intensifies the grave risk of jury confusion and
> it invites the jury to render its findings based on emotion or prejudice."

(Doc. 128, pp. 204–05).

Defense counsel is well aware that the sidebar conference was at least *the third*

*time* the Court had addressed on the record the evidentiary foundation that would be

required before alternative perpetrator evidence could be argued to the jury. The defense

team was not confused about this standard. Instead, they made the strategic decision

*not* to call Mr. Williams to the stand because: (1) they knew they could not lay a non-

speculative foundation for his testimony, and (2) any such attempt to do so would invite

the Government's proffered rebuttal testimony.

Defense counsel's in-chambers proffer confirmed he was aware of no evidence

placing Mr. Williams in Arkansas between May 14 and May 16, 2019—the dates that child

pornography was downloaded in this case. *See* Doc. 127, p. 19. Further, Mr. Duggar's

expert, Ms. Bush, testified at trial that someone who was physically present at the car lot on May 13 installed the Linux operating system by inserting a thumb drive into the HP desktop computer. *See* Doc. 128, pp. 22–25. The defense had no evidence that Mr. Williams was in Arkansas on May 13 or anytime thereafter. In fact, the only proffered evidence was that Mr. Williams was *not* present in Arkansas on May 13–16. *See* Doc. 128, p. 201. Since the defense chose not to call Mr. Williams to the stand at all—not even to ask him about his employment history, his time spent working for Wholesale Motorcars, his eBay business, or the Duggar family passwords he knew—the Court surmises the only reason for calling him was to reveal his sex offense conviction to the jury.

Without proof of a non-speculative nexus between Mr. Williams and the offense conduct in this case, the jury's knowledge of his sex offense conviction was of little probative value and would have mislead the jury and likely created the danger of unfair prejudice—all which are legitimate grounds to exclude this evidence under Rule 403. Mr. Duggar is not entitled to a new trial on the basis of this argument.[10]

### 3. Alleged Rule 16 and Jencks Act Violations

Mr. Duggar's next argument is that a new trial is warranted due to the Government's failure to disclose certain demonstrative exhibits Mr. Fottrell used during his rebuttal testimony. The "exhibits" were screenshots Mr. Fottrell printed while working with Oracle VirtualBox, which was described as "a very popular piece of virtualization software." (Doc. 125, p. 193). As he explained during the Government's case-in-chief,

---

[10] The Court further observes that it never definitively ruled on whether Mr. Williams could be impeached with his prior conviction. Instead, the Court simply noted that Rule 403's balancing factors would apply to the decision on whether to admit evidence of Mr. Williams' conviction under Rule 609. (Doc. 128, pp. 202-203). Since the defense elected not to call Mr. Williams, the Court never had the opportunity to apply Rule 403.

Mr. Fottrell "converted the forensic image [of Mr. Duggar's HP desktop computer] into a format that Oracle Virtualbox [could] use" and then he "configured a virtual machine . . . to match the configuration of the desktop computer." *Id*. "It's just a method to visualize what the computer looked like at the moment in time it was seized by law enforcement." *Id*. at 192. The software does not identify, reveal, or create substantive evidence. Mr. Fottrell explained that he uses the virtualization software "*to demonstrate what the [computer] image looks like*." *Id*. "One of the features of the software is, once you boot it up, and you're seeing something on the screen, you can just hit the print screen button and then it saves what the screen looks like to a file." *Id*. at 193. Fottrell explained that he saved numerous print screens as he was "navigating around on the computer looking at different things." *Id*. He went through this process multiple times: "I would go back periodically to create additional print screens for things I forgot to do the first time around. I rebooted the virtual machine multiple times *to get to the point to illustrate the things that I thought were effective to illustrate*." (Doc. 126, p. 188).

It is undisputed that the defense, through their expert, Michele Bush, had access during discovery to the actual substantive evidence: the forensic image of the HP desktop computer. Likewise, it is undisputed that the defense was aware of Mr. Fottrell's use of the VirtualBox software and its print screen feature. In fact, during the Government's case, pre-marked exhibits containing print screens from Mr. Fottrell's virtualization software were received into evidence without objection. *See, e.g.,* Gov. Ex. 28; Doc. 125, pp. 194–96.

Ms. Bush also testified with the aid of screenshots from her own virtualization software called VMware Workstation. *See* Def. Ex. 84; Doc. 127, pp. 116–19. According

to the defense theory, in direct response to Mr. Fottrell's opinions, Mr. Duggar could not have selected the username "dell_one" when creating the Linux partition.  Ms. Bush testified that the underscore is not a permitted character for such purposes and that an error message would have been generated if a user attempted to include an underscore in the username.  *Id*.  To illustrate, the defense offered Defendant's Exhibit 84, which was a screenshot of the error message.  The Court admitted this defense exhibit into evidence over the Government's objection that they had no notice of any such opinions. *Id*.

Afterwards, Mr. Fottrell was re-called by the Government as a rebuttal witness. Returning to the topic of whether Mr. Duggar could have used the "dell_one" username when creating the Linux partition,[11] Mr. Fottrell testified that the underscore character was problematic when naming the computer but was an accepted character in the username. To illustrate, the Government sought to introduce Government's Exhibits 86 and 87, which were identified as screenshots Mr. Fottrell saved during an installation of the Linux partition. Mr. Duggar objected because the Government had not previously provided notice of these particular screenshots.  Counsel explained that the exhibits were made after Ms. Bush's testimony and were being offered in rebuttal to her testimony.  The Court provisionally admitted the exhibits, subject to cross-examination and Mr. Duggar's ability to renew the objection if the exhibits were not in keeping with counsel's description or objectionable for some other reason.  *See* Doc. 128, pp. 213–17.

On cross-examination Mr. Fottrell testified that he created these screenshots on November 24 or 25, 2021, less than a week *before* trial began.  *See id.* at p. 239. After the jury recessed, the defense renewed their objection to Government's Exhibits 86 and

---

[11] More specifically, Ubuntu software, which is a Linux-based operating system.

87, arguing that the screenshots were created prior to trial, but not disclosed to the defense, in violation of Rule 16 and the *Jencks* Act. *Id*. at pp. 249–50. Counsel for the Government explained that while the screenshots were apparently created prior to trial, the culling of particular screenshots into exhibits to illustrate Mr. Fottrell's anticipated rebuttal testimony was only done after Ms. Bush's testimony. *Id*. at pp. 253–54.

Although both sides had earlier introduced screen shots as substantive evidence, the Court observed that the screenshots were more akin to demonstrative aids. The substantive evidence resided on the hard drive of the HP desktop, as interpreted by expert opinion. Each expert orally testified as to what they found and observed while forensically analyzing the hard drive. Both experts used visualization software for the purpose of illustrating their testimony. Ultimately, the Court sustained the objection to the extent that Exhibits 86 and 87 were not received as substantive evidence. The Court re-marked the exhibits as Court's Exhibits 4 and 5 and then instructed the jury as follows:

> Members of the Jury, I did want to explain a correction that I have made with regard to Government's Exhibits 86 and Government's Exhibit 87 that Mr. Clayman introduced a few minutes ago through Mr. Fottrell. You'll recall that he described these as screenshots that he had made using the virtualization software. In the moment, I received those as actual exhibits, which would mean that they would be actual evidence and that they would be available to you in the jury room. I should have, and I now do find it proper to treat these two exhibits as demonstrative aids. And I find that what was marked as Government's 86 and Government's 87 will be received as Court's Exhibit 4 and 5  respectively. You may use these screenshots as an aid to this witness's testimony to the extent that you believe it is useful to do so. There will be more instructions about  how to use demonstrative aids in the final set of jury instructions, but for now, I just wanted to clarify for the record that those were for demonstrative use to aid the witness's testimony and they are not being received into evidence.

Doc. 128, pp. 256–57.[12]

---

[12] *See* also Final Jury Instruction Number 4, Doc. 118, p. 6.

Under Federal Rule of Criminal Procedure 16(a)(1)(E), the defense is entitled to copies of any documents that are in the Government's possession if they are material to preparing the defense.  A new trial is an appropriate remedy for the government's failure to disclose Rule 16 evidence if the remedy offered by the Court during trial was inadequate to afford the defendant a fair trial.  *United States v. Miller*, 199 F.3d 416, 420 (7th Cir. 1999).

After considering Mr. Duggar's Rule 16 argument, the Court finds the screenshots in question were not material to the defense.   Mr. Fottrell did not refer to these screenshots when he originally testified on direct that the user of the HP desktop manually inputted a username during installation of the Linux partition.  Ms. Bush disagreed with Mr. Fottrell and testified on direct that the username for the Linux side of the hard drive, "dell_one," was autogenerated.  *See* Doc. 128, p. 63.  Ms. Bush was asked on cross-examination whether she agreed with Mr. Fottrell that it was *possible* to create a Linux username that contained an underscore. She replied in the negative.  She was then asked, "If a user could create a username with an underscore, would that change your opinion at all that the individual who set up this account had an auto-generated dell_one username?"  Again, she replied, "No."  *Id.* at p. 66.

Given Ms. Bush's unequivocal testimony, it is difficult to understand why Mr. Fottrell's screenshots of his virtual computer would have changed her mind or altered the defense's trial strategy.  The screenshots were merely a visual aid to Mr. Fottrell's oral testimony on direct that it is possible for a user to create a Linux username containing an underscore.   Accordingly, Mr. Duggar's assertion that possessing these screenshots

during Ms. Bush's testimony would have caused her to "form[] a different opinion" is singularly unpersuasive.  (Doc. 142, p. 18).

Moreover, Mr. Fottrell testified during the Government's case that while using his VirtualBox software he would "hit 'print screen' like a mad fool every couple of minutes," not knowing at that time which particular printscreens would later be effective to illustrate his testimony. (Doc. 126, p. 188).   Thus, the production of every such screenshot, without any further context, would not have been materially helpful to the defense.  More to the point, then knowing Mr. Fottrell's methodology, Ms. Bush could have tested her underscore-not-accepted-in-the-username theory using the widely available VirtualBox software, but she elected not to do so.

In any event, if the Government's failure to disclose the screenshots used by Mr. Fottrell in rebuttal did violate Rule 16, a new trial would only be appropriate if the remedy the Court offered during trial was inadequate to afford Mr. Duggar a fair trial.  *Miller*, 199 F.3d at 420.   During trial, the Court ultimately sustained the defense objection, in part, and instructed the jury that the exhibits would not be received as substantive evidence, but were presented as a demonstrative aid to the testimony, which the jury could use to that extent.  The screenshots were only viewed by the jury during Mr. Fottrell's rebuttal testimony. The Court finds that its remedy was appropriate and did not prejudice Mr. Duggar for a variety of reasons.  First, the content of the screenshots should not have been a surprise to Mr. Duggar, as they merely confirmed through a visual depiction Mr. Fottrell's prior testimony on direct.   Second, Mr. Duggar was aware of Mr. Fottrell's virtualization software and could have had Ms. Bush use the same software when performing her analysis.   Third, Mr. Duggar never otherwise explained why reviewing

these screenshots before Mr. Fottrell's rebuttal hindered the defense's ability to prepare. Fourth, a new trial would be an extreme and unwarranted remedy for this type of discovery violation, especially in light of the overwhelming evidence of Mr. Duggar's guilt.

If the Government's disclosure of the screenshots violated the Jencks Act,[13] a new trial would only be justified if the screenshots were withheld by the Government in bad faith and resulted in prejudice to Mr. Duggar. *United States v. Vieth*, 397 F.3d 615, 619 (8th Cir. 2005).   It is clear Mr. Duggar failed to establish the screenshots were withheld in bad faith.   He concedes in his brief that the Government was "unaware that the screenshots occurred prior to [Mr. Fottrell's] testimony" the previous week.  (Doc. 131, p. 19).   Mr. Duggar also failed to prove he was prejudiced.   As previously explained, Mr. Fottrell orally testified about the creation of the "dell_one" username on direct, and he testified similarly on rebuttal.   He used the screenshots in rebuttal to aid the jury's understanding of his testimony.   The substance of his rebuttal testimony had already been disclosed to the jury during the Government's case.   It follows that Mr. Fottrell's use of the screenshots as a demonstrative rebuttal exhibit did not result in the kind of prejudice that would warrant a new trial.

---

[13] The Jencks Act provides:

> After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to Produce any statement . . . of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified.

18 U.S.C. § 3500(b).

#### 4. Mr. Fottrell's Testimony on Geolocation

Mr. Duggar's fourth and final argument is that Mr. Fottrell's testimony on the geolocation of certain photographic evidence was improper and should have been stricken from the record. Mr. Fottrell testified that he reviewed EXIF data taken from photographs on Mr. Duggar's iPhone. The EXIF data disclosed GPS coordinates indicating where the photographs were taken. Mr. Fottrell then plugged the coordinates into Google Maps and testified about the locations. *See* Doc. 126, p. 62.

This same objection was raised by Mr. Duggar's legal team during trial. *See id.* at p. 58. Mr. Duggar's counsel addressed the Court outside the jury's hearing and argued Mr. Fottrell was not qualified to offer testimony as to geolocation. Counsel also suggested there was "an abundance of case law" indicating that "this kind of EXIF data related to geolocation in particular is unreliable." *Id.* After hearing from the Government, the Court ruled that Mr. Fottrell's investigative act of plugging coordinates from EXIF data into Google Maps and then testifying about the results was lay testimony under Rule 701. *See id.* at pp. 59-60, 67-69.[14] The Court further ruled that to the extent some portion of the testimony fell under Rule 702, Mr. Fottrell was qualified to offer expert testimony about the EXIF data he harvested from Mr. Duggar's devices. Id. The defense team was on notice that Mr. Fottrell would be opining at trial about the metadata gleaned from the photographic exhibits. Furthermore, Ms. Bush had access to the same EXIF data and

---

[14] Mr. Fottrell works for the United States Department of Justice. He is the director of the High Technology Investigative Unit. He is a federal investigator of child exploitation crimes. (Doc. 125, pp. 182-183). An investigator's testimony about the course of an investigation and the meaning of investigative clues along the way is fact testimony. This is true even if the testimony takes the form of a Rule 701 lay opinion, provided that it is rationally based on facts perceived by the investigator and does not not qualify as an expert opinion under Rule 702.

Google Maps application that Mr. Fottrell did, and she never contradicted his testimony about the various locations where the photographs were taken.

Mr. Duggar's reliance on *United States v. Crawford*, 2021 WL 2367592, at *2 (W.D.N.Y 2021), and *United States v. Boyajian*, 2012 WL 4094977, at *16 (C.D. Cal. 2012), is misplaced. *Crawford* involved a dispute about the accuracy of cell-site location information, satellite geolocation, and historical Wi-Fi location data to track the location of an individual's cell phone. Obviously, the technology at issue in *Crawford* is dissimilar to the low-tech "geolocation" testimony Mr. Fottrell offered at Mr. Duggar's trial, which consisted of plugging coordinates into Google Maps. In the *Boyajian* case, the defendant objected that EXIF data corresponding to certain photographs on his camera did not match the precise location where the photographs were taken. Mr. Duggar made no such objection at trial. Accordingly, the Court finds no merit in Mr. Duggar's request for a new trial based on Mr. Fottrell's testimony.

### III.  CONCLUSION

**IT IS THEREFORE ORDERED** that the Motion for Judgment of Acquittal Under Rule 29(c), or in the Alternative, Motion for New Trial Under Rule 33 (Doc. 131) is **DENIED**.[15]

**IT IS SO ORDERED** on this 24th day of May, 2022.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE

---

[15] However, with respect to Count 2 of the Indictment, the parties stipulated, and the Court agreed, that the possession count in this case is a lesser-included offense to the receipt offense charged in Count 1. Consequently, it is the Court's intention to vacate the jury's conviction for the possession offense and formally dismiss Count 2 during the sentencing hearing tomorrow.