IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION


UNITED STATES OF AMERICA                    PLAINTIFF

v.                    CASE NO. 5:21-CR-50014

JOSHUA JAMES DUGGAR                    DEFENDANT
_____


SENTENCING HEARING

BEFORE THE HONORABLE TIMOTHY L. BROOKS

MAY 25, 2022

FAYETTEVILLE, ARKANSAS


_____

```
 1                      A P P E A R A N C E S

 2

 3   FOR THE PLAINTIFF:

 4   MR. DUSTIN S. ROBERTS
     MS. CARLY MARSHALL
 5   United States Attorney's Office
     414 Parker Avenue
 6   Fort Smith, Arkansas 72901
     (479) 494-4069
 7   dustin.roberts@usdoj.gov
     carly.marshall@usdoj.gov
 8
     MR. WILLIAM G. CLAYMAN
 9   U.S. Department of Justice
     Criminal Division
10   1301 New York Avenue, NW
     Washington, DC 20005
11   (202) 514-0040
     william.clayman@usdoj.gov
12

13   Also Present:  Special Agents Howard Aycock
                    Director Jim Fottrell
14
     United States Probation:  Office Diem Nguyen
15

16   FOR THE DEFENDANT:

17   MR. JUSTIN GELFAND
     MR. IAN TALBOT MURPHY
18   Margulis Gelfand, LLC
     7700 Bonhomme Avenue, Suite 750
19   Saint Louis, Missouri 63105
     (314) 390-0234
20   justin@margulisgelfand.com
     ian@margulisgelfand.com
21
     MR. TRAVIS WAYNE STORY
22   Story Law Firm, PLLC
     2603 East Main Drive, Suite 6
23   Fayetteville, Arkansas 72704
     (479) 443-3700
24   travis@storylawfirm.com

25
```

2

1                      I N D E X

2                                                    Page

3   Discussion Regarding Objections              4-64

4   Sentencing Argument by Mr. Roberts            72

5   Sentencing Argument by Mr. Gelfand            89

6   Opportunity to Allocute                      104

7   Court's Explanation Regarding Sentencing Analysis   104

8   Sentence Pronounced                          123

9   Reporter's Certificate                       137

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

9:35AM  1          THE COURT:  The Court will call up the matter of

2       the United States versus Joshua James Duggar.  Our Case

3       Number is 5:21-CR-50014.

4               The matter is before the Court today for purposes

9:36AM  5       of a sentencing hearing.  Counsel in attendance today, first

6       for the government, would include Carly Marshall, Dustin

7       Roberts, and William Clayman.  And I see that you have some

8       of your agents with you, Ms. Marshall.

9               MS. MARSHALL:  Yes, Your Honor.

9:36AM 10          THE COURT:  Would you like to introduce them?

11              MS. MARSHALL:  Yes, Your Honor.  We have Special

12      Agent Howard Aycock and then Director Jim Fottrell that will

13      be conducting any evidence that we need to display, Your

14      Honor.

9:36AM 15          THE COURT:  Thank you.  And then appearing and

16      representing Mr. Duggar, Justin Gelfand, Mr. Travis Story,

17      and Ian Murphy.

18              The Court's probation officer who conducted the

19      presentence investigation is present as well.  That is Diem

9:37AM 20      Nguyen.  Then also present is Mr. Duggar.

21              Good morning, sir.

22              THE DEFENDANT:  Good morning.

23              THE COURT:  Mr. Duggar, do you understand that

24      the purpose of this hearing is to allow the Court to impose

9:37AM 25      its sentence as a result of your conviction in this matter?

9:37AM 1              THE DEFENDANT:  Yes, Your Honor.

2              THE COURT:  In the last 24 hours or so, have you

3  consumed any substances or intoxicants of any kind that

4  would interfere with your ability to understand what's going

9:37AM 5  on today?

6              THE DEFENDANT:  No, Your Honor.

7              THE COURT:  Sir, do you remain fully satisfied

8  with the legal services of your attorneys?

9              THE DEFENDANT:  Yes.

9:37AM 10             THE COURT:  All right, sir.  Mr. Duggar, if at

11  any time when you're responding to the Court today you would

12  like to remove your mask when responding, feel free to do

13  so, please.

14             THE DEFENDANT:  Thank you, sir.

9:38AM 15             THE COURT:  Let's walk through a brief procedural

16  history of your case to get things started here.

17             You were originally indicted on two counts having

18  to do with child pornography.  Count One charged you with

19  receipt of child pornography.  Count Two was a charge of

9:38AM 20  possession of child pornography.  The indictment was

21  returned by the Grand Jury on April 28th of 2021.

22             The matter proceeded to a jury trial that

23  commenced on November 30th and ran through December 9th.

24  After its deliberations, as you're aware, the Jury returned

9:39AM 25  a verdict of guilty on both Counts One and Two.  At that

time, the Court commissioned a presentence investigation, and since December, we have been going through that process.

Officer Nguyen filed her initial presentence report of record on February 11th, and at that time, counsel was given an opportunity to review the presentence report and to lodge objections or requests for corrections to the presentence report.  In this case, the government raised 22 objections, and, ironically, the defense raised exactly 22 objections as well.

Officer Nguyen considered those objections.  She was able to resolve some objections, but obviously she was not able to resolve all of the objections, but she finalized the presentence report of record on March 18th.  And on that same day, she filed a document that we call the addendum to the presentence report.  And this is where the probation officer explains how and why she has responded to the objections the way that she has in the final presentence report.

Now, Mr. Duggar, I mention these materials to you because under the Rules of Criminal Procedure, your attorneys are obligated to have reviewed these presentence report documents with you to make sure that you understand the contents of these documents.  So my question for you is, did your attorneys in this case review these materials with you?

1    THE DEFENDANT:  Yes, Your Honor.

2    THE COURT:  And did your attorneys answer any and

3    all questions that you may have had about the contents of

4    these presentence report documents?

5    THE DEFENDANT:  Yes, Your Honor.

6    THE COURT:  All right.  Thank you, sir.

7    THE DEFENDANT:  Thank you.

8    THE COURT:  Now, in addition to being advised by

9    the results of the presentence investigation, and obviously

10   the Court should note for the record here that this Judge

11   did preside over the trial of the proceedings, but the Court

12   has obviously reviewed in great detail the presentence

13   report as well.  In addition, the Court has received

14   sentencing memorandums from both the government and from

15   defense counsel, as well as response memorandums from the

16   government and defense counsel.

17        The Court has also received, read, and

18   considered, Mr. Duggar, a number of letters written in

19   support of you.  And I say in almost every sentencing

20   hearing that I find these letters to be very helpful to the

21   Court.  When someone is charged with a crime and they are

22   prosecuted, the focus of the proceeding is on a criminal act

23   that has allegedly been committed, and when a presentence

24   report is prepared, it focuses mainly on the crime that has

25   been committed.  And although there is other biographical

9:42AM 1   and historical information in there, it's always helpful to

2   the Court to receive and consider information about the

3   defendant being sentenced from other facets to have a more

4   holistic and fulsome view of the person before the Court.

9:43AM 5   So for that reason, I truly appreciate all of the letters

6   that have been submitted.  They are not normally placed on

7   the public docket, but, here, counsel elected to do so, so I

8   might identify the letters that I have reviewed a little

9   more specifically than I otherwise would.

9:43AM 10              Obviously, read and considered the letter from

11   your wife and from your mother and from your father-in-law.

12   You have some neighbors, or maybe it's your parents that

13   have some neighbors that are very familiar with you and they

14   each wrote nice letters.  You have a brother-in-law who is a

9:44AM 15   pastor and he wrote a nice letter for you.  Your third-party

16   custodian while you were on pretrial release, Mr. Reber,

17   wrote a very nice letter and I thought that was an

18   interesting facet in time and his comments during that

19   period were very helpful to the Court.  And then more

9:44AM 20   recently, very recently, the Court has received -- there

21   have been some other letters from family, friends, or

22   somebody that had worked with you before, but then today,

23   the Court received another letter from someone that has

24   known you since you were a kid.  So, collectively, I have

9:44AM 25   reviewed and want you to know that I considered and I

appreciate counsel putting that packet of nice letters together for the Court.

The Court has also received a victim impact statement from one of the series victims and I had staff make inquiry. Ms. Marshall, am I correct that this victim would be the mother from the marissa series?

MS. MARSHALL: That's correct, Your Honor.

THE COURT: Thank you. So I have read that victim impact statement, and the Court, unfortunately, reads these statements quite often. And it's always very helpful for the Court to go back at sentencings such as this and reread these letters. They are heartbreaking, and I appreciate the opportunity to do that in this case.

I think that I have identified all of the materials that have been submitted for the Court's consideration today, but I want to be sure that I haven't overlooked something. Ms. Marshall or Mr. Roberts, are you aware of anything that you have submitted that I have failed to identify?

MS. MARSHALL: No, Your Honor.

MR. ROBERTS: No, Your Honor.

THE COURT: Mr. Gelfand, are you aware of anything that you have submitted that I have not identified?

MR. GELFAND: No, Your Honor. Thank you.

THE COURT: All right. So let me say that in

9:46AM 1  announcing the procedural history in the case, I explained
2  that the Jury returned guilty verdicts and convictions as to
3  both the receipt count and the possession count.  The record
4  in this case will reflect that prior to the Jury's
9:47AM 5  deliberations, the parties stipulated and the Court agreed
6  that in the event of a guilty verdict on both counts, that
7  only the receipt count could proceed to entry of judgment,
8  because the way that the indictment was charged, the
9  possession offense was a lesser included offense of the
9:47AM 10 receipt count.
11         So consistent with what we discussed at that time
12 and have since discussed, it would be the Court's intention
13 at this time to vacate the Jury's conviction on the
14 possession count, which is Count Two.  It would be the
9:48AM 15 Court's intent to enter a separate written order
16 contemporaneous with entry of judgment dismissing Count Two.
17 That's the Court's intention.
18         Does the government have any objection?
19         MR. CLAYMAN:  No objection, Your Honor.  Other
9:48AM 20 than to note, based on our communication previously, we
21 don't believe this count should be dismissed with prejudice,
22 so if the Court is intending to do that, we would be happy
23 to discuss it more, but, otherwise, no objection.
24         THE COURT:  Mr. Gelfand?
9:48AM 25         MR. GELFAND:  Your Honor, we don't disagree with

9:48AM  1    the government as to that point.  We join, as we have

2    formally so moved, in the request to dismiss Count Two based

3    on the double jeopardy clause of the Constitution.  To the

4    extent that double jeopardy were implicated in the event of

9:49AM  5    a reversal of a conviction on the one count that remains,

6    the Court would obviously be in a position with facts and

7    law not before the Court right now to evaluate the impact

8    and ramifications of that under the double jeopardy clause.

9    So that's a long-winded way of saying, without waiving any

9:49AM  10   such rights under the double jeopardy clause, we don't

11   disagree with Mr. Clayman.

12           THE COURT:  Then the Court's order will be

13   without prejudice, and depending on what the Eighth Circuit

14   says and how that all shakes out, we can address these

9:49AM  15   double jeopardy issues if there's a reason or need to do so

16   in the future.

17           So let's take up the remaining objections.  And

18   this may take a little while, but the only way that I really

19   know to do this is to kind of take things one by one here.

9:50AM  20           My understanding would be, Mr. Roberts -- I'm not

21   sure who I should be addressing.

22           MR. ROBERTS:  That's fine, Your Honor.

23           MS. MARSHALL:  Yes, Your Honor.  We will be

24   tag-teaming some of the objections.

9:50AM  25           THE COURT:  Well, let me just lob this softball

11

9:50AM 1   up here.  My understanding is that the final presentence

2   report resolved all of the government's 22 objections, is

3   that correct?

4            MS. MARSHALL:  That is correct, Your Honor.

9:50AM 5            MR. ROBERTS:  Yes, Your Honor.

6            THE COURT:  And then with regard to the

7   defendant's 22 objections, I understand that the final

8   presentence report only resolved one of those objections.

9   That was objection number 13.  And when I refer to objection

9:50AM 10   number, I'm referring to the numbering system used by

11   Officer Nguyen in the addendum.  Objection 13 was resolved.

12   This had to do with paragraphs 132 and 133.  Revisions were

13   made to more accurately describe Mr. Duggar's background in

14   automotive sales and Wholesale Motorcar Company

9:51AM 15   specifically.  That leaves 21 defense objections

16   outstanding.

17            I wanted to state something on the record here

18   and I want to be very clear about this.  Today, when ruling

19   on objections with regard to offense conduct facts that will

9:51AM 20   be considered for any sentencing purposes, the Court will be

21   relying exclusively on evidence that was introduced either

22   at trial or at an evidentiary hearing, or if need be, during

23   the course of this sentencing hearing rather than relying on

24   any facts that the defendant has objected to in the

9:52AM 25   presentence report.  The Court makes this threshold

12

9:52AM  1    observation pursuant to *United States v. Lawrence*, 854 F.3d
       2    462.  The pinpoint is pages 466 and 467.

       3              That said, let's dive in.  Objection number 1,
       4    Mr. Gelfand, as I understand it, is an objection to the
9:53AM  5    entirety of the offense conduct section of the presentence
       6    report, which is to say to the entirety of the content at
       7    paragraphs 25 through 88.  However, as I read your
       8    objections and your briefing, I realized that this is not as
       9    scary as I thought it was going to be.  What I gather is
9:53AM 10    that the primary reason for your objection is simply to
      11    preserve Mr. Duggar's position for appeal inasmuch -- and
      12    you've stated this -- that Mr. Duggar maintains his
      13    innocence.  He affirmatively plans and knows already that he
      14    is going to appeal his conviction.
9:54AM 15              So my understanding would be, with a couple of
      16    exceptions, and I'll note these exceptions here in just a
      17    second.  My understanding would be that Mr. Duggar is not
      18    saying that Officer Nguyen has inaccurately summarized the
      19    evidence that was placed before the Jury.  Rather, my
9:54AM 20    understanding would be that Mr. Duggar is making a very
      21    broad and general objection and in effect saying, I didn't
      22    commit the offense conduct, so I categorically object to the
      23    inclusion of offense conduct on that basis.
      24              I gather that there are some exceptions, though.
9:54AM 25    One exception would be with regard to the facts stated in

paragraphs 60 and 87 which has to do with image counts.
Here, Mr. Duggar has made a specific objection to the
factual accuracy of the image calculations in those
paragraphs.  I would observe, however, that there's a
related objection, objection number 7, where the image count
enhancement is actually applied at paragraph 101.  So what
I'm going to do with these two paragraphs, 60 and 87, and
your objections to those facts, I'm going to group those
with your objection number 7 and I'll take that up as one
categorical line item, the image count enhancement.

        You have also objected to paragraph 88, which is
what I call the collector paragraph at the end of the
offense conduct section where the probation officer has
identified conduct that will serve as a basis for
enhancements to the base offense level in the offense level
calculation section of the presentence report.  Here,
Mr. Duggar has specifically objected to the probation
officer's identification of enhancements to include the
pattern of activity enhancement.  Obviously, there's an
objection separately to the images and to attributes of
conduct in those images.

        But setting aside these specific fact objections
to image count and pattern of activity enhancement, am I
correct, Mr. Gelfand, that your objections to paragraphs 25
through 88 are nonspecific categorical objections that

9:57AM 1    Mr. Duggar maintains because he is maintaining his innocence

2    and does not wish to potentially prejudice that position by

3    not objecting?

4              MR. GELFAND:  Yes, Your Honor.

9:57AM 5              THE COURT:  All right.  Very well.

6              So these nonspecific categorical objections will

7    be overruled.  Mr. Duggar does have an absolute right to

8    appeal.  That's a fundamental cornerstone of our judicial

9    process, therefore, from his point of view, he certainly has

9:58AM 10   the right to maintain his innocence for that purpose.

11             However, for our purposes today, Mr. Duggar was

12   in fact convicted by the Jury at a trial and he no longer

13   enjoys the presumption of innocence.  For sentencing

14   purposes, it is obviously appropriate to include a summary

9:58AM 15   of the offense conduct in the presentence report.  So except

16   for the noted enhancement objections, the Court finds that

17   objection number 1 is nonspecific.  It is intentionally a

18   broad categorical objection, and the Court finds that under

19   Eighth Circuit authority, these are not proper objections.

9:59AM 20             For example, in *United States v. Razo-Guerra*, 534

21   F.3d 970, the Eighth Circuit said that, "Unless a party

22   objects with specificity and clarity to fact statements in

23   the PSR, the District Court may accept those facts as true

24   at sentencing."  The Court says, "The purpose of the

9:59AM 25   objection is to put the government on notice of the

15

challenged facts and to alert the government as to which specific facts it needed to substantiate at the hearing."

*United States v. Toirac* says, "Rule 32 does not obligate a District Court to make a finding or determination unless the defendant asserts with specificity and clarity each factual mistake of which he or she complains."

Finally, *United States v. Rodriguez*, 711 F.3d 928 says, that, "Vague and blanket objections lacking specific clarity are not sufficient". And, "Merely making objections to the summaries of the offense conduct outlined in the criminal history does not put the government or the District Court on notice of a specific objection."

So objection number 1 will be overruled for the reasons described by the Eighth Circuit in these cases. And because of that, those paragraphs will remain in the presentence report without revision. That said, I want to be clear again. When ruling on the remaining objections and any objections today to facts that the Court will consider for sentencing purposes, this Court is relying on the evidence that was introduced at trial or in other evidentiary hearings or as may be heard today rather than on any objected to facts in the presentence report.

Objection number 2. This is an objection to paragraphs 89 and 90, which provides that the children depicted in the pornographic images are victims. As I

10:02AM 1   understand the objection, the defendant obviously concedes

2   that these minors are victims, but he objects to clarify

3   that they are not his victims, because he maintains his

4   innocence that he has not personally victimized anyone.

10:02AM 5           Is that an accurate summary of your objection,

6   Mr. Gelfand?

7           MR. GELFAND:  Yes, Your Honor.  And it was really

8   the result of just the way that those paragraphs read in the

9   initial PSR.  As a practical matter, I think the Court

10:02AM 10  understands our position.  I'm happy to obviously address

11  anything further from the Court on this.  We clearly

12  acknowledge that any children depicted in these images are

13  victims and very real victims in that sense, and I hope

14  there's no ambiguity there.

10:02AM 15          THE COURT:  So the Court will overrule objection

16  number 2.  This objection is neither factual nor legal.

17  It's an objection having to do with semantics and an

18  objection having to do with the preservation of Mr. Duggar's

19  appeal rights and not wishing to prejudice those rights by

10:03AM 20  inadvertently acknowledging that someone is a victim.

21          Objection number 3.  Defendant objects to

22  paragraph 94.  Paragraph 94 is the opening paragraph to the

23  offense level calculation section of the presentence report.

24  At that time, Officer Nguyen had no ability to work with

10:04AM 25  anything other than the two convictions returned by the

10:04AM 1  Jury, and so certain language that she used referred to

2  multiple convictions.  And in paragraph 94, there's stock

3  language that is used to describe rules that come into play

4  whenever -- I should say grouping rules that come into play

10:04AM 5  whenever there's a conviction on multiple related counts.

6         Now that the Court has vacated the conviction on

7  Count Two, I'm going to sustain this objection and ask,

8  Officer Nguyen, if you would prepare a final revised

9  presentence report and use language as if the only

10:04AM 10  conviction for judgment purposes will be the conviction for

11  the receipt charge on Count One.

12         Objection number 4 pertains to paragraph 97's

13  application of a two-level enhancement for distribution

14  pursuant to 2G2.2(b)(3)(F).  The defendant contends that he

10:05AM 15  did not knowingly engage in distribution.  He contends he

16  was not charged with distribution.  I don't know that that's

17  a winning argument, but he says that he did not knowingly

18  engage in distribution.

19         It is the government who would bear the burden of

10:05AM 20  establishing the application of this enhancement by a

21  preponderance, but, Mr. Gelfand, I will give you the first

22  opportunity to make any additional argument that you would

23  like to make.  And by the way, is anyone anticipating an

24  evidentiary hearing on any of the issues today?

10:06AM 25         MS. MARSHALL:  No, Your Honor.  We do not

18

10:06AM 1  anticipate an evidentiary hearing unless the Court would

2  like to view some of the government's exhibits that were

3  already introduced into evidence at trial.

4           THE COURT:  Okay.

10:06AM 5           MR. GELFAND:  We do not anticipate putting on

6  evidence, Your Honor.

7           THE COURT:  Anything else you would like to add

8  on objection number 4, Mr. Gelfand?

9           MR. GELFAND:  Very briefly.  Does the Court want

10:06AM 10  me to do that from counsel's table or from the podium?

11           THE COURT:  Either.

12           MR. GELFAND:  If you don't mind, I'm kind of a

13  podium guy.  Thank you, Your Honor.

14           With respect to the distribution enhancement, we

10:07AM 15  relied on some legal precedent that we cited in our

16  sentencing memorandum and in our objections to the

17  presentence report, which I'm sure the Court is familiar

18  with, that basically establishes that -- and I'm going to

19  paraphrase -- but the simple fact that a peer-to-peer

10:07AM 20  file-sharing program was utilized, if the Court were to

21  accept that as fact for purposes of sentencing, which I

22  expect the Court would do, that alone does not establish

23  sufficient evidence in support of this two-level

24  distribution enhancement.

10:07AM 25           And as an initial matter, the initial presentence

report to which we lodged this objection did precisely that. It was predicated entirely on the existence of that fact. And we objected accordingly.  As a practical matter, Your Honor, there's no evidence of intentional or knowledgeable distribution of alleged child pornography in this particular case.  The government in subsequent pleadings, in particular its own sentencing memorandum and its response to our sentencing memorandum on this issue, has basically, if I understand their argument correctly, laser-focused on the notion that they believe there's circumstantial evidence that Mr. Duggar was a knowledgeable, or to use a synonym, sophisticated computer user, so to speak.

I would note that none of the testimony in that capacity that the government heard at trial spoke to peer-to-peer programs in particular.  So even if the Court were to credit in full Mr. Branham's testimony, for example, and similar testimony that the Court heard, we believe that it's an insufficient evidentiary record to give rise to the application of this particular enhancement.

We would reference, and I appreciate the Court's clarification this morning that it is relying on the evidentiary record before it as opposed to kind of tieing us to sentences here and there in the offense conduct.  And I would address -- I would direct the Court's attention to testimony that came out at trial and evidence that came out

10:09AM 1    at trial that there were two instances involving

2    peer-to-peer file-sharing networks on Mr. Duggar's personal

3    devices, in particular, the personal devices that the

4    government does not even contend had anything to do with

10:10AM 5    alleged child pornography offenses.  In those two instances,

6    as the Court may recall, there were essentially two

7    commercial videos that were downloaded and no evidence at

8    all that there was any sort of distribution in the way that,

9    even outside of the context of illegal activity, perhaps

10:10AM 10   putting aside intellectual property issues, in the way that

11   people often used programs like Napster or LimeWire, as the

12   Court is no doubt familiar, where there would be theoretical

13   evidence that somebody, again, even in the context of

14   noncriminal conduct, would basically engage as much in

10:10AM 15   distribution intentionally, meaning sharing their own files

16   with others with intentionality, with purpose, with

17   knowledge, than simply just downloading and receiving.

18          The evidence that came out at trial was that

19   there were two instances.  I believe both were in 2017, at

10:10AM 20   least approximately, and they were downloads using two

21   separate programs, not including the program at issue in

22   this case, of two commercial videos, and that was it.  And

23   so based on the record that is before the Court and the

24   government and the defense's intention this morning that it

10:11AM 25   does not intend to put on any further evidence for the

10:11AM 1    Court's consideration this morning, there's an insufficient

2    evidentiary record to apply this enhancement and I would ask

3    the Court to sustain our objection.

4                THE COURT:  Thank you, Mr. Gelfand.

10:11AM 5                Ms. Marshall?

6                MS. MARSHALL:  Thank you, Your Honor.

7                Your Honor, just for the Court's awareness, I

8    will be addressing the distribution enhancement as well as

9    the pattern of activity enhancement.  Mr. Clayman will be

10:11AM 10   addressing the number of images and the sadistic and

11   masochistic, just for the Court's awareness, Your Honor.

12               Your Honor, under this enhancement, case law

13   states that the standard is that a fact-finder may

14   reasonably infer that he intended to distribute files unless

10:12AM 15   there is concrete evidence showing ignorance.  There are

16   many facts in this case that point that there is not

17   concrete evidence of ignorance regarding distribution.

18   First, we factually know that Joshua Duggar distributed

19   files of child pornography because we have the downloads

10:12AM 20   from Detective Amber Kalmer.  So we know that factually, it

21   did happen, that he did distribute child pornography.

22               So how do we look at the knowledge component?  As

23   the Court stated in *United States v. Dodd*, it's a fact

24   intensive inquiry.

10:12AM 25               THE COURT:  What year was *Dodd*?

10:12AM 1              MS. MARSHALL:  *Dodd* was 2010, I believe, Your

2      Honor.

3              THE COURT:  Prior to the 2016 amendments?

4              MS. MARSHALL:  Yes, Your Honor, but I believe

10:12AM 5      that we can still look at the facts of what Mr. Duggar was

6      doing in order to show his knowledge of distribution.  And,

7      Your Honor, we can look at the indirect evidence besides

8      just what he says about file sharing in his knowledge of

9      distribution.

10:13AM 10             Like the defendant in *United States v. Glassgow*,

11     Duggar was a savvy computer user.  We know that from

12     testimony from Clint Branham and also from Jim Holt, and

13     also from the actions that Mr. Duggar took to download child

14     pornography.  He downloaded and installed the Linux

10:13AM 15     partition.  He then downloaded and installed the BitTorrent

16     program, the TOR browser, all to circumvent Covenant Eyes

17     that was monitoring what he was doing on the computer.  We

18     also have his statement to law enforcement that he was

19     familiar with file sharing, so he says himself file sharing,

10:13AM 20     Your Honor.

21             We have his history with uTorrent that

22     Mr. Gelfand noted, that he had previously used the

23     BitTorrent/uTorrent programs to download a movie.  And we

24     also have Government's Exhibits 69 and 70 that show on two

10:14AM 25     occasions that Mr. Duggar was blocked from downloading

10:14AM 1    uTorrent.  And the explanation of this block in the Covenant

2    Eyes' e-mail sent to Joshua Duggar himself says the site

3    allows sharing of files, the content of the files may be

4    objectionable.

10:14AM 5            Government's Exhibit 30 at page 8 shows what the

6    BitTorrent program would have looked like.  Mr. Fottrell

7    testified to that exhibit.  And you see on that screen that

8    there is the downloaded speed and the uploading speed, Your

9    Honor.  There's ample evidence to show that Mr. Duggar is a

10:14AM 10   sophisticated computer user.  He downloaded this Linux

11   partition in order to circumvent Covenant Eyes.  He has a

12   history with peer-to-peer programming.  He factually

13   distributed child pornography because of the downloads to

14   Detective Amber Kalmer, and he has a history with uTorrent

10:15AM 15   and BitTorrent file-sharing programs, which that is the

16   point, is to share files, Your Honor.  Therefore, we would

17   ask that the distribution enhancement apply.

18           THE COURT:  There's no evidence in this case, is

19   there, that the file-sharing application was one where

10:15AM 20   someone had to share a file in order to get a file?

21           MS. MARSHALL:  Your Honor, that is how the

22   BitTorrent application works is that you cannot turn it off.

23   You cannot turn off the file-sharing part of that program.

24           THE COURT:  I understand that in a passive sense.

10:15AM 25           MS. MARSHALL:  Yes, Your Honor.

10:15AM   1           THE COURT:  But there are also mediums where --

2    and this may be in more closed environments where, in order

3    to take something, you have to give something in a more

4    active sense.  There's no evidence that that type of sharing

10:16AM   5    was involved here, is there?

6           MS. MARSHALL:  I'm not sure I'm following your

7    question, Your Honor.

8           THE COURT:  To the extent that there was

9    distribution -- and we know that there obviously was because

10:16AM  10    Detective Kalmer downloaded it -- it was entirely passive.

11           MS. MARSHALL:  You cannot turn off the

12    file-sharing aspect, Your Honor, correct.

13           THE COURT:  Thank you, ma'am.  Mr. Gelfand?

14           MR. GELFAND:  Just two very brief remarks, Your

10:16AM  15    Honor.  Exactly as the Court pointed out.  The government's

16    argument is essentially the tail wagging the dog saying if

17    there's file-sharing software, then there is knowing

18    distribution.  That is expressly not the law in the Eighth

19    Circuit and the Court should reject that.  The only other

10:17AM  20    thing I would point out for the record to the extent it's

21    necessary is, without quibbling with what Ms. Marshall

22    represented to the Court about how this particular software

23    works, I don't believe, certainly based on memory, that

24    there was any evidentiary record as to that issue at trial.

10:17AM  25    And there's certainly no evidence before the Court right

now, so I don't think that that actually matters, meaning that the argument itself carries the day.  But to the extent that the Court was inclined to give weight to that, I don't believe there's an evidentiary record to sustain it.

THE COURT:  Thank you.  The Court is going to sustain objection number 4 and not impose the two-level enhancement for distribution pursuant to 2G2.2(b)(3)(F).

In interpreting this guideline section, the Eighth Circuit acknowledges that the government bears the burden to prove by a preponderance of the evidence that the defendant knowingly engaged in distribution.  *United States v. Martinez*, 970 F.3d 986, the pinpoint I think is pages 988 and 989.  This is a 2020 Eighth Circuit case.  There, the Eighth Circuit -- I'll just read a quote here -- quote, "Effective November 1, 2016, the Sentencing Commission amended the guideline to add an express scienter requirement of knowledge.  USSG Supp. to Appendix C, Amendment 801, at 144-45, 2016.  The Commission stated that the amendment generally adopted the approach of three circuits that required a showing that the defendant knew of the file-sharing properties of the program."

So my observation would be that, prior to the Commission's 2016 amendment, it was relatively easy to apply the distribution enhancement, especially where there was evidence of peer-to-peer file-sharing even on a passive,

purely passive basis.  And for sure, the government cites the Court to such cases, but as we established with *Dodd*, that was a pre-2016 amendment case.

But Ms. Marshall is still correct in the sense that the Eighth Circuit has not expressly repudiated all of its prior case law.  Some of those principles still apply and I think that she argued, made correct legal arguments.  Nevertheless, the Court believes that post the 2016 amendment, the Court must take a more measured view of the evidence as it relates to the knowing intent to distribute.

It is not this Court's belief that a plain vanilla, passive distribution is enough to warrant the enhancement.  In *Martinez*, for example, the enhancement was deemed to have been properly applied because there was evidence in the record that the defendant, quote, "Knew the characteristics of the BitTorrent program" and was, quote, "fully aware of its capabilities.  Martinez admitted that he downloaded files through the BitTorrent program and that he knew that the program allowed others to access files that he placed into the shared folder."  That's *Martinez* at page 988.

The evidence before the Court at trial is somewhat of a mixed bag.  There was some lay testimony that's been referenced about Mr. Duggar being a power computer user.  Not exactly sure what that means or what one

does to achieve the status of being a power computer user.
But I suppose we know that that's true to the extent that
Mr. Duggar did have the knowledge and capability to install
a hard drive partition, that he did know how to use TOR, and
that he did know how to locate and use peer-to-peer
file-sharing programs.  So this may be a pretty close call,
and while it may be true that BitTorrent doesn't give you
the option to turn on or turn off the file-sharing part of
it, I'm not sure which side of the sword that helps.  I
mean, if a program had the ability to turn it off and
someone left it on, then that might actually be evidence
that they intended to share because they had the option not
to do so.

        The fact that this software doesn't give you that
option means two things.  It means that you can, as was
argued, and I don't know whether there's evidence of this or
not in the record, but there's a display or something on the
dashboard to show you download activity and upload activity
and I suppose from that there could be an inference that
there was knowledge.  But once we go there on a software
that doesn't give you the option, then you're basically
saying that all passive distribution on this type of
software qualifies for the distribution enhancement.  I
think that used to be the case.  I don't think that that is
the case.  I don't think that plain vanilla, passive

10:24AM 1   distribution is intended to receive this enhancement, so for

2   those reasons, the Court is going to sustain the objection.

3           Objection number 5.  This pertains to paragraph

4   98's application of a four-level enhancement for sadistic or

10:24AM 5   masochistic conduct.  In very short summary, Mr. Duggar

6   maintains that the evidence in this case does not depict

7   sadistic or masochistic conduct.  This is an enhancement

8   where the government bears the burden to establish the

9   appropriateness of this enhancement by a preponderance, but

10:25AM 10  once again, Mr. Gelfand, I'm going to give you the

11  opportunity to make any further argument that you like.

12          MR. GELFAND:  Your Honor, I can cut to the chase

13  on our argument here, and that's that the sole basis for

14  this enhancement in the presentence report and as the

10:25AM 15  government is arguing arises out of the so-called marissa

16  series, a particular zip file.  And the evidence that came

17  out at trial, and I want to be crystal clear, we're not

18  grappling with the government's descriptions of what aspects

19  of that series portray.  What we're grappling with, Your

10:26AM 20  Honor, is the inconsistent testimony that came out in the

21  record and the absence of any further evidentiary basis

22  today as to which particular images from this file were

23  actually successfully downloaded.

24          I would point the Court to the government's

10:26AM 25  characterization in its pleading is that there was an

10:26AM 1    extraction of at least approximately 58 images from this zip

2    file.  And that's a direct quote.  Page 3 of this Court's

3    order yesterday references that this is a series with 65

4    still images.

10:26AM 5            THE COURT:  Well, that was what Detective Kalmer

6    testified to.  There's other testimony about marissa, but

7    what you're referring to is Detective Kalmer --

8            MR. GELFAND:  And I appreciate that.  I think

9    that actually highlights and underscores what I'm saying,

10:27AM 10   Your Honor, which is that there's inconsistent -- there's

11   two issues.

12           THE COURT:  I agree.  I agree.

13           MR. GELFAND:  There's what the series as known to

14   law enforcement outside of the paradigm of this case

10:27AM 15   depicts.  And then there's a smaller subtext, broad as it is

16   in the record, of what portion or what fraction of that was

17   actually successfully downloaded.  And there is a delta

18   between those two.  And there's some ambiguity as to -- and

19   a complete lack of specificity -- as to what that delta is.

10:27AM 20   And so the reason that that's significant is that to the

21   extent that the Court is basically, or that the government,

22   I'm sorry, is basically arguing, if you look at this series

23   in its entirety, it contains images, still images, that

24   would meet the legal criteria to apply this guideline

10:28AM 25   enhancement, which we acknowledge is a broad enhancement.

10:28AM 1    We actually argue under 3553(a), without putting the cart
2    before the horse, that it's such a broad enhancement that it
3    applies in the vast majority of cases.  But as a practical
4    matter, our argument boils down to the fact that there's an
10:28AM 5    insufficient evidentiary basis based on the inconsistent
6    evidence at trial, but there's one consistency that matters,
7    and that's that there is a delta between what exists in the
8    series as previously or otherwise known to law enforcement
9    and what was ever successfully downloaded in this case.
10:28AM 10              That's the core of our objection, Your Honor, and
11   it's tied directly to the marissa series because that's the
12   sole basis for the enhancement.
13              THE COURT:  But there's evidence in the record --
14   I mean, Mr. Clayman, in a moment will respond, I'm certain,
10:29AM 15   about what's in the record as it relates to the marissa
16   series.  But assuming just for the sake of argument that
17   you're correct with regard to that particular item of
18   images.  There's also evidence in the record -- well, let me
19   back up.
10:29AM 20              Do you concede that in the Eighth Circuit, images
21   that would reflect child rape, an adult male penetrating a
22   minor, in the Eighth Circuit, that qualifies for the
23   application of the sadistic and masochistic content
24   enhancement?
10:30AM 25              MR. GELFAND:  As a general proposition, yes, Your

10:30AM 1  Honor.

2          THE COURT:  And that for purposes of imposing

3  that enhancement, we would just have to have evidence of one

4  such series or movie or image?

10:30AM 5          MR. GELFAND:  Yes, Your Honor, but if I could put

6  an asterisk on that.  From a procedural standpoint, I think

7  there is some significance to the fact that the entire basis

8  of the enhancement coming into sentencing without objection

9  from the government is the marissa series.  And so I think

10:30AM 10  if we're talking as a general proposition, yes, this

11  enhancement applies to a broad range of alleged images or

12  videos.

13          THE COURT:  So you are saying that the Court

14  can't look for testimony characterizing image content.  I

10:31AM 15  mean, there were lots of testimony about image content other

16  than the marissa series.  Are you saying this Court can only

17  look to what the government is saying about marissa?

18          MR. GELFAND:  Yes and no.  From a procedural

19  standpoint, I'm saying that the Court's analysis of the

10:31AM 20  imposition of this enhancement should be based on what's in

21  the actual presentence report and what has been

22  substantively and procedurally objected to along the way.

23          THE COURT:  Well, let's talk about Exhibit 51,

24  "asi se mama linda."  Minor girl, depictions of oral sex and

10:31AM 25  intercourse with an adult male.  Does that qualify as

10:32AM  1    sadistic and masochistic in the Eighth Circuit?

2                    MR. GELFAND:  I think if you're asking as a

3    general proposition, would that description qualify, yes.

4                    THE COURT:  Generally, and in this case.

10:32AM  5    Exhibit 51, there's evidence.

6                    MR. GELFAND:  Yes, I understand the Court doesn't

7    appear swayed by my argument, but I want to be crystal clear

8    for purposes of the record.  That's not the basis of the

9    enhancement in the PSR.

10:32AM  10                   THE COURT:  The Court has said at the beginning,

11   I'm not relying on the content of any objected to portions

12   of the presentence report.  This Court presided over the

13   trial.  It has evidence before it.  And it's this Court's

14   responsibility to properly calculate the guideline range.

10:32AM  15   And I'm looking at the evidence and I'm asking you whether

16   this evidence qualifies for the enhancement.

17                   MR. GELFAND:  And I understand, Your Honor.  And

18   as a practical matter, I think the only dispute,

19   disagreement that we have, Your Honor, is whether there's

10:33AM  20   any significance to the fact that the basis in the PSR is

21   limited to the marissa series versus other images and

22   videos.  I understand where the Court is coming from.  I

23   think the Court understands, even though it disagrees where

24   we are coming from, but that's our argument.

10:33AM  25                   THE COURT:  Thank you.  I really don't.  You have

10:33AM  1  said it three times.  I hear the words, but I don't

2  understand it.  I think it's a frivolous argument, actually.

3            Mr. Clayman?

4            MR. CLAYMAN:  Yes, Your Honor, just briefly.

10:33AM  5            As the Court just referenced, I'm not sure why we

6  are cabined to this specific marissa series in order to

7  apply this enhancement.  There were multiple videos that I

8  think both the government expert and the defense expert

9  testified were downloaded and viewed in this case that

10:33AM 10  depicted adult males having penetrative, vaginal sex with a

11  prepubescent minor female.  There's a video Your Honor just

12  referenced.  There's also, I believe, "mov_0216" which

13  depicted a similar thing with two prepubescent females.

14            So setting aside the defendant's attempts to

10:34AM 15  understand or parse the evidence regarding marissa, this

16  application of the enhancement is plainly appropriate here

17  based on those videos alone.  But just to briefly address

18  the marissa series, I think what Director Fottrell testified

19  to at trial is that he found hundreds of images from this

10:34AM 20  marissa zip file in the unallocated space of the computer.

21  So while Detective Kalmer said she was able to download 65,

22  Director Fottrell testified that, yes, the 65 exist, but

23  there were hundreds more on the defendant's computer, all of

24  which were admitted as Government's Exhibit 36.

10:34AM 25            THE COURT:  Do you have a citation to the

10:34AM 1    transcript?

2                MR. CLAYMAN:  Yes, Your Honor.  Regarding

3    Director Fottrell's testimony, I believe it was at page 523

4    to 524.

10:35AM 5                THE COURT:  I need the document number.

6                MR. CLAYMAN:  One moment, Your Honor, we can find

7    it.  I know it was the transcript from day three of the

8    trial.

9                THE COURT:  Was day three the afternoon or the

10:35AM 10   full day?

11               MR. CLAYMAN:  Day three was when Director

12   Fottrell began in the afternoon.  Day four is the full day.

13   We could provide the Court with the exact docket number at a

14   break.  I don't think we have it handy right now.  But in

10:35AM 15   that testimony, Directer Fortrell explained that he found

16   hundreds of images from the marissa series in the

17   unallocated space, which corroborated his understanding and

18   his opinion that the defendant downloaded that zip file from

19   uTorrent and then extracted all of those images and then

10:36AM 20   deleted them.  Of course, though, as I argued previously,

21   the marissa series is really irrelevant to the application,

22   although it does support it because we already have two

23   videos depicting an adult male having penetrative sex with

24   prepubescent females.

10:36AM 25               THE COURT:  Thank you.  The objection to the

four-level enhancement for sadistic and masochistic conduct will be overruled.  And I don't know that we even need -- the Court doesn't really need at this time to rule on the marissa trial evidence because it's clear that even without considering that series, there is substantial evidence in the record to support the imposition of this enhancement. I've mentioned Exhibit 51.  There's also Exhibit 53.  This is the 14-year-old girl.  There's Exhibit 55.  There is Exhibit 57, "test.avi."  There is Exhibit 33, minors eight to 12-years-old, sexual acts, intercourse.

And then there's Exhibit 39, "Daisy's Destruction."  Infant three to four months old, sexually abused, tortured.  So there is ample evidence in the trial record from which the Court deems it appropriate to apply the four-level enhancement here and the objection will be overruled.

I would note I made reference to the Eighth Circuit *United States v. Morgan*, 842 F.3d 1070.  The pinpoint is 1076 is one example of how the Eighth Circuit views and defines sadistic and masochistic conduct and that penetration, intercourse is sufficient.

Objection number 6.  The defendant is objecting to paragraph 99's application of the five-level enhancement for a pattern of activity involving sexual abuse or exploitation of a minor pursuant to guideline Section

10:39AM 1  2G2.2(b)(5).  It is the government's burden, once again, to

2  prove by a preponderance the appropriateness of the

3  application of this enhancement, but, Mr. Gelfand, I will

4  give you an opportunity to argue first.

10:39AM 5              MR. GELFAND:  Thank you, Your Honor.  May I

6  proceed?

7              THE COURT:  You may.

8              MR. GELFAND:  Your Honor, we don't believe that

9  the government has met its burden in establishing that this

10:40AM 10  particular five-level enhancement applies.  As a threshold

11  matter that the Court is no doubt cognizant of, the Court

12  would have to make a factual finding that there's a pattern

13  of activity for which there is a sufficient legal and

14  factual nexus between alleged conduct by Mr. Duggar when he

10:40AM 15  himself was a child and the crime of receipt of child

16  pornography for which he is being sentenced today.

17              At most, what the Court has is evidence, and this

18  is if the Court were to credit kind of in its entirety, so

19  to speak, the evidence before the Court that a child engaged

10:40AM 20  in alleged inappropriate touching of other children that

21  never became the subject of a criminal charge for which

22  there was never any sort of trial and for which there has

23  never been any sort of conviction.  And then approximately

24  20 or so years later, that same person allegedly committed a

10:41AM 25  computer-based child pornography receipt offense.  So

37

there's a number of issues that the Court would have to get past to apply this particular enhancement in this particular context.

Number one, the simple length of time between incidents is a matter of decades.  Number two, the allegations at issue are very different.  Number three, Mr. Duggar, at the time he allegedly committed the 20-or-so-year-old conduct was himself a child.  And I would point the Court and ask the Court to consider, just broadly speaking, that the reason we have juvenile justice systems is because even just neurological development isn't fully instate by the time -- at the time that this allegedly occurred.

And, fourth, that this never resulted in a charge, a trial or other sort of due process in which there was a plea or some other sort of adjudication, let alone a conviction.  And the government's reliance on *Woodward*, I would just note for the record, was predicated on a juvenile conviction.  And as a practical matter, that's not what we have here.  So I think that there's kind of two layers to this onion that the Court has to unpeel.  The first is, even if the Court were to credit all of the allegations as true, is that sufficient to apply the enhancement?  And, number two, does the Court make the factual finding that this legally and factually constituted a pattern of activity

10:43AM 1  sufficient to apply this very significant enhancement?

2         At its core, Your Honor, we adamantly disagree

3  that Mr. Duggar's sentence under the advisory sentencing

4  guidelines, at the very least, regardless of the sentence,

10:43AM 5  that the application of the advisory sentencing guidelines

6  should be enhanced based on alleged conduct when he himself

7  was a child.  That was approximately 20 or so years before

8  the sole crime for which he's now being sentenced, which is

9  Count One.

10:43AM 10        THE COURT:  Thank you, Mr. Gelfand.

11        MS. MARSHALL:  Your Honor, the government laid

12  out in its sentencing memorandum the federal statutes that

13  we believe apply in this case; 18 U.S.C. 2241 and 2244, as

14  well as the state offenses that would be equivalent to the

10:44AM 15  federal offenses if committed in an area of exclusive

16  federal jurisdiction.  We pointed to Arkansas Code Annotated

17  5-14-103 and 5-14-125, which is rape and sexual assault in

18  the second degree.

19        The evidence for this case is based on the

10:44AM 20  testimony of Bobye Holt, and to a lesser extent, Jim Bob

21  Duggar, Your Honor.  Bobye Holt testified both during the

22  pretrial hearing on November the 29th, 2021, and during

23  trial.  Specifically in regards to Jane Doe 4, Holt

24  testified that in 2005, Josh Duggar told her that he had

10:45AM 25  penetrated her vagina with his fingers.  Additionally, Bobye

Holt testified during that hearing and during the jury trial that Josh Duggar stated during March of 2003, that he told her he had touched the breasts and vaginas of Jane Doe 2, 3, and 4 under the clothes.

During the 414 hearing, when asked on cross examination by Mr. Gelfand to be specific with what Josh Duggar told her, she said that he told her that he touched their breast areas and their vaginal areas, sometimes on the clothes and sometimes under the clothes.  That was page 50 of the transcript of the 414 hearing.  And she again made the statement on redirect, which is page 56 of that transcript.

Jim Bob Duggar corroborated the conversation that happened, although did not corroborate all of the details of that conversation.  And during trial, Mrs. Holt testified again that Josh Duggar told her that he touched Jane Doe 1, 2 and 3, and that he had been touching their breast area and their private area on top of their clothes and sometimes under their clothes since the age of 12.  He was 15 years old at the age of that conversation.  That's page 952 of the transcript.  It was day five, Your Honor.

Your Honor, the Court had an opportunity to see and hear Mrs. Holt testify both times.  The government would submit that Mrs. Holt was truthful and honest and forthcoming in her testimony and that her testimony meets

the preponderance burden.  While the defense says that these
actions are too remote in time, the Eighth Circuit has taken
this into account.  In the *Woodward* case, the sexual abuse
that occurred in that case occurred 19 years before the
triggering of the enhancement.  Your Honor, I believe in
this case, it would have been approximately 18 years.  It's
approximately the same amount of time as that case.

Additionally, the Third Circuit has contemplated
this issue and ruled that conduct very similar to the
conduct that we have in this case, conduct from a defendant
from the ages of 15 to 17, was sufficient to trigger the
pattern of activity enhancement.

The enhancement does not say for an adjudication
of charges.  It says, two or more instances that happened.
Your Honor, Mrs. Holt talked about two or more instances
that Joshua Duggar told her.  If the Sentencing Commission
had wanted it to be adjudication, convictions, then that's
what it would say.  But it doesn't say that, Your Honor.  It
says, "instances of activity," and that's what we have in
this case.  Your Honor, we believe that the evidence is
sufficient to uphold the pattern of activity enhancement in
this case.

THE COURT:  What about Mr. Gelfand's argument
that, assuming that these actions occurred when Mr. Duggar
was 14, 15 years old, he was a juvenile and you can't look

10:48AM 1    back to conduct as a juvenile?

2                    MS. MARSHALL:  Your Honor, the Courts have

3    contemplated that issue in the *Woodward* case and the *Olfano*

4    case, Your Honor.  They have contemplated actions of a

10:48AM 5    juvenile that happened at approximately the age of 15, which

6    is the age that we have here with Joshua Duggar.  So the

7    Courts have contemplated that issue and have ruled that that

8    enhancement still applies.

9                    THE COURT:  Thank you.  Mr. Gelfand, would you

10:48AM 10   like to respond?  Not that you have to, but if you want to.

11                   MR. GELFAND:  I would, Your Honor.  Can I just

12   confer with my client for one quick second?

13                   THE COURT:  Sure.

14             (pause)

10:48AM 15                   MR. GELFAND:  Thank you, Your Honor.  Just two

16   brief things to respond to without rehashing what's been

17   abundantly briefed by the parties and argued this morning.

18                   Number one, I do think there's a distinction in

19   cases like *Woodward* where there's actually a juvenile

10:49AM 20   conviction, an adjudication, and situations where someone is

21   pointing back to alleged conduct that happened when someone

22   was a child.  I also think when it comes to what I call the

23   nexus argument -- I don't mean that in any sort of legal

24   significance, but that's kind of how I envision it, whether

10:49AM 25   the Court is ultimately going to make a factual finding of a

10:49AM 1    pattern of activity.  I think that even in a -- and it's a
2    tough thing to articulate, but even in a completely benign
3    context, there's a difference in saying that someone who is
4    in his 30s who commits an act directed at a child is
10:50AM 5    participating in essentially step two of a pattern because
6    that person, when he himself was a child, allegedly
7    participated in an act, allegedly victimizing a child.  And
8    I think that there's just a distinction between the two that
9    the Court can consider.  And it's not just a black letter
10:50AM 10   legal argument.  I don't think the Court should be
11   cabined -- to borrow a phrase -- by, okay, in the Eighth
12   Circuit, there's at least some theoretical precedent that a
13   juvenile conviction can apply.  It doesn't mean the Court
14   has to, in its own discretion, apply this enhancement.  And
10:50AM 15   we believe, based on the totality of the facts and the law
16   that controls this, the Court should not apply this
17   enhancement.
18            THE COURT:  Thank you, Mr. Gelfand.
19            Objection number 6 will be overruled.  The Court
10:50AM 20   will apply the five-level enhancement for pattern of
21   activity involving sexual abuse or exploitation of a minor
22   pursuant to Section 2G2.2(b)(5).
23            First of all, the Court would make reference and
24   incorporate by reference the evidence that was received
10:51AM 25   during an evidentiary hearing conducted on November 29th in

43

10:51AM  1    this case.  This is the hearing on the 414 evidence.  This

2    is the hearing that was alluded to where Ms. Holt and the

3    defendant's father testified.  Subsequent to that hearing --

4    and that hearing from November 29th, the transcript appears

10:52AM  5    in the record as Document 102.

6           The Court entered a written opinion and order

7    ruling on the 414 motion.  That appears as Document 106.

8    That was entered actually, it was filed on December 1st,

9    which was the first day of testimony in the case.  And the

10:52AM 10    order is like 15 pages long, so I'm going to adopt and

11    incorporate that by reference, but just for our purposes

12    today, I'm going to read some passages that summarize the

13    Court's findings of the testimony.

14           Referring to Doc 106 at page 10, the Court wrote,

10:52AM 15    "The defendant revealed to the Holts," this was on March --

16    testimony was that Bobye Holt and her husband were summoned

17    to the Duggar residence on March 30th of 2003 to discuss an

18    incident that had just happened.  Now quoting the defendant,

19    Josh Duggar, "revealed to the Holts that he inappropriately

10:53AM 20    touched a child that day, identified during the hearing as a

21    Jane Doe.  Defendant acknowledged that he touched this child

22    while she was sitting on his lap during bible time and he

23    used his fingers to contact her vaginal area through her

24    clothes.  He also confessed that he had touched the breasts

10:53AM 25    and vaginas of three other victims on multiple occasions,

10:53AM 1  also over their clothes, sometimes when they were asleep and

2  sometimes when they were awake."  And for the record, on

3  March 30th of 2003, the defendant, Mr. Duggar, would have

4  been 15 years old.

10:54AM 5       In the next paragraph on page 10, the Court

6  summarizes a second conversation that Joshua Duggar had with

7  Ms. Holt, this time in Little Rock.  The Court explains that

8  the Holts invited the defendant to live with them for a

9  brief time in Little Rock so that they would have time to

10:54AM 10 talk with him and get to know him better.  Ms. Holt

11 testified that one evening, the defendant entered her

12 bedroom to talk with her and Mr. Holt.  Mr. Duggar confessed

13 to Mrs. Holt that he had not told her the complete truth

14 about past incidents of child molestation.  Specifically, he

10:55AM 15 told Ms. Holt that on March 30, 2003, he touched a Jane Doe,

16 both over her clothes and under her clothes and admitted

17 that he used his fingers to penetrate the child's vagina.

18      At the top of page 11, the Court said, quote,

19 "Based on Mrs. Holt's credible testimony, the Court finds by

10:55AM 20 a preponderance of the evidence that the defendant committed

21 a previous act or acts of child molestation as defined by

22 Rule 414."  And more specifically, the Court found that the

23 defendant had committed sexual assault in the second degree,

24 which was made criminal by Arkansas Code Annotated Section

10:56AM 25 5-14-125.

45

10:56AM 1          So the Court has in fact already made a finding

2     by a preponderance of the evidence that the defendant here

3     engaged in sexual criminal conduct with a minor.  I

4     acknowledge that there was no adjudication.  There was no

10:56AM 5     conviction for that.  But the Court is not aware of any

6     requirement that there be an adjudication, and in fact the

7     Court can make such findings for sentencing purposes and

8     guideline calculation purposes by a preponderance of the

9     evidence, which is the very standard that the Court used

10:57AM 10    during the 414 ruling.

11         I would also incorporate by reference the trial

12    testimony from Ms. Holt.  That can be found at Doc 127 at

13    pages 152 through 172 when she testified in substance to the

14    same testimony that I just summarized.

10:57AM 15         And so based on the transcript from the

16    November 29th hearing, based on the Court's order which it

17    adopts and incorporates by reference here, and based on the

18    additional trial testimony that I have just cited, the Court

19    believes that there has been conduct by the defendant that

10:57AM 20    would be a sexual assault upon a minor that was a violation

21    of Arkansas law and that that triggers the pattern of

22    activity enhancement.

23         The Eighth Circuit in *United States v. Emmert*

24    held, quote, "There is no temporal limitation that restrains

10:58AM 25    the trigger of this guideline provision."  878 F.3d 618.

46

10:58AM  1    The pinpoint is 621.  That case cites the *Woodward* case that

2    both parties have discussed today which observes that

3    2G2.2(b)(5) contains no temporal limitation and conduct

4    separated by 19 years could trigger the enhancement.

10:58AM  5         Here, the Court would observe that, yes, it's

6    true that this activity happened 18 or 19 years ago.  Yes,

7    Mr. Duggar was a minor at the time.  He was 15.  The one

8    Jane Doe that we have been talking about was five.  There

9    was a 10-year age difference.  I agree with the government

10:59AM 10    and the authorities that they have cited that would suggest

11    that the fact of Mr. Duggar being a minor at the time does

12    not preclude the imposition of this enhancement.  I do think

13    that when we get to the 3553(a) factors that the temporal

14    issue is relevant and we can take these arguments up again,

10:59AM 15    but the Court's first obligation is to correctly calculate

16    the guideline range, and I believe on these facts that the

17    enhancement applies.

18         Objection number 7.  Defendant's objection

19    number 7 is with regard to paragraph 101 of the presentence

11:00AM 20    report.  There, Officer Nguyen has held Mr. Duggar

21    accountable for 725 images of child pornography.  It takes

22    600 images for a five-level enhancement.  Mr. Duggar

23    contends that at most, there were 127 images documented in

24    the trial record and that at most, a two-level enhancement

11:01AM 25    should apply.  Again, this is the government's burden to

11:01AM  1    prove the enhancement, whether it applies at all, and if so,

2    which level applies.  It is Mr. Duggar's objection, so,

3    Mr. Gelfand, I'll give you an opportunity to make any

4    further argument that you like.

11:01AM  5                MR. GELFAND:  Thank you, Your Honor.

6                With respect to the number of images, just to

7    provide some clarity, I kind of want to respond to this in

8    two separate ways.  The number that we have tethered to is

9    straight out of the government's expert report in this case.

11:01AM 10    But if the Court were to look instead at how the government

11    basically characterized its computation of images in the

12    sentencing pleadings --

13                THE COURT:  Mr. Gelfand, the government's expert

14    report is not before the Court.  I don't get discovery

11:02AM 15    material.

16                MR. GELFAND:  I understand, Your Honor.  With

17    respect to what the government is basing its computation on

18    and what the probation office based its computation on, I

19    would direct the Court specifically to very specific files

11:02AM 20    that reduce the number of images, so to speak, from the

21    computation in the presentence report.  The first is the --

22    and I'm just going to use the file names, Your Honor -- the

23    "playtoysweetie" file, which the government's sentencing

24    memorandum -- well, let's back up for a second.  The

11:02AM 25    government relies on essentially Exhibit 39 and Exhibit 44,

11:02AM 1    both of which were introduced as basically summary exhibits

2    on day three of the trial.  It's page 530 and page 542 of

3    the transcript.  And the government expressly says that in

4    the evidence before the Court, that this file was attempted

11:03AM 5    to be accessed, but was unable to produce the video or

6    images at trial by way of the thumb drive, the point being

7    because they weren't on the computer in either allocated or

8    unallocated space.  So that should be zero images.

9              With respect to the DD Torrent set of --

11:03AM 10             THE COURT:  Why is that?

11             MR. GELFAND:  Because there's no evidence that it

12   was actually on the computer, the file itself.  Because

13   there's a distinction between Torrents and files, be they

14   images or videos.  And what the government is doing here is

11:03AM 15   asking the Court to include Torrents without the actual

16   files.

17             THE COURT:  Well, what if there's evidence that

18   the defendant viewed --

19             MR. GELFAND:  I think that as a practical matter,

11:04AM 20   I think that there needs to be evidence -- that evidence

21   would be inconsistent with the absence of the evidence that

22   it's on the actual computer itself.

23             THE COURT:  Well, not if it had been deleted, it

24   wouldn't.

11:04AM 25             MR. GELFAND:  I think it would, because the

11:04AM 1    unallocated space includes the so-called deleted.

2            THE COURT:  That's what I'm saying.  What

3    difference does it make for this enhancement whether it was

4    deleted or not?

11:04AM 5            MR. GELFAND:  Because even if it was deleted, it

6    would be in the unallocated space.  And in this particular

7    instance, it wasn't in the unallocated space.

8            THE COURT:  In that particular --

9            MR. GELFAND:  Correct.  In the DD Torrent, the

11:04AM 10   argument -- and I think that argument stands, but the

11   argument is even stronger for the defense, because as the

12   Court may recall, both experts -- the experts, as the Court

13   no doubt observed, disagreed on quite a bit, but they agreed

14   on the general parameters of what a Torrent is.  In essence,

11:04AM 15   borrowing the same analogy that it's a recipe of ingredients

16   as opposed to what -- as opposed to putting a recipe

17   together and actually making something.  And the DD Torrent

18   evidence, the government uses language that it's, quote,

19   "associated with five video files."  They rely again on

11:05AM 20   Exhibits 39 and 41, which are just summary files of lists of

21   Torrent files.  And as a practical matter, this is literally

22   just a Torrent file.  These were not -- there's no evidence

23   before the Court that the DD Torrent, DD.Torrent files, were

24   ever actually downloaded as opposed to the Torrent itself.

11:05AM 25   And that's insufficient legally to be included within the

number of images.

I would incorporate -- and I don't think we need to rehash it -- that there's ambiguity in the record on the marissa.zip files and how many images should be included. The government contends that there were, quote, "approximately 215 images."  I don't even know how you can approximate images -- there's either images or there's not -- that were found in unallocated space.  But then there's separate findings and separate allegations that there were extractions of at least approximately 58 images from the zip file.  And so there's significance there to what, if any, number is applied from the marissa series based on everything that we not only argued before, but that the Court observed.

And then in a separate category, which I acknowledge is a separate legal argument as opposed to the Torrents and the lack of substantive evidence in the record, there's -- and, again, I'm just using the file name -- the "pedomom.wmv" file.  And there's evidence that seemed undisputed.  Mr. Clayman's cross examination, both the question and the answer incorporating in essence the question into it by Ms. Bush when she testified, that whoever viewed this particular file only viewed the first 29 seconds of this video, which contained -- those 29 seconds, which contained no alleged child pornography.  And that as a

11:07AM 1   practical matter, we don't think that that should qualify as

2   75 images.  Now, that's a different argument because we

3   acknowledge that that file was on the device in full even if

4   it wasn't --

11:07AM 5               THE COURT:  So under relevant conduct, it counts?

6               MR. GELFAND:  It can, but I don't think the Court

7   necessarily has to include it.  I think there's some

8   discretion based on the totality of the evidence.

9               THE COURT:  Let's start with what you concede.

11:07AM 10   Seven videos times 75 images, we're at 525.  You concede

11   525, correct?

12               MR. GELFAND:  In other words, if the Court were

13   to exclude Torrents, then the Court would get to 525 with

14   those videos.  And if the Court were to disregard kind of

11:08AM 15   the expert disclosure argument, so, yes.

16               THE COURT:  This isn't a negotiation.  I'm

17   asking.

18               MR. GELFAND:  I understand.  I understand.  I'm

19   being very precise on the math here because it matters,

11:08AM 20   because 525 obviously is lower than 600.  It's higher than

21   the two-level.  It gets us to the three-level.  So I think

22   that the government would then have to find essentially 75

23   more images, so to speak.  And I don't think there's a

24   sufficient evidentiary record to do that.

11:08AM 25               THE COURT:  Thank you.  Mr. Clayman?

11:08AM 1        MR. CLAYMAN:  Yes, Your Honor.

2        I think you cut sort of to the core of the issue

3 here.  The defendant's arguments about Torrent files or

4 whether something was accessed in VLC player are irrelevant.

11:08AM 5 They are sort of red herrings because we have undisputed

6 evidence that there were seven videos downloaded to the

7 computer via uTorrent, which brings us to 525.  For the

8 record, those videos and storyboards depicting the contents

9 of those videos were admitted as Government's 45 through 58.

11:09AM 10 I think it's undisputed that they were all child pornography

11 videos.  The remaining 75, or rather 76 images, at a

12 minimum, to get us to the 600 count come from the

13 marissa.zip file that we have been discussing.

14        As I referenced earlier, Director Fottrell

11:09AM 15 testified that he found hundreds of images from the zip file

16 in the unallocated space of the defendant's computer.  These

17 images were admitted as Government's Exhibit, I believe it

18 was 36 or 33; 36.  We have copies of that exhibit here.  The

19 defendant appears to be disputing whether there's over 75

11:09AM 20 images of child pornography.  We can certainly go through

21 them, but I would proffer for the Court, there were hundreds

22 of images depicting child sexual abuse material from the

23 marissa series found in the unallocated space, which

24 confirms, as Director Fottrell said in his direct testimony,

11:10AM 25 that they at one point existed on the computer, meaning they

11:10AM 1   were extracted from the marissa file that he downloaded,

2   existed, and then deleted.  I think we have cited ample case

3   law in our sentencing memorandum and our reply brief that

4   that is appropriate for this Court to consider in its total

11:10AM 5   number of images and I think that certainly brings us over

6   600.

7           Again, we have copies of that exhibit.  We can go

8   through it if the Court would like, but I would proffer for

9   the Court, there's certainly over 75 images from within the

11:10AM 10  marissa series that were found on the computer, in addition

11  to the seven video files we discussed.

12          THE COURT:  Thank you.  Well, the Court gets to

13  525 images very easily.  I think that the record establishes

14  that we're all in agreement with that.  I was prepared to

11:11AM 15  make a lengthy record about that and to summarize

16  Mr. Fottrell's testimony about the VLC Media Player and the

17  uTorrent program and how it goes out and fetches and all

18  that sort of thing, the fact that these seven videos, he

19  testified that they were actually downloaded and actually

11:11AM 20  viewed.

21          I think all of this testimony, rather than just

22  reading it, I'm just going to refer to the record.  It's

23  Document 125.  And I think that starts at about page 268 and

24  we go through 271, 281, and maybe page 282.  I would also

11:12AM 25  note that Ms. Bush conceded at trial that the marissa.zip

11:12AM 1   images were unzipped, placed in a folder on the desktop, and

2   then opened in the image viewer.  That's Document 128,

3   page 39.  She further testified that according to her

4   analysis of the HP desktop, the user of that computer viewed

11:13AM 5   approximately 12 files of child pornography from May 14th to

6   May 16th.

7            Exhibits 39 and 40 explained the Torrent files

8   that were downloaded.  Those videos are in the record.  The

9   actual videos are on a thumb drive entered as Exhibit 45.

11:13AM 10  But then the storyboards that document the seven different

11  videos that were downloaded are Exhibits 46, 48, 50, 52, 54,

12  56, and 58.  So that's the record of how we get seven

13  videos.  Under the guidelines, each video is worth 75

14  images, and the math is 525.

11:14AM 15           So how do we get to 600 or more?  One way would

16  be to get this exhibit out and accept Mr. Clayman's

17  invitation to look at those and count individual numbers.

18  I'm not going to do that.  I scoured the record, and

19  sometimes when we see testimony about marissa, it's 65

11:14AM 20  images.  That's the number that was downloaded by Agent

21  Kalmer.  Somebody else has said that there's 200 images.

22  Somebody else has said there's hundreds of images.  There

23  are other images separate and apart from marissa that are

24  discovered in different sections of the hard drive.  I have

11:15AM 25  no idea of knowing when I'm double counting and when I'm not

11:15AM 1    double counting, and I don't know whether to use 65 images

2    or 200 images.  And I'm not going to go through the actual

3    exhibit.

4              So we know that there's 525.  I'm prepared to add

11:15AM 5    65 to that and that would get us up to, like 590.  But it

6    doesn't get us to 600, which is where the next level would

7    kick in.  And, you know, I believe that if additional

8    testimony was put on or if we actually got these materials

9    out and actually looked at them and counted them, you know,

11:16AM 10   probably we would get over 600.  But I don't know that.  And

11   it's the government's burden.  And I'm going to sustain in

12   part the objection.  I'm going to make a finding that there

13   is somewhere between 525 and 600 images, but there aren't

14   enough images to reach the threshold that would invoke the

11:16AM 15   five-level enhancement.

16             Well, let me just for purposes of being able to

17   revise the presentence report, the Court is going to make a

18   finding that there's 525 images associated with the seven

19   videos and 65 images associated with marissa that I can find

11:17AM 20   by a preponderance of the evidence.  And if my math is

21   right, that's 590 images that the defendant will be held

22   accountable for, and that corresponds to four increases to

23   the base offense level pursuant to 2G2.2(b)(7)(C).

24             I was hoping that we could get at least through

11:17AM 25   the objections before we took a break.  Let me see how much

11:17AM 1   progress we can make in the next five or 10 minutes, but we

2   will take a break soon.

3          Next, I'm going to group together the defendant's

4   objections 8, 9, 15, and 19 because they all involve math

11:18AM 5   that will work itself out at the end of the day.  They have

6   to do with the addition of the enhancements that have been

7   imposed and the adjusted offense level and the total offense

8   level and that sort of thing.  So I don't need to rule on

9   those now.  I will in effect be ruling on those whenever I

11:18AM 10  calculate the guideline range, so I'll reserve ruling on

11  those until I actually calculate the guideline range.

12         One of these objections, though, does go to the

13  notion of statutory maximum and whether the sentences should

14  be imposed consecutive or not to achieve a guideline range

11:19AM 15  sentence.  Officer Nguyen, those paragraphs, I think it's

16  138, 139 and 163, will be impacted by the fact that the

17  Court vacated the conviction on Count Two.  And so you will

18  need to make revisions to show that the statutory -- that

19  there's only one count of conviction.  It's a 240-month

11:19AM 20  maximum and then that -- well, that impacts the guideline

21  range at some point, and those revisions should be made.

22         Objection number 10 is an objection to

23  paragraph 114.  This objection is to a paragraph that

24  describes the conduct that we discussed earlier from when

11:20AM 25  Mr. Duggar was 14 or 15 years old.  Officer Nguyen has

described that conduct in the "other criminal conduct"
section of the presentence report.  There's an objection to
including it at all, but in light of the Court's ruling with
regard to objection number 6, perhaps, Mr. Gelfand, your
objection number 10 is moot at this point?

          MR. GELFAND:  I'm fine with that, Judge.

          THE COURT:  All right.  The Court will find that
it's moot.

          Objections 11 and 12 pertain to paragraphs 128
and 129.  This is where the probation officer has described
the so-called Ashley Madison scandal.  Mr. Duggar takes the
position that all information about the so-called Ashley
Madison scandal should be stricken from the presentence
report.  He says that his admission to the press that he had
a quote, unquote, "addiction to pornography" should not be
considered a true addiction.  Instead, he maintains that his
admission to the press was more along the lines of admitting
to having a moral or religious shortcoming rather than a
true addiction, which he maintains has never been proven.
Defendant further notes that none of the information in
these paragraphs should factor into the Court's
considerations of the factors under Section 3553(a).

          So that's kind of a summary of the objections 11
and 12.  Would you like to make any further argument,
Mr. Gelfand?

11:22AM  1           MR. GELFAND:  No, we don't need to make any
2    further argument.  I just don't think that alleged
3    infidelity, for lack of a better way of putting it, should
4    be included in a presentence report.  I've literally never
11:22AM  5    seen it before.  That in and of itself is not an argument,
6    but it provides the Court perhaps some context for the basis
7    of the objection.
8           THE COURT:  All right.
9           MR. ROBERTS:  Your Honor, the government's
11:22AM 10    position is that we will leave it to the discretion of the
11    Court if it needs to be in the PSR.  However, with respect
12    to the consideration of the 3553(a) factors, I think there's
13    enough information for the Court to consider that.
14           The defense's own objection shows that there's a
11:23AM 15    scandal in approximately 2015 involving infidelity.  Two,
16    the defendant was identified as a participant in that
17    infidelity.  And, three, they are openly showing or telling
18    the Court that this shows moral shortcomings, infidelity.
19    Their argument at sentencing is that he is a family man
11:23AM 20    deserving of a downward variance.  I think that is something
21    ripe for the Court to consider when addressing the
22    defendant's argument.
23           So for purposes of 3553(a), I think it's ripe
24    information.  I'll leave it to the discretion of the Court
11:23AM 25    whether it should be in the PSR or not.

11:23AM  1          THE COURT:  The Court will make the observation
      2   that it doesn't really need to rule on this objection.  It
      3   is not guideline determinative.  As to whether any of the
      4   content of these two paragraphs is relevant for any purpose
11:24AM  5   or whether it should be taken into consideration under
      6   3553(a), let me categorically say that I agree with
      7   Mr. Gelfand that, as it relates to the Ashley Madison
      8   scandal, the notion of infidelity should not and will not
      9   factor in to the Court's consideration for any sentencing
11:24AM 10   purposes.

     11          However, I do think that certain aspects of the
     12   information in these paragraphs is relevant.  For example,
     13   there's a reference to marriage counseling, which depending
     14   on the setting and the situation, is appropriate for the
11:25AM 15   sentencing purpose of directing physical and mental health
     16   treatment programming.  And I think that it is information
     17   that would be helpful to the Bureau of Prisons and later to
     18   the supervising probation officer, so I think it's relevant
     19   for that purpose.

11:25AM 20          The addiction to pornography is relevant in
     21   several respects.  My analogy would be to drug addiction.
     22   In order for the Bureau of Prisons to flag the need for drug
     23   treatment programming, there has to be something in the
     24   presentence report that would note an abuse of drugs or an
11:26AM 25   addiction to drugs.  That's where they look to determine

11:26AM  1   programming that should be administered.  And I think a

2   pornography addiction is relevant for programming treatment,

3   both while incarcerated and later on supervised release.

4   And while there is absolutely nothing illegal about adult

11:27AM  5   pornography, and it's not clear what the addiction is to,

6   but let's assume that it's to adult pornography that was

7   being referred to there.  That is an important -- that

8   statement, that recognition, is an important part to

9   treatment programming for child pornography issues, and so I

11:27AM  10  think that it is relevant and properly included for that

11  purpose.

12          We'll take up conditions of supervised release in

13  a moment, but at least potentially, it is relevant to the

14  issue about conditions of supervised release and whether the

11:28AM  15  defendant will be prohibited from viewing any types of

16  pornography.  So I'm going to leave it in and I think that

17  it is relevant and the Court may very well consider it for

18  those purposes, but not for any other guideline or 3553(a)

19  purposes.

11:28AM  20          Objection number 14 -- we're almost finished --

21  pertains to paragraph 136.  At the time of the filing of the

22  initial presentence report, the probation officer was

23  relying on financial information that Mr. Duggar had

24  provided initially to his supervising probation officer

11:29AM  25  while on pretrial release.  The objection was that it wasn't

current information and that it would be updated.  Kind of
my understanding at this point is that that information was
updated and that the final presentence report at paragraph
136 reflects updated information.

        Is that correct, Mr. Gelfand?

        MR. GELFAND:  It is, Your Honor.  And for that
reason, we will just withdraw that objection.

        THE COURT:  Objection 14 is withdrawn.

        Objection 16 has to do with an objection to the
special conditions that were recommended by probation in
paragraph 147 regarding restricting contact with minors.
This is not guideline determinative.  Paragraph 147 is what
the Court's probation officer is recommending.  What the
Court's probation officer recommends is not guideline
determinative and may or may not be what the Court imposes,
but the Court need not take that issue up at this time.  I
will reserve this issue about future contact with minors
when we get to supervised release conditions.

        Similarly, there's an objection to paragraph 152.
The probation officer is recommending a polygraph testing
condition while on supervised release.  Again, that's her
recommendation.  That's her opinion.  Can't really object to
her opinion.  You can object to the imposition of it, but
we'll take that up in due course when we get to supervised
release conditions.

11:30AM 1          Objection 18 has to do with special assessments.

2    The presentence report as written imposes $100 per count of

3    conviction for a total of $200.  Obviously, we need to

4    revise that and only impose a $100 special assessment.

11:31AM 5          Objection number 20, I'm not sure if this is a

6    live objection or not.  It dealt with paragraph 165.

7    Restitution is a possibility in these types of cases, but

8    there is no restitution petition before the Court, so is

9    this -- can this be withdrawn?

11:31AM 10         MR. GELFAND:  I'm sorry to interrupt, Your Honor.

11   It's completely moot.  It can be withdrawn, Your Honor.

12         THE COURT:  So objection 20 is withdrawn because

13   there is no restitution being requested.

14         Objections 21 and 22 pertain to paragraphs 167

11:31AM 15   and 168.  This is where the probation officer opined that in

16   her opinion, there are no grounds for a traditional downward

17   departure and/or a variance.  The probation officer's

18   opinion is the probation officer's opinion.  It's not

19   guideline determinative and what matters is the Court's view

11:32AM 20   when it imposes sentence.  Certainly, to the extent that

21   there's a request for a traditional departure, we can take

22   that up.  My understanding is that what we're really dealing

23   with is a variance under the 3553(a) factors, but, again,

24   it's not guideline determinative.  The Court need not rule.

11:32AM 25         Mr. Gelfand, has the Court addressed and resolved

11:32AM 1   all of Mr. Duggar's objections at this point?

2   MR. GELFAND:  Yes, Your Honor.

3   THE COURT:  All right.  It's 11:30.  We need to

4   take a break.  We have been working our court reporter very

11:32AM 5   hard.  We are going to need to take some amount of a lunch

6   break to allow her fingers to kind of recoup.  They normally

7   rebound in about 30 or 40 minutes.  Let's say, is 40 minutes

8   good for everyone, or would you like to take a longer lunch

9   break?

11:33AM 10   MR. ROBERTS:  That's fine, Your Honor, for the

11   government.

12   MR. GELFAND:  We're fine with whatever the Court

13   prefers.

14   THE COURT:  So let's come back at, let's say

11:33AM 15   12:10.  Be in recess until 12:10.

16   (Recess taken from 11:33 a.m. to 12:19 p.m.)

17   THE COURT:  Mr. Duggar, we began the hearing and

18   I reviewed the procedural history in the case with you.  And

19   then the Court turned its attention to the attorneys to deal

12:20PM 20   with the objections and the objections have now been

21   addressed, so I'd like to turn my focus back to you now.

22   What I would like to do now is to explain to you

23   the various factors that the Court has considered as it

24   contemplated and has analyzed what in its opinion would be

12:20PM 25   an appropriate sentence for you in this case.

12:20PM 1        Federal sentencing involves a two-step framework.

2   In step one, the Court is obligated to calculate what we

3   call the guideline range of punishment, and you have heard

4   the attorneys and I discussing various inputs to that

12:21PM 5   calculation.

6        The Court must calculate the guideline range, and

7   the Court must take the guideline range into consideration

8   as one, among many, factors at sentencing.  The guideline

9   range itself is merely advisory to this Court.  This Court

12:21PM 10  is not bound to impose a guideline range sentence, but it is

11  required to begin its analysis with considering the

12  guideline range as one appropriate sentencing factor.

13       After the Court considers the guideline range, we

14  move to step two of the process.  In step two, the Court is

12:22PM 15  required to consider several other sentencing factors and

16  apply those factors to the defendant and to the case and to

17  the facts in the specific matter then before the Court.  The

18  idea here is that federal sentencing should not be a

19  one-size-fits-all approach.  So we begin with the guideline

12:22PM 20  range, and then we use the factors in the second step of the

21  process as a means by which the Court can impose an

22  individualized, custom-tailored sentence to fit the case and

23  the circumstances then before the Court.

24       So that's the big picture idea.  We must begin

12:22PM 25  with step one, and when we get to step two, I will further

12:23PM 1    summarize what the other sentencing factors are.

2                    THE DEFENDANT:  Thank you.

3                    THE COURT:  So the guideline calculation involves

4    the Court determining two component parts.  The first part

12:23PM 5    is called the offense level.  The second part is called the

6    criminal history category.

7                    As to the offense level, your conviction for

8    receipt of child pornography is what is referred to as a

9    non-hands-on child pornography case, and the Court uses

12:24PM 10   Guideline 2G2.2.  There's a base offense level, and then

11   there are other enhancements.  These are called special

12   offense characteristics.  The idea is that the special

13   offense characteristics are attributes of how the particular

14   crime was committed and they increase the base offense level

12:24PM 15   from what would otherwise be a plain vanilla way of

16   committing a crime.  So, here, the base offense level is a

17   22 pursuant to 2G2.2(a)(2), so that's where we begin.

18                    Now we add specific offense characteristics.  The

19   first one is a two-level enhancement because the images of

12:25PM 20   child pornography in this case involve prepubescent minors.

21   I'm going to ask the probation officer at paragraph 97 of

22   the presentence report to delete the distribution

23   enhancement, leave the paragraph number unchanged, and

24   instead just say, "Deleted per ruling of the Court."

12:25PM 25                    The second enhancement -- we discussed this

66

12:25PM 1    earlier -- is a four-level enhancement because the images

2    portrayed sadistic and masochistic conduct.

3            Next, there is a five-level enhancement that's

4    being applied because of your prior history that

12:26PM 5    demonstrates a pattern of activity involving the sexual

6    abuse or exploitation of a minor.

7            Then there's an enhancement of two levels just

8    because the conduct involved the use of a computer.

9            And then there is a four-level enhancement

12:26PM 10   because of the number of images that you have been held

11   accountable for.  I explained that earlier.  You're being

12   held accountable for 590 images.  That correlates to a

13   four-level enhancement.

14           And if we add all of these enhancements to the

12:27PM 15   base offense level of 22, that gets us up to an adjusted

16   offense level of 39.

17           We then go to the next chapter in the guidelines,

18   and this would be an opportunity, for example, for the Court

19   to award a downward adjustment for acceptance of

12:27PM 20   responsibility.  But per the guidelines, you do not qualify

21   for acceptance of responsibility.  And so the total offense

22   level, which is the final offense level, is the same as our

23   adjusted offense level of a 39.  So that's the first part of

24   the formula.

12:28PM 25           The second part of the formula is your criminal

12:28PM 1   history category, and for that, we look to your prior

2   criminal convictions, if any, and those would score points.

3   And then based on how many points, you would fall out in one

4   of six categories.  In your case, this is a very easy

12:28PM 5   calculation because you have no prior criminal convictions.

6   You score zero criminal history points and that places you

7   in the lowest criminal history category, which is a category

8   I.

9           Now, knowing those two inputs to the formula, the

12:28PM 10   Court then consults what we call the sentencing grid and I

11   find the point on that grid where an offense level 39

12   intersects a criminal history category I.  And, there, I

13   calculate the guideline range as follows:

14           The grid would actually say that you should be

12:29PM 15   sentenced to a period of incarceration of between 262 and

16   327 months.  However, there is a rule built into the

17   guidelines that says the guideline range can never exceed

18   the statutory maximum, which in this case is 20 years.  And

19   when this condition presents, then the guideline range,

12:29PM 20   although it's not much of a range, is defined as the

21   statutory maximum.  So your guideline range for

22   incarceration is recommended at 240 months.  It's further

23   recommended that the Court impose a period of supervised

24   release for some period of between five years and the rest

12:30PM 25   of your life.

12:30PM 1          It is also recommended that the Court impose a

2      fine in the range of $50,000 and up to as much as $250,000.

3      There is also the requirement that the Court impose a basic

4      special assessment in the sum of $100 per count of

12:30PM 5      conviction, and in this case, it's a total of $100.

6          And then in these types of sex offense cases,

7      there is an additional special assessment that should be

8      imposed in the sum of $5,000, and that's mandatory unless

9      the Court makes a finding that you are indigent.  And then

12:31PM 10     pursuant to Title 18 U.S.C. Section 2259(a), there is an

11     extra special assessment that applies in these types of

12     cases, and the sum is to be not more than $35,000.

13          So this is the guideline range.  This is step

14     one.  This is where the Court is required to take this range

12:31PM 15     into consideration as its first sentencing factor.  But as I

16     said, the guideline range is merely advisory and it

17     shouldn't be a one-size-fits-all.  So now we go to step two,

18     as I explained earlier.

19          The other sentencing factors that the Court

12:32PM 20     considers in step two include the Court's obligation to look

21     at the totality of the facts and circumstances that surround

22     your offense of conviction and your offense conduct.  The

23     Court is also required to take into account your personal

24     history, background, and characteristics.  And, again, this

12:32PM 25     is a reason why letters to the Court from family members are

12:32PM  1    helpful because they give the Court broader insight.

2              The Court is also required when sentencing you to

3    avoid any unwarranted differences in sentencing as compared

4    to other similar defendants.  And when I say other similar

12:33PM  5    defendants, we're talking about other defendants with the

6    same or similar prior criminal history who have been

7    convicted of the same offense of conviction or a similar

8    offense of conviction.

9              At the end of the day, there's another factor

12:33PM 10    that in my view kind of sums up the entire sentencing

11   process.  The Court is required, using its best judgment, to

12   impose a sentence that will be sufficient, but not greater

13   than necessary, to achieve the purposes and goals of federal

14   sentencing.  So what are those?

12:34PM 15             Congress instructs the District Courts that its

16   sentence should be a reflection of several things.  The

17   Court's sentence should reflect the relative seriousness of

18   the offense.  The Court's judgment should be one that

19   promotes respect for the law.  The Court's judgment should

12:35PM 20   be one that is just, which is to say a sentence that fits

21   the crime.  A Court's sentence must also have a deterrent

22   effect.  And there are two types of deterrence; specific and

23   general.  The Court's sentence should be imposed such that

24   it will specifically deter you from engaging in criminal

12:35PM 25   conduct in the future.  But the Court's sentence should also

promote general deterrence, which is to say that others in the community and beyond will see the Court's sentence and be deterred from engaging in this type of criminal activity.

Finally, the Court's sentence should also take into account the need to protect the public, to the extent that the Court has concerns that you might reoffend in the future and thereby put public safety at risk.

The Court should also take into account the need for correctional treatment in various forms, whether it be educational or medical or rehabilitative types of treatment.

So these are the other sentencing factors. They are sometimes referred to, Mr. Duggar, as the 3553(a) factors. That's simply a reference to the place in our U.S. Code where they can be found.

Now that I have summarized what those factors are, what I would next like to do is to get some additional input. And then after I have received this additional input, I'm going to tell you how I see these factors being applied in your case. I'm first going to ask the attorneys if they have any particular recommendations or arguments as to what an appropriate sentence should be. They have provided the Court written memorandums, so I have a pretty good idea of what their positions are, but I'm going to give them an opportunity to argue further if they like. And then, Mr. Duggar, I'm going to give you an opportunity to

address the Court.  Now, to be sure, you are not required to
do that, and often is the case where someone who has taken
their case to trial and plans to appeal a conviction does
not make a statement.  But I want you to understand that I
will give you the opportunity, and if you're so inclined,
I'm more than happy to listen to anything that you might
want to say today.

THE DEFENDANT:  Thank you.

THE COURT:  We'll begin with counsel.

Mr. Roberts?

MR. ROBERTS:  Thank you, Your Honor.

As the Court noted, we have filed a sentencing
memorandum.  The government is recommending 240 months; 20
years.  That's based on the guidelines.  That is satisfying
the 3553(a) concerns of reflecting the serious nature of
this offense, which includes imagery reflecting rape and
violent sexual acts committed on very young females.  It
accounts for his background, history, and characteristics,
which include multiple hands-on abuse that we discussed
today.

Most importantly, it would reflect and accomplish
a need to protect the public, specifically children, from
future acts by Mr. Duggar.  As the evidence reflects, he is,
I believe, likely to recidivate and he is very unlikely to
take any accountability and receive treatment.

Turning first to the guideline, the defense has written in their sentencing memorandum that our recommendation is unprecedented, which is surprising to me since I've stood before this Court on the majority of hands-on abuse cases and I've argued those, and every time, every time, unequivocally, I've argued for a guideline sentence or something higher.  I have never, ever, argued for something lower than the guideline.  So any indication that that is an anomaly, that Mr. Duggar is getting special treatment because perhaps there's people in the courtroom or this would be reported is downplaying -- is, one, sorely missed, but also downplaying the nature of his offense, downplaying what he is here for, and only what he is here for, the criminal conduct, the criminal acts that he committed.

Turning to the serious nature of this offense, in our sentencing memorandum, we cited one of the victims of the known -- a quote from one of the known images of child pornography.  She wanted the Court to know in a case very similar to this where an individual was downloading and viewing the images of her abuse that -- I believe the quote to paraphrase was, "Please don't let them come into court and act like no one is getting hurt."  That resonated with me.  I actually hadn't read that before.  It did remind me of something Judge Hendren used to say in these cases.

He used to comment on almost every one of the possession, receipt, trafficking type offenses on child pornography that child pornography represents an injury, an added injury to those who can least sustain another injury. And to put that in context and explain, he was meaning that the individuals depicted in the child pornography, the victims, they have to live with the abuse every day, their entire life, knowing that they were violated, knowing that they were sexually abused. That's trauma. But in the cases where there's child pornography, there's extra trauma. There's trauma in the fact that they have to know that that individual who was doing that took so much pleasure in it, they reduced it to pictures and videos. And then they took so much pleasure in it, they sent it out to others to enjoy, like Mr. Duggar, for their own sexual gratification. So each time that individual in a situation like Mr. Duggar, he's adding one more injury to that victim who has already been through so much, the individual who can least sustain it. That's what that means. I actually didn't fully understand it until reading that passage. That is why child pornography across the board is a very serious offense, Your Honor.

Turning to the facts of this case, not only serious, but it is clear that the defendant went through great efforts to obtain his child pornography, to obtain

12:43PM 1    these images depicting this sexual abuse of minors.  He

2    operated with a singular purpose.  I mean, look at the facts

3    and the way they came out.  Downloading the Linux partition

4    on May 11th.  May 13th, installing the Linux partition.

12:43PM 5    Shortly after, installed TOR browser, looked up child

6    pornography.  Shortly after, installed the uTorrent, the

7    BitTorrent client, looked up images of child pornography.

8    That is goal-oriented, Your Honor.  That is a very singular

9    purpose.

12:43PM 10          But the effort there, the effort there is very

11   telling, Your Honor.  I don't think I have ever presented a

12   case to this Court where someone went through so much

13   effort.  For instance, in this case, there's Covenant Eyes

14   on the device, on every one of his devices, which is ideally

12:43PM 15   going to operate as a deterrent effect.  It's going to be an

16   accountability software that keeps an individual from

17   looking up pornography.  Mr. Duggar did not see it that way.

18   Mr. Duggar treated it as something that -- he had a savvy,

19   an understanding of the technology that enables him just to

12:44PM 20   get around it, to bypass it, to download this Linux

21   partition.  And then he acted again with his singular

22   purpose to obtain these images.

23          The images themselves were so horrendous that,

24   actually, the defense had to file a motion to keep law

12:44PM 25   enforcement from calling it some of the most, or among the

12:44PM 1   worst child pornography in existence.  Now, looking

2   specifically at the images, the defense has even referenced

3   today that the sadistic and masochistic conduct, or

4   enhancement, rather, it applies in the majority of cases.  I

12:44PM 5   think they are probably right, it does apply in the majority

6   of cases.  There is a difference, however, in satisfying the

7   very technical legal definition of penetration of a

8   prepubescent minor by an adult male versus what we have seen

9   in this case.

12:45PM 10          The marissa series, eight-year-old female, forced

11   into sexual acts, locked in a cage, covered in simulated

12   blood.  Stood over with, with someone holding a knife.  Had

13   things written on her body such as, "Cut me."  "Hurt me."

14   "Slut."  Seeing and depicted in pictures where there's a

12:45PM 15   whip, a cat of nine tails.  Your Honor, that is the extreme

16   other end of sadistic and masochistic conduct.  That is not

17   a technical definition; yes, you've got the enhancement, but

18   we just see this in every case.  That is not a typical case

19   that we present.

12:45PM 20          The defendant compares, in their sentencing

21   memorandum, this to cases in which there's a large number of

22   images.  And that's true, we've presented some that's well

23   into the thousands, high into the thousands.  And that is an

24   indication that that individual is deep into looking at

12:46PM 25   child pornography, deep into that world.  But it's not the

76

only indication.  Another indication is their background,
their history.  And I'll address that in a minute.  But the
content in particular is telling of something different.
Not that they are necessarily deep into child pornography,
but where their sexual interests lie, and that is most
concerning in this case.

Moving to his background and characteristics,
this is where that most concerning part really stands out to
the government.  We have had testimony, we've had days of
testimony.  I won't repeat everything involving the Jane
Does.  Not every case -- very few cases, actually, that we
present to this Court involving receipt or distribution or
trafficking of child pornography qualify for the pattern of
activity enhancement.  The one that springs to mind is
*United States v. Brion Carey*.  A lot of similarities;
age-wise of the defendant, previous acts of what equated to
child molestation, also went to trial, similar guideline
range.  The government recommended a guideline sentence in
that case also.  The guideline was actually much higher.  I
believe it was higher, either way, than in this case.

The defense also has taken the position -- and I
understand we're beyond the PSR stage -- that Ms. Holt, who
came in here and testified, that somehow or another that the
testimony she provided should not be relied upon because it
came directly from the defendant.  But I think in context,

12:47PM  1    she is probably the most accurate historian that this Court

2    could hope to have testify.  I mean, the defense's own

3    argument, that she was an elder in the church, that she held

4    this role in the church that was respected by others, that

12:48PM  5    she was essentially clergy.  So the concept that she would

6    come in here, she would take the stand and lie after being

7    sworn in, she would take the stand and lie before all these

8    people looking at Mr. Duggar and telling him that she still

9    loves him regardless, that is not reasonable.  That is

12:48PM 10    against common sense, Your Honor.

11            When referring to these previous acts, the

12    defense keeps reminding the Court, or keeps -- not

13    insinuating -- stating to the Court that the defendant was a

14    child.  Minor, yes.  Child, absolutely not.  He was 14, 15

12:48PM 15    years of age.  You don't call a 14 or 15-year-old a child,

16    unless you are trying to downplay what he did.  The only

17    child in that description would be the Jane Does.  That's

18    the accurate depiction of what his background, his history

19    shows.

12:49PM 20            They talk about, in their sentencing memo, it

21    didn't result in an adjudication.  It didn't go through the

22    juvenile justice system.  It didn't.  If it did, he would be

23    sitting here with adjudications for rape and multiple counts

24    of sexual assault.

12:49PM 25            Turning to the argument that this somehow should

12:49PM 1   weigh on the Court less that it happened 20 years ago or 18

2   years ago.  That was a while back.  If you take those

3   activities in isolation and you go forward 20 years, and

4   this is a tax case, I'd say you had a pretty good argument.

12:49PM 5   Take those activities, go 20 years, in isolation this was a

6   drug case.  Okay.  The defendant had some deviant activity

7   when he was a minor, does not really reflect on the activity

8   of being a drug dealer.  I agree.  Take those activities, go

9   forward 20 years and have an individual who set up a

12:50PM 10  partition where he can hide from his family the images that

11  we have described, that shows one thing.  That pattern of

12  pervasive, long-standing sexual interest in minors that has

13  not been addressed, Your Honor.  There is no reference in

14  the PSR that he has ever received any kind of mental

12:50PM 15  treatment or therapy for this addiction, for this

16  attraction.  And that is of concern.

17          The pattern of activity is the highest

18  enhancement we have.  Past performance is the best indicator

19  of future activities.  I've said that, I can't imagine, on

12:50PM 20  countless juries, I've said that quite a bit, at least in

21  arguing to this Court.  I believe it to be true.  Because of

22  that, I think the evidence shows that he's likely to

23  reoffend.  That brings me to the need to protect the public,

24  specifically children.

12:51PM 25          As I said, per the PSR, he has not received any

treatment.  But different from that is that he carried this

to trial.  He has that right.  But we have previous sexual

activity that was admitted in the public sphere, but not

admitted here.  We have an individual who is now sitting

before this Court that is convicted of looking up some of

the most disturbing images of child sexual abuse out there,

but yet this Court cannot look at him and say, all right,

you're going to receive treatment and you're going to change

your ways because there is no accountability.  He has a

right to trial, but that does not change what the Court has

to do, meaning protect the public.

It leaves this Court in a situation that you have

an individual who is highly likely to reoffend, but

unwilling to accept or acknowledge the attraction he has to

minors.  It leaves this Court in a position that you have a

savvy offender, someone who has shown himself willing to go

in and commit acts of child molestation while the minor is

sleeping.  And then shown himself to be in this case someone

who will look at a program like Covenant Eyes and use his

technical abilities to mask, to hide his activities, his

viewing and downloading of child pornography.  That leaves

you with someone who is not going to address any underlying

issues they have.

Now, the defense is asking for a motion for

downward variance and arguing that he has extraordinary

80

1 family ties, connections, worthy of getting a variance.

2 Your Honor, he has a large number of children.  But, Your

3 Honor, the offense conduct -- and I used to stand before a

4 Judge who would always ask the defendant in that

5 circumstance, were you thinking about your family on the day

6 you committed the crime?  I mean, look at the nature of the

7 crime.  Mr. Duggar knew more than anybody what a scandal

8 would do to his family.  He had been through it.  He didn't

9 look at the crime of like, "I have Covenant Eyes up here.  I

10 owe my family a responsibility not to do this."  No.  He

11 just installed his Linux partition and thought he could hide

12 it and keep doing what he wanted to do.  Also added to that

13 is, Mr. Duggar comes from a privileged, wealthy family.

14 That's hardly a basis to find someone who is deserving of a

15 downward variance simply because they have a large number of

16 children.  He does have a wife.  As far as I know, nothing

17 in the PSR showing that she does not have the ability to

18 work.  His larger family, definitely known within Northwest

19 Arkansas.

20    So, Your Honor, to summarize our position, the

21 government is recommending 240 months.  We believe that is

22 consistent with every recommendation we have ever given,

23 whether there's people in this audience or not.  And we also

24 believe that that is the only way to ensure that the public,

25 meaning specifically children, is safe upon his release.

12:54PM 1          Happy to answer any questions, Your Honor.

2          THE COURT:  I do have a couple.  And you, as you

3     said, have been prosecuting these types of cases as long as

4     I have been on the bench, and before that.  And I don't know

12:54PM 5     that this issue that's bothering me a little bit has ever

6     been present before.  I just can't recall it ever coming up,

7     or don't recall ever having an opportunity to consider this.

8          So we know from the trial evidence that there's

9     this HP desktop computer in the tollbooth office at the car

12:55PM 10    lot.  We know that on May 13th, 2019, Mr. Duggar, as you

11    have noted, went to some sort of extraordinary length to

12    circumvent internet monitoring software for the purpose of

13    searching and downloading and viewing the content that we

14    know about from the trial.  And that activity took place on

12:56PM 15    May 14th, May 15th, and May 16th.

16         Detective Kalmer testified to what she testified

17    about, took some time to get some reports that were

18    generated, and then she, as part of a task force, handed

19    that off to Special Agent Faulkner.  And then they had some

12:56PM 20    other things that were going on and couldn't give this case

21    the top priority, but they did get to this case.  They did

22    go through all of the necessary administrative subpoenas and

23    acquire all the other information before they can apply for

24    a warrant.  They did get a warrant.  They did show up in

12:57PM 25    November, six months later in November, and they seize the

82

12:57PM  1   computer.  It eventually finds its way to Mr. Fottrell who

2   testified for a day and a half about what he found.  And

3   what he found was, a computer that didn't have any child

4   porn on it.  It had all been deleted, which is not unusual.

12:57PM  5          But as I understand it, the remnants and

6   artifacts of child pornography that were discovered were all

7   discovered to have been downloaded or viewed within that

8   three-day window in May without any other such activity

9   taking place in the six-month period up and to the point

12:58PM 10   when the search warrant was executed.  And so what I'm

11   struggling with here is, I mean, you make a good point about

12   anyone who would search for and view this sort of content, I

13   mean, that's the sickest -- that's some sick stuff.  One

14   would reasonably draw the conclusion that they have a very

12:58PM 15   warped addiction.  But then nothing for six months.

16          Have you ever seen a fact pattern like that?  I

17   know you have thought about this.  What is your take on

18   that?

19          MR. ROBERTS:  Your Honor, I have.  I actually

12:59PM 20   wondered if you would ask.  I believe there are some factual

21   issues that are before the Court in the trial record that

22   speak to this.

23          One, at the end of April, Mr. Waller, who

24   testified, the young man that I think I yelled at for about

12:59PM 25   10 minutes, testified that he quit his job approximately end

12:59PM 1    of April, last day at the car lot.  Maybe May 6th, he went

2    there to get a van.  Then we had Mr. Berry who did not

3    testify, but he's referenced in the PSR, and he's been

4    referenced in previous hearings.  He starts about end of

12:59PM 5    May, May 26th, somewhere in there.  So you have a window;

6    May 6th, May 26th, approximately 20 days.  That's when the

7    defendant was alone with the computer.  I mean, that is a

8    factual reason of why I believe this happened during this

9    time frame versus others.

12:59PM 10          Now, could he have found time?  I mean, he did

11   not delete the partition.  He did not delete the TOR browser

12   and then separately the uTorrent client.  Could he have

13   found time to go back?  Perhaps.  I mean, I don't have any

14   insight beyond that.  I find it hard to believe, personally,

1:00PM 15   that an individual who did what you just described did it

16   one time, got caught by law enforcement and just happened to

17   be that one time.  Don't see that a lot in my life.  Don't

18   see that a lot in case law, in reality.

19          But that's the insight I can give to the Court

1:00PM 20   from that.  I think there's a factual reason why it happened

21   that way, just that he had less access to the computer with

22   these programs, at least less alone access to that.  And

23   then separately, law enforcement knows what law enforcement

24   knows, and we presented that in trial.  What we don't know

1:00PM 25   is if there's other devices, if this has been done in the

1:00PM 1    past and there are just no forensic remnants of it.  We

2    don't know what the TOR browser was used for beyond what we

3    introduced in trial.  We know those things, but we can't

4    account for what the TOR browser was used for, I believe it

1:01PM 5    started October 26th, so what it was used for in September

6    on his phone, with respect to what was on his phone.

7            THE COURT:  Thank you.  You brought up Brion

8    Carey, which was another case that went to trial.  He was

9    sentenced in May of 2020.  He was a 37/IV, guideline 292 to

1:01PM 10   365.  This Court sentenced him to 180 months.  In terms of

11   sentencing disparity, is Mr. Duggar's situation similar or

12   more or less aggravating than the Carey case that your

13   office prosecuted?

14           MR. ROBERTS:  Your Honor, I think Carey, when you

1:02PM 15   look at enhancements that applied and overall conduct, there

16   are a lot of similarities.  But what stands out to me is

17   that Mr. Carey, and I think should be of concern to the

18   Court in imposing sentence, very unsophisticated user.  We

19   are talking about an individual who had 86 still images and

1:02PM 20   he e-mailed himself from one account to his other e-mail

21   account, and that's how he got caught.  He is not an

22   individual that I think upon release, that if he engages in

23   this activity, that law enforcement won't be shortly behind

24   him.  He's just an unsophisticated user.

1:02PM 25           Mr. Duggar, juxtaposition to Mr. Duggar is that

1:02PM  1   he's a savvy user before we ever got there.  He's a savvy
2   user before he ever heard the testimony in trial about the
3   TOR browser and how it's hard to track.  He's a savvy user
4   before he saw that this peer-to-peer is how we got to his
1:03PM  5   car lot, Your Honor, so, I mean, that is one thing of big
6   concern now, I think the aggravating factor that separates
7   that from Carey.
8               The other thing is, in Carey, his prior, what the
9   pattern of activity was based on, and I'm not trying to talk
1:03PM 10   about it like it is somehow lesser or something like that.
11   There was a 16-year-old that was taken advantage of.  But
12   there is a difference between a 16-year-old who was
13   exploited and a five-year-old who was exploited.  There is.
14   And I think that's present and adds an aggravating light to
1:03PM 15   this case, Your Honor.
16               THE COURT:  Jeremy Kelley, did you try that case?
17               MR. ROBERTS:  I did, Your Honor.
18               THE COURT:  Jeremy Kelley, charged with receiving
19   and possession.  Did not plead guilty, took the case to
1:04PM 20   trial.  Didn't dispute that there was evidence of child
21   pornography on his computer, but said that he wasn't the one
22   that accessed it or downloaded it or what have you.  And he
23   attempted to put on an alibi defense and the Jury was not
24   persuaded.  He ended up being a 37/I, so same criminal
1:04PM 25   history category, 210 to 262 guideline range.  The Court

1:04PM  1   sentenced Mr. Kelley to 124 months.

2               In terms of unwarranted differences in

3   sentencing, is Mr. Kelley a good comparator or is

4   Mr. Duggar, is his situation and circumstances more or less

1:05PM  5   aggravating?

6               MR. ROBERTS:  Your Honor, that would be a very

7   good comparison, but for the pattern of activity

8   enhancement.  That was not present.  There was nothing in

9   Mr. Kelley's background when he presented this -- again, it

1:05PM 10   was a peer-to-peer case.  His overall defense was a SODDI

11   defense, had someone testify that I believe he was in

12   Ft. Smith when it was either raining or not raining.  We had

13   a weatherman to come in and clarify that, if the Court

14   remembers.

1:05PM 15               The fact that there is an enhancement in this

16   case, it's the largest enhancement in 2G2.2.  It's the

17   largest one for pattern of activity, five points.  Could be

18   equivalent to the number of images is the largest, but it's

19   one of the largest, regardless.  Your Honor, that carries a

1:05PM 20   lot of weight.  To me, that identifies him as someone that

21   is likely to recidivate.  Mr. Kelley was held accountable

22   for his activities, and he went to trial.  He had the right

23   to do that.  I did not have evidence -- if we did, if the

24   government had evidence that he had committed any kind of

1:06PM 25   prior hands-on molestation, we would have presented that.

1:06PM   1   But knowing that there's a pattern of activity, knowing that

2   Mr. Duggar has a past record of molesting not just one

3   child, not just two, not just three, but at least four.

4   That is significant.  And that, in my mind, makes that case

1:06PM   5   not a very good comparison to this one.

6           THE COURT:  Double?  I mean, you're essentially

7   asking for -- you're recommending to the Court double the

8   sentence imposed on Mr. Kelley, who in many respects, but

9   not all, is similar.

1:06PM   10          MR. ROBERTS:  Mr. Dean did the sentencing in

11   Mr. Kelley's case.  I cannot remember what he recommended to

12   the Court.  Knowing Mr. Dean for a long time, I would

13   imagine it was a guideline sentence.  I don't know what he

14   recommended.  Double, Your Honor, if we had something, some

1:07PM   15   indication that Mr. Duggar was going to receive treatment

16   when he was in BOP, which I know the Court can order, but if

17   you're not willing, you're not willing.  If we had some

18   indication that he had some accountability for these

19   previous hands-on offenses.  The only statement we have, the

1:07PM   20   only statement we could do is bring up Ms. Holt, and then

21   she was attacked.

22          Your Honor, there has to be some acknowledgment

23   for an individual to have a hope.  Once they have committed

24   these kind of acts and looked up the child pornography that

1:07PM   25   we are talking about, there has to be some awareness of a

1:07PM  1    problem.  And I think that is the most worrisome thing for
     2    the government is that there is no acknowledgment here.
     3    There's a likely to recidivate, or likelihood of
     4    recidivation if released without some kind of treatment,
1:07PM  5    without some kind of therapy.  And it just doesn't seem like
     6    it's going to occur in this case.
     7             THE COURT:  Thank you, Mr. Roberts.  Mr. Gelfand?
     8             MR. GELFAND:  Thank you, Your Honor.
     9             Your Honor, as this Court is aware and as we set
1:08PM  10   out in an abundance of detail in our sentencing memoranda,
     11   we are requesting that this Court impose a sentence of 60
     12   months, which is five years, for the offense for which
     13   Mr. Duggar is being sentenced.
     14            I want to start where I think Congress
1:08PM  15   anticipated the Courts start, which is asking yourself,
     16   asking ourselves, who is this person who finds himself
     17   before this Court for sentencing?  Because one of the more
     18   unusual aspects of this case is that there are a lot of
     19   opinions about Mr. Duggar, and some of those opinions come
1:09PM  20   from people who candidly don't know him.  But the important
     21   opinions, the ones that the Court will take into account for
     22   sentencing, are the opinions and facts of those that not
     23   only know him, but know him in ways that a lifetime of
     24   knowing someone can only reveal.  And one of the things that
1:09PM  25   we attempted to highlight for the Court -- and I hope that

we succeeded; we certainly did our best -- was not to overwhelm the Court with 100 letters from people who may have taught Mr. Duggar how to play the piano 30 years ago, but with letters from people who genuinely have a history and a lifetime and a track record of knowing who this man actually is.

As the Court is aware, he's 34 years old.  He's married to a wonderful woman and he has seven wonderful children.  And as this Court no doubt knows, his wife, Anna, has been here with him by his side literally at every court hearing, every day throughout trial, and she's sitting here in the front row supporting her husband right here today.

I would submit to you that short of maybe one's parents -- and I'm not even sure I would concede short of that -- a person's spouse is someone who knows them best. And this is someone who has been married to Josh for approximately, I believe 13 years.  Mr. Duggar has never been charged with, let alone convicted of, a single criminal offense.  I'm going to address in a few minutes the allegations that give rise to the pattern enhancement through the context of 3553(a).  But before we get there, I think it's important for the Court to recognize that Mr. Duggar's life has been atypical in many ways.

At a relatively young age, he was thrust into the public spotlight with the rest of his family.  And as the

1:11PM  1    Court can see through what's reflected in the presentence

2    report and in the letters that the Court has that we have

3    submitted, this is a man who has exemplified hard work

4    throughout his adult life.  Real hard work.  From a formal

1:11PM  5    education standpoint, he has a GED after being homeschooled.

6    And he went on to support his family and to make his living

7    primarily by running a car lot, not as some passive

8    investment, but as a place where he was actually, as the

9    Court knows, very involved on a regular basis in working

1:12PM 10    there.  Hard work.  This is a man who would build and

11    renovate homes, one at a time, two at a time, on the side as

12    a way to earn extra money.  And this is a man who,

13    juxtaposed against all that, spent decades giving himself to

14    others.

1:12PM 15            I think one of the most powerful letters that the

16    Court has is the letter that we unfortunately only were able

17    to receive and submit on the eve of sentencing, but

18    fortunately in time for sentencing.  I know it's in the

19    public record.  I'm not going to gratuitously share the

1:13PM 20    person's name, but that's the letter from a widow who

21    unfortunately found herself in need of help, financial help,

22    approximately four years ago, as she shares.  Every single

23    month, Josh Duggar provided significant financial support to

24    this woman and to her family, completely out of the public

1:13PM 25    spotlight.  This is the first time, as we find ourselves at

a sentencing hearing, that this has even been publicized in
any way, shape or form.  And I note, to state the obvious,
four years ago is way before any allegations in this case.
This is not the result of, "Oh, my God, I might find myself
before a sentencing hearing, better donate to charity or
better do something that looks good."  This is who Josh
Duggar actually is, Your Honor.  He's a man who regularly
employed people, as the Court heard, including with various
odd jobs who for various reasons had trouble finding other
jobs and gave them a chance and a life.  That's who Josh
Duggar is.  And as reflected by Pastor Waller and by
Mr. Reber, the individual who was gracious enough to take
Mr. Duggar in as a third-party custodian, this is a man who
is constantly looking for ways to help with his own hands.
It's not just writing a check when you're fortunate enough
to be able to do it.  It's literally getting on your hands
and knees, sweat equity, so to speak, and helping those that
need help when they need it.  Pitching in.  That's who Josh
Duggar is.

So directing our attention to the crime for which
Mr. Duggar is being sentenced, Mr. Duggar accepts that he
stands before this Court for sentencing, having taken this
case to trial and having maintained his plea of not guilty.
But I think, as the Court considers the sentence, it's only
fair to consider the allegations and to put them in the

92

context of, as much as I hate this phrase, similar cases,
because that's what the law requires and that's what
fairness and justice require.

Now, let me be clear.  As we have said all along,
including today, we fully acknowledge and recognize that
this crime, possession of child pornography, or more
specifically receipt of child pornography, this is a crime
that of course has real victims.  It's heartbreaking.  But
when considering the appropriate sentence, I think it is
only fair for the Court to consider, as the Court was asking
the prosecution in this case a few minutes ago, to place
what actually happened here into its proper context.

Based on the entirety of the allegations,
everything happens over a four-day period.  In other words,
if you take the government at face value with everything
they claim, it happens over four days.  Every image was
permanently deleted insofar as it was not accessible to a
user on the fourth day.  And significant computer forensic
analysis not only of the HP desktop computer, but of
literally every personal device that was seized; the MacBook
Pro laptop computer, the phone, a number of other just
external thumb drives, things like that.  They revealed
that, for lack of a better way of putting it, they got the
right devices.  The Court heard testimony that these were
devices used ubiquitously by Mr. Duggar for five years

93

before, and they were used on a virtually everyday basis, particularly the laptop computer.  And there was not even a forensic trace, Your Honor, of any alleged child pornography.  Not a Torrent.  Not a file.  Not in allocated space, not in unallocated space.  The reason that they sent, meaning the government, sent an exact forensic image of every device seized to Michele Bush to her lab in Arizona, but not the desktop computer, is precisely because they didn't contain child pornography.  They couldn't send it to her appropriately, like the desktop computer.

Now, the significance of this is that this is profoundly atypical for a case of this nature.  And that's not only the case based on I think the way that the Court was appropriately -- and I agree -- asking the prosecution that question.  What we have in this case -- and it's not limited to this case, we have all seen it in a number of cases of this nature -- are search warrant affidavits that state by federal law enforcement -- presumably because they believe it -- that state that people who commit receipt or possession of child pornography tend to amass large quantities of it.  They tend to keep it somewhere safe.  And they tend to do this over a long period of time.  In technical speak, it's to some extent how they try to get around, and successfully get around, timeliness challenges of the date of the search warrant versus the date of the

alleged underlying conduct.

So I think what's important here, Your Honor, is that as the Court considers this case especially, and I'm going to talk about similarly situated defendants when looking at avoiding unwarranted sentencing disparities as the law requires. I think it's only fair for the Court to contextualize this case for what it is and for what it isn't. And I think that the Court has the benefit of a real understanding of that record, including the personal laptop and the lack of anything for five years, the cell phone, the kinds of things, because this case proceeded in the way that it did.

So the need for the sentence to promote respect for the rule of law and to provide for deterrence. A five-year prison sentence, followed by a substantial term on supervised release, which we anticipate the Court will impose, accomplishes these objectives. That's not a slap on the wrist. People are not out there saying to themselves, five years in prison, supervised release for however long this Court ultimately imposes, sex offender registration and all the collateral consequences that come with that, that's deterrence. That's promoting respect for the rule of law. So the question that this Court, and candidly every District Judge in courtrooms in every kind of criminal case across the country have to grapple with at every sentencing is

1:20PM 1    this.  What's really accomplished by a longer sentence?  And
2    there's arguments that can be made that it sends a message
3    that people are removed from society.  And that may very
4    well be understandable in the case, in certain cases.  But I
1:21PM 5    submit to you, Your Honor, in this case, nothing is
6    accomplished by a longer sentence.  And that is because Josh
7    Duggar is not someone who will ever find himself before this
8    Court or any other again.  And this Court has the power, as
9    its well aware, to impose conditions of supervised release
1:21PM 10   that will continue to be simultaneously protective of the
11   community and punitive by their very nature, the
12   restrictions on liberty.  And this Court can and presumably
13   will impose, without objection from the defense, conditions
14   of supervised release related to whatever the Court deems
1:22PM 15   appropriate, including, but not limited to, counseling and
16   things along those lines.
17           But here's the most important thing, and that's
18   that Mr. Duggar will follow the conditions that this Court
19   imposes.  Now, every defendant, every defense counsel is
1:22PM 20   going to say that, right?  Of course.  But in this case, we
21   have a track record.  We had very real conditions imposed by
22   the Judge, the Magistrate Judge in this case, who released
23   Mr. Duggar on bond over the government's objection.  And we
24   have perfect performance by Mr. Duggar on bond.  What that
1:23PM 25   signifies, Your Honor, is that whatever conditions this

1:23PM  1   Court imposes, Mr. Duggar will take them very seriously, as

2   Mr. Reber shared with the Court in his letter.  And he will

3   follow them as this Court can acknowledge from its own

4   docket, the lack of any violations.

1:23PM  5           So I want to talk about the guidelines and

6   avoiding unwarranted sentencing disparities, Your Honor.  We

7   detailed, putting aside the objections to the guidelines

8   that obviously I'm not going to address right now and that

9   the Court has ruled on.  We detailed some of the fundamental

1:23PM  10  problems with the advisory sentencing guidelines applicable

11  to this offense in contrast to other federal offenses.  The

12  problem here -- and many Courts, as we have cited, have said

13  it better than I will -- is that the so-called specific

14  offense characteristics that are supposed to speak to the

1:24PM  15  unique severity of a case to enhance an advisory sentence

16  are found in nearly every case.  That's inconsistent with

17  what 3553(a) requires.

18          So, for example, we reference the Court to a

19  June 2021 U.S. Sentencing Commission report which revealed

1:24PM  20  that 99.4 percent -- and I appreciate that Your Honor has

21  that -- 99.4 percent of offenses of this nature included the

22  enhancement for prepubescent victims.  That's two levels

23  applied to Mr. Duggar.  Over 95 percent received

24  enhancements for use of a computer.  That's two levels for

1:24PM  25  Mr. Duggar.  84 percent, approximately, received

97

1:24PM   1   enhancements for sadistic or masochistic conduct, that

         2   guideline.  That's four levels.  And the number of images

         3   applicable, even if this Court were to find itself slightly

         4   higher than 600, which the Court did not, is so much lower

1:25PM   5   than the median number of images in 2019, which is 4,265

         6   images.  To sum that up, Your Honor, as a practical matter,

         7   the guidelines, while the Court has to consider them, lose

         8   their value in light of these statistical realities and

         9   empirical realities.

1:25PM  10              The pattern enhancement.  The Court alluded to

        11   this when addressing this enhancement and overruling our

        12   objection.  And I do want to address this through a

        13   different lens, because I think it's appropriate, and that's

        14   the 3553(a) lens.  The guidelines that are advisory in this

1:26PM  15   case, as the Court is well aware, would be substantially

        16   lower if this Court did not apply that five-level

        17   enhancement.  That's fairly obvious.  That's math.  What is

        18   significant here is that, as the Court considers -- and I

        19   don't need to rehash these arguments in detail -- but the

1:26PM  20   amount of time that transpired between the alleged

        21   incidents.  The fact that Mr. Duggar was a minor then, and

        22   allegedly committed the crime that he's being sentenced for

        23   in his 30s as an adult, and the different nature of one

        24   being a hands-on alleged offense, or set of offenses, and

1:26PM  25   the other being a computer-based crime.  Those are factors

that the Court can take into account when crafting a sentence that is sufficient, but not greater than necessary.

With respect to all of these guidelines, with the exception of arguments, with the exception of the pattern one, what stands out about the government's briefing is that they don't respond to these realities that the Sentencing Commission, that Federal Judges in various courthouses over the last decade have shared about these guidelines unfairly resulting in higher advisory sentencing ranges.  And I think that that's a reality that the Court should take into account.

Finally, I want to talk about sentencing disparities.  Now, the prosecution stood before this Court a few minutes ago, Your Honor, and basically said -- and I take them at face value -- that they regularly stand before this Court and advocate for the kinds of harsh sentences that they are advocating for in this case.  But that's not what the 3553(a) factors speak to.  In other words, it's not what the prosecution is recommending.  It's what sentences are people actually getting across the country who are similarly situated.  The idea here is that the 20-year sentence that the government is seeking in this case is unprecedented by law, even if it's not unprecedented by what Mr. Roberts advocates for.  And this is precisely what Section 3553(a) mandates not doing.

So I want to direct the Court's attention to a couple of cases that we addressed in more detail in our sentencing pleadings.  The *Welch* case.  That defendant was before this Court for a receipt of child pornography offense involving approximately 82,000 images.  That defendant organized his images, saved useful search terms, and held on to his collection for a long period of time.  This Court sentenced that defendant to 83 months.

The *Carey* case the government submits is, I just wrote it down when the prosecutor said it, the quote, "most similar," end quote.  Despite higher guidelines, the Court gave Mr. Carey 15 years.  I would point out, Your Honor, a couple of facts about that case that were not raised earlier, or maybe they were and I didn't hear them, but I think they're important to emphasize.  That defendant had a criminal history category IV, in stark contrast to Josh Duggar who has no criminal history and a category I.  That defendant engaged in hands-on abuse and possessed child pornography that he himself recorded as opposed to downloaded from some sort of source.  That defendant, Your Honor, apparently held a knife to one of his victims and threatened her not to say anything to anyone.  We got that information from Mr. Roberts' sentencing memorandum in that case filed before this Court.

The point here is, every case has some

differences, but if somebody who was convicted at trial for receipt of child pornography with a significant criminal history category of IV and literally recorded child pornography that he possessed, in other words, participated in manufacturing it, regardless of whether that was the basis of conviction, and literally threatened the life, with a violent weapon, of an alleged victim.  If that person deserves a sentence of 15 years, by any objective measure, Mr. Duggar deserves a substantially lower sentence.

We direct the Court's attention to the *Tanksley* case.  Two counts of receipt, one count of possession.  The defendant in that case was an active participant in two internet-based bulletin board groups dedicated to actual trading of child pornography.  In other words, one-on-one interactions; "I'll give you this if you give me this." That defendant was sentenced to 80 months.

The *McGrew* case, receipt of child pornography. Sentenced to 75 months for receiving a total of 22,000 images, approximately, for guidelines purposes.  And most importantly, Your Honor, we provided the Court with an abundance of legal authority of defendants sentenced for this crime, not going back a million years, but relatively recent sentences, who received 60-month sentences, the exact sentence that we're asking this Court to consider to avoid unwarranted sentencing disparities.

1:32PM 1          *Sipult* in the Eastern District of Virginia, 60

2      months, more than 4,000 images. *MacKinnon*, District of

3      Massachusetts, 60 months, was personally producing child

4      pornography. *Fuguet*, Northern District of Florida, multiple

1:32PM 5      devices with child pornography, 60 months. *Foster*, Southern

6      District of Illinois, multiple videos, 60 months. *Welsh*,

7      Nebraska, receipt and distribution, 60 months.

8          Our take-away is this, Your Honor. The sentence

9      that we are asking for is not inconsistent with what the

1:33PM 10      3553(a) factors require, and the sentence that the

11      government is asking for is.

12          So I want to end by addressing what I believe to

13      some extent is, at least could be, the elephant in the room.

14      And that's that this case has garnered a lot of attention,

1:33PM 15      not because of the alleged crimes, but because of the name

16      of the defendant. And I appreciate that throughout this

17      entire process -- and Mr. Duggar does as well -- that the

18      parties and the Court have treated this like any other case,

19      which is obviously the only way to treat such a serious

1:33PM 20      matter. What we're asking this Court to do in this case is

21      to treat Josh Duggar like similarly situated defendants, and

22      similarly situated defendants have received sentences, and

23      every day receive sentences substantially lower than the 20

24      years the government is seeking, even for categorically

1:34PM 25      worse crimes.

1:34PM 1     Now, we wrote in our sentencing memo that we

2 stand before this Court asking this Court to temper justice,

3 which this Court has to consider, with mercy.  And I'm going

4 to add one additional component in that request, Your Honor.

1:34PM 5 And that's to add a dose of compassion into this process.

6 I've gotten to know Josh Duggar over the course of

7 representing him.  I didn't know Mr. Duggar before I took

8 this case, and I've had the opportunity to get to know him,

9 some members of his family.  And I want to leave the Court

1:35PM 10 with this.  Josh Duggar is a good person who has so much

11 more to offer his family and his community.  And what we're

12 asking this Court to do is to give him that chance.

13     We're asking for a sentence of 60 months.

14 Obviously, I'm happy to address any questions that the Court

1:35PM 15 has.  I'd also, and I don't know if this is this Court's

16 practice at this time or later, I'd ask the Court to include

17 a location recommendation to the Bureau of Prisons in its

18 judgment at the appropriate time.

19     THE COURT:  What's the location recommendation?

1:35PM 20     MR. GELFAND:  Assuming that it's within the

21 appropriate security designations, we would ask the Court to

22 recommend that BOP consider placement at one of three

23 institutions:  Seagoville, Texarkana, or Ft. Worth, Texas.

24     THE COURT:  Ft. Worth is a medical facility.

1:36PM 25 They have a cadre there, but --

1:36PM 1              MR. GELFAND:  I understand, Your Honor.

2              THE COURT:  All right.  Thank you very much,

3       Mr. Gelfand.  Well said.

4              MR. GELFAND:  Thank you.

1:36PM 5              Your Honor, I apologize.  I neglected to add that

6       Mr. Duggar appreciates his opportunity to address the Court.

7       He asked me to address the Court on his behalf.  He does not

8       wish to address the Court directly.

9              THE COURT:  All right.  I'm searching for a piece

1:37PM 10      of paper, but I was going to take that up next.

11              MR. GELFAND:  Sorry, didn't mean to beat you to

12      it.

13              THE COURT:  Mr. Duggar, I appreciate

14      Mr. Gelfand's passing along that you do not wish to, what we

1:37PM 15      call allocute, but the rules require that the Court give you

16      that opportunity.  So as I was saying earlier, you do have

17      the right to make a statement and address the Court.  I'll

18      perfectly understand if you don't want to do that, but by

19      the same token, I want you to know I'm happy to listen to

1:38PM 20      anything that you may have to say.

21              Would you like to make a statement?

22              THE DEFENDANT:  No, Your Honor.  Thank you very

23      much.

24              THE COURT:  Thank you, sir.

1:38PM 25              So we go back to this two-step framework that I

was explaining to you earlier. Step one is the advisory
guideline range. For the reasons that I explained earlier,
as to incarceration, the guideline range is not much of a
range. It's 240 months. That's the statutory maximum.
Although that range is merely advisory, and although the
Court can impose less of a sentence, the Court cannot impose
more of a sentence. So the question here is whether the
statutory maximum of 240 months is the most appropriate
sentence, all things considered in this case, or whether
something less than that is the most appropriate, whether
something less is sufficient, but not greater than
necessary, and if so, how much less.

So now we go to step two. And, again, the
factors in step two allow the Court to custom-tailor and
individualize the sentence to the defendant and the
defendant's case then before the Court.

I typically begin this analysis by discussing
relative seriousness and the totality of the facts and
circumstances in the given case. With regard to relative
seriousness, there are all types of cases that are
prosecuted in this courtroom; tax cases, immigration cases.
Over 50 percent of the Court's docket is drug cases,
firearms cases, robberies, kidnappings. They are all
federal felonies. All federal felonies are serious, but
this particular objective is relative seriousness. And in

terms of relative seriousness, the types of cases prosecuted

in this courtroom run a very broad spectrum.  Child sex

offense cases are among the most serious of all of the cases

that are prosecuted in this courtroom.  Certainly more

serious would be child sex offense cases where there was

hands-on activity.  And so certainly this is not one of

those cases, and so certainly it's not as serious as if your

offense conduct for the offense of conviction related to

hands-on activity.  But crimes that involve child sexual

abuse are nevertheless among the more serious crimes that

are prosecuted in this courtroom.

Moving on to the totality of the facts and

circumstances.  The Court is required to calculate the

guideline range, and I've done that.  That said, I happen to

agree with Mr. Gelfand in his criticisms of the 2G2.2

guideline.  This Court in every non-hands-on sentencing that

I can think of, at least in the last five or six years, the

Court has stated that it has a policy disagreement with this

particular guideline.  Now, I'm not going to change that

philosophy just because it's Mr. Duggar that is being

sentenced.  I continue to have a policy disagreement with

2G2.2.  And I'm not alone.  District Courts from all over

the country have written opinions explaining the problems

with 2G2.2.  The 2021 study that Mr. Gelfand referenced has

a lot of data in it.  It was focused on data from the year

2019.  In that year, less than 1/3rd, specifically 30 percent, of non-production child pornography offenders received a sentence within the guideline range.  59 percent of non-production child pornography offenders in the year 2019 received a variance below the guideline range.  Why is that?  I just said, these are very serious offenses.  Yes, they are.  For anyone that's really interested in why so many courts have come to that conclusion, I would commend reading the United States Sentencing Commission's 2012 Report to the United States Congress.  It's about 6 or 700 pages thick, and it explains in extraordinary detail all of the criticisms that there are with the 2G2.2 guideline.  And we could spend all afternoon talking about that, but we're not, because I agree.  But in summary, I would say that Mr. Gelfand has pretty accurately given the nutshell. Enhancements under the sentencing guidelines are supposed to be how the plain vanilla case is differentiated by cases who have characteristics that make the perpetration of that crime in that case more serious.  2G2.2 and the enhancements at 2G2.2 don't do that, because most of the enhancements in 2G2.2 are applied in every case.  Now, that's not true with pattern of activity, but it's true with most of them.  Why is that?  Well, a lot of reasons, but it has a lot to do with technology and the changes over time in technology.

You've been assessed an enhancement, for example,

107

of two levels because you used a computer.  I've never seen a case of child pornography -- well, I take that back.  We had one that I can recall that they found a thumb drive in a motel room, so there wasn't a computer enhancement.  That's the only case.  Every other case gets that enhancement.  So why is that an enhancement?  Well, in the mid-1990s, people were buying or renting or whatever video, VHS tapes.  A computer wasn't involved, or a CD.  It was viewed as more serious if someone had access to a computer and that was their means of accessing child pornography.  Now, that's the way that it's all accessed.  And this applies to many of these enhancements.

Prepubescent minors.  Well, for whatever reason, and not to say that other circumstances, that children over let's say 12 years old, certainly appropriate to prosecute those crimes.  It's just that they are not.  Law enforcement tends to focus on the cases where we are talking about younger children, prepubescent children.  And so that enhancement gets applied in almost every case.

Number of images.  Almost -- not always -- but almost every case gets the maximum, because it only takes 600 images to reach the maximum.  So the point here -- and I'm speaking to you, but I'm also addressing the record in this case -- I have a policy disagreement as do apparently 60 percent of all the Judges in this country in 2019 with

108

2G2.2.

So what does the Court do?  Do I just untether myself completely from the guideline range?  And if so, do I just make this stuff up?  No, I can't do that either, because Congress says that the Court must take the guideline range into consideration.  So I have to take that into consideration, but I choose, under the 3553(a) factors, to adopt a different approach.  This is an approach that was adopted by the United States Sentencing Commission in their recommendation to Congress in 2012.  They have advocated for using this framework as a means of identifying what is relatively more serious versus what is relatively less serious when it comes to different attributes associated with the offense of non-hands-on child pornography.  And this is a little bit of an oversimplification that I'm going to walk through, but it is a pretty straightforward framework.

The Sentencing Commission says that the Court should look to three categories and assess relative seriousness or the circumstances based on criteria that fall into these three categories.  The three categories are: Content, community, and what the Sentencing Commission calls conduct.  Conduct refers to a history of prior sexual abuse or other exploitive conduct.  Within each of these categories, there are different attributes, so let's go

through these and I'm going to use this framework and this lens to tell you how I see what is relatively more aggravating or more typical than other cases.

Content, one of the attributes there is volume; number of images. You have been held accountable for 590 images. That got you a four-level offense level increase, and yet that is significantly below the typical number of images that are seen in these types of cases, not only in this Court, but nationally. Mr. Gelfand was correct, the June 2021 study says in 2019, the average image accountability was 4,250 images. Mr. Welch that Mr. Gelfand referred to was like 18 or 19 times that. That was viewed as aggravating in Mr. Welch's case. The images that you are being held accountable for are about 14.5 percent, or maybe 14 percent exactly, of the national average of images in terms of accountability from the year 2019. So what I'm saying is that this first attribute, volume, the Court views as being less than typical. The number is actually mitigating under this framework.

There's another attribute to content; types of conduct depicted. What this Court sees and what Courts see nationally runs a very broad spectrum. And I can tell you that even though the volume of images here wasn't particularly great, the images that were there were some of the worst that this Court has ever encountered. I can't get

110

the dog kennel image out of my head.  The description of the
"Daisy's Destruction" is horrific.  Sick.  So in terms of
the attribute of types of conduct depicted, what I see here
is more aggravating than typical.

        Ages of the victims depicted in the images.
Prepubescent is always kind of a starting point, not always,
but most of the time.  That would be nine to 12 years old,
very common of what we see.  Go so far as to say that's
typical, nine to 12 years old.  The idea in this part of the
framework is that the younger the minors are that are
depicted in these images, that has some sort of
qualitative -- that offers some sort of qualitative insight
to the perverseness of the offender.  Nine to 12 is bad.
Five to eight is worse.  Two to four is horrific.  And
infants to two years old is the sickest of the sickest.

        I have intentionally scoured the trial record for
descriptions in order to evaluate this attribute.
Exhibit 45, seven to nine-year-old.  Same for Exhibit 3 and
Exhibit 47.  There's also an Exhibit 3(a), I think.  Many of
the exhibits of child sexual abuse material in the testimony
were described simply as minors.  There wasn't a specific
age.  But in the webcam collection "prevs.7zip," that's
Exhibit 33, eight to 12-years-old.  "Daisy's Destruction"
involved an infant three to four months old being sexually
abused and tortured.  That's the sickest of the sick.

111

1:58PM   1          Marissa, this is Exhibit 3, or 3(a), or both.
         2  Sorry, I can't read my notes.  Also Exhibits 36 and 59,
         3  eight to 10-year-old.  The heartland, as best that I can
         4  tell, is this seven to nine, eight to 10, which is more
1:58PM   5  aggravating.  And then we have "Daisy's Destruction," which
         6  is the sickest of the sickest.  And so I view this
         7  particular circumstance to certainly be more aggravating
         8  than typical.
         9          There's another attribute about collecting
1:59PM  10  behavior.  Sometimes you see offenders who have an
        11  obsession.  They will meticulously organize their
        12  collection.  That is believed to be attributed, this sort of
        13  obsessive collection and organizing is believed to be a
        14  psychological aspect that is believed to be more
1:59PM  15  aggravating, more serious.  No evidence in this case of any
        16  sort of obsessive organization, or, really, any organization
        17  at all.  You were a deleter, didn't maintain the collection
        18  over a long period of time, so all of that is mitigating.
        19          This also asks, though, about special protections
2:00PM  20  from detection and use of sophisticated technology.  And in
        21  your case, I find these to be aggravating, because you went
        22  to much more than normal or typical means to make your
        23  downloading and viewing undetectable.  For reasons that may
        24  or may not have to do with the discussion earlier about
2:00PM  25  pornography addiction, what we know is that you had internet

112

monitoring software, Covenant Eyes.  Your accountability
partner was your wife.  The testimony was that -- and you
can adjust the settings -- but if you search for
inappropriate content, based on how you dial that term in,
your accountability partner would be notified by Covenant
Eyes.  You knew that you had Covenant Eyes on the HP in the
tollbooth and you figured out a way intentionally to defeat
that.  The way you did that was to use technology that we
really don't see.  I'm not saying it's unique, but it's an
extra step that we don't see, and you created a special
partition on the hard drive.  And so the Court views these
attributes of the circumstances to be more aggravating than
typical.

          The next category is called community.  This is
referring to internet community.  It asks, is this a person
who is so addicted or has such pedophilia tendencies that
they are online and communicating with other like-minded
people?  And there are many different levels of community.
The first level is none.  A lot of people that are
prosecuted here may access this material over the internet,
but without associating themselves with an internet
community.  That's probably typical.  I mean, we see a lot
of peer-to-peer, but no peer-to-peer is probably more common
than the presence of peer-to-peer.  The next level of
seriousness would be someone who has an open peer-to-peer

environment.  That's common, but still aggravating.  The
next level is peer-to-peer on the Dark Web, and that's
viewed as still common, but a little bit less than viewing
on the surface web and therefore more aggravating.  The next
level would be a closed community, a membership required,
passwords required, chat rooms.  The next level would be pay
to obtain, or trade to obtain, or active distribution, which
is well beyond passive peer-to-peer.

So you fall out on peer-to-peer on the Dark Web.
You were out on TOR doing this.  So the peer-to-peer, not as
aggravating as the other levels that I mentioned, but still
more aggravating than normal.  So this category is
aggravating, but not very aggravating.

The third category is conduct.  And, again, that
refers to a prior history of sexually abusive or exploitive
conduct.  The different levels here are none.  And, frankly,
the Court does not see a whole lot of people sentenced under
2G2.2 that have a history of abusive or exploitive behavior.
It's relatively rare.  I mean, we see it, but it's
relatively rare.  Much more common in hands-on, but in
non-hands-on, it's not all that common.  The vast majority,
I would say well over 90 percent of defendants, non-hands-on
defendants that this Court sentences are criminal history
category I, just like you.

So the most common is that there would be a

defendant that had no prior history of such conduct.  The
next level would be physically abusive.  The next level
would be sexually abusive.  The next level would be
exploitive behavior.  And the next level would be extensive
history.  Well, as this Court has found, you have a history
of sexual abuse.  One of the Jane Does was five years old.
You were 15.  The other Jane Does were a little bit older
than that.  This is when you were 15.  The argument has been
made, this was a long time ago.  And if 18 or 19 years is a
long time, then it has been a long time ago.  So let's
fast-forward to May of 2019.  You are accessing images of
child sexual abuse, and you're locked into the very same age
group as those Jane Does.  So we can say, hey, it's been a
long time.  And it has.  But the sexual interest is the
same.

On the other hand, it has been a long time, and
there is no other documented history before the Court that
you have engaged in any other hands-on contact with minors.
And so I have to temper the remarks that I just made by that
observation as well.  Does this mean that you stopped this
type of sexually abusive behavior in March of 2003, or does
it mean that you became more secretive and you've avoided
detection?  We don't know and we likely never will.  But
what we do know is, in May of 2019, you searched for some of
the worst of the worst, and the ones that weren't the worst

of the worst were still bad and they were in this same age range from when you were 15, and the victims, the Does, the Jane Does, were in this same relative age range.

So all of that to say, the conduct category, the prior history, much, much, much, much more common that there is no history of any kind.  Here, this category is viewed by this Court to be an aggravating factor.  I've tempered my thoughts about that given how long ago it was and given the fact that there's been no other reported conduct since then, but it still is an aggravating factor.

So just to kind of return to the framework, we're looking at the other sentencing factors, and this is how the Court chooses to separate more serious from less serious, more aggravating from less aggravating, worse than typical, not as bad as typical, all under the framework of the 3553(a) factors and the nature and circumstances surrounding the offense conduct.

Now we go on to your background, personal history, and characteristics.  We've talked about some problems as an adolescent.  Let's set that to the side.  You have no prior criminal history in terms of convictions.  That's certainly mitigating.  The letters that the Court has received describe you as someone who thinks of other people and is selfless.  Someone can show up at your car lot and give you a hard luck story and you usually bite.  There's a

widow.  I think almost every letter writer told me about the widow that you have been silently, and not publicizing, paying a couple thousand dollars a month to help her get by. I thought the letters that your mother and your wife in particular wrote were very articulate, and certainly they describe someone that we really can't recognize from the Josh Duggar that we see and read about in the presentence report.  And so I must acknowledge that you have done some bad things, some very bad things.  But your life as a whole, the Court must look at as well.  And in your life as a whole, you have done a lot of good things.  You do have a lot of good attributes, and it is only fair that the Court recognize the good things that Josh Duggar has done.

I'm reminded, though, of a quote that's attributed to John Wooden, the basketball coach.  He said, or is attributed as having said, "The true test of a man's character is what he does when no one is watching."  And you knew Covenant Eyes was watching, and you went around Covenant Eyes.

I mentioned the no criminal history.  I've also talked about the sexual abuse that you didn't have a conviction for.  And what I forgot to mention was that the Court, all things considered, certainly believes that the pattern enhancement more than adequately accounts for that. I find to be aggravating, and I want to be careful about how

I say this.  I find to be aggravating the lack of acceptance of responsibility.  I say it that way because in the vast majority of sentencings, I find to be mitigating the acceptance of responsibility.  My concern is that my words will be misinterpreted to suggest that you had to plead guilty.  You didn't.  Every American has the right to force the government to put on the proof, and I do not hold that against you.  I'm not saying that at all.  You had every right to make the government come to this courtroom and persuade 12 people unanimously that you did this.  But there is a distinction when it comes to sentencing, when the Court evaluates unwarranted sentencing disparity, there is a difference between when you're comparing defendants about whether they have accepted responsibility or not, and you have not.  And I would add that you have not against the weight of very compelling evidence.

You're 34 years old.  You're young.  No matter what sentence the Court imposes, you will by my standards still be a relatively young person when you get out.  That bodes well for you.  You have a large family, in many respects.  Your immediate family, you have a wife and seven children who are dependent upon you financially.  And I suppose you can look at that from many different angles, but the reality is that sending you to prison for an especially long period of time will be more harming to you and to

others that depend on you that aren't in that circumstance.
And I don't think that I put a lot of weight on that, but I
think that it is a relevant, mitigating circumstance here.

You also have a large extended family.  And
here's what I want to say about that.  Often is the case
where the only people in this courtroom are the people
sitting inside the rail, which is to say that the defendant
has no one here as support.  And that doesn't reflect very
well on them, because that means that when they get out of
prison, there is probably not going to be anybody around to
help them either.  And in your case, by the letters, by the
presence of some of your family members today, that
demonstrates that they are going to be there with you
through this.  They are going to love you no matter what,
and they are going to be there when you get out.  And that
family support is mitigating, because they will help you get
through this.  They will help you transition.  It bodes well
for you not recidivating, and this is mitigating.

It is true that while you were on pretrial bond,
you had no infractions whatsoever.  The Court appreciates
that.  That hopefully speaks well of your ability to comply
with the conditions of supervised release, and I think
that's good in terms of recidivism.  I view that as
mitigating.

In terms of what is just, what will deter, and

what will protect the public, again, these types of offenses are some of the most serious that are prosecuted in this Court.  There has to be deterrence.  The Court's sentence must be emblematic of both specific deterrence and also general deterrence.  And, obviously, the Court has to take public safety into consideration as it contemplates a sentence that will be sufficient, but not greater than necessary.  I, too, have read the mother's letter, the victim impact statement.  I was going to ask you whether you had read that, but since you didn't allocute, I'm not going to ask you that question, but I can tell you that I have.  And I can tell you that Mr. Roberts' representation of what it says is accurate, and it's chilling.  And the victims, it never goes away.  If you get robbed, then maybe you never get robbed again.  But if you're a victim of child sexual abuse material, it's on the internet, and probably forever.  And these victims literally live with that all their lives.  So the Court, to the extent that it has concerns that you would recidivate, must take that into account, and given the history, the Court does have concerns.

Next, the Court must take into account sentencing disparity.  Both attorneys have addressed that.  Mr. Gelfand mentioned Mr. Carey, and I acknowledge that, 180 months.  I think that Mr. Carey is comparable in a lot of respects.  I think a few things are less aggravating about Mr. Carey,

2:23PM   1   especially the sophistication level, but some things are
       2   more serious in a lot of ways about Mr. Carey.  He was
       3   sentenced to 180 months.

       4           Mr. Kelley, I talked about with Mr. Roberts.
2:24PM   5   He's similar in the sense that he, too, went to trial.  He,
       6   too, was a criminal history category I.  124 months.
       7   However, Mr. Kelley, again, was a total offense level 37.
       8   You're a 39.  And Mr. Kelley didn't have the prior sex abuse
       9   history that you have.

2:24PM  10           Mr. Welch was mentioned.  Mr. Welch received a
      11   sentence of 83 months.  As I recall -- and that's the note
      12   that I was looking for -- his total offense level was
      13   significantly less.  Mr. Welch pled guilty.  Mr. Welch
      14   accepted responsibility.  Not only did Mr. Welch accept
2:25PM  15   responsibility, when law enforcement showed up at his door,
      16   by the time he was charged, he was in therapy.  That's how
      17   serious he accepted responsibility.  Welch's total offense
      18   level was a 34, so he's five levels lower on offense level,
      19   and he ends up with an 83-month sentence.

2:26PM  20           I couldn't find the *Tankersly* reference.  *McGrew*,
      21   he was a total offense level 34, so five levels less than
      22   you.  And keep in mind that in all of these cases that we're
      23   talking about, the Court has made the same recognition that
      24   it has a policy disagreement with 2G2.2, so this is all
2:26PM  25   apples to apples except that the comparators being offered

are significantly lower in terms of their total offense
level.

            To add a little more color to this, this Court's
average sentence in 2G2.2 non-hands-on child pornography
sentences where the defendant being sentenced was in a
criminal history category I, the average sentence was 81
months.  However, 78 percent of those defendants that
account for that average had a total offense level of
between 28 and 34, and the low end of their guideline ranges
was therefore 78 to 151.  You're at 240.  So compared to the
average offender, you start out a whole lot higher.

            The Court has also consulted the United States
Sentencing Commission.  They have an application on their
website that allows anyone to plug in -- I think anyone can
-- you can plug in the guideline that applies and you can
plug in various factors such as the total offense level and
the criminal history category.  Here, I've consulted that
database for purposes of avoiding unwarranted sentencing
disparity and I can tell you that in the five-year period
between 2017 and 2021, nationally, 93 defendants were
sentenced who had a total offense level 39 and criminal
history category I, just as you do.  The average sentence
across those 93 persons in that five-year period, the
average sentence was 192 months.  The median sentence was
188 months.

2:30PM 1        Now, that data is not the end-all to be-all.

2        Again, the Court has to look at all of these 3553(a) factors

3        more holistically and the point is to pinpoint a sentence

4        that is sufficient, but not greater than necessary.  And

2:30PM 5        that brings us to your sentence, Mr. Duggar.  I hope that I

6        have explained, it's very important to me that a defendant

7        understand the factors that the Court has considered.  I've

8        explained the framework.  I've explained the guideline

9        range, 240 months, that the Court must start at.  I've

2:31PM 10       explained why the Court has a policy disagreement with the

11       particular guideline in your case.  I've gone through all of

12       these 3553(a) factors and tried to articulate how I see them

13       as being applied in your case.  And now I'm tasked to

14       determine what is the number, what is the sentence that

2:31PM 15       would be sufficient, but not greater than necessary, to

16       achieve all of the goals and purposes of sentencing.

17               Mr. Duggar, it is the judgment of this Court that

18       you are to be committed to the custody of the United States

19       Bureau of Prisons for a term of 151 months on Count One of

2:31PM 20       the indictment.  The Court will make a recommendation that

21       you be designated to the BOP facilities in either

22       Seagoville, Texas, or Texarkana?

23               MR. GELFAND:  Yes, Your Honor, please.

24               THE COURT:  To the extent that they have bed

2:32PM 25       space in either of those facilities.  Since you mentioned

123

2:32PM 1   Seagoville, that would be the Court's preference because the
2      Court knows that they have the high-end treatment
3      programming available at Seagoville.  It's called the sex
4      offender treatment program and I will make a recommendation
2:32PM 5   that you be allowed to participate in that program.
6      Obviously, they are going to allow you to do that, but
7      somewhat oddly, although not really, they won't make you do
8      that if you don't want to.  And the reason is, if you don't
9      think you have a problem, then going through the treatment
2:33PM 10  isn't going to do anyone any good.  So I don't know what to
11     make of your situation.  You're maintaining your innocence,
12     so maybe you see no reason to engage in that therapy, but
13     I'm going to make the recommendation just in case that that
14     is of interest to you at some point.
2:33PM 15          Upon release from imprisonment, the defendant
16     shall be placed on supervised release for a term of 20
17     years.  Within 72 hours of release from the custody of the
18     United States Bureau of Prisons, the defendant shall report
19     in person to the probation office in the district to which
2:34PM 20  he is released.  While on supervised release, the defendant
21     shall not commit any federal, state, or local crimes.  He
22     shall be prohibited from possessing a firearm or other
23     dangerous device.  He shall not possess a controlled
24     substance and he must comply with the DNA collection
2:34PM 25  provisions of Title 18 U.S. Code Section 3583(d).

2:34PM  1           Since the defendant has no history of substance

2    abuse, the mandatory drug testing provisions will be waived.

3           The defendant shall comply with all local, state,

4    and federal sex offender registration requirements.

2:34PM  5           The defendant shall further comply with all of

6    the standard conditions of supervised release as recommended

7    by the United States Sentencing Commission and those

8    standard conditions are incorporated herein by reference.

9           In addition, the Court intends on imposing the

2:35PM  10    following special conditions, however, I'm going to recite

11    what those conditions are, and I'm going to give Mr. Gelfand

12    an opportunity to object and I will hear him out as I

13    promised earlier with regard to some of these conditions.

14           Number one, the defendant shall have no

2:35PM  15    unsupervised contact with minors.  And this shall include

16    his own minor children.  By supervision, or supervised

17    contact, the Court would make a finding that supervision by

18    his wife or his parents or other person approved by the

19    probation officer would be fine.  The Court would also

2:36PM  20    observe that if there's any concern about whether you might

21    attend an event or be at a location or a function or a party

22    where children or minors might be present, you should

23    proceed with caution and get the approval of your probation

24    officer before attending any such event or function.

2:36PM  25           Number two, the defendant shall submit his

person, residence, place of employment, vehicle, papers, computer and other electronic communication and/or data storage devices and effects to a search to be conducted by the U.S. Probation Office at a reasonable time and in a reasonable manner based upon any reasonable suspicion that a violation of any of the conditions of supervised release might thereby be disclosed.

Number three, the defendant shall not possess, use, or have access to a computer or any other electronic device that has internet or photographic storage capabilities unless he has first sought and obtained the prior advance approval of the United States Probation Office. Reasonable requests by the defendant for such approval should not be denied, provided that the defendant allows the United States Probation Office to install internet monitoring software, that the defendant pays for that software, and that the defendant submits to random searches of all such approved computers and electronic devices and peripherals.

The Court certainly would expect that for purposes of employment, that he should be authorized to have access to a computer, but the Court does have concern, more concern if it's in a self-employed capacity as was the case of the offense conduct here. The Court wouldn't necessarily insist on internet monitoring software if the defendant were

2:38PM  1    employed at some employer who had complete control over

2    their computers and how they are used.

3              Next, the defendant shall not purchase, possess,

4    use, distribute or administer marijuana or obtain or possess

2:38PM  5    a medical marijuana card or prescription.

6              Next, the defendant must participate in a sex

7    offense specific treatment program.  The defendant must pay

8    for the cost of the program if financially able.

9              Next, Mr. Duggar may not access or view

2:39PM 10    pornography of any kind, including so-called adult

11    pornography.  The Court is going to give an opportunity to

12    object to this.  This is not a typical condition, but the

13    Court believes that it is appropriate to impose in this case

14    and here's why.

2:40PM 15              Although the only child pornography that there

16    was evidence about at trial was the period of May 14 through

17    16, there was evidence that Mr. Duggar used other devices to

18    access adult pornography and in a manner that defeated

19    Covenant Eyes.  The Court has never had a case where an

2:41PM 20    offender had internet monitoring software and an

21    accountability partner, but this is one of those cases and

22    Mr. Duggar has factually demonstrated that he will go to

23    great links to defeat internet monitoring software.  The

24    Court has imposed conditions about access to such devices,

2:41PM 25    but has said that if he allows the probation office to put

2:41PM  1   monitoring software on the device, that reasonable access

2   should be permitted.  Well, this is a person who has shown

3   by the facts in this case to go to extreme means to avoid

4   detection.  He is also a person who has a self-admitted

2:42PM  5   pornography addiction.  We also have this weird circumstance

6   about the child pornography only being in that three-day

7   period.  And I suppose another reasonable assumption or

8   hypothesis would be, someone who has a pornography addiction

9   may on a particular set of days take that addiction in a

2:42PM  10  direction that crosses a legal line.  And the Court believes

11  that rather than leave that temptation in place against all

12  of this evidence of defeating monitoring and admitted

13  addictions, that it would be appropriate to impose a no

14  pornography of any kind condition.

2:43PM  15          The Court imposes this condition after having

16  consulted the Eighth Circuit opinions in *United States v.*

17  *Adams*, 12 F.4th 883, and *United States v. Wiedower,* 634 F.3d

18  490.  The pinpoint cite is 496 to 97.  And the record that

19  the Court has made are the specific findings as those cases

2:43PM  20  suggest need to be made.

21          This also reminds me that when I was analyzing

22  the mitigating and aggravating sentencing factors earlier,

23  that I have taken into consideration in imposing sentence

24  the very unusual fact pattern whereby the evidence, even

2:44PM  25  though there was six months of opportunity to view more, the

2:44PM 1    evidence is confined to those three days.  And that is a
2          fact pattern that I have never seen before and I have taken
3          that into consideration as a significant mitigating factor
4          in arriving at the Court's sentence.
2:44PM 5          The final condition of supervised release is, the
6          defendant shall be required to submit to periodic polygraph
7          testing at the discretion of the probation office as a means
8          to ensure that he is compliance with the requirements of his
9          supervision or treatment program.
2:45PM 10         These are the Court's intended special conditions
11         of supervised release.  Mr. Gelfand, do you wish to impose
12         an objection to one or more of those?
13         MR. GELFAND:  Yes, Your Honor, just briefly, to
14         two of them.  I believe the Court has designated the first
2:45PM 15         one as condition number six, which I'll loosely label the
16         adult pornography proposed condition.
17         THE COURT:  Yes.
18         MR. GELFAND:  I would object on First Amendment
19         grounds.  Obviously, the Court can impose conditions of
2:45PM 20         supervised release that would otherwise be violations of the
21         Constitution, but I do think that it's important to note
22         that.  I would expressly note that accessing adult
23         pornography is completely legal activity.
24         THE COURT:  I agree.
2:46PM 25         MR. GELFAND:  And I understand that, Your Honor.

2:46PM 1    The Court's computer and internet restrictions that it's

2      imposing, or at least intends to propose with respect to the

3      earlier conditions, I believe are sufficient to detect

4      illegal activity such that imposing this additional

2:46PM 5    restriction, especially considering the First Amendment

6      ramifications of it, would be unwarranted.  I think that's

7      especially true based on the fact that Mr. Duggar will be

8      subject to all of these robust collection of supervision and

9      oversight conditions by the probation office in the ordinary

2:46PM 10   course of administering its duties such that it, to me, goes

11     one step too far from a legal standpoint.

12          The next one, if the Court wants me to address

13     these collectively.

14          THE COURT:  Yes.

2:47PM 15        MR. GELFAND:  I would object as a general matter

16     to the polygraph testing condition.  In particular,

17     polygraphs are notoriously unreliable, so much so that even

18     under most case law that I'm familiar with, they are not

19     even admissible under the Federal Rules of Evidence if

2:47PM 20   somebody wanted to introduce them in the context of a trial

21     or some other hearing where the Rules of Evidence apply.

22     The lack of reliability coupled with the potential

23     ramifications based on the results of a polygraph causes

24     concern such that I would ask the Court to not impose it.

2:47PM 25        I think that as a practical matter, as is the

2:47PM 1   case with any condition of release, if specific

2   circumstances warrants the probation office to seek, or the

3   U.S. Attorney's Office, to seek some sort of modification,

4   in the same way that the defense, of course, can at the

2:47PM 5   appropriate time, the Court can perhaps take either of these

6   up, but I think that as it stands, they should not be

7   ordered.

8           THE COURT:  Thank you, Mr. Gelfand.  Does the

9   government wish to be heard?

2:48PM 10          MR. ROBERTS:  Your Honor, with respect to the

11   first issue raised, I think the Court has made the

12   appropriate record to protect the record from appeal.

13          With respect to the polygraph, there are factors

14   the Court can look at whether, for one, the defendant went

2:48PM 15   through efforts to hide his collecting activities, which he

16   did in this case.  Did he have prior instance of hands-on

17   offenses, which he did in this case.  So, again, I think

18   there's enough on the record to protect the Court's ruling

19   and conditions.

2:48PM 20          THE COURT:  Thank you.  The Court will impose the

21   special conditions as stated.

22          With regard to the objection to the ability to

23   view adult pornography, I made the record for the reasons

24   that I've already stated.  This is permissible according to

2:49PM 25   the Eighth Circuit in *United States v. Adams* and *United*

*States v. Wiedower.* I think given the considerations that I stated for the record, that it is appropriate in this case.

With regard to the polygraph, the polygraph condition is actually a very common condition in a lot of districts. It's just kind of routine. This Court does not typically impose that condition unless the Court can make findings about a defendant's particular abilities or inclination to avoid detection monitoring software. Also, in situations where there is a history of prior sexual abuse, and the Court has made findings about prior sexual abuse. And so the combination of his getting around Covenant Eyes, his ability and technical know-how to do that, combined with his prior history, the Court believes collectively is justification for imposing the polygraph testing condition in this case.

I will note that the Administrative Office has a very detailed policy, United States Probation Office has a very detailed policy about this, and it's actually used as part of a treatment program. It's not used as a tool to trip people up, and, obviously, any results could not be evidence in a revocation type hearing. So to the extent that's the concern, it shouldn't be a concern.

So those are the conditions. With regard to a fine, the Court has assessed the updated financial information as set out in the presentence report and finds

2:52PM  1    that the defendant does have the ability to pay a fine.

2    Specifically refer and incorporate by reference paragraph

3    136.  And the information there indicates a net worth in

4    liquidatable assets that can support the imposition of a

2:52PM  5    fine and the special assessments.  And given the size of the

6    special assessments, the Court will impose a fine in the sum

7    of $10,000.  Interest will be waived.  The Court will also

8    impose the $100 regular special assessment.  It will also

9    impose the $5,000 special assessment as well as the $35,000

2:53PM  10   special assessment pursuant to Title 18 U.S.C. Section

11   2259(a).  That would make the total financial obligations

12   $50,100.  These financial obligations are technically due

13   and payable immediately.  To the extent they are not paid in

14   full immediately, the Court will require payments on the

2:54PM  15   following schedule:

16           Any unpaid portion of the financial obligations

17   shall be paid by the defendant during his term of

18   imprisonment at a rate of up to 50 percent of the

19   defendant's available funds in accordance with the Bureau of

2:54PM  20   Prisons Inmate Financial Responsibility Program.  During any

21   period of residential reentry placement, to the extent that

22   that would be permitted in a case such as this, the payments

23   shall become an amount equal to 10 percent of the

24   defendant's gross monthly income.

2:55PM  25           The payment of any remaining balance shall become

a condition of supervised release and shall be payable in

monthly installments of $500, or 15 percent of the

defendant's net monthly household income, whichever is

greater, with the entire balance to be paid in full not

later than one month prior to the end of the period of

supervised release.

        Mr. Gelfand, this is the Court's intended

sentence.  Are you aware of any legal reason why it should

not be imposed?

        MR. GELFAND:  No, Your Honor, none other than as

previously raised and ruled on by the Court.

        THE COURT:  Thank you.  Mr. Roberts?

        MR. ROBERTS:  No, Your Honor.  No objections.

        THE COURT:  Very well.  The sentence is imposed

as stated.

        Mr. Duggar, I need to advise you of your appeal

rights.  I think this is superfluous, but I'm required to

advise you anyway.

        You do have the right to appeal, and that

obviously includes the conviction by the Jury and the

judgment to follow in your case.  Some important things you

need to know about your right to appeal would include the

fact that there's a short time limit for doing so.  You only

have 14 days from the day that the Court files its judgment

to get your notice of appeal filed with the clerk.

2:56PM  1    Ordinarily, there's a filing fee that goes along with that,

2       but if for some reason, you can demonstrate that you cannot

3       afford to pay the filing fee, then the Court would waive it.

4              Finally, and importantly, you do have the right

2:56PM  5    to be represented by counsel on appeal.  And to the extent

6       that you cannot afford to retain counsel privately for that

7       purpose, the Court will appoint counsel to represent you

8       free of charge on appeal.

9              Mr. Duggar, do you understand these appeal

2:56PM  10   rights?

11             THE DEFENDANT:  Yes, Your Honor.

12             THE COURT:  All right.  I think we have one more

13      matter.  There was the forfeiture of the HP computer.  For

14      the record, the Court has kind of been e-mailing back and

2:57PM  15   forth with the attorneys on this.

16             Mr. Gelfand, my understanding would be that you

17      have no objection in principle to the concept of the

18      forfeiture, but you want to make darn sure that the computer

19      remains and is considered evidence and nothing will change

2:57PM  20   about its character or conditions throughout any period of

21      appeal and until any judgment may be found to be final in

22      the sense of a mandate issued by the highest court of

23      appeal.

24             MR. GELFAND:  Precisely, Your Honor.  Nobody

2:58PM  25   wants the computer back, so to speak.  Just preserved.

135

2:58PM 1          THE COURT:  So the Court is going to enter the
2    form of the order that the government prepared, except we
3    are going to add a sentence that says that you can't do
4    anything else with it without further order of the Court.
2:58PM 5          Upon conclusion of our hearing, Mr. Duggar will
6    be remanded to the custody of the United States Marshals
7    Service pending designation and transfer to the Bureau of
8    Prisons.
9          Anything else from the government?
2:58PM 10         MR. ROBERTS:  No, Your Honor.  Thank you.
11         THE COURT:  Anything else from the defense?
12         MR. GELFAND:  No, Your Honor.  Thank you very
13    much.
14         THE COURT:  We're adjourned.
3:00PM 15         (proceedings concluded at 2:58 p.m.)

C E R T I F I C A T E

I, Paula K. Barden, CCR, RPR, RMR, Federal Official Court Reporter, in and for the United States District Court for the Western District of Arkansas, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 30th day of May 2022.



‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
PAULA K. BARDEN, CCR, RPR, RMR #700
Federal Official Court Reporter
Western District of Arkansas