# United States Court of Appeals
## For the Eighth Circuit

_____

No. 22-2178
_____

United States of America

*Plaintiff - Appellee*

v.

Joshua James Duggar

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Western District of Arkansas - Fayetteville

_____

Submitted: February 16, 2023
Filed: August 7, 2023

_____

Before SMITH, Chief Judge, STRAS and KOBES, Circuit Judges.

_____

STRAS, Circuit Judge.

     Joshua Duggar challenges his conviction for receiving child pornography. *See* 18 U.S.C. § 2252A(a)(2), (b)(1). Although he seeks to suppress incriminating statements and get a new trial, we affirm.

I.

Duggar used a computer to download hundreds of child-pornography images. Law enforcement tracked the images to a used-car dealership he owned by identifying the internet-protocol address of the computer.

Not long after, a team of federal agents arrived with a search warrant. Two walked "directly" up to Duggar, who pulled out a cell phone and said he "wanted to call his attorney." But before he could complete the call, they seized it because it "was considered evidence."

When asked whether he would like "to discuss further details" about the warrant, he said yes. Without waiting for an explanation, Duggar blurted out, "[w]hat is this about? Has somebody been downloading child pornography?" He then let it slip that he was "familiar with" file-sharing software and had installed it on "all of" his electronic devices, including "the computer in the office."

A grand jury indicted Duggar for possessing and receiving child pornography. *See* 18 U.S.C. § 2252A(a)(2), (a)(5)(B), (b)(1)–(2). Before trial, he filed a motion to suppress the statements he made at the scene without his lawyer present. The district court[1] denied the motion, concluding he was not in custody at the time. *See United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990).

Those statements took on a critical role at trial. And so did the metadata from his iPhone, which placed it at the dealership when the child pornography was downloaded.

Duggar, for his part, tried to point the finger elsewhere. Looking to convince the jury that it faced "a classic, old-fashioned 'whodunit,'" he suggested that a

---

[1]The Honorable Timothy L. Brooks, United States District Judge for the Western District of Arkansas.

-2-

former employee, who happened to be a convicted sex offender, was to blame. Duggar ultimately decided not to call him to the stand, however, because the district court ruled that any mention of the employee's prior conviction was off-limits. *See* Fed. R. Evid. 403, 609(a)(1)(A).

The jury found Duggar guilty as charged. After entering judgment on the receipt-of-child-pornography count, *see United States v. Soto*, 58 F.4th 977, 982 (8th Cir. 2023), the district court sentenced him to 151 months in prison.

## II.

Duggar believes that the district court's decision to stop him from asking about the employee's prior sex-offense conviction deprived him of his right to present a complete defense. Our review is de novo. *See United States v. West*, 829 F.3d 1013, 1017 (8th Cir. 2016).

### A.

The Fifth and Sixth Amendments "guarantee[] criminal defendants a meaningful opportunity to present a complete defense." *United States v. Clay*, 883 F.3d 1056, 1060 (8th Cir. 2018) (per curiam) (citation omitted); *see* U.S. Const. amends. V, VI. What it includes is subject to debate, but there seems to be little doubt that it applies to evidence "show[ing] that someone else committed the crime." *Holmes v. South Carolina*, 547 U.S. 319, 327 (2006). Nevertheless, the Supreme Court has struck a balance to accommodate other "legitimate interests in the criminal trial process": ordinary evidentiary rules still apply, except when they "'infring[e] upon a weighty interest of the accused' and are 'arbitrary' or 'disproportionate to the purposes they are designed to serve.'" *Id.* at 324–26 (quoting *United States v. Scheffer*, 523 U.S. 303, 308–09 (1998)).

The district court, for its part, tried to strike a balance too. It recognized that Duggar should have an opportunity "to create reasonable doubt" by "call[ing]" the

-3-

former employee to testify and asking whether he was "present on the car lot" when the downloads occurred. But he could not impeach him with a prior sex crime or introduce "speculative" testimony. *See* Fed. R. Evid. 609(a) (explaining that a prior felony conviction "must be admitted, subject to Rule 403" to attack "a witness's character for truthfulness"); *United States v. Thibeaux*, 784 F.3d 1221, 1226 (8th Cir. 2015). The reason, according to the court, was to prevent confusion: the jury might think he did it *because* he was a sex offender, even though the conviction was only potentially admissible as impeachment evidence. *See* Fed. R. Evid. 403 (allowing courts to "exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . confusing the issues"); *see also* Paul F. Rothstein, *Federal Rules of Evidence* 508–09 (3d ed. 2019) (explaining that "the similarity of the past crime" is "a factor militating against admission . . . because of the likelihood a juror might impermissibly use the conduct to suggest guilt rather than merely incredibility").

The court had no obligation under the Fifth and Sixth Amendments to do anything more. As the Supreme Court has put it, nothing in the Constitution calls into question "well-established rules" that "permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." *Holmes*, 547 U.S. at 326. The right to present a complete defense, in other words, does not trump a district court's discretion to keep out confusing or misleading evidence, even if it would be helpful to the defense. *See Crane v. Kentucky*, 476 U.S. 683, 689–90 (1986) (emphasizing that courts have "'wide latitude' to exclude evidence that is 'repetitive . . . , only marginally relevant' or poses an undue risk of 'harassment, prejudice, [or] confusion of the issues'" (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986))).

In short, the district court had "unquestionably constitutional" discretion to exclude the conviction under Federal Rule of Evidence 403. *Montana v. Egelhoff*, 518 U.S. 37, 42 (1996) (plurality opinion). It necessarily follows that the court's application of this "well-established rule[]" could not have violated Duggar's Fifth

-4-

and Sixth Amendment rights. *Holmes*, 547 U.S. at 326; *see State v. Pass*, 832 N.W.2d 836, 842–43 (Minn. 2013) (concluding that the exclusion of alternative-perpetrator evidence under Minnesota's version of Rule 403 did not violate the defendant's right to present a complete defense).

B.

It is true, as Duggar points out, that the district court slipped up along the way. It mentioned "the strength of the prosecution's case" as a factor weighing against the admission of alternative-perpetrator evidence.

Although this statement was wrong, any error was harmless. *See* Fed. R. Crim. P. 52(a); *see also United States v. Herbst*, 668 F.3d 580, 585–86 (8th Cir. 2012). The district court later clarified that it had actually "relied on" the weaknesses in *Duggar's* evidence and the risk of confusion, not the strength of the government's case. *See Holmes*, 547 U.S. at 329 (emphasizing the need to "focus on the probative value or the potential adverse effects of admitting the defense evidence of third-party guilt"); *United States v. White Plume*, 847 F.3d 624, 630 (8th Cir. 2017) (affirming a ruling that limited the defendant's ability to impeach his wife with evidence that she had previously abused children when he "provid[ed] only speculation to connect" it to later abuse). Both were independently valid reasons for limiting the alternative-perpetrator evidence that Duggar could introduce.

III.

In his second argument, Duggar shifts his attention from what the district court kept out to what it let in: his incriminating statements during the search at the car dealership. He wanted them suppressed on the ground that the agents violated his right to counsel, which he tried to invoke by mentioning a lawyer and then attempting to call one. *See Miranda v. Arizona*, 384 U.S. 436, 473–75 (1966). We review any factual findings for clear error but consider de novo whether Duggar's

-5-

right to counsel had attached. *See United States v. Parker*, 993 F.3d 595, 601 (8th Cir. 2021).

The right to counsel at issue "relat[es] to the Fifth Amendment guarantee" against self-incrimination. *McNeil v. Wisconsin*, 501 U.S. 171, 176 (1991); *see* U.S. Const. amend. V ("No person . . . shall be compelled in any criminal case to be a witness against himself . . . ."). Under *Miranda*, certain protections attach, including a right to counsel, the moment a suspect is in custody. *See Davis v. United States*, 512 U.S. 452, 457–58 (1994); *see also United States v. Ferguson*, 970 F.3d 895, 901 (8th Cir. 2020) (stating that "whether a person is in custody dictates whether he is entitled to *Miranda* protections"). Here, the government argues that, even if the agents interrogated Duggar, they did not take him into custody before he incriminated himself.

Custody includes more than just formal arrest. It also covers situations in which "a reasonable person" in the suspect's shoes "would consider his freedom of movement restricted to the degree associated with formal arrest." *United States v. Muhlenbruch*, 634 F.3d 987, 995–96 (8th Cir. 2011) (citation omitted). Everyone agrees that there was no arrest that day, but we must still consider if someone in Duggar's shoes might have reasonably thought otherwise. Six factors guide our analysis:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong[-]arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

*Griffin*, 922 F.2d at 1349.

The first factor, which is "[t]he most obvious and effective means of demonstrating that a suspect has not been 'taken into custody,'" weighs heavily in the government's favor. *Id.* (quoting *Miranda*, 384 U.S. at 444). When the agents arrived, they told Duggar that they had "a federal search warrant, not an arrest warrant, and [that] he was free to leave if he chose to do so." Later, when the agents invited Duggar to speak with them, they reiterated that he "ha[d] the right to stop the questioning at any time." The agents, in other words, "clearly inform[ed] [Duggar] that [he] [was] free to leave or decline questioning." *United States v. Sanchez*, 676 F.3d 627, 631 (8th Cir. 2012).

It is true that the agents read him his *Miranda* rights, which ordinarily might leave someone with the impression they are in custody. But when Duggar signed a form acknowledging his rights, he had the agents "scratch . . . out" the portion saying that he was being "taken into custody." Modifying the form made it clear he was free to leave:

> I have had the above statement of my rights read and explained to me and I fully understand these rights. I waive them freely and voluntarily, without threat or intimidation and without any promise of reward or immunity. ~~I was taken into custody at~~ 1540 (time), on 11/8/2019 (date), ~~and have signed this document at~~ _____ (time), on _____ (date).
>
> JOSHUA JAMES DUGGAR
> Print Name                                     Signature

The second and third factors also favor the government. Duggar sat in the front passenger seat of the agents' truck during the interview. They "did not handcuff him, the doors remained unlocked, and he entered and exited the front seat of the vehicle on his own," which means he "retained freedom of movement throughout the" encounter. *United States v. Johnson*, 39 F.4th 1047, 1051 (8th Cir. 2022); *see United States v. Soderman*, 983 F.3d 369, 377 (8th Cir. 2020). And although the agents "initiated contact with" Duggar, he still "voluntarily acquiesced" to the questioning. *Griffin*, 922 F.2d at 1349; *see United States v. Axsom*, 289 F.3d

-7-

496, 501–02 (8th Cir. 2002). Indeed, he began the interview with a question of his own—"[h]as somebody been downloading child pornography?"—and "continued to converse" with them for about an hour. *United States v. Sandell*, 27 F.4th 625, 629 (8th Cir. 2022); *see Johnson*, 39 F.4th at 1052.

The fourth and fifth factors, by contrast, do not move the needle much in either direction. It is true that the agents failed to follow through on their promise to "alert" Duggar's lawyer to the search. Even so, it would not have "prevent[ed] a reasonable person from terminating the interview." *United States v. Laurita*, 821 F.3d 1020, 1026 (8th Cir. 2016) (citation omitted) (explaining that "[t]he use of deception is irrelevant unless it relates to a reasonable person's perception of his freedom to depart"). Nor does the fact that law enforcement "assume[d] control of the" dealership necessarily mean the interview was "police dominated." *Griffin*, 922 F.2d at 1352. At least not here, when Duggar and the agents were engaged in consensual, "two-way questioning." *Laurita*, 821 F.3d at 1027 (citation omitted); *see Johnson*, 39 F.4th at 1051 (describing the fifth factor as "mixed" when "the interviews were two-way discussions" but "occurred in the agents' vehicle").

Finally, Duggar was not "arrest[ed] at the termination of the questioning." *Griffin*, 922 F.2d at 1349. To the contrary, he ended the interview on his own and then left the dealership—hardly an option available to someone in custody. *See United States v. Treanton*, 57 F.4th 638, 642–43 (8th Cir. 2023) (Stras, J., concurring in the judgment) (emphasizing that the sixth *Griffin* factor "still counts").

Viewed through *Griffin*'s lens, we conclude that a reasonable person in Duggar's position would not have thought "his freedom of movement" was "restricted." *Muhlenbruch*, 634 F.3d at 995 (citation omitted). It follows that the admission of his statements did not violate *Miranda*. *See id.* at 997.

IV.

The last issue deals with the metadata from Duggar's iPhone. Metadata can provide the who, what, when, and where of electronic files and records. *See United States v. Hager*, 710 F.3d 830, 832 n.2 (8th Cir. 2013); *see also The American Heritage Dictionary of the English Language* 1105 (5th ed. 2016) (defining metadata as "[d]ata that describes other data," including "the origin, structure, or characteristics of computer files"). Here, according to the government's forensic analyst, it revealed the where (at the dealership) and the when (at the same time as the child-pornography downloads) that connected Duggar to the crime. On appeal, he challenges the analyst's qualifications and methods as well as the limitations placed on the testimony of his own expert. Our review of both issues is for an abuse of discretion. *See Shipp v. Murphy*, 9 F.4th 694, 700 (8th Cir. 2021); *Russell v. Anderson*, 966 F.3d 711, 730 (8th Cir. 2020).

A.

The government's analyst explained in detail how he conducted his analysis. His examination began with photographs that Duggar had transferred from his iPhone to his laptop. They "contain[ed] a lot of EXIF information," including "the GPS coordinates of where" he took them. *See Hager*, 710 F.3d at 832 n.2 (explaining that EXIF metadata "provides identifying information about [a] file," like "when the . . . file was produced" and "when it was last modified" (citation omitted)). The next step involved plotting the coordinates online, in programs like Bing and Google Maps, which placed the iPhone at the car lot at the same time as the downloads of child pornography.

The analyst was qualified to testify about what he found. To start, not everything he said required "scientific, technical, or other specialized knowledge." Fed. R. Evid. 701(c). For example, even if interpreting EXIF metadata takes some expertise, *see United States v. Natal*, 849 F.3d 530, 536–37 (2d Cir. 2017) (per curiam), the "process" of plotting coordinates on a map does not, *United States v.*

*Mast*, 999 F.3d 1107, 1112 (8th Cir. 2021); *see United States v. STABL, Inc.*, 800 F.3d 476, 487 (8th Cir. 2015).  Nor did the analyst have an obligation to explain how GPS technology works, given that its "accuracy and reliability" are "not subject to reasonable dispute."  *United States v. Brooks*, 715 F.3d 1069, 1078 (8th Cir. 2013) (quoting Fed. R. Evid. 201(b)).

To the extent some of the testimony required "specialized knowledge," the district court did not abuse its discretion in concluding that he had it.  Fed. R. Evid. 702(a).  After all, he had examined "[t]housands" of electronic devices and written "[h]undreds" of forensic reports, many of which involved the analysis of EXIF metadata.  *See United States v. Perry*, 61 F.4th 603, 606 (8th Cir. 2023) (affirming the admission of expert testimony by a firearms examiner with eight years of experience who had previously performed ballistics comparisons "a few dozen times").

The analyst also provided enough detail to conclude that his "methods" were "reliably applied."  Fed. R. Evid. 702(d).  First, he personally "examin[ed]" the photographs himself.  *See* Fed. R. Evid. 703 (allowing an expert to "base an opinion on facts or data" that he "personally observed"); *see also Klingenberg v. Vulcan Ladder USA, LLC*, 936 F.3d 824, 829 (8th Cir. 2019).  Then he "look[ed] at the raw data" and "verif[ied] that it's basically accurate" by displaying "the GPS coordinate[s]" in online maps.  *See Kozlov v. Associated Wholesale Grocers, Inc.*, 818 F.3d 380, 394 (8th Cir. 2016).  Given that he had used these methods "in many cases" over "a long time" and that he doublechecked his work before reaching a conclusion, we cannot say the court abused its discretion in admitting his testimony.[2]  *See Russell v. Whirlpool Corp.*, 702 F.3d 450, 457 (8th Cir. 2012).

---

[2]The government satisfied its disclosure obligation by informing Duggar that its forensic analyst may discuss "digital photos . . . that contain metadata, including geolocation information."  *See* Fed. R. Crim. P. 16(a)(1)(G); *see also United States v. Spotted Horse*, 914 F.3d 596, 601 (8th Cir. 2019).

-10-

B.

The same goes for the limitations on what Duggar's expert could say. Although the district court allowed her to speak generally about EXIF metadata, she could not suggest that the "dates and times" were wrong. She never "load[ed]" any of it "into [her] software." So, as she put it, her testimony consisted of a lot of "I don't know[s]."

It was not an abuse of discretion to limit her testimony to what she knew. After all, it would have been "pure conjecture" for her to suggest that there were errors in metadata she never examined. *J.B. Hunt Transp., Inc. v. Gen. Motors Corp.*, 243 F.3d 441, 444 (8th Cir. 2001); *see UnitedHealth Grp. Inc. v. Exec. Risk Specialty Ins. Co.*, 870 F.3d 856, 865 (8th Cir. 2017). Not to mention it had the potential to confuse and mislead the jury. *See* Fed. R. Evid. 403; *United States v. Coutentos*, 651 F.3d 809, 821 (8th Cir. 2011); *Fireman's Fund Ins. Co. v. Canon U.S.A., Inc.*, 394 F.3d 1054, 1060 (8th Cir. 2005).

It does not matter that the government cross-examined her about the EXIF time stamps on the photographs. She responded by "assuming the information" in the government's exhibits was "accurate," because she had "not personally" verified it. Given that qualification, she did not leave the jury with the "false impression" that she agreed with the government's analysis. *United States v. Midkiff*, 614 F.3d 431, 442–43 (8th Cir. 2010). There was, in other words, nothing for her to clarify. *See Valadez v. Watkins Motor Lines, Inc.*, 758 F.3d 975, 981 (8th Cir. 2014).

V.

We accordingly affirm the judgment of the district court.

_____