IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF ARKANSAS

FAYETTEVILLE DIVISION

| | |
|---|---|
| FILED | |
| United States District Court | |
| Western District of Arkansas | |
| October 28 2025 | |
| Office of the Clerk | |

JOSHUA JAMES DUGGAR,                    )

    Movant,                                         )

v.                                                      )    **Case No. 5:21-CR-50014**

UNITED STATES OF AMERICA,            )

    Respondent.                                  )

## MOVANT'S REPLY TO GOVERNMENT'S RESPONSE MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE PURSUANT TO 28 U.S.C. § 2255

### BACKGROUND

**I. The 2019 Search and Origins of the Case**

On November 8, 2019, federal agents with Homeland Security Investigations (HSI) executed a search warrant at Wholesale Motorcars, a small used-car dealership, owned by Joshua James Duggar ("Movant," "Mr. Duggar") near Tontitown, Arkansas. Although the warrant was based on an IP address associated with the business, the subscription was listed in Mr. Duggar's name, and agents treated him as the central figure from the outset. Sworn testimony shows agents waited for Mr. Duggar to arrive before initiating the search, despite the lot being open to other employees and customers.

Prior to this, agents had mistakenly attempted to execute a warrant at another nearby property but did not proceed once they

realized Mr. Duggar was not present. This illustrates that the focus was on Mr. Duggar rather than the location or network itself.

During the search of the business, agents seized Mr. Duggar's HP desktop computer, personal laptop, and iPhone, which were sent to government laboratories for examination. Randall Berry, an employee present at the time, had his phone subjected to a brief "manual triage" and returned to him. Other devices on-site, including those potentially used by other individuals, were not forensically imaged or seized. The HP computer was shared-use, and network evidence, including a Wi-Fi router, was left in place.

## II. The Indictment and Charging Theory

On April 28, 2021, a Grand Jury returned a two-count indictment against Mr. Duggar. Count One charged Receipt of Child Pornography under 18 U.S.C. § 2252A(a)(2), and Count Two charged Possession of Child Pornography under 18 U.S.C. § 2252A(a)(5)(B). The possession charge was later dismissed as a lesser-included offense. These charges reflected continued focus on Mr. Duggar personally, rather than the broader shared-access environment, including other alternative perpetrators.

## III. Pretrial and Witnesses

In late 2021, the defense sought to present evidence regarding alternative users of the office computer. Notably, Caleb

Williams was not contacted by agents until November 2021, approximately 30 months into the investigation, after the defense referenced him in filings. Agents had not examined Williams' devices prior to this time, and none of his devices were submitted for forensic examination. Defense evidence, including emails referencing additional passwords and potential use of the shared computer, was restricted in its presentation.

## IV. The Trial

Mr. Duggar's trial began December 1, 2021, lasting eight days. Numerous evidentiary rulings limited the defense's ability to present contextual evidence regarding shared access to the HP computer, the uncollected router, and other potentially relevant sources. Government expert testimony was admitted to draw conclusions from the forensic examination of Mr. Duggar's devices, whereas the defense expert's scope was narrowly circumscribed. The jury received a narrow, curated view of the evidence, and questions about other users of the computer remained unresolved.

On December 9, 2021, the jury returned guilty verdicts on two counts.

## V. Sentencing

On May 25, 2022, Mr. Duggar was sentenced before Judge Timothy L. Brooks. The possession count was dismissed as a lesser-included offense, consistent with the Double Jeopardy

4

Clause. He received 151 months imprisonment, followed by 20
years of supervised release.

## VI. Direct Appeal and Supreme Court Review

The appeal raised three main issues: exclusion of
alternative-perpetrator evidence, alleged interference with
counsel, and challenges to the government expert testimony
versus restricted defense expert testimony. The appellate brief
was filed October 4, 2022.

On March 1, 2023, the Eighth Circuit affirmed the conviction.
Mr. Duggar petitioned the U.S. Supreme Court, which denied
certiorari on June 24, 2024, regarding the exclusion of
alternative-perpetrator evidence.

## VII. Post-Conviction Filings

On May 27, 2025, Mr. Duggar filed a pro se motion requesting
appointment of counsel for a potential 28 U.S.C. § 2255
proceeding. The motion was denied June 6, 2025.

On July 29, 2025, Mr. Duggar filed a § 2255 motion to vacate,
set aside, or correct his sentence (Doc. 179). A duplicate copy
was filed August 22, 2025 (Doc. 182). The Court ordered the
government to respond on or before September 4, 2025.

On August 28, 2025, the Government filed a motion to Strike
(Doc. 183). On September 3, 2025 the government filed for an
extension of time (Doc 184). The Court granted an extension of
time for Government response through September 11 and extended

Mr. Duggar's reply time to October 9, 2025. The Government filed a response motion on September 11, 2025. This filing constitutes Mr. Duggar's reply to the government's response.

## INTRODUCTION TO ARGUMENT

### A. RESPONSE TO GOVERNMENT REPLY: A CHANCE TO CLEAR THE AIR

This § 2255 motion is Movant's first opportunity to address this Court, in more detail, and by extension the public, directly and with complete candor from federal prison, as a pro se filer. To that end, Movant must speak plainly. **While he respects the jury's verdict based on the evidence presented, he believes the full context of his life and actions was not fully before them, which he hopes this motion will help begin to clarify.**

He is not perfect; as a child over 20 years ago, he made choices that later came under public scrutiny. A damaging, illegal 2015 release of sealed juvenile investigation records contained allegations that have caused recurring pain for his family, specifically his sisters. He also made poor decisions as an adult, specifically concerning infidelity in his marriage, for which he takes full responsibility. Prior to this federal conviction, however, Movant had never been charged with a crime or any other legal violation, other than a couple of traffic tickets.

6

But those personal failings are not the crimes for which he was convicted. While the jury reached a verdict based on the evidence presented at trial, Movant contends that the jury saw a one-sided view, built largely on circumstantial evidence, and did not have the opportunity to fully consider all relevant facts, including matters of prior acts and disputed technical data. He is a committed husband and father and strives to be a productive member of his community. Ultimately, Movant seeks relief not only for himself but also for the sake of his wife of seventeen years, Anna, and their seven children: Mackynzie, Michael, Marcus, Meredith, Mason, Maryella, and Madyson.

Movant understands it is difficult to prove a negative. The government built its case on a hodgepodge of circumstantial evidence, which focused heavily on disputed location and photograph data. The government repeatedly argued that Movant's presence within a certain radius of his business—even sometimes over 10 miles away—constituted evidence of guilt. The simple act of demonstrating responsibility in managing his small business was somehow twisted into criminality. This, combined with a host of other disputed so-called 'facts' and technical data, was used to destroy his reputation and to argue to the jury that "only Mr. Duggar" had the access and opportunity to commit these alleged crimes. Many government assertions went unrebutted at

trial because Movant exercised his constitutional right not to testify, and prior counsel failed to challenge a cascade of constitutional violations.

This flawed narrative was then presented to a grand jury, a body the public believes to be a robust check on prosecutorial power. The reality is starkly different. The infamous line, "a grand jury would indict a ham sandwich," is a cynical but statistically accurate reflection of the modern federal system. A federal grand jury is a secret, one-sided proceeding of up to 23 people where there is no judge present and the prosecutor alone runs the show. An indictment requires the votes of only 12 jurors, not a unanimous decision. This complete prosecutorial control has led critics to label the grand jury a mere "rubber stamp." Data from the Bureau of Justice Statistics (BJS, 2010) shows that out of tens of thousands of cases presented by federal prosecutors, grand juries decline to indict in less than 0.1% of cases—an effective 99.9% indictment rate. **Apparently, only God is correct more often than a federal grand jury.**

Once an indictment is secured, the system is structured to discourage the very act of a defense. Over 97% of federal convictions are obtained through plea bargains—creating a coercive environment where the choice is not between guilt and innocence, but between a negotiated sentence and the risk of a

much harsher one. The small percentage of defendants who go to trial (only about 2%) are often hit with the unspoken "trial penalty"— a price this Movant paid for exercising his constitutional right to a jury. That penalty was not merely the loss of a potential plea offer; it was a concrete punishment that included over $50,000 in fines and fees. Movant did not receive credit for 'acceptance of responsibility,' a benefit typically applied when a defendant pleads guilty, because he maintained his innocence. While he understands the jury reached a verdict based on the evidence presented, he respectfully notes that this procedural rule meant he was not afforded the usual recognition for accepting responsibility.

In effect, if you exercise your right to defend yourself, you pay for it. The process is heavily one-sided: once a prosecutor files charges, a grand jury almost always returns an indictment, and most defendants accept plea agreements rather than risk trial. For the few who go to a jury, convictions are nearly inevitable—only 290 of 71,954 federal criminal defendants in fiscal year 2021, only about 0.4%, were acquitted. See Pew Research Center, *Fewer Than 1% of Defendants in Federal Criminal Cases Were Acquitted in 2022* (June 14, 2023). **In short, indictment to conviction is more certain than punching someone in the nose and drawing blood.**

This flawed process becomes even more dangerous when fueled by a politicized narrative. After Movant joined the conservative national political scene, **he was greeted by a long, multi-year IRS audit initiated by the Obama-Biden administration**, which he successfully passed, resulting in a refund for overpayment. See H. Comm. on Oversight & Gov't Reform, *How Politics Led the IRS to Target Conservative Tax-Exempt Applicants for Their Political Beliefs*, H.R. Rep. No. 113-415, at 1 (2014).

The illegal 2015 release of sealed juvenile investigation records, in response to a FOIA request, contributed to additional significant public scrutiny. Movant acknowledges that, by living a public life and not living up to his own Christian standards at times, he exposed himself and his family to criticism—including from those who opposed their political and religious views. However, this **public attention should not be equated with criminality.** While Movant is not immune to criticism, the manner in which these events intersected with the federal criminal process raises serious concerns about fairness and the proper application of constitutional protections.

The timing of Movant's indictment—on the 100th day of the Biden administration—and the assignment of a prosecutor from Washington, D.C., at the Department of Justice are matters of public record. Politics should have no place in court

proceedings, but unfortunately, it often does. **Bias infects every person, but the legal process is where those biases must be set aside. The Constitution and the law demand it.**

At trial, prosecutors focused on the shocking nature of the alleged evidence. While the depictions are undeniably disturbing, Movant has never viewed them—in fact, he instructed his defense team to turn off the preview monitors. But for all the emotional spectacle, the government agents cared only about one thing: getting the big fish to hang on their wall. They wanted the reality TV star to be their big catch. Well, they got him. **But just like dynamite is illegal in fishing, so too are the explosive constitutional violations outlined in this § 2255 motion.**

This desire for a more just system, however, is not born of bitterness. It is important for the public to understand that in the federal system, a jury's role ends with the verdict. **The jury flips the power switch at conviction, but the judge drives the machine.** The federal sentencing guidelines are a labyrinth: enhancements often add years for the same allegations, and even uncharged conduct can be piled on, creating a system that feels arbitrary and punitive. Sentences are often driven by public fear rather than a rational calibration of punishment to the crime. While non-contact sexual offenses are not always legally

classified as "violent," they are punished with a severity that rivals violent crimes, guided by rigid mandatory minimums built on public anger rather than on true concern for public safety or rehabilitation.

Yet, it is within this flawed system that a glimmer of how things could be different can emerge. During Movant's sentencing, Judge Brooks himself shared concerns regarding these very guidelines and the broader need for a conversation about over-criminalization. While Movant fundamentally disagrees with the verdict and judgment, **he is profoundly grateful that Judge Brooks recognized the system's potential for injustice and granted a downward departure**—a discretionary act of mercy not afforded to all. That moment showed what is possible when a thoughtful jurist balances justice with mercy, particularly when so many are subject to a "cookie-cutter" approach to justice, which politicians often fear altering lest they be labeled "soft on crime."

As uncomfortable as it may be, this is a conversation our society must have. Federal sentences on average are significantly longer than state sentences, and because there is no parole, inmates serve far more of their term. On top of the sentence, they then face years of supervised release, a restrictive form of probation. Despite this added severity,

research finds no evidence that longer sentences reduce crime or
recidivism. See *U.S. Sent'g Comm'n, Length of Incarceration and
Recidivism* 3 (2022); *The Pew Charitable Trs., Federal Drug
Sentencing Laws Bring High Cost, Low Return* 2 (2015).

However, **President Trump's 2018 bipartisan landmark First Step
Act (FSA) proves that a different, better path is possible.**
Movant has seen its tremendous benefits firsthand, and its
data-driven success is undeniable. The FSA makes our communities
safer, with a recidivism rate 37% lower than comparable pre-Act
groups. Nancy La Vigne et al., *Nat'l Inst. of Just., The First
Step Act: A Five-Year Review* 4 (2023). It saves taxpayers
billions by reducing the immense costs of incarceration—over
$43,000 per inmate annually. 89 Fed. Reg. 15,015 (Mar. 1, 2024).
This is achieved through an evidence-based system where inmates
must earn their way to a lower-risk classification by completing
targeted programs. U.S. Dep't of Just., *The First Step Act of
2018: Third Annual Report* 20 (2023).

Congress and President Trump should look at expanding this
successful model's eligibility. **Currently, most sex offenders
and other similar "risk" groups are excluded from many benefits
of FSA, highlighting the need for broader reform.** Surprisingly,
over 99% of federal inmates have a release date and will
eventually reenter society. See *U.S. Sent'g Comm'n, Life*

*Sentences in the Federal System* 2, tbl.1 (2022). This reality underscores the need for robust reentry programs that are restorative. For those who say "lock them up and throw away the key," remember: these people will one day be your neighbors. Do you want them returning angry and broken, or as law-abiding citizens contributing to your community? The old system has made too many bitter; our goal should be to make them better. This motion is not about solving all these broad criminal justice issues, but it provides a backdrop of the canvas upon which Movant's current situation has been painted.

Since Movant has been in prison, primarily with sex offenders, he has reflected deeply on those with release dates coming up. According to a nine-year study, 92% of sex offenders are not rearrested for another sex crime, while about 67% of other released prisoners—including theft, drug, and violent offenders—are rearrested at some point. *See* BJS, 2010. The difference comes down to culture and rehabilitation. Society needs to ask why fear and outrage are so out of proportion to actual risk—and focus on real solutions: better treatment, reasonable monitoring, and safe reintegration. Whether a sex offender gets 1 year or 20, they will eventually walk out the prison gate. Change does not happen magically with time served; rational reforms and bold leadership are needed to keep

communities safe while helping people rebuild their lives—and bold leaders like President Trump understand the merits of these strategic evidence-based reforms. These and similar thoughts have guided Movant as he has pursued higher education while incarcerated, obtaining his paralegal certification from Adams State University, and he is currently pursuing accredited business administration and management degrees from another state university.

Movant remains grateful for the enduring principles of the United States. Even as an imprisoned man—incarcerated in the very system he now petitions—he can attend Christian chapel services and read his Bible daily. It is in the spirit of those same foundational principles of justice and liberty that he brings this motion, holding onto his faith in the promise of this country, while offering prayers for this honorable Court and for the United States of America.

The government's response to these serious claims is telling. It dedicates an extraordinary amount of resources to procedural arguments, asking this Court to litigate a postage stamp rather than confront the cascade of constitutional violations at the heart of this case. As this filing will now demonstrate in detail, the law and order necessary for any society require prosecutorial oversight, judicial integrity, and the right to a

fair and vigorous defense—elements that did not exist in Movant's trial.

**THEREFORE**, he will show why this Court must vacate his conviction, order a new trial, or, at a bare minimum, grant a full evidentiary hearing with appointed counsel.

**ARGUMENT**

**A. Movant's § 2255 Motion is Timely Filed, and the Government's Procedural Fixation is a Diversion**

Movant's motion was dropped in his unit housing mailbox, following standard procedures for mailing on June 24, 2025, the date reflected in the filing's certificate of service. Under the controlling prison mailbox rule, a prisoner's motion is deemed filed on that date. Houston v. Lack, 487 U.S. 266 (1988). Movant has fulfilled his responsibility under the law, showing diligence, filing on time and in the interests of justice. Movant, confined in federal prison and without access to the resources required to litigate every procedural minutia, respectfully declines to engage in the government's speculative dispute over mailing. The government devoted thirteen pages across two separate filings—seven pages in its initial filing and six pages in its formal reply—speculating about alleged mailing and filing technicalities, yet it offered no evidence to challenge the controlling law. Movant's statement of timely

filing should therefore be accepted, allowing the Court to focus
on the substantial constitutional issues at the heart of this
case. Having done his part, Movant asks the Court to proceed to
the merits of his claims without distraction.

The weakness of the government's position is further highlighted
by what it chooses to ignore. While dedicating extraordinary
resources to mailing procedures, the government fails to address
the merits of Movant's claims, including a damning piece of
newly discovered evidence that could not have been discovered
through due diligence before his conviction became final: its
key propensity witness, Bobye Holt, was found by an Arkansas
court to have subjected her own children to a "history and
continuing pattern of abuse." This fact, which completely
undermines the moral authority the government bestowed upon her
at trial, is **precisely the type of evidence for which relief is
permitted under 28 U.S.C. § 2255(f)(4).** The government's silence
on this evidence, contrasted with its noisy complaints about
alleged mailing and filing issues, underscores the weakness of
its case.

In the alternative, arguendo, should the Court find any
technical deficiency for any reason, it should apply equitable
tolling in the interests of justice, particularly for a pro se
litigant who has been denied counsel, provided Movant
demonstrates reasonable diligence and that applying equitable

tolling would not cause prejudice to the government. As the
Supreme Court held in *Holland v. Florida*, 560 U.S. 631 (2010),
equitable tolling is available in habeas cases when a petitioner
diligently pursues his rights and extraordinary circumstances
prevent timely filing. Similarly, the D.C. Circuit in *United
States v. McDade*, No. 09-3094 (D.C. Cir. 2012), affirmed that
equitable tolling applies to § 2255 motions, emphasizing that
diligence and extraordinary circumstances are key factors.
Movant's circumstances—being a pro se prisoner without counsel
and relying on unexplainable and inconsistent BOP and USPS mail
systems—constitute such extraordinary circumstances warranting
equitable tolling.

## B. **The Government's Procedural Default Argument Fails Because Appellate Counsel Was Constitutionally Ineffective.**

The government's primary argument for dismissing the majority of
Movant's claims is procedural default. The government contends
that Grounds One, Two, Three, Four, Six, and Seven are
time-barred because they were not raised on direct appeal and
that Movant has failed to establish the requisite "cause and
prejudice" to excuse this default. This argument fundamentally
fails because the "cause" for the failure to raise these
meritorious claims is the ineffective assistance of appellate
counsel, a claim properly raised for the first time in a § 2255
motion.

## 1. Ineffective Assistance of Appellate Counsel Establishes Cause and Prejudice

The Sixth Amendment's guarantee of counsel extends to a defendant's first appeal as of right. When appellate counsel's performance is constitutionally deficient, it serves as "cause" to excuse a procedural default. See *Murray v. Carrier*, 477 U.S. 478, 488 (1986). To establish ineffective assistance of appellate counsel, a movant must show (1) that counsel's performance was objectively unreasonable and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the appeal would have been different. See *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984). Appellate counsel is not required to raise every non-frivolous claim, but a reasonably competent attorney is expected to identify and raise significant and obvious issues, especially those with a strong likelihood of success. The failure to raise the following meritorious claims on appeal was not a strategic decision; it was a deficient performance that fell below the objective standard of reasonableness.

- **a. Failure to Appeal Known Perjury and False Testimony (Grounds Two & Three):** The trial record is clear that government expert James Fottrell admitted under cross-examination to modifying the forensic image and

connecting it to the internet, directly contradicting his
earlier sworn testimony. Likewise, Agent Faulkner's
testimony regarding an unrecorded, uncorroborated
"confession" was a powerful, yet baseless, assertion that
went to the heart of Movant's defense. The government's
knowing use of false testimony constitutes a due process
violation under *Napue v. Illinois*, 360 U.S. 264 (1959).
Competent appellate counsel would have recognized that a
*Napue* violation is a potent issue for appeal. The failure
to raise these claims constitutes cause.

- b. **Failure to Appeal Improper Admission of Prejudicial Testimony (Grounds Four & Seven)**: Appellate counsel failed
to challenge the court's admission of Bobye Holt's highly
inflammatory and uncorroborated testimony regarding alleged
confessions from nearly two decades prior. Similarly,
counsel failed to appeal the government's prejudicial use
of a corporate-driven public statement that was falsely
attributed to Movant as a personal confession. These issues
present classic appellate arguments regarding violations of
Federal Rules of Evidence 403 and 404(b) and a defendant's
due process right to a trial free from unfairly prejudicial
character evidence. A reasonable appellate attorney would
have raised these powerful claims.

- c. **Failure to Appeal Structural and Due Process Violations**

**(Ground Six):** Movant's trial was tainted by a structural
conflict of interest, as the presiding judge simultaneously
oversaw sensitive civil litigation involving Movant and his
family. This, combined with evidence suggesting a
politically motivated prosecution, created an atmosphere
incompatible with impartial adjudication. These were not
routine trial errors but fundamental constitutional defects
affecting the fairness of the entire proceeding. Competent
appellate counsel had a clear duty to identify and preserve
these claims; their failure to do so deprived Movant of
effective appellate advocacy and warrants relief under
*Strickland*.

The "prejudice" prong is met because these defaulted claims are
meritorious. Had counsel raised them, there is a reasonable
probability the Eighth Circuit would have reversed the
conviction or remanded for a new trial. The cumulative effect of
the perjured testimony, inflammatory character evidence, and
structural conflicts so infected the trial as to render the
verdict unreliable.

**2. A § 2255 Motion is the Proper Venue for This Claim**

The Supreme Court has made clear that a § 2255 motion is the
preferred, and often required, venue for raising claims of
ineffective assistance of counsel. In *Massaro v. United States*,

538 U.S. 500 (2003), the Court held that a petitioner does not procedurally default an ineffective-assistance-of-counsel claim by failing to raise it on direct appeal. The Court reasoned that such claims often rely on facts outside the trial record and are better developed in a collateral proceeding where an evidentiary hearing is possible.

While *Massaro* specifically addressed ineffective assistance of trial counsel, its logic applies with equal force to ineffective assistance of appellate counsel. The question of why appellate counsel chose not to raise certain issues is not answered by the trial record. It requires a new inquiry into counsel's strategy and decision-making process, which can only occur in a § 2255 proceeding.

**THERRFORE,** Movant is properly raising these claims for the first time before this Court.

By establishing that ineffective assistance of appellate counsel serves as the cause for the default, and that the underlying defaulted claims are meritorious (establishing prejudice), Movant has overcome the government's procedural default argument. The Court should therefore reach the merits of Grounds One, Two, Three, Four, Six, and Seven.

**C. Movant Renews His Request for Appointment of Counsel and Shows the Standard Is Now Met**

Movant respectfully renews his request for the appointment of counsel. This Court previously denied Movant's request, reasoning that because the § 2255 petition had not yet been filed, the Court could not "determine, in advance, whether Defendant has any nonfrivolous issues to raise, or whether other factors such as the complexity of his case warrant appointment of counsel." (Doc. 178, p. 2). That threshold deficiency is now cured. With Movant's detailed § 2255 motion and the Government's comprehensive response now on the docket, the complexity of the case is no longer speculative but is plainly evident.

**The Court's Order of June 6, 2025,** properly identified the controlling factors for appointing counsel: the legal and factual complexity of the case and the petitioner's ability to investigate and present his claims. The record now overwhelmingly demonstrates that each factor weighs heavily in favor of appointing counsel.

1. **Legal Complexity:** The Government's Response confirms the extreme legal complexity of this matter. Each of Movant's substantive claims involves its own complex constitutional tests, such as the two-prong standard for ineffective assistance of counsel under Strickland v. Washington.

2. **Factual Complexity:** The resolution of this case is not a simple matter of reviewing the trial record. Movant's claims of perjured testimony and suppressed exculpatory

evidence create direct factual conflicts with the Government's assertions. These are not just legal arguments; they are fact-intensive disputes that will almost certainly require discovery and an evidentiary hearing to resolve. A pro se, incarcerated Movant has no meaningful ability to conduct the necessary investigation, secure affidavits, interview witnesses, or effectively cross-examine government agents at such a hearing.

3. **Movant's Inability to Investigate and Present Claims:** As detailed in the initial motion, Movant is proceeding pro se from a federal prison with severely limited access to legal resources. He has relied very heavily on outside help from family and friends in preparing these very filings, without legal counsel. He does not possess a complete copy of the trial and appellate records at FCI Seagoville and lacks any meaningful ability to investigate the detailed factual claims asserted by the Government in its Response.

The Court's initial denial was prudently based on an undeveloped record. Now that the claims and the Government's technical defenses are squarely before the Court, the need for counsel is manifest. The issues are non-frivolous, the legal and factual matters are profoundly complex, and the Movant is incapable of adequately litigating them without assistance. Accordingly, in

the interest of justice, Movant prays that the Honorable Court will appoint counsel to represent him in these proceedings.

**D. Merits of the Claims**

**GROUND ONE: SIXTH AND FIFTH AMENDMENT VIOLATIONS – DENIAL OF THE RIGHT TO PRESENT A COMPLETE DEFENSE AND PROSECUTORIAL MISCONDUCT**

**1.1. Introduction: A Trial Fundamentally Unmoored from Due Process**

The Sixth Amendment guarantees a criminal defendant a "meaningful opportunity to present a complete defense," a right so fundamental that it is essential to due process. *Crane v. Kentucky, 476 U.S. 683, 690 (1986)*. In this case, that right was not merely abridged; it was systematically dismantled by a two-pronged assault on the truth-seeking function of the trial. First, the trial court imposed a constitutionally impermissible evidentiary standard, acting as a gatekeeper to block the jury from hearing compelling evidence of alternative perpetrators. Second, the prosecution exploited this judicial error, knowingly presenting a false and misleading narrative to the jury, secure in the knowledge that the defense was gagged by the court's own rulings.

This was not an adversarial contest decided on the evidence. It was a conviction obtained through constitutional error and prosecutorial overreach. The combination of the trial court's unconstitutional exclusion of a complete defense under *Holmes v.*

*South Carolina, 547 U.S. 319 (2006)*, and the government's subsequent use of false and misleading arguments in violation of *Napue v. Illinois, 360 U.S. 264 (1959)*, rendered the trial fundamentally unfair and the verdict unreliable.

## 1.2. The Court's Unconstitutional Standard: The "Demonstrable Nexus" Test

The central issue at trial was identity. The government's entire case rested on a flawed inference: because the computer was on Movant's property, he must be the perpetrator. The defense sought to demolish this inference by presenting the jury with powerful evidence of multiple alternative perpetrators who had the access, opportunity, and, in one case, the precise technical skills and criminal predisposition to commit the offense. The trial court, however, foreclosed this defense. It explicitly ruled that it would not permit evidence of third-party guilt without a "demonstrable nexus of proof that links the alternative perpetrator to the crime." This arbitrary "direct link" requirement mirrors the exact type of rule the Supreme Court condemned in *Holmes*. By requiring the defense to first prove the alternative perpetrator's guilt to the judge, the court invaded the province of the jury, shifted the burden of proof to the Movant, and created a judicial shield that rendered the government's theory immune from meaningful challenge.

## 1.3. The Complete Defense the Jury Was Forbidden to Hear

### 1.3.1. Randall Berry: The Felon on the Lot

Profile and Access: Berry was a convicted felon who was physically present at the dealership during the relevant timeframe. The defense had pay records and photographs that directly contradicted the government's claim that Berry was irrelevant. He possessed clear access and opportunity to the HP desktop computer.

- **Investigative Failures:** The government never preserved or produced any physical evidence from Berry to verify his self-serving statements. His phone was only subjected to a cursory "manual triage" and was never forensically imaged.

- **Judicial Bar:** The trial court prevented the defense from fully exploring Berry's access and from introducing Movant's own statements about Berry's presence, dismissing the evidence as improper "self-serving testimony... going to the defense theory of the case."

### 1.3.2. Caleb Williams: The Perfect Suspect

The evidence against Caleb Williams was so compelling that it alone could have created reasonable doubt. The jury heard none of it:

- **Profile and Predisposition:** Williams was a registered sex offender with a state conviction for sexual assault of a minor. His crime was heinous: as a man in his twenties, he

repeatedly raped a 14-year-old girl, resulting in her eventually getting pregnant with his child.

- **Technical Skills**: He was a remote-access IT consultant with advanced knowledge of Linux, Tor, and Torrent programs—the exact digital fingerprint of this offense. He regularly used the dealership HP computer for personal and business purposes.

- **Consciousness of Guilt**: Williams exhibited profound consciousness of guilt. His devices were wiped or replaced; he was extremely nervous during interviews; and he provided edited photos and vague bank statements as a completely unverified alibi.

**The Court's Unconstitutional Gag Order**: The court barred any and all evidence of his criminal history, technical skill, and suspicious conduct. It issued a chilling, preemptive order: "Under no circumstances are you to get into any prior sex offense history that he has without approaching the bench." This ruling ensured the jury would never know that a registered sex offender with the precise technical skills to commit this crime had unfettered access to the computer. As a direct result, the defense was forced to abandon calling him as a witness.

**1.4. Rebuttal: Limited References to Randall Berry Do Not Cure Constitutional Error**

The government's assertion that Randall Berry was adequately "addressed" through closing argument and Agent Faulkner's testimony fundamentally mischaracterizes the record. While Berry was mentioned briefly in closing, and the government relied on Faulkner as a witness, these references were selective, one-sided, and insufficient to convey the full scope of Berry's access, opportunity, and relevance to the offense. The defense was precluded from presenting corroborating evidence, including time-stamped photographs, cash payments, and interview recordings, all of which would have supported the theory that Berry was a viable alternative perpetrator. The jury's exposure to Berry was therefore constrained to a single, government-controlled narrative, leaving no meaningful window for the defense to present its case. This "limited window" does not satisfy the Sixth Amendment's guarantee of a complete defense and underscores the structural error that requires remedial relief.

The artificially constrained presentation of Randall Berry's involvement set the stage for the prosecution to exploit the defense's silenced theory, magnifying the prejudice against Movant and paving the way for knowingly misleading arguments.

**1.5. Prosecutorial Misconduct: Knowingly Exploiting the Court's Error**

The prejudice from the court's unconstitutional rulings was
magnified exponentially by the prosecution's deliberate
misconduct. The government seized upon the court-ordered silence
to present a narrative to the jury that it knew was false and
misleading, including the demonstrably false or misleading
statements that Williams was out of state and Berry was not
employed until after the dates in question. This knowing use of
false testimony and argument, and the failure to correct it, is
incompatible with the rudimentary demands of justice and
constitutes a profound violation of due process. *Napue v.
Illinois, 360 U.S. at 269.*

1.6. **Direct Rebuttal to the Government's Response**

The government, in its reply, argues that this claim is
procedurally defaulted because it was already decided on direct
appeal. This argument fundamentally misconstrues both the record
and the nature of this claim.

1.6.1. **The Claim is Constitutionally Distinct, Not "Previously
Decided"**: The government correctly notes that the Eighth Circuit
reviewed the exclusion of the Williams evidence. However, it was
reviewed for a mere "abuse of discretion" under Evidence Rule
403. The claim presented here is that the trial court's entire
framework—its "demonstrable nexus" test—is a structural
constitutional error under *Holmes v. South Carolina.* This
constitutional issue, which demands a more searching de novo

review, was never raised by appellate counsel and therefore
never decided by the Eighth Circuit. A claim is not "decided"
when the core constitutional basis for that claim was never
presented.

**1.6.2. Prosecutorial Misconduct Was Never Addressed:** The
government's reply is conspicuously silent on the claim of
prosecutorial misconduct. The direct appeal did not address the
government's knowing use of false or misleading closing
arguments that were built upon the trial court's erroneous
evidentiary rulings. This is a distinct due process violation
that stands on its own and has never been subject to appellate
review.

**1.6.3. Cause and Prejudice Excuse Any Purported Default:** To the
extent any procedural default exists, it is excused. The "cause"
for the default is the ineffective assistance of appellate
counsel for failing to raise these claims properly (as argued in
Ground Five). The "prejudice" is manifest: Movant was convicted
after being deprived of his constitutional right to present a
defense while the jury was simultaneously misled by the
prosecution.

**1.7. Conclusion: A Verdict Tainted by Unremedied Constitutional
Error**

Movant was convicted not because the government proved its case
in a fair adversarial contest, but because the trial court

disarmed the defense and the prosecution misled the jury. The unconstitutional exclusion of a complete and compelling alternative perpetrator defense, compounded by the government's knowing use of a false narrative, violated Movant's Sixth and Fifth Amendment rights. The prejudice is manifest, the injustice is clear, and this Court has the power and the duty to rectify it.

**Movant respectfully requests that the Court:**

1. **Vacate the conviction** and sentence, or in the alternative,

2. **Grant an evidentiary hearing** under 28 U.S.C. § 2255(b) to fully develop the record and demonstrate the constitutional violations outlined above.

## GROUND TWO: THE CONVICTION WAS OBTAINED THROUGH THE USE OF PERJURED EXPERT TESTIMONY, FATALLY UNDERMINING THE INTEGRITY OF THE TRIAL

### 2.1. Introduction: The Government's Case Rests on a Foundation of Known Falsehoods

The Fifth Amendment's Due Process Clause is unequivocal: a conviction cannot stand if it is built on a foundation of lies. The Supreme Court has consistently held that "a conviction obtained by the knowing use of perjured testimony is fundamentally unfair" and a clear violation of due process. This

principle, established in landmark cases like *Mooney v. Holohan*, 294 U.S. 103, 112 (1935), and reinforced in *Napue v. Illinois*, 360 U.S. 264, 269 (1959), mandates that a conviction must be vacated when the prosecution fails its "duty to correct what he knows to be false and elicit the truth."

In this case, the government's entire forensic theory was channeled through its star expert, James Fottrell, Director of the Department of Justice's High Technology Investigative Unit. The prosecution presented him not as a mere technician, but as the government's foremost authority, whose word was meant to be taken as scientific gospel. His testimony, however, was not merely flawed; it was riddled with demonstrable perjury, a reckless manipulation of evidence, and outright contradictions. These were not minor inconsistencies but material falsehoods that formed the very bedrock of the prosecution's case. This conviction, resting entirely on the word of a proven perjurer, is a stain on the judicial process and cannot stand.

## 2.2. **The Anatomy of Perjury and Misconduct: A Willful Deception of the Court**

The government's response attempts to reframe Mr. Fottrell's conduct as an innocent mistake or a "faulty recollection" that was later corrected. This narrative is a fiction, directly contradicted by the record. The deception was multifaceted,

deliberate, and designed to mislead.

## 2.2.1. Willful Perjury Regarding the Internet Connection

Mr. Fottrell did not simply make an error; he repeatedly lied under oath. He was asked direct, unambiguous questions about connecting the evidence to the internet, and he emphatically denied it multiple times:

- **First Lie**: "Q. You didn't connect it to the internet, did you? A. No."
- **Second Lie**: "Q. And you never connected that virtual machine to the internet, correct? A. Correct."

It was only after being confronted with irrefutable proof—a 2020 software copyright date on an image seized in 2019 that literally didn't exist at the time—that his story shifted. His subsequent pivot to the implausible "five-minute window" excuse was not a clarification; it was a desperate attempt to explain away prior, intentional falsehoods. The government's characterization of this as a mere "inconsistency" is an affront to the record. This was perjury, plain and simple.

### 2.2.1.1. The Contradictory "Cleanup" Lie

To minimize his misconduct, Fottrell claimed that when he connected the virtual machine to the internet, no CSAM was

present. This statement is inherently contradictory to his other
sworn testimony that the VM was an "exact replica" of the hard
drive. Both statements cannot be true. This was not a "faulty
recollection"; it was a calculated falsehood designed to obscure
the full extent of his forensic malfeasance.

### 2.2.3. Irrevocable Alteration of Evidence

~~Fottrell's perjury concealed a catastrophic failure of forensic~~
protocol. Connecting a forensic image to the internet violates
the cardinal rule of digital forensics: never alter the
evidence. The moment the image was connected, its integrity was
compromised. The government's claim that this had "no material
impact" ignores the unanswerable doubt this casts over all of
Fottrell's findings.

### 2.2.4. A Theatrical Performance Designed to Inflame, Not Inform

The misconduct was compounded by a calculated performance
designed to provoke an emotional response rather than present
objective science. Fottrell admitted under oath that the graphic
videos shown to the jury were not recovered from the device in
evidence. He physically brought them from a government database
in Washington, D.C., to present to the jury as "exemplars." This
was a theatrical bait-and-switch designed to horrify the jury.
He further inflamed the proceedings with prejudicial commentary,

describing the material as part of a "very popular collection"
and "one of the most offensive" he had ever seen—commentary so
improper the Court had to sustain an objection. This
unprofessional performance proves his role was not that of a
neutral expert, but a biased agent of the prosecution.

## 2.3. Materiality, Prejudice, and the Failure of the Court's Remedy

Fottrell's perjury was not a collateral issue; it was the entire
case. He was the government's one and only witness connecting
the digital files to the HP computer. His credibility was the
linchpin. The government's argument that there was no
"reasonable likelihood that the perjured testimony could have
affected the jury's verdict" is untenable. When the sole expert
linking the defendant to the crime is exposed as a liar who
manipulates evidence, confidence in the outcome is completely
eroded.

The idea that any prejudice was cured is a legal fiction. The
court's instruction asked the jury to perform an impossible
mental gymnastic. This is akin to a forensic chemist testifying
about a blood sample. He swears he followed every protocol to
keep it sterile. On cross-examination, he admits he repeatedly

opened the vial and exposed it to contaminated air. The judge's instruction is the equivalent of saying:

*"Please disregard the fact that the primary evidence sample is contaminated and that the chemist lied to you about contaminating it. However, you are free to believe all of his conclusions about what he found in that same contaminated sample."*

It is a logical, scientific, and constitutional impossibility. As Justice Jackson warned, the "naive assumption that prejudicial effects can be overcome by instructions to the jury . . . all practicing lawyers know to be unmitigated fiction." *Krulewitch v. United States*, 336 U.S. 440, 453 (1949) (concurring). The bell of perjury cannot be "unrung."

## 2.2.5. Ineffective Assistance of Counsel as Cause to Overcome Procedural Default

The government correctly notes this claim was not raised on direct appeal and is therefore procedurally defaulted. However, this default is the direct result of ineffective assistance of counsel, establishing the necessary "cause" and "prejudice" to excuse it. *Murray v. Carrier*, 477 U.S. 478 (1986).

### 2.2.5.1. Deficient Performance

**2.2.5.1.1. Trial Counsel:** After commendably exposing Fottrell's perjury, trial counsel became constitutionally deficient by failing to move to strike Fottrell's testimony or for a mistrial. Allowing the testimony of a proven perjurer to go to the jury unchallenged is not reasonable trial strategy.

**2.2.5.1.2. Appellate Counsel:** Failure to raise this clear, meritorious issue on direct appeal was objectively unreasonable and constitutes deficient performance.

## 2.2.5.2. Prejudice

The prejudice is self-evident. The Movant was convicted based on testimony the jury should have been instructed to disregard entirely. Allowing a known perjurer's testimony to stand created a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," undermining confidence in the outcome. *Strickland v. Washington*, 466 U.S. 668, 694 (1984).

## 2.2.6. An Evidentiary Hearing is Required

The Eighth Circuit mandates an evidentiary hearing when a petitioner's allegations, if true, would entitle him to relief, unless the record affirmatively refutes them. The government's own response confirms the factual disputes—they characterize Fottrell's lies as a "mistake," while the record shows a pattern

of deception. These conflicting interpretations of the facts demand a full evidentiary hearing.

## 2.2.7. **The Government's Mischaracterization of the Record**

The government's attempt to minimize this misconduct as a "mere inconsistency" or "clarification" misstates the record. Their argument that Fottrell's admission of brief internet access was a trivial error ignores that:

- The jury was led to believe the virtual machine was a perfect, unaltered copy — a representation later directly contradicted by Fottrell himself.

- The perjury was material — it touched the central issue linking the defendant to the crime. Courts have repeatedly held that a *Napue* violation is established when false testimony "could in any reasonable likelihood have affected the jury's verdict." *United States v. West*, 612 F.3d 993, 996 (8th Cir. 2010).

- Clarifications do not cure perjury — even if Fottrell attempted an explanation, the fact that he initially swore falsely and the jury may have relied on those statements is dispositive. *Miller v. Pate*, 386 U.S. 1, 7 (1967).

- Prejudice is manifest — the government's insistence that no harm occurred is belied by the record and precedent:

misleading an expert to falsely present evidence to a jury "cannot be deemed harmless." *Kyles v. Whitley*, 514 U.S. 419, 453 (1995).

## 2.2.8. Conclusion and Requested Remedy

The government's case was built on the word of a single man, and his word was proven to be worthless. He lied under oath, created an impossible contradiction to cover his tracks, manipulated evidence, and presented a theatrical, prejudicial performance in place of science. This conduct violated the Movant's due process rights under *Mooney*, *Napue*, and *Giglio*. Trial and appellate counsel's failure to challenge this injustice constituted ineffective assistance under *Strickland*.

For the sake of justice and to restore integrity to these proceedings, the conviction cannot stand.

**The Movant respectfully requests:**

1. **Vacate** the judgment of conviction and grant a new trial, or in the alternative,

2. **Grant an evidentiary hearing** to examine the full extent of Mr. Fottrell's misconduct and counsel's failures.

## GROUND THREE: GOVERNMENT MISCONDUCT AND FABRICATION OF EVIDENCE

### 3.1. Introduction: Trophy Hunting

40

From the outset, this case was never an impartial investigation—it was a targeted campaign. The agents and prosecutors involved pursued one goal: to secure the high-profile arrest and conviction of Joshua Duggar, a former television personality. The public record confirms this singular focus. The official press releases by the Department of Justice and Homeland Security Investigations each prominently identified Movant as a "former reality television personality," ensuring that the name "Josh Duggar" became the headline rather than the alleged offense itself. See Press Release, U.S. Immigration and Customs Enforcement, *HSI Investigation Leads to 12-Year Sentence for Former Reality Television Personality* (May 25, 2022); Press Release, U.S. Attorney's Office, Western District of Arkansas, *Former Reality Television Personality Sentenced to 151 Months in Federal Prison for Downloading and Possessing Child Sexual Abuse Material* (May 25, 2022).

By highlighting Movant's celebrity status, the government demonstrated its intent to capitalize on publicity rather than to conduct an objective investigation. These agencies sought credit, headlines, and notoriety. They wanted a trophy, not truth. The trial that followed was the burial ground of the Constitution, and those responsible seemed eager to dance on its grave.

## 3.2. Pattern of Investigative Misconduct

The record shows a pattern of selective, sensationalized
conduct—one that placed publicity and prosecution above
fairness. Rather than following the evidence, agents followed
the fame. Their investigation centered entirely upon Joshua
Duggar, and all procedural safeguards fell victim to that
singular focus. Every stage of the process, from the search
warrant to the public statements, reflected an effort to secure
one name and one outcome. This pattern of conduct violated the
bedrock principle that criminal prosecutions must be driven by
evidence, not identity.

## 3.3. Fabricated Statement and Evidentiary Misconduct

At the heart of this Ground lies the government's reliance on an
alleged, unrecorded statement that forms no part of the
51-minute recorded interview conducted on November 8, 2019.
Agent Faulkner testified that, before activating the recording
device, Movant allegedly asked, "What is this about, has
somebody been downloading child pornography?"

When questioned at trial, Agent Faulkner admitted that this
supposed statement was neither memorialized nor captured on the

recording—despite his acknowledgment that interviews are recorded "to make sure that there's no ambiguity."

"Q. During that interview, you testified yesterday that the reason that you record interviews is to make sure that there's no ambiguity, correct?

A. Correct."

"Q. In other words, when it's on a recording, we know what's said, we know what's not said, correct?

A. Yes, sir."

"Q. You record so that there's an accurate memorialization of whether someone said something or didn't, correct?

A. Yes, sir."

Yet, over the course of the 51-minute recorded interview, Agent Faulkner never revisited or referenced this alleged statement.

"Q. Over the next 51 minutes, did you ever circle back around so that you had it captured on a recording and say, 'Hey, Josh, remember when you said, what's this about, has somebody been downloading child pornography,' or anything along those lines?

A. No, sir. We did not directly verbatim ask him about that question or statement, but we did cover the topic."

"Q. But you never once covered the topic of even suggesting on the recording that he had said this to you before there was a recording, correct?

A. Not verbatim, no, sir."

Agent Aycock later claimed to have corroborated Faulkner's recollection in his own report, but that report was not written contemporaneously with the interview. This kind of after-the-fact corroboration—between agents who both stood to defend the integrity of their operation—raises deep constitutional concern. **The absence of any memorialization, despite the availability of a recording device and the agents' own stated procedures, undercuts the reliability of the alleged statement.**

Moreover, the recording itself directly contradicts the government's version of events.

Q. "[A]t one point, Josh Duggar asks, 'So what are you here for then,' correct?

A. Yes, sir."

If Movant had already asked about "downloading child pornography," it defies logic that he would later express

uncertainty as to the purpose of the visit. This internal inconsistency exposes the alleged unrecorded statement as unreliable and self-serving.

### 3.4. The Broader HSI Pattern of Misconduct and Deliberate Deception

The fabrication of the alleged unrecorded statement by HSI Agent Faulkner cannot be viewed in isolation. It was part of a broader pattern of misconduct where the agency prioritized a high-profile conviction over the constitutional rights of the accused. The same agency, through its Public Affairs division, was simultaneously engaged in selective and prejudicial public communication about the investigation. HSI spokesperson Bryan Cox publicly confirmed to KNWA News an "ongoing federal criminal investigation" at the "Duggar home" on November 19, 2019—only to call back the next day to modify the location to Movant's business before later reverting to a "no comment" stance after the story had already spread like wildfire nationally.

This pattern—publicly naming the target while privately fabricating key evidence—reveals a culture within HSI where outcome superseded objectivity. The agency's behavior demonstrated that Joshua Duggar himself, not the truth, was the investigative focus from the outset. This "win-at-all-costs" mentality is precisely what the Supreme Court condemned in

*Berger v. United States*, 295 U.S. 78, 88 (1935), where it famously warned that a prosecutor is a "servant of the law" whose interest "in a criminal prosecution is not that it shall win a case, but that justice shall be done." That duty extends to the investigative agents acting on the government's behalf.

When government agents engage in a pattern of misconduct that includes both fabricating evidence and fueling prejudicial pretrial publicity, it creates a toxic environment where a fair trial becomes impossible. The Ninth Circuit has held that there is a "clearly established constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government." *Devereaux v. Abbey*, 263 F.3d 1070, 1074-75 (9th Cir. 2001). This right is violated regardless of the defendant's guilt or innocence.

The conduct here, pairing the knowing use of an unrecorded and unreliable statement with a prejudicial media strategy, epitomizes the kind of "deliberate deception" condemned by the Supreme Court in cases like *Mooney v. Holohan* and *Napue v. Illinois*. The HSI agents and spokespeople were not impartial investigators seeking truth; they acted as "zealots bent on conviction," a practice the Eighth Circuit has explicitly forbidden. *United States v. Cox,* 923 F.2d 519, 526 (8th Cir.

1991). This coordinated effort to shape a public narrative and manufacture evidence represents a fundamental breakdown of due process that requires this Court's intervention.

### 3.5. Constitutional Implications

The government's use of an unrecorded, uncorroborated statement that was never confirmed during a contemporaneously recorded interview constitutes a violation of due process under *Mooney v. Holohan, 294 U.S. 103 (1935)*, *Napue v. Illinois, 360 U.S. 264 (1959)*, and *Miller v. Pate, 386 U.S. 1 (1967)*. Each of these cases holds that a conviction obtained through false, misleading, or fabricated evidence is fundamentally unconstitutional.

When federal agents invent or embellish evidence—particularly in a case marked by media attention and political interest—the resulting trial ceases to be a fair adjudication and becomes a performance. Courts have consistently found that where law enforcement knowingly relies upon false or misleading testimony, reversal is required. See *United States v. Agurs, 427 U.S. 97, 103 (1976)*; *United States v. Olsen, 737 F.3d 625, 631 (9th Cir. 2013)*.

### 3.6. Conclusion and Requested Remedy

The cumulative effect of the government's conduct—its targeting of a celebrity defendant, its manipulation of public perception, and its reliance on an unrecorded and unreliable statement—renders the proceedings constitutionally defective. The trial was not an exercise in justice; it was a showcase of misconduct.

**Accordingly, Movant respectfully requests that this Court:**

> A. **Vacate the conviction** in its entirety on the grounds of government misconduct and fabrication of evidence; or, in the alternative,

> B. **Grant an evidentiary hearing** to fully examine the extent of the investigative and prosecutorial improprieties detailed herein.

## GROUND FOUR: VIOLATIONS OF DUE PROCESS AND CONSTITUTIONAL RIGHTS THROUGH ADMISSION OF UNCORROBORATED AND PREJUDICIAL TESTIMONY FROM BOBYE HOLT

### 4.1. Introduction: A Trial Built on a Lie, Exposed by Newly Discovered Evidence

The government's response asks this Court to view the admission of Bobye Holt's testimony as a routine evidentiary matter. This is impossible. This claim is not a mere disagreement over the rules; it is an assertion of a profound constitutional crisis. The admission of Mrs. Holt's testimony was the poisonous fruit

of a cascade of constitutional failures, including profound
prosecutorial misconduct, the deliberate suppression of
game-changing impeachment evidence in violation of *Brady v.
Maryland* and *Giglio v. United States*, and the constitutionally
ineffective assistance of counsel who failed to expose this
deception.

As the Supreme Court held in *Brady v. Maryland, 373 U.S. 83, 87
(1963)*, "the suppression by the prosecution of evidence
favorable to an accused upon request violates due process where
the evidence is material either to guilt or to punishment,
irrespective of the good faith or bad faith of the prosecution."
Similarly, in *Giglio v. United States, 405 U.S. 150, 154 (1972)*,
the Court extended this rule to impeachment evidence, stating
that "[w]hen the 'reliability of a given witness may well be
determinative of guilt or innocence,' nondisclosure of evidence
affecting credibility falls within this general rule."

**Newly discovered evidence**, unavailable at the time of trial, now
reveals that the government built its case on a witness whose
credibility has been shattered by a formal judicial finding that
she presided over a household defined by a **"pattern of abuse."**
The government vouched for Mrs. Holt as a compassionate, moral
authority while it either failed to discover or actively
concealed the rot beneath the surface. Her testimony was the
sole, indispensable pillar supporting the admission of Rule 414

49

evidence, allegations bolstered by the Court's jury
instructions, **"Now, you did hear evidence that the defendant may
have previously committed another offense of child molestation."**
That devastating pillar has now collapsed, and the trial's
fundamental unfairness is laid bare.

## 4.2. The Court's Flawed Process: A High-Stakes Credibility Determination Delegated to a Blindfolded Jury

The government's assertion that Mrs. Holt's testimony was
properly admitted is fundamentally flawed because the Court's
Rule 403 balancing was predicated on a false choice: it admitted
the highly prejudicial testimony based on a low standard of
proof while explicitly delegating the ultimate, high-stakes
credibility determination to a jury that was kept in the dark.
The government invited the jury to play a game of high-stakes
poker with Mr. Duggar's life on the line, but it dealt them a
deck missing all the cards that mattered.

The trial record is clear that the Court's admission was not an
endorsement of Mrs. Holt's credibility. The Court stated,
"I understand the Court is not deciding whether to believe or
disbelieve Bobye Holt for purposes of how a jury will ultimately
weigh things if it's allowed."

However, the testimony was admitted under the low "preponderance
of the evidence standard," and the jury was later instructed to
decide if the prior act was "more likely true than not true."

This created an extreme risk of prejudice: the jury was forced to weigh uncharged, 18-year-old alleged child molestation allegations under a low evidentiary standard—a huge disconnect from the charged offenses—without the crucial evidence needed to properly assess the witness's character, her history of abuse, her financial motives, and her deep-seated animus.

This low threshold for admission is rooted in Supreme Court precedent, as articulated in *Huddleston v. United States, 485 U.S. 681, 690 (1988)*, where the Court held that similar acts evidence "should be admitted if there is sufficient evidence to support a finding by the jury that the defendant committed the similar act." However, such a standard heightens the need for careful balancing under Rule 403, as the Supreme Court warned in *Old Chief v. United States, 519 U.S. 172, 180 (1997)*: "The term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged."

**4.3. The Smoking Gun: A Judicial Finding of a "Pattern of Abuse" Annihilates Holt's Credibility and Mandates Relief Under § 2255(f)(4)**

The most powerful evidence of the constitutional violations that occurred is also newly discovered. Pursuant to *28 U.S.C. § 2255(f)(4)*, this Court must consider facts that "could not have

been discovered previously through the exercise of due diligence." The 2024 Arkansas state court order removing Mrs. Holt's children from her custody is precisely such a fact. Since trial, a public timeline of escalating crisis in the Holt household has been revealed. In **April 2023**, law enforcement responded to the residence for child safety concerns (*Docket No. 72DR-23-680*) and culminated in a 2024 (exact date unknown) Washington County court order that took the drastic step of removing the children from both their mother and father. The court's justification was not a vague concern, but a specific, damning judicial finding:

"**[D]ue to a history and continuing pattern of abuse in the household of the Respondents, James and Bobbye [sic] Holt, that there is an imminent threat to the health and safety of [the] minor children.**" (*Attachment A*)

The impact of this evidence cannot be overstated. The government's entire Rule 414 case was built on the jury's belief in Mrs. Holt as a selfless protector of children. **Can there be any doubt that a reasonable jury would have disbelieved every word she said had they known she would later be found by a court to be part of a "pattern of abuse" so severe it resulted in the loss of her own children?** The question answers itself. This is not mere impeachment; it is a wholesale obliteration of her credibility.

**4.4. A Tainted Trial: Graphic Testimony and the Creation of an Impermissible "Trial by Character"**

The newly discovered evidence confirms that the Court's Rule 403 balancing was fatally flawed because it was based on the government's fraudulent portrayal of its witness. The graphic and inflammatory nature of Mrs. Holt's testimony made it impossible for the jury to render a fair verdict on the charged conduct alone. The Court's suggestion that the testimony was not "graphic" cannot withstand objective scrutiny. Mrs. Holt described uncharged and uncorroborated allegations of sexual misconduct involving a minor in vivid, clinical terms—including digital penetration—that no reasonable juror could compartmentalize or separate from the charged offenses.

The limiting instructions by the Court just before Bobye Holt's prejudicial testimony, sucked all the air out of the room — visibly affecting the jurors:

**"Members of the Jury, it's the Court's understanding that you are about to hear evidence that the defendant may have previously committed another offense, or I should say an offense of child molestation."**

This brash "warning" by the trial court judge, served to place extreme weight on her uncorroborated testimony—heavily favoring the prosecution's tainted narrative. A limiting instruction like this in the face of such graphic testimony was merely a hollow

53

formality, backfiring to completely defeat its stated purpose.
This fatal error mirrors the due process violations identified
in some recognizable high-profile state cases like *People v.
Cosby (PA Sup. Ct. 2021)* and *People v. Weinstein (NY Ct. App.
2024)*. While those were state court decisions, they addressed a
universal constitutional principle: a defendant has the right to
be tried for the charged offense, **not for being a "bad person."**
In those cases, the courts found that uncharged, decades-old
sexual assault testimony created an impermissible **"trial by
character,"** overwhelming the jury's ability to deliberate fairly
on the actual charges. The principle is even more forceful here.
Federal courts demand very strict scrutiny under Rule 403, and
Mrs. Holt's testimony created an insurmountable prejudice,
branding Movant as a predator in the jurors' minds, with
unfounded allegations that were not related to any material
facts alleged in the charged conduct.

The Eighth Circuit has echoed these concerns in federal cases
involving Rule 414 evidence. In *United States v. LeCompte, 99
F.3d 274, 278 (8th Cir. 1996)*, the court reversed a conviction
due to the admission of prior acts evidence, holding that
"\[t\]he prior acts were remote in time... and dissimilar," and
that "the danger of unfair prejudice from this evidence
substantially outweighed its probative value." Unlike in cases
such as *United States v. Marechale, No. 24-2271 (8th Cir. July*

*21, 2025)*, where the court affirmed admission of documented prior criminal convictions, here the evidence was uncorroborated testimony from a single, deeply flawed witness, amplifying the prejudice to an unconstitutional level.

## 4.5. A Pattern of Government Misconduct: A Coached Witness, a Concealed Grudge

The government's misconduct was not peripheral; it went to the very heart of the trial's most damaging evidence. The entire legal basis for admitting the prior bad acts evidence rested exclusively on the uncorroborated, uniquely detailed testimony of Bobye Holt. As trial counsel argued, the admissibility issue "all ultimately boils down to Bobye Holt's testimony" because her account—and hers alone—supplied the specific details regarding the "where on the body" graphic depictions necessary to meet the Rule 414 threshold the government needed. Because her uncorroborated account was the indispensable foundation, any constitutional violation that concealed her profound credibility flaws is exponentially more prejudicial.

### 4.5.1. Concealed Bias, Animus, and Financial Motive

The government suppressed evidence of Mrs. Holt's deep-seated hostility, which she broadcast publicly. In social media posts, she made threatening and hateful statements, including a chilling wish for Movant's death as the only path to freedom for his wife, stating, "She will never be free until his death."

This is not the statement of a concerned friend; it is the voice of a bitter enemy. This animus was further evidenced on the day of Movant's sentencing, when she published a vindictive Instagram post, declaring him a "coddled" and "privileged" man who had "hoodwinked" everyone (Attachment B).

This, combined with her paid participation in a sensationalized anti-Duggar docuseries, reveals a clear financial motive to lie. The suppression of this vast trove of impeachment evidence constitutes a clear *Brady violation*.

### 4.5.2. **The Confession of a Coached Witness**

The government's control over Mrs. Holt is confirmed by her own words on the stand. When asked why she refused to speak to a defense investigator, she admitted, **"I hadn't been given permission."** This stunning admission reveals the truth: her testimony was not a free and independent recollection but a performance directed by the prosecution. This is a direct violation of the government's duty under *Napue v. Illinois* to present truthful, uncoached evidence. As the Supreme Court made clear in *Napue, 360 U.S. 264, 269 (1959)*, "[t]he principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction... does not cease to apply merely because the false testimony goes only to the credibility of the witness."

### 4.6. **Ineffective Assistance of Counsel: The Failure That Enabled**

**the Deception**

The government's deception was enabled by counsel's constitutionally deficient performance. Under *Strickland v. Washington, 466 U.S. 668, 687 (1984)*, "[f]irst, the defendant must show that counsel's performance was deficient... Second, the defendant must show that the deficient performance prejudiced the defense." Movant meets both prongs. A reasonable investigation would have uncovered Mrs. Holt's public hostility and the red flags surrounding her household long before the 2024 court order. The failure to conduct a basic background check and search publicly available social media for the government's star witness is inexcusable. This was not a strategic choice; it was a catastrophic omission that left the government's false narrative completely unchallenged. This failure was profoundly prejudicial and provides an independent basis for relief while excusing any procedural default.

**4.7. Conclusion and Request for Relief**

The entire foundation for the prejudicial Rule 414 evidence rested on the testimony of a single, uncorroborated, and deeply compromised witness whose credibility has now been judicially impeached. This new evidence, combined with the clear record of government misconduct and ineffective counsel, reveals a trial that was fundamentally unfair.

**Movant respectfully requests that the Court:**

1. **Vacate the conviction and sentence**, or in the alternative,

2. **Grant an evidentiary hearing** under *28 U.S.C. § 2255(b)* to examine the full scope of this constitutional catastrophe.

## GROUND FIVE: INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL — FAILURE TO PRESERVE THE CUMULATIVE DENIAL OF THE CONSTITUTIONAL RIGHT TO PRESENT A COMPLETE DEFENSE

**5.1. Introduction: A Fundamentally Flawed Appeal Requiring Collateral Review**

This claim is not a disguised attempt to relitigate the trial court's evidentiary rulings under a simple abuse-of-discretion standard. It is a Sixth Amendment claim asserting that appellate counsel was constitutionally ineffective for failing to challenge the very foundation of the trial's unfairness: the court's systematic application of an unconstitutional evidentiary standard that dismantled Movant's entire defense. The trial court, citing cases like McVeigh, repeatedly demanded that Movant prove a **"demonstrable nexus of proof that links the alternative perpetrator to the crime"** before the jury could hear any evidence. This standard directly violates the Supreme Court's holding in Holmes v. South Carolina, 547 U.S. 319 (2006), which forbids excluding defense evidence based on a judge's premature assessment of the prosecution's strength. Appellate counsel's performance was constitutionally deficient

in two catastrophic ways:

- Failing to frame the trial court's error as a **Holmes-based constitutional violation**, which led the Eighth Circuit to apply the wrong, highly deferential standard of review; and

- Failing to argue the **cumulative effect of the court's exclusionary ruling**s, which silenced all critical evidence concerning three plausible alternative perpetrators—Caleb Williams, Randall Berry, and William Mize—thereby masking the systemic nature of the trial's error.

## 5.2. The Complete Defense the Jury Was Forbidden to Hear

The Sixth Amendment guarantees a defendant a meaningful opportunity to present a complete defense. The trial court violated this right by erecting an unconstitutional barrier around any evidence that pointed away from Movant. The court made its position clear: it **"will not allow speculative testimony or speculative argument about alternative perpetrators."** In practice, this barred the defense from presenting compelling evidence regarding individuals who had both access and motive: Caleb Williams, Randall Berry, and William Mize.

## 5.2.1. Randall Berry: The Felon on the Lot

The defense was prepared to show that Randall Berry was a viable alternative suspect whose presence and access were improperly dismissed by the government. The jury heard virtually none of

it.

- **The Profile:** Berry was a convicted felon physically present at the dealership during the relevant timeframe. Pay records, photographs, and payroll inconsistencies contradicted the government's claim that Berry was irrelevant or uninvolved. Berry had a prior criminal history indicating dishonesty and potential financial motive.

- **Access and Opportunity:** Berry had clear, unmonitored access to the HP desktop computer central to the case. He had the technical familiarity to use it, contrary to the government's assertions.

- **Suspicious Conduct and Timeline:** Berry was on the lot during critical periods when the alleged offenses occurred. He was observed performing tasks and handling dealership vehicles, contradicting government testimony that he was uninvolved.

- **Investigative Failures:** Law enforcement never forensically imaged Berry's phone, conducting only a cursory "manual triage." No records were produced verifying Berry's self-serving statements. His co-worker statements about Berry's activity were improperly excluded.

- **Court Exclusion:** The trial court prevented the defense from

fully questioning Berry about his access, and from
introducing Movant's statements concerning Berry under the
Rule of Completeness, ruling the evidence "self-serving"
and irrelevant. Appellate counsel's failure to challenge
this exclusion on appeal concealed the court's pattern of
biased rulings and deprived Movant of a critical
opportunity to highlight investigative deficiencies.

### 5.2.2. Caleb Williams: The Perfect Suspect

The evidence against Caleb Williams alone could have created
reasonable doubt. The jury was systematically denied every
critical detail about his background, technical skill, and
suspicious behavior.

- **The Profile:** Williams was a registered sex offender
  convicted of sexual assault of a minor. His crime was
  heinous: **as a man in his twenties, he repeatedly raped a
  14-year-old girl,** resulting in her eventually getting
  pregnant with his child. He had advanced IT skills,
  including Linux, Tor, and Torrent programs—the exact
  technical fingerprint of the offenses charged. He had
  unrestricted access to the dealership HP computer for
  personal and business purposes.

- **Timeline and Presence:** Williams misrepresented his
  whereabouts but later admitted being in Arkansas during the
  critical May 8-11, 2019 window. He had the ability to

access dealership passwords, social media accounts, and the HP computer remotely.

- **Criminal and Behavioral Red Flags:** Williams' prior sexual offense conviction for sexual assault with a young uunderage girl was highly relevant to his potential for similar conduct. He exhibited signs of consciousness of guilt: wiping and replacing devices after the investigation began, providing incomplete and edited alibis, and displaying extreme nervousness during interviews with the defense investigator, a former FBI Agent ready to testify.

- **Specific Evidence Excluded:** The defense attempted to present:

  - Williams' March 2019 sales contract confirming dealership employment;

  - Emails showing he possessed highly relevant Duggar family passwords;

  - Texts and admissions about his presence on the lot during critical timeframes;

  - Evidence of remote computer activity matching the offense fingerprints;

  - Evidence of activity and access on the HP office computer in early 2019, including printing eBay labels from his account and email.

○ Potential **impeachment** using his prior sex offense, involving sexual assault of a young girl.

The trial court barred all of this, leaving the jury reliant on Williams' self-serving statements. Appellate counsel failed to argue that excluding this evidence violated Holmes and deprived the jury of a meaningful chance to evaluate a viable alternative perpetrator.

### 5.2.3. William Mize: A Third Party Whose Evidence Was Excluded

William Mize was another individual with access to the Wholesale Motorcars lot whose potential involvement was minimally investigated by the government. The defense presented evidence that Mize was regularly present at the dealership, purchased multiple vehicles, and occasionally performed odd jobs, yet the government limited its investigation to a superficial review of his devices, conducting only a cursory manual triage and failing to forensically image his phone. Defense was prepared to present evidence of his operational knowledge of technology and networks, as he lived in his vehicle allowing him to move around from place to place—where he got the nickname, "McLoiterer" for being parked in various McDonald's parking lots, regularly using their wifi. The trial court excluded defense attempts to introduce testimony and transcripts concerning Mize's access and the government's investigative gaps, labeling them as "self-serving" and "islands" of evidence. Appellate counsel

failed to challenge this exclusion or argue its cumulative effect alongside the barred evidence regarding Williams and Berry. The exclusion of Mize, like the other alternative perpetrators, denied the jury a full understanding of potential third-party involvement, compounding the Sixth Amendment violation.

## 5.2.4. HSI's Campaign: Manufacturing a Narrative of Guilt

The trial court's exclusion of defense evidence did not occur in a vacuum; it was reinforced by a public campaign initiated by Homeland Security Investigations (HSI) that pointed a finger at the Movant from day one. This pattern of misconduct reveals a concerted effort to target a high-profile individual, not to conduct a neutral investigation.

On November 19 and 20, 2019, HSI Public Affairs Officer Bryan Cox deliberately abandoned the agency's standard "no comment" policy to engage in a series of highly prejudicial public statements. First, speaking to KNWA local news via telephone, he confirmed HSI's presence at the Duggar family home, stating, "I do not dispute the information that HSI was present there pursuant to an ongoing federal criminal investigation." The next day, commenting yet again to KNWA, he amended the location to give the address of Wholesale Motorcars. These selective, sequential leaks created an ominous and prejudicial effect, forcing Movant to permanently close his business on November 19,

2019 to protect his family and employees from threats of violence and vandalism. Threats that came immediately. More importantly, the public and potential witnesses were now conditioned to believe the government had its man. Only after the damage was done—and the narrative of guilt was firmly planted in the public consciousness—did Cox revert to the agency's standard "no comment" policy again on November 21, 2019. This was not a mistake; it appeared to be an HSI law enforcement strategy.

This external misconduct mirrored the internal fabrication of evidence. It was the same agency, HSI, that produced the unrecorded and undocumented statement from Agent Faulkner, who alleged the Movant asked, "What is this about, has somebody been downloading child pornography?" The agency's public communications, paired with Faulkner's manufactured evidence, demonstrate a pattern of agency misconduct and a singular prosecutorial focus that directly undermined the opportunity to present a complete defense.

Appellate counsel's failure to challenge this sequence of official misconduct was a catastrophic omission. This evidence of a coordinated agency effort to frame the narrative would have provided powerful context for the trial court's unconstitutional exclusion of alternative perpetrators. It shows the court's rulings were not isolated errors but the culmination of a biased

investigation. By failing to preserve this issue, counsel allowed the government's tunnel vision to infect the entire trial and appellate process, compounding the cumulative unfairness of a conviction obtained without a complete defense.

## 5.3. Direct Response to Government's Objections

### 5.3.1. This Claim Is Not Procedurally Barred Because It Is Constitutionally Distinct

- **Different Legal Standard:** Direct appeal reviewed the trial court's exclusions under an abuse-of-discretion lens (Rule 403). This § 2255 claim asserts a Sixth Amendment violation for appellate counsel's failure to challenge a Holmes-based constitutional defect, requiring de novo review.

- **Broader Factual Scope:** Direct appeal addressed only Caleb Williams. William Mize and Randall Berry's exclusion and cumulative error were never presented.

- **Massaro and Kimmelman:** Ineffective assistance of appellate counsel is separately reviewable under Massaro v. United States, 538 U.S. 500 (2003), and Kimmelman v. Morrison, 477 U.S. 365 (1986). Appellate counsel's failure is properly considered for the first time in this collateral proceeding.

### 5.3.2. The Claim Has Merit: Appellate Counsel's Performance Was Deficient and Prejudicial

- **Deficient Performance:** Competent appellate counsel would

have recognized that the trial court's "demonstrable nexus" standard was unconstitutional under Holmes and that its cumulative application silenced three critical alternative perpetrators. Failing to present this controlling precedent and cumulative error claim constituted constitutional deficiency.

- **Prejudice:** The prejudice is self-evident. By framing the appeal under the wrong standard, counsel subjected Movant to near-insurmountable deference. A proper Holmes-based argument, emphasizing the cumulative exclusion of Williams, Mize, and Berry, would have required the Eighth Circuit to conduct a de novo review. There is a reasonable probability that under correct constitutional framing, the appellate court would have recognized the structural defects that so undermined the trial process as to violate due process (see Chambers v. Mississippi, 410 U.S. 284, 302 (1973)).

## 5.4. Conclusion

Appellate counsel's failure to challenge the trial court's unconstitutional evidentiary standard and to argue the cumulative effect of excluding Williams, Berry, and Mize evidence resulted in a fundamentally unfair trial. The jury convicted Movant without ever hearing a complete defense, not due to lack of evidence, but because of the court's unconstitutional barriers and counsel's inaction on appeal. This

cascade of errors denied Movant the very Sixth Amendment
protections designed to ensure that every defendant receives a
fair trial and a meaningful opportunity to present a defense.
The omissions were not minor procedural oversights—they struck
at the core of the adversarial system and allowed a conviction
to stand despite powerful evidence suggesting alternative
perpetrators.

Relief under 28 U.S.C. § 2255 is warranted to restore the
integrity of the conviction, correct constitutional violations,
and reaffirm public confidence in the judicial process.

**Movant respectfully requests that this Court:**

1. **Vacate the conviction** and sentence, and order a new trial
   to ensure that a jury may hear all relevant evidence and
   fairly assess the credibility of alternative perpetrators;
   or, alternatively,

2. **Grant an evidentiary hearing** to fully explore the
   constitutional errors, cumulative prejudice, and the
   systemic failure of appellate counsel to protect Movant's
   rights, including the exclusion of critical evidence
   regarding Williams, Berry, and Mize.

## GROUND SIX: UNCONSTITUTIONAL INTERFERENCE WITH THE FUNDAMENTAL RIGHT OF ACCESS TO THE COURTS AND RESULTING PREJUDICE

## 1. Introduction: A Targeted Obstruction of Justice

This ground details a specific and egregious violation of the Constitution: the government's calculated effort to neutralize Movant's ongoing federal civil rights lawsuit by seizing electronic devices containing key litigation and investigation materials. This act of interference violated his fundamental First and Fifth Amendment right of access to the courts, caused irreparable prejudice to him and his family, and effectively shielded state actors from accountability for their illegal conduct.

The government, in its response, fundamentally misconstrues this claim. It attempts to reframe it as a vague and unsupported allegation of "judicial bias" or "improper motive." This is a classic strawman tactic. The government erects a phantom argument that is easy to knock down, while deliberately ignoring the actual, far more serious claim: that the government's own actions created a direct, tangible, and unconstitutional impediment to Movant's access to civil justice. The timing of the charges—coming after nearly 18 months since the DOJ raid, shortly after a new presidential administration, and on the heels of a high-profile raid of a political ally—illustrates the politically motivated nature of the interference. This section demonstrates that the government's actions constitute a clear

structural error that resulted in profound and ongoing prejudice. *See Christopher v. Harbury*, 536 U.S. 403, 415 (2002); *Lewis v. Casey*, 518 U.S. 343, 351 (1996); *United States v. Simmons*, 506 F.3d 720, 725 (8th Cir. 2007).

## 2. **The Bedrock Constitutional Right of Meaningful Access to the Courts**

The right of every citizen to access the courts is "one of the fundamental attributes of sovereignty" and is "the bedrock of our judicial system." *Chambers v. Baltimore & Ohio R. Co.*, 207 U.S. 142 (1907). This right is not a mere formality; it must be "adequate, effective, and meaningful." *Bounds v. Smith*, 430 U.S. 817, 822 (1977). A violation occurs when government actors take actions that create an "insurmountable" or "material" impediment to a litigant's ability to pursue a non-frivolous claim. *See Lewis v. Casey*, 518 U.S. 343, 351 (1996).

The critical element is "actual injury"—a litigant must show that the government's action "hindered his efforts to pursue a legal claim." Id. The Eighth Circuit has consistently applied this standard, finding that "interference with a litigant's access to evidence can constitute actual prejudice." *Simmons*, 506 F.3d at 725. Prejudice arises when a defendant is "materially impaired in his ability to pursue" a legal action, civil or criminal. *United States v. Crook*, 139 F.3d 1292, 1297

(8th Cir. 1998). Structural errors may also arise when government actions systematically block access to legal remedies. *See United States v. Whitted*, 11 F.4th 660, 667 (8th Cir. 2021); *United States v. Allen*, 247 F.3d 741, 745-46 (8th Cir. 2001) (holding that interference with evidence or counsel can constitute structural error). *Caplin & Drysdale v. United States*, 491 U.S. 617, 626-27 (1989) further underscores the judiciary's role in preventing executive interference with legal process.

## 3. Factual Predicate: An Active Civil Case Paralyzed by Government Action

### 3.1. The Underlying Civil Lawsuit and the Path Forward

The civil lawsuit, *Duggar v. City of Springdale*, et al., No. 5:16-CV-05241 (W.D. Ark.), was a legitimate effort to seek redress for the illegal release of sealed juvenile records. Judge Timothy L. Brooks's October 2017 order dismissed certain claims without prejudice, leaving the door open for Movant to re-file once the factual record was more fully developed. *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 396 (1990). The Eighth Circuit has recognized that dismissal without prejudice preserves a litigant's ability to pursue claims and that governmental obstruction of this right constitutes actual prejudice. *See Simmons*, 506 F.3d at 725.

## 3.2. Seizure of Key Investigative Materials

Movant was a primary investigator for his family, steadily
compiling evidence over time. His electronic devices were a
dedicated repository for this dynamic and developing case file.
The November 2019 seizure captured materials essential to
proving the claims, including:

- Digital communications from sources and potential
  whistleblowers.
- FOIA records obtained from state and local agencies.
- Time-sensitive information regarding officials who leaked
  the records.
- Audio files and photographic evidence relevant to the
  claims.

By seizing these devices, the government took the heart of an
active investigation being prepared for trial on behalf of
himself and his sisters. The intentional targeting of materials
tied directly to ongoing civil litigation demonstrates
interference beyond mere criminal investigation. *See Whitted*, 11
F.4th at 667; *United States v. Allen*, 247 F.3d at 745-46.

## 3.3. Insurmountable Post-Seizure Obstacles

The seizure was followed by a complete denial of tools
necessary to continue litigation. Court-imposed pretrial release

conditions prohibited him from accessing the internet or any computer. This combination created an absolute barrier—classic "actual injury" under *Lewis v. Casey*, 518 U.S. 343 (1996). The Eighth Circuit has recognized that when a defendant is materially prevented from gathering or using evidence in pursuit of claims, this constitutes a structural error requiring relief. *See Simmons*, 506 F.3d at 725; *Allen*, 247 F.3d at 746.

The denial of access to electronic devices not only obstructed the civil case, but it also limited Movant's ability to document government collusion, political motivations, and the illegal dissemination of his sisters' juvenile records. The combined effect is direct and irreparable prejudice to both Movant and his family.

### 4. Point-by-Point Rebuttal of the Government's Deficient Arguments

### 4.1. Mischaracterization of Bias

**Government claim:** Duggar's ground "appears to be that the judge and prosecutors were biased because of a civil lawsuit."

**Rebuttal:** This is a deliberate mischaracterization. The claim is not about subjective bias; it is about the objective, unconstitutional effect of government actions. The seizure of litigation materials combined with restrictions on access to computers created an unconstitutional impediment to court

access. *Christopher v. Harbury*, 536 U.S. 403 (2002); *Whitted*, 11 F.4th at 667.

## 4.2. Alleged Lack of Evidence

**Government claim:** Duggar "offers no evidence of bias or improper motive." **Rebuttal:** The claim does not require motive; it depends on unconstitutional effect. The evidence is concrete: (1) existence of a federal lawsuit preserved by court order; (2) seizure of devices containing case materials; and (3) denial of access to tools to continue litigation. The government's timing and coordination in targeting evidence further substantiate the interference. *Simmons*, 506 F.3d at 725; *Allen*, 247 F.3d at 746.

## 4.3. Alleged Speculative Harm

**Government claim:** Harm is "speculative." **Rebuttal:** This is demonstrably false. The harm was the termination of a viable, non-frivolous lawsuit. Loss of a preserved legal claim is a concrete injury. The additional exposure of juvenile records and denial of tools to protect or pursue civil claims caused real-world prejudice to Movant's sisters. *Christopher v. Harbury*, 536 U.S. at 415; *Whitted*, 11 F.4th at 667; *Simmons*, 506 F.3d at 725.

## 5. The Profound and Irreparable Prejudice

The constitutional violation denied Movant the ability to hold officials accountable. *See Bivens v. Six Unknown Named Agents*,

74

403 U.S. 388 (1971). It harmed his sisters by destroying their best chance at civil redress. The integrity of the judicial process was also damaged, creating a precedent for executive interference. *Caplin & Drysdale*, 491 U.S. at 626-27; *Allen*, 247 F.3d at 746.

## 6. Conclusion

The government did not merely investigate a crime; **it surgically excised a civil rights lawsuit that threatened state actors**. This was an unconstitutional abuse of power, denying Movant access to the courts and causing profound, ongoing prejudice to him, his sisters, and the rule of law. Courts must vindicate the fundamental right of access to the courts and grant relief. Relief is necessary to restore the constitutional guarantees violated, to ensure accountability, and to prevent future abuses of executive power. Bounds v. Smith, 430 U.S. 817, 822 (1977); Lewis v. Casey, 518 U.S. 343, 351 (1996); Whitted, 11 F.4th 660 (8th Cir. 2021).

**Movant respectfully requests that this Court:**

1. Vacate **his conviction and sentence**, and, in the alternative,

2. **Grant an evidentiary hearing** to fully develop the factual record and determine the full scope and impact of the government's interference.

GROUND SEVEN: THE TRIAL WAS UNCONSTITUTIONALLY TAINTED BY PREJUDICIAL PRE-TRIAL PUBLICITY THAT COUNSEL FAILED TO ADEQUATELY COUNTERACT

7.1. **Acknowledgment of Factual Error and Constitutional Reframing**

Movant acknowledges the government's accurate observation that the 2015 corporate-issued statement was not formally admitted as evidence at trial. This fact does not cure the constitutional violation; it sharpens it. The prosecution knowingly exploited an environment so saturated with false and inflammatory publicity that Movant was deprived of an impartial jury, in violation of the Sixth and Fourteenth Amendments.

The Supreme Court has made clear that convictions obtained in atmospheres "utterly corrupted by press coverage" cannot stand. *Sheppard v. Maxwell*, 384 U.S. 333, 352 (1966). Due process is violated when community sentiment, fueled by pervasive and hostile publicity, makes a fair trial impossible, regardless of whether the prejudicial material is formally entered into evidence. *Irvin v. Dowd*, 366 U.S. 717 (1961). The government's focus on the exhibit list sidesteps the core issue: the

constitutional injury occurred not in the courtroom, but in the minds of the jurors before they ever entered it.

## 7.2. The "Poisoned Well": A False Confession Engrained in Public Consciousness

Years before the indictment, a false "confession"—a corporate-driven statement drafted under duress to protect the TLC/Discovery television franchise—was disseminated to millions. This document, which falsely portrayed Movant as leading a "double life" and battling a "pornography addiction," became the undisputed public narrative. From 2015 to 2021, this statement dominated national and local media, was trending on web searches, becoming an article of faith in the small Northwest Arkansas community from which the jury was drawn. The prosecution did not need to introduce the statement at trial because the damage was already done. As the Supreme Court held in *Rideau v. Louisiana*, 373 U.S. 723, 726 (1963), a televised or **widely publicized confession can render any subsequent trial a "hollow formality."** Here, Movant's trial had effectively concluded in the court of public opinion long before the jury was empaneled.

## 7.2.1. Juror Awareness and In-Chambers Hearing

Trial transcripts and in-chambers discussions record multiple instances of juror awareness and media exposure. One juror, Juror Number 18, self-reported possible prior Facebook contact,

becoming, "Facebook friends with... either the show or Josh."
The juror stated this was due to his celebrity, explaining that
he and his wife "watched the show when the Duggars were in the
high of their celebrity" and believed the account to be an
actual friend connection, not merely a page "like". Although the
precise voir dire questions and responses are not in the record,
the Court held an in-chambers hearing, discussed the issue with
counsel, and accepted the juror's explanation before resuming
trial proceedings. *The Duggar Family Official* Facebook page for
the family TV show is the very place where the corporate-driven
statement was posted, and where viewers frequented to gather
information about television show updates and news about the
Duggar Family. This demonstrates that jurors were exposed to
extrajudicial publicity, both directly and via social media,
creating a fertile ground for bias.

7.2.2. **Media Exposure and Celebrity References in Trial
Testimony**

Additionally, trial testimony reflects the pervasive public
narrative:

- Defense counsel noted the excitement of federal agents
  investigating "the reality T.V. star we're excited to
  investigate," highlighting the effect of celebrity on
  investigative focus.

- Special Agent Faulkner acknowledged the intensity of media scrutiny during a recorded interview, stating, "Man to man, I don't know how you do it. It is amazing to me what the media is putting you through on a daily basis."
- Prosecution witnesses and attorneys repeatedly referenced the 2015 public statement and Duggar family fame, including the Megyn Kelly interview, Covenant Eyes account, and social media management, showing the jury's exposure to a preformed narrative.

## 7.3. Counsel's Ineffectiveness in Confronting the Taint

Under *Strickland* v. Washington, 466 U.S. 668 (1984), counsel's performance was constitutionally deficient. Faced with a jury pool where nearly every member acknowledged familiarity with Movant, reasonably competent counsel would have taken specific, aggressive steps to mitigate the prejudice stemming from the 2015 statement. Trial counsel failed to do so.

### 7.3.1. Failure to Seek a Change of Venue

In a small, saturated media market where a celebrity defendant had been publicly branded by a scandalous "confession," the need for a change of venue was overwhelming. The publicity was far more personal and inflammatory than that in Skilling v. United States, 561 U.S. 358 (2010). Yet, no motion to transfer the case was ever filed.

### 7.3.2. **Failure to Conduct a Constitutionally Sufficient Voir Dire**

While trial counsel did conduct a general voir dire regarding media exposure, the examination was fatally flawed. Counsel failed to ask the one question that mattered most: "What do you know about the 2015 statement issued by the Duggar Family Facebook page, at the direction of TLC/Discovery?"

In Mu'Min v. Virginia, 500 U.S. 415 (1991), the Court emphasized the necessity of probing jurors on their exposure to specific prejudicial information. Here, counsel's generic inquiries about publicity were insufficient to uncover the deep-seated bias caused by the false confession and celebrity exposure. By failing to confront the specific content of the 2015 statement and the defendant's widely known fame, counsel allowed the government to seat a jury whose impartiality had already been compromised.

### 7.3.3. **Failure to Request Meaningful Curative Instructions**

Counsel also failed to request robust, specific jury instructions designed to counteract the 2015 statement. A generic admonition to disregard media reports is useless against a "fact" that jurors had accepted as true for over six years. As *Sheppard* requires, the court must "vigorously guard the right to an impartial jury through clear and forceful instructions" 384 U.S. at 363. None were sought.

## 7.4. Presumed and Actual Prejudice

The prejudice here is both **legally presumed and factually
evident**. Under Rideau, the pervasive dissemination of a
confession creates a presumption of prejudice. The failure to
counteract this through a change of venue or a targeted voir
dire cemented that prejudice.

**Actual prejudice** is also clear from the trial record. Jurors
were exposed to years of celebrity-driven media narratives, the
2015 statement, and social media references, including
self-reported awareness by Juror Number 18, with a direct
reference to social media and Facebook relating to awareness of
Movant and the Duggar family. Counsel's failure to identify or
challenge this exposure ensured that jurors entered the box with
a fundamentally skewed perception of Movant's character and
credibility.

## 7.5. Government Response and Rebuttal

The government will predictably argue that voir dire was
sufficient because jurors affirmed they could be fair. This
argument is hollow and ignores decades of Supreme Court
precedent.

- Superficial voir dire cannot substitute for confronting
  jurors about the single most inflammatory extrajudicial
  information. Counsel's failure to question the jury about

exposure to the 2015 statement and celebrity coverage made any objective assessment impossible.

- Reliance on juror assurances is misplaced. As the Supreme Court warned in Irvin, such assurances "cannot be dispositive" in the face of pervasive, inflammatory publicity 366 U.S. at 728. *Murphy v. Florida*, 421 U.S. 794, 802 (1975), confirms the standard is objective, not based on a juror's self-diagnosis.

- Deference to counsel under *Strickland* does not extend to ignoring the core source of bias—celebrity and the false 2015 statement. This was not strategy; it was a failure to perform a basic function of trial advocacy.

## 7.6. **Conclusion and Requested Relief**

Movant's trial was held before a jury drawn from a community already saturated with a false and damning narrative masquerading as a confession, amplified by the defendant's celebrity status and social media presence. Trial counsel's failure to seek a change of venue and conduct voir dire that directly confronted jurors' prior exposure to that publicity denied Movant the right to a fair and impartial jury. This failure resulted in actual prejudice under *Strickland*, undermining confidence in the verdict and the integrity of the judicial process. The Constitution demands relief.

Accordingly, **Movant respectfully requests that this Court:**

1. **Vacate the conviction** and grant a new trial; or, in the
   alternative,

2. **Grant an evidentiary hearing** to fully develop the record
   regarding the extent of pretrial prejudice and counsel's
   failure to address it.

## GROUND EIGHT: THE TOTALITY OF COUNSEL'S FAILURES CAUSED A COMPLETE BREAKDOWN OF THE ADVERSARIAL PROCESS, RESULTING IN A PRESUMPTION OF PREJUDICE

### 8.1 Claim

Movant was denied his Sixth Amendment right to the effective
assistance of counsel. This is not a "cumulative error" claim,
as the government mistakenly argues. Rather, it is a single,
unified claim: the totality of counsel's failures demonstrates a
complete breakdown of the adversarial process, triggering a
presumption of prejudice under *United States v. Cronic*, 466 U.S.
648 (1984), and satisfying the prejudice prong of *Strickland v.
Washington*, 466 U.S. 668 (1984).

Each failure independently violated Movant's rights, and their
combined effect rendered the trial a complete denial of the
adversarial testing required under the Sixth Amendment. These
were not isolated strategic missteps but fundamental lapses in
addressing profound constitutional violations. Counsel was
constitutionally ineffective when they:

- ⊚ **8.1.1** Failed to preserve the core defense by allowing the
  trial court to exclude any evidence implicating plausible
  alternative perpetrators, including Randall Berry and Caleb
  Williams, thereby functionally gutting the entire defense
  theory before the jury (Grounds One & Five).

- ⊚ **8.1.2** Failed to challenge perjured expert testimony,
  permitting James Fottrell—a witness who admitted to
  altering forensic evidence and providing false testimony
  under oath—to serve as the unchallenged centerpiece of the
  government's scientific case (Ground Two).

- ⊚ **8.1.3** Failed to suppress or strike a fabricated confession,
  allowing the government to build its case around an
  unrecorded, uncorroborated, and devastatingly prejudicial
  statement attributed to Movant (Ground Three).

- ⊚ **8.1.4** Failed to protect Movant from a compromised witness,
  allowing Bobye Holt to introduce a highly prejudicial,
  uncorroborated allegation about a supposed confession that
  allegedly occurred nearly two decades earlier. Counsel
  failed to expose her documented history of child abuse and
  profound, publicly stated animus toward Movant, thereby
  abdicating the duty to challenge this invented testimony
  (Ground Four).

- ⊚ **8.1.5** Failed to address a structural conflict of interest,

allowing the same judge to preside over Movant's criminal trial while simultaneously handling contentious civil litigation involving Movant, which created a clear appearance of partiality (Ground Six).

- **8.1.6** Failed to neutralize pervasive, prejudicial pretrial publicity, including a coerced, corporate-driven statement falsely portraying Movant as leading a "double life." Counsel's failure to seek a change of venue, conduct meaningful voir dire on the issue, or request specific curative instructions ensured the jury pool was irrevocably tainted (Ground Seven).

When a trial becomes a contest between unchecked government misconduct and defense silence on foundational issues, the adversarial process collapses. That is precisely what occurred here.

## 8.2 Factual Background

The government's characterization of this claim as bundling minor errors fundamentally misreads counsel's failures. Movant's defense faced a cascade of constitutional violations that, taken together, made a fair trial impossible. Counsel's omissions were not limited to one front but pervaded every critical aspect of the trial:

**8.2.1 Failure to Preserve the Core Defense (Grounds One & Five):**
In a circumstantial case reliant on digital forensics, the only

plausible defense was to show another individual with motive, access, and technical skill could have committed the offense. The trial court excluded evidence related to Randall Berry and Caleb Williams, including Williams' criminal history and Berry's access and motive. Counsel failed to preserve these rulings for appeal and did not adequately challenge the court's exclusion as a functional denial of Movant's Sixth Amendment right to present a defense.

**8.2.2 Failure to Challenge Perjured Expert Testimony (Ground Two):** James Fottrell admitted under oath to modifying forensic images and connecting them to the internet, contradicting prior sworn testimony. Counsel failed to move to strike his testimony, request a mistrial, or seek a curative instruction, leaving the jury to rely on a witness who had admitted material falsehoods.

**8.2.3 Failure to Suppress a Phantom Confession (Ground Three):** Agent Gerald Faulkner testified that Movant made an incriminating statement about "downloading child pornography" before any recording began. Counsel failed to file a pre-trial motion to suppress or, upon admission, to strike or mitigate its impact, allowing uncorroborated, prejudicial testimony to remain unchallenged.

**8.2.4 Failure to Investigate and Impeach a Biased Witness (Ground Four):** Bobye Holt testified about an uncharged act nearly two decades old. Counsel failed to uncover public

information that would have impeached her, including a family court order removing her children due to a "history and continuing pattern of abuse" (Attachment A) and her public statements that expressed vitriol and hatred, for Movant and his family (*See* Attachment B).

**8.2.5 Failure to Address a Structural Conflict (Ground Six):** The presiding judge simultaneously handled Movant's criminal trial and contentious civil litigation involving Movant and his sisters. Competent counsel would have moved to recuse the judge under 28 U.S.C. § 455 or preserved the record. Counsel's inaction waived a critical challenge to impartiality.

**8.2.6 Failure to Neutralize Prejudicial Pretrial Publicity (Ground Seven):** The 2015 corporate-driven statement, drafted under duress to protect TLC/Discovery, falsely portrayed Movant as leading a secret "pornography-addicted" life. It was widely disseminated and dominated public perception in the jury pool. Counsel failed to seek a change of venue, conduct voir dire specifically probing exposure to the statement, or request meaningful curative instructions. This allowed the jury to enter with a deeply skewed perception of Movant's character.

**8.3 Legal Issue**

Whether the totality of counsel's omissions—failing to preserve the defense, challenge perjured testimony, suppress a fabricated confession, neutralize a biased witness with a fabricated story,

address a structural conflict, and counter prejudicial publicity—constituted a complete breakdown of the adversarial process, triggering a presumption of prejudice under *Cronic* and satisfying the prejudice prong of *Strickland*.

## 8.4 Discussion

The government's attempt to dismiss this as a forbidden "cumulative error" claim fundamentally misinterprets both the facts and the law. The Eighth Circuit's rejection of aggregating *non-prejudicial* errors is irrelevant here. *See Middleton v. Roper*, 455 F.3d 838, 851 (8th Cir. 2006). This claim does not seek to stack minor errors; it asserts that counsel's pervasive failures on multiple, outcome-determinative fronts caused the trial to lose its character as a true adversarial proceeding. The Supreme Court in *United States v. Cronic*, 466 U.S. 648, 659 (1984), held that prejudice is presumed when "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing." Such a breakdown occurred here, where counsel's omissions were not isolated but systemic, gutting the defense at every critical juncture:

8.4.1 **The Defense Theory:** Counsel's failure to preserve a challenge to the exclusion of the alternate perpetrator evidence is a classic Sixth Amendment violation. A defendant's right to present a complete defense is an essential component of adversarial testing. *See Holmes v. South Carolina*, 547 U.S. 319,

324 (2006). By allowing the court to eliminate the entire defense theory without adequate objection, counsel left Movant defenseless against the government's circumstantial narrative.

**8.4.2 The Government's Evidence**: Counsel's silent acquiescence to perjured testimony from the government's lead expert, James Fottrell, is indefensible. The knowing use of false testimony violates due process. *Napue v. Illinois*, 360 U.S. 264, 269 (1959). Competent counsel has an absolute duty to challenge it. Similarly, allowing Agent Faulkner's uncorroborated "confession" to be admitted without a suppression motion or a motion to strike left the most damning piece of evidence wholly untested.

**8.4.3 The Government's Witnesses**: The failure to investigate and impeach Bobye Holt was a catastrophic dereliction of duty. Effective cross-examination is the "greatest legal engine ever invented for the discovery of truth." *California v. Green*, 399 U.S. 149, 158 (1970). Counsel's failure to discover and seek out public records revealing Holt's own history of child abuse and her public death wishes for Movant was not a strategic choice; it was a failure to investigate that is the hallmark of ineffective assistance. *See Wiggins v. Smith*, 539 U.S. 510, 524-25 (2003). By failing to expose her as a deeply compromised and vindictive witness, counsel allowed her invented, 18-year-old haunted story to go to the jury unchallenged.

**8.4.4 The Fairness of the Forum**: An impartial judge is a bedrock

requirement of due process. Counsel's failure to file a recusal motion under 28 U.S.C. § 455 in the face of an obvious conflict waived a critical structural protection and allowed the trial to proceed under a cloud of partiality.

8.4.5 **Prejudicial Pretrial Publicity**: The failure to mitigate the effects of the intensely negative and widespread publicity surrounding the 2015 corporate statement created a strong likelihood of a biased jury pool. In cases of pervasive pretrial publicity, prejudice may be presumed. *Sheppard v. Maxwell*, 384 U.S. 333 (1966); *Skilling v. United States*, 561 U.S. 358 (2010). Counsel's inaction—failing to move for a change of venue or conduct probing voir dire—denied Movant his right to an impartial jury.

The synergistic effect of these failures destroyed any semblance of a fair trial. A jury that never hears the defense's theory, is presented with perjured expert testimony and a phantom confession, hears a damning, invented story from an unimpeached and deeply biased witness, and is empaneled from a tainted jury pool has not witnessed an adversarial contest. It has witnessed a "breakdown in the adversarial process that would justify a presumption that [the] conviction was insufficiently reliable to satisfy the Constitution." *Cronic*, 466 U.S. at 662.

8.5 **Conclusion**

Movant's trial was rendered fundamentally unfair by counsel's

systemic failures across every critical stage. This was not a collection of minor errors but a total breakdown of adversarial testing. The Sixth Amendment guarantee of effective assistance was violated. Prejudice must be presumed under *Cronic* and *Strickland*, and relief under 28 U.S.C. § 2255 is both warranted and necessary to restore integrity to the proceedings.

**Movant respectfully requests that this Court:**

1. **Vacate the conviction** and grant a new trial based on the complete breakdown of the adversarial process caused by counsel's systemic failures; or, in the alternative,

2. **Grant an evidentiary hearing** to fully develop the record regarding the extent and impact of counsel's failures and the resulting prejudice, including the pervasive pretrial publicity, unchallenged perjured testimony, exclusion of the defense theory, and other constitutional violations.

**E. CONCLUSION: A Cascade of Constitutional Errors Demands Relief**

The record now before this Court paints an undeniable picture of a trial that was fundamentally unfair. While Movant respects the jury's verdict based on the evidence presented to them at trial, he submits this filing as a step toward examining the full truth and ensuring the record is properly considered. The government secured its conviction not through a neutral presentation of evidence, but through a narrative built on constitutional

violations. They systematically dismantled the defense, presented tainted evidence, and relied on witnesses who were compromised or had committed perjury. This filing serves as Movant's testimony—an opportunity to shed light on the errors that undermined the fairness of the trial, while hoping it helps shed light on the truth. Taken together, the issues outlined in the preceding grounds created a cascade of constitutional violations that denied Movant a fair opportunity to defend himself. It is Movant's hope that this entire §2255 filing, considered as a whole, demonstrates his innocence and prompts this Court to grant the relief necessary to restore justice.

## F. REQUEST FOR RELIEF

**WHEREFORE**, for all the foregoing reasons, Movant respectfully requests that the Court, holding this pro se filing to "less stringent standards than formal pleadings drafted by lawyers" (Haines v. Kerner, 404 U.S. 519, 520 (1972)), grant relief as follows:

1. **Vacate the judgment** of conviction and sentence entered in Case No. 5:21-CR-50014; or, in the alternative,

2. **Order a new trial**; or, in the alternative,

3. **Hold an evidentiary hearing** to fully develop the factual record on the constitutional claims raised herein, including counsel's systemic failures and the resulting prejudice;

4. **Appoint counsel to assist Movant** in navigating these complex proceedings to ensure a just and fair outcome; and

5. **Grant any other relief** the Court deems just and proper.

Movant submits that the cumulative effect of the constitutional violations described above demonstrates a breakdown in the fundamental fairness of the criminal proceedings and warrants relief under 28 U.S.C. § 2255.

Respectfully submitted,

/s/ Joshua James Duggar

Movant, Pro Se

FCI Seagoville

P.O. Box 9000

Seagoville, TX 75159

**Attachments:**

Attachment A: *Holt Custody Order in Arkansas Family Court*, Presumably from Washington County Circuit Court (2024).

Attachment B: Instagram Post from Bobye Holt, (@jnbholtfamily) (May 25, 2022)

**VERIFICATION / DECLARATION**

I, Joshua James Duggar, declare under penalty of perjury that I am the Movant in this action and that I have read the foregoing motion and know the contents thereof. The facts stated in the motion are true and correct to the best of my knowledge, information, and belief. This declaration is made pursuant to 28 U.S.C. § 1746.

Due to conditions at FCI Seagoville, Movant has faced significant limitations in preparing this motion. The facility's law library is extremely abbreviated and does not offer adequate resources for individuals working on their own cases. In addition, the law library is frequently inaccessible for extended periods. Movant does not have access to a complete copy of the trial transcript or all pretrial motions and has relied on family and friends to mail partial records.

The prison mail system is also severely delayed and unreliable, as has been discussed at length by the government. These delays have caused repeated disruptions and harm to Movant's ability to receive legal documents and effectively prepare this motion. Movant's request for court-appointed counsel was denied previously, and he respectfully submits this motion pro se and

in forma pauperis, with the best effort possible under these circumstances.

Executed on October __9__, 2025.

Respectfully submitted,

_____

Joshua James Duggar

Reg. No. 42501-509

FCI Seagoville

P.O. Box 9000

Seagoville, TX 75159

CERTIFICATE OF SERVICE

I, Joshua James Duggar, hereby certify that on October __9__, 2025, I placed a true and correct copy of the foregoing Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. § 2255 in the prison legal mail system, with first-class postage prepaid, addressed to the following:

Clerk of Court

United States District Court

Western District of Arkansas

Fayetteville Division

35 E. Mountain Street, Room 510

Fayetteville, AR 72701


and


United States Attorney's Office

Western District of Arkansas

35 E. Mountain Street, Suite 300

Fayetteville, AR 72701

Joshua James Duggar, Pro Se, Movant

### "Movant's Attachment A"

Presumably from Washington County Circuit Court (2024). Unconfirmed court, date and docket number due to sealed records. (Screenshot copy from public online circulation)

2. That the Court finds that Spencer Holt is qualified and suitable, and otherwise fit and proper, to act as guardian of the minor children named herein.

3. That by agreement of the parties, the Petitioner, Spencer Holt, shall be granted permanent guardianship of the person and the estate of █████████

4. That this Court finds that due to a history and continuing pattern of abuse in the household of the Respondents, James and Bobbye Holt, that there is an imminent threat to the health and safety of █████ and █████████ and as a result, a guardianship is desirable to protect the interests of the minor children.

5. That for that reason, Spencer Holt shall be awarded temporary guardianship of █████ and █████████, and Spencer Holt is authorized to take all necessary or proper actions to provide for their care.

"ATTACHMENT B"

Bobye Holt, Instagram Post (@jnbholtfamily) (May 25, 2022)

Instagram

jnbholtfamily

85 likes

jnbholtfamily I wrote some notes for Jim and I what I had been feeling about the sentencing that was coming up. But I wasn't able to to post it because of technical difficulties. But I revised it and will post it here.

Josh James Duggar sentenced to 12 years, 7 months. While being at the sentencing of Joshua today, there's lots we have been praying about and a big decision made by Judge Brooks. My heart hoped the judge would take into account that,
* Joshua has had all his loved ones believe in him, friends who feel he's a great man & father to encourage him, all the money needed and more than enough time to get the real therapy he's needed long before now.

jnbholtfamily I wrote some notes for Jim and I what I had been feeling about the sentencing that was coming up. But I wasn't able to to post it because of technical difficulties. But I revised it and will post it here.

Josh James Duggar sentenced to 12 years, 7 months. While being at the sentencing of Joshua today, there's lots we have been praying about and a big decision made by Judge Brooks. My heart hoped the judge would take into account that,
* Joshua has had all his loved ones believe in him, friends who feel he's a great man & father to encourage him, all the money needed and more than enough time to get the real therapy he's needed long before now.

(Sentencing only 5 years would have been a spit in the face to the victims. Which is what the defence suggested.)

* It's been 7 years since admitting (NOT because he was remorseful but because he was caught) to cheating and being addicted to p*rn. (2015 Ashley Madison hack) All the while parading around like a God fearing, loving husband, father & friend, and supporter of widows.

* Also in 2015, Let's not forget the cause of the lawsuit that was brought against him from one woman he cheated with. (The stripper that was paid off to be silent & drop the case)

* Because he has been trusted, privileged, coddled, protected & favoured his whole life, he's only gotten worse. He's really just been masquerading as someone else. No wonder he had letters of support. Has it not occurred to them he's fooling them? But he HAS hoodwinked them!

Instagram

* It's been 7 years since admitting (NOT because he was remorseful but because he was caught) to cheating and being addicted to p*rn. (2015 Ashley Madison hack) All the while parading around like a God fearing, loving husband, father & friend, and supporter of widows.

* Also in 2015, Let's not forget the cause of the lawsuit that was brought against him from one woman he cheated with. (The stripper that was paid off to be silent & drop the case)

* Because he has been trusted, privileged, coddled, protected & favoured his whole life, he's only gotten worse. He's really just been masquerading as someone else. No wonder he had letters of support. Has it not occurred to them he's fooling them? But he HAS hoodwinked them!

I truly didn't think even 20 years was enough when 19 hasn't been. No telling what he would do next had he only gotten 5 years!
BUT I truly feel Judge Brooks was a very fair and considerate Judge and had already considered all I listed above except the fact that some of his family has only enabled him.

And to all who wrote letters for him,
You define a man with what he does in secret rather than what he does openly!

"To do justice and judgment is more acceptable to the LORD than sacrifice."

So grateful justice has been served and more children have been healed!

~Jim & Bobye Holt

View all 19 comments

⇔42501-509⇔
Joshua Duggar
#42501-509#
Federal Correctional Facility
P.O. BOX 9000
Seagoville, TX 75159
United States

COVER LETTER: OCT 9, 2025:

PLEASE EXCUSE THE LINES ON THE COPIES,
THE COPIER WAS MESSING UP, BUT IT IS
THE ONLY COPIES I HAVE TO SEND.

THANK YOU.

— JOSH DUGGAR

10, 9, 2025

⇔42501-509⇔

Joshua Duggar
#42501-509#
Federal Correctional Facility
P.O. BOX 9000
Seagoville, TX 75159
United States

GGAR # 42501-509
EAGOVILLE
OX 9000
LLE, TX 75159-9000

Received WD/AR

OCT 28 2025

H.⋅ Clerk's Office









Retail

U.S. POSTAGE PAID
USPS Ground Advtg
DALLAS, TX 75253
OCT 23, 2025

72701

$0.00

RDC 01    1 Lb 1.50 Oz    S2324M506128-01

CLERK OF COURT
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION
35 E. MOUNTAIN ST, ROOM 510
FAYETTEVILLE, AR 72701



USPS TRACKING® #

9534 6102 4177 5296 6383 05

J. DUGGAR #42501-
FCI SEAGOVILLE
P.O. BOX 9000
SEAGOVILLE, TX 75159-9000

Received WD/AR

OCT 28 2025

U.S. Clerk's Office







Retail

U.S. POSTAGE
USPS Ground
DALLAS, TX 7
OCT 23, 2025

72701        $0.00

RDC 01    1 Lb 1.50 Oz    S2324M50612

CLERK OF COURT
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION
35 E. MOUNTAIN ST, ROOM 510
FAYETTEVILLE, AR 72701

USPS TRACKING® #



9534 6102 4177 5296 6383 05