**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

UNITED STATES OF AMERICA PLAINTIFF

vs. CASE NO. 5:21-cr-50014

JOSHUA JAMES DUGGAR DEFENDANT

---

MOTIONS HEARING

**BEFORE THE HONORABLE TIMOTHY L. BROOKS**

APRIL 15, 2026

FAYETTEVILLE, ARKANSAS

---

Proceedings recorded in realtime via voice writing.

**REBECCA ROSS, CVR, CVR-M, RVR**
Federal Official Court Reporter
35 East Mountain Street, Fayetteville, Arkansas 72701

## APPEARANCES

ON BEHALF OF THE PLAINTIFF:
**MR. DUSTIN ROBERTS**
United States Attorney
414 Parker Avenue
Fort Smith, Arkansas 72901
(479)783-5125
dustin.roberts@usdoj.gov

**MS. CARLY MARSHALL**
United States Attorney
414 Parker Avenue
Fort Smith, Arkansas 72901
(479)494-4069
carly.marshall@usdoj.gov

ON BEHALF OF THE DEFENDANT:
**MR. BEAU BRINDLEY**
Law Offices of Beau B. Brindley
53 W. Jackson Boulevard, Ste. 1410
Chicago, Illinois 60604
(312)765-8878
bbbrindley@gmail.com

# INDEX


| | Page |
|---|---|
| APPEARANCES | 2 |
| INDEX | 3 |
| EXHIBITS | 4 |
| TESTIMONY OF JOSHUA JAMES DUGGAR | |
| Direct Examination By Mr. Brindley | 9 |
| Cross-Examination By Mr. Roberts | 18 |
| Redirect Examination By Mr. Brindley | 31 |
| Recross Examination By Mr. Roberts | 34 |
| Examination By The Court | 36 |
| Further Examination By Mr. Brindley | 47 |
| Further Recross Examination By Mr. Roberts | 49 |
| Further Redirect Examination By Mr. Brindley | 55 |
| Further Examination By The Court | 55 |
| TESTIMONY OF L. CROWDER | |
| Direct Examination By Mr. Roberts | 57 |
| Cross-Examination By Mr. Brindley | 64 |
| Examination By The Court | 65 |
| REPORTER'S CERTIFICATE | 78 |

## EXHIBITS

Government's Exhibits:

| Number | Description | Page |
|---|---|---|
| 1 | Legal Mail Log from FCI Seagoville | 62 |

**PROCEEDINGS**

THE COURT: Now before the court is the matter of the *United States v. Joshua James Duggar*. Our case number -- the criminal case number is 5:21-cr-50014. The companion case number for the assigned civil case is 5:25-cv-5161. The matter appears before the Court today for purposes of a preliminary hearing on Mr. Duggar's 2255 petition, which seeks to collaterally attack the underlying criminal judgment in his case. We are proceeding by a video conference platform this afternoon.

Present for the United States are Carly Marshall and Dustin Roberts. Present for Mr. Duggar is Beau Brindley.

And the record should reflect that Mr. Duggar is appearing remotely as well from the BOP facility in Seagoville, Texas.

Good afternoon, Mr. Duggar. Can you hear me okay?

THE DEFENDANT: Good afternoon, Judge Brooks. Yes, glad to be back in your court.

THE COURT: Virtually anyways. Good to see you as well.

THE DEFENDANT: Yes, sir.

THE COURT: So let me tee up the hearing a little bit. As I mentioned, this is a preliminary hearing on a 2255 motion that Mr. Duggar has filed. I said that this is a preliminary hearing, and what I mean by that is, the sole

question which is the subject of this hearing is whether the 2255 petition was timely filed. I believe it is undisputed that the accrual date of when the one-year deadline to file under 2255(f), the accrual date is June 24 of 2025. That is when the United States Supreme Court denied Mr. Duggar's petition for a writ of certiorari. So, in other words, to be timely filed within the one-year period, he would had to have filed his 2255 petition by no later than June 24 of 2025.

I may have misspoke earlier. The petition for writ of certiorari was denied on June 24 of 2024. Applying the one-year limitation to that, his petition under Section 2255 would have had to have been filed by no later than June 24 of 2025. However, best case scenario, the petition was not filed with the Clerk's Office until June -- I'm sorry, July 29 of 2025, which would be about 35 days too late. However, Mr. Duggar has attached to his petition a declaration or a certificate of service saying that he dropped the petition in the mailbox facility at Seagoville on June 24 of 2025. And under the so-called mailbox rule, if that declaration is correct, then it would make the petition arguably timely filed.

However, the government has raised a number of issues. Generally speaking, they take the position that the petition was not timely filed, and they challenge the veracity of the statement that it was deposited within the prison mailbox on June 24.

There's a secondary issue here that has to do with what I understand to be the duplicate copy of the 2255 petition. What I mean by that is, via the mail, this Court also received an identical copy of the 22 [sic] petition. That was received on August 18 of 2025. The petition that found its way to our Clerk's Office on July 29 has been filed and given Document Number 179.

The petition that was received by mail in our Clerk's Office has been assigned Document Number 182. And the docket text indicates it was filed as a duplicate filing.

The government contends that Document 179 was addressed to the U.S. Attorney's Office in this same federal building, but that, in fact, it found its way to the Clerk's Office and was submitted on that date. The government contends that it was misfiled because that was their copy, not the Clerk's copy.

The government contends that the operative copy before the Court is the one at Document 182 that was received by mail on August 18.

There are some additional more nuanced facts that we don't need to get into here, but that has to do with various markings on the envelopes.

So this is a preliminary hearing for the purpose of determining the timeliness of the filing of the 2255 petition. If the Court finds that the petition is timely filed, then the

Court will separately take up the merits of the 2255 petition. But if the Court finds that the petition was not timely filed, then it will rule in favor of the government on its motions and dismiss the petition as untimely.

In this hearing, it would be the Court's understanding that Mr. Duggar bears the ultimate burden of proving his entitlement to the benefit of the prison mailbox rule, that's pursuant to *Grady v. United States*, 269 F.3d 913. Pinpoint site is pages 916 through 917. That's a 2001 decision of the Eighth Circuit. That being the case, and I'm flexible, I don't necessarily mind who goes first, but it will be Mr. Duggar's ultimate burden.

Let me ask Ms. Marshall and Mr. Roberts, and then I'll go to Mr. Brindley, if y'all had any thoughts on who should go first today.

MR. ROBERTS: Your Honor, the government's position is that Mr. Duggar and his attorney should go first.

THE COURT: Mr. Brindley, do you agree?

MR. BRINDLEY: I do, Your Honor.

THE COURT: All right. You may proceed.

MR. BRINDLEY: Thank you, Your Honor.

Sir, please state your name for the Court.

THE COURT: Just as a -- whoa. As a matter of formality, let's have you formally call Mr. Duggar, and I will assume that that's what you meant. So Mr. Duggar will be

called in this case remotely.

We first need to swear him in.

Mr. Duggar, if you would, please raise your right hand to be sworn. I'm sorry. I have to do that when we do it remotely.

(Witness sworn.)

THE COURT: All right. Mr. Brindley, you may proceed.

MR. BRINDLEY: Thank you, Your Honor.

JOSHUA JAMES DUGGAR,

Having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. BRINDLEY:

Q. Please state your name for the record.

A. Joshua James Duggar.

Q. For the record, can you spell your last name?

A. D-U-G-G-A-R.

Q. How old are you, Mr. Duggar?

A. Thirty-eight years old.

Q. And where do you currently reside?

A. Federal Correctional Institution in Seagoville, Texas.

Q. And how long have you been incarcerated at the FCI Seagoville?

A. About 45, 46 months.

Q. Now, Mr. Duggar, did you draft a habeas petition under

Section 2255 and send it to the Court for purposes of filing?
A. Yes, sir.
Q. Now, can you explain for the Court how the inmate mailing system works at FCI Seagoville from the perspective of you, an inmate?
A. Just like any letter we send out, we take it to -- you know, we put the postage on there and we fill out an envelope and then we slide that into the mail slot and usually in our housing unit. There's multiple depositing stations all, you know, across the compound. But in our housing unit --
Q. Okay.
A. -- is a lock box on the wall generally is how it's set up with a lock on there that only an officer can access. So once we slide it in, it's in their possession at that point.
Q. Okay. Would you have knowledge as an inmate of what happens after that? So you slide it into the mail receptacle at your housing unit and then what happens next from your understanding as an inmate?
A. My understanding is there's a mail bag that comes around with a mailroom officer that comes and picks that mail up at some point, some interval. I'm not really aware of everything that goes on from there, but I know they collect it and, I assume, send it out.
Q. So after you put a piece of mail in the mail receptacle at your housing unit, do you have any personal control over where

it goes or what happens to it after that?
A. No, sir.
Q. All right. So can you tell me, in general terms, based on your experiences at FCI Seagoville -- can you explain how the timeliness and organization of the prison mail system works in practice?
A. I mean, there's routine delays on both sides, outgoing mail and incoming mail. Generally, you know, just no rhyme or reason. I'll send a letter out to my family, it will make it there in a few days, sometimes a few weeks, sometimes a few months. The same with receiving mail. I've got mail in several months late. It's just all over the map. That's pretty routine as far as just knowing that you can't count on it.
Q. So are delays in the sending out of your mail at FCI Seagoville common in your experience?
A. Yes, sir.
Q. Now -- so, in reality from your personal experience and in practice of what really happens at the facility, does the mail, as you understand it, always go out on the same day that it is put in the mailbox?
A. No, sir.
Q. Does it always get processed on the same day that it's put in the mailbox?
A. No, sir.

Q. Can you explain, Mr. Duggar, how it is that you know that from your own experience?

A. I have been here, you know, almost four years and I mail out stuff all the time and, you know, it's just part of the process. I don't know if the delays are with the Postal Service or with the mail, but there's no explanation that I can understand from my side of it. I just put it in the mailbox and then hope it makes it there. Some things don't even make it. Some things -- I have mail that has just been lost.

Q. Your 2255 petition that this litigation is about, did you place that petition in the prison mail receptacle in your housing unit?

A. Yes, sir.

Q. And when did you place the document that you wanted to be filed with the Court, the 2255 petition that you have prepared, when did you place that in the mail receptacle at your housing unit?

A. June 24 of 2025.

Q. And how is it that you can be certain that it was on June 24, 2025, that you placed your 2255 petition in the mailbox at your housing facility?

A. I mean, I put it in there. I had recently got the paper printed by Unit Team and them I went and put it in the mailbox.

Q. When you say the paper printed, you mean the actual document itself?

A. I had a -- well, I had just the financial statement paper that I have that's attached to it, I had that printed the same day. And then the afternoon I put it in. So that was attached to my original filing.
Q. And so your financial affidavit went with your original filing, and you put it in the mail on June 24, 2025, in the receptacle at your housing unit; is that right?
A. Yes, sir.
Q. Do you know then or have any way to know when it was actually removed from that receptacle?
A. No, sir.
Q. Have you observed an exhibit that was filed by the government in this case that purports to be a log of certified mail? I think that's what I read it to be.
A. Yes, sir. I received a copy of that.
Q. I think that was marked as Government Exhibit B to Docket 188 for the record.
Have you seen one of these certified logs actually in the prison when you have been there?
A. No, sir. Not prior to this.
Q. So do you have any idea -- after your mail is put into the receptacle for the mail in your housing unit, is there any way for you to know whether it's treated as a certified or regular mail or how it's treated after that?
A. No, sir.

Q. When you send something out for the Court, do you ever get back any kind of receipt showing that it was sent certified or when it specifically went out of the facility?
A. No, sir. Of all of my filings, no. No, sir.
Q. Now, did you also send at some point a duplicate copy of your 2255 petition?
A. They were both mailed on the same day.
Q. So you mailed both copies on the same day in terms of placing them in the mail receptacle at the housing unit; is that right?
A. Yes, sir. Both copies.
Q. Why were there two?
A. The one had to be sent to the government and the one had to be sent to the Assistant United States Attorney's Office.
Q. So did you ever send any duplicate copy after the fact, after those two that were sent on the 24th and placed in the mailbox that day?
A. No, sir.
Q. All right. Now, Mr. Duggar, did you ever receive in the mail through the prison mail system a copy of the government's response to your 2255 petition?
A. Yes, sir.
Q. Where did you receive that copy of the government's response?
A. It was delivered to me in my housing unit by one of the

other inmates.
Q. You got -- another inmate delivered it?
A. Yes, sir.
Q. Now, in terms of mail that's coming from the government or from the Court, is there a procedure that's supposed to be followed at the facility for the provision of that kind of legal mail?
A. Yes, sir, from what I understand.
Q. What is that -- let me ask it this way. So how is it supposed to happen from what you understand that legal mail is provided to an inmate?
A. Legal mail is supposed to be only opened in the presence of the inmate is my understanding. Some of it is marked that way on the front. But I believe anything from a court is supposed to be treated that way.
Q. And when you received this copy of the government's filing, it was delivered to you by another inmate. Obviously, it wasn't then opened by staff in your presence; am I right about that?
A. It was already opened. It had already been opened and taped. They cut the mail open and then they tape it back just to make sure there's not contraband in it I assume. All of my receipt filings from the government have been received that way. Not a single one of them has went through the proper legal mail system where they call your name over the

loudspeaker and you go and receive it.
Q. Now, when you received the government's response, did you look at any point at the date on which that document indicated that it was sent out by the government?
A. I believe I did, yes, sir.
Q. Do you know what that date is from your memory?
A. I do not. I don't have my paperwork right in front of me, I'm sorry. Can you refresh my memory on that?
Q. Yes. Let me ask you, Mr. Duggar, referring to -- this is Document 184, which was the government's response. Do you recall and does this sound right to you, a certificate of service date indicating that it was sent out on the 3rd of September 2025?
A. Yes, sir.
Q. And do you recall, does this date seem right to you, based on your preparation of responses and replies in this case, that the UPS -- the United States Postal Service postmark on the government's response you received was October 29, 2025? Does that date sound correct?
A. Yes, sir, it does.
Q. And in your filings that you ultimately sent in in response to the issue of timeliness, did you provide exhibits that included those dates?
A. I don't know if those were actually filed with the Court or not.

Q. But you received certainly a document from the government postmarked October 29 which had indicated that it was sent out on September 3, 2025; is that accurate?
A. Yes, sir. I believe it has a meter date as well on the front that says September 4, one day after that, if I remember right. Am I correct on that? I don't have the filing in front of me.
Q. Understood. Given the Zoom situation or the video conference situation, I think that's sufficient. Mr. Duggar, one other thing I want to ask you before I turn it over to the government is this. Now, your petition, your 2255 petition which you prepared, did you ever provide that to some third party for the purposes of them relaying it to the Court somehow?
A. No, sir. I mailed my motion.
Q. And when you mailed your motion, did you mail the motion that you sent on the 24th of June 2025 in any different way than you mailed other motions that were filed in this case with the Court?
A. No, sir.
Q. Did you indicate on the envelope that you sent out that the motion was supposed to go to the United States District Court?
A. Yes, sir.
Q. All right. When the document was received on July 29 of

2025 by the Clerk's Office, do you personally have any idea how or why that delay between June 24 when you put it in the mailbox and July 29 when it was received, do you have any basis to understand what caused that delay?
A. No, sir.
Q. Did you as an inmate have any ability to control that delay whatsoever?
A. No, sir.
MR. BRINDLEY: I have no further questions at this time, Your Honor. Thank you.
THE COURT: Thank you, Mr. Brindley.
Mr. Roberts.
MR. ROBERTS: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. ROBERTS:
Q. Mr. Duggar, where you are currently housed do you have access to computers or typewriters?
A. We have access to typewriters.
Q. So you're currently housed in the Special Housing Unit. Were you housed there in June of 2025?
A. No, sir.
Q. Where you were housed in June of 2025 did you have access to computers?
A. No, sir.
Q. Again, did you only have access to typewriters?

A. Yes, sir.
Q. Do inmates in either the Special Housing Unit or the unit you were in in June of 2025 have access to any type of printers?
A. No, sir.
Q. Can you tell the Court who printed your legal documents in this case? Who actually typed them and printed them then?
A. I had my motions prepared prior to the mailing date and then I sent them out.
Q. So a third party prepared the motions?
A. I mean, I prepared them. I made sure I signed them. I filled out the envelopes and put the stamps on them and sent them out.
Q. I'm not trying to confuse you here. The ultimate question is: So someone else typed out and printed out the motion and sent it to you for verification, authorization, and you signed it; is that correct?
A. I mean, I sent it from here, yes.
Q. Okay. I want to make sure you're answering my question. I see that you're saying that you sent it from there. I need to know and for you to verify, so a third party, someone outside of the prison system, physically typed and printed the documents and then sent them to you; is that correct?
A. I had my motions prepared and then I -- I had a typewriter and I was able to type up and prepare my motions, and then I

sent those motions out from here. I signed everything, I put the stamps on and sent it out on June 24, 2025.

Q. Okay, Mr. Duggar. Maybe I'm asking a bad question.

So you say you had your motion prepared. What does that mean?

A. I filled out the motions and I sent them to the Court.

Q. Okay. But you have access to a typewriter and a typewriter only; is that correct?

A. Yes, sir.

Q. Would you agree that the motions, the actual 2255 motions - there's two in this case - they were printed from a printer, not produced via a typewriter? Do you agree with that?

A. I mean, there are aspects of it that were, yes, sir. The attachments and things like that, yes.

Q. So my specific question with regard to the aspects that were printed from a printer produced via computer, who provided you those documents?

THE WITNESS: I mean, am I required to state that, Your Honor? I don't know.

THE COURT: Yes.

THE WITNESS: Okay.

A. (The witness continued.) I had a friend on the outside that helped me with some of that preparation work.

Q. (Mr. Roberts continued.) Okay. Who is that friend?

THE WITNESS: Do I need to state the name of that person as well?

THE COURT: Yes.

THE WITNESS: Okay.

A. (The witness continued.) My wife helped me with that, Anna Duggar.

Q. (Mr. Roberts continued.) Again, we're not trying to confuse you. So Ms. Duggar, your wife, did she print out the entire document and you signed it? Is that what happened?

A. Yes.

Q. Okay.

A. I mean, I prepared the motion and sent things. There was correspondence there on that.

Q. So you kind of coordinated back and forth what you wanted the document to say, but she actually typed it out, printed it, and sent it to you?

A. Well, it was photocopied is what I understand, but I'm not sure if it was photocopied or printed, but something along those lines.

Q. Well, am I correct that, prior to June 24 of 2025, you received two copies of that document and you signed them; is that correct?

A. Yes, sir. Two copies of the 2255, yes, sir.

Q. And so after receiving those two copies, your statement is

that you signed them, you placed them in separate envelopes, and you mailed one to the U.S. Attorney's Office and the other to the Clerk of the Court?
A. Yes, sir.
Q. All right. I don't know -- since you don't have the documents in front of you, with regard to the envelope in Document 179, that was the one addressed to the United States Attorney's Office, am I right that you intended that to come to the United States Attorney's Office and not to be the one received by the Clerk of the Court?
A. I'm not sure what happened with that, because I don't know if the envelopes got switched, but I intend -- I sent two motions out on the same day. So I don't know if the envelopes got switched or if something happened. I sent two motions out on June 24.
Q. I understand what you're saying. My question is your intent. Did you physically write "U.S. Attorney's Office" on the outside of the envelope?
A. I wrote "U.S. Attorney's Office" on one envelope and I wrote the "United States District Court" on another envelope the same day and sent them out at the same time.
Q. Okay. So with respect to the envelope labeled -- intending to be sent to the U.S. Attorney's Office, you intended that to actually be received by my office; is that correct?

A. The envelope, yes. I'm not sure of the contents. You know, I'm not sure.
Q. Well, would you agree with me the contents of both envelopes are the same?
A. Yes, sir.
Q. Now, one question I have got for you. So the certificate of service, and I know that's a little bit harder since you don't have it right in front of you, but the certificate of service, the date of June 24, 2025, is actually typed in. And you told us that you received that from, I believe, your wife. So is she the one that typed in that date?
A. I don't recall.
Q. It was printed along with the rest of the documents. It's not handwritten in.
A. It might have been typed on a typewriter. I really don't recall. I believe I typed it on a typewriter.
Q. So your statement is that the documents your wife sent you, that was printed out and provided to you sometime before June 24, 2025, came, and there was a blank with regard to the "executed on" and then there was just a blank and you typed in "June 24, 2025"?
A. I don't recall, sir.
Q. Now, do you recall -- so you sent two different envelopes and the envelopes contained the exact same content, is that correct, just two copies of the same motion; right?

A. Yes, sir.
Q. Do you recall how many stamps you placed on the envelope destined for the U.S. Attorney's Office?
A. No, sir.
Q. If Document 179, which was scanned by the Clerk when it was received, that's your U.S. Attorney's Office version of your motion, would it surprise you to find that it only has five stamps on that envelope?
A. I believe -- if you're telling me that's correct, I can't see it right in front of me.
Q. All right. So if the Court finds that as evidence, you're not disputing it if it's filed along with the motion?
A. Certainly.
Q. Now, on that date would you have put the same -- would you have affixed the same amount of stamps to the second envelope?
A. I prepared -- I don't remember exactly. I had the envelopes ready to go before. I didn't really know how much it was going to weigh, because I had to go take it and get it weighed. I put too many stamps on one, you know, not knowing and just kind of guessing. And so once I went there and weighed it that day after I had the documents I realized I didn't need that many, but I couldn't peel them off. That's what I do remember. I don't remember how many or what on each envelope, but that's the -- we have a scale that we can use to weigh things, and that's where we -- I was able to determine

that I was way off. I was guessing.
Q. Okay. So if you are way off on Document 179, the envelope containing the U.S. Attorney's Office mailing, wouldn't you have added additional postage in order to send it through the mail?
A. We have a book that they open and look at, an inmate helps us with that. I don't know what's right and what's not. There's a whole bunch of charts in there and they routinely get it wrong. So it's like you send it out and see what happens. It usually makes it. There's never -- I mean, it could cause a delay on that, but I'm just saying I just send it out.
Q. Would it surprise you -- did you fill out the entire envelope, meaning you put your name, your address, and then the "United States District Court" written on the envelope containing the second 2255 motion, the copy that actually went to the District Court? Did you fill out everything on that envelope?
A. Is that Document 182?
Q. That is Document 183, I believe.
A. Okay. That's the envelope. Yes, sir, I believe that's -- that's correct, I filled out everything -- I believe everything that was on there. There were some things -- other attachments on there that look like postal things and stuff like that, I believe. Is that right? Is that the one we're talking about?
Q. Mr. Duggar, you were right with respect to the document

number. It is Document 182, so this would be the second 2255 motion we were referring to. Did you fill out the entire envelope in both instances?

A. I mean, I put the postage and I put the address, and I put the return address. Just to be clear. I think there's other markings and accoutrements on there. I'm not sure now.

Q. Did you write "Media Mail Only Books" on the outside of the envelope?

A. No, sir.

Q. Not your handwriting?

A. No, sir.

Q. Do you recall affixing - if my math is right - one, two, three, four, five, six, seven, 14 stamps to that envelope?

A. I'm confused now, sir. Media mail?

Q. The envelope that contains Document 182, the envelope that contained the second identical version of your motion, that envelope has seven -- excuse me -- 14 stamps. Whereas the envelope that was destined to the U.S. Attorney's Office, again, containing the same amount -- or the same exact document, had five stamps. I'm trying to explain the difference there.

A. Right. I think that's already been covered. I explained that was the envelope that I filled out first before I weighed it based on the advice of another inmate. And then I went and weighed it -- or maybe it was the other way around. I don't

really remember which one. One had the right weight, one had the wrong weight based on whatever it was. At that point, I just -- you know, I was like, "Oh, okay." I think the five was sufficient is what he told me. I think I put too many on the one, but I couldn't unpeel those stamps without damaging them. I believe it was -- I think it was too many stamps, if I remember right. I think you're correct on that.

Q. All right. Moving on. So Document 182, the envelope, U.S. Postage. There's a stamp that says "Retail". It says "U.S. Postage Paid. USPS Ground Advantage. Dallas, Texas. August 8, 2025."

So you are telling the Court that you placed that in the mail drop box within your unit not quite two months prior?

A. Yes, sir. June 24 of 2025.

Q. So, Mr. Duggar, if there is a legal mail system within FCI Seagoville and there's a process that attaches to that legal mail, are you aware of it?

A. There is an ability for us to send certified mail, but that is not considered necessarily the only course for legal mail. So there is a process for us to send certified mail. But my understanding is institutional mail is considered legal mail. So anytime we deposit something into the prison mailbox, no matter what that mailbox is, when it is behind a lock box, that is the legal mail system.

Q. Okay. So your understanding, and I am not here debating

you, your understanding is that all mail that's going to be filed or that's coming from the Court, the legal mail sent in any manner from FCI Seagoville is legal mail?

A. Yes, sir.

Q. And we both agree that you sent this via the mail drop box in your unit, not through any other process?

A. Not through certified mail, yes, sir.

MR. ROBERTS: Your Honor, can you give me one minute just to make sure I have covered everything I am intending to?

THE COURT: Yes.

Q. (Mr. Roberts continued.) Mr. Duggar, throughout your mailings from when you asked for an attorney through the time you replied to -- or submitted your reply to the government's response, there were a couple different ways the U.S. Attorney's Office was listed, at least the address was listed. Did you list those or was that an anomaly because your wife was typing it?

A. I had -- I don't recall really. You guys actually had different addresses on some of the paperwork that I had from before. So when I was preparing them I might have typed -- I think there is a Fort Smith address and maybe a Fayetteville address. Is that what you are getting to?

Q. There are a couple different, yes.

A. I assumed it was fine if I used either address. So I didn't really pay that much attention beyond that as far as

where it went.

Q. I know it is not in front of you. So the envelope with respect to Document 179, this is the U.S. Attorney's Office version of the 2255 motion you sent. Now, if the envelope itself has no indicia that it went through the postal system, meaning like canceled stamp or a postmark, do you have any explanation for the Court for that?

A. I believe that's actually something the Postal Service itself has an explanation for, sir.

Q. Okay. Could you please explain that?

A. My attorney probably has a copy of it with him, but there's actually a postal notice on that that just because something is not postmarked -- it was a Federal Register I want to say December of last year. Do you have that? Does my counsel have that? He might have that for me to be able recall.

THE COURT: Mr. Duggar, just answer the question.

A. (The witness continued.) There is a postal rule that was literally saying -- that literally says if the postmark is not affixed or if there's no mailing equipment that is included on that, it does not mean that it did not travel through the Postal Service. I actually pulled that out of the Federal Register.

Q. (Mr. Roberts continued.) Mr. Duggar, I'm asking you do you personally have any explanation that you can

provide to the Court why there would not be either a postmark, canceled stamps, or other indicia that this envelope went through the mail system?
A. No, sir, other than what --
Q. Mr. Duggar, did your wife drop this particular mailing off at the U.S. Courthouse in Fayetteville, Arkansas, on the day it was filed?
A. Absolutely. Not.
Q. Did any third party drop this filing off at the U.S. Courthouse in Fayetteville, Arkansas, on the day it was filed?
A. Absolutely not. No, sir.
Q. And so, as we sit here today, we have one filing that occurred on July 29, 2025. The second filing of the same document that you said that you mailed on the same day filed on August 18, 2025. And the only explanation that you have is that you dropped them in the mail drop box on the same day and something happened?
A. I deposited my motion into the institutional mailbox, you know, just like my sworn statement said, on June 24 of 2025, yes, sir. Both motions, both copies, yes.
Q. But we are in agreement that you deposited these into the mail drop box in your unit and did not send them certified mail; is that correct?
A. Yes, sir. They were not sent certified mail.
MR. ROBERTS: Your Honor, that's all I have. I'll

pass the witness.

THE COURT: Anything else, Mr. Brindley?

MR. BRINDLEY: Yes.

REDIRECT EXAMINATION

BY MR. BRINDLEY:

Q. So, Mr. Duggar, a couple of questions. First of all, to clarify this number of stamps issue. You sent out two filings. Did you put the wrong number of stamps on one?

A. I mean, both of them made it. I don't know -- you know, my understanding was once I weighed it something was wrong. I don't remember the whole situation. I just put a bunch of stamps on an envelope and then one of my buddies here in the unit said, "Oh, you don't need that many. It will make it with less."

By then, I had already prepared the envelope.

Q. So did you put too many stamps on one and then less stamps on the other; is that right?

A. Yes, sir.

Q. Now, there's an indication about somebody writing on the envelope "Media Mail Books." First of all, is that something that you wrote?

A. No, sir.

Q. And what you were sending, the contents of these envelopes, you agree they are motions that need to get to the government and to the Court; is that right?

A. Yes, sir.
Q. So was either one of those envelopes containing something that you intended to be media mail or books?
A. No, sir, not at all.
Q. So whoever handled that envelope after you, do you know if it was misidentified as media mail or books?
A. I don't know. But I assume someone must have at some point.
Q. Obviously your wife, when she was sending you the document after it was printed and sent back to you, she knew that these were motions for the Court; right?
A. Right.
Q. So there was no one, whether it was you or her, that would, as far as you understand, be confusing motions for the Court as media mail or books; is that right?
A. Absolutely.
Q. Now, someone handling mail at the facility that went through the mailbox, they could make a mistake like that without knowing the contents of your envelope, do you agree?
A. Yes, sir.
Q. Now, there's a question about certified mail versus putting it in the mailbox. What's the certified mail process like there and is it always available every day at all times? How does it work?
A. Well, I have never sent anything certified mail from this

place in the 46 months that I have been here, not a single thing. My understanding is you have to have commissary and you can go and you can purchase something is my understanding. I don't know how that works, but I have never done it. It's not something -- I don't generally have a lot of commissary.

Q. So if you don't have the necessary commissary money, is it fair to say that you can't, as far as you understand, use certified mail?

A. That's my understanding.

Q. There was a question asked about whether or not somehow your wife delivered one of the documents, one of the two identical 2255 documents to the Court. And so what I would ask about that, Mr. Duggar, is it your understanding -- maybe you don't know, but is it your understanding that if somebody is hand-delivering legal documents to the Court that there would be a log kept either by the Clerk's Office or the deputy that receives it?

A. Certainly, sir. I have spent some time in that courthouse. There are definitely things being documented what comes and goes from the courthouse.

Q. Now, with respect to these two items, the government has drawn a distinction because the items are ultimately received on different days. But my question is this: Would there be any cognizable reason for you to want to send the motion to the government on a different day than you're sending the same

motion to the Court?

A. No, sir.

Q. The government's copy, that is service of a copy of what you're filing with the Court; is that your understanding?

A. Yes, sir. That's my legal requirement. In fact, it's attached right there saying I did that as such on the same day.

Q. So then is there any reason that you can think of why you would send one at one point in time and the other one at some different time if you were doing it on purpose?

A. No, sir.

Q. So did you send the two documents at the same time from your housing unit?

A. Yes. On June 24, 2025.

MR. BRINDLEY: No further questions, Your Honor.

MR. ROBERTS: Your Honor, I do have a few follow-ups, if I may.

THE COURT: That's fine.

RECROSS EXAMINATION

BY MR. ROBERTS:

Q. Mr. Duggar, was there anyone else other than your wife and you involved in the preparation or the printing or the writing of these motions?

A. I had some other inmates that I consulted with, but I don't think, you know, really -- she might have consulted with somebody, but it wasn't anything that I had anything to do

with. But, no, it was really, you know, just preparing them. You know, she worked on them and I did too.

Q. Outside of inmates, are you aware of anybody other than your wife that had any role in writing, printing, or preparing these documents?

A. No, sir.

Q. No third parties?

A. No, sir.

Q. You did not use a professional service, is that what you are telling the Court?

A. Yes, sir.

Q. You did not use any friends that you had outside of the BOP?

A. No, sir.

Q. Now, when your attorney asked you any cognizable reason to send motions on separate days, would you agree with me that if you did factually miss the date and wanted to get it filed quick, it would make sense for someone who had the document that was physically in Northwest Arkansas to drive to the courthouse in Northwest Arkansas to have that document filed?

A. I would actually say that is completely false, because why wouldn't they deliver it to both offices? That doesn't make sense. It's not cognizable to me at all.

MR. ROBERTS: Your Honor, I'll pass the witness.

THE COURT: Anything else, Mr. Brindley?

MR. BRINDLEY: No, Your Honor. Thank you.

THE COURT: All right.

EXAMINATION BY THE COURT

THE COURT: Mr. Duggar, I have some questions. And let me preface this by saying there's nothing significant that I am aware of about who the author was of your 2255 motion. I don't care whether you're the author or whether there's some prison jailhouse lawyer that did it or whether your wife did it, it doesn't make any difference.

What I am interested in understanding though is the flow of the process between the typewriter and whether what the Court has received are two typewriter-produced versions of the same document or whether there's one typewriter version and the second one was run through a photocopier or printed off of a computer stick somehow. This is what I'm trying to get at, so bear with me.

If I look at the petition, let's just assume it's the one that's filed as Document 179, the front part of that, which is to say pages 1 through 12, is like a form where you fill in the blanks. And then pages 13 through 47 are what you call Attachment A. And then on page 48, there's a certificate of service. And then on pages 49 and 50, there's something called an inmate inquiry talking about an account balance. And then at page 51 through 53, there is what is captioned on page 51 "Attachment B," which is your application to proceed without

paying a filing fee. Which of those documents or sections of Document 179 were you the author of?

THE DEFENDANT: So, generally speaking -- I mean, I don't have it right in front of me, I don't have copies of the motion right in front of me. Generally speaking, I prepared everything. And then some of that was probably -- I mean, at this point, it's speculation, but I can kind of speak to it. I assume she used a PDF something to fill in some of those, you know, what I had handwritten. Basically, I sent her a handwritten copy of the paper and then she was able to make it more legible for the Court. And the same way with the attachments, just sort of organized it a little bit to where it's more easier to read.

Now, the main body and everything, that was typed by me. And I believe that's pretty much intact. I'm not certain with that. It might have been -- you know, it's a copy or it might have been scanned in somehow. I'm not sure how that works. I'm speculating, Your Honor, as far as what actually happened outside of my control. I don't have that.

THE COURT: What I hear you saying, correct me if I am wrong, is that the front part of the petition, what I'm calling the fill-in-the-blank part -- for the record, that would be pages 1 through 12 -- you took the form, you hand wrote it, you gave the handwritten version to your wife, and your wife then inputted what you had handwritten in using a

computer or a word processor; is that correct?

THE DEFENDANT: I believe so. And also AO 243 is the form number; right? I have kind of memorized these. I believe that one also I might have signed a blank copy and she might have filled it out. I'm not sure. I don't remember exactly. I don't have it right in front of me, but I believe that's generally correct, yes, sir.

THE COURT: Yes, it's AO 243. The front part is fill-in-the-blank, but you had a number of claims that wouldn't fit in the blanks. So beginning at page 13, it's attachment -- it's styled "Attachment A. AO 243 Form. Memorandum of Additional Grounds for Relief." And that goes from page 13 for dozens of pages. Does that refresh your recollection a little?

THE DEFENDANT: Yes, sir, it does. Yes, sir. Basically what I sent was just a filled-out version of the same thing just handwritten and she just tried to copy it. It was just really hard to read. My penmanship isn't the best, Your Honor.

THE COURT: Well, you testified on direct that you used a typewriter.

THE DEFENDANT: Yes, sir.

THE COURT: What portion of your petition was typewritten versus handwritten and given to your wife?

THE DEFENDANT: Well, I don't recall that exactly, but, I mean, it's pretty clear there's no way a typewriter can

fit in that small little AO 243 form. The boxes are just -- they're really small. I tried and it wouldn't work, so I had to handwrite that. I have helped other inmates here with that, Your Honor, and it's a common problem. They give us these forms that are made not for our work here.

THE COURT: Mr. Duggar, I'm not suggesting that there's any problem with how you've done this. I'm just trying to understand your workflow here.

THE DEFENDANT: Yes, sir.

THE COURT: What I hear you telling me is you took a blank AO 243, you hand-wrote in what you wanted to put there, you somehow gave the handwritten version to your wife, and then she used a computer to convert your handwriting into a typewritten format; is that correct?

THE DEFENDANT: That's my understanding, yes, sir.

THE COURT: Okay. Now, how is it -- I guess you're saying that later she brought back the typewritten version for you to sign and put in the prison mail?

THE DEFENDANT: Yes. It was mailed to me. Yes, sir.

THE COURT: She mailed it to you?

THE DEFENDANT: Yes, sir.

THE COURT: Okay. When you were submitting the handwritten version to your wife, how did that work? Did you give that to her at a visit or did you mail it to her?

THE DEFENDANT: No, we're not allowed to bring papers

to visits. I just mailed it out to her just through the regular mail system. That was prior -- I had a year, you know, as far as from this time, so it wasn't like it was one response. It was kind of sent back and forth over time working on things and kind of getting it there, we had been working on it. We knew that June 24 was going to be the day that it was done and final as far as that goes, so I had been preparing for that. It came and I don't remember exactly when.

THE COURT: Where did you buy the stamps that you put on the envelopes containing Documents 179 and 182?

THE DEFENDANT: Those were stamps that I had. You can tell they're different stamps. I just had them here in the unit.

THE COURT: Do you buy them from the commissary?

THE DEFENDANT: You can, yes, Your Honor.

THE COURT: Well, where did you get these stamps?

THE DEFENDANT: Another inmate gave them to me, Your Honor. He saw me working on it and he wanted to help with that.

THE COURT: Where did you get the stamps when you were mailing your drafts back and forth to your wife?

THE DEFENDANT: From the same, another inmate gave them to me as well.

THE COURT: So since you were mailing the drafts back and forth to your wife, why didn't you just mail it to her and

have her file it with the Court?

THE DEFENDANT: Because that's not -- you're not allowed to do that, Your Honor. It has to be -- if you're signing it from you coming from prison, it has to be signed and sent by the inmate directly. On a *pro se* motion, I have to be the one to file it. It has to come -- in order for the prison mailbox rule to apply, unless I have counsel, I can't file on my own. It has to be filed -- I can't have a third party do it.

THE COURT: Well, that presupposes that you need to take advantage of the prison mailbox rule. That wasn't my question. You had been exchanging these drafts, as you have testified, back and forth to your wife. I couldn't you have just signed the final version, mailed it to your wife, and had her show up at the courthouse on June 24 to file it?

THE DEFENDANT: Well, I still had to get the financial stuff together because I am indigent. And I had to get that stuff together for my Unit Team as well. I knew what it was, but, you know, I just had to get that printed out. And I kind of waited until the last minute, there were some delays on that side too. But I was able to get that document printed and done. I notified them of the deadline.

THE COURT: Mr. Brindley asked you this question, but I forgot your response. Why is it that you know with certainty that you placed it in the unit mailbox on June 24?

THE DEFENDANT: I mean, I knew what date it was I deposited it into that mailbox. I mean, I definitely knew what day it was. I went to the Unit Team right before that and got that financial printout. And I had been waiting on that to be able to file the completed motion. So that's when I slid it into the mailbox there in the housing unit, both motions, and I attached that and I put it in. I don't remember --

THE COURT: That was on June 24?

THE DEFENDANT: Yes, sir. I did have one clarification on that, Your Honor. I don't remember if I had photocopies made at that point or not of the motion in the Unit Team office. I don't recall that for sure, because there was some things that we made copies of as well, you know, before it went out that day as well. Like I had a financial statement, the other attachments on the end, I believe I had to copy those because I only had one copy or I don't remember exactly how it worked.

THE COURT: What I heard you say in response to my question was you remember it was the 24th because you had kind of highlighted in your head that that was your deadline and you recall that you met the deadline.

THE DEFENDANT: Yes, sir.

THE COURT: Now, in this process of exchanging drafts back and forth through the mail with your wife, did she mail back to you the final version to sign?

THE DEFENDANT: Basically, yes, Your Honor. I don't know if all of the attachments were included in that or if that was for my previous draft that we had. But, yes, sir, essentially.

THE COURT: And she would have typed up the several-dozen-page-long Attachment A; is that right?

THE DEFENDANT: Yes, AO 243. Yes, sir.

THE COURT: So when she sends back the final version, perhaps less some of the other attachments, when she sends that back to you, does she send you one copy to be the original that you signed or does she send you two copies to serve as duplicate originals in which case you signed both of them?

THE DEFENDANT: As far as those both final versions, Your Honor?

THE COURT: Yes.

THE DEFENDANT: I believe I did receive a multiple copies of that one, but I don't recall exactly, Your Honor.

THE COURT: You don't recall whether she sent two copies of the final version for you to sign as duplicate originals that you would then mail versus one copy that you would then have to take somewhere and have it photocopied?

THE DEFENDANT: Well, I thought there might have been three copies, Your Honor, because I think I had a copy that I kept, but I don't really recall. But it was, I believe, at least two.

THE COURT: Two that your wife sent you?

THE DEFENDANT: Yes, sir. Yes, Your Honor.

THE COURT: When, relative to June 24, did you receive the two duplicate originals from your wife?

THE DEFENDANT: I honestly don't recall, Your Honor. Maybe two weeks prior. I don't want to speak out of turn. I don't really recall exactly, Your Honor.

THE COURT: So you had these duplicate originals for two weeks before you dropped them in the -- signed them and dropped them in the mailbox?

THE DEFENDANT: Yes, Your Honor. That's what I recall.

THE COURT: Why would you wait two weeks if all you had to do was sign them?

THE DEFENDANT: I had to get the financial team as well from the Unit Team. And that's a process here, Your Honor. It's just the government so...

THE COURT: What all was involved in obtaining what you're calling the financial statement?

THE DEFENDANT: Well, they were very helpful with getting that statement once I notified them, but there was a little bit of confusion over what was required. So they had to do a little research on what was needed and things like that, and so there was a little back and forth on that. And then we had a change in some unit staff that caused a little bit of a

delay on that. One didn't want to sign off on it, the other was okay with that. Anyway, I can go into more detail if you want on that.

THE COURT: Well, when, relative to when you dropped the two envelopes in the mailbox, did you obtain what you're calling the financial statement from the financial team?

THE DEFENDANT: Within two hours, Your Honor. I think the print time was like 2-something in the afternoon, if I remember right. And I had it in the mailbox by, I would say, 4 p.m.-ish, right around there.

THE COURT: And when had you first requested the financial statement relative to June 24?

THE DEFENDANT: I had talked to them about it probably about a month prior, because I knew it was going to be needed, maybe even two months prior. We had a change in some unit staffing, and I think I kind of got misdirected to a different -- to talk to trust fund and different places and it wasn't exactly -- they said, "No, go back to Unit Team."

Probably two weeks prior I had requested it. And the unit manager has to be the one to sign off ultimately is what I found. And so we didn't know that at the time, and we ended up getting it done. They were very helpful in getting it once they understood what they were able to do and what they needed to provide.

THE COURT: Did you keep the envelopes or envelope

that your wife sent the duplicate originals to you in?

THE DEFENDANT: I don't believe so, Your Honor. I don't typically retain envelopes from her.

THE COURT: Well, you said you thought there was a third copy for you to keep. Would you not have just kept that in the envelope that it was mailed in?

THE DEFENDANT: I have some folders that I keep my legal work in. And usually I just file those sequentially and I keep them organized that way, that way I don't lose track of folders for those.

THE COURT: Knowing the importance of -- I mean, you knew the deadline, June 24, that was the last day, you had that in your mind. Did you ask for any sort of receipt that would document you dropping it off in the unit mailbox on the 24th?

THE DEFENDANT: Your Honor, I mean, since then, since the government has brought up this issue, I've learned different things. But what I can tell you with certainty is, I send these -- you know, I have watched inmates send things out every day and I've never seen an issue. This is routine for prisoners, and especially those of us who help other inmates. We send these out on the last day all the time. It's constantly received by courts without any issue.

THE COURT: And you're certain that you mailed both envelopes on the same date?

THE DEFENDANT: Certain. Yes, Your Honor. I knew

that was required, I had to do that.

THE COURT: On Document 182, that's the version of the petition that was received in our Court Clerk's Office on August 18, there is a United States Postal Service label saying, "U.S. Postage Paid." It's postmarked Dallas, Texas, to show where it was processed. It shows that it was processed there in Dallas on August 6. The stamps are marked through as a form of canceling them. No such documentation, no such canceling appears on the envelope associated with Doc 179 that was received at our Clerk's Office on July 29. Do you have any understanding or explanation as to why that is?

THE DEFENDANT: No, sir.

THE COURT: Do you have any understanding or explanation as to why the envelope addressed to the U.S. Attorney's Office at this federal building was delivered to the Clerk's Office instead of the U.S. Attorney's Office?

THE DEFENDANT: No, sir, but I would like to know.

THE COURT: Okay.

Mr. Brindley, does that prompt any further questions?

MR. BRINDLEY: Yes, one thing.

FURTHER REDIRECT EXAMINATION

BY MR. BRINDLEY:

Q. Mr. Duggar, I'm looking at Document 179 which the Court was just looking at. The judge asked you some questions about the financial documentation that you had to provide, okay? I

want to look at that for a minute.

And, for the record, this is Document 179 at page 49.

Now, what this shows here is an inmate inquiry talking about account balances and commissary. Do you recall that document, Mr. Duggar?

A. Yes, I do.

Q. And when that document is produced, at the time that it's produced is there a timestamp and date that is affixed?

A. Yes, sir. There's a date on there.

Q. And do you recall or does it sound right to you -- I'm over at the top of page 49 -- the report date for the inmate inquiry for your financial information was June 24, 2025, and at the time was 2:20 p.m. Does that sound right?

A. Yes, sir.

Q. And do you recall that you put these in the mailbox on the same day that you had them printed --

A. Yes, sir.

Q. -- by your Unit Team?

A. Yes, sir.

Q. And is the reason that your Unit Team printed this on 6/24/2025 because you explained to them that it had to be filed that day?

A. I had been telling them for a few days that I had to have this on that date, and that I needed to know who had to sign off or whatever had to be done. So it was more of them just

verifying how that worked, covering their bases.
Q. Okay. Understood. But the date that's on this, 6/24, the reason that it ultimately got printed on that day, is that because that was known by you and communicated to you by them that that was the deadline?
A. Yes. Certainly.
Q. So knowing that and getting it printed on there that day, is there any explanation you can think of logically for why you would then wait some lengthy period of time to send it out?
A. No, sir.
MR. BRINDLEY: No further questions, Your Honor.
THE COURT: Anything else, Mr. Roberts?
MR. ROBERTS: Yes, Your Honor, if I may. May I inquire, Your Honor?
THE COURT: You may.

FURTHER RECROSS-EXAMINATION

BY MR. ROBERTS:
Q. Mr. Duggar, now if I understand what you are telling us is THAT you more or less wrote this out, sent it to your wife via mail. She typed it out, printed it out, sent it back to you, where you signed it and then obtained this commissary statement and sent out the document, is that correct, on June 24?
A. Generally, I would say yes. There are some copies and, again, the attachments and things that I mentioned. There may have been copies of things made as well. But, yes, that's

generally true.

Q. So one thing that stood out to me, there are some sequential numbers in the left-hand column, and that's why I knew it wasn't typewritten and it looks like it's printed. But based on what you're telling me today, you said that you obtained the commissary statement on June 24, attached it to the document that your wife had already sent you and sent it out. However, those numbers in the left-hand column are still there on the commissary print. So it appears that someone took the entire document and printed that out all at once. Do you have any explanation for the Court for that?

A. I don't have any explanation for that. I mean, like I say, we made copies of things when I was in the office with the Unit Team. So I don't know if there was something that -- I didn't pay attention to that, you know, until it's being brought up here, but there are some numbers that are there.

Q. Okay. Do you know where those numbers come from?

A. No, sir. I do not. I think they are from a copy machine. I believe they are from a copy machine.

Q. Were those numbers on the versions that your wife sent you?

A. No, sir. I don't believe so.

Q. So after your wife sent you these typed-out, prepared motions, what did you do with them in order to produce this final copy?

A. I compiled everything and I made the final -- like all of the papers together and then I copied those, and I believe that was done right there in the Unit Team's office right there on whatever machine. And then we did the final ones and we stuck them in the envelopes at that point. So I would assume that any numbers -- I mean, if that's where they are. I thought they might be from the Court, I didn't know. But there's numbers that are on there that you pointed out in your filings that, you know, it was probably from the photocopy machine I would assume.

Q. So Mr. Duggar, my understanding now, you are saying that you were the one who photocopied and produced all of these documents after your wife sent them?

A. No, sir. That's not what I'm saying. What I'm saying is we had the stuff -- I have the copy she sent me, I believe it was either two or three copies, but it was not inclusive. I had, like, the middle body portion and some other, and I got them all in order for the Court. And so then I made a final copy of that with the Unit Team and then I slid them into those envelopes -- after getting the financial statement, then I slid them into those envelopes and sent them out within two hours of the time that financial statement was printed, just like I told the judge.

Q. All right. So I'll go back to your certification on Document 179, this is page 48. It states, "Certificate of

Service. I, Joshua James Duggar, hereby certify that on June 24, 2025, I placed a true and correct copy of the foregoing Motion to Vacate, Set Aside, or Correct a Sentence pursuant to 28 U.S.C. Section 2255 in the prison legal mail system with first class postage prepaid." And then it lists the Court of the Clerk and U.S. Attorney's Office.

Again, this portion is what your wife typed out; is that correct?

A. I don't know. I think that was typewriter; right?

Q. Well, sir, I'm asking you. This is your document.

A. I don't see it, but I believe that's generally correct. If it was prepared originally by me then sent to her and she photocopied it or if she, you know, made a change to it, I don't know. I don't recall. What I do know is that I deposited it in there and made the copies. The last copy was made right before I sent it off to the Court so it was all organized and not mismatched. It was all nice and clean and ready for the Court.

Q. Well, sir, just to be direct, the issue I'm having is that within this document there's several references to June 24, 2025, that are typed into the document, not typed by a typewriter. But it certainly appears to flow with all of the other computer-produced and printed-out words.

A. Right.

Q. Sir, my direct question is: Did you receive the documents

with "June 24, 2025," already inserted in them or did you yourself insert that date?
A. On some I think I inserted them, but I believe all of them were -- when the final document was photocopied, all of the dates were in the right place.
Q. Well, again, that's not answering the question I asked. I'm asking: Did your wife, when she prepared these documents for you, insert the date "June 24, 2025," in any location inside the motion?
A. Oh, certainly. Yes, sir, of course.
Q. So all along your statement is for this Court that you intended to mail these - and your wife knew this - on June 24, 2025?
A. Certainly, yes, sir.
Q. You are going back and forth and she is giving you different copies?
A. We knew that was the deadline, sir.
Q. And knowing that's the deadline with all of the preparation where she could place "June 24, 2025," in the body of this document, you waited until the afternoon of June 24, 2025, to obtain this commissary statement?
A. Sir, I wasn't going to put the wrong date and I wasn't going to send it out. I was waiting on a commissary statement just for staffing issues. That wasn't anything that -- I could have got that at any point if they would allowed me, I just

didn't realize it was going to be that much trouble.
Q. So the document right on 179, page 51, it starts "Attachment B. Application to Proceed in District Court Without Prepaying Fees or Costs." There is a question, "Do you have income from any other source?" And it's marked, "No."
Now, did you fill out this form? Let me start there. Did you fill out the long form, it's AO 240, did you fill this out yourself? Type this yourself? Or did your wife produce it?
A. I believe it was the same process that I already covered with the judge earlier where I filled it out and then she used a -- if I remember right, I might have used a typewriter to do that. I had done some of each. I don't remember really. Sir, I don't really remember. Generally, it's the same process. I would send -- you know I tried to send everything ready to go as much as I could where it would just be transferred somehow where it would be more legible for the Court.
Q. So if this references "Commissary or hygiene needs: Varies - limited due to $0 balance," just, again, presupposes that you knew the balance would be zero on June 24, 2025; is that correct?
A. Of course, yes, sir. I can check my commissary balance on the True Links computers in our unit at any time.
Q. No, Mr. Duggar, this is my last question. You are aware that this is a hearing before the Court, so you have the ability to call your wife to further support this. Are you

aware of that?
A. I was not aware of that.
Q. Okay. Again, you have an attorney. So are you -- I'll leave it there.
I'll pass the witness, Your Honor.
THE COURT: Final pass, Mr. Brindley. Anything else?
MR. BRINDLEY: Yes, Your Honor.

FURTHER REDIRECT EXAMINATION

BY MR. BRINDLEY:
Q. Finally, Mr. Duggar, with respect to this commissary statement, obviously that was filled out on the specific date -- or was printed on the specific date when this document was due. Is there any sense in which that was a coincidence or did you know at that time that this was the due date?
A. No, I knew that was the due date.
MR. BRINDLEY: I don't have any further questions, Your Honor.

FURTHER EXAMINATION BY THE COURT

THE COURT: One more thing, Mr. Duggar. If you want to photocopy something, how do you do that and does it cost you anything?
THE DEFENDANT: Well, the way it's supposed to work or in practice, sir?
THE COURT: Let's go for how you -- to the extent that you used a photocopier on the 24th, did you?

THE DEFENDANT: Yes, sir.

THE COURT: So tell me how you did it on the 24th.

THE DEFENDANT: The Unit Team is able to make copies for us on certain things, especially when they are time-sensitive. And if someone is indigent, they have a photocopy machine they can use to make final copies for things like this. So that's where I would have used that. I didn't use the machine, actually one of the staff members did that.

THE COURT: What's the staff member's name?

THE DEFENDANT: Well, the one who prepared the financial statement was involved, but I don't know actually who did the copies. It may have been Mr. Beasley or possibly Mr. Griffin or possibly Ms. Williams. One of those three. They were all there that day. Those are all Unit Team staff.

THE COURT: All right. Thank you, Mr. Duggar.

Any other witnesses, Mr. Brindley?

MR. BRINDLEY: No, Your Honor.

THE COURT: Mr. Roberts, any witnesses?

MR. ROBERTS: Yes, Your Honor. I'd like to call case management coordinator L. Crowder from FCI Seagoville. I believe this will be a fast witness, Your Honor.

THE COURT: All right.

Ms. Crowder, if you would please raise your hand.

(Witness sworn.)

THE COURT: All right. You may inquire.

MR. ROBERTS: Thank you, Your Honor.

L. CROWDER,

Having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. ROBERTS:

Q. Ms. Crowder, would you state your name for the record and spell your last name.

A. L. Crowder, C-R-O-W-D-E-R.

Q. I don't know if it's on my end or everyone's end, but I'm hearing a little bit of kind of breaking up of your testimony. Would you state your name again and spell your last name.

A. L. Crowder, C-R-O-W-D-E-R.

Q. That might be as good as we get. So just please speak directly into the mic, I think we're having a little bit of difficulties.

Can you tell the Court how you're employed and how you're assigned within that employment?

A. [Inaudible due to audio quality.]

THE COURT REPORTER: I can't understand her.

THE COURT: We can't understand you, Ms. Crowder.

THE WITNESS: Can you guys hear me now?

THE COURT: No, it's a rattly sound.

MR. ROBERTS: There seems to be some, like I said, reverberating coming back. Do you have like another screen open or anything like that, Ms. Crowder? We could hear you

perfectly before this hearing started.

THE COURT: Let me ask everyone else to mute your microphones. And then, Mr. Roberts, ask your question and then you mute your microphone.

MR. ROBERTS: Yes, sir.

Q. (Mr. Roberts continued.) Ma'am, will you state your name and spell your last name for the court reporter or for the record?

A. My name is L. Crowder, C-R-O-W-D-E-R.

Q. Ma'am, can you tell the Court how you're currently employed and how you're currently assigned?

A. I am currently employed with the Federal Bureau of Prisons at FCI Seagoville. I am the case management coordinator.

Q. Could you describe your duties and your role as a case management coordinator within FCI Seagoville?

A. I am the subject-matter expert for Unit Team, and I am the subject-matter expert for receiving and discharge. That includes the mailroom records, and anything that has to do with receiving and discharge of inmates.

Q. So in other terms, would that be that you oversee the mailroom?

A. Yes.

Q. Can you briefly describe options that inmates have at FCI Seagoville to mail documents.

A. They have a certified version and they have an uncertified

version.
Q. Starting with the certified version, is that specific to legal mail?
A. Correct.
Q. Okay. Could you describe -- so am I right FCI Seagoville has a legal mail system; is that right?
A. Yes. We have a legal mail system that goes out Monday through Friday. We do open house on Tuesday through Thursday where inmates come to a central area in the mailroom and get certified documents from our staff members who are the mailroom officers if you want it to be certified. If you want it to be regular mail, you can place that in the housing unit box.
Q. But for legal mail, pursuant to FCI Seagoville's policies and procedure, does it have to go through this certification process?
A. Yes. It has to be an approved official and it has to be certified through that.
Q. As opposed to another route that Mr. Duggar described, would that be the regular mail drop box located in the housing units?
A. Yes.
Q. Is that considered legal mail within FCI Seagoville?
A. No, it's not.
Q. All right. Can you describe exactly what happens when an inmate brings legal mail to the legal mail area of FCI

Seagoville, the process?

A. My officers get a log and log out the document, which is the document that you guys brought up, I believe it's number 88.2. We log and track all documentation that goes out. We will put down where it shipped to and the inmate's name and number.

Q. And this is a process that you follow in every bit of legal mail that leaves FCI Seagoville?

A. Correct.

Q. Is this the same process that was in place in June of 2025?

A. Correct.

Q. Is this process something that all inmates have access to?

A. Correct.

Q. Is this a process that all inmates are informed of?

A. Yes, it's in our admissions handbook.

Q. In addition to that, is it widely known within FCI Seagoville -- I mean, do you have inmates routinely using the legal mail process?

A. Yes.

Q. Now, as part of the procedure for the legal mail process, am I right that FCI Seagoville creates a log?

A. Yes.

Q. All right. So this log identifies legal mail going out on a particular date; is that correct?

A. Correct.
Q. Does it identify the destination of the mail, meaning the address?
A. Yes.
Q. Does it identify the inmate who sent the legal mail?
A. Yes.
Q. And is that something that is kept and maintained by FCI Seagoville in the normal course of business like you just keep it as a matter of course?
A. Yes.
Q. In preparation for the hearing today, did you receive Document 188 from me?
A. Yes.
Q. Make sure we are talking about the same thing. Document 188 is styled *U.S. v. Duggar* and the heading reads, "U.S. Response to Court Order Directing the Submission of Certain Mail Logs from FCI Seagoville." Is that all correct?
A. Yes.
Q. Attached to that, the overall document consists of three pages, Exhibit A and Exhibit B. I want to turn your attention to Exhibit B. Do you recognize that document?
A. Yes.
Q. Can you tell us what that document is?
A. This is our certified mail log.
Q. Again, is that coming from the certified mail -- the main

log maintained by FCI Seagoville documenting all legal mail that leaves that facility?
A. Correct.
Q. Exhibit B, was that a true and correct copy of the certified mail log from FCI Seagoville?
A. Yes.
MR. ROBERTS: Your Honor, I'd move to introduce to the extent necessary that certification. It's marked as Exhibit B on Document 188.
THE COURT: Any objection, Mr. Brindley?
MR. BRINDLEY: I don't have any objection, Your Honor.
THE COURT: All right. As described --
MR. BRINDLEY: You're on mute, Your Honor, I think. I can't hear you.
THE COURT: Can you hear me now?
MR. BRINDLEY: Yes, I can.
THE COURT: Okay. Without objection the log as described is received.
(Government's Exhibit 1 was received.)
Q. (Mr. Roberts continued.) Case Coordinator Crowder, just to confirm. On June 24, 2025, pursuant to that log did you see any entries from inmate Josh Duggar -- Joshua Duggar?
A. I did not, sir.

Q. Did you see any entries being sent to -- meaning the recipient's address -- to the federal courthouse in Fayetteville, Arkansas?
A. No, sir.
Q. Did you see any entries to the United States Attorney's Office in Fayetteville or the Western District of Arkansas?
A. No, sir.
Q. Now, Case Coordinator Crowder, I also wanted to ask you, are you familiar with the copying system that Mr. Duggar described?
A. Yes, I am.
Q. Could you tell us how that works?
A. So inmates have no access to copy machines within the Unit Team area, so they will have to ask a Unit Team staff members to make those copies. Unit Team staff members are instructed to not provide copies. So as far as them providing him a copy, I'm not sure if that even took place. But we have a protocol that is followed, it's a policy they're not to use any of our electronic devices or any of our computers, tablets, anything, they are staff-prohibited -- I mean, inmate-prohibited.
Q. So let me parse that out a little bit. So, one, inmates do not have access to a copying machine; is that correct?
A. Correct.
Q. And, two, it would be against policy for any employee of FCI Seagoville to make the copies for Mr. Duggar; is that

correct?
A. Yes.
Q. All right.
MR. ROBERTS: Thank you, Your Honor. I believe that's all I have. I pass the witness.
THE COURT: Mr. Brindley.
MR. BRINDLEY: Yes, Your Honor.

CROSS-EXAMINATION

BY MR. BRINDLEY:
Q. Ms. Crowder, is there a set of specified hours during the day when the certified mail system is available?
A. Yes.
Q. And what are those hours?
A. We have open house Tuesday through Friday 10:45 to 11:45 when you can send out certified mail. Monday and Friday is upon request.
Q. And so if an inmate was not -- the inmate is not able to get the certified mail or it's not ready during the time frame when certified mail is available that day, would it be correct that the only way the inmate could get that document in the mail on that day is through the regular mail, do you agree?
A. Yes.
Q. Okay. And then regarding the making of photocopies, you said the policy is that staff are not supposed to do that. In practice can you and I agree that staff don't always follow

policy to the letter?

A. I am not aware of that, sir. Staff that --

MR. BRINDLEY: No further questions, Your Honor.

THE COURT REPORTER: Can you ask her to repeat that last answer?

THE COURT: Ms. Crowder, can you repeat that last answer? It was garbled.

THE WITNESS: I'm sorry. I said, "Not that I am aware of. Staff that I supervise follow policy."

FURTHER EXAMINATION BY THE COURT

THE COURT: Ms. Crowder, looking at the form marked Exhibit B that Mr. Roberts was asking you about and you told him that there was not a record of any filings going to Fayetteville, Arkansas, on the 24th, is the log that you're referring to only logging in certified mail or is it logging in everything that you have described going through the legal mail process?

THE WITNESS: We only log certified mail. If it's placed in the box in the housing unit, the mailbox, we do not track or log that.

THE COURT: Is there a difference in what you have described as legal mail and certified mail?

THE WITNESS: No. Legal mail is certified mail.

THE COURT: And I assume that if an inmate wants to send something certified, what you're calling legal, there's an

extra charge for that beyond the regular postage.

THE WITNESS: Correct.

THE COURT: In other words, if an inmate wants to create a record of having mailed something on a specific date, their only option is to send it certified?

THE WITNESS: Correct.

THE COURT: Do you have knowledge of the normal or averaging pick-up and processing times to move an envelope that's been dropped off at a unit mailbox to get it through the prison system and over to the Postal Service on the outside, how long does that take?

THE WITNESS: Approximately 24 hours, excluding weekends and holidays.

THE COURT: Can you think of any situations, to your knowledge, where it's taken more than a week or ten days to move an envelope from a unit mailbox receptacle to the Postal Service?

THE WITNESS: No, sir, not outside of the inmate just not placing it in the box when they say they placed it in there.

THE COURT: Does that prompt any other questions, Mr. Roberts?

MR. ROBERTS: No, Your Honor.

THE COURT: Anything else, Mr. Brindley?

MR. BRINDLEY: No, Your Honor.

THE COURT: All right. Ms. Crowder, you can go ahead and mute your microphone now.

Any other witnesses, Mr. Roberts?

MR. ROBERTS: No, Your Honor. The government would rest.

THE COURT: All right. The Court will entertain argument.

Mr. Brindley.

MR. BRINDLEY: Yes, Your Honor.

Your Honor, I think that, you know, at the heart of this is the problem that inmates in custody have limited ability to prepare legal documents, they have limited ability as *pro se* defendants to send them out. And that is why this mailbox rule exists, to accommodate the realities of inmates in prison.

And in terms of prison mail delays, I think any defense lawyer will tell you it happens all the time. Things are put in the mail and we sit around and we wait on them for months. Mr. Duggar's facility is not anomalous. It's a reality that all of us know.

And that reality I think is exemplified by what we see that I talked to Mr. Duggar about in the government's own response filing which was sent out on September 3 and not postmarked until October 29, and not in his hands until sometime in November, okay? And that's a longer delay than

what we have on his mail. So that's just proof of how this system goes. And it's not a science, and it doesn't always work like it's supposed to, and it doesn't always work like it should. And I think that's apparent.

And so what we are left with is to try to parse out, well, what makes sense? And, of course, inmates have to have people help them. His wife helps him to put this together. That happens, okay? That's a reality.

But the question here I think is do we believe that he placed them in the mailbox on that day or not? And here's what I think is instructive. He did get the financial document information off the commissary that he has to have. He did get that on that very day and there's proof of that. He can prove based on the printing that that happened on the 24th, which is the due date. And I don't believe it makes sense, oh, it's just a coincidence that happened. He printed that on the day that it was due because he knew it was due that day. That's the only reason to do it that day. Otherwise, I think it becomes too extraordinary to be just some sort of coincidence, I don't buy that.

So I think when we put that into perspective we know he was printing that out on that day for a reason. The reason is because he knows it's due. If he knows it's due, he knows it has to get in the mailbox. Now, we have two different documents that go through the system in two different ways:

One ends up with the Court from the -- that was supposed to be the U.S. Attorney's copy perhaps; and the other one ends up later to the Court. But either way, there's no reason for anyone to send the two documents at different times. Even if you're going to have a third-party person, as the government speculates without proof, a third-party person is somehow going to somehow drop something off, two things are going to happen. One, that third party knows what this is. These are his documents for the Court. So you're not going to give them one and not the other. Both of the documents would be provided at the same time. It doesn't make any sense that they wouldn't if somebody else is just dropping them off.

And two, the Clerk's Office is going to take note of when they receive something hand-delivered, all clerk's offices do. That's not something where it just goes in there and it is a hand-delivered filing and it just magically drifts its way around the courthouse. That's not how courthouses work.

So when we put all of that together, he says that he put it in that day, and that's affirmative evidence that satisfies his burden. And then he explains how he got the document from commissary printed that day and he can prove that that's the same day that he got it printed. So then the question is: If he knew that date and was getting it printed, then why in the world would he -- to be that specific, why in the world would he wait to drop it in the mailbox some other

day rather than the day that he says? And why would there be two different dates for sending the copy for the government and the copy for the Court?

And common sense tells us there's not. I mean, this is an imperfect system and it didn't work the way that we would all hope. But in reality, he got the thing printed on that day because he knew it was due that day, and that's the day that he took the steps that he can from where he's at to try to get it sent. It was clearly after the hours when he could do any kind of certified mail, even if he wanted to. And so he had one choice, and that's put it in the mailbox. And then we are left with whatever happens after that to get mail in and out of the prison. Just like with the government's response, you know, there was a long delay, and those delays happen.

I understand people from the prison aren't going to want to say, "Oh, yeah. These delays happen all the time," of course they're not going to say that. I understand why they don't want to.

But, in reality from what he says is his experience, and what the government's response experience indicates, and what this document experience indicates is that this is not an exact system and it doesn't work the right way.

So when we put all of that together, Your Honor, there's enough here to say -- to meet the basic mailbox rule. He says he put it in on that day. The printing of the

commissary on that exact date I think supports him pretty well. And then logic after that of why it would be sent some other day or on two different days does not -- nor does the government speculation about a third party, because we don't have the record that we would if a third party was dropping something off with the Clerk.

THE COURT: What is your understanding or explanation for this sequential numbering in the upper left-hand corner of each page of the motions?

MR. BRINDLEY: Well, he says he thinks it may be from the photocopying machine, which makes sense. It would be uniform if it was from something like that. That makes sense to me. I don't know. He doesn't really know. It doesn't sound like he's speculating. None of us know. But if it was from a particular machine that was printing it out that way, it would make sense. And it goes across the 6/24 document which was printed that day. So if they were copying it all that day as he said, that would be consistent with those markings.

THE COURT: Thank you.

Mr. Roberts. You're muted.

MR. ROBERTS: Sorry about that, Your Honor.

As the Court noted at the beginning of this hearing, the singular issue is whether Mr. Duggar complied with the prison mailbox rule. It's his burden to do that.

The three general issues that indicate that he did

not comply with that rule is: One, all of the evidence suggests that Mr. Duggar did not use the legal mail system. I think it's by his own admission today he dropped it in the unit box. According to case coordinator Ms. Crowder --

THE COURT: Well, let me push back on you a little bit here. This term "legal mail," I don't know what you're intending that word to mean. Ms. Crowder testified that legal mail is the same thing as certified mail. So are you suggesting that the only way that an inmate can take advantage of the prison mailbox rule is if they pay the extra money associated with sending it certified?

MR. ROBERTS: Your Honor, I'm suggesting and directing the Court to Rule 3(d) of the rules governing Section 2255. I believe that in order for an inmate to take advantage of the prison mailbox rule if the facility offers a legal mail system, they have to utilize that system. I believe I do cite that in my brief. It is, again, Rule 3(d) of the rules governing Section 2255. So that's where I'm getting that from, and that's why I feel like that's kind of a threshold issue, Your Honor. If he didn't avail himself to the legal mail system -- and as the Court noted, you know, that's a good way to document, "Hey, we're sending this on this day." And it documents for purposes just like this whether he complied with the prison mailbox rule. It provides objective evidence, Your Honor, and I think that's why it's in place.

All evidence suggests in this case - I mean, by his own admission -- that he was mailing it back and forth with his wife. We have document -- the second issue, we have Document 179 filed on July 29, 2025. It's addressed to the U.S. Attorney's Office. Mr. Duggar admitted he intended that for the U.S. Attorney's Office. Obviously, we're not the Clerk of the Court. I think equally there's an issue that, one, it was intended for a third party, not the Clerk of the Court. It was mistakenly filed, and I stand on the motion that we filed trying to strike that document.

Second, Your Honor, I mean, it kind of dovetails back to the first point. There's just no indication at all that that mailing, that U.S. Attorney-labeled envelope, went through the mail system. It's just against common sense to think that the stamps were not canceled out, there was no marking through, there was no postmark, just simply void of any indicia that it went through the mail system. It's unexplained other than the common sense reality of someone dropped it off.

Now, I take the point from defense counsel that a Clerk's Office might log something like that. I don't know. But, again, it's not my burden. If the defense wanted to rely on something like that since it was clearly one of the government's arguments in our motion, again, they could have called a witness. So I don't think the Court should rely on the fact that a Clerk's Office could have logged this.

The third issue is Document 182, Your Honor. It's filed of record on August 18, 2025. It's 55 days late. And there's simply no explanation advanced by the defense. It would make more sense if Mr. Duggar would have said, "I sent it and it was sent back to me and I had to resend it."

That wasn't his testimony. I could not nail him down on at first who produced the document, when he received the document, and how the final document actually came into existence, and how it came to be filed in the Court. As the Court asked the defense attorney, there are sequential numbers from Document 179 to Document 182. Those sequential numbers shows it was not photocopied. One document was not photocopied; it was printed out sequentially and marked. So, again, it goes against what we have heard today.

When you combine all of those three facts, Your Honor, I just think it is reflective that the defendant hasn't met his burden that he complied with the prison mailbox rule. Simply stating that employees of FCI Seagoville might have, could have violated policy and made these copies for him doesn't meet his burden. They could have called them.

Again, if they wanted his wife to verify, "I sent them in timely, and he had this on June 24," they could have called his wife.

Just saying that's how it works, the same as the Clerk of Court check-in, that doesn't satisfy or carry a

burden, Your Honor.

There is one little kind of factual issue that I'm not sure I'm tracking entirely. If I get what the defense is saying, they're saying that my response that was filed of record on 9/11, September 11, was not received by Mr. Duggar until later in October. That's strange to me, because his reply to my response was dated where he handwrote "October 9" into the blank on October 9. That would indicate that he got the document pretty quick, within 30 days, and had time to send it back to his wife, whatever he wrote out, have her print it -- have her, you know, type it out and print it, send it to him, allow him to insert "October 9" and send it out via the mail. So I'm not sure I'm following that turnaround there, but I think there are some discrepancies with the idea that he didn't get my response until later in October.

Your Honor, that's all I have. I'm happy to answer any questions.

THE COURT: That's fine.

Mr. Brindley, I'll give you the last word.

MR. BRINDLEY: Thank you, Your Honor.

Two things. With respect to the government's filing, what we're talking about is the postmark on the envelope. They say they sent it in September. The postmark on the envelope says "October 29." That is in evidence, Your Honor, as an exhibit. So that happened. And so that means it didn't get

to -- the hard copy version of it didn't get to Mr. Duggar that the government sent out. Now, that doesn't mean -- there's electronic version of these things that are filed, it's possible he can get the information otherwise. But the postmark which the government wants to rely on on their side doesn't support them on the other side with respect to their own response. It just shows that this mail system is flawed.

Now, in terms of meeting the burden, all he has to do is provide facts. He testified, "I put it in on that day. I printed the financial document the same day. I sent the stuff out."

He doesn't have to account for what happens to it after that if he doesn't know. He says, "I don't know what happened to it after I put it in the mailbox." And how could he?

That doesn't have anything to do with meeting his burden. He doesn't have to call another witness or something to explain what happened to the mail. He said it was in the box. And he said, "It was the same day I printed the financial information."

I think the fact he printed the financial information that day is instructive and it's important. I'm going to end with that, because if he knows enough that he has to print it that day because he needs that financial information so he can send it out on the day that it's due, I think that's consistent

with the idea that he's going to take whatever step he can to get it sent out that day. There's no explanation that anybody can come up with for why he would send it on two different days, the government's and the Court's.

And so, unfortunately, the mailbox situation didn't work the way that we would hope in prison. But the reality is, this is a *pro se* defendant trying to get legal relief, trying to avail himself of this mailbox rule obviously based on when that thing was printed, the commissary financial information. And if he's doing that and giving this testimony, that's enough to satisfy this rule rather than trying to prevent him from getting access to possible relief on this threshold issue.

THE COURT: All right. Thank you very much, Mr. Brindley.

The Court will take the issue under advisement.

I thank the attorneys for their briefing and for their argument today.

I thank Ms. Crowder for her time. I thank Mr. Duggar for his time.

And we are adjourned.

(Proceeding adjourned at 5:24 p.m.)

**C E R T I F I C A T E**

I, REBECCA CARROLL-ROSS, Federal Official Court Reporter in and for the United States District Court for the Western District of Arkansas, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the proceedings reported by voice writing held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 23rd day of April, 2026.

ARKANSAS SUPREME COURT
Rebecca Carroll-Ross
License No. 612
CERTIFIED COURT REPORTER

REBECCA CARROLL-ROSS, CCR, CVR-M, RVR
Federal Official Court Reporter
Western District of Arkansas
Arkansas License No. 612