**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION**

UNITED STATES OF AMERICA                                              PLAINTIFF

V.                                    CASE NO. 5:21-CR-50014

JOSHUA JAMES DUGGAR                                                   DEFENDANT

**ORDER**

Presently before the Court are Joshua James Duggar's *pro se* Motion to Vacate

under 28 U.S.C. § 2255 (Docs. 179 & 182), the Government's Response in Opposition (Doc.

186), and Mr. Duggar's Reply (Doc. 189).   The Government also filed a Motion to Strike

(Doc. 183), to which Mr. Duggar responds in his Reply.[1]  For the reasons explained below,

Mr. Duggar's Motion to Vacate and the Government's Motion to Strike are **DENIED**.  Since

the Court finds Mr. Duggar's motion to be untimely, there is no need to conduct an

evidentiary hearing on the merits.  *See United States v. Ledezma-Rodriguez*, 423 F.3d

830, 835–36 (8th Cir. 2005) (finding that an evidentiary hearing is unnecessary where the

files and records conclusively show petitioner is not entitled to relief).  No certificate of

appealability will issue.

**I.      BACKGROUND**

On April 28, 2021, Mr. Duggar was charged in each count of a two-count indictment

with receipt and possession of child pornography.  (Doc. 11).   The case proceeded to

trial, and Mr. Duggar was found guilty of both charges (Doc. 120).  On May 27, 2022, he

was sentenced to 151 months of imprisonment and 20 years of supervised release, and

---

[1] The Court ordered the parties to submit the outgoing prison mail logs from the federal correctional institution where Mr. Duggar is incarcerated (Doc. 187).  The Court has also considered the certified mail log submitted by the Government in response to that Order. *See* Doc. 188-2.

ordered to pay a $10,000.00 fine and a $35,100.00 special assessment.  *See* Doc. 162.

Mr. Duggar timely filed a notice of appeal and the Eighth Circuit affirmed this Court's

sentence.  *See* Doc. 172.  He then petitioned the U.S. Supreme Court for a writ of

certiorari, which was denied on June 24, 2024.  *Duggar v. United States*, 144 S.Ct. 2685

(mem.) (June 24, 2024).

Under 28 U.S.C. § 2255(f), the statute which authorizes him to move to vacate his

sentence, Mr. Duggar had one year after the Supreme Court denied certiorari to file his

motion to vacate.  *See Clay v. United States*, 537 U.S. 522, 527 (2003) (In the § 2255

context, "[f]inality attaches when this Court affirms a conviction on the merits on direct

review *or denies a petition for a writ of certiorari*, or when the time for filing a certiorari

petition expires.") (emphasis added).  Thus, for his motion to be timely, it must have been

filed by June 24, 2025.  It was not.  People who are incarcerated, however, benefit from

a special rule (the so-called "prison mailbox rule") which requires that courts consider

their motions timely if they are "deposited in the institution's internal mailing system on or

before the last day for filing."  *See* Rules Governing Section 2255 Proceedings, Rule 3(d).

Mr. Duggar contends his motion is timely under the prison mailbox rule.  He claims

that on the exact one-year deadline, June 24, 2025, he mailed two duplicate copies of his

Motion to Vacate using FCI Seagoville's mail system.  The first copy, addressed to the

United States Attorney's Office, was received and filed by the Clerk of this Court on July

29, 2025.  (Doc. 179).  The second copy, addressed to this Court, was received and filed

weeks later by the Clerk on August 18, 2025.  (Doc. 182).  In its Response, the

Government disputes this narrative, and argues that Mr. Duggar's story strains common

sense for several reasons.  To resolve the dispute, the Court set the matter for a hearing

2

on the issue of timeliness as required by *Grady v. United States*, 269 F.3d 913 (8th Cir. 2001). On April 15, 2026, the Court heard testimony from Mr. Duggar as well as the BOP official in charge of mail at FCI Seagoville. Mr. Duggar was represented by counsel at the hearing.

## II.    ANALYSIS

The issue before the Court is whether Mr. Duggar should benefit from the prison mailbox rule. The answer is clearly no.

To obtain the benefit of the prison mailbox rule, an inmate "*must* use" the institution's system designed for legal mail so long as one exists. *See* Rules Governing Section 2255 Proceedings, Rule 3(d) (emphasis added).[2] According to the testimony of L. Crowder, a case management coordinator at FCI Seagoville, FCI Seagoville has a "legal" mail system" and an "ordinary" mail system. "Legal" mail is processed and documented as certified mail. There are dedicated hours and locations from which inmates can send "legal mail," and outgoing legal mail is logged. Inmates are informed of the system during intake through the prison's admissions handbook, and the system is regularly used. But as Mr. Duggar testified repeatedly at the hearing, he did not use FCI Seagoville's legal/certified mail system. He instead chose to mail the copies of his motion via the ordinary mail system, in which inmates drop their mail in a drop box near their cell, the mail is collected by other inmates, and then eventually mailed out without a record or receipt given to the inmate. Mr. Duggar's failure to use the legal mail system is dispositive. Indeed, situations like this are why the procedural rule exists—without proof

---

[2] The Rules Governing 2255 Proceedings were promulgated under the Rules Enabling Act, 28 U.S.C. § 2072, and are valid so long as they do not "abridge, enlarge, or modify any substantive right. *See U.S. v. Irby*, 103 F.3d 126, at *1 (5th Cir. Nov. 26, 1996). Rule 3(d) is procedural and thus binding on the Court.

of mailing, the Court is left with only an inmate's self-serving testimony as evidence for their entitlement to the rule.

But even if the prison mailbox rule afforded relief to inmates who use the ordinary mail system, the Court would still find against Mr. Duggar because his testimony was not credible.  In the Eighth Circuit, prisoners bear the "ultimate burden of proving [their] entitlement" to the prison mailbox rule.  *Grady v. United States*, 269 F.3d 913, 916–17 (8th Cir. 2001).  As such, it is Mr. Duggar who must persuade the Court that he should receive the benefit of the prison mailbox rule.  He has not done so.

Mr. Duggar's tale about how he mailed his motion was not consistent on the stand, but the Court has done its best to reconstruct it:

- Mr. Duggar began exchanging drafts of his motion via mail with his wife, Anna Duggar, well before his motion was due.  Mr. Duggar would hand write or use a typewriter to complete the drafts and then send them to her.

- Months before the deadline on June 24, 2025, Mr. Duggar mailed his final draft to Mrs. Duggar, who transcribed it on a computer and pre-filled the date on the Certificate of Service as June 24.

- Rather than simply file the motion on Mr. Duggar's behalf, Ms. Duggar then mailed back two or three copies of the motion ready for filing weeks before the motion was due.  Mr. Duggar signed them.

- But Mr. Duggar says he did not mail the motion at that point.  He was still diligently preparing to file—he addressed two envelopes before the deadline, and he affixed five stamps to one envelope and fourteen to the other.  Mr. Duggar testified that he did not purchase these stamps (and so

4

cannot produce a receipt), but instead obtained them from another inmate. The other inmate was apparently generous enough with Mr. Duggar to allow him to affix fourteen stamps to the envelope without weighing it first.  Mr. Duggar corrected the issue after weighing the envelope and affixed only five stamps to the second envelope, which he claims was the correct amount.

- He had difficulty obtaining a statement showing his commissary account balance for weeks or months (which he claimed delayed the mailing of his motion), but on the very day of the deadline, the issue was somehow resolved and Mr. Duggar was able to access his balance.

- Although copies of the Motion would presumably be ready to mail given the above, he then convinced staff at FCI Seagoville to violate policy and make even more copies of his motion for him for free.  They supposedly did so.

- He then mailed two copies of the motion, one addressed to the U.S. Attorney's Office and one to the Court.

- The copy addressed to the U.S. Attorney's office (with five stamps) was not postmarked after it was supposedly mailed, and was delivered to the Clerk's office instead of the U.S. Attorney's office 35 days after Mr. Duggar says he mailed it.  Mr. Duggar claims to have no knowledge as to why it was delivered to the Clerk's Office rather than the U.S. Attorney's office.

- The copy addressed to the Clerk's Office was postmarked on August 8, 2025, or 45 days after it was supposedly mailed and 10 days after the other copy was *delivered*.  This envelope had fourteen stamps, and also bears the words "postage due," but Mr. Duggar did not testify that the copy was

5

sent back to him for insufficient postage. It was correctly delivered to the Clerk of Court on August 18, 2025—55 days after Mr. Duggar claims to have mailed the motion.

It is worth noting that Mr. Duggar did not call Mrs. Duggar or the staff from his Unit Team who supposedly assisted him in making copies to testify as witnesses at the hearing to corroborate his story. Mr. Duggar also offered some explanations for the form of the copies of the motion, which the Government argues further undermines the credibility of his account. There are numbers at the top left of each page, running sequentially across both copies of the motion. This at least gives the appearance that the two copies of the motion were printed sequentially instead of being photocopied from one original, and the Government suggests that the printing was perhaps done by a third party service. Mr. Duggar does not know how the numbers got there, and believes they were possibly added by the ECF system (it was not). Finally, the first copy of his motion that was filed with the Court (which was addressed to the U.S. Attorney's Office) lacks the postmark, tracking label, and cancelled stamps that are included on the second copy (addressed to the Court), and bears no evidence of having being mailed. On this, Mr. Duggar points to 39 C.F.R. § 111, which clarifies that the "absence of a postmark does not imply that the Postal Service did not accept custody of a mail piece." This is true, but yet another coincidence the Court must believe in order for Mr. Duggar to satisfy his burden.

The Court can grant Mr. Duggar one coincidence. Perhaps even two or three odd happenstances. But Mr. Duggar is asking the Court to believe something akin to a magic bullet theory—a sequential chain of events that defies common sense. Collectively, this chain of events—where Murphy's law was lurking at every turn—is simply not credible.

At the least, Mr. Duggar has not met his burden of convincing the Court that he mailed either copy of his motion on June 24, 2025 (either through legal mail *or* normal mail), so his Motion is **DENIED** as untimely.[3]

**IT IS THEREFORE ORDERED** that Mr. Duggar's Motion to Vacate (Doc. 182) and the Government's Motion to Strike (Doc. 183) are **DENIED**. No certificate of appealability shall issue, as Mr. Duggar has not made a substantial showing of the denial of a constitutional right. *See* 28 U.S.C. § 2253(c)(2).

**IT IS SO ORDERED** on this 1st day of June, 2026.

_____
TIMOTHY L. BROOKS
CHIEF UNITED STATES DISTRICT JUDGE

---

[3] Finally, the Government also asks the Court to strike Document 179, the first copy of the motion, from the record as it was erroneously filed. It does appear more likely that Document 179 was hand-delivered to the Clerk's office, which would explain why they filed it without noticing that it was addressed to the United States Attorney's Office and not to the Court. But the Court declines to strike it from the record and therefore denies the motion.